**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **BILLIE JEROME ALLEN**<br>    **Petitioner** | §<br>§<br>§ | |
| **vs.** | §<br>§ | **Cause No.  4:07-CV-27-ERW** |
| **UNITED STATES OF AMERICA**<br>    **Respondent** | §<br>§<br>§ | |

# MOTION UNDER 28 U.S.C. §2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY UNDER A SENTENCE OF DEATH

Elizabeth Unger Carlyle #51877
P.O. Box 962
Columbus, MS  39701
Missouri Bar No. 41930
(816)525-6540
FAX (866) 764-1249
elizcar@bellsouth.net

Joseph M. Cleary #534292
Attorney at Law
1455 N. Pennsylvania
Indianapolis, IN  46202
(317) 630-0137
jcleary498@aol.com

**ATTORNEYS FOR PETITIONER**

TABLE OF CONTENTS

Introduction .......................................................................................................1

Procedural background .....................................................................................3

Facts of the Offense .........................................................................................9

Grounds for Relief ...........................................................................................12

    A.  Mr. Allen was denied effective assistance of counsel in connection
    with his motion to suppress evidence of his confession. .........................12

    B.  Mr. Allen was denied his rights to the presumption of innocence, to be
     present at his trial, to effective assistance of counsel, to be free of cruel
    and unusual punishment, and to due process of law Under the Fifth, Sixth,
    Eighth and Fourteenth Amendments to the United States Constitution,
    because he was required by the court to wear a stun belt, and neither trial
    counsel nor appellate counsel challenged this ruling................................14

    C.  Mr. Allen was denied effective assistance of counsel in connection
    with jury selection. ...................................................................................17

    D.  Mr. Allen was denied effective assistance of counsel when the jurors
    possibly learned that the Lindell bank had been robbed again.................18

    E.  Mr. Allen was denied effective assistance of trial counsel when trial
    counsel failed to object to his being tried for two versions of the same
    offense as a violation of the Double Jeopardy Clause.............................19

    F.  Mr. Allen was denied effective assistance of counsel when trial counsel
    failed to request a hearing regarding the late-provided evidence that
    government witness Thomas Mundell was a paid government snitch, and
     when appellate counsel failed to raise an issue concerning Mr. Mundell
    on direct appeal; he was also denied due process of law when the
    government failed to disclose impeaching information before trial ..........20

    G. Mr. Allen was denied effective assistance of counsel when trial counsel
    failed to obtain relief when the government suggested he had gang
    connections ...............................................................................................21

    H. Mr. Allen was denied the effective assistance of counsel at the guilt
    phase of his trial by counsel's failure to use available evidence that would
    have established a reasonable doubt as to his participation in the charged
    murder and robbery. .................................................................................22

I.  Mr. Allen was denied effective assistance of counsel because of failure to investigate and present evidence at the penalty phase of his trial........24

J.  Mr. Allen was denied effective assistance of counsel when trial counsel failed to object to prejudicial victim impact evidence ...............................31

K.  Mr. Allen was denied effective assistance of counsel because of trial counsel's failure to make proper objections to the government's final penalty phase argument .........................................................................32

L. Mr. Allen was denied effective assistance of trial and appellate counsel because there was no objection to the use of "pecuniary gain" as a statutory aggravator...............................................................................36

M.  Mr. Allen was denied effective assistance of appellate counsel when appellate counsel failed to provide the court of appeals with relevant authority concerning his assertion that his rights were violated when the grand jury did not hear evidence regarding statutory aggravating circumstances.....37

Conclusion ...........................................................................................37

Verification ...........................................................................................40

Certificate of Service ..........................................................................41

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| **BILLIE JEROME ALLEN** | § | |
| **Petitioner** | § | |
| | § | |
| **vs.** | § | **Cause No.  4:07-CV-27-ERW** |
| | § | |
| **UNITED STATES OF AMERICA** | § | |
| **Respondent** | § | |

**MOTION UNDER 28 U.S.C. §2255 TO VACATE, SET ASIDE, OR CORRECT
SENTENCE BY A PERSON IN FEDERAL CUSTODY UNDER A SENTENCE OF
DEATH**

Billie Jerome Allen challenges his convictions of bank robbery and murder, and his sentences of life imprisonment without parole, entered in this Court in Cause No. 4:97-CR-00141 ERW/TCM.  In support of his motion, Mr. Allen says as follows:

**Introduction**

Mr. Allen was convicted of both counts of a two-count indictment alleging bank robbery which resulted in death and murder.  He was sentenced to life imprisonment without parole on the bank robbery count, and death on the murder count.  In addition to being placed in the position of defending his life twice for what was essentially the same offense, Mr. Allen was severely disadvantaged in his trial, and the proceedings were fundamentally unfair.

The first unusual problem faced by Mr. Allen and his defense team was the extremely short period of time between indictment and trial, and more specifically between the notice to seek the death penalty and the trial.  That period was only six months, or about half the average time before trial in federal death penalty cases

1

according to statistics maintained by the Federal Death Penalty Resource Counsel.[1]  As the specific grounds for relief below demonstrate, this truncation of the trial process resulted in insufficient time for counsel to prepare the case adequately for trial.

Second, Mr. Allen and his attorneys experienced unusual difficulty in communicating.  Mr. Allen's cognitive and emotional difficulties (which were not adequately explored by trial counsel) complicated attorney-client communication in this case.  As a result of his frustration with his inability to get trial counsel to listen to him or to act on the information he provided, Mr. Allen requested, during trial, that his lead trial counsel be replaced.  The court declined to do this.  Lead trial counsel acknowledges that he and Mr. Allen had grave difficulties in communicating, and raised the issue that the motion to replace him should have been granted in the motion for new trial filed in Mr. Allen's case.  This affected both the guilt-innocence and penalty phases of the trial, and to some extent the appeal process.

Third, the problem of lack of time was complicated by the fact that lead counsel engaged a mitigation investigator shortly after the death penalty notice was filed but failed to provide him with the necessary tools to perform his investigation until approximately six weeks before trial.  At that point, the investigator declined to participate, saying that he could not adequately investigate the case in the remaining time.  Since trial counsel had anticipated that the primary investigation for the penalty phase would be performed by the investigator, they had not done much of that

---

[1] See Declaration of Kevin McNally, Director of the Federal Death Penalty Resource Counsel project, attached as Exhibit 1.  According to Mr. McNally, "The average time between indictment and trial in federal capital cases is 20.5 months.  The average time between indictment and notice to seek the death penalty is 12.5 months.  The average time between notice to seek the death penalty and trial is approximately 12.6 months."

investigation themselves.  They were able to engage another investigator, but, as THAT investigator testified at the hearing on Mr. Allen's motion for continuance, he had inadequate time to complete his investigation.  Had he done so, trial counsel could have presented evidence from Mr. Allen's paternal family, as well as evidence that Mr. Allen's brain was severely compromised from lead poisoning as a child, which would have been mitigating.

As a result of this "rush to judgment," and the other difficulties with the case, Mr. Allen was not afforded his right to a fair trial and his conviction and sentence cannot stand.

*Provisional nature of motion.*  On November 13, 2007, this Court granted Mr. Allen's unopposed motion for equitable tolling of the statute of limitation provided in 28 U.S.C. 2255 until February 11, 2008.  Counsel intend to rely on that order and will file a more elaborate and comprehensive motion by that date, pursuant to further investigation.  This provisional motion is being filed solely in an abundance of caution to protect Mr. Allen lest there are any changes in the law on equitable tolling which could conceivably pose timeliness problems at some point in the future.  Mr. Allen respectfully proposes that the government not be required to file an answer pursuant to Rule 5 of the Rules Governing Section 2255 Proceedings until after the February 11, 2008, filing.

**Procedural background.**

The offense involved in this case was the robbery of the Lindell Bank in St. Louis, Missouri, and the killing of Richard Heflin, a bank security guard, in connection with that killing. Mr. Allen, along with his co-defendant Norris Holder was indicted in two counts for his alleged part in this offense on April 17, 1997. Thereafter, the United States Attorney for the Eastern District of Missouri received authorization from the United States Department of Justice to seek the death penalty of Mr. Allen and Mr. Holder. Notice of intent to seek the death penalty was filed on August 8, 1997

The cases of Mr. Holder and Mr. Allen were severed for trial, and Mr. Allen was tried first beginning on February 9, 1998, just six months after the case had been authorized for the death penalty. Several pretrial hearings were conducted, including a lengthy hearing on Mr. Allen's motion to suppress evidence seized in a search of his home, his identification in a lineup, and his confession. Mr. Allen also unsuccessfully sought a continuance due to difficulties in conducting the penalty phase investigation. Mr. Allen's motion to dismiss the indictment or preclude the death penalty because the indictment did not state the aggravating circumstances on which the government would rely to establish eligibility for the death penalty was also denied.

Throughout the trial, Mr. Allen was required to wear a "stun belt," a device that officers can use to deliver a painful electric shock to a prisoner who disobeys their commands. The use of this device rendered even more stressful to Mr. Allen the trial for his life. Mr. Allen was fully cooperative with the United States Marshals and with the custodial staff where he was held during trial. No incidents precipitated the use of the

4

stun belt.  Mr. Allen also suffered considerable pain and discomfort from medical problems, including allergies which caused swelling of his eyes and severe headaches, during trial.  These factors made it difficult for him to concentrate and understand the proceedings fully.  At times he was so uncomfortable that he sought to be excused from the courtroom.

Prior to trial, the prospective jurors were required to complete an extensive questionnaire which contained, among other questions, questions about the prospective jurors' views on the death penalty.  Once in court, the judge required that the jurors be addressed exclusively by their juror numbers.  Trial counsel made no objection to this procedure, which had the effect of making the jurors suspect that they were in some danger with regard to their service.  Mr. Allen, who was ill with allergy symptoms, left the courtroom before the defense completed announcing its peremptory strikes.  Before leaving, he informed trial counsel of three specific prospective jurors who he believed merited strikes.  All three of these jurors served on the jury.  The defense objected to five peremptory strikes exercised by the government on the ground that they were made because of racial discrimination.  The trial court, finding no evidence of intentional racial discrimination, overruled the objections.

During the first phase of trial, the defense made the court aware that  the same bank had been robbed during the trial.  Counsel requested that the jurors be examined individually to determine whether they were aware of this event, and its effect on them. The request was denied.  When the government presented evidence concerning Mr. Allen's confession, Officer  Henderson, who had acknowledged in the pretrial hearing

that he was aware of Mr. Allen's invocation of his right to counsel changed that testimony and stated that he was not aware that Mr. Allen had requested a lawyer when Mr. Allen asked to talk with him. Also during this phase, considerable evidence was presented concerning the positive characteristics of the victim, Richard Heflin. Trial counsel filed a motion in limine before trial concerning such evidence, but made no objection during trial after the motion in limine was denied.

After the jury convicted Mr. Allen of both counts, the penalty phase was conducted. The government presented extensive victim impact evidence concerning Mr. Heflin during this phase; defense counsel made no attempt to limit this testimony. Mr. Allen presented evidence concerning his difficult upbringing, and expert testimony that he suffered from possible brain damage resulting in a learning disorder and post-traumatic stress disorder. At the end of the trial, the prosecutor, without objection by the defense, referred to Mr. Allen as a "murderous dog," improperly denigrated the mitigating evidence, and sought to inflame the jurors by references to victim impact testimony. The jurors sentenced Mr. Allen to life in prison without parole on Count 1, the bank robbery count, and to death on Count 2, the murder count. A motion for new trial was denied, and Mr. Allen was formally sentenced on June 4, 1998.

Mr. Allen appealed his conviction and sentence. The issues raised in his appeal were:

1. 18 U.S.C. §3591et seq., the Federal Death Penalty Act of 1994, is unconstitutional because:

a) §3592(c), which permits the Government to define non-statutory aggravating factors when it seeks a death sentence, fails to limit and guide the sentencing discretion of jurors as required by the constitutional prohibition against cruel and unusual punishment; reflects an impermissible delegation of legislative authority to the executive branch; and violates the Ex Post Facto Clause by allowing prosecutors to enhance the punishment for a crime after its commission.

b) §3591(a) permits the arbitrary imposition of the death penalty by allowing the sentencing decision in capital cases to be made on the basis of "information" rather than "evidence."

c)  The provisions for appellate review of death sentences in §3595(a) single out condemned defendants for circumscribed appellate opportunity and the failure of the Act to require proportionality review will facilitate arbitrary imposition of death sentences.

2.  The indictment in this case was inadequate to charge a crime punishable by death because it failed to allege the existence of aggravating factors which are the unique indicia of capital offenses.

 3.  The confession introduced into evidence and attributed to Mr. Allen should have been suppressed because it was obtained in violation of Mr. Allen's Fifth and Sixth Amendment rights.

4.  The trial court abused its discretion by denying Mr. Allen's motion for continuance to permit a full penalty phase investigation to occur..

7

5.  Counsel for the Government committed prosecutorial misconduct when they failed to inform defense counsel before trial that two prosecution witnesses, who gave statements provided to defense counsel suggesting that Mr. Holder had shot Mr. Heflin, had recanted those statements and would (and did) testify at trial that Mr. Allen shot Mr. Heflin.

6.  The District Court created undue risk to Mr. Allen's rights to be free from involuntary self-incrimination and cruel and unusual punishment, and his rights to enjoy due process of law and equal protection of the law, by affording Government counsel access to statements made in a court-ordered psychiatric evaluation, and that those constitutional deprivations appear to have been actualized by the improper sharing of that information despite the establishment of a "Chinese wall" within the office of Government counsel.

7.  The District Court committed plain error in failing to take remedial action sua sponte when Government counsel referred to him as a "murderous dog" during closing argument.

8.  The Government's introduction of emotionally charged victim impact testimony from many of Mr. Heflin's relatives, friends, and colleagues was calculated and likely to produce a verdict informed by emotion rather than reason.

9.  Mr. Allen was entitled to have the jury instructed during the penalty phase of trial that the law never requires a jury to impose a sentence of death.

10.  The submission of two capital counts to the jury at the penalty phase of trial was precluded by the Double Jeopardy Clause and the legislative history of 18 U.S.C.

§924(j).  The double submission, which required the jury to go through the weighing process twice, unduly highlighted the option of a death sentence and improperly enhanced the likelihood that jurors who initially considered death inappropriate eventually would vote for such a sentence.

The Eighth Circuit Court of Appeals affirmed on April 12, 2001 in Cause No. 98-2549.  *United States v. Allen,* 247 F.3d 741 (8th Cir. 2001).  Rehearing was denied on July 24, 2001.  Mr. Allen then sought certiorari in the United States Supreme Court.  On June 28, 2002, That Court  granted certiorari, vacated the judgment, and remanded the case to the Eighth Circuit for reconsideration in light of the recent Supreme Court decision in *Ring v. Arizona*, 536 U.S. 584 (2002).  *Allen v. United States,* 536 U.S. 953 (2002)  On remand, a panel of the Eighth Circuit found that constitutional error in the failure of the indictment to include aggravating factors, and that the error was not harmless beyond a reasonable doubt.  *United States v. Allen*, 357 F.3d 745 (8th Cir. 2004).  On rehearing, the *en banc* court reversed the panel, finding the error harmless.  *United States v. Allen*, 406 F.3d 940 (8th Cir. 2005).  The U.S. Supreme Court denied review on December 11, 2006. *Allen v. United States*, 127 S.Ct. 826 (2006).

On December 15, 2006, Mr. Allen filed a motion for appointment of habeas corpus counsel.  Pursuant to 18 U.S.C. § 3599(a)(2), the undersigned counsel were appointed on March 1, 2007.

**Facts of the offense.**

On the morning of March 17, 1997, two men parked a minivan in front of the Lindell Trust Bank in St. Louis, climbed out of the car wearing masks and carrying semi-automatic rifles, and walked into the bank lobby. (T. VII[2]: 231; 11: 53-54, 59, 110) One of the men fired his rifle twice or three times as he entered the lobby.  (T. VII: 117, 125, 231, 249) Richard Heflin, the bank's armed security guard, was shot and fell to the floor. (T. VI: 76-77, 97; VII: 126, 233)

The intruder who had fired his rifle yelled, "Everybody get the fuck down." (T. VII: 231) A bank employee who had been standing in front of the teller counter jumped over the counter.  (T. VII: 127, 232)  The gunman in the lobby walked toward him and fired at him, but the employee was not injured.  (T. VII: 232)  The gunman then shot Mr. Heflin again as he lay on the floor.  (T. VI: 100; VII: 129)  Mr. Heflin was mortally wounded.  (T. VIII: 141-42, 145).

The other intruder (not the man who had shot Mr. Heflin) went directly behind the bank counter and filled a money bag with currency from the tellers' cash drawers. (T. VII: 132, 235, 241)  After the man behind the counter had gathered the cash, both robbers left the bank.  (T. VII: 133)

William Green, who had driven to the bank to cash a check and had heard shots coming from inside the bank, saw the two men leave the bank and re-enter the van.  (T. VIII: 139) According to Mr. Green's trial testimony, the man who got into the driver's seat was carrying a money bag.  (T. VIII: 160)  Betty Thompson, a bank customer who

---

[2] This and similar references are to the trial transcript.  It should be noted that each volume of the transcript begins with page 1.

10

also was outside the building during the robbery, saw the gunmen arrive and enter the bank, emerge afterward, and get into the van. (T. VII: 75-82) Ms Thompson testified at trial that the man who left the bank with the money bag got into the driver's seat of the van. (T. VII: 82)

The robbers drove away from the bank, onto an adjacent highway, then into a park. (T. VIII: 160-63) A fire started inside the van. (T. VIII: 164, 203, 217) The driver, later identified as Norris Holder, was on fire when he emerged. (T. VIII: 203-04, 234) Police officers arrested him immediately afterward near the vehicle. (T. VIII: 165, 222) A passenger in the van ran into a wooded area of the park and was not captured. Mr. Holder later identified the passenger as Mr. Allen.

Police officers arrested Billie Jerome Allen, the petitioner, at a house in St. Louis at around 2:00 a.m. the following morning. (H.T. 5/16/97[3]: 142-46) They took him to police headquarters, placed him in a small interrogation room, and handcuffed him to a table. (H.T. 5/16/97: 146-47, 152, 191-93) Mr. Allen remained handcuffed to the interrogation room table until approximately 10:00 a.m. (H.T. 5/16/97: 192-93) According to police, he was advised of his constitutional rights several times. (H.T. 5/16/97: 146-47, 152, 192-93, 244).

Around 4:20 a.m., a Federal Bureau of Investigation agent named Janet Hartman came to interview Mr. Allen and began to advise him of his constitutional rights once again. (H.T. 5/16/97: 80, 88) Mr. Allen interrupted Agent Hartman and stated that he wished to have an attorney appointed to assist him. (H.T. 5/16/97: 88-89, 202) Agent

---

[3] The reference is to the transcript of the hearing on Mr. Allen's motion to suppress evidence, which was conducted on May 16, 1997.

Hartman ended the conversation.   (H.T. 5/16/97: 90, 202)  No police officer or prosecuting official made any attempt to secure counsel for Mr. Allen for the remainder of the morning. (H.T. 5/16/97: 90, 201, 257-58)  Mr. Allen was not permitted to make any telephone calls after having requested a lawyer; he was held "incommunicado." (T. 9: 200-02)

A homicide detective, who acknowledged that the entire homicide division was notified early in the morning that Mr. Allen had requested an attorney, testified that at approximately 10:15 a.m. Mr. Allen insisted on discussing the bank robbery with the Deputy Commander of the St. Louis Police Department homicide unit.   (H.T. 5/16/97: 249,  259-60, 284) According to police witnesses, Mr. Allen recanted his request for an attorney and made a detailed statement in which he admitted having participated in the bank robbery and having shot Mr. Heflin.  (T. 2/17: 9-13).  Mr. Allen was identified as one of the perpetrators in a lineup or photo lineup by several witnesses.

### Grounds for relief

The following grounds for relief are apparent, in whole or in part, as of the time of the filing of this petition.  As noted above, this is not a complete statement of the grounds for relief which will be asserted on behalf of Mr. Allen.  Unless otherwise noted, none of these grounds has previously been presented in any court.  In these grounds, the phrase "effective assistance of counsel" refers to the constitutional right conferred upon Mr. Allen by the Sixth Amendment to the United States Constitution, and

construed by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), and its progeny.

### A.  Mr. Allen was denied effective assistance of counsel in connection with his motion to suppress evidence of his confession.

**Supporting facts.**  During the hearing on the motion to suppress evidence, the government presented evidence through FBI Agent Jan Hartman that when she began to read Mr. Allen his rights early in the morning of his arrest, Mr. Allen requested an attorney.  Officer Harper then testified that, after he was told he had been identified in a lineup, Mr. Allen made a request to speak with Officer Henderson, whom Mr. Allen knew from the investigation of the death of Mr. Allen's friend, and retracted his previous assertion of his right to an attorney.  Officer Harper said he, and all the other officers involved in the case, had learned that Mr. Allen had requested an attorney, and therefore did not initiate contact with Mr. Allen, but Mr. Allen had contacted Officer Henderson.  Mr. Allen told his trial attorneys that this was not true, and that the officer had initiated the conversation.  Trial counsel attempted to present Mr. Allen's testimony, but the court ruled that if he testified, he would be subject to full cross-examination.  At the close of the hearing, the court gave trial counsel the opportunity to submit a written offer of proof concerning Mr. Allen's testimony, as well as any legal argument concerning limitation on the scope of cross-examination.  The docket sheet does not reflect any memorandum or offer of proof by counsel between May 16, 1997, when the evidentiary hearing was held, and June 16, 1997, when the magistrate judge issued his report and recommendations.  An offer of proof was submitted, but it was late (June 19, 1997), after the evidence was already closed.  In his offer of proof, Mr. Allen asserted

13

that he had never been warned of his rights until he spoke with Agent Hartman.  He further stated that after he had invoked his right to counsel, he was questioned by Officer Nickerson.  He was never told of his right to counsel at the lineup, and never requested to speak with agents before Officer Henderson began to question him.  The trial court ruled that Mr. Allen's confession was voluntary and admissible.

Officer Henderson, Officer Harper's superior who took Mr. Allen's statement, testified at the pretrial hearing and at trial that he was aware that Mr. Allen had requested an attorney before Mr. Allen made his statement.  At trial, Officer Henderson testified that he did NOT know that Mr. Allen had been informed of his rights before Officer Henderson interviewed him.  Officer Harper, on the other hand, testified at trial that it was Officer Henderson who had informed him that Mr. Allen had requested an attorney.  The pretrial hearing testimony of both officers that they knew Mr. Allen had requested an attorney and made sure he was withdrawing that request was now suspect, since Officer Harper said he relied on Officer Henderson for his knowledge of the request for an attorney, and Officer Henderson said he was unaware of the request. Trial counsel failed to re-urge the pretrial motion at that point.

On appeal, the suppression issue was raised entirely as a failure to honor Mr. Allen's request for an attorney.  In making that argument, counsel on appeal failed to mention the discrepancy in testimony between the trial and pretrial testimony of Officers Harper and Henderson.  Moreover, counsel on appeal failed to raise (for plain error at least) the trial court's refusal to consider Mr. Allen's testimony without full cross-examination.  This ruling of the trial court violated *Simmons v. United States*, 390 U.S.

377 (1968), which held that a defendant may not be forced to waive his right to remain silent at trial in order to testify on a motion to suppress, but counsel on appeal did not raise this issue, nor did they argue the facts contained in Mr. Allen's offer of proof.

Had any or all of these deficiencies in the representation of Mr. Allen not occurred, there is a reasonable probability of a different outcome.  Mr. Allen is entitled to a new trial

**B.  Mr. Allen was denied his rights to the presumption of innocence, to be present at his trial, to effective assistance of counsel, to be free of cruel and unusual punishment, and to due process of law Under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, because he was required by the court to wear a stun belt, and neither trial counsel nor appellate counsel challenged this ruling.**

**Supporting facts:**  Mr. Allen was forced to wear restraints during the guilt and penalty phases of his trial.  He was made to wear a shock or stun belt.  A shock belt is an electric shocking device that is worn around the waist.  The belt can be activated by a remote control device from up to 300 feet away.  Once activated, the belt delivers an eight second, 50,000 volt shock that cannot be stopped.  The high-pulsed electrical current travels through the body along blood channels to nerve pathways.  The shock knocks down most of its victims, causing them to shake uncontrollably and remain incapacitated for up to forty-five minutes.

Mr. Allen was not disruptive in any court proceeding nor was there any cause to restrain him.  The trial court simply informed the parties that Mr. Allen would be wearing a stun belt.  A stun belt, like shackles, is an extreme security measure.  Because no specific reasons existed or were advanced showing the need for restraints, the trial

15

court violated constitutional law requiring a hearing and an opportunity to be heard on the issue of need as well as a showing of need prior to restraining a criminal defendant. Mr. Allen's due process rights were violated.

A criminal defendant has a constitutional right to appear unrestrained before his jury because, in part, restraints negate the presumption of innocence.  Unjustified restraint negates that presumption.  The right to a fair and impartial jury is a fundamental right.  Making Mr. Allen appear before the jury in restraints is an inherently prejudicial practice at the guilt and penalty phases of trial.  If interviews with the jurors (as requested in Mr. Allen's pending motion before this court) reveal that the jurors were aware of the stun belt, the prejudice is evident.

Even if the jurors were unaware of the stun belt, Mr. Allen was.  The belt compromised his ability to communicate with and assist his counsel in his own defense. Mr. Allen was warned by security personnel not to make any sudden moves to avoid the painful shock.  This affected his ability to concentrate on his trial and communicate with his counsel.  Mr. Allen's ability to concentrate was further compromised by the fact that he was ill through much of the trial.  As a result of allergic symptoms, his eyes were swollen, and he suffered from headaches.  He complained of these symptoms to the jail personnel where he was being held, but they did not provide him with medication adequate to alleviate the symptoms.  As a result of these factors, Mr. Allen was constructively denied his right be present at trial.

Trial counsel's performance fell below the prevailing professional norms when counsel did not object to the trial court forcing Mr. Allen to wear a stun belt at the guilty

and penalty phases of his trial. An objection to this would or should have been sustained because there was no cause to restrain him. Mr. Allen was prejudiced by counsel's failure in that he was forced to appear before his jury in restraints, stripping him of his presumption of innocence, impairing his ability to assist in his defense, and creating an inference that he was dangerous.

Appellate counsel's performance also fell below the prevailing professional norms when counsel failed to raise as a plain error issue on direct appeal that Mr. Allen was forced to wear a stun belt at the guilty and penalty phases of his trial. The judge's actions in forcing Mr. Allen to be restrained violated Mr. Allen's due process rights.

Mr. Allen is entitled to a new trial.

### C. Mr. Allen was denied effective assistance of counsel in connection with jury selection.

**Supporting facts.** During jury selection, the court directed that the prospective jurors were to be addressed and referred to only by their numbers. Trial counsel made no objection to this procedure, and the procedure was not challenged on appeal. This procedure improperly suggested to the jurors that they might be in some danger as a result of their jury service, in violation of Mr. Allen's right to an impartial jury. Trial counsel made no objection. Assuming that this error is not so fundamental as to require no showing of prejudice, there is a reasonable probability of a different outcome had it not occurred.

At the time the defense counsel were preparing to make their peremptory challenges, Mr. Allen became ill. Nonetheless, he provided his counsel with a list of

three prospective jurors who, in his opinion, should be the subject of strikes.  Trial

counsel failed adequately to consider Mr. Allen's opinions and desires concerning which

prospective jurors should be stricken; several of Mr. Allen's choices were not stricken

and served on the jury.  Had Mr. Allen's wishes been respected, there is a reasonable

probability of a different outcome.

At the conclusion of the jury selection, trial counsel objected to the strikes of

several black jurors as improper discrimination under *Batson v. Kentucky*, 476 U.S. 79

(1986).  The objection was overruled.  Appellate counsel failed to include this ground for

relief in Mr. Allen's  direct appeal.  Had they done so, there is a reasonable probability of

a different outcome.

*The following portion of this ground for relief is incomplete due to the inability to*

*complete its investigation as yet.*  Prior to appearing in court, the prospective jurors had

filled out a lengthy questionnaire.  When present counsel for Mr. Allen received the files

of trial counsel, a box of these questionnaires was included.  However, the

questionnaires filled out by the persons who served as jurors and alternates was not

included in that box, and has not been located elsewhere in the files.  In response to Mr.

Allen's motion for the district clerk to provide copies of the questionnaires, this Court

has determined that the clerk has no such copies; counsel continue to look for them.

Should it prove to be the case that trial counsel failed to consider information in the

questionnaires of the jurors which could have formed the basis for a challenge for

cause, or would have indicated the need for a peremptory challenge, that failure would

be ineffective assistance of trial counsel, and prejudiced Mr. Allen's right to a fair and impartial jury.

### D. Mr. Allen was denied effective assistance of counsel when the jurors possibly learned that the Lindell bank had been robbed again.

On February 24, 1998, during the first phase of the trial, trial counsel informed the court that the Lindell bank had been robbed again.  He requested that the court inquire individually of the jurors whether they had heard of this event and what, if any, impact it had on them.  The jurors in this case were not sequestered during trial, so although they had been admonished to avoid news reports concerning the trial, it is possible that they were exposed to this event.  The trial court denied the request to examine the jurors.  Trial counsel sought no further relief during trial.

Trial counsel mentioned this problem in their motion for new trial, but they did not seek leave of court to interview the jurors, nor did they request the opportunity to present evidence on this issue at a hearing.  Had such a hearing been held, and had it been discovered that one or more of the jurors were prejudiced by this event, there is a reasonable probability of a different outcome.  Mr. Allen has pending before this Court a motion to interview jurors to determine whether they were exposed to this event, and if so, whether it affected their deliberations.  If there is showing of prejudice, Mr. Allen is entitled to a new trial.

Appellate counsel failed to raise the denial of the examination of the jurors as a ground for direct appeal.  Had they done so, there is a reasonable probability of a different outcome.

19

**E.  Mr. Allen was denied effective assistance of trial counsel when trial counsel failed to object to his being tried for two versions of the same offense as a violation of the Double Jeopardy Clause.**

**Supporting facts:**  The two counts with which Mr. Allen was charged involved virtually identical facts.  Appellate counsel raised this as a double jeopardy issue, but the court of appeals reviewed only for plain error since the issue was not preserved prior to trial.  Had trial counsel raised the issue, there is a reasonable probability of a different outcome.  Mr. Allen is entitled to a new trial.

**F.  Mr. Allen was denied effective assistance of counsel when trial counsel failed to request a hearing regarding the late-provided evidence that government witness Thomas Mundell was a paid government snitch, and when appellate counsel failed to raise an issue concerning Mr. Mundell on direct appeal; he was also denied due process of law when the government failed to disclose impeaching information before trial.**

**Supporting facts:**  After trial, the prosecutor wrote to Mr. Allen's counsel and disclosed for the first time that government witness Thomas Mundell, who testified about Mr. Allen's participation in the purchase of a bulletproof vest, had been a paid informant for the United States government.  Despite the fact that Mr. Mundell had been paid considerable amounts of money over a long period, the prosecutor stated that he was unaware of Mr. Mundell's status prior to the sending of the letter.

Subsequently, Mr. Allen's counsel included the late-provided notice as a ground for a motion for new trial.  Counsel did not request a hearing on the motion, and no hearing was held.  Therefore, the court never had a chance to hear how it was that government prosecutors were unaware that their own witness had been a paid

informant for the same government for which they worked.  Ruling on the issue, the court treated this as newly discovered evidence, rather than as a *Brady v. Maryland*, violation.  But because knowledge of government agents is imputed to the prosecutor under *Brady v. Maryland* 373 U.S. 83 (1963)*,* and *Kyles v. Whitley*, 514 U.S. 419 (1995), Mr. Allen should have been required to show only a reasonable probability of a different outcome, rather than the more stringent standard for newly discovered evidence, that the evidence would likely result in an acquittal upon retrial.  *United States v. Parker*, 267 F.3d 839, 846 (8th Cir. 2001).  Mr. Mundell's testimony was important to the government's case.  By showing Mr. Allen's alleged presence at the purchase of a bullet-proof vest by Mr. Holder, the government was able to show that Mr. Allen was involved in the planning and preparation for the robbery.  And, the fact that a bulletproof vest was purchased demonstrated his awareness that violence would be involved.  Had Mr. Mundell's testimony been impeached with the fact that he was in the business of testifying for money, trial counsel could have softened considerably the importance of this evidence.

Appellate counsel abandoned this ground for relief, entirely failing to raise it.  Since it had been raised in at least a cursory way in the motion for new trial, it would have received plenary review.  Had trial and appellate counsel performed effectively, there is a reasonable likelihood of a different outcome.  Mr. Allen is entitled to a new trial.

### G. Mr. Allen was denied effective assistance of counsel when trial counsel failed to obtain relief when the government suggested he had gang connections.

**Supporting facts.**  Prior to trial, the court granted a motion in limine protecting Mr. Allen from government insinuations that he was a member of a gang. Notwithstanding this order, when questioning Officer Thomas Carroll, the prosecutor called the jury's attention to the fact that Mr. Allen was wearing blue undergarments. The color blue is commonly associated with the criminal Crips gang.  Several moments later, the officer was asked to describe a tattoo that Mr. Allen had on his arm.  The officer responded that it said, "Crips."  This was apparently incorrect; the actual tattoo said "cash."  In response to a defense objection, the court instructed the jury to disregard the "crips" reference.  Trial counsel requested no further relief.  Later, when cross-examining defense witness Eric Taylor, the prosecutor called attention to Mr. Taylor's blue clothing in an attempt to insinuate that *he* had gang connections.  There was no objection by trial counsel.  Had Mr. Allen's counsel requested relief as to these references, there is a  reasonable probability that a mistrial would have been granted, and that the outcome of any subsequent proceeding would have been different.

Appellate counsel failed to raise this ground as a basis for plain error review on appeal.  Had they done so, there is a reasonable probability of a different outcome. Mr. Allen is entitled to a new trial, or at least a new penalty phase.

**H. Mr. Allen was denied the effective assistance of counsel at the guilt phase of his trial by counsel's failure to use available evidence that would have established a reasonable doubt as to his participation in the charged murder and robbery.**

**Supporting facts**:  Trial counsel was given voluminous discovery from the government, but failed to use information contained in the discovery documents which would have created  a reasonable doubt that Mr. Allen was present and participated in the robbery.  Among other items:

1.  Counsel failed to present evidence from a DNA report (June 5, 1997) from Donna Becherer and Kim Gorman that showed that blood from item Q-4, a white strap found near Mr. Heflin's body, did not match either Richard Heflin or Mr. Allen.  This evidence suggests the involvement of another person in the shooting.

2.  Counsel failed to present evidence from a gas chromatographic analysis of the clothing seized from Mr. Allen's when he was arrested which showed that the clothing was negative for the presence of petroleum distillates.  This report would have impeached the testimony of one of the officers who arrested Mr. Allen two days after the robbery that Mr. Allen's clothes "reeked of smoke" at that time.

3.  Counsel failed present evidence found in a report of an interview with Greg Prater and Joe Prowell in which they stated that the person they saw running through Forest Park after the van caught fire was 5'8" tall.  Mr. Allen is considerably taller than 5'8".

4.  Counsel failed to present evidence found in a report of an interview with James Combs, who worked at Deaconess Hospital.  Mr. Combs said that on the day of the robbery, he saw a black male enter the hospital and act suspiciously.  The black

23

male exited the hospital and got in a brown Jeep Wagoneer.  The black male was described by Mr. Combs as 5'10" tall wearing dark clothing, a knit cap and prescription glasses.  This does not match the description of Mr. Allen, but could have been another participant in the robbery.

5.  Counsel failed to cross-examine government witness Wayne Ross regarding statements he made to the FBI that on the Wednesday or Thursday before the bank robbery, a person named "JB" called for Norris Holder.

6.  Counsel failed to cross examine government witness Michael West, who identified Mr. Allen, with his prior statement that he did not see either suspect's face and that due to the ski mask he could not relate any age of either suspect.

7.  Counsel failed to present evidence from an interview with Broderick Bonner that on the evening when Mr. Allen and Mr. Holder allegedly met in a bowling alley, Mr. Bonner did not sit with them nor was he in a position to overhear any conversation between Mr. Holder and Mr. Allen.  Mr. Bonner also indicated that Mr. Holder did not discuss a bank robbery that night and Mr. Ross did not know anything about Mr. Holder having a plan to rob a bank.  This would have contradicted Wayne Ross's trial testimony about overhearing a conversation between Mr. Holder and Mr. Allen about the robbery.

8.  Counsel failed to present evidence from an interview with Jeffrey Moore that when Mr. Moore went into the bowling alley the evening that Mr. Holder and Mr. Allen allegedly met there, he saw Mr. Smith and Mr. Ross sitting at a different table from Mr. Holder.  Mr. Moore could not see who Holder was with. This would have contradicted

24

Wayne Ross's trial testimony about overhearing a conversation between Holder and Allen.

9. Counsel failed to investigate and present evidence suggested by an FBI report of an anonymous telephone call which indicated that Mr. Holder had been seen at the bowling alley discussing the bank robbery with someone other than Mr. Allen..

While some of these points are more significant than others, taken together, had trial counsel effectively used the discovery provided to him, there is a reasonable probability of a different outcome at the guilt phase. Mr. Allen is entitled to a new trial.

### I. Mr. Allen was denied effective assistance of counsel because of failure to investigate and present evidence at the penalty phase of his trial.

**Supporting facts:** The crime in this case took place on March 17, 1997. Mr. Allen was indicted on April 17, 1997. The death penalty was authorized on August 8, 1997. The jury trial in this case began on February 9, 1998. This was an unreasonably short span of time within which to investigate a case for life.[4] Shortly after the death penalty was authorized, trial counsel retained Craig Haney to act as a mitigation investigator and expert in this case. In October 1997, trial counsel sent Dr. Haney a few documents pertaining to the case, but made no effort to speak with Dr. Haney about this case until January 1998. Although Dr. Haney was initially informed that the trial was set for February 1998, he believed that the date had been continued since he had not heard

---

[4]See Exhibit 1, Declaration of Kevin McNally.

from trial counsel nor received any material from him.  The minimal contact that was made came through trial counsel's paralegal.

Dr. Haney received a few more records concerning Mr. Allen in December 1997 with a cover letter stating more records were to follow.  No additional records were received by Haney.  Specifically, as of January 13, 1998, Dr. Haney had received no investigative material generated by counsel—no information regarding the guilt phase defense, no information regarding potential mitigation witnesses, and no information regarding the prosecution case in aggravation. It was not until mid-January 1998, that Dr. Haney was informed that the case would actually go to trial in February, 1998.

When trial counsel contacted Dr. Haney on January 13, 1998, Dr. Haney informed trial counsel that the *first* stage of what was a five or six stage process of investigation and preparing a penalty phase defense had not been completed.  He said that there was no way he could not possibly be prepared to assist on a trial that was scheduled to start in a matter of weeks and that the investigation could not be completed in that short amount of time.  As a result, he declined to participate further in the case.

On January 29, 1998, counsel filed a Motion for Continuance in order to get time for a new mitigation expert, Dr. David Randall to complete work on the case.  Counsel asked for 120 days.  A hearing was held on the motion the next day and counsel again asked for 120 days.  In both the written motion and the hearing on the continuance counsel suggested that the problem was with Dr. Haney and his failure to respond to counsel.  In fact, the problem was that counsel had completely failed in his obligations

26

to investigate the case and get material and records to Dr. Haney in a timely fashion. Dr. Randall testified at the continuance hearing that he did not believe he could do an adequate job in the time available, but was prepared to assist because of his belief that something was better than nothing.  This Court denied the motion for continuance, and trial started as scheduled on February 9, 1998.

As a result of the lack of a full penalty phase investigation, trial counsel and the jury did not have a full picture of Mr. Allen.  Specifically:

1.  No witness from Mr. Allen's father's family was interviewed or testified.  Mr. Allen's father essentially abandoned Mr. Allen and his family and suffers from alcoholism.  The picture that emerged from the penalty phase testimony was that Mr. Allen only spent time with family on his mother's side of the family.  Post-conviction investigation reveals that Mr. Allen spent time with his father's side of the family as well. Investigation reveals that his father's side of the family has significant issues with substance abuse and criminal behavior.  Mr. Allen's jury was never informed of this.

2.  There were two penalty phase experts, Dr. Michael Gelbort, a neuropsychologist, and Dr. Cuneo a clinical psychologist.  Except for a brief conversation between Dr. Cuneo and Mr. Allen's mother, which she does not recall, neither ever interviewed or spoke to Mr. Allen's family or friends.  Their testimony was based only on reports.  As such, it lacked significant information which they could have gained from interviews, and the immediacy which would have stemmed from personal experience with the people they were talking about.

27

3.  Mr. Allen's mother, Juanita, did not testify at trial.  For most, or all, of Mr. Allen's childhood, she was an alcoholic.  During the post-conviction investigation, counsel have learned that Mr. Allen's sisters would describe their mother has having "checked out" during their childhood, but they were not asked about this at trial.  There was no little or mention of Juanita's drinking during the penalty phase.  Such testimony from Mr. Allen's sisters; Nicole, Ann, and Yvette, all of whom testified at trial would have provided the jurors with a much fuller, richer, and truer picture of Mr. Allen's childhood and adolescence.

4.  Counsel had medical records stating that October of 1979, when Mr. Allen was approximately 26 months old, he was hospitalized from the effects of lead poisoning.  Those hospital records indicate that at that time, Mr. Allen had a blood lead level of 60 mcg/dl.   This is an extremely high level of lead and such a lead level is very damaging for a young child.  According to Dr. Howard Hu, Chair of the Department of Environmental Health Sciences and Professor of Environmental Health, Epidemiology and Medicine at the University of Michigan Schools of Public Health and Medicine, a level of 10 micrograms per deciliter in a child's blood is considered toxic,  however, some studies suggest that even lower levels can cause harmful effects.  There is no safe level of lead exposure.  Lead is particularly harmful to developing fetuses and young children.

Scientific studies now show that lead poisoning can cause a variety of permanent health effects in children, including Attention Deficit Hyperactivity Disorder, learning disabilities, and behavioral problems.  Lead in the blood can also cause lowered I.Q.

Other chronic or long term effects include headaches, nervous irritability, severe psychological disorders, and anxiety.

Common sources of lead exposure are house paint, leaded gasoline, and drinking water funneled through lead pipes, or copper pipes soldered with lead. Research also indicates that the top few inches of urban soil can contain a large reservoir of accumulated lead. [5]  Wind blown lead-enriched soil or dust is another primary source of this neurotoxin.  After lead enters the body, it circulates through the body and stored in bones, fat, organs and other body tissues, including the kidneys and liver.  However, the kidneys are unable to remove lead from blood so it can eventually poison the entire body.  Lead can also be stored in the bones of pregnant women, and passed to their infants.

Lead poisoning has been linked to impaired cognitive development in infants. The danger is acute for children under the age of 6 because their brains and nervous system are still developing.  According to Dr. Donald Lewis, Professor of Pediatrics and Neurology at Children's Hospital of the King's Daughters at Eastern Virginia Medical School in Norfolk, Virginia, a blood lead level of 60 at age 2 could result in as much as a 40 point drop in IQ.

Trial counsel unreasonably failed to consult with experts in lead poisoning and its impact upon young children.  Had counsel done so, expert testimony could have been

---

[5]Medical records also reveal that as a young child Mr. Allen suffered from Pica, a disorder in which a person ingests substances that are not food, such as dirt or paint chips, for example.

29

presented which would show that Mr. Allen's mental problems (low IQ, and organic brain damage) were due, at least in part, to toxic lead poisoning.

5. Post-conviction investigation also leads counsel to believe that Mr. Allen is suffering from a mental disease or defect which should have been diagnosed at the time of trial. Trial counsel made repeated references to Mr. Allen as someone who did not tell the truth or attempted to make himself appear to be something that he was not. Undersigned counsel are not trained mental health professionals but upon information and belief, allege that Mr. Allen is suffering from an undiagnosed mental illness.

6. Post-conviction investigation also leads counsel to believe that Mr. Allen may be mentally retarded. Mr. Allen's school records reveal someone who had dismal performance and record of achievement at all levels of school. Dr. Gelbort administered a WAIS-R IQ test on Allen. Dr. Gelbort found that Allen had a full scale IQ of 82. According to Dr. Denis Keyes, an expert in mental retardation, at the time this test was administered to Mr. Allen, it was approximately 15 years out of date and a WAIS-III should have been administered. Even assuming that the WAIS-R was administered properly, the fact that such an old test was administered raises the likelihood that Mr. Allen's IQ score was inflated by the Flynn Effect and is actually 4-5 points lower. This means that Mr. Allen's true IQ is likely to be no more than 77 or 78, which means that it is conceivable that he suffers from mental retardation, or at least, that his cognitive abilities were significantly lower than the trial testimony indicated. While mental retardation bars the death penalty, severe mental impairment which is not classified as mental retardation is still relevant mitigating evidence. Dr. Keyes believes that the

school records he reviewed were not complete; complete records may yield evidence of early intelligence testing.

7.  Trial counsel should have consulted with an expert with specialized knowledge of Missouri's special education laws and systems.  Juanita Allen sent Ann Allen, Billie's sister, to school in Clayton, because of her significant developmental problems which could not be addressed by the St. Louis schools.  Ann had severe speech problems.  Juanita sent Mr. Allen to school in Clayton so that Ann would not go alone.  Mr. Allen was also diagnosed with auditory learning problems in school.  Ann received significant special education services and today is doing well.

Mr. Allen received no special education services. Dr. Keyes was shocked that Mr. Allen had apparently never even been evaluated for special education services.  An expert in special education could testify that someone with Mr. Allen's significant problems should have received special education assistance, assistance that made a great deal of impact upon his sister.

8.  Trial counsel should also have consulted with an expert knowledgeable about the cultural issues which arise when someone is sent from an impoverished, largely African-American inner-city school district to an affluent, largely Caucasian school district, especially when that someone has the cognitive impairments suffered by Mr. Allen.  Trial counsel repeatedly painted Mr. Allen has someone who claimed to have material items that he did not possess.  The Government repeatedly painted Mr. Allen as someone who was greedy .  Many of the character traits that were used against Mr.

31

Allen at trial, could be explained by the unique constellation of cultural factors that occurred during his childhood.

As a result of trial counsel's failure adequately to investigate Mr. Allen's background and pathology, he was denied his right to effective assistance of counsel and to be free from cruel and unusual punishment.  Had this evidence been presented to the jury, there is a reasonable probability of a different outcome.  If a new trial is not granted, Mr. Allen is entitled to a new penalty phase.

### J.  Mr. Allen was denied effective assistance of counsel when trial counsel failed to object to prejudicial victim impact evidence.

**Supporting Facts:**  Counsel filed a Motion in Limine to limit the quantum of victim impact evidence introduced at trial.  The trial court denied the motion.  Counsel did not renew the motion in limine or object to the large quantum of victim impact evidence that was introduced at trial.

The victim impact evidence started at the guilt phase when the government elicited information regarding the personal qualities of the victim, Richard Heflin, from the many bank employees who testified.  See guilt phase testimony of; Amy Boehjle, Sandy Foppe, Michael West, Mary Garvels, Lisa Moore, and Virginia Michael.  At the penalty phase there was testimony from eleven witnesses regarding the consequences of Mr. Heflin's death.  See, penalty phase testimony of; Kelly Davis, Janice Walton, Evelyn Heflin, Sherry Holmes, Michael Heflin, Ron Tamburello, Sue Heflin, Jason Heflin, Richard Heflin, Justin Heflin, and Dana Heflin.   The government argued extensively on this issue to the jury at the final arguments at the penalty phase without objection from counsel.  See Ground K below.

Counsels' conduct fell below the prevailing professional norms when they did not object to the prejudicial victim impact evidence and argument at the guilt and penalty phases of Mr. Allen's trial.  The evidence of Mr. Heflin's personal characteristics and the impact his death had upon others was not relevant to the aggravating circumstances and mitigating factors.  This evidence and argument only served to inflame the passions of the jury.

This issue was raised on direct  appeal, but was only considered for plain error. Had a proper record been made, there is a reasonable probability of a different outcome, and Mr. Allen is entitled to a new penalty phase even if he is not granted a new trial.

### K.  Mr. Allen was denied effective assistance of counsel because of trial counsel's failure to make proper objections to the government's final penalty phase argument.

**Supporting facts.**  On appeal, appellate counsel raised as plain error the prosecutor's statement in final penalty phase argument that Mr. Allen was a "murderous dog."  Reviewing for plain error only, the court of appeals denied relief.  But that argument was only a small part of a pattern of prosecutorial misconduct in final argument that was not attacked by defense counsel.  The objectionable arguments fall into four categories.

1. *Improper arguments regarding lack of nexus between the offense and the mitigating evidence.*  The law is clear:  In imposing a death sentence, the jury must consider not only the offense, but the character and circumstances of the defendant.  By

repeatedly stating that the mitigation evidence was unrelated to the offense, the

prosecutor encouraged the jurors to ignore this constitutional principle.  The fact that the

jury imposed death for one count and life for another demonstrates that this tactic

worked to the prosecution's advantage.

Examples include:

> The fact that he had a bad father or a drinking father has nothing to do with what he did in the Lindell Bank and Trust, has nothing to do with him cold bloodedly murdering Richard Heflin. T. XIX 96.

> "All these mental defenses you are hearing about, there is no connection to this defendant walking into that bank and killing for money.  They're just sitting out there kind of floating out in space, no nexus, no causation, no connection of any kind between those little things and what this defendant did." T. XIX 100.

> [W]hen you take any one of those [aggravators] and weigh them against all of the mitigators—and what are those mitigators?  When you put them all together and put them in a bag, and then you open that bag and look in there, what is it?  It's a bag of air.  It's a bag of fog.  There's nothing in there at all.  It's nothing concrete.  It's all conjecture.  There's no connection between that and this defendant's conduct on the day of this murder.  T. XIX 102

> He has the nerve to come in here and say, My dad was an alcoholic and so don't impose the death sentence on me, my dad wasn't a good dad.  This is the same guy who took Justin, Jason and Richard's father from them so he could have money, and he has the nerve to come in and say, well, gee, I didn't have a good dad." T. XIX 102

> The post-traumatic stress syndrome is like a joke. T. XIX 102

> And what does your common sense tell you about depression, post-traumatic stress disorder, and that he had little trouble learning in school?  Your common sense tells you these are excuses.  These are excuses for a guy who was committing one of the most violent crimes you'll ever

34

see for one of the baseless reasons you can ever dream of: money." T. XIX 103.

Post-traumatic stress disorder does not exist. The diagnosis is not PTDS; it is cold-blooded killer. T. XIX 104.

You weigh the cold-blooded murder of Richard Heflin against the evidence he put on in mitigation, that he's kind and gentle and artistic. [H]e wasn't artistic on the day of this robbery. What was he creating that day? Murder and mayhem, total destruction in that bank. The evidence and the law in this case make it so clear that this defendant deserves one punishment, and it's not life in prison, it's death." T. XIX 109.

This is not a case about a little boy, and that's why they brought that little nine year old boy in here and showed you those pictures of him when he's a little boy. It's not about a little boy. It's about a grown man the same age of Richard Heflin when he went to Vietnam. It's about a man his family doesn't know. It's about a man that those teachers in grade school, ten and twelve years ago, don't know. It's a man that you all know very well. You know exactly what he did and what he's capable of. T. XIX 109-110

Trial counsel did object when the prosecutor argued,

When you're weighing, when you're weighing the defendant's mitigating evidence back there and you're weighing that bag of fog, that bag of air they presented to you, weight it against the weight of Richard Heflin's body. Because that's what this is all about – T. XIX 108.

The jury was instructed to disregard the remark. But trial counsel requested no further relief, and so there was no mistrial despite the fact that the curative instruction was ineffective to dispel the error.

2. *Improper emotional appeals to the jury*. The decision to impose the death penalty must be a reasoned one, not the product of passion. The prosecutor violated this principle and inflamed the jury when he argued,

35

He wants to go to prison for life.  he wants to go there and he wants to watch movies and read books, he wants to write letters and have visits from his relatives, he wants to exercise and play basketball and volleyball.  Don't let him down there dribbling basketballs on Richard Heflin's grave; it wouldn't be right. T. XIX 97-98.

Richard Helfin didn't think this guy with the mask, armed for war, armed to kill, was kind. lighthearted, or gentle.  He thought he was a murderous dog coming in there to kill people for money.  That's what Richard Heflin thought. T. XIX 105-106

[A]nd the terrible irony is [Mr. Heflin] survived Vietnam, survived Vietnam, managed to live through having to fight people with guns just like that, and he's killed at High Point in St. Louis City on St. Patrick's day, that is a terrible irony." T. XIX 106.

You cannot find a case that more cries out for a jury to impose the death penalty than the facts of this case, the cold-blooded, wanton murder and attempted murder and putting other people's lives at risk for money and really for fun.  T. XIX 107

But when you're back there I want you to remember one thing—three things, really: That Richard Heflin's mother on Christmas day will always have an empty chair at her Christmas table.  Justin Heflin when he's hitting a home run or making a great play in baseball will never look up and see his father sitting in those stands cheering for him.  And Dana Heflin, when she looks out her window and sees those doves on Richard Heflin's bird feeder, her heart is going to break yet again." T. XIX 111

In addition to these arguments, the prosecutor spent considerable time in a totally speculative and inflammatory argument about how Mr. Heflin was shot and what his final thoughts were. T. XIX 106-107.

3. *Improper statements of concerning the prosecutor's personal beliefs and opinions*.  The prosecutor may not use his position of authority in the community to

36

persuade the jury that, because he believes the death penalty is appropriate, it must be appropriate.  But without object, the prosecution here did so:

> He is capable of absolute inhumanity.  I would hate to be at his mercy."  T. XIX 100/
>
> I am honored to present this case on behalf of Richard Heflin who died doing what he always did, protecting others.  Who died doing what he always did, doing his duty.  T. XIX 111

4. *Improperly arguing facts not in evidence.*  In the penalty phase as in the guilt-innocence phase, the prosecutor may not argue facts not in evidence.  But without objection, the prosecutor here did so.  He speculated about Mr. Allen's culpability when his friend was killed:

> He contributed to this violence [in this city] before [March 17th] when he apparently got Marquis killed because somebody was trying to kill this defendant, probably because he had ganked them.  T. XIX 105.

There was no objection.

If each of these failures to object does not individually require a new penalty phase, the cumulative impact of this improper argument was clearly prejudicial to Mr. Allen.  If a new trial is not granted, Mr. Allen is entitled to a new penalty phase.

### L.  Mr. Allen was denied effective assistance of trial and appellate counsel because there was no objection to the use of "pecuniary gain" as a statutory aggravator.

**Supporting facts:**  Mr. Allen was charged with bank robbery, which includes as an element an attempt or actual theft.  To use one of the elements of the offense as a statutory aggravating circumstance violates both the Double Jeopardy Clause of the United States Constitution, which forbids multiple punishments for the same offense,

and the Cruel and Unusual Punishment Clause of the Eighth Amendment to the United States Constitution.  Neither trial nor appellate counsel raised an objection to this aggravator.  Had they done so, there is a reasonable likelihood of a different outcome. Mr. Allen is entitled to a new penalty phase.

**M.  Mr. Allen was denied effective assistance of appellate counsel when appellate counsel failed to provide the court of appeals with relevant authority concerning his assertion that his rights were violated when the grand jury did not hear evidence regarding statutory aggravating circumstances.**

**Supporting facts:**  After a panel of the Eighth Circuit Court of Appeals held that Mr. Allen's death sentence should be vacated because of the government's failure to present aggravating evidence to the grand jury, the *en banc* court granted rehearing and ordered re-briefing and re-argument.  In the brief, counsel for Mr. Allen failed to cite persuasive authority that it was improper for the appellate court to speculate about what the grand jury would have done had the aggravating evidence been presented to it. The *en banc* court of appeals vacated the panel opinion and held that the error was harmless because any reasonable grand jury would have requested the death penalty. Had the relevant authority been presented to the court of appeals, there is a reasonable probability of a different outcome.

## CONCLUSION

For the foregoing reasons, petitioner Billie Jerome Allen prays the court:

1.  To permit him to amend and supplement this petition on or before February 11, 2008, as contemplated by this Court's order granting an extension of time to file this petition;

2.  Following the filing of the amended petition, to require the United States to file an answer in the form prescribed by Rule 5 of the Rules Governing 28 U.S.C. §2255 Cases in the United States District Court, identifying all proceedings conducted in Mr. Allen's case, including any which have not been recorded or transcribed, and specifically admitting or denying the factual allegations set forth above;

3.  Permit Mr. Allen to file a traverse to respondent's answer, responding to any affirmative defenses raised by the Answer;

4.  Permit Mr. Allen to utilize the processes of discovery set forth in F. R. Civ. P. 26-37, to the extent necessary to identify and develop fully the facts supporting this petition, and any defenses raised by the respondent's answer;

5.  Conduct an evidentiary hearing to resolve any factual disputes raised by the respondent's answer, or by Mr. Allen's traverse.  Because Mr. Allen has alleged facts which, if true, entitle him to relief, he is also entitled to a full evidentiary hearing to establish the facts he alleges;

6.  Order the respondent to release Mr. Allen from custody unless he is given a new trial or, alternatively, a new penalty phase proceeding, or, alternatively, a new direct appeal proceeding; and

7.  Grant such further relief as may be appropriate and just.

Respectfully submitted,

/s Elizabeth Unger Carlyle

Elizabeth Unger Carlyle #51877
P.O. Box 962
Columbus, MS  39701
Missouri Bar No. 41930
(816)525-6540
FAX (866) 764-1249
elizcar@bellsouth.net

Joseph M. Cleary #534292
Attorney at Law
1455 N. Pennsylvania
Indianapolis, IN  46202
(317) 630-0137
jcleary498@aol.com

## VERIFICATION

ELIZABETH UNGER CARLYLE declares as follows:

I am an attorney admitted to practice before the courts of the states of Missouri, Mississippi and Texas, the United States District Courts for the Eastern and Western Districts of Missouri, the Northern and Southern Districts of Mississippi, the Fifth, Seventh and Eighth Circuit Courts of Appeals, and the United States Supreme Court. My office is located at 413 4th Ave. S, #17, Columbus, MS  39701.

I am authorized by Billie Jerome Allen to file the foregoing Motion Under 28 U.S.C. §2255 to Vacate, Set Aside, Or Correct Sentence By A Person In Federal Custody Under A Sentence Of Death on his behalf.  Mr. Allen is confined and restrained of his liberty at the United States Penitentiary at Terre Haute, Indiana.

I declare that the contents of the foregoing Motion Under 28 U.S.C. §2255 to

Vacate, Set Aside, Or Correct Sentence By A Person In Federal Custody Under A

Sentence Of Death are true except for those matters based upon information and belief

and I believe those matters to be true.  The sources of my information and belief

include, but are not limited to, official court records from the United States District Court

for the Eastern District of Missouri and the Eighth Circuit Court of Appeals, various

documents prepared during the investigation of this petition, and items in the

possession of other lawyers, investigators and/or experts connected with the

preparation and presentation of this case.  I make this verification on Mr. Allen's behalf

because these matters are more within my knowledge than his.

I declare under penalty of perjury that the foregoing is true and correct.

/S/ ELIZABETH UNGER CARLYLE

ELIZABETH UNGER CARLYLE

December 10, 2007

CERTIFICATE OF SERVICE

I hereby certify that it is my belief and understanding that
counsel for respondent, Mr. Joseph M. Landolt, United
States Attorney, 111 South 10th Street, 20th Floor, St. Louis,
Missouri 63102, and Mr. Steven Holtshouser, Assistant
United States Attorney, 111 South 10th Street, 20th
Floor, St. Louis, Missouri 63102., are participants in the
Court's CM/ECF program and that separate service of the
foregoing document is not required beyond the Notification
of Electronic Filing to be forwarded to counsel on December
10, 2007 upon the filing of the foregoing document.

/s/ Elizabeth Unger Carlyle
ELIZABETH UNGER CARLYLE

41