**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **BILLIE JEROME ALLEN** | § | |
|    **Petitioner** | § | |
| | § | |
|    **vs.** | § | **Cause No.  4:07-CV-27-ERW** |
| | § | |
| **UNITED STATES OF AMERICA** | § | |
|    **Respondent** | § | |

# AMENDED MOTION UNDER 28 U.S.C. §2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY UNDER A SENTENCE OF DEATH

Elizabeth Unger Carlyle #51877
P.O. Box 962
Columbus, MS  39701
Missouri Bar No. 41930
(816)525-6540
FAX (866) 764-1249
elizcar@bellsouth.net

Joseph M. Cleary #534292
Attorney at Law
1455 N. Pennsylvania
Indianapolis, IN  46202
(317) 630-0137
jcleary498@aol.com

**ATTORNEYS FOR PETITIONER**

**TABLE OF CONTENTS**

Introduction ........................................................................................1

Procedural background ........................................................................4

Facts of the Offense ...........................................................................11

Grounds for Relief ..............................................................................14
    A.  Mr. Allen was denied effective assistance of trial and appellate counsel in connection with his motion to suppress evidence of his confession. ....14

    B.  Mr. Allen was denied his rights to the presumption of innocence, to be present at his trial, to effective assistance of counsel, to be free of cruel and unusual punishment, and to due process of law Under the Fifth, Sixth, and Eighth Amendments to the United States Constitution, because he was required by the court to wear a stun belt, and neither trial counsel nor appellate counsel challenged this ruling; the prejudice to Mr. Allen was compounded by the failure to provide him with adequate medical treatment during trial...............................................................................16

    C.  Mr. Allen was denied due process of law, the right to be free of cruel and unusual punishment, and effective assistance of counsel because the federal death penalty, as administered is disproportionately and unconstitutionally applied by race, and trial and appellate counsel made no objection based on this fact ...............................................................19

    D.  Mr. Allen was denied effective assistance of counsel in connection with jury selection. ...............................................................................23

    E.  Mr. Allen was denied effective assistance of counsel when the jurors possibly learned that the Lindell bank had been robbed again.................25

    F.  Mr. Allen was denied effective assistance of trial counsel when trial counsel failed to object to his being tried for two versions of the same offense as a violation of the Double Jeopardy Clause.............................26

    G.  Mr. Allen was denied effective assistance of counsel when trial counsel failed to request a hearing regarding the late-provided evidence that government witness Thomas Mundell was a paid government snitch, and when appellate counsel failed to raise an issue concerning Mr. Mundell on direct appeal; he was also denied due process of law when the government failed to disclose impeaching information before trial ..........27

i

H. Mr. Allen was denied effective assistance of counsel when trial counsel failed to obtain relief when the government suggested he had gang connections ........................................................................................28

I. Mr. Allen was denied the effective assistance of counsel at the guilt phase of his trial by counsel's failure to use available evidence that would have established a reasonable doubt as to his participation in the charged murder and robbery. ...............................................................................29

J.  Mr. Allen was denied effective assistance of counsel because of failure to investigate and present evidence at the penalty phase of his trial........32

K.  Mr. Allen was denied effective assistance of counsel when trial counsel failed to object to prejudicial victim impact evidence ...............................41

L.  Mr. Allen was denied effective assistance of counsel because of trial counsel's failure to make proper objections to the government's final penalty phase argument ...........................................................................42

M. Mr. Allen was denied effective assistance of trial and appellate counsel because there was no objection to the use of "pecuniary gain" as a statutory aggravator...............................................................................48

N.  Mr. Allen was denied effective assistance of trial and appellate counsel because there was no objection to the non-statutory aggravator, "Was Billie Jerome Allen's conduct in committing the offenses substantially greater than that described in the definition of the crime, apart from the statutory aggravating factors?"............................................................................48

O.  Mr. Allen was denied effective assistance of appellate counsel when appellate counsel failed to provide the court of appeals with relevant authority concerning his assertion that his rights were violated when the grand jury did not hear evidence regarding statutory aggravating circumstances. ....49

P.  Mr. Allen was denied due process of law and the right to be free from cruel and unusual punishment, as well as effective assistance of appellate counsel, because the jurors were not instructed that in order to impose a death sentence, they must find beyond a reasonable doubt that the aggravating evidence outweighed the mitigating evidence, and appellate counsel failed to raise this issue on direct appeal....................................50

Q.  The manner in which the government would carry out Mr. Allen's execution would violate the Eighth Amendment ......................................52

R.  Even if no one of the violations of Mr. Allen's rights listed in this petition merits relief, the effect of the cumulative violations of Mr. Allen's rights undermines confidence in the verdict, the sentence, and the operation of due process of law in Mr. Allen's case ...............................................................................52

Conclusion ...............................................................................53

Verification ...............................................................................55

Certificate of Service ...............................................................................56

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| **BILLIE JEROME ALLEN** | § | |
| **Petitioner** | § | |
| | § | |
| **vs.** | § | **Cause No.  4:07-CV-27-ERW** |
| | § | |
| **UNITED STATES OF AMERICA** | § | |
| **Respondent** | § | |

**AMENDED MOTION UNDER 28 U.S.C. §2255 TO VACATE, SET ASIDE, OR
CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY UNDER A
SENTENCE OF DEATH**

Billie Jerome Allen challenges his convictions of bank robbery and murder, and his sentences of life imprisonment without parole, entered in this Court in Cause No. 4:97-CR-00141 ERW/TCM.  This amended motion is intended as a substitute for  the original motion filed on December 11, 2007.  It supersedes the earlier motion.  In support of his motion, Mr. Allen says as follows:

**Introduction**

Mr. Allen was convicted of both counts of a two-count indictment alleging bank robbery which resulted in death and murder.  He was sentenced to life imprisonment without parole on the bank robbery count, and death on the murder count.  In addition to being placed in the position of defending his life twice for what was essentially the same offense, Mr. Allen was severely disadvantaged in his trial, and the proceedings were fundamentally unfair.

The first unusual problem faced by Mr. Allen and his defense team was the extremely short period of time between indictment and trial, and more specifically

1

between the notice to seek the death penalty and the trial.  That period was only six months, or about half the average time before trial in federal death penalty cases according to statistics maintained by the Federal Death Penalty Resource Counsel.[1]  As the specific grounds for relief below demonstrate, this truncation of the trial process resulted in insufficient time for counsel to prepare the case adequately for trial.

Second, Mr. Allen and his attorneys experienced unusual difficulty in communicating.  Mr. Allen's cognitive and emotional difficulties (which were not adequately explored by trial counsel) complicated attorney-client communication in this case.  As a result of his frustration with his inability to get trial counsel to listen to him or to act on the information he provided, Mr. Allen requested, during trial, that his lead trial counsel be replaced.  The court declined to do this.  Lead trial counsel acknowledges that he and Mr. Allen had grave difficulties in communicating, and raised the issue that the motion to replace him should have been granted in the motion for new trial filed in Mr. Allen's case.  This affected both the guilt-innocence and penalty phases of the trial, and to some extent the appeal process.

Third, the problem of lack of time was complicated by the fact that lead counsel engaged a mitigation investigator shortly after the death penalty notice was filed but failed to provide him with the necessary tools to perform his investigation.  Trial counsel did not provide the investigator with information about Mr. Allen, the offense, and potential mitigation issues.  Approximately six weeks before the trial was scheduled to

---

[1] See Declaration of Kevin McNally, Director of the Federal Death Penalty Resource Counsel project, attached as Exhibit 1.  According to Mr. McNally, "The average time between indictment and trial in federal capital cases is 20.5 months.  The average time between indictment and notice to seek the death penalty is 12.5 months.  The average time between notice to seek the death penalty and trial is approximately 12.6 months."

begin, trial counsel called the investigator to discuss beginning the trial preparation. At that point, the investigator declined to participate, saying that he could not adequately investigate the case and prepare for trial in the remaining time. He explained to trial counsel that a mitigation investigation necessarily takes longer than six weeks, because witnesses must be interviewed several times as the continuing investigation yields new facts. Since trial counsel had anticipated that the primary investigation for the penalty phase would be performed by the investigator, they had not done much of that investigation themselves before they learned of the investigators withdrawal.

Trial counsel were able to engage another investigator, but, as THAT investigator testified at the hearing on Mr. Allen's motion for continuance, he had inadequate time to complete his investigation. He agreed to participate only because he believed, in light of the fact that a continuance had been denied, that some investigation was better than none. Had there been time to perform a complete mitigation investigation, trial counsel could have presented evidence from Mr. Allen's paternal family, evidence concerning Mr. Allen's mother's increasing problem with alcohol abuse, evidence concerning Mr. Allen's limited intelligence, and evidence that Mr. Allen's brain was severely compromised from lead poisoning as a child. This highly mitigating evidence was not available to the jury which sentenced Mr. Allen to death.

It is clear that the mitigation evidence that trial counsel DID present was not lost on the jury. Their verdicts indicate that they considered, and found to be true, a number of mitigating factors. They even wrote in three mitigating factors of their own which they derived from the evidence. However, none of the jurors found brain damage to be a

3

mitigating factor.  Had the evidence concerning Mr. Allen's childhood lead poisoning and its effects been clearly presented, it is likely that the jury would have found this mitigating factor, as well as the factors related to diminished capacity, severe mental or emotional disturbance, and diminished ability to deal with stress.  And, had more evidence concerning Mr. Allen's troubled childhood been presented, it is likely that more of the jurors would have responded favorably to the mitigators related to that evidence, such as "Billie Allen's family was unable to assist him in dealing with his problems in making the transition from childhood to adulthood," which was found by only two jurors, and "Billie Allen was born with a predisposition toward alcoholism or other substance abuse," which was found by only one juror.

As a result of this "rush to judgment," and the other difficulties with the case, Mr. Allen was not afforded his right to a fair trial and his conviction and sentence cannot stand.

**Procedural background.**

The offense involved in this case was the robbery of the Lindell Bank in St. Louis, Missouri, and the killing of Richard Heflin, a bank security guard, in connection with that robbery.  Mr. Allen, along with his co-defendant Norris Holder was indicted in two counts for his alleged part in this offense on April 17, 1997.  Thereafter, the United States Attorney for the Eastern District of Missouri received authorization from the United States Department of Justice to seek the death penalty for Mr. Allen and Mr. Holder. Notice of intent to seek the death penalty was filed on August 8, 1997.

4

Since the federal death penalty was reinstituted, it has been applied in a racially discriminatory manner, with blacks authorized at a higher rate than whites and cases with white victims authorized and sentenced to death at a higher rate than cases with non-white victims.  Mr. Allen was a victim of both of these discrepancies, since he is an African-American charged with killing a white man.  Information about this pattern was available to trial and appellate counsel, but neither made any objection to the authorization or imposition of a death sentence based on this information.

The cases of Mr. Holder and Mr. Allen were severed for trial, and Mr. Allen was tried first beginning on February 9, 1998, just six months after the case had been authorized for the death penalty.  Several pretrial hearings were conducted, including a lengthy hearing on Mr. Allen's motion to suppress his confession, evidence seized in a search of his home, and his identification in a lineup.  Mr. Allen's motion to dismiss the indictment or preclude the death penalty because the indictment did not state the aggravating circumstances on which the government would rely to establish eligibility for the death penalty was also denied.  In a final pretrial motion, Mr. Allen unsuccessfully sought a continuance due to difficulties in conducting the penalty phase investigation.

Throughout the trial, Mr. Allen was required to wear a "stun belt," a device that officers can use to deliver a painful electric shock to a prisoner who disobeys their commands.  The use of this device rendered even more stressful to Mr. Allen the trial for his life.  Mr. Allen was fully cooperative with the United States Marshals and with the custodial staff where he was held during trial.  No acts or threats by Mr. Allen precipitated the use of the stun belt; he had little prior history of violence.  Mr. Allen also

5

suffered considerable pain and discomfort during the trial from medical problems, including allergies which caused swelling of his eyes and severe headaches.  At times he was so uncomfortable that he sought to be excused from the courtroom.  These factors made it difficult for him to concentrate and understand the proceedings fully.

Throughout the trial, the judge required that the prospective jurors (and, later, the selected jurors),  be addressed and referred to exclusively by their juror numbers.  The court made no explanation to the jurors for this policy.  Trial counsel made no objection to this procedure, which had the effect of making the jurors suspect that they were in some danger with regard to their service.

Mr. Allen, who was ill with allergy symptoms, left the courtroom before the defense completed announcing its peremptory strikes.  Before leaving, he informed trial counsel of three specific prospective jurors who he believed merited strikes.  All three of these jurors served on the jury.

The defense objected to five peremptory strikes exercised by the government on the ground that they were made because of racial discrimination.  After hearing the prosecution's explanations for the strikes, the trial court, finding no evidence of intentional racial discrimination, overruled the objections.

During the first phase of trial, defense counsel made the court aware that  the same bank had been robbed during the trial, and that the story had been covered by the local news media.  Counsel requested that the jurors be examined individually to determine whether they were aware of this event, and its effect on them.  The request was denied.

6

When the government presented evidence concerning Mr. Allen's confession, Officer Henderson, who had acknowledged in the pretrial hearing that he was aware of Mr. Allen's invocation of his right to counsel, changed that testimony and stated that he was not aware that Mr. Allen had requested a lawyer when Mr. Allen asked to talk with him.

Also during the guilt-innocence phase of the trial, considerable evidence was presented concerning the positive characteristics of the victim, Richard Heflin. Trial counsel filed a motion in limine before trial concerning such evidence, but made no objection during trial after the motion in limine was denied.

After the jury convicted Mr. Allen of both counts of the indictment, the penalty phase was conducted. The government presented extensive victim impact evidence concerning Mr. Heflin during this phase; defense counsel made no attempt to limit this testimony. Mr. Allen presented evidence concerning his difficult upbringing, and expert testimony that he suffered from possible brain damage resulting in a learning disorder and post-traumatic stress disorder.

In their penalty phase argument, the prosecutors, without objection by the defense, referred to Mr. Allen as a "murderous dog," improperly denigrated the mitigating evidence, and sought to inflame the jurors by references to victim impact testimony. The jurors sentenced Mr. Allen to life in prison without parole on Count 1, the bank robbery count, and to death on Count 2, the murder count. A motion for new trial was denied, and Mr. Allen was formally sentenced on June 4, 1998.

Mr. Allen appealed his conviction and sentence.  The issues raised in his appeal were:

1.  18 U.S.C. §3591 et seq., the Federal Death Penalty Act of 1994, is unconstitutional because:

a) §3592(c), which permits the Government to define non-statutory aggravating factors when it seeks a death sentence, fails to limit and guide the sentencing discretion of jurors as required by the constitutional prohibition against cruel and unusual punishment; reflects an impermissible delegation of legislative authority to the executive branch; and violates the Ex Post Facto Clause by allowing prosecutors to enhance the punishment for a crime after its commission.

b) §3591(a) permits the arbitrary imposition of the death penalty by relaxing the standard for admission of evidence at the penalty phase; under the statute the Federal Rules of Evidence do not apply at the penalty phase.

c)  The provisions for appellate review of death sentences in §3595(a) single out condemned defendants for circumscribed appellate review and the failure of the Act to require proportionality review permits arbitrary imposition of death sentences.

2.  The indictment in this case was inadequate to charge a crime punishable by death because it failed to allege the existence of aggravating factors which are the unique indicia of capital offenses.

3.  The confession introduced into evidence and attributed to Mr. Allen should have been suppressed because it was obtained in violation of Mr. Allen's Fifth and Sixth Amendment rights.

4.  The trial court abused its discretion by denying Mr. Allen's motion for continuance to permit a full penalty phase investigation to occur..

5.  Counsel for the Government committed prosecutorial misconduct when they failed to inform defense counsel before trial that two prosecution witnesses, who gave statements provided to defense counsel suggesting that Mr. Holder had shot Mr. Heflin, had recanted those statements and would (and did) testify at trial that Mr. Allen shot Mr. Heflin.

6.  The trial court created undue risk to Mr. Allen's rights to be free from involuntary self-incrimination and cruel and unusual punishment, and his rights to enjoy due process of law and equal protection of the law, by affording Government counsel access to statements made in a pretrial psychiatric evaluation performed by a government expert; the information concerning that evaluation was improperly shared with the prosecutor's despite the establishment of a "Chinese wall" within the U.S. Attorney's office.

7.  The trial court committed plain error in failing to take remedial action sua sponte when Government counsel referred to Mr. Allen as a "murderous dog" during closing argument.

8.  The government's introduction of emotionally charged victim impact testimony from many of Mr. Heflin's relatives, friends, and colleagues was calculated and likely to produce a verdict informed by emotion rather than reason.

9.  Mr. Allen was entitled to have the jury instructed during the penalty phase of trial that the law never requires a jury to impose a sentence of death.

10.  The submission of two capital counts to the jury at the penalty phase of trial was precluded by the Double Jeopardy Clause and the legislative history of 18 U.S.C. §924(j).  The double submission, which required the jury to go through the weighing process twice, unduly highlighted the option of a death sentence and improperly enhanced the likelihood that jurors who initially considered death inappropriate eventually would vote for such a sentence.

The Eighth Circuit Court of Appeals affirmed Mr. Allen's conviction and sentence on April 12, 2001 in Cause No. 98-2549.  *United States v. Allen,* 247 F.3d 741 (8th Cir. 2001).  Rehearing was denied on July 24, 2001.  Mr. Allen then sought certiorari in the United States Supreme Court.  On June 28, 2002, That Court  granted certiorari, vacated the judgment, and remanded the case to the Eighth Circuit for reconsideration in light of the recent Supreme Court decision in *Ring v. Arizona*, 536 U.S. 584 (2002). *Allen v. United States,* 536 U.S. 953 (2002).  On remand, a panel of the Eighth Circuit found constitutional error in the failure of the indictment to include aggravating factors, and that the error was not harmless beyond a reasonable doubt.  *United States v. Allen*, 357 F.3d 745 (8th Cir. 2004).  On rehearing, the *en banc* court reversed the panel, finding the error harmless.  *United States v. Allen*, 406 F.3d 940 (8th Cir. 2005).  The

10

U.S. Supreme Court denied review on December 11, 2006. *Allen v. United States*, 127 S.Ct. 826 (2006).

On December 15, 2006, Mr. Allen filed a motion for appointment of habeas corpus counsel.  Pursuant to 18 U.S.C. §3599(a)(2), the undersigned counsel were appointed on March 1, 2007.

**Facts of the offense.**

On the morning of March 17, 1997, two men parked a minivan in front of the Lindell Trust Bank in St. Louis, climbed out of the car wearing masks and carrying semi-automatic rifles, and walked into the bank lobby. (T. VII[2]: 231; XI: 53-54, 59, 110).  One of the men fired his rifle twice or three times as he entered the lobby.  (T. VII: 117, 125, 231, 249).  Richard Heflin, the bank's armed security guard, was shot and fell to the floor.  (T. VI: 76-77, 97; VII: 126, 233).

The intruder who had fired his rifle yelled, "Everybody get the fuck down." (T. VII: 231).  A bank employee who had been standing in front of the teller counter jumped over the counter.  (T. VII: 127, 232).  The gunman in the lobby walked toward him and fired at him, but the employee was not injured.  (T. VII: 232).  The gunman then shot Mr. Heflin again as he lay on the floor.  (T. VI: 100; VII: 129).  Mr. Heflin was mortally wounded.  (T. VIII: 141-42, 145).

The other intruder (not the man who had shot Mr. Heflin) went directly behind the bank counter and filled a money bag with currency from the tellers' cash drawers.  (T.

---

[2] This and similar references are to the trial transcript.  It should be noted that each volume of the transcript begins with page 1.

VII: 132, 235, 241).  After the man behind the counter had gathered the cash, both robbers left the bank.  (T. VII: 133).

William Green, who had driven to the bank to cash a check and had heard shots coming from inside the bank, saw the two men leave the bank and re-enter the van.  (T. VIII: 139).  According to Mr. Green's trial testimony, the man who got into the driver's seat was carrying a money bag.  (T. VIII: 160).  Betty Thompson, a bank customer who also was outside the building during the robbery, saw the gunmen arrive and enter the bank, emerge afterward, and get into the van.  (T. VII: 75-82).  Ms. Thompson testified at trial that the man who left the bank with the money bag got into the driver's seat of the van.  (T. VII: 82).

The robbers drove away from the bank, onto an adjacent highway, then into a park.  (T. VIII: 160-63)  A fire started inside the van.  (T. VIII: 164, 203, 217).  The driver, later identified as Norris Holder, was on fire when he emerged.  (T. VIII: 203-04, 234).  Police officers arrested him immediately afterward near the vehicle.  (T. VIII: 165, 222).  A passenger in the van ran into a wooded area of the park and was not captured.  Mr. Holder later identified the fleeing passenger as Mr. Allen.

Police officers arrested Mr. Allen at a house in St. Louis  at around 2:00 a.m. the following morning.  (H.T. 5/16/97[3]: 142-46).  They took him to police headquarters, placed him in a small interrogation room, and handcuffed him to a table.   (H.T. 5/16/97: 146-47, 152, 191-93).  Mr. Allen remained handcuffed to the interrogation room table until approximately 10:00 a.m.   (H.T. 5/16/97: 192-93).  According to police, he was

---

[3] The reference is to the transcript of the hearing on Mr. Allen's motion to suppress evidence, which was conducted on May 16, 1997.

advised of his constitutional rights several times.  (H.T. 5/16/97: 146-47, 152, 192-93, 244).

Around 4:20 a.m., Federal Bureau of Investigation Agent Janet Hartman came to interview Mr. Allen and began to advise him of his constitutional rights once again. (H.T. 5/16/97: 80, 88).  Mr. Allen interrupted Agent Hartman and stated that he wished to have an attorney appointed to assist him.   (H.T. 5/16/97: 88-89, 202).  Agent Hartman ended the conversation.   (H.T. 5/16/97: 90, 202).  No police officer or prosecuting official made any attempt to secure counsel for Mr. Allen for the remainder of the morning.  (H.T. 5/16/97: 90, 201, 257-58).  Mr. Allen was not permitted to make any telephone calls after having requested a lawyer; he was held "incommunicado." (T. 9: 200-02).

A homicide detective, who acknowledged that the entire homicide division was notified early in the morning that Mr. Allen had requested an attorney, testified that at approximately 10:15 a.m. Mr. Allen insisted on discussing the bank robbery with the Deputy Commander of the St. Louis Police Department homicide unit.   (H.T. 5/16/97: 249,  259-60, 284).  According to police witnesses, Mr. Allen recanted his request for an attorney and made a detailed statement in which he admitted having participated in the bank robbery and having shot Mr. Heflin.  (T. 2/17: 9-13).  Mr. Allen was identified as one of the perpetrators in a lineup or photo lineup by several witnesses.

13

**Grounds for relief**

Unless otherwise noted, none of the specific grounds for relief presented below has previously been presented in any court.  In these grounds, the phrase "effective assistance of counsel" refers to the constitutional right conferred upon Mr. Allen by the Sixth Amendment to the United States Constitution, and construed by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), and its progeny, including *Evitts v. Lucey*, 469 U.S. 387 (1985) (right to effective assistance of direct appeal counsel).

**A.   Mr. Allen was denied effective assistance of trial and appellate counsel in connection with his motion to suppress evidence of his confession.**

**Supporting facts.**  During the hearing on the motion to suppress evidence of Mr. Allen's confession, the government presented evidence through FBI Agent Hartman that when she began to read Mr. Allen his rights early in the morning of his arrest, Mr. Allen requested an attorney.  Officer Harper then testified that, after he was told he had been identified in a lineup, Mr. Allen made a request to speak with Officer Henderson, whom Mr. Allen knew from the investigation of the death of Mr. Allen's friend, and retracted his previous assertion of his right to an attorney.  Officer Harper said he, and all the other officers involved in the case, had learned that Mr. Allen had requested an attorney, and therefore did not initiate contact with Mr. Allen, but Mr. Allen had contacted Officer Henderson.  Mr. Allen told his trial attorneys that this was not true, and that the officer had initiated the conversation.  Trial counsel attempted to present Mr. Allen's testimony,

but the court ruled that if he testified, he would be subject to full cross-examination.  At the close of the hearing, the court gave trial counsel the opportunity to submit a written offer of proof concerning Mr. Allen's testimony, as well as any legal argument concerning limitation on the scope of cross-examination.  The docket sheet does not reflect any memorandum or offer of proof by counsel between May 16, 1997, when the evidentiary hearing was held, and June 16, 1997, when the magistrate judge issued his report and recommendations.  An offer of proof was submitted, but it was late (June 19, 1997), after the evidence was already closed.  In his offer of proof, Mr. Allen asserted that he had never been warned of his rights until he spoke with Agent Hartman.  He further stated that after he had invoked his right to counsel, he was questioned by Officer Nickerson.  He was never told of his right to counsel at the lineup, and never requested to speak with agents before Officer Henderson began to question him.  The trial court ruled that Mr. Allen's confession was voluntary and admissible.

Officer Henderson, Officer Harper's superior who took Mr. Allen's statement, testified at the pretrial hearing and at trial that he was aware that Mr. Allen had requested an attorney before Mr. Allen made his statement.  At trial, Officer Henderson testified that he did NOT know that Mr. Allen had been informed of his rights before Officer Henderson interviewed him.  Officer Harper, on the other hand, testified at trial that it was Officer Henderson who had informed him that Mr. Allen had requested an attorney.  The pretrial hearing testimony of both officers that they knew Mr. Allen had requested an attorney and made sure he was withdrawing that request was now suspect, since Officer Harper said he relied on Officer Henderson for his knowledge of

15

the request for an attorney, and Officer Henderson said he was unaware of the request. Trial counsel failed to re-urge the pretrial motion at that point.

On appeal, the suppression issue was raised entirely as a failure to honor Mr. Allen's request for an attorney.  In making that argument, counsel on appeal failed to mention the discrepancy in testimony between the trial and pretrial testimony of Officers Harper and Henderson.  Moreover, counsel on appeal failed to raise (for plain error at least) the trial court's refusal to consider Mr. Allen's testimony without full cross-examination.  This ruling of the trial court violated *Simmons v. United States*, 390 U.S. 377 (1968), which held that a defendant may not be forced to waive his right to remain silent at trial in order to testify on a motion to suppress, but counsel on appeal did not raise this issue, nor did they argue the facts contained in Mr. Allen's offer of proof.

Had any or all of these deficiencies in the representation of Mr. Allen not occurred, there is a reasonable probability of a different outcome.  Mr. Allen is entitled to a new trial.

**B.  Mr. Allen was denied his rights to the presumption of innocence, to be present at his trial, to effective assistance of counsel, to be free of cruel and unusual punishment, and to due process of law Under the Fifth, Sixth, and Eighth Amendments to the United States Constitution, because he was required by the court to wear a stun belt, and neither trial counsel nor appellate counsel challenged this ruling; the prejudice to Mr. Allen was compounded by the failure to provide him with adequate medical treatment during trial.**

**Supporting facts:**  Mr. Allen was forced to wear restraints during the guilt and penalty phases of his trial.  He was made to wear a shock or stun belt.  A shock belt is an electric shocking device that is worn around the waist.  The belt can be activated by

16

a remote control device from up to 300 feet away. Once activated, the belt delivers an eight second, 50,000 volt shock that cannot be stopped. The high-pulsed electrical current travels through the body along blood channels to nerve pathways. The shock knocks down most of its victims, causing them to shake uncontrollably and remain incapacitated for up to forty-five minutes.

Mr. Allen was not disruptive in any court proceeding nor was there any cause to restrain him. The trial court simply informed the parties that Mr. Allen would be wearing a stun belt. A stun belt, like shackles, is an extreme security measure. Because no specific reasons existed or were advanced showing the need for restraints, the trial court violated constitutional law requiring a hearing and an opportunity to be heard on the issue of need as well as a showing of need prior to restraining a criminal defendant. Mr. Allen's due process rights were violated.

A criminal defendant has a constitutional right to appear unrestrained before his jury because, in part, restraints negate the presumption of innocence. Unjustified restraint negates that presumption. The right to a fair and impartial jury is a fundamental right. Making Mr. Allen appear before the jury in restraints is an inherently prejudicial practice at the guilt and penalty phases of trial.

Even if the jurors were unaware of the stun belt, Mr. Allen was. The belt compromised his ability to communicate with and assist his counsel in his own defense. Mr. Allen was warned by security personnel not to make any sudden moves to avoid what he was told would be an extremely painful shock. This affected his ability to concentrate on his trial and communicate with his counsel. Mr. Allen's ability to

17

concentrate was further compromised by the fact that he was ill through much of the trial. As a result of allergic symptoms, his eyes were swollen, and he suffered from headaches. He complained of these symptoms to the jail personnel where he was being held, but they did not provide him with medication adequate to alleviate the symptoms. The symptoms made him so uncomfortable that at various times, he requested to be excused from the courtroom. Although he was actually present during the trial, he was unable fully to concentrate and understand the proceedings. (As will be described more fully below, Mr. Allen was already at a disadvantage in understanding the trial proceedings because of his low intelligence level.) As a result of these factors, Mr. Allen was constructively denied his right be present at trial.

Trial counsel's performance fell below the prevailing professional norms when counsel did not object to the trial court forcing Mr. Allen to wear a stun belt at the guilt and penalty phases of his trial. An objection to this would or should have been sustained because there was no cause to restrain him. Mr. Allen was prejudiced by counsel's failure in that he was forced to appear before his jury in restraints, stripping him of his presumption of innocence, impairing his ability to assist in his defense, and creating an inference that he was dangerous. Trial counsel should also have insured that Mr. Allen had adequate medical care so that he would be able to concentrate on his trial.

Appellate counsel's performance also fell below the prevailing professional norms when counsel failed to raise as a plain error issue on direct appeal that Mr. Allen was forced to wear a stun belt at the guilty and penalty phases of his trial. The judge's

18

actions in forcing Mr. Allen to be restrained violated Mr. Allen's due process rights.

Mr. Allen is entitled to a new trial.

**C. Mr. Allen was denied due process of law, the right to be free of cruel and unusual punishment, and effective assistance of counsel because the federal death penalty, as administered is disproportionately and unconstitutionally applied by race, and trial and appellate counsel made no objection based on this fact.**

**Supporting facts.** Some twenty years ago, the federal death penalty was reintroduced; since then it has been used as a tool of federal law enforcement with escalating frequency. Statistics maintained by the Federal Death Penalty Resource Counsel (FDPRC) as a part of its mandate to facilitate the effective defense of federal capital cases demonstrate that the authorization process by which the Department of Justice (DOJ) selects those defendants who will face the death penalty, and subsequent Government decision-making regarding whether to accept pleas to sentences less than death, are impermissibly influenced by the defendant's race, in violation of the Equal Protection Clause of the Fifth Amendment and the Cruel and Unusual Punishment Clause of the Eighth Amendment. The statistics maintained by FDPRC as of 2000, which includes the period when Mr. Allen's death sentence was authorized, indicate the following:

- Of the one hundred and ninety-nine (199) individuals against whom the Department of Justice has authorized or directed local authorities to seek the death penalty, seventy-six percent (76%) are non-white and fifty-two percent (52%) are black;

- The death penalty is authorized by the DOJ more than three times as often against non-whites as against whites; the death penalty is authorized by the DOJ more than twice as often against blacks as against whites;

- Of those cases for which DOJ has authorized the death penalty to be sought, 47.5% of all white defendants obtain a plea resulting in a sentence less than death, while only 27.2% of all blacks are permitted to plead to sentences less than death and only 29.1% of non-whites as a whole are permitted to plead guilty in exchange for a sentence less than death;

- White defendants thus receive non-death sentences in exchange for pleas at 1.7 times the rate of black defendants and 1.65 times the rate of non-white defendants as a whole;

- There are three times as many blacks, and four times as many non-whites, as whites among the condemned on the federal death row.

The 1998 statistics, although incomplete, are particularly telling. They indicate that although the overall authorization rate was 21% for cases in which the race of the victim and defendant were available, the death penalty was authorized more than twice as often—44% of the time—for African-Americans accused of killing whites.

Current statistics from the FDPRC show that matters have not changed for the better. As of June 26, 2006 of the 382 people for whom the DOJ authorized a capital prosecution, the racial composition is as follows: (1) African-American, 195 (51%); (2) Latino, 64 (17%); (3) Caucasian, 104 (27%); and (4), "other," 19 (5%).Thus, of the 382 death-authorized prosecutions, 71% were against people of color.

These statistics create a startlingly strong inference that Government decisions regarding who will face the death penalty—at both the selection stage and the plea bargaining stage—are impermissibly influenced by the race of the defendant. The disparate impact of these decisions is clear:  Despite the fact that whites are arrested for homicide in roughly the same numbers as blacks, they occupy only twenty percent of those condemned to die under federal law, while blacks account for sixty percent of federal death row.

In addition to the improper influence of the race of the defendant on the authorization decision, the race of the victim also impermissibly influences both the authorization and sentencing process.  A significantly higher percentage of cases involving white victims are authorized for death than cases involving non-white victims. And, when those cases involving white victims go to trial, there is a much greater likelihood of a death sentence.

The pattern was evident during the time Mr. Allen's death sentence was authorized.  "Between January 27, 1995 and July 20, 2000, Attorney General Reno's approval rate for capital prosecutions was .37 (61/167) in white-victim cases and .21 (81/383) in minority-victim cases—a 16 percentage point difference that is statistically significant at the .001 level."  David Baldus, Memo to Sen. Russell D. Feingold (June 11, 2001),

Continuing the pattern, during the administration of Attorney General Ashcroft, 32% of cases involving white victims which were presented for authorization were authorized for death, while only 19% of cases involving non-white victims were so

authorized.  During the administration of Attorney General Gonzalez, the difference was even more striking:  41% of cases involving white victims were authorized, while only 16% of cases involving non-white victims were authorized.  (Overall authorization rates were roughly equal; 22% for Attorney General Ashcroft and 20% for Attorney General Gonzalez.

As for the sentencing pattern,  "The death sentencing rate from 1995 to 2000 was twice as high in white victim cases as it was in minority victim cases.  Nationwide, the rates were .05 (10/198) for the white victim cases versus .02 (10/446) for the minority victim cases. In the eleven states in which death sentences were actually imposed, the rate in the white victim cases was .17 (10/59) versus .08 (10/119) in the minority victim cases - a nine percentage-point difference."  David Baldus, Memo to Sen. Russell D. Feingold (June 11, 2001),

While some of the statistics above are based on periods after Mr. Allen's trial, evidence of the developing pattern was available to trial counsel from the Federal Death Penalty Resource Counsel by or before the time of trial; that office has maintained this data since 1992.  Trial counsel's failure to obtain the information and pursue a pre-trial challenge to the Government's racially discriminatory actions was deficient performance.  Had counsel performed effectively, it is reasonably likely that the Government would have been precluded from seeking death.

Alternatively, the statistics regarding the application of the federal death penalty since Mr. Allen's trial constitute new evidence that warrants review of this ground for relief. Although a racially disproportionate pattern of capital charging, standing alone,

may be insufficient to demonstrate purposeful discrimination on the basis of race, the numbers here warrant discovery and an evidentiary hearing concerning the Government's authorization process and plea bargaining decisions. Accordingly, Mr. Allen will pursue both remedies in a to-be-filed motion.

Mr. Allen has proffered evidence that shows that the racial discrepancy present in the administration of the Federal Death Penalty Act, is the work of a single decision maker, i.e. the DOJ. This fact renders the above statistics all the more probative of discrimination. The Court should grant relief from Mr. Allen's death sentence because the Government's charging and plea practices, as well as the sentencing patterns, are influenced by the race of defendants and victims, in violation of the Fifth and Eighth Amendments.

### D.  Mr. Allen was denied effective assistance of counsel in connection with jury selection.

**Supporting facts.**  During jury selection, the court directed that the prospective jurors were to be addressed and referred to only by their numbers.  The court made no explanation to the prospective jurors as to why this procedure was being used which might have protected Mr. Allen from the jurors' likely conclusion that he was dangerous to them.  Nor did the court make any finding that there was a strong reason to believe the jury needs protection.  Such a finding would not have been justified by the evidence. Mr. Allen had no history of violence, and there was no suggestion that he or anyone else connected with the case posed a threat to jurors.

23

At the time of trial, *United States v. Darden*, 70 F.3d 1507, 1532-1533 (8th Cir. 1995), required that in order to empanel properly an anonymous jury, a court must make a finding that there is a specific reason the jury needs protection, and must take precautions to insure that the defendant's rights are not violated by the procedure. Trial counsel made no *Darden* objection to this procedure, and the procedure was not challenged on appeal. Because there was no explanation given to the jurors, this procedure improperly suggested to them that they might be in some danger as a result of their jury service, in violation of Mr. Allen's right to an impartial jury and to the presumption of innocence under the Fifth and Sixth Amendments. Assuming that this error is not so fundamental as to require no showing of prejudice, there is a reasonable probability of a different outcome had it not occurred.

Defense counsel also unreasonably and ineffectively failed to consult with Mr. Allen concerning defense peremptory challenges. At the time the defense counsel were preparing to make their peremptory challenges, Mr. Allen became ill. Nonetheless, he provided his counsel with a list of three prospective jurors who, in his opinion, should be the subject of strikes. Trial counsel failed adequately to consider Mr. Allen's opinions and desires concerning which prospective jurors should be stricken; several of Mr. Allen's choices were not stricken and served on the jury. Had Mr. Allen's wishes been respected, there is a reasonable probability of a different outcome.

Finally, trial counsel unreasonably abandoned a *Batson v. Kentucky*, 476 U.S. 79 (1986), challenge. At the conclusion of the jury selection, trial counsel objected to the strikes of several black jurors as improper discrimination under *Batson*. The objection

24

was overruled. Appellate counsel failed to include this ground for relief in Mr. Allen's direct appeal. Had they done so, there is a reasonable probability of a different outcome.

Individually and cumulatively, these errors require that Mr. Allen be granted a new trial. Alternatively, the erroneous empanelling of an anonymous jury at least was prejudicial on punishment, where Mr. Allen's dangerousness was a proper consideration for the jury. Therefore, if not entitled to a new trial, he is at least entitled to a new penalty phase.

### E. Mr. Allen was denied effective assistance of counsel when the jurors possibly learned that the Lindell bank had been robbed again.

On February 24, 1998, during the first phase of the trial, trial counsel informed the court that the Lindell bank had been robbed again. He requested that the court inquire individually of the jurors whether they had heard of this event and what, if any, impact it had on them. The jurors in this case were not sequestered during trial, so although they had been admonished to avoid news reports concerning the trial, it is possible that they were exposed to this event. The trial court denied the request to examine the jurors. Trial counsel sought no further relief during trial.

Potentially, the knowledge that the bank had been robbed again would have improperly influenced the jurors to believe that they needed to convict Mr. Allen in order to send a message to the community that the Lindell Bank could not be robbed with impunity. This was an improper consideration, but it is hard to see how the jury could have avoided being influenced by it if they were aware of the second robbery.

Trial counsel mentioned this problem in their motion for new trial, but they did not seek leave of court to interview the jurors, nor did they request the opportunity to present evidence on this issue at a hearing.  Had such a hearing been held, and had it been discovered that one or more of the jurors were prejudiced by this event, there is a reasonable probability of a different outcome.

Appellate counsel failed to raise the denial of the examination of the jurors as a ground for direct appeal.  Had they done so, there is a reasonable probability of a different outcome.

### F.  Mr. Allen was denied effective assistance of trial counsel when trial counsel failed to object to his being tried for two versions of the same offense as a violation of the Double Jeopardy Clause.

**Supporting facts:**  The two counts with which Mr. Allen was charged involved virtually identical facts.  Appellate counsel raised this as a double jeopardy issue, but the court of appeals reviewed only for plain error since the issue was not preserved prior to trial.  Had trial counsel raised the issue, there is a reasonable probability of a different outcome.  Mr. Allen is entitled to a new trial.  In the alternative, if prejudice is found only as to penalty, Mr. Allen is entitled to have his sentence reformed to life imprisonment without parole or to a new penalty phase.

**G.  Mr. Allen was denied effective assistance of counsel when trial counsel failed to request a hearing regarding the late-provided evidence that government witness Thomas Mundell was a paid government snitch, and when appellate counsel failed to raise an issue concerning Mr. Mundell on direct appeal; he was also denied due process of law when the government failed to disclose impeaching information before trial.**

**Supporting facts:**  After trial, the prosecutor wrote to Mr. Allen's counsel and disclosed for the first time that government witness Thomas Mundell, who testified about Mr. Allen's participation in the purchase of a bulletproof vest, had been a paid informant for the United States government.  Despite the fact that Mr. Mundell had been paid considerable amounts of money over a long period, the prosecutor stated that he was unaware of Mr. Mundell's status prior to the sending of the letter.

Subsequently, Mr. Allen's counsel included the late-provided notice as a ground for a motion for new trial.  Counsel did not request a hearing on the motion, and no hearing was held.  Therefore, the court never had a chance to hear how it was that government prosecutors were unaware that their own witness had been a paid informant for the same government for which they worked.  Ruling on the issue, the court treated this as newly discovered evidence, rather than as a *Brady v. Maryland*, violation.  But because knowledge of government agents is imputed to the prosecutor under *Brady v. Maryland* 373 U.S. 83 (1963)*,* and *Kyles v. Whitley*, 514 U.S. 419 (1995), Mr. Allen should have been required to show only a reasonable probability of a different outcome, rather than the more stringent standard for newly discovered evidence, that the evidence would likely result in an acquittal upon retrial.  *United States v. Parker*, 267 F.3d 839, 846 (8th Cir. 2001).

Mr. Mundell's testimony was important to the government's case.  By showing Mr. Allen's alleged presence at the purchase of a bullet-proof vest by Mr. Holder, the government was able to argue that Mr. Allen was involved in the planning and preparation for the robbery.  And, the fact that he knew a bulletproof vest was purchased arguably showed Mr. Allen's awareness that violence would be involved in the robbery.  Had Mr. Mundell's testimony been impeached with the fact that he was in the business of testifying for money, trial counsel could have softened considerably the importance of this evidence.

Appellate counsel abandoned this ground for relief, entirely failing to raise it. Since it had been raised in at least a cursory way in the motion for new trial, it would have received plenary review.  Had trial and appellate counsel performed effectively, there is a reasonable likelihood of a different outcome.  Mr. Allen is entitled to a new trial.

### H. Mr. Allen was denied effective assistance of counsel when trial counsel failed to obtain relief when the government suggested he had gang connections.

**Supporting facts.**  Prior to trial, the court granted a motion in limine protecting Mr. Allen from government insinuations that he was a member of a gang. Notwithstanding this order, when questioning Officer Thomas Carroll, the prosecutor called the jury's attention to the fact that Mr. Allen was wearing blue undergarments when arrested.  The color blue is commonly associated with the criminal Crips gang. Several moments later, the officer was asked to describe a tattoo that Mr. Allen had on

his arm.  The officer responded that it said, "Crips."  This was apparently incorrect; the actual tattoo said "cash."  In response to a defense objection, the court instructed the jury to disregard the "Crips" reference.  Trial counsel requested no further relief.  Later, when cross-examining defense witness Eric Taylor, the prosecutor called attention to Mr. Taylor's blue clothing in an attempt to insinuate that *he* had gang connections. There was no objection by trial counsel.  Had Mr. Allen's counsel requested relief as to these references, there is a  reasonable probability that a mistrial would have been granted, and that the outcome of any subsequent proceeding would have been different.

Appellate counsel failed to raise this ground for plain error review on appeal. Had they done so, there is a reasonable probability of a different outcome. Mr. Allen is entitled to a new trial, or at least a new penalty phase.

### I. Mr. Allen was denied the effective assistance of counsel at the guilt phase of his trial by counsel's failure to use available evidence that would have established a reasonable doubt as to his participation in the charged murder and robbery.

**Supporting facts**:  Trial counsel was given voluminous discovery from the government, but failed to use information contained in the discovery documents which would have created  a reasonable doubt that Mr. Allen was present and participated in the robbery.  Among other items:

1.  Counsel failed to present evidence from a DNA report (June 5, 1997) from Donna Becherer and Kim Gorman that showed that blood from item Q-4, a white strap

found near Mr. Heflin's body, did not match either Richard Heflin or Mr. Allen. This evidence suggests the involvement of another person in the shooting.

2. Counsel failed to present evidence from a gas chromatographic analysis of the clothing seized from Mr. Allen when he was arrested which showed that the clothing was negative for the presence of petroleum distillates. This report would have impeached the testimony of one of the officers who arrested Mr. Allen the day after the robbery that Mr. Allen's clothes "reeked of smoke" at that time.

3. Counsel failed present evidence found in a report of an interview with Greg Prater and Joe Prowell in which they stated that the person they saw running through Forest Park after the van caught fire was 5'8" tall. Mr. Allen is considerably taller than 5'8".

4. Counsel failed to present evidence found in a report of an interview with James Combs, who worked at Deaconess Hospital. Mr. Combs said that on the day of the robbery, he saw a black male enter the hospital and act suspiciously. The black male exited the hospital and got in a brown Jeep Wagoneer. The black male was described by Mr. Combs as 5'10" tall wearing dark clothing, a knit cap and prescription glasses. This does not match the description of Mr. Allen, but could have been another participant in the robbery.

5. Counsel failed to cross-examine government witness Wayne Ross regarding statements he made to the FBI that on the Wednesday or Thursday before the bank robbery, a person named "JB" (rather than Mr. Allen) called for Norris Holder.

30

6.  Counsel failed to cross examine government witness Michael West, who identified Mr. Allen, with his prior statement that he did not see either suspect's face and that due to the ski mask he could not relate any age of either suspect.

7.  Counsel failed to present testimony of Broderick Bonner that on the evening when Mr. Allen and Mr. Holder allegedly met in a bowling alley, Mr. Bonner did not sit with them nor was he in a position to overhear any conversation between Mr. Holder and Mr. Allen.  Mr. Bonner also indicated that Mr. Holder did not discuss a bank robbery that night and Wayne Ross did not know anything about Mr. Holder having a plan to rob a bank.  Trial counsel were aware of these statements because they were contained in discovery documents.  This testimony would have contradicted Mr. Ross's trial testimony about overhearing a conversation between Mr. Holder and Mr. Allen about the robbery.

8.  Counsel failed to present testimony of Jeffrey Moore that when Mr.  Moore went into the bowling alley the evening that Mr. Holder and Mr. Allen allegedly met there, he saw Mr. Smith and Mr. Ross sitting at a different table from Mr. Holder.  Mr. Moore could not see who Holder was with.  Trial counsel were aware of these statements because they were contained in discovery documents.  This evidence would have contradicted Wayne Ross's trial testimony about overhearing a conversation between Holder and Allen.

9.  Counsel failed to investigate and present evidence suggested by an FBI report of an anonymous telephone call which indicated that Mr. Holder had been seen at the bowling alley discussing the bank robbery with someone other than Mr. Allen..

31

While some of these points are more significant than others, taken together, had trial counsel effectively used the discovery provided to them by investigating and presenting testimony at Mr. Allen's trial, there is a reasonable probability of a different outcome at the guilt phase.  Mr. Allen is entitled to a new trial.

### J.  Mr. Allen was denied effective assistance of counsel because of failure to investigate and present evidence at the penalty phase of his trial.

**Supporting facts:** The crime in this case took place on March 17, 1997.  Mr. Allen was indicted on April 17, 1997.  The death penalty was authorized on August 8, 1997.  The jury trial in this case began on February 9, 1998.  This was an unreasonably short span of time within which to investigate a case for life.[4]  Shortly after the death penalty was authorized, trial counsel retained Craig Haney to act as a mitigation investigator and expert in this case.  In October 1997, trial counsel sent Dr. Haney a few documents pertaining to the case, but made no effort to speak with Dr. Haney about this case until January 1998.  Although Dr. Haney was initially informed that the trial was set for February 1998, he believed that the date had been continued since he had not heard from trial counsel nor received any material from them.  The minimal contact that was made came through trial counsel's paralegal.

Dr. Haney received a few more records concerning Mr. Allen in December 1997 with a cover letter stating more records were to follow.  No additional records were received by Dr. Haney.  As of January 13, 1998, Dr. Haney had received no

---

[4]See Exhibit 1, Declaration of Kevin McNally.

investigative material generated by counsel—no information regarding the guilt phase defense, no information regarding potential mitigation witnesses, and no information regarding the prosecution case in aggravation. It was not until mid-January 1998, that Dr. Haney was informed that the case would actually go to trial in February, 1998.

When trial counsel contacted Dr. Haney on January 13, 1998, Dr. Haney informed trial counsel that the *first* stage of what was a five or six stage process of investigation and preparing a penalty phase defense had not been completed.  He said that there was no way he could possibly be prepared to assist on a trial that was scheduled to start in a matter of weeks and that the investigation could not be completed in that short amount of time.  As a result, he declined to participate further in the case.

On January 29, 1998, eight days before the trial began, counsel filed a Motion for Continuance in order to get time for a new mitigation expert, Dr. David Randall, to complete work on the case.  Counsel asked for a continuance of 120 days.  A hearing was held on the motion the next day and counsel again asked for 120 days.  In both the written motion and the hearing, counsel suggested that the problem was with Dr. Haney and his failure to respond to counsel.  In fact, the problem was that counsel had completely failed in their obligations to investigate the case and get material and records to Dr. Haney in a timely fashion.  Dr. Randall testified at the continuance hearing that he did not believe he could do an adequate job in the time available, but was prepared to assist because of his belief that something was better than nothing.

This Court denied the motion for continuance, and trial started as scheduled on February 9, 1998.

As a result of the lack of a full penalty phase investigation, trial counsel were unable to present to the jury a full picture of Mr. Allen which might have persuaded the jury to spare his life.  The list of additional evidence that follows is not intended to be exhaustive, since investigation into mitigation evidence is ongoing.  Additional evidence will only add to the necessary conclusion that Mr. Allen was denied effective assistance of counsel and a fair penalty phase.  Specifically:

1.  No witness from Mr. Allen's father's family testified.  The picture that emerged from the penalty phase testimony was that Mr. Allen only spent time with family on his mother's side of the family.  Post-conviction investigation reveals that Mr. Allen also had a significant relationship with his father (during early childhood) and his father's family. Like Mr. Allen's mother, Mr. Allen's father's family has significant issues with substance abuse and criminal behavior.  John Allen, Mr. Allen's father, has been a severe alcoholic since Mr. Allen was a child.  According to Billie Allen Sr., Mr. Allen's paternal uncle, John Allen's behavior when drunk was a source of embarrassment to Mr. Allen and his family.  Billie, Sr. was a drug addict, and Mr. Allen was aware of this and of Billie, Sr.'s gang involvement.  The father of Billie, Sr. (Mr. Allen's paternal grandfather), was an alcoholic and illiterate.

When John Allen and Mr. Allen's mother Juanita divorced, John Allen abandoned Mr. Allen and his other children.  This abrupt cessation of what had been a close relationship created severe problems for Mr. Allen.  Billie, Sr. also describes an incident

in which Mr. Allen's cousin, Cory Roy, was shot under circumstances that indicate that Mr. Allen himself may have been the intended target.  Billie, Sr. was interviewed by someone connected with Mr. Allen's defense team, but he was not called to testify.

Upon information and belief, other members of John Allen's family, and other informants, would support and provide additional information regarding  both sides of Mr. Allen's family of origin.

Mr. Allen's jury was never informed of the information described above, and it was not available to the defense penalty phase experts.

2.  There were two penalty phase experts, Dr. Michael Gelbort, a neuropsychologist, and Dr. Cuneo a clinical psychologist.  Except for a brief conversation between Dr. Cuneo and Mr. Allen's mother, which she does not recall, neither ever interviewed or spoke to Mr. Allen's family or friends.  Their testimony was based only on reports.  When they testified, they lacked significant information which they could have gained from interviews, and the immediacy which would have stemmed from personal experience with the people they were talking about.  They also were not informed of the additional information which is described in this ground.  As a result, their testimony lacked the kind of concrete experience which would have rendered it more persuasive.  In that the jury did not find that Mr. Allen suffered from either brain damage or PTSD, it is clear that the deficiencies in the expert testimony were prejudicial to Mr. Allen.

3.  Mr. Allen's mother, Juanita, did not testify at trial.  For most, or all, of Mr. Allen's childhood, she was an alcoholic.  During the post-conviction investigation,

counsel have learned that Mr. Allen's sisters would describe their mother has having "checked out" during their childhood, but they were not asked about this at trial. There was no little or mention of Juanita's drinking during the penalty phase. Such testimony from Mr. Allen's sisters; Nicole, Ann, and Yvette, all of whom testified at trial would have provided the jurors with a much fuller, richer, and truer picture of Mr. Allen's childhood and adolescence. Additional investigation has disclosed that Mr. Allen's relationship with his mother was seriously affected by the fact that her boyfriend, Louis, committed suicide. Not only was this traumatic for Mr. Allen personally, since he knew and liked Louis, but Mrs. Allen deteriorated badly after the suicide. Her drinking, which had been a problem on weekends only, spread into the week and accelerated for the next twelve or thirteen years, until she finally received treatment. This period of heavy drinking coincided with Mr. Allen's teen years. Upon information and belief, additional informants would support and augment the information concerning this issue. This information was available neither to the jury in Mr. Allen's case nor to the defense penalty phase experts.

4. Trial counsel had medical records stating that October of 1979, when Mr. Allen was approximately 26 months old, he was hospitalized from the effects of lead poisoning. Those hospital records indicate that at that time, Mr. Allen had a blood lead level of 60 mcg/dl. This is an extremely high level of lead and such a lead level is very damaging for a young child. According to Dr. Howard Hu, Chair of the Department of Environmental Health Sciences and Professor of Environmental Health, Epidemiology and Medicine at the University of Michigan Schools of Public Health and Medicine, a

36

level of 10 micrograms per deciliter in a child's blood is considered toxic, however, some studies suggest that even lower levels can cause harmful effects. There is no safe level of lead exposure. Lead is particularly harmful to developing fetuses and young children. Mr. Allen's medical records indicate that no treatment was given to Mr. Allen, although medical treatment which would have lessened the effects of the lead poisoning was available at the time the lead poisoning was discovered.

Common sources of lead exposure are house paint, leaded gasoline, and drinking water funneled through lead pipes, or copper pipes soldered with lead. Research also indicates that the top few inches of urban soil can contain a large reservoir of accumulated lead.[5] Wind blown lead-enriched soil or dust is another primary source of this neurotoxin. After lead enters the body, it circulates through the body and stored in bones, fat, organs and other body tissues, including the kidneys and liver. However, the kidneys are unable to remove lead from blood so it can eventually poison the entire body. Lead can also be stored in the bones of pregnant women, and passed to their infants.

Scientific studies now show that juvenile lead poisoning can cause a variety of permanent health effects in children, including Attention Deficit Hyperactivity Disorder, learning disabilities, and behavioral problems. Lead in the blood can also cause lowered I.Q. Other chronic or long term effects include headaches, nervous irritability,

---

[5]Medical records also reveal that as a young child Mr. Allen suffered from Pica, a disorder in which a person ingests substances that are not food, such as dirt or paint chips, for example.

severe psychological disorders, and anxiety. Juvenile lead poisoning is also associated with impulsive behavior and with violent behavior.

Lead poisoning has been linked to impaired cognitive development in infants. The danger is acute for children under the age of 6 because their brains and nervous system are still developing.  According to Dr. Donald Lewis, Professor of  Pediatrics and Neurology at Children's Hospital of the King's Daughters at Eastern Virginia Medical School in Norfolk, Virginia, a blood lead level of 60 at age 2 could result in as much as a 40 point drop in IQ.  Mr. Allen's low tested IQ suggests the influence of lead poisoning in his case.

Trial counsel unreasonably failed to consult with experts in lead poisoning and its impact upon young children.  Had counsel done so, expert testimony could have been presented which would show that Mr. Allen's mental problems (low IQ, and organic brain damage) were due, at least in part, to toxic lead poisoning.  Since the jury did not find that Mr. Allen suffered from brain damage, this deficiency was clearly prejudicial to Mr. Allen.

5.  Post-conviction investigation also leads counsel to believe that Mr. Allen is suffering from a mental disease or defect which should have been diagnosed at the time of trial.  Trial counsel made repeated references to Mr. Allen as someone who did not tell the truth or attempted to make himself appear to be something that he was not. Undersigned counsel are not trained mental health professionals but upon information and belief, allege that Mr. Allen is suffering from an undiagnosed mental illness.

6. Post-conviction investigation also leads counsel to believe that Mr. Allen may be mentally retarded. Mr. Allen's school records reveal someone who had dismal performance and record of achievement at all levels of school. Dr. Gelbort administered a WAIS-R IQ test to Mr. Allen. According to Dr. Gelbort, Mr. Allen had a full scale IQ of 82 based on the WAIS-R testing. Dr. Denis Keyes, an expert in mental retardation, explains that when the WAIS-R was administered to Mr. Allen, it was approximately 15 years out of date and a WAIS-III, the current version, should have been administered instead. Even assuming that the WAIS-R was administered properly, the fact that such an old test was administered raises the likelihood that Mr. Allen's IQ score was inflated by the Flynn Effect and is actually 4 to 5 points lower.[6] This means that Mr. Allen's true IQ is likely to be no more than 77 or 78, which means that it is conceivable that he suffers from mental retardation, or at least, that his cognitive abilities were significantly lower than the trial testimony indicated. While mental retardation bars the death penalty, severe mental impairment which is not classified as mental retardation is still relevant mitigating evidence. A person with an IQ of 77 is in the bottom 5% of the general population in intelligence. The failure of trial counsel to develop and present such evidence was prejudicial to Mr. Allen.

7. Trial counsel should have consulted with an expert with specialized knowledge of Missouri's special education laws and systems. Juanita Allen sent Ann Allen, Billie's sister, to school in Clayton, because of her significant developmental problems which could not be addressed by the St. Louis schools. Ann had severe

---

[6] The "Flynn effect" is the term used to describe the fact that as an IQ test ages, mean scores on that test rise over time. The reason for this is not clear, but the effect is well documented.

speech problems.  Juanita sent Mr. Allen to school in Clayton so that Ann would not go alone.  Mr. Allen was also diagnosed with auditory learning problems in school.  Ann received significant special education services and today is doing well.

Mr. Allen received no special education services, a fact which was shocking to Dr. Keyes.  An expert in special education could testify that someone with Mr. Allen's significant problems should have received special education assistance, assistance that made a great deal of impact upon his sister.  While some of the jurors found that Mr. Allen's educational experience was deficient, additional evidence on this issue would likely have caused the jury to give these facts greater weight.  Given the close nature of the death verdict, this deficiency in the penalty phase proceedings was prejudicial to Mr. Allen.

8.  Trial counsel should also have consulted with an expert knowledgeable about the cultural issues which arise when a child is sent from an impoverished, largely African-American inner-city school district to an affluent, largely Caucasian school district, and then returned to the inner-city district.  These transitions are especially difficult when the child has the cognitive impairments suffered by Mr. Allen.  Trial counsel repeatedly painted Mr. Allen has someone who claimed to have material items that he did not possess.  The Government repeatedly painted Mr. Allen as someone who was greedy .  Many of the character traits that were used against Mr. Allen at trial, could be explained by the unique constellation of cultural factors that occurred during his childhood.

The failure to perform an adequate mitigation investigation before trial does not merely impair the presentation of the penalty phase evidence.  Experienced mitigation experts recognize that it is important to "front-load" the mitigation themes during the guilt-innocence phase of the trial.  Here, trial counsel had only an imperfect idea of what the penalty phase evidence would be during the guilt-innocence phase; the mitigation investigation was still ongoing at that time.  As a result, they were unable to bring out aspects of the offense evidence that corresponded to the themes and evidence that would be offered in the penalty phase if needed.

As a result of trial counsel's failure adequately to investigate Mr. Allen's background and pathology, he was denied his right to effective assistance of counsel and to be free from cruel and unusual punishment.  Had this evidence been presented to the jury, there is a reasonable probability of a different outcome.  If a new trial is not granted, Mr. Allen is entitled to a new penalty phase.

### K.  Mr. Allen was denied effective assistance of counsel when trial counsel failed to object to prejudicial victim impact evidence.

**Supporting Facts:**  Counsel filed a Motion in Limine to limit the quantum of victim impact evidence introduced at trial.  The trial court denied the motion.  Counsel did not renew the motion in limine or object to the large quantum of victim impact evidence that was introduced at trial.

The victim impact evidence started at the guilt phase when the government, without defense objection, elicited information regarding the personal qualities of the victim, Richard Heflin, from the many bank employees who testified.  See guilt phase

41

testimony of; Amy Boehjle, Sandy Foppe, Michael West, Mary Garvels, Lisa Moore, and Virginia Michael.  At the penalty phase there was testimony from eleven witnesses regarding the consequences of Mr. Heflin's death.  See, penalty phase testimony of; Kelly Davis, Janice Walton, Evelyn Heflin, Sherry Holmes, Michael Heflin, Ron Tamburello, Sue Heflin, Jason Heflin, Richard Heflin, Justin Heflin, and Dana Heflin. The government argued extensively on this issue to the jury at the final arguments at the penalty phase without objection from counsel.  See Ground L below.

Counsels' conduct fell below the prevailing professional norms when they did not object to the prejudicial victim impact evidence and argument at the guilt and penalty phases of Mr. Allen's trial.  The evidence of Mr. Heflin's personal characteristics and the impact his death had upon others was not relevant to the aggravating circumstances and mitigating factors.  This evidence and argument only served to inflame the passions of the jury.

This issue was raised on direct  appeal, but was only considered for plain error. Had a proper record been made, there is a reasonable probability of a different outcome, and Mr. Allen is entitled to a new penalty phase even if he is not granted a new trial.

### L.  Mr. Allen was denied effective assistance of counsel because of trial counsel's failure to make proper objections to the government's final penalty phase argument.

**Supporting facts.**  On appeal, appellate counsel raised as plain error the prosecutor's statement in final penalty phase argument that Mr. Allen was a "murderous

dog." Reviewing for plain error only, the court of appeals denied relief. But that argument was only a small part of a pattern of prosecutorial misconduct in final argument that was not attacked by defense counsel either at trial or on appeal. The objectionable arguments fall into four categories.

1. *Improper arguments regarding lack of nexus between the offense and the mitigating evidence.* The law is clear: In imposing a death sentence, the jury must consider not only the offense, but the character and circumstances of the defendant. By repeatedly stating that the mitigation evidence was unrelated to the offense, the prosecutor encouraged the jurors to ignore this constitutional principle. The fact that the jury imposed death for one count and life for another demonstrates that this tactic worked to the prosecution's advantage.

Examples (this list is not exhaustive) include:

> And the bottom line on all those things, post-traumatic stress disorder, depression, is there any connection to this crime? And there's not. T. XIX 62.
>
> A lot of the defendant's mitigators are about what other people think about him, not what he really is. they don't know the defendant that you know. They don't know the violent man that this is. Many of the mitigators are totally unproven and some are entitled to no weight whatsoever. T. XIX 63.
>
> The fact that he had a bad father or a drinking father has nothing to do with what he did in the Lindell Bank and Trust, has nothing to do with him cold bloodedly murdering Richard Heflin. T. XIX 96.
>
> "All these mental defenses you are hearing about, there is no connection to this defendant walking into that bank and killing for money. They're just sitting out there kind of floating out in space, no nexus, no causation, no connection

43

of any kind between those little things and what this defendant did." T. XIX 100.

[W]hen you take any one of those [aggravators] and weigh them against all of the mitigators—and what are those mitigators?  When you put them all together and put them in a bag, and then you open that bag and look in there, what is it?  It's a bag of air.  It's a bag of fog.  There's nothing in there at all.  It's nothing concrete.  It's all conjecture.  There's no connection between that and this defendant's conduct on the day of this murder.  T. XIX 102

He has the nerve to come in here and say, My dad was an alcoholic and so don't impose the death sentence on me, my dad wasn't a good dad.  This is the same guy who took Justin, Jason and Richard's father from them so he could have money, and he has the nerve to come in and say, well, gee, I didn't have a good dad."  T. XIX 102

The post-traumatic stress syndrome is like a joke. T. XIX 102

And what does your common sense tell you about depression, post-traumatic stress disorder, and that he had little trouble learning in school?  Your common sense tells you these are excuses.  These are excuses for a guy who was committing one of the most violent crimes you'll ever see for one of the baseless reasons you can ever dream of: money."  T. XIX 103.

Post-traumatic stress disorder does not exist.  The diagnosis is not PTDS; it is cold-blooded killer.  T. XIX 104.

You weigh the cold-blooded murder of Richard Heflin against the evidence he put on in mitigation, that he's kind and gentle and artistic.  [H]e wasn't artistic on the day of this robbery.  What was he creating that day? Murder and mayhem, total destruction in that bank.  The evidence and the law in this case make it so clear that this defendant deserves one punishment, and it's not life in prison, it's death."  T. XIX 109.

This is not a case about a little boy, and that's why they brought that little nine year old boy in here and showed you those pictures of him when he's a little boy.  It's not about a little boy.  It's about a grown man the same age of Richard

44

Heflin when he went to Vietnam.  It's about a man his family doesn't know.  It's about a man that those teachers in grade school, ten and twelve years ago, don't know.  It's a man that you all know very well.  You know exactly what he did and what he's capable of.  T. XIX 109-110

Trial counsel did object when the prosecutor argued,

When you're weighing, when you're weighing the defendant's mitigating evidence back there and you're weighing that bag of fog, that bag of air they presented to you, weight it against the weight of Richard Heflin's body.  Because that's what this is all about –  T. XIX 108.

The jury was instructed to disregard the remark.  But trial counsel requested no further relief, and so there was no mistrial despite the fact that the curative instruction was ineffective to dispel the error.

2. *Improper emotional appeals to the jury*.  The decision to impose the death penalty must be a reasoned one, not the product of passion.  The prosecutor violated this principle and inflamed the jury when he argued, among other  instances,

He wants to go to prison for life.  he wants to go there and he wants to watch movies and read books, he wants to write letters and have visits from his relatives, he wants to exercise and play basketball and volleyball.  Don't let him down there dribbling basketballs on Richard Heflin's grave; it wouldn't be right. T. XIX 97-98.

Richard Helfin didn't think this guy with the mask, armed for war, armed to kill, was kind. lighthearted, or gentle.  He thought he was a murderous dog coming in there to kill people for money.  That's what Richard Heflin thought. T. XIX 105-106

[A]nd the terrible irony is [Mr. Heflin] survived Vietnam, survived Vietnam, managed to live through having to fight people with guns just like that, and he's killed at High Point in St. Louis City on St. Patrick's day, that is a terrible irony." T. XIX 106.

45

> You cannot find a case that more cries out for a jury to
> impose the death penalty than the facts of this case, the
> cold-blooded, wanton murder and attempted murder and
> putting other people's lives at risk for money and really for
> fun.  T. XIX 107
>
> But when you're back there I want you to remember one
> thing—three things, really: That Richard Heflin's mother on
> Christmas day will always have an empty chair at her
> Christmas table.  Justin Heflin when he's hitting a home run
> or making a great play in baseball will never look up and see
> his father sitting in those stands cheering for him.  And Dana
> Heflin, when she looks out her window and sees those
> doves on Richard Heflin's bird feeder, her heart is going to
> break yet again."  T. XIX 111

In addition to these arguments, the prosecutor spent considerable time in a totally speculative and inflammatory argument about how Mr. Heflin was shot and what his final thoughts were. T. XIX 106-107.

3. *Improper statements of concerning the prosecutor's personal beliefs and opinions.*  The prosecutor may not use his position of authority in the community to persuade the jury that, because he believes the death penalty is appropriate, it must be appropriate.  But without objection, the prosecution here did so in opening penalty phase argument:

> The next statutory mitigator that they're suggesting to you,
> that he had a sever mental or emotional disturbance.  I think
> that's a joke.  T. XIX 60.
>
> He smoked pot to self-medicate.  I think he smoked pot
> because he liked to get high.  And he always did what he
> wanted to do, not what he should do.  That had nothing to do
> with self-medication or post-traumatic stress disorder.  T.
> XIX 64.

The pattern of improper opinion statements was even more pronounced in the prosecutor's rebuttal argument.  Again without objection, the prosecutor argued:

46

> He is capable of absolute inhumanity.  I would hate to be at
> his mercy.  T. XIX 100

> I am honored to present this case on behalf of Richard Heflin
> who died doing what he always did, protecting others.  Who
> died doing what he always did, doing his duty.  T. XIX 111

4. *Improperly arguing facts not in evidence.*  In the penalty phase as in the guilt-innocence phase, the prosecutor may not argue facts not in evidence.  But without objection, the prosecutor here did so.  In opening argument, he made a totally unsupported statement comparing this bank robbery with others, about which no evidence was offered:

> This is a violent bank takeover, the kind you just don't see. ...
> The crime that was committed by these defendants is much
> greater in degree than would normally be seen in a bank
> robbery.  T. XIX 50-51.

In rebuttal, the prosecutor speculated about Mr. Allen's culpability when his friend was killed:

> He contributed to this violence [in this city] before [March
> 17th] when he apparently got Marquis killed because
> somebody was trying to kill this defendant, probably because
> he had ganked them.  T. XIX 105.

There was no objection.

The instances described above are part of an overall pattern of prosecutorial misconduct in argument.  If each of these failures to object does not individually require a new penalty phase, the cumulative impact of this improper argument was clearly prejudicial to Mr. Allen.  The failure to raise these issues on appeal was ineffective assistance of appellate counsel, If a new trial is not granted, Mr. Allen is entitled to a new penalty phase, or a new appeal.

47

**M.  Mr. Allen was denied effective assistance of trial and appellate counsel because there was no objection to the use of "pecuniary gain" as a statutory aggravator.**

**Supporting facts:**  Mr. Allen was charged with bank robbery, which includes as an element an attempt or actual theft.  To use one of the elements of the offense as a statutory aggravating circumstance violates both the Double Jeopardy Clause of the United States Constitution, which forbids multiple punishments for the same offense, and the Cruel and Unusual Punishment Clause of the Eighth Amendment to the United States Constitution.  Neither trial nor appellate counsel raised an objection to this aggravator.  Had they done so, there is a reasonable likelihood of a different outcome. If a new trial is not granted, Mr. Allen is entitled to a new penalty phase.

**N.  Mr. Allen was denied effective assistance of trial and appellate counsel because there was no objection to the non-statutory aggravator, "Was Billie Jerome Allen's conduct in committing the offenses substantially greater than that described in the definition of the crime, apart from the statutory aggravating factors?"**

**Supporting facts:**  This "aggravator" is so vague that it entirely fails to narrow the class of cases available for the death penalty, and therefore falls afoul of the Eighth Amendment to the United States Constitution.  This factor also allows for impermissible double-counting of aggravators, since it does not spell out what it is about the defendant's conduct in committing the crime that is "substantially greater in degree than that described in the definition of the crime."  Here, for example, a possible distinction which made the crime "greater in degree" than the statutory definition of the crime was the fact that the case involved spraying gunfire in a crowded bank during the course of

48

the robbery, which overlaps with one of the statutory aggravators alleged and found by the jury here, "grave risk of harm to others."

The government compounded the error in submitting this aggravator by arguing, without evidentiary support, that "This is a violent bank takeover, the kind you just don't see. . . .  The crime that was committed by these defendants is much greater in degree than would normally be seen in a bank robbery."  T. XIX: 50-51.  Not only did  the prosecutors not present any evidence about "normal" bank robberies, they invited the jury to speculate about what "greater in degree" might mean.  And, as noted above, this characterization of the robbery overlaps with the statutory aggravator "grave risk of harm."

The jurors found this non-statutory aggravating circumstance to be true.  In light of the facts that Mr. Allen was sentenced to death on only one of the two counts, and the jury identified a number of mitigating factors, this error was not harmless.  If a new trial is not granted, Mr. Allen is entitled to a new penalty phase.

**O.  Mr. Allen was denied effective assistance of appellate counsel when appellate counsel failed to provide the court of appeals with relevant authority concerning his assertion that his rights were violated when the grand jury did not hear evidence regarding statutory aggravating circumstances.**

**Supporting facts:**  After a panel of the Eighth Circuit Court of Appeals held that Mr. Allen's death sentence should be vacated because of the government's failure to present aggravating evidence to the grand jury, the *en banc* court granted rehearing and ordered re-briefing and re-argument.  In the brief, counsel for Mr. Allen failed to cite

persuasive authority that it was improper for the appellate court to speculate about what the grand jury would have done had the aggravating evidence been presented to it. The *en banc* court of appeals vacated the panel opinion and held that the error was harmless because any reasonable grand jury would have requested the death penalty. Had the relevant authority been presented to the court of appeals, there is a reasonable probability of a different outcome. If Mr. Allen does not receive a new trial, he is entitled to a new appeal process.

**P. Mr. Allen was denied due process of law and the right to be free from cruel and unusual punishment, as well as effective assistance of appellate counsel, because the jurors were not instructed that in order to impose a death sentence, they must find beyond a reasonable doubt that the aggravating evidence outweighed the mitigating evidence, and appellate counsel failed to raise this issue on direct appeal.**

The jury in this case was instructed that they must impose a death sentence if they found by a preponderance of the evidence that the evidence in aggravation outweighed that in mitigation.

Under the Federal Death Penalty Act, the jury may not recommend a death sentence unless it finds that the aggravating factors proved by the Government outweigh the mitigating factors proved by the defendant. 18 U.S.C. § 3593(e). After Mr. Allen's trial, in *Ring v. Arizona*, 536 U.S. 584 (2002) and subsequent cases, the United States Supreme Court held that a legislature's choice to make a particular finding the predicate of an increased maximum sentence triggers certain procedural requirements as a matter of federal constitutional law, regardless of how the statutory scheme itself characterizes that finding. This decision was based on the court's prior decision in

*Apprendi v. New Jersey*, 530 U.S. 466 (2000), which was decided while Mr. Allen's case was pending on direct appeal.

Since Congress chose to condition the jury's power to recommend a death sentence on a prerequisite finding that aggravation outweighs mitigation, that finding operates to increase the potential maximum sentence, regardless of whether one labels that determination a "finding of fact" or a "normative judgment." Cf. *Booker v. United States*, 543 U.S. 220, 232 (2005). (Sixth Amendment protections apply to "any particular fact that the law makes essential to [the defendant's] punishment"). 21 U.S.C. §3593(e) makes the jury's determination that aggravating factors outweigh mitigating factors "essential to" imposing a death sentence under the FPDA. *Ring*'s emphasis on~ function, rather than form, leads to the conclusion that this finding was required to be made by the jury beyond a reasonable doubt before a death sentence was legally available. Cf. *Blakely v. Washington*, 542 U.S. 296, 303-04 (2004) ("the relevant 'statutory maximum' [for purposes of *Ring*] is not the maximum sentence a [jury] may impose after finding additional facts, but the maximum [it] may impose without any additional findings").

While appellate counsel were not privy to the decisions in *Ring*, *Blakely*, and *Booker* at the time Mr. Allen's appellate brief was filed, they were clearly aware of the *Ring* indictment issue (which was raised at trial) and, in fact, raised it on appeal. When *Apprendi* was decided while the case was pending before the Eighth Circuit, it was incumbent upon appellate counsel to file a supplemental brief raising this issue, since *Apprendi* clearly applied to Mr. Allen's pending case. Alternatively, when the United

States Supreme Court remanded the case for reconsideration in light of *Ring*, appellate counsel should have broadened their objection to include the contention that the jury should have been instructed that they could not impose death without a finding beyond a reasonable doubt that the aggravating evidence outweighed the mitigating evidence. Had they done so, there is a reasonable probability that the case would have been reversed for a new penalty phase.  If a new trial is not granted, Mr. Allen is entitled to a new penalty phase.

### Q.  The manner in which the government would carry out Mr. Allen's execution would violate the Eighth Amendment.

If the United States chooses to execute Mr. Allen using its current protocol for lethal injection, the manner of carrying out his execution would violate the Eighth Amendment to the United States Constitution. The combination of drugs used, the protocol governing the execution, the use of untrained non-medical and unqualified personnel and the physical space in which the execution would be carried out, would all result in the infliction of  unnecessary pain and suffering in violation of the Eighth Amendment.

Mr. Allen contends that the execution under the current Bureau of  Prison protocols would violate the Eighth Amendment.  However, that for two reasons,  this challenge is not appropriate at this time, or in this pleading. First, since Mr. Allen's execution is far from imminent, the question  is not yet ripe.  Second, under the United States Supreme Court's decision in *Hill v. McDonough*, 126  S.Ct. 2096 (2006), a challenge to lethal injection is properly brought in a  separate civil rights action under 42

U.S.C. §1983.  Despite his contention that the issue is not ripe, Mr. Allen nonetheless raises this ground for relief to avoid a later claim of waiver.  Should this Court hold that the issue should be litigated in this proceeding, Mr. Allen will seek to amend this ground to allege additional and specific facts pertaining to this issue.  Should this Court find that the mode of execution would violate the Eighth Amendment, Mr. Allen is entitled to either a commutation of his sentence to life imprisonment or to an order requiring that any execution be carried out in accordance with the requirements of the Eighth Amendment.

**R.  Even if no one of the violations of Mr. Allen's rights listed in this petition merits relief, the effect of the cumulative violations of Mr. Allen's rights undermines confidence in the verdict, the sentence, and the operation of due process of law in Mr. Allen's case.**

While Mr. Allen was not entitled to a perfect trial and appeal, he was entitled to effective assistance of counsel and due process of law.  The cumulative and multiple violations of these rights undermine confidence in the verdict and sentence in this case.  Therefore, the writ should issue, and a new trial should be granted.

## CONCLUSION

For the foregoing reasons, petitioner Billie Jerome Allen prays the court:

1. To require the United States to file an answer in the form prescribed by Rule 5 of the Rules Governing 28 U.S.C. §2255 Cases in the United States District Court, identifying all proceedings conducted in Mr. Allen's case, including any which have not

been recorded or transcribed, and specifically admitting or denying the factual allegations set forth above;

2. Permit Mr. Allen to file a traverse to respondent's answer, responding to any affirmative defenses raised by the Answer;

3. Permit Mr. Allen to utilize the processes of discovery set forth in F. R. Civ. P. 26-37, to the extent necessary to identify and develop fully the facts supporting this petition, and any defenses raised by the respondent's answer;

4. Conduct an evidentiary hearing to resolve any factual disputes raised by the respondent's answer, or by Mr. Allen's traverse. Because Mr. Allen has alleged facts which, if true, entitle him to relief, he is also entitled to a full evidentiary hearing to establish the facts he alleges;

5. Order the respondent to release Mr. Allen from custody unless he is given a new trial or, alternatively, a new penalty phase proceeding, or, alternatively, a new direct appeal proceeding; and

8.  Grant such further relief as may be appropriate and just.

Respectfully submitted,

/s Elizabeth Unger Carlyle

Elizabeth Unger Carlyle #51877
P.O. Box 962
Columbus, MS  39701
Missouri Bar No. 41930
(816)525-6540
FAX (866) 764-1249
elizcar@bellsouth.net

Joseph M. Cleary #534292
Attorney at Law
1455 N. Pennsylvania
Indianapolis, IN  46202
(317) 630-0137
jcleary498@aol.com

**VERIFICATION**

ELIZABETH UNGER CARLYLE declares as follows:

I am an attorney admitted to practice before the courts of the states of Missouri, Mississippi and Texas, the United States District Courts for the Eastern and Western Districts of Missouri, the Northern and Southern Districts of Mississippi, the Fifth, Seventh and Eighth Circuit Courts of Appeals, and the United States Supreme Court. My office is located at 413 4th Ave. S, #17, Columbus, MS  39701.

I am authorized by Billie Jerome Allen to file the foregoing Motion Under 28 U.S.C. §2255 to Vacate, Set Aside, Or Correct Sentence By A Person In Federal Custody Under A Sentence Of Death on his behalf.  Mr. Allen is confined and restrained of his liberty at the United States Penitentiary at Terre Haute, Indiana.

I declare that the contents of the foregoing Motion Under 28 U.S.C. §2255 to Vacate, Set Aside, Or Correct Sentence By A Person In Federal Custody Under A Sentence Of Death are true except for those matters based upon information and belief and I believe those matters to be true.  The sources of my information and belief include, but are not limited to, official court records from the United States District Court for the Eastern District of Missouri and the Eighth Circuit Court of Appeals, various documents prepared during the investigation of this petition, and items in the possession of other lawyers, investigators and/or experts connected with the preparation and presentation of this case.  I make this verification on Mr. Allen's behalf because these matters are more within my knowledge than his.

I declare under penalty of perjury that the foregoing is true and correct.

/S/ ELIZABETH UNGER CARLYLE

ELIZABETH UNGER CARLYLE

February 11, 2008

CERTIFICATE OF SERVICE

I hereby certify that it is my belief and understanding that counsel for respondent, Mr. Joseph M. Landolt, United States Attorney, 111 South 10th Street, 20th Floor, St. Louis, Missouri 63102, and Mr. Steven Holtshouser, Assistant United States Attorney, 111 South 10th Street, 20th Floor, St. Louis, Missouri 63102., are participants in the Court's CM/ECF program and that separate service of the foregoing document is not required beyond the Notification of Electronic Filing to be forwarded to counsel on February 11, 2008, upon the filing of the foregoing document.

/s/ Elizabeth Unger Carlyle
ELIZABETH UNGER CARLYLE

56