**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| **BILLIE JEROME ALLEN,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )   **No. 4:07CV0027 ERW** |
| | )   **THIS IS A CAPITAL CASE** |
| **UNITED STATES OF AMERICA** | ) |
| | ) |
| **Respondent.** | ) |

**GOVERNMENT'S RESPONSE TO MOVANT'S MOTION AND AMENDED MOTION
UNDER 28 U.S.C. §2255 TO VACATE, SET ASIDE OR CORRECT CONVICTIONS
AND SENTENCES BY A PERSON IN FEDERAL CUSTODY**

**COMES NOW** the United States of America, by and through its attorneys, Catherine L.

Hanaway, United States Attorney for the Eastern District of Missouri, and Joseph M. Landolt,

Steven E. Holtshouser, and Cristian M. Stevens, Assistant United States Attorneys for said

District, and responds to movant Billie Jerome Allen's Amended Motion Under 28 U.S.C. §2255

to Vacate, Set Aside or Correct Convictions and Sentences by a Person in Federal Custody as

follows:

**TABLE OF CONTENTS**

I. Procedural Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II. History of the Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

III. Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

IV. Physical Layout . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

V. The Robbery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

VI. The Planning . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

VII. Allen's Arrest and Confession . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

VIII. The Penalty Phase . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

IX. Mitigating Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

X. The Jury's Findings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

XI. General Legal Principles Applicable To Petitioner's Motion . . . . . . . . . . . . . . . . . . . . . . . 35

     A. Standards For Relief and Evidentiary Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

     B. Procedural Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

     C. Teague Rule of Non-Retroactivity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

     D. Ineffective Assistance of Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

XII. Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

     A. Motion to Suppress Confession . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

     B. Stun Belt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

     C. Racial Discrimination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

     D. Voir Dire . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

     E. Publicity of Second Robbery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

     F. Double Jeopardy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

     G. Impeaching Information re Thomas Mundell . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

     H. Gang Connections . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

     I. Failure to Present Exculpatory Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

     J. Mitigation Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

     K. Victim Impact Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

     L. Closing Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

M. Pecuniary Gain . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140

N. Non-Statutory Aggravator  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144

O. Failure of Indictment to Allege Statutory Aggravators  . . . . . . . . . . . . . . . . . . . . . 150

P. Non-statutory Aggravators and Weighing Decision  . . . . . . . . . . . . . . . . . . . . . . . . 151

Q. Manner of Execution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

R. Cumulative Effect . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

XIII. Conclusion  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

## I. Procedural Requirements

Section 2266(b)(1)(A) of Title 28, United States Code, provides as follows:

> A district court shall render a final determination and enter a final judgment on any application for a writ of habeas corpus brought under this chapter in a capital case not later than 450 days after the date on which the application is filed.

The instant application was filed on February 11, 2008.  Therefore, this Court must enter a final judgment not later than May 7, 2009.  The 450-day time period may be delayed for not more than one additional 30-day period if this Court finds that "the ends of justice that would be served by allowing the delay outweigh the best interests of the public and the applicant in a speedy disposition of the application."  28 U.S.C. §2266(b)(1)(C)(I).

Furthermore, the Government requests that this Court decide the matter based on Allen's Petition and the Government's Response herein. Allen has had since December of 2006, when certiorari was denied, to file his petition.  He received the benefit of equitable tolling of the one-year statute of limitations found in the AEDPA.  In that time period, and during the period the Government sought extensions to file its response, Allen has not sought leave to supplement his petition.  This Court should not permit Allen to use this petition as a guise under which he may

in effect conduct discovery and re-open these proceedings.  He has had more than sufficient time to research, file and supplement his motion under § 2255.  Any further grant of time to conduct discovery or otherwise add to his petition violates the letter and spirit of the AEDPA.  Allen has taken advantage of every avenue with which to contest his conviction and sentence.  At this point, the Court should rule based on the claims raised in Allen's petition so that the sentence may be carried out.

## II. History of the Proceedings

In 1998, defendants Norris Holder and Billie Allen were convicted after separate trials of killing a security guard, Richard Heflin, during the commission of an armed bank robbery, in violation of 18 U.S.C. §2113(a) and (e) (Count I), and using and carrying a firearm during the commission of a crime of violence that resulted in the death of another person under circumstances constituting first-degree murder, in violation of 18 U.S.C. §924(j) (Count II). In accordance with the jury's recommendation, defendant Allen was sentenced to life imprisonment without parole on Count I and death on Count II.

In a decision that predated the Supreme Court's decision in Ring v. Arizona, 536 U.S. 584 (2002), the Eighth Circuit affirmed the defendants' convictions and death sentences, expressly rejecting defendant Allen's claim that the indictment violated the Fifth Amendment because it failed to allege at least one aggravating factor and one mental intent factor that would make the defendant eligible for the death penalty.  United States v. Allen, 247 F.3d 741, 761-764 (8th Cir. 2001).

After deciding in Ring that the statutory aggravating factors that define eligibility for the death penalty are the functional equivalent of offense elements that need to be unanimously

found by the petit jury under the reasonable doubt standard (and, presumably, alleged by indictment in federal prosecutions), the Supreme Court granted defendant Allen's certiorari petition, vacated the Eighth Circuit decision, and remanded the case for reconsideration in light of Ring.  United States v. Allen, 536 U.S. 953 (2002).  On reconsideration, a divided panel of the Eighth Circuit (R.S. Arnold & Melloy, JJ.; Hansen, J., dissenting in part) held that "the indictment in Allen's case failed to charge a federal capital offense, and that given Allen's timely objections this failure cannot be dismissed as harmless."  United States v. Allen, 357 F.3d 745 (8th Cir. 2004).  The majority therefore ordered that the death penalty be vacated.  In a rehearing en banc, the Eighth Circuit affirmed the convictions and sentence, holding that the Fifth Amendment defect in Allen's indictment was non-structural and the error was harmless.  United States v. Allen, 406 F.3d 940 (8th Cir. 2005) (en banc).  The Supreme Court denied Allen's petition for a writ of certiorari on December 11, 2006.  United States v. Allen, 127 S.Ct. 826 (2006).  The Supreme Court denied the petition for rehearing on February 20, 2007.  United States v. Allen, 127 S.Ct. 1361 (2007).

### III. Statement of Facts

Shortly after 10:30 a.m. on March 17, 1997, the Lindell Bank and Trust Company (hereinafter "the Bank") was robbed in a violent, terrifying, "take-over" style robbery.  The robbers, Appellant Billie Jerome Allen and Norris Holder, arrived in a stolen blue van; Holder, who was driving, left the engine running, and both robbers left the doors to the van open when they went into the Bank.

The surveillance cameras in the Bank were not activated until after the robbers had left.  Allen and Holder, dressed in dark clothes and wearing masks, entered the lobby of the Bank

heavily armed, with semi-automatic SKS assault rifles.  Shooting began immediately, and the evidence reflected that both weapons were fired during the robbery.  There were at least ten Bank employees in the lobby at the time; Richard Heflin, the security guard, who never fired a shot, was riddled with bullets and died. Although shots were sprayed around the Bank, no one else received serious physical injury.

Because of the robbers' disguises, no one inside the Bank was able to visually identify either Holder or Allen.  The United States relied upon the physical evidence collected, the testimony of bank employees and patrons, and Allen's post-arrest statements to establish the actions of Holder and Allen within the Bank.  This evidence clearly demonstrated that both Allen and Holder fired their weapons, that Allen remained near the east doors in the lobby and shot Mr. Heflin with a Chinese SKS rifle numerous times, and that Holder went over the tellers' counter and took the money.  The evidence also established that Allen fired several lethal shots into Mr. Heflin. Holder played the lead role in planning the robbery and amassing an arsenal of weapons and ammunition and other equipment for the robbery.  Holder also drove the getaway van.    It took only minutes for the robbery; Holder and Allen then fled in the waiting blue van, attempting their getaway.  Their plan was to burn the getaway van,  switch to a second stolen van in nearby Forest Park, and then switch to a third car parked in a Barnes Hospital parking garage. The second car contained a loaded weapon.  However, the getaway van burst into flames a short distance from the second van.  Norris Holder was captured as he fled the burning van;  Billie Jerome Allen was arrested in the early morning hours of March 18.

**IV. Physical Layout**

The Bank is located at 6900 Clayton Avenue in St. Louis, Missouri, near Highway 40

and McCausland Avenue. (Tr. Trans. 2-17-98, pp. 79-80).  There are entrances to the lobby on both the east and west sides of the Bank.  Each entrance has a double set of glass entry doors from the outside of the Bank to a vestibule and another set from the vestibule to the bank lobby.  Along the south wall of the lobby, from east to west, is the safe deposit area including the Bank's vault and the tellers' line.  These areas are separated by a counter from the rest of the lobby.  Behind the tellers' line is a wall which separates the tellers' line from the drive up tellers' area and a series of rooms used by safe deposit customers.  (Government's Trial Exhibit 22A).  The eastern entrance to the Bank is adjacent to Forest Avenue.  Directly across Forest Avenue to the east of the Bank is a bank parking lot.  The drive-up area is on the south side of the bank. (Government's Trial Exhibits 2A, 22A).

## V. The Robbery

At approximately 10:35 a.m. on March 17, 1997, there were ten Bank employees within the bank lobby.  Kelley Davis, the customer service manager, was at her desk across the lobby from the tellers' line.  (Tr. Trans. 2-17-98, p. 92).  Amy Boehlje was behind the counter in the safe deposit area and Sandy Foppe was in the work room portion of the safe deposit area. (Tr. Trans. 2-17-98, p. 92).  Four tellers were behind the tellers' counter:  Lisa Moore, on the east end of the counter; Mary Garvels, next to her; and Laura Riehmann and Virginia Michaels at the teller window immediately to the right of the break in the counter.   Michael West, a maintenance man, was transacting business at Lisa Moore's window.  (Tr. Trans. 2-18-98, pp. 93-94, 122-123).  Debbie Stoltz was in the reception area in the middle of the lobby.  Richard

Heflin, a uniformed, armed security guard for the Bank[1] (Tr. Trans. 2-17-98, p. 94; Tr. Trans. 2-18-98, p. 105), was on duty and in the general area of the snack table; he had been talking with Michael West.  (Tr. Trans. 2-17-98, p. 94).

March 17, 1997, St. Patrick's Day, was also Customer Appreciation Day at the Bank.  In the lobby bank employees had set up a snack table with punch and cookies next to the teller counter.  (Tr. Trans. 2-18-98, pp. 176-177).  A St. Patrick's Day parade was scheduled to begin at noon in the area, known as "Dogtown."  (Tr. Trans. 2-18-98, p. 224).  At approximately 10:15 - 10:30 a.m., members of the "Sterling Club,"  a senior citizens club, who had gathered in the lobby of the Bank, left on a bus for a trip to one of the area gambling boats. (Tr. Trans. 2-18-98, p. 177).

Betty Thompson, a bank customer, had parked in the east parking lot and was walking up to the east door of the bank when she saw the blue van drive up to the Bank at a fast rate of speed and screech to a halt in front of the Bank on the wrong side of the street.  (Tr. Trans. 2-18-98, pp. 76-77).  Two men with rifles got out of the van; she could not identify them because they were masked, but she noticed that the driver walked with a limp.  (Tr. Trans. 2-18-98, pp. 78-80).   (Norris Holder lost the lower part of his right leg when he attempted to hop a train at the age of 15; however, he was fitted with a prosthesis and was able to play basketball and football. (Tr. Trans. 2-18-98, pp. 6-7)).  Ms. Thompson testified that the men left the doors to the van open.  (Tr. Trans. 2-18-98, p. 82).  She saw the two men run into the Bank, and within a few

---

[1]Mr. Heflin had been married for six months to Dana Heflin, an assistant vice-president at the Bank.  Although Dana Heflin normally worked in the lobby area of the Bank, on the morning of March 17 she was working at another Lindell Bank & Trust facility.  (Tr. Trans. 2-18-98, p. 288).

seconds she heard about four or five gunshots.   She returned to her car and called 911 on her cell phone.  (Tr. Trans. 2-18-98, pp. 80-81).

At approximately 10:35 a.m., Virginia Michael, the teller supervisor, was standing at her window and observed a person entering the bank.  She testified that he "came in shooting" at the area where Richard Heflin was.  (Tr. Trans. 2-18-98, p. 294).   He moved toward the safe deposit area, and toward Richard Heflin, and as he did so she saw him continue to move his gun lower and lower.  (Tr. Trans. 2-18-98, p. 295).   Although none of the eyewitnesses inside the Bank ever saw the faces of the robbers, the evidence clearly indicates that Billie Allen was the man seen repeatedly firing at Mr. Heflin.

Kelley Davis was standing at her desk, talking on the telephone.  She heard what sounded like firecrackers, and as she looked up and at the east doors of the lobby, she saw a man holding a gun.  (Tr. Trans. 2-17-98, p. 95).  The gun, a long black gun with a wood handle, was pointed at Richard Heflin, and Ms. Davis observed fire coming out of the end of the barrel.  She observed Heflin being shot in the left leg; the leg blew back and blood flew out of it.  Mr. Heflin's eyes and mouth were wide open, and he looked shocked.  His hands were out to his side with his palms wide open.  (Tr. Trans. 2-17-98, pp. 97-99).

Ms. Davis glanced back at the assailant, and observed fire still coming out of the gun; she then looked back at Mr. Heflin, and observed that he had fallen on the floor on his back.  She observed that his holster was empty, but that his gun was not in his hands.  (Tr. Trans. 2-17-98, pp. 98-99).   Although she was unable to see the shooter, because she was now crouching down, she heard more gunfire, and observed Mr. Heflin's stomach explode and blood fly out of it.  Mr. Heflin was lying on the floor helpless and not moving at the time of the gunfire.  (Tr. Trans. 2-

17-98, pp. 100-101).   Ms. Davis then got under her desk and called 911.  While on the telephone, she heard voices or a voice in the far corner of the lobby near the tellers and the safe deposit area, and also noticed a shadow in front of her desk.  (Tr. Trans. 2-17-98, p. 101).

Sandra Foppe, who was in the work room portion of the safe deposit area, testified that she heard a noise that sounded like firecrackers going off, looked up and saw Mr. Heflin fall. She then heard more shots, and observed blood and pieces of Mr. Heflin's uniform flying around.  She also saw gunsmoke and pieces of carpeting in the air.  (Tr. Trans. 2-18-98, pp. 125-126, 135).  Michael West took off running and dove over the teller counter.  (Tr. Trans. 2-18-98, p. 127).  She observed one of the bank robbers, dressed in dark clothes, swing his feet over the gate into the tellers' area.  (The gate was next to where Richard Heflin lay dying.)  She noticed that the soles of the robber's shoes were black, and identified the shoes Holder was wearing when he was arrested, Exhibit 35(e), as the shoes that she had seen.   (Tr. Trans. 2-18-98, pp. 128-130; Tr. Trans. 2-20-98, pp. 164-165).  The robber, who was holding a gun with a banana clip, went over a second gate and behind the tellers' area.  (Tr. Trans. 2-18-98, p. 131).  Another man was standing in front of her with a gun pointed at Mr. Heflin and telling her to get down, and then pointed the gun at her.  (Tr. Trans. 2-18-98, p. 131)

Michael West corroborated Ms. Davis's and Ms. Foppe's descriptions of the attack on Richard Heflin.  West testified that he was standing at Lisa Moore's teller station when he heard a noise, turned around, and saw a masked man coming in carrying a rifle pointed up in the air. When the man saw Mr. Heflin, he pointed the gun at him and shot him.  After Mr. Heflin fell down, the man walked over on top of him and fired repeatedly.  (Tr. Trans. 2-18-98, pp. 154-156).  Meanwhile, West saw the second masked man, who was wearing a long coat and carrying

a rifle, approach and go over the teller counter.  Virginia Michael also observed the man going behind the teller counter with a gun in his hand.  (Tr. Trans. 2-18-98, pp. 297-298).  West testified that he turned and ran, and jumped over the counter and left by an exit door in the basement.  (Tr. Trans. 2-18-98, pp. 159-160).  Lisa Moore observed the gunman who had shot Mr. Heflin walk toward Michael West, at which point West jumped over the table and ran away.  (Tr. Trans. 2-18-98, pp. 232-233).  The gunman then turned toward Ms. Moore, who got down on the floor.   Ms. Michael testified that as Mr. West jumped over the counter, she heard gunshots.  (Tr. Trans. 2-18-98, pp. 297-298).

Ms. Moore testified that she noticed the presence of the second gunman standing behind her; he said "Bitch, I say, 'Get down.'" (Tr. Trans. 2-18-98, p. 234). He took money out of her drawer, dropping a pack of $20 bills on her in the process.  She testified that at some point he fired his weapon.  (Tr. Trans. 2-18-98, pp. 235-236).  He then said, "I am going to hit the back." A voice responded back to him, "Fuck the back.  Get the bitch down now."  (Tr. Trans. 2-18-98, pp. 236-237).  At that time, the robber near her headed toward the other end of the tellers' counter, toward Ms. Michael; then he came back.  After arguing between themselves, the robbers left the bank.  Ms. Moore then stood up and set off the alarms and cameras, which were triggered to operate when one of the tellers pulled bait money from his or her drawer.  (Tr. Trans. 2-18-98, pp. 238-239).

After the robbers left, the employees began to survey the scene.  Several testified that they noticed bullet holes sprayed all over the building, and that the lobby was filled with smoke. (Tr. Trans. 2-18-98, pp. 135, 162).  Sandra Foppe testified that after the robbers left, she got up, and saw Mr. Heflin lying on the floor, his hand on his stomach.  He was grey.  (Tr. Trans. 2-17-

98, p. 134). A short time later police and paramedics arrived; the paramedics worked on him for a while, and then took him away. She learned shortly thereafter that he was dead. (Tr. Trans. 2-18-98, pp. 136-137). An audit reflected that approximately $51,949.00 had been taken. (Tr. Trans. 2-20-98, p. 7).

Outside the Bank, Betty Thompson, the bank customer who had seen two men run into the Bank, was still on the phone to 911 when she saw the men come out. The man carrying a bulky blue bag, the one who limped, got in on the driver's side of the van, and the van sped off. (Tr. Trans. 2-18-98, pp. 82, 84). She identified the same van in Forest Park later that day. Tr. Trans. 2-18-98, p. 85). Alma Gilliam, another bank customer, was approaching the Bank when she saw the van parked in front with its doors open. She heard what sounded like gunshots, returned to her car, and attempted to call 911 on her cellular phone. She was unable to get through, and drove out of the parking lot. She stopped her car at the corner, and observed one of the robbers get into the passenger side of the van. He took his mask off and she saw his face. After about thirty seconds to one minute, the other robber came out, got into the van and drove away. (Tr. Trans. 2-18-98, pp. 315-318, 320). The van was being followed by a Jeep, and as the van went by, she observed the license number. She then proceeded to a gas station in the area, and gave one of the attendants the license number. (Tr. Trans. 2-18-98, pp. 323-324). Later in the day she identified the van in Forest Park. (Tr. Trans. 2-18-98, p. 325). The next day she identified Billie Allen as the person she saw get into the passenger seat of the van after the robbery. (Tr. Trans. 2-18-98, pp. 330-331).

William Green, an attorney and former prosecuting attorney, was in the middle of the six drive-through lanes at the Bank and noticed the blue van parked outside the bank with its doors

open and unoccupied. When the teller came over the intercom, he heard what he believed to be shots inside the bank, and he saw the teller duck down or step behind a wall. He then saw two individuals come from the Bank and get in the van. Each individual was carrying a rifle, and the driver was carrying a bag. (Tr. Trans. 2-19-98 and 2-23-98, pp. 157-160). He followed the van as it left the Bank and entered the eastbound ramp to Highway 40. He continued to pursue it when it exited a short distance down the highway onto the Hampton-Forest Park exit. (Tr. Trans. 2-19-98 and 2-23-98, pp. 161-162). He observed the van stop just before the intersection of Hampton and Wells Avenue in Forest Park. He heard some popping noises and saw the passenger exit the van. He also saw smoke. The van then began to roll forward onto Wells Avenue, about twenty or thirty yards. (Tr. Trans. 2-19-98 and 2-23-98, pp. 163-164). While he pulled up and continued to observe, the driver exited the van, and there appeared to be a struggle outside the van between the driver and two park workers. Meanwhile, a police car arrived. There was smoke coming from the van, and it became fully engulfed in flames. (Tr. Trans. 2-19-98 and 2-23-98, pp.165-166). Mr. Green testified that the van was in his sight during the entire series of events, and that he did not see anyone else get into the van. (Tr. Trans. 2-19-98 and 2-23-98, pp. 165-166).

Keith Smith, an employee of the City of St. Louis Parks Department, was driving with a co-worker westbound on Wells toward Hampton Avenue when he saw the van on fire. He saw the driver get out; the driver was on fire also. He and his co-worker got out of their truck and went over to the driver. They assisted him to the ground to extinguish the fire. (Tr. Trans. 2-19-98 and 2-23-98, pp. 201-205). By that time the police had arrived and taken him into custody (Tr. Trans. 2-19-98 and 2-23-98, p. 206). The driver was Norris Holder.

Meanwhile, at approximately 10:35 a.m., Captain Robert Oldani of the St. Louis Metropolitan Police Department had just returned from roll call to a command van set up at the intersection of Clayton Avenue and Art Hill Place in the Dogtown area; he was in command of the Hibernians Parade for St. Patrick's Day. (Tr. Trans. 2-19-98 and 2-23-98, pp. 15-17). He was advised that a citizen had reported persons armed with guns entering the Bank. (Tr. Trans. 2-19-98 and 2-23-98, p. 18). He and two other officers were the first to respond to the scene. The robbers had left. When he entered the lobby through the east doors, he noticed a revolver on the floor near the doors, about ten feet from Mr. Heflin. (Tr. Trans. 2-19-98 and 2-23-98, pp. 19-20). The revolver was fully loaded and had not been fired. (Tr. Trans. 2-19-98 and 2-23-98, p. 38). To his left, he saw Mr. Heflin on his back, bleeding profusely. The carpet where Mr. Heflin was lying had been ripped by gunfire. (Tr. Trans. 2-19-98 and 2-23-98, pp. 26). In front of him Captain Oldani saw the tellers; some were still behind the teller windows and others were huddled together on the other side of the bank. (Tr. Trans. 2-19-98 and 2-23-98, pp. 21-22). He immediately ordered an urgent ambulance and the city EMS and fire department responded within ten minutes. He also secured the scene. (Tr. Trans. 2-19-98 and 2-23-98, pp. 21-22).

The police began processing the crime scene at the Bank. From the area on Forest Avenue in front of the Bank where the getaway van had been parked, they found a black stocking hat, an audio C.D.[2] and miscellaneous papers from the van. (Tr. Trans. 2-19-98 and 2-23-98, pp. 37-38). Also in the street outside of the east bank entrance they found two live cartridges. (Tr. Trans. 2-19-98 and 2-23-98, p. 38). In the east vestibule between the sets of

---

[2]In "Set It Off," a movie Holder and Allen watched before the robbery, a bank robber tosses C.D.s from stolen getaway vehicles.

glass doors was a live cartridge, and another live round was nearby. (Tr. Trans. 2-19-98 and 2-23-98, pp. 43, 94). Four more live rounds were recovered from behind the tellers' line and another by the gate which leads from the lobby to the safe deposit area. (Tr. Trans. 2-19-98 and 2-23-98, pp. 44, 47-48, 53, 56, 83, 85, 89-90; Government's Trial Exhibit 22A). Nine bullet fragments were recovered from the floor in the area where Mr. Heflin fell. (Tr. Trans. 2-19-98 and 2-23-98, p. 54). The carpet was damaged by bullets striking it in the area of Mr. Heflin's crotch. (Tr. Trans. 2-19-98 and 2-23-98, pp. 26, 42). Other bullet fragments were found behind Lisa Moore's teller station, beneath a desk directly in front of the area where Amy Boehlje took cover, just inside the east bank doors and imbedded in the interior portion of the south outer wall to the Bank. (Tr. Trans. 2-20-98, pp. 82, 90-91, 92; Government's Trial Exhibit 22A). Sixteen (16) spent shell casings were recovered within the bank.[3] Two were found by chairs just inside the east lobby doors and another just to the west of the doors. Three were recovered near the location Mr. Heflin fell. Three were found near the check desk in the lobby. Two more were directly in front of the teller line and one was behind the line. Two were recovered from the safe deposit area near the vault. Police recovered two casings from the area of the new accounts desk which is across the lobby from the teller line. (Tr. Trans. 2-19-98 and 2-23-98, pp. 38, 40-41, 45, 57-59, 61, 64-66, 83-84, 86-87, 91; Government's Trial Exhibit 22A). Pieces of carpet were blown from the area where Mr. Heflin fell and landed across a counter in the safe deposit area. (Tr. Trans. 2-19-98 and 2-23-98, p. 93; Government's Trial Exhibit 22A).

---

[3]Both the Russian and Chinese SKS rifles are semi-automatic weapons. In a semi-automatic weapon, each time the trigger is pulled, a bullet is fired and a spent shell is thrown from the weapon. The recovery of sixteen (16) spent shell casings means at least sixteen (16) shots were fired inside the Bank.

There was a considerable amount of damage from the bullets fired within the bank. One bullet penetrated two chairs by the east door and then struck the floor in front of the safe deposit area. Another bullet passed through one of the chairs. A bullet ricocheted off of the floor close to the location of Mr. Heflin's left leg as he lay on the floor. Several bullets struck the floor in the area of his crotch. There was extensive damage to the carpet in that area. A bullet passed through the counter in the safe deposit area, struck a desk leg and fragmented. Had this bullet not hit the desk leg, it could have hit Ms. Boehlje. Higher on the wall above this spot was another bullet hole. A bullet went through the gate between the lobby and safe deposit area, passed through three interior walls and landed against the south exterior wall of the bank. Another bullet passed through the wall behind the tellers' counter and landed near the south exterior wall. Both this bullet and the one just previously described passed through the wall behind Lisa Moore's teller station. A bullet struck the tile floor immediately in front of the teller line near the spot where Mr. West jumped the counter. Two bullets struck the wall behind Virginia Michael's teller station. (Tr. Trans. 2-19-98 and 2-23-98, pp. 44-58, 83-87 ; Tr. Trans. 3-2-98, pp. 44-52; Government's Trial Exhibits 3B, 3C, 22, 22A).

Emergency rescue workers arrived at the Bank, treated Mr. Heflin, and took him to Barnes Hospital. When he arrived, he was moribund; he did not have a measurable blood pressure, was not breathing on his own, and had no obvious evidence of neurologic functioning. (Tr. Trans. 2-19-98 and 2-23-98, p. 8). The trauma surgeon who treated him stated that "this weapon was obviously a high velocity weapon and it caused a tremendous amount of tissue destruction." (Tr. Trans. 2-19-98 and 2-23-98, p. 9). The gunshot wound to the left leg shattered the thigh bone and severed the major blood vessel going down the leg, and vital structures in the

abdominal cavity had been hit. (Tr. Trans. 2-19-98 and 2-23-98, pp. 9, 117-18).   The trauma team was unable to revive him, and he was pronounced dead at approximately 11:10 a.m. (Tr. Trans. 2-19-98 and 2-23-98, p. 10).

An autopsy revealed Mr. Heflin suffered at least eight (8) discrete bullet entry wounds and numerous puncture wounds caused by bullet fragments.  At least four of the bullet wounds were potentially deadly. (Tr. Trans. 2-19-98 and 2-23-98, pp. 128-129, 131). Only a wound to the left leg, a wound to the right thigh and a wound to the left knee were consistent with Mr. Heflin having received them while he was standing.   (Tr. Trans. 2-19-98 and 2-23-98, pp. 128, 130, 134).  Three of the lethal wounds entered through the buttocks, shattered the pelvis and massively damaged the abdomen.  (Tr. Trans. 2-19-98 and 2-23-98, pp. 118, 120, 122-123, 143). The bullets which caused these wounds apparently ricocheted off of the floor and struck Mr. Heflin as he lay on his back on the floor.  (Tr. Trans. 2-19-98 and 2-23-98, pp. 117, 122).  7.62 by 39 millimeter bullets relating to these three wounds were recovered: one from the kidney, one from the liver and a third from the abdomen near the spinal column.  (Tr. Trans. 2-19-98 and 2-23-98, pp. 118, 121, 123).  The wound which nearly severed his left leg was also lethal.  (Tr. Trans. 2-19-98 and 2-23-98, p. 128).  The wound to the right thigh shattered his femur.  Bullets and bullet fragments were also recovered from Mr. Heflin's right thigh, left thigh and left knee. (Tr. Trans. 2-19-98 and 2-23-98, pp. 127-128).  All of these bullets and fragments were taken to the police laboratory for comparison.  Mr. Heflin also received less serious wounds to his left hand and lower left leg as well as two clusters of puncture wounds from fragments.  (Tr. Trans. 2-19-98 and 2-23-98, pp. 136. 138-139). He was alive when he received all of these wounds. (Tr. Trans. 2-19-98 and 2-23-98, p. 141).  He was shot with "hollow point" ammunition, which is

more destructive than non-hollow point.  (Tr. Trans. 2-19-98 and 2-23-98, p. 119).  Some of the wounds were consistent with the shooter moving toward Mr. Heflin's left as he shot.  (Tr. Trans. 2-19-98 and 2-23-98, pp. 125, 141).  Upon examination of Mr. Heflin's clothing, a criminalist found over twenty (20) holes and rips to his shirt, t-shirt and trousers and corresponding damaged areas to his jockey shorts.  (Tr. Trans. 2-24-98, p. 89).

Police rapidly arrived at the scene of the burning van in Forest Park.  John Ackermann, a St. Louis City police officer, received a call about the robbery at about 10:45 a.m. and arrived at the scene in Forest Park in time to see both the passenger and the driver exit the van.  He observed the passenger, Allen, run across a path and into a wooded area of the park; he also observed the driver, Holder, leaning into the van.  (Tr. Trans. 2-19-98 and 2-23-98, pp. 218-220).  He ordered Holder to get down on the ground and crawl to him; he could hear rounds of ammunition going off inside the van and the van was in flames.  Holder repeatedly refused to do so, but finally went to the ground, whereupon Ackermann handcuffed him, after a struggle, and pulled him to safety.  (Tr. Trans. 2-19-98 and 2-23-98, pp. 220-221).

Billie Allen had run into a wooded area.  He encountered a City Forestry employee, Bobby Harris, who was working with another employee, Bruce Norman, in Forest Park hooking up a wood chipper to the back of a truck.  Harris testified that a man came running toward him; he was patting the top of his hair.  He stopped and asked if they were hiring; Harris noticed that there was smoke in the distance behind the man.  Harris and Norman gave the man a ride to the Metrolink Station; he paid them $30 apiece.  (Tr. Trans. 2-19-98 and 2-23-98, pp. 220, 243, 247-248, 251).  He attempted to buy Norman's hat from him, but Norman refused.  (Tr. Trans. 2-19-98 and 2-23-98, p. 251).  Harris identified Allen in a lineup the next day as the man he had seen

18

in Forest Park.  (Tr. Trans. 2-19-98 and 2-23-98, p. 257).[4]

The getaway van was "fully involved" in fire when the fire department arrived and put it out. Two weapons were seized from the van after the fire was extinguished.   Holder's weapon, the Russian-made SKS with a bayonet and an extended magazine known as a banana clip attached to it, Government's Trial Exhibit 38,  was on the floor between the driver's and passenger's seats.  The Russian SKS still had some cartridges in the extended magazine at the time of the fire.  (Tr. Trans. 2-20-98, p. 80).   Allen's weapon, the Chinese SKS, Government's Trial Exhibit 37, which did not have a clip, was on the floor in front of the passenger's seat.  It was not loaded at the time of the fire. (Tr. Trans. 2-20-98, p. 78-79).  Burned money was attached to the remains of the stock of the Russian SKS.  A large quantity of partially burned money was found strewn about the front of the van.  Police also seized a burned magazine, Government's Trial Exhibit 53, attached to the Russian SKS  Tr. Trans. 2-20-98, p. 81), and four other banana clips (Government's Trial Exhibit 39) from the van, (Tr. Trans. 2-20-98, p. 82). The four magazines were of the extended type usable only in the altered Russian SKS, (Tr. Trans. 2-25-98, p. 60), and had been consumed in the fire; they had exploded areas within them, indicating that there had been a "cook-off" of live ammunition.   (Tr. Trans. 2-25-98, p. 61). Also seized from the van were 85 fire-damaged shells, caliber 7.62 by 39mm; 79 .30 caliber

---

[4]Lakeshia Williams, who had seen Billie Allen the night before the bank robbery, saw him the afternoon of the bank robbery.  She noticed that, unlike the night before, he now had a burn on one of his ears.  (Tr. Trans. 2-24-98, pp. 134, 144-145). Marcella Chowning, who had been with Lakeshia Williams and Billie and Norris the night before the robbery also noticed Allen's blister the next day.  (Tr. Trans. 2-24-98, p. 195).  When Allen was arrested early in the morning after the robbery, he reeked of smoke.  He had burn blisters on his right ear and right nostril, and his hair was singed.  He also had a burn on his wrist.  (Tr. Trans. 2-20-98, p. 162-165, 177).

bullets; 8 burned 12 gauge shotgun shells, and one loaded round of 7.62 by 39mm ammunition. (Tr. Trans. 2-20-98, pp. 97-98).   A Radio Shack transceiver and yet another (the sixth) banana clip were recovered from the street by the burning van.  There were 18 live rounds of 7.62 by 39 millimeter ammunition in this banana clip.  (Tr. Trans. 2-20-98 pp. 76-77).

Police also found Allen's leather jacket on a hill near the scene, and retrieved from it three shotgun shells, Government's Trial Exhibit 47,  and five stripper clips of ammunition for fast reloading, four of them fully loaded and holding ten rounds of 7.62 by 39 mm ammunition, and one of them partially loaded; in total, there were 44 rounds of ammunition loaded in the stripper clips and 6 loose live cartridges, Exhibit 46,  in the pockets of the jacket.  In the front pocket of the leather jacket were three Winchester 12 gauge shotgun shells loaded with triple aught buck.  (Tr. Trans. 2-20-98, pp. 69-72; Tr. Trans. 2-25-98, p. 71).

The Russian SKS, the Chinese SKS and all of the cartridges, shell casings and bullets recovered during the investigation were taken to the St. Louis Metropolitan Police Department Laboratory for analysis and comparison.  Firearms examiner Frank Stubits reached the following conclusions:

The Russian-made SKS was a 7.62 X 39 mm calibered semiautomatic rifle with a bayonet attached and a loaded extended magazine.  In the magazine were three spent shell casings, three "cooked-off" shell casings and one burnt bullet.  The "cooked-off" casings were a result of the fire; the live cartridges in the magazine exploded within it, erupting from the magazine and leaving remnants of ammunition.  (Tr. Trans. 2-25-98, pp.  61-62).  The Russian SKS, which was designed to hold only eleven rounds of ammunition, had been modified to accept the extended magazine or "banana clip," which held 37 rounds of ammunition.  The

Russian SKS was reloaded by exchanging an empty "banana clip" for a full one.

The Chinese-made SKS was also a 7.62 X 39 mm calibered semiautomatic rifle. Unlike the Russian SKS, it had not been altered to accept banana clips. It had a fixed magazine and held 11 rounds when fully loaded. It was not loaded at the time of the fire; the magazine was still attached and was empty and undamaged. (Tr. Trans. 2-25-98, p. 59-61). The Chinese SKS was designed to be reloaded by means of a "stripper clip" of the type found in Allen's jacket pocket. Each "stripper clip" held ten rounds of ammunition and was designed to reload the SKS quickly. (Tr. Trans. 2-25-98, pp. 60-61).

A total of one hundred eighty-four (184) 7.62 by 39 millimeter rounds were recovered during the course of the investigation. (Tr. Trans. 2-25-98, pp. 68). All of this ammunition was high powered, Russian made, military-style ammunition of the hollow point design. Hollow point ammunition is designed to mushroom open upon impact to create more damage. (Tr. Trans. 2-25-98, p. 68-70). Twenty-one (21) 12 gauge shotgun cartridges were also recovered.

Of the sixteen shell casings recovered from within the Bank, eight were positively identified as having been fired by Allen's Chinese SKS. Another three were consistent only with having been fired by the Chinese SKS.[5] Of the remaining five rounds, three could only have been fired by Holder's Russian SKS, and two could have been fired by either of the weapons. (Tr. Trans. 2-25-98, pp. 73, 82-86, 88).

The bullets recovered from Mr. Heflin's liver, right thigh, left thigh and bullet fragments from the knee could not be positively identified to either firearm due to mutilation of the bullets.

---

[5]This total of eleven rounds accounts for all of the rounds that the Chinese SKS could have held without reloading. It also explains why the Chinese SKS was not loaded at the time of the fire in the getaway van. It had been fired in the Bank until it was empty.

These items could have been fired from either firearm.   (Tr. Trans. 2-25-98, pp. 92, 94).   The bullets recovered from the lethal wounds to Mr. Heflin's abdomen[6] and kidney were positively fired by Allen's Chinese SKS. (Tr. Trans. 2-25-98, p. 96-97).

A bomb and arson expert testified that gasoline had been poured in a Z pattern in the van behind the two front seats and that vapors from the gasoline ignited, causing the van to burn. (Tr. Trans. 2-20-98, pp. 105-107).  Gasoline was on the clothes and black gloves Holder wore during the bank robbery.  (Tr. Trans. 2-24-98, p. 78-79).  Two police officers who arrived at the scene of the burning van described the sound of exploding ammunition and bullets "hissing and whizzing" past. (Tr. Trans. 2-19-98 and 2-23-98, pp. 222, 225, 232). One officer admitted he feared for his own safety.  (Tr. Trans. 2-19-98 and 2-23-98, p. 222).

Near the corner of Clayton Avenue and Faulkner Drive in Forest Park, police found the second getaway vehicle, a Dodge van which had been stolen overnight.  Inside the Dodge van, the police recovered a 12 gauge shotgun with pistol grips, owned by Norris Holder.  It was fully loaded with eight (8) rounds of 12 gauge ammunition.  Some of this ammunition was also triple aught buckshot of the type found in the pocket of the jacket Allen discarded in Forest Park.   The route Allen and Holder took from the Bank would have led directly to the Dodge van had the getaway van not caught fire and burned.  (Tr. Trans. 2-20-98, pp. 115-117; 151-154).

About 10:00 p.m. on March 17, police discovered the third getaway vehicle, Holder's Mercury Topaz, in the Barnes Hospital parking garage.  The garage is only a short distance from the location where the second getaway van was recovered.  Allen's left thumb print was found

---

[6]The bullet from the abdomen appeared to have ricocheted off of a hard object before entering Mr. Heflin's body.

on the window of the passenger's door of the Topaz.  Holder's palm print was found on the window of the driver's door.  Inside the Topaz was Holder's driver's license and a cellular telephone.  (Tr. Trans. 2-20-98, pp. 126-129).

## VI. The Planning

The Government introduced detailed evidence of the substantial amount of planning that had preceded the bank robbery.

Billie Jerome Allen, who was born on June 18, 1977, (Tr. Trans. 2-20-98, p. 181), was acquainted with Norris Holder and the two had been seen together at a night club known as the Cloud Nine. (Tr. Trans. 2-18-98, pp. 10-11).   Holder was a regular customer of the Bank.  (Tr. Trans. 2-18-98, p. 209).   Between January of 1996 and March of 1997 Holder made fifteen withdrawals of $500 from the Bank.  (Tr. Trans. 2-18-98, pp. 211-212).  The last withdrawal before the robbery was on March 13, 1997.  (Tr. Trans. 2-18-98, p. 216).

Holder amassed a stockpile of weapons in the two years prior to the robbery.  In April of 1995, Holder took possession of a Winchester 12-gauge shotgun purchased for Holder by his cousin in 1995.  (Tr. Trans. 2-17-98, p. 243-247).   The Russian SKS assault rifle, equipped with a bayonet and a curved clip, was purchased on November 19, 1996, and later sold to Holder. (Tr. Trans. 2-17-98, pp. 258,265).  Holder, accompanied by Allen, purchased the bulletproof vest from a kiosk at the St. Louis Centre shopping center in downtown St. Louis on March 13, 1997. The salesman testified that he informed Holder and Allen that the vest would stop bullets from the types of weapons carried by St. Louis police.  (Tr. Trans. 2-17-98, p. 144, 211-213).  Allen said he wanted to purchase a vest, but was unable to because he did not have enough money.  By March 16, 1997, Holder had also obtained a Chinese SKS rifle.  This rifle did not have a bayonet

and was not able to accept a detachable magazine. (Tr. Trans. 2-18-98, p. 30; Tr. Trans. 2-25-98, pp. 59-61; Government's Trial Exhibit 37). Holder was in possession of all three weapons on March 16, 1997. (Tr. Trans. 2-17-98, pp. 27-32). The Russian SKS and Chinese SKS were both involved in the robbery of the Bank. (Tr. Trans. 2-25-98, pp. 73, 82-86, 88). The Winchester 12-gauge shotgun was placed in the second getaway vehicle. (Tr. Trans. 2-20-98, pp. 151-154).

Allen had on several occasions seen the movie "Set It Off," which involves a series of violent bank robberies which are very similar to the March 17, 1997, robbery of the Bank. (Tr. Trans. 2-24-98, pp. 257-258; Tr. Trans. 2-25-98, pp. 3-4).[7] Upon seeing the movie in the fall of 1996 with his friend Johnnie Grant, Allen wondered "how they plan to get away with it." (Tr. Trans. 2-24-98, p. 257).

During the week before March 17, 1997, Allen and Holder began their planning and preparations for the Bank robbery. (Tr. Trans. 2-17-98, pp. 143-144). Holder watched the movie "Heat" – another movie which involves a violent bank robbery – with some friends. (Tr. Trans. 2-18-98, p. 12). On the Thursday before the robbery, Holder, who normally came alone to the Bank, brought Allen with him. Allen sat across the lobby from the teller line and "look[ed] around" as Holder made his usual five hundred dollar ($500.00) withdrawal. (Tr. Trans. 2-18-98, pp. 216-223; Tr. Trans. 2-17-98, pp. 143-144). The two then went to a shopping

---

[7]The bank robberies in the movie "Set It Off" are of the takeover type; the robbers are heavily armed; stolen vehicles are used for getaways and are abandoned as the robbers switch to their personal vehicle; the robbers yell "Get the f--- down!" upon entering the bank; and, the robbers shout out the time remaining to complete the robbery. It is apparent from these similarities that Allen and Holder used "Set It Off" and the movie "Heat"– in which a getaway vehicle is burned – as templates for the robbery of the Bank.

center where Holder bought a bullet-proof vest.  Allen expressed interest in buying a vest, but lacked money to make the purchase.  (Tr. Trans. 2-17-98, pp. 144, 206-213).  On Saturday, March 15, Allen and Holder met at a bowling alley and discussed the robbery.  (Tr. Trans. 2-18-98, pp. 12-24).

The night before the robbery of the Bank, Allen and Holder watched  part of "Set It Off" together at the home of Marcella Chowning at 3164 Oregon.  (Tr. Trans. 2-24-98, pp. 181-189).  Part of the plan for the Bank robbery involved the theft of two vans by a person known only as "J.B."  One van would be used for the robbery, while the second would be stationed in Forest Park.  After the robbery, Allen and Holder planned to drive to Forest Park, burn the van used for the robbery to destroy evidence and make their getaway in the second van.  Once in the second van, they would drive to a nearby hospital garage where they would switch vehicles again, this time to Holder's Mercury Topaz.  While at the Bank, Holder would jump the counter to the tellers' area while Allen would be the "lookout."  Holder insisted that the robbery take place on a Monday.  (Tr. Trans. 2-17-98, pp. 144-146).

Other witnesses and physical evidence corroborated the planning.  The Government introduced evidence that on the evening of March 16, 1997, sometime after 11:00 p.m., a blue 1987 Astrovan was stolen from in front of its owner's residence.  (Tr. Trans. 2-18-98, p. 54).  That vehicle was burned almost beyond recognition.  (Tr. Trans. 2-18-98, p. 56).   Also on the evening of March 16, 1997, a blue Dodge Caravan was stolen from in front of its owner''s residence, also after 10 or 11:00 p.m.  (Tr. Trans. 2-18-98, pp. 66-67).  That vehicle was found in Forest Park on Faulkner Drive, near Barnes Hospital.  (Tr. Trans. 2-20-98, pp. 115-117).  Holder's .12 gauge shotgun with pistol grips was stashed fully loaded in the Dodge van.  (Tr.

25

Trans. 2-18-98, pp. 59-61, 65-67; Tr. Trans. 2-20-98, pp. 151-154). The third vehicle, a 1988 gray Mercury Topaz was found parked in the Barnes Hospital parking garage, near Forest Park. (Tr. Trans. 2-20-98, pp. 126). Early in the morning of Monday, March 17, Holder called Allen, who was staying at the residence of Marcella Chowning at 3164 Oregon.  Holder told Allen it was "payday" and picked Allen up in the stolen Astro Van.  Holder's two SKS assault rifles were in the van.  (Tr. Trans. 2-17-98, p. 145).

Wayne Ross, a childhood friend of Norris Holder's, (Tr. Trans. 2-18-98, p. 5), testified that he observed Norris and Billie Allen talking together at a nightclub named "Cloud Nine" on March 7 or 8, 1997.  (Tr. Trans. 2-18-98, pp. 10-11; Tr. Trans. 2-24-98, pp. 131,  258).   During the following week, he watched the movie "Heat" at his uncle's house with some friends, including Norris.  (Tr. Trans. 2-18-98, pp. 11-12)  On March 15, Ross and a group of friends, including Norris, went to a bowling alley.  As they were leaving, around midnight, Norris left the group, met up with Billie Allen, and he and Allen went back into the bowling alley.  Ross and the others also went back into the bowling alley, and saw Norris and Billie whispering.  He overheard them referring to knowing the "perfect place" along the highway, and that it had two doors.  (Tr. Trans. 2-18-98, pp. 15-17).  He also overheard them say that they had to "do it quick" and "when did they want to do it."  (Tr. Trans. 2-18-98, p. 22).  On Sunday, March 16, 1997, Ross stopped by Norris's house to trade some clothing with him before he returned to college from spring break.  He observed two guns, some clips, and a bulletproof vest in Norris's closet.  One of the guns had a "knife" on it and the other had something like Chinese writing on it.  (Tr. Trans. 2-18-98, pp. 27-29).   Ross identified Plaintiff's Exhibits 37 and 38 as the guns he saw in Norris's closet, and he identified Government's Trial Exhibit 42 as similar to the clip he

saw, and Government's Trial Exhibit 34(b) as the bulletproof vest. (Tr. Trans. 2-18-98, pp. 29-30). He identified Government's Trial Exhibit 60 as a pump shotgun with a short handle that he had seen over the years in Norris's residence. (Tr. Trans. 2-18-98, pp. 27-28). Finally, Ross testified that he saw a stun gun on the table next to Norris's bed. (Tr. Trans. 2-18-98, p. 81). Ross testified that he invited Norris to accompany him back to campus, but Norris declined, saying that he had some business to take care of. (Tr. Trans. 2-18-98, p. 32). Lisa Moore, the bank teller, testified that a man accompanied Holder on the March 13 visit; while she waited on Holder, the other man sat on the edge of a chair in the lobby looking around. (Tr. Trans. 2-18-98, p. 218). Ms. Moore later identified Billie Allen in a lineup as the man who accompanied Holder to the Bank that day. (Tr. Trans. 2-18-98, pp. 221-222). As Holder and Ms. Moore chatted during Holder's transaction, he asked her, "Is this bank always this empty?" (Tr. Trans. 2-18-98, p. 221).

### VII. Allen's Arrest and Confession

The cellular telephone found in the Mercury Topaz showed the last telephone number dialed was "644-7250." (Tr. Trans. 2-20-98, p. 128-129). That telephone number was registered to the address of 3164 Oregon in St. Louis, the home of Marcella Chowning and Lakeshia Williams. This is the address where Allen had spent several nights just before March 17. (Tr. Trans. 2-20-98p. 171; Tr. Trans. 2-24-98, pp. 177-180). Allen appeared at this address after the robbery of the Bank in the afternoon of March 17. He watched the evening news with Marcella and Lakeshia. The story of the robbery of the Bank and the arrest of Holder was on the news. The women recognized Holder as the person who had watched "Set It Off," a movie about a

violent bank robbery, with Allen the night before.[8]  They also noticed Allen had an injury to his ear which appeared to be a burn.  Allen denied participation in the robbery and claimed the injury to his ear was caused by a bite he received in a fight that day.  Allen showed no reaction to the news that the bank guard was killed.  (Tr. Trans. 2-24-98, pp. 140-147, 191-196).

After the  police determined that telephone number 664-7250 was registered to 3164 Oregon, they went to that address.  They arrived early in the morning of March 18 and found Allen in the basement.  Allen immediately volunteered, "I didn't kill anybody."  Allen wore two pairs of sweat pants; a gray pair over a blue pair.  He had burn blisters to his ear and nose and scrapes on his hand.  The soles of Allen's shoes were a  clear color – in contrast to the black soles of Holder's shoes – and had mud on them. "Cash Money"[9] was tattooed on his abdomen.  (Tr. Trans. 2-20-98, pp. 171-190; Tr. Trans. 2-24-98, p. 280).  His hair was singed.  (Tr. Trans. 2-24-98, pp. 69-71, 100-102).  Allen's gray sweat pants exhibited globs of blue melted plastic that were very similar to the globs found on Holder's Dickies coveralls and the leather jacket recovered from the dirt field.  The melted plastic from all of these items was consistent with having been blown onto the clothing during the blast and fire in the getaway van.  (Tr. Trans. 2-24-98, pp. 102-112).   Allen spoke with detectives after his arrest.  At that time he said that he had been at a shopping center during the day and received injuries in a fight.  He said his hair was singed from a treatment he had put on it.  He then indicated he wanted a lawyer and the conversation ceased.  (Tr. Trans. 2-20-98, pp. 192-195).  However, Allen told the emergency

---

[8]See "The planning," supra.

[9]"Cash money" is an expression which means "I got my mind on my money, my money on my mind."  (Tr. Trans. 2-24-98, p. 280).

medical technician who treated him early that morning that they "were going through the park and the van caught fire." Allen said that he burned his ear getting out of the burning van. (Tr. Trans. 2-24-98, pp. 24, 36).

Allen appeared in a lineup later on the morning of March 18. Alma Gilliam and the two forestry workers, Bobby Harris and Bruce Norman, identified Allen. When Allen was informed of the identifications after the lineup, he insisted on talking to the police even though a detective told him that because Allen had requested an attorney the police couldn't talk to him. Allen specifically asked to speak to Lt. Henderson. (Tr. Trans. 2-24-98, pp. 218-229). Allen gave the following statement to Lt. Henderson:

Allen and Holder planned to rob a bank where Holder had an account. On the Wednesday or Thursday before the robbery, Holder took Allen to the Bank where Holder made a withdrawal and introduced Allen to a clerk named "Lisa." They then went to St. Louis Centre where Holder bought a bullet proof vest but Allen did not have enough money to buy one. The two continued to plan throughout the week. Holder told Allen that "J.B." would steal two vans. They would use one van for the robbery, burn it to destroy evidence and transfer to the second stolen van in Forest Park at the corner of Clayton and Faulkner. They would then go to Barnes Hospital and get into Holder's Mercury Topaz.

On the morning of the robbery, Holder called Allen at Allen's girlfriend's home at 3164 Oregon and told him it was "payday" and that he was on the way. Holder picked Allen up in the blue Chevrolet van. Inside the van were two assault rifles and two ski masks. Holder gave Allen one of each. The van was already doused in gasoline. At the bank, Holder was to jump the teller line and Allen would serve as lookout.

29

When Allen entered the bank, he saw the security guard drawing his weapon. Allen fired at the guard and saw him fall backwards bleeding. Allen then approached the guard and fired two more shots at him, but was not sure if these shots hit him.[10] Allen thought, but was not sure, that Holder also shot inside the bank. According to Allen, Holder jumped the counter and threw money into a green bag. The two then left the bank and got back into the van. Holder drove the van. They were headed to the second van on Faulkner Drive in Forest Park. When they approached the park, Holder flicked a cigarette lighter and caught his arm on fire. As Holder waved his arm trying to put out the fire, the interior of the van became a fireball because it had been soaked in gasoline. Both of them got out of the van in the park. Allen got out of the passenger side and reached for the money, but didn't think he got any. He then ran across an open area and approached two park workers and offered them $50 each for a ride to Metrolink. Allen took Metrolink and eventually went to Northwest Plaza where he shopped and applied for a job. He then got a ride to 3164 Oregon. Allen declined to say more and the conversation with Lt. Henderson stopped. (Tr. Trans. 2-17-98, pp. 139-151; Tr. Trans. 2-24-98, pp. 217-239).

While in custody awaiting trial, Allen made a series of telephone calls to Lakeshia Williams. In these calls, Allen at first denied participation in the Bank robbery. Then he said he was just a driver. Finally, Allen admitted being inside the bank, but said he "didn't do anything." (Tr. Trans. 2-24-98, p.149). Allen also called his friend Johnnie Grant. Allen told Grant that he drove the van, but he "didn't go inside or nothing like that." (Tr. Trans. 2-24-98, p. 264). Allen also wrote Grant a series of letters in an attempt to induce Grant to testify falsely for him. In one letter, Allen wrote: "You know I go to trial real soon and I [will] call you for a

---

[10]The evidence indicated that these shots hit Mr. Heflin after ricocheting off of the floor.

witness.  When I call you and told you I didn't go in the bank, I just drove[,] and they are trying to use it against me.  What I need you to say is that I told you that because I was trying to throw them off.  Do you feel me?[11]  I want you to be there because you will see that with the help of God, I will be up out of here real soon.  I told them that I was never broke and I got my money from rapping with flicks and I told them that you never seen me with Norris, we just saw him at Cloud Nine an all I will say is ["]what's up?["] My case can be won if you say the right things and I know you know what to say."  (Tr. Trans. 2-24-98, pp. 266-277; Government's Trial Exhibits 82A, 82B, 82C, 82D).

## VIII. The Penalty Phase

In the penalty phase of trial, the United States submitted two statutory aggravating factors and three non-statutory aggravating factors to the jury as to each of Count I and Count II.   The statutory aggravating factors were :

> 1.  That Billie Jerome Allen, in the commission of the offense, or in escaping apprehension for the violation of the offense, knowingly created a grave risk of death to one or more persons in addition to Richard Heflin;
> 2.  That Billie Jerome Allen committed the offense in the expectation of the receipt of anything of pecuniary value.

The Government relied on the evidence presented at the guilt phase of the trial to prove these statutory aggravating factors.

> The non-statutory aggravating factors were:
>
> 1. That Billie Jerome Allen's conduct in committing the offenses was substantially greater in degree than that described in the definition of the crime, apart from the statutory aggravating factors;
> 2.  That Billie Jerome Allen is likely to commit criminal acts of violence in the future

---

[11]"Do you feel me" is an expression which means "do you understand."  (Tr. Trans. 2-24-98, p. 276).

which would be a continuing and serious threat to society; and

3. That Richard Heflin's personal characteristics as an individual human being and the impact of the death of Richard Heflin upon his family make this crime more worthy of the death penalty than other murders.

(Tr. Trans. 3-9-98 and 3-10-98, pp 27-29).

The United States presented victim impact testimony from Mr. Heflin's mother, his wife of six months, his three children, his ex-wife (the children's mother), two of his siblings, two co-workers and a former co-worker. This testimony established that Mr. Heflin, a decorated veteran who was forty-seven years old at the time of his death, was a hard working family man who was cheerful and well liked. The witnesses testified about their last contacts with Mr. Heflin and the effect of his murder on their lives. (Tr. Trans. 3-2-98, pp. 77-165). Byron Woodard, Allen's probation officer, testified that Allen was on probation at the time of the robbery of the Bank and was in violation of virtually every condition of his probation. Mr. Woodard had planned to place Allen in an "intensive supervision" program, but his arrest for the Bank robbery prevented this. He thought Allen's intelligence was "average to maybe even above average," and did not see a violent tendency in Allen. (Tr. Trans. 3-2-98, pp. 165-212). Allen's friend Johnnie Grant testified that Allen "ganked" people in his neighborhood by selling them fake drugs instead of real drugs. Grant also read into the record the letters Allen sent him, which showed Allen's lack of remorse. (Tr. Trans. 3-2-98, pp. 214-269; Government's Trial Exhibits 82A-82D).

## IX. Mitigating Evidence

Allen submitted four statutory mitigating factors and twenty-two non-statutory mitigating factors for each count. (Allen Appendix on Appeal, pp. 464-470, 481-487). The statutory mitigating factors were:

1.  Billie Allen's capacity to appreciate the wrongfulness of his conduct to the requirements of the law was significantly impaired, regardless of whether his capacity was so impaired as to constitute a defense to the charge;

2.  Billie Allen did not have a significant prior history of other criminal conduct;

3.  Billie Allen committed the offenses under severe mental or emotional disturbance; and

4.  Other factors in Billie Allen's background, record, or character or any other circumstances of the offenses that mitigate against imposition of the death sentence.

(Tr. Trans. 3-9-98 and 3-10-98, pp. 32-33).

The nonstatutory mitigating factors presented by Allen included the following:

Billie Allen suffered brain damage that impaired his ability to focus his attention, to learn and to use good judgment, or that impeded his personality development.  Billie Allen demonstrated severe learning problems in school which led to academic failure, increased frustration, and eventual dropout.  His family was unable to assist him in dealing with his problems in making the transition from childhood to adulthood.  Billie Allen was born with a predisposition toward alcoholism or other substance abuse.  Billie Allen has suffered from longstanding depression.  He has an impaired ability to cope with stress.

At the time of the offenses for which he stands convicted, Billie Allen suffered from post-traumatic stress disorder resulting from the shooting death of his best friend, at which time he began to abuse marijuana in an effort to self-medicate for depression or other symptoms of post-traumatic stress disorder.  Billie Allen has consistently demonstrated impaired judgment, no real leadership potential, the personality characteristics of a follower, or an incapacity to plan an event as complicated as the offenses for which he has been convicted.

In the events underlying his conviction, Billie Allen, who was only 19 at the time, was associated with an older individual at a time when Billie Allen was suffering from emotional problems.  In the killing for which Billie Allen was convicted, the wounds to the pelvis were from bullets that struck Mr. Heflin after ricocheting off the floor.

Despite growing up in a neighborhood that was surrounded by gang factions and losing several close friends to gang violence, Billie Allen was known as a likeable, gentle, light-hearted person.  The offenses for which he has been convicted are inconsistent with his prior behavior.  He was not considered aggressive or violent.

Billie Allen is a creative, artistic person who has demonstrated the capacity to be a loving and caring person who can be adequately managed in a prison setting and who will not be a threat to society if he is sentenced to life imprisonment without the possibility of release.  Billie Allen is part of an extended family whose members will assist him in his adjustment to incarceration.

33

(Tr. Trans. 3-9-98 and 3-10-98, pp. 33-35)

Allen presented the testimony of at least thirty-six witnesses. Twelve of the witnesses were family members, ten were family friends or neighbors, twelve were teachers, coaches or school administrators and two were clinical psychologists. These witnesses testified in support of the four statutory and twenty-two non-statutory mitigating factors Allen presented to the jury. (Allen Appendix on Appeal, pp. 459-492). Generally, the lay witnesses testified that Allen came from a disadvantaged background, was likeable, non-violent and a follower. A "clinical psychologist practicing in the specialty of neuropsychology" testified that Allen had "neuropsychological deficits, which most prominently affect frontal lobe and verbal information processing." (Tr. Trans. 3-5-98, pp. 23-85). Another clinical psychologist testified that Allen was "fit or competent to stand trial" and that he suffered from post-traumatic stress disorder, which "could make him more impulsive." (Tr. Trans. 3-5-98, pp. 200-256). In rebuttal, the United States presented the testimony of a forensic psychiatrist and a clinical psychologist who disputed the conclusions of Allen's experts. (Tr. Trans. 3-6-98, pp. 18-89).

## X. The Jury's Findings

The jury's findings regarding the aggravating and mitigating factors were identical for each count. (Allen Appendix on Appeal, pp. 460-470, 477-487). The jury unanimously found the existence of both statutory aggravating factors and the first of the three non-statutory aggravating factors. The jury did not find the second non-statutory aggravating factor which related to Allen's future dangerousness or the third non-statutory aggravating factor which involved victim impact. (Id.). The jury unanimously found one statutory and three non-statutory mitigating factors. Another statutory mitigator and eight non-statutory mitigators were found to

exist by at least six jurors.  One statutory mitigator received one vote and one received no votes. One non-statutory mitigator received five votes, three received two votes, six received one vote and three received no votes.  (Id.).  All jurors found one additional mitigator to exist, nine voted for a second additional mitigator and five jurors voted for a third.  (Allen Appendix on Appeal, pp. 470, 488).

The jury returned a sentence of life imprisonment without the possibility of release as to Count I and death as to Count II.  (Allen Appendix on Appeal, pp.472, 489).

## XI. General Legal Principles Applicable To Petitioner's Motion

### A. Standards For Relief and Evidentiary Hearing

Pursuant to 28 U.S.C. § 2255, a federal prisoner may seek relief from a sentence imposed against him on the grounds that "the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C.§ 2255. The Court must hold an evidentiary hearing to consider claims in a § 2255 motion "'[u]nless the motion and files and records of the case conclusively show that the prisoner is entitled to no relief.'" Shaw v.United States, 24 F.3d 1040, 1043 (8th Cir.1994)(quoting 28 U.S.C.§ 2255). Thus, a "petitioner is entitled to an evidentiary hearing 'when the facts alleged, if true, would entitle [petitioner] to relief.'" Payne v. United States, 78 F.3d 343, 347 (8th Cir. 1996) (quoting Wade v. Armontrout, 798 F.2d 304, 306 (8th Cir. 1986)). The Court may dismiss a claim "without an evidentiary hearing if the claim is inadequate on its face or if the record affirmatively refutes the factual assertions upon which it is based." Shaw, 24 F.3d at 1043; see also Blankenship v. United States,159 F.3d 336, 337 (8th Cir. 1998) (petition may be dismissed without

a hearing if allegations, accepted as true, would not entitle petitioner to relief, or allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact).

Rule 8(a) of the Rules Governing Proceedings under Title 28, U.S.C., Section 2255, provides that the district court shall, upon a review of the files, records, and supporting evidence, determine whether an evidentiary hearing is required and/or dispose of defendant's motion as justice dictates. It is well settled that the district court need not hold an evidentiary hearing for every allegation raised in a Section 2255 motion. As noted by the Eighth Circuit:

> A §2255 motion "can be dismissed without a hearing if (1) the petitioner's allegations, accepted as true, would not entitle the petitioner to relief, or (2) the allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact." (citations omitted).

Sanders v. United States, 341 F.3d 720, 722 (8th Cir. 2003), cert. denied, 124 S.Ct. 1460 (2004), quoting Engelen v. United States, 68 F.3d 238, 240 (8th Cir. 1995). Affidavits may be reviewed by the court to determine whether an evidentiary hearing is required. United States v. Goodman, 590 F.2d 705, 712 (8th Cir. 1979).

Allen presents this Court with a Section 2255 motion that is unique in the experience of the undersigned. Allen makes numerous claims, but fails to support almost all of his allegations with any legal authority, affidavit or offer of proof. Under such circumstances, this Court is not required to conduct a hearing to permit the "discovery" of testimony of witnesses who might support Allen's claims. Kafo v. United States, 467 F.3d 1963 (7th Cir. 2006); Porcaro v. United States, 832 F.2d 208, 212-13 (1st Cir. 1987)(per curiam). Essentially, Allen states that he is entitled to a hearing for the mere asking. This is a request for a fishing expedition. Bald,

36

unsubstantiated and unsupported allegations are not entitled to an evidentiary hearing or relief.

Clearly, from the content of the claims, especially those concerning the inadequacy of the mental health and mitigation investigation, further investigation has been conducted by his habeas counsel and, upon information and belief, this Court has authorized the expenditure of sums of taxpayer dollars to hire investigators and experts to support Allen's petition.  Yet, the petition for relief is devoid of any specifics regarding the results of said efforts or affidavits concerning what said witnesses would testify to if they had been discovered earlier.  In the event such affidavits, authorities and supporting documents surface in any reply brief that Allen should file, the Government should be permitted an opportunity to supplement its response herein.

However, based on the principles discussed, *infra*, the lack of supporting authority or information provides added justification for denying Allen's petition without a hearing.  The Government submits that the issues raised by Allen may be resolved against him without the necessity of the introduction of facts outside the trial record. Accordingly, because the trial transcript, files, and records of the court are adequate to dispose of Allen's Section 2255 claims, no evidentiary hearing is required.

### B. Procedural Default

Claims that were raised and decided on direct appeal cannot be relitigated in a Section 2255 motion.  United States v. Davis, 406 F.3d 505 (8th Cir. 2005); United States v. Wiley, 245 F.3d 750, 752 (8th Cir. 2001).  The only exception to this rule is where the alleged error is a "fundamental defect[] that inherently result[s] in a complete miscarriage of justice." United States v. Manko, 772 F.2d 481, 482 (8th Cir. 1985).  In addition, if a claim could have been raised on direct appeal, but was not, it cannot be raised in a Section 2255 motion unless the

petitioner can show both (1) a "cause" that excuses the default, and (2) "actual prejudice" resulting from the errors of which he complains. United States v. Frady, 456 U.S. 152, 168 1982); Matthews v. United States, 114 F.3d 112, 113 (8th Cir. 1997); Schneider v. United States, 981 F.2d 989, 990 (8th Cir. 1992). If a petitioner is unable to show "cause" and "actual prejudice," he must make a "substantial claim that constitutional error has caused the conviction of an innocent person." Schlup v. Delo, 513 U.S. 298, 324 (1995). A claim of actual innocence must be based on "new evidence," and must convince the court that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." Id. at 327. See also, Embrey v. Hershberger, 131 F.3d 739 (8th Cir. 1997). Moreover, this Court may not hold an evidentiary hearing to consider a procedurally barred claim absent a showing that excuses the default. Fretwell v. Norris, 133 F.3d 621, 623 n.1 (8th Cir. 1998)(citing Keeney v. Tamayo-Reyes, 504 U.S. 1, 11-12 (1992)).

Procedural default is a complete bar to non-constitutional or non-jurisdictional issues. Anderson v. United States, 25 F.3d 704, 706 (8th Cir. 1994). Constitutional or jurisdictional claims that could have been raised on direct appeal, but were not, are procedurally defaulted unless the petitioner can demonstrate either cause for the default and actual prejudice or actual innocence. Bousley v. United States, 523 U.S. 614, 622 (1998); Matthews v.United States, 114 F.3d 112, 113 (8th Cir. 1997).

The cause and prejudice standard requires Allen to show not only that some objective factor external to the defense impeded his effort to raise the issue as required by each relevant procedural rule, but also that the error alleged worked against his actual and substantial disadvantage, infecting his entire trial with error. Frady, 456 U.S. at 170; Coleman v. Thompson, 501 U.S. 722, 753 (1991).

38

This is a "significantly higher hurdle" than the plain error standard required to overcome a default on direct appeal. United States v. Olano, 507 U.S. 725 (1983); Frady, 456 U.S. at 166. If Allen cannot show cause and prejudice with respect to a defaulted constitutional or jurisdictional claim, Allen cannot have his claim considered unless he can satisfy the actual innocence exception. Bousley v. United States, 523 U.S. 614, 623 (1998). Here, as to his defaulted claims, Allen cannot show that a factor external to the defense prevented trial counsel from raising his present constitutional claims. Further, he cannot show "by clear and convincing evidence that but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty." Schlup v. Delo, 513 U.S. at 323 (quoting Sawyer, 505 U.S. at 347, 336).

### C. Teague Rule of Non-Retroactivity

Some of Allen's claims are also barred by the non-retroactivity doctrine. Under Teague v. Lane, 489 U.S. 288 (1989), and its progeny, a defendant may not rely on a "new" rule of "procedure" in seeking to overturn his conviction on collateral review. Id. at 310. "The Teague inquiry is conducted in three steps." O'Dell v. Netherland, 521 U.S. 151, 155 (1977). "First, the date on which the defendant's conviction became final is determined." Id. at 156. Where, as here, a defendant does file a petition for certiorari, the conviction becomes final when certiorari is denied. Griffith v. Kentucky, 479 U.S. 314, 321 n.6 (1987). In this case that date was December 11, 2006. "Next, the habeas court considers whether a . . . court considering [the defendant's] claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule he seeks was required by the constitution." O'Dell, 521 U.S. at 156 (alterations and internal quotations omitted). It is important to emphasize the word "compelled." The Court in Teague defined a "new rule" as one that "breaks new ground or imposes new obligation on the States or the

Federal Government." 489 U.S. at 301 (plurality opinion). Put another way, a new rule is one that was not "dictated by precedent existing at the time the defendant's conviction became final." Id.; see also, Graham v. Collins, 506 U.S. 461, 466-467 (1993). Subsequent decisions have made clear that a rule may be "new" despite the fact that earlier cases supported it, Sawyer v. Smith, 497 U.S. 227, 236 (1990), "or even control or govern" it, Saffle v. Parks, 494 U.S. 484, 491 (1990). Unless a legal principle is compelled by existing precedent – i.e., not susceptible to reasonable debate – it will be treated as a "new" rule. Butler v. McKellar, 494 U.S. 407, 415 (1990). In almost all cases, if the rule is "new," it is unavailable to the defendant on collateral review. That is the basic doctrine of Teague.

The third inquiry concerns the Teague exceptions. If the rule is determined to be new, the final step in the Teague analysis requires the court to determine whether the rule nonetheless falls within one of the two narrow exceptions to the Teague doctrine. O'Dell, 521 U.S. at 156-157. The first exception is "for new rules forbidding criminal punishment of certain primary conduct and rules prohibiting a certain category of punishment for a class of defendants because of their status or offense." Id. at 157 (alterations and internal quotations omitted). It is important to note that this first exception involves constitutional prohibitions on punishment. The second Teague exception, which is "even more circumscribed" than the first, is for "watershed rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding." Id. The example used by the Court to illustrate this second exception is Gideon v. Wainwright, 372 U.S. 335 (1963), the decision that gave indigent felony defendants the right to counsel. The exception is reserved for genuine "bedrock" rules that are essential to basic fairness. O'Dell, 521 U.S. at 167.

### D. Ineffective Assistance of Counsel

When a defendant raises a claim of ineffective assistance of counsel, he shoulders a particularly heavy burden as courts "indulge a strong presumption that counsel's conduct falls within the wide range of professionally reasonable assistance and sound trial strategy." Driscoll v. Delo, 71 F.3d 701, 706 (8th Cir. 1995) (citing Strickland v. Washington, 466 U.S. 668, 689 (1984)). In order to prevail, the defendant must establish that his counsel's performance was constitutionally deficient and that he was prejudiced as a result of the deficient performance. United States v. Robinson, 301 F.3d 923, 925 (8th Cir. 2002). "Reasonable trial strategy does not constitute ineffective assistance of counsel simply because it is not successful." Graham v. Dormire, 212 F.3d 437, 440 (8th Cir. 2000). Moreover, the Court does not have to analyze the performance prong if it determines that the defendant suffered no prejudice. Whitehead v. Dormire, 340 F.3d 532, 537 (8th Cir. 2003); Pryor v. Norris, 103 F.3d 710, 713 (8th Cir. 1997).

In evaluating counsel's conduct, "judicial scrutiny of a counsel's performance must be highly deferential." Strickland, 466 U.S. at 689. Indeed, the distorting effects of hindsight must be avoided, and courts "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Id. at 690. Counsel's conduct is deficient if it falls "outside the wide range of professionally competent assistance." Graham, 212 F.3d at 440. Thus, counsel's performance is objectively unreasonable if "counsel failed to exercise the customary skill and diligence that a reasonably competent attorney would use under like circumstances." Battle v. Delo, 19 F.3d 1547, 1554 (8th Cir. 1994). As the Eighth Circuit has stated, "[w]e will presume attorneys provide effective assistance and will not second guess strategic decisions or exploit the benefits of hindsight." Henderson v. Norris, 118 F.3d 1283, 1287 (8th Cir.

41

1997).

In analyzing the prejudice prong, it must be determined whether the defendant has established "a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.  However, as the Supreme Court stated in Lockhart v. Fretwell, 506 U.S. 364, 369-70 (1993), "to set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him."  Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated.  United States v. Cronic, 466 U.S. 648, 658 (1984).

The Government presents each of the legal standards in the introduction to this response in an effort to eliminate redundancy.  Each of the standards pertains to many of the issues discussed in this response.  The Government will reference the standard without encumbering each sub-section with a list of duplicative case citations.

## XII. Argument

### A. Motion to Suppress Confession

Allen raises a variety of issues regarding the effectiveness of his trial and appellate counsel in connection with Allen's motion to suppress his confession.  None of the issues Allen raises merits relief from this Court.  Specific allegations will be discussed seriatim.

As an initial matter, to the extent these claims were not raised earlier, they are procedurally barred as they could have been raised and there has been no showing of good cause to justify the default or prejudice resulting therefrom.

### 1. Offer of Proof Issue

Allen alleges that his trial counsel was ineffective in his representation of Allen in connection with his motion to suppress his confession, in that trial counsel failed to timely provide the magistrate judge who presided over the motion to suppress hearing with an offer of proof detailing Allen's proposed testimony at the hearing. This claim is without merit.

The record in the underlying criminal matter reflects that the following occurred at the motion to suppress hearing held on May 16, 1997:

The Government presented evidence that on at least two occasions prior to March 17, 1997, Allen had received Miranda warnings and indicated an understanding of them. (Hrg. Trans. 5-16-97, pp. 14-15). Following the robbery of the Bank on March 17, 1997, Allen received his Miranda warnings at the time of his arrest around 2:00 a.m. on March 18 and again at about an hour later at STLMPD headquarters. About 4:00 a.m., FBI SA Jan Hartman attempted to inform Allen of his Miranda rights yet a third time, but before she finished Allen indicated he wished to speak to a lawyer. (Hrg. Trans. 5-16-97, pp. 152 -155). Later that morning, Allen appeared in a lineup after having first declined counsel for the procedure. (Hrg. Trans. 5-16-97 pp. 248-251). Using a practice followed after every lineup, a detective informed Allen he had been identified, but did not try to question Allen at that time. (Hrg. Trans. 5-16-97, pp. 247-248). Allen then told a detective he wanted to "talk about it," but the detective told Allen the police couldn't talk to him because he had requested an attorney. Allen persisted, stating "I don't want no fucking attorney," and specifically asked to speak with Lt. Henderson. (Hrg. Trans. 5-16-97, pp. 248-250). Allen was taken straight to an interview room where he again received the Miranda warnings. After laying out the ground rules for the interview, Allen gave a

statement in which he admitted participation in the robbery of the Bank and shooting of the guard. All questioning ceased when Allen indicated he no longer wished to discuss the matter. (Hrg. Trans., 5-16-97, pp. 250-255). After this interview, Allen continued to attempt to discuss the robbery of the Bank. He made spontaneous statements to an FBI agent while being fingerprinted later on March 18, 1997. Between March 19 and March 25, Allen made three unsolicited telephone calls to Lt. Henderson, who declined to speak with him. (Hrg. Trans. 5-16-97, pp. 284-304).

To rebut this testimony, trial counsel indicated a desire to call Allen as a witness at the hearing, but upon learning that the magistrate would not limit the Government's cross examination of Allen to just the issues raised on direct testimony, indicated that he would proceed by an offer of proof instead. (Hrg. Trans. 5-16-97, pp. 349-351, 357-358). The Government indicated it would accept counsel's offer of proof. (Hrg. Trans., 5-16-97, p. 351).

On June 19, 1997, trial counsel filed his offer of proof, which tended to contradict the Government's evidence presented at the May 16, 1997 hearing. In particular, Allen's offer of proof indicated, *inter alia*: Allen did not receive his Miranda rights before being advised by SA Hartman; after he invoked his Miranda rights to SA Hartman, although she did not question him further, a detective questioned him for about three hours; Allen asked for counsel before the lineup took place and was never informed that he had a right to the assistance of an attorney during the lineup procedure; after the lineup, a detective told Allen he had been picked out and asked to talk to him again; Allen did not initiate contact with the officers, but Lt. Henderson entered the room and began talking to Allen about the homicide of Allen's friend named Marquis; and, Allen was not readvised of his Miranda rights after the lineup procedure and was

44

interrogated by officers.  (Defendant's Offer of Proof, Addendum 1).

By memorandum on June 13, 1997, the magistrate entered findings of fact and conclusion of law recommending that Allen's motion to suppress statements be denied ("the R&R").  On July 8, 1997, the magistrate issued an Order permitting Allen's trial counsel to supplement the record on Allen's motion to suppress statements with his offer of proof.   On that same day, the magistrate issued a Supplemental Order and Amended Findings (the "Supplemental Order") which both supplemented and amended the June 13 findings of fact and conclusions of law.  In the Supplemental Order, the magistrate did not amend its recommendation that Allen's motion to suppress statements be denied, but did amend certain portions of the memorandum.

Trial counsel was not ineffective.  At the May 16, 1997 hearing on Allen's motion to suppress statements, trial counsel attempted to present Allen's testimony which would have contradicted the testimony of the Government's witnesses but – based on the magistrate's denial of trial counsel's motion in limine to limit cross examination – also exposed Allen to extensive cross examination on the issues involved in the lawsuit. (Hrg. Trans. 5-16-97, pp. 348-349).   To remedy this conundrum, trial counsel made the reasonable decision to offer Allen's testimony via an offer of proof.  This vehicle had the salutary effect of presenting to the fact finder Allen's version of events while protecting Allen from *any* cross examination whatsoever.  The Government did not object to the Allen's offer of proof, but in fact accepted it.  (Hrg. Trans. 5-16-97, p. 351). Thus, as the magistrate concluded, the offer of proof would allow "any reviewing court to know what [Allen] intended to prove." (Id.)  Moreover, trial counsel huddled with Allen regarding the use of this strategy and before deciding to proceed in this fashion.  (Hrg. Trans. 5-

16-97, pp. 357-358).

While Allen's offer of proof was not provided to the magistrate before the magistrate filed the R&R on June 13, 1997, it was provided to the magistrate just a few days later, on approximately June 19. In any event, the magistrate had the benefit of Allen's offer of proof for nearly three weeks before he filed the Supplemental Order on July 8, 1997. The magistrate specifically permitted Allen to supplement the record by submitting the offer of proof, to which the Government did not object. (Order, 7-8-97, Addendum 2). Although the magistrate did not specifically refer to Allen's offer of proof in the Supplemental Order, the record is clear that it was available to him before the Supplemental Order was entered. It is also clear from the Supplemental Order that the magistrate considered other pleadings which had been filed after the R&R, as those are the pleadings which in fact occasioned the Supplemental Order. For instance, the Supplemental Order specifically refers to matters raised by the Government in its response to the R&R which was filed the day before Allen's offer of proof. As the magistrate clearly considered matters raised concurrently with the filing of the offer of proof, the record thus supports the proposition that trial counsel was successful in presenting Allen's offer of proof to the magistrate and that the magistrate considered the offer of proof. However, the magistrate still concluded that Allen's motion to suppress statements should be denied. In any event, the record is uncontroverted that this Court had the benefit of Allen's offer of proof well before it adopted the magistrate's R&R on August 13, 1997.

Trial counsel's performance was neither deficient nor prejudicial. Faced with the magistrate's denial of his motion to limit the cross examination of Allen, trial counsel embarked on a most reasonable course of action – the submission of the offer of proof – which had the net

46

effect of advancing Allen's position concerning the facts relevant to his motion to suppress statements while shielding him from cross examination. In effect, Allen "got the best of both worlds." Reasonable trial strategy does not constitute ineffective assistance simply because it was not successful. Graham v. Dormire, 212 F.3d at 440. Allen has failed to overcome the strong presumption that trial counsel's conduct fell within the wide range of professionally reasonable assistance and sound trial strategy. Strickand, 466 U.S. at 689. Nor can Allen demonstrate prejudice. To do so, Allen must show that he has established a reasonable probability that but for trial counsel's unprofessional errors, the result of the proceeding would have been different. Id. at 694. Thus, Allen must show that but for the fact he was precluded from giving live testimony before the magistrate, he would not have been convicted or received the death penalty. This claim fails *ab initio* as the substance of his proposed testimony was provided to the magistrate before the magistrate entered the Supplemental Order, which was the last word regarding its R&R, and was also before this Court well before this Court adopted the magistrate's R&R. Allen suffered no prejudice.

## 2. Alleged Failure to Re-urge Motion to Suppress

Allen alleges that his trial counsel was ineffective in his representation of Allen in connection with his motion to suppress his confession, in that trial counsel failed to "re-urge the pretrial motion" to suppress statements after Government witnesses allegedly gave inconsistent testimony regarding whether Allen had received his Miranda warnings. The Government understands Allen's present claim to be as follows:

(1) Lt. Henderson, who took Allen's statement on March 18, testified both at the motion to suppress hearing and at trial that "he was aware that [Allen] had requested an attorney before

47

[Allen] made his statement." (Allen Petition at 15);

(2) at trial, Lt. Henderson testified he did not know that Allen had been informed of his rights before Lt. Henderson interviewed Allen; (Id.)

(3) Det. Harper testified at trial that it was Lt. Henderson who informed him that Allen had requested an attorney; (Id.)

(4) the testimony of both witnesses at the motion to suppress that they knew Allen had requested an attorney and was not withdrawing that request was "suspect" as Officer Harper relied on Lt. Henderson for that information and Lt. Henderson denied knowledge of the request; (Allen Petition at 15-16).

(5) as a result of this discrepancy, trial counsel should have "re-urged" the pretrial motion. (Allen Petition at 16)

Allen makes this claim without benefit of any citation to the record. However, a careful review of the record reveals the claim is factually inaccurate, that any inconsistencies between the testimony of Lt. Henderson and Det. Harper are irrelevant, and that Allen's trial counsel exploited the inconsistencies in closing argument.

Pretrial testimony of Lt. Henderson

At the May 16, 1997, hearing on Allen's motion to suppress, Lt. Henderson testified on cross examination that he was unaware that Allen had requested a lawyer during the early morning hours of March 18. (Hrg. Trans. 5-16-97, p. 294). Lt. Henderson became aware of that after he had talked to Allen. (Id.). On further cross examination, Lt. Henderson testified as follows;

Q.    [By Mr. Sindel] When did you know [Allen] had said, "No questions"?

A.    [By Lt. Henderson] Well, after I talked to him.  After he had requested to see me, okay, at that time, as I understand it, Harper is telling me, – Detective Harper tells me that he had invoked his right to the detectives, but he's requesting to see me.  At that time, I asked him to bring him in, – bring him up, and when he comes up I ask Billie, "Sir, did you want to speak with me?" He said, "Yes." "What do you want to talk about?"  He said he wanted to talk about the robbery.

*   *   *

Q.    Now did you, – were you, – I mean, we as lawyers and police officers, we understand when somebody invokes their rights under the <u>Miranda</u> decision that can be a whole bunch of different things?

A.    Yes sir.

Q.    Right?  It can be, "I'm not answering any questions," –

A.    Uh-huh (positive utterance.)

Q.    — right?

A.    Uh-huh (positive utterance.)

Q.    Or, "The questioning's stopping right here, I'm not gonna answer any more questions"?

A.    Yes sir.

Q.    But you didn't know whether he had requested a lawyer?

A.    No.

Q.    So they hadn't told you how he had invoked his rights, they just told you he had?

A.    That's correct.

Q.    Did anybody use the phrase that he "lawyered-up"?

A.    No.

(Hrg. Trans. 5-16-97, p. 297-298)

49

Pretrial testimony of Det. Harper

On cross examination at the May 16, 1997, motion to suppress hearing, Det. Harper

testified that he was aware that Allen had requested an attorney.

> Q.    [By Mr. Sindel] Basically were people told throughout the Homicide Division that he had lawyered up (sic) and requested an attorney?

> A.    [By Det. Harper] Yes, we were all notified that he had requested an attorney, that's why no one could talk to him.

(Hrg. Trans. 5-16-97, pp. 257, 259-260)

Trial - Renewal of motion to suppress

At trial, before Lt. Henderson's testimony, Allen's trial counsel renewed the motion to

suppress statements.  Trial counsel specifically referenced the early morning hours of March 18

in which Allen indicated he did not want to answer questions on two occasions, and requested

that an attorney be appointed for him on the second occasion.  This Court permitted trial

counsel's objection to the testimony of Lt. Henderson to continue throughout the witness's

testimony.  (Tr. Trans. 2-17-98, pp. 135-136)

Trial testimony of Lt. Henderson

At trial, Lt. Henderson testified on cross examination by Allen's trial counsel that he was

aware Allen had invoked his Miranda rights, but not that he had requested an attorney:

> Q.    [By Mr. Sindel] and were you advised at that point in time concerning the conversation that they had with FBI Agent Hartman?

> A.    [By Lt. Henderson] I understood she had spoken with him, yes.

> Q.    Were you advised concerning anything about what he had said?

> A.    He indicated at that time he did not wish to speak with anyone, that he invoked his Miranda rights.

Q.    When you talk about the Miranda rights, there are several of them, but one of them is the right to have an attorney present, right?

A.    That is correct.

Q.    Were you told that he requested to have an attorney present?

A.    No I wasn't.

*  *  *

Q.    (By Mr. Sindel) I'm sorry.  As far as you know, had anyone, had no one gave you any indication that he had requested either to talk with an attorney or to have an attorney appointed for him?

A.    No.  Basically I was told that Mr. Allen wasn't talking about the case.

(Tr. Trans. 2-17-98, pp. 159-160)

Later in his testimony, on redirect, Lt. Henderson indicated he later found out that Allen invoked his right to have an attorney, although it is not clear from the context of the questions specifically when Lt. Henderson became aware of that fact:

Q.    [By Mr. Dowd] Do you know whether his rights had been read to him by Special Agent Hartman?

A.    *I later found out that –*

      MR. SINDEL: Object, unless there is a time frame.

      THE COURT: Sustained.

Q.    [By Mr. Dowd] After his arrest?

A.    Yes, sir.

Q.    Do you know what happened at that time?

A.    He invoked his right to have an attorney represent him.

(Tr. Trans. 2-17-98, pp. 194-195) (emphasis supplied)

51

On recross, Allen's trial counsel seized on this apparent contradiction and opened fire. Despite counsel's withering recross examination, Lt. Henderson maintained that at the time he interviewed Allen, he did not know Allen had requested counsel earlier:

Q.    [By Mr. Sindel] I understood that your questions concerning Agent Hartman, which that you testified both in your direct and again on cross, that when you arrived there that morning you did not realize that the defendant had invoked his right to an attorney; isn't that what you testified to?

A.    Yes.

Q.    And then when Mr. Dowd got up here and just asked you the question again, you said you were aware that he had requested an attorney?

A.    Yes, I mean he –

Q.    It can't be both ways.  When he asked you the first time on direct you said you didn't know that he had asked Agent Hartman for an attorney, right?

A.    Yes.

Q.    And when I asked you again on cross, did you know whether or not Agent Hartman or he had told Agent Hartman he wanted an attorney, Allen had told Agent Hartman that he wanted an attorney, did you also indicate that you did not know that?

A.    I didn't know that.  I hadn't talked to –

Q.    You just now indicated in response to Mr. Dowd's question – let me finish then you can do it – in answer to Mr. Dowd's question that you did know that when you interviewed him?

A.    I'm confused on the times that you're asking when I was aware of that, sir.

Q.    I only care if you were aware of it before you interviewed him.

*  *  *

Q.    Listen to my question.  I don't care if you spoke with Agent Hartman or not. What I want to know is at the time you interviewed Mr. Allen, were you aware that he had told Agent Hartman that –

A.      No, no, I was not, sir.

(Tr. Trans. 2-17-98, pp. 202-203)

Trial testimony of Det. Harper

At trial, Det. Harper testified that Lt. Henderson had informed him that Allen had requested an attorney prior to the lineup and that Det. Harper was therefore not to ask Allen any questions. (Tr. Trans. 2-24-98, p. 228, 246). After Det. Harper's trial testimony, Allen's trial counsel did not renew the motion to suppress statements for a second time.

Any discrepancy between the testimony of Lt. Henderson and Det. Harper is irrelevant

The basis of Allen's current claim is that trial counsel was ineffective for failing to renew the motion to suppress statements after Det. Harper's trial testimony. Contrary to the allegations in Allen's Petition, taken as a whole, Lt. Henderson's pretrial and trial testimony indicated he was not aware that Allen had asked for an attorney before Lt. Henderson interviewed Allen on March 18. There is nothing in Det. Harper's pretrial testimony that refutes this testimony. The only discrepancy between the pretrial and trial testimony of Lt. Henderson and the trial testimony of Det. Harper is Det. Harper's assertion that Lt. Henderson told him Allen had asked for an attorney. This discrepancy, however is irrelevant.

Allen's Petition does not explain *why* trial counsel should have renewed, or "re-urged" the motion to suppress statements after the conflicting testimony. To the extent Allen now argues the discrepancy supports his claim that his confession should have been suppressed because his request for counsel was not scrupulously honored, it matters not one whit who told Det. Harper that Allen had requested counsel or whether Lt. Henderson knew that Allen had requested counsel before speaking with him. No one contests that Allen told Agent Hartman he

53

wished to speak to a lawyer.   The legal issue, then, becomes whether under the totality of the circumstances Allen's confession was voluntary. United States v. Garlewicz, 493 F.3d 933, 935-936 (8th Cir. 2007) (confession voluntary where defendant initiated contact with officer while incarcerated and defendant received Miranda warnings.  Even if counsel had been appointed before defendant met with officer, it would have no bearing on waiver analysis, which requires only that defendant knew of right to an attorney).

To the extent Allen now argues that the discrepant testimony affected the credibility of the witnesses, and thus the finding that the confession was voluntary, the differences do not matter.  Trial counsel renewed the motion to suppress statements before Lt. Henderson's testimony and aggressively challenged his credibility.  This Court had ample opportunity to revisit the suppression issue based upon trial counsel's animated and professional cross examination of Lt. Henderson.

Ultimately, trial counsel exploited the difference in testimony to Allen's benefit in closing argument.  Trial counsel attacked the voluntariness Allen's confession vigorously, arguing that the inconsistent testimony of Lt. Henderson and Det. Harper, in conjunction with the other circumstances involved, cast it in a dim light.  Trial counsel argued that: if a defendant invokes his right to an attorney all questioning must cease; the right is important because it protects a defendant from coercion, force and compulsion; officers took no steps to allow Allen to make a phone call to get a lawyer; officers did not try to obtain a public defender for Allen; Lt. Henderson testified that he didn't know Allen had requested an attorney but Det. Harper testified it was Lt. Henderson who told him that Allen had made the request; there is no reason for this inconsistency; Lt. Henderson testified no notes were taken, but Det. Harper testified that

he took notes; Det. Nickerson also questioned Allen; and, Allen was handcuffed to the table in the interview room, thus Allen could not have stood up as Det. Harper testified. (Tr. Trans. 2-26-98, pp. 63-69).

Allen's trial counsel was not ineffective in this regard and Allen suffered no prejudice.

### 3. Alleged Ineffectiveness of Appellate Counsel

Allen claims that his appellate counsel was ineffective for failing to argue the discrepancy between the pretrial and trial testimony of Lt. Henderson and Det. Harper and for failing to raise the claim that the magistrate's refusal to consider Allen's testimony at the hearing on Allen's motion to suppress without full cross examination violated Simmons v. United States, 390 U.S. 377 (1968). These claims are without merit.

In order to demonstrate that his appellate counsel rendered ineffective assistance within the meaning of the Sixth Amendment, Allen must satisfy the two-pronged Strickland test discussed above. Initially, Allen must prove his appellate counsel's performance was deficient, that is, it was objectively unreasonable. Allen can only meet this prong by overcoming the strong presumption that counsel's conduct falls within the wide range of reasonably professional assistance. Pfau v. Ault, 409 F.3d 933, 939 (8th Cir. 2005) (citing Strickland, 466 U.S. at 688-689). The deficient performance standard is rigorous, as "[e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal." United States v. Brown, 528 F.3d 1030, 1032-1033 (8th Cir. 2008) (quoting Jones v. Barnes, 463 U.S. 745, 751 (1983)). Thus, absent evidence to the contrary, courts assume that appellate counsel's failure to raise a claim was an exercise of sound appellate strategy. Id. In the event Allen satisfies this prong, he must also satisfy the second prong by demonstrating that

counsel's performance prejudiced him by resulting in a fundamentally unreliable or unfair outcome.  It is not sufficient for Allen to prove the errors had some conceivable effect on the result, he must show appellate counsel's deficient performance actually affected the proceedings; that is, Allen must show that but for appellate counsel's unprofessional errors there is a reasonable probability that the result of the proceeding would have been different.  Pfau, 409 F.3d at 939.   Thus, in the present matter, Allen must convince this Court that there is a reasonable probability that had appellate counsel argued the allegedly inconsistent testimony and cited Simmons v. United States he would have prevailed in the Eighth Circuit.  Brown, 528 F.3d at 1033, Pfau, 409 F.3d at 939-940.

Discrepancies in testimony

Although Allen claims appellate counsel did not argue the differences between the testimony of Lt. Henderson and Det. Harper, a review of the Brief of Appellant filed on Allen's behalf by appellate counsel yields a different result.  Appellate counsel did note the discrepancy. After introducing Lt. Henderson as "the Deputy Commander of the St. Louis Police Department homicide unit," appellate counsel argues that "[a]ccording to Detective Harper, *the entire homicide division was notified early on March 18, 1997, that Mr. Allen had requested an attorney*: '[T]hat's why no one could talk to him.'  (Allen's Brief, filed 6-7-98, pp. 74-75 ) (emphasis supplied).  As Lt. Henderson was the deputy commander of the homicide unit, it is a reasonable inference from Det. Harper's testimony that Lt. Henderson, as an integral part of "the entire homicide unit" *had* been informed of Allen's request for counsel.  In light of this inference, appellate counsel continues: "Lt. Henderson testified that Detective Harper had informed him prior to the interview 'that [Mr. Allen] had invoked his right . . . but he's

requesting to see me' . . . According to Lt. Henderson, he was not specifically apprised before the interview that Mr. Allen had requested an attorney." (Allen's Brief, filed 6-7-98, p. 75).

Thus, the appellate court was clearly on notice that Det. Harper and Lt. Henderson had differing recollections as to when Lt. Henderson first became aware that Allen had requested counsel. Thus, to the extent that variance bears any relevance whatsoever, appellate counsel brought it to the attention of the appellate court and cannot now be faulted for failing to do so. Appellate counsel cannot be held ineffective on the basis of an alleged omission which did not in fact occur. Allen's appellate counsel was not ineffective and Allen was not prejudiced.

Failure to raise Simmons v. United States.

At the motion to suppress hearing, Allen's trial counsel attempted to present Allen's testimony regarding the motion to suppress statements, but decided to proceed by offer of proof when the magistrate ruled that he would not limit the Government's cross examination of Allen to just the matters raised on direct. (Hrg. Trans. 5-16-97, pp. 349-351). Allen now claims the magistrate's decision was contrary to Simmons v. United States, 390 U.S. 377 (1968). This claim fails, as Allen misapprehends the holding in Simmons. The defendant in Simmons testified at a hearing on his motion to suppress as evidence a suitcase which had been seized from the home of the mother of a co-defendant. In order to assert his standing to object to the seizure, the defendant testified at the motion to suppress that he owned the suitcase. This testimony was admitted against him at trial. The Supreme Court reversed defendant's conviction, finding that it was error to admit at defendant's trial his pretrial admissions concerning the suitcase. Simmons, 390 U.S. at 381, 389-394. The Supreme Court succinctly articulated its holding in Simmons:

57

> We therefore hold that when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not be thereafter admitted against him at trial on the issue of guilt unless he makes no objection.

Simmons, 390 U.S. at 394.

Any reliance on Simmons is decidedly inapposite to Allen's situation. Allen's objection to the magistrate's refusal to limit cross examination had nothing to do with the later use of Allen's testimony at trial. That bridge had not yet been reached. Even if Allen had testified at the suppression hearing and the Government had sought to present the testimony at trial, Allen had no guarantee that Simmons would have precluded its use. See United States v. Jaswal, 47 F.3d 539, 543 (2nd Cir. 1995) (cross examination of defendant at motion to suppress on facts of offense not erroneous where on direct testimony, defendant accused agents of fabricating his confession and overcoming his will; use of defendant's suppression hearing testimony at trial to impeach defendant's trial testimony not a Simmons violation); Oken v. Corcoran, 220 F.3d 259, 266-268 (trial court's advice to defendant that any testimony he provided at the criminal responsibility phase could be used against him during the sentencing phase in a bifurcated capital murder prosecution not contrary to Simmons.). Appellate counsel's winnowing out of this weak argument is assumed to be sound appellate strategy. Brown, 528 F.3d at 1033.

Allen can only prevail on this issue if he can show that, but for appellate counsel's failure to cite Simmons, there is a reasonable probability that he would have prevailed before the Eighth Circuit. Pfau, 409 F.3d at 939-940. This is rigorous standard which Allen has abundantly failed to meet. Brown, 528 F.3d at 1033. Allen's appellate counsel was not ineffective and Allen

suffered no prejudice.[12]  Accordingly, each of Allen's claims raised in Grounds for Relief "A"
should be rejected without a hearing.

### B. Stun Belt

Allen challenges the fact that he was required to wear a "stun belt" under his clothing
during trial deprived him of his Fifth Amendment right to be presumed innocent and to be
present at his trial, his Eighth Amendment right to be free from cruel and unusual punishment
and his Fifth Amendment right not to be deprived of his liberty without due process of law.  He
also alleges that he was denied effective assistance at trial and on appeal by his counsel's failure
to challenge this security measure.

First, Allen's substantive challenges are procedurally barred because they were not raised
in the district or appellate courts.  They could have been raised and there has been no showing of
good cause to justify the default.

Alternatively, his substantive claims lack merit, because both the nature of the crime and
the logistical considerations of the trial courtroom justified the District Court's action.  Allen
committed a premeditated, carefully planned, violent takeover-style bank robbery complete with
getaway and switch cars, much ammunition, high-powered assault rifles and attempted
destruction of evidence.  Allen also fled both the bank robbery and the fiery crash of his vehicle
and had the presence of mind to convince total strangers to expedite his getaway by driving him
from the area.  He later went to a mall where he similarly had the presence of mind to shop for
gifts.  During the bank robbery, deadly shots were directed at Richard Heflin with intent to kill

---

[12]Although Allen now claims his appellate counsel was ineffective regarding the handling
of the motion to suppress statements, at least one Judge of the Eighth Circuit would disagree.
Judge Richard Arnold  found Allen's confession inadmissible and would have reversed the
conviction.  See Allen I, dissent of J. Arnold, 247 F.3d at 795-797.

him, and Allen continued to tear Mr. Heflin's body apart while the victim lay prone and defenseless on the ground. Allen also participated with Holder in indiscriminately spraying the bank lobby with shots that could have taken more lives. In sum, Allen was, and always will be, a dangerous person who cannot be trusted. The circumstances of the crime alone justified the District Court's *sua sponte* decision to have Allen restrained by a stun belt – the security measure which created the least risk of prejudice to Allen with the jury and the greatest assurance that Allen would not harm anyone else or attempt to escape.

In addition to the circumstances of the crime, the District Court's action was justified by the logistics of its courtroom. The trial was held in the old courthouse at 1114 Market Street and the District Court's courtroom was small and located on the first floor not far from several exits, some manned and some unmanned. During trial, mere feet separated Allen from spectators, including family members, exit doors, government counsel, the jury and the judge. Given his violent criminal conduct and the logistics of the courtroom, the District Court did not abuse its discretion regarding security matters.

Numerous courts have upheld the use of stun belts, particularly in capital cases. Recently, the Eighth Circuit rejected an attack on the redundant use of leg shackles which were bolted to the floor and a stun belt. United States v. Honken, 541 F.3d 1146 (8th Cir. 2008). While the record of the threat Honken posed was more egregious, Allen's underlying offense and the circumstances of courtroom security in this case would clearly survive the "close judicial scrutiny" countenanced by the court. Other courts have similarly upheld the use of stun belts. Chavez v. Cockrell, 310 F.3d 805, 807 n.1 (5th Cir. 2002); Busch v. United States, 2008 WL 2421696 (S.D.Oh. 2008); United States v. Durham, 219 F.Supp.2d 1234 (N.D.Fl. 2002); United

States v. Driscoll, 250 F.Supp.2d 443 (M.D.Pa. 2002); United States v. Gray, 245 F.Supp.2d 1 (D.D.C. 2002); United States v Edelin, 175 F.Supp.2d 1, 7-8 (D.D.C. 2001).  The factors which the court found persuasive in Gray were that the belt was unobtrusive under the defendant's clothes, the defendant was facing death, the stun belt resulted in the need for fewer and more obtrusive courtroom deputies, there was a low likelihood that the belt would misfire and there was no undue danger to the defendant.

Busch is particularly on point because it rejected nearly identical arguments in the context of a Section 2255 petition.  The Court found that the petitioner failed to show the stun belt had any impact on his case or that its presence and the alleged anxiety caused thereby were sufficient to violate due process.  In Busch, as here, there was no evidence that the jury was aware of the stun belt and petitioner's violent background supported the court's decision.  The Busch court also rejected an ineffective assistance claim based on counsel's failure to challenge the security measure, as follows:

> The use of devices such as the stun belt are within the Court's discretion and are authorized by the Policy Directives of the U.S. Marshals' Service, and therefore the Court finds it reasonable that Petitioner's counsel did not contest this issue.  Therefore, the Court finds that counsel's choice not to bring an issue regarding the stun belt at trial is not objectively deficient.

Busch, 2008 WL 2421696 at 2.

Allen is critical of the District Court for failing to fully explain its reasons for imposing the stun belt.  A district court may rely on the advice of the U.S. Marshals in securing its courtroom and a district court's "failure to assign reasons for physically restraining a defendant . . .is not 'reversible error' where those reasons 'are readily apparent . . . from the record.'" United States v. Fields, 483 F.3d 313, 357 (5th Cir. 2007)(quoting United States v. Hope, 102 F.3d 114,

61

118 (5th Cir. 1996)).  In addition, "[a] trial court need not wait until an obviously dangerous defendant actually injures trial participants or tries to escape from the courtroom before restraining him."  Fields, 483 F.3d at 357.

Similarly, Allen's ineffective assistance claims fail.  Because the District Court's action was supported by the record and the circumstances of the courtroom, the performance of his counsel was not deficient in failing to challenge the use of a stun belt.  In addition, nothing in the record supports Allen's claim of prejudice.  There is no evidence that any juror ever became aware of the fact that Allen was wearing a stun belt.  The jury was aware that the U.S. Marshals sitting near Allen were not part of the defense team and easily could have surmised that they were there to restrain Allen and prevent him from harming anyone or escaping.  Similarly, they could have surmised that Allen was in custody, although the record is devoid of any incident where a juror was exposed to Allen being escorted into the courtroom by U.S. Marshals or being seen in handcuffs or leg shackles.  Even if a juror became aware of the stun belt by the way Allen moved or conducted himself, the marginal prejudice over and above knowledge that Allen was in custody hardly rose to the level of prejudice required to succeed on an ineffective assistance claim.

There is also no evidence in the record of any health issues being experienced by Allen during the trial or the effect of wearing the stun belt on his ability to concentrate and communicate with his counsel.  He claims that he complained about these at the jail, but there is no record of these complaints.  If Allen knew how to complain to the jail, nothing prevented him from also complaining to the Court. He knew how to instruct his attorney on jury strikes, ask the Court to dismiss his attorney, and waive his right to testify, never once complaining of health

issues.  He was also examined by several mental health experts who inquired about health matters at great length and there is nothing in the record that he advised either his or the Government's mental health professionals about any health issues he was experiencing as a result of wearing a stun belt.  If he was experiencing any anxiety, the anxiety produced from being on trial for his life had to have cast a larger shadow over his concerns about the stun belt.  Also, any initial concern that Allen had about the belt had to have been brief relative to the length of the voir dire, guilt phase and penalty phase sections of the over four-week-long trial.  Accordingly, he could not have been prejudiced thereby.

Assuming Allen was having allergy issues, watery eyes or headaches, there is no support in the record that these had anything to do with wearing a stun belt or that these impacted his ability to concentrate.  There is even less support for the argument that his alleged inability to concentrate had any impact on the outcome of the trial.  Counsel for Allen fails to put forth even speculation as to what a more focused Allen could have done to impact the outcome, much less bring about a different result.

Moreover, both this Court and Government counsel had numerous opportunities to observe Allen in the courtroom.  The Government saw no evidence of lack of concentration or discomfort on the part of Allen, apart from the discomfort of being held accountable for the terrible damage he caused by his crimes and the potential penalty he faced.  Likewise, the Court did not indicate that it observed any such discomfort or lack of concentration on the part of Allen.

Accordingly, Allen's claims regarding the use of the stun belt are without merit and should be rejected without a hearing.

### C. Racial Discrimination

Allen claims that the federal death penalty, as administered, is disproportionately and unconstitutionally applied by race.  He further argues that trial and appellate counsel were ineffective in that they did not object based on this fact.  Allen has not previously raised this issue on appeal, and it is therefore procedurally barred.  Allen does not show cause which prevented trial counsel from raising his present constitutional claims, nor that he was prejudiced by failure to raise the claim.

Allen's claims are also barred by the non-retroactivity doctrine.  Under Teague v. Lane, 489 U.S. 288 (1989), and its progeny, a defendant may not rely on a "new" rule of "procedure" in seeking to overturn his conviction on collateral review.  Id. at 310.  Here, the constitutional rule Allen proposes, declaring the federal death penalty unconstitutional as applied, is clearly not one dictated by precedent existing as of December 11, 2006, and indeed is without support in existing precedent.  Further, neither of the two Teague exceptions to non-retroactivity applies.  Accordingly, Allen's claim is barred for this additional reason.

Finally, Allen's constitutional claims fail on their merits.  Allen essentially claims that race of a defendant unconstitutionally influences the Department of Justice authorization process and that the race of the victim unconstitutionally influences both authorization and sentencing decisions.  He claims, based largely on selected statistics[13], that disparate treatment based on race violates the Equal Protection component of the Fifth Amendment[14] and the Eighth Amendment

---

[13]To quote British Prime Minister Benjamin Disraeli, "There are three kinds of lies: lies, damned lies, and statistics."

[14]Although the Fifth Amendment does not contain an Equal Protection Clause, "it does contain an equal protection component" that provides "precisely the same" protection as the

protection against cruel and unusual punishment.  Allen is an African-American and Richard

Heflin was white.  These contentions fail in light of the Supreme Court's decision in <u>McCleskey</u>

<u>v. Kemp</u>, 481 U.S. 279 (1987).  Supreme Court precedent also forecloses Allen's alternative

request for an evidentiary hearing.  In addition, the statistical analysis supplied in support of his

motion is flawed.

### 1. Race of the Defendant

Within the U.S. Department of Justice, decisions to seek the death penalty in the federal

system are made pursuant to the so-called "Death Penalty Protocol," which was promulgated by

the Department of Justice shortly after enactment of the FDPA and now appears in Title 9 of the

U.S. Attorneys' Manual (USAM).[15]  Under the Protocol, a U.S. Attorney must initially decide

whether to charge a defendant in his district with a capital-eligible offense.  Once a defendant is

charged with such an offense, the U.S. Attorney must make a detailed submission to the

Department of Justice, including a recommendation for or against seeking the death penalty.  <u>See</u>

USAM § 9-10.040.  The submission is reviewed by the Attorney General's Review Committee

on Capital Cases, which makes its own recommendation, but not before providing defense

counsel with an opportunity to make a submission and to "present to the Committee the reasons

why the death penalty should not be sought."  § 9-10.050.  The Attorney General then makes the

final decision whether or not to seek capital punishment, based on standards that track the factors

---

Equal Protection Clause of the Fourteenth Amendment.  <u>Wayte v. United States</u>, 470 U.S. 598, 608 n.9 (1985) (citations and quotation marks omitted).

[15]

The Death Penalty Protocol is available online at <http://www.usdoj.gov/usao/eousa/foia_reading_room/usam/title9/10mcrm.htm >.

a jury is required to consider under the FDPA. § 9-10.050, 10.080. The Protocol provides that "bias for or against an individual based upon characteristics such as race or ethnic origin may play no role in the decision whether to seek the death penalty." § 9-10.080.

Allen bases his claims, in part, on a statistical survey that was performed by the Department of Justice in September 2000 and updated in June 2001.[16] The 2000 Survey and the 2001 Supplement presented a series of statistics regarding the federal death penalty process that were broken down by time period, participants in the decision-making process (U.S. Attorneys, the Review Committee, and the Attorney General), and by the racial or ethnic groups of defendants and victims. See 2000 Survey at 6. The survey found "no evidence of bias against racial or ethnic minorities" in the process, but its authors made several recommendations aimed at "promot[ing] public confidence in the process's fairness." Allen argues that, in the aggregate, blacks are selected to face the death penalty more than whites. A similar argument was rejected in United States v. Bin Laden, 126 F. Supp. 2d 256, 258 (S.D.N.Y. 2000).

Allen cannot overcome the high hurdle he must surmount to prevail on a facial challenge to the FDPA. A facial challenge is a "claim that [a] law is 'invalid *in toto* – and therefore incapable of any valid application." Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 494 n.5 (1982) (quoting Steffl v. Thompson, 415 U.S. 452, 474 (1974)). Because the remedy being sought in a facial challenge is to invalidate the statute in all its applications, it logically follows that a litigant bringing a facial challenge must show that the statute has no valid application. The Supreme Court most clearly articulated that principle in

_____

[16]

The 2000 Survey and 2001 Supplement are also available online at <www.usdoj.gov/dag/pubdoc.html>.

United States v. Salerno, 481 U.S. 739 (1987), in which it stated that "[a] facial challenge to a legislative Act is . . . the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." Id. at 745. Allen cannot demonstrate that the FDPA is incapable of constitutional application; indeed, he cannot even show that the statute is unconstitutional in most or many cases. The Supreme Court and the other courts of appeals have upheld numerous sentences imposed under the FDPA against various constitutional challenges. See, e.g., Jones v. United States, 527 U.S. 373 (1999); United States v. Brown, 441 F.3d 1330 (11th Cir. 2006); United States v. LeCroy, 441 F.3d 914 (11th Cir. 2006); United States v. Purkey, 428 F.3d 738, 748-750 (8th Cir. 2005); United States v. Bourgeois, 423 F.3d 501 (5th Cir. 2005); United States v. Higgs, 353 F.3d 281 (4th Cir. 2003); United States v. Bernard, 299 F.3d 467 (5th Cir. 2002); United States v. Webster, 162 F.3d 308 (5th Cir. 1998); United States v. Hall, 152 F.3d 381 (5th Cir. 1998); United States v. Tipton, 90 F.3d 861 (4th Cir. 1996). Although a number of minority defendants have been convicted and sentenced to death under the FDPA, no circuit has stated, or even suggested, that any such sentence was the product of racial discrimination. "The fact that [a statute] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid." Salerno, 481 U.S. at 745.

Defendant's Fifth and Eighth Amendments arguments have become perfunctory in modern federal capital cases. Other defendants have filed similar motions on the grounds that they were unfairly subjected to the death penalty because they are white,[17] female,[18] African-

---

[17]United States v. Holloway, 29 F. Supp. 2d 435 (M.D. Tenn. 1998).

[18]United States v. Gilbert, 75 F. Supp. 2d 12 (D. Mass. 1999) (female and white).

American,[19] Arabic,[20] and Hispanic.[21]  Except for the decision of a divided panel of the Sixth Circuit in United States v. Bass, 266 F.3d 532 (6th Cir. 2001), such motions have been denied in every reported case.  Bass itself was summarily reversed in a per curiam decision by the United States Supreme Court.  See United States v. Bass, 122 S.Ct. 2389 (2002).  Defendant's motion here should meet no different fate than all the others.

In any event, even if Allen could sidestep the Salerno standard, his claim would fail under McCleskey.  The equal protection component of Allen's challenge fails because he cannot show "that the decision-makers in *his* case acted with discriminatory purpose" or that the purposeful discrimination had "'a discriminatory effect' on him."  481 U.S. at 292.

The Eighth Amendment component of Allen's claim also fails under McCleskey.  The Baldus study at issue in McCleskey suggested, among other things, that black defendants accused of killing white victims were substantially more likely to receive a death sentence than white defendants accused of killing black victims.  481 U.S. at 286-287.  In rejecting McCleskey's Eighth Amendment claim based on those statistics, the Court explained that "apparent disparities . . . are an inevitable part of our criminal justice system" and that "where the discretion that is fundamental to our criminal process is involved, [courts should] decline to assume that what is unexplained is invidious."  Id. at 312-313.  To assume invidiousness would be particularly inappropriate here.  Although the statistics relied on by Allen indicate that more

---

[19]United States v. Webster, 162 F.3d 308 (5th Cir.), cert. denied, 528 U.S. 829 (1999); United States v. Edelin, 134 F. Supp. 2d 59, 89 (D.D.C. 2001); United States v. Johnson, 136 F. Supp. 2d 553 (W.D. Va. 2001); United States v. Cooper, 91 F. Supp. 2d 90 (D.D.C. 2000).

[20]United States v. Bin Laden, 126 F. Supp. 2d 256 (S.D.N.Y.  2000).

[21]United States v. Roman, 931 F. Supp. 960 (D. Conn. 1996).

black defendants than white defendants are authorized for capital prosecution, they do not

indicate what percentage of the individuals committing (as opposed to being arrested for) death

eligible offenses are minorities.

Dozens of factors influence decisions about whom to prosecute, what charges to file, and

what penalties to seek. The complex interplay of these factors inevitably produces some

variation in the application of the criminal law. In McCleskey, the Supreme Court explained:

> The Constitution is not offended by inconsistency in results based on the objective circumstances of the crime. Numerous legitimate factors may influence the outcome. . . . If sufficient evidence to link a suspect to a crime cannot be found, he will not be charged. The capability of the responsible law enforcement agency can vary widely. Also, the strength of the available evidence . . . may influence a prosecutor's decision to offer a plea bargain or go to trial. Witness availability, credibility, and memory also influence the results. . . . The foregoing factors necessarily exist in varying degrees throughout our criminal justice system. 481 U.S. at 307, n.28.

These are precisely the types of factors considered under the capital review process at

issue in this case. See United States Attorneys' Manual § 9-10.000. Courts are poorly equipped

to second-guess prosecutorial decisions balancing these competing considerations. United States

v. Webster, 162 F.3d at 333 ("The decision to prosecute one person and not another is a proper

exercise of executive discretion with which [courts] are reticent to interfere."). The "capacity of

prosecutorial discretion to provide individualized justice is firmly entrenched in American law."

McCleskey, 481 U.S. at 1777. This Court should not interfere with that capacity through the

exercise of its supervisory powers in the absence of compelling proof that the Government has

abused its discretion.

To be similarly situated with respect to the Attorney General's decision to seek the death

penalty, the comparator must have "committed the same basic crime in substantially the same

manner as defendant — so that any prosecution of that individual would have the same deterrence value and would be related in the same way to the Government's enforcement priorities and enforcement plan" and "the evidence [against the comparator must be as] strong or stronger than that against the defendant." See United States v. Smith, 231 F.3d 800, 810 (11th Cir. 2000). Also, the factors that properly inform a decision to seek the death penalty must be such that there can be no legitimate prosecutorial justification for not seeking the death penalty against the comparator while doing so for the defendant. See United States v. Olvis, 97 F.3d 739, 743 (4th Cir. 1996). Defendant has made no such showing.

In addition to those factors generally relevant to a decision to prosecute, a myriad of factors properly inform a decision to seek the death penalty. For example, the United States Attorney's Manual provides certain standards for determination of whether it is appropriate to seek the death penalty:

> In deciding whether it is appropriate to seek the death penalty, the United States Attorney, the Attorney General's Committee and the Attorney General may consider any legitimate law enforcement or prosecutorial reason that weighs for or against seeking the death penalty.

> In determining whether or not the Government should seek the death penalty, the United States Attorney, the Attorney General's Committee, and the Attorney General must determine whether the statutory aggravating factors applicable to the offense and any non-statutory aggravating factors sufficiently outweigh the mitigating factors applicable to the offense to justify a sentence of death, or, in the absence of any mitigating factors, whether the aggravating factors themselves are sufficient to justify a sentence of death. To qualify for consideration in this analysis, an aggravating factor must be provable by admissible evidence beyond a reasonable doubt. Because there may be little or no evidence of mitigating factors available for consideration at the time of this determination, any mitigating factor reasonably raised by the evidence should be deemed established and weighed against the provable aggravating factors. The analysis employed in weighing the aggravating and mitigating factors that are found to exist should be qualitative, not quantitative: a sufficiently strong aggravating factor may outweigh several mitigating factors, and a sufficiently strong mitigating factor may outweigh several aggravating factors. Weak aggravating or mitigating factors may be

accorded little or no weight. Finally, there must be substantial admissible and reliable evidence of the aggravating factors.

The authorization process is designed to promote consistency and fairness. As is the case in all other actions taken in the course of Federal prosecutions, bias for or against an individual based upon characteristics such as race or ethnic origin may play no role in the decision whether to seek the death penalty.

United States Attorneys Manual, §9-10.080. See also 18 U.S.C. §3593(a) (requiring the Government to set forth in its notice of intent to seek the death penalty the aggravating factors upon which it will rely).

Defendant advances no facts to support his request for discovery. Nor has he produced any evidence of actual discriminatory intent on the part of the Attorney General in this case.

Similarly, the statistics fail to provide "the most meaningful information of all" – whether similarly situated offenders have been treated differently. Bin Laden, 126 F. Supp. 2d at 263. Allen's analysis presumes that race is the only factor which explains the result. However, his statistics, assuming they are reliable and accurate fail to account for the myriad of factors which may impact the decision that a defendant should face the death penalty. For example, there are cultural and other divides between the races in this country. There is a higher probability that a white person who kills a black person or a black person who kills a white person are strangers to each other. Stranger murders, such as Allen's murder of Richard Heflin, in the federal system are generally more deserving of the death penalty than would a non-stranger murder. Non-stranger murders are also less likely to occur under circumstances that would give rise to federal jurisdiction. Allen fails to provide statistics suggesting that whites and blacks kill strangers of another race at equal rates. Likewise, the decision whether to withdraw a death notice and permit a defendant to plead guilty to a life or other sentence may also be a factor of racial

71

cultural differences.  A defendant must be willing to accept such a plea for it to occur in the first place.  To obtain any meaningful conclusions from the statistics provided by Allen, every detail must be known and controlled regarding the universe of federal death eligible defendants and their crimes.  Allen also bases his analysis on an unsupported premise: that when blacks or whites kill federally, they kill at equal rates based on their representation in the population and kill similarly with respect to aggravating circumstances.  Allen merely states, without any supporting evidence, that "whites are arrested for homicide in roughly the same numbers as blacks."  (Allen Petition at 21).  Simply using arrest statistics (as opposed to conviction), homicide statistics (as opposed to federal murders) and rough numbers (as opposed to rates) does not entitle Allen to any relief, regardless of what his other statistics show, because he cannot show that the defendants analyzed were similarly situated by any definition.

Finally, Department of Justice policy prohibits bias based on characteristics such as race or ethnicity, see USAM § 9-10.080, and, in most cases, the Department's decision-makers are not aware of the race of the defendant or the victim.[22]  See 2000 Survey, at 5-6.  Under the circumstances, Allen's claim would fail under McCleskey even if it could survive the Salerno standard.

### 2. Race of the Victim

Allen does not suggest that the Department of Justice purposefully targets white victim cases for capital prosecution.  He claims, however, that the DOJ survey establishes that the system is nevertheless unconstitutional in its impact because a defendant accused of killing a

---

[22]U.S. Attorney submissions to DOJ are directed to be race-neutral and not disclose the race of the defendant or victim.  However, such information is usually imparted, if at all, by defense counsel.

white victim is more likely to receive a death sentence than someone accused of murdering a non-white victim. This assertion fails.

In McCleskey, the Supreme Court rejected a minority capital defendant's contention that the Georgia death penalty scheme violated the Equal Protection Clause and the Eighth Amendment based on a statistical analysis (the "Baldus study") indicating that defendants charged with killing white victims were eleven times more likely to receive a death sentence than those charged with murdering non-whites. McCleskey, 481 U.S. at 286. The Court held that to prevail on an equal protection claim, the defendant must show both "that the decision-makers in *his* case acted with discriminatory purpose" and that the purposeful discrimination had "'a discriminatory effect' on him." Id. at 292 (citations omitted; emphasis in original). The McCleskey Court defined "discriminatory purpose" as entailing:

> more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group.

481 U.S. at 298 (quoting Personnel Administrator of Massachusetts v. Feeney, 442 U.S. 256, 279 (1979)). "Because discretion is essential to the criminal justice process," the Court stressed that it would "demand exceptionally clear proof before [it] would infer that the discretion has been abused." Id. at 297. Applying that standard, the Court explained that, in the context of capital sentencing, statistics about the general operation of a death penalty scheme are insufficient to support an inference of discriminatory purpose. Id. at 292-299.

For similar reasons, the Supreme Court also rejected McCleskey's Eighth Amendment challenge. 481 U.S. at 299-313. The Court explained:

> At most, the Baldus study indicates a discrepancy that appears to correlate with race. Apparent disparities in sentencing are an inevitable part of our criminal justice system.

73

The discrepancy indicated by the Baldus study is "a far cry from the major systemic defects identified in Furman[.]"  As this Court has recognized, any mode for determining guilt or punishment "has its weaknesses and the potential for misuse."  Specifically, "there can be 'no perfect procedure for deciding in which cases governmental authority should be used to impose death.'"  Despite these imperfections, our consistent rule has been that constitutional guarantees are met when "the mode [for determining guilt or punishment] itself has been surrounded with safeguards to make it as fair as possible."  Where the discretion that is fundamental to our criminal process is involved, we decline to assume that what is unexplained is invidious.  In light of the safeguards designed to minimize racial bias in the process, the fundamental value of jury trial in our criminal justice system, and the benefits that discretion provides to criminal defendants, we hold that the Baldus study does not demonstrate a constitutionally significant risk of racial bias affecting the Georgia capital sentencing process.

Id. at 312-313 (citations and footnotes omitted).

Allen fares no better than McCleskey.  Allen is unclear regarding the legal basis for his "white victim effect" claim, but it appears to have both equal protection and Eighth Amendment components.  Allen cannot establish any error on an equal protection theory.  Allen has no evidence of purposeful discrimination on the basis of victim race in this case or any other.  McCleskey establishes that general statistics, like those relied on by Allen, are insufficient to establish "that the decision-makers in his case acted with discriminatory purpose." See 481 U.S. at 292 (emphasis in original).  In short, Allen has failed to provide the requisite "exceptionally clear proof" of intent to discriminate on the basis of the race of the victim.  Id. at 297.

Allen's Eighth Amendment claim also fails.  In McCleskey, the Baldus study indicated that, when factors other than race were not controlled for, a defendant accused of killing a white victim was eleven times more likely to be sentenced to death than a person accused of murdering a black victim.  See 481 U.S. at 286.

Because the federal capital prosecution and sentencing process has been "surrounded with safeguards to make it as fair as possible," it would be at least as inappropriate here as it was

in McCleskey for a court to "assume that what is unexplained is invidious." 481 U.S. at 313.

The Department of Justice's Protocol for capital prosecutions prohibits bias based on

characteristics such as race or ethnicity, see USAM § 9-10.080, and, in most cases, the

Department's decisionmakers are not aware of the race of the defendant or the victim.[23]

Moreover, the FDPA guided the jury's discretion in this case by requiring it to "consider the

circumstances of the crime and criminal before it recommended [a] sentence." See Gregg v.

Georgia, 428 U.S. 153, 197 (1976). Each juror in this case expressly certified in accordance

with 18 U.S.C. 3593(f) that he or she was not influenced by the race of the defendant or the

victim. Under these circumstances, the statistics relied on by Allen fall far short of

"demonstrat[ing] a constitutionally significant risk of racial bias" affecting the federal sentencing

process. McCleskey, 418 U.S. at 312-313.

Because Allen is not entitled to relief in connection with his statistical claims, his

counsel's failure to raise this issue was not deficient and Allen has not been prejudiced by said

failure. Allen's claims should be rejected without a hearing.

### D. Voir Dire

Allen claims he was denied effective assistance of counsel in connection with jury

selection. Specific claims focus on the empaneling of an anonymous jury, counsel's failure to

consult with Allen regarding peremptory strikes, and the failure to raise Batson challenges on

---

[23]

   In some cases involving racially-motivated murders or civil rights violations, the race of
the defendant and the victims may be obvious. Furthermore, in presenting reasons why the death
penalty should not be sought, defense counsel sometimes provide DOJ's decision-makers with
information about the race or ethnicity of the defendant or the victim. See 2000 Survey at 56;
see also USAM § 9-10.050 (stating that the Department will consider "evidence of racial bias
against the defendant or evidence that the Department has engaged in a pattern or practice of
racial discrimination in the administration of the Federal death penalty").

appeal.  He contends that referring to members of the venire panel by numbers rather than names implied that Allen was dangerous.  Allen further claims that had counsel addressed the errors in the jury selection process on appeal, a different outcome would have resulted.

Allen did not raise these issues on appeal, and does not show cause to justify the failure or any prejudice resulting therefrom.  The claims on this issue are therefore procedurally barred.  Even if they were not barred, Allen fails to show that counsel's performance was deficient, that he suffered prejudice or had the claims been addressed, a different outcome would have resulted.

### 1. Empaneling of Anonymous Jury

Allen claims that referring to the jury panel by their numbers instead of their names was suggestive to the jury that Allen was dangerous and therefore violated his right to an impartial jury.  In United States v. Darden, 70 F.3d 1507 (8th Cir. 1995), the Eighth Circuit analyzed the question of whether a court may empanel an anonymous jury.  The Court adopted the Second Circuit guidelines, finding it proper to empanel an anonymous jury after: "a) concluding that there is a strong reason to believe the jury needs protection and b) taking reasonable precautions to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are protected."  Id. at 1532, quoting United States v. Paccione, 949 F.2d 1183, 1191-93 (2nd Cir. 1991).  Using the guidelines, the Court considered the Eleventh Circuit factors to determine if an anonymous jury is proper:

> "[S]ufficient reason for empaneling an anonymous jury has been found to exist upon a showing of some combination of several factors, including: (1) the defendant's involvement in organized crime, (2) the defendant's participation in a group with the capacity to harm jurors, (3) the defendant's past attempts to interfere with the judicial process, (4) the potential that, if convicted, the defendant will suffer a lengthy incarceration and substantial monetary penalties, and (5) extensive publicity that could enhance the possibility that jurors' names would

become public and expose them to intimidation and harassment."

See United States v. Ross, 33 F.3d 1507, 1520 (11th Cir. 1994).

Here, two of the Ross factors are present.  Specifically, when the jury was empaneled, there was the potential that if Allen was found guilty, he would suffer not only a lengthy incarceration, but he could receive the death penalty.  In addition, there was media coverage of the robbery itself as well as the trial.  Many of the potential jurors admitted to seeing media coverage surrounding the bank robbery.  One of the potential jurors saw a television report of the commencement of the trial after voir dire began, even after being instructed not to do so.[24]  (Tr. Trans. 2-13-98, p. 125).  Because of the potential for a significant sentence and the extensive media coverage surrounding the trial which could have enhanced the possibility that the jurors' names would become public, referring to the jury panel by numbers rather than names was warranted.

Where jury anonymity is warranted, the defendant's "fundamental right to an unbiased jury is sufficiently guaranteed by the court's conduct of a voir dire that can uncover any bias toward issues in the case or to the defendant himself." Darden, 70 F.3d at 1533, citing Ross, 33 F.3d at 1520.  Any potential prejudice to the defendant is minimized by embarking upon a comprehensive voir dire process. Id.

Here, the voir dire process was comprehensive and minimized any potential for prejudice.  Defense counsel was given the names of the venire panel.  (Tr. Trans. 2-6-98, p. 68). See United States v. Lee, 886 F.3d 998, 1001-1002 (1989) (Court found that empanelling an anonymous jury was appropriate and prejudice avoided where defendants' counsel were

---

[24]The juror was subsequently stricken by the Government.

provided with the names of the jurors.).   Both parties had the opportunity to review the 14-page,

54-question questionnaires which each juror completed,[25] and engage in follow-up questioning to

uncover any potential bias.  The jury was properly empanelled, and there is no showing of

prejudice to Allen, nor the potential for a different outcome.  Allen's claim on this issue

therefore is without merit.

### 2. Peremptory Strikes

Allen contends that defense counsel unreasonably and ineffectively failed to consult with

Allen concerning defense peremptory challenges.  The Eighth Circuit made clear that the trial

court has a responsibility to make sure that defendants are given an ample opportunity to confer

with their counsel during all phases of the jury selection process including the exercise of

peremptory strikes.  See  United States v. Chrisco, 493 F.2d 232, 237 (8th Cir. 1974).  The

"exact mechanics of this requirement are properly the subject of the trial court's discretion." Id.,

quoting United States v. Crutcher, 405 F.2d 239, 242-243 (2d Cir. 1968), cert. denied, 394 U.S.

908, 89 S.Ct. 1018, 22 L.Ed.2d 219 (1969).  A defendant has no absolute due process right to be

present during a specific portion of jury selection, but rather has a constitutional right to be

present "to the extent that a fair and just hearing would be thwarted by his absence, and to that

extent only." United States v. Gagnon, 470 U.S. 522, 526, 105 S.Ct. 1482, 84 L.Ed.2d 486

(1985) (quotation omitted).

In Williams v. Kemna, 311 F.3d 895, 897-898 (8 th Cir. 2002), the Eight Circuit

addressed the issue, concluding that "the defendant's constitutional right was not violated when

he was not present while counsel exercised peremptory strikes over the noon recess because the

_____

[25]The questionnaires were identified by juror numbers, not names.  The names were not matched up with the numbers to maintain anonymity.

defendant was present during voir dire and when the strikes were given effect."  Furthermore, "even where a defendant is absent when counsel exercises peremptory strikes, his absence does not prevent his right to a fair hearing because he had observed the potential jurors during voir dire, had ample opportunity to discuss who to strike before counsel exercised the strikes, and had an opportunity to object to the seated jurors before they were sworn." Id., quoting United States v. Chrisco, 493 F.2d at 236-37, United States v. Gayles, 1 F.3d 735, 738 (8th Cir. 1993).  Even where the defendant provides his wishes in regard to peremptory strikes and counsel fails to make them, the strikes will be upheld because counsel is presumed to have strategic reasons to reserve strikes for other jurors. See Graham v. Mabry, 645 F.2d 603, 606-607 (8th Cir. 2008).

Here, Allen was present during the voir dire process.  Allen admits in his motion under Section 2255 that he provided a list of three prospective jurors who in his opinion should be stricken.  Although Allen claims that he fell ill as counsel prepared to make their peremptory challenges, he had the opportunity to consult with counsel and offer his opinion as to which jurors he thought should be struck.  (Allen Petition at 24).  Allen makes no reference to the record, but generally claims that "several" of his choices were not stricken, which indicates that counsel did consider Allen's opinion and struck at least one of his three choices. Counsel is presumed to have strategic reasons to reserve remaining strikes for other jurors.  Allen does not show that counsel's performance was constitutionally deficient under Strickland.  Even if his claim satisfied the first prong of Strickland, defendant fails to show that any seated juror was biased or otherwise unqualified, or that he was prejudiced in any way by seating jurors whom he wished to strike.  This claim, therefore, lacks merit.

### 3. Batson Challenges

Allen contends that trial counsel unreasonably abandoned a <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986) challenge.  The issue was not taken up on appeal, and Allen asserts that had appellate counsel included this ground for relief on appeal, there is a reasonable probability of a different outcome.

The Court undertakes a three-step analysis when considering a <u>Batson</u> challenge.  First, the defendant must make a prima facie showing that the prosecution has used its peremptory challenge to strike a potential juror because of race.  <u>Batson</u>, 476 U.S. at 93. Once the defense makes such a showing, the burden shifts to the Government to provide a race-neutral explanation for challenging that particular juror.  <u>Id</u>. at 98.   Finally, the Court determines if the defense met its burden, including proving pretext if the Government provides a race-neutral explanation.  <u>Id</u>.

 A trial court's ruling on a <u>Batson</u> challenge is itself a factual determination, and "federal law has never required explicit fact-findings following a <u>Batson</u> challenge, especially where a prima facie case is acknowledged and the prosecution presents specific nondiscriminatory reasons on the record.  See <u>Miller-El I</u>, 537 U.S. at 347, 123 S.Ct. 1029 ("We adhere to the proposition that a state court need not make detailed findings addressing all the evidence before it."); <u>see</u> <u>also</u> <u>Smulls v. Roper</u>, 535 F.3d 853, 860 (8th Cir. 2008).

Here, defense counsel challenged five of the Government's peremptory strikes under <u>Batson</u>. The Court found that defense counsel made a prima facie showing, shifting the burden to the Government.  The Government provided explanations for each of the strikes, including:

- One juror indicated on the questionnaire that she was philosophically, morally or religiously opposed to the death penalty, and affirmed that stance during voir dire. (Tr. Trans. 2-13-98, p. 124-125)

- Another responded that she was sympathetic to psychological reasons and testimony as a mitigator for the death penalty, she had a husband charged with narcotics and was a legal secretary who indicated a problem with partiality in response to one of the questions. (Id.)

- A third juror was struck for being generally opposed to the death penalty and having relatives who were incarcerated. (Id.)

- Another potential juror was struck for her response on the questionnaire indicating she was generally opposed to the death penalty, but believed she could set aside her feelings. Furthermore, she had a nephew who was incarcerated and a brother who was arrested for assault in Texas. (Id.)

- The fifth challenge involved a juror struck for watching television reports about the incident after being instructed not to do so, in addition to having a cousin in the penitentiary, a brother arrested for drug possession and a sister charged with shoplifting, and expressing resentment toward the system. (Id.)

Under the third prong of the Batson analysis, the Court analyzed the strikes and the Government's reasoning behind them. The Court noted that "a legitimate reason is not a reason that makes since [sic] but a reason that does not deny equal protection. The prosecutor must articulate neutral explanations related to a particular case to be tried. The prosecutors need only state a reason that is neutral or in other words not inherently discriminatory with regards to whether it makes sense."(Tr. Trans. 2-13-98, p. 135). After considering arguments from both parties, and conducting an independent review of the record, this Court determined that the Government provided race-neutral reasons in regard to the challenged strikes. The Court found there to be no discriminatory motive in the Government's action, the strikes did not exhibit purposeful discrimination, and the reasons given for the strikes were not pretext for purposeful discrimination. (Tr. Trans. 2-13-98, pp. 136-137). The Batson challenge was properly made, and the Government met its burden by offering race-neutral, non-pretextual reasons for the strikes. There is no evidence that Allen was prejudiced when the Batson challenges were

overruled, nor is there a showing that raising the <u>Batson</u> issue on appeal would have a probability of a different outcome. Allen's claim on this issue, therefore, is without merit, and should therefore be denied without a hearing.

### **E. Publicity of Second Robbery**

Allen alleges that his trial counsel was ineffective in that, upon learning during trial that the Bank had been robbed again, trial counsel requested this Court to conduct an individual inquiry of the jury to determine whether they had heard of the event and if it had any impact on them. Trial counsel sought no further relief at that time, and although the issue was mentioned in the motion for new trial, made no request to interview the jurors or present evidence on the issue at a hearing. Allen now opines that had such a hearing been held, and had it been determined that one or more jurors were prejudiced by the event, there is a reasonable probability that the result would have been different. This ephemeral and highly speculative allegation is baseless and merits no relief.

Again, Allen did not raise this claim earlier in the litigation, and fails to show cause as to why it was not raised or prejudice resulting from the failure. The claim is therefore procedurally barred. His claim for ineffective assistance of counsel is addressed below.

On February 9, 1998, the first day of Allen's trial, this Court began the voir dire proceedings by giving the assembled venire an instruction which contained the following information:

> There may be discussions about this case in the workplace and social settings and other places. You are now instructed from this moment until you are discharged as jurors not to discuss this case or the case of United States of America versus Norris G. Holder with anyone, including the other prospective jurors here assembled, members of your family, people involved in the trial or anyone else.

If anyone tries to talk to you about either of these cases, you are obligated to notify me immediately.  My name is E. Richard Webber, United States District Judge.  *Do not read, watch, or listen to any news reports concerning either this case or the case of United States of America versus Norris G. Holder.*

If there is any person among you who cannot on your oath absolutely abide by this order, please raise your hand at this time.

(NO RESPONSE)

This instruction requires that if anyone, any place begins to talk about either of this case or United States of America versus Norris G. Holder, that you must put your hands to your ears and walk away.  *If you begin to hear any news or other broadcast about either of these cases, you must turn off the radio, television, or other sound or picture device, and if you cannot, put your hands over your ears and walk away.*

*If anyone places before you, or if you accidentally or otherwise see any material pertaining to either of these cases, you must turn your eyes away and not refer to any such material.*

If there is anyone who cannot do that, please raise your hand now.

(NO RESPONSE)

At a later time when you are under oath, you will be asked whether you have read about either of these cases, whether you have seen any reports on television or listened to any reports on radio, or any other picture or sound device, and whether you have heard or seen anything about either of these cases from any source, including family members, friends, or otherwise, *so you must not violate this instruction by any exposure to any information outside the courtroom to either of these cases.*

*As you can see, you are expected to follow this instruction absolutely.*  If there is anyone who cannot , please raise your hand at this time.

(NO RESPONSE)

(Tr. Trans. 2-9-98, pp. 8-10) (emphasis supplied).

Thereafter throughout the trial, before each recess, this Court admonished the jurors

essentially as follows:

We're about to take a recess and I'll remind you of the instruction I gave

83

you at the very beginning.  During this recess or any other recess, you must not discuss this case with anyone, including your fellow jurors, members of your family, people involved in the trial, or anyone else.  If anyone tries to talk to you about the case, please let me know about it immediately.

*Do not read, watch, or listen to any news reports of the trial.*  Finally, keep an open mind until all the evidence has been received and you've heard the views of your fellow jurors.

(Tr. Trans. 2-9-98, p. 55) (emphasis supplied). See, e.g., Tr. Trans. 2-9-98, pp. 108-109; p. 234; etc.

The jury was thus admonished when trial recessed for the day on February 23, 1998, and before the lunch break the following morning, February 24.  (Tr. Trans. 2-9-98 and 2-23-98, p. 280; Tr. Trans. 2-24-98, pp. 125-126).   At that time, outside of the presence of the jury, Allen's counsel informed this Court that he had been told by the Government that the Bank "had been robbed again."   Concerned that the jurors may have heard of this event, and that it may "somehow impact or affect [the jurors'] deliberation in this particular case," Allen's trial counsel requested that this Court question the jurors individually to see if any of them had read about the recent robbery,  while still following the Court's admonition not to read about this case.  (Tr. Trans. 2-24-98, p. 126).   The Government opposed the request, stating that such an inquiry may "have the effect of highlighting to them that perhaps someone has done something improper," that the issue was covered by the Court's repeated admonitions, and that if a juror had heard something, the juror would have brought it to the Court's attention.  (Tr. Trans. 2-24-98, pp. 126-127).

This Court responded as follows:

My inclination at this time is to say nothing about the incidents.

For the record, yesterday – and this is according to what I heard on the radio – I heard on the radio that yesterday at curiously at 10:30 someone went

84

into the Lindell Bank and Trust, the same building that's the source of this case, money was taken, it is my belief it was a single, who then exited.  There was a chase on Highway 40, person was apprehended near Union Station after high speed chase, money was recovered.

Has anyone heard anything differently than those facts? Okay.

My inclination at this time is to not bring any – that matter to the jury's attention.

(Tr. Trans. 2-24-98, p. 127).

The Government is unable to find in the record any specific information concerning media reports of the second robbery, apart from that related by the Court.  No juror reported to the Court that they had heard or read of the second robbery.

To support his ineffective assistance of counsel claim, Allen bears the burden of proving he was prejudiced by trial counsel's alleged ineffectiveness. If this Court determines Allen suffered no prejudice as a result of these allegations, it need not analyze the performance of trial counsel.  Whitehead v. Dormire, 340 F.3d at 537.  To prove prejudice in this instance, Allen must establish a reasonable probability that, but for trial counsel's unprofessional errors in failing to seek leave to interview the jurors or present evidence on the issue at a hearing, the result of this case would have been different. Strickland, 466 U.S. at 694.  Allen's claim of ineffectiveness is based on layers of speculation, each of which is without a foundation in fact. A careful review of this claim leads inescapably to the conclusion that Allen was not prejudiced and merits no relief.

To have been prejudiced by media accounts of the second robbery, jurors must first have actually been exposed to those accounts.  Apart from this Court's rendition of a radio report describing certain aspects of the second robbery, the record contains no recitation of any additional media reports whatsoever.  More importantly, there is no evidence in the record that

85

any juror was exposed in any way to media coverage of the second robbery, such as it was.  Even after repeated admonishments to report contacts of any description affecting the case, no juror reported reading, hearing or seeing anything about the second robbery.   Allen's claim of prejudice is thus based on the purest speculation that the jurors were actually exposed to the "publicity."

By the time of the second robbery, the jurors had been reminded several times each day of trial not to "read watch or listen to any television, radio or news reports of the trial." Based upon these repeated admonitions, there is a reasonable probability that had a juror heard any news report involving the Bank, he or she would have immediately turned the report off, probably even before hearing the information that an subsequent robbery had occurred.  As the jury was admonished not to expose themselves to media coverage, a presumption arises that the jurors did not violate the admonition, and Allen bears a heavy burden to show the jury was actually prejudiced by the news accounts.  Frank v. Brookhart, 877 F.2d 671, 675 (8th Cir. 1989); see also, Tunstall v. Hopkins, 306 F.3d 601, 609 (8th Cir. 2002) (court assumes that jurors follow admonitions to avoid media coverage of case upon which they are sitting, and where jurors have been so advised, there is presumption that admonitions were followed).

Even if this Court adopts Allen's invitation to speculate that the jurors had been infected by media accounts of the second robbery, it must then engage in the next level of speculation – the prejudicial effect of the media accounts on the jury's verdict.  This is a most difficult task, given that there is minimal information concerning the existence of media coverage at all, and *no* information that any such publicity actually reached a juror.  Allen expresses the magnitude of this difficulty in his failure, both at the time of trial and ten years post, to articulate a meaningful theory of prejudice.   When Allen's trial counsel raised the issue on February 24, 1998, he could

not offer a rationale as to how information of the second robbery would impact upon the jury (if, in fact, the jury had actually heard of the event) except to opine that the information may "somehow impact or affect" the jury's deliberation.   Nearly ten years later, Allen is still unable to express a compelling theory of prejudice.  Allen currently advances that "[p]otentially, the knowledge that the Bank had been robbed again would have improperly influenced the jurors to believe that they needed to convict Mr. Allen in order to send a message to the community that the Lindell Bank could not be robbed with impunity."

In order for this claim to have affected the outcome of the trial, this Court would have to find that: (1) the jurors were exposed to the publicity; (2) the jurors were so outraged as a result of the publicity that, *sua sponte*, they determined to violate their oaths as jurors and the instructions of this Court and based their first phase verdict of guilt, not on the overwhelming evidence before them, but on the ethereal notion that the Bank must be protected from future robberies; and, (3) the jurors were so outraged as a result of the publicity that, *sua sponte*, they determined to violate their oaths as jurors and the instructions of this Court and based their penalty phase verdict of death, not on a careful weighing of the guilt phase evidence and aggravating and mitigating circumstances presented, but on the same illusory inclination to vouchsafe the security of the Bank.  This is a demonstration which Allen has wholly failed to make.

Allen does not advance legal authority to support his claim of ineffectiveness. Unsurprisingly, the weight of precedent refutes this claim.  Upon learning of the second robbery, Allen's trial counsel alertly requested the jury be questioned regarding their potential knowledge of the incident. (Tr. Trans. 2-24-98, p. 126).  This Court denied the request, and rightfully so. Absent a showing that the jury actually was infected by media accounts of the second robbery,

this Court had no obligation to conduct an inquiry. King v. Bowersox, 291 F.3d 539, 541 (8th Cir. 2002) (in absence of any showing that jury was even aware of hallway display placed near entrance to jury room which consisted of photo of murder victim and memorial effects, trial court was under no duty to inquire into petitioner's claim of juror interference); Tunstall, 306 F.3d at 608-611 (Newspaper was observed in jury lounge same day as article appeared containing information about trial of petitioner and his co-defendants.  Trial counsel was not ineffective for failing to voir dire jury on issue when there was no evidence that newspaper was same one that contained offending article, that juror with newspaper was a juror in petitioner's trial, or that any member of petitioner's jury had seen the article.  In absence of any showing of actual exposure, trial court had not duty to poll jury.)

Even if Allen could establish that a juror had been exposed to news reports of the second robbery, he would not thereby be entitled to relief.  In Frank v. Brookhart, supra, a recess was called during petitioner's murder trial when two prosecution witnesses disappeared.  During the recess, jurors were exposed to news accounts concerning the missing witnesses.  The Eighth Circuit rejected petitioner's claim that trial counsel was ineffective for failing to voir dire the jury concerning their knowledge of news accounts regarding the search for the missing witnesses.  Trial counsel had made the reasoned decision that a reviewing court would infer prejudice from the publication of the news articles, and did not want to remove a ground for direct appeal.  The appellate court further found that petitioner was not prejudiced by the publication of the articles, notwithstanding petitioner's claim that they suggested she was responsible for the disappearance of the witnesses. [26]  The court found that although petitioner

---

[26]The same claim cannot be made here.  Allen was in custody during the time of the second robbery, and in fact had been in open court in the presence of the jurors shortly after the

88

had established that a juror read some of the news accounts, it is not required that jurors be totally ignorant of the facts and issues involved. The court endorsed the finding of the State Appellate Court and the District Court that petitioner suffered no actual prejudice as the articles were not inflammatory and did not directly indicate petitioner had forced the witnesses' disappearance. Id. at 674-675.

The court reached a similar result in White v. Luebbers, 307 F.3d 722 (8th Cir. 2002). There, the petitioner urged the ineffectiveness of trial counsel for failing to request the removal of a juror who was reported by a bailiff to be unable to follow the trial court's admonition not to watch the television news and had discussed the case with other jurors before final instructions were read. In denying the ineffectiveness of counsel claim, the court noted that had trial counsel moved for removal of the juror, there was no reason to suppose the motion would have been granted. Neither would the trial court's denial of the motion, had it been made, been erroneous. Id. at 729-730. If the much more egregious situations in Frank and White do not support a finding of ineffectiveness of trial counsel, the benign facts of Allen's present claim require a symmetrical result.

Finally, Allen's appellate counsel cannot be faulted for choosing not to pursue this claim on appeal. Allen can pass neither the performance nor prejudice standards for ineffectiveness of appellate counsel. The deficient performance standard is rigorous, as "[e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal." United States v.Brown, 528 F.3d 1030-1032-2033 (8th Cir. 2008) (quoting Jones v. Barnes, 463 U.S. 745, 751 (1983)). Absent contrary evidence, courts assume

---

second robbery apparently took place. Docket entry 2/23/98, No. 296; Tr. Trans. 2-23-98, p. 280.

that appellate counsel's failure to raise a claim was an exercise of sound appellate strategy. Id. Equally rigorous is the prejudice standard, which requires Allen to show the result of the proceeding would have been different had counsel raised the second robbery issue on direct appeal. Id. Allen's mere assertion that "[h]ad [appellate counsel] done so, there is a reasonable probability of a different outcome" falls woefully short of establishing he was actually prejudiced. This ground for relief should be denied without a hearing.

### F. Double Jeopardy

Allen argues that his counsel was ineffective for failing to raise the argument at the District Court level that his Double Jeopardy rights were violated by charging his offense as two (2) counts. This issue was raised on appeal. Allen I, 247 F.3d at 767. Although the Court deemed it waived by failing to raise it before the district court, the Eighth Circuit proceeded to analyze the claim and rejected it. Specifically, the Eighth Circuit held that "multiple punishments for the same underlying circumstances does not violate the Constitution as long as Congress intended it." Id. (citations omitted). The Court found that Congress intended the conduct in this case to violate both 18 U.S.C. Sections 924(c) and 2113 and that each count had different elements. Id. at 767-68. Similarly, the Court held that double exposure to a sentence of death did not violate Allen's Eighth Amendment rights. Rather than the result of skewing the deliberative process in favor of death, the Court deduced that the split sentencing verdict was a reflection that "Allen was far more culpable for the firearm count than the armed bank robbery count." Allen I, 247 F.3d at 770.

Given the Eighth Circuit's clear rejection of these arguments, Allen's counsel could not have been deficient in failing to raise it in the District Court and Allen could not have been prejudiced by said failure. This Court should reject the claim without a hearing.

90

**G. Impeaching Information re Thomas Mundell**

After the trial of Allen's case, the Government became aware that witness Thomas Mundell had, for a period of time from approximately 1982 to 1986, been a paid government informant. Upon discovery of this information, the Government immediately informed this Court, as well as trial counsel for Allen and co-defendant Holder. See Holder Tr. Trans. 3-18-98, pp. 7-10; letter to Richard Sindel, May 7, 1998. The letter to Mr. Sindel included the following information: prior to his testimony in the Holder trial, witness Mundell informed the Government that in 1982 he had been arrested by DEA agents while in possession of approximately 52 grams of cocaine powder; an additional 23 grams was found in his car, and he voluntarily surrendered another 37 grams; in lieu of prosecution, Mundell agreed to cooperate with authorities; records reflect that between 1982 and 1985, Mundell was paid approximately $3,950 for his cooperation; Mundell received an additional $650 in 1986; Mundell has received nothing since. Allen's trial counsel raised this issue as ground for new trial. See Allen's Motion for New Trial, ¶ 15. As Allen failed to raise these claims on direct appeal they have been procedurally defaulted. Moreover, Allen has not been prejudiced.

To the extent Allen did not raise these claims earlier, they are procedurally barred. Allen cannot show cause as to why the claim was not raised nor prejudice. Furthermore, he fails to show by "clear and convincing evidence that but for a constitutional error, no reasonable juror would have found [Allen] eligible for the death penalty." See Frady, 456 U.S. at 170; See also Schlup v. Delo, 513 U.S. at 323.

**1. Due Process Claim**

Allen presently claims that, with respect to witness Mundell, "he was [] denied due process of law when the Government failed to disclose impeaching information before trial."

91

(Allen Petition at 28).  He currently frames this as a claim under Brady v. Maryland, 373 U.S. 83 (1963).  (Id. at p. 27).  Allen now freely admits this issue was not raised on direct appeal, although it was included as a ground for new trial.  (Id. at p. 28).  As this due process claim appears to be separate from the ineffective assistance of counsel issues which he also raises, Allen's failure to include the present due process issue in his direct appeal results in its procedural default.  See Gray v. Netherland, 518 U.S. 152, 161-162 (1996) (Brady claim procedurally defaulted where petitioner was aware of factual basis for claim at time he litigated state habeas proceeding and failure to raise claim in state court); Lefkowitz v. United States, 446 F.3d 788, 790-791 (8th Cir. 2006) (issue procedurally defaulted where it could have been raised on direct appeal but was not).  Thus, to obtain relief, Allen must demonstrate (1) cause for the default and actual prejudice or (2) actual innocence.  United States v. Moss, 252 F. 3d 993, 1001 (8th Cir. 2001) (citing Bousley, 523 U.S. at 622).   As the claim was available to raise on direct appeal, Allen fails to establish cause and prejudice.  United States v. Bailey, 235 F.3d 1071-1072 (8th Cir. 2000).  To merit relief, Allen must demonstrate actual factual innocence, that is, "in light of all the evidence, it is more likely than not that no reasonable juror would have convicted [him]."  Id. (quoting Hohn v. United States, 193 F.3d 923-924 (8th Cir. 1999).  This is a standard which Allen does not attempt to meet.  As detailed below, Allen has not been prejudiced.

### 2. Ineffective Assistance of Trial Counsel

Allen claims trial counsel was ineffective for failing to request a hearing on the motion for new trial.  Without the benefit of citation to the record, Allen avers that this Court ruled on the present matter by "treat[ing] it as newly discovered evidence, rather than as a Brady v. Maryland, violation." (Allen Petition at 27).  As a result, Allen argues, he "should have been required to show only a reasonable probability of a different outcome, rather than the more

stringent standard for newly discovered evidence, that the evidence would likely result in acquittal upon retrial." (Id.)  The record refutes this contention.  This Court denied Allen's motion for new trial without referring to the Mundell issue directly, stating:

> Okay, I have had an opportunity to review the very artfully drafted motion and response before argument today and have considered those independent of argument. Mr. Sindel is correct in his statement that no arguments are waived in any event, or no points are waived because they were not mentioned today.
> The Court is going to deny the motion for new trial at this time.

(Hrg. Trans. 6-4-98, p. 11).

There is thus no basis for Allen's current contention that this Court held him to a higher standard in considering the Mundell claim in the motion for new trial.  Even assuming, arguendo, that Allen is correct, his claim fails.  Allen was not prejudiced under either standard.

Allen overstates the importance of Mundell's testimony to the Government's case.  He argues that "[b]y showing Mr. Allen's alleged presence at the purchase of a bullet-proof vest by Mr. Holder, the Government was able to argue that Mr. Allen was involved in the planning and preparation for the robbery."  (Allen Petition at 28).  Allen neglects to inform the Court that Mundell's testimony was only a small part of the totality of evidence which demonstrated Allen's participation in the planning of the robbery of the Bank, for: Holder and Allen met on several occasions in the time leading up to the robbery; Allen accompanied Holder to the Bank the Thursday before the robbery; two days later, Allen and Holder met at a bowling alley and discussed the robbery; and, the night before the robbery Allen and Holder watched a portion of "Set It Off," a movie which served as a template for the crime.  See Statement of Facts, supra. In fact, the Government did not need the testimony of Mundell to establish Allen's presence during Holder's purchase of body armor.   In his post-arrest statement to Lt. Henderson, Allen

admitted making the trip to St. Louis Centre with Holder to buy a bullet proof vest – and being unable to afford the item.  (Tr. Trans. 2-17-98, p. 144).  Allen's statement to Lt. Henderson exposed Allen's detailed knowledge of the plan to rob the Bank, including: that the robbery had to happen on a Monday; that inside the Bank, Holder would go over the counter and Allen would serve as the lookout; that three getaway vehicles would be used, including two stolen vans; and, after the robbery, the pair would drive one of the stolen vans to Forest Park where they would burn the van to destroy fingerprints, transfer to another van, drive to Barnes Hospital and get into Holder's Mercury Topaz.  (Tr. Trans. 2-17-98, pp. 144-146).  While Mundell's testimony was clearly relevant, it was just as clearly cumulative to the substantial volume of other evidence demonstrating Allen's preparations for the crime.  In light of the sheer weight of evidence regarding Allen's participation in the planning of the robbery of the Bank, Allen fails to show that additional impeachment of Mundell would have led to a reasonable probability of a different outcome, much less that the impeachment information would have resulted in his acquittal on retrial.  See Collier v. Norris, 485 F.3d 415, 421-426 (8th Cir. 2007) (even if defense had been aware that witness was paid $300 and promised a reward for his testimony, there was no reasonable probability that result of proceeding would have been different in light of testimony of other witnesses); Morales v. Ault, 476 F.3d 545, 554 (8th Cir. 2007) (Brady prejudice cannot be shown unless there is a reasonable probability that the suppressed evidence would have produced a different verdict.)

Allen asserts that had trial counsel been able to impeach Mundell with his earlier cooperation with the Government, "trial counsel could have softened considerably the importance of this evidence."  (Allen Petition at 28).  Apart from the cumulative nature of Mundell's testimony in the first instance, trial counsel subjected Mundell to a very careful and

professional cross examination.  Trial counsel honed in on Mundell's rather loose record-keeping practices (Tr. Trans. 2-17-98, pp. 227-232), that the receipt for the bullet proof vest bought by Holder was dated "January 13"although Mundell testified the transaction occurred on March 13, (Tr. Trans. 2-17-98, pp. 234-238), and the procedure used in Mundell's identification of Allen in a photo spread (Tr. Trans. 2-17-98, pp. 231-234).  Trial counsel was able to exploit an inconsistency in Mundell's testimony; the time at which Mundell first realized that date on the Holder receipt was incorrect. (Tr. Trans. 2-17-98, p. 236).  Trial counsel did an expert job of "soften[ing] considerably the importance of this evidence," and Allen was not prejudiced by trial counsel's professional performance.

Quite understandably, Allen does not quantify the effect that the Mundell impeachment information would have had.  He speculates only that it would have affected the importance of the evidence.  However, the potence of this allegedly impeaching material was tested in a real-world crucible – the trial of co-defendant Holder.  Holder was aware of the impeaching information and made use of it. (Holder Tr. Trans. 3-19-98, pp. 26-27).  The Mundell information did not alter the outcome of Holder's trial, nor would have it affected the outcome of Allen's.  Trial counsel was not ineffective and Allen was not prejudiced.

### 3. Ineffective Assistance of Appellate Counsel

Allen complains that appellate counsel was ineffective in abandoning this ground for relief in that it was subject to plenary review, and had appellate counsel performed effectively, there is a reasonable likelihood of a different result.   Allen does not expand further upon this claim, nor does he provide information of any description to support his conclusory allegation, which is decidedly unworthy of relief.

The discussion above, which takes into account the totality of the circumstances involved

95

in this claim, demonstrates its insubstantial essence.  It is precisely the type of complaint which experienced appellate counsel would choose to eschew.  To establish ineffective assistance of appellate counsel, Allen must demonstrate that counsel's performance was deficient, and that the deficiency caused prejudice to him.  United States v. Brown, 528 F.3d at 1032-1033.  The performance standard is rigorous, as "[e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal." Id. (quoting Jones v. Barnes, 463 U.S. at 751).  Where, as here, there is no evidence to the contrary, courts "assume that appellate counsel's failure to raise a claim was an exercise of sound appellate strategy. Id. (quoting Roe v. Delo, 160 F.3d 416, 418 (8th Cir. 1998)).  The prejudice standard is also rigorous.  Allen must show that the result of the proceeding would have been different had he raised the Mundell impeachment issue on direct appeal.  Id. (citing Becht v. United States, 403 F.3d. 541, 546 (8th Cir. 2005)).   This is a showing Allen has wholly failed to make.  Appellate counsel quite reasonably culled this weak argument from the herd of ten issues raised on direct appeal.

Each of these issues should be denied without a hearing.

**H. Gang Connections**

Allen claims that his trial counsel was ineffective in that counsel failed to obtain relief when the Government suggested he had gang connections.  Allen points to two specific references, one made during the direct examination of government witness Officer Carroll and another made during the cross-examination of defense witness Eric Taylor, both of whom testified during the penalty phase. Allen contends that had counsel sought further relief, or had appellate counsel raised the ground for review on appeal, there would be "a reasonable probability that a mistrial would have been granted, and that the outcome of any subsequent

proceeding would have been different."

This claim is procedurally barred, to the extent this is the first time Allen raises the issue in the proceedings against him. Allen fails to show cause for the failure or any resulting prejudice. Allen's substantive claims likewise fail. Allen claims that counsel's failure to seek relief when the Government suggested he had gang connections amounted to ineffective assistance of counsel. An examination of the record shows Allen's claims are without merit.

The first reference involves the direct examination of Officer Thomas Carroll. Officer Carroll was asked about the circumstances surrounding the arrest and interview of Allen, including Allen's physical appearance. Officer Carroll relayed what he observed as follows:

Q.    (By Mr. Dowd) Okay. What was Mr. Allen's condition at the time that you took him into homicide?

A.    He had burns on his right ear, burns on his right nostril and scrapes on the top of his right wrist.

Q.    Okay. Were photographs taken of Mr. Allen at that time?

A.    Yes, they were.

Q    Okay. I'll show you what's been marked as Government's Exhibit 71-A. Is that a fair and accurate representation of Mr. Allen that night?

A.    Yes, sir, it is.

Q.    And what does it show Mr. Allen wearing?

A.    Gray sweat pants and white T-shirt and black tennis shoes.

Q.    Does it show – can you see in that picture whether he has any other pants underneath those gray sweat pants?

A.    Yes, you can.

Q.    And what color is underneath there?

A.    Blue.

(Tr. Trans. 2-20-98, pp. 181-182)

The Government then entered into evidence the individual items of clothing which Officer Carroll identified.  The Government asked no further questions regarding the blue sweat pants, nor about the significance of the clothing's blue color.

Officer Carroll was later asked by the prosecution to describe Allen's two tattoos. Officer Carroll responded that one tattoo said "Crip," and a second tattoo below it said "Money." Mr. Sindel called a bench conference, during which he referenced the defendant's motion in limine to exclude gang references. The Government had anticipated that the witness would answer that the tattoo featured the word "cash" rather than a gang reference, and the Government agreed to question the witness further to clarify the wording.  (Tr. Trans. 2-20-98, p. 187-188). The Court directed the Government to show another picture and ask again what the tattoo showed.

> Q. I'll show you another picture that has been marked as Government's Exhibit 71-J. It's a – is this a close-up of Mr. Allen's stomach?
>
> A. Yes, it is.
>
> Q. And the lower one says money?
>
> A. Yes, it does.
>
> Q. When you saw this up close, does that look more like cash?
>
> A. It could be that also.
>
> Q. Okay.
>
> A. Yeah.
>
> Q. Thank you.

(Tr. Trans. 2-20-98, pp. 188-189).

The Court then instructed the jury to disregard the earlier reference of the witness to his first statements as to what the tattoo showed.  The Government continued, reaffirming that the tattoo said "cash":

> Q.    I'm going to show you 71-J again, detective.  Is that a fair and accurate representation of the tattoo on the defendant's stomach area or abdomen?
>
> A.    Yes, it is.
>
> Q.    Okay.  And it says cash money?
>
> A.    I believe so.

Allen is incorrect when he states that trial counsel did not seek relief.  Trial counsel filed a motion in limine to exclude any gang reference.  When a reference was inadvertently made, defense counsel immediately asked for a bench conference. The Court instructed the jury to disregard the testimony.  Allen is also incorrect when he claims the Government suggested Allen's gang connection.  In fact, the Government willingly showed the witness two pictures, twice clarifying that the tattoo said "cash."  There is no evidence that any other relief needed to be sought, nor is there evidence that any prejudice resulted from the remark.  Furthermore, the references were made after the guilt phase of the trial, and therefore could not have had an impact on the outcome of the trial.

The second reference Allen notes was made by defense witness Eric Taylor.  Taylor, on direct examination, brought up the fact that there were many gangs in the neighborhood where he and Allen lived, and they "had to be really careful about the colors we wore." (Tr. Trans. 3-4-98, p. 205).   He went on to describe which colors were associated with particular local gangs:

> Q.    Were there things you had to do in your neighborhood about watching what you wore?
>
> A.    Yeah, you couldn't go outside in colors like yellow.   I stayed on Cote Brilliant.

The street across the alley from Cote Brilliant was Four Five Field and across the other way was like some Bloods on that street. And further down Cote Brilliant there was Six Duces. And further down the other way was some more Six Duces. So we was like surrounded by it, pretty much surrounded by different gangs. And we had to be really careful about the colors we wore, because they kind of trip on the colors we're wearing.

Q.    What do you mean trip on the colors you were wearing?

A.    Say I was walking down the street with a red cap, they make me take it off or they rip it or something like that.

Q.    What difference does it make what color cap you wore as far as you know?

A.    Well, they was tripping off the colors. Like if you're a teenager, it's like over there you had to be in a gang. Either you was with them or against them. That's pretty much how they trip off everything. Either you with us or against us. If you wasn't with them then they try and see who you with and sometimes base it on where you stay. You know, if you stay in that area then they just say you belong to them people even though you're not with them.

(Tr. Trans. 3-4-98, pp. 205-206).

During cross-examination, the prosecution asked the following questions to Eric Taylor:

Q.    Have you been involved in any of the gang activity in the neighborhood around Cote Brilliant?

A.    No.

Q.    Is it just a coincidence that you're dressed in blue today?

A.    Yes.

(Tr. Trans. 3-4-98,  p. 225). At that, the Government pursued another line of questioning and did not bring up the witness' blue clothing again. The line of questioning was brief and limited to a topic which Eric Taylor brought up on direct examination.

Although trial counsel did not object to this line of questioning, there is no indication that jurors would have inferred that Allen himself had gang connections. Allen fails to show that trial counsel was deficient in its performance. Rather, trial counsel sought to exclude all

references, and acted promptly to correct the reference made by Officer Carroll. There is no evidence that these brief, indirect references were in any way prejudicial to Allen. Any such claim relies on mere speculation.

Furthermore, the Government's case did not hinge upon that evidence. Overwhelming evidence supported Allen's role in planning and participating in the robbery and that he fired lethal shots at Mr. Heflin. See Pfau, 409 F.3d at 933 (Court allowed cross-examination of a witness regarding his association to a gang for impeachment purposes; such questioning showed bias, and there was "substantial eyewitness testimony that Pfau planned and participated in the robbery."); see also Odem v. Hopkins, 382 F.3d 846, 851-852 (8th Cir.2004) (holding *Strickland's* prejudice prong was not met because of overwhelming evidence of guilt); Bear Stops v. United States, 339 F.3d 777, 782 (8th Cir.2003) (holding *Strickland's* prejudice prong was not met because appellate counsel's failure to raise an evidentiary issue would not have altered the result of the proceedings because the erroneous admission of evidence would have constituted harmless error beyond a reasonable doubt); Collins v. Dormire, 240 F.3d 724, 727-28 (8th Cir.2001) (holding defendant did not show prejudice to support ineffective assistance of appellate counsel claim because any evidentiary error was harmless).

Allen does not show cause for his failure to raise the claim on direct appeal. Even if he had established cause, the overwhelming evidence of Allen's guilt outweighs any minimal prejudice that would have resulted from the references to gangs. See Statement of Facts, supra. Allen's claim that had an objection been made to the very limited line of questioning, there would have been a different outcome in the trial is without merit and this claim should be rejected without a hearing.

**I. Failure to Present Exculpatory Evidence**

Allen claims that his trial counsel was ineffective in that counsel failed to use information contained in discovery documents that would have created a reasonable doubt that Allen was present and participated in the robbery.  Allen presents nine separate instances in which he claims this failure occurred.  This claim fails *ab initio* in light of the overwhelming evidence of defendant's guilt as detailed *supra*, and the insubstantial nature of the alleged omissions raised here.  A review of each of the claimed deficiencies demonstrates that counsels' performance was neither deficient nor prejudicial.

Allen failed to raise these claims earlier, and further fails to show cause or resulting prejudice.  To that extent, the claims are procedurally barred.

**1. DNA evidence**

Allen claims that trial counsel's failure to present evidence of a DNA examination which revealed that blood found on item "Q-4," found near Mr. Heflin's body, did not match either Allen or Mr. Heflin.   Allen concludes from this result that it "suggests the involvement of another person in the shooting."  Allen fails to support this allegation with any citation to the record of the case, other than a parenthetical reference to the date of the DNA report, "June 5, 1997."   Allen further fails to explain how this finding exculpates him.  However, these matters are of no moment, for Allen apparently misapprehends what the examined "Q-4" item is and where it was recovered.  "Q-4" was *not* found near the body of Mr. Heflin.  It was recovered in Forest Park in the vicinity of the burned van.

The DNA report dated June 5, 1997 (Discovery Document ("DD") 0001266, Addendum 3), describes item "Q-4" as "[b]lood from white strap."  The chain of custody information indicates it was seized by Det. Priest on March 17, 1997, given to Officer Vincent, who gave it

to criminalist Margaret Owens, all on the same date.  Thereafter it was received by Donna Becherer, the DNA examiner, on March 21, 1997, who subsequently prepared the June 5, 1997, DNA report referenced by Allen.

On March 17, 1997, after the robbery of the Bank, Allen and Holder fled in a stolen van which burned in Forest Park, near the intersection of Hampton and Wells Avenues.  (Tr. Trans. 2-19-98, pp. 160-164).  Holder was arrested next to the burning van, but Allen escaped by running away from the van toward I-64, and eventually arriving at the Forestry Area alongside that highway.  (Tr. Trans. 2-19-98, pp. 219-221, 242-246).  Det. Priest reported to the area in Forest Park where the getaway van burned and recovered evidence, which he delivered to the STLMPD lab.  (Tr. Trans. 2-20-98, pp.  65-83).  Among the items he recovered and conveyed to the lab was a "white velcro strip/body armor with blood spattering" which was found in the street.  (DD 0000029-0000030, Addendum 3).  The item is also described as a "strip of white cloth with blood, from the street, northeast of van."  (DD 0000188-0000189, Addendum 3).  The item and its location in the street in relation to the burned getaway van is depicted in the photograph (DD 0000574, Addendum 3).   The area where item "Q-4" was recovered was near the area that Holder was taken after his arrest. (Tr. Trans. 2-19-98, pp.232-234).  Holder was wearing body armor at the time and had suffered a burn, abrasions and bumps.  (Tr. Trans. 2-19-98, pp. 233, 239).  This area was northeast of the burned van, in contrast to the direction which Allen ran, which was southeast.

Records from the STLMPD lab indicate that Det. Priest took the item there on March 17, 1997, where he turned it over to Officer Vincent.  (DD 0000172-0000173, Addendum 3). Criminalist Margaret Owens received it on the same date, and later prepared a report in which she identified the item as "Q-4[,] One 2" by up to 10-1/2" piece of cut white elastic strap with

103

red blood stains." The records further reflect that Criminalist Owens performed a presumptive serological examination of the red stain, which disclosed the presence of apparent blood. She then cut a portion of the strap and forwarded it to the DNA Unit of the lab. (Id.). Criminalist Donna Becherer then performed DNA analysis on item "Q-4," with the results reported by Allen. The item was not examined for the presence of Holder's blood. (DD 0001266). None of this information exculpates Allen in any way.

Far from being a "smoking gun" of the involvement of someone other than Allen in the robbery of the Bank, all the circumstances indicate that item "Q-4" was merely a strap from Holder's body armor which probably contained some of Holder's blood. Contrary to Allen's claim, it was decidedly not found near Mr. Heflin's body, as all of the evidentiary items taken from within the Bank were seized by Det. Tatum, not by Det. Priest. (Tr. Trans. 2-29-98, pp. 79-103). Nor does any item fitting the description of "Q-4" appear in photographs of the area where Mr. Heflin lay mortally wounded. See, e.g., DD 0000493, Addendum 3. If Allen is now claiming (against the weight of overwhelming evidence) that the man who ran from the burning van was not Allen but another, item "Q-4" does not help substantiate the fantasy. The person who ran from the van ran to the southwest, toward I-64 and the Forestry Area. That person did not go in the northeasterly direction where Det. Priest found "Q-4." In sum, item "Q-4" is entirely irrelevant to the determination of Allen's guilt or innocence in the robbery of the Bank and murder of Mr. Heflin. Trial counsel was not ineffective for failing to pursue this fruitless field of inquiry, and Allen has not been prejudiced thereby.

### 2. Gas Chromatographic Evidence of Allen's Clothing

Allen proffers that his trial counsel was ineffective for failing to present evidence that a gas chromatographic analysis of clothing taken from Allen at the time of his arrest tested

"negative for the presence of petroleum distillates." Allen claims that this finding would have impeached the testimony of one of Allen's arresting officers who indicated Allen "reeked of smoke" at the time. Again Allen fails to support his allegations with citations to the record, or any affidavits in support of his claim that the alleged information is in fact impeaching in any way. Assuming, *arguendo*, that trial counsel's failure to present exculpatory testimony was constitutionally deficient, Allen must still make a substantial showing that, but for counsel's failure to produce the evidence in question, the is a reasonable probability that the result of the trial would have been different. See Kramer v. Kemna, 21 F.3d 305, 309 (8th Cir. 1994). Allen must present independent evidence, by affidavit or otherwise, as to what a witness would have said had the witness been interviewed or called to testify. See Sanders v. Trickey, 875 F.2d 205, 210 (8th Cir. 1989). Absent any independent evidence, prejudice cannot be found without speculating that the outcome of the trial might have been different. Such speculation is "simply inadequate to 'undermine confidence in the outcome.'" Id. at 210 (quoting Strickland, 466 U.S. at 694). In this instance, Allen must present some evidence to support his allegation that the fact that clothing he was wearing at the time of his arrest tested negative for petroleum distillates indicates he could not have "reeked of smoke," and that this impeachment would have led to a different outcome. He cannot make that showing because, among other things, trial counsel did in fact undertake to impeach the government's witness on this issue.

Allen presents the impression that one of the officers who arrested Allen testified that Allen had an overpowering odor of smoke about him. In fact, Officer Carroll, who arrested Allen never used the words "reeked of smoke." Instead, he testified as follows on direct examination:

Q.    [By Mr. Dowd] Could you smell anything?

105

A.      Yes. He smelled like smoke.

(Tr. Trans. 2-20-98, p. 177).

On cross examination, it was Allen's counsel who pursued the issue:

Q.      You said that when you got to the house, his clothes, or he smelled like smoke; is that right?

A.      Yes.

Q.      Was it strong?

A.      It was strong.

Q.      Was it overpowering?

A.      Not overpowering.

Q.      Did he reek of it?

A.      Yes. Stronger than like a cigarette smoke.

(Tr. Trans. 2-20-98, p. 217).

Although Allen claims trial counsel was ineffective for failing to impeach this testimony, in fact trial counsel did just that. Government witnesses Lakeshia Williams and Marcie Chowning each testified on cross examination by Allen's trial counsel that, contrary to Officer Carroll's testimony, Allen did *not* smell of smoke:

Q.      [By Mr. Sindel] When he came into your house that afternoon, did you think that he smells a lot like smoke?

A.      [By Lakeshia Williams] No.

Q.      When he came into your house that evening, did you think, boy, he smells of smoke?

A.      No.

Q.      And when the police came and arrested him, did you think boy, he reeks of smoke?

106

A.      No.

(Tr. Trans. 2-24-98, pp. 167-168).

Q.      [By Mr. Sindel] Did you smell anything unusual about Bill?

A.      [By Marcie Chowning] No.

Q.      And at any time during the course of the evening did you smell like smoke or anything else on him?

A.      No.  I don't recall smelling anything.

(Tr. Trans. 2-24-98, p. 212).

Allen's trial counsel thus elicited testimony from two government witnesses which directly impeached the arresting officer's testimony that Allen smelled of smoke.  Trial counsel cannot be ineffective for actually performing the act, the absence of which is the grounds for the ineffectiveness claim.  Moreover, Allen's claim that this impeachment should have been done by admission of the gas chromatographic examination results fails, as one of the criminalists involved in this investigation has informed this office that there is no necessary connection between a positive test for the presence of petroleum distillates and an odor of smoke.  In other words, it is abundantly possible for items testing negative for petroleum distillates to present the smell of smoke. See Affidavit of Margaret Owens, Addendum 4.  One need only spend a few minutes near a camp fire to know the truth of this assertion, while Allen supplies no authority to support his argument that the proposed evidence would have in fact been impeaching.

In any event, the reasonableness of Officer Carroll's testimony is buttressed by the testimony of Bobby Harris.  Harris came in contact with Allen at the Forestry Area minutes after Allen escaped from the burning getaway van.  Harris saw Allen "patting the top of his head like his hair was on fire or something," and also saw "burnt hair on the top."  (Tr. Trans. 2-19-98, pp.

243-244).   In light of this testimony, jurors had little cause to question the veracity of Officer

Carroll's observation that Allen smelled "stronger than like cigarette smoke."  For all of these

reasons, Allen's claim of ineffectiveness fails.[27]

### 3. Greg Prater and Joe Prowell

Allen claims trial counsel was ineffective for failing to present evidence from Greg Prater

and Joe Prowell that "the person they saw running through Forest Park after the van caught fire

was 5'8" tall," and Allen is taller than that.  Allen provides no citation to the record or other

context for this claim.  Neither does he support the claim, by affidavit or otherwise, to advance

his burden of demonstrating a reasonable probability that had the evidence been presented, the

outcome would have been different.  A cursory review of the information apparently possessed

by Messrs. Prater and Prowell reveals that it is irrelevant, immaterial and trial counsel was in no

way ineffective for the decision not to pursue it.

The police report prepared by the SLMPD regarding the robbery of the Bank indicates

that Prater and Prowell, "were working at the corner of Kingshighway and Lindell for the City

Water Department and saw the following described subject standing on the southeast corner:

> Black, male, 23 to 27 years of age, 5 feet 8 inches tall, 160 pounds, thin build,
> with red, frizzy hair combed straight back, wearing a multi-colored shirt and
> grey pants . . . possibly sweat pants.

The subject was last seen walking south on the east side of Kingshighway from Lindell at about

12:00 p.m."  (DD 000132-000133, Addendum 5).  The report does not reflect that either Prater

or Prowell had any additional information to impart, thus for Allen to prevail on this claim, he

---

[27]Yet another reason exists to explain trial counsel's reticence to draw attention to Allen's clothing; it contained gobs of melted plastic consistent with originating from the burned van. (Tr. Trans., pp. 102-112).

108

must show that had the jury heard this tidbit of information, Allen would not have been convicted or would not have received the death penalty. Allen does not favor this Court with even a theory of the relevance of this information. In fact, the report of Prater's and Prowell's observations refutes the basis of Allen's present claim that the man was "running through Forest Park." The man was neither running nor in Forest Park. He was seen at the southeast corner of Kingshighway and Lindell, and he was walking. The southeast corner of Kingshighway and Lindell is across the street from the northeast corner of Forest Park, and at the opposite corner of Forest Park from the Bank, which is near the southwest corner of the Park. The man was seen around noon on March 17, 1997, nearly an hour and a half after the robbery. Allen proffers no rational explanation as to how this evidence of a man walking peaceably down a street miles from the Bank and nearly an hour and a half after the robbery would have changed the outcome of his trial.

Trial counsel was not ineffective for the decision not to present this irrelevant and immaterial evidence and Allen was not prejudiced.

### 4. James Combs

Allen presents a similar claim with respect to James Combs. Allen complains that trial counsel did not present evidence that Mr. Combs, who worked at Deaconess Hospital, saw a man enter the hospital, act suspiciously, and then leave in a brown Jeep Wagoneer. The only relevance Allen advances for this information is that the man did "not match the description of Mr. Allen, but could have been another participant in the robbery." Allen fails to show that had this evidence been presented, there is a reasonable probability that his trial would have ended with a different result.

Mr. Combs provided investigators with the following information: he is the director of

security at Deaconess Hospital; on the morning of March 17, 1997, he was aware of the Bank robbery and was alert for any young, black males seeking medical attention; he saw a black male who "appeared suspicious" approach the hospital from the east, enter the main lobby and sit down near the door; the man appeared nervous, went to the pay phones and appeared to be pretending to make a phone call, then hurriedly left the hospital; the man then entered a brown Jeep Wagoneer, which was driven by another black male, and drove north on Hampton. (DD 0000774-0000775, Addendum 6). Allen fails to support this claim by affidavit or articulate in what way this information would have resulted in a different outcome of his trial. In fact, the information is innocuous for several reasons.

Mr. Combs indicates the man he saw arrived at Deaconess Hospital from the east. The Bank is west of the hospital, thus to the extent Allen suggests this man was one of the robbers, he is coming from the wrong direction. In addition, there is no information from any other witness which would indicate a "brown Jeep Wagoneer" was in any way involved in the robbery of the Bank. Allen's suggestion that this person "could have been another participant in the robbery" is based upon the sheerest of speculation. Even assuming (against the great weight of the evidence) that this is so, Allen fails to articulate how the evidence would have exculpated him. The evidence of Allen's participation in the robbery of the Bank was overwhelming. Allen's trial counsel was not ineffective for the decision not to present this irrelevant and immaterial evidence and Allen was not prejudiced.

### 5. Wayne Ross

In this complaint, Allen alleges trial counsel was ineffective for failing to cross examine witness Wayne Ross about a statement Mr. Ross made to the F.B.I. indicating that several days before the robbery of the Bank, a person known as "J.B." – and not Allen – called for co-

defendant Holder.  Allen fails to show the relevance of this claim, and wholly fails to demonstrate a reasonable probability of a different outcome had the questioning been pursued.

In a statement given to an F.B.I. agent, Ross indicated that either Wednesday or Thursday of Spring Break (the week prior to the robbery of the Bank) Ross was with Holder when Holder received a call from someone identified only as "J.B.," "one of Bill's 'Cats.'" (DD 0001059-0001064, Addendum 7).  Ross gave no indication that he knew who was actually calling, or had any knowledge regarding the substance of the conversation.  At trial, Ross testified that he was present at a bowling alley on the Saturday before the robbery and overheard Allen and Holder discuss robbing the bank.  (Tr. Trans. 2-18-98, pp. 13-24).  Allen's trial counsel cross examined Ross about, *inter alia*, Ross's identification of Allen in a photo spread.  Trial counsel also attempted to establish that Allen did not have much connection with Holder, thereby distancing Allen from his co-defendant.  (Tr. Trans. 2-18-98, pp. 35-51).

To the extent Allen is claiming that his trial counsel's failure to question Ross about the call from "J.B." prevented the jury from learning that a third person may have been involved in the robbery of the Bank – although he fails to disclose how this benefits Allen– he need not worry.  The jury was well aware that a person known as "J.B." may have been involved.  The Government disclosed this information in its opening statement.  (Tr. Trans. 2-17-98, pp.70-71).  Later, Lt. Henderson recounted Allen's post arrest statement which contained the same information.  (Tr. Trans. 2-17-98, p. 156).  Allen's trial counsel adduced the same information during his cross examination of Lt. Henderson. (Tr. Trans. 2-17-98, pp. 184-185).  Finally, Det. Harper also testified that Allen had identified a "J.B." as someone who could be involved in the robbery and murder.  (Tr. Trans. 2-24-98, pp. 238-239).  Allen fails to indicate how trial counsel's decision not to ask Ross if he had knowledge that Holder had received a call from

"J.B." would have changed a thing.  Allen's trial counsel was not ineffective in this regard and Allen assuredly was not prejudiced.

### 6. Michael West

Allen faults trial counsel for failing to cross examine witness Michael West, who Allen claims identified him, with West's prior statement that he did not see either suspect's face, and that due to the ski mask, he could not relate the age of either suspect.  Trial counsel is without fault in this regard.  Mr. West did not identify Allen. (Tr. Trans. 2-18-98, pp. 146-170).  Trial counsel was not ineffective and Allen was not prejudiced.

### 7. Broderick Bonner

Allen alleges his trial counsel was ineffective for failing to present the testimony of Broderick Bonner, whom, based on statements contained in discovery documents, would have been able to testify in impeachment of Wayne Ross that: (1) Bonner did not sit with Allen and Holder in the bowling alley, and thus was not in a position to overhear any conversations between the two; and, (2) Holder did not discuss the bank robbery that night and Ross did not know anything about Holder having a plan to rob a bank.  Allen does not refer to the record or support the claim by affidavit or otherwise.  Even so,  Allen claims this testimony would have contradicted the testimony of Wayne Ross that Ross overheard a conversation between Allen and Holder about the robbery.  Allen's claim of ineffectiveness must fail.  The proposed testimony of Bonner is actually consistent with the trial testimony of Wayne Ross, and the totality of Bonner's testimony would have been very inculpatory to Allen.

Allen's contention that Bonner did not sit with Allen and Holder and thus was in no position to overhear the conversation between the two is completely consistent with the testimony of Wayne Ross.   Ross testified he went to the bowling alley in the company of Holder and three

other friends; Bonner, Jeff Moore and Charles Smith.  When Holder met Allen at the bowling alley, those two had a conversation while seated at a table about "three tables down" from the rest of the group.  (Tr. Trans. 2-18-98, pp. 15-16).  While Bonner may have been "three tables" away, Ross moved closer. Ross was "at the next table, but [he] was leaning back trying to listen to what they were talking about."  As a result, Ross was between the two groups, "in the middle between two and three tables," and although he was "facing [his] other friends," he was also "leaning back toward [Allen and Holder] trying to listen."  (Tr. Trans. 2-18-98, pp. 16, 21).  This testimony is symmetrical with Bonner's statement that *Bonner* could not overhear the conversations between Allen and Holder.  Bonner was three tables away.  Ross was at the next table straining to listen.

As Bonner could not hear what Allen and Holder were talking about, Allen is correct in the assertion that, according to Bonner, Holder did not discuss the robbery.   Bonner does not know what Allen and Holder discussed.  Similarly, the proffer that Bonner would state that Ross did not know about Holder's plan to rob a bank is correct from Bonner's perspective.  Bonner did not overhear the plan like Ross did, and Bonner could not therefore know what Ross knew.  This proposed testimony would not impeach Ross, and trial counsel was not ineffective for choosing to avoid it.

There is another reason trial counsel may have eschewed the testimony of Bonner. Bonner would have been able to testify to matters very damaging to Allen.  After the trip to the bowling alley, Bonner and Ross visited Holder in Holder's bedroom. There, according to the discovery document:

> Bonner saw weapons in Norris' bedroom. Bonner noted that "[Holder] had all kinds of guns."  Bonner recalled seeing a pistol or two.  Bonner saw what he called "little machine guns."  Bonner saw a few of the "little machine guns" . . . Bonner described the machine guns as being black in color.  Bonner saw at least three of the machine guns.  Bonner noted they were the kind of weapons you put a clip in

113

the weapon . . . Bonner also saw a weapon he believed was called a Mossberg. Bonner believes the handle and the barrel were sawed off the Mossberg. . .

(DD 0001065-0001069, Addendum 8).

In light of Ross's testimony that he overheard Holder planning a bank robbery with Allen, the testimony of Bonner that Holder had an arsenal in his bedroom would have certainly loaned credence to Ross.   As Ross testified Allen planned the robbery with Holder, this testimony would have been very damaging to Allen as well.  Trial counsel wisely avoided this problem by keeping Bonner off the witness stand.   Trial counsel was not ineffective and Allen was not prejudiced.

### 8. Jeffrey Moore

Allen's contentions regarding Jeffrey Moore are similar to his complaints regarding Broderick Bonner; that trial counsel did not present testimony from Moore which would have contradicted the testimony of Wayne Ross concerning events at the bowling alley.  The Moore claims are similarly deficient.  Moore's testimony would have tended to corroborate Ross, and would have been damaging to Allen.

Again without the benefit of reference to the record or affidavits in support, Allen alleges Moore would have testified that when Moore went into the bowling alley the evening that Holder and Allen allegedly met, Moore saw Ross sitting with Smith at a different table than Holder. Moore could not see who Holder was with.  Allen avers that this testimony would contradict Ross's testimony about overhearing a conversation between Holder and Allen.  A cursory review of the facts refutes this claim.  At the bowling alley, when Holder realized that Ross was eavesdropping, he and Allen moved farther from Ross.  Ross's testimony described the events:

Q.     [By Mr. Landolt] At that point, sir, did they notice your location?

A.     [By Mr. Ross] Yes.

Q.      Tell the jurors what, if anything, happened then.

A.      Norris told me to – he just told me, "Get back.  I'm talking business."

Q.      At what point what, if anything – at that point, rather, what, if anything, did those two do?

A.      They got up and moved a table – two tables down.

Q.      When they moved, tell the jurors what, if anything, you did next.

A.      *Well, my cousin and I we moved to see what was going on.*

Q.       *That's Mr. Smith?*

A.      *Yes.*

Q.      You moved farther down as well?

A.      Yes.

Q.      Where were you at this point?

A.      I was approximately in the same position I was at the other table, but a little further – like a little further away.  I was trying to like lean over and listen, like eavesdrop.

Q.      Were you able to eavesdrop from that position and hear portions of the conversation?

A.      Yes.

(Tr. Trans. 2-18-98, pp. 22-23) (emphasis supplied).

Far from impeaching Ross, Moore's proffered testimony would have: (1) corroborated the trip to the bowling alley; (2) corroborated that Holder was sitting apart from the group; and, (3) corroborated that Smith and Ross were together.  Allen fails to mention that Moore could have also testified that he was aware that Holder had been talking about robbing a bank, and that Holder had told Moore that he was "on a paper chase."  Moore also knew that Holder had guns, and had in fact seen Holder with what, to Moore, appeared to be a "Glock" handgun.  (DD

115

0001276-0001277, 0001281-0001282, Addendum 9).  Since Moore's testimony actually increased the credibility of Ross's, and Ross testified Holder planned the robbery with Allen, this testimony would have inculpated Allen further.  Trial counsel wisely decided not to adduce the testimony of Jeffrey Moore.  Trial counsel was not ineffective and Allen was not prejudiced.

### 9. Anonymous Caller

In this allegation, Allen complains that trial counsel was ineffective for failing to investigate and present evidence that an anonymous caller informed the F.B.I. that Holder had been seen at the bowling alley discussing the bank robbery with someone other than Allen.  Allen again fails to support the claim with any reference to the record, affidavit or otherwise.  He fails to articulate how this information would have changed the outcome of his trial, and this Court should reject the claim.

On the day of the robbery of the Bank, the F.B.I. received an anonymous telephone call, in which the caller advised "[a]pproximately one week prior, the caller had seen Holder at the bowling alley and heard him talking to an individual known as "DeMarco" about robbing the bank."  According to the caller, "both DeMarco and Holder frequent the bowling alley."  (DD 0000671, Addendum 10).  Allen does not indicate how this information would have led to a different result.  On its face, because it comes from an anonymous source its reliability is questionable.  Neither does it impeach any evidence presented by the Government at trial.  The government's evidence is that Holder and Allen met in the bowling alley on March 15, just two days before the robbery of the Bank.  (Tr. Trans. 2-18-98, pp. 12-13).  The anonymous caller recounted an event which took place sometime before that, "approximately one week" before the robbery.  Even if the information was accurate, the fact that Holder may have tried to recruit "DeMarco" to help him rob the bank does not exculpate Allen; rather it provides a motive for

116

Holder to contact Allen and offer the job to him, as "DeMarco" apparently passed on the opportunity.

Importantly, Allen offers no legal theory which would have supported the admission of this information at trial. Allen does not suggest how the offer of this material would have survived a hearsay objection, as it is clearly inadmissible. See Harris v. Zurich Ins. Co., 527 F.2d 528, 531-531 (8th Cir. 1975) (anonymous phone call made to the Bomb and Arson Squad which allegedly implicated plaintiff in the arson was inadmissible hearsay); Brown v. Keane, 355 F.3d 82 (2nd Cir. 2004) (anonymous 911 call describing person shooting gun was hearsay). Allen offers no exception to the hearsay rule which would have allowed the admission of this evidence. Allen's counsel cannot be faulted for failing to offer inadmissible evidence. Allen has suffered no prejudice as he does not carry the burden of demonstrating a reasonable probability that use of the information would have resulted in a different outcome. As with each of the foregoing claims, this Court should deny Allen any relief without a hearing.

### J. Mitigation Evidence

Allen attacks the performance of his trial counsel in connection with investigating and presenting his mitigation evidence. He prefaces his claims with a narrative regarding the alleged procedural background of the mitigation investigation. Like his other claims, the claimed facts are not supported by the record or any materials submitted in support of the application. But, the issue is not the background that led to the eventual mitigation investigation, but whether counsel's performance was deficient and whether Allen was prejudiced by the failure to locate and present any particular mitigation evidence.

Regarding the circumstances of the prior investigation, these facts were presented to the District Court, and a motion for continuance was denied. On direct appeal, counsel raised the

117

denial of the motion to continue as error.  In Allen I, the Eighth Circuit reviewed the circumstances that were in the record and determined that the District Court had not abused its discretion in denying the motion for continuance.  In doing so, the Court noted that mitigation evidence was presented over three (3) days of the penalty phase and consisted of 36 witnesses that included family, friends, educators and experts.  The evidence covered 900 pages of trial transcript.  This evidence supported the submission of four statutory mitigators and twenty-two non-statutory mitigators.  At the time of the direct appeal, Allen could not "point to any specific mitigation evidence that he was deprived of presenting to the jury."  Allen I, 247 F.3d at 771. The Court of Appeals specifically rejected the contention that Allen had been prejudiced by the timing of the trial and mitigation investigation.  Id.

### 1. Mitigation Evidence

A cursory review of the actual mitigation case put on by Allen's trial counsel demonstrates that not only was Allen not prejudiced by the timing of the trial, but that trial counsel put on a very thorough, strong mitigation case that fully developed a number of themes that were linked together by his experts and his closing argument.  Volumes 15, 16, 17 and 18 of the trial transcript contain the mitigation case.

The mitigation investigation was able to locate, prepare and present most of the educators who dealt with Allen during his life: John Lents (third grade teacher at Glenridge Elementary School in the Clayton School District); Ann Edmons (special teacher assigned to Allen at Glenridge); Tyrone Jones (basketball coach for Allen circa age 14-15); Susan Duke (Allen's kindergarten teacher); Tracy Eaton (fourth grade); Lawrence Wells (football coach for Allen circa 1992-93); Marvin Neals (Sumner High School freshman teacher); Stephanie Stock (first grade); and Julie Ellis (sixth grade teacher who was particularly close to and supportive of Allen).  Other

lay witnesses included friends, neighbors, cousins, siblings, and aunts: Debrah Ruffin (mother's co-worker at the City Library); Melissa Petty (aunt); Claud McLemore (19 year old cousin); Otha Petty, Jr. (aunt); Beverly Oliver (mother of Ahmed, close friend of Allen); Ahmed Oliver (19 year old friend); Lucy McLemore (aunt); Latasha Valentine (former girlfriend); Martha Burns (mother of Latasha); Shimeka Taylor (20 year old neighbor and friend); Yvette Allen (18 year old sister); Angela Allen (19 year old sister); Nicole Petty (older sister); Eric Taylor (neighbor); Colette Mclemore (cousin in college at the University of Kansas); Nancy Harris (neighbor); Monette Petty (cousin in college at UMSL); Erica McLemore (cousin in college at Mizzou); George Ingle (Sumner High School Assistant Principal); Russell Vanecek (sixth grade art teacher); Samuel Moore (neighborhood softball coach); Luvetta Taylor (mother of Marquis and friend of Juanita Allen); Barbara Murrell (Clayton school counselor); Raymond Petty, Jr. (third grade age cousin); and Raymond Petty, Sr. (Uncle). In addition, Allen presented the testimony of two mental health experts: Dr. Michael Gelbort, a neuro-psychologist; and Dr. Daniel Cuneo, a clinical psychologist.

Allen's experts presented two sides of his mental health. Dr. Gelbort noted several possible sources of brain damage in Allen's life (febrile seizures, lead poisoning, head injuries and asthma, Tr. Trans. 3-5-98, pp. 47-50) and testing which confirmed deficits that could be the result of brain damage (impulsivity and inability to inhibit actions, frontal lobe problems, Tr. Trans. 3-5-98, pp. 51-69). Dr. Gelbort also reinforced the mitigation themes that Allen was a follower not a leader, could be misled, and that the education system had failed Allen. (Tr. Trans. 3-5-98, pp. 75-83). Finally, Dr. Gelbort concluded that Allen could function well in a structured environment, such as prison. (Tr. Trans. 3-5-98, pp. 83-85). Dr. Cuneo attempted to establish that in addition to organic brain damage, Allen suffered from a mental disease, Post Traumatic

Stress Disorder accompanied by depression.  Dr. Cuneo attributed this to Allen losing two peers to violent death, one of which occurred in his presence.  (Tr. Trans. 3-5-98, pp. 228-243).  From this base, Dr. Cuneo painted a downward spiral in Allen's life resulting in marijuana dependency, being rejected by his mother, and seeking help through suicide attempts and emergency room visits in the weeks preceding the robbery.  (Tr. Trans. 3-5-98, p. 251).  Dr. Cuneo also reinforced the theme that Allen could not control his impulses as a result of his mental problems.

The actual presentation of the mitigation evidence shows that the investigation was thorough and that trial counsel had a complete mastery of the details of Allen's life.  An actual review of the mitigation case presented by Allen's trial counsel is the best rebuttal to the claim that his counsel was ineffective.  The order in which the witnesses were presented was carefully designed to achieve the maximum impact, emotional and otherwise, on the jury.  Allen's lead trial attorney was and is a nationally-recognized criminal defense specialist who has a wealth of experience in trying capital cases and who is known for his high level of preparation and effective courtroom and cross-examination skills.  He is often selected to represent capital defendants in this and other federal and state trial courts.  He is often selected to represent capital defendants in habeas litigation.

Allen's second trial counsel was equally well-versed in the facts of the case, but emphasized his capital appellate experience and legal research skills.  It was Allen's trial counsel who raised and preserved the issue which, for a time, resulted in remand of this case from the Supreme Court and temporary reversal of his death sentence, before it was ultimately reinstated by the Eighth Circuit en banc and upheld by the Supreme Court.

Allen's mitigation case stressed his lack of leadership skills and his tendency to follow others – a very compelling argument in support of a life sentence when compared with the

portrayal of Norris Holder as the leader of the bank robbery.  He also stressed Allen's broken home at a young age and the contrast between the path Allen took and the paths taken by his friends and relatives who grew up in stable, two-parent homes.  This theme suggested that Allen was not fully responsible for his conduct because it was, in part, a product of the nature of his upbringing.  Other themes included his non-violent nature, the notion that his actions in this crime were completely out of character, the difficulty that he experienced coming from a disadvantaged background and being bused to Clayton Schools, the failure of education resources to provide Allen with the help he needed to succeed in a difficult situation, and Allen's positive qualities, including his artistic and athletic abilities.

Now, over ten (10) years after this case was tried, Allen claims that the additional evidence that should have been discovered, "is not intended to be exhaustive, since investigation into mitigation evidence is ongoing." (Allen Petition at 34).  Allen has had the benefit of numerous counsel and resources to investigate and determine what, if any, additional evidence could have been presented.  He's also had the benefit of the period of time since December of 2006, when certiorari was denied.  He received the benefit of equitable tolling of the one-year statute of limitations found in the AEDPA.  He's also received the benefit of the time period during which the Government sought extensions to respond to his motion and he has not sought leave to supplement his petition.  Having now filed his Section 2255 motion, Allen should not be permitted to continue fishing.  Such an open-ended approach violates the letter and spirit of the AEDPA – at some point this case should be final so the sentence can be carried out while those that loved Richard Heflin are still alive.  Allen's claim should be evaluated on what has been raised in his petition.  If it does not warrant relief, this Court should say so and permit this case to move to appellate review (which would be Allen's fourth time to be heard by the Eighth Circuit).

Allen raises eight arguments in support of his ineffective assistance claim regarding the mitigation investigation and presentation.

### 2. Allen's Paternal Family

Allen claims that counsel failed to present evidence from the paternal side of his family. Again, Allen's failure to support his petition with any affidavit or evidentiary basis dooms his claim. He states that the basis for believing that other paternal family members and "other informants" would have provided paternal family evidence is nothing more than "information and belief." This is not the basis upon which this Court can grant Section 2255 relief or require the Government to participate in a hearing on Allen's claims.

Allen specifically claims that his counsel was ineffective for not calling Billie Allen, Sr., the brother of Allen's father and thus his paternal uncle. Yet, Allen does not submit an affidavit or even a memorandum of interview supporting what his uncle would testify to. Allen concedes that his trial counsel caused Billie Allen, Sr. to be interviewed. Allen claims that the failure to call Billie Allen, Sr. left the jury with the impression that Allen spent time only with his maternal family, whereas Allen allegedly had a close relationship with his father until his parents' divorce. Allen also states that the jury did not learn that his father, uncle and grandfather were substance abusers (alcohol or drugs), that he was embarrassed by his father's alcoholism and that his cousin, Cory Roy, was shot by a gunman targeting Allen.

Allen fails to show that the absence of this evidence rendered his trial counsel's performance deficient or that he was prejudiced thereby. The jury was aware of pertinent facts concerning Allen's father, John Allen. Several witnesses testified that John Allen had a severe alcohol problem and had little or no role in Allen's life after a young age. (Melissa Petty, Tr. Trans. 3-3-98, pp. 140-42; Lucy McLemore, Tr. Trans. 3-3-98, p. 263; Angela Allen, Tr. Trans.

3-4-98, p. 168; Nicole Petty, Tr. Trans. 3-4-98 pp. 182-84; Luvetta Taylor, Tr. Trans. 3-5-98 pp. 375-76).  Nicole Petty and Angela Allen, themselves daughters of John Allen, testified that Allen's father could be seen regularly at their grandparents' house, but that Allen did not like his father and did not get along with him.

Allen claims that the failure to call his paternal uncle as a witness was ineffective, because the jury did not hear that Allen had a close, positive relationship with his father prior to his parents' divorce and that the break-up had a negative impact on Allen.  But, the actual testimony demonstrated the opposite, and the fact that the break-up impacted Allen negatively was covered by other evidence and was well within the common sense purview of the jury.

### 3. Defense Experts Reliance On Third-Party Reports

Allen claims that his trial counsel was deficient in permitting the defense experts to rely on third-party reports of family interviews and other information and that, as a result, the jury failed to find that Allen was brain-damaged or suffered from PTSD.[28]  Allen's experts were qualified professionals in their field and did not condition or qualify their opinions on the nature of the evidence on which they relied.  In addition, many of the witnesses who provided reports to investigators testified live before the jury.  Further, Dr. Cuneo personally interviewed Allen's mother, Juanita Allen, and actually presented her testimony to the jury by covering what she told him.

Again, Allen fails to support his petition with affidavits of his trial experts or any other expert suggesting that reliance on third-party reports rendered their opinions less than reliable.

---

[28]As indicated, *supra*, the fact that the jury did not find a mitigator does not mean that it was not convinced of it factually – it could mean either that it was not convinced factually or that in the context of the crime it did not view the claimed mitigator as mitigating of punishment.

Allen fails to specify what his experts would have done or found differently had they personally interviewed all third-party historians. They did personally examine and evaluate Allen. Most of the individuals who provided historical details about Allen testified at trial and had they felt the need to see the individuals in person, they could have easily done so. A review of the actual content of his experts' testimony reveals nothing inadequate or ineffective about the methodology used. (Dr. Gelbort, Tr. Trans. 3-5-98, pp. 44-85; Dr. Cuneo, Tr. Trans. 3-3-98, pp. 200-251).

### 4. Failure To Call Juanita Allen As A Witness

If there was evidence that Juanita Allen could have provided that would have benefitted Allen, it could have been provided to this Court in the form of an affidavit to review the need for a hearing. It was clear from the evidence that Juanita Allen was available and had been interviewed during the mitigation investigation. Dr. Cuneo relied on his interview with her and gave a summary of her statements. (Tr. Trans. 3-5-98, pp. 248-49). The jury also saw her sitting in the courtroom. It was clearly a matter of strategy not to call her as a witness. Allen was attempting to portray himself as the product of his negative environment and lack of opportunity to succeed. Part of that attempt included portraying his upbringing as broken and both of his parents as alcoholics who did not give Allen what he needed. If Juanita Allen could not depict herself as that dysfunctional to the jury, Allen's mitigation strategy would have been undermined.

Allen's sisters clearly did not blame Allen's downfall on the lack of a loving and decent mother. In fact, Allen was the product of a two-parent home during the formative years of his life and his mother worked to support her children. When the marriage broke up, Juanita Allen provided a stable home for Allen at her parents' house and Juanita's father, by all accounts, was a good man and a good role model for Allen. (Samuel Moore, Tr. Trans. 3-5-98, pp. 350-364). Rather than ineffective, the failure to call Juanita Allen was consistent with the mitigation

strategy and served to protect it from a part of the truth that Allen needed to escape – that he was not the product of as bad an environment as he would have liked the jury to believe.  He had the benefit of a good education, but simply failed to apply himself.  His predicament was the result of bad choices made by him, not the shortcomings of others.  Juanita Allen provided a stable home that included the male influence of her father and extended family until Allen's behavior was so bad that she ejected him from the household in January 1997, just weeks before the robbery.  (Tr. Trans. 3-5-98, p. 251).  Juanita Allen's alleged alcoholism would not have added anything to Allen's mitigation case where alcohol did not play a role in his decision to rob a bank and murder the guard.

Allen also claims that the jury was not made aware of the effect that the suicide of Juanita Allen's boyfriend, Louis, had on Allen.  His petition suggests that the suicide had a serious effect on his mother, which is to be expected, but there is no evidence put before this Court to support its impact on Allen.  Any support that such testimony would have lent to Allen's mitigation was marginal and paled by comparison to far more mitigating evidence that was rejected by the jury.

### 5. Lead Poisoning

Allen notes that his trial counsel had medical records documenting Allen's exposure to lead at an early age.  The jury was aware of these facts.  Dr. Gelbort testified about these medical records and gave uncontroverted evidence of the negative effects of lead on the brain and linked it to Allen's alleged frontal lobe damage.  (Tr. Trans. 3-5-98, pp. 49-50, 198-99).  Allen claims it was unreasonable not to consult lead experts.  But, Allen fails to specify what additional information such experts could have provided that would have added anything meaningful to the clear and concise statements of Dr. Gelbort concerning the effects of lead.  The failure of Allen to submit an affidavit of a what a lead expert would have testified to differently than Dr. Gelbort

leaves this court to speculate as to the content and impact of the missing testimony.  This Court cannot presume prejudice and Allen essentially asks this Court to do so based upon his "information and belief."  On the other hand, Dr. Gelbort did connect lead exposure to low IQ.  Moreover, Allen's Full Scale IQ, which was known to the jury, was in the low average category.

Again, the jury did not necessarily find that Allen did not factually suffer from brain damage, because its finding could just as well as have been based on its failure to find Allen's brain damage mitigating of punishment.  The brain damage might have explained why Allen was not likely to succeed in an academic setting, as Dr. Gelbort pointed out, (Tr. Trans. 3-5-98, p. 56), but it did not explain why he had to resort to murder to get money from a bank and it did not explain the relatively high level of functioning and planning that his actions in the crime demonstrated.

### 6. Undiagnosed Mental Illness

This is the most outrageous example of Allen's failure to support his petition.  This ground simply states that although Allen's habeas counsel are not "trained mental health professionals," said counsel "believe[s]" that "Allen is suffering from a mental disease or defect which should have been diagnosed at the time."  (Allen Petition at 38) (emphasis added).

Allen had the benefit of being evaluated by not one but four mental health experts at the time of his trial.  There were two for the defense and two for the Government.  The government's experts were professors at Washington University School of Medicine.  All four were qualified mental health professionals and each gave their diagnosis.  The fact that Allen's habeas counsel believes, based on their exposure to Allen now, over 10 years after his trial, that he suffers from a mental disease or defect is entitled to no weight whatsoever.  Even if he has such a disease now, it is irrelevant to the effectiveness of his counsel at trial.  The fact that even his trial counsel had to

concede that at times Allen was a bit of con man, such as by selling fake drugs or "ganking" people in his neighborhood, does not support a finding that a mental disease went undiagnosed. Allen makes no effort whatsoever to tie this naked allegation to any prejudice to his counsel's mitigation effort.

### 7. Mental Retardation

Again, based on nothing more than habeas counsel's belief, Allen asserts that he may be "mentally retarded." Allen fails to support this ground with any new evidence or expert opinion. There is a reference to a Dr. Keyes[29], but no citation to any report or published article by him, regarding the tests that were utilized in this case. Even if the allegations concerning the WAIS-R are correct, an adjusted IQ still places Allen well above mentally retarded ranges. The testing by Dr. Gelbort and Dr. Wetzel were known to the jury and neither was of the opinion that he was retarded, because his test scores and his performance in life did not support such a finding. Moreover, even if the WAIS-R was out-of-date when given to Allen, which is debatable because Dr. Gelbort did not think it was obsolete, and his actual test scores should have been lower, there is nothing to suggest that his trial counsel should have known this, was deficient in not knowing the subject area better than his experts or that Allen was prejudiced by the jury's consideration of his fate without said information. The jury clearly understood the mental and academic difficulties that Allen had in his life.

### 8. Missouri Special Education System

Allen claims that his trial counsel should have consulted (but not necessarily presented) an

---

[29]It appears from other arguments that Dr. Keyes has reviewed this case and has reached conclusions. Allen's failure to attach a report of those conclusions or an affidavit of Dr. Keyes renders his petition not worthy of a hearing.

expert in Missouri's special education system. The details of Allen's education could not have been more developed at trial. Allen called nearly every teacher that he had in grade school and high school. Several of his teachers clearly noted the extra help that they gave Allen and the fact that they felt he needed more help but did not receive it. Barbara Murrell in particular, a Clayton School District counselor, specifically described the lack of resources for Allen and the failure of the system to intervene and provide him with special education services. (Tr. Trans. 3-5-98, p. 393). She specifically stated that Allen failed at school because he did not get what he needed. (Tr. Trans. 3-5-98, p. 393).

Several jurors found these deficiencies mitigating but ultimately did not give them more weight than the aggravators. There is no basis to suggest that the jury would have given this factor more weight or that more jurors would have found it if they had heard expert testimony about Missouri's system. The evidence of Allen's guilt was overwhelming and Allen's failure to master his academic courses had nothing to do with the facts of the offense for which the jury was sentencing Allen. His academic failure may have lead to his dissatisfaction with his financial status, but it did not preclude choices other than robbing and killing. There was no evidence tying education to the manner in which the robbery was carried out or the decision to murder Richard Heflin.

Allen describes the death verdict in this case as "close." (Allen Petition at 40). The fact that the jury gave Allen death on the firearm count but not the robbery did not render the death verdict here "close." The Court of Appeals itself noted the rational explanation for this difference in result: "There was overwhelming evidence that Allen was responsible for firing all or at least most of the shots that killed the security guard, which is more than enough to support the jury's finding that the aggravating factors outweighed the mitigating factors thus warranting a sentence

128

of death." Allen I, 247 F.3d at 771. It was also a unanimous verdict.

### 9. Cultural Expert

Allen claims that trial counsel should have consulted an expert about the cultural differences that children encounter in school busing desegregation circumstances and the impact on children. He also claims that his trial counsel did not "front-load" mitigation themes and failed to bring out aspects of the offense that supported mitigation themes. This claim must fail, because the jury heard much evidence from educators and family members of the issues faced in busing Allen to Clayton School District. For example, Tracy Eaton saw the pain that Allen suffered because he did not have the things that he saw his classmates had. (Tr. Trans. 3-3-98, p. 285). Another example was Barbara Murrell, a Clayton School District Counselor who testified concerning the cultural difficulties that Allen had in adjusting to Clayton school. (Tr. Trans. 3-5-98, p. 389). These are also issues to which any juror could relate in their common experience and do not require explanation by an expert. These are issues that might have explained why Allen needed and wanted money, but they do not explain why he chose killing as the means to get money. Thus, any further evidence on these issues would not have impacted the outcome and Allen was not prejudiced by the failure to present such an expert. Moreover, Allen again fails to specify an expert that should have been called, what that expert would have said, and how that expert would have related his or her testimony to mitigation of Allen's punishment.

Regarding trial counsel's cross-examination of guilt phase witnesses, Allen fails to specify or identify what "aspects of the offense evidence" were not brought out and should have been brought out by trial counsel to correspond to and support mitigation themes. The themes of non-violence, artistic ability, home life, test scores and dissatisfaction with his material wealth were hardly supported by any offense evidence. Trial counsel would have been ill-advised to provide

129

the Government with a specific motive for the robbery.  This argument is hollow and without merit.

In sum, trial counsel was not hampered by the timing of the trial and fully developed and presented one of the most thorough mitigation cases ever presented in a capital case in this district.  It is a testament to trial counsel's skill that the jury found many mitigators and did not return death on both counts, as they did for Norris Holder.

All of these complaints should be rejected without a hearing.

### K. Victim Impact Evidence

Allen argues that trial counsel rendered ineffective assistance by failing to renew a motion in limine or otherwise to object to the victim impact evidence introduced at trial.  For lack of citations to the record (or any caselaw, for that matter), the scope of Allen's complaint is difficult to discern.  Allen does not identify the victim impact evidence he finds objectionable, and instead appears to generally challenge the "large quantum" of victim impact evidence he claims was adduced at the guilt and penalty phases of the trial.  (Allen Petition at 41-42).

As a preliminary matter, over the course of more than ten years and multiple briefings on appeal, Allen has not previously raised any issue regarding victim impact evidence in the guilt phase of his trial.[30]  The reason for this apparent oversight is that no victim impact evidence was adduced in the guilt phase.  The testimony Allen characterizes as victim impact evidence in the guilt phase – the testimony of Amy Boehlje, Sandy Foppe, Michael West, Mary Garvels, Lisa Moore, and Virginia Michael– was not victim impact evidence at all.  The FDPA describes victim

---

[30]  Tellingly, trial counsel's motion in limine seeking to limit the Government's victim impact evidence was taken up by the Court only after the guilt phase had been completed and before the penalty phase began.  (Tr. Trans. 3-2-98, pp. 26-34).

impact evidence as evidence:

> concerning the effect of the offense on the victim and the victim's family, and may include oral testimony, a victim impact statement that identifies the victim of the offense and the extent and scope of the injury and loss suffered by the victim and the victim's family, and any other relevant information.  18 U.S.C. § 3593(a)(2).

The testimony of these witnesses had nothing to do with "the effect of the offense on the victim and the victim's family."  Rather, these eyewitnesses testified that they were Bank employees, were co-workers and friends of Richard Heflin, and were present during the robbery. (Tr. Trans. 2-18-98, pp. 103-106, 118-121, 146-150, 172-175, 206-208, 287-288).  As fact witnesses, they described the circumstances of the bank robbery and the violent shooting murder of Richard Heflin.  (Tr. Trans. 2-18-98, pp. 106-117, 122-136, 150-162, 175-189, 223-245, 289-302).[31]

The guilt phase evidence erroneously identified by Allen as victim impact evidence actually was fact witness testimony admitted to prove the elements of the crimes charged and the surrounding circumstances.  Thus, trial counsel, by choosing not to object to the evidence as victim impact evidence, did not render assistance that fell below the objective standard of reasonableness under prevailing professional norms.  See Strickland, 466 U.S. at 688.  Because the evidence properly was admitted, no prejudice inured to Allen.  See id. at 691.

Allen's challenge to the victim impact evidence presented in the penalty phase is entirely without merit for a number of reasons.  First, the FDPA and Supreme Court precedent allow for victim impact evidence in no uncertain terms.  Second, the quantum of victim impact evidence presented in Allen's trial was not unduly prejudicial, and the Eighth Circuit and this Court have

---

[31]  Lisa Moore also testified that she knew Holder as a customer of the bank and reviewed the bank records of Holder's transactions.  (Tr. Trans. 2-18-98, pp. 208-223).

so held.  Last, but not least, that the jury did not find the victim impact non-statutory aggravating factor renders Allen's issue moot.

Again, Allen has yet to specify the evidence he alleges was unduly prejudicial, but appears to argue that counsel was ineffective for allowing any victim impact evidence whatsoever.  His argument contravenes the clear terms of the FDPA and Supreme Court precedent.  As already established, the FDPA provides:

> The factors for which notice is provided under this subsection may include factors concerning the effect of the offense on the victim and the victim's family, and may include oral testimony, a victim impact statement that identifies the victim of the offense and the extent and scope of the injury and loss suffered by the victim and the victim's family, and any other relevant information.  18 U.S.C. § 3593(a)(2).

Likewise, the Supreme Court has held that sentencing juries are permitted "to consider evidence relating to the victim's personal characteristics and the emotional impact of the murder on the victim's family in deciding whether an eligible defendant should receive a death sentence." Jones v. United States, 527 U.S. 373, 395 (1999) (citing Payne v. Tennessee, 501 U.S. 808, 827 (1991)).

Thus, to the extent Allen argues that no victim impact evidence should have been admitted at the penalty phase of his trial, he is wrong.

If Allen may be said to narrow his challenge at all, he appears to attack the quantum of victim impact evidence.  ("Counsel did not . . . object to the large quantum of victim impact evidence that was introduced at trial.") (Allen Petition at 41).  The quantum of victim impact evidence was not unduly prejudicial, and counsel was not ineffective for choosing not to object.

The Eighth Circuit's quantitative analysis of victim impact evidence focuses on objective facts, including the number of witnesses and transcript pages dedicated to victim impact testimony.  See United States v. Johnson, 495 F.3d 951, 977 (8th Cir. 2007); United States v.

Nelson, 347 F.3d 701, 713 (8th Cir. 2003). Here, the entire penalty phase transcript exceeds 1,700 pages. The testimony of the 11 victim impact witnesses called by the Government lasted a portion of one trial day and accounts for only 88 pages of the transcript. This quantity of evidence is by no means excessive. See Johnson, 495 F.3d at 977 (victim impact testimony from six family members); Nelson, 347 F.3d at 713 (testimony from six witnesses, accounting for 100 pages of 1,100-page trial transcript); United States v. Barnette, 211 F.3d 803, 818 (4th Cir. 2000) (Barnette I) (testimony from 23 witnesses accounting for 83 pages of transcript); United States v. McVeigh, 153 F.3d 1166, 1216-22 (10th Cir. 1998) (testimony from 38 witnesses).

In contrast to the relative modesty of the quantum of the Government's victim impact testimony, the testimony of Allen's penalty phase witnesses fills approximately 985 pages of the transcript. That Allen presented a large quantity of mitigating evidence is a factor in alleviating any potential prejudice that may otherwise flow from aggravating victim impact evidence. See Johnson, 495 F.3d at 977; Nelson, 347 F.3d at 713; United States v. Hall, 152 F.3d 381, 405 (5th Cir. 1998).

This Court recently considered a nearly identical issue in the Section 2255 petition of co-defendant Norris Holder. There, Holder argued, as does Allen here, that "counsel was ineffective for failing to object to the victim impact evidence." (Memorandum & Order at 92). At the outset, this Court recognized that, while Allen and Holder were tried separately, "the victim impact evidence submitted in both cases was substantially the same." (Memorandum & Order at 93). The Court held, "The evidence submitted by the Government in this case in support of the [victim impact] non-statutory aggravating factor was admitted in accordance with the Supreme Court's holding in *Payne* and *Jones*, and is further supported by the Eighth Circuit's holding in *Allen*." (Memorandum & Order at 93). In the Allen case to which this Court cited – this petitioner's

direct appeal – the Eighth Circuit likewise rejected Allen's argument that the victim impact evidence was unduly prejudicial. See Allen I, 247 F.3d at 779. The court concluded, "Our own review of the record convinces us that neither the amount nor the scope and nature of the victim-impact testimony was unduly prejudicial." Id. Although the Eighth Circuit reviewed for plain error, the Court went so far as to hold that "the district court did not commit any error, much less plain error." Id. (emphasis added).

Finally, it should go without saying that evidence supporting facts not found by a jury can hardly be said to have prejudicially impacted that jury. This is particularly true in a capital case, in which the FDPA explicitly prohibits a jury from considering any aggravating factor not found unanimously by the jury. See 18 U.S.C. § 3593(d), (e). For all of Allen's complaints over the years regarding the victim impact evidence, the fact of the matter is the jury did not find the victim impact non-statutory aggravating factor. (Tr. Trans. 3-9-98 and 3-10-98, pp. 123, 132). The Eighth Circuit noted as much in Allen's direct appeal. See Allen I, 247 F.3d at 779 ("[T]he jury did not find the existence of the victim-impact aggravating factor, which is strong evidence of and in most cases will be sufficient to make a ruling of no undue prejudice . . ..").  Thus, even if Allen could establish that his counsel should have objected to the victim impact evidence, he cannot establish any prejudice resulting from the failure to do so. This clam should be rejected without a hearing.

### L. Closing Argument

Allen argues that his trial counsel rendered ineffective assistance of counsel in failing to object to four categories of prosecution closing argument. Specifically, Allen lumps several arguments together as 1) "arguments regarding lack of nexus between the offense and mitigating evidence;" 2) "emotional appeals;" 3) "personal beliefs and opinions" of Government counsel;

and 4) "facts not in evidence."  Allen's characterizations of the arguments is incorrect, the arguments were not improper and, even if improper, the failure of defense counsel to object did not prejudice Allen to the degree required by Strickland.

Government counsel did not urge the jury to ignore Allen's mitigation evidence, which would have been improper.  The jury in the penalty phase of a capital case is required to consider all of the evidence put before it on the question of punishment.  Government counsel's arguments urged the jury to consider the mitigation, but to reject it and give it little or no weight.  Such arguments are clearly proper and defense counsel was not deficient in failing to object to said arguments.  The Eighth Circuit has held that a jury engages in a two-step process when it comes to mitigators and considering mitigating evidence: first, the jury considers whether the alleged fact has been proven by a preponderance of the evidence; and second, the jury considers whether the fact, if proven, is mitigating in the context of the case.  Only after the jury makes both of those findings does the jury weigh aggravators found against mitigators found.  United States v. Paul, 217 F.3d 989, 1000 (8th Cir. 2000).  The Committee Comments to the Eighth Circuit Manual of Model Jury Instructions state that mitigating factors "may be factually true, and yet not be perceived by a juror as . . . mitigating."  Instruction 12.10, Committee Comments (2003).  In Paul, the defendant was 18 years old but the jury failed to find his age as a mitigator.  See also, United States v. Bernard, 299 F.3d 467, 485-86 (5th Cir. 2002).

Therefore, it was appropriate to argue that Allen's alleged PTSD, even if proven factually, was not mitigating of punishment because it bore no connection to the crime.  Government counsel's argument was not even close to questionable in arguing that "many of the mitigators are totally unproven and some are entitled to no weight whatsoever."  (Tr. Trans. 3-9-98 and 3-10-98, p. 63).  The other arguments listed by Allen at pages 43 and 44 of his petition fall into the

135

category of arguing either that Allen's alleged mitigators should not be found because they were not mitigating of punishment or, if found, were not entitled to much weight. There was a disconnect between the man described by Allen's mitigation witnesses and the man who murdered Richard Heflin, thus, it was entirely appropriate for Government counsel to continually remind the jury of the man they were sentencing and the vile conduct for which they were sentencing him.

The Eighth Circuit's more recent decision in United States v. Johnson, 495 F.3d 951, 966 (8th Cir. 2007) addressed similar arguments. The Court rejected attacks on an argument that the mitigation evidence deserved little or no weight based on the circumstances of the case and an argument that the jury should dismiss the mitigation evidence as excuses where he had the ability to make correct, non-violent choices. The Court reviewed the law and concluded that the statements accurately reflected the law, as follows: "jurors are obliged to consider relevant mitigating evidence, but are permitted to accord that evidence whatever weight they choose, including no weight at all." Id. at 966. The Court also held that it was proper to argue that the mitigation was "insufficient to outweigh the gravity of the offense." Id. at 978. See also, Bland v. Simmons, 459 F.3d 999, 1026 (10th Cir. 2006), cert. denied, 127 S.Ct. 2117 (2007)(reference to mitigators as "excuses" not improper).

The second category of allegedly improper arguments appealed to emotion to such an extent that the jury's ability to reach a reasoned judgment was impaired. On the contrary, the arguments of Government counsel's argument noted at pages 45 and 46 were fair comment on the evidence injected into the penalty phase and fair reply to defense arguments. Allen presented evidence concerning his calm adjustment to a custodial setting to overcome the future dangerousness aggravator, and his relatives and jail staff testified about their contacts with him.

136

His relatives wanted to continue those contacts.  It was appropriate to comment on what life in prison without parole would be like for Allen, because the jury had to decide whether such a life was adequate punishment considering the aggravating and mitigating circumstances.  The Eighth Circuit clearly held that the basketball comment was not improper because Allen's own witnesses made basketball a feature of their testimony.  Allen I, 247 F.3d at 775.  The "murderous dog" argument was held in Allen I to be improper, but the Eighth Circuit carefully analyzed the argument and rejected the contention that it prejudiced Allen to a degree that warranted reversal.  The same analysis and result holds true under Strickland.  Allen I, 247 F.3d at 775-778.  The references to Mr. Heflin's life, the actual facts of the offense and the holes left in the lives of Mr. Heflin's family were appropriate arguments in support of the victim impact aggravator and the weight it should be given by the jury.  Allen can't hamstring the Government by preventing it from confronting the jury with the full victim impact of his conduct or suggesting to the jury that victim impact deserves superior weight.  As the Eighth Circuit stated in Allen I:

> We also reject Allen's argument that the murderous dog reference, in combination with telling the story through the eyes of the victim, makes the statement unduly prejudicial. No undue prejudice arises from reminding the jury to consider the murder victim's perspective where the defendant has asserted a gentle spirit and accused the government of being unable to produce any witness to testify that the defendant was violent.

Allen I, 247 F.3d at 777.  Allen I reached the correct result.  In Darden v. Wainwright, 477 U.S. 168, 182 (1986), the Supreme Court held that although the reference to the defendant as an "animal" was improper, the comment did not deprive the defendant of a fair trial.

Allen claims that Government counsel improperly asserted his personal opinions. However, the context of each statement listed at pages 46-47 of his petition was not to urge the jury to find a certain way because of Government counsel's opinions, but to deduce a conclusion from the evidence which comported with Government counsel's statement.  His arguments were

137

clearly clothed in the context of the facts and evidence rather than his personal beliefs or knowledge independent of the evidence. Allen's alleged mental defects stood in contrast to his actual performance in the facts of the case, and his motives for smoking pot were likewise placed in the context of his resisting the control of outside influence or authority to do "what he wanted to do." (Tr. Trans. 3-9-98 and 3-10-98, p. 64). Government counsel's argument must be evaluated as a whole, not the surgical manipulation to which it has been subjected by Allen's petition. For example, on rebuttal Government counsel contrasted Allen's claim for mercy with his lack of mercy shown to Mr. Heflin. It was not inappropriate to state that Government counsel was honored to "present this case on behalf of Richard Heflin" when placed in the context of his unique personal characteristics and qualities as a victim. (Tr. Trans. 3-9-98 and 3-10-98, p. 111).

Regarding arguments which allegedly rested on facts not in evidence, Government counsel merely appealed to the jury's common sense and knowledge regarding a common criminal episode – bank robberies. Jurors' own personal experience and knowledge supported the claim that the level of violence in this bank robbery was rare. The reference to the probable cause behind the death of Allen's friend, Marquis, was an appropriate inference drawn from Allen's own mitigation witnesses' testimony about the incident, the activities with which Allen was associated and its impact on Allen.

Prosecutors "are free to use colorful and forceful language in their arguments to the jury," Clayton v. Roper, 515 F.3d 784, 792 (8th Cir. 2008), including "colorful pejoratives," Jumping Eagle, 515 F.3d 794, 805 (8th Cir. 2008). Describing Allen as a "murderous dog," was squarely within the bounds of propriety. Compare United States v. Pungitore, 910 F.2d 1084, 1127 (3d Cir. 1990) (monikers "cold-blooded murderer" and "mob killers" were "fair comment on the evidence"); Clayton, 515 F.3d at 787 (describing defense expert's testimony as "voodoo"); United

138

States v. Schoff, 151 F.3d 889, 893 (8th Cir. 1998) (defendant was a "con man" who "exhibits all the signs of a liar"); United States v. Rude, 88 F.3d 1538, 1547-48 (9th Cir. 1996) (defendants described repeatedly as "evil," "crooks," "con men," "charlatans," "trolling around for victims," and "practicing their craft").

Even if any prosecutorial comment strayed beyond permissible bounds and went uncured by his counsel's failure to object to it, any claim of prejudice fell far short of "infect[ing] the trial with unfairness so as to deny [Allen] due process." Clayton, 515 F.3d at 792. Viewing the arguments as a whole, together with the instructions to the jury to not treat the arguments of counsel as evidence and to base their verdict on the facts and the law, no argument or collection of arguments, if improper, so prejudiced Allen as to entitle him to relief under section 2255. Allen I, 247 F.3d at 777. In fact, prosecutorial arguments have been upheld or found harmless that went miles beyond anything Allen charges here. See, United States v Mitchell, 502 F.3d 931, 994 (9th Cir. 2007) (upholding, on plain-error review, a closing argument that was "riddled with comments that should not have been made"); Johnson 495 F.3d at 978-80; United States v. Fields, 483 F.3d 313, 360-61 (5th Cir. 2007)(comparative worth, labeling defendant "psychopath," commenting on demeanor); United States v. Higgs, 353 F.3d 281, 330-32 (4th Cir. 2003); United States v. Ortiz, 315 F.3d 873, 903-04 (8th Cir. 2002)(comparing defendant to Hitler and Manson); United States v. Bernard, 299 F.3d 467, 487-88 (5th Cir. 2002); Simmons v. Bowersox, 235 F.3d 1124, 1135-39 (8th Cir. 2001). By comparison, the argument here was a model of restrained and professional advocacy. This argument should be denied without a hearing.

### M. Pecuniary Gain

In a single paragraph unburdened with any citations to the record or to any legal authority, Allen argues that trial counsel and appellate counsel were ineffective by failing to object to and appeal the submission of the pecuniary gain aggravating factor. Specifically, Allen argues that counsel should have objected that submitting the pecuniary gain aggravating factor in a bank robbery case violates the Double Jeopardy Clause and constitutes cruel and unusual punishment under the Eighth Amendment. (Allen Petition at 48). Allen is wrong on both the facts and the law.

Allen raises this issue for the first time in the more than ten years of litigation emanating from this case, and it is therefore procedurally barred. To overcome the bar, Allen must establish both cause for his failure to raise the claim on direct appeal, and prejudice resulting therefrom. Although ineffective assistance of counsel for failing previously to raise the issue may amount to cause, see Williams v. Kemna, 311 F.3d at 895; Boyd v. Minnesota, 274 F.3d 497 (8th Cir. 2001), the pecuniary gain aggravator properly was submitted in this case and counsel was not ineffective for choosing not to object to it. In any event, even if Allen could establish his counsel was ineffective for failing to object to the pecuniary gain aggravator, he cannot establish prejudice resulting therefrom.

First, Allen is incorrect that counsel failed to object to the pecuniary gain aggravator. In fact, prior to trial, counsel filed a motion to dismiss Government's notice of intent to seek the death penalty, in which counsel objected to the pecuniary gain aggravator as duplicative of an element of the underlying bank robbery count and argued the aggravator applies only in murder for hire cases. (Motion to Dismiss Government's Notice of Intent to Seek Death Penalty and For Other Appropriate Relief (Oct. 20, 1997), pp. 15-16). Thus, Allen's factual premise is incorrect, and trial counsel did not render ineffective assistance.

Even if counsel had failed to object, he would have done so for good reason. It is well settled that the pecuniary gain aggravator in 18 U.S.C. §3592(c)(8) is applicable to robbery cases. The pecuniary gain statutory aggravator has two separate and independent prongs. See United States v. Mitchell, 502 F.3d 931, 975 (9th Cir. 2007); United States v. Brown, 441 F.3d 1330, 1370 (11th Cir. 2006); United States v. Wicklund, 114 F.3d 151, 154 (10th Cir. 1997); United States v. O'Reilly, No. 05-80025, 2007 WL 2420830 at 5 (E.D.Mich. 2007); United States v. Cooper, 91 F.Supp.2d 90, 105 (D.D.C. 2000). The first prong deals with murders-for-hire committed "as consideration for the receipt" of anything of pecuniary value. The second prong, applicable here, is broader and deals with killings committed "in the expectation of the receipt" of anything of pecuniary value. See Wicklund, 114 F.3d at 154; United States v. Matthews, 246 F.Supp.2d 137, 148 (N.D.N.Y. 2002); United States v. Cuff, 38 F.Supp2d 282, 288 (S.D.N.Y. 1999); United States v. Spivey, 958 F.Supp. 1523, 1530 (D.N.M. 1997); United States v. Nguyen, 928 F.Supp. 1525, 1535-36 (D.Kan. 1996); United States v. Walker, 910 F.Supp. 837, 848-49 (N.D.N.Y. 1995).

Although Congress chose not to include bank robbery among the list of offenses which are automatically death-eligible, neither the Double Jeopardy Clause nor the Eighth Amendment prohibits the Government from showing, in the context of a robbery, that the murder was committed in expectation of the receipt of anything of pecuniary gain. Mitchell, 502 F.3d at 975 ("Section 3593(c)(8) by its plain terms applies to robbery scenarios in which the defendant is motivated to kill for pecuniary reasons."); Brown, 441 F.3d at 1370 (holding pecuniary gain aggravator applies to some but not all robbery/murder scenarios); United States v. Barnette, 390 F.3d 775 (4th Cir. 2004) (Barnette II) (holding pecuniary gain aggravator applies to carjacking in which murderer took car and victim's credit cards); Perry v. Lockhart, 871 F.2d 1384, 1392-93

141

(8th Cir. 1989) (holding submission of pecuniary gain aggravator did not violate Eighth Amendment or Due Process despite that aggravator duplicated element of underlying robbery murder); O'Reilly, 2007 WL 2420830 at 7 (rejecting movant's argument that submission of pecuniary gain aggravator in robbery murder violates Eighth Amendment); Cummings v. Polk, No. 5:01-HC-910-BO, 2006 WL 4007531 at 17-18 (E.D.N.C. Jan. 31, 2006) (holding petitioner's constitutional rights not violated by submission of pecuniary gain aggravator in robbery murder). In other words, that a murder committed during a robbery will not necessarily satisfy the pecuniary gain aggravator does not mean that such murders can never give rise to the death penalty.  See, e.g., United States v. Roman, 371 F.Supp.2d 36, 45-46 (D.P.R. 2005)(murder in connection with scheme to rob armored trucks); United States v. Taylor, 316 F.Supp.2d 730, 737-38 (N.D.Ind. 2004) (murder during robbery of firearms store); Matthews, 246 F.Supp.2d at 148 (drug-related robbery); United States v. Cooper, 91 F.Supp.2d 90, 105 (D.D.C. 2000) (murder during robbery of coffee shop).  Thus, even if counsel had opted not to object to the pecuniary gain aggravator, that decision would not have amounted to ineffective assistance of counsel.

At any rate, Allen cannot show prejudice.  The jury was required to find only a single statutory aggravating factor to render Allen eligible for the death penalty.  See 18 U.S.C. § 3593(d).  Here, the jury found not only the pecuniary gain aggravator, but also the grave risk of death to others aggravator, rendering the pecuniary gain aggravator superfluous to Allen's death penalty eligibility.

Similarly, the jury's consideration of the pecuniary gain aggravator, even if erroneously submitted (it was not), did not prejudice Allen in the death penalty selection process.  In Jones v. United States, 527 U.S. at 402, the Supreme Court made clear that, in reviewing a capital case in which an aggravating factor improperly was considered by the jury, a reviewing court should

142

consider whether "absent an invalid factor, the jury would have reached the same verdict." Here, the record establishes that the jury would have reached the same verdict absent the pecuniary gain aggravator.

The evidence of grave risk of death to others is replete throughout the record and is inseparable from the bank robbery itself. The Bank is located near the busy intersection of Highway 40 and McCausland Avenue. (Tr. Trans. 2-17-98, pp. 79-80). At the time of the robbery, ten Bank employees, including Richard Heflin, were in the lobby. That day, in addition to being St. Patrick's Day, also was Customer Appreciation Day, which drew a senior citizens club to the Bank before the robbery. (Tr. Trans. 2-18-98, pp. 176-177). In addition to the potential victims inside the bank, there were various people in the vicinity of the bank. A St. Patrick's Day parade was scheduled to start nearby. (Tr. Trans. 2-18-98, p. 224). Betty Thompson, a bank customer, was walking towards the Bank when Allen and Holder entered the Bank armed with rifles. She heard gunshots from inside the Bank. (Tr. Trans. 2-18-98, pp. 76-81). Allen "came in shooting" and repeatedly shot Richard Heflin in the lobby of the bank. (Tr. Trans. 2-18-98, pp. 97-99, 294). Allen then pointed the gun at Sandra Foppe. (Tr. Trans. 2-18-98, p. 131). Meanwhile, Holder jumped the teller counter and fired additional shots. (Tr. Trans. 2-18-98, pp. 235-236). Allen and Holder left bullet holes sprayed all over the building. (Tr. Trans. 2-18-98, pp. 135, 162). Later, nine bullet fragments were recovered from where Richard Heflin fell and other bullet fragments were recovered from behind a teller station, beneath a desk in front of where a bank employee took cover, and other locations. (Tr. Trans. 2-18-98, p. 54; Tr. Trans. 2-20-98, pp. 82, 90-91, 92). Sixteen spent shells casings were recovered from inside the Bank. (Tr. Trans. 2-19-98 and 2-23-98, pp. 38, 40-41, 45, 57-59, 61, 64-66, 83-84, 86-87, 91). The robbery left the Bank riddled with bullet holes, including bullet holes very close to the

locations where various Bank employees tried to take cover.  (Tr. Trans. 2-19-98 and 2-23-98, pp. 44-58, 83-87; Tr. Trans. 3-4-98, pp. 44-52).

Betty Thompson and another bank customer, Alma Gilliam, saw Allen and Holder exit the bank and speed away in the blue van.  (Tr. Trans. 2-18-98, pp. 82, 84, 315-318, 320).  William Green heard gunshots from inside the bank and pursued the blue van as it fled the scene.  (Tr. Trans. 2-19-98 and 2-23-98, pp. 157-162).  He saw Allen and Holder abandon the moving blue van and saw the van engulfed in flames.  (Tr. Trans. 2-19-98 and 2-23-98, pp. 163-166).  As the van burned, rounds of ammunition cooked off from inside the van.  (Tr. Trans. 2-19-98 and 2-23-98, pp. 220-221).  The exploding ammunition could have harmed people in the vicinity of the burning van.  (Tr. Trans. 2-19-98 and 2-23-98, p. 221-222).

Based on all this evidence regarding the grave risk of death to others, the jury would have reached the same verdict even absent the pecuniary gain aggravator.  This is particularly true considering that, after the jury decided beyond a reasonable doubt that Allen was eligible for the death penalty, the facts underlying the pecuniary gain aggravator became merely facts to be weighed along with all the other facts relevant to the guilt phase, including the details of the crime, and the facts underlying the grave risk of death to others aggravating factor, the non-statutory aggravating factors, and the mitigating factors.

For these reasons, no prejudice resulted from any failure of defense counsel to object to the pecuniary gain aggravating factor, and Allen cannot establish ineffective assistance of counsel.  This ground for relief should be denied without a hearing.

### N. Non-Statutory Aggravator

Allen's claim that his trial and appellate counsel were ineffective because there was no objection to the submission of the non-statutory aggravating factor, "Was Billie Jerome Allen's

144

conduct in committing the offenses substantially greater than that described in the definition of the crime, apart from the statutory aggravating factors," (the "greater in degree factor") is without merit.

To the extent these claims were not raised earlier, they are procedurally barred. Allen can show neither that a factor external to the defense prevented counsel from raising his present constitutional claims, nor can he show by "clear and convincing evidence that but for a constitutional error, no reasonable juror would have found [Allen] eligible for the death penalty." Schlup v. Delo, 513 U.S. 298, 323.

### 1. Allen's Counsel Sought Dismissal of the Greater in Degree Aggravator

The gravamen of Allen's current complaint is that his trial and appellate counsel failed to object to the greater in degree factor. The record in the underlying criminal matter, however, refutes this contention. In fact, trial counsel sought the dismissal of the greater in degree factor. On October 20, 1997, trial counsel filed Allen's Motion to Dismiss Government's Notice of Intent to Seek Death Penalty and for Other Appropriate Relief ('Motion to Dismiss Death Notice"). In that pleading, trial counsel sought dismissal of the Government's notice of intent to seek the death penalty generally, and in particular sought dismissal of the greater in degree factor. See Motion to Dismiss Death Notice, pp. 18-19. Allen raised before this Court at that time the same issues he raises now – that the greater in degree factor is duplicative of a statutory aggravating factor and is vague. Allen's present claim that the greater in degree factor "allows for the double-counting of aggravators" echoes the argument advanced by trial counsel that it is a "catch-all provision [] intended as a fallback provision if the Government is unable to convince the court or the jury that the [commission of the offense in a heinous, cruel or depraved manner] factor set out in §3592(c)(6) falls short on merit." (Motion to Dismiss Death Notice, p. 18)

145

Allen's current vagueness challenge mimics the claim raised by trial counsel that "the lack of adequate notice of what conduct is proscribed by this sweeping aggravator deprives Mr. Allen of his rights under federal statutes as well as the Fifth, Sixth, and Eighth Amendments to the Constitution." Id. pp. 18-19. Moreover, although the District Court denied Allen's Motion to Dismiss Death Notice, it preserved the claim for further review. See United States v. Crumley, 528 F.3d 1053, 1061-62 (8th Cir 2008) (circuit has rejected rigid requirement that defendant must renew severance motion after close of government's case).

Nor was the issue ignored by Allen's appellate counsel. On appeal, Allen specifically argued that the Federal Death Penalty Act of 1994 was unconstitutional because it permitted the use of non-statutory aggravators. See Allen's Brief filed June 7, 1999, pp. 49-54. The Eighth Circuit ultimately rejected the claim. Allen I, 247 F.3d at 757-759. That these efforts to attack the use of non-statutory aggravators proved unsuccessful does not support a finding that counsel was therefore ineffective. See, e.g., Gibson v. Simmons, 520 F.3d 1196, 1247 (10th Cir 2008) (that trial strategy proved unsuccessful is not grounds for branding counsel as ineffective); Fliegler v. Delo, 16 F.3d 878, 886 (8th Cir. 1994) (same).

### 2. Non-statutory Aggravators are not Eligibility Factors

Allen misapprehends the purpose of non-statutory aggravators. He complains that the aggravator is "so vague that it entirely fails to narrow the class of cases available for the death penalty, and therefore falls afoul of the Eighth Amendment to the United States Constitution." (Allen Petition at 48). Non-statutory aggravators, such as the greater in degree factor, do not serve the purpose of determining eligibility for the death penalty, rather they serve the purpose of guiding the selection decision. "Non-statutory aggravating factors may be considered by the jury in selecting the appropriate sentence once a defendant is found eligible for the death penalty, but

146

they are not, and cannot be, used to determine that eligibility.  As the Supreme Court  has

explained: '[S]tatutory aggravating circumstances play a constitutionally necessary function at the

stage of legislative definition: they circumscribe the class of persons eligible for the death

penalty.  But the Constitution does not require the jury to ignore other possible aggravating

factors in the process of selecting, from among that class, those defendants that will actually be

sentenced to death." United States v. Fields, 483 F.3d 313, 325 (5th Cir. 2007) (quoting Zant v.

Stephens, 462 U.S. 862, 878 (1983).  These are the same sentiments expressed by the Eighth

Circuit in Allen I:

> We disagree with Allen's underlying premise that the purpose of the nonstatutory
> aggravating factors under the FDPA is to limit and guide a jury's discretion in
> determining who is eligible to receive a sentence of death.  The statutorily defined
> aggravating circumstances are those which channel the sentencer's discretion because
> they are the circumstances which make a defendant eligible for the death penalty . . .
>      The primary purpose of nonstatutory aggravating factors, as opposed to the
> listed statutory aggravating factors which do fulfill the role of limiting and guiding
> a jury's discretion in making the eligibility decision, is to allow for the individualized
> determination of whether a death sentence is justified for a particular defendant; that
> is, they help to inform the selection decision.

Allen I, 247 F.3d at 757.

The Allen I court based its holding on the Supreme Court's decision in Tuilaepa v.

California, 512 U.S. 967 (1994).  In Tuilaepa, the Supreme Court recognized two distinct aspects

in the capital decision making process: the eligibility decision and the selection decision.  The

Court explained that to find a defendant eligible for the death penalty, the trier of fact must find

one statutory aggravating circumstance.  The Court further expanded on the use of non-statutory

aggravators:

> We have imposed a separate requirement for the selection decision, where the sentencer
> determines whether a defendant eligible for the death penalty should in fact receive
> that sentence.  What is important at the selection stage is an *individualized* determination
> on the basis of the character of the individual and the circumstances of the crime.

147

Tuilaepa, 512 U.S. at 971-972 (emphasis in original).

The greater in degree factor provided just such a function; it allowed the jury to make an individualized determination of whether the selection of the sentence of death for Allen was justified.

### 3. The Greater in Degree Factor is not Unconstitutionally Vague

The greater in degree factor submitted in Allen's case has been found to pass constitutional muster. The Government's Notice of Intent to Seek Death Penalty regarding co-defendant Holder contained the same greater in degree factor at play here. Holder challenged the use of the greater in degree factor on the basis that it was unconstitutionally vague and unsupported by sufficient evidence. See Opening Brief of Appellant Holder, pp. 60-66. In rejecting Holder's arguments, the Eighth Circuit noted:

> The 'substantially greater in degree' language, combined with the district court's submission to the jury of the statutory elements of each offense of which Holder was convicted, provided the jury a sufficient common-sense core meaning of the aggravating factor that it was capable of understanding and applying. The relative seriousness of a crime is a factor that is routinely taken into account by sentencing courts. See, e.g., United States Sentencing Guidelines § 5K2. 0 (allowing an upward departure 'if the factor is present to a degree *substantially in excess* of that which ordinarily is involved in the offense') . . . We therefore find no vagueness problems with this aggravating factor.

Allen I, 247 F.3d at 787 (emphasis added by Eighth Circuit).

The Allen I court's discussion of the sufficiency of the evidence presented to support the greater in degree factor also dispels Allen's present claim that the factor "overlaps with one of the statutory aggravators alleged and found by the jury here, 'grave risk of death to others.'" In reciting the evidence presented in Holder's trial – which is symmetrical in this regard to that presented in Allen's – the Court identified the following facts which support the greater in degree factor: that three firearms were involved including two semi-automatic weapons; the crime

148

involved over two hundred rounds of mostly hollow point ammunition, which is designed to inflict more serious wounds than regular ammunition; sixteen shots were fired in the bank and nearly hitting three other employees besides Richard Heflin; Holder was aware that Heflin would be armed and he was shot at least eight times; two vehicles were stolen for use as getaway vehicles and one of them was started on fire while containing live ammunition.  Allen I, 247 F.3d at 787-788.   These expansive elements go well beyond the limited circumstances which support the grave risk of death to others factor.  They include the extravagant planning that preceded the crime, the explosion of violence unleashed within the bank during the crime and the calamitous getaway after the crime.  Taking these facts as a whole, they do not overlap with the grave risk of death aggravator, but instead describe a particular essence of this crime, which the jury was entitled to consider in determining the selection of a sentence apropos to Allen's conduct. Submission of the greater in degree factor was completely appropriate

In order to prevail on this claim Allen must show not only the deficient performance of his counsel, but that he was prejudiced thereby.  To establish prejudice, Allen must show a reasonable probability that, but for his counsel's unprofessional errors, the result of the proceeding would have been different. Strickland, 466 U.S. at 694.  While in some instances whether the result of the proceeding would have changed is open to speculation, the case is decidedly different here.  As discussed above, the very claim which Allen alleges his counsel was deficient for omitting was raised here by co-defendant Holder.  The same appellate court which reviewed Allen's trial considered and rejected the claim.  This emphatically refutes the  notion that had Allen raised the claim the result would have somehow been different.  Allen has failed to establish either that his counsel acted unprofessionally or that he was prejudiced in any way by their representation.   This Court should reject this argument without a hearing.

**O. Failure of Indictment to Allege Statutory Aggravators**

In <u>Allen III</u>, the Eighth Circuit en banc held that the failure of the Government to obtain an indictment from the grand jury which alleged statutory aggravating factors was not structural error and was thus subject to the harmless error rule. <u>United States v. Allen</u>, 406 F.3d 940, 945 (8th Cir. *en banc* 2005), <u>cert.</u> <u>denied</u>, 127 S.Ct. 826 (2006). Allen now claims that his appellate counsel was ineffective in failing to cite "persuasive authority that it was improper for the appellate court to speculate about what the grand jury would have done had the aggravating evidence been presented to it." Yet, Allen asks this court to speculate about what authority was not cited to the Eighth Circuit that would have resulted in a different holding. It is impossible for this court to evaluate this ground and for the Government to respond in the absence of identifying the authority. The failure to do so suggests that the authority, if it exists, was not persuasive at all. This argument is without merit and should be rejected for failure to support it.

<u>Allen III</u> was correctly decided. Having determined that harmless error analysis applied, the Court identified the issue as "whether any rational grand jury . . . would have found the existence of the requisite mental state and one or more of the statutory aggravators found by the petit jury if the grand jury had been asked to do so." <u>Id</u>. The Court identified three possible methodologies for answering this question and rather than choose one, it held that the under the narrowest test, i.e., review of the actual grand jury testimony, "any rational grand jury, including Allen's grand jury, would have found probable cause to charge Allen" with the requisite mental state and at least one statutory aggravator. <u>Id</u>. at 945-49. This review did not involve speculation. Rather, it involved rational analysis of facts placed before the grand jury. The only right that Allen was deprived of was the opportunity for grand jury nullification – an opportunity that does not implicate "substantial rights." <u>Id</u>. at 949.

150

Because Allen fails to identify what persuasive authority his appellate counsel failed to assert, his claim that his counsel was ineffective must fail.  Likewise, he could not have been prejudiced by the claimed failure to cite some unspecified authority, because Allen III was correctly decided.  This claim should be rejected without a hearing.

### P. Non-statutory Aggravators and Weighing Decision

This argument is procedurally barred from review, because it could have been raised on appeal and was not.  It is also barred by the Teague non-retroactivity doctrine.

Allen claims that the Fifth Amendment requires that non-statutory aggravators and the weighing decision be found by the grand jury and alleged in the capital indictment in this case. The corollary of this argument is that the petit jury must find beyond a reasonable doubt that the aggravators outweigh the mitigators such that a sentence of death is justified.  This claim is foreclosed by United States v. Purkey, 428 F.3d 738, 748-750 (8th Cir. 2005).

Purkey held that non-statutory aggravators are not Apprendi-type facts because they "are neither sufficient nor necessary under the FDPA for a sentence of death," but merely "aid the sentencer 'in selecting' the appropriate sentence from the available options."  428 F.3d at 749 (quoting Higgs, 353 F.3d at 298-99).  Purkey further held that the weighing decision is not an "elemental fact for which a grand jury must find probable cause," because it is only a "lens through which the jury must focus the facts that it has found to produce an individualized determination."  Id. at 750.  For these reasons, Purkey held, neither the non-statutory aggravators nor the weighing decision itself need be charged in the indictment.

Purkey is based upon sound reasoning and is in accord with the Fourth, Ninth, and Eleventh circuits. United States v. Mitchell, 502 F.3d 931, 979 and 993-94 (9th Cir. 2007); United States v. Brown, 441 F.3d 1330, 1367-1368 (11th Cir. 2006); Higgs, 353 F.3d at 298-99.  The

151

weighing decision by the petit jury need not be made beyond a reasonable doubt.  United States v. Fields, 516 F.3d 923 (10th Cir. 2008); United States v. Fields, 483 F.3d 313, 345-346 (5th Cir. 2007).  It also accords with Kansas v. Marsh, 126 S.Ct. 2516, 2526 (2006), which described weighing as an "equation" that "merely channels a jury's discretion by providing it with criteria by which it may determine whether a sentence of life or death is appropriate."

Allen fails to cite any authority which supports his argument.  Mitchell, 502 F.3d at 994 ("no authority suggesting that Apprendi extends as far as" the defendant would have it). The Supreme Court recognized the FDPA's distinction between eligibility facts and selection criteria under the FDPA as a difference of effect rather than nomenclature.  Jones v. United States, 527 U.S. 373, 376-81 (1999).  The same term, the Court previously decided Jones v. United States, 526 U.S. 227 (1999), and Apprendi is a logical extension of the earlier Jones decision (serious bodily injury fact in carjacking statute was an element that needed to be found by jury).  Blakely v. Washington, 124 S.Ct. 2531 (2004), a further extension of Jones, does not alter the legal landscape as to selection criteria, and was pre-Purkey.  See, Id. 2538n.8.  This claims should be denied without a hearing.

### Q. Manner of Execution

In his penultimate argument, Allen half-heartedly argues that use of lethal injection to execute him would violate the Eighth Amendment.  The Supreme Court recently has held directly to the contrary.  See Baze v. Rees, 128 S.Ct. 1520, 1537-38 (2008).

At any rate, Allen concedes that the issue is not yet ripe for consideration by this Court and is more properly raised in a civil rights action pursuant to 42 U.S.C. § 1983.  (Allen Petition at 52-53 (citing Hill v. McDonough, 126 S.Ct. 2096 (2006)).

**R. Cumulative Effect**

In three sentences, without citations to case law or the record, Allen makes a conclusory claim that the "cumulative and multiple violations of these rights" amount to meritorious grounds on which relief may be granted.  However,  none of Allen's claims merit relief individually; therefore they merit no relief cumulatively.  Because Allen's claims lack merit, both individually and as a whole, Allen's petition should be denied without a hearing.

**XIII. Conclusion**

WHEREFORE, for the foregoing reasons, the Government respectfully requests that defendant Allen's Section 2255 motion be denied without a hearing.

Respectfully submitted,

CATHERINE L. HANAWAY
United States Attorney

*/s/ Steven E. Holtshouser*
STEVEN E. HOLTSHOUSER, #24277
JOSEPH M. LANDOLT, #6484
CRISTIAN M. STEVENS, #98871
Assistant United States Attorneys
111 South 10th Street, 20th Floor
St. Louis, MO 63101
(314) 539-6894

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 31, 2008, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon:


Elizabeth Unger Carlyle
Attorney at Law
P.O. Box 962
Columbus, MS 39701

Joseph M. Cleary
Attorney at Law
1455 N. Pennsylvania
Indianapolis, IN 46202


*/s/Steven E. Holtshouser*
Assistant United States Attorney