# ADDENDUM 1

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | No. 4:97CR0141 ERW (TCM) |
| BILLIE J. ALLEN, | ) ) | |
| Defendant. | ) ) | |

## DEFENDANT'S OFFER OF PROOF

If Defendant had testified at the Motion to Suppress Hearing in this case held on May 16, 1997, he would have testified as follows:

1. He was arrested in the basement of a residence at 3164 Oregon where he had been staying with Keesha Williams.

2. He had been residing there for approximately one month.

3. The living arrangements were such that he slept on the couch in the basement.

4. On March 18, 1997, at approximately 3:00 a.m. he was arrested in the basement of 3164 Oregon.

5. There were approximately six officers who participated in his arrest.

6. When the officers approached him they had their guns drawn.

7. The officers immediately began asking him questions such as, "where did you get your haircut?" and demanded to see his hands.

8. At no time at the residence at 3164 Oregon was he advised of his rights pursuant to Miranda v. Arizona.

9. He was transported to central booking at 12th and Clark, and during the course of the ride in the automobile he was asked by the officers "who shot the guard?", and was told "you're

1

going to fry anyway".

10. While being transported to central booking he was not advised of his Miranda rights.

11. Upon arrival at the police department at 12th and Clark, he was taken to the homicide division, escorted to a small room approximately 9 feet by 13 feet, and handcuffed to a table. While he was in the room Lieutenant Henderson came into the room and advised him that Norris Holder was "snitching" on him. At this time he still had not received his rights pursuant to the Miranda decision.

12. He was then questioned as to where he was at the time the bank robbery occurred and what he had been doing that day.

13. He asked if he could have an attorney appointed by the courts and was told he could not get one until the following morning.

14. He was questioned about how long he had known Norris, whether Norris had any medical problems, and whether Norris had any nicknames. He was repeatedly questioned about where he had gone on March 17th and who he had been with.

15. Later in the morning, Detective Nickerson, along with two other officers, questioned him further as to his activities on that day, what he knew about Norris, and if he knew who had shot the guard at the bank. Again, he was not advised of his Miranda rights.

16. After the interrogation by Detective Nickerson, he met with FBI Agent Hartman. This was the first time he was advised of his rights. He told Hartman that he wanted to have the court appoint him a lawyer. She did not question him further.

17. After invoking his right to counsel Nickerson again came into the room to question him yet again and told him that "things will get worse if you don't tell."

18. He estimates he was questioned about three hours. During the questioning he asked for a towel because his eyes were bothering him, and was allowed to see paramedics because of

2

the irritation in his eyes.

19. Immediately before the lineup Allen again asked to see an attorney, but was told that one could not be provided for him at that time.

20. He was then taken to a room to participate in a line-up.

21. He was never advised that he had a right to the assistance of an attorney during the line-up procedure.

22. He could see the individuals viewing the line-up and could hear what was being said to them and by them concerning the line-up procedure.

23. The first person to view the line-up was a woman. The procedure was that each participant would individually walk forward and turn to the right four times until they had done a complete circle. After each individual had walked forward and turned around, the woman requested No. 4 to come forward a second time. At that time Defendant heard Lt. Henderson say to the woman "are you sure?" Henderson then asked that the Defendant come forward. Defendant did so. Henderson then asked the woman "do you recognize him?" The woman said "that may be the man." Defendant was positioned in the No. 3 position.

24. After the line-up Detective Nickerson advised Defendant that he had been picked out and asked to talk with him again, at this time Henderson came into the room and began talking with Allen about Mr. Allen's help in an investigation concerning the homicide of a friend of Allen's named Marquis.

25. Defendant was not readvised of his Miranda rights after the line-up procedure, and was interrogated concerning this offense.

26. On March 18, 1997, the defendant never initiated any contact with any federal agents or police officers.

3

Respectfully Submitted,

RICHARD H. SINDEL, MBE 23406
Federal Registration No. 4380
8008 Carondelet, Suite 301
Clayton, MO 63105
(314) 721-6040
(314) 721-8545 Facsimile

Certificate of Service

A copy of the foregoing was mailed this ___ day of June, 1997, to: Office of the United States Attorney, 1114 Market Street, St. Louis, Missouri 63101; and Charles Shaw, 222 S. Meramec, St. Louis, Missouri 63105.

4

RECEIVED
U.S. ATTORNEY'S OFFICE
ST. LOUIS, MISSOURI

1997 JUN 19 AM 10: 46

# ADDENDUM 2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:97CR0141 ERW |
| | ) | (TCM) |
| BILLIE JEROME ALLEN, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Pending before the undersigned United States Magistrate Judge is the motion of defendant Billie Jerome Allen to file an Offer of Proof -- docketed as number 92 -- in order to supplement the record on his motions to suppress evidence, identification, and statements. Defendant explains in that motion that the the offer of proof was prepared in accordance with the undersigned's order granting him leave at the conclusion of the evidentiary hearing to file an offer of proof detailing what the testimony of defendant would have been had the Court allowed him to testify under the limitations he requested; however, the offer of proof was inadvertently never filed with the Court. The Government has not filed an opposition to the motion.

Accordingly,

**IT IS HEREBY ORDERED** that defendant Billie Jerome Allen's Motion to

Supplement the Record on Defendant's Motions to Suppress Evidence, Identification, and

Statements is **GRANTED**.   [Doc. 91]


THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE


Dated this _8th_ day of July, 1997.

- 2 -

# ADDENDUM 3

## LABORATORY REPORT

Richard HEFLIN, JR.
204 Sandra Dr.          :VICTIM

Norris HOLDER
5607 Curry              :SUSPECTS

Billy ALLEN                .

FATAL SHOOTING,
3-17-97

| | |
|---|---|
| COMPLAINT NO.: | 97-3 4 2 8 4 |
| REQUEST REC'D: | 3-18-97 |
| REPORT DATE: | 6-5-97 |
| LABORATORY NO.: | 7 0 3 3 6 0 |
| EXAMINER: | DONNA BECHERER |
| EXAMINED FOR: | Homicide Section<br>Det. Toretta<br>U.S. Attorney<br>Joe Landolt |

### REPORT

**SPECIMENS:**

    Q-4.    Blood from white strap
    K-1.    Blood of Richard Heflin, Jr.
    K-2.    Blood of Billie Allen

**RESULTS OF EXAMINATION:**

Deoxyribonucleic acid (DNA) profiles from genetic loci D1S7, D2S44, D4S139, D5S110, D10S28 and D17S79 were developed from HaeIII-digested high molecular weight DNA extracted from the above-listed specimens. Based on these results, the DNA detected in the Q-4 white strap stain does not match the DNA of Richard Heflin or Billie Allen, and could not have been contributed by either of these individuals.

### CHAIN OF CUSTODY

| Priest<br>Q-4 | to | Vincent<br>3-17-97 | to | Owens<br>3-17-97 | to | Becherer<br>3-21-97 | |
|---|---|---|---|---|---|---|---|
| Graham<br>K-1 | to | Barry<br>3-18-97 | to | Karr<br>3-18-97 | to | Owens<br>3-18-97 | to Becherer<br>3-21-97 |
| Crow<br>K-2  3-18-97 | to | | | Becherer<br>3-21-97 | | | |

EXAMINER: *Donna Becherer*
          Donna Becherer
          Criminalist

EXAMINER: *Kim Gorman*
          Kim Gorman
          Criminalist

eas


0001266

# EVIDENCE TECHNICIANS REPORT

FILE NO. FOR RECORDS DIVISION

COMPLAINT NO. _34345_

| CONCERNING | *Shooting* | ORIGINAL C.N. | DIVISION REPORTING | DATE OF THIS REPORT |
|---|---|---|---|---|
| | TYPE OF ORIGINAL REPORT | 34284 | 452 | 3-17-97 |

| DATE AND TIME OF OCCURRENCE | PLACE OF OCCURRENCE | | DISTRICT | LOCATION CODE |
|---|---|---|---|---|
| 3-17-97 | 6900 CLAYTON | | 2 | |

| VICTIM | HOME ADDRESS |
|---|---|
| Heflin, Richard | |
| | BUSINESS ADDRESS |
| | 6900 CLAYTON |

| REQUESTING OFFICER | DSN | ASSIGNMENT | REQUESTING CAR | TIME RECEIVED CALL | TIME OF ARRIVAL | TIME COMPLETED |
|---|---|---|---|---|---|---|
| Wilkinson | 0744 | 452 | 203 | 11⁰³ | 11⁵ | 10⁰⁰ |

| RESPONDING OFFICER(S) | DSN | | DSN | RESPONDING UNIT |
|---|---|---|---|---|
| A. | | B. | | 763 |

LATENT PRINT EXAMINATION ( ✓ ) YES ( ) NO   IF YES, CHECK RESULTS: ( ✓ ) POS. ( ) NEG.

| NEGS. | LIFTS. | LOCATION OF RECOVERY | OFFICER'S DSN |
|---|---|---|---|
| | A | _left side of payphone_ | |
| | B | _right side of payphone_ | 1 |
| | C | _left of key pad of payphone_ | 1 |
| | | | 1 |
| | | Payphone (#64-9570) is located in front lobby | ↓ |
| | | area of Deaconess Hosp. | |
| | | NO OTHER IDENTIFIABLE LATENT LOCATED | |

PHYSICAL EVIDENCE SEARCH ( ✓ ) YES ( ) NO    EVIDENCE SEIZED ( ✓ ) YES ( ) NO

| DESCRIPTION OF EVIDENCE & LOCATION OF RECOVERY | OFFICER'S DSN |
|---|---|
| 1 Norinco 7.62× 9mm semi-auto rifle ser# 1500 9196 w/w | |
| 1 Tela Norinco 7.62-9mm semi-auto rifle ser# C 0539 w/w wln | 1 |
| Ll undetermined amount of U.S. currency = | 1 |
| recpt. misc. and narcotics all of above from front | 1 |
| int case evi. March No. WIN 900 w/ Evi Co | ↓ |

PHOTOGRAPHY ( ✓ ) YES ( ) NO

| NEGS. | DESCRIPTION & LOCATION OF RECOVERY | OFFICER'S DSN |
|---|---|---|
| | | |
| | | |

| PHOTO EVIDENCE TO I.D. BY: | LATENT EVIDENCE TO I.D. BY: | PHYSICAL EVIDENCE TO LAB BY: |
|---|---|---|
| | | |

| TECHNICIAN REPORTING | DSN | SUPERVISOR APPROVING | DSN |
|---|---|---|---|
| | | | |

0000188

PAGE_____OF_____

MPD FORM LAB-22 (R-5) 5/87

MILITARY POLICE DEPARTMENT, ST. LOUIS
CONTINUATION REPORT

FILE NO. ·FOR RECORDS DIVISION

PAGE NO. Two of Two

COMPLAINT NO. 34345

| EVIDENCE & LOCATION of RECOVERY | DSN |
|---|---|
| 1 STRIP of WHITE CLOTH with blood, FROM THE STREET, NORTH EAST of VAN — 1 pr BLACK LEATHER GLOVES FROM THE GRASS NEAR VAN — 1 "TOM PETTY WILDFLOWER" CD and CASE, 1 LOADED MAGAZINE, 1 "COLUMBIA HOUSE" ENVELOPE & CONTENTS, 1 GLOVE, 1 LIGHTER, 3 LIVE ROUNDS, 1 "RADIO SHACK VOICE ACTIVATED FM TRANSCEIVER" ALL FROM THE STREET NORTH WEST of the VAN — 1 BLACK LEATHER COAT CONTAINING 3 LIVE SHOTGUN SHELLS IN THE RIGHT FRONT POCKET AND 5 STRIPPER CLIPS WITH 44 LIVE ROUNDS AND 6 LOOSE ROUNDS IN THE LEFT BREAST POCKET IN A BARE FIELD EAST of THE VAN — 1 pr. of BLACK CLOTH & LEATHER GLOVES (NOT MATCHING) FROM THE PARKING LOT of CITY FORESTRY GROUNDS SOUTH EAST of ABOVE COAT | 8204 |

PO Michael Priest

Sgt. Joseph Dumston

0000180

IF ADDITIONAL SPACE IS NEEDED, USE ANOTHER CONTINUATION REPORT

APD FORM 13 (R-2)

```
Quantity:                           3
Property Type:        MISCELLANEOUS
Characteristics:      LIVE SHOTGUN SHELLS
Estimated Value:      $         0
Property Disp:        TAKEN TO LABORATORY
Recovery:
    Loc. Recovered:   IN POCKET/BLACK LEATHER JACKET
    Date:             03/17/97
    Address:
        Street:          5900 WELLS DR
        City/State:   ST. LOUIS                MO
    DSN/Officer:      8204 PRIEST
    Assignment Code:  452
Owner:
    Name:             A (SUSPECT)
                      BILLIE
```

## P R O P E R T Y

```
Property Status:      EVIDENCE
Held as Evidence:     Y
Quantity:                           5
Property Type:        MISCELLANEOUS
Characteristics:      STRIPPER AMMUNITION CLIPS
Estimated Value:      $         0
Property Disp:        HELD AS EVIDENCE
Recovery:
    Loc. Recovered:   MUDDY FIELD/BLK JACKET POCKET
    Date:             03/17/97
    Address:
        Street:          5900 WELLS DR
        City/State:   ST. LOUIS                MO
    DSN/Officer:      8204 PRIEST
    Assignment Code:  452
Owner:
    Name:             A (SUSPECT)
                      BILLIE
```

## P R O P E R T Y

```
Property Status:      EVIDENCE
Held as Evidence:     Y
Property Type:        MISCELLANEOUS
Characteristics:      WHITE VELCRO STRIP/BODY ARMOR
                      WITH BLOOD SPATTERING
Estimated Value:      $         0
Property Disp:        TAKEN TO LABORATORY
Recovery:
    Loc. Recovered:   ON STREET
    Date:             03/17/97
```

0900029

```
Address:
    Street:            5900 WELLS DR FOREST PK
    City/State:     ST. LOUIS              MO
DSN/Officer:       8204 PRIEST
Owner:
    Name:              H (SUSPECT)
                       NORRIS
```

## P R O P E R T Y

```
Property Status:    EVIDENCE
Held as Evidence:   Y
Property Type:      FIREARM
Characteristics:    1 PR BLACK LEATHER GLOVES
Estimated Value:    $          0
Property Disp:      TAKEN TO LABORATORY
Recovery:
    Loc. Recovered:  ON GROUND
    Date:            03/17/97
    Address:
        Street:           5900 WELLS DR FOREST PK
        City/State:    ST. LOUIS              MO
    DSN/Officer:      8204 PRIEST
    Assignment Code: 452
Owner:
    Name:             NORRIS H.
                      BILLIE A.
```

## P R O P E R T Y

```
Property Status:    DAMAGED
Held as Evidence:   Y
Property Type:      TV/RADIO/CAMERA
Characteristics:    CASSETTE DISC; TOM PETTY'S
                    "WILD FLOWER"
Estimated Value:    $          0
Property Disp:      HELD AS EVIDENCE
Recovery:
    Loc. Recovered:  ON PAVEMENT
    Date:            03/17/97
    Address:
        Street:           5900 WELLS DR FOREST PK
        City/State:    ST. LOUIS              MO
    DSN/Officer:      8204 PRIEST
    Assignment Code: 452
Owner:
    Name:
```



LABORATORY REPORT

E:  Richard HEFLIN, JR. :VICTIM        COMPLAINT NO.:  97-3 4 2 8 4
    204 Sandra Dr.
                                       DATE RECEIVED:  3-17-97
    Norris HOLDER
    5607 Curry          :SUSPECT       DATE EXAMINED:  3-21-97 & 4-1-97

    Billy ALLEN         :SUSPECT       LABORATORY NO.:  7 0 3 3 6 0-2

    FATAL SHOOTING,                    EXAMINER:       MARGART OWENS
    3-17-97
                                       EXAMINED FOR:   Homicide Section
                                       Med. Ex. No.:   97-5 7 3

                              REPORT

SPECIMENS:

    Q-1. Clothing belonging to Richard Heflin, Jr. consisting of:  a) pair
         of dark blue uniform trousers and b) pair of blue jockey shorts.
    Q-2. Clothing belonging to Richard Heflin, Jr. consisting of:  a) pair
         of white socks and b) pair of black boots.
    Q-3. Clothing belonging to Richard Heflin, Jr. consisting of:  a) dark
         blue uniform shirt and b) black t-shirt.
         Submitted items:  set of black leather with accessories and six
         keys; two ink pens; I.D. badge; and metal badge.
    Q-4. One 2" by up to 10-1/2" piece of cut white elastic strap with red
         stains.
    Q-5. One pair of blue, red and white "Fila" shoes, size 11-1/2 -
         recovered from rear seat of vehicle.
    Q-6. One partially burnt black leather coat, with hood.
    Q-7. One red baseball cap with a white "D" on the crown front,
         recovered from the rear seat of vehicle.
    Q-8. Evidence bag containing:  a) black knit left glove and b) dark
         blue cloth right glove.  Both gloves were recovered from the rear
         seat of vehicle.
    K-1. Whole blood sample removed from Richard Heflin, Jr.

RESULTS OF EXAMINATION:

    Q-1, Q-2 & Q-3.  Visual, microscopic and chemical examinations of

    Richard Heflin, Jr. clothes disclosed the following:

    1)  An 1/8" by up to 3/8" damaged area (with lead residue) in the

    shirt right epaulet, toward the collar.

    2)  A 1/16" by up to 1/4" hole (with a 3/4" diameter area of lead

    residue) in the shirt lower left back;  and with a corresponding

    1/8" by up to 1/4" hole (with lead residue) in the t-shirt.

                        Page 1 of 3 Pages                    0000172

LABORATORY NO.:   7 0 3 3 6 0-2

COMPLAINT NO.:   97-3 4 2 8 4

3)   A 1/4" by up 3/8" hole (with a 1-1/2" by up to 1-3/4" area of lead residue) in the trousers upper left leg front near the inseam and above the knee region.

4)   An 1/8" diameter hole in the trousers lower left leg front, toward the outer seam.

5)   A 1/2" by up to 1-1/8" damaged area (with a 2" by up to 2-1/4" area of lead residue) in the trousers upper left back, above the pocket opening.

6)   A 6" by up to 7" area consisting of a 1/16" by up to 3/8" damaged area, a 1/4" by up to 1-1/4" hole, two 1/8" diameter holes, a 3/16" by up to 1" hole, an 1/8" by up to 3/4" hole, a 1/4" diameter hole and a 1/4" by up to 1" piece of copper bullet jacket in the trousers upper left back at the buttock; and with corresponding holes (with lead residue) in the jockey shorts.  A 7" by up to 8" area of scattered lead residue was noted at this area.

7)   A 3/4" by up to 1" hole (with a 3-1/2" by up to 4" area of scattered lead residue) in the trousers upper right back, toward the crotch; and with a corresponding hole (with lead residue) in the jockey shorts crotch.

8)   An 1/8" diameter hole (with lead residue) in the trousers upper right leg center back.

9)   An 1/8" by up to 2" hole (with lead residue) in the trousers lower right leg back, toward the outer seam.

10) A 3/8" by up to 3-1/2" area consisting of a 3/8" by up to 1-7/8" damage area (with lead residue) and two 1/4" diameter damaged areas (each with lead residue) in the trousers center left leg back.                Page 2 of 3 Pages

0000173



COMPLAINT NO.:   97-3 4 2 8 4

11) A 3-1/2" by up to 3-3/4" area consisting of a 3/16" by up to 1/4" hole, an 1/8" by up to 1/2" hole and a 3/16" diameter hole in the trousers lower left leg back.   Lead residue was noted at all three holes.

Cuts apparently made by Emergency Medical Personnel across the shirt upper right front; down and across the front of the t-shirt; down the trousers right leg front; and down the front of both legs of the jockey shorts may have possibly obliterated some bullet damage.

Q-4.  Presumptive serological examination of the red stains disclosed the presence of apparent blood.   A 2" by up to 3" piece of the strap was cut off, repackaged and forwarded to the DNA Unit on March 21, 1997.

Q-5, Q-6, Q-7 & Q-8.  Visual and presumptive serological examinations of the shoes, coat, cap and gloves failed to disclose the presence of apparent blood.

K-1.  A stain of the whole blood sample was prepared and forwarded to the DNA Unit on March 21, 1997.

Q-1, Q-2, Q-3, Q-4, Q-5, Q-6, Q-7, Q-8 and the empty K-1 blood tube will be forwarded to the F.B.I.

**CHAIN OF CUSTODY**

| | | | | |
|---|---|---|---|---|
| Lorino<br>Q-1 & Q-2 | to | Turner<br>3-17-97 | to | Owens<br>3-17-97 |
| Tatum<br>Q-3 | to | Vincent<br>3-17-97 | to | Owens<br>3-17-97 |
| Priest<br>Q-4, Q-6 & Q-8 | to | Vincent<br>3-17-97 | to | Owens<br>3-17-97 |
| Barton<br>Q-5 & Q-7 | to | Turner<br>3-17-97 | to | Owens<br>3-17-97 |

EXAMINER: _Margaret Owens_
Margaret Owens
Criminalist

/eas

Page 3 of 3 Pages

0000174

## LABORATORY REPORT

E: Richard HEFLIN, JR.
204 Sandra Dr.          :VICTIM

Norris HOLDER
5607 Curry             :SUSPECTS

Billy ALLEN

FATAL SHOOTING,
3-17-97

COMPLAINT NO.:   97-3 4 2 8 4

REQUEST REC'D:   3-18-97

REPORT DATE:     6-5-97

LABORATORY NO.:  7 0 3 3 6 0

EXAMINER:        DONNA BECHERER

EXAMINED FOR:    Homicide Section
                 Det. Toretta
                 U.S. Attorney
                 Joe Landolt

### REPORT

PECIMENS:

    Q-4.    Blood from white strap
    K-1.    Blood of Richard Heflin, Jr.
    K-2.    Blood of Billie Allen

ESULTS OF EXAMINATION:

Deoxyribonucleic acid (DNA) profiles from genetic loci D1S7, D2S44, D4S139, D5S110, D10S28 and D17S79 were developed from HaeIII-digested high molecular weight DNA extracted from the above-listed specimens. Based on these results, the DNA detected in the Q-4 white strap stain does not match the DNA of Richard Heflin or Billie Allen, and could not have been contributed by either of these individuals.

### CHAIN OF CUSTODY

| Priest Q-4 | to | Vincent 3-17-97 | to | Owens 3-17-97 | to | Becherer 3-21-97 |
|---|---|---|---|---|---|---|
| Graham K-1 | to | Barry 3-18-97 | to | Karr 3-18-97 | to | Owens 3-18-97 | to | Becherer 3-21-97 |
| Crow K-2 3-18-97 | to | | | Becherer 3-21-97 | | |

EXAMINER: _Donna Becherer_
          Donna Becherer
          Criminalist

EXAMINER: _____
          Kim Gofman
          Criminalist

eas

0001266

LABORATORY REPORT

RE:  Richard HEFLIN, JR. :VICTIM          COMPLAINT NO.:  97-3 4 2 8 4
     204 Sandra Dr.
                                          DATE RECEIVED:  3-17-97
     Norris HOLDER
     5607 Curry           :SUSPECT        DATE EXAMINED:  3-21-97 & 4-1-97

     Billy ALLEN          :SUSPECT        LABORATORY NO.:  7 0 3 3 6 0-2

     FATAL SHOOTING,                      EXAMINER:       MARGART OWENS
     3-17-97
                                          EXAMINED FOR:   Homicide Section
                                          Med. Ex. No.:   97-5 7 3
                              REPORT

## SPECIMENS:

Q-1.  Clothing belonging to Richard Heflin, Jr. consisting of:  a) pair of dark blue uniform trousers and b) pair of blue jockey shorts.

Q-2.  Clothing belonging to Richard Heflin, Jr. consisting of:  a) pair of white socks and b) pair of black boots.

Q-3.  Clothing belonging to Richard Heflin, Jr. consisting of:  a) dark blue uniform shirt and b) black t-shirt.
      Submitted items:  set of black leather with accessories and six keys; two ink pens; I.D. badge; and metal badge.

Q-4.  One 2" by up to 10-1/2" piece of cut white elastic strap with red stains.

Q-5.  One pair of blue, red and white "Fila" shoes, size 11-1/2 - recovered from rear seat of vehicle.

Q-6.  One partially burnt black leather coat, with hood.

Q-7.  One red baseball cap with a white "D" on the crown front, recovered from the rear seat of vehicle.

Q-8.  Evidence bag containing:  a) black knit left glove and b) dark blue cloth right glove.  Both gloves were recovered from the rear seat of vehicle.

K-1.  Whole blood sample removed from Richard Heflin, Jr.

## RESULTS OF EXAMINATION:

Q-1, Q-2 & Q-3.   Visual, microscopic and chemical examinations of Richard Heflin, Jr. clothes disclosed the following:

1)  An 1/8" by up to 3/8" damaged area (with lead residue) in the shirt right epaulet, toward the collar.

2)  A 1/16" by up to 1/4" hole (with a 3/4" diameter area of lead residue) in the shirt lower left back;  and with a corresponding 1/8" by up to 1/4" hole (with lead residue) in the t-shirt.

Page 1 of 3 Pages

COMPLAINT NO.:   97-3 4 2 8 4

3)  A 1/4" by up 3/8" hole (with a 1-1/2" by up to 1-3/4" area of lead residue) in the trousers upper left leg front near the inseam and above the knee region.

4)  An 1/8" diameter hole in the trousers lower left leg front, toward the outer seam.

5)  A 1/2" by up to 1-1/8" damaged area (with a 2" by up to 2-1/4" area of lead residue) in the trousers upper left back, above the pocket opening.

6)  A 6" by up to 7" area consisting of a 1/16" by up to 3/8" damaged area, a 1/4" by up to 1-1/4" hole, two 1/8" diameter holes, a 3/16" by up to 1" hole, an 1/8" by up to 3/4" hole, a 1/4" diameter hole and a 1/4" by up to 1" piece of copper bullet jacket in the trousers upper left back at the buttock; and with corresponding holes (with lead residue) in the jockey shorts.  A 7" by up to 8" area of scattered lead residue was noted at this area.

7)  A 3/4" by up to 1" hole (with a 3-1/2" by up to 4" area of scattered lead residue) in the trousers upper right back, toward the crotch; and with a corresponding hole (with lead residue) in the jockey shorts crotch.

8)  An 1/8" diameter hole (with lead residue) in the trousers upper right leg center back.

9)  An 1/8" by up to 2" hole (with lead residue) in the trousers lower right leg back, toward the outer seam.

10) A 3/8" by up to 3-1/2" area consisting of a 3/8" by up to 1-7/8" damage area (with lead residue) and two 1/4" diameter damaged areas (each with lead residue) in the trousers center left leg back.                    Page 2 of 3 Pages

11) A 3-1/2" by up to 3-3/4" area consisting of a 3/16" by up to 1/4" hole, an 1/8" by up to 1/2" hole and a 3/16" diameter hole in the trousers lower left leg back.   Lead residue was noted at all three holes.

Cuts apparently made by Emergency Medical Personnel across the shirt upper right front; down and across the front of the t-shirt; down the trousers right leg front; and down the front of both legs of the jockey shorts may have possibly obliterated some bullet damage.

Q-4. Presumptive serological examination of the red stains disclosed the presence of apparent blood.  A 2" by up to 3" piece of the strap was cut off, repackaged and forwarded to the DNA Unit on March 21, 1997.

Q-5, Q-6, Q-7 & Q-8.  Visual and presumptive serological examinations of the shoes, coat, cap and gloves failed to disclose the presence of apparent blood.

K-1. A stain of the whole blood sample was prepared and forwarded to the DNA Unit on March 21, 1997.

Q-1, Q-2, Q-3, Q-4, Q-5, Q-6, Q-7, Q-8 and the empty K-1 blood tube will be forwarded to the F.B.I.

### CHAIN OF CUSTODY

| Lorino Q-1 & Q-2 | to | Turner 3-17-97 | to | Owens 3-17-97 |
|---|---|---|---|---|
| Tatum Q-3 | to | Vincent 3-17-97 | to | Owens 3-17-97 |
| Priest Q-4, Q-6 & Q-8 | to | Vincent 3-17-97 | to | Owens 3-17-97 |
| Barton Q-5 & Q-7 | to | Turner 3-17-97 | to | Owens 3-17-97 |

EXAMINER: _Margart Owens_
Margart Owens
Criminalist
Page 3 of 3 Pages

/eas

# ADDENDUM 4

AFFIDAVIT OF MARGART OWENS

I am Margart Owens, and I am currently a Criminalist (forensic scientist) with the St. Louis Metropolitan Police Department and have been for the past twenty-four years. My primary duty consists of managing the Arson Section, and my other duties consist of analyzing unknown substances for the possible presence of controlled substances and identifying unknown organic compounds in homicide and assault cases.

I have been requested by the United States Attorney's Office to reflect my opinion concerning Paragraph 2 of Ground for Relief "I," which relates to Laboratory Report 703360. I believe that in this instance, there is no correlation between the smell of smoke on the clothes from Mr. Allen and the Laboratory's analysis result that "no petroleum distillates were detected" on the clothes. The method of analysis to which the clothing was subjected was not a test for the presence of smoke.

My opinion is based on my following qualifications:

* B.S. in Chemistry from Southeast Missouri State University (1979)

* M.S. in Chemistry from St. Louis University (1986)

* Analyzed arson cases (in excess of 200 cases) at the St. Louis Metropolitan Police Department Crime Laboratory since October 2003

* <u>Fire Investigation</u> - St. Louis Community College (1-16-08 to 5-12-08)

* <u>Chemistry of Pyrotechnics</u> - Michigan State Highway Patrol - Lansing, MI (5-2-06 to 5-4-06)

* <u>Advanced Fire Debris Analysis Course</u> - MFRS - Ames, IA (8-8-05 to 8-12-05)

* <u>Basic Fire Debris Analysis Course</u> - MFRS -Ames, IA (8-30-04 to 9-3-04)

I declare under the penalty of perjury that the foregoing is true and correct.


10-24-08
_____
Date

_Margart Z Owens_
Margart Owens

METROPOLITAN POLICE DEPARTMENT - CITY OF ST. LOUIS

## LABORATORY REPORT

| | | |
|---|---|---|
| **RE:** Richard HEFLIN | | **COMPLAINT NO.:** 97-3 4 2 8 4 |
| 6900 Clayton :VICTIM | | |
| | | **DATE RECEIVED:** 3-17/3-18 & 3-19-97 |
| Norris HOLDER | | |
| 5607 Curry :SUSPECT | | **DATE EXAMINED:** 4-3-97 |
| | | |
| Billy ALLEN | | **LABORATORY NO.:** 7 0 3 3 6 0 |
| 3164 Oregon :SUSPECT | | |
| | | **EXAMINER:** JOSEPH STEVENS |
| HOMICIDE/BANK ROBBERY, | | |
| 3-17-97 | | **EXAMINED FOR:** Homicide Section |
| | | Det. Nickerson |

### REPORT

**SPECIMENS:**

Q-1. Metal can containing one damp rag.

Q-2. One metal can containing carpet and debris from behind passenger seat of van.

Q-3. Paper evidence bag containing clothing of suspect Allen consisting of: a) gray sweatpants, b) blue sweatpants, c) black, red and white pullover shirt.

Q-4. Paper evidence bag containing clothing of suspect Norris consisting of: a) blue coveralls, b) blue and red "Nautica" shirt, c) blue jeans, d) white "bullet proof" vest.

Q-5. Paper evidence bag containing one black leather jacket recovered from front seat of vehicle.

Q-6. Paper evidence bag containing plastic bag containing one pair of very wet leather gloves.

**RESULTS OF EXAMINATION:**

Q-1. Gas chromatographic analysis of the head space of Specimen Q-1 failed to disclose the presence of any petroleum distillates.

Q-2. Gas chromatographic analysis of the head space of Specimen Q-2 disclosed the presence of gasoline.

Q-3 through Q-6. Specimens Q-3 through Q-6 were repackaged by heat sealing in Kapak bags.

Subsequent gas chromatographic analysis of the head spaces inside these Kapak bags disclosed the following:

Q-3. No petroleum distillates were detected.

Q-4. Gasoline detected

Q-5. Gasoline detected

Q-6. Gasoline detected

Page 1 of 2 Pages

0000157

LABORATORY NO.:   97-0 3 3 6 0

COMPLAINT NO.:   97-3 4 2 8 4

All specimens will be forwarded to the FBI for further examination.

## CHAIN OF CUSTODY

Q-1        to        Vincent 3201    to    Stevens 6766        to
P.O. Schulze 2395    3-17-97              3-18-97

         S.A.Hartman
         4-4-97

Q-2        to        Crow 0620       to    Stevens 6766        to
Det. Horn 3882       3-18-97               3-18-97

         S.A. Hartman
         4-4-97

Q-3 & Q-4 to         Stevens 6766    to    S.A. Hartman
Det. Carroll 3263    3-19-97               4-4-97

Q-5        to        Turner 1098     to    Stevens 6766        to
P.O. Barton          3-18-97               3-18-97

         S.A. Hartman
         4-4-97

Q-6        to        Vincent 3201    to    Stevens 6766        to
P.O. Priest          3-17-97               3-18-97

         S.A. Hartman
         4-4-97

EXAMINER: _____
          Joseph Stevens
          Criminalist

/eas

0000158

# ADDENDUM 5

10
97035218

████████████ White, female, DOB: ████████ Social
Security Number: ████████████, home
address ████████████████████,
Missouri, home telephone ████████████,
work address 6900 Clayton, St.
Louis, Missouri, 63143, business
telephone #645-7700, ████████████
████

████████████ White, female, ████████████, Social
Security Number: ████████████, home
address ████████
████████ Missouri, ████████ home
telephone ████████ work address
6900 Clayton, St. Louis, Missouri,
business telephone #645-7700,
████████████

████████████ Black, female, ████████████ Social
Security Number: ████████████ home
address ████████████,
████████████ home telephone
████████████ work address 6900
Clayton, St. Louis, Missouri, 63143,
business telephone #645-7700,
████████

████████ Black, female, ████████████ Social
Security Number: ████████████, home
address ████████████ Alorton,
████████████ no home telephone,
work address 6900 Clayton, St.
Louis, Missouri, 63143, business
telephone #645-7700, ████████████

████████ Black, female, DOB:B ████████████
Social Security Number: ████████████
home address ████████████████,
████████████ home telephone
████████████ work address 6900
Clayton, St. Louis, Missouri, 63143,
business telephone #645-7700,
████████████

The following individuals were interviewed at the scene by
Detectives Bateman and Oberschelp:

████████████ White, male, 3████████████:
████████████████
home telephone ████████████

and:

0000121

11
97035218

 

Black, male, residing e telephone

Both were working at the corner of Kingshighway and Lindell for the City Water Department and saw the following described subject standing on the southeast corner:

> Black, male, 23 to 27 years of age, 5 feet 8 inches tall, 160 pounds, thin build, with red, frizzy hair combed straight back, wearing a multi-colored shirt and grey pants... possibly sweat pants.

The subject was last seen walking south on the east side of Kingshighway from Lindell at about 12:00 p.m.

Both subjects can be contacted at home or at the Water Division at 4800 McRee, telephone

Sergeant Sasenger interviewed the following witness/employees at the bank:

who is a clerk in the safe deposit department at the bank, stated at about 10:30 a.m. she received a fax machine message and asked the security guard, victim Heflin, to make a copy of the message for her. Victim Heflin took the message from her and began walking toward a table near the east door of the bank, where they had snacks and beverages on display for customers and employees.

stated she sat down by her computer, when suddenly she heard numerous gunshots in the bank coming from the direction of the east door. Seconds later, she observed victim Heflin falling backwards to the floor in front of her counter. She observed one of the subjects wearing a dark colored ski mask and clothing and armed with a rifle standing near the east door.

stated she heard the subject standing near the east door yelling toward the center of the bank lobby where another subject, dressed somewhat in the same manner, having clear, dark-rimmed glasses, armed with a rifle, was standing and stated, "You have thirty five seconds to get the money!" She stated the second subject, who was wearing what appeared to be prescription glasses, jumped over the counter behind victim Heflin and told her to lie on the floor and she complied with his demand. The subject behind the counter then walked away from her, toward the tellers, and she heard the subject standing by the east door of the bank state, "Thirty seconds are up, hurry!"

0980132

# ADDENDUM 6

FD-302 (Rev. 10-6-95)

- 1 -

# FEDERAL BUREAU OF INVESTIGATION

Date of transcription    04/03/97

On April 3, 1997, ████████████, Physical Engineer, Deaconess Hospital, 6150 Oakland, St. Louis, Missouri, telephone ████████████ was interviewed at his place of employment by Special Agent Michael A. Vick, Federal Bureau of Investigation. Combs was advised of the identity of the interviewing agent, and the purpose of the interview. He provided the following information:

████████ is the director of Deaconess Hospital security. On the morning of March 17, 1997, he and his assistant, ████████, were standing outside of the main hospital entrance when they observed a lone black male approaching the hospital from an easterly direction on Oakland. Having heard over their police radio of the Lindell Bank and Trust robbery, they were alert for any young black males seeking emergency medical treatment. ████ stated he and ██████r immediately felt the man approaching them appeared suspicious, and they therefore observed him closely.

The black male walked into the main entrance of the hospital and sat down in the waiting area nearest the doors. ████s and ████████ walked into the lobby and made eye contact with the man. The black male appeared to be nervous, and glanced at ██████ frequently.

Suspecting that the man might be the robber the police were still seeking, ██████ placed a call to the St. Louis Metropolitan Police Department (SLMPD) to inform them of the presence of the suspicious man. Seeing ████ making a telephone call, the black male got up and walked to the pay telephones and appeared to be pretending to place a call. ██████ stated he thought the man acted as if he were calling someone so that he could get closer to ████s and overhear his conversation with the police.

The black male stood at the phones for a short time, and then hurriedly exited the hospital. He crossed Berthold and whistled to another black male who was sitting in a car, apparently waiting for him. The black male entered the vehicle, a brown Jeep Wagoneer, and drove north on Hampton. ████s stated the vehicle bore Missouri license AEA-228.

---

Investigation on    04/03/1997    at  St. Louis, Missouri

File #  91A-SL-181120                                          Date dictated    04/03/1997

0000774

by    SA Michael A. Vick

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency

(Rev. 10-6-95)

91A-SL-181120

Continuation of FD-302 of ███████████ _____ , On 04/03/1997 , Page    2

      ████████ described the unknown man as a black male, approximately 20 - 25 years of age, 5'10" in height, weighing 160 lbs, wearing dark clothing, a knit cap, and round wire-rimmed prescription glasses. The individual driving the car was also a black male in his early twenties, wearing a Minnesota Twins baseball cap.

      ███████ stated he provided the above information to the SLMPD on the day of the robbery.

# ADDENDUM 7

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    06/25/97

██████████████████████████████, date of birth ██████████
residential address ████████████████████, ████████,
█████████████    telephone number (███████████████ (emergency
daytime)██████████████ was interviewed at his residence in regards
to his association with Norris G. Holder. ████ was advised of
the identity of the interviewing Agents and the nature of the
interview. He provided the following information:

████████ is a student at Southern Illinois University at
Carbondale, Carbondale, Illinois, and on scholarship to play
football. He will be a Junior. ████ is from St. Louis,
Missouri, and goes back on holidays, springbreaks, and some
weekends to his Grandmother's residence at ██████████ ████████
████████.

████████ is a close friend to Norris Geroy Holder, Jr. The
two grew up in the same neighborhood. ████ lived on 25th Street
and Holder lived in the Blumeier projects at Delmar and Franklin
in St. Louis, Missouri. The two went to separate elementary
schools, but they both attended Rockwood South Junior High School
in Fenton, Missouri and later Eureka High School in Eureka,
Missouri. ████ graduated in 1995. Holder was suspended in 1993
and never returned. He earned his General Education Diploma(GED)
later.

████ and Holder became closer friends as they grew
older. They would frequent each other's homes and knew each
other's families. When Holder was younger, he lost his leg in a
train accident. Holder would jump the train that goes under
Grand Street near Highway 40 and ride to Union Station. He had
done this for a long time before he got hurt. It was hard for
Holder; he knew he was handicapped, but he did not want to face
up to it. Holder used to play football with ████ and the rest of
their friends; he was the fastest runner. He also liked playing
baseball. Holder was depressed for a couple of years, but he
never appeared to be suicidal.

Holder always said what was on his mind. It got him
into trouble at school. In Junior High School, he was suspended
for talking back to a teacher. ████ was also aware that Holder
was suspended for wearing a gold necklace with an AK-47

Investigation on    06/24/1997    at ████████████████████

File #  91A-SL-181120                          Date dictated    06/25/1997
        SA Jan R. Hartman
by      SA John Ward Durso

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.                                         0001059

1A-SL-181120

██████████████ , On 06/24/1997 , Page 2

...ion of FD-302 of ██████████████

medallion. ████ said that he ████ wore a dagger earring to school, but they simply asked him to remove it. He admitted, though, that the difference between the two was that Holder talked back and refused to remove the necklace when asked. Holder was suspended. ████ was also familiar with Holder's last suspension at Eureka High School over a girl. ████ advised that the incident occurred on the side of the school bus where the girl claimed that Holder felt her "butt." ████ stated that Holder was only flirting with her, and that he was wearing a black skull cap, not a face mask. Holder was suspended. He then dropped out of school and got his GED. Holder would generally get in trouble at school when he associated with Terry Jett and Shawn Carr. The teachers did not like those two. Jett wore a big herringbone necklace, and Carr had gold teeth. It seemed to ████ that the "devil" followed Holder around as he was always picked out by police and others who wanted to fight him in the different bars they frequented. He didn't go out looking for trouble. Holder used to have a black SS Monte Carlo and a red 1972 "drop top" Oldsmobile Cutlass. The Monte Carlo was the one that was retagged and confiscated. He eventually sold the Cutlass because he kept getting hassled by the police for his music (numerous stereos). The police would "flag" him and give him tickets—he seemed to always stand out.

Holder worked for a Temporary Service for three weeks. He quit because he said his leg hurt. Holder sold crack cocaine up until the time that he was caught by police with crack cocaine and a gun (June 28, 1994). ████ and a twelve or thirteen year old named ████████ were with him. The incident scared Holder. He told ████ that selling drugs was not worth the risk of going to jail. So, Holder stopped selling drugs and carrying guns. Holder did not sell crack when ████ was around because he knew ████ was not involved with drugs. Holder stayed around friends like Terry Jett if he was selling drugs. Jett is currently locked up for robbing a jewelry store. Another friend named Marco McRoberts "hung" around with Holder when he was on the street. McRoberts graduated from Vashon High School this year. McRoberts, Holder, and ████ associated frequently. They would go to the skating rink together, barbecue at Ross's grandmother's house, or go to the Normandy Bowling Alley to shoot pool and bowl.

Holder likes guns and has had several. About a year

0001060

02s (Rev. 10-6-95)

91A-SL-181120

Continuation of FD-302 of ████████████████████████████ , On 06/24/1997 , Page 3

and a half ago, Holder purchased, or was given, a twelve gauge Mossberg pump shotgun by his girlfriend when he lived on Hamilton. It was purchased in a store like WalMart. He owned a .22 caliber small handgun which he was caught with by police. The gun was seized and not returned. He obtained that gun the summer of ████ senior year in high school. Holder had a Glock pistol that he showed ████ when he was home over his last Christmas break. Holder shot it on New Year's Eve to celebrate the new year. And, ████ has seen Holder with a SKS rifle and an AK-47 rifle which were stored in his room. There was no magazine for the SKS rifle; it was Chinese made as ████ saw Chinese writing on the side of the rifle. Holder told ████ that he keeps guns for protection. ████ advised that Holder would have trouble with some gang members in O'Fallon Park. Everyone goes to O'Fallon Park to "chill", and the Crips gangs did not like Holder because he drove his red Cutlass. ████ claimed that he and Holder did not mess with gangs. They wore red, blue, or whatever color they wanted. ████ has heard the term GMP at Blumeier, but does not know what it stands for.

████ went home to St. Louis for Spring Break which began around March 8, 1997. He brought home one of his fellow teammates from the football team named ██████████████ also known as ████. ████ was from Georgia and did not want to travel home for Spring Break. ████ and ████ were at ████ grandmother's for a week. The first weekend, there was a birthday party for ████ uncle, ██████████████. Holder was there as well. They partied until 7:00AM the following day. On Saturday, March 8, 1997, ████, Holder and ████ went to Cloud 9 Club in East St. Louis. ████ saw Billie Allen at Cloud 9 but did not speak to him. Holder only greeted him with "What's up?"

████ had met Allen three years ago through a friend named Stan Morris. Morris had bought a new car and took ████ for a ride. Morris took ████ to the south side near I44 and Grand by the Amoco station where they met with three individuals. One of them was Allen. Morris introduced him as Bill. Morris said that Allen lives "in the hood". ████ had the impression that Allen was a gang member, possibly Blood, as he was wearing red. ████ disliked him immediately; he looked shady, more so than the other two individuals he was with, and was someone he didn't trust. Morris knew Allen as he and Allen both lived on the south side. Morris and ████ knew each other from Rockwood South Junior High.

0001061

302a (Rev. 10-6-95)

91A-SL-181120

Continuation of FD-302 of ███████████████████████████████ , On 06/24/1997 , Page    4

Morris was into gangs and is currently locked up for murder. ████ also found out after Holder was arrested that Allen had lived with his cousin ██████████ three or four years ago. ████ called ███ grandmother, ██████████████, after he heard the news of the robbery. Allen had even written ████ and told him that he was going to rob a bank. ████ had stated that Allen was "out there", that he was wild and would do anything. ████ currently lives in Columbia, Missouri with his brother.

On Sunday, March 9, 1997, ████ and ████ did not go out. The next day, ████ ████, and Holder went to Northwest Plaza to show ████ around. After that, ████ did not see Holder until the following Thursday. ████ tried to get Holder to go out with he and ████. Holder did not. They say Holder the next day, Friday, March 14, 1997, at Holder's home. Holder showed ████ and ████ his SKS and AK-47 rifles. The SKS had a knife (bayonet) and looked old. Holder advised that he had bought it off the street, that he did not have a magazine clip for it yet, but was going to get one. It looked like the clip went on the side of the rifle. Holder told ████ that the other rifle was an AK-47. It did not look like the SKS and had two banana magazine clips taped together. It loaded from underneath. ████ asked Holder what he was doing with those guns. Holder replied that he was "going to pull a lick(robbery)". ████ was surprised when he observed the weapons as he had come from the country.

On Saturday, March 15, 1997, at approximately 11:45PM, ████, ████, ████████████████, Holder, and ████████████ went to the bowling alley to shoot pool. When they arrived, all the pool tables were in use, and the bowling lanes were going to close. They did not leave because Holder was paged. He said he was waiting on a "cat" named Bill who was coming from the south side. They waited for twenty or thirty minutes. As they stood outside, ████ observed a small old car, possibly red, come into the lot. The passenger was Allen. ████ did not know his last name, but he recognized him immediately. Allen got out of the vehicle, and he and Holder walked into the bowling alley and sat at one of the tables. Ten minutes later, the rest of the group went into the bowling alley as the Normandy police were driving around the lot. They sat with Holder and Allen. Holder and Allen moved to another table. The two were talking quietly, but ████ and ████ were listening to their conversation. They were talking about robbing a bank. When ████, Holder, ████ ████,

0001062

91A-SL-181120

Continuation of FD-302 of ████████████████████████. ,On 06/24/1997 . Page 5

FD-302a (Rev. 10-6-95)

and ████ left in their car, Holder talked to ████ about the robbery. ████ could not understand why he picked Allen to rob a bank with. The two did not associate with each other. Holder kept saying that ████ didn't understand. He said he had to do it because he needed money. ████ tried to reason with Holder. He told Holder that he could not even run, and Holder replied that he was not going to get caught. Holder stated that no one was going to get hurt, that the bank had insurance, and that he was not going to have bullets in his gun. ████ asked him what if the police or security guards came and shot at him. Holder said that he would be wearing a bullet proof vest. ████ told him that the police would not shoot at his chest, but probably his head. Holder kept saying that he would get away with it and not get caught. Holder had an answer for everything ████ threw at him. ████ was very angry with him. Holder would not tell ████ which bank. ████ knew it involved Allen; Holder said they had it planned out but would not say who's idea it was as it did not matter. ████ asked him how he was going to get away, and Holder stated that they had a car. ████ told him that the banks had cameras, and Holder said that he has seen how they are set up and will take care of the cameras. Holder knew how long they would be in the bank; he told ████ twenty seconds. He said there was a highway right next to the bank. He knew when the police changed shifts. Holder said that no one would get hurt, that they would have everyone lay on the ground. ████ could not understand why Holder would do this with Allen as he did not know him. Holder told ████ that Allen was "cool", and that they would not get caught. At one time, ████ asked why Holder had changed. Holder told him that the streets made him change. ████ asked Holder why a bank, and Holder said, "I can't take from my brother who's struggling like me." ████ and Holder argued about Holder not following through with his plan. Holder kept saying that no one would get hurt, that they would not be in the bank long enough for anyone to get hurt. Holder never tried to get ████ involved with the robbery, but he had tried a couple of weeks prior to get ████ to do it with him. (████ did not know this until later.) ████ did not think that Holder tried to recruit ████, but he probably asked ████████ ████ assumed that Holder was going to use the rifles. He thought that Allen had his own guns.

████ argued with Holder the rest of Saturday and Sunday, trying to convince Holder not to rob a bank. Later, he found out that he was the last to know about Holder's plan.

0001063

FD-302a (Rev. 10-6-95)

91A-SL-181120

Continuation of FD-302 of _____ , On 06/24/1997 , Page ___6___

Their friend, ▉▉▉▉▉▉▉▉, had the same argument with Holder about robbing a bank as Holder had told him about it. ▉▉▉'s is one that is always in trouble himself. He went to college for two and a half years. The last ▉▉▉ knew, ▉▉▉▉ lived in Normandy with his brother. ▉▉▉ also found out that he and Holder's barber, "Plum", knew Holder was talking about robbing a bank. The last girlfriends Holder had prior to the robbery was a female named Cafe and Colette Howard, a girl they went to high school with. Howard is living with her sister somewhere off of Riverview.

Sunday, March 16, 1997, ▉▉▉ went to Holder's house to convince him to go back to Carbondale with him. Holder told him that he had something to do. ▉▉▉ stayed there a couple of hours, then left to go back to college.

When asked if he was familiar with anyone named JB, ▉▉▉▉▉ advised that either Wednesday or Thursday of Spring Break, a group of friends were at ▉▉▉ grandmother's residence playing playstation when Holder was paged. Shortly thereafter, someone called for "808", a nickname for Holder. ▉▉▉ asked who was calling, and the caller told him JB. ▉▉▉ asked Holder who it was, and Holder told him one of Bill's "cats". ▉▉▉ knew the nickname of "T" to possibly be associated with Tyrone Martin, or "Fat Boy". Martin lives on Ashland Street near Cora. He used to go to Kemper College. Now, he is in St. Louis working. Drey is a friend whose real name is Andre. He is seventeen to nineteen years of age who used to go to Southwood South. Drey knows how to steal cars, but he and Holder are not talking as they had argued some time prior. Drey heard about the robbery and thought Holder was stupid for doing it. ▉▉▉ knows Rico Simms who was kicked out of Rockwood South. He lives by Rasheed and Hakeem Savage.

▉▉▉ was displayed a photographic lineup in which he was asked if he recognized anyone. ▉▉▉ immediately pointed to photograph number three, advising that he was the individual he knew as Bill. Photograph number three is Billie Jerome Allen. ▉▉▉ initialed and dated the photograph.

0001064

# ADDENDUM 8

AUG-11-1997  10:58

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription ___7/24/97___

████████████████, also known as ████████, was contacted at the DuQuoin State Fairgrounds where he was working. ████ was informed of the identities of the interviewing Agents. ████ provided the following information:

████████ was born on ███████████████. He is currently residing at ████████████, telephone number █████.

████████ a student at SOUTHERN ILLINOIS UNIVERSITY AT CARBONDALE (SIU-C). He is on a football scholarship at SIU-C.

████████ has known ████████ for about two or three years. ████ knows ████ from the football team, as both individuals are members of that team. ████ girlfriend and ████ girlfriend are roommates.

████████ went to St. Louis, Missouri, with ████ only one time. This occurred over spring break of 1997. ████ does not remember the day or the month in which the trip to St. Louis occurred. However, ████ noted it was the last spring break at SIU-C.

████████ stayed in St. Louis with ████ at his uncle's home. ████ recalled that ████ uncle's name was ████; however, ████ did not recall this individual's last name. ████ does not know where ████ residence was located or the name of the street on which the residence was located. ████ stayed with ████ at his uncle's residence about one week. While in St. Louis, ████ went with ████ and some of his friends to nightclubs for music and dancing. They went to a nightclub called "CLOUD NINE" and a nightclub called "CLUB CASINO". They also went to a strip club in Brooklyn, Illinois. However, ████ did not remember the particular days on which they visited the nightclubs. ████ believes it was toward the weekend when they went to the nightclubs.

████████ met a few of ████ friends. ████ met an individual named ████ and an individual named NORRIS. ████ does not remember the last names of these individuals. NORRIS grew up with ████ NORRIS came over to ████ uncle's residence

---

Investigation on ___6/27/97___ at ___DuQuoin, IL___

File # ___91A-SL-181120___                          Date dictated ___6/30/97___

SA GREGORY T. HOLSTON
by ___SA JOHN WARD DURSO___     JWD/llm

0001065

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

AUG-14-1997 10:09

91A-SL-181120

Continuation of FD-302 of _____ , On 6/27/97 , Page 2

about every day while ▮▮▮▮ was there.

▮▮▮▮▮ went to NORRIS' house one night. ▮▮▮▮▮ picked NORRIS up when they were going to a bowling alley. ▮▮▮▮ was driving that night. ▮▮▮▮▮ did not go into NORRIS' house that night. However, on the day ▮▮▮ and ▮▮▮ were getting ready to leave St. Louis and return to SIU-C, ▮▮▮ went into NORRIS' house. This was probably on a Sunday. ▮▮▮ saw weapons in NORRIS' bedroom. ▮▮▮▮ noted that "he had all kinds of guns". ▮▮▮▮ recalled seeing a pistol or two. ▮▮▮▮ saw what he called "little machine guns". ▮▮▮▮ saw a few of the "little machine guns". ▮▮▮▮ does not know what the weapons were called. ▮▮▮▮ is not really knowledgeable about guns. ▮▮▮ described the machine guns as being black in color. ▮▮▮ saw at least three of the machine guns. ▮▮▮▮ noted they were the kind of weapons you put a clip in the weapon. ▮▮▮▮ did not recall seeing a bayonet on any of the weapons he saw. ▮▮▮ also saw a weapon he believed was called a Mossberg. ▮▮▮ believes that the handle and the barrel were sawed off the Mossberg. However, ▮▮▮▮ is not sure if the barrel was sawed off that weapon.

NORRIS did not say what he was doing with the weapons. NORRIS did say he liked to collect guns.

One night, ▮▮▮▮ and ▮▮▮ went to the bowling alley with some of ▮▮▮ friends. ▮▮▮▮ does not remember the particular night they went to the bowling alley. ▮▮▮▮ drove that night. ▮▮▮▮ recalled that ▮▮▮▮ ▮▮▮ NORRIS, and a "dude" named ▮▮▮▮ went to the bowling alley. ▮▮▮▮ described ▮▮▮ as a person who used to play ball with ▮▮▮. However, ▮▮▮▮ did not remember ▮▮▮▮ last name. ▮▮▮▮ thinks ▮▮▮ is the name of one of the individuals who went to the bowling alley. This individual was ▮▮▮ cousin.

▮▮▮▮ picked up NORRIS at his house. ▮▮▮▮ does not remember the name of bowling alley. ▮▮▮▮ recalled it could have been on a Thursday night, but he was not sure of the exact day they went to the bowling alley. ▮▮▮▮ does not remember the time they went to the bowling alley, other than it was dark outside.

0001066

*a (Rev. 10-6-95)

91A-SL-181120

Continuation of FD-302 of _____ , On 6/27/97 , Page 3

    NORRIS mentioned that he was supposed to meet some "dude" there. NORRIS did not say the name of the person he was going to meet at the bowling alley. NORRIS said something about wanting to meet the guy because NORRIS wanted to buy a gun.

    NORRIS met a guy at the bowling alley and they were inside the bowling alley talking. ████████ waited outside in the car at least 20 minutes while NORRIS was talking to someone inside the bowling alley. ████████ then went inside the bowling alley while NORRIS and this other guy were talking. ████████ did not overhear the conversation between NORRIS and the other guy because they were sitting at a different table. ████████ was sure he did not overhear any conversation between NORRIS and the other guy. ████████ wanted to leave the bowling alley and go to the strip club.

    ████████ does not remember what the other guy NORRIS met at the bowling alley looked like, other than he was a black male. ████████ would not recognize this other guy if he ever saw him again.

    After NORRIS talked to this other guy, ████████ ████████ ████████, NORRIS, and ████ got in ████████ car and went to the strip club called the PINK SLIP in Brooklyn, Illinois. NORRIS mentioned something about he had to take care of some business.

    While they were in the car going to the strip club, ████████ was driving and he believes ████ was in the front seat. ████████ thinks NORRIS was in the back seat.

    NORRIS did not talk about a bank robbery. ████████ did not hear NORRIS talk about any bank robbery. When NORRIS was asked what took so long in the bowling alley, NORRIS said he had to take care of some business. ████████ does not remember the conversation that took place in the car. ████████ did not hear NORRIS discussing a bank robbery with ROSS. There was no mention of any bank robbery. No one talked about a bank robbery when ████████ was present.

    ████████ noted that ████ did not know anything about a bank robbery at that time. The trip to the bowling alley was before ████ saw the weapons in the bedroom of NORRIS' house.



(Rev. 10-6-95)

91A-SL-181120

Continuation of FD-302 of ███████████████████████ . On 6/27/97 , Page 4

There was no conversation about a bank robbery at the strip club. The conversation was about women.

NORRIS did not have a gun with him when they went to the bowling alley or strip club, to best of ████████ knowledge.

NORRIS never mentioned anything about a bank robbery in ████████ presence.

████████ was back at school less than a week after the spring break visit to St. Louis when he heard about the bank robbery. ████████ was in the training room or weight room when ████████ told ████████ that NORRIS and some "dude" tried to rob a bank.

████████ never had a conversation with the other "dude" that NORRIS met at the bowling alley.

████████ was only in NORRIS' bedroom on one occasion.

████████ did not see NORRIS with any illegal drugs.

The night that they went to the bowling alley and the strip club, ████████ was drinking beer; however, he was not drunk as he was driving that night. ████████ was not paying that much attention to the conversation. ████████ was listening to the music.

████████ was surprised when he heard about the bank robbery.

████████ reiterated that he never heard NORRIS say anything about a bank robbery. ████████ reiterated that he never heard NORRIS and ████████ discussing a bank robbery.

████████ does not remember NORRIS' last name.

NORRIS never made a comment about robbing anything. NORRIS never said what he was going to do with the guns he had.

████████ may have seen a box of shells in NORRIS' bedroom.

████████ recalled that NORRIS had a Topaz or a Tempo

0001068

FD-302a (Rev. 10-6-95)

91A-SL-181120

Continuation of FD-302 of ███████████████████████ , On 6/27/97 , Page 5

automobile.

A photographic lineup was displayed to ████████ ████████
recognized the individual depicted in photograph number two as
the individual he knew as NORRIS. ██████████initialed and dated
photograph number two.

0061069

# ADDENDUM 9

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription          07/30/97

        Jeffrey Charvez Moore, date of birth 12/04/1974, residential address 5883 Enright, Apartment C, St. Louis, Missouri, 63112, telephone number (314)361-5769, was contacted at his residence regarding his association with Norris Holder and Billie Allen. Moore was advised of the identity of the interviewing Agent and the nature of the interview. He provided the following information:

        Jeffrey Moore has known Norris Holder since he was in seventh grade. Both attended Rockwood South Junior High School, then Eureka High School. Moore has known Billie Allen for approximately one year. Their only association has been saying, "What's up?" when encountering each other.

        The Saturday before the robbery of the Lindell Bank and Trust, Moore, Wayne Ross, and Holder were at Ross' home for a while, then went to Club Casino in E. St. Louis, Illinois for the evening, staying out until 2:00AM or 3:00AM. Moore saw Holder the next day at Ross' residence. It may have been the late morning or early afternoon.

        Last year, Moore heard second hand that Holder was talking about robbing a bank. In November or December, 1996, Holder told Moore that he was "on a paper chase." Moore was aware that Holder got into some trouble a while back, and he tried to tell Holder to "chill." Holder's remark would be that Moore and Ross had something going for them, but he didn't. Holder was very frustrated because he could no longer play sports. When Ross, Holder, and Moore were together, Moore and Ross talked about school sports. Both Moore and Ross are on football scholarships to colleges. Moore attends Missouri Valley College in Marshall, Missouri.

        Moore also heard second hand that Holder was involved with drugs. But, when Holder was around him, he was just a "clown", someone fun to be around. Moore was aware that Holder had the nickname "Chu Nu". He had never heard of a gang named Gangsters Making Paper or GMP.

        The only person Moore knows that may go by JB is James Braxton. Tyrone Martin is an acquaintance who works at Wohl's

---

Investigation on    06/20/1997    at  St. Louis, Missouri

File #  91A-SL-181120                                          Date dictated    06/27/1997

by   SA Jan R. Hartman                                                              0001276

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 10-6-95)

91A-SL-181120

Continuation of FD-302 of ___ Jeffrey C. Moore _____ , On 06/20/1997 , Page ___ 2 ___

Recreational Center in St. Louis, Missouri.

Moore was shown a photographic lineup wherein he was asked if he recognized anyone. Moore advised that photograph number three was the individual he knew as Billie. Photograph number three is Billie Jerome Allen. Moore initialed the photograph.

0001277

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription     10/14/97

Jeffrey Charvez Moore, date of birth 12/04/1974, residential address 5883 Enright, Apartment C, St. Louis, Missouri, 63112, telephone number (314)361-5769, was recontacted at his residence regarding further information of is association with Norris G. Holder and Billie J. Allen. Moore provided the following information:

Moore recalled the Friday evening prior to the robbery of Lindell Bank and Trust. He and Holder, Wayne Ross, Chuck Smith, and a college friend of Ross's from Georgia named Coe went to the North Oaks Bowling Alley to bowl. The bowling lanes were closed, though, so they played video games instead. Coe was driving his black Volvo. The two of them went out to Coe's vehicle and waited for the others. They stayed in the vehicle approximately forty five minutes. Moore got impatient and went inside to tell the others that Coe was ready to go. Moore saw Smith and Ross sitting at a table; Holder was sitting at a separate table. He did not see who was with Holder.

Once everyone returned to Coe's vehicle, Moore sat in the left rear passenger seat listening to the radio. He did not hear any discussions about robbing banks.

The following day, the everyone went to the Club Casino together. While at the club, Moore saw Billie Allen. His only conversation with Allen was "What's up?".

On the following Monday, March 17, 1997, Smith called Moore and asked him if he had seen the news. He told Moore that Holder had been locked up for robbing a bank. Smith asked Moore if he remembered when they were talking about doing that. Moore didn't know and was "tripping off it." It was after the bank robbery that Moore found out that Allen had been at the North Oaks Bowling Alley that Friday night.

Moore advised that Holder used to call himself 808 at school. He had different joke names for himself. Moore was also aware that Holder had guns. He saw Holder with a gun one time at Holder's house about one year ago. It was a handgun, possibly a Glock. Some people had shot up Holder's house, so that particular day Holder was sitting out front with his gun. Chuck

Investigation on   06/25/1997   at St. Louis, Missouri

File # 91A-SL-18120                              Date dictated   10/14/1997

by   SA Jan R. Hartman                                           0001281

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 10-6-95)

91A-SL-18120

Continuation of FD-302 of ___Jeffrey Charvez Moore_____ , On __06/25/1997__ , Page ___2___

Smith told Moore that Holder had either an AK or SK weapon.
Moore had also heard that Holder was shooting a gun last New
Years Eve.

Moore knew that Holder sold drugs, crack or weed.
Holder may smoke weed, but he never drinks.

0001282

# ADDENDUM 10

91A-SL-181120
SDK/pmw
1

On Monday, March 17, 1997, an anonymous telephone call was received at the St. Louis office of the Federal Bureau of Investigation. The caller, a black male, advised that he had seen the television news concerning the arrest of Norris Holder in connection with a bank robbery at the Lindell Bank and Trust. The caller advised that he had seen Holder at the North Oaks Bowling Alley in Normandy. Approximately one week prior, the caller had seen Holder at the bowling alley and heard him talking to an individual known as ███████ about robbing a bank. The caller advised that both Holder and ███████ frequent the bowling alley.

On March 17, 1997, Special Agents (SAs) Stephen D. Kettner and Michael A. Vick responded to North Oaks Bowl, 101 North Oaks Plaza, near the intersection of Lucas and Hunt and Natural Bridge Roads. Inquiry in the cocktail lounge and at the billiards center disclosed that "████████████████ frequents the bowling alley and has been seen in the company of several black males.

The following individuals were particularly helpful and offered to assist in the investigation as necessary:

Security Guard ███████████ is a Police Officer at ██████████, ███████████████, working secondary employment in uniform at North Oaks Bowl. ████████ can be contacted at the ████████ ████████████.

Police Officer ██████████████████████████ Department, was off-duty in the cocktail lounge. ████████████ advised that he frequents the cocktail lounge, had seen ████████ there and would attempt to identify any associates seen with ████████. ████████ can be contacted at the ███████████████████████████.

(w)  084pmw02.ins

0000671