**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| BILLIE ALLEN, | § | |
| | § | |
| Petitioner, | § | |
| | § | No. 4:07-CV-27-ERW |
| -v- | § | |
| | § | |
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Respondent. | § | |

---

**PETITIONER'S TRAVERSE TO THE GOVERNMENT'S
RESPONSE TO MOTION UNDER SECTION 2255**

Elizabeth Unger Carlyle, # 51877
P.O. Box 866
Columbus, MS 39701
Missouri Bar No. 41930
(816) 525-6540
FAX (866) 764-1249
elizcar@lawalumni.neu.edu

Michael Wiseman
Chief, Capital Habeas Corpus Unit
Federal Community Defender
Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
(215) 928-0520
Michael_Wiseman@fd.org

Attorneys for Petitioner
Billie Jerome Allen

Joseph M. Cleary # 534292
Attorney at Law
1455 N. Pennsylvania
Indianapolis, IN 46202
(317) 630-0137
jcleary498@aol.com

TABLE OF CONTENTS

List of Exhibits ......................................................................................................... iv

Table of Authorities ................................................................................................ vii

Preliminary statement .................................................................................................1

Introduction and Overview ..........................................................................................2

Structure of the Traverse ............................................................................................6

Part One: Procedural Issues .......................................................................................6

    A.  The Government's "Procedural Requirements" do not Apply to Section
        2255 Cases ........................................................................................7
    B.  The Government's Discussion of "General Legal Principles Applicable
        to Petitioner's Motion" ......................................................................9

Part Two: Argument Regarding Grounds For Relief ...........................................................16

    Ground A:  Mr. Allen was denied effective assistance of trial and appellate
        counsel in violation of the Sixth Amendment to the United States
        Constitution in connection with the pre-trial motion to suppress
        statements made to the police. ...............................................................16

    Ground B:  Mr. Allen was denied his rights to the presumption of innocence, to be
        present at his trial, to effective assistance of counsel, to be free of cruel and
        unusual punishment, and to due process of law under the Fifth, Sixth, and
        Eighth Amendments to the United States Constitution, because he was
        required by the court to wear a stun belt, and neither trial counsel nor
        appellate counsel challenged this ruling; the prejudice to Mr. Allen was
        compounded by the failure to provide him with adequate medical
        treatment during trial ...........................................................................24

    Ground C:  Mr. Allen was denied due process of law, the right to be free of
        cruel and unusual punishment, and effective assistance of counsel
        because the federal death penalty, as administered is disproportionately
        and unconstitutionally applied by race, and trial and appellate counsel
        made no objection based on this fact. ......................................................32

    Ground D:  Mr. Allen was denied effective assistance of counsel in connection
        with jury selection ...............................................................................38

i

Ground E:  Mr. Allen was denied effective assistance of counsel when the jurors possibly learned that the Lindell Bank had been robbed again .................59

Ground F:  Mr. Allen was denied effective assistance of trial counsel when trial counsel failed to object to his being tried for two versions of the same offense as a violation of the Double Jeopardy Clause ...............................65

Ground G:  Mr. Allen was denied effective assistance of counsel when trial counsel failed to request a hearing regarding the late provided evidence that government witness Thomas Mundell was a paid government snitch, and when appellate counsel failed to raise an issue concerning Mr. Mundell on direct appeal; he was also denied due process of law when the government failed to disclose impeaching information before trial. .........76

Ground H.  Mr. Allen was denied effective assistance of counsel when trial counsel failed to obtain relief when the government suggested he had gang connections.......................................................................................85

Ground I.  Mr. Allen was denied the effective assistance of counsel at the guilt phase of his trial by counsel's failure to use available evidence that would have established a reasonable doubt as to his participation in the charged murder and robbery. ...........................................................................................89

Ground J.  Mr. Allen was denied effective assistance of counsel because of failure to investigate and present evidence at the penalty phase of his trial. ......100

Ground K.  Mr. Allen was denied the effective assistance of counsel when trial counsel failed to object to prejudicial victim impact evidence................141

Ground L.  Mr. Allen was denied effective assistance of counsel when trial counsel failed to make proper objections to the government's penalty phase arguments....................................................................................146

Ground M.  Mr. Allen was denied effective assistance of trial and appellate counsel because there was no objection to the use of "pecuniary gain" as a statutory aggravator. ...........................................................................................159

Ground N.  Mr. Allen was denied effective assistance of trial and appellate counsel because there was no objection to the non-statutory aggravator, "Was Billie Jerome Allen's conduct in committing the offenses substantially greater than that described in the definition of the crime, apart from the statutory aggravating factors?" ...........................................................................159

Ground O.  Mr. Allen was denied effective assistance of appellate counsel when appellate counsel failed to provide the court of appeals with relevant authority concerning his assertion that his rights were violated when the grand jury did not hear evidence regarding statutory aggravating circumstances. ....................................................................................162

Ground P.  Mr. Allen's jury should have been instructed that in order to impose a death sentence, they must find beyond a reasonable doubt that aggravating evidence outweighed the mitigating evidence, and appellate counsel was ineffective for failing to raise this issue on appeal. ..................................165

Ground Q.  The manner in which the government would carry out Mr. Allen's execution would violate the Eighth Amendment.....................................169

Ground R.  Even if no one of the violations of Mr. Allen's rights listed in this petition merits relief, the effect of the cumulative violations of Mr. Allen's rights undermines confidence in the verdict, the sentence, and the operation of due process of law in Mr. Allen's case................................................170

Conclusion ..................................................................................................172

Certificate of Service .................................................................................173

## LIST OF EXHIBITS

1.    Racial Disparity Seen in U.S. Death Penalty; Execution Under 'Kingpin' Law Sought Mostly for Blacks, Hispanics, Kenneth Cooper, Washington Post (March 18, 1994)

2.    House Committee on Civil and Constitutional Rights, Racial Disparities in Federal Death Penalty Prosecutions 1988-1994

3.    Special Verdict Sheets Count I

4.    Special Verdict Sheets Count II

5.    Letter from Joseph Landolt to Richard Sindel (May 7, 1998)

6.    Evidence Receipt - St. Louis Metropolitan Police Department (March 17, 1997)

7.    DNA Laboratory Report

8.    Continuation Report - St. Louis Metropolitan Police Department

9.    Letter from Richard Sindel to Dr. Craig Haney (January 12, 1998)

10.    Letter from Dr. Craig Haney to Richard Sindel (January 13, 1998)

11.    Declaration by Richard H. Sindel, Esq.

12.    Declaration by John W. Simon, Esq.

13.    *North St. Louis Neighborhood Analysis* by Dr. Colin Gordon, Ph.D.

14.    Jerry Bostic - AC Felony

15.    Jerry Bostic - CC Felony

16.    Jerry Bostic - Medical Examiner's Report

17.    Jerry Bostic - Court History

18.    Declaration of Colin Gordon, Ph.D.

19.    Declaration of David Randall, Ph.D.

20.    Declaration of Pablo Stewart, M.D.

21.    Report by Daniel Martell, Ph.D.

iv

22.     Declaration of Daniel Cuneo, Ph.D.

23.     Declaration of Juanita Petty Allen

24.     Declaration of Nicole Petty

25.     Declaration of Angela Allen

26.     Declaration of Billy Wayne Allen

27.     Declaration of Raymond Petty

28.     Declaration of Cathy Toliver

29.     Declaration of Brady Toliver

30.     Declaration of Samuel Moore

31.     Declaration of Johnnie Grant

32.     Declaration of Shirlene Grant

33.     Declaration of Ahmed Oliver

34.     Declaration of Claude McLemore

35.     Declaration of Antonio Rycraw

36.     Declaration of Tyrone Jones

37.     Declaration of Darletta Tabb

38.     Declaration of Tracy Joyce Eaton

39.     Declaration of James Monroe

40.     Declaration of Connie Supranowich

41.     Juror questionnaires

42.     Gas Chromatographic Analysis

43.     Police Reports of Greg Prater and Joe Powell

44.     FBI Report of Billie Allen, 4/5/97

45.     Police Report of James Combs

46.     FBI Report of Wayne Ross

47.     FBI report of Broderick Bonner

48.     Report of Anonymous Phone Call

49.     Appellant's Opening Brief

50.     Appellant's Reply Brief

51.     Appellant's Opening Brief on Remand

52.     Appellant's Reply Brief on Remand

53.     Order Denying Motion to Dismiss, Roane v. Holder

## TABLE OF AUTHORITIES

*Cases*

Albernaz v. United States, 450 U.S. 333 (1981).......................................................................... 73

Alcorta v. Texas, 355 U.S. 28 (1957) ........................................................................................ 23

Antwine v. Delo, 54 F.3d 1357, 1368 (8th Cir. 1995)...................................................... 135, 138

Apprendi v. New Jersey, 530 U.S. 466 (2000) .................................................. 163, 165, 166, 167

Arizona v. Rumsey, 467 U.S. 203, 212 (1984)................................................................. 66, 73, 75

Atkins v. Virginia, 536 U.S. 304, 316 (2002)............................................................................ 147

Banks v. Dretke, 540 U.S. 668 (2004)................................................................................... 11, 72

Batson v. Kentucky, 476 U.S. 79 (1986) ..................................................... 3, 37, 38, 43, 44, 54, 58

Baze v. Rees, 128 S.Ct. 1520, 1532 (2008) ....................................................................... 168, 169

Berger v. United States, 295 U.S. 78, 88 (1935) ....................................................................... 152

Blockburger v. United States, 284 U.S. 299 (1932) ............................................................... 67, 68

Bousley v. United States, 523 U.S. 614, 622 (1998) ................................................................... 73

Bracy v. Gramley, 520 U.S. 899, 908-09 (1997).......................................................................... 8

Brady v. Maryland, 373 U.S. 83 (1963) ........................... v, 4, 11, 76, 77, 80, 81, 83, 84, 120, 169

Brewer v. Quarterman, 550 U.S. 286, 289 (2007)...................................................................... 150

Brooks v. Kemp, 762 F.2d 1383, 1410 (11th Cir. 1985)............................................................. 153

Bullington v. Missouri, 451 U.S. 430 (1981) ................................... 65, 66, 67, 68, 69, 73, 74, 75

Burks v. United States, 437 U.S. 1, 15-16 (1978) ...................................................................... 66

Burns v. Gammon, 260 F.3d 892, 896-97 (8th Cir. 2001)................................... 69, 70, 71, 86, 144

Campbell v. Louisiana, 523 U.S. 392 (1998) .................................................................... 162, 163

Cargle v. Mullin, 317 F.3d 1196 (10th Cir. 2003)..................................................................... 169

Carter v. Bowersox, 265 F.3d 705, 716-17 (8th Cir. 2001) ...................................................... 32, 42

Chandler v. Florida, 449 U.S. 560, 575 (1981).................................................................................. 38

Chapman v. California, 386 U.S. 18 (1967) ..................................................................................... 162

Claudio v. Scully, 982 F.2d 798, 799 (2nd Cir 1992)................................................... 24, 58, 83, 88

Coker v. Georgia, 433 U.S. 584 (1977) ............................................................................................. 67

Costello v. United States, 350 U.S. 359, 362 (1956). ..................................................................... 163

Danforth v. Minnesota, 128 S.Ct. 1029, 1046 (2008)...................................................................... 13

Darden v. Wainwright, 477 U.S. 168 (1986)........................................................................... 43, 149

Davidson v. Harris, 30 F.3d 963, 966 (8th Cir. 1994) .............................................. 46, 48, 49, 53

Davis v. Alaska, 415 U.S. 308, 316 (1974) ............................................................................... 30, 79

Deck v. Missouri, 544 U.S. 622 (2005) .................................................................................. 26, 27, 30

Depew v. Anderson, 311 F.3d 742, 751 (6th Cir. 2002)............................................................... 170

Devose v. Norris, 53 F.3d 201, 204 (8th Cir. 1995) ....................................................................... 44

Doss v. Frontenac, 14 F.3d 1313, 1316-17 (8th Cir.1994) .......................................................... 54

Drake v. Kemp, 762 F.2d 1449, 1459 (11th Cir. 1985).............................................................. 152

Dunne v. Libbra, 448 F.3d 1024, 1029 (8th Cir. 2006) ................................................................ 61

Eddings v. Oklahoma, 455 U.S. 104 (1982).................................................................. 46, 146, 147

Edwards v. Arizona, 451 U.S. 477 (1981)........................................................................................ 22

Enmund v. Florida, 458 U.S. 782, 797 (1982)................................................................................. 67

Estelle v. Williams, 425 U.S. 501, 505 (1976) ................................................................................ 25

Evitts v. Lucey, 469 U.S. 387 (1985) ................................................................................................ 83

Ford v. Norris, 67 F.3d 162, 169 (8th Cir. 1995)........................................................................... 53

Foster v. Lockhart, 9 F.3d 722, 726 (8th Cir. 1993)............................................................... 89, 135

Frank v. Brookhart, 877 F.2d 671, 675 (8th Cir. 1989) ................................................................. 57

Freeman v. Lane, 962 F.2d 1252 (7th Cir. 1992) ....................................................... 24, 58, 83, 88

Furman v. Georgia, 408 U. S. 238 (1972) ........................................................................ 166, 167

Georgia v. McCollum, 505 U.S. 42, 47 (1992)................................................................................ 33

Giglio v. United States, 405 U.S. 150 (1972) ........................................................................ 23, 76

Gonzales v. Pliler, 341 F.3d 897 (9th Cir. 2003) ................................................................ 27, 28

Gray v. Branker, 529 F.3d 220, 229, 235, 238 (4th  Cir. 2008).................................................. 135

Gray v. Netherland, 518 U.S. 152, 166 (1996) ............................................................................ 72

Gregg v. Georgia, 428 U.S. 153 (1976).............................................................................. 67, 144

Harris ex rel. Ramseyer v. Wood, 64 F.3d 1432, 1434 (9th Cir. 1995).................................... 170

Harris v. Nelson, 394 U.S. 286, 299 (1969) ................................................................................ 8

Hernandez v. Cowan, 200 F.3d 995 (7th Cir. 2000)................................................................... 64

Hill v. Lockhart, 28 F.3d 832, 835 (8th Cir. 1994)............................................................ 135, 138

Hill v. McDonough, 547 U.S. 573 (2006) ................................................................................... 168

Holbrook v. Flynn, 475 U.S. 560 (1986) ............................................................................... 25, 26

Holder v. United States, No. 4:03-CV-923ERW .......................................................................... 7

Huynh v. King, 95 F.3d 1052 (11th Cir. 1996)............................................................................ 20

Illinois v. Allen, 397 U.S. 337 (1970)................................................................................... 25, 30

Irvin v. Dowd, 366 U.S. 717, 722 (1961) .............................................................................. 38, 57

J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127, 140 (1994)........................................................... 33

Jackson v. Leonardo, 162 F.3d. 81, 85 (2nd Cir. 1998)............................................. 23, 58, 83, 88

Jenkins v. Artuz, 294 F.3d 284 (2nd Cir. 2002) ..................................................................... 170

Johnson v. California, 545 U.S. 162, 169 (2005) .......................................................................37

Jones v. Delo, 56 F. 3d 878, 882 (8th Cir. 1995)................................................................. 75

Joshua v. Dewitt, 341 F.3d 430 (6th Cir. 2003)................................................................. 64

Kansas v. Marsh, 548 U.S. 163 (2006) ................................................................ 165, 166, 167

Kennedy v. Louisiana, 128 S.Ct. 2641, 2659 (2008)................................................................ 67

Kesser v. Cambra, 465 F.3d 351, 362 (9th Cir. 2006) ................................................................ 54

Kimmelman v. Morrison, 477 U.S. 365 (1986)................................................................ 20, 82

Kyles v. Whitley, 514 U.S. 419, 433-34 (1995) ................................................................ 77, 170

Lockett v. Ohio, 438 U.S. 586 (1978)................................................................ 46, 146, 166

Lockhart v. Fretwell, 506 U.S. 364 (1993) ................................................................ 13, 14

Mak v. Blodgett, 970 F.2d 614, 622, 624-25 (9th Cir. 1992) ................................................................ 170

Manning v. Bowersox, 310 F.3d 571, 576-77 (8th Cir. 2002) ................................................................ 69, 86, 144

Marshall v. United States, 360 U.S. 310, 313 (1959) ................................................................ 28, 38

Mason v. Hanks, 97 F.3d 887, 892 (7th Cir. 1996) ................................................................ 32, 42

Massaro v. United States, 538 U.S. 500 (2003)................................................................ 11, 35

Matire v. Wainwright, 811 F.2d 1430, 1438 (11th Cir. 1987).................. 24, 32, 42, 59, 82, 83, 88

Mayo v. Henderson, 13 F.3d 528, 533 (2nd Cir. 1994)................................................................ 32, 42, 82

McClain v. Prunty, 217 F.3d 1209, 1220 (9th Cir. 2000)................................................................ 54

McCleskey v. Kemp, 481 U.S. 279, 312, 319 (1987)................................................................ 32, 33, 36

Miller-El v. Dretke, 545 U.S. 231, 241 (2005) ................................................................ 44, 46, 48, 49, 54

Monge v. California, 524 U.S. 721, 733 (1998) ................................................................ 68, 74

Montejo v. Louisiana, 129 S.Ct. 2079, 2087 (2009) ................................................................ 22

Mooney v. Holohan, 294 U.S. 103 (1935)................................................................ 23

Murphy v. Puckett, 893 F.2d 94 (5th Cir. 1990)................................ 21, 24, 59, 71, 82, 83, 88

Murray v. Carrier, 477 U.S. 478, 488 (1986) ................................................. 11, 35, 73

Napue v. Illinois, 360 U.S. 264, 271 (1959) ............................................................. 23

Newlon v. Armontrout, 885 F.2d 1328, 1335-37 (8th Cir. 1989).................................... 153, 156

Orazio v. Dugger, 876 F.2d 1508, 1513 (11th Cir. 1989) ........................................... 59

Parkus v. Delo, 33 F.3d 933, 938-39 & n.6 (8th Cir. 1994) ........................................ 89

Parle v. Runnels, 505 F.3d 922, 934 (9th Cir. 2007) ................................................ 169

Payne v. Tennessee, 501 U.S. 808 (1991) .............................................................. 143

Penry v. Lynaugh, 492 U.S. 302 (1989) .......................................................... 147, 150

Poland v. Arizona, 476 U.S. 147, 153 n.3 (1986)................................................ 65, 73, 75

Pyle v. Kansas, 317 U.S. 213 (1942) ..................................................................... 23

Reagan v. Norris, 365 F.3d 616, 622 (8th Cir. 2004) ....................................... 69, 86, 143

Riley v. Taylor, 277 F.3d 261, 280 (3rd Cir. 2001)..................................................... 53

Ring v. Arizona, 536 U.S. 584 (2002) ................................................ 163, 165, 166, 167

Roche v. Davis, 291 F.3d 473, 482-83 (7th Cir.2002) ............................................... 30

Roe v. Delo, 160 F.3d 416, 419 (8th Cir.1998) ....................................................... 70

Roe v. Flores-Ortega, 528 U.S. 470, 476-77 (2000)............................................... 23, 83

Rompilla v. Beard, 545 U.S. 374, 387 n.6 & n.7 (2005) ...... 15, 100, 128, 134, 135, 136, 137, 139

Russell v. United States, 369 U.S. 749, 761 (1962) ................................................. 163

Sattazahn v. Pennsylvania, 537 U.S. 101, 109 (2003)................................................ 66

Sawyer v. Whitley, 505 U.S. 333, 341-43 (1992)...................................................... 75

Schiro v. Farley, 510 U.S. 222, 228 (1994) ............................................................ 12

Schlup v. Delo, 513 U.S. 298, 323 (1995)............................................................... 75

Schneider v. Delo, 85 F.3d 335, 339 (8th Cir. 1996).................................................. 89

Shepherd v. Maxwell, 384 U.S. 333, 351 (1966) .......................................................... 38

Shurn v. Delo, 177 F.3d 662, 667 (8th Cir. 1999) ....................................... 152, 153, 154

Simmons v. Luebbers, 299 F.3d 929, 936-938 (8th Cir. 2002) ........................... 135, 138

Simmons v. United States, 390 U.S. 377 (1968) ..................................................... 19, 21

Skipper v. South Carolina, 476 U.S. 1, 4-5 (1986) ....................................................... 147

Smith v. Dugger, 911 F.2d 494 (11th Cir. 1990) ............................................................ 21

Smith v. Texas, 543 U.S. 37, 44-45 (2004) ......................................................... 147, 150

Snyder v. Louisiana, 128 S. Ct. 1203, 1208 (2008) ....................................................... 44

Starr v. Lockhart, 23 F.3d 1280 (8th Cir. 1993) ............................... 24, 58, 83, 88, 160

State v. Flieger, 91 Wn. App. 236, 242, 955 P.2d 872, 874 (1998) ............................... 31

Stephenson v. State, 864 N.E.2d 1022,1032 (Ind. 2007) ............................................... 31

Strauder v. West Virginia, 100 U.S. 303 (1879) ........................................................... 36

Strickland v. Washington, 466 U.S. 668 (1984) .. 13, 14, 15, 22, 23, 24, 30, 60, 63, 65, 68, 69, 71, 73, 82, 83, 84, 90, 100, 134, 135, 136, 139, 153, 157, 158, 159, 167

Teague v. Lane, 489 U.S. 288 (1989) ....................................................... 12, 13, 35, 164

Tennard v. Dretke, 542 U.S. 274 (2004) ...................................................................... 147

Thompson v. United States, 7 F.3d 1377, 1379 (8th Cir. 1993) .................................... 73

Tomlin v. Myers, 30 F.3d 1235 (9th Cir. 1994) ...................................................... 20, 82

Trass v. Maggio, 731 F.2d 288, 293 (5th Cir.1984) ............................................... 21, 22

Tuilaepa v. California, 512 U.S. 967, 971-72 (1994) .................................................. 160

Turner v. Marshall, 121 F.3d 1248, 1251-1252 (9th Cir. 1997) ................................... 54

Turner v. Murray, 476 U.S. 28, 35 (1986) ............................................................. 33, 42

United States v. Allen, 247 F.3d 741, 770 (8th Cir. 2005) (Allen I) . 17, 67, 68, 71, 146, 149, 157,

158, 159, 160

United States v. Allen, 357 F.3d 745. 758 (8th Cir. 2004) ................................................. 161, 164

United States v. Allen, 406 F.3d 940, 945 (8th Cir. 2005) (Allen III)....................................... 162

United States v. Anderson, 2009 U.S. App. LEXIS 14850 (8th Cir. 2009) ................................ 12

United States v. Bagley, 473 U.S. 667 (1985) .......................................................................... 76

United States v. Bassler, 651 F.2d 600, 602 (8th Cir.1981) ....................................................... 62

United States v. Battle, 836 F.2d 1084, 1086 (8th Cir. 1987) ...................................................... 44

United States v. Blumeyer, 62 F.3d 1013, 1015 (8th Cir.1995) .................................................. 62

United States v. Chandler, 326 F.3d 210, 222-23 (3rd Cir. 2003)............................................... 79

United States v. Cheyenne, 855 F.2d 566, 567 (8th Cir.1988) .................................................... 62

United States v. Darden, 70 F.3d 1507, 1532 (8th Cir. 1995) .................................. 39, 40, 41, 42

United States v. Durham, 287 F.3d 1297 (11th Cir. 2002)................................................ 27, 28, 31

United States v. Easter, 539 F.2d 663 (8th Cir. 1976).................................................................. 89

United States v. Fell, 531 F.3d 197, 239 (2nd Cir. 2008)......................................................... 144

United States v. Fields, 483 F.3d 315, 345-346 (5th Cir. 2007)................................................. 165

United States v. Fields, 516 F.3d 923 (10th Cir. 2008) ............................................................. 165

United States v. Garcia, 562 F.3d 947, 953 (8th Cir. 2009) ......................................................... 77

United States v. Gomez-Diaz, 712 F.2d 949, 951-952 (5th Cir. 1983) ................................ 18, 22

United States v. Hernandez, 779 F.2d 456, 460 (8th Cir. 1985)................................................. 155

United States v. Honken, 541 F.3d 1146 (8th Cir. 2008) ....................................................... 28, 29

United States v. Johnson, 96 F.2d 768, 771 (8th Cir. 1992)............................................... 155, 156

United States v. Lee, 886 F.2d 998, 1001-02 (1989)................................................................... 39

United States v. Lewis, 483 F.3d 871, 873 n.2 (8th Cir. 2007) .................................................... 12

United States v. Martin, 740 F.2d 1352, 1357 (6th Cir.1984) ....................................................... 62

United States v. McAdory, 501 F.3d 868, 872 (8th Cir. 2007) ...................................................... 12

United States v. McKay, 431 F.3d 1085, 1093 (8th Cir. 2005) ..................................................... 87

United States v. O'Conner, 64 F.3d 355, 358 (8th Cir. 1995) ....................................................... 76

United States v. Ortega, 270 F.3d 540, 547 (8th Cir. 2001) ......................................................... 12

United States v. Pulliam, 566 F.3d 784, 787 (8th Cir. 2009) ........................................................ 76

United States v. Purkey, 428 F.3d 738 (8th Cir. 2005) ............................................................... 164

United States v. Roberts, 14 F.3d 502, 517 (10th Cir. 1993) ................................................... 18, 21

United States v. Ross, 33 F.3d 1507, 1521 (11th Cir. 1994) ............................................ vi, 41, 42

United States v. Schoneberg, 388 F.3d 1275, 1278 (9th Cir. 2004) ............................................. 79

United States v. Street, 548 F.3d 618 (8th Cir. 2008) ................................................................... 87

United States v. Swinton, 75 F.3d 375, 381 (8th Cir. 1996) ......................................................... 62

United States v. Two Elk, 536 F.3d 890, 909 (8th Cir. 2008) ..................................................... 155

United States v. Weathers, 493 F.3d 229 (D.C. Cir. 2007) ........................................................... 64

United States v. Williams, 754 F.2d 672, 676 (6th Cir. 1985) ............................................... 18, 22

United States v. Williamson, 183 F.3d 458, 463 (5th Cir. 1999) ........................................... 21, 22

Vasquez v. Hillery, 474 U.S. 254, 263 (1986) ........................................................................... 163

Vincent v. Seabold, 226 F.3d 681, 690 (6th Cir. 2000) .............................................................. 170

Von Kahl v. United States, 242 F.3d 783 (8th Cir. 2001) ............................................................ 64

Walbey v. Quarterman , 309 Fed.Appx. 795, 800, 803 (5th Cir. 2009) ............................ 135, 140

Walton v. Arizona, 497 U.S. 639 (1990) ........................................................................... 143, 167

Whalen v. United States, 445 U.S. 684 (1980) ............................................................................ 73

White v. Roper, 416 F.3d 728, (8th Cir. 2005) .................................................................... 99, 169

Wiggins v. Smith, 539 U.S. 510, 534 (2003).......... 14, 15, 100, 111, 115, 128, 134, 136, 137, 139

Williams (Terry) v. Taylor, 529 U.S. 362 (2000)........................ 14, 100, 128, 134, 136, 139, 159

Williams v. Allen, 542 F.3d 1326, 1340 (11th Cir. 2008)................................................ 135, 138

Wrinkles v. Buss, 537 F.3d 804, 814 (7th Cir. 2008).................................................................... 30

Wrinkles v. State, 749 N.E.2d 1179, 1194 (Ind. 2001)............................................................ 27, 31

*Statutes*
21 U.S.C. §848.................................................................................................................... 32, 33

28 U.S.C. §2255........................................................................ 1, 7, 8, 9, 10, 12, 60, 84, 89

28 U.S.C. §2266........................................................................................................................... 7

28. U.S.C. §2261........................................................................................................................ 7

K. S. A. 21-4625 ..................................................................................................................... 165

U.S. Const. Amend. V ......................................................................................................... 65, 68

U.S. Const. Amend. VI ................................................................................................ 16, 38, 69, 89

U.S. Const. Amend. VIII ......................................................................................................... 68, 167

*Other Authorities*
American Bar Association Guidelines for the Appointment and Performance of Defense Counsel

   in Death Penalty Cases, Revised Edition, 1989 Edition.................................................. 69, 135

American Bar Association, Supplementary Guidelines for the Mitigation Function of Defense

   Teams in Death Penalty Cases, 36 Hofstra Law Review 677 (2008).................................... 107

American Bar Association's 2003 edition of the Guidelines for the Appointment and

   Performance of Defense Counsel in Death Penalty Cases, 31 Hofstra  L. Rev. 913 (2003)... 15,

   63, 69, 90, 101, 135, 136

Fed. R. Evid. 104, Note to Subdivision (d).................................................................................. 18

http://foia.fbi.gov/foiaindex/cripsbloods.htm ............................................................................ 85

McClintock, Indictment by a Grand Jury, 26 Minn.L.Rev. 153 ................................................. 163

Orfield, Criminal Procedure from Arrest to Appeal, 137-140, 144-146 .................................... 163

*Rules*

Fed. R. Evid. 104(d) ........................................................................................ 17, 18, 19, 20, 21, 24

Fed. R. Evid. 606(b) ..................................................................................................... 43, 61

Rules Governing Habeas Corpus Cases under 28 U.S.C. §2255 .................................... 1, 8, 10, 61

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| BILLIE ALLEN, | § | |
| | § | |
| Petitioner, | § | |
| | § | No. 4:07-CV-27-ERW |
| -v- | § | |
| | § | |
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Respondent. | § | |

_____

**PETITIONER'S TRAVERSE TO THE GOVERNMENT'S
RESPONSE TO MOTION UNDER SECTION 2255**

Petitioner Billie Allen, pursuant to Rule 5, Rules Governing Habeas Corpus Cases under

*28 U.S.C. §2255*, files his Traverse to the Government's Response to his Motion Under Section

2255.

**PRELIMINARY STATEMENT**

Mr. Allen was convicted of capital murder and related charges and was sentenced to

death by this Court. His original *Motion Under 28 U.S.C. §2255 to Vacate, Set Aside or Correct*

*Sentence by a Person in Federal Custody Under Sentence of Death* was filed December 10,

2007. (Doc. 47) An *Amended Motion Under 28 U.S.C. §2255 to Vacate, Set Aside or Correct*

*Sentence by a Person in Federal Custody Under Sentence of Death*, was filed February 11, 2008.

(Doc. 69) The Amended Motion, which is the active pleading in this case, will be cited as *M-*,

followed by a page reference.

On October 31, 2008 the government filed Government's Response to Movant's Motion

and Amended Motion Under 28 U.S.C. §2255 to Vacate, Set Aside or Correct Convictions or

1

Sentences by a Person in Federal Custody. (Doc. 79) The response will be cited as *GR-* followed by a page reference.

The trial transcript is cited by the "T.", the volume (Roman numerals are used) and the page number. Documents previously filed in this §2255 proceeding will be cited "Doc." followed by the document number. Documents filed in the trial proceeding will be cited "Tr. Doc." followed by the document number. All other citations are either self-explanatory or are explained. All emphasis is added unless otherwise noted.

## INTRODUCTION AND OVERVIEW

Billie Jerome Allen was one of two defendants convicted and sentenced to death for the murder of Richard Heflin, a bank security guard, during the robbery of the Lindell Bank in St. Louis, Missouri. His conviction was affirmed on appeal after remand from the United States Supreme Court. In his Amended Motion, Mr. Allen raises a total of seventeen grounds for relief from his conviction and/or sentence. He also alleges cumulative error. The issues will be discussed in detail below, but are summarized here.

Mr. Allen's trial and appeal were saturated by unfairness. First, the decision of the government to seek the death penalty in his case was the product of race discrimination. Mr. Allen and his co-defendant Norris Holder are African-American; Mr. Heflin was white. The federal death penalty statute is applied disproportionately against people of color and against defendants accused of killing white victims.

Throughout the trial, Mr. Allen, who had no history of violence and had made no attempts or threats of escape, was required to wear a stun belt. This substantially impaired his participation in his trial because of the constant anxiety it caused. Trial counsel made no

2

objection. During jury selection, the trial judge concealed the names of the prospective jurors, requiring that they be referred to only by number. This suggested to the jurors that they were in danger if Mr. Allen knew their names, and prejudiced them against Mr. Allen. Trial counsel made no objection to this procedure.

Mr. Allen's jury selection was also infected by racial discrimination, but trial counsel failed properly to demonstrate to the court that the government's peremptory challenges were discriminatory under *Batson v. Kentucky,* 476 U.S. 79 (1986). Thus, Mr. Allen was denied his right to an impartial jury. Appellate counsel failed to raise the *Batson* issue on appeal.

Mr. Allen was charged with the same murder in the same bank robbery in two separate counts. He was convicted on both counts. The jury sentenced him to life in prison on Count One, and death on Count Two. Prior to trial, counsel made no Double Jeopardy objection to the two counts alleging the same offense. While the issue was raised on appeal, it was reviewed only for plain error because of the lack of a pretrial objection.

The unfairness to Mr. Allen continued during his trial. Prior to trial, Mr. Allen filed a motion to suppress evidence of his custodial statements. Trial counsel failed adequately to support the motion at the hearing, and, after the motion was denied, appellate counsel failed adequately to support the denial as a ground for appellate relief. As a result, Mr. Allen was convicted on the basis of an inadmissible and unconstitutional confession.

During the trial, the Lindell Bank was robbed again. The jurors were not sequestered. The trial court refused to allow them to be examined concerning their knowledge of this event, and trial counsel made no further request for relief during trial. Evidence of this new robbery was highly prejudicial to Mr. Allen.

After trial, Mr. Allen's counsel learned for the first time that Thomas Mundell, a government witness, was a paid informant. They were thus unable to impeach Mr. Mundell with this fact before the jury. Counsel raised this issue in a motion for new trial, but failed to obtain a hearing on this issue. Denying the motion, the district court used the newly discovered evidence standard rather than the less stringent *Brady v. Maryland,* 373 U.S. 83 (1963), standard for prejudice. Appellate counsel abandoned this ground for relief entirely. Thus, Mr. Allen was denied his constitutional right to confront and cross-examine witnesses.

The government, despite a pretrial order, injected into the trial insinuations that Mr. Allen was a member of a gang. Trial counsel largely failed to object to these references. As a result, the jury was permitted to convict Mr. Allen based on his associations rather than on his actions. Appellate counsel abandoned this issue.

Trial counsel also failed to present evidence that would have cast doubt on Mr. Allen's guilt. Physical evidence and eyewitness testimony suggested that another man, Jerry Bostic, was actually the accomplice of Mr. Allen's co-defendant Norris Holder. Trial counsel was aware of this evidence through discovery, but failed to develop and present it.

If the unfairness of the guilt phase were not enough, it was eclipsed by the unfairness of the penalty phase. Mr. Allen's trial counsel had only six months—less than half the usual time for federal death penalty cases—to prepare for trial. With respect to the penalty phase, they did virtually nothing until one month before the trial was due to start. At that point, their investigation was so incomplete that they neither obtained a clear history of Mr. Allen's life nor secured the expert testimony that would have explained to the jury who Mr. Allen was and the stresses of his life. As Dr. David Randall, the mitigation investigator hired a month before trial, put it in his sworn declaration, "I want to be clear: from my perspective Mr. Allen's counsel did

4

not make a choice between different mitigation theories. Rather, they resorted to picking the low-lying fruit. We went with what we more readily could obtain, and never conducted anything approaching a thorough investigation." Exhibit 19, p. 16.

Trial counsel presented some evidence concerning Mr. Allen's deprived childhood, as well as expert testimony that Mr. Allen suffered from post-traumatic stress disorder. The presentation was severely limited, and was subject to damaging cross-examination, because the experts had so little information about Mr. Allen's early life and background.

Dr. Randall has now reviewed the declarations presented with this Traverse. He comments, "In the many years I have been a mitigation specialist, the story of Billie Allen is one of the most compelling untold stories I have encountered." Ex. 19, p. 18. Trial counsel Richard Sindel concurs:

> The topics covered by current counsel include childhood abuse, neglect, family dysfunction, family and neighborhood impoverishment, and abandonment. In my experience these are potent mitigation subjects. There is no question in my mind that if I had the materials developed and information gathered by current counsel at my disposal at the time of trial , I would have used them. In my view, the areas covered by current counsel provide a far more comprehensive explanation of the stressors and traumas, and organic brain dysfunction that helped to shape Mr. Allen's life and adult conduct, and therefore a far more compelling case for life than what was actually presented at trial.

Ex. 11, Decl. of Sindel, p. 7.

In addition to failing to present a proper mitigation case for Mr. Allen, trial counsel failed to object to the government's presentation of prejudicial and improper victim impact evidence and to a highly improper government final argument in the penalty phase. Trial counsel also failed to object to the submission of the "pecuniary gain" statutory aggravating circumstance and to a vague non-statutory aggravator asking the jury to find that his conduct was "substantially

5

greater than that described in the definition of the crime." Appellate counsel failed to raise this issue even for plain error. Nor were the jurors instructed that they had to arrive at their weighing of aggravating and mitigating circumstances beyond a reasonable doubt in order to assess death. Finally, appellate counsel failed to present to the court of appeals, on remand, adequate argument and authority in support of the contention that he was denied due process of law when the grand jury did not hear evidence and issue an indictment specifying statutory aggravating circumstance. As a result of all of these errors, individually and cumulatively, Mr. Allen's death sentence was not the result of a fair and constitutional process, and must be reversed even if his conviction is not.

## STRUCTURE OF THE TRAVERSE

The Government's Response has portions which discuss procedural issues and others devoted to substantive grounds for relief. In Part One of the Traverse, Mr. Allen will address the government's procedural arguments. Part Two will address the substantive arguments made by the government in the section of its Response numbered XII, "Argument."

As required by the applicable rules, the Amended Motion contained only factual allegations in support of Mr. Allen's grounds for relief. It did not include legal arguments. This Traverse, however, will supply the legal basis for each ground for relief. This Traverse also provides documentary support, where available, for each ground.

## PART ONE: PROCEDURAL ISSUES

The governments presents a number of procedural arguments which it suggests should either undermine Mr. Allen's entitlement to relief, truncate these proceedings, or impact Mr.

6

Allen's entitlement to full and proper process. These arguments are numbered I ("Procedural

Requirements") and XI ("General Legal Principles Applicable to Petitioner's Motion"). Mr.

Allen responds to each argument.

### A.    The Government's "Procedural Requirements" do not Apply to Section 2255 Cases.

In Section I of the Response, the government asks this Court to apply the constricted time

frames contained in 28 U.S.C. §2266 *et seq.* to the adjudication of Mr. Allen's Amended Motion.

*GR-*, 3.  The government's request is based on its mistaken view that §2266 applies in §2255

proceedings.

As is plain from the face of that statute, *§2266* is a part of Chapter 154.  Section 2261 of

Chapter 154 begins: "This chapter shall apply to cases arising under §2254 brought by prisoners

in State custody."  Chapter 154 has no application to post-conviction proceedings challenging a

federal conviction.  See *Kreutzer v. Bowersox*, 231 F.3d 460, 462 (8th Cir. 2000) ("AEDPA also

provides for an expedited 180-day statute of limitations, found in chapter 154, 28 U.S.C.

§§2261-2266, for qualifying **states** in capital habeas proceedings.")

The government doggedly raises this argument despite having lost on it in Mr. Allen's

co-defendant's case. In *Holder v. United States*, No. 4:03-CV-923ERW at 1-2 (E.D. Mo. Dec. 2,

2004) (Scheduling and Transport Order) this Court rejected this argument:

> The Court notes that the 180-day time limit in 28 U.S.C. §2266
> does not apply to §2255 motions.  Section 2266 states that the 180-
> day limit applies to "any application for a writ of habeas corpus
> brought *under this chapter. . .*"  28 U.S.C. §2266 (emphasis
> added).  Section 2266 is in Chapter 154, and Chapter 154
> encompasses only §2254 motions, unless otherwise specifically
> noted.  *See* 28 U.S.C. §2261(a).  Accordingly, the 180-day limit
> does not apply in this case.

The Court should again reject the government's attempt to constrict the process due Mr. Allen.

Using its erroneous premise as a starting point, the government further urges the Court to decide this case based only on Mr. Allen's "Petition" and the government's "Response" *GR*-3. The government cites no authority for this proposition, which of course flies in the face of the *Rules on Motion Attacking Sentence Under Section 2255* (hereafter, *§2255 Rules*), and Supreme Court authority regarding Mr. Allen's right to full development of the grounds for relief included in his Amended Motion.

Mr. Allen is entitled to discovery and he will soon be filing a motion seeking specific discovery under Rule 6 of the *§2255 Rules:* "A judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law." A post-conviction petitioner establishes "good cause" whenever "specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997), (quoting *Harris v. Nelson*, 394 U.S. 286, 299 (1969)).

Mr. Allen's prior submissions, supplemented by this Traverse, and its documentary exhibits, have more than established good cause for discovery. The government's suggestion that this case can be disposed of on the "Petition" and its "Response" is misguided. The *§2255 Rules* permit Mr. Allen not only to traverse the government's response but to move for discovery, and as his to-be-filed motion will demonstrate, he will be entitled to discovery under the above noted standard. Moreover, Mr. Allen is entitled to an evidentiary hearing and not summary dismissal as requested by the government.

8

**B.    The Government's Discussion of "General Legal Principles Applicable to Petitioner's Motion"**

In Section XI, the government sets forth a number of arguments ostensibly related to this case. *GR*-35-42. These arguments are either incorrect, erroneous or irrelevant to the facts before the Court.

**1.    Standard for Relief and Evidentiary Hearing.**

Despite its point heading, the government does not actually discuss the "Standard for Relief." That is not surprising as different substantive and procedural "standards" governing Mr. Allen's entitlement to relief apply to different grounds. Mr. Allen addresses these standards in his discussion of each ground for relief.

The government acknowledges that a hearing is required if the motion cannot be disposed of based solely on the "motion," "files" and "records" of the case. *GR*-36, citing 28 U.S.C. §2255(b). However, the government incorrectly assumes that the Court's inquiry into whether a hearing is warranted ends with its submission of the Response. Mr. Allen's prior submissions, the arguments and allegations contained in this Traverse, and the annexed exhibits, demonstrate that he is entitled to a hearing on a number of grounds, as they cannot be determined based simply on the existing record. Mr. Allen will also soon file a motion for an evidentiary hearing in which he will further demonstrate his entitlement to evidentiary development of a number of his grounds for relief.

The government requests an opportunity to "supplement" its response should "affidavits, authorities and supporting documents surface in any reply brief" filed by Mr. Allen. *GR*-, 37. Although Mr. Allen has no objection in principle to the filing of any such supplements, he is

9

confident that the Court will see, from a review of this Traverse and annexed exhibits, that the only way in which the bulk, if not all of, his grounds for relief can be disposed of will be through an evidentiary hearing. Mr. Allen will highlight these points in his soon to-be-filed motion for an evidentiary hearing.

Finally, the government contends that "Allen presents this Court with a Section 2255 motion that is unique in the experience of the undersigned. Allen makes numerous claims, but fails to support almost all of his allegations with any legal authority, affidavit or offer of proof." *GR- 36.* Again, the government misunderstands the structure of §2255 and the applicable rules. Neither the statute nor the rules require, nor make provision for, the submission of "legal authority" "affidavits" or "offers of proof" in the filing of a §2255 motion. Rule 2 of the *§2255 Rules*, titled "The Motion" provides only for the submission of a motion containing specified "grounds for relief" and the articulation of *factual* allegations in support of those grounds. Mr. Allen does not shy away from providing such authority, proffers, affidavits and offers of proof and in fact he provides them in this reply and the annexed exhibits.

### 2.    **"Procedural Default."**

The government presents a generic section on procedural default which does not relate to any specific contention that particular grounds for relief are subject to procedural default. *GR- 37-39.* Because this recitation is so general and much of it bears no relevance to actual issues in this case, Mr. Allen has no quarrel with the general recitation of these non-debatable points of law. A few comments, however, are appropriate at this stage.

The bulk of Mr. Allen's grounds for relief are based upon either ineffective assistance of counsel or due process violations owing to prosecutorial suppression of exculpatory information.

The government fails to acknowledge either as a basis for overcoming an ostensible procedural default.

Ineffective assistance of counsel overcomes a procedural default in raising other constitutional grounds for relief. *Murray v. Carrier*, 477 U.S. 478, 488 (1986) ("if the procedural default is the result of ineffective assistance of counsel, the Sixth Amendment itself requires that responsibility for the default be imputed to the State, which may not conduct trials at which persons who face incarceration must defend themselves without adequate legal assistance.").

Prosecutorial suppression of exculpatory evidence also overcomes a default. *Strickler v. Greene*, 527 U.S. 263, 283 (1999) ("As we explained in *Murray v. Carrier*,. . . it is just such [suppression of exculpatory evidence that] ordinarily establish[es] the existence of cause for a procedural default."); *Banks v. Dretke*, 540 U.S. 668 (2004). Thus, to the extent Mr. Allen did not previously raise the due process/prosecutorial suppression claims at trial or on direct appeal, the government's suppression of the exculpatory evidence provided "cause" for the ostensible default.

As to the "prejudice" prong of the "cause and prejudice" test, it is clear that the prejudice analysis is coextensive with *Brady v. Maryland*, 373 U.S. 83 (1963) materiality. *Banks v. Dretke*, 540 U.S. at 698. Thus, if Mr. Allen demonstrates that the suppressed evidence was material either as to guilt or penalty, he establishes "prejudice" for overcoming the default.

This proceeding is the first opportunity for Mr. Allen to raise claims of ineffectiveness of his trial and/or appellate counsel. *Massaro v. United States*, 538 U.S. 500 (2003), makes plain that ineffective assistance of counsel claims are appropriately considered in the district court in collateral proceedings because that court is:

> the forum best suited to developing the facts necessary to
> determining the adequacy of representation during an entire trial.

11

> The court may take testimony from witnesses for the defendant and the prosecution and from the counsel alleged to have rendered the deficient performance. . . [T]he §2255 motion often will be ruled upon by the same district judge who presided at trial. . . [who] having observed the earlier trial, should have an advantageous perspective.

*Id.* at 505-506. *See also United States v. Ortega,* 270 F.3d 540, 547 (8ᵗʰ Cir. 2001) ("Nor will we address Castro's claim that his counsel was ineffective for failing to file a suppression motion. This claim should be raised in a 28 U.S.C. §2255 motion."); *United States v. Lewis*, 483 F.3d 871, 873 n.2 (8ᵗʰ Cir. 2007), *United States v. Anderson*, 2009 U.S. App. LEXIS 14850 (8ᵗʰ Cir. 2009), *United States v. McAdory*, 501 F.3d 868, 872 (8ᵗʰ Cir. 2007).

Thus, none of the ineffectiveness of counsel grounds are subject to procedural default analysis, as this proceeding is Mr. Allen's first and only chance to raise such grounds.

### 3.    *Teague* **Retroactivity.**

In another generic section, the government recites non-controversial principles regarding retroactivity as articulated in *Teague v. Lane*, 489 U.S. 288 (1989). *GR*- 39-40.

The government correctly notes that Mr. Allen may not avail himself of any new rule announced by the United States Supreme Court subsequent to the date on which his conviction became "final" on December 11, 2006, unless the new rule meets one of the two exceptions to the *Teague* doctrine. GR- 39.  Mr. Allen is unaware that any of his grounds for relief rely on a rule announced by the Supreme Court since December 11, 2006, and therefore the government's recitation of these general principles is quite irrelevant to any issue before the Court.

*Teague*, however, does not affect this Court's jurisdiction. *Schiro v. Farley*, 510 U.S. 222, 228 (1994) ("*Teague* bar to the retroactive application of new rules is not . . . jurisdictional").  Rather, it is an affirmative defense that the government can waive if not

12

properly and timely asserted. *Danforth v. Minnesota*, 128 S.Ct. 1029, 1046 (2008) ("We have held that the States can waive a *Teague* defense, during the course of litigation, by expressly choosing not to rely on it. . . . or by failing to raise it in a timely manner.")  Therefore, it is incumbent upon the government to identify with specificity what claims – if there are any – it contends are not cognizable due to the application of *Teague*.  The government's general introductory assertions that some unnamed claims may be *Teague* barred does not properly raise this defense.  Nor do the boilerplate *Teague* assertions that are provided at the beginning of virtually every claim properly raise this defense.  It is incumbent upon the government to argue with specificity why it believes any of Mr. Allen's ground for relief are barred under *Teague* and its progeny.

### 4.      Ineffective Assistance of Counsel.

The government provides a largely non-controversial recitation of general principles of the law regarding claims of ineffective assistance of counsel. *GR-* 42.  Mr. Allen will elaborate on the law regarding ineffective assistance of counsel within the context of each ground for relief. The following brief comments are appropriate here.

The government cites *Lockhart v. Fretwell*, 506 U.S. 364 (1993), as governing prejudice under *Strickland v. Washington*, 466 U.S. 668 (1984):

> [T]o set aside a conviction or sentence solely because the outcome
> would have been different but for counsel's error may grant the
> defendant a windfall to which the law does not entitle him."
> Absent some effect of challenged conduct on the reliability of the
> trial process, the Sixth Amendment guarantee is generally not
> implicated.

*GR-* 42, citing *Lockhart*, 506 U.S. at 369-370.

13

This is incorrect. *Lockhart*'s "unreliability or unfairness" requirement does not govern *Strickland* prejudice, as the Supreme Court has stated repeatedly. In *Williams (Terry) v. Taylor*, 529 U.S. 362 (2000), the Court held that the Virginia Supreme Court's reliance on *Lockhart*'s prejudice standard (requiring a petitioner to show "unfairness and unreliability") was erroneous:

> The Virginia Supreme Court erred in holding that our decision in *Lockhart*. . . , modified or in some way supplanted the rule set down in *Strickland*. . . Cases such as . . . *Lockhart*, do not justify a departure from a straightforward application of *Strickland* when the ineffectiveness of counsel does deprive the defendant of a substantive or procedural right to which the law entitles him. In the instant case, it is undisputed that Williams had a right--indeed, a constitutionally protected right--to provide the jury with the mitigating evidence that his trial counsel either failed to discover or failed to offer.

*Williams (Terry)*, 529 U.S. at 391, 393. *See also Glover v. United States*, 531 U.S. 198, 202  (2001) ("the Seventh Circuit drew the substance of its no-prejudice rule from our opinion in *Lockhart* . . . our holding in *Lockhart* does not supplant the *Strickland* analysis").

Contrary to the government's assertion, prejudice is established when a petitioner shows that there is a reasonable probability that, but for counsels' unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Wiggins v. Smith*, 539 U.S. 510, 534 (2003). Such a probability can be shown by less than a preponderance of the evidence:

> The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.

*Strickland*, 466 U.S. at 694. *Lockhart* has no application to prejudice review in this case.

Moreover, with respect to any claim of penalty phase ineffectiveness, prejudice is established if even one juror would have voted for life imprisonment. *Wiggins*, 539 U.S. at 537

14

("Had the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance.")

Finally, citing *Strickland*, the government correctly notes that "judicial scrutiny of counsel's performance must be highly deferential" *GR-* 41.  However, the government failed to cite the other portion of *Strickland* that is relevant to many of Mr. Allen's ineffectiveness allegations. Such deference is not owed when counsel's decisions are not based on full, thorough and complete investigation. *Wiggins v. Smith*, 539 U.S. 510, 528 (2003) ("As we established in *Strickland,* 'strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.' [*Strickland*], 466 U.S. at 690-691").

The American Bar Association's 2003 edition of the Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, available at 31 Hofstra  L. Rev. 913 (2003), is cited as "2003 ABA Guidelines" followed by a pinpoint cite to the Hofstra Law Review. The 2003 Guidelines are a proper guide for analyzing trial counsel's performance, even though Mr. Allen's trial occurred in 1998. *See Rompilla v. Beard*, 545 U.S. 374, 387 n.6 & n.7 (2005) (analyzing the performance of counsel under the 1989 and 2003 editions of the ABA Guidelines where trial occurred before publication of either edition).

**PART TWO: ARGUMENT REGARDING GROUNDS FOR RELIEF**

The arguments that follow are ordered by the letter designations in the Amended Motion.

**A.    Mr. Allen was denied effective assistance of trial and appellate counsel in violation of the Sixth Amendment of the United States Constitution in connection with the pre-trial motion to suppress statements made to the police.**

        **1. Background.**

As alleged in the *Amended Motion*, Mr. Allen was prevented from testifying at the pre-trial suppression hearing regarding the voluntariness and admissibility of his alleged pre-trial statements to law enforcement.  This occurred when the Magistrate Judge, to whom the suppression motion was referred, erroneously failed to limit the scope of cross examination of Mr. Allen in the event he testified:

> I just want to make my point. I don't know what Mr. Landolt's position is, but to avoid this when we're in the middle of it, my position is once an individual takes a witness stand he's there for whatever cross examination that may pop up, especially in a situation like this. So, if you want to limit his testimony to various items, I'm not sure I can keep Mr.,— or I won't keep Mr. Landolt to that limitations. I want to make sure you knew that going in.

TR 5/16/97 at 348.

Thus, the Magistrate Judge erroneously accepted the government's argument that Mr. Allen was subject to cross examination on all issues that "might pop up":

> COURT:      Unless Mr. Landolt agrees to cross only on the issues addressed in the questioning.
>
> LANDOLT:   Judge, I think once he takes the stand he's, – the issues in the case are the scope of the cross examination.
>
> DEDE[1]:      Well, my position, – my argument is that just as the Government has objected all day long about being limited in the scope of this proceeding, I think that his testimony is limited to the scope of this proceeding.

---

[1] Bradley S. Dede represented Norris Holder in this pretrial hearing, which involved both Mr. Allen and Mr. Holder.

16

COURT:    Yeah, it is except that I just think it goes a lot broader because Mr. Allen and Mr. Holder for that matter, —Mr. Holder and Mr. Allen I should say, were participants in this questioning and answer process in the police department from get to go, ...that the cross examination is going to be a lot wider and more open that I permitted with the police officers who were here to,– or the witnesses who were just here to testify about the specific identification process.

COURT:    Unless Mr. Landolt agrees to cross only on the issues addressed in the questioning.

LANDOLT:    Judge, I think once he takes the stand he's, – the issues in the case are the scope of the cross examination.

DEDE: Well, my position, – my argument is that just as the Government has objected all day long about being limited in the scope of this proceeding, I think that his testimony is limited to the scope of this proceeding.

COURT:    Yeah, it is except that I just think it goes a lot broader because Mr. Allen and Mr. Holder for that matter, —Mr. Holder and Mr. Allen I should say, were participants in this questioning and answer process in the police department from get to go, ...that the cross examination is going to be a lot wider and more open that I permitted with the police officers who were here to,– or the witnesses who were just here to testify about the specific identification process.

*Id*. at 348-349.

Based on this ruling, Mr. Allen declined to testify at the suppression hearing, even though he had important, and if credited, dispositive testimony to offer on the suppression issues. *Id.* at 357.

The Magistrate Judge's ruling violated Fed. R. Evid. 104(d) and United States Supreme Court precedent. Trial counsel ineffectively failed to present this controlling authority to the Magistrate Judge. Then, instead of objecting to the Magistrate's Report and Recommendation on the ground that the Magistrate Judge's ruling violated the above described authority, counsel took a half-measure, submitting a proffer of Mr. Allen's testimony *after* the Magistrate Judge

17

had made his Report and Recommendation. Tr. Doc. 89, 92.[2] That was ineffective because a

proffer cannot substitute for live testimony that is subject to cross examination. Appellate

counsel ineffectively failed to raise this issue at all on direct appeal.

### 2.      Relevant Law.

The error committed by the Magistrate was plain. Fed. R. Evid. 104(d) is explicit:

> Rule 104.  Preliminary Questions
> (d) Testimony by accused. The accused does not, by testifying
> upon a preliminary matter, become subject to cross-examination as
> to other issues in the case.

This rule places limits on the scope of cross examination during "preliminary matters"

such as a suppression hearing. *United States v. Roberts*, 14 F.3d 502, 517 (10th Cir. 1993)

(acknowledging that Rule 104(d) circumscribed the government's cross examination and finding

that the lower court did not err in allowing cross examination on the defendant's mental capacity

because it directly related to the voluntariness of the confession); *United States v. Gomez-Diaz*,

712 F.2d 949, 951-952 (5th Cir. 1983); *United States v. Williams*, 754 F.2d 672, 676 (6th Cir.

1985); *see also* Fed. R. Evid. 104, Note to Subdivision (d) ("The limitation upon cross-

examination is designed to encourage participation by the accused in the determination of

preliminary matters. He may testify concerning them without exposing himself to cross-

examination generally. The provision is necessary because of the breadth of cross-examination

under Rule 611(b).")

---

[2] The government contends that the Magistrate judge possessed and considered Mr. Allen's offer of proof when it rendered his report and Recommendation(GR 46).  This is incorrect. Counsel filed the offer of proof and the Motion to Supplement on June 19, 1997, six days after the Magistrate issued his Report. The Magistrate judge did not consider Mr. Allen's proposed testimony in the offer of proof when it denied Mr. Allen's motion to suppress. This is evidenced by the fact that the Magistrate did not reference Mr. Allen's offer of proof in the Report and Recommendation.

Indeed, Rule 104(d)'s lineage and *raison d'etre* can be traced to *Simmons v. United States*, 390 U.S. 377 (1968). In *Simmons*, the Court squarely addressed the situation confronted by Mr. Allen and held that a criminal defendant should not be made to forego his right Fifth Amendment right against self-incrimination at the suppression hearing in order to avail himself of the full process offered to demonstrate that the police did not honor his Fifth Amendment right at an earlier time. *Simmons* condemned such trade-offs:

> [I]n this case Garrett was obliged either to give up what he believed, with advice of counsel, to be a valid Fourth Amendment claim or, in legal effect, to waive his Fifth Amendment privilege against self-incrimination. In these circumstances, we find it intolerable that one constitutional right should have to be surrendered in order to assert another. We therefore hold that when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection.

*Simmons*, 390 U.S. at 393. Needless to say, in a death penalty case, where Mr. Allen was forced to balance self-incrimination for a capital offense against his right to litigate the suppression issues, this Catch-22 was even more "intolerable."

In response to this claim, the government presented an overly cramped reading of *Simmons*, *GR-* 57-58, suggesting that it only applies to Fourth Amendment suppression issues that contain components of standing. Yet, the government offers neither principled reasons nor authority to support this narrow and unsupportable reading of *Simmons*. And it utterly fails to explain how the Magistrate Judge's ruling can be squared with Fed. R. Evid. 104(d).

19

**3.     Trial Counsel Was Ineffective in Litigating Mr. Allen's Motion to Suppress.**

      **a.     Deficient Performance.** Trial counsel recognized the importance of Mr. Allen's testimony and clearly intended to present his testimony at the suppression hearing. H.T. 5/15/97 350.[3]

Likewise, counsel understood that the law limited the potential cross examination of Mr. Allen at the suppression hearing. *Id.* at 350. In anticipation of presenting Mr. Allen's testimony, counsel considered moving *in limine* to limit the scope of the government's cross examination in accordance with the law. *Id.*  Counsel discussed the issue in chambers with the court in advance of the suppression hearing. *Id.* Despite counsel's stated intention to make an offer of proof, no such offer of proof was made during the course of the suppression hearing.  Instead, counsel simply agreed to file an offer of proof at a later date. *Id.* at 387. More importantly, an offer of proof was not an adequate response to the Magistrate Judge's failure to abide by Rule 104(d).

Counsel's failure to litigate properly the motion to suppress constitutes deficient performance. *Kimmelman v. Morrison*, 477 U.S. 365 (1986) (Counsel's failure to file timely motion to suppress evidence was deficient performance) *Huynh v. King*, 95 F.3d 1052 (11th Cir. 1996) (Trial counsel ineffective in murder case for failing timely to file potentially meritorious

---

[3] Mr. Allen would have testified that although he had not been advised of his *Miranda* rights, he was repeatedly interrogated by Detective Nickerson and other police officers. When Mr. Allen requested an attorney, he was told by Detective Nickerson that he couldn't get one until the next day. Mr. Allen was told by police "that he would fry". Mr. Allen was handcuffed to a table while the police attempted to the interrogate him. Mr. Allen was finally advised of his *Miranda* rights by FBI agent Hartman. Agent Hartman stopped speaking with Mr. Allen when he informed her that he wanted an attorney. After Mr. Allen invoked his right to counsel, Detective Nickerson entered the interrogation room and told Mr. Allen that things would "get worse for if you don't tell." Detective Nickerson continued to press Mr. Allen over the next few hours. A lineup was then conducted by Officer Henderson, at which time a female witness identified a person other than Mr. Allen. Following the lineup, Detective Nickerson informed Mr. Allen that he had been identified in the lineup. Detective Nickerson told Mr. Allen that he wanted to question him. Officer Henderson then entered the room and began speaking about a homicide investigation involving the death of Mr. Allen's friend Marquis. Officer Henderson then began questioning Mr. Allen about the robbery. Officer Henderson never re-advised Mr. Allen of his *Miranda* rights. Mr. Allen never informed Officer Henderson or any other police officers or agents that he wished to waive counsel or his right to silence and speak to police about the incident. These events occurred following Mr. Allen's arrest on March 18th and 19th, 1997. Tr. Doc. 92.

motion to suppress evidence); *Tomlin v. Myers*, 30 F.3d 1235 (9th Cir. 1994) (Trial counsel ineffective in murder prosecution for failing to file motion to suppress witness lineup identification); *Smith v. Dugger*, 911 F.2d 494 (11th Cir. 1990) (Counsel ineffective for failing to move to suppress defendant's confession); *Murphy v. Puckett*, 893 F.2d 94 (5th Cir. 1990) (trial counsel ineffective for failing to raise valid double jeopardy claim).

When counsel fails to bring relevant and controlling authority to the attention of the court, that too is deficient. As the court held in *United States v. Williamson*, 183 F.3d 458, 463 (5th Cir. 1999).

> An objectively reasonable attorney, keeping abreast of legal developments related to his case, as he should, would have discovered [controlling authority] . . . . Regardless of the standard of review we would have employed, [appellate] counsel, by failing to cite directly controlling precedent, rendered deficient assistance.

*See also Trass v. Maggio*, 731 F.2d 288, 293 (5th Cir.1984) (ignorance of relevant law constitutes an "identifiable lapse in constitutionally adequate representation").

Counsel was prepared to call Mr. Allen as a witness and knew the nature of Mr. Allen's testimony. Following the hearing and the suppression court's denial of Mr. Allen's motion, counsel eventually submitted a written offer of proof containing Mr. Allen's testimony with the trial court. Mr. Allen's offer of proof was limited to the issues surrounding his arrest and his statement. Thus, this case fit squarely within Fed. R. Evid. 104(d) and *Simmons v. United States*, 390 U.S. 377 (1968). But, neither during the hearing nor in conjunction with the offer of proof did counsel bring to the court's attention this controlling authority. Had counsel done so, the Magistrate Judge or this Court would have been bound to correct this error. *United States v. Roberts*, 14 F.3d 502, 517 (10th Cir. 1993); (Rule 104 circumscribes the government's cross examination to issues directly related to the voluntariness of the confession); *United States v.*

21

*Gomez-Diaz*, 712 F.2d 949, 951-952 (5th Cir. 1983); *United States v. Williams*, 754 F.2d 672, 676 (6th Cir. 1985).

**b. Prejudice.** *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), requires, in order to show prejudice from constitutionally ineffective counsel, a showing of a reasonable probability of a different outcome had counsel performed adequately.  Here, that means that prejudice is shown if Mr. Allen demonstrates that he would have prevailed on limiting the scope of the cross examination. When counsel fails to provide clear authority to the court, and there is a reasonable probability of a different outcome, prejudice is shown. *United States v. Williamson*, 183 F.3d 458, 463 (5th Cir. 1999); *Trass v. Maggio*, 731 F.2d 288, 293 (5th Cir.1984).   Thus, Mr. Allen should have been permitted to testify without potentially incriminating himself with respect to the underlying offenses.

Had he been permitted to do so, Mr. Allen's testimony would have put the lie to the government's case that the statements were voluntary.  As noted in the Motion to Suppress (Tr. Doc. 71), a strong presumption exists that a defendant's statement to police is involuntary when that defendant has previously invoked his right to counsel. *Edwards v. Arizona*, 451 U.S. 477 (1981); *cf., Montejo v. Louisiana*, 129 S.Ct. 2079, 2087 (2009) (courts should not presume waivers of right to counsel). In this case, the suppression court simply accepted Officer Henderson's uncontested testimony that the Mr. Allen's statement was voluntary. Yet Officer Henderson's account of Mr. Allen's confession is suspect.  Officer Henderson's testimony at the suppression hearing was called into question by Officer Harper's testimony at trial. At the suppression hearing, Officer Henderson testified that he did not know that Mr. Allen had requested an attorney. TR 5/16/97 at 298. Officer Harper, however, testified that Officer Henderson told him that Mr. Allen had requested an attorney,

22

| | |
|---|---|
| **Sindel:** | Okay.  Did you ask [Billie Allen] any questions? |
| **Harper:** | No Sir. |
| **Sindel:** | Why didn't you ask him any questions? |
| **Harper:** | I'd been informed that he had requested an attorney prior to the line-up and, therefore, I was told not to ask him any questions. |
| **Sindel:** | Okay.  Who told you that. |
| **Harper:** | That would be Lieutenant Ron Henderson. |

T. X 228. Officer Harper's testimony was equally incredible. He testified to taking notes of Mr. Allen's statement, but inexplicably destroyed those notes sometime before trial. H.T. 5/16/97 262, 265. Officer Henderson testified that he didn't recall Officer Harper taking notes of Mr. Allen's statement. *Id.* at 292. Given the fundamentally inconsistent and problematic testimony of government witnesses Henderson and Harper, there is a reasonable probability that the statements would have been suppressed had the Court, or the Magistrate Judge, had Mr. Allen's testimony before them.[3]

**4.  Ineffective assistance of appellate counsel .**

As noted above, when a lawyer fails to present controlling authority to the court with resulting prejudice, that lawyer renders ineffective assistance under *Strickland* and its progeny. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984) provides the standard for effective assistance of appellate as well as trial counsel. *See Roe v. Flores-Ortega*, 528 U.S. 470, 476-77 (2000) (Applying *Strickland* to claim that counsel failed to file a notice of appeal). Failure to raise a meritorious issue on appeal constitutes ineffectiveness. In *Jackson v. Leonardo*, 162 F.3d

---

[3]The testimony of Officers Henderson and Harper undermined the reliability of the Mr. Allen's confession and ultimately the jury's verdict, given the great weight afforded confessions by juries. The use of exaggerated, inaccurate, or misleading testimony, such as that provided by Officer Henderson and Harper, deprives a defendant of a fair trial if "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury." *Napue v. Illinois*, 360 U.S. 264, 271 (1959); *Mooney v. Holohan*, 294 U.S. 103 (1935); *Pyle v. Kansas*, 317 U.S. 213 (1942); *Alcorta v. Texas*, 355 U.S. 28 (1957); *Giglio v. United States*, 405 U.S. 150 (1972).

81 (2nd Cir. 1998), the court held that appellate counsel's failure to raise a ground that was a "sure winner" constituted ineffective assistance: "In the instant case, we believe that appellate counsel's failure to raise a well-established, straightforward, and obvious [ground of error] constitutes ineffective performance."

See also *Starr v. Lockhart*, 23 F.3d 1280 (8th Cir. 1993) (finding trial and appellate counsel ineffective for failing to object to and raise an erroneous jury instruction); *Matire v. Wainwright*, 811 F.2d 1430, 1438 (11th Cir. 1987) (The failure to raise meritorious issue on appeal constituted ineffective assistance); *Claudio v. Scully*, 982 F.2d 798, 799 (2nd Cir 1992); *Freeman v. Lane*, 962 F.2d 1252 (7th Cir. 1992) (appellate counsel ineffective for failing to raise a meritorious claim that was "presented squarely" at trial regarding a violation of the defendant's Fifth Amendment rights); *Murphy v. Puckett*, 893 F.2d 94 (5th Cir. 1990) (counsel's failure to raise valid defense at trial and on direct appeal constituted ineffective assistance).

Here, appellate counsel failed to raise the Rule 104(d)/*Simmons* issue at all.  As noted above, had it been raised, Mr. Allen would have prevailed in the Eighth Circuit Court of Appeals. *Strickland* ineffectiveness is established. Mr. Allen is entitled to a new trial.

**B.** **Mr. Allen was denied his rights to the presumption of innocence, to be present at his trial, to effective assistance of counsel, to be free of cruel and unusual punishment, and to due process of law Under the Fifth, Sixth, and Eighth Amendments to the United States Constitution, because he was required by the court to wear a stun belt, and neither trial counsel nor appellate counsel challenged this ruling; the prejudice to Mr. Allen was compounded by the failure to provide him with adequate medical treatment during trial.**

The government's response confirms two critical facts in regard to this ground. The government does not dispute that Mr. Allen was forcibly restrained with a stun belt at all phases of his capital trial. And the government does not dispute that no hearing took place and that the district court failed to make a record as to why Mr. Allen had to be forcibly restrained with a stun

24

belt at his trial. See *GR-* at 59-63. The government's procedural argument against this claim –

that it is procedurally defaulted because not raised in the district or appellate courts (*GR*-59) is no

bar to this court's merits review. This ground for relief is based upon trial and appellate

counsel's ineffective assistance of counsel for failure to properly challenge the use of the stun

belt. As discussed above, ineffective assistance of counsel overcomes procedural bars to relief.

### 1. Applicable law

At the time of Mr. Allen's trial in 1998, it was well established that a trial court could not

restrain a criminal defendant absent a particularized justification. In *Illinois v. Allen*, 397 U.S.

337 (1970), the Supreme Court held that a defendant could forfeit his Sixth Amendment right to

be present and unrestrained at his own trial. The *Allen* Court sanctioned the use of physical

restraints "as a last resort" and articulated a framework for handling unruly defendants that

linked the trial court's response to the seriousness of the defendant's misbehavior. *Id.* at 343-44.

In *Estelle v. Williams*, 425 U.S. 501, 505 (1976), the Court found that forcing "an

accused to wear jail clothing furthered no essential state policy." This was contrasted by the

Court with *Allen* which recognized the "the substantial need to impose physical restraints on

contumacious defendants."

At issue in *Holbrook v. Flynn*, 475 U.S. 560 (1986), was the presence of armed guards at

trial. The Court concluded that the presence of armed guards was not the "sort of inherently

prejudicial practice that, like shackling, should be permitted only where justified by an essential

state interest specific to each trial." *Id*. at 568-69.

At Mr. Allen's trial, there was no particularized reason established by the district court

for Mr. Allen's restraint. In its response, the government cites the facts of Mr. Allen's case and

25

the physical layout of the courtroom as reasons that supported Mr. Allen's restraint. *GR-* 59-60. The government did not cite any conduct of Mr. Allen beyond the facts of the crime as warranting the use of the stun belt; the government mentioned nothing about Mr. Allen's conduct in the roughly eleven months he was incarcerated prior to trial. Capital murder cases, by their nature, are violent crimes. If the heinousness of the crime were the basis for making restraint decisions, then all capital defendants could be lawfully restrained. Such is not a particularized determination "specific to each trial." *Holbrook v. Flynn*, 475 U.S. 560, 569(1986).

Most recently, in *Deck v. Missouri*, 544 U.S. 622 (2005), the Supreme Court had occasion to revisit this issue. The Court began by noting that the "the law has long forbidden routine use of visible shackles during the guilt phase; it permits a state to shackle a defendant only in the presence of a special need." *Id.* at 626. The Court traced the law back to 18th century England. *Id.* at 626. The Court held that "given their prejudicial effect, due process does not permit the use of visible restraints if the trial court has not taken account of the circumstances of the particular case." *Id.* at 632.

The particular issue in *Deck* concerned the restraint of the defendant at the penalty phase of a capital trial. As to that issue the Court held that:

> courts cannot routinely place defendants in shackles or other physical restraints visible to the jury during the penalty phase of a capital proceeding. The constitutional requirement, however is not absolute. It permits a judge, in the exercise of his discretion, to take account of special circumstances, including security concerns, that may call for shackling. In so doing, it accommodates the important need to protect the courtroom and its occupants. But any such determination **must be case specific**, that is to say, **it should reflect particular concerns**, say, special security needs or escape risks, related to the defendant on trial.

*Id.* at 633.

26

The *Deck* Court found that the trial court did not act within its discretion in that it the trial court did not make any informal or formal findings. *Id.* at 634. The trial court did not refer to Deck's risk of escape, which Missouri raised on appeal. In short, the trial court failed to make the appropriate record to support its decision.

### 2. Stun Belts and Close Judicial Scrutiny

The amended motion set forth facts regarding stun belts and what can happen when a stun belt is activated. *M* - 16-17. At least one jurisdiction, the State of Indiana, has banned the use of stun belts as a means of restraining defendants. *Wrinkles v. State*, 749 N.E.2d 1179, 1194 (Ind. 2001). Other courts have reversed when the use of stun belts was not amply justified on the record. *See*, *e.g.*, *Gonzales v. Pliler*, 341 F.3d 897 (9th Cir. 2003); *United States v. Durham*, 287 F.3d 1297 (11th Cir. 2002).

Both *Gonzales* and *Durham* discussed the unique problems presented by the use of a stun belt. The *Gonzales* court noted:

> the nature of the device and its effect upon the wearer when activated, requiring and unwilling defendant to wear a stun belt during trial may have significant psychological consequences. These "psychological consequences" cannot be understated. Stun belts, for example, may pose a far more substantial risk of interfering with a defendant's Sixth Amendment right to confer with counsel than do leg shackles. We have long noted that "one of the defendant's primary advantages of being present at the trial is his ability to communicate with his counsel." . . .  Stun belts may directly derogate this "primary advantage," impacting a defendant's right to be present at trial and to participate in his or her defense. . . . "wearing a stun belt is a considerable impediment to a defendant's ability to follow the proceedings and take an active interest in the presentation of his case."  "The fear of receiving a painful and humiliating shock for any gesture that could be perceived as threatening likely" hinders a defendant's participation in defense of the case – including those movements necessary for effective communication with counsel.

27

*Gonzales*, 341 F.3d at 900 (citations omitted).

In this Traverse, Mr. Allen has pled in great detail facts regarding his background, mental status, and other unique factors which demonstrate that the fear and stress of being forced to wear a stun belt throughout his trial would have compromised his ability to confer with counsel and participate in his defense. This is especially true when coupled with the medical problems Mr. Allen was suffering from at the time of trial. *M*-17, 18.

Both the *Gonzales* and *Durham* courts noted that "a decision to use a stun belt must be subjected to at least the same close judicial scrutiny required for the imposition of other physical restraints." *Gonzales* at 901, citing *Durham*, 287 F.3d at 1306. In fact, the *Honken* case cited by the government is a good example of close judicial scrutiny and demonstrates the lack of such scrutiny in Mr. Allen's case. *United States v. Honken*, 541 F.3d 1146 (8th Cir. 2008). Honken faced capital murder and witness tampering charges involving the alleged murder of five witnesses to his drug-trafficking or other alleged criminal conduct.[4] The government in that case filed a motion under seal to allow the shackling of Honken at trial. At the evidentiary hearing on that motion, the government presented evidence and testimony about, among other things:

(1) Honken's previous attempt to escape and his recent training in martial arts and body contortion;

(2) Honken's previous involvement with violent associates both in and out of prison who could be, and have been in the past, recruited to assist him with an escape attempt;

(3) Honken has a record of infractions while incarcerated;

(4) the trial will require management of several incarcerated witnesses and the management and protection of nine witnesses currently in witness protection; a U.S. Marshall testified that several of the persons identified on Honken's witness list are among the most dangerous prisoners that he is aware of in federal custody; and

---

[4] At the time of the capital charges, Honken was serving a sentence for drug-trafficking.

28

(5)  the trial will involve heightened demands on the Marshals Service owing to the sheer number of trial participants.

*United States v. Honken*, 378 F. Supp. 2d 1010, 1020 (N.D Iowa 2004). Ultimately, the district court issued a thirty-page opinion explaining his ruling and the safeguards to be imposed. *See id.* The Eighth Circuit affirmed the use of shackles at Honken's trial, reasoning:

> Honken's potential for violence, history of escape attempts, and threats against witnesses and law enforcement is beyond serious dispute. Honken stood accused of murdering five people, including two young girls. The district court found ample evidence in the record from which to conclude Honken presented a serious escape risk and a threat to courtroom security--Honken plotted additional murders, including murdering officials in connection with his trial, and Honken planned various escape attempts, including training in martial arts, for the very purpose of escaping during his trial. These were compelling circumstances to shackle Honken at trial.

*Honken*, 541 F.3d at 1163.

As the government concedes, "the record of the threat Honken posed was more egregious." *GR*- 60. Unlike Mr. Honken, Mr. Allen did not pose "a serious escape risk and a threat to courtroom security." He was charged with a single murder, had never attempted to escape, faced no charges of witness tampering, witness murder, or threats against witnesses or law enforcement. Crucially, due to trial counsel's failure to properly raise this issue, there was no close judicial scrutiny in this case. The trial court did not hold an evidentiary hearing on the need for courtroom security measures and did not make findings of the particular circumstances which warranted use of the stun belt in Mr. Allen's case.

29

### 3. Ineffective assistance of counsel[5]

Mr. Allen was tried in 1998. As set forth above, the law regarding the forcible restraint of a defendant at trial was well established at the time of trial. For counsel to stand mute and not object when Mr. Allen was forcibly restrained amounted to deficient performance. *See*, *e.g.*, *Wrinkles v. Buss*, 537 F.3d 804, 814 (7th Cir. 2008) (counsel deficient in 1995 trial for failure to object to use of stun belt, where the trial court provided no individualized justification for the stun belt). The question is the prejudice that flows from counsel's deficient performance.

In many cases, the prejudice is determined by whether or not the jury was aware that the defendant was restrained at trial. *Id.* at 815, citing, *Illinois v. Allen*, 397 U.S. 337, 344 (1970), *Roche v. Davis*, 291 F.3d 473, 482-83 (7th Cir.2002). In some cases, this turns on whether or not the belt was visible to the jurors.

In determining that Deck was entitled to relief the Supreme Court first noted that the shackles were visible to the jury. *Deck v. Missouri*, 544 U.S. 622, 634 (2005). In an effort to make that showing, Mr. Allen, earlier in this litigation, requested permission to interview the jurors. Doc. 46. Specifically, Mr. Allen informed this Court that he wished to inquire whether the jurors **were aware** that Mr. Allen was restrained with a stun belt during the entire trial (emphasis added). The government objected (Doc. 49) and this Court denied Mr. Allen's request (Doc. 52).

The government's response to Mr. Allen's request to interview jurors again does not dispute that Mr. Allen was forcibly restrained with a stun belt. In that motion, the government makes the following assertion:

> Finally, the Government does not believe that there is any way that any juror could have been aware that Mr. Allen wore a stun belt, because said belt was always concealed under his clothing and very few individuals besides the defendant and the U.S. Marshals

---

[5]The general *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984) standard for ineffective assistance of counsel relief is set forth in Part One and will not be repeated here.

> were aware of such restraint. Had there been an instance during the trial when any juror even was accidentally able to observe Mr. Allen's belt, no juror would have necessarily known what it was and petitioner's counsel was in a position to have made a record on such an event. Jurors were obviously aware that there were security personnel in the courtroom, this Court placed a curtain in front of defense table to protect the jury from observing any restraints on petitioner and this Court always made sure that petitioner was in the courtroom and seated behind defense table before any juror was permitted to enter the courtroom. If there had been a violation of this procedure, trial counsel was in a position to raise it and complain about it.

*GR-* 6.

The government speculates similarly in its response that the jurors may not have seen the stun belt worn by Mr. Allen. *GR-* 62. But stun belts are not invisible. The stun belt at issue in *Durham* protruded "some three inches beyond the wearer's back." *United States v. Durham*, 287 F.3d 1297, 1305 (11th Cir. 2002. In *State v. Flieger*, 91 Wn. App. 236, 242, 955 P.2d 872, 874 (1998), the device was so noticeable that it piqued juror's curiosity about what the device was. *See Stephenson v. State*, 864 N.E.2d 1022,1032 (Ind. 2007) (several jurors knew that Stephenson wore the belt during trial and recognized it for what it was); *Wrinkles v. State*, 749 N.E.2d 1179 (Ind. 2001) (seven jurors submitted affidavits indicating awareness of Wrinkles' stun belt).

But whether or not the jurors saw the stun belt, Mr. Allen suffered prejudice from defense counsel's deficient performance. First because of the psychological consequences that arise from wearing a stun belt, especially when coupled with Mr. Allen's unique psychological and mental health make-up, prejudice occurred because Mr. Allen's ability to participate in his own defense and confer with counsel were compromised. This is especially true when combined with the physical maladies suffered then by Mr. Allen (*M*-17, 18). Mr. Allen has sought, and will continue to seek discovery on this ground. The assertions by the government in its response are just that, assertions unsupported by evidence.

31

Similarly, Mr. Allen's appellate counsel were ineffective for failing to raise this issue as plain error in his appeal. On appeal, one of Mr. Allen's counsel, Mr. Simon, also represented Mr. Allen at trial. Thus, he knew, or should have known of Mr. Allen's forcible restraint. For the same reasons that trial counsel rendered deficient performance, Mr. Allen's appellate counsel were deficient in not raising this issue in his direct appeal. *Carter v. Bowersox*, 265 F.3d 705, 716-17 (8th Cir. 2001) (finding appellate counsel ineffective for failure to raise meritorious claim, even though the appellate claim would have been reviewed under the plain error standard); *see also Mason v. Hanks*, 97 F.3d 887, 892 (7th Cir. 1996) (appellate counsel constitutionally deficient for failing to raise meritorious claim); *Mayo v. Henderson*, 13 F.3d 528, 533 (2nd Cir. 1994) (same); *Matire v. Wainwright*, 811 F.2d 1430, 1435 (11th Cir. 1987) (same).

Mr. Allen was prejudiced. Had this issue been raised in his direct appeal, there is a reasonable probability that he would have received relief in the form of a new trial or a new penalty phase proceeding. Mr. Allen is entitled to discovery and a hearing on this ground. Upon hearing, he should be granted a new trial.

**C.     Mr. Allen was denied due process of law, the right to be free of cruel and unusual punishment, and effective assistance of counsel because the federal death penalty, as administered is disproportionately and unconstitutionally applied by race, and trial and appellate counsel made no objection based on this fact.**

**1.     The Due Process Violation.**

In *McCleskey v. Kemp*, 481 U.S. 279, 312, 319 (1987), the Supreme Court took note of systematic discrepancies in the implementation of the death sentence, which "appear to correlate with race," but held that those discrepancies were "best presented to the legislative bodies." Shortly thereafter, in enacting 21 U.S.C. §848(o), Congress expressly granted capital defendants the "right . . . to justice without discrimination," requiring juries to certify that racial

discrimination played no role in the imposition of the death penalty in specific cases; and took note of the kind of systematic statistical evidence of racial discrimination discussed in *McCleskey*.[6]

One of the fundamental goals of our criminal system is to ensure that justice is meted out fairly, in accordance with the law, and not on the basis of improper concerns such as race. *See e.g., Georgia v. McCollum*, 505 U.S. 42, 47 (1992).  This case involved the racially-charged murder of a white security guard in a mostly-white, prosperous suburb allegedly committed by two black men from inner-city St. Louis. Statistical evidence shows disproportionate prosecution of people of color under the federal death penalty statute. This prosecution and death sentence violates Mr. Allen's rights under §848 to "justice without discrimination," and also contributes to "the inevitable loss of confidence in our judicial system that state-sanctioned discrimination in the courtroom engenders." *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 140 (1994).

Since the filing of the *Amended Motion*, racial disproportionality in the application of the federal death penalty has only increased. As of May 12, 2009,[7] of the 460 defendants against whom the Attorney General has authorized the government to request the death penalty, 119

---

[6]The importance of recognizing both case-by-case and systematic discrimination stems from the fact that capital sentencing hearings offer a "unique opportunity for racial prejudice to operate but remain undetected":

> Because of the range of discretion entrusted to a jury in a capital sentencing hearing, there is a unique opportunity for racial prejudice to operate but remain undetected. On the facts of this case, a juror who believes that blacks are violence prone or morally inferior might well be influenced by that belief in deciding whether petitioner's crime involved the aggravating factors specified under Virginia law. Such a juror might also be less favorably inclined toward petitioner's evidence of mental disturbance as a mitigating circumstance. More subtle, less consciously held racial attitudes could also influence a juror's decision in this case. Fear of blacks, which could easily be stirred up by the violent facts of petitioner's crime, might incline a juror to favor the death penalty.

*Turner v. Murray*, 476 U.S. 28, 35 (1986). Thus, the certification by jurors on verdict sheets that racial discrimination did not influence a particular sentencing cannot guarantee the absence of such discrimination.
[7]The following information updates the information at M-20.

33

have been white, 85 Hispanic, 16 Asian/Indian/Pacific Islander/Native American, 3 Arab, and

***237 have been African-American***. In other words, the federal government has sought death

sentences against ***twice as many African Americans as whites***. Further, 341 of the 460, or 74%,

of the defendants approved for a capital prosecution by three Attorney Generals to date, are

members of minority groups. Thirty-one of the fifty-five defendants now on federal death row

under active death sentences, or 56%, are non-white. Thirty-six prisoners, or 65%, of federal

death row inmates were convicted of killing white victims.

Although trial counsel in this case challenged the constitutionality of the federal death

penalty statute on several grounds, both facially and as applied to Mr. Allen, counsel failed to

argue that the racially discriminatory administration of the federal death penalty statute requires

the courts to invalidate the statute as applied to Mr. Allen's case on the grounds that it violates

the equal protection clause of the Fifth Amendment and the Eighth Amendment prohibition on

cruel and unusual punishment. *See* Motion to dismiss government's notice of intent to seek the

death penalty and for other appropriate relief. Tr. Doc. 172.

At the time of the capital charging decision in Mr. Allen's case, the racially

disproportionate use of the federal death penalty statute had been widely publicized,[8] and

Congress had requested and received a report documenting a disturbing pattern of racial

disparity. That report showed that twenty-nine of the thirty-seven defendants (more than 78 %)

to be capitally charged under the statute were African-American. The report begins:

> Racial minorities are being prosecuted under federal death penalty
> law far beyond their proportion in the general population or the
> population of criminal offenders. Analysis of prosecutions under
> the federal death penalty provisions of the Anti-Drug Abuse Act of
> 1982 reveals that 89% of the defendants selected for capital
> prosecution have been either African-American or Mexican-

---

[8]*See, e.g.*, March 18, 1994, Racial Disparity Seen in U.S. Death Penalty; Execution Under 'Kingpin' Law Sought Mostly for Blacks, Hispanics, Kenneth Cooper, Washington Post. Ex. 1.

American. Moreover, the number of prosecutions under this Act has been increasing over the past two years with no decline in the racial disparities. All ten of the recently approved federal capital prosecutions have been against black defendants.

House Committee on Civil and Constitutional Rights, Racial Disparities in Federal Death Penalty Prosecutions 1988-1994, Ex. 2, p. 1.

The federal death penalty act has been administered in a racially discriminatory manner in violation of the Fifth Amendment's equal protection clause and the Eighth Amendment. Mr. Allen's rights were further violated when his trial and appellate counsel failed to raise the widely-known issue of racial disproportionality in the federal death penalty, despite the fact that Mr. Allen's case involves an African-American defendant, a white victim, a predominantly white jury, and a crime in an affluent, predominantly-white suburb.

### 2.     The Government's Response Highlights the Need for an Evidentiary Hearing.

The Government's Response to this ground fails to defeat Mr. Allen's entitlement to discovery and an evidentiary hearing on these important questions. Initially, the government asserts that this ground is procedurally barred and that Mr. Allen has not shown cause and prejudice to overcome the bar. GR- 64. The government, however, ignores that this has been pled as a claim of ineffective assistance of counsel which overcomes the ostensible procedural bar. *Murray v. Carrier,* 477 U.S. 478, 488 (1986); *Massaro v. United States*, 538 U.S. 500, 505-506 (2003).

Next, the government contends that this claim is barred by *Teague v. Lane*, 489 U.S. 288 (1989). GR- 64. The government cannot contend that banning racial discrimination in the administration of the federal death penalty would constitute a new rule of criminal procedure.

35

Such discrimination has been prohibited under the Federal Constitution since the late 19th Century. See e.g. *Strauder v. West Virginia*, 100 U.S. 303 (1879). Mr. Allen does not seek application of a new rule.

The government spends pages arguing that Mr. Allen cannot prevail on a facial challenge to the FDPA. GR- 66-68. But Mr. Allen has not alleged a facial challenge to the statute, rather he has pled that the statute *as applied* violates the Fifth and Eighth Amendments. M-19: "Mr. Allen was denied due process of law . . .because the federal death penalty, *as administered* . . ." violates the constitution. Mr. Allen is not challenging the statute on its face, but rather as it has been administered.

The government then says that this challenge is foreclosed by *McCleskey v. Kemp*, 481 U.S. 279 (1987). GR- 68-72. This argument demonstrates a fundamental misunderstanding of *McCleskey*. While *McCleskey* rejected a state-wide, statistical study as sufficient, standing alone, to show racial discrimination, there are critical distinctions between Mr. Allen's current allegations and those rejected in *McCleskey. McCleskey* reviewed the death penalty practice throughout the entire state of Georgia. Thus, each of dozens of county prosecutors played a role in deciding whether to seek death in a given case, and obviously made myriad choices in how to prosecute each case. In view of the countless variables and numerous decision makers, the Court rejected this statistical study, standing alone, as a basis for relief. Federal capital prosecutions, on the other hand, are authorized by a single final decision-maker, the Attorney General of the United States.

Moreover, Mr. Allen does not seek relief on statistics alone, powerful as those statistics are. Nor does he seek to determine the decision making process of multiple actors in the criminal justice system, as did the petitioner in *McCleskey*. Rather, he uses these statistics to raise an

36

inference of discrimination, and he seeks discovery and an evidentiary hearing concerning the government's decision-making process *in this case*, so that he can prove that the sole decision maker in this case, the Attorney General, based her decision to seek death upon prohibited racial considerations.

The remainder of the Government's Response focuses on general denials of discriminatory intent. See e.g., *GR-* 75 (noting that the Department of Justice's policy precludes consideration of race in the charging process). However, such general denials of discrimination are insufficient to rebut a *prima facie* case of discrimination. See *Batson v. Kentucky*, 476 U.S. 76, 94 (1986) (prosecutor "cannot meet this burden on mere general assertions that its officials did not discriminate or that they properly performed their official duties").

The government does not address Mr. Allen's primary point:  Statistics show a grossly disproportionate use of the federal death penalty against people of color in general and African-Americans in particular. This fact raises an inference of discrimination. See *Johnson v. California*, 545 U.S. 162, 169 (2005) ("prima facie case of discrimination can be made out by offering a wide variety of evidence, so long as the sum of the proffered facts gives 'rise to an inference of discriminatory purpose'"). Mr. Allen has met this burden and should be permitted to support his *prima facie* case through discovery and a hearing. Upon hearing, this Court should either vacate Mr. Allen's sentence of death or, if he is granted a new trial, preclude the government from again seeking death.

**D.     Mr. Allen was denied effective assistance of counsel in connection with jury selection.**

The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to an impartial jury. In addition, due process has long required that the jury "consider

37

only the evidence developed before it at trial," and not information received from outside sources. *Chandler v. Florida*, 449 U.S. 560, 575 (1981); *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) ("The theory of the law is that a juror who has formed an opinion cannot be impartial."); U.S. Const. Amend. VI. A jury's exposure to inadmissible evidence from outside sources, such as a suggestion that the defendant is particularly dangerous, violates due process and is especially prejudicial because the jury's receipt of such information is not accompanied by any procedural safeguards. *Shepherd v. Maxwell*, 384 U.S. 333, 351 (1966); *Marshall v. United States*, 360 U.S. 310, 313 (1959). It is of course axiomatic that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable to impartially to consider the State's case against a defendant." *Batson v. Kentucky*, 476 U.S. 79, 89 (1986).

Mr. Allen's jury was selected in violation of the guarantee of an impartial jury and the bar on race-based peremptory challenges. The empaneling of an anonymous jury exposed the jurors to the inference that the Court had reason to believe the defendant was particularly dangerous.[9] Trial and appellate counsel ineffectively failed to raise properly and/or litigate these deficiencies.

### 1.   Defense counsel failed to object to the unconstitutional empaneling of an anonymous jury.

The anonymous empaneling of Mr. Allen's jury violated his right to an impartial jury, because the awkward and unusual reference-only-by-number approach made the jurors likely to conclude that Mr. Allen was dangerous and that their safety was at risk. This practice has been condemned by the Eighth Circuit, due to "the danger that use of an anonymous jury could

---

[9] In addition, of course, the use of the stun belt, to the extent they were aware of it, gave the jurors more reason to believe Mr. Allen posed a danger. See Ground B above.

38

prejudice the jurors against the defendants." *United States v. Darden*, 70 F.3d 1507, 1532 (8th

Cir. 1995). *Darden* adopts a five-factor test to determine if an anonymous jury is proper:

> [S]ufficient reason for empaneling an anonymous jury has been
> found to exist upon a showing of some combination of several
> factors, including: (1) the defendant's involvement in organized
> crime, (2) the defendant's participation in a group with the capacity
> to harm jurors, (3) the defendant's past attempts to interfere with
> the judicial process, (4) the potential that, if convicted, the
> defendant will suffer a lengthy incarceration and substantial
> monetary penalties, and (5) extensive publicity that could enhance
> the possibility that jurors' names would become public and expose
> them to intimidation or harassment.

The government disputes that the anonymous empaneling of Mr. Allen's jury violated his

right to an impartial jury, and yet it concedes that this case implicates none of the first three of

the five *Darden* factors. *GR*- 76-78. The government cites no case[10] in which the first three of

the *Darden* factors are unsatisfied, and yet a court found the empaneling of an anonymous jury

constitutional.

The fourth *Darden* factor considers the potential for a lengthy incarceration. *United

States v. Darden*, 70 F.3d 1507, 1532 (8th Cir. 1995). Although that factor is satisfied in this case,

as Mr. Allen was facing the death penalty, this factor alone is insufficient to justify anonymous

empaneling of the jury. Were it otherwise, juries in capital cases would always be anonymous.

The fourth factor is significantly mitigated by the fact that none of the first three factors – which

concern potential harm to jurors from the defendant or the defendants' associates – was met in

this case. Thus, although the prospect of a sentence of death or of life in prison might motivate

certain defendants to engage in activity from which the jury needs protection, Mr. Allen, by

definition of the first three *Darden* factors, is not one of those defendants.

---

[10]In fact, the Government cites only one other Eighth Circuit case, *United States v. Lee*, 886 F.3d [sic] 998, 1001-02 (1989). *GR* 77. The correct citation for this case is 886 F.2d 998 (8th Cir. 1989). This case was decided pre-*Darden* and therefore does not apply the *Darden* factors.

The fifth factor, media coverage risking that jurors' names would be made public, was not present either. *United States v. Darden*, 70 F.3d 1507, 1532 (8th Cir. 1995). Although the government argues that there was "extensive media coverage surrounding the trial," *GR-* 77, the publicity was not so extensive as to warrant a motion for change of venue in this case. A motion for change of venue is a touchstone for the establishment of this factor. *Darden*, 70 F.3d at 1533 (noting that multiple defendants filed motions for change of venue due to high publicity in St. Louis). In addition, some degree of media coverage is inherent in any federal capital case. Thus, again, under the government's interpretation of *Darden*, anonymous juries would be constitutional in all capital cases, a rule that would undermine both due process and the heightened reliability required in capital cases.

Finally, publicity alone is insufficient, under *Darden*, to require an anonymous jury. It is only when the jurors might suffer "intimidation or harassment" that jury anonymity is required. There was no suggestion that Mr. Allen had ever threatened jurors, or was connected with any group which might intimidate or harass jurors. Nor was Mr. Allen likely to garner significant public sympathy which might subject jurors to criticism if they convicted him. Thus, this factor has not been met, either.

This case, then, contrasts sharply with Mr. Darden's case, in which the Eighth Circuit found all five factors present:

> In this case, all five of the factors were present. Each of the nine defendants was charged with participating in an extraordinarily violent organized criminal enterprise. The enterprise had many members and associates who remained at large throughout the trial. The enterprise had an extensive history of conflict with the criminal justice system, including the intimidation and murder of government witnesses. Several of the defendants had criminal records including convictions for violent crimes such as armed robbery, rape, and murder. All the defendants faced possible sentences of life in prison. The case was so highly publicized in St.

40

> Louis that some defendants filed motions for a change of venue.
> The District Court thus had ample reason to conclude that the
> jurors in this case needed the protection of anonymity.

*United States v. Darden*, 70 F.3d 1507, 1533 (8th Cir. 1995), emphasis added. Mr. Allen's

trial failed to present circumstances even remotely similar to those present in *Darden.* This was

not a multi-defendant organized crime prosecution. Mr. Allen had never been convicted of a

violent crime; his only criminal conviction was for motor vehicle tampering, for which he was

sentenced to probation.[11] Mr. Allen had no history of conflict with the criminal justice system,

witness intimidation or witness murder. Neither Mr. Allen nor his co-defendant Mr. Holder filed

a motion for change of venue due to pervasive publicity.

This case is also very different from *United States v. Ross*, 33 F.3d 1507, 1521 (11th Cir.

1994), on which the Eighth Circuit relied in *Darden*. *Ross* was another organized crime case in

which the defendant had made a prior attempt to kill a potential witness, among other dangerous

factors:

> First, Appellant, the leader of a **large-scale criminal
> organization**, was actively involved in organized crime. Second,
> that organization had the means to harm jurors and had in fact
> committed prior acts of violence. Third, Appellant had **previously
> attempted to interfere with the judicial process** by ordering the
> death of Singer, a potential witness against Appellant. The
> government had also averred before trial that there had been **three
> separate incidents of violence** directed at the relatives of Raul and
> Roberto Aspuru**, potential government witnesses**. Appellant also
> offered bribes to government witness Bertram Gordon and to the
> officer who arrested Appellant. Finally, Appellant faced the
> possibility of a life sentence and extensive monetary penalties.
> Consequently, the court correctly found strong reason to empanel
> an anonymous jury.

---

[11]Counsel for Mr. Allen are not aware of co-defendant Norris Holder's criminal history, but that is irrelevant because the juries were selected separately for Mr. Allen and Mr. Holder; thus, any factors that might weigh differently in the decision on whether Mr. Holder's jury should be anonymous do not apply to Mr. Allen's jury selection.

As the government conceded, none of the first three factors, involving potential danger to jurors or to other actors in the judicial process, are satisfied in Mr. Allen's case.

Moreover, unlike this case, neither *Darden* nor *Ross* were capital cases. Due to the "range of discretion entrusted to a jury in a capital sentencing hearing, there is a unique opportunity for racial prejudice to operate but remain undetected." Such prejudice can involve the belief "that blacks are violence prone" or an unconscious "fear of blacks." *Turner v. Murray*, 476 U.S. 28, 35 (1986). Particularly given the racial dynamics of this case, the trial court was under an obligation to ensure that those types of hidden prejudice, especially the fear that the defendant is by nature dangerous, are not exacerbated by easily-remedied circumstances of the trial, such as the decision whether to empanel an anonymous jury.

The factors developed for cases where the defendants posed genuine danger to jurors such as *Darden* and *Ross* clearly do not apply in this case. Given the racial implications of this case and the overwhelmingly white jury that was empaneled, trial counsel should have been alerted to the need to prevent prejudice to their client. [12] Counsel should have objected to the anonymous empaneling of the jury. Had they done so, there is a reasonable likelihood of a different result. Appellate counsel should have raised this claim as plain error; failure to do so was likewise ineffective. *Carter v. Bowersox*, 265 F.3d 705, 716-17 (8th Cir. 2001) (finding appellate counsel ineffective for failure to raise meritorious claim, even though the appellate claim would have been reviewed under the plain error standard); *see also Mason v. Hanks*, 97 F.3d 887, 892 (7th Cir. 1996) (appellate counsel constitutionally deficient for failing to raise meritorious claim); *Mayo v. Henderson*, 13 F.3d 528, 533 (2nd Cir. 1994) (same); *Matire v. Wainwright*, 811 F.2d 1430, 1435 (11th Cir. 1987) (same).

---

[12]The fear that the jurors likely felt by the use of numbers instead of names could only have been exacerbated by the Court's offer to have them escorted to their vehicles at the end of the day. *See e.g.* T. XIX 117.

42

Mr. Allen's §2255 counsel filed a motion to interview the jurors regarding, *inter alia*, "whether their anonymity during jury selection had any prejudicial effect on their deliberations." Doc. 46. The Court denied this motion. Doc. 53. The Court reasoned that the request did not fall under Rule 606(b)'s three exceptions for juror testimony, which are: (1) whether extraneous prejudicial information was improperly brought to the jury's attention; (2) whether any outside influence was improperly brought to bear upon any juror; or (3) whether there was a mistake in entering the verdict onto the verdict form. Fed. R. Evid. 606(b). Respectfully, the Court erred, and Mr. Allen hereby repeats his request to conduct juror interviews. As explained above, the message that is conveyed by the impaneling of an anonymous jury is that the defendant is particularly dangerous. *See United States v. Darden*, 70 F.3d 1507, 1532 (8th Cir. 1995). This is extraneous and prejudicial information that should not have been before the jury, especially where, as here, the defendant can show that the anonymity was imposed without proper justification.

### 2.    Appellate counsel ineffectively failed to raise the *Batson* challenge.

Trial counsel preserved objections to the government's peremptory strikes of three African-American venirepersons based on *Batson v. Kentucky,* 476 U.S. 79 (1986). The issue was meritorious, and should have been raised on appeal. Had it been raised on appeal, there is a reasonable probability the appellate court would have found the government's reasons for at least one of the peremptory strikes pretextual. "[U]nder *Batson*, the striking of a single black juror for racial reasons violates the equal protection clause, even though other black jurors are seated, and even when there are valid reasons for the striking of some black jurors." *United States v. Battle*,

43

836 F.2d 1084, 1086 (8th Cir. 1987) (cited with approval for this proposition in *Snyder v. Louisiana*, 128 S. Ct. 1203, 1208 (2008)).

The government used peremptory challenges to strike five of the eight African-American venirepersons[13] on the panel: Nos. 83, 102, 124, 134, 139. T.V-A 119-20. The Court heard argument and ruled that the defense had presented a *prima facie* case of discrimination. *Id*. at 120. The Court asked for the government's reasons for exercising those five strikes. After the government gave its reasons, defense counsel conceded that two of the strikes, Nos. 102 and 124, were legitimately made based on reservations regarding the death penalty. *Id*. at 128. The defense did not waive the objection to the strikes of Nos. 83, 134 and 139.

"It is well-established that peremptory challenges cannot be lawfully exercised against potential jurors of one race unless potential jurors of another race with comparable characteristics are also challenged." *Devose v. Norris*, 53 F.3d 201, 204 (8th Cir. 1995).[14] During voir dire, defense counsel made a convincing argument that the reasons provided by the government for striking Nos. 83, 134, and 139, were mere pretext for racially-motivated strikes, because comparable white venirepersons were not challenged. T.V-A at 128-131. Defense counsel said, with regard to No. 83, that the government's asserted concern included the fact that she worked as a legal secretary; but white venirepersons who worked as a legal assistant and a paralegal were not struck. Another proffered reason for the strike of No. 83, as well as for 134 and 139, was that they had relatives or friends who had been arrested or incarcerated. Defense counsel argued that "there were just any number of individuals who were white who were in the

---

[13]Ultimately, Mr. Allen's jury consisted of ten white jurors and two African-American jurors. The third African-American venireperson who was not struck during voir dire served as an alternate and did not participate in any deliberations.

[14] *See also Miller-El v. Dretke*, 545 U.S. 231, 241 (2005) ("If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step.").

44

same circumstances," and also noted that African-American venirepersons are more likely than whites to have relatives or friends incarcerated. *Id.* at 130-31.

The government's final proffered reason was that Nos. 83 and 139 were among the four people who "raised their hands and said that blacks are treated unfairly in the system." *Id.* at 127, 133. As to No. 83, this reason was false, as the government now apparently concedes.[15] A review of the voir dire transcript shows that the five jurors who responded to that question were Nos. 16, 63, 100, 139, and 195. See T. I 79-82; T.II 103-105; T.IV 3-5. The fact that the government gave a factually incorrect reason for the strike of No. 83 is further indication that the strike was pretextual.

In the *Response*, the government again asserts facially-neutral reasons for each of the strikes. *GR-* 80-81. A comparative analysis of the government's reasons for these strikes with the characteristics of the venirepersons who were not stricken shows that the government's asserted reasons are pretexts for racial discrimination. The government did not strike white venirepersons with similar characteristics to Nos. 83, 134, and 139.

The Response asserted four reasons for striking No. 83: (1) she was sympathetic to psychological reasons and testimony as mitigating evidence against the death penalty; (2) her husband was once charged with narcotics; (3) she was a legal secretary; and (4) she had a problem with partiality in response to one of the questions. *See GR-* 81.

The first reason does not distinguish No. 83 from the accepted jurors. Every venireperson who was not excused for cause had to answer that she or he could consider factors, including psychological evidence, as a reason to impose a sentence less than death. The parties and the Court, in fact, extensively discussed the wording of these questions during voir dire. *See*, *e.g.*, T.III 68-73. An example of this type of question, asked of every venireperson, is:

---

[15] The Government's response reiterates other reasons for the strike of No. 83, but this one is not reasserted. GR-80.

> If the defendant were able to prove to anyone of you by a preponderance of the evidence that amongst the things that -- among other things, he came from a deprived background, was raised in a dysfunctional family, was the victim of racial prejudice, was exposed to drug abuse at an early age, suffered from a **psychological disorder**, could you consider this evidence, among other things, under the Court's instructions as a reason not to impose the death penalty?

T.III 73.

Thus, the fact that No. 83 could consider psychological evidence in mitigation does not distinguish her from the other venirepersons eligible to serve. The law has long required the sentencing jury to be able to consider and give effect to the character, background, and record of the defendant himself. *Lockett v. Ohio*, 438 U.S. 586 (1978); *Eddings v. Oklahoma*, 455 U.S. 104 (1982). This proffered reason for this strike is meaningless and pretextual.

The government may be referring to No. 83's answer on the juror questionnaire to question 22, which asks, "Do you have any prejudice in favor, against, or any fixed opinions concerning psychiatric or psychological testimony?" No. 83 answered yes to this question, and wrote, "I do believe that a person's attitude and actions can be affected by psychological problems." Ex. 41[16] #83, p.4. If this statement is the government's reason for the peremptory strike, it can be shown to be pretextual in two ways, First, the government did not ask No. 83 any questions regarding this issue. The failure to question prospective jurors about matters the prosecutor later says were reasons for a peremptory strike was found to be evidence of pretext in *Miller-El v. Dretke*, 525 U.S. 231, 244 (2005), and *Davidson v. Harris*, 30 F.3d 963, 966 (8th Cir. 1994).

---

[16] Exhibit 41 includes the juror questionnaires referred to in this Traverse. They are reproduced here for the court's convenience. Counsel for Mr. Allen have copies of virtually all of the questionnaires, and will produce them on request if the court desires.

Second, the government did not strike two white venirepersons who also answered "yes" to the question about psychological evidence. Nos. 121 and 169, both white females, answered "yes" and provided written comments on this question. Prospective juror 121 wrote "I have a strong background of work experience in the mental health field." Ex. 41, #121, #169 p. 4.

The fourth reason, that No. 83 had a problem with partiality, is also not supported by the record. A careful review of all of No. 83's testimony reveals nothing close to a response indicating partiality. She stated that her husband, who was on probation for two years, was treated fairly by the criminal justice system, and that she would not be influenced by his situation. T. I - 86-87. She said that any past brushes with criminal activity by others would not affect her opinion of the criminal justice system because all incidents occurred in a "pretty bad part of town." T.I-120-121. She said she is a legal secretary at a brokerage company and spends her free time with her children and grandchildren. T.I-148. She could not say whether she would never vote to impose the death penalty, could not say whether she would always vote to impose it. T. III-A 36-38. She also that she did not hold any personal, moral, religious, philosophical or other beliefs that would substantially impair her ability to return a verdict of death and that she could be impartial and weigh aggravating and mitigating circumstances and could return a life verdict. T. III-A 77-80. She might be able to impose the death penalty in some cases. T. III-A 112-114. Her feelings about the death penalty would not affect her ability "to reach a fair and impartial verdict in the first phase of the case." T.III-A 79.

The government does not specify what "partiality" of No. 83 caused the strike. Actually, No. 83 did give one answer that showed she might have been partial *to the government*. Question 54 reads:

47

> So far as you know at this time, is there anything that would prevent you from being a fair and impartial juror for the trial of this case?

No. 83 answered "Yes" and wrote:

> If there are some young hoodlums that don't care at all about taking a life, yes, I would strongly lean towards guilty.

Ex. 41 #83 p. 14. It seems unlikely that this answer formed the basis for a *government* strike. And if it concerned the government, one would expect that follow-up questions would have been asked, but none were. The failure to ask follow-up questions about matters deemed significant is evidence of pretext. *Miller-El v. Dretke*, 525 U.S. 231, 244 (2005), and *Davidson v. Harris*, 30 F.3d 963, 966 (8th Cir. 1994).

Several of the seated jurors showed more inclination toward partiality that No. 83. No. 21, a white male on the jury, responded to the question: "Do any of you have any commitments that will prevent you from giving your complete and undivided attention to this case for that period of time?" that his salary is based solely on commission which would create "financial hardship" for him. T.I 21. The Judge himself mentioned that "No. 21 cannot afford to lose his salary." T.I 233. No. 83 mentioned no such commitments that would interfere with her impartiality. No. 119, a white female who served as Juror No. 9, was questioned by the court about whether her husband's nephew's arrest for drugs would in any way affect her opinion of the criminal justice system. T.II 107-108. Although No. 119 answered, "No," she later stated: "I figured if he did it he deserved whatever he got." *Id.* Her complete trust in the punishment aspect of the system indicates her partiality.

The government's third reason for the strike of No. 83, and a reason given to explain the strikes of African-American Nos. 134 and 139, was that they had relatives or friends who had

48

been arrested or convicted. This reason is pretextual as to all three venirepersons, as many white

venirepersons, and several white jurors who served, testified to similar experiences.

No. 83 told the Court, "My current husband was on probation for about two years. I think

they found narcotics in his car." T. I 86. No follow-up questions established how recently that

happened or the exact nature or disposition of the charges against her husband. No. 83 testified

that she believed her husband was treated fairly in the criminal justice system, and that she

would be able to decide this case without any influence from that situation. *See* T. I 87. No more

questions were asked on this topic. The failure to ask follow-up questions about matters deemed

significant is evidence of pretext. *Miller-El v. Dretke*, 525 U.S. 231, 244 (2005) (*Miller-El II);*

*Davidson v. Harris*, 30 F.3d 963, 966 (8th Cir. 1994).

No. 134 said she had a nephew who was incarcerated and a brother who was arrested for

assault in Texas. She told the Court she was not biased by those situations and she could be

impartial as to this case:

> THE COURT:                Next, please? Yes, ma'am.
>
> JUROR NUMBER 134:         I have a nephew who is currently
> serving time in the Missouri Correctional Institution for drugs --
> drug possession.
>
> THE COURT:                Okay.
> JUROR NUMBER 134: And a brother who was arrested -- this
> was in Texas -- for assault.
>
> THE COURT:                Okay. Do you have an opinion as to
> whether any of these persons were treated unfairly by the criminal
> justice system, including police, prosecuting attorney, judge,
> defense lawyer, correctional officer, probation or parole office.
>
> JUROR NUMBER 134:         As far as I know, they were treated
> fairly.
>
> THE COURT:                Okay. Have these experiences
> affected your view of the criminal justice system in any way?

> JUROR NUMBER 134: No, they haven't.
>
> THE COURT:                If you're selected, could you try this case based only on the evidence and under the Court's instructions and nothing else?
>
> JUROR NUMBER 134: Yes, sir.
>
> THE COURT:                Thank you. Next, please?

T.II 136-37. The government did not ask any follow up questions regarding No. 134's relatives. As discussed in more detail below, several white venirepersons who were not stricken also had relatives with experience with the criminal justice system

No. 139 testified that her sister had arrests for shoplifting, and that her brother and cousins may have been arrested, but she did not know whether they were convicted and did not specify the charges. Like Nos. 83 and 134, she indicated that these situations did not bias her and she would be impartial:

> THE COURT:                Number 139. Go ahead.
>
> JUROR NUMBER 139:      My brother, cousins, and my sister way back. I don't know how far back you want to go.
>
> THE COURT:                All the way. All the way.
>
> JUROR NUMBER 139: She had a couple -- my sister did a couple of arrests like for shoplifting. One time, her and a girl friend robbed somebody.
>
> THE COURT:                What offense was your brother charged with?
>
> JUROR NUMBER 139:      Badgering an undercover Cop (sic).
>
> THE COURT:                And how about your cousins?
>
> JUROR NUMBER 139:      I am not sure they admitted to it.

50

THE COURT:                    In your opinion, were any of them treated unfairly by the criminal justice system, including the police, the prosecuting attorney, the judge, the defense lawyer, correctional officers, the probation and parole officers?

JUROR NUMBER 139:      Not as far as I can tell.

THE COURT:                    Okay. Have any of these experiences affected your view of the criminal justice system?

JUROR NUMBER 139:      No.

THE COURT:          Okay. Would this in any way affect your ability to be a completely fair and impartial juror in this case?

JUROR NUMBER 139:      No.

THE COURT:                    Thank you.

T. II 113-14.

Later that day, No. 139 remembered that her brother-in-law was in the penitentiary, alerted the Court, and again answered that it did not affect her view of the criminal justice system in any way. T. II 156. The government did not ask any follow up questions regarding No. 139's experience with her relatives in the criminal justice system.

Having a family member or friend who had been arrested and/or convicted of a crime does not distinguish these three venirepersons from those not stricken peremptorily. Fifty venirepersons – including thirty-nine white people – told the Court that a family member or friend had been arrested or convicted,[17] and nine white venirepersons told the Court that they themselves had been arrested or convicted.[18] The government struck eight venirepersons in this

---

[17]All venirepersons identified themselves as white on their questionnaires unless otherwise noted. Nos. 3, 8, 9, 15, 23, 24, 34, 47 (black), 51, 55, 63 (black), 66, 69, 75, 83 (black), 89 (black), 97, 98, 113 (black), 115, 116, 119, 120, 124 (black), 125, 126, 130, 132, 133 (black), 134 (black), 139 (black), 140, 144 (black), 145 (black), 146, 151, 155, 157, 159, 170, 171, 177, 182, 184, 186.

[18]Nos. 13, 30, 37, 77, 91, 122, 138, 166, 177.

51

category.[19] Of those eight strikes, four were against African-American Nos: 83, 124, 134, and 139. Seven venirepersons in this category served as jurors,[20] and one served as an alternate.[21]

Even if the only venirepersons used for a comparison to the government's strikes of Nos. 83, 134, and 139 are the five white jurors or alternates who had relatives involved in the criminal justice system, the validity of this reason for the peremptory strikes is called into question. The answers those venirepersons gave during voir dire are not substantially different than Nos. 83, 134, and 139; the only difference is that the jurors who served had relatives who were convicted of **more serious** crimes than the African-American venirepersons who were struck. In fact, one white juror told the Court during voir dire that she considered that a friend was treated unfairly in the system, an assertion that none of the struck African-American venirepersons made. Specifically, white jurors testified as follows:

| | |
|---|---|
| 23[22] | His brother-in-law in Kentucky was convicted of a DUI ten years ago. T. I 93-94. |
| 98 | An acquaintance was convicted of several DWIs about 12 years ago. T. I 102-03. |
| 119 | Her husband's nephew was convicted of **drugs** and served time in prison, but is now out. T. II 107-08. |
| 130 | Her husband was arrested and charged with **controlled substance possession** about twelve years ago, and served probation. She knew one person who had been convicted for **drug possession** and served prison time, and she considered he had been **unfairly treated** in the system. T. II 140-42. |
| 132 | His stepson was presently serving time in state prison in Missouri for **manslaughter or second-degree murder**. T. II 138-39. |

---

[19]Nos. 24, 55, 83 (black), 91, 122, 124 (black), 125, 134 (black), 139 (black).
[20]Nos. 23, 98, 113 (black), 130, 132, 133 (black).
[21]No. 144 (black).
[22]References are to juror numbers.

As the chart above shows, one white juror had a close relative serving time for **murder**, while the most serious crime reported by the African-American struck venirepersons was a brother arrested for an assault (No. 134). Two of the white jurors had relatives or friends with drug or substance abuse convictions: No. 119 (nephew), and No. 130 (husband and friend). No. 130's husband served probation for his charge, but the others, including No. 130's friend, were incarcerated for their drug charges, indicating the charges were probably more serious than the charges against No. 83's husband, who merely served probation. None of the testimony indicates that those who served time were convicted of greater or lesser charges than No. 134's nephew; in fact there is no distinction in the transcripts between his conviction and the other drug convictions that resulted in prison time.

The failure to strike similarly-situated non-minority jurors is widely recognized as an important consideration in determining whether an explanation for a strike is pretextual. In *Davidson v. Harris*, 30 F.3d 963, 966 (8th Cir. 1994), the Eighth Circuit Court of Appeals rejected the explanation that the defense attorney struck an African-American because she had young children: "Because the defendants did not apply their theory for striking Jones consistently to strike white venirepersons with characteristics identical to Jones, the defendants' explanation for striking Jones is pretextual." The Eighth Circuit also rejected a prosecutor's explanation that an African-American prospective juror had unacceptable views on the death penalty because a similarly situated white juror was not stricken. *Ford v. Norris*, 67 F.3d 162, 169 (8th Cir. 1995).

Cases from other circuits reinforce the importance of this factor. In *Riley v. Taylor*, 277 F.3d 261, 280 (3rd Cir. 2001), the court rejected a strike of an African-American on the basis that she had a work conflict because a similarly situated white juror had not been stricken. In *Kesser*

53

*v. Cambra*, 465 F.3d 351, 362 (9th Cir. 2006), the court rejected as pretextual a prosecutor's statement that he struck a Native American because of the juror's work obligations. The court noted, "Devoid of context, his proffered explanation for his peremptory challenge is at least plausible." But the court recognized that under *Batson v. Kentucky*, 476 U.S. 79 (1986), it could not stop there. It went on, "But the prosecutor's explanation, read in the context of a 'side-by-side comparison' with the background and responses of the jurors who were seated, reveals the prosecutor's purposeful and plainly racial motives. . . ." *Kesser v. Cambra*, 465 F.3d 351, 361-362 (9th Cir. 2006), citing *Miller-El v. Dretke (Miller-El II)*, 525 U.S. 231, 241 (2005).

*Kesser* rested on the earlier Ninth Circuit precedent of *Turner v. Marshall*, 121 F.3d 1248, 1251-1252 (9th Cir. 1997), which cited an Eighth Circuit case:

> A comparative analysis of jurors struck and those remaining is a well-established tool for exploring the possibility that facially race-neutral reasons are a pretext for discrimination. Peremptory challenges "cannot be lawfully exercised against potential jurors of one race unless potential jurors of another race with comparable characteristics are also challenged." *Doss v. Frontenac*, 14 F.3d 1313, 1316-17 (8th Cir.1994).

See also *McClain v. Prunty*, 217 F.3d 1209, 1220 (9th Cir. 2000).

The government's assertion of the loved ones' arrests and convictions as reason for the peremptory strikes of 83, 134 and 139 simply falls apart upon comparison with white jurors. This reason was clearly pretextual.

The government's third asserted reason for striking No. 83 was her work as a legal secretary. She testified in response to the government's voir dire that her work was in a brokerage firm; her work as a legal secretary would not affect her ability to be fair and impartial; she had no training in the area of criminal law; she did not do criminal work day-to-day at the law firm; and she would be able to follow the court's instructions of the law. T. III-A 78-79.

54

Juror No. 70, a white female who served as Juror No. 5, worked as a part-time paralegal. T. II 212-15.

The government failed to distinguish this juror's work in the legal field from No. 83's work in the legal field, and thus this reason was also pretextual. The government's questioning of No. 70 about her work and her answers, were almost identical to the questions and answers by No. 83. *See* T.III-a 60 (answering that her employer does not do criminal law work; she has no specific legal training in criminal law; and that she would be able to base her verdict on the evidence in this case and the court's instructions). Because there is no substantive difference between No. 83's answers to the questions about her work as a legal secretary, and the answers of white juror No. 70, this proffered race-neutral reason for the strike of 83 must fail.

The government further explained its strike of No. 134 based on "her response on the questionnaire indicating that she was generally opposed to the death penalty, but believed she could set aside her feelings." *GR*- 81. This is apparently a reference to question 42 on the juror questionnaire, which presents ten multiple-choice options for venirepersons to describe their beliefs about the death penalty. No. 134 marked letter E on question 42, which indicates "I am generally opposed to the death penalty, but I believe I can put aside my feelings against the death penalty and impose the death penalty if it is called for by the facts and the law in this case." Ex. 41, #134 p.11.

When questioned by the government regarding the death penalty, No. 134 testified: She had no personal, moral, religious, ethical or philosophical beliefs against the death penalty that would prevent or substantially impair her ability to return a death verdict; her feelings about the death penalty would not affect her ability to be fair during the guilt phase; she would always follow the Court's instructions; she would weigh the mitigating evidence against the aggravating

55

evidence before returning a verdict; and she could vote for a verdict of death if she found that the aggravating factors outweighed the mitigating factors. T.V 41-43. All of these answers are perfectly appropriate for a juror who serves in a capital case and provide no particular reason to strike this venireperson. In addition, No. 149, a white venireperson, also answered E to question 42, and gave similar answers as 134 during voir dire. T. V-A 24-28; Ex. 41#149, p.11. No. 149 was selected as an alternate juror. Thus, this reason for the peremptory strike of No. 134 is also pretextual. In addition, white alternate juror No. 165. answered "E" to question 42 on the questionnaire. T. V-A 24-28; Ex. 41 #149, p. 11, #165 p. 11. Thus, this reason for the peremptory strike of No. 134 is also pretextual.

The government asserted three reasons for striking No. 139: (1) she watched television reports about the incident after being instructed not to; (2) she had a cousin in the penitentiary, a brother arrested for drug possession and a sister charged with shoplifting; (3) "she expressed resentment toward the system" (apparently a reference to the voir dire question regarding whether African-Americans are treated fairly in the criminal justice system). *GR*-81. The second reason has been discussed above. The other two reasons for this strike are also pretextual.

Many venirepersons – over fifty in total – testified that they read, watched, or heard media coverage about the crime before they were called as jurors. T.I 26-53; T.II 24-63. The government asserted at trial that No. 139 was the only person who told the Court she viewed media coverage in error after her first day of jury selection. The Court examined her, and she explained that what she had heard on television was that there was a jury selection in the case, and she didn't realize it was the same case she had been summoned on until they said that. She also testified that despite what she heard, she could set it aside and decide the case based solely on the evidence and the Court's instructions. Neither the Court nor counsel asked further

questions. *See* T. II 27-29. White jurors Nos. 70, 98, 132 and alternate juror 162 all testified that they had heard or read some news coverage about the offense. In answer to the Court's questions, all four of them answered that they had not formed any opinion as to the defendant's guilt or innocence, and they would be able to decide the case based on the evidence and the Court's instructions. *See* T.I 49 (No. 70); T.I 51-52 (No. 98); T.II 37 (No. 162); T. II 46-47. The government did not ask any follow-up questions of these venirepersons. The brief television coverage seen by No. 39 was no more significant to the case than the news reports heard by the four white jurors who served on the jury.

As the government points out in its *Response* regarding Ground E (*GR-* 86-87), the defense must meet a heavy burden to show that a juror is actually prejudiced by news accounts. "[A]lthough [the government] has established that a juror read some of the news accounts, 'it is not required that jurors be totally ignorant of the facts and issues involved.'" *Frank v. Brookhart*, 877 F.2d 671, 675 (8th Cir. 1989) (citing *Irvin v. Dowd*, 366 U.S. 717, 722 (1963)) (affirming District Court's denial of habeas relief where jurors were exposed to mid-trial publicity where the information in the news accounts was already exposed to the jurors and the news reports were not inflammatory). A similar burden should apply here where there is a *prima facie* case of discrimination. As in *Frank*, the information in the news account accidentally heard by No. 139 was information she already knew – jury selection had begun – and it was not inflammatory. The government's assertion of news coverage as the reason for this peremptory strike is pretextual.

The government's final reason for the peremptory strike of No. 139 is clearly pretextual. The government argued that her affirmative answer to the Court's question whether she believed that African-American males are treated unfairly by the criminal justice system was a racially-neutral reason for the strike. First of all, this question is not race-neutral and thus is not a valid

reason for a peremptory strike. Of the five venirepersons who answered affirmatively to this question, *see* T.I 79-82; T.II 103-105, four were African Americans (Nos. 16, 63, 139 and 139); No. 195 was a white male. Clearly this question has a disparate effect on African-American venirepersons and thus does not provide a valid reason to defeat a defendant's *prima facie* case of racially-discriminatory peremptory strikes. Second, No. 134 testified that her opinion would not affect her ability to be a completely fair and impartial juror in this case. T.II 104-05. Third, the government did not question No. 134 about this statement, and therefore it is suspect as a ground for a peremptory challenge.

Although the trial court found that the reasons for the strikes were not "generally or merely pretext for purposeful discrimination," T. V 137, this record clearly presents a strong issue for appeal. There is a reasonable probability that, had this issue been raised on appeal, the Eighth Circuit would have found a *Batson* violation and vacated Mr. Allen's conviction and sentence. Appellate counsel failed to identify and litigate this entirely record-based issue, and that failure was ineffective.

Where, as here, there is a "reasonable probability that the neglected claim[s] would have succeeded on appeal,. . . counsel's failure to raise the claim f[alls] outside the range of reasonably competent assistance." *Claudio v. Scully*, 982 F.2d 798, 799 (2nd Cir. 1992); *Jackson v. Leonardo*, 162 F.3d. 81, 85 (2nd Cir. 1998) (appellate counsel's failure to raise "sure winner" constituted ineffective assistance: "In the instant case, we believe that appellate counsel's failure to raise a well-established, straightforward, and obvious . . . [ground for relief] . . . constitutes ineffective performance."); *Starr v. Lockhart*, 23 F.3d 1280 (8th Cir. 1993) (finding trial and appellate counsel ineffective for failing to object to and raise an erroneous jury instruction*)*; *Freeman v. Lane*, 962 F.2d 1252 (7th Cir. 1992) (appellate counsel ineffective for failing to raise

58

a meritorious claim that was "presented squarely" at trial regarding a violation of the defendant's

Fifth Amendment rights); *Murphy v. Puckett*, 893 F.2d 94 (5th Cir. 1990) (counsel's failure to

raise valid defense at trial and on direct appeal constituted ineffective assistance); *Orazio v.*

*Dugger*, 876 F.2d 1508, 1513 (11th Cir. 1989) (appellate counsel's failure to raise claim on direct

appeal found to violate defendant's right to effective assistance of counsel); *Matire v.*

*Wainwright*, 811 F.2d 1430, 1435 (11th Cir. 1987) (where the basis for a claim "was obvious on

the record, and must have leaped out upon even a casual reading of transcript," and the law on

the subject was "known at the time," appellate counsel was ineffective for failing to raise it).

**E.     Mr. Allen was denied effective assistance of counsel when the jurors possibly learned that the Lindell Bank had been robbed again.**

On February 24, 1998, during the first phase of the trial, trial counsel informed the Court

that the Lindell Bank had been robbed again.  He requested that the Court inquire individually of

the jurors whether they had heard of this event and what, if any, impact it had on them.  The

jurors in this case were not sequestered during trial, so although they had been admonished to

avoid news reports concerning the trial, it is possible that they were exposed to this event.  The

Court denied the request to examine the jurors.  T. X 126-27.  Trial counsel sought no further

relief during trial.  The entire proceeding on this issue is reproduced below for the convenience

of the Court.

> MR. SINDEL: Yes, Your Honor. I simply drew the Court's attention to the fact that yesterday I was advised by Mr. Landolt that the Lindell Bank & Trust had been robbed again. I had some concerns about whether or not the jury may have read about that particular case and whether or not they somehow impact or affect their deliberations in this particular case. It would be my request that the Court question the jurors individually to see whether or not some of them may have inadvertently read something about that particular case while still following the Court's instructions that

> they are not to read about this case. That is, they are two separate instances.
>
> MR. LANDOLT: Our position at that point, to make an inquiry of that sort with the jurors may have the effect of highlighting to them perhaps someone has done something improper. The admonition the Court gave the jurors at the beginning of the voir dire process as well as it continues to give the jurors at each break I think covers the issue, and I believe if any of the jurors had heard anything about it, they appear to be a conscientious crew and would have brought it to the Court's attention.
>
> THE COURT: My inclination at this time is to say nothing about the incidents. For the record, yesterday -- and this is according to what I hear on the radio I heard on the radio that yesterday at curiously at 10:30 someone went into the Lindell Bank & Trust, the same building that's the source of this case, money was taken, it is my belief it was a single, who then exited. There was a chase on Highway 40, person was apprehended near Union Station after high speed chase, money was recovered. Has anyone heard anything differently than those facts? Okay. My inclination at this time is to not bring that matter to the jury's attention. Court's in recess.

The issue was not raised again during trial.  Nor was it raised in Mr. Allen's motion for new trial or on appeal.

### 1.      Procedural defense raised by the government

In response to Mr. Allen's contention that he was denied effective assistance of counsel, the government first notes that any "substantive" contention that Mr. Allen was prejudiced is "procedurally barred." Of course, as discussed earlier in this Traverse, Mr. Allen's ground for relief here is ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). The issue of ineffective assistance of counsel is not properly raised on direct appeal.[23] To apply the *Strickland* standard, this Court must make a determination as to the merits of Mr. Allen's contention that he was denied an impartial jury and due process of law by trial

---

[23] For authorities concerning the propriety of raising ineffective assistance of counsel issues for the first time in §2255 proceedings, the Court is referred to p. 12, above.

counsel's failure to discover whether the jurors were aware of—and prejudiced by—this occurrence.

### 2.      Need for discovery on this issue

This Court has previously denied Mr. Allen's motion to interview the jurors in this matter, citing Federal Rule of Evidence 606(b). Doc. 53. That rule applies only when there is an inquiry into "the validity of a verdict or indictment." The issue here, ineffective assistance of counsel, is different. If Mr. Allen is found to have been denied effective assistance of counsel, the jury's verdict will still be valid. Moreover, Rule 606(b) further provides that "a juror may testify about (1) whether extraneous prejudicial information was improperly brought to the jury's attention." That is precisely the issue as to which current counsel sought to interview the jurors.

In jury misconduct cases, in order to obtain juror testimony at a hearing, the party asserting jury misconduct must produce evidence, not speculation, suggesting that extraneous information was received and considered. During Mr. Allen's trial, there was no way counsel could satisfy that standard without questioning the jurors or having the Court do so. Similarly, in order to develop the issue for a hearing in this collateral proceeding, Mr. Allen must present evidence to the Court. *See Dunne v. Libbra*, 448 F.3d 1024, 1029 (8th Cir. 2006) (Evidentiary hearing properly denied where no specific request was made to question jurors about extraneous influence). Mr. Allen is entitled to interview the jurors, and will therefore renew his request to do so in the discovery motion he will soon file with the Court. *See §2255 Rules*, Rule 6(a).

### 3.    Jury misconduct

Jurors must decide cases based on what they see and hear in the courtroom, not on "extrinsic or extraneous influences."

> Extrinsic or extraneous influences include publicity received and discussed in the jury room, matters considered by the jury but not admitted into evidence, and communications or other contact between jurors and outside persons. Extrinsic or extraneous influences may be grounds for impeaching a verdict.

*United States v. Bassler*, 651 F.2d 600, 602 (8th Cir.1981). Information concerning the second robbery of the Lindell Bank is a clear example of "publicity received and discussed in the jury room" as well as "matters considered by the jury but not admitted into evidence."

In jury misconduct cases, where jurors receive outside information, an evidentiary hearing, or at least an inquiry to the jurors, is ordinarily required to determine whether jury misconduct occurred and whether it was prejudicial to the defendant. *See, e.g.*, *United States v. Swinton*, 75 F.3d 375, 381 (8th Cir. 1996) (Receipt of information by jurors concerning other crimes committed by defendant was improper extraneous influence warranting evidentiary hearing); *United States v. Blumeyer*, 62 F.3d 1013, 1015 (8th Cir.1995) (district court interviewed jurors after allegation that foreman had discussed legal issues without outside lawyer); *United States v. Cheyenne*, 855 F.2d 566, 567 (8th Cir.1988) (evidentiary hearing conducted concerning jurors' use of a dictionary during deliberations); *United States v. Martin*, 740 F.2d 1352, 1357 (6th Cir.1984) (remanded for evidentiary hearing to determine whether jurors overheard judge's comments during bench conference relating to defendant's guilt). In *United States v. Hall*, 85 F.3d 367, 372 (8th Cir. 1996), the court of appeals found the district judge abused his discretion in granting a new trial based only on affidavits of jurors without conducting a hearing.

**4.     Ineffective assistance of Counsel**

The duties of constitutionally effective counsel under *Strickland*, 466 U.S. at 687-88,

include the requirement that counsel raise and litigate all legal issues that affect the verdict. This

responsibility is particularly acute in capital cases. The 2003 ABA Guidelines, 31 Hofstra L.

Rev. at 1028, provide:

> **GUIDELINE  10.8 – THE DUTY TO ASSERT LEGAL CLAIMS**
>
> A.     Counsel at every stage of the case, exercising professional judgment in accordance with these Guidelines, should:
>
> > 1.     consider all legal claims potentially available; and
> >
> > 2.     thoroughly investigate the basis for each potential claim before reaching a conclusion as to whether it should be asserted; and
> >
> > 3.     evaluate each potential claim in light of:
> >
> > > a.     the unique characteristics of death penalty law and practice; and
> > >
> > > b.     the near certainty that all available avenues of post-conviction relief will be pursued in the event of conviction and imposition of a death sentence; and
> > >
> > > c.     the importance of protecting the client's rights against later contentions by the government that the claim has been waived, defaulted, not exhausted, or otherwise forfeited; and
> > >
> > > d.     any other professionally appropriate costs and benefits to the assertion of the claim.
>
> B.     Counsel who decide to assert a particular legal claim should:
>
> > 1.     present the claim as forcefully as possible, tailoring the presentation to the particular facts and circumstances in the client's case and the applicable law in the particular jurisdiction; and

2.      ensure that a full record is made of all legal proceedings in connection with the claim.

Here, after the Court indicated that it was inclined not to question the jurors, trial counsel sought no further relief. Nor did they make any attempt to contact or question the jurors about this issue. In this regard, the case of *Von Kahl v. United States*, 242 F.3d 783 (8th Cir. 2001), is instructive. Mr. Von Kahl asserted that his trial counsel was ineffective for failing to appeal the district court's ruling the no jury misconduct had occurred. The jury misconduct at issue was improper contact between a deputy marshal who was also a trial witness and the jurors. Holding that there was no denial of the right to effective counsel, the Court observed,

> What we know about the district court's handling of the issue is that the parties were given an opportunity to be heard on the alleged contact, that the district court apparently heard testimony from [the deputy marshal], and that it resolved the issue in the government's favor. . . . On this record, we find it impossible to conclude that trial counsel's failure to appeal the issue was an unprofessional error. . . .

*Von Kahl v. United States*, 242 F.3d 783, 792 (8th Cir. 2001).  The Court's cursory handling of the issue here is in stark contrast to that found sufficient in *Von Kahl.* The Court here gave only a minimal opportunity to counsel to be heard, and they did not pursue the matter further. Specifically, they did not raise the issue in the motion for new trial or on appeal.

Failure to make and preserve legal arguments has been found to be ineffective assistance of counsel on a regular basis. For example, in *United States v. Weathers*, 493 F.3d 229 (D.C. Cir. 2007), counsel was found ineffective for failing to file a challenge to the indictment. In *Joshua v. Dewitt*, 341 F.3d 430 (6th Cir. 2003), counsel was held ineffective for failing to file a meritorious motion to suppress evidence obtained as the result of an improper detention. *See also Hernandez v. Cowan*, 200 F.3d 995 (7th Cir. 2000) (Counsel ineffective for failing to file severance motion).

For the foregoing reasons, Mr. Allen is entitled to discovery and an evidentiary hearing on this ground. After full factual development, he will be found to be entitled to a new trial.

**F.     Mr. Allen was denied effective assistance of trial counsel when trial counsel failed to object to his being tried for two versions of the same offense as a violation of the Double Jeopardy Clause.**

Trial counsel was constitutionally deficient for failing to object where the jury imposed a death sentence after imposing a life imprisonment sentence for the same crime. *M*-26. In failing to object, trial counsel facilitated an unconstitutional death sentence and ensured that appellate litigation of the error would be subject to the more onerous plain error standard, thus undermining an otherwise meritorious claim. In its *Response* to this ground, the government fails to rebut – or even to acknowledge – that the Eighth Circuit's prior consideration of this claim was restricted to plain error review. *GR*- 90. The government likewise fails to rebut that, under the *Strickland* standard applicable here, this claim requires reversal of Mr. Allen's death sentence.

### 1. The Double Jeopardy Violation.

In *Bullington v. Missouri*, 451 U.S. 430 (1981), the Supreme Court held that the Double Jeopardy Clause of U.S. Const. Amend. V applies to a capital jury's sentencing decision with the same force and effect that it applies to a jury verdict at trial. As the Court later explained, "[t]he analogy drawn [in *Bullington*] was between a death sentence and a verdict of guilty, a life sentence and a verdict of innocent." *Poland v. Arizona*, 476 U.S. 147, 153 n.3 (1986). At both the guilt trial and capital sentencing proceeding, double jeopardy restricts the government to "one fair opportunity to offer whatever proof it can assemble... and accord[s] absolute finality to a jury's verdict." *Bullington*, 451 U.S. at 442 (quoting *Burks v. United States*, 437 U.S. 1, 15-16

65

(1978)). Thus, since more than 15 years before Mr. Allen's trial, a capital sentencing jury's decision to impose a life sentence has been "treated as an 'acquittal' of the death penalty under the Double Jeopardy Clause" and creates an absolute bar to a subsequent sentence of death for the same offense. *Poland*, 476 U.S. at 153 (discussing *Bullington*); *see also Arizona v. Rumsey*, 467 U.S. 203, 212 (1984) ("holding that "[petitioner's] initial sentence of life imprisonment constitutes an acquittal of the death penalty, and the [government] cannot now sentence [him] to death").[24]

Mr. Allen was convicted of two separate murder counts for committing a single homicide during a single bank robbery. During the penalty phase, the government presented witnesses and evidence in aggravation to support the same statutory and the non-statutory aggravating factors for each count. The defense presented witnesses and evidence to support the same statutory and non-statutory mitigating factors for each count. Neither the government nor the defense presented any evidence or made any argument differentiating the appropriate penalty for the two counts.

After its deliberations, the jury unanimously decided not to impose a sentence of death and instead to impose a sentence of life imprisonment for Count 1. T. XIX 129-30. As to Count 2, the jury decided to impose a sentence of death. *Id.* at 138. For both counts, the jury unanimously found "that the government has established beyond a reasonable doubt that Billie Jerome Allen intentionally inflicted serious bodily injury which resulted in the death of Richard Heflin." *Id.* at 122, 131, and the same statutory and non-statutory aggravating factors. *Id.* at 122-23, 131-32. For both counts, the exact same number of jurors voted for each statutory, non-

---

[24] Although Mr. Allen here discusses only the Supreme Court law available to defense counsel at trial, *Bullington* and its progeny remain vital and have been repeatedly reaffirmed by the Supreme Court. *E.g., Sattazahn v. Pennsylvania*, 537 U.S. 101, 109 (2003) ("We made clear [in *Bullington*] that an 'acquittal' at a trial-like sentencing phase... give[s] rise to double-jeopardy protections.").

66

statutory, and additional mitigating factor. *Id.* at 123-30, 132-38. Only when confronted with the final determination did the jury's decisions diverge. There, the jury was required to decide, "[b]ased upon consideration of whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist," what sentence to impose or recommend. Ex. 3 at 14-16; Ex. 4 at 14-17. At that point, despite finding the exact same aggravating and mitigating circumstances for each count, the jury reached a verdict of life imprisonment for Count 1 and then a verdict of death for Count 2. *Id.*

The jury's imposition of a life sentence on Count 1 was an acquittal of the death penalty for the murder of Mr. Heflin and thus precluded imposition of a death sentence for the same murder in Count 2. This is so for at least three reasons. First, under the test set forth in *Blockburger v. United States*, 284 U.S. 299 (1932), each of the counts of which Mr. Allen was convicted does not require proof of any facts that the other does not. *See Allen I*, 247 F.3d at 768 n.10.[25] The two counts thus cover the same offense, and the Double Jeopardy Clause does not permit Mr. Allen to "be subject for the same offense to be twice put in jeopardy of [his] life." U.S. Const. amend V. Under *Bullington v. Missouri*, 451 U.S. 430 (1981), "absolute finality" is accorded to the jury's life verdict on Count 1 and bars a death verdict for the same offense in Count 2.

Second, under the Eighth Amendment, capital punishment is reserved for homicide and is unconstitutional for other crimes. *See Enmund v. Florida*, 458 U.S. 782, 797 (1982) (discussing *Coker v. Georgia*, 433 U.S. 584 (1977), and *Gregg v. Georgia*, 428 U.S. 153 (1976)).[26] It follows that different elements in varying murder statutes cannot independently justify a death

---

[25] The import of the Eighth Circuit's double jeopardy analysis in *Allen I* is discussed below.

[26] *See also Kennedy v. Louisiana*, 128 S.Ct. 2641, 2659 (2008) ("The death penalty should not be expanded to instances where the victim's life was not taken").

sentence for a single homicide; only the underlying homicide itself justifies a death sentence. One homicide may give rise to only one death sentence, regardless of the *Blockburger* analysis.

Finally, *Bullington* and its progeny stand for the proposition that the Eighth Amendment's requirement of heightened reliability in capital cases precludes the type of double exposure to the death penalty that Mr. Allen faced in this case. *See Strickland v. Washington*, 466 U.S. 668, 686-687 (1984), (citing *Bullington* for the proposition that capital sentencing proceedings require heightened procedural protections); *see also Monge v. California*, 524 U.S. 721, 733 (1998) ("we have cited *Bullington* as an example of the heightened procedural protections accorded capital defendants."). Reviewing for plain error on direct appeal, the Eighth Circuit did not reach the heightened reliability issue but opined that the jury's disparate verdicts were not due to Mr. Allen's double exposure to the death penalty but instead "most likely" derived from the jury's analysis of Mr. Allen's relative culpability for each count. *Allen I*, 247 F.3d at 769-70. The significance of the Eighth Circuit's plain error analysis, particularly in light of Petitioner's lesser burden of *Strickland* prejudice here, is discussed below.

For these reasons, Mr. Allen's death sentence for Count 2 was imposed in violation of the Double Jeopardy Clause and the Eighth Amendment.

### 2. Ineffective Assistance of Trial Counsel

At the time of Mr. Allen's trial in 1998, longstanding, extensive, and still-vital Supreme Court jurisprudence prohibited the government from having two opportunities to obtain a death sentence against a defendant for a single homicide. The Fifth Amendment provides that no person shall "be subject for the same offense to be twice put in jeopardy of life." That is

precisely what happened to Mr. Allen, but his trial counsel failed to object at any time. That failure violated Mr. Allen's Sixth Amendment right to effective assistance of counsel by enabling a death sentence to be imposed by the jury and by ensuring that appellate litigation of this claim would be subject to the onerous plain error standard.

It is well established that counsel's failure to raise a timely objection to a constitutional violation at trial may constitute ineffective assistance. *E.g., Reagan v. Norris*, 365 F.3d 616, 622 (8th Cir. 2004) (finding trial counsel's failure to object to jury instructions constitutionally deficient); *Manning v. Bowersox*, 310 F.3d 571, 576-77 (8th Cir. 2002) (finding trial counsel's failure to object to admission of evidence constitutionally deficient); *Burns v. Gammon*, 260 F.3d 892, 896-97 (8th Cir. 2001) (counsel deficient for failure to object to prosecutor's closing argument). As in *Reagan, Manning*, and *Burns*, the two prongs of the *Strickland* analysis are easily met here.

Counsel's performance was deficient. *See* 2003 ABA Guidelines, Guideline 10.8.[27] Even under the 1989 version of the ABA Guidelines which had been published at the time of Mr. Allen's trial, counsel was required to understand "that the sentencing phase of a death penalty trial is constitutionally different from sentencing proceedings in other criminal cases." ABA Guideline 11.8.1.[28] Nowhere is that constitutional difference more apparent than in double jeopardy law. Indeed, in *Strickland v. Washington*, 466 U.S. 668, 686-687 (1984), itself, the Supreme Court cited *Bullington v. Missouri*, 451 U.S. 430 (1981), for the principle that capital sentencing proceedings require special constitutional considerations. The 2003 ABA Guidelines

---

[27] The Guideline is set out in full at p. 63 above.

[28] *Bullington* is the first case cited in the ABA's Commentary to this Guideline.

further require counsel to "present the claim as forcefully as possible, tailoring the presentation to the particular facts and circumstances in the client's case and the applicable law in the particular jurisdiction." 2003 ABA Guidelines, Guideline 10.8.B.1. Counsel did not meet this duty here, and counsel had no conceivable strategic or tactical reason for failing to object and preserve for review the double jeopardy claim. *See Burns v. Gammon*, 260 F.3d 892, 897 (8th Cir. 2001) ("No sound trial strategy could include failing to make a constitutional objection. . . ."). Counsel was deficient.

Counsel's deficient performance was prejudicial. As in *Burns*, counsel's failure to object here precluded relief at trial and "started a chain reaction of burdensome review" by the appellate courts. *Id.* As in *Burns*, the "burdensome review" here was that of plain error. *Id.* Obviously, "[p]lain error review is much more onerous for both the direct appeal defendant and the habeas corpus petitioner than is review for a defendant or petitioner pursuing a properly preserved [claim]." *Id.* at 898 (citing *Roe v. Delo*, 160 F.3d 416, 419 (8th Cir.1998)). As the Eighth Circuit concluded in *Burns*:

> Counsel's performance thus prejudiced [petitioner] at trial, on direct appeal, and on collateral review. But for counsel's unprofessional errors, the result of either the trial or the later appeals would likely have been different, and [petitioner] can therefore establish that counsel's deficient performance prejudiced his defense.

*Burns v. Gammon*, 260 F.3d 892, 897 (8th Cir. 2001) (citing *Pryor v. Norris*, 103 F.3d 710, 713 (8th Cir.1997)). Given the deferential standard of review applied by the Eighth Circuit on Mr. Allen's direct appeal, had trial counsel properly raised the double jeopardy issue at trial, there is a reasonable probability that Mr. Allen would not be under sentence of death. *See*

*Murphy v. Puckett*, 893 F.2d 94, 96 (5th Cir. 1990) (Finding that the outcome of the trial was vitally affected by counsel's dereliction in failing to raise a double jeopardy error.)

This conclusion is particularly apparent when considering the Eighth Circuit's finding that Mr. Allen's double exposure to the death penalty "did not unduly emphasize the death sentence option over life in prison." *United States v. Allen*, 247 F.3d 741, 770 (8th Cir. 2005). The Eighth Circuit based this finding on its view that the "more plausible" and "most likely" explanation for the disparate verdicts was that the jury found Mr. Allen more culpable for Count 2 than for Count 1. *Id.* Under plain error review, this finding was sufficient to affirm the death sentence, because plain error requires the appellant to prove that the error "*had a decisive effect on the outcome of the trial.*" *Burns v. Gammon*, 260 F.3d 892, 897 (8th Cir. 2001) (internal quotation omitted). Under *Strickland*, on the other hand, a petitioner must show only a reasonable probability of a different outcome – a standard that does not require him to demonstrate the "more plausible" or "most likely" outcome.[29] *Strickland v. Washington*, 466 U.S. 668, 694 (1984)466 U.S.: "The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome."

---

[29]There is at least a reasonable probability that the jury reached split verdicts simply because its decision was a close and contested one. In other words, Mr. Allen's double exposure to the death penalty permitted the jury to avoid making the more difficult decision of having to choose only one verdict, one time. A review of the verdict forms suggests additional possibilities. For example, both verdict forms refer to each juror's "recommendation regarding a sentence." Ex. 3 at 17; Ex. 4 at 18. It is quite possible that one or more jurors interpreted this language to mean that he or she was making only a "recommendation," and thus could be comfortable "recommending" that the Court impose either a life sentence or a death sentence, but not a term of years. Additionally, in the only place where the verdict forms differ – in reciting the applicable code sections for each crime – the first count refers *only* to the possibility that defendant would be "punished by death or life imprisonment," whereas the second count introduced the possibility of "imprisonment for any terms of years." Ex. 3 at 5; Ex. 4 at 6; *see also* T. XIX 39 (instructing the jury that, in the absence of a death verdict, the sentence "will be life imprisonment under Count I or life imprisonment or a term of years under Count II"). It is quite possible that, fearing the possibility of a finite prison term on Count 2, the jury voted for death to ensure that would not happen.

Further, the Eighth Circuit's prejudice analysis is thrown into question by §2255 counsel's investigation. As discussed below in connection with Ground I, it is not at all clear that Mr. Allen was in fact the one who shot Mr. Heflin, and thus any jury finding that Mr. Allen was primarily responsible for shooting Mr. Heflin may well have been misplaced. In addition, although this Court previously denied counsel's request to interview the jurors in this case, such interviews could cast the jury's disparate verdicts in a different light than that perceived by the Eighth Circuit.[30]

As the foregoing discussion makes clear, if trial counsel had fulfilled their duty to object and preserve the double jeopardy error at trial, there is a reasonable probability that Mr. Allen would not have received a death sentence at trial and would have been granted relief on appeal.

### 3.    Procedural defenses have been waived

The Government's Response does not specifically assert that this ground for relief is procedurally barred. *See GR-* 90. The government's general introductory assertions that some unspecified claims may be procedurally barred do not properly raise this defense. *See GR-* 37-39. Therefore, any procedural defense has been waived, and the Court should consider the merits of the claim. *See Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("procedural default defenses [can] be waived based on the [government's] litigation conduct"); *Gray v. Netherland*, 518 U.S. 152, 166 (1996) (explaining that, where a claim "was addressed at some stage of federal proceedings, the [government] would have been obligated to raise procedural default as a defense, or lose the right to assert the defense thereafter").

---

[30]Counsel will soon file a discovery motion renewing their request to interview the jurors.

Even if the government has properly asserted a procedural defense and assuming that this Court found that the issue had not been properly preserved, habeas review is still proper where the petitioner demonstrates either cause and prejudice or actual innocence. *Bousley v. United States*, 523 U.S. 614, 622 (1998); *see Thompson v. United States*, 7 F.3d 1377, 1379 (8th Cir. 1993). Mr. Allen can establish both here.

The cause and prejudice standard is established by the ineffective assistance of Mr. Allen's direct appeal counsel in litigating this claim. *See Murray v. Carrier*, 477 U.S. 478, 488 (1986) ("if the procedural default is the result of ineffective assistance of counsel, the Sixth Amendment itself requires that responsibility for the default be imputed to the State"). The "cause" is appellate counsel's deficient performance, and the "prejudice" is the *Strickland* prejudice caused by the deficiency.

Appellate counsel's performance was patently deficient. Appellate counsel inexplicably failed to cite *Bullington v. Missouri*, 451 U.S. 430 (1981), *Arizona v. Rumsey*, 467 U.S. 203, 212 (1984), *Poland v. Arizona*, 476 U.S. 147, 153 n.3 (1986), or any of the other Supreme Court case law establishing a wholly different – and wholly more favorable – double jeopardy standard for capital sentencing proceedings than for noncapital sentencing proceedings. *See* Ex. 49, *AOB* pp. 135-50. Instead, appellate counsel relied exclusively on cases governing noncapital sentencing proceedings such as *Whalen v. United States*, 445 U.S. 684 (1980), and *Albernaz v. United States*, 450 U.S. 333 (1981). Under the *Whalen-Albernaz* line of cases, the crucial inquiry for determining when multiple and cumulative *noncapital* punishments violate the Double Jeopardy Clause is whether Congress intended to authorize such punishments. *See Albernaz*, 450 U.S. at 344. Relying on this inapposite case law, appellate counsel thus argued to the Eighth

Circuit that "[t]he dispositive question is whether Congress intended to authorize separate punishments" in Mr. Allen's *capital* case. *AOB* 137. The Eighth Circuit analyzed the claim accordingly.

Appellate counsel's failure to cite the controlling authority was inexcusable. When appellate counsel filed the Appeal Brief, the *Bullington v. Missouri*, 451 U.S. 430 (1981), line of cases had been the law of land for eighteen years, and those cases established a distinct double jeopardy rule for capital sentencing proceedings. Indeed, the year before appellate counsel filed the Appeal Brief, the Supreme Court began one of its opinions this way:

> This case presents the question whether the Double Jeopardy Clause, which we have found applicable in the capital sentencing context, *see Bullington v. Missouri*, 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981), extends to noncapital sentencing proceedings. We hold that it does not...

*Monge v. California*, 524 U.S. 721, 724 (1998). Counsel's failure to research, argue, and cite the relevant law was constitutionally deficient performance. *See Carter v. Bowersox*, 265 F.3d 705, 716-17 (8th Cir. 2001) (finding appellate counsel ineffective for failure to raise meritorious claim, even though the claim would have been reviewed under the plain error standard).

Appellate counsel's deficient performance was prejudicial for the same reasons that trial counsel's performance was prejudicial. If the Eighth Circuit had been presented with the controlling authority and proper appellate arguments based thereon, Mr. Allen would have been granted relief from his death sentence. Thus, cause and prejudice exist for overcoming any procedural default based on the Eighth Circuit's prior consideration of Mr. Allen's deficient Appeal Brief.

74

Even assuming, *arguendo*, that the government has properly asserted procedural bar, that this claim has been procedurally defaulted, and that cause and prejudice for any procedural fault have not been established, review is proper under the miscarriage of justice exception to procedural default. A "miscarriage of justice" exists when the petitioner is "innocent of the death penalty." *Sawyer v. Whitley*, 505 U.S. 333, 341-43 (1992); *accord, Schlup v. Delo*, 513 U.S. 298, 323 (1995); *Jones v. Delo*, 56 F. 3d 878, 882 (8th Cir. 1995). A petitioner is "innocent of the death penalty" when he shows "by clear and convincing evidence that but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty." *Sawyer*, 505 U.S. at 336.

Mr. Allen meets this standard for the same reason that the underlying claim is meritorious. The jury's sentence of life imprisonment on Count 1 must be "treated as an acquittal of the death penalty." *Poland v. Arizona*, 476 U.S. 147, 153 n.3 (1986) 153; *accord Arizona v. Rumsey*, 467 U.S. 203, 212 (1984); *Bullington v. Missouri*, 451 U.S. 430, 442 (1981). The Double Jeopardy Clause requires that this acquittal be treated with "absolute finality." *Id.* Thus, but for the double jeopardy error, no reasonable juror would have – or even could have – sentenced Mr. Allen to death for the same homicide for which it had already acquitted him of the death penalty. Executing Mr. Allen under these circumstances would be a profound miscarriage of justice. One need only to read again the text of the Fifth Amendment to recognize that this is so: "No person... shall be subject for the same offense to be twice put in jeopardy of life."

Mr. Allen's death sentence must be vacated, and in the event he is retried, he may not be again subject to the death penalty.

75

**G.** **Mr. Allen was denied effective assistance of counsel when trial counsel failed to request a hearing regarding the late provided evidence that government witness Thomas Mundell was a paid government snitch, and when appellate counsel failed to raise an issue concerning Mr. Mundell on direct appeal; he was also denied due process of law when the government failed to disclose impeaching information before trial.**

The government failed to disclose powerful impeachment evidence concerning its witness Thomas Mundell. Specifically, the government failed to disclose the fact that Mr. Mundell had been a paid informant for the government and had himself avoided prosecution by the government on a significant drug charge in exchange for his cooperation.[31] Following his receipt of the government's letter, trial counsel filed with this Court a *Motion for New Trial*, but did not ask for an evidentiary hearing on the issue. Tr. Doc. 421. The government's failure to disclose this information prior to Mr. Allen's trial violated its duty under *Brady v. Maryland*, 373 U.S. 83 (1963), *United States v. Giglio*, 405 U.S. 150 (1972).

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87 (1963). Impeachment evidence may be material under the *Brady* doctrine. *United States v. Bagley*, 473 U.S. 667 (1985); *United States v. O'Conner*, 64 F.3d 355, 358 (8th Cir. 1995) (*per curiam), United States v. Pulliam*, 566 F.3d 784, 787 (8th Cir. 2009).

---

[31] The Government first disclosed Mundell's cooperation with the government following Mr. Allen's trial in a letter to trial counsel dated May 7, 1998. The entire substance of the Government's letter is contained in the following paragraph: "Please be advised that, prior to his testimony in the matter of *United States v. Holder,* Government witness Thomas Mundell informed this office that in 1982, he was arrested by agents of the Drug Enforcement Administration in possession of approximately 52 grams of a substance containing cocaine powder. An additional 23 grams was recovered from his car and he voluntarily turned over 37 grams of same substance. In lieu of prosecution for this offense, Mr. Mundell agreed to cooperate with authorities. Records reflect that between December of 1982 and 1985, Mundell was paid approximately $3,950 for his cooperation. Additionally, he received another $650 during the year of 1986. He has received nothing since this time. This information is detailed in Mundell's trial testimony in *United States v. Holder.*" Ex. 7, Mundell Letter.

The government does not contest that Thomas Mundell could have been impeached with the fact that he had been a paid government informant and had avoided prosecution on serious federal drug charges for his cooperation. (*GR*- 91-96). The government also acknowledges that the evidence was not provided to counsel before trial.

Thus, the only substantive question remaining under *Brady* is whether the evidence pertaining to Mr. Mundell is material. While it is clear that Mr. Allen was prejudiced by the government's failure to turn over the evidence, the full extent of that prejudice cannot be known without an evidentiary hearing.

Undisclosed Brady information is deemed material so as to require reversal and a retrial "if there is a reasonable probability that, had [it] been disclosed to the defense, the result of the proceeding would have been different." A reasonable probability of a different result is shown when the government's failure to disclose "undermines confidence in the outcome of the trial." *United States v. Garcia*, 562 F.3d 947, 953 (8th Cir. 2009) (quoting *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995)).

Mr. Mundell's testimony was critical for the government. He was the third witness called by the government in Mr. Allen's multi-week trial. Mr. Mundell testified that Mr. Allen accompanied Norris Holder to Mr. Mundell's St. Louis Centre kiosk when Mr. Holder purchased a bullet proof vest. (T.VI 206-240). Mr. Mundell's testimony directly linked Mr. Allen to the planning and preparation of the robbery of the bank. He was the only government witness directly linking Mr. Allen to the planning of the robbery.[32] Mr. Mundell's testimony also indicated that Mr. Allen expected that the robbery would be violent.

> The only thing I really recall was (Billie Allen) was just looking at
> the body armor and he goes, are you sure it's going to stop all those

---

[32] While other witnesses testified that they observed Mr. Allen with Norris Holder on days preceding the robbery, no other witnesses directly connected Mr. Allen to the preparation of the robbery.

rounds, and I said yes. I'm not sure which one had said it to me, but one said that if there was a guarantee.

*Id.* at 212.

In guilt phase closing argument, the government seized on Mr. Mundell's testimony that Mr. Allen had prepared for a violent encounter at the bank:

> Later that Thursday, they go to get a vest and they go together and once again they're identified there at Thomas Mundell's store on the second floor of St. Louis Centre, and you know what they wanted the vest for? You saw it introduced into evidence. They're together again, they're planning the robbery, they're planning to protect themselves, but this defendant didn't have enough money at that time to get a vest and told Mr. Mundell, "I'll be back."

Tr. XII 2/26/97 at 32.

Thomas Mundell's testimony was clearly a significant piece of the government's case against Mr. Allen.

The government now argues that Mr. Mundell's deal with the government is not material because "trial counsel subjected Mundell to a very careful and professional cross examination." (*GR*- 94-95). Mr. Allen's counsel certainly attacked inconsistencies in Mr. Mundell's testimony, counsel was unable to establish that Mundell had a bias or a motive to fabricate testimony. Counsel questioned Mr. Mundell concerning the fact that the date on his receipt for the bulletproof vest was inconsistent with his testimony (T.VI 234-238). Counsel also attacked Mr. Mundell's problematic identification of Mr. Allen from a photograph. (T.VI 231-234).

But while counsel's cross examination on these points tested the quality of Mundell's testimony, trial counsel had no opportunity to attack his bias. Had the government provided the details of Mr. Mundell's cooperation, Counsel would have been able to establish his bias for the government. Instead, trial counsel was limited to arguing that Mr. Mundell's testimony was not credible because it simply did not make sense. (Tr. XII 2/26/97 at 70-71). The jury likely

78

rejected counsel's argument because Mr. Mundell appeared to have no bias or motive to lie. Had

counsel been able to show that Mr. Mundell was a paid government informant, who had avoided

being prosecuted for drug dealing, in addition to the inconsistencies in his testimony, it is likely

that the jury would have rejected Mundell's testimony altogether. The government's suppression

of Mr. Mundell's deal prevented trial counsel from exposing Mr. Mundell's bias and from

completely discrediting his testimony.

It is essential that a defendant be allowed to cross examine a witness on the witness's

bias. *United States v. Schoneberg*, 388 F.3d 1275, 1278 (9th Cir. 2004), *Davis v. Alaska*, 415 U.S.

308, 316 (1974). *See United States v. Chandler*, 326 F.3d 210, 222-23 (3rd Cir. 2003) (trial court

exceeded bounds of discretion when it inhibited defendant's cross examination of government

witness' bias and motive).

Mr. Mundell's testimony was devastating to Mr. Allen at both the guilt and penalty

phases of his trial. Mr. Mundell was the only witness at either phase who provided evidence that

Mr. Allen was actively planning the robbery with Mr. Holder. Government witnesses Lorenza

Blockton[33] and Gerald Vaughn[34] provided testimony that Mr. Holder alone acquired the guns for

the robbery.  Neither Mr. Blockton nor Mr. Vaughan had any contact with Mr. Allen. Their

testimony, along with Mr. Allen's lack of a bullet proof vest, suggests that Mr. Holder was the

sole planner of the robbery and that he alone anticipated that the robbery would be violent. Thus,

Mr. Mundell is the only witness who connects Mr. Allen directly to the planning of the robbery.

The government vociferously argued at the penalty phase that Mr. Allen should receive a

death sentence because of his planning of the robbery and his expectation that the robbery would

be violent

---

[33] T. VI 241-257
[34] T. VI 257-283

> This crime that was committed by these defendants is much greater in degree than would normally be seen in a bank robbery. There was absolute violence, total intimidation, massive force, extravagantly planned, elaborately planned with total destruction and mayhem in mind.

T. XIX 51.

> That is about whether this defendant knew right from wrong. Could he stop himself from going in that bank? Of course he did, he knew exactly what he was doing, he had planned if for days if not weeks or months. We know he was hanging out with Norris Holder in December, the same time that Norris Holder bought this gun. We know they were together on March 8th, we know they were together in that bank the previous Thursday, they went to buy vests together and Norris only had enough money to get it. Id. at 58-59. It was all very planned, very rational, how are we going to get in there, blow this place apart, kill Richard Heflin, and get away with the money. Nothing impulsive about it.

*Id.* at 61.[35]

Counsel could have used the withheld evidence to demonstrate Mr. Mundell had motive to lie and was therefore not credible. This would have undercut the government's argument that Mr. Allen was involved in the planning and preparation of the robbery. It is likely that this would have led to a different outcome in verdicts at both the guilt and penalty phases of the trial.

### 1.    Trial Counsel was Ineffective in Litigating Mr. Allen's Post-Sentence Motion.

**a. Deficient Performance**. Trial counsel recognized the importance of the  government's deal with Mr. Mundell. Trial counsel responded to the withheld evidence by asking this Court to grant Mr. Allen a new trial. Tr. Doc. 421. While trial counsel correctly understood that Mr. Allen was entitled to relief under *Brady*, his motion for a new trial was an inadequate request for relief.

---

[35] The Government made additional penalty phase arguments that Mr. Allen planned to violently rob the bank. See T. XIX, 62, 101.

Trial counsel's *Motion for New Trial* listed forty separate errors in Mr. Allen's trial. The *Motion* addressed the government's *Brady* violation in only one paragraph.[36] In requesting a new trial for the *Brady* violation, counsel failed to provide this Court with any controlling authority to support the position that Mr. Allen's Constitutional rights had been violated. Counsel even failed to cite *Brady v. Maryland*, 373 U.S. 83 (1963).

Counsel was also deficient for failing to request an evidentiary hearing on this issue. As Paragraph 15 of the Motion for New Trial demonstrates, counsel's understanding of Thomas Mundell's agreement with the government was limited to the one paragraph letter that they received from the government following Mr. Allen's conviction. Ex. 7. Counsel could not know from the government's letter whether Mr. Mundell expected some additional consideration or pay from the government in exchange for his testimony or whether Mr. Mundell believed that he was obligated to cooperate with the government under his earlier agreement. Counsel did not know if a formal written agreement had been executed between the government and Mr. Mundell, and if so, what were the provisions of that agreement. Trial counsel did not know if Mr. Mundell feared prosecution from the government when he first spoke with FBI agents after the robbery. These questions could only have been answered through Mr. Mundell's testimony at an evidentiary hearing. Counsel would have then supported his motion for a new trial with evidence from the hearing demonstrating the extent to which Mr. Allen was prejudiced by the government's Brady violation. Counsel's legally unsupported and boilerplate *Motion* coupled with the failure to request an evidentiary hearing was deficient.

---

[36] Paragraph 15. "The prosecution violated the defendant's right to disclosure of exculpatory evidence, guaranteed by the Due Process Clause of the Fifth Amendment, by failing to disclose until after trial that Government witness Thomas Mundell had previously been arrested for possession of cocaine; that to avoid being prosecuted, he became a paid Government informant; and that in the latter capacity he received several thousand dollars for giving evidence to assist the Government's prosecuting others. Timely disclosure of this evidence would have enabled the defendant to demonstrate a clear bias on Mundell's part and a pattern that would have established his motive for testifying in the way he did."

Counsel's failure to litigate properly the post-sentence motion constitutes deficient performance under *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). *Kimmelman v. Morrison*, 477 U.S. 365 (1986) (counsel's failure to file timely motion to suppress evidence was deficient performance); *Tomlin v. Myers*, 30 F.3d 1235 (9th Cir. 1994) (trial counsel ineffective in murder prosecution for failing to file motion to suppress witness lineup identification); *Murphy v. Puckett*, 893 F.2d 94 (5th Cir. 1990) (trial counsel ineffective for failing to raise valid double jeopardy claim); *Mayo v. Henderson*, 13 F.3d 528, 533 (2nd Cir. 1994) (appellate counsel ineffective for failing to raise issue relating to state discovery rule); *Matire v. Wainwright*, 811 F.2d 1430, 1435 (11th Cir. 1987) (appellate counsel ineffective for failing to raise claim relating to comment on defendant's post arrest silence).

**b. Prejudice.** As discussed at pp. 77-78 above, Mr. Allen was clearly prejudiced by Mr. Mundell's testimony at both the guilt and penalty phases of the trial. The full extent of the prejudice however, cannot be known without an evidentiary hearing. Had an evidentiary hearing been held on the motion for new trial, counsel could have cross-examined Mr. Mundell on the full extent of his agreement with the government and his expectations under that agreement when he first met with FBI agents after the robbery, and when he testified at Mr. Allen's trial. Counsel could also have questioned Mr. Mundell about concerns that Mr. Mundell may have had about being prosecuted for past crimes. Mr. Allen is entitled to an evidentiary hearing to demonstrate the full extent of the prejudice suffered by the government's suppression of Thomas Mundell's deal. Current counsel will file a discovery motion seeking additional information from the government pertaining to Thomas Mundell in support of this ground.

82

### 2.    Appellate Counsel Was Ineffective

When a lawyer fails to present controlling authority to the court with resulting prejudice, that lawyer renders ineffective assistance under *Strickland* and its progeny. The *Strickland* standard also applies to appellate counsel. *Evitts v. Lucey*, 469 U.S. 387 (1985); s*ee Roe v. Flores-Ortega*, 528 U.S. 470, 476-77 (2000) (applying *Strickland* to claim that counsel failed to file a notice of appeal). Failing to raise a meritorious issue on appeal constitutes ineffectiveness. *Matire v. Wainwright*, 811 F.2d 1430, 1438 (11th Cir. 1987) (the failure to raise meritorious issue on appeal constituted ineffective assistance); *Claudio v. Scully*, 982 F.2d 798, 799 (2nd Cir 1992); *Jackson v. Leonardo*, 162 8F.3d 81 (2nd Cir. 1998) (appellate counsel's failure to raise "sure winner" constituted ineffective assistance: "In the instant case, we believe that appellate counsel's failure to raise a well-established, straightforward, and obvious [ground for relief] constitutes ineffective performance"); *Starr v. Lockhart*, 23 F.3d 1280 (8th Cir. 1993) (finding trial and appellate counsel ineffective for failing to object to and raise an erroneous jury instruction); *Freeman v. Lane*, 962 F.2d 1252 (7th Cir. 1992) (appellate counsel ineffective for failing to raise a meritorious claim that was "presented squarely" at trial regarding a violation of the defendant's Fifth Amendment rights); *Murphy v. Puckett*, 893 F.2d 94 (5th Cir. 1990) (counsel's failure to raise valid defense at trial and on direct appeal constituted ineffective assistance).

Appellate counsel failed to raise the government's suppression of Thomas Mundell's deal with the government under *Brady v. Maryland*, 373 U.S. 83 (1963). Had this issue been raised, there is a reasonable probability that Mr. Allen would have prevailed in the Eighth Circuit Court of Appeals, hence *Strickland* ineffectiveness is established.

### 3.      This Issue is not Procedurally Defaulted

The government incorrectly argues that this issue is procedurally defaulted. (*GR*- 91). The law in the Eighth Circuit is well settled. The issue of ineffective assistance of counsel is not cognizable on direct appeal. Rather, issues of ineffectiveness are reserved for 28 U.S.C. §2255 actions. Pursuant to Eighth Circuit law, Mr. Allen's §2255 Motion is the first opportunity to assert issues pertaining to trial and appellate counsel ineffectiveness.[37]

In this proceeding, Mr. Allen does not contend that he is entitled to relief on the *Brady v. Maryland*, 373 U.S. 83 (1963), issue standing alone. Rather, he asserts that because his trial and appellate counsel failed properly to litigate his meritorious *Brady* issue, there is a reasonable probability of a different outcome either in the trial court or on appeal. See *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). That showing, of course, requires a demonstration of the merits of the *Brady* issue. But, precisely because of trial counsel's ineffectiveness, this proceeding is Mr. Allen's first opportunity to make that showing. This Court should review Mr. Allen's ineffective assistance of counsel issue, and after hearing, should grant a new trial.

**H.      Mr. Allen was denied effective assistance of counsel when trial counsel failed to obtain relief when the government suggested he had gang connections.**

Prior to trial, Mr. Allen filed a Motion in Limine to prevent the government from, *inter alia*, suggesting that Mr. Allen was involved in gang activity. Tr. Doc. 277. The district court granted that part of motion. T. VI 3-10. Nevertheless, at trial the government made repeated efforts to connect Mr. Allen with gang activity in violation with this Court's order.

The Crips are a large and violent association of street gangs in the United States. The gang is known for dealing narcotics, murder, and showing their gang affiliation by wearing blue

---

[37] For authorities concerning the propriety of raising ineffective assistance of counsel issues for the first time in §2255 proceedings, the Court is referred to p. 12, above.

clothing.[38]

The government attempted to connect Mr. Allen to the Crips gang by presenting evidence that he was wearing blue clothing at the time of the robbery. At trial, the government presented St. Louis police officer Thomas Carroll and questioned him about clothing worn by Mr. Allen at the time of his arrest. Mr. Allen was wearing two pairs of sweat pants. T.IX 181-82. Officer Carroll testified that the color of the pants worn underneath the outer pair of sweat pants was blue. T.IX 181-82. No objection was offered by trial counsel nor did counsel renew his motion in limine.

The color of the pants worn underneath Mr. Allen's clothing was highly prejudicial and totally irrelevant. As the blue pants were worn under another pair of pants they were not relevant to eyewitness accounts of what the bank robbers were wearing. Further, as the pants themselves were introduced into evidence, the exhibit spoke for itself and there was no need to place additional emphasis on the color. The government's only purpose in having Officer Carroll testify to the blue color of the pants was to identify Mr. Allen with the Crips gang. This was explicitly prohibited by this Court and counsel was ineffective for failing to object and ask this Court for a cautionary instruction.

Officer Carroll was also asked about Mr. Allen's tattoo. Officer Carroll testified that the tattoo read "Crip" and underneath it, "Money ". T.IX 187-88. Trial counsel responded by approaching the bench and reminding the Court of its prohibition of gang references following the motion in limine. *Id.* The government acknowledged that the tattoo did not say "Crip" but in fact said "Cash". This Court instructed the government to lead the witness into acknowledging the tattoo said "Cash" and the court instructed the jury to disregard what the witness had earlier said. T.IX 197-89. Trial counsel did not otherwise object or move for a mistrial based upon this

---

[38] See http://foia.fbi.gov/foiaindex/cripsbloods.htm.

85

prejudicial evidentiary harpoon.

The government's attempt to connect Mr. Allen to gang activity extended into the penalty phase. Mr. Allen presented Eric Taylor as a witness during the penalty phase. On cross-examination the government asked Mr. Taylor if it was "just a coincidence that you're dressed in blue today?" T. XVI 225. The government then asked Mr. Taylor if he had ever described Mr. Allen as a "gang wanna-be?" T.XVI 225. The government then tried to impeach Mr. Taylor by suggesting that he had previously told FBI agents that Mr. Allen was a "gang wanna be". T. XVI 225-226. The government's questioning of Mr. Taylor, along with earlier gang references, served no legitimate purpose at trial.  In its response, the government suggests that this line of cross-examination was relevant to a "topic that Eric Taylor brought up on direct examination." *GR-100*. This is disingenuous. Taylor was asked questions about the neighborhood in which he and Mr. Allen had lived. This neighborhood had problems with street gangs and Mr. Taylor testified about those problems. T. XVI 225-226. Mr. Taylor did not say that he or Mr. Allen were members of a gang and nothing in his testimony opened the door to this line of cross-examination.

Trial counsel was deficient for failing to object to the above comments and to move for a mistrial. It is well established that counsel's failure to raise a timely objection to a constitutional violation at trial may constitute ineffective assistance. *E.g., Reagan v. Norris*, 365 F.3d 616, 622 (8th Cir. 2004) (finding trial counsel's failure to object to jury instructions constitutionally deficient); *Manning v. Bowersox*, 310 F.3d 571, 576-77 (8th Cir. 2002) (finding trial counsel's failure to object to admission of evidence constitutionally deficient); *Burns v. Gammon*, 260 F.3d 892, 896-97 (8th Cir. 2001) (finding trial counsel's failure to object to prosecutor's closing argument constitutionally deficient).

86

This Court had already determined that evidence concerning gangs would not be admitted into evidence when the government purposely elicited evidence suggesting that Mr. Allen belonged to a gang. T.VI 3-10. Clearly, this Court, based on its prior ruling, would have sustained a timely objection by counsel. Trial counsel had no reasonable basis for failing to object to the references to gang activity.

Mr. Allen was prejudiced by trial counsel's failure to object and to move for a cautionary instruction and a mistrial. The Eighth Circuit has recognized the prejudicial nature of gang evidence. *United States v. Street*, 548 F.3d 618 (8th Cir. 2008). Evidence about gang membership and activity is so prejudicial that even when it is admissible for a limited purpose it often requires an instruction to prevent jurors from drawing improper influences. *United States v. McKay*, 431 F.3d 1085, 1093 (8th Cir. 2005).

The prejudice to Mr. Allen must be viewed in the larger context of the trial and in particular the penalty phase. As set forth below in Grounds K and L, Mr. Allen's penalty phase was beset by problems. The government was permitted without objection to bring in overwhelming amounts of prejudicial victim impact evidence. See Ground K. At closing argument, the government relied on racially tinged inflammatory comments. See Ground L. Nevertheless, the jury rejected one of the two government requests for death in this case.

This suggests that despite outrageous government conduct, the decision by the jury to sentence Mr. Allen to death was a close one. Under these circumstances, the repeated suggestion that Mr. Allen was involved with the Crips, a violent street gang, clearly prejudiced him. In *United States v. Street*, 548 F.3d 618 633 (8th Cir. 2008), the Eighth Circuit reversed Street's conviction due to the erroneous introduction of gang evidence because "it was a close case". Such is the case here.

87

Appellate counsel did not raise this issue as plain error in Mr. Allen's direct appeal. Appellate counsel were ineffective in this regard.  The problems were apparent on the face of the record and thus appellate counsel clearly had notice that the motion in limine regarding gang activity had been granted and then violated in the testimony of Officer Carroll and the cross-examination of Eric Taylor. The law is clear that failing to raise a meritorious issue on appeal constitutes ineffectiveness. *Matire v. Wainwright*, 811 F.2d 1430, 1438 (11th Cir. 1987) (the failure to raise meritorious issue on appeal constituted ineffective assistance); *Claudio v. Scully*, 982 F.2d 798, 799 (2nd Cir. 1992); *Jackson v. Leonardo*, 162 F.3d 81 (2nd Cir. 1998) (appellate counsel's failure to raise "sure winner" constituted ineffective assistance: "In the instant case, we believe that appellate counsel's failure to raise a well-established, straightforward, and obvious … [ground for relief] … constitutes ineffective performance"); *Starr v. Lockhart*, 23 F.3d 1280 (8th Cir. 1993) (finding trial and appellate counsel ineffective for failing to object to and raise an erroneous jury instruction); *Freeman v. Lane*, 962 F.2d 1252 (7th Cir. 1992) (appellate counsel ineffective for failing to raise a meritorious claim that was "presented squarely" at trial regarding a violation of the defendant's Fifth Amendment rights); *Murphy v. Puckett*, 893 F.2d 94 (5th Cir. 1990) (counsel's failure to raise valid defense at trial and on direct appeal constituted ineffective assistance).

Had appellate counsel raised the issue in Mr. Allen's direct appeal it is reasonably likely that the Eighth Circuit would have granted Mr. Allen relief on his sentence of death and remanded the matter for a new penalty phase and a new trial.

The government erroneously suggests that this claim is procedurally barred. GR- 97. It is not. The law in the Eighth Circuit is well settled; appellate review of ineffective assistance of counsel is not cognizable on direct appeal. Rather, issues of ineffectiveness are reserved for 28

88

U.S.C. §2255 actions. [39]

Mr. Allen must be granted a new trial.

**I.      Mr. Allen was denied the effective assistance of counsel at the guilt phase of his trial by counsel's failure to use available evidence that would have established a reasonable doubt as to his participation in the charged murder and robbery.**

Trial counsel was ineffective in the guilt phase for failing to present available evidence on Mr. Allen's behalf. *M*-29 *et. seq*. The Government's Response argues that trial counsel was not ineffective because the omitted evidence was "insubstantial." *GR*- 102. The government's specific arguments are addressed and refuted below. The government also asserts that this claim has been waived because Mr. Allen has not demonstrated cause and prejudice for failing to raise the claim earlier. The assertion is meritless. A §2255 motion is a petitioner's first opportunity to raise ineffective assistance of counsel claims.

**1.      Introduction**

The Sixth Amendment to the U.S. Constitution requires counsel to investigate and consider viable theories relevant to the innocence of the accused. *Foster v. Lockhart*, 9 F.3d 722, 726 (8th Cir. 1993) (affirming grant of writ when trial counsel failed to investigate guilt issue); *Parkus v. Delo*, 33 F.3d 933, 938-39 & n.6 (8th Cir. 1994) (remanding for evidentiary hearing to address counsel's failure to thoroughly investigate guilt phase defense); *Schneider v. Delo*, 85 F.3d 335, 339 (8th Cir. 1996) (where counsel fails to present evidence of innocence, court must determine whether counsel's performance fell below professional standards and whether the defense was prejudiced); *United States v. Easter*, 539 F.2d 663 (8th Cir. 1976) (finding counsel

---

[39] The authorities concerning the propriety of raising ineffective assistance of counsel grounds in the §2255 motion are found on p. 12 above.

89

ineffective for failing to present available evidence that government informant harbored animosity against defendant and had misused the police to harass the defendant).

Here, trial counsel failed to do what the Sixth Amendment requires. Trial counsel was provided with several pieces of exculpatory evidence in discovery that counsel failed to present at trial. Counsel had no reasonable basis for failing to present the exculpatory evidence in defense of Mr. Allen.

Counsel's failure to present this evidence prejudiced Mr. Allen under *Strickland v. Washington*, 466 U.S. 668 (1984). Had counsel presented the evidence discussed below, it is reasonably probable that Mr. Allen would have been found not guilty.

Counsel also failed to investigate significant evidence regarding Mr. Allen's guilt. See 2003 ABA Guidelines, Guideline 10.7.A.: "Counsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty."

At the time of trial, counsel was aware of evidence indicating that an individual named "J.B." was involved in the crime. *E.g.* T. XI 71. Trial counsel failed to investigate this lead in any way. If a proper investigation had been conducted, counsel would have learned important information including that:

- "J.B." was Jerry Bostic; *see* ex. 39, Decl. of James Monroe;

- Jerry Bostic was in and out of police custody in Saint Louis, Missouri, in the months leading up to trial and therefore would have been easy for trial counsel to contact; *see* Ex. 14, 15, 17;

- Jerry Bostic accurately fit the description of the individual implicated in the bank robbery by several sources, whereas Mr. Allen did not; *see* discussion, *infra*.; *see also* Ex. 14-17.

This evidence was readily available to trial counsel and would have had a significant impact on the jury's consideration of Mr. Allen's guilt. Trial counsel was ineffective in failing to

90

investigate and present evidence of Mr. Bostic's involvement in this crime. This evidence is discussed in detail below.

### 2.    The White Strap

Trial counsel failed to investigate and present exculpatory DNA evidence from blood found on a white strap from the body armor Mr. Holder wore during the robbery. *M* 29-30. In its Response, the government contests (a) where the strap was found; (b) whose blood was on the strap; and (c) the exculpatory, i.e., the prejudicial, value of the evidence. *GR-* 102-04.

**a. Where the Strap Was Found.** The government argues that the bloody white strap was found in Forest Park in an area just northeast of the burned getaway van, *GR-* 103, not, as the Amended Motion contended, at the bank. Discovery documents received by trial counsel, however, provide conflicting information regarding where the strap was found. An Evidence Receipt from the St. Louis Metropolitan Police Department dated 3-17-97 indicates that "1 White Strip of Cloth w/blood" was recovered from "6900 Clayton," – the street address of the Lindell Trust Bank where the crime occurred. Ex. 6. In contrast, a Continuation Report filed by Detective Priest refers to "1 strip of white cloth with blood, [recovered] from the street, northeast of the van." Ex. 8. Because there is no indication that two separate bloody straps were found, there is an apparent discrepancy between these two documents. Nonetheless, assuming *arguendo*, that the government is correct that the strap was found in the vicinity of the van, the evidence remains relevant and exculpatory, as explained below.

**b. Whose Blood Was On The Strap?** In its response, the government reveals for the first time that "[t]he item was not examined for the presence of Holder's blood." *GR-* 104. Nonetheless, the government baldly asserts that the evidence "was merely a strap from Holder's

91

body armor which *probably* contained some of Holder's blood." *Id.* Without comprehensive DNA testing, however, this assertion is entirely speculative. Further, the conclusory DNA report provided to trial counsel in discovery indicated only that the DNA was not consistent with Mr. Allen or with Mr. Heflin. *Ex.* 7. No underlying data was provided with the report, however, and counsel was deficient for failing to request and analyze the underlying data, and to request additional testing as appropriate.

**c. Exculpatory Value.** The exculpatory value of this evidence depends on the outcome of DNA testing of the blood.[40] Clearly, the potential exculpatory value of the blood is significant. If the strap is found to contain blood belonging to Mr. Bostic, then the evidence strongly supports that Mr. Allen was not the person who accompanied Mr. Holder into the bank.

### 3. Gas Chromatographic Analysis

Trial counsel was deficient for failing to present evidence of a gas chromatographic analysis of the clothing seized from Mr. Allen when he was arrested. The testing, completed by the St. Louis Police Department, showed that the clothing was negative for the presence of petroleum distillates. Ex. 42.

At trial, the government connected Mr. Allen to the robbery through the testimony of Police Officer Carroll. Officer Carroll testified when Mr. Allen was arrested he smelled strongly of smoke. T. IX 177. In asking Officer Carroll to describe Mr. Allen's smell, the government's message to the jury was clear; Mr. Allen smelled like smoke because he was in the getaway van when it caught fire**.**

---

[40] Petitioner will soon be filing a motion for discovery with a request that DNA testing be performed on the bloody strap.

**a. Counsel's trial performance was deficient.** At the time of trial, counsel possessed the chromatographic analysis of Mr. Allen's clothing that could have been used to impeach Officer Carroll and to cast doubt on the government's theory that Mr. Allen was in the getaway van when it exploded. Counsel could have used the chromatographic evidence for two purposes: to impeach Officer Carroll and to show that if Mr. Allen did smell like smoke, it was not from the van fire. Counsel had no strategic reason for failing to use this evidence in Mr. Allen's defense.

**b. Prejudice:** The government contends that this evidence was not material because it was possible for Mr. Allen to smell like smoke while testing negative for petroleum distillates. The government seems to suggest that Mr. Allen could have been exposed to smoke from a campfire. The government argues that Officer Carroll could not have been impeached by chromatographic analysis because the smoke smell could have come from a source other than the burning van.

Under the government's new theory, Mr. Allen would not have been in the burning van and would not have been Norris Holder's accomplice. If Mr. Allen smelled of smoke, the chromatographic analysis shows that the smoke did not come from the van.[41]

The government also argues that the absence of this evidence was not material because trial counsel impeached Officer Carroll through witnesses Marcie Chowning and Lakeisha Williams, who testified that Mr. Allen did not smell of smoke. *GR*- 106-07. In determining whether Mr. Allen actually smelled of smoke at the time of his arrest, the jury had to decide whether to credit the memory or credibility of Officer Carroll, an experienced law enforcement officer or of Mr. Allen's friends, Ms. Chowning and Ms. Williams. Counsel was in a position to

---

[41] At trial, the government presented extensive evidence that the van caught fire after gasoline fumes within the van ignited. T. IX 93-113 (testimony of Stephen Sorocko). It is highly implausible that Mr. Allen's clothing would not contain petroleum distillates if he had been in the van with Mr. Holder. Several other items from the Van tested positive for gasoline.

93

make this question easy for the jury by presenting the evidence of the chromatographic analysis. Had counsel presented evidence that Mr. Allen had tested negative for petroleum distillates in a report prepared by the St. Louis Police Department, the jury would have determined that Mr. Allen did not smell like smoke and could not have been present in the van when it ignited.

### 4. The Police interview with Greg Prater and Joe Powell

Trial counsel failed to present evidence contained in a police report that witnesses Greg Prater and Joe Powell told police that they observed a man who was 5 feet 8 inches tall, fleeing from the burning van and running through Forest Park. Ex. *43*.

Counsel was deficient for failing to introduce the exculpatory testimony provided by witnesses Prater and Powell. The man seen fleeing from the burning van and running through Forest Park was, according to these witnesses, 5 feet and 8 inches tall. *Id*. Jerry Bostic was 5 feet and 8 inches tall. Ex. 14. Mr. Allen is considerably taller: six feet one inch. Ex. 44. Counsel could have had no strategic purpose for not introducing this information into evidence.

Because Jerry Bostic fits the description of the suspected bank robber seen by Gregory Prater and Joe Powell, Mr. Allen was prejudiced by counsel's failure to present the evidence contained in the police report. The government's contention that this evidence is not prejudicial is incorrect. The government fails to consider this evidence in conjunction with the other evidence that counsel failed to present concerning Jerry Bostic. Mr. Allen was prejudiced by counsel's failure to present this evidence in conjunction with the other evidence concerning Jerry Bostic.

### 5.    Police Interview with James Combs

Trial counsel failed to present evidence that James Combs observed a 5 foot, 10 inch black male enter Deaconess Hospital acting suspiciously. This evidence was contained in a police report disclosed to trial counsel before trial. Ex. 45.

Mr. Combs was the director of security at Deaconess Hospital in St. Louis and was working on the date of the robbery. Prior to observing the 5 foot and 10 inch male, Mr. Combs had heard about the robbery and was keeping watch for a suspicious black male who might be seeking medical attention. *Id.* The man that Mr. Combs described to police left the hospital and drove away in a brown Jeep Wagoneer. *Id.*

Trial counsel was deficient for failing to present Mr. Combs' observations at trial. While Mr. Allen is much taller than 5 feet, 8 inches[42]; Jerry Bostic, at 5 feet, 8 inches,[43] closely resembled the description of the suspicious acting male observed by Mr. Combs at Deaconess hospital on the day of the robbery. Counsel possessed the police report prior to Mr. Allen's trial and could have had no strategic purpose for failing to present this evidence.

Contrary to the government's contention, Mr. Allen was prejudiced by counsel's failure to present this evidence in conjunction with other evidence concerning "J.B." and Jerry Bostic.

### 6.    Statement of Wayne Ross

Trial counsel was ineffective for failing to cross examine witness Wayne Ross regarding his statements to the FBI. Ex. 46. Mr. Ross told the FBI that a man named "J.B." called Ross's grandmother's house looking for Norris Holder. This phone call occurred a few days before the robbery. *Id.*

---

[42] *See Ex.* 46.
[43] *See Ex.* 14.

95

Counsel was deficient for failing to cross examine Mr. Ross on his statement to the FBI concerning "J.B." *See Delo v. Driscoll,* 71 F.3d 701 (8ᵗʰ Cir. 1995) (Counsel ineffective for failing to impeach a state's witness with a prior inconsistent statement and for failing to adequately cross-examine another witness). Counsel had Mr. Ross's FBI statement at the time of trial and had no strategic reason for failing to question Mr. Ross about J.B.

Mr. Allen was also prejudiced by counsel's failure to cross examine Mr. Ross about J.B.'s phone call to Mr. Holder. Counsel had considerable evidence that J.B. was Norris Holder's co-conspirator. This evidence was ultimately exculpatory to Mr. Allen as it corroborates other evidence that J.B. planned and carried out the robbery, not Mr. Allen.

The government argues that the failure to present this evidence is not prejudicial because Mr. Allen made statements to the police about J.B's involvement in the robbery which were introduced at trial. But at closing argument, the government argued that Mr. Allen was trying to "present a false defense" and that he was trying to get Johnnie Grant to commit perjury for him. T. XII 59. It is entirely inconsistent for the government to now claim that there is no prejudice because the jury heard and believed Mr. Allen's statement about J.B., when the government accused Mr. Allen of fabricating this very defense at trial.[44] Trial counsel had an opportunity to corroborate Mr. Allen's statement about J.B. by questioning Mr. Ross about J.B.'s call to Mr. Holder. The prejudice resulting from this error is significant, particularly when viewed in conjunction with the other evidence that counsel failed to present of Jerry Bostic's involvement in the robbery.

---

[44] In the context of arguing that Mr. Allen was fabricating a defense, the government undercut the involvement of J.B., "The feds were going to use that against him because everyone knows that no guy who just drove. Both guys went in and both guys fired their weapons." T. XII 59.

96

7.    **Interview of Broderick Bonner**

Counsel failed to present evidence from an interview with Broderick Bonner that on the evening when Mr. Allen and Mr. Holder allegedly met in a bowling alley, Mr. Bonner did not sit with them nor was he in a position to overhear any conversation between Mr. Holder and Mr. Allen. Ex. 47. Mr. Bonner also indicated that Mr. Holder did not discuss a bank robbery that night and that Mr. Ross did not know anything about Mr. Holder having a plan to rob a bank. *Id.* This would have contradicted Wayne Ross's trial testimony about overhearing a conversation between Mr. Holder and Mr. Allen about the robbery. *Id.*

In its Response, the government contends that, unlike Wayne Ross, Mr. Bonner was not physically in a position to hear Holder discuss the robbery. The government also suggests that Mr. Bonner's testimony would ultimately be inculpatory. *GR-* 112-14.

Contrary to the government's assertion, Mr. Bonner's statement is *not* inculpatory. Mr. Bonner never identified Mr. Allen as the person meeting Mr. Holder. Mr. Bonner told the FBI that Mr. Holder was meeting someone to discuss buying a gun, which is consistent with his observation of guns at Mr. Holder's house. Mr. Bonner further stated that he was with Mr. Ross. There is *no indication* that Mr. Ross was sitting at a different table than Mr. Bonner when Mr. Ross allegedly heard the conversation between Mr. Allen and Mr. Holder. Mr. Bonner's testimony would have impeached Mr. Ross, as would Mr. Bonner's assertion that Mr. Ross never mentioned that he heard Mr. Holder planning a robbery. *GR-* 113. Further, Mr. Bonner's observation of a large gun collection *at Holder's house* is, of course, not inculpatory of Mr. Allen. Mr. Allen does not contend that *Mr. Holder* did not commit the robbery, only that *he* did not.

97

Mr. Bonner's statement therefore would have impeached evidence that the government presented both to show Mr. Allen's involvement in the crime, and to show his alleged participation in planning the crime. Counsel's failure to present this evidence was prejudicial.

### 8. The Anonymous Phone Call

Trial counsel failed to investigate and present evidence from an FBI report of an anonymous telephone call in which the caller indicated that Mr. Holder had been seen at the bowling alley, North Oaks Bowl, discussing the bank robbery with someone other than Mr. Allen. Ex. 48.

In its Response, the government contends that the evidence: (1) is not reliable, (2) does not impeach any of the government's evidence, (3) does not exculpate Mr. Allen, and (4) is not admissible.

First, the reliability of the phone call is not at issue. Counsel's failure to investigate the contents of the report is at issue. The anonymous call provided information that would have led to admissible evidence at trial, which counsel should have pursued. This information includes the name of another suspect and/ or witness, "DeMarco"; and the identity of other witnesses who worked at North Oaks Bowl or who were patrons of North Oaks and who recognized Holder and his associates.

Contrary to the government's contentions, the telephone call *does impeach* the government's allegations that Mr. Allen and Mr. Holder planned and participated in this crime together. The FBI report listed three additional witnesses that were never investigated by counsel. These witnesses would have provided evidence that Holder was the planner of the

98

robbery; that an associate of Mr. Holder (and not Mr. Allen) was the coconspirator in the robbery; and that Mr. Allen was never observed at the North Oaks with Mr. Holder.

Further, this report would have led to admissible evidence. The witnesses in the cocktail lounge of North Oaks could have been presented by counsel at the trial, and would have provided important evidence exculpating Mr. Allen and implicating a third person as Holder's accomplice.

**Conclusion.**

As the above summary shows, trial counsel's investigation and presentation of evidence at the guilt phase of Mr. Allen's trial was seriously deficient. Even if no one omission was prejudicial, taken together, they clearly present a reasonable probability of a different outcome. In *White v. Roper*, 416 F.3d 728, (8th Cir. 2005), the court found prejudice from counsel's ineffectiveness in failing to investigate and call two witnesses. Here, far more than two witnesses were omitted, and the prejudice is evident. The declarations and reports presented in this Ground clearly require an evidentiary hearing. Upon hearing, Mr. Allen is entitled to a new trial.

**J.     Mr. Allen was denied effective assistance of counsel because of failure to investigate and present evidence at the penalty phase of his trial.**

**1.     Introduction**

Trial counsel failed to fulfill their constitutional duty to investigate fully mitigation evidence in Mr. Allen's case. For several months, counsel failed to communicate with the individual they believed would be performing the mitigation investigation. Because of this failure, the original mitigation consultant resigned from the case approximately one month before trial. Counsel retained a new mitigation investigator, but he was left with less than thirty

days to conduct the entire investigation. Before the new mitigation specialist was retained, there was no mitigation investigation conducted. In their declarations, discussed below, counsel have acknowledged their errors and the dramatic impact those errors had on the outcome of the penalty hearing. As will be demonstrated, counsels' deficient performance caused Mr. Allen *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), prejudice, and relief is warranted.

Mr. Allen "had a right – indeed, a constitutionally protected right – to provide the jury with the mitigating evidence that his trial counsel either failed to discover or failed to offer." *Williams (Terry) v. Taylor*, 529 U.S. 362, 393(2000). In a trilogy of cases, including *Williams (Terry)*, the Supreme Court has explained the responsibility of capital counsel to conduct a thorough investigation in preparation for the penalty phase of a capital trial. *See Williams (Terry)*, 529 U.S. at 395-96 (counsel ineffective when they failed to begin to prepare for penalty phase until one week prior to trial; failed to investigate defendant's harsh childhood, including abuse and neglect, or obtain records showing the same); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) ("investigations into mitigating evidence should comprise efforts to discover all reasonably available mitigating evidence . . . counsel abandoned their investigation into Petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources."); *Rompilla v. Beard*, 545 U.S. 374 (2005) (counsel did not conduct thorough investigation when failing to review documents that would be offered in aggravation).

### 2.     Declarations in Support of Already Pled Facts.

Mr. Allen has presented the essential facts supporting this ground for relief to the Court in his *Amended Motion*. The government has responded that he has not pled enough and has failed to support his pleadings with proffers and declarations. *GR-* 117 ("the claimed facts are not

supported by the record or any materials submitted in support of the application"). While Mr.

Allen maintains that he was not required to submit in his motion what the government now

claims is lacking from his presentation (*see* Part One, above), he proffers the following facts

demonstrating counsels' deficient performance and resulting prejudice.

**a.  The Failure to Conduct a Timely Mitigation Investigation**. The 2003 ABA

Guidelines, Guideline 10.7.A., provides, "Counsel at every stage have an obligation to conduct

thorough and independent investigations relating to the issues of both guilt and penalty." The

Commentary to this Guideline explains that this investigation must begin as soon as counsel is

aware that the death penalty will be sought:

> The mitigation investigation should begin as quickly as possible,
> because it may affect the investigation of first phase defenses (e.g.,
> by suggesting additional areas for questioning police officers or
> other witnesses), decisions about the need for expert evaluations
> (including competency, mental retardation, or insanity), motion
> practice, and plea negotiations.

2003 ABA Guidelines, Commentary to Guideline 10.7.

Between April 1997 and mid-January 1998 (one month before trial), trial counsel took a

sum total of one step to prepare for the penalty phase. In September 1997, Mr. Sindel retained

Craig Haney, Ph.D., J.D., a Professor of Psychology at the University of California, Santa Cruz,

to consult as a mitigation expert. After retaining him, counsel did not have direct contact with

Dr. Haney again until mid-January, 1998. Trial counsel did not meet with Dr. Haney, did not

telephone him, did not consult with him, and did not arrange for him to meet with Mr. Allen, Mr.

Allen's family, or any other mitigation witness. Indeed, trial counsel had not identified any

mitigation witnesses and did not interview any of Mr. Allen's family members, friends, or

acquaintances about mitigation topics during that time.

101

In early January 1998, co-counsel John Simon became concerned with the state of affairs.

He wrote Mr. Sindel on January 9, 1998 expressing those concerns, and on January 12, Mr.

Sindel sent a fax to Dr. Haney. Mr. Sindel wrote the following:

> The above matter is set for trial on February 9, 1998, which is less than one month away. We have made several unsuccessful attempts to contact you regarding the status of your review of the materials you have received. The mitigation aspect of this case may be the only hope we have of saving Mr. Allen's life and I am concerned it is not being investigated to the extent it needs to be. Due to your unexplained lack of response, I am concerned that you do not intend to assist us with this case. Obviously, the loss of a mitigation consultant leaves Mr. Allen in an extremely precarious position.
>
> Please contact me immediately upon receipt of this letter. If you are on let me know me know, if not I need to take immediate steps and must confirm your response in writing to the Court.

Ex. 9 (January 12, 1998 letter, Sindel to Haney).

Dr. Haney responded the next day by faxing a response to Mr. Sindel. Ex. 10. The letter

shows that the mitigation investigation had yet to begin and that there was insufficient time to

conduct it, as the following excerpts from the letter demonstrate:

> I had no idea that you were actually planning to go to trial in February of this year until Connie Caspari[45] called my office last week. . . . I had assumed you had obtained a lengthy continuance. Let me tell you why I reached that conclusion:
>
> 1) Until your fax yesterday expressing concern about my inability to return Ms. Caspari's two most recent phone calls (I was in Florida working on another capital case and inaccessible for the entire week), you have never once attempted to converse with me about the case; not through phone calls or letters. All of the contacts have been made by your paralegal, Ms. Caspari. I assumed that as we got to within several months of the actual trial date you would make direct contact. I was apparently wrong about that.

---

[45] As discussed below, Connie Caspari was Mr. Sindel's contract paralegal/ assistant, who was tasked by him to, among many other responsibilities, assist Dr. Haney.

> I did talk to Ms. Caspari in December and thought, at least, that I had underscored the importance of getting additional documentation and beginning work on a client chronology or "timeline." But none of that material has been forthcoming. So I assumed, until the phone message I received last week, that the delay in receiving any further materials was due largely to the holiday and the fact that had been a substantial delay in the case.
>
> In short, I have almost none of the information I or anyone would need to begin to develop mitigating themes in this or any case. . . . I *still* didn't understand [in early January] that you were approaching an actual trial date with so little information having been gathered.

Ex. 10.

Dr. Haney also explained in his letter what his role was to be in the generation of a mitigation case. He explained that the development of a mitigation case "proceeds in stages." Before he set out to conduct interviews with potential witnesses and the defendant he needed "to be provided with a substantial number of relevant documents, not to mention the results of initial interviews with a wide range of persons conducted by a trained investigator." He related that in the typical case this information generally "fills several binders (as opposed to the inch or so of material I have been given in his case)." He further explained that after he reviews and digests these voluminous materials, he consults with counsel and the investigator and then identifies a number of set interviews that he personally conducts. He uses this information to create a "client chronology." *Id.*

> I am not, **as I hope you understand**, an investigator. I don't retrieve documents, don't locate people, and typically (for reasons of economy) don't do initial interviews with the whole range of folks who could – but won't necessarily be – helpful to the case.
>
> There is little that I can do until the. . . early steps have been completed. . . [O]nce I have the requisite amount of information, I work with investigators and attorneys to focus the investigation, develop themes that need further investigation and analysis, focus the evidence by conducting interviews with key people myself,

103

> assist in organizing penalty phase themes and witness preparation, and then testify about the client's mitigating social history.

Lead trial counsel Sindel acknowledges the accuracy of Dr. Haney's letter in recounting the sparse materials that were provided to Dr. Haney and the lack of contact between Dr. Haney and him. Ex. 11, Sindel Decl. ¶ 9. Mr. Sindel explains that "When I retained Dr. Haney I expected that he would assume responsibility for the day-to-day preparation of the penalty phase." *Id.* ¶ 7. Mr. Sindel goes on to explain:

> It is obvious from his letter and my recollection of the circumstances, that he and I did not have a common understanding of what his role was to be. I believed he would be the person responsible for performing the mitigation investigation, including interviews, obtaining documents, finding witnesses and the like. We would have been ready to investigate any leads he suggested we pursue. He on the other hand, apparently saw his role as that of an expert witness who would be responsible for development of broad mitigation themes once the witness interviews, document collection and mental health evaluations were conducted. As his letter makes plain, because of this misunderstanding, he had done nothing on the case as he was awaiting my office's production of this initial investigative information. **The fact that neither Mr. Simon nor I were in direct communication with Dr. Haney during this time period permitted this misunderstanding to undermine the penalty phase preparation.**

Ex. 11.

Mr. Sindel acknowledges that he failed in his responsibility to insure that the required work was being performed in order for Mr. Allen to be able to present an adequate penalty phase:

> As a result of my misunderstanding with Dr. Haney, Mr. Allen was deprived of an adequate opportunity to present to the jury far more significant mitigating evidence than I was able to muster. As lead counsel for Mr. Allen I accept full responsibility for the lapse that occurred with Dr. Haney and the resulting shortcomings in the penalty hearing presentation.  It was undoubtedly my duty as lead counsel to insure that the required work was being performed in a

timely and thorough manner, and I do not believe I and co-counsel satisfactorily performed this duty.

Mr. Sindel's co-counsel, John W. Simon, was also a witness to the unfolding events with Dr. Haney. In his declaration, he recounts how Mr. Sindel and he failed in their responsibility to prepare for capital sentencing:

> When I joined the case I knew that Mr. Sindel had retained Dr. Craig Haney to act as his mitigation specialist. I knew of Dr. Haney's strong reputation and assumed that aspect of the case was in good hands. I first became concerned with a difficulty with regard to the mitigation case in early January 1998, and wrote Mr. Sindel about it on January 9, 1998. Thereafter Mr. Sindel wrote Dr. Haney. On January 13, 1998, we received a letter from Dr. Haney responding to Mr. Sindel's letter. It was my understanding that Mr. Sindel received a letter from Dr. Haney, on the basis of which I learned that Dr. Haney would not be serving as our mitigation specialist. It is clear that Mr. Sindel and I had a very different perception than Dr. Haney about what he would be doing for the case. Prior to Mr. Sindel's receipt of Dr. Haney's letter, I had neither mail, telephone, nor personal contact with him in regard to the mitigation issues in this case.

Ex. 12, Decl. of John Simon.

After receiving Dr. Haney's letter, counsel immediately set out to find a replacement, and Dr. David Randall from Illinois was brought into the case. He recounts the circumstances of his joining the case:

> I was first contacted about this case by Connie Caspari on January 15, 1998. Ms. Caspari was employed as an assistant by Billie Allen's trial counsel, Rick Sindel. She stated at that time that the mitigation expert Mr. Sindel had initially retained (Professor Craig Haney, Ph.D.) was no longer involved in the case, and that Mr. Allen's trial was set to start on February 9, 1998. She also explained that substantial mitigation work on the case still needed to be done. As I later learned, this was a considerable understatement. In fact almost no mitigation work had been done. It was clear that during the time leading up to trial, the communication between Mr. Allen's attorneys and mitigation expert Haney was abysmal. The essence of what I was told about the exchange between counsel and Dr. Haney was that counsel had

105

> contacted Dr. Haney in January 1998, asking him, "Where's the mitigation? Trial's next month," with the response essentially being, "What do you mean trial's next month?" In any case, Dr. Haney had done no discernable work preparing mitigation for Mr. Allen's case, and there was no outreach on counsel's part to regularly check in with Dr. Haney in the months before trial for briefings on his progress – nor Dr. Haney to counsel.

Ex. 19.

Dr. Randall's Declaration makes plain that he believed that there was far too little time to conduct a mitigation investigation that comported with the standards of his profession, but he nonetheless accepted the assignment. As he now relates, this was a difficult choice, and one which he believes did more harm than good:

> Understanding that a continuance was unlikely, I nevertheless agreed to work on Billie Allen's case. Presented with a moral dilemma, my decision was not without significant ambivalence about taking on what I perceived to be a virtually impossible task. However, Mr. Allen and his attorneys were in a desperate predicament. I decided to work on the case. Unfortunately, in hindsight, that decision was a serious error, in that our work may have presented a "veneer of competence or adequacy" to the mitigation investigation and sentencing phase, where none existed.

*Id.*

Dr. Randall also reveals that the mitigation case was in shambles when he joined the team with less than one month until the start of trial:

> Upon starting work, I quickly realized that the case was in even worse shape than I had expected. In their limited contact with Mr. Allen's family members, trial counsel had not discussed substantive mitigation-related topics and seemed to have not even explained what a mitigation investigation entailed. In essence, counsel had spoken to the family only to keep them updated on the progress of the case. No attempts had been made to begin the laborious process of generating Mr. Allen's social history. Only a few records on Mr. Allen and his family had been collected. Mitigation witnesses outside Mr. Allen's immediate family – teachers, friends, neighbors, etc. – had not even been identified, let alone contacted. Because of their limited contact with the family,

106

compounded by obvious racial and social class issues, counsel had not put the time in, over time, to develop the level of trust necessary for engaging family members around sensitive personal information germane to mitigation.

*Id.*

Dr. Randall set up a "war room" and set out to perform his duties. On January 30, 1998, counsel unsuccessfully moved for a continuance of the start date for the trial, while Dr. Randall confronted the mountain of obstacles created by the short time he had to do to conduct a mitigation investigation from scratch:

> The mitigation investigation and sentencing hearing were a chaotic, seat-of-the-pants scramble. There was little time to digest what we learned as we learned it, conduct adequate follow up, or make deliberative decisions. Time is needed to make measured, informed decisions in a matter of this magnitude. Had the same number of hours expended in this case been stretched over a more reasonable period of time, a more effective process would have ensued.

Ex. 19.

Dr. Randall explains that, as in any mitigation investigation, a great deal of time is required not only to identify relevant mitigation witnesses, but to earn the trust of individuals who may be asked to divulge embarrassing and painful secrets about their family and friends:

> The nature of capital mitigation requires the mitigation expert to probe the most intimate details of a client's life, and those of his family, friends and acquaintances. Therefore, repeat interviews are virtually always required over an extended period of time, especially with family members, as it is incredibly challenging to have family members open up to reveal aspects of the family dynamic that range from embarrassing to criminal (as current counsel have done). Capital mitigation is a painstaking and time consuming process. While this was all known in 1998, and was accepted as a standard of practice, the recent American Bar Association, *Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases,* 36 Hofstra Law Review 677 (2008), explain the exhaustive nature of capital

107

mitigation, and I commend them to the Court as an excellent overview of the unique challenges posed by capital mitigation.

*Id.*

Trial counsel's failure to perform a timely mitigation investigation colored virtually every decision and strategy after Dr. Randall joined the defense. In particular, the time pressure caused the team to rely almost exclusively on Mr. Allen's mother to guide the mitigation investigation and prevented the defense from investigating Mr. Allen's father's side of the family, which was estranged from the mother's side:

> As I worked on Mr. Allen's case, it quickly became apparent that there was an obvious schism in the family between Mr. Allen's father and his mother. There was a considerable amount of animosity between the two sides of the family. It became obvious that our client was in contact with his mother and her side of the family, and that he was largely estranged from his father's side. This dynamic made Mr. Allen's maternal side of the family more accessible. The extreme time pressure in this case fed the defense team's need to not alienate his mother and keep her as an ally, because keeping her as an ally allowed access to important potential mitigation witnesses from the maternal side of the family. Therefore, because of the acrimony between Mr. Allen's mother and father, and the compressed time frame, my attempts to reach out to family members on the father's side were limited. This has proved to be a serious shortcoming, given what current counsel have uncovered from the father's side. In my short time working on this case, I expended considerable effort working with Ms. Allen to increase her chances of cooperation with a Caucasian defense team she did not trust. We needed more time to build trust, time we always have had in other capital cases.

*Id.*

The defense relied on Mr. Allen's mother to its severe detriment, as Dr. Randall discusses:

> Aside from missing half the picture in Mr. Allen's family, focusing solely on his mother's side of the family presented its own problems. She had an obvious drinking problem, short temper, and was an unpredictable, intimidating, and bullying character. These

108

personality traits and behaviors caused extreme tension even with people on her side of the family. Nonetheless, I was forced to rely on her as the entre to important potential mitigation witnesses. It was clear that Ms. Allen was one of the primary abusers of her son. Unfortunately for the jury and for Mr. Allen, we did not have sufficient time to develop the necessary rapport with his mother, and speak with her about painful and embarrassing details of her past, and those of her family, and the abuse she meted out on our client, her son – details that would have been highly relevant in both content and emotional impact.

*Id.*

Dr. Randall believed that Mr. Allen was the subject of childhood abuse and family dysfunction, but he did not have adequate time to investigation and substantiate his suspicions:

I strongly suspected that Mr. Allen was the product of an abusive and highly dysfunctional upbringing. Dysfunction does not arise in a vacuum. This impression was based on clinical experience and on bits and pieces of information I was able to put together from talking with witnesses and reviewing documents. I knew that as a child and adolescent, Mr. Allen had problems learning and achieving, attentional difficulties, suffered from behavior problems, was emotionally immature and, as a young adult, suffered bouts of depression, leading to his self-medication with illegal drugs, his rapid mental deterioration and seeking psychological help in the weeks before the offense. I also observed the maternal family dynamic. Ms. Allen was an aggressive, dominant, and heavy-drinking woman who demonstrated a notable lack of warmth and compassion. The only emotions she seemed to readily display were anger and rage.

Despite my suspecting family abuse and dysfunction, I was not able to obtain concrete information from any family member that this existed. Again, the unique nature of capital mitigation came into play. One cannot expect family members to reveal such embarrassing and traumatic facts during an initial interview, or even after a number of meetings. All told, I knew these people for just over one month. In my experience as a mitigation specialist, many confidence and trust-building encounters are required before a witness will open up about these types of topics. On other capital cases, I have typically been afforded from one to two years, sometimes more, to work up a case. Mitigation investigation in capital cases is simply a time and labor-intensive process – the iterative process mentioned earlier – which trial counsel should

109

have begun many months before my entry into the case, in close collaboration with Dr. Haney.

Ex. 19.

The defense team failed to uncover even available information. Both Mr. Allen's mother and paternal uncle, Billy Wayne Allen, explain how they were either ignored or not listened to by the defense. Billy Wayne Allen explains:

> I was aware when Billie was tried for capital murder in St. Louis. Except for my time in the Air Force, I am a life long resident of the St. Louis area. At the time of his trial, I never met with anyone working on Billie's case. My only contact with Billie's lawyers came when I telephoned them after Juanita asked me to. I spoke briefly on the phone with someone I thought was his attorney on that occasion and maybe one other time. I received no other phone calls from Billie's lawyers or their associates. The phone call did not last for more than about 10 minutes. The person I spoke with asked me if I could be a "character" witness for Billie. When I asked what that meant, the person told me that he wanted to hear about "good" things Billie had done. I really wanted to help, but I could not think of much Billie had done in his young life that was "good." Billie had a very hard life, and I had lots of information to share about that, but I was never asked about those details until Billie's current lawyers began to speak with me and asked me to complete this statement. I wanted to attend the trial, but when the person on the phone heard that I had nothing "good" to say about Billie, he told me it would be best for Billie if I stayed away.

Ex. 26, Decl. of Billy Wayne Allen.

Mr. Allen's mother Juanita Allen also recounts that she was not asked crucial questions to develop mitigation evidence:

> Billie's lawyers at trial did not spend very much time with me at all. They would give me some basic information about the case, like when the next court date was. But they never really sat with me to hear my story. I told them some information, and they seemed to focus on the story about Marquis Taylor and the shooting. Had they spent more time with me, and asked about my background, problems and those of Billie's father, I would have told them. But, as I said, it is hard for me to discuss these topics. I only came to do so with Billie's current lawyers after spending

many hours over many days with them. Billie's current lawyers have also asked me a lot of different types of questions, which have helped me to understand what information would be important to help Billie's legal case. Billie's trial lawyers were always so rushed and never seemed to have time for me or my family.

Ex. 23, Decl. Juanita Allen ¶ 14.

### b. The Results of Counsel's Truncated Mitigation Investigation – What was Presented at Trial.

"The record of the actual sentencing proceedings underscores the unreasonableness of counsel's conduct by suggesting that their failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment."

*Wiggins v. Smith*, 539 U.S. 510, 526 (2003)

Given the short time they had to work with a mitigation specialist, the defense team presented a penalty phase that focused, as Dr. Randall summarizes, on a small number of themes, "that only scratched the surface of Mr. Allen's" true history and development:

I have read the complete penalty phase transcript in preparation for completing this declaration. Although the defense presentation was long (approximately 30 lay witnesses were called), these witnesses repeated a small number of themes that only scratched the surface of Mr. Allen's upbringing, impairments, and troubled character. In the desperate scramble to prepare for the sentencing hearing, the focus was on mustering witnesses.

As a result, the depth of preparation for each witness suffered greatly. Given the time constraints, it was impossible to prepare witnesses with sufficient depth. Thus, witness after witness described Mr. Allen laconically as a "follower" not a "leader." His flaky skin condition and childhood illnesses like asthma were repeatedly described. Mr. Allen's adjustment to going to the "white" school in Clayton was also discussed. In the time allotted to me, I did the best I could to line up witnesses to present the themes that we had been able to throw together. The emphasis on school teachers was no accident. Given our time constraints, I focused on people who were more readily accessible and who

111

> could provide a coherent articulation of the limited themes we had been able to develop. Although these themes are worthy of inclusion in a comprehensive penalty phase presentation, I knew at the time that they were just a small part of a much larger story about Mr. Allen's life. It may be seductive for some to conclude that the Allen sentencing hearing was adequate based on the sheer number of witnesses presented. However, this conclusion is erroneous.

Ex. 19.

Indeed, aspects of the penalty phase presentation were downright misleading. In the opening statement at penalty, trial counsel informed the jury that: "The testimony will show that Billie has and had a loving family." T. XIV 58. Counsel subsequently presented testimony, *inter alia*, that Billie had a "caring mother," T. XVI 292, and that Billie was taught good values at home, *e.g.* T. XV 267. As current counsel's investigation makes clear, and as discussed in detail below, this was a starkly inaccurate picture of Mr. Allen's upbringing.

Mr. Sindel acknowledges that the penalty phase presentation was limited and based only on what Dr. Randall could find in the limited time after he joined the case: "I recall that we settled on the presentation of a limited number of themes for the likely penalty hearing. These themes were based on what investigation Dr. Randall was able to perform in the short time he was on the case." Ex. 11, ¶ 14. Mr. Simon concurs:

> As is evident from the dates of our retaining of Dr. Randall, and the dates that Dr. Gelbort and Dr. Cuneo conducted their evaluations, our mitigation preparations were impacted by severe time pressures. This pressure permeated our preparation. Dr. Randall was making decisions about whom to investigate, interview, and follow up on, based primarily on what could be done in our limited time. I assisted Dr. Randall with some of the mitigation interviews. This was done out of necessity.

Ex.12. ¶ 6.

112

Once Dr. Randall joined the team, he was able to convince defense counsel that it was imperative to have Mr. Allen evaluated for the presence of potential mitigation by a mental health evaluator. However, due to the time pressures, the team relied upon a previous evaluation done by Dr. Daniel Cuneo, who had earlier evaluated Mr. Allen only for trial competency. Dr. Cuneo generated a report touching on post-traumatic stress disorder, but the report and subsequent testimony was also impacted and compromised by the shortened time frame. as Dr. Randall explained:

> The sentencing presentation also touched upon Mr. Allen's post-traumatic stress disorder (PTSD). Dr. Cuneo conducted an evaluation of Mr. Allen the same day I was appointed to this case (January 16, 1998). Therefore, he went into the evaluation with extremely limited background information and literally no lay accounts of Mr. Allen's life. And, as Dr. Cuneo's report indicates, **his sole contact with Mr. Allen was for the purpose of determining his trial competency, and not mitigation**. Dr. Cuneo's report also indicates that Mr. Allen reported that he was "stressed out" over the 1995 killing of his friend, Marquis Taylor. I recall that in subsequent discussions with Dr. Cuneo and counsel, that it was decided to seize upon this fact as the underlying trauma for what would be the doctor's PTSD presentation. I was concerned about this strategy because, while an event like the Taylor shooting can support a diagnosis of PTSD, it was apparent that Mr. Allen's trauma symptoms existed long-before this shooting, and were based upon a much richer trauma history and predisposition. Indeed, in his arguments to refute the PTSD mitigator as presented by the defense, one thing USA Dowd was correct about was, "This defendant deteriorated long before Marquis Taylor was ever killed." Unfortunately, the reasons underlying this long-term deterioration, and Mr. Allen's lack of resilience, were inadequately explained by the defense. And, like virtually every aspect of this preparation, we were forced to make decisions without adequate information and deliberation, which was a function of the time constraints on the penalty phase investigation.

Ex. 19.

113

The same problems arose with respect to having Mr. Allen evaluated for the possible presence of organic brain damage. That evaluation literally took place the night before the start of trial:

> Mr. Allen manifested many signs and symptoms of an organic brain impairment that impacted his ability to function, let alone succeed, in life. I have now learned that he had a history of maternal in-utero heavy alcohol abuse and cigarette smoking. I knew then that he had childhood febrile seizures, lead poisoning, asthma, lack of school achievement, emotional lability, and head injuries.  Given these signs, it is a standard of care in death penalty cases that possibility of brain damage be thoroughly explored, so that the sentencer can understand the interplay between head trauma, emotional trauma, and their emotional and behavioral sequelae. Soon after my involvement began in the case, I told counsel that we needed to involve a neuropsychologist. The defense retained Dr. Gelbort to conduct a neuropsychological evaluation in an attempt to explore these areas, however this was done at a late hour. The evaluation was conducted on February 8, 1998 – just one day before jury selection. As a clinical psychologist with academic and practical training in neuropsychological assessment, I would note the difference in the scope of Dr. Gelbort's testing when compared with the far more comprehensive testing and reporting done by Dr. Martell, per the request of current counsel for Mr. Allen. There is little question that Dr. Gelbort's evaluation was rushed and truncated due to the extreme time constraints trial counsel put him under.
>
> The mental health experts did last-minute, quick reviews and evaluations. The level of care and attention to details that one would expect in an endeavor of this magnitude was simply not evident – neither I, the lawyers, nor the experts had sufficient time to fully investigate and consider, in a deliberative manner, the relevant issues in Mr. Allen's life that mitigated the offense. Indeed, it was not until my entry into the case that Dr. Cuneo focused on mitigation at all: he had initially been retained to perform a competency evaluation. With proper preparation, mitigating mental health information could have been presented to the jury in a manner that was credible, persuasive, and in a way that they could comprehend. Unfortunately, because of extreme time constraints, their last minute entry into the case, the superficial nature of the evaluations performed by Drs. Cuneo and Gelbort, and the failure to present the full range of foundation, lay testimony in substantial scope and depth (e.g., mother's and

114

father's side of family, more thorough examination of current witnesses, other critical witnesses not identified or interviewed), the mental health experts' testimony was more easily obfuscated.

*Id.* ¶ 18.

### c.       The Unpresented Mitigation – What Trial Counsel Failed to Discover and Present.

"The mitigating evidence counsel failed to discover and present in this case is powerful."
*Wiggins v. Smith*, 539 U.S. 510, 534 (2003)

In truth, Mr. Allen was the subject of savage childhood abuse, abandonment, neglect, family dysfunction, and severe impoverishment. He was repeatedly abandoned by his mother and beaten by his mother, father and other relatives. He was taught the illicit drug trade at an early age by his father and uncle, and he was forced to take to the streets to fend for himself at an equally tender age.

Billy Wayne Allen, Sr., Mr. Allen's paternal uncle, describes many of the dire circumstances surrounding this child's early life. But, as he points out in his declaration, the "story of Billie's life really starts with the story of my family":

> I was one of six children born to my parents. I have three sisters, Billie's dad (Junior) and a third brother (Bobby Elliot), who died some time ago. My parents were not normal. My dad drank and my parents fought and put their needs ahead of their children's needs. My parents used beatings as a means of discipline. We took a lot of negative habits from them. My brothers and I each have had severe problems with drug and alcohol abuse. Junior and I took to making a living selling drugs for years in our neighborhood. We also have each had physically and verbally abusive relationships with our families. We behaved just as our parents did.
>
> Junior was badly beaten. That is because my father resented him because once Junior told our mom that our dad was having an affair with another woman. Our dad almost beat Junior to death for

115

that, and since then, my father seemed to take special pleasure in beating him.

As I will get to, I became a regular drug user – I was an addict for many, many years. I used mostly marijuana, cocaine and angel dust (also known as PCP).

Ex. 26 ¶¶ 3-5.

Billy Wayne Allen, and his brother (Petitioner's father, whom he calls "Junior"), took up a life of drug abuse and sales. This life had a dramatic impact on Mr. Allen. Billy Wayne Allen had a bird's-eye view of this impact. He describes the abuse and family dysfunction suffered by Mr. Allen:

I am about 22 years older than my nephew Billie. I lived across the street from where he lived for a good portion of his young life. I had a good opportunity to see what his life was like. Junior and I went into the drug business together. We sold mostly angel dust (PCP) and cocaine. I honestly do not remember whether we began using first or selling first, but I can tell you that it did not take long before we were addicts. Being in business, we always had a steady supply, and the money to use all we wanted. We were not big time drug dealers, but we just had a nice steady business that paid our bills and kept us in all the drugs that we wanted. And we used those drugs. I have found God and have been sober for about 15 years. I have gained much understanding of why we led the lives we did. We used those drugs because we were in lots of pain over the way we were treated by our parents. Those drugs allowed us to escape that pain, and brought some joy to our otherwise unhappy lives.

During the time that Billie lived with his mother (Juanita) and Junior, and his sisters, I knew that the my brother and Juanita fought all the time. They were verbally and physically nasty to each other. Juanita may have been a drug user, and she may have gotten into our PCP. I am certain however that she drank. She could drink alcohol like a man. She drank for as long as I knew her, including when she was pregnant with Billie and her other kids. There is no way to describe her except to say that she was a heavy drinker who would drink all day and every day.  And when she drank, she could fight and get nasty like a man. She used to get the best of my brother when they fought. They fought in front of the children, drank and cussed, and Junior and I used drugs in front

116

of them too. They also beat their kids, just like we got beat by our parents who would use straps, shoes, broom handles and pretty much anything that was around.

Ex. 26. ¶¶ 6-8. What is more, he described how he and Junior integrated Mr. Allen into the "easy life":

> But worse than the act of selling drugs, we introduced Billie to the "easy" life. We taught him all the wrong stuff. Instead of teaching him about hard work, we taught Billie about crime and drugs. We did not teach him the value of people, but only taught him about getting things. We taught him about jewelry and liquor, but not about hard work. To say that we were a bad influence on him would not even begin to tell the story. He was with us when we were surrounded by the illegal activities of drug dealers, drug users, and prostitutes. He was still a little kid, but oh we thought this was cool. Eventually, Billie went to work for a really mean dealer named Johnnie Boyce. He was a rival dealer, who specialized in heroin. When Billie went to work for him, I knew that the cycle was complete. We reaped what we sowed.

Ex. 26 ¶ 9.

Mr. Allen's mother, Juanita Allen, also discusses the actual mitigating evidence that could have been presented had counsel left adequate time for investigation. Like her brother-in-law, her early life was hard and she learned bad habits young, particularly to rely on alcohol as a salve for her difficulties. These bad habits carried over into the way she lived as an adult and how she reared Mr. Allen:

> My mother died of cancer when I was about fourteen years old and it took a great toll on me. Her death changed my life and my relationships with my family and friends from then through adulthood. When I was about sixteen years old, I started drinking alcohol. There was always alcohol in the house, and my father would let me drink. I started drinking more and more because I could get it so easily. As I became older and the death of my mother still weighed heavily on me, I continued to drink more and more heavily.
>
> My family was poor growing up and life was very hard. As pressures grew in life, I found more and more comfort in drinking.

117

Ex. 23 ¶¶ 2-3. Eventually, Ms. Allen met Mr. Allen's father, John Allen (who went by "Junior" or "JR"), and the two wed. It quickly became apparent that life with JR would be chaotic and impoverished:

> I married JR because I became pregnant with his child and I thought he would be a provider for our family.
>
> I was wrong. He never held a job for long, and was always in and out of work. He was rarely home while my children were growing up. He was always out running around, drinking and doing and selling drugs. I already didn't like him, even when we got married, but I began to despise him once he proved to be such a terrible husband and father. Things got even worse, when his brother, Billy Wayne Allen, returned from the army. He escalated JR's drug use. I watched as JR's severe drug habit went from bad to worse and ate away at him and ruined his life. He would often come home high or drunk and wouldn't be able to get up the stairs to the house. Once he came in saying he was hungry and told me to make him some food. I threw out the rest of the dinner I had made earlier that night and told him that he hadn't provided the food, so he shouldn't be able to eat it.

*Id.* ¶¶ 4-5.

As life with JR continued, the family's circumstances continued to spiral downward. With that downward spiral, Juanita Allen drank more and was horribly abusive to Mr. Allen:

> The hardest thing for me to talk about is my own treatment of Billie. I have always been a fighter from a young age. I could beat up a man bigger than myself and was always able to handle myself during a fight. Billie was a difficult child and I would get easily frustrated by his behavior. I am so sorry to say that I would take my anger and frustration out on him physically. I would use a belt, an extension cord, or any object within reach to hit Billie. Sometimes I slapped him across the mouth. When I was drinking, I was mean and when I was drunk the beatings and abuse got worse.
>
> I did not only abuse Billie physically, but I would treat him differently from my three daughters. There was just something about Billie, about his problems and about the difficulties in his behavior that just lit my fuse. I could not control myself. So, sometimes, I just wanted him out of my sight. There were periods

118

of time when I would throw him out of the house and not let him back for days. During those times, I could often only guess about where he stayed (sometimes I know he went to stay with his father and Uncle Billie) and what he did for food. I did this even while he was a young boy, and this continued up threw the time of the bank robbery. As I recall, I threw him out of the house (again), just after our house got shot up as a result of Billie selling fake drugs. I did not know how to cope and so my response was either to hit him or get rid of him.

Ex. 23 ¶¶ 8-9.

When she threw her son out of the house, Mrs. Allen knew that he went to stay with his father and uncle (*id.* ¶ 11-12), or else with unknown others. He would return from those visits with a different "street attitude." The violence was every where around young Billie Allen, and eventually, he was "transformed into somebody [she] didn't recognize":

There was so much violence in Billie's life. There was my treatment of him. My brother, Jerome, would often rough him up sometimes. Jerome was a rough man during those years, and sometimes his treatment of Billie was abusive. As Billie became a teenager, many of his friends were rough and disobedient kids. There were frequent fights and even shootings. The violence seemed everywhere around us. By the time he was around fourteen years old, Billie transformed into someone I didn't recognize. He was a drug user and seller. School became at best secondary in his life. I thought about getting him into counseling, and I signed him up for community groups like the Boys Scouts to get him away from the rough crowd he always hung out with, including his father and uncle. But, I was so frustrated with him and didn't know what I was supposed to do about it. So, I resorted to my habits – I beat him and threw him out whenever I thought he deserved it (which was often). I was also going through hard times myself trying to maintain a job and provide for my family, and I found it difficult to focus on solving Billie's problems as well as my own. When I thought my kids were in some kind of trouble or having problems, I just didn't want to know about it.

Ex. 23 ¶ 13.

Numerous other family and friends share the recollections of Billy Wayne Allen and Juanita Allen, and these witnesses' Declarations are attached as exhibits to this Traverse. While

119

each witness has a different view of the life of young Billie Allen, together they provide a

compelling yet untold story of Mr. Allen's young life of suffering frequent abuse, abandonment,

and the burgeoning psychological impact of that history. Counsel here provides only a brief

sampling of those witnesses' accounts.

A lifelong friend of the family describes the abuse Mr. Allen suffered:

> She was too wrapped up in her own depression, alcoholism,
> confusion and in her own survival and happiness. When Billie and
> her other kids were babies, Juanita would not change their diapers
> for days at a time. They were just left to lie in their own filth.
> When Billie began to cry, she would stand over him in his crib and
> just look at him, smoking her cigarettes, dropping ash right on him.
> She would not pick him up or comfort him.
>
> Billie had health problems from the time he was a baby, and he
> always had bad asthma. When he had bad asthma attacks as a
> toddler, Juanita would pick him up and shake him violently while
> he gasped for air. She had no idea how to sooth him or tend to his
> needs. I know that she loved her kids, but I have always thought
> that he[r] own experiences sapped her of any ability to show love
> and affection, particularly to Billie. It's hard to believe that Juanita
> and her kids are still here. Because of the way he was raised, Billie
> never had a chance.
>
> From the time he was a toddler when she would shake him until he
> was a full grown teenager, she physically abused him. She
> whipped Billie with belts. She threw shoes and knives at him. She
> beat him with broomsticks and even with the back of a butcher
> knife. She verbally abused him, calling him a "m[----]f[----],"
> calling him stupid, telling him that she wished he wasn't her son.
> Sometimes she would just yell at Billie to "get the f[---] out of
> here" and chase him out of the house swinging a broom stick at
> him. She took her anger out on the boy his whole life.

Ex. 28, Decl. Cathy Toliver ¶¶ 6-7, 11. Ms. Toliver's son, a childhood friend of Billie

Allen, shares similar memories:

> She used to call him names and cuss at him. She called him stupid.
> Sometimes Juanita would lose her mind and go crazy on Billie.
> She would scream at him and hit him or throw any object that was
> close to her at him. She threw shoes, an iron, and I even saw her

120

> throw a pan off the stove at Billie. It was never a regular
> whooping. There was never an explanation after the beatings.

Ex. 29, Decl. Brady Toliver ¶¶ 6-7.

Numerous other witnesses confirm these accounts. *See* Ex. 24, Decl. Nicole Petty ¶ 3 ("She would yell and scream at Billie and beat him with a shoe, a cord, or anything else within her reach."); Ex. 34, Decl. Claude McLemore ¶ 5 ("When he was young, Juanita [would] grab Billie, rough him up, and beat him with thick belts, extension cords, high-heel shoes, whatever she could put her hands on. When I stayed over for a weekend, Juanita usually beat Billie at least once or twice, even though we weren't in the house most of the time."); Ex. 30, Decl. Samuel Moore ¶ 2 ("Juanita beat Billie. I know that she thought it was the way to raise a child, but this went beyond discipline. It was excessive and abusive. I knew of instances when she beat him for no good reason. By that I mean I have seen her hit him as soon as he walked onto the porch when he came home from playing ball."); Ex. 31, Decl. Johnnie Grant ¶ 4 ("Juanita and his grandfather would cuss him and hit him and throw things at him. Billie got picked on and whooped all the time for no reason. Sometimes he would even turn it into a game and tell me, 'Watch this.' Then he'd approach his grandfather's room and say something like, 'Hey, grandpa,' and a shoe would just come flying out at Billie's head. I have never in my life seen anything like it.").

The jury never learned about Mr. Allen's abusive upbringing. They likewise never learned that as a young child Billie Allen's family frequently abandoned him in the violent neighborhood where they lived. The family inexplicably chased him out of the house and kept him locked out of the house overnight for days at a time. As childhood friend Antonio Rycraw recalls:

> Billie's family put him out from the house, even at night. When he
> was only 10 or 11 years old, I remember he'd be walking the street
> late at night, acting like he had somewhere to go. When Marquis

121

> and Eric Taylor moved into the neighborhood, he would go over and spend the night with them at lot. Before that, it seemed like he had nowhere to go. I never knew why he got locked out from his house so much. Billie would just play it off like he didn't want to go home, but everyone knew that his family locked him out. They just threw him out like trash.

Ex. 35, Decl. Antonio Rycraw ¶ 2.

Numerous other witnesses confirm Mr. Rycraw's account of this abandonment. *See* Ex. 33, Decl. Ahmed Oliver ¶ 6 ("Billie would come over to my home several times a week. Sometimes he came over because his family locked him out of the house and wouldn't let him in."); Ex. 31, Decl. Johnnie Grant ¶ 6 ("The entire time I knew Billie he did not have a key to his own house. When I was first getting to know him, I remember after softball one day we left him off at his house, and he acted like he was going inside. But the next morning, I came by his place and he was asleep on the front porch. I first realized then that his family locked him out overnight. They didn't care if it was cold and they didn't care that the neighborhood was dangerous and violent."); Ex, 34, Decl. Claude McLemore ¶ 9 ("Juanita would often kick Billie out of the house for days at a time. She just wouldn't let him back in.").

Dr. Pablo Stewart, M.D., a psychiatrist who specializes in the treatment of trauma victims and drug abusers, has reviewed these declarations, has personally interviewed many of the declarants, has walked the streets of Mr. Allen's childhood neighborhood, and evaluated Mr. Allen over a two-day period.

Dr. Stewart has reached a number of clinical and forensic conclusions. He notes that Mr. Allen was subjected to savage brutality:

> Throughout his life, Mr. Allen was physically abused by Juanita, J.R., and other family members. Affiants and interviewed witnesses describe almost daily beatings in which Juanita would violently shake Billie, whip him with belts and extension cords, slap him, hit him with shoes, and throw objects at him. His uncle

122

and grandfather would punch and whip Billie as well. Many of these beatings occurred without provocation or explanation, and coincided with frequent severe verbal abuse. When Mr. Allen was not being abused and beaten by his mother, he was assaulted by his father. Once the parents separated, Mr. Allen was also subjected to the harsh conditions imposed upon him by his father and uncle and their life as drug addicts and drug dealers.

Ex. 20, Decl. Dr. Pablo Stewart ¶ 8. He notes that Mr. Allen also suffered parental

abandonment:

> Particularly after Juanita and J.R. separated, Juanita's ability and willingness to care for and nurture her son were severely tested. Unfortunately for Mr. Allen, as he grew from childhood into his teen years, his mother all but abdicated her significant maternal responsibilities. Saddled with her own addictions and mental health problems, she took out many of her frustrations on Mr. Allen. She banned him from the home for long periods of time, even at night when he was only 10 or 11 years old. Such abandonment of a child by a parent can have long-lasting and durable psychological impacts on the child. In Mr. Allen's case, the abandonment, abuse, and family dysfunction had such an impact.

Ex. 20 ¶ 9. This abandonment helped shape Mr. Allen's psychological make-up and helps

to understand events that precipitated the offense:

> Abandonment is a significant theme in Mr. Allen's history. In addition to the many times he was put out of his house, there was an incident that pre-dated the offense by a short time, during which he was thrown out of the maternal home, ostensibly for good. This final act of maternal abandonment occurred just after the home was shot-up in January 1997 in apparent retaliation for Mr. Allen cheating somebody in a drug deal. This final act of abandonment preceded a particularly severe decline, during which Mr. Allen was suicidal and actually made efforts to seek mental health intervention. Then, just a few nights before his arrest, Mr. Allen returned to the home and pleaded unsuccessfully to be let back in. That this act of abandonment came shortly before the bank robbery is of great significance from a clinical and forensic perspective.

Ex. 20 ¶ 10.

123

Dr. Stewart also noted the significance of Mr. Allen's impoverished neighborhood and family circumstances. *Id.* ¶ 11. In addition to the fear he felt being in the neighborhood in daylight ("Despite the fact that I was there in the daylight, and despite my military background, I was genuinely scared for my safety") *id.*, Dr. Stewart has reviewed the report of Professor Colin Gordon, Ph.D., who, at the request of undersigned counsel has generated a report entitled *North St. Louis Neighborhood Analysis*. The report and executive summary are attached as exhibits 13 and 18, respectively. This report provides extensive empirical data—available at the time of trial—documenting the extent to which Mr. Allen's neighborhood presented a constellation of risk factors notably worse even than other inner-city neighborhoods. Dr. Stewart summarizes the risk factors that affected Mr. Allen's life because of where he grew up:

> The poverty, unemployment rate, hyper-segregation, as well as the violent crime rates, low educational attainment, single parent families, and child abuse in the neighborhood combined to create an environment posing singular risks to Billie's development.
>
> Certainly, as discussed in this Declaration, it is significant that many of the risk factors identified in Billie's neighborhood played out in his own family and/or his own experience. He directly experienced prenatal toxins, child abuse, neglect, lead poisoning, poverty, gun violence, gang violence, the drug trade, and being raised by a single mother. In Billie's case, these particular experiences were compounded by the fact – illustrated in Dr. Gordon's maps – that he was literally surrounded by peers and adults undergoing similarly traumatic experiences, and he was geographically and socially isolated from stabilizing influences and from communities with greater social capital.

Ex. 20 ¶¶ 12-13.

Although trial counsel presented general, lay testimony that Mr. Allen grew up in a disadvantaged neighborhood, trial counsel did not investigate or present to the sentencing jury information showing the true isolation and poverty of that neighborhood. The sentencing jury, mostly white jurors who grew up in the suburban counties, far removed from Mr. Allen's inner-

124

city neighborhood. Among the ample available information about Mr. Allen's neighborhood that

counsel did not present:

- Mr. Allen's neighborhood population has been over 99% African-American since 1970, and the population shrunk by over 70% between 1950 and 1990.

- This urban flight literally emptied Mr. Allen's neighborhood, to the point where he grew up surrounded by vacant and abandoned properties. A side-by-side comparison of his neighborhood in 1930 and his neighborhood in the 1990s, with vacant properties highlighted, starkly illustrates why his neighborhood has been described by so many as "bombed out."

- Mr. Allen grew up in a neighborhood where family incomes were less than 50% of the metropolitan region – the lowest-income category of neighborhoods measured by the census; the suburban counties, with very few exceptions, had average family incomes ranging from 75-100% of the regional average to twice the regional average.

- Mr. Allen's neighborhood was in the highest category in the entire metropolitan area for risks such as child abuse; infant mortality; low birth weight; child victims of violence crime; and adults with less than a high school education. These risk factors are barely present in the suburban counties.

  Ex. 13, 39-51, 56, 60-61, 63-76; Ex. 18, 2.

  Dr. Stewart reviews the general impact of living through a childhood replete with

violence, danger, trauma, dysfunction, and impoverishment:

> The devastating adverse mental health effects of being subjected to such a traumatic childhood are well established. As discussed below, Mr. Allen exhibits the full constellation of symptoms typically seen in survivors of severe childhood abuse. Children who are forced to endure such trauma are left with long-term debilitating psychological impairments. They are likely to have adjustment difficulties in a number of areas, including behavior problems and disorders in cognitive and emotional development. They are likely to feel guilty for failing to stop the violence, and to feel angry because others failed to protect them. Their ability to trust others may be severely compromised. They may become paranoid and suspicious. They often have difficulties with interpersonal relationships, their ability to relate in healthy ways to others is impaired, and they frequently become socially isolated. They are likely to feel very dependent on others while, at the same time, their relationships are unstable. They tend to have self-image problems and poor self-esteem. They are more likely to have poor

125

judgment and poor impulse control, often behaving in self-destructive ways. They have problems recognizing, verbally expressing, and coping with their own emotions. They frequently suffer from depression, shame, despair, and anxiety. They may suffer from Posttraumatic Stress Disorder and are prone to develop Borderline Personality Disorder. They have greater difficulty understanding their place in the world and a more limited ability to cope with the ordinary problem solving needed for daily living. Their compromised ability to trust others, and their overall levels of suspiciousness and guardedness, may prevent them from obtaining mental health treatment, often until their symptoms become completely debilitating and acute. Such individuals are at significantly higher risk for substance abuse and addiction.

Children learn adult roles and behaviors by observing and interacting with adults. In a chaotic, violent, and neglectful home, the child learns that the world is a frightening and unpredictable place. They come to see the world as populated by people who alternately mistreat and ignore you, harm and abandon you. They are taught that violence and aggression are normal and acceptable means of problem solving. Children from violent and dysfunctional homes frequently develop cognitive deficits in the processing of social information, including failure to attend to relevant cues, a tendency to attribute hostile intentions to others, and failure to develop competent ways of solving interpersonal problems. Exposure to violence and abuse make children experience heightened arousal and hypervigilance, effects that often persist into adulthood. The abused child is often unable to react normally to stressors, but will hyper-react and be unable to properly control these reactions. Because their brains have been flooded with stressors since an early age, they may live in a permanent state of arousal, fear, and anxiety. Abuse causes particularly severe hypervigilance when it is unpredictable and recurrent. Such abuse has a physiological as well as a psychological impact on its victims.

The harmful effects of childhood trauma are exacerbated where the child is abused by close family members. Children, of course, rely on family members for guidance, support, and safety. When family members instead abuse and neglect a child, the child's emotional and cognitive impairments are significantly magnified. The effect is greater still when a child is abandoned by his ostensible care-giver, as was the case when Mr. Allen was repeatedly locked out of his mother's home from a young age. The impact of these actions on Mr. Allen's psychiatric pathology cannot be understated.

126

Ex. 20, ¶¶ 15-17. Mr. Allen suffers from all of these symptoms. *Id.* ¶¶ 18-20.

Based upon his entire evaluation, Dr. Stewart reached the following clinical diagnosis of Mr. Allen:

Axis I          Posttraumatic Stress Disorder, Chronic
                Dementia, Due to Multiple Etiologies
                Major Depressive Disorder, Recurrent
                Substance Abuse (alcohol, cannabis), in Sustained, Full Remission in a
                Controlled Environment; Rule Out Substance Dependence

Axis II:        Borderline Personality Disorder

In paragraphs 22-34 of his Declaration, Dr. Stewart discusses these diagnoses, including his bases for reaching them, as well as the relevant diagnostic criteria.

As discussed by Dr. Stewart, Mr. Allen suffers from Dementia. This is the technical name for brain damage. Much of his opinion in this regard is based on the evaluation conducted by Daniel Martell, Ph.D., a member of Park Dietz & Associates, Inc. Dr. Martell reviewed the same materials as Dr. Stewart, conducted clinical interviews, and administered neuropsychological and psychological testing to Mr. Allen over a three-day period.

His findings are notable in several respects. He observed that Mr. Allen was subject in utero to a number of toxins, including maternal cigarette smoking and consumption of alcohol. Ex. 21, Dr. Martell Report 5-8. Mr. Allen suffered from PICA, lead poisoning, enuresis, febrile seizures, and asthma. *Id.* 8-14. He had eczema, learning problems, and closed head injuries. *Id.* 14-17. Dr. Martell also spent a great deal of time learning about Mr. Allen's "Family Environment" which centered around his findings of "childhood abuse and neglect" *Id.* 17-21. Finally, Dr. Martell reviewed Mr. Allen's history of many traumatic encounters as a child and teenager. *Id.* 22-24.

Dr. Martell administered a comprehensive battery of tests. Dr. Martell concluded:

127

> On the basis of these test results, [Mr. Allen] clearly meets criteria for a diagnosis of Dementia due to Multiple Etiologies (maternal cigarette smoking; maternal alcohol abuse; lead poisoning; recurrent febrile convulsions; uncontrolled asthma; and one or more mild head injuries).
>
> I base this opinion on his history and the fact that Mr. Allen's test performance revealed significant impairments in memory, together with impairments in language, motor skills, and executive functioning, consistent with frontotemporal dementia.

Ex. 21, pp. 32-33. Dr. Martell's definitive finding of Mr. Allen's brain damage, and the extensive social history on which it was based are a far cry from the tentative and incomplete neuropsychological findings presented (and rejected by the jury) at trial. The discrepancies between what was presented to the jury and an accurate, complete picture of Mr. Allen's life and mental health are discussed in detail below.

### d. The Impact of Counsel's Failure to Uncover the Most Compelling Mitigating Evidence.

> "[T]he graphic description of Williams' childhood, filled with abuse and privation …might well have influenced the jury's appraisal of his moral culpability."
> *Williams (Terry) v. Taylor*, 529 U.S. 362, 398 (2000) .

A childhood history of abuse and privation is precisely the type of evidence that a capital sentencing jury must hear to weigh accurately the mitigating factors relevant to the decision whether to sentence a defendant to death. *Williams (Terry)*, 529 U.S. at 398; *Wiggins v. Smith*, 539 U.S. 510, 535 (2003); *Rompilla v. Beard*, 545 U.S. 374, 391-392 (2005). In the broadest sense, then, the consequence of trial counsel's truncated, eleventh-hour mitigation investigation was that the jury never heard the most important and compelling details of Mr. Allen's childhood and upbringing.

As trial counsel John Simon states:

> I have reviewed materials provided to me by Mr. Allen's current section 2255 counsel, including the reports of their experts, Dr. Stewart and Dr. Martell. My review of these materials makes it apparent to me that we could have done so much more if the misunderstanding with Dr. Haney had not taken place, or if we had more time, or both. These materials show that there was much significant information about Mr. Allen's life and mental health problems about which we were not aware. We were unaware because the time-compression made it impossible to develop the level of rapport that would enable the client's family to make the disclosures necessary to develop the information. This information is exactly the kind of information that I have at all relevant times understood to be appropriate to the presentation of a defense penalty phase in a capital case. I regard the additional information gathered by section 2255 counsel as making a powerful case for life. If we had access to it, we would certainly have used it along with or, in some instances, instead of the information we were able to find within the weeks between the incident with Dr. Haney and the trial. Based on my experience from both before and after this trial, I am confident that if we had this information, we would have used it at trial. We did not make a choice between presenting what we did and presenting the facts collected by section 2255 counsel. We simply were never aware of these new facts because we did not have adequate time.

Ex, 12 ¶ 7.

Dr. David Randall had a similar reaction when comparing the full scope of mitigating information collected by current counsel with the presentation given at trial. He states:

> These documents present a dramatically more severe and clinically significant picture of the mitigating evidence and psychological conditions that confronted Mr. Allen in his developmental years. It is very difficult to read these declarations now, learning what critical information we missed. The physical and emotional abuse to which our client was subjected, as I suspected pre-trial, was severe. It was visited upon him by both parents at various times. Significantly, it was accompanied by repeated abandonment by his mother when she would force him to leave the family home and lock him out on the streets even as a young child. As a child, he was subjected to his family members' drug abuse, extreme alcohol use, and exposed to inappropriate and illegal sexual behavior.

Ex. 19 ¶ 21.

129

After reviewing the powerful mitigating evidence that was available to trial counsel but not presented at trial, Dr. Stewart gives the following opinion:

> Instead of capitalizing on the mitigating value of Mr. Allen's deplorable upbringing and resultant mental illness, the jury was told by Mr. Allen's lawyers that '[t]he testimony will show that Billie has and had a loving family,' that Billie was taught 'good values' at home, and that Juanita was a 'caring' mother. This starkly inaccurate picture suggested that Mr. Allen was given a full opportunity to develop into an emotionally and psychologically healthy young adult, and that he simply chose not to do so. This picture directly conflicts with his history as an innocent childhood victim of violence and neglect in the home and with the resulting severe psychiatric impairments over which he had no control and for which he never received treatment.

Ex. 20 ¶ 37.

Trial counsel's failure to fully investigate Mr. Allen's upbringing was not only an important omission from an accurate life story of Mr. Allen; it also undermined the testing and testimony of the defense's mental health experts. For example, Dr. Cuneo's evaluation revealed symptoms of Posttraumatic Stress Disorder (PTSD). But because they failed to uncover Mr. Allen's abusive upbringing, the only underlying trauma of which trial counsel provided evidence was the shooting of Mr. Allen's friend, Marquis Taylor. In tracing Mr. Allen's PTSD to that event, however, the defense invited the government to undermine the PTSD diagnosis by showing (correctly) that Mr. Allen's symptoms predated the shooting (which occurred when Mr. Allen was about 16 years old). Dr. Cuneo now explains:

> In his clinical interview and from the information provided by other witnesses, Mr. Allen displayed all of the symptoms of Chronic PTSD. However, as described above, the murder of his friend Marquis Taylor was the most significant traumatic event of which I was aware at the time. While this event would have been sufficient to cause his PTSD, it is now clear based upon my review of the materials provided to me by Mr. Allen's current counsel, that the trauma underlying Mr. Allen's PTSD was not this single event late in his teen years. Rather Mr. Allen suffered lifelong trauma as

a result of the pervasive and severe abuse suffered, as exacerbated by the family's dysfunction and over-all impoverishment…

[That I was unaware of this information] prevented me from responding to some of the government's attempts to impeach my PTSD diagnosis with evidence suggesting that Marquis Taylor's shooting was not the precipitating event of Mr. Allen's PTSD. For example, the prosecutor questioned my finding that Mr. Allen suffered from "persistent avoidance" secondary to the shooting ("persistent avoidance" being a diagnostic criteria for PTSD), by asking questions that suggested that persistent avoidance was inconsistent with Mr. Allen's subsequent return to the streets and to the scene of the crime. I did not have a good response to those questions. However, had I possessed the information collected by current counsel, which establishes that Mr. Allen had no choice - he was locked out of his home throughout his teen years for no reason and for days at a time, I could have powerfully responded to those questions.

The prosecutor similarly questioned me about how Mr. Allen's "social impairment" (another diagnostic criteria for PTSD) could be traced to Marquis Taylor's shooting, and instead suggested that Mr. Allen simply chose not to apply himself throughout his life and that his "impairments" predated the Taylor shooting. Once again, these questions were hard to answer because of the limited information that was available to me. Had I possessed then the comprehensive picture of Mr. Allen's upbringing that I now possess, I could have shown that his PTSD symptomotology, including his social impairment, dated to many years before the Marquis Taylor shooting. In short, had a full history been available at the time of trial, the jury would have been presented with a consistent and compelling account of Mr. Allen's tragic life and severe psychological impairments. Without that comprehensive history, the jury instead heard a starkly inaccurate and misleading portrayal of Mr. Allen.

Ex. 22, Cuneo Decl. ¶¶ 7, 11-12.

Indeed, all of the mental health experts were handicapped by the inadequate mitigation investigation. Dr. Stewart notes that all of the testifying mental health experts:

were hampered by the absence of any background information shedding light on the severe abuse and neglect that Mr. Allen suffered beginning in early childhood. Based on my review of their reports and testimony, it appears that these experts were not

131

> provided with adequate information on Mr. Allen's PTSD symptomology predating Marquis Taylor's death; were not provided with information demonstrating Mr. Allen's history of childhood physical abuse; and, given Mr. Allen's penchant for "faking good," could not expect Mr. Allen to volunteer such information unprompted.

Ex. 20 ¶ 39.

Just as the inadequate mitigation investigation undermined testimony about Mr. Allen's PTSD, so too did it undermine creditable testimony about his brain damage. In the opening statement at penalty phase, trial counsel could forecast only that there would be evidence of "*possible* brain damage." T. XIV 67. Then, in the testimony presented, defense expert Dr. Michael Gelbort ventured only that "the data is *consistent and indicative* of front lobe dysfunction." T. XVII 68.

The tentative and incomplete nature of this evidence derived both from the rushed timing of the testing and the absence of accurate and comprehensive information describing Mr. Allen's background. As Dr. Randall explains:

> [Dr. Gelbort's] evaluation was conducted on February 8, 1998 – just one day before jury selection. As a clinical psychologist with academic and practical training in neuropsychological assessment, I would note the difference in the scope of Dr. Gelbort's testing when compared with the far more comprehensive testing and reporting done by Dr. Martell, per the request of current counsel for Mr. Allen. There is little question that Dr. Gelbort's evaluation was rushed and truncated due to the extreme time constraints trial counsel put him under.

Ex. 19 ¶ 17.

Dr. Martell likewise explains that Dr. Gelbort's testing was inadequate due to its brevity:

> It appears that [Dr. Gelbort] undertook a brief "screening" battery of neuropsychological tests, rather than the comprehensive examination that a full appreciation of Mr. Allen's history would have clearly indicated.

132

Ex. 21 p. 33. According to Dr. Martell, the lack of a comprehensive history of Mr. Allen's background undermined Dr. Gelbort's testing:

> Dr. Gelbort's evaluation was informed by an inadequate and incomplete set of background materials, and therefore fell short of the standard of care expected in forensic practice due to a failure to recognize the full extent of Mr. Allen's neurobehavioral history, particularly in view of the fact that this was a capital case.

*Id.* Dr. Martell goes on to explain the true extent of Mr. Allen's brain damage, as compared to what was presented at trial:

> Mr. Allen was exposed to multiple neurotoxic substances, both in-utero and in very early childhood, that resulted in a complicated cascade of medical and neurobehavioral disorders that then interacted synergistically with a family environment of neglect and abuse to produce both brain damage and psychiatric disorders; all in the larger social context of a deteriorating community environment plagued by violence, drugs and crime.
>
> The additive burden of each of these factors exacted a significant toll on Mr. Allen's neuropsychological and psychosocial development, yet **there was in the testimony a lack of any synthesis or "connecting the dots" for the jury to present this evidence in a complete and integrated fashion**.
>
> Many people from Mr. Allen's background experience stressful life experiences. However, even in that context, his life experiences were not only excessive but psychiatrically devastating, resulting in life-long psychiatric distress and neurobehavioral abnormalities. Although some of his significant biopsychosocial life stressors were touched on in testimony at the time of his sentencing, a full exploration of those stressors and their linkages to his subsequent psychiatric damages was not carefully or completely presented.

*Id.* 36.

In light of the significant inadequacies and inaccuracies of the background information provided to the defense experts – most notably the complete omission of Mr. Allen's lifelong history of severe abuse – it is little wonder that zero jurors found the mitigating factor that Billie

133

Allen suffered brain damage. See Ex. 3, 4, Special Verdict Sheets. It was likewise predictable that zero jurors found the mitigating factor that Billie Allen suffered from PTSD. *See id.* And only one juror found that Mr. Allen committed the offense under severe mental or emotional disturbance.[46] *See id.* In short, by retaining experts at the eleventh hour and providing them with the misleading and incomplete results of just a few weeks of mitigation investigation, trial counsel presented an inaccurate and easily rebutted picture of Mr. Allen's mental health problems, which the jury wholly rejected. Trial counsel's failures prevented the jury from learning the true extent of Mr. Allen's "devastating" psychiatric and organic impairments, just as they prevented the jury from learning about Mr. Allen's lifelong history of abuse, trauma, and neglect.

### 3. Legal Analysis

The facts above clearly establish that Mr. Allen's counsel provided ineffective assistance of counsel at the penalty phase of trial, in violation of the Sixth Amendment. Under the familiar *Strickland v. Washington,* 466 U.S. 668, 687-88 (1984), standard, counsel's performance was deficient, and that deficiency prejudiced the outcome of the penalty phase proceedings.

#### a. Deficient Performance

The Supreme Court has made clear that capital trial counsel are ineffective where they fail to thoroughly investigate a defendant's social history and to collect any available evidence that a defendant suffered abuse and privation as a child. *Williams (Terry) v. Taylor*, 529 U.S. 362, 398 (2000); ; *Wiggins v. Smith*, 539 U.S. 510, 535 (2003); *Rompilla v. Beard*, 545 U.S. 374, 391-392 (2005).. The Eighth Circuit has similarly found that "there [is] no justifiable reason [for

---

[46] Since trial counsel was unaware that Mr. Allen suffered from a lifelong history of severe abuse, no such mitigating factor was submitted to the jury.

134

trial counsel] to prevent the jury from learning about [petitioner's] childhood experiences," including a parent's alcoholism, domestic violence between the parents, and physical abuse of the petitioner. *Simmons v. Luebbers*, 299 F.3d 929, 936-938 (8th Cir. 2002).[47] Further, the Eighth Circuit has emphasized that "[a]lthough we generally give great deference to an attorney's informed strategic choices, we closely scrutinize an attorney's preparatory choices." *Foster v. Lockhart*, 9 F.3d 722, 726 (8th Cir. 1993); *see also Strickland*, 466 U.S. at 690-691 ("Strategic choices made after less than complete investigation are reasonable only to the extent that reasonable professional judgments support the limitations on investigation") (internal quotation omitted).[48]

Trial counsel here was deficient in several significant ways, including:

▪ Failing to investigate and prepare for the penalty phase until less than one month before trial. *See* 1989 ABA Guideline 11.8.3. (A) ("[P]reparation for the sentencing phase, in the form of investigation, should begin immediately upon counsel's entry into the case.").

▪ Failing to communicate with, consult with, or prepare the mitigation expert until less than a month before trial. *See Rompilla v. Beard*, 545 U.S. 374, 391-392 (2005); *see also* 2003 ABA Guidelines, 31 Hofstra L. Rev. at 959 "Perhaps most critically, having a qualified mitigation specialist assigned to every capital case *as an integral part of the defense team* insures that the presentation to be made at the penalty phase is integrated into the overall preparation of the case *rather than being hurriedly thrown together* by defense counsel still in shock at the guilty verdict").

▪ Failing to explore Mr. Allen's history of abuse and neglect by speaking with all available family members and friends, including the members of the father's side of Mr. Allen's family. *See* 1989 ABA Guideline 11.4.1 (C) ("[The mitigation] investigation should comprise efforts to discover all reasonably available mitigating evidence"); 2003 ABA

---

[47] *See also Antwine v. Delo*, 54 F.3d 1357, 1368 (8th Cir. 1995) (finding counsel ineffective for failing to effectively present evidence of petitioner's mental impairment at penalty phase); *Hill v. Lockhart*, 28 F.3d 832, 835 (8th Cir. 1994) (finding counsel ineffective at penalty phase for failing to present in coherent fashion evidence regarding, *inter alia*, defendant's history of mental illness).

[48] Recent cases from other circuits analyzing penalty phase ineffectiveness of counsel claims are likewise instructive. *See Gray v. Branker*, 529 F.3d 220, 229, 235, 238 (4th Cir. 2008); *Williams v. Allen*, 542 F.3d 1326, 1340 (11th Cir. 2008); and *Walbey v. Quarterman*, 309 Fed.Appx. 795, 800, 803 (5th Cir. 2009). Taken together, these cases stand for the proposition that trial counsel must present the "details," the "full picture," the "entire," "cohesive" story of the "strongest mitigation case possible," and not a scattered narrative that is "incomplete," "inaccurate," or "misleading."

135

Guidelines, 31 Hofstra L. Rev. at 1024 ("It is necessary to locate and interview the client's family members (who may suffer from some of the same impairments as the client), and virtually everyone else who knew the client and his family"); *see also Williams*, 529 U.S. at 398.

▪ Failing to provide adequate time and background mitigation information for the evaluations of defense mental health experts. *See* 2003 ABA Guidelines, 31 Hofstra L. Rev. at 956 ("Creating a competent and reliable mental health evaluation consistent with prevailing standards of practice is a time-consuming and expensive process. Counsel must compile extensive historical data, as well as obtain a thorough physical and neurological examination.").

The government responds to Mr. Allen's allegations of trial counsel's deficiencies with an irrelevant defense of trial counsel's experience and skills. *See GR-* 120. Post-conviction counsel does not contest that Mr. Sindel and Mr. Simon are experienced and well-regarded criminal defense attorneys. The legal issue here, however, is whether trial counsel "fulfilled their obligation to conduct a thorough investigation of the defendant's background." in *this* case. *Williams (Terry) v. Taylor,* 529 U.S. 362, 396 (2000). The Sixth Amendment has long imposed upon counsel "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland v. Washington*, 466 U.S. 668, 691 (1984).

The government also argues that trial counsel's performance was not deficient because of the number of mitigation witnesses presented at trial. *See GR-* 118-20. Again, this argument misses the mark. The legal standard is whether counsel conducted a thorough investigation of Mr. Allen's background. A comparison of the mitigation presented at trial with the mitigating evidence that was available shows that the investigation was not thorough. *Williams*, *Wiggins* and *Rompilla* are particularly illustrative of this point, because the defense attorneys in those cases conducted penalty-phase investigation – far more than in this case – and yet those investigations were found to be inadequate, and counsel were found ineffective.

136

In *Williams (Terry) v. Taylor*, 529 U.S. 362 (2000), the defendant was evaluated before trial by three mental health experts and counsel interviewed family members. Yet, the Supreme Court ruled that counsel's performance was deficient because counsel did not "thoroughly" seek out, discover and present evidence of Williams' difficult childhood, as well as evidence indicating that Williams "might have mental impairments." *Id.* at 370.

Similarly, in *Wiggins v. Smith*, 539 U.S. 510 (2003), counsel conducted an investigation of mitigating evidence. Counsel obtained a Presentence Investigation ("PSI") report, "which included a one-page account of Wiggins' 'personal history.'" *Id.* at 523. Counsel "'tracked down' records kept by the Baltimore City Department of Social Services (DSS)" about Wiggins and his family. *Id.* Defense investigators interviewed Wiggins' family members. *Id.* at 544 (Scalia, J., dissenting). Counsel retained a psychologist (Dr. Stejskal), who "conduct[ed] a number of [psychological] tests" on Wiggins and rendered expert conclusions based on the testing, "clinical interviews with Wiggins, . . . meetings with Wiggins' family members," and the DSS records. Id. at 523, 532; *Id.* at 544 (Scalia, J., dissenting). Counsel also retained a criminologist (Dr. Johnson), who interviewed Wiggins and rendered an expert opinion that he would adjust adequately to life in prison. *Id.* at 526; *Id.* at 544 (Scalia, J., dissenting). The Supreme Court found that this investigation did not satisfy the Sixth Amendment because it gave counsel only a "rudimentary knowledge of [Wiggins'] history from a narrow set of sources." *Id.* at 524.

In *Rompilla v. Beard,* 545 U.S. 374 (2005), trial counsel extensively interviewed members of the defendant's family and reviewed evaluations by three mental health experts, but failed to review court records of a prior conviction that the Commonwealth used in support of the

137

alleged aggravating circumstances. The United States Supreme Court reversed, finding ineffective assistance of counsel in the penalty phase.

Presenting incomplete mitigating evidence can be just as deficient as presenting no mitigating evidence. *See. e.g. Williams v. Allen*, 542 F.3d 1326, 1329-30 (11th Cir. 2008) (finding counsel's performance deficient and prejudicial: mother testified at trial, but the unpresented mitigating evidence showed that the level of abuse and neglect was more severe than what the defendant's mother had acknowledged, and the evidence at trial had painted a misleading picture of the mother's role in his life).

As trial counsel candidly admit, their failure to uncover and present the compelling mitigation evidence collected by current counsel was not the result of any strategic choices made after thorough investigation. *See* Ex. 11, Sindel Decl. ¶¶ 13-15; Ex. 12, Simon Decl. ¶ 7. Trial counsel was deficient.

**b. Prejudice**. The mitigation evidence that was not collected and presented by trial counsel as a result of their deficient performance is clearly of such a nature, scope, and power that it undermines confidence in the death verdict that the jury reached without hearing that evidence. The Eight Circuit's analysis of prejudice in *Simmons v. Luebbers*, 299 F.3d 929, 939 (8th Cir. 2002) is directly on point:

> During the penalty phase, Simmons's attorneys could have presented evidence of Simmons's background to demonstrate that his compulsive, violent reactions were the result of an abusive and traumatic childhood. Further, a vivid description of Simmons's poverty stricken childhood, particularly the physical abuse, and the assault in Chicago, may have influenced the jury's assessment of his moral culpability. Our confidence in the outcome of the McClendon trial has been undermined by Simmons's attorneys' failure to include the details of Simmons's background during their penalty phase presentation.

138

*See also Antwine v. Delo*, 54 F.3d 1357, 1368 (8ᵗʰ Cir. 1995) (finding prejudice at capital sentencing for counsel's failure to effectively present mitigating evidence of mental impairment); *Hill v. Lockhart*, 28 F.3d 832, 847 (8ᵗʰ Cir. 1994) (prejudice at capital sentencing for counsel's failure to present defendant's history of psychiatric treatment and the fact he was not on his anti-psychotic medication at the time of the offense).

The Supreme Court's analysis of prejudice in cases like this has followed along the same lines. *See Williams (Terry) v. Taylor*, 529 U.S. 362, 398 (2000) (finding *Strickland* prejudice where "the graphic description of Williams' childhood, filled with abuse and privation …might well have influenced the jury's appraisal of his moral culpability."); *Wiggins v. Smith,* 539 U.S. 510, 537 (2003) ("Had the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance."). The Court in *Rompilla v. Beard,* 545 U.S. 37, 392-393 (2005), facing a situation quite similar to that here, held:

> The jury never heard any of this [evidence of abuse and neglect] and neither did the mental health experts who examined Rompilla before trial. . . . It goes without saying that the undiscovered mitigating evidence, taken as a whole, might well have influenced the jury's appraisal of Rompilla's culpability, and the likelihood of a different result if the evidence had gone in is sufficient to undermine confidence in the outcome actually reached at sentencing [citations omitted].

The same considerations require a finding of *Strickland* prejudice here. Counsel's deficient social history investigation affected the work of the trial experts and the impact of their testimony. In a recent case from this district, *Worthington v. Roper*, 2009 U.S. Dist. Lexis 26000 (E.D. Mo. March 27, 2009), the court found prejudice in a capital habeas case due to trial counsel's failure to "properly prepare" the defense mental health experts. In that case, as in this one, the sentencer did not find that the defendant suffered from mental illness as a mitigating

139

factor. Post-conviction experts, with the benefit of an "overwhelming" amount of relevant information that was available but not presented at the trial, testified that the defendant suffered from substance abuse caused by his childhood environment, ADHD and bipolar disorder.[49] Similarly in this case, presentation of records and a thorough social history to Mr. Allen's post-conviction experts has dramatically expanded the mental health expert testimony beyond that presented at trial. Prejudice is shown.

One additional point bears emphasis. In weighing the prejudice from trial counsel's failure to uncover and present the compelling mitigating evidence of abuse and privation that characterized Mr. Allen's life, it must be recognized that the jury in this case sentenced Mr. Allen to life imprisonment for Count 1 before sentencing him to death for Count 2. The jury's disparate verdicts in weighing the same aggravating and mitigating circumstances for the same homicide suggest that the jury's decision between life and death was a close and contested one. Any compelling mitigating evidence could have tipped the balance in favor of life on Count 2. The extensive and powerful mitigating evidence at issue almost certainly would have done so. Mr. Allen was prejudiced by trial counsel's deficient performance. If he is not granted a new trial, he is entitled to a new penalty phase.

**K.      Mr. Allen was denied the effective assistance of counsel when trial counsel failed to object to prejudicial victim impact evidence.**

The Amended Motion alleged that Mr. Allen received ineffective assistance of counsel for failing to properly object to the government's use of extensive victim impact evidence at both

---

[49] The Court of Appeals for the Fifth Circuit reached a similar conclusion in *Walbey v. Quarterman*, No. 08-70007, 309 Fed. Appx. 795, 2009 WL113778 (5th Cir. Jan. 19, 2009). In *Walbey*, trial counsel retained and called as witnesses two psychologists, and obtained records on the defendant's background from the prosecution. *Id.* at 796. Nevertheless, the Court of Appeals found that counsel's performance was deficient because he "severely limited" his mitigation investigation and also limited the work of the experts. *Id.* at 801-02. Counsel's deficiencies prejudiced the defense because the mitigating evidence introduced at trial was "substantially incomplete." *Id.* at 802.

the guilt and penalty phases of trial. *M* 41-42. In response, the government first claims that "no victim impact evidence was adduced in the guilt phase" because the evidence about Mr. Heflin's personal characteristics does not constitute victim impact evidence. Specifically, the government argues that only evidence which deals with "the effect of the offense on the victim and the victim's family" is "victim impact evidence."

The government's assertion is inaccurate. The fact is that irrelevant and prejudicial evidence was adduced at the guilt phase for which the only purpose could have been to inflame the passions of the jury.

At the guilt phase, the government elicited the following testimony from Michael West:

> A. I met him when he first started working there. And he was a nice guy. We just talked to one another and, you know, just –
>
> Q. Did you develop a relationship with him?
>
> A. Yes I did.
>
> Q. Could you describe for the jury your relationship with Mr. Heflin?
>
> A. Well, it was like this. You know, we would joke around and we would, you know, like – you know, like – if he have something that was bothering him, he would tell me; and if I had something that was bothering me, I would tell him, you know.
>
> And like I had promised to give him this lawn mower one time. And he kept saying, "When am I getting my lawn mower? When am I getting my lawn mower, man?" Just like that, you know. And I said, well, I will bring it the next day. But I would always forget to bring it, you know.
>
> So you know, the day before his demise he had wanted me to bring the lawn mower again. I said, "I'll bring it tomorrow for sure." That's the last I said to him.
>
> Q. Is it fair to say Mr. Heflin was a friend of yours?
>
> A. Yes.

141

T.VII 148 -49.

The government then elicited the following testimony from Mary Garvels:

Q. How did you know Richard Heflin?

A. I met him the first day I worked.

Q. Okay. And what did Mr. Heflin do for the bank?

A. He was a security guard.

Q. All right. Would you describe the relationship you developed with Mr. Heflin?

A. We played a lot of jokes on each other. He was kind of a prankster and so am I. And we really hit it off, and his wife, and he just made me comfortable being there. He was a good friend.

Q. Did his wife also work for the bank.

A. Yes.

Q. And what was her name – what is her name?

A. Dana

Q. Are you also a friend of hers?

A. Yes.

T.VII 174.

Government witness Lisa Moore then testified,

Q. Can you tell the jurors how your knew Mr. Heflin?

A. He was the security guard at the bank, but he and I were friends, close friends.

Q. Okay. And describe your relationship with him if you would.

A. He [sic] would eat together and joke around and play a lot together. At the time I was pregnant, so he used to always say he was the father of my baby. And when he ate, I ate, and he would

142

rub my stomach when I came in, and we made little jokes and
things together.

T.VII 207. Government witness Amy Boehjle testified that "she considered Rich a friend." T. VII 105. Sandy Foppe testified that she had known Mr. Heflin for nine years and that "Rich was a friend. He was always hanging out in my department." T.VII 121. Finally, government witness Virginia Michael added that Mr. Heflin was a good friend, and that his wife, Dana, worked there and was also a friend. T. VII 288.

While these people were witnesses to what occurred at the bank on the day of the robbery, none of the above cited testimony was relevant to whether Mr. Allen was present and participated in the bank robbery and the murder of Mr. Heflin. Whether or not Mr. Heflin was a nice man or a friend to these people was not relevant to the question of whether the government could prove its case against Mr. Allen beyond a reasonable doubt. Counsel made no objection to this testimony.

Trial counsel made a *motion in limine* after the guilt phase requesting the Court limit the number of victim impact witnesses that the government could call at the penalty phase pursuant to *Payne v. Tennessee*, 501 U.S. 808 (1991), which authorized only a "brief glimpse" of Mr. Heflin's life. The motion was overruled and the Court noted that it would consider the testimony as it "is presented," T. XIV 35, and warned the government not to "go beyond the bounds of the statute or the case law."

Eleven government witnesses testified at the penalty phase as victim impact witnesses: Kelly Davis, Janice Walton, Evelyn Heflin, Sherry Holmes, Michael Heflin, Ron Tamburello, Sue Heflin, Jason Heflin, Richard Heflin, Justin Heflin, and Dana Heflin. Trial counsel did not object or otherwise renew his motion in limine. This constituted deficient performance.

143

As has been noted above, trial counsel can be ineffective for failing to raise a timely objection to a constitutional violation. *See Reagan v. Norris*, 365 F.3d 616, 622 (8th Cir. 2004) (finding trial counsel's failure to object to jury instructions constitutionally deficient); *Manning v. Bowersox*, 310 F.3d 571, 576-77 (8th Cir. 2002) (finding trial counsel's failure to object to admission of evidence constitutionally deficient); *Burns v. Gammon*, 260 F.3d 892, 896-97 (8th Cir. 2001); and 2003 ABA Guideline 10.8-The Duty to Assert Legal Claims.

Mr. Allen was prejudiced by trial counsel's deficient performance. It is well established that "[m]uch of the information that is relevant to the [capital] sentencing decision may have no relevance to the question of guilt, *or may even be extremely prejudicial to a fair determination of that question*." *Gregg v. Georgia*, 428 U.S. 153, 195 (1976). Accordingly, victim impact evidence can be, as it was here, "unduly prejudicial, inflammatory, or irrelevant to guilt." *United States v. Fell*, 531 F.3d 197, 239 (2nd Cir. 2008). This ground cannot be viewed in isolation but must be viewed through the facts and law set out below in Claim L regarding the government's closing argument. The victim impact testimony did not exist in a vacuum but was viewed by the jury through the prism of the government's inflammatory statements in closing argument. Further, and unlike the cases cited by the government, Mr. Allen's jury found for life on one of the two counts, suggesting that its penalty phase deliberations were close and difficult.

The eleven witnesses and nearly 90 pages of testimony of victim impact evidence were extremely prejudicial to Mr. Allen. Because trial counsel did not object, appellate counsel was forced to raise this issue as plain error. As set forth above, the plain error standard is much more onerous on the appellant. *See Burns v. Gammon*, 260 F.3d 892, 896-97 (8th Cir. 2001). Given the onerous standard applied to Mr. Allen's direct appeal, had trial counsel timely objected to the victim impact evidence (to which the district court cautioned the government not to exceed the

144

statute or the constitution) there is a reasonable probability that Mr. Allen would not be under a sentence of death.

The government's contention that this Court's ruling in co-defendant's Holder's §2255 proceeding is dispositive of this ground is without merit. Mr. Allen's jury found against death on one of the two counts. Mr. Holder's jury did not. Thus, Mr. Allen and Mr. Holder are not similarly situated when evaluating the prejudice component of this claim, even if the victim impact evidence in both cases was substantially similar.

Trial counsel was concerned enough about the potential prejudice from large amounts of victim impact testimony that he filed a Motion in Limine prior to the penalty phase of the trial. When that motion was denied, it was incumbent upon him to renew it with a timely objection during the penalty phase. Trial counsel also should have objected at the guilt phase when irrelevant and prejudicial information about Mr. Heflin's personal characteristics were introduced into evidence. The prejudice to Mr. Allen was amplified by the government's inflammatory closing argument at the penalty phase. In spite of that, Mr. Allen's jury rejected death on one of the two requests. But for counsel's omission, it is reasonably likely that Mr. Allen's jury would have rejected death on both counts and that he would have ultimately received a sentence less than death. If Mr. Allen is not granted a new trial, he is entitled to a new penalty proceeding.

**L.    Mr. Allen was denied effective assistance of counsel when trial counsel failed to make proper objections to the government's penalty phase arguments.**

The Government's Response to this ground for relief conspicuously omits reference to almost all of the cited improper statements[50] made by the government at trial, except for two

---

[50]The *Amended Motion* reproduces the improper arguments, M-42-47, and they will not be repeated here.

instances addressed previously by the Eighth Circuit in *United States v. Allen*, 247 F.3d 741, 770 (8th Cir. 2005) (*Allen I*).[51] The verdict sheets show that these improper arguments had a powerful effect on the jury's evaluation of the mitigating evidence. The government's position that the cumulative effect of the improper argument was not prejudicial is belied by the transcript and the verdict sheets. Had trial counsel objected and secured the curative instructions to which Mr. Allen was entitled, there is a reasonable probability that at least one juror would have viewed the mitigating evidence in a far different light, and Mr. Allen would have been sentenced to life. Alternatively, the trial court might have concluded that a mistrial was required. Under either alternative, Mr. Allen, if he is not granted a new trial, is entitled to a new penalty proceeding.

### 1.    Improper Arguments Requiring a Nexus Between the Offense and the Mitigating Evidence.

It is beyond dispute that the Eighth Amendment requires a sentencing jury to consider and give effect to all mitigating evidence, whether or not it is related to the criminal offense. Mitigating evidence regarding the character, background and record of the defendant is constitutionally relevant, and the jury cannot be precluded from considering it. One of the most fundamental requirements of capital sentencing is that the jury must be permitted to undertake an exhaustive review of both the criminal offense and the offender. The jury must be able to consider and give effect to the character, background, and record of the defendant himself. *Lockett v. Ohio*, 438 U.S. 586 (1978); *Eddings v. Oklahoma*, 455 U.S. 104 (1982).

---

[51]Those references are: "He wants to go to prison for life. . . . he wants to exercise and play basketball and volleyball. . . . Don't let him down there **dribbling basketballs on Richard Heflin's grave**; it wouldn't be right." T. XIX 97-98; and "Richard Heflin didn't think this guy with the mask, armed for war, armed to kill, was kind, lighthearted, or gentle. He thought he was a **murderous dog** coming in there to kill people for money." T. XIX 105-06.

The Supreme Court has also made clear that the jury cannot constitutionally be limited to mitigating evidence that has a "nexus" to the criminal offense – the very argument made by the government to Mr. Allen's sentencing jury. In *Tennard v. Dretke*, 542 U.S. 274 (2004), the Supreme Court reaffirmed that any requirement that mitigation evidence be linked to the offense "has no basis in our precedents and, indeed, is inconsistent with the standard we have adopted for relevance in the capital sentencing context." *Id*. at 287; *accord Smith v. Texas*, 543 U.S. 37, 44-45 (2004). Thus, evidence need not have any causal connection to the crime for it to be mitigating, and conditioning its consideration as mitigation upon a substantive link to the offense violates the Eighth Amendment. *See*, *e.g.*, *Skipper v. South Carolina*, 476 U.S. 1, 4-5 (1986) (defendant's post-arrest conduct in prison "would not relate specifically to petitioner's culpability for the crime he committed" but "there is no question but that such inferences would be 'mitigating'"); *Penry v. Lynaugh*, 492 U.S. 302 (1989) (same as to a defendant's brain damage and mental retardation);[52] *Eddings v. Oklahoma*, 455 U.S. 104 (1982) (same as to a defendant's turbulent family history).

The government does not dispute the above-cited law. Instead, it says that what the prosecutors really meant to say is that their arguments went to the **weight** to be given the mitigating evidence. *GR*- 135-36. This is belied by the transcript. At the penalty phase, the government told the jury to discount mitigating evidence unless it has a "connection to the crime," e.g. T.XIX 62, 64; or "[some]thing to do with what he did in the Lindell Bank," e.g. T.XIX 96, 100, 102. For example:

---

[52] In *Atkins v. Virginia*, 536 U.S. 304, 316 (2002), the Court indicated that "mentally retarded offenders [are viewed] as categorically less culpable than the average criminal." This categorically lesser culpability of persons with mental retardation, extrinsic of the circumstances of the offense, now prevents the State from applying the death penalty against a mentally retarded defendant. But for the years preceding *Atkins*, "it [was] precisely because the punishment should be directly related to the personal culpability of the defendant that the jury [was required] to consider and give effect to mitigating evidence" of mental retardation, irrespective of the circumstances of the offense. *Penry*, 492 U.S. at 327-28.

147

> All these mental defenses you are hearing about, there is **no connection** to this defendant walking into that bank and killing for money. They're just sitting out there kind of **floating in space**, **no nexus, no causation, no connection** of any kind between those little things and what the defendant did.

T.XIX 100. The government made this "no connection" argument with respect to several mitigating factors. The government argued: "And the bottom line on all those things, post-traumatic stress disorder, depression, is there any connection to the crime? And there's not." T.XIX 62. This argument was specifically directed at non-statutory mitigating factors (5), (6), (7), and (8).[53] The government's argument that Mr. Allen's "bad father or drinking father has nothing to do with what he did," T. XIX 96, directly challenged mitigating factor (4),[54] and non-statutory mitigating factors (3), (4).[55] The government's blanket argument against "all these mental health defenses you're hearing about," T. XIX 100, *supra*, directly challenged the above-enumerated mitigating factors as well as non-statutory mitigating factors (1) and (11).[56] For good measure, the government then challenged directly "all of the mitigators" for having "no connection between [the mitigation] and the defendant's conduct on the day of the murder." T. XIX 102.

And these "no connection" arguments undoubtedly influenced the jury. None of the non-statutory mitigating factors directly challenged by these arguments, i.e. (1), (3), (4), (5), (6), (7),

---

[53](5) Billie Allen has suffered from long-standing depression, Ex. 3 at 9; Ex. 4 at 10; (6) Billie Allen has an impaired ability to cope with stress, *Ibid*; (7) At the time of the offense for which he stands convicted, Billie Allen suffered from post-traumatic stress disorder resulting from the shooting death of his best friend, Ex. 3 at 9-10; Ex. 4 at 10; (8) At the time of the offenses of which he stands convicted, Billie Allen was abusing marijuana in an effort to self-medicate for depression or other symptoms of post-traumatic stress disorder, Ex. 3 at 10; Ex. 4 at 10-11.
[54]Even though some jurors found this mitigating factor, the Government's improper arguments may well have persuaded other jurors not to find the factor and had an adverse impact on the jury's weighing of this factor.
[55](3) Billie Allen's family was unable to assist him in dealing with his problems in making the transition from childhood to adulthood, Ex. 3 at 9; Ex. 4 at 9.; (4) Billie Allen was born with a predisposition toward alcoholism or other substance abuse, Ex. 4 at 9; Ex. 4 at 10.
[56](1) Billie Allen suffered brain damage that impaired his ability to focus his attention, to learn, and to use good judgment, or that impeded his personality development, Ex. 3 at 8; Ex. 4 at 9; (11) In the events underlying his conviction, Billie Allen was associated with an older individual at a time when he was suffering from emotional problems, Ex. 3 at 10; Ex. 3 at 11.

148

(8), and (11), were found by a majority of the jurors. The first, brain damage, **was rejected by all twelve jurors**. Only two jurors found (3), that Mr. Allen's family was unable to assist him in making the transition to adulthood. Only one juror found (4), predisposition toward alcoholism or substance abuse. Only five jurors found (5), long-standing depression. Only one juror found (6), impaired ability to cope with stress. **All twelve jurors rejected** (7), PTSD. Only one juror found (8), that Mr. Allen used marijuana to self-medicate for depression or PTSD. And only two jurors found (11), which includes that Mr. Allen was suffering from emotional problems. Ex. 3 at 8-10; Ex. 4 at 8-11.

## 2. Emotional Appeals to Jury.

The government's response to Mr. Allen's assertion that the argument contained improper emotional appeals to the jury[57] **acknowledges** that the "murderous dog" comment was held improper by the Eighth Circuit in *United States v. Allen*, 247 F.3d 741 (8th Cir. 2005) (*Allen I*) , and that this result was preordained by the Supreme Court's holding in *Darden v. Wainwright*, 477 U.S. 168, 179-80 (1986) (referring to a defendant as an "animal" is improper). *GR-* 137.[58] The government's reliance on *Allen I* to dispose of this ground for relief is legally incorrect, however. The standard here is not whether a single comment, such as referring to the defendant as a "murderous dog," was a stand-alone due process violation, but whether the improper argument *as a whole* "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181.

---

[57]The Government's improper emotional appeals to the jury are detailed at M-45-46.

[58]Although conceding that holding, the Government later attempts to retract its concession by comparing the "murderous dog" comment to alleged improper argument in other cases that use colorful language that stops short of comparing the defendant to an **animal**. But the comparison of Mr. Allen to an animal is what the *Allen-I* court expressly relied upon in finding this comment improper: "[W]e do find that the reference to Allen as being a "murderous dog" is inappropriate and improper. *See Darden,* 477 U.S. at 179-80 (finding it improper to characterize the defendant as an "animal")." *Allen-I* at 776. Thus, the Government's citations to colorful comments that do not refer to the defendant as an animal are irrelevant.

The government's emotional appeals distorted the jury's consideration of mitigating evidence, in violation of the Eighth Amendment, by granting primacy to the role of fear and emotion in the decision making process, thus "prevent[ing the] jury from giving meaningful effect to mitigating evidence that may justify the imposition of a life sentence rather than a death sentence." *Brewer v. Quarterman*, 550 U.S. 286, 289 (2007) ("we have long recognized that a sentencing jury must be able to give a 'reasoned moral response' to a defendant's mitigating evidence – particularly that evidence which tends to diminish his culpability – when deciding whether to sentence him to death"); *Smith v. Texas*, 127 S. Ct. 1686, 1690 (2007) (*Smith II*) (Eighth Amendment violated when "instructions [were not] 'broad enough to provide a vehicle for the jury to give mitigating effect' to the evidence at issue"); *Smith v. Texas*, 543 U.S. 37, 45 (2004) (*Smith I*) (where the defendant presented relevant mitigating evidence, "the Eighth Amendment required the trial court to empower the jury with a vehicle capable of giving effect to that evidence"); *Penry v. Lynaugh,* 492 U.S. 302, 319 (1989) (Eighth Amendment requires "reasoned moral response" to the evidence at penalty phase).

Moreover, the government's basketball argument – "Don't let him down there **dribbling basketballs on Richard Heflin's grave**; it wouldn't be right," T. XIX 97-98 – is unquestionably racially tinged, in a trial with overt racial significance: the defendant was African-American, the victim was white, and the jury was overwhelming white. The government's vitriolic admonishment to the jury not to let Mr. Allen "dribbl[e] basketballs on Richard Heflin's grave," id., is a classic "facially-neutral" pretext for an explicit racial argument.

150

### 3.    Improper argument of belief, opinions, and facts outside the evidence.

The government repeatedly injected into the penalty phase arguments opinion, belief, and implied special knowledge of cases and facts outside the record, *e.g.* comparison to other prosecuted cases and implied "other crimes" that Mr. Allen had committed. The government asserts that its arguments were "clothed in the context of the facts and evidence rather than the prosecutors' personal beliefs or knowledge independent of the evidence." *GR*- 138.

The government's position is refuted by the record. At the penalty phase, the prosecutors repeatedly argued that their particular knowledge and experience gave them a perspective on this case that the jurors did not have and injected contentious opinions about the mental health and social history mitigating evidence. This started at the beginning of the opening argument and continued through the closing argument:

> I've been doing this for about 20 years. I've never thanked a jury and I don't thank juries because it is our obligation. . . but you have been through a lot. T. XIX 41-42.

> This is a violent bank takeover, the kind you just don't see. . . . This crime that was committed by these defendants is much greater in degree than what would normally be seen in a bank robbery. T. XIX 50-51.

> The next statutory mitigator that they're suggesting to you, that he had a severe mental or emotional disturbance, I think that's a joke. T. XIX 60.

> "He smoked pot to self-medicate." I think he smoked pot to get high. And he always did what he wanted to do, not what he should do. That had nothing to do with self-medication or post-traumatic stress disorder. T. XIX 64.

> He contributed to this violence [in the city] before, when he apparently got Marquis killed because somebody was trying to kill this defendant, probably because he had ganked them. T. XIX 105.

> You cannot find a case that more cries out for a jury to impose the death penalty than the facts of this case. T. XIX 107.

151

These improper arguments directly supported one of the non-statutory aggravating factors – the offense conduct was substantially greater in degree than the statutory definition[59] – and directly challenged several mitigating factors, including statutory factor (3), severe mental or emotional disturbance; and non-statutory factors (4), (5), (6), (7), (8) (enumerated above), and (14), losing several close friends to gang violence. Notably, the jury rejected these mitigating factors.[60]

In addition, the improper arguments relying on the prosecutor's personal experience and comparison to other cases imply that this case is particularly egregious in comparison to "20 years" of prosecuting other cases. The government suggested that the jury could consider that in its sentencing decision. The government also boldly argued that Mr. Allen was responsible for the fatal shooting of his friend Marquis, in an attempt to turn a compelling piece of mitigation into aggravation. Mr. Allen was never arrested or charged with any crime in connection with Marquis's death, of course, but the jurors heard this accusation from an experienced U.S. Attorney, whom it would naturally presume to know the truth about this shooting.

Such improper argument violates due process. Because of a U.S. Attorney's prominent courtroom role as a representative of the federal government – and the mantle of respect and authority this created in the eyes of the jury – jurors are predisposed to give great deference to the government's words, and "improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when the should properly carry none." *Berger v. United States*, 295 U.S. 78, 88 (1935); accord *Drake v. Kemp*, 762 F.2d

_____

[59]The jury found this non-statutory aggravating factor. Ex. 3, p. 5; Ex. 4, p. 6. The propriety of this factor is challenged in Ground N below.

[60]As explained above, the jury near-unanimously rejected each of those mitigating factors, which the exception of (5), long-standing depression, which was found by five of the twelve jurors.

1449, 1459 (11th Cir. 1985) ("Arguments delivered while wrapped in the cloak of state authority have a heightened impact on the jury") (citing *Berger*).

Prosecutorial misconduct occurs when a prosecutor asserts that the jury should believe a particular fact or arrive at a particular result based on the prosecutor's personal belief, opinion, knowledge or professional judgment. *See*, *e.g.*, *Shurn v. Delo*, 177 F.3d 662, 667 (8th Cir. 1999) (prosecutor committed misconduct in penalty phase closing when he "emphasized his position of authority and expressed his personal opinion on the propriety of the death sentence" and "appealed to the jurors' fears and emotions"); *Newlon v. Armontrout*, 885 F.2d 1328, 1335-37 (8th Cir. 1989) (same); *Brooks v. Kemp*, 762 F.2d 1383, 1410 (11th Cir. 1985) ("it is wrong for the prosecutor to undermine [the jury's] discretion by implying that he ... has already made the careful decision required."). Here, as in *Shurn*, the prosecutor "emphasized his position of authority and expressed his personal opinion on the propriety of the death sentence" and "appealed to the jurors' fears and emotions." *Shurn*, 177 F.3d at 667.

### 4.    Prejudice

Despite the government's rhetoric in its *Response*, this argument was **not** "a model of restrained and professional advocacy." *GR*- 139. The government repeatedly told the jury not to consider mitigation unless it had a connection to the offense conduct, relied on years of experience and implied facts not in evidence, and  appealed to the jurors' emotions. The relevant inquiry when an improper prosecutorial argument is not cured by the prosecution, the defense, or the court is to:

> examine the totality of the circumstances to determine whether there is a reasonable probability that error complained of affected the outcome of the penalty phase.

*Newlon v. Armontrout*, 885 F.2d 1328, 1338 (8th Cir. 1989); *see also Shurn v. Delo*, 177 F.3d 662, 667 (8th Cir. 1999). Because the totality of the circumstances here shows that the improper prosecutorial argument infected the sentencing phase with unfairness, the *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), prejudice standard for counsel's ineffectiveness is also met. Trial and appellate counsels' deficiency in not raising the totality of improper prosecutorial argument affected the outcome of the trial and appeal.

The totality of the circumstances here shows two things. First, the government's argument, though improper, was undeniably effective. Second, this was a close case on punishment. The jury was split on whether to impose the death penalty and was amenable to consideration of mitigating circumstances. Had this jury not heard the government's improper argument, or heard proper curative instructions, there is a reasonable probability that at least one juror would have weighed the mitigation differently and voted against a death sentence. In fact, Mr. Allen's jury demonstrated its mixed feelings when it returned a death sentence on Count II but a life sentence on Count I. Where "the jury disagreed on punishment, . . . we must assume it likely that the jury would have sentenced Shurn to life imprisonment rather than death if not exposed to the improper argument." *Shurn v. Delo*, 177 F.3d 662, 667 (8th Cir. 1999).

The effect of the government's argument is immediately apparent from the verdict sheets. The jury found the non-statutory aggravating factor that the prosecution improperly argued for – offense conduct was substantially greater in degree than the statutory definition – but did not find either of the other two non-statutory aggravating factors. Ex. 3 at 5-6; Ex. 4 at 6-7. The jury did not find the mitigating circumstances challenged by the government's improper argument, e.g. the severe mental or emotional disturbance statutory mitigating factor and non-statutory mitigating circumstances (1), (3), (4), (5), (6), (7), (8), (11), and (14). In fact, with the exception

154

of the long-standing depression mitigator, which five jurors found, all of the mitigating factors challenged by the government's improper arguments were found by two or fewer jurors.

The jury's rejection of the mitigating factors challenged improperly by the government stands in sharp contrast to the jury's treatment of the other mitigation. The jury overwhelmingly found several mitigating factors, including: no significant history of prior criminal conduct, found by 8 jurors; "other factors" in his background, found unanimously; (2) learning problems, found by ten jurors; (9) impaired judgment, found by ten jurors; (13) growing up in a neighborhood surrounded by gangs, found by eight jurors; (11) the offense was inconsistent with prior behavior, found unanimously; (17) Mr. Allen was not considered aggressive or violent, found by eleven jurors; and (21) he could be adequately managed in prison, found by nine jurors. The jury also found two additional mitigating factors that they wrote in themselves. *See* Ex. 3 at 7-13; Ex. 4 at 7-14.

The three factors to be considered in the prejudice analysis for improper prosecutorial argument are: "(1) the cumulative effect of such misconduct; (2) the strength of the properly admitted evidence of the defendant's guilt; and (3) the curative actions taken by the trial court." *United States v. Hernandez*, 779 F.2d 456, 460 (8th Cir. 1985). Part of the analysis of the cumulative effect is whether the improper arguments were made repeatedly. "'Prejudice sufficient to warrant reversal may result from the cumulative effect of repeated improper comments by the prosecutor.'" *United States v. Two Elk*, 536 F.3d 890, 909 (8th Cir. 2008) (citing *United States v. Johnson*, 96 F.2d 768, 771 (8th Cir. 1992)).[61] Here and in the Amended Motion, Mr. Allen has raised twenty-three separate improper statements made by the

---

[61]However, improper argument need not be repeated to deprive a defendant of a fair sentencing proceeding. In *United States v. Johnson*, 968 F.2d 768 (8th Cir. 1992), the Eighth Circuit reversed a non-capital conviction on the basis of one improper prosecutorial statement in the rebuttal closing argument. In that case, defense counsel objected at trial, the trial court overruled the objection; defense counsel moved for a mistrial, and the trial court denied the motion.

155

government. The government repeatedly told the jury to discount mitigating evidence with no connection to the offense; repeatedly referenced the U.S. Attorneys' experience and implied knowledge of facts outside the record; and repeatedly made emotional appeals to the jury. Because trial counsel objected to just one of these statements, the jury received a curative instruction regarding only that one statement.[62] The other twenty-two improper statements were not remedied. The government argued in its *Response* that the standard jury instructions support their position that any improper argument does not reach the level of a due process violation. *GR-* 139. In fact, the law in this Circuit is the opposite:

> The State's argument that the standard jury instruction that statements made by counsel during opening and closing argument are not evidence cures any error made by the prosecutor is without merit. Such a broadly sweeping rule would permit any closing argument, no matter how egregious.

*United States v. Johnson*, 968 F.2d 768, 772 (8th Cir. Iowa 1992) (citing *Newlon v. Armontrout*, 885 F.2d 1328, 1337 (8th Cir. 1989). With regard to the second factor, the strength of the evidence for conviction, or in this case, a death sentence, several facts show that this was not an "overwhelming" case for death: (1) the jury's split verdict on the two near-identical capital counts; (2) the jury's rejection of two of the government's non-statutory aggravating factors; and (3) the jury's willingness to consider and find mitigating factors, even in light of the improper argument. Although improper prosecutorial argument may prejudice the outcome even

---

[62]Trial counsel objected when the Government argued:

> When you're weighing, when you're weighing the defendant's mitigating evidence back there and you're weighing that bag of fog, that bag of air they presented to you, weigh it against the weight of Richard Heflin's body. Because that is what this is all about.

T.XIX 108. This is the only improper argument for which trial counsel secured a curative instruction, which was in full, "The last comment will be disregarded." T.XIX 109, without any explanation to the jury of what constitutes proper weighing of the evidence.

156

in a case with strong evidence against the defendant, the evidence for a death sentence here was far from overwhelming.

Had trial counsel objected and secured curative instructions for each of the government's improper arguments, the vituperative, racially-tainted, and legally incorrect nature of the government's argument would have been exposed. There is a reasonable probability that at least one juror would have voted for a sentence of life imprisonment on Count II. Therefore, under *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), Mr. Allen has shown prejudice from the ineffectiveness of trial counsel.

Appellate counsel was also ineffective for failing to raise the numerous instances of overreaching by the government at the penalty phase. Although appellate counsel raised the "murderous dog" and "don't let him down there dribbling basketballs on Richard Heflin's grave" comments, appellate counsel failed to raise the twenty-two other instances of improper argument cited above and in the *Amended Motion*. There is no conceivable *reasonable* strategic reason to limit the appeal in a capital case to some but not all instances of improper argument. The effect of these two comments can only be understood, as the government correctly points out, when "government counsel's argument [is] evaluated as a whole." *GR-* 138. Because the reviewing court's analysis is cumulative, and repeated improper arguments can show a due process violation, there is at least a reasonable probability that appellate counsel's failure to raise every instance of improper argument affected the outcome of the direct appeal. In fact, the Eighth Circuit in *Allen-I* found the "murderous dog" comment alone improper, but then found Mr. Allen was not deprived of his right to a fair sentencing because, *inter alia*:

> the comment was made **only once** and did not misstate or manipulate the evidence. . . . Although it is possible that one isolated comment can result in the denial of a defendant's due process right to a fair trial or sentencing, **the lack of any**

157

> **cumulative effect of more than one improper comment** is certainly a strong indication that the sentencing was not fundamentally unfair.

*United States v. Allen*, 247 F.3d 741, 777 (8ᵗʰ Cir. 2005) (*Allen I*).

With the full range of improper argument before it instead of one comment, there is a reasonable probability that the Eighth Circuit would have found the sentencing hearing fundamentally unfair.[63]

Because he was denied effective assistance of counsel during the prosecution's penalty phase argument, Mr. Allen's death sentence violates due process and the Eighth Amendment and must be vacated. If he is not granted a new trial, Mr. Allen is nonetheless entitled to a new sentencing hearing.

**M.    Mr. Allen was denied effective assistance of trial and appellate counsel because there was no objection to the use of "pecuniary gain" as a statutory aggravator.**

Mr. Allen has no response to the government's arguments regarding Ground M.

**N.    Mr. Allen was denied effective assistance of trial and appellate counsel because there was no objection to the non-statutory aggravator, "Was Billie Jerome Allen's conduct in committing the offenses substantially greater than that described in the definition of the crime, apart from the statutory aggravating factors?"**

This non-statutory aggravator was submitted to the jury in both counts, and was found by the jury as to each count. Ex. 3, p. 5, Ex. 4, p. 5. Prior to trial, Mr. Allen's counsel included an objection to this aggravator in their motion to strike the government's notice of intent to see the death penalty. Allen's Motion to Dismiss Government's Notice of Intent to Seek Death Penalty

---

[63] The *Allen I* court also stated that the evidence was "essentially overwhelming" that Mr. Allen was the triggerman and therefore the prejudice prong of the *Strickland* test was satisfied. *United States v. Allen*, 247 F.3d 741, 777 (8ᵗʰ Cir. 2001). However, at the penalty phase, the issue is not guilt but penalty and the rest of the jury's actions show indecisiveness on penalty. Using the proper standard, prejudice has been shown.

158

and for Other Appropriate Relief (Oct. 20, 1997). The motion was denied. The Court found that the notice of intent to seek the death penalty was proper. Of course, the standards for determining that motion are not the same as those for determining how the jury is to be instructed.

Inexplicably, considering their evident strategy to eliminate this non-statutory aggravating circumstance from the jury's consideration, counsel entirely failed to object when it was submitted to the jury. Thus, on appeal, Mr. Allen's counsel was limited to plenary review of his argument that the death penalty was unconstitutional because this factor was included, rather than having the ability to raise the improper instruction as an issue in itself. Nonetheless, appellate counsel could have raised this issue for plain error, but failed to do so.

The government points out that this issue *was* raised by trial and appellate counsel for Mr. Allen's co-defendant, Norris Holder. In what was apparently a holding of first impression, since the court cited no authority, the Eighth Circuit found that the factor was not vague and was permissible. *United States v. Allen*, 247 F.3d 741, 787 (8th Cir. 2005) (*Allen I*). The government cites no other similar holding, before or since, and current counsel for Mr. Allen has not located any other authority either way.

The government argues that because the Eighth Circuit rejected the argument in Mr. Holder's case, there is no reasonable probability of a different result in Mr. Allen's case. A "reasonable probability," for *Strickland* purposes, is less than a preponderance of the evidence. *Williams (Terry) v. Taylor*, 529 U.S. 362 (2000). Mr. Allen and Mr. Holder were tried separately, and there are significant differences in the way this issue was handled in each case.

In Mr. Allen's case, the government compounded the error in submitting this aggravator by with improper arguments, made without evidentiary support. For example, the government argued: "This is a violent bank takeover, the kind you just don't see. . . . The crime that was

159

committed by these defendants is much greater in degree than would normally be seen in a bank robbery." T. XIX: 50-51; *see also* Ground L, *supra*. Not only did the prosecutors not present any evidence about "normal" bank robberies, they invited the jury to speculate about what "greater in degree" might mean. Moreover, the jury in Mr. Allen's case imposed death on only one count, which suggests that his death sentence was a closer issue than that of Mr. Holder, who received two death sentences. *United States v. Allen*, 247 F.3d 741, 755 (8th Cir. 2005) (*Allen I*).

As the court noted in *Allen I*, non-statutory aggravating circumstances are considered not in determining eligibility for the death penalty, but in the constitutionally required individualized consideration of the death penalty to determine which eligible defendants should be sentenced to death and which to life. What is important at the selection stage is an "individualized determination on the basis of the character of the individual and the circumstances of the crime." *Tuilaepa v. California*, 512 U.S. 967, 971-72 (1994). If the factors presented to the jury for their consideration are so vague that they defy rational explanation, then the defendant is denied the "individualized determination" required by the Constitution.

Had the Eighth Circuit had the opportunity to review this issue in the context of Mr. Allen's trial, particularly in light of the improper argument of the prosecutor, there is a reasonable probability of a different outcome. Because the prosecutor in Mr. Holder's case apparently did not argue that this was not a "normal" bank robbery, it was not clear that this factor required rank speculation by the jury. Thus, the court was able to characterize this factor as simply a circumstance of the offense. But it is more than that here—it implies a requirement that the jury quantify and differentiate the offense on trial from other offenses in a way that, without evidence, a lay jury is simply unequipped to do. Counsel's failure to object to the aggravating factor, as compounded by the government's improper arguments, was prejudicial.

160

*See Starr v. Lockhart*, 23 F.3d 1280, 1286 (8th Cir. 1994) (finding prejudice for counsel's failure to challenge the constitutionality of an aggravating circumstance).

As discussed more fully in Ground E above, constitutionally effective trial and appellate counsel in death penalty cases must raise and litigate all available legal issues affecting penalty. Their failure to do so here was clearly ineffective. Not only did they raise the issue in another way, thus eliminating the possibility that they had some strategic reason why they wanted this non-statutory factor before the jury, but the issue *was* raised by the co-defendant's counsel, demonstrating that it was reasonably available to competent counsel. Because Mr. Allen has also demonstrated prejudice, he is entitled to a new penalty phase even if he is not afforded a new trial.

**O.      Mr. Allen was denied effective assistance of appellate counsel when appellate counsel failed to provide the court of appeals with relevant authority concerning his assertion that his rights were violated when the grand jury did not hear evidence regarding statutory aggravating circumstances.**

Mr. Allen's appeal on remand turned on the question of whether the government's failure to present evidence concerning statutory aggravating circumstances to the grand jury, and to obtain and indictment specifying those circumstances, was harmless. A panel of the Eighth Circuit determined that the error was reversible because it was not harmless beyond a reasonable doubt, and remanded to the district court for imposition of a life sentence. *United States v. Allen*, 357 F.3d 745. 758 (8th Cir. 2004) (*Allen II*).

The *en banc* court affirmed the finding that Mr. Allen was denied his right to indictment, but found the error harmless. In so finding, the court agreed with the panel that the proper test was whether the error was harmless beyond a reasonable doubt. The court then specified the following test for making that determination: "[W]hether any rational grand jury. . . would have

161

found the existence of the requisite mental state and one or more of the statutory aggravating factors found by the petit jury if the grand jury had been asked to do so. *United States v. Allen*, 406 F.3d 940, 945 (8th Cir. 2005). In examining that question, the court limited itself to the evidence actually presented to the grand jury. *Id.* at 946. Based on the testimony presented there, the court determined that the grand jury would have charged the statutory aggravator of whether Mr. Allen "'in the commission of the offense, or in escaping apprehension. . . , knowingly create[d] a grave risk of death to one or more persons in addition to Richard Heflin,'" had it been asked to do so. *Id.* at 947.

In their brief on remand, Mr. Allen's appellate counsel argued that, because the Federal Death Penalty Act of 1994, under which Mr. Allen was indicted and prosecuted, did not require the grand jury to charge the requisite *mens rea* or aggravating factors, the Act was unconstitutional. Ex. 51, Appellant's Brief on Remand, pp. 18-24. They briefly argued that the court should not attempt to determine what a grand jury would have done, but did not fully develop this argument. Ex. 15, Appellant's brief on Remand, pp. 15-16.

In their reply brief, appellate counsel responded to the government's contention that the *Chapman v. California*, 386 U.S. 18 (1967), standard applied to this error, and that the error was harmless under that statute. Appellate counsel again contended in the reply brief that showing of prejudice should be required. However, in so doing, they omitted considerable persuasive authority which might have changed the result. Ex. 52, Reply Brief on Remand.

In particular, counsel failed to cite *Campbell v. Louisiana*, 523 U.S. 392 (1998). There, in the course of holding that Mr. Campbell, who is white, was entitled to challenge the racial composition of the grand jury, the U.S. Supreme Court re-emphasized the historic and important protections afforded a criminal defendant by grand jury proceedings:

162

> The grand jury, like the petit jury, "acts as a vital check against the wrongful exercise of power by the State and its prosecutors." [Citation omitted]. It controls not only the initial decision to indict, but also significant decisions such as how many counts to charge and whether to charge a greater or lesser offense, **including the important decision to charge a capital crime**. See *Vasquez v. Hillery*, 474 U.S. 254, 263. . . (1986).

*Campbell*, 523 U.S. at 399. Similarly, in *Russell v. United States,* 369 U.S. 749, 761 (1962), the Supreme Court emphasized again the fact that the grand jury acts as a historical check on the power of the prosecutor:

> The constitutional provision that a trial may be held in a serious federal criminal case only if a grand jury has first intervened reflects centuries of antecedent development of common law, going back to the Assize of Clarendon in 1166. 'The grand jury is an English institution, brought to this country by the early colonists and incorporated in the Constitution by the Founders. There is every reason to believe that our constitutional grand jury was intended to operate substantially like its English progenitor. The basic purpose of the English grand jury was to provide a fair method for instituting criminal proceedings against persons believed to have committed crimes.' *Costello v. United States*, 350 U.S. 359, 362 [(1956)]. *See* McClintock, *Indictment by a Grand Jury*, 26 Minn.L.Rev. 153; Orfield, CRIMINAL PROCEDURE FROM ARREST TO APPEAL, 137-140, 144-146.

The Court in *Russell* overturned an indictment because it failed to charge an element of the offense. Both *Campbell* and *Russell* emphasized the importance of the grand jury and the fact that the reviewing court could not reasonably determine how the grand jury would have responded to evidence and issues which were not presented by the prosecutor. In light of the recent emphasis of the United States Supreme Court of the importance of a determination of the Founders' intent in interpreting the Constitution, from *Apprendi v. New Jersey*, 530 U.S. 466 (2000), to *Ring v. Arizona*, 536 U.S. 584 (2002), through *Crawford v. Washington*, 541 U.S. 36 (2004), it was incumbent on appellate counsel to make clear to the court that the violation of Mr.

163

Allen's right to a determination by the grand jury that the offense with which he was charged met the statutory criteria for a capital prosecution was not subject to harmless error analysis.

Had they done so, there is a reasonable probability that the court would not have decided the case as it did. In this connection, it must be noted that a panel of the Eighth Circuit had already concluded that it could not find the error harmless because of the jury's finding of guilt: "Nothing in the petit jury's findings compels the conclusion that a completely different group of people-the grand jury-would have found the same fact, even if the evidentiary burdens are lower." *United States v. Allen*, 357 F.3d 745, 757 (8th Cir. 2004) (*Allen II*). The panel declined to sit as a new grand jury and reweigh the evidence presented to the original grand jury. Appellate counsel failed in their constitutional duty to present appropriate authority to the *en banc* court which would have supported the panel's finding.

**P.  Mr. Allen's jury should have been instructed that in order to impose a death sentence, they must find beyond a reasonable doubt that aggravating evidence outweighed the mitigating evidence, and appellate counsel was ineffective for failing to raise this issue on appeal.**

The government does not dispute that Mr. Allen's sentencing jury was not instructed that the government was required to prove the weighing element beyond a reasonable doubt. Thus, there is no dispute as to the factual assertions Mr. Allen makes in support of this claim.

The government nonetheless misreads or misstates Mr. Allen's ground. The *Amended Motion* alleged, quite clearly, that his jury should have been instructed on the weighing determination beyond a reasonable doubt. The government misstates that as an argument regarding the grand jury and the indictment. *GR-* 151. The government's reliance on *United States v. Purkey*, 428 F.3d 738 (8th Cir. 2005), is therefore misplaced. Purkey raised a claim regarding the sufficiency of the indictment. *Id* at 748. Under Ground P, Mr. Allen is not

164

attacking the sufficiency of the indictment. The government's argument misses the mark entirely.

Similarly, the government's vague reliance on *Teague v. Lane*, 489 U.S. 288 (1989), should not bar relief, given that the government has attempted to recast Mr. Allen's ground into something it is not. *See* Part One, Sec. B(3), above.

The government does assert that "the weighing decision by the petit jury need not be made beyond a reasonable doubt". *GR*- 151-52. In that regard the government relies on *United States v. Fields*, 516 F.3d 923 (10th Cir. 2008); *United States v. Fields*, 483 F.3d 315, 345-346 (5th Cir. 2007); and *Kansas v. Marsh*, 548 U.S. 163 (2006).

*Marsh* does not encompass Sixth Amendment and appurtenant due process rights. The commonality between the justices in the *Marsh* majority and those who championed *Apprendi* provides no authority on the extent to which *Apprendi/Ring* safeguards apply to the federal death penalty statute. This is so because the claims in *Marsh* are distinguishable, and their bases arise from different constitutional principles.

The issue in *Marsh* was whether a statutory "presumption in favor of death" and a corollary proposition that death should be imposed if aggravators and mitigators "are in equipoise" runs afoul of the Supreme Court's death penalty jurisprudence.  The challenged statute read:

> "If, by unanimous vote, the jury *finds beyond a reasonable doubt* that one or more of the aggravating circumstances enumerated in K. S. A. 21-4625 . . . exist and, further, that the existence of such *aggravating circumstances is not outweighed by any mitigating circumstances* which are found to exist, the defendant shall be sentenced to death; otherwise the defendant shall be sentenced as provided by law."

*Kansas v. Marsh*, 548 U.S. 163, 166 (2006).

165

Significantly, this same statute "requires the State to bear the burden of proving to the jury, *beyond a reasonable doubt*, that aggravators are not outweighed by mitigators." *Id.* at 172. Given this "beyond a reasonable doubt" requirement, Marsh could not, and did not, make a challenge to the Kansas statute similar to Mr. Allen's claim here.

Implicit in the government's reliance on *Marsh* is its equating of two different concepts. *Marsh* deals with the construction of the weighing equation in the Kansas statute. The question decided in *Marsh* was whether the jurisprudence of *Furman v. Georgia*, 408 U.S. 238 (1972), and *Lockett v. Ohio*, 438 U.S. 586 (1978), requires the equation to be phrased such that a capital defendant is ineligible for a death sentence if the capital juror concluded the aggravation and mitigation are in equipoise.

On the other hand, Mr. Allen's ground deals with the concept of how convinced the capital juror must be about the relative weight of the aggravators and mitigators. *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Ring v. Arizona*, 536 U.S. 584 (2002) dictate that a capital juror under the federal death penalty statute must be convinced beyond a reasonable doubt of the relative weight of the aggravating and mitigating circumstances. These protections apply because of statutory construction. To conclude that *Marsh* controls distorts the nature of the constitutional principles at issue there.

The constitutional principles at stake in *Kansas v. Marsh*, 548 U.S. 163 (2006), arise from *Furman v. Georgia*, 408 U. S. 238 (1972), and its progeny. Marsh's claims were analyzed on the basis of two constitutional mandates: That a capital sentencing system must "(1) rationally narrow the class of death-eligible offenders; and (2) permit a jury to render a reasoned, individualized sentencing determinations based on a death-eligible defendant's record, personal

166

characteristics and the circumstances of the crime." *Marsh,* 548 U.S. at 174. The Sixth Amendment jury trial right and appurtenant due process rights are nowhere discussed.

The *Marsh* majority relies in part on the Eighth Amendment branch of *Walton v. Arizona*, 497 U.S. 639 (1990), which survives *Ring*. Ultimately, *Marsh* determined that a death penalty statute does not violate constitutional principles flowing from *Furman* if its structure allows imposition of a death sentence where the aggravators and mitigators are in equipoise.

*Marsh* has no precedential impact upon the constitutionality of the instructional omission for which Mr. Allen seeks relief. Indeed, relying upon *Marsh* to decide Mr. Allen's ground would effectively resurrect that part of *Walton* which the *Ring* Court declared dead.

Appellate counsel was deficient in not presenting this issue to the court in Mr. Allen's direct appeal brief, and there is a reasonable probability that the outcome would have been different if counsel had presented this issue in a timely fashion. Counsel raised at trial and on appeal the indictment issue later addressed in *Ring v. Arizona*, 536 U.S. 584 (2002). *Apprendi v. New Jersey*, 530 U.S. 466 (2000), was decided while the case remained pending on direct appeal and counsel could have requested leave to file a supplemental brief as to this issue. Ultimately, the Supreme Court remanded the case in light of *Ring* and at that time counsel again could have broadened their objection to include this ground. Had counsel taken any of the above steps there is a reasonable probability that Mr. Allen's death sentence would have been reversed and the matter remanded for a new penalty phase proceeding.

Under the *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), standard, Mr. Allen's appellate counsel failed in their duty to render effective assistance of counsel, and he was prejudiced thereby. The Court is respectfully referred to the authorities cited in Ground D, above, which are equally applicable to this instance of appellate ineffective assistance of counsel.

167

If Mr. Allen is not granted a new trial, he is nonetheless entitled to a new penalty phase.

**Q.      The manner in which the government would carry out Mr. Allen's execution would violate the Eighth Amendment.**

The government mischaracterizes the contention in this Ground. Mr. Allen does not contend that lethal injection, *per se*, violates the Eighth Amendment. Rather, as stated in the amended motion, "Mr. Allen contends that the execution *under the current Bureau of Prison protocols* would violate the Eighth Amendment." Motion, p. 52. As the United States Supreme Court recognized in *Baze v. Rees*, 128 S.Ct. 1520, 1532 (2008), challenges to the method of execution must be decided on a case by case basis.

*Baze v. Rees*, 128 S.Ct. 1520 (2008), contrary to the government's argument, did not "hold directly to the contrary" of Mr. Allen's argument. Instead, *Baze* established the legal standard for review of the constitutionality of lethal injection procedures, and held that Kentucky's procedure was constitutional. In fact, a challenge to the current federal execution protocol is now pending in the United States District Court for the District of Columbia. On April 20, 2009, the U.S. District Court denied the defendants' motion to dismiss in the case of *Roane v. Holder*, Civil Action No. 05-2337 (RWR). The order is attached as Exhibit 53.

In July of 2008, a copy of the BOP execution protocol was filed in the *Roane* case. Addenda dated July 1, 2008, and August 1, 2008 were subsequently filed in the same case. Counsel for Mr. Allen are unaware of any further modifications to the execution protocol. Obviously, the federal government's lethal injection method is subject to revision at any time. This Court should hold that any consideration of this ground at this time is an unnecessary waste of judicial resources. The ground was included in the amended motion to forestall any later contention by the government that Mr. Allen was raising the issue at the "Eleventh Hour." See

168

Ex. 53, pp. 5, 13-16; *Hill v. McDonough*, 547 U.S. 573 (2006). This Court should acknowledge that Mr. Allen has raised the issue at an early stage of the proceedings, and should defer its resolution to another proceeding at another time.

Should the court wish to attempt a resolution of this issue now, it is clear that an evidentiary hearing would be required. In *Baze v. Rees*, 128 S.Ct. 1520, 1526 (2008), the United States Supreme Court cited the extensive evidence developed in evidentiary hearings in support of its conclusion that the *Baze* protocol did not carry a substantial risk of unnecessary suffering. Clearly, this issue cannot be decided on the pleadings.

Accordingly, Mr. Allen requests that this Court deem the issue of the propriety of the method of execution to have been presented, and rule that it is not now ripe for consideration in this proceeding or at this time. The government, in its response, asserts no objection to this disposition of Ground Q.

**R.      Even if no one of the violations of Mr. Allen's rights listed in this petition merits relief, the effect of the cumulative violations of Mr. Allen's rights undermines confidence in the verdict, the sentence, and the operation of due process of law in Mr. Allen's case.**

In this traverse, Mr. Allen has addressed why each particular ground for relief was prejudicial to him.  Without waiving his contention that each instance, by itself, merits relief, Mr. Allen points out that, in assessing prejudice, this Court must consider cumulatively all of the instances of prosecutorial misconduct and ineffective assistance of counsel which the court finds to have been established.

In *White v. Roper*, 416 F.3d 728, (8th Cir. 2005), *cert. denied*, 546 U.S. 1157, the court found prejudice from counsel's ineffectiveness in failing to investigate and call two witnesses. In *Cargle v. Mullin*, 317 F.3d 1196 (10th Cir. 2003), the court found prejudice both because of

169

numerous instances of ineffective assistance of trial counsel and because of prosecutorial misconduct (*Brady* violations.) See also *Parle v. Runnels*, 505 F.3d 922, 934 (9th Cir. 2007) (Cumulative errors in admission and exclusion of evidence were not harmless)s; *Harris ex rel. Ramseyer v. Wood*, 64 F.3d 1432, 1434 (9th Cir. 1995) ("Because Benjamin Harris was deprived of his Sixth Amendment right to effective assistance of counsel, we hold that the district court properly granted his petition for a writ of habeas corpus. His defense counsel's many deficiencies cumulatively prejudiced the defense."); *Mak v. Blodgett*, 970 F.2d 614, 622, 624-25 (9th Cir. 1992) (cumulative errors requiring reversal included counsel's failure to present mitigating evidence in the penalty phase, the court's refusal to admit exculpatory evidence and its failure to instruct the jury properly in the penalty phase.).

Cumulative prosecutorial misconduct also can merit relief. *Kyles v. Whitley*, 514 U.S. 419.. 437 (1995); *Vincent v. Seabold*, 226 F.3d 681, 690 (6th Cir. 2000) (errors in trial, taken together, were not harmless); *Depew v. Anderson*, 311 F.3d 742, 751 (6th Cir. 2002) ("Cumulatively, it is clear that these [prosecutorial misconduct] errors are not harmless."); *Jenkins v. Artuz*, 294 F.3d 284 (2nd Cir. 2002) (Cumulative effect of prosecutor's presenting false testimony and improper summation required reversal). Thus, even if no one instance of prosecutorial misconduct or ineffective assistance is found to require relief, they must be considered in the aggregate to determine whether Mr. Allen is entitled to a new trial or a new penalty phase.

## CONCLUSION

For the foregoing reasons, Mr. Allen prays the Court:

1. To grant discovery in this matter as discussed in Grounds B, C, D, E, F, G, and I (This request will be amplified in a soon-to-be-filed discovery motion.)

2. To grant an evidentiary hearing as to all grounds for relief. (This request, too will be amplified in a subsequent motion.)

3. Upon hearing, for the reasons discussed in Grounds A, B, D, E, G, H, and I, to grant Mr. Allen a new trial; and

4. For the reasons discussed in Grounds C, F and O, to preclude the government from seeking a death sentence at any future trial; or

5. For the reasons discussed in Grounds C, F and O, to reform Mr. Allen's sentence on Count 2 to life imprisonment; or

6. For the reasons discussed in Grounds J, K, L, M, N, and P, to order that if the government chooses to continue to seek the death penalty against Mr. Allen, a new penalty phase must be conducted; and

7. For the reasons discussed in Ground Q, if Mr. Allen remains subject to a death sentence, to order that consideration of his contentions concerning lethal injection are not ripe for resolution at this time, and

171

8. For such other and further relief to which he may show himself entitled.

Respectfully submitted,

/s Elizabeth Unger Carlyle

Elizabeth Unger Carlyle #51877
P.O. Box 866
Columbus, MS  39703
Missouri Bar No. 41930
(816)525-6540
FAX (866) 764-1249
elizcar@lawalumni.neu.edu

Joseph M. Cleary #534292
Attorney at Law
1455 N. Pennsylvania
Indianapolis, IN  46202
(317) 630-0137
jcleary498@aol.com

Michael Wiseman
Chief, Capital Habeas Corpus Unit
Federal Community Defender for the
Eastern District of Pennsylvania
Suite 545 West -- The Curtis Center
Philadelphia, PA  19106
215-928-0520

ATTORNEYS FOR PETITIONER

CERTIFICATE OF SERVICE

I hereby certify that it is my belief and understanding that counsel for respondent, Mr. Joseph M. Landolt, Asst. United States Attorney, 111 South 10th Street, 20th Floor, St. Louis, Missouri 63102, and Mr. Steven Holtshouser, Assistant United States Attorney, 111 South 10th Street, 20th Floor, St. Louis, Missouri 63102., are participants in the Court's CM/ECF program and that separate service of the foregoing document is not required beyond the Notification of Electronic Filing to be forwarded to counsel on August 14, 2009, upon the filing of the foregoing document.

/s/ Elizabeth Unger Carlyle
ELIZABETH UNGER CARLYLE

172