# RACIAL DISPARITIES IN FEDERAL DEATH PENALTY PROSECUTIONS 1988-1994

153840

**U.S. Department of Justice**
**National Institute of Justice**

This document has been reproduced exactly as received from the person or organization originating it. Points of view or opinions stated in this document are those of the authors and do not necessarily represent the official position or policies of the National Institute of Justice.

Permission to reproduce this copyrighted material has been granted by

Public Domain/103 Congress
House Judiciary Committee

to the National Criminal Justice Reference Service (NCJRS).

Further reproduction outside of the NCJRS system requires permission of the copyright owner.

**Staff Report by the**
**Subcommittee on Civil and Constitutional Rights**
**Committee on the Judiciary**
**One Hundred Third Congress, Second Session**
**March, 1994**

**Chairman Don Edwards of the House Judiciary Committee's Subcommittee on Civil and Constitutional Rights directed the subcommittee majority staff to prepare this report. This report has not been reviewed or approved by other members of the subcommittee.**

# Racial Disparities in Federal Death Penalty Prosecutions

*"Twenty years have passed since this Court declared that the death penalty must be imposed fairly, and with reasonable consistency, or not at all, and, despite the effort of the states and courts to devise legal formulas and procedural rules to meet this daunting challenge, the death penalty remains fraught with arbitrariness, discrimination, caprice, and mistake."*

**-Justice Harry A. Blackmun, Feb. 22, 1994[1]**

## Summary

Racial minorities are being prosecuted under federal death penalty law far beyond their proportion in the general population or the population of criminal offenders. Analysis of prosecutions under the federal death penalty provisions of the Anti-Drug Abuse Act of 1988[2] reveals that 89% of the defendants selected for capital prosecution have been either African-American or Mexican-American. Moreover, the number of prosecutions under this Act has been increasing over the past two years with no decline in the racial disparities. All ten of the recently approved federal capital prosecutions have been against black defendants. This pattern of inequality adds to the mounting evidence that race continues to play an unacceptable part in the application of capital punishment in America today. It confirms Justice Blackmun's recent conclusion that "the death penalty experiment has failed."

## The Federal Death Penalty

Since the Supreme Court's 1972 decision in *Furman v. Georgia*,[3] the death penalty has been almost exclusively a state prerogative. Congress has so far not adopted the general sentencing procedures that would reinstate the federal death penalty. No federal executions have been carried out since 1963 and, until very recently, prosecutions under federal death penalty law were rare. But that began to change over the past few years, and can be expected to change dramatically if the

---

1. Callins v. Collins, No. 93-7054 (1994) (Blackmun, J., dissenting) (Supreme Court denial of review).

2. 21 U.S.C. 848(e)-(q).

3. 408 U.S. 238 (1972).

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 2

House adopts pending legislation to restore generally — and expand — the federal death penalty.

In 1988, President Reagan signed the Anti-Drug Abuse Act. This legislation included a provision, sometimes referred to as the "drug kingpin" death penalty, which created an enforceable federal death penalty for murders committed by those involved in certain drug trafficking activities. The death penalty provisions were added to the "continuing criminal enterprise" statute first enacted in 1984, 21 U.S.C. § 848. The drug trafficking "enterprise" can consist of as few as five individuals, and even a low-ranking "foot soldier" in the organization can be charged with the death penalty if involved in a killing.

As the first enforceable federal death penalty adopted after *Furman*, § 848 offers a forewarning as to how a general federal death penalty might be applied. This report, prepared with the assistance of the Death Penalty Information Center in Washington, D.C. and with case data from the Federal Death Penalty Resource Counsel Project, examines the application of § 848.

Three-quarters of those convicted of participating in a drug enterprise under the general provisions of § 848 have been white and only about 24% of the defendants have been black.[4]  However, of those chosen for death penalty prosecutions under this section, just the opposite is true: 78% of the defendants have been black and only 11% of the defendants have been white.  (See Fig. 1). Although the number of homicide cases in the pool that the U.S. Attorneys are choosing from is not known (the Justice Department has not responded to Congressional inquiries for that data), the almost exclusive selection of minority defendants for the death penalty, and the sharp contrast between capital and non-capital prosecutions under § 848, indicate a degree of racial bias in the imposition of the federal death penalty that exceeds even pre-*Furman* patterns.

---

4. U.S. Dept. of Justice,  Bureau of Justice Statistics, *Special Report:  Prosecuting Criminal Enterprises, ,* at 6, Table 10 (convictions 1987-90) (1993).

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 2

Case: 4:07-cv-00027-ERW   Doc. #: 94-3   Filed: 08/14/09   Page: 4 of 13 PageID #:
718

Federal Death Penalty Prosecutions
Page 3



**Fig. 1: Race of Defendants Selected for Capital Prosecution**

Black 78%

11% 11%

Hispanic   White

White - 4
Hispanic - 4
Black - 29

Federal regulations require that local U.S. Attorneys obtain the personal written authorization of the Attorney General of the United States before proceeding with a capital prosecution. So far, former Attorneys General Thornburgh and Barr, and present Attorney General Reno have approved capital prosecutions against a total of 37 defendants under the 1988 "kingpin" law. Twenty-nine of the defendants have been black and 4 have been Hispanic. All ten of the defendants approved by Attorney General Reno for capital prosecution have been black. Judging by the death row populations of the states, no other jurisdiction comes close to this nearly 90% minority prosecution rate.[5]

## Pace of Prosecutions Increasing

The pace of these prosecutions has been substantially increasing over the past two years. Although widely touted during the 1988 election year as a "tough" response to drug crime, there were only seven defendants prosecuted under this Act in the first three years after its passage and only one death sentence handed down. However, in 1992 alone, capital prosecutions against fourteen defendants were announced and another five death sentences resulted from these cases. Since January, 1993, sixteen more prosecutions have been announced.[6] (See Fig. 2).

---

5. See NAACP Legal Defense Fund, *Death Row, U.S.A.*, January 1994 (death rows by state with racial breakdowns).

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 2

Case: 4:07-cv-00027-ERW    Doc. #: 94-3    Filed: 08/14/09    Page: 5 of 13 PageID #:
719

Federal Death Penalty Prosecutions
Page 4



Fig. 2: Capital Prosecutions Under § 848

The underlying crimes for which these defendants are being prosecuted are not excusable because the offenders are members of minorities. But the statistics raise the question of why these cases were chosen out of the large number of drug-related homicides over the past five years. By way of comparison, the proportion of African-Americans admitted to federal prison for all crimes has remained fairly constant between 21% and 27% during the 1980s, while whites accounted for approximately 75% of new federal prisoners.[7] Yet, when it comes to the federal death penalty, the scales dramatically tip the other way.

The federal government employed the death penalty for a variety of crimes prior to the 1972 *Furman* decision. But the racial breakdown was also just the opposite from current death penalty prosecutions. Between 1930 and 1972, 85% of those executed under federal law were white and 9% were black. The dramatic racial turnaround under the drug kingpin law clearly requires remedial action.

Although challenged at a Congressional hearing to provide an explanation for such racial disparities, and asked by the Chairman of this Subcommittee for data

---

6. Prosecutions against 10 defendants were approved by Attorney General Reno, including at least one in 1994. Prosecutions against 6 other defendants were approved in the previous Administration, but were not announced until June, 1993.

7. Bureau of Justice Statistics, *Sourcebook of Criminal Justice Statistics, 1991*, at table 6.78, p. 644 (1992).

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 2

on potentially capital cases referred to Washington for approval by federal prosecutors, the Justice Department has offered no response.[8]

It is worth noting that some of the death penalty prosecutions under § 848 have been against defendants who do not seem to fit the expected "drug kingpin" profile. In a number of cases, the U.S. Attorneys have sought the death penalty against young inner-city drug gang members and relatively small-time drug traffickers.[9] In other cases, the death penalty was returned against those directly involved in a murder, while the bosses who ordered the killings were given lesser sentences.[10]

## Background on Race and the Death Penalty

Throughout American history, the death penalty has fallen disproportionately on racial minorities. For example, since 1930 nearly 90% of those executed for the crime of rape in this country were African-Americans.[11] Currently, about 50% of those on the nation's death rows are from minority populations representing 20% of the country's population.

In 1972, the United States Supreme Court overturned existing death penalty

---

8. On October 21, 1993, Rep. Melvin Watt (D-NC) asked then Deputy Attorney General Philip Heymann for an explanation of the racial disparities in capital prosecutions during the course of a House Judiciary Subcommittee hearing on the Administration's crime bill. Mr. Heymann promised a reply in two weeks. To date, Rep. Watt has received no response to his inquiry. Death Penalty Information Center phone conversation with Rep. Watt's office, Feb. 28, 1994 .

During the same hearing, Rep. Craig Washington (D-Tex.) remarked to Mr. Heymann that "if some redneck county in Texas had come up with figures like that, you'd been down there wanting to know why." See Federal Death Penalty Update, Newsletter of Federal Death Penalty Resource Counsel Project, January, 1994.

9. See, e.g., United States v. Tipton et al., 3-92-CR68 (E.D. Va.) (prosecution of four young black inner-city gang members in Richmond, Va.); United States v. Bilal Pretlow, No. 90-CR-238 (D.N.J.) (a young black New Jersey gang member who committed suicide during his trial); United States v. Chandler, 996 F.2d 1073 (11th Cir. 1993) (prosecution of rural Alabama marijuana grower in murder-for-hire scheme).

10. See, e.g., United States v. Hutching et al., No. CR-032-S (E.D. Okl.) (two "managers" of the drug enterprise received life sentences for murder while lower level defendant who was present at the murder was sentenced to death); United States v. Michael Murray, Cr. No. 1: CR-92-200 (M.D. Pa.) (Dept. of Justice reportedly declined to approve the U.S. Attorney's request to authorize the death penalty against the gang leader, Jonathan Bradley, whom the indictment alleges ordered the killing. A death sentence is being sought against Murray who was 19 years old at the time of the incident.). Information obtained from the Federal Death Penalty Resource Counsel Project report, Feb. 15, 1994.

11. U.S. Dept. of Justice, Bureau of Justice Statistics, *Capital Punishment, 1981* (1982).

Case: 4:07-cv-00027-ERW   Doc. #: 94-3   Filed: 08/14/09   Page: 7 of 13 PageID #: 721

statutes in part because of the danger that those being selected to die were chosen out of racial prejudice. As the late Justice Douglas said in his concurrence overturning the death penalty:

> [T]he discretion of judges and juries in imposing the death penalty enables the penalty to be selectively applied, feeding prejudices against the accused if he is poor and despised, and lacking political clout, or if he is a member of a suspect and unpopular minority, and saving those who, by social position, may be in a more protected position.[12]

Following the *Furman* decision, legislatures adopted death sentencing procedures that were supposed to eliminate the influence of race from the death sentencing process. However, evidence of racial discrimination in the application of capital punishment continues. Nearly 40% of those executed since 1976 have been black, even though blacks constitute only 12% of the population. And in almost every death penalty case, the race of the victim is white. (See Fig. 3). Last year alone, 89% of the death sentences carried out involved white victims, even though 50% of the homicides in this country have black victims.[13] Of the 229 executions that have occurred since the death penalty was reinstated, only one has involved a white defendant for the murder of a black person.

---

12. Furman v. Georgia, 92 S. Ct. 2726, 2735 (1972) (Douglas, J., concurring).

13. See, e.g., S. LaFraniere, *FBI Finds Major Increase in Juvenile Violence in Past Decade*, Washington Post, Aug. 30, 1992, at A13 (half of U.S. murder victims are black).

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 2



**Fig. 3: Race of Victim in Cases Resulting in Execution Since 1976**

White — 84%
Asian — 2%
Black — 12%
Hispanic — 3%

Race of the victim discrimination was singled out by the U.S. General Accounting Office in its report "Death Penalty Sentencing" which concluded that studies showed:

> [The] race of the victim was found to influence the likelihood of being charged with capital murder or receiving the death penalty, i.e., *those who murdered whites were found more likely to be sentenced to death than those who murdered blacks.*[14]

This record of racial injustice played a significant part in Justice Harry Blackmun's recent decision to oppose the death penalty in every case. "Even under the most sophisticated death penalty statutes," said Blackmun, "race continues to play a major role in determining who shall live and who shall die."[15]

## Conclusion

Race continues to plague the application of the death penalty in the United States. On the state level, racial disparities are most obvious in the predominant selection of cases involving white victims. On the federal level, cases selected have

---

14. U.S. General Accounting Office, *Death Penalty Sentencing* 5 (Feb. 1990) (emphasis added).

15. Callins v. Collins, No. 93-7054 (1994) (Blackmun, J., dissenting).

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
· Exhibit 2

almost exclusively involved minority defendants.

Under our system, the federal government has long assumed the role of protecting against racially biased application of the law. But under the only active federal death penalty statute, the federal record of racial disparity has been even worse than that of the states.   So far, the number of cases is relatively small compared to state capital prosecutions.   However, the numbers are increasing, and under legislation currently being considered in Congress, the federal government would play a much wider role in death penalty prosecutions.

# APPENDIX

## FEDERAL DEATH PENALTY PROSECUTIONS, 1988-94[*]

Following enactment of the first modern federal death penalty statute on November 18, 1988, 21 U.S.C. §848(e)-(q) (the so-called "drug kingpin" murder provision), the Bush and Clinton Administrations have approved death penalty prosecutions under § 848 against 37 defendants. Of these, four defendants were white, four were Hispanic, and twenty-nine were black. All 10 of the defendants approved for capital prosecution by Attorney General Reno, and all 15 defendants now awaiting federal death penalty trials or currently on trial, are African-American.

**Federal Capital Cases Tried to Date**

The federal death penalty cases brought to trial during 1989 -1994 by the Bush and Clinton Administrations are listed below:

° A white **Alabama** marijuana grower named Ronald Chandler, was sentenced to death for the murder for hire of a subordinate in his drug ring. Chandler's convictions and death sentence were affirmed by a panel of the Eleventh Circuit July 19, 1993; a petition for writ of certiorari is now pending before the United States Supreme Court. Claiming innocence, Chandler refused a pretrial plea bargain offer for life without possibility of parole. United States v. Chandler, 996 F.2d 1073 (11th Cir. 1993).

° Three of four young black inner-city gang members in Richmond, **Virginia**, were sentenced to death on February 16, 1993, for their roles in eleven crack-related murders. United States v. Tipton et al., 3-92-CR68 (E.D. Va.). The trial of a fourth defendant, Vernon Thomas, was severed. On April 23, 1993, moments before a scheduled hearing on Mr. Thomas's motion to bar the death penalty due to his mental retardation, the government withdrew its request for the death penalty. Mr. Thomas was ultimately convicted and sentenced to life imprisonment.

° A Hispanic drug distributor was sentenced to death by a jury on August 2, 1993 in Brownsville, **Texas**, in connection with the murders of three other drug traffickers in the Brownsville area. United States v. Juan Raul Garza, No. CR 93-0009 (S.D. Tex.). Attorney General Barr authorized the prosecution to seek the death penalty in December, 1992. Mr. Garza's appeal is pending

---

[*] Case data provided by the Federal Death Penalty Resource Counsel Project, Columbia, SC.

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 2

before the U.S. Court of Appeals for the 5th Circuit.

°       Two Hispanic defendants in **Texas** were sentenced to life imprisonment and forty years, respectively, for the marijuana-related murder of a state police officer after a joint trial. The sentencing jury found no facts legally warranting the death penalty. United States v. Reynaldo & Baldemar Villarreal No. 9:91CR4 (E.D. Tex. 1991), aff'd, 963 F.2d 725 (5th Cir.), cert. denied, 113 S.Ct. 353 (1992).

°       Two black **Chicago** gang members received life sentences for cocaine-related murders after separate trials.  The Government had offered one defendant, but not the other, a plea bargain prior to trial.  United States v. Alexander Cooper & Anthony Davis, No. 89-CR-0580 (N.D. ILL. 1991).

°       A white Mafia contract killer received a life sentence from a Brooklyn, New York jury after being convicted of eight murders, three of which qualified as capital crimes under 21 U.S.C. § 848.  United States v. Pitera, 5 F.3d 624 (2d Cir. 1993).

°       A young black **New Jersey** gang member committed suicide during his federal capital trial. United States v. Bilal Pretlow, No. 90-CR-238 (D.N.J.).

°       One Hispanic and two white defendants were tried jointly in connection with the drug-related kidnap/murder of a Muskogee, Oklahoma auto dealership employee.  United States v. Hutching et al., No. CR-032-S (E.D. Okl.).  The two capitally-charged "managers" of the drug enterprise received life sentences from the jury, while the lowest-level defendant, John McCullah (who, unlike the bosses, had been present at the killing) was sentenced to death on March 23, 1993.

**Federal Capital Prosecutions Not Yet Tried:**

Capital prosecutions initiated since early 1992 which are still pending (either as capital or noncapital cases) in federal district courts involve indictments charging:

°       Two black **New Orleans** inner-city gang members, in connection with an allegedly drug-related murder.  United States v. Green & Brown, E.D. La. No. 92-46.  On November 24, 1992, the Government dropped its request for the death penalty in this case.

°       One black Tampa, Florida drug distributor, for having allegedly ordered a murder in retaliation for the theft of drugs. United States v. Mathias, (M.D. Fla. No. 91-301-CR-T-17(A)).  Trial is set in this case for February 2, 1994.

°       One black **Atlanta** drug distributor in connection with three murders. United States v. Williams, No. 1:92-CR-142 (N.D.Ga.).  No trial date is set as

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 2

yet.

°       Two black crack cocaine dealers in Macon, **Georgia**, in connection with the murders of two other crack dealers. United States v. Tony Chatfield and Arleigh Carrington, (M.D. Ga. No. 92-82MAC-WDC). Attorney General Barr authorized this death prosecution in his last week in office. On December 6, 1993, the government dropped its request for the death penalty against these two defendants.

°       United States v. Reginald Brown et al., (E.D.Mich.Cr. No. 92-81127). This case reportedly involved six death authorizations against members of a cocaine distribution organization alleged to be responsible for a total of twelve murders over a 4-year period. The initial authorization occurred during the Bush Administration, but the authorizations were not announced until June, 1993. Only three of the six defendants against whom the death penalty has been authorized are currently in custody. One defendant, Terrance Brown, has been found dead, apparently a homicide victim.

The Federal Death Penalty Resource Counsel Project is aware of 7 cases, involving 16 defendants, in which the death penalty is reported to have been authorized by Attorney General Reno or announced since she took office. All 16 defendants are African-American. Three of the cases have been brought in jurisdictions (New York, Michigan, and the District of Columbia) which do not have capital punishment statutes. The cases are:

°       United States v. Darryl Johnson, (W.D.N.Y. Cr. No. 92-159-C-S), involving two alleged cocaine-related killings by a Buffalo, New York group. Trial is not anticipated before the fall of 1994.

°       United States v. Wayne Anthony Perry (D.C.D.C. No. 92-CR-474), an alleged hitman for a D.C. cocaine distribution ring; eight homicide counts. Trial is set for February 8, 1994.

°       United States v. Michael Murray, (M.D.Pa. Cr. No. 1:CR-92-200), involves the killing of a Harrisburg, **Pennsylvania** drug dealer by a gang headed by one Jonathan Bradley. DOJ reportedly declined to approve the U.S. Attorney's request to authorize the death penalty against Bradley, who allegedly ordered the killing, and against another participant in the shooting, Emmanuel S. Harrison.

°       United States v. Edward Alexander Mack et al., (S.D. Fla. 93-0252-CR-Ungaro-Benages), involves two drug-related murders in the course of a **Miami** drug trafficking operation. Three defendants are facing the death penalty in this case; trial is not anticipated until the latter part of 1994. Attorney General Reno authorized this capital prosecution in early January 1994.

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 2

- <u>United States</u> v. <u>Jean Claude Oscar et al.</u>, (E.D.Va. 93 CR 131) involves three capitally charged defendants and two crack-related murders in Norfolk, Va. Attorney General Reno authorized this capital prosecution in November 1993.

- <u>United States</u> v. <u>Todd Moore</u>, (E.D. Va. 1994), the prosecution of this black defendant in Norfolk, Va. was announced March 8, 1994.