Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 11

## Declaration of Richard H. Sindel, Esq.
## Pursuant to 28 U.S.C. § 1746

I, Richard H. Sindel, Esq. hereby declare and certify that the following is true to the best of my knowledge, information and belief, subject to the penalty of perjury.

1.     I am an attorney admitted to practice law in the State of Missouri. I have been a practicing attorney since 1973. My areas of expertise include criminal defense in state and federal court, and federal appellate practice. I have handled trial cases in multiple federal district courts, and have represented clients in several federal circuit courts of appeal. I have argued two cases in the United States Supreme Court.

2.     On April 4, 1997 I was appointed by the United States District Court for the Eastern District of Missouri to represent Mr. Billie Jerome Allen in a capital murder case. (United States v. Allen, 97-cr-141 (E.D. Mo.)). The charges in this case arose from the March 17, 1997 robbery of the Lindell Bank and Trust Company, located in St. Louis, Missouri, during which a bank security officer was shot dead. Mr. Allen was convicted following a jury trial, and he was sentenced to death. I have been asked by his current section 2255 counsel to complete this declaration setting forth my recollection of facts relevant to the penalty phase of Mr. Allen's trial. Counsel have not requested that I comment in this Declaration on any other issue or ground for relief that may be presented in his section 2255 motion.

1

3.      I realized that this probably would be prosecuted as a capital case.  I was informed in June, 1997 by the local prosecutors that they had requested authorization from the Attorney General to seek the death penalty.  Based on my expectation that the case would be authorized as a death penalty prosecution, I moved in July, 1997 for appointment of investigative, and expert services, including a mitigation specialist.  The local prosecutors obtained authorization to seek the death penalty and on August 8, 1997 the Government filed a *Notice of Intent to Seek the Death Penalty Against Defendant* Allen.

4.      After the Government filed its death notice, I set out to identify a mitigation specialist to work on this case.  I communicated with federal death penalty resource counsel and they provided me with a number of names of people they believed to be qualified.  Professor Craig Haney from the University of California at Santa Clara was one of those names, and I retained him in early September, 1997.

5.      Once the case formally became a capital prosecution, I moved for appointment of a second lawyer, to which I was entitled under the statute.  John Simon was appointed as second counsel on September 24, 1997.  I anticipated we would divide the responsibilities of preparing and trying the lawsuit.  I would be primarily responsible for the preparation of guilt phase and Mr. Simon would assist with legal research, family contacts and assist with the mitigation phase investigation.

2

It was my responsibility to try the case and supervise the entire endeavor.

6.     This was the first federal capital case tried in the Eastern District of Missouri since Furman. I have handled many federal capital cases in other districts. None have had such a short window between the government's authorization to seek the death penalty and trial. In my experience, as stated to the trial court, in most death authorized cases, the period between authorization and trial is at least one year. The time between indictment/appointment of counsel and trial is much closer to two years. In this case the period between authorization and trial was half the norm – approximately six months – and this short time period already hampered our ability to prepare.

7.     When I retained Dr. Haney I expected that he would assume responsibility for the day-to-day preparation of the penalty phase. I instructed my assistant, Connie Caspari, to provide him with whatever documents we had gathered and to assist him in whatever ways he requested. Several letters were exchanged between Ms. Caspari and Dr. Haney. On October 1, 1997 she provided him with the St. Louis police report. He wrote to her on November 25, 1997 to provide us with an estimate of the hours he would likely spend on the case. I needed this information to provide the Court with a case-budget. She wrote to him again on November 26, 1997 to enclose a number of background documents, including school records, records

3

from the Metropolitan St. Louis Psychiatric Center, jail records, medical records. Finally, on December 5, 1997 she sent to him a so-called "biography" written by Mr. Allen. This was the extent of the defense team's written communications with Dr. Haney through 1997. Neither I, nor my co-counsel, Mr. Simon, had any additional contact with Dr. Haney.

8.     In early January, 1998 I asked Ms. Caspari to check on the status of Dr. Haney's work. She left him phone messages which were not returned. Accordingly, on January 12, 1998 I faxed him a letter expressing concern that he had not returned our calls given that the trial was scheduled to start in less than one month.

9.     Our next contact occurred on January 13, 1998 when Dr. Haney faxed me a four page response, which I have recently again reviewed. His letter accurately recounted the materials that were provided to him by my office. It also accurately stated that he and I never spoke up until that time. He also stated: "I have never seen a single investigative report generated by your office. That is, I have no information concerning the guilt-phase case-in-chief, potential mitigation witnesses, the prosecution case in aggravation, and so on and on." The rest of the letter went on to explain the laborious process of putting together a penalty phase, and how – because we had not provided him with required information about Mr. Allen and his life – he was not even in the earliest stages of this preparation for Mr. Allen's case. Finally,

4

he pointed out that he would require significant additional time to do his work, and advised me to secure the needed investigative services to generate the type of mitigation investigation that is required.

10.     It is obvious from his letter and my recollection of the circumstances, that he and I did not have a common understanding of what his role was to be. I believed he would be the person responsible for performing the mitigation investigation, including interviews, obtaining documents, finding witnesses and the like. We would have been ready to investigate any leads he suggested we pursue. He on the other hand, apparently saw his role as that of an expert witness who would be responsible for development of broad mitigation themes once the witness interviews, document collection and mental health evaluations were conducted. As his letter makes plain, because of this misunderstanding, he had done nothing on the case as he was awaiting my office's production of this initial investigative information. The fact that neither Mr. Simon nor I were in direct communication with Dr. Haney during this time period permitted this misunderstanding to undermine the penalty phase preparation.

11.     Once I received Dr. Haney's January 13 letter, I immediately realized that we could no longer work together on the case. There was too little time to do what he requested, and his letter made it clear that he would not work on the case

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 11

without his requirements being met. I set out to find a substitute mitigation specialist.

I settled upon Dr. David Randall of Illinois. Not surprisingly, he told me that the less

than four weeks until the start of trial was insufficient to perform all of the required

tasks, particularly since nobody at my direction had conducted the types of mitigation

interviews discussed in Dr. Haney's letter. Nonetheless, I was able to convince him

to do the best he could, and he agreed. I also told him that I would try to obtain a

continuance of the February 9 trial date.

12. Dr. Randall got right to work and in short order he was working

exclusively on this matter. The penalty phase preparation took on a frenetic pace. In

late January we unsuccessfully moved for a continuance. I had arranged for Dr.

Cuneo to evaluate Mr. Allen and he did so in mid-January. Both Dr. Cuneo and Dr.

Randall believed that Mr. Allen might have brain impairments and consequently, I

arranged for an evaluation by Dr. Gelbort, at Dr. Randall's recommendation, who I

believed would do a neuropsychological battery of tests. This was done the day

before jury selection commenced.

13. In my experience, in a capital case, it is important to develop fully the

mitigation themes before jury selection, because prospective jurors can be questioned

and evaluated based on the planned mitigation evidence. In this case, the mitigation

investigation was still going on while the jury was being selected. In my opinion, this

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 11

limited my ability most effectively voir dire the jury panel.

14.    I recall that we settled on the presentation of a limited number of themes for the likely penalty hearing.  These themes were based on what investigation Dr. Randall was able to perform in the short time he was on the case.  I have now reviewed materials provided to me by Mr. Allen's current counsel.  It is apparent that they have developed themes that we did not realize existed or present xxx, and that they have been able to significantly expand on other themes that we treated only superficially.  The  topics covered by current counsel include childhood abuse, neglect, family dysfunction, family and neighborhood impoverishment, and abandonment.  In my experience these are potent mitigation subjects.  There is no question in my mind that if I had the materials developed and information gathered by current counsel at my disposal at the time of trial, I would have used them.  In my view, the areas covered by current counsel provide a far more comprehensive explanation of the stressors and traumas, and organic brain dysfunction that helped to shape Mr. Allen's life and adult conduct, and therefore a far more compelling case for life than what was actually presented at trial.

15.    As a result of my misunderstanding with Dr. Haney, Mr. Allen was deprived of an adequate opportunity to present to the jury far more significant mitigating evidence than I was able to muster.  As lead counsel for Mr. Allen I accept

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 11

full responsibility for the lapse that occurred with Dr. Haney and the resulting shortcomings in the penalty hearing presentation. It was undoubtedly my duty as lead counsel to insure that the required work was being performed in a timely and thorough manner, and I do not believe I and co-counsel satisfactorily performed this duty. I have reviewed the portion of the Government's response to that section of Mr. Allen's section 2255 motion alleging my penalty phase ineffectiveness. The Government states: "trial counsel was not hampered by the timing of the trial and fully developed and presented one of the most thorough mitigation cases ever presented in a capital case in this district." I respectfully disagree with this assertion. It is now clear we did not investigate and present a "thorough" mitigation case. Rather, once Dr. Haney dropped out of the case and Dr. Randall came into it, we did the best we could under the exigent circumstances presented by the Haney misunderstanding to put together a presentation that had already been significantly impaired by the length of time allotted to us. I doubted at the time that we were presenting the full picture of Mr. Allen's life, history and mental health profile. I now know that to be a fact based on what current counsel have presented to me.

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 11

16.     I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information and belief subject to the penalties of perjury pursuant to 28 U.S.C. § 1746.

_____
Richard H. Sindel, Esq.

Dated:        July 27, 2009
              Clayton, Missouri

9