# North St. Louis Neighborhood Analysis

A Report to:

Capital Habeas Unit
Federal Community Defender Office for the Eastern District of Pennsylvania
Suite 545 West-Curtis Center
Independence Square West
Philadelphia, PA 19106


Colin Gordon, University of Iowa
June 2009

# Contents

List of Maps and Figures ................................................................................ 3

**Introduction** ................................................................................................... 4

   *A Note on the Maps* .................................................................................... 5

**Part 1: Causes** ............................................................................................... 6

   **A) Racial Restrictions on Property** ........................................................ 6

   **B) Public Policy and Racial Restrictions** ............................................ 12

     *i) Federal Housing and Mortgage Policies* ......................................... 12

     *ii) Exclusionary Zoning* ...................................................................... 14

     *iii) Urban Redevelopment and Public Housing* .................................. 25

     *iv) Race, Realty, and Redevelopment in St. Louis Since 1960* ............ 30

   **C) Economic Decline** .............................................................................. 33

**Part II: Consequences** ............................................................................... 37

   **A) Urban Flight** ...................................................................................... 38

   **B) Racial Segregation** ............................................................................ 47

   **C) Employment** ...................................................................................... 52

   **D) Concentrated Poverty** ...................................................................... 52

   **E) Disinvestment and Abandonment** .................................................... 59

   **F) Social Costs, Social Risks** ................................................................ 63

**Summary and Conclusion** ......................................................................... 76

**References** .................................................................................................. 77

## List of Maps and Figures                                          **page**

Map 1: Restrictive Covenants and Real Estate Restrictions, 1945 ...........................................8
Map 2: Restrictive Covenants in North St. Louis, 1941 ......................................................9
Map 3: Residential Security Ratings, 1940 ..............................................................15
Map 4: St. Louis Use Districts, 1918 .................................................................17
Map 5: St. Louis Use Districts, 1925 .................................................................19
Map 6: Ladue, Use Districts, 1938 ...................................................................21
Map 7: Zoning, St. Louis County, circa 1965 .........................................................23
Map 8: Major Chapter 99 Areas, 1954-2000 ...........................................................26
Map 9: Major Chapter 353 Areas, 1954-2000 ..........................................................27
Map 10: Relocations from Kosciusko and Mill Creek Valley, 1951-55...............................29
Map 11: Public Housing and Assistance, 1942-2000 ...................................................31
Figure 1: Employment by Sector, St. Louis, 1948-1994 ..............................................33
Table 1: Percent of Metro Employment by County, 1950-2000 ........................................34
Map 12: Major Plant Closings and Layoffs, 1975-2000 ..............................................35
Figure 2: Retail Growth and Decline in Greater St. Louis, 1940-1997 ..............................36
Map 13: Neighborhood Risk, 1997 ...................................................................38
Table 2: Growth and Decline of Major US Cities, 1940-2000 ........................................39
Map 14: Urban Flight, 1940-1950 ....................................................................41
Map 15: Urban Flight, 1950-1960 ....................................................................42
Map 16: Urban Flight, 1960-1970 ....................................................................43
Map 17: Urban Flight, 1970-1980 ....................................................................44
Map 18: Urban Flight, 1980-1990 ....................................................................45
Map 19: Urban Flight, 1990-2000 ....................................................................46
Figure 3: Population of St. Louis Census Tract 11D, 1930-2000 ...................................47
Map 20: Racial Segregation, 1940 ..................................................................49
Map 21: Racial Segregation, 1970 ..................................................................50
Map 22: Racial Segregation, 1990 ..................................................................51
Map 23: Unemployment, 1990 ........................................................................53
Map 24: Family Incomes, 1950 ......................................................................54
Map 25: Family Incomes, 1990 ......................................................................56
Map 26: Poverty, 1990 .............................................................................57
Map 27: The Very Poor, 1990 .......................................................................58
Map 28: Vacant and Tax Delinquent Property, 2000 .................................................60
Map 29: Property Abandonment in North St. Louis since 1930 ......................................61
Map 30: Vacant and Tax Delinquent Property in North St. Louis, 1993 ..............................62
Map 31: Child Abuse, 1993 .........................................................................64
Map 32: Teen Motherhood, 1993 .....................................................................65
Map 33: Maternal Health, 1993 .....................................................................67
Map 34: Infant Mortality, 1993 ....................................................................68
Map 35: Birthweight, 1993 .........................................................................69
Map 36: Hospitalizations for Asthma, 1995 ........................................................70
Map 37: Lead Poisoned Children, 1995 .............................................................71
Map 38: St. Louis Homicides, 1978-1995 ...........................................................72
Map 39: Child Victims of Violent Crime, 1995 ....................................................73
Map 40: Youth Victims of Adult Crime, 1995 ......................................................74
Map 41: Educational Attainment: 1990 .............................................................75

# Introduction

This report is an effort to trace the historical development of North St. Louis; to document the conspiracy of causal factors which contributed to the stark decline of these residential neighborhoods; and to suggest the full range of social, economic, and ecological disadvantages faced by the residents of North St. Louis in the closing decades of the twentieth century. The material presented here—in the narrative and in the accompanying maps—draws on my 2008 study, *Mapping Decline: St. Louis and the Fate of the American City* (University of Pennsylvania Press) and on additional research on the social conditions of North St. Louis in the 1980s and 1990s. Where the analysis draws directly on *Mapping Decline*, I refer to relevant pages (rather than reproduce the background documentation found there). Where the analysis incorporates new material, I have included parenthetic references to relevant sources (all of which are listed in the "references" appendix).

The basic elements of this history are straightforward. American cities suffered through an extended era of decline in the latter half of the twentieth century. The multi-faceted urban crisis featured sustained losses in the local industrial and employment base, dramatic racial transition and depopulation, and a host of consequential economic and social challenges—including a collapsing tax base, a growing share of vacant or abandoned housing, rapid disinvestment, and spatially-concentrated threats to public safety and public health. By the 1970s, it became increasingly common to refer to the "bombed out" appearance of devastated inner cities. This allusion held for cartographic snapshots of urban poverty, racial segregation, fiscal capacity, crime, and private investment—all of which identified a growing statistical crater, its epicenter in a city's oldest residential wards, its edges, by century's end, circumscribing not only most of the city but many of its inner-ring suburbs as well.

All of this was particularly severe in greater St. Louis, and particularly severe on the City's residential northside. Large midwestern cities (Chicago, St. Louis, Detroit, Milwaukee) sat at the leading edge of urban decline, bearing the brunt of both demobilization after World War II and the deindustrialization of later years. By the 1970s, St. Louis was clearly the exemplar of the nation's unfolding urban crisis: "By almost any objective or subjective standard," the *New York Times* reported in the late 1970s, "St. Louis is still the premier example urban abandonment in America." Patterns of racial conflict and racial segregation were also especially pronounced in St. Louis. The national pattern of white flight and inner city decay, as one observer noted, could be found in St. Louis "in somewhat purer and less ambiguous form than almost anywhere else." St. Louis retained (decade after decade) its dubious distinction as one of the nation's most segregated metropolitan areas. And, for all these reasons, St. Louis was also the setting for a string of landmark civil rights litigation including *Shelley v. Kraemer* (the 1948 Supreme Court decision that outlawed state enforcement of restrictive deed covenants), *Jones v. Mayer* (the 1968 case that prohibited private discrimination in real estate transactions), and *Black Jack v. United States* (1972, one of the first "exclusionary zoning" cases).

4

Case: 4:07-cv-00027-ERW    Doc. #: 94-14    Filed: 08/14/09    Page: 5 of 40 PageID #: 790

By the late twentieth century, by almost any measure, north St. Louis was the most devastated residential neighborhood in the most devastated city in the country. The northside, as one observer noted in 1978, featured block after block of "windowless houses, ransacked apartments, [and] littered streets"—adding that the few "strong locations" were "almost like medieval, baronial, castle strongholds in the midst of lawless savagery." Today it claims the dubious distinction, among the City's 70 neighborhoods, of ranking first or second in vacant buildings, condemned buildings, and recent demolitions. The 1999 City Plan concluded glumly that "a visual survey of the neighborhood reveals a tree-lined block of stable, well-kept, two- and four- family homes followed by a block of overgrown board-ups on a one-to-one ratio with intact housing."

These stark circumstances and conditions reflect large economic and demographic trends (deindustrialization, suburbanization), and an array of practices and policies which facilitated and responded to those trends. This report traces the private practices and public policies which shaped St. Louis's urban crisis, the scale and scope (relative to metropolitan peers) of that crisis, and its local dimensions and consequences in north St. Louis (relative to the rest of the metropolitan area).

The analysis is broken into two parts. **Part I** examines the proximate causes of St. Louis' urban crisis, examining in turn the history of racial restrictions on property, exclusionary zoning, urban redevelopment policies, and economic decline. **Part II** turns to the consequences of this history for neighborhood conditions in the 1980s and 1990s, examining in turn patterns of racial segregation, concentrated poverty, neighborhood disinvestment—and their extensive social costs.

## *A Note on the Maps*

The analysis is extensively illustrated with maps of both greater St. Louis and conditions on the City's northside. Each map can be found on the page following the first reference to it in the text. The maps examining historical causes reach back into the early and middle years of the twentieth century. The maps examining the consequences either run in chronological series (showing patterns of "white flight" for example, from one decennial census to the next) or focus on the 1980s and 1990s—reflecting City and neighborhood conditions at the time the defendant lived on the northside. The data behind the maps is drawn from a range of sources--including the decennial census; local, state, and federal archives; and various local agencies and departments (public health, community development, police). When tracing broader patterns or documenting the relative experience of north St. Louis, the maps encompass the larger metropolitan area (10 counties in 1990, 5 each in Missouri and Illinois). In some cases, this contrast can be captured by focusing more closely on the City of St. Louis and its immediate Missouri suburbs. And, when local patterns or detail are important, the maps focus even more closely on the City's residential northside. On each map, the defendant's residential address from the early 1980s, 4535 Cote Brilliante Avenue, is clearly marked.

# Part 1: Causes

The conditions of north St. Louis in the 1980s and 1990s were deeply-rooted in a history of private racism, public policy, and economic decline.  Understanding this history is important for at least three reasons:  First, it assigns causal weight and responsibility to the forces (and actors) which contributed to ghettoization and to the ongoing urban crisis. Second, such historical forces cast a long and dismal shadow: even if the explicitly racial policies and practices which created the ghetto are no longer in place, their impact can still be seen in patterns of segregation, in the built environment, in persistent racial gaps in wealth and income and educational attainment, and in the cultural legacy—inside the ghetto and out—of sustained discrimination and disadvantage. Third, such an understanding of causes and consequences helps to puncture the common (but mistaken) assumption that the persistence of concentrated African-American poverty in the post-civil rights era can be attributed to the poor themselves.

## A) Racial Restrictions on Property

The isolation of African Americans on St. Louis' near northside was accomplished and enforced by private and public strategies of exclusion which overlapped and reinforced one and other.  At the center of this story was the local realty industry, which lobbied for explicitly racial zoning in the World War I era; pursued and enforced race-restrictive deed covenants into the middle years of the century; pioneered the practice of residential security rating which governed both private mortgages and public mortgage guarantees; and—as a central precept of industry practice—actively discouraged desegregation of the private housing market.  The first such effort was quite blunt.  At a time when cities were first exploring the politics and legality of zoning, St. Louis was one of a handful of cities to propose formalizing racial segregation.  The St. Louis law (1916) and others like it were subject to immediate political challenge—both on "equal protection" grounds and as an unwarranted intrusion of the local police power onto private property rights.  The ordinance sat in legal limbo for about a year until it was struck down when the Supreme Court ruled against a similar Louisville law in *Buchanan v. Warley* (1917) (Gordon 2008, 69-71).

In the wake of *Buchanan*, local property and realty interests moved to segregate by other means.  The solution was a combination of private realty practices and race-restrictive deed covenants.   In St. Louis, racial occupancy was the focal point of both original deed covenants and restrictive agreements.  "It is to the mutual benefit and advantage of all of the parties," the preamble to most of the St. Louis restrictions read, "to preserve the character of said neighborhood as a desirable place of residence for persons of the Caucasian Race."  The boilerplate covenant drafted by the St. Louis Real Estate Exchange included "a restriction against selling, conveying, leasing, or renting to a negro or negroes, or the delivery of possession, to or permitting to be occupied by a negro or negroes of said property and properties of the other owners of properties in the said City blocks . . . for a term of such years said attorney may deem proper."  Developers routinely imposed covenants on new subdivisions (observers estimated that as much as 80 percent of new suburban housing that sprawled west into St. Louis County contained such agreements) and homeowners associations (often at the prodding of realtors) cobbled them together in established neighborhoods (Gordon 2008, 71-73).

By the 1940s, almost 380 separate covenants covered large and strategic swaths of the City's residential property base. Aside from a few development-specific covenants to the south, St. Louis's covenants formed a ragged quadrangle at the western boundary of the City's traditionally African American wards **(Map 1)**. Not surprisingly, given their fragmentary and defensive coverage, these were imperfect instruments. In some cases, African American owners or renters might live on a block for years before local homeowners invoked a longstanding (but little-known) restriction. In 1927, for example, white homeowners dredged up a restrictive agreement covering the 4500 block of Cote Brilliante, an area—at that date—of well-established black occupancy. Suddenly black tenants and owners faced a court order to vacate their homes (Gordon 2008, 75-76). Although the reach and legal hold of deed restrictions was uneven, their spatial and political logic was clear. Taken together, the northside covenants **(Map 2)** were clearly aimed—as both realtors and signatories understood them—at stemming the "contagion" of black residency "spreading westward" or to block the "colonization" of white neighborhoods "at the point of threatened invasion." The drafting of local restrictions was often accompanied by meticulous examination (featuring house-by-house surveys and color-coded plat maps) of the reach and timing of Negro occupancy. The end result was a frantic, if also fragile, boundary composed of the Mississippi to the east, the commercial core of downtown to the south, and restrictive covenants to the west and north (Gordon 2008, 78).

Into the 1940s, the courts routinely held that—like all private contracts—restrictive deed covenants were legal and enforceable. Signatories, and their successors in ownership, were bound by the covenant for its duration and liable for civil or criminal prosecution if they violated its terms. The World War II era, in St. Louis and elsewhere, saw a flurry of challenges to restrictive agreements -- culminating in the St. Louis case that would ultimately end up in the Supreme Court: *Shelley v. Kraemer.* While the Missouri courts had sustained the agreement in question, the Supreme Court disagreed and decided in 1948 that "judicial enforcement by state courts of such covenants is inhibited by the equal protection clause." In the wake of the decision, private parties were free to draft such agreements but could not turn to the courts for their enforcement (Gordon 2008, 81-83).

Race restrictive deed covenants were promoted, bolstered, and sustained by the practice of real estate in Greater St. Louis. In defense of the industry's core assumption—that African Americans posed a grave threat to property values—the St. Louis Real Estate Exchange maintained a Committee on the Protection of Property whose purpose was "to cooperate with local improvement and protective associations to maintain certain restrictions and shall have the authority to make investigations, to hold hearings, to file charges on violations of restrictions." In St. Louis, fully 85 percent of restrictive agreements used a uniform contract drafted by the Exchange. Realtors launched door-to-door campaigns in threatened neighborhoods, first to organize "neighborhood improvement associations" and then to work through those associations to draft, circulate, and defend restrictive covenants. The Exchange and its officers were also formal parties to most covenants, essentially binding the other signatories (the property owners) to sustain the broader pattern of restriction (Gordon 2008, 79).

7

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 13A

# Map 1
# Restrictive Covenants and
# Real Estate Restrictions, 1945



∧  4535 Cote Brilliante

unrestricted zone

covenants

Adapted from Charles Johnson and Herbert Lang, People V, Property: Restricitve Race Covenants in Housing (Nashville, 1947), 24, 60.

# Map 2
# Restrictive Covenants in North St. Louis, 1941

Newstead (1923)
Woytus v Winkler (1947)

Dolan (1924)

Marcus Avenue (1911)
Shelley v. Kraemer (1946)

Wagoner Place (1923)
Dolan v. Richardson (1940)

Vine Grove (1924)
Thornhill v Herdt (1938)

Marcus Ave. Assoc.

signatories

1941 covenant estimate

4500 Cote Brilliante (1924?)

Newberry Terrace (1924)

West Evans (1923)

Fountain Park (1924)

Washington Avenue (1923)

Finney Cook (1924)
Pickel v. McCawley (1930)

Enright (1923, 1938)

Grand/Page (1911?)
(abandoned 1924)

Source: Long, People V. Property; Vose, Caucasians Only; Dolan V. Richardson, "Plaintiff's Exhibit A";
Transcript of Record, Kraemer v. Shelley, St. Louis Circuit Court (March 1946); Pickle v McCawley
329 Mo. 166; 44 SW 2d 857; 1931 LEXIS 693; Meuninghaus v James 324 Mo. 767; 24 SW 2d 1017;
1930 LEXIS 548; St. Louis Deed Book 4018:77-81; 4018:339-344; 5896:574-5; SLPL Clippings collection.

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 13A

Realtors also sustained the color line in other ways.  The professional code of the National Association of Real Estate Boards (NAREB), first adopted in 1924, specified that "a Realtor should never be instrumental in introducing into a neighborhood a character of property or occupancy, members of any race or nationality, or any individuals whose presence will clearly be detrimental to property values in that neighborhood."  The St. Louis Real Estate Exchange incorporated identical language in its own code of ethics.  After 1950, both the local and national codes dropped the explicit racial reference and held simply that "a realtor should not be instrumental in introducing into a neighborhood a character of property or use which will clearly be detrimental to property values." But realtors clearly continued to base home values as much on the class or racial homogeneity of the neighborhood as on the physical structure (Gordon 2008, 83-84).

These guidelines and assumptions shaped the practice of real estate in greater St. Louis. After losing the fight for segregation by zoning in 1916, St. Louis realtors moved to accomplish the same ends by regulating real estate transactions.  In 1923, the Exchange adopted, by referendum of its members, three "unrestricted zones" corresponding roughly to the boundaries of the City's historic black neighborhoods and to the spread of restrictive covenants on their western borders **(Map 1)**  Perhaps better considered a restricted zone covering the *rest* of the City, these zones rounded out—as a professional code of conduct—what the legal mechanism of the restrictive covenant could only accomplish by patchwork. Realtors selling to African American buyers outside the restricted zone stood to lose their licenses.  As of 1930, the City Plan Commission estimated that just over 80 percent of City's African American population lived within the boundaries of the "Negro" districts established by the Exchange (Gordon 2008, 85-86).

Far from relaxing such restrictions over time, the Exchange underscored them in response to perceived threats, including the in-migration of the war years, the legal challenges culminating in *Shelley,* and the specter of "blockbusting" in the 1950s and 1960s.  In the wake of *Shelley*, the Exchange quickly "approved a recommendation of the Committee on the Protection of Property that no realtor shall sell to Negroes, or finance any transaction involving the purchase of a Negro of any property north of Easton Avenue and West of Marcus avenue, nor elsewhere outside of the established unrestricted districts."  "The method being used here in St. Louis," as Marcus Avenue Improvement Association attorney Gerald Seegers noted, "is to have the Real Estate Exchange zone the City and forbid any member of the exchange under pain of expulsion to sell property in the White zone to a Negro"  (Gordon 2008, 84).

These strategies were bolstered by the day-to-day practice of selling and leasing real estate.  St. Louis newspapers listed rental and resale properties available to African Americans under a separate "for colored" heading into the late 1950s.  African American realtors tracking these advertisements noted both dramatic fluctuations in rental and housing stock and the paucity of options for black renters and buyers.  The number of ads for rental property stood at nearly 1,500 in late 1941 (of which fewer than 100 were listed

10

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 13A

"for colored").  This shrank dramatically as the war boom hit St. Louis: only 300 properties were listed in mid-1942, shrinking to 10 or 20 in the late war and early postwar years—virtually none of which were available to African Americans.  As the housing stock recovered, the split market remained intact: of nearly 800 rentals listed in 1956, only 175 were available to blacks.  The pattern for property sales was even starker.  The ratio of "for colored" options to the larger housing market was 10 of 1,600 in 1940, 80 of 2,200 in 1945, 250 of 3,700 in 1950, and 250 of 4,400 in 1955.  Factoring in the uneven availability of federal mortgage insurance, the St. Louis Urban League estimated that, of the roughly 70,000 housing units built in the City and St. Louis County between 1947 and 1952, fewer than 35 were available to African Americans (Gordon 2008, 86).

This spatial and racial sorting was reinforced in the world of personal contacts and referrals that shaped storefront realty.  Confronted by prospective black clients, St. Louis realtors routinely denied that apartments or houses were available, often pulling them off the market (or advising the sellers to do so) in response to expression of interest or offers to buy. "We never sell to colored," boasted one realtor in 1969. "When they ask for a specific house, we tell them there is already a contract on that house"—adding that office staff were routinely reminded that "a house is not to be shown to colored." Regardless of their stated preferences or price range, black clients were only shown houses in transitional neighborhoods in inner-ring suburbs while white clients were warned away from the same neighborhoods. And even in recent years, prospective buyers and fair housing advocates have routinely charged local realtors with steering African Americans to homes in certain limited geographic areas (Gordon 2008, 86-7).

The accumulation of local, state, and federal fair housing legislation eventually curbed the worst of these practices.  But this could neither magically integrate neighborhoods nor undo the damage done by decades of explicit discrimination and restriction.  In the late 1960s, realtor Jerome Howe assured a client that he could "weed out niggers," while admitting that, as president of the Real Estate Board "sometimes he had to talk out of both sides of his mouth . . . he is more prejudiced than he used to be, and had considered that maybe he should not have accepted the Presidency of the Real Estate Board because of his prejudices, but it has turned out there is no conflict" (Gordon 2008, 87-88).

Restrictive agreements had a lasting and decisive impact on residential patterns and opportunities in Greater St. Louis.  During the peak years of African-American migration to the St. Louis area, all but a handful of the City's neighborhoods were off limits. "Housing is desperately short-handed in St. Louis as it is in most other large cities," the St. Louis Urban League noted in the wake of World War II, "but the lack of housing facilities for Negroes in St. Louis is critical for peculiar reasons.  Approximately 97% of the Negro population in St. Louis lives at the geographical heart of the city, surrounded on the east by commerce and business, and on the south, west, and north by neighborhood covenant agreements.  There are no outlets to the open county for any kind of expansion.  There is a complete circle of restriction" (Gordon 2008, 78),

11

Such restrictions were damaging while they were effective: they limited residential options and put tremendous stress on the limited housing stock which was "open" to African-American occupancy. And they were damaging when they failed: New development not only created new restrictions and exclusions on the suburban fringe but also hastened racial succession and conflict in the blocks and neighborhoods opened up by white flight. The collapse of a restrictive agreement (which often by its very presence nurtured an "expectation of sudden and rapid racial transition") was like the breaking of a dam. The resulting damage—pent-up demand, rapid property turnover, overcrowding— was swift and severe (Gordon 2008, 73).

## B) Public Policy and Racial Restrictions

The importance of these agreements and practices should not be underestimated—both for their impact on residential patterns in Greater St. Louis and for the ways in which they lived on in other forms of public policy. The practices and assumptions of private realtors distorted not only the market for housing but also local and federal public policies that subsidized and regulated that market. Of these policies, three deserve closer attention: federal insurance of private mortgages, local zoning of land use, and combined federal-local efforts at urban redevelopment.

*i) Federal Housing and Mortgage Policies*

The first sustained push for real estate subsidies came during the Depression, when the new Home Owners Loan Corporation (HOLC) and Federal Housing Administration (FHA), established the basic framework (low down payment, long-term amortization) for modern home ownership by offering federal insurance on qualifying mortgages. In the FHA's first five years it backed the financing of nearly one-quarter of all non-farm home sales. This swelled during the war to nearly one-half of all sales, and then settled in at about 20 percent through the 1950s and early 1960s. The FHA wedded its mortgage guarantee programs to an elaborate system of rating prospective borrowers, properties, and neighborhoods. New suburban developments, by the FHA's reckoning, were vastly preferable to the "crowded neighborhoods" and "older properties" found in central cities. The FHA viewed racially, ethnically, or economically heterogeneous neighborhoods as inherently risky and unattractive: until 1950, FHA regulations held simply that "if a neighborhood is to retain stability, it is necessary that it be occupied by the same racial and social classes." The importance and impact of the FHA/HOLC, in other words, lay in both its transformation of the home mortgage market and in the criteria it used to sort the good risks from the bad (Gordon 2008, 88-89).

In order to rate local properties and neighborhoods, the FHA/HOLC turned to the architect of racial zoning and restrictive deed covenants, the local real estate industry. In practice, federal policy followed the lead of private lenders and assumed that neighborhoods "invaded" or "infiltrated" by African Americans had lost all value. The FHA's willingness to sustain and succor segregation was captured in its underwriting manuals, which echoed the language of similar guides maintained by real estate boards and lenders. Early on, this included explicit support of restrictive deed agreements. "Restrictive covenants should strengthen and supplement zoning ordinances," the 1938 underwriting manual put it; "restrictions should be recorded with the plat, or imposed as a

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 13A

blanket encumbrance against all lots in the subdivision, and should run for a period of at least twenty-five to thirty years." Foremost among its "risk rating instructions" for appraisers, the manual noted that

> Deed restrictions are apt to prove more effective than a zoning ordinance in providing protection from adverse influences. Where the same deed restrictions apply over a broad area and where these restrictions relate to types of structures, use to which improvements may be put, and racial occupancy, a favorable condition is apt to exist. Where adjacent lots or blocks possess altogether different restrictions, especially for type and use of structure and racial occupancy, the effect of such restrictions is minimized and adequate protection cannot be considered to be present. . . it must be realized that deed restrictions, to be effective, must be enforced.

Among the recommended restrictions, parroting the same juxtaposition of "nuisances" found in many St. Louis covenants, was the prohibition of "undesirable buildings such as stables, pig pens, temporary dwellings, and high fences" and *prohibition of the occupancy of properties except by the race for which they are intended*" (italics added). Such sentiments appeared again and again, including the warning that "schools should be appropriate to the needs of the new community and they should not be attended in large numbers by inharmonious racial groups." During the housing crisis of the 1940s and after, civil rights groups routinely identified FHA policies as a source of segregation and housing shortage—even as other federal programs (such as public housing) promised to address some of the damage. For its part, the NAACP scored what it viewed as an "extension of racial discrimination and segregation abetted and furthered by a government agency backed by billions of dollars of insurance secured by taxpayers' money" and concluded bitterly: "We are breaking down the ghetto in old housing only to see federal funds being used to establish impregnable ghettos in new, desirable suburban developments" (Gordon 2008, 89-91).

In the demographic and legal tumult of the late 1940s, FHA policies changed little. Its 1947 Underwriting Manual removed most direct racial references but still recommended restrictive deed covenants as the best way of "meeting the needs of a particular development and in promoting maximum possible protection." The FHA's blessing was blunted by the *Shelley* decision, whose prohibition of "state action" in support of restrictions called into question not only enforcement through the courts but encouragement through public zoning and underwriting. Yet, while the FHA officially agreed to drop its support of race-restrictive covenants, it privately assured lenders and developers that there would be no real change in policy (Gordon 2008, 91).

In local settings such as St. Louis, the FHA's guidelines were enshrined on a series of "residential security maps" that documented the insidious "spread" of the black population and carved the City into risk-rated neighborhoods. Major metropolitan areas were surveyed annually, and each map was accompanied by textual descriptions justifying each (running into the hundreds for a city the size of St. Louis) of the neighborhood ratings. In its early maps, the HOLC settled on a four-color code: A areas (colored green) were designated "best," B (blue) areas were "still desirable," C (yellow) areas were "definitely declining," and D (red) areas were simply "hazardous" (Gordon 2008, 92).

13

While city surveys and area descriptions took due note of zoning issues and the age of housing stock, their primary concern—and the key to the rating system—was racial occupancy.  The standard local area survey form prefaced its narrative description with required entries for local population, the "class and occupation" of residents, the percentage of foreign born and Negro residents, and the degree of "shifting or infiltration." The most commonly noted unfavorable factors in C areas were *expiring restrictions* [deed covenants] or lack of them" and "infiltration of a lower grade population."  D areas were almost invariably marked by "infiltration" or the presence of a "colored settlement" or "Negro colony"—and the summary judgment that "the only hope is for the demolition of these buildings and transition of the area into a business district." African Americans did not, in the logic of the HOLC, live in residential areas; they invaded them and compromised them. In St. Louis, residential security rating closely followed the contours of both the black community and the "steel ring" (the Real Estate Exchange's "unrestricted zone" and the patchwork of covenants) that surrounded it (see **Map 3**).  For its part, the local FHA office admitted to following these ratings—including the blanket rule that "below Grand Avenue meant no insurance"—at least until 1962.  As late as 1968, the "Valuation Instructions for Appraisers" used in the St. Louis FHA office warned against "change in occupancy" or in the "income or social characteristics of the occupants other than those well established in the neighborhood"(Gordon, 92-93).

FHA policies clearly contributed to the flight and sprawl that left the City—and its African American residents—behind.  As of 1940, the HOLC estimated that its subsidies were enjoyed by about one of every six residential properties (16 percent) in St. Louis County but fewer than one of every ten (9 percent) in the City.  "As matters now stand," one observer noted in 1942, "the FHA practically refuses to insure any mortgage loans throughout the City of St. Louis, while insuring a steady stream of speculative building development in suburban areas."  Between 1934 and 1960, the FHA insured 62,772 mortgages in St. Louis County (valued at just under $560 million) and just 12,166 in the City (just under $95 million).  In the course of the *Shelley* litigation, federal officials readily conceded that the local pattern of FHA assistance had been decisively shaped by the deference of appraisers and lenders to the reach of restrictive covenants.  A survey of just over 400,000 FHA mortgages in greater St. Louis between 1962 and 1967 found that only 3.3 percent went to African Americans—a number that dropped to less than 1 percent (only 56 units) in St. Louis County. "A separate and unequal housing market exists," the Commission on Civil Rights concluded in 1970, adding sadly that federal programs "have had the effect of perpetuating and promoting it"  (Gordon 2008, 96).

*ii) Exclusionary Zoning*
Early patterns of racial restriction and segregation were also sustained by zoning.  Local governments interested in maintaining property values and in funding local services by taxing those properties have every incentive to exclude the poor and compete for the rich—to sort the population by race and class in such a way as to maximize tax returns and minimize other demands on the public purse. Where local governance is fragmented (The St. Louis Metro region includes over 260 incorporated municipalities; over 100 of which are in St. Louis County alone), there is an exaggerated incentive and opportunity to use property zoning as a means of sorting and segregating populations.  Outside the



# Map 3
# Residential Security Ratings, Median House Value, and Racial Occupancy (1940)

∧  4535 Cote Brilliante

▧  median home value > $10,000

▱  great than 75 percent black

**HOLC ratings (1940)**
- 🟩 A - First Grade
- 🟦 B - Second grade
- 🟨 C - Third Grade
- 🟥 D - Fourth Grade

Source: Elbring Survey Associates, "Map of Greater St. Louis," (1940),
Box 2, City Survey Files, Records of the Home Owners' Loan
Corporation, RG 195; 1940 Census (Bogue Files)

central city, the dominant practice (emerging in the middle years of the twentieth century) was "exclusionary zoning": land-use controls that ensured a pattern of predominantly low-density single-family settlement through a combination of outright prohibitions (heavy industry, manufactured housing), effective prohibitions (no land zoned for multifamily housing), and area or density standards (minimums for lot size, setbacks, and building size). Older cities, by contrast, did not have the power to zone until long after local land use had been decided by private restrictions and market forces. Unable to compete with the suburbs for high-end residential development, central cities often ran in the other direction—designating large areas for commercial or industrial use, and often "clearing" low-return residential tracts as part of the bargain (Gordon 2008, 112).

From a metropolitan perspective, the results have not been pretty. Exclusive and fragmented zoning in the suburbs erased any semblance of residential diversity, sorting the white middle class into income-specific single-family enclaves on the periphery and leaving African Americans, the elderly, and the poor to filter into older and higher-density housing stock (much of it unprotected by local zoning) in the central city. Over time, exclusionary zoning also fueled sprawl as those anxious to leave the City, but priced out of established suburban housing markets, leapfrogged to new subdivisions in unincorporated areas. Over the course of the twentieth century, the power to zone was used in different ways by different fragments of greater St. Louis. In the City, zoning tended to describe patterns of land-use rather than to shape them: Residential development was relatively dense and substantial areas were set aside for commercial and industrial use. By contrast, land use in suburban St. Louis County reflected the preference of midcentury developers for large-lot single-family subdivisions, with only minimal allowance for commercial, industrial, or higher-density residential development (Gordon 2008, 112-3).

In the city of St. Louis, early zoning efforts were organized around the conviction that "blight" was caused by the City's inability to protect residential properties from the incursion of industry, commerce, and substandard housing. Early zone plans were both a lament for the City's "former good residential districts" and an attempt to shore up residential property values. The first such plan (drafted in 1918 by struck down by the Missouri Supreme Court in 1922) established five "use" districts: a scattering of still desirable "first residence" districts, a wider swath of "second residence" districts, "commercial" districts running along most major arterial streets, and a combination of "industrial" and "unrestricted" districts covering much of the riverfront, the central city east of Grand Avenue, and the Mill Creek and River Des Peres valleys **(Map 4).** The first residence districts were small pockets of higher-end single-family homes, their scale and location corresponding closely to the City's private streets. Indeed, city planners used private streets and deed restrictions as a general guide for its most exclusive residential districts, admitting that "in practically all cases the first residence districts are areas that now have restrictions in the deeds . . . . "prepared primarily with the view of preserving the more desirable residential neighborhoods against the day when private restrictions expire." The goal, stated quite explicitly, was to stem the spread of blight "where values have depreciated, [and] homes are either vacant or occupied by colored people or boarding houses" (Gordon 2008, 120).

16

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 13A

# Map 4
# St. Louis Use Districts, 1918



∧  4535 Cote Brilliante

| | |
|---|---|
| 🟧 | first residence |
| 🟨 | second residence |
| ⬛ | commercial |
| 🟥 | industrial |
| ▨ | unrestricted |

Source: Use District Map (1918), "Exhibit B,"
Evraiff v St. Louis (1922),  RG 600, Supreme
Court Judicial Case Files, Missouri State Archives,
Jefferson City

The racial premises of zoning emerged most clearly in areas of established black occupancy—running from downtown west to the Ville (the City's oldest African-American neighborhood, bounded by Taylor Avenue on the West, St. Louis Avenue on the North, Sarah Street on the East, and Easton Avenue [now Martin Luther King Drive] on the South) and the contested neighborhoods surrounding it. The 1918 ordinance zoned downtown "industrial" and placed most of the north side under the elastic "second residence" designation. In 1926, the boundaries of the downtown industrial district were widened and almost all of the near north side was placed under the new "multiple family" classification (**Map 5**). "A decade ago the Zoning Commission left not a single block or neighborhood zoned as residential in the area from Delmar to Labadie and from Grand to Taylor and Core," the St. Louis Urban League noted in the late 1930s, "this wide Negro section was zoned as multiple dwelling, commercial, and industrial districts." Barred by private restrictions from settling elsewhere, the black middle class pressed for some protection of single-family residences in north St. Louis. What emerged instead was a pattern of "expulsive zoning," which underzoned black neighborhoods and denied them protection from commercial or industrial development. In the longer term, it hardened the view that black occupancy was a nonconforming blight on the central city and paved the way for its displacement under urban renewal (Gordon, 122-5).

The City's zone policies were revised in 1950 and again in the early 1980s, but not in such a way as to challenge the basic pattern set earlier in the century. Citing the deficiencies of the 1926 ordinance, the expectations of federal agencies like the FHA, the demographic impact of depression and war, and the City's continued decline, the 1947 City Plan returned to the core goal of protecting residential property. But not on the residential northside, where underzoning (commercial or industrial or multifamily designation of single family blocks) not only failed to protect residential properties but also rendered them ineligible for FHA assistance. By this point, zoning was increasingly marginal to the politics of planning in St. Louis. Residential zones, after all, offered little to neighborhoods in which no one lived anymore. In turn, a tangle of other land-use tools had, by the latter decades of the twentieth century, largely eclipsed the zoning ordinance. Community planners instead invested most of their energies in a profusion of urban renewal tools, including redevelopment corporations, land reclamation authorities, conservation districts, and locational tax incentives such as tax-increment financing districts (Gordon 2008, 128-9).

In suburban St. Louis County, by contrast, zoning proceeded alongside development and was instrumental in shaping patterns of residential land use. Zoning authority rested in the hands of individual municipal governments (numbering 35 in 1940 and 95 by 1960) and the county. Each of these governments had every incentive to maximize tax revenues, stabilize property values, and minimize demands on local government—a combination best accomplished by creating large-lot single-family enclaves. And none of these governments had any incentive to think about broader metropolitan goals or needs regarding commercial development, affordable housing, or regional infrastructure. Fragmented zoning, in this respect, came most directly at the expense of the city of St. Louis, which shouldered many of the costs of urban development even as the suburbs poached its population, retail trade, and employment base (Gordon 2008, 129-31).

18

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 13A
Case: 4:07-cv-00027-ERW    Doc. #: 94-14    Filed: 08/14/09    Page: 19 of 40 PageID #: 804

# Map 5
# St. Louis Use Districts, 1925

∧  4535 Cote Brilliante

residence

multiple dwelling

commercial

industrial

unrestricted



Source: Use District Map (1925), "Exhibit B,"
State Ex Rel. Oliver Cadillac v Christopher (1927),
28010; RG 600, Supreme Court Judicial Case
Files, Missouri State Archives, Jefferson City

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 13A
Case: 4:07-cv-00027-ERW    Doc. #: 94-14    Filed: 08/14/09    Page: 20 of 40 PageID #: 805

Development of  St. Louis County proceeded west from its border with St. Louis in raggedly concentric rings of subdivision, incorporation, and local zoning.  County growth and development before 1945 was largely confined to a few well-established municipalities and inner suburbs, and a scattering of estates in the central county. As the pace of subdivision picked up in the 1940s and 1950s, much of the building still preceded incorporation.  Between 1946 and 1948, for example, just under half of all building permits (6,868 of 13,803) in St. Louis County were issued for unincorporated areas.   Of the county's present-day count of 100-odd municipalities, fully half were incorporated between 1943 and 1954.  In only a few settings did local zoning precede development. As of 1950, barely a third of the metropolitan area's municipalities had a local zoning ordinance on the books.  Once developed, these areas often looked to municipal incorporation as a means of maintaining community standards, perpetuating the spirit of private deed restrictions, and forestalling annexation by neighbors (Gordon 2008, 131).

Suburban zoning ordinances followed a logic of systematic exclusion.  These strategies included stark restrictions on multifamily housing—indeed, the rule in the first wave of zoning beyond the inner-ring was to make no allowance for alternatives to detached single-family homes.  Residential districts, in turn, were shaped by density controls, including minimum lot sizes and yard or frontage requirements.  Between 1930 and 1940, 274 subdivisions (representing just under 12,000 building lots) were platted in St. Louis County: Less than 10 percent of these lots were smaller than 5,000 s.f., just over three-quarters were between 5,000 s.f. and a half-acre (roughly 20,000 s.f.), and the rest ranged from a half-acre to three acres.  The city of Ladue, for example, incorporated in 1936 and adopted its first zoning ordinance in 1938 (**Map 6**), adopting as its A residential district a lot size of 3 acres, the standard set by the Deer Creek and McKnight subdivisions.  Smaller districts were set aside for lots at 1.8 acres (B), 30,000 s.f. (C), 15,000 s.f. (D), and 10,000 s.f. (E)—the latter still more than double the minimum lot size of St. Louis' single-family districts.  No land was zoned for multifamily residence (Gordon 2008, 131).

Across the County, the most pervasive priority of local zoning was the preservation of large-lot single-family districts.  As planners readily admitted, single-family zoning not only protected existing homes but also placed "highest use" restrictions on undeveloped land, even if it was unsuitable for residential development.  Before 1926, "there was a strong doubt as to the legality of establishing residential districts which excluded two-family and multi-family dwellings," as Kirkwood noted upon passage of its first zoning ordinance (1927), but "it is now considered entirely proper not only to set aside areas solely devoted to single-family dwellings but to create several classes of single-family districts in which differentiation is made between permitted lot sizes."  When the Kirkwood ordinance was revised in 1941, planners advised city officials to establish even larger lot thresholds on the grounds that "the most important function of the zoning ordinance is to give this type of use [single-family] the most protection possible and to encourage its further development in areas now vacant" (Gordon 2008, 136).



Map 6
Ladue, Use Districts 1938

University City

Clayton

Richmond Heights

Brentwood

Huntleigh

Warson Woods

Rock Hill

Zone Districts

A: 3 Acres
B: 1.8 Acres
C: 30,000 sf
D: 15,000 sf
E: 10,000 sf
F: commercial
G: light industry

Source: Ladue Use District Map, Harland
Bartholomew Papers, Washington University

This equation of zoning with the protection of existing subdivision patterns and restrictions was most pronounced in the wealthy central County suburbs.  Richmond Heights crafted its 1941 ordinance with the expressed "intention of maintaining said subdivision as an exclusive subdivision of single-family residences of substantial value." In Ladue, city planners allowed for single-family districts of less than an acre in 1959, but only with the assurance that property owners could use deed covenants to maintain the one-acre threshold.  Defending its exclusive single-family ordinance in 1969, Calverton Park officials cited "a promise made to the original purchasers of land in Calverton Park that there would never be any commercial zoning in this Village."  As early ordinances were revised and refined in the 1940s and 1950s, minimum lot sizes swelled—with 10,000 or 7,500 s.f. lots replacing the older 5,000 s.f. threshold in the inner-ring suburbs and minimum lots as large as one or two acres the rule in more exclusive settings (Gordon 2008, 136-7).

The flip side of all of this, of course, was the paucity of alternatives: duplexes, townhomes, garden apartments, and multistory apartment buildings **(Map 7)**.  As land-use law took shape in St. Louis County, prohibition of multifamily housing reflected both the logic of early century campaigns against the tenement and contemporary conflations of race and poverty.  By the 1960s, suburban city planners generally considered even a duplex a "nuisance" under the police power, agreeing with single-family homeowners that such uses were "annoying to them, interfered with their proper use and enjoyment of their homes, and tended to depreciate the value of their homes."  Many municipalities made no provision for multifamily dwelling at all; those that did typically created districts representing a tiny fraction (1 or 2 percent) of zoned land.   Of the nearly 7,000 residential building permits issued in St. Louis County the first three years after World War II, only 46 (two-thirds of 1 percent) were for duplexes and none were for denser residential development.  By 1960, the County had just over 200,000 dwelling units, of which barely 7 percent were in multifamily units (almost all of which were duplexes). Into the 1980s, most of the suburban multifamily housing stock was concentrated in smaller units (unsuitable for families) in the inner-ring suburbs (Gordon 2008, 137-141).

All of this was designed to sort the metropolis not just by income or family status but by race as well.  Just as "tenement" was synonymous with "immigrant housing" in the Progressive Era city, so "apartment" was understood as "black housing" by the planners and residents of suburban St. Louis.  This, as we have seen, was the core logic behind the practice of realty in greater St. Louis.  And it was the core logic of the zoning ordinances that inherited and perpetuated those practices.  Prospectuses for urban subdivisions typically lauded the "protection" afforded by restrictive deed covenants, which (for a time) the FHA not only accommodated but also recommended.  Planning consultants marketed municipal zoning as means of extending those protections behind a veil of public policy.  The deliberations of suburban city planning or zoning commissions, in turn, were invariably haunted by the specter of "the City"—a ghostly reminder of what might happen if residential density and racial occupancy were not controlled (Gordon 2008, 145-6).

# Map 7
# Zoning, St. Louis County circa 1965



**Zoning Districts, circa 1965**

- single family, over one acre
- SF, 20,000sf - one acre
- SF, 10,000-20,000sf
- SF, under 10,000sf
- duplex
- multifamily
- commercial
- industrial
- park or public
- no data
- St. Louis

Source: Municipal zone maps, 1958-1974; various archival sources.

The only exception to this pattern, Kinloch in north central St. Louis County, underscored these patterns and the anxieties behind them. Before 1960, fully a third of the County's African American population lived in Kinloch, whose population hovered around 6,000. A historically all-black community, Kinloch claimed few of the advantages enjoyed by its white suburban peers. It remained unincorporated and unzoned, and largely ignored by the County. It was almost surrounded by its neighbors, Berkeley and Ferguson, whose own zoning and planning history were largely animated by the desire to quarantine Kinloch and its residents. Most Berkeley and Ferguson streets dead-ended before they reached Kinloch, and, until 1968, Ferguson barricaded the through streets. Until it was sued by the Justice Department in 1971, Berkeley maintained its own school district, forcing Kinloch to cobble together a meager "separate but equal" alternative. Kinloch was one of the few targets of urban renewal in the County, and, after 1980, its population shrank dramatically—falling to 2,700 in 1990 and under 450 in 2000. Similar pockets of African American settlement, including Elmwood Park, were quarantined by local zoning ordinances, which surrounded such (often unincorporated) parcels with industrial or commercial districts (Gordon 228, 146).

The politics of race and zoning in greater St. Louis were underscored in the late 1960s and early 1970s in Black Jack, an unincorporated county subdivision. In 1969, St. Mark's Methodist Church of Florissant and the United Methodist Ministry in St. Louis decided to cosponsor a federal Section 236 housing development and settled on a site adjacent to the Black Jack subdivision. The land was undeveloped and zoned multifamily by St. Louis County. The plans for the project (Park View Heights) sparked immediate opposition from white residents, who pushed to incorporate the town of Black Jack, annex the site, and impose a single-family zone over everything. The racial logic and motivation of this ploy were transparent. The new corporate boundaries encompassed 24 census blocks and part of one other, the combined population of which was 98.8 percent white and .2 percent black. Opposition to the Park View Heights proposal was "repeatedly expressed in racial terms . . . by leaders of the incorporation movement, by individuals circulating petitions, and by [the] zoning commissioners themselves" as an appeals court later observed that "racial criticism of Park View Heights was made and cheered at public meetings." Invoking the unhappy history of large-scale public housing in St. Louis, opponents claimed the development would be "another Pruitt-Igoe." One zoning commissioner tried to deflect charges of local racism by pointing to the existence of a "nigger cemetery" nearby. The subsequent legal battle underscored the racial logic of zoning in the St. Louis suburbs. The court of appeals (reversing the trial court's decision in favor of Black Jack) concluded simply that such zoning was "but one more factor confining blacks to low-income housing in the center city, confirming the inexorable process whereby the St. Louis metropolitan area becomes one that has the racial shape of a donut, with the Negroes in the hole and with mostly Whites occupying the ring" (Gordon 2008, 147-150).

24

*iii) Urban Redevelopment and Public Housing*

The net effect of political fragmentation, real estate restrictions, and exclusionary zoning was the virtual devastation of north and central St. Louis. City planners began taking stock of these conditions (substandard housing, abandoned commercial property, aging infrastructure) as early as World War I, but all that really changed over the following decades were the terms—obsolescence, decadence, blight, ghettoization, decay—used to label them. The prescription, in St. Louis and elsewhere, was urban renewal—a tangled combination of federal money, state enabling laws, local initiative, quasi-public redevelopment corporations, and private investment (Gordon 2008, 153).

Between 1954 and 2000, the city of St. Louis blighted just over 100 separate urban renewal areas under Chapter 353, the Missouri Urban Redevelopment law. As of 1989, an investment of just under $2 billion had yielded 28 million square feet of commercial development and fewer than 7,000 residential units. **Map 8** summarizes the major project areas, showing the year in which the area was first blighted. Chapter 99 areas, blighted under Missouri's Land Clearance Act, betray a similar pattern **Map 9**. While overlapping with Chapter 353 areas in the central business district and West End, Chapter 99 focused more on redevelopment of major industrial areas—including the Mill Creek Valley, the north and south riverfront, and the inner suburbs such as Wellston. Chapter 99 also reached into the County, creating redevelopment areas in Wellston, University City, Kinloch, Webster Groves, and Elmwood Park. As of 2000, about 50 major redevelopment areas had been blighted under Chapter 99 (Gordon 2008, 164-67).

In this story, two important elements stand out: First, although the condition of the residential northside was often used to make the case for urban renewal or redevelopment, those neighborhoods received virtually none of the subsequent political attention, private investment, or public subsidies. A half century of urban renewal and redevelopment programs not only failed to stem the decline of central St. Louis but pointedly avoided the very neighborhoods in which that decline was most palpable. Assessments of urban decay in St. Louis have changed little in the last century: the scope of blight mapped in the City plans of 1919 or 1963 or 1947 is essentially the same as that circumscribed by development or enterprise zone programs today (Gordon 2008, 186-7). Second, the projects actually pursued under these programs—stadiums, convention centers, hotels, medical complexes, shopping malls—actually made things worse in the City's struggling neighborhoods. Residential relocation from major urban renewal projects in the 1950s and 1960s filtered into the closely-confined and stressed housing stock of north St. Louis. The combination of "slum clearance" and large scale public housing actually deepened local patterns of racial segregation. The taxes abated on large swaths of the commercial core made it more difficult to maintain basic services (public safety, education) in the rest of the City. And the redevelopment subsidized by more recent programs fell farther and farther out in the Missouri suburbs. This produced (or reproduced) what the East-West Gateway Coordinating Council dubbed the "musical chair effect": By its measure (in 1973), only a small percentage of new investment trumpeted by local governments had not come at the expense of another local government, and the competition between those local governments (bidding down the tax base) then came at the expense of the region (Gordon 2008, 194-200).

25

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 13A



Map 8
Major Chapter 99 Areas, 1954-2000

4535 Cote Brilliante
spot blighting since 1990
1954 - 1965
1966 - 1975
1976 - 1985
1986 - 2004

Maline Creek (Kinloch)

Elmwood Park

Tandy

North Broadway Industrial

West End

Wellston

Broadway/North Market

University City (various areas)

Murphy-Blair

North Webster Groves

Grandel

DeSoto Carr

Mill Creek Valley

St. Louis Center

Union Station

Plaza Square

Stadium

Kosciusko

LaSalle-Park

Source: Various LCRA reports, archival maps



# Map 9
# Major Chapter 353 Areas, 1954-2000

Pershing/DeBaliviere (1976)

Union Station (1974)

Plaza Square (1954)

Downtown (1971)

Washington Medical (1974)

LaClede's Landing (1966)

Manchester-Chouteau (1973)

McCree Town (1982)

Mansion House (1959)

Midtown Medical (1974)

St. Louis Centre (1971)

Lafayette Town (1974)

Civic Center (1960)

LaSalle Park (1971)

LaFayette Square (1971)

∧  4535 Cote Brilliante

before 1965

1965 to 1975

1975 to 1985

since 1985

Source: Various LCRA, CDA reports; Collins (1974); Urban Land Institute (1985); City ordinances and parcel data; UR Map in Mercantile Library, UMSL

27

The overarching irony in all of this was that urban renewal often created, or re-created elsewhere, the very conditions it purported to fight. More than a decade into its urban renewal program, the City concluded glumly that "the gap actually has increased between the quantity of substandard housing that must be replaced (or rehabilitated) and the supply of new or renewed housing." By the late 1960s, the presence of large public housing projects was considered a harbinger of blight, and not a means of fighting it. And, as urban renewal attention drifted west, residents and planners alike attributed the decline of these neighborhoods to the migration of those cut loose by the first generation of urban renewal projects surrounding the central business district. The real threat to the public welfare, as many argued, was haphazard and halfhearted redevelopment schemes—and not the "blight" that justified them (Gordon 2008, 206).

The City's first major projects were accompanied by cynical and haphazard plans for relocated residents. Urban renewal authorities simply expected dislocated residents to fend for themselves and vastly inflated (for the consumption of federal officials) their ability to accommodate or assist those losing their homes. The relocation office of the Mill Creek project, for example, claimed it had placed all those displaced by initial land clearance (4,172 families) in decent housing. But a federal audit found that more than half of those eligible for relocation assistance received no help, and that most of the assisted relocations were to substandard dwellings. **Map 10** (see also **Maps 14-19**) neatly captures the haphazard movement of African Americans from cleared tracts— some into local public housing but most into neighborhoods to the west and north. This had the effect of both deepening segregation in many central city neighborhoods, and creating demands for clearance in neighborhoods accommodating the refugees from the latest round of renewal (Gordon 2008, 206-11)..

Some displaced residents were accommodated in public housing, but the location and administration and history of these projects relocations tended to cement both local patterns of segregation and widespread political despair at the fate of the American city. A run of public housing projects erected between the late 1940s and the early 1960s accompanied the City's first major renewal projects and were almost immediately overrun by refugees (nearly all African-American) from those cleared neighborhoods. Indeed, the earliest consideration of large-scale, central city public housing was accompanied by the hope that it would slow the spread of black residents "[to] other portions of the city that would not welcome them." Federal policy deferred relocation policies to local officials, who routinely steered displaced families by race. For its part, the St. Louis Housing Authority maintained separate relocation offices for white and black residents. Because the slums and substandard homes targeted for renewal were overwhelmingly occupied by African Americans, so too was the accompanying public housing—widely considered a "dumping ground for families left behind by 'slum clearance'." And because local relocation efforts were so haphazard and halfhearted (of the nearly 6,000 families displaced in Mill Creek, barely a quarter received formal assistance), the African American population moved west and north, creating both new segregated neighborhoods and new demands for slum clearance (Gordon 2008, 99-100).

# Map 10
# Relocations from Kosciusko
# and Mill Creek Valley (1951-55)

∧    4535 Cote Brilliante

☐    1 Dot = 2

)    families, Kosciusko

!    individuals, Kosciusko

)    families, Mill Creek

!    individuals, Mill Creek

Mill Creek Valley

Kosciusko

Source: tables and maps in St. Louis Development
Corporation, Technical Report: History of Renewal.

The net result was a pattern of public housing that tightened the noose woven by deed covenants, private realty, and the FHA.  Public housing—and especially the larger projects—was concentrated in the City (**Map 11**).  Of the nearly 8,000 units made available under various programs between 1950 and 1980, 94 percent were in predominantly (over 75 percent) African American tracts—including *all* of the public housing units and 88 percent of the units subsidized under post-1973 programs.  "Federally subsidized services have succeeded in moving many poor people from one place to another," one observer noted in 1970, "but they have provided very few with good housing and have had almost no impact on the poverty problem as such" (Gordon 2008, 100)

While the City's public housing policies tended to harden patterns of segregation within St. Louis, those of the County municipalities worked to harden the racial divide between the City and its western suburbs. Urban renewal in St. Louis County was often designed and pursued as a means of relocating suburban pockets of African American settlement "back" into the City.  For their part, federal officials viewed greater St. Louis as a stubborn outlier for its resistance to subsidizing housing. "This is the only metropolitan area, the only area in the [four-state HUD] region where you cannot carry on an intelligent discussion of the policies and programs," noted one HUD official, adding that "refusing to accept any responsibility for the problems of the disadvantaged . . . has been profitable for St. Louis County and for several of the leaders in the right sections of St. Louis City"  (Gordon 2008, 100-1).

On balance, federal housing and renewal policies did little to address the paucity of safe low-income housing in greater St. Louis and actually *deepened* patterns of residential segregation.  FHA mortgage insurance flowed primarily to the suburbs, subsidizing white flight.  Federal public housing assistance flowed primarily to the inner city, cementing the region's spatial organization of race and poverty.  Indeed, when the federal government—in the context of protracted litigation over school desegregation—set out to prove that the St. Louis Board of Education was defying the mandate of the 1954 *Brown* decision, both local officials and expert witnesses identified federal housing policies as the prime culprit. "The segregated black community was left to fester," as a City official observed, "while developers aided by the federal government rushed out to build new white enclaves on the city's edge" (Gordon 2008, 98-9).

*iv) Race, Realty, and Redevelopment in St. Louis Since 1960*
Most explicitly racial strategies of exclusion were erased in the flurry of civil rights law and legislation of the middle 1960s.  City civil rights leaders won a basic public accommodations ordinance in 1961.  Fair housing provisions began to crop up in various Housing and Urban Development programs.  The city of St. Louis passed its own open housing law in 1966.  And—twenty years after *Shelley*—another challenge to the exclusionary practices of St. Louis realtors and developers pressed the Supreme Court (*Jones v. Mayer)* to outlaw discrimination in private real estate transactions.  But restrictive real estate practices persisted both as a continuation of the pattern set in the middle years of the century and as a response to the disinvestment and physical decay that followed in its wake (Gordon 2008, 102).



# Map 11
# Public Housing and Assistance, 1942-2000
# St. Louis and St. Louis County

BLACK POPULATION (1970)

- under 50 percent
- 50 to 75 percent
- over 75 percent

units

1942-1957

10 - 50   51 - 200   201 - 500   501 - 2000

1958-1973

10 - 50   51 - 200   201 - 500   501 - 2000

since 1973

10 - 50   51 - 200   201 - 500   501 - 2000

Source: 1970 Census (NHGIS); City and County parcel data; various housing reports.

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 13A

All of this was accompanied by a fundamental recasting of federal housing policy.  In the early 1970s, federal urban spending was rolled into the new Community Development Block Grant (CDBG) program, and housing assistance turned from bricks-and-mortar spending to direct subsidies to renters or homeowners.  Just as federal civil rights law reached all corners of the housing market, in other words, federal policy relinquished effective control over housing policy to local and private interests—"yet another chapter," as Gary Orfield noted during his work on the City's school desegregation case, "in the long epic of federally-funded, locally-administered residential segregation and resegregation." In settings such as St. Louis, quite simply, the damage was done.  New fair housing or mortgage disclosure laws made it easier to assess that damage but could do little to reverse it.  Indeed, new federal programs and policies often helped to tip transitional neighborhoods by encouraging high-risk (often predatory) lending, and by making it easier for remaining white property owners to flee (Gordon 2008, 103)..

In turn, discriminatory practices—including client "steering" and the "redlining" of private mortgages and home insurance—continued.   Racial or spatial discrepancies in access to insurance or credit were widely acknowledged but difficult to measure.  Certainly mortgages and homeowner's insurance were much harder to get in the City, and the terms or interest rates were much less favorable.  In 1975, on the eve of the first federal mortgage disclosure law, local fair housing groups estimated that St. Louis County claimed just over twice as many standard housing units as the City itself, but garnered nearly eight times the access to credit.  An investigation by the Phoenix Fund found a precipitous decline in lending (1960-75) by savings and loans across the City, with the most dramatic collapse downtown and across the north side.  In the City, they lent one dollar for every 109 dollars on deposit; in the County, the ratio of loans to savings was barely 1:9.  The same disparity extended to homeowner's insurance (a prerequisite for most mortgages).  Big insurers "are all trying to cut out city business," as one agent admitted, "[but] will carry just a few policies within the city limits to cover themselves" (Gordon 2008, 106-7).

These patterns emerged more clearly in the wake of the first federal Home Mortgage Disclosure Act (HMDA) in 1976 and the Community Reinvestment Act (CRA) in 1977 (the former required lenders to report data on mortgage applications, including census tract, race and income of applicant, and disposition; the latter imposed broader requirements that banks meet the credit and deposit needs of the entire community they were chartered to serve).  The first HDMA survey confirmed what fair housing advocates in St. Louis had long suspected:  the City claimed less than 6 percent of all new loans in the metropolitan area, almost all of which were in the southern reaches.  Taken together, the HMDA and CRA provide a wealth of data on lending patterns in greater St. Louis after the late 1970s.  Yet, because these laws generated both new rules and new reporting requirements, they offer a skewed portrait: We know the most about financial and actuarial discrimination just at the point when it became harder to get away with.  Even as both application and origination rates for St. Louis improved in the early 1990s, the underlying pattern—continued sprawl west into the metro area's Missouri counties, and continued disinvestments in north and central St. Louis itself—remained largely unchallenged (Gordon 2008, 108-9).

## C) Economic Decline

These patterns of racial discrimination and segregation played out against an inexorable story of economic decline. In part, this simply reflected national trends including deindustrialization. Between 1970 and 1995, the share of the American workforce employed in manufacturing fell by one half (from 31 percent to 16 percent of all workers). These losses, especially in industries like auto, steel, and equipment manufacturing, also meant steady losses of secure, high-wage, career employment (Jaret 2003). Large Midwestern cities (Chicago, St. Louis, Detroit, Milwaukee) sat at the leading edge of urban decline, bearing the brunt of both demobilization after World War II and the deindustrialization of later years.

In these respects St. Louis, whose local economy was rooted in the commerce of the Mississippi, lagged behind even its regional peers. The region experienced neither as dramatic a boom in the World War I era nor as dramatic a collapse after 1929 as many of its peers. As in the nation, the coming of World War II ended the Depression in St. Louis. But economic decline began very shortly thereafter. In the City itself **(Figure 1),** the employment base collapsed alongside its more general depopulation. Indeed, over the postwar era, the City's share of regional employment dropped dramatically, from about half (1950) to just over 10 percent (2000) **(Table 1).** Against national patterns of growth and decline, the region's outer Missouri counties did very well and St. Louis County held its own, but the City lagged well behind—suffering dramatically higher rates of job loss in declining sectors (manufacturing, mining) and near stagnation in growing sectors (services, retail) (Gordon 2008, 13-15).

**Figure 1: Employment by Sector, St. Louis, 1948-1994**



Source: County Business Patterns, various years.

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 13A

**Table 1: Percent of Metro Employment by County, 1950-2000**

|                  | 1950 | 1960 | 1970 | 1980 | 1990 | 2000 |
|------------------|------|------|------|------|------|------|
| **Madison**      | 9.5  | 10.0 | 10.0 | 9.8  | 9.6  | 9.9  |
| **St. Clair**    | 9.9  | 10.6 | 10.3 | 9.2  | 9.0  | 8.8  |
| **St. Charles**  | 1.6  | 2.3  | 3.7  | 6.4  | 9.5  | 12.1 |
| **St. Louis**    | 21.4 | 32.6 | 41.3 | 45.1 | 43.1 | 40.3 |
| **St. Louis (city)** | 50.1 | 36.4 | 24.9 | 16.6 | 13.7 | 11.4 |
| **Jefferson**    | 1.9  | 2.7  | 4.0  | 5.9  | 7.0  | 8.0  |
| **Franklin**     | 1.9  | 2.1  | 2.2  | 2.8  | 3.2  | 3.7  |
| **Clinton**      | 1.1  | 1.0  | 1.0  | 1.3  | 1.3  | 1.4  |
| **Monroe**       | 0.7  | 0.7  | 0.7  | 0.8  | 0.9  | 1.2  |
| **Jersey**       | 0.7  | 0.7  | 0.7  | 0.8  | 0.8  | 0.8  |
| **Lincoln**      | 0.7  | 0.6  | 0.7  | 0.8  | 1.1  | 1.5  |
| **Warren**       | 0.4  | 0.4  | 0.4  | 0.6  | 0.8  | 1.0  |
|                  |      | census-defined MSA | | | | |

Source: David Laslo, "The Past, Present, and Future, of the St. Louis Labor Force," in Terence Jones and Brady Baybeck, St. Louis Metromorphosis: Past Trends and Future Directions (St. Louis: Missouri Historical Society Press, 2004), Table 2 (p72).

Leading this decline was manufacturing, which counted almost 200,000 jobs in the City in the decade after the war, but barely half that (99,100) by 1979, and half that again (46,427) by 1994. Even wholesale and retail employment in the City (in a national economy increasingly dominated by these sectors) had withered by 1994 to half their 1948 levels. As the entire metro area grew, new investment flowed disproportionately to suburbs where new industrial sites (especially along major thoroughfares and surrounding the airport, Lambert Field) were readily available. Employment in river- and rail-based industry on both sides of the Mississippi lost ground steadily through the 1950s and early 1960s (see Figure I.4). Between 1963 and 1976, the City lost around 3,000 total jobs but almost 35,000 manufacturing jobs. After the early 1970s, deindustrialization set in and the employment totals for the MSA and its constituent counties declined in tandem—although the City continued to count losses to poaching by neighboring counties. The City suffered a steady stream of significant plant closings that savaged employment in core sectors—including automobiles, chemicals, aerospace, and electrical goods. Local job losses **(see Map 12)** were concentrated along the City's old industrial corridors, in its inner suburbs (including Clayton and the now rapidly declining industrial enclave surrounding Wellston), and in the volatile aerospace industry surrounding Lambert Field (Gordon 2008, 15-22).

Case: 4:07-cv-00027-ERW    Doc. #: 94-14    Filed: 08/14/09    Page: 35 of 40 PageID #: 820

# Map 12
# Major Plant Closings and Layoffs
# Greater St. Louis, 1975-2000

Jobs Lost
(total for 1975-2000)

- 100
- 500
- 1,000
- 5,000
- 10,000

**1990 unemployment rate**

- over 18%
- 12% to 18%
- 6% to 12%
- under 6% (Metro average)

Source: Cummings (2004); St. Louis and St. Louis County parcel data; City of St. Louis and Missouri EPA sites inventory; St. Louis Post-Dispatch; St. Louis Business Journal

Even as service employment displaced manufacturing, the older center of the metro area reaped few of the benefits.  Perhaps most dramatically, St. Louis lost virtually its entire retail base over the course of the postwar era—claiming (see **Figure 2**) over 75 percent of regional retail sales in the late 1940s but barely 11 percent by the late 1990s.  Retail flight was exacerbated by a number of factors.  Much more so than industrial employment or office locations, retail markets were responsive to the proximity and needs of the local population: as the more prosperous moved to the suburbs stores tagged along.  The City also struggled to hang on to managerial jobs, as corporate headquarters and other white collar jobs drifted west to the corporate campuses of Clayton and elsewhere (Gordon 2008, 142-3).

**Figure 2: Retail Growth and Decline in Greater St. Louis, 1940-1997**



Source: Gordon 2008, 21.

# Part II: Consequences

I offer the preceding historical survey because it is necessary to our understanding of the causal origins of the urban crisis in St. Louis, and because the influence of this past weighs heavily on contemporary conditions and circumstances and consequences. Now we turn to those consequences. What follows is meant as a suggestive (rather than exhaustive) survey of the state of St. Louis—and particularly its residential northside neighborhoods—in the 1980s and 1990s. Of importance is both the objective conditions in those neighborhoods, and their relative standing in the larger metropolitan region. The resulting portrait, drawn from documentary and statistical sources available in the middle 1990s, is stark and unambiguous. In a region suffering economic decline, slow population growth, and considerable political and fiscal challenges, north St. Louis (identified in the analysis and maps which follow by census tract, zipcode, or neighborhood) stands out as an area in which all such problems are sharply focused or starkly magnified.

By way of introduction, consider the summary conclusions of three reports drawing on data from the 1990s. In 1993, Project Respond (a coalition of local foundations and service agencies) issued *The Children of Metropolitan St. Louis: A Report to the Community*. The study, drawing on 1990 census data and reports from participating agencies, identified eight broad risk areas for St. Louis children: family support, material needs, health care, child care, schooling, community assets and environment, poverty, and racial isolation. On each measure, risk was starkly concentrated in the City's near northside neighborhoods. On each measure (much of this data is mapped below), the zipcode encompassing 4535 Cote Brilliante ranked among the very worst in the City (Project Respond, 2003). More recently, Scott Cummings of St. Louis University completed a survey of racial and spatial inequalities in Greater St. Louis. Collecting data (again from the middle 1990s) by neighborhood, Cummings focuses on a similar range of local risks including racial isolation, per capita income, average household income, and unemployment. Combining these measures yields a composite score of economic and social risk—summarized in **Map 13.** Characteristically, the map highlights the bright boundary between the City' stable or low-risk neighborhoods to the south, and high-risk neighborhoods, including the Ville and the Greater Ville surrounding 4535 Cote Brilliante, of the northside. In 1997, Project Respond updated its findings: the zipcode surrounding 4535 Cote Brilliante scored substantially worse than national or regional norms on sixteen of its eighteen measures of risk (Project Respond, 1997, 334).

Case: 4:07-cv-00027-ERW    Doc. #: 94-14    Filed: 08/14/09    Page: 38 of 40 PageID #: 823

# Map 13
# Neighborhood Risk, 1997



| | | | | |
|---|---|---|---|---|
| 4 | 8 | 12 | | 16 = highest risk |
| 5 | 9 | 13 | ∧ | 4535 Cote Brilliante |
| 6 | 10 | 14 | | |
| 7 | 11 | 15 | | |

Color ramp (light to dark) shows composite measure of risk.   Each neighborhood is scored 1-4 on racial isolation, per capita income, average household income, and unemployment; yielding a composite score of 4 (low risk) to 16 (high risk).

Source: Adapted from Cummings (2008), Table 8.

## A) Urban Flight

Certainly the most dramatic element of St. Louis' postwar history is the depopulation of the City itself.  The City's population peaked at just over 850,000 in 1950, at which point it claimed just under half (47.9 percent) of the population of the metropolitan area.  With each new census, the City's population dropped farther (750,000 in 1960, 622,000 in 1970, 453,000 in 1980, 397,000 in 1990, 348,000 in 2000) as did its share of the metropolitan area.  The City lost an average of just over 10,000 persons a year between 1950 and 2000.  The housing shortage of the 1940s and 1950s gave way to chronic vacancy and abandonment: by 1978, St. Louis had the highest vacancy rate (just under 10 percent) of all central cities.  This was a pace of depopulation and decline unmatched by any other American city (**see Table 2**).

**Table 2: Growth and Decline of Major US Cities, 1940-2000.**

|  | 1900 | 1910 | 1920 | 1930 | 1940 | 1950 | 1960 | 1970 | 1980 | 1990 | 2000 | 2000 peak |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| New York | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 100% |
| Chicago | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 3 | 3 | 80% |
| Philadelphia | 3 | 3 | 3 | 3 | 3 | 3 | 4 | 4 | 4 | 5 | 5 | 73% |
| Los Angeles | 36 | 17 | 10 | 5 | 5 | 4 | 3 | 3 | 3 | 2 | 2 | 100% |
| Detroit | 13 | 9 | 4 | 4 | 4 | 5 | 5 | 5 | 6 | 7 | 9 | 51% |
| Baltimore | 6 | 7 | 8 | 9 | 7 | 6 | 6 | 7 | 10 | 12 | 17 | 69% |
| Cleveland | 7 | 6 | 5 | 6 | 6 | 7 | 8 | 10 | 18 | 23 | 33 | 52% |
| **St. Louis** | **4** | **4** | **6** | **7** | **8** | **8** | **10** | **18** | **26** | **34** | **48** | **41%** |
| Washington | 15 | 16 | 14 | 14 | 11 | 9 | 9 | 9 | 15 | 19 | 21 | 71% |
| Boston | 5 | 5 | 7 | 8 | 9 | 10 | 13 | 16 | 20 | 20 | 20 | 74% |
| San Francisco | 9 | 11 | 12 | 11 | 12 | 11 | 12 | 13 | 13 | 14 | 13 | 100% |
| Pittsburgh | 11 | 8 | 9 | 10 | 10 | 12 | 16 | 24 | 30 | 40 | 51 | 49% |
| Houston | 85 | 68 | 45 | 26 | 21 | 14 | 7 | 6 | 5 | 4 | 4 | 100% |
| Buffalo | 8 | 10 | 11 | 13 | 14 | 15 | 20 | 28 | 39 | 50 | 57 | 50% |
| Cincinnati | 10 | 13 | 16 | 17 | 17 | 18 | 21 | 29 | 32 | 45 | 53 | 66% |
| Dallas | 88 | 58 | 42 | 33 | 31 | 22 | 14 | 8 | 7 | 8 | 7 | 100% |
| San Antonio | 71 | 54 | 41 | 38 | 36 | 25 | 17 | 15 | 11 | 10 | 8 | 100% |
| San Diego |  | 93 | 53 | 43 | 31 | 18 | 14 | 8 | 6 | 6 | 100% | |
| Phoenix |  |  |  |  |  | 99 | 29 | 20 | 9 | 9 | 5 | 100% |

Source: Gordon 2008, 233.

As important as the gross dimensions, of course, was the inexorable racial logic that earned postwar suburbanization the moniker of "white flight."  Suburbanization was shaped by racial restrictions (detailed above) that both denied African Americans the same residential mobility and—as spatial segregation deepened—exaggerated the motives of those who wanted out.  Again, this was a pattern established early in the century, cemented by the demographic and political changes of the 1940s, and exaggerated in St. Louis by the City's fixed boundaries, aged housing and industrial stock, and substantial rural hinterland.

39

These demographic patterns are traced in Maps 14-19, each of which spans a decade and shows the local growth and decline of the regions black and white populations.  Between 1940 and 1950 (**Map 14**), whites settled throughout the suburban St. Louis counties and in a few tracts surrounding Forest Park and in the City's southern reaches.  Many of these were new arrivals to the St. Louis area, but many (evidenced by the collapsing white population in many central city tracts) were moving from the City to its suburbs. Blacks, by contrast, settled almost exclusively in a few northside tracts, the old industrial suburbs on the Illinois side, and scattered outposts like Kinloch in north St. Louis County.  These patterns continued in the 1950s (**see Map 15).**  White settlement retained its suburban pattern, and flight from the City was now evident in all but a few southern tracts.  African American settlement now reached the City limits along the northern border of Forest Park, concentrated in tracts being abandoned by whites.  This decade also saw swaths of black depopulation, particularly in the downtown and Mill Creek tracts being "cleared" for urban renewal.  Between 1950 and 1970, close to 60 percent of the (1960) white population fled the City.  The same period saw a slight in-migration of African Americans, although almost all of this occurred before 1960.  By 1970 (**Map 16**), the locus of white settlement had moved to the western reaches of St. Louis County, racial succession and white flight now reached the inner-ring suburbs (University City, Normandy, Wellston) sitting east of the City's northside, and the older northside neighborhoods were largely abandoned (Gordon 2008, 22-25).

Certainly it was not longer accurate to label the disparate patterns of settlements "white flight."  African-Americans—one step ahead of the urban renewal bulldozer, fleeing the same conditions (crime, deteriorating schools) as whites, and redlined out of their homes and neighborhoods—were also leaving.  After 1970 (**Maps 17-19**), the depopulation of the City (and especially the near northside) accelerated, falling by almost 170,000 (from 622,236 to 452,801) by the 1980 census, and by more than 100,000 more (to 348,189) by 2000.  By this time, whites were fleeing the inner suburbs as well, and white population growth was concentrated in the western reaches of St. Louis County and beyond.  In a sense, the suburban color line had drifted west from the City limits to encompass much of near northeastern St. Louis County (Wellston, Bridgeton, Normandy, Jennings, Ferguson, Bellefontaine Neighbors) south and east of Lindbergh Boulevard.