## Declaration of David M. Randall, Ph.D.
### Pursuant to 28 U.S.C. § 1746

I, David M. Randall, Ph.D. hereby declare and certify that the following is true to the best of my knowledge, information and belief, subject to the penalty of perjury.

1.    I have been asked by current counsel for Billie Allen to provide this declaration with regard to my involvement in Mr. Allen's 1998 capital trial in the United States District Court for the Eastern District of Missouri. I was retained by trial defense counsel to act as the mitigation expert for Mr. Allen's trial and because of this involvement I am familiar with the facts related to trial counsel's preparation for the sentencing hearing in this case. I have also been asked to provide my expert opinions with regard to how trial defense counsel's penalty phase preparation may have fallen short, and to compare the mitigating information obtained and presented at the time of trial with what current counsel have uncovered.

2.    In 1994, I received a Doctorate in Clinical Psychology from the University of Health Sciences/The Chicago Medical School. In 1982, I received a Master's of Arts degree in Psychology from Fairleigh Dickinson University in Teaneck, New Jersey. In 1980, I received a Bachelor of Arts degree in Psychology from Muhlenberg College, Allentown, Pennsylvania. By the time of the Allen trial, I had worked as a sentencing consultant and mitigation expert for over ten years. In

the course of my work, I had consulted on over 60 capital cases in Illinois, Indiana, Missouri, and California, as well as two Federal capital cases. As a sentencing consultant and mitigation expert, one of my primary functions was social history investigation and the development and preparation of social history in mitigation of sentencing. I have provided extensive training to attorneys, mitigation specialists, mental health professionals, and others regarding the development and presentation of mitigation and preparation for the penalty phase in capital cases.

3. I am a licensed psychologist in the State of Hawaii. Since 2001, I have worked for the Hawaii Department of Education, School-Based Behavioral Health Program, Maui District. From 2001 to 2003, I worked in a small, rural elementary school providing psychotherapy to children – primarily special education children – presenting with emotional and behavioral issues. Since 2003, I have worked as a clinical psychologist throughout Maui District. My primary functions include providing expert consultation to K – 12 school teams and administrators, providing clinical supervision and oversight to master's level counselors, and psychological and neuropsychological assessment of children presenting with a wide range of emotional and behavioral issues.

4. I was first contacted about this case by Connie Caspari on January 15, 1998. Ms. Caspari was employed as an assistant by Billie Allen's trial counsel, Rick

Sindel. She stated at that time that the mitigation expert Mr. Sindel had initially retained (Professor Craig Haney, Ph.D.) was no longer involved in the case, and that Mr. Allen's trial was set to start on February 9, 1998. She also explained that substantial mitigation work on the case still needed to be done. As I later learned, this was a considerable understatement. In fact almost no mitigation work had been done. It was clear that during the time leading up to trial, the communication between Mr. Allen's attorneys and mitigation expert Haney was abysmal. The essence of what I was told about the exchange between counsel and Dr. Haney was that counsel had contacted Dr. Haney in January 1998, asking him, "Where's the mitigation? Trial's next month," with the response essentially being, "What do you mean trial's next month?" In any case, Dr. Haney had done no discernable work preparing mitigation for Mr. Allen's case, and there was no outreach on counsel's part to regularly check in with Dr. Haney in the months before trial for briefings on his progress – nor Dr. Haney to counsel.

5. Based on my experience as a mitigation specialist, I knew that there was no way an adequate investigation could be completed in the time between being contacted by Ms. Caspari and the start of the trial. This was true even taking into account the additional time that would be taken up by the jury selection and guilt phase of trial. I told this to trial counsel and requested that they seek additional time.

Case: 4:07-cv-00027-ERW    Doc. #: 94-26    Filed: 08/14/09    Page: 4 of 20 PageID #: 935

I reiterated the need for more time in my January 28, 1998 affidavit in support of a

continuance (and again in a later February 6, 1998 affidavit addressing the need to

retain a neuropsychologist). Trial counsel agreed to seek more time, but they were not

optimistic given that they had been on the case for many months and because this

would be an eleventh hour request. In the January 28 affidavit, I stated,

> The role of the mitigation specialist in a capital murder case is to assist the attorney by conducting a thorough social history investigation; identifying factors in the client's background or situation that may require expert evaluations; assisting to locate appropriate experts; providing background materials and information to experts to enable them to perform competent and reliable evaluations; consulting with the attorney regarding the development of the theory of the case and case strategy, thereby assuring coordination of the strategy for the guilt/innocence phase with the strategy for the penalty phase; identifying potential penalty phase witnesses; and working with the client and his or her family while the case is pending....

Unfortunately, aside from identifying the need for other experts, every one of these

important facets of mitigation support listed above was negatively impacted due to

extreme time constraints, impacted to the point of being inadequate. Indeed, even the

expert witness work was negatively impacted, as I discuss below. For example,

counsel should know the precise contours of a potential penalty presentation even

before jury selection, as, in my experience, mitigation themes often impact jury

selection and guilt phase issues. Because there was insufficient time to adequately

conduct the mitigation investigation and digest the results of the limited investigation

that was conducted, the jury – the trier of fact and sentencer – was deprived of hearing the totality of information with which they should and could have been presented prior to making their grave decision.

6.      Understanding that a continuance was unlikely, I nevertheless agreed to work on Billie Allen's case.  Presented with a moral dilemma, my decision was not without significant ambivalence about taking on what I perceived to be a virtually impossible task.   However, Mr. Allen and his attorneys were in a desperate predicament.  I decided to work on the case.  Unfortunately, in hindsight, that decision was a serious error, in that our work may have presented a "veneer of competence or adequacy" to the mitigation investigation and sentencing phase, where none existed. On January 16, 1998, the day after Ms. Caspari had first contacted me, I was appointed by the Court, replacing Dr. Haney.  Even though my initial work on the case had to compete with time I had to spend on preexisting obligations, I started work on this case.  I ramped up, I started to do as much as I could, as quickly as I could.

7.      Upon starting work, I quickly realized that the case was in even worse shape than I had expected.  In their limited contact with Mr. Allen's family members, trial counsel had not discussed substantive mitigation-related topics and seemed to have not even explained what a mitigation investigation entailed.  In essence, counsel had spoken to the family only to keep them updated on the progress of the case.  No

attempts had been made to begin the laborious process of generating Mr. Allen's social history. Only a few records on Mr. Allen and his family had been collected. Mitigation witnesses outside Mr. Allen's immediate family – teachers, friends, neighbors, etc. – had not even been identified, let alone contacted. Because of their limited contact with the family, compounded by obvious racial and social class issues, counsel had not put the time in, over time, to develop the level of trust necessary for engaging family members around sensitive personal information germane to mitigation.

8.    Two weeks after I joined the case, and just 11 days before trial was to begin, trial counsel finally requested a continuance on January 29, 1998. I provided trial counsel with an affidavit in support of the continuance request. The affidavit stated that a continuance was needed because there was inadequate time to prepare prior to February 9th start of trial Although my affidavit suggested a continuance of 120 days, I actually did not consider this to be sufficient time to prepare a proper penalty phase defense. It would have merely provided breathing room. I asked counsel to move for even more time, but they declined to do so, telling me that we would be fortunate to get even 120 days given the circumstances.

9.    I testified as a witness at a January 30, 1998 hearing regarding the motion for continuance. I told the Court why I believed a continuance was needed. I will not

repeat that testimony here, except to note that at the time I explained that capital mitigation was an "iterative process" which denotes the organic process of such an investigation. Interviews with a mitigation source can lead to multiple other sources. Time is needed to present facts to a mental health expert to determine what further leads ought to be pursued. The nature of capital mitigation requires the mitigation expert to probe the most intimate details of a client's life, and those of his family, friends and acquaintances. Therefore, repeat interviews are virtually always required over an extended period of time, especially with family members, as it is incredibly challenging to have family members open up to reveal aspects of the family dynamic that range from embarrassing to criminal (as current counsel have done). Capital mitigation is a pain-staking and time consuming process. While this was all known in 1998, and was accepted as a standard of practice, the recent American Bar Association, *Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases*, 36 Hofstra Law Review 677 (2008), explain the exhaustive nature of capital mitigation, and I commend them to the Court as an excellent overview of the unique challenges posed by capital mitigation.

10.     As a court-appointed mitigation expert, I appreciated that the Court gave me full latitude in conducting the mitigation investigation as I saw fit. The Court also fully compensated me for my time. Nevertheless, while I worked up this case to the

best of my ability, there was simply not sufficient time to adequately prepare for the sentencing hearing. I set up a "war room," an office, in my room at the Holiday Inn. The mitigation investigation and sentencing hearing were a chaotic, seat-of-the-pants scramble. There was little time to digest what we learned as we learned it, conduct adequate follow up, or make deliberative decisions. Time is needed to make measured, informed decisions in a matter of this magnitude. Had the same number of hours expended in this case been stretched over a more reasonable period of time, a more effective process would have ensued.

11.    As I worked on Mr. Allen's case, it quickly became apparent that there was an obvious schism in the family between Mr. Allen's father and his mother. There was a considerable amount of animosity between the two sides of the family. It became obvious that our client was in contact with his mother and her side of the family, and that he was largely estranged from his father's side. This dynamic made Mr. Allen's maternal side of the family more accessible. The extreme time pressure in this case fed the defense team's need to not alienate his mother and keep her as an ally, because keeping her as an ally allowed access to important potential mitigation witnesses from the maternal side of the family. Therefore, because of the acrimony between Mr. Allen's mother and father, and the compressed time frame, my attempts to reach out to family members on the father's side were limited. This has proved to

be a serious shortcoming, given what current counsel have uncovered from the father's side. In my short time working on this case, I expended considerable effort working with Ms. Allen to increase her chances of cooperation with a Caucasian defense team she did not trust. We needed more time to build trust, time we always have had in other capital cases.

12.     Aside from missing half the picture in Mr. Allen's family, focusing solely on his mother's side of the family presented its own problems. She had an obvious drinking problem, short temper, and was an unpredictable, intimidating, and bullying character. These personality traits and behaviors caused extreme tension even with people on her side of the family. Nonetheless, I was forced to rely on her as the entre to important potential mitigation witnesses. It was clear that Ms. Allen was one of the primary abusers of her son. Unfortunately for the jury and for Mr. Allen, we did not have sufficient time to develop the necessary rapport with his mother, and speak with her about painful and embarrassing details of her past, and those of her family, and the abuse she meted out on our client, her son – details that would have been highly relevant in both content and emotional impact.

13.     I strongly suspected that Mr. Allen was the product of an abusive and highly dysfunctional upbringing. Dysfunction does not arise in a vacuum. This impression was based clinical experience and on bits and pieces of information I was

able to put together from talking with witnesses and reviewing documents. I knew that as a child and adolescent, Mr. Allen had problems learning and achieving, attentional difficulties, suffered from behavior problems, was emotionally immature and, as a young adult, suffered bouts of depression, leading to his self-medication with illegal drugs, his rapid mental deterioration and seeking psychological help in the weeks before the offense. I also observed the maternal family dynamic. Ms. Allen was an aggressive, dominant, and heavy-drinking woman who demonstrated a notable lack of warmth and compassion. The only emotions she seemed to readily display were anger and rage.

14.    Despite my suspecting family abuse and dysfunction, I was not able to obtain concrete information from any family member that this existed. Again, the unique nature of capital mitigation came into play. One cannot expect family members to reveal such embarrassing and traumatic facts during an initial interview, or even after a number of meetings. All told, I knew these people for just over one month. In my experience as a mitigation specialist, many confidence and trust-building encounters are required before a witness will open up about these types of topics. On other capital cases, I have typically been afforded from one to two years, sometimes more, to work up a case. Mitigation investigation in capital cases is simply a time and labor-intensive process – the iterative process mentioned earlier – which

trial counsel should have begun many months before my entry into the case, in close collaboration with Dr. Haney.

15.    I have read the complete penalty phase transcript in preparation for completing this declaration.    Although the defense presentation was long (approximately 30 lay witnesses were called), these witnesses repeated a small number of themes that only scratched the surface of Mr. Allen's upbringing, impairments, and troubled character.  In the desperate scramble to prepare for the  sentencing hearing, the focus was on mustering witnesses.  As a result, the depth of preparation for each witness suffered greatly.  Given the time constraints, it was impossible to prepare witnesses with sufficient depth.  Thus, witness after witness described Mr. Allen laconically as a "follower" not a "leader."  His flaky skin condition and childhood illnesses like asthma were repeatedly described.  Mr. Allen's adjustment to going to the "white" school in Clayton was also discussed.  In the time allotted to me, I did the best I could to line up witnesses to present the themes that we had been able to throw together.  The emphasis on school teachers was no accident.  Given our time constraints, I focused on people who were more readily accessible and who could provide a coherent articulation of the limited themes we had been able to develop.  Although these themes are worthy of inclusion in a comprehensive penalty phase presentation, I knew at the time that they were just a small part of a much larger story

about Mr. Allen's life.  It may be seductive for some to conclude that the Allen sentencing hearing was adequate based on the sheer number of witnesses presented.  However, this conclusion is erroneous.

16.    The sentencing presentation also touched upon Mr. Allen's post-traumatic stress disorder (PTSD).  Dr. Cuneo conducted an evaluation of Mr. Allen the same day I was appointed to this case (January 16, 1998).  Therefore, he went into the evaluation with extremely limited background information and literally no lay accounts of Mr. Allen's life.  And, as Dr. Cuneo's report indicates, his sole contact with Mr. Allen was for the purpose of determining his trial competency, and not mitigation.  Dr. Cuneo's report also indicates that Mr. Allen reported that he was "stressed out" over the 1995 killing of his friend, Marquis Taylor.  I recall that in subsequent discussions with Dr. Cuneo and counsel, that it was decided to seize upon this fact as the underlying trauma  for what would be the doctor's PTSD presentation.  I was concerned about this strategy because, while an event like the Taylor shooting can support a diagnosis of PTSD, it was apparent that Mr. Allen's trauma symptoms existed long-before this shooting, and were based upon a much richer trauma history and predisposition.   Indeed, in his arguments to refute the PTSD mitigator as presented by the defense, one thing USA Dowd was correct about was, "This defendant deteriorated long before Marquis Taylor was ever killed (p. 61)."

Unfortunately, the reasons underlying this long-term deterioration, and Mr. Allen's lack of resilience, were inadequately explained by the defense. And, like virtually every aspect of this preparation, we were forced to make decisions without adequate information and deliberation, which was a function of the time constraints on the penalty phase investigation.

17. Mr. Allen manifested many signs and symptoms of an organic brain impairment that impacted his ability to function, let alone succeed, in life. I have now learned that he had a history of maternal in-utero heavy alcohol abuse and cigarette smoking. I knew then that he had childhood febrile seizures, lead poisoning, asthma, lack of school achievement, emotional lability, and head injuries. Given these signs, it is a standard of care in death penalty cases that possibility of brain damage be thoroughly explored, so that the sentencer can understand the interplay between head trauma, emotional trauma, and their emotional and behavioral sequalae. Soon after my involvement began in the case, I told counsel that we needed to involve a neuropsychologist. The defense retained Dr. Gelbort to conduct a neuropsychological evaluation in an attempt to explore these areas, however this was done at a late hour. The evaluation was conducted on February 8, 1998 – just one day before jury selection. As a clinical psychologist with academic and practical training in neuropsychological assessment, I would note the difference in the scope of Dr.

Gelbort's testing when compared with the far more comprehensive testing and reporting done by Dr. Martell, per the request of current counsel for Mr. Allen. There is little question that Dr. Gelbort's evaluation was rushed and truncated due to the extreme time constraints trial counsel put him under.

18.    The mental health experts did last-minute, quick reviews and evaluations. The level of care and attention to details that one would expect in an endeavor of this magnitude was simply not evident – neither I, the lawyers, nor the experts had sufficient time to fully investigate and consider, in a deliberative manner, the relevant issues in Mr. Allen's life that mitigated the offense. Indeed, it was not until my entry into the case that Dr. Cuneo focused on mitigation at all: he had initially been retained to perform a competency evaluation. With proper preparation, mitigating mental health information could have been presented to the jury in a manner that was credible, persuasive, and in a way that they could comprehend. Unfortunately, because of extreme time constraints, their last minute entry into the case, the superficial nature of the evaluations performed by Drs. Cuneo and Gelbort, and the failure to present the full range of foundation, lay testimony in substantial scope and depth (e.g., mother's and father's side of family, more thorough examination of current witnesses, other critical witnesses not identified or interviewed), the mental health experts' testimony was more easily obfuscated. Indeed, because of the time

constraints in preparing for sentencing, and superficial nature of the sentencing presentation, Mr. Dowd was credible in asserting that, "All these mental defenses you are hearing about…. They're just sitting out there kind of floating out in space, no nexus, no causation, no connection of any kind between those little things and what this defendant did….The post-traumatic stress syndrome is like a joke. It's thrown in by Kuneo [sic] at the last minute. We get his report on February 18th…." (Mr. Dowd, p. 100 and p. 102). While Mr. Dowd's understanding of Mr. Allen's history and it's impact on our client's mental condition does not comport with reality, his argument was persuasive. As a result of the constrained – and rushed – defense presentation, none of the what I believe to be factual mental health mitigators were endorsed by the jury: severe mental or emotional disturbance, brain damage that impaired his ability to focus, learn, and use good judgment; born with a predisposition to alcohol and substance abuse, long-standing depression, impaired ability to cope with stress, PTSD resulting from the death of a friend, or abusing marijuana to self-medicate.

19.    Extreme time pressure in this case resulted in a "shotgun approach" to the investigation, development, and presentation of mitigating evidence. There was no time to reflect and develop a coherent strategy of mitigation. This also negatively impacted the development of mitigating factors for the jury to consider and weigh during their deliberations. For example, given what we know of Mr. Allen's life, the

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 19

mitigating factor "PTSD resulting from the death of a friend" only superficially captures his significant history of trauma, and ignores the PTSD-related trauma experienced by Mr. Allen throughout his childhood and adolescence, prior to this event. Seemingly irrelevant bits of information, like a Clayton elementary schoolteacher's revelation that young Billie dressed as a pimp one Halloween, could have been placed in their proper context during the sentencing hearing had counsel had sufficient time for an adequate mitigation investigation. Simply, with adequate time, information that was readily available would have been obtained. Current counsel have obtained such information; as a child, Mr. Allen was exposed to unsavory aspects of life.

20. I want to be clear: from my perspective Mr. Allen's counsel did not make a choice between different mitigation theories. Rather, they resorted to picking the low-lying fruit. We went with what we more readily could obtain, and never conducted anything approaching a thorough investigation. I was literally still scrambling to search for and interview witnesses late at night during the penalty phase. Of the witnesses who testified, some were either not interviewed by counsel at all, or only briefly. I would bring some witnesses to court and Mr. Sindel would just put them on without preparation and without even knowing what exactly they were going to say. This lack of preparation, and lack of rapport with witnesses, was

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 19

apparent in the flow, content, and lack of emotional impact of testimony, often resulting from superficial "yes/no" questioning.

21.    I have reviewed extensive materials provided to me by current counsel for Mr. Allen. These include declarations and reports from:  Angela Allen, Billy Wayne Allen, Juanita Allen, Tracy Eaton, Johnnie Grant, Shirlene Grant, Tyrone Jones, Claude McLemore, Sam Moore, Nicole Petty, Raymond Petty, Antonio Rycraw, Darletta Tabb, Brady Toliver, Cathy Toliver, Dr. Pablo Stewart, Dr. Daniel Martell and Professor Colin Gordon.  These documents present a dramatically more severe and clinically significant picture of the mitigating evidence and psychological conditions that confronted Mr. Allen in his developmental years.  It is very difficult to read these declarations now, learning what critical information we missed.  The physical and emotional abuse to which our client was subjected, as I suspected pre-trial, was severe.  It was visited upon him by both parents at various times.  Significantly, it was accompanied by repeated abandonment by his mother when she would force him to leave the family home and lock him out on the streets even as a young child.  As a child, he was subjected to his family members' drug abuse, extreme alcohol use, and exposed to inappropriate and illegal sexual behavior.  Dr. Martell's report leaves no doubt but that he suffers from brain damage.  Dr. Stewart's declaration places Mr. Allen's trauma-related impairments and behavior in their

proper context: secondary to a lifetime of neglect, abandonment, and physical abuse in the home, instead of the one shooting of Marquis Taylor that occurred in his teen years.

22.     We now know that Mr. Allen's was subjected to a life of unrelenting abuse which drove him from his home and into a life of drugs, quick fixes, and failures.   The declarations of his mother, his paternal uncle, and other witnesses that current counsel have supplied to me present a vivid set of facts of a child who really never had a chance.   In the many years I have been a mitigation specialist, the story of Billie Allen is one of the most compelling untold stories I have encountered.   My years of experience as a mitigation specialist tell me that this is precisely the type of evidence that can persuade a jury to see a capital defendant as less morally culpable, and to punish them with something other than death.   While this type of evidence obviously does not excuse criminal behavior, it certainly goes a long way to explaining it and helping the sentencer understand how a person can act out in such a way.   Had I been given the requisite amount of time to prepare and investigate, I am confident that I would have uncovered (if not the exact same evidence and themes), the type of mitigation narrative that current counsel have developed.   And there should be no doubt, that if I had uncovered this narrative, or a variation of it, I would have implored counsel to present it – and they would have done so.

**Randall Declaration**
**July 28, 2009**
**Page 18 of 20**

23.    Perhaps the one statement that most accurately synopsizes the failures of the defense team in this case are contained in Juanita Allen's declaration:

> Billie's lawyers at trial did not spend very much time with me at all. They would give me some basic information about the case, like when the next court date was. But they never really sat with me to hear my story. I told them some information, and they seemed to focus on the story about Marquise Taylor and the shooting. Had they spent more time with me, and asked about my background, problems and those of Billie's father, I would have told them. But, as I said, it is hard for me to discuss these topics. I only came to do so with Billie's current lawyers after spending many hours over many days with them. Billie's current lawyers have also asked me a lot of different types of questions, which have helped me to understand what information would be important to help Billie's legal case. Billie's trial lawyers were always so rushed and never seemed to have time for me or my family.

This statement says it all. Proper and thorough mitigation investigation takes a substantial amount of time expended over a reasonable period of time. I never had that time as a result of many adverse circumstances described above. As a result, we failed to uncover what current counsel have uncovered. There was a mitigation story to tell on Mr. Allen's behalf, and we failed to tell it.

24.     I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information and belief, subject to the penalties of perjury pursuant to 28 U.S.C. § 1746.

_David M. Randall, Ph.D._
David M. Randall, Ph.D.

Dated:          July 28, 2009
                Maui, Hawaii