## DECLARATION OF PABLO STEWART, M.D.
## PURSUANT TO 28 U.S.C. § 1746

I, Pablo Stewart, do hereby declare, affirm, and verify under penalty of perjury as follows:

### Scope

1.      I am a medical doctor and am Board Certified by the American Board of Psychiatry and Neurology.  I am a Clinical Professor in the Department of Psychiatry at the University of California, San Francisco School of Medicine.   I maintain both a clinical and forensic practice with a specialty in diagnosing and addressing the needs of trauma victims and those suffering with Posttraumatic Stress Disorder (PTSD).  I also have significant expertise in the treatment and management of trauma-related substance abuse.

2.      I have been engaged as an expert witness in a wide range of civil and criminal matters, including capital cases. I have been retained by the both the prosecution and the defense, and have been a court expert on multiple occasions in state and federal jurisdictions throughout the country, including in the military justice system.  I have served as a psychiatric consultant to government and private agencies on a variety of psychiatric and forensic issues.  With regard to capital matters, I am familiar with legal and psychiatric standards related to capital case mitigation.  My latest *curriculum vitae* is attached to this Declaration.  All opinions contained herein

Billie Allen v. United States of America,
No. 4:07-CV-27-ERW
Exhibit 20

are stated to a reasonable degree of medical and psychiatric certainty.

3.      I was retained by Billie Allen's current counsel to conduct a forensic evaluation of Mr. Allen in connection with his present court proceedings.  I was particularly asked to determine whether there were any mental health-related conditions, symptoms, or formal diagnoses that would be relevant in a capital sentencing context.  I was also asked to determine the presence or absence of any such conditions that may have been relevant to the charged criminal conduct.  Finally, I was asked to determine if there was any question as to Mr. Allen's competency at the time of trial and at the current time.

4.      As part of this evaluation, I reviewed the following materials:

- direct appeal opinion in United States v. Allen (8th Cir. April 12, 2001);

- transcripts of penalty phase testimony from Mr. Allen's trial;

- psychiatric evaluation conducted by Sean H. Yutzy, M.D. (March 2, 1998);

- psychological report of Daniel J. Cuneo, Ph.D. (February 16, 1998);

- neuropsychological evaluation by Michael M. Gelbort, Ph.D. and supporting raw neuropsychological testing data (February 8, 1998);

- neuropsychological and psychological report of Dr. Daniel Martell (June 30, 2009);

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 20

- neighborhood analysis and declaration by Colin Gordon, Ph.D.;

- school records for Mr. Allen and for his sisters, Nicole, Angela, and Yvette;

- psychiatric, pediatric, and other medical records for Mr. Allen; and probation records for Mr. Allen;

- transcript of testimony of Dr. Sean H. Yutzy in <u>Dykstra v. United States Bureau of Prisons</u>, 95-cv-3193 (W.D. Missouri) (May, 1997);

- declarations from the following individuals: Billy Wayne Allen, Juanita Allen, Nicole Petty, Angela Allen, Claude McLemore, Raymond Petty, Darletta Tabb, Cathy Toliver, Brady Toliver, Sam Moore, Antonio Rycraw, Johnnie Grant, Shirlene Grant, and Tyrone Jones.

5.      In addition to the above documents, I also interviewed a number of family members and friends of Mr. Allen in Saint Louis (some in person and some by telephone), including notably Juanita Allen and Billy Wayne Allen.

6.      Finally, my evaluation was based on an extensive two-day in person clinical interview with Mr. Allen at the United States Penitentiary at Terre Haute, Indiana on December 8 and 9, 2008.

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 20

### Relevant Background and Mental Health Information

7.      Mr. Allen is a 32-year old African American male who was convicted of murder and sentenced to death in federal court in Saint Louis, Missouri, in 1998. Billie Allen was the second of four children born to John ("J.R.") Allen and Juanita Petty Allen. Declarants report that Billie's entire life was marked by severe abuse and trauma. He has also been assaulted by environmental conditions; for example, while pregnant with Billie, his mother Juanita drank alcohol excessively and chain-smoked cigarettes. As a baby and young child, Mr. Allen suffered from asthma, lead poisoning, and febrile seizures. As young children, Billie and his three sisters were directly exposed to J.R. and Juanita's violent relationship, their sexual infidelity and promiscuity, and their severe substance abuse problems.

8.      Throughout his life, Mr. Allen was physically abused by Juanita, J.R., and other family members. Affiants and interviewed witnesses describe almost daily beatings in which Juanita would violently shake Billie, whip him with belts and extension cords, slap him, hit him with shoes, and throw objects at him. His uncle and grandfather would punch and whip Billie as well. Many of these beatings occurred without provocation or explanation, and coincided with frequent severe verbal abuse. When Mr. Allen was not being abused and beaten by his mother, he was assaulted by his father. Once the parents separated, Mr. Allen was also subjected to the harsh

conditions imposed upon him by his father and uncle and their life as drug addicts and drug dealers.

9.     Particularly after Juanita and J.R. separated, Juanita's ability and willingness to care for and nurture her son were severely tested. Unfortunately for Mr. Allen, as he grew from childhood into his teen years, his mother all but abdicated her significant maternal responsibilities. Saddled with her own addictions and mental health problems, she took out many of her frustrations on Mr. Allen. She banned him from the home for long periods of time, even at night when he was only 10 or 11 years old. Such abandonment of a child by a parent can have long-lasting and durable psychological impacts on the child. In Mr. Allen's case, the abandonment, abuse, and family dysfunction had such an impact.

10.     Abandonment is a significant theme in Mr. Allen's history. In addition to the many times he was put out of his house, there was an incident that pre-dated the offense by a short time, during which he was thrown out of the maternal home, ostensibly for good. This final act of maternal abandonment occurred just after the home was shot-up in January 1997 in apparent retaliation for Mr. Allen cheating somebody in a drug deal. This final act of abandonment preceded a particularly severe decline, during which Mr. Allen was suicidal and actually made efforts to seek mental health intervention. Then, just a few nights before his arrest, Mr. Allen

returned to the home and pleaded unsuccessfully to be let back in. That this act of abandonment came shortly before the bank robbery is of great significance from a clinical and forensic perspective.

11.    Also notable in Mr. Allen's history is the fact that he was raised in a crime-ridden, poverty-stricken neighborhood in the north side of St. Louis. He witnessed his first of several shootings before he was old enough to attend school. When he was banned from his home, even as a child, he was forced to fend for himself in what was essentially a war zone.

12.    I spent some time in Billie's neighborhood, the Greater Ville, when working on this case. Despite the fact that I was there in the daylight, and despite my military background, I was genuinely scared for my safety. It looks like a bombed out war zone. With the many vacant, crumbling properties, empty lots, and boarded-up businesses, the neighborhood has a feeling of extreme abandonment by mainstream society. I have reviewed the Declaration and Neighborhood Analysis by Dr. Colin Gordon, and his objective data serves to confirm the atmosphere I sensed immediately in Billie's neighborhood. The poverty, unemployment rate, hyper-segregation, as well as the violent crime rates, low educational attainment, single parent families, and child abuse in the neighborhood combined to create an environment posing singular risks to Billie's development.

13.    Certainly, as discussed in this Declaration, it is significant that many of the risk factors identified in Billie's neighborhood played out in his own family and/or his own experience. He directly experienced prenatal toxins, child abuse, neglect, lead poisoning, poverty, gun violence, gang violence, the drug trade, and being raised by a single mother. In Billie's case, these particular experiences were compounded by the fact – illustrated in Dr. Gordon's maps – that he was literally surrounded by peers and adults undergoing similarly traumatic experiences, and he was geographically and socially isolated from stabilizing influences and from communities with greater social capital.

14.    According to declarants, neither J.R. – who was an unemployed drug addict for most of Mr. Allen's life – nor Juanita provided Billie with the basic love, nurturing, and support that is crucial to a child's emotional and psychological development. In short, Billie Allen suffered a traumatic childhood that had profound psychological consequences, and he did not have the support system necessary to overcome the harmful effects of his trauma.

15.    The devastating adverse mental health effects of being subjected to such a traumatic childhood are well established. As discussed below, Mr. Allen exhibits the full constellation of symptoms typically seen in survivors of severe childhood abuse. Children who are forced to endure such trauma are left with long-term

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 20

debilitating psychological impairments. They are likely to have adjustment difficulties in a number of areas, including behavior problems and disorders in cognitive and emotional development. They are likely to feel guilty for failing to stop the violence, and to feel angry because others failed to protect them. Their ability to trust others may be severely compromised. They may become paranoid and suspicious. They often have difficulties with interpersonal relationships, their ability to relate in healthy ways to others is impaired, and they frequently become socially isolated. They are likely to feel very dependent on others while, at the same time, their relationships are unstable. They tend to have self-image problems and poor self-esteem. They are more likely to have poor judgment and poor impulse control, often behaving in self-destructive ways. They have problems recognizing, verbally expressing, and coping with their own emotions. They frequently suffer from depression, shame, despair, and anxiety. They may suffer from Posttraumatic Stress Disorder and are prone to develop Borderline Personality Disorder. They have greater difficulty understanding their place in the world and a more limited ability to cope with the ordinary problem solving needed for daily living. Their compromised ability to trust others, and their overall levels of suspiciousness and guardedness, may prevent them from obtaining mental health treatment, often until their symptoms become completely debilitating and acute. Such individuals are at significantly higher risk for

substance abuse and addiction.

16.     Children learn adult roles and behaviors by observing and interacting with adults. In a chaotic, violent, and neglectful home, the child learns that the world is a frightening and unpredictable place. They come to see the world as populated by people who alternately mistreat and ignore you, harm and abandon you. They are taught that violence and aggression are normal and acceptable means of problem solving. Children from violent and dysfunctional homes frequently develop cognitive deficits in the processing of social information, including failure to attend to relevant cues, a tendency to attribute hostile intentions to others, and failure to develop competent ways of solving interpersonal problems. Exposure to violence and abuse make children experience heightened arousal and hypervigilance, effects that often persist into adulthood. The abused child is often unable to react normally to stressors, but will hyper-react and be unable to properly control these reactions. Because their brains have been flooded with stressors since an early age, they may live in a permanent state of arousal, fear, and anxiety. Abuse causes particularly severe hypervigilance when it is unpredictable and recurrent. Such abuse has a physiological as well as a psychological impact on its victims.

17.     The harmful effects of childhood trauma are exacerbated where the child is abused by close family members. Children, of course, rely on family members for

guidance, support, and safety. When family members instead abuse and neglect a child, the child's emotional and cognitive impairments are significantly magnified. The effect is greater still when a child is abandoned by his ostensible care-giver, as was the case when Mr. Allen was repeatedly locked out of his mother's home from a young age. The impact of these actions on Mr. Allen's psychiatric pathology cannot be understated.

18.    Family, friends, and others who knew Billie describe him as a boy who constantly lived in a fantasy world to avoid dealing with the pain of his life. He lived his life in a nearly constant state of fear. He was emotionally fragile and frequently broke into tears. He latched on to anyone who would spend time with him, was easily manipulated, and was taken advantage of by his peers. School records and teachers indicate cognitive and intellectual impairments, including low scores on standardized testing, failing grades, and difficulty concentrating. Also, consistent with children raised in dysfunctional, violent homes, Billie began using and abusing marijuana.

19.    All of the harmful effects of childhood trauma are also magnified in children who suffer from underlying brain damage. At trial, Mr. Allen's counsel sought to present evidence of "possible brain damage," and the testimony, report, and data of Michael Gelbort, Ph.D., indicated that Mr. Allen had impairments "consistent and indicative of front [sic] lobe dysfunctions." These tentative opinions have now

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 20

been confirmed and amplified by the recent testing of Daniel Martell, Ph.D., who administered a comprehensive battery of neuropsychological measures and concluded that Mr. Allen has "Dementia due to Multiple Etiologies" and "brain damage that impacted his neurobehavioral functioning in multiple areas."

20.    Such brain damage itself can cause increased impulsivity, self-destructive behavior, depression, and substance abuse.  When combined with the trauma of childhood abuse, these effects become even more pronounced and the conduct of the subject even more erratic, unpredictable, and pathological. Brain damage likewise undermines a child's ability to cope with and overcome the effects of trauma.

21.    In his clinical interview, Mr. Allen presented as an individual who avoids painful topics to the point of dissociating.  He is highly invested in appearing mentally healthy and thus dissociates from reality and "fakes good" in order to meet this need. He is concrete in his thinking and has difficulty discerning reality from fantasy.

**Clinical Diagnoses**

22.    Based upon all of the above, it is my opinion to a reasonable degree of psychiatric certainty that Mr. Allen has the following diagnoses:

Axis I:    Posttraumatic Stress Disorder, Chronic
Dementia, Due to Multiple Etiologies
Major Depressive Disorder, Recurrent
Substance Abuse (alcohol, cannabis), in Sustained, Full Remission
in a Controlled Environment; Rule Out Substance Dependence

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 20

Axis II:      Borderline Personality Disorder

Axis III:     Asthma

23.    Posttraumatic Stress Disorder is a severe, debilitating and, when untreated, chronic psychiatric impairment. The diagnostic criteria for PTSD are: (1) exposure to a traumatic event; (2) persistent re-experience of the traumatic event; (3) persistent avoidance of stimuli associated with the trauma and numbing of general responsiveness; (4) increased arousal; (5) symptoms lasting more than 1 month; and (6) significant resulting distress or impairment in important areas of functioning. Billie Allen meets all of these diagnostic criteria. Even if one wished to quibble over a formal diagnosis of PTSD, however, there is no question but that the severe abuse and violence he suffered and witnessed throughout his childhood had a profound and lasting impact on his brain and his behavior, consistent with the harmful effects of trauma discussed in detail above.

24.    Billie Allen has long suffered from chronic PTSD as a result of the severe physical abuse he suffered as a child at the hands of his mother and other family members. These recurrent episodes of physical abuse were the traumatic events underlying his PTSD, and his response to the abuse involved feelings of intense fear, helplessness, confusion, and despair. His witnessing of physical violence between his parents and on the street (including witnessing a number of shootings) represent

Billie Allen v. United States of America
Case: 4:07-cv-00027-ERW    Doc. #: 94-27    Filed: 08/14/09    Page: 13 of 28 PageID
No. 4:07-CV-27-ERW    #: 964
Exhibit 20

additional significant traumatic events in his life.

25.    Mr. Allen evidenced persistent re-experiencing of the traumatic physical abuse through unwanted, intrusive thoughts and nightmares; dissociative flashbacks; and intense psychological distress and physiological reactivity when exposed to reminders of the trauma. His dissociative flashbacks were evident during my clinical interview. When forced to recall and relive the severe physical abuse and neglect of his childhood, he frequently became lost in thought, emotionally absent, and displayed great difficulty focusing his attention on those memories. His severe distress and reactivity were apparent in the clinical interview and are also demonstrated by various witnesses' descriptions of his susceptibility to severe anxiety, his childhood tearfulness, and his extreme startle response to unexpected noises and stimuli.

26.    Mr. Allen's persistent avoidance of stimuli associated with the trauma are demonstrated by his well-documented history of "faking good" and dissociating from painful experiences. Repeated and severe trauma caused his mind to literally believe that the trauma was not happening. In this context, dissociation protected Mr. Allen from the reality of the physical and emotional agony inflicted upon him; his dissociation acted as a psychological wall. Mr. Allen's dissociation is remarkable because, from an early point in his childhood, it solidified into an apparently constant barrier that protected and prevented him from consciously experiencing deeply painful

things – including, to be sure, the abuse itself, but also the extreme poverty in which he lived, his own limited abilities and opportunities, his social isolation among peers, and so forth. Mr. Allen also demonstrates persistent avoidance through his sense of a foreshortened future and related self-destructive behavior; his extreme emotional and social isolation, detachment, and estrangement; his limited range of affect and numbing of emotion; and his marijuana and alcohol abuse, which aided his efforts to avoid emotions and memories related to his trauma.

27. As various records and declarants demonstrate, since childhood, Mr. Allen has also displayed persistent increased arousal in his difficulty maintaining focus and attention; his hypervigilance and anxiety; his frequent restlessness; and an extremely exaggerated startle response. His abuse of marijuana was one attempt he made to self-medicate these PTSD symptoms. Indeed, studies show that close to ninety percent of people suffering from PTSD also suffer from substance use related disorders.

28. There is no question that Mr. Allen's PTSD symptomology has lasted for more than a month – in fact, it dates to his early childhood years. Likewise, there is no question that his PTSD caused significant functional impairments in Mr. Allen's school performance, work history, and family and social relationships.

29. Depression is also a debilitating major mental illness that can and does

have a profound impact on those it afflicts. Individuals with depression are overwhelmed by feelings of hopelessness and despair, have difficulty concentrating on important matters, and may suffer from sleep disorders. Symptoms include sadness, loss of interest or pleasure in nearly all activities; changes in appetite, weight, sleep, and psychomotor activity; decreased energy, tiredness, or fatigue; feelings of worthlessness and guilt; difficulty thinking, concentrating, or decisionmaking; and clinically significant distress or impairment in social, occupational, or other important areas of functioning. Depression in adolescents significantly increases the likelihood of developing substance-related disorders. Moreover, the incidence of clinical depression is quite high in persons suffering from PTSD and/or its symptoms.

30.    Mr. Allen meets the diagnostic criteria for Major Depressive Disorder, Recurrent. As a result of his traumatic and chaotic upbringing, Mr. Allen struggled with depression from a very young age. As a young child, he displayed such symptoms as apathy, tearfulness, insomnia, anxiety, and phobias. As an adolescent, he had a history of suicide attempt, self-destructive behavior, and marijuana and other substance abuse. Dr. Martell's psychodiagnostic testing confirmed that Mr. Allen suffers from symptoms of an Affective Disorder, specifically Major Depression or Bipolar II Disorder. Mr. Allen's depression long predated the offense in this case, but was severely exacerbated in the months directly preceding the offense, as related in

detail below.

31.    Mr. Allen also displays cognitive deficits including impairments to memory and executive functioning indicative of Dementia, as found in Dr. Martell's report. Mr. Allen displays poor judgment, poor insight into his own impairments, and is unable to realistically assess his life, his abilities, or his relationships. Mr. Allen's dementia derives from some combination of his trauma, brain damage, lead poisoning, and prior marijuana and alcohol abuse.

32.    Mr. Allen has a history of marijuana abuse that is in remission due to his incarceration. His marijuana abuse began early in his teen years and soon escalated to an almost daily habit. As is common for people in Mr. Allen's cohort, who turn to drugs and alcohol to alleviate the depression and anxiety he experienced as a result of his trauma, abandonment, and brain damage, Mr. Allen became a chronic substance abuser. Indeed, drug abuse and dependence is typical of children who have been exposed to far less traumatic circumstances than the abuse, neglect, abandonment, chaos, and insecurity inflicted on Billie. Further, people suffering from Borderline Personality Disorder and/or PTSD suffer from high rates of substance abuse. Billie's marijuana abuse was yet another factor that impaired his judgment and decision-making ability and undoubtedly intensified the effects of his other mental disorders.

33.    Borderline Personality Disorder is generally considered to be the most

profound of the personality disorders. Individuals with Borderline Personality Disorder are severely dysfunctional. For an individual who suffers from Borderline Personality Disorder, the fear of impending abandonment or rejection, or the loss of external structure, can lead to profound changes in self-image, affect, cognition, and behavior. The perception of impending loss or abandonment can produce sudden uncontrolled despair, anger, or paranoia. Individuals with Borderline Personality Disorder therefore show a pervasive pattern of instability in interpersonal relationships and self-image, and their impairments cause marked impulsivity that can begin by early childhood. Dissociative episodes and impulsive behavior can frequently occur. Especially when under stress, Borderline individuals may experience psychotic symptoms such as paranoid ideation, hallucinations, and dissociative symptoms. The most common pattern of Borderline Personality Disorder is one of chronic instability with episodes of serious affective and impulse dyscontrol.

34. Mr. Allen meets the diagnostic criteria for Borderline Personality Disorder, and his childhood and upbringing reflect the dysfunction and abandonment that characterizes the history of those who suffer from the disorder. He repeatedly experienced cruel and inexplicable abandonment. His mother locked him out of the house overnight and for days at a time from an early age. At other times, she simply left young Billie and his sisters to fend for themselves alone for days. Even when she

was at home with him, she was usually drunk, disengaged, and abusive. Thus, although present physically, she was emotionally absent. Mr. Allen found his mother's behavior confusing and devastating. There was no consistency or predictability in what would cause her to become enraged. Billie could not anticipate what would precipitate a beating or what he could do to please her. From a very young age, Billie therefore lived in a state of constant fear and emotional solitude.

**Forensic Opinions**

35. Mr. Allen's current counsel asked that I address a number of forensic issues. There is no question but that Mr. Allen's history of abuse, trauma, brain damage, with resultant substance abuse and chronic depression, and the diagnoses listed above, are commonly considered mitigating in capital sentencing and are typically offered at trial when they are found to exist. My review of Mr. Allen's background, documents, and penalty phase transcripts shows that such evidence was available, but was not fully presented to the jury. The information existed upon which to present a coherent and uncontradicted mitigating profile of Mr. Allen, but the record shows it was not before the jury.

36. It is well accepted in the field of forensic mental health in capital cases that, where a defendant was the childhood victim of serious physical abuse, such trauma is a powerful vehicle for presenting the defendant as a human being worthy of

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 20

empathy and compassion. The mitigation is even more powerful when, as in Mr. Allen's case, the underlying childhood trauma leads directly to debilitating psychiatric illnesses which contributed to and help explain the criminal behavior for which a defendant was convicted. Indeed, Mr. Allen's already severe psychiatric illnesses intensified in the weeks and months before his arrest and sent him into a profound psychiatric crisis.

37.   For reasons about which this examiner can only speculate, the jury heard only a small sample of the above-described mitigating evidence. Instead of capitalizing on the mitigating value of Mr. Allen's deplorable upbringing and resultant mental illness, the jury was told by Mr. Allen's lawyers that "[t]he testimony will show that Billie has and had a loving family," that Billie was taught "good values" at home, and that Juanita was a "caring" mother. This starkly inaccurate picture suggested that Mr. Allen was given a full opportunity to develop into an emotionally and psychologically healthy young adult, and that he simply chose not to do so. This picture directly conflicts with his history as an innocent childhood victim of violence and neglect in the home and with the resulting severe psychiatric impairments over which he had no control and for which he never received treatment.

38.   I have also noted another flaw in the defense's presentation of Mr. Allen's relevant history and illnesses. Although the defense correctly presented that

Mr. Allen suffered from PTSD, the defense misidentified and incorrectly limited the precipitating trauma. The defense expert opined that the trauma causing the PTSD was the shooting death of Mr. Allen's friend, Marquise Taylor. While the mental health effect of witnessing such a violent, unpredictable and sudden event cannot be overstated, this was hardly the only, earliest, or most damaging trauma visited upon Mr. Allen.

39. This flaw was reflective of the lack of comprehensive information in possession of the mental health experts who evaluated Mr. Allen for PTSD – Drs. Gelbort, Cuneo, and Yutzy. There were hampered by the absence of any background information shedding light on the severe abuse and neglect that Mr. Allen suffered beginning in early childhood. Based on my review of their reports and testimony, it appears that these experts were not provided with adequate information on Mr. Allen's PTSD symptomology predating Marquise Taylor's death; were not provided with information demonstrating Mr. Allen's history of childhood physical abuse; and, given Mr. Allen's penchant for "faking good," could not expect Mr. Allen to volunteer such information unprompted.

40. A stark example of the inaccurate and incomplete picture presented of Mr. Allen at trial appears during the testimony of Drs. Yutzy and Gelbort. Medical records reflect that in April 1985, when Billie was just 7 years old, he received

emergency medical treatment for a head injury. The records indicate that Mr. Allen suffered a laceration on the back of his head when he "fell on gate." At trial, Drs. Yutzy and Gelbort testified that Mr. Allen suffered this injury while "boxing with his uncle" after stepping backwards and slipping on the grass. However, declarations provided by current counsel demonstrate that in fact the injury was suffered while being beaten by his uncle, Jerome Petty. The declarations also reflect that Jerome Petty was 21 years old at the time he was supposedly "boxing" with 7-year old Billie. The episode is significant for several reasons. First, Juanita, who took Billie to the hospital for the injury, did not report the beating but instead apparently covered up the beating by describing it as an accident to hospital personnel. Second, despite being asked about this incident by Drs. Yutzy and Gelbort, Mr. Allen's description of the episode as a 7-year old child "boxing" with a 21-year old sheds light on his dissociation and his inability to draw clear distinctions between fact and fiction.

41.    One of the criteria for diagnosing PTSD is the presence of significant resulting distress or impairment in important areas of functioning. Because of the lack of a comprehensive view of Mr. Allen's life and trauma, the defense experts were compromised when they were asked to explain why Mr. Allen's functioning deteriorated **prior** to the Marquise Taylor shooting. From a mental health perspective, this could have been easily answered – the Taylor shooting was not the precipitating

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 20

trauma that caused the PTSD. Rather, Mr. Allen's PTSD derives from his life-long exposure to trauma, violence, and abandonment. But the government used Mr. Allen's lifelong history of poor achievement to undercut the defense claim that Marquise Taylor's death sent Mr. Allen into a downward spiral of depression and PTSD.

42.     In another respect, the trial evaluators failed to note the significant issues of abandonment to which Mr. Allen was subjected, and their impact on his overall mental health deficits. Unaware of the series of childhood abandonments, the evaulators were not able to appreciate the significance of the events occurring in the two months before Mr. Allen's arrest. In January 1997, drug dealers sprayed his family's house with gunfire and threatened to kill him. That resulted in what was literally his mother's final act of abandonment: he was locked out of his house, and his mother refused to speak to him. This rendered him homeless. Given his intense fear of abandonment secondary to his Borderline Personality Disorder, and his heightened sensitivity to trauma secondary to his PTSD, these events triggered severe depression and dissociation. By February, he was contemplating suicide and had at least one suicide attempt. By March, as reported to Dr. Yutzy, Mr. Allen had lost his appetite, was perceiving that he was about to break through in the music recording industry (of which there is no evidence), and was in a increasingly good mood – all

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 20

suggestive of euphoric dissociation and possible mania. Information collected by current counsel further indicates that just a few days before his arrest, Mr. Allen tried for the final time to return home, but was turned away by his family. In short, his impairments, his personal history, and external events combined to propel Mr. Allen into a period of extreme psychiatric crisis. Yet, in the absence of relevant historical information, the trial experts were unable to place the 1997 shooting incident into proper context.

43. Similarly, the government challenged Drs. Cuneo and Gelbort with evidence that Mr. Allen did not exhibit the PTSD symptom of "persistent avoidance" because he returned to the scene of Marquise Taylor's death and failed to avoid other reminders of the shooting, also undercutting the defense theory that Marquise Taylor's shooting was a uniquely traumatic event in Mr. Allen's life. Dr. Yutzy similarly relied on this behavior to dispute that Mr. Allen suffered from PTSD at all. However, Mr. Allen's decline, it is now clear, was a lifelong process secondary to the severe abuse and neglect he suffered at home. Given that he was alternately abused at home and kicked out to survive on the violent streets, it was impossible in a literal sense for him to avoid – persistently or otherwise – threatening places and situations. Instead, his only means of persistently avoiding the trauma of his life was by dissociating from reality, and numbing his psychic pain through drugs, which he did, as discussed in

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 20

detail above.

44.    In another area of misunderstanding based upon a lack of relevant historical information, the jury heard extensive testimony about Mr. Allen's pattern of exaggerating, fantasizing, and lying.  However, the jury did not learn that this behavior was a symptom of Mr. Allen's Dementia and of the trauma and brain damage underlying it.  The dissociative  aspects of Mr. Allen's trauma, brain damage, and mental illnesses were mischaracterized as him being a liar.  To the contrary, Mr. Allen's Dementia and dissociation caused him to sincerely confuse his imagination with his memory and perceptions.  Mr. Allen had great difficulty differentiating between fiction and reality and came to inhabit a world of fantasy.  I have worked with thousands of trauma victims in my professional career, and such dissociation and impairment in discerning fact from fantasy are hallmarks of severely abused and traumatized people.  Because the evidence suggested that Mr. Allen lived in a fantasy world since early childhood, the defense's psychiatric profile (that Mr. Allen began suffering from PTSD only after witnessing Marquise Taylor's death as a 16-year old) was again undermined by failing to make the basic connection between his dissociation and his trauma and PTSD.

45.    In the absence of evidence about Mr. Allen's abusive upbringing, the prosecution succeeded in establishing that, because Mr. Allen's psychiatric symptoms

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 20
Case: 4:07-cv-00027-ERW    Doc. #: 94-27    Filed: 08/14/09    Page: 25 of 28 PageID #: 976

did not significantly change after the shooting of Marquise Taylor, a PTSD diagnosis could not reliably be traced to that incident. Indeed, Mr. Allen's counsel even argued to the jury that Mr. Allen "may or may not" have PTSD, and, understandably, the jury was unanimous in subsequently rejecting PTSD as a mitigating factor. It is now clear, however, that Marquise Taylor's shooting occurred many years after Mr. Allen began suffering the severe physical abuse that prompted the onset of his PTSD. As a result, the jury was not provided with any insight into the traumatic experiences that most profoundly damaged and shaped Mr. Allen.

46. I also wish to comment on Dr. Yutzy's report and testimony disputing the diagnosis of PTSD, which suffered from two basic flaws. First, in his report on Mr. Allen and in his testimony at trial, Dr. Yutzy stated that PTSD "is essentially a subjective diagnosis" and that he "normally would not" interview a patient's family members, teachers, or friends as part of an evaluation. Dr. Yutzy further stated that, because a PTSD diagnosis depends on the individual's reporting of symptomology, and because he had significant concerns about Mr. Allen's reliability, he was unable to diagnose Mr. Allen with PTSD. Dr. Yutzy's underlying assumptions are incorrect. A PTSD diagnosis does not depend on the reliability of subjective reporting. Indeed, in Mr. Allen's case, his behavior of "faking good" is a basic symptom of his trauma, but of course inhibits him from presenting a full and accurate picture of his own

history. In such cases, it is necessary and appropriate to rely on other witnesses who can describe Mr. Allen's trauma and symptomology, and this practice is widely accepted in the practice of psychiatry. Dr. Yutzy's refusal to consider such information makes it impossible for him to accurately diagnose a patient like Mr. Allen.

47.    The second basic flaw in Dr. Yutzy's approach is that he does not even believe in the validity of PTSD and other psychiatric diagnoses, despite his training and certification as a psychiatrist. At trial in May of 1997 in the case of Dykstra v. United States Bureau of Prisons, Dr. Yutzy testified that most of the diagnoses and labels established by the Fourth Edition of the Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), including PTSD, are not valid and are not reliable diagnoses. His views on the DSM-IV, the most widely accepted text in American psychiatry, are far outside the mainstream of psychiatry and are highly questionable. In having such a radical bias against a widely accepted, extensively researched, and well-documented diagnosis like PTSD, Dr. Yutzy was severely handicapped in his ability to reliably evaluate trauma victims like Billie Allen, and his conclusions must be viewed with skepticism.

48.    His current counsel has also asked me to assess Mr. Allen's competency. Retroactive competency determinations are inherently difficult. It is clear based on the

information I have reviewed that his many significant cognitive and emotional impairments limited Mr. Allen's ability to appreciate the gravity and seriousness of his trial proceedings and likewise limited his ability to assist counsel. That Mr. Allen would have decompensated while under stress, as part of his multiple deficits, means that his ability to understand and cooperate was further compromised. Nonetheless, I am unable to confidently opine to a reasonable degree of medical and psychiatric certainty that he was incompetent at the time of trial or that he is currently incompetent, although I can say that his overall mental health profile certainly raises questions about his competency to proceed at trial. I would add that during the forensic interview Mr. Allen appeared competent to understand and assist his current counsel.

49.    Each of the opinions contained in this declaration was procurable at the time of Billie Allen's trial. Indeed, the records and testimony presented at trial contained multiple "red flags" for further investigation and evaluation of Mr. Allen's history of childhood physical abuse and the cognitive and emotional impairments he suffered as a result. As a matter of sound forensic and clinical practice, I would not be able to render these opinions without having the background information provided by current counsel regarding Mr. Allen's extensive history as a victim of physical abuse, and without conducting an in person evaluation of the patient with at least a basic

understanding of this information in hand. Had counsel come to me pre-trial with indications of childhood physical abuse, I would have recommended a full forensic work-up, including face-to-face forensic interviews with Mr. Allen, his family members, teachers, and friends, appropriate testing, and record review.

50.    I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information and belief, subject to the penalties of perjury pursuant to 28 U.S.C. § 1746.

_____
Pablo Stewart, M.D.

Dated:    July 15, 2009