Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 49B

murderers who will receive the death penalty: only the information categorized as aggravating factors may be considered by the jury in its sentencing determination.  Defining what constitutes criminal conduct and setting appropriate sanctions for that conduct is a quintessential legislative function.  See Whalen v. United States, 445 U.S. 684, 689 (1980) ("[S]pecifying the circumstances under which someone may be put to death must . . . be a function of the elected representatives of the people").  It seems clear, then, that the empowerment of Government attorneys to define and charge non-statutory aggravating factors is a delegation of legislative authority.

The delegation effected by § 3592(c) is not governed by an intelligible principle.  The statute sets forth no parameters for Government lawyers to consider in their formulation of aggravating factors.  It fails to identify any policy goals or general considerations that could serve to confine unchecked prosecutorial discretion.  Rather, § 3592(c) invites the prosecution to rewrite the statutory list of aggravating factors to justify the imposition of a death sentence on a case-by-case basis.

This flaw stands out in stark relief when the present delegation of legislative power is contrasted to the delegation of authority to formulate

53

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 49B

sentencing guidelines which passed constitutional muster in Mistretta. There Congress had clearly delineated the goals to be achieved, the policy behind the goals, and the boundaries of the delegated authority. Congress specified mandatory ratios among sentences for related crimes, listed specific guidelines that the sentencing commission was to consider in categorizing offenses, and directed the commission to use current average sentences as a starting point for its discussion. Mistretta, 488 U.S. at 374-77. Here, on the other hand, except by negative inference, Congress has provided no guidance or limitations whatsoever to guide prosecutors in their formulation of potential aggravating factors.

### c. Violation of Ex Post Facto Clause

The Constitution provides that "[n]o ex post facto law shall be passed." U.S. Const. art I., § 9, clause 3. The constitutional prohibition of ex post facto laws is violated by a punitive measure which is retrospective in its application and which places an affected person at a disadvantage. United States v. Allen, 886 F.2d 143, 145 (8th Cir. 1989) (citing Miller v. Florida, 482 U.S. 423, 430 (1987)). The test for retrospective application is whether the measure applies "to events occurring before its enactment." Id. Disadvantage for ex post facto purposes may consist of "increasing the

54

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 49B

punishment of the crime." United States v. Comstock, 154 F.3d 845, 848 (8th Cir. 1998).

Section 3592 allows the prosecution to invent aggravating factors which are not identified in the Federal Death Penalty Act and which will be applied retroactively to crimes committed prior to their formulation. The act thus violates the Ex Post Facto Clause by authorizing the Government to make up and employ non-statutory aggravating factors which augment the punishment for a crime after its commission. Beazell v. Ohio, 269 U.S. 167, 169 (1925); see Lindsey v. Washington, 301 U.S. 397 (1937) (Ex Post Facto Clause violated by statutory change from discretionary to mandatory death penalty).

d.  Improper Allowance of "Information" Rather Than "Evidence"

The death penalty act provides for the questions of eligibility for capital punishment and the appropriateness of execution in a particular case to be determined at a sentencing hearing. 18 U.S.C. §§ 3591(a) and 3592(e). In order to pass constitutional muster, the factual predicate supporting death eligibility must be established in accordance with valid evidentiary rules, Cabana v. Bullock, 474 U.S. 376, 391 (1986), and the sentencing procedures must ensure the reliability of a determination that

55

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 49B

death is the appropriate penalty. Johnson v. Mississippi, 486 U.S. 578

(1988). The Supreme Court has emphasized:

> "[T]he penalty of death is qualitatively different from a sentence of imprisonment, however long. Death in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding need for reliability in the determination that death is the appropriate punishment in the specific case."

Woodson v. North Carolina, supra, 428 U.S. at 305; see also Lowenfield v.

Phelps, 484 U.S. 231, 238-39 (1988) (quoting Lockett v. Ohio, 438 U.S. 586,

604 (1978)).

The federal act stands this concern for greater reliability in capital

sentencing on its head, and then bounces it a time or two. Section 3593(c)

features evidentiary standards which effectively diminish the degree of

sentencing reliability in capital prosecutions:

> "At the sentencing hearing, information may be presented as to any matter relevant to the sentence, including any mitigating or aggravating factor permitted or required to be considered under section 3592. Information presented may include the trial transcript and exhibits if the hearing is held before a jury or judge not present during the trial, or at the trial judge's discretion. The defendant may present any information relevant to a mitigating factor. The government may present any information relevant to an aggravating factor for which notice has bee provided under subsection (a). Information is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials except that

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 49B

> information may be excluded if its probative value is
> outweighed by the danger of creating unfair prejudice,
> confusing the issues, or misleading the jury."

18 U.S.C. § 3593(c) (emphasis added). The statute contemplates an evidentiary free-for-all at the penalty trial, subject only to a modified Fed.R.Evid. 403 standard of exclusion. And thereby Congress thumbed its nose at a basic tenet of modern American death penalty jurisprudence.

Another Court of Appeals has explained: "The sentencing phase of a death penalty trial is one of the most critical proceedings in our criminal justice system." Lesko v. Lehman, 925 F.2d 1527, 1541 (3rd Cir. 1991). For this reason, the Supreme Court has emphasized the constitutional importance of capital sentencing procedures which require the jury's decision to be strictly "rooted in the aggravating and mitigating evidence introduced during the penalty phase." California v. Brown, 479 U.S. 538, 542 (1987) (emphasis added); see also Gardner v. Florida, 430 U.S. 349, 357-69 (1977) (opinion of Stevens, Stewart, and Powell, JJ.) (recognizing that capital sentencing proceedings require substantially more stringent procedural safeguards than routine sentencing).

The present statute plainly fails to perform the constitutionally required task of "confin[ing] the jury's deliberations to considerations

57

arising from the <u>evidence</u> presented, both aggravating and mitigating." Id., at 543 (emphasis added). The pointed congressional degradation of evidentiary requirements at the penalty phase of capital trials may radiate political moxey, but it is a cancer on the Constitution.

e. Failure to Provide for Proportionality Review

"[P]roportionality review presumes that the death sentence is not disproportionate to the crime in the traditional sense. It purports to inquire instead whether the penalty is nonetheless unacceptable in a particular case because it is disproportionate to the punishment imposed on others convicted of the same crime." <u>Pulley v. Harris</u>, 465 U.S. 37, 43 (1984). Although proportionality review is not constitutionally required in all capital sentencing schemes, Eighth Amendment jurisprudence mandates proportionality review in statutes which permit a jury to weigh non-statutory aggravating factors in deciding whether to impose a death sentence. <u>See Gregg v. Georgia, supra,</u> 428 U.S. at 187. The Federal Death Penalty Act of 1994 requires juries to weigh aggravating and mitigating factors and permits the Government to formulate non-statutory aggravating factors, but does not provide for proportionality review. 18 U.S.C. § 3591, <u>et seq.</u>

Under sentencing schemes which require weighing and permit the charging of non-statutory aggravating factors, proportionality review serves the salutary purpose of detecting arbitrary imposition of the death penalty which inevitably will result from a prosecutor's virtually limitless discretion to formulate new rationales for execution. Id., 428 U.S. at 198 (with proportionality review, "[n]o longer should there be 'no meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not'") (quoting Furman, 408 U.S. at 313) (White, J., concurring)). In Gregg, the Supreme Court rejected an Eighth Amendment challenge to Georgia's capital sentencing procedure. That procedure narrowed the category of persons eligible for the death penalty by requiring that the sentencer find the existence of at least one statutory aggravating circumstance before imposing a death sentence. In the opinion announcing the judgment of the Court, three Justices determined that the statute's procedures sufficiently minimized the risk of arbitrary and capricious decisions to execute. That determination was premised in part upon the requirement that the sentencer find at least one aggravating factor. The opinion, and a separate concurrence by three additional Justices, placed significant reliance also on the statutory

59

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 49B

requirement of comparative proportionality review to prevent inconsistency in sentencing. Id., at 198, 204-06 (opinion of Stewart, Powell, and Stevens, JJ.); Id., at 222-24 (White, J., concurring, joined by Burger, C.J., and Rehnquist, J.).

The Georgia statute was challenged again in Zant v. Stephens, 462 U.S. 862 (1983). The Court reiterated the importance of proportionality review as a safeguard against arbitrary sentencing. The questioned statute did not provide for the weighting of aggravating factors against mitigating factors, but rather used the finding of an aggravating factor only to narrow the class of persons convicted of murder who would be eligible for the death penalty. Id., at 874. The defendant argued that the limited purpose served by a statutory aggravating circumstance under that statute allowed a sentencing jury the unbridled discretion which had been forbidden by Furman v. Georgia, supra, and its progeny. The Court rejected that argument, relying again on the state's proportionality review as one of the two features necessary to satisfy the principles which had been enunciated in Furman:

> "The approval of Georgia's capital sentencing procedure rested primarily on two features of the scheme: that the jury was required to find at least one valid statutory aggravating circumstance and to identify it in writing, and that the State

60

> Supreme Court reviewed the record of every death penalty proceeding to determine whether the sentence was arbitrary or disproportionate. These elements, the opinion concluded, adequately protected against the wanton and freakish imposition of the death penalty."

Id., at 876.

In contrast to the Georgia statute considered in Gregg and Zant, the federal death penalty act does not require any sort of proportionality review by any court. Although proportionality review is not required in capital sentencing schemes that confine prosecutors to the use of aggravating factors formulated by the legislature, Pulley v. Harris, supra, 465 U.S. 37 (1984), the omission of such review is a vital flaw in a statute which allows the prosecution to formulate its own non-statutory aggravating factors and thus enables arbitrary and disproportionate capital sentencing. Where such a broad spectrum of evidence and argument in support of execution is permitted, proportionality review is necessary "to ensure that the sentence of death in a particular case is not disproportionate." Gregg, 428 U.S. at 198.

f. Failure to Provide for Adequate Appellate Review

The Supreme Court has made clear the "crucial role" that "meaningful appellate review" plays in ensuring that the death penalty is

61

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 49B

not imposed in an arbitrary or irrational manner. Parker v. Dugger, 498 U.S. 308, 321 (1990); see also Clemons v. Mississippi, 494 U.S. 738, 749 (1990) ("this Court has repeatedly emphasized that meaningful appellate review of death sentences promotes reliability and consistency"). Congress sharply restricted appellate review of death sentences in the Federal Death Penalty Act of 1994. The statute is unconstitutional for that reason.

### 1. Requirement of Appeal by Defendant

Section 3595(a) provides that review of federal death sentences shall occur only when an appeal is taken by the defendant. Because of the well known phenomenon of condemned individuals failing or refusing to appeal their convictions, the absence of mandatory appellate review renders it inevitable that individuals will be executed without any higher court consideration of their death sentences. A statute which facilitates execution without appellate review, and which does so in part by turning the other cheek to the emotional and intellectual vulnerability of individuals fresh from the protracted trauma of a capital trial, is incompatible with "evolving standards of decency that mark the progress

62

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 49B

of a maturing society" and thus violative of the Eighth Amendment. Trop v. Dulles, 356 U.S. 86, 101 (1958).[3]

### b. Failure to Genuinely Narrow Class of Persons Eligible for Execution

A constitutional death penalty statute must "genuinely narrow the class of persons eligible for the death penalty" as well as "reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." Zant v. Stephens, supra, 462 U.S. at 877. "The legislature may itself narrow the definition of capital offenses . . . , or the legislature may more broadly define capital offenses and provide for narrowing by jury findings of aggravating circumstances at the penalty phase." Lowenfield v. Phelps, 484 U.S. 231, 244 (1988). The present federal statute--like most state death penalty schemes--requires that the jury find at least one aggravating circumstance during the sentencing phase of trial if a sentence of death is to be imposed. See Lowenfeld v. Phelps, supra, 484 U.S. at 255. "By doing so, the jury

---

[3] Nor is it any answer that the right to appeal a criminal conviction exists purely as a matter of legislative grace. See McKane v. Durston, 153 U.S. 684 (1894). The constitutional need for meaningful appellate review of a death sentence prior to execution is not attributable solely to the interest of the condemned individual: the intentional and calculated extinguishment of a life--any life--is something that a two-century-old society which aspires to decency ought to look at twice for its own sake.

63

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 49B

narrows the class of persons eligible for the death penalty according to an objective legislative definition." Id. The difficulty with the "objective legislative definition" embodied in the Federal Death Penalty Act of 1994 is its remarkable breadth.

The federal act applies, inter alia, to any federal offense "for which a sentence of death is provided." 18 U.S.C. § 3591(a)(2). The federal statute attempts to narrow the class of persons eligible for a death sentence by setting forth two additional elements that a jury must find beyond a reasonable doubt before a defendant is eligible for a death sentence. First, a defendant must have acted with one of the mental states listed in § 3591(a)(2)(A)-(D). Second, the jury must find the existence of an aggravating factor set forth in Section 3592(c), which lists 16 separate categories of such factors.

On its face, read as a whole, the act fails to narrow the class of individuals eligible for the death penalty from the entire category of persons convicted of crimes involving intentional killings. The statute proclaims its applicability to all federal offenses where death is a possible penalty. 18 U.S.C. § 3591(a)(2). Although the act requires a sentencing jury to find a statutory aggravating circumstance as a condition of

64

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 49B

recommending execution, the codified aggravating factors are so broadly defined that they apply to virtually any of the broad range of federal offenses for which a sentence of death is provided. The first statutory aggravating factor exists whenever a death or fatal injury "occurred during the commission or attempted commission of, or during the immediate flight from the commission of" twenty enumerated federal offenses, 18 U.S.C. § 3592(c)(1). Another aggravating factor is broad enough to apply to virtually any premeditated killing. 18 U.S.C. § 3592(c)(9) ("substantial planning and premeditation").

The array of aggravating factors set forth in § 3592(c) utterly fails to narrow the class of persons eligible for the death penalty or to channel a sentencing jury's discretion. See Gregg v. Georgia, supra, 428 U.S. at 189 (opinion of Stewart, Powell, and Stevens, JJ.); McCleskey v. Kemp, supra, 481 U.S. at 304. The statute thus violates the Eighth Amendment rights of individuals charged with capital offenses. Zant v. Stephens, supra.

## E. Conclusion

The Federal Death Penalty Act of 1994 admits of numerous constitutional shortcomings. The act actually violates or portends violation of the rights of criminal defendants to due process and equal

65

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 49B

protection of the law, to be free from ex post facto laws, and to avoid being subjected to cruel and unusual punishment. This Court should declare the statute under which Mr. Allen was sentenced unconstitutional and unenforceable, and vacate Mr. Allen's death sentence.

66

## II.

The District Court erred in denying Mr. Allen's motion to preclude imposition of the death penalty because the indictment did not allege either that Mr. Allen had acted with the intent specified in 18 U.S.C. § 3591(a) or that at least one of the aggravating factors enumerated in 18 U.S.C. § 3592(c) had been present, and the indictment thus was inadequate to charge a capital offense.

> **Standard of Review:** This Court reviews the sufficiency of an indictment and claims of constitutional error de novo. United States v. O'Hagan, 139 F.3d 641, 651 (8th Cir. 1998); United States v. Hoosman, 62 F.3d 1080, 1081 (8th Cir. 1995).

The grand jury returned an indictment charging Billie Jerome Allen and Norris Holder with two crimes. First, the grand jury charged that Mr. Allen and Mr. Holder had violated 18 U.S.C. §§ 2 and 2113(a) and (e) by killing Richard Heflin during the commission of a bank robbery. Second, it charged that the defendants had violated 18 U.S.C. §§ 2 and 924(c)(1) and (j)(1) by carrying a firearm and killing Mr. Heflin while committing that bank robbery. (App. 82-83) The Government subsequently filed notice of its intent to seek Mr. Allen's execution if a jury found him guilty of the offenses charged in the indictment. (App. 186-91) That notice presented the first allegations of the aggravating factors which would transform this prosecution into a capital case.

67

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 49B

Mr. Allen filed a motion to preclude the imposition of the death penalty. (App. 194-227) One of the bases for relief alleged in that motion was that the Government had failed to secure an indictment sufficient to charge Mr. Allen with a capital crime. (App. 260-63) The District Court denied that motion, permitted the case to proceed to trial, and ultimately sentenced Mr. Allen to death. (App. 260-63, 493-94, 502-03)

The Fifth Amendment states that "no person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." U.S.Const. amend. V.[4]   This was not a capital case until the Government filed its notice of intent to seek the death penalty. Neither the District Court nor this Court--nor Mr. Allen nor anyone else who might care--has anyone of knowing whether the grand jury would have returned an indictment alleging the presence of aggravating factors and thus charging Mr. Allen with a crime punishable by death.

The bifurcated charging mechanism employed against Mr. Allen defeated the purpose of requiring grand jury approval of capital and other serious charges. The indictment alone was not adequate to satisfy a

---

[4] Fed.R.Crim.P. 7(a) provides that "[a]n offense which may be punished by death shall be prosecuted by indictment."

68

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 49B

fundamental and unequivocal constitutional mandate, and the judgment of conviction should be reversed and the sentence of death vacated.

The common law mandated the use of indictments in all cases warranting serious punishment. Smith v. United States, 360 U.S. 1, 9 (1959). "The Fifth Amendment made the rule mandatory in federal prosecutions in recognition of the fact that the intervention of a grand jury was a substantial safeguard against oppressive and arbitrary proceedings." Id. The Supreme Court refused to countenance judicial modification or amplification of indictments more than a century ago:

> "If it lies within the province of a court to change the charging part of an indictment . . . , the great importance which the common law attaches to an indictment by a grand jury, as a prerequisite to a prisoner's trial for a crime, and without which the Constitution says 'no person shall be held to answer,' may be frittered away until its value is almost destroyed."

Ex Parte Bain, 121 U.S. 1, 10 (1887).[5] More recently, the Supreme Court held without dissent that a defendant may not be tried "on charges that are not made in the indictment against him" and therefore that "after an indictment has been returned its charges may not be broadened through amendment except by the grand jury itself." Stirone v. United States, 361

---

[5] This aspect of Ex Parte Bain has been reaffirmed in numerous cases. See United States v. Miller, 471 U.S. 130, 142-43 (1985).

69

U.S. 212, 217 (1960). Surely allowing prosecutors to top off indictments with the allegations that transform a non-capital charge to a capital charge poses a greater threat to the safeguard of grand jury intervention than that contemplated in Ex Parte Bain.

The Government's allegation of aggravating factors converted the non-capital charge returned by the grand jury into the capital charge upon which Mr. Allen was compelled to go to trial. See 18 U.S.C. §§ 3591, 3593. The notion that aggravating factors are mere sentencing considerations, rather than an integral part of the charge, is sophistic and misses the point of having a grand jury at all.[6] The "most celebrated" purpose of the grand jury "is to stand between the government and the citizen" and protect individuals from the abuse of arbitrary prosecution. United States v. Dionisio, 410 U.S. 19, 33 (1973); see also Wood v. Georgia, 370 U.S. 375, 390 (1962); Russell v. United States, 369 U.S. 749, 770-71 (1962). The Supreme Court explained that function of the grand jury in Dionisio:

> "Properly functioning, the grand jury is to be the servant of neither the Government nor the courts, but of the people . . . As such, we assume that it comes to its task without bias or self-

---

[6] That notion was central to the rejection of a claim similar to Mr. Allen's in United States v. Spivey, 958 F.Supp. 1523, 1528 (D.N.Mex. 1997). See also United States v. Nguyen, 928 F.Supp. 1525, 1545 (D.Kan. 1996).

70

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 49B

interest. Unlike the prosecutor or policeman, it has no election to win or executive appointment to keep."

Id., 410 U.S. at 35; see also Stirone v. United States, supra, 361 U.S. at 218. This Court has acknowledged and adhered to that rationale. See United States v. Leisure, 844 F.2d 1347, 1365 (8th Cir. 1988); United States v. ITT Blackburn Company, 824 F.2d 628, 630-31 (8th Cir. 1987). It is simply impossible to know whether the grand jury would have voted a true bill on the aggravating factors which became an integral part of the charge against Mr. Allen and of the petit jury's recommendation that he be put to death.

Mr. Allen acknowledges the authority vested in the Government to decide whether to seek the death penalty. See McCleskey v. Kemp, 481 U.S. 279, 296-97 (1987). But the force of that discretion hardly overrides-- in fact, is an archetypical reason for--the constitutional requirement of neutral review of prosecutorial intentions. The Government should have been precluded from seeking Mr. Allen's execution through allegations never charged by the grand jury.

71

Billie Allen v. United States of America
Case: 4:07-cv-00027-ERW    Doc. #: 94-57    Filed: 08/14/09    Page: 20 of 53 PageID
No. 4:07-CV-27-ERW
Exhibit 49B
                                                        #: 1267

## III.

Whether the District Court erred in denying Mr. Allen's motion to suppress evidence of statements obtained from him after he had requested the assistance of counsel and prior to the provision of counsel, because the evidence clearly established that the police did not scrupulously honor Mr. Allen's request that counsel be provided for him, in violation of the Fourth, Fifth, and Sixth Amendments.

> **Standard of Review:** The factual findings which underpin a District Court's denial of a motion to suppress evidence are reviewed for clear error. United States v. Looking, 156 F.3d 803, 809 (8th Cir. 1998). The legal conclusions drawn by the District Court in such a ruling are reviewed de novo. Id.

St. Louis police officers arrested Mr. Allen at approximately 2:00 a.m. on March 18, 1997. (H.T. 5/16/97: 142-46) They took him to the homicide office at police headquarters. (H.T. 5/16/97: 146-47, 152) At approximately 3:00 a.m., Mr. Allen was placed in a small interrogation room and handcuffed to a table. (H.T. 5/16/97: 152, 191-93) He was advised of his constitutional rights. (H.T. 5/16/97: 152) Mr. Allen remained handcuffed to the interrogation room table until approximately 10:00 a.m. (H.T. 5/16/97: 192-93)

Police left Mr. Allen alone in the interrogation room for approximately one hour. (H.T. 5/16/97: 193, 195) At approximately 4:20 a.m., a Federal Bureau of Investigation agent named Janet Hartman came to interview Mr. Allen and began to advise him of his constitutional rights

72

once again.   (H.T. 5/16/97: 80, 88) Mr. Allen said that he wished to have an

attorney appointed to assist him.   (H.T. 5/16/97: 88-89, 202) Agent

Hartman promptly terminated the conversation.   (H.T. 5/16/97: 90, 202)

None of the law enforcement personnel who were involved in the

investigation made any effort to comply with Mr. Allen's request for

counsel.   (H.T. 5/16/97: 90, 201, 257-58) Agent Hartman testified:

> "Q And do you know whether or not there were any steps to try
> and secure him an attorney in the early morning hours of
> March 18th?
>
> "A I did not.
>
> "Q Did you direct anyone else to take any steps to try and
> secure him an appointed attorney in the early morning hours of
> March 18th?
>
> "A No sir.
>
> "Q Did anyone else tell you that they had made phone calls or
> inquiries to try and secure him a public defender or some other
> attorney on the early morning hours of March 18th?
>
> "A No, I'm not aware of any."

(H.T. 5/16/97: 90) St. Louis homicide detective Clifford Harper

acknowledged that there had been no discussion between law enforcement

73

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 49B

personnel about "getting [Mr. Allen] a lawyer at all."   (H.T. 5/16/97: 200-01, 257-58)[7]

At approximately 10:10 a.m., Mr. Allen was unshackled from the table in the interrogation room and taken to a lineup room.   (H.T. 5/16/97: 192-93, 244) According to Detective Harper, Mr. Allen was advised of his right to have an attorney present at the lineup and now declined representation.   (H.T. 5/16/97: 249, 251) Three of the four crime witnesses who viewed the lineup identified Mr. Allen as a participant in the bank robbery.   (H.T. 5/16/97: 247-48) A fourth witness, William Green, identified a person other than Mr. Allen.   (H.T. 5/16/97: 239-40, 247)

Mr. Allen was taken to a holding area after the lineup had been concluded.   (H.T. 5/16/97: 249) Detective Harper "advised him that he had been identified by witnesses."   (H.T. 5/16/97: 248-49, 295) According to Detective Harper, Mr. Allen immediately recanted his request for an attorney and said: "I want to talk about it."   (H.T. 5/16/97: 249)

Detective Harper testified that Mr. Allen insisted on discussing the bank robbery with Ronald Henderson, the Deputy Commander of the St.

---

7 At trial, Detective Carroll acknowledged that Mr. Allen had not been permitted to make any telephone calls after having requested a lawyer and that he was being held "incommunicado." (T. 9: 200-02)

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 49B

Louis Police Department homicide unit.   (H.T. 5/16/97: 249, 284) Lt. Henderson, Detective Harper, and a third police officer then met with Mr. Allen in an interrogation room at St. Louis police headquarters.   (H.T. 5/16/97: 290-91, 294) Lt. Henderson testified that Mr. Allen was again informed of his constitutional rights, acknowledged his understanding of those rights, and made a statement in which he admitted having participated in the bank robbery and having shot Mr. Heflin.   (T. 2/17: 9-13)

According to Detective Harper, the entire homicide division was notified early on March 18, 1997, that Mr. Allen had requested an attorney: "[T]hat's why no one could talk to him."   (H.T. 5/16/97: 259-60) Lt. Henderson testified that Detective Harper had informed him prior to the interview "that [Mr. Allen] had invoked his right . . . but he's requesting to see me."   (H.T. 5/16/97: 297) According to Lt. Henderson, he was not specifically apprised before the interview that Mr. Allen had requested an attorney.   (H.T. 5/16/97: 298)

This Court has recognized that Miranda v. Arizona, 384 U.S. 436 (1966), "places upon the prosecution the heavy burden of demonstrating that the accused knowingly and intentionally waived his privilege against

75

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 49B

self-incrimination and his right to have counsel present." <u>Williams v. Brewer</u>, 509 F.2d 227, 233 (8th Cir. 1974), <u>aff'd, Brewer v. Williams</u>, 430 U.S. 387 (1977). Once a suspect asserts his right to counsel, police must stop interviewing or interrogating him "and he cannot be approached for further questioning 'until counsel has been made available to him.'" <u>Grubbs v. Delo</u>, 948 F.2d 1459, 1466 (8th Cir. 1991) (quoting <u>Edwards v. Arizona</u>, 451 U.S. 477, 484-85 (1981)). If questioning is resumed, as it was in this case,

> "'the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial, even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards.'"

<u>Grubs v. Delo, supra</u> (quoting <u>McNeil v. Wisconsin</u>, 501 U.S. 171, 179 (1991)). "[C]ourts indulge in every reasonable presumption against waiver." <u>Brewer v. Williams, supra</u>, 430 U.S. at 404.

Statements obtained from a suspect in police custody "are admissible if law enforcement officers'scrupulously honored' the suspect's right to remain silent." <u>Grubbs v. Delo, supra</u> (quoting <u>Michigan v. Mosley</u>, 423 U.S. 96, 103-04 (1975)). The confession obtained from Mr. Allen surely should have been suppressed. The strong presumption of involuntariness prescribed by <u>Edwards v. Arizona</u> was not overcome in this case, nor can

76

the Government claim with a straight face that police "scrupulously honored" Mr. Allen's invocation of his rights to remain silent and to have counsel.

For some six hours after their capital suspect decided to rely on his Fifth Amendment right to refrain from self-incrimination and to take federal and local authorities up on their offer to fulfill his Sixth Amendment right to the help of an attorney, neither the FBI agent assigned to the case nor any St. Louis police officer lifted a finger to procure counsel for him.  (H.T. 5/16/97: 90, 201-02, 257-58) Rather, the FBI agent and the police left Mr. Allen handcuffed to a table in an interrogation room.  (H.T. 5/16/97: 193) Finally, after Detective Harper told him that he had been identified in a lineup, with no effort having been made to provide him with the attorney he had requested, Mr. Allen surrendered to the situation and gave an uncounseled confession.  (H.T. 5/16/97: 248-49)

The Supreme Court has identified three factors as the determinants of whether police have "scrupulously honored" a suspect's right to terminate interviewing: (1) whether there was an immediate cessation of questioning at the time that the right was invoked; (2) whether a

77

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 49B

"significant amount of time" had elapsed between the invocation of the right and its purported relinquishment; and (3) whether the latter interrogation involved inquiries about a separate crime. Mosley, at 104.

The first factor was satisfied in this case. But even if the six hours which elapsed between Mr. Allen's request for counsel might in some circumstances amount to a "significant amount of time," in this case Mr. Allen spent virtually that entire time shackled to a table in an interrogation room at homicide headquarters. The passage of that time cannot have done anything to promote rational deliberation and clear-headed decision-making about the waiver of fundamental constitutional rights in desperate circumstances.

Finally, the subject in which police were interested never changed. Although "a second [questioning] is not rendered unconstitutional simply because it involves the same subject matter discussed during the first questioning," United States v. McClinton, 982 F.2d 278, 282 (8th Cir. 1992), the combination of circumstances presented in this case--the utter failure to respond to Mr. Allen's request for an attorney, the isolation of Mr. Allen handcuffed to a table in an interrogation room from the middle of the night until late in the morning, the pointed passing along of news that he

78

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 49B

had been identified in a lineup, and the fact that the interview which finally occurred did in fact concern the same crime as the interview aborted by Mr. Allen's request for counsel--is singularly inconsistent with any reasonable notion of scrupulous regard for the rights which had been invoked.

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 49B
Case: 4:07-cv-00027-ERW    Doc. #: 94-57    Filed: 08/14/09    Page: 28 of 53 PageID #: 1275

## IV.

The District Court abused its discretion in denying Mr. Allen's motion for a continuance of the trial setting after he was abandoned by his original court-paid mitigation expert, because that ruling compelled defense counsel and a substitute mitigation expert to proceed to trial without adequate time to locate and secure mitigation evidence and distracted defense counsel from other matters of trial preparation on the eve of trial, in violation of Mr. Allen's right to due process of the law.

> **Standard of Review:** A District Court's refusal to grant a continuance is reviewed for abuse of discretion. United States v. Weisman, 858 F.2d 389, 391 (8th Cir. 1988). An abuse of discretion occurs when the denial of a continuance is "arbitrary" and occurs despite a "justifiable request for delay." Ungar v. Sarafite, 376 U.S. 575, 589 (1964).

Ten days before trial, Mr. Allen asked the District Court to postpone the trial setting. (H.T. 1/30/98: 2; App. 306-16) Defense counsel apprised the Court that Mr. Allen's original mitigation expert, who had been retained with Court funds, had abandoned the case. (H.T. 1/30/98: 2) The original expert had been employed promptly after Government attorneys obtained approval to seek the death penalty, and a new expert had been located and retained almost immediately after the first defaulted. (H.T. 1/30/98: 2-4, 20) Mr. Allen sought the postponement of trial for 120 days in order to facilitate the location and organization of mitigation evidence by his counsel and the new mitigation expert. (H.T. 1/30/98: 2-4, 17)

80

David Randall, the new mitigation expert, explained the need for more time:

> "[E]ach case is different, but there's certain tasks that need to be done . . . in every case. And those tasks involve interviewing the client on several occasions, developing a social history, developing a list of leads, other people--other information sources that can provide insight into the client's life and provide the story of the client through their eyes basically.
>
> "So it's a process that occurs and it's sort of an iterative process that builds on itself as time goes on. So as the process continues, I might learn from one . . . family member a certain piece of information that needs to be followed up on. A certain perhaps hospital that he was at that we became aware of that--you know, where we need to get additional records. And then once we get those records, there might be leads within those records that need to be followed up on; people to locate, doctors to locate, things of that nature.
>
> "So this is a process that takes some time because we're dealing with a life history of a human being."

(H.T. 1/30/98: 6, 9) Dr. Randall testified that he had been contacted about the case for the first time on January 15, 1998, and had traveled to St. Louis to begin work the following day and had been "practically living down here working on this case" ever since. (H.T. 1/30/98: 7, 9) He advised the Court that there were "some 60 potential witnesses" to be located and interviewed. (H.T. 1/30/98: 9, 11)

81

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 49B

Counsel for the Government suggested during cross-examination that Dr. Randall could not responsibly have accepted employment in the case if there actually was not adequate time to prepare properly for the presentation of mitigation evidence. Dr. Randall responded:

> "They were working within certain time constraints. They were in a bind. We were going under the assumption that some work was better than no work at all. So my goal was to do as much work as I possibly could by that date. And, you know, we didn't think it would be enough time. But given the fact that the other expert backed out at the last minute, this is what they were left with . . . . [I]f push comes to shove we were going to do as much work as possible. But what I'm saying is that that's not enough time to do the work adequately."

(H.T. 1/30/98: 13-14) Counsel for Mr. Allen pointed out that the original mitigation expert had been retained promptly after Government attorneys had obtained authorization to seek the death penalty. (H.T. 1/30/98: 20)

The District Court noted the "relearning" that would have to be done if the trial was postponed, the absence of any assurance that the case would be tried at the time of any new setting, the absence of any "showing of a lawful right to use a mitigation expert," and its own expectation "that the doctor will have sufficient time to apply his knowledge and his input to the work that's already been done." (H.T. 1/30/98: 21-22) The motion for a continuance was denied. (H.T. 1/30/98: 22) Mr. Allen contends that this

82

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 49B

ruling was an abuse of the District Court's discretion which deprived him of the opportunity to fully present his case in mitigation of punishment.

Mr. Allen is aware of the broad discretion of District Courts to grant or deny continuances. United States v. Weisman, 858 F.2d 389, 391 (8th Cir. 1988). As extensive as that discretion may be, however, it has bounds. "[A]n . . . arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay'" not only constitutes an abuse of discretion but has constitutional ramifications in a criminal case. See Swindler v. Lockhart 885 F.2d 1342, 1350 (8th Cir. 1989) (quoting Morris v. Slappy, 461 U.S. 1, 11-12 (1983)). The Supreme Court has explained:

> "There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied."

Ungar v. Sarafite, 376 U.S. 575, 589 (1964).

The "heightened standard of reliability" required at every step of a capital prosecution, Ford v. Wainwright, 477 U.S. 399, 411 (1986), has an obvious application in this context. The importance of facilitating a capital defendant's presentation of mitigating evidence is well established. McClesky v. Kemp, 481 U.S. 279, 306 (1987); Penry v. Lynaugh, 492 U.S.

83

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 49B

302, 318 (1989). The right to present such evidence is a hollow right

without adequate preparation of the mitigation case:

> "To do this . . . counsel must know what mitigating evidence
> there is, know what evidence may be used to rebut it, and make
> reasonable decisions about what mitigating evidence to use.
> Penalty phase investigation and preparation therefore are
> fundamental to effective advocacy in capital cases."

Goodpaster, The Trial For Life: Effective Representation Of Counsel In

Death Penalty Cases, 58 N.Y.U.L.Rev. 299, 318 (1983).

In this case, defense counsel earnestly told the District Court:

> "[W]e face an extraordinary situation here in which Mr. Sindel,
> lead counsel for the defendant, thought he had hired a
> mitigation expert several months ago . . . [T]he mitigation
> expert did not respond to inquiries from counsel. As trial
> approached we became increasingly agitated about this. And
> we received a communication from him to the effect that he
> simply could not do the work. Within a very few days Mr.
> Sindel hired another mitigation expert . . . . He is at work on
> the case . . . . We have simply been left holding the bag by a
> third party to this case and we are asking for basically any
> amount of time the Court is willing to provide to let Dr.
> Randall do his job."

((H.T. 1/30/98: 2, 4) The District Court noted that it regarded defense

counsel "as an officer of this Court and a highly respected one" and that it

accepted counsel's representations as true. ((H.T. 1/30/98: 16) And then

the Court entered an order which compelled defense counsel and their

mitigation expert to do precisely what they had insisted they could not.

84

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 49B

When an indigent capital defendant is effectively denied the opportunity to make reasonable use of an integral member of his appointed defense team, it is of little matter that the services of that individual were retained for him.  See Chandler v. Fretag, 348 U.S. 3, 9 (1954).  The harm of the deprivation in this case is that Mr. Allen was playing with one hand trussed up behind his back during the penalty phase of his trial.  The fact that his attorneys and Dr. Randall managed to procure professional evaluations and supportive testimony from relatives and acquaintances is singularly insufficient to establish that a full presentation of mitigating evidence was made:

> "We recognized long ago that mere access to the courthouse doors does not by itself assure a proper functioning of the adversary process, and that a criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense . . . [F]undamental fairness entitles indigent defendants to 'an adequate opportunity to present their claims fairly within the adversary system.'"

Ake v. Oklahoma, 470 U.S. 68, 78 (1985) (quoting Ross v. Moffitt, 417 U.S. 600, 612 (1974)).

Dr. Randall explained that he could not fully identify and procure mitigation evidence without adequate time to develop relationships and

85

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 49B

conduct research. The District Court's election to proceed to trial based on its notion that Dr. Randall would find a way to prove himself wrong is a breathtaking flaw in Mr. Allen's trial--a "structural flaw" which "so pervasively contaminate[d] the trial mechanism . . . that it is not susceptible to quantitative assessment in the context of the entire trial to determine whether it was harmless." See Beets v. Iowa Department of Corrections Services, 164 F.3d 1131, 1136 (8th Cir. 1999) (citing Arizona v. Fulminante, 499 U.S. 279, 307-10 (1991)). Not that appreciation of the harm done in this case is difficult to come by: after the Government's recitation of the bone-chilling facts of Mr. Heflin's murder and its presentation of heart-rending victim impact testimony from nearly a dozen of Mr. Heflin's relatives and friends, the need for a full and unfettered case in mitigation most assuredly was a matter of life and death.

Because it cannot be known what a properly developed defense would have achieved at the penalty phase of Mr. Allen's trial--and especially because the defense with which Mr. Allen was left was sufficient to convince more than one juror to find numerous mitigating factors and all jurors to recommend a sentence other than execution on one count--it is

86

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 49B

impossible to conclude that the trial was fair.  See Ake v. Oklahoma, supra,

470 U.S. at 84.  His sentence should be vacated for that reason.

87

V.

The District Court erred and abused its discretion in denying Mr. Allen's motions to strike testimony of Betty Thompson and William Green regarding the identity of a person whom they had seen leaving the crime scene with a money bag, and for the declaration of a mistrial, upon the basis of the Government's misconduct in withholding information about a material change in the testimony of those pivotal witnesses and its failure to comply with defense requests for discovery, because the Government's suppression of that information misled defense counsel in their preparation for trial and compromised their ability to plan and present a defense and to provide Mr. Allen with informed advice and was violative of the Due Process, Assistance of Counsel, and Cruel and Unusual Punishment Clauses.

> **Standard of Review:** This issue raises claims arising from constitutional deprivation and misconduct in discovery. This Court reviews claims based upon the interpretation of constitutional guarantees de novo. Hamilton v. Schriro, 74 F.3d 1545, 1552 (8th Cir. 1996). The Court reviews matters pertaining to discovery sanctions for abuse of discretion. United States v. Flores-Mireles, 112 F.3d 337, 340 (8th Cir. 1997).

A. Introduction

Witnesses to the robbery of Lindell Trust Company and the murder of Richard Heflin told a story of two men armed with assault rifles emerging from a van and entering the bank, one of whom stood in the bank lobby firing his weapon madly and causing Mr. Heflin's death while the other went behind the bank counter and collected money in a money bag, and then of the two men returning to their van, one with a money bag and one

88

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 49B

without. (T. VI: 95-102; VII: 76-80, 82-83, 109-13, 125-33, 153-60, 179-87, 231-38, 294-300, 320-21; VIII: 159-60) William Green and Betty Thompson, who saw the robbers fleeing from the bank, testified at trial that the man with the money bag got into the van on its driver side. (T. VII: 82; VIII: 160, 180-81) The Government adduced evidence sufficient to establish that Mr. Holder had driven the van away from the bank. (T. VIII: 203-06, 218-22, 232-34)

A Federal Bureau of Investigation Agent named Kevin Harrah prepared a report when the crime was being investigated, and the report was provided to defense counsel. (T. VIII: 181, 185-86; Def. Exh. 1) The report related Mr. Green's observation that the man who entered the passenger side of the van was carrying the money bag. (T. VIII: 181) Mr. Green insisted in his trial testimony that he had told every law enforcement agent who ever questioned him that the driver of the van had been carrying the money bag. (T. VIII: 180-81) He acknowledged having been "debriefed" prior to his appearance at trial and having met with Government counsel "on a couple of occasions" to discuss his observations. (T. VIII: 180-81) And Mr. Green acknowledged in his trial

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 49B

testimony: "I knew that the FBI . . . agent had written [the wrong information] in his report, yes." (T. VIII: 181)

Other information made available to defense counsel prior to trial supported the propositions that Mr. Holder had been the man who stood in the bank lobby firing his weapon and while Mr. Allen went behind the bank counter to gather money, and that Mr. Allen had emerged from the bank holding the money bag. Ms Thompson appears to have made a statement to that effect to law enforcement officers, who memorialized it in an investigative report. (T. VII: 95-98) And Lisa Moore, a bank employee who had become acquainted with Mr. Holder through a series of banking transactions prior to the robbery, told police that she recognized the voice of the man who remained in the lobby as that of Mr. Holder. (T. (VII: 245-47)

After being surprised by Mr. Green's trial testimony, defense counsel requested remedial action by the District Court. Counsel contended that the discrepancy between the FBI report of Mr. Green's observations and Mr. Green's testimony must have been known to the Government prior to trial and that the suppression of that knowledge had been both a discovery

90

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 49B

violation and a violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).[8]

Counsel complained in particular about the sandbagging effect of the

Government's election:

> "[T]hey didn't tell me . . . because they wanted me to begin to
> set up whatever defense I was going to do based on what I
> thought they would testify to . . . . [T]he point of Brady material
> is to enable me to make certain decisions about the defense."

(T. VIII: 185-86) Counsel added that cross-examining about the

inconsistency "is not the loss that I'm talking about." (T. VIII: 188-89)

Counsel for the Government responded: "I don't think the Government

has any obligation to disclose that a witness is now saying something that

---

[8] Mr. Allen's discovery requests began with a motion for the production of favorable evidence, which specifically requested the production of "[a]ll statements . . . in the possession of the Government that are favorable to Defendant." (App. 86-87) In a separate discovery motion filed at the same time, Mr. Allen requested "[a]ny evidence that any prospective government witness has made a contradictory or inconsistent statement with regard to this case." (App. 94) The Report and Recommendation of the United States Magistrate Judge granted the former motion in part and denied the latter motion as moot. (App. 109-10) The Magistrate's opinion explained:

> "The Government is aware that included in the requirement to
> produce favorable evidence mandated by <u>Brady v. Maryland</u>,
> 373 U.S. 83 (1963), is the requirement to produce impeaching
> evidence. <u>See United States v. Bagley</u>, 473 U.S. 667, 676 (1985)
> The Government has agreed to disclose such evidence."

(App. 134)

may be different than what they had said earlier. We've provided reports." (T. VIII: 191)

Defense counsel moved for the declaration of a mistrial or for an order striking the testimony of Mr. Green and Ms Thompson "as it pertains to who was carrying the bag into the van." (T. VIII: 196) The District Court concluded that the Government had no obligation to notify defense counsel of its knowledge that prosecution witnesses "are going to testify . . . inconsistently with statements previously given," and denied relief. (T. VIII: 198)

## B. Argument

The knowledge that a pivotal fact in the statements reportedly made by Mr. Green and Ms Thompson and disclosed to defense counsel would change in their trial testimony was impeaching material: the transformed fact tended to prove which of the robbers had shot Mr. Heflin and shot up the bank, and by concealing the existence of the transformation the Government kept defense counsel from knowing that the impeachment of Mr. Green and Ms Thompson would be necessary. It is unmistakable that the failure to disclose information which supports the impeachment of a Government witness on a material matter is a due process violation.

92

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 49B

United States v. Bagley, 473 U.S. 667, 677 (1985); see also Giglio v. United States, 405 U.S. 150, 154 (1972). It was facile at best for the Government to contend that its knowledge was not impeachment material, and it is inexplicable that the District Court adopted the Government's position.[9]

The Government's election to remain mum until mid-trial about the crucial change in Mr. Green's and Ms Thompson's statements left defense counsel with no opportunity to investigate the apparent abandonment of their original recounting. The Government's provision of those first versions in discovery naturally had left counsel with no reason to believe that such investigation was necessary. As a result of the Government's

---

[9] This was not the only instance in which the Government failed to provide impeaching information to the defense. Thomas Mundell, who sold "security equipment" from a kiosk in a downtown St. Louis shopping mall, testified that Mr. Holder had purchased "a two-piece body armor suit" from him on March 13, 1997, and that Mr. Allen had been with him at that time. (T. VI: 206-222) The Government relied on Mr. Mundell's testimony for its penalty-phase argument that Mr. Allen had been planning the robbery "for days if not weeks or months." (T. XIX: 58) Counsel for the Government explained: "We know he was hanging out with Norris Holder . . . . [T]hey went to buy vests together . . . . He knew exactly what he was doing." (T. XIX: 58-59)

On May 7, 1998, approximately two months after Mr. Allen's trial had ended, counsel for the Government advised defense counsel for the first time that agents of its Drug Enforcement Administration had arrested Mr. Mundell for possession of cocaine during 1982 and that Mr. Mundell had spent the next four years as a Government operative or informant. (App. 506)

conduct, Mr. Allen was deprived of any reasonable opportunity to plumb the circumstances and test the legitimacy of these crucial testimonial changes.

Information which has not been fairly exposed to the adversarial process does not qualify as reliable. Gardner v. Florida, 430 U.S. 349, 359 (1977). The unambiguous circumstances and defense counsel's logical and plaintive representations left the District Court with no room to doubt that the Government's suppression of this vital information had affected the planning and presentation of Mr. Allen's defense.

As defense counsel pointed out to the District Court, the Brady rule is premised upon the defendant's right to a fair trial and a significant part of the harm done by the Government's withholding of material information in this case was to deprive Mr. Allen of the opportunity to prepare an informed defense against the imposition of a death sentence. (T. VIII: 191-92) Counsel explained:

> "[I]f there is a verdict of guilty, obviously . . . one of the key questions is going to be who pulled the trigger . . . . And that stuff is kind of way up in the air . . . . [T]hat is what I think this thing goes to. And they know it's important."

(T. VIII: 192)

94

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 49B

The discovery process had established clearly that Mr. Green and Ms Thompson would provide testimony which tended to establish that Mr. Allen had not shot Mr. Heflin. (T. VIII: 181, 185-86; Def. Exh. 1) The trial was well into its second week before defense counsel learned that the Government would elicit precisely the opposite testimony from them. (T. VII: 93, 95-98; VIII: 159-60, 180) The notion that the Government is entitled to so mislead a capital defendant and his counsel is frightful.

This Court has made note of its disregard for "the deliberate tactic of 'lying in the weeds' in anticipation of an ambush." United States v. Calvert, 523 F.2d 895, 912 (8th Cir. 1975). Another Court of Appeals has observed that "[o]rdinarily it is disclosure, rather than suppression, that promotes the proper administration of criminal justice." United States v. Baum, 482 F.2d 1325, 1331 (2nd Cir. 1973) (citing Dennis v. United States, 384 U.S. 855, 870 (1966)).[10]

The Government pulled the rug out from under the defense in this case. That may qualify as fair play under some circumstances, but here the

_____

[10] The Baum opinion includes the following pertinent quotation: "A defendant has hardly had a fair trial if he has been denied the opportunity to discover . . . information crucial to his defense." Id., 482 F.2d at 1332 (quoting Traynor, Ground Lost and Found in Criminal Discovery, 39 N.Y.U.L.Rev. 228, 242 (1964)).

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 49B

Government itself had set the rug in place and invited Mr. Allen and his counsel on board. Intentional or not, knowing Government conduct which has the effect of lulling a capital defendant and his lawyers into a false belief that evidence in mitigation of punishment will be presented by prosecution witnesses is wildly inconsistent with a basic tenet of our death penalty jurisprudence: because the death penalty is qualitatively and morally different from any other penalty, "[i]t is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, the consequence of scrupulously fair procedures." Smith v. Murray, 477 U.S. 527, 545-46 (1986) (dissenting opinion of Stevens, J.). The judgment of conviction should be reversed and the sentence of death should be vacated.

## VI.

The District Court erred and abused its discretion in granting the prosecution's motion for psychiatric examination of the defendant without also granting the defendant the full relief requested in his motion for protective order respecting prosecution mental examination results, and plainly erred or abused its discretion in allowing the prosecution to proceed with the penalty phase of the trial after (1) the United States Attorney had designated an individual Assistant United States Attorney to receive the results of the prosecution's mental-health investigation, (2) the District Court had issued an oral order providing that this individual prosecutor not disclose these results until the conclusion of the guilt-or-innocence phase, and (3) this individual prosecutor disclosed at least part of the results before the conclusion of the guilt-or-innocence phase. In the context of this trial, the District Court's initial disposition of the question and the prosecution's violation of it deprived the defendant of his rights under the Self-Incrimination Clause of the Fifth Amendment, the Due Process Clause of the Fifth Amendment (including the equal protection component of that guaranty), the Assistance of Counsel Clause of the Sixth Amendment, and the Cruel and Unusual Punishments Clause of the Eighth Amendment.

**Standard of Review:** On the question whether the relief Mr. Allen requested in the matter covered by this point on appeal was required by the Constitution of the United States, this Court's standard of review is de novo. Hamilton v. Schriro, 74 F.3d 1545, 1552 (8th Cir. 1996). On the question whether the relief was indicated by prudential considerations touching the regularity and reputation of the judicial process—and the effective sanctioning of prosecutorial misconduct, to return the accused citizen to the status quo ante and to deter future misconduct by government appointees and employees—this Court reviews the district court's acts and omissions for abuse of discretion.

97

A.    The District Court erred and abused its discretion in granting the prosecution's motion for psychiatric examination of the defendant (Doc. No. 250) without also granting the defendant the full relief requested in his motion for protective order respecting prosecution mental examination results (Doc. No. 276).

A citizen accused of a capital offense has a right not to disclose to the prosecution or its privies any information in aggravation under an order to submit to a prosecution mental-health examination unless the accused citizen has waived his or her right to counsel and right to remain silent. In order to protect the accused citizen's rights under the Fifth, Sixth, and Eighth Amendments, the trial court must deny to the prosecution the fruits of any such examination until there is a guilty verdict in the guilt-or-innocence phase and until the defense has reaffirmed its intention to introduce mental-health information.

In this case Mr. Allen sought such protection, and the District Court denied it in part, allowing one member of the prosecution team to receive such information on the United States Attorney's representation that it would remain with that individual attorney. That order created the temptation—which was, in the event, actualized *at least* in open court—that the prosecution team would learn information from its

98

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 49B

mental-health examination of the accused citizen which it could use against him in the guilt-or-innocence phase.

In the absence of an effective prophylactic rule preventing prosecutors from obtaining access to the results of their mental-health expert's examination of the accused citizen until after a verdict of guilty and after defense counsel reaffirms the accused citizen's intent to introduce mental-health information in the penalty phase, requiring the accused citizen to undergo such an examination as a condition of presenting mental-health information in the penalty phase unconstitutionally forces him or her to choose between the exercise of the constitutional right to individualized capital sentencing, e.g., Penry v. Lynaugh, 492 U.S. 302, 318 (1989), and the various constitutional rights implicated in a prosecution mental-health examination. See Simmons v. United States, 390 U.S. 377, 389-94 (1968). At least on the facts of this case, the relief Mr. Allen requested was constitutionally required.

In Estelle v. Smith, 451 U.S. 454, 462 (1981), the Supreme Court held that the privilege against self-incrimination and the right to counsel prevent the prosecution from introducing, in the penalty phase of a capital case, the results of a prosecution mental-health examination if the

99

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 49B

defendant had not been advised of his rights under <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), in respect to the prosecution mental-health examination, and had not waived his right to counsel in the matter. In <u>Estelle v. Smith</u>, the Court held that in a capital case the decision whether to undergo a mental-health examination designed to establish future dangerousness was "'literally a life or death matter,'" and that in making it, the accused citizen has a right to "'the guiding hand of counsel.'" <u>Id.</u>, 451 U.S. at 471 (quoting <u>Smith v. Estelle</u>, 602 F.2d 694, 708 (5th Cir. 1979), and <u>Powell v. Alabama</u>, 287 U.S. 45, 69 (1932)).

In <u>Estelle v. Smith</u>, Mr. Allen did not seek to introduce mental-health evidence in the penalty phase; the prosecution put his mental health in issue, in an effort to prove future dangerousness as an aggravating factor. <u>Id.</u> at 468. In <u>Buchanan v. Kentucky</u>, 483 U.S. 402, 422 (1987), the Court held that when the defendant does present mental-health evidence of his own, the prosecution may "at the very least" use "the reports of the examination that the defendant requested" in rebuttal to his expert's testimony. The Supreme Court proceeded on an equitable waiver theory, under which the defendant waived the right to refuse such an examination by asserting a defense that required the prosecution to obtain it. In <u>Powell</u>

100

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 49B

v. Texas, 492 U.S. 680 (1989), the Supreme Court rejected the Fifth Circuit's decision that the defendant's choice to present mental-health evidence in the defendant's own case waives the right to notice, before submitting to a mental-health examination, that the results of the prosecution's examination may be introduced to show future dangerousness.  Id., at 684.  In Savino v. Murray, 82 F.3d 593, 604 (4th Cir. 1996), the Fourth Circuit sought to expand on Buchanan v. Kentucky to rule that under the Supreme Court's decision, a defendant who seeks to introduce mental-health evidence in mitigation waives his right to remain silent in response to interrogation or examination by a prosecution psychiatrist or psychologist.

In United States v. Vest, 905 F.Supp. 651, 653-54 (W.D. Mo. 1995), the late Senior Judge Stevens found that the federal death penalty statutes establish a right on the part of the prosecution to rebut information in mitigation, and that this right would be meaningless without an opportunity to have its own mental-health expert examine the defendant when he or she has interposed a mental-health issue in mitigation.  But that court also recognized that "[r]equiring a defendant to undergo to a psychiatric examination may, in some circumstances, infringe on a

101

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 49B

defendant's rights under the Fifth and Sixth Amendments." Judge Stevens held that "[t]he results of any Court-ordered examination of a defendant shall be released to the government at the Court's discretion, and only in the event that the jury reaches a verdict of guilty as to that defendant." Id. at 654; see also United States v. Haworth, 942 F.Supp. 1406, 1409 (D.N.M. 1996).

In United States v. Beckford, 962 F.Supp. 748 (E.D. Va. 1997), the court held that it had inherent power to provide for prosecution mental examination of the accused citizen in a criminal case when the citizen's mental health was an issue. Id., at 754-57. It also found a right to conduct a prosecution mental-health examination in 21 U.S.C. § 848(j), which creates a "right of rebuttal" when the accused citizen has introduced mental-health evidence in mitigation. Id., at 757-61. The court held that the prosecution could not receive the results of its own mental-health professionals' examination of a defendant unless that defendant is found guilty and reaffirms an intention to employ mental-health defenses in the penalty phase. Id., at 762.

In United States v. Hall, 152 F.3d 381, 398-99 (5th Cir. 1998), the Fifth Circuit held that the sealing of a prosecution penalty phase psychiatrist's

102

report was not constitutionally required. It declined to reverse a conviction and death sentence on the ground that the trial court ordered the defendant to submit to a prosecution mental-health examination as a condition of presenting any such information in mitigation. Although it rejected Mr. Hall's argument that the Constitution required Beckford relief, it agreed that "it likely advances interests of judicial economy by avoiding litigation over whether particular pieces of evidence that the government seeks to admit prior to the defendant's offering psychiatric evidence were derived from the government psychiatric examination." The present case illustrates the functional need for the Beckford remedy.

Hall reasons unsoundly that a prosecution psychiatric examination is like a coerced confession, and that the defendant "must go forward with specific evidence demonstrating taint," on which the prosecution "has the ultimate burden of persuasion to show that its evidence is untainted." 152 F.3d at 399 (citing Alderman v. United States, 394 U.S. 165, 183 (1969), and Nardone v. United States, 308 U.S. 338, 341 (1939)). A psychiatric examination on aggravating and mitigating factors is far more invasive of a citizen's privacy than questioning in a custodial arrest situation. Matters may lead the prosecution mental-health expert to contradict defense

103

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 49B

experts or to assert the existence of aggravating factors on the basis of answers that have no real or apparent connection to criminal conduct. In such examinations, questioning is likely to be far more personal than in a police station or at a traffic stop. It creates a greater threat to the integrity of the accused citizen and of abuse by a government agent, and should therefore be subject to stronger remedies—as Judge Stevens and the Haworth and Beckford courts imposed.

In his motion for a protective order, Mr. Allen set forth the reasons for imposing the prophylactic rule he advocates here, and requested that the District Court impose it. (App. 326-31) The Court imposed the rule only in part, by allowing one Assistant United States Attorney, Steven Holshouser, to receive the results of the prosecution's psychiatric interview of Mr. Allen, on the condition that Mr. Holshouser not disclose this information to any other member of the prosecution team. (Tr. IV-A: 70; V: 189)

In the next subdivision of this point on appeal, Mr. Allen argues that he should receive relief because the prosecution breached the promise of nondisclosure on which the district court conditioned the prosecution's mental-health examination of Mr. Allen. But the eventual breach shows

104

that the district court's original denial of <u>Beckford</u> relief was error or an abuse of discretion. In a highly charged capital case, human nature renders it risky to charge one staff attorney with withholding potentially damning evidence from the remainder of prosecution team. The District Court did not need the benefit of hindsight to know that. The prophylactic rule from <u>Vest</u>, <u>Haworth</u>, and <u>Beckford</u> was not only the sound discretionary choice, in order to promote confidence in the system and to avoid the need to litigate "fruit of the poisonous tree" issues, but also was constitutionally required in order to avoid forcing Mr. Allen to choose between his Eighth Amendment rights and his Fourth, Fifth, and Sixth Amendment rights.

B.   The District Court plainly erred or abused its discretion in allowing the prosecution to proceed with the penalty phase of the trial, after the United States Attorney had designated an individual Assistant United States Attorney to receive the results of the prosecution's mental-health investigation, the District Court had issued an oral order providing that this individual prosecutor shall not disclose these results until the conclusion of the guilt-or-innocence phase, and this individual prosecutor disclosed at least part of the results before the conclusion of the guilt-or-innocence phase. The prosecutors' behavior in this matter deprived the defendant of his rights under the Due Process Clause of the Fifth Amendment (including the equal protection component of that guaranty), the Assistance of Counsel Clause of the Sixth Amendment, and the Cruel and Unusual Punishments Clause of the Eighth

105