Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 49C

Amendment (including the right of an indigent defendant to the assistance of experts recognized in <u>Ake v. Oklahoma</u>, 470 U.S. 68 (1985)).

It is one thing to say that the District Court was not constitutionally obliged to impose the restrictions for which <u>Beckford</u> stands, and quite another to say that having imposed these restrictions, it should have tolerated the prosecution's violation of them when the defense cooperated with the prosecution's psychiatrist in reliance on them. In particular, the prosecution *agreed* to the watered-down limitations as a precondition to its psychiatrist's examination of the defendant:

> "MR. SINDEL: Part of our concerns . . . would be a situation in which perhaps defendant referred to an incident in which he was involved in other alleged criminal activity in trying to answer the psychiatrist's questions truthfully. That information is then given to the U.S. Attorneys and used in the penalty phase to try and prove future dangerousness or to try and prove other aggravated acts.
>
> "THE COURT: They promised the won't do that.
>
> "MR. SINDEL: We have heard promises that they won't introduce that evidence. But if they get it from a separate source.
>
> "THE COURT: They promised they won't do it. It's understood?
>
> "MR. DOWD: Yes, Your Honor.

106

"MR. BERTOLET: Yes, Your Honor, <u>that will be a sealed document.</u>"

(T. IV-A: 70) (emphasis added).

In open court, on February 24, 1998—while the prosecution was still putting on its case-in-chief in the guilt-or-innocence phase—the Assistant United States Attorney whom the United States Attorney had designated to receive the results of the prosecution psychiatrist's interview of Mr. Allen recited that "there was no discussion of [the offense charged] with the court-appointed [<u>i.e.</u>, prosecutorial] psychiatrist beyond Mr. Allen's maintaining that he wasn't there . . . ." (T. 10: 2-3.)

The fact that the Assistant United States Attorney would make reference to what the prosecutors' psychiatrist had told him within the hearing of the remainder of the prosecution team in open court precludes judicial confidence in the Government's promise to observe the protective order in the privacy of its offices. That is why <u>Beckford</u> is a constitutional requirement; that is why it is a prudential requirement independently of its constitutional bases. It is too much to expect that prosecutors will report their violations of an oral order with which they disagreed and which they repeatedly attempted to have rescinded in spite of their agreement to it when it suited their purposes. (T. 10: 1-16)

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 49C

The prosecution's violation of the district court's order precluding anyone but Mr. Holshouser from receiving the results of the Government psychiatrist's examination of Mr. Allen is not only proof that full <u>Beckford</u> relief was required in the first instance; it is prosecutorial misconduct which infects the entire proceeding. When the breach was a knowing violation of a dickered court order to which the prosecution agreed, the accused citizen and this Court should not be required to parse the record for specific fruits of the breach. Because it occurred during the guilt-or-innocence phase, it requires reversal of the convictions and well as of the sentences.

# VII.

The District Court committed plain error, and thereby violated Mr. Allen's rights to due process of law and to be free from cruel and unusual punishment, by failing to declare a mistrial or order another remedial measure sua sponte when counsel for the Government referred to Mr. Allen as "a murderous dog" during closing argument in the penalty phase of trial.

> **Standard of Review**: Error not preserved for appellate review is reversed upon demonstration that error occurred, that the error was clear or obvious, and that the error affected the defendant's substantial rights. United States v. Johnson, 12 F.3d 827, 835 (8th Cir. 1994). "[B]ecause improper closing remarks are reversible only if they are so prejudicial as to deprive the defendant of a fair trial, there is no difference between improper remarks which require reversal where an objection to the remarks has been preserved and remarks which constitute plain error." United States v. Freisinger, 937 F.2d 383, 387 (8th Cir. 1991).

At the penalty phase of trial, Mr. Allen presented the testimony of several people who had known him at various stages of his life and asked the jury to find as a mitigating factor that he had been known before this offense as a "likeable, gentle, light-hearted person." (T. XIX: 34) Six jurors so found. (T. XIX: 136)

During his closing argument in that part of the trial, counsel for the Government purported to oppose this mitigating factor by characterizing Mr. Allen instead as "a murderous dog." (T. XIX: 106) Not content with merely characterizing the youthful African-American defendant as a vile

109

animal before a jury already inundated with brutal and emotionally

shattering information and about to determine whether he should be put

to death, the Government's lawyer presented this view of Mr. Allen as one

of the final thoughts entertained by Richard Heflin.  (T. XIX: 105-06) The

prosecutor then exploited his epithet by tying it into the remainder of Mr.

Heflin's dying thoughts and perceptions:

> "That's what Richard Heflin thought.  And remember when
> you're back there deliberating, the last thing Richard Heflin
> ever saw was these two come in and start blazing at him, blow
> him down . . . . But he kept going, this guy kept going.  Once
> he's down he had to do it some more, he had to fire some more.
> And the last thing Richard Heflin saw when he was standing
> [was] this defendant and his friend firing bullets into him, and
> the last thing he saw when he was lying on the ground flat on
> his back with his left leg almost blown off and his right leg
> pumping blood . . . , he's lying on the ground, this war hero, this
> good man--remember . . . he was conscious-- . . . [h]e sees this
> man with a mask walk over to him and fire some more, and fire
> some more, and feels the incredible agony of those bullets
> tearing into him as he calmly, coolly, calculatedly, did exactly
> what he wanted to do.  He's dangerous, he's extremely
> dangerous in every way.  Think about that.  That was Richard
> Heflin's last thought, my God he's going to shoot me some
> more, and he is."

(T. XIX: 106-07)

Despite--perhaps because of--the emotional power and stunning

impropriety of a prosecuting attorney first sowing the comparison of a

young African-American just convicted of a frightful homicide to "a

110

murderous dog" and then, without so much as a wave of the hand, reaping a harvest of horrible images emanating from the dying victim's mind, neither defense counsel nor the trial court responded to the Government's argument. Because the "murderous dog" image cultivated by Government counsel was bound to remain in the minds of jurors and thus inevitably undermined the prospect of a sentencing decision reached through rational deliberation, Mr. Allen's fundamental rights were compromised and plain error occurred.

It is important to note the distinction first between inflammatory argument in a non-capital trial, or even at the guilt phase of a capital trial, and such argument made to a jury which is about to deliberate on the question of whether a convicted capital offender will be sentenced to death. This Court has had occasion to note the harmlessness of concededly improper argument in the face of overwhelming evidence when the question before the jury is one of guilt or innocence. See, e.g., United States v. Macklin, 104 F.3d 1046, 1049-50 (8th Cir. 1997). The qualitative difference of death and the heightened standard of reliability required at all stages of capital proceedings, Caldwell v. Mississippi, supra, 472 U.S. at 329, coupled with the "vital importance to the defendant and to the

111

community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion," <u>Gardner v. Florida, supra</u>, 430 U.S. at 357-58, surely calls for distinction between the prejudicial potential of inflammatory argument when guilt is at issue and when the death sentence itself is at issue.

It is "well established" that improper argument by the Government may warrant reversal. <u>United States v. Johnson</u>, 968 F.2d 768, 769-70 (8th Cir. 1962). Further, "'a single misstep' on the part of the prosecutor may be so destructive of the right to a fair trial that reversal is mandated." <u>Id.</u>, at 771 (quoting <u>United States v. Solivan</u>, 937 F.2d 1146, 1150 (6th Cir. 1991). Claims of improper closing argument are reviewed case-by-case to ascertain whether "the jury verdict could reasonably have been affected by the prosecutor's remarks." <u>United States v. Splain</u>, 545 F.2d 1131, 1135 (8th Cir. 1976). This Court has established a two-part test for that inquiry:

> "(1) [T]he prosecutor's remarks . . . must in fact have been improper, and (2) such remarks or conduct must have prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial."

<u>United States v. Hernandez</u>, 779 F.2d 456, 458 (8th Cir. 1985). It is of no moment that defense counsel failed to object to the Government's argument: "There is no difference between improper remarks which

112

require reversal where an objection . . . has been preserved and remarks which constitute plain error" because "a prosecutor's remarks [which are] so prejudicial that they deny the defendant a fair trial . . . must, ipso facto, affect a substantial right of the defendant." United States v. Freisinger, 937 F.2d 383, 387 (8th Cir. 1991).

In this case, the United States Attorney's description of Mr. Allen as "a murderous dog," and his attribution of that characterization to the heroic and singularly sympathetic murder victim at the penalty phase of the trial, was impermissible argument. The Supreme Court has held that a prosecuting attorney's reference to the defendant as an animal was "decidedly improper." Darden v. Wainwright, 477 U.S. 168, 180-81 (1986). This Court recently found that descriptions of a defendant as a "monster" and a "sexual deviant" had been inflammatory and improper. Kellogg v. Skon, ___ F.3d ___ (8th Cir. May 10, 1999).

The description in this case also "prejudicially affected the defendant's substantial rights" and "deprive[d] the defendant of a fair trial." United States v. Hernandez, supra, 779 F.2d at 458. Mr. Allen acknowledges that reference to the defendant in a capital case as an animal does not invariably render the entire trial "fundamentally unfair."

113

Darden, at 181-82. A vital aspect of the Supreme Court's analysis in

Darden, however, was its observation that the "overwhelming eyewitness

and circumstantial evidence to support a finding of guilt on all charges . . .

reduced the likelihood that the jury's decision was influenced by

argument." Id., at 182. The circumstances in this case stand in stark

contrast: Mr. Allen's jurors heard him characterized as "a murderous

dog," and were told to envision that literal beast through the eyes of Mr.

Heflin through each step of the grisly murder, after the question of guilt

had been put behind them, immediately after they had been called upon to

share the specific grief of Mr. Heflin's many relatives and friends, and as

they were about to deliberate upon the most profound and difficult

question ever put to a jury. It would be folly to equate inflammatory

prosecutorial argument before a jury concerned with the determination of

guilt or innocence with similar argument before a jury charged with

capital sentencing responsibility.

It is useful in this connection to recall the admonition of the Supreme

Court in Berger v. United States, 295 U.S. 78 (1934). There the Court

noted the duty of Government counsel "to refrain from improper

methods" because of the probability that improper argument by federal

114

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 49C

prosecutors will "carry much weight against the accused when they should properly carry none." Id., at 88; see also United States v. Johnson, supra, 968 F.2d at 770; United States v. Harvey, 756 F.2d 636, 649 (8th Cir. 1985). That special regard for prosecuting attorneys enhanced the likelihood that jurors would accept the characterization of Mr. Allen as "a murderous dog" and the invitation to visualize him as a veritable werewolf ruthlessly murdering Mr. Heflin.

Perhaps those jurors resisted the prosecutorial exhortation. But that sort of rank speculation about the effect of emotionally loaded closing argument by the United States Attorney himself has no place in the review of a death sentence. The Supreme Court has "emphasized repeatedly" the vital role of "meaningful appellate review in ensuring that the death penalty is not imposed arbitrarily or irrationally." Parker v. Dugger, 498 U.S. 308, 321 (1991). More to the point, "the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination." Caldwell v. Mississippi, supra, 472 U.S. at 329.

Counsel for the Government denigrated Mr. Allen's humanity and led the jury through imagery of a transmogrified defendant acting out a

115

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 49C

murderous fit with his assault rifle. The precise impact of that emotional invocation upon jurors may be unknowable. That the prosecutor's argument stirred passion and that the vision of a literally inhuman murderer firing bullets into Mr. Heflin stayed with jurors through their deliberation can hardly be debated. Mr. Allen's fundamental right to a rational sentencing determination was invaded by that argument and the death sentence which resulted should be vacated.

116

Billie Allen v. United States of America
Case: 4:07-cv-00027-ERW    Doc. #: 94-58    Filed: 08/14/09    Page: 12 of 53 PageID
No. 4:07-CV-27-ERW    #: 1312
Exhibit 49C

## VIII.

The District Court abused its discretion or committed plain error in denying Mr. Allen's motion to limit the quantum of victim impact evidence because the Government thus was permitted to adduce the testimony of numerous victim impact witnesses, constituting substantially more than a quick glimpse of Richard Heflin's life, causing the death penalty to be imposed under the influence of passion, prejudice, or other arbitrary factors, and depriving Mr. Allen of his rights to due process of law and to be free from cruel and unusual punishment.

> **Standard of Review:** District Court rulings regarding the admission or exclusion of evidence are reviewed for abuse of discretion. United States v. Rouse, 100 F.3d 560, 568 (8th Cir. 1996). A ruling based upon an erroneous legal conclusion is an abuse of discretion by definition. Koon v. United States, 518 U.S. 81 (1996). Plain error in the admission of evidence occurs when "the admission of the challenged testimony undermined the fundamental fairness of the trial and contributed to a miscarriage of justice." U.S. v. Whitetail, 956 F.2d 857, 861 (8th Cir. 1992).

Mr. Allen filed a motion in limine to limit the quantum of victim impact evidence introduced at trial. (App. 380-85) The district court overruled that motion, noting that it would "consider victim impact as it is presented." (T. 14: 35) The court further stated that it had "no way of knowing [at that time] what [the evidence would] be" and admonished that "the government should not go beyond the bounds of either the statute or the case law" permitting victim impact evidence. (T.14:35-36) The

117

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 49C

Government proceeded to call eleven witnesses to describe the consequences of Mr. Heflin's death.

Victim impact evidence is admissible under both federal statute and case law. Under 18 U.S.C. Section 3593, which requires the government to give the defendant written notice of its intent to seek the death penalty, "the factors for which notice is provided...may include factors concerning the effect of the offense on the victim and the victim's family." 18 U.S.C. Section 3593(a)(2).

Section 3593 was enacted shortly after the Supreme Court held in Payne v. Tennessee, 501 U.S. 808 (1991), that victim impact evidence does not violate the constitution. In Payne, the Court concluded that the Eighth Amendment "erects no per se bar [to] evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed." Payne, 501 U.S. at 827.

Payne overruled two Supreme Court cases which held that the Eighth Amendment prohibits a jury from considering victim impact evidence at the sentencing phase of a capital trial: Booth v. Maryland, 482 U.S. 496 (1987), and South Carolina v. Gathers, 490 U.S. 805 (1989).

118

"Booth and Gathers were based on two premises: that evidence relating to a particular victim or to the harm that a capital defendant causes a victim's family do not in general reflect on the defendant's 'blameworthiness,' and that only evidence relating to 'blameworthiness' is relevant to the capital sentencing decision." Payne, 501 U.S. at 819. The Court rejected those premises, holding that "a State may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant." Id., 501 U.S. at 825. Toward that end, the Court determined that evidence which gives the jury a "quick glimpse of the life [a capital defendant] chose to extinguish" is relevant in a murder trial. Id., 501 U.S. at 830-31.

Payne contains no suggestion that the prosecution in a murder trial enjoys an absolute, unfettered right to present victim impact evidence. The Court did not hold that "victim impact evidence must be admitted, or even that it should be admitted" -- the Court held only that the Eighth Amendment erects no *per se* bar to such evidence. Payne, 501 U.S. at 831 (O'Connor, J., concurring).

The defendant in Payne "echoe[d] the concern voiced [in Booth][11] that the admission of victim impact evidence permits a jury to find that defendants whose victims were assets to the community are more deserving of punishment than those whose victims are perceived to be less worthy." Payne, 501 U.S. at 823. In response to that argument, the Court recognized that "as a general matter...victim impact evidence is not offered to encourage comparative judgments of this kind." Id. Nowhere in its opinion did the Court imply that Payne signaled a new era of tolerance for death penalty decisions based on comparative analyses of murder victims.

When the Government in this case informed the jurors that it would present victim impact testimony, it did not tell the jurors that the evidence was offered to give them a glimpse of Mr. Heflin's, life. The Government did not tell the jury that the evidence was offered to show Mr. Heflin's "uniqueness as an individual human being." See Payne, 501 U.S. at 823. The Government did not tell the jury that the evidence was offered to

_____

[11] The Court voiced its concern in footnote 8 of that opinion: "We are troubled by the implication that defendants whose victims were assets to their community are more deserving of punishment than those whose victims are perceived to be less worthy. Of course, our system of justice does not tolerate such distinctions." Booth, 482 U.S. at 506 n.8, 107 S.Ct. at 2534 n.8.

120

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 49C

show the harm that Mr. Heflin's family suffered as a result of his death. The Government informed the jury that it would "rely on this [evidence] as [a] non-statutory aggravating factor, that Richard Heflin's personal characteristics as an individual human being and the impact of the death of Richard Heflin upon his family make this crime more worthy of the death penalty than other murders." (T. 14: 51-52)

After telling the jury that Mr. Heflin's personal characteristics made Mr. Allen more worthy of the death penalty than other murderers, the government brought eleven witnesses to the stand--seven of Mr. Heflin's family members and four of his friends--to describe for the jury Mr. Heflin's good character and their feelings of loss. The jury was thus presented with hours of emotionally charged, tactically unrebuttable testimony that was offered for the illegitimate purpose of encouraging a comparative judgment between Mr. Heflin and victims of "other murders" and generally stirring their emotions.

Admission of the victim impact evidence in this case was so unduly prejudicial that it rendered the trial fundamentally unfair. The fact that Mr. Allen's jurors did not find the particular aggravating factor sought by the Government is hardly inconsistent with this proposition. The purpose

121

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 49C

of the evidence and the argument derived from that evidence was to upset the jury and encourage a sentence reached through emotional rather than rational thinking. The evidence deprived Mr. Allen of his rights under the Due Process Clause of the Fifth Amendment (including the equal protection component of that guarantee), the Assistance of Counsel Clause of the Sixth Amendment, and the Cruel and Unusual Punishments Clause of the Eighth Amendment.

IX.

The District Court erred and abused its discretion in refusing to instruct the jury that the law never requires a jury to impose a sentence of death, as requested in Mr. Allen's several proposed instructions and partial instructions prior to and during the penalty phase of the trial, because each of those instructions would have corrected the mandatory language in the Government's proffered instructions relating to the outcome of the weighing process and would have clarified the jury's options with respect to sentencing.

> **Standard of Review:** Questions of whether a trial court correctly interpreted the law in formulating jury instructions are reviewed de novo. Arkwright Mutual Insurance Company v. Gwinner Oil, Inc., 125 F.3d 1176, 1180 (8th Cir. 1997). Other challenges to jury instructions are reviewed for abuse of discretion. Id. Trial courts are afforded wide discretion in the formulation of instructions and an abuse of discretion will only be found when the charge to the jury, read as a whole, fails to provide the jury with adequate information regarding the law applicable to the case. United States v. Casas, 999 F.2d 1225, 1230 (8th Cir. 1993).

The Government provided the District Court with proposed instructions for the commencement and the conclusion of the penalty phase of Mr. Allen's trial. (App. 449-57) Those proffers purported to implement "a principled weighing procedure" to guide jurors in their sentencing decision. (T. 14: 19) Counsel for the Government explained the rationale of this instruction: "It's quite clear from the legislative history of [18 U.S.C.

123

§§ 3591, <u>et seq.</u>] that this was an attempt to codify the <u>Blystone</u> decision." (T. 14: 20)

Mr. Allen objected to the mandatory language of the instructions proposed by the Government and sought a modification of the instructions which would apprise the jury clearly and unequivocally "that the jury is never required to vote for a sentence of death." (T. 14: 11) The defense provided the District Court with alternative modifications of the instructions proposed by the Government for both the commencement and the conclusion of the penalty phase. (App. 388-91, 449-58)

The District Court elected to submit the instructions which the Government had tendered without modification at the beginning and the end of the penalty phase of Mr. Allen's trial. (T. 14: 26; App. 391-448) The Court explained that "in approving the Government's proffer it is satisfying the statutory scheme, the long body of constitutional law as pronounced in the cases of the United States Supreme Court, and that's the basis for the Court's ruling." (T. 14: 36)

The District Court was mistaken in its apprehension of a Congressional intent to preclude clear instruction regarding the jury's freedom to recommend a sentence other than death. The sentencing

124

procedure defined in §§ 3591, et seq., is not a replica of the state death penalty scheme which passed Eighth Amendment muster in Blystone v. Pennsylvania, 494 U.S. 299 (1990), nor does the federal act reflect a plan to constrain jurors as the Pennsylvania law did.  And the District Court abused its discretion in withholding the instructions requested by Mr. Allen:  especially in the context of this case, such instruction was required for the jury to appreciate its authority to incorporate residual doubt or free-floating mercy into the sentencing process.  The death sentence which resulted should be vacated.

The Pennsylvania death penalty statute considered in Blystone provided:

> "The verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance . . . and no mitigating circumstance or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances."

Id., 494 U.S. at 312.  A five-member majority of the Supreme Court found that requirement adequate to allow the jury in a capital trial "to consider and give effect to all relevant mitigating evidence." Id.  Section 3593(e) requires the jury in a federal death penalty prosecution to find and weigh aggravating and mitigating factors to determine whether execution can be

125

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 49C

justified, and then to recommend on the basis of that consideration "whether the defendant should be sentenced to death, to life imprisonment without possibility of release or some other lesser sentence." The state procedure automatically converts the result of the weighing process into the sentencing decision. The federal procedure requires a jury to determine through the weighing process whether capital punishment would be "justified," and then to reach sentencing decision with that consideration as a principal determinant. The difference between the two plans is not subtle: the Pennsylvania legislature has explicitly stripped jurors of the discretion to exercise their judgment once the weighing process is completed, and Congress has not.

A. Legislative History and Congressional Intent

The pertinent legislative history provides compelling support for the proposition that this is not the Blystone replica for which the Government contended in the District Court. The original version of what is now § 3593(e) was introduced by Senator Biden on September 23, 1993, as part of Title II of S. 1488, then entitled the Violent Crime Control and Law Enforcement Act of 1993. The subsection included a requirement that every capital jury be instructed that it would never be required to impose a

126

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 49C

sentence of death "regardless of its findings with respect to aggravating and mitigating factors."139 Cong. Rec. S12396 (daily ed., September 23, 1993).

The only Senate amendment to § 3593(e) was Amendment No. 1135. 139 Cong. Rec. S15286 (daily ed. November 8, 1993). One of the changes made by the amendment was the deletion of the final sentence of the original version of this subsection. Id., S15288. No floor debate or other legislative material sheds light on the precise purpose behind this deletion. In every other respect, the decidedly discretionary sentencing structure of the original legislation survived the amendment process in the Senate.

The sentencing procedure that emerged from the Senate never provided for the automatic conversion of a finding that aggravating factors outweighed mitigating factors into a recommendation that the defendant be executed, nor did it otherwise require a jury to impose a death penalty based upon its balancing of aggravating and mitigating circumstances. Considering the section as a whole, the Senate's deletion of the final sentence of its original version did nothing more than eliminate a redundant statement of the jury's sentencing discretion and the rather

127

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 49C

unusual inclusion of language specifying a particular jury instruction. 139 Cong. Rec. S15340-01, S15344, S15286.

When the House of Representatives took up the 1994 Crime Bill's death penalty procedures the following spring, proponents of a considerably more rigid sentencing procedure advocated a scheme similar to embodied in the state law which had narrowly survived constitutional scrutiny in the Blystone v. Pennsylvania, supra. Representative Gekas proposed an amendment which would have brought the federal death penalty act into parity with the Pennsylvania death sentencing scheme. 140 Cong. Rec. H2333 (daily ed., April 14, 1994).

The Gekas amendment was adopted by the House on a vote of 226-198, replacing a version of § 3593(e) that had been identical to that originally proposed in the Senate by Senator Biden. Id. at H2335. A House-Senate conference committee subsequently rejected the Gekas amendment and agreed upon the amended Senate version of § 3593(e). House Report 103-964.[12]

---

[12] Representative Gekas roundly criticized this change when the conference report returned to the House for final passage. He opined that the Senate version, even with the final sentence removed by amendment, was no different than the House version which his own amendment had replaced. 140 Cong. Rec. H7940 (daily ed., August 11, 1994).

128

The legislative history of § 3593(e) disposes of the Government's argument in the District Court that the current federal death penalty scheme was intended to replicate the Pennsylvania sentencing procedure which had been before the Supreme Court in <u>Blystone</u>.   On the contrary, Congress considered and ultimately rejected such a procedure.  That Congressional determination should not be undone by jury instructions which concededly are designed to constrain a capital jury in precisely the manner that they would be constrained under Pennsylvania law.  (T. 14: 20) To the extent that the District Court in this case found that § 3593(e) forbade the instruction requested by Mr. Allen, its interpretation of the statute was erroneous.

To be sure, Congress also deleted the express statutory requirement that trial judges instruct juries of their power to reject the death penalty regardless of their findings respecting aggravating and mitigating factors. But that deletion left intact a sentencing arrangement which accorded capital juries virtually unlimited discretion to choose or reject execution as a punishment.  In view of Congress's retention of the terms "sufficiently outweigh" and "justify," the deletion of the original final sentence of § 3593(e) cannot have been intended to signify more than that a jury ought to

recommend execution once it finds capital punishment to be justified.

What is important in the present analysis is that the statute as enacted

codifies the jury's moral authority as the final arbiter of life and death.

## B. The District Court's Abuse of Discretion

Instructions have the salutary purpose of helping jurors to

understand the substantive law which must govern their deliberation and

decision-making. Grogan v. Garner, 806 F.2d 829, 837 (8th Cir. 1986). Mr.

Allen acknowledges the "wide discretion" accorded trial courts in the

formulation of jury instructions. United States v. Casas, supra. Despite

that latitude, the review of instructions in a capital case is matter of

considerable gravity. The Supreme Court has noted both the profound

influence of the trial judge upon a jury generally and the "unique power of

the jury instruction" in particular. Carter v. Kentucky, 450 U.S. 288, 302

n.20, 303 (1981). Because a death sentence is "qualitatively different" from

any other outcome of litigation, Woodson v. North Carolina, 428 U.S. 280,

305 (1976), the adequacy of instructions given to a jury which has

recommended death ought to be scrutinized closely indeed.

Mr. Allen sought to prevail upon the mercy of the jury during the

penalty phase of his trial. He did this through the assertion of mitigating

130

circumstances and through the production of evidence and testimony intended to prove those allegations, as well as through argument appealing to the consciences and humane instincts of jurors. (T. XIX: 66-96) In connection with that defense, Mr. Allen sought an instruction at the beginning and at the end of the proceeding which would assure jurors that nothing in the law required them to recommend execution. His requests were founded on the proposition that § 3593(e) both requires capital juries to weigh aggravating factors against mitigating factors and affords those juries the authority to reach a sentencing decision which includes final reference to individual and collective conscience. (T. 14: 11)

A criminal defendant who makes a timely request for a jury instruction on a theory of defense is entitled to receive that instruction if it is consistent with the evidence and "sets out a correct declaration of law." United States v. Phelps, 168 F.3d 1048, 1058 (8th Cir. 1999) (quoting United States v. Fay, 668 F.2d 375, 377 (8th Cir. 1981)). Because an appeal to mercy was the rationale of Mr. Allen's defense at the penalty phase of his trial, and because § 3531(e) does not preclude juries in capital cases from entertaining that defense, he was entitled to the instruction that he requested.

131

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 49C

This is not a case in which there is room to doubt the effect of the omitted instruction. During closing argument, counsel for the Government--who apparently was not present during argument over the instruction requested by Mr. Allen--told the jury:

> "[T]he Court did tell you that when you weigh these factors, if you find the aggravating factors outweigh the mitigating factors, the aggravating factors weigh more, they're more serious and have more weight to you, then you shall impose the death penalty."

(T. XIX: 47-48) There was an objection to the argument and a conference at the bench ensued. When defense counsel pointed out that the instruction implementing § 3593(e) did not mandate recommendation of the death penalty, counsel for the Government responded: "What's the difference?" The best the District Court could do to ease counsel's confusion was explain that "there is nothing in the instruction that has the language, you shall impose a death sentence." (T. XIX: 48) Certainly Mr. Allen's jurors were susceptible to the same want of clarity about their ultimate sentencing discretion that still beset the United States Attorney after presumably careful review of the instructions in preparation for closing argument.

132

Nor can there be any doubt that mercy was afoot among the jurors. In the consideration of mitigating factors, all twelve found that the offenses of conviction were inconsistent with Mr. Allen's prior behavior, that Mr. Allen had grown up without strong parental guidance, and that there were additional factors about him and about his offenses which mitigated against a sentence of death. (T. XIX: 133, 136, 138) Eleven jurors found that Mr. Allen had not been considered aggressive or violent and eight found that he had no significant prior history of other criminal conduct. (T. XIX: 137) Six jurors found that Mr. Allen was known as a gentle and likeable person. (T. XIX: 136) Eight jurors found that Mr. Allen had grown up in a neighborhood surrounded by gang factions, nine found that the socio-economic environment of the upper middle class grade school he attended had been "inappropriate" for him, ten jurors found that Mr. Allen had demonstrated learning problems in school which had led to academic failure and frustration, and five found that schools and probation authorities had failed to intervene in his "downward spiral path." (T. XIX: 134, 138) Ten jurors found that Mr. Allen had "the personality characteristics of a follower" and lacked the capacity to plan an elaborate crime such as the present bank robbery. (T. XIX: 135)

133

## C. Conclusion

It is likely that the jury refrained from exercising mercy in this case because one or more jurors failed to apprehend that a weighing process which established the legal foundation for execution did not require the recommendation of a death sentence. An unequivocal instruction to that effect would have given the ring of judicial authority to defense counsel's argument for mercy and might have avoided the chillingly equivocal verdict now before this Court. The effect which that clarification of the law would have had upon the outcome of this case is incalculable.

Billie Allen v. United States of America
Case: 4:07-cv-00027-ERW   Doc. #: 94-58   Filed: 08/14/09   Page: 30 of 53 PageID
No. 4:07-CV-27-ERW                         #: 1330
Exhibit 49C

## X.

The District Court erred and exceeded its jurisdiction or committed plain error in submitting both Count I and Count II to the jury for its sentencing recommendation, because the Government was precluded by the Double Jeopardy Clause from seeking to have Mr. Allen punished twice for a single crime and multiple submissions unduly emphasizing the option of death violated the Due Process Clause the prohibition against cruel and unusual punishment, and Mr. Allen's substantial rights were thereby affected.

> **Standard of Review:** This Court reviews claims based upon the construction of statutes and the interpretation of constitutional guarantees de novo. Hamilton v. Schriro, 74 F.3d 1545, 1552 (8th Cir. 1996).

The Government charged Mr. Allen with two capital offenses arising out of a homicide. (App. 82) After the jury convicted Mr. Allen of both charges, the District Court instructed its members to identify and weigh aggravating factors against mitigating factors twice and to recommend a sentence of death or imprisonment for each count. (App. 395, 407-09, 413) Jurors found both aggravating factors and mitigating factors. (App. 458-92) They determined that Mr. Allen should be imprisoned for life without the possibility of parole for the first crime. (App. 472) But after weighing the aggravating factors against the mitigating factors a second time, they recommended execution for the second crime. (App. 489)

135

The Double Jeopardy Clause of the Fifth Amendment and pertinent rules of statutory construction precluded the Government from charging him with two offenses or obtaining two punishments and the District Court from entertaining the two-count prosecution. Similarly, the submission of both counts for sentencing determinations was constitutionally impermissible. Because that submission required the jury to repeat the process of weighing aggravating factors against mitigating factors twice, and thus improperly emphasized the option of execution, Mr. Allen's right to a fair trial and to be free from cruel and unusual punishment also were violated. This combination of constitutional wrongs culminating in a sentence of death had a grave effect upon Mr. Allen's substantial rights.

### A. The Double Jeopardy Clause Forbids The Imposition of Two Punishments For A Single Act Which Violates Both 18 U.S.C. § 924(j) and 18 U.S.C. § 2113

### 1. Introduction

Constitutional and statutory principles govern the power of a court to impose multiple punishments for a single offense. The double jeopardy clause prohibits "multiple punishments for the same offense." Whalen v. United States, 445 U.S. 684, 688 (1980); North Carolina v. Pearce, 395 U.S.

136

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 49C
Case: 4:07-cv-00027-ERW   Doc. #: 94-58   Filed: 08/14/09   Page: 32 of 53 PageID #: 1332

711, 717 (1969). "But the question whether punishments imposed by a court after a defendant's conviction upon criminal charges are unconstitutionally multiple cannot be resolved without determining what punishments the Legislative Branch has authorized." Whalen, 395 U.S. at 688, 100 S.Ct. at 1436.

"Where consecutive sentences are imposed at a single criminal trial, the role of the constitutional guarantee is limited to assuring that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense." Brown v. Ohio, 432 U.S. 161, 165 (1977). "If a federal court exceeds its own authority by imposing multiple punishments not authorized by Congress, it violates not only the specific guarantee against double jeopardy, but also the constitutional principle of separation of powers in a manner that trenches particularly harshly on individual liberty." Whalen, 445 U.S. at 689. The dispositive question thus is whether Congress intended to authorize separate punishments for the two crimes. Albernaz v. United States, 450 U.S. 333, 344 (1981).

Blockburger v. United States, 284 U.S. 299 (1932), states the rule of statutory construction generally employed to decide that question.

> "[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to

137

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 49C

determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not."

Blockburger, 284 U.S. at 304; see also Whalen, 445 U.S. at 691. The assumption underlying the Blockburger rule is that Congress ordinarily does not intend to punish the same offense under two different statutes. Whalen, 445 U.S. at 692. Therefore, "where two statutory provisions · proscribe the 'same offense,' they are construed not to authorize cumulative punishments in the absence of a clear indication of contrary legislative intent." Id.

This Court explained in United States v. Kragness, 830 F.2d 842 (8th Cir. 1987):

> "Since Blockburger, the Supreme Court has repeatedly emphasized that, at least in cases where cumulative punishments are imposed in a single prosecution, the Blockburger rule is a tool of statutory construction used to determine legislative intent rather than a constitutional 'litmus test' that imposes a conclusive presumption of law."

United States v. Kragness, supra, 830 F.2d at 863. Because the Blockburger rule is simply a "means of discerning congressional purpose," it cannot be used to circumvent a clearly expressed legislative intent that is "contrary to the presumption which should be accorded [two statutes] after

138

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 49C

application of the <u>Blockburger</u> test." <u>Missouri v. Hunter</u>, 459 U.S. 359, 367-68, 103 S.Ct. 673, 679, 74 L.Ed. 2d 535 (1983).

Converse principles thus attend a court's determination of whether the imposition of multiple punishments will violate double jeopardy. First, regardless of whether two statutes describe the "same offense" under <u>Blockburger</u>, imposition of multiple punishments for that offense will not violate the double jeopardy clause where Congress intended that multiple sentences be imposed. <u>Hunter</u>, 459 U.S. at 367-68. And second, regardless of whether two statutes describe different offenses under <u>Blockburger</u>, imposition of multiple sentences are impermissible if Congress intended to impose only one. <u>See United States v. Golay</u>, 560 F.2d 866, 869 (8th Cir. 1977). Ultimately, "the question of what punishments are constitutionally permissible is not different from the question of what punishment the Legislative Branch intended to be imposed." <u>Hunter</u>, 459 U.S. at 368 (quoting <u>Albernaz</u>, 450 U.S. at 344)).

2. Congress did not intend to impose multiple punishments for the alternative theories of first degree murder described in 18 U.S.C. §2113

Mr. Allen was convicted of having violated two statutes: 18 U.S.C. § 2113, the federal bank robbery statute, and 18 U.S.C. § 924, which proscribes the use of firearms during the commission of crimes of violence.

139

In this case, the violation of § 2113 constituted the predicate "crime of violence" giving rise to prosecution under § 924.

The federal bank robbery statute provides that "whoever, in committing any offense defined in this section,...kills any person...shall be punished by death or life imprisonment." 18 U.S.C. § 2113(e). The firearms statute enhances the punishment called for in Section 2113 by prescribing an additional term of imprisonment for use of a firearm during the commission of the violent crime. Under Section 924(c)(1),

> "Whoever, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime which provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which he may be prosecuted in a court of the United States, uses or carries a firearm, shall, *in addition to the punishment provided for such crime of violence or drug trafficking crime*, be sentenced to imprisonment for five years, and if the firearm is a short-barreled rifle, short-barreled shotgun, or semiautomatic assault weapon, to imprisonment for ten years, and if the firearm is a machinegun . . . . to imprisonment for thirty years."

18 U.S.C. § 924(c)(1) (emphasis added). The statute authorizes a different penalty where the use of the firearm causes death: where "a person . . . in the course of a violation of subsection (c), causes the death of a person through the use of a firearm," that person shall "if the killing is a murder

140

(as defined in section 1111)[13], be punished by death or by imprisonment for any term of years, or for life." 18 U.S.C. § 924(j)(1). Thus, the bank robbery statute and the firearms statute describe alternative theories of first degree murder: under § 2113, a person who commits murder in the course of a bank robbery is subject to the death penalty, and under § 924, a person who commits murder with a firearm during the commission of a bank robbery also is subject to the death penalty.

The capital murder provision of 18 U.S.C. § 924 is relatively new. The statute was enacted in the late 1960s, but the subsection "relating to persons who, in the course of a violation of subsection (c) cause the death of a person through the use of a firearm," was added as subsection (i) in 1994. A 1996 amendment redesignated subsection (i) as subsection (j). No other amendments to the capital murder provision of Section 924 have been made.

Congress has enacted amendments to subsection (c) of the statute. In part, those amendments had the obvious purpose of undoing two Supreme Court decisions. In both Simpson v. United States, 435 U.S. 6 (1978), and

---

13 18 U.S.C. § 1111 defines murder as the "unlawful killing of a human being with malice aforethought," and further defines first and second degree murder. The statute authorizes imposition of the death penalty for first degree murder. 18 U.S.C. § 1111(b).

141

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 49C

Busic v. United States, 446 U.S. 398 (1980), the Court had held that Section 924(c) was inapplicable to predicate statutory offenses which included their own "enhancement"provisions.  Those Supreme Court decisions had disallowed multiple sentences for violations of § 924(c) and a predicate offense.  At the time that Simpson and Busic were decided, § 924(c) provided that "in addition to the punishment provided for the commission of [the underlying] felony," a person convicted under Section 924(c) could be sentenced to a consecutive term of imprisonment for one to ten years.  However, the statute did not contain language authorizing additional punishment where the underlying crime already provided for enhanced punishment if it was committed by the use of a deadly weapon.

Congress, apparently displeased with Simpson and Busic, noted that the Supreme Court's decisions in those two cases "negated [§ 924(c)'s] use in cases involving statutes . . . which [had] their own enhanced, but not mandatory, punishment provisions in situations where the offense [was] committed with a dangerous weapon." S.Rep. No. 225, at 312-13, 1984 U.S.C.C.A.N. at 3184, 3490-91.  Congress felt that such situations involved "precisely the type of extremely dangerous offenses for which a mandatory punishment for the use of a firearm is most appropriate." Id.  It

142

therefore undertook to "completely revise" § 924(c) to "ensure that all persons who commit Federal crimes of violence, including those crimes set forth in statutes which already provide for enhanced sentences for their commission with a dangerous weapon, receive a mandatory sentence, without the possibility of a probationary sentence or parole." Id.

Congress amended § 924(c) in 1984 by substituting "provisions setting forth a mandatory, determinate sentence for persons who use or carry firearms during and in relation to any Federal crime of violence for former provisions which set out a minimum sentencing scheme for the use or carrying, unlawfully, of a firearm during a federal felony." 18 U.S.C. § 924, Historical and Statutory Notes, 1984 Amendment. Congress also added language within Section 924(c) which directed that the mandatory sentence be imposed for "any crime of violence...(including a crime of violence . . . which provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device)." Congress thereby clearly expressed its intention within the statute that violations of Section 924(c) carry a penalty cumulative to the punishment for the underlying felony. United States v. Mills, 835 F.2d 1262, 1264 (8th Cir. 1987).

143

Congress did not express a similar intention in 1994 when it enacted § 924(i), "relating to persons who, in the course of a violation of subsection (c) cause the death of a person through the use of a firearm," nor did Congress express such an intention when it revised § 924 in 1996 to redesignate subsection (i) as subsection (j). 18 U.S.C. § 924, Historical and Statutory Notes, 1994 Amendment, 1996 Amendment. Unlike § 924(c), § 924(j) does not state that the death penalty or a life sentence may be imposed "in addition to the punishment provided" for the underlying "crime of violence." Instead, § 924(j) authorizes a single punishment for causing the death of a person through the use of a firearm "during and in relation to any crime of violence": if the killing is a murder, it is punishable "by death or by imprisonment for any term of years or for life"; if the killing is manslaughter, it may be punished "as provided in [18 U.S.C. Section 1112]." 18 U.S.C. Section 924(c), (j). The legislative intent to impose cumulative punishments so clearly expressed in subsection (c) is conspicuously absent from subsection (j).

The exclusion of a cumulative punishments provision from § 924(j) is a striking indicator of legislative intent with regard to the punishments contained in that provision. "It is a rudimentary axiom of statutory

144

construction that 'expressio unius est exclusio alterius'; the expression of one implies the exclusion of the other." McGee v. Funderburg, 17 F.3d 1122, 1125 (8th Cir. 1994). Application of that maxim in view of both the legislative history of § 924 and the language used in that statute compels a finding that Congress did not intend the punishment for violation of Section 924(j) to be cumulative to the punishment received for violation.of the predicate violent crime.

When Congress enacted 18 U.S.C. § 924, it expressed its intent that punishments authorized for violation of subsection (c) be "in addition to the punishment" for the predicate violent crime. Congress later amended § 924(c) to clarify its intention that cumulative punishments be imposed under that particular subsection, even where the predicate offense contained an enhancement provision for use of a firearm. The amendment of § 924(c) was prompted by Congress' awareness that the United States Supreme Court had not fully grasped the legislative intent regarding the cumulative punishments authorized. Nevertheless, Congress has never stated in § 924(j) that the punishment for murder authorized by that subsection be cumulative to the punishment for murder committed during the predicate violent crime.

145

The application of "expressio unius est exclusio alterius" in the context of §924 is particularly telling. A determination that Congress intended cumulative punishments under Section 924(j) would necessarily carry the assumption that Congress simply forgot to include language authorizing such punishments when it enacted that subsection. That assumption is unreasonable given Congress' awareness of prior Court. confusion regarding legislative intent, and Congress' efforts to express and clarify its intent in a different subsection of the same statute. See McGee v. Funderburg, 17 F.3d 1122, 1125 (8th Cr. 1994); I.C.C. v. Blue Diamond Products Company, 192 F.2d 43, 45-46 (8th Cir. 1951). By failing to include a provision in § 924(j) allowing punishment "in addition to" the punishment for the predicate offense, Congress expressed its intent that punishment under that section not be cumulative.

Assuming arguendo that the exclusion of a provision for cumulative punishment in § 924(j) was not indicative of legislative intent, Congress' unexpressed intent at a minimum renders the statute sufficiently ambiguous to warrant application of the rule of lenity. The rule of lenity is a rule of statutory construction applied when congressional intent with respect to a punitive law is ambiguous. See United States v. Kinsley, 518

146

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 49C

F.2d 665, 666 (8th Cir. 1975). The rule was established in <u>Bell v. United States</u>, 349 U.S. 81 (1955):

> "When Congress leaves to the Judiciary the task of imputing to Congress an undeclared will, the ambiguity should be resolved in favor of lenity.... [I]f Congress does not fix the punishment for a federal offense clearly and without ambiguity, doubt will be resolved against turning a single transaction into multiple offenses."

<u>Id.</u>, 349 U.S. at 83-84.

Under the rule of lenity, "a court cannot interpret a federal criminal statute 'so as to increase the penalty that it places on an individual when such an interpretation can be based on no more than a guess as to what Congress intended." <u>United States v. R.L.C.</u>, 915 F.2d 320, 325 (8th Cir. 1990). Because Congress did not fix the punishment for violation of Section 924(j) "clearly and without ambiguity," this Court is required to resolve any doubt about congressional intent "against turning a single transaction into multiple offense," and in favor of lenity for Mr. Allen. <u>Id.</u>, <u>Kinsley</u>, 518 F.2d at 666. The rule of lenity compels a finding that Mr. Allen committed only one offense.

147

2. The Submission of Both Offenses Gave Undue Emphasis
To the Death Penalty and Violated the Fifth and Eighth Amendments

The submission of both Count I and Count II at the penalty stage of Mr. Allen's trial compelled his jurors to go through the process of weighing aggravating factors against mitigating factors--and deciding whether Mr. Allen would live or die--twice. (App. 395, 407-09, 413) The process and the responsibility must have been remarkably intense and surely had the capacity to be brutalizing: knowing that yet another life hung in the balance and was theirs to take or spare, Mr. Allen's jurors dwelled upon and measured the terror of the crime and the horror of its consequences against the history and humanity of the young man whom they had convicted of being one of its perpetrators, and then they did it again. By the end of their deliberation on the second count, the weight of the crime had prevailed. (App. 458-92)

Because the Double Jeopardy Clause forbade the imposition of two punishments upon Mr. Allen, the submission of both counts to the jury infringed Mr. Allen's Fifth Amendment rights and was erroneous. Because that multiple submission unduly emphasized the option of a death sentence and inevitably ground down the inclination toward mercy, the Eighth Amendment also was transgressed. The injustice of putting Mr. Allen to

148

death in the face of those gross constitutional deprivations would be profound.

The Supreme Court has emphasized repeatedly that the unique nature of the death penalty demands a greater degree of reliability in capital sentencings than in other criminal proceedings. See, e.g., Lockett v. Ohio, 438 U.S. 586, 604 (1978) (opinion of Burger, C.J., joined by Stewart, Powell, and Stevens, JJ.); Woodson v. North Carolina, supra, 428 U.S. at 305 (opinion of Stewart, Powell, and Stevens, JJ.). The absence of any coercion upon or other skewing of the sentencing jury's deliberative process is of special importance in a capital trial. See Lowenfield v. Phelps, supra, 484 U.S. at 241. It is axiomatic, in short, that "the decision whether a man deserves to live or die must be made on scales that are not deliberately tipped toward death." Witherspoon v. Illinois, 391 U.S. 510, 522-23 n. 20 (1968).

The great vice of requiring Mr. Allen's jurors to recommend two punishments was the grinding effect of twice having to weigh the wrong and the harm of the crime against the life of the defendant. This Court has recognized the danger inherent in the submission of instructions which unnecessarily repeat and thus highlight particular deliberative choices.

149

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 49C

Vanskike v. ACF Industries, Inc., 665 F.2d 188 (8th Cir. 1981), cautioned trial courts to "go as far as possible" to avoid the "undue prominence" of one option over others in a jury charge. Id., 665 F.2d at 201; see also Halladay v. Verschoor, 381 F.2d 100, 113 (8th Cir. 1967). The Court also has noted that "repetitious instructions which place undue emphasis on a particular matter so as to . . . prejudice the jury require reversal." Dobson v. Bacon Transport Company, 607 F.2d 805, 807-08 (8th Cir. 1979) (citing Flentie v. American Community Stores Corporation, 389 F.2d 80, 83 (8th Cir. 1968)).

The penalty phase instructions in this case did not merely emphasize the option of death by improperly submitting that choice twice: those instructions were harmful most of all because they required the jury to immerse itself two times instead of one in the grotesque events and maddening consequences of a grisly crime, and allowed Mr. Allen to live only if the understanding and mercy engendered by his mitigating evidence survived the process twice. It did not. The impossibility of knowing what verdict Mr. Allen's jury would have returned after a single weighing of aggravating and mitigating factors demands that the sentence recommended by the jury and imposed by the District Court be set aside.

150

## CONCLUSION

For the reasons set forth in this brief, the judgment of conviction should be reversed and the sentences imposed upon Mr. Allen should be vacated.

Michael A. Gross
15 North Gore Avenue, Suite 201
St. Louis, Missouri 63119
Telephone: (314) 918-1080
Facsimile:  (314) 918-1070


John W. Simon
Inglish & Monaco
237 East High Street
Jefferson City, Missouri 65101
Telephone: (573) 634-2522

Attorneys for Appellant

## CERTIFICATE OF COMPLIANCE

This brief is submitted pursuant to Fed.R.App.P. 32(a)(7)(B) and 8th

Cir.R. 28A(c). The undersigned counsel for Mr. Allen certifies that the brief

contains 27,862 words and is printed in 14-point proportionally-spaced

type. The brief thus complies with the typeface and volume provisions of

Fed.R.App.P. 32. The brief was prepared with WordPerfect for Macintosh

version 3.5.1. The computer diskettes submitted to the Court and to

counsel for the Government have been scanned for viruses and were found

to be virus-free.

Michael A. Gross
Attorney for Appellant Emmanuel Jones
15 North Gore Avenue, Suite 201
St. Louis, Missouri 63119
Telephone: (314) 918-1080
Facsimile:  (314) 918-1070

152

# CERTIFICATE OF SERVICE

Two printed copies of this brief, together with one electronic copy,

were sent by first class mail on June 7, 1999, to:

Mr. Joseph Landolt
Ms Mary Jane Lyle
Office of United States Attorney
1114 Market Street, Room 401
St. Louis, Missouri 63101

Michael A. Gross

153

ADDENDUM

|  | Page |
|---|---|
| Judgment in a criminal case, June 4, 1998 | A-1 |
| Amended Judgment in a criminal case, June 11, 1998 | A-3 |

AO 245B (Rev. 8/96) Sheet 1- Judgment in a Criminal Case

FILED

# United States District Court

## Eastern District of Missouri

JUN 4 1998

U. S. DISTRICT COURT
EASTERN DISTRICT OF. MO

| | |
|---|---|
| UNITED STATES OF AMERICA | JUDGMENT IN A CRIMINAL CASE |
| v. | (For Offenses Committed On or After November 1, 1987) |
| BILLIE JEROME ALLEN | Case Number:  4:97-CR-141 ERW |
| | Richard H. Sindell & John W. Simon |
| | Defendant's Attorney |

**THE DEFENDANT:**

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
   which was accepted by the court.

☒ was found guilty on count(s)   I and II _____
   after a plea of not guilty

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number(s) |
|---|---|---|---|
| 18 USC Section 2, 2113(a) and (e) | Bank Robbery By Force or Violence. | 03/17/97 | I |
| 18 USC Section 2, 924(c)(1) and 18 USC Section 2, 924(j)(1) | Carry a Firearm During Crime of Violence and Commit Murder. | 03/17/97 | II |

Allocution is granted.

Defendant assigns no lawful reason as to why judgment of Court should not be pronounced.

The defendant is sentenced as provided in pages 2 through __2__ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☐ Count(s) _____ dismissed on the motion of the United States.

IT IS FURTHER ORDERED that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.

| | |
|---|---|
| Defendants Soc. Sec. No.:  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 | June 4, 1998 |
| Defendant's Date of Birth:  06/18/77 | Date of Imposition of Judgment |
| Defendant's USM No.:  26901-044 | |
| Defendant's Residence Address: | |
| | Signature of Judicial Officer |
| 4535 Cote Brilliant | |
| St. Louis, MO  63113 | E. RICHARD WEBBER |
| | UNITED STATES DISTRICT JUDGE |
| Defendant's Mailing Address: | Name & Title of Judicial Officer |
| | |
| (Same As Above) | June 4, 1998 |
| | Date |

A1

2123

AO 245B (Rev. 8/96) Sheet 2 - Imprisonment

Judgment-Page __2__ of __2__

DEFENDANT: BILLIE JEROME ALLEN

CASE NUMBER: 4:97-CR-141 ERW

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of __(See Below)__

On Count I, the defendant shall be imprisoned for a term of life, without the possibility of release.

On Count II, the defendant is sentenced to death.

Both Count I and Count II are to run consecutively.

☒ The court makes the following recommendations to the Bureau of Prisons:

The defendant requests a recommendation for imprisonment at the Federal Correctional Institution at Florence, Colorado. Since the defendant is sentenced to death, the recommendation maybe unacceptable, and the Court understands the recommendation may not be accepted, but the Court will recommend imprisonment at the Federal Correctional Institution at Florence, Colorado.

☒ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

☐ at _____ a.m./pm on _____

☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

☐ before 2 p.m. on _____

☐ as notified by the United States Marshal.

☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

_____

_____

_____

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
Deputy U.S. Marshal

A 2

AO 245C (Rev. 3/95) (Exhibit 49C) Sheet 1 - Amended Judgment in a Criminal Case   PC : PARTIES, USM, USP, USPT   (NOTE: Identify Changes with Asterisks A))

# United States District Court
## Eastern District of Missouri

JUN 11 199_

UNITED STATES OF AMERICA
v.
BILLIE JEROME ALLEN

**AMENDED JUDGMENT IN A CRIMINAL CASE**
(For Offenses Committed On or After November 1, 1987)

Case Number:  4:97-CR-141 ERW

Richard H. Sindell & John W. Simon

Defendant's Attorney

**Date of Original Judgment:**  June 04, 1998
(or Date of Last Amended Judgment)

### Reason for Amendment:

☐ Correction of Sentence on Remand (Fed. R. Crim. P. 35(a))
☐ Reduction of Sentence for Changed Circumstances (Fed. R. Crim. P. 35(b))
☒ Correction of Sentence by Sentencing Court (Fed. R. Crim. P. 35(c))
☐ Correction of Sentence for Clerical Mistake (Fed. R. Crim. P. 36)

☐ Modification of Supervision Conditions (18 U.S.C. § 3563(c) or 3583(e))
☐ Modification of Imposed Term of Imprisonment for Extraordinary and Compiling Reasons (18 U.S.C. § 3582(c)(1))
☐ Modification of Imposed Term d Imprisonment for Retroactive Amendment(s) to the Sentencing Guidelines (18 U.S.C. § 3582(c)(2))
☐ Direct Motion to District Court Pursuant to   ☐ 28 U.S.C. § 2255.
   ☐ 18 U.S.C. § 3559(c)(7), or   ☐ Modification of Restitution Order

### THE DEFENDANT:

☐ pleaded guilty to count(s) _____
☐ pleaded nolo contendere to count(s) _____
   which was accepted by the court.
☒ was found guilty on count(s)  I and II
   after a plea of not guilty.

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number(s) |
|---|---|---|---|
| 18 USC Section 2, 2113(a) and (e) | Bank Robbery By Force or Violence. | 03/17/97 | I |
| 18 USC Section 2, 924(c)(1) and 18 USC Section 2, 924(j)(1) | Carry a Firearm During Crime of Violence and Commit Murder. | 03/17/97 | II |

Allocution is granted.

Defendant assigns no lawful reason as to why judgment of Court should not be pronounced.

  The defendant is sentenced as provided in pages 2 through 2 ___ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____
☐ Count(s) _____ dismissed on the motion of the United States.

  IT IS FURTHER ORDERED that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.

Defendants Soc. Sec. No.:  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
Defendants Date of Birth:  06/18/77
Defendants USM No.:  26901-044
Defendants Residence Address:

4535 Cote Brilliant

St. Louis, MO  63113

Defendants Mailing Address:

(Same As Above)

June 11, 1998

Date of Imposition of Judgment

_E. Richard Webber_ (signature)

Signature of Judicial Officer

E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE

Name & Title of Judicial Officer

June 11, 1998

Date

(431)

A3

AO 245C (Rev. 8/96) Sheet 2 - Imprisonment

Judgment-Page __2__ of __2__

DEFENDANT: BILLIE JEROME ALLEN

CASE NUMBER: 4:97-CR-141 ERW

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of  (See Below)* _____

*On Count II, the defendant is sentenced to death.

*On Count I, the defendant shall be imprisoned for a term of life, without the possibility of release. This sentence and judgment of life without the possibility of release is in addition to the sentence and judgment of death on Count II.

*Both Count I and Count II are to run consecutively.

☒ The court makes the following recommendations to the Bureau of Prisons:

The defendant requests a recommendation for imprisonment at the Federal Correctional Institution at Florence, Colorado. Since the defendant is sentenced to death, the recommendation maybe unacceptable, and the Court understands the recommendation may not be accepted, but the Court will recommend imprisonment at the Federal Correctional Institution at Florence, Colorado.

☒ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

    ☐ at _____ a.m./pm on _____

    ☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐ before 2 p.m. on _____

    ☐ as notified by the United States Marshal.

    ☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

_____

_____

_____

Defendant delivered on _____ to _____

at _____, with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
                             Deputy U.S. Marshal

A4