# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

No. 98-2549

## UNITED STATES OF AMERICA,

*Appellee,*

v.

## BILLIE JEROME ALLEN,

*Appellant.*

On Appeal from the United States District Court for the
Eastern District of Missouri, Eastern Division
The Hon. E. Richard Webber, District Judge

## REPLY BRIEF OF APPELLANT

Respectfully submitted,

MICHAEL A. GROSS                    JOHN WILLIAM SIMON

15 North Gore Avenue, Suite 201     200-A East High Street
St. Louis, Missouri  63119          Jefferson City, Missouri  65101

(314) 918-1080                      (573) 632-6777

*Attorneys for Appellant*

RECEIVED

DEC  6 1999

U. S. COURT OF APPEALS
EIGHTH CIRCUIT

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 50

# IN THE
# UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

No. 98-2549

## UNITED STATES OF AMERICA,

*Appellee,*

v.

## BILLIE JEROME ALLEN,

*Appellant.*

On Appeal from the United States District Court for the
Eastern District of Missouri, Eastern Division
The Hon. E. Richard Webber, District Judge

## REPLY BRIEF OF APPELLANT

Respectfully submitted,

MICHAEL A. GROSS                    JOHN WILLIAM SIMON

15 North Gore Avenue, Suite 201     200-A East High Street
St. Louis, Missouri  63119          Jefferson City, Missouri  65101

(314) 918-1080                      (573) 632-6777

*Attorneys for Appellant*

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 50

## Table of Contents

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    I.      Unconstitutionality of the Federal Death Penalty Act . . . . . . . . . . . . 7

          A.     FDPA allows prosecutors to make up nonstatutory aggravating factors that vary from prosecutor to prosecutor and from case to case, and lead to arbitrary and capricious capital sentencing. . . 7

          B.     FDPA's purported authorization of "nonstatutory aggravating factors" delegates a legislative function to executive officers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

          C.     FDPA's purported authorization of "nonstatutory aggravating factors" violates the constitutional prohibition on ex post facto laws. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

          D.     FDPA purports to allow a court or jury to impose a death sentence on the basis of "information" that would not be admissible in the judicial trial of any other claim or issue. . . . 11

          E.     FDPA fails to provide for proportionality review, even though it also provides for the use of "nonstatutory aggravating factors" that vary from prosecutor to prosecutor and from case to case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

F.   FDPA restricts appellate review of federal death sentences beyond what is required of state capital sentencing schemes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

G.   FDPA fails to define a category of homicides that narrows the sentencer's discretion in a principled manner, but instead allows a federal death sentence for virtually any homicide in which Congress has expressed an interest. . . . . . . . . . . . . . . . . . . . . 15

II.  Failure to require grand jury indictment on mens rea and statutory aggravating factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

A.   The prosecution's principal authority for *not* requiring a grand jury indictment on the special mens rea required for considering a death sentence and on at least one statutory aggravating factor is of no significance, because it is a state case from a state that does not require grand jury indictments at all. . . . . . . . . . . . . 17

B.   The prosecution's position cannot withstand the analysis the Supreme Court of the United States applied in *Jones v. United States* to analogous factors that raised a sentencing ceiling under a noncapital criminal statute. . . . . . . . . . . . . . . . . . . . . . . . . . 19

III. Failure scrupulously to honor request for counsel . . . . . . . . . . . . . 23

IV.  Denial of continuance when third-party mitigation expert abandoned appellant and his counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

A.   The penalty phase the defense did present demonstrates their good faith in seeking the continuance when they sought it. . . 26

B.   Appellant need make no further showing of prejudice than appears from the record on appeal, and, in the alternative, if a further showing is required, the cause should be remanded to allow him to do so in the district court. . . . . . . . . . . . . . . . . . . 27

C.  The principle underlying *Ake v. Oklahoma* requires an effective opportunity to employ a mitigation expert in a capital case, not just funding to hire one whether he or she works or not. .... 29

V.  Prosecutorial failure to disclose change of story by witnesses to perpetrators' entry into getaway vehicle ...................... 31

A.  The undisclosed change of story bore on a factual issue critical to the jury's assessment of punishment. ................. 32

B.  Defense counsel were entitled to rely on the prosecution's responses to discovery in preparing their case. ........... 33

VI.  Failure to afford full *Beckford* relief, and prosecutorial failure to abide by relief granted .................................. 37

A.  Compelling a statement to a prosecution psychiatrist without effectively preventing its use in the guilt phase is a structural error that does not require a showing of prejudice. ......... 38

B.  These actions chilled the appellant's constitutional right to testify in his own defense. ........................... 39

VII.  United States Attorney's reference, in penalty phase closing argument, to appellant as "murderous dog" ........................... 41

VIII.  Denial of motion in limine concerning "victim-impact" testimony exceeding constitutionally permissible "quick glimpse" ......... 48

IX.  Refusal to instruct on life option, right to act with mercy, and otherwise to avoid *Blystone* instruction when Congress rejected *Blystone* bill ...................................... 51

X.  Allowing the prosecution two bites at death predicated on same homicide ...................................... 54

- iii -

A.    The relevant statutes do not authorize cumulative punishments.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

   1.    The prosecution has not refuted, and cannot refute, the appellant's analysis of the legislative history of the firearms statute, which *excludes* a murder committed during a bank robbery from the class of offenses punishable under subsection (j) of 18 U.S.C. § 924.  . . 54

   2.    Under established norms of statutory construction, the two offenses on the basis of which the prosecution charged the appellant were the "same offense." . . . . . . 57

B.    Submission of multiple capital counts predicated on the same homicide skews the jurors' deliberations toward death. . . . . . 67

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

Certificate of Compliance  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 50

## Table of Authorities

### Constitutional Provisions

U.S. Const. amend. V (Double Jeopardy Clause) . . . . . . . . . . . . . . . . . . . . . . 59, 61

U.S. Const. amend. V (Due Process) . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 37, 46, 54

U.S. Const. amend. V (Grand Jury Clause) . . . . . . . . . . . . . . . . . . . . 11, 17-19, 21

U.S. Const. amend. V (Self-Incrimination Clause) . . . . . . . . . . . . . . . . . . . . . . 37

U.S. Const. amend. VI (Assistance of Counsel Clause) . . . . . . . . . . . . . . . . 34, 37

U.S. Const. amend. VI (Jury Trial Clause) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

U.S. Const. amend. VIII (Cruel and Unusual Punishments Clause) . . 7, 11, 32, 37, 46, 54

U.S. Const. amend. XIV, § 1 (Due Process Clause) . . . . . . . . . . . . . . . . . . . . . . 10

U.S. Const. art. I, § 9, cl. 1 (Ex Post Facto Law Clause) . . . . . . . . . . . . . . . . . 9, 11

### Statutes

18 U.S.C. § 2113 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57, 58, 64

18 U.S.C. § 2119 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

18 U.S.C. § 3591 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 17, 20

18 U.S.C. § 3592 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 9, 16, 17, 20

18 U.S.C. § 3593 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 37, 52

18 U.S.C. § 924 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55-57, 59, 63, 64

21 U.S.C. § 848 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

28 U.S.C. § 2255 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 39, 49

Federal Death Penalty Act of 1994, Pub. L. 103-322 (FDPA) . . 7-9, 11-15, 17, 21, 52

Mo. Rev. Stat. § 565.020 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

## Court Rules

28 U.S.C. § 2254, Rule 5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

8th Cir. R. App. P. 30A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

Fed. R. App. P. 28 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Fed. R. App. P. 30 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

Fed. R. App. P. 30(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *

Fed. R. App. P. 32 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

## Judicial Decisions

*Ake v. Oklahoma*, 470 U.S. 68 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

*Apprendi v. New Jersey*, No. 99-478 (U.S. Nov. 29, 1999) (granting certiorari) . 20

*Blockburger v. United States*, 284 U.S. 299 (1932) . . . . . . . . . . . . . . . 57-60, 62-64

*Blystone v. Pennsylvania*, 494 U.S. 299 (1990) . . . . . . . . . . . . . . . . . . . . . 51, 52

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 50

*Brady v. Maryland*, 373 U.S. 83 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Brewer v. Williams*, 430 U.S. 387 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Buchanan v. Angelone*, 522 U.S. 269, 118 S.Ct. 757 (1998) . . . . . . . . . . . . . . . . 12

*Caldwell v. Mississippi*, 472 U.S. 320 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*California v. Brown*, 479 U.S. 538 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . .. 12

*Dawson v. State*, 612 N.E.2d 580 (Ind. App. 1 Dist. 1993) . . . . . . . . . . . . . . . . . 65

*Drossos v. State*, 442 N.E.2d 1 (Ind. App. 4 Dist. 1983) . . . . . . . . . . . . . . . . . . 65

*Edwards v. Arizona*, 451 U.S. 477 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Ervin v. State*, 991 S.W.2d 804 (Tex. Ct. Crim. App. 1999) . . . . . . . . . . . . . . 64-66

*Ford v. Wainwright*, 477 U.S. 399 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . 22, 29

*Furman v. Georgia*, 408 U.S. 238 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . 16, 46

*Gregg v. Georgia*, 428 U.S. 153 (1976) . . . . . . . . . . . . . . . . . . . . . 13-16, 21, 29

*Grubbs v. Delo*, 948 F.2d 1459 (8th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . 24

*Harris v. Oklahoma*, 433 U.S. 682 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*Hildwin v. Florida*, 490 U.S. 638 (1989) (per curiam) . . . . . . . . . . . . . . . . . . . . 20

*Houser v. State*, 474 So. 2d 1193 (Fla. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . 65

*Illinois v. Vitale*, 447 U.S. 410 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*In re Burns*, 974 F.2d 1064 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 50

*Jones v. United States*, 119 S.Ct. 1215 (1999) . . . . . . . . . . . . . . . . . . . 11, 19-22, 64

*Kyles v. Whitley*, 514 U.S. 419 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

*Lewis v. Jeffers*, 497 U.S. 764 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*Loscomb v. State*, 45 Md. App. 598, 416 A.2d 1276 (1980) . . . . . . . . . . . . . . . . 24

*McNeil v. Wisconsin*, 501 U.S. 171 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Mills v. Maryland*, 486 U.S. 367 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Miranda v. Arizona*, 384 U.S. 436 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Missouri v. Hunter*, 459 U.S. 359 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Mistretta v. United States*, 488 U.S. 361 (1989) . . . . . . . . . . . . . . . . . . . . . . . 43

*Origel-Candido v. State of Nevada*, 956 P.2d 1378 (Nev. 1998) . . . . . . . . . . . . 48

*Payne v. Tennessee*, 501 U.S. 808 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*People v. Kincaid*, 87 Ill.2d 107, 429 N.E.2d 508 (1981) . . . . . . . . . . . . . . . . . 18

*People v. Lewis*, 175 Ill.2d 412, 677 N.E.2d 830 (1996) . . . . . . . . . . . . . . . . . . 18

*People v. Owens*, 102 Ill.2d 88, 464 N.E.2d 261 (1984) . . . . . . . . . . . . . . . . . . 18

*People v. Wisslead*, 108 Ill.2d 389, 484 N.E.2d 1081 (1985) . . . . . . . . . . . . . . 46

*Pratt v. Attorney-General*, [1994] 2 A.C. 1, [1993] 4 All E.R. 769 (P.C. 1993) . . 13

*Pulley v. Harris*, 465 U.S. 37 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Spaziano v. Florida*, 468 U.S. 447 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

Case: 4:07-cv-00027-ERW   Doc. #: 94-59   Filed: 08/14/09   Page: 11 of 82 PageID #: 1364

*State v. Chapman*, 625 So. 2d 838 (Fla. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 45

*State v. Finch*, 137 Wash. 2d 792, 975 P.2d 967 (1999) . . . . . . . . . . . . . . . . 66, 67

*State v. Gilroy*, 199 N.W.2d 63 (Iowa 1972) . . . . . . . . . . . . . . . . . . . . . . . . . 65, 67

*State v. Wissing*, 528 N.W.2d 561 (Iowa 1995) . . . . . . . . . . . . . . . . . . . . . . 16, 21

*Tison v. Arizona*, 481 U.S. 137 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Tuilaepa v. California*, 512 U.S. 967 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Turner v. Murray*, 476 U.S. 28 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*United States v. Bagley*, 473 U.S. 667 (1985) . . . . . . . . . . . . . . . . . . . . 38, 40, 42

*United States v. Beckford*, 962 F.Supp. 748 (E.D. Va. 1997) . . . . . . . . . . . . 59-63

*United States v. Dixon*, 509 U.S. 688 (1993) . . . . . . . . . . . . . . . . . . . . . . . . 37, 38

*United States v. Hall*, 152 F.3d 381 (5th Cir. 1998),
    *cert. denied*, 119 S.Ct. 1767 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*United States v. Mayotte*, 76 F.3d 887 (8th Cir. 1996) . . . . . . . . . . . . . . . . . . . 67

*United States v. McVeigh*, 153 F.3d 1166 (10th Cir. 1998),
    *cert. denied*, 119 S.Ct. 1148 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*United States v. Mills*, 835 F.2d 1262 (8th Cir. 1987) . . . . . . . . . . . . . . . . . . . 56

*United States v. Staggs*, 152 F.3d 931 (9th Cir. 1998) (table) . . . . . . . . . . . . . . 65

*Walker v. State*, 582 N.E.2d 877 (Ind App. 3 Dist. 1991) . . . . . . . . . . . . . . . 10, 20

*Walton v. Arizona*, 497 U.S. 639 (1990) . . . . . . . . . . . . . . . . . . . . . . 58-60, 62, 63

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 50

*Whalen v. United States*, 445 U.S. 684 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . 13, 44

*Zant v. Stephens*, 462 U.S. 862 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 44


## Additional Authority

140 Cong. Rec. H7940 (daily ed.) (August 11, 1994) . . . . . . . . . . . . . . . . . . . . . 53

21 AM.JUR.2D, *Criminal Law*, § 546 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

24 C.J.S. *Criminal Law*, § 1567(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

House Report 103-964 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Matt Teague, "The Return of the White Man," ESQUIRE, Dec. 1999 . . . . . . . . . . 42

Michael E. Tigar et al., FEDERAL APPEALS: JURISDICTION & PRACTICE
(3d ed. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

NEW OXFORD ANNOTATED BIBLE WITH THE APOCRYPHA (1994) . . . . . . . . . . . . . 65

R. Posner, THE FEDERAL COURTS (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 50

## Introduction

The prosecution has repeatedly refused to observe the limits on the length of the briefs in this appeal. It certified that its first overlength brief contained 41,274 words. This exceeded *by approximately fifty percent* the limit of 28,000 words that the Court established for both sides' opening briefs, which the appellant observed. This Court struck the first overlength brief, ordered the prosecution to submit a brief within the same limitation it imposed on the appellant, and gave the prosecution weeks in which to prepare a proper brief.

Instead, the prosecution submitted a second overlength brief that it certified to contain 30,297 words. P.S.B. 132.[1] It also submitted a new separate appendix. As it had in its unsuccessful effort to have this Court file its first overlength brief, the prosecution argued that it "had" to file an overlength brief because the appellant's statement of the case was deficient. This allegation is a post hoc rationalization.

---

[1]Appellant will cite to his own opening brief as "A.O.B." (Appellant's Opening Brief); to the prosecution's second opening brief as "P.S.B."; to his own separate appendix as "A.S.A."; and to the prosecution's separate appendix as "P.S.A." Citations to the trial transcript will appear as a roman numeral for the volume number, a colon, and the page or pages within the cited volume. Citations to hearing transcripts will be in the form "H.T." (Hearing Transcript), the date of the hearing, a colon, and the page or pages from the transcript of the hearing.

- 1 -

There is no requirement of prolixity in a statement of the case. Fed. R. App. P. 28(a) sets out the real requirements as follows:

> (6)   a statement of the case briefly indicating the nature of the case, the course of proceedings, and the disposition below; [and]

> (7)   a statement of facts relevant to the issues submitted for review with appropriate references to the record (see Rule 28(e))[.]

In a case, like this one, involving disparate issues, it is frequently of more service to the tribunal to give an overview of the facts and procedural history in the statement of the case, and then to provide more detailed facts and record citations pertaining to each point in the argument of each point: that way, the reader does not have to choose between memorizing the statement of the case, and constantly flipping back and forth between the front and the middle or back of the brief. *See, e.g.,* Michael E. Tigar et al., FEDERAL APPEALS: JURISDICTION & PRACTICE § 9.11 at 454 (3d ed. 1999). In explaining each point in the opening brief, this appellant has provided much of the factual background the prosecution could conceivably be complaining about his having omitted. What the appellant did *not* do was violate the Court's word limitation by using up words to reargue the prosecution's case for death.

- 2 -

That is what the prosecution did in both of its overlength briefs. In its first overlength brief, the statement of facts is thirty-three pages long. After the Court struck this brief and ordered it to file one within 28,000 words, it omitted the procedural history that Fed. R. App. P. 28(a)(6) requires, and submitted a "statement of facts" thirty-two pages long.

When its "statement of facts" in the second brief was virtually as long as the one in the first, stricken, brief, how did the prosecution reduce the word count from 41,274 to 30,297?

One way was by shifting argument from the brief to the prosecution's separate appendix. In response to the appellant's third point on appeal, the prosecution says:

> Because of the word limitations of this brief, the Government adopts the facts as set out in the Memorandum of Magistrate Judge Thomas C. Mummert which accompanied his Order and Report and Recommendation of United States Magistrate Judge. See AllenApp,pp115,121-25,130-31,155-62. *A rendition of the facts with citations to the Hearing Transcript is provided for this Court's convenience at GovernmentApp,pp121-25.* [P.S.B. 55 (italics supplied).]

The prosecution had not sought to incorporate the magistrate judge's memorandum in its first overlength brief. Rather than presenting its version of the facts more

- 3 -

economically, the prosecution shifted its argument about the facts from the beginning of the argument section on Point III of its first overlength brief to pages 121-25 of its new separate appendix.

Another, similar, way of artificially bringing down the word count was by "refer[ring] the Court" to previous briefing in the district court, and adding that briefing to the separate appendix. In response to the appellant's first point on appeal, the prosecution says:

> Because of the word limitations of this brief, the Government will respond only briefly to each of Allen's challenges, and refers the Court to its fuller discussion of the constitutional issues in the Government's District Court response to Allen's Motion to Preclude Imposition of the Death Penalty and his Motion to Dismiss Government's Notice of Intent to Seek Death Penalty. (GovernmentApp,pp50-120). [P.S.B. 43.]

In about sixty words, therefore, the prosecution sought to incorporate seventy pages of briefing, which it had added to its separate appendix after the Court struck its first brief. P.S.B. 43.

Subdivision (h) of this Court's Rule 30A provides: "A party may not incorporate by reference the contents of a brief filed elsewhere." Fed. R. App. P. 30(a)(2) provides that "[m]emoranda of law in the district court should not be included in the appendix unless they have independent relevance." The latter move

- 4 -

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 50

by the prosecution violates these rules. The previous gambits violate at least the spirit of the rules. All of them are attempts to circumvent the word-length limitation to the appellant's prejudice in a capital case.[2]

What is most disturbing about these attempts to circumvent the Court's word limitation is that the prosecution *still* didn't meet it, and attempted to blame its refusal on the appellant's counsel. Its behavior is of a piece with the way it has run roughshod over the appellant from the inception of its case against him. In this case, the prosecution and its privies have—

- chained the appellant to a table in an interrogation cell, held him incommunicado, and refused his request for a lawyer until after he had made a statement to the police

---

[2]Even these rule violations were not enough for the prosecution. One will notice from the foregoing quotations from its second overlength brief the semiliterate citations to the record that leave out spaces between words, abbreviations, and numbers. Why is the Court seeing these for the first time? WordPerfect's word-count subprogram does not recognize a string of characters as separate words unless they have a space between them. Thus,thepresentsentencewillonlycountasoneword. The prosecution did not do this in its first overlength brief. Instead of citing to the record as the needs of the reader and the practice of virtually all writers would indicate, the prosecution has come up with a new trick to make it appear that its second word-count was significantly lower than its first. Appellant's counsel have not gone through the second overlength brief and counted how many words a regular form of citation would have added to the 30,297 words the prosecution certified. It would certainly be at least in the hundreds.

- 5 -

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 50
Case: 4:07-cv-00027-ERW    Doc. #: 94-59    Filed: 08/14/09    Page: 18 of 82 PageID #: 1371

- withheld its knowledge that federal prosecutor's office job applicant William Green had changed his story between discovery and trial, to fit the prosecution's theory of the case in the first of the Lindell Bank & Trust robbery trials

- opposed a continuance when the appellant's first mitigation expert quit

- constantly attempted to evade the limits the district court placed on its use of its psychiatrist's examination of the appellant, and openly violated them before the district court finally dissolved its order granting partial relief

- insisted on the most prosecution-oriented possible verdict directors rather than the models Judge Matsch had used in the Oklahoma City bombing trials; and

- referred to this young African-American male as a "murderous dog," calling for his death to a predominantly white jury so he couldn't "dribbl[e] basketballs" on the white bank guard's grave.

The prosecution's actions speak louder than their words or the appellant's. It has shown that it knows it cannot win a fair fight. If Billie Allen had had a fair trial, he would not be one of the handful of prisoners on the new Federal Death Row. The judgment must be reversed.

- 6 -

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 50

## Argument

### I.   Unconstitutionality of the Federal Death Penalty Act

For his first point on direct appeal, the appellant raised several constitutional issues about provisions of the statute under which the prosecution sought the death penalty—the Federal Death Penalty Act of 1994, Pub. L. 103-322 (FDPA). A.O.B. 40-66.

### A.   FDPA allows prosecutors to make up nonstatutory aggravating factors that vary from prosecutor to prosecutor and from case to case, and lead to arbitrary and capricious capital sentencing.

Subsection (c) of 18 U.S.C. § 3592 allows federal prosecutors to create, and have judges submit to juries, an open-ended category of "nonstatutory aggravating factors." Appellant's *first* constitutional grievance with FDPA relates to its injection of uncertainty and creation of disparate sentences by allowing prosecutors to come up with "nonstatutory aggravating factors" that vary from prosecutor to prosecutor and from case to case, in violation of the Cruel and Unusual Punishments Clause of the Eighth Amendment and, in this federal prosecution, the Due Process Clause of the Fifth Amendment. A.O.B. 50-51. The prosecution responds that these factors are not *supposed* to "serve a narrowing function" but are instead supposed to allow an "individualized determination" on the basis of the

- 7 -

Case: 4:07-cv-00027-ERW    Doc. #: 94-59    Filed: 08/14/09    Page: 20 of 82 PageID #: 1373

accused and the offense. P.S.B. 43-44, *citing, inter alia, Tuilaepa v. California,* 512 U.S. 967, 972 (1994). It cites several other United States court of appeals and district court decisions rejecting other points, without suggesting any reason why this Court does not have the power, duty, and competence to consider the issue independently. P.S.B. 44.

*Tuilaepa* does not provide specific doctrinal support for the position the prosecution has taken. At the place for which the prosecution cites it, *Tuilaepa* explained the distinction between eligibility and selection functions in contemporary capital jurisprudence. Although Mr. Tuilaepa challenged the constitutionality of factors the State of California had prescribed for consideration in the selection phase, it was the *legislature* which had prescribed them as part of a comprehensive capital sentencing statute intended to pass constitutional muster. 512 U.S. at 975-76. This decision is authority for doing what the appellant says Congress *should* have done, not for what it did.

**B.   FDPA's purported authorization of "nonstatutory aggravating factors" delegates a legislative function to executive officers.**

Appellant's *second* constitutional grievance is that by allowing prosecutors to come up with these "nonstatutory aggravating factors," FDPA impermissibly delegates a legislative function to the executive branch. A.O.B. 51-54. The

- 8 -

prosecution cites three other circuits and two district courts as upholding the statute against similar challenges, and quotes *Mistretta v. United States*, 488 U.S. 361, 390 (1989), to the effect that sentencing is a "peculiarly shared responsibility among the Branches of Government" and not "the exclusive province of any one Branch." P.S.B. 44-45.

*Mistretta*, of course, upheld the Act under which the Federal Sentencing Guidelines were promulgated. It had nothing to do with capital sentencing. Would anyone seriously contend that a state or the federal government could transfer capital sentencing to executive officers?

**C.    FDPA's purported authorization of "nonstatutory aggravating factors" violates the constitutional prohibition on ex post facto laws.**

Appellant's *third* constitutional grievance with FDPA is that the same subsection of section 3592 violates the constitutional prohibition on ex post facto laws. U.S. Const. art. I, § 9, cl. 1. The Act allows prosecutors to invent legal norms under which some offenses are capital and others are noncapital, and to apply these norms to conduct that occurred before their creation. That is the essence of an ex post facto law. A.O.B. 54-55.

- 9 -

The prosecution responds by quoting *Walton v. Arizona*, 497 U.S. 639, 648 (1990), and *Lewis v. Jeffers*, 497 U.S. 764, 782 (1990), to the effect that aggravating factors are not separate "offenses," "elements," or "penalties," and cites several district courts as rejecting similar challenges. P.S.B. 45-46.

*Walton* will not carry the prosecution's water. In relevant part it involved a claim that under the Sixth Amendment, a jury must find the existence of statutory aggravating factors. 497 U.S. at 647-49. *Walton* did not involve the creation and application of a legal norm for the first time *after* the conduct on the basis of which it leads to increased punishment. Whether the factfinder may be a judge rather than a jury is a completely separate question from whether a judge or a jury may impose a death sentence on the basis of a legal norm that did not exist at the time of the underlying offense or the asserted factual predicate of the aggravating factor.

Even less so will *Lewis v. Jeffers* bear the weight the prosecution would place on it. The prosecution cites *Lewis* for a reference to *Walton* in a qualifying antecedent clause of a compound sentence, when the main body of the sentence emphasizes the federal constitutional right to heightened reliability in findings whether aggravating factors exist in capital cases:

> the standard of federal review for determining whether a
> state court has violated the Fourteenth Amendment's

- 10 -

> guarantee against wholly arbitrary deprivations of liberty is equally applicable in safeguarding the Eighth Amendment's bedrock guarantee against the arbitrary or capricious imposition of the death penalty. [497 U.S. at 782.]

There can hardly be a more "bedrock" protection against the "arbitrary or capricious imposition" of *any* punishment than the requirement that the offense itself and the punishment for it are prescribed before the conduct takes place which is said to merit the punishment.[3]

### D.    FDPA purports to allow a court or jury to impose a death sentence on the basis of "information" that would not be admissible in the judicial trial of any other claim or issue.

Appellant's *fourth* constitutional grievance with FDPA is that subsection (c) of 18 U.S.C. § 3593 expressly purports to allow the introduction of "information" at a capital sentencing hearing which would not be admissible in a suit about who owns a horse. A.O.B. 55-58. It is not enough that the prosecution can introduce this "information" as to nonstatutory aggravating factors; the statute makes no distinction between these factors and the statutory aggravating factors which are said to fulfill the constitutional necessity of "narrowing" in a rational manner the

---

[3]*See also Jones v. United States*, 119 S.Ct. 1215 (1999), discussed at length at pages 19-22, *infra*, in which the Supreme Court held that aggravating factors in the federal carjacking statute *are* elements of the offense for purposes of the Grand Jury Clause. This implicates the Ex Post Facto Clause as well.

- 11 -

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 50

death-eligible class of persons convicted of deliberate homicide. *E.g., Buchanan v. Angelone*, 522 U.S. 269, 118 S.Ct. 757, 761 (1998).

In response, the prosecution complains that the appellant "[e]ssentially cit[es] no authority" against the novel statutory waiver of the rules of evidence, but must acknowledge that he relied on *California v. Brown*, 479 U.S. 538, 543 (1987), for the proposition that the Constitution requires a death-dealing sovereign to "confin[e] the jury's deliberations to considerations arising from the *evidence* presented, both aggravating and mitigating." P.S.B. 47 (emphasis from A.O.B. 57). This Supreme Court decision is not supposed to count, because "[t]he distinction between 'evidence' and 'information' was not at issue" in the case the appellant cited. P.S.B. 47 n.24. By this standard, the prosecution could have filed a brief within the Court's word limitation simply by not citing cases where the point for which it cites them "was not at issue."

**E.    FDPA fails to provide for proportionality review, even though it also provides for the use of "nonstatutory aggravating factors" that vary from prosecutor to prosecutor and from case to case.**

Appellant's *fifth* constitutional grievance is that FDPA does not provide for proportionality review. As the appellant explains, proportionality review presumes that the legislature has limited capital sentencing to offenses for which the death

- 12 -

penalty is not in principle disproportionate, but asks, instead, whether a particular death sentence is sufficiently more severe than the sentences imposed in similar cases as to suggest an arbitrary or capricious result. A.O.B. 58, *quoting Pulley v. Harris*, 465 U.S. 37, 43 (1984). Appellant concedes that under existing law, proportionality review is not categorically required in order for a death-dealing sovereign's scheme to pass muster under *Gregg v. Georgia*, 428 U.S. 153 (1976), and its progeny. A.O.B. 58. But *Gregg* does require it when, as in the Georgia scheme and under the FDPA, juries consider nonstatutory aggravating factors in the selection process. A.O.B. 58-61, *citing* 428 U.S. at 187 & 198, and *Zant v. Stephens*, 462 U.S. 862, 874, 876 (1983). Without it, these factors may lead a jury to impose the death penalty on an arbitrary and capricious basis, and believe that the law allowed or even commanded it.

In response, the prosecution appears to say that the statute's omission of proportionality review is constitutional because the statute omits it. Other than its gaggle of out-of-circuit opinions and its perfunctory citation of *Pulley*, the prosecution's argument is: "Proportionality review . . . is not required . . . by federal statute." P.S.B. 48-49. *But that is the appellant's grievance.* Although the prosecution champions its own prerogative to make up nonstatutory aggravators

- 13 -

Case: 4:07-cv-00027-ERW    Doc. #: 94-59    Filed: 08/14/09    Page: 26 of 82 PageID #: 1379

(even ones it can't prove to a jury that returns a death verdict anyway, A.S.A. 481-82), it refuses to deal with the appellant's reasoned application of mandatory Supreme Court precedent to sentencing schemes, like FDPA, which involve such factors.

**F.     FDPA restricts appellate review of federal death sentences beyond what is required of state capital sentencing schemes.**

Appellant's *sixth* constitutional grievance is that FDPA restricts appellate review of the capital sentencing process beyond what the Supreme Court has approved in state capital sentencing schemes. A.O.B. 61-63. It does so by abandoning the automatic appeal requirement that was part of the basis for approving the Georgia procedure in *Gregg* itself:

> As an important additional safeguard against arbitrariness and caprice, the Georgia statutory scheme provides for automatic appeal of all death sentences to the State's Supreme Court. That court is required by statute to review each sentence of death and determine whether it was imposed under the influence of passion or prejudice, whether the evidence supports the jury's finding of a statutory aggravating circumstance, and whether the sentence is disproportionate compared to those sentences imposed in similar cases. [428 U.S. at 198.]

- 14 -

As the appellant suggests in a footnote, the determination whether we as a society are going to kill one of our fellow-citizens is one in which *we* have a moral stake in assuring a second look. A.O.B. 63 n.3.

In response to this mandatory authority from the Supreme Court, the prosecution dismisses as "speculation" the appellant's reference to the psychological vulnerability of death-sentenced defendants. It completely ignores the stake society (including the prosecutor's office) has in the integrity of *all* capital sentencing proceedings. It focuses on how easy it is for a defendant to get a notice of appeal on file from a logistical point of view; but its approach would allow an individual to use the federal judiciary as a tool of suicide. P.S.B. 49-50.

G.     **FDPA fails to define a category of homicides that narrows the sentencer's discretion in a principled manner, but instead allows a federal death sentence for virtually any homicide in which Congress has expressed an interest.**

Appellant's *seventh* constitutional grievance with FDPA, and the last one included in this point on appeal, is that the statute fails to define a category of death-eligible homicides which satisfies the norms of rationality and principle required under *Gregg* and its progeny. A.O.B. 63-65. Although 18 U.S.C. § 3591(a)(2)(A)-(D) requires a finding of one of four mental states, these reach well beyond the touchstone of "deliberation" that *Gregg* specifies as justifying the

- 15 -

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 50

execution by organized society of one of its members. 428 U.S. at 187 (death penalty was not per se unconstitutional "when a life has been taken *deliberately* by the offender"). This provision of the statute is toothless, because a prosecutor with a license to coin nonstatutory aggravating factors—working for the monopoly on printing money and raising armies—can satisfy a death-qualified jury that *any* homicide carried one or more of the mens rea requirements.

If the statute were to perform the narrowing function *Gregg* demands, it would not be by allowing the prosecutor to satisfy any of the mental elements the political branches thought had a chance of being found consistent with *Gregg* as weakened to some extent by *Tison v. Arizona*, 481 U.S. 137 (1987). It would be by requiring that the jury find the existence of one or more of the statutory aggravating factors in § 3592(c). But once more, Congress could not stop itself from allowing the death penalty for *any* homicide—a more bloodthirsty approach than before *Furman v. Georgia*, 408 U.S. 238 (1976). Instead of straightforwardly letting the jury decide, Congress set out so many statutory aggravating factors—which require so little showing of a special deathworthiness on the part of the accused citizen—that the statute fails to do what the Supreme Court required in *Gregg*.

- 16 -

## II. Failure to require grand jury indictment on mens rea and statutory aggravating factors

Instead of disclosing its intent to seek the death penalty in the indictment, and demonstrating to the grand jury that it had probable cause for holding the accused citizen to answer for a *capital* crime, the prosecution tendered an indictment that did not allege Billie Allen had acted with the mens rea § 3591(a) requires the jury to find before even considering the death penalty under FDPA, or that at least one of the statutory aggravating factors § 3592(c) was present. A.S.A. 82-83. The prosecution did not disclose its intent to seek the death penalty—*i.e.*, to charge the appellant with a *capital* crime—until it filed a separate pleading before the district court. A.S.A. 186-91. It did not present this accusation to a grand jury. Appellant objected to this procedure in a pretrial motion (A.S.A. 260-63), which the district court denied (A.S.A. 259-63). Appellant advances this grievance as a violation of the Grand Jury Clause of the Fifth Amendment. A.O.B. 67-71. The prosecution's response is unavailing.

**A.** **The prosecution's principal authority for *not* requiring a grand jury indictment on the special mens rea required for considering a death sentence and on at least one statutory aggravating factor is of no significance, because it is a state case from a state that does not require grand jury indictments at all.**

- 17 -

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 50

The prosecution responds that the *appellant* has cited no case in which a court has yet applied the Fifth Amendment's grand jury indictment guaranty to the 1994 statute. P.S.B. 52-53. The prosecution asserts that aggravating factors "play a post-conviction role" rather than adding to the elements of the offense, and cites an Illinois *state* case for the proposition that "there [is] no constitutional requirement that any aggravating factor be charged[.]" P.S.B. 53-54, *quoting People v. Owens*, 102 Ill.2d 88, 106-07, 464 N.E.2d 261, 269 (1984).

The latter citation is of no benefit to the prosecution, because the Illinois state constitution does not require a grand-jury indictment at all, but allows prosecution by information. *E.g., People v. Lewis*, 175 Ill.2d 412, 414, 677 N.E.2d 830, 831 (1996); *People v. Wisslead*, 108 Ill.2d 389, 393, 484 N.E.2d 1081, 1082 (1985); *People v. Kincaid*, 87 Ill.2d 107, 120-26, 429 N.E.2d 508, 513-16 (1981). Indeed, the passage for which the prosecution cites the *Owens* opinion makes clear that the only question before the Illinois state court was whether the accused received sufficient notice that the prosecution was seeking the death penalty. Important as such notice is, it is separate from the issue in this point on appeal: Illinois has not decided, as the People of the United States decided in adopting the Fifth Amendment, to interpose a body of lay citizens between the United States

- 18 -

Government, and an individual whom the government attorneys or their privies have accused of a crime, before he or she can be held to answer for any capital or otherwise infamous crime. By leaving out the most critical factors in the charge against Billie Allen, the prosecution short-circuited this constitutional process.

**B.      The prosecution's position cannot withstand the analysis the Supreme Court of the United States applied in *Jones v. United States* to analogous factors that raised a sentencing ceiling under a noncapital criminal statute.**

In *Jones v. United States*, 119 S.Ct. 1215 (1999), the Supreme Court held that the provisions of the federal carjacking statute, 18 U.S.C. § 2119, which make the punishment greater if the victim suffers serious bodily injury or death set forth elements of the offense, to which the Grand Jury Clause applies. It analyzed the statute, and found that the subsections—(2) and (3), respectively—providing for imprisonment for twenty-five years or for life, rather than for fifteen years, "not only provide for steeply higher penalties, but condition them on further facts (injury, death) that seem quite as important as the elements in the principal paragraph (*e.g.*, force and violence, intimidation)." It concluded:

> It is at best questionable whether the specification of facts
> sufficient to increase a penalty range by two-thirds, let
> alone from 15 years to life, was meant to carry none of
> the process safeguards that elements of an offense bring
> with them for a defendant's benefit. [119 S.Ct. at 1219.]

- 19 -

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 50

It observed that the factors in subsections (2) and (3) do not define independent offenses. *Id.* at 1219-20. It distinguished the facts in these subsections from prior adjudications of crime, concerning which the accused had already had a fair trial or made a competent plea of guilty. *Id.* at 1220-21 & 1226-27. It distinguished three capital-sentencing cases, *Spaziano v. Florida*, 468 U.S. 447 (1984); *Hildwin v. Florida*, 490 U.S. 638 (1989) (per curiam); and *Walton v. Arizona*, 497 U.S. 639 (1990). It explained that *Spaziano* rejected the notion that capital sentencing may be done only by a trial jury rather than a judge; it pointed out that in *Hildwin*, the jury had found the existence of a statutory aggravating factor, without which the judge could not have considered a death sentence; it emphasized that *Walton* relied on language in *Hildwin* to the effect that capital sentencing is "a choice between a greater and a lesser penalty, not . . . a process of raising the ceiling of the sentencing range available." 119 S.Ct. at 127-28.[4]

Like the factors in subsections (2) and (3) of section 2119, the mens rea requirements of § 3591(a)(2) and the statutory aggravating factors in § 3592(c) bear

---

[4]*See also Apprendi v. New Jersey*, No. 99-478 (U.S. Nov. 29, 1999) (granting certiorari). A New Jersey state judge increased from ten years to twelve after the judge determined by a preponderance of the evidence that the defendant "had a purpose to intimidate." Apprendi's successful certiorari petition argues that this latter determination had to be made by a jury beyond a reasonable doubt as an element of the offense.

- 20 -

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 50

the earmarks of "elements" of an offense for the purpose of the Grand Jury Clause. They rely on facts beyond those presented in the guilt-or-innocence phase—facts at least as significant as the latter facts. In *Jones*, the Court looks to state practice to assist it in determining whether the factors bearing on sentencing under the federal carjacking statute required inclusion in the indictment. 119 S.Ct. at 1221. In Missouri capital sentencing practice, the mens rea of deliberation is an element of the offense of first-degree murder that renders an otherwise noncapital homicide death-eligible. Mo. Rev. Stat. § 565.020 (1994). Except insofar as *Tison* qualifies it by permitting a somewhat broader definition of the deathworthy mental element, *Gregg* requires no less. 428 U.S. at 178.

The findings that the trial jury must make beyond a reasonable doubt under FDPA, but concerning which the prosecution contends a grand jury need not find probable cause, "provide for [a] steeply higher penalt[y]" than the elements presented to the grand jury. 119 S.Ct. at 1219. In this respect, they "rais[e] the ceiling of the sentencing range available": that is why Congress put them in the statute. As in *Jones*, "[i]t is at best questionable whether the specification of [these factors] was meant to carry none of the process safeguards that elements of the offense bring with them for a defendant's benefit." *Id.* When Congress *meant* to

- 21 -

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 50

take away a constitutional protection of the accused, as it did in substituting "information" for "evidence," it knew how to say so. *See* pages 11-12, *supra*. All agree that Congress did not dispense with a trial jury's finding beyond a reasonable doubt of either the mens rea or at least one statutory aggravator. This Court should not presume that Congress even *intended* to take away the right to grand-jury indictment, when it *didn't* say so, but the prosecution decided to do so without leave of Congress. 119 S.Ct. at 1222 (collecting cases).

All of the arguments the prosecution raises in this appeal could have been made in *Jones*, but the Supreme Court held that the factor raising the sentencing ceiling had to be in the indictment. In a jurisdiction like the federal government that has a grand-jury indictment requirement for all capital offenses, and requires a *higher* standard of reliability "[i]n capital proceedings generally," *Ford v. Wainwright*, 477 U.S. 399, 411 (1986), this principle applies all the more forcefully in a capital case. The judgment must be reversed.

- 22 -

Case: 4:07-cv-00027-ERW    Doc. #: 94-59    Filed: 08/14/09    Page: 35 of 82 PageID #: 1388

## III.    Failure scrupulously to honor request for counsel

In the district court, the appellant challenged, under *Miranda v. Arizona*, 384 U.S. 436 (1966), and its progeny, the admission of the statement he purportedly made in the late morning of the day following the robbery.  His challenge was premised on his prompt request for counsel and on the conduct of law enforcement officers in response to the invocation of that right:  while no law enforcement official lifted a finger to obtain an attorney to advise him, the appellant remained shackled to a table and held incommunicado in an interrogation room throughout the night and most of the morning, taken to a lineup by police, informed by police that lineup witnesses had identified him as the perpetrator of a capital crime, and told by police that his request to speak with a law enforcement official of prior acquaintance could not be honored because of his outstanding request for counsel. H.T. 5/16/97:88-90, 146-47, 152, 191-93, 200-02, 248-49, 257-60, 284, 295.

The district court denied the motion to suppress evidence of the resulting statement.  The prosecution responded to the appellant's opening brief that "[i]t is abundantly clear under the totality of the circumstances presented herein that Allen's statement to Lt. Henderson came only after Allen reinitiated contact with police and effected a constitutionally valid waiver of his *Miranda* rights." P.S.B.

- 23 -

56-60. This may have a certain through-the-looking-glass charm, but chutzpah and a distorted vision of stationhouse history cannot salvage the unconstitutional behavior of police in this case.

Once a suspect asserts his right to counsel, police must stop interviewing him "until counsel has been made available to him." *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). If questioning is resumed, any resulting statement is "presumed involuntary . . . . even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards.'" *Grubbs v. Delo*, 948 F.2d 1459, 1466 (8th Cir. 1991), *quoting McNeil v. Wisconsin*, 501 U.S. 171, 179 (1991). "[C]ourts indulge in every reasonable presumption against waiver." *Brewer v. Williams*, 430 U.S. 387, 404 (1977).

The prosecution observes that *Edwards* and other decisions acknowledge the possibility of constitutional interrogation if the defendant has voluntarily initiated further contact with police and withdrawn his request for counsel. P.S.B. 55-56. But reliance on that proposition to legitimize the police conduct in this case begs the question or misses the point altogether: here, an entire homicide division stonewalled a suspect's invocation of his right to counsel, and drove him toward the belief that requesting an attorney had been of no avail; then the suspect gave up.

- 24 -

Billie Allen v. United States of America
No. 4.07-CV-27-ERW
Exhibit 50

The notion that a confession obtained in the manner documented by police testimony in this case ought to be admissible in a *federal* capital prosecution is a frightening throwback to meaner times. That position should find no purchase in this Court.

## IV.    Denial of continuance when third-party mitigation expert abandoned appellant and his counsel

Shortly before trial, the mitigation expert selected by trial counsel and compensated by the district court notified trial counsel that he would not continue to work on the case unless trial counsel obtained a substantial continuance.  A.S.A. 307.  Trial counsel obtained another mitigation expert, and sought a continuance to become familiar with the case and to perform his tasks in a manner calculated to develop evidence adequate to the stakes.  *Id.* 306-15.  The district court denied the continuance, observing that if the trial were continued, the prosecution's witnesses would have to "relearn[]" their stories.  H.T. 1/30/98:21.  Appellant advances this grievance as his fourth point on direct appeal.

### A.    The penalty phase the defense did present demonstrates their good faith in seeking the continuance when they sought it.

The prosecution harps on the fact that trial counsel sought the questioned continuance ten days before trial.  P.S.B. 61.  Neither the appellant nor his counsel should be penalized for trying to prepare the penalty phase case *without* a continuance, and for going to the district court for relief *only* when it became clear it would be necessary.  The effort and partial success of the penalty-phase the defense team *was* able to present in spite of the denial of the continuance—which

- 26 -

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 50

the prosecution fulsomely praises (P.S.B. 65-66) in arguing that the continuance was unnecessary—is proof that the motion for continuance was advanced in good faith, by attorneys and experts who were doing their best after having been abandoned by a third party.  If the prosecution believes defense counsel was in any way responsible for the omissions of the first mitigation expert (an adult with a law degree as well as a Ph.D. in psychology), it will be interesting to see how the respondent handles this issue in any action under 28 U.S.C. § 2255 that may be necessary in this matter.

**B.     Appellant need make no further showing of prejudice than appears from the record on appeal, and, in the alternative, if a further showing is required, the cause should be remanded to allow him to do so in the district court.**

The prosecution contends that appellate counsel have not alleged or demonstrated "any specific fact or mitigating information" he did not receive because the district court denied the continuance.  P.S.B. 65-66.  Of course, if appellate counsel had pled facts not in the trial record, the prosecution would have moved to strike those portions of the brief.  The remedy for the failure to find additional facts would be an appropriate cause for remand to the district court; it is not a sufficient basis for denial of relief.

- 27 -

Appellant's substitute mitigation expert, Dr. David Randall, explained that the process of developing a penalty phase defense is an "iterative" one: the expert and counsel ask questions of the accused citizen's family and close associates that lead to further questions for the same sources, and also, in turn, to other sources. H.T. 1/30/98:6,9. It is common for a mitigation investigation to probe into parts of the defendant's life, and his or her family members' lives, that they had suppressed. Just as prosecution witnesses like Mr. Green and Ms. Williams need time to "relearn[]" their lines, the appellant's family members need time to rediscover, and gain the confidence to repeat for strangers, the seamy side of their past. Only by allowing time for self-discovery on the part of potential witnesses, and the development of trust between these witnesses and the defense team, can one hope to get at the truth. The need for time in which to develop trust between potential sources and the defense team is especially significant when, as here, the appellant and the bulk of his family and friends are from a minority community that has been oppressed for over three hundred years, and the court-appointed defense counsel and mitigation experts are not.

Far from showing that the appellant got all the Constitution requires, the strong penalty phase presentation, the multiple mitigating factors that the jurors

- 28 -

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 50

found, and their decision to spare Billie Allen from the death penalty on count I all demonstrate that he was severely prejudiced by the district court's truncating the mitigation investigation. Appellant does not concede there was overwhelming evidence he was at the Lindell Bank & Trust on March 17, 1997, or that he fired a single shot at Mr. Heflin; from the jury's verdicts, however, it is clear that there was not overwhelming evidence to support a death sentence. From what the defense team was able to accomplish without a single day of continuance, this Court can draw the inference that but for the district court's denial of the motion for continuance, Billie Allen would not be sitting on Federal Death Row now.

C.    **The principle underlying *Ake v. Oklahoma* requires an effective opportunity to employ a mitigation expert in a capital case, not just funding to hire one whether he or she works or not.**

The prosecution would have this Court ignore law and practice formally recognized in mandatory authority at least since *Gregg* when it says this Court should ignore the fact that this is a capital case. P.S.B. 66-67. In the United States of America at the dawn of the third millennium, a "heightened standard of reliability" applies at every step of a capital prosecution. *Ford v. Wainwright*, 477 U.S. 399, 411 (1986). Under *Ake v. Oklahoma*, 470 U.S. 68, 77 (1985), the Supreme Court recognized that an indigent defendant's right to representation by an

- 29 -

Case: 4:07-cv-00027-ERW   Doc. #: 94-59   Filed: 08/14/09   Page: 42 of 82 PageID #: 1395

attorney would be hollow if the defendant does not also receive funding for litigation services that are reasonably necessary in light of the case.

Although a wealthy defendant may hire Dr. Randall to work on a driving while intoxicated case, it would be an uphill battle to argue that *Ake* would require funding for such an expert in such a case. But at least where, as here, the accused has a background justifying the submission of four (4) statutory and twenty-two (22) nonstatutory mitigating factors—and jury findings of three (3) *more* such factors—*Ake* requires such funding in a *capital* case.

To pay for a mitigation expert but not to allow him or her the minimum time that professionally reputable mitigation experts would need to do their job would violate the principle of *Ake*. By approving trial counsel's initial request, and by approving the substitution of Dr. Randall when the first mitigation expert abandoned the case, the district court recognized that the appellant *needed* a mitigation expert; the question before this Court is whether the *need* was for the *work* the expert would do or for the *appearance* that the system had provided a mitigation expert.

- 30 -

## V.    Prosecutorial failure to disclose change of story by witnesses to perpetrators' entry into getaway vehicle

Appellant's trial counsel objected contemporaneously and sought relief, then sought a new trial, on account of the prosecution's failure to disclose that two prosecution witnesses had changed a critical part of their testimony from what the prosecution had provided in discovery.  VIII:183-99.  Not only did the district court deny all *remedial* relief; it went ahead to rule that the prosecution did not have to disclose to the defense any *upcoming* discrepancies between what it had disclosed in discovery and what it knew its witnesses were going to say in front of the jury. VIII:198.  Appellant has advanced this grievance on appeal.  A.O.B. 88-96.

This testimony concerned whether Billie Allen or Norris Holder was the person who actually shot the security guard, as opposed to collecting the money from the tellers' cages.  The prosecution's witnesses testified that the man who shot the guard was not the man who went behind the teller line, took the money, and left with the money bag.

Shortly after the robbery, William Green, an attorney who had a job application pending with the same federal prosecutor's office which was preparing him as a witness, and Betty Thompson, a disinterested customer, told the FBI that the man with the bag got into the passenger side of the getaway van.  VII:80-82 &

- 31 -

94-102; VIII:154-60 & 179-82. The prosecution provided the defense the FBI reports reflecting these statements. At trial, both witnesses changed their story to testify that the man with the bag got into the driver's side. The Russian SKS was found on the driver's side; the Chinese SKS was found on the passenger's side. IX:9-12 & 78-80; XI:61. Thus, these witnesses' trial testimony pointed to the passenger as the shooter.

### A. The undisclosed change of story bore on a factual issue critical to the jury's assessment of punishment.

The prosecution responds that its failure to disclose these "jumped statements" was not "material" for the purpose of *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny, because the appellant did not need to be the triggerman in order for him to be guilty of the offenses for which he was sentenced to death. P.S.B. 74.

Whether or not a nontriggerman can receive the death penalty according to the Eighth Amendment and the Supreme Court, it would—like truth as a defense in libel cases—have a way of influencing the jury. The proposition that Billie Allen shot Richard Heflin once, then walked over and shot him again, had a "reasonable probability" of influencing the *punishment* the jury assessed. Later on in the brief,

- 32 -

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 50

the prosecution argues *just the opposite*: that the jury *must* have paid attention to the distinction between triggerman and nontriggerman. P.S.B. 129-30.[5]

**B.      Defense counsel were entitled to rely on the prosecution's responses to discovery in preparing their case.**

Trial counsel's crossexamination was insufficient to *remove* a "reasonable probability" that the jury would punish Billie Allen more severely than it would if Green's and Williams's trial testimony had been the same as the discovery the prosecution provided concerning their evidence. Focusing on crossexamination (P.S.B. 70) minimizes the importance of the prosecution's interference with defense preparation. In trying to raise a reasonable doubt of one or more essential elements of the prosecution's case, counsel had relied for months on the discovery the prosecution provided as indicating what its trial testimony was going to be.

---

[5]The prosecution's other violation of *Brady v. Maryland*, 373 U.S. 83 (1963), included in the appellant's opening brief at 93 n.9, was also material to the outcome, in that the prosecution relied in arguing for substantial planning over a few months on the testimony of paid informant Thomas Mundell, without disclosing the fact he was an informant and the circumstances under which he became an informant. Its response to the appellant's advancing this grievance on appeal (P.S.B. 71 n.27) is unavailing, because facts known to law enforcement are attributable to the prosecution for purposes of applying *Brady* and its progeny. *E.g.*, *Kyles v. Whitley*, 514 U.S. 419, 438 (1995). There can be no good-faith argument that the federal law enforcement establishment in the Eastern District of Missouri, Eastern Division, did not know that Mr. Mundell had already taken the King's shilling, and that this knowledge was attributed to the prosecution by operation of law.

- 33 -

Counsel were deceived by the prosecution's failure to disclose its witnesses' intention to testify contrary to their FBI statements.

Was this ineffective assistance of counsel? Does the Sixth Amendment require that a defense lawyer assume a federal prosecutor is sandbagging, as these prosecutors were? The Supreme Court did not appear to think so in *United States v. Bagley*, 473 U.S. 667, 682-83 (1985), in which it ruled that "the prosecutor's failure to respond fully to a *Brady* request may impair the adversary process" because "[i]n reliance on . . . misleading representation [suggesting that certain evidence did not exist], the defense might abandon lines of independent investigation, defenses, or trial strategies that it otherwise would have pursued." In the instant case, the defense did not just rely on the absence of a response to a specific inquiry, but from an affirmative response to a mass of inquiries both general and specific.

The prosecution contends that it revealed in opening statement that its witnesses would testify the man with the money bag got into the driver's side of the van. P.S.B. 70. It cites "TrVI,pp51-52" as the source for this claim. One will read these pages in vain for any clue of the perfidy afoot. If one goes one page *back* in the transcript, one will read that the prosecutor said Holder was carrying the money bag, and that the appellant got in the passenger side. VI:50 (line 16). That *had* to

- 34 -

be the prosecution's line in light of the physical evidence from inside the van, *if* it wanted the appellant to be the shooter, as it did in *this* trial. (Holder was to be tried separately.) Although the prosecutor said that Green saw Holder *get out* of the driver's side (VI:53 (lines 17-20)), the prosecutor also says Green could not tell what was going on inside the van. VI:52 (lines 17-18). These uncited statements did *nothing* to alert defense counsel that Green was going to jump his statement to conform to the prosecution's theory of the case at this trial, or that Thompson would jump her statement at all.

The district court's ruling (VIII:198) that it doesn't matter what the prosecution provides in discovery, its witnesses can change their stories to fit the prosecution's case as a given trial approaches, sends an iniquitous message to prosecutors around the country. What is the use of *providing* discovery if it is not seasonably supplemented to correct what the prosecution comes to learn are misleading statements?

The prosecution argues that trial counsel should have requested a continuance. P.S.B. 75. What good would that have done? The prosecution's violation affected months of previous trial preparation. Only a mistrial could have

- 35 -

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 50

cured the situation, and even that would have involved the involuntary disclosure of the defense team's work-product based on the prosecution's discovery.

The inexcusable damage arising from this deception will appear even more boldly if this Court takes judicial notice of the trial transcript in its Appeal No. 98-2984, *United States v. Norris G. Holder*, the companion case to the appellant's. In the appellant's trial, the prosecution argued that he was the perpetrator who shot Mr. Heflin but in Holder's—having gotten the death penalty against the younger and more sympathetic of the accused—it argued that Holder, too, shot Mr. Heflin. Vol. VII at 60.

- 36 -

## VI.    Failure to afford full *Beckford* relief, and prosecutorial failure to abide by relief granted

For his sixth point on direct appeal, the appellant advances his grievance concerning the district court's requiring him to participate in an interview by a prosecution psychiatrist without affording him the protection against prosecution use of the fruits of this interview in the guilt phase of the trial that is necessary to accommodate the prosecution's rights under § 3593(c) and the accused citizen's rights under the Fifth, Sixth, and Eighth Amendments.  A.O.B. 97-108.

The prosecution responds with a lengthy discussion in defense of its ability to conduct any psychiatric or psychological testing at all (P.S.B. 78-83), which is not in question, and continues to complain about what the district court *did* do to protect the appellant's right to be free from being forced to provide evidence against himself, his right to counsel, and his right to individualized consideration in capital sentencing (P.S.B. 83-86).  The prosecution contends that the district court erred or abused its discretion in following, to any extent at all, the several precedents on which the appellant relied, and should have followed, instead, the one decision on which the prosecution now relies.  P.S.B. 84-86 & n.31, citing *United States v. Hall*, 152 F.3d 381 (5th Cir. 1998), *cert. denied*, 119 S.Ct. 1767 (1999).  Having expressed its disagreement with the district court's resolution of the issue,

- 37 -

the prosecution proceeds to assert that the appellant wasn't prejudiced when the prosecution *openly* violated it. P.S.B. 86-87. The effort is unavailing in a federal capital case that will no doubt have precedential effect throughout the Nation.

## A. Compelling a statement to a prosecution psychiatrist without effectively preventing its use in the guilt phase is a structural error that does not require a showing of prejudice.

Citing *Hall*, the prosecution asserts that the appellant must show proof of leaks in addition to the one everyone heard and saw in open court. P.S.B. 85. When the information in question is as sensitive as statements by a person on trial for his life to a psychiatrist employed by the prosecution, and the district court allowed the examination to proceed only on condition that the results not be provided to the prosecution team until the beginning of the penalty phase, this Court need not measure the relief so finely. The evil of obtaining the most private of an defendant's recollections and character traits—to be analyzed and presented with the skill of a person having the equivalent of two doctorates with a view to helping the federal government kill him—is so great that the courts must confine it to where they have found it necessary. *United States v. Beckford*, 962 F.Supp. 748, 754-62 (E.D. Va. 1997), does this; the district court attempted to do it, in part; the

- 38 -

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 50
Case: 4:07-cv-00027-ERW    Doc. #: 94-59    Filed: 08/14/09    Page: 51 of 82 PageID #: 1404

prosecution sought at every point to avoid and evade its order, and finally breached it in open court.

This Court has common sense, and therefore the appellant is entitled to the presumption that if the designated recipient would divulge in open court *anything at all* of what the prosecution psychiatrist told him about his examination of the appellant, there is no telling what the employee told the rest of the prosecution team in the secrecy of their offices.

**B.      These actions chilled the appellant's constitutional right to testify in his own defense.**

Appellant knew he could not testify in the guilt-or-innocence phase of the trial without fear that the illicit fruits of the prosecution psychiatrist's examination would be used against him in the prosecution's preparation for crossexamination. Appellant credits the prosecution with the ability to mask their reliance on these fruits in phrasing their questions. Appellant wanted to testify at all points, and trial counsel's decision not to call him will be grist for any section 2255 proceeding that may be necessary. His right to *insist* on testifying was severely chilled by the knowledge that he had been compelled to give statements to a representative of the prosecution team, and that the prosecutors were engaged in a guerrilla campaign to overthrow the district court's partial *Beckford* order.

- 39 -

The district court's failure to order full *Beckford* relief, and the prosecution's *Beckford* violation, add up to a structural defect in the proceeding. No showing of prejudice was necessary. In any event, the appellant's right to testify in the guilt phase was chilled by the prosecutors' pattern and practice of attempting to have the "firewall" breached virtually from the day it was erected. No one in the appellant's situation could be expected to trust the prosecution in deciding whether to insist on his right to testify in the guilt phase. Neither should this Court in deciding this point on appeal.

- 40 -

## VII.   United States Attorney's reference, in penalty phase closing argument, to appellant as "murderous dog"

In closing argument in the penalty phase, the United States Attorney referred to the appellant as a "murderous dog."  Trial counsel did not object.  Counsel *did* include this grievance in the motion for new trial, and pressed it in the argument of this motion, explaining that especially in light of the demographics of the case, trial counsel's shock at the use of such dehumanizing rhetoric by a federal prosecutor in a capital case was "cause" for failure to leap to his feet.  XIX:8.

Appellant advanced this grievance on direct appeal.  A.O.B. 109-16.  The prosecution argues for only limited review because trial counsel did not contemporaneously object; it makes various attempts to link its dehumanizing reference to the appellant to some honorable rhetorical target.  P.S.B. 88-89.  The prosecution relies heavily on the body of cases upholding convictions and sentences on collateral attack when prosecutors made references to defendants that denied their humanity.  P.S.B. 90-97.  As it did in the district court, the prosecution fails to explain why the low standard the courts have tolerated in such a situation should apply in this different procedural posture, especially when this Court is breaking new ground in respect to the federal death penalty.

- 41 -

The prosecution asserts that its argument "does not implicate race at all," and that Mr. Allen's "insinuat[ion]" of an appeal to racial bias "is unfounded and unfortunate." P.S.B. 89-90 n.10. But the prosecution's appeal to the fears of all jurors—especially the overwhelming majority of them, who happened to be white—concerning this young African-American male was not confined to the most egregious instance:

- Despite an order to avoid the reference to urban gangs, the same prosecutor who *publicly* breached the district court's partial *Beckford* order asked a young African-American defense witness if there was any significance to the fact that he was wearing *blue*—the color associated with an urban gang called the "Crips." XVI:225.

- The same Presidential appointee who referred to the appellant as a beast like Cujo told the jury that the appellant must be killed so that he would not be able to play *basketball*: "Don't let him down there dribbling basketballs on Richard Heflin's grave; it wouldn't be right." XIX:98.

It was not necessary for the prosecution to invoke fried chicken and watermelon to make its unmistakable point. To the white jurors (virtually the entire panel), these images are stereotypes of "us" as opposed to "them." *See, e.g.,* Matt Teague, "The Return of the White Man," ESQUIRE, Dec. 1999, at 121-26, 171:

- 42 -

> Once upon a time, great passers with pasty skin roamed the earth. Men like Bob Cousy, Pete Maravich, Jerry West, and Larry Bird. And then they went away. That is, until Jason Williams [nicknamed 'White Chocolate'] came into the NBA.

*Cf. Origel-Candido v. State of Nevada*, 956 P.2d 1378, 1381 (Nev. 1998) ("the state's gang expert . . . testified that 'what separates [a criminal gang] from a group of kids that play basketball . . . [is] criminal activity, that is the defining point, the criminal activity'").

The message of the United States Attorney's comments was that the jurors did not need to regard Billie Allen as their peer—that he was either an animal, or, in the case of virtually every juror and alternate, that he was one of "them" as opposed to "us."

In contending that there must have been "cumulative" misconduct for its improper argument to have mattered, the prosecution ignores the *context* of its reference to Billie Allen as something frighteningly subhuman. The statement in question occurred during closing argument in the penalty phase, and came not from a mere employee but from the President's own appointed United States Attorney.

There is a the stark distinction between the vices of inflammatory argument during a noncapital trial, or the guilt phase of a capital trial, and the constitutional

- 43 -

evils of such argument during the sentencing phase of a capital case. As the Supreme Court reasoned in *Turner v. Murray*, 476 U.S. 28 (1986): "In a capital sentencing proceeding before a jury, the jury is called upon to make a 'highly subjective, "unique, individualized judgment regarding the punishment that a particular person deserves."'" *Id.* at 33-34 (*quoting Caldwell v. Mississippi*, 472 U.S. 320, 340, n.7 (1985), and *Zant v. Stephens*, 462 U.S. 862, 900 (1983)). The remarkable "range of discretion" entrusted to capital jurors with respect to sentencing gives rise to "a unique opportunity for . . . prejudice to operate but remain undetected;" the risk of prejudice infecting the sentencing phase of a capital prosecution "is especially serious in light of the complete finality of the death sentence." *Id.* at 35. Because of its special concern that racial prejudice will infect a jury's exercise of discretion in the penalty phase, the Court held that "a capital defendant accused of an interracial crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias." 476 U.S. at 33-38.

The special sensitivity of the penalty phase to appeals to fear and prejudice comes out, as well, in caselaw regarding other forms of official displays of animus toward the accused. In *State v. Finch*, 137 Wash. 2d 792, 975 P.2d 967 (1999), the

- 44 -

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 50

Washington Supreme Court found that the shackling of a capital defendant throughout his trial had been improper, but concluded that the error had been harmless at the guilt phase of the trial because the evidence of guilt had been overwhelming. *Id.* at 861-62, 975 P.2d at 1007-08. Then it pointed out the pronounced difference between the significance of erroneously exposing jurors to inflammatory information in the guilt phase and in the penalty phase of a capital trial:

> Unlike the guilt phase, the prejudice to the Defendant during a special sentencing proceeding cannot necessarily be overcome by objective and overwhelming evidence . . . . The evidence considered during the special sentencing proceeding is of a more subjective nature dealing with not only the nature of the crimes involved but also with personal history and the character of the Defendant.

*Id.* at 862-63, 975 P.2d at 1007. The court remanded the case for resentencing. *Id.* at 865-66, 975 P.2d at 1009.

Moving jurors toward a verdict based on passion can result from the dehumanizing commentary of an authority figure such as the United States Attorney as well as from the unnecessary restraint of the defendant in the courtroom. Even if a court could deny relief when the dehumanizing governmental action occurred in the guilt phase—in which the choice before the jury is arguably driven by objective

- 45 -

fact—the Fifth and Eighth Amendments will not tolerate such conduct in the penalty phase.

This appeal is from the first capital conviction in a United States district court in the State of Missouri since the informal moratorium on the death penalty following *Furman v. Georgia*. So far, there are relatively few federal capital cases nationwide. What this Court does in this appeal will set the tone for federal capital prosecutions not only throughout this Circuit, but nationwide and even in the few other jurisdictions in the Anglo-Saxon legal tradition that have not already eliminated capital punishment. *E.g.*, *Pratt v. Attorney-General*, [1994] 2 A.C. 1, [1993] 4 All E.R. 769, 773-74, 775, 783 (P.C. 1993) (appeal taken to U.K. Privy Council from Jamaica).

Like the district court, this Court has supervisory jurisdiction over federal attorneys who practice before it, and its scrutiny is not limited to the minimum the Constitution requires—certainly not to what would require a grant of federal habeas corpus from a state conviction and sentence. This Court has great influence over the decorum with which the most powerful entity on the face of the earth must conduct itself when it seeks to extinguish the life of one of its citizens. It can hold federal prosecutors to the standard it would enforce in proceedings before this

- 46 -

Case: 4:07-cv-00027-ERW    Doc. #: 94-59    Filed: 08/14/09    Page: 59 of 82 PageID #: 1412

Court, or it can allow them to behave as local prosecutors would in the trial courts of states to which no one on this Court would wish to have the federal courts compared. That is the choice before the Court on this point.

## VIII. Denial of motion in limine concerning "victim-impact" testimony exceeding constitutionally permissible "quick glimpse"

The prosecution went beyond any pretense of giving a constitutionally permissible "quick glimpse" of the life of Richard Heflin, *Payne v. Tennessee*, 501 U.S. 808, 822 (1991), *quoting with approval Mills v. Maryland*, 486 U.S. 367, 397 (1988) (Rehnquist, C.J., dissenting), in spite of trial counsel's filing and arguing a motion in limine presenting *not only* the constitutional objection to the quantity of "victim-impact information" the prosecution planned to introduce, *but also* the reason the issue had to be ruled on in limine in order for the appellant's rights to be effectively protected. A.O.B. 117-22. The prosecution argues that trial counsel waived this grievance by not objecting during the testimony of the bereaved family members and coworkers. P.S.B. 98-99. It responds to the merits by arguing that the appellant was not prejudiced because the jury did not find Mr. Heflin's "personal characteristics" or the impact of his death on his family was an independent nonstatutory aggravating factor (P.S.A. 38), and that, in any event, because *one* "victim-impact" testimonial was constitutionally admissible, the tear-jerking parade of the bereaved was not an unconstitutional attempt to instill wrath. P.S.B. 99-105.

- 48 -

Common sense indicates there was no way trial counsel could have objected to these witnesses seriatim. Counsel said so in their motion in limine. A.S.A. 382-83. They presented the district court with a judicially manageable proposal for relief: limiting the prosecution to three "victim-impact" witnesses. *Id.* The district court denied the motion anyway. By seeking specific relief and receiving a ruling on it, counsel did all they had to do—on the facts of this case—to preserve this issue for plenary appellate review. If the prosecution wishes to rely on allegations of incompetence by counsel in handling this issue as they did, they should receive cold comfort when the appellant raises an ineffective assistance of counsel claim on this basis in any section 2255 action as may be necessary.

If this Court were to hold that the request for timely, specific relief were not effective to preserve the point under existing law, the appellant would request this Court to modify or extend existing law, or to make new law, to recognize the behavioral constraints on contemporaneously objecting to "victim-impact" testimony. Even if individual decisions appear to support this "heads I win, tails you lose" prosecution position, the Constitution will not countenance its continued application to deny capital defendants the right to have their counsel effectively

- 49 -

Case: 4:07-cv-00027-ERW    Doc. #: 94-59    Filed: 08/14/09    Page: 62 of 82 PageID #: 1415

assert their rights to a fair trial before an impartial jury, and to be free from cruel

and unusual punishments.

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 50
Case: 4:07-cv-00027-ERW   Doc. #: 94-59   Filed: 08/14/09   Page: 63 of 82 PageID #: 1416

**IX.**   **Refusal to instruct on life option, right to act with mercy, and otherwise to avoid *Blystone* instruction when Congress rejected *Blystone* bill**

Appellant gave the prosecution and the district court repeated opportunities to step back from the brink concerning their verdict-directing instructions which mandated a verdict of death on a finding that the aggravating factors outweighed the mitigating factors; but after a little backing and filling, the district court followed the essence of the prosecution's theory, and gave what amounts to a *Blystone v. Pennsylvania*, 494 U.S. 299 (1990), instruction. These decisions were not supported by the legislative history of the statute under which the prosecution sought the death penalty. A.O.B. 123-30. The district court erred and abused its discretion in refusing his attempts to conform the instructions to the statute giving it jurisdiction to submit a capital count to the jury. A.O.B. 130-34. Now the prosecution argues that the instructions it fought for in the district court weren't mandatory after all, and that, in any event, the trial judge didn't repeat them very often. P.S.B. 106-17. A review of the respective parties' analysis of the legislative history on this point should be sufficient to require reversal.

A *statute's* mandating a "life option" *jury instruction*—as 21 U.S.C. § 848(k) does in other federal capital cases—is at best adventitious, and at worse a violation of the separation of powers. P.S.B. 111 & 113-14. Because the structure of both

- 51 -

the Title 21 capital sentencing provisions and the Title 18 analogues imply a life option, the legislative instruction to the court to instruct the jury was gratuitous. There is no reason to assume that the omission of such a provision from FDPA indicated legislative intent to remove the life option. The statute itself—what Congress said to the courts, not what it said they should say to jurors—leaves jurors the option of returning a verdict of life without release even if they find that the aggravating factors outweigh the mitigating.

Whereas the prosecution dwells on the fact that Congress did not include a gratuitous legislative "life option" jury instruction in the bill that became FDPA, it ignores the fact that the person *it* cites as its principal spokesman for legislative intent, Representative Gekas (P.S.B. 113-14), introduced an amendment to make the federal government a *Blystone* jurisdiction, and the House of Representatives adopted it, but Congress as a whole rejected it. A House-Senate conference committee agreed to the amended Senate version of § 3593(e), House Report 103-964, and rejected the Gekas Amendment. Rep. Gekas himself roundly criticized this change when the conference report returned to the House for final passage. Rep. Gekas made clear that he regarded the Senate version (despite its deletion of

- 52 -

the jury instruction) to be *no different than the original House version his amendment replaced.* 140 Cong. Rec. H7940 (daily ed.) (August 11, 1994).

## X.    Allowing the prosecution two bites at death predicated on same homicide

That trying a person for two capital counts predicated on the same homicide was not authorized by the statutes on which the prosecution relies, and that submitting both counts to the jury in the penalty phase violated the special norms which apply to capital sentencing under the Due Process Clause and the Cruel and Unusual Punishments Clause. A.O.B. 135-50.

The prosecution responds that it is "unimaginable" and "inconceivable" that Congress would not want to allow prosecutors to argue to the same jury for the death of the same defendant *twice* based on the same homicide. P.S.B. 125-26.

Appellant's legislative history and constitutional law arguments stand unrefuted. The only question is whether this Court will correct the error on direct appeal, or leave the appellant to litigate the claim that trial counsel was ineffective for failing to raise this grievance in the trial court. P.S.B. 118-19.

### A.    The relevant statutes do not authorize cumulative punishments.

1.    **The prosecution has not refuted, and cannot refute, the appellant's analysis of the legislative history of the firearms statute, which *excludes* a murder committed during a bank robbery from the class of offenses punishable under subsection (j) of 18 U.S.C. § 924.**

- 54 -

In his opening brief (at 139-46), the appellant has traced the evolution of those parts of 18 U.S.C. § 924 involved in this appeal. The legislative history of subsection (c) demonstrates both that Congress appreciated the need for clear expression of any intent to legislate cumulative punishments for single incidents of criminal behavior, and that it knew how to evince such an intent in an unambiguous enactment. When one compares the history and language of subsections (c) and (j), it appears that Congress has not expressed an intent to see one citizen subjected to the death penalty twice for a single act of homicide during the commission of a crime of violence.

In its 1984 amendment of subsection (c), Congress expressed its intention that violations of the subsection carry a penalty cumulative to the punishment imposed for commission of a predicate felony. *United States v. Mills*, 835 F.2d 1262, 1264 (8th Cir. 1987). Despite unequivocal legislative history reflecting *precisely that intent*—an expressed intent, in fact, to undo Supreme Court constructions of the prior version of subsection (c) which had precluded cumulative punishment based on the absence of clear enabling language in the statute—Congress did *not* articulate an intention that punishment specified in subsection (j) be cumulative to punishment imposed for a predicate crime.

- 55 -

The prosecution suggests that the appellant's interpretation of subsection (j) is "strained," and that the only reasonable procedure for obtaining the intent of that statute is by affording it the "benefit" of language found in § 924(c)(1). P.S.B. at 123.[6] One must expect more from Congress in the enactment of a statute providing for capital punishment—particularly if the statute is to be relied on for the nightmarish notion of giving prosecutors a multiplicity of whacks at executing one citizen for a single homicide.

Even if such an approach to death penalty legislation could be countenanced, it is not what happened here. The prosecution has failed to show this Court an alternative legislative history or purpose. Subsection (c) prescribes cumulative prison sentences for individuals convicted of using guns in the commission of violent crimes. Subsection (j) was enacted separately, and enables an entirely different sort of punishment—a punishment the law recognizes to be in a class by itself. It neither needs, nor may have the "benefit" of, borrowing crucial language which was codified only in another subsection.

---

[6]The prosecution's level of regard for rules in this capital prosecution is demonstrated again by its reliance (P.S.B. 124-25 & 127) on the unpublished opinion in *United States v. Staggs*, 152 F.3d 931 (9th Cir. 1998) (table), which the issuing court disowns for precedential purposes. *See In re Burns*, 974 F.2d 1064, 1067-68 (9th Cir. 1992). *See also* R. Posner, THE FEDERAL COURTS 120-27 (1985).

- 56 -

Rather than being intended to punish the same conduct twice, subsection (j) was intended to make the death penalty available for homicides occurring during federal crimes of violence committed with a firearm for which the death penalty was *not otherwise available*.

### 2. Under established norms of statutory construction, the two offenses on the basis of which the prosecution charged the appellant were the "same offense."

Under the test the Supreme Court announced in *Blockburger v. United States*, 284 U.S. 299 (1932), the crime of murder in the course of a bank robbery proscribed by 18 U.S.C. § 2113(e) is the "same offense" as murder committed with a firearm in the course of a violent crime (bank robbery) proscribed by § 924(j). On the basis of the appellant's discussion of statutory construction, congressional intent, and the rule of lenity (A.O.B. 136-47), a federal court does not have the authority to impose cumulative sentences for the same alleged act by calling it, *first*, murder committed during a crime of violence and, *second*, murder committed with a firearm during a crime of violence. This Court need not rely on the *Blockburger* test to determine whether the district court erred in imposing cumulative sentences. As the Supreme Court held in *Missouri v. Hunter*, 459 U.S. 359, 367-68 (1983), prosecutors cannot use *Blockburger* to circumvent a clearly expressed legislative

- 57 -

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 50
Case: 4:07-cv-00027-ERW   Doc. #: 94-59   Filed: 08/14/09   Page: 70 of 82 PageID #: 1423

intent that is "contrary to the presumption which should be accorded [two statutes] after application of the *Blockburger* test."

Even under the *Blockburger* test, moreover, Congress did not authorize cumulative sentences for violation of the two statutes at issue here. *Blockburger* asks whether each offense contains proof of a fact not contained in the other. 284 U.S. at 304. If one criminal offense requires proof of every element of the other, then the two offenses are the same, and multiple punishments are not allowed. *E.g.*, *Whalen v. United States*, 445 U.S. 684, 694 (1980).

Both statutes at issue in this case describe felony murder. The federal bank robbery statute authorizes the death penalty or life imprisonment for the killing of a person during the commission of a bank robbery. § 2113(e). The firearms statute authorizes the death penalty or life imprisonment for the killing of a person with a firearm during the commission of any violent crime. § 924(j). Bank robbery is a violent crime. *United States v. Mayotte*, 76 F.3d 887, 889 (8th Cir. 1996). Examination of the two statutes under the *Blockburger* rule refutes the prosecution's contention that conviction of each offense requires proof of a fact not required for conviction of the other. A conviction for killing a person with a firearm during the course of a bank robbery cannot be obtained without proving all

- 58 -

the elements for a conviction of killing a person during the course of a bank robbery.

The fact that section 924 does not proscribe a specific "crime of violence" does not alter the result under *Blockburger*: one applies the *Blockburger* test by reference to how the statutory elements of the two crimes are satisfied by the facts of a particular case. Put another way, the *facts* define the crimes examined. In this regard, two Supreme Court cases—*Whalen v. United States, supra*, and *United States v. Dixon*, 509 U.S. 688 (1993)—are instructive.

In *Whalen*, the defendant was convicted of two separate statutory offenses—rape, and felony murder committed in the course of the rape—and sentenced to consecutive terms of imprisonment. 445 U.S. at 686. The felony murder statute proscribed killing in the course of committing six enumerated felonies, including rape. *Id.* at 693-94. Defendant argued the imposition of multiple punishments violated the Double Jeopardy Clause. *Id.* at 686. After applying the *Blockburger* test, the Supreme Court agreed with the defendant, noting that "a conviction for killing in the course of a rape cannot be had without proving all the elements of the offense of rape." *Id.* at 693-94.

- 59 -

The Government contended that the felony murder and rape were not the

same offense under *Blockburger*, because "the former offense [did] not in all cases

require proof of a rape; [it proscribed] the killing of another person in the course of

committing rape *or* robbery *or* kidnaping *or* arson, etc." *Id.* The Supreme Court

rejected the Government's argument:

> Where the offense to be proved does not include proof of
> a rape—for example where the offense is a killing in the
> perpetration of a robbery—the offense is of course
> different from the offense of rape, and the Government is
> correct in believing that cumulative punishments for the
> felony murder and for a rape would be permitted under
> *Blockburger*. In the present case, however, proof of rape
> is a necessary element of proof of the felony murder, and
> we are unpersuaded that this case should be treated
> differently from other cases in which one criminal offense
> requires proof of every element of another offense. There
> would be no question in this regard if Congress, instead
> of listing the six lesser included offenses in the
> alternative, had separately proscribed the six different
> species of felony murder under six statutory provisions.
> It is doubtful that Congress could have imagined that so
> formal a difference in drafting had any practical
> significance, and we ascribe none to it. To the extent that
> the Government's argument persuades us that the matter
> is not entirely free of doubt, the doubt must be resolved in
> favor of lenity. [445 U.S. at 694.]

In *Dixon*, the Supreme Court decided how *Blockburger* should be applied in

cases involving subsequent prosecutions for offenses contemplated by contempt

- 60 -

convictions. *Dixon* involved two appeals. In the first appeal, Mr. Dixon had been released on bond with the condition of release that he not commit "any criminal offense"; while awaiting trial, Dixon was charged with a drug offense. The trial court found him guilty of criminal contempt, and sentenced him to jail for it. The trial court granted Dixon's motion to dismiss the drug indictment on double jeopardy grounds. The Government appealed. 509 U.S. at 691.

In the second appeal, a Mr. Foster was subject to a court order which required that he refrain from abusing his estranged wife. Foster was later found guilty of contempt for assault, and sentenced to prison for it. The Government subsequently charged Foster with several assaults. Two counts were based on the events for which Foster had been held in contempt. The trial court denied Foster's motion to dismiss. Foster appealed. 509 U.S. at 692.

The District of Columbia Court of Appeals consolidated the Dixon and Foster appeals, and held that the subsequent prosecutions were barred by the Double Jeopardy Clause. The Supreme Court granted certiorari to determine whether this guaranty "bars prosecution of a defendant on substantive criminal charges based upon the same conduct for which he previously has been held in criminal contempt of court." The Court held that the Double Jeopardy Clause

- 61 -

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 50

prevented subsequent prosecution of Dixon for the drug offense, and subsequent prosecution of Foster for one of the assault offenses; its decision was predicated on application of the *Blockburger* test to both situations. 509 U.S. at 698-700.

In Dixon's case, the Court noted that the defendant could not commit an "offense" under the applicable contempt statute until an order setting out conditions of release was issued; the statute applicable to Dixon's contempt prosecution provided that a person who had been conditionally released and had violated a condition of release would be "subject to . . . prosecution for contempt of court." 509 U.S. at 697-98. Relying on precedent that double jeopardy bars subsequent prosecution for a lesser offense after prosecution for the greater,[7] the Court reasoned that the incorporated drug offense was a "species of lesser-included offense." As with felony murder—in which the crime was not a "separate offense distinct from its various elements"—the "'crime' of violating a condition of release [could not] be abstracted from the 'element' of the violated condition." *Id.*

The Court applied the same analysis to one count of Foster's assault indictment, and summarily held that the "subsequent prosecution for assault fail[ed] the *Blockburger* test, and [was] barred." 509 U.S. at 700.

---

[7]*Harris v. Oklahoma*, 433 U.S. 682 (1977); *Illinois v. Vitale*, 447 U.S. 410 (1980); *Whalen v. United States*, 445 U.S. 684, 694 (1980).

- 62 -

The instant case does not involve a lesser included offense or subsequent prosecution, but the reasoning in *Whalen* and *Dixon* applies, and requires reversal. Those cases illustrate how *Blockburger* should be applied in situations where one offense incorporates another. The analysis in *Whalen* rested on the recognition that when the statutory elements of two crimes are examined in light of the facts, the *Blockburger* rule prohibits multiple punishments if proof of one offense cannot be had without proving all the elements of the other. Consequently, the fact that a person could violate the felony murder statute in *Whalen* through commission of several felonies did not make it a "different offense" from the underlying rape felony which actually had been perpetrated. Similarly, the criminal statutes at issue in *Dixon* did not describe "different offenses" when those statutes were examined in the context of the facts, because the criminal contempt statutes incorporated the offenses on which the contempt was based. The contempt statutes could not be separated from the elements of the underlying crimes.

As the Supreme Court reasoned with respect to the felony murder statute in *Whalen* and the contempt statutes in *Dixon*, it is impossible to violate § 924(j) without first committing some underlying "crime of violence or drug trafficking crime." § 924(c), (j). In this case there were two crimes of violence—bank

- 63 -

robbery, and murder in the course of a bank robbery. One cannot separate subsection (j) of section 924 from the elements of either of those underlying crimes.

Appellant was convicted of killing a person during the commission of a bank robbery, § 2113(e), and killing that same person with a firearm during the commission of a bank robbery, § 924(j). Conviction of the latter would be impossible without proving every element of the former. Application of the *Blockburger* rule of statutory construction shows that Congress did not intend multiple punishments for violations of the two statutes.

The Supreme Court of the United States has looked to state practice for guidance in the resolution of similar issues in federal practice. *E.g.*, *Jones v. United States*, 119 S.Ct. at 1221. Even where elements of two homicide offenses diverge under *Blockburger*, "a decisive majority of [American] jurisdictions that have addressed the issue have held that a trial court cannot impose multiple convictions and sentences for variations of murder when only one person was killed." *Ervin v. State*, 991 S.W.2d 804, 807-14 (Tex. Ct. Crim. App. 1999) (collecting cases). "Most, if not all, of the reasons given by [these] jurisdictions appear to invoke double jeopardy principles." *Id.* at 809. In cases where the two homicide offenses differ under the *Blockburger* test, "other factors nevertheless" can compel a

- 64 -

determination that "the offenses are the same for double jeopardy purposes. *Id.* at 810-11. "That [the two types of unlawful killing] are contained within the same section, are phrased as alternative means of committing an offense, are considered forms of 'murder,' and carry the same punishment ranges are strong indications that the legislature intended the offenses to be the same for double jeopardy purposes." *Id.* at 815.[8] In addition, variant forms of homicide "have a common focus: the death of an individual." *Id.* at 816.

---

[8]The evolution of capital jurisprudence has, in this instance, come full-circle. When it was introduced, the Torah's maxim of "an eye for an eye, a tooth for a tooth" (Exodus 21:22-23), was a liberal concept, limiting punishment rather than promoting vengeance. NEW OXFORD ANNOTATED BIBLE WITH THE APOCRYPHA OT 97 n. (1994). In *Ervin v. State*, 991 S.W.2d 804, 812 (Tex. Ct. Crim. App. 1999), the court documents that American courts have applied the same concept to prevent prosecutors from obtaining multiple homicide convictions of the same person for one killing: "Although the trend is less one-sided [than the one in cases where multiple potential charges are based on separate statutes], the greater number of jurisdictions that have addressed the issue have held that a trial court cannot impose multiple convictions and sentences for variations of homicides when only one person was killed: Florida, *Houser v. State*, 474 So. 2d 1193, 1196-97 (Fla. 1985) (DWI manslaughter and vehicular homicide) and *State v. Chapman*, 625 So. 2d 838, 839-840 (Fla. 1993) (same); Indiana, *Dawson v. State*, 612 N.E.2d 580, 585 (Ind. App. 1 Dist. 1993) (reckless homicide and DWI homicide), and *Walker v. State*, 582 N.E.2d 877, 881-82 (Ind. App. 3 Dist. 1991) (DWI homicide and BAC [breath alcohol content] homicide), and *Drossos v. State*, 442 N.E.2d 1, 6 (Ind. App. 4 Dist. 1983) (reckless homicide and DWI homicide); Iowa, *State v. Wissing*, 528 N.W.2d 561, 567 (Iowa 1995) (vehicular homicide and involuntary manslaughter); Maryland, *Loscomb v. State*, 45 Md. App. 598, 416 A.2d 1276, 1285 (Md. App. 1980) (manslaughter by motor vehicle and homicide by motor vehicle while intoxicated)."

- 65 -

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 50

After a broad survey of state and federal decisions, the Texas Court of

Criminal Appeals concluded that "manslaughter" and "intoxication manslaughter"

under separate Texas statutes could not yield cumulative punishments, for the same

death, consistently with the Double Jeopardy Clause:

> Both crimes are result of conduct crimes with death being
> the result. Because a person can die only once, two
> result-of-conduct homicide offenses involving the same
> victim must necessarily involve the same result. Given
> that the result is the focus of these offenses, the sameness
> of the result is some indication that the Legislature did not
> intend to impose multiple punishments. And this
> sameness of result is an inherent characteristic of
> homicide offenses that does not depend upon the
> development of evidence at trial. [*Id.* at 816.]

One of the principal cases in *Ervin*'s nationwide canvas and supporting its

ultimate conclusion is *State v. Gilroy*, 199 N.W.2d 63 (Iowa 1972), which, like this

case, involved a robbery resulting in the death of one individual. Mr. Gilroy was

convicted of "murder in the perpetration of a robbery, premeditated murder, and

robbery with aggravation," and received concurrent life sentences for the two

homicide counts. 199 N.W.2d at 64-65. In *Gilroy*, the Iowa Supreme Court

reversed a cumulative sentence for homicide when the grievance had not been

raised in the trial court or even on appeal:

- 66 -

> Although defendant has at no time, either in trial court or here, challenged the two sentences imposed as the result of one homicide we are satisfied this is double punishment which cannot be allowed to stand. See 21 Am.Jur.2d, Criminal Law, § 546; 24 C.J.S. Criminal Law, § 1567(5). [*Id.* at 68.]

*Accord, State v. Wissing*, 528 N.W.2d 561, 567 (Iowa 1995) ("where the offenses arise from one homicide, we permit sentencing on only one of the homicide offenses"; relief granted though appellant had not raised "one death, one homicide" theory).

### B.    Submission of multiple capital counts predicated on the same homicide skews the jurors' deliberations toward death.

The instances the prosecution cites in which courts have upheld multiple capital counts in the same case did not involve, as here, the submission to the jury of cumulative pleas for the death of the accused based on the death of a single victim, in which the jurors who opposed death had to withstand pressure for death on one count after another.

The prosecution's citation of the Timothy McVeigh case (P.S.B. 121) is inapposite. Mr. McVeigh killed 168 people, not one. *United States v. McVeigh*, 153 F.3d 1166, 1176 (10th Cir. 1998), *cert. denied*, 119 S.Ct. 1148 (1999). It does

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 50

not minimize the value of Richard Heflin's life to bear in mind that he was one person, not two or 168.

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 50

## Conclusion

WHEREFORE, the appellant renews his prayer that the judgment of the district court be reversed.

Respectfully submitted,

MICHAEL A. GROSS

15 North Gore Avenue, Suite 201
St. Louis, Missouri  63119

(314) 918-1080

JOHN WILLIAM SIMON

200-A East High Street
Jefferson City, Missouri  65101

(573) 632-6777

*Attorneys for Appellant*

## Certificate of Compliance

The Introduction and Argument of this brief, *see* Fed. R. App. P. 32(a)(7)(B)(iii) (excluding other matters from volume limitation), contain no more than 13,962 words, in 14-point ~~Zapf Calligraphy~~ Times New Roman, prepared and measured using WordPerfect 6.1 (File | Document Information | Word Count).

Attorney for Appellant

- 69 -

<u>Certificate of Service</u>

I hereby certify that two (2) true and correct copies of the foregoing were deposited in the mails, first-class postage prepaid, this ⸺day of December, 1999, to:

> Joseph M. Landolt, Esq.
> Mary Jane Lyle, Esq.
> Assistant United States Attorneys
> 1114 Market Street, Suite 401
> St. Louis, Missouri 63101

Attorney for Appellant