Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 52

# IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

No. 98-2549-EMSL

**UNITED STATES,**

*Appellee,*

v.

**BILLIE JEROME ALLEN,**

*Appellant.*

On Appeal from the United States District Court for the
Eastern District of Missouri, Eastern Division
The Hon. E. Richard Webber, District Judge

**REPLY BRIEF OF APPELLANT**

Respectfully submitted,

Michael A. Gross
34 North Brentwood Boulevard
Clayton, Missouri 63105
 (314) 727-4910
FAX (314) 727-4378

John William Simon
P.O. Box 16005
Clayton, Missouri 63105
 (314) 645-1776
FAX (314) 645-2125

*Attorneys for Appellant*

RECEIVED

NOV 2 6 2002

U. S. COURT OF APPEALS
EIGHTH CIRCUIT

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 52

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT**

No. 98-2549-EMSL

**UNITED STATES,**

*Appellee,*

v.

**BILLIE JEROME ALLEN,**

*Appellant.*

On Appeal from the United States District Court for the
Eastern District of Missouri, Eastern Division
The Hon. E. Richard Webber, District Judge

**REPLY BRIEF OF APPELLANT**

Respectfully submitted,

Michael A. Gross
34 North Brentwood Boulevard
Clayton, Missouri 63105
　(314) 727-4910
　FAX (314) 727-4378

John William Simon
P.O. Box 16005
Clayton, Missouri 63105
　(314) 645-1776
　FAX (314) 645-2125

*Attorneys for Appellant*

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 52

# Table of Contents

Table of Contents ............................................................................................. i

Table of Authorities............................................................................................ ii

Summary of Argument........................................................................................ 1

Argument............................................................................................................ 3

I.   In a federal capital case, *Ring v. Arizona* requires the prosecution to submit the capital mens rea and at least one statutory aggravating factor to a grand jury, and obtain a true bill including the prerequisites for a capital case, and the prosecution has failed to show that it *did* this here or *could* do it sub silentio. ...................................................... 3

   A.   Alleging that one or both defendants intentionally killed during a bank robbery did not substitute for pleading a statutory aggravating factor, and did not charge that Bille Allen (as opposed to his co-defendant) possessed the requisite intent to kill.   ............................................................................................ 3

   B.   In light of the functions served by the Indictment Clause in federal criminal jurisprudence, exclusion of the grand jury from federal capital charging is not subject to avoidance or evasion under the rubric of "harmless error." ........................................... 7

II.   The Federal Death Penalty Act of 1994 violates the Fifth and Eighth Amendments in light of the text of the Indictment Clause and the Supreme Court's decisions defining "element" in federal crimes and in capital cases. ...................................................................................... 20

Conclusion......................................................................................................... 26

Certificate of Compliance ................................................................................. 27

Certificate of Service......................................................................................... 28

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 52

## **Table of Authorities**

### Constitutional Provisions

U.S. Const. amend. V (Due Process Clause) ............................................................ 7

U.S. Const. amend. V (Indictment Clause) ...................................................... passim

U.S. Const. amend. VII .................................................................................... 16

U.S. Const. amend. VIII (Cruel & Unusual Punishments Clause) ...................... 5, 20

U.S. Const. art I, § 10 ........................................................................................ 16

U.S. Const. art. I, § 9 (Suspension Clause) ....................................................... 23

U.S. Const. art. III, § 2, cl. 3 ........................................................................... 16

### Statutes

18 U.S.C. § 1111 ................................................................................................ 4

18 U.S.C. § 3592(c) ......................................................................................... 4, 5

18 U.S.C. § 3593(a) ........................................................................................... 25

18 U.S.C. § 3593(e) ........................................................................................... 10

28 U.S.C. § 2241 ............................................................................................... 23

28 U.S.C. § 2255 ............................................................................................... 17

Federal Death Penalty Act of 1994, 18 U.S.C. §§ 3591-93 (FDPA) ............... passim

### Rules

Fed. R. Crim. P. 52 ............................................................................................ 18

Fed. R. Crim. P. 7 ..................................................................................... 16, 19, 20

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 52

<u>Cases</u>

*Brown v. Board of Education*, 347 U.S. 483 (1954) ............................................... 14

*Chapman v. California*, 386 U.S. 18 (1967) ........................................................ 7

*Crowell v. Benson*, 285 U.S. 22 (1932) ......................................................... 22, 24

*Custis v. United States*, 511 U.S. 485 (1994) ................................................... 17

*Enmund v. Florida*, 458 U.S. 482, 797 (1982) .................................................... 5

*Ex parte Bain*, 121 U.S. 1 (1887) ............................................................. 17, 18

*Furman v. Georgia*, 408 U.S. 238 (1972) ...................................................... 14

*Hooper v. California*, 155 U.S. 648 (1895) ................................................... 21, 22

*INS v. St. Cyr,* 533 U.S. 289 (2001) ....................................................... 21, 22, 23

*Jones v United States*, 526 U.S. 227 (1998) ................................................. 12

*Lockett v. Ohio*, 438 U.S. 586 (1978) .......................................................... 9

*Neder v. United States*, 527 U.S. 1 (1999) .................................................... 8

*Planned Parenthood v. Minnesota*, 910 F.2d 479 (8th Cir. 1990) ........................ 22

*Powell v. Alabama*, 287 U.S. 45, (1932) ..................................................... 14

*Ring v. Arizona,* 122 S.Ct. 2428 (2002) ................................................ passim

*Rose v. Mitchell,* 443 U.S. 545 (1979) ....................................................... 13

*Salinas v. United States*, 522 U.S. 52 (1997) ............................................. 24, 25

*Seminole Tribe v. Florida,* 517 U.S. 44 (1996) ............................................ 25

*Smith v. United States*, 360 U.S. 1 (1959) ............................................... 19, 20

*State v. Finch,* 137 Wash.2d 792, 975 P.2d 967, *cert. denied,* 528 U.S. 922 (1999) 9

*Strauder v. West Virginia,* 100 U.S. (10 Otto) 303 (1880) ............................. 13

*Tuiliaepa v. California,* 512 U.S. 967 (1994) ........................................................ 6

*United States v. Begnaud,* 783 F.2d 144 (8th Cir. 1986) ................................. 10, 11

*United States v. Bernard,* 299 F.3d 467 (5th Cir. 2002) ......................................... 4

*United States v. Caldwell,* 302 F.3d 399 (5th Cir. 2002) ...................................... 19

*United States v. Chandradara,* 230 F.3d 1237 (10th Cir. 2000) ........................... 4, 5

*United States v. Cothran,* 302 F.3d 279 (5th Cir. 2002) ....................................... 18

*United States v. Cotton,* 112 S.Ct. 1781 (2002) ......................................... passim

*United States v. Cuff,* 38 F.Supp.2d 282 (S.D.N.Y.1999) ...................................... 4

*United States v. Dodson,* 288 F.3d 153 (5th Cir. 2002) ........................................ 19

*United States v. Five Gambling Devices,* 346 U.S. 441 (1953) ............................... 21

*United States v. Mezzanatto,* 513 U.S. 196 (1995) ............................................. 19

*Vasquez v. Hillery,* 474 U.S. 254 (1986) ......................................... 9, 12, 13, 15

*Wainwright v. Sykes,* 433 U.S. 72 (1977) ........................................................ 17

*Walton v. Arizona,* 497 U.S. 639 (1990) ..................................................... 22, 23

*Witherspoon v. Illinois,* 391 U.S. 510 (1968) .................................................... 5

*Woratzeck v. Stewart,* 97 F.3d 329 (9th Cir. 1996) ............................................. 4

## Other Authorities

U.S. DEPT. OF JUSTICE, THE FEDERAL DEATH PENALTY SYSTEM: A STATISTICAL SURVEY (1988-2000) (Sept. 12, 2000) ......................................................... 14

## Summary of Argument

I.     The indictment the prosecution submitted to the grand jury did not charge Billie Allen, as distinguished from Norris Holder, with any fact that would subject him to the death penalty.  Merely referring to a bank robbery fails, as a matter of law, to state a claim under the Federal Death Penalty Act of 1994, 18 U.S.C. §§ 3591-93 (FDPA), that either alleged participant killed the decedent for the purpose of pecuniary gain.  By charging the two men jointly, moreover, the indictment fails to attribute *either* intent to kill *or* any statutory aggravating factor to Billie Allen individually.

Whether the grand jury would have alleged facts sufficient to put Billie Allen on trial for his life is beyond the competence of the prosecution or any court to answer after the fact.  Commitment of this function to the grand jury rather than to the prosecution is a structural matter that is not subject to "harmless error" analysis.  The prosecution's attempted expansion of "harmless error" to excuse what occurred in this case would read the Indictment Clause out of the Fifth Amendment by eliminating the realistic possibility of a remedy for its violation.

II.     There is no reconciling FDPA with the Indictment Clause in light of *Ring v. Arizona,* 122 S.Ct. 2428 (2002).  Because homicidal mens rea and at least one statutory aggravating factor are both constitutionally and statutorily required elements of any federal capital offense, and because the Fifth Amendment requires a grand jury indictment for any capital or otherwise infamous offense against the

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 52

United States, FDPA's commitment of the charging of these latter elements to the prosecution rather than the grand jury places the statute in direct contradiction to the Constitution. There is no ambiguity which could give rise to a saving construction. The relevant provisions of the statute must fall, and with them, any death sentence such as Billie Allen's charged by a mere notice of intent to seek the death penalty signed by a prosecutor.

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 52

## Argument

**I.      In a federal capital case, *Ring v. Arizona* requires the prosecution to submit the capital mens rea and at least one statutory aggravating factor to a grand jury, and obtain a true bill including the prerequisites for a capital case, and the prosecution has failed to show that it *did* this here or *could* do it sub silentio.**

**A. Alleging that one or both defendants intentionally killed during a bank robbery did not substitute for pleading a statutory aggravating factor, and did not charge that Bille Allen (as opposed to his co-defendant) possessed the requisite intent to kill.**

The indictment does not differentiate between the alleged roles and intents of Holder and the appellant.  The prosecution attempts to cloak this ambiguity by cropping quotations from the indictment to make it appear that the grand jury had singled out "Billie Jerome Allen."  But the actual text of the indictment blurs him with Holder.  (PB:4-5.)  This failure to attribute the elements in aggravation to each of the indicted alleged participants is a separate, independently sufficient, reason why the averments of the indictment cannot do service for a charge of one or more aggravating factors of the appellant consistent with the Fifth Amendment and *Ring*.

Although *Ring* involved statutory aggravating factors, even the prosecution acknowledges in effect that FDPA's assignment of the function of charging the mens rea requirement codified in 18 U.S.C. § 3591(a)(2) to prosecutors rather than

- 3 -

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 52

to the grand jury is invalid. It also attempts to show that the grand jury "found" this element sub silentio by charging that Holder and Allen committed murder as defined in 18 U.S.C. § 1111. (PB:4.)

The indictment fails to charge a federal capital offense because it contains no specification that *Billie Allen* possessed the requisite homicidal intent, without recourse to accomplice liability principles, and that *Billie Allen* individually committed the murder for his own (as opposed to Holder's) pecuniary gain.

To equate a charge of taking U.S. currency from a federally insured bank with a statutory aggravating factor of committing a murder in expectation of the receipt of something of pecuniary value would erroneously transform *every* robbery or burglary resulting in a death into a capital case. Both courts of appeals to have considered the issue have rejected this expansion of the "pecuniary gain" aggravator so as to convert every felony murder in which the *underlying felony* had a pecuniary object or benefit into a federal capital offense. *United States v. Bernard*, 299 F.3d 467, 482-83 (5th Cir. 2002); *United States v. Chandradara*, 230 F.3d 1237, 1263-64 (10th Cir. 2000). *See also United States v. Cuff*, 38 F.Supp.2d 282, 288 (S.D.N.Y.1999) ("[Section 3592(c)(8)] appear[s] to be directed at a murder . . . in which pecuniary gain can be expected to follow as a direct result of the crime. . . . A *murder* from which pecuniary gain does not directly result would not appear to be within the reach of the statute.") (emphasis supplied); *cf. Woratzeck v. Stewart*, 97 F.3d 329, 334-35 (9th Cir. 1996) (construing Arizona pecuniary gain aggravator as requiring proof "that the killing was done with the expectation of pecuniary gain" and noting further that "[e]ven if it is true that

- 4 -

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 52

under many circumstances a person who kills in the course of a robbery is motivated to do so for pecuniary reasons, that is not necessarily so" and that "[a] defendant is free to argue that the killing was motivated by reasons unrelated to pecuniary gain").

The pecuniary gain aggravator extends to murders for hire, murders for insurance proceeds, and other killings committed because the killer has been paid, or expects to be paid, *for the killing itself.* In 18 U.S.C. § 3592(c)(1), Congress allowed certain felonies to serve as the predicates for a statutory aggravating factors, and robbery was not one of them. *United States v. Chandradara*, 230 F.3d at 1263-64. Expressio unius est exclusio alterius.

The prosecution argues that the grand jury charged the intent required for a federal capital crime in Count II, on which the jury returned a death verdict. (PB:4.) But *Count I* does not come close to alleging that either defendant had the mens rea that both FDPA and the Eighth Amendment, *see Enmund v. Florida*, 458 U.S. 482, 797, 798-99 (1982), require. Because the district court treated Count I as an adequately alleged capital charge—which it was not—the trial jury was compelled to deliberate on death twice instead of only once. Submission of both counts based on the same homicide erroneously doubled the appellant's risk of a death sentence, when "the decision whether a man deserves to live or die must be made on scales that are not deliberately tipped toward death." *Witherspoon v. Illinois*, 391 U.S. 510, 522-23 n. 20 (1968).

- 5 -

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 52

The prosecution anticipates what it acknowledges to be a key weakness in its after-the-fact reliance on noncapital findings as supporting a capital charge by asserting "there is no 'label' requirement at the trial stage," and arguing by analogy that the averments it presents to the lay people who are supposed to be a check on it need not disclose to the grand jury what the consequences are of its finding probable cause of the predicates for a death sentence. (PB:5-6.) Such "stealth" charging violates the Fifth Amendment just as surely as not referring the case to the grand jury at all. That the prosecution would even endorse such loose practice in a capital case is all the more reason why it needs the check which a grand jury would place on its charging.

The prosecution relies on *Tuiliaepa v. California,* 512 U.S. 967, 972 (1994), as its sole support for the "no label required." But *Tuilaepa* stands for the proposition that that a death penalty scheme is only constitutional if it provides "principled" protection against "arbitrary and capricious" imposition of capital punishment. *Id.* at 973.

The prosecution obliquely suggests that the grand jury was intentionally alleging an aggravating factor that could convert a non-capital offense into a capital offense. (PB:5.) As FDPA required, the prosecution refrained from including the grand jury in the process that would make this a capital case. There is no basis for believing that the grand jurors intended to charge the additional elements which would make it so.

- 6 -

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 52

**B. In light of the functions served by the Indictment Clause in federal criminal jurisprudence, exclusion of the grand jury from federal capital charging is not subject to avoidance or evasion under the rubric of "harmless error."**

Appellant acknowledges that not all constitutional violations are subject to automatic reversal: in some cases, an appellate court may decline to reverse if the prosecution carries the burden of proving that the error was "harmless *beyond a reasonable doubt*." *Chapman v. California*, 386 U.S. 18, 24 (1967) (emphasis supplied). Here, the prosecution has not carried the "reasonable doubt" burden it assumed in making this argument.

The prosecution stresses that the trial affords many more rights to the accused than does the federal grand jury process, and concludes from this that the trial jury's finding of guilt beyond a reasonable doubt renders harmless any omission of essential elements from the indictment. This is the argument that, if accepted, would vitiate the Indictment Clause, because *every* appeal of a criminal conviction occurs only after a trial jury has found the defendant guilty of every element of the offense charged beyond a reasonable doubt. The prosecution cannot point to any case in which a missing element would *not* be harmless, so long as the accused citizen was not actually surprised by the missing element at trial. Of course, unfair surprise would violate the Due Process Clause of the Fifth Amendment, not the Indictment Clause, so the prosecution's proposed method of reviewing Indictment Clause claims would leave that constitutional guaranty

- 7 -

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 52

without any independent effect. It would, moreover, allow the plain-error analysis of *United States v. Cotton*, 112 S.Ct. 1781 (2002), to swallow up the general rule of Indictment Clause review. Under the prosecution's approach, there would be no practical difference between plain error and plenary review, and thus no difference between review of preserved and unpreserved Indictment Clause claims. If such is the law, the Supreme Court will have to say so, and more than a century of Indictment Clause decisions suggests that it will not.

The prosecution cites *Neder v. United States*, 527 U.S. 1 (1999), for the proposition that failure to instruct a trial jury on an element of an offense can be "harmless error." (PB:8-10.) *Neder* does not apply to the displacement of a constitutionally-mandated check on executive power. In *Neder* the omitted element was not even at issue between the parties, so the Court could hardly have found a situation more conducive to "harmless error" analysis. 527 U.S. at 7 & 15. By contrast, it is hard to imagine a more "structural" difference than the one between entrusting the decision whether a fellow-citizen must stand trial for his life to independent grand jurors or to politically-appointed government functionaries.

In addition, *Neder* referred to "overwhelming evidence of guilt" as a basis for withholding the remedy of reversal for established error. *Id.* at 9 & 16-17. In this respect the elements of an underlying offense are different from statutory aggravating factors. In *State v. Finch*, 137 Wash.2d 792, 975 P.2d 967, *cert.*

- 8 -

*denied*, 528 U.S. 922 (1999), the Washington State Supreme Court held that shackling a man on trial for a capital offense did not prejudice him during the guilt phase because of "overwhelming evidence of guilt." It explained, however, that there is no such thing as "overwhelming evidence" of the death penalty: whereas there can be objective evidence of a person's guilt or innocence—such that a reviewing court can say whether a trial jury's deliberations would have come out the same way as to the verdict on the underlying offense—aggravating and mitigating factors are "of a more subjective nature dealing with not only the nature of the crimes involved but also with personal history and the character of the [accused.]" *Id.* at 863, 975 P.3d at 1008, *citing Lockett v. Ohio*, 438 U.S. 586, 604 (1978). Accordingly it held that shackling the accused had prejudiced him during the penalty phase, and granted relief from the capital sentence. *Id.* at 861-66, 975 P.3d at 1007-09. Because it is part of the grand jury's role in federal constitutional jurisprudence to act as a check on whether the prosecution may seek the death penalty, *Vasquez v. Hillery*, 474 U.S. 254, 263 (1986), one cannot say there was "overwhelming evidence" of the levers by which it would grant or deny the federal government authority to turn this single-homicide case into a two-count capital prosecution.

The prosecution concedes that the second, "grave-risk-of-death." factor submitted to the trial jury was not charged in the indictment, but it insists that the appellant cannot have been harmed by that submission because "that

- 9 -

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 52

aggravator . . . did not alter the crimes charged or the maximum punishment" and thus "did not constitute an amendment to the indictment"—asserting that this aggravating factor "was simply a factor to be weighed in making the ultimate sentencing determination." (PB:7.) It cites *United States v. Begnaud,* 783 F.2d 144, 147 (8th Cir. 1986). *Begnaud* offers the prosecution no actual support.

The jury's essential function at the penalty phase of Billie Allen's *trial* was to weigh "all the aggravating factor or factors found to exist" against "all the mitigating . . . factors found to exist" and determine whether a sentence of death was justified. 18 U.S.C. § 3593(e). Even if the indictment had pled the aggravating factor of having committed murder in expectation of pecuniary gain— the only other statutory aggravating factor submitted to the trial jury—the submission and finding of a second aggravating factor necessarily added weight to death's side of the penalty determination. The suggestion that submission of this second statutory aggravator did not effect an amendment of the indictment makes no practical sense.

In *Begnaud* this Court explained the distinction "between an actual or constructive amendment of the indictment, which is reversible error per se," and mere "variance between the indictment and proof," which does not require reversal unless the variance results in prejudice:

> An amendment of the indictment occurs when the *essential elements* of the offense set forth in the indictment are altered, either actually or in effect, by the prosecutor or the court after the grand jury has passed upon them . . . . In contrast, a variance occurs when the essential elements of the offense set forth in the indictment are left unaltered but the evidence offered at trial proves facts materially different from

- 10 -

those alleged in the indictment. [783 F.2d at 147 n.4 (emphasis supplied).]

In light of *Ring* it is unreasonable to claim that submission to the trial jury of an aggravating factor the grand jury never charged does not alter "the essential elements of the offense set forth in the indictment." Especially in the context of a federal death penalty prosecution—where the collective weight of aggravating factors is an essential determinant of whether the accused will live or die—the prosecution's position must be rejected.

The prosecution's "harmless error" argument relies heavily cases in which the accused citizen's counsel did not preserve their constitutional objections at trial. No such default occurred here; those cases are beside the point. The question before this Court is whether, over this appellant's timely objection, the prosecution and the district court could try the appellant for a capital offense and obtain a death sentence, without having submitted all the elements of the capital offense to a grand jury. In other words, does the Indictment Clause *count* as to the capital mens rea and statutory aggravating factor elements of a federal capital case, or is it just something we like to say whether it means anything or not?

The prosecution asserts that the fact the defense had notice of its intent to seek the death penalty renders harmless the failure to submit the capital-specific elements of the offense to the grand jury. (PB:7-8.) This assertion confuses the issue: the Fifth Amendment right to grand jury indictment for any "capital, or otherwise infamous crime" would mean nothing at all if the prosecution would call

- 11 -

up defense counsel on the telephone or otherwise give notice of the charges against an accused citizen without having a disinterested body of lay citizens intervene between the sovereign and the accused. The question in this case is not one of knowledge but one of power, and under *Ring, Jones v United States*, 526 U.S. 227, 232 (1998), and the Fifth Amendment, the United States Attorney's Office did not have the power to charge Billie Allen with a capital crime.

One of the situations in which even the prosecution admits we do not apply the "harmless error" doctrine to avoid reversal is racial discrimination in the composition of a grand jury. In *Vasquez v. Hillery*, the Supreme Court recognized that a grand jury is not obliged to indict in every case the prosecution submits to it. In a Freudian slip that shows why we need an independent judiciary to maintain our Constitution, the prosecution quibbles with this, implying that if the members of a grand jury disagree with another prosecutor, they must be wrong. (PB:14.) The Supreme Court goes on to observe that not only does a grand jury have the right to refuse a true bill; it also has the right to charge a person with an offense other than what the prosecution has submitted, *and to deny it the authority to seek the death penalty. Id.* at 263.

The Court explained that one reason we do not use "harmless error" in grand-jury discrimination cases is that it is impossible to identify the prejudice the discrimination caused. The burden of showing regularity of the proceedings is on the sovereign. That the process take place behind a screen means the accused

- 12 -

citizen *could not* show a subsequent court how the underrepresentation of minority Americans caused a harsher charge against him. Selection of the grand jurors was within the power of the sovereign, and the risk of error falls on the sovereign rather than on the accused citizen.

*Vasquez v. Hillery* held that discrimination in grand jury selection is unconstitutional not only because of its diminution of the citizenhood of the minority persons thus excluded, *see Strauder v. West Virginia,* 100 U.S. (10 Otto) 303, 308 (1880), but also because it skews the process against minority persons thus charged with crimes. *Id.* at 262-64, *citing, inter alia, Rose v. Mitchell,* 443 U.S. 545 (1979). Like a rule of evidence that a black person's testimony is not admissible against a white person's, such exclusion is not unconstitutional solely because of its offense against the person excluded from the process, but also because such exclusion foreseeably brings about wrong results to the parties to the litigation. No showing of "harmless error" would suffice to uphold a conviction in a case where the trial court applied such a rule.

Here the evidence is not that the grand jury was stacked with white people, but that it was excluded altogether from the decision whether to charge a capital crime against this appellant. Just as one cannot say from what goes on behind a screen of secrecy what would have happened absent wrongful racial discrimination, one cannot say what would have happened absent the wrongful exclusion of the grand jury as a whole. This statement is particularly true of the

- 13 -

prosecution's hitherto successful effort to subject the appellant to capital sentencing twice for the same homicide.

In the Supreme Court's five-to-four decision in *Furman v. Georgia*, 408 U.S. 238 (1972), JUSTICE DOUGLAS's deciding vote was based on racial disparity in the imposition of the death penalty. 408 U.S. at 242, 250-53 & 256-57 (concurring opinion). Since *Powell v. Alabama*, 287 U.S. 45, 49 (1932), the specter of racial discrimination has haunted dozens of capital cases before the Supreme Court. In light of this history there is no way to speak realistically about capital charging in the United States without speaking about racial discrimination. The United States has substantial populations of minorities—some of which the majority enslaved, and others of which it conquered. These minorities are historically disfavored in the allocation of goods and services as well as in social esteem. *See Brown v. Board of Education*, 347 U.S. 483, 494 n.11 (1954). For as long as statistics have been kept, white sentencers have used the death penalty disproportionately against African-American defendants. The United States is the only white country that has not abolished the death penalty.

One might have thought that federal prosecutors would be more color-blind in capital charging than their state equivalents; data which the Department of Justice has reported since the adoption of FDPA shows that the same patterns appear to exist at the federal level. U.S. DEPT. OF JUSTICE, THE FEDERAL DEATH PENALTY SYSTEM: A STATISTICAL SURVEY (1988-2000) at 2 (Sept. 12, 2000).

- 14 -

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 52

Because racial discrimination in the selection of grand jurors has long been illegal, the unconstitutional exclusion of the grand jury from the charging process in federal capital cases is an invitation to disparity in federal capital charging. Like a rule requiring a court to admit the testimony of witnesses irrespective of their color, the constitutional requirement of nondiscrimination in the composition of grand juries does not exist for its own sake or as a matter of good manners, but because it promotes fair government behavior by objectively enforcing the principle that we treat each other as we would be treated. In order that "we" and "each other" are reflected accurately, we make it illegal to exclude minority citizens from grand jury service. Lawfully selected grand juries objectively discourage prosecutors from charging minorities more heavily than they charge white people. Excluding lawfully constituted grand juries from the capital charging process promotes the racial discrimination the Department of Justice's own figures betray. This case might as well be *Vasquez v. Hillery.*

The principles on which the Supreme Court relied in denying the prosecution the cover of "harmless error" in that case apply here as well, with the added consideration that *that* was a federal habeas corpus case arising in a state system—to which the considerations of "equity, comity, and federalism" apply, whereas *this* is a federal case over which this Court has direct supervisory jurisdiction. The Court's own integrity is at issue by virtue of its supervisory jurisdiction over the district court and the officers of the Court.

- 15 -

There is a quantum leap between a prosecution by the largest state in the country and by the federal government itself. The Framers put checks on the federal government which they did not put on the states. Whereas even in the original Constitution (art I, § 10), they forbade the states to "pass any bill of attainder, ex post facto law, or law impairing the obligation of contracts," they did not require either trial by jury or grand juries in state cases. In the original Constitution (art. III, § 2, cl. 3), they required trial by jury in federal criminal cases. In the Fifth and Seventh Amendments they added the requirements of grand jury indictment and civil jury trials in federal cases. They clearly contemplated that the federal government posed a greater threat to their rights than did the states.

Subsequently legal development below the constitutional level but consistent with it has buttressed the special status of the grand jury's check on a federal capital prosecution. Fed. R. Crim. P. 7(a) precludes any holding that the fundamental Fifth Amendment error in this capital case could either be forfeited by counsel's failure to object (and thus reviewed on appeal only for "plain error") or swept under the rug once this preserved error is before the Court on remand from the Supreme Court of the United States.

From time to time the prosecution relies on the pre-*Ring* noncapital case of *United States v. Cotton*, 112 S.Ct. 1781 (2002), in which the accused citizen had not preserved his constitutional claims regarding the insufficiency of the indictment. In this decision, the Court explains what it meant in holding that

- 16 -

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 52
Case: 4:07-cv-00027-ERW    Doc. #: 94-61    Filed: 08/14/09    Page: 23 of 34 PageID #: 1499

failure of a federal indictment to charge an offense was not a "jurisdictional" error

in light of *Ex parte Bain*, 121 U.S. 1 (1887), and its progeny:

> The Court's desire to correct obvious constitutional violations led to a "somewhat expansive notion of 'jurisdiction,'" *Custis v. United States,* 511 U.S. 485, 494 . . . (1994), which was "more a fiction than anything else," *Wainwright v. Sykes,* 433 U.S. 72, 79 . . . (1977).

Because Congress has subsequently expanded the remedies for accused citizens on

direct appeal, under 28 U.S.C. § 2255, and in federal habeas corpus, it is no longer

necessary for the Court to engage in such "fiction" in order to afford a person a day

in court on a federal constitutional violation. 122 S.Ct. at 1784-85. Thus the Court

overruled *Bain* and reversed the appellate court's holding that the omission of the

drug amount on which the accused citizen's sentence depended was

"jurisdictional" error. *Id.* at 1785.

In *Bain* and *Cotton* the Court used the term "jurisdictional" to mean "subject

to judicial scrutiny notwithstanding the absence of a right to plenary review."

Here, the appellant has preserved his constitutional grievances, and the latter

concept of "jurisdictional" error has no applicability. Here the appellant uses the

term "jurisdictional" to mean that the prosecution did something it did not have the

authority to do, when that thing was a prerequisite to seeking the death penalty in

the trial court.

The very opinion so recently overruling *Bain* on which the prosecution relies

shows that the Court's concern in using the term "jurisdictional" is animated by a

belief that definite constitutional errors not go without a remedy unless the accused

- 17 -

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 52

citizen has waived them. Appellant stands in a different position than the accused citizens in *Cotton*. There, the indictment omitted certain facts necessary to increase their punishment beyond the facts which the indictment pleaded. Here, Congress passed a statute vesting the power to charge the analogous facts in a politically appointed prosecutor rather than in the grand jury. It is as if the entire indictment in *Cotton* had not been approved by a grand jury but by the prosecution team alone. Viewed in this light, it is hard to see what *is* "jurisdictional" if having a politically appointed cadre rather than a constitutionally grounded body of lay people approve a charging instrument, when that instrument is a sine qua non of a federal capital prosecution. The fact that it was a "reach" to characterize the error in *Bain* as "jurisdictional" in order to avoid the abhorrent anomaly of a right without a remedy should not make a federal court shrink from treating errors as jurisdictional when, as here, they reflect the ultra vires action of an official who purports to do something which only another set of citizens had the right to do.

*Cotton* held that where an indictment in a noncapital drug conspiracy case failed to allege the specific quantity of drugs involved, *and the defendant failed to object at trial*, appellate review was limited to determining whether the violation amounted to "plain error" under Fed. R. Crim. P. 52(b). 122 S. Ct. at 1785. All this means is that "*Cotton* demonstrates that standard waiver principles apply to defects in the indictment." *E.g.*, *United States v. Cothran*, 302 F.3d 279, 282-83 & n.1 (5th Cir. 2002).

- 18 -

In *United States v. Mezzanatto*, 513 U.S. 196, 201-02 (1995), the Supreme Court ruled that those "standard waiver principles" must be put aside where a positive expression of congressional will to the contrary exists, as in this precise context—indictment in a federal capital case. Analysis "start[s] from the premise that waiver is presumptively available *absent some sort of express statement otherwise.*" *E.g., United States v. Dodson*, 288 F.3d 153, 160 (5th Cir. 2002) (emphasis supplied). In *Smith v. United States*, 360 U.S. 1 (1959), the Court held that "waiver of the indictment requirement embodied in Federal Rule of Criminal Procedure 7(a) is confined to the specific circumstances outlined in the Rule's text: 'Rule 7(a) recognizes that this safeguard may be waived, but only in those proceedings which are noncapital.'" In *Mezzanatto* the Court reaffirmed that Rule 7(a) reflects precisely such a fixed requirement for a valid indictment in a prosecution for any offense "which may be punished by death." A "constitutionally sufficient indictment" is one "containing all the elements of the charged offense." *E.g., United States v. Caldwell*, 302 F.3d 399, 410 (5th Cir. 2002). It would be silly to suggest that although an accused citizen in a capital case may not waive indictment, he *may* waive the right to have the indictment satisfy this constitutional minimum for sufficiency.

Nor did *Cotton* itself challenge this settled law. In concluding that a challenge to a flawed indictment in a noncapital case could be forfeited by failure to object, *Cotton* cited Rule 7(b), which provides that a properly advised defendant

- 19 -

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 52

can waive indictment in a *noncapital* case. 122 S. Ct. at 1785. The same section of *Cotton* cites *Smith*, which, as noted, held that indictment *cannot* be waived in a capital case under either the Fifth Amendment or Rule 7(a). For all of these reasons, the pre-*Ring* decision in *Cotton* does not address itself to, let alone control, this case.

Like the Fifth Amendment's Indictment Clause itself, Rule 7 reflects a fundamental insight of the Framers and subsequent generations that it is a fearful thing to authorize the federal government to seek the death of one of its citizens. Time has vindicated their wisdom. A federal capital prosecution carries with it the risk that the infinitely greater resources of the federal government—symbolized by its ability to print money—will allow it to run roughshod over the accused citizen. The judgment must be reversed.

**II.   The Federal Death Penalty Act of 1994 violates the Fifth and Eighth Amendments in light of the text of the Indictment Clause and the Supreme Court's decisions defining "element" in federal crimes and in capital cases.**

In FDPA Congress channeled authority to decide whether a person will be put on trial for his life into the hands of federal prosecutors. The Supreme Court since has held, in *Ring*, that the statutory aggravating factors in a capital case are "elements" for purposes of constitutional analysis, and, in *Jones*, that all elements

of federal felony must be pleaded in the indictment. The Act cannot be squared with these decisions. Nor should this Court be persuaded by the prosecution's contortion of an interpretive canon to suggest that a statute must not be held unconstitutional when it *is* unconstitutional. (PB:19.)

The prosecution argues that this Court must adopt any "'otherwise acceptable construction'" of FDPA in order to avoid declaring the act unconstitutional. (PB:22, *quoting INS v. St. Cyr,* 533 U.S. 289 (2001)). In *St. Cyr* the Supreme Court noted that this "elementary rule" is premised in significant part on the recognition "that Congress . . . is bound by and swears an oath to uphold the Constitution" and on judicial reluctance to "assume that Congress intended to infringe constitutionally protected liberties." *Id.* at 300, *quoting Hooper v. California,* 155 U.S. 648, 657 (1895). That recognition has no application to FDPA: the constitutional requirement that a grand jury must charge statutory aggravating factors in a federal death penalty case *could not have been known* to Congress prior to the announcement of *Ring.* In *United States v. Five Gambling Devices,* 346 U.S. 441, 449 (1953), the Court *qualified* the "strong presumption of constitutionality" that it accords acts of Congress: "The rational and practical force of the presumption is at its maximum only when it appears that the precise point in issue . . . has been considered by Congress and has been explicitly and deliberately resolved." If the Congress that adopted FDPA had asked whether a

Billie Allen v. United States of America
No. 4:07-CV-27-ERW
Exhibit 52

statutory aggravator was an element of a capital offense, counsel would directed it to *Walton v. Arizona*, 497 U.S. 639 (1990), which held that it was not.

The language the prosecution quotes from *Hooper v. California*, 155 U.S. 648 (1895), bears only a gossamer relationship to the question before this Court. In *Hooper* the Supreme Court refused to strike down state regulatory legislation. Observing in dictum that "every reasonable construction must be resorted to in order to save a statute from unconstitutionality," the Court refused to read *out* of that legislation the very words which made the state's action constitutional. *Id.* at 656. Thus the principle of construction the prosecution relies on in this case does appear in *Hooper*, but *Hooper* provides no authority for the contention that this Court can make FDPA constitutional by reading *into* it words never written by Congress.

The very language the prosecution quotes from *Hooper* and *St. Cyr* suggests a finding of constitutionality only when a "reasonable" or "acceptable" construction of the statute under consideration is available. The prosecution cites *INS v. St. Cyr*, 533 U.S. 289, 299-300 (2001), *quoting Crowell v. Benson*, 285 U.S. 22, 62 (1932), and *Planned Parenthood v. Minnesota*, 910 F.2d 479, 482 (8th Cir. 1990), for the proposition that "if an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statute is 'fairly possible,' [this Court is] obligated to construe the statute to avoid such problems."

- 22 -

Case: 4:07-cv-00027-ERW   Doc. #: 94-61   Filed: 08/14/09   Page: 29 of 34 PageID #: 1505

As the Supreme Court saw it, *St. Cyr* involved an extreme claim by the INS that Congress had removed from the federal courts any authority whatsoever to entertain a federal habeas corpus petition raising only questions of law relating to a deportation. The Court reviewed the background against which Congress was legislating, and observed that since 1789 a federal court would have had the authority to decide such a case under what is now 28 U.S.C. § 2241 and the Suspension Clause. 533 U.S. at 300-01. By contrast, it found that the new statutes on which the INS relied did not directly address the federal courts' jurisdiction under section 2241. *Id.* at 312-13. Faced with a clear constitutional provision— the Suspension Clause—and over two hundred years of practice to the contrary, on the one hand, and the absence of a clear statement of intent to divest the federal courts of habeas corpus jurisdiction, on the other, the Court rejected the INS's attempt to shield its behavior from judicial scrutiny. The instant case is different from *St. Cyr* in that there is a clear mandate from Congress that federal prosecutors by a notice of intent are to charge the mens rea and statutory aggravators in a federal capital case. There is no room for doubt whether they intended for grand juries to include them in true bills as well: in light of *Walton v. Arizona*, such a mechanism would not have occurred the legislator favoring the bill who was the most solicitous of the role of the grand jury, because *Walton* held that statutory aggravators did not even have to be submitted to the *trial* jury.

- 23 -

In *Crowell*, likewise, a federal statute provided for administrative hearings on claims by longshoremen in certain cases. A losing litigant argued that a claim did not fall within the jurisdiction of the statute. The Court held that he was entitled to a day in court on whether the administrative tribunal had jurisdiction to determine the underlying dispute. Speaking through CHIEF JUSTICE HUGHES, the Court found its decision implicit in the statute's severability clause and its provision that a court was authorized to set aside an award "not in accordance with law." *Id.* at 62-63. Here, by contrast, it is as if Congress said that the administrative hearing officer would decide whether the case fell within his jurisdiction, and his determination would be binding on all concerned. The commitment of the charging of mens rea and the statutory aggravators to the prosecutor's office is that clear.

The prosecution's argument is a demand for the constitutional vindication of FDPA based on an unreasonably constrained reading of the Act. That reading is neither reasonable nor acceptable because it would require this Court to import into the statute a capital charging procedure different from that prescribed without ambiguity by Congress.

The prosecution cites *Salinas v. United States*, 522 U.S. 52, 59-60 (1997), as another instance of the Supreme Court "counseling courts to construe statutes to avoid constitutional infirmity." (PB:22.) In fact *Salinas* hammers home the appellant's response to the prosecution's argument for constitutionality. There the

- 24 -

Court stressed that the interpretative canons providing for restraint in considering and deciding the constitutionality of statutes are "not a license for the judiciary to rewrite language enacted by the legislature." *Id.* at 59-60. It observed that "[a]ny other conclusion, while purporting to be an exercise in judicial restraint, would trench upon the legislative powers vested in Congress by Art. I, § 1, of the Constitution." *Id.* at 59-60. And the Court reiterated the proposition that "'we cannot press statutory construction to the point of disingenuous evasion even to avoid a constitutional question.'" *Id., quoting Seminole Tribe v. Florida,* 517 U.S. 44, 57 n. 9 (1996).

"Disingenuous" would be a *charitable* way to describe the "find-it-constitutional-even-if-you-have-to-squint-like-Popeye" construction of the statute urged by the prosecution in this case. FDPA provides without ambiguity that it is appointed prosecutors rather than grand jurors who charge the element of aggravating factors in a federal death penalty case. 18 U.S.C. § 3593(a). The Fifth Amendment states that "no person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury." FDPA bypasses grand juries in this integral aspect of the capital charging process. Congress plainly and purposefully committed the decision to charge two elements of a capital offense to federal prosecutors rather than to a body of lay citizens. There endeth reasonable constitutional analysis. The judgment of the district court must be reversed.

## Conclusion

WHEREFORE, the petitioner renews his prayer that the judgment of the district court be reversed.

Respectfully submitted,

Michael A. Gross
34 North Brentwood Boulevard
Clayton, Missouri 63105
  (314) 727-4910
  FAX (314) 727-4378

John William Simon
P.O. Box 16005
Clayton, Missouri 63105
  (314) 645-1776
  FAX (314) 645-2125

*Attorneys for Appellant*

## Certificate of Compliance

This brief has been prepared pursuant to the Court's order regarding length and to Fed.R.App. 35(a)(7)(A). It has been prepared in 14-point proportionally-spaced type, using Microsoft Word 9.0/10.0.

I have scanned the computer diskettes submitted to the Court and to opposing counsel for viruses using Norton AntiVirus 2002, and the program reported that no infection was found.

JOHN WILLIAM SIMON

## Certificate of Service

I hereby certify that two true and correct copies of the foregoing were deposited in the mails, first-class postage prepaid, this 26th day of November, 2002, to:

> Joseph M. Landolt, Esq.
> Mary Jane Lyne, Esq.
> Assistant United States Attorneys
> 111 South Tenth Street, Twentieth Floor
> St. Louis, Missouri 63102

_____
Attorney for Appellant