**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

BILLIE ALLEN,                           §
                                        §
         Petitioner,                    §
                                        §        No. 4:07-CV-27-ERW
                     -v-                §
                                        §
UNITED STATES OF AMERICA,               §
                                        §
         Respondent.                    §

_____

## SUPPLEMENT TO AMENDED MOTION UNDER 28 U.S.C. §2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY UNDER A SENTENCE OF DEATH

Billie Jerome Allen challenges his convictions of bank robbery and murder, and his sentences of life imprisonment without parole, entered in this Court in Cause No. 4:97-CR-00141 ERW/TCM.  The ground for relief in this Supplement, lettered :"S" to follow Grounds A through R raised in the Amended Motion is based on facts discovered after the filing of Mr. Allen's Amended Motion under Section 2255.

This supplemental pleading does not supersede the Amended Motion filed in this matter on February 11, 2008. Mr. Allen continues to rely on the grounds for relief stated in that motion.

**S. New evidence establishes that Mr. Allen was convicted and sentenced to death on the basis of inaccurate and unreliable expert scientific testimony, in violation of his due process and Eighth Amendment rights.**

On February 18, 2009, the National Academy of Sciences ("NAS" or the "Academy") issued a landmark report regarding the state of forensic science in this country. *See* NAT'L ACAD. OF SCI., STRENGTHENING FORENSIC SCIENCE IN THE UNITED

STATES: A PATH FORWARD (Feb. 2009) (hereinafter "NAS Report"), attached hereto as Exhibit 1. The NAS is the preeminent scientific organization in the United States, and it was commissioned by Congress to study the forensic sciences and to issue the instant report. This report undermines the reliability of critically important ballistics and fingerprint testimony presented by the Government at Mr. Allen's trial to establish Mr. Allen's participation in this crime, to portray him as the triggerman, and to obtain a sentence of death. The specific testimony at issue is described below.

### A.    The Unreliable Ballistics Testimony

At the guilt phase of Mr. Allen's trial, Frank Stubits testified for the Government as an expert firearm and toolmark examiner. T. XI 32-111. Mr. Stubits testified quite definitely that his expertise allowed him to match specific bullets to the specific firearm from which they were fired:

> Q. (by the Government): Can you determine if a particular bullet was fired from a specific firearm?
>
> I can make determinations if the fired bullet, evidence bullet matches a test bullet that I fire through a firearm, compare these markings microscopically and make the determination if they were definitely fired from this and only this one firearm or if it was fired from a different firearm....
>
> I can make the determination that they were definitely fired in this only one firearm because these markings only match one firearm.

*Id.* at 36-37. Mr. Stubits likewise testified that he could identify definite matches between shell casings and the firearm from which they were expelled. *Id.* at 38-39. Mr. Stubits described the "definite" match of a firearm with a bullet or shell casing as a

"positive identification." *Id.* at 37-39.

The Government presented evidence that two firearms – a Chinese firearm and a Russian firearm – were used in the robbery, and that Mr. Allen had carried the Chinese firearm while Mr. Holder had carried the Russian firearm. Mr. Stubits testified that he matched eight spent shell casings recovered from the crime scene to the Chinese firearm, i.e., the firearm that Mr. Allen was accused of carrying. *Id.* at 73-77. With each "positive identification" Mr. Stubits made, the Government placed a Chinese flag on a large diagram of the crime scene and presented the diagram to the jury. *Id.*

The Government then elicited the following testimony from Mr. Stubits:

> Q.      You testified earlier that it's possible to determine if a shell casing or a bullet actually came from a particular weapon; is that correct?
>
> A.      Yes, sir.
>
> Q.      Okay. It's also possible to absolutely exclude a bullet or shell casing from having been fired from a particular weapon?
>
> A.      That would be a negative-type result, yes.

*Id.* at 78-79. Mr. Stubits testified that three additional shell casings were inconsistent with the Russian firearm, and the Government placed a Chinese flag on the jury exhibit where each of the shell casings was recovered. *Id.* at 81-84. Mr. Stubits next testified that three shell casings were negative for matches with the Chinese firearm, and the Government placed a Russian flag for each these three shell casings on the jury exhibit. *Id.* at 84-87. For the remaining two shell casings recovered from the crime scene, Mr. Stubits admitted that he could make neither a positive identification nor a negative result with either of the firearms. *Id.* at 87-88. Thus, sixteen spent shell casings

3

were recovered from the crime scene, and Mr. Stubits' testimony, through "positive identification" and "negative-type result[s]," concluded that eleven casings came from the Chinese firearm and three from the Russian firearm. *See id.* at 88.

After testifying that he could not match or exclude four bullet fragments with either firearm, *id.* at 89-94, Mr. Stubits testified that a bullet recovered from Mr. Heflin's body "was definitely fired from the Chinese make firearm." *Id.* at 96. He likewise identified a second bullet recovered from Mr. Heflin's body as definitely coming from the Chinese firearm. *Id.* at 96-97.

In its closing argument at the guilt phase, the Government relied on Mr. Stubits' testimony to argue that Mr. Allen was the triggerman who shot Mr. Helfin:

> The police begin seizing evidence, and what does the physical evidence show you? Showed there are 16 shell casings in that bank. There's 16 shell casings in that bank and 11 of them, marked by these Chinese flags, are from the Chinese gun, and what does that tell you about this defendant? What does it tell you about his intent? He squeezed that trigger the 11 different times at Richard Heflin, at Michael West, and at the other people in that bank. ...

T. XII 47.

During the penalty phase argument, the Government returned to this theme, arguing that Mr. Allen "was the one who walked up closer with this Chinese gun and fired more rounds into Richard Heflin after he was on the ground" and that "you [the jury] know that those two bullets came from the Chinese gun that destroyed Richard Heflin's any chance he had of surviving." T. XIX 98-99. The jury was apparently impressed by this evidence and argument. Their first question during penalty phase deliberations was, "We would like to see the floor plan with the flags attached." The

Court granted their request. *Id.* at 113-14. Thus, at both guilt and penalty, the Government urged the jury to rely on the expert ballistics testimony to establish that Mr. Allen was the triggermen who had fired eleven bullets inside the bank, including multiple bullets that were removed from Mr. Heflin's body. That expert testimony, and the floor plan exhibit studied by the jury during its deliberations, it is now clear, were patently unreliable.

### B.    The Unreliable Fingerprint Testimony

The government presented the testimony of FBI fingerprint analyst William Pauley, and St. Louis Metropolitan Police Department latent fingerprint examiner Thomas Shulze. Agent Pauley and Examiner Schulze both testified that they processed, compared, and matched latent prints with prints from Mr. Allen. Agent Pauley compared prints found on inculpatory letters that were allegedly written by Mr. Allen. T. X 42-53. Examiner Schulze compared prints found on the vehicle parked at Barnes hopsital in which Mr. Allen allegedly was riding with Norris Holder prior to the bank robbery, and which was to be their final getaway car. T. IX 148-50. Both Agent Pauley and Examiner Schulze testified that they could match the latent fingerprints with those of Mr. Allen by using a process whereby the ridges of the latent fingerprints are analyzed and then compared against Mr. Allen's known fingerprints. T. X 50-53; T. IX 146-47. This process of fingerprint identification is known as "friction ridge analysis." *See* T. IX 146.  As discussed below, its reliability has now been called into serious question.

### C.   The National Academy of Sciences Report

The NAS Report has particular force because it was developed not at the request of the criminal defense bar, but in response to a request from Congress. The report reflects the generally accepted consensus of the scientific community. The NAS is a private, non-profit, self-perpetuating society of distinguished scholars engaged in scientific and engineering research, dedicated to the furtherance of science and technology and to their use for the general welfare of the United States. Under the charter granted to it by the Congress in 1863, the Academy has a mandate that requires it to advise the federal government on scientific and technical matters.[1]

The NAS came into being when the authorizing legislation was signed by President Abraham Lincoln on March 3, 1863, at the height of the Civil War. As mandated in its Act of Incorporation, the NAS has, since 1863, served to "investigate, examine, experiment, and report upon any subject of science or art" whenever called upon to do so by any department of the government. The Academy's service to government has become so essential that Congress and the White House have issued legislation and executive orders over the years that reaffirm its unique role.

The NAS Report concluded that "with the exception of nuclear DNA analysis . . . no forensic method has been rigorously shown to have the capacity to consistently, and with a high degree of certainty, demonstrate a connection between evidence and a

---

[1] *See* http://www.nasonline.org/site/PageServer?pagename=ABOUT_main_page. "Members and foreign associates of the Academy are elected in recognition of their distinguished and continuing achievements in original research; election to the Academy is considered one of the highest honors that can be accorded a scientist or engineer." *Id.* "The Academy membership is comprised of approximately 2,100 members and 380 foreign associates, of whom more than 200 have won Nobel Prizes."

specific individual or source." NAS Report at S-5. As the NAS recognized, "there is a notable dearth of peer-reviewed published studies establishing the scientific bases and validity of many forensic methods," *id.* at S-6, and the report makes clear that these deficient methods include the precise types of scientific evidence presented at Mr. Allen's trial: ballistics (a subspecialty of toolmark identification) and fingerprint analysis. *Id.* at 5-18-26, 5-33-35.

Further, the NAS report "concludes that every effort must be made to limit the risk of having the reliability of certain forensic methodologies judicially certified before the techniques have been properly studied and their accuracy verified." *Id.* at 3-1. Thus, the NAS is highly critical of the type of testimony presented in Mr. Allen's case. "Much forensic evidence -- including, for example, bite marks and firearm and toolmark identifications–is introduced in criminal trials without any meaningful scientific validation, determination of error rates, or reliability testing to explain the limits of the discipline." *Id.* at 3-18.

Because there has not been sufficient scientific study to support such claims, the NAS is highly critical of forensic experts testifying to "absolute" identifications, like the testimony presented in this case. "Claims of 'absolute' and 'positive' identification should be replaced by more modest claims about the meaning and significance of a purported 'match'." *Id.* at 5-12. "Imprecise or exaggerated expert testimony has sometimes contributed to the admission of erroneous or misleading evidence." *Id.* at S-3.

The NAS also recognized that the law's greatest dilemma in its heavy reliance on forensic evidence, concerns the question of whether—and to what extent—there even is *science* in any given "forensic science" discipline. As the Report finds:

> Two very important questions should underlie the law's admission of forensic evidence in criminal trials: (1) the extent to which a particular forensic discipline is founded on a reliable scientific methodology that gives it the capacity to accurately analyze evidence and report findings and (2) the extent to which practitioners in a particular forensic discipline rely on human interpretation that could be tainted by error, the threat of bias, or the absence of sound operational procedures and robust performance standards. These questions are significant. Unfortunately, these important questions do not always produce satisfactory answers in judicial decisions pertaining to the admissibility of forensic science evidence proffered in criminal trials.

*Id.* at S-7.

The NAS emphasized the pressing need to insure the reliability of forensic

testimony.

> Law enforcement officials and the members of society they serve need to be assured that forensic techniques are *reliable*. Therefore, we must limit the risk of having the reliability of certain forensic science methodologies condoned by the courts before the techniques have been properly studied and their accuracy verified.

*Id.* at 3-19-20.

Nevertheless, the NAS notes judicial reluctance to subject forensic testimony to appropriate scrutiny. "[S]ome courts appear to be loath to insist on such research as a condition of admitting forensic science evidence in criminal cases, perhaps because to do so would likely 'demand more by way of validation than the disciplines can presently offer.'" *Id.*

The NAS Report thus demonstrates, as discussed in detail below, that the expert scientific testimony relied upon by the Government in this case is neither scientifically accurate nor reliable. Indeed, there is no scientifically reliable basis to support the

8

scientific testimony used to link Mr. Allen to this crime, to paint him as the triggerman, and to obtain a death sentence. Consequently, the jury's guilty verdicts and death sentence are likewise unreliable.

**D. The NAS Report Findings regarding Ballistic and Fingerprint Evidence.**

**1. Ballistics**

Ballistics evidence has a long history of acceptance by state and federal courts as a legitimate forensic science. The NAS Report, however, requires re-examination of that view. The Report demonstrates that ballistics, like other forms of toolmark identification, has never been subject to scientific rigor and scrutiny. NAS Report at 1-6 ("**Questionable or Questioned Science** .... The fact is that many forensic tests – such as those used to infer the source of toolmarks...have never been exposed to stringent scientific scrutiny"). No adequate statistical foundations have ever been laid to support the premise that a gun leaves unique, individualized markings on a bullet or shell casing. *Id.* at 5-20 ("But even with more training and experience using newer techniques, the decision of the toolmark examiner remains a subjective decision based on unarticulated standards and no statistical foundation for estimation of error rates"). There has been no study of error rates in firearms identification; nor has the data to support such a study ever been gathered. *Id.* at 5-21 ("Sufficient studies have not been done to understand the reliability and repeatability of the methods"). There are no generally accepted objective criteria by which a "match" or a "positive identification" can be determined, and the analysis is inherently subjective. *Id.* ("Because not enough is known about the variabilities among individual tools and guns, we are not able to

9

specify how many points of similarity are necessary for a given level of confidence in the result").

These findings render Mr. Stubits' testimony at trial unreliable. The admission of such unreliable expert testimony taints the integrity of the trial process and denies a defendant a just and fair trial. *Napue,* 360 U.S. at 271. The new evidence demonstrating the unreliability of Mr. Stubits' testimony is neither cumulative nor corroborative of evidence presented at trial. Indeed, at trial, the defense presented no evidence undermining the scientific validity of the expert ballistics testimony. Further, the new evidence does not simply impeach Mr. Stubits' testimony. There is no question that Mr. Stubits' believed in the validity of his science. It is not Mr. Stubits' credibility at issue now, but the very validity of the scientific testimony that was given.

Accordingly, there is a reasonable likelihood that the new evidence would have affected the jury's judgment at both the guilt and penalty phases of trial.[2] Without Mr. Stubits' unreliable testimony, the Commonwealth's evidence against Mr. Allen as the shooter would have been much weaker. But Mr. Stubits' testimony provided a scientific basis that allowed the jury to disregard any doubt concerning the prosecution's case, as his uncontradicted testimony unquestionably linked Mr. Allen to the shooting of Mr. Heflin. Without that testimony, those doubts could not be disregarded, and a different result would have been likely.

---

[2] The two firearms recovered and compared in this case are remarkably similar. Both weapons share interchangeable parts and a large number of class characteristics and sub-characteristics. The similarities between these two weapons, in the context of the NAS report, cast even greater doubt on the reliability of the testimony of government expert Frank Stubits.

### 2. Fingerprint evidence

While fingerprint evidence has a long history of acceptance by state and federal courts as a legitimate forensic science, the NAS Report requires re-examination of that view. The NAS Report devotes considerable attention to deficiencies in forensic fingerprint practices. Virtually all of the general failings of forensic science are found in the area of friction ridge analysis – the method of fingerprint analysis used in Mr. Allen's case. The NAS Report findings on fingerprints include:

- The training of personnel to perform latent print identifications varies from agency to agency. Agencies may have a formalized training program, may use an informal mentoring process, or may send new examiners to a one- to two-week course. NAS Report at 5-8

- The ACE-V methodology (Analysis, Comparison, Evaluation, and Verification) commonly used in latent print identification does not rest on a reliable factual foundation does not specify particular measurements or a standard test protocol and examiners must make subjective assessments throughout. *Id.* at 5-9.

- Outcome of a friction ridge analysis is not necessarily repeatable from examiner to examiner because of its subjectivity and further experienced examiners do not necessarily agree with even their own past conclusions when the examination is presented in a different context some time later. *Id.*

- The subjectivity is intrinsic to friction ridge analysis, as can be seen when comparing it with DNA analysis ... [T]he process does not allow one to stipulate specific measurements in advance, as is done for a DNA analysis. Moreover, a small stretching of distance between two fingerprint features, or a twisting of angles, can result from either a difference between the fingers that left the prints or from distortions from the impression process. For these reasons, population statistics for fingerprints have not been developed, and friction ridge analysis relies on subjective judgments by the examiner. Little research has been directed toward developing population statistics, although more would be feasible. *Id.* at 5-10.

- The criteria for identification are much harder to define, because they depend on an examiner's ability to discern patterns (possibly complex)

among myriad features and on the examiner's experience judging the discriminatory value in those patters. The clarity of the prints being compared is a major underlying factor. For 10-print fingerprint cards, which tend to have good clarity, even automated pattern-recognition software (which is not as capable as human examiners) is successful enough in retrieving matching sets from databases to enjoy widespread use. When dealing with a single latent print, however, the interpretation task becomes more challenging and relies more on the judgment of the examiner. *Id.*

- At present, fingerprint examiners typically testify in the language of absolute certainty. Both the conceptual foundations and the professional norms of latent fingerprinting prohibit experts from testifying to identification unless they believe themselves certain that they have made a correct match. Experts therefore make only what they term "positive" or "absolute" identifications—essentially making the claim that they have matched the latent print to the one and only person in the entire world whose fingertip could have produced it . . . Given the general lack of validity testing for fingerprinting; the relative dearth of difficulty proficiency tests; the lack of statistically valid model of fingerprinting; and the lack of validated standards of declaring a match, such claims of absolute, certain confidence in identification are unjustified . . . *Id.* at 3-17, n.79.

- Although there is limited information about the accuracy and reliability of friction ridge analyses, claims that these analyses have zero error rates are not scientifically plausible. *Id.* at 5-12

- ACE-V provides a broadly stated framework for conducting friction ridge analyses. However, this framework is not specific enough to qualify as a validated method for this type of analysis. ACE-V does not guard against bias; is too broad to ensure repeatability and transparency; and does not guarantee that two analysts following it will obtain the same results. *Id.*.

- Error rate is a much more difficult challenge. Errors can occur with any judgment-based method, especially when the factors that lead to the ultimate judgment are not documented. Some in the latent print community argue that the method itself, if followed correctly (i.e., by well-trained examiners properly using the method), has a zero error rate. Clearly, this assertion is unrealistic, and, moreover, it does not lead to a process of method improvement. The method, and the performance of those who use it, are inextricably linked, and both involve multiple sources of error (e.g., errors in executing the process steps, as well as errors in human judgment). *Id.* at 5-13.

- Uniqueness and persistence are necessary conditions for friction ridge

identification to be feasible, but those conditions do not imply that anyone can reliably discern whether or not two friction ridge impressions were made by the same person. Uniqueness does not guarantee that prints from two different people are always sufficiently different that they cannot be confused, or that two impressions made by the same finger will also be sufficiently similar to be discerned as coming from the same source. The impression left by a given finger will differ every time, because of inevitable variations in pressure, which change the degree of contact between each part of the ridge structure and the impression medium. None of these variabilities—of features across a population of fingers or of repeated impressions left by the same finger—has been characterized, quantified, or compared. *Id.*

The techniques used by Agent Pauley and examiner Schulze to link Mr. Allen's fingerprints to the processed latent fingerprints were deficient and unreliable. Virtually all of the failings of forensic science in the area of friction ridge analysis identified in the NAS Report are present in this case. The findings were not and cannot be demonstrated to be reliable or based on valid science.

The admission of unreliable fingerprint evidence taints the integrity of the trial process and denies a defendant a just and fair trial. *See Napue*, 360 U.S. at 271. The new evidence of demonstrating the unreliability of Schulze and Pauley's testimony is neither cumulative nor corroborative of evidence presented at trial. *See id.* Indeed, at trial, the defense presented no evidence undermining the scientific validity of the experts' fingerprint testimony. Further, the new evidence does not simply impeach the testimony of Schulze and Pauley, but rather questions the very validity of the scientific testimony that was presented.

Accordingly, there is a reasonable likelihood that the new evidence would have affected the jury's judgment at both the guilt and penalty phases of trial. The expert fingerprint testimony connected Mr. Allen to inculpatory evidence used by the

13

government at trial. In its closing argument, the government argued that the letters connected to Mr. Allen through Agent Pauley's testimony demonstrated that Mr. Allen gave numerous voluntary statements to police and that he lied. T.XII. 96. The government also used examiner Schultz's testimony to connect Mr. Allen to Norris Holder and his car. The government argued that Mr. Holder and Mr. Allen planned to use the car for their getaway. *Id.* at 49. Without Schulze's and Pauley's unreliable testimony, the Commonwealth's evidence against Mr. Allen would have been much weaker. The fingerprint testimony provided a scientific basis that allowed the jury to disregard any doubt concerning the prosecution's case, as his uncontradicted testimony unquestionably linked Mr. Allen to the shooting of Mr. Heflin. Without that testimony, those doubts could not be disregarded, and a different result would have been likely.

### E. The Due Process and Eighth Amendment Standards Governing Analysis of the New Evidence

The NAS Report reveals that Mr. Allen's convictions and death sentence were based on unreliable evidence, in violation of due process and the Eighth Amendment. "Reliability is. . . a due process concern." *White v. Illinois*, 502 U.S. 346, 363-64 (1992). Hence, the Due Process Clause requires that criminal convictions be based on reliable and trustworthy evidence. *See Donnelly v. DeChristoforo*, 416 U.S. 637, 646 (1974); *Thompson v. City of Louisville*, 362 US 199, 204 (1960). The use of exaggerated, inaccurate, or misleading testimony, such as that presented by the Government here, deprives a defendant of a fair trial if "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury." *Napue v. Illinois*, 360 U.S. 264, 271

(1959); *see also Mooney v. Holohan*, 294 U.S. 103 (1935); *Pyle v. Kansas*, 317 U.S. 213 (1942); *Alcorta v. Texas*, 355 U.S. 28 (1957); *Giglio v. United States*, 405 U.S. 150 (1972).

The requirement of reliability stretches across our criminal justice system and is the backbone of much constitutional analysis. For example, due process precludes the admission of identification evidence if, under the totality of the circumstances, the identification process was impermissibly suggestive so as to give rise to a substantial risk of misidentification. *Stovall v. Denno*, 388 U.S. 293 (1967). Indeed, the linchpin for the admission of identification testimony is its reliability. *E.g., Manson v. Braithwaite*, 432 U.S. 98, 114 (1977); *Neil v. Biggers*, 409 U.S. 188 (1972). The due process inquiry applicable here is therefore whether the new evidence "could. . . in any reasonable likelihood have affected the judgment of the jury" in its determinations of guilt and in its sentence of death.

Similarly, the Eighth Amendment imposes a heightened standard "for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (plurality opinion); *see also Godfrey v. Georgia*, 446 U.S. 420, 427-28 (1980); *Mills v. Maryland*, 486 U.S. 367, 383-84 (1988). This need for heightened reliability requires "*accurate* sentencing information [as] an indispensable prerequisite to a reasoned determination of whether a defendant shall live or die," *Gregg v. Georgia*, 428 U.S. 153, 190 (1976) (plurality opinion), and invalidates death sentences imposed as a result of the jury's consideration of materially inaccurate evidence. *Johnson v. Mississippi*, 486 U.S. 578, 590 (1988) (Eighth Amendment does not permit a death sentence to be imposed by a jury that was allowed to consider

materially inaccurate evidence); *Tuggle v. Netherland*, 516 U.S. 10, 14 (1995) (same). The jury's death verdict here was based in significant part on materially inaccurate and unreliable pseudo-scientific evidence. As such, Mr. Allen's death sentence cannot stand.

### E.    Conclusion

Given the new evidence undermining the reliability of the Government's expert evidence described above, an evidentiary hearing is necessary to determine the precise impact of the NAS Report's findings on the scientific evidence at issue. Mr. Allen requests that the Court hold an evidentiary hearing to address this matter, and, upon hearing, that he be granted a new trial.

### CONCLUSION

For the foregoing reasons, petitioner Billie Jerome Allen prays the court:

1. To require the United States to file a supplemental answer responding to Ground S above;

2.  Permit Mr. Allen to file a traverse to respondent's answer, responding to any affirmative defenses raised by the Answer;

3.  Permit Mr. Allen to utilize the processes of discovery set forth in F. R. Civ. P. 26-37, to the extent necessary to identify and develop fully the facts supporting this supplement, and any defenses raised by the respondent's answer;

4.  Conduct an evidentiary hearing to resolve any factual disputes raised by the respondent's answer, or by Mr. Allen's traverse.  Because Mr. Allen has alleged facts

which, if true, entitle him to relief, he is also entitled to a full evidentiary hearing to establish the facts he alleges;

5.  Order the respondent to release Mr. Allen from custody unless he is given a new trial or, alternatively, a new penalty phase proceeding, or, alternatively, a new direct appeal proceeding; and

8.  Grant such further relief as may be appropriate and just.

Respectfully submitted,

/s Elizabeth Unger Carlyle

Elizabeth Unger Carlyle #51877
P.O. Box 866
Columbus, MS  39703
Missouri Bar No. 41930
(816)525-6540
FAX (866) 764-1249
elizcar@bellsouth.net

Joseph M. Cleary #534292
Attorney at Law
1455 N. Pennsylvania
Indianapolis, IN  46202
(317) 630-0137
jcleary498@aol.com

Michael Wiseman
Chief, Capital Habeas Corpus Unit
Federal Community Defender for the
Eastern District of Pennsylvania
Suite 545 West -- The Curtis Center
Philadelphia, PA  19106
215-928-0520

ATTORNEYS FOR PETITIONER

CERTIFICATE OF SERVICE

I hereby certify that it is my belief and understanding that counsel for respondent, Mr. Joseph M. Landolt, United States Attorney, 111 South 10th Street, 20th Floor, St. Louis, Missouri 63102, and Mr. Steven Holtshouser, Assistant United States Attorney, 111 South 10th Street, 20th Floor, St. Louis, Missouri 63102., are participants in the Court's CM/ECF program and that separate service of the foregoing document is not required beyond the Notification of Electronic Filing to be forwarded to counsel on August 14, upon the filing of the foregoing document.

/s/ Elizabeth Unger Carlyle
ELIZABETH UNGER CARLYLE