**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **BILLIE JEROME ALLEN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 4:07CV0027 ERW** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | **THIS IS A CAPITAL CASE** |
| | ) | |
| **Respondent.** | ) | |

**GOVERNMENT'S RESPONSE TO MOTION FOR LEAVE TO SUPPLEMENT THE AMENDED 2255 MOTION WITH GROUND "S" AND TO THE MERITS OF PETITIONER'S GROUND "S"**

**COMES NOW** the United States of America, by and through its attorneys, Richard G. Callahan, United States Attorney for the Eastern District of Missouri, and Joseph M. Landolt, Steven E. Holtshouser, Carrie Costantin and Cristian M. Stevens, Assistant United States Attorneys for said District, and responds to movant Billie Jerome Allen's Motion For Leave To Supplement To The Amended Motion Under Section 2255 and Responds to the merits of Ground S as follows:

**I. Motion To Supplement Amended Section 2255 Motion With Ground S:**

Petitioner, Billie Jerome Allen ("Allen"), was convicted of bank robbery resulting in death and murder. He was later sentenced to life in prison without parole for the bank robbery and death for the murder. After a series of appeals, Petitioner's judgment of conviction and sentence became final on December 11, 2006, some 8 and 1/2 years after the trial. Petitioner requested appointment of habeas corpus counsel, which was granted on March 11, 2007.

Petitioner submitted a timely amended petition on February 11, 2008 ("Amended Motion").[1]

Over eighteen months later, on August 14, 2009, Petitioner filed a motion for leave to supplement the Amended Motion ("Supplement to the Amended Motion") and sought to add a new claim, Ground "S", to his 2255 petition.  In the proposed Supplement "S" to the Amended Motion, Petitioner attempts to raise a substantive challenge to the admission of ballistics and fingerprint evidence used at trial.  Allen claims that the evidence should have been excluded as scientifically unreliable in violation of his 5th Amendment Due Process and 8th Amendment rights.  He claims that the issue was not known to habeas counsel until they became aware of new evidence in the form of a February, 2009, report issued by the National Academy of Sciences ("NAS Report") which report raised questions about forensic evidence including fingerprint and ballistics comparison expert opinions.

### A. The Supplement Is Barred by the One-year Statute of Limitations Because the Facts Relied Upon In The NAS Report Could Have Previously Been Discovered Through the Exercise of Due Diligence

28 U.S.C. § 2255(f) imposes a one-year limitation on petitioners bringing federal habeas corpus claims.  The tolling period begins on the latest date of the following occurrences:

(1) the date on which the judgment of conviction becomes final;

(2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;

---

[1]The Government acceded to Allen's requests for equitable tolling to allow him additional time to prepare his 2255 Motion.  Many of the pending claims were presented 2 months after the statute of limitations would have run.

(3) the date on which the right asserted was initially recognized by the

Supreme Court, if that right has been newly recognized by the Supreme

Court and made retroactively applicable to cases on collateral review; or

(4) the date on which the facts supporting the claim or claims presented

could have been discovered through the exercise of due diligence.

28 U.S.C. § 2255(f).  Petitioner claims under subsection (4) that the NAS Report is a new fact

which could not have been discovered through the exercise of due diligence, because it was not

issued until February 18, 2009.  Petitioner argues that, under 2255(f)(4), the one-year tolling

period began on February 18, 2009.  Petitioner claims that the Supplement to the Amended

Motion is timely because it was filed within the one-year tolling period on August 14, 2009.

Petitioner's reliance on 2255(f)(4) is misguided because the issuance of a report is not

itself a "fact."  *See* United States v. Davis, 2008 WL 1914352, at *3 (D. Neb. Apr. 28, 2008)

(analyzing a similar habeas challenge under 2255(f)(4) and holding that Supreme Court

decisions are not facts for purposes of the statute), *citing* E.J.R.E. v. United States, 453 F.3d

1094, 1098 (8th Cir. 2006) (court decisions are not "operative facts").  The "facts" that Petitioner

uses to support his substantive claims are the information included in the NAS report—not the

issuance of the report itself.  The information in the NAS Report was not new and the NAS was

hardly the first publication to question the reliability of fingerprint and ballistics evidence.

Moreover, the NAS Report does not conclude that either form of evidence is in fact unreliable or

inadmissible (which, of course, would be a matter beyond their expertise and authority).  The

report is titled, "Strengthening Forensic Science In The United States: A Path Forward."  The

NAS is a private, non-profit group of "scholars" whose role is to simply "advise" the federal

government on scientific matters.  The result of the NAS Report is 13 Recommendations, none

of which recommends that fingerprint or ballistics evidence be excluded.  The recommendations,

generally, call for additional research, work, refinement, improvement of standards, etc.  The

specific chapter on fingerprint evidence generally criticizes the science due to a lack of sufficient

documentation and error rate analysis.  It recommends further research, but never states that

fingerprint evidence is unreliable or should not be admitted.  The NAS Report stated that "it

seems plausible that a careful comparison of two impressions can accurately discern whether or

not they had a common source."  NAS Report, p.142.  The specific chapter on firearms and

toolmark identification makes criticisms and makes recommendations similar to those for

fingerprint evidence.  Again, the report does not conclude that such evidence is unreliable or

should not be admitted, but does recommend further research and studies.  NAS Report, p.150-

156.  Thus, it is not, as counsel claims, a "definitive statement from the scientific community

challenging the reliability" of either type of evidence.  Doc. 97 at 3.  That may the "spin" that the

defense bar wishes to place on the Report, but that is not what is says.  Moreover, as the material

in Addendum 11 and 12 suggest, the "facts" which underlie the NAS Report have been known

for some time and have been acted upon by criminal defense counsel long before the NAS

Report was published.  The NAS Report is simply a collection and review of pre-existing facts.

With respect to fingerprint evidence, challenges to its scientific admissibility were well-

known even prior to the crime in this case.  Attached as Addendum 11[2] are just a few of the

---

[2]Ten addenda were attached to the Government's Response to Allen's 2255 Motion.
Allen used numbers to identify his exhibits in his Traverse.  To avoid confusion, the Government
will continue to refer to any supporting documents in this document or the Sur-Reply regarding

publications raising the same concerns addressed in the NAS Report.  In 1996, a publication

known as "Scientific Sleuthing Review "published an article discussing perceived deficiencies in

fingerprint examination science.  In United States v. Havvard, 2000 WL 1585083 (S.D. IN

2000), the court examined whether latent print analysis satisfied the standards of reliability for

admissible expert testimony.  The other items included in Addendum 11, and available to

defense counsel before the one-year limitation had run are  "The Myth of Fingerprints"

(November, 2000); "Fingerprint Examination Standards: Do We Need Them?" (Summer, 2001);

"Suspect Identities: A History of Fingerprinting and Criminal Identification" (Harvard

University Press, 2001); and a Continuing Education seminar on "Fingerprint Evidence and the

Nature of Forensic Science," February 13, 2002; a January, 2002 District Court opinion rejecting

a Daubert challenge to fingerprint analysis; a January 7, 2002, 59-page opinion in United States

v. Plaza, Cr. No. 98-362-10 (E.D. Pa. 2002), finding that fingerprint evidence does not meet

scientific standards; a January 11, 2002 New York Times article labeling the Plaza decision a

"'blockbuster'" opinion; an entire issue of "Evidence Technology Magazine" for July-August,

2003, devoted to the "Evolution of Fingerprint Technology"; and an August, 2003 Eighth Circuit

opinion in United States v. Collins, No 02-3353, considering a Daubert challenge to fingerprint

evidence.  See also, "A Systematic Challenge To The Reliability and Admissibility of Firearms

and Toolmark Identification," 6 Columbia Science and Technology Law Review 2 (2004-05).

Between 2001 and 2005, there was a plethora of law review articles on the topic, as well.

Moreover, this very Court entertained a Daubert challenge to fingerprint evidence and

heard testimony from an expert in United States v. Coleman, No. S2-4:01CR296 ERW on

---

Allen's 2255 Motion by consecutively numbered addenda.

February 5, 2002.  The evidence was ultimately admitted and included in Addenda 12 and 13 is a copy of the Defendant's Motion for the Daubert hearing and the Government's Supplemental Response to the Motion for a Daubert Hearing, citing cases between 1999 and January, 2002, and addressing Daubert challenges to fingerprint evidence.  It is beyond comprehension that this claim could not have previously been discovered through due diligence.

The same is also true of the ballistics claim.  Easily located court decisions have discussed this issue at length.  *See* United States v. Green, 405 F.Supp.2d 104 (D. Mass. 2005)(challenge to the reliability of ballistics evidence); United States v. Monteiro, 407 F.Supp.2d 351 (D. Mass. 2006)(motion to exclude ballistics testimony granted without prejudice); United States v. Diaz, 2007 WL 485967 (N.D. Cal. Feb. 12, 2007)(motion to exclude ballistics evidence granted in part and denied in part)*;* United States v. Glynn, 578 F.Supp.2d 567 (S.D.N.Y. 2008)(challenge to ballistics evidence granted in part and denied in part).  Allen's counsel, whether trial or habeas, through the exercise of due diligence, could have discovered the facts that support his claim by simply researching cases that address this issue.

For the foregoing reasons, Petitioner's Supplement to the Amended Motion is untimely under 28 U.S.C. § 2255(f)(4).  To find otherwise renders the limitations period and the language of Section 2255(f)(4) meaningless.

### B.  Ground "S" Does Not "Relate Back" to the Amended 2255 Motion, Because it Does Not Arise out of the Same Conduct, Transaction, or Occurrence Set Forth in the Amended Motion

Habeas proceedings are governed by the Federal Rules of Civil Procedure.  United States v. Hernandez, 436 F.3d 851, 856-57 (8th Cir. 2006).  Thus, a habeas petition acts as an original pleading in a habeas proceeding.  Mayle v. Felix, 545 U.S. 644, 655 (2005).  Under Rule

15(c)(1)(B), an amendment "relates back to the date of the original pleading when...the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." FED. R. CIV. P. 15(c)(1)(B). The rationale for Rule 15(c) is that a claim arising from the same facts underlying a previous claim may be added later because the requisite notice has already been provided by the previous claim. United States v. Mandacina, 328 F.3d 995, 1000 (8th Cir. 2003).

The term "conduct, transaction, or occurrence" is construed more narrowly in a habeas proceeding than in other civil proceedings. Felix, 545 U.S. at 657. In order to satisfy the "relation back" standard, supplemental motions "must be of the same time and type as those in the original motion, such that they arise from the same core set of operative facts." Hernandez, 436 F.3d at 857. In the habeas context, the Supreme Court held that an event does not relate back simply because it was part of the same trial, as this would allow a "miscellany of claims for relief [which] could be raised later rather than sooner." Felix, 545 U.S. at 662.

Whether a subsequent motion relates back to the original pleading depends upon the circumstances of each case. In Hernandez, the petitioner's original motion challenged the admission of evidence and his amended motion included an ineffective assistance of counsel claim for failing to effectively cross-examine two witnesses 436 F.3d at 858. The Eighth Circuit held that the ineffective cross-examination claim did not relate back to the original petition. *Id.* In McKay v. Purkett, the petitioner's original motion "challenged the conduct by the trial court in the state postconviction proceedings, whereas the amended complaint challenged the conduct of [petitioner's] counsel prior to his conviction and sentence." McKay v. Purkett, 255 F.3d 660, 661 (8th Cir. 2001) The Eighth Circuit held that the petitioner's amended claim did not relate

7

back to his original claim.  *Id.*  In <u>Felix</u>, the petitioner's original motion challenged the

admission of a witness' videotaped statements and his amended motion argued that his pretrial

statements were coerced by police, and therefore, inadmissible.  545 U.S. at 651-52.  The

Supreme Court held that the admissibility of the petitioner's pretrial statements did not relate

back to the admissibility of a witness' videotaped statements.  *Id.* At 664-65.

Petitioner's claim challenging the reliability of fingerprint and ballistics evidence

included in the Supplement to the Amended Motion does not relate back to the Amended

Motion.  The Amended Motion does not contain any references to fingerprint or ballistics

evidence, nor to the experts who testified about such evidence.  The mere fact that Petitioner's

challenge to fingerprint and ballistics evidence arose from the same trial is irrelevant.  To say

that the relation back standard is met under these circumstances constitutes "[a]n

approach...[which] views 'occurrence' at too high a level of generality."  <u>Felix</u>, 545 U.S. at 661.

Because Petitioner's amended claim does not relate back to the original petition, it is time-barred

under 28 U.S.C. § 2255(f).

## II.  The Fingerprint and Ballistics Evidence Presented at Trial Was Both Accurate and Reliable and its Admission Did Not Constitute a Miscarriage of Justice

### A. Ground "S" Is Procedurally Barred

The legal principles governing the procedural bar doctrine were discussed in the

Government's Response to Allen's 2255 Motion and are incorporated by reference herein.  See,

Doc. 79 at 37-39.  The Government also incorporates by reference the further discussion of those

principles contained in the Government's Sur-Reply filed this same date.  In essence, a habeas

petitioner may not seek collateral review of substantive claims which could have been raised at

trial or on appeal and were not raised.  In this case, neither trial nor appellate counsel raised any

issue regarding the admissibility of the fingerprint and ballistics evidence in Allen's trial and they easily could have.  Ground "S" is not a claim of ineffective assistance of counsel - it is a substantive constitutional due process claim.  The procedural bar rule set forth by the Supreme Court in Frady v. United States, 456 U.S. 152, 168 (1982), applies to constitutional claims as well as non-constitutional claims.  There is an exception to the bar where it can be shown that the habeas petitioner has good cause for not having raised the claim despite previous opportunities and where he can also show a heightened degree of prejudice.

### 1. Allen Does Not Meet The Cause Prong of The Exception to The Procedural        Bar

To establish cause, Allen must demonstrate that some objective factor external to the defense impeded his effort to raise the issue previously.  As discussed *supra*, the legal requirements for the admission of scientific evidence under Federal Rule of Evidence 702 were well-known when this case was tried.  Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).  Daubert, which did not announce a rule rooted in the Constitution, interpreted Rule 702 of the Federal Rules of Evidence as a "flexible" inquiry "tied to the facts of a particular case" rather than the previous "general acceptance" standard.  Daubert, 509 U.S. at 595.  Daubert requires reliability and relevance.  To qualify as scientific knowledge, it must be "derived by the scientific method," "be supported by appropriate validation," and "assist the trier of fat."  *Id.* Daubert identified a list of factors, but stated that the list was not a "definitive checklist or test." *Id*. at 593.  The possible factors include: 1) whether the technique can be and has been tested; 2) whether it has been subjected to peer review and publication; 3) the known or potential rate of error for the technique and the existence of standards for controlling the technique; and 4)

whether the technique has been generally accepted by the scientific community. *Id*. *See*, United States v. Coleman, 202 F.Supp.2d 962 (E.D.Mo. 2002).

The facts regarding fingerprints and ballistics have not changed in the past 13 years. The same absence of data that the NAS Report laments was absent in 1998. Fingerprints were questioned as early as 1996. This Court held a Daubert hearing on fingerprints in 2002 in the Coleman case.[3] Nothing prevented counsel, at trial or on appeal, from looking at the Daubert factors and challenging both fingerprints and ballistics. The failure to do so can be explained and justified on many levels, but the fact remains that this argument cannot be raised in a 2255 motion, because it could have been raised previously, was not raised previously and the failure to raise it previously cannot be excused as cause under Frady. Allen cannot show that a factor external to the defense prevented trial counsel from raising his present constitutional claim.

**2. Allen Does Not Establish Sufficient Prejudice To Overcome the Procedural Bar**

Even if Allen could establish cause, he cannot meet the prejudice prong of the Frady procedural bar exception. The Frady prejudice standard is higher than the prejudice standard for ineffective assistance of counsel. To meet Frady prejudice, the alleged error, the admission of fingerprint and ballistics evidence must have worked against his actual and substantial disadvantage, infecting his entire trial with error. Frady, 456 U.S. at 170; Coleman v. Thompson, 501 U.S. 722, 753 (1991). This is also a "significantly higher hurdle" than the plain

---

[3]Of course, one reason that Allen's claim is without merit is that there was a Daubert hearing on fingerprints, directly challenging the reliability and lack of error rate analysis for fingerprints, and the evidence presented by the Government overcame the challenge in the Coleman case.

error standard required to overcome a default on direct appeal. United States v. Olano, 507 U.S. 725 (1983); Frady, 456 U.S. at 166.

Allen cannot seriously claim that he was prejudiced by the admission of the fingerprint from the third getaway car and the shell casing analysis. The evidence confirming Allen's guilt was set out in detail in the Government's Response, Doc. 79 at 5-31. The Government did not need the fingerprint or ballistics evidence to prove beyond any doubt that Allen murdered Richard Heflin. Betty Thompson saw two men, each with a rifle, enter the bank from the van and the driver limped (Holder having a prosthetic leg). Inside, one robber stayed near Richard Heflin and riddled his body with bullets and the other robber, wearing black-soled shoes, jumped the counter and filled a bag with money. The autopsy showed that several of Mr. Heflin's wounds were received while he was on the ground. When they exited, the man with the limp was carrying the bag of money and re-entered the driver's side of the van. Alma Gilliam, who saw the passenger remove his mask, positively identified Allen as the robber who entered the passenger side. William Green saw that each robber had a rifle, saw the driver enter the van with a bag and followed the van into Forest Park where it crashed and burned. He saw the passenger get away and saw the driver subdued by park workers. The driver was Holder. Two other park workers were paid $60 to drive Allen, whom they positively identified, to a Metrolink station. His hair and ear had been burned and Allen tried to buy a hat from them to conceal his injuries. The Russian SKS was recovered in the van near the driver's seat and the Chinese SKS was recovered on the floor in front of the passenger seat. Allen was arrested that evening and admitted to a medical technician that he hurt his ear when the van he was in caught on fire in the park. He later confessed his involvement in the robbery to police and admitted that he was the

one who shot and killed Mr. Heflin. Doc. 79 at 29. His confession was corroborated by several other witnesses and evidence highlighted in the Government's response. Doc. 79 at 23-29.

Neither the fingerprint nor the ballistics evidence was the key to proving Allen's guilt. The fingerprint evidence only tied Allen to a third vehicle which belonged to Norris Holder's mother and the existence of the print did not prove when Allen placed his print in the car. It was a circumstantial link, at best. Other, more direct, evidence connected Allen to Holder and placed Allen at the bank robbery. Other evidence linked Allen to the third vehicle, including the fact that it was in the direction they were heading, the fact that Allen's leather jacket recovered from the park contained shotgun shells and the only shotgun was located in the third getaway vehicle.

The ballistics evidence was also far less crucial to proving Allen's guilt than it was to proving Holder's guilt. Frank Stubitts was a firearms expert. There is no claim that he was not qualified to discuss the results of his physical examinations of the Russian and Chinese SKS rifles. The Chineses SKS would not accept banana clips and the Russian rifle would. The Chinese rifle had a fixed magazine that held 11 rounds and was empty. The only way to reload it was through the use of stripper clips that were found in Allen's leather jacket.

Even without his opinions concerning his comparison of the rifles to the shell casings, certain facts were equally, if not more, incriminating of Allen. There were 16 spent shell casings in the bank. Mr. Heflin was shot 8 times. Allen's 11-round rifle was empty. Even if Allen did not reload and Holder shot the other 5 shells recovered from the bank, logically, Allen had to have shot Heflin at least 3 times.

More importantly, other independent evidence, including Allen's confession, unquestionably identified Allen as the robber who murdered Mr. Heflin. There were only 2

firearms brought into and discharged in the bank. The ballistics evidence simply served to identify which of the two guns Allen used to shoot Mr. Heflin.[4]

Under the facts of this case, assuming it should not have been admitted, Allen was not prejudiced by the admission of the print and ballistics evidence.

### 3. Allen Cannot Show That He Is Actually Innocent

If Allen cannot show cause and prejudice with respect to a defaulted constitutional claim, Allen cannot have his claim considered unless he can satisfy the actual innocence exception. Bousley v. United States, 523 U.S. 614, 623 (1998). Here, Allen cannot show "by clear and convincing evidence that but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty." Schlup v. Delo, 513 U.S. at 323 (quoting Sawyer, 505 U.S. at 347, 336).

As the prejudice analysis above demonstrates, Allen is not actually innocent. Among other things, he confessed to having planned and participated in the robbery and murder with Norris Holder. Allen admitted that he was the one who shot Richard Heflin.

### B. Ground "S" Lacks Merit And Should Be Denied On Its Merits Without A Hearing

#### 1. Burden of Proof

---

[4]Ballistics evidence might have been more critical if there had not been a direct pursuit of Allen and Holder from the bank to the crash scene where the weapons were recovered or if there was a question concerning which of the two robbers was shooting at Mr. Heflin. In the case of Holder, the importance of the ballistics evidence was to not exclude Holder as a contributing shooter to the death of Mr. Heflin and to establish that the firearm he was linked to by elimination and logic had, in fact, been fired in the bank to establish the endangerment of others statutory aggravator.

13

To obtain relief under 28 U.S.C. § 2255, a petitioner must prove that an error amounts to a "fundamental miscarriage of justice."  Kinworthy v. United States, 2009 WL 2836463, at *2 (E.D. Mo. Aug. 31, 2009), *citing* Davis v. United States, 417 U.S. 333, 346 (1974).  "A fundamental miscarriage of justice can be demonstrated only if it is shown that the alleged constitutional violation 'has probably resulted in the conviction of one who is actually innocent.'"  Phillips v. Steele, 2010 WL 682329, at *11 (E.D. Mo. Feb. 24, 2010), *citing* Murray v. Carrier, 477 U.S. 478, 496 (1986).  Allen must present new evidence that firmly demonstrates his innocence.  Steele, 2010 WL at *11, *citing* Abdi v. Hatch, 450 F.3d 334, 338 (8th Cir. 2006).

Allen must first establish an error.  As such, it is his burden to show that had he requested a Daubert hearing on fingerprint and ballistics evidence, he would have been successful in excluding the experts' opinions as to the significance of their matches.  But, the inquiry does not end there.  Daubert is not a rule rooted in the Constitution - it is rooted in Rule 702.  To prevail, Allen must show that the evidence that was wrongfully admitted was so unreliable, and in fact incorrect, that it offended due process.[5]  This requires Allen to prove not simply that a group of scientists think both categories of evidence deserve further study and examination, but that the evidence in unconstitutionally unreliable.  Allen must also show that he was prejudiced by the evidence.  The analysis above shows positively that he was not prejudiced by it.  The record before this Court shows that Allen cannot meet his burdens.  Therefore, this ground should be denied without a hearing.

---

[5]For good measure, Allen throws in a claim that because this was a capital case, the scientific evidence must meet a higher standard of reliability than required by Daubert.  This argument is addressed, *infra*.

14

## 2. Fingerprint and Ballistics Evidence Meets Daubert Standard For Admissibility

"Fingerprint evidence and analysis is generally accepted." United States v. Collins, 340 F.3d 672, 682 (8th Cir. 2003).  The principles underlying fingerprint identification "bear the imprimatur of a strong general acceptance, not only in the expert community, but in the courts as well." United States v. Janis, 387 F.3d 682, 690 (8th Cir. 2004).  The 8th Circuit has cited with favor United States v. Llera Plaza, 188 F. Supp.2d 549 (E.D. Pa. 2002), which held that "expert testimony regarding fingerprint evidence should, subject to sufficient trial court oversight, be regarded as satisfying Daubert...."  United States v. Hernandez, 299 F.3d 984, 991 (8th Cir. 2002).  *See also* Janis, 387 F.3d at 689-90.  In short, courts have long recognized the validity of fingerprint evidence.  This, in and of itself, meets one of the Daubert factors, none of which is determinative of admissibility.

Federal courts have also admitted ballistics evidence almost without exception.  United States v. Mouzone, 2009 WL 3617748, at *14 (D. Md. Oct. 29, 2009).  Mouzone is the only post-NAS Report decision located by the undersigned.  Firearm identification has been treated as a forensic discipline for over seventy years.  United States v. Diaz, 2007 WL 485967, at *3 (N.D. Cal. Feb. 12, 2007).  The acceptance of firearm identification testimony has been "semi-automatic."  United States v. Monteiro, 407 F.Supp.2d 351, 364 (D. Mass. 2006).  Indeed, the Fifth Circuit has held that "the matching of spent shell casings to the weapon that fired them has been a recognized method of ballistics testing in this circuit for decades."  United States v. Hicks, 389 F.3d 514, 526 (5th Cir. 2004).  No decision has ever excluded ballistics evidence for being inherently unreliable.  Diaz, 2007 WL at *5.

Allen's argument is solely based on one study, the NAS Report.  While Allen claims that its findings "render [expert] testimony at trial unreliable," the NAS Report never concluded that fingerprint evidence was so unreliable that it should warrant against admissibility.  United States v. Rose, 2009 WL 4691612, at *2 (D. Md. Dec. 8, 2009).  In fact, the co-chair of the project authoring the NAS Report, Judge Harry Edwards of the D.C. Circuit Court of Appeals, specifically stated that the report does not "speculate about pending or future cases," or "offer[] proposals for law reform." Forensic Science: Hearing Before the S. Comm. On the Judiciary, 111th Cong. (February 18, 2009) (statement of Hon. Harry T. Edwards).  He also stated:  "The question whether forensic evidence in a particular case is admissible under applicable law is not coterminous with the question whether there are studies confirming the scientific validity and reliability of a forensic science discipline." Id. (emphasis added) Stated another way, the NAS Report concludes that some disciplines have not been studied as much as the scientific community would prefer so that they are considered reliable according to their standards and to provide a comfortable basis for the levels of certainty claimed by experts, but the NAS Report does not conclude that any particular discipline is, in fact, unreliable.  The NAS Report makes no Daubert findings concerning any discipline.  The standards employed by scientists also are not the same as judicial standards of reliability which involve discretion, judgment and the flexible approach mandated by the Supreme Court in Daubert.

The import of the report is a restatement of what was already known: in some cases there is a dearth of research and analysis of the standards and the error rates for some long generally-accepted methodologies.  The Government does not quarrel with the call in the NAS Report for such research and testing to be conducted.  The Government does quarrel with the suggestion

that the NAS Report finds that any particular methodology fails to meet the Daubert standard of admissibility. It is hardly surprising that a scientific group funded by Congress to conduct a review would conclude that further review was warranted. The mere fact that a methodology's reliability has not been empirically verified to the same degree as DNA evidence[6], does not logically lead to the conclusion that it is, in fact, unreliable. This explains, in part, why Allen fails to cite any Court decision since the publication of the NAS Report that has excluded fingerprint and ballistics evidence.

In fact, Courts have previously cited with favor other studies examining the validity of fingerprint and ballistics evidence. *See* Mouzone, 2009 WL at *16 (citing an NRC[7] Forensic Science Report, which found that ballistics testimony has been rigorously shown to have the capacity to consistently, and with a high degree of certainty, demonstrate a connection between evidence and a specific individual or source); United States v. Glynn, 578 F.Supp.2d 567, 574 (citing an NRC Report to support the proposition that the methodology used in ballistics testing "has garnered sufficient empirical support as to warrant its admissibility").

While some decisions have called into question the reliability of fingerprint and ballistics evidence, no court has rendered this evidence per se inadmissible.[8] Applying a Daubert analysis,

---

[6]Ironically, the NAS published a report that was critical of DNA evidence statistical analyses in 1992.

[7]The National Research Council (NRC) is part of the National Academy of Sciences (NAS).

[8]The NAS Report is critical of the fact that judges make determinations of which scientific evidence to admit. NAS Report at 7. However, the Supreme Court - not the NAS - has set the guidelines for determination of admissibility in Daubert.

the courts that have questioned their reliability have merely limited the extent[9] to which an

expert may provide an opinion. *See* Diaz, 2007 WL at *14 (ballistics expert may only testify "to

a reasonable degree of certainty" about his findings); Montiero, 407 F.Supp. 2d at 375 (same);

United States v. Green, 405 F.Supp.2d 104, 124 (D. Mass. 2005) (ballistics expert may not

testify that his findings allowed him to exclude all other guns as a possible match); Glynn, 578

F.Supp.2d at 575 (ballistics expert opinion may only be stated in terms of "more likely than

not"). These decisions are not binding precedent, and none support the proposition that

fingerprint and ballistics evidence are so inherently unreliable as to warrant exclusion. Based on

such precedent, admission of the evidence hardly constituted a "miscarriage of justice."[10]

### 3. The Admission of the Expert Evidence Here, Even if Incorrect, Did Not Violate Due Process

Allen provides no support for his claim that Due Process governs the admission of expert

evidence in criminal cases. He cites a number of cases in Ground S, but they do not stand for the

proposition that there is a Due Process component to the Daubert standard. Doc. 98 at 14-15. In

fact, they do not stand for the proposition that there is a Due Process limitation on the use of

---

[9]Even if the extent of certainty that the experts communicated to the jury in Allen's case should have been tailored, Allen suffered no prejudice. The overwhelming non-scientific evidence that existed independent of the scientific evidence created no doubt about the accuracy of the experts' opinions. The scientific evidence was merely cumulative and corroborating. The fingerprint evidence was particularly marginal in incriminating value. Mr. Stubitts' testimony about ballistics merely corroborated what the eyewitnesses, physical circumstances, factual context, logic and Allen himself (through his confession) had already told the jury.

[10]Allen seems to suggest that the NAS Report constitutes new evidence not only for the purpose of a Daubert hearing, but for the jury to consider. Doc. 98 at 10. Allen does not support this with any theory of admissibility for the report, which is necessarily inadmissible hearsay. It is highly doubtful that such evidence would be admissible, just as expert evidence about the unreliability of eyewitness identification is generally not admitted. It has never been successfully presented to a jury in this district.

18

evidence which otherwise satisfies the rules of evidence. White v. Illinois, 502 U.S. 346 (1992), stated reliability is a due process concern, but not in the context of a Confrontation Clause analysis of hearsay otherwise admissible under the Federal Rules of Evidence. Donnelly v. DeChristofor, 416 U.S. 637 (1974), was a closing argument, prosecutorial misconduct case involving the knowing use of false evidence. Thompson v. City of Louisville, 362 U.S. 199 (1960), involved review of a loitering conviction that was devoid of any evidence to support it such that it violated 14th Amendment Due Process standards. Napue v. Illinois, 360 U.S. 264 (1959), was a prosecutorial misconduct, knowing use of false evidence case. Allen's other cases are no less inapplicable.

Allen recognizes the absence of a firm legal foundation for his argument by the fact that he analogizes this issue to eyewitness identification evidence following a line-up or show-up or photospread identification. This analogy fails. The line of cases culminating in Neil v Biggers, 409 U.S. 188 (1972), confronted the situation where an in-court identification follows a pre-trial identification obtained as a result of impermissibly suggestive procedures. The issue was the due process limitations needed to ensure that the in-court identification was not so tainted by the prior presumptively inadmissible pre-trial procedure. The Biggers Court adopted a "totality of the circumstances" test for the admission of the in-court identification testimony. Nothing in this line of cases extends it to apply its due process limitations to restrict the admission of evidence otherwise admissible under the Federal Rules of Evidence.

Finally, as in most capital cases, Allen resorts to the worn-out argument that "death is different." Allen argues that the Woodson v. North Carolina, 428 U.S. 280 (1976); Gregg v. Georgia, 428 U.S. 153 (1976); Godfrey v. Georgia, 446 U.S. 420 (1980); and Mills v. Maryland,

486 U.S. 367 (1988), line of cases imposes a "heightened standard" of reliability for evidence in capital cases. The suggestion is that there is one Daubert standard for non-capital cases and a higher Daubert standard for capital cases. This argument lacks any support. The "reliability" that these cases were referring to concerned the statutory scheme and process for choosing between life and death during the eligibility or selection phases. Woodson, Gregg and Godfrey involved statutory language or schemes that lacked standards and terms for determining a sentence of death. The North Carolina scheme in Woodson also was a mandatory death scheme that did not allow for the consideration of mitigation evidence. Similarly, the problem with the scheme in Mills is that it did not allow for the consideration of mitigation. These cases simply do not support a heightened standard for the admissibility of evidence, scientific or otherwise, in capital cases.

## Conclusion

Petitioner's Supplement to the Amended Motion should be time-barred under 28 U.S.C. § 2255(f). However, even if the court finds the motion timely, Petitioner should be denied relief because the claim is procedurally barred and, alternatively, admission of fingerprint and ballistics evidence at trial did not constitute a miscarriage of justice.

Respectfully submitted,

RICHARD G. CALLAHAN
United States Attorney

*/s/ Steven E. Holtshouser*
STEVEN E. HOLTSHOUSER, #24277
CARRIE COSTANTIN, #54734
JOSEPH M. LANDOLT, #6484
CRISTIAN M. STEVENS, #98871
Assistant United States Attorneys

20

111 South 10th Street, 20th Floor
St. Louis, MO 63101
(314) 539-6894

**CERTIFICATE OF SERVICE**

I hereby certify that on March 19, 2010, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon:

Elizabeth Unger Carlyle
Attorney at Law
P.O. Box 962
Columbus, MS 39701

Joseph M. Cleary
Attorney at Law
1455 N. Pennsylvania
Indianapolis, IN 46202

*/s/Steven E. Holtshouser*