**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **BILLIE JEROME ALLEN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **No. 4:07CV0027 ERW** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | **THIS IS A CAPITAL CASE** |
| | ) | |
| **Respondent.** | ) | |

**GOVERNMENT'S SUR-REPLY TO MOVANT'S TRAVERSE TO THE**
**GOVERNMENT'S RESPONSE TO MOVANT'S MOTION AND AMENDED MOTION**
**UNDER 28 U.S.C. §2255 TO VACATE, SET ASIDE OR CORRECT CONVICTIONS**
**AND SENTENCES BY A PERSON IN FEDERAL CUSTODY**

**COMES NOW** the United States of America, by and through its attorneys, Richard G.

Callahan, United States Attorney for the Eastern District of Missouri, and Joseph L. Landolt,

Steven E. Holtshouser, Carrie Costantin and Cristian M. Stevens, Assistant United States

Attorneys for said District, and offers this Sur-Reply to movant Billie Jerome Allen's ("Allen")

Traverse (Doc. 94)  to the Government's Response (Doc. 79) to Allen's Amended Motion Under

28 U.S.C. §2255 to Vacate, Set Aside or Correct Convictions and Sentences by a Person in

Federal Custody (Doc. 60), as follows:

**TABLE OF CONTENTS**

I.  Introduction                                                                                    2

II. The Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A. "Entitlement" To A Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    B. Procedural Bar . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    C. Ineffective Assistance of Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

1

III. Sur-Reply To Traverse . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    A. Motion to Suppress Confession  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    B. Stun Belt  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    C. Racial Discrimination  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

    D. Voir Dire . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

    E. Publicity of Second Robbery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

    F. Double Jeopardy  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

    G. Impeaching Information re Thomas Mundell . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

    H. Gang Connections . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

    I. Failure to Present Exculpatory Evidence  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

    J. Mitigation Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

    K. Victim Impact Evidence  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

    L. Closing Argument  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

    M. Pecuniary Gain  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

    N. Non-Statutory Aggravator  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 139

    O. Failure of Indictment to Allege Statutory Aggravators  . . . . . . . . . . . . . . . . . . . 142

    P. Non-statutory Aggravators and Weighing Decision  . . . . . . . . . . . . . . . . . . . . . . 144

    Q. Manner of Execution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 146

    R. Cumulative Effect . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

IV. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150

## I. Introduction

After filing his Amended 2255 Motion, which was not supported by witness statements

or other particulars, the Government responded and Allen subsequently filed a Traverse to the Government's Response.  Unlike his motion, the Traverse was supported by 53 exhibits, mostly unsworn witness statements.  In addition, Allen provided more insight into the theories and bases for his claims which had been lacking from his actual motion.  The Government can stand on its Response with respect to most of the issues.  Where appropriate this Reply will cross-reference the pages of the Response which are applicable.   The Government's failure to address a particular point in either its Response or this Reply is not intended to abandon or waive any argument or claim as to any issue, especially if this Court grants a hearing on a particular issue.  Allen has taken a "scatter-gun" approach to his allegations and there are many nuances to each argument.  If the Government has failed to address any particular point, the Government reserves the right to address that point at a later date and respectfully requests the opportunity to do so.

References to Exhibits are to the exhibits submitted in support of Allen's Traverse.  Trial exhibits will be referred to as "Tr Ex."  For transcript and record citations, "TR" refers to the Trial Transcript and will be followed by the volume number assigned to the original transcript followed by the page number(s).  In other cases, the date of the trial transcript and page number is provided.  Motions hearings and other transcripts will be referred to by the date of the hearing.

The Government respectfully submits that Allen is not entitled to a hearing on any of the issues raised in his Motion.  His substantive claims are either procedurally barred from review or without merit based on the trial and appellate records.  As to his ineffective assistance of counsel claims, the record clearly establishes that he is not entitled to relief, because his counsel's performance was not constitutionally deficient or because he cannot meet his burden that he was prejudiced by his counsel's action or inaction.  There is no need for a hearing to develop more

facts concerning his counsel's performance, primarily because this Court can look at the whole record and factual context of this case and conclude with confidence that there is no reasonable likelihood that the result would have been different.  In the event that this Court grants a hearing on any of Allen's claims, nothing herein is intended to waive or abandon any position or affirmative defense that the Government may assert.

## II. The Law

### A. Allen Is Not "Entitled" To A Hearing

Frequently using the term "entitled," Allen argues that this Court cannot determine the merits of his claims without discovery and a hearing.  Allen overlooks the well-settled principle in federal habeas litigation that a claimant does not have an automatic entitlement to discovery and a hearing.  Rule 6 of the Rules governing Section 2255 motions states that a Court "may" authorize discovery for "good cause."  Under Shaw v. United States, 24 F.3d 1040, 1043 (8th Cir. 1994), this Court can dismiss and reject Allen's claims without discovery or a hearing if it is "inadequate on its face or if the record affirmatively refutes the factual assertions upon which it is based."  Doc. 79 at 35-37.  With respect to some of Allen's claims, he is not entitled to relief even if the Court accepts his factual allegations as true.  In other cases, the factual allegations upon which the claims are based are contradicted by the record, inherently incredible or based only on conclusions rather than facts.  Sanders v. United States, 341 F.3d 720, 722 (8th Cir. 2003), cert. denied, 124 S.Ct. 1460 (2004).  In the Section 2255 motion by Allen's accomplice, Norris Holder ("Holder"), this Court determined most of his claims without a hearing.  United States v. Holder, WL 2008 2909648 (E.D.Mo. 2008).  As discussed, *infra*, Allen is not entitled to a hearing on any of his claims.

**B. Procedural Bar To Collateral Review of Substantive Claims**

With respect to Allen's substantive, non-ineffective assistance of counsel claims, they are completely barred from collateral review if they are non-constitutional in nature and could have been raised in the trial and previous appeals.  Claims of constitutional substantive violations are barred from collateral review, unless Allen can meet the exception for cause and prejudice.  Doc. 79 at 37-39.  Allen argues that because he claims that certain substantive issues were not previously raised due to ineffective assistance of counsel, he satisfies the cause prong of the exception, citing Murray v. Carrier, 477 U.S. 478, 488 (1986).  However, in Murray, the Court stated that "the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rules."  The Court offered "a showing that the factual or legal basis for a claim was not reasonably available to counsel or . . . 'some interference by officials'" as possible objective factors that could meet this standard.  Id. (citations omitted).  Additionally, the court listed ineffective assistance of counsel as cause for procedural default.  Id.  However, error by counsel that is not constitutionally ineffective does not qualify as cause.  Id.  See also, Cagle v. Norris, 474 F.3d 1090, 1099 (8th Cir. 2007)(court cited Murray regarding the need for "some objective factor external to the defense [that] impeded counsel's efforts).

Examples of cases in which cause was established demonstrate the nature of Allen's burden.  In Amadeo v. Zant, 486, U.S. 214, (1988), the Court found that there was cause for a procedural default of the petitioner's constitutional challenge to the composition of juries that indicted him, convicted him, and sentenced him to death.  Id. at 221-22.  In this case, there was a memorandum from the District Attorney that was not reasonably discoverable because it was

concealed by county officials.  Id. at 222.  It was this "concealment, rather than tactical considerations" which caused the default.  Id.  This "situation . . . fits squarely, indeed almost verbatim, within . . . *Carrier*."  Id.  In Ivy v. Caspari, 173 F.3d 1136 (8th Cir. 1999) the court found there was cause for the petitioner's procedural default.  Here a state prisoner "timely and properly" mailed a post-conviction motion.  Id. at 1141.  However, that motion was never received by the court the prisoner mailed it to.  Id. at 1140.  The fact of non-delivery was not a fault of the petitioner and constituted "'something external.'"  Id. at 1140.  Finally, in United States v. Moss, 252 5.3d 993 (8th Cir. 2001), the court acknowledged that a claim that "is so novel that its legal basis is not reasonably available to counsel" may constitute cause for a procedural default.  Id. at 1001.

On the other hand, in Dejan v. United States, 208 F.3d 682 (8th Cir. 2000), the court held that the failure to raise the claim, because the petitioner assumed the claim to be futile at the time, was not cause excusing procedural default.  Id. at 685.  Also, in Greer v. Minnesota, 493 F.3d 952 (8th Circuit 2007), the court found there was no cause for the procedural default.  The petitioner made a constitutional claim that there was actual judicial bias at the trial.  Id. at 957.  The petitioner claimed cause existed for his procedural default because the affidavits of two law clerks he would use to show judicial bias were unavailable to him during his direct appeal.  Id. at 958.  The court noted that there was no elaboration as to why these affidavits were unavailable.  Id.  The court found that this claim did not constitute an "objective factor external to the defense [that] impeded the counsel's efforts to comply with the State's procedural rule."  Id. at 957-58

Several of Allen's substantive claims are the subject of parallel ineffective assistance of counsel - Allen blames his counsel' failure to raise an issue as the "cause" for his procedural

6

default.  If all that it took to overcome the bar was to allege ineffective assistance of counsel, the exception would swallow the bar rule.  The law is clear that ineffective assistance of counsel may satisfy the cause prong of the exception, but only if ineffective assistance of counsel claim succeeds.  Becht v. United States, 403 F.3d 541, 545 (8th Cir. 2005)(to establish ineffective assistance of counsel, both as an independent claim and as cause and prejudice to excuse a procedural default, claimant must show that 'counsel's errors were so serious as to deprive [him] of a fair trial, a trial whose result is reliable.'")

However, the prejudice prong of the procedural bar exception is not synonymous with the prejudice standard for ineffective assistance of counsel.  In United States v. Frady, 456 U.S. 152, 170 (1982), the Court held that a federal prisoner "must shoulder the heavy burden of showing, not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."  *See also*, Armstrong v. Kemna, 590 F.3d 592, 606 (8th Cir. 2010)(quoting Frady and noting that "our court has 'observed that [procedural bar] 'prejudice' is higher than that required to establish ineffective assistance of counsel under Strickland.'").  Allen cannot show that the any of the substantive claims made by him worked to his actual, as opposed to possible, disadvantage or that any claimed prejudice was substantial.

### C. Ineffective Assistance of Trial Or Appellate Counsel

It is easy to state the legal principles applicable to a claim of ineffective assistance of counsel, Doc. 79 at 41-42, but difficult to apply them faithfully.  This Court also set them out in United States v Holder, 2008 WL 2909648 at 23-24.  The Supreme Court's recent restatement of these principles, and the two prongs of the Strickland test, demonstrates the heavy burden that

Allen must meet.  Wong v. Belmontes, 130 S.Ct. 383  (2009).  *See also*, Kinworthy v. United

States, 209 WL 2836463 (E.D.Mo. 2009).

The performance prong requires deficient performance: Allen must establish that defense

counsel's "representation fell below an objective standard of reasonableness."  Wong, 130 S.Ct.

at 384-85  (quoting Strickland, 466 U.S. at 688)(emphasis added).  Further, "[i]n light of the

'variety of circumstances faced by defense counsel [and] the range of legitimate decisions

regarding how best to represent a criminal defendant,' the performance inquiry necessarily turns

on 'whether counsel's assistance was reasonable considering all of the circumstances.'" Id.

(emphasis added).  The circumstances that must be taken into account are those that were

confronted by defense counsel - not hindsight.  Further, in evaluating the performance prong,

"[a]t all points, '[j]udicial scrutiny of counsel's performance must be highly deferential.'" Id.[1]

The Eighth Circuit has summarized the performance prong, as follows: "we must assess

reasonableness on all the facts of the particular case, we must review the facts as they existed at

the time of counsel' conduct, and we must evaluate counsel's performance with a view to

---

[1]Allen argues that the deference principle does not apply to his claim of ineffective
assistance relating to the mitigation investigation, because "counsel's decisions were not based
on full, thorough and complete investigation."  Doc. 94 at 15.  Allen cites Wiggins v. Smith, 539
U.S. 510 (2003).  Allen misinterprets and misapplies Wiggins, a case in which counsel's
mitigation investigation consisted of no more than looking at a presentence report and a social
service records.  Wiggins did not alter the Strickland test for deficient performance.  Rather, the
Wiggins Court simply that deference to the reasonableness of strategic decisions is
commensurate with the reasonableness of the decisions regarding the extent of the mitigation
investigation and presentation.  Wiggins, 539 U.S. at 528.  Under Allen's theory, counsel's
decisions would not be entitled to any deference by virtue of simply alleging that the mitigation
investigation was incomplete in any respect.  Moreover, the more recent decision in Wong
involved a claim of ineffective assistance in the context of mitigation investigation and
presentation, yet the Supreme Court still reviewed the performance prong of counsel's strategy
with deference.  Wong, 130 S.Ct. at 385.

whether counsel functioned to assure adversarial testing of the state's case.  Macrum v. Luebbers, 509 F.3d 489, 502 (8th Cir. 2007).

Allen argues that this Court should evaluate defense counsel's performance according to the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases in effect in 2003 or later.  In support of this proposition, Allen cites Rompilla v. Beard, 545 U.S. 374, 387 n.6 and n.7 (2005).  But Rompilla did not hold that the performance prong may be evaluated according to standards that did not exist at the time of defense counsel's performance.  Rather, the Court, in footnote 6, merely stated that it could use the later guideline because there was "no material difference between [the] two phrasings."  Id.  Rompilla does not create a general license for Courts to judge the reasonableness of counsel's conduct according to standards that were not even articulated at the time of the conduct.

The prejudice prong requires Allen to show "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'"  Wong, 130 S.Ct. at 386 (quoting Strickland, 466 U.S. at 694)(emphasis added).  As to evidence that was not discovered or presented, Allen must show that "'had the jury been confronted with this . . . evidence, there is a reasonable probability that [the jury] would have returned with a different sentence.'"  Id. (quoting Wiggins v. Smith, 539 U.S. 510, 535-36 (2003))(emphasis added).  To evaluate this question, this Court must "consider all the relevant evidence that the jury would have had before it" rather than just the questioned evidence.  Id. (emphasis in original).  In a capital case, the prejudice prong does not require the Government to establish that a life sentence would have been "rule[d] out" despite the additional evidence.  Id. at 390.  Rather, it is Allen's burden to show a reasonably probability that the result would have been different.  Id.  With

particular relevance to Allen's mitigation evidence claim, Ground J, Allen must "show a reasonable probability that the jury would have rejected a capital sentence after it weighed the entire body of evidence (including the additional testimony . . .) against the entire body of aggravating evidence." Id.. at 386 (emphasis added). As in Wong, Allen cannot meet this burden.

## III. Sur-Reply To Traverse

### A. Motion to Suppress Confession

Allen's Traverse raises some new claims in connection with his assertion that trial and appellate counsel were ineffective. These claims will be addressed below. The Government's Response provided a detailed rebuttal of Allen's initial allegations contained in his Amended Motion. Therefore, the Government will not repeat these arguments but will reference the appropriate portion of its prior response.

#### 1. The Magistrate Did Not Err in Permitting Cross-Examination of Allen

On May 16, 1997, the Magistrate Judge heard evidence on Allen's and co-defendant Holder's Motions to Suppress Statements, Identification and Evidence. As fully outlined in the Government's Response, the Government presented evidence that Allen received *Miranda* warnings at the time of his arrest on March 18, 1997 and an hour later at the St. Louis Metropolitan Police Department headquarters. At four a.m. on March 18, an FBI agent attempted to inform Allen again of his *Miranda* rights but he requested an attorney before she finished. Allen was placed in a lineup that morning after he declined the presence of counsel for the procedure. After Allen was identified in the lineup by several witnesses, a detective informed him that he had been identified but the detective did not question Allen. Allen told the

detective that he wanted to talk but the detective told him that the police could not talk to him because he had previously requested an attorney. Allen insisted that he did not want an attorney and asked to speak with Lt. Ronald Henderson, who he knew from a prior investigation. Allen was then taken to an interview and was advised of his *Miranda* rights. Allen then admitted participation in the robbery and shooting of the victim. When questioned about details, Allen told the detectives that he did not wish to discuss the case anymore. The interview then ceased. Between March 19 and 23, he subsequently made three unsolicited telephone calls to Lt. Henderson, who declined to discuss the case with him. (All citations contained in Government's Response, pp. 43-44).

After all the evidence, the attorney for Holder (Mr. Dede) told the Court that he intended to call his client to testify at the motion hearing. The following occurred:

THE COURT: I just want the,—I just want to make my point. I don't know what Mr. Landolt's position is, but to avoid this when we're in the middle of it, my position is once an individual takes a witness stand he's there for whatever cross examination that may pop up, especially in a situation like this. So, if you want to limit his testimony to various items, I'm not so sure that I can keep Mr.,—or I won't keep Mr. Landolt to that limitations (sic). I want to make sure you knew that going in.

MR. DEDE: Oh, alright. Well, then let me discuss that with the Defendant. It would be my position that consistent with,--

THE COURT: Unless Mr. Landolt agrees to cross only on the issues addressed in the questioning.

11

MR. LANDOLT: Judge, I think once he takes the witness stand, he's,—the issues in the case are the scope of cross examination.

THE COURT:  Yeah.  Well, that's what,--

MR. DEDE:  Well,– I'm sorry.  I didn't mean to interrupt.

THE COURT:  No, that's okay.  Go ahead.

MR. DEDE:  No, please, you.

THE COURT: I probably should have let Mr. Landolt make that objection first, but, again, I didn't want to put you in a position of making the ruling before,—or after you had already subjected your client to the cross examination.  That's my understanding of the law.  But if you can convince me otherwise, I'll be glad to listen to it.

MR. DEDE: Well, my position,–my argument is, that just as the Government has objected all day long about being limited in the scope of this proceeding, I think that his testimony is limited to the scope of this proceeding.

THE COURT: Yeah, it is, except, –I think you're right, except that I just think it goes a lot broader on, –because Mr. Allen and Mr. Holder, for that matter,–Mr. Holder and Mr. Allen, I should say, were participants in this questioning and answer process in the police department from get to go (sic), that the cross examination is gonna be a lot wider and more open than I permitted with the police officers who were here to, –or the witnesses who were just here to testify about the specific identification processes.

MR. DEDE: Okay.  Well, if I could have a few minutes to discuss that with Mr.,--

THE COURT: Mr. Sindel, are you gonna make the same type of request?

MR. SINDEL: Yes, your Honor. I had indicated to you in chambers that I had intended to call my client, and I intended to seek an order from the Court in a Motion in Limine to restrict the cross examination to those matters that were brought up and appropriately touched up in the direct examination. It's my understanding that would be, in fact, the rule of law, that there would not be a situation in which they could be questioned about other matters that have not been specifically raised during the course, –or touched upon during the course of direct. Just so the record is clear, and I hope I'm not misstating anything, but, you know, you did indicate to me what your ruling would be in that particular situation and I indicated to you that I would like to make an offer of proof in that regard. I don't know how the Court wants me to do it. I know if we were in State Court how you'd want me to do it, okay–

THE COURT: I wouldn't  want you to do it, okay. But I'm not gonna let you have, –how would you want to make the offer of proof?

MR. SINDEL: I could either do it through the testimony of the Defendant or I could do it through the statements that I make to the Court.

THE COURT: Yeah, that's how I would prefer you doing.

Hrg. Trans. 5-16-97,  pp. 348-351.

The Government agreed to accept Mr. Sindel's offer of proof. Hrg. Trans. 5-16-97,  p. 351. The Court indicated that the offer of proof would be made in writing. Hrg. Trans. 5-16-97, p. 358.

Allen first contends that the Magistrate Judge erroneously permitted cross-examination of Allen. Specifically, he contends that Federal Rule of Evidence 104(d) and Simmons v. United

States, 390 U.S. 377, 88 S. Ct. 967, 19 L.Ed2d 1247 (1968) strictly limit the cross examination

of a defendant at a preliminary hearing.  Allen misinterprets  the Simmons holding and Rule

104(d).  The Magistrate Judge properly permitted the cross-examination of Allen at the hearing

to all aspects of the "questioning and answer process in the police department" and did not limit

cross examination to only the issues raised on direct.

As a preliminary matter, a Section 2255 motion is not the proper vehicle to challenge an

evidentiary ruling.  Houser v. United States, 508 F.2d 509, 515-16 (8th Cir. 1974) ("Claimed

errors in evidentiary rulings...do not state a claim for relief under 2255.").

Moreover, Allen cannot prevail on the merits of his claim.  Rule 104(d) states "The

accused does not, by testifying upon a preliminary matter, become subject to cross-examination

as to other issues in the case."  The Note to the Rule states "The rule does not address itself to

questions of the subsequent use of testimony given by an accused at a hearing on a preliminary

matter."  1972 Note to subdivision (d).  "This rule is not, however, intended to immunize the

accused from cross-examination where, in testifying about a preliminary issue, he injects other

issues into the hearing."1974 Enactment Note.

The Magistrate Judge cautioned the attorneys for Allen and Holder that cross-

examination of their clients would necessarily be broad because they both "were participants in

this questioning and answer process in the police department from get to go (sic)."  He

contrasted their testimony with those of  "the witnesses who were just here to testify about the

specific identification processes."  Hrg. Trans. 5-16-97,  p. 349.  The Magistrate's ruling did

not violate Rule 104(d).         Allen would have properly been subject to cross examination

concerning all his contacts with the police officers from his arrest to the lineup and to his

14

statements.   Furthermore, as the notes to Rule 104(d) indicate, if Allen injected other issues, he would be subject to cross examination on those issues as well.

In <u>United States v. Gomez-Diaz</u>, 712 F.2d 949 (5th Cir. 1983), the defendant contended that he did not consent to an X-ray that found that he was carrying balloons of cocaine within his body.  Defendant did not testify at the motion to suppress hearing after the Magistrate Judge ruled that he could not limit his testimony to the sole question of whether he had verbally agreed to the X-ray.  The Court held that "The magistrate ruled correctly.  There is no federal right to limit the testimony of a witness on a preliminary matter to one single phase of an issue." <u>Id</u>., at 951.  The Court stated that "The magistrate correctly interpreted Rule 104(d) to permit full cross-examination on the 'preliminary matter' of consent if Gomez-Diaz chose to take the stand on that matter at the suppression hearing." <u>Id</u>., at 952.

Other courts have also refused to narrowly confine the scope of cross-examination. <u>United States v. Williams</u>, 754 F.2d 672, 676 (6th Cir. 1984) (At a motion to suppress hearing, trial court properly compelled defendant to answer questions concerning whether he knew he was carrying drugs when he denied that he had shown signs of nervousness, which led to his apprehension); <u>United States v. Jaswal</u>, 47 F.3d 539, 543 (2nd Cir. 1994) (At the motion to suppress hearing, trial court properly permitted cross-examination concerning accuracy of defendant's statement to agents when he testified that agents fabricated his statement and made false promises to him to induce him to sign a false statement.);   <u>United States v. Roberts</u>, 14 F.3d 502, 518 (10th Cir. 1993) ("Although Rule 104(d) circumscribes the government's cross-examination to the issue of voluntariness, defendant's credibility is inextricably tied to that resolution."  At the hearing to suppress his confession, the Court permitted cross-examination on

statements that he knew his actions were illegal and on his ability to direct sales and collect money from drug sales).

Simmons, 390 U.S. 377,  does not limit the extent of cross-examination at a preliminary hearing.  In Simmons, the Court stated:

> We therefore hold that when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection.

Simmons, 390 U.S. at 976.  Simmons only constrains the admissibility of a defendant's motion hearing testimony at a later trial.  It does not prevent a full cross examination of a defendant at a preliminary hearing.  The defendant's suppression testimony can be used to impeach a defendant during trial.   Jaswal, 47 F.3d at 543;  Gomez-Diaz, 712 F.2d at 951, fn 1.

Allen's offer of proof concerns all his contacts with police officers and agents on March 18th and 19th.  Allen's Traverse, p. 20, fn 3.  Thus, the proper scope of cross examination would necessarily be broad because, as the Magistrate Judge noted, he was a participant in the multiple interviews and the lineup.   The Magistrate Judge did not err in permitting the cross-examination of Allen.

### 2. Trial Counsel Was Not Ineffective in Litigating the Motion to Suppress

Allen contends that his trial counsel was ineffective for failing to make an offer of proof during the motion to suppress hearing and for failing to cite Simmons and Rule 104(d).  Trial counsel preserved Allen's objection to the Magistrate Judge's ruling by filing a written offer of proof.  As noted above, Rule 104(d) and the Simmons case do not support Allen's contention that the Magistrate Judge ruled erroneously.  Trial counsel cannot be found to be ineffective for

failing to make frivolous arguments.  United States v. Arena, 180 F.3d 380, 396  (2d Cir.1999) ("Failure to make a meritless argument does not amount to ineffective assistance.").

The Motion to Suppress hearing was held on May 16, 1997.  The Magistrate Judge issued his initial Report and Recommendation on June 13, 1997, which, among other findings, rejected Allen's Motion to Suppress Statements.   On June 19, 1997, Allen's trial counsel filed his offer of proof which asserted that he was not advised of his *Miranda* rights until 4 a.m. on March 18 by the FBI agent, that he then invoked his rights, that detectives continued to question him, that he was not identified in the lineup but was told that he had been identified, and that he continued to be questioned by detectives and Lt. Henderson despite his invocation of his rights.  On July 8, 1997, the Magistrate Judge issued a Supplemental Order and Amended Findings which amended certain findings of fact but continued to deny Allen's Motion to Suppress Statements. Subsequently, both the Government and Allen filed Objections to the Report and Recommendation of the Magistrate Judge.  On August 13, 1997, the District Court adopted the Magistrate Judge's Report and Recommendation and denied Allen's Motion to Suppress Statement.  Thus, trial counsel preserved Allen's objection to the admission of his statements by filing a written offer of proof.  The written offer of proof was before the Magistrate Judge when he issued his Supplemental Order and Amended Findings and before the District Judge when he issued his order denying Allen's Motion to Suppress Statements.

Trial counsel's choice to present the offer of proof was neither deficient nor prejudicial to his client.  The offer of proof presented facts Allen would have presumably testified to at the hearing without exposing him to cross-examination.   The cross-examination would have been extensive because of the nature of Allen's contacts with officers and agents on March 18 and

March 19.  Reasonable trial strategy does not constitute ineffective assistance of counsel simply because it was not successful.  Graham v. Dormire, 212 F.3d 437, 440 (8th Cir. 2000).

### 3. Allen Cannot Demonstrate Prejudice From Trial Counsel's Actions

In order to prevail on this claim, Allen must show that there is a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different. Strickland v. Washington, 466 U.S. 668, 694, 104 S. Ct. 2052, 2068, 80 L.Ed.2d 674 (1984). Allen's Traverse asserts that if Allen had testified he would have established that his confession was not voluntary because the testimony of Lt. Henderson and Detective Harper was not credible. In the Government's Response, the trial and motion hearing testimony of Lt. Henderson and Detective Harper is extensively recounted on pages 48 to 53.  At the hearing and trial, both witnesses testified that they knew that Allen had previously invoked his *Miranda* rights but that Allen had requested to speak to Lt. Henderson after Allen had been identified in the line-up.  The only discrepancy between the two witnesses was that Lt. Henderson stated that he was not aware that Allen had specifically asked for an attorney when he invoked his *Miranda* rights while Detective Harper stated that Lt. Henderson had told him that Allen had asked for an attorney.

This discrepancy is completely irrelevant to the issue of whether Allen's statement was voluntary.   Both witnesses testified that after Allen invoked his *Miranda* rights he was not interviewed, that Allen requested to speak to Lt. Henderson after he was identified in the line-up and that Allen made admissions about the robbery and murder to Lt. Henderson.   Allen has not established that there is a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different.

Allen's trial counsel was not ineffective in litigating the Motions to Suppress and Allen did not suffer prejudice.

### 4. Appellate Counsel Was Not Ineffective

Allen contends that appellate counsel was ineffective for his alleged failure to present controlling authority to the court, resulting in prejudice to him.  As fully discussed above, the Magistrate Judge cautioned trial counsel that cross-examination would be broad because of the facts and issues in the case.  The Magistrate Judge properly applied the law.  Appellate counsel cannot be found ineffective for failing to pursue a legal argument that would fail.  Claims of ineffective assistance of appellate counsel fail when the underlying issues are meritless because petitioner cannot establish prejudice.  Meyer v. Sargent, 854 F.2d 1110, 1115-16 (8th Cir.1988) (no prejudice when appellate counsel does not raise meritless issues on appeal).  Allen's appellate counsel was not ineffective for failing to raise a meritless issue on appeal.

### B. Stun Belt

To the extent this issue raises a substantive due process claim, it is procedurally barred. Wrinkles v. Buss, 537 F.3d 804, 812 (7th Cir. 2008).

Alternatively, if the substantive claim is not barred, then it is without merit.  Allen's Traverse cites several cases to support his claim that due process was violated by requiring him to where a stun belt and his counsel were ineffective in failing to object.  Illinois v. Allen, 397 U.S. 337 (1970), upheld removal of a disruptive defendant from a courtroom.  Estelle v. Williams, 425 U.S. 501 (1976), upheld, against a due process challenge, defendant's appearance before the jury in prison clothes.  Holbrook v. Flynn, 475 U.S. 560 (1986), upheld the presence of uniformed State troopers in the courtroom to provide additional security.  Deck v Missouri,

544 U.S. 622 (2005), found a due process violation where the defendant in a capital case had been required to appear in front of the jury in shackles and the trial court had failed to justify the action.  None of these cases supports Allen's claim of a due process violation nor his attack on the lack of a record, because Allen wore a stun belt under his clothes that was not visible to the jury.  These cases do not establish a due process right to have a trial court state reasons on the record for a restraint that is not visible to the jury.

Allen also relies on Gonzales v. Pliler, 341 F.3d 897 (9th Cir. 2003), which found a constitutional violation based on the use of a stun belt and remanded the case to determine whether a non-visible stun belt prejudiced defendant.  However, this decision is not binding precedent in this circuit and a close examination of the opinion demonstrates that it is flawed.  Aside from the fact that it cites such pre-eminent authorities as the film "Cool Hand Luke", the Gonzalez court based its holding on speculation of psychological consequences and interference with 6th Amendment communication rights.  It also relied primarily on several of the above cases, none of which involved invisible restraints.  To extend the visible restraint line of cases, which were concerned with the impact of the jury's awareness of the need for such restraints on defendant's right to a fair trial, is simply unwarranted by any meaningful principle.  Similarly, United States v. Durham, 287 F.3d 1297, 1305 (11th Cir. 2002), based its concern not the jury's awareness of a visible restraint, but on the mere "possibility" of impacting defendant's ability to confer with his counsel.  The law generally does not find a violation of rights based upon the possibility of prejudice.  Such standards are not a meaningful way to order society.  Actual prejudice is normally required.

The Government cited numerous cases in its Response which have not been addressed by Allen in his Traverse.  Doc. 79 at 60.

If this Court were to determine that its requirement that Allen where a stun belt under his clothes, which belt was not visible to the jury, was a due process violation without adequate justification on the record, it would amount to a new rule of constitutional procedure barred from habeas review under Teague.  See Doc. 79 at 39-40.

Allen fails to support his claim with any evidence or good faith basis to assert that the jury was aware that he was wearing a stun belt.  This Court presided over this case for many weeks and can find that the stun belt was not visible to jurors, but it is Allen's burden to claim and establish that there is at least a factual basis to claim that jurors were aware of it.  Allen attempts to circumvent this requirement by anecdotally speculating that the stun belt caused Allen anxiety and restricted his ability to confer with counsel.  Allen could attest to such a claim if it were true as could his defense team, but they have not done so.  Allen was meeting with no less than 3 mental health experts during the trial.  If he was experiencing anxiety or trauma as a result of having to wear the stun belt in Court, he did not share it with them.  TR 17-257-58.  It was part of their examinations to inquire about his physical health and the medications, if any, that he was on.  According to Dr. Gelbort, Allen was not receiving any medication for asthma, sleep or stress at the jail.  TR 17-108.  This Court can infer from the absence of any issue being raised with the mental health experts that there wasn't an issue.

There is evidence in the record that the stun belt did not interfere with Allen's ability to communicate with his counsel.  For example, when Mr. Sindel wanted to ask Johnnie Grant who "OT" was, Mr. Sindel was able to speak with Allen and Allen was able to tell him who "OT"

was. TR 14-305. In addition, there was a point in the trial when Allen addressed the Court in the context of making a record on his decision not to testify. TR 18-545. If there was anything bothering Allen, he could have easily communicated it to the Court. Witness statements have been submitted from defense counsel, Dr. Randall and Connie Caspari all of whom were at counsel table with Allen at various points in the trial. Not one of them made reference in their statements to any issue concerning the stun belt or it having any adverse impact on Allen. In addition, Allen fails to support this claim with his own statement that he was actually suffering any adverse consequences from the stun belt. The anxiety concerning the belt probably paled by comparison to the anxiety of being on trial for his life. This Court can also find, based on its own observations at trial, that Allen regularly conferred with his entire team at defense table, took notes during trial and was not otherwise impacted by wearing the belt under his clothes. In addition, whatever impact it may have had on his mental state, it was diminished by the length of time which passed in which he wore the belt without incident. This Court should not grant a hearing on this issue based upon mere speculation or the experience of anyone other than Allen.[2]

With respect to the claim of ineffective assistance of counsel, defense counsel's failure to object to or request that a record be made on use of the stun belt was not deficient, because defense counsel were aware at the time that the belt was not visible to the jury, that the logistical circumstances of the courtroom together with the nature of the charge and the potential penalty and that Allen was not having any difficulty communicating with them as a result of wearing the belt.

---

[2]Even if it is true that a stun belt may cause anxiety in others, the only relevant question is whether it had that effect on him.

More importantly, the record clearly refutes the claim that Allen was prejudiced by wearing the belt.  For example, if Allen had objected, facts were available to the Court to justify the use of a restraint, visible to the jury or otherwise.  These facts were set out in the Government's Response.  Doc. 79 at 60.  To establish prejudice, Allen appears to suggest that he need only prove that if counsel had objected and if the Court had chosen to make a record on the need for the stun belt, counsel's objection would have been sustained.  Allen's actual burden is far greater.  To establish prejudice, he must prove that if counsel had objected, then: 1) Allen would not have had to wear the stun belt; 2) Allen would have been able to communicate something to his counsel; and 3) the result in guilt and/or the penalty phase would have been different.

Allen requests this Court to make a leap of faith.  It is fantasy to suggest that there is any probability, much less a reasonable probability, that if only Allen was not wearing a stun belt, he would have been found not guilty or the jury would not have imposed the death penalty.  What was Allen prevented from communicating to his counsel that would have made a difference in the outcome?  Even assuming that the jury was aware of the stun belt and knew what it was, the incremental prejudice to Allen over and above the jury's knowledge of the crime was *de minimus.*

As far appellate counsel, Allen has had several, but the Government assumes that this claim is directed at his first direct appeal counsel.  Mr. Simon was one of those counsel and Allen has now provided this Court with Mr. Simon's statement concerning mitigation, but it is silent as to the sun belt issue.  The Court and the Government are left to discern the logic of this claim, but it has to assume the facts that counsel knew at the time, which included the fact that

trial counsel had not objected or requested a record on this issue.  Therefore, by raising the issue on appeal, Allen would have received nothing more than plain error review.  How would this have been a meritorious point resulting in reversal under a plain error standard.  Moreover, even it was error it was not structural and therefore the claim would have been subject to harmless error analysis.  Thus, Allen fails to establish a viable theory for why he was prejudiced by the failure of appellate counsel to raise this issue in appeal.  Again, there is no reasonable probability that if only this issue had been raised for the first time on appeal, Allen would have received a new trial or penalty phase hearing or had his death sentence set aside.

### C. Racial Discrimination Claim

It is still unclear whether Allen alleges a substantive racial discrimination claim, an ineffective assistance of counsel claim or both.  The Government assumes that it is both, but the substantive claim is procedurally barred.  Not only could counsel have raised this issue below and chose not to, the record shows that defense counsel were aware of the facts giving rise to this claim and raised it as part of the presentation to the Department of Justice.  Addendum 15 at 4-8.  Even if Allen could prevail on the substantive theory, it would be Teague-barred - it would certainly be a new rule of constitutional law that the principles of Batson apply to capital prosecution decisions.  Allen claims that because he alleges ineffective assistance of counsel, he automatically meets the cause exception and he erroneously equates Strickland prejudice with Frady prejudice.  The fallacy of these arguments is addressed in the introductory section of this Sur-Reply.

Allen's trial counsel were not deficient for not raising this argument, because it lacked merit.  McCleskey had been decided 10 years before the offense and was controlling.  There is

no need for counsel to raise issues that are totally lacking in merit.  Allen was not prejudiced by the failure to raise it, because <u>McCleskey</u> was controlling and Allen would not have succeeded. The argument was raised in another capital prosecution in this district, <u>United States v. Bolden,</u> No. S1-4:CR-02-557, and was rejected.  There is no reason to believe Allen would have fared better.  See, <u>Bolden</u>, Doc. 240 at 67-73 (Magistrate R&R 9-2-04); Addendum 14 (<u>Bolden</u>, Memorandum and Order 11-2-05 at 12).   Since Allen's prosecution, there have been capital prosecutions and not one has been set aside based on the type of statistics presented here. <u>United States v. Sampson</u>, 486 F.3d 13, 25-26 (1st Cir. 2007); <u>United States v. Green</u>, 2008 WL 4000901 (W.D.Ky. 2008); <u>United States v. Duncan</u>, 2008 WL 544847 (D. Idaho 2008); <u>United States v. Taylor</u>, 2008 WL 4614500, at 3-4 (E.D.Tn. 2008).  This is in part due to the fact that the statistics have no meaning in the absence of evidence that the defendants involved, both those against whom capital punishment were sought and those against whom it was not sought, were similarly situated.  Doc. 79 at 69-71.  In addition, the Eighth Circuit recently rejected this claim in <u>United States v. Rodriguez</u>, 581 F.3d 775, 815 (8th Cir. 2009).

What Allen fails to advise the Court is that since the enactment of the FDPA, there have been four studies of the impact of race on federal capital cases: 1) the Reno Study (2000); 2) the Ashcroft Report (2001); 3) the RAND Study (2006); and 4) the NORC Study (2006).[3]  None of these studies found evidence of racial bias in the administration of the federal death penalty and the studies included the administration of Janet Reno.

In his Traverse, Allen stated: "Mr. Allen does not seek relief on statistics alone, powerful as those statistics are.  Nor does he seek to determine the decision making process of multiple

---

[3]Copies of these studies are publicly available.

25

actors in the criminal justice system, as did the petitioner in McClesky.  Rather, he uses these statistics to raise an inference of discrimination, and he seeks discovery and an evidentiary hearing concerning the government's decision-making process *in this case*, so that the can prove that the sole decision maker in this case, the Attorney General, based her decision to seek death upon prohibited racial considerations."   Doc. 94 at 37 (emphasis added).  "Mr. Allen's primary point: Statistics show a grossly disproportionate use of the federal death penalty against people of color in general and African-Americans in particular.  This fact raises an inference of discrimination." Doc. 94 at 37.

Allen's argument is internally inconsistent.  On the one hand he attempts to evade McClesky by claiming that what he is really doing is attempting to show that Janet Reno, the Attorney General who authorized the Government to seek death in Allen's case acted with discriminatory intent.  On the other hand, he relies on statistics that are not limited to Ms. Reno - he relies on statistics drawn from the entire course of the federal Government's involvement in capital punishment since passage of the FDPA.

Moreover, even Batson did apply, mere statistics alone are insufficient to establish a prima facie case under Batson warranting an explanation of a race-neutral reason for the challenge.  United States v. Wolk, 337 F.3d 997, 1006 (8th Cir. 2003; United States v. Roebke, 333 F.3d 911, 913 (8th Cir. 2003); Luckett v. Kemma, 203 F.3d 1052, 1054 (8th Cir. 2000). *See also*, United States v. Walley, 2009 WL 1544433, at 2 (8th Cir. 2009).  Rather than discovery, even if he established a prima facie case, Allen would only be entitled to an explanation of the race-neutral reasons why Allen was selected for capital prosecution.  It would then be incumbent upon Allen to prove that the reasons were a pretext for race discrimination.  To do so, Allen

would have to show that white bank robbers who killed bank guards under identical relevant circumstances were <u>not</u> selected for capital prosecution by Ms. Reno.

Allen, now represented by counsel who do not reside in the St. Louis area, make several false allegations along racial lines in an effort to bolster his empty statistics. The Government disagrees that this was a "racially-charged" case. Witnesses and victims (those inside and outside of the bank, were black as well as white. Allen characterizes the schools that jurors attended as "white." Upon what basis does Allen's counsel reach this conclusion? Allen describes the area where the crime occurred as located in a mostly-white, prosperous suburb. Lindell Bank and Trust, as this Court is well aware, is located just feet outside the St. Louis City limits, near Forest Park and the racially and economically diverse neighborhoods surrounding the park. It was also not far from where Allen attended middle school. The neighborhood surrounding the bank was and is primarily multi-family, rental properties. No one familiar with St. Louis, Missouri would describe the location of the bank as a "mostly-white, prosperous suburb."

Allen's argument that prosecutorial decisions regarding capital punishment are subject to the same procedural analysis as peremptory challenges under <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986) is not supported by any persuasive authority. Allen's argument is nothing more than a fanciful end-run around <u>McCleskey v. Kemp</u>, 481 U.S. 279 (1987) and its progeny. In <u>United States v. Sampson</u>, 486 F.3d 13, (1ˢᵗ Cir. 2007), the court rejected a "claim[] that the FDPA is unconstitutional because the death penalty is sought based on the race of the defendant and victim" while noting that <u>McCleskey</u> firmly established that "[b]are statistical discrepancies are insufficient to prove a Fifth Amendment violation with respect to the implementation of a

statute." Id. at 26. In United States v. Barnes, 532 F.Supp.2d 625, (S.D.N.Y. 2008), the court held that under McClesky, the a defendant could not use statistics from a 2000 DOJ study showing the federal death penalty was disproportionately sought against minorities to establish an equal protection violation. Id. at 634. In United States v. Soloman, 2007 WL 1300769 (W.D.Pa. 2007), the court found that despite having "an impressive group of statistical studies which demonstrate that death sentences are much more likely to be imposed if the defendant is black and the victim is white," McClesky stands for the proposition that "statistical information . . . is not sufficient to raise an inference of discriminatory intent." Id. at *2 In United States v. Jones, 287 F.3d 325, (5th Cir. 2002), the court noted that while "sufficiently 'stark' statistics might open a *prima facie* case, mere statistical evidence of racial disparity is usually *per se* insufficient to support an inference of any 'unacceptable risk' of racial discrimination in the administration of capital punishment," in rejecting the use of statistics regarding death penalty prosecutions authorized by the Attorney General as establishing a *prima facie* selective prosecution claim[4]. *Id*. at 334. In United States v. Rodriguez, 2007 WL 466752 (D.N.D. 2007), *affirmed*, 581 F.3d 775 (8th Cir. 2009), the court noted that "[a] defendant may use statistics to demonstrate discriminatory effect, but those statistics must relate to the same charging authority that is prosecuting him." Id. at *18. In rejecting the defendant's use of statistics the court noted while the defendant argued that the Attorney General was the only decision maker involved in his statistics, "this argument ignores the fact that an individual United States Attorney may never

---

[4]This case particularly refutes Allen's argument, because Allen now seems to argue that a specific Attorney General, Janet Reno, selected Allen to face the death penalty solely because he is black. This is a claim of selective prosecution in violation of 5th Amendment equal protection. The legal requirements for such a claim were discussed and the claim was rejected in a recent capital case. Rodriguez, 581 F.3d at 815.

decide to seek the permission of the Attorney General to seek the death penalty on a case that is designated as a capital offense." Id. at *19.  Thus, the statistics the defendant was trying to offer were like those rejected by the Supreme Court in McClesky.  Finally, in United States v. Taylor, 608 F.Supp.2d 1263 (D.N.M. 2009), the court rejected the defendant's request for discovery noting that "general statistics, without more, are insufficient to satisfy the discriminatory intent element." Id. at 1266.

These authorities demonstrate that Allen is not entitled to a fishing expedition[5] and that his claim is not meritorious.

**D. Voir Dire**

Allen's Traverse claims that trial counsel was ineffective for failing to object to the use of an anonymous jury and that appellate counsel was ineffective for failing to raise a Batson claim on appeal in regards to venirepersons 83, 134 and 139.  Allen's Traverse has abandoned the claim that 1)  trial counsel supposedly failed to consult with Allen regarding peremptory strikes; and 2) "trial counsel unreasonably abandoned a Batson v. Kentucky, 476 U.S. 79 (1986) challenge."  These assertions were addressed in the Government's Response and the abandoned arguments will not be covered again.

### 1. Trial Counsel Was Not Ineffective for Failing to Object to Anonymous Jury

Allen claims that trial counsel was ineffective because he did not object to the use of an anonymous jury.  He asserts that an anonymous jury violated his right to an impartial jury.  The

---

[5]What discovery would shed light on Janet Reno's motivations?

use of numbers to refer to the venirepersons followed the guidelines approved by the Eighth Circuit Court of Appeals and did not prejudice Allen.

As a initial matter, the jury was not truly anonymous.  The District Court ordered that the names and addresses of all jurors on the panel be provided to Allen.  Order, February 2, 1998, p. 68.  The jurors were to be addressed in court by numbers only.  Pretrial Motion Hrg Trans., 2-6-98, p. 3.  Extensive juror questionnaires were completed by the panel members.  Pretrial Motion Hrg Trans, p. 3.  These fourteen-page questionnaires covered, among other topics, the neighborhood in which the juror resided, their educational background, their current employer and employment history, contact with law enforcement, spouse's occupation, children, medical problems, hobbies, military service, jury service, experience with the criminal and civil justice system, family members' experience with the criminal justice system, sources of news, opinion on the death penalty, religious and ethnic background, and knowledge of the parties.  Allen had a plethora of information about the jurors.

The Eighth Circuit Court of Appeals set out the guidelines for the use of an anonymous jury in United States v. Darden, 70 F.3d 1507 (8th Cir. 1995).  The Court stated that "...every court that has considered the issue has concluded that in appropriate circumstances the empanelment of an anonymous jury does not infringe on the right to an impartial jury."  Id., at 1532.  The Court adopted the guidelines from the Second Circuit:

> ...a court should not empanel an anonymous jury without  "a) concluding that there is a strong reason to believe the jury needs protection, and b) taking reasonable precautions to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are protected."

Id. (citations omitted).

In considering the need for an anonymous jury the Court adopted factors from the Eleventh Circuit, United States v. Ross, 33 F.3d 1507, 1520 (11th Cir. 1994):

> [s]ufficient reason for empaneling an anonymous jury has been found to exist upon a showing of some combination of several factors, including: (1) the defendant's involvement in organized crime, (2) the defendant's participation in a group with the capacity to harm jurors, (3) the defendant's past attempts to interfere with the judicial process, (4) the potential that, if convicted, the defendant will suffer a lengthy incarceration and substantial monetary penalties, and (5) extensive publicity that could enhance the possibility that jurors' names would become public and expose them to intimidation or harassment.

Id.   These factors "are neither exclusive nor dispositive, and the district court should make its decision based on the totality of the circumstances." United States v. Shryock, 342 F.3d 948, 971 (9th Cir. 2003).  "None of these factors is dispositive; rather, the decision to empanel an anonymous jury should be made on the totality of the circumstances." United States v. Brown, 303 F.3d 582, 602 (5th Cir. 2002).

In United States v. Peoples, 250 F.3d 630 (8th Cir. 2001), the Court approved the use of an anonymous jury where the defendants were charged with killing a government witness.  The Court noted that the trial court had complied with the statute applicable to capital cases--Title 18, United States Code, Section 3432--by supplying the parties with the names and place of residence of the venirepersons but then requiring the panel members to be identified in court by number rather than name.  The Court stated that the district court had wide discretion to use numbers for identification in any case.  Id., at 635.

At the time that the jury was empaneled, this Court was aware of at least two of the Ross factors:  1) Allen was facing the death penalty or lengthy imprisonment and 2) there was extensive publicity about the case.  Numerous jurors told the Court that they had heard about the

robbery and murder from newspaper or television. (Veniremembers 15, 20, 32, 35, 37, 40, 41, 55, 80, 3, 4, 7, 8, 9, 30, 31, 43, 44, 47, 51, 63, 67, 70, 75, 100, 98, 97, 91, 124, 120, 139, 140, 143, 144, 145, 146, 147, 162, 66, 190, 104, 110, 112, 113, 132, 136, 57, 158, 154, 117, 127, 177, 178, 199). There was television coverage the night before the first day of jury selection. (Tr. Trans., 2-9-98, p. 45). Despite being ordered not to view media accounts of the trial, one venireperson stated that she saw television coverage after the first day of trial indicating that jury selection had started.[6] (Tr. Trans., 2-10-98, p. 27).

In reviewing whether a defendant is willing to tamper with the judicial process, "...we are not limited to the facts available at the time of the actual empanelment; rather, we may consider any relevant evidence in the record." United States v. Quinones, 511 F.3d 289, 295 (2nd Cir. 2007). During the trial, the Government introduced letters written by Allen to his friend Johnnie Grant. In these letters, Allen told Grant that Grant needed to change his testimony so that Grant did not implicate Allen in the robbery and murder. (Government Exhibit 82-C, "come see me real soon because I need to tell you something about my case that I need you to testify for me about. I don't want to say in the letter because you know how the feds are."; Government Exhibit 82-D, "When I call you and told you I didn't go in the bank, I just drove and they are trying to use it against me. What I need you to say is that I told you that because I was trying to throw them off. Do you feel me?" "I told them that I was never broke and I got my money from rapping with flicks and I told them that you never seen me with [co-defendant]." "My case can be won if you say the right things and I know you know what to say."). Allen was clearly

---

[6]This venireperson was struck by the Government.

attempting to interfere with the judicial process, which is another factor to be considered under Ross and Darden.

In United States v. Brown, 303 F.3d 582 (5th Cir. 2002), the Court approved the use of an anonymous jury where the defendants were charged with public corruption related to a "sham settlement." The Court found that defendants' history of corruption of the legal system, the potential lengthy sentences and publicity justified the use of an anonymous jury.

The District Court here took appropriate precautionary measures to ensure that the defendant was not prejudiced by the use of an anonymous jury. In Darden, 70 F.3d at 1533, the Court stated that "Furthermore, 'where jury anonymity is warranted, the defendant's fundamental right to an unbiased jury is sufficiently guaranteed by the court's conduct of a voir dire that can uncover any bias toward issues in the case or to the defendant himself." (citations omitted). Similarly, in Brown, 303 F.3d at 603, the Court stated "Furthermore, the court's efforts to provide the defendants with sufficient information on the jurors through extensive juror questionnaires and voir dire adequately protected the defendants' rights and permitted them to select a jury intelligently." *See, also,* United States v. Byers, 603 F. Supp.2d 826, 834 (D. Md. 2009). In the instant case, the venire panel completed a thorough fourteen-page questionnaire and voir dire lasted for five days, including evening sessions. Allen had a great deal of information about each juror.

In addition, instructions concerning the presumption of innocence serve to prevent prejudice to defendant from the use of an anonymous jury. United States v. Ochoa-Vasquez, 428 F.3d 1015, 1035, fn 28 (11th Cir. 2005). Here, the District Court repeatedly instructed the jury on the presumption of innocence. At the beginning of voir dire, the Court stated "In a criminal

33

trial the defendant is presumed innocent until proven guilty beyond a reasonable doubt.  This presumption remains with the defendant until found guilty by a jury.  The obligation is always on the Government to prove the defendant's guilt, and there is no obligation for the defendant to prove his innocence."  (Tr. Trans., 2-9-98, p. 25; 2-10-98, p. 22). Before submission of the case to the jury. the Court instructed them again on the presumption of innocence.  (Tr. Trans., 2-26-98, p. 12-28, Model Instruction 3.06).

The District Court properly found that an anonymous jury was warranted.  Allen cannot show that he was prejudiced by the use of numbers to identify the jurors.  United States v. Scarfo, 850 F.2d 1015, 1026 (3rd Cir. 1988) (The anonymity feature is not intrinsically suggestive of any inference of guilt).   Allen has failed to show that trial counsel was deficient for failing to object to the use on an anonymous jury.   Allen has not established that there is a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different.  Trial counsel cannot be found to be ineffective for failing to make meritless arguments.  United States v. Arena, 180 F.3d at  396.  Similarly,  Allen's claims of ineffective assistance of appellate counsel fail because petitioner cannot establish prejudice.  Meyer v. Sargent, 854 F.2d at  1115-16. (No prejudice when appellate counsel does not raise meritless issues on appeal).

### 2. Jury Selection Claims

#### a. Alleged Failure to Consult on Peremptory Challenges

In Allen's Amended Motion Under 28 U.S.C. Section 2255 to Vacate, Set Aside, or Correct Sentence By a Person in Federal Custody Under Sentence of Death, he alleged that trial counsel failed to consult with him concerning peremptory strikes and failed to strike three

vernire persons.  Allen did not state which jurors were not struck.  In the Government's

Response, it extensively addressed this claim.  Government Response, pp. 78-9.  Allen's

subsequent Traverse includes no mention of this claim.  There is nothing in the record to support

the claim.  Although trial counsel provided an affidavit to Allen's post-conviction relief counsel,

there is no mention of this claim in the affidavit.  No other affidavits have been presented in

support of this assertion.  This claim has apparently been abandoned by Allen.

### b. Batson challenges

In Allen's Amended Motion Under 28 U.S.C. Section 2255 to Vacate, Set Aside, or

Correct Sentence By a Person in Federal Custody Under Sentence of Death, he alleged that trial

counsel unreasonably abandoned a Batson v. Kentucky, 476 U.S. 79 (1986), challenge and that

appellate counsel was ineffective for not raising the issue on appeal.  However, in Allen's

Traverse, he concedes that trial counsel preserved objections to the Government's strikes under

Batson.  He persists in his claim that appellate counsel was ineffective for not pursing the issue.

Allen's Batson claim is without merit and appellate counsel cannot be ineffective for failing to

raise it on appeal.  In addition, Allen cannot show a reasonable probability of a different outcome

if his challenges had been sustained.

> Under Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), if
>
> the objecting party makes a prima facie showing that a peremptory strike was
>
> racially discriminatory, and if the striking party responds with a facially-neutral
>
> explanation for the strike, the district court must decide whether the objecting
>
> party has met his burden of proving purposeful race discrimination. [citations
>
> omitted].  We review the court's determination of this issue for clear error.

United States v. Love, 419 F.3d 825, 827 (8th Cir. 2005).

In his Traverse, Allen claims that the Government's strikes of venire members 83, 134 and 139 were racially discriminatory. The Government provided explanations for the strikes and the District Court found that the Government had provided race-neutral reasons. Because the District Court properly found no discriminatory motive in the strikes, there was no basis for appellate counsel to include a Batson claim on appeal.

A review of the record demonstrates that the strikes were race-neutral. When the Government struck number 83, it stated that the main reason was "she was the only person at the time of the strikes were left who indicated that she was sympathetic to psychological reasons–to psychological testimony as a mitigator for the death penalty." Trial Trans, 2-13-98, evening session, p. 125. On the juror questionnaire, she had indicated on question 22 that she had a prejudice in favor of psychiatric or psychological testimony. She also indicated that she, her sister and her mother had all been treated for depression. The Government also noted that her husband had been charged with narcotics, that she was a legal secretary, and had indicated that she had some problems with partiality in answer to question 54.

Allen's Traverse claims that two other jurors–121 and 169–had similar answers on question 22 indicating that they favored psychiatric testimony. However, neither of these venirepersons were available at the time the strikes were made. Tr. Trans., 2-13-98, evening session, pp. 105-107. The strikes were made from the first 165 venirepersons. Tr. Trans., 2-13-98, evening session, p. 105. Number 169 was therefore not available to serve. Number 121 was also not one of the eligible venirepersons. Tr. Trans., 2-13-98, evening session, pp. 105-7. Number 121 was an extra panelist and was excused by the Court when a sufficient number of

eligible venirepersons was reached.  Tr. Trans., 2-12-98, pp. 4-311 - 4-313.  Because those jurors were not involved in any strikes, the Government did not exercise its peremptory strikes in an inconsistent manner.   Thus, no venireperson who indicated that they would be prejudiced in favor of psychiatric testimony sat on the jury.  The Government's strike of number 83 was race neutral.

The Government's strike of number 134 was similarly justified and not based upon race. When the Government struck number 134, it stated that she had answered question 42 with response "E" that she was generally opposed to the death penalty but believed she could set aside her feelings.  The Government stated that with respect to venirepersons who had answered "E," they struck all persons in the regular pool and all but one in the alternate pool.  Tr. Trans.,  2-13-98, evening session, pp. 125-6.  The Government also noted that she had a nephew who was incarcerated that she had visited in prison and that her brother was arrested for assault.  Allen's Traverse indicates that other jurors also had family members who had been incarcerated. However, Allen has not identified any jurors who had answered "E" on question 42 but decided Allen's case.   The Government struck venirepersons who were generally opposed to the death penalty in a case in which the death penalty was a possible sentence.  There is nothing pretextual about the strike of number 134.

The Government struck number 139 for race-neutral reasons.  The Government stated that she "after being told not to watch anything about this incident on television, watched it on television."  Tr. Trans., 2-13-98, evening session, p. 127.   She had a brother arrested for drug possession, a cousin in the penitentiary, and a sister charged with shoplifting and robbery.  Tr. Trans., 2-13-98, evening session, p. 127-8.  She answered that she agreed with the statement that

sometimes African-American males are treated unfairly by the criminal justice system.  Tr. Trans., 2-13-98, evening session, p. 127; Tr. Trans., 2-10-98, p. 104.  The Government also noted that the venireperson's demeanor indicated that she was not interested in pursuing the case. Tr. Trans., 2-13-98, evening session, p. 127.  Finally, the Government stated that number 139 had asked whether she would have to impose the death penalty, thus indicating her discomfort with the death penalty.    Tr. Trans., 2-13-98, evening session, p. 128, 131.   The Government's reasons were not pretextual.

The District Court instructed the venire panel:

Do not read, watch, or listen to any news report concerning either this case or the case of United States v. America versus Norris G. Holder.

If there is any person among you who cannot on your oath absolutely abide by this order, please raise your hand at this time. [NO RESPONSE].

This instruction requires that if anyone, any place begins to talk about either this case or United States of America versus Norris G. Holder, that you must put your hands to your ears and walk away.  If you begin to hear any news or other broadcast about either of these cases, you must turn off the radio, television, or other sound or picture device, and if you cannot, put your hands to your ears and walk away.

If anyone places before you, or if you accidentally or otherwise see any material pertaining to either of these cases, you must turn your eyes away and not refer to any such material.  If there is anyone who cannot do that, please raise your hand now. [NO RESPONSE]

Tr. Trans., 2-9-98, pp. 8-9.

The next day, Number 139 stated that the previous night–hours after the Court's instruction–she had seen television coverage of the trial explaining that jury selection had started.  Tr. Trans., 2-10-98, p. 29.  No other member of the venire panel viewed television accounts of the trial after being instructed by the Court not to do so.  Allen's Traverse asserts that white venirepersons 70, 98,  132 and 162 stated that they had seen news coverage of the trial.  However, those venirepersons all stated that the news coverage they had seen had been months before the trial–not the same day after the Court had instructed the jurors not to watch news accounts of the trial.  (Venireperson 70: Tr. Trans., 2-9-98, p. 49; Venireperson 98:  Tr. Trans., 2-9-98, pp. 51-2; Venireperson 132: Tr. Trans., 2-10-98, pp. 46-7; Venireperson 162: Tr. Trans., 2-10–98, p. 37).

Venireperson 139 had a sister who had been arrested for robbery; Allen was charged with robbery and murder.  Tr. Trans., 2-10-98, p. 113.  Allen's Traverse has not indicated that there was another venireperson who had a close relative convicted of robbery that served on the jury. In addition, number 139 indicated an unwillingness to participate in a vote to return a verdict of death.

> MR. LANDOLT: All of you could do that as well?  I see everybody nodding their heads.  I want you to assume just for a moment, ma'am, that we're in the second phase, you found the defendant guilty in the first phase, all the other requirements you need to beyond a reasonable doubt, unanimously with your fellow jurors. You have engaged in the weighing process, and you found that the aggravating factors sufficiently outweigh the mitigating factors such that a sentence of death is

justified.  In that situation, can you vote to return a verdict of death against this defendant?

JUROR 139: I could but I need a little clarification.  I don't have to vote, do I?

THE COURT: Was your question?

JUROR 139:  I don't have to, right? I could, but I'm thinking back to what you said when you first brought all this evidence, I mean, the description of the CASE [sic], I wouldn't have to.

Tr. Trans., 2-13-98, pp. 48-9.  Number 139 indicated significant hesitancy in her ability to impose the death penalty.   The Government provided multiple race-neutral reasons for its strike of number 139.

The Court proceeded to the third step of the Batson process:  the district court must decide whether the objecting party has met his burden of proving purposeful race discrimination. United States v. Love, 419 F.3d 825, 827 (8th Cir. 2005).  When considering the prosecutor's reasons for striking a venireperson, "[t]he 'evaluation of the prosecutor's state of mind based on demeanor and credibility lies peculiarly within a trial judge's province.'" United States v. Pherigo, 327 F.3d 690, 696 (8th Cir. 2003), quoting United States v. Feemster, 98 F.3d 1089, 1092 (8th Cir. 1996).  "The ultimate burden of persuasion rests with, and never shifts from, the opponent of the strike." Elem v. Purkett, 64 F.3d 1195, 1198 (8th Cir. 1995).  The Court considered arguments from both parties and reviewed the record.  The Court found that the Government provided race-neutral reasons for its strikes and that there was no discriminatory motive in its actions.  Tr. Trans., 2-13-98, evening session, pp. 136-7.  The Court stated "There is no showing that the reasons given for any of the strikes or either of them are generally or

merely pretext for purposeful discrimination.  There is no showing whatsoever of any purposeful discrimination in the strikes that have been made."  Tr. Trans. 2-13-98, evening session, p. 137.  A reviewing court gives great deference to a trial court's findings.  Batson, 476 U.S. at 98, fn 21.

Trial counsel properly made a Batson challenge, the Government provided race-neutral reasons and the Court found that there was no discriminatory motive in the Government's strikes.  Allen cannot show that an appeal had a reasonable probability of a different outcome.  There is no prejudice when appellate counsel does not raise meritless issues on appeal.  Meyer v. Sargent, 854 F.2d at  1115-16.

### E. Publicity of Second Robbery

During the trial, on February 24, 1998, Allen's trial counsel informed the Court that the prosecutor had told him that the Lindell Bank had been robbed the previous day.  He requested that the Court question the jurors individually to determine if they had heard of the new robbery.  The following exchange occurred:

MR. LANDOLT:  Our position at this point, to make an inquiry of that sort with the jurors may have the effect of highlighting to them perhaps someone has done something improper.  The admonition the Court gave the jurors at the beginning of the voir dire process as well as it continues to give the jurors at each break I think covers the issue, and I believe if any of the jurors had heard anything about it, they appear to be a conscientious crew and would have brought it to the Court's attention.

THE COURT: My inclination at this time is to say nothing about the incidents.  For the record, yesterday–I heard on the radio that yesterday at curiously at 10:30

someone went into the Lindell Bank & Trust, the same building that's the source

of this case, money was taken, it is my belief it was a single, who then exited.

There was a chase on Highway 40, person was apprehended near Union Station

after high speed chase, money was recovered.  Has anyone heard anything

differently than those facts?  Okay.  My inclination at this time is to not bring

any–that matter to the jury's attention.

Tr. Trans., 2-24-98, p. 10-126 - 10-127.

Allen claims that trial counsel was ineffective for not seeking further relief.  Under

Strickland, 466 U.S. at 692, Allen must show that his counsel's actions were deficient and that

he was prejudiced by counsel's actions.  Because Allen cannot show prejudice from trial

counsel's "failure to seek further relief," his claim must fail.

"The defendant must show that there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different.  A reasonable

probability is a probability sufficient to undermine confidence in the outcome."  Strickland, 466

U.S. at 694.  Thus, Allen must show that if  trial counsel had sought further relief, there was a

reasonable probability he would have been acquitted or not received a death sentence.  This

assertion is ridiculously speculative.

There is no evidence that the jurors were exposed to any media accounts of the new

robbery.  The jurors were repeatedly admonished not to watch any news accounts concerning the

case.  Government's Response, pp. 82-4.  Jurors are presumed to have followed court

admonitions to avoid media coverage concerning the case upon which they are sitting.  Tunstall

v. Hopkins, 306 F.3d 601, 609 (8th Cir. 2002).

42

Allen has requested that the jurors be interviewed to determine whether they were exposed to extraneous prejudicial information.  The Court has previously denied the request, holding that Rule 606(b) and case law require that Allen make a threshold showing that there has been extraneous prejudicial information improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror.  Allen v. United States, 2008 WL 80061 (E.D. Mo. 2008), citing Economou v. Little, 850 F. Supp. 849, 852-3 (N.D. Cal. 1994) (*citing* United States v. Eagle, 539 F.2d 1166, 1170-71 (8th Cir. 1976)).   Allen still fails to make a threshold showing that the jury was aware of the new robbery of the Lindell Bank & Trust.

Allen asserts that Rule 606(b) does not apply because this is an ineffective assistance of counsel claim.  This is nonsensical.  Allen's claim is that his attorney was ineffective for failing to "seek further relief" when the trial court denied his request to voir dire the jurors when there was a radio report of a second robbery of the Lindell Bank & Trust.   Allen must show prejudice from the alleged ineffectiveness of his attorney.  Allen seeks to interview the jurors to inquire into the validity of their verdict in order to establish prejudice.  Rule 606(b) prohibits such an inquiry without a threshold showing that extraneous prejudicial information was improperly brought to the jury's attention.

Furthermore, even if the jurors had heard that the Lindell Bank & Trust had been robbed again, they would not be permitted to testify concerning its effect on their deliberations.  In United States v. Honken, 541 F.3d 1146, 1168 (8th Cir. 2008), *rehearing denied,* 1/7/09, the Court stated:  "We now hold Rule 606(b) prohibits a juror from testifying at a post-verdict hearing as to whether extraneous information or an outside influence affected that juror's ability to be

43

impartial."  The Court stated: "Because Rule 606(b) precludes questioning the jurors as to the subjective effects of an outside influence, 'the court must apply an objective test, assessing for itself the likelihood that the influence would affect a typical juror.'"  Id., at 1169.

Allen posits that if the jurors had heard that the Lindell Bank & Trust had been robbed again, they would  "believe that they needed to convict Mr. Allen in order to send a message to the community that the Lindell Bank could not be robbed with impunity."  Amended Motion Under Section 2255 to Vacate, Set Aside, or Correct Sentence By a Person in Federal Custody Under a Sentence of Death,  p. 25.  It is far more likely that such information would be viewed by a typical juror as an interesting coincidence or even that it indicated that the Government had charged the wrong person, while the "real robber" returned to rob the bank again.  Applying an objective test, it is highly likely that knowledge that the bank was robbed again would have no influence on a typical juror.  Once again, Allen has failed to show prejudice.

Appellate counsel was not ineffective for choosing not to pursue this claim on appeal. There is no ineffective assistance of appellate counsel when none of the issues that counsel failed to raise on appeal were meritorious.  Meyer v. Sargent, 854 F.2d 1110, 1115 (8th Cir. 1988). Allen cannot show that there was a reasonable probability that his claim would have succeeded on appeal.

### F. Double Jeopardy Claim

Allen's Section 2255 Motion asserted a double jeopardy claim in 5 sentences.  Doc. 60 at 26.  He did not cite any case, but it was clearly limited to an ineffective assistance argument. The caption stated that the deficiency was that "trial counsel failed to object to his being tried for two versions of the same offense."  He further elaborated that the prejudice of this deficiency

was the resulting appellate standard of review being only plain error review.  Now, his Traverse

seeks to expound on this claim in 10 pages of argument and actually expands his claim to 3

additional matters not asserted within the limitations period for habeas claims.  Doc. 94 at 65-75.

First, Allen attempts to raise a substantive Double Jeopardy claim, arguing that his claim is

different than the one addressed by the Eighth Circuit in Allen I.  United States v. Allen, 247

F.3d 741,767 (8th Cir. 2001).   His claim now is that Double Jeopardy was violated by the return

of the death verdict on the second count, because the life verdict on the first count constituted an

acquittal of the death penalty for the second count, even though there was no intervening second

proceeding. Second, Allen claims that the Government cannot assert a procedural bar defense to

this new substantive claim because the Government waived the bar by not asserting it

specifically in its response.  Third, Allen claims that his appellate counsel was ineffective for not

arguing the acquittal theory[7] of Double Jeopardy and not citing pertinent authorities.

Allen's three attempts to amend his original Ground F should be rejected, because his

new claims do not relate back to the scant bases asserted in his original Ground F.  The legal

principles relating to the relation back doctrine are discussed in the Government's response to

Allen's motion to amend his 2255 Motion and assert a Ground S, which response is being filed

simultaneously with this Sur-Reply.

There is nothing in Allen's original sparse Ground F that put the Government on notice

that he was asserting a substantive Double Jeopardy claim.  Yet, Allen must now be attempting

---

[7]Allen's argument concedes that this is a "wholly different . . double jeopardy standard" than the standard implicated in part of the Eighth Circuit's analysis.  Doc. 94 at 73.  But, it is also different than the standard originally alleged in Ground F.

to do so[8], because he has the nerve to claim that the Government waived a procedural bar defense by not specifically asserting it to this ground.  How could the Government have waived a procedural bar defense to a substantive claim that the Government could not possibly have discerned from the five sentences that made up Ground F?  If Allen is asserting a substantive Double Jeopardy claim, not just a claim of ineffective assistance of trial counsel, then the Government now asserts the defense of procedural bar.

Allen fails to meet the cause and prejudice exception to obtain substantive review of any Double Jeopardy claim.  His appellate counsel did raise this issue on appeal and it was rejected by an Eighth Circuit panel and has passed the muster of an additional panel, the Eighth Circuit *en banc* and the Supreme Court.  Even if Allen can successfully convince this Court that his substantive claim is a different shade of the issue raised by appellate counsel, which it is not, he does not meet the cause and prejudice exception to the procedural bar.  Nothing external to the defense prevented his many counsel from asserting this issue.  Cause is not established by merely alleging ineffective assistance of trial and appellate counsel, but by successfully establishing ineffective assistance.

As to the prejudice prong of the bar exception, Allen's claim in his 2255 Motion was that he should not have <u>faced</u> capital punishment twice for offenses arising out of "virtually identical

_____

[8]It is also clear that he now attempts to do so by breaking his Traverse into 3 parts in Ground F: "1. The Double Jeopardy Violation"; "2. Ineffective Assistance of Trial Counsel"; and "3. Procedural defenses have been waived."  Doc. 94 at 65-75.  Of course, Allen also attempts to slip a fourth claim into Ground F by arguing that appellate counsel was ineffective. Doc. 94 at 73-74.

facts.[9]  To show prejudice, Allen must show that the jury would not have imposed death for the offense on which he received death.  He cannot make this showing, because, as the 8th Circuit stated in Allen I, Allen was far more culpable for the firearms murder during the bank robbery than the killing resulting from a bank robbery count.  Allen I, 247 F.3d at 770.

Allen also belatedly asserts that his appellate counsel was ineffective for not raising the new Double Jeopardy argument that he now attempts to assert in his Traverse.  This claim is time-barred, because his original Ground F was clearly limited to ineffective assistance of trial counsel.  No where in his original Ground F did Allen link the phrase "appellate counsel" with the phrase "ineffective assistance of counsel."  Doc. 60 at 26.  This claim does not relate back to his original claim either.  Moreover, he does not even attempt to seek leave of Court to amend his motion.

Alternatively, each of Allen's arguments is without merit.  Trial counsel was not ineffective for not preserving the issue that appellate counsel raised, because the result did not turn on the standard of review.  There is nothing in Allen I to suggest that the result might have been different if a higher standard of review applied.  Allen I is a decision on the merits that Congress intended multiple punishments for these offenses and facing death twice for the same underlying circumstance does not violate Double Jeopardy protection.  Allen fails in his burden to show that the result of the appeal turned on the standard of review.  Trial counsel may have raised the multiple count issue before trial, but the acquittal issue did not arise until after the verdict was read.

---

[9]His argument was not that he could not face death on the second if the jury returned life on the first.  His original Ground F did not even suggest the argument that Allen could not face death twice for offenses arising out of the same homicide, as he seems to argue now.

Realizing that the Eighth Circuit clearly held in <u>Allen I</u> that Double Jeopardy did not prevent Allen from facing death in two counts for one underlying episode, Allen now attempts to argue that trial and appellate counsel were ineffective for not utilizing longstanding case-law to allege that the verdict on Count I barred a death verdict on Count II.  However, <u>Bullington v. Missouri</u>, 451 U.S. 430 (1981), involved <u>re-trial</u> on the same count after a life verdict had been returned in the first trial.  Nothing in <u>Bullington</u> suggests that its reach extends to valid multiple counts in the <u>same</u> trial.  <u>Bullington's</u> use of the phrase "one fair opportunity to offer whatever proof it can assemble" is clear.  <u>Id</u>. at 442.  Once the single trial, the one fair opportunity, ended, the Government was entitled to a verdict on both counts.  Count II did require proof of facts that Count I did not, contrary to Allen's suggestion in his Traverse.  Doc 94 at 67.  Similarly, <u>Arizona v. Rumsey</u>, 467 U.S. 203 (1984), involved a re-trial for the same offense where the first proceeding resulted in a life sentence.  Allen fails to explain what about these decisions should have led his trial counsel to object to the imposition of death on Count II or his appellate counsel to raise the claim that the first verdict amounted to an acquittal of death that barred death for any other valid capital count?  Moreover, if previous counsel were ineffective, why didn't habeas counsel raise this argument in Ground F?  Again, the language of his Ground F was to attack being "tried for two versions of the same offense."

Allen I, taking a narrow view of how the <u>Blockberger</u> "same offense" test applies to predicate offenses, held that Congress intended multiple punishments for the predicate and firearms murder charges.  <u>Allen I</u>, 247 F.3d at 769-770.  Allen's new argument is that upon returning the life verdict on Count I, death was no longer available on Count II.  There are

48

several problems with this argument, but none of them is controlled by existing case-law and therefore none of prior counsel's[10] decisions could be considered ineffective.

First, what would be the point of permitting a defendant to face multiple death sentences for the same underlying circumstance in the same proceeding if a rejection of death on one prevented the imposition of death on the other?  Second, it would be a curious Double Jeopardy rule if the difference between death and life turned on the order in which the counts were charged or the verdicts were read.  Third, a finding of life on Count I could not be viewed as an acquittal of death for purposes of Count II, because Count II required proof of facts that Count I did not and Allen's moral culpability for each offense was not the same.  Id.  Fourth, Allen's rule treats death on Count I as a predicate offense to a finding of death on Count II.  Lastly, it creates the anomaly that Allen could only receive death on one count if he received death on the other count. The anomaly is that even though he could face death twice, he could not receive a split verdict.  If this is a consequence of a life verdict on Count I, then it follows that the jury would be entitled to be instructed that returning a verdict of death on the second count they had to return death on the first.  Allen's argument is a novel, illogical, legally unsupported frustration of Congress' intent that disconnects Double Jeopardy protection from common sense.

Allen's claim that a single homicide may give rise to only on death sentence is not supported by any of the authorities cited by him and Allen I specifically held to the contrary.

In his Traverse, Allen also purports to toss in an 8th Amendment substantive argument, but this is not reviewable for the reasons set forth above.  Doc. 94 at 68.  The claim that 8th

---

[10]Allen's prior counsel are not alone, because Norris Holder's trial, appellate and habeas counsel did not raise this issue.

Amendment "heightened reliability" bars multiple death sentences for the same homicide is also not supported by the authorities cited by Allen.  The scope of the so-called "heightened reliability" principle is addressed by the Government in the Response to Allen's Ground S claim at the last page and is incorporated herein by reference.  The heightened procedural protection that Bullington represents is not generic to Double Jeopardy issues in general, but to the circumstance of retrying in a second proceeding a capital charge where a jury has already determined that the Government failed to convince 12 jurors that the defendant deserved death. The essence of Double Jeopardy protection is implicated in that situation.  Once the Government has failed to convince 12 jurors in one proceeding that defendant deserves death, it should not have the opportunity to convince another 12 jurors in another proceeding.  Reliability is threatened in that situation because the result stems not from one fair opportunity but two.  Such interests were not implicated in this case where the same jury in the same proceeding determined in the same breath that Allen did not deserve death on Count I but did on Count II.  It was not improper for Allen to face death twice for two charges, one of which required proof of a fact that the other did not, in the same proceeding.  Such a result does not implicate the reliability of the death determination as the Eighth Circuit found in Allen I, 247 F.3d at 769-70.

Allen's weakest argument concerns appellate counsel's performance.  Appellate counsel could not be considered ineffective for not raising such a unique and novel argument as that raised by Allen.  Appellate counsel could not be deficient for not raising a claim that they were not reasonably aware of Bullington might arguably be viewed as analogous, but was hardly "controlling" on the Double Jeopardy issue before the Eighth Circuit. Doc. 94 at 74.  That Double Jeopardy "applied" in the capital sentencing context hardly answers the question Allen

50

now raises.  Monge v. California, 524 U.S. 721, 724 (1998).  There is no showing that had appellate counsel presented Allen's new Double Jeopardy claim, Allen would have been successful.  It is Allen's burden to make such a showing.

### G. Impeachment Information Concerning Thomas Mundell

Allen claims that trial counsel was ineffective for failing to request a hearing concerning impeachment information of Thomas Mundell and that appellate counsel was ineffective for failing to raise the issue on direct appeal.  Allen also asserts that the late disclosure of the impeachment information was a due process violation mandating reversal of his conviction.  Because Allen cannot show prejudice, his claims should be denied.

In Allen's trial, Thomas Mundell testified that Allen and co-defendant Holder had come to his business in St. Louis Centre and Holder had purchased a bulletproof vest.   When meeting with Mr. Mundell before his testimony to the same facts in the later Holder trial, Mr. Mundell advised the Government that he was a paid Drug Enforcement Administration informant in the 1980's after he was implicated in a drug transaction. Holder Tr. Trans., 3-18-98, p. 7.  The Government informed the Court and Holder's attorney promptly.   The Government sent a letter to Allen's trial counsel stating that:

> Thomas Mundell informed this office that in 1982, he was arrested by agents of the Drug Enforcement Administration in possession of approximately 52 grams of a substance containing cocaine powder.  An additional 23 grams was recovered from his car and he voluntarily turned over 37 grams of same substance.  In lieu of prosecution for this offense, Mr. Mundell agreed to cooperate with authorities. Records reflect that between December of 1982 and 1985, Mundell was paid

approximately $3,950 for his cooperation.  Additionally, he received another $650 during the year of 1986.  He has received nothing since this time.  This information is detailed in Mundell's trial testimony in United States v. Holder.  Allen's Exhibit 6.

### 1. Due Process Claim

Allen contends that the late disclosure of the information was a due process violation. Traverse, p. 76.  Allen is procedurally barred from raising this due process claim because he did not raise it on direct appeal.  A defendant who failed to raise an issue on direct appeal cannot obtain Section 2255 relief because he has procedurally defaulted the claim.  He can only obtain such relief if he can show cause and prejudice excusing the default.  United States v. Collier, 585 F.3d 1093, 1097 (8th Cir. 2009).  Allen has not even attempted to meet this burden.

### 2. Ineffective Assistance of Trial Counsel

Allen also casts his claim in terms of ineffective assistance of trial counsel for counsel's failure to provide controlling authority in his Motion for New Trial and for his failure to request an evidentiary hearing on the issue.  Under Strickland, 466 U.S. at 692, Allen must show that his counsel's actions were deficient and that he was prejudiced by counsel's actions.  In other words, Allen must show that if counsel had acted differently, he would have prevailed on his the merits of his claim.  Because Allen cannot show prejudice from trial counsel's actions,  his claim must fail.

Allen's assertion that impeachment information should have been disclosed is governed by  Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).  "Under Giglio v. United States, 405 U.S. 150, 153-55, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), the government

must disclose matters that affect the credibility of prosecution witnesses." United States v. Morton, 412 F.3d 901, 906 (8th Cir. 2005).   However, the nondisclosure of Giglio evidence only justifies a retrial if the withheld information is deemed material.  United States v. Spinelli, 551 F.3d 159, 164 (2d Cir. 2008).  "Undisclosed Brady/Giglio information is deemed material so as to justify a retrial only if there is a reasonable probability that, had it been disclosed to the defense, the result of the proceeding would have been different.  A reasonable probability of a different result is shown when the government's failure to disclose undermines confidence in the outcome of the trial."  United States v. Garcia, 562 F.3d 947, 953 (8th Cir. 2009) (punctuation omitted).

Allen cannot show that there was a reasonable probability that the outcome of the proceeding would have been different if the impeachment evidence here had been known to trial counsel.  Allen contends Mr. Mundell's testimony was critical for the Government because he was the only witness who directly linked Allen to the planning and preparation of the robbery. Allen's Traverse, p. 77.  This assertion is completely contradicted by the evidence at the trial.

First, Lt. Ronald Henderson and Detective Clifford Harper testified that Allen told them that he went to St. Louis Centre with Holder when Holder purchased a bullet proof vest but that Allen did not have the funds to purchase a vest at the time.  Tr. Trans., 2-17-98, p. 144; Tr. Trans., 2-24-98, pp. 233-4.  Thus, Mr. Mundell's testimony was not even necessary to establish that Allen went with Holder to purchase the bulletproof vest.

Second, there was ample evidence that Allen had participated in the planning of the robbery.  Allen told Lt. Henderson and Detective Harper that he and Holder were planning on robbing a bank where Holder had an account.  He went with Holder to the bank.  Later, he was

with Holder when Holder bought the bulletproof vest. Allen and Holder discussed robbing the bank throughout the week. Tr. Trans., 2-17-98, p. 144. They discussed that J.B. would steal two vans as getaway vehicles, one parked in Forest Park and the other used in the robbery. Tr. Trans., 2-17-98, p. 144. They would destroy the first van to eliminate fingerprints. Tr. Trans., 2-24-98, p. 234. One of the tellers, Lisa Moore, testified that Allen came to the Lindell Bank & Trust with Holder and "look[ed] around" during Holder's transaction the week before the robbery. Tr. Trans., 2-18-98, pp. 218-223. Holder's friend Wayne Ross testified that on March 15, 1998 he saw Allen and Holder meet at a bowling alley and heard discussions indicative of a robbery. Tr. Trans., 2-18-98, pp. 22-3 ( He heard them say the it was the "perfect location" off the highway and had two doors; they had to "do it quick" and discussed "when did they want to do it.").

Mr. Mundell's testimony was largely cumulative to other evidence establishing the planning and execution of the robbery and murder. The impeachment evidence–that Mr. Mundell was paid $4,600 by the DEA as an informant twelve years before Allen's trial–did not create a reasonable probability that, had it been disclosed to the defense, the result of the proceeding would have been different. The impeachment evidence was available to Holder's trial counsel. He used it to cross-examine Mr. Mundell. Both Holder and Allen received the same outcome: conviction and death sentence. Allen cannot show prejudice.

### 3. Ineffective Assistance of Appellate Counsel

Allen asserts that appellate counsel was ineffective for failing to raise the impeachment issue on appeal. In order to establish ineffective assistance of appellate counsel, a petitioner

must show that counsel's performance was deficient, and that he suffered prejudice  from that deficiency.

The deficient performance standard is rigorous. United States v. Brown, 528 F.3d 1030, 1033-4.  "Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal." Jones v. Barnes, 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983).   Allen's appellate counsel did not include the impeachment issue on appeal because it was doomed to failure.

The prejudice standard is equally rigorous.   A petitioner must show that "the result of the proceeding would have been different" had he raised the issue on direct appeal. Becht v. United States, 403 F.3d 541, 546 (8th Cir.2005), cert. denied, 546 U.S. 1177, 126 S.Ct. 1346, 164 L.Ed.2d 59 (2006).

Allen's impeachment evidence claim fails because he cannot show a reasonable probability that, had it been disclosed to the defense, the result of the proceeding would have been different.   Allen's appellate counsel cannot be found to be ineffective for failing to make a meritless argument on appeal.  Meyer v. Sargent, 854 F.2d 1110, 1115 (8th Cir. 1988).  Allen's claim should be denied without a hearing.

**H. Gang Connections**

Allen's Traverse claims that counsel was ineffective for his actions in connection with the Government's alleged attempts to improperly introduce evidence that Allen had gang connections.  The record refutes his assertion and his claim should be denied.

**1. The Sweat Pants**

First, Allen claims that trial counsel was ineffective for not objecting to St. Louis Police Officer Thomas Carroll's testimony that Allen was wearing blue sweat pants under his gray sweat pants when Allen was arrested.  Here is the entire exchange:

Q. (By Mr. Dowd) Okay. What was Mr. Allen's condition at the time that you took him into homicide?

A. He had burns on his right ear, burns on his right nostril and scrapes on the top of his right wrist.

Q. Okay. Were photographs taken of Mr. Allen at that time?

A. Yes, they were.

Q Okay. I'll show you what's been marked as Government's Exhibit 71-A. Is that

a fair and accurate representation of Mr. Allen that night?

A. Yes, sir, it is.

Q. And what does it show Mr. Allen wearing?

A. Gray sweat pants and white T-shirt and black tennis shoes.

Q. Does it show – can you see in that picture whether he has any other pants underneath those gray sweat pants?

A. Yes, you can.

Q. And what color is underneath there?

A. Blue.

Trial. Trans. 2-20-98, pp. 181-182.

The individual items of clothing were then entered into evidence. The Government asked no further questions regarding the blue sweat pants. The Government never inquired about whether the clothing's blue color was gang-related.

The color and type of clothing of Allen and his co-defendant Holder were relevant because they wore masks during the robbery. Therefore, the identification of each robber–and the actions each took in the robbery and murder of Mr. Heflin–was largely dependent on their clothing and their location in the bank. The first robber (Allen) entered the bank and shot Mr. Heflin repeatedly. The second robber (Holder) went behind the teller counter and took the money. Tr. Trans., 2-17-98, pp. 97-98, 154-6, 297-8. Teller Lisa Moore testified that the man who had taken the money from the drawers had on dark  workman's clothing, like Dickies. Tr. Trans., 2-18-98, p. 236. According to her, the man behind the teller counter was not wearing sweatpants. Tr. Trans., 2-18-98, p. 280. Thus, by implication, the person who shot Mr. Heflin repeatedly was not the person in the dark workman's clothing.

After the robbery and murder, Allen and Holder ran outside to a blue van. The driver, Holder, limped. Tr. Trans., 2-18-98, p. 82, 84. Holder had a prosthetic leg. They drove to Forest Park where the van became engulfed in flames and the driver (Holder) and passenger (Allen) fled. Tr. Trans., 2-19-98, pp. 165-6). There were various descriptions of the clothing of Allen and co-defendant Holder. Witness Bill Green described the driver (Holder) as wearing "dark outer clothing" and "some coloring on some type of shirt" that was "red or yellow." Tr. Trans., 2-19-98, p. 165. Witness Keith Smith testified that the driver (Holder) had on a blue jumpsuit. Tr. Trans., 2-19-98, pp. 203-4. Mr. Smith identified a blue jumpsuit as being worn by the driver (Holder) who was arrested by the police outside the burning van. Tr. Trans., 2-19-98,

p. 207.  Officer Morici testified that when Holder was arrested he was wearing a multi-colored rugby-type shirt and a blue pair of coveralls.  Tr. Trans., 2-19-98, p. 233.

Meanwhile Allen had fled to a nearby St. Louis City Forestry Division lot.  Tr. Trans., 2-19-98, p. 243.  According to witness Bobby Harris, Allen was wearing two pairs of sweatpants.  Tr. Trans., 2-19-98, p. 244.   He had on gray sweat pants with blue pants underneath them.  Tr. Trans., 2-19-98, p. 259.  Witness Bruce Norman also testified that Allen was wearing gray jogging pants with dark blue pants underneath.  Tr. Trans., 2-20-98, p. 9-18-19.  Mr. Norman and Mr. Harris gave Allen a ride to the Metrolink station.  Tr. Trans., 2-20-98, p. 9-20.  Allen was arrested in the early morning of the day after the robbery.  As Officer Carroll testified, Allen was wearing two pairs of sweat pants: a gray pair over a blue pair.  Tr. Trans., 2-20-98, pp. 181-182.

There was no implication that the color of Allen's sweat pants indicated that he was a gang member.  The Government elicited the details concerning Allen's two sweat pants because it matched information from other witnesses who described  Allen's actions in the robbery and murder and his subsequent flight.

### 2. The Tattoo

Allen next complains that the Government elicited testimony that Allen had a tattoo that stated "Crips" and that trial counsel was ineffective for not objecting further or moving for a mistrial.  Because trial counsel properly sought and obtained relief, this claim should be denied.

During the trial, the Government showed Officer Carroll photographs of Allen's tattoos.  One of the tattoos said "Cash Money."  Tr. Trans., 2-20-98, p. 9-188.  However, Officer Carroll mistakenly stated that the tattoo read "Crip Money."  Tr. Trans., 2-20-98, p. 9-188.  Trial counsel

promptly requested a bench conference.  During the conference, trial counsel noted that there was a motion in limine to exclude gang evidence. Tr. Trans., 2-20-98, p. 9-189.  The Government stated that the photo said "cash," not "Crip."  The Court then directed the Government to show the witness another photo and to lead the witness.  The Government complied and Officer Carroll conceded that the tattoo said "Cash Money."  Tr. Trans., 2-20-98, p. 9-189.  The Court instructed the jury to disregard the first statements as to what the tattoo showed.  Tr. Trans., 2-20-98, p. 9-189.  The photographs were then introduced into evidence so the jury could see that the tattoo stated "Cash Money."  Tr. Trans., 2-20-98, p. 9-189.

Trial counsel obtained full relief from the mistaken statement of Officer Carroll.  The mistake was corrected, the jury was told to disregard the prior incorrect statement, and the photographs of the tattoo were introduced into evidence.  Trial counsel was not ineffective.  Moreover, Allen cannot show that he was prejudiced from trial counsel's actions.

### 3. Eric Taylor's Clothing

Allen's third claim is that the Government's questioning of Eric Taylor improperly attempted to introduce gang evidence and that trial counsel was ineffective for his failure to object.  This claim should be denied because counsel used reasonable trial strategy and Allen cannot show prejudice.

During the penalty phase, trial counsel introduced evidence that Allen grew up in a neighborhood dominated by gangs.  The Allen home was shot up. Tr. Trans., 3-3-98, pp. 55, 270; There were a number of shootings in the area. Tr. Trans., 3-3-98, p. 154.  Probably 50 percent of the housing stock was occupied; the rest was boarded up or in the process of being boarded up. Tr. Trans., 3-3-98, p. 153.  There was significant gang territorial activity around

Allen's block.  Tr. Trans., 3-3-98, p. 154.    His high school, Sumner,  had gang activity.  Tr. Trans., 3-3-98, p. 163.  Allen's neighborhood was pretty rough and scary and marauding gangs might attack you.  Tr. Trans., 3-3-98, p. 211.  The "street element" became more apparent in Allen when he was 15, 16, 17 years old.  Tr. Trans., 3-3-98, p. 215.  There was gang violence and drug sales.  Tr. Trans., 3-3-98, p. 219.  Allen's neighborhood had gang kind of activities.  Tr. Trans., 3-3-98, p. 240.  Cote Brilliante, Allen's block, was a neutral street but there were gangs and gang activities–drive-by shootings and graffiti–around the block.  Tr. Trans., 3-4-98, p. 130.

The *Government* objected to the introduction of evidence of gang activity.  Tr. Trans., 3-4-98, p. 131.   The Court noted that "throughout the earlier part of the trial the government under an agreement was precluded from mentioning the word gang or anything associated with gang activity.  And in this phase of the trial the defendant has repeatedly referred to this.  Sort of give us some explanation."  Tr. Trans., 3-4-98, pp. 131-2.  Trial counsel explained that "I think it's important to establish kind of the environment that he was living in and I'd refer to the environment in terms of my opening statement and the fact that Cote Brilliante is a street that's sort of like bordered and bounded by these various gangs, none of which he was affiliated with, but people he knew."  Tr. Trans., 3-4-98, p. 132.   He further stated that it was relevant to the diagnosis that Allen had post-traumatic stress syndrome because he was present when his friend was shot and killed on his street.  Trial counsel stated "And one of the points that the psychiatrist makes is that this guy goes back into the same neighborhood where he lived and the traumatic event occurred.  I can show that he can't leave that particular neighborhood on foot because of the presence of gang activity."  Tr. Trans., 3-4-98, p. 133.  The Court then overruled *the Government's objection* to the admission of gang evidence.  Tr. Trans., 3-4-98, p. 134.

Trial counsel continued to introduce evidence that Allen lived in a gang dominated area. The Four Five Field gang, the Bloods, the Disciples and the Kitchen Crips were all located on streets near Cote Brilliante.  Tr. Trans., 3-4-98, p. 134.  A person would have to be careful about the color and kind of their clothing as they went through the neighborhood because a certain type could be thought as an affiliate of a certain gang.  Tr. Trans., 3-4-98, pp. 135-6.  Allen's house was shot up because he had cheated somebody out of drugs.  Tr. Trans., 3-4-98, p. 147.  Allen sold fake drugs.  Tr. Trans., 3-4-98, p. 148.   There were gangs around Allen's street.  Tr. Trans., 3-4-98, p. 162.  When Allen's friend Marquis was shot and killed, there were rumors that Allen was the cause of the shooting.  Tr. Trans., 3-4-98, p. 188.  Allen's block was surrounded by gang activity and shootings.  Tr. Trans., 3-4-98, p. 190.

After trial counsel had elicited this evidence he called Eric Taylor to testify.  On direct examination, he testified that there were many gangs in the neighborhood: Garfield, Four Five Field, Six Deuces, and KC Kitchen Crips.  Tr. Trans., 3-4-98, p. 202-3.  He and Allen had to play basketball outside their neighborhood because there was so much violence.  Tr. Trans., 3-4-98, p. 205.  You had to be careful about what colors you wore because of the gangs.  Tr. Trans., 3-4-98, p. 205.  Mr. Taylor testified "Like if you're a teenager, it's like over there you had to be in a gang.  Either you was with them or against them.  That's pretty much how they trip off everything."  Tr. Trans., 3-4-98, p. 206.  He described an incident in which the Four Five Field gang shot at him, Allen and Taylor's brother Marquis and Marquis was killed by the gang in the shooting.  Tr. Trans., 3-4-98, pp. 208-9.  Another friend of Allen, Dennis, was part of the Garfield gang and was shot and killed in a drive-by shooting.  Tr. Trans., 3-4-98, p. 210.

During cross-examination of Mr. Taylor, the Government asked him whether he was involved in any gang activity in the neighborhood, whether it was coincidental that he was dressed in blue, and whether he had told the FBI that Allen was a gang wannabe.  Tr. Trans., 3-4-98, p. 225.  This cross-examination was clearly within the scope of the direct examination and tested the credibility of the witness.  Mr. Taylor testified that neither Allen nor he was a gang member and that they had resisted pressures to join a gang.  Tr. Trans., 3-4-98, p. 226.  Mr. Taylor admitted that Allen had "ganked" people–ripped them off by selling flour as cocaine.  Tr. Trans., 3-4-98, pp. 230-1.  He stated that the Allen house was shot up because Allen  had "ganked" the Five One gang.  Tr. Trans., 3-4-98, p. 234.

Trial counsel was not ineffective for failing to object to the cross-examination of Mr. Taylor.  Trial counsel explained to the Court that his trial strategy was to show that Allen was surrounded by gangs and that, even after his close friend Marquis was killed, Allen could not leave the neighborhood because he was trapped by the gangs. This contributed to his post-traumatic stress syndrome.  The Government fairly cross-examined Mr. Taylor on alternate explanations for Allen staying in the neighborhood: he himself wanted to be in a gang or he was stealing from people through the sale of fake cocaine.  Trial counsel's objections would have been over-ruled because the cross-examination was within the scope of the direct examination. Allen cannot show prejudice from trial counsel's actions.

Similarly, appellate counsel was not ineffective for not raising the point on appeal. Allen's claim fails because he cannot show a reasonable probability that the Eighth Circuit would have granted him relief on his sentence and ordered a new penalty phase hearing.  Allen's

appellate counsel cannot be found to be ineffective for failing to make a meritless argument on appeal.  Meyer v. Sargent, 854 F.2d 1110, 1115 (8ᵗʰ Cir. 1988).  Allen's claim should be denied.

### I. Failure to Present Exculpatory Evidence

Allen claims that trial counsel was ineffective for failing to present allegedly exculpatory evidence included in discovery provided by the Government.  He claims that this evidence would have created a reasonable doubt that he was one of the robbers and killers of Richard Heflin.  His claim fails because he cannot show prejudice.  The evidence of Allen's participation in the robbery was overwhelming, as outlined in the Government's Response to Movant's Motion and Amended Motion, pp. 5-31.

In his Amended Motion, Allen raised nine separate claims related to allegedly exculpatory evidence.  The Government's Response exhaustively refuted each claim.  Allen's Traverse has abandoned two points and raised a completely new claim.   This Response will address the claims raised in the Traverse and the significance of Allen's abandonment of two of his claims.

### 1. Jerry Bostic

In Allen's Traverse, he raises, for the first time, his claim that trial counsel was ineffective for his failure to investigate evidence that "J.B." was involved in the crime.   This claim was not raised in Allen's Amended Motion Under 28 U.S.C. Section 2255 to Vacate, Set Aside, Or Correct Sentence by a Person in Federal Custody Under A Sentence of Death that was filed on February 11, 2008.  The claim was first raised in Allen's Traverse filed on August 14, 2009.  While Allen's Amended Motion was timely filed, his Traverse was not.  Therefore, claims

raised in the Traverse are time-barred unless he can satisfy a relation-back analysis.  United

States v. Mandacina, 328 F.3d 995, 999 (8th Cir. 2003).

The Court explained the relation-back doctrine in the context of a Section 2255 motion as

follows :

> Pursuant to the Federal Rules of Civil Procedure, relation back of amendments
> filed after the period of limitations is permitted in certain instances.  The relation
> back doctrine allows untimely claims to be deemed timely by treating the claims
> as if they had been filed when the timely claims were filed.  Davenport v. United
> States, 217 F.3d 1341, 1344 (11th Cir. 2000).  "An amendment to a pleading shall
> 'relate back' to the date of the original pleading only if the claim asserted in the
> original pleading and the claim asserted in the amended pleading arose out of the
> same conduct, transaction, or occurrence."  United States v. Cryacraft, 167 F.3d
> 451, 457 (8th Cir. 1999) (citing Fed. R. Civ. P. 15(c)(2)).

Mandacina, 328 F.3d at 999-1000.

In Mandacina, the Court found that the relation-back doctrine prevented petitioner from

asserting in his untimely amended motion that trial counsel was ineffective for failing to

investigate other potential suspects when the original timely motion had alleged that trial counsel

was ineffective for failing to discover alleged exculpatory footprint evidence.  Id., at 1002.  The

Court found that "The claims are not sufficiently similar in both 'time and type.'"  Id.

Allen's claim that trial counsel was ineffective for not investigating J.B. as the bank

robber is time-barred because it does not relate back to his original timely motion.  The only

mention of J.B. in Allen's Amended Motion claim of failure to present exculpatory evidence

(filed on February 11, 2008) is:

> 5.  Counsel failed to cross-examine government witness Wayne Ross regarding
> statements he made to the FBI that on the Wednesday or Thursday before the
> bank robbery, a person named "JB" (rather than Mr. Allen) called for Norris
> Holder.

Allen's new claim is not similar in both time and type to his original claim. His original claim concerned trial counsel's actions during trial and his cross-examination of a particular witness. Allen's new claim concerns pre-trial actions of trial counsel and his alleged failure to investigate J.B. as the robber. The Court has rejected the argument that the trial itself is the transaction or occurrence that satisfies the relation-back doctrine. United States v. Hernandez, 436 F.3d 851, 858 (8th Cir. 2006). This claim is not similar enough to satisfy the "time and type" test, nor does it arise out of the same set of operative facts as the original claim. Id. Allen's new claim should be dismissed as time-barred.

Even if the Court does not find that the new claim that trial counsel was ineffective for not investigating J.B. as the robber is time-barred, the claim should be denied on its merits. Allen has not shown that further investigation would have led to his acquittal or a different sentence.

Allen's exhibits do not provide evidence that Jerry Bostic was one of the two robbers at the Lindell Bank and Trust. Allen's exhibits merely demonstrate that J.B. was Jerry Bostic, Jerry Bostic was charged with Tampering with a Motor Vehicle and Possession of Heroin, Jerry Bostic died at the St. Louis City jail on May 22, 1998, Jerry Bostic was a 22 year-old black male, and was 135 lbs and five foot, five inches tall when he died. Allen's Exhibits 14, 15, 16 (Medical Examiner's report, p. 5), 39.

At trial, the Government presented Allen's confession. Allen stated that co-defendant Holder told him that "J.B" would steal two vans and that one van would be used for the robbery and the second van would be used to drive to Holder's car. Tr. Trans., 2-17-98, p. 144. Allen has presented no evidence that J.B. was one of the robbers of the Lindell Bank and Trust. He

asserts that "Jerry Bostic accurately fit the description of the individual implicated in the bank robbery by several sources."  This contention is refuted by the record.  Betty Thompson testified that the passenger in the getaway van was five or six feet tall–a description consistent with Allen, Bostic and thousands of others.  Tr. Trans., 2-18-98, p. 95.  Alma Gilliam testified that the passenger was about 5'8" which was taller than her.  Tr. Trans., 2-18-98, pp. 346, 352.  Bobby Harris, who gave the passenger a ride after the getaway van caught fire, stated that he believed the passenger was 5'9" or 5'10" tall, 175 lbs..  Tr. Trans., 2-19-98, p. 267.  Bruce Norman, who was with Bobby Harris, stated he had told the police that the person was 5'9" tall, 175 lbs.  Tr. Trans., 2-20-98, p. 9-37.  None of these match Jerry Bostic's true height and weight of 5'5" and 135 lbs.

Allen has not shown prejudice from trial counsel's failure to further investigate Jerry Bostic as a possible robber.  The evidence was overwhelming that Allen was the robber of the Lindell Bank and Trust who repeatedly shot Mr. Heflin.  He confessed to robbing the bank and shooting Mr. Heflin.  He was identified as the passenger in the getaway van.  He was identified as the passenger who fled from the burning getaway van.  His clothing had burnt plastic on it that was consistent with the burnt plastic in the getaway van.  His hair and ear were burnt.  He made admissions to two acquaintances about his involvement in the robbery.  He attempted to convince a friend to lie for him at trial.  Allen's claim should be denied as untimely and on the merits.

### 2. DNA Evidence

Allen's original claim asserted that a white strap was found by Mr. Heflin's body that had blood that was not from Allen or Mr. Heflin.  The strap was never tested for co-defendant

Holder's blood.  The Government's Response explained in detail that, in fact, the strap was found near the burned getaway van and had been described as a "white velcro strip/body armor with blood spattering" which was consistent with the evidence that co-defendant Holder was wearing body armor when he was arrested near the burning van.  Government's Response, pp. 102-4.

Allen now contends that even if the blood was on a strap consistent with Holder's body armor and found near Holder's arrest by the burning van, trial counsel was still ineffective for failing to request an analysis of the blood.  He posits that if the blood was not Holder's blood then it would mean that another person committed the robbery with Holder.

Allen's argument is purely speculative.  In his claim, he even concedes that the exculpatory value of the evidence is unknown.  Allen's Traverse, p. 92.  Item "Q-4" was found in the area northeast of the getaway van where Holder was arrested–not in the southwest location that the passenger ran.  Tr. Trans., 2-19-98, pp. 219-221, 232-234, 242-246.  Allen was identified as the person (whose hair was burnt)  who ran to the nearby St. Louis City Forestry Division lot by Bobby Harris and Bruce Norman .  Tr. Trans., 2-19-98, pp. 244, 246; 2-20-98, pp. 9-18, 9-20-1. This lot was southwest of the burning van.  The strap would not exculpate Allen.   It was irrelevant to his involvement in the crime.   Allen has not and cannot show prejudice from the failure to request an analysis of the strap.

### 3. Gas Chromatographic Evidence of Allen's Clothing

Allen's next claim is that trial counsel was deficient for failing to present evidence of a gas chromatographic analysis that showed that his clothing was negative for the presence of petroleum distillates.  He claims that the report should have been used to impeach         Officer

Carroll who testified that Allen smelled like smoke when he was arrested.  Tr. Trans., 2-20-98, pp. 177, 217.   Allen's claim should be denied because 1) the lack of petroleum distillates does not indicate that he did not smell of smoke and 2) trial counsel impeached Officer Carroll with the testimony of two witnesses who stated that Allen did not smell of smoke at the relevant time period.

In the Government's Response, Addendum 4, Forensic Scientist Margart Owens states that she has reviewed the laboratory report that found that there were no petroleum distillates on Allen's clothing.  She states:

> I believe that in this instance, there is no correlation between the smell of smoke on clothes from Mr. Allen and the Laboratory's analysis result that "no petroleum distillates were detected" on the clothes.  The method of analysis to which the clothing was subjected was not a test for the presence of smoke.

Ms. Owens manages the Arson Section at the St. Louis Metropolitan Police Department laboratory and has analyzed in excess of 200 arson cases.  Government's Response, Addendum 4.

Allen has presented no affidavits or evidence to show that the lack of petroleum distillates on Allen's clothing was inconsistent with his clothing smelling like smoke.  The van was doused in gasoline by Holder and then set fire prematurely by Holder as he and Allen were fleeing from the scene.  Tr. Trans., 2-17-98, pp. 145-6, 148-9.  Since Holder poured gasoline on the van (and apparently his sleeve as well), petroleum distillates were likely to be found on his clothing.  The lab report indicates that petroleum distillates were found on Holder's clothing. Government's Response, Addendum 4.   Because Allen was in a burning vehicle, it is logical that he would smell of smoke even if none of the gasoline had been poured on him.  There is no

68

inconsistency between Allen smelling like smoke and the finding that there were no petroleum distillates on his clothing.

Trial counsel took the direct approach in his impeachment of Officer Carroll's testimony–he obtained testimony from two other witnesses that Allen did not smell of smoke. Lakeisha Williams testified that Allen did not smell of smoke when he was arrested. Tr. Trans., 2-24-98, pp. 167-8. Marcie Chowning also testified that Allen did not smell of smoke that evening. Tr. Trans., 2-24-98, p. 212.

Trial counsel impeached Officer Carroll and therefore cannot be found to be ineffective. Allen's claim that the gas chromatographic examination would have been more effective is belied by Ms. Owens' affidavit that there is no correlation between the lack of petroleum distillates and the smell of smoke. Allen can show no prejudice from trial counsel's failure to use the laboratory report to impeach Officer Carroll.

### 4. Greg Prater and Joe Powell

Allen's next claim falsely states that "witnesses Greg Prater and Joe Powell told police that they observed a man who was 5 feet 8 inches tall, fleeing from the burning van and running through Forest Park." Allen's Traverse, p. 94. He claims that trial counsel was ineffective for failing to introduce such evidence.

Allen has completely misstated the interviews of Mr. Prater and Mr. Powell. Their entire statement was as follows:

> Both were working as the corner of Kingshighway and Lindell for the City Water Department and saw the following described subject standing on the southeast corner:
>> Black, male, 23 to 27 years of age, 5 feet, 8 inches tall, 160 pounds, thin build, with red, frizzy hair combed straight back, wearing a multi-colored shirt and grey pants...possible sweat pants.

69

> The subject was last seen walking south on the east side of Kingshighway from Lindell about 12:00 p.m.

Government's Response, Addendum 5.

Mr. Prater and Mr. Powell saw a black man with frizzy red hair standing on a street corner (which is at the complete opposite end of Forest Park from the burning van).  The man was walking south at noon.  Allen cannot show any relevance to a man walking an hour and a half after the robbery at the opposite end of the park from the robbery.  Trial counsel cannot be found to be ineffective for failing to present irrelevant and immaterial evidence.

### 5. James Combs

Allen claims that trial counsel was ineffective for failing to present the testimony of James Combs.  Allen has failed to demonstrate the relevance of Mr. Combs testimony and cannot show prejudice from the trial counsel's actions.

James Combs was the director of security at Deaconess Hospital.  On the morning of March 17, 1997, he saw a black male approaching from the east, the man entered the lobby and sat in the waiting area and then appeared to pretend to make a telephone call, the man left the hospital, got into a brown Jeep Wagoneer and left the area.  Mr. Combs described the man as 5'10" tall, 160 lbs.   Government's Response, Addendum 6.  The

Allen's Traverse claims that the this description closely resembled Jerry Bostic.  The autopsy report for Jerry Bostic states that he was 5'5" tall and weighed 135 lbs.  Allen's Traverse, Exhibit 16 (Medical Examiner's report, p. 5).  Allen's own exhibit thus contradicts his claim that the man seen by Mr. Combs closely resembled Jerry Bostic.

In addition, as the Government's Response noted, the man seen by Mr. Combs approached from the east–the robbery was west of the hospital.  Allen has not shown that a

brown Jeep Wagoneer was involved in the robbery in any form.  Allen has failed to show the relevance or materiality of Mr. Combs' statement.  Trial counsel cannot be found to be ineffective for failing to present irrelevant and immaterial evidence.

### 6. Wayne Ross

Allen claims that trial counsel was ineffective for failing to cross-examine Wayne Ross concerning a telephone call from "J.B." that Mr. Ross told the FBI had been received by co-defendant Holder the week before the robbery.   Allen contends that this evidence would have showed that "J.B." was involved in the robbery.  Allen has failed to show that this evidence exculpates him and that cross-examination on the issue would have led to a different outcome at trial.

> The entire portion of the report of Mr. Ross' interview related to J.B. is:
> When asked if he was familiar with anyone named JB, Ross advised that either Wednesday or Thursday of Spring Break, a group of friends were at Ross' grandmother's residence playing playstation when Holder was paged.  Shortly thereafter, someone called for "808," a nickname for Holder.  Ross asked who was calling, and the caller told him JB.  Ross asked Holder who it was, and *Holder told him one of Bill's cats*.

Government Response, Addendum 7, p. 6 (emphasis added).

The jury was already aware that a "J.B." may have been  involved in the robbery of the bank.  Lt. Henderson testified that Allen had told him that J.B. supposedly stole two vans that would be used in the robbery.  Tr. Trans., 2-17-98, p. 156.   The fact that J.B called Holder would not have exculpated Allen.   Mr. Ross told the FBI that J.B. was "one of Bill's 'cats.'"  Thus, Allen was further tied to co-defendant Holder.  In addition, the content of the conversation was not known to Mr. Ross.  There is no evidence that the call was related to the robbery.

Allen has neglected to indicate how trial counsel's failure to cross-examine Mr. Ross concerning the telephone call would have caused a different outcome of the trial. Trial counsel was not ineffective. There was no prejudice to Allen.

### 7. Michael West

In his Amended Motion, Allen alleged that trial counsel was ineffective for failing to cross examine Michael West, who he asserted had identified Mr. Allen. In the Government's Response, it noted that Mr. West never identified Allen. Tr. Trans. 2-18-98, pp. 146-170. Thus, trial counsel was not ineffective. Allen's Traverse completely abandons this claim. There is no mention of Mr. West's supposed identification of Allen or, in fact, of any of Mr. West's testimony. Allen's claim regarding Mr. West should be dismissed as abandoned.

### 8. Broderick  Bonner

Allen claims that trial counsel was ineffective for failing to call Broderick Bonner as a witness to impeach Wayne Ross. Mr. Ross testified that he heard Allen and co-defendant Holder discussing the robbery while they were at a bowling alley. Allen claims that Mr. Bonner would have impeached Mr. Ross because Mr. Bonner never heard Allen and co-defendant Holder discussing the robbery. Because there was no contradiction between Mr. Bonner's statement and Mr. Ross' testimony, trial counsel cannot be ineffective for his failure to call Mr. Bonner as a witness. In addition, if he testified, Mr. Bonner would have confirmed damaging evidence concerning the weapons used by Holder and Allen in the robbery. Trial counsel wisely did not call Mr. Bonner as a witness and thus avoided the inculpatory evidence.

Mr. Ross testified that he, Mr. Bonner , Mr. Moore, Mr. Smith and Holder went to a bowling alley a few days before the robbery. Tr. Trans., 2-18-98, p. 12. They waited at the

bowling alley because Holder planned to meet someone. Tr. Trans., 2-18-98, p. 14. That person was Allen. Tr. Trans., 2-18-98, p. 15. Allen and Holder sat down about three tables down. Tr. Trans., 2-18-98, p. 16. Mr. Ross was at the next table and was leaning back to listen to their conversation. Tr. Trans., 2-18-98, p. 16. He heard Allen and Holder discussing a robbery. Tr. Trans., 2-18-98, p. 16. He was sitting facing his friends and was leaning back listening to Allen and Holder. Tr. Trans., 2-18-98, p. 21. Allen and Holder were leaning toward each other and whispering. Tr. Trans., 2-18-98, p. 21. Allen and Holder got up and moved two tables down. Tr. Trans., 2-18-98, p. 23. Mr. Ross and Mr. Smith moved down so that they could listen to Allen and Holder. Tr. Trans., 2-18-98, p. 23. He heard more discussion of the robbery. Tr. Trans., 2-18-98, pp. 23-4. Allen and Holder told him to leave because they were talking business and Mr. Ross got up and walked toward the door. Tr. Trans., 2-18-98, p. 24.

Mr. Bonner's statement to the FBI was that Holder met a guy at a bowling alley. He did not hear the conversation between them because he was at another table. Government's Response, Addendum 8, p. 3. This statement does not contradict Mr. Ross's statement that, although he was at another table from Holder and Allen, he leaned back so that he could hear the conversation. Furthermore, when Allen and Holder moved tables to avoid Mr. Ross, Mr. Ross and Mr. Smith (not Mr. Bonner) moved to the table next to them so that Mr. Ross could overhear the conversation. Similarly, Mr. Bonner's statement that Mr. Ross did not know about a bank robbery at the time does not contradict Mr. Ross. Mr. Ross's testimony was that he could hear the conversation–not that others at his first table could also hear the plotting. From Mr. Bonner's perspective, Mr. Ross did not know about a bank robbery. However, Mr. Bonner did

73

not know that Mr. Ross had actually heard the discussions between Allen and Holder about the robbery.

Mr. Bonner would have provided damaging testimony if he had been called to testify.  In his statement to the FBI, Mr. Bonner said that he saw all kinds of guns at Holder's residence, including little machine guns.   Government's Response, Addendum 8, p. 2.   This description is consistent with the weapons used by Holder and Allen to rob the Lindell Bank and Trust.  It would have corroborated Mr. Ross' testimony about the weapons.  Trial counsel prudently avoided these problems by declining to call Mr. Bonner as a witness.

Allen has failed to show that trial counsel was ineffective or that he was prejudiced.

### 9. Jeffrey Moore

In his amended Motion, Allen alleged that trial counsel was ineffective for his failure to present the testimony of Jeffrey Moore.  Allen claims that Mr. Moore would have testified that he saw Mr. Ross sitting at a different table than Holder and that Mr. Moore did not see the person sitting with Mr. Holder.  Allen has not included this claim in his Traverse and it should be deemed to be abandoned.

As the Government's Response noted, pp. 114-116, Mr. Moore's statement did not contradict Mr. Ross's testimony.  Mr. Moore told the FBI that he saw Mr. Ross and Mr. Smith sitting at a table and Holder and another person sitting at another table.  Government's Response, Addendum 9.  Mr. Ross testified that he was sitting at another table from Holder and Allen and overheard the robbery discussion.  Tr. Trans., 2-18-98, pp. 15-6.  He testified that Holder and Allen then moved and that Mr. Ross and Mr. Smith moved to a table next to Holder and Allen. He again heard discussion of a robbery.  Tr. Trans., 2-18-98, pp. 23-24.  In addition, Mr. Moore

told the FBI that Holder had guns and had discussed robbing a bank. Government's Response, Addendum 9.

Allen has abandoned his claim concerning the testimony of Mr. Moore. He has not included the claim in his Traverse. Allen's claim should be dismissed as abandoned and on its merits. Allen has not shown that trial counsel was ineffective or that he was prejudiced.

### 10. Anonymous Telephone Call

Allen alleges that trial counsel was ineffective for failing to investigate an anonymous telephone call received by the FBI on March 17, 1997. The anonymous caller stated that, one week earlier, he had seen Holder at the bowling alley and heard him talking to "DeMarco" about robbing a bank. FBI agents went to the bowling alley and two police officers there indicated that DeMarco might be a patron of the bowling alley named DeMarco Roberts. Government's Response, Addendum 10. Allen asserts that further investigation would have shown that Holder was the robbery planner, that DeMarco Roberts was the co-conspirator and that nobody saw Allen at the bowling alley with Holder. Because these assertions are completely speculative and unsupported by affidavits or other evidence, Allen cannot show prejudice.

The anonymous telephone caller stated that he had seen Holder with DeMarco one week before the robbery discussing a robbery. This statement does not impeach any evidence presented by the Government at trial. Mr. Ross testified that he heard Holder discussing a robbery with Allen two days before the robbery. Tr. Trans., 2-18-98, pp. 12-3. The anonymous call was inadmissible hearsay. *See*, Harris v. Zurich Ins. Co., 527 Fed 528, 531-2 (8th Cir. 1975).

Allen's assertions concerning possible testimony by DeMarco Roberts or the two police officers at the bowling alley is completely speculative. The FBI report never indicates that any

75

known witness stated that Holder was the planner of the robbery, that DeMarco Roberts was a co-conspirator in the robbery, and that Allen had never been at the bowling alley with Holder. Allen has offered no affidavits from DeMarco Roberts or the two police officers that they would have testified at trial to any of these assertions. In fact, Allen has conducted no investigation of these alleged witnesses and can make no valid claim as to their likely testimony. Allen offers only speculation concerning the contents of their *possible* testimony. Thus, he has shown no prejudice from trial counsel's failure to investigate these individuals as possible witnesses. *See* Sanders v. Trickey, 875 F.2d 205, 210 (8th Cir.1989) (finding that a petitioner's failure to offer an affidavit or testimony of the witness at issue leaves the court to speculate whether the witness might have testified that petitioner was innocent, which "is simply inadequate to 'undermine confidence in the outcome'" (quoting Strickland v. Washington, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)).

### J. MITIGATION EVIDENCE:

#### 1. Introduction:

Allen's Traverse claims differ from those in his 2255 Motion. Many of the original factual allegations in the motion are now admittedly false. For example, it is not correct that the first effort on defense counsels' behalf to check on Prof. Haney's status occurred in January, 1998, because the record reflects a series of unreturned telephonic attempts at contact prior to January, 1998. Other examples include: the original claim that Drs. Gelbort and Cuneo did not personally talk to any witnesses and based their opinions solely on memos of interview (Dr. Cuneo talked to both Mrs. Allen and Marquis' mother); the original claim that Mrs. Allen's drinking was not presented (it was); the original habeas counsel lay opinion that Allen suffered

from an undiagnosed mental illness (none has been established and Allen was seen by four mental health experts prior to the mitigation evidence); the original claim that Allen is mentally retarded; the original claim that jurors did not know Allen should have received Special School District services (this was a focal point of the school-related mitigation evidence); the original claim that the jury did not hear about the difficulties of the desegregation program (they did); the original claim that defense counsel failed to bring out unspecified guilt phase evidence that related to mitigation (this is still unspecified). The failure to present any support for these allegations should result in a finding that they have been waived or abandoned and, at a minimum, do not warrant a hearing.

The gist of Allen's claim is that counsel was ineffective for failing to discover and present more information about Allen's alleged maladies and deficiencies, rather than a claim that counsel failed to investigate or present mitigation evidence at all. According to the current statements of defense counsel, they believe that habeas counsel have developed evidence of new themes, including childhood abuse, neglect, family dysfunction, impoverishment and abandonment. Ex. 11. The record clearly refutes Allen's claim and a hearing is not warranted. Allen's defense team conducted a thorough mitigation investigation and were not deficient in their performance. The themes which habeas counsel claim were not developed were, in fact, sufficiently developed consistent with the deliberate, wise strategy chosen by the defense team. To the extent any aspects of Allen's life were not as fully developed as habeas counsel think they should have been, the absence of the marginal benefit of additional or cumulative evidence, when viewed as a whole in the context of the actual trial evidence, was not prejudicial. This is

77

due to the fact that none of the evidence emphasized by habeas counsel is consistent on any theme and may have been more detrimental than beneficial to Allen's cause.

### 2. Cases Cited By Allen Do Not Support His Claim

The cases relied on by Allen do not support his claim and are not factually similar. Williams v. Taylor, 529 U.S. 362 (2000), involved a capital case where defense counsel waited until one week before trial to start his investigation. Allen's counsel began 7-8 months before the presentation of mitigation evidence. In Wiggins. V. Smith, 539 U.S. 510 (2003), defense counsel completely abandoned a mitigation investigation. In Rompilla v. Beard, 545 U.S. 374 (2005), defense counsel failed to review police reports that the Government planned to use in aggravation. These were egregious errors that are without parallel in this case. This Court knows first hand that Allen's defense counsel were experienced and conscientious capital defense attorneys who made informed, consistent and strategic decisions in the defense of Allen.

### 3. The Performance Prong: Defense Counsel's Performance Was Not Deficient

### a. The Prof. Haney "Misunderstanding"

According to the statements of defense counsel, Professor Craig Haney was retained as a mitigation expert in September, 1997 (one month after the Department of Justice authorized the Government to seek death). Ex. 11 and 12. Prof. Haney[11] came highly recommended by Capital

---

[11]Based upon an Internet search of Professor Haney's credentials, he is a Professor in the Psychology Department at University of California - Santa Cruz. *See* Addendum 17.

Resource Counsel[12] and Mr. Simon was aware of Prof. Haney's strong reputation.  Mr. Simon

stated that he felt that the mitigation investigation was in good hands and Mr. Sindel believed

that Prof. Haney would conduct the day-to-day preparation of the penalty phase evidence and

Mr. Simon's primary task was to assist with that preparation.  See ¶10 of Ex. 11.  Absent from

the statements of Mr. Sindel and Mr. Simon is an explanation of why they believed Prof. Haney

was going to competently perform the day-to-day functions of mitigation preparation.  However,

there being no evidence to suggest that defense counsels' state of mind as to Prof. Haney's role

and competence was not reasonable, this Court should presume that defense counsels' beliefs

were reasonable until they were confronted with evidence to the contrary.  Their good faith is

corroborated by their prompt and decisive attempts to inquire into Prof. Haney's progress in

December, 1997, and to hire Dr. Randall and move for a continuance when it became clear that

Prof. Haney was not living up to their reasonable expectations.

Contrary to Allen's claim, substantial work was performed on the mitigation

investigation prior to January, 1998.  The FBI had conducted interviews which had been

disclosed in discovery and many of these were interviews with friends and acquaintances who

provided information relevant to both the guilt and penalty phases.[13]  In October, 1997, Prof.

Haney was provided with the police report of the crime, which included witness contact

information.  By November 26, 1997, a large quantity of records had been obtained by the

---

[12]The Government has reason to believe that this recommendation was made by Kevin McNally, who frequently submits statements in support of capital habeas motions and who was a witness in support of Norris Holder's 2255 motion.  Mr. McNally was providing legal advice and guidance to the defense team during Allen's prosecution.

[13]For example, Johnnie Grant, Latasha Valentine, Eric Taylor, Mrs. Taylor.

defense team independent of Prof. Haney.  These included background records, school records, Metro Psych center records, medical history records, and jail records.  These were forwarded to Prof. Haney.  These records represent the bulk of third-party documentation that existed regarding Allen's life history, became the focal point for witnesses and experts.  The efforts of habeas counsel have not discovered any significant records which were not uncovered by defense counsel or the Government.  More importantly, someone[14] caused Allen to prepare his own biography[15] at some time prior to December 5, 1997, when it was sent to Prof. Haney.  It also appears that several family members had been interviewed prior to that time, including Juanita Allen.  For example, Prof Haney's January 13, 1998, letter acknowledges the existence of probation and parole records, more medical records and "a biographical account from his mother"[16].  Ex. 10.  The source of his knowledge was one of Ms. Caspari's earlier letters.  These are presumably within the control of the habeas counsel, but have not been provided to the Court and were not referenced in the selected statements of any of the witnesses.  Therefore, although

[14]Mr. Simon's primary role was have contact with Allen's family and conduct the mitigation investigation according to both Mr. Simon and Mr. Sindel. Ex.11 and Ex. 12.  Yet, habeas counsel did not include in Mr. Simon's statement any information as to what Mr. Simon actually did between the time of his appointment and January, 1998.  Clearly, someone was searching for, obtaining and evaluating the information that was obtained and forwarded to Prof. Haney, but conveniently no one takes credit for what was done.  Mr. Sindel's contract paralegal, Connie Caspari Supranovich stated that her role was to have frequent contact with Allen and to conduct investigation. Ex. 40.  She also states that she sent everything obtained by the defense team to Prof. Haney.

[15]This "biography" was never produced to the Government in discovery and not noted by Allen's experts as something they reviewed as part of their work.  In this regard, this Court should recall that Dr. Cuneo attempted to redact from his notes and conceal from the jury Allen's statements to him about the offense. TR 17-282.

[16]If this was reviewed by any mitigation expert, it was never produced to the Government during the trial.

habeas counsel has attempted to create a "veneer" of inactivity, the record conclusively shows the opposite.

Habeas counsel posit a misunderstanding between Prof. Haney and members of the defense team.  However, an examination of the record suggests that there is more than a misunderstanding - someone is affirmative misrepresenting the truth.  Prof. Haney dodged Connie Caspari's calls and then defense counsel took the step of faxing a letter to their own expert on January 12, 1998.  That letter contains Mr. Sindel's state of mind as it was 12 years ago.  If Mr. Sindel thought that there was insufficient time to master the mitigation evidence before trial, he did not indicate that to Prof. Haney. Mr. Sindel and Mr. Simon obviously had different views about what was needed for mitigation than Prof.. Haney and Dr. Randall, or else they would have sounded an alarm much sooner.  Mr. Sindel's letter cites "several unsuccessful attempts to contact" Prof. Haney concerning his "review of the materials you have received."  He refers to his "unexplained lack of response."  One thing this letter suggests is that neither Mr. Sindel nor Mr. Simon were relying on Prof. Haney to conduct the mitigation investigation himself.  The letter used the term "review" to describe Prof. Haney's role.  There was a later reference to "investigation", but there was no suggestion that Mr. Sindel believed that it was Prof. Haney's job to conduct that investigation.  In fact. Mr. Simon and Ms. Caspari seem indicated that it was their roles to investigate, which only made sense because the witnesses were in St. Louis, not Santa Barbara, California where Prof. Haney was located.  Prior to this time, the defense team had no reason to believe that Prof. Haney had traveled to St. Louis on the case, because Prof. Haney would surely have coordinated such travel with the defense team.

Prof. Haney's responsive letter can best be described as self-serving and reveals a different understanding and that he excuses his failure to do any work with the materials provided on his unreasonable and unjustified assumption that the trial date had been continued. One could fault Prof. Haney for making that assumption without verifying his belief, but it was not the fault of Mr. Sindel and Mr. Simon that Prof. Haney made that false assumption. Allen is not entitled to relief or a hearing because his mitigation expert made a mistake. But, the important point is that Prof. Haney's mistake is not the fault of Mr. Sindel or Mr. Simon and their failure to discover the mistake or misunderstanding sooner was not the result of incompetence or constitutionally significant deficient performance. Rather, they failed to discover Prof. Haney's mistake sooner due to their reasonable belief that Prof. Haney was reviewing the materials that had been sent to him.

Allen's position is that if Mr. Sindel and Mr. Simon had been communicating with Prof. Haney personally, rather than delegating it to Ms. Caspari, Prof. Haney's mistake would have been discovered sooner. This argument is speculative. Whether through personal contact or in writing, or whether by Ms. Caspari or defense counsel, there is no basis on which to conclude that Prof. Haney's mistaken belief that the trial date had been continued would have been discovered sooner than it was. The very fact that Mr. Sindel caused Ms. Caspari to start calling Prof. Haney prior to January 12, 1998[17], and followed up with his January 12, 1998 letter refutes the claim that defense counsel were deficient. In addition, Prof. Haney's letter of January 13, 1998, references a telephone conversation, i.e., personal contact with Ms. Caspari, and Prof.

---

[17]From Prof. Haney's January 13, 1998 letter, it appears that Ms. Caspari called him during the first week of January and then called two more times during the second week of January. Ex. 10.

Haney's mistaken assumption was not discovered then.  In that same conversation, Prof. Haney outlined what he wanted from the defense team.  Whether that message reached Mr. Sindel and Mr. Simon or not is irrelevant, because both were experienced capital counsel and did not need to be lectured by Prof. Haney as to what was involved in preparing for mitigation.[18]

Regardless of the mistake, both Mr. Sindel and Mr. Simon had not seen any work product from Prof. Haney as of early January, 1998, yet they were not alarmed, only "concerned."  They were also not alarmed by the fact that no testing had been done by defense experts yet.  This, of course, was because the core details and documentation regarding Allen's life had already been discovered by defense counsel on their own and they were already aware of what was or was not there.  What records were never discovered by the trial team?  What leads were never discovered by the trial team?  None of any significance.  In addition, they knew in January, 1998, what the Government's evidence was going to be.  They also were smart, knowledgeable and experienced enough about the potential jury pool in this community to know what mitigation strategy had the best chance to result in a life sentence - the balanced, focused, consistent strategy that they pursued.

At best, Mr. Sindel and Mr. Simon might have discovered that Prof. Haney had not done what they thought he was doing by late October or early November, 1997.  At best, that might have given them an extra 60 days or so to investigate.  There is no reason to conclude that 60 days would have made any more difference than 13 years has made.

---

[18]Allen's claim might have some merit, at least as far as the performance component of the Strickland test, if it could be shown that Mr. Sindel and Mr. Simon were simply unaware or uninformed of what was required to prepare a mitigation presentation.  Nothing in the record supports such a conclusion and ample evidence suggests the contrary.

The motion for continuance filed January 29, 1998, sought 120 days.  Paragraph 3 of the motion stated that Mr. Simon was "concentrating on the penalty phase (if any)."  Absent from his statement in support of the habeas motion is what he had been doing since September, 1997 to "concentrate" on the penalty phase.  Paragraph 4 stated that Prof. Haney was hired to "consult" and that "numerous documents, reports, and records" had been sent to Prof. Haney.  Paragraph 5 stated that Prof. Haney "completely failed to respond to letters and telephone calls."  Paragraph 6 stated that Prof. Haney's response to the January 12, 1998, was that he could not contribute to Allen's case due to the pendency of 2 other trials within the following 2 months.  No mention was made of a so-called "misunderstanding" about the trial date.  The motion also referenced a legal emergency that Mr. Simon had to address which did not arise until January 7, 1998, in another capital case and Mr. Simon's brief was due on February 17, 1998.  Mr. Simon devoted the next 2 and ½ pages of the motion to describing the legal issue pending in that other case.  Mr. Simon stated that the other case was preventing him from "filling in the gap created by Dr. Haney's situation."  ¶14.  Mr. Simon also complained that he had just received the names of previously redacted Government witnesses and the other case was preventing him from "following up on the disclosure" of those names.  ¶15.  The motion was signed by Mr. Simon.

Several conclusions can be drawn from the motion.  First, Prof. Haney was a scapegoat and the defense team had never been relying on him to conduct the mitigation investigation.  Rather, he was to act as a consultant.  Second, Mr. Simon and the team in St. Louis were pulling the laboring oar on investigating Allen's life, collecting the raw data and third-party documentation, and identifying, locating and interviewing witnesses.  Third, a substantial dent had already been in that work prior to January 12, 1998.  Fourth, a motivation for the

continuance was to free Mr. Simon up to devote his time to the other case, which involved a legal issue that Mr. Simon obviously thought was very important. If the motion was denied, Mr. Simon would obviously have to make other arrangements that he preferred not to make. Finally, it was not defense counsel's intention to share with the Court the correspondence between Mr. Sindel and Prof. Haney unless required by the Court.

Defense counsel's representations to the Court at the hearing on the motion for continuance buttress these conclusions. Mr Simon's representations to the Court on January 30, 1998, were not vague and varied substantially from the tone of the motion itself: a third-party had left them "holding the bag" and had "betrayed" them. TR 1-30-98 at 2 and 17. There was no admission that the misunderstanding was the fault of Mr. Sindel and Mr. Simon. Mr. Simon presented Dr. Randall's testimony, who had already been on the job for 2 weeks, to state that based on the work that had already been done, they only needed an additional 120 days. *Id*. at 9. Dr. Randall testified that each capital case was different - some needed more time to prepare and some needed less. *Id*. at 4. He admitted that a mitigation investigation never ends, but a point of diminishing returns is reached. *Id*. at 9-17. Dr. Randall told the Court that the time remaining was not enough time to do the job "completely" based on the schedule Dr. Randall envisioned, but he did not tell the Court that a constitutionally effective job could not be done in the time remaining if he worked at a higher pace. He had not started from ground zero because information, witness names and witness statements had already been obtained, but all of the witnesses were located in St. Louis. The 120 day estimate assumed that this would not be the

only case he would be working on.[19]  As of January 15, 1998, he had flown down to St. Louis

immediately and already met with the defense team, reviewed the records gathered[20] and met

with Allen.  The work he envisioned included obtaining additional records[21], interview the

remaining witnesses out of 60[22] that had not been interviewed.  *Id*. at 9.  Yet, he had already

invested 30-40 hours in the case and the additional time was needed in the event that he needed

to double check or verify facts.  *Id*.  Mr. Simon confirmed that the defense had begun collecting

records immediately upon the notice of death being authorized and concluded that "someone

who is not in this room is responsible for where we are."  *Id*. at 21.

Another Court hearing one week later was even more revealing in terms of the level of

preparation that had been reached without Prof. Haney.  On February 6, 1998, the Court heard

---

[19]Because the continuance was denied, it appears that Dr. Randall did devote more than full-time efforts to Allen's case.  At that pace, given the over 6 week span between the time he started and the time the evidence was presented in early March, 1998, and given the original 120 day continuance request, Dr. Randall actually found the total amount of time that he sought.  It was not perhaps the way he wanted it, but he effectively got what he wanted.  Moreover, this does not take into consideration the work performed before he joined the team.

[20]The records in this case were neither voluminous nor complex, because not much of Allen's life was "documented", as in the case of someone who had extensive prior contact with law enforcement or had a significant mental history.  This fact made the mitigation tasks in this case far less burdensome than in the typical capital case.

[21]As it turned out, most of the records had already been obtained by that date.

[22]Allen presented 34 witnesses and the Government presented 2 witnesses that were likely sources of information for Allen in the aggravation.  Of the lay witness statements submitted by Allen in support of his 2255 motion, a total of 16, 9 did testify at trial.  The remaining 7 include Mrs. Allen, Billy Wayne Allen and Shirlene Grant, all of whom were in actual contact with or known to the defense team.  That leaves only 4 witnesses who the Government cannot show were already known to the defense team: Cathy and Brad Toliver, Antonio Rycraw and Darletta Tabb.  None of their information, even if not known at the time of trial, would have made a difference in the outcome of this case.  Most of the information is not endorsed by the people they impugn, is contradicted by other evidence and, in most cases, was actually known to the defense team,

Pretrial Motions, but thereafter Mr. Sindel and Mr. Simon made ex parte applications for an MRI to be conducted by Dr. Gelbort. TR 2-6-98 at 37. A pistol-whipping incident[23] and medical records were discussed and a declaration was presented by Dr. Randall concerning various traumas and harms suffered by Allen. All of the facts of the pistol-whipping had been gained from Allen. There were also medical records revealing lead poisoning and seizures which were corroborated by statements from Mrs. Allen. The defense team was aware of a learning disability issue in Allen's life and had records from Homer G. Phillips and was in the process of getting Children's Hospital records. Dr. Cuneo was also conferring with Mr. Sindel and Dr. Gelbort wanted an MRI to supplement his neuro-psychological exam. The Court granted the request. *Id*. at 50. Missing from this colloquy is any indication that they did not have time to get the necessary things done or that they were having trouble getting witnesses to cooperate because the witnesses did not trust a Caucasion defense team. This colloquy shows that the defense team was getting done what it needed to do despite the time pressure that always exists before a trial begins. It also shows that defense counsel were pretty far along in their preparation approximately 1 month before the evidence would be needed.[24]

---

[23]This incident is typical of the factual confusion of various witness accounts which confronted the defense team on almost every issue in Allen's life. According to Allen the pistol-whipping had occurred in front of his mother's house in 1995 and it resulted from a basketball bet he won and he was whipped with a 9mm Ruger and the incident rendered Allen unconscious. TR 2-6-98 at 37-50. No medical records supported the loss of consciousness and the witness statement of Antonio Rycraw stated that Allen was pistol-whipped by gangs for crossing Taylor Avenue. Ex. 35.

[24]Whatever time pressures the defense team suffered under were less than the Government. The defense had access to Allen's life story for almost a year and had been gathering information and statements since September, 1998. The Government was getting it for the first time a day or 2 before the start of voir dire.

Prior to and during trial, the Government received mitigation discovery from the defense team. Among that discovery were Dr. Randall's memoranda of interview for 16 witnesses. These included Prentiss Church, who did not testify and who would have testified that Allen had been discussing robbing a bank for some period prior to March 17, 1997; and Otha Petty, Jr., Juanita's brother, who provided information about Allen's early years with Juanita and John Allen and who stated that it was Allen who convinced his mother to transfer him to the St. Louis City Schools. The Government was also given 6 other memoranda, but it is not clear whether the author was Dr. Randall or not. The defense team also had the benefit of FBI interviews of Prentiss Church, Eric Taylor, Shawn Midgett (a cell mate whom Allen attempted to persuade to falsely testify for him at trial) and Marcella Chowning (a female acquaintance whom Allen had contact with on March 16 and 17, 1997, before the murder, and on March 17, 1997, after the murder. The third-party documentation pertaining to Allen that the Government received from Allen, which has not been added to by habeas counsel, was only about 1 and ½ inches thick and could be easily reviewed in a matter of hours.

While Sindel and Simon are willing, in 20/20 hindsight, to take responsibility for the timing of the discovery of the betrayal, neither admits that they were not justified in the reasonableness of their belief that Prof. Haney was employing his social science expertise[25] in support of Allen's cause. The record reveals that Mr. Simon was performing investigation and that memos of interview had been prepared. Some discovery materials had been forwarded to

---

[25]HANEY"S QUALIFICATIONS?

88

Prof. Haney.  A biographical timeline of Allen' s life[26] had been prepared and sent to Prof. Haney

Allen fails to carry his burden of showing that Mr. Sindel and Mr. Simon were constitutionally deficient in failing to discover Haney's malfeasance sooner.  After they discovered Haney's "betrayal", it was brought to the Court's attention, the Court was not convinced that there was insufficient time remaining to complete an adequate investigation and the Court of Appeals found that the District Court did not abuse its discretion.  To the extent that Allen quarrels with Court rulings, his claims are procedurally barred, but the complaint has no place in an attack on the performance of Mr. Sindel and Mr. Simon.

### b. Defense Counsel Had Adequate Time To Investigate

Allen argues that the "misunderstanding" that was the result of his defense counsel's ineffectiveness caused him prejudice because it created the time squeeze that prevented discovery and use of certain information and witnesses.  Allen's claim is a bootstrap way to collaterally attack the Court's denial of the continuance motion - a claim he is barred from review. The Court determined that there was sufficient time remaining to complete a full and fair mitigation investigation.  The Court of Appeals affirmed the denial of the continuance. Allen I, 247 F.3d at 770.  To affirm the conviction, the Court of Appeals panel had to believe that on January 30, 1998, there was sufficient time remaining to complete and prepare a proper mitigation case.

---

[26]This timeline was never produced in discovery by the defense and Allen's has not included it as an exhibit to his Traverse.  Much ado is made about the time it would have taken to get Allen's family members to open up about the abuse they allegedly inflicted on Allen, but there was no reason for Allen to have concealed said information

Although this is a tempting issue on which to grant a hearing, close examination of the factual record reveals that it is a flawed argument and no hearing should be granted. Offered in support of this issue is the opinions of Allen's mitigation experts that they were unable to discover the allegedly missing information because they were deprived of the time to earn the "trust" and "rapport" of family members and witnesses. If the experts know the questions to ask, implicit in the argument is the premise that mitigation witnesses conceal information or lie during early contacts. They point to reluctance to admit embarrassing and criminal conduct to the defense team and to racial barriers. Essentially, the experts accuse Allen's family and witnesses of being racists who would not give the information to the defense team readily because of the race of the defense team.[27] Even if any of this is true, it cannot be deficient for counsel to fail to discover that a witness, who presumably is motivated to help the capital defendant, is lying or intentionally concealing something.

However, the evidence in the record conclusively establishes that none of the witnesses concealed information or lied about any facts. If defense counsel did not pursue particular information, it was because it was not consistent with the strategy choices they made. That habeas counsel would have made different strategy choices, does not meet the Strickland standard. The record also conclusively establishes that none of the witnesses were reluctant to discuss embarrassing subjects and would have provided any requested information if they had been asked. No where in any of the witnesses' statements is there a claim that they did not trust the defense team or did not reveal information because they were white. All seem to have been

_____

[27]The experts do not explain why, if racism is the obstacle and this is a common barrier to their efforts, they do not employ investigators or experts of the same race as the witnesses.

aware that Allen was on trial for his life and were not concerned about how much time was spent with them; they readily cooperated in any way they could and cooperated with the team regardless of the race or class of team members.

Juanita Allen had no reason not to trust the defense team. They represented her son from the start and she understood their role was to help save her son's life. TR 15-284. Mrs. Allen trusted Mr. Sindel enough to encourage any witness she could think of to call him to make themselves known and disclose their information. TR 15-26, 27 (Mrs. Allen wanted Johnnie Grant to have Mr. Sindel's card to call him). There is no evidence in the record that Mrs. Allen was a racist. In fact, the evidence was clear that it was her affirmative choice to give her children, including Allen, educational opportunities by sending him to what habeas counsel view as a predominantly white, affluent school. TR 15-102 (education a priority for her).

Clearly, a year was sufficient time to build Mrs. Allen's trust and convince her what information would help Allen. The relationship between Mrs. Allen and the defense team, the one who presumably would have the most difficulty admitting her alleged abuse and the only witness who could endorse the alleged volume of abuse, did not begin after discovery of Haney's betrayal. It began in March, 1997. Whatever information she possessed had more than ample time to come to the surface. If she concealed the information or lied about it, after that much time, which is not alleged, defense counsel could not be faulted for not discovering that she was lying.

Time was not an obstacle to contact with Allen and his mother. If it was difficult for Mrs. Allen to discuss certain subjects, Allen himself possessed all the leads and information concerning his alleged abuse that the defense team needed. Yet, Allen did not disclose it to any

expert as being a source of trauma.  Perhaps, this is because the alleged abuse has now been exaggerated, because it is self-serving to do so. Allen was not incompetent and could communicate his own life history.[28]  There was no reason for Allen not to trust his team.  The facts that habeas counsel claim that certain "facts" could not be discovered because they lacked time to gain the trust of certain witnesses does not explain why Allen did not tell his team about the alleged abuse or other "stressors" in his life.   Dr. Randall was certainly aware of the role that childhood abuse could play in trauma and development.  Did Dr. Randall or any of the other experts for that matter, even ask Allen about the possibility of abuse?  Even if they did not, the failure to do so was not a function of time pressures.

All of the habeas witness statements endorsed the fact that if they had simply been asked about any subject, they would have readily volunteered it.  Not one of these witnesses stated that they lied to investigators or withheld evidence because they did not trust them, whether out of racist views or otherwise.  On the contrary, several stated that they told investigators some negative things about Allen and his family, but the defense team strategically chose not to pursue it.  That is the definition of the kind of strategic choice that is above scrutiny in a Section 2255 motion.  In addition, several of the trial witnesses were asked a general catch-all question near the end of direct that invited them to relate anything else they wanted the jury to know about Allen.  Therefore, each witness had an opportunity to convey any information they wished.  This

---

[28]In fact, he wrote his own biography, a document that was never produced to the Government. Ex. 10.  His mother also apparently wrote a "biographical account."  Id.

contradicts the portrayal of defense counsel as not listening to anything negative[29] or not giving

them the opportunity to convey negative information.

Time pressures was not the reason these topics were not developed further or made focal

points of the mitigation strategy.  Time pressures cannot explain the failure to contact Cathy or

Brad Toliver.  Cathy is Juanita's close friend and they partied together.  Ex. 28 and 29.  Her son

claims he was Allen's best friend[30] and spent every day with Allen growing up.  If they had

relevant information, they clearly could have come forward, Mrs. Allen could have given their

names and contact information to defense counsel and Allen could have done the same.  The fact

that they were not heard from until this motion was not a function of time pressure.

Another flaw in the habeas temporal argument is that some of the conduct which Juanita

and Uncle Billy now describe was criminal and they could have been prosecuted for it in 1997

and 1998..  They can now safely discuss it, if it is true[31], because the statute of limitations has

run on these crimes.  Is it really credible that Billy Wayne Allen would have admitted in 1998

that a few years earlier BA was selling drugs for he and Junior?  Is it really credible that Juanita

would have admitted at any time in 1998 that she physically abused BA?  If either of these facts

---

[29]Like a chant, the witness statements repeatedly state that defense counsel was only interested in the "good stuff."  Even if true, it is odd that so many independent witnesses would use identical terms.

[30]Several witnesses seem to have been Allen's "best friend."  (Johnnie Grant, Marquis Taylor, Prentiss Church, Eric Taylor, Ahmed Oliver, Brad Toliver) This somewhat contradicts Dr. Cuneo's testimony that Allen had no friends, which he based on his interview with Mrs. Allen.  TR 17-301

[31]Given the evidence that Juanita Allen chastised Johnnie Grant for failing to "co-sign" for BA and that the habeas witnesses acknowledge a realization of what kind of information will now support habeas counsel's strategy, along with the volume of contact between them and the habeas team, there is more than ample reason to discredit the claims being made or to conclude that they are at best exaggerated.

were true, there is no likelihood that the full extent of the information would have been discovered within the 120 days additional time that Mr. Simon sought.  There is no evidence that any witness would have exposed himself or herself to criminal charges even if they had a "rapport" with the defense team.  Rather than a function of trial preparation time, the failure of certain witnesses to admit criminal conduct toward Allen, if true, was a function of the statute of limitations period.

Finally, time pressures could not have influenced the failure to call witnesses from Allen's paternal side. The defense did reach out to his paternal side as they spoke to Billy Wayne Allen. Ex. 26.  However, the Traverse argues that further paternal contact was ill-advised because it would have alienated Mrs. Allen.  Although she does not endorse this, if it is true then defense counsel made a reasonable choice to not alienate Allen's biggest supporter and source of mitigation leads: his mother.  In any event, paternal witnesses were just as accessible as Allen's maternal family.  There is no evidence that John Allen was not located and interviewed.  Based on the testimony, during trial investigators need only have gone to a corner near Cote Brilliante or a local liquor store to find him.

It is clear that the trial team did find and talk to Billy Wayne Allen, twice, at the time of trial. Ex. 26, ¶12.  It also appears that Billy Wayne Allen knew then and knows now of John Allen's whereabouts. Rather than a function of time pressure, what explains the focus on the maternal side is that both John Allen and Billy Wayne Allen (the uncle) were substance-dependent, unreliable witnesses who had little or nothing positive to say about Allen (and still don't) and were not the primary influence in his life.  Would it have helped Allen's cause to portray him as a drug dealer for them and then later a heroin dealer for Johnnie Boyce?  This

94

would have been somewhat inconsistent with Mr. Sindel's efforts to portray Allen's claims to be a drug dealer as the wishful fantasy of his unrealistic mind and liken his drug dealer claims to other boasting.

The Petty family was the family that Allen truly belonged to.  He had the closest associations with them and Allen lived with his immediate family in his maternal grandfather's house.  He was a member of the group of cousins born in 1977.  There was not and is not any evidence of paternal cousins with whom he was close.   Because Allen was basically estranged from his paternal side and because his maternal side was far less dysfunctional, it was logical and reasonable for defense counsel to focus their efforts on presenting the far more positive family support system in Allen's life.  His maternal side valued and pleaded for Allen's life.  His paternal side apparently would not have done so.

### c. What the record shows regarding counsels' performance and preparation

Besides the logical flaw in the temporal pressure argument, there is a factual flaw.  The record is replete with examples of the extent of contact that was achieved between the defense team and the mitigation witnesses.  The following demonstrate that habeas counsel's argument that the so-called "misunderstanding" put the defense team under unreasonable time pressures to conduct an adequate mitigation investigation is clearly wrong.

Johnnie Grant was interviewed by a defense investigator.  TR 15-27.  Dr. Randall was present at the defense table throughout the penalty phase and was actively involved in coordinating witnesses and applying his expertise to assist defense counsel.  TR 15-35 and 74.  Mr. Sindel talked and met with Deborah Ruffin several times prior to and during the trial.  TR 15-37.  John Lents had spoken with Dr. Randall three times.  TR 15-96.  Dr. Randall had located

95

Holiday Simmons at U. of Virginia, but she could not attend so he had Ahmed Oliver speak with her and relate her thoughts to the jury. TR 15-232 and 252. Dr. Randall spoke with Latasha Valentine 2-3 times. TR 16-30. Mr. Sindel spoke with her before she testified. TR 16-52. According to Angela Allen, Juanita Allen frequently spoke and met with Allen's attorneys. TR 16-171. Eric Taylor was contacted by Dr. Randall and Dr. Randall had the benefit of an FBI interview of Mr. Taylor. TR 16-227. When Mr. Sindel needed additional time to prepare and ready a witness, he knew how to ask for it. TR 16-303. Russell Vanacek had been contacted by Dr. Randall. TR 17-20. Dr. Gelbort had worked with Dr. Randall on a previous capital case and so they were not strangers, which made preparing him easier. TR 17-95. Dr. Gelbort had extensive contact with Dr. Randall and Mr. Sindel in Allen's case and had reviewed faxed information, Dr. Randall's notes of interviewing witnesses, Grand Jury testimony and had interviewed Allen. Tr 17-100. Dr. Randall, Dr. Gelbort, Dr. Cuneo, Mr. Simon and Mr. Sindel even had joint discussions of the mitigation case. TR 17-104. The only reason the MRI ordered by the Court was not performed was because Dr. Gelbort recommended against it. TR 17-105-107. Mr. Sindel met with Raymond Petty, Jr. TR 18-12. Mr. Sindel also has sur-rebuttal prepared and ready, in the form of at least Dr. Wuertz,[32] at the conclusion of the mitigation evidence. TR 18-47. Finally, the defense team also had the full-time services of Ms. Caspari available to them and she was present during the trial. TR 18-50.

### 4. Prejudice Prong:

---

[32]Dr. Wuertz was the treating psychiatrist at the St. Louis Metropolitan Psychiatric Center who saw Allen in February, 1997.

Even if defense counsel's performance was deficient, because their failure to communicate with Prof. Haney personally caused a delayed discovery of his "betrayal" which in turn produced time pressures, this Court can confidently look at this record and conclude that no hearing is required, because the record demonstrates that Allen was not prejudiced.  This Court's rejection of an ineffective assistance of counsel claim with respect to Holder's counsel is strong authority for the same result here.  United States v. Holder, 2008 WL 2909648 at 39-44 (E.D.Mo. 2008).  In addition, in rejecting Holder's Rule 59(e) motion, this Court also noted that "mere speculation about what *might* have happened to the balance of the mitigation and aggravation factors" is "not sufficient to establish prejudice under Strickland."  United States v. Holder, No. 4:03CV-923 ERW, Doc. 99 at 21 (E.D.Mo. 2009)(emphasis in original)(citing Sanders v. Trickey, 875 F.2d 205, 210 (8th Cir. 1989)).  Allen's arguments about what might have resulted if more evidence about Allen's background had been available is nothing more than speculation.

### a. What was presented:

Allen claims in his Traverse that defense counsel presented only a small number of "themes" and that they should have presented more evidence concerning Allen's upbringing, impairments and troubled character.  But, a careful review of what was presented proves that this argument is contradicted by the record.  Allen also argues that the defense only focused on witnesses who were "available," yet Allen fails to identify any witness who was not known to either him or his defense team or not readily available and easily located in the St. Louis area.  After 13 years, Allen cannot establish any significant facts that were not known to defense counsel or even, in most cases, to the jury.  That defense counsel did not place the significance

on particular facts and themes was a function of the strategy adopted by defense counsel, not a function of time pressure. What was presented was the best strategy for life - good enough to get a split verdict.[33]

The circumstances faced by defense counsel included compelling, overwhelming evidence of guilt, Allen's preparation for the crime and the fact that the manner of Mr. Heflin's murder was so aggressive, violent and vicious that the jury was left with the strong belief that Allen premeditated the death. Defense counsel also had to overcome strong victim impact evidence[34] and affirmative evidence that Allen not only lacked remorse but was looking forward to beating the case. In fact, Allen sought to avoid responsibility for the murder by asking, in writing, Johnnie Grant to lie for him. The defense was further hampered by the fact that Allen's mother would be a volatile, temperamental witness and was subject to impeachment for having endorsed Allen's attempt to obstruct justice by asking Grant to "co-sign" for Allen by lying under oath

It is self-serving for Dr. Randall to describe the work performed by the defense team as a "veneer of competence" and his opinion, or that of any other member of the habeas team, is entitled to no more weight than Mr. Dowd's opinion. A close examination of what was actually discovered and developed was far more than veneer. It was both relevant in content and had a

---

[33]Norris Holder, a one-legged man who was also the product of a dysfunctional home life, fired his weapon in the bank but did not necessarily shoot Heflin and he received 2 death sentences. The fact that Allen, the actual murderer of Heflin, received only 1 death sentence is a testament to the efforts of his defense counsel.

[34]Even though the jury did not find the victim impact non-statutory aggravator, that fact is hindsight. Defense counsel, viewing the case from the pre-trial point of view, knew that Richard Heflin was a remarkable man with a family that loved him and missed him. Defense counsel had every reason to be concerned about the weight the jury would give victim impact.

98

strong emotional impact on the jury.  Surely this Court cannot forget the emotional impact of 9-year Raymond Petty, Jr. telling the jury what value Allen brought to his life and how much he wanted to continue to maintain a relationship with his older cousin.  TR 18-4 to 18-12.  Several of the educators were very emotional in describing their feelings for Allen and in describing his difficulties as a child.  Latasha Valentine and her daughter clearly loved Allen.  All of Allen's family members were emotional in describing Allen as a valued member of their family.

Mr. Sindel and Mr. Simon's strategy was clearly to emphasize the positive in Allen rather than the negative, although some negative themes were presented.  An effective strategy in mitigation must be consistent to maintain credibility with jurors.  In addition, even though not legally required, mitigation evidence that serves to offer jurors a causal nexus for commission of the crime can be extremely powerful and the defense team presented several causes that were not Allen's fault.[35]  No where in the any of the ABA standards[36] has it ever state that counsel should use <u>everything</u> known to them even if it presents an inconsistency, confusion or opens the door to additional aggravation.  Here, the defense emphasized far more themes than habeas counsel are willing to admit.  Moreover, there was ample evidence to support these themes.  Because

---

[35]This Court is experienced in presiding over capital cases.  The Government submits that in a vicious, unnecessary murder like the murder here, the best chance at a life verdict is convincing the jury that the murderer was less than 100% responsible for what he did and why he did it.  Several of defense counsel's actual themes were aimed at this objective.  Both the themes they pursued and the themes they did not pursue were not the result of accident or time pressure.

[36]However, as a self-proclaimed expert on these standards, Kevin McNally was in a position to influence the choices made by Mr. Sindel and Mr. Simon, given his early involvement in this case.  <u>See</u>, Addendum 15 at (Defense Submission to DOJ Capital Crimes Review Committee), on which Mr. McNally was copied in 1997.  It also cannot be forgotten that Mr. McNally, a witness for Norris Holder in his 2255 motion hearing, was the source of the Prof. Haney recommendation to Allen's team.

habeas counsel has not fairly reminded the Court of what was presented in the mitigation phase, the Government offers the following detailed review:

### 1) Positive Themes:

#### a) Allen was loved and valued by his friends and family who wished to continue to have him in their lives

Allen's Aunt Lucy McLemore testified that Allen was "precious" to their family. TR 15-276. She particularly emphasized that Allen had opened up to her. She made a strong pitch for Allen's life on the grounds that he was a good person, that she wanted him in her life and that he would contribute something valuable to her life. TR 15-279. She encouraged the jury to look at the "whole" person, stated that she was "telling it like it is" and that Allen was needed alive by her family. Allen's cousin, Claude McLemore similarly described Allen as lovable. TR 15-176. Latasha Valentine loved Allen and still cared for him at the time of trial. TR 16-18. Yvette Allen, his sister, stated that Allen was a good person and wanted a future with him. TR 16-157. Angela Allen, another sister, stated that she loved Allen as did her young daughter. Still another sister, Nicole Allen, testified that she loved him. TR 16-193 to 16-194. Collette McLemore, a cousin attending college testified that Allen still had positive energy in him. TR 16-263. Erica McLemore, a cousin at Mizzou, testified that Allen was an integral part of their family's structure. TR 16-309. The implication of her statement was that if Allen received death sentence, it would devastate their extended family. She also described Allen as a caring person. TR 16-310. Luvetta Taylor, a mother whose son had been murdered, testified emotionally that she did want to see Allen die and drew the jury's attention to Juanita Allen, noting that Ms. Taylor did not want Mrs. Allen to experience the pain of losing a son. TR 17-385. Finally, both

Raymond Petty, Jr., a nine-year old cousin, and Raymond Petty, Sr., Allen's maternal uncle,[37] testified that they loved him and wanted them in their lives.

### b) Allen's had a family support network made up of law-abiding, successful, contributing members of society

Allen's witnesses were clearly chosen to present Allen in a positive light by association. For the most part, they were law-abiding, hard-working, contributing citizens.  They were eloquent and designed to win credibility with the jury and sympathy for them and Allen.  They added strength to Allen's "aberration" theme.

### c) Allen had talents and a good side

Numerous witnesses attested to Allen's artistic talents.  TR 14-66; TR 15-52; Other witnesses endorsed positive personality traits and contributions he made to their lives. TR 15-44 Allen's 6th grade teacher, Russell Vanecek, testified that Allen was highly motivated and talented in art.  TR 17-16.

### d) Allen was a non-violent person by nature and this conduct was out of character and an aberration

This was a consistent and compelling theme.  Melissa Petty testified that she did not believe Allen was capable of committing the murder.  TR 15-148.  Angela Allen, his sister, stated that this event was completely out of character for Allen, because he was usually so afraid

---

[37]Habeas counsel creates the impression that defense counsel were so rushed that mitigation was presented haphazardly without any overall plan due to the press of time. However, the order and content of mitigation was no accident.  The mitigation ended with the eloquent, credible testimony of Raymond Petty, Sr., on the heels of the emotional testimony of his nine-year old son, to appeal to the jury's sympathy and mercy.  As a frequent observer of courtroom performance, this Court should recall and recognize Mr. Sindel's mitigation presentation as masterful and controlled to maximize its impact.

of things. TR 16-175. Nicole Allen described Allen as an immature boy, rather than someone for whom such conduct was expected. TR 16-194. Erica McLemore testified that this behavior was out of character for him. TR 16-303. Samuel Moore, a softball coach and neighbor, and Luvetta Taylor, Marquis and Eric Taylor's mother, both testified that this behavior was outside Allen's normal character. TR 17-362; TR 17-385.

Allen had a criminal record, but nothing as significant as murder. TR 14-58.

### e) Allen was redeemable and could function peacefully in the structured environment of prison for life

Byron Woodard, Allen's probation officer, opined that Allen could function peacefully in jail. TR 14-204. Allen's letters to Johnnie Grant attested to Allen's life in jail - he was high, working out, and playing basketball. TR 14-263. Several witnesses testified to visiting him in jail and there was no evidence of jail misconduct. TR 15-53; 15-68; 15-176; TR 17-83; 17-385. Nicole Petty testified that prison was hard for Allen. TR 16-198.

### 2) Negative themes

### a) Allen's home and family life

Witness after witness presented their views of the family environment in which Allen grew up. Allen now argues that his counsels' performance was deficient because they did not present enough evidence about Allen's family. On the contrary, it is doubtful that the jury could have absorbed any more information about Allen's family and home environment than they received. Some information was brought out in direct and still other information emerged though cross-examination.

Contrary to Allen's claim, the trial jury heard a lot about his father. Mr. Sindel described him as man who worked when he could, but then became an alcoholic and left the Allen family

when Allen was young. TR 14-61. Mr. Sindel stated that Allen had no real relationship with his father. Witness after witness described John Allen as someone who was always intoxicated in the neighborhood. TR 15-22 (Johnnie Grant); TR 15-48 (Deborah Ruffin - saw him drunk always and as recently as one month before the trial); TR 15-137 (Melissa Petty - John Allen always drunk and was not a role model for Allen); TR 15-201, 207 (Otha Petty, Jr. - John Allen worked and supported his family early on but lost his job, turned to alcohol, provided no support for the family, left the family when Allen was around 10 years old, was not around Allen much and was present at family functions off and on; however, he described John Allen as a good father who cared about Allen); TR 15-263, 265 (Lucy McLemore - described the Juanita/John relationship and John's departure from Allen's life); TR 16-140 (Shimeka Taylor - John Allen was a drunk who gave Allen and his sister a dollar to "split" one time and who said he was not getting a job until the kids were grown up); TR 16-154 and 165 (Yvette Allen and Angela Allen - their father was an alcoholic who was never there for them); TR 16-180 (Nicole Petty - the Allen children saw their father at his mother's house; John Allen drank, used drugs, was very vocal when drunk; Allen did not like or get along with his father); TR 17-374, 376 (Luvetta Taylor - John Allen was not fit to be around children and was always drunk); TR 18-24 (Raymond Petty, Sr. - John Allen was a drunk); TR 18A-25 (Dr. Sean Yutzy cross-examination - John Allen was a crack addict and alcoholic).

Much information was also presented about Juanita Allen that was both positive and negative. There is no suggestion that these witnesses were lying in either respect, but it shows that Mrs. Allen was not the monster that Allen and his witnesses now portray her as. The truth usually lies somewhere in the middle and this jury had an adequate flavor of what Mrs. Allen

was like, as did Allen's mental health experts.  It was noted by Mr. Sindel in his penalty phase

opening statement that it was difficult for his witnesses to open up and talk about their personal

lives, so that the defense team was not unaware of the need to press hard for details.  TR 14-71.

However, one need look no further than Mr. Sindel's opening statement to see why it was not

critical to mitigation to more fully pursue Mrs. Allen as the "boogeyman" in Allen's life: Norris

Holder was a far more appealing and factually significant boogeyman.  Mr. Sindel's strategy can

be found in one of his final lines of his opening statement: this was Norris Holder's crime and

Allen was his exploited lackey.  TR 14-74.  This was a far more effective strategy than vilifying

Mrs. Allen - the strategy now endorsed by Allen's habeas team.

On the positive side[38] Mrs. Allen appears to have had rules and standards for her children

that, especially as a teenager, Allen refused to follow or meet.  TR 14-192 (Byron Woodard -

extreme conflict between mother and son due to Allen's behavior[39] and his refusal to comply

with home standards); TR 15-67 (Deborah Ruffin - Mrs. Allen taught her children right from

wrong); TR 15-102 (John Lents - education was a priority for Mrs. Allen); TR 15-147 (Melissa

Petty - Mrs. Allen had rules for Allen, which included no drug use); TR 15-263, 265 (Lucy

---

[38]One of the many reasons that Allen could not have been prejudiced by the failure to more fully develop his family life, if there was such a failure, was that the facts did not clearly point in one direction.  As discussed in the text, there was as much positive information about Mrs. Allen as negative, even considering the so-called "new" information.

[39]Even Mrs. Allen endorses Allen's bad behavior.  Her present statement claims that Allen talked back, yelled, cussed at her and disobeyed her and that Allen "deserved" the punishments he received.  Ex. 23.  Eric Taylor noted that Allen even stole from his sisters and mother.  TR 16-230. Nicole Petty stated that Mrs. Allen took the appropriate action in evicting Allen from her home after the home was shot up due to Allen's conduct.  Ex. 24.  The question for this Court is whether all of this information, which could not have been surgically excised from a fuller development of Allen's home life, would have been a net gain or a net loss to Allen's plea for life.

McLemore - Allen taught well by his mother and Mrs. Allen worked; all of the Petty sisters taught the same values to their children); TR 16-292 (Nancy Harris - Juanita was a caring mother who looked to others for strength; Juanita set a good example in the way she loved her children); TR 17-251, 294 (Dr. Cuneo - Mrs. Allen tried to get Allen to go to counseling; she was Allen's only stability, structure and control); TR 17-357 (Samuel Moore - Otha Petty, Sr. and Mrs. Allen tried to keep Allen in line; Allen had curfews); TR 18-27 (Raymond Petty, Sr. - Mrs. Allen demanded respect, worked at the public library, tried to be a good mother and did the best she could). Mrs. Allen apparently attended parent/teacher conferences on behalf of Allen. TR 15-80 (John Lents); TR 15-291 (Tracy Eaton). This contradicts the portrait of a mother who abandoned and rejected Allen. In addition, Mrs. Allen twice filed missing persons reports on Allen. One was on January 20, 1998. TR17-314. Johnnie Grant testified that Allen never confided anything negative in Grant about Allen's family. TR 14-226. Also, Mrs. Allen obviously sought medical attention for Allen when he needed it, based upon the medical records and other information. Ex. 29. If Mrs. Allen was as bad as habeas counsel now claim, it is doubtful that Angela Allen would have moved back home with her own daughter, TR 16-172, or that Mrs. Allen would have suggested that the family needed counseling to deal with Allen's situation, TR 16-198. Raymond Petty, Sr. testified that he tried to help Allen by acting as his scoutmaster. TR18-27.

Otha Petty, Sr. is also now vilified by Allen. However, the trial evidence about him could not have been clearer that he was a good, hard-working man who kept his emotions in. TR 15-197 (Otha Petty, Jr. - father a hard-working, loving caring man; a good role model for Allen); TR 16-282 (Nancy Harris - Otha Petty, Sr. got Allen to help her with chores when Allen was 16

or 17 and that he raised a well-mannered family trying to succeed); TR 17-357 (Samuel Moore - Otha was an upright, church-going man who was respected in the neighborhood; he had a role in raising and controlling Allen); TR 18-15, 25 (Raymond Petty, Sr. - good religious man, but not proactive enough with Allen; lenient but strong person; a loving person who did not show his emotions).

In addition, Allen had no outward sign that would corroborate the level or seriousness of the "abuse" now claimed. Allen was described by many as a happy child. TR 15-73 (Deborah Ruffin). Every person that dealt with Allen in grade school or as a child testified, yet not one describes suspecting physical abuse or noted any physical signs of injury. If Allen was constantly being hit with any object either his mother (who supposedly fought like a man) or his grandfather could find, wouldn't the abuse leave a mark? Allen's sisters lived in the same house, yet neither their testimony nor their present statements contain any endorsement of the physical abuse now claimed by Allen. Mrs. Allen's statement is questionable at best, given that she was angry with Johnnie Grant for giving Allen's letters to the FBI and for not "co-signing" for Allen. Also, Billy Wayne Allen claims that John and Juanita Allen "beat"[40] their children, Ex. 26, yet this is not endorsed by those who would know - their children. None of the Allen girls endorse the claim that they were beaten and Allen does not support his motion with a statement of his own.

---

[40]The Government notes that little, if any, details are ever given to the conclusions concerning beatings. Thus, it is not clear whether this is simply a matter of corporal punishment or torture. Raymond Petty, Sr. notes that he and his siblings were all "whooped" as kids and they each raised their kids the same way, Ex. 27, but there is no explanation of what "whooped" means.

On the negative side, it was known to the jury that, at home, Allen was the subject of verbal criticism and correction, which Allen now exaggerates by characterizing it as "abuse."[41] TR 14-247, 248, 291 (Johnnie Grant - Allen chewed out at home, sisters yelled at him); TR 16-154 (Yvette Allen[42] - Allen and her mother fought all the time).  Raymond Petty, Sr., who was the last mitigation witness, testified in more detail than anyone else about Mrs. Allen's faults and the jury was left with an accurate view of Allen's home experiences.  Mrs. Allen, at times, left her children at home alone while she pursued a relationship with a man.  She did not have any goals.  TR 18-35.  She cursed and drank a lot.  TR 18-37.  He observed Mrs. Allen beating Allen severely with an extension cord when he was age 16 or 17.  TR 18-37, 38.  She had constant conflict with Allen.  TR 18-39.  However, rather than vilifying herself to help her son, as she does now, she told Mr. Petty that she had done the best she could with Allen.  TR 18-35.

If Allen was traumatized by his mother's treatment of him, it was not evident by 1998.  Allen encouraged Johnnie Grant to meet with his mother and have her drive Grant to visit Allen.  TR 14-260, 280.[43]  Mrs. Allen was described as a caring mother who was simply overwhelmed by her single parent responsibilities.  TR 15-80 (John Lents).

---

[41]Perhaps Mrs. Allen should have put Allen in "time-out" for causing the family home to be shot at and the lives of its occupants to be put in jeopardy.

[42]Allen seems to allege that all of his sisters and his mother abused him.  Yet, Yvette Allen testified at trial that she did not fight with Allen, loved him and that they got along well.  TR 16-154.  Angela Allen admitted that she had a lot of conflict with Allen when they were young, but that as adults they had gotten past that and were close by the time of trial.  TR 16-172.  At the time of trial, Angela testified that Allen gave her advice about staying off the streets and avoiding the wrong people.  *Id.*

[43]This encouragement may have been because Mrs. Allen was willing to help Allen get Johnnie Grant to retract his incriminating information and "co-sign" for Allen.  TR 14-267.

There are stray allegations and rumors included in the witness statements, which are clearly very edited and "form"-like.  These should not be given any weight, because they are not corroborated or endorsed by the subjects of the allegations.  For example, Cathy Toliver claims Juanita was a bad mother and a prostitute and that Juanita's customers molested her children.  Ex. 28.  No one else, including Juanita and her children, endorse this claim, but habeas counsel included it.  Moreover, Mrs. Toliver's own son describes how Mrs. Toliver and Juanita "partied" together on the weekends until 4-5 a.m. and he and the Allen children were left home alone. Ex. 29.  Another example is the claim that Allen was molested by an uncle.  This was reported by Tracy Eaton, Allen's 4th grade teacher, and the source of her information was Allen's sister.  Ex. 38.  Again, this is not endorsed by any uncle, sister or even Allen.  Unlike defense counsel, who had a disciplined, strategic approach to defending Allen, habeas counsel appear to have adopted a strategy of throwing everything to the wall to see if anything sticks.

### b) Allen lacked of a father and male role model

Several of Allen's cousins who were the product of some of the same conditions and neighborhoods as he were law-abiding, in college or working.  Mr. Sindel used several opportunities to suggest that the difference between them and Allen was Allen's absence of a father or male role model.  TR 15-112 (Claude McLemore); TR 15-210 (Otha Petty, Jr.); TR 15-226 (Barbara Oliver); TR 16-191 (Nicole Petty); TR 16-282 to 16-292 (Nancy Harris); TR 18-24 (Raymond Petty, Sr.).

### c) Allen grew up in a poor, segregated section of the City of St. Louis infested by gangs, drugs and violence

It is surprising that habeas counsel suggest that there was little or no evidence, or even not enough evidence, concerning the neighborhood and conditions in which Allen grew up and

lived. On the contrary, there was a plethora of evidence on these and related topics. Any juror living near St. Louis, of course, would already be well aware of such conditions and not need to have it explained. They see it and read about the conditions and activities in North St. Louis City every day. Nonetheless, the jurors in this case heard graphic and voluminous details about the immediate area where Allen lived. TR 14-187, 196, 197, 210 (Byron Woodard - plight of inner city black males); TR 15-22 (Johnnie Grant - poverty and need for money); TR 15-44 (Deborah Ruffin); TR 15-145, 150, 151, 153 (Melissa Petty - shootings, single parents, drug houses, vacant buildings, boarded up houses, gangs); TR 15-162 (Claude McLemore - winos, vacant buildings, beer bottles); TR 15-193 (Susan Duke - Allen came to school in old clothes); TR 15-210, 216 (Otha Petty, Jr. - rough, scary, gangs, drugs and gangs); TR 15-240 (Ahmed Oliver - crime and gangs); TR 16-115 (Stephanie Stock - Allen came to Halloween as a "pimp" in 1st grade); TR 16-126, 132, 134, 150 (Shimeka Taylor - gangs, drive-bys, graffiti, Allen and Marquis Taylor knew many people who died); TR 16-161 (Yvette Allen - gunshots, gangs, paranoid to walk); TR 16-200 (Eric Taylor - violence and gangs); TR 16-290 (Nancy Harris - renters, torn down houses, no one working, nearby streets are rough); TR 17-14 (George Ingle - low graduation rates); TR 17-355, 357 (Samuel Moore); TR 17-369 (Luvetta Taylor - bad conditions); TR 18-22 (Ray Petty, Sr. - vacant lots and houses); TR 18A-70 (Dr. Sean Yutzy - gangs, drive-bys, violence).

### d) Allen suffered from poor health, including febrile seizures, lead poisoning, asthma and a skin rash for which he was hazed

There was extensive evidence of Allen's skin condition as a youth and the fact that he was hazed by his peers. For example, Claude McLemore discussed this them. TR 15-166 to 15-

109

170. Other family members, teachers and acquaintances touched on the same theme. Drs Gelbort and Cuneo, presented the medical records detailing Allen's febrile seizures, lead poisoning and head injuries.

### e) Allen had a difficult time adjusting to the grade school he attended as part of a school desegregation program

Several witnesses endorsed the theme that Allen had a difficult time adjusting to the difference between his background and that of most of his peers in the Clayton School District. TR 15-86, 110 (John Lents); TR 15-140 (Melissa Petty - culture shock); TR 15-162 (Claude McLemore); TR 15-190 (Susan Duke); TR 15-236 (Ahmed Oliver); TR 17-389 to 17-393 (Barbara Murrell - hard for Allen because he did not fit in with either desegregation students or Clayton School District residents).

### f) Allen had learning difficulties in school, the school system failed to meet Allen's needs through intervention, he should have received Special School District services

This was another prong of the defense mitigation strategy. It clearly shows that the defense was not just interested in the "good stuff." The details of Allen's difficulties in school were revealed by each of his teachers and counselors at Clayton School District and Sumner High School. The jury was left with a conflict: on the one hand there was no documentation that Allen had ever been tested for SSD services, there was an explanation that perhaps he was tested but probably did not meet the criteria because his performance and abilities were not that divergent. TR 15-96 (John Lents - Allen did not qualify for SSD); TR 15-116 (Ann Edmonds - Allen needed lots of special attention in 3rd grade); TR 15-192 (Susan Duke - school was frustrating for Allen every day); TR 16-95 (Marvin Neals - withdrawn from Sumner due to lack

of motivation and Allen may have slipped through the SSD cracks); TR 16-110 (Stephanie Stock - in 1st grade she recommended SSD testing for Allen; he was tested and did not qualify); TR 16-273 (Julie Ellis - in 6th grade his needs were not being met); TR 17-15 (George Ingle - at Sumner he demonstrated a lack of interest but managed to get a B in math); TR 17-78 (Dr. Gelbort - at Sumner Allen received F's in art as well as PE and disrupted class, but he made fewer spelling errors in his letters than in the neuro-psychological testing); TR 17-389, 93 (Barbara Murrell - Allen needed SSD services and did not receive enough support and slipped through the cracks).

Interestingly, Marvin Neals gave the jury a glimpse of the person that Allen had become as a teenager - although school was supposedly a frustrating failure for Allen and he was not motivated, Allen reacted to being withdrawn in September, 1994, with belligerence, cursing and enragement.  TR 16-104.  Perhaps that is the side of Allen that Mrs. Allen had to deal with at home and that Richard Heflin encountered in his last moments of life.

### 3) Causal nexus themes

There is no doubt that numerous themes pursued by defense counsel were designed to present an explanation for what caused Allen's aberrational behavior and why he chose to participate in the crime.  Such themes, above others, were the most likely to motivate the jury to return a sentence of life.  If some explanation beyond his reasonable control led him to make wrong choices, assuming he now regretted them, a jury would be far more likely to show mercy than if Allen merely convinced the jury that he had a hard childhood and had been dealt a "bad hand."

> **a) Allen was a vulnerable follower, not a leader and not capable of planning this offense; Allen was an "easy mark" for being misled by Norris Holder**

111

Mr. Sindel planted the seeds of this theme in his penalty phase opening statement: Allen was "bait" for Norris Holder, was a lackey, was not predisposed to commit the murder, was vulnerable.  TR 14-66, 69, 74.  A fact which supported this theme was that Allen, unlike Holder, did not possess or wear a bullet-proof vest.  This theme received support from numerous witnesses.  TR 14-221 (Johnnie Grant - Allen did not plan things); TR 15-70 (Deborah Ruffin - Allen was a "follower"); TR 15-93 (John Lents - Allen relied on the advice of others); TR 15-125 (Ann Edmonds); TR 15-143 (Melissa Petty - follower; others were attracted to Allen's weakness); TR 15-172 (Claude McLemore); TR 15-278 (Lucy McLemore); TR 15-297 (Tracy Eaton - Allen acted without thinking); TR 16-240 (Shimeka Taylor - Allen was a "pleaser"); TR 16-191, 198 (Nicole Petty - Allen could not plan or lead; he was a loving follower); TR 16-220 (Eric Taylor - someone had to get to Allen real good for him to do this); TR 16-269, 280 (Julie Ellis - Allen was an outsider with no friends; Allen did not think things through and had bad judgment); TR 17-23 (Dr. Gelbort); TR 17-405 (Barbara Murrell - Allen was a follower); TR 18-33 (Raymond Petty, Sr. - Allen was lead by bad influence).  This theme was further supported by the testimony of both Drs. Gelbort and Cuneo.

### b) Allen suffered from PTSD as a result of witnessing a friend's death and this disorder lead to a downward spiral that Allen could not control and adversely impacted Allen's judgment

Post Traumatic Stress Disorder was and is a major component of Allen's mitigation evidence.  The problem is that habeas counsel and the mental health experts now treat the stressor or trauma as a moving target that can be manipulated to suit the circumstances.  Mr. Sindel identified two traumatic events - the death of Dennis Noble and the death of Marquis

112

Taylor.  TR 14-69.  The problem with the first, of course, was that it did not happen in Allen's

presence so that it would not have qualified for PTSD.  TR 17-294.  The death of Marquis Taylor

was a qualifying event and witness accounts suggested that it was the event which triggered the

change in Allen from good to bad.  TR 15-73 (Deborah Ruffin - after Marquis passed, Allen was

no longer happy or joking); TR 15-169 (Claude McLemore - Allen was close to Marquis); TR

15-240 (Ahmed Oliver - Allen talked about Marquis); TR 16-136 (Shimeka Taylor - Allen

impacted by Marquis' death; afterwards is when he started hanging with a bad crowd, drank and

became more of a "pleaser"); TR 16-161 (Yvette Allen - Allen more quiet after Marquis); TR

16-188 (Nicole Petty - Allen impacted by Marquis' death; stayed in house, more quiet; started

hanging with the wrong people in 1996-97); TR 16-220 (Eric Taylor - Allen depressed in

January, 1997 and talking about Marquis); TR 16-293 (Nancy Harris - after Marquis Allen

distraught and upset); TR 17-114 (Dr. Gelbort[44] - after Marquis' death Allen not interested in

school); TR 17-378 (Luvetta Taylor - Allen impacted by Marquis' death).

Dr. Cuneo was adamant about his diagnosis of PTSD for Allen as a contributing factor to

his poor impulse control and vulnerability to leaders and as an explanation of why he

participated in what Dr. Cuneo dismissively characterized as an "off-the-wall" scheme.  TR 17-

250.  Habeas counsel try to suggest that Dr. Cuneo was only hired to do a competency

examination, but Dr. Cuneo clearly stated that he conducted a mitigation evaluation as well.  TR

---

[44]As pointed out in cross-examination of Dr. Cuneo, Dr. Gelbort's linking of Marquis' death to Allen's lack of interest in school was clearly contrived, because Marquis was killed in 1995 and Allen was withdrawn from Sumner for lack of interest in September, 1994.  Dr. Cuneo had to admit that Allen's school issues preceded Marquis' death.  TR 17-294.  In addition, Allen advised Dr. Cuneo that he skipped school when he was still enrolled to sleep rather than lament Marquis' death.  TR. 17-293.

17-207. He wanted all the information about Allen that he could get and saw Allen on January 16, 1998 (2 weeks before defense counsel sought a continuance) and again on February 22, 1998. TR 17-220. In discussing PTSD, Dr. Cuneo analogized it to children who are repeatedly abused. TR 17-228. Thus, if there was an indication of relevant childhood abuse, Dr. Cuneo knew to be looking for it. Dr. Cuneo also spoke with Mrs. Allen and she linked Allen's changes to the deaths of Dennis Noble and Marquis Taylor. TR 17-230, 240, 248-49. Allen apparently endorsed both nightmares and voices, even though he had denied them to Dr. Gelbort. TR 17-120; Tr 17-232. Dr. Cuneo declared the death of Marquis as the "defining moment" when Allen's life began to unravel. TR 17-239. Dr. Cuneo testified that he had "no doubt" about Allen's PTSD and that it was what made him a "schmuck."[45] TR 17-240, 55-56. By February, 1997, Dr. Cuneo stated that Allen was spiraling down and essentially stated that PTSD contributed to Allen's participation in the offense. TR 17-250. Dr. Cuneo stated buttressed his diagnosis with the claim that he had the "full picture."

It was not Dr. Cuneo's fault that his PTSD diagnosis could not hold water. Whether due to Marquis' death or due to childhood abuse, the evidence contradicted the diagnosis more than it supported it. Allen was socially functional[46], still visited the site of Marquis' death without

---

[45]The Government cannot find this term in any of the versions of the DSM.

[46]He had friends, found the money to frequent clubs and had at least 2 girlfriends, one of whom loved him and was willing to allow him to live with her if he could remain faithful. He was also socially functional enough to have numerous persons who claimed to be his best friend and the mothers of these friends all welcomed Allen into their homes. It was curious that Dr. Cuneo did not believe that Allen ever visited a club named Cloud 9, TR 17-306, because that would have flown in the face of his PTSD diagnosis, but Johnnie Grant's testimony about going there with Allen and conducting an experiment about people's reactions to material possessions was uncontradicted. TR 14-223, 256. Dr. Cuneo also failed to consider that Allen was fully functional in jail and numerous witnesses endorsed Allen's ability to function peacefully in

reluctance, TR 17-306, and engaged in activities that would have exposed him to the very trauma that allegedly caused the PTSD.[47]   It was not Dr. Cuneo's fault that the voices Allen endorsed to him had been denied to others.  TR. 17-316; TR 18A-6.  As to whether the PTSD would have been better supported if the experts had more information about childhood abuse, Allen was still more than socially functional and was trying to get back into his mother's home even though he had living options outside her home.[48]  It was also not Dr. Cuneo's fault that Dr. Yutzy effectively and more credibly refuted the diagnosis of PTSD.  TR 18-80.  At least Dr. Yutzy had the credibility to conclude that he could neither confirm nor deny the existence of PTSD.  Dr. Yutzy stated that true PTSD carries with it withdrawal from life and not functioning in a reasonable capacity as far as the activities of daily life.  TR 18A-90.

### c) Prior to the offense Allen was unrealistic about his future, depressed about not being able to go back home, allegedly attempted suicide, and sought  mental help on his own once

Mr. Sindel suggested that Allen did not live in the real world and that his thoughts about the future were fantasy.  TR 14-60.  He cited Allen's letters to Johnnie Grant as an example of Allen's wishful thinking, because Allen thought he was going to beat the case and get out of jail

---

prison for life.  TR 18A-8.

[47]These ranged from "ganking" to drug sales to robbing a bank with an armed security guard.  Dr. Cuneo had to admit, after looking to Mr. Sindel for the answer but finding no assistance, that Allen's role in the crime was inconsistent with a PTSD diagnosis.  TR 17-329.  It would be inconsistent regardless of whether the trauma was Marquis' death or his mother's alleged abuse.  Likewise, Allen's actions immediately after the murder were not consistent with PTSD, in part because they did not display the impairment that is symptomatic of PTSD.  TR 17-334.

[48]If Allen had killed his mother rather than a bank security guard who was a stranger to him, Allen's PTSD claim might have more credibility.

soon.  TR 14-64.  Mr. Sindel presented a chronology of events leading up to the crime that

served to explain Allen's downward spiral and his participation in the offense.  TR 14-71 (1-19-7

house shooting, 2-11-97 presentation at St. Louis Psychiatric Center, and 2-20-97 presentation

there).  Tasha Valentine testified that Allen was depressed in February, 1997, and was crying

because he could not return home.  TR 16-6, 8.  She believed that he tried to kill himself on

February 11, 1997 and that he felt he had nothing to live for.  TR 16-9 to 16-14; TR 16-34.

Tasha's mother endorsed Allen's depression near March, 1997, believed that Allen wanted to

kill himself in February, 1997 and that the cause of his depression was his then homelessness.[49]

> ### d) Allen's brain was damaged, possibly from febrile seizures or lead poisoning or being hit in the head, and as a result he was mentally slow and could not inhibit his impulses

There was nothing subtle about the evidence that Allen was brain damaged and that the

brain damage had a causal nexus to Allen's involvement in the offense.  Mr. Sindel made it a

focal point of his opening statement.  TR 14-67.  Prior to Dr. Gelbort's testimony, educator John

Lents endorsed the connection between lead poisoning/febrile seizures and learning motivation.

TR 15-108.  There was, of course, documentation of both.  Dr. Gelbort testified that there were 4

things wrong with Allen's brain.  TR 17-44 to 17-50.  These led Allen to have frontal lobe

damage, uninhibited impulses which became worse in stressful situations and vulnerability to

being misled.  TR 17-66 to 17-75.  His diagnoses dove-tailed with the defense themes that Allen

---

[49]Allen seems to now blame his mother for his alleged homelessness, but the facts show that he was to blame.  Whatever lead to the shooting at his mother's house, it was Allen's fault. He had a home with Tasha if he had not cheated on her with another girl.  TR 16-48.  And, it should not be forgotten that Allen was not a child - in January, 1997, he was well over 18 years of age.

116

was misled by Norris Holder and planted the suggestion that the murder of Richard Heflin was the result of Allen being unable to control his impulses under the stress of the bank robbery. There was nothing rushed about Dr. Gelbort's presentation and he did not qualify his diagnosis by the timing of his examination. The jury also heard plenty about the effects of lead poisoning and febrile seizures. TR 17-160 to 17-170; TR 17-199. Dr. Gelbort left no doubt in the jury's mind that he believed that Allen's brain was not normal. TR 17-199, 200.

Allen now criticizes the tests that Dr. Gelbort used, but Dr. Gelbort came with the recommendation of Dr. Randall. Dr. Randall, himself a psychologist, had worked with Dr. Gelbort in the past so he obviously considered him reliable and competent. TR 17-95. Dr. Gelbort testified that he used the best tests. TR 17-189. If he was incorrect, how is that the fault of Mr. Sindel and Mr. Simon?

Dr. Gelbort was impeached by the fact that his testing showed that Allen was a good problem-solver, that he had not adjusted Allen's IQ scores for age and education level. TR 17-140, 144. He also had to admit that Allen's conduct during the bank robbery was not impulsive. TR 17-174. Dr. Wetzel effectively rebutted Dr. Gelbort not due to the pressure of time, but due to the fact that Dr.Wetzel's opinions were simply more accurate. Dr. Wetzel had to reach his conclusions upon even greater time pressure than Dr. Gelbort. Dr. Wetzel effectively demonstrated why Allen was not brain damaged or impaired in ways that mattered to the offense by presenting several test result summaries. Dr. Wetzel showed that Allen's test scores were highly variable, suggesting something was at work other than brain damage. TR 18A-96 to 18A-100. Of the tests Dr. Gelbort performed, 4 were excellent detectors of frontal lobe damage. TR

117

18A-103.[50]  Dr. Wetzel explained why age and education adjustments were necessary to get accurate test result interpretations.  TR 18A-107.  The category test in particular measures executive functioning and the results showed that Allen functioned in the 93% range.  TR 18A-122.  Executive functioning involves abilities most related to the offense.  TR 18A-126.  On his IQ scores, Dr. Wetzel found that Allen was at the 75% level for problem-solving, 50% for verbal skills and 27% in school-related abilities.  TR 18A-122.  Based on these results, Dr. Wetzel concluded that Allen was not brain damaged and the cross-examination of Dr. Wetzel failed to impeach him.  TR 18A-16 (Allen's executive functioning as good college graduates and he was functioning well in the real world).

It is ironic that Allen now complains that the jury did not hear enough information about lead poisoning and febrile seizures, because Mr. Sindel objected to the introduction of research on the effects of the amount of lead poisoning and the type of seizures suffered by Allen.  TR 18A-12.  Dr. Yutzy testified that Allen's seizures were not problematic and that the levels of lead that Allen was exposed to could account for, at most, a 1-3 point drop in IQ.  TR 18A-18.  On cross-examination, Mr. Sindel then explored the subject of lead poisoning and its effects in greater detail.

### b. Themes Allegedly Not Discovered or Presented

The core facts concerning Allen's paternal family, the lack of Special School District services in Allen's education, verbal and physical abuse visited upon Allen, and Allen's "abandonment" were not only known to defense counsel.  They were also known to the jury.

---

[50]The fact that Dr.Wetzel thought that Dr. Gelbort had chosen the appropriate tests for frontal lobe damage refutes Dr. Martel's claim that the test-selection was deficient.

The evidence of Mrs. Allen's physical "abuse" was discussed, *supra*, but regardless of whether another source of trauma could be found the defense team could not change the facts inconsistent with a diagnosis of PTSD. More importantly, regardless of the trauma source, PTSD could not have had anything to do with the crime and was therefore a weak mitigator.

The theme most emphasized by habeas counsel seems to be abandonment and homelessness. However, it hard to conceive how the jury could have heard still more evidence about this than it did. The evidence on this was not consistent, but extensive. In his opening statement, Mr. Sindel stated that Allen was not coming home and staying away from home, as if to suggest that it was Allen's choice, not something imposed on him. TR 14-70. Johnnie Grant testified that Allen did not want to be at home, because Allen was "chewed out" for not doing anything to help at home. TR 14-246. Deborah Ruffin stated that Allen wanted to be on the street more than at home and that he had been away from home for a full month before the January, 1997 shooting.[51] TR 15-54. Yvette Allen, on the other hand, testified that Allen had been living at home prior to the shooting, but had to leave afterwards due to the shooting. TR 16-163. Melissa Petty said that Allen was in and out of home during 1996 and 1997. TR 15-145. One of the problems was that Allen would not follow Mrs. Allen's rules on curfew, visitors and chores. TR 15-147. Mrs Allen objected to Allen's less than savory friends. TR 15-150. Nicole Petty stated that Allen had been bringing bad people to his mother's house during 1996 and 1997, but in 1996 Mrs. Allen reported Allen missing to the police. TR 16-188, 189.

---

[51]Although the evidence was not clear as to what led to the shooting, it was undisputed that the shooters came to Allen home, asked for him and then shot the house up. TR 16-146. It would have been prudent for Allen to stay away from home if the shooters knew where he lived, because they were never apprehended.

Raymond Petty, Sr. gave an account that supported Mr. Sindel's opening statement - Allen was not going to school of coming home during his later teen years. TR 18-35. Allen told Dr. Yutzy that he left home to protect his family. TR 18A-82.

Prior to the robbery, Allen was not homeless - he was staying frequently at Beverly Oliver's home. TR 15-221. Lucy McLemore stated that Allen was never homeless. Tr 15-269, 279. It also seems that Allen wanted to go home in February, 1997, and had Tasha Valentine call his mother for him. TR 16-6,7. Understandably, Mrs. Allen wanted Allen to call her himself. *Id.*; TR 16-32. The record then and now is silent on whether Allen did so and what was said. Mrs. Allen would seem to be in a position to shed light on this subject. Prior to the robbery, Allen was staying between Tasha's home and Johnnie Grant's house and Beverly Oliver's home. TR 16-23. Prior to the robbery, Allen was welcome to move in with Tasha at her new apartment, but for the fact that she found out that he had also been staying with and dating Marcy and Keisha, 2 young females who would also seem to have been available to the defense. TR 16-44, 48.

The present claims of abuse are exaggerated. If they were true, they could not have been as severe as counsel wants to portray them because Allen was never injured by them and his teachers at school would have noticed the injuries.

### c. Why none of the so-called new information would have made a difference to the outcome

Regardless of whether Mr. Sindel and Simon were deficient for not discovering or presenting certain evidence, this Court can confidently say, without a hearing, that Allen was not prejudiced for several reasons. In the Government's Response, the incriminating facts of the offense were laid out in detail and will not be repeated herein. Doc. 79 at 5-34.

First, as in <u>Wong</u>, much of the evidence that Allen claims should have been presented would have been "merely cumulative." <u>Wong</u>, 130 S.Ct. at 387. "[A]dding it to what was already there would have made little difference." *Id.* Allen put on substantial mitigation evidence and additional evidence on the difficulty of Allen's childhood or the faults of his parents "would have offered an insignificant benefit, if any at all." *Id.* at 388. It actually could have served to confuse the jury and distract it from the mitigation themes that had a causal nexus to the offense.

As in <u>Wong</u>, some of the additional evidence would have also brought with it costs. Each of the witness statements presented contain more fodder for effective cross-examination and additional opportunities for aggravation. For example, very similar to the prior murder evidence in <u>Wong</u>, Allen's defense team had fought hard to successfully exclude any evidence that Allen was in a gang. Such evidence would have been particularly damaging to Allen. Here, Brad Toliver suggests that Allen joined a gang. Ex. 29. The <u>Wong</u> Court pointed out that under <u>Strickland</u>, a reviewing Court must consider all the evidence, both good and bad in evaluating prejudice. <u>Wong</u>, 130 S.Ct. at 386.

Similarly, additional evidence of Allen's alleged abandonment and rejection or abuse would have focused more light on Allen's behavior that led to his mother's actions.[52] The defense team did a good job of portraying a young Allen who needed more help in school and avoided gangs and bad behavior. Additional evidence of what Allen did to justify his expulsion or corporal punishment would have planted a seed that Allen had an anti-social personality from an early point. To attribute PTSD to the death of Marquis had less to do with Allen's

---

[52]Allen stole from his own family. TR 16-232.

121

misconduct.  In addition, the defense did a splendid job of presenting Allen's family as good, hard-working people which gave them more credibility when pleading for Allen's life.  By association they helped the jury to temporarily forget what Allen did.  The quality of Allen's family made this crime all the harder to understand.  It fit with the overarching theme that Allen would have never done this, but for the stronger leading influence of Norris Holder, the architect of the crime.  Presenting too much information about Allen's dysfunctional, criminal paternal side, such as Billy Wayne Allen and John Allen, would have only lead the jury to view Allen's behavior as characteristic of the environment that produced him.  It would have served more to inculpate Allen than to explain or excuse his conduct. A tactic of trashing Mrs. Allen, Allen's sisters, his grandfather, would have given them far less credibility.  Also, the defense team was able to downplay Allen's alleged drug dealing as fantasy, but Billy Wayne Allen would have confirmed it and implicated Allen in more damaging heroin sales for a dealer named Johnnie Boyce.  Ex. 26.

Another reason that more evidence along certain lines would not have made a difference is the fact that no theme was consistently supported by the evidence.  Within each category of theme, there were contradictions and evidence pointing against the existence of the theme or character trait or issue being presented.  For example, Eric Taylor contradicted the aberration theme by stating that he had seen Allen with a .25 caliber firearm and that Allen claimed that he had shot it at someone. TR 16-232.  On the follower/leader topic, Eric Taylor said that Allen was not so much of a follower that he could not resist the lure of gangs.  Allen's counsel also wanted desperately for the jury to think that Allen was not in a gang. TR 16-226.  The reason the house was shot up in January, 1997, was also inconsistent.  Allen told Byron Woodard it was due

to a fight at Northwest Plaza.  Other theories included retaliation for "ganking," something having to with a drug deal, and a basketball bet.  There was general consensus that the shooter was trying to kill Allen. TR 16-243.

There was wide variation among the witnesses who did testify as to when Allen began to decline and what triggered it.  Raymond Petty, Sr. said it occurred when he dropped out of school.  TR 18-17, 18.  At that time his "negative was taking over his positive." *Id.*  He believed that Allen had been heading the wrong way for over 2 years before the offense.  TR 18-32-33.  But, Allen effectively dropped out in Spring 1994, because he was withdrawn on the first day of school in September, 1994, based on his behavior the previous semester, 3 years before he murdered Richard Heflin.  The "Marquis" effect, and Marquis Taylor was killed on May 3, 1995[53], was to cause Allen to stay away from home and not be seen for a while, because the shooter had been after Allen, not Marquis.  TR 18-19.  Of course, the effect was short-lived, because Allen drifted back to his old ways such that shooters targeted him at his home in January, 1997.  TR 18-80 (Dr. Yutzy).

Several witnesses pointed to anger that Allen seemed to have when he became a teenager.  TR 15-142 (Melissa Petty). There was conflict about whether he actually tried to commit suicide.  There was also conflict about how he was feeling the week before the murder.  Barbara Oliver testified that Allen did not appear depressed prior to the offense.  TR 15-226.  Allen told Dr. Yutzy that he was actually feeling better than usual the week preceding the offense and was optimistic about the future.  According to Tracy Eaton, Allen appeared happy in late 1996 when she ran into him where he was working.  TR 15-294.  Similarly, Tasha Valentine

---

[53]TR 18A-8 (Dr. Yutzy).

testified that when she first met him in November, 1996, Allen was not stressed or depressed and never complained of nightmares. TR16-26.

The record was muddy about why Allen did not work. Allen quit jobs. TR 15-271, 272 (Lucy McLemore). Allen did not like to work. TR 17-117. Allen had a job at a chemical plant, but quit after 2 weeks. TR 17-118. But he was happily working at a pizza place when Tracy Eaton saw him in late 1996. TR 15-294. The conflict was whether he did not work because he was a dysfunctional misfit or motivated and interested "if it was what he wanted to do." TR 17-16. Tasha Valentine said that Allen was smart and intelligent. TR 16-23. Allen could focus on what he wanted to according to Deborah Ruffin. TR 15-63 to 15-67. Allen had the ability to be successful. TR 17-20.

Did Allen abuse drugs and alcohol? Claude McLemore said Allen did not drink or do drugs. TR 15-172. Allen told Dr. Wuertz that he supported himself selling drugs. TR 16-34. Allen begged for money on the streets to buy "blunts." TR 16-150. Allen denied to Raymond Petty, Sr. that he was selling drugs. TR 18-17.

Was Allen abandoned by his mother? If he was, why did she twice report him missing? TR 16-189. Was Allen abandoned or did Allen abandon his home? There was evidence that his objective was to leave St. Louis in March, 1997. TR 16-220.          .

Could Allen plan? Allen was talking to Eric Taylor about robbing the bank some time before the event. TR 16-214. Thus, it was not a spur of the moment impulse. Allen's confession and the evidence that he cased the bank contradicted any notion that he could not plan an event as simple as this crime.

The point is that at every turn, defense counsel had a choice of emphasis.  Emphasis on one detracted from the value of another - was his school failure due to a failure to intervene or brain damage; did he have a positive side or was he brain-damaged?  Whatever course defense counsel chose, they had to be concerned about the strength of the evidence to support it.  They had to be concerned with what the actual recollections of family and friends and educators and neighbors endorsed

Habeas counsel's argument treats mitigation as a blank canvas on which they could paint whatever picture they choose.  Both they and the mental health experts seem to blame the failure of the PTSD argument on the wrong choice of stressor.  If the viability of the claim depends on a choice, what does that say about the integrity of the diagnosis?  Even if physically abused, Allen still did not have PTSD for the same reasons established at trial.  The failure of PTSD was not in the lack of an identifiable or correct trauma, but in the lack of symptoms that fit the diagnosis.  More was inconsistent in Allen's behavior than was consistent with the malady.  Did defense counsel and the experts choose Marquis' death as the stressor and then find witnesses to support it or did the witnesses identify a stressor and then the diagnosis was formed based on the facts?

Defense counsel were limited by the actual facts and the truthful recollections of witnesses.  They had to worry about how the real jury, seated, sworn and facing defense counsel, not an imaginary, generic one, would react and perceive certain themes.  And they had to be concerned about what weight the jury will give those themes.  One of Mr. Sindel's points on cross-examination contains, perhaps, the best evidence that more or different mental health evidence would not have mattered to this jury: due to the inexactitude and subjective nature of

mental health expertise, mental health experts rarely agree on a diagnosis. TR 18B-6. Hence, in the final analysis, it is of marginal value, at best, to forensic determinations like punishment.

The Government's cross-examination of the defense experts was effective not because of time-pressure, but because the Government asked good questions and made powerful points. The Government's rebuttal evidence, which was prepared under greater time pressures than that experienced by the defense, was particularly effective. To evaluate the significance of the evidence that Allen and his experts now claim should have been presented, this Court can presume that the Government's cross-examination and rebuttal to said evidence would have been just as effective.

Clearly, the actual mitigation evidence presented a complicated set of facts for defense counsel to weave into consistent themes. The complexity and inconsistency in the facts was but one reason why more evidence on any particular topic would not have had any impact on the outcome. It is a flawed argument to suggest that even more of what did not work would have worked.

What determined the outcome was consistent and not complex - the overwhelming weight of the aggravation evidence and the circumstances of the crime. The primary components, among many were: 1) the manner in which Allen killed Mr. Helfin; 2) the reason he killed him; 3) the complete lack of necessity to kill Mr. Heflin to accomplish the objective; 4) Allen's attempts to obstruct justice; 5) Allen's complete and total lack of remorse; and 6) the fact that Allen continued to shoot Mr. Helfin after he was wounded, defenseless and lying on the ground. It was not more complex than that.

On two of these powerful themes there was complete consistency in the penalty phase: Allen's materialistic motivation and his complete lack of remorse for killing Richard Heflin. From the letters to Johnnie Grant to the experiment that they had done at a club, Allen was obsessed with material possessions and believed that people would treat you better if you had more wealth. TR 14-223, 249, 256. Even in grade school, Allen was concerned about the difference in material wealth between the desegregation children and the Clayton School District residents. TR 15-86; TR 15-285. Tracy Eaton stated that Allen could not accept why others had things and he did not. Allen told lies about his wealth to impress peers. TR 15-105; TR 15-250; TR 16-115; TR 16-145; TR 16-274. Barbara Oliver noted that Allen longed for material things and Allen was very frustrated by what he did not have. TR 15-216, 225. Allen wanted cars and clothes to get girls. TR 16-176; TR 16-184. Eric Taylor stated that Allen wanted to be a "baller." TR 16-216. The way Allen wanted money was the fast way, not the work way. TR 14-225; TR 18-27. The week of the robbery, Allen told Dr. Yutzy that he was feeling better than usual. TR 18A-2, 5. The nickname he wanted to be known by was "Dolla Bill."

A second damning theme was Allen's lack of remorse. He claimed he was not at the robbery. TR 18A-4. Allen's letters to Johnnie Grant boasted about beating the case, not taking responsibility for what he had done. TR 14-249 to 14-262. Allen told Byron Woodard that he just drove and played no other role in the robbery. TR 14-276. There was evidence that Mrs. Allen felt bad about Mr. Heflin, but not one of the witnesses who had visited Allen stated that Allen had any remorse or feelings of sorrow or regret for what had happened to Mr. Heflin. TR 15-69. In his letter to Lucy McLemore, Allen never told her that he participated in the robbery and murder. TR 15-272. His demeanor right after murdering Mr. Heflin was far from

remorseful - he was concerned about her daughter's shoe size. TR 16-14. He seemed normal. TR 16-40, 43. In any of his phone conversations with Tasha Valentine he never said that he was sorry for Mr. Heflin. TR 16-50. As close as Allen came was to state to Claude McLemore that Allen had messed up his, Allen's, life. TR 16-178. There was no recognition or care about what he had done to Mr. Heflin's life and his family's life. Dr. Cuneo attempted to conceal from the jury the parts of his notes in which Allen discussed the offense, because Allen told him that he was not at the bank, was not in the van and was being set up. TR 17-282. Even more inconsistent with remorse, Allen sought help from Samuel Moore to get out of jail for a few days to care of some of his business and then return to jail to fight the case. TR 17-358. Finally, Allen told Dr. Yutzy that he did not shoot anyone. TR 18-75.

The overarching reason that Allen was not prejudiced by any alleged deficiency of his defense counsel in the penalty phase was the clear evidence that Allen killed Mr. Heflin because he stood in the way of the money Allen wanted and that Allen was not sorry for what he had done. As the Supreme Court emphasized in Wong, the burden is on the defense to show a reasonable probability of a different outcome. Given the nature of the crime, Allen's materialistic motive, his lack of remorse, his attempts to obstruct justice, and the qualities of the victim, it is "hard to imagine" additional or different evidence about Allen's past outweighing the facts of the murder. Wong, 130 S.Ct. at 391. The suggestion that more evidence about Allen's father or mother would have produced a reasonable likelihood of a different result is "fanciful." *Id*. In fact, some of the evidence habeas counsel claim should have been used would have done more to hurt Allen than to help him. If habeas counsel had represented Allen and had

128

presented everything that they claim should have been presented, it is morel likely that there would have two, not one, death verdicts.

### K.  Allen was not denied effective assistance of counsel when trial counsel chose not to object to victim impact evidence.

In his § 2255 motion, Allen argued that trial counsel rendered ineffective assistance by failing to renew a motion in limine or otherwise to object to the victim impact evidence introduced in both the guilt phase and penalty phase of trial.  Allen did not identify the victim impact evidence he found objectionable.  Motion at 41-42.

As the Government explained in its response, no victim impact evidence was adduced in the guilt phase.  The testimony Allen characterized as victim impact evidence was not victim impact evidence at all under the FDPA definition.  See 18 U.S.C. § 3593(a)(2).

In his traverse, Allen appears to give up on characterizing the guilt phase testimony as victim impact evidence, and instead now characterizes the evidence as simply "irrelevant and prejudicial."  Traverse at 141.  Allen also finally makes an effort to specify the evidence to which he objects.  He takes issue with discrete, background portions of the testimony of Michael West, Mary Garvels, Lisa Moore, Amy Boehjle, Sandy Foppe, and Virginia Michael, in which those witnesses briefly stated they worked with, and developed a friendship with, Richard Heflin.  Traverse at 141-143.  Allen conveniently omits that, directly following the foundational testimony to which he now objects, the witnesses, without exception, were asked to identify a photograph of Richard Heflin and describe his occupation as a bank guard, his manner of dress as a bank guard, and that he was armed.  Tr. VII 105 (Amy Boehjle), 121 (Sandy Foppe), 149 (Michael West), 175 (Mary Garvels), 208 (Lisa Moore), 289 (Virginia Michael).

Preliminarily, "[i]t is not improper for the government to elicit background information from a witness." United States v. Hanley, 190 F.3d 1017, 1029 (9th Cir. 1999); United States v. Croft, 124 F.3d 1109, 1120 (9th Cir. 1997).  Furthermore, the testimony at issue supplied the necessary foundation for the witnesses to explain the basis and extent of their knowledge of Richard Heflin before identifying him and his occupation, and describing his murder.  See generally Fed. R. Crim. P. 602 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.").  At any rate, Allen's direct quotations of the testimony of the six witnesses at issue account for less than two pages of text in the context of a massive trial record, and even Allen now concedes that these witnesses otherwise "were witnesses to what occurred at the bank on the day of the robbery."  Traverse at 143.

The guilt phase evidence erroneously identified by Allen as victim impact evidence actually was fact witness testimony admitted to prove the elements of the crimes charged and the surrounding circumstances.  That the witnesses introduced themselves to the jury as co-workers and friends of Richard Heflin, and laid the required foundation to identify Richard Heflin and what happened to him, does not render their testimony "irrelevant and prejudicial," and certainly does not transform it into victim impact evidence.  Thus, trial counsel, by choosing not to object to the evidence as victim impact evidence, did not render assistance that fell below the objective standard of reasonableness under prevailing professional norms.  *See* Strickland, 466 U.S. at 688.  Because the evidence properly was admitted, no prejudice inured to Allen.  *See* Id. at 691.

Allen's challenge to the victim impact evidence presented in the penalty phase likewise amounts to shifting sands.  Allen's only basis for challenging that evidence now appears to be

130

that trial counsel moved in limine to limit the number of victim impact witnesses in the penalty phase, this Court denied the motion, and trial counsel did not renew the objection during the penalty phase. Traverse at 143 ("Trial counsel did not object or otherwise renew his motion in limine. This constituted deficient performance."). Allen still utterly fails to identify any offending testimony or to specify any prejudice therefrom, but instead appears to find fault only in trial counsel's failure to renew his objection.

That defense counsel reasonably opted not to renew his objection is clear from the record. This Court expressed it would reconsider its ruling as necessary at the time the evidence was presented, expressed confidence that the "[p]arties understand the statutory scheme which provides for the impact testimony and also the body of . . . cases dealing on that subject," and cautioned the Government not to "go beyond the bounds of either the statute or the case law." Tr. XIV 35-36. The Government heeded the Court's instructions and stayed well within the bounds of the FDPA and cases by presenting the concise testimony of 11 victim impact witnesses accounting for only 88 pages of a more than 1,700-page penalty phase transcript. *See* United States v. Bolden, 545 F.3d 609, 625-27 (8th Cir. 2008) (victim impact testimony from 16 friends, family members, and co-workers, accounting for 80% of Government's penalty phase case-in-chief); United States v. Johnson, 495 F.3d 951, 977 (8th Cir. 2007) (victim impact testimony from six family members); United States v. Nelson, 347 F.3d 701, 713 (8th Cir. 2003) (testimony from six witnesses, accounting for 100 pages of 1,100-page trial transcript); United States v. Barnette, 211 F.3d 803, 818 (4th Cir. 2000) (Barnette I) (testimony from 23 witnesses accounting for 83 pages of transcript); United States v. McVeigh, 153 F.3d 1166, 1216-22 (10th Cir. 1998) (testimony from 38 witnesses).

Notwithstanding Allen's attempt to distinguish this Court's previous rejection of co-defendant Norris Holder's nearly identical argument, Allen cannot escape the Court's recognition that "the victim impact evidence submitted in both cases was substantially the same."  Memorandum & Order at 93; see also Traverse at 145 (acknowledging that "the victim impact evidence in both cases was substantially similar").  Likewise, Allen complains that his appellate counsel was hamstrung by trial counsel's failure to object to the victim impact testimony and the resulting plain error standard of review, yet the Eighth Circuit made clear on Allen's direct appeal that "the district court did not commit any error, much less plain error." United States v. Allen, 247 F.3d 741, 779 (8th Cir. 2001) (Allen I), vacated on other grounds, 357 F.3d 745 (8th Cir. 2004) (emphasis added).

Lastly, Allen's bald claims of prejudice are irreconcilable with the fact that the jury did not find the victim impact non-statutory aggravating factor. Tr. 19, pp. 123, 132.  Accordingly, Allen cannot prevail on his claim of ineffective assistance in this regard.

### L. Closing Argument

With few exceptions, the Government stands on its Response to Allen's arguments concerning ineffective assistance of counsel during closing argument.  Allen cannot establish deficient performance, because the arguments were not improper and were fair response to and comment on defense evidence and arguments.  The Government's arguments in this case were far less harmful than those deemed harmless in the other cases cited in the Government's response.  Allen cannot establish prejudice because he cannot show a reasonable probability that a successful objection to a particular argument would have produced a different result.  Allen's attempt to draw meaning from the jury's split verdict is nothing more than speculation.

132

### 1. Nexus

The Government's arguments concerning nexus were not improper.  The Government's arguments were proper both on the question of which mitigators the jury should find and on the question of what weight to attribute to the mitigators it did find.[54]  Allen's mistake is to confuse consideration of mitigating evidence with accepting mitigating evidence as mitigating. Allen does not cite any case which stands for the proposition that a capital jury must "give effect to all mitigating evidence."  Rather, the cases cited by Allen state that the government cannot preclude a jury from giving effect to any mitigating evidence it chooses to find.  Allen is correct that Lockett v. Ohio, 438 U.S. 586 (1978), and Eddings v. Oklahoma, 455 U.S. 104 (1982), require that a jury "be able to consider" mitigators.  Doc. 94 at 146.  But they do not hold that a jury must consider them if they find they are not proven or are not mitigating of punishment.  Simply because a defendant puts a mitigator before a jury does not mean that they must give effect to it in the sense that it they must find it and agree that it is mitigating of punishment in the circumstances of the case.

United States v. Paul, 217 F.3d 989, 1000 (8th Cir. 2000), sets out the 2-step process for finding mitigators. The Government was entitled to argue that certain mitigators were not proven as a matter of fact and did so.  The Government was entitled to argue that certain mitigators were not mitigating of punishment in the context of the circumstances of all the evidence, which includes the circumstances of the crime.  Those circumstances did not disappear from the

---

[54]Allen Traverse argument ignores the careful process that the FDPA sets out.  The verdict form explained this process to the jury in great detail and its findings progressed from eligibility elements to aggravators and mitigators to the weighing/selection decision.  Each of these steps is a properly subject to argument about what the jury should do and how it should do it.

133

equation simply because the guilt phase was over.  In so arguing, the Government did not express an opinion or take a position on the potential validity of a claimed mitigating fact, but it did argue against the jury finding particular mitigators.  In none of the Government's arguments did Mr. Dowd suggest that mitigators once found should be ignored or not considered, but he did argue that they were entitled to little or no weight.  None of his arguments placed any <u>limit</u> on what they <u>could</u> consider mitigating if they did not agree with Mr. Dowd's suggested yardstick.  None of his arguments argued anything contrary to the limits of the law.

The cases relied on by Allen all involve legal limitations on what they jury <u>could</u> consider, not prosecution arguments about what the jury <u>should</u> consider mitigating.  Also, no case states that the Government may not also[55] argue the relative weight to be assigned to mitigators and aggravators found by the jury.  Here, the Government did nothing to prevent the jury from being <u>able</u> to give effect to whatever mitigator it found (including the ones it found on its own).  Providing them with a reasoned basis for finding that the mitigators were not proven or that they were not mitigating of punishment was proper and not objectionable.

The Government's so-called nexus arguments were also fair response to the evidence presented by Allen in support of his mitigators.  As discussed, *supra*, much of Allen's mitigation evidence was specifically directed at providing a causal explanation for why Allen followed Holder, for why Allen acted impulsively in a stressful situation, for why he exercised bad judgment and for why he may have perceived the robbery as his only means to obtain the money he so desperately craved.  Having presented evidence of several causal theories for Allen's conduct, which causes he allegedly had little or no control over, the Government was surely

---

[55]

134

permitted to argue that such evidence was not a causal explanation.  In terms of what was mitigating of punishment before finding mitigators, it was appropriate for the Government to suggest a method of analysis where the law provided none, namely whether the mitigator had anything to do with what Allen did and why he did it.  The question, after all, was what was appropriate punishment for conduct.

Allen also overlooks the fact that jurors likely rejected his brain damage and PTSD mitigators, among others, not because the mitigator lacked a nexus to the crime, but because Allen failed to convince the jury that he had brain damage or PTSD.  The Government's cross-examination and rebuttal evidence on these particular issues was extremely effective.

The Eighth Circuit recently considered nexus arguments.  In United States v. Rodriguez, 581 F.3d 775 (8th Cir. 2009), the defense objections to numerous arguments had been overruled and therefore reserved for plenary appellate review.  Rodriguez, held that numerous arguments were not improper.  Rodriguez generally supports the Government's position here that counsel was not ineffective for failing to object, because even if he had objected to the arguments they would have been found not to warrant reversal even under a plenary review standard.  But more specifically, Rodriguez held that nexus arguments similar to and stronger than those here were not improper for the reason that none of them directed the jury to disregard or ignore the mitigators.  Similarly, in this case, Mr. Dowd did not direct the jury to disregard or ignore mitigators - he argued that in considering them they should not find certain mitigators mitigating of punishment, and therefore not weigh them, in the circumstances of this case without a nexus.

**2. Emotion**

135

A single improper argument in the context of the evidence and arguments as a whole did not deprive Allen of due process or a fair trial.  The prejudice to defendant from the isolated reference to Allen as a "murderous dog" was *de minimus* compared to the prejudice and emotional impact on the jury of the crime committed by Allen.  Words could hardly have the impact on the jury that the facts of the case had.  "Murderous" was an accurate description of Allen given the facts and referring to him as a "dog" could not have been more prejudicial than being murderous.

Allen's Traverse argument that basketball is racist is ridiculous.  This is nothing more than a bootstrap attempt to make race an issue in this case.  Why is a basketball reference racist?  Has habeas counsel ever watched basketball?  African-Americans do not have a monopoly on basketball.  Basketball was part of the defendant's mitigation evidence - it is what he did in his free time in jail and it was what he aspired to do in life (beside rap).  Allen wrote about it in his letters.  The Government also rejects Allen's suggestion, authored by his counsel who did not participate in the trial, that the trial had "overt racial significance."

### 3. Miscellaneous Arguments

In Allen's Traverse he delineates several arguments which he claims were based on "particular knowledge and experience."  Doc. 94 at 151.  These warrant only brief response: 1) "doing this for about 20 years" was a reference to practicing law and appearing before juries, something which would have been obvious to jurors based on Mr. Dowd's age; 2) "the kind [of violence] you just don't see" in bank robberies was something which was common knowledge and common sense because any juror knew that such violence was not necessary to rob a bank; 3) "I think that's a joke" was a fair comment on the utter lack of evidence supporting the claim

of a "severe" mental disturbance; 4) "I think he smoked pot to get high" was supported by the evidence that Allen drank and smoked because it made him more creative as a rap lyric writer; 5) the suggestion that Marquis was killed because Allen "ganked" someone was supported by evidence[56] that the shooter was after Allen, not Marquis Taylor, and that Allen did "gank" people in the neighborhood as well as sell drugs; and 6) the extent to which the case cried out for the death penalty was not linked to any claim of unique knowledge or expertise and was not improper or prejudicial in the context of the arguments as a whole.  Mr. Dowd did not emphasize his position of authority or personal opinion on the death sentence, even though that opinion had to have been obvious to the jury just as defense counsel's opinion was obvious.

### 4. Prejudice

The cumulative effect of any improper argument was not great in the context of all the arguments.  The strength of the arguments for death was strong as compared to the strength of the mitigation. And the Court's instructions that argument was not evidence is entitled to some weight in the analysis, although obviously not dispositive.  Taken as a whole, any improper arguments together with defense counsel's failure to object does not meet the prejudice prong of Strickland.

### M.  Allen Was Not Denied Effective Assistance of Trial and Appellate Counsel Because There Was No Objection to the Use of "Pecuniary Gain" as a Statutory Aggravator

Despite having accused trial counsel and appellate counsel of rendering ineffective assistance by failing to object to and appeal the submission of the pecuniary gain aggravating factor, Allen can muster in his traverse only that "Mr. Allen has no response to the government's

---

[56]This evidence is discussed in the Section J, *supra*.  TR 18-19.

arguments regarding Ground M." Traverse at 158. Allen's failure to respond is dictated by the now well established proposition that the pecuniary gain aggravator in 18 U.S.C. §3592(c)(8) is applicable to robbery cases like this. *See*, e.g., United States v. Bolden, 545 F.3d 609, 615-16 (8th Cir. 2008) (agreeing with "[a]t least five other circuits . . . that § 3592(c)(8) applies, not only to murder-for-hire, but also when the murder itself, and not just the underlying offense such as robbery, was committed with the expectation of pecuniary gain); United States v. Mitchell, 502 F.3d 931, 975 (9th Cir. 2007) ("Section 3593(c)(8) by its plain terms applies to robbery scenarios in which the defendant is motivated to kill for pecuniary reasons."); United States v. Brown, 441 F.3d 1330, 1370 (11th Cir. 2006) (holding pecuniary gain aggravator applies to some but not all robbery/murder scenarios); United States v. Barnette, 390 F.3d 775 (4th Cir. 2004) (Barnette II) (holding pecuniary gain aggravator applies to carjacking in which murderer took car and victim's credit cards); Perry v. Lockhart, 871 F.2d 1384, 1392-93 (8th Cir. 1989) (holding submission of pecuniary gain aggravator did not violate Eighth Amendment or Due Process despite that aggravator duplicated element of underlying robbery murder); United States v. O'Reilly, No. 05-80025, 2007 WL 2420830 at 7 (E.D. Mich. Aug. 23, 2007) (rejecting movant's argument that submission of pecuniary gain aggravator in robbery murder violates Eighth Amendment); Cummings v. Polk, No. 5:01-HC-910-BO, 2006 WL 4007531 at 17-18 (E.D.N.C. Jan. 31, 2006) (holding petitioner's constitutional rights not violated by submission of pecuniary gain aggravator in robbery murder).

### N. Non-Statutory Aggravator

Allen's Amended Motion claimed that trial counsel was ineffective because there was no objection to the submission of the non-statutory aggravator "Was Billie Jerome Allen's conduct

138

in committing the offenses substantially greater than that described in the definition of the crime, apart from the statutory aggravating factor."   In his Traverse, Allen concedes that trial counsel did, in fact, object to this non-statutory aggravator in his Motion to Dismiss Government's Notice of Intent to Seek Death Penalty and for Other Appropriate Relief.  Allen maintains in his Traverse that appellate counsel should have raised the issue on appeal, specifically that it was so vague that it failed to narrow the class of cases available for the death penalty, and therefore violated the Eighth Amendment.

On appeal, Allen in fact did challenge the use of non-statutory aggravators and the Court of Appeals held that they did not violate the constitution.  The Court distinguished between statutory and non-statutory aggravating circumstances.  The Court stated: "The statutorily defined aggravating circumstances are those which channel the sentence's discretion because they are the circumstances which make a defendant eligible for the death penalty."  United States v. Allen and Holder, 247 F.3d 741, 757 (8th Cir. 2001) (Allen I).

> The primary purpose of the nonstatutory aggravating factors, as opposed to the listed statutory aggravating factors which do fulfill the role of limiting and guiding a jury's discretion in making the eligibility decision, is to allow for the individualized determination of whether a death sentence is justified for a particular defendant; that is, they help to inform the selection decision.

Allen I, 247 F.3d at 757.

The Court concluded that "The framework of the FDPA passes constitutional muster because it does not allow imposition of the death penalty unless the jury first finds at least one *statutory* aggravating circumstance."  Allen I, 247 F.3d at 758 (emphasis in original).

Allen also contends that the "greater in degree" factor was unconstitutionally vague.  As fully outlined in the Government's Response, Allen cannot show prejudice on this issue.  His

139

co-defendant Holder specifically challenged the "greater in degree" aggravating factor on the

grounds that it was unconstitutionally vague.  The Court rejected his argument:

> The "substantially greater in degree" language, combined with the district court's submission to the jury of the statutory elements of each offense to which Holder was convicted, provided the jury a sufficient common-sense core meaning of the aggravating factor that it was capable of understanding and applying. The relative seriousness of a crime is a factor that is routinely taken into account by sentencing courts. *See, e.g., United States Sentencing Guidelines,* § 5K2.0 (allowing an upward departure "if the factor is present to a degree substantially in excess of that which ordinarily is involved in the offense")(emphasis added). We therefore find no vagueness problems with this aggravating factor.

Allen I, 247 F.3d at 787.  Thus, the Court of Appeals has rejected the same argument here

advanced by Allen.

Allen's Traverse now contends that the Court would have adopted his argument against

the "greater in degree" aggravating factor--despite its rejection of Holder's claim–because the

prosecutor's closing argument in Allen was improper whereas it was appropriate in the Holder

case.  This argument is belied by the record in each case.

> In the Holder case, the U.S. Attorney argued that:
>
> Let's look at the first one, that the crime is greater in degree than that described in the definition of the offense.
> I have really discussed already in many ways.
> But the definition of the offense is for someone to go into the bank, take money that is in the care and custody of the bank, by force, violence or intimidation, and that the money insured.
> They did much more than that, in every way.
> The violent takeover, the three getaway vehicles, planning to burn one, the incredible arsenal of weapons that they had, the six–five or six extra clips that you see here on the table this defendant had ready for more killing.
> The danger that they presented all of these people at the bank and in the park.
> The extravagant planning for a period of months before this crime, a plan that had nothing in it but eventual mayhem, total maliciousness and mayhem were the end result of this plan from the beginning.
> Absolute violence, total intimidation, massive force.
> That was the plan; and that's what they did.

Holder Trial Transcript, 4-3-98, pp. 12-173-4.

> In the Allen trial, the U.S. Attorney argued:
>
> Let's look at the fact that the crime is greater in degree than that described in the definition.  This is a violent bank takeover, the kind you just don't see.  They are heavily armed with military weapons.  They've got 205 rounds of ammunition.  They have a second shotgun in the second van.  You know what that's for.  That's to stop anybody from getting their cash money from them when they're getting away.  And you know this defendant was carrying these and his extra rounds of the Chinese gun because he was literally going to be riding shotgun with this, ready to kill anyone who tried to take their money from them or tried to stop them from getting away.
> They intended to burn that van.  That is extreme in degree. The defendant had all of those rounds for killing.  His intent was obvious.  Trying to shoot at another person like Michael West.  This crime that was committed by these defendants is much greater in degree that would normally be seen in a bank robbery.
> These was absolute violence, total intimidation, massive force, extravagantly planned, elaborately planned with total destruction and mayhem in mind.

Tr. Trans., 3-9-98, pp. 50-1.

These two arguments are almost identical.  Each discusses the "absolute violence, total intimidation, massive force" used in the robbery.

In finding that there was sufficient evidence to support the "greater in degree" aggravating factor, the Court echoed the arguments made in both cases:

> As for the sufficiency of the evidence in support of this factor, our review of the record convinces us that the circumstances of the killing in this case were enough for a jury to find that the conduct of Holder (and his aider and abettor Allen) was substantially greater in degree than the definition of the crime. There were three firearms involved including two semiautomatic rifles; Holder and Allen had approximately two hundred rounds of ammunition, most of which was hollow point ammunition designed to inflict more serious wounds than regular ammunition; sixteen shots were fired inside the bank and at least three bank employees besides Heflin were almost hit; Holder was well aware that security guard Heflin would be at the bank in uniform and carrying a weapon during the time of the armed robbery, and Heflin was shot at least eight times; and two vehicles were stolen for use as getaway vehicles, one of which started on fire while containing live rounds of ammunition. In sum, there is sufficient evidence to support the jury's finding.

141

Allen I, 247 F.3d at 787-8.

Allen cannot show that he was prejudiced by appellate counsel's failure to specifically challenge the "greater in degree" aggravating factor. The Court should reject this claim without a hearing.

### O. Ineffective Assistance of Appellate Counsel re Grand Jury Indictment

Allen's 2255 Motion left the Government and this Court in the dark as to what authority appellate counsel[57] was ineffective for failing to cite. Allen revealed the identity of the authority in his Traverse: Campbell v. Lousiana, 523 U.S. 392 (1998), and Russell v. United States, 369 U.S. 749 (1962). Campbell dealt with the question of the racial composition of a grand jury and *dicta* commented on the importance and role of the grand jury. The Campbell Court commented that one of the roles of the grand jury the important decision whether or not to charge a capital crime, *citing* Vasquez v. Hillery, 474 U.S. 254, 263 (1986). The en banc court in Allen III, United States v. Allen, 406 F.3d 940 (8th Cir. 2005), was not unmindful of the role of the grand jury. In fact, Vasquez was discussed in the oral argument[58] in Allen II, Allen III and in post-argument filings by the parties. Copies of the relevant post-argument filings are contained in Addendum 16 and clearly show that appellate counsel brought Vasquez and Campbell to the

---

[57]Michael Gross, a respected private practitioner specializing in appellate practice, represented Allen, along with Mr. Simon, at the *en banc* argument. In the time permitted to respond to Allen's Traverse, the Government has not been able to locate the oral argument transcript from the en banc argument, but the question of the role and purpose of the grand jury was before the *en banc* court.

[58]The oral argument tapes can be obtained but the Government's notes of those arguments reflects that Vasquez was discussed.

Court's attention.  The grand jury's purpose and role was a focal point of written and oral arguments before the 8th Circuit.

In any event, Allen reads too much into the Campbell *dicta*, and wrongly presumes that the Court was recognizing a nullification power in the grand jury.  Other cases, which arose in factual contexts where the scope of grand jury powers was actually at issue, have clarified that the role of the grand jury is to determine simply whether there is probable cause to support the charges presented.  *See*, Allen III, 406 F.3d at 946 (cases cited).  The grand jury protection in the constitution is designed to prevent unfounded charges, not to second-guess the prosecutorial discretion of the executive branch.

The same is true of Russell v. United States, 369 U.S. 749 (1962).  Allen takes the phrase "fair method for instituting criminal proceedings", *id*. at 761,  and translates it into "a historical check on the power of the prosecutor."  Doc. 94 at 163.  Allen is correct, but not in the sense of supplanting prosecutorial discretion.  The "fair method" is satisfied if the grand jury finds probable cause.  It is a check on the prosecutor instituting unfounded charges - those not supported by probable cause.

Not only did the Eighth Circuit *en banc* overrule the panel decision in Allen II, United States v. Allen, 357 F.3d 754, 758 (8th Cir. 2004), but the original panel (with the exception of Judge Richard Arnold who did not participate in the en banc decision) agreed that Allen II was wrongly decided.   There was also no doubt that the grand jury indictment error was not structural and therefore subject to the Chapman v. California, 386 U.S. 18 (1967), harmless error standard.  Accordingly, it was not inappropriate for the Court to determine what the grand jury would have done and it applied the most restrictive of the available tests.  The Court determined

that based on the evidence that <u>was actually</u> presented to the grand jury, it would have found at least one statutory aggravator, if asked.  As the Government argued in <u>Allen III</u>, prior decisions of the Supreme Court had already held that the failure of a petit jury to find essential elements was not structural error and it was inconceivable that the 6th Amendment jury trial right was worthy of less protection that the 5th Amendment grand jury indictment right.  <u>Neder v. United States</u>, 527 U.S. 1 (1999).

Citing <u>Campbell</u>[59] and <u>Russell</u> to the Eighth Circuit, would not have changed the outcome of <u>Allen III</u> and appellate counsel were not ineffective.

### P. Standard of Proof For The Weighing Decision

To be clear, it is the Government's position that to the extent this is a substantive claim, it is procedurally barred and <u>Teague</u>-barred.  Allen fails to meet the cause and prejudice exception to obtain review of the substantive issue.  The Government also perceives Allen's claim as a claim of ineffective assistance of appellate counsel for failing to raise this issue on appeal at some point during the lengthy direct appeal life of this case.

The Government's Response adequately addressed this issue and none of the arguments raised in the Traverse weaken the strength of the Government's response.  It does appear that Allen has abandoned any claim that his grand jury indictment rights were violated by the failure of the grand jury to find non-statutory aggravators or the weighing decision.  Allen's alternative claim was not misunderstood in the Government's Response.  The weight of authority and a proper application of the relevant constitutional principles supports a finding that appellate counsel was not ineffective, because Allen cannot establish that had he raised the argument that

---

[59]<u>Campbell</u> <u>was</u> cited in Allen's en banc Motion for Rehearing.  Addendum 16.

the petit jury should have been instructed to find the weighing decision beyond a reasonable doubt, he would have prevailed in having his death sentence vacated.

United States v. Purkey, 428 F.3d 738 (8th Cir. 2005), is controlling authority in this circuit on this issue. Purkey did address the question whether the indictment should have found the weighing decision, but the logic of Purkey is controlling as to the petit jury instruction issue a well. The only reason this case was remanded in light of Ring v. Arizona, 536 U.S. 584 (2002), was because after Apprendi v. New Jersey, 530 U.S. 466 (2000), at least one statutory aggravator was an essential element of capital murder to increase the maximum penalty to death. This was a natural consequence of the determination that facts which increased the statutory maximum were essential elements and it was axiomatic that essential elements had to be proven beyond a reasonable doubt - the holding of Apprendi. Purkey is determinative of Allen's claim here, because Purkey held that the weighing decision did not have to be alleged in the indictment for the reason that it was not an essential element[60]. Thus, the logical extension of Purkey is that the weighing decision does not have to be found by the jury beyond a reasonable doubt, because the weighing decision is not an essential element or fact which increases the statutory maximum to death - the requisite mental state and at least statutory aggravating factor does that under the FDPA. Allen fails to provide any principled basis upon which to find that the weighing decision is an essential element for purposes of petit jury determinations, but not an essential element for grand jury indictment right purposes. The teaching of Ring is that essential elements are equivalent for grand and petit jury purposes. Further support for the correctness of the Government's position can be found in Jones v. United States, 527 U.S. 373, 376-81 (1999),

---

[60]The Government's Response discussed the rationale for Purkey's holding.

which was the source of <u>Apprendi</u> rights, which distinguished between the FDPA's eligibility (<u>Apprendi</u> applies) and selection (<u>Apprendi</u> does not apply).

As discussed in the Response, <u>Purkey</u>[61] is also in accord with other circuits that have directly addressed Allen's petit jury argument and *dicta*[62] in <u>Kansas v. Marsh</u>, 548 U.S. 163 (2006).

### Q.  The Manner in Which the Government Would Carry out Allen's   Execution Would Not Violate the Eighth Amendment.

Allen argues that his execution pursuant to the Federal Bureau of Prisons' protocol for lethal injection would violate the Eighth Amendment.  The Supreme Court recently has held directly contrary to Allen's position.  *See* <u>Baze v. Rees</u>, 128 S.Ct. 1520, 1537-38 (2008). Specifically, the Supreme Court held that Kentucky's lethal injection protocol, which is substantially similar to the protocols of 35 other states and the federal government, does not violate the Eighth Amendment.  <u>See</u> <u>Baze v. Rees</u>, 128 S.Ct. 1520, 1537-38 (2008).

Although Allen would limit <u>Baze</u> to its facts, <u>Baze</u> is not as narrowly tailored as Allen would have this Court believe.  In addition to deciding the narrow issue of the constitutionality of Kentucky's protocol, the plurality opinion of the Court made clear that "[a] State with a lethal injection protocol substantially similar to the protocol we uphold today would not create a risk that meets [the cruel and unusual punishment] standard."  <u>Id</u>. at 1537.  In an obvious effort to

---

[61]<u>Purkey</u> was recently reaffirmed by a different panel in <u>United States v. Rodriguez</u>, 581 F.3d 775 (8th Cir. 2009), wherein it held that non-statutory aggravators were not essential elements that needed to be included in the indictment.

[62]Allen devotes much of his Traverse to first propping up a straw man, that the Government argued that <u>Marsh</u> was controlling, and then knocking it down.  The Government merely stated in its response that dicta in <u>Marsh</u> supported <u>Purkey</u> and the other circuits that have rejected Allen's argument.  The Government did not argue that <u>Marsh</u> was controlling.

avoid "transform[ing] courts into boards of inquiry charged with determining 'best practices' for executions," id. at 1531, the plurality repeatedly noted the substantial similarity, and therefore the presumptive constitutionality, of the protocols of the other 35 states and the federal government. *See* Id. at 1525-26 (noting that "[l]ike 35 other States and the Federal Government, Kentucky has chosen to impose capital punishment for certain crimes" by lethal injection); Id. at 1526-27 ("A total of 36 States have now adopted lethal injection as the exclusive or primary means of implementing the death penalty . . .. It is also the method used by the Federal Government."); Id. at 1527 ("Of these 36 States, at least 30 (including Kentucky) use the same combination of three drugs in their lethal injection protocols."). To avoid precisely the "extensive evidence developed in evidentiary hearings" Allen claims is necessary to resolve this issue, Traverse at 169, the plurality made abundantly clear:

> In applying these standards to the facts of this case, we note at the outset that it is difficult to regard a practice as 'objectively intolerable' when it is in fact widely tolerated. Thirty-six States that sanction capital punishment have adopted lethal injection as the preferred method of execution. The Federal Government uses lethal injection as well. This broad consensus goes not just to the method of execution, but also to the specific three-drug combination used by Kentucky. Id. at 1532.

In applying Baze, several courts have rejected the narrow reading Allen proposes here and denied other petitioners' challenges to substantially similar lethal injection protocols. *See*, e.g., Cooey v. Strickland, 589 F.3d 210, 215 (6th Cir. 2009) (noting that petitioner "previously challenged Ohio's old execution protocol, one that mirrored the Kentucky execution protocol in all material respects and was upheld by the United States Supreme Court. *See* Baze v. Rees, *supra*."); Harbison v. Little, 571 F.3d 531, 536 (6th Cir. 2009) ("Given the direction in Baze that a protocol substantially similar to Kentucky's would not create a risk that violates the

147

constitutional standard set forth in the Court's opinion, Tennessee's protocol must be upheld because Baze addressed the same risks identified by the trial court, but reached the conclusion that they did not rise to the level of a constitutional violation."); Emmett v. Johnson, 532 F.3d 291, 300 (4th Cir. 2008) (affirming district court's grant of summary judgment and declining to remand for further evidentiary hearing because "Virginia's protocol is substantially similar to Kentucky's protocol" and petitioner failed as a matter of law to demonstrate the level of risk required by Baze).

For these reasons, the Supreme Court's decision in Baze is dispositive here, and "extensive evidence" in a litany of "evidentiary hearings" is not required.

At any rate, Allen's mere allegation that the federal protocol violates the Eighth Amendment is utterly insufficient.  Allen's raising the issue and then suggesting to this Court that it should "hold that any consideration of this ground at this time is an unnecessary waste of judicial resources," Traverse at 168, comes nowhere close to meeting Allen's burden under Baze to establish that the protocol creates a demonstrated risk of severe pain and that the risk is substantial when compared to the known available alternatives.  *See* Id. at 1537.  As Allen has not even attempted to meet his burden, this ground should be denied.

### R. Cumulative Effect

Allen argues that, even if none of his claims merits relief individually, he should be granted relief because the cumulative effect of alleged ineffective assistance or prosecutorial misconduct caused prejudice to him.   The Eighth Circuit Court of Appeals has rejected the cumulative error theory of post-conviction relief.

In Middleton v. Roper, 455 F.3d 838, 851 (8th Cir. 2006), the Court stated:

We repeatedly have recognized "a habeas petitioner cannot build a showing of prejudice on a series of errors, none of which would by itself meet the prejudice test." Hall v. Luebbers, 296 F.3d 685, 692 (8th Cir.2002) (citation omitted); see, e.g., United States v. Robinson, 301 F.3d 923, 925 n. 3 (8th Cir.2002) (recognizing "the numerosity of the alleged deficiencies does not demonstrate by itself the necessity for habeas relief," and noting the Eighth Circuit's rejection of cumulative error doctrine); Wainwright v. Lockhart, 80 F.3d 1226, 1233 (8th Cir.1996) ("Errors that are not unconstitutional individually cannot be added together to create a constitutional violation." (citation omitted)); Scott v. Jones, 915 F.2d 1188, 1191 (8th Cir.1990) (holding "cumulative error does not call for habeas relief, as each habeas claim must stand or fall on its own" (citation omitted)). Therefore, we have no hesitancy in rejecting Middleton's argument and concluding the cumulative effect of alleged trial counsel errors is not grounds for granting habeas relief.

The Court reiterated this position in United States v. Brown, 528 F.3d 1030, 1034 (8th Cir. 2008): "Brown acknowledges that we have repeatedly rejected the cumulative error theory of post-conviction relief."

None of Allen's claims merits relief.  The Court should deny Allen's assertion that the cumulation of those claims caused prejudice to him.

**IV. Conclusion**

Allen withheld much of the support and rationale for his claims from his original 2255 Motion.  He has now attempted to clarify his grounds and in doing so has asserted grounds that were not raised in the original motion.  These new grounds are time-barred and Allen has not demonstrated that he is entitled to amend his Motion.  Allen has had two opportunities to convince this Court that he is entitled to relief or that any particular issue warrants a hearing.  As in Holder's 2255 proceeding, the Government requests this Court to delineate which, if any[63], of Allen's claims warrant a hearing.  Following that determination, the parties can engage in discovery preparatory to any hearing.  If this Court provides Allen with any further briefing

---

[63]The Government suggests that no hearing at all is warranted on any of Allen's claims.

opportunities, the Government requests an opportunity to convince this Court that new

arguments have been raised and that the Government should have an opportunity to respond still

further.

Respectfully submitted,

RICHARD G. CALLAHAN
United States Attorney

_/s/ Steven E. Holtshouser_
STEVEN E. HOLTSHOUSER, #24277
CARRIE COSTANTIN, #54734
JOSEPH M. LANDOLT, #6484
CRISTIAN M. STEVENS, #98871
Assistant United States Attorneys
111 South 10th Street, 20th Floor
St. Louis, MO 63101
(314) 539-6894

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 19, 2010, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon:


Elizabeth Unger Carlyle
Attorney at Law
P.O. Box 962
Columbus, MS 39701

Joseph M. Cleary
Attorney at Law
1455 N. Pennsylvania
Indianapolis, IN 46202


*/s/Steven E. Holtshouser*