Case: 4:07-cv-00027-ERW    Doc. #: 110-2    Filed: 03/19/10    Page: 1 of 3 PageID #: 1775

# CELEBRATING OUR 20TH YEAR

# SCIENTIFIC SLEUTHING

# REVIEW

PROPERTY OF ST. LOUIS POLICE LIBRARY

### forensic science in the courts

volume 20, number 4 — ISSN 1043-4224 — Winter, 1996

# Forensic Science on the Ropes
## Procellous Times in the Citadels of Infallibility

by James E. Starrs
Professor of Law and Professor of Forensic Sciences
The George Washington University

## The FBI Lab Takes Its Licks

Remember "where's the beef?", which was something of a sequel to "what's up Doc?" Now we know that there is a severe "beef" with the F.B.I. Laboratory but we are not yet fully informed as to the extent of "what's up." Enough has been leaked about the Inspector General's extensive draft report to indicate that the F.B.I. Laboratory will be justly taking some very hard knocks.

After U.S. District Court Judge Edward Lodge held the F.B.I. in contempt of court in 1993 for its "callous disregard for the rights of the defendants (in the Ruby Ridge, Montana shoot-out) and the interests of justice and (its) demonstrate(d) complete lack of respect for the order and directions of (the) court" the F.B.I.'s heady stature as being beyond reproach in the public's eyes suffered a body blow of immense proportions. Much of that which caused Judge Lodge to lose patience with the F.B.I. had resulted from snafus (to be polite) in the F.B.I. Laboratory's processing of physical evidence involving the debacle at Ruby Ridge.

continued on page 4…

## An Upper Cut to Fingerprinting

### The Bad News

The word is out and it is enough to startle, perplex and lay fingerprint examiners low. The short of it is that fingerprint identifications are worse than on the ropes. They are down and verging on being counted out. This citadel of forensic science is not only fissure-ridden. It is veering towards collapse, if this report of the results of an International Association for Identification sponsored proficiency testing program can be credited.



**Down for the *Ridge* Count**

11 - A

INSIDE... INSIDE... INSIDE... INSIDE... INSIDE... INSIDE... INSIDE... INSIDE...

The Partisan Defense Expert in Texas - page 8
DUI for Attorneys and Others - page 14

The Quadro Tracker Axed - page 10
Oklahoma City Explosives Find - page 17

*vol.* 20 no. 4

## The I.A.I. Proficiency Test

A proficiency test was the medium of disclosure of this "dismal" situation in the ranks of fingerprint examiners. In this Collaborative Testing Service's external proficiency testing of fingerprint examiners in 1995 the test was, for the first time, "designed, assembled, and reviewed by those representing the International Association for Identification." Seven supposititious latent (crime scene) prints were provided which were to be compared individually to four inked ten-print cards which were asserted to be known standards. In fact five of the seven latents were from "persons whose inked fingerprints were provided." The other two latent impressions were not included among the four exemplars.

## The "Dismal" Results

156 fingerprint examiners were tested. Of these "only 68, or 44%, had correctly identified the five latent impressions as well as correctly noted the two eliminations." 88 or 56% "provided divergent (read as wrong, incorrect, erroneous) answers." Whether these divergent responses were to all of the seven latents or to only some of them we are not informed in this report on the test results. Six respondents were declared to have "failed to identify any of the latent prints", resulting in false negatives. "In such instances, valuable evidence would be negated, and the likelihood of repeated offenses would be increased." But the six errant (false negatives) examiners were a small percentage of the 88 who had submitted "divergent" answers.

## False Positives Bulked Largest

It is reported that of the 156 examiners 48 included "erroneous identifications." This was said to result "in actual casework" in an alarming "one in five" instances where "damning evidence" would have been presented "against the wrong person." False positives of this statistical magnitude (even though the basis for the statistical conclusions is clearly murky - at least as contained in this report) were said to give rise to "a serious concern requiring immediate action." As the author of this commentary (who is none other than the editor of the Journal of Forensic Identification, which is the official publication of the International Association for Identification) puts it in its most draconian form: "If one in five latent print examiners truly possesses knowledge, skill, or ability at a level below an acceptable and understood base line, then the entire profession is in jeopardy."

## The Remedy?

The desperate plight of accuracy in fingerprint identifications having been revealed, it remains to propound remedial measures. The author of this report does not waffle. He does not take kindly to the necessity for "categorical absolutes of certainty posing as science." Fingerprint examiners should be free, so he maintains, to declare a match with less than absolute certainty. That may be "a place to start" in correcting the noted deficiencies, he concludes.

## Au Contraire

In reply, this commentator would most vociferously riposte - au contraire. To release fingerprint examiners from a locked-step adherence to the categorical imperative of stating their opinions of an identification as a matter of absolute certainty would merely sweep the problem of misidentifications under the convenient cover of less than absolute statements of an identification.

If a fingerprint identification is wrong when stated as a firm matter of absolute certainty, it does not gain credibility by expressing the identification as reasonably probable. A reasonably probable identification can be just

# SCIENTIFIC SLEUTHING REVIEW

A quarterly publication of Scientific Sleuthing, Inc. a non-profit corporation devoted to the study of forensic science in the courts

James E. Starrs
Charles R. Midkiff
**senior editors**

Duayne J. Dillon, D.Crim.
George C. Stephens, PhD
**contributing editor**

Barbara A. Starrs
**editor**

Nancy K. Raber
Seamus na Realta
**writers**

Dale Wise
**artwork**

address all correspondence and subscriptions to:

**SCIENTIFIC SLEUTHING**
c/o Prof. James E. Starrs
The GWU National Law Center
Washington, DC 20052
FAX: 202/994-9446

Subscription Rates are $20 per year for individuals, $25 per year for libraries and government agencies.

◆ **BACK ISSUES ARE AVAILABLE** ◆

Scientific Sleuthing                                                                                        page 3

as erroneous as one stated as a matter of absolute certainty and, what is more, a creature of greater deviltry for it can provide a medium for identifications which should, by all rights, be declared to be exclusions. Moreover the verbiage of less than absolute identifications can be deceptively misleading to juries who must put it to use in their decision-making.

### Worse Yet - The test was not blind

This troubling report of the "dismal" performance of fingerprint examiners on this proficiency test glosses over other concerns that could knock fingerprint identifications right out of the ring (to continue the boxing metaphor) of legitimate forensic science applications. It is to be recalled that this proficiency test was not blind. The respondents were surely on notice that they were being tested and such notice must have put them on their guard to do their very best. Even if the test subjects received no forewarning and were tested in a "snap quiz" format, still they should have been more attentive to the task than they would have been in the regular course of business. Assuming such an alert and quickened mind-set, the results can be perceived as even more dismal.

### The Testing Varied from the Norm

Moreover the testing format was not that encountered in the normal course of a fingerprint examiner's business. It is not farfetched to hypothesize that most fingerprint comparisons are conducted in a one on one fashion. A latent print from a crime scene is routinely submitted along with the inked prints of a suspect and a comparison is requested of a fingerprint examiner.

However in this International Association for Identification driven proficiency test the line-up format was used. Such a format requires the examiner to make an identification, or not, from a group of inked prints, none of which bears the incriminating baggage of a police-targeted suspect. The line-up procedure should be more conducive to an unbiased appraisal than the one on one method. Removing the implicit bias of the one on one technique should result in greater accuracy rather than less.

If the line-up procedure can result in such numerous flawed identifications, heaven help us when the bias of the more customary one on one comparison is added to the equation. Under such circumstances, a fingerprint identification knock-out is more than in the offing. It lurks as a fait accompli. Grieve, David L., "Possession of Truth," J.Forensic Ident. 46(5), 1996, 521-528.

Editorial Comment: The report which Mr. Grieve bemoans is entitled Latent Prints Examination, Report No. 9508 conducted by Collaborative Testing Services, Inc. There were 228 participants and replies received from 156. The method employed involved four inked print cards as exemplars and seven bloody prints in black and white. The overall figures for the results demonstrated that 44% were correct on all matching while 43% failed to identify

one or more latents. Six persons failed to make any correct identifications. In the Proficiency Advisory Committee's comments it is said that the failure to identify prints resulted from "procedural restrictions regarding the number of points observed before an identification" can be said to occur. The question of what number of points of similarity should be required to justify an identification is said to be "a continuing issue that needs to be resolved within the latent print community."

Erroneous identifications constituted 22% of the total, meaning that erroneous identifications were reported for one or more latents. Twenty-nine of the misidentifications were of one fictitious Peter Gomes (print #4) who was not even at the scene of the hypothetical crime.

The practice of some laboratories of "destroying evidence" which eliminates "any opportunity for a re-examination of the item in question" was deplored.

One question that this "dismal" proficiency testing shocks into mind is whether any miscarriages of justice have resulted from the false positives which, in actual practice, would mirror what was demonstrated on the proficiency testing. In a leading text on such miscarriages, published in 1960, it is said that "so far as the author can discover not a single miscarriage of justice has resulted from identification by fingerprint evidence...The Scotland Yard bureau seems infallible ...." Du Cann, C.G.L.I, Miscarriages of Justice (p. 269, 1960) It remains to be seen whether the laboratories in the proficiency test in question where false positives were revealed in the test performance of their examiners will review the cases where persons were convicted based on those mistaken examiners fingerprint identifications.

It is devoutly to be hoped that this report will force trial judges to be more approving of defense requests for the appointment of fingerprint experts to assist in the defense of indigents. As of this date too many state courts have denied defense requests under Ake v. Oklahoma, 470 U.S. 68 (1985) for the assistance of fingerprint examiners at state or local expense in criminal trials of the indigent.

 

### Announcements

**Bloodstain Evidence Institutes:** May 5-9, June 9-13, September 15-19, 1997. **Contact:** Prof. Herbert Leon MacDonell, P.O. Box 1111, Corning, N.Y. 14830. **Phone:** 607-962-6581; **Fax:** 607-936-6936.

**The Shaken Baby Syndrome and Investigation Pitfalls:** May 19-20, 1997 at Las Vegas, Nv. **Contact:** Karen Griest, M.D., 160 Washington, SE #234, Albuquerque, NM 87108. **Phone:** 505-281-8109.