# GOVERNMENT'S ADDENDUM 11 - C

# (ADDENDUM TO DOCUMENT 107)

such information has gone unanswered. Apparently, like an autumn leaf, interest in McDaniel's case has dried up and blown away.

Concealed behind all the legal and media fol-de-rol in the McDaniel incident is the troubling recognition that McDaniel's behavior is not at all a rarity in drug labs across the country. It is altogether too easy to report a finding of a controlled substance when in fact the identification is only founded on a presumptive or screening test and not the greater certainty of a confirmatory test. If the time ever comes that a trial is necessitated, then a confirmatory test can be thrown into the hopper, so it is thought by some crime laboratory folk. Defense attorneys and the accused "druggie" can readily be taken in by this ploy, resulting in a guilty plea which then eliminates the need for a follow-up confirmatory test.

### Pamela Fish: Chicago Lab in Chaos

Unlike the claims from the states of Washington, and West Virginia, the system may not have worked in the Chicago, Illinois, police laboratory in the mid 1980's when Pamela Fish was employed there. The Illinois state police have been, since 1986, the agency administering the former Chicago police laboratory.

Fish is apparently the point person in the allegations and investigations into the former Chicago police laboratory. It was she, according to a report by Edward Blake, who gave "false or incomplete testimony" which caused Billy Wardell and Donald Reynolds to be wrongly convicted of the rape of two University of Chicago students in 1986. DNA has since exonerated them and they have a suit for damages for the wrongs perpetuated upon them now pending.

In conjunction with that pending litigation, a six page single spaced report was rendered by Howard A. Harris, Ph.D, J.D., who is the director of the forensic science program at the University of New Haven. Harris' report was the result of a thorough-going investigation by him of the Chicago police laboratory's practices and procedures at or about the time of the wrongful conviction of Wardell and Reynolds.

Harris's report requires careful reading and an ability to reign in the urge to cry out in anger over the abuses in the Chicago police laboratory which he documents with scientific panache. The laboratory was said to have followed "a policy or custom of failing to provide complete and accurate records to defendants and failing to monitor, supervise or train its crime laboratory employees." Moreover, these deficiencies were declared to evidence "a deliberate and reckless indifference" to the constitutional rights' of Billy Wardell and Donald Reynolds, among others. These "deviations" were "obvious and known to city of Chicago police department" through its deputy superintendent and crime laboratory director as well as the laboratory's supervisors.

A worst case scenario for a functioning crime laboratory could not be envisioned and yet the sore festered and went unremedied for years. And Pamela Fish, whose testimony was a vital stimulus for Harris' report, where is she now? She is now the chief of the biochemistry section at the state police laboratory, the successor to the Chicago crime laboratory. In her current managerial role, Fish no longer regularly testifies at trial so all is well that ends with a supervisory, out-of-the-courtroom role. Ditto for Oklahoma City's Joyce Gilchrest. But the end is not yet nigh for Fish in view of the pending litigation in Chicago.

A. E. Houseman's sage and melancholy words may be the best answer to those who cavalierly assert that the defalcations of crime laboratories and their employees are just "isolated incidents." A "wise man," with the true skepticism of the scientific mind, should approach the subject of scientists who stray by consciously and calculatingly training "for ill and not for good." It must be emphatically recognized that where there is one fallen forensic expert, there are very likely to be more. Only then will the good prevail and the "ethos of unrelenting positivity" be justified.

*Summer 2001*
*Sci Sleuthing*



**Fingerprinting**

### Fingerprint Examination Standards: Do We Need Them?

A look at fingerprinting practices in several countries finds that, while uniformity is more common than may at first be evident, there are areas where differences range from minor to significant. This paper, presented at the Fingerprint Society Lectures in March, 1999 asks the question: is standardization needed in the collection and comparison of print impressions for reliable identification of individuals? What is to be gained by an in-depth study and is it worth the effort?

The author, the editor of the Journal of Forensic Identification, identifies several areas where, on careful examination, no changes are found to be needed, in his in-house estimation. In those areas it is said that the community can be confident that the science of today is solid. If, in some areas, the science and practice are shaky, then organizations such as SWGFAST are ensuring that fingerprint science is just that.

This thought provoking article should be priority reading for anyone using or facing fingerprint evidence. The title is at least suggestive of a change of view on the part of the author in that up to now he was one of the staunchly committed among those calling fingerprinting a well-established scientific endeavor. Grieve, "The Identification Process: SWGFAST and the Search for Science," 50 J. Forensic Ident. 145 (2000)

**ADDENDUM 11 - C**