# GOVERNMENT'S ADDENDUM 11 - F

# (ADDENDUM TO DOCUMENT 107)

## UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

v.

CARLOS IVAN LLERA PLAZA,

WILFREDO MARTINEZ ACOSTA,
and

VICTOR RODRIGUEZ

Cr. No. 98-362-10, 11, 12

FILED

JAN - 7 2002

MICHAEL E. KUNZ, Clerk

By _____ Dep. Clerk

## OPINION

January   7, 2002.

Pollak, J.

Currently before the court is defendants' Motion to Preclude the United States from Introducing Latent Fingerprint Identification Evidence,[1] in which defendants contend that evidence relating to fingerprints fails to conform to the standard for admitting expert testimony under Federal Rule of Evidence 702, as interpreted by the United States Supreme Court in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) and Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999). The United States has responded to defendants' motion by submitting a Combined Motion in Limine to Admit Latent Print

---

[1] This motion was initially submitted only by defendant Martinez Acosta, but was subsequently adopted by defendants Llera Plaza and Rodriguez.

ADDENDUM 11 - F

Evidence and Response to Defendant Acosta's Motion to Preclude the Introduction of Latent Fingerprint Identification Evidence. In this combined motion and response, the government has moved the court to (1) admit fingerprint evidence at trial and (2) take judicial notice of the uniqueness and permanence of fingerprints. Defendants have submitted a Reply Memorandum of Law in Support of Mr. Acosta's Motion to Exclude the Government's Latent Fingerprint Identification Evidence. In support of their respective positions, the defendants and the government have agreed by stipulation to rely on the testimony regarding fingerprint evidence that was presented to my colleague Judge Joyner in 1999 in United States v. Mitchell, Cr. No. 96-407 (E.D. Pa.). The testimony that is referred to in the remainder of this opinion is drawn from the Mitchell hearing.[2]

## I.    Background: Fingerprints and Their Identification

The defendants' and government's motions bring into question (1) whether each individual has a unique set of fingerprints and, if so, whether these unique fingerprints are permanent, and (2) whether latent prints—fragments of fingerprints "lifted" from a surface touched by an unidentified person—can accurately be matched to "rolled" prints—complete fingerprints that are obtained from an identified person through established fingerprinting

---

[2] Listed among the government's potential witnesses in the case at bar are four FBI fingerprint examiners: Linda A. Hileman, James N. Hudson, Lashawn Sims, and Kim Decarla Smith. Also listed is FBI unit chief Stephen Meagher, a supervisory fingerprint specialist. Mr. Meagher was a government witness at the Mitchell hearing.

-2-

procedures. These questions warrant a preliminary examination of what fingerprints are, what the basic premises of fingerprint identifications are, and how fingerprints are identified.

## A.    What Fingerprints Are

At the <u>Mitchell</u> hearing, government witness Dr. William Babler, a former President of the American Dermatoglyphics Association,[3] professor of gross anatomy, and embryologist, gave testimony on his research on the prenatal development of fingerprints. According to Dr. Babler, friction ridges—in simple terms, the lines on the ends of fingers that are arranged in patterns—start forming when the fetus is in the ninth or tenth week of development. Test. Babler, Tr. July 7, 1999, at 35–36.[4] He described these early formations

---

[3] Dr. Babler described dermatoglyphics:

> [B]asically the configurations and the patterns that are found on the surfaces of the hands and feet, not only humans, but also primates. . . . The people who study it basically are physical anthropologists, medical geneticists, biologists, populational geneticists, a variety of people whose study—who study these configurations of what we call friction ridges, from the aspect of looking at specific populational genetic components, looking at the relationships of these configurations for determining predictability for, say, a medical condition or for a variety of related situations.

Test. Babler, Tr. July 7, 1999, at 12–13. The American Dermatoglyphics Association has approximately 200 members. <u>Id.</u> at 13.

[4] Dr. Babler provided a more detailed description of what friction ridges are:

> [T]he basal layer of the epidermis will produce new cells . . . . These cells then move toward the surface. As they do so, they change their shape. And there are different zones and I won't go into that.
> As they get to the surface, they start to basically be cornified, that means that they release keratin. That's the horny outer covering of the skin,

as primary friction ridges, which develop "deep to the surface of the skin." Id. at 40. At about fourteen weeks, sweat glands or sweat ducts begin to form, "start[ing] out as proliferations from the primary ridge. They grow down into the dermis and they ultimately mature into a duct and into a gland." Id. at 44. The deep, primary ridges proliferate until sometime between the fetus's fifteenth and seventeenth weeks of development, when primary ridges stop proliferating and secondary ridges begin to form. These secondary ridges, which begin to appear on the skin surface at about week seventeen, mature from weeks seventeen through twenty-four. According to Dr. Babler:

> [T]his interface between the epidermis and the dermis really provides a template of the configuration of the friction ridges on the surface. And this template tends to be permanent. It does not change. Unless it gets injured, and it would take a deep injury. It would take an injury that would pierce through that interface such as a deep knife wound, or a deep burn to actually distort this template at the epidermal, dermal interface.

Id. at 47. In sum, "at the stage of 17 weeks then, we see that the friction ridge basically has become permanent and fixed on the surface of the skin. And it does not change thereafter."

Id. at 50.

---

> the covering of the skin.
> Ultimately, they die and they are shed off. But since the cells that produce the skin are deep to the surface at the interface of the dermis and epidermis, the fact is that they will continue to grow because that layer keeps producing what the template holds and moves it up to the surface.
> So you can keep on brushing away your skin. And indeed, it's why it's called friction ridge because there's a lot of friction. You're going to rub away cells.

Test. Babler, Tr. July 7, 1999, at 70.

-4-

Dr. Babler also discussed factors that may affect the arrangement of friction ridges, including genetics, environmental factors, chemicals, disease, and perhaps the shape of the volar pad (end of the finger):

> [T]here are many different factors, many, many different factors that influenced the development of the friction ridge and ultimately the development of its secondary characteristics, the minutiae, the actual shape of the ridge itself. All these are so numerous and so individual that they—that I cannot conclude anything but that each and every friction ridge and their arrangements are individual and specific.

Id. at 63.[5]

Fingerprint examiners refer to three levels of detail that can be observed on mature fingerprints. At the first level of detail, an examiner looks at the overall pattern of a fingerprint. These overall patterns are described as whorl patterns, loop patterns, and arch patterns. See, e.g., id. at 53. According to the testimony of Sergeant David Ashbaugh, a fingerprint specialist of the Royal Canadian Mounted Police, level two detail consists of "a path of ridges," which are islands (a group "of individual ridge units fused together"), or bifurcations ("friction ridges splitting into two"). Test. Ashbaugh, Tr. July 7, 1999, at 99–101. Stephen Meagher, an FBI unit chief and supervisory fingerprint specialist whom the government has listed as a witness in the case at bar,[6] testified in Mitchell that when

---

[5] On cross examination, Dr. Babler acknowledged that his research "did not examine statistically the frequency within which any given human being in a particular population group would have, say, for level two minutia in common," and that he "didn't examine whether they would have four, six, or any particular number in common." Test. Babler, Tr. July 7, 1999, at 75.

[6] See supra note 2.

fingerprint examiners look at level two detail, they often look for points (referred to as "Galton points") on the ridges that the latent and rolled prints have in common. Test. Meagher, Tr. July 8, 1999, at 79, 83.[7] The most intricate level of detail—level three detail—consists of "minutiae," including sweat pores and their structures. Id. at 74.[8]

### B.   The Two Premises of Fingerprint Examination: Uniqueness and Permanence

The process of examining fingerprints is based on two premises—that each person's fingerprints are unique and that they are permanent. The government's contention that fingerprints are unique is supported in part by Dr. Babler's testimony that the prenatal development of fingerprints is affected by "many different factors." Test. Babler, Tr. July 7,

---

[7] According to Sergeant Ashbaugh, Galton points are "almost less than level two, because you just look at where the ridge ends as opposed to where the ridge goes." Test. Ashbaugh, Tr. July 7, 1999, at 130.

[8] It appears that, at one time, there was disagreement among fingerprint specialists about the utility of examining sweat pores. According to a 1972 FBI publication that was quoted at the Mitchell hearing:

> Writers on fingerprints quite frequently mention the value of poroscopy in affecting [sic] identifications where only a few characteristics are present. FBI technicians know of no case in the United States in which pores had been used in the identification of fragmentary impression. To the contrary, our observations on pores have shown that they are not reliably present and that they can be obliterated or altered by pressure, fingerprint ink, or developing media.

Test. Ashbaugh, Tr. July 7, 1999, at 213–14 (quoting FBI, An Analysis of Standards and Fingerprint Identification (1972)). Sergeant Ashbaugh stated that he disagreed with this analysis. Id. at 214. This dispute may now be a thing of the past: Mr. Meagher, the FBI fingerprint specialist, described the examination of level three detail, including pores. Test. Meagher, Tr. July 8, 1999, at 74–75, 84.

1999, at 63. The government also relies on a survey directed by Mr. Meagher, in which he sent the latent fingerprints and ten-print card (rolled fingerprints) of Byron Mitchell, the defendant in <u>Mitchell</u>, to law enforcement agencies in all fifty states. The state fingerprint examiners were asked, <u>inter alia</u>, whether the rolled prints matched any prints in their repositories.[9] Except for West Virginia, which did not have sufficient technological capabilities, the state agencies used automated or computer-run programs to compare Mr. Mitchell's ten-print card with the records in their repositories. The only state that had a "hit" was Pennsylvania, the state in which Mr. Mitchell was incarcerated. Test. Meagher, Tr. July 8, 1999, at 126.

The government also bases its claim of uniqueness on an algorithmic study, dubbed the 50k x 50k study, in which 50,000 fingerprints, all in loop arrangements and taken from white males, were compared with each other. The goal of this study, which was comprised of two separate tests, was to determine the probability that fingerprints of two people could be identical. <u>Id.</u> at 157–58. Donald Ziesig, an algorithmist at Lockheed Martin Information Systems who played an important role in developing the FBI's computer-based fingerprint system (the Automatic Fingerprint Identification System, or AFIS), Test. Ziesig, Tr. July 9, 1999, at 32–39, was a developer of the 50k x 50k study and explained in detail how it operated. <u>Id.</u> at 50–80. The result of the first test, in which full-sized, one inch fingerprints

---

[9] Examiners were also asked if Mr. Mitchell's rolled prints matched the latent prints. <u>See</u> <u>infra</u>, Part V.C.1.b.

were compared with each other, was that the probability of finding two people with identical fingerprints was one in ten to the ninety-seventh power. Id. at 68, 73. In the second test, the rolled prints were artificially cropped to the average size of latent prints so that only the center 21.7% of the rolled prints was analyzed, with the resultant conclusion that the probability of finding two different, partial fingerprints to be identical was one in ten to the twenty-seventh power. Id. at 73–74.

The government also contends, based on Dr. Babler's testimony, that fingerprints do not change over time, but are permanent. In particular, Dr. Babler testified that "at the stage of 17 weeks then, we see that the friction ridge basically has become permanent and fixed on the surface of the skin. And it does not change thereafter." Test. Babler, Tr. July 7, 1999, at 50. These two premises—uniqueness and permanency—provide the basis for associating a particular fingerprint with a particular individual, and for matching latent fingerprints with rolled fingerprints.

C.    **Examination of Fingerprints**

A fingerprint examiner's job consists of comparing latent and rolled fingerprints to determine if the person who left the latent prints can be identified. The FBI describes latent prints in a training manual:

> [T]he ridges of the fingers and palms are in intermittent contact with other parts of the body, such as the hair and face, and with various objects, which may leave a film of grease or moisture on the ridges. In touching an object, the film of moisture and/or grease may be transferred to the object, thus leaving an outline of the ridges of the fingers or palm thereon. This print is called a

latent impression, the word "latent" meaning hidden, that is, the print many times is not readily visible.

U.S. Dep't Justice, Fed'l Bur. Investigation, The Science of Fingerprints: Classification and Uses 170, *reproduced at* Def. Mot. Ex. 9.

According to the testimony of Mr. Meagher, latent prints are usually incomplete—the average size of a latent print is 21.7% the average size of a rolled print, Test. Meagher, Tr. July 8, 1999, at 162–63—and are often distorted. Distortion is due to the manner in which the finger comes into contact with the surface, the nature of the surface on which the print is left, and the property of the material and/or medium that is used to "lift" the latent print. Test. Ashbaugh, Tr. July 7, 1999, at 160. Rolled fingerprints, by contrast, are obtained from known persons and are taken under controlled circumstances. The average size of a rolled fingerprint is one square inch. Id. at 98.

In comparing latent and rolled prints, fingerprint examiners employ a process known as "ridgeology"[10] or ACE-V, an acronym for "analysis," "comparison," "evaluation," and "verification." Sergeant Ashbaugh testified that, during the analysis stage, examiners look at the unknown, or latent, print and note both the "anatomical aspects" of the fingerprint and the clarity of the print. He described the analysis stage in some detail:

---

[10] "Ridgeology" is a term that was frequently mentioned during the Mitchell hearing. Sergeant Ashbaugh testified that he invented this term; he defined "ridgeology" as "the study of the uniqueness of the friction ridges and the use of that information for personal identification." Test. Ashbaugh, Tr. July 7, 1999, at 136.

-9-