Does it have first, second and third level detail or a combination?

What is the clarity of the print? We would then look at all the ridge paths, all the ridge arrangements. We'd explore ridge shapes and we would note any red flags.

Red flags—I'll be very brief with this because it is a very large area—we would look for any lines running in the print that could have been caused by pressure, substraight [sic] or matrix smears. We would look for areas of fat ridges, possibly that could be caused by overlapping ridges. We'd look for differing amounts of pressure. We'd look for similar ridge characteristics close to each other. This could mean a double tap, two pressures and a [sic] again, an overlapping print. We'd look for shadows, shadow ridges in the furrows, which also could mean two prints deposited.

We'd look for misaligned ridges protruding into the furrow. We'd look for cross-over ridges running through the furrow and, of course, we'd look for inappropriate print outline.

Id. at 113–14. After analysis:

[W]e move on to comparison, and comparison is carried out in sequence or systematically and we start—first of all, we would look at first level detail, is the overall pattern configuration in agreement. And then we would look at—start at an area that is common to both the unknown and the known print. And we would start at a common area and we start systematically comparing all the various friction ridge arrangements and friction ridge shapes, including relative pore position, if it's at all possible.

The comparison is something that is very objective. We're dealing with physical evidence and if I discuss something in the ridge arrangement, I should be able to point to it, so it's a very objective process.

Once the comparison is complete, and we recommend that the whole print be compared, the next thing that we would do is then evaluate what we saw during comparison as far as agreement of the various ridge formations. And I break it down into actually two separate areas. The first area is, do I have agreement? If you say yes to that, if you form the opinion you have agreement, then you have to ask yourself, is there sufficient unique detail present to individualize?

That final decision is a subjective decision. It's based on your knowledge and experience and your ability. And that, if you say yes, I feel there's enough to individualize, then you formed an opinion of identification.

The conclusions that we recommend that are available to you at the end of identification, would be elimination, which usually would start very early

-10-

in the identification process, identification, a situation where you have sufficient volume of unique details to individualize. And a situation where you have agreement, but you're unable to individualize or eliminate. And, in other words, you can't differentiate from others. And those are the three conclusions that we recommend that you can form.

From there we move into the very last box, which deals with the verification, which is a form of peer review, and it is part of the scientific process. From this point the person actually starts right at the beginning and goes through the whole identification process again individually.

Id. at 114-16.

In some state jurisdictions in the United States, and in some foreign jurisdictions, fingerprint examiners must find a minimum number of Galton points (characteristics on the fingerprint ridges) in common before they can declare a match with absolute certainty. Id. at 143–45. The FBI switched from relying on a mandatory minimum number of points to no minimum number in the late 1940s. Test. Meagher, Tr. July 8, 1999, at 105.[11] Testifying in

---

[11] The FBI does use a "12-point quality assurance" process, as explained by Mr. Meagher:

> There have certainly been a number of points requirement in terms of a quality assurance effort. We have today what's referred to as a 12-point quality assurance issue. And that is, generally speaking, at the level two information. That is saying when you start to go below that, that requires a close scrutiny by a supervisory examiner or more senior examiner, simply as a quality assurance mechanism. It has nothing to do—
> A: Would that be in addition to the normal verification that you talked about or that has been talked about?
> A: Yes. It is, as I implied, a quantity—a quality assurance measure that we have implemented. It does not—it did by no means imply that you cannot individualize on less.

Test. Meagher, Tr. July 8, 1999, at 104–05. In a previous part of his testimony, Mr. Meagher referred to the point system as "a simplistic way of explaining the identification

United States v. Havvard, 117 F. Supp. 2d 848 (S.D. Ind. 2000), aff'd 260 F.3d 597 (7th Cir. 2001), Mr. Meagher discussed the absence of a uniform standard prescribing a minimum number of points in common as a precondition of finding a match. Judge Hamilton, in his opinion holding fingerprint identification testimony admissible, referred to Mr. Meagher's testimony, which he found persuasive:

> Meagher testified that there is no single quantifiable standard for reaching an identification opinion because of differences in both the quantity of characteristics shown in the latent print and the quality of the image. For example, if a latent print shows a relatively small portion of a fingerprint but has a very clear image—one that allows clear identification of level three detail such as the shapes of ridges, locations of pores, and the like, a reliable identification may still be possible even with relatively few level two "points."
>
> Meagher's explanation makes sense, and the court credits it. See also Moenssens, et al., Scientific Evidence in Civil and Criminal Cases at 514–16 (by tradition, latent print examiners in the United States have required a match of at least six to eight characteristics to show identity, but most experts prefer at least ten to twelve; in English courts 14 to 16 matches are required for identity). Professor Moenssens also reports the results of study conducted for the International Association for Identification, which concluded that there was no valid basis for requiring a predetermined minimum number of ridge characteristics, and that an identification opinion must take into account other factors, including the quality and clarity of the impressions. Id.

117 F. Supp. 2d at 853.

To aid them in deciding whether a latent fingerprint and a rolled fingerprint were deposited by the same individual, FBI fingerprint examiners are trained in the "quantitative/qualitative process." Test. Meagher, Tr. July 8, 1999, at 78. This process

---

process to the jury." Id. at 99.

-12-

denotes an inverse relationship whereby the more quantity of detail that can be matched, the less clear the print has to be, and vice versa:

> For example, if a print has a large number of level two information of Galton details, the quality does not have to be there present to provide level three information.
>
> He can make an identification and individualize strictly based on level two information.
>
> However, the contrary is that if he has small numbers of the level two information, he must then rely on the quality of the image to present additional information which might be present in the level three.

Id. at 79.

After utilizing the ACE-V and quantitative/qualitative processes, an examiner is ready to make a determination with respect to the latent print in question. The three options that the examiner has are described in one of two ways: (1) identification, elimination, or "agreement but not enough to individualize—not enough to eliminate," Test. Ashbaugh, Tr. July 7, 1999, at 154, or (2) "absolutely him, absolutely not him, and absolutely I don't know," id. at 154–55. Whichever terminology is used, the result is the same—an examiner who makes a positive identification is determining that the latent fingerprint necessarily came from the individual in question, "to the exclusion of all other fingers in the world." Id. at 191.

## II.    Court Decisions Regarding the Admissibility of Fingerprint Testimony

Several courts have addressed the issue of whether fingerprint identifications are admissible as expert testimony under Federal Rule of Evidence 702, and, since the Supreme Court's Daubert ruling, all have come to the conclusion that fingerprint testimony should be

admitted.[12] In the Eastern District of Pennsylvania, fingerprint testimony has been considered and admitted in two cases, United States v. Mitchell, Cr. No. 96-407 (E.D. Pa. Sept. 13, 1999), and United States v. Ramsey, Cr. No. 01-5-4 (E.D. Pa. Sept. 21, 2001). In Mitchell, my colleague Judge Joyner took judicial notice of the uniqueness and permanence of friction ridges, permitted fingerprint examiners to testify as experts, and reserved for the jury the issue of "whether or not there's been a positive identification pursuant to whatever standards are applicable." Mitchell, Cr. No. 96-407, at 4–5. In Ramsey, my colleague Judge Yohn held that fingerprint identification techniques are scientifically reliable and that fingerprints are unique and permanent. Ramsey, Cr. No. 01-5-4, at 5–6, 12.

Courts in other circuits have also concluded that fingerprint testimony is sufficiently scientific and reliable to be admitted under Rule 702. Published opinions applying Rule 702 prior to its December 2000 amendment are: United States v. Sherwood, 98 F.3d 402, 408 (9th Cir. 1996) (finding that the district court did not err in admitting fingerprint testimony); United States v. Havvard, 117 F. Supp. 2d at 855 (stating that "latent print identification is

---

[12] Courts that have addressed the admissibility of fingerprint evidence have generally analyzed the proposed testimony in terms of whether it constitutes "scientific" knowledge within the meaning of Rule 702. In the present case, too, submissions before this court address the "scientific" validity of fingerprint evidence. But it is to be borne in mind that Daubert's analysis of Rule 702's treatment of "scientific" knowledge was extended by Kumho Tire to Rule 702's treatment of "technical or other specialized knowledge" as well. 526 U.S. at 141. The Court observed in Kumho Tire that "[w]e do not believe that Rule 702 creates a schematism that segregates expertise by type while mapping certain kinds of questions to certain kinds of experts. Life and the legal cases that it generates are too complex to warrant so definitive a match." Id. at 151.

-14-

the very archetype of reliable expert testimony"), aff'd 260 F.3d 597 (7th Cir. 2001) (reviewing the district court's determination de novo and finding that the district court did not err in its consideration of the Daubert factors as they apply to fingerprint techniques); United States v. Cooper, 91 F. Supp. 2d 79, 82 (D.D.C. 2000) (declining to hold a pre-trial Daubert hearing and finding that fingerprint identification techniques are "well-established principles"). Published opinions applying Rule 702 as amended are: United States v. Reaux, 2001 WL 883221, *2 (E.D. La. July 31, 2001) (relying on the Seventh Circuit's opinion in Havvard and admitting fingerprint testimony); United States v. Martínez-Cintrón, 136 F. Supp. 2d 17 (D.P.R. 2001) (admitting fingerprint examination testimony); United States v. Joseph, 2001 WL 515213, *1 (E.D. La. May 14, 2001) (finding that fingerprint analysis is "scientific knowledge").

## III.    Judicial Notice of the Uniqueness and Permanence of Fingerprints

The government requests that this court take judicial notice of the uniqueness and permanence of fingerprints (friction ridges and friction ridge skin arrangements). Gov't Mot. & Resp. at 113. Federal Rule of Evidence 201(b) lays down the types of facts for which judicial notice is appropriate.

> A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

Fed. R. Evid. 201(b). Under some circumstances, the trial judge must take judicial notice of adjudicative facts: "A court shall take judicial notice if requested by a party and supplied with the necessary information." Fed. R. Evid. 201(d). Even when not required to do so, trial judges may take judicial notice of an adjudicative fact as a matter of discretion: "A court may take judicial notice, whether requested or not." Fed. R. Evid. 201(c). Judicial notice under either the mandatory or discretionary subsection is only appropriate when "particular facts are outside the area of reasonable controversy . . . . A high degree of indisputability is the essential prerequisite." Fed. R. Evid. 201(a), advisory committee note. The government contends that this court should take judicial notice of both the uniqueness and the permanence of fingerprints under the mandatory subsection of Rule 201. Gov't Mot. & Resp. at 113.

With respect to the uniqueness of fingerprints, both Dr. Babler and Mr. Ziesig testified, essentially, that their work provides a basis for concluding that fingerprints are unique. Dr. Babler testified that because multiple factors affect the prenatal development of fingerprint ridges, they must be unique. Test. Babler, Tr. July 7, 1999, at 63. While this assertion makes intuitive sense, Dr. Babler did not actually compare fingerprint ridges to determine whether the assertion was factually correct. Mr. Ziesig, however, did undertake such a comparison. As described above, Mr. Ziesig's 50k x 50k study found the probability to be one in ten to the ninety-seventh power that two rolled fingerprints (whether taken from fingers of two different people or from two fingers of the same person) would be identical.

-16-

Test. Ziesig, Tr. July 9, 1999, at 68, 73. Mr. Ziesig's testimony provides the "necessary information" for this court to take judicial notice of the uniqueness of fingerprints, in accordance with Federal Rule of Evidence 201(d).

Based on his research involving the prenatal development of fingerprints, Dr. Babler testified that fingerprints are permanent. Because the deeply-rooted primary ridges form a template for secondary ridges—the ridges that are visible on the surface of the skin—he conjectured that only a very deep wound could alter a fingerprint. Test. Babler, Tr. July 7, 1999, at 47. Dr. Babler's research provides an adequate basis for this court to take judicial notice of the permanency of fingerprints.

## IV.    Admission of Expert Testimony

For several decades, the standard for admission of expert testimony was the "general acceptance" standard that was established in Frye v. United States, 293 F. 1013, 1014 (D.C. Cir. 1923): "[W]hile courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." In articulating the "general acceptance" standard, the Frye court addressed only the admissibility of novel scientific evidence. Other courts subsequently extended "general acceptance" as a test of admissibility for all scientific evidence.

Some fifty years after Frye's articulation of the "general acceptance" standard, Congress adopted Federal Rule of Evidence 702, entitled "Testimony by Experts":

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Federal Rules of Evidence, Pub. L. No. 93-595, 88 Stat. 1926, 1937 (1975). Rule 702 did not mention "general acceptance," much less adopt this as the test for admission of expert testimony. Daubert, 509 U.S. at 588. Nevertheless, many courts continued to use the "general acceptance" standard until the Supreme Court clarified, in 1993, that Frye's "general acceptance" standard had been superseded by Federal Rule of Evidence 702. Daubert, 509 U.S. at 587.

Daubert emphasized that the basic standard of relevance under the Rules is "a liberal one," id. at 587, but that a "trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable," id. at 589.[13] That is, trial judges are called on to play a "gatekeeping role" with respect to scientific testimony. Id. at 597. In applying Rule 702 to the admission of scientific testimony, the Court emphasized that, for evidence to be considered "reliable," the proposed expert's opinion must actually be based on what Rule 702 terms "scientific knowledge." The Court, speaking through Justice Blackmun, clarified what "scientific knowledge" signifies:

---

[13] In the present case, the defendants only challenge the reliability of fingerprint identifications, not their relevance.

-18-

> The adjective "scientific" implies a grounding in the methods and procedures of science. Similarly, the word "knowledge" connotes more than subjective belief or unsupported speculation. The term applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds. Of course, it would be unreasonable to conclude that the subject of scientific testimony must be "known" to a certainty; arguably, there are no certainties in science. But, in order to qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method. . . . In short, the requirement that an expert's testimony pertain to "scientific knowledge" establishes a standard of evidentiary reliability.

Id. at 590 (quotations and citations omitted). In further delineating what trial judges should be looking for in scientific testimony, Justice Blackmun presented four "general observations," which are commonly referred to as the "Daubert factors": (1) whether the technique "can be (and has been) tested," (2) whether the technique has been "subjected to peer review and publication," (3) "the known or potential rate of error . . . and the existence and maintenance of standards controlling the technique's operation," and (4) "general acceptance." Id. at 593–94.[14]

---

[14] In a pre-Daubert Third Circuit case that was cited with approval by the Supreme Court in Daubert, 509 U.S. at 591, 594, 594 n.12, Judge (now Chief Judge) Becker articulated three factors for determining when scientific testimony should be permitted.

> In our view, Rule 702 requires that a district court ruling upon the admission of (novel) scientific evidence, i.e., evidence whose scientific fundaments are not suitable candidates for judicial notice, conduct a preliminary inquiry focusing on (1) the soundness and reliability of the process or technique used in generating the evidence, (2) the possibility that admitting the evidence would overwhelm, confuse, or mislead the jury, and (3) the proffered connection between the scientific research or test result to be presented, and particular disputed factual issues in the case.

United States v. Downing, 753 F.2d 1224, 1237 (3d Cir. 1985). With respect to the