In Kumho Tire, the Court held that Daubert's interpretation of Rule 702 applies with equal force to proposed expert testimony based on technical or other specialized knowledge. 526 U.S. at 141. The Court also emphasized that the four Daubert factors are flexible and that the "list of specific factors neither necessarily nor exclusively applies to all experts or in every case." Id.

In an effort to bring Rule 702 into closer verbal harmony with Daubert and Kumho Tire, Congress amended Federal Rule of Evidence 702:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. This newly-amended Rule 702 took effect on December 1, 2000 and is thus applicable to the case at hand.

## V.   Fingerprint Identifications

The primary question that the parties dispute is whether fingerprint identifications are scientifically reliable and thus admissible under Federal Rule of Evidence 702, as construed

---

soundness or reliability of the technique, Judge Becker offered a non-exhaustive list of factors that trial judges may examine: scientific acceptance, novelty, "existence of a specialized literature dealing with the technique,"qualifications of the witness, non-judicial uses of the technique, and the frequency of erroneous results. Id. at 1238–39.

by the Supreme Court in Daubert and Kumho Tire. While the four factors discussed in Daubert are flexible general guidelines, not a rigid test for admissibility, Daubert, 509 U.S. at 594–95; Kumho Tire, 526 U.S. at 152, the factors do provide a useful framework for determining whether fingerprint identifications are scientifically valid and thus reliable, Daubert, 509 U.S. at 594–95. In their submissions in the case at bar, both the government and the defendants have undertaken to apply the Daubert factors, albeit with discrepant results. Agreeing with the parties that, with respect to fingerprint identification evidence, the Daubert factors constitute a proper touchstone of admissibility, this court will also proceed along the analytic path marked out by the Daubert factors.

### A.    Testing

#### 1.    Definition of "Testing"

The first Daubert factor is "whether a theory or technique . . . can be (and has been) tested." 509 U.S. at 593. According to the government, "[t]he ACE-V process and the experts' conclusions have been tested empirically over a period of 100 years and in any particular case they can be tested by examination of the evidence by another expert." Gov't Mot. & Resp. at 112.

The second clause of this sentence seems to be arguing that, following testimony by one fingerprint examiner that a particular latent print corresponds with a particular known print, testimony by a second examiner constitutes a form of "testing." However, this is not "testing" of the "theory" or the "technique" of fingerprint identification in the Daubert sense.

-21-

With respect to "theory," the fact that a second examiner, following the same "technique" as a prior examiner, reaches the same (or, indeed, a different) result, would not seem to shed any light on the validity of the "theory" underlying that "technique." With respect to "technique"—assuming, for purposes of discussion, that the validity of the "theory" were acknowledged—it is difficult to see that a single confirmatory examination would be adequate to validate the "technique." Conversely, it is not apparent that a result arrived at by a second examiner discrepant from a result arrived at by a prior examiner would (1) establish that the first result was erroneous, or (2) offer a secure basis for concluding that the "technique" was faulty. A scientist might be disposed to require scores, or perhaps hundreds, of observations before regarding the "technique" as having been "tested."[15]

The first clause in the sentence from the government's motion papers quoted above—"[t]he ACE-V process and the experts' conclusions have been tested empirically over a period of 100 years"—apparently refers to the fact that fingerprint identification has been a customary ingredient of trials for a century. Some courts that have addressed the admissibility of fingerprint testimony have also equated the use of fingerprint identifications in court with "testing." In <u>Havvard</u>, for example, the court stated, "the methods of latent print

---

[15] With respect to the ACE-V process at issue here, reliance on a second examiner's same result as a confirmatory "test" of the first examiner's result is subject to the further dilution that, not infrequently, the second examiner has been advised of the prior result. <u>See</u>, <u>e.g.</u>, Test. Ashbaugh, Tr. July 7, 1999, at 116 ("There are situations where, when we ask for verification, the expert will know that an identification has been made.").

-22-

identification . . . have been tested for roughly 100 years. They have been tested in adversarial proceedings with the highest possible stakes—liberty and sometimes life." 117 F. Supp. 2d at 854, aff'd 260 F.3d 597; accord Ramsey, Cr. No. 01-5-4, at 6–7.

"[A]dversarial" testing in court is not, however, what the Supreme Court meant when it discussed testing as an admissibility factor. In his brief elaboration on testing, Justice Blackmun quoted an evidence treatise with approval: "'Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry.'" Daubert, 509 U.S. at 593 (quoting Green, Expert Witnesses and Sufficiency of Evidence in Toxic Substances Litigation: The Legacy of Agent Orange and Bendectin Litigation, 86 Nw. U. L. Rev. 643 (1992)). In an article on Daubert, Professor Imwinkelried explained the importance of falsifiability to scientific testing:

> Attempts to disprove the hypothesis are more significant [than verification] in two respects. First, although a single outcome consistent with an hypothesis furnishes little proof of the truth of the hypothesis, a hypothesis phrased as a universal statement is disproved by even one singular inconsistent outcome. Second, even when there are an impressive number of consistent outcomes and no inconsistent outcomes, the hypothesis is not definitively confirmed because it is always possible that an empirical test will some day demonstrate the theory to be incorrect. The theoretical possibility of disproof remains.

Edward J. Imwinkelried, Evidence Law Visits Jurassic Park: The Far-Reaching Implication of the Daubert Court's Recognition of the Uncertainty of the Scientific Enterprise, 81 Iowa L. Rev. 55, 62 (1995) (quotations and citations omitted). Thus, by striving to falsify a certain

-23-

premise or outcome, scientists can more closely approximate what is "true." Id. at 61–62.[16]

It makes sense to rely on scientific testing, rather than "adversarial" courtroom testing, because to rely on the latter would be to vitiate the gatekeeping role of federal trial judges, thereby undermining the essence of Rule 702 as interpreted by the Court in Daubert. If "adversarial" testing were the benchmark—that is if the validity of a technique were submitted to the jury in each instance—then the preliminary role of the judge in determining the scientific validity of a technique would never come into play. Thus, even 100 years of "adversarial" testing in court cannot substitute for scientific testing when the proposed expert testimony is presented as scientific in nature.

### 2.   Absence of Testing of Fingerprint Techniques

On the record made in Mitchell, the government had little success in identifying scientific testing that tended to establish the reliability of fingerprint identifications.[17] By

---

[16] The centrality of falsifiability to the scientific pursuit is further examined in another article:

> A universal statement can be shown to be false if it is found inconsistent with even one singular statement about a particular event of occurrence. But the reverse is not true; a universal statement can never be proven true by virtue of the truth of particular statements, no matter how numerous.
> . . . . Thus no hypothesis can ever be proven absolutely true, but a hypothesis may become well corroborated if it survives a variety of tests that fail to falsify it.

Bert Black et al., Science and the Law in the Wake of Daubert: A New Search for Scientific Knowledge, 72 Tex. L. Rev. 715, 755–56 (1994).

[17] In a recent "solicitation," the National Institute of Justice requested research that would test the "validity of *individuality in friction ridge* examination based on

-24-

measurement of features, qualification and statistical analysis." U.S. Dep't Justice, Nat'l Inst. Justice, Solicitation: Forensic Friction Ridge (Fingerprint) Examination Validation Studies 4 (2000) (emphasis in original). Under the heading "Areas of Research Required," the solicitation explained what it sought: "statistical validation of individuality in friction ridge analysis," "qualitative/quantitative aspects of friction ridge comparison," and "statistical validation of standard operating procedures for friction ridge (fingerprint) comparison." Id. at 4–5. The solicitation stated that the need for this research/testing stemmed from Daubert:

> [A]ll expert testimony must follow the admissibility rules for scientific evidence set forth in recent court cases e.g. *Daubert v. Merrill* [sic] *Dow Pharmaceuticals* (113 S.Ct. 2786). These rules require scientists to address the reliability and validity of the methods used in their analysis. Therefore, the purpose of this solicitation is to address the needs identified in the above NIJ publication and to provide greater scientific foundation for forensic friction ridge (fingerprint) identification.

Id. at 3.

It appears that the timing of the NIJ solicitation release was tied, at least in part, to the Mitchell case. Dr. Richard M. Rau, a forensic program manager at the Department of Justice who played a leading role in the development of the solicitation, testified about the relationship between the solicitation, Daubert and Kumho Tire, and the Mitchell case:

> Q: The question was, with that in paragraph two of that letter, you provided some reasons as to why you believe that it was urgent, and you used the word urgent at the very end of that paragraph as to why the solicitation should be issued. Correct?
>
> A: Yes.
>
> Q: And you identified the opinion changed to Rule 702, Federal Rule of Evidence 702. Why did you believe that made the issuance of the solicitation to be urgent?
>
> A: I think it's because they raised the issue of reliability.
>
> Q: And because they raised the issue of reliability, you thought it was important that these validation studies be conducted?
>
> A: Yes.
>
> Q: You also identified the Kumho Tire decision. Why did you believe that made the issuance of the solicitation urgent?
>
> A: It had come out just before I wrote this, and it supported the

-25-

contrast, defense testimony strongly suggested that fingerprint identification techniques have not been tested in a manner that could be properly characterized as scientific. Particularly pointed was the testimony of forensic scientist David Stoney, the Director of the McCrone Research Institute in Chicago. According to Dr. Stoney:

---

Daubert case and the findings. It applied not only to scientific evidence, but to technical evidence.

Q: So you understood Kumho Tire to mean that the government or prosecution would have to make the same kind of showing of reliability for all kinds of experts, not just scientific experts, correct?

A: yes.

. . . .

Q: And, finally, you refer there in paragraph two to the challenge to the admissibility of fingerprint evidence in a case in Philadelphia. Now, of course, you were referring to this case, correct?

A: yes.

Q: And why did you believe that the challenge that was brought in this case made the issuance of the solicitation urgent?

A: As you know, I'm not an expert in fingerprint analysis and matching. So what I'm going to say is based on my opinion only.

The feeling was that when the people that wrote status and needs met to discuss about the needs for research in the forensic field, that they pulled out the documents, the weapons and fingerprints, among others, and the issue of the need to do more research in those fields to show the reliability of the procedures. I felt that if what happened in the document case, where a federal judge ruled that it wasn't admissible on that basis—

Q: Ruled that what wasn't admissible, sir?

A: The document examination, the matching of documents.

Q: Handwriting analysis?

A: Handwriting analysis. That if that were to happen for fingerprints, there was no fallback position since there wasn't any other research around.

. . . .

Test. Rau, Tr. Jan. 3, 2001, at 41–44.

-26-

> The determination that a fingerprint examiner makes . . . when comparing a latent fingerprint with a known fingerprint, specifically the determination that there is sufficient basis for an absolute identification is not a scientific determination. It is a subjective determination standard. It is a subjective determination without objective standards to it.

Test. Stoney, Tr. July 12, 1999, at 87.

Dr. Stoney's point that "[t]he determination that a fingerprint examiner makes . . . when comparing a latent fingerprint with a known fingerprint . . . is a subjective determination," was fully confirmed by the testimony presented by government witnesses Ashbaugh and Meagher. After describing the "analysis" ingredient of ACE-V, Sergeant Ashbaugh proceeded to discuss "comparison" and "evaluation" in the following terms:

> Once the comparison is complete, and we recommend that the whole print be compared, the next thing that we would do is then evaluate what we saw during comparison as far as agreement of the various ridge formations. And I break it down into actually two separate areas. The first area is, do I have agreement? If you say yes to that, if you form the opinion you have agreement, then you have to ask yourself, is there sufficient unique detail present to individualize?
> That final decision is a subjective decision. It's based on your knowledge and experience and your ability. And that, if you say yes, I feel there's enough to individualize, then you formed an opinion of identification.

Test. Ashbaugh, Tr. July 7, 1999, at 115–16. FBI supervisory fingerprint specialist Meagher gave very similar testimony:

> A: The analysis and comparison process is a very objective process. The evaluation process is the subjective opinion of that examiner that he has reached the conclusion that it's ident, non-ident.
> Q: The evaluation, the ultimate determination is a subjective one, is it not, sir?
> A: Yes.

-27-

Test. Meagher, Tr. July 8, 1999, at 228–29.

The significance of the fact that the determinations are "subjective" was explained by the further testimony of Dr. Stoney:

> Now, by subjective I mean that it [a fingerprint identification determination] is one that is dependent on the individual's expertise, training, and the consensus of their agreement of other individuals in the field. By not scientific, I mean that there is not an objective standard that has been tested; nor is there a subjective process that has been objectively tested. It is the essential feature of a scientific process that there be something to test, that when that something is tested the test is capable of showing it to be false.

Test. Stoney, Tr. July 12, 1999, at 87.[18]

---

[18] Likewise, Professor James E. Starrs, a professor at George Washington University's Department of Forensic Sciences and at the Law School, who teaches courses on fingerprints and their examination, testified that fingerprint identification techniques have not been scientifically tested:

> It is my opinion that the present process as I know it of fingerprint comparison and analysis, is not predicated on a sound and adequate scientific basis for purposes of making an individualization to one person from a fragmentary print to the exclusion of all other persons in the world.
>
> . . . .
> Shorthand for my reasons are, many of which you have already heard even today, and that is that the claim of absolute certainty either way on the part of fingerprint examiners, the failure to carry out controlled empirical data searching experimentation, a failure to recognize the value of considerations of the error rate. The lack of objectivity and uniformity and systemization with respect to the standards, if any, of the fingerprint analysis.
> Finally, . . . , a failure to show a due regard to a vigorous and uncompromising skeptism [sic] as Carl Sagan described it, to a mind open vision of what might or might not be accepted skeptism [sic], what they are doing as to the inconsistencies they are making on an individual and general basis.

-28-

## B.    Peer Review and Publication

The second <u>Daubert</u> factor is "whether the theory or technique has been subjected to peer review and publication." 509 U.S. at 593.[19] As with the testing factor, the purpose of the inquiry into peer review and publication is to gauge the scientific reliability of the proposed testimony. Thus, in explaining this factor, the Supreme Court wrote that "submission to the scrutiny of the scientific community is a component of 'good science.'" <u>Daubert</u>, 509 U.S. at 593. This sentiment was echoed in a law review article that attempted to explain the scientific method to lawyers and judges: "The peer-review system represents both an effort to police scientific claims and to assure their widest possible dissemination." Bert Black et al., <u>Science and the Law in the Wake of *Daubert*: A New Search for Scientific Knowledge</u>, 72 Tex. L. Rev. 715, 777 (1994). Thus, formal peer review is an "integral part of the scientific publication process." <u>Id.</u> At the <u>Mitchell</u> hearing, Dr. Stoney defined a peer-reviewed publication:

> The term is used in the context of scientific publications to refer to where you have made a formal submission to a peer review journal where an editorial board of that journal has then usually anonymously, but in any case, has reviewed the work in a formal way, given an opinion to the editor of the journal, and then subsequently your paper has either been accepted or rejected from that process.

Test. Starrs, Tr. July 12, 1999, at 150.

[19] In <u>Havvard</u>, the court stated that the publication factor "does not fit well with fingerprint identification because it is a field that has developed primarily for forensic purposes." 117 F. Supp. 2d at 854. While it is correct that the end purpose of fingerprint identifications is a forensic one, the reliability of identification techniques must be assessed just as any other scientific, technical, or specialized technique under Rule 702.

-29-