Test. Stoney, Tr. July 12, 1999, at 41.

The government maintains that "[t]he fingerprint field and its theories and techniques have been published and peer reviewed during a period of over 100 years." Gov't Mot. & Resp. at 112. It is the case that there are numerous writings that discuss the fingerprint identification techniques employed by fingerprint examiners.[20] But it is not apparent that their publication constitutes "submission to the scrutiny of the scientific community" in the Daubert sense. Even those who stand at the top of the fingerprint identification field—people like David Ashbaugh and Stephen Meagher—tend to be skilled professionals who have learned their craft on the job and without any concomitant advanced academic training. It would thus be a misnomer to call fingerprint examiners a "scientific community" in the Daubert sense.

The Havvard court suggested that the "verification" phase of the ACE-V process constitutes peer review:

> [A]ny other qualified examiner can compare the objective information upon which the opinion is based and may render a different opinion if warranted. In

---

[20] For example, Sergeant Ashbaugh has authored several books and articles on the uniqueness of fingerprints, and on "ridgeology." The Ashbaugh articles brought to this court's attention include David Ashbaugh, The Premises of Friction Ridge Identification, Clarity and the Identification Process, 44 J. of Forensic Identification 499 (1994); David Ashbaugh, The Key to Fingerprint Identification, 10 Fingerprint Whorld 93 (April 1985); and David Ashbaugh, Defined Pattern, Overall Pattern, and Unique Pattern, 42 J. of Forensic Identification 505 (1992). These articles do not, however, establish the scientific reliability of fingerprint identifications, nor does it appear that the articles were published in peer-reviewed journals, as defined by Dr. Stoney supra.

fact, peer review is the standard operating procedure among latent print examiners.

117 F. Supp. 2d at 854. In his <u>Mitchell</u> testimony, Sergeant Ashbaugh voiced the same view. ACE-V "verification," he said, "is a form of peer review, and it is part of the scientific process." Test. Ashbaugh, Tr. July 7, 1999, at 116. The difficulty is that if the opinion announced by a fingerprint examiner—"ident, non-ident," as Mr. Meagher expressed it—is, as both Mr. Meagher and Sergeant Ashbaugh acknowledged, "subjective," another opinion rendered by another examiner, whether in corroboration or in refutation, does little to put a "scientific" gloss on the first opinion, much less constitute "peer review" as described by Dr. Stoney.[21]

## C.    Rate of Error and Controlling Standards

The third <u>Daubert</u> factor is that trial judges "consider the known or potential rate of error . . . and the existence and maintenance of standards controlling the technique's operation." <u>Daubert</u>, 509 U.S. at 594.

### 1.    Rate of Error

The government divides the "rate of error" question into two parts—"methodology error" and "practitioner error." The government's argument with respect to these two different rates of error is as follows:

---

[21] It is to be recalled that the government also contends that a regime of re-examination by a second examiner constitutes a <u>Daubert</u> "test"—a contention that this court, for the reasons explained <u>supra</u>, Part V.A.1 of this opinion, finds unpersuasive.

Dr. Budowle's testimony established that methodology error rate in the science of fingerprints is not a relevant inquiry. Moreover, practitioner error can be detected and corrected by another qualified examiner, either in the verification process or through consultation with other experts during litigation.

Gov't Mot. & Resp. at 113.

### a.   "Methodology Error"

Dr. Bruce Budowle, whose testimony the government invokes ("Dr. Budowle's testimony established that methodology error rate in the science of fingerprints is not a relevant inquiry") is a geneticist in the FBI's Laboratory Division. Dr. Budowle's testimony with respect to methodology error was as follows:

> Q: Tell us how it [error rate] applies to scientific methods, methodology.
> A: Well, this transcends all kinds of forensic, it transcends all disciplines in that, but in the forensic area particularly, this has been an issue discussed repeatedly in lots of disciplines, whether it is DNA chemistry and latent fingerprints.
> We have to understand that error rate is a difficult thing to calculate. I mean, people are trying to do this, it shouldn't be done, it can't be done. I'll give you an example as an analogy. When people spell words, they make mistakes. Some make consistent mistakes like separate, some people I'll say that I do this, I spell it S-E-P-E-R-A-T-E. That's a mistake. It is not a mistake of consequence, but it is a mistake. It should be A-R-A-T-E at the end.
> That would be an error. But now with the computer and Spell Check, if I set up a protocol, there is always Spell Check, I can't make that error anymore. You can see, although I made an error one time in my life, if I have something in place that demonstrates the error has been corrected, it is no longer a valid thing to add as a cumulative event to calculate what a error rate is. An error rate is a wispy thing like smoke, it changes over time because the real issue is, did you make a mistake, did you make a mistake in this case? If you made a mistake in the past, certainly that's valid information that someone can cross-examine or define or describe whatever that was, but to say there's an error rate that's definable would be a misrepresentation.

-32-

So we have to be careful not to go down the wrong path without understanding what it is we are trying to quantify.

Now, error rate deals with people, you should have a method that is defined and stays within its limits, so it doesn't have error at all. So the method is one thing, people making mistakes is another issue.

Test. Budowle, Tr. July 9, 1999, at 122–23, quoted in Gov't Mot. & Resp. at 42–43.

The full import of the quoted Budowle testimony is not easy to grasp. Its basic thrust, however, would seem to be contained in the concluding sentences: "Now, error rate deals with people, you should have a method that is defined and stays within its limits, so it doesn't have error at all. So the method is one thing, people making mistakes is another issue."

Mr. Meagher's testimony with respect to error rate tracked Dr. Budowle's testimony and is easier to understand. The testimony is as follows:

Q: Now—Your Honor, if I could just have a moment here.

Let's move on into error rate, if we can, please, sir?

I want to address error rate as we have—you've heard testimony about ACE-V, about the comparative process, all right?

Have you had an opportunity to discuss and read about error rate?

A: Yes.

Q: Are you familiar with that concept when you talk about methodologies?

A: Sure.

Q: And where does that familiarity come from, what kind of experience?

A: Well, when you're dealing with a scientific methodology such as we have for ever since I've been trained, there are distinctions—there's two parts of errors that can occur. One is the methodological error, and the other one is a practitioner error.

If the scientific method is followed, adhered to in your process, that the error in the analysis and comparative process will be zero.

It only becomes the subjective opinion of the examiner involved at the evaluation phase. And that would become the error rate of the practitioner.

-33-

Q: And when you're talking about this, you're referring to friction ridge analysis, correct?

A: That is correct. It's my understanding of that regardless of friction ridge analysis.

The analysis comparative evaluation and verification process is pretty much the standard scientific methodology and a lot of other disciplines besides—

Q: And that may be so.

Are you an expert or familiar with other scientific areas of methodologies?

A: No, I'm not an expert, but I do know that some of those do adhere to the same methodology as we do.

Q: Are you an expert on their error rate?

A: No.

Q: Based on the uniqueness of fingerprints, friction ridge, etcetera, do you have an opinion as to what the error rate is for the work that you do, latent print examinations?

A: As applied to the scientific methodology, it's zero.

Test. Meagher, Tr. July 8, 1999, at 154–56.

This court accepts Dr. Budowle's testimony "that error rate is a difficult thing to calculate" and his further testimony that "error rate deals with people, you should have a method that is defined and stays within its limits, so it doesn't have error at all." Test. Budowle, Tr. July 9, 1999, at 122–23. Further, this court accepts, arguendo, Mr. Meagher's response to the question whether "you have an opinion as to what the error rate is for the work that you do, latent print examinations": "As applied to the scientific methodology, it's zero." Test. Meagher, Tr. July 8, 1999, at 156. Assuming, for the purposes of the motions now at issue before this court, that fingerprint "methodology error" is "zero," it is this court's view that the error rate of principal legal consequence is that which relates to "practitioner error." As Dr. Stoney explained at the Mitchell hearing:

-34-

> You can't have a fingerprint examination without a fingerprint examiner. If you attempt to say errors that individuals make don't count, then you wouldn't have a scientific process that is being tested anymore.
>
> The individual is an inherent part of getting to the opinion in this process. And, errors that individuals make are a very important part of evaluating whether or not it works.

Test. Stoney, Tr. July 12, 1999, at 104. It is the practitioner error rate that affects, for better or worse, the reliability of the fingerprint identification testimony on which the government seeks to have the jury base some aspects of its verdicts.[22] Accordingly, the next Daubert ingredient to be considered is practitioner error.

### b. "Practitioner Error"

After having opined, in his Mitchell testimony, that the error for "scientific methodology" is "zero," Mr. Meagher was questioned by government counsel about "practitioner error":

> Q: How would one correct the practitioner error that you talked about? Sir, you do not deny that there's practitioner error, correct?
> A: Yes, there is.
> Q: Practitioners make mistakes?
> A: Sure, we're human.
> Q: And how would one, like myself, if I was charged with a crime and part of that evidence had to do with fingerprint analysis and fingerprint opinion, how would I be able to see if there was practitioner error?

---

[22] In Daubert, after instructing that "in the case of a particular scientific technique, the court ordinarily should consider the known or potential rate of error," Justice Blackmun noted "see, e.g., *United States v. Smith*, 869 F.2d 348, 353–54 (CA7 1989) (surveying studies of the error rate of spectographic voice identification technique)." 509 U.S. at 594. The studies described in Smith dealt with the error rates of spectographic voice identification specialists, or, to use the terminology of the parties in the case at bar, "practitioner error."

A: Well, the images exist. You haven't done anything. They can simply be—the corrected action can simply be given to another qualified examiner for review.

Q: So what you used to—as an examiner used to come to an opinion, any other practitioner could pick up, do ACE-V and come to whatever opinion they are going to come to?

A: That is correct.

Test. Meagher, July 8, 1999, at 156–57.

As previously noted supra, Part I.B, Mr. Meagher had conducted a survey in which he sent Byron Mitchell's ten-print card and alleged latent fingerprints to state agencies. The ten-print card was to be compared with the state fingerprint records: the result—that only Pennsylvania, the state in which Mitchell had been incarcerated, reported a "hit"—was significant confirmation of the uniqueness of fingerprints. The other aspect of the Meagher survey—a request that state agencies determine whether the latent prints matched the known Mitchell prints—offered scant support for the accuracy of fingerprint identification. Nine of the thirty-four responding agencies did not make an identification in the first instance.[23] In

---

[23] Mr. Meagher followed up by sending photographic enlargements of the prints in a plastic sleeve, on which the level two Galton detail information was marked. Mr. Meagher asked the nine agencies to reconsider their initial responses, emphasizing that the survey was being prepared for a Daubert hearing. All nine agencies changed their responses and made a positive identification. Test. Meagher, Tr. July 8, 1999, at 119–21. Mr. Meagher explained his resubmission of the fingerprints to the nine agencies:

Well, just as if I would have done in-house with any examiner, especially in a training status, if an individual fails to make an identification that we believe they should have been able to, we would take that information back to that individual, show them the characteristics of which they should take into consideration, ask them to reassess their position and, you know, use the information that's now presented to them and try to come

-36-

his testimony, Mr. Meagher offered a variety of explanations: the examiner did not know that the survey was related to a <u>Daubert</u> hearing, <u>id.</u> at 136; the photos of the ten-print card or latent prints were insufficiently clear, <u>id.</u> at 136, 141–42, 148–49; three of the examiners "just screwed up," <u>id.</u> at 138, 139, 150; inexperience, <u>id.</u> at 143–45; insufficient time, <u>id.</u> at 147; the examiner "attitude toward the survey was not as serious as it should have been," <u>id.</u> at 148; and "[i]t was late in the day and [the examiner] was probably tired," <u>id.</u> at 150. While the survey results fall far short of establishing a "scientific" rate of error, they are (modestly) suggestive of a discernible level of practitioner error.[24]

### 2.    Controlling Standards

The parties raise three types of "standards controlling the technique's operation," <u>Daubert</u>, 509 U.S. at 594, which play a role in fingerprint identifications.

---

up with the same conclusion. That is, that the two prints were identical.

<u>Id.</u> at 124–25.

[24] The defendants also point out that in proficiency examinations that were given to fingerprint examiners beginning in 1995, the error rates have been alarmingly high. In 1995, fewer than half of the 156 participating examiners—44%—correctly identified all five latent prints that were being tested, while 31% of the examiners made erroneous identifications. <u>Possession of Truth</u>, 46 J. Forensic Identification 521, 524 (1996) (Def. Ex. 2).While the results had improved somewhat by 1998, only 58% of the examiners correctly identified all the matching prints and did not make incorrect identifications. Latent Prints Examination Report No. 9808, Forensic Testing Program 2 (Def. Ex. 3). As with the <u>Mitchell</u> survey, these proficiency examination results may be taken as somewhat suggestive of practitioner error. However, it should be stressed that these results, standing alone, can hardly be regarded as significant evidence of what the "rate of error," in the <u>Daubert</u> sense, may be. 509 U.S. at 594.

### a.  Galton Point Minima

Various witnesses at the Mitchell hearing testified that the ACE-V process is the method in general use among fingerprint examiners in the United States. However, the application of this method, in particular whether a minimum number of Galton points must be identified before a match can be declared, varies from jurisdiction to jurisdiction. Sergeant Ashbaugh testified that the United Kingdom employs a sixteen-point minimum, Australia mandates that twelve points be found in common, and Canada uses no minimum point standard. Test. Ashbaugh, Tr. July 7, 1999, at 144–45. In the United States, state jurisdictions set their own minimum point standards, while the FBI has no minimum number that must be identified to declare an "absolutely him" match, Test. Meagher, Tr. July 8, 1999, at 105, but does rely on a twelve-point "quality assurance" standard, id. at 104. As described by the Havvard court, "there is no single quantifiable standard for rendering an identification opinion because of differences in both the quantity of characteristics shown in the latent print and the quality of the image." Havvard, 117 F. Supp. 2d at 853. While there may be good reason for not relying on a minimum point standard—or for requiring a minimum number, as some state and foreign jurisdictions do—it is evident that there is no one standard "controlling the technique's operation," Daubert, 509 U.S. at 594.

### b.  Identifying Fingerprints

Government and defense witnesses agreed that the actual identification of a latent fingerprint—that is, the decision that the ridges of the two prints that are being compared are

sufficiently "identical" to be considered an "absolutely him" match—is a subjective determination. Sergeant Ashbaugh testified for the government:

> The opinion of individualization or identification is subjective. It is an opinion formed by the friction ridge identification specialist based on the friction ridge formations found in agreement during comparison. The validity of the opinion is coupled with an ability to defend that position and both are found in one's personal knowledge, ability and experience.

Test. Ashbaugh, Tr. July 7, 1999, at 142. Likewise, Mr. Meagher testified for the government that the evaluation phase is characterized by "the subjective opinion of the examiner." Test. Meagher, Tr. July 8, 1999, at 155. Dr. Stoney, testifying for the defense, agreed:

> The determination that a fingerprint examiner makes or that an examiner makes when comparing a latent fingerprint with a known fingerprint, specifically the determination that there is sufficient basis for an absolute identification is not a scientific determination. It is a subjective determination standard. It is a subjective determination without objective standards to it.

Test. Stoney, Tr. July 12, 1999, at 87. With such a high degree of subjectivity, it is difficult to see how fingerprint identification—the matching of a latent print to a known fingerprint—is controlled by any clearly describable set of standards to which most examiners subscribe.

### c. Examiner Qualifications

The Scientific Working Group on Friction Ridge Analysis, Study, and Technology (SWGFAST) adopted "quality assurance guidelines for latent print examination" in 1997.

-39-

Test. German, Tr. July 8, 1999, at 35.[25] Nevertheless, it appears that these guidelines remain just that, optional recommendations. There are no mandatory qualification standards for individuals to become fingerprint examiners,[26] nor is there a uniform certification process. Mr. Meagher, for example, testified that while some FBI fingerprint examiners are certified by the International Association for Identification (IAI),[27] he is not certified by the IAI, but by the FBI. Test. Meagher, Tr. July 8, 1999, at 66.

---

[25] Edward German, a Special Agent with the U.S. Army Criminal Investigation Laboratory, chair of the Quality Assurance Committee of SWGFAST, and chair of the Friction Ridge Automation Committee of SWGFAST, explained the SWGFAST Guidelines. Special Agent German testified that the Guidelines "concern minimum qualification guidelines for considering a person to be trained as a latent print examiner. They also concern the training to competency guidelines, which means the topics or subjects that need to be covered, the recommended and suggested topics to be covered at training." Test. German, Tr. July 8, 1999, at 35.

[26] According to one critic:

Traditionally, fingerprint training has centered around a type of apprenticeship, tutelage, or on-the-job training, in its best form, and essentially a type of self study, in its worst. Many training programs are the "look and learn" variety, and aside from some basic classroom instruction in pattern interpretation and classification methods, are often impromptu sessions dictated more by the schedule and duties of the trainer than the needs of the student. Such apprenticeship is most often expressed in terms of duration, not in specific goals and objectives, and often end with a subjective assessment that the trainer is ready.

David L. Grieve, The Identification Process: The Quest for Quality, 40 J. of Forensic Identification 109, 110–11 (1990), quoted in Def. Mot. at xxix.

[27] The IAI is "a forensic organization here in the United States that supports training and holds conferences and attempts to set standards for the United States." Test. Ashbaugh, Tr. July 7, 1999, at 178.

-40-