### D.   General Acceptance

In Daubert, the Supreme Court noted that "general acceptance"—the major ingredient of the Frye legacy—can still lend support to a trial judge's finding that a technique is scientifically reliable. Daubert, 509 U.S. at 594.[28] The government points out that fingerprint identifications have been used for over 100 years. Gov't Mot. & Resp. at 3. See also Ramsey, Cr. No. 01-5-4, at 9 (acknowledging that fingerprint identifications are "generally accepted in the relevant scientific community" because they are "accepted by the vast, vast majority of persons who are engaged in fingerprint analysis"). In addition, Mr. Meagher testified that he sent a survey to state law enforcement agencies, with a striking result: "Unanimously, all states responded, the fact that they do use fingerprints as a means to individualize and they all believe in the two basic principles to our discipline, that is, fingerprints are unique and permanent." Test. Meagher, Tr. July 8, 1999, at 112. It is apparent that law enforcement officials uniformly place strong reliance on the fingerprint examiner community's acceptance, and utilization, of ACE-V and its kindred identification processes.

General acceptance by the fingerprint examiner community does not, however, meet the standard set by Rule 702. First, there is the difficulty that fingerprint examiners, while respected professionals, do not constitute a "scientific community" in the Daubert sense. See

---

[28] In listing "general acceptance" as a reliability factor, the Court quoted with approval Judge Becker's opinion in Downing, in which he wrote that a "reliability assessment does not require, although it does permit, explicit identification of a relevant scientific community and an express determination of a particular degree of acceptance within that community." 753 F.2d at 1238.

supra, text following note 20; see also note 28. Second, the Court cautioned in Kumho Tire that general acceptance does not "help show that an expert's testimony is reliable where the discipline itself lacks reliability." 526 U.S. at 151. The failure of fingerprint identifications fully to satisfy the first three Daubert factors militates against heavy reliance on the general acceptance factor.[29] Thus, while fingerprint examinations conducted under the general ACE-V rubric are generally accepted as reliable by fingerprint examiners, this by itself cannot sustain the government's burden in making the case for the admissibility of fingerprint testimony under Federal Rule of Evidence 702.

## VI.    Admission of Fingerprint Testimony

Pursuant to the foregoing discussion, it is the court's view that the ACE-V fingerprint identification regime is hard to square with Daubert.

The one Daubert factor that ACE-V satisfies in significant fashion is the fourth factor: ACE-V has attained general acceptance within the American fingerprint examiner

---

[29] As noted above, until Daubert displaced Frye, "general acceptance" was widely considered the standard of admissibility for scientific evidence. The Court ruled that "the Frye test was superseded by the adoption of the Federal Rules of Evidence." Daubert, 509 U.S. at 587. Thus, in stating that general acceptance was still a factor to be considered in determining the admissibility of scientific evidence, the Court did not intend that scientific evidence could be deemed reliable and thus admissible based on its general acceptance alone. To do so would be to maintain Frye as the controlling standard for the admission of scientific evidence, a prospect which the Court clearly did not intend.

community.[30] But the caveat must be added that, in the court's view, the domain of knowledge occupied by fingerprint examiners should be described, in Rule 702 terms, by the word "technical," rather than by the word "scientific," the word the government deploys.

Given that Kumho Tire establishes that the Daubert analysis is applicable to "technical" as well as "scientific" knowledge, it may be thought that this court's characterization of the knowledge base of fingerprint examiners as "technical" rather than "scientific" is a semantic distinction which is of no practical consequence. However, as discussed above, the court finds that ACE-V does not adequately satisfy the "scientific" criterion of testing (the first Daubert factor) or the "scientific" criterion of peer review (the second Daubert factor). Further, the court finds that the information of record is unpersuasive, one way or another, as to ACE-V's "scientific" rate of error (the first aspect of Daubert's third factor), and that, at the critical evaluation stage, ACE-V does not operate under uniformly accepted "scientific" standards (the second aspect of Daubert's third factor).

Since the court finds that ACE-V does not meet Daubert's testing, peer review, and standards criteria, and that information as to ACE-V's rate of error is in limbo, the expected conclusion would be that the government should be precluded from presenting any

---

[30]General acceptance need not connote universal and unqualified acceptance. As pointed out above, some state fingerprint examiners (like some in other countries) require a minimum number of points in common between the latent print and the rolled print before an identification can be arrived at, whereas ACE-V, at the "evaluation" phase, sets no minimum standard and relies, instead, on the "subjective" judgment of the examiner. See supra Parts I.C, V.C.2.b.

fingerprint testimony. But that conclusion—apparently putting at naught a century of judicial acquiescence in fingerprint identification processes—would be unwarrantably heavy-handed. The Daubert difficulty with the ACE-V process is by no means total. The difficulty comes into play at the stage at which, as experienced fingerprint specialists Ashbaugh and Meagher themselves acknowledge, the ACE-V process becomes "subjective"—namely, the evaluation stage. By contrast, the antecedent analysis and comparison stages are, according to the testimony, "objective": analysis of the rolled and latent prints and comparison of what the examiner has observed in the two prints. Up to the evaluation stage, the ACE-V fingerprint examiner's testimony is descriptive, not judgmental. Accordingly, this court will permit the government to present testimony by fingerprint examiners who, suitably qualified as "expert" examiners by virtue of training and experience, may (1) describe how the rolled and latent fingerprints at issue in this case were obtained, (2) identify and place before the jury the fingerprints and such magnifications thereof as may be required to show minute details, and (3) point out observed similarities (and differences) between any latent print and any rolled print the government contends are attributable to the same person. What such expert witnesses will not be permitted to do is to present "evaluation" testimony as to their "opinion" (Rule 702) that a particular latent print is in fact the print of a particular person. The defendants will be permitted to present their own fingerprint experts to counter the government's fingerprint testimony, but defense experts will also be precluded from presenting "evaluation" testimony. Government counsel and defense counsel will, in closing

-44-

arguments, be free to argue to the jury that, on the basis of the jury's observation of a particular latent print and a particular rolled print, the jury may find the existence, or the non-existence, of a match between the prints.

In arriving at this disposition of the competing government and defense motions and supporting memoranda, this court has derived substantial assistance from the thoughtful approach taken by Judge Gertner, of the District of Massachusetts, in dealing with the comparable problem of handwriting evidence. In United States v. Hines, 55 F. Supp. 2d 62 (D. Mass. 1999), Judge Gertner wrote as follows:

> The Harrison [Diana Harrison, an FBI document examiner] testimony may be divided into two parts: Part 1 is Harrison's testimony with respect to similarities between the known handwriting of Hines, and the robbery note. Part 2 is Harrison's testimony with respect to the author of the note, that the author of the robbery note was indeed Hines.

55 F. Supp. 2d at 67.

> When a lay witness, the girlfriend of the defendant for example, says "this is my boyfriend's writing," her conclusion is based on having been exposed to her paramour's handwriting countless times. Without a lay witness with that kind of expertise, the government is obliged to offer the testimony of "experts" who have looked at, and studied handwriting for years. These are, essentially, "observational" experts, taxonomists—arguably qualified because they have seen so many examples over so long. It is not traditional, experimental science, to be sure, but *Kumho*'s gloss on *Daubert* suggests this is not necessary. I conclude that Harrison can testify to the ways in which she has found Hines' known handwriting similar to or dissimilar from the handwriting of the robbery note; part 1 of her testimony.

> Part 2 of the Harrison testimony is, however, problematic. There is no data that suggests that handwriting analysts can say, like DNA experts, that this person is "the" author of the document. There are no meaningful, and accepted validity studies in the field. No one has shown me Harrison's error

-45-

rate, the times she has been right, and the times she has been wrong. There is no academic field known as handwriting analysis. This is a "field" that has little efficacy outside of a courtroom. There are no peer reviews of it. Nor can one compare the opinion reached by an examiner with a standard protocol subject to validity testing, since there are no recognized standards. There is no agreement as to how many similarities it takes to declare a match, or how many differences it takes to rule it out.

Id. at 69 (footnotes omitted).

I find Harrison's testimony meets Fed. R. Evid. 702's requirements to the extent that she restricts her testimony to similarities or dissimilarities between the known exemplars and the robbery note. However, she may not render an ultimate conclusion on who penned the unknown writing.

Id. at 70–71.[31]

## VII.  CONCLUSION

For the foregoing reasons:

A.    This court will take judicial notice of the uniqueness and permanence of fingerprints.

B.    The parties will be able to present expert fingerprint testimony (1) describing how any latent and rolled prints at issue in this case were obtained, (2) identifying, and placing before the jury, such fingerprints and any necessary magnifications, and (3) pointing

---

[31] Accord United States v. Van Wyk, 83 F. Supp. 2d 515, 523–24 (D.N.J. 2000) (relying on Hines in permitting a forensic stylist to compare writings of known authorship with writings of unknown authorship, but not permitting the forensic stylist to give an opinion as to the author of the questioned writings). But see United States v. Paul, 175 F.3d 906 (11th Cir. 1999) (upholding trial court's decision to permit a handwriting examiner to give an opinion as to the author of documents in question).

out any observed similarities and differences between a particular latent print and a particular rolled print alleged by the government to be attributable to the same persons. But the parties will not be permitted to present testimony expressing an opinion of an expert witness that a particular latent print matches, or does not match, the rolled print of a particular person and hence is, or is not, the fingerprint of that person.

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

v.

CARLOS IVAN LLERA PLAZA,

WILFREDO MARTINEZ ACOSTA, and

VICTOR RODRIGUEZ

Cr. No. 98-362-10, 11, 12

ORDER

For the reasons expressed in the accompanying opinion,

1. The government's Combined Motion in Limine to Admit Latent Print Evidence and Response to Defendant Acosta's Motion to Preclude the Introduction of Latent Fingerprint Identification Evidence is GRANTED insofar as it asks this court to take judicial notice of the uniqueness and permanence of fingerprints;

2. The balance of the government's motion, together with the defendants' Motion to Preclude the United States from Introducing Latent Fingerprint Identification Evidence, are GRANTED IN PART and DENIED IN PART. The government may present expert fingerprint testimony (1) describing how the rolled and latent fingerprints at issue in this case were obtained, (2) identifying, and placing before the jury, the fingerprints and such