# HOMELAND SECURITY SPECIAL

**KART DIGITAL, INC.**

**New Pricing**






Item Number:  1
Bryco Arms 380 pistol,semi aut
Date Submitted:  10/3/2000 11:43:00 AM
Date Printed   10/3/2000 12:44:46 PM

Invoice #:
G1005540
Property Tag:
425307A

**If you are ready to update your Property Room, this is the System you need.**

A complete turnkey System, including:

- Professional Evidence Tracking System Software
- New Dell Computer w/ Monitor
- Wireless Handheld Bar Code Scanner
- Bar Code Printer
- Manual, training, etc.

**Special Offer**

This Dell Computer is shipped to you with the entire Evidence Tracking System installed, tested and operational.

Open the Box and you are operational from the first day. We offer a sixty day satisfaction guarantee, or a full refund.

# $2995 Full Turnkey Price

## System provides:

- Complete Chain of Custody
- Fully user programmable
- User can customize screens and format to fit current practices and routines
- Unique prompt for future review or purge
- Full range of Reports
- Search entire inventory with web-style browser
- Add many upgrade features as desired

This is a Professional Full Featured System that can grow with your needs.

For demo, go to www.kartdigital.net then select PRIMS 4G Demo, then click "Login" to see screens.

**Contact us at:**
**3525 Turtle Creek #11E**
**Dallas, TX 75219**
**Phone:  214-528-1969**
**Fax:  214-512-1969**
**Email:**
**jack.hooker@kartmail.com**

# PRIMS 4 G WITH VIPER TECHNOLOGY



KART DIGITAL, INC.

**PRIMS 4 G** is the 4th Generation of the most-advanced, fully automated property and evidence management system available for law enforcement agencies.   It manages, tracks, and archives the day-to-day property and evidence management workload.

**VIPER TECHNOLOGY** is the advanced technology that allows integration of **PRIMS 4G** into all Law Enforcement Databases, RMS Systems, and more.

**PRIMS 4 G** and **VIPER TECHNOLOGY** together create a system that is user customized and can be easily integrated into your operation.

**PRIMS** was designed by a specialized team of law enforcement, forensic, and data processing professionals with over 75 years of property room and law enforcement experience.

KART Digital developed **PRIMS** for and with the Dallas (Texas) Police Department.  It closely follows I.A.P.E. principles.

**Viper Technology: The new generation technology designed to integrate and/or replace expensive RMS systems with a modern and powerful database, including Property Room, Quartermaster, Auto Pound, Pawn Shop, Traffic tickets, and more.**

## *Other KART Digital Systems Built on VIPER Technology*

**CLIMS**
Crime Lab Information Management System

**LIMS**
Forensic Lab Information Management Systems

**ADSTAR**
Advanced Digital Security Tracking and Receiving (QuarterMaster)

**PRIDE**
Police Regional Investigative Data Exchange

**DSS**
Digital Surveillance Systems



**Contact us at:**
**3525 Turtle Creek #11E**
**Dallas, TX 75219**
**Phone:  214-528-1969**
**Fax:  214-512-1969**
**Email:**
**jack.hooker@kartmail.com**
**Demo available at**
**www.kartdigital.net**
**Click on "login" to enter**

# Daubert Hearings:
# Their impact on fingerprint examiners

An exclusive *Evidence Technology Magazine* interview with
## Stephen B. Meagher
Unit Chief, Supervisory Fingerprint Specialist
Latent Print Unit 3—Forensic Analysis Section—Laboratory Division
Federal Bureau of Investigation



Stephen B. Meagher

**EVIDENCE TECHNOLOGY:** *According to the background information we have, you've testified in more than a dozen Daubert Hearings. Correct?*

**MEAGHER:** Yes, although I use the term "Daubert Hearing" generically. Some state cases don't use "Daubert." Instead, they use whatever local case law reflects the admissibility of expert testimony in court. In addition, I have been indirectly involved in another 50 or 60 cases where the attorneys or local fingerprint examiners have consulted with me on how to approach these types of hearings. I've helped them determine what information should be available for testifying and for meeting the Daubert criteria.

**EVIDENCE TECHNOLOGY:** *What is the real issue in a Daubert Hearing? Is it determining what will be allowed into testimony in a trial? Or does the hearing focus on determining how that evidence will be presented?*

**MEAGHER:** Let's discuss what the term "evidence" means when we're talking about latent fingerprints. In a Daubert Hearing, the actual evidence that would be presented in the trial is not even relevant. In other words, the actual identification—or ident—testimony against a defendant is not an issue. Neither is the evidence on which the latent print was developed. What *is* at issue in a Daubert Hearing is the underlying basis that allows you to make an identification. That is what has to be testified to in court in a Daubert Hearing. You have to be able to provide the scientific basis that allowed you to make the ident. If you're going to say, "This fingerprint belongs to this person to the exclusion of any other individual," then you have to be able to sit there and support the basis for that position.

**EVIDENCE TECHNOLOGY:** *And in most cases, what is that basis?*

**MEAGHER:** There are two fundamental principles for fingerprints. Number One, they are unique. And Number Two, they are permanent. Uniqueness means that the friction-ridge arrangement of each person's fingerprint, palmprint, and footprint is unique to that individual area. One fingerprint on your left index finger is different from the fingerprint on your left middle finger —and it is also different from any other area of friction-ridge detail on your finger, your palm, or your foot.

**EVIDENCE TECHNOLOGY:** *What about the permanence of fingerprints?*

**MEAGHER:** The other issue is the permanence of fingerprints. The friction-ridge detail on a person's finger, palm, or foot was created before birth and it remains constant throughout life until decomposition of the body after death.

**EVIDENCE TECHNOLOGY:** *So how do you go about proving uniqueness and permanence?*

## A brief look at Meagher's career with the Federal Bureau of Investigation

Stephen B. Meagher joined the FBI in Feburary of 1972. His entire 30-year-plus career has been focused on learning, using, and advancing the technology of latent fingerprints. He has been involved in forensic latent-print examinations in more than 1,000 cases, including international investigations and FBI investigations of a sensitive and secret nature. He has effected millions of technical comparisons and thousands of latent-print identifications and verifications. He has testified in more than 80 Federal, state, and local courts, each time qualifying as an expert. In 1976, Meagher began research in fingerprint automation technology—and in 1983, he implemented the first FBI operational automated latent-print search-and-match system. From 1990 through 1998, he managed the latent-print aspects that were associated with the development of the IAFIS (Integrated Automated Fingerprint Identification System). That system became operational in 1999. Over the years, Meagher has given more than 100 informational speeches and technical lectures outside the FBI. He is a member of the board of directors for the International Association for Identification (IAI); a member of the Scientific Working Group on Friction-ridge Analysis, Study, and Technology (SWGFAST); and an inspector for the American Society of Crime Laboratory Directors—Laboratory Accreditation Board (ASCLD—LAB). Meagher is stationed at the new FBI Laboratory Division in Quantico, Virginia.

# INTERVIEW

**MEAGHER:** You have to understand that you could never totally prove it unless you were to fingerprint every person in the world and compare those fingerprints with every person who is currently living or who has ever lived. You will never achieve 100-percent certainty. But what we can do is study the biological sciences. And those sciences maintain that the human body will create and develop unique friction-ridge arrangements—and that those friction-ridge arrangements will remain permanent throughout a person's life. Studies such as this have been done numerous times over the past 100 years. There is a huge amount of literature that has been published and peer-reviewed in the medical journals and forensic-science journals. It is well understood that genetics, embryology, and anatomy all have an influence on the actual creation of one's fingerprint friction-ridge arrangement.

**EVIDENCE TECHNOLOGY:** *Such as arches, loops, and whorls...*

**MEAGHER:** That's the way the general society understands it: arches, loops, and whorls. But those are just terms used to classify the general shapes of the friction-ridge arrangements. They are not used alone in making an identification decision. They are *part* of it—but an ident cannot be based *solely* on that information.

**EVIDENCE TECHNOLOGY:** *Okay. The biological sciences help support our position. What is the other part?*

**MEAGHER:** The other thing that supports the fundamental principles of uniqueness and permanence is the existence of statistical studies. One of the more high-profile statistical studies was done in connection with a Daubert Hearing for the case of *U.S. v. Byron C. Mitchell.* In that study, the FBI asked Lockheed Martin Corporation to conduct a fingerprint comparison test involving 50,000 fingerprints. The test used the Integrated Automated Fingerprint Identification System—or IAFIS—matcher algorithms to run each fingerprint against the 50,000 fingerprints. The purpose of the study was to support the position that latent finger-

> "In a Daubert Hearing, the actual evidence that would be presented in the trial is not even relevant. In other words, the actual identification testimony ...is not an issue. Neither is the evidence on which the latent print was developed. What is at issue ...is the underlying basis that allows you to make an identification."

prints are unique from one individual to another. There is that study, as well as a number of other studies that have been done over the last 100 years. There are probably 12 to 15 of these studies that examine the matching of fingerprints—and the results are common: They all agree that the chance against finding two individuals who have the same fingerprint far exceeds the world's population—multiplied times ten for each finger. In other words, the chance of ever finding two individuals who have the same fingerprint basically amounts to zero. Of course, statistically, you can't say "zero" because when you're talking about a statistical probability, it will always be "one chance in something or other."

**EVIDENCE TECHNOLOGY:** *Didn't that particular study—the Lockheed Martin study—generate some criticism, including an article that was posted on the Internet entitled "When Bad Science Leads to Good Law"?*

**MEAGHER:** Right. That was an article written by Dr. James L. Wayman of the U.S. National Biometric Test Center. He criticized the study we had done with regard to using IAFIS technology to support the premise of the uniqueness of fingerprints. In my opinion, it was unfortunate the way that he received information prior to writing his article. He was contacted

by the defense and they presented him with the report that was generated by Lockheed Martin. I think they probably misrepresented its purpose. As a result, Dr. Wayman responded critically with the wrong perception of what that test was meant to achieve. Therefore, his criticisms—while they would be valid under the conditions outlined by the defense—were not valid at all given the actual purpose of the test.

**EVIDENCE TECHNOLOGY:** *Can you be more specific?*

**MEAGHER:** Sure. He criticized two main aspects of the study: the statistical model and the fact that we were not using multiple samples from the same finger. But our purpose was not to demonstrate the matching of multiple impressions from the same finger. Instead, our purpose was to show how different fingerprints are from each other. So I was interested in matching fingers against different fingers in an effort to try and find two different individuals with the same fingerprint. And that is an entirely different question from the one Dr. Wayman was trying to answer. He was asking, "What do you need in order to match two fingerprints?" Unfortunately, because he had that misunderstanding, he wrongly criticized the report. In essence, he was criticizing the statistical model. And I would agree with him if we were addressing the question he *thought* we were addressing. I would be in total agreement that that would be the wrong math to use if you were trying to demonstrate the matching of fingerprints. But the intent of our test was to demonstrate how vastly different are the fingerprints from different individuals. And we believe the Lockheed Martin study was appropriate for that task.

**EVIDENCE TECHNOLOGY:** *This whole controversy—over whether latent-fingerprint analysis is scientific in nature—has been brewing for quite some time now. You seem to be one of those individuals who are at the center of the controversy. Tell us more about your role.*

**MEAGHER:** Let me give you some historical perspective. In 1993, the

# INTERVIEW

U.S. Supreme Court handed down its decision in the case of *Daubert v. Merrill-Dow Pharmaceutical.* That was a civil case—and it had nothing to do with fingerprints or forensic science. But it did set a precedence for the criteria that the Federal courts needed to follow in an effort to determine what is valid science—and to keep out the so-called "junk science" and the experts who really didn't have the basis upon which to state their opinions. We—the people who deal with latent fingerprints on a daily basis—knew from 1993 that the forensic sciences would eventually be challenged. And the first one that was really challenged was the field of DNA analysis. We were just waiting for our turn. And the first case that came up to challenge fingerprints occurred in 1999. It was *U.S. v. Byron C. Mitchell* in the court of Judge J. Curtis Joyner of the Eastern District of Pennsylvania. It was an FBI case. And that case stimulated an effort within the FBI Laboratory to prepare a very sound argument to defend the science of fingerprints under the Daubert ruling.

**EVIDENCE TECHNOLOGY:** *This was the 1999 case that we're still hearing about, right?*

**MEAGHER:** Correct. I was asked to be the lead in coordinating the efforts of the government's witnesses. I began by reviewing all of the existing literature that we had for our discipline at that time and I put together a strategic framework for gathering the appropriate people to discuss how we would answer all of the Daubert guidelines. As part of my duties, I worked closely with SWGFAST—the Scientific Working Group on Friction-ridge Analysis, Study, and Technology. This is a group of individuals who are experts within the field of fingerprints. They meet twice a year to discuss standards and guidelines that are used to regulate the latent-fingerprint discipline. SWGFAST members are recognized throughout the country by federal, state, and local agencies as being prominent and significant individuals within the field. Those meetings are one week in duration. We took two full days of discussion in identifying all of the information

> "Since this particular Daubert Hearing and trial (the trial was in January, 2000) there have been 40 other hearings that were similar in nature. They ranged from formal Daubert Hearings to informal hearings that addressed the same type of issues. We have won all (of them). It should be obvious that the courts have accepted latent-fingerprint evidence under the new Daubert guidelines."

needed to address the Daubert issues. We not only identified information and exhibits, but we also identified individuals who would be best-suited to testify in court.

**EVIDENCE TECHNOLOGY:** *And what was the next step?*

**MEAGHER:** And then we had a meeting with the Assistant United States Attorney who was handling this particular case: Paul Sarmousakis of the U.S. Attorney's office in Philadelphia. Then, we had another two-day strategy meeting with all of the identified individuals who could possibly testify in support at the Daubert Hearing. From that, we narrowed it down to six individuals who would be witnesses at the Daubert Hearing in this case and who would testify to different aspects of the Daubert criteria. Then, we went to Philadelphia and put on a five-day hearing—which was basically three days of direct testimony by the government's witnesses and about a day and a half by the defense witnesses. All of the information regarding the scientific basis for fingerprints was presented to the court in that hearing. Judge Joyner ultimately ruled in favor of fingerprints—and the evidence and the testimony from the fingerprint expert was admitted at the trial.

**EVIDENCE TECHNOLOGY:** *And then the trial took place and the defendant was found guilty. Correct?*

**MEAGHER:** Yes. It was a significant event, this particular Daubert Hearing and trial. Since then—the trial was held in January of 2000—there have been 40 other hearings that were similar in nature. They ranged from formal Daubert Hearings to informal hearings that addressed the same type of issues. We have won all of those challenges. It should be obvious that the courts have accepted latent-fingerprint evidence under the new Daubert guidelines. That was a long answer to your question. But if you want more information, you can check it out on the Internet at **www.onin.com.** That's where you can see a listing of most of those cases.

**EVIDENCE TECHNOLOGY:** *So what is the status of these legal challenges? Has it been decided once and for all? Is it carved in stone, so to speak?*

**MEAGHER:** I don't think we can ever say that. The fingerprint discipline has been around for 100 years. If you look at the history of fingerprint evidence in the court systems over those 100 years, you will see that there have been numerous challenges. Depending on what seems to be the prevalent procedure for getting forensic-science testimony into the courtroom, we have been challenged in many different ways. And we have usually been able to withstand those challenges. For example: In 1923, we had the Frye Hearings that had to do with the general acceptance of a particular methodology or discipline. And as long as you adhered to that, the courts generally allowed you to testify. Federal Rules of Evidence revised those guidelines and set up Rule 702. And in 1993, along came the concept of Daubert Hearings and suddenly we had new guidelines. So if you look at it historically, we have been challenged many times in many different ways and we have withstood those challenges.

**EVIDENCE TECHNOLOGY:** *So it seems that the Daubert guidelines are just the current set of criteria that we have to deal with.*