# INTERVIEW

**MEAGHER:** Right. It wouldn't surprise me if there are modifications to the Daubert guidelines at some point in the next several years. There may be some clarifications or some new hoops that we will have to jump through. Or there might be some Supreme Court decision regarding expert testimony and scientific evidence that will set up a whole new set of guidelines.

**EVIDENCE TECHNOLOGY:** *Things just keep changing...*

**MEAGHER:** I don't think we can say that the Daubert issue for fingerprints is totally resolved. We certainly have noticed one thing: The number of challenges presented in formal Daubert Hearings have diminished significantly. We are not seeing them as often as we did over the last few years. But we are continuously being scrutinized. And I think that—the scrutiny—is a healthy thing. We should never shy away from scrutiny or the challenges. It's good for the fingerprint discipline to always take a look at itself and reexamine its basis. We must always look closely at new technologies and new ways of doing business in our field.

**EVIDENCE TECHNOLOGY:** *How are the defense attorneys adapting to this new "state of the art"? Have they developed any new tricks to get around the rulings we've been talking about?*

**MEAGHER:** The main thing we've been seeing is that the defense has adopted a tactic of not filing a formal Daubert challenge prior to trial as they did in the past.

**EVIDENCE TECHNOLOGY:** *Why?*

**MEAGHER:** Simply because they were not winning the pre-trial challenges —so now they are picking another time to challenge. What they are doing is waiting for the forensic witness to take the stand during the trial and then they raise the issue in front of the jury. In my opinion, that puts the court into a difficult position because the judge is then faced with having to deal with not only the qualifications of the witness, but also with Daubert issues during trial. Theoretically, those issues should be resolved prior to trial.

---

*"A fingerprint expert has to be prepared not only for a Daubert Hearing in a formal process, but he or she must also be able to understand the little nuances of defense attorneys... For example: You have to know the difference in meaning when the defense asks you questions based on your personal qualifications versus questions about the scientific basis of fingerprint identification."*

What the defense attorneys are doing is simple: They are trying to put the seed of doubt into the jury's mind instead of putting the seed of doubt into the judge's mind. This complicates the legal process—but that seems to be the approach of defense attorneys today. We have to remember that this is the defense attorney's job—to get their client acquitted. Complication and confusion are just some of the tactics that can be used by the defense attorney to mollify the effects of forensic science. So to answer your question: I don't think we're finished seeing the Daubert issues raised; they're just not going to be raised in the more formal way of a Daubert Hearing prior to trial.

**EVIDENCE TECHNOLOGY:** *It sounds like the groundrules will be changing considerably in the near future. What are the ramifications of these tactics as far as the witness is concerned?*

**MEAGHER:** The key thing is going to be the witness's ability to convince the judge that there is a justification for the overall admissibility of the fingerprint evidence and reliability in fingerprint identification in spite of how the defense might question it. But the witness must also be able to demonstrate to the jury that fingerprint identifications are reliable. He must be able to demonstrate to the jury that there is a

---

basis for the evidence as an established scientific discipline. He must be able to show that it goes beyond the actual pieces of evidence that are being used in the trial for identification of the defendant. So this is going to complicate the testimony of the fingerprint expert. And it puts an additional burden on the expert to convey a lot more information than would normally be presented during a trial.

**EVIDENCE TECHNOLOGY:** *It seems that this should raise some major warning flags for fingerprint examiners. They are obviously going to have to be prepared for a lot of challenges in the future.*

**MEAGHER:** That is absolutely correct. In the course of my job, I give a lot of presentations to fingerprint examiners and prosecuting attorneys. And this is one message that I try to get across loud and clear: A fingerprint expert has to be prepared not only for a Daubert Hearing in a formal process, but he or she must also be able to understand the little nuances of the defense attorneys when they are at trial. For example: You have to know the difference in meaning when the defense asks you questions based on your personal qualifications versus questions about the scientific basis of fingerprint identification. It is a difficult situation. I strongly suggest that law-enforcement agencies should incorporate training programs that will bring the fingerprint examiner back to basics to enable them to withstand a formal Daubert challenge, while at the same time teaching them how to deal with these issues in a regular trial setting.

**EVIDENCE TECHNOLOGY:** *Are there any educational resources you might recommend to a reader of Evidence Technology Magazine?*

**MEAGHER:** There are three very good websites that can be helpful. I mentioned one of them earlier: **www.onin.com**. The other two are **www.cplex.com** and **www.scafo.org**. These websites can provide you with extensive amounts of up-to-date information on Daubert matters.

**EVIDENCE TECHNOLOGY:** *Thank you for speaking with us today.* ⦿

# LATENT-FINGERPRINT FABRICATION

## Simple steps to prevent fabrication and ensure the integrity of legitimate prints

> "A *forged* latent is the print of an innocent person 'planted' at the scene of a crime by the perpetrator in an attempt to throw attention away from himself and implicate the innocent person.
> A *fabricated* latent is one manufactured or misrepresented by a person involved in the investigation in order to enhance the case against a suspect."
>
> —Pat A. Wertheim (*Journal of Forensic Identification*, Vol. 44, No. 6, 1994)

HONESTY AND INTEGRITY. These two words are perhaps the most important ingredients in the character of a person working in law enforcement. Unfortunately, those who work with latent prints may at some point have their integrity called into question—or they may be faced with questioning the integrity of another law-enforcement professional.

One small mistake or a single act of carelessness can cause the integrity of a print to be called into question during a trial, possibly resulting in the acquittal of a truly guilty individual. On the other hand, it is diligence and care on the part of sharp-eyed latent-print examiners that can reveal the dishonesty of someone in the crime-scene unit when a fabricated latent print is discovered. *(For the definition of a "fabricated" print, see the quote in the above box.)*

Cases of fabrication have shown up throughout the history of latent-print evidence. The mere fact that fabrications have been documented places a burden on the overwhelming majority of crime-scene technicians and latent-print examiners who rigidly adhere to prescribed standards of honesty and integrity. A latent-print examiner who fails to recognize a fabricated latent print and allows it to continue into a court case—no matter how innocent the oversight—is only perpetuating the crime of fabrication. Therefore, while fabricated latent prints may be rare, they do occur with enough frequency that all examiners should be aware of the warning signs of a fabricated print.

Also, those who work with latent prints should understand the steps that can be taken to ensure that the integrity of a latent print is maintained, thereby preventing legitimate prints from ever being called into question.

### Fabricated latent prints

Most of those in law enforcement will never encounter a fabricated latent print, because most officers and civilian technicians adhere to high standards of honesty and integrity.

In the rare cases when the fabrication of prints does occur, however, there are typically two differing motivations for commiting this crime: (1) a desire to catch a criminal that overwhelms one's basic sense of honesty; and (2) a need to be accepted and appreciated by one's colleagues and superiors.

According to Pat Wertheim, a criminalist at the Arizona Department of Public Safety Crime Lab in Tucson, latent-print fabrication cases have been documented involving both sworn officers and civilian technicians. "In my research," he said, "I have found completely opposite motivations to fabricate prints for these two groups."

Wertheim said the sworn officer who fabricates latent prints is usually driven by a desire to present evidence that will result in the arrest and conviction of the person he is certain is the perpetrator.

"The officer that fabricates prints, by and large, is absolutely convinced that he has the right criminal, but he lacks sufficient physical evidence to take it to trial and be assured of a conviction," said Wertheim. "So he will fabricate fingerprint evidence just to put that one final nail in the coffin, so to speak."

Wertheim said he believes that in the majority of fabrication cases, the officer who fabricates prints is probably correct in his suspicions. But, clearly, the possibility that the officer might be wrong in his suspicions is what makes the fabrication of prints so dangerous.

"Unfortunately, in my experience, I have found cases where the officer did not have the right person," said Wertheim. "The New York State Police fabrication case that dates back to the late 1980s and early 1990s is a classic example: A lieutenant was coaching several subordinates in fabricating evidence. Most of the time they had the right people. But there were some stark exceptions to that, where the absolutely wrong people ended up going to the penitentiary for crimes that they did not commit."

Wertheim said that while he was investigating one officer, he discovered that others in the department were afraid of that officer. "They said it seemed as if he was on a holy crusade against crime. It was too much. And they did not trust him. Sure enough, he was fabricating evidence—not just fingerprint evidence but other kinds, as well."

# INTEGRITY OF A PRINT

The other category of people in law enforcement who may fabricate prints consists of a small category of misguided civilian employees who are consciously or subconsciously hungry for acceptance from their sworn-officer counterparts in the unit.

"These are typically the 'wannabe' cops," Wertheim explained. "For some reason, they cannot quite cut the mustard to be a sworn officer. So they are willing to work in a civilian capacity as a crime-scene technician in order to be close to cops. They want to ingratiate themselves with cops by showing that they can always come through with the crucial evidence that the officers need."

He said these civilian technicians often do not care whether the fingerprint evidence they fabricate links the correct person to the crime. They simply want to be recognized and appreciated for making a positive identification.

The individuals who are actually willing to take the step to fabricate evidence are, of course, few and far between. But Wertheim said it is important for everyone working with evidence to be prepared for the possibility that—someday—they might cross paths with the work of an officer or technician who has a mentality that allows him to fabricate prints.

"I'm not saying that a latent-print examiner should be suspicious of every lift that is sent to him. But it happens. For example: In my agency, I receive latent-print evidence from about 80 different police departments in southern Arizona," said Wertheim. "Do I believe that every single cop working for those 80-some-odd agencies is 100-percent honest? No. There's always going to be a rotten apple in the barrel somewhere."

## Preventing dishonesty while promoting integrity

While the presence of dishonest individuals within any agency may be unavoidable, there are steps that can be taken to promote an environment that does not encourage dishonest individuals to fabricate prints. There are things that can be done to thwart any attempts at fabrication and to protect the legitimate evidence from being questioned.

> **"I'm not saying that a latent-print examiner should be suspicious of every lift that's sent to him... But there's always going to be a rotten apple in the barrel somewhere."**

The road to creating an environment where personnel are not inclined to fabricate evidence begins with what Wertheim described as "...a very strong, stated, and supported commitment to honesty and integrity."

Although most police departments would consider themselves to have such a policy, Wertheim said there are several inherent problems that hinder the kind of environment that promotes uncompromised honesty and integrity in law-enforcement agencies.

The first problem is an added emphasis on clearance rates. With the focus on successfully clearing latent prints, some subordinate officers might feel inclined to target their clearance rate rather than their integrity.

A second problem outlined by Wertheim is the pay structure within the crime-scene units and the crime laboratories. He said there are two differing philosophies that dictate the salaries of an agency's personnel. The first philosophy—which Wertheim recommends—considers the training and retaining of a competent civilian employee to be an investment in the department's betterment. Therefore, at agencies which practice this kind of approach, civilian crime-laboratory technicians may earn more than sworn personnel in commensurate positions.

The opposing philosophy, which can cause problems within an agency, allows certain positions to be filled with civilians—who require a lower salary than a sworn officer—simply as a means for reducing a department's payroll expenditures.

"Unfortunately, most police departments take the position that you can save money in the budget by civilianizing positions that do not require arrest power," said Wertheim. "So the civilians earn less than the officers. When the administration of a department values the civilians less than the officers, the officers' attitude toward the civilians can reflect the administration's attitude.

"Plus, most of those are such low-paid positions that they will not attract quality people who are willing to stay. So you have a high turnover. And you have a tendency to draw in people who will take those low-paid civilian positions in the hope of later getting real police jobs. That kind of person can be very, very dangerous, because he might do anything to ingratiate himself with the officers and to look good in their eyes."

These two situations—the emphasis on clearance rates and the unbalanced pay structure of civilian and sworn personnel—must be corrected before an agency can truly commit itself to honesty and integrity, said Wertheim.

Another step to creating an environment of honesty and integrity is to follow through with that commitment by openly disciplining personnel who do step over the line between honesty and dishonesty.

"When there is a problem, you have to spank that rascal so hard that everyone else realizes that if they try to cheat in your department, they're going to be gone," said Wertheim. "There can't be any sweeping it under the carpet. You have to throw the doors open to the press and make everything public immediately. You have to make a big show of cleaning house."

Wertheim again pointed to the New York State Police fabrication case as an example of how a bad situation was handled in a positive way. "They made a big public show of re-establishing their integrity," he said. "Most police departments don't do that. They tend to try to cover it up. They are afraid of what is going to happen to other cases this officer has worked on. They can see hundreds of appeals coming down the pike.

"But you must overcome that fear of what might happen and deal with it openly," Wertheim explained with some emphasis. "That way the press can see

# INTEGRITY OF A PRINT

that you will not tolerate dishonesty, and other officers will see that, too."

### When warning bells go off: How to recognize fabricated prints

Ultimately, there is one key way to stop fabricated latent prints from getting into the system, and that is for latent-print examiners to recognize a case of fabrication and to call it into question.

"The latent-print examiner needs to be constantly alert for signs of fabrication," said Wertheim. "I personally don't look at all evidence suspiciously, but as soon as a little warning bell goes off in my head, I immediately put that case aside for closer examination."

Latent prints are generally fabricated in one of three ways, according to research conducted by Wertheim. First, a print might be lifted from a known, inked print and then labeled as having come from a crime scene. Second, a print might be mislabeled as having come from a crime scene when it was actually lifted from a more benign location. And third, a print might be fabricated through the use of a staged photograph.

Wertheim listed a number of factors that should alert a latent-print examiner to a possible fabrication:

❑ **The print is too good to be true.** "Very few latent prints are absolutely pristine. They are smeared. They are partial," said Wertheim. "But the individual who is going to fabricate evidence wants to be sure that the latent-print examiner does not miss

> **"When there is a problem ...there can't be any sweeping it under the carpet. You have to throw the doors open to the press and make everything public immediately. You have to make a big show of cleaning house."**

the identification—so he fabricates a fingerprint that is really too good to be true."

Wertheim pointed to one case of fabrication that he stumbled upon. According to the documentation on the print's lift card, the latent came from the inside of a car's windshield. However, the print was fully rolled. "Hey, come on," he said. "Nobody really rolls their fingerprints on the inside of the windshield in their car."

❑ **Inconsistent background noise.** Does the background noise in the actual lift match the surface that the print was supposedly taken from? Wertheim described a case he worked on from the United Kingdom, where a print was documented as having been lifted from a piece of unfinished wood. "If that were the case, you are going to see wood grains showing up

in the background noise on the lift," he explained. "This lift didn't have any background noise like that. But it did have curved creases coming into it from all sides, and no background noise other than that."

Based on the characteristics of the lift (*Example 1, below*), Wertheim determined that the print more likely came from a curved piece of glass or ceramic. "For example, it might have come from a light bulb, or a vase," he said. "In this case, I suspect the print was lifted from a vase and then it was labeled as having come from a wooden jewelry box."

❑ **Lifts that simply do not fit in.** A latent-print examiner should be alert for lifts that have different characteristics from the other lifts collected at the same scene. Watch for inconsistencies in the colors of powders, said Wertheim. For example, if all of the latents taken from a crime scene were developed with a black powder, the presence of one or two lifts with gray powder should quickly capture the examiner's attention.

Also, Wertheim warns to watch for prints that are in ink instead of powder. "Many fabrications occur from an inked print card," he said.

You should watch for a different color in the pen ink or irregularities in the handwriting on the lift card, as well. "If I have 50 lifts marked and initialed with black ink and the 51st lift is marked with blue ink and has a different style of handwriting—and that 51st is the only identification—then I have a real problem with it," said Wertheim.

❑ **Inconsistency in lift tapes.** The kind of tape used to lift a latent print should be taken into consideration, as well. "In one fabrication case that I saw, the fabricated latents were lifted with regular Scotch-brand tape," said Wertheim (*Example 2 on next page*). "They were lifted from a ten-print card—and the adhesive on regular lift tape is too aggressive to take a lift from a piece of paper, because it will shred the paper. So the fabricator had used Scotch-brand tape because it is only a moderately aggressive adhesive and it will not shred the paper on the ten-print card."



*Example 1*—A latent-print lift similar to this one was labeled as having been taken from the top of a jewelry box at a burglary scene. A defense expert reviewing the evidence noticed the scalloping and curved creases. The jewelry box was made of flat, unfinished wood with heavy woodgrain. The surface from which the latent was lifted is believed to have been curved glass such as a vase or a bottle.

# INTEGRITY OF A PRINT

**When the prints are legitimate: Documentation for latent integrity**

It is not enough to know the signs of fabricated latents. A crime-scene technician must also understand that defense attorneys will be looking for flaws in the integrity of legitimate latent prints, as well. And while it might seem like a basic step, Wertheim said one mistake made when handling latent prints is quite common: The failure to properly document a print.

"Documentation, documentation, documentation," said Wertheim. "You don't know how many fingerprint lifts I get submitted to me from small agencies that do not have a single mark of ink on the lift." Wertheim stressed that it is not enough for a crime-scene technician to initial the tape and the lift card. Much more documentation is required to ensure the latent-print evidence is not called into question months or years later, when it is finally entered as evidence in court.

"I handled one murder case that was eleven years old when I received the comparison request," Wertheim said. "Now, I had not made the lifts—they were made years before. When I pulled them out, there were eleven lifts, and every single one of them was identifiable to the suspect that the agency had developed. But not a single one of those lifts had an ink mark on it: no initials, no date, nothing. And, in the meantime, the technician who lifted them had died. Now, how could we expect to get those lifts admitted into court? It was impossible. Utterly impossible."

This kind of error can be avoided by following one or more of these simple procedural steps that ensure the integrity of a latent print:

**1) Photograph the latent print.** The most effective way of documenting a latent print is to photograph it in place, before it is lifted. "And that does not mean just one close-up," said Wertheim. "You need to take overall crime-scene photos, medium-range photos, and close-up photos."

**2) Have the lifts witnessed.** When most crime-scene technicians work a scene, chances are they are not working alone. Another officer,

> "When you are aware that fabrication does occur and that evidence can be challenged on those grounds, documentation becomes the most important thing for latent-print examiners and crime-scene technicians to practice."

technician, or even a victim can initial the lift card to verify the authenticity of the latent-print lift.

**3) Take detailed, thorough notes.** Document the latent by taking good crime-scene processing notes. Describe the surface where you lifted the print, as well as the numerous surfaces that you processed but did not find prints.

**4) Create some background noise.** Wertheim said that after dusting and photographing a print, he marks the surface near the latent print with a ball-point pen, a Sharpie marker, or an erasable marker, depending on the surface and the situation. This mark can be a line, an initial, or an arc over the latent. "Then I will re-photograph after marking the latents. When I lift the print, the markings show up as background noise in the lift—which corresponds with the photograph of the print in place," he said.

**5) Keep your lift cards together.** At the Arizona Department of Public Safety, said Wertheim, their lift cards arrive at the agency in padded form—like a notebook or tablet. "I do not separate my lift cards, so that when I am finished with a crime scene, all of my lifts are still in the padded form, That prevents the substitution or the insertion of a lift by someone else—or by me, for that matter—at a later date."

**6) Use serial-numbered lift cards.** This tip is similar to keeping the lift cards attached in padded form. Serial-numbered lift cards prevent the insertion of fabricated latents at a later date. "The lift cards come from the printer with unique serial numbers that cannot be duplicated," explained Wertheim. "Then, in your crime-scene notes and your evidence-processing notes, you record the numbers on the lift cards that you used for that scene."

While Wertheim recommends these as possible methods of documentation, each department should choose a combination of these or other methods that meet their specific needs.

"When you are aware that fabrication does occur and that evidence can be challenged on those grounds, documentation becomes the most important thing for latent-print examiners and crime-scene technicians to practice," said Wertheim. "Document your evidence so absolutely that it can always be tied back independently to the surface where you lifted it." ⟨⟨O⟩⟩

*—By Kristi Mayo*



*Example 2—A latent-print lift similar to this one was submitted to a state crime lab. It was labeled as having been lifted from the inside surface of a car's windshield. But note three tell-tale items: (1) There are colored paper fibers in the lines to the left of the print; (2) It is a fully rolled print; and (3) It was obviously lifted with 1/2-in. Scotch-brand cellophane tape rather than regular lifting tape.*