# GOVERNMENT'S ADDENDUM 15

# ALLEN DEPARTMENT OF JUSTICE SUBMISSION 1998

# (ADDENDUM TO DOCUMENT 110)

UNITED STATES OF AMERICA
DEPARTMENT OF JUSTICE
DISTRICT OF COLUMBIA

----------------------------

In the matter of the application of
      EDWARD L. DOWD, United States
      Attorney for the Eastern District of Missouri,
      for authorization to seek the
      death penalty in the case of:

UNITED STATES v. BILLIE ALLEN
Docket Number 4:97CR0141 ERW (TCM)

        To:    Kevin DiGregory
              Department of Justice
              Washington, D.C. 20530

## DEFENDANT'S OPPOSITION TO THE UNITED STATES ATTORNEY'S REQUEST TO SEEK PENALTY BY DEATH

On behalf of Billie Allen, the undersigned counsel requests that the Attorney General not seek penalty by death for charges against Allen filed pursuant to 18 U.S.C. Sections 1111, 2, 924(c)(1) and (j)(1), and 2,2113(a) and (e). This request is submitted pursuant to Section 9-10.000(F) of the United States Attorneys Manual (hereinafter "Manual"). This document is submitted with the understanding that, pursuant to Federal Rule of Criminal Procedure 11(e)(6) and Federal Rule of Evidence 410, any statement made herein is inadmissible against the defendant.

### A. THE PROCESS

The Attorney General's determination of whether to seek the death penalty is an administrative one, and as such, is subject to the Administrative Procedure Act, 5 U.S.C. §701 et seq., and more particularly §706 which provides in pertinent part:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of an agency action. The reviewing court shall --

1

\* \* \* \*

2. hold unlawful and set aside agency action, findings and conclusions found to be --

a. arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;..."

5 U.S.C. §706.

In this case, the Attorney General is called upon to make her evaluation in accordance with the recently issued Protocol relating to Section 9-10.000 of the United States Attorney's Manual. See Protocol: Federal Prosecutions in Which the Death Penalty May Be Sought (Jan. 27, 1995). The Attorney General is bound by her own regulations, and review of the granting of an application to seek the death penalty is subject to the "arbitrary and capricious" and "abuse of discretion" standards contained in the Administrative Procedure Act. See Harper v. Levi, 520 F.2d 53, 64-69 (D.C. Cir. 1975) (holding that Attorney General decisions are reviewable); see also, Jean v. Nelson, 472 U.S. 846, 855-56 (1985) (noting that the Attorney General abuses her discretion if she or her agents deviate from their own internal regulations); Haitian Centers Council, Inc. v. Sale, 823 F. Supp. 1028, 1048-49 (E.D.N.Y. 1993) (noting that one of the ways by which the Attorney General can abuse her discretion is if she or her agents deviate from their own internal regulations).

## B. THE AGGRAVATING FACTOR REQUIREMENT

Before the government can even consider seeking the death penalty, it must first be able to prove, beyond a reasonable doubt, that at least one aggravating factor exists, and that said factor outweighs any mitigating factors. If no mitigating factors are found to exist, it must then find that the aggravator alone justifies a sentence of death. 18 U.S.C. § 3593 (c)-(e). During this weighing process, any mitigating factor that could reasonably be raised by

2

the evidence must be considered in the light most favorable to the defendant.

In this case the list of possible factors that may be utilized at the penalty phase of the trial includes:

1.  The defendant intentionally killed the victim. (18 U.S.C. § 3591(a)(2)(A)).

2.  The defendant, in the commission of the offense, or in escaping apprehension for the offense, knowingly created a grave risk of death to one or more persons in addition to the victim of the offense. (18 U.S.C. § 3592(c)(5)).

3.  The defendant committed the offense in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to the victim. (18 U.S.C. § 3592(c)(6)).

4.  The defendant committed the offense as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value. (18 U.S.C. § 3592(c)(8)).

5.  The defendant committed the offense after substantial planning and premeditation to cause the death of a person. (18 U.S.C. §3592(c)(9)).

6.  The effect of the offense on the victim and the victim's family as evidenced by oral testimony, the victim impact statement, and any other relevant information. (18 U.S.C. §3593(a)).

Counsel is not presently prepared to refute the possible existence of all of the above listed aggravating factors, nor to present evidence to support the existence of mitigating factors, and thus will not do so here. Mr. Allen has not yet been examined by a mental health care expert in order to determine the possible existence of neurological or mental disorders or syndromes that could have impaired his capacity or contributed to his alleged behavior. See 18 U.S.C. §§ 3592(a)(1) and (6). Additionally, Allen's level of participation, if any, is a factual determination to be made from all the evidence, and thus had not been sufficiently evaluated or investigated.

There are, however, several immediately apparent mitigating factors. First, there is

another at least equally culpable co-defendant. Because culpability is the crux of the death penalty question, see Penry v. Lynaugh, 492 U.S. 302, 319 (1989), due process and 18 U.S.C. Section 3592 (a)(3) require consideration of the relative culpability of a co-participant as a mitigating factor. Cf. Mak v. Blodgett, 970 F.2d 614, 623 (9th Cir. 1992). It would be a great injustice if an equally (and possibly more) culpable Holder escapes with his life, while Allen faces the possibility of losing his.

Second, Allen's youth should also be considered as a potential mitigating factor. Adolescence is a time and a condition of life when a person may be most susceptible to influence and psychological damage. Eddings v. Oklahoma, 455 U.S. 104, 115 (1982). Generally, teenagers are less mature and responsible than adults. They often the lack experience, perspective, and judgment expected of adults, and tend to have less capacity to control their conduct. Id. at 115-16. "Moreover, youth crime as such is not exclusively the offender's fault; offenses by youth also represent a failure of family, school, and the social system, which share responsibility for the development of America's youth." Id. at 115 n.11 (quoting Twentieth Century Fund Task Force on Sentencing Policy Toward Young Offenders, Confronting Youth Crime 7 (1978)). See also Johnson v. Texas, 113 S.Ct. 2658, 2668-69 (1993). Despite Allen's having nosed[1] under the statutory limitation imposed by the legislation, his youth remains an appropriate mitigating factor.

## C. THE APPEARANCE OF RACIAL IMPROPRIETY

From a prosecutor's viewpoint, there is one distinct advantage to prosecuting cases emanating from large metropolitan areas such as St. Louis - the racial composition of the jury. That "advantage" indisputably violates Allen's right to a trial by a jury of his peers as

---

[1]    Allen was 19 at the time of the offense.

4

guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution.

Congress' concern over the existence of possible racial motives in the pursuit of a federal death sentence is apparent. The Congressional debate prior to the enactment of 21 U.S.C. Section 848 included explicit discussion of the problem of racial discrimination, and of the Supreme Court's treatment of it in McCleskey v. Kemp, 482 U.S. 920 (1987). For instance, during the Senate debates, Senator Orrin Hatch of Utah discussed McCleskey's requirements for proof of discrimination:

> The McCleskey versus Kemp decision itself establishes the proposition that racial animus will not be allowed to taint the criminal justice system. At the very outset of its opinion the Supreme Court establishes that McCleskey would prevail under the equal protection clause and escape the death penalty if he could show that "the decision makers in this case acted with discriminatory purpose".
>
> The slightest proof that a single juror, prosecutor or judge acted with discriminatory purpose would invalidate the sentence.
>
> In other words, if McCleskey could produce any evidence that discrimination "specific to his own case" occurred, he would prevail. This is ample protection against any racial prejudice creeping into these sensitive criminal justice processes.
>
> *   *   *   *
>
> The slightest evidence of purposeful discrimination that actually relates to a defendant's case will receive the strictest of judicial attention and that needs to be brought forth.

134 CONG. REC. S7472-02 (June 9, 1988) (statement of Senator Orrin Hatch of Utah). Similarly, Senator Alfonse D'Amato of New York, the prime sponsor of the bill, expressed the intention to "take every step possible to eliminate discrimination by the juries, by the prosecutors, by the judges." 134 CONG. REC. S15746-01 (October 13, 1988) (statement by Senator Alfonse D'Amato). Accordingly, Congress mandated that allegations of discrimination would "receive the strictest of judicial attention" and that "[t]he slightest proof

that a single juror, prosecutor, or judge acted with discriminatory purpose would invalidate the sentence." 134 CONG. REC. S7472-02 (June 9, 1988) (emphasis added). The same concerns about racial bias entering into a decision to seek or impose a capital sentence exist when the death penalty is imposed pursuant to 18 U.S.C. Section 3592(f).

The racial overtones in this case are significant. The victim was white and the perpetrators were black.

While the fact that St. Louis African-Americans feel disenfranchised by a judicial system that they believe values white victims more than black, may, in and of itself, be insufficient to justify the conclusion that the defendant's and\or the victims' race constituted a basis for pursuing the death penalty in a federal venue, there is a more significant factor that is apparent from the pending request for federal authority to execute Billie Allen. According to the 1990 census, the population of the City of St. Louis is 47.5% African-American.[2] As a result, St. Louis City juries frequently have six or more African-American members. In sharp contrast, African-Americans comprise only 16% of the population of the Eastern District of Missouri. Accordingly, by seeking the death penalty in federal court, the potential number of African-Americans on the jury is reduced by one-third. Moreover, according to the District Clerk's 1994 Report on the Operation of the Jury Selection Plan, no more than 14.81% of the African-Americans in the Eastern District of Missouri are qualified for the federal jury pool. Accordingly, after the exercise of peremptory strikes on the consequentially small number of African-Americans on the venire, it is very likely that Allen's fate in federal court will be decided by an all-white jury.

---

[2]    The City of St. Louis is considered a separate entity from suburban St. Louis County.

6

The lack of African-American members in the federal jury venire and the race of the defendant and victims, dramatically increase the probability that racism will taint the sentencing decision. In light of the irrefutable statistical evidence, the decision to seek the death penalty in this case would frustrate Congress', the Supreme Court's and the lower federal courts' efforts to eliminate all forms of discrimination, "whether accomplished ingeniously or ingenuously." Smith v. Texas, 311 U.S. 128, 132 (1940). "[T]he core of the Fourteenth Amendment is the prevention of meaningful and unjustified official distinctions based on race." Hunter v. Erickson, 393 U.S. 385, 391 (1969). Although Allen will arguably not be protected by the equal protection clause of the Fourteenth Amendment if this case proceeds as a federal prosecution, because the Fourteenth Amendment applies to state action, the due process clause of the Fifth Amendment has long been held to embody the same requirements, by implication. Bolling v. Sharpe, 347 U.S. 497, 499 (1954). See also Weinberger v. Wisenfeld, 420 U.S. 636, 638 n.2 (1975) ("[Our] approach to Fifth Amendment equal protection claims has...been precisely the same as to equal protection claims under the Fourteenth Amendment"). This is especially true in the area of criminal justice, where the Supreme Court has "consistently" articulated a "strong policy...of combating racial discrimination," because such discrimination "strikes at the fundamental values of our judicial system and our society as a whole". Rose v. Mitchell, 443 U.S. 545, 556-58 (1979).

While it is too early to speculate about whether a death sentence plagued by such racial factors would hold up on appeal, no degree of conjecture is required to conclude that federal intervention will have a significant and divisive impact on the black community in St. Louis. If, as the Manual states, "[t]he authorization process is designed to promote consistency and fairness", Allen should not be subjected to federal exposure to the death

7

penalty.

Since 1993 almost 80% of the authorized death penalty prosecutions have been authorized for non-white defendants; 60% against black or African-Americans. This statistic alone is enough to give cause for concern. Perhaps the statistical data belies some underlying truth about race in America, whatever that truth may be, the fact is that since 1992 more than 60% of death-authorized cases involve African-Americans and more than 80% involve requests for capital authorization against non-white defendants. The lack of sufficient aggravation, Allen's age, his relatively insignificant criminal history, and the unmistakable racial disparity that continues to plague capital authorizations supply a compelling basis for rejecting a request that Allen pay for his crime with his life.

## D. THERE IS NOT SUFFICIENT EVIDENCE TO PROVE BEYOND A REASONABLE DOUBT ALL OF THE STATUTORY AGGRAVATING CIRCUMSTANCES THAT ARGUABLY MAKE MR. ALLEN ELIGIBLE FOR THE DEATH PENALTY

A possible aggravator that "the defendant committed the offense in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to the victim, 18 U.S.C. §3592(c)(5)" has been the subject of much litigation and debate.[3] From the

---

[3] The constitutionality of aggravating factors such as (c)(6) have been the subject of more constitutional litigation than any other circumstance. See, e.g., Richmond v. Lewis, 506 U.S. 40 (1992); Shell v. Mississippi, 498 U.S. 1 (1990); Walton v. Arizona, 497 U.S. 639 (1990); Lewis v. Jeffers, 497 U.S. 764 (1990); Clemons v. Mississippi, 494 U.S. 738 (1990); Maynard v. Cartwright, 486 U.S. 356 (1988); Godfrey v. Georgia, 446 U.S. 420, 429 (1980). The Supreme Court has upheld the use of the phrase "especially heinous, cruel or depraved" where the state courts interpreting the language have further defined the term to avoid vagueness. Walton, 497 U.S. at 654. Arguably, the language at issue here has not been, and cannot be narrowed. Even if the use of this factor does not violate the Eighth Amendment, the use of this provision may violate fundamental principles of due process. People v. Superior Court, 647 P.2d 76, 79 (1982) (distinguishing Supreme Court cases that have approved the use of this factor when it is adequately defined by the courts, noting that those decisions were based on the limited inquiry of whether the State statute at issue violated the Eighth Amendment and finding that even when defined

outset, it is clear from the terms of the statutory provision that any allegations of torture or serious physical abuse must be applied only if they can be proven to actually relate to the homicide victim. This factor is identical to the aggravator in 21 U.S.C. Section 848(n)(12), which was intended by Congress to encompass "situations involving 'torture, aggravated battery, the deliberate prolonging of suffering, or the serious physical abuse of the victim before inflicting death....' It would also cover other situations involving unusual, extraordinary depravity, such as 'the execution style killing of a stranger for the thrill of it or the extended terrorizing of a victim before execution.'" 133 CONG. REC. S18412 n.1 (Dec. 18, 1987) (Section-by-Section Analysis). A similar analysis is also appropriate in determining the application of 18 U.S.C. Section 3592(c)(6).

Counsel is unaware of any evidence supporting the allegation that torture or serious physical abuse was involved in this homicide. Under the facts of this case, it is clear to counsel that the government cannot establish this circumstance beyond a reasonable doubt. The evidence demonstrates that this shooting was spontaneous. There was no physical abuse of the victim before or after the shooting.

Even if the government argued that the multiple gunshots aggravated the nature of the crime and established the (c)(6) circumstance, and the jury so found, the government would still encounter difficulty defending the decision on appeal as a constitutional application of the circumstance. See supra note 7. In Godfrey, the Court found that a similar aggravating factor (ie., "outrageously or wantonly vile, horrible and inhuman") was unconstitutional because "[a] person of ordinary sensibility could fairly characterize almost every murder as

---

as "unnecessarily torturous to the victim," the use of this aggravating factor violated the Due Process Clause).

9

'outrageously or wantonly vile, horrible and inhuman.'" Godfrey, 446 U.S. at 428-29. While the shooting of Richard Heflin, Jr., like every other murder by use of a firearm, can be described as heinous and cruel in the lay person's sense of those terms, nothing about the shooting sets it apart from other murders as a matter of constitutional significance. To say that there was "serious physical abuse" because Heflin was shot more than once would stretch the concept of the term to its limits as every victim of a homicide suffers serious injuries.

The above conclusion is supported by numerous decisions in state courts, which in interpreting similar circumstances, have found that multiple gunshot wounds alone are insufficient to sustain a finding under statutory provisions similar to (c)(6). See, e.g., Ex Parte Kyzer, 399 So. 2d 330 (Ala. 1981) (evidence that the defendant shot one person once in the head at close range, shot another twice and shot a third victim once, was insufficient to find that the murder was "especially heinous, atrocious or cruel"); Phillips v. State, 297 S.E.2d 217 (Ga. 1982) (evidence that defendant shot wife four times -- in shoulder, ear, back and head -- and that she lived at least five minutes from the onset of the injuries, was insufficient to demonstrate that offense was "outrageously and wantonly vile, horrible and inhuman"); State v. Stanley, 312 S.E.2d 393 (N.C. 1984) (evidence that defendant shot wife nine times was insufficient to demonstrate that the murder was "especially heinous, atrocious, or cruel"); Marquez v. State, 890 P.2d 980 (Okla. Crim. App. 1995) (evidence that defendant shot victim three times, including once to the head, was insufficient to establish torture or serious physical abuse).

Accordingly, counsel submits that the government could not establish beyond a reasonable doubt that "physical abuse" or "torture" under (c)(6) occurred, and that if it arguably did, such a finding cannot constitutionally be applied to the circumstances of this

case.

An additional aggravator that "[t]he defendant committed the offense as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value. 18 U.S.C. § 3592 (c)(8)" is also not supported by sufficient evidence. Although the offense occurred contemporaneous with the theft of money from the bank, there is no evidence that the shooter or his companion committed the offense as "consideration for the receipt" of the money in question. As worded, the circumstance clearly applies only to murder-for-hire situations, not murders committed in the course of a robbery. See, e.g., United States v. Chandler, 996 F.2d 1073 (11th Cir. 1993) (applying "pecuniary gain" aggravator in murder for hire situation); Wiley v. Puckett, 969 F.2d 86, 95 n.11 (5th Cir. 1994) ("Murder for pecuniary gain [refers] to conduct different than murder committed in the course of a robbery, as the former may encompass murder-for-hire"); Heath v. Jones, 941 F.2d 1126 (11th Cir. 1991) (applying "pecuniary gain" aggravator in murder for hire situation). Second, as such, it only applies when the killer sets out with the unmistakable intent and premeditation to kill the victim. The spontaneity of this shooting belies any such intent or motivation on Allen's part.

Another possible aggravator that "the defendant committed the offense after substantial planning and premeditation to cause the death of a person, 18 U.S.C. §3592(c)(9)" is not supported by sufficient evidence. Statements made by co-defendant Holder to others are to the effect that Allen was a last-minute substitution when others refused to participate. While Holder may have planned and premeditated the robbery and shooting, Allen did not. There is plenty of doubt whether from eye-witness statements, ballistic tests and other evidence the robber presumed to be Allen was indeed the trigger-man. Clearly, Holder has much to gain by pointing the finger at Allen and was impliedly told by the authorities at the outset that if

11

he were to deny shooting the guard it would probably influence whether the United States Attorney would seek the death penalty against him. All contacts with the bank emanated from Holder. Clearly he is the "brains" behind the robbery. This factor, quite simply, does not apply to Allen.

## CONCLUSION

For all the foregoing reasons, counsel respectively requests that the Attorney General reject the United States Attorney's request to seek the death penalty against Billie Allen.

Respectfully Submitted,

RICHARD H. SINDEL, #23406
SINDEL & SINDEL, P.C.
8008 Carondelet, Suite 301
Clayton, MO 63105
(314) 721-6040
(314) 721-8545 Facsimile

cc:    Congressman William Clay
       Congressman Richard Gephardt
       Mr. Kevin McNally
       Mr. David Bruck
       Mrs. Juanita Allen

12