IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| BILLIE JEROME ALLEN | § | |
|    Petitioner | § | |
| | § | |
| | § | |
|    v. | § | Cause No.  4:07-CV-27-ERW |
| | § | |
| UNITED STATES OF AMERICA | § | CAPITAL CASE |
|    Respondent | § | |

PETITIONER'S TRAVERSE TO SUPPLEMENT TO
THE AMENDED MOTION UNDER SECTION 2255

Petitioner, Billie Jerome Allen, submits this Traverse in support of his Supplement to the

Amended Motion Under Section 2255 (the "Supplement").

BACKGROUND

Mr. Allen filed his Motion for Leave to Supplement the Amended Motion Under Section

2255 and the proposed Supplement on August 14, 2009.  On August 17, 2009, this Court entered

the following Order on the docket:

> Motion for Leave to File Supplement to Amended Motion [doc. #97] is
> GRANTED. Petitioner's Supplement as to Ground S shall be accepted for filing
> by this Court.

It thus appears from the Court's orders that Petitioner's Motion for Leave to Supplement has been

granted, and that only the merits of supplemental Ground S remain unresolved.

The Government nonetheless recently filed a Response to Motion for Leave to Supplement

the Amended 2255 Motion with Ground "S" and to the Merits of Petitioner's Ground "S" (the

"Response").  The Response urges the Court to deny Petitioner's Motion for Leave to Supplement.

In this pleading, Mr. Allen responds both to the Government's procedural arguments urging the

1

Court to disallow supplementation of the Amended Petition, and to the Government's substantive arguments on the merits of Ground S.

## ARGUMENT

### I.    Ground S Meets the Requirements of 28 U.S.C. §2255(f)(4) and Therefore Is a Timely, Properly Raised Claim

The Motion for Leave to Supplement the Amended Petition established that Ground S is based on evidence – the National Academy of Sciences (NAS) Report[1] – that was not available to Mr. Allen before February 18, 2009, and thus that this ground, submitted on August 14, 2009, is timely and proper under 28 U.S.C. §2255(f)(4).  In response, the Government raises several arguments that §2255(f)(4) does not apply to this claim: first, that the NAS Report is not itself evidence or a "fact"; second, that the NAS Report is not "new" evidence; and third, that the NAS Report did not find that forensic evidence is unreliable.  Resp. at 2-6.  These arguments are meritless, as discussed below.

The Government's Response also discusses various procedural issues not relevant here. Specifically, the Government argues that Ground S does not "relate back" to the Amended Motion; that cause and prejudice do not excuse any procedural default; and that the miscarriage of justice exception does not excuse any procedural default.  *Id*. at 6-13.  Mr. Allen does not address those arguments here, because he has not invoked any of those procedural mechanisms

---

[1]The NAS Report – entitled *Strengthening Forensic Science in the United States: A Path Forward* – was cited as an exhibit in Petitioner's Supplement to the Amended Motion Under Section 2255, but counsel inadvertently omitted filing the exhibit.  Petitioner thus attaches the NAS Report as Exhibit 1 to this pleading.

but instead relies expressly on §2255(f)(4), as clearly set forth in the Motion for Leave to Supplement the Amended Motion.

### A.      The NAS Report Is Evidence

The Government first argues that the NAS Report "is not itself a fact" and thus that §2255(f)(4) does not apply. *Id*. at 3. To make this argument, the Government equates the NAS Report to a Supreme Court decision, and then invokes uncontroversial law that court decisions are not operative facts. *Id*. The Government's analogy finds no support in logic or law. A court decision is "a ruling exclusively within the domain of the courts and is incapable of being proved or disproved." *E.J.R.E. v. United States*, 453 F.3d 1094, 1098 (8th Cir. 2006). The published consensus of the scientific community, as set forth in the NAS Report, on the other hand, presents operative facts regarding the unreliability of pseudo-scientific evidence relied upon by the Government. The difference between such a definitive scientific report and a court decision is plain.

As set forth in the Supplement, the Government presented extensive expert evidence at trial claiming, *inter alia*, that many of the bullets and shell casings recovered from the crime scene had been definitively matched to a specific firearm. The Government relied on this evidence to argue – at both the guilt and penalty phases of trial – that Mr. Allen was the triggerman who shot Mr. Heflin. Supp. at 2-5. The NAS Report's factual findings establish that these and other forensic expert opinions presented at trial were unsupported and unreliable as a matter of science. *See* NAS Report at 5-20-21; Supp. at 9-10. Indeed, in the wake of the NAS Report, the only other federal court to consider this issue ruled that this exact same type of definitive ballistics testimony was unreliable and therefore inadmissible. *United States v.*

*Mouzone*, 2009 WL 3617748 at \*22-\*23 (D. Md. 2009) (finding that conclusive testimony about whether a certain bullet did or did not come from a certain gun was beyond the capability of reliable ballistics analysis and thus inadmissible).

Thus, the NAS Report presents a series of factual findings that expose the unreliability and inaccuracy of critical Government evidence introduced at trial. This is precisely the type of evidence covered by §2255(f)(4). Had these facts been available at the time of trial, the Court would not have found the Government's forensic evidence admissible.

Further, even to the extent that some forensic testimony may have been admissible at trial (e.g., testimony that did *not* claim to definitively match certain bullets to a certain gun), Mr. Allen could have used the NAS Report to rebut that evidence as well. In asserting that the report "is necessarily inadmissible hearsay," Resp. at 18 n.10, the Government fails to recognize that the NAS Report is admissible evidence under the public records hearsay exception of Fed. R. Evid. 803(8)[2], the business records exception of Fed. R. Evid. 803(6)[3], and the learned treatise exception of Fed. R. Evid. 803(18).[4]

---

[2] Fed. R. Evid. 803(8) provides, in relevant part, that "reports, in any form, of public offices or agencies, setting forth . . . (C) . . . factual findings resulting from an investigation made pursuant to authority granted by law" are admissible evidence. The NAS Report falls squarely within this exception. The NAS Report resulted from an "investigation made pursuant to legal authority," as Congress specifically commissioned NAS to issue the report. **Error! Main Document Only.**Ex. 1 at S-1. Further, the Supreme Court has recognized that opinions and conclusions, like those in the NAS Report, fall within the Rule's broad definition of "factual findings." *See Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 175 (1988); *see also Kehm v. Proctor & Gamble Mfg. Co.*, 724 F.2d 613, 618 (8th Cir. 1983). The NAS Report also meets the "public offices or agencies" provision, because courts recognize that non-governmental reports, when issued pursuant to a legal duty, are admissible under this Rule. *See, e.g., Boerner v. Brown & Williamson Tobacco Co.*, 394 F.3d 594, 600 (8th Cir. 2005) (ruling that findings made by independent scientists were properly admitted under the public records exception where included in reports prepared pursuant to a legal obligation); *United States v. Central Gulf Lines, Inc.*, 747 F.2d 315, 319 (5th Cir. 1984) (finding independent surveyor's report admissible as public record where it was prepared pursuant to a legal duty and stating that "Rule 803(8) does not require a public official to make the record").

[3] Fed. R. Evid. 803(6) excepts from the hearsay rule a "report…, in any form, of … opinions…, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity." The NAS Report was clearly "made from information transmitted by [persons] with knowledge" of the facts. *See* Ex. 1 at S-2-3 (describing the testimonial and documentary evidence considered by the

The NAS Report is admissible evidence, and the Government's contrary assertion lacks support. The NAS Report likewise presents findings that speak directly to a court's analysis of whether forensic testimony is admissible under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See Mouzone*, 2009 WL 3617748; *see also United States v. Oliveira*, No. 08-CR-10104 (D. Mass. 2010) (Order, attached as Exhibit 2) ("While the [NAS] report does not speak to admissibility or inadmissibility in a given case, it raised profound questions that need to be carefully examined in every case prior to trial"). The NAS Report's findings are thus "facts" in this sense as well, as discussed in more detail, *infra*.

### B.    The NAS Report Is New

The Government next argues that the NAS Report is "not new" evidence, because other publications previously questioned the reliability of ballistics and fingerprint evidence. *Id*. at 3-6. The Government's argument lacks merit and plainly misconstrues Mr. Allen's claim.

First and foremost, §2255(f)(4) concerns newly-discovered *facts* – not newly-discovered *challenges* (or *arguments*). The Government, unfortunately, confuses *new facts* with *new challenges*. Mr. Allen recognizes, for example, that he could have *challenged* the reliability and validity of ballistics evidence earlier. But his challenge would have proved futile because he did not have the requisite *facts* to establish the unreliability of ballistics "science," even if he had

committee). The NAS Report was also "made at or near the time" that the drafters obtained this knowledge. *See id.* at S-2. Further, the report was made and kept "in the course of a regularly conducted business activity." Indeed, the NAS is specifically organized to produce such reports. *See* National Research Council home page, *available at* http://sites.nationalacademies.org/NRC/ (last visited Apr. 1, 2010) (indicating that a "core service" of the NAS is to issue "Consensus Studies: . . .comprehensive reports [that] focus on major policy issues and provide recommendations for solving complex problems" – like the NAS Report itself). The NAs Report is thus admissible as a business record. *See, e.g., United States v. Frazier*, 53 F.3d 1105, 1109 (10th Cir. 1995) (finding an auditor's report admissible as a business record where the auditor regularly issued similar reports).

[4] Under Rule 803(18), the NAS Report could be used to cross examine Government forensic experts. Unlike Rules 803(6) and 803(8), however, Rule 803(18) does not permit the treatise to be admitted as an exhibit but instead only allows the report to be read into evidence.

relied on the handful of isolated articles that the Government proffers as exhibits to its Response. Contrary to the Government's claim, however, simply because some professor previously questioned whether a particular forensic science technique was reliable, that does not mean that the relevant scientific community reached that conclusion. The NAS is the nation's preeminent scientific organization, and its report is the authoritative statement of the scientific community, made in response to a Congressional mandate. When the NAS empirically determines that a forensic science technique is valid and reliable (or invalid and unreliable), it becomes a fact that this is the position of the scientific community. Thus, although a petitioner could *argue* that ballistics analysis was unreliable and unaccepted in the field of science, his argument would bear no fruit prior to the NAS Report. It is the *new findings of fact* set forth in the NAS Report that provide the evidence for Mr. Allen's claim, as expressly set forth in the Supplement to the Amended Motion. *Cf. Hooper v. Warden*, 2010 WL 1233968 (D.N.H. 2010) (newly discovered evidence claim based on NAS Report must be exhausted in state court). Because Mr. Allen had no access to the NAS Report until its release on February 17, 2009, the report's conclusions and findings qualify as newly-discovered facts under §2255(f)(4).

The Government's contrary reasoning would produce absurd results. If the Government were correct, defense attorneys would be obliged to file unripe (and, in many cases, meritless) forensic evidence challenges in their initial motions under §2255 whenever a single article challenged a forensic method – just in case the relevant scientific community changed course in the future and accepted the article's view. Such a "counterintuitive approach would add to the burden imposed on courts, applicants, and the State. . ., with no clear advantage to any." *Panetti v. Quaterman*, 551 U.S. 930, 943 (2007).

Further, if the Government is correct and the NAS Report's findings and conclusions are not new facts but are old facts, then the Government had an obligation under *Brady v. Maryland* to disclose those old facts as soon as they were known.  Thus, the Government's argument that questions about forensic reliability are actually "old" facts, known to it before trial or during the pendency of Mr. Allen's appeal, suggests that the dubious reliability of its forensic testimony should have been disclosed much earlier.  Its failure to do so – if the Government's argument was accepted – would establish alternative grounds on which to raise this claim.

Ultimately, however, the Government's argument is simply unpersuasive.  The NAS Report has changed the factual landscape in which forensic evidence is admitted and presented in court.  Indeed, the Supreme Court recognized as much in *Melendez-Diaz v. Massachusetts*, 129 S.Ct. 2527 (2009), where it relied heavily on the NAS Report's findings and conclusions to invalidate the appellant's conviction.  In holding that the Confrontation Clause requires prosecutors to produce forensic examiners and lab analysts to testify about their laboratory reports, the Court relied on the NAS Report to emphasize that "[f]orensic evidence is not uniquely immune from the risk of manipulation."  *Id*. at 2536.  The Court continued:

> According to a recent study conducted under the auspices of the National Academy of Sciences, "[t]he majority of [laboratories producing forensic evidence] are administered by law enforcement agencies, such as police departments, where the laboratory administrator reports to the head of the agency."  And "[b]ecause forensic scientists often are driven in their work by a need to answer a particular question related to the issues of a particular case, they sometimes face pressure to sacrifice appropriate methodology for the sake of expediency."  A forensic analyst responding to a request from a law enforcement official may feel pressure  – or have an incentive – to alter the evidence in a manner favorable to the prosecution.

*Id*. (quoting NAS Report, at 6-1, S-17).  To hammer home the point that the NAS Report

7

revealed serious problems in the forensic science community, the Court wrote:

> [T]he National Academy Report concluded: "*The forensic science system, encompassing both research and practice, has serious problems that can only be addressed by a national commitment to overhaul the current structure that supports the forensic science community in this country.*"

*Id.* (quoting *NAS Report*, at P-1) (emphasis in original report).  In short, the NAS Report has led to an entirely new understanding of forensic evidence.  The Government's attempt to characterize the Report as a "review of pre-existing facts" is simply unpersuasive.

**C.      The NAS Report Establishes the Unreliability of the Forensic Testimony in Mr. Allen's Case**

The Government next contends that the "result of the NAS Report is 13 Recommendations, none of which recommends that fingerprint or ballistics evidence be excluded" from court.  Resp. at 4.  Of course, the NAS Report is a scientific report, not a legal opinion, so such a recommendation would be remarkable and out of place.  The Government nonetheless seeks to minimize the report's findings by characterizing them as a "call for additional research, work, refinement, improvement of standards, etc."  *Id.*  The report itself belies the Government's assertion.

As set forth above, the Supreme Court recognized in *Melendez-Diaz* that the NAS Report revealed "serious problems" in the forensic science community.  Indeed, the Report repeatedly concludes that forensic evidence is unreliable as a matter of science.  *E.g.*, Ex. 1 at S-5 ("With the exception of nuclear DNA analysis, however, no forensic method has been rigorously shown to have the capacity to consistently, and with a high degree of certainty, demonstrate a connection between evidence and a specific individual or source.").  Mr. Allen set forth the report's specific findings and deficiencies with regard to fingerprint and ballistics analysis in the

8

Supplement, and does not re-state them here. *See* Supp. at 6-13. The plain language of the Report, as set forth in the Supplement and as recognized by the Supreme Court in *Melendez-Diaz*, refutes the Government's characterization that the report was a mere "call for additional research."

### D.    Conclusion

Pursuant to §2255(f)(4), Ground S is based on the issuance of the NAS Report. Contrary to the Government's contentions, the NAS Report contains evidence or "facts"; those facts are "new" and were not available to Mr. Allen before February 18, 2009; and those facts directly undermine the reliability of evidence upon which the Government relied to convict Mr. Allen and sentence him to death. This claim is properly before the Court.

## II.    The Unreliable Forensic Testimony Violated Due Process

In his Supplement to the Amended Motion, Mr. Allen set forth in detail the extensive, unreliable ballistics and fingerprint testimony that the Government relied upon to convict and sentence Mr. Allen to death. Supp. at 2-6. In its response on the merits, the Government first invokes the wrong legal standard and then mischaracterizes the issue as one of admissibility only. The Government fails to rebut Mr. Allen's claim that his convictions and death sentence were based on unreliable testimony.

### A.    The Fundamental Miscarriage of Justice Standard Does Not Apply

The Government begins its merits argument by invoking the wrong legal standard. The Government asserts that "[t]o obtain relief under §2255, a petitioner must prove that an error amounts to a fundamental miscarriage of justice." Resp. at 14. The Government is mistaken.

The fundamental miscarriage of justice standard applies only when a petitioner seeks to litigate a ground for relief that could have been litigated on direct appeal.  See, e.g., *Schlup v. Delo*, 513 U.S. 298, 324 (1995); *Weeks v. Bowersox*, 119 F.3d 1342, 1350-52 (8th Cir.1997) (en banc) (actual innocence can excuse a procedural default).  In *Davis v. United States*, 417 U.S. 333 (1974), the case cited by the government, the court held that Mr. Davis was entitled to litigate the issue that the conduct for which he was convicted had been held by a *subsequent* Supreme Court case to be non-criminal.  The Court reasoned that even though he could have raised this issue on direct appeal, since the relevant evidence was before the trial and appellate courts, he was entitled to have the issue considered under §2255 because conviction for non-criminal conduct was a fundamental miscarriage of justice.  The standard, then, does not apply to the *merits* of the ground for relief but to the issue of default.  The Government's citation to *Phillips v. Steele*, 2010 WL 682329 (E.D. Mo. 2010), is thus misleading.  In *Phillips*, this Court plainly analyzed the fundamental miscarriage of justice standard as a potential exception to procedural default – not as a standard for reviewing substantive constitutional claims, as the Government urges here.  *See Phillips*, 2010 WL 682329 at *11 ("Petitioner may also overcome procedural default by showing that this Court's failure to address his claim will result in a fundamental miscarriage of justice.")

As discussed above, Mr. Allen here relies on §2255(f)(4) to present a claim based on new, previously unavailable facts, and has not invoked the fundamental miscarriage of justice exception in connection with this claim.  Despite the Government's assertion, the fundamental miscarriage of justice standard does not apply.

**B.** **The Forensic Evidence at Trial Was Unreliable and Inadmissible; To the Extent the Evidence Was Admissible, the NAS Report Would Have Undermined It**

The Government contends that ballistics and fingerprint evidence are admissible under *Daubert*. Remarkably, the Government cites cases issued *before* the NAS Report for the proposition that such evidence "is generally accepted" by the scientific community. *See* Resp. at 15. Of course, that may have been true before the NAS Report, but the opposite is true now.

Indeed, as the Supreme Court recognized in *Melendez-Diaz*, the NAS Report revealed "serious problems" with forensic evidence. Federal district courts have likewise relied on the report to drastically change their approach to admitting forensic evidence. *See Mouzone*, 2009 WL 3617748; *Oliveira*, No. 08-CR-10104, Ex. 2. In *Mouzone*, the court accepted and took into account the NAS Report's harsh criticisms of ballistics analysis. 2009 WL 3617748 at *15-*17. The court then conducted a two -step process for determining the admissibility of the proffered ballistics testimony: first deciding whether ballistics analysis, as a general practice, was admissible, then deciding whether the specifically proffered testimony was admissible. *Id*. at *17. While the court decided that *some* ballistics testimony was admissible, it specifically found that conclusive testimony about whether a certain bullet came from a certain gun (or did *not* come from a certain gun) was beyond the capability of reliable ballistics analysis. *Id*. at 22-23. The court thus excluded the proffered expert testimony because it spoke in such conclusive and definite terms, explaining that "firearms toolmark identification evidence is only relevant, reliable, and helpful to a jury if it is offered with the proper qualifications regarding its accuracy." *Id*.

Here, the forensic experts testified in precisely these absolute terms. *See* Supp. at 2-6.

11

The NAS Report reveals that this testimony was unreliable, as the *Mouzone* court recognized. Thus, even assuming that some forensic testimony concerning ballistics is admissible, the crux of the forensic testimony in Mr. Allen's case was inadmissible under *Daubert*.  And it was significant to the jury.  During their deliberations, the jury requested to see Government's Exhibit 22-A, which was a floor plan showing the shell casings found at the scene and indicating which gun fired each casing.  This Court granted the jury's request.  Trial Tr. Vol. XIX, pp. 113-114.

Further, the Government casts the issue as one of admissibility only.  *See* Resp. at 18. As established above, however, the NAS Report is admissible as substantive evidence to rebut and to reveal the limitations of any ballistics or fingerprint testimony presented at trial.  Thus, the NAS Report not only demonstrates the inadmissibility of the crucial parts of the Government's forensic evidence here, it would have shed light on the unreliability of *any* forensic evidence that was properly admitted.  The Government's reliance on this unreliable evidence to convict and sentence Mr. Allen to death violated due process.

WHEREFORE, for the reasons stated above, in the Supplement to Amended Motion Under Section 2255, and in the Motion for Discovery and Evidentiary Hearing, Mr. Allen is entitled to relief from his convictions and death sentence on this ground, or at a minimum is entitled to discovery and an evidentiary hearing.

Respectfully Submitted,

/s/ Elizabeth Unger Carlyle                    /s/ Joseph M. Cleary

_____                    _____

Elizabeth Unger Carlyle                              Joseph M. Cleary
P.O. Box 866                                  1455 N. Pennsylvania
Columbus, Mississippi 39703           Indianapolis, Indiana 46202
(816)525-6540                                        (317)630-0137
elizcar@bellsouth.net                              Jcleary498@aol.com


/s/ Michael Wiseman

_____

Michael Wiseman
Chief, Capital Habeas Corpus Unit
Capital Habeas Corpus Unit
Federal Community Defender Office
for the Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520
Fax: 215-928-0826
Michael_Wiseman@fd.org


Dated:  April 9, 2010
             St. Louis, Missouri

13

**CERTIFICATE OF SERVICE**

I hereby certify that on April 9, 2010, the foregoing Petitioner's Traverse to Supplement to the Amended Motion Under Section 2255 was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the following:

Mr. Joseph M. Landolt
United States Attorney
111 South 10th Street, 20th Floor
St. Louis, Missouri 63102

Mr. Steven Holtshouser
Assistant United States Attorney
111 South 10th Street, 20th Floor
St. Louis, Missouri 63102.


/s/ Elizabeth Unger Carlyle
_____

Elizabeth Unger Carlyle
Counsel for Petitioner