UNITED STATES OF AMERICA
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

BILLIE JEROME ALLEN,                )
                                    )
        Petitioner,                 )
                                    )
    vs.                             )   No. 4:07-CV-27 ERW
                                    )
UNITED STATES OF AMERICA,           )
                                    )
        Respondent.                 )


TRANSCRIPT OF EVIDENTIARY HEARING

BEFORE THE HONORABLE E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE

June 11, 2012
Volume VI

APPEARANCES:

For Petitioner:     Ms. Elizabeth U. Carlyle
                    P.O. Box 30418
                    Kansas City, MO  64112

                    Mr. Joseph M. Cleary
                    COLLIGNON AND DIETRICK
                    310 N. Alabama, Suite 250
                    Indianapolis, IN  46204

                    Mr. Erick John Montroy
                    Mr. James Henry Moreno
                    FEDERAL COMMUNITY DEFENDER OFFICE
                    The Curtis Center, Suite 545 West
                    Philadelphia, PA  19106

For Respondent:     Mr. Steven E. Holtshouser
                    Ms. Carrie Costantin
                    OFFICE OF U.S. ATTORNEY
                    111 S. 10th Street, 20th Floor
                    St. Louis, MO  63102

REPORTED BY:        SUSAN R. MORAN, RMR, FCRR
                    Official Court Reporter
                    111 South 10th Street
                    St. Louis, MO  63102
                    (314) 244-7983

I N D E X

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|

PETITIONER'S WITNESSES

JOHN SIMON
        (By Ms. Costantin)                          3 (Cont'd)
        (By Mr. Moreno)                                        107
        (By Ms. Costantin)                                              134

DAVID RANDALL, PH.D
        (By Mr. Montrey)          151


E X H I B I T S

|  | Offered | Received |
|---|---|---|

RESPONDENT'S EXHIBITS

| 674 | 7 | 7 |

(The following proceedings were held in open court on June 11, 2012 at 8:34 a.m.:)

THE COURT:  Whenever you're ready, you may proceed.

MR. HOLTSHOUSER:  Thank you.

MS. COSTANTIN:  Thank you, Judge.

CROSS-EXAMINATION (Cont'd)

BY MS. COSTANTIN:

Q.    Good morning.

A.    Good morning.

Q.    I want to just clear up one point, a very small point from last week.  We had a discussion about your Life History and the footnote concerning the definition of pica.  Do you see that down in the second footnote?

A.    My screen is blank.

Q.    Well, that's a bad start.

A.    I see that footnote.

Q.    Okay.  And the definition of pica, I think you said you might have gotten it from a dictionary, that you had just looked it up?

A.    I certainly did not know where I got it from as of last week.  I would not have made up that definition, so I had to have gotten it from somewhere.  I don't know where I got it. That was my testimony last week, and that's my testimony today.

Q.    And I want to show you 324.9, which would be -- this

would be the Exhibit 324, which is a memo from Nancy to Connie Caspari on January 4th of 1998 talking about transcribing medical records and providing some definitions. I wanted to show you the definition there, and just simply ask you, is it likely that this definition of "pica" within that -- those records provided by Nancy to Connie Casperi is where you got your definition of pica?

A.    Yes.

Q.    All right.  Moving along to where we were last week, I want to go to Exhibit 343.  This was the letter that you wrote to Mr. Sindel on January 20th of 1998.  And this is the second page of that letter.  And we had talked about the third full paragraph there.  And I want to point to a specific portion, specifically the sentence that says, "Section 2255 counsel can point to the denial of continuance along with acts or omissions of trial counsel as cause for failure to present additional evidence if any emerges or occurs to someone later."  Is that what you wrote back in January of 1998?

A.    Yes.

Q.    I want to focus on that phrase, "additional evidence if any emerges or occurs to someone later."  At that time back in January of 1998, you were making efforts to locate mitigation information and evidence; is that correct?

A.    Yes.

Q.    And that was the point of your hour's long interview with Mr. Allen as well as the interviews with Lucy McLemore and Raymond Petty, that family meeting, as well as the followup with the Boy Scouts and the music career; is that correct?

A.    As I testified last week, that was one of at least three purposes I had in engaging in those activities.

Q.    And the other purposes besides collecting information relevant to mitigation and identifying evidence relevant to mitigation were to build rapport for later putting them on as witnesses; is that right?

A.    That was the first.

Q.    And in some way, some sort of cry for help to Mr. Haney -- or Dr. Haney; is that correct?

A.    Yes, that is correct.  Both of those are correct.  The three of them together were why I did what I did.

Q.    During those meetings with the defendant and Ms. McLemore and Raymond Petty as well as that family meeting, you weren't deliberately ignoring any leads, were you?

A.    No.

Q.    Now, would you consider yourself to be an intelligent man?

        THE COURT:  I'll take judicial notice that he is.

        MS. COSTANTIN:  Thank you, Your Honor.

BY MS. COSTANTIN:

Q.   Can you listen to someone and tell -- someone tell you about their life, ask them questions about it?  You can do that, can't you?

A.   Yes.

Q.   And you can see leads that would need to be followed up on.  For example, the music career, the Boy Scouts, medical records, that sort of thing; is that correct?

A.   Some, but not necessarily a majority of the relevant ones.

Q.   So you could see some leads to follow up but not a majority of them, is that what your testimony is?

A.   Yes.

Q.   Well, what you did in the Life History is you did follow up on leads that you saw based on your interviews of Billie Allen and the other people we talked about; is that correct?

A.   In certain isolated instances I did, yes.

Q.   Now, were you the chair of the Missouri Bar Committee on Criminal Law from 1995 to 1997?

A.   I believe those years are correct, yes.

Q.   And you were -- we talked about you being a board member currently of the Missouri Association of Criminal Defense Lawyers.  But you also were on that same board from 1998 to 2002; is that correct?

A.    I believe those years are correct.

Q.    I'm going to switch over to the document camera for a moment.  I'm going to show you what's been marked as Government's Exhibit 674.  Does that appear to be a copy of your resume?

A.    Yes.

THE COURT:  What was the number again?

MS. COSTANTIN:  674.  And, Judge, this is an add-on to the list.  I provided a copy of it to Ms. Carlyle.

THE COURT:  Just a second.  Let me add it.  Consent admission?

MR. MORENO:  Yes, Your Honor.

THE COURT:  Received.  Go ahead.

BY MS. COSTANTIN:

Q.    And this is a resume that's posted on your website, Constitutional Advocacy, is shown at the bottom line; is that correct?

A.    This is the first page of it, yes.

Q.    And I want to refer just for a moment back to page 5.  And we're not going to go through all this.  I will say, first of all, on page one it does indicates your educational background; is that correct?

A.    Yes.

Q.    I just want to look at a couple items towards the top of the page.  You organized and moderated a session on

"Ethical Considerations in the Defense and Prosecution of Criminal Cases in Post-Conviction Relief Proceedings" back in the Missouri bar in November of 1996; is that right?

A.     Yes.

Q.     And you also organized and moderated another session on "Ethical Dilemmas Facing Defense Counsel Who Are Accused of Ineffective Assistance of Counsel."  And that was back in September of 1996; is that correct?

A.     Yes.

Q.     Now, going to page 2 of your resume, you indicated that you handled as an Assistant Attorney General, you handled over 700 habeas corpus cases; is that correct?

A.     Yes.

Q.     And that was from 1991 to 1996?

A.     Yes.

Q.     And that included capital cases; is that right?

A.     Yes.

Q.     And then moving to when you were at Inglish and Monaco --

A.     I'm sorry, Monaco.

Q.     Monaco, excuse me.

A.     Mr. Monaco puts the accent on the second syllable.

Q.     While you were at Inglish and Monaco from 1996 to 1999, you represented petitioners in federal habeas corpus proceedings including capital litigation; is that right?

A.    Yes.

Q.    Now, when you were trial counsel in the -- with the Capital Division of the Missouri State Public Defenders Office, none of the cases in which you personally and substantially participated resulted in the death penalty; is that right?

A.    Yes.

Q.    And is it correct that Mr. Allen is the only person you've represented as trial counsel who received the death penalty?

A.    Yes.

Q.    Now, last week you indicated in so many words that you were somehow junior counsel to Mr. Sindel, is that fair to say?

A.    Yes.

Q.    Now, you were being paid the same hourly rate as Mr. Sindel, is that correct, $125 an hour?

A.    That is the rate I recall.

Q.    And that was the same as Mr. Sindel; is that correct?

A.    I do not know what his rate was, but my recollection is that was the statutory cap, and I see no reason why he would not be paid at statutory cap.

Q.    So we're looking at Exhibit 68.  And this is your CJA submission; is that correct?

A.    Yes.

Q.    And you were being paid $125 an hour; is that right?

A.    Yes.

Q.    And then let's look at Mr. Sindel -- 69, Exhibit 69, this is Mr. Sindel's CJA or one of his submissions; is that correct?

A.    Yes.

Q.    And he also is being paid $125; is that right?

A.    Yes.

Q.    Now, is it your contention that the only inkling that you had that there was any alleged childhood abuse of Billie Allen was based on one conversation with Dr. Randall that occurred during the trial; is that correct?

A.    I do not believe that that's correct as I sit here now. As I'm sure everyone is familiar, I have been occupied with other matters in the last 15 years.  So I'm sure there are some things that came to my attention in late 1997 and early 1998 that I do not recall now and that I did not recall at my deposition.  I simply don't remember everything that was going on 14 or 15 years ago.

Q.    Do you recall any indication that -- of any alleged childhood abuse of Billie Allen other than one conversation with Dr. Randall that occurred during the trial?

A.    I believe there were questions during my deposition that indicated that there was testimony of physical abuse by someone against Mr. Allen.  And that refreshed my

recollection that there probably was testimony to that effect. I have not re-read the transcript in preparation for this testimony. Despite the complimentary words that have been used this morning, I am modest about my own memory as well as intelligence generally, and I cannot say that because I do not remember something, that it did not happen.

Q. What do you recall of any alleged childhood abuse of Billie Allen back in 1998, that you knew back in 1998?

A. I believe that at my deposition you pointed out evidence from the trial transcript that he had been beaten with an extension cord.

Q. And was that evidence by Raymond Petty?

A. I'm sorry?

Q. Was that testimony by Raymond Petty?

A. I don't remember, but that would not be inconsistent with my recollection.

Q. Other than that, what other evidence or inkling did you have that there was childhood abuse of Billie Allen?

A. I don't remember any other testimony or statement, but I must place emphasis on the word "remember." I don't remember anything coming up. I know that I had the inkling; it was something that I shared with Dr. Randall. I think that he suggested it to me and that it struck a chord. But, I mean, I don't have tapes. I don't have videotapes of Billy being beaten, no.

Q.    I'm not asking videotapes.  I'm asking what you knew, what inkling or what evidence or what knowledge did you have of any alleged childhood abuse of Billie Allen back in 1998. We talked about the Raymond Petty testimony.  You said you had a conversation with Dr. Randall; is that right?

A.    Yes.

Q.    Anything other than those two items?

A.    My testimony is that I do not remember one way or the other.

Q.    And in that conversation with Dr. Randall, is it correct that according to your memory Dr. Randall simply told you there's a lot more going on here, and it involved the child abuse of Billie Allen?

A.    That is my recollection.

Q.    Now, you have been shown some of the other -- have you read the 2255 motion?

A.    I read that motion shortly after it was filed.  I have reviewed it from time to time, but I have not reviewed it recently.

Q.    And is it your contention that the facts in the 2255 motion related to the alleged childhood abuse of Billie Allen by his mother were not known to you at the time of trial except for that conversation with Dr. Randall?

A.    That's my recollection, yes.

Q.    And we've talked about, of course, that there was the

testimony of Raymond Petty; is that correct?

A.    That -- that is my -- my answer was in response to the question, and I found the question -- the factual predicate of the question to be credible.  I have not gone and looked that up.

Q.    In other words, you don't actually remember Raymond Petty, it's just that because I asked you about Raymond Petty's testimony, you think that that was correct?

A.    Yes, as I believe I've explained here, and as I know I explained in the deposition, my role during the penalty phase involved working outside the courtroom on -- for a substantial period of time.  It was not as if I was somewhere drinking coffee or loafing.  I was doing things that Mr. Sindel couldn't do because he chose to do all of the witnesses.

Q.    And isn't it true that in one of those interviews that you did of Mr. Petty with Dr. Randall, that he told you that Juanita Allen would use her fists on Billie Allen?

A.    I do not remember that, but if my notes say that then I believe that that was said.

Q.    Isn't it true that Juanita Allen's friend, Deborah Ruffin, told you in an interview that Juanita Allen had to get physical with Billie Allen?

A.    It's my recollection now that I have seen that in my notes.

Q.    And isn't it true that Shimeka Taylor, who was the sister of Billie Allen's friend, Marquis Taylor, told you in an interview that if Bill did something, he got the snot kicked out of him?

A.    On that particular remark, I would have to see my own notes, because I -- while I know that I don't remember everything from that period, I specifically don't remember the use of the word "snot."

Q.    Okay.  We'll get to those notes in a little bit.  Isn't it true in an interview with Lucy McLemore, Juanita Allen's sister, that she told you that the family, referring to Juanita Allen's family, was dysfunctional?

A.    That's consistent with my recollection.

Q.    Now, I want to go back to your time sheets for a moment, and that's 498, specifically 498.8.  Down at the bottom, the last two entries here relate to telephone calls with a Mr. Strauss, a couple different calls with a Mr. Strauss; is that right?

A.    Yes.

Q.    And then going to --

A.    I'm sorry, I didn't see the time amounts on those.

Q.    Okay.  You see the telephone calls to Mr. Strauss, the last two entries?

A.    So that's 2/10ths of an hour?

Q.    That's correct.  In looking at the top, and we'll get

all the way over.  Can you read that if I put the time in or is it too small for you to read?

A.    No, it makes more sense with the time.

Q.    Then you can see you have a telephone call with Ms. Joiner, and then you have a third entry relates to a telephone call with Mr. Strauss, then that fifth entry relates to a Mr. Recla?

A.    Yes.

Q.    And then moving down further, there's a telephone call with the AG's office; is that right?

A.    Yes.

Q.    Now, all those entries actually relate to a Springfield administrative hearing that had nothing to do with Billie Allen; is that right?

A.    That's a compound question.  It did have -- it grew out of a scheduling matter that arose in Mr. Allen's hearing.  In order to free up myself for activity in Mr. Billie Allen's case, I had to get the other case moved, which meant that I had to communicate with people on the other side of that case or with my client in that case.  It was work -- it was less than an hour's work that I had to do, but I had to do it in order to be here for Mr. Allen's case.

Q.    So you billed on Mr. Allen's case for your phone calls to attorneys on another case; is that correct?

A.    Yes, as a result of the scheduling conflict.

Q.    I'm going to show you Exhibit 352.   Is this a letter that you faxed to Mr. Sindel on January 27th of 1998?

A.    Yes.

Q.    And you were given the task of drafting and filing a motion for continuance in the Allen case; is that correct?

A.    Well, it was my idea to do it.   And consequently it was left to me to do it.

Q.    So that was your job was to file a motion for a continuance; is that right?

A.    Yes.

Q.    And I'm going to show you on page 3 a paragraph that says, "Consistent with what I learned from calling Connie yesterday, I will proceed to create a motion for continuance. Please fax or e-mail me the party line on Dr. Haney.   Is it okay to blend this with the discussion of the Johns case."   Is that correct?

A.    Yes.

Q.    Now, subsequently Ms. Casperi did fax you what the, quote, party line on Dr. Haney was; is that right?

A.    Yes.

Q.    Now, you yourself had no contact with Dr. Haney; is that correct?

A.    That is correct.

Q.    So I'm showing you Exhibit 354, a fax from Ms. Casperi to you with the comment, "Paragraph for motion.   Call if any

questions." Is that correct?

A. Yes.

Q. And looking at the second page of that document, I want to go through different parts of it at a time. It indicates, correct, this paragraph from Ms. Casperi that, "Mr. John Simon, appointed co-counsel on this case, has assumed responsibility for handling the penalty phase of the trial while Mr. Richard Sindel is handling the guilt phase." Is that correct?

A. That is what it says.

Q. And moving down, so that was the division of responsibility was you were doing the penalty phase and Mr. Sindel was doing the guilt phase?

A. That's an incomplete characterization of the division of labor, because I was also doing the legal research, drafting and argumentation, while Mr. Sindel was focusing on factual development.

Q. So you have assumed, however, is it correct that we're going to get to what you actually filed, that you assumed the responsibility for handling the penalty phase?

A. As I've testified, it was my understanding that I would be presenting a substantial portion of the witnesses in the penalty phase. And at that time I thought that I might be doing the closing argument of the penalty phase.

Q. So despite what this says here, your understanding was

that you had not assumed responsibility for the penalty phase, you had only assumed responsibility to put on witnessed and do closing, is that your testimony?

A.    I don't think that there is a contradiction between the two characterizations.  One thing that this -- one thing that the second sentence in this excerpt from the document from Sindel, Sindel & Noble -- actually I think at that time it was Sindel & Sindel.  One thing that this snippet does include is that both Mr. Sindel and I thought that Dr. Haney was doing the factual development in -- for the penalty phase.

Q.    And we're going to get to that.  In fact, that sentence says, "Mr. Sindel hired Dr. Craig Haney as an expert mitigation to consult."  Is that the word that's used there?

A.    That is what this text uses, a text that I did not choose.

Q.    And then moving down in that text, it indicates that, "Mr. Sindel made initial contact with Dr. Haney in early September 1997, at which time Dr. Haney agreed to consult -- is that the word used -- with counsel regarding mitigation in the above matter."

A.    That's -- yes, that is what the text on the screen says.

Q.    And that was the information you received from Mr. Sindel's office at least apparently how he viewed the

situation, is that fair to say?

A.    This is one document that I received from Mr. Sindel's office.

Q.    And it describes the responsibility of each party, each attorney, excuse me, in the penalty phase as well as the role of Dr. Haney; is that correct?

A.    It is one characterization along with several.

Q.    And it is the one that we're looking at right now, correct?

A.    I'm reading.

Q.    You want me to make it larger?  Now I want to move down to the portion where it states, and this is what you received from Mr. Sindel's office, "Dr. Haney responded by fax stating that he had two trials within the following two months and did not feel he could adequately contribute to Mr. Allen's defense within the given time constraints, thus forcing Sindel to locate, screen, and hire a new mitigation expert with less than a month until the trial was to begin."  Is that what that sentence reads?

A.    Yes, you have read that correctly.

Q.    So Dr. Haney indicated, at least according to this fax, that the problem was that he had two trials within the following two months?

A.    That's what it says.

Q.    Now, I want to move to the filed motion, which is

Exhibit 32.  And going to the end, you signed this motion; is that correct?

A.    Yes.

Q.    And you filed it?

A.    Yes.

Q.    And you signed for Mr. Sindel as well; is that correct?

A.    Yes.

Q.    Now, going to the first page of that motion that you filed before January 29th of 1998, it indicates that, "As defense counsel for Mr. Allen have divided their work, appointed lead counsel for Defendant Allen, Richard H. Sindel, is concentrating on the guilt or innocence phase, and appointed co-counsel, John William Simon, is concentrating on the penalty phase."  Is that right?

A.    Yes.

Q.    So your responsibility, according to this motion, is for the penalty phase; is that correct?

A.    That is what this motion says.  That was what I intended.  I also as of this point, I still thought that I would be doing at least part of the penalty phase in court.

Q.    And what I'm getting at, is that's what you told the Court is that you're concentrating on the penalty phase, that's your responsibility; is that right?

A.    Yes.  Yes, you've correctly read the words.  What I'm giving you is the music.

Q.    And going to --

THE COURT:  Wait.  What did you mean by giving her the music?

THE WITNESS:  Your Honor, I'm trying to present the context in which that sentence was uttered.  At no point did I consider it to be my duty to act as a mitigation investigator in the case.  I explained on Friday that the actions I took were taken out of desperation because I was not receiving anything from Dr. Haney.  I have admitted that I should have been more assertive about this.  I should have gone after this as Mr. Landolt admitted in the continuance hearing in October.  Perhaps November would have been more reasonable in light of the fact that I did not have as many guns at my disposal as Mr. Landolt had.  Certainly October or November I should have been more aggressive about this.

THE COURT:  You've covered all that.  You've covered that time and time again.  I just wondered what the word "music."

BY MS. COSTANTIN:

Q.    So, Mr. Simon, what you said to the Court on January 29th of 1998, however, was that you were responsible for the penalty phase; is that right?

A.    By which I meant I was responsible for calling witnesses in the second stage, if there was one.

Q.    And I want to direct your attention to paragraph 4

where you describe Mr. Haney, what was Mr. Haney's --
Dr. Haney's role in this.  In it you indicated that as part
of his representation of Mr. Allen, Mr. Sindel hired Craig
Haney, J.D., Ph.D, in early September 1997, at which time
Dr. Haney agreed to consult with counsel.  Is that the words
you used?

A.    That's the word that I used, tracking facts I received
from Ms. Supranowich.

Q.    You did not in your motion state that Dr. Haney's role
was to locate, interview, and develop all the mitigation
evidence, did you?

A.    No.  There are many things that I knew or believed that
I did not include in that motion.

Q.    We're talking about what you told the Court back in
January of 1998.  You didn't indicate that Dr. Haney had a
role other than to consult, is that fair to say?

A.    That's the verb that I put in based on the facts from
Ms. Supranowich.

Q.    And would you have put those words in there if they
weren't true?

A.    No.

Q.    I'm going to go to Exhibit 36, the transcript of the
motion hearing held on January 30th of 1998.  Specifically I
want to go to page 10, in which you are questioning
Dr. Randall, who is testifying.  And your question is:  "Is

120 days a reasonable approximation of the time that you believe necessary to do your job according to the standards of your professional specialty?"  Is that the question you asked?

A.    Yes.

Q.    And his answer was:  "At this point I believe that would be sufficient."  Is that correct?

A.    Yes.

Q.    Now, going to page 2 and then three, top of three, you're indicating to the Court that you were doing some of the work that the first mitigation, Dr. Haney, either should have done or expected other people to do; is that right?

A.    Yes.  That's been covered in detail last week.

Q.    So you're telling the Court that you, in fact, are doing mitigation work; is that right?

A.    Yes.

Q.    And in that same motion, did you tell the Court in that extra sentence that it might be in your client's interest for you to be found ineffective in the penalty phase of the case?

A.    Yes.  And that I did not choose to take that route.

Q.    So you were choosing and attempting to develop mitigation in the case; is that correct?

A.    I was choosing to get a mitigation expert involved in the case.

Q.    No, I'm talking about your effectiveness.  You up to

that point had chosen and were, in fact, developing mitigation evidence; is that correct?

A.    For the three reasons I've explained in court just this morning.

Q.    You were, in fact, doing that though; is that correct?

A.    Yes.

Q.    Now, that same day, January 30th of 1998, you had a conference with Dr. Haney, is that right, concerning -- I'm sorry, with Dr. Randall, I apologize -- with Dr. Randall concerning mitigation; is that correct?

A.    Yes.

Q.    For 1.9 hours; is that right?

A.    Yes.

Q.    And at that meeting with Dr. Randall, he referred you to a book called "From Pain to Violence;" is that right?

A.    Looking at my time sheet, I am not sure that that was exactly when he referred me to the book, but he did refer me to the book, and I obtained it.

Q.    The book "From Pain to Violence," posits that there's a causal relationship between childhood trauma on the one hand and later violence or criminal activity of a violent nature later on; is that correct?

A.    That is my recollection.

Q.    And as you just testified, I believe you first tried to get that book out of the library, and then you eventually

purchased it and discussed it with Dr. Randall; is that right?

A.    I don't remember discussing it with Dr. Randall.  I do remember purchasing it.

Q.    And so at the end of January of 1998, you and Dr. Randall -- more specifically let's just talk about you. At the end of January 1998, you believe that this theory that childhood trauma could lead to later criminal violent activity was relevant to Billie Allen's mitigation case; is that correct?

A.    Yes.

Q.    And I'm going to show you notes concerning that January 20th, or I'm sorry, that January 30th, 1998 meeting that you had with Dr. Randall.  First of all, we can see in that middle portion that this is a book that's brought up or discussed, "From Pain to Violence;" is that right?

A.    I see that.  And I cannot -- I cannot say whose handwriting it is.  But I understand from the context of this, this is supposed to be Dr. Randall's notes.

Q.    And it indicates at the top, "Meeting with John Simon." Is that right?

A.    Yes.

Q.    Now, in that meeting, didn't you tell Dr. Randall that Billie Allen was a pot head?

THE COURT:  Was a what?

MS. COSTANTIN:  Pot head.

THE COURT:  Oh, okay.

A.    I -- sitting here this morning, I have no recollection independently of the notes except that based on what I have seen from what I did 15 years ago, it would have been logical for me to inform the new -- the first actual mitigation specialist that Mr. Allen had used marijuana.

Q.    So that was consistent with your belief at the time that Billie Allen was a pot head?

A.    I'm not admitting to having used the term "pot head" to describe my client.  That's the distinction we're talking about here.  I would have discussed marijuana with Dr. Randall, however.

Q.    In that meeting didn't you tell him that Billie Allen's brain was half fried?

A.    First of all, I have no recollection of having made that statement.  Second, I think that it would have been out of character for me to go that far into someone else's specialty, and rendering an opinion that I wasn't qualified to do or even read a test on.

Q.    Was it consistent with your belief at that time that Billie Allen's brain was damaged in some way?

A.    I simply don't know.

Q.    Did you tell Dr. Randall that Billie Allen's lying was symptomatic of a problem in that meeting?

A.    I don't remember one way or the other.

Q.    Was Billie --

A.    Wait, hang on.  I'm not sure that I told Dr. Randall that Mr. Allen lied.  I simply don't remember.  These -- I see the notes.  I see the notes.  I'm not saying there's any fabrication going on here.  I do think that they reflect the interpretation of what Dr. Randall was hearing.  And this is not a situation which Dr. Randall was a secretary and I was dictating what appeared on his notes.

Q.    Was Billie Allen lying to you?

A.    I later learned that there were some things that Mr. Allen told me that were not true.

Q.    When we're talking about later, are we talking about back in 1998 or '97 or are you talking about in 15 years later or 10 years later?

A.    Fifteen to ten years later the answer is certain.  At the time of trial, the evidence that Mr. Allen had made false statements came primarily from Ms. Casperi or Ms. Supranowich rather than from my own crosschecking, like we talked about last week.

Q.    So let me understand.  Are you saying that to your knowledge, Billie Allen did not lie to you?

A.    I would not say that he never lied to me.  All I'm saying is that to -- like to use me as a source for the underlying statement, lying as a symptomatic problem, would

extend beyond my recollection of the conversation with Dr. Randall.

Q.    I'm not asking about your conversation with Dr. Randall.  I'm asking whether Billie Allen was lying to you at times in 1997 and 1998 when you were speaking with him?

A.    At the time I was speaking with Mr. Randall, my information was that Mr. Allen had lied to the team.  The --

Q.    Mr. Simon, slow down for a second.  Here, let's do this.  Here, let's make the screen go blank.  Let's just ask you the simple question.  Was Billie Allen lying to you in 1997 and 1998?  And did you figure that out during that time period?

A.    I believe so, yes.

Q.    And was his lying to you and to other members of the trial team a recurring issue that the trial team had to deal with?

A.    Yes.  Yes, that certainly was.

Q.    I'm going to show you a letter that you wrote to Dr. Gelbort, February 15 of 1998.  First of all, let me just direct you to the second paragraph.

            THE COURT:  What number is it?

            MS. COSTANTIN:  That is Exhibit 379.

            THE COURT:  Thank you.

BY MS. COSTANTIN:

Q.     You had obtained a court order to have an MRI performed on Billie Allen; is that correct?

A.     That's what it says, and I have no reason to doubt the authenticity of this document.

Q.     And you wrote this document, right?

A.     I believe so, yes.

Q.     Okay.  All right.  So you had obtained a court order or Judge Webber had issued a court order authorizing an MRI for Billie Allen; is that right?

A.     Yes.

Q.     And subsequently that was canceled based on the advice of Dr. Gelbort; is that right?

A.     That's what it says.

Q.     And that's because Dr. Gelbort did not believe an MRI would show any brain damage, isn't it?

A.     My recollection of that is that he did not think that one test would be persuasive.  I have no recollection of him telling me that there was no brain damage.  My recollection is his issue was with one particular test.

Q.     So he thought an MRI results would not be persuasive?

A.     As of this point I'm really stretching to the limit of my recollection concerning things that I'm not aware either side has documentation for.  But my recollection on this is that we needed a quantitative PET scan, and that the question

wasn't whether or not Mr. Allen had brain damage, but what the right form of examination was, because if we used the wrong form of examination, it would come back as a false negative.  It would appear to someone viewing the results that there was no brain damage, when, in fact, it was our opinion that there had been.

Q.    So the concern from Dr. Gelbort, or can you state based on your memory the concern from Dr. Gelbort is that an MRI would not show brain damage.  Is that correct?

A.    Yes, because it was an inappropriate test.

Q.    But you had gotten a court order for it because Dr. Gelbort originally wanted one, correct?

A.    Yes.  And we did not have anything from him that -- in which he said he would never change his mind about anything.

Q.    All I'm asking you simply is he wanted one, then he canceled it; is that correct?

A.    That's what the document indicates, and that is also consistent with my recollection.  Once again, I was simply providing the context.  It's not that Dr. Gelbort said that it was frivolous to argue brain damage.  He argued that we needed one test as opposed to another.

Q.    Let's go to your time sheets, 498, Exhibit 498, page 10.  On February 6th of 1998, you had a conference with Billie Allen for his case; is that correct?

A.    Yes.

Q.   Concerning his case.  And on February 7th of 1998, you had another conference with Mr. Allen, described there as to prepare for trial; is that correct?

A.   Yes.

Q.   And that second conference was 2.5 hours; is that right?

A.   Yes.

Q.   I'm going to show you --

THE COURT:  Now, which was the second conference, the earlier date or --

MS. COSTANTIN:  February 7th.

THE COURT:  2.5 hours, correct.

MS. COSTANTIN:  2.5 hours.

BY MS. COSTANTIN:

Q.   And I'm going to show you 499.388.  Is that the beginning of your notes concerning -- your handwritten notes from your conference with Billie Allen on February 7th, 1998?

A.   Those are notes by me of a conference with Billie Allen, 2/7/98.

Q.   Okay.

A.   I would have to see more pages to see whether it was only the beginning or not.

Q.   I'm going to page through for you.  I believe it's 11 pages.  Are those your notes, handwritten notes, from your conference with Mr. Allen on February 7th?

A.    They do certainly look like that, yes.

Q.    Now, for ease of reading, we're going to go to 500.41. You see halfway down the page it says, "Conference with Billie Allen, 2/7/98"?

A.    Yes.

Q.    And let me page through those so you can take a look at that, pages 41 through 46.  Are these your transcribed notes of your conference with Billie Allen on February 7th of 1998?

A.    Yes.

Q.    Now, going to page 44 of Exhibit 500, is it correct that Billie Allen is telling you that a lot of things happened to him in the past, "Three guys were trying to rob me, he said 'There's a robbery.' They didn't know I had a .25 automatic.  That was the beginning of '96.  They were trying to steal money and drugs."  Is that what Billie Allen told you that day?

A.    Yes.

Q.    And going to page 45, did he tell you that, "I'm a convincing person.  I can convince a person who saw a drug deal that he only saw somebody shaking hands"?

A.    Yes.

Q.    And did he also tell you, "If I feel they have an open-and-shut case.  I would show tears"?

A.    Both of those phrases appear here.  The way that I take notes, it would be my opinion that if this was an "if, then"

construction, there would be a comma after the word "case."

Q.    So you simply wrote, "If I feel they have an open-and-shut case"?

A.    Yes.

Q.    And then the next line, "I would show tears."  It's your testimony the "I would show tears" has nothing to do with the statement, "If I feel they have an open-and-shut case"?

A.    I was simply -- I was taking notes.  I was not -- I was not taking them stenographically.  I realize that the collocation of those two phrases is subject to the construction that it was an "if, then" clause.  I simply don't know that.  I can understand -- I can understand my own note taking to have left off -- I mean, these notes are not complete.  They are not like a court reporter would prepare. It could be, if I felt they had an open and shut case, I would slash my wrists right now.  I think a sensitive note taker might not keep writing if they heard that.  What my notes show is that he said two things.  "If I feel they have an open and shut case," and then he also said, "I would show tears."  It could be, it makes more sense to me that if he were testifying in the penalty phase, he would show tears.  I don't know -- I simply don't know.

        I transcribed these with microscopic care, but leaving out the comma, if the comma was not there in my

handwritten notes, was part of that microscopic care.

Q.    Could you stop there.  You were saying that you think what he really said was, "I would show tears in the penalty phase."  Is that what your interpretation of this is?  Is that what you're saying?

A.    That's not my interpretation of what happened 15 years ago.  It's my interpretation of the English prose I see on the screen.

Q.    Okay.  So what you wrote was, "If I feel they have an open and shut case," and then you wrote, "I would show tears."  And right now your interpretation of what you wrote is, he would show tears in the penalty phase?  I'm just trying to understand what your interpretation is right now.

A.    I think that's -- I think that is one reasonable interpretation of it.  I'm simply trying to explain why someone who is neither a court reporter nor a stenographer, who is taking notes while they are asking questions at the same time would leave a clause hanging somewhere.  Of course when one goes through these accurate transcriptions, one will see one hanging clause after another.  This is -- it's not as if this is an exceptional situation where the only way of reading it is that it's an "if, then" construction.  That's inconsistent with the way the entire document that I drafted is set up.

Q.    You wrote, "If I feel they have an open-and-shut case,"

and then below that you wrote, "I would show tears."  Is that correct?

A.    That is correct.

Q.    Let's go to 378.  Are these your notes from a phone call to Dr. Cuneo from Sindel & Sindel on February 14 of 1998?

A.    Yes.

Q.    And in it do you indicate that Dr. Cuneo told you or whoever is on the other side of the conversation with you, "My report will be faxed on Monday."

A.    Yes.

Q.    And did he indicate that his findings were "PTSD, cannabis abuse"?  Is that correct?

A.    Those phrases appear there, yes.  Because this is not -- because this is not a report, but a list of phrases that were used, I can't testify to the exact context of PTSD and cannabis abuse.  My recollection is that that would be consistent with what he would say.

        THE COURT:  I need to take a brief like honest five-minute break.  We may want to expand it if anyone else needs a ten-minute break.  Let's take ten minutes at this time.

        (Court in recess 9:28 a.m. until 9:37 a.m.)

        THE COURT:  You may proceed.

BY MS. COSTANTIN:

Q.    Mr. Simon, looking at Exhibit 378, which are your notes from a phone call to Dr. Cuneo from Sindel & Sindel's office on February 19 of 1998, I want to direct your attention to this bottom portion.  That last line, does that state, "If I put in brain damage, that will be attacked"?

A.    Yes.

Q.    Now, this Exhibit 378, this reflects a discussion of mitigation evidence, not competency; is that correct?

A.    Yes.

Q.    I'm going to show you 499.106, and actually the following two pages as well.  And ask you, are these notes reflective of a conversation that you had with Dr. Cuneo on February 22nd, 1998?

A.    Yes.

Q.    And I just want to go through those next couple pages so you see what we're talking about.  And those are your notes from that conversation; is that correct?

A.    Yes.

Q.    And now we're going to go to 500.32.  And that is your transcription of those notes; is that correct?

A.    Yes.

Q.    I'm just -- there looks like there's a repeat between the top and the bottom of the page, that's because that 301.6, BA-301.6 and BA-301.5 were identical; is that correct?

A.     Precisely.

Q.     Okay.  Now, Dr. Cuneo -- and this meeting you had with -- or this conversation, I'm sorry, that you had with Dr. Cuneo on February 22nd of 1998, that was after he had evaluated Billie Allen that same day; is that correct?

A.     I can't today answer that it was the same day, but it certainly looks like it was after he evaluated him.

Q.     So -- and we do know that your notes, however, are from February 27th; is that correct?

A.     Yeah, that is correct.  I'm simply trying to avoid saying things that I don't remember.

Q.     And he stated, and I've blown up that portion.  "I threatened to walk out.  He's horrible on times.  He's not lying on that, he just," and then it ends.

THE COURT:  I'm sorry, early on you said that notes of February 22nd and it says -- you say now, so we do know your notes are from February 27th.

MS. COSTANTIN:  22nd.  I'm sorry, Judge, I'm not speaking clearly.

BY MS. COSTANTIN:

Q.     We do know your notes are from February 22nd; is that right?

A.     2/22/98.

Q.     Right.  And in those notes you wrote that Dr. Cuneo told you, "I threatened to walk out.  He's horrible on times.

He's not lying on that, he just," and then, "Marquis Taylor's death is a dividing line." Is that right?

A. Yes. And that illustrates the problem in making the assumption that because one line ends, the next line is a continuation of it. I have no idea what he said after, "He just."

Q. Okay. I'm not asking -- I mean, what he did say after that was, "Marquis Taylor's death is a dividing line," correct?

A. Yes. But the fact that the one line comes after the other does not mean that there was a continuous flow of language from the speaker.

Q. My simple question is that Dr. Cuneo told you that, "Marquis Taylor's death was a dividing line for Billie Allen." Is that right?

A. Yes.

Q. And that he also notes -- you also note he talked to you about Dennis Noble's killing; is that right?

A. Yes.

Q. And that "B," would that be referring to Billie Allen, "is scared to death"?

A. Yes.

Q. Did Dr. Cuneo also tell you that, "Billie Allen and Marquis Taylor were soulmates in each other's world, and after he died nothing was ever right"?

A.    Yes.

Q.    And does he also make a reference to nightmares?

A.    Yes.

Q.    And he indicates to you that he "doesn't see any trouble with the PTSD."  Is that right?

A.    Yes.

Q.    He also indicates that, "The house was shot up over a bad drug deal."

A.    That's what the notes reflect.  That's the statement that the notes reflect.

Q.    Right.  That's what Billie Allen told Dr. Cuneo, and Dr. Cuneo told you?

A.    That concatenation of statements is more than I know. But I do know that what the notes say is, "House shot up over a bad deal."

Q.    And that's what Dr. Cuneo told you?

A.    Yes.

Q.    And he also told you that, "Bill Allen denied again that he did the robberies," right?

A.    Yes.

Q.    Now -- oh, and I'm sorry, there's also a reference there about Job Corps, that he was in Job Corps, that Billie Allen was in Job Corps?

A.    Yes.

Q.    Now, you already knew from talking to Billie Allen back

in December of 1997 that Marquis Taylor's death was critical; is that correct?

A.   "No" would be a too strong a term, but I had data to that effect.

Q.   Billie Allen had told you that nothing was the same after Marquis died; is that right?

A.   That -- that is consistent with my recollection of Mr. Allen's self reporting, yes.

Q.   So to Mr. Allen at the very least, Marquis Taylor's death was critical?

A.   Yes.

Q.   And you also already knew about Dennis Noble having been killed; is that right?

A.   Yes.

Q.   And you also knew about the Job Corps; is that right?

A.   That's my recollection, yes.

Q.   And you also already knew that the house had been shot up over a bad drug deal; is that correct?

A.   Yes.

Q.   And Dr. Cuneo told you, "When he's lying, his legs bounce back and forth, they swing in and out"?

A.   That's what my notes say.

Q.   And that's what -- based on your conversation with Dr. Cuneo; is that right?

A.   I have no other explanation.

Q.    And he also told you, "He was only supposed to back this guy up.  He was the driver when it left.  Only one gun." Is that what Dr. Cuneo told you?

A.    Yes, ma'am.

Q.    Now, you have -- going back to this, his legs bouncing when he lies, you had already figured out that Billie Allen was lying to you at times; is that correct?

A.    I had that perception based on my conversations with members of the team.

Q.    And we already looked at some stuff in which he indicated that he was going to be -- Billie Allen had told you he was going to be a pro basketball player, but he never actually made varsity at the high school; is that right?

A.    Yes.

Q.    So not just information from the team, you also had your conclusions, is it fair to say, that Billie Allen was not always truthful with you?

A.    I also know very little about pro sports.  I agree that that seems unlikely.  I'm trying to say that I'm a little more careful than that about using the word "lie" with people.  The conclusion that I came to in this case is that Mr. Allen was lying to the team.  I can't go through every statement that seems to me improbable and say this is a lie, that's a lie, the other thing is a lie.

Q.    My question is simply that you knew that he was lying

to the team before Dr. Cuneo told you that on February 22nd of 1998?

A.     That was my understanding.

Q.     I'm going to show you 499.24.  Is that your handwriting?

A.     Yes.

Q.     And does it indicate that you wrote, "Cuneo says there will be no second report.  Should I call Holtshouser now and tell him that?"

A.     Yes.

Q.     So it was your understanding that despite the fact that Dr. Cuneo had had a second interview with Billie Allen, he did not intend to send a second report on mitigation; is that correct?

A.     That's the way I read it.

Q.     And if there was no second report, there would be nothing to give to the government obviously?

A.     That's right.

Q.     Now I'm going to show you 383, and then also the next page, which appears to be an updated version of 383 with more filled in.  383 and 383.2, those are witness schedules for mitigation witnesses; is that correct?

A.     Yes.

Q.     And looking at 383.2, does it indicate that the following witnesses were set for interviews?  First of all,

let's take Saturday, February 21st:  Deborah Ruffin, Julie Ellis, Nancy Harris --

THE COURT:  I'm sorry, just a second.  Okay.  Thank you.  I have Nancy Harris.

BY MS. COSTANTIN:

Q.    On February 21st, also Sam Moore, Russ Vanacek, Joyce Eaton, Jerome Petty, and Jerome Petty, Jr., Shimeka, Eric and Mrs. Taylor, is that correct, that's who is set for interviews on Saturday, February 21st?

A.    Yes.

Q.    And then is it correct that on Saturday, February 22nd, it looks like Sam Moore has been moved over.  And then Susan Duke, John Lents, Stephanie Stock, Lucy McLemore, Raymond Petty, Carol Petty, Monette Petty, Raymond, Jr., Ahmed and Beverly Oliver, and Juanita, Nicole and Yvette Allen were all set for interviews on those days?

A.    That's the way it appears to me.

Q.    And on your time sheets referring you to February 21st, first of all, does it indicate that with Mr. --

THE COURT:  What?

MS. COSTANTIN:  498.13, 13th page.

BY MS. COSTANTIN:

Q.    On February 21st, does it indicate that, "With Mr. Sindel and Dr. Randall, you interviewed mitigation witnesses and discussed strategy"?

A.    Yes.

Q.    And that was 8.6 hours?

A.    Yes.

Q.    Going to the next page, on February 22nd, does that indicate that you interviewed mitigation witnesses for 8.2 hours?

A.    Yes.

Q.    And then moving down to the last line of that same page, does it indicate on February 23rd, you participated in witness interviews for a total of 4.1 hours?

A.    Yes.

Q.    And going to the next page, which would be the 15th page of Exhibit 498, does it indicate that you interviewed on February 23rd -- I'm sorry, February 24th of 1998, you interviewed mitigation witnesses with Dr. Randall for 4.3 hours?

A.    Yes.

Q.    And then moving down to the 25th of February, you attended parts of the interview with mother and grandfather of defendant.  That was .4; is that right?

A.    Yes.

Q.    And that would have been Juanita Allen and Otha Petty, Sr.; is that right?

A.    Yes, ma'am.

        THE COURT:  Just a second, please.  Okay.

Q.   Oh, I'm sorry, I need to go to the next page.  Going to the next page, which is page 16 of 498, you participated in briefings of Ms. Allen and other witness preparation; is that correct?

A.   Yes.

Q.   And that's one hour?

A.   Yes.

Q.   And moving down to page --

THE COURT:  What was that date on page 16?

MS. COSTANTIN:  Page 16 was February 28th.

THE COURT:  Okay.

BY MS. COSTANTIN:

Q.   And looking at page 18, do these reflect -- first of all, March 4th, "Counsel with Dr. Gelbort, Dr. Randall, Dr. Cuneo, and Mr. Sindel concerning testimony and witnesses"?

A.   Yes.

Q.   Now, during these -- and during these interviews and meetings, it was your practice to take notes; is that correct?

A.   It was my practice to do so as a rule.  There were some instances in which I did not take notes in order to preserve candor by the person with whom I was speaking.

Q.   And could you give me an example of some of those people that you spoke with or situations in which you did not

take notes?

A.   Fifteen years ago, I can't tell you I did not take notes on this conversation, that conversation, or on the other occasion.  I'm saying that both now and 15 years ago there were points at which I would make a point not to take notes, because having someone taking notes would have the same -- the same anti-candor effect as taping the conversation.  I don't have a specific situation in mind in which I can look at my time sheets and say, oh, yes, that's the one where I didn't take notes.  I'm just saying it's part of my modus operandi and was even at that time that there are some things you don't take notes about.

Q.   And is there any memory you have of any interview that you had in which you didn't take notes from the Allen case?

A.   No, but that's due to the passage of time rather than to any lack of --

Q.   I'm not doubting that --

A.   -- correspondence of my behavior in the Allen case with my modus operandi.

Q.   Mr. Simon, I'm not doubting that.  I'm just asking if there's something that I don't know about because I don't have notes on, that's all.  If there's any conversation or interview that you recall related to a witness that you recall now that you didn't take notes on?

A.   I cannot recall now that there's a specific

conversation that I did not take notes on.

Q.     Okay.  I'm going to show you 499.35.  First of all, is this the first page of your notes of interview of Deborah Ruffin on February 21st of 1998?

A.     Yes.

Q.     And I'm going to go down, I believe it's five pages, make sure that these are all -- making clear that these are all your notes.  Is that right?

A.     They certainly look like my notes, yes.

Q.     Okay.  And were these among -- going to 500.8, were these among the notes that you transcribed in compliance with the court order?

A.     Yes.

Q.     And going to 500.8, halfway down that indicates these are notes, transcribed notes of your interview with Deborah Ruffin on February 21st of 1998 at 10:30 in the morning; is that right?

A.     Yes.

Q.     Now, Ms. Ruffin indicated to you that she was friends with Juanita Allen back from when Ms. Allen worked with Ms. Ruffin at the St. Louis Public Library when they were clerks there; is that correct?

A.     Yes.

Q.     And we've already established, correct, that Ms. Ruffin was one of the people who was at that meeting with you on

January 7th at the house on Cote Brilliante?

A.    Yes.

Q.    Now, looking at these notes, there are references -- let me go back -- there are references to an "R."  Can you see that?

A.    Yes.

Q.    And then in other areas there's references to a "D"?

A.    Yes.

Q.    You see that?

A.    Yes.

Q.    And can you tell me who "R" -- does "R" refer to when Rick Sindel is speaking and "D" or "Dave" refer to when Dave, Dr. Randall is speaking?

A.    Yes.

Q.    Now, this date, February 21st, we've looked at your time sheets, this was one of the dates on which you interviewed mitigation witnesses with Dr. Randall and Mr. Sindel; is that correct?

A.    Yes.

Q.    And going to 500.9, is it true that she told you that, "Everybody I knew liked Billy.  He would B.S. a lot.  He doesn't tell the truth.  Bill will shine you on.  You have to read between the lines.  Bill may not tell you the whole truth.  Some people lie to avoid trouble."  And then there's something illegible.  And that she was shocked to hear he was

selling drugs.  Is that correct?

A.    Yes.

Q.    And did she also tell you that, "Billie Allen's father, what I know is not good.  Secondhand, alcohol pretty bad, I saw him up close about a month ago.  I saw him, he was drunk. He's a drunk."

A.    Yes.

Q.    And that was nothing new to you; is that correct?  I mean, you knew Billie Allen's father was a drunk back from December when you talked to him at least, correct?

A.    I certainly had data to that effect.  I shrink from using the word "no."  But the answer is I had data to the same effect as Ms. Ruffin's statements in the interview.

Q.    And isn't it true that Ms. Ruffin also told you that when asked, does Juanita have a problem with alcohol, she told you she drinks to excess when she is in trouble?

A.    Yes.

Q.    So you had information concerning Juanita Allen's drinking apart from that one meeting on January 7th where it appeared she was under the influence -- or impaired, I believe you said?

A.    Impaired, yes.

Q.    She had told you that; is that correct?

A.    Yes, that's what these notes reflect.

Q.    So I guess my question is simply, it wasn't -- your

information concerning whether or not Juanita Allen drank was not limited to one meeting with her at nine o'clock at night on January 7th of 1998; is that correct?

A.   That's correct.

Q.   I'm going to show you 486.  Are these your handwritten notes concerning a second session, as it's called, with Deborah Ruffin, more interview notes with Deborah Ruffin?

A.   Yes.

Q.   And I'm going to show you -- I'm going to go down through those.  I'm going to show you 500.14.  And are these your transcribed notes, the first page of your transcribed notes of the Deborah Ruffin second session interview?

A.   Yes.

Q.   And going to the next page, did she tell you, referring to Juanita Allen, that she had to "'tighten Bill up' -- get physical"?

A.   Yes.

Q.   So Ms. Ruffin had told you that Juanita Allen had to -- had gotten physical with Billie Allen; is that right?

A.   Yes.

Q.   Now, I'm showing you what's 499.28, the first page of interview you had with Lucy McLemore on February 23rd of 1998.  Is that right?

A.   Yeah, I see that.  I see that page.

Q.   And I'm going to keep going.  Are those your notes?

A.    Yes.

Q.    And then going to 500.6, are those your transcribed notes of that same interview with Lucy McLemore on February 23rd of 1998?

A.    Yes, including the gap of substantially one page that I still can't explain.

Q.    Was that redacted in any way or you just have a blank spot there?

A.    No, it was not redacted.  I'm just saying in most of these notes, they just flow sequentially from one thing to another.  Here there's the one phrase, "lack of violence" at the top of a page and then an empty remainder of the page, and then the next page begins.  And I'm just observing that that would be atypical of the way I would take notes.  I don't know why there's that emptiness there.

Q.    Ms. McLemore told you that Billie Allen, when he was 16, 17, or 18 was stealing.  He "would pick up things."  Is that correct?

A.    Yes.

Q.    And did she also tell you that, "He" -- referring to Billie, and Nita, referring to Anita Allen, "had a problem, as he got older, he thought he could stay out as long as he wanted to"?

A.    Yes.

Q.    And did she also tell you that the family was

dysfunctional, more subtle than in the usual case?

A.    That's the way I interpret that.

Q.    So Ms. McLemore, who is Lucy McLemore, who is Juanita Allen's sister, is telling you that the family is dysfunctional; is that correct?

A.    That's the way I interpret it, yes.

Q.    I want to show you some notes of interview, handwritten notes, starting partly down the page of Shimeka.  Is that Shimeka Taylor?  That's Exhibit 451.  These are your handwritten notes of your interview of Shimeka Taylor; is that correct?

A.    Yes.

Q.    Let me go through them.  And now I'm going to go to 500 -- excuse me, let me start at the beginning.  The top of the page, it starts with Shimeka.  These are your transcribed notes of your interview you had with Shimeka Taylor?

A.    Yes.

Q.    And going down through them, these are the -- the next four pages are also all notes concerning the interview with Shimeka Taylor; is that correct?

A.    It looks like it, yes.

Q.    Now, I want to direct your attention to page 22 of Exhibit 500.  Did she tell you that, "If Bill did something, he got the snot kicked out of him"?

A.    Yes.

Q.      "Got back around ten."

A.      Yes.

Q.      "Bill cried.  Whipping and a punishment.  Early '90s, 12 to 13"?

A.      Yes.  Yes, I see that.

Q.      So does that refresh your recollection --

A.      Yes.

Q.      -- that Shimeka Taylor did, in fact, tell you that, "If Bill did something, he got the snot kicked out of him"?

A.      Yes.  I'm surprised that didn't register before, but that's definitely what I transcribed.

Q.      And is she relating an incident in which Bill got back around ten and got a whipping and a punishment, and that occurred in the early nineties when he was 12 or 13?

A.      Yes.

Q.      So not only is she telling you that he'd get the snot kicked out of him, she's telling you that he would get a whipping; is that right?

A.      Yes.

Q.      So you were aware that Juanita Allen was using physical punishment on Billie Jerome Allen; is that correct?

A.      "Aware" might be too strong a term.  But we had this data.  There's no denying that we had this data.

Q.      Okay.  Now, what is the difference between being aware and people telling you that he was getting a whipping?

A.    It's whether you believe the person or not.

Q.    So are you saying that you did not believe Deborah Ruffin when she said that Juanita Allen got physical with Bill Allen?

A.    Well, it's not that I would accuse her of lying, it's just I would use a different term, a different verb to describe my level of confidence in the statement besides no.

Q.    And what verb would you use?

A.    Well, I already used the verb that I had data to that effect, and I have no discomfort with that.

Q.    Would you use --

A.    To state that I know that something happened 20 years ago when I can't say that I know what happened 15 years ago, and when I was in the room when it happened, it doesn't seem to be much of a -- entail much of a mental effort to make a distinction.

Q.    Were you aware at that time that Deborah Ruffin reported that Billie Allen -- that Juanita Allen had gotten physical with Billie Allen?

A.    Yes.

Q.    Did you have any reason to doubt Deborah Ruffin's statement?

A.    Well -- well, I am not personally accusing Ms. Ruffin of trying too hard to help us out.  That's something that someone whose had experience on both sides of the question

would have to think about.

Q.   So are you saying that Ms. Ruffin by telling you back in 1998 that "Juanita Allen would get physical with Billie Allen" was trying to help you out?

A.   Again, I want to make it very clear, I have no disrespect for Ms. Ruffin nor do I question her integrity. All I'm saying is that as someone who has seen these cases from both sides, I simply can't say because a friend of the family tells me that someone was hit on the head as a child or that their mother was drinking when they were carrying the defendant, that that's the truth.

We had data from Ms. Ruffin.  I considered Ms. Ruffin to be a good source.  I simply can't go all the way and say that it happened.

Q.   Okay.  But you were aware that a close family friend of the Allen family, of Juanita Allen specifically, I mean, someone who she'd worked with, a close family friend of Juanita Allen, had told you that Juanita Allen would get physical with Billie Allen?

A.   Yes, and those are what my notes reflect.

Q.   And you were aware that a neighbor, Shimeka Taylor, told you that Bill would get the snot kicked out of him --

A.   Yes.

Q.   -- if he did something?

A.   Yes.

Q.    And you were aware through Shimeka Taylor -- that Shimeka Taylor had told you that Bill would get a whipping and a punishment in the early nineties when he was 12 or 13?

A.    Yes.  Based on my viewing of these documents, I can agree to all of that.

Q.    So you had data, as you describe it, that Billie Allen was physically punished --

A.    Yes.

Q.    -- by Juanita Allen; is that right?

A.    Yes, ma'am.

Q.    Now, I want to go to 499.  Let me ask you a question before I move on.  But to your knowledge, neither Billie Allen or Juanita Allen ever described any abuse by Juanita Allen; is that correct?

A.    That is also correct.

Q.    Now, let's look at 499.347, and go down -- this would be notes of your interview with Raymond Petty on February 20th of 1998; is that correct?

A.    Yes.  And as with this interview as with most of the interviews we've been talking about today, this is with Dr. Randall.

Q.    Okay.  And I'm going to go through these pages to make sure that you've seen them all.  And are those the pages of your interview?

A.    Yes.

Q.   Now, let's move to -- and those are six pages, I believe, we just went through.  Let's move to 500.37.  And just to set the tone, Raymond Petty is Juanita Allen's brother; is that correct?

A.   Yes.

Q.   So he is the uncle of Billie Allen; is that right?

A.   Yes.

Q.   Now, 500.37, part way through that page it starts with, "Raymond Petty, February 22nd, 1998."  Is that right?

A.   Yes.

Q.   And so those are the -- that's the beginning of your transcribed notes?

A.   Yes.

        THE COURT:  Okay.  Just a second.  Again, not that -- well, there's a mention of February 20th.  But there's no doubt this happened on February 22nd; is that correct?

        MS. COSTANTIN:  Yeah, actually that's a good point, Judge.  Let me take a look at this.

        THE COURT:  You said --

BY MS. COSTANTIN:

Q.   The handwriting, let's look at 499.347.  Are you right, is that a 22nd or is that a 20th?  Because it appears on your transcribed notes you've written the 22nd?

A.   Two, stroke, two two, stroke, 98.

Q.    Okay.  To many of us that looks like a zero, but you know your own handwriting.  So it's February 22nd just to clarify?

A.    February 22nd, 1998.

Q.    Okay.  And that's what you wrote when you transcribed, it was February 22nd of '98, right?

A.    Yes.

Q.    Now, that's page 37.  I want to go down a few pages and just make sure these are your transcribed notes of the interview with Raymond Petty.  Is that correct?

A.    Yes.

Q.    And it ends obviously where it says, "Conference with Billie Allen."  Is that correct?

A.    Yes.  Well, wait.

Q.    I'm sorry?

A.    I would have to go back.  Could we go back one page?

Q.    Sure.

A.    Here we have Raymond, Jr.

Q.    Right.  Do you recall from the witness interview schedule that you interviewed the Pettys, Raymond Petty and his wife and children in one group?

A.    Yes.  After -- partly due to the time pressure and partly because Dr. Randall's decision to do so, some of these were group interviews.

Q.    So let's go back to 37 where we're definitely talking

about Raymond Petty.  Is that correct?

A.    Yes.

Q.    All right.  And I want to direct your attention to 500.39.  Is it correct that Mr. Petty told you that Juanita Allen or just "Juanita drinks when problems arise"?  Is that correct?

A.    Yes.

Q.    So her brother told you that she drank when there were problems, is that fair to say?

A.    Yes.

Q.    Now, I want to go to 500.38.

A.    And I would also note that shortly after that it says, "Mrs. Petty in."  There was someone else inserted into the conference and --

Q.    That would be Carol Petty, Mr. Raymond Petty's wife?

A.    I assume so.  Actually from my point of view it could be anyone.  The fact that any other witness is added to the interview cuts down on its probative value to me as an interviewer.

Q.    Okay.  But his statement, Raymond Petty's statement, "Juanita drinks when problems arise," occurred before Mrs. Petty came in?

A.    Before Mrs. Petty.

Q.    So any issue about accuracy because there's more than one person there is not existing in this situation; is that

right?

A.    Exactly.

Q.    Okay.  Let's go back up.  So this is still merely Mr. Raymond Petty there.  Didn't Mr. Raymond Petty tell you concerning Juanita Allen, "She would use her fists on him," referring to Billie Allen, "16-17-18 and she was beating him up.  B" -- referring to Billie -- "called me.  I got in between.  Whipping him with extension cord.  You talk, and you talk, and you talk."  Is that what she -- that's what he told you?

A.    Yes.

Q.    So he told you specifically, Juanita Allen's brother told you that Juanita Allen would use her fists on Billie Allen; is that right?

A.    Yes.

Q.    And then he also told you about a specific incident when Billie was 16, 17, or 18, in which Juanita Allen was beating Billie Allen with an extension cord?

A.    Yes.

Q.    And I want to get to that next page so we can see the continuation.  "You talk, and you talk, and you talk."  And he told you, "You hit, hit, hit, put out, put out, put out.  She wasn't consistent."  Is that correct?

A.    Yes.

Q.    And I want to go to 39.  This is after Mrs. Petty has

entered the room; is that correct?

A.    Yes.

Q.    And there's a statement you wrote, "This is not the time to hold back about making judgments on people."  Is that correct?

A.    Yes.

Q.    So there's a discussion in that interview about the need to be frank in what occurred in the family; is that correct?

A.    Yes.

Q.    And do you recall if that was a statement made by Carol Petty or Raymond Petty or was that a statement made by the trial team?

A.    In my view that was a statement made by the trial team. And it would be unlikely that I would write down what I would have said.  But I would have said it if I didn't.  I mean, if I didn't say that, I would have.

Q.    Okay.  Let's not say about what who would have or whatever.  You think it was the trial team --

A.    That was a statement by the trial team, yes, I agree.

Q.    All right.  And, in fact, Mr. Petty was not holding back; is that correct?

A.    Well, that would depend on whether I knew everything that he knew.  I really can't answer that question.

Q.    Well, he told you that she would drink when she was in

trouble, correct?

A.     Yes.

Q.     And he told you that Juanita Allen would use her fists on Billie Allen, correct?

A.     Yes.

Q.     And he told you that there was a specific incident when Billie Allen was 16, 17, or 18, where she was whipping him with an extension cord; is that right?

A.     Yes.

Q.     Now, do you recall testifying at your deposition that you couldn't press Juanita Allen about drinking or physical treatment of Billie Allen because you were afraid of alienating the witnesses?  Is that correct?

A.     Yes.  It actually went beyond alienating the witnesses. It would be -- it would have made it impossible for us to actually find some of the witnesses.

Q.     But your notes here are reflecting that a family friend, a close family friend of Juanita, Deborah Ruffin; a neighbor, Shimeka Taylor; and Juanita Allen's brother are all telling you that Juanita Allen drank and was physical, physically punished Billie Allen; is that correct?

A.     Yes.

Q.     I'm going to show you Exhibit 304.  Is this the four-page handwritten autobiography of Billie Allen?

A.     Well, I believe it is.  It's not a document that I'm

personally familiar with.

Q.   You never saw the -- Billie Allen's autobiography?

A.   I can't say never.  I have seen this before.  I don't remember when.  But what I'm trying to do is answer the question precisely.  I believe this is the autobiography, yes.

Q.   No, and I'm asking you, did you see it during the trial preparation phase or did you only see it when it was shown to you in the deposition?

A.   I have no recollection of seeing it during the trial phase.  But given the passage of time and the obvious importance of the document, I cannot testify that I did not see it during the trial preparation phase.

Q.   I want to go to page 3 of Exhibit 304, and focus you on that first paragraph.  Tell me if I'm reading this correctly.  "I smoked weed every day because I had so much stress, and I needed someone to talk to, but I didn't feel right talking to my mom about it.  Me and my mom were real tight, but it's just a lot better when you have a father there to love you and spend time with you like fathers do."

A.   Yeah, I believe that's a correct reading.

Q.   And then I'm going to direct you to another portion of the letter.  That middle portion, "I felt alone like nobody loved me.  Even though my mom loved me to death, I wanted to just die."  Is that correct?

A.     Yes.

Q.     Now, would you agree that in this written document, Billie Allen is describing a close relationship with his mother?

A.     Oh, yes, the document says that, there's no doubt about that.

Q.     And Billie Allen himself never gave you any indication that his mother was physically abusive to him; is that correct?

A.     That's correct.

Q.     Now, I want to show you your declaration, and that's Exhibit 251.  And I want to go down to page 3, paragraph 5. "Therefore, we asked Dr. Cuneo, who already evaluated Mr. Allen for competency, to assess the presence of mitigating factors.  To opine on mitigation, he relied upon his prior competency evaluation, conversations with Dr. Randall, an interview with Mr. Allen's mother, and a review of documents."  Is that what you wrote in your declaration, paragraph 5?

A.     That is what was in the document I was presented, and I have no reason to doubt those propositions.

Q.     Okay.  Well, didn't we just determine that Dr. Cuneo, in fact, conducted a second interview on -- of Billie Allen on February 22nd of 1998, before rendering his opinion concerning mitigation?

A.    Yes.  And this does not say he didn't.

MR. MORENO:  I'm going to object, wasn't the second interview after the first interview where he laid out his diagnosis, the report?

MS. COSTANTIN:  The first --

THE COURT:  I don't understand.

MS. COSTANTIN:  The first report specifically said it was a competency report.  My point is simply that there was -- this indicates there was only one interview, and, in fact, there were two interviews.

MR. MORENO:  Well, that wasn't the question as I understood with all due respect.

THE COURT:  Okay.  Just so there's no doubt, would you rephrase it, please.

MS. COSTANTIN:  Sure.

THE COURT:  But at any rate, there were never two Cuneo reports?

MS. COSTANTIN:  That's correct.  That's correct.

BY MS. COSTANTIN:

Q.    There were never two Cuneo reports; is that correct?

A.    That's what I've learned from reviewing the documents this morning on the stand, yes.

Q.    But Dr. Cuneo in evaluating and assessing the presence of mitigating factors did more than just rely upon his prior competency evaluation, he met again with Billie Allen on

February 22nd of 1998; is that correct?

A.    Yes, that appears to be omitted from this document.

Q.    And you never asked to see any documents related to what Dr. Cuneo had done before you signed this declaration; is that correct?

A.    No.

Q.    I want to show you some of the witness interviews or notes of witness interviews, specifically 418.  Are these notes of interview with -- your notes of interview with Yvette Allen?

A.    Yes.  And by "your," I mean to include, I would have been involved in this interview.

Q.    And these are your notes?

A.    These are my notes, yes.

Q.    And correct me if I'm wrong as I read your handwriting, does she state, "Relationship" -- or your notes state, "Relationship, we got close.  He used to take me to parties with him.  He would pick me up at Wydown."  Is that correct?  Is that what that reads?

A.    Yes.

Q.    And Wydown is a middle school; is that correct?

A.    Yes, in Clayton.

Q.    And going to 499.344, are these your handwritten notes from a meeting with Ahmed and Beverly Oliver?

A.    Well, it's Olivers plural.  I certainly don't have

independent recollection of how many Olivers there were there.

Q.   Do you recall looking at the interview schedule that indicated Beverly, Oliver, and Ahmed Oliver coming in for the interview?

A.   I remember looking at it this morning.  But all I'm trying to say is I'm just trying to be accurate.  I can see it has the plural form of Olivers.  Whether it's Ahmed and Beverly or not is beyond my recollection.

Q.   Does that refresh your recollection, "4:30, Ahmed and Beverly"?  That would refer to Ahmed and Beverly Oliver; is that right?

A.   Yes.

Q.   So we looked at your notes, your handwritten notes.  I'd like to look at your transcribed notes of that interview.  Page 36 of Exhibit 500 as well as page 37.  Are those your handwritten notes of the interviews with Beverly and Ahmed Oliver?

A.   Yes.

Q.   And did the Olivers state or one of the Olivers state, "When he took the money from you, it really disappointed me.  I caught him fair and square.  I knew then that he had lied about a lot of stuff."  Is this correct, "He thought he could turn it over and give it back"?

A.   Yes.

Q.    Now, Billie Allen never told you that Brady Toliver was one of his friends, did he?

A.    That who?

Q.    Brady Toliver.  Was that name given to you by Billie Allen, do you recall?

A.    I can't recall having heard that name before, before now.

Q.    All right.  And Billie Allen never told you that Cathy Toliver was a friend of his mother?  Is that name familiar to you at all from back in 1998?

A.    No, I just don't recall that.

Q.    And, in fact, nobody ever told you that Brady Toliver or Cathy Toliver knew Billie Allen well or could testify on his behalf, did they?

A.    Well, I have no recollection of that, but it's not as if I was all seeing at that point.  I don't know that -- I don't have a recollection of that, but I'm only speaking for myself.

Q.    And that's all I'm asking.

A.    Yeah, okay.  I don't recall those people from that time.

Q.    And you don't recall anyone ever telling you or indicating to you that either Jerome Petty, Billie Allen's uncle; or Otha Petty, Billie Allen's grandfather, was physically abusive to Billie Allen, do you?

A.   Well, with Mr. Petty, Sr., this is where we get into the inkling business.  I did not have evidence of that, but I shared with Dr. Randall the view that there was something going on along those lines.

Q.   So you're saying you had an inkling that Otha Petty, that Otha Petty was --

A.   Yeah, was physically abusive.  Yes.  But I did not have what I considered to be actionable intelligence.

Q.   And that conversation that -- let me direct you to your deposition.  Do you recall being asked the question:  "Based on that conversation or statement by Otha Petty, did that make you believe that Otha Petty had been physically abusive to Billie Allen?"  And your answer was, "No.  The question was on emotional distance."

A.   Oh, yes.  And that also is correct.  This is the one where we were talking about what amounts to execution impact.  And Mr. Petty, Sr. said, "Well, you have to take the bitter with the sweet."

Q.   Okay.  Mr. Simon, here's my question.  No one ever told you, and you had no indication that Otha Petty had been physically abusive to Billie Allen; is that correct?

A.   That is correct.

Q.   Okay.  There was a conversation that you're attempting to relate in response to my question in which there was a discussion about -- with Otha Petty about the fact that

because Billie Allen had killed the bank guard, he might be subject to the death penalty; is that correct? I mean, that was the context of the conversation, was that because Billie Allen had been charged with killing the bank guard, he might be subject to the death penalty?

A.   Yes, as phrased that time, I can agree to that.

Q.   Okay. And Mr. Petty indicated, "You have to take the bitter with the sweet." Is that correct?

A.   Yes.

Q.   Indicating that perhaps that there would be consequences for killing a bank guard?

A.   Oh, yes.

Q.   But there was nothing about that conversation that made you believe or lead you to believe that he beat Billie Allen or was physically abusive to Billie Allen; is that right?

A.   That also is correct.

Q.   Now, you expected -- you and the trial team expected that Juanita Allen was going to testify at the penalty phase; is that correct?

A.   When I went into this, I had assumed that she would.

Q.   And looking at Exhibit 416, that's the first page, and there's four pages. Is that a witness outline of Juanita Allen?

A.   Yes.

Q.   And going to page 2, do you see the proposed question:

"How did you raise your kids?"  Is that one of the questions that was proposed to be asked for Juanita Allen?

A.     Yes.

Q.     And what answer did you expect?

A.     Well, I did not prepare this.

Q.     What answer would you expect based on your contacts with Juanita Allen back in 1998 to the question, "How did you raise your kids?"

A.     I would have expected that she would give an answer that would be consistent with her own self interest.

Q.     What was the answer that you expected her to give to the question, based on your contacts with her, "How did you raise your kids?"

A.     Oh, like a normal Christian family.

Q.     So you expected she would say, like a normal Christian family?

A.     Yes.

Q.     And the question, "Is it hard for them to talk about things like that?"  What was that a reference to?

A.     I don't know.

Q.     So do you have any idea what you expected the answer to that would be?

A.     Well, I mean, ma'am, you're proceeding on a misconception that I tried to eliminate earlier.  I did not prepare this outline.  It would have been prepared either by

Mr. Sindel, by Ms. Supranowich, or by Dr. Randall.

Q.    I'm asking you based on your knowledge of the case, of the investigation including your contacts with Juanita Allen and all other witnesses, what did you expect the answer would be, "Is it hard for them to talk about things like that?"

A.    I really don't know.

Q.    Now, Juanita Allen was not called as a witness; is that correct?

A.    That's correct.

Q.    And you have no memory as to why that was; is that correct?

A.    I certainly have no knowledge.  Anything that I would say about why Ms. Allen was not called would be speculation.

Q.    So you have no knowledge as to why Juanita Allen was not called?

A.    No.

Q.    And is that because you have no memory of it or you've never had knowledge of it?

A.    I may have had perceptions of it at the time, but I do not have knowledge.  I don't have a recollection of those perceptions, and I certainly don't have knowledge.

Q.    Now, after reviewing your notes that we've done this morning, do you still contend that you only had a slight idea that Juanita Allen had a drinking problem and that she was physical with Billie Allen, she physically punished Billie

Allen?

A.    As my memory has been refreshed by my own notes, I understand that there was data to support that, that go beyond some kind of sixth sense.

Q.    You had specific statements from witnesses, family friend, brother, neighbor, that Juanita Allen drank and that she physically punished Billie Allen; is that right?

A.    Drank and physically punished, yes.

Q.    And isn't it true that the trial team considered such evidence back at that time but that the evidence due to Billie Allen's PTSD related to Marquis's death was simply more clear-cut?

A.    More what?

Q.    Clear-cut.  That the PTSD was due to Marquis Taylor's death.

A.    Well, that's --

Q.    Well, I'll break it down in two parts.

A.    Okay.

Q.    First of all, isn't it true that the trial team considered evidence that Ms. Allen drank and that she physically punished Billie Allen?

A.    Yes.

Q.    So there was consideration by the trial team of that evidence?

A.    We were aware of that evidence.  We were aware of the

data on the basis of which we could introduce that if we could.

Q.   So you knew that a family friend, the brother, and a neighbor would testify that Juanita Allen had a drinking problem and physically punished Billie Allen?

A.   Yes -- well, wait, a drinking problem --

Q.   That she had drank when she had troubles?

A.   Exactly.

Q.   That she drank when she was stressed, that sort of thing?

A.   Yes, I'm just trying to be more precise.

THE COURT:   Okay.  Just a second.

Q.   And you also had evidence or recounts from many, many people that Billie Allen suffered from symptoms of post traumatic stress disorder after Marquis Taylor's death; is that right?

A.   Yes.

Q.   So you had these two things, you knew about the physical punishment and the drinking, and you knew about the PTSD from Marquis Taylor's death, right?  You know both those things?

A.   Yes.

Q.   And isn't it true that the trial team just chose to work with the stronger evidence, which was the PTSD due to Marquis's death?

A.    No, that is not a correct statement of what the trial team did or did not do.

Q.    But, in fact, the trial team was aware of Juanita Allen's drinking and physical punishment of Billie Allen?

A.    Yes.

Q.    Now, I want to show you Exhibit 505, factors -- entitled, "Factors that affected Billie's life."  And is this, in fact, a list of factors that affected Billie Allen's life?

A.    Yes.

Q.    Now, did you or Dr. Randall prepare this document?

A.    Well, I certainly did not.

Q.    Okay.  But this was a document that obviously was prepared by someone on the trial team since it came from 2255 counsel; is that correct?

A.    I would agree to that.

Q.    And is the third factor listed, "Poor maternal role model"?

A.    Yes.

Q.    So the trial team considered that Juanita Allen was a poor maternal role model, and that had affected Billie Allen's life, is that fair to say?

A.    I would say that as an intellectual matter, the trial team was aware that that was a theoretical option.

Q.    And that was listed on this sheet as one of the factors

that affected Billie Allen's life; is that right?

A.    Yes, ma'am.

Q.    And going down to the ninth factor that's listed is "Physical abuse and beatings;" is that correct?

A.    Yes.

Q.    So the trial team considered that Billie Allen was affected by physical abuse and beatings; is that correct?

A.    Of which there was evidence besides the allegations that Mrs. Allen had administered any of the abuse or beatings.

Q.    Okay.  Could you explain?  The physical abuse, the trial team was aware of physical abuse and beatings; is that correct?

A.    Yes.

Q.    And they were aware specifically of what is being characterized as physical abuse and beatings by Juanita Allen; is that right?

A.    Yes.

Q.    Are you saying the physical abuse and beatings listed here actually referred to something other than Juanita Allen?

A.    What I'm saying is that we considered it to be something that was not within our power to do to employ what Dr. Randall characterized as the trash-the-mother defense. However, other people had beaten Mr. Allen, and we had evidence of that.  So we did not have to -- we did not have

to go with the trash-the-mother defense for that -- for the beating of Mr. Allen to be an element in the penalty phase.

Q.    Okay.  So let's unpack that a little bit what you just said.  Physical abuse and beatings did refer on this list to actions by Juanita Allen; is that right?

A.    That would be beyond my knowledge as I did not prepare the list.

Q.    Hold on, because I thought you just said it did when I asked you that about two minutes ago.

A.    That would be beyond my knowledge because I did not prepare the list.

Q.    Okay.  Well, the trial team was aware of what's being characterized here as physical abuse and beatings by Juanita Allen; is that correct?

A.    I believe the documents show that.

Q.    Okay.  And you're saying that the decision was made not to go with the trash-the-mother defense; is that correct?

A.    I'm actually denying that that was a decision.

Q.    Dr. Randall told you, we cannot go with the trash-the-mother defense, is that your testimony?

A.    Yes.

Q.    And --

A.    It isn't just that Dr. Randall told us that, that reflected the reality we were confronted with.

Q.    And the choice or the reality, whatever -- I mean, a

decision is made, someone is deciding we're not going with the trash-the-mother defense, correct?

A.    What I'm saying is that it was necessity, not choice.

Q.    And why was it necessity, not choice?

A.    Because the trial team believed, correctly or incorrectly, that we could not alienate Mrs. Allen by making her the target of the penalty phase and still have the other witnesses we were relying on.

Q.    And that's my problem here, because I'm seeing that the other witnesses who are telling you about the abuse are a neighbor, her close friend, and her brother.  So why would putting -- why -- the witness will be alienated by testifying?

A.    Well, that's the difference in our perspective, I think.  The defense does not have singleton witnesses.

Q.    So what you're saying, if you put on any evidence, that would alienate Juanita Allen and then you couldn't have access to the rest of the family, is that what your testimony is?

A.    I believe so.

Q.    Okay.  So --

THE COURT:  Wait a minute.  Okay.

Q.    So to clarify, your testimony is that you cannot put on evidence of -- by a family friend, by Juanita Allen's brother, and by a neighbor that Juanita Allen drank and

physically punished Billie Allen because that might alienate a neighbor, family friend, and family members?

A.   First of all, the evidence that I think the prosecution is now coming up with goes beyond Ms. Allen's drinking and her using of corporal punishment, both of which are lawful activities.

Q.   Hold on.  Hold on.  Just the question.  The question is simply, what we just read, the notes of your interviews of Deborah Ruffin, Shimeka Taylor, and Raymond Petty, including portions where apparently Carol Petty is in there and talking about a dysfunctional family, that they have a dysfunctional family, you could not put on that evidence because you were -- the trial team said, decided that they couldn't put on that evidence because it would alienate Mrs. Allen, who, therefore, would prevent any other family friend, family member, or neighbor from testifying?

A.   Correctly or incorrectly, that was what our perception --

Q.   And that was the choice that was made?

A.   That's my point.  Because of what we perceived as reality, we did not believe we had a choice.

Q.   Okay.  You believe that no matter what, that you would not have access to the other witnesses if you put that evidence on?

A.   That -- whether that was correct or not, that was our

perception of the reality we faced.

Q.    And you made a choice based on that perception; is that correct?

A.    I don't characterize that as a choice.  I'm saying that we believed that we faced the reality.  The facts -- the record will reflect what happened and why.  I am not going to characterize that as a choice.

Q.    And you did, in fact, put on evidence from Raymond Petty of at least one incident in which Juanita Allen whipped Billie Allen with an extension cord; is that correct?

A.    It's my understanding that that was presented.  When you say "you," I understand that you're using "you" as the plural, meaning the trial team.  I was, of course, not presenting any witnesses whatsoever in the penalty phase.

Q.    The trial team, in fact, put on evidence that Juanita Allen on at least one occasion had whipped Billie Allen with an extension cord; is that right?

A.    That is my understanding of the transcript, yes.

Q.    Now, all those meetings that were happening on February, I believe it was the 22nd and 23rd, it might have been the 21st and 22nd, when you had those meetings all day that Saturday and Sunday with those witnesses; is that correct?

A.    Yes.

Q.    So you've got full access to those witnesses at that

time; is that correct?

A.    What do you mean by "full access"?

Q.    What I mean is you're not going, hey, Ms. Allen, could you give me the address for Beverly Oliver?  You already had that information, correct?

A.    We had that information, correct.

Q.    And they are actually meeting with you, correct?

A.    Yes.

Q.    So she's not in any way able to limit your access to them, correct?

A.    As a realistic matter -- as a realistic matter, we could not -- we could use the subpoena power of the court, we could employ compulsory process to make them show up.  We could put -- ask the Court to put a body attachment on them. We could force them to be sitting where I'm sitting, but we couldn't make them say what we wanted them to say.

Q.    And you thought that Juanita Allen would tell them at the trial of her son, the penalty phase of her son, just get up there and don't talk?  Is that what the trial team and you personally believed?

A.    Whether it was that specific scenario or not, our perception of the reality was along those lines.

THE COURT:  Wait a minute.  Okay.

Q.    And Ms. Allen had been cooperative with you and the trial team throughout this process; is that correct?

A.     Yes.

Q.     I mean, she gave you the names and contact -- Deborah Ruffin was her friend, correct?

A.     Yes.

Q.     Okay.  Shimeka Taylor was a neighbor; Raymond Petty was her brother.  I mean, these are all people, you got that information about them through Juanita Allen or Billie Allen, right?

A.     Yes.

Q.     So at any time -- or at no time did she indicate to you that she wasn't going to give you information; is that right?

A.     Yes.  And, furthermore, I am not sitting here 15 years after the fact and asserting that that perception of the reality was correct.

Q.     But at the time that was your perception --

A.     Yes.

Q.     -- and the decision -- the trial team's perception, and a decision was made not to put on evidence of Juanita Allen's physical punishment; is that correct?

A.     No decision was made to put it on.

Q.     And the problem you seem to have is with the word "decision," okay.  I mean, there's two ways you could go. You could put it on, the evidence, of those three witnesses, or you could not put it on.  Isn't it correct that a decision was made not to put on that evidence?

A.    It is my perception that no one deliberates on what is beyond their ability to perform.  And for that reason I did not consider that to be subject to deliberation or decision. Now, maybe I was wrong.  Maybe I was wrong.  Maybe Rick Sindel was wrong.  Maybe David Randall was wrong.  Maybe we were all wrong.  But it's not as if we made a decision not to put on -- not to put these people on.  We thought that the reality we were facing was that if we went with the trash-the-mother defense, we would burn the rest of our case, and that we could not do that.  And it was beyond our power to do it.

Q.    All three of these people actually did testify, correct, in the penalty phase?

A.    What I'm talking about is going the whole nine yards with the full range of traumatic mistreatment by Ms. Allen that 2255 counsel have developed.

Q.    And here's my question.  Those three witnesses did testify; is that correct?

A.    That's my recollection.

Q.    And Ms. Ruffin and Ms. Taylor were never asked at all about Juanita Allen's drinking or physical punishment of Billie Allen; is that correct?

A.    Mr. Sindel did those directs, and that's my perception of your statement is correct.

Q.    And Raymond Petty did testify, and he did testify about

that specific incident of the whipping with the extension cord; is that right?

A.    Yes.

Q.    So your point is that there is no decision when you ask or don't ask the questions of the witness sitting in front of you, is that your contention?

A.    It's my attempt to reconstruct the reality of the situation, that we had no choice.

Q.    I'm not asking you whether you made a good or bad decision, I'm just asking you simply to concede that a decision was made to ask a question or not ask a question.

A.    If Mr. Sindel was standing where you are and I were one of the witnesses on the stand, there is some point at which there would be a tree, and it would be, do I go on to the next question or do I ask what I believe will burn us on everything else.  Only in that trivial sense, I did not consider him to have a choice in that matter.

Q.    But this information --

A.    I was not at the lectern.

    THE COURT:  Wait, let him finish.

A.    I was not at the lectern.  I was not giving policy to Mr. Sindel.

Q.    But the information of physical punishment of Billie Allen by Juanita Allen was available and was not presented through at least Shimeka Taylor and Deborah Ruffin; is that

right?

A.    That is correct.

Q.    And whether we call it a decision or not, this information was known and it was not presented?

A.    That is -- well, we had the data.  I'm sticking on the word "no."

THE COURT:  Well, you know, that's what troubles me about a lot of your evidence, Mr. Simon.  You're attempting to be intellectual to me, and I find it personally offensive. When you talk around these issues, sir, all it suggests to me is that you're trying to get to a point in this case that you think you want to pursue without answering the questions. Now, you can continue with that, and it's your right to do so, but I'm drawing other conclusions, and you just need to know that.  Go ahead, ask the next question.

THE WITNESS:  Your Honor, I knew that the data existed.  I did not know the underlying -- the underlying premises that the data was evidence of.  And I'm -- certainly, Your Honor, I'm not trying to mislead the Court. I'm just trying to be as accurate as I can.

BY MS. COSTANTIN:

Q.    And let me be clear.  Billie Allen never told you that he was beaten by his mom or that there was any trauma from any physical punishment of his -- by his mother; is that correct?

A.    He did not tell me that he was beaten by his mother, and he did not say an opinion that he suffered trauma from it.

Q.    In fact, he described as we saw, I guess Friday that he described that he had a good childhood, "Everybody said I had a good childhood," right?

A.    And I -- yes, and I've seen that before.

Q.    Okay.  Let me get back to this physical abuse and beatings listing.  Now, I think you said you had other evidence of Billie Allen being beaten, is that right, or did I misunderstand your answer?

A.    Well, yes.  Yes.

Q.    And what was that?

A.    Well, for one thing it was in the materials I transcribed, there was the thing where there was the -- I mean, the way it was presented was that there was boxing with an uncle, and that he accidentally hit his head as a result of an amateur sports episode.  And, again, that's the kind of thing that now sticks out to me as something where there actually was physical abuse, but there was a story made up.

Q.    Let's fly back to 1998, okay.

A.    Okay.

Q.    When this document was created, when that's listed, "physical abuse and beatings," are you saying that you included Billie Allen's account that he slipped when he was

boxing with his Uncle Jerome and hit his head?  Like you knew at that time that that was really physical abuse and beatings?

A.   Well, I'm trying to avoid creating more of a problem about this.  But I did not know that that was physical abuse.

Q.   Okay.  So --

A.   I did not know that it was a mere accident.

Q.   Well, didn't we look at your notes -- and I'm not going to dig them back up -- where he says said Billie Allen told you, "Slipped on grass, hit head.  Boxing with uncle, slipped on grass, hit head"?

A.   Yes.

Q.   Okay.  Is that describing --

A.   Yes.  Yes.

Q.   Okay.  That's not a description of -- are you saying that when he told you that, you put that in the category of physical abuse?

A.   I didn't do it then.

Q.   Okay, that's my point.  Back in 1998 you didn't put that account that Billie Allen gave you of him hitting his head when he slipped on the grass as physical abuse; is that right?

A.   But please keep in mind that I did not prepare the document that's on the screen.

Q.   Well, when you read that document on the screen and you

see "physical abuse and beatings," the question was didn't that refer to Juanita Allen?  And you said, I thought there was other evidence that -- of beatings of Billie Allen.  So I'm trying to figure out, we already covered the Juanita Allen stuff.  I'm trying to figure out back in 1998 when this document was written, what did you or the trial team know of other physical abuse or beatings of Billie Allen and by who?

A.    I thought he got pistol whipped with a Ruger.

Q.    Okay.  Okay.  Is that -- so we've taken out the Jerome Petty boxing, slipped on the grass?

A.    Well, you've taken it out.

Q.    No, I'm asking you.

A.    Okay.  I would count the -- I would count the slip and hitting on the head, and I would certainly include the Ruger. I think there were other incidents, but I don't recall them at this moment.

Q.    Okay.  So let me make this clear.  You're considering the beating, the Ruger -- being hit in the head with the Ruger, okay.  And you're considering the slipping on the grass, hitting the head, boxing with Uncle Jerome to be physical abuse or beating.  When you looked at that, when -- back in 1998 you considered that to be physical abuse and beatings?

A.    I'm not aware that I saw this in 1998.

Q.    When Billie Allen told you about that, did you consider

that to be physical abuse and beatings?

A.   I put it in my notes, that's all I can say.

Q.   And I'm asking how it's characterized, how you characterized that.  Because I thought you told me previously that you did not have any evidence that Jerome Petty had physically abused Billie Allen.  And now I think you're saying that that boxing incident was physical abuse.  Is that correct?

A.   My opinion on the incident is that it may or may not have been physical abuse.

Q.   No, no, no, I'm not asking about opinion.  I'm talking about back at that time when he told you that, when Billie Allen told you that he was boxing with his Uncle Jerome, he slipped on the grass and hit his head, back at that time in your mind did you characterize that as physical abuse of Billie Allen by Jerome Allen?

A.   No.

Q.   Now, have you reached any conclusion in your mind right now as to whether the allegations of more extensive abuse of Billie Allen than your team discovered are true?

A.   Yes.

Q.   And what is that conclusion?

A.   That they did.

Q.   So your conclusion reading what specifically?

A.   The materials collected by the 2255 team.

Q.    And what materials is it that you reviewed?

A.    My recollection sitting here this morning is that it is the motion and affidavits.  Given an opportunity to review, I could be more precise.

Q.    So you believe it was the 2255 motion and then the declarations along with those?

A.    Yes, declarations or affidavits as the case may be.

Q.    Now, would you --

A.    And I would also add I've reviewed other pleadings. What I'm -- the essence of my testimony is that it is materials submitted to the Court by the 2255 team.

Q.    Now, and that's what -- did you talk to any of those witnesses?

A.    No.

Q.    Okay.  It wasn't just data that you got, that wasn't just data in your mind, that was actually -- it wasn't just data that you read concerning Juanita Allen's alleged abuse? When you read those declarations, that wasn't just data to you, that you couldn't reach a conclusion about?

A.    Ma'am, all of these things are data to me.  I'm simply saying, you asked me if I formed a conclusion, not if I personally knew that Mr. Allen was beaten by X person on Y date with a Z weapon.

Q.    Let's go back to Shimeka Taylor telling you that Billie Allen used to have the snot beat out of him and that he would

getting a whipping --

THE COURT: Kicked out of him. Kicked out of him. You said knocked out of him.

Q. Snot kicked out of him, you're correct. I'm sorry. That he would have the snot kicked out of him. Did you reach a conclusion as to whether Shimeka Taylor was telling you the truth when you met with her?

A. No.

Q. But you did reach a conclusion by reading these declarations; is that correct?

A. Yes.

Q. Have you spoken with Mr. Allen concerning the allegations?

A. No.

Q. Have you spoken with Juanita Allen concerning the allegations?

A. No.

Q. And I believe we've covered, you haven't spoken to any of the fact witnesses who prepared those declarations; is that correct?

A. That is correct.

Q. Have you spoken to any expert who prepared any declarations or reports filed with the 2255 motion?

A. No.

Q. Do you know how this new information, this breakthrough

was developed regarding this new information -- this new evidence?

THE COURT: Is this maybe a good time to take a break? I've been waiting for a breaking spot. This may be as good as any. We'll take a 15-minute break.

(Court in recess from 11:02 a.m. until 11:18 a.m.)

THE COURT: You may continue.

BY MS. COSTANTIN:

Q. I want to go back to the contact with the 2255 counsel. What's your understanding as to when or how the factual breakthrough regarding the alleged new evidence of physical abuse by Juanita Allen occurred?

MR. MORENO: I'm going to object to the relevance. What he knew about and what 2225 counsel knew is not relevant to what he did at the time of the trial.

THE COURT: Well, it could have, because I sat through the trial and I saw two lawyers putting their heart and soul into doing what I perceived to be everything humanly imaginably possible to represent Billie Allen, and thought that everything was being done that could be done. And something happened thereafter. Mr. Sindel has testified about it, Mr. Simon has testified about it. So I think it very well could have relevance in terms of how much time it's taking now to develop this and so forth. So I'll overrule it for that reason.

BY MS. COSTANTIN:

Q.    What is your knowledge about how or understanding about how the factual breakthrough was made regarding the alleged new evidence of physical abuse of Billie Allen by Juanita Allen?

A.    The lead counsel initially appointed in the 2255 was Elizabeth Unger Carlyle to right -- to start out with, she and Mr. Joe Cleary had the information that we had plus the time that we did not have to develop it, so --

Q.    No, here's my specific question.  I'm not asking about the differences.  I'm asking you specifically what is your understanding as to when and how that supposed breakthrough occurred?

A.    In the years between the trial and the present hearing.

Q.    And how did that occur?  Have you been told how that occurred?

A.    First of all, I do not have operational detail about when these things occurred, but I do know that Ms. Carlyle and Mr. Cleary were able to get the Federal Public Defender's Office in Philadelphia onto the case as well.  So in addition to having the time that we did not have, there were additional personnel that we did not have, personnel with training to do these interviews, training to track down the witnesses, training to answer the questions.

Q.    Okay.  I'm asking a very -- let me ask a slightly

different question.  Are you saying that to your knowledge a mitigation specialist was used to develop this new evidence?

A.   I cannot recite as to that.  All I know is that there were people who had training that I did not have.

Q.   My simple question is, to your knowledge was a mitigation specialist or a mental health professional used to talk to any of the witnesses who provided declarations, to your knowledge?

A.   I don't have recollection one way or the other from reading the declarations of the mental health experts.

Q.   Do you know to whom Billie Allen first confided that his mother had physically abused him?

A.   No.

Q.   Do you know to whom Juanita Allen first admitted that she had abused Billie Allen?

A.   No.

Q.   Now, would those circumstances be relevant to determining what the truth is?

A.   I can't deny that they might be.  I simply don't know.  So the answer is, therefore, yes.

Q.   At the time that you conveyed the file to Mr. Cleary, did you have any reason to think that there was new evidence that you had not discovered?

A.   Yes.

Q.   And what was the basis of that?

A.    The denial of the continuance.

Q.    So when the continuance was denied back in January 30th of 1998, it's your testimony that you knew there was new evidence you hadn't discovered?

A.    I didn't know what the evidence was, and I cannot -- and here I really don't mean to be offensive about this, I did not know that there was additional evidence.

Q.    That's my point.

A.    I would have to know the evidence.

Q.    Right.

A.    And if I knew it at that point, it would not have been undiscovered.  But --

Q.    And I'm asking you a question about, we've already established, I believe, to some extent what you knew at trial about Juanita Allen's physical punishment of Billie Allen. I'm asking you at the time you dropped that file off at 2255 counsel with Mr. Cleary, did you have any basis to know of any new evidence that had not been discovered at the time back in 1998?

A.    Now you're talking about specific pieces of data?

Q.    Yes, I am.

A.    Okay.  As to specific pieces of data, the answer is that I did not know that.

Q.    Okay.  All right.  But your answer before was basically that if there was -- a continuance was denied, there might be

new evidence you wouldn't find.  Is that a correct summary of what you were attempting to say before?

A.    I believe that use of the verb "might" slights the probability that there would have been additional evidence discovered.

Q.    So you're saying you knew that new evidence would be discovered?  I mean, wasn't it just a possibility?  Are you saying back in 1998 when you filed that motion for a continuance, you knew that new, significant evidence to mitigation would be discovered?

A.    Something that I learned from Dr. Randall and credited, which has turned out to be true in my subsequent experience, is that the discovery of mitigation evidence in a capital case is a cyclical process, that one begins to build confidence in a witness and gets some information at Point A. Then as one gets to know them better and they get to know you better, you get more evidence at Point B.  That in turn leads to other witnesses.  And to use the expression Dr. Randall used at the hearing, that it feeds on itself.  Now, this was ridiculed by the respondent, but it turned out to be true.

Q.    And back in 1998 Deborah Ruffin, Shimeka Taylor, and Raymond Petty apparently felt comfortable enough with you all to talk to you about Juanita Allen's physical punishment of Billie Allen and her drinking; is that correct?

A.    In the privacy of Mr. Sindel's office.

Q.   Okay.  That's what they told you, the trial team, correct?

A.   That's what they told at least in this, I believe two members of the trial team, yes.

Q.   You and Dr. Randall?

A.   It would either be me and Dr. Randall or Mr. Sindel, Dr. Randall, and myself.

Q.   And this cyclical process, they tell you and then that leads to something else, ended right then because you didn't pursue it any further, correct?  That was the choice you made back at that time?

A.   I don't think it's a choice.  We had a court date the next morning.

        THE COURT:  What was that?

        THE WITNESS:  Your Honor, I do not believe it was a choice when one has a court date the next morning.

BY MS. COSTANTIN:

Q.   You made a choice not to ask any of the other witnesses or Juanita Allen or Billie Allen about it, correct?

A.   Well, as I tried to explain before the break, we may have been wrong that we had no choice.  But I did not view it as a choice.  I thought we faced the reality that we had to go with what we had without getting involved in -- without going negative on Mrs. Allen.

Q.   Now, the cycle you talked about, that cycle all occurs

before a witness is actually put on the stand; is that right?

A.    Yes.

Q.    What I'm saying is, you ended that cycle right after you were told that information.  That's the choice that you made in all those difference interviews; is that correct?

A.    Let me take another run at explaining this cyclical phenomenon in the discovery of mitigation evidence.  It's not simply a question that you hear one piece of evidence and so you go back to the same witness and ask them the same thing again the next day.  As Dr. Randall testified at the hearing on the Motion for Continuance, this is something that involves the passage of months and in some cases years to gain the confidence of people to talk about the dark things in their own past and in the past of those close to them. The evidence that the 2255 team has discovered has only been discovered because they had the time and the skills that we lacked.

Q.    And I'm trying to unpack your answer, because to your knowledge, first of all, you have no idea whether a mitigation specialist was used by the 2255 team, correct?  I mean, didn't you just answer no?

A.    Yes, yes, yes.  I answered no because I was being honest with you.  I do not know whether they had one or not. I know that they had mental health experts and I know they had staff from the Federal Public Defender's Office in

Philadelphia.  For all I know, those people would fall into the category I would describe as a mitigation specialist.  I know they had paralegals.  And if someone is a paralegal in a Federal Capital Public Defender's Office, their job description might be identical to mitigation specialist.  I simply don't know.  I was only looking at the results.  I wasn't nit-picking how they got there.

Q.   Now, let's just break it down.  You had mental health experts, the 1998 trial team did, correct?

A.   Yes.

Q.   And you had a paralegal, Connie Casperi, correct?

A.   Yes.

Q.   And she interviewed witnesses, are you aware of that?

A.   I'm not -- right now I'm not sure -- I'm just not sure one way or the other.  I'm sure she interviewed first phase witnesses.  I think she interviewed penalty phase witnesses, but I can't tell you who she interviewed.

Q.   And let's go back to you conveying the file to Mr. Cleary, the 2255 counsel.

A.   Yes.

Q.   At that point when you conveyed the file, you had -- you knew of no new evidence that you hadn't discovered; is that correct?

A.   That's correct.

Q.   And when I say, "you hadn't discovered," you knew of no

new evidence that came out from the end of the trial and your delivery of the file to the 2255 counsel; is that correct?

A.     I can't think of any.

Q.     And after you conveyed that file to Mr. Cleary, when and how was it that you learned that 2255 counsel had developed new additional evidence?

A.     I don't remember whether I received e-mails or whether I did Pacer searches myself.  I received this in electronic form either directly from Pacer or on a compact disk from Mrs. Carlyle or other members of the 2255 team or by e-mails from Mrs. Carlyle or other members of the 2255 team.

Q.     And, I'm sorry, I forgot to ask you a question, which is that you completed a case book with Ms. Carlyle in which she's the co-author; is that correct?

A.     It's not a case book.

Q.     What is it?

A.     It's the Eighth Circuit Appellate Practice Manual. It's the chapter on criminal appeals, which includes direct appeals and federal habeas corpus and 2255 as well.

Q.     And she's the co-author with you on that?

A.     Yes.

Q.     It's entitled "Criminal and Habeas Corpus Appeals;" is that right?

A.     Yes.

Q.     And that first came out in 2005, and it's on the Fifth

Edition; is that right?

A.   There have been -- I believe we have worked together on three editions, the most recent of which was 2010.

Q.   And going back to what you were told, what were you told concerning new additional evidence and by who?

A.   I believe that I learned this from reading the pleadings and accompanying affidavits.  There was no Oliver Stone scenario about this.  I either looked them up myself or received them via e-mail or a compact disk in the mail and I read them.  And I don't remember what all -- I don't remember much of what there is.  All I could see is it was much more than we were able to en masse in the time we had.

Q.   Mr. Simon, all I'm trying to figure out is what you learned about the supposed new evidence and how you learned it.  And it's my understanding that your testimony is the only way you learned about it was by getting a copy of the filing and the declarations.  Is that right?

A.   Where these people are my friends, I'm not going to testify that I never had a conversation with them.

Q.   Well, and that's what I'm trying to understand is what you were told in those conversations about what supposedly the new evidence was and how it was developed.

A.   It was my under -- what I was told simply reinforced what I learned from the publicly filed documents, that it was a product of time and expertise.

Q.    Is your testimony that you don't recall what you were told?

A.    I recall one conversation with Mrs. Carlyle in which she explained to me that Ms. Allen had ceased her substance abuse.

Q.    And when was that, do you recall?

A.    It would have been in 2010 or 2011.

Q.    The conversation with her?

A.    Yes.

Q.    And that's the only thing that in regards to anything you were told by 2255 counsel about the new evidence that had been developed that you recall; is that right?

A.    That's all that I recall that I was told in a manner other than the conveyance of the pleadings and filings.

Q.    Did you have any role at all in discovery in learning or talking to any of these people who prepared declarations or people who did not prepare declarations?

A.    No.

Q.    How many times have you discussed Mr. Allen's case with habeas counsel?

A.    I would say that by this time I've had approximately a dozen discussions.

Q.    And were those just over the phone or were those in-person meetings as well?

A.    Some by phone, some in person.

Q.    And would you describe those as substantive discussions concerning Mr. Allen's case?

A.    No.

Q.    What was the purpose of the discussions?

A.    Witness preparation, because I have only testified in one 2255 before.  And in that 2255 there was no allegation of ineffective assistance on the phase of the case I worked on.

Q.    Okay.  So let's break this down.  You were interviewed by Ms. Carlyle back in 2007; is that right?

A.    Yes.

Q.    And that was quite an extensive interview?

A.    Yes.  And I've got to qualify my previous answer.  I thought you were talking about witness preparation.  And that was a substantive interview that occurred in Kansas City in or about 2007.

Q.    Apart from that interview in Kansas City, did you have other contacts concerning this case other than scheduling or witness prep or anything like that?

A.    Not that I recall.

Q.    Well, you were sent the declaration in 2009; is that right?

A.    Yes.

Q.    Did you have any substantive discussions with 2255 counsel about the declaration?

A.    As I recall, I made minor edits to it, but did not

engage in -- I did not go through the SUV full of files before signing it.

Q.   And, in fact, you didn't even look over your notes from that trial; is that right?

A.   That's correct.

Q.   Even though it had occurred over ten years before when you completed that declaration?

A.   That's correct.

Q.   And, in fact, the only time you were given any of your own notes to review was when I requested it and then the Court subsequently ordered you to transcribe a portion of those; is that correct?

A.   That's not completely correct.  Because when something existed in digital form, I had not deleted that on my end.

Q.   I'm talking about your notes.  Did you have -- you still have notes of your interviews?

A.   I think some of them I did.  As I tried to explain in the deposition, I moved.  I had to move offices once, and I discovered some materials that I had not put in the SUV.  So I scanned them and e-mailed them or sent them on compact disk to the 2255 team.

Q.   And my question is in preparation for your declaration or for your testimony, the notes you reviewed were the ones given to you to transcribe; is that correct?

A.   Yes.  And what I'm trying to explain is that I cannot

testify that those are the universe of notes that I reviewed.

Q.    Did you review any other notes other than those to prepare for your testimony today or to prepare your declaration back in 2009?

A.    To prepare the declaration, I don't believe I recall I reviewed any notes.  I believed then that the text was correct with the exception of the minor edits that I made.  I now realize that while it was not false, it was incomplete, and for that I apologize to the Court and to 2255 counsel. However, I did not view it as my role to second guess them, and I --

Q.    Let's just break it down, because we seem to have gone off on a tangent here.  My simple question is, we already established before you did the declaration, you hadn't looked at your notes, correct?

A.    That's correct.

Q.    Before you testified, is it correct that the only notes you looked at were the ones provided you because I asked you to transcribe them and the Court ordered you to transcribe them?

A.    Well, certainly I did do those.  What I'm trying to get out is that I probably looked at some other things as well. I just can't -- I cannot swear that the only things I looked at were the things that I transcribed.  I do know that I looked at the things I transcribed.

Q.   Did you pull other notes to prepare for your testimony? That's all I'm asking, did you pull your other notes?

A.   Well, in the sense of pulling them, I did collect them onto a USB drive.  But I did not go through every digital image from the case.  The one thing we agree on is the principle thing that I looked at was what I transcribed at the prosecutor's request.

Q.   Okay.  And that was the principle thing you looked at. Did you look at anything else to prepare for your testimony?

MR. MORENO:  I think he's answered that already.

MS. COSTANTIN:  I'm not sure.  I'm really trying.

THE COURT:  I'm not sure.  He said -- what I have here is that he can't say that he didn't look at something else other than his notes, he pulled them up on the USB port. Didn't look at every one, which suggests he looked at some. And so then this followup question is did you look at anything else.  So overruled.

A.   The answer is yes.

Q.   Okay.  And the question then is what else did you look at?

A.   I don't remember.

Q.   Okay.  The notes that you did look at and were required to transcribe by this court included accounts that Juanita Allen had physically punished Billie Allen and about her drinking, and those were accounts by Deborah Ruffin, Shimeka

Taylor, and Raymond Petty; is that right?

A.    Yes.

MS. COSTANTIN:  Judge, I don't have anything more.

THE COURT:  All right.

MR. MORENO:  May I, Your Honor?

THE COURT:  You want a recess or if you're ready.

MR. MORENO:  Whatever pleases the Court.  I'm ready.

THE COURT:  All right.  Go ahead, Mr. Moreno.

REDIRECT EXAMINATION

BY MR. MORENO:

Q.    Good morning, Mr. Simon.

A.    Good morning, Mr. Moreno.

Q.    Now, you were discussing a few minutes ago in questions about your declaration, do you recall that?

A.    Yes.

Q.    I have your declaration up on the screen, it's Exhibit 251.  I wanted to go down to page 3 of 5, 4 of 5, paragraph 7.  Do you see that?

A.    Yes.

Q.    And in the beginning of the paragraph it says, "I've reviewed materials provided to me by Mr. Allen's current Section 2255 counsel, including the reports of their experts, Drs. Stewart and Martell."  Is that accurate?

A.    Yes.

Q.    Do you recall being provided materials by 2255 counsel

prior to the execution of your affidavit?

A.    I was provided the materials that were filed with the Court.  I was provided the declarations.  To the extent that I indicated that I had not reviewed something, it was something from my own work product preexisting the work of 2255 counsel.

Q.    So just so we're clear, do you recall the 2255 counsel providing you with case materials, materials about this case, prior to executing the affidavit?

A.    Yes.

Q.    Okay.  And do you recall whether you had an opportunity to review those materials prior to discussing your potential declaration with either Ms. Carlyle or with Mr. Wiseman, who was with my office at the time?

A.    Yes.

Q.    Now, paragraph 2 of this affidavit, which is on page 1, it indicates that you discussed the January 13th, 1998 letter received from Dr. Haney.  Is that accurate?

A.    Yes.

Q.    Do you recall if that was provided to you by 2255 counsel prior to executing this affidavit?

A.    Well, I certainly know that I had it.

Q.    Does this paragraph imply or make you believe that based on what it contains that you would have reviewed that document prior to executing this affidavit?

A.     Yes.

Q.     Similarly, there's a letter that you wrote to Mr. Sindel dated January 9th, 1998, referenced in this letter.  Is that also a document you would have reviewed prior to executing this declaration?

A.     It is.

Q.     Now, based upon the fact that you reviewed case materials that were provided to you by 2255 counsel prior to executing this declaration, do you recall meeting with Ms. Carlyle and Mr. Wiseman before you signed and executed the declaration?

A.     Yes, I believe that would have been at Mr. Sindel's office.

Q.     And do you recall whether, and can you tell us whether or not there was on more than one occasion that you met with Ms. Carlyle and Mr. Wiseman concerning your role in this case?

A.     Given the passage of time, I don't remember the number of meetings, but I will say that it was not a take-it-or-leave-it situation.

Q.     What do you mean by that?

A.     I mean they didn't simply put this in front of my nose and make me sign it.  I had an opportunity to review it.  I simply didn't go through that SUV full of materials before signing it.

Q.    Sure.  And do you recall whether in your meetings with Ms. Carlyle and Mr. Wiseman if they took notes of the conversation they were having with you?

A.    Well, that's certainly my perception.  I did not make a note of it myself, but it would surprise me if they did not.

Q.    What was the purpose of the meeting?  What were they talking to you about?

A.    Well, I assume that they were investigating what the defense team at trial had done.

Q.    And you answered those questions as best you could?

A.    Yes, I did.

Q.    And I think you testified on cross-examination that you had an opportunity to make changes that you felt necessary?

A.    Yes.

Q.    Now, during the course of your representation of Mr. Allen, did you learn that about a month before the bank robbery he was hospitalized at the Metropolitan Psychiatric Center?

A.    Yes.

Q.    And do you recall as you sit here today what that hospitalization was for?

A.    I'm very foggy on this --

Q.    Sure.

A.    -- given the passage of time, but I believe there was something about a suicide attempt.

Q.    Now, what investigative steps did you take concerning the information in the Metropolitan Psychiatric Center records?  Did you go and investigate or interview anybody from the hospital?

A.    No.

Q.    And did you have strategic reason for not interviewing the doctor or staff who treated Mr. Allen --

A.    No.

Q.    -- at the Metropolitan Psych Center?  Now, there's a lot of discussion on cross-examination about the mitigation workbook and checklist that you used in preparing Mr. Allen's Life History.  And I want to talk to you about that if we can for a few minutes.  Can you tell us, do you know whether or not the mitigation checklist is intended as a guide for subject areas that need investigation in developing mitigation in a capital case?

A.    That is my understanding.

Q.    And prior to using the mitigation checklist in this case, had you ever used it in a previous capital case to interview a defendant?

A.    Absolutely not.

Q.    Now, what investigation did you conduct regarding Mr. Allen's school performance?

A.    Zero.

Q.    Is that an area -- do you recall if that's an area

that's contained in the mitigation checklist?

A.    Yes.

Q.    What investigation did you conduct regarding Mr. Allen's history of chronic illnesses or conditions?

A.    Nothing that I recall.

Q.    Is that -- can you tell us if that's also contained within the mitigation checklist?

A.    Yes, it is.

Q.    What investigation did you conduct regarding Mr. Allen's exposure to toxic chemicals or drugs?

A.    None.

Q.    And can you tell us whether or not to your recollection that's contained within the mitigation checklist?

A.    Yes, it is.

Q.    What investigation did you conduct regarding Mr. Allen's history of childhood illnesses or accidents?

A.    I can't recall taking any affirmative step about that, but if something came up in a conversation that I had while looking for other data, it would not surprise me.

Q.    And if that data came to your attention, what investigative steps did you take concerning that data?

A.    No investigative steps, but I would have forwarded it to the mitigation investigator, Dr. Randall.

Q.    Now, what investigation did you conduct regarding the social history of Mr. Allen's parents?

A.   Nothing.  I mean, I had -- we've established that I had a meeting where Mrs. Allen was one of the participants. We've established that I had conversations with other people. But as far as going out the way a social worker would do and doing a multi-generational study of the family, I did nothing of that nature.

Q.   So you did not investigate the social history of Mr. Allen's parents?

A.   That's correct.

Q.   And is that something that's also contained within the mitigation checklist?

A.   Well, sir, I think that actually transcends the mitigation checklist.

Q.   I'm just asking is it in the mitigation checklist as you recall?

A.   No.  The family certainly is.  The family is, but I did not do -- I did not do everything that the checklist -- that the checklist would indicate, and the checklist would only scratch the surface of what I would consider to be a social history.

Q.   Now, what investigation did you conduct regarding a history of domestic violence in Mr. Allen's family?

A.   Avoid it.

Q.   I'm sorry?

A.   I avoided it.

Q.   All right.  So you conducted no investigation --

A.   That's correct.

Q.   -- into that aspect?  Is that something that's also contained within the mitigation checklist?

A.   Yes, it is.

Q.   What investigation did you conduct regarding whether or not Mr. Allen was the victim of neglect?

A.   I can't recall any.

Q.   Now, what investigation did you undertake in Mr. Allen's case regarding the subject areas, any of the subject areas referenced in the mitigation checklist?

A.   The things that I can think of are delegating to Ms. Supranowich the search for Scout records.  And there were the spot questioning surrounded by contextual questioning concerning his baptism.  And the contact with the person I was introduced to as Flexx, which turned out to be a former employer of Flexx concerning some of his music activities, that's all I can remember right now.

Q.   Now, did you utilize the mitigation checklist in any of your meetings with Mrs. Allen?

A.   Not to my recollection.

Q.   And did you have a strategic reason for not doing so?

A.   No.

Q.   Do you recall whether or not you utilized the mitigation checklist with any other potential mitigation

witness in this case?

A.    No, I did not.

Q.    I have up on the screen Exhibit 498, which I believe is your time sheet.  And, I'm sorry, do you recall an entry -- I'm not seeing one here --

MR. MORENO:  I'm sorry, Your Honor, could I have just a moment?

THE COURT:  Sure.

BY MR. MORENO:

Q.    On 11/6, it's, "Discussed case with Mr. Allen's mother and sister," .2?

A.    Yes.

Q.    Did any information you learned in your discussion with Mrs. Allen and her sisters or with Mr. Allen's sisters in the 2/10th of an hour you spent with them, did any of that information make it into your Life History?

A.    Not to my recollection.

Q.    Now, on page 6 of your time sheet, on January 7th, there's an entry down here which states, "Discussed case with witnesses," for 7/10th of an hour.  Do you see that?

A.    Yes.

Q.    Do you recall whether or not any of the information you may have learned in that meeting with witnesses made it into your Life History?  Was there anything they conveyed to you that was important that you put in your Life History of

Mr. Allen that you recall?

A.    Well, I certainly can't recall anything right now.  I can't rule out that if one compared the notes to the Life History, there might be some overlap.  But I don't have any recollection in direct response to your answer.

Q.    All right.  Now, do you recall approximately when you drafted the Life History?

A.    I have no recollection, but I believe that my timesheets would contain the correct answer to the question.

Q.    Okay.  And on the next page, on page 7 of your timesheet, 1/8, prepare Life History of client?

A.    Yes, sir.

Q.    And that was 3.4 hours to prepare, to write that Life History; is that correct?

A.    Yes, sir.  And I believe that would have included self-editing as well.

Q.    And do you recall how far out from trial was January 8th?  When was trial to begin?

A.    About a month.

Q.    About a month.

        MR. MORENO:  Your Honor, the other day we used an Exhibit 303-A, and I was wondering if I could grab a copy.

        THE COURT:  Sure.

        MR. MORENO:  Thank you.

        THE COURT:  I'm a little fuzzy on my notes.  Was

1/8 the day ascribed to the completion of the --

MR. MORENO:  Yes.  It was a timesheet, had the fax on the bottom.

THE COURT:  Right.

MR. HOLTSHOUSER:  You didn't keep the exhibit?

MR. MORENO:  I thought it stayed with the Court.

MR. HOLTSHOUSER:  You what?

MR. MORENO:  I thought it stayed with the Court.  I don't remember.  Well, actually I have one right here. That's fine.  It's not the one -- it's the same one I used the other day?

MR. HOLTSHOUSER:  It is.

MR. MORENO:  The one had the fax number at the top. This isn't the same one.  The one I have right here is not.

BY MR. MORENO:

Q.    Mr. Simon, do you recall -- I know it's been a long time ago, do you recall when you would have conveyed that document to Mr. Sindel?  Do you have a recollection of when that would have been?

A.    Well, I believe that it would have been -- well, may I look at the timesheet?

Q.    Yeah, your timesheet doesn't --

A.    But the thing is, to narrowly answer the question, I don't recall what date it was, but I believe it would be reflected on my timesheet.  And it would have been in early

February -- I mean, early January -- or wait --

Q.    There was an exhibit that was introduced with Mr. Sindel that had a fax line along the bottom of it from you to him that was dated January 16th.  Does that --

A.    Yeah, that -- the deal is I would go with the documents rather than my recollection is all I'm saying.

Q.    It's BA-416.  So if the records reflected that were introduced earlier, that I don't think the government is disputing, that the fax indicates it was sent to Mr. Sindel on January 16th?

A.    Then it --

          MS. COSTANTIN:  I would say that a copy -- we will concede that a copy was sent on January 16th that was then forwarded to Dr. Randall.  I'm not conceding that that was the first time it was sent to Mr. Sindel's office.  I just don't believe we know the answer.

          MR. MORENO:  That's fine.

A.    But I think we've got it narrowed down to four or five days.

Q.    Prior to your preparation of the Life History of Mr. Allen that you prepared in January of 1998, do you recall whether you had seen any other Life History or Social History prepared by any other member of Mr. Allen's defense team?

A.    No, I had not.

Q.    Now, you testified on cross-examination that you had

some conversations with Dr. Randall where he voiced concern about the potential for abuse in this case; is that correct?

A.    Yes.

Q.    And do you recall when those conversations were?

A.    It -- well, we know that it would have been after he commenced his work.  And my recollection is that it was -- it would either have been before the penalty phase started or early in the penalty phase.

Q.    Do you recall whether or not after learning that from Dr. Randall, you took any investigative steps to pursue this information?

A.    I did not.

Q.    And would there have been a strategic reason for not doing that?

A.    No.

Q.    Do you ever recall, did you ever see a fax from Dr. Haney wherein he -- to Mr. Sindel or to yourself wherein he stated that he had two trials in the upcoming months and that was the reason why he couldn't help out on the case?

A.    Yeah, I recall -- I recall having seen that.

Q.    You recall having seen that?

A.    Yes.

Q.    Would that have been the January 13th, 1998?

A.    I can't answer at that level of detail, but I know that I saw that somewhere.

Q.    Other than in the pleading?

A.    I believe I saw a letter to -- I believe I saw a fax to that effect.  The only alternative explanation would be that Ms. Supranowich told me that, but I believe I saw it in a fax from Dr. Haney.  I simply don't remember whether it was the one or the other.  I credited Ms. Supranowich, so if that was what Ms. Supranowich told me, I would have gone with that. But I believe I saw it in a fax.

        MR. MORENO:  May I have a moment, Your Honor?

        THE COURT:  Yes, sir.

BY MR. MORENO:

Q.    We're going to come back to that in a moment. Ms. Carlyle is finding the exhibit number for me that I need. But I want to ask you, there was some questioning earlier about whether or not Dr. Gelbort wanted to do an MRI.  Do you recall that?

A.    Yes.

Q.    Now, do you know whether or not Dr. Randall was the one who first recommended an MRI or do you have a recollection of where that idea came from?

A.    Now that you mention it, I believe that it was Dr. Randall's idea, but I cannot swear one way or the other.

Q.    Do you have a recollection of whether or not Dr. Gelbort actually recommended a different type of imaging?

A.    I know that someone did.  My assumption during

cross-examination was that it was Dr. Gelbort.

Q.   Who had suggested a different type of imaging other than an MRI is my question.

A.   Yeah, it was a -- what a healthcare professional advised the attorneys was that Mr. Allen needed a -- I believe it's a quantitative PET scan, something that would be more precise than a qualitative PET scan, which would basically have created a picture of the brain, but that would not have provided data at the level on which a healthcare professional could opine as to the specific extent of brain damage Mr. Allen had suffered.

Q.   Do you recall if Dr. Gelbort was that health professional who recommended the quantitative PET scan?  If you don't, that's fine, I'm just asking if you recall.

A.   Yeah, as a result of the passage of time, I don't remember.  But it wasn't as if we had some -- somebody out there -- I don't think there was any other expert.

Q.   Other than Dr. Gelbort?

A.   Or Dr. Cuneo or Dr. Randall.  It had to be one of them.

Q.   Okay.  Now, we were discussing a moment ago, I asked you about whether or not you had seen anything from Dr. Haney indicating that he had a conflict, that he had two capital trials upcoming.  Do you recall?

A.   Yes.

Q.   And this is the -- it's Exhibit 330.  It is the faxed

letter from Dr. Haney to Mr. Sindel dated January 13th, 1998. Do you recognize this document?

A.    Yes.

Q.    All right.  And you saw that document at the time of trial?

A.    By the time of trial, I would have seen that, yes.

Q.    And you had an opportunity to read it before the time of trial, or during the course of the trial, shortly after it was received?

A.    Yes.

          THE COURT:  Is this a good time to break for lunch?

          MR. MORENO:  Sure, Your Honor.  Thank you.

          THE COURT:  Recess, one hour.

          MR. MORENO:  One o'clock?

          THE COURT:  1:05 by that clock.

          MR. MORENO:  Thank you.

          (Court in recess from 12:05 p.m. until 1:02 p.m.)

          THE COURT:  Whenever you're ready.

          MR. MORENO:  We're just waiting for Mr. Allen.

          THE COURT:  Oh, sure.

          MR. MORENO:  Whenever it pleases the Court, Your Honor.

          THE COURT:  Yes, sir.

BY MR. MORENO:

Q.    Good afternoon, Mr. Simon.

A.      Good afternoon.

Q.      Mr. Simon, before we broke for lunch, we were talking about the letter that Mr. Haney had faxed to Mr. Sindel dated January 13, 1997.

A.      Yes.

Q.      And on --

        MS. COSTANTIN:  Which exhibit was that?

        THE COURT:  330.

        MR. MORENO:  330.

        MS. COSTANTIN:  I'm sorry, I didn't write it down.

BY MR. MORENO:

Q.      I've blown up a paragraph here from Dr. Haney's letter. And I want to talk to you about this.  It says, "In any event, you must get a substantial continuance from the court. Although I believe the above-stated tasks are clearly your responsibility, use me as an excuse with the judge if you like.  You can tell him I misunderstood the timetable, was overcommitted, have become unavailable, am incompetent or whatever you need to in order to get the time you must have to do the things I've outlined (and only in summary fashion) Above.  If you can get the continuance and want me to continue on the case, I am certainly willing to do so, with the understanding that we must proceed in the fashion that I have outlined above and is reflected in the documents that I will send you."

From that paragraph does it appear that Dr. Haney -- does that refresh your recollection as to whether Dr. Haney reported that he had two capital trials coming up in the coming months?

A.   It eliminates my recollection that he told me that. Well, when I say -- I never had any contact with Dr. Haney until I had him as an instructor years after the trial.  I never had any contact with Dr. Haney.  And, I mean, the source for the two trials then must have been Ms. Supranowich.

Q.   And does it appear to you from the correspondence from Dr. Haney that he was willing to work with the team, but a continuance was needed given the miscommunication that had previously happened?

A.   Well, that's what the words say.  Please keep in mind that I -- because I had no dealings with him, I had -- I was seeing all of this after the fact.

Q.   You would agree -- let me rephrase that.  Well, having had an opportunity to look at this paragraph we just discussed, does it appear to you that Dr. Haney conveyed to the defense team that he had two capital trials in the upcoming months?

A.   No.

Q.   Do you have a recollection -- do you know why when it came time for the continuance, you and Mr. Sindel just didn't

tell the Court that the ball had been dropped and you had very little developed that late in the game?

A.    Well, my interpretation of the motion and my statements and Dr. Randall's testimony was just to that effect.

Q.    All right.  That was your understanding of what you had argued to the Court?

A.    I mean, I don't know -- I cannot think of anything that would give the Court the impression that we had much developed.  I mean, the -- one has to keep in mind that I was never involved in the hiring, or if you call it that, the firing of Dr. Haney.

Q.    I understand that.

A.    Everything was filtered through Ms. Supranowich.  It was my understanding that we -- I mean, I was told after the fact that Dr. Randall was hired.  When I requested the information that at that time I colorfully characterized as the party line, which simply meant the information to put in the motion for the continuance.  I was seeking facts from those who had facts that I did not have.

Q.    So you made a good faith representation to the Court is what you're telling us?

A.    Well, it was absolutely good faith.  And if it sounds more vigorous than other people would have said, I can't help it.

Q.    Would it have been -- in your opinion would it have been in Mr. Allen's best interest to rather than blame Dr. Haney, to tell the Court that we dropped the ball, and at this point in time, Judge, this far, we're a month from trial, we don't have a sufficient mitigation case to present on Mr. Allen's behalf?  Do you think that would have been more in Mr. Allen's best interest?

A.    It would certainly have been a reasonable choice.  We are admonished not to take hindsight into account.  In hindsight we know that the strategy we adopted did not work. I think -- for one thing, I believed -- I believed what was in the motion, and I believe Dr. Randall's testimony.  I believed that it was in the best interest of both sides to go with the continuance.

Q.    I'm showing you on the screen what is Exhibit 383. It's the schedule, the handwritten schedule, the Allen weekend witness schedule that you discussed on cross-examination.  Do you recall this document?

A.    I recall that this is a draft of the document.  There is a more complete draft that has certain names added and others changed.

Q.    Such as this one, which is the second page of this same exhibit?

A.    Yes.  Yes, sir, this looks like the one we discussed on cross-examination.

Q.    All right.  And I think on cross-examination you --
your attention was focused to Sunday, February 22nd, and you
were shown the different witnesses who were interviewed at
various times during the course of the day; is that correct?

A.    Yes, sir.

Q.    All right.  According to my count, it looks like 15
witnesses were interviewed on Sunday, the 22nd of February.
Is that consistent with your recollection?

A.    Yes, sir.

Q.    And in what period of time were 15 witnesses
interviewed, do you recall?

A.    I don't have an independent recollection as of this
moment, but viewing -- looking at this, I think that the
amount of time consumed is greater, was greater than the
times on the chart would suggest.

Q.    Your timesheet for that day shows about 8.6 hours; is
that correct?

A.    Well, I would defer to the timesheet.

Q.    On Saturday the 21st, how many witnesses does it appear
the team interviewed in that one day?  Ten, does that seem
right?

A.    Actually I got 11 the first time, but this was an
imprecise thing, and some of them were more than one witness
at a time, so I'm not disposed to quibble.

Q.    And so some of the interviews, you were interviewing

more than one witness at the same time?

A.    Yes, sir.

Q.    Now, who was doing the questioning of the witnesses? Was it you?  Was it Dr. Randall?  Was it Mr. Sindel?

A.    The primary person doing the questioning was Dr. Randall.

Q.    Now, on February 21st and 22nd, was the trial already well underway?

A.    Yes, sir.

Q.    If you recall, about how far removed from the start of the penalty phase was that weekend?

A.    I would have to speculate.

Q.    Now, you were cross-examined earlier about notes you took from these two days of interviews?

A.    Yes, sir.

Q.    And one of the witnesses that was discussed with you was a Ms. Deborah Ruffin.  Do you recall?

A.    Yes, sir.

Q.    And your notes reflected that she had conveyed to you and Dr. Randall and Mr. Sindel that Mrs. Allen drank when she was in trouble?

A.    Yes, sir.

Q.    Once you learned of that information, what investigative steps did you take to investigate that further?

A.    Nothing.

Q.    Would you have had a strategic reason for not following up on that information?

A.    No.

Q.    If the penalty phase started on March 2nd, would that sound about right?

A.    That does.

Q.    So that would be about eight days removed from when you were doing the interviews on the 21st and 22nd of February?

A.    Yes, sir.  Yes, sir.

Q.    Now, you were also shown your notes which indicated that Ms. Ruffin also reported that Mrs. Allen got physical with Billie Allen.  Do you recall that?

A.    Yes, sir.

Q.    After you learned of that information, what investigative steps did you take to follow up on that?

A.    Nothing.

Q.    Was there a strategic reason for not doing that?

A.    No.

Q.    Would you have had a strategic reason for not interviewing Deborah Ruffin before February 22nd, 1998?  Was there a reason that she wasn't interviewed in the summer or the fall or even late in the winter?

A.    First, there was no strategic reason for not interviewing Deborah Ruffin earlier.  Second, there was a reason, and that was the misunderstanding about the role of

Dr. Haney. It was my understanding that Dr. Haney was doing or supervising substantive investigation of potential penalty phase witnesses and exhibits.

Q. So let me ask it this way. Did you have a strategic reason for not interviewing Ms. Ruffin well before February 22nd?

A. No.

Q. Now, Lucy McLemore told you that during those interviews on February 21st and 22nd that the Allen family was dysfunctional. Do you recall that?

A. I recall having seen that in the notes, yes.

Q. And after you learned from her, her generalization that the family was dysfunctional, what investigative steps did you take to follow up on that information?

A. I did not take any steps to follow up on that information.

Q. Would you have had a strategic reason for not doing that?

A. No.

Q. Would you have had a strategic reason for not conducting a substantive mitigation interview of Ms. McLemore prior to February 22nd, 1998?

A. No.

Q. You were shown some -- your interview notes from that same weekend, the 21st and 22nd of February of 1997,

concerning an interview with Ms. Shimeka Taylor.  Do you recall seeing those notes on cross?

A.    Yes.

Q.    And I believe Ms. Taylor said something to the effect that he got the snot knocked out of him?

A.    I now recall having seen that in my notes.

Q.    And that he was 12 or 13 at the time that she recalled that.  Does that sound right from your notes?

A.    That sounds right, though I don't have them in front of me.

Q.    Sure.  Now, what investigative steps did you take upon learning this information from Ms. Taylor to follow up on that?

A.    Nothing.

Q.    And was there a strategy behind not following up on that?

A.    No.

Q.    Can you tell us whether or not you had a strategy for not interviewing Ms. Shimeka Taylor prior, well in advance of February 22nd?

A.    No, I did not.

Q.    Now, also your notes reflect during the same weekend, you, Mr. Sindel, and Dr. Randall interviewed Raymond Petty; is that correct?

A.    Yes, sir.

Q.   And Raymond Petty conveyed that Juanita Allen had beat him with belts?

A.   Yes, sir.

Q.   Or with an extension cord?

A.   Had beaten Mr. Allen with the cord.

Q.   And I believe the notes reflect that she would use her fists on him?

A.   That is my recollection as well.

Q.   All right.  After receiving that information, learning that information from Mr. Petty, what investigative actions did you take to follow up on that information?

A.   Nothing.

Q.   Did you have a strategic reason for not interviewing Mr. Petty substantively concerning mitigation well in advance of trial?

A.   No.

        MR. MORENO:  If I could have just a moment, Your Honor.

        THE COURT:  Sure.

BY MR. MORENO:

Q.   Now, you testified both on direct and on cross-examination that you did interview Lucy McLemore and Raymond Petty in January of 1998; is that correct?

A.   I talked with them for the purposes as I've explained in detail before.

Q.    Okay.  And your notes reflect that they conveyed some information to you; is that correct?

A.    Yes, sir.

Q.    Above and beyond what your initial purpose was?

A.    Yes.  Yes.

Q.    Do you recall in that interview whether or not you inquired of them whether Juanita Allen or anyone else had physically abused Mr. Allen while he was growing up?

A.    I certainly don't believe that I did.

Q.    Okay.

A.    It would have been inconsistent with my purpose in conducting the discussion.

Q.    All right.

MR. MORENO:  I have no further questions.  Thank you, Your Honor.

THE COURT:  All right.

MR. MORENO:  Can I have a moment to consult with Mr. Allen?

THE COURT:  Sure.  Sure.

MR. MORENO:  Your Honor, thank you for the indulgence.

THE COURT:  Yes.

MR. MORENO:  I have no further questions.

THE COURT:  All right.  Recross.

MS. COSTANTIN:  Thanks, Judge.

RECROSS-EXAMINATION

BY MS. COSTANTIN:

Q.   The mitigation checklist that you used during the interviews of Billie Allen both in December of 1997 and in January of 1997 was provided to you by Kevin McNally of the Capital Public Defender's Unit; is that correct?

A.   Yes.

Q.   And he's a lawyer; is that correct?

THE COURT:   I'm sorry, you said December '97 and January '97.

Q.   I'm sorry, January '98, I apologize.

A.   Mr. McNally is a lawyer, yes.

Q.   And he was providing that to you; is that correct? Another lawyer was providing to you, not to anybody else; is that correct?

A.   Well, I believe so.  When I say to me, I don't personally recall that it came to me.  I don't mean to overstate that.  If it was addressed to me then it came to me.  If it came to Sindel & Sindel, I nonetheless received it and used it.

Q.   So if it wasn't sent to you, it was sent to the law firm of Sindel & Sindel; is that right?

A.   Yes, ma'am.  And I don't remember.  I'm not denying that it was sent to me, I just don't remember.

Q.   You testified on redirect that you didn't do

investigations in certain areas, and I want to kind of explore that with you.  You indicated that you didn't do any investigation of Billie's schooling; is that correct?

A.    That's correct.

Q.    You had the school records, though, correct?  The trial team had his school records from both Clayton and the City schools?

A.    I believe so, yes.

Q.    So when you say you didn't do any investigation, that didn't mean that nobody did any investigation, is that fair to say?

A.    That was how I understood the question, yes.

Q.    And you participated in those interviews of Billie Allen's teachers, didn't you?

A.    Oh, yes.  Yes.

Q.    So you might not interpret that to be your investigation, but there was investigation done, and you were present at the very least for that; is that correct?

A.    Yes.  As in the exhibit that's still up on the screen.

Q.    Right.  I'm just clarifying what it meant by you didn't do any further investigation.  And Billie Allen's teachers, many of them did, in fact, testify; is that right?

A.    There were a good number of them, yes.

Q.    And you indicated, I believe, that you didn't do any investigation concerning any chronic illnesses or conditions

that Billie Allen had, is that what you testified to?

A.    Yes.  I can't recall any that I did.

Q.    But you had copies of those medical records, didn't you?

A.    I think that I at some point had copies of them, and I would certainly agree that the team had copies of them.

Q.    And the point you had them was at least for the Life History where you footnote down to some of them, is that fair to say?

A.    Yes, it is.

Q.    And evidence concerning Mr. Allen's asthma and his lead poisoning, that was presented at trial; is that right?

A.    Yeah.  I believe so, yes.

Q.    So whether or not you personally did that investigation, some sort of investigation was done enabling that evidence to be presented at trial; is that correct?

A.    Correct.  I simply didn't mean to speak for Mr. Sindel or Ms. Supranowich.

Q.    And you testified also that you did no investigation of any toxic chemical exposure that Mr. Allen might have sustained at the Chemisco job; is that right?

A.    Yes.  I did not contact Chemisco or anyone who is an expert in that area.

Q.    And, in fact, someone did contact Chemisco and determined that he worked there.  Do you recall that?

A.    That would be consistent with my general recollection.

Q.    But you personally didn't do that?

A.    That is correct, I did not.

Q.    And then Dr. Gelbort testified at trial concerning Billie Allen's possible exposure to toxic chemicals based on that job; is that right?

A.    I'm not going to deny that, but I don't have recall of that at this moment.

Q.    Now, you testified that you didn't do any investigation of Billie Allen's parents' social history; is that right?

A.    Wait, I'm not so sure about that.

Q.    That's what I was going to ask you.  Did you -- let's ask it in a simple way.  Did you do any investigation of Billie Allen's parents' social history?

A.    I had conversations with people, and at some point those topics would have come up.  I did identify siblings.  I identified some siblings.  But, see, I've seen real social histories, and I did not do anything of that nature, partly because I did not have the skills to do it.

Q.    Okay.  But you did, in fact, identify siblings, you learned from several sources that Billie Allen's father was a drunk; is that right?

A.    Yes.

Q.    And I'm talking about what you did now, right, you did that?

A.   Yes.  I heard that and took it down.

Q.   Now, there's a question asked, did you do any investigation concerning a history of domestic violence in Juanita Allen's family.  And I believe your answer was, no, you did not.  What does that mean, a history of domestic violence in Juanita Allen's family?  You talking about whether Otha Petty, Sr. beat his wife or how did you understand?  When you answered that question, how did you understand what that question meant?

A.   The kind of multi-generational investigation that would be involved in a social history, in which one would talk to third parties as well as the accused and their immediate family.  And that one would document over a period of time what had gone on.

Q.   And what I'm asking you is what family were you looking at, were you considering when you answered that question?

A.   Only the Petty side.

Q.   Okay.  So you were considering Otha Petty and his treatment of his wife?

A.   Yes, ma'am.

Q.   Okay.  To your knowledge is there any evidence that Otha Petty beat his wife in the new 2255 material?

A.   I do not recall.

Q.   And as far as any sort of physical punishment within Juanita Allen's family as in her treatment of her son Billie

Allen, you did talk to Raymond Petty, Shimeka Taylor, and Deborah Ruffin about that; is that correct? We went through those notes this morning.

A. Yes, I'm not denying what's in the notes.

Q. And you indicated, I believe, that that January 7th, 1998 meeting, that family meeting at the house, that there were no mitigation topics that came up, is that my understanding of your testimony?

A. Oh, well, we all know from the records that mitigation topics came up. My objective in going there was to report on the status of the case and to familiarize the potential witnesses with myself and vice versa.

Q. And you learned mitigation information there, correct?

A. I learned mitigation. As I've indicated on cross, I was surprised at Ms. Allen's statement because that's exactly -- that is 180 degrees from what I would have asked about in a group setting.

Q. You mean that she didn't drink while she carried Billie?

A. Yes. Ma'am, you don't know me. I never would have asked that question.

Q. But she told you that, right?

A. I wrote it down.

Q. And that's significant mitigation investigation?

A. And I wrote it down, yes, ma'am.

Q.   All right.  And that was January 7th?

A.   Yes.

Q.   Of 1998?

A.   Yes.

Q.   Now, I think we've established we prepared the Life History on January 8th of 1998; is that correct?

A.   I agree with that date.

Q.   And it's your understanding that the defendant's penalty phase portion started March 3rd?

A.   Yes.

Q.   Now, there's a question concerning Mr. -- or Dr. Haney. Now, this is from the 354.2.  This is your motion that you filed with the court for a continuance.  And in that motion you stated, "Dr. Haney responded by fax stating he had two trials within the following two months and did not feel he could adequately contribute to Mr. Allen's defense within the given time constraints."  Is that correct?

A.   Of course I can't see the context of this, but -- now, hold on.  This is the document that refers to Mr. Sindel as Sindel.  Is this the fax that I received from Connie Casperi?

Q.   Oh, is that your question?  I'm sorry.  I thought you just wanted it larger on the page.  Yes, this is the fax from Connie Casperi.

A.   Thank you.

Q.   Is that correct, that's what was indicated to you

from -- I'm sorry, I asked it a different way.  That's what was indicated to you from Mr. Sindel; is that correct?

A.      Well, Mr. Sindel or Ms. Supranowich.

Q.      And in your motion, which we're now looking at, paragraph 7, you stated:  "Dr. Haney responded by fax stating he had two trials within the following two months."  Is that right?

A.      Yes, following the fax.

Q.      So that information that you placed in there was -- the source was the fax from Mr. Casperi; is that right?

A.      Yes, Ms. Casperi, now Ms. Supranowich, who I routinely relied on in doing my work in Mr. Allen's case.

Q.      Now, there's been some discussion about an MRI or PET scan back in 1998; is that right?

A.      Yes.

Q.      Now, to your knowledge has any MRI or PET scan been done by 2255 experts?

A.      I don't recall one way or the other.

Q.      Now, do you recall in your continuance motion indicating that there had not been significant development of mitigation?  I mean, were you hiding that from the Court?

A.      I do not believe there had been significant development done.  So I was, therefore, not hiding anything from anyone.

Q.      Okay.

A.      By this time I had worked on numerous -- several

capital cases from the other side, and I did not consider what we had done to be significant compared with what I was accustomed to in my practice.

Q.    But there's a question about, wouldn't it have been in Mr. Allen's best interest to tell the Court that very little had been developed at the time?  And I believe your answer was that you thought you did that.  Is that right?

A.    I believe -- yes, I believe that was the question, and I believe that was my answer.  I don't think very much had been done, and I thought we told the Court that.

Q.    Now, looking at Exhibit 383, page 2, the list of or the witness interview schedule.  You indicated that Deborah Ruffin was interviewed on February 21st; is that right?

A.    Yes.

Q.    And we saw your notes of that meeting; is that correct?

A.    Yes.

Q.    And it was at that meeting that she told you, according to your notes, that Ms. Allen drank at times and also got physical with Bill; is that correct?

A.    Yes.

Q.    And you indicated that you had -- first of all, that you did no further investigation concerning that.  Was that your testimony?

A.    Yes.

Q.    Okay.  Well, you were present when there was

discussions later that day when Shimeka told you about Ms. Allen kicking the snot out of Billie Allen, right?

A.   And that interview had been set up already.

Q.   Okay.  But it was after that that she told you that, correct?

A.   Yes, the Shimeka interview was after the Ruffin interview.

Q.   And then Raymond Petty the next day also told you about Juanita using her fists on Mr. Allen, Billie Allen; is that right?

A.   That is what I recall.  And I don't interpret that as new investigation based on the Ruffin statements.

Q.   Okay.  So talking to witnesses later about information received from earlier witnesses would not be investigation?

A.   The way I understood the question was did I go out and do something that I wouldn't have done otherwise because of the statements made by Ms. Ruffin.

Q.   But followup was conducted with these other witnesses, approximately I guess 23 witnesses scheduled that weekend; is that right?

       MR. MORENO:  I'm going to object to the characterization of followup.  There's no indication whether there was any followup.

       THE COURT:  Well, it gets into -- well, I won't say that, no.  If you understand the question, you may answer.

Overruled.

BY MS. COSTANTIN:

Q.    You may answer the question.

A.    Thank you.  I was present and taking notes for subsequent interviews that were already scheduled.  I did not go out and do anything that I would not have done otherwise.  And I do not know who was doing the questioning that resulted in the answers in my notes.

Q.    So it wasn't your investigation because you didn't set up the meetings, right?

MR. MORENO:  I'm going to object, that's a mischaracterization of his testimony.

THE COURT:  In part he said it was because he wasn't sure who was asking the questions.

BY MS. COSTANTIN:

Q.    Okay.  It wasn't your investigation because you weren't asking the questions and you didn't set up the meetings; is that correct?

MR. MORENO:  Object to that characterization.  He never said it wasn't his investigation.

MS. COSTANTIN:  That's what I'm asking.

THE COURT:  I thought he did.  Okay.

BY MS. COSTANTIN:

Q.    Well, that's what I'm asking, that's my question.  It wasn't your investigation because you didn't set up the

meetings and you didn't ask the questions; is that correct?

THE WITNESS:   Your Honor, I'd like to explain.

Q.    Well, just answer the question.   That will explain it.

MR. MORENO:   I think he should be allowed to answer the question as he sees fit.

THE COURT:   Well, I'm going to allow redirect.   So you can ask -- he can explain it then.

A.    I did not answer as I did because -- simply because I was not the individual who had set up these interviews.   The way I interpreted the question is after you heard these statements about domestic violence, did you launch some new investigation looking for evidence of domestic violence by Ms. Allen.   And that is what I did not do.   I did attend these meetings.   I did take notes.   The Court has my notes.

Q.    So that's your limitation of what your investigation means, not just in regards to Deborah Ruffin, but anybody else that we're talking about here means you didn't launch an investigation and go in a new area apart from attending these interviews; is that correct?

A.    I honored the schedule that had already been set up, and that's the limit of any -- I mean, I don't understand this to be investigation based on the information you're referring to.

Q.    Okay.   Let me --

A.    I honored the schedule, and that's it.

Q.    Let me ask it another way.  Did you believe that any investigation was done to follow up on Deborah Ruffin's statement that Juanita Allen would get physical with Bill?

A.    I'm sorry?

Q.    Did you -- do you believe that any investigation -- would you characterize there being any investigation done concerning Deborah Ruffin's statement that Juanita Allen would get physical with Bill?  I'm separating it from your investigation, okay.  I'm asking was there any -- in your view of what an investigation is, was any investigation done of Deborah Ruffin's statement that Juanita used to get physical with --

A.    As I interpret that language, the answer is no.

Q.    Okay.

A.    But I am not completely denying your point of view that subsequent questions were asked about it in interviews that were already scheduled.

Q.    And that's what I'm trying to understand is what your view of an investigation would be.  So when you answer a question that you didn't do an investigation or nobody did an investigation, it would not mean that there was not further information elicited concerning Juanita Allen's physical punishment of Billie Allen; is that correct?

A.    It does not mean that no one asked anyone about that.  It certainly does not mean that I did not take notes about

it.

Q.    Okay.  And for a moment on Deborah Ruffin, you actually interviewed Deborah Ruffin initially back on January 7th of 1998; is that right?

A.    I recall that contact.

Q.    And Shimeka Taylor, I believe you testified that you didn't -- and I don't remember if you used the word "follow up" or "investigate" her statements about Juanita Allen giving Billie a whippin' and that she kicked the snot out of him?

A.    I did not follow -- I did not follow up on that.  I did not pursue it.

Q.    But is it your testimony that nobody on the trial team followed up or pursued that?

A.    That is my belief.  And I do not have knowledge which contradicts the belief.

Q.    Okay.  So the subsequent interview of Raymond Petty in which he said that Juanita Allen used her fists on Billie Allen and hit him with an extension cord, that would not be a followup in your mind?

A.    I think he was a witness we were going to interview anyway.

Q.    So because it was someone who was already on the schedule, that wasn't a followup as far as you were concerned?

A.    In my view, a followup would have been pursuing official records, documents, or witnesses who are not already on the list.

Q.    And what official records or documents do you know that have been developed by 2255 counsel concerning Juanita Allen's physical punishment of Billie Allen?

A.    All I'm talking about is what I -- I'm trying to place myself back in 1998.  And I'm assuming that I received the direction from Mr. Sindel or Dr. Randall that we need to pursue this, let's go with trash the mother, you go out and do this.  And I would have done that.

Q.    I just asked you a separate question, and the separate question is, what documents or records are you aware of that 2255 counsel has obtained concerning Juanita Allen's physical abuse as it's characterized of Billie Allen?

A.    I'm not aware.

Q.    You're not aware of any records?

A.    Right.

Q.    Okay.  So if you were directed to do or you chose to do that, as far as you know nothing would have been found as far as records or documents; is that right?

A.    I testified that I did not know what was in the 2255 team's file.  That is not denying the existence of something that I would have found in 1998.

Q.    Okay.  You've read the filing; is that correct?

A.    I'm sorry?

Q.    You've read the filing, the 2255 filing?

A.    I read them months ago, yes.

Q.    Okay.  Do you recall there being any documents or records concerning Juanita Allen's alleged physical abuse of Billie Allen?

A.    Not at this time.

Q.    In regards to Lucy McLemore, who was listed as being interviewed on Sunday, February 22nd, you also interviewed her a month before, is that correct, on January 11th of 1998?

A.    That was the baptism questioning, which I received some collateral information, yes.

Q.    Including the family history as far as who is -- where the brothers were and the sisters were and the birth order and when they got married and all that sort of information; is that right?

A.    Yeah, that's what my notes reflect.

Q.    And that was done to complete the Life History; is that right?

A.    That was done to fill a blank, yes.

Q.    And in regards to Raymond Petty, you had also spoken to him before, back on January 11th of 1998; is that right?

A.    As I recall, that was the Scouting plan.

Q.    And it was -- we looked at the notes already.  Didn't it cover more than Scouting?  Do you recall that?

A.    Yeah, I have agreed that I didn't simply call these people up or visit them and ask them a single question.  I gave them a context.  But my objectives were, first, witness preparation in the sense of familiarization and, second, answering a specific question that was a blank left in my -- from my actual interviews of Mr. Billie Allen.

Q.    And that was back on January 11th of 1998?

A.    That's my recollection.

        MS. COSTANTIN:  Judge, I don't have anything more.

        MR. MORENO:  I have nothing further.

        THE COURT:  All right.  You are excused, Mr. Simon.  Thank you, sir.

        THE WITNESS:  Thank you, Your Honor.

        THE COURT:  Yes, sir.

        MR. MORENO:  Your Honor, we're getting our next witness.

        THE COURT:  Pardon me?

        MR. MORENO:  We're getting our next witness.

        THE COURT:  Okay.  Do you want a few minutes?  It's up to you.  If you think it's helpful to you, I'll give you a few minutes.

        MR. MONTROY:  Good afternoon.  Eric Montroy.  I thought I'd reintroduce yourself since I haven't said anything in the last week and a half.

        THE COURT:  Yes, sir.

MR. MONTROY:  Yeah, if we could have a few minutes to shift around for a second.

THE COURT:  Yeah, we'll take a ten-minute break.

MR. MONTROY:  Thank you, Your Honor.

(Court in recess from 1:48 p.m. until 2:03 p.m.)

MR. MONTROY:  Your Honor, Mr. Allen would call Dr. David Randall as our next witness.

THE COURT:  All right.  Would you raise your right hand, sir, and state and spell your first and last name.

THE WITNESS:  David Randall, David, R-a-n-d-a-l-l.

MR. MONTROY:  May I, Your Honor?

THE COURT:  You may inquire.

MR. MONTROY:  Thank you.

DAVID RANDALL, Ph.D,

Having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. MONTROY:

Q.    Good afternoon, Dr. Randall.

A.    Hello.

Q.    Dr. Randall, how are you employed?

A.    Currently?

Q.    Currently employed, yes.

A.    My full-time position at this time is as a clinical psychologist with the Hawaii Department of Education, Maui

District Office, Special Education Section.

Q.     And what does that entail exactly?

A.     Well, I've been there since 2001.  I work in the district.  As a clinical psychologist I am responsible for providing clinical supervision of master's level therapists who are stationed or assigned to our schools.  They provide direct service to students, and I oversee some of that.  Also I do psychological evaluation of students who are referred for a variety of learning or behavior problems.

       And I also do consultation to school teams throughout our district when school teams are having issues with the students, whether they be learning issues or whether they be behavior issues, and they are having trouble figuring out what's going on, I come in and we try to sort it out and see what next steps need to be taken, whether we refer for other assessments or what types of interventions we might do.

Q.     And before you moved to Hawaii and started doing the work that you're doing now, before Hawaii, what kind of work were you doing?

A.     Since I believe roughly 1989, I was working as a private consultant, sentencing consultant in mitigation, doing work on a couple different types of cases.  One type of case was cases where probation was a possibility.  So I was doing social histories of defendants and devising alternative sentencing plans that we could present to courts as

alternatives to incarceration.  Some of those courts were federal courts, so we dealt with downward departures and things of that nature, trying to get support for those.

And then the other types of cases I worked on was capital cases, capital mitigation cases.

Q.   Okay.  And in terms of the -- well, in terms of your employer, were you doing that as like a solo practitioner or were you working for a firm?

A.   The mitigation work?

Q.   Uh-huh.

A.   I was working as a private practitioner, solo practitioner.

Q.   Okay.  And the noncapital cases, you were developing mitigation in those cases?

A.   Yes.

Q.   Okay.  And how would you, you know, be retained in a case, in one of the private cases that you're talking about, noncapital?

A.   A private case I might get directly retained by the attorney for the client.  And -- so that's how that would work.

Q.   And what would that mitigation involve?  Would it involve collecting records, talking to witnesses, that sort of thing?

A.   Yes, it would be basically talking to the defendant and

collaterals, people who know them, whether it be family members, friends, neighbors, coworkers, things of that nature. And then writing a social history so that the trier of facts, who in these cases was a judge, could get a sense of how the person got to the point where they were.

And then I would device an alternative sentencing plan that would tailor the person's skills to some not-for-profit agency in the community. I would try to find an area of need in the community that could be met by the skills that the defendant had. So it wasn't just busy work that they were doing, they were doing something valuable to pay the community back for what they did.

Q. Okay. And you also mentioned that you did mitigation in capital cases?

A. Yes.

Q. And when did you start doing that type of work?

A. I started doing that work, I believe, around April of 1989.

Q. And how was it that you made the transition from doing noncapital mitigation to working on capital cases?

A. As part of my -- I was working for myself, and I was trying to promote my business and get business, so I would reach out to attorneys who had cases in the paper or, you know, who might have a potential need for that type of work. And there were cases at the Cook County Public Defender's

Office.  So I was writing to some attorneys at the Cook County Public Defender's Office and following up with them.

At some point Andrea Lyon, who was working in their capital section, contacted me and said, you know, my office might be interested in working with you, can I meet with you? And we had a meeting, a discussion about, you know, the type of work that they did.  I had never done capital work before, never really thought about doing it.  And through that avenue I became involved in death penalty mitigation work.

Q.   Okay.  Was that in Chicago then where you were doing that type of work?

A.   Primarily in Chicago, but I also over time did cases in the surrounding counties in state cases in Missouri, Indiana, and then I did a federal case in Kansas City, a couple in Michigan, and this one.  And then I was involved in one right after this one briefly here in Missouri.

Q.   Okay.  About how many capital cases do you think that you worked on in terms of developing mitigation?

A.   Over the course of the ten years, I worked on over 60 cases.

Q.   Okay.  And prior to Mr. Allen's case, how many cases do you think you might have worked on?

A.   Well, his case was at the tail end of my career in a sense, so when I started working on his case it was about 60 at the time, so.

Q.   Okay.  And do you have any special education that you have in terms of -- well, let me strike that actually.  What is your educational background?

THE COURT:  Wait a second.  I have a confused part of my notes.  I thought he said he started capital cases in April of '99.

THE WITNESS:  No, '89.

THE COURT:  Got it, sorry.  That takes care of that.

MR. MONTROY:  Thank you, Your Honor.

BY MR. MONTROY:

Q.   What is your educational background, Dr. Randall?

A.   I have a bachelor's degree in psychology from Muhlenberg College in Allentown, Pennsylvania.  After achieving my bachelor's, I obtained a master's degree in psychology at Fairleigh Dickinson University in Teaneck, New Jersey.  And then in 1994, I received my doctorate in clinical psychology from the University of Health Sciences, Chicago Medical School in Illinois.

Q.   Okay.  And are you a licensed psychologist?

A.   As of 2005, I am a licensed psychologist in the state of Hawaii.

Q.   Were you a licensed psychologist at the time of Mr. Allen's trial?

A.   No.

Q.   Let's talk a little bit about how you got involved in

Mr. Allen's case, the Billie Allen case.  When was it that you became involved in Mr. Allen's case?

A.    I became involved in his case in January of 1998.

Q.    And how exactly did you get involved?  How did that come about?

A.    Well, I received a phone call from Connie Casperi, who was Mr. Sindel's paralegal.  And I believe it was on January 15th, 1998.  And she informed me that they were in need of a mitigation expert because their previous mitigation expert had left their case, was no longer involved in their case.  That -- and that trial was coming up very soon as well.

Q.    Okay.  And at some point before taking the case, did you discuss what your work would be, what kind of work you would be doing either with Ms. Casperi or Rick Sindel?

A.    Can you repeat that, please?

Q.    Yeah, sure.  Before you actually came to St. Louis and got involved in the case, did you have some conversation with either Connie Casperi or Mr. Sindel about what your role would be in the case?

A.    Well, they contacted me because they found my name through the defense grapevine.  So they knew I was a mitigation specialist who worked on capital cases, and that's where they needed help.  And so, you know, that was -- I'm not sure, you know --

Q.   Okay.  So your understanding was that you were going to be a mitigation specialist on the case?

A.   Right.  They had a discussion with me about the status of the case, and that their mitigation expert had sort of at the 11th hour had withdrawn from the case, and the trial was -- there was an impending trial, and, you know, would I be able to assist them in the case.  And we had a discussion about how unusual that situation was.

Q.   Okay.  And we'll come back to that in a second. Thanks.  But in terms of -- and actually if you could look up at the screen, I'm showing you Exhibit 347.  Do you recognize this as a letter sent to you by Rick Sindel?

THE COURT:  What's the number, please?

MR. MONTROY:  347, Your Honor.

A.   Yes.

Q.   And that's dated January 23rd, 1998; is that right?

A.   Yes.

Q.   By January 23rd, 1998, were you already working on Mr. Allen's case?

A.   Yes.  What happened was given the -- given the time pressure involved in what they had described, I talked to Connie Casperi on the 15th of January.  On the 16th, I believe, I was appointed to the case.  And then I said once I was appointed, I went down the next day to see Billie and to meet with Mr. Sindel and come to St. Louis for the first

time.

Q.    And where were you living at the time?

A.    In Evanston, Illinois.

Q.    Okay.

A.    So -- and then basically what was going on, I had like a brief window where I could come down.  And then I was in the process of finishing up another capital case.  There was another sentencing hearing that was prepared at this point.  And so, therefore, I had liberty to come down to see Billie.  And so I did.  There was that window there.

Q.    And that other capital case that you just mentioned, where was that case being tried?

A.    You know, I'm trying to think about that.  It was, I'm sure, a local Illinois case in either Cook or one of the surrounding counties.

Q.    And was it in the guilt phase or the penalty phase when you got the call from Connie?

A.    I believe it was either at the -- it had to be at the tail end of the guilt phase of that case.

Q.    Okay.  And you had said that your penalty phase was completed at that point?

A.    My work was completed.

Q.    In that case?

A.    Yeah.  And so there was no urgent need for me to be through until the actual start of their penalty phase, which

was the following week.

Q.   All right.  And if I could just point your attention to Exhibit 347, the body of that letter.  And this is the letter from Mr. Sindel to yourself.  Does that summarize your understanding of what your role would be in Mr. Allen's case?

A.   What this was was I asked him for a retention letter to formalize our relationship.  So this describes that, why I was involved in his case.

Q.   Okay.  And it indicates that you're going to be doing the social history investigation relative --

A.   -- to assistance in preparation of mitigation for the possible sentencing hearing and aggravation and mitigation.

Q.   Okay.  When you were getting involved in Mr. Allen's case after you talked to Ms. Casperi, did you have any sense of who was working on the case at that time?

A.   The people who were part of Mr. Sindel's team at the time were Mr. Sindel himself, Mr. Simon, John Simon.  I knew there was an investigator, Andy Rackers, who was involved with them, and Connie Casperi.

Q.   And did you have any personal relationship with any of those people when you were retained?

A.   At the time I was retained?

Q.   At the time you were retained.

A.   I had never met them before.

Q.   When you were asked to work on Mr. Allen's case, when

you received the phone call from Ms. Casperi and any subsequent conversations that you had with Mr. Sindel or Mr. Simon, did you have any understanding of any specific challenges, you know, that were unique to Mr. Allen's case when you were deciding whether or not to sign on?

A.   The -- in my experience over a ten-year period working on the capital cases, I would say that I would have at least a year to work on a case to work it up to the point where we were ready to present at a penalty phase.

This was a highly unusual situation because for whatever reason their mitigation expert -- I don't know if he bailed, but he was no longer available at the very last minute, three weeks before a trial.  So that was very, very unusual, because these cases take a lot of time to prepare, a long time to prepare typically.

And so I was reluctant to sign on because of that situation.  And also I was like, I will come down tomorrow, you know, I will come down Saturday and get started, but you have to understand that we're going to go in and seek more time on this case.  You know, so that was how I went into it.

Q.   Okay.  With the understanding that there would be a request for more time?

A.   Yes.

Q.   Aside from that, was there -- were you given any understanding of what sort of work had already been done on

the mitigation?

A.    I believe that at the time there were records that were collected, some school records, some medical records, some jail records.  There was this document that was called a Life History of Billie Allen that was drafted by Mr. Simon.  That was available to me when I started.

Q.    Not to cut you off, were these things that you saw after you decided to take the case?  I guess what I'm inquiring into is as to what you knew about when you're deciding do I get involved in this case or not, what was your understanding of where the mitigation case was at that point?  I mean, maybe you did see specific documents.

A.    Well, based on the communication that I had from Mr. Sindel was that they had had a discussion with their mitigation expert as trial was approaching, I believe some time in December, and they said, hey, where's the mitigation investigation at, the trial is coming up real soon.  And he says, you know, what was communicated to me, because I didn't talk to Dr. Haney, but what was communicated to me was Haney reacted in a way, What do you mean trial is next month, the case is at the most basic stage at this point?  And so that's what I had learned during our initial conversation.

Q.    So when you were deciding whether or not to come on to the case, your understanding -- if this is fair -- is that in terms of mitigation, it was at the most basic stage?

A.     Yes.

Q.     And do you recall how you had that understanding, how that was conveyed to you?

A.     I guess on a couple different levels, one was the level I just described about the conversation with their former expert.  The other level was just a sense I got from them about their sense of desperation at this time that they were really up the creek in a sense.

Q.     And, I'm sorry, just to be clear, you never talked to Dr. Haney; is that right?

A.     That's correct.

Q.     Okay.  Did Mr. Sindel, did he have to work hard to encourage you to actually get involved in this case?

A.     It depends on what you mean by "working hard."  I mean, we had -- there was a dialogue, and I wouldn't say he twisted my arm, but they needed help on the case.  And I was reluctant initially to consider it because it was basically an impossible task to do within that time frame.  And he was persuasive enough that I signed on, that I said, I will do -- you know, I'll try to help, and we're going to need to get more time.  We're going to need to go in and try to get more time.

Q.     Okay.  So you, I guess taking it along a little bit, you agreed to join Mr. Allen's legal team?

A.     What had happened was the penalty phase of that other

case that was coming up was going to be over, it was going to be several days the following week, and then my calendar was pretty much clear at that point. So in my mind I thought, once that's done, I can devote whatever time I could to this case. So --

Q.    Okay. And you said you came down to St. Louis from Evanston the next day?

A.    The day after I was appointed.

Q.    Okay. Were you eventually given some materials early on in your involvement in the case?

A.    Yes. I received the materials that I mentioned earlier, the document that's called the Life History of Billie Allen that Mr. Simon wrote, or, you know, drafted -- that he wrote. Different records like school records I got. Some medical records I got.

Q.    Okay. If you would look at Exhibit 335 --

A.    Okay.

Q.    -- which is up on the screen. Do you recognize this document?

A.    Yes, that was Friday, January 16th.

Q.    And that's a fax to you; is that right?

A.    From Connie Casperi.

Q.    And I'll just do this trick here. Does this letter give an indication to you of the materials that you were given when you first started working on Mr. Allen's

mitigation case?

A.    This fax notes that there were 16 pages including the cover.  I requested the initial contact information in Billie's -- the mother's phone number, the grandfather's phone number, so they provided that to me in this fax.  And she also faxed the draft that John Simon had compiled that I mentioned before.

Q.    And that's the document that's entitled the Life History?

A.    Yes.

Q.    So were these the initial documents that you had when you started the case?

A.    Yes.  So I -- I'm not sure what time that was that I got this, but it's highly likely that I had that document on Friday with me.

Q.    Okay.  I'm now showing you Exhibit 350.  Do you recognize this document?

A.    Yes, it's a letter from Mr. Sindel's office from Connie that -- where she is enclosing four items.

        THE COURT:  Could I see the date?

        MR. MONTROY:  I'm sorry, Your Honor, I cut it off.

        THE COURT:  That's okay.  The 26th, okay.

        MR. MONTROY:  The 26th, yeah, that's right.

A.    So at this point she's giving me some incident reports, reports of his prior arrests, documents about his history in

the Boy Scouts, and some medical records and interpretation, which I'm not sure as I'm sitting here what that was.

Q.    Would it refresh your recollection if I told you that Mr. Sindel or Ms. Casperi had hired somebody to transcribe medical records?

A.    It doesn't ring a bell.

Q.    Okay.  I just want to show you one other exhibit here. Do you recognize this document?

THE COURT:  That's 340, for the record?

MR. MONTROY:  Yeah, I'm sorry, Your Honor.

A.    Yes, this is a fax that I sent to Mr. Simon on January 19th, 1998.  It essentially introduces myself to him. So this is three days after I was appointed.  And I informed him that I flew to St. Louis on Saturday, met with Rick and Connie, perused numerous documents, had my first meeting with Billie at the jail.  And I had said that I will be phoning other family members today and tomorrow to start setting up appointments with them.

Q.    Let me just stop you there for a second.  In this letter you mention you perused numerous documents.  Would this have been -- strike that actually.  What day is this fax dated?

A.    This is on the 19th of January.  So a Monday, I believe.

Q.    So do you remember going to St. Louis on that Saturday?

A.     Yes.

Q.     And do you remember meeting with Rick and Connie?

A.     Yes.

Q.     And do you remember perusing numerous documents?

A.     I remember reviewing documents in their office.

Q.     Which documents were those that you reviewed?

A.     I reviewed police reports and documents related to the offense and whatever documents, medical records, and things they had collected up to that point.

Q.     Okay.  Other than the documents that you've identified in these three exhibits, were there any other documents that were given to you, do you recall, when you started your mitigation investigation?

A.     Not that I recall.

Q.     Okay.  Was there any indication to you in those early days when you started your mitigation investigation that Mr. Sindel had been -- had been conducting an investigation prior to that date?

A.     My sense was that it was at the most beginning phase of any kind of mitigation investigation at this point.  Based on what I had received in terms of, you know, I received some medical records, education records, things of that nature, but in terms of any kind of real social history information, the only thing that I received was what Mr. Simon had prepared.  So there were no witness transcripts.  There were

no -- there's nothing developed, especially given that this was many, many, many months into the case at this point.  So I -- you know, I would have expected by the time of my entrance into the case that they would have been way further along at this point.

Q.    Okay.  And at that time when you were just entering the case, did Rick ever tell you that he had done anything else?  I mean, did he give any indication to you that he had conducted some investigation on his own?

A.    None.

Q.    Now, you had mentioned that one of the documents that you had received was a document entitled the Life History; is that correct?

A.    That's correct.

Q.    And that was a document that was prepared by Mr. Simon?

A.    Yes.

        MR. MONTROY:  Your Honor, I'm pulling up Exhibit 303.

        THE COURT:  Okay.

BY MR. MONTROY:

Q.    Is this the Life History document you received?

A.    It's entitled "Life History of Billie Jerome Allen," yes.

Q.    Do you recall how you got this document?

A.    That was the document that I believe was faxed to me on

that Friday afternoon by Connie Casperi.

Q.    Now, when you got this document from Connie, I assume that you read it?

A.    Yes.

Q.    What was your impression of it in terms of being a Life History?

A.    It's pretty sparse in my opinion.  Well, it's entitled "Life History of Billie Jerome Allen."  And it's highly incomplete.  It would be as if I was doing a psychological evaluation, writing in the name of my client, the date, and his birthday and all that.  And then there would be subheadings that I would do in an evaluation, and there might be a little like sentences there under the subheadings, but there would be nothing really flushed out at all, you know, in the document.  And then I would --

Q.    I'm sorry?

A.    Then I would save the document and then I would work on it later and flush it out as time went on in my evaluation. With this, I'm glad that -- I mean, this is something that is conscientious on Mr. Simon's part to have done, but it's a start, you know.  It's a very basic start.

Q.    What are the things that make it insufficient, if that's your word?

A.    Insufficient in terms of --

                MS. COSTANTIN:  Object as to insufficient, for what

purpose?  What do we mean?

MR. MONTROY:  I think Mr. Randall described it as insufficient, Your Honor, so that's what I'm attempting to flush out.

THE COURT:  I think he said very basic, incomplete.

MR. MONTROY:  Well, Your Honor, if I may, I would ask what makes it very basic or what makes it incomplete.

A.    Okay.  If the goal was to present a Life History of Billie Allen, like the complete Life History, it would be -- there would be much more detail here.  There would be much more information.  We had how many binders of transcripts of information?  So think when you compare the information that was collected at some point, if it was anywhere near complete, you would have substantial information in this document.

This is a preliminary document.  It was saved as a preliminary document, probably with the intention of further work on the document.

Q.    Well, what types of information would you want to have in the Life History that are absent from the Life History that was given to you by Mr. Simon?

A.    I think that this document has smatterings, fragments of very important things in terms of leads to pursue.  Okay.  But that's what it is, it's leads to pursue.

Q.    Do you have any -- did you have any understanding of

the source of the information that was used by Mr. Simon when developing this, or sources I should say?

A.    Yeah, the main source of the information here is Billie himself.  And then I believe he speaks to Raymond Petty and I believe Juanita as well.

Q.    Okay.  So would you expect a Life History to have more collateral sources than what's contained in this Life History?

A.    I have trouble even referring to it as a Life History. It's a document entitled Life History.  Calling it a Life History gives it a higher sense of importance than it really is, okay.  What it is, it's a rough -- it's the beginnings of an outline of different areas that a mitigation investigator would want to proceed on.

Q.    Okay.  Was this document helpful to you at all in terms of developing mitigation?

A.    I'm glad that Mr. Simon did this; it was a start.

Q.    Well, in your experience, would you expect a more complete Life History to be -- to have been developed by this point in time?

A.    Given that the crime happened in, I believe, March of '97, trial was coming up in February, this was prepared in mid January, I believe, this is a very -- like I said before, very basic and preliminary.  In terms of being portrayed as something that was complete, I would not -- it's beyond

fathom to consider it like that.  If it was turned in to me as an assignment as a complete, something that should have been complete, I would say it's willfully inadequate and would get an F in terms of where it was at, okay.

Q.    Now, you mentioned that Billie Allen was the source of most of the information in the Life History?

A.    Yes.

Q.    Is that right?  Was there -- was Billie in your mind a reliable source of information?

A.    I would have trouble saying in a dichotomy whether he was reliable or not reliable, because I wouldn't discount everything he said.  But whatever clients tell me, I always take it with a grain of, you know, doubt, you know, given their circumstances.  So I want to talk to the client, I want to get a sense of what's going on with them.

But it's likely that they are not going to be testifying.  And I would rely on them for leads, where I can find other people, other information to -- you know, other people who are ultimately going to talk about him and his life.  So his veracity or reliability, that's information for us because it's who he is, and, you know -- you know, he got to this point because of certain upbringing, a certain environment and so on and so forth.  So it's information that he might be inconsistent at times, but it's not going to -- it's nothing that I haven't seen like dozens of times, you

know, so --

Q.   So would you say that the reliability of clients of yours in capital cases is -- in terms of being in question is something that you had seen in other capital cases or was common in other capital cases?

A.   I go into these cases with some skepticism.  I respect my clients, but I'm not going to believe everything that they tell me.

Q.   Had any -- had any information been conveyed to you by either Mr. Sindel or Mr. Simon or Ms. Casperi regarding the reliability of Mr. Allen?

A.   Their sense of him was that he was a liar, is what they would describe him as, that you don't know what to believe from him and so on and so forth.

Q.   And did you meet with Mr. Allen -- or, I'm sorry, yeah, did you meet with Mr. Allen at any time?

A.   Yes, I did.  I met with him on the 17th, and I met with him a week or two later.

Q.   Okay.  Now, you mentioned in the Life History that there were leads; is that right?

A.   It's leads, yes.

Q.   Okay.  Would you say that a Life History generally speaking has to have more than just leads in it?

A.   It depends on what the intent of the document is.  If I was doing a Life History, let's say for my noncapital cases

where there's going to be one trier of fact and that was going to be a judge, I would want to have a compelling narrative developed based on what people had told me. And it would be a narrative, and it would be chronological, and it would be based on integrating what folks had said, and it would be complete. And after reading this narrative, hopefully the trier of fact would have some understanding of how my client got from Point A to Point B, why he was in front of the Court.

And then it would be clear as to what needs he had in terms of interventions that we needed to do in terms of therapeutic interventions, and it would also be clear in terms of what skills he had to go out in the community and provide restitution that way.

Q.    Okay.

A.    So I don't know what Mr. Simon's intent was when he drafted this. You know, so in terms of, you know, the intent of the Life History ultimately how it was going to be used or what, I have no idea.

Q.    Did the Life History have all the things that you just described in it?

A.    I don't think it was ever meant to. I don't know if it was ever meant to. It does not, no.

Q.    All right. So when you take a Life History that has leads, there's something that a mitigation investigator or

mitigation specialist would want to do with those leads; is that right?

A.    I would say that -- I would have to just say it's not a Life History with leads, it's a document that's entitled Life History that has leads.  I have trouble calling it a Life History.

Q.    What would the next step be after you get leads then? What should have been done in your opinion with this Life History had it been more than just basic?

A.    Well, the leads that were here were preliminary leads. The material that I got was, this was the extent of the material that I got.  I didn't get any information, any well-developed information about -- how should I say this? All I can really say that it was a preliminary starting point for the case.

Q.    Aside from this Life History, did you receive at any point any other materials from John Simon regarding any mitigation work that he had done?

A.    This was the extent of what I received from Mr. Simon.

Q.    Did you ever receive any memorandums of -- memoranda from interviews that he had done with witnesses, from interviews that he had done with witnesses?

A.    Never.

Q.    Other than the documents that you were given, the Life History, some of the medical records, some of the school

records, when you got involved in the case was there any indication, was anything given to you that other penalty phase investigation had been conducted by either Mr. Sindel or Mr. Simon?

A.   The limit of the material that I received, I've already told you what it was.  It was the records and -- medical records, school records, jail records, and this.  And given how long we were -- you know, given the age of the case, one would have expected much more at that point in time.

Q.   Okay.  So now we saw that you received the names and phone numbers of a couple witnesses; is that right?

A.   Yes.

Q.   Did you receive any witness reports or any affidavits of interviews done with witnesses?

A.   No.

Q.   By the lawyers or by anybody else in the case?

A.   Zero.

Q.   To your knowledge had any experts been retained for the purpose of the mitigation?

A.   At the time I came on board, Dr. Dan Cuneo was involved.  I believe he was retained for the purpose of competency.  And then later on he addressed some mitigation.

Q.   Had Dr. Cuneo conducted an evaluation by the time you got retained?

A.   I believe his evaluation was done on January 16th, and

so at that point he was focused on developing -- the first meeting he had was focused on the competency question.

Q.   Did you consider it problematic that no mitigation had been developed via mental health experts at that point?

A.   This -- yes, it was -- I felt that the situation was disastrous in terms of where it should have been at that point in time.

Q.   I just want to point you to Exhibit 357.  Do you recognize the handwriting in this document?

A.   Yes, that's mine.

Q.   And this is a document dated January 30th, 1998; is that right?

A.   That -- I believe the date was the date of the motion for the continuance, yes.

Q.   All right.  And is -- does this document contain notes from a meeting that you had with John Simon?

A.   Yes.

Q.   And what is this -- what did you write concerning your meeting with Mr. Simon?

A.   Okay.  Do you want me to read what I wrote?

Q.   Sure.

A.   He said -- it says meeting -- it's entitled or it has Allen underlined, that's the case it is.  "Meeting with John Simon.  He wanted to follow Nicole to City schools."

THE COURT:  Wanted to follow what?

A.     He wanted to follow Nicole to City schools.  So his older sister.  These are sort of bullet points.

Q.     Okay.

A.     The next thing I write, "He was a pot head," underlined.  "His brain half fried."  The next point was, lying -- "Lying, symptomatic of a problem."  So his lying was symptomatic of a problem.  The next bullet point was "MRI." And it says, "The boxing accident."  There's like five subpoints here.  Boxing accident, febrile seizures, pistol whipped, pica, pot, headaches.  And then I have a bracket, brain damage, question mark, right next to that.  And then the next bullet point is, "Issue of information on victims."

Q.     Okay.  And let me just ask you about those.  Would these be things that you would have -- well, let me ask you this:  Do you recall this meeting with Mr. Simon?

A.     I don't really recall this, no, but --

Q.     Do you think these are things you would have discussed with Mr. Simon?

A.     I obviously did discuss these with Mr. Simon, yes.

          THE COURT:  Just a second.  So there's a boxing --

          THE WITNESS:  Oh, boxing accident.

          THE COURT:  Okay.  Just a second.  Pica, pot.

          THE WITNESS:  It goes boxing accident, febrile seizures, pistol whipped, pica, pot.

          THE COURT:  Right.

THE WITNESS:  And then headaches.

THE COURT:  Okay.  I got them.

A.    So we're having a discussion obviously about these. And we're hypothesizing where it says brain damage, question mark, this is an area that we're going to want to look at.

Q.    And do you recall, was there a time you had a discussion with Mr. Simon about having an MRI done of Mr. Allen?

A.    This must be the time.

Q.    Okay.  And do you recall, was that your suggestion or was that somebody else's suggestion about having an MRI done on Mr. Allen?

A.    I believe it was my suggestion.

Q.    Other than this January 30th, 1998 discussion with Mr. Simon that's documented here, do you have any other recollections of having meetings with Mr. Simon where you discussed what had been done by him in terms of mitigation investigation?

A.    From my recollection, the contact that I had with Mr. Simon was later on in the case around -- I believe I sent him a fax about trying to get an MRI and a neurological evaluation.  And then in terms of anything else, the next time I really had any dealings with him was around jury instructions, discussions around jury instructions, I think. Way into the -- into the trial and penalty phase at that

point.

Q.   So when you came on the case, was Mr. Simon still doing investigation from that point on?

A.   When I came on board, given the status of what I was walking into, that these guys had clearly dropped the ball on this case, I had never met Rick Sindel before, I never met John Simon before.  All I know is I've never encountered in my career a case in such bad shape, so -- at such a late stage.  So I didn't know if I could trust these guys.  And John Simon, who -- you know, Rick was lead counsel.  John, my impression based on what I received, he was probably second chair and doing mitigation.

But given what had been done and given my sense of him, I wrote -- I basically said I want to take the lead on the mitigation, I don't want him involved, at the first round especially.

Q.   When you say "given your sense of him," what do you mean by that?

A.   Excuse me?

Q.   When you say, referring to Mr. Simon, "given your sense of him, you didn't want him involved," what exactly do you mean by that?

A.   I felt that he was a very cerebral, smart person, but his social sense was way off.  And it's important to develop rapport with mitigation witnesses and have a sense of how

hard you can push them in the interview and things of that nature. And I just didn't trust his judgment in terms of being able to do that, you know.

Q. And you mentioned that you indicated that you were going to -- you were going to go out and do some initial interviews on your own; is that right?

A. Yes.

Q. And I'll just point your attention to Exhibit 340, which we've already seen once.

MR. MONTROY: Sorry, Your Honor, I'm still getting the hang of this.

THE COURT: That's all right.

BY MR. MONTROY:

Q. Did you indicate to Mr. Simon on January 19th, 1998, that you were going to be doing the initial interviews on your own?

A. Yes. I say that I find from my experience it's best for me to do these by myself as it gives me a chance to develop rapport, et cetera.

Q. And was your decision in doing that primarily because of the state of the case at that time?

A. That was the main reason. And I felt it would be more efficient, actually sort of paradoxically to do it that way because given the compressed time frame, I needed to know what -- it would be problematic -- let's say we were talking

to two different family members or two different people, one person was talking -- Simon was talking to one, I was talking to the other, and we weren't present at the other's interview, and somebody revealed like something to me that might have been inconsistent with what they said.  And it's harder, it would be much harder to crosscheck things.

Like he might not realize what's important given that he's not a mental health expert and things of that nature.  So he might be looking for different things than I am.  And I felt that I needed, given the situation, to take charge of the situation, to try to --

Q.    What do you mean by that when you say "given the situation," could you clarify what you mean by "the situation"?

A.    This was like a desperate sort of emergency kind of situation given the time frame of the case where there was three weeks before trial.  And even if the trial was going to take a few weeks, you know, with jury selection, the guilt phase, even taking that into account, it was such a compressed time frame that in my judgment at the time I was like, you know -- and they dropped the ball on it, I was like, you know what, I'm going to take the reins on this, I'm going to be doing the interviews of the mitigation witnesses.  Once I learn what I learn, then I can bring you guys in basically.

Q.   Okay.  You had mentioned a little while ago that when you got involved in the case, you anticipated that the lawyers would be moving for a continuance; is that right?

A.   That was part of our first discussion.

Q.   All right.  And why did you feel the need and why did the team feel that there was a need to ask for a continuance at that point?

A.   Well, I think it was obvious given that their expert had done -- their own expert had done nothing.  Dr. Haney had done nothing up until that point.  They had done next to nothing, minimal.  So it was just a matter of necessity, and we had to seek more time.

Q.   And was that view that you just expressed, was that shared by Mr. Simon and Mr. Sindel?

A.   Yeah.  Yes, it was.

Q.   And was a Motion for a Continuance, in fact, filed?

A.   Yes.

Q.   And did that motion, if you recall, ask for 120 days?

A.   I asked in my affidavit for at least 120 days.

Q.   All right.  So you submitted an affidavit in support of this motion; is that right?

A.   Yes.

Q.   I just point your attention to Exhibit 35.

Dr. Randall, do you recognize this document?

A.   I do.

Q.     And what is this document?

A.     This was the affidavit that I wrote in support of the Motion for the Continuance on January 30th, 1998.

Q.     And is that your signature at the -- on the third page of this document?

A.     Yes.

Q.     I want to turn your attention to paragraph No. 9.  Can you see that?

A.     Yes.

Q.     In your affidavit do you write, "Realistically, I believe that a continuance of at least -- which is underlined -- 120 days, would allow for the adequate preparation of mitigation for a potential death penalty sentencing hearing, based on my appraisal of the work that remains to be completed in the Allen case."

A.     Yes, that's what I wrote.

Q.     That's what you wrote.  Why did you -- why is the 120 days -- or, I'm sorry, why is the "at least" underlined?

A.     Because realistically I would want more than 120 days.  So that's why I put "at least" there.

Q.     So how did you or you and the team come to this determination that you were going to ask for 120 days?

A.     I think given the nature of what happened with the other mitigation expert and that relationship being severed at a late stage in the case, that put everybody in a pickle

in a way. Because this affected a whole system of people. There were timetables and schedules and jury selection, and this had been scheduled some time in advance. So ideally, of course, as I mentioned earlier, I'd like to have a year to work on a case. Some of the cases two, three, four years even it's taken. But one year is workable, okay.

So but the reality was that these guys made a big mistake. I'm talking about counsel, by -- and it would be difficult to ask for a year, it would not be realistic. It just wouldn't be.

Q.    Did you have a conversation with Mr. Sindel or Mr. Simon about that fact?

A.    We had a discussion like the kind of discussion we're having now, where it's like, what can -- yeah, there was a discussion about what can we realistically expect to get in terms of the amount of time the case continued. So -- so we settled on the 120 days as a time that was not -- that was within the realm of reason, you know.

Q.    And who ultimately decided that you would move for 120 days as opposed to, you know, 180 days or 200 days?

A.    Right.

Q.    Was that somebody -- was there somebody on the team that made that decision?

A.    Well, Rick, that was his sense of how much we could possibly get.

Q.    Okay.  So is it fair to say you would have liked more than 120 days but you were willing to give it a shot with 120 days if you could get that much time?

A.    Yes, that's why I underlined the "at least" in that affidavit.

Q.    While we're on this document, just scroll up here.  I want to direct your attention to paragraph 7 of Exhibit 35.  In paragraph 7, was this sort of setting forth for the Court the role of the mitigation specialist as you saw it?

A.    Yeah, I was explaining what is entailed in the course of preparing for penalty phase, preparing mitigation for the penalty phase.

Q.    Okay.  I just want to take you through some of the points in this paragraph.  You say first, "Conducting a thorough social history investigation."

A.    Yes.

Q.    Can you explain for the Court what that means exactly?  What does it mean to conduct a thorough social history investigation?

A.    Okay.  From my perspective what it means is developing -- investigating the client's life, not only from the client but also from people who know the client, collaterals.  And that can be the whole nexus of people, many of whom testified, teachers.  It could be former employers.  There were some jobs, for instance, he had that were short.

We could have potentially have pursued those.  Family members, friends, neighbors, teachers.

So I don't necessarily mean preparing a narrative history of his life, but the social history investigation would entail going out into the world and obtaining information about his life.  That's what I mean by that.

Q.   Okay.  And is that done primarily through witnesses?

A.   Well, there was some confusion I think early on in this case that they thought I was going to be a testifying expert.  That never entered my mind because I haven't done that in years, so -- in terms of the mitigation case.  Okay.  So it would be developing a nexus of people who can tell Billie Allen's life story through their eyes basically, his life story, his social history through their eyes.

Q.   Okay.  The next thing you write, you note is, "Identifying factors in the client's background or situation that require expert evaluations."

A.   Yes.

Q.   In this -- I'm sorry, go ahead, explain.

A.   So, yeah, that's -- so you're going to want to find factors of like the seizures and the brain damage and history of head injuries, things of that nature.  Learning disabilities.  Did he have difficulty in school?  And depending on what you find in the social history, that's going to guide what kinds of experts you're going to want to

bring in.  So that's a big part of it.

Q.    Okay.  And the next thing you mentioned is, "Providing background materials and information experts to enable them to perform competent and reliable evaluations."  Is that important?

A.    That to me is critically important.  Because you want your -- your experts are not going to be going out and doing their own interviews, they are going to be relying on what's being provided to them.  So you can bolster their evaluations by providing them with complete information, accurate information in a timely manner.  And so that's one role -- another role of the mitigation expert is to find that information.

Q.    Okay.  To find that information and get it to the expert?

A.    Yeah.

Q.    "Consulting with the attorney regarding the development of the theory of the case and case strategy."  That's something else that is necessary of a mitigation specialist?

A.    That can be part of it.  That can be part of it.

Q.    "Thereby assuring coordination of the strategy for the guilt/innocence phase with the strategy for the penalty phase."  Does that happen sometimes?

A.    Well, yeah, you would like to have some consistency across phases.

Q.    "Identifying potential penalty phase witnesses."

A.    That's the most basic, most important piece of it.

Q.    "And working with the client and his or her family while the case is pending."

A.    That's important also given that the client is oftentimes from a difficult home environment, and their family -- there's a lot of people impacted by the crime, his family is one of those groups.

Q.    And when you included all this stuff in paragraph 7 that we've just gone through, are you trying to convey a sense that this, you know, takes a lot of time?

A.    That was my intent.

Q.    Is this something that you think can be done in, you know, three weeks to three to six weeks, or is it something that should have been done over, you know, the earlier months before January and February of 1998?

A.    In terms of competently done, it could not be done, I don't believe, in the period of time that we had.  What I would have wanted -- I would have wanted to have come in at a point when the stuff that we had done had been already done. So it would have been at a much later stage.

Q.    Okay.

A.    Even longer, I mean, to be quite honest.

Q.    And just to clarify, because you've said the word a couple times, you thought the lawyers made a mistake or they

dropped the ball.  And are you saying that their mistake or dropping the ball was not performing these tasks at an earlier time?

A.    Well, that's part of it.  But I feel that in the cases that I've worked on as a mitigation expert, I maintain real open lines of communication with lead counsel.  So if I, you know, start a case, you know, trial is a year out or whatever, counsel brings me on early on.  We have a working relationship over the course of that whole time line.  So what was striking in this situation was that up until December apparently, there had been no communication or minimal communication between, from what they told me, Sindel and --

MS. COSTANTIN:  Your Honor, I'm going to object to hearsay, what he's been told.

THE COURT:  The question -- or the witness started to say up until this time there had been no communication or minimal communication between counsel based upon what Sindel, and then I got the objection.  And the objection is hearsay?

MS. COSTANTIN:  My objection is hearsay exactly as to what this witness was told by other witnesses about what happened and what was said by Dr. Haney.

THE COURT:  You can testify about your conclusions after talking to them, but you can't say what they said. Sustained.

THE WITNESS:  I can tell you about my conclusions?

THE COURT:  Yeah.

A.    Okay.  Based on what they told me, my conclusions were there was very poor communication between counsel and the expert.  And that led to my conclusion that they dropped the ball on the case, because in my experience that should never have happened.

Q.    Okay.  I want to talk to you a little bit about Mr. Sindel.  Mr. Sindel, as you said, was the lead counsel on the case; is that right?

A.    Yes.

Q.    And through Ms. Casperi, he's the one who brought you on to be the mitigation specialist?

A.    Yes.

Q.    When you first started working on the case or at any point during your work on the case, did Mr. Sindel ever discuss what he had learned about Billie Allen's mother, Juanita Allen?  Did he ever discuss what he learned about her background or history with you?

A.    If what you're saying or asking is that did I receive anything of any substance -- did I receive anything from Mr. Sindel about Juanita's background or social history, the answer would be no.

Q.    Did Mr. Sindel any time ever tell you about any investigative efforts that he made concerning the development

of mitigation in this case?

A.    My sense, he was more focused on the guilt/innocence phase, and I don't recall him telling me anything like that.

Q.    All right.  Was there any indication that any member of the trial team had a conversation with Juanita Allen about possible abuse and neglect of Billie Allen?

A.    I saw no evidence of any kind of communication like that.

Q.    Was there any discussion or were you made aware that questions of abuse had been asked by members of the legal team of other family members of Mr. Allen?

A.    I was not informed of any types of discussions of that nature.

Q.    What about with other witnesses, non-family witnesses?

A.    At the time I came into the case?

Q.    Yeah, and throughout your experience in the case, were you ever made aware of any conversations where trial counsel or other members of Billie Allen's trial team asked questions of witnesses about abuse and neglect issues?

A.    The only time that that could have potentially happened that I know of was during our joint witness prep session with Raymond Petty, where there was an incident that he described with Billie being beaten by an extension cord, and him having to intervene to stop Juanita from continuing to do that.  So prior to that there was no discussion of any information from

them about abuse that they knew, that I didn't know.

Q.   So if Mr. Sindel had discussions with potential witnesses about abuse and neglect prior to your involvement in the case, would it have been your expectation that he would have shared those discussions with you?

A.   Obviously, yes, I would -- yes.

Q.   Did Mr. Sindel ever tell you that he had developed a Life History of Mr. Allen?

A.   The only Life History of Mr. Allen that I know of is this so-called Life History, this draft of notes that Mr. Simon prepared.

Q.   Did Mr. Sindel ever tell you that he had a life -- strike that.  Did Mr. Sindel ever tell you that he had a Life History of Mr. Allen that he had not written down?

A.   No.

Q.   If Mr. Sindel had a Life History of Mr. Allen that he had not written down, that he had not committed to memorandum, would you have wanted to know about that?

A.   Yes.

Q.   Would you have expected that Mr. Sindel would have told you about that Life History?

A.   I would hope so.

Q.   Now, you testified that you didn't know Mr. Sindel when you first got involved in this case; is that right?

A.   Correct.

Q.    Did you develop a relationship with Mr. Sindel after you started working on the case?

A.    A working relationship?  Yeah.

Q.    Of course.  How was your working relationship with Mr. Sindel?

A.    As we proceeded to work on the case -- like after I got involved, you know, after he told me what was going on and after I got involved, initially my discussions were, you know, I need this, I need this, I need a retention letter, you know, this is what I intend to do, you know, and try to hit the ground running, you know, after my other penalty phase was done.  But -- and then over time, I think that him knowing that someone was finally on board, sort of let him focus more on the guilt/innocence phase of the case, and trusting that, you know, given my communication with him, keeping him in the loop, that something was being done and the ball wasn't being dropped this time, we ended up having I would call it a good collaboration.

Q.    And so was it your impression that Mr. Sindel liked your work ethic?

A.    Both of us had a good work ethic.

Q.    And did you, in fact, work with Mr. Sindel on another case after this?

A.    Yes, I did.

Q.    Would you say that you and Mr. Sindel became friends as

a result of this?

A.    We developed a friendship.  We've stayed in touch intermittently.  He had been seeing a new girlfriend, and they came out to Hawaii to visit me one time this past year.  So, you know, we do have a friendship.

Q.    Okay.  And I want to ask you a couple questions about rapport.  Is building rapport with witnesses an important part of what you do as a mitigation specialist?

A.    It's like a very basic, important thing that we do.

Q.    And why is that?

A.    Because by developing rapport, you over time get them to reveal things that they might at first not feel comfortable revealing.  You want to develop a relationship with them of trust.  And so that's part and parcel of a mitigation approach.

Q.    And generally speaking, how does a mitigation specialist develop rapport with witnesses?

A.    Well, oftentimes during the first interview it's more focusing on basic facts, times, dates, places, people, list of potential leads, other people who I can talk to, their phone numbers, where Billie went to school, you know.  Had the client had any kind of medical history, what was it, what hospitals were they at.  And also coming into a case that's highly emotionally charged like a death penalty case, people are at different places emotionally.  Client's families are

different places emotionally.  And you have to sort of be sensitive to that, so -- because you want them to share with you ultimately.

Q.   So would you say there's different stages in terms of when you're trying to develop a rapport, that it is a multi-step process?

A.   I would say yes.

Q.   And the first step, I think you just described is sort of, you know, initial, non-heavy conversations; is that right?

A.   Yes.

Q.   All right.  And then what would you do normally?

A.   Well, it takes multiple meetings, it takes time.  Some people it's easier to develop a rapport than others.  Some people are different temperamentally than others.  But typically you have repeated meetings with folks to continue gathering information and maintaining that trust.

Q.   And the ultimate goal of rapport building in investigating mitigations is what?

A.   Is obtaining as much helpful information as possible in terms of what I would call positive mitigation and negative mitigation, and then enlisting the person's cooperation.  So there's some people who might be reluctant to testify, let's say, and by developing rapport over time, they are more on board with that.  You know, they are less afraid of it or

that kind of thing.

Q.    In your experience as a mitigation specialist is rapport building something that you try to do in every case or is it something that's unique to cases?

A.    I do it in every case, and I also do it in my work now.

Q.    Now, when you came on board with Mr. Allen's legal team, did you have any concerns about rapport between Billie's legal team and potential mitigation witnesses?

A.    I don't know.  My sense was that given how far along they were in their case, that -- I don't know, "concern" is just too strong a word I think.

Q.    Well, did you have an understanding as to whether Mr. Sindel or Mr. Simon had established rapport with Juanita Allen when you got involved in the case?

A.    My sense was that they had established like a basic rapport with her, like keeping her in the loop about dates and times and, you know, things of that nature.

Q.    Was that the type of rapport that you would think -- that you would want to have established to get into sort of the heavier stuff or the family secrets, things of that nature?

A.    That would be a preliminary stage, yes.

Q.    So is it your impression that you would want something greater in terms of the relationship between Juanita Allen and the trial team than what you had at that point?

A.    That's a hard question to answer.  I'm not sure how to answer that question.

Q.    Well, based on what you saw, based on what your understanding was of the level of rapport that either Mr. Sindel or Mr. Simon had with Juanita Allen, if you were in their shoes I guess, would you feel comfortable with at that point in time broaching more serious subjects of mitigation?

A.    Well, all I can say is I didn't feel comfortable broaching those subjects by the time -- you know, when I entered the case.  And as I worked on the case, I hadn't had time to develop it in that time period.  And given what I was presented with, I got really no meat, no visceral information about abuse or anything like that from them by the time I entered the case, and I certainly would have expected that.

Q.    When you say from "them," are you talking about the trial team?

A.    Counsel.  So by the time I -- several months into the case, they had been working with -- they had retained mitigation experts, supposedly working with one, they should have been further along.  And by the time I entered there should have been some real meat, so to speak, especially about the abusive information at that time.

Q.    Okay.  Let's just talk a little bit more about your role in the case.  When you started working on the case,

recognizing that a minimal amount of mitigation work had been done by the time you came into the case, what was your plan for developing mitigation?  How were you going to go about doing this?

A.    Well, my plan as I outlined in that letter was I was going to interview, do a first round of mitigation interviews with folks I found.  And then I believe the letter said start preparing some rough draft examination questions and then do followup interviews.

Q.    I'm just going to point your attention back to Exhibit 340.  When you said "the letter," is this the letter that you're referring to?

A.    Yes.

Q.    And so is what you're talking about, what you write here in this letter, "Following the initial round of interviews, we can sketch out a rough draft -- I'm sorry -- a rough direct of each potential mitigation witness and then conduct followup interviews soon thereafter."

A.    This is my impression of the plan three days into the case.

Q.    Okay.

MR. MONTROY:  Your Honor, if I could just have a second?

THE COURT:  Sure.

MR. MONTROY:  Thank you.

BY MR. MONTROY:

Q.    All right.  So was it your plan then to have only one meeting before drafting the direct examination, one meeting with a witness before drafting the direct examination?

A.    Based on what this fax says, that was the initial plan, but that's not something you typically want to do.

Q.    Why is that?  Why is this not a plan you typically want to do?

A.    Well, I had described earlier in the motion and the affidavit for the continuance that mitigation is an iterative process in the sense that it builds on itself, the investigation builds on itself.  So one set of leads will -- you interview some people, they will share about the person's life.  And then there will be information in their interviews that -- like other people who -- the one that stands out to my mind is Joyce Eaton mentioned, the teacher mentioned that she learned from her students, one of his classmates what happened in this situation.  So that student would have been a person who I would have wanted to track down and interviewed as well.

So but once you do the initial round of interviews of people, there's followup interviews you need to do with the same people, with many of the same people.  Because of the rapport question you had posed earlier, the initial round of interviews, you might not get the whole story.  You might

learn from, say, Raymond Petty at the very end of our, towards the end of our mitigation investigation, you might learn about that incident of abuse with the extension cord where he was getting whipped and he had to intervene.

And then in subsequent interviews I would go, you know, I would have ideally wanted to have gone to other family members and say, this is what I learned -- or I wouldn't have said this is what I learned from Raymond first, I would have said, what can you tell me about the abuse that might have gone on in the house? I would try to be nonleading at first. Then later on I would bring, well, I learned from Uncle Raymond that this happened. Was anyone else there when that happened, blah, blah, blah, blah.

So you would take information and you would follow up on the information with other people. And that can go back and forth. So just doing one initial round of interviews and then preparing some directs and then followups, I mean, that's not the ideal way you want to proceed.

And had we -- had I -- well, had we been involved early on when, let's say -- the way I practice, if I had been retained back in the day instead of Dr. Haney, I would have had time to have moved this investigation way further along than it was at the time when I did come in. Okay.

Q.    So is this process where you've described going,

following up and seeing witnesses multiple times, learning information from witnesses, and then going to back to other witnesses, is -- how long in your experience does that process take place?

A.    Well, I've said before that it can take -- you know, typically it takes a year.  And sometimes I've worked on cases much longer than that.  I've had the good fortune to do so.  I've had one case when I tracked down the brother of a client, it took me two years to do it.  So I knew -- you know, so you learn things.

Q.    And so your testimony is that if you had been involved in this case, you know, from the beginning, this is a process that you would liked to have employed, this process that you've just described?

A.    I would have employed the more normal process rather than the emergency process.

Q.    Well, how is this in your view, this process you set forth on January 19th, 1998, how was it flawed?

A.    I think it's flawed because there's no real appreciation -- I basically -- we ran out of time at the end.  There was no time to close the loop on a lot of things.

So, for instance, the first thing I asked Billy or one of the first things I asked Billie was about the jail guards.  So who is the jail guards, who did you interact with, what do they think of you, who is next to you, what do

you think of them, you know.  And I would have liked to have closed the loop and have interviewed and gotten information from those guys or men and women as well.  That's just one example.

But we ran out of time.  There was really no followup interviews -- I mean, very few followup interviews. So the clock ran out basically.

Q.    So was this the process that you ultimately ended up using; the one interview, direct, followup interview, or were you not even able to do this in some circumstances?

A.    I mean, sometimes I just spoke to -- I only had time to speak to people on the phone, I didn't even have time to go out to see them.

Q.    Do you consider that to be a problem?

A.    That is problematic.

Q.    And why is that?

A.    Because face-to-face is -- you get -- there's a lot of nonverbal communication that goes on with folks.  You get to size them up.  There might be certain intonations of certain things like they are paying attention to what I'm saying or they'll follow up.  When I do interviews, I want to pay attention to what's going on because I want to follow up with things.

Q.    So generally in other cases that you worked on, is that what you would do, more face-to-face interviews than phone

interviews?

A.     I would have the time to do that.  And, I mean, I've had cases where I traveled to Kansas from Illinois on state cases to find witnesses in Salina and other places.  Or through the Bootheel or through, you know, West Plains.  I've been all throughout Missouri on cases traveling, finding people in different cases.  So ideally that's -- I have the time to do that ideally.

Q.     Are there limitations to sketching out a rough direct examination of a witness after an initial meeting?

A.     It's just very rough, because you haven't --

Q.     Well, I guess what I mean is when you do that, are you boxing witnesses in before you find out, you know, more information?  Is that something that happens or is that not a concern?

A.     The major concern for me would not be so much boxing in witnesses, but just having incomplete information from witnesses on which to base a direct that would glean what they could tell us, you know, the full picture of what they could tell us, so --

Q.     All right.  When you had the second meeting in this case or the followup meeting with the witnesses, could you describe how that meeting took place, who was there, where did it occur, what were the circumstances of the second meeting?

A.   Okay.  The second meeting, with one exception that I can think of right now for all the other witnesses -- I don't know if I'd say all, but for many of the witnesses, the second meeting took place, for many there was no second meeting but for some there was a second meeting that took place during the witness prep sessions that we had.  So as trial was ongoing, I was doing the investigation.

Then it got to a certain point where we were getting really close to the penalty phase, and it was time to start engaging Rick in meeting the witnesses.  And, you know, so that he would hopefully meet them before he put them on.  And so during these meetings, we had -- the one that I'm thinking of right off the bat is on, I believe it was January 21st and 22nd, I compiled a schedule of people who would come in like on the hour and we would jointly talk to them.  So that was the second -- so-called second meeting.

Q.   Did you mean January or February?

A.   I'm sorry, February.

Q.   I'm showing you Exhibit 383.  Do you recognize this document?

A.   I do.

Q.   I believe there's two pages.  And what do you recognize this document to represent?

A.   This is a Saturday, a schedule for Saturday and Sunday of -- it's called, "The Allen Weekend Interview Schedule Thus

Far."  And I was attempting to pack full days in to make efficient use of Rick's time and try to schedule people who I had spoken to so that he had a chance to meet them and get a sense of what their direct might be.

Q.    Okay.  And was this the meetings that you were just referring to that you remembered?

A.    Yes.

Q.    Okay.  And could you describe what that weekend was like?

A.    Well, it was -- the word that I used to describe it is it was like an assembly line of people; boom, boom, boom, boom, boom.  One would come in, we would talk, they would leave.  One would come in, they'd talk, they'd leave.  So we were on a tight schedule because there were just so many people, we had to basically cram them in to these weekends.  And this was the time -- this was the time that was available to do this, and it was during the day of the weekend.

Q.    Okay.  And when you were doing this during the week, was the guilt phase of the trial going on?

A.    I believe so.

Q.    Okay.  Was this -- it sounds like you're describing a chaotic situation, is that right, or did you have some order to it?

A.    It was hard to keep straight what was going on.  It was probably chaotic.

Q.   Okay.   And who was present during these sessions with the witnesses?

A.   I recall that Rick was present.

Q.   Okay.   And would you describe these sessions as information gathering or was it more preparation for the trial?

A.   It was more preparation for the trial.   There was an element of information gathering, but it was more preparation for the trial.   So, for instance, like with Raymond Petty, in my initial interview with him a few days before this, I'm not sure exactly what day that was, but in my initial interview, he mentioned the incident of the extension cord, the beating that Billie received.   So during this witness prep session, you know, we asked him more about that.   He elaborated more about that.   He described it in more detail.   So you could call that new information.   And there might have been some other new information presented, but for the most part it was building on the information that I had already collected.

Q.   Okay.

A.   For the most part.

Q.   Was Rick going to see these witnesses again before he had them on the witness stand or was this it?

A.   This was it.

Q.   In your experience as a mitigation specialist, is this sort of an ideal way to -- for counsel to meet with witnesses

for the first time?

A.    Not really.  There was a case I worked on where the attorney came -- after my first round of interviews, she came to the homes of the people who I had interviewed so she could get a really good sense of their life and their demeanor and their presentation.  And meeting them in their home environment, they were more comfortable in a sense than coming into an office.  And that was a really, really difficult case.  Far more -- well, I won't go into that.  But that was the way that I'd want to do it.

I had another case, it was a Missouri state case actually, where the client was from Ohio and had done sort of a Thelma and Louise cross country thing and ended up in Missouri.  And there were two attorneys here who ended up -- I said, you guys need to come to Ohio.  So we went to Ohio, and they got a chance to --

Q.    Well, let me ask you this:  If you had been working on this case earlier on as opposed to, you know, starting in January, would you have wanted Mr. Sindel to have more contact with the witnesses?

A.    No doubt.

Q.    Was there -- if you know, were there any witnesses who you ultimately presented at trial as mitigation witnesses that Mr. Sindel didn't have the opportunity to meet before they testified?

A.    I don't have an accounting of every single witness, every single witness that Rick met or didn't meet.  What -- we had these prep sessions and then after each day of the penalty phase, we met at night with other witnesses who were going to be testifying the next day.  So that was the first time for him to meet most of those people, all those people, most of those people as well.  So this assembly line type of process that we did led to a very seat-of-the-pants direct at times, unprepared.  There may have been some that he didn't meet.  I think there were some that he didn't meet, but I'm having trouble right now identifying some.

THE COURT:  We're going to take about a 15-minute break.

MR. MONTROY:  Okay, great.  Thank you, Your Honor.

THE COURT:  Court's in recess 15 minutes.

(Court in recess from 3:38 p.m. until 3:58 p.m.)

MR. MONTROY:  May I continue?  Thank you, Your Honor.

THE COURT:  Whenever you're ready.

BY MR. MONTROY:

Q.    I just want to ask a couple more questions from where we left off discussing this work this weekend, this prep session weekend on February 21st and February 22nd.  Do you recall when the penalty phase started in this case?

A.    The specific date escapes me right now.  I think it was

March 2nd or 3rd.

Q.    So was this meeting pretty close to -- in time to the start of the penalty phase?

A.    Yes, it was getting to that point.

Q.    Was there any plan that you discussed with Mr. Sindel or that you didn't discuss and was in your head for the followup with witnesses based on, you know, new information that may have come to light during these prep sessions?

A.    I did those types of followup interviews as I could. Like so there were some people I spoke to more than once. But how should I say this, this whole process was -- I essentially had to immerse myself completely into this process. And it was a nonstop, ongoing -- there wasn't a lot of time to -- for deliberation, so to speak.

        So I interviewed who I could when I could in terms of their schedules, in terms of mine. And there were some people, a handful who I interviewed more than once. Like the one that stands out is John Lents, the administrator from Clayton who I spoke to, I think, three times on the phone. There were some people I talked to twice on the phone. Deborah Ruffin, I think I met with twice. But that was the minority of cases, I believe.

Q.    Okay. So, I mean, were you -- was that a result of the time frame that -- or why did you not --

A.    Well, we basically --

Q.      -- follow up?

A.      -- ran into a wall, a time wall that is.  I mean, there were some people I didn't interview even for the first time. Like I never really had the time to close the loop on the jail personnel.  And it was as if the situation of the day was what needed to be dealt with.

When the FBI became involved, for instance, they came -- you know, we were provided some discovery after their interviews.  And then I would have -- you know, I had to follow up with that and seek out those witnesses and see what they had to say.

Q.      Was the -- talking about the FBI for a second, was the FBI contacting guilt phase witnesses or mitigation witnesses?

A.      They were contacting penalty phase witnesses.  They were contacting, I think, people who could provide aggravation.  It was the sense I had.  So -- or what they perceived to be aggravation.  It's not real aggravation in my mind, but they perceived it to be aggravation.  So like for instance, the people at Sumner High School, the VP, the principal.  So to me it got to a point where it was a highly reactive situation where I was just doing what I could do in the moment essentially.

Q.      Okay.  One more question about the FBI.  Was the FBI going out and speaking to penalty phase witnesses, did that enhance your penalty phase investigation at all?

A.     What do you mean "enhance"?

Q.     I mean, did it assist you?  I mean, thinking from the perspective, okay, well, you know, the FBI is going out, they are seeing witnesses, couldn't you just take the work they did and add it to your investigation?  Was it beneficial or was it detrimental, I guess?

A.     It ultimately added to the work load in the sense that I needed to go out there, interview those people and either, you know, neutralize, you know, work to try to neutralize their aggravation, reframe that in a way, you know, or find mitigating information from these potential aggravation kinds of witnesses, you know.  Either way I had to try to diffuse it or I had to try to seek mitigating information for us.  And we ended up actually calling those people.

Q.     Let me ask you this:  Was that something you anticipated when you got -- first got involved in the case in terms of going and seeing witnesses because, you know, the FBI was seeing them as aggravation, as potential aggravation evidence?

A.     That was the first time that I had ever encountered such a thing.  And there were a couple instances where the agent and I passed each other, and they were coming out and I was going in.

Q.     Okay.

A.     It was unique in my experience.

Q.   And we'll come back to some of the time factors, but in terms of the question about this weekend, February 21st and February 22nd, was it your feeling that there were witnesses that you saw that weekend and information that you ascertained that weekend that you would like to have followed up on but didn't get the chance because of the time crunch?

A.   The interviews that I had done up to this point were first interviews, preliminary interviews most of the time. So, you know, not only would I have liked to follow up with them particularly, but, you know, there was information that people provided to me that I would have liked to followed up. At crossroads as well, not just linearly with those people but with other people.

Q.   So you would liked to have taken information that you learned and asked other witnesses about that information?

A.   Correct.

Q.   And did you feel that you were precluded from doing that?

A.   I just felt in the moment that we were doing what we could to basically survive this process, that we were trying to prepare in a very compressed time frame.  And I don't recall -- there were elements of weighing certain types of evidence, certain types of information, but I don't recall -- we didn't have the time to really deliberate and process this massive amount of information that was coming in so quickly.

So that was a severe impediment in my opinion.  And that would not have occurred had we started this case, you know, many months before when it should have been started.

Q.    Okay.  Well, let me ask you this:  Looking at this Exhibit 383, this schedule for Saturday, February 21st, and Sunday, February 22nd, if you were having these meetings, say, in November or December of 1997, would that have changed the picture in your mind in terms of what you would have been able to do for followup?

A.    Oh, yes, it would have added two months to the process. And 120 days would have added more, you know, obviously.

Q.    And given when this case was I guess initially authorized as a death penalty case or when there was an indication that it might be authorized, would you expect something like this, like these sorts of interviews going on on February 21st and February 22nd to normally be happening much earlier in the process?

A.    Yeah, it would have been much farther along, you know. And not only these interviews but also before this process would have started, you would have had those followup interviews going into this process.  So in terms of preparing for the direct, you'd have much more meatier, fuller information, a fuller picture, so the direct of these people would be more effective.

Q.    So is it fair to say then that there should have been

more work done before this kind of prep session took place?

A.    Absolutely.

Q.    I just want to go back a little bit and talk about the roles that different people played in Mr. Allen's team, so to speak, or at least how you understood them.  What -- how did you see your role once you got involved in the case?  What was your role going to be in terms of developing the mitigation for the penalty phase?

A.    Well, once I got involved, I tried to make it clear to the team what I thought my role should be.  I had no opposition to that.  And that was that I was going to be doing -- I was the one that was going to be contacting the mitigation, potential mitigation witnesses and interviewing them -- excuse me, interviewing them.  And are you talking about my complete role?  I mean --

Q.    Are you saying that you were basically sort of taking the lead role in developing mitigation from that point forward?

A.    Yes.  And then I also, early on I provided like closing -- sample closing arguments to Mr. Sindel from cases that had been successful in terms of obtaining a sentence other than death.  And they provided some potential ideas that he could integrate into his closing eventually.  And I didn't know him, so, you know, I wanted to sort of take some things that I knew could be potentially helpful and help him

along with that process.

Q.    And I think you testified that Mr. Sindel was focusing on the guilt phase, was that your words?  I don't want to put words in your mouth.

A.    Yeah.  Once I became involved, you know, I took the mitigation stage.  And it was clear that he was only focused on the guilt stage.  And to me, it was apparent that he was only focused on the guilt stage even prior to that.  Because the sense that I had was that Mr. Simon was focused more on the mitigation stage when I entered, and so --

Q.    And you've described for the Court to some extent what Mr. Simon's role was once you got involved, so I don't want to rehash all of that, but was Mr. Simon involved in developing mitigation once you were on the case?

A.    Once I got involved, he was not involved with me in terms of the process I was doing.  To my knowledge, I never obtained any information from him about anything related to mitigation, you know, except for that so-called Life History.

So at that point I saw his role -- you know, my understanding of his role was he was just more second chair. I thought he was helping Mr. Sindel with legal aspects of the case, motions, things like that, support.

Q.    Okay.  So at any point in time was Mr. Simon -- while you were involved in the case, at any point in time was Mr. Simon developing direct examinations for penalty phase

witnesses?

A.   None.

Q.   When you were involved in the case, was there any indication that Mr. Simon was going to be presenting witnesses at the penalty phase?

A.   Absolutely not.

Q.   I guess then was his role a rather limited role once you were involved in the case?

A.   That's the sense I had, yes.

Q.   Confined to sort of legal stuff?

A.   Yes.

Q.   Did Mr. Simon -- are you aware he did write the Motion for the Continuance?

A.   He did.  And he also actually did my direct.

THE COURT:  And did what?

THE WITNESS:  The direct examination when I testified in support of the Motion for the Continuance.

BY MR. MONTROY:

Q.   And just to be clear, a couple points about Mr. Sindel, I think you've been pretty clear about this, but just to be certain, during the mitigation investigation while you were involved in the case, was the plan for Mr. Sindel to identify any mitigation witnesses?

A.   The plan as far as I knew after I wrote that e-mail -- wrote that fax saying, you know, I want to basically take

charge and do it, no one else was involved in that.

Q.   So Mr. Sindel as far as you knew was fine with you handling the mitigation investigation that way?

A.   Right.

Q.   Do you know, was Mr. Sindel, was the plan for Mr. Sindel to contact any mitigation witnesses even while you were working on the case?

A.   The way that the plan was, was I was doing that.  I was contacting the witnesses, and then when I was done or at whatever point I would bring him in, which is what I did.

Q.   Okay.  Are you familiar with a person named Andrew Rackers?

A.   I know the name.

Q.   And who is Mr. Rackers as far as you know?

A.   He's an investigator.

Q.   And did he have a role in Mr. Allen's case?

A.   From what I understand, he did.  But in terms of any interaction with me, zero.

Q.   Okay.

A.   That I recall.

Q.   So did you actually ever meet him?

A.   Not that I recall.

Q.   As far as your understanding was when you got involved in the case, was Mr. Rackers going to be participating at all in the mitigation investigation?

A.    My plan, as I said before, was that I was going to be doing that, and there was never any hint of Mr. Rackers being involved in that.

Q.    Based on your understanding at the time -- I'm sorry, go ahead.

A.    Knowing that Mr. Rackers was an investigator that Mr. Sindel had, there was a certain point where when I was obtaining different records, there was one point where I wanted to get some records, I think it was from Clayton schools.  And I sent a fax to Rick and Connie saying, is it more -- basically I was saying, you know, is it quicker for me to do it or is it quicker for Rackers to do it?  That was the extent of the involvement with Rackers.

Q.    Beyond that, were you aware of any investigation that Mr. Rackers had done in terms of the mitigation investigation?

A.    The only thing that I'm aware of, and I became aware of it as part of this process, was a letter that he received, that was addressed to him from Clayton schools, I think, saying we have no records.  That's the extent of what I know. I didn't know that at the time, I don't believe.  Because I went to seek the same records, so --

Q.    So if Mr. Rackers had done any investigation on the penalty phase, is it your testimony that you didn't know about it?

A.    Correct.

Q.    Do you know if Mr. Rackers was working on the guilt phase investigation?

A.    I really don't know what Mr. Rackers was doing, but that's what I assumed.

Q.    Did Mr. Sindel ever tell you that Mr. Rackers would be working on the mitigation investigation?

A.    No.

Q.    Now, you've mentioned Connie Casperi a couple times. What role did she have in terms of the mitigation case?

A.    Connie Casperi was oftentimes my liaison, my contact person with Rick's office. So that was the extent of my contact with her. You know, like if I needed something, if -- like around the records for the schools, I sent the fax to her and Rick, I believe. You know, who should do it, Rackers or me? She was more of a liaison between me and Rick than anything else.

Q.    Well, let me ask you this: Why did you need a liaison for Rick? Why didn't you just contact Rick yourself?

A.    Well, it's like Rick's secretary in a sense. I mean, that was -- she was more easily -- she was in the office a lot and --

Q.    Well, was Rick not in the office? What was Rick's availability, Mr. Sindel's availability?

A.    I think he was focused more on the guilt phase part.

And back to the original question about Connie's involvement, she never participated in any type of interview, anything that I did. To me she was a liaison, somebody who I'd call if I needed something or if I needed to leave a message for Rick.

Q. Were you ever made aware of any mitigation investigation that Connie had participated in prior to your involvement in the case?

A. All that I know is the materials that she sent me. So I have no idea what her role was in obtaining those materials. But in terms of after I got involved, I don't think she did anything.

Q. Okay. Was your plan to use her at all in the mitigation investigation?

A. Not really, no.

Q. Okay. Other than -- well, strike that. Was there ever an investigator -- and of course this is what you were aware of, all right. Was there ever an investigator who was assigned to developing mitigation in Mr. Allen's case working on this case prior to your involvement?

A. The only person who I'm aware of is Dr. Haney.

Q. What about after you got involved in the case, were there any other investigators who joined the team or were there any other people taking an active investigation role, you know, in the case other than, you know, those who had

been mentioned so far?

A.    No.

Q.    All right.  Now, do you recall that you essentially started your investigation on January 20th, 1997, in terms of -- I'm not counting when you spoke to Mr. Allen earlier that weekend, but in terms of doing stuff extraneous to meeting with Mr. Allen, do you recall the date being January 20th?

            THE COURT:  1998?

Q.    Oh, 1998, I'm sorry.

A.    As I sit here, I don't recall that specifically.

Q.    Do you recognize this document?  And for the record it is Exhibit 54.

A.    Yes, I do.

Q.    Let me go back up.  There.  Do you recognize this document?

A.    Yes.

Q.    And what is this document?

A.    It's basically -- the top page is a voucher for my final bill for the case, for my time on the case.

Q.    Okay.  So this is a document that you submitted to the Court so you could be paid?

A.    Yes.

Q.    And I just want to point your attention to the second page.  Do you see the entry for January 20th, 1998?

A.      Yes.

Q.      "Pursue mitigation leads, phone potential mitigation witnesses, attorney, psychologist."  That's one hour and 20 minutes?

A.      1.2 hours.

Q.      1.2 hours.  Okay.  And so would that be the date that you started your investigation?

        MS. COSTANTIN:  Judge, I'd object to the start -- characterization of start the investigation.  We can see the time sheets.  There's earlier work that he's doing.  I think that might be Dr. Randall's hesitation in answering that question.

        THE COURT:  Earlier he was asked other than interviewing Allen if the investigation started on the 20th, and he said he didn't recall.

BY MR. MONTROY:

Q.      I worded that a little awkwardly.  So let's just go through your bill briefly just to see what you did and when you did it in the beginning days.  I think you testified earlier that on January 16th, that's when you spoke with Mr. Sindel's office, specifically Connie, about taking the case; is that right?

A.      I think I spoke to her on the 15th.

Q.      Okay.

A.      And then on the 16th, I talked to Rick.  And I believe

I received the phone numbers of Juanita and Otha and the document that John Simon had prepared.

Q.    Okay.  And the 17th, that's what you described when you came down to St. Louis from Evanston and met with Mr. Allen?

A.    Right, the next day I came down.

Q.    And you also spoke with Mr. Sindel that day?

A.    Yes.

Q.    That's the day you looked at some --

A.    I likely met with him at his office that day.

Q.    And that's the day you looked at some records that day?

A.    Yes.

Q.    I think you described as police records, discovery, and some medical records?

A.    About the offense, and -- yeah.

Q.    Okay.  So the 19th, you're looking over some of the documents that you have, is that fair, a file review?

A.    What that looks like is I'm looking over the mitigation documents that they had given me.

Q.    Okay.

A.    So the medical records, the school records, all that.

Q.    The Life History?

A.    And then when I say correspondence, what that is is based on when I did my interview with Billie, he signed releases for me.  So then on the 19th, I'm preparing letters to the various places where I can get documents.  So that's

what that refers to.

Q.    All right.  And on the 20th, that's the first day that you phoned any potential mitigation witnesses; is that right?

A.    Yes.

Q.    Prior to that you hadn't tried to contact any witnesses in the case?

A.    Not that I recall.

Q.    Okay.  And not that you billed for, right?

A.    Right.

Q.    Okay.

A.    And that might be the week of the other hearing as well.

Q.    When you say the "other hearing," you mean that's the other capital case you had going on in Illinois?

A.    Right.

Q.    Do you remember what day the trial was going to start?

A.    Not -- day of the week, not that I remember.

Q.    Or the date.  February 9th, right?

A.    February 9th.

Q.    Okay.  You know, I think you've touched upon this, but just to be clear, was working from January 20th to February 9th an adequate amount of time to conduct a mitigation investigation?

A.    On its face, that's an absurd assumption.

Q.    Why is that absurd?

A.   Just because of what I described before about what's involved in a mitigation investigation in terms of -- someone's life is on the line.  You have to go into their life, find people who know them, interview them, build up rapport with them, follow up with them, find the network of people who had contact with him throughout his life; teachers, neighbors, coworkers, guards.  That's just too much to do in that period of time.

Q.   Okay.  Well, what about from January 20th, you know, to the start of the penalty phase in the first days of March?

A.   My answer is exactly the same.

Q.   Okay.  So I think you said that you sort of went all in when you decided you were going to work on this and you came down, you were going to be all in in terms of your work on the penalty phase; is that right?

A.   Right.

Q.   I mean, did you work pretty hard?

A.   Everybody worked hard, yeah.

Q.   Okay.  How would you describe the investigation from the point that you started until, you know, you concluded, whenever you concluded actually.  When did you conclude?

A.   We were still -- I think it might have been the last day of the penalty phase when I tried to get ahold of Wuertz, Dr. Wuertz.  So we were running right basically up to the wall.

Q.   Well, how did working on this case, working on this mitigation case from January 20th until, you know, throughout the penalty phase, what was your sense of how it was proceeding?  How did it feel?

A.   It was like being at war.  It was very chaotic, very -- it was like I said earlier, it was like a totally immersive experience.  I don't know if I'd call it seat-of-the-pants, but there was so much information that was coming in all at once, it was impossible to really process it and make rational, informed decisions in terms of directions in certain aspects.  It was, how should I say -- as this was going on, so much energy went into this, it was sort of like a light bulb before it goes out, you know, how it like glows and then burns.

Q.   That's what it felt like?

A.   (Nodding.)

Q.   So in terms of the effort that was -- in terms of the effort that was put forth by yourself, I mean, do you have sort of any regrets about the effort that you put into the case?

A.   I have regrets about the outcome.  In terms of the actual energy expended, I don't have regrets.

Q.   And what about in terms of Mr. Sindel, do you think he was -- was he doing the same, putting in a tremendous amount of effort?

A.    As the penalty phase went on and we were working into the evening and he was working all day also and going into the evening, he put forth intense effort as well.

Q.    Do you think and did you think at the time that this chaotic investigation, this chaotic pace that you just described, did it present any challenges that were unique to this particular case that maybe you hadn't experienced before?

A.    Are you asking did the compressed time frame create challenges?

Q.    Yes.

A.    Okay.  Well, many challenges.  I've touched upon them several times before about not being able to sufficiently follow up with witnesses with subsequent interviews and cross-interviews with other people.

Also in terms of establishing rapport with witnesses, with certain key witnesses like Juanita, for instance, I never felt that I had the time to really develop a rapport with her where I could get into some substantially delicate information with her.  That was huge for me.

I think also like in my experience, this was -- I've never dealt with a situation like this.  I've always had time to work on a case.  So I think that my style of interviewing, like being used to having time, I don't think I was as aggressive in terms of my interviewing like, you know, in

terms of like digging in right away.  That's not something that I did, because I've never had to do that before, and so --

Q.    That was something you did in this case?

A.    No.  No, I tended to do -- I was used to -- I had a certain style of how I worked because in other cases I had the time to work.  And I carried some of that style to this case in terms of the interviews.  So like, you know, I've learned like subsequently that Juanita said, hey, if you would have asked me -- if they asked me anything, I would have told them anything.  Well, I didn't know that at the time, okay.  I'm treating it as cases that I've treated my whole career.  So I'm not pushing her too hard, I'm not pushing her because I don't want to alienate her.  I don't want to lose her because of her temperament.  So that was a problem with the compressed time frame too.

One huge problem -- another huge problem was that had this case been done the right way early on, a lot of the experts would have been presented with a lot of information, and they would have been better prepared and not blasted out of the water I think like they were.

And I think we might have gone also with different, potentially different mitigators if we had more time. Because the PTSD mitigator was not, you know, was -- that's what we ran with at this hearing, but had we really had time

to analyze it, we might not even have gone with that.

So it affected -- the compressed time frame affected things on any number of different levels.  It also just in terms of the trial itself, the part I was not involved in, it would have impacted voir dire in terms of Mr. Sindel's approach to voir dire and witnesses' receptivity to certain kinds of information.

So had we done our -- had this investigation been done months before as it should have been done, he would have been better prepared even for the guilt phase.  And so this problem had ripple effects throughout the case.

Q.   Okay.  Based on your understanding of the case, is there -- was there a way that a lot of the problems that you just described, a lot of the problems that you encountered in developing mitigation, was there a way that those problems could have been avoided?

A.   Can you repeat that one more time?

Q.   Sure.  Sure.  You just described a series of problems that you faced and problems that you identified, you know, in the development of the penalty phase.  Was there a way that those problems could have been avoided?

A.   I think there were two ways.  The first way was if counsel had done that work in a timely manner when they had the chance to do so, that would have avoided it.  And then I think that had we gotten more time on the case, that would

have mitigated it, perhaps avoided it, I'm not sure, it's hard to say.

Q.    Is it your opinion that work on the case, on the mitigation case should have started earlier?

A.    Beyond the shadow of a doubt.

Q.    Now, the defense at trial presented the testimony of two expert witnesses; is that right?

A.    Yes, at the penalty phase.

Q.    At the penalty phase, I'm sorry, that' right.  Do you recall how Dr. Gelbort became involved in the case?

A.    Yes.  After I learned that there were some factors -- there was awareness on the part of the team that there were some factors in Billie's life; the febrile seizures, the pica, the head injuries, et cetera, that would be sort of grist for the mill for a neuropsychologist, so I told them immediately, I said, you need to get a neuropsychologist involved in this case.

Q.    Okay.  I'm going to point your attention to Exhibit 362.  Do you recognize this document?

A.    Yes, it's a fax that I sent to Rick on February 2nd, 1998, regarding the potential experts who I talked to.  One who I talked to and another one who I was aware of, two neuropsychologists.

Q.    Did you think it was important to have a neuropsychologist in this case?

A.     I thought it was very important to have one.

Q.     And why is that?

A.     Well, part of our job or our duty was to try to get information about the client's life in front of the jury so that they could understand how he got to the point he did, and perhaps consider those factors in determining his moral culpability for what he did or in terms of the type of punishment that they felt that he deserved for the offense.

So oftentimes the prosecution side-talks about choice, free will, and things of that nature.  Psychological data oftentimes helps explain that there are factors that impinge on someone outside of their control that impact the way they function, the way they cope, the way they behave.  And it was important for a jury to understand about those factors.

And a neuropsychologist can explain a piece of the mitigation puzzle.  That was the type of expert that could do it.  A psychologist could also do it potentially.  I've had cases where I've called the school psychologist in.  That would have been helpful potentially in this case too.

But you need experts to help convey to a jury the relevance of certain things, the importance of certain things.

Q.     Okay.  And were there factors specifically, actually I think you -- without rehashing it, you mentioned some factors

about Billie's life, the seizures, the lead paint, those are the factors that indicated to you that you should get a neuropsychologist; is that right?

A.    Yes.

Q.    Is it because those are factors that are synonymous with potential brain damage?

A.    They are synonomous with several things, one is potential brain damage.  But they are synonomous with factors that impact brain functioning.  So damage and functioning.

Q.    And was it a fairly obvious decision for you to get a neuropsychologist at that point or was it something you struggled with?

A.    It was instantaneous.

Q.    Had the trial team prior to your fax here, or prior to discussions you had with the trial team, had there been any discussions that you were aware of to retain a neuropsychologist?

A.    None that I'm aware of.

Q.    And in this -- I'm sorry.

A.    This is something that instead of on the eve of jury selection, this is something that should have been done months before.

Q.    Okay.  You indicate two possible neuropsychologists here; is that right?

A.    Yes.

Case: 4:07-cv-00027-ERW   Doc. #: 277   Filed: 09/13/12   Page: 234 of 249 PageID #: 3250

Q.    Robert Heilbronner?

A.    Dr. Heilbronner, who is a former colleague of mine in my graduate program, and Dr. Gelbort.

Q.    And was it determined that at some point neuropsychological testing should be conducted on Mr. Allen or a neuropsychological assessment?

A.    Yes.

Q.    And was that a decision that you made based on basically all the things that you just talked about?

A.    Right.  Based on what -- those factors, the seizures, the head injuries, and so on and so forth, it was important to explore that as a possible avenue of mitigation.

Q.    And did Dr. Gelbort eventually do an evaluation or assessment of Mr. Allen?

A.    Yes.

Q.    I'm going to point your direction to -- I'm going to direct you -- I'm sorry, I'm going to direct you to Exhibit 366.  Do you recognize this document?

A.    I do.  It's a fax that I sent to John Simon about Billie, and it's stating -- indicating to John that we need to get an MRI and a neuropsychological assessment because of events that suggest the existence of brain impairment or injury.  And those factors can have an impact on learning, personality, and behavior, and potentially can help explain why someone might not be functioning in the best way.

Q.     And this fax was sent on February 4th, 1998?

A.     Yes.

Q.     And why were you sending this to Mr. Simon, any idea?

A.     Well, I was involved in the case on the 16th, which is just a couple weeks before this.  And so I'm new to the case.  And my understanding was that he had been involved in the mitigation work and also he was second chair.  And, you know, I thought that he could expedite or he could help get this done.  He had also written the motion for my continuance, not my continuance, the motion for Billie's continuance that took place, the hearing on January 30th.  So I figured that he would be the one responsible for writing the motion for this.  So that's why I sent it to him.

Q.     All right.  And do you know, was there ultimately an order obtained?

A.     Yes.

Q.     And that was obtained -- I'm just directing your attention to Exhibit 41.  And there's a court's order for an MRI?

A.     And for the services of a neuropsychologist.

Q.     That's right.

A.     Yes.

Q.     So was it your understanding that Mr. Simon was going to be attempting to arrange the MRI?

A.     That was my hope or expectation.

Q.     Well, let me ask you this:   Whose idea was it to get an MRI?

A.     That was my idea, and a neuropsychologist for that matter.

Q.     Do you have any understanding as to why Mr. Allen wasn't ultimately given an MRI?

A.     When Dr. Gelbort got involved, he advised the team that an MRI would perhaps not be all that informative because the impairments that Billie experienced are not as dramatic, let's say, as a motorcycle accident or, you know, where there's more severe head trauma, obvious head trauma.   Where an MRI, which is sort of like an x-ray, something like that would be picked up on an MRI.

He believed the impairments that Billie had would not be evident in an MRI even if there were impairments there.   The MRI wouldn't show the types of impairments that he would have.   So, therefore, he advised an MRI would not be informative.   And that I believe he mentioned or recommended that we get a functional PET scan instead, which he felt would be potentially informative.

Q.     Did Dr. Gelbort ever give an indication to you that Mr. Allen didn't have -- did not have brain impairments?

A.     Did he give an indication that he did not have brain impairments?

Q.     Yeah.

A.      He felt he did have brain impairments.

Q.      Okay.  Do you recall when Dr. Gelbort actually did his assessment or evaluation of Mr. Allen?

A.      I believe it was around, I think the date February 22nd stands out to me.

Q.      Okay.

A.      But I'm not 100 percent sure.  I think he went to see him on the 9th, and I think the report was dated the 22nd, but I'm not 100 percent sure.

Q.      So the actual testing was done on February 9th, is that what your recollection is?

A.      Wait, I thought it was February 22nd.

Q.      When you said February 22nd, were you talking about the actual evaluation or were you taking about when he did the report?

A.      I'm thinking the written report was on the 22nd.  I might be getting confused with the dates.

Q.      That's your recollection, though?

A.      That's what I -- that's when I think it might have been.

Q.      Okay.  So starting from the position that it was done on February 9th --

A.      Okay.

Q.      -- the actual testing was done on February 9th, did you have any concerns about the timing of Mr. Gelbort's -- I'm

sorry, Dr. Gelbort's evaluation?

A.   Yes, I had major concerns about it.  Because it was at a very late hour that this evaluation was being conducted, very late in the case.  And I had mentioned earlier that had the case -- had the evaluation been done in a timely manner many months before, in conjunction with the mitigation investigation many months before, the evaluator would have had the benefit of a rich, descriptive information about what happened to the client.  And not only would it have been more effective in terms of his evaluation, but it might even have informed some of the tests he gave, who knows.  Okay.  It would have led to a more informative evaluation.

Q.   Do you recall if Dr. Gelbort ever expressed to you concerns that he needed more time?

A.   I am aware of a three-by-five card where -- which implies I had a conversation with him about the need for time or his concern for time.

Q.   I want to direct your attention to Exhibit 400.  Is this the index card that you're talking about?

A.   Yes.

Q.   And do you know -- for starters, is your handwriting on that index card?

A.   My handwriting is the top four lines.

Q.   Okay.  And what does that say?

A.   It says, "Do you want to get on the record that Gelbort

would have liked more time?"

Q.   Okay.  And you wrote those words; is that right?

A.   Yes.

Q.   And who did you write those words to?

A.   To Rick.

Q.   And at what time would you have written these words, do you recall?

A.   Probably during Gelbort's testimony.  I'm not 100 percent sure, but I was passing cards.

Q.   All right.  So you were passing cards during the trial to Mr. Sindel if you had a question or a point?

A.   Yes.

Q.   And these are the type of cards that you were using to do that?

A.   Yes.

Q.   Is there somebody else's handwriting on there that's different than yours?

A.   Down below it says, "Why?"  The word "why" is scribbled out, "why" question mark.  And then the word "Scary" question mark is written as well.

Q.   Who wrote the word "why" crossed out and then "scary" question mark?

A.   Rick did.

Q.   Okay.  Do you have any idea why he thought it would be scary to tell the Court that Dr. Gelbort wanted more time?

MS. COSTANTIN:  Judge, I'm going to object to speculation unless he actually does know.

THE COURT:  Sustained, unless he had this discussion.

A.    I don't recall why --

Q.    Okay.

A.    -- Rick wrote that.

Q.    So it was your understanding then that Dr. Gelbort wanted more time than he was given?

A.    Right.  He was concerned.  There was serious time pressure for him.

Q.    Now, I think you had testified earlier that Dr. Cuneo had been retained by the time you were involved in the case, but he had not done an evaluation yet; is that right?

A.    He hadn't written his -- wait, when I was retained, I was retained on the 16th of January.  I believe Cuneo's report was dated on the 16th of January.  And so when I come into the case -- I mean, if my recollection is correct, when I come into the case, that's when I become aware.

Q.    Okay.  So but is it your understanding that there really -- Dr. Cuneo prior to your entering the case had not conducted any evaluations of Mr. Allen or not done any records review, or were you aware of any of that is what I should say?

A.    When I came into --

MS. COSTANTIN:  He wrote a report on it, January 16th.

MR. MONTROY:  I'll strike that question.  I got confused by my own question.

BY MR. MONTROY:

Q.    Were you ever present for any communications between Mr. Sindel and Dr. Cuneo or Dr. Gelbort?

A.    Physically present?

Q.    Uh-huh.

A.    As I sit here today, I'm sure I was, but I don't recall specific instances.

Q.    Okay.  Are you aware or do you have an understanding of whether or not Drs. Gelbort or Cuneo ever knew or were made aware of Mr. Sindel's conversations with witnesses?

A.    I wasn't made aware of any so-called conversations with witnesses, and to my knowledge they never received that information either.

Q.    When you were involved in the case, were you communicating with the experts or was Mr. Sindel communicating with the experts?

A.    I know I was doing some communication with the experts. Mr. Sindel may have or may not have, I don't know.  I know that I provided at certain points in time notes to the experts.

Q.    Okay.

A.   So --

Q.   You provided your notes --

A.   Right.

Q.   -- to the experts?

A.   Right.

Q.   Do you know if Mr. Sindel ever provided any notes to the experts?

A.   On the basis of their evals and what they testified to, there was no indication of that.

Q.   So if Mr. Sindel had done some investigation prior to your involvement in the case, that information as far as you know was never passed on to Dr. Gelbort or Dr. Cuneo?

A.   That's correct.  And nor was it passed on to me because I would have been sure that it would have been passed on to them.

Q.   And would it have been important for Dr. Cuneo and Dr. Gelbort to have information that was --

A.   -- relevant, yes.

Q.   Okay.  And that was accumulated by Mr. Sindel?

A.   If such information existed, it would have been important to pass on.

Q.   If Mr. Sindel had developed a Life History of Mr. Allen that had not been committed to writing, would it have been important to pass that along to Dr. Gelbort and Dr. Cuneo?

A.   The only way that would be possible is if he told them.

Q.    And you don't have any knowledge that he told them; is that right?

A.    No.

Q.    Did you ever work in tandem with Dr. Cuneo and Dr. Gelbort in terms of developing mitigation for the penalty phase?  And just to clarify what I mean by "in tandem," were they part of the mitigation team?  Were they helping you develop mitigation themes, find mitigation witnesses, that sort of thing?

A.    "In tandem," it implies I think a higher degree of coordination than what occurred.  They had their jobs to do. I saw my role as a supportive role to them, trying to get them whatever I had.  And then at a certain point when they had some results or opinions, there was discussion -- you know, there was discussion about that.

Q.    Did they ever direct you to go see a witness or --

A.    No.

Q.    Concerning Dr. Cuneo and Dr. Gelbort, was there ever a strategic decision made to bring them into the case late in order to delay them having to turn over reports to the government in an earlier fashion?

        MS. COSTANTIN:  Judge, I would object only as in limiting it to if he knows.

        THE COURT:  If he knows.

BY MR. MONTROY:

Q.   Of course.  Were you aware of any strategic decisions that were made by the trial team to intentionally bring them, Dr. Cuneo and Dr. Gelbort, into the case late so the government would receive their reports late?

A.   To me that's absurd.  There was no indication of that, no.

Q.   Do you think it would have been helpful to actually bring Dr. Gelbort and Dr. Cuneo into the case earlier than they had been brought into the case?

A.   That would have been a nice idea to have done it in a timely way where they could have done an effective job as well.

Q.   Are you familiar with a person named Dr. Wuertz?

A.   I am.

Q.   And --

     THE COURT:  How is that spelled?

     MR. MONTROY:  W-u-e-r-t-z.

BY MR. MONTROY:

Q.   I'm going to direct your attention to Exhibit 388.  Do you recognize this document, Dr. Randall?

A.   I do.

Q.   And what is this document?

A.   It's a fax that I sent to Dr. Christopher Wuertz on March 6th, 1998.  It's a fax cover letter.  And Dr. Wuertz was an ER -- he was a psychiatrist at a hospital where Billie

had been taken.  And I felt he had critical -- I felt there was some records of his that had really critical information, mitigating information for Billie.  And so I was trying to get ahold of him, and it was -- I had great difficulty, I couldn't do it.

Q.   What is the date on this letter?

A.   It's March 6th, 1998.

Q.   Okay.  And do you have any recollection of where you were in terms of the case on March 6th, 1998?

A.   That was during the heat of the penalty phase.

Q.   Okay.  And you just testified that you believe that Dr. Wuertz was critical to your mitigation case.  Why was Dr. Wuertz a critical witness?

A.   Why was he critical?

Q.   Yes.

A.   Okay.  In the course of Billie's life there were a lot of things that happened.  The events leading up to this crime, this offense, while not -- what's the word I'm looking for -- it doesn't excuse the behavior or doesn't rise to the level of insanity -- okay, I'm blocking right now -- there's information there that goes to how much difficulty he was having personally in his life, coping with life, functioning, his depression and mental state at the time.  And Dr. Wuertz could have spoken to that.

Q.   Okay.  And part of this exhibit is blocked out by what

appears to be a sticky with Dr. Wuertz's contact information on it; is that right?

A.    Yes.

Q.    But do you refer to a February 11th, 1997 evaluation that Dr. Wuertz did of Mr. Allen?

A.    Yes, that was during a visit to the psychiatric center where Dr. Wuertz was working.  Billie's girlfriend and her mother were so concerned about his behavior, his mental state.  He had taken some pills at their house.  They thought he was suicidal.  They basically escorted him, took him to the mental hospital to get evaluated.

Q.    And was Dr. Wuertz the doctor who evaluated?

A.    He was on call apparently at this time.  This was around midnight or so, late at night.

Q.    And then you say your eval is being relied on by the prosecution expert to rebut the diagnosis of PTSD, depression?

A.    Right.

Q.    Is that right?

A.    Yeah, that's what it says.

Q.    Was that your understanding of what was happening during the penalty phase?

A.    Yes.  I mean, Dr. Wuertz, there was check boxes in this intake form that he had signed.  And he didn't check the one -- I think there might have been one for PTSD, and he

didn't check it.  And so they were claiming, well, he didn't endorse PTSD, therefore, Billy doesn't have PTSD.  Or he didn't check the suicidal box either, so therefore he must not have been suicidal.  And to me on its face, especially the suicidal one was a big problem.

Q.    Okay.  And you were hoping to bring Dr. Wuertz in to --

A.    To help clarify this problem.

Q.    Okay.  So does this letter refresh your recollection in that the -- your witnesses, Dr. Cuneo and Dr. Gelbort, have already testified?

A.    Yes.

Q.    And the prosecution experts have already been called in rebuttal?

A.    Yes.

Q.    So are we talking about the tail end of the penalty phase here?

A.    That's why it says on top of the fax, "Extremely Urgent."

Q.    In your opinion should Dr. Wuertz have been spoken to before the last day of the penalty phase?

A.    Dr. Wuertz was not a hard witness to find.  They could have found those documents.  I believe I was the one who found the Wuertz document.  That was easy to find.  That could have been found months before.  They could have contacted him months before.  They could have potentially

headed off, you know, having his cross-examination for our experts that didn't need to happen.

Q.   So ideally would you have wanted to get -- well, strike that.  Why didn't you contact Dr. Wuertz?

A.   Why didn't I?

Q.   Yeah.

A.   I did whatever I could to contact Dr. Wuertz.  I --

Q.   Let me rephrase that.  Why did you wait so long to contact Dr. Wuertz?

A.   Given -- okay, given the compressed time frame that we had, I was scrambling a lot in this case.  And there were a lot of things that fell through the cracks.  And, you know, then in terms of when it really became apparent that Wuertz was essential was after the testimony of the experts, which was already late in the game.  And so there was a lot coming at me.  And this is when I contacted him.  It wasn't intentionally waiting until the last minute, I'm going to leave Wuertz for the end and hopefully not find him.  I mean, that's --

Q.   Did you have --

THE COURT:  I think we'll break here for now.

MR. MONTROY:  Very well.

THE COURT:  Court is recess until 8:30.  We're going to be recessing at three tomorrow.

(Court in recess at 5:03 p.m.)

C E R T I F I C A T E

I, Susan R. Moran, Registered Merit Reporter, in and for the United States District Court for the Eastern District of Missouri, do hereby certify that I was present at and reported in machine shorthand the proceedings in the above-mentioned court; and that the foregoing transcript is a true, correct, and complete transcript of my stenographic notes.

I further certify that I am not attorney for, nor employed by, nor related to any of the parties or attorneys in this action, nor financially interested in the action.

I further certify that this transcript contains pages 1 - 249 and that this reporter takes no responsibility for missing or damaged pages of this transcript when same transcript is copied by any party other than this reporter.

IN WITNESS WHEREOF, I have hereunto set my hand at St. Louis, Missouri, this 13th day of September, 2012.

_____
/s/ Susan R. Moran
Registered Merit Reporter