UNITED STATES OF AMERICA
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

BILLIE JEROME ALLEN,              )
                                  )
            Petitioner,           )
                                  )
      vs.                         )   No. 4:07-CV-27 ERW
                                  )
UNITED STATES OF AMERICA,         )
                                  )
            Respondent.           )


TRANSCRIPT OF EVIDENTIARY HEARING

BEFORE THE HONORABLE E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE

October 17, 2012
Volume VII

APPEARANCES:

For Petitioner:     Ms. Elizabeth U. Carlyle
                    P.O. Box 30418
                    Kansas City, MO   64112

                    Mr. Eric John Montroy
                    Mr. Timothy Kane
                    FEDERAL COMMUNITY DEFENDER OFFICE
                    The Curtis Center, Suite 545 West
                    Philadelphia, PA   19106

For Respondent:     Mr. Steven E. Holtshouser
                    Ms. Carrie Costantin
                    OFFICE OF U.S. ATTORNEY
                    111 S. 10th Street, 20th Floor
                    St. Louis, MO   63102


REPORTED BY:        SUSAN R. MORAN, RMR, FCRR
                    Official Court Reporter
                    111 South 10th Street
                    St. Louis, MO   63102
                    (314) 244-7983

I N D E X

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| PETITIONER'S WITNESSES |  |  |  |  |
| DAVID RANDALL, Ph.D |  |  |  |  |
| (By Mr. Montroy) | 9 (Cont'd) |  |  |  |
| (By Ms. Costantin) |  | 86 |  |  |

(The following proceedings were held in open court on October 17, 2012 at 8:37 a.m.:)

THE COURT:  Good morning.  The case is Allen versus United States, 4:07-CV-00027 ERW.  This case was originally called in -- just a moment, I have it all right here -- on June 4th through June 8th, and then again on June 11th, 2012.  And then the case, because of my unavailability due to an illness, was rescheduled.  And I regret the inconvenience that that caused all the parties.

And so with that, proceed, sir.

MR. KANE:  Okay.  Thank you, Your Honor.  As we had been doing in June, we thought with the Court's permission we would begin by formally entering the exhibits that were referred to in the last day of testimony.

THE COURT:  All right.  Whenever you're ready.

MR. KANE:  The first one was Exhibit No. 350, which is a letter dated January 26th, 1998.

THE COURT:  Received.

MR. KANE:  The next one is Exhibit No. 354, which is a facsimile dated January 28th, 1998.

THE COURT:  Received.

MR. KANE:  Then Exhibit No. 357, which are notes from a meeting dated January 30th, 1998.

THE COURT:  Received.

MR. KANE:  362, a facsimile dated February 2nd,

1998.

THE COURT: Received.

MR. KANE: No. 366, a memorandum dated February 4th, 1998.

THE COURT: Received.

MR. KANE: No. 379, a letter dated February 15th, 1998.

THE COURT: Received.

MR. KANE: No. 388, a facsimile dated March 6th, 1998.

THE COURT: Received.

MR. KANE: No. 390, an invoice dated March 16th, 1998.

THE COURT: Received.

MR. KANE: No. 451, which are handwritten interview notes that are not dated or that at least I don't have a date for.

THE COURT: Received.

MR. KANE: More handwritten notes, No. 486.

THE COURT: No date? No date?

MR. KANE: No date that I have on my list at least.

THE COURT: Received.

MR. KANE: And that is all that I have.

THE COURT: All right.

MR. KANE: No. 674.

THE COURT:  Okay.

MR. KANE:  Which was Mr. Simon's CV.

THE COURT:  Okay.  Received.

MR. HOLTSHOUSER:  Judge, I think we're in agreement as to the way the exhibits stood on June the 11th.

THE COURT:  All right.

MR. HOLTSHOUSER:  There's one exception, and that is Exhibit 525.

THE COURT:  Five what?

MR. HOLTSHOUSER:  Twenty-five.

THE COURT:  Okay.

MR. HOLTSHOUSER:  Which is the Connie Supranowich deposition.  274 is the Connie Supranowich declaration. Those were covered by a joint stipulation, Document No. 258. It was filed on June the 11th.  And while the stipulation covers those two exhibits, I'm not sure we had a formal offer and receipt of those exhibits.

THE COURT:  All right.  And you're asking for receipt at this time; is that correct?

MR. HOLTSHOUSER:  I am, Your Honor.

THE COURT:  They are received.

MR. HOLTSHOUSER:  There were also then -- there was a list attached to that stipulation that contained a couple of exhibits that I don't believe have been formally offered or received either, and I'll go through those now.  I'm

referring to what would be Document 258-1, the attachment to the stipulation regarding Ms. Supranowich.  And these are the exhibits which I believe have not been formally accepted by the Court.  317, which is the time records of Ms. Supranowich.

THE COURT:  Okay.  Received.

MR. HOLTSHOUSER:  322, an additional set of time records from Ms. Supranowich.

THE COURT:  Okay.  Received.

MR. HOLTSHOUSER:  334, which is a fax to John Simon containing a letter to Dr. Haney.

THE COURT:  Received.

MR. HOLTSHOUSER:  361, which is a fax from Dr. Randall.

THE COURT:  Received.

MR. HOLTSHOUSER:  363, which is a letter to Dr. Cuneo.

THE COURT:  Received.

MR. HOLTSHOUSER:  365, which is a fax from Dr. Randall to Connie Supranowich.

THE COURT:  Okay.  Just a second.  How is that name spelled?

MR. HOLTSHOUSER:  Supranowich is S-u-p-r-a-n-o-v-i-c-h.

THE COURT:  Okay.  Received.

MS. CARLYLE:  I think it's w-i-c-h actually.

MR. HOLTSHOUSER:  W-i-c-h, yes.

THE COURT:  Okay.  Thank you.

MR. HOLTSHOUSER:  The next one is Exhibit 397, additional time records of Ms. Supranowich.

THE COURT:  Received.

MR. HOLTSHOUSER:  393, a letter to Luvreeta Taylor.  And it's spelled L-u-v-r-e-e-t-a Taylor.

THE COURT:  Received.

MR. HOLTSHOUSER:  371, which is a note regarding a PET scan, P-E-T.

THE COURT:  Received.

MR. HOLTSHOUSER:  508, interview notes.

THE COURT:  Just a second.  508, what did you say?

MR. HOLTSHOUSER:  Interview notes.

THE COURT:  Okay.  Received.

MR. HOLTSHOUSER:  509, which is another addition, typed interview notes.

THE COURT:  Received.

MR. HOLTSHOUSER:  I believe according to my notes that's everything.

THE COURT:  Okay.  Thank you.

MR. HOLTSHOUSER:  And just for the record, Judge, we've discussed with counsel today that after completion of the proceedings this week, we would -- we previously

submitted a joint exhibit list.  We would submit before the beginning of the next session an amended joint exhibit list, which would contain some of these changes that have been made along with a column that would indicate at least what the parties believe all the exhibits that have been accepted so we have a baseline to start the next session.

THE COURT:  All right.  Very well.  That sounds good.

MR. MONTROY:  Shall we proceed, Your Honor?

THE COURT:  Whenever you're ready.

MR. MONTROY:  Thank you.  Your Honor, Mr. Allen would recall Dr. Randall.

THE COURT:  Dr. Randall.  Let's have Dr. Randall resworn.  I'll read the last question.  It's been a long time since we were here.  The question was:

"Let me rephrase that.  Why did you wait so long to contact Dr. Wuertz?"

"ANSWER:  Given -- okay, given the compressed time frame that we had, I was scrambling a lot in this case and there were a lot of things that fell through the cracks. And, you know, then in terms of when it really became apparent that Wuertz was essential was after the testimony of the experts, which was already late in the game.  And so there was a lot of -- there was a lot coming at me.  And this is when I contacted him.  It wasn't intentionally waiting

until the last minute.  I'm glad to -- I'm going to leave Wuertz for the end and hopefully not find him.  I mean, that's --"

"QUESTION:  Did you have --"  And I interrupted.

"THE COURT:  I think we'll take a -- I think we'll break here for now."

MR. MONTROY:  Great.  Thank you, Your Honor.

DIRECT EXAMINATION (Continued)

BY MR. MONTROY:

Q.   And, Dr. Randall, I'm just going to pick up right where His Honor just left off.

Was there a strategic decision made by yourself or Mr. Sindel or Mr. Simon that you were aware of to not call Dr. Wuertz earlier than the time that you actually tried to contact him?

A.   There was no strategic decision made.  If what is meant by "strategic decision" is some sort of rational, conscious, deliberative decision based on strategy to obtain some sort of probability of increased outcome in a certain way, it was simply just due to the compressed time frame that -- that's how it sort of just played out.

Q.   Is it fair to say you would like to have called him and contacted him earlier?

A.   Absolutely.

Q.   Now, moving along to some questions about the

mitigation investigation that you conducted.  When you were conducting your investigation for mitigation, were you looking for all types of mitigation that could be presented at the penalty phase?

A.    Yes.  There's two general types of mitigation that I look for, what I call positive mitigation and negative mitigation.  Positive mitigation being good character information and positive things that people have done, et cetera.  Negative mitigation is bad things that happened to people that help explain how they turn out the way they do.

So I'm -- in every case I work on I seek to or intend to look for both kinds of mitigation to try to get the whole picture of the individual.

Q.    Okay.  And did you make any strategic decisions or any decisions at all for that matter to exclude certain types of evidence from your actual investigation?

A.    I was trying to find as much evidence of both kinds of mitigation as I could.

Q.    Were you ever instructed by Mr. Simon or Mr. Sindel to avoid certain types of evidence when you were conducting your mitigation investigation?

A.    No.

Q.    Okay.  So at any point in time was there a strategic decision made by yourself or by one of the attorneys that you're aware of to exclude evidence from your investigation

that Mr. Allen had been abused as a child?

A.    That would have been at cross purposes of what my job was.

Q.    And what do you mean by that?

A.    In other words, that kind of evidence of abuse or neglect or, like I said, negative mitigation is the type -- is one primary type of mitigation that I strive to find in any case I work on.

Q.    Was there any strategic decision to exclude evidence of neglect from your investigation?

A.    No.

Q.    Was there any strategic decision that either you made or that you were aware of to exclude evidence that Mr. Allen had been abandoned as a child?

A.    No.

Q.    Was there any strategic decision made by yourself or made by the attorneys in Mr. Allen's case that you're aware of to exclude evidence from your investigation that would have portrayed Mr. Allen's family members in a negative light?

A.    Again, that would be at cross purposes of what my role is.  And there was no -- that's an absurd type of assumption.

Q.    Would it be fair to say that when you're conducting mitigation investigation that you sometimes look for evidence that might cast family members in a negative light?

A.     If evidence is there that is potentially disparaging to family members, parents, siblings, you know, in terms of the way they might have treated my client, that's the type of information, you know, that helps -- you know, if he was mistreated, that helps explain a lot of things.  So that's the type of information I would actively seek out and not want to exclude.

Q.     Okay.  If you would have uncovered evidence during your investigation of abuse and neglect and abandonment, would you have wanted to present that evidence to the jury at the penalty phase?

A.     Absolutely.

Q.     Given what you did present at the penalty phase or your team presented at the penalty phase, would you have wanted to present evidence generally speaking of abuse and neglect in conjunction with that evidence that you actually presented at trial?

A.     I would want to present the full picture of my client, including what -- you know, the negative mitigation, abuse and neglect information as part of the comprehensive mitigation phase.

Q.     Okay.  Now, during your investigation, did you have any suspicions that Mr. Allen had been abused and neglected as a child?

A.     Yes.

Q.    What were those -- well, strike that, I'm sorry.  What led you to believe Mr. Allen had been either abused or neglected?

A.    Well, early on -- well, first of all, coming in to cases like this, in general there's a high probability of abuse and neglect in any case that reaches this level.

Q.    When you say "this level," what do you mean?

A.    Well, a case that involves somebody killing somebody.  There's a high probability that they didn't grow up in a Brady Bunch kind of environment, that there was a problematic home life.  So any case like this, it's a high probability that the client has had a difficult upbringing.  So, you know, going into the case, you know, that's on the radar, okay.

      And then when I started working on the case, when I met Billie's mom, for instance, Juanita Allen, it was apparent to me that she was a tough character, you know, someone who had been through a lot herself, and someone who was quick to anger sort of, you know, potentially hot-headed, and so that sent red flags, you know, red flags for me, you know, as I started the mitigation investigation.

Q.    Okay.  Aside from your interactions with Mr. Allen's mother, was there anything else that led you to be suspicious of the fact that abuse and neglect might have existed in Mr. Allen's life as a child?

A.    Well, as time went on and we talked to potential mitigation witnesses, the thing that stands out in my mind right now is a Raymond Petty incident where he describes Billie being beaten by his mother with I believe an extension cord.  So that type of information is consistent with abuse.

Q.    I'm sorry.

A.    Go ahead.

Q.    And just generally speaking were you interested in pursuing evidence of abuse and neglect and abandonment in Mr. Allen's case?

A.    In every case that I work on, that's what I look for.

Q.    If it exists, it's something you're interested in investigating, is that fair to say?

A.    Yes, it's one of the major pillars of a mitigation case.

Q.    And you kind of touched upon this already, but just to be clear, generally speaking would you have been aware of any strategic or tactical decisions made by, you know, either Mr. Sindel or Mr. Simon, you know, and yourself concerning the investigation and the presentation of evidence at the penalty phase?

A.    When I became involved in the case, I -- how should I say this, I sort of took primary responsibility or was given primary responsibility for developing the mitigation phase, as Mr. Sindel was doing the guilt phase.  So -- so, you

know -- so I was given sort of carte blanche in terms of, you know, what to look for, who to talk to, and so on and so forth.

I know -- I can't think of specific instances, but I know I kept Mr. Sindel apprized over the course of this generally how things were going. And then at a certain point when we get closer to the penalty phase, we had the weekend prep session where we spoke to 20 some odd witnesses together.

So if I recall your question, you're asking me if there was a strategic decision to exclude types of information?

Q.   Well, would you have been aware of any strategic or tactical decisions made, you know, by the legal team in terms of presenting mitigation at the penalty phase?

A.   The strategy was to try to present as much information as possible from what I recall.

Q.   Okay. So you were aware then of any decisions that were being made?

A.   Pretty much, yeah.

Q.   And you may or may not have answered this, but just in case. Were you aware of a strategic decision for not pursuing evidence that Mr. Allen was abused and neglected?

A.   Again, that would be at cross purposes with the mitigation hearing and my role in the case.

Q.   Okay.  I'd like to point your attention to Exhibit 505, which you have on your screen.

THE COURT:  Is this a new --

MR. MONTROY:  This, I believe, is a new exhibit, Your Honor.  Yes.

THE COURT:  Thank you.

MR. MONTROY:  I think so.  We can double check on that real quick.  I'm sorry, Your Honor, it has already been introduced.  I apologize.

BY MR. MONTROY:

Q.   Do you recognize this document, Exhibit 505, Dr. Randall?

A.   Yes, it looks like a brief list of general mitigation points that I prepared in Billie's case.

Q.   So you did prepare this document?

A.   Yes.

Q.   Do you have any idea when you would have presented this?

A.   I don't have a specific date.  It would be close to the penalty phase.

Q.   Are these --

A.   Close or during.

Q.   Okay.  Closer to the penalty phase?

A.   Close to or during.

Q.   Okay.  Is -- well, strike that.  What does this list

represent to you?

A.   I don't believe it's an all inclusive list, but it's a list of potential areas of mitigation that we wanted to touch upon during the hearing.

Q.   Okay.

A.   And factors that affected Billie in terms of his ability to cope with things as an adult.

Q.   And based on your recollection of what was investigated and what was presented at the penalty phase, did you present at least some evidence of these categories?

A.   Yes.  I think we touched on all those categories, not to the extent that I think we could have, given the constraints that we were operating under, but we did touch on these things.

Q.   So would it be fair to characterize this as sort of a wish list, sort of an idea of themes that you wanted to present evidence of at the penalty phase?

A.   It's some of the factors that impacted on Billie's life, yes.

Q.   Now, let's just talk about actually what was -- not so much the investigation, but what was actually presented at the penalty phase.  And actually -- well, strike that.

How were decisions made when it came to deciding what evidence would be presented at the penalty phase?

A.   Can you please repeat that?

Q.   Sure.  How was the decision -- strike that.  You obviously conducted an investigation and you developed mitigation that could or could not be presented at penalty phase, is that fair to say?

A.   Yes.

Q.   How was the decision made or the decisions -- how were the decisions made as to what would actually be presented to the jury at the penalty phase?

A.   Okay.  As I was going through and doing this investigation out in the community, there was a certain point in time when it was getting close to the penalty phase, and I said to Rick that we needed to meet.  And, you know, that's when we set up the interviews with all the witnesses.  Not all the witnesses, but the witnesses that we saw that particular weekend.

     And as we were getting closer, it was sort of -- there were a lot of people that I found in the course of this.  And we basically put up what we had, you know.  So whoever we found, we basically put up.

Q.   So it wasn't so much a decision making process, it was whatever the investigation had uncovered was what was presented at the penalty phase?

A.   Yes.

Q.   Did Mr. Sindel or Mr. Simon ever decide to not present evidence that you had uncovered in the penalty phase

investigation at the actual penalty phase?

A.    There was no decision or no direction to me saying that in terms of what we put on or that we shouldn't put any of that on.

In thinking about this case since the last time we met, I remember the first thing that I talked to Billie about was the jail guards that were at -- where he was being housed during the trial.  And I had wanted to explore that further, you know, interview the guards and put on evidence of his adjustment to incarceration being a critical mitigating factor.

And I don't recall the specific -- any specific conversations with Mr. Sindel, but I -- my impression is that we did have a conversation about that, and he didn't want to put on the jail guards for some reason.  And I don't recall what that reason is, but that would be the only thing that I recall of things -- of an avenue that we weren't going to be pursuing or presenting.

Q.    Did he express this to you before or after you conducted an investigation of the jail guards?

A.    Well, the first thing I did when I entered the case was fly down the next day and saw Billie and developed a list of guards, among other things, people who might be able to speak to his adjustment.  And then we got onto other topics.  And that was really the last time that we went down that route.

Like I don't recall ever reaching out and speaking to any of the guards. I wasn't able to close that loop. And the impression I had was that Mr. Sindel didn't want to put on the guards for some reason.

Q. So it wasn't a situation where you had gone out and talked to some guards and collected some information and then Mr. Sindel said, you know, we're not going to go down this avenue for whatever reason. It was at the start of the investigation, you know, you had suggested talking to the guards and he said, no, we're not going to do that?

A. I don't think it went down exactly like that. I think that as the investigation was ongoing, it was a total immersive experience, and I just think I never -- I never developed the guards as potential witnesses. I never interviewed them. I never talked to them. It would have been something I would have liked to have done, but I never got to that point.

So then towards the penalty phase when it became time to put on witnesses, the guards weren't, like I said, developed at that time, and they weren't going to be at that point.

Q. Okay.

A. So we never had -- like we never had full information from them to even weigh like what types of witnesses they would be. It was just a general like, no, we're not going to

put them on, I think.

Q. Okay. Why did you want -- why did you want to see the guards?

A. Well, I've had cases with a lot of different clients, some of whom have a good adjustment to a correctional setting and then some who are terrible in a correctional setting. And when I have evidence where they are good, that's a very, very strong mitigating factor because that's the reason to punish for something other than death. If they can be safely housed and managed, then that's a reason to punish for something other than death. And that's -- some jurors, that's something that resonates with some jurors. And so to me it was, you know, a critical piece.

Q. Okay. And so did you ever make any determination whether Billie Allen had a positive prison adjustment record?

A. From my recollection of the files, there was little, if any, disciplinary writeups on him. I think maybe covering a light or, you know, just minor, minor things. So to me that's potentially very helpful evidence that -- and an avenue that we didn't develop.

Q. Did you have the names of guards that could be potential witnesses at the penalty phase?

A. I found those on the first day of my involvement in the case.

Q. And did you ever talk to any of those guards?

A.   No, not that I recall.

Q.   I just want to get back to something you just said, that this was a "total immersive experience."

A.   Yes.

Q.   Those are your words, right?

A.   Yes.

Q.   Can you just explain what you meant by a "total immersive experience"?

A.   Okay.  I knew of the time constraints in the case. When I first became involved, I flew down the next day to see Billie and meet with Mr. Sindel and review some records. Then I went back to Chicago because that following week I was involved in a penalty phase on another case.  So then when that was over, when that case was over, I started full on working on Billie's case.  And from the time I started until the very last day, it was pretty much going on all cylinders the whole way.

It was -- I decided to basically move down to St. Louis and throw myself completely into the case.  And it was unlike any situation that I had been in previously in terms of the intensity of the situation.  The attorneys had sort of put us in a situation where we had sought a continuance and we didn't get one.  So it was like these are the cards we're dealt.  And I basically had to live, breathe this case from the beginning when I first -- you know, after that other

penalty phase was done, from that point until the very last day. So I don't know how else to explain it.

Q. And what was the impact of that on your work in this case, if any?

A. Oh, well, I think it negatively impacted the case in a number of different ways. One is in terms of just generally there was so much information coming at us -- there was so much information, I found that we didn't have time to synthesize and to digest and to make good deliberative decisions in terms of who we put on, who we didn't put on, that kind of thing.

The stress level was pretty -- was very high. And so when interviewing witnesses, like I've never been put in a situation or I've never put myself in a situation where it was sort of like -- like I've usually had time to see witnesses more than once and develop relationships with them and really get at the meat of what they have to potentially offer. And in this case for most of them I was only able to skim the surface of what they potentially had to offer.

There were certain like critical things that I messed up on because of the crunch in terms of what I now know, what certain people would say based on the declarations and things like that. Information that was right there for the taking that I just for whatever reason, mental lapses or preoccupation with other things, I didn't pursue. Really

basic things to be quite honest for some of this.

So while -- how should I say this -- certain aspects of the work were of really high quality and -- but a lot of it was uneven because just the time constraints involved. And then also in terms of, you know --

MS. COSTANTIN:  Judge, at this point I'm going to object to the narrative nature of this answer.

THE COURT:  The question originally was how did his work negatively impact.  And so long as that continues, I'll consider that part of the question or his answer part of that question.  Is that where he's going?

MR. MONTROY:  I believe that's correct, Your Honor.

THE COURT:  Overruled.

THE WITNESS:  Can I clarify one thing?

THE COURT:  Sure.

A.    The question is how did it negatively impact my work?

Q.    Yeah.  Well, how did it negatively impact your work and how did it negatively impact the presentation at the penalty phase?

THE COURT:  The question specifically as I wrote it down was, the impact of his work negatively impacted the case.

MR. MONTROY:  Very well.  Sure.  That makes sense.

A.    Also, so we had incomplete information from witnesses that could have been more fully developed but wasn't.  And

then when it came time to put these witnesses on, we didn't have time to adequately prepare the witnesses for testifying. And then when they were put on, because of the compressed time, Rick didn't I don't think understand or appreciate what these witnesses could potentially offer.  And his -- a lot of his questioning during the sentencing phase was I felt very superficial, a lot of yes/no answers in a lot of the testimony.  He didn't really know the witnesses.

There was areas where he led the witnesses where had he known better, you know, he could have asked better questions to help them open up more.  There were areas where the witnesses gave him information that sort of cried out for followups so they could have explained certain areas in more detail.  But he would jump to other -- you know, he would just drop it and move on to something else without pursuing something that needed to be pursued that would have provided the jury with a more complete picture.

Let's see, I mean, it impacted our experts in terms of the 11th hour when we brought the experts in and the amount of information that we had to give the experts at the time.  So the experts were I think underprepared themselves and were more easily attacked, you know, during the cross and were less competent -- you know, gave less competent presentation than they should have been able to do because of the way this thing rolled out.

So there's a number of -- numerous areas. And it was sort of like a domino reaction where things affected things.

Q.    Okay. Did Mr. Sindel ever tell you that you should not develop certain types of mitigating evidence and not be prepared to as a team present certain types of mitigating evidence because a jury specifically in St. Louis might not be receptive to that type of mitigating evidence?

A.    I hadn't heard of that, no.

Q.    Did you ever have any conversations with Mr. Sindel or Mr. Simon about St. Louis juries and any particular nature that St. Louis juries might have as opposed to other juries you had been in front of?

A.    No. Never specifically anything about St. Louis juries, no.

Q.    When you were developing your mitigation for the penalty phase, did you ever limit your investigation because you had concerns about how the jury might respond to a certain kind of evidence?

A.    I think juries are -- I've been in many cases and juries are people, and people generally respond in similar ways, you know. So doing a mitigation investigation, you're looking, like I said earlier, at positive and negative mitigation, you know, good things people do, good character information, and also negative mitigation, being bad things

that happened to people that help explain why they turn out the way they do.  And regardless of the venue, I've always looked for the same type of information, so --

Q.   Are you familiar with the concept of residual doubt?

A.   Yes.

Q.   I have a question for you about residual doubt.  Did you ever make a strategic decision or was a strategic decision ever made by Mr. Allen's legal team to not investigate a particular area of potential mitigation because you were concerned that it might negatively impact any residual doubt that may have existed from the guilt phase of Mr. Allen's trial?

A.   I don't see any logical connection there between residual doubt and other mitigating factors, so I think residual doubt is another type of mitigating factor that is independent of other mitigating factors that you would want to pursue in any case.

Q.   Okay.  Well, specifically does evidence of abuse and neglect and abandonment, does that in any way negate the concept of residual doubt as it existed in Mr. Allen's case?

A.   No, they are mutually independent mitigators.

Q.   Did you ever make a strategic decision or were you aware of a strategic decision made by Mr. Sindel or Mr. Simon not to investigate a particular area of potential mitigation because you were concerned that it might contradict the idea

that was presented at the guilt phase that Mr. Allen was a, quote, follower?

A.   So is your question that we were directed -- that I was directed not to pursue certain areas because the theme during the guilt phase was that he was a follower?

Q.   Exactly.  Was there ever a decision that was made, let's not -- hey, let's not pursue this type of mitigation because it might contradict this theme that we have that Mr. Allen was a follower?

A.   No.  Like I said earlier, I was given carte blanche to develop the mitigation.  And no, the answer is no.

Q.   Let me ask you this:  Did you want to show that Mr. Allen was a follower?

A.   Well, if that was what Mr. Allen was, then that's what we wanted to show.  Because if that was the theme of the guilt phase and there was evidence of that from other people who might be testifying at the penalty phase, and that would be consistent, congruent, and if it existed, then we would want to present it.

Q.   And do you recall, did you actually present evidence that Mr. Allen was a follower?

A.   Yes.

Q.   And just to follow up one question about residual doubt.  Specifically I think that you gave an answer about residual doubt.  But did the lawyers ever specifically tell

you not to investigate a particular kind of evidence because they were concerned that it might have an impact on residual doubt?

A.   No, I don't see how anything that I would potentially investigate have an impact on that.

Q.   Okay.  And did anybody ever tell you not to investigate?

A.   No.

Q.   If you had had evidence that Mr. Allen was abused and neglected, would you have wanted to introduce that evidence even though you were also introducing evidence that Mr. Allen was a follower and not a leader?

A.   Those would be, again, two mutually exclusive areas of mitigation, and we would want to present both.

MR. MONTROY:  Sorry, Your Honor, if I could just have a quick moment?

THE COURT:  Sure.

BY MR. MONTROY:

Q.   Dr. Randall, just to clarify, is evidence that Billie Allen was a follower inconsistent with evidence of abuse and neglect in his life?

A.   No, it's not inconsistent.

Q.   And could you have seen presenting evidence of abuse and neglect if you were also presenting evidence that he was a follower?

A.     You would present both, yeah.

Q.     Did Mr. Sindel or Mr. Simon ever suggest that evidence of abuse and neglect should not be presented and should not be investigated because it was inconsistent with the guilt phase?

A.     No.  And I don't see how it would be inconsistent.  And if it was in existence, then we would want to present it because it's a critical mitigating area.

Q.     Did Mr. Sindel or Mr. Simon or did you yourself reach this conclusion to limit the penalty phase investigation because you were concerned about testimony from the guilt phase, say, from evidence that was presented at the guilt phase from the park workers?  And actually just to back up a second -- strike that.

       Do you recall testimony from the guilt phase?

A.     I was not at the guilt phase, I was in the field doing what I needed to do to help prepare for the penalty phase.

Q.     Are you aware that there were witnesses that were presented at the guilt phase to show that Mr. Allen was guilty for the crimes that he was charged with?

A.     Was there -- were there witnesses that were --

Q.     That's kind of an obvious question.

A.     Yes, of course.

Q.     You're right, that's kind of a silly question.  Let me back up.  Were you aware that Mr. Allen was alleged to have

given a confession in this case?

A.    As I sit here now, I don't recall.  But -- one way or another, but --

Q.    Well, if the guilt phase --

A.    -- it doesn't matter.

Q.    Okay.  Yeah, that was my next question.  If the evidence at the guilt phase had shown that Mr. Allen had given a confession, would that in any way have eliminated the investigation that you presented at the penalty phase?

A.    No.  I don't see how it could possibly be related.

Q.    You touched upon this earlier, but to get in a bit more detail, do you recall if you had uncovered any evidence of abuse and neglect during your investigation?

A.    We uncovered some evidence of that, yes.

Q.    And I believe before you mentioned specifically Raymond Petty stands out in your mind?

A.    That's the one that stands out right now, yes.

Q.    Did you ultimately present any evidence of physical abuse as mitigating evidence at Mr. Allen's penalty phase?

A.    Yes, it was the type of evidence that I would want to seek out, and we did present that.

Q.    And was that evidence through Mr. Petty?

A.    Yes.

        MR. MONTROY:  Your Honor, I'm pointing the witness' attention to Exhibit 458.

THE COURT: Okay. Is that one received?

MR. MONTROY: The Court's indulgence, Your Honor. I apologize. No, Your Honor, this is a new exhibit.

THE COURT: Okay.

MR. MONTROY: Actually if I could just have your indulgence for a second.

BY MR. MONTROY:

Q.    Dr. Randall, do you recognize this document?

A.    Yes, it's typed interview notes from my interview with Mr. Petty, Raymond Petty.

Q.    Sorry, I think I did something here. Okay. Dr. Randall, do you recall when you produced this document?

A.    It was during my mitigation investigation for Billie's case. I don't recall specifically when I prepared it. I believe that the information after the line, there's a horizontal line in the document, that information was, I believe, written during the actual witness prep session with him.

Q.    Okay. And do you recall when that witness prep session was?

A.    It was during that weekend, I believe it was the 20th or 21st, or 21st, 22nd. I don't recall the specific day.

Q.    Okay. If I can just turn your attention to the second page. I'm going to ask you to look specifically down to the 12th paragraph. I'll see if I can focus in on that. And

specifically the paragraph that I'm referring to is, "One time she was getting on him."

A.    I see it.

Q.    "She was beating him.  He was supposed to be in a certain time, and do something, and he didn't do it.  He's 16-18-18, not too long ago.  Bill calls me, I drive to his house.  I jump in between them.  He broke out of the house and ran.  I never got beat like that before.  She was whooping him with an extension cord, just whacking at him.  It just went back to slavery times.  I couldn't see my blood getting beat like that.  I've never seen that kind of beating before.  (Like a slavery beating.)"  Did you write that?

A.    Yes.

Q.    And is that a reference to what you were talking about earlier, Billie being subjected to physical abuse?

A.    Yes, this would be one example of that.

      MR. MONTROY:  Sorry, Your Honor, if I could just have a second.  And, Your Honor, I think I indicated the wrong page when I said page 2.

      THE COURT:  Okay.

      MR. MONTROY:  Unfortunately I don't have the actual document in front of me.  That was page 4, Your Honor.

      THE COURT:  Page 4.

      MR. MONTROY:  Thank you.

BY MR. MONTROY:

Q.   Was Mr. Sindel aware of this episode that Mr. Petty described?

A.   Yes.

Q.   And you learned this evidence, this particular passage you said during the prep session before the penalty phase?

A.   I think that I learned of it during my initial contact with Mr. Petty, and then during the prep session we discussed it again --

Q.   Okay.

A.   -- I believe.

Q.   When you first talked to Mr. Petty, do you recall when exactly that it was?

A.   No, it had to be -- it had to be -- when I really immersed myself in the case was when that first -- when the other penalty phase was over, and so it had to be after that point.  Somewhere between that point and the 22nd or 20 -- it was from that point up till the weekend where we had those prep sessions.  So it had to be somewhere in there.  I don't recall specifically when.

Q.   So some time after June -- or, I'm sorry, some time after January 20th, and some time before February 22nd?

A.   Yeah -- yes.  Generally, yes.

Q.   Do you remember if you saw Mr. Petty in person or if you talked to him on the phone?

A.    I don't recall.

Q.    Okay.  Was Mr. Sindel and Mr. Simon present at the first interview that you had with Mr. Petty?

A.    I don't know, no.

Q.    When you and Mr. Sindel are meeting with Mr. Petty on that February 22nd, 2012 -- or, I'm sorry, not 2012 -- that February 22nd date, did you or Rick ever ask him if there were any additional episodes of physical abuse of Mr. Allen that he witnessed?

A.    I don't believe I asked him the followup questions.

Q.    Okay.  Would you -- is that something that you would have wanted to have done?

A.    Yes.

Q.    Why did you not follow up and ask Mr. Petty if he had observed other instances of physical abuse?

A.    Okay, it would seem logical and obvious that I would ask the followup question.  I would attribute it to this sort of being a very chaotic situation.  This was like an assembly line, these interview sessions.  So it was definitely a lapse on my part not to follow up with Mr. Petty on this.  But I can attribute it to the conditions at the time.

Q.    Do you recognize this document --

        MR. MONTROY:  And, Your Honor, I'm showing Exhibit 506.

        THE COURT:  New?

MR. MONTROY:  And this exhibit is already in evidence.

THE COURT:  Okay.

BY MR. MONTROY:

Q.    Do you recognize this document, Dr. Randall?

A.    Yes, I do.

Q.    And what is this document?

A.    This is a sketch of a rough direct examination for Raymond Petty.

Q.    And who drafted this document, do you know?

A.    This is mine.

Q.    And what did you do with this document after you drafted it?

A.    I shared it with Mr. Sindel.

Q.    I'm going to turn your attention to page 4.  And do you specifically recall this question on page 4:

Quote:  "Do you recall any specific incidents between Bill and his mother that stand out for you?  Please tell the jury about that."

A.    I wrote that.

Q.    And was that in reference to the evidence of physical abuse that Mr. Petty --

A.    The one with the extension cord where he was getting whacked, yes.

Q.    Did Mr. Petty -- strike that.  Did Mr. Petty eventually

testify at the penalty phase?

A.    He did.

Q.    Did he testify to evidence of physical abuse?

A.    He related the incident as he related it to us, the beating incident.

Q.    When you presented these draft questions to Mr. Sindel, did Mr. Sindel ever ask you to follow up on the evidence of physical abuse that Mr. Petty had related?

A.    The answer would be no at that point, because we were -- there was -- we were doing rapid-fire witness prep and just going through them and getting information that they shared with us and making sure that we were able to try to present the information that we had already.  So I don't think -- I mean, there was no directive from Rick about ask more about this or explore more about this.

Q.    And following the February 22nd or February 21st meeting with Mr. Petty where Rick, Mr. Sindel, was present, did he ever ask you after that meeting to follow up with Mr. Petty or any other witnesses about potential physical abuse?

A.    No.

Q.    After you got this information from Mr. Petty, did you ever take this information and discuss this incident with other family members or friends of Mr. Allen?

A.    This would be the -- when I initially testified in

court for the continuance motion, I talked about how the development of mitigation is an iterative process where you get information from people.

MS. COSTANTIN: Judge, I'm going to object, this is nonresponsive. The question was simply did he follow up with any abuse.

THE COURT: Sustained.

BY MR. MONTROY:

Q. Dr. Randall, did you follow up with any family members or any other potential mitigation witnesses?

A. No, I did not.

Q. Is that something in your opinion you should have done?

A. Yes.

Q. Why should you have done that?

A. Because it -- by following through with other witnesses about incidents that they might have been present at, you develop stronger evidence to support the facts that Witness 1 related to you or Witness A related to you, if there's other people who can also share their recollection of that same experience. And also it provides information. This particular beating happened when Billy was 16, 17, 18 years old, when he was older. And by inference this was a pattern of behavior. It was highly doubtful that this behavior on the part of Juanita Allen started when Billie was an adolescent. So you would want to also ask people about other

episodes of abuse as well. So that's part of the normal course of a mitigation investigation.

Q. And forget for a second actually going to family members and other potential witnesses and presenting them with this particular story. When you heard this story and you learned about the physical abuse, would that have been something that you wanted to go back and explore with witnesses, potential witnesses without actually saying, hey, this is what Mr. Petty told us?

A. Right. Well, this was sort of like -- mitigation investigation is sort of perverse in a sense that what's bad is good for us. So if this is a bad incident that happened to the client, this is like the mother lode. This is what we want to find in a mitigation investigation.

And what I would do is I would go back in his world and talk to people. And when I start questions, I usually use open-ended types of questions so I'm not putting words in people's mouths. So I would -- I would want to try to get to this in a roundabout way initially. And then if I needed to ask more specific questions later, I would do so.

Q. And did you ever do that in this specific case?

A. No, I didn't.

Q. So you never went back to Mr. Allen's immediate family and after talking to Mr. Petty to try and find out whether there had been physical abuse in Mr. Allen's life?

A.    I did not, no.

Q.    Did you do that with any witnesses outside of Mr. Allen's family?

A.    I don't believe so.

Q.    And why not?

A.    I believe it was a lapse on my part.

Q.    So was it something you just simply forgot to do or failed to do?

A.    It was a failure on my part.  I think that as this compressed time frame was -- you know, that we were working under, I was talking to witnesses from different cross-sections of Billie's life, teachers, people in the community, et cetera, and it was sort of a rapid-fire process.  And even though this is an obvious thing to follow up on in hindsight, it sort of fell through the cracks at the time.

Q.    And did Mr. Sindel or Mr. Simon ever tell you to use this process that you just described and go back to the family or go back to other witnesses and determine whether or not there were other instances of physical abuse?

A.    It was a process that I would typically use, but they did not direct me to do that, no.

Q.    Are you familiar with the idea of establishing a causal nexus between the facts of the crime and mitigation?

A.    Am I aware that's possible to do so?

Q.      Yeah, are you aware of the theory of doing this?

THE COURT:  Okay.  I think it may be a little confusing.  Could you state what you think the theory is?

MR. MONTROY:  Sure.

BY MR. MONTROY:

Q.      Well, have you heard the term "causal nexus" before in terms of doing mitigation?

A.      Well, not necessarily in terms of doing mitigation. But a causal nexus in general is an explanation, certain factors cause a certain behavior or outcome.

Q.      And how would the mitigation -- how would that relate to mitigation in a capital case in your mind, or does it not?

A.      It could potentially relate to one.  I think more so when mental state at the time of the offense is an issue. Let's say the person was psychotic or schizophrenic at the time of the offense, then there might be a causal nexus between the mental state and the offense.  And that if the person was found guilty rather than NGRI, then we'd get into the penalty phase, and then that mental state information would again come up at the penalty phase.  And even though it would not be exculpatory per se, it would be more about diminished capacity.  And there would be a causal nexus between the person's mental state and the offense in a case like that.  In this particular case I didn't see that kind of --

Q.    Okay.  And at the time of Mr. Allen's penalty phase, did you believe that you needed to establish a causal nexus for the mitigation that you were presenting to be credited by the jury?

A.    No.

Q.    Did Mr. Sindel or Mr. Simon ever advise you that you should look for mitigation evidence where there was a causal nexus?

A.    If I found it -- you know, if it was there, I would have hopefully found it.  But I was never instructed to do so.

Q.    Okay.  Did the idea of needing to establish a causal connection in any way limit your investigation into mitigation in this case?

A.    I see that as being unrelated to the mitigation.

Q.    Okay.  I just want to ask you some questions now about Mr. Allen's mother, Juanita.  Did you ever have the opportunity to meet with Billie's mother, Juanita Petty?

A.    Yes.

Q.    And do you recall what you discussed with her when you met with Ms. Petty?

A.    Off the top of my head, I don't recall specifics.  It was an initial interview, initial meeting.  I don't recall specifically as I sit here what I asked her.

MR. MONTROY:  If I could just have the Court's

indulgence for a second?

THE COURT:  Sure.

BY MR. MONTROY:

Q.    Dr. Randall, I'm pointing your attention to Exhibit 411.

MR. MONTROY:  This is a new exhibit, Your Honor.

THE COURT:  All right.  Thank you.

Q.    Do you recognize this document, Dr. Randall?

A.    Yes, it's a transcribed or typed meeting notes from my meeting with Juanita.

Q.    And before we get into the substance of it, how would this type of document be prepared or how was this specifically, this document prepared?

A.    Okay.  It was either prepared -- I don't recall specifically.  When I prepare my notes, I'm either typing on a laptop or I'm writing quickly, and then later dictating my handwritten notes and having them transcribed.  So I believe that this might have been handwritten and then later dictated and transcribed.

Q.    And would you be the person who transcribed it?

A.    No, I would put it on a tape and drop it off at a secretary, and she would transcribe it.

Q.    So this document reflects an interview that you did with Billie's mother, is that correct, Mr. Allen's mother?

A.    Yes.

Q.    Do you recall the substance of this document -- well, actually if you wouldn't mind just reading the document to yourself for a second.

A.    Can I backtrack on a previous answer?

Q.    Sure.

A.    When I asked about whether it was transcribed or not or whether I had -- if this was done after the point when I moved to St. Louis, I don't believe I went back up to -- I don't recall -- like if I had a chance to go back to Chicago, then it was probably transcribed.  If it was in St. Louis, then I wrote it out, then I typed it out myself.  So that's -- so I just wanted to add that.

Q.    Let me ask you this question, this might make things simple.  Do you recall ever having discussed evidence of abuse and neglect of Mr. Allen with his mother?

A.    I don't recall doing so, no.

Q.    Do you think that you ever had a conversation with Ms. Allen -- Mrs. Allen regarding abuse and neglect?

A.    I am pretty sure I did not have that conversation.

Q.    If you had a conversation with Mr. Allen's mother about abuse and neglect in his household, would that be reflected in your notes?

A.    It would be.

Q.    When you -- I'm sorry, go ahead.

A.    This was an initial meeting with Mrs. Allen.  And so

when I first meet a client's mother or family member, I try to sort of meet them where they are at. And usually where they are at is in a place of some distress given that their family member is on trial. So I usually start with questions like, so what's going on, what was your reaction to hearing about Billie getting charged with all this? Because I'm trying to meet them where they are at first to sort of feel them out. And so that's what you see in the beginning here of this document.

And so during this initial meeting, I'm just trying to get a sense of who she is as a person, what her belief system is in terms of whether -- you know, how much she's tied into he's innocent kind of thing, you know, versus not. Trying to get a sense of what her relationship is like with the attorneys. Getting a sense of what she's like emotionally. So, you know, that was my sort of mission during this first interview.

Q.    Was there anything that Juanita Allen said to you that made you suspicious that Mr. Allen had been abused and neglected?

A.    I don't believe it was what she -- it was more of the way she said things than what she said. Because I think in this initial meeting, she's not volunteering that she's, you know, beat her son, abused her son. And I'm not pushing her to tell me at this point. Because the sense I have of her,

you know, at this point is this is a very angry woman who has been through a lot in her life, and she is -- I don't know how much questioning she can -- I got the sense that she couldn't tolerate specific questioning about her potential culpability in helping shape Billie in a negative way.  In terms of -- what I mean by that is bad things that she could have done to him at this point.

So, you know, this is my first meeting with her.  I don't want to alienate her and push her away.

Q.   Okay.  I'm going to direct your attention to the third page of Exhibit 411.  All right.  For starters, can you tell whether or not this was the top of page -- strike that.  I want to direct your attention to the very top line of page 3.

A.   All right.  "You don't want to see me angry"?

Q.   Correct.  And that appears to be underlined.  Was that underlined by you or do you know who underlined it?

A.   I don't believe that was underlined by me.

Q.   Does that line have any significance to you in terms of your meeting with Ms. Allen and her demeanor?

A.   Like I said earlier, I mean, I could tell from her demeanor that she was an angry individual.  But this sort of was consistent, her statement was consistent with that.  And she has some awareness of her propensity.

Q.   And do you know if she made the statement to you at your first meeting with her or a subsequent meeting?

A.   This was all during the first meeting, I believe.

Q.   Do you recall, did you also meet with Juanita on the February 23rd prep session?

A.   I believe we did.

Q.   Do you know, was Mr. Sindel present for that meeting?

A.   He was present for those -- the whole purpose was for him to become familiar with some of these witnesses.

Q.   Okay.  Did Mr. Sindel ever tell you about any substantive conversations that he had had with Mr. Allen's mother?

A.   Not that I'm aware of.

Q.   Did Mr. Sindel ever tell you if he'd ever asked Juanita if Mr. Allen had been physically abused?

A.   No.  I think he would have hopefully shared that with me.

Q.   And based on your conversations with Mr. Sindel, did you conclude whether Mr. Sindel had ever discussed abuse with Billie's mother?

A.   Not that I'm aware of.

Q.   When you say, "not that you're aware of," you concluded that he did not have that discussion or he did have that discussion?

A.   I'm not clear on the question.

Q.   I'm sorry.  In your answer, did you -- based on your conversations with Mr. Sindel, did you form a conclusion as

to whether or not he had ever discussed abuse with Mr. Allen's mother?

A.   I don't -- it never came up with me, so I don't -- I don't know.

Q.   Okay.

MR. MONTROY:  Your Honor, I'm going to point the Court's attention to Exhibit 301.  This is an exhibit that's already in evidence.

THE COURT:  All right.

BY MR. MONTROY:

Q.   Dr. Randall, is this a document that you prepared?

A.   No.

Q.   Is -- do you recognize this as to whether or not this document was ever given to you?

A.   I don't recall.  I don't recall.

Q.   And could you just take a minute to look at this document.  Let me know when you get to the bottom of the first page.

A.   Okay.  It's an interview of -- it appears to be an interview of Juanita Allen by Rick.

Q.   And actually if you could just read it to yourself for a second and then let me know when you're done with the first page.

A.   I'm done with the first page.  Okay.  Okay.  Okay. Okay.  Okay.  Okay.  Okay.  Okay.  Okay.

Q.   Okay.   And this document is entitled *USA versus Billie Allen.*  Is that right?

A.   Yes.

Q.   And the next line says, *Juanita Allen, April 16, 1997*?

A.   *Mitigation Notebook,* yes.

Q.   April 16th, 1997, were you involved in Mr. Allen's case yet?

A.   No, this was well before I was involved.

Q.   And what does this document appear to be to you?

A.   It appears to be --

      MS. COSTANTIN:  Judge, I'm going to object.  He's already said he's never seen it before.

      THE COURT:  Correct.

      MS. COSTANTIN:  So as far as his opinion on something that he never saw as part of his preparation, I'm not sure of the relevance.

      THE COURT:  Sustained.  Unless there can be a foundation, sustained.

BY MR. MONTROY:

Q.   You see on the first line there that there's an "R"?

A.   Yes.

Q.   And then there's a question, school there, is that correct?

A.   Yes.

Q.   And then that's "W"?

A.    Yes.

Q.    And then there's an answer, "4535 Cote Brilliante"?

A.    Yes.

Q.    Do you recall who lived at 4535 Cote Brilliante?

A.    I believe the Allen family.

Q.    Okay.  Do you have any idea who the "R" represents in this document?

MS. COSTANTIN:  Judge, once again I'm going to object, this is just speculation.

THE COURT:  Yeah, sustained.  Unless he says -- if he's had some familiarity with it previously.

BY MR. MONTROY:

Q.    Okay.  At any point in time in this document is there any discussion of physical abuse and neglect in the Allen household?

A.    No.

Q.    And, again, did you receive -- setting aside this document for a second, did you receive any documents from Mr. Sindel regarding interviews that he might have done with Mr. Allen's mother?

A.    No, not that I recall.

Q.    Did Mr. Sindel ever tell you that he had spoken with Mr. Allen's mother and that Mr. Allen's mother denied that there was any physical abuse of Mr. Allen?

A.    No.

Q.    If Mr. Sindel had told you that Mr. Allen's mother denied abuse of Mr. Allen, what would you have done with that information?

A.    I would have sort of filed it in the -- I would have written it down and filed it in the back of my mind as something that she said, but I would not have necessarily taken -- I would not have taken it at face value.

Q.    Okay.  Would that information have precluded you from investigating potential evidence of physical abuse in the Allen household?

A.    No.  That information should -- would not have or should not have impacted either way.  The investigation of abuse in the household should have happened, period.

Q.    And that's regardless of whether or not Mr. Allen's mother --

A.    Regardless of what she said, yeah.

Q.    But just to be clear, there was never any indication to you from Mr. Sindel or Mr. Simon that Mr. Allen's mother denied physical abuse to them?

A.    Correct.

Q.    Did John Simon ever tell you about any of his conversations with Juanita Allen?

A.    Not that I -- not that I recall.

Q.    Did Mr. Simon ever tell you that Juanita Allen was drunk when he went to the house to talk to her?

A.    Not that I recall, no.

Q.    If you had had this information that Mrs. Allen was drunk in her house several months before the start of the trial, if you had had that information several months before the start of the trial, is there anything that you would have done with that information?

A.    Similar to the other question, I would have written it down and it would have been something that I would have wanted to explore further in terms of her propensity to drink.  And in this particular case when I met her, my sense was that she was someone who was a drinker.

Q.    And did you ever follow up with her drinking with her or other witnesses?

A.    Not -- not that I recall.

Q.    And was there a reason why you didn't follow up with that?

A.    Similar to what I stated earlier, I didn't close the loop on this really important mitigation area because I -- it was a lapse on my part, and I was preoccupied with other witnesses, nonfamily member witnesses during this compressed time period.

Q.    And can you describe what you mean by you "didn't close the loop"?

A.    In terms of the iterative nature of the mitigation investigation, cross-checking things like what Raymond Petty

had told me about abuse in the house.  I didn't -- I neglected to pursue additional interviews with the family members, the sisters, the mom over the course of the investigation.  There was a lot of information, there were a lot of people I talked to, and I just never -- I wasn't -- this was the first time I've worked under these kinds of conditions, under this kind of compressed time frame.  And I don't think I adjusted my style or approach to this case in a way that perhaps I needed to.

I was used -- or in all other situations, I'm able to do an investigation over a period of time and always get to the point where I need to get.  I never -- I didn't calibrate myself in my approach for this type of situation. I don't know how else I can say it.

Q.   Okay.  Did Mr. Sindel or Mr. Simon ever direct you to follow up on evidence that Mrs. Allen was an alcoholic?

A.   Did they -- no.

Q.   Was there any reason that you knew of that you didn't follow up on evidence that Mrs. Allen was an alcoholic?

A.   Was there any reason I didn't follow up on it?

Q.   Yeah, was there any strategic reason or reason that you didn't follow up on it?

A.   No.  I had an idea, but I didn't develop it.

Q.   If you had developed evidence that Mrs. Allen was a severe alcoholic, would that be evidence that you would

consider mitigation?

A.    It was one of the -- if you go back to the list of factors that affect Billie's life, that initial, that typed list, one of the items was genetic -- I believe genetic predisposition to alcoholism or genetic predisposition to alcohol abuse.  That would have tied into that factor.  I had information about the dad's side, the father being a substance abuser and alcoholic.  That part we knew superficially.  But I did not close the loop on the maternal side.  And that was really critical information in hindsight.

Q.    I'm sorry.  If you had some information that Mrs. Allen was an alcoholic and had a drinking problem, would that have been evidence that you would have wanted to present at the penalty phase?

A.    It was evidence that we were -- it was consistent with evidence that we presented, and it should have been presented more fully.

Q.    Okay.

THE COURT:  I think we'll take about a 15-minute break.  Court's in recess.

(Court in recess from 10:13 a.m. until 10:32 a.m.)

THE COURT:  Everyone all set?  You may proceed.

MR. MONTROY:  Thank you, Your Honor.

BY MR. MONTROY:

Q.    Dr. Randall, you had described your initial impressions

of Mr. Allen's mother. I think you used the terms, she was a hard person, had a temper. Is that an accurate indication of what your impressions were of her?

A.    Yes.

Q.    Did you ever discuss with Rick his -- I'm sorry, Mr. Sindel, his impressions of Mrs. Allen?

A.    I probably did, but I don't recall as I sit here right now.

Q.    Do you have any recollection of whether he shared your impressions?

A.    As I sit here right now, I don't recall.

Q.    Did you ever talk with Mr. Sindel about calling Mrs. Allen as a witness at Mr. Allen's penalty phase?

A.    I believe that she was one of the people who was -- who came in during the weekend when we were interviewing all the potential witnesses, so I believe she was on the witness list.

Q.    Do you recall why she did not testify?

A.    I don't recall.

Q.    Do you know -- was she not called as a witness because of testimony given by Johnnie Grant during the guilt phase, was that a reason that she was not called?

       MS. COSTANTIN: Judge, I'm going to object, he just said he doesn't recall why she wasn't called.

       THE COURT: Correct. Unless you can somehow refresh

his recollection.  Sustained.

MR. MONTROY:  Thank you.

BY MR. MONTROY:

Q.    Was that ever expressed to you by Mr. Sindel, that Mrs. Allen was not going to be called because of testimony given by Johnnie Grant at the guilt phase?

A.    That doesn't stand out to me.

THE COURT:  That was what?

THE WITNESS:  Oh, that does not stand out to me.

Q.    So you don't remember Mr. Sindel or Mr. Simon saying that to you?

A.    Correct.

Q.    Have you had an opportunity to review Mr. Allen's mom's -- mother's deposition that was conducted by the government in this case?

A.    I did.

Q.    Was there evidence in that deposition presented by Mrs. Allen that you would want to present at the penalty phase in Mr. Allen's case?

MS. COSTANTIN:  Judge, I'm going to object, first of all, as to hearsay.  We're not talking about what evidence there was.  And it's Juanita Allen's deposition, and he was not present for the deposition, it was just talking about a document.

THE COURT:  Okay.  Well, here's what I will allow.

Understanding that he wasn't present and understanding he has reviewed the deposition, the question was, is there some part of it that he would in hindsight like to have presented?

MR. MONTROY: That's absolutely right, Your Honor.

THE COURT: I'll hear that.

BY MR. MONTROY:

Q. Is there testimony that Juanita Allen presented in her deposition that had you had that testimony, you would have wanted to present it at Mr. Allen's penalty phase?

A. Yes. Information there and also from the declaration that was prepared also.

Q. Okay. And can you speak generally about what types of mitigation you saw in her testimony that you would wanted to have presented?

A. Okay. In that information, in her dialogue she talks about what she was like temperamentally in the home when Billie was growing up, the fact that she was physically abusive to Billie in terms of beating him, whipping him in a number of different ways, throwing shoes at him, et cetera. There was a point -- she described a continuing pattern of beating that escalated when Billie got to a certain age, I think around ten years old. She described her drinking and how out of control she was. She described feeling regretful for what she had done.

THE COURT: I didn't hear that.

THE WITNESS:  She described feeling regretful for what she had done, the way she raised her kids, that not only did it affect Billie, but it affected his sisters as well.

Q.   Do you recall testimony of Juanita Allen locking Billie Allen out of the home when he was a child?

THE COURT:  Testimony from the deposition?

MR. MONTROY:  From the deposition, that's right, Your Honor.

A.   Yes.  She would basically, you know, lock him out.

Q.   Is that evidence that you would have wanted to present at the penalty phase?

A.   Absolutely.

Q.   Is that evidence -- and the evidence that you just described, is that evidence that you would wanted to have developed during your mitigation investigation?

A.   That was readily available apparently and should have been developed at the time.

Q.   And would you have wanted to develop that evidence not only from Mrs. Allen but through other witnesses?

A.   Through the siblings as well as sisters that were living in the house, as well as other individuals who had the opportunity to visit the house, like other relatives and friends of Billie's.

Q.   And is that evidence that you would wanted to have presented at the penalty phase?

A.    Yes.

Q.    Was there any strategic reason or any kind of reason that you were aware of made either by yourself or by Mr. Sindel or Mr. Simon not to develop that type of evidence and not to present that type of evidence at the penalty phase?

A.    That type of evidence is critically important to any penalty phase.  And there would be no logical or strategic reason to want to not present it.

Q.    When you were meeting with Juanita Allen, was there any type of barrier that you discerned between yourself and her?

A.    The only barrier that I discerned was being unfamiliar with her, not having a sufficient rapport with her, not having had the time to develop a sufficient rapport with her to really dig deep and get at some of these more sensitive issues.

Q.    And not having a rapport or needing time to develop a rapport, is that something that is unique to Mr. Allen's case or is that something that you found exists often in death penalty cases?

A.    Well, in death penalty cases you're dealing with difficult family situations, most if not almost all of the time.  And so you -- you're not going to ask at the first meeting, you know, did you beat your son or, you know, tell me about the different ways you beat him.  That's very

off-putting. That could be potentially off putting and you might lose that person. So that's why it's important to develop a trust and a working relationship so that you can get to that information. And, you know, with time, you know, I approach these cases in a nonjudgmental way and folks in a nonjudgmental way, so over time I can build that relationship and get to that information.

In this case I didn't feel I had the time to press her on this stuff. And in hindsight having read her deposition, she said, hey, if they asked me, I would have told them, okay. But I couldn't read her mind at the time. And based on her temperament, she was one angry person who I did not want to alienate. And I thought I needed to take my standard approach with her, which is what I did, and I didn't press her. And then basically the clock ran out.

Q.    If you would have been retained in this case, say four or five months before you were brought in, is that the kind of situation that you're talking about where you would have had the time to develop the rapport that you felt was necessary to ask the type of questions that would be needed to elicit evidence of physical abuse?

A.    Yes, absolutely.

Q.    Did Juanita Allen ever say anything to you directly to give you the impression that she was unwilling to talk to you about topic likes abuse and neglect?

A.    No, she never gave me that impression per se.  It was her demeanor and the fact that we were unfamiliar with each other that that was the reason why I didn't ask straight up.

Q.    And is it fair to say that you didn't ask those questions of most of the witnesses in this case?

A.    The reason I didn't ask her was because of her demeanor.  The reason I didn't ask it of the others, I think the clock sort of ran out and I didn't get time to close the loop, as I said earlier, and ask the questions that would have needed to be asked in terms of like the sisters and other folks.  And even looking at Raymond Petty's interview, there's many things in here that would require follow -- were leads, things that he was saying that I would have said, hey, tell me more about this.  And, you know, it was more like, tell me what you tell me.  Next.  Next.  You know, bring the next one on.  So --

Q.    So it sounds like what you're saying with both Juanita Allen and the other witnesses, it was ultimately a question of or a problem of getting a late start in terms of beginning the mitigation investigation?

A.    Yes.

Q.    In Juanita Allen's case it was, the problem was you got a late start developing a rapport with her?

A.    Yes.  Yes.

Q.    In terms of the other witnesses, it was a problem of

not having the opportunity to, you know, have multiple

conversations with them and that sort of thing?

A.    Yes.

Q.    Now, you had mentioned that you had an opportunity to

review some of the documents provided by Mr. Allen's current

legal team; is that right?

A.    Yes.

Q.    And those were affidavits that you mentioned in your

declaration?

A.    Correct.

Q.    And also Juanita Allen's deposition?

A.    Yes.

Q.    Generally speaking, was there mitigating information

about Mr. Allen contained in those documents?

A.    I believe there was substantial information in there

that I would like to -- I would like the jury to have known.

Q.    Okay.  So was there -- excuse me -- was there

mitigating information contained in those documents that you

failed to uncover during your investigation?

A.    Yes.

Q.    And what was the nature of that evidence?

A.    Well, the one that stands out most pronounced was the

descriptions of Juanita's drinking at the home, her demeanor

in the home, and her physical abuse of Billie.  There was a

lot -- there was information about the atmosphere in the home

and Billie's relationships with his sisters as well, and how he was the one in the house that was like, I think the word was dogged or picked on.

There was information in there about him being locked out of the house from an early age, even before he started to get into any of the drug dealing or whatever he was into when he was older, even as a young child.

There was information in there that was -- we presented some of it at the hearing, but there was some information in there about Billie being slow.

THE COURT:  Being what?

THE WITNESS:  Him being slow intellectually and not picking up on things like his peers, particularly around like sports and rules of basketball.  He was -- there was information in there about how he seemed as a child to be sort of zoned out, that he was sort of zoned out.  Like he was on Thorazine, one person said.  Spacy.  You know, I would interpret that as someone who is spacy.

I felt that the information from Billie Wayne Allen on the father's side was a critical piece that was missing during our presentation in terms of, you know, a whole different side of the family, that explained how Billie got co-opted into a drug subculture as a young child because his father and his uncle were selling drugs and sort of brought Billie along.

There was information in there about Billie being -- I believe it was having to cross Taylor Street to get from one point to another and how he wasn't a member of any particular gang, but he would be picked on by the different factions.

So, I mean, off the top of my head, those are just some of the things that I recall that would have put some things into a broader context.

Q.   And the evidence that you just described, the evidence that you've seen in the declarations and Mrs. Allen's deposition, is that the type of evidence that you would wanted to have developed in your mitigation investigation?

A.   It's critically important information that I would have wanted to develop and hopefully would have had the conditions been different.

Q.   And is it also evidence that you would have ultimately wanted to present at the penalty phase?

A.   Yes.

Q.   Was there any evidence contained in those documents that you would not have wanted to present or develop in your investigation for whatever strategic reason?

A.   There was nothing in there that I was afraid of.

Q.   And the evidence that you saw in those declarations and in that deposition, did you have or were you aware of any strategic reason for not investigating that evidence, for not

developing that evidence and for not presenting that evidence to the jury?

A.    There was no logical or strategic reason to have not presented that evidence.

MR. MONTROY:  If I could just have a second, Your Honor.

Q.    Were you actually present in court during the penalty phase?

A.    For much -- for much or most of it, I believe, if I recall.

Q.    Do you recall, did Mr. Sindel present any witnesses who he had not physically met prior to their testimony in Mr. Allen's case?  These are the defense witnesses I'm speaking of.

A.    Yes, I believe there were several that he had not met.

Q.    Do you find that to be problematic?

A.    Yes.

Q.    And why is that?

A.    Well, given the stakes, you would want to be familiar with your witnesses before you put them on the stand.

Q.    The defense presented 36 witnesses at trial at the penalty phase; is that correct?

A.    Yes.

Q.    In your opinion was this a sufficient number of witnesses?

A.    Well, in terms of sheer number, it was a large number of witnesses.  I don't think number tells the whole story.  I think it's the qualitative way that they were put on that's more important than the sheer number.

Q.    What's the difference between I guess qualitative and quantitative in terms of the witnesses that were presented?

A.    Well, I alluded or stated this earlier or something to this effect, where we put up as much as -- whatever we had, we put up, okay.  It was sort of, we threw it on the wall, so to speak, and there were pockets of good questioning and good testimony.  But much of it was sort of off the cuff, the questioning was a lot of it was off the cuff.  So in terms of the jurors getting the full picture of what witnesses could say, I don't think that happened.  So that would be the qualitative aspect.

The number of witnesses was impressive, I think.  I mean, I would have liked to have actually more.  The guards would have been more.  But 36 is a lot of witnesses.  It's probably the most witnesses I've had in a case.

Q.    Do you find that -- I guess when you mentioned quantitative versus qualitative, did you find that although there were a lot of witnesses, that there was something lacking on a qualitative level?

MS. COSTANTIN:  Judge, I'm going to object to the generality of these questions.  We want to get specifics.

Otherwise it's just his opinion about something we don't even know what he's talking about.

THE COURT:  Just a second, I was making notes.  I'm not sure I heard the whole question.  Just a second.  Could you read the last question.

(The reporter read from the record as directed.)

THE COURT:  Overruled.  I'll hear it.

A.    Yes, I -- yes.  Earlier I stated how a lot of the questioning was superficial, witnesses would say something that was important, but there was no questioning to follow up on those topics.  Oftentimes it would go from haphazard, from one topic to another.  There was a lot of questioning that led to yes/no type of answers that did not allow people to explain themselves fully in my opinion.  So that goes to the qualitative aspect.

Q.    And in your mind does the qualitative aspect also include the development of the mitigation from the investigation stage?

A.    Itself, like the foundation, yes.

Q.    What you're actually able to find or what you miss?

A.    Yes.

Q.    Did you at any point in time prepare a declaration in this case?

A.    I did.

MR. MONTROY:  And, Your Honor, I'm going to direct

the Court and Dr. Randall to Exhibit 254.

THE COURT:  Is that new?

MR. MONTROY:  This is new, yes.

THE COURT:  2-5-4?

MR. MONTROY:  That's correct, 2-5-4.

BY MR. MONTROY:

Q.    Do you recognize this document, Dr. Randall?

A.    I do, it's the declaration that I prepared.

Q.    And who did you -- I'm sorry, strike that.  What were the circumstances by which you prepared this document?

A.    I was contacted by Billie Allen's current counsel, and they wanted to speak with me about the case, and so I went down to Philadelphia and met with the team, the new team, and discussed, you know, the case.  And eventually they said they were asking me to prepare a declaration, sort of memorializing my thoughts on the case.

Q.    Okay. And where did it go from there?  How did this actual document get prepared, if you could --

A.    Okay.

Q.    -- explain the detail.

A.    Based on my discussions with the team and Mr. Wiseman, who is no longer with your office, I believe, a draft of the declaration was sent to me.  And then I worked on it to revise it to make it as accurate as I thought it could be.

Q.    Okay.  And then after you worked on it, did you sign

the document that you ultimately made changes to?

A.    Yes.

Q.    And is that document reflected in Exhibit 254?

A.    It appears to be, yes.

        MR. MONTROY:  The Court's indulgence.

Q.    And I'm directing your attention to page 20 of 20.  Is that your signature on that document?

A.    Yes.

Q.    And is that document dated?

A.    July 28th, 2009.

Q.    So does that reflect the date that you finished making the edits to this document and signed it?

A.    Correct.

Q.    I'd like to direct your attention to paragraph 1, the very last sentence, where you type, "I have also been asked to provide my expert opinions with regard to how trial defense counsel's penalty phase preparation may have fallen short, and to compare the mitigating information obtained and presented at the time of trial with what current counsel have uncovered."  Is that correct?

A.    Yes.

Q.    Were you ever told or was it ever suggested to you that the penalty phase preparation had, in fact, fallen short? Was that something that was suggested to you or told to you by 2255 counsel, or was that an opinion that you rendered on

your own?

A.    No, I knew that at the time, at the time of the hearing.

Q.    When you say you knew it at the time of the hearing, specifically when are you talking about?

A.    I knew back in March, in February and March of 1998 that there were problems.

Q.    All right.  So you're talking specifically about Mr. Allen -- you knew it at the time of Mr. Allen's trial?

A.    Yes, I knew that it had fallen short at that time because we weren't able to fully explore what we needed to. And due to the harried, rushed nature of the presentation, it was not effective like it could have been.

Q.    Okay.  So when you were asked by current 2255 counsel, were you asked to provide an objective opinion of how you perceived the case?

A.    Yes.

        MR. MONTROY:  The Court's indulgence.

Q.    I next want to draw your attention to paragraph 7:

        "Upon starting work, I quickly realized the case was in even worse shape than I expected.  In their limited contact with Mr. Allen's family members, trial counsel had not discussed substantive mitigation-related topics and seemed to have not even explained what a mitigation investigation entailed.  In essence, counsel had spoken to

the family only to keep them updated on the progress of the case.  No attempts had been made to begin the laborious process of generating Mr. Allen's social history.  Only a few records on Mr. Allen and his family had been collected.  Mitigation witnesses outside of Mr. Allen's immediately family -- teachers, friends, neighbors, et cetera -- had not even been identified let alone contacted.  Because of their limited contact with the family, compounded by obvious racial and social class issues, counsel had not put the time, in over, time to develop the level of trust necessary --"

THE COURT:  A little bit slower.

MR. MONTROY:  I'm sorry, I always do that.

Q.   "-- necessary for engaging family members around sensitive personal information germane to mitigation."

Does that accurately state paragraph 7?

A.   Yes.  And that's what it felt like, it was -- it felt as if it was in the embryonic stage when I became involved.

Q.   So are you discussing the time frame when you first began working on Mr. Allen's case?

A.   Yes.

Q.   Now, the -- you begin the third sentence with the words, "In essence, counsel had spoken to family only to keep them updated on the progress of the case.  No attempts had been made to begin the laborious process of generating Mr. Allen's social history."  And then the next sentence

says, as I just read, "Only --

A.    "Only a few records..."

Q.    Sure.  What did you mean by "In essence"?

A.    Okay.  Can you scroll up, please?

Q.    Yes, sure.

A.    Thank you.  Okay.  When I first became involved in the case -- these cases are confusing not only for -- even for professionals, but for lay people.  And in terms of explaining my involvement in the case and what's -- you know, why I'm focusing on the penalty phase and not guilt/innocence, and helping the --

      MS. COSTANTIN:  Judge, I'm going to object, this is nonresponsive.  I think the question was simply, what do you mean by "In essence."

      THE COURT:  Yes.  Sustained.

A.    Okay.

Q.    Well, had counsel only -- had counsel spoken only to the family to keep them updated on the case and no attempts had been made to begin the laborious process of generating Mr. Allen's social history?  You seemed to qualify that by saying "In essence," and I'm just wondering if there's something more to it than that specifically.

A.    Well, it's not entirely accurate.  And I said it felt like that it was at the embryonic stage.  It would have been more accurate to have said they had done just the most

preliminary work.

There was a document that was prepared by Mr. Simon that was entitled Social History of Billie Allen or something like that. So that -- they had done -- up to that point, that's pretty much what they had done, which is next to nothing.

Q.    Is that what you're describing in the next sentence or does that refer to something completely different? "Only a few records on Mr. Allen and his family had been collected," that sentence?

A.    I would say that they did collect some records, you know.

Q.    And, "Mitigation witnesses outside Mr. Allen's family -- teachers, friends, neighbors -- had not been identified."

THE COURT:  Just a little slower.

MR. MONTROY:  Sure.

A.    Going back to the previous statement where, "No attempts had been made to begin the laborious process of generating social history." I would say that a minimal attempt or embryonic. It was just the beginning. So the word "no" is too extreme I think. Okay.

And then with regarding outside the immediate family, minimal, I think there was a mention of Raymond Petty in the social history, so-called social history, this little

outline that Simon prepared.  But I would have expected at this late date, by the time I got involved that the work I had -- the amount of work I had done on my part, you know, up until March, that should have been what I walked into when I walked into this case, okay.

Q.    Moving down in the sentence, "Because of their limited contact with the family, compounded by obvious racial and social class issues, counsel had not put the time in, over time, to develop the level of trust for engaging family members around sensitive personal information germane to mitigation."

A.    Okay.

Q.    When you refer to "obvious racial and social class issues," what are you talking about there?

A.    Okay.  What I'm saying there is the defense team is Caucasian, the offender and his family are African American, different racial makeup, different socioeconomic class makeup.  And so, you know, that in my past experience are gaps that need to be bridged in the course of building a trust, building relationships with people who you're working with.

Q.    In your experience, how do you bridge those gaps?

A.    It takes time.  It takes communicating a genuine concern for the person.  Hearing what they are saying, you know, what they are really trying to tell you.

Acknowledging -- you know, validating where they are at. You know, and like I said earlier, regardless of what happened that led up to this point, or regardless of what they did in their family to their family member, not being -- conveying a feeling of not being judgmental to them.

Q.    So is it possible to bring the sort of racial and socioeconomic gaps?

A.    Sure, of course.

Q.    And your concern that you're expressing here is that those gaps had not been bridged when you entered the case; is that right?

A.    Yes.

Q.    And to be clear, did any of the witnesses that you encountered in this case, Mr. Allen's case, suggest that they would not speak freely with you because of race or socioeconomic issues?

A.    Not at all.

Q.    I'd like to direct your attention to the middle of paragraph 9, or I should say the end of paragraph 9, beginning with the sentence that says, and I'll read it: "While this was all known in 1998, and was accepted as a standard of practice, the recent American Bar Association, Supplementary Guidelines for the *Mitigation Function of Defense Teams in Death Penalty Cases,* 36 Hofstra Law Review 677 (2008), explain the exhaustive nature of capital

mitigation, and I commend them to the Court as an excellent overview of the unique challenges posed by capital mitigation."

Q.    Does that state accurately what is contained in your declaration?

A.    Yes.

Q.    Were these guidelines that you reference in that law review article, was that available to you at trial?

A.    No, because they were written many years after trial, that particular article was written.  However, what I stated in my continuance motion and other motions about the nature of mitigation and the nature of mitigation investigations is consistent with what was eventually written in these guidelines.

Q.    So why reference them in this declaration?

A.    Well, it's a more recent reference that is from a legal journal.  And it would be relevant to the reader, you know, to be aware of it.

Q.    And why did you ultimately commend then to the Court?

A.    Because it's a good overview of what's entailed in a mitigation investigation.

Q.    And how was it that these guidelines that we're discussing were mentioned in your declaration, how did that come about?

A.    They were suggested by Mr. Wiseman who drafted the

recommendation, and then I reviewed the article in preparation for the declaration.

Q.    And after reading the article, is that when you thought it would be appropriate to commend them to the Court?

A.    Yes.

Q.    I next want to point your attention to paragraph 11, to the sentence at the top of the page:  "In my short time working on this case, I expended considerable effort working with Ms. Allen to increase her chances of cooperation with a Caucasian defense team she did not trust.  We needed more time to build trust, time we always have had in other capital cases."  Is that an accurate reading of your declaration?

A.    That's what it says.  I would qualify that a little bit.

Q.    Would you explain what you meant by that for the Court?

A.    Okay.  I would -- the trust had not fully been built up.  I believe that I did not expend considerable effort working with her because I didn't have the time really to do so.

Q.    Okay.  Did Juanita Allen ever indicate to you that she didn't trust you?

A.    No.

Q.    Did she ever refuse to answer any questions that you asked her?

A.    No.

Q.    So was this description that you give in your declaration more of an understanding that in capital cases, working across racial and socioeconomic lines, you need to develop trust to get to serious issues?

MS. COSTANTIN:  Judge, I object, that's leading.

THE COURT:  It is.  Sustained.

BY MR. MONTROY:

Q.    When you say you needed more time to build trust --

A.    Yes.

Q.    -- is that something that you believe generally in these cases or is that something that was specific to this case?

A.    It takes -- different cases have different rates of sort of unfolding.  In this case I needed more time to -- I felt I needed more time to build a rapport and build a trust with her so I can get out what I needed to get out.  We didn't have that time.

Q.    Do you recall that your first meeting with Juanita Allen was on January 28th?

A.    I don't recall the specific date, but that sounds about right.

Q.    And do you recall when the penalty phase started?

A.    I think it was the end -- towards the end of February.

MR. MONTROY:  I'm sorry, Your Honor, if I could just have the Court's indulgence for a second.

Q.   Assuming that the guilt phase government opening was on February 17th, 1998, the penalty phase was on March 2nd, 1998, voir dire began on February 9th, 1998, and assuming that your first meeting with Juanita Allen was on January 28th, 1998, was that enough time in your mind to develop a rapport with Juanita Allen to get to the issues that you thought were important to get to?

A.   That's about a month period of time, and that is insufficient.  That was insufficient to do so.

Q.   Is that what you mean when you said, "We need more time to build trust, time we always have had in other capital cases"?

A.   Yes.

Q.   And now I'm just going to focus your attention to paragraph 12, which is already on the screen.  You write, "She had an obvious drinking problem, short temper, and was unpredictable, intimidating, and bullying character."

A.   Yes.

Q.   And you're referring to Juanita Allen there; is that correct?

A.   My impression of Juanita, yes.

Q.   Was this information that you would have wanted to be introduced at trial?

A.   Yes, uh-huh.

Q.   You then write a couple sentences down, "It was clear

that Ms. Allen was one of the primary abusers of her son."

A.    Right.

Q.    What do you mean by that?  What gave you that understanding?

A.    Based on my experience in capital cases, her emotional presentation to me and Billie's affect, his unemotional presentation, it was clear to me he was not raised in a nurturing home.

Q.    And were there things about Juanita Allen that gave you that impression, that she was one of the primary abusers?

A.    Yes, her demeanor, her angry temperament, that was my first impression.  And then later on we learned from Raymond about the beating incident, which confirmed that impression.

Q.    The fact that you believe that she was one of the primary abusers of her son, is that the theme that you would have wanted to develop in your mitigation investigation?

A.    Yeah, we would have wanted to have expanded on that.

Q.    And would you have wanted to present additional evidence at the penalty phase of that?

A.    It would have been very important to not only do it in a general way, but also bring out specific examples of episodes of abuse of the nature that were brought out in some of the declarations that were prepared.  It brings life to what happened.  It helps people understand, you know, the feeling of what happened at that time.

Q.    Now --

A.    The jury.

Q.    Okay.  Turning your attention to the end of paragraph 13.  The last sentence, you write:  "I also observed the maternal family dynamic.  Ms. Allen was an aggressive, dominant, and heavy-drinking woman who demonstrated a notable lack of warmth and compassion.  The only emotions she seemed to readily display were anger and rage."

A.    Okay.  My impression of her was, like I said just before, was that she was very angry, not a nurturing person, just sort of rough, a rough person.

Q.    Okay.

A.    And someone who it was clear had her own demons in her life.  And so that was my impression.

Q.    Was this the type of evidence that you would have wanted to have developed in your mitigation investigation?

A.    It was the type of information that should have been presented at the hearing.

Q.    Okay.  And was there any strategic decision that was made either by yourself or that you were made aware of by either Mr. Sindel or Mr. Simon to not develop this information and present it at the penalty phase?

A.    Like I said earlier, it would not be logical to do such a thing -- logical or strategic to do such a thing.  It would have been important to have presented it had we been fully

aware of it, or I should say we should have -- I don't know if "fully aware" was the right word.  We should have presented -- we should have developed it more fully and presented it.

Q.   Thank you.

MR. MONTROY:  Your Honor, could I just have one minute to consult with my co-counsel?

THE COURT:  Sure.

(There was a conference held off the record.)

MR. MONTROY:  Thank you.  Your Honor, I'm almost finished, just a couple additional questions.

THE COURT:  Okay.

BY MR. MONTROY:

Q.   Just switching gears away from the declaration for a second.  If Mr. Sindel had said to Juanita at their first meeting, "tell me everything," would you expect her or any mitigation witness in your experience to be able to answer that question -- or strike that.

If Mr. Sindel had told Juanita at their first meeting, "tell me everything," would you expect her to talk about physical abuse?

MS. COSTANTIN:  Judge, I'm going to object, that's speculation.

THE COURT:  I would probably allow it based upon, you know, his knowledge, training, and so forth, but, yeah,

just as it is, it is speculation.  Sustained.

BY MR. MONTROY:

Q.   Dr. Randall, you spent time meeting with Juanita Allen; is that correct?

A.   Yes.

Q.   And you have an impression of her from those meetings; is that correct?

A.   Yes.

Q.   Based on your experience in meeting with Juanita Allen and based on your experience working in death penalty mitigation cases, would you expect if you had asked or if anyone had asked Juanita Allen at the first meeting, tell me everything, to divulge instances of physical abuse, do you expect that she would have done so?

A.   Highly unlikely.  I mean, highly unlikely for her or for others.

        MR. MONTROY:  Your Honor, I'm going to direct the Court and Dr. Randall to Exhibit 305, which is already an exhibit.

        THE COURT:  Okay.

BY MR. MONTROY:

Q.   Dr. Randall, could you take a second to review this document.

A.   Okay.

Q.   What is the date of this document?

A.   It's April 17, 1997.

Q.   Okay.  And this appears to be a letter from Richard Sindel to Juanita Allen; is that correct?

MS. COSTANTIN:  Judge, I'm going to object to the relevance of this.  The witness has never seen the letter and it was months before, almost a year before he was ever involved in the case.

MR. MONTROY:  I'm sorry, if I may, Your Honor, I'm using this, I'm going to ask Dr. Randall a question about -- Dr. Randall has testified extensively about coming into a situation where he had a limited amount of time to develop mitigation.  And there may or may not have been done -- things done in that investigation prior to his involvement.  And so specifically I'm going to ask him a question about this document to elicit whether or not information in this letter might or might not have affected his investigation.

THE COURT:  Okay.  Let me hear the question first and then I'll rule.

MR. MONTROY:  Okay.  Sure.

BY MR. MONTROY:

Q.   I'm going to point your attention specifically to the second paragraph, and I'll highlight it there where Mr. Sindel indicates:  "Also, please provide me with names, addresses and phone numbers of individuals that you think I can talk to to help me understand Billie's character and that

can be used in court to present a strong and positive picture of his background."

A.    Okay.

Q.    Okay.  And so my question to you is, does this letter in your opinion as a mitigation investigator, as a mitigation specialist, appear to be eliciting specific types of information?

MS. COSTANTIN:  Judge, I'm going to object.  This letter speaks for itself.

THE COURT:  Yeah, it does.  Sustained.

MR. MONTROY:  Okay.  Well, my followup question, Your Honor, is actually the real question, which would be:

Q.    Is this the type of letter that you would want to use to start a mitigation investigation?

A.    No.

Q.    And why is that?

A.    Because I think that it's trying to -- I think it could potentially give the reader the impression that the only kind of information they are looking for is positive information.  And which is a component of what you want to find, but I think it could potentially bias the investigation in that direction.

So, you know, I would have -- if it was me writing it, I would just say, write it in a more general way without the frame of -- I would say, you know, can you give me the

names, addresses, and phone numbers of people who know Billie well and who had interactions with Billie so I can better understand him. Period. And I would leave out the frame of the -- the slant towards the strong, positive picture of his background. Because that's only part of it. And I'm not going to leave it up to her to interpret what that means, you know.

MR. MONTROY: Thank you, Your Honor. Thank you, Dr. Randall. I don't have any additional questions.

THE COURT: Whenever you're ready, you may inquire.

MS. COSTANTIN: Yes. I'm ready to go.

CROSS-EXAMINATION

BY MS. COSTANTIN:

Q.    That letter right there, that's a letter between Rick Sindel and Juanita Allen; is that right?

A.    Yes.

Q.    You have no idea how many other letters there were between Rick Sindel and Juanita Allen, do you?

A.    Correct.

Q.    You have no idea how many other phone conversations there were between Rick Sindel and Juanita Allen; is that right?

A.    That's correct.

Q.    And you have no idea how many in-person meetings there were between Rick Sindel and Juanita Allen, do you?

A.   That's correct also.

Q.   So you really have no idea about the relationship between the two of them other than the fact that you object to the word "strong and positive picture of his background" in this one letter written on April 17 of 1997; is that right?

A.   You're saying that I -- okay.

Q.   You have no idea of the content of the communications between Juanita Allen and Rick Sindel other than the fact that you object to those, what, six words on a letter written on April 17th?

A.   I know that there was a dearth of information given to me when I became involved.  I don't know if there was -- how frequent the contact was between Mr. Sindel and Juanita Allen was before.

Q.   And you have no idea if Rick Sindel ever said to Juanita Allen, I only want positive information, do you?

A.   That's what it says here.

Q.   Oh, is that what it says?

A.   I don't know -- well, no, there's a little more.  But I don't know what subsequent communication was.

Q.   Or prior communication for that matter, right?

A.   This --

Q.   My point is you seem to be drawing a conclusion from those few words that Juanita Allen was told by Rick Sindel,

don't tell me anything negative about Billie Allen every time. Do you think that's a little bit of an exaggeration to draw that from those few words in that letter?

A.   I didn't draw that conclusion. That would be a stretch.

Q.   That would be a stretch, wouldn't it?

A.   Yes.

Q.   Now, you were hired by the mitigation expert in this case for the trial back in 1998; is that right?

A.   Yes.

Q.   And at that time you had consulted in over 60 capital cases in Illinois, Indiana, Missouri, and California; is that right?

A.   And Michigan.

Q.   And Michigan as well?

A.   Yes.

Q.   Was that a state or federal in Michigan?

A.   I believe there were two federal cases in Michigan.

Q.   All right.

A.   But --

Q.   I'm sorry?

A.   The computer just went out.

Q.   I know, because we don't need to talk about that.

A.   Okay.

Q.   At the time of this case, you had been working in

mitigation for ten years; is that right?

A.   Since I believe -- in death penalty cases, since April of '89, I believe.

Q.   Okay.

A.   And on other types of mitigation, like non-death penalty cases from '86 on.

Q.   So you had been doing mitigation from '86 through this time, 1998, and death penalty mitigation specifically since April of '89 through 1998; is that right?

A.   And after this case as well.

Q.   And I'll talk to you about that in a moment.  But at the time, your experience at the time of Billie Allen's case was approximately, what, nine years in death penalty mitigation specifically?

A.   Correct.

Q.   And you are a staunch opponent of the death penalty and have been so for many years; is that right?

A.   I developed that belief over the course of my work.

Q.   And that is correct, you are a staunch opponent of the death penalty?

A.   I am now, yes.

Q.   You are not, however, an attorney; is that right?

A.   Correct.

Q.   And so when we're talking about strategic decisions being made about what witnesses to call or not in the death

penalty portion of a trial, those are decisions made by the trial attorneys; is that correct?

A.    I would say the ultimate responsibility for the decision is the trial attorney.  At the penalty phase there was collaboration between us.

Q.    And who makes the final call?  Who actually calls the witness to the stand and puts them on the stand?  The attorney, correct?

A.    It would be the attorney, yes.

Q.    Now, you were first contacted by Connie Caspari on January 15 of 1998; is that right?

A.    I believe so.

Q.    And you have no personal knowledge of anything that occurred between Rick Sindel or John Simon and Dr. Haney, the prior mitigation person; is that right?

A.    I have no knowledge of that?

Q.    You have no personal knowledge of that?

A.    Just from letters that I've seen subsequently.

Q.    So you have -- my point is, you had no communication with Dr. Haney about that; is that right?

A.    That's correct.

Q.    So any statements that you make in the declaration about what occurred between Rick Sindel and Dr. Haney is things that you were told by other people?

MR. MONTROY:  Objection, Your Honor, if we could see

exactly what statements counsel is referring to.

THE COURT:  Well, is that any statements --

MS. COSTANTIN:  Right.

THE COURT:  -- that would have occurred before January 15, '98, since he had no personal knowledge would necessarily have to be related by someone else.

MS. COSTANTIN:  Correct.

BY MS. COSTANTIN:

Q.   My question is, any statements in your declaration concerning what had occurred between Dr. Haney and Rick Sindel would have been based upon other people's telling you about what happened?

A.   It would have been based on input from him and his office, yeah.

Q.   "Him" being Rick Sindel?

A.   Mr. Sindel, yeah.

Q.   Now, on January 16th of 2008 is when you first had the conversation with Mr. Sindel about working on the case, is that correct, you remember that in your direct examination?

A.   I believe so, yes.

Q.   And that same day you faxed him a letter; is that right?  I'm showing you on the screen Government's Exhibit 336.  Is that the January 16th, 1998 letter that you faxed to Rick Sindel?

A.   Yes.

Q. And in that letter do you indicate that you are going to come down tomorrow to meet with him?

A. I said, "I can fly down to meet with you and your client as soon as tomorrow morning. Please let me know your intentions." Yes.

Q. Okay. And did you also at that time send a retention letter to him?

A. I'm not sure exactly when that letter was sent.

Q. Well, let's look at this letter, Government's Exhibit -- or the Exhibit 339. Is that dated January 16th of 1998?

A. It is.

Q. Okay. And in it do you -- is this what you would characterize as a retention letter?

A. Yes.

Q. Now, in this letter, and I'm going to highlight this portion, the actual text of the letter. You indicate that Billie Allen has been referred to you for a social history investigation in connection with preparing mitigation for a possible hearing on aggravation mitigation; is that correct?

A. Yes.

Q. And in this retention letter you also indicate that it's your understanding that any interviews or written contacts between you and the defendant or any other people are going to be confidential and privileged?

A.   That was my understanding.

Q.   Okay.  In this retention letter where you indicate that you plan to work on Billie Allen's case, you in no way indicate that your involvement in the case is conditioned on there being a continuance granted; is that correct?

A.   In this letter there is nothing about a continuance.

Q.   There is nothing in which you say, I'm not taking this case unless we get a continuance; is that right?

A.   There's nothing written in here to that effect.

Q.   And at the time that you wrote this letter at the time you were retained in this case, you knew the trial date, correct?

A.   Yes.

Q.   And you agreed to work on the case knowing that trial date; is that correct?

A.   With the understanding that we would go in to seek a continuance.

Q.   You didn't condition your involvement, however, on there being a continuance; is that correct?

A.   Correct.

Q.   And at that time your calendar was clear and you could use the work, right?  You were finishing up mitigation in one case and you had the time to work on it?

A.   I had time to work on a case, yes.

Q.   Now, I'm going to show you another letter that was

faxed to you this time, and this is dated January 16th of 1998.  Is that correct?

A.    Yes.

MS. CARLYLE:  I'm sorry, what exhibit are we talking about?

MS. COSTANTIN:  I'm sorry, Exhibit 335.

Q.    And in this fax it includes some contact information for you on both Billie Allen's mother as well as his grandfather; is that correct?

A.    Just the phone numbers of the mother and grandfather.

Q.    And it also includes a Life History prepared by John Simon; is that right?

A.    What they term as Life History.

Q.    That's what it states, the Life History completed by our co-counsel John Simon; is that right?

A.    What they term as Life History.

Q.    That's what the letter says, right?

A.    The letter says that they have included the Life History completed by our co-counsel John Simon.

Q.    And it also includes the fax of the court order on your fees and expenses; is that right?

A.    Yes.

Q.    And specifically the court order, which I'm showing Exhibit 29, indicates that you're being compensated $100 an hour, not to exceed 15,000 without prior authorization of the

Court; is that correct?

A.    Yes.

Q.    And that was your understanding of your -- of the payment situation at the time you were retained; is that right?

A.    Yes.

Q.    Now, do you recall going to St. Louis the next day on the 17th?

A.    I believe so.

Q.    And that's the day you met with Billie Allen; is that right?

A.    Right.

Q.    And the mitigation evidence that we discussed started on March 2nd; is that correct?

A.    You mean the penalty phase?

Q.    Yes, I'm sorry.

A.    The penalty phase started on March 2nd.

Q.    And then the defendant's case started on March 3rd?

A.    I believe so.

Q.    So you got to St. Louis on January 17th, and then the penalty phase started on March 2nd?

A.    Correct.

Q.    Now, when you were in St. Louis on January 17th, you met with Rick Sindel; is that right?

A.    Yes.

Q.   You did not meet with John Simon; is that right?

A.   I don't recall.

Q.   Well, let's look at Exhibit 340.  That's a letter dated January 19th or a fax dated January 19th from you to John Simon; is that right?

A.   Yes.

Q.   And looking at the first paragraph, doesn't it indicate, "I am the new mitigation expert on Billie's case. I flew to St. Louis on Saturday, met with Rick Sindel and Connie Caspari, perused numerous documents, and had my first meeting with Billie Allen at the jail in Union."  Is that correct, that's what that states?

A.   Yes.

Q.   So that would indicate to you, is it fair to say, that this is the fax in which you're introducing yourself to John Simon?

A.   That's correct.

Q.   And so as of January 19th, you had not met John Simon; is that right?

A.   Correct.

Q.   Now, the other portion of that first -- or second sentence indicates that you had "perused numerous documents." Is that right?

A.   Yes.

Q.   So the information that you had concerning this case

wasn't simply limited to material that had been mailed or faxed to you, right?

A.   I believe that had to do with police reports and things of that nature that were not mailed or faxed to me but that were present at Mr. Sindel's office.

Q.   And my question is simply that you are picking up -- you're perusing and then picking up documents when you're in St. Louis; is that right?  You didn't just look at documents, leave them there, and then go back to Evanston?

A.   I may have done that, I'm not sure.  I don't know what I brought back to Evanston.

Q.   Do you recall testifying previously back in June that you believe some of the documents that you had perused included medical records, police reports, and educational records?

A.   Yes.

Q.   And is that correct?

A.   I believe so.

Q.   Okay.  So back on January 17th, you were perusing Billie Allen's medical records, police reports, and educational records?

A.   Correct.

Q.   Now, when you met with Mr. Sindel on that Saturday in St. Louis, did he give you a rundown on the case?

A.   I'm sure he did.

Q.   And did he give you a rundown on Billie Allen and Billie Allen's family?

A.   He probably did.

Q.   Okay.  So he did give you background on Billie Allen and his family?

A.   I'm sure there was -- yes.

Q.   And he did give you some sort of insights, I assume, concerning his own contacts with Billie Allen?

A.   I don't recall specifically, but I'm sure he did.

Q.   Right.  And I'm sure he also gave you some insights on his contact with Juanita Allen?

A.   I'm sure he did also.

Q.   Now, as you sit here today, what is it, 15, 14 years later, do you recall the contents of those conversations?

A.   I do not.

Q.   But it's just logical to you that that's what he would have talked to you about, right?

A.   He would have given me his impressions at the time.

Q.   Okay.  And those impressions at the time would have included his impressions about Billie Allen and Juanita, their cooperation, their attitude, that general sort of information; is that right?

A.   Generally, yes.

Q.   And you don't remember any specifics because you don't even remember the conversation?

A.    I don't recall the specific conversation.

Q.    And would he have given you -- do you think he would have given you some information about where Billie grew up, went to school, perhaps that he was in the deseg program, that he was a good artist, that he had supportive family members, is that the kind of thing you would have expected him to say to you?

A.    If he had that information, he would have -- I would have expected him to share that.

Q.    But you're not saying he didn't share that with you, you're just saying you don't remember?

A.    I'm saying that it is logical that he would share his general impressions of his client and his -- whatever contact he had with family members with me.

Q.    So if at that time he knew that Billie had a situation where he went to the Clayton schools through the deseg program and then went back to the City schools and Mr. Sindel knew that, you would have expected that's the sort of information he would have shared with you?

A.    Yes.

Q.    And you're not saying he didn't share it with you, you're just saying you don't remember?

A.    I don't recall the specifics of the conversation.

Q.    Okay.  And so you don't recall any specifics of whether he told you that Billie was a good artist or that he had

family members had drawings of his or anything like that?

A.    He may have done that.

Q.    But you just don't remember the specifics?

A.    He may have given me some preliminary information.

Q.    And did he tell you, do you recall, whether or not Billie Allen had a criminal record?

A.    I think he had a tampering.

Q.    Yeah, that's what I'm asking you, did Mr. Sindel tell you anything about Billie Allen's criminal record on that meeting, January 17, 1998, or you just don't remember the contents of that?

A.    I don't recall the specific contents of our conversation.

Q.    Let me go back to that letter, Government's Exhibit 340, which is still up on the screen in front of you. There's a portion, five lines down, that says:

        "I have found from my experience that it's best for me to discuss, arrange, and conduct initial interviews with the family members by myself, as it gives me a chance to develop a rapport with these people and gives me a better feel for the mitigation case.  Following this initial round of interviews we can sketch out a rough direct of each potential mitigation witness, and then conduct followup interviews soon thereafter."

        Is that what you wrote to Mr. Simon on January 19th?

A.    Yes.

Q.    Now, do you recall testifying on direct examination back in June that one of the reasons that you chose to do all the interviews was because you felt that John Simon was too cerebral and his social sense was way off?  Do you recall that testimony?

A.    I do, yes.

Q.    Okay.  But, in fact, you hadn't even met Mr. Simon at the time you sent him this fax and told him that that's the way it was going to work, correct?

A.    Correct.

Q.    So the reality is that you wanted to do all the interviews, period, had nothing to do with your personal evaluation of Mr. Simon, because you hadn't even met him?

A.    Having met him confirmed my -- my plan here, that this was the way to proceed.

Q.    But your plan here was developed and that decision was made before you even met him.  This plan is because you wanted to do it this way, not because your evaluation of Mr. Simon; is that right?

A.    At this time -- at this point in time, yes.

Q.    Now, Mr. Simon was present for many of the interviews you did; is that correct?

A.    He may have been present during the witness prep, I don't recall.

Q.    Have you seen any of Mr. Simon's notes concerning mitigation interviews that either he did or that you did?

A.    I have not seen his notes.

Q.    So 2255 counsel has not provided you with copies of any of Mr. Simon's notes?

A.    Correct.

Q.    I want to direct your attention to 341, Exhibit 341.

THE COURT:  Already in?

MS. COSTANTIN:  Exhibit 341.

THE COURT:  Is it already in?

MS. COSTANTIN:  I believe so.

THE COURT:  Okay.

MR. HOLTSHOUSER:  Yes.

BY MS. COSTANTIN:

Q.    And is this a fax that you sent to Mr. Sindel on January 19th of 1998?

A.    Yes.

Q.    And I just want -- it's very similar to the fax that you sent to Mr. Simon.  Do you also indicate to Mr. Sindel that you found from your experience that it's best for you to discuss, arrange, and conduct initial interviews with the family members by yourself, as it gives you a chance to develop a rapport with these people and gives me a better feel for the mitigation case; is that right?

A.    Yes.

Q.    And that you also indicate that, "Following that initial round of interviews, we can sketch out a rough direct of each potential mitigation witness, and then conduct followup interviews soon thereafter."  Is that right?

A.    Yes.

Q.    And your understanding with Mr. Sindel as well is you were going to do all the interviews, right?

A.    That's what it appears to be, yes.

Q.    And that's how you remember it too; is that correct?

A.    Yes.

Q.    And you knew you had a time crunch, correct?

A.    I was going in with the expectation that we would seek a continuance, and I thought there was a good chance of getting one.

Q.    But you knew that there was a trial setting.  And you did not condition your involvement on there being a continuance granted, did you?

A.    I did not condition my involvement.

Q.    So you knew there was a time crunch, correct?

A.    I was going in with the expectation that we were going to seek more time, which we needed.  However, I did not condition my involvement on the granting of the continuance.

Q.    This is your plan, that you're going to do all the initial interviews and then a rough direct and then conduct followup interviews.  That's your plan; is that correct?

A.   As it's stated here, does not capture the verbal conversation that I had with Mr. Sindel about needing more time.

Q.   My question is simply, your plan in dealing with mitigation was:  "Following this initial round of interviews, we can sketch out a rough direct of each potential mitigation witness and then conduct followup interviews soon thereafter."  Was that your plan?

A.   That's what -- that's the stated plan.

Q.   And that was the plan on January 19th of 1998?

A.   Yes.

Q.   And as of January 19th of 1998, you knew what the trial date was?

A.   Yes.

Q.   Now, you've talked in your direct examination, you've talked a little bit about what an ideal mitigation investigation involved.  But this was the plan that you had on January 19th of 1998; is that right?

A.   Not correct as your question is stated.  It has some implicit assumptions.  The description of what a mitigation investigation entails that I had done in the continuance motion is not an ideal one, it's inadequate.  It's what a mitigation investigation entails, so --

Q.   This was your plan for how you were going to do the mitigation investigation in this case, correct?

A.    I would say that that statement taken in isolation would not be a full description of the plan.

Q.    Okay.  This is the plan that you told both attorneys you were going to do, correct?

A.    That was the approach that I was going to be taking.

Q.    Okay.  And are you stating that this plan that you told the attorneys on January 19th of 1998 was actually inadequate, and that you knew that on January 19th of 1998?

A.    What I'm saying by this statement is that this was the approach we were going to take, and that we were going to seek more time for the continuance.

Q.    No, no, here's my question.  My question is simply, this description right here when you wrote this on January 19th of 1998, did you believe that this plan was an inadequate mitigation investigation?  What you are proposing to them was an inadequate mitigation investigation?

A.    I don't think that my intention was to do an inadequate investigation by following this plan.

Q.    So this plan that you're proposing was what you thought would work?  That was your plan that you thought would work?

A.    What's -- no, because implicit in my mind was the fact that we were going to seek a continuance.  And this was the approach I was going to be taking towards the case with the understanding that we were going to be seeking more time.

Q.    And when I look at this, when we blow up this whole

letter, can you see in this letter or in the retention letter anywhere where it says that you weren't going to get involved in this case unless a continuance was granted?

A.    There is nothing in anything that I wrote that conditioned my involvement on the continuance.

Q.    Okay.  So there was nothing -- when you're writing to these attorneys and you're telling these attorneys what you can do, there's nothing in writing that's telling them that it will be an inadequate investigation if we don't get this continuance?

A.    In hindsight maybe that's something I should have written.  But my understanding through our verbal conversations was that we were going to seek more time and that I was going to involve myself full on in this case with that understanding.

Q.    No one ever told you that a continuance would be granted either, correct?

A.    We don't have a crystal ball.

Q.    So nobody ever told you a continuance would be granted, correct?

A.    Correct.

Q.    You said on direct both back in June and today that you would have liked to have talked to the jail guards; is that right?

A.    Yes.

Q.    And that if you had more time, you would have talked to jail guards, I think is how you phrased it?

A.    I would like to have had the opportunity to have spoken to the guards and developed that facet of the mitigation.

Q.    In fact, you did talk to at least four jail guards, didn't you?

A.    I don't recall.

Q.    Is that your handwriting?

A.    Yes.

Q.    Okay.  I'm showing you what's been marked as Government's Exhibit 680.  Are those your notes from an interview of Deputy Karen Burns?

A.    I guess they are.

Q.    Okay.  And so would that indicate -- and can you read what those say?

A.    It says, "Deputy Karen Burns," and there's like four bullet points.  "Bullet Point 1:  Not anything about him harming anybody else.  No. 2:  He's basically slow.  No. 3: Never violent or aggressive.  And No. 4 is:  Hard time getting him ready in the morning."

Q.    So that would be a jail guard that you spoke to; is that correct?

A.    Yes, it is.

Q.    I'm showing you Government's Exhibit 677.  Is that your notes from the interview of Lieutenant Dave Boehm from the

Franklin County Jail?

A.    Yes, it is.

Q.    Okay.  And so you did interview at least a second jail guard, Dave Boehm; is that right?

A.    Lieutenant Dave Boehm, yes.

Q.    Boehm, okay.  And that's -- you wrote out how it should be pronounced; is that right?

A.    I did.

        MR. MONTROY:  I'm sorry, if we could have an objection.  These exhibits don't appear on our list on the joint exhibit list.

        THE COURT:  677?

        MS. COSTANTIN:  These are your BAs.

        MR. MONTROY:  There's a joint exhibit list as the Court is aware in this case, and our version of it stops at 674.

        THE COURT:  Okay.

        MS. COSTANTIN:  These four have been added since the last hearing.  That was the joint exhibit list he was just talking about.  I mean, if you want me to give you the BA numbers, I'll give you the BA numbers.  These were produced by you to us.

        MR. HOLTSHOUSER:  The BA numbers are on the document.

        MR. MONTROY:  Your Honor, the only problem is we

together came up with a joint exhibit list of the universe of exhibits. And these exhibits aren't in that universe, so I'm not sure --

MS. COSTANTIN: And, Your Honor -- I'm sorry to interrupt.

MR. MONTROY: So, Your Honor, I would ask that these questions be stricken at this time because they involve materials that were not part of the exhibit list that were not agreed upon by the parties and had not been discussed before.

THE COURT: You mentioned that these were --

MS. COSTANTIN: These were provided to us by them. These were notes that were provided to the government by 2255 counsel. These are the BA numbers. They gave these to us.

MR. MONTROY: Your Honor, these are documents I'm assuming came from Mr. Sindel's file. There are thousands of pages of documents in this case. Obviously not all of them are in the exhibit list that we spent weeks working out. So these suddenly appear today. This is the first time that we're learning about them. We didn't -- we had no knowledge that they were going to be introduced today. There's never been any discussion from the government that these were going to be exhibits that they intended to use with this witness.

MS. COSTANTIN: Judge, as we've gone along, we have had to add exhibits. I mean, this is always something that's

been added as we go along as we realize we need exhibits. There no surprise here.  These are their documents.  And until Dr. Randall testified that -- first of all, until Dr. Randall testified that he had never talked to the jail guards, frankly, they weren't relevant.

I would also point out that on our amended list we state:  "Each party reserves the right to offer additional exhibits not listed for good cause shown."  And the good cause is that Dr. Randall just testified that he never talked to jail guards.  And now I have notes that they've provided to us that he did talk to jail guards.

MR. MONTROY:  Your Honor, if I just may.  The government clearly intended on introducing these documents. They are in the computer system.  At every other point we've informed each other that we were going to be adding documents when that's happened.  As I said, this was a motion that was filed with the Court.  It was a joint motion regarding a joint exhibit list.  And the first that we're hearing of these exhibits is right now.  And clearly there was an intention, there was an understanding that these documents were going to be used today prior than just this moment.  In fact, counsel referenced testimony from the June hearing, and Dr. Randall's testimony at the June hearing, and that was four months ago.

THE COURT:  Here's what I plan to do.  I don't want

to open a flood gate of new documents that the parties have not had an opportunity to review.  I think for good cause on this particular one since it came from the defendant's files, that in view of the witness' testimony that he had not -- that he wanted time to interview guards but didn't have the time, and now it appears that he did, I think that good cause will permit this one to come in.

However, I want to make it clear at this point that I have been particularly pleased with the level of cooperation between the parties in agreeing to these kind of things.  And by doing this, as I mentioned, I don't want this to become an exception.  There may very well be instances where the defendant may want to present evidence, and on a good cause showing I would likely permit that also.

So let me ask you this:  What other documents, Ms. Costantin, of which you are aware at this time would you expect to use that have not been part of this stipulation?

MS. COSTANTIN:  I'm just going by what Mr. Holtshouser has written, handwritten, and that would be the documents of the four interviews of the jail guards.  And I can give them the BA numbers.  That would be Karen Burns, Dave Boehm, Mark Prackt, and Todd Sinclair.  And then also the deposition -- I mean, not the deposition, the testimony of --

MR. HOLTSHOUSER:  There's a couple of these we have

discussed.  There is -- since the filing of the amended exhibit list, we've added a total of -- the parties have added a total of one, two, three, four, five, six, seven, eight, nine exhibits.  The last four that Ms. Costantin is referring to, which are 677 through 680, did not become apparent truthfully until the completion of the direct exam today.

While there was reference in the direct exam that he would have liked to talk to jail guards, there wasn't actually direct testimony that he didn't talk to jail guards until I think the completion of the direct today.  So whether or not those were going to be used was not really known until the completion of the direct.

But, however, 672, 673 were added to that original list from the last hearing.  Those were the letters of Claude McLemore.  674 was the CV of Mr. Simon.  675 was a handwritten draft of a fax to Dr. Wuertz.  And 676 is the transcript of Dr. Randall's testimony on June 11th.  It's been digitized.

But these other four are only related to jail guards.  Their relevance, good cause really was not clear until the completion of the direct here.

THE COURT:  We'll take a lunch break at this time, and I would ask that other documents that you intend to use that are not on that consent list, please disclose those.

And then we will take up and make a further record when we come back at one o'clock.

MS. COSTANTIN:  That's fine, Judge.

THE COURT:  Court's in recess.

(Court in recess from 12:03 p.m. until 1:04 p.m.)

THE COURT:  Well, before the break we were discussing 677, and the likelihood that there might be other exhibits used that were not on the consent list.  I'll hear anything further on that issue at this time.

MS. COSTANTIN:  Judge, as far as I know there's not -- and I mean that sincerely -- as far as this witness is concerned and this hearing this week, there's no other we're going to be adding.

THE COURT:  All right.

MS. COSTANTIN:  Other than the notes from the jail guards and then potentially Dr. Randall's transcript of his testimony from the first portion.

THE COURT:  All right.  Mr. Montroy.

MR. MONTROY:  Yes, Your Honor.  I mean, the arguments I made initially when this issue first came up, those arguments remain.  But we had an opportunity to talk, and my understanding is there is no additional exhibits as well.

THE COURT:  All right.  Very well.  Well, I'll permit receipt of 677.  You may proceed.

MS. COSTANTIN: Okay. To clarify, there's going to be 677, 678 and 679 and 680 are all those notes of his interviews with the jail.

MR. MONTROY: We're aware of those. We discussed those.

THE COURT: All right. Very well.

MS. COSTANTIN: Okay. I just wanted to make sure. It was the next thing I was going to ask about.

MR. HOLTSHOUSER: Judge, it will still be our plan at the conclusion of, the end of Dr. Randall's testimony, we would still clean up the record as far as exhibits.

THE COURT: Correct.

MR. HOLTSHOUSER: And the parties are attempting to keep track.

THE COURT: Correct. Thank you.

MS. COSTANTIN: May I proceed, Your Honor?

THE COURT: Yes.

BY MS. COSTANTIN:

Q.   Dr. Randall, directing you to Exhibit 677, and I know it says Government's Exhibit 677, but that's not correct. Are these your interview notes of Lieutenant Dave Boehm?

A.   They are.

Q.   And that's concerning -- and Lieutenant Dave Boehm is a Franklin County jail guard; is that right?

A.   Yes.

Q.   And he basically -- referring to your notes, does that help you remember that you actually did talk to Lieutenant Boehm?

A.   Yes, it does.

Q.   And Lieutenant Boehm indicated to you, is it correct, that Billie Allen was an average inmate, he had days when he was upset with his hair, that he had some policy violations, but nothing of any real significance involving lights and toothpaste and that sort of thing?

A.   Yes.

Q.   And that he hadn't learned to let the small stuff roll off his back.  And he indicated, or is this your notation right down here, "The prisons are full of people like this. That's what they are for."  The second from the bottom line, is that what he told you or what --

A.   In -- those are in brackets, those two sentences there. And my thinking is that that's my words because otherwise I wouldn't have put brackets around them.

Q.   Okay.  So basically your conclusion after interviewing Lieutenant Boehm was that prisons are full of people like he's describing Billie Allen, and that's what they are for, is that what you're concluding there?

A.   That and also does Lieutenant Boehm know about federal supermax options, imprisonment and incarceration options.

Q.   Okay.  I'm going to direct you to 678.  Does that

appear to be your notes of your interview of Deputy Mark Prackt?

A.    It does.

Q.    And he also was a Franklin County jail guard?

A.    Yes.

Q.    And that's where Billie Allen was being held was at Franklin County; is that right?

A.    Yes.

Q.    And he indicated just very briefly that he did intake and transportation.  And as far as he knew, there were no problems of adjustment of Billie Allen; is that right?

A.    Yes.

Q.    And then we have, I'm going to show you 679.  679 are interview notes of your interviews with Deputy Todd Sinclair?

A.    Yes.

        THE COURT:  What was the last name, Potts?

        MS. COSTANTIN:  The last one was Prackt, P-r-a-c-k-t.

Q.    679, what you see on the screen right now, are your notes of your interview of Deputy Todd Sinclair, also a Franklin County deputy or guard; is that right?

A.    Yes.

Q.    And he indicated to you, is it correct, that Mr. Billie Allen was just like a teenager, they don't listen all the time, hadn't been in any real trouble, he hadn't had to use

force on him, his room is never neat, he can be a good cleaner when he stays out of the module; is that right?

A.   No, he stays -- oh, he stays out at night to clean the rest of the module.  He does a good job, yeah.

Q.   So you actually did talk to four jail guards who dealt with Billie Allen; is that right?

A.   Yes.

Q.   And none of them testified; is that correct?

A.   Correct.

THE COURT:  Wait.  What was the fourth one?  Boehm --

MS. COSTANTIN:  The first one was Karen Burns.

THE COURT:  Karen Burns, okay.  Yes, thank you.

BY MS. COSTANTIN:

Q.   Is that right, Karen Burns was the first one?

A.   It sounds familiar.

Q.   Okay.  That was the handwritten notes?

A.   Yes.  The four bullet point one, yeah.

Q.   That one?

A.   Yes.

Q.   None of those four people testified, correct?

A.   Correct.

Q.   And they really didn't have much to add; is that correct?

A.   In my opinion they actually did have a lot to add.

VII - 118

Q.   So you're saying that you interviewed those people and you chose not to call them?

A.   Me personally?

Q.   Yes.

A.   I did not choose not to call them.

Q.   Okay.  Who chose not to call them?

A.   That was ultimately Mr. Sindel's call.

Q.   Okay.  Now, before you said you never had even interviewed the jail guards, but now you recall that you interviewed them, and Mr. Sindel made a conscious decision not to call them; is that right?

A.   Yes.

Q.   Okay.  All right.  So now do you remember talking to the jail guards?

A.   I see my notes from the jail guards.  I don't as I sit here now specifically recall, you know, the actual conversations, but I see the product of those conversations.

Q.   But you do recall Mr. Sindel making a conscious decision not to call them?

A.   Correct.

Q.   And was that -- did he explain to you why he didn't want to call them?

A.   I don't recall the nature of the conversation around that.

Q.   And when was that decision made?

A.    Some time after the interviews and before -- or during the penalty phase.  I'm not sure when.

Q.    Do you recall when the interviews were?

A.    A lot of the -- or the interviews, some of them looked like they were sort of -- a couple of them were a little more in detail.  Two of them were like in passing, so they were likely during my visits with Billie.

Q.    And how many visits did you have with Billie?

A.    I think I had at least two.

Q.    So it's your memory that the interviews would have likely occurred while you were visiting Billie?

A.    Yes.

Q.    And some time between the interviews and the time of the end of the penalty phase, a decision was made by Mr. Sindel not to call them?

A.    Correct.

Q.    Okay.  And did you agree or disagree with that decision?

A.    I feel that that's really important mitigating information, so I'm sure I disagreed with that.

Q.    And what was his response when you told him you thought the jail guards should be called?

A.    I don't recall what his response was.

Q.    So though you testified apparently back in June and also today that you never talked to the jail guards, you now

recall that you had a conversation with Mr. Sindel in which he told you he was specifically not going to call the jail guards after you had interviewed them?

MR. MONTROY: Objection, Your Honor, on direct examination today, although counsel is right that Dr. Randall testified that he did not actually recall speaking with the guards, he did recall having a conversation with Mr. Sindel where Mr. Sindel told him he didn't want to present evidence of the guards. So he did on direct examination -- it is a slight mischaracterization of his direct testimony.

MS. COSTANTIN: Let me rephrase it, Judge.

THE COURT: Very well.

BY MS. COSTANTIN:

Q. Okay. Did you testify on direct examination that Mr. Sindel had told you not to pursue the jail guards and that's why you didn't interview them? Do you recall testifying to that this morning?

A. I don't think he ever told me not to interview jail guards.

Q. Do you recall testifying this morning that he told you not to pursue the jail guards?

A. I don't -- I didn't -- no, what I recall is that the universe of that information around the correctional setting and witnesses potentially from that setting, he didn't want to present that information.

Q.   Okay.  So you testified this morning, and what you recall is that Mr. Sindel told you not to pursue any information around the correctional setting?

A.   He didn't direct me not to pursue it, it was his decision not to present it.

Q.   So you're saying this morning you did recall interviewing the jail guards?

A.   No.  What I'm saying is that I didn't recall specific interviews of the jail guards.  I recalled that that was information that I got from Billie during my first interview from my notes with him.  What I said was that -- the impression I had was Mr. Sindel did not want to pull from that universe of information, that jail universe.  And whether those guards or additional guards, I don't think he -- my impression is he didn't want to present that kind of information.

Q.   Your testimony this morning was that you got the names of jail guards from Billie Allen; is that right?

A.   Yes.

Q.   And that you spoke with Rick Sindel about that, correct?

A.   I think I testified that I did not recall specific conversations, but my impression was that he didn't want to present that kind of information.

Q.   And therefore you didn't pursue it?

A.    At a certain point there was a point where I didn't pursue it further.  But apparently I pursued it at some point because I did interview some people.

Q.    So I'm not quite understanding, and I mean this sincerely.  This morning were you saying that you did recall that you had talked to the jail guards and you discussed it with Mr. Sindel?

A.    No.  Up until the time that you presented the testimony today about the jail guards -- not the testimony, the notes, okay, my notes from my brief encounters with them, I had forgotten that I had talked to them, okay.  So -- they didn't testify.  So I'd forgotten I talked to them.  And now obviously I did talk to them because I took notes.  So I lost your question, I'm sorry.

Q.    Okay.  So my question was simply, this morning you testified that Rick Sindel told you not to pursue that area.  This afternoon appears what you're testifying to is that you did pursue that area --

        MR. MONTROY:  Objection, Your Honor.  Your Honor, I just have an objection.  This question has been asked five times now.  It's the same question.  Whether his testimony differs from this morning than what it is now, I mean, he's explained several times what his recollection is now of his conversations with Mr. Sindel and why Mr. Sindel did or did not want him to pursue this evidence.  If his direct

testimony this morning contradicts that, then that is what it is.

THE COURT: There's some confusion in my mind in precisely -- you know, I heard the testimony this morning, and the answers are a little bit different each time. Because the most recent statement was that he didn't recall talking to the guards, which is quite understandable after 14 years, until he saw the notes.

So I think this is still being developed. And while you're right, it is probed in some fashion in the same way, but we haven't yet gotten to the final conclusion, so overruled.

The question was this morning you said, and that's when there was an interruption. Go ahead.

BY MS. COSTANTIN:

Q.   This morning you had said that you had gotten the names of the guards from Billie Allen, and that Mr. Sindel indicated he didn't want you to go in that direction or didn't want you to pursue that. Is that right?

A.   No, that's not correct.

Q.   Okay.

A.   I got the names of the guards. I obviously spoke to the guards.

Q.   I'm talking about what you testified to this morning, not what you now want to testify to. I'm talking about what

did you testify to this morning.  Didn't you testify to this morning that you got the names of the guards from Billie Allen, and then Rick indicated that you don't go in that direction, Rick Sindel indicated to you, don't go in that direction?

A.    That is not true.

Q.    Okay.  So you didn't --

A.    If I said that, that was a misstatement on my part.

Q.    So in reality what you're saying is you did talk to the guards, and you and he discussed calling the guards as witnesses, right?

A.    Okay, the guards that I spoke to, the four guards, I doubt that those were all the guards I could have potentially talked to.  Obviously --

Q.    That is not my question.  Dr. Randall, my simple question is, did you talk to Rick Sindel after you interviewed the four guards about calling them as witnesses?

A.    And what I said was, my impression was that he didn't want to use that evidence or use evidence from the jail in general or guards at the penalty phase.

Q.    Did Rick Sindel make a conscious decision and tell you that he did not intend to use the jail guards as witnesses?

        MR. MONTROY:  Objection, Your Honor, the witness just answered that question.  He said it was his impression that Mr. Sindel didn't want to go in that direction.

MS. COSTANTIN:  Judge, I think he already answered that question yes about five minutes ago.

THE COURT:  Yeah, it's a different question. Overruled.

BY MS. COSTANTIN:

Q.    Did Rick Sindel convey to you a conscious decision that he did not intend to call those four jail guards as witnesses?

A.    My impression is that he didn't want to pursue evidence from -- use evidence from the jail at the sentencing.

Q.    Did you talk to him about what you found out from the four jail guards?

A.    I don't specifically recall, but I'm sure that I shared it with him.

Q.    And he made the decision that he didn't want to call those four people?

A.    Ultimately I believe you're right.

Q.    Let me go to Exhibit 341, which is that fax that you sent to Rick Sindel back on January 19th of 1998.  In that did you indicate that, "I will fax John Simon today to apprize him of my involvement, and discuss the mitigation witnesses with him before I conduct my interviews"?

A.    Yes.

Q.    So you were aware that he had done interviews of some mitigation witnesses; is that correct?

A.    I was aware -- at that point I believe I had the written materials prepared by Mr. Simon about his so-called Life History, so I knew he talked to some people at this point in time.

Q.    Okay.  And you met with Mr. Cuneo concerning mitigation; is that correct?

A.    I know that at certain points I met with Cuneo and spoke to Cuneo.

Q.    So when we look at your time sheets, and we look at January 20th of 1998, one of the things you did was phone potential mitigation witnesses, the attorney and the psychologist; is that right?

A.    Yes.

Q.    And that psychologist would have been Dr. Cuneo, correct?

A.    Yes.

Q.    And on that same day, January 20th of 1998, I'm showing you what's been marked as Exhibit 344.  Did you indicate a fax -- in a fax to Mr. Sindel on January 20th of 1998, did you indicate that you have a call in to Dr. Cuneo so you could coordinate your efforts with him?

A.    Yes.

Q.    Now, your efforts were for mitigation; is that correct?

A.    Yes.

Q.    So your attempts to coordinate are related to

mitigation, not competency; is that right?

A.    Yes.

Q.    So you're going to do witness interviews and then get that information to Dr. Cuneo to inform his diagnosis concerning mitigation; is that right?

A.    And his opinion, yes.

Q.    Now, I want to talk to you about an affidavit that you completed in connection with a request for a continuance. I'm going to show you Exhibit 35.  Can you see that?

A.    Yes.

Q.    And does that appear to be the affidavit that you completed on -- and I'm going to page through.  Is that the affidavit that you completed on January 28th of 1998?

A.    It is.

Q.    And that's the affidavit that was requesting at least a 120-day continuance; is that right?

A.    Yes.

Q.    I want to go to paragraph 9, which is on the third page of Exhibit 35.  And does that state and did you write in your affidavit back in January of 1998:  "Realistically, I believe that a continuance of at least 120 days would allow for the adequate preparation of mitigation for a potential death penalty sentencing hearing, based on my appraisal of the work that remains to be completed in the Allen case."  Is that right?

A.    Yes.

Q.    Now, you had been on the case for approximately two weeks when you completed that affidavit, is that right, or 12 days?  You remember your retention letter was January 17th?

A.    The letter was the 17th, and then there's a period of time I was involved in the other case when I was not working in earnest on the Allen case.  And then after that other death penalty case was completed, then I reengaged in Billie's case, right before, I believe, this hearing.

Q.    So my question is simply, you had been in the case, you had entered, been appointed on the case on January 17th, 12 days before -- I'm sorry, 11 days before you completed this affidavit?

A.    Technically, yes.

Q.    And in this affidavit you told the Court that your appraisal was that an additional 120 days would allow for adequate preparation; is that right?

A.    I said at least 120 days, yes.

Q.    I'm going to show you your declaration.  Do you recognize it?  And go to the first page.  Do you recognize that as the declaration, Exhibit 254, that you prepared in connection with this case?

A.    Yes.

Q.    I want to go to paragraph 8.  And is it correct that you wrote in your affidavit, and this is the affidavit in

connection with this hearing, "Although my affidavit" --
referring back to the one in 1998 -- "suggested a continuance
of 120 days, I actually did not consider this to be
sufficient time to prepare a proper penalty phase defense."

A.    That's -- yes.

Q.    That's what you wrote in your declaration in connection
with this case; is that right?

A.    Yes.

Q.    Now, you testified in regards to the continuance motion
back on January 30th of 1998; is that correct?

A.    Correct.

Q.    And you testified in support of that motion for at
least a 120-day continuance; is that right?

A.    Yes.

Q.    And at that time you did not tell the Court that you
did not consider this to be sufficient time to prepare a
proper penalty phase defense, did you?

A.    I said that I was requesting at least 120 days.

Q.    My question is, did you tell the Court when you
testified that you did not consider 120 days to be sufficient
time to prepare a proper penalty phase defense?

A.    I did not use that language at the continuance motion.

Q.    Okay.  And is this your testimony from that hearing,
Exhibit 36?

A.    Yes.

Q.   Do you recall being asked on that day, "Is 120 days a reasonable approximation of the time that you believe necessary to do your job according to the standards of your professional specialty?"  Do you recall being asked that question?

A.   I see the question.

Q.   Do you recall it or not?

A.   I -- I don't recall point by point.  I recall being here for the hearing.  But I see the question as it was asked.

Q.   And do you see your answer, "At this point I believe that would be sufficient."

A.   Yes.

Q.   So under oath you testified that 120 days was sufficient; is that correct?

A.   Yes.

Q.   Okay.  But in your affidavit -- well, let me ask you this, that Motion for Continuance was denied after evidence was heard; is that right?

A.   Correct.

Q.   Now, however, in your affidavit you're saying that 120 days wasn't enough; is that correct?

A.   Yes.

Q.   Isn't it true that in your deposition back in January of this year, you stated under oath that your testimony at

the continuance motion hearing, that 120 days was sufficient, was, in fact, not correct, and that you knew that at the time you gave that testimony?

A.    I had asked for at least 120 days, and -- but in response to John Simon's question, I did endorse the 120 days as being sufficient.

Q.    I'm going -- do you see what's up on the screen?

A.    Yes.

Q.    Can you read that?  It's not the easiest thing to read.

A.    It says --

MR. MONTROY:  I'm sorry, which exhibit is this?

MS. COSTANTIN:  This is Exhibit 532.  This is a deposition.

A.    Line 16?

Q.    Starting at line 16.  So you were asked, "So in 1998, were you actually giving the Court your honest state of mind when you represented to the Court that 120 would be adequate, or is the statement here in this declaration a correct statement of your state of mind?"  And that's referring to your declaration when you said 120 days was not sufficient; is that correct?

A.    In the declaration I said 120 days was not sufficient, and I needed at least 120 days.

Q.    And do you see your answer there, your answer in the deposition is: "Yeah.  What I stated back in 1998 was that I

needed at least 120 days."  Is that right?

A.    Yes.

Q.    And the question was:

       "Yes.  We've established that."

       "And --"

       And the question is:  "Which one?"

       And do you see your answer is:  "But consistent with other cases I've worked on in the past and how these questions evolved --"

       And the question is:  "That's not the question, Dr. Randall."

       And your answer is:  "My answer is I did not consider it to be sufficient time."

       The question is:  "Would that be a yes, that you did not indicate to the Court your -- you did not answer that question in 1998 honestly?"

       And your answer is:  "I would have to say that my answer in 1998 was not correct."

       Is that what you testified to in your deposition back in January of 2012?

A.    Yes.

Q.    And is that your testimony here today is that your answer back in 1998 that 120 days was sufficient was false?

A.    I think that I needed at least 120 days.

Q.    Was your answer in 1998 --

MR. MONTROY: Objection, Your Honor, he started to answer the question. He should be allowed to answer the question.

THE COURT: Yeah, sustained. Go ahead and finish your answer.

A. I had asked in my affidavit for at least 120 days. I know you want a black and white answer. Obviously it's black and white here. It would have been on the edge of being adequate. So -- you know, I'd have to say that the answer in '98 was not 100 percent correct in the sense that at least -- at least 120 days would have been needed. It would have been borderline adequate.

Q. In 1998 when you testified that 120 days was sufficient, was that a true or false statement at the time?

A. I would say it's -- it was an inaccurate statement at the time.

Q. Let me talk to you a moment about -- and that's a statement you gave under oath at the motion, correct?

A. Correct.

Q. That the Court relied on in making its decision?

A. We had -- the attorneys were in a situation where they felt that --

Q. Dr. Randall, my question is, your testimony is something the Court heard in deciding the motion, that is my only question. Is that correct?

A.    The Court did hear that testimony, yes.

Q.    I want to talk to you about a meeting that you had with John Simon on January 30th of 1998.  And I'm going to refer you to Exhibit 357.  Are those your notes from that meeting?

A.    Yes.

Q.    And the purpose of that meeting, is it correct, was to discuss mitigation evidence or potential mitigation evidence?

A.    Yes.

Q.    And I want to -- did Mr. Simon tell you that Billie Allen lying -- was lying and that was symptomatic of a problem?

A.    I'm not sure if this is what he was telling me or this is what I concluded.  It's probably what he was telling me.

Q.    Had you also concluded that Billie Allen lied on January 30th, about the time you're writing this?

A.    I don't think I knew him well enough to really say whether he was lying or not at this time.

Q.    So you think this is information that came from Mr. Simon?

A.    Probably.

Q.    Was symptomatic of what problem according to Mr. Simon?

A.    I'm not sure what Mr. Simon exactly said, what his contribution is and what my contribution is to these little sentences.

Q.    Do you have -- at that time did you have a belief of

what Billie Allen's lying was symptomatic of?

A.    I did not know him well enough to say that except that it's generally -- it's a general statement that his lying is symptomatic of a problem.

Q.    So you don't remember what -- you had no conclusion and you don't remember what Mr. Simon told you?

A.    I knew that they told me that he lied.  So that's what I knew.

Q.    Did Mr. Simon also tell you that Billie Allen had sustained a head injury in what is described as a boxing accident?

A.    Yes.

Q.    And at that meeting you refer him to a book called *From Pain to Violence;* is that right?

A.    Yes.

Q.    And that book posits that there's a causal relationship between childhood trauma and criminally violent actions; is that right?

A.    It's related.

Q.    Okay.  So back on January 30th of 1998, you believed that -- in the theory that abuse of a child could lead to a child's later violent activity; is that right?

A.    It increases the risk for it, yes.

Q.    And you believed that that was relevant to Billie Allen's case, correct?

A.    Potentially relevant.

Q.    Okay.  So at this point on January 30th of 1998, you're discussing a book in relation to Billie Allen's case that finds a link or some sort of connection between child abuse, abuse as a child, and future violent actions by that child as an adult, right?

A.    Yes.

Q.    And so as a mitigation expert, you're going to be alert to evidence of child abuse, right?

A.    I would hope so, yes.

Q.    And Billie Allen never told you that he had been physically abused, did he?

A.    I don't believe I asked him that.

Q.    Did he ever tell you?

A.    Not that I'm aware of.

Q.    And you don't think that you ever asked him that?

A.    Correct.

Q.    Despite the fact that you were discussing the possibility that this concept of a link between childhood trauma, childhood abuse, and later violent actions was relevant to his case?

A.    Correct.

Q.    Now, in fact, Billie Allen had told John Simon that he'd had a good childhood and everyone would say he had a good childhood, didn't he?

MR. MONTROY: Objection, Your Honor. I don't believe Dr. Randall was present for any conversations between Mr. Allen and Mr. Simon.

THE COURT: Okay. Sustained.

BY MS. COSTANTIN:

Q. Are you aware that Billie Allen told John Simon that he had had a good childhood and everyone would say he had a good childhood?

A. If it was included in that life, so-called life social history, I don't recall if it was in there, but Billie may have a statement in there.

Q. Okay. I'm going to play a clip of 630A.3, which is an interview portion, a short portion of interview of John Simon. And --

THE COURT: What's the number?

MS. COSTANTIN: It's 630A.3.

THE COURT: 630A?

MS. COSTANTIN: A.3.

MR. MONTROY: And I'm going to object to this based on Dr. Randall's basis of knowledge. Is this something that Dr. Randall was present for?

MS. COSTANTIN: Judge, here's what I'm going to do. I'm going to play it, and then I'm going to ask him simply if it is consistent with what Billie Allen told him about his childhood.

THE COURT:  Okay.  For that limited purpose, overruled.

MS. COSTANTIN:  We're having a crisis about the sound.

MR. HOLTSHOUSER:  We're not having a crisis.

MS. COSTANTIN:  No, we're not apparently.

THE COURT:  You want a technician to come up?

MS. COSTANTIN:  No, I think we've got it.  Well, we'll find out, I'm going to hit play.

MR. HOLTSHOUSER:  It should come over the speakers in here.

MS. COSTANTIN:  And this is a clip we've already played with Mr. Simon.  Here's what I'm going to do instead.

THE CLERK:  Do you want me to get someone up here?

MS. COSTANTIN:  No, I'm going to have him read along.  He doesn't need to hear the words.  It's already been admitted.

BY MS. COSTANTIN:

Q.    Dr. Randall, what's up in front of you is 630A.3, which is a clip of an interview between Mr. Allen and John Simon.  And there's a transcript that you can see below that; is that correct?

A.    Yes.

Q.    Okay.  And we're having trouble with the audio, but this has already been admitted.  And I'm going to ask you to

read as it comes -- as it scrolls on the screen.  And then my simple question for you when I'm done is that this statement that Mr. Allen is making here consistent with what he told you about his childhood?

THE COURT:  I have a question first, Ms. Costantin.

MS. COSTANTIN:  Yes.

THE COURT:  It says when he was living in the house.  To whom does "he" refer?

MS. COSTANTIN:  That's a reference to John Allen, Billie Allen's father.

THE COURT:  All right.  Okay.  For the record, could you as you go through, could you read.

MS. COSTANTIN:  Absolutely, I can do that.  I can start at the beginning.

"MR. SIMON:  Mmm-hmm.  Did, uh, when, when he was living in the house, when it was just the marital home then, uh, to the best of your knowledge, did he beat your mother?"

"MR. ALLEN:  No."

"MR. SIMON:  Did he beat you kids?"

"MR. ALLEN:  No."

"MR. SIMON:  Uh, well that, the fight that we were talking about, were they, they strictly verbal or oral?"

"MR. ALLEN:  They are verbal.  Uh, because the only reason he even had (inaudible) was because my mom had three big brothers.  Three real big brothers and they don't, they

don't go for that. I mean, that, that's, that's who mostly raised me. My uncles. Keep me out of trouble and make sure I stay very positive. Wasn't nothing I got in without them, you know, being involved with me. It was like going, you know, I went to Boy Scouts for my, we had a Father and Son's day --"

THE COURT: A little bit slower.

"MR. ALLEN: -- and my uncle came with me. You know, he (inaudible) came with me, so. Pretty much, he was taking the place of him, you know. It really didn't bother me that he was gone, for real. That's what, I mean, every, everybody who knows me says I had a good childhood."

"MR. SIMON: Mmm-hmmm."

"MR. ALLEN: You know all since I was, you know, young, I always had a real good childhood. I had people that cared for me. People who cared and just wanted to be there for me, you know. And it was, it was, really, I don't know who was a mentor in my life, you know, me growing up (inaudible) father figure, you know. True enough, I have an uncled but I, you know, he had his own kids so he would spend most of the time with them, but. You know, he could be there for, he would be there for you, you know, for certain things and I didn't have it, so. You know, I was getting older, that's what I needed. I know I needed that."

Is that consistent with what Billie Allen told you

about his childhood?

A.    I am not looking at my notes of my interviews with Billie.  I can't tell you right now that it was consistent or not.  My recollection is that I don't know if I got into this with him at all.

Q.    Okay.  So if you can refer to them, I'm going to hand you copies of exhibits, hard copies of Exhibits 338 and 621, which are your handwritten notes of your interviews with Billie Allen.

MS. CARLYLE:  I'm sorry, could you tell me the two exhibit numbers?

MS. COSTANTIN:  338 and 621.  Mr. Holtshouser pointed out to make the record clear what I was reading was the 630A.3.

A.    Okay.  I reviewed these.

Q.    Okay.  Did Billie Allen tell you anything inconsistent with what's stated here?

A.    Yes, I believe so.

Q.    Okay.  And what was that?

A.    Let's see, on BA 2109:  "John Allen.  Me and my dad didn't get along.  I didn't associate with him.  He wasn't there, didn't really spend no time with him.  They split when I was five or six."

Q.    Now, Dr. Randall, why is that inconsistent with what it says here, which is that his father was gone?

A.    Well, he adds in what I had written down, that he and his dad didn't get along.  He adds that the dad is over at his grandmother's house.

Q.    Why is that inconsistent with these statements here that Billie Allen stated he had a good childhood, he had nothing to do with his father, and his uncles were involved in his life, but he didn't have a father figure.  He needed his father there.  Why is that inconsistent with that?

A.    I would say it's additive, not necessarily consistent.

Q.    Okay.  If Mr. Sindel testified that he had asked Juanita Allen about whether she had abused Billie Allen and she denied it, do you have any reason to doubt Mr. Sindel's testimony?

A.    Okay.  Mr. Sindel -- you're saying Mr. Sindel interviewed Juanita Allen and she denied abusing --

Q.    I'm saying Mr. Sindel testified that he had asked Juanita Allen about whether she had abused Billie Allen, and she denied it.  Do you have any reason to doubt Mr. Sindel's testimony that that occurred?

A.    That could have occurred.

Q.    On a minor issue, did John Simon ever send you any encrypted documents via e-mail?

A.    Not that I'm aware of.

Q.    Do you recall him sending you a program, an encryption program?

A.    Not that I recall.

Q.    I'm referring to his -- I'm sorry, I'm referring to 498.9, so the ninth page of Exhibit 498.  Do you see 31, referring to January 31st, "E-mail encryption program to Dr. Randall"?

A.    I see that.

Q.    Any memory at all about what that involved?

A.    First time I've ever seen this.

Q.    Does that jog your memory as to whether he did, in fact, e-mail you an encryption program or anything like that?

A.    No, it doesn't.

Q.    Now, you testified back in June, I believe, that in an ideal case the attorney on the case would visit with the family in their home; is that right?

A.    In an ideal case?

Q.    Yes, an ideal mitigation case, they would have visited the family in the home?

A.    I don't know if I used the word "ideal."  I said that that would be something that you would want to encourage.

Q.    Okay.  So are you aware that in -- that Rick Sindel testified that he had visited Juanita Allen in her home before you were involved?

A.    I don't know whether he did or not.

Q.    Are you aware that John Simon has testified that he visited Juanita Allen in her home and met with Juanita Allen,

Billie Allen's grandfather, Otha Petty, one of his sisters, as well as Deborah Ruffin, a family friend?

A.   He could have potentially visited.

Q.   Are you aware one way or the other about that?

A.   No.

Q.   Are you aware that he testified to that, that that occurred?

A.   No.

Q.   Now, you testified back in June that the FBI was also interviewing witnesses for possible aggravation; is that correct?

A.   Yes.

Q.   And, in fact, the defense called three of those witnesses in mitigation; is that right?

A.   Yes.

Q.   Okay.  Do you recall who they were?

A.   One was a Mr. Neals.

Q.   Marvin Neals.

A.   Marvin Neals, N-e-a-l-s.  I believe there was another one from that school.

Q.   Lawrence Walls?

A.   Lawrence Walls.  And I'm not sure about the third.

Q.   Eric Taylor perhaps?

A.   I don't remember.

Q.   Marquis's brother.  You don't recall?

A.    Not -- I don't recall.

Q.    Okay.  I'm showing you Exhibit 133, that's the 302 of an interview of Eric Taylor.  Does that refresh your recollection as to whether that was one of the people interviewed by the FBI for the penalty phase?

THE COURT:  What was the number?

MS. COSTANTIN:  133.

THE COURT:  Thank you.

A.    This is a statement prepared by the agent about his interview with Eric Taylor.

Q.    And do you recall -- I'm showing you Exhibit 199 -- that Eric Taylor, in fact, was called by Mr. Sindel as a witness in the mitigation?

A.    Yes.

Q.    Now, do you recall back in June, in the testimony in June that you had testified that Andy Rackers did not do mitigation interviews?

A.    I said to my knowledge I don't even know if I met Andy Rackers.  And I never saw any work product from him about mitigation that I was aware of generated -- that was generated by him.

Q.    I'm showing you Exhibit 442.  Does that appear to be a memorandum from Andy Rackers to Rick Sindel concerning an interview of Eric Taylor on February 14th, 1998?

A.    Yes.

Q.    And does that appear to be a mitigation-related interview?

A.    I am not clear as to the intent of the interview.  It's more than one page, I assume, right?

Q.    There's the second page.

A.    Okay.  Could you go back to page 1, please?

Q.    Sure.

A.    Okay.  And what can you --

Q.    My question was, does this appear to be an interview concerning mitigation, potential mitigation?

A.    I would say that -- I'm not sure what the intent of the interview was, but there is some information in here that could be relevant to mitigation when --

Q.    And, in fact, Eric Taylor was called in mitigation, correct?

A.    He was, yes.

Q.    Right.  So at least in this situation Andy Rackers did an interview after the guilt phase had started, correct?

A.    Yes.

Q.    On issues related to mitigation.  And he was called -- Eric Taylor was called as a mitigation witness, right?

A.    Yes.  I've never seen this before in my recollection.

Q.    But it was to Mr. Sindel, correct?

A.    Correct.

Q.    So my question is, you said to your knowledge Andy

Rackers didn't do mitigation interviews, but I've just shown you something that appears he did do something related to mitigation, correct?

A.   He did do an interview of Eric Taylor where Eric talks about Billie's reaction to Marquis's death.  So in that sense that could be helpful information.

Q.   What other purpose is there for this?

A.   Well, provides background information.  There was some information there -- I mean, some of it can be mitigating.

Q.   It's certainly not guilt related, is it?

A.   Well, it's on February 14th.

Q.   Right.  So it's certainly not guilt related.

A.   I would hope not.

Q.   In fact, it talks a lot about whether he was using drugs and how depressed he was by Marquis's death; is that right?

A.   That's part of it, yeah.

Q.   And my simple question I guess is, you didn't know that Andy Rackers did this interview?

A.   Correct.

Q.   Okay.  But that doesn't mean that Andy Rackers wasn't doing interviews?

A.   Well, it's clear that he was doing interviews.

Q.   Let me show you another one.  Exhibit 449, this is an interview, appears to be an interview, correct, by Andy

Rackers of Luveetra Taylor?

A.    Luveetra Taylor.

Q.    Or Lu as she was called?

A.    Okay.

Q.    Did you talk to Lu Taylor, do you recall?

A.    I don't recall.

Q.    And that's also on February 14th of 1998; is that right?

A.    Yes.

Q.    And does this also appear to be mitigation related, as opposed to guilt related?

A.    Yes, it does.

Q.    So Andy Rackers was doing some mitigation investigation, is that fair to say?

A.    It appears that these two interviews -- this one more so than the last one, is more relevant to mitigation.

Q.    Let me go back for a moment.  We talked about some people who were interviewed by the FBI.  One of those people was -- showing you Exhibit 131 -- was Marvin Neals; is that right?

A.    Yes.

Q.    And he did testify, correct?

A.    Yes.

Q.    And another one, as we said before, was Eric Taylor, and he testified, right?

A.    Right.

Q.    And then -- and that was Exhibit 133.  And I'm going to show you Exhibit 134.  Another person interviewed by the FBI was Lawrence Walls; is that right?

A.    Yes.

Q.    And he also testified for the defense in the mitigation portion?

A.    Yes.

Q.    I want to go back to your declaration, which is Exhibit 254, the fifth page.  Referring you to paragraph 7.  That second sentence, you wrote in your sworn declaration:

"In their limited contact with Mr. Allen's family members, trial counsel had not discussed substantive mitigation-related topics and seemed to have not even explained what a mitigation investigation entailed."

Is that what you wrote?

A.    Yes.

Q.    "In essence, counsel had spoken to the family only to keep them updated on the progress of the case."

Is that what you wrote?

A.    Yes.

Q.    And then going to the next page, it starts here, it says:

"No attempts had been made to begin the laborious process of generating Mr. Allen's social history.  Only a few

records on Mr. Allen and his family had been collected."

Is that what you wrote?

A.    Yes.

Q.    And this was a declaration that you at the very least revised and reviewed before you signed it?

A.    Yes.

Q.    Now, at the time of this crime -- or the trial, Billie Allen was 19 years old; is that right?

A.    Yes.

Q.    And he'd lived in St. Louis his whole life; is that correct?

A.    As far as I know, yes.

Q.    And he'd only attended two school districts, right?

A.    He was in Clayton and the St. Louis City.

Q.    And he had a limited criminal record; is that right?

A.    Yes.

Q.    So we're not talking about -- first of all, let's talk about the records.  There weren't a voluminous number of records to start off with, right?

A.    I would say that much of the records that were available were collected by counsel before I entered.  There are some records that I believe still remain elusive, but they secured most of them.

Q.    Okay.  Because we know that, referring to Exhibit 301, which you just read through earlier today, that Mr. Sindel

had discussed the defendant's medical and school history with Juanita Allen back on April 16th of 1997; is that right?

A.    Yes.

Q.    And that discussion also included Billie Allen's lead poisoning, seizures, and mental health history; is that right?

A.    It touched on those things, yes.

Q.    And you're aware, I believe, that the Notice of Intent to Seek the Death Penalty was not filed until months after April of 1997?

A.    I think it was around August.

Q.    Correct, August of 1997.  You're aware of that; is that right?

A.    Yes.

Q.    Now, is it your testimony that Rick Sindel never gave you any information about Billie Allen, Juanita Allen, or the family at any time?

A.    Is it true that he never gave me information?

Q.    Correct.  I'm asking you, is that your testimony?

A.    That would be incorrect.

Q.    Okay.  So, in fact, he did brief you about Billie Allen's background and his meetings, Rick Sindel's meetings or conversations with Juanita?

A.    I'm sure we had a discussion about his general impressions and some of the information that he collected.

Q.   Do you believe he --

A.   But I don't recall specific conversations with him.

Q.   So you just don't remember because it was so long ago, but you're sure that conversation occurred?

A.   I'm sure a conversation about general information occurred on my entry to the case.

Q.   And would that have included information about his medical history like the lead poisoning?

A.   I believe that, like you pointed out, in his interview with Juanita, he was starting to explore some leads in terms of where he can get some records and things like that.

Q.   My question is, did Mr. Sindel talk to you at any time about the lead poisoning that Billie Allen had as a child or alleged lead poisoning?

A.   I'm sure we had a discussion about that.

Q.   Okay.  And are you sure that you had a discussion about or do you believe you had a discussion about Billie Allen's house being shot up a month or so before the robbery?

A.   I'm sure we had a discussion about that.

Q.   Okay.  And are you sure you had a discussion with Mr. Sindel about him visiting Billie Allen, going to the Metropolitan psychiatric unit about a month or so before the robbery occurred?

A.   I believe so.

Q.   So he didn't just hire you and leave you to figure it

all out, he gave you information; is that correct?

A.    There was some information, yes.

Q.    And, in fact, John Simon had conducted hours of interviews with Billie Allen on December 12th of 1997 concerning his life; is that right?

A.    I'm not sure when those interviews occurred, but there was a written work product generated from that that I saw.

Q.    Were you aware that that had been the result of hours of interviews that he conducted both in December and -- of '97 and then January of '98?

A.    I don't know specifically how much time he spent, but it appeared to be -- that so-called Life History most seemed to be generated from interviews with Billie.

Q.    And all that happened before you were involved in the case; is that correct?

A.    Yes.

Q.    And that Life History that Mr. Simon prepared, that was sent to you back on January 16th of 1998 even before you were formally appointed; is that right?

A.    I have trouble calling it a Life History, but that document was sent to me during my initial contact with counsel's office.

Q.    Showing you Exhibit 335.  Is that a fax to you from Connie Caspari on January 16th of 1998 indicating that she has included the Life History completed by our co-counsel,

John Simon.

A.    What they entitled Life History, yes, what they refer to as a Life History.

Q.    I'm going to show you Exhibit 303.  Is this entitled *Life History of Billie Jerome Allen*?

A.    It is entitled that, yes.

Q.    And is that the document that you were sent by Ms. Caspari back on January 16th of 1998?

A.    Yes.

Q.    Let's go quickly to the end.  Does it appear to be 14 pages long?

A.    Yes.

Q.    And as we go through this, is it fair to say that this covers Billie Allen's early years?

A.    I would say that it's a list of notes that covers different topics.

Q.    And those include his early years, including his father's alcohol abuse and drug dealing; is that right?

A.    Yes.

Q.    And also covers Billie Allen's lead poisoning or the fact that he allegedly ingested lead; is that right?

A.    Yes.

Q.    And also covers the fact that his mother had moved out on his father; is that right?

A.    Yes.

Q.    And moved in with her grandfather -- or her father, excuse me?

A.    Yes, I see that.

Q.    Does it also include church activities?

A.    There's a section on church.

Q.    Does it also include Scouting activities?

A.    Yes.

Q.    Does it also include sports and school activities?

A.    Yes.

Q.    Does it also include his involvement -- brief involvement with the Job Corps?

A.    Yes.

Q.    Does it also include his involvement with rap music and a rap group?

A.    Yes.

Q.    Does it also include his friendships as well as some traumas that he underwent?

A.    There's sections on friendships, employment, traumas.

Q.    And in that trauma section, it particularly discusses what is described as the principal trauma in Billie's life being Marquis Taylor being shot in front of him?

A.    Yes.

Q.    Does it also include prior record as well as jobs?

A.    There's a section on that, yeah.

Q.    Substance abuse?

A.   Yes.

Q.   Now, all these areas that we've talked about here, none of those are relevant to guilt, are they?

A.   I don't believe so.

Q.   They are all relevant to mitigation; is that correct?

A.   Yes.

Q.   Now, at trial there was evidence of John Allen's alcohol abuse, wasn't there?

A.   I believe so.

Q.   And there was evidence of Billie Allen's supposed lead poisoning?

A.   Yes.

Q.   And there was evidence that Billie Allen's mother had left his father?

A.   Yes.

Q.   And there was evidence that he had an absent father and the effect that that had on him; is that correct?

A.   Probably.  I don't recall specifically.

Q.   Do you recall there being testimony about his church activities?

A.   No.

Q.   Okay.  You don't recall there being any photographs introduced of him at church with his cousins?

A.   There may have been, I don't recall.

Q.   Do you recall there being evidence concerning the

schools he attended?

A.    Yes.

Q.    Do you recall there being evidence concerning sports?

A.    Yes, sports was touched on in terms of his being slow and participating in some sports.

Q.    Do you recall there being evidence concerning his rap music efforts?

A.    I believe so.

Q.    And do you recall there being evidence concerning Marquis's death?

A.    Yes.

Q.    As well as there being evidence presented in the penalty phase concerning his head trauma?

A.    Yes.

Q.    Now, I believe on direct you've described this Life History as being leads to pursue; is that correct?

A.    Correct.

Q.    And you pursued those leads, didn't you?

A.    To the extent I could.

Q.    And you stated, I believe back in June, that you have done narrative life histories in some cases; is that correct?

A.    In either non-death penalty cases or cases where there might be a bench capital sentencing.

Q.    But that was -- that was never the plan in a case like this is to have a narrative?

A.    I was not going to be doing one.  The point was in this case to develop mitigation, go out into Billie's world, find people who knew him, and have them tell his life story through their eyes to the fullest extent possible.

Q.    And my question is simply, there was never a plan for you to do a narrative Life History in this case?

A.    Not in my mind there wasn't.

Q.    And that's because a narrative Life History would have been inadmissible, correct?

A.    Yes.

MR. MONTROY:  Objection, Your Honor, that's not -- that's a legal conclusion.

THE COURT:  Sustained.  Sustained.

BY MS. COSTANTIN:

Q.    Now, did you receive a copy, I'm going to show you, of Exhibit 304, a copy of what has been described as Billie Allen's handwritten autobiography?  You received a copy of that, didn't you?

A.    I probably did.

Q.    Can you see --

MS. CARLYLE:  What number?

MS. COSTANTIN:  I'm sorry, it's Exhibit 304.

MS. CARLYLE:  You said that, I'm sorry.

BY MS. COSTANTIN:

Q.    This is hard to read.  I'm trying to do small parts.

Do you see a portion up -- "We would tell people we were brothers."  About the third line down?

A.    Yes.

Q.    I'm sorry.  "We got real close.  We got real close to each other and we would tell people we were brothers --"

A.    I see it.

Q.    "-- when we would go places."

A.    I see that.

Q.    Okay.  And in this, he discusses Marquis being shot in front of him; is that correct?  I'm reading at the portion --

A.    Yes.

Q.    -- where it says, "One day we were going over our friend's house and while we were walking around to the next block and we got in front of the person's house we were going over to someone started shooting at us and hit Marquis.  I was thinking he just fell but he was hit.  So then I went back to get him and I picked him up so we could run and we took about --"  What does that say?

A.    Eleven steps, something like that.

Q.    "-- eleven steps and he just fell on our front steps and I just stopped and looked at him on the steps while they were still shooting and he called me and his brother's names before he died right there.  I've never seen a person die but him.  That was the only death I took real hard made me not take life for granted."

Did I read that correctly?

A.    I believe so.

Q.    And so in his own words he's telling you how traumatic watching his closest friend die in front of him; is that right?

A.    Yes.

Q.    And you considered that to be a highly traumatic event in his life, didn't you?

A.    Yes.

Q.    Now, I want to go down just below that.  Is it correct that he wrote, "I was always a good artist and could draw anything.  I had a picture go to the Art Museum where I -- when I was in the third grade at Glenridge."  Is that right?

A.    I see that.

Q.    And do you see before that where he talks about, "I never had a father figure in my life and the father I had taught me to sell dope"?

A.    I see that.

Q.    He also indicated, "I always got guns pulled out on me."  Is that right?

A.    I see that.

Q.    "I played basketball real good but the only thing that stopped me from playing a lot was I have asthma."  Is that correct?

A.    I see that.

Q.    And all that information written there is useful information for mitigation, isn't it?

A.    It would be areas you would want to explore.

Q.    And that was something that was prepared before you were involved; is that correct?

A.    I didn't see the date on that.

Q.    It's undated.  I'll show it to you.  Do you recall asking him to prepare it?

A.    No.

Q.    Do you recall him writing that:

      "I smoked weed every day because I had so much stress and I needed someone to talk to but I didn't feel right talking to my mom about it.  Me and my mom were real tight but it's just a lot better when you have a father there to love you and spend time with you like fathers do."

      Is that what he wrote?

A.    It appears so, yes.

Q.    And did he also write:

      "I went to a mental hospital because my stress was taking over and I would think about -- all I would think about was Marquis and all the things he had going on for his self and he would never be able to do the things he want to do again.  I felt alone like nobody loved me even though my mom loved me to death I wanted to just die."

      Is that what he wrote?

A.    Yes.

Q.    And that information is also relevant to mitigation; is that right?

A.    Yes.

Q.    Now, he doesn't indicate in there that his mother physically abused him, did he?

A.    Correct.

Q.    And he never told you that she had physically abused him; is that right?

A.    I never asked him, and he didn't tell me.

Q.    Was that a deliberate action on your part to never ask him?

A.    No, it was a major lapse on my part.

Q.    Now, in this he does discuss in detail how traumatic the death of Marquis was and how that led him to go to the mental hospital; is that right?

A.    No, I'm not sure if those were contiguous events.  But he does talk about how traumatic the death of Marquis was, and then he also talks about there's a certain point in time when he went to a mental hospital.

Q.    Let's look at what I just brought up on the screen.  "I went to a mental hospital because my stress was taking over and all I would think about was Marquis and all the things he had going on for himself."

A.    Okay.

Q.   So is that fair to say that's his explanation of what led him to go to the mental hospital?

A.   Apparently.

Q.   Now, the trial team, I think you referred to this, had already obtained Billie Allen's medical records before you were involved in the case; is that right?

A.   I believe so.

Q.   So we can see that the records from -- I'm going to 303.2, the footnote refers to hospital records showing the diagnosis of Pica; is that right?

A.   Yes.

Q.   And John Simon had, before you were involved, talked to other family members about Billie Allen's background; is that correct?

A.   I believe he talked to Raymond Petty briefly and to Juanita, I'm sure.

Q.   Okay.  And looking at Exhibit 303.4, do those notes, first of all, at the top reflect a conversation with Lucy McLemore, "Per Lucy 1/11/98"?

A.   Yes.

Q.   And then looking at paragraph 26, the handwritten, "Not per Raymond 1/11/98."  Does that indicate a conversation with Raymond Petty?

A.   Yes.

Q.   And then Footnote 4, does that indicate a conversation

with Otha Petty, Sr., the defendant's grandfather?

A.    Yes.

Q.    And those occurred on January 7th and 11th of 1998, before you were involved; is that correct?

A.    Yes.

THE COURT:  What date?

MS. COSTANTIN:  January 7th and January 11th of 1998.

BY MS. COSTANTIN:

Q.    Now, referring to Footnote 5, it appears that Mr. Simon also talked to the secretary of the sponsoring church for the Boy Scouts; is that right?

A.    It seems so, yes.  Yes, uh-huh.

Q.    Now, were you aware that John Simon had also met with Juanita Allen, Yvette Allen, Otha Petty, and Deborah Ruffin on January 7th of 1998?

A.    I assumed that he did meet with them.  I don't know what date he met with them.

Q.    So you knew he had met with those folks before you were involved?

A.    I knew about this Life History.  So whoever is referenced in here, I would infer that he had spoken to or met.

Q.    But were you aware that he'd also met with Juanita Allen, Yvette Allen, Otha Petty, and Deborah Ruffin on

January 7th at Juanita Allen's house?

A.    I do not recall that.

Q.    Okay.  Referring to Exhibit 303, is it correct that this Life History contains contact information for various people in Billie Allen's life?

A.    Yes.

Q.    And that includes his mother, his grandfather, his sisters; is that right?

A.    An auntie.

Q.    Right?

A.    Yeah.

Q.    The grandmother?

A.    Uh-huh.

Q.    A minister; is that correct?

A.    These people would not be hard to find.

Q.    Okay.  The other Boy Scout members, they are listed in there.  They were also listed; is that correct?

A.    There's a couple -- there's two or three other boys.

Q.    And then on 303.6, there's four other boys; is that right?

A.    Yes.

Q.    Scoutmaster is also listed.  Do you recall that?

A.    I believe so.

Q.    And his friend Ahmed Oliver is also listed?

A.    I don't see where, but I'm sure.

Q.    You see at the top of page 8 of 303?

A.    Yes, Uh-huh.

Q.    And was -- do you recall Coach Sam Moore also being listed?

A.    I see that.

Q.    And do you recall Johnnie Grant, his friend, being listed with some contact information?

A.    Yes.

Q.    And do you also recall there being listed an individual named "Flex" or Wilson Hankins being listed?

A.    I had heard that name, but there's no contact information that I was aware of.

Q.    Is there an address or location?

A.    There's a flower shop noted that he might be working at.

Q.    And does it also list some of his friends, including Prentiss Church?

A.    Prentiss Church, Shonte, Tasha.

Q.    So when we go to 254.5, and we see that the word no is at the bottom of that page. And you go to the top of that page, that "No attempts had been made to begin the laborious process of generating Mr. Allen's social history." Would you agree that statement in your declaration was an exaggeration?

A.    I testified earlier that the word "no" is too definitive, and that --

Q.   My question is, would you agree that your statement in that declaration that "No attempts had been made to begin the laborious process --"

MR. MONTROY:  Objection, Your Honor, I would ask the witness be allowed to answer the question.  He was in mid sentence.

THE COURT:  Go ahead.

A.   I would call it an exaggeration.  I would say that that's what it felt like when I entered the case.  I would say that what was provided was mostly based on interviews with Billie, mostly, and that it was leads to pursue.  So I was provided with some background information.

Q.   Is the statement, "No attempts had been made to begin the laborious process of generating Mr. Allen's social history" incorrect in light of what we've just gone through?

MR. MONTROY:  Objection, he just answered that question.

THE COURT:  Well, overruled.

A.   I would say the sentence is incorrect as stated.  The word "no" is too black and white.

Q.   Now, in your first interview with Billie Allen, which occurred on January 17th of 1998, I'm showing you your notes, 338, Exhibit 338.  Can you see that?

A.   Yes.

Q.   And you also have got the hard copies in front of you,

correct?

A.   Yes.

Q.   Now, in that interview you got the names of some jail guards; is that right?

A.   Seven, at least seven.

Q.   And you got the names of his mom and his grandfather and some uncles; is that right?

A.   Aunts and uncles.

Q.   Got the name of his grandmother, Rachel Allen.  You got the name of his coach, Sam Moore, right?

A.   Right.

Q.   Names of girlfriends, correct?

A.   Tasha, yes.

Q.   Some schools he went to.  Names of his sisters; is that right?

A.   Yes.

Q.   Isn't this remarkably similar to what John Allen had done?

A.   John Simon.

Q.   John Simon.  Excuse me, John Simon had done?

A.   There is overlap, yes.

Q.   Now, yours is a much shorter version of what he did, correct?

A.   Yes.

Q.   In fact, you didn't get any information about his

VII - 169

medical or that sort of thing in this interview?

A.    Not during this initial interview, no.

Q.    And to clarify, those medical records related to him, his treatment as a child, had already been obtained and transcribed before you were involved in the case; is that correct?

A.    Yes.

Q.    All right.  And I'm showing you Exhibit 324.  That shows that they, in fact, had been transcribed, the medical records had been obtained and transcribed; is that right?

A.    That's what it appears, yes.

Q.    Okay.  And going to the second page, does that appear to be transcription of some medical records?

A.    A brief note, yes.

Q.    So going back to your declaration, when you indicate that "Only a few records on Mr. Allen and his family had been collected," that was not accurate, is that true?

A.    I would say that -- again, I would say that probably most of the records were collected.

Q.    Okay.  And to go through those a little bit, I'm showing you Exhibit 334.  This is the seventh page of 334, which is a letter dated November 26th of 1997, indicating that elementary and junior high school records were being sent to Dr. Haney; is that right?

A.    Those and other records.

Q.   Right.  That's one of the things that was being sent, correct?

A.   Yes.

Q.   So those -- his school records had been collected before you were involved, correct?

A.   I would say that there are probably school records out there that were not collected that I attempted to collect, which I still believe are out there that we didn't get, the Special Ed records.

Q.   Let's talk about that.  I'm sorry.

A.   No.  So I would say that they got records that were readily obtainable and records that they -- I'm glad they got, yeah.

Q.   Let's talk about the school records for a moment.  It's correct that you did not obtain any additional school records of Billie Allen, correct?

A.   I was attempting to get Special Ed records.  There was reference to Special Ed testing.  I suspect the records exist, but I was never able to acquire them.

Q.   And to your knowledge nobody has ever acquired any records related to Special School District, correct?

A.   That's correct.

Q.   So you speculate that there's additional records out there, but no one has ever found those records?

A.   There's reference in the testimony to testing that was

done, that Billie was found not eligible.  Which means there were assessments done, it's just that our attempt to acquire those assessments was unsuccessful.

Q.    No, my question was not whether the testing was done, my question is no one has ever found those supposed records?

MR. MONTROY:  Objection, Your Honor, the question before he said -- he answered that question, he said that --

THE COURT:  He said that Billie was found not eligible, which means there were assessments, so overruled. It's a little different question.  The question was not whether testing was done, my question is not -- my question is no one has ever found those supposed records.

A.    That's correct.

Q.    And then the second thing listed is psychiatric records from the Metropolitan St. Louis Psychiatric Center; is that right?

A.    Yes.

Q.    And those, in fact, were obtained before you were involved; is that right?

A.    Yes.

Q.    And then the third thing listed is the inmate medical records from Franklin County Jail; is that right?

A.    Right.

Q.    And those were also obtained before you were involved, correct?

A.    Yes.

Q.    And then as we saw before with reference to the Life History, medical records from the City of St. Louis Department of Health and Hospitals were obtained by the trial team, correct?

A.    Yes.

Q.    And that was also before you were involved?

A.    Yes.

Q.    Do you recall --

THE COURT:  Excuse me for interrupting.  I need to meet with an attorney briefly in chambers.  We'll take about a 15-minute break.

(Court in recess from 2:33 p.m. until 2:53 p.m.)

MR. KANE:  Your Honor, I just wanted to let you know, my son ended up in the hospital shortly after I arrived yesterday, so I'm going to be slipping out this afternoon probably before court ends and won't be back until November. But Mr. Montroy and Ms. Carlyle have things well in hand, so I just wanted to let you know.

THE COURT:  Will this interfere with your presentation?  This is the most important thing and we'll take care of that for sure, but --

MS. CARLYLE:  No, I don't think.

MR. KANE:  No, Your Honor.

MS. CARLYLE:  I don't think it's going to affect us.

THE COURT:  Keep us advised.  They will let me know what's going on.

MR. KANE:  Thank you.

THE COURT:  The last question was:

"And those were also obtained before you were involved, correct?"

"Yes."

The question was:  "And then as we saw before with reference to Life History, medical records from the City of St. Louis Department of Health and Hospitals were obtained by trial team, correct?"

"Yes."

"And that was also before you were involved?"

"Yes."

And the question was:  "Do you recall --" and that's where I interrupted you.

MS. COSTANTIN:  Okay.

BY MS. COSTANTIN:

Q.   Do you recall the psychiatric records from the Metropolitan St. Louis Psychiatric Center where it involved an examination of Dr. Wuertz of Billie Allen?

A.   Yes.

Q.   And do you recall testifying back in June that you believe that you were the person who obtained the records from Dr. Wuertz, the Metropolitan Psych records?  I'm

directing you to Exhibit 676, page 247.

A.    I see that, yes.

Q.    Okay.  And did you, in fact, testify that you believed that you were the ones who found those Metropolitan Psychiatric records?

A.    I thought from my recollection that I could have been the one to have found those, but --

Q.    But, in fact -- I'm sorry.

A.    But indeed they were found earlier.

Q.    Okay.  And months before your involvement?

A.    Yes.

Q.    Okay.  I'm showing you Exhibit 350.  These are -- this is a letter to you dated January 26th of 1998 from Connie Caspari including some items; is that correct?

A.    Yes.

Q.    And specifically she's indicated she's adding those to the penalty phase notebook; is that right?

A.    Yes.

Q.    And so she sends them to you and then she also adds them to the penalty phase or the mitigation notebook; is that right?

A.    That's what she's saying in this letter.

Q.    Okay.  And those include reports of incidents concerning Billie Allen, Juanita Allen, and the address that they lived at; is that correct?

A.    Yes.

Q.    As well as some reports concerning Billie Allen's prior arrests?

A.    Yes.

Q.    And then also the records related to the Boy Scouts; is that correct?

A.    Yes.

Q.    And then finally he's -- or she's enclosing some medical records for you?

A.    Yes.

Q.    And those -- she indicates that she thinks you already have those; is that right?

A.    In parenthesis that's what she notes, yes.

Q.    Now, in fact, you're not aware of any records that the habeas team, this trial team has found, the 2255 team has found that were not found by the trial team; is that correct?

A.    I believe that's correct.

Q.    And, in fact, those records were all found before you were involved in the case?

A.    The records that were found by Mr. Sindel and his team appear to have been found before my involvement in the case.

Q.    So that's part one.  And then part two is, and no new records were found that you're aware by anyone?

A.    That's correct.

Q.    Now, is it correct that many of Billie Allen's teachers

were interviewed by you and testified at trial?

A.    Yes.

Q.    And none of them indicated that they ever saw any signs of physical abuse of Billie Allen; is that correct?

A.    Regarding physical abuse, I think that's correct.

Q.    And as teachers, they would have been mandated to report any physical abuse to a child abuse hotline or to the authorities; isn't that correct?

MR. MONTROY:  Objection, unless Dr. Randall is aware of the reporting law.

THE COURT:  If you somehow know that, you can answer.  Don't speculate.

Q.    I mean, you're a school psychologist, right?

A.    A clinical psychologist who works in the schools.

Q.    And you're familiar with reporting requirements for school personnel, correct?

A.    Yes.

Q.    And teachers are mandated reporters under the child abuse laws; is that correct?

A.    I know they are now.  I would assume they were back then, but -- so --

Q.    Okay.  So you're assuming that they were, but you don't know that for certain, is that your answer?

A.    Correct, yeah.

Q.    I want to talk to you for a moment about the

Metropolitan Psychiatric records. Towards the end of the penalty phase -- I'm showing you Exhibit 388. You attempted to convince Dr. Wuertz, the doctor who saw Billie Allen in February of 2007 (sic), to provide you with a diagnosis of PTSD, didn't you?

A.   In February 1997. I attempted to contact Dr. Wuertz on March 6th.

Q.   And your purpose in contacting Dr. Wuertz was to attempt to convince him of -- to diagnose Billie Allen with PTSD; is that right?

A.   No, my question to him was, if you had the additional information that I provided, would you have changed your opinion about PTSD.

Q.   And his opinion, original opinion when he saw him back in February of 2 -- I'm sorry, 1997, was not a diagnosis of PTSD; is that right?

A.   That's -- from my recollection, that's right.

Q.   Okay. He diagnosed him with depressive disorder, not otherwise specified?

A.   Right.

Q.   Right. So back in March of 1998, you send a fax or letter to him and try to see if you provide this information, is he going to change his opinion and provide you with a diagnosis that Billie Allen was, in fact, suffering from PTSD; is that right?

A.    Yes.

Q.    And I'm showing you Exhibit 675, which is also BA-1609. I'm going to highlight this portion.  "I need to know whether or not the additional collateral information provided might cause you to change your impressions, particularly whether or not a diagnosis of PTSD is tenable."  Is that right?

A.    Yes.

Q.    So that was the purpose of contacting him, to see if he's changed his diagnosis to include PTSD; is that right?

A.    He did not endorse PTSD on his initial interview of Billie.  And I presented this additional information to see whether or not knowing this additional information, whether he would opine differently.

Q.    And would, in fact, find PTSD.  That's what your goal was, right?

A.    If it existed.  If he thought it supported it.

Q.    And part of what you sent him was 15 pages of rough social history notes from family members of client's friends who were murdered, the primary traumatic event; is that correct?

A.    That's what it says there.

Q.    And is that, in fact, what you sent?

A.    Probably.

Q.    And the social history notes that you reference from the family members of the client's friend who was murdered,

those would be interview notes from the Taylor family, right?

A.    Probably.

Q.    So when we're talking about social history notes, we're talking about interview notes; is that right?

A.    Yes.

Q.    Now, you reference that the client's friend who was murdered is the primary traumatic event; is that correct?

A.    Can you please repeat that?

Q.    In here you reference that the murder of the client's friend is the primary traumatic event in Billie Allen's life; is that right?

A.    I don't see the whole thing right now, so -- I'm not sure where I'd say that that's the primary traumatic -- oh, there it is, yes.

Q.    All right.  What were the other traumatic events that you knew at that time in Billie Allen's life?

A.    The beating -- Juanita's beating of Billie with the extension cord that was testified to by Raymond Petty.  And, you know, given Juanita's demeanor, it was my impression that that household was a traumatic environment.  So that would be some other information.

Q.    So as far as you were concerned, the other traumatic events that you can recall today would have been the beating of Billie Allen by Juanita Allen that Raymond Petty testified to?

A.    And the likely history of other beatings that we were unaware of.

Q.    Okay.  So when you wrote --

A.    Also --

Q.    Back when you wrote this, you're not writing about things you're not aware of, right?  My question is, at the time when you wrote this on March of 1998, what did you know to be the secondary traumatic event in Billie Allen's life?  You said the beating of Billie Allen by Juanita Allen, your impressions of the household.

A.    Growing up in that neighborhood, getting pistol whipped, the long history of difficulty in schools, school failure, transitioning to an inner city school from a very affluent suburban school, and the difficulty around that.  There was, I believe, another friend killed as well.  So off the top of my head, this was not an isolated event.

Q.    And what you've talked about here, evidence was put on during the penalty phase of these items that you've listed, correct?

A.    Some evidence was put on, yes.

Q.    On all these different topics you've talked about?

A.    Some evidence was put on.

Q.    Let's go to the Metropolitan Psychiatric records for a moment.  Oh, I'm sorry, let me ask you this:  You sent that fax to Dr. Wuertz on March -- in March of 1998.  What did

Dr. Wuertz tell you?

A.    I never got a reply as far as I know.

Q.    So you never actually spoke to Dr. Wuertz?

A.    Not that I recall as I sit here.

Q.    Do you recall if anybody else talked to Dr. Wuertz?

A.    Not that I'm aware of.

Q.    Are you aware if anyone to this day has ever talked to Dr. Wuertz?

A.    I believe at this point members of the habeas team have talked to him.

Q.    And what's your understanding of what Dr. Wuertz has told the habeas team?

A.    I don't know the details of that.

Q.    Do you know the general nature of it?

A.    No.

Q.    So what you know is that they've spoken to Dr. Wuertz, but you don't know what his statements generally or specifically are to them?

A.    Correct.

Q.    Let's go to Exhibit 119.  As we talked about before, Dr. Wuertz testified -- I'm sorry, didn't testify, diagnosed Billie Allen on February 11th of 1997 with depressive disorder not otherwise specified; is that correct?

A.    Yes.

Q.    And going to page 3, there's a discussion of stressors.

I'm going to history of present illness. Billie Allen told Dr. Wuertz that he had been under a number of psychosocial stressors. "These were being put out of the family home because he was selling drugs as well as the death of friends. Patient states he has been --"

A.  Thinking.

Q.  -- thinking. Go ahead. About dying?

A.  "-- thinking about dying, but denies a suicidal ideation, plan, or intent."

Q.  And he's unable to articulate any other depressive symptoms; is that correct?

A.  "He is unable to articulate any other depressive symptoms."

Q.  And did Dr. Wuertz also find that he is denying a past psychiatric history, although he may have antisocial personality disorder traits. Is that what that stands for?

A.  Yes.

Q.  Does Dr. Wuertz also note that has history of suspension for truancy, supported self via drug sales since adolescence; is that right?

A.  Yes.

Q.  Denies other antisocial personality --

A.  -- symptoms.

Q.  But may be unreliable in this regard. Is that correct?

A.  Yes.

Q.   Now, no person in this case, anyone that you've talked to, gave you the names of Brady Toliver or Cathy Toliver to contact; is that correct?

A.   I'm not sure.  I'm not sure.

Q.   Well, you want to look at your notes of your interview of Billie Allen or what is it that you could refer to to refresh your recollection?

A.   You're asking me whether or not anyone gave me Brady or --

Q.   Brady or Cathy Toliver's name to contact, that's my question.

A.   I don't recall specifically who gave me those names --

Q.   Did someone give you those names?

A.   -- if anyone.

Q.   Okay.  Let me make this clear, you have no idea one way or the other whether anyone gave you the names of Brady Toliver or Cathy Toliver to contact?

A.   The names sound familiar as I sit here.  I know I've seen those names, I just don't recall them.

Q.   Have you seen those names because you were given declarations by those two individuals?

A.   Probably, yes.

Q.   Okay.  So my question is, we have to go back to the time of the trial.  Did you know about those two people at the time of the trial?

A.    I don't recall if I did.

Q.    Okay.  What did you do to prepare for your testimony today?

A.    What did I do?

Q.    Yes.  In order -- because this happened back in 1998, what did you do to prepare for your testimony?

A.    Okay.  When I was here back in June, I studied -- I had transcripts from the penalty phase and the declarations and the records that were available at the penalty phase as well.

Q.    When you say the "records available at the penalty phase," what are you referring to?

A.    School records, medical records, things like that.

Q.    So you reviewed the transcripts of the penalty phase, correct?

A.    Correct.

Q.    You reviewed the declarations that were prepared in connection with the 2255?

A.    Correct.

Q.    And you did that to prepare for your testimony back in June?

A.    Yes.

Q.    Okay.  Now, obviously none of that was available to you back at the time, back in 1998, correct?

A.    Uh-huh, correct.

Q.    Then you reviewed the records that were available at

the time of the penalty phase; is that right?

A.    I reviewed the penalty phase records, yes.

Q.    And we're talking about records about school records, medical records?

A.    Yes.

Q.    Did you review your notes?

A.    The notes, yes.

Q.    Okay.  So you reviewed the notes that you took of your witness interviews?

A.    Whatever was given to me by the habeas team, I've reviewed.  My original file was gone.

Q.    Okay.  So you reviewed the notes that were provided by the habeas team?

A.    Yes.

Q.    Okay.  Those notes apparently did not include the notes of your interviews with the jail guards; is that correct?

A.    That's -- I think that's correct.

Q.    And when you prepared your declaration, the declaration that was filed in this case --

A.    Right.

Q.    -- what did you review?

A.    I've reviewed the penalty phase transcripts, the declarations, and I think that was it.

Q.    So you didn't review any records?

A.    Well, that all -- I got several volumes including

records.

Q.   Okay.  But when you make a statement in your declaration like only a few records on Mr. Allen and his family have been collected, you must have reviewed those, all the records before you would put that in your declaration, correct?

A.   I made a mistake in saying that.

Q.   Okay.  But my question is, when you made a mistake, was it because you didn't have those records or did you just not look at the records or did you look at the records and write that statement anyway?

A.   I'm not sure how to answer that question.

Q.   Well, my question is, when you wrote that statement that only a few records on Mr. Allen and his family have been collected, did you, in fact, review all the records that had had been collected before you wrote your declaration?

A.   I believe I did.

Q.   Okay.  So even though you reviewed the hospital records, the Metropolitan Psych records, the school records, all the records we have listed and gone through, you still wrote that statement in there that only a few records have been collected?

A.   I have to take responsibility for making a mistake by writing that statement, by keeping that statement in there.

Q.   So my question is, did you do that on purpose?  Did you

knowingly put a false statement in there?

A.    No, I did not.

Q.    Okay.  You just didn't look at what there was or how did that occur?

A.    The -- I feel uncomfortable blaming anybody because I'm responsible for that ultimately because I signed it.  I think that escaped me when I was reviewing the statement that was -- the draft that was sent to me.  And that statement survived when it shouldn't have.

Q.    And when you were reviewing documents before the declaration was prepared, did you review or were you provided with a copy of the Life History?

A.    Yeah, I believe so.

Q.    Okay.  So when you wrote the statement, "No attempts had been made to begin the laborious process of generating Mr. Allen's social history," did you just ignore that?  Did you remember that the Life History was sitting there in front of you?  Did you knowingly write that incorrect statement?

A.    As I said earlier, the investigation was at an embryotic stage in my opinion.  I would not call that document a Life History.  They called it a Life History.  It's basically a list of notes or leads to pursue that were primarily based on interviews with Billie Allen.  There was some minor collateral people who were talked to briefly during the course of that.

So I would say that the word "no" is too strong, like I said earlier.  I would say that it was at the most elemental phase, in that I would have expected at the time that I got involved that the work that I had done, that the case would have been prepared up to the point of March 6th.  You know, the work that I had done should have been done before I became involved.

Q.    When you wrote, "No attempts have been made to begin the laborious process of generating Mr. Allen's social history," when you wrote those words, did you have what is entitled the Life History of Billie Allen that was prepared by John Simon in front of you?

A.    Yes.

Q.    And you didn't write in there that, however, John Simon prepared a Life History that was merely leads, you wrote, "No attempts had been made," correct?

A.    Correct.

Q.    Now, I want to go to paragraph 11 of your declaration, and specifically the portion that states -- hold on one second.  I'm sorry, Judge.  So I'm on Exhibit 254, page 9.  You wrote, "In my short time working on this case, I expended considerable effort working with Ms. Allen to increase her chances of cooperation with a Caucasian defense team she did not trust."  Is that what you wrote in your sworn declaration?

A.    Yes.

Q.    But is it your testimony today that you didn't actually expend considerable effort working with Ms. Allen, wasn't that your testimony earlier?

A.    Yes.

Q.    So that's a false statement as well in your declaration; is that correct?

A.    It's inaccurate.

Q.    It is not correct?

A.    It's not correct.

Q.    And you also -- the sentence continues, "to increase her chances of cooperation with a Caucasian defense team she did not trust."  And you just testified this morning that she never expressed to you a lack of trust; is that correct?

A.    When I became involved in the case and my initial meetings with her --

Q.    Now, let's just break it down.  My question is simply, didn't you testify this morning that Juanita Allen never expressed to you a lack of trust?

A.    Well, she never said the words, "I don't trust you." There was a feeling that that trust was not there.

Q.    Did she ever express to you -- did you testify this morning that she never expressed to you a lack of trust?

        MR. MONTROY:  Objection, Your Honor, he just answered what was said.

VII - 190

MS. COSTANTIN:  My question is did he testify.

THE COURT:  He has.  Overruled.

BY MS. COSTANTIN:

Q.    Did you testify this morning that Juanita Allen never expressed to you a lack of trust?

A.    She never verbally stated, "I don't trust you."

Q.    No, no, my question is, did you testify this morning that she never expressed a lack of trust?  Do you recall testifying to that this morning?

A.    If I said that, that statement is a little too strong.

Q.    I want to go to paragraph 9 of your declaration.  And that's 254.7.  In that paragraph, as you discussed before, you reference a law review article from Hofstra Law Review; is that correct?

A.    Yes.

THE COURT:  Excuse me, could you spell that?

MS. COSTANTIN:  H-o-f-s-t-r-a.

THE COURT:  Okay.

BY MS. COSTANTIN:

Q.    And that's a 2008 Hofstra Law Review article; is that right?

A.    Yes.

Q.    And you, in fact, stopped working on capital litigation back in 2001, is that correct, when you moved to Hawaii?

A.    I moved in the end of 1999, and then I worked on two

cases in 2002, but that was it after that.

Q.    Okay.  So you stopped working in capital litigation in 2002; is that correct?

A.    Yes.

Q.    And so you had no knowledge of this article until the habeas attorneys gave it to you; is that right?

A.    Correct.

Q.    You also completed an affidavit for this court in support of hiring Dr. Gelbort as a neuropsychologist; is that right?

A.    I believe so.

Q.    And I'm showing you a fax in which you indicate the -- Exhibit 368, a fax dated February 6th, 1998, to John Simon from you indicating that you have attached a declaration in support of the appointment of additional experts; is that right?

A.    Yes.

Q.    Now I'm going to page 2 of that document.  Is that your affidavit?  I'm going to go through these pages with you.  Is that your affidavit that you completed in support of hiring additional experts?

A.    Yes.

Q.    And that was executed on February 6th of 1998; is that right?

A.    Yes.

Q.    Okay.  I want to go to the fourth -- I want to go to the fourth page of the exhibit, which at the bottom is labeled page 3 because the fax is the cover page.  And we're on Exhibit 368, paragraph 11.  In paragraph 11 you are reciting the duties of a mitigation specialist; is that correct?

A.    Yes.

Q.    And specifically what the mitigation specialist shall obtain from the client; is that right?

A.    Yeah.  "The mitigation specialist shall interview the client to obtain detailed social history information, and to ascertain the names or identity --"

THE COURT:  Slow, slow.

THE WITNESS:  Should I start from the beginning?

THE COURT:  Yes.  The reporter's eyes are flashing over.

A.    "No. 11:  The mitigation specialist shall interview the client to obtain detailed social history information, and to ascertain the names or identity of collateral sources of information.  Information that should be obtained from the client regarding childhood should include, but not be limited to:"

Q.    And you were the mitigation specialist in this case, correct?

A.    Yes.

Q.   So you're talking in this about the duties, your duties basically, correct?

A.   Yes.

Q.   I want to refer you to one of those things that the mitigation specialist, which is you, is supposed to determine is get the history from the client of discipline in the home, including the form of discipline, how it's administered, the frequency, by whom, and for what; is that correct?

A.   Yes.

Q.   And that was your understanding and your statements to the Court about what you should be doing?

A.   Among other things, yes.

Q.   And are you aware that Billie Allen told Dr. Cuneo that his mother had physically disciplined him until the end?

A.   Excuse me?

Q.   Are you aware that Billie Allen told Dr. Cuneo that Juanita Allen had disciplined him until the end?

A.   "Until the end," meaning the time he was arrested?

Q.   Well, I mean, here it is.

MR. MONTROY:  I'm sorry, what exhibit?

MS. COSTANTIN:  This is Exhibit 565, page 22. Dr. Cuneo's handwritten notes.

MR. MONTROY:  Page 22?

MS. COSTANTIN:  Yes, page 22.

BY MS. COSTANTIN:

Q.    Do you see where it says, "Mom physically disciplined him until end"?

A.    It appears to say that.

Q.    Okay.  Were you aware of that?

A.    I should have been, but I don't recall.

Q.    Okay.  So you're not saying you weren't aware of it, it's just something you don't remember?

A.    Correct.

Q.    And that's something that would be likely when you're meeting with Dr. Cuneo and talking about possible mitigation that you would want to know about; is that right?

A.    Yes.

Q.    And this is a -- these are the notes of Dr. Cuneo's interview from January 6th of 1998.  So that's the day that you talked to Mr. Sindel, is that right, the first day you talked to Mr. Sindel?

A.    Right.

Q.    So that was something Dr. Cuneo was already looking at, correct?

A.    It appears so.

Q.    So it wasn't a secret that Billie Allen had been physically disciplined by his mother throughout his lifetime, was it?

A.    It's not surprising, no.

Q.    And that's the kind of information or question that

would be related to mitigation, not competency, correct?

A.    Yes.

Q.    And so that evaluation on January 16th of 1998 that Dr. Cuneo is doing of Billie Allen dealt with at least some mitigation issues, correct?

A.    There would potentially be some overlap when he's collecting -- when he's doing his clinical interviews for competency, there would be some information in there germane to mitigation.

Q.    And some of that might be information related to whether he was physically disciplined as a child?

A.    As it indicates here.

Q.    And you're aware that Dr. Cuneo's report was filed February 16th of 1998.  I'm showing you Exhibit 565, the very first page.

A.    Okay.

Q.    Does that comport with what you recall?

A.    Okay.  As of February 16th?

Q.    1998.  That's when he filed his report; is that correct?

A.    Yes.

Q.    And that was after the trial started, correct?

A.    Yes.

Q.    Okay.  So it couldn't possibly be solely related to competency, could it?

A.    Probably not.

Q.    Let me go back to your affidavit that you filed with the Court back during the criminal trial or the criminal case. And I want to go through things that the mitigation specialist shall cover according to what you wrote.

MR. MONTROY:  What exhibit are we on?

MS. COSTANTIN:  We're on 368, page 5.

BY MS. COSTANTIN:

Q.    So this is the affidavit that you completed when you're asking for additional support. And in this case you're talking about what a mitigation specialist should do. And do you recall that one of those things you stated a mitigation specialist shall do is, "Inquire of the client about any significant childhood experiences, including family violence, parental alcohol or drug abuse, abuse of the client, including physical, sexual, or emotional abuse." Is that right?

A.    Yes.

Q.    And then going to the next page, paragraph 13, you state that, "The mitigation specialist shall conduct collateral interviews with family members and others to supplement and corroborate the information obtained from the client." Is that correct?

A.    That's what it says.

Q.    And is that what you believed the mitigation specialist

shall do?

A.    I think that the corroboration can go both ways.   In other words, doing collateral interviews with family members and corroborating the information across those family members is also part of this, that the client is a key source of information potentially, but that it's not limited to corroborating information with just the client.

Q.    And those interviews, those collateral interviews should be covering the same areas that we just talked about being covered with the client; is that right?

A.    Yes.

Q.    Okay.  So that means that they should be covering family violence, parental alcohol or drug abuse, abuse of the client including physical, sexual, or emotional abuse; is that right?

A.    Yes.

Q.    So you're looking -- as the mitigation expert, you're looking for evidence of physical abuse, correct?

A.    That's what I should be looking for as part of the mitigation investigation.

Q.    And were you looking for evidence of physical abuse in the Billie Allen case?

A.    Not as -- I think I got distracted by a lot of other things and I didn't put enough focus on that area.

Q.    Were you looking for evidence of physical abuse?

A.    Yes.

Q.    Because that's a standard area that you're going to cover with a client and with collateral witnesses, correct?

A.    That is an area that you want to cover to the extent possible with the client and collateral witnesses.

Q.    So you expect that you would have asked Billie Allen if he had been physically abused as a child, correct?

A.    As part of a mitigation case, typically in my past history, that is an area that's covered.

Q.    And you expect that you would have done that with him; is that correct?

A.    I would have hoped to.

Q.    Okay.  But you -- let's go -- you recall in your testimony when asked the question if you had asked Billie Allen if he had been physically abused as a child, you giving the answer, "I would expect that I would have, but as I sit here right now I don't know if I did, but I expect that I would have"?

A.    Yes.

Q.    And he never told you he had been physically abused as a child, did he?

A.    I never asked him specifically about that.

Q.    Hold on a second.  Didn't you just testify that you expect you would have asked him if he had been physically abused?

A.    It would be in my notes if it was asked.

Q.    So you're saying that when you testified at your depo, you expect you would have asked him about that, you're saying that that's not true?  And when you just testified to what you're saying --

A.    What I'm saying, I should have asked him.  I probably did not ask him because it's not in my notes.  And had I had the time to close the loop on this case and spend the time with him and with family members, I would have gotten a lot more information from them.

Q.    That doesn't really answer my question.  My question is simply, are you testifying right now that you did not ask Billie Allen whether he was physically abused, that you recall not asking him that?

A.    I would say based on the notes that I have here, that information is not in the notes, therefore I did not ask him about it.

Q.    Okay.  So your testimony today is that you never asked Billie Allen whether he had been physically abused?

A.    That's what I'm concluding right now.

Q.    And even though you filed an affidavit with this court saying that that's what a mitigation specialist should do is ask the client about that?

A.    There were a lot of things that should have happened in this case that didn't happen because of the situation.

Q.    And you filed an affidavit with the Court saying that's what would happen, that's what you shall do, correct?

A.    Yes.

Q.    And you're saying as you sit here today, 14 years later, you recall specifically that you never asked Billie Allen about that?

MR. MONTROY:  Objection, Your Honor, this question has been asked several times.

THE COURT:  Overruled.  Yes, it has in different context.  Overruled.

A.    What I'm saying is that if I did ask it, it would be in my notes.

Q.    And you would have written down, "Billie Allen says he was not physically abused"?

A.    I would have written down whether he said he was or whether he wasn't.

Q.    And nothing in your notes indicate that he was, correct?

A.    That seems to be true.

Q.    Now, in the same way you would cover sexual abuse, wouldn't you?

A.    Yes.

Q.    And did you cover sexual abuse with Billie Allen?

A.    I don't believe so.

Q.    But you did discuss with Dr. Cuneo -- I'm going to show

you 496.  Do you recall discussing with Dr. Cuneo whether or not Billie Allen was sexually abused by his father?  I'm going to show you this portion.  "Ask Juanita, was daddy sexually abusive."  Do you recall discussing that with Dr. Cuneo, Mr. Simon, and Mr. Sindel?

A.    As I sit here, I didn't recall that, no.

Q.    But you wrote that apparently?

A.    Yes.

Q.    Did you ask Juanita Allen if daddy was sexually abusive to Billie Allen?

A.    I doubt it.

Q.    Though that's what you were supposed to do, right?

A.    There were a lot of things that I was supposed to do during this case.

Q.    So it's your testimony you talked about this with everybody but the trial team, and you specifically remember that you did not ask that question?

A.    Had I asked it, I would have seen notes.  And I know I didn't ask about the physical abuse and, therefore, it's unlikely that I asked about sexual abuse, because I hadn't established a rapport with her sufficient to delve into that type of information.

Q.    And Billie Allen never told you that he had been sexually abused, correct?

A.    Correct.

Q.    So nothing in your notes indicated that Billie Allen had been sexually abused, but you still discussed this as a possibility; is that correct?

A.    Obviously I took notes here, and the topic was discussed.

Q.    Now, in the same way, you would cover parental alcohol abuse, correct?

A.    Yes.

Q.    And you covered that area with Billie Allen in your interviews, didn't you?

A.    Regarding the father, he volunteered that his father was a drinker.

Q.    When you say "he volunteered," did you ask him a question about his father?  I'm showing you Exhibit 338, page 7 of your interview notes from January 17th of 1998.

A.    I see them.

Q.    And my question is, are you saying he volunteered -- what does that mean, you didn't even ask him about his father?

A.    I asked him about John Allen.  He says, I just have contact with my grandmother, not his side of the family. They are drunks and alcoholics, all my cousins on his side are locked up.  I don't mess with them.  Staying drunk all the time, fighting.  One cousin, his name is Cory Roy.  He had got shot, locked up, all kinds of things.  Now

straightened out.  Another cousin Jason, robbing -- I can't make out the second word -- drugs, guns, et cetera.

Q.    Did you ask him --

A.    So --

Q.    -- if his father or his father's side of the family were alcoholics?

A.    I don't recall the specific question that I asked, but this is my writing, so one can infer that either questions were asked or I could have said, well, tell me about your dad's side of the family.  I don't know what specific question I asked.

Q.    So when you say he volunteered it, you're just saying that he's answering questions that you're asking?

A.    Yes.

Q.    And he told you -- I'm going to page 4 of 338 -- that he didn't associate with his father; is that correct?

A.    Correct.

Q.    He did not tell you that his mother drank too much, did he?

A.    I didn't ask him and he didn't tell me.

Q.    You remember that, you remember that you didn't ask him that?

A.    If I would have asked him, I would have written it down.

Q.    So you would from written down, mother does not drink?

A.    Or mother drinks, either one.

Q.    So unless it's actually written down, an area is written down, you never asked him about it?  If the answer was no, you wouldn't write it down, or the answer was yes -- if you didn't write it down, it was never asked, is that your testimony?

A.    It was -- I don't believe I asked him that.

Q.    Do you remember that or -- I mean, do you really remember that from 14 years ago?

A.    Had I asked about it, I would have written it down.

Q.    Did you ask Juanita Allen if she drank?

A.    I don't believe so.

Q.    Did you believe that Juanita Allen drank?

A.    Yes, I did.

Q.    Did that prompt you to ask anybody else about it?

A.    There were other people who spoke about her drinking.

Q.    Did that prompt you to ask them about it?

A.    To ask them about it?

Q.    Right.

A.    I believe I did ask them.

Q.    But you did not ask Billie Allen about it?

A.    Billie wasn't going to be testifying.

Q.    Okay.  In the affidavit that you filed about what a mitigation specialist shall do, one of the areas that you shall ask the client about was parental alcohol or drug

abuse.  And it's your testimony that you did not ask about Juanita Allen's alcohol or drug abuse; is that correct?

A.   Given the time frame involved, I did not ask those questions.

Q.   Okay.  So you're in the jail with him, you're talking to him.  We have your notes from January 17th.  He's telling you, my dad's side of the family is drunk.  You didn't have enough time to ask the question, how about your mom's side of the family?

A.   I didn't ask it.

Q.   Okay.  But it wasn't because of time?

A.   Overall, had the time been there, like I said earlier today, I would have closed the loop on a lot of this information and followed up with it.

Q.   My question is, when you're in there and you're talking to him about father's alcohol abuse, is it your testimony that you did not have time to ask about whether there was alcohol or drug abuse on the mother's side?

A.   Theoretically I could have followed up with a question, and it would have been a good followup.

Q.   It wasn't a time issue is my question.

A.   I would say overall when looking at all the information, that time was a factor.

Q.   Okay.  When you sat in that interview on January 17 of 1998 with the defendant in the Franklin County Jail and

you're asking him questions about his family, you did not have time to ask the question about whether his mother abused alcohol or you just chose not to?

A.    It wasn't a conscious choice.

Q.    You're saying there wasn't time to ask that question?

A.    I'm sorry that you have trouble with my style.  The question wasn't asked and --

Q.    My question is, was that because of time that you didn't ask that question on January 17th of 1998?

A.    I would say on January 17th, 1998, time was probably not the variable, but overall in the course of the case time was the variable.

Q.    So what was the reason that you didn't ask about the maternal alcohol abuse on January 17th if you asked about the paternal?

A.    That's a good -- I can't answer that question.

Q.    You took notes during your interviews of Billie Allen and other witnesses, correct?

A.    Yes.

Q.    Or sometimes you typed them on the laptop or sometimes you handwrote and then typed them up; is that right?

A.    Yes.

Q.    And is it correct that you got as close as you could get them to be verbatim transcripts of what they were saying, the witnesses were saying?

A.   I tried most of the time.  And some of it was shorthand, some of it was abbreviations.  But I tried to capture what they were telling me accurately.

Q.   And referring you to your declaration that you filed in connection with the 2255, which is Exhibit 254, page 7, and that's paragraph 9, you state that:

"Therefore, repeat interviews are virtually always required over an extended period of time, especially with family members, as it is incredibly challenging to have family members open up to reveal aspects of the family dynamic that range from embarrassing to criminal (as current counsel have done)."

Is that correct?

A.   Yes.

Q.   And did you also indicate in Exhibit 254, page 6, paragraph 7 that:

"Because of their limited contact with the family, compounded by obvious racial and social class issues, counsel had not put the time in, over time, to develop the level of trust necessary for engaging family members around sensitive personal information germane to mitigation."

Is that correct?  Is that what you wrote in your declaration?

A.   I'm reading it right now.  Yes.

Q.   But, in fact, multiple people told you about the

physical discipline of Billie Allen and about Juanita's drinking; is that correct?

A.     Not that I recall.

Q.     You recall there being a lack of trust preventing Raymond Petty, Deborah Ruffin, Shimeka Taylor, Sam Moore from telling you about the physical punishment that Juanita Allen used with Billie Allen?

A.     All right, I'm confused about the time frame here.  Can you please repeat your question?

Q.     Okay.  My question is -- well, let me rephrase the question.  Isn't it a fact Raymond Petty, Deborah Ruffin, Shimeka Taylor, and Sam Moore all tell you about the physical punishment that Juanita Allen had used with Billie Allen?

A.     As I got into the case, we learned some of that, yes.

Q.     Okay.  So your testimony right now is that Raymond Petty, Deborah Ruffin, Shimeka Taylor, and Sam Moore all told you that Juanita Allen had physically punished Billie Allen?

A.     Can you repeat the four people?

Q.     Raymond Petty, Deborah Ruffin, Shimeka Taylor, Sam Moore.

A.     I'm only remembering Raymond Petty.

Q.     And in your deposition -- well, first of all, in your declaration, going to 254.9, so the ninth page, you stated that:  "It was clear that Ms. Allen was one of the primary abusers of her son."  Is that right?

A.    Yes.

Q.    And you recall being asked in your deposition what evidence that you had to support those suspicions or that statement?

A.    Yes.

Q.    Okay.  And do you recall that you said that that was based on the mother's demeanor, Juanita Allen's demeanor?

A.    Yes.

Q.    And you've testified to that somewhat today about her being an angry person; is that right?

A.    Yes.

Q.    And you had an impression that she drank; is that right?

A.    Yes.

Q.    Do you also recall testifying in your deposition that a statement that Mr. Petty made, made you believe that Ms. Allen was one of the primary abusers of her son?

A.    He described the incident about the beating with the extension cord, I believe.

Q.    I'm talking about Otha Petty, the grandfather.

A.    Oh, Otha Petty.

Q.    You were disturbed by a statement that Otha Petty had made, and that made you think there was abuse in the family. Do you recall testifying to that in the deposition?

A.    Yes.

Q.    Okay.  And specifically do you recall that you testified in the deposition that when you told Otha Petty, Sr., Billie Allen's grandfather, that Billie Allen could face the death penalty or life imprisonment without parole for killing the bank guard, that he sat there for a moment and then said, "You have to take the bitter with the sweet"?  Is that correct?

A.    That's correct.

Q.    And that statement, you believed, indicated that Billie Allen had been abused?

A.    From his affect and from what he said and from his daughter's -- the way she turned out, the way Juanita turned out, I suspected that there was physical abuse in that family.

Q.    And it's your testimony that you did nothing to follow up on that; is that right?

A.    Unfortunately I did not follow up with that to the extent that it needed to be followed up on.

Q.    Do you recall discounting Raymond Petty's -- in the deposition discounting Raymond Petty's trial testify that he had to pull Juanita Allen off of Billie Allen when she was beating him with the extension cord because Billie Allen was a teenager at that time?  Do you recall discounting the importance of that?

A.    I don't recall discounting the importance of that, no.

Q.    So you knew that at the time that that was very important, at the time of the trial you knew that that statement by Raymond Petty was important?

A.    Yes.

Q.    And, in fact, multiple people told you that Juanita Allen had physically disciplined Billie Allen; is that correct?

A.    I don't recall.  The salient incident that stands out to me was Raymond Petty's statement.

Q.    Well, let's look at Exhibit 485.  These are your notes of the interview of Deborah Ruffin, correct?

A.    No, those are somebody else's notes.

Q.    Those are not your notes?

A.    No.

Q.    Whose notes are they?

A.    I don't know.

Q.    Are they Mr. Sindel's notes?  Do you recognize his handwriting?

A.    It could be Sindel or Simon.

Q.    Okay.  And you're certain that those are not your notes?

A.    Yes.

Q.    Okay.  Are you certain that -- let me show you page 2, where Deborah Ruffin, the statement is made in quotes, "'had to tighten Bill up' -- get physical."  Do you recall Deborah

Ruffin making that statement while you were around?

A.   I do not recall that.

Q.   Do you recall -- let me show you 488.  Whose notes are those?

A.   Those are mine.

Q.   And those are your notes of an interview with -- typed interview with Deborah Ruffin; is that right?

A.   Yes.

Q.   And referring you now to page -- referring you to page 4 of those typed notes.  Do you see the one that a mark has been made by, Deborah Ruffin indicating that Billie Allen, "Not having a father in the house.  Her dad is an older man.  She has to do what she has to do to maintain control"?

A.   Yes.

Q.   Okay.  Is that an indication to you of some physical actions?

A.   That's something that could have been followed up on.

Q.   Okay.  And that's something that Deborah Ruffin told to you?

A.   Yes.

Q.   So when we say it was only Raymond Petty, you had information from other people, is that correct, that there was physical abuse?

A.   From this it corroborates the potential for physical

abuse.  That is something that should have been developed further.  Followup questions should have been asked.

Q.    And looking at 485, you don't recognize that as Mr. Sindel's handwriting?

A.    It's probably Mr. Sindel's handwriting.

Q.    So it does appear that Mr. Sindel did do some interviews of witnesses and took notes; is that correct?

A.    It was likely simultaneous with me.  I'd have to look at them side by side.  I don't know if that was during the weekend interview sessions or if that was at another time.

Q.    So I'm showing you a hard copy of 488 and a hard copy of 485.

A.    This is going to take me a minute or two to check.

Q.    That's fine.

          MR. MONTROY:  Your Honor -- excuse me, Your Honor, is it possible that we step outside with Mr. Kane?

          THE COURT:  We'll take a ten-minute break.

          THE WITNESS:  Can I stay here and do this?

          THE COURT:  You can stay or if you take the time and then need a break after that, you'll get a break.

          THE WITNESS:  This will just be helpful if I stay and take care of this.  Thanks.

          (Court in recess from 3:56 p.m. until 4:07 p.m.)

          MS. COSTANTIN:  Judge, may I proceed?  May I proceed?

THE COURT: Yes, you may proceed.

BY MS. COSTANTIN:

Q. Dr. Randall, have you had a chance to look at those?

A. Yes, I have.

Q. Do those appear to be the handwritten notes to be from part of the same session as the typewritten notes?

A. It appears to be Rick Sindel's handwriting from the page 3 and 4 of my notes, which was the witness -- the prep session that we held that weekend.

Q. And that's of Deborah Ruffin; is that right?

A. Yes.

Q. So Deborah Ruffin during that prep session in February indicated that Juanita had to tighten Bill up and get physical; is that right?

A. That's what Sindel's notes say.

Q. Okay. And he was at the same session with Ms. Ruffin that you were, right?

A. Yes.

Q. So there is stuff that a witness will say that perhaps you don't write down but was said; is that right?

A. Yes.

Q. Okay. And Deborah Ruffin testified at trial, correct?

A. Yes.

Q. She was not -- she did not, however, testify about Juanita Allen getting physical with -- about Juanita Allen

getting physical with Billie Allen, did she?

A.    I'd have to see that transcript to see, but I don't believe so.

Q.    But that was information that was obviously known to the trial team?

A.    Because it wasn't in my notes, it wasn't in the rough direct exam questions that would have been prepared for Rick. So they could have been in his notes and not in mine.  And since I didn't pick up on that, the question wasn't asked that should have been asked.

Q.    Okay.  My question was, it was known to the trial team that Deborah Ruffin had made the statement that Juanita Allen got physical with Billie Allen?

          MR. MONTROY:  Your Honor, I'm just going to object, she's -- counsel is referring to notes that were prepared not by this witness but by a different witness.  So he's testified what were in his notes.

          THE COURT:  Yeah, clearly it does appear in Mr. Sindel's notes, that he wrote it down.  I would assume he was aware, but that's a little bit different than asking if this witness was aware of what the team knew.

          MS. COSTANTIN:  Okay, Judge, I'll withdraw it and ask another question.  That's fine.

BY MS. COSTANTIN:

Q.    I want to refer you to Exhibit 457.  Those are

handwritten notes of your interview or an interview with Raymond Petty; is that right?

A.    Yes.

Q.    And I want to refer you to page 8 of that.  And did Raymond Petty tell you:  "She was really on him one time, I broke her off him.  He was a big kid.  I couldn't see her punishing him like that, doing the things she was doing.  She'd beat the crap out of him real good."  Is that correct?

A.    Yes.

Q.    And then moving to your typed notes -- actually let me show the first page of Exhibit 458.  Those are your typed notes of interviews you conducted with Raymond Petty; is that correct?

A.    It appears so, yes.

Q.    And you had indicated that there was a line on page 3, and the stuff below the line was things that he talked to you about during that prep session, and then the stuff above the line was a separate interview; is that right?

A.    Yes.

Q.    And so let's talk about page 4 of that exhibit, which is Exhibit 458, and at the bottom portion.  He told you that Juanita Allen, "One time she was getting on him --" Referring to Billie Allen.  "She was beating him.  He was supposed to be in a certain time, and do something, and he didn't do it.  He's 16-18-18, not too long ago.  Bill calls

me, I drive to his house.  I jump in between them.  He broke out of the house and ran.  I never got beat like that before. She was whooping him with an extension cord, just whacking at him.  It just went back to slavery times.  I couldn't see my blood getting beat like that.  I've never seen that kind of beating before.  (Like a slavery beating.)"  Is that correct?

A.    Yes.

Q.    And that is information that Raymond Petty told you, correct?

A.    Yes.

Q.    And that's information he told you, I believe you testified during that prep session or those weekend sessions, the 21st, 22nd, and maybe 23rd when you were meeting with a bunch of witnesses?

A.    He could have said it at the earlier session.  If you scroll up I can check.  But he definitely said it at the latter session.

Q.    And, in fact, he did say it at the earlier session. And I'm going to show you 458.2.  "She was really on him one time.  I broke her off him.  He was big kid already.  I couldn't see her punishing him like that, doing the things she was doing.  She's beat the crap out of him real good." Is that right?

A.    Yes.

Q.    So when you testified this morning that Raymond Petty

had made those statements to you during that weekend when there were an assembly line of witnesses, he'd actually made those statements to you before that; is that correct?

A.    The statement -- about this incident, yes.

Q.    Is this one incident she talking about?

A.    I'd have to scroll down again and double check, it could be one incident, it could be two.  My impression was that it was the same incident, but it could have been separate.

Q.    But the point is, he told you about this before that weekend, which you describe as an assembly line of witnesses; is that right?

A.    Yes.  Within the two- to three-week time frame before the assembly line.

Q.    So within the time period that you were in the case?

A.    Correct.

Q.    Right.  Okay.  So some time between, what did we decide, January 20th and that weekend of February 21st, 22nd?

A.    It would have been more after the 28th or 30th of January.

Q.    Okay.

A.    And then before, of course, the witness prep session.  So it would be in that window.

Q.    Okay.  So you did not learn about this just five days before trial, you learned about it some period of time before

the penalty phase of trial?

A.    I learned about it before the 20th, 21st, 22nd, whenever that weekend was.  I don't know exactly when I learned it.

Q.    And, in fact, he testified at trial; is that correct?

A.    Yes.

Q.    And he -- I'm going to show you Exhibit 213, page 27 of 213.  And this is Raymond Petty testifying; is that correct?

A.    Yes.

Q.    I'm sorry.  "She was -- he had to be around 16, 17, something.  15, 16 or 17 and she was whooping him with an extension cord and I think Bill called me on the phone -- this must have been my layoff period also and Bill --"

        And the question was:  "About how old would Bill have been at that time?"

        "ANSWER:  I'm -- he had to be 15, 16 or 17.  15 or 16.  Maybe 17.  But Bill called me on the phone and I went down to the house and she was really just -- just beating him and I stepped between them and Bill broke out the house and he ran down the street and Juanita and I had a few words and I got in the car and I took off and he -- I don't think he came back in the house and this -- from that day, from that night it was just all down hill from there."

        Is that right?

A.    Yes.

VII - 220

Q.    So you knew of physical punishment by Juanita Allen, or the trial team did, from Deborah Ruffin, correct?

A.    It's -- how should I say this.  The incident that Raymond described was much more salient and apparent.  It was more salient.  Deborah alluded to it, and at the time Rick noted it.  She said, "I had to tighten Bill up."  Rick wrote, "Get physical," okay.  And then I did not pursue it with Deborah.  I did not follow up with that.

Q.    My question is simply, you knew that Juanita Allen had been physical with Billie Allen from Deborah Ruffin; is that correct?

MR. MONTROY:  Objection, Your Honor, he just explained what he knew from Deborah Ruffin.

THE COURT:  This is a little different question.  It says that -- my question, you knew that Juanita Allen had been physical with Billie Allen from Deborah Ruffin.  Can you answer that?

A.    Okay.  I would say that --

Q.    Just a yes or no, Dr. Randall.

A.    There's -- there was some awareness on some level that there was physical abuse related by Deborah Ruffin about Juanita with Billie.

Q.    And you knew that Juanita Allen had gotten physical with Billie Allen from Raymond Petty?

A.    Yes.

Q.     And the jury heard of that testimony from Raymond Petty?

A.     Yes.

Q.     And did you interview Shimeka Taylor, the sister of Marquis Taylor?

A.     I may have, yes.

Q.     Let me show you Exhibit 452.  First of all, do you recall that Shimeka Taylor was the sister of Marquis Taylor?

A.     Yes.

Q.     And Marquis Taylor was Billie Allen's friend who was shot to death in front of him; is that correct?

A.     Yes.

Q.     And Billie Allen had told you that nothing was right after Marquis was shot.  Do you recall that?

A.     Yeah, he said he wasn't the same, right.

Q.     All right.  And when you interviewed Shimeka Taylor, and I'll refer you to Exhibit 452, we're going to the third paragraph from the bottom.  Do you recall Shimeka Taylor telling you:

       "I was there one time when we hung out too late.  It was around Christmas holiday.  He got back at maybe ten o'clock.  Bill had always been tall for his age.  She put him on punishment.  His mother, my mother the type they need to control their kids up to a certain point.  A whooping and a punishment.  Early '90s.  He was 12, 13."

Now, she told you that, correct?

A.    Yes.

Q.    And she's describing Juanita Allen and her own mother, Lu Taylor, administering whipping and a punishment; is that right?

A.    Yes.

Q.    Now, would you quarrel with Mr. Simon's account of that interview in which he wrote, "If Bill did something, he got the snot kicked out of him.  Got back around ten.  Bill cried.  Whipping and a punishment, early nineties, 12 to 13." Would you argue with his account of that interview?

A.    It seems consistent.

        MS. CARLYLE:  What exhibit?

        MS. COSTANTIN:  522.

Q.    I'm sorry?

A.    It seems consistent.

Q.    So you knew Billie Allen was getting whoopings as a child; is that correct?

A.    We were told this, yes.

Q.    And you were told that Juanita would kick the snot out of Billie Allen as punishment; is that correct?

        MR. MONTROY:  Objection, Your Honor, that's in Mr. Simon's note, not Mr. Randall's notes.

        THE COURT:  Yes, it is.  The question was, did you know that.  So it doesn't ask about what the person who wrote

the notes knew, but the question is at that time did you know it.

A.    Okay.  The phraseology there, "get the snot kicked out of him," I didn't recall.  It wasn't in my notes.  But the fact that there was physical whipping and punishment was in my notes.

Q.    So you knew then from Shimeka Taylor that Juanita Allen physically punished Billie Allen, right?

A.    Yes.

Q.    And you also interviewed Samuel Moore, Billie Allen's softball coach, didn't you?

A.    Yes.

Q.    I'm going to Exhibit 436.  Are these your typed notes of your interview with Samuel Moore?

A.    They are, yes.

Q.    I want to go to the second page.  And that's above that line, correct?

A.    Yes.

Q.    Did Samuel Moore tell you:  "Billy was on punishment just a little while back.  Try to keep him stay in the house. She'd mop him up."

       Do you recall, is that what you wrote concerning what Samuel Moore told you?

A.    Yes.

Q.    And did -- I'm going to go to the bottom of that page.

Did he also tell you:  "Everybody knew Bill would be on punishment.  That his mother would kick his ass in the street"?

A.     We were told that.

Q.     I'm sorry, let me -- and, "He had to sneak out when his mama was at work."  Is that right?

A.     Yes.

Q.     So in your declaration, going to Exhibit 254, page 10, paragraph 14, when you wrote, "Despite my suspecting family abuse and dysfunction, I was not able to obtain concrete information from any family member that this existed."  Would you agree that that statement is not correct?

A.     I would say that the -- with regard to Raymond Petty, that statement is not correct.

Q.     Okay.  Would you agree that that statement is misleading to say that you didn't get any concrete information from any family member of family abuse or dysfunction, if you had, in fact, obtained it from Deborah Ruffin, a family friend; Shimeka Taylor, a neighbor; and Samuel Moore, the defendant's coach?

A.     I did not intentionally try to mislead anybody here.

Q.     So when you wrote that you "didn't obtain concrete information from any family member," you didn't specifically use the term "family member" knowing that Deborah Ruffin, Shimeka Taylor, and Samuel Moore had told you about Juanita's

abuse of Billie Allen?

A.    You know, to be quite honest, up until this point I did not recall them telling me this.  The one incident that stood out was Raymond Petty.  And this is information that we would obviously have wanted to exploit and use at the hearing in their testimony.

Q.    And this is information that you knew before they testified?

A.    You know what, like I said earlier today, this was a totally immersive experience that was quite overwhelming, and there were mistakes made.  There was sloppiness.

Q.    Here's my simple question, you knew this information before they testified, correct?

A.    I had an awareness of this information.  And because of other distractions receded from my awareness to the extent that it was not exploited.

Q.    So it was in your notes?

A.    Yes.

Q.    So you did know this information?

A.    Well, obviously because if it's in my notes, I wrote it, so at one point technically I knew it.  But in terms of recalling it, in terms of having 36 witnesses and what they told me at my fingertips every minute of every day, I did not have that facility with this information.

Q.    Okay.  When you prepared your declaration, did you have

your notes of the interviews of Deborah Ruffin, Shimeka Taylor, Samuel Moore, and Raymond Petty?

A.   I may have had them.

Q.   So when you made that statement, "Despite my suspecting family abuse and dysfunction, I was not able to obtain concrete information from any family member that this existed," did you make any efforts to go back and see the work you had done at the time of the mitigation investigation to see if that statement was true?

A.   Okay.   When I wrote the statement, with the exception of the Raymond Petty information, the other information that was told to me was not salient in my mind that I would recall it.

Q.   Well, I understand.   That was 14 -- go ahead.

A.   So when I reviewed the information to prepare the declaration, I made a diligent attempt to review everything that was given to me.   And from that the extent of the family abuse information that was presented at the hearing was not -- was not a lot.

THE COURT:   Was not what?

THE WITNESS:   Was not real substantial.   It was mostly Raymond Petty, if I recall.

Q.   Dr. Randall, my question is simply, in this declaration, you state, "I was not able to obtain concrete information from any family member that this existed."   At

the time you wrote this declaration, had you made any efforts to look at the work you'd done before you wrote that and signed it?

A.   Yes.

Q.   And did that include looking at the interview notes of Deborah Ruffin, Shimeka Taylor, or Samuel Moore?

A.   If I had them, I looked at them, and I still missed it.

Q.   Did you ask for all your notes before you completed this declaration?  Did you ask the habeas team for all your notes to clarify?

A.   I'm pretty sure I got the notes.  I didn't say, "May I have my notes," but I think I got the notes and I think I missed it again.

Q.   Okay.  So you're saying back in --

A.   With the exception of Raymond Petty.

Q.   So you're saying back in 1998 when these folks told you; Deborah Ruffin, Shimeka Taylor, and Samuel Moore told you about Juanita Allen physically punishing Billie Allen, you just forgot that information, you just forgot to ask about it, or have the attorneys ask about it in testimony?

A.   That's what I'm saying, yes.

Q.   Okay.  And then when you completed this affidavit -- excuse me, this declaration stating that you're not able to obtain concrete information from any family member that this existed, you missed it again.  You looked at your notes of

all your witness interviews and you missed it again?

A.   With the exception of Raymond Petty, I did, yes.

Q.   But you did miss it, because this doesn't even talk about Raymond Petty, right?  You say you weren't able to obtain concrete information from any family member.  Your declaration doesn't talk about Raymond Petty either, correct?

A.   Correct.

Q.   Okay.  So you made this statement that you weren't able to obtain concrete information from any family member that this existed, and you missed including the interview notes of these folks, Raymond Petty's trial testimony when you completed this?

A.   Apparently as stated, yes.

Q.   Okay.  Are you aware that your declaration was given to experts who were hired by the 2255 team?

A.   Yes.

Q.   Okay.  And that they would rely upon statements you make in your declaration for their opinions, correct?

A.   I would assume that would be part of the information that they would review.

Q.   I'm sorry?

A.   It's probably part of the information that they would review.

Q.   So when you say, "I was not able to obtain concrete information from any family member that this" -- meaning the

family abuse and dysfunction existed, that's what the 2255 experts think too, right?

A.    I don't know what they think.

Q.    But they have no evidence from you, that's what you told them, correct?

A.    If they are relying solely on my declaration, they probably wouldn't want to rely solely on my declaration.

Q.    Because your declaration is wrong, correct?

A.    Parts of it are incorrect.

Q.    The parts we've talked about?

A.    Some of them, yes.

Q.    Now, have you made any attempt to correct this information since you prepared the declaration?

A.    I never even knew that was within the realm of possibility.

Q.    So but you knew your declaration was being given to experts, correct?

A.    Yes.

Q.    And it would be relied upon for what was said in it, correct?

A.    In part, yes.

Q.    But you never made any effort to correct the mistakes in it?

A.    That's correct.

Q.    Are you familiar with the phrase, "garbage in/garbage

out"?

A.    Generally.

Q.    An opinion is only as good as the facts underlying it, correct?

A.    Yes.

Q.    And at least some of the facts we've noted today that you provided are just flat wrong in your declaration, correct?

A.    In matters of degree, yes.

Q.    In matters of degree like, "I was not able to obtain concrete information from any family member that family abuse or dysfunction existed"?  Would that just be a matter of degree?

A.    Well, the one family member that I obtained the information from was Raymond Petty.

Q.    And you didn't put that in here, correct?

A.    That's correct.

Q.    And then you obtained information from Deborah Ruffin, Shimeka Taylor, and Samuel Moore, but you didn't put that in there either, did you?

A.    Like I said earlier, that was basically missed by me on the next pass.

Q.    In preparing the declaration?

A.    At the hearing itself apparently and later on.

Q.    And you had multiple witnesses also tell you about

family dysfunction; is that correct?

A.    I believe so.

Q.    So we're looking right now at Raymond Petty, so you can see your typed notes of Raymond Petty.  Didn't Raymond Petty tell you that, "When problems arise, Juanita will drink.  She would drink to cover what's going on.  When she gets depressed, she'll drink"?

A.    Yes.

Q.    And Mr. Petty told the jury about that as well, do you recall that?

A.    He may have.

Q.    Referring you to Exhibit 213, page 26.  "My sister, I think she -- she doesn't -- she curse a lot, and cursing and drinking and -- it's not going to alleviate the problem.  When you are done cursing, when you put that glass down, the problem's still there."  Is that right?

A.    Yes.

Q.    And you had looked before at this Exhibit 506, which is the direct examination outline that I believe you testified you prepared for Mr. Sindel?

A.    Yes.

Q.    Was that typical that you prepare suggested outlines?

A.    Oftentimes.

Q.    I'm sorry?

A.    Oftentimes towards the end of my work in this field, I

would do that.

Q.    And what other witnesses did you prepare them for?

A.    Which ones?

Q.    Yeah.

A.    I thought I prepared a bunch of them.  I couldn't tell you exactly which ones.

Q.    Did you -- when you reviewed in preparation for your testimony and for the declaration, did you find any others that you recall that you prepared?

A.    I'm sure there were, but like I said, there's 36 witnesses.  I don't know everything that was done or said by all of them.

Q.    I'm saying when you were reviewing the documents that were provided to you to prepare for either your declaration or for trial, did you find any besides this of witness outlines that you had prepared?

A.    I don't recall specifically right now as I sit here, but I probably did see some of them.

Q.    And these are questions -- going to page 3 of Exhibit 506.  These are questions that you were going to ask Juanita Allen, is that right?  Or not you, I'm sorry, that you wanted Mr. Sindel to ask Juanita Allen?

A.    No, I think it's -- is that the Raymond Petty?

Q.    Yes, it's Raymond Petty.  I'm sorry, that you wanted to ask Raymond Petty.  I apologize.

A.    Those were suggested questions for Mr. Sindel, yes.

Q.    And those questions were, "How does Juanita deal with her feelings?  Does she drink?  When?"  Is that right?

A.    Yes.

Q.    And that answer that his sister drinks to deal with her feelings was anticipated and known to you, correct?

A.    Yes.

Q.    Okay.  So it was no surprise to you that Raymond Petty answered that Juanita Allen drank when she couldn't deal with her feelings?

A.    The questions were based on what he had told me, I believe, and so we were likely aware of the answers to the questions that we prepared.

Q.    And also interviewed as we've seen before was Deborah Ruffin, is that correct, during those interviews from February 21st?

A.    Yes.

Q.    And that's the weekend schedule.  I'm showing Exhibit 382.2.  That's the weekend schedule from Saturday, the 21st and the 22nd; is that right?

A.    Yes.

Q.    And it's showing Deborah Ruffin scheduled for Saturday at 10 o'clock in the morning; is that right?

A.    And someone else scheduled at 10:30, yes.

Q.    And Julie Ellis?

A.    Yes.

Q.    And you're present for all these mitigation interviews; is that right?

A.    I believe so.

Q.    Okay.  And I'm going to show you what's been admitted as the transcribed notes of John Simon.

MR. MONTROY:  I'm sorry, what number is that?

MS. COSTANTIN:  It's 500.11.  And I'm at page -- I'm at 500.8.

Q.    This is the interview of Deborah Ruffin, February 21st of 1998, 10:30 in the morning.  Do you see that?

A.    Yes.

Q.    500.11, I'm sorry.  And do you see that Mr. Simon indicated, "Does Juanita" -- asks, indicated that he wrote down from his interview or your interview of Deborah Ruffin on February 21st of 1998, that when she was asked the question, "Does Juanita have a problem with alcohol?"  She answered, "She drinks, to excess, when she is in trouble."

A.    I see that.

Q.    Do you have any reason to doubt that that's what Deborah Ruffin said during those interviews on February 21st of 1998?

A.    It's likely she said that.

Q.    Now, I want to show you some notes of interviews of Nancy Harris.  Are those your notes or are those Rick

Sindel's notes?

A.    Those look like Rick Sindel.

MS. CARLYLE:  Can we have the number?

MS. COSTANTIN:  465.  I'm sorry.

Q.    And those would have been interviews that occurred or part of the interviews that occurred on that February 21st and 22nd?

A.    I'm not sure, can you -- this is Nancy Allen?

Q.    This is Nancy Harris, who was a neighbor.  Nancy Harris.  Do you want to go to the schedule?

A.    Yes.  Okay.

Q.    Okay.  Nancy Harris, Saturday the 21st at 11 o'clock in the morning.

A.    I see it.

Q.    So I'm going to page 5 of 465.5.  Do you see where it states, "Has not seen Juanita drunk."  Do you see that statement?

A.    I see that.

Q.    And do you see written below it, "Juanita would not show this woman her bad behaviors."

A.    I see that.

Q.    Do you have any reason to doubt that Nancy Harris said that during that interview on February 21st of 1998?

MR. MONTROY:  Objection, Your Honor, these are not Dr. Randall's notes.

THE COURT: Correct. There is testimony that he was there during those interviews. And the question doesn't ask him to interpret or give veracity to the notes, only if he has a reason to doubt that that was said. So in that limited frame, overruled.

A.   I suspect that she stated something to this effect.

Q.   Now, I'm referring you to your declaration, Exhibit 254.10, paragraph 14, where you state -- I've looked at this before. "One cannot expect family members to reveal such embarrassing and traumatic facts during an initial interview, or even after a number of meetings." Is that correct?

A.   Yes.

Q.   And going to paragraph 12, do you recall in your declaration writing that you "were forced to rely on her" -- referring to Juanita Allen -- "as the entrée to important potential mitigation witnesses." Is that right?

A.   Yes.

Q.   Now, in fact, you had the names and contact information of these witnesses from at least that first interview with Billie Allen. And, in fact, from prior information you had received from Sindel & Sindel; is that right?

A.   I believe the witnesses are -- that I'm referring to are more the immediate family.

Q.   So you're saying you did not have names and contact information of those witnesses until late in the game?

A.    No, I never said that.

Q.    When you said you had to rely on Juanita Allen "as the entrée to important potential mitigation witnesses," is that right?

A.    That's a correct statement.

Q.    And you, in fact, from early on had those names and contact information, correct?

A.    What I mean by "entrée" is I mean access.  So if Juanita was alienated then I would not have access to members of her immediate family, particularly Billie's sisters.  And I believe that she would have less to zero influence once I had the names on my contact with others, like people outside the family like Deborah Ruffin, Nancy Harris.  Juanita would have limited influence about my accessing them.  It was more about the immediate family.

Q.    So when you stated that, and let's get to it to make sure I'm not misstating it.  When you stated, "I was forced to rely on her as the entrée to important potential mitigation witnesses," what you really meant was the sisters?

A.    Yes.

Q.    Okay.  All right.  So -- but you didn't say that there, did you?

A.    The sisters are important potential mitigation witnesses.

Q.    Okay.  But you didn't say that you still had entrée to

Shimeka Taylor and Raymond Petty and Deborah Ruffin and Samuel Moore and Nancy Harris; is that right?

THE COURT: Sam Moore?

Q. Sam Moore.

A. And others as well.

Q. So when you wrote that, what you really meant to say was sisters in parenthesis?

A. The nuclear family, yes.

Q. So would you agree that that is a misleading statement?

A. It's not as clear as it could be. I don't believe I intended to mislead anybody here.

Q. Okay. And you didn't intend to -- would it have been easier just to write, I was forced to rely on her as the entrée to her daughters, would that have been more accurate?

A. That would have been more parsimonious probably.

Q. Would it have been more accurate?

A. Who are important mitigation witnesses.

Q. Okay. So, in fact, Ms. Allen was not the entrée to anyone else besides the sisters; is that right?

A. It would be primarily the -- once I got the initial information from her about extended family, and once I made contacts with extended family, Juanita's potential influence on them would probably be lessened if I alienated her at that point. The nuclear family, I think this is more germane to the nuclear family.

Q.   Because, in fact, you had plenty of other people tell you about dysfunction, abuse, or drinking; is that right?

A.   I would say no.

Q.   Okay.  We talked about Deborah Ruffin, right?  We talked about Raymond Petty.  We talked about Nancy Harris.  We talked about Shimeka Taylor.  We talked about Sam Moore.  Is that right?

A.   Yes.

Q.   None of those people's entrée was controlled by Juanita Allen; is that correct?

A.   I would say that her potential to interfere with them after I made my initial contact with them was not an issue, it was more about what was going on in the nuclear family and the people who were living with Billie and growing up with Billie.  Those were the relationships I was concerned about regarding Juanita's potential cooperation or lack of cooperation.

Q.   The testimony or the statements -- excuse me, not the testimony, but the statements that Deborah Ruffin, Raymond Petty, Nancy Harris, Shimeka Taylor, and Samuel Moore made to you about Juanita Allen's physical punishment of Billie Allen, her abuse of alcohol, or the dysfunction in the family, would that make them important potential mitigation witnesses?

A.   Yes.

Q.    And she had no control over them?

A.    Not over those, no.

Q.    And they all told you about that, correct?

A.    Yes.

Q.    Now, I want to talk to you about some of the family members and what some of the family members said to you.  Did you interview Monette, also known as Nishelle Petty?

A.    Yes.

Q.    And that was one of Billie Allen's cousins; is that right?

A.    Yes.

Q.    Now, I want to go over or down to the last paragraph of 479.  "When I went over to pop's house, I could do anything I want.  At my house, I had to go in.  Over there, no rules, not too much they couldn't do.  Juanita was pretty much lenient on them.  Stay outside, walk the streets, go to the park, go outside the gate.  Over there I could visit, people could come over.  Not in my mouse.  I can't say it was neglect, but they kind of grew on their own.  She'd go out a lot.  At night, she'd leave."  Is that what she told you?

A.    Yes.

Q.    So Nishelle Petty at the very least is telling you that Juanita Allen has her problems as a mother; is that correct?

A.    Yes, I would agree with that.

Q.    And she might not call it neglect, but that's something

that you might call neglect, is that fair to say?

A.    Yes, it is.

Q.    Okay.  Now, let's look at Exhibit 427.  You interviewed Claude McLemore; is that right?

A.    Yes.

Q.    And Claude McLemore told you --

A.    These are Rick's notes, by the way.

Q.    I'm sorry, these are Rick's notes.  And these are also notes -- you want to go back to the schedule to see when you talked to Claude McLemore or --

A.    If we have to.  It's up to you.

Q.    Also known as -- no, that's Lucy.  So do you see Claude McLemore on here, also known as Ed McLemore?

A.    I do not.

Q.    Does it appear that Ed McLemore was interviewed or Claude McLemore was interviewed by Rick Sindel without you being present?

A.    Doubtful.  Possible, but doubtful.

Q.    Okay.  So if he's not on the schedule, you're thinking that it's more likely that Rick's notes are of meetings that you had with Ed McLemore?

A.    With Claude.

Q.    Yeah, I'm sorry.  Claude also goes by Ed.

A.    I'm not sure when these notes were taken.

Q.    Well, let me ask you this, this statement right here,

"Marquis's death really flipped him out"?

A.    Yes.

Q.    Is that consistent with what he had told you?

A.    With what Billie Allen had told me?

Q.    With what Ed or Claude McLemore had told you.

A.    I don't recall specifically what Claude told me.

Q.    Okay.  You do recall that you spoke to Claude, though, don't you?

A.    I probably did speak with Claude.

Q.    Do you also see, "Mother had problems staying out."  Do you see that statement?

A.    Yes.

Q.    And do you have any quarrel with Mr. Sindel's notes that that's what Ed McLemore had told you?

A.    It seems like Mr. Sindel's account of the interview.

        MR. MONTROY:  Your Honor, I'm just going to object to Mr. Sindel's notes.  These aren't his notes.

        THE COURT:  Yeah, this may be a little bit different than the other one because I recall, and maybe incorrectly, that he -- that this witness was not present during this interview with Sindel and McLemore.

        MS. COSTANTIN:  I'll make that clear, Judge.

        THE COURT:  Okay.

BY MS. COSTANTIN:

Q.    Do you believe you were present during this interview?

A.    I'm not sure.

Q.    Okay.  Then we'll move on.  I'm going to show you 500.7.  And let me go back to -- I'm trying to figure out the best way to show you.  Let me show you the interview of Lucy McLemore.  Do you see these notes of the interview of Lucy McLemore, 2/23/98, that's Exhibit 500.6, but admitted as the transcribed notes of John Simon.  Do you see that?

A.    "Lucy McLemore, 2/23/98."  "Lack of violence" is right underneath that?

Q.    Right.  And moving down to the next page, which is page 7, interview of Lucy McLemore on February 23rd of 1998.  Is that an interview that you would have been present for?

A.    I'm trying to find it on the page.

Q.    Oh, you want me to go back?  Lucy McLemore.

A.    Oh, the 2/23/98?

Q.    Yeah, I'm sorry.  At that point you were doing all the interviews of all the mitigation witnesses, correct?

A.    Yes.

Q.    And is that an interview that you would have been present for?

A.    Most likely.  I mean, most likely.

Q.    And going to the bottom of that page 7, you see it states, "Dysfunctional.  More subtle than in usual case," talking about the family?

A.    I see that.

Q.    Do you have any reason to doubt Mr. Simon's account of that interview that you were present for?

A.    Whether the dysfunction was more subtle than in the usual case?

Q.    Right.

A.    I don't know Mr. Simon's universe of previous cases on which he bases the comparison.  I don't think he had a lot of death penalty experience.

Q.    My question is, is that what Lucy McLemore -- do you have any reason to doubt that's what Lucy McLemore told John Simon in that interview?

A.    I don't know if that's what she told him or whether that's his conclusion based on what she told him.

Q.    So to go to this whole part here, "Sad--Teacher in Clayton who recommended that he be taken out of Clayton.  Age--was ten when (illegible).  Deseg--going back and forth.  Artificial alienation.  Too much for this kid.  Dysfunctional.  More subtle than in usual case.  Petty family a v. (illegible) family tight it (illegible)."

       You're saying you don't know if that's what Lucy McLemore said or if that's what John Simon analyzed; is that right?

A.    Correct.  I can't tell who made the statement just on the basis of that.

Q.    I'm sorry?

A.    Oh, I said I can't tell who made the statement based on that alone.

Q.    Didn't Carol -- well, first of all, you interviewed Carol Petty; is that correct?

A.    Yes.

Q.    And who is Carol Petty?

A.    I thought you had asked that.  I don't recall.

Q.    Okay.  It's Juanita's sister-in-law.

A.    Okay.

Q.    Do you recall her telling you, referring to Billie Allen's family, and the children, "They could come and go as they please.  He didn't have to report.  Didn't know a lot of whereabouts.  I didn't condone that.  They were free to run the neighborhood.  My children weren't allowed to do that. We were more strict.  Tried to be consistent as much as possible.  If they are not with us, we know who they are with."  Is that what your notes indicate she told you?

A.    Yes.

        MS. CARLYLE:  I'm sorry, can we have an exhibit with that?

        MS. COSTANTIN:  Yeah -- I'm sorry, that's 503.

BY MS. COSTANTIN:

Q.    So Carol Petty told you that there were problems in Juanita Allen's family in how she was raising the children; is that right?

A.    Yes.

Q.    And I'm going to the second paragraph, "I heard he had conflicts with his mother.  He was staying out late, wouldn't come home, things like that."  Is that correct?

A.    Yes.

Q.    And then that continues to that "They could come and go as they please," the portion I read previously; is that correct?

A.    Yes.

Q.    So is she describing to you a dysfunctional family?

A.    She describing a laissez-faire parenting style that is I would say dysfunctional.

Q.    So that's Carol Petty describing that?

A.    Yes.

Q.    And going to page 2 of 500, the very top portion, she's also told that, "They are more loose, more lax.  Rules were not, they might have been thrown out there, but not followed through.  No consequences came if they were broken.  And unstable."  Is that correct?

A.    That's her account, yes.

Q.    And you described that also as indicating that there's a dysfunctional family according to Carol Petty?

A.    Yes, that's consistent with that.

Q.    And going to your interview of Raymond Petty, which is Exhibit 458, I want to go to page 3, the very bottom, and

then we'll go to the next page.  "I think she failed at the time she should be there knowing what Bill was doing.  When he started his slide, he was out to one or two in the morning.  I'd call, mom wouldn't be there, doing her thing.  She had just gotten a new boyfriend.  That's when Bill got loose.  She didn't move out, but she might go over there and not come back till the next day 11 or 12 o'clock.  No one to supervise Bill."  That's what Raymond Petty told you, correct?

A.    Yes.

Q.    And you would agree that that's also Raymond Petty is describing a dysfunctional family?

A.    Consistent with what Carol has said.

Q.    Carol said, correct?

A.    Yes.

Q.    And going to Nancy Harris, which we already stated, I believe, that Nancy Harris, these are interview notes of Rick Sindel; is that correct?

A.    Yes.

Q.    And this is an interview that you were present for during that February 21st or 22nd; is that right?

A.    Probably.

Q.    And he wrote, "Juanita and her children -- boy scared of her -- hard to make him into a young man.  Grandfather is older than father."  Is that right?

A.    Yes.

Q.    So when you wrote or contended that if family members or friends were unwilling to share negative information about Billie Allen's upbringing, that just wasn't correct?

A.    We did obtain some information about his upbringing.

Q.    And negative information, correct?

A.    Some, yes.

Q.    Like information that his mom would get physical with him, that she kicked the snot out of him, right?

A.    That she was neglectful.

Q.    That she was neglectful, that she beat the crap out of him I think another person told you. And she's, as we've talked about before, she's not controlling entrée to any of these people that we looked at who made these statements, right?

A.    Correct.

Q.    And those interviews that you're doing are not -- she's not present for those interviews, correct?

A.    Correct.

Q.    And all these folks are telling you about physical punishment or neglect, right?

A.    Yes, they are giving examples.

Q.    So you and the trial team were, in fact, aware that there was dysfunction and abuse present in the family, weren't you?

A.    We were aware from collaterals, yes.

Q.    So statements that you've made that you didn't know about that, you only suspected it because of Juanita Allen's demeanor and that one thing Raymond Petty said, that's just not accurate, correct?

A.    On my entrée to the case, from her demeanor and from the family, from Billie's affect as well, I knew that there was a complicated picture here.

Q.    When Mr. Holtshouser asked you at your deposition, why in your declaration you had written that it was obvious that Juanita Allen was the primary abuser, do you recall telling him simply that it was Juanita Allen's demeanor, Otha Petty's statement about the bitter and the sweet, and Raymond Petty's statements to you after he reminded you of those, do you recall that?

A.    Can you say that one more time, please?

Q.    Do you recall in your deposition when Mr. Holtshouser asked you why in your declaration you had written that, "It was clear that Juanita Allen was the primary abuser in her son's life," he asked you what was the basis for that.  The basis you described was Juanita Allen's demeanor, Otha Petty's statement that 'You have to take the bitter and the sweet,' and Raymond Petty's statement that he had -- she had beaten him with an electric cord one time.

A.    Okay.

Q.    Is that correct?

A.    From the deposition as you're reading it, yeah.

Q.    All right.  Now, this morning on your direct exam and back in June, you talked about the reason you believed she was the primary physical abuser was because of her demeanor, and what Raymond Petty told you, correct?

A.    That was my impression of her, yes.

Q.    Okay.  Those were the only two reasons that you wrote in your declaration that you believed that she was the primary abuser of her son.  That's what you testified to today and back in June; is that correct?

A.    Okay.

Q.    I'm asking you, is that correct?

A.    That was information that I did rely on.

Q.    And what I'm saying to you is --

A.    There was additional information obviously.

Q.    -- now that you've reviewed notes involving interviews of Deborah Ruffin, Nancy Harris, Shimeka Taylor, Sam Moore, Nishelle Petty, Lucy McLemore, and Carol Petty concerning abuse and dysfunction in Juanita Allen's family, Billie Allen's family, do you change your statement that the only reason that you thought Juanita Allen was the primary abuser was because of her demeanor and what Raymond Petty said?

A.    I would say that this additional information reinforces that initial impression.

Q.    But my question is, this isn't additional information, this is information you knew back before the trial, correct?

A.    I learned this information over the course of the investigation.

Q.    Okay.  So it's not new information -- or, I mean, is it new information to you?  I mean, do you not remember any of this stuff from back at the trial time?

A.    The thing that stands out to me most, as I said, was the Raymond Petty information.

Q.    Okay.  But in your declaration, you didn't mention the Raymond Petty information.

A.    That's true.

Q.    And you didn't mention any of these other people that I've read off, correct?

A.    That's true.

Q.    And when you came in here to testify, the only person you remembered was Raymond Petty?

A.    I'm sorry about that.

Q.    Okay.  But when you make statements that nothing was done, and then I show you statements from one, two, three, four, five, six, seven, eight different people --

MR. MONTROY:  Objection, Your Honor, if there can just be a question and not --

MS. COSTANTIN:  There is a question.

THE COURT:  Okay.  I think it was started.  Go

ahead.

BY MS. COSTANTIN:

Q.   When I show you statements from eight different people, do you agree that your testimony that nothing was known by the trial team is incorrect?

A.   We obviously knew that information.

Q.   And going to Exhibit 505, this is the "Factors that Affected Billie's Life," is that what it's titled?

A.   Yes.

Q.   And I believe you testified you prepared that, correct?

A.   Yes.

Q.   Okay.  And one of the things on the list is physical abuse and beatings, right?

A.   And other things as well like poor maternal role model.

Q.   But physical abuse and beatings is one of the factors that affected his life, right?

A.   Yes.

Q.   So when you prepared this sheet here, you knew that there were statements made by people that there was physical abuse and beatings of Billie Allen by Juanita Allen, correct?

A.   I knew that there were instances of abuse and a pattern of abuse that, A, when I suspected, and, two, was verified by Raymond.  And also now that you're reviewing some more of this material with me, other people also alluded to it, some more directly than others, but there were definite allusions

to this.

THE COURT:  Excuse me, I've been trying to catch a good break time.  We're a little over five o'clock.

MS. COSTANTIN:  It is a good break time.  I didn't realize we were past five.

THE COURT:  There's a Missouri Bar function going on, I'd like to attend the breakfast in the morning, so we'll start at nine o'clock tomorrow morning.

MS. COSTANTIN:  Okay.

THE COURT:  Court is in recess until nine o'clock.

(Court in recess at 5:09 p.m.)

C E R T I F I C A T E

I, Susan R. Moran, Registered Merit Reporter, in and for the United States District Court for the Eastern District of Missouri, do hereby certify that I was present at and reported in machine shorthand the proceedings in the above-mentioned court; and that the foregoing transcript is a true, correct, and complete transcript of my stenographic notes.

I further certify that I am not attorney for, nor employed by, nor related to any of the parties or attorneys in this action, nor financially interested in the action.

I further certify that this transcript contains pages 1 - 254 and that this reporter takes no responsibility for missing or damaged pages of this transcript when same transcript is copied by any party other than this reporter.

IN WITNESS WHEREOF, I have hereunto set my hand at St. Louis, Missouri, this 28th day of February, 2013.

_____
/s/ Susan R. Moran
Registered Merit Reporter