UNITED STATES OF AMERICA
                    EASTERN DISTRICT OF MISSOURI
                          EASTERN DIVISION

BILLIE JEROME ALLEN,                )
                                    )
            Petitioner,             )
                                    )
     vs.                            )   No. 4:07-CV-27 ERW
                                    )
UNITED STATES OF AMERICA,           )
                                    )
            Respondent.             )


                 TRANSCRIPT OF EVIDENTIARY HEARING

              BEFORE THE HONORABLE E. RICHARD WEBBER
                   UNITED STATES DISTRICT JUDGE

                        October 18, 2012
                          Volume VIII

APPEARANCES:

For Petitioner:        Ms. Elizabeth U. Carlyle
                       P.O. Box 30418
                       Kansas City, MO  64112

                       Mr. Eric John Montroy
                       Mr. James Henry Moreno
                       FEDERAL COMMUNITY DEFENDER OFFICE
                       The Curtis Center, Suite 545 West
                       Philadelphia, PA  19106

For Respondent:        Mr. Steven E. Holtshouser
                       Ms. Carrie Costantin
                       OFFICE OF U.S. ATTORNEY
                       111 S. 10th Street, 20th Floor
                       St. Louis, MO  63102


REPORTED BY:           SUSAN R. MORAN, RMR, FCRR
                       Official Court Reporter
                       111 South 10th Street
                       St. Louis, MO  63102
                       (314) 244-7983

I N D E X

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| PETITIONER'S WITNESSES | | | | |
| DAVID RANDALL, Ph.D | | | | |
| (By Ms. Costantin) | | 3 (Cont'd) | | |
| (By Mr. Montroy) | | | 161 | |
| (By Ms. Costantin) | | | | 232 |

(The following proceedings were held in open court on October 18, 2012 at 9:13 a.m.:)

MS. COSTANTIN:  Judge, may I proceed?

THE COURT:  You may proceed.

CROSS-EXAMINATION (Cont'd)

BY MS. COSTANTIN:

Q.    I want to -- Dr. Randall, I want to go back to where we finished up yesterday.  We were talking about Exhibit 505. And that is an exhibit entitled "Factors that Affected Billie's Life," is that right?

A.    Yes.

Q.    And one of those factors listed is physical abuse and beatings; is that right?

A.    Yes.

Q.    As well as poor maternal role model?

A.    Yes.

Q.    And I believe you testified that you're the one that prepared this document?

A.    Yes.

Q.    And so there was a discussion about the factors among the trial team, including you, about the factors that affected Billie Allen, correct?

A.    Those are some of the factors that affected him.  I don't think they are inclusive, but these were presented to the team.

Q.    And those factors that were discussed with the team included physical abuse and beatings, right?

A.    Yes.

Q.    So at a bare minimum, information was known to you about what you describe as physical abuse and beatings of Billie Allen?

A.    Yes.

Q.    And decisions were made about what themes to prevent -- present, excuse me, in the mitigation case, correct?

A.    Yes.

Q.    And this area, the area of physical abuse and beatings was not presented except through Raymond Petty; is that right?

A.    It seems so at this time, that's correct.

Q.    And you had decided, and it was decided by the trial team not to go with the, quote, Trash the Mom or Trash the Mother defense; is that right?

A.    That is incorrect.

Q.    Okay.  Are you aware that John Simon has testified that you told him that you couldn't go with the "Trash the Mom" defense?

A.    I don't believe I would ever say such a thing to Mr. Simon.

Q.    I'm showing you what's been -- what is admitted -- well, what is Exhibit 533, page 171, the last few lines of

171.  The question was asked of Mr. Simon:

"QUESTION:  What did Dr. Randall say about trashing the mother?  Tell me what Dr. Randall said about trashing the mother."

"ANSWER:  That we couldn't do."

"QUESTION:  Dr. Randall said we can't do the Trash the" -- I'm going to go to the next page -- "Mother defense."

"ANSWER:  Because of the time constraints."

So, in fact, did you tell John Simon that you could not go with the "Trash the Mother" defense because of time constraints?

A.    If what you mean by the "Trash the Mother" defense is presenting information about the mother and her culpability in her treatment of her son and how that might have impacted him, what you're presenting to me and what Mr. Simon is representing is contrary to logic in my opinion and contrary to what we would do and contrary to what I would say.

Q.    Let's ask --

A.    He's obviously -- if I said something to that effect about this "Trash the Mother," he misunderstood what I said, because I would never -- that would be a critical component of a mitigation strategy.  I would never say that we shouldn't pursue that.

Q.    So it's your testimony you did not tell Mr. Simon that you couldn't go with the "Trash the Mother" defense because

of time constraints?

A.    I would never say such a thing.

Q.    It's your testimony that you did not say that?

A.    Correct.

Q.    Okay.  Is it your testimony that you discussed the idea of putting on evidence of physical abuse and beatings of Billie Allen by Juanita Allen as shown in Exhibit 505?

A.    These would be non-inclusive, but these would be the areas that we would definitely want to touch on during the presentation.

Q.    And did you, in fact, discuss with the trial team the idea of putting on evidence of physical abuse and beatings by Juanita Allen of Billie Allen?

A.    These were listed.  These were discussed.  And we did present evidence of this at the hearing.

Q.    So, in fact, you did discuss with the trial team the idea of putting on evidence of physical abuse and beatings by Juanita Allen of Billie Allen?

A.    It must have been discussed because I presented this outline to the team.

Q.    Okay.

A.    And we did present that type of information at the hearing.

Q.    So a decision was made to put on evidence from Raymond Petty; is that correct?

A.    Correct.

Q.    Okay.  And a decision was made not to put on evidence from the other seven people we talked about yesterday; is that correct?

A.    That is false.  That is incorrect.

Q.    Okay.  Are you saying that when you wrote "physical abuse and beatings," the only physical abuse and beatings you were discussing was the one incident that Raymond Petty described?

A.    What I said yesterday for whatever reason, the other -- what the other people were saying was not salient in my mind at the time.  And the Raymond Petty incident stood out.  And had I not been operating under the situation that we were operating under, you know, doing basically many months of work in three weeks, four weeks, I would have been more on top of it and we would have followed up on those snippets that you presented yesterday, which were really important, and we would have expanded on those, and we would have made sure that that came out at the hearing.

Q.    And here's my question:  Exhibit 505, you wrote, "One of the factors that affected Billie Allen's life was physical abuse and beatings."  I'm asking you that when you wrote that, "physical abuse and beatings," is it your testimony the only evidence that you recalled when you wrote that was Raymond Petty's description of a single incident?

A.   And the incident with the uncle, I believe, the boxing incident.

Q.   Okay.  So what you're saying now is that you recall -- that when you wrote that back in 1998, you were also referring to Jerome Petty boxing with Billie Allen?  You recall that, that's what you were referring to?

A.   What I'm -- as I sit here right now, I know obviously that the testimony of Raymond Petty included the information about the whipping, the severe whipping.  And I believe that we presented information about the boxing incident.  But as I sit here right now I don't recall whether I knew it back in -- I made the connection back in 1998.  I think I did, but I -- you know, might be confounding with later work, you know.

Q.   In fact, your notes from the discussion with Mr. Simon describe that as a boxing accident; is that right?

A.   Excuse me?

Q.   Your notes of your meeting with Mr. Simon describes that as a boxing accident.

A.   I'd have to see the notes to see what you're talking about.

Q.   Okay.  I'll get you to those.  I'm showing you Exhibit 357.  You have -- this is the January 30th, 1998 meeting -- I'm sorry, yes, meeting with John Simon, correct?

A.   Yes.

Q.   And you describe when you're talking about if you should have an MRI.  You describe it as a boxing accident; is that right?

A.   Yes.

Q.   Okay.  But what you recall now is that when you wrote 505, Exhibit 505, "physical abuse and beatings," you recall that you were thinking of the Raymond Petty incident, and you were also thinking of the boxing accident with Jerome Petty?

A.   No, what I said was I definitely knew about the Raymond Petty incident because we definitely presented that at the hearing.  Had we been aware of more incidents at the hearing, we would have presented them at the hearing.  For some reason in the chaos, that information receded into the background and wasn't pursued.

With regard to the boxing accident that I note, what I just told you was that I'm not sure if I later learned that that -- in 1998, during that time period, whether I learned that that, quote, accident, was, in fact, a beating by Jerome.  Or whether or not as part of my later discussions and later review of the declarations that -- that I'm confounding the time frame regarding that boxing accident.

I'm definitely sure about the Raymond Petty because he testified to that, and that was in the hearing transcripts that I reviewed.

Q.   And my question is, if all you can recall is the

Raymond Petty incident, why did you write down "physical abuse and beatings," plural?

A.    Because it was clear at the time that even though we had knowledge of that one incident, that that wasn't the only thing that happened to Billie.

Q.    Well, it was clear because we just talked about seven other people who told you about what you described as physical abuse and beatings, right?

MR. MONTROY:  Objection, Your Honor, there isn't evidence of seven other people.  There were three other people that discussed physical abuse, and there were illusions to neglect.  I would object on the basis that those are two separate things.

THE COURT:  Overruled.

BY MS. COSTANTIN:

Q.    We went through yesterday, correct, that Deborah Ruffin testified -- excuse me, told you in meetings with the trial team that Juanita Allen had to "'tighten Bill up' and get physical," correct?

MR. MONTROY:  Objection, Your Honor, that was not in Dr. Randall's notes.  Dr. Randall's note had a different account.

THE COURT:  She said yesterday.  Talking about testimony yesterday.

BY MS. COSTANTIN:

Q. Yesterday. In the testimony yesterday, you acknowledged that Deborah Ruffin had told you and the trial team that Juanita Allen had to "'tighten Bill up' and get physical," correct?

A. That is what Rick Sindel had written -- no, she said that she had to "tighten Bill up." And Rick Sindel wrote his interpretation of "get physical" next to that.

Q. Oh, so you remember that she said "get physical," but that -- she said "tighten Bill up," and his interpretation was Bill -- was "get physical"?

A. If I recall, he put "tighten Billie up" in quotes and then put a hyphen and then "get physical" right next to it.

Q. And that's -- are you disputing that that was said during the meeting?

A. No.

Q. Okay. All right. So "tighten Bill up," Deborah Ruffin said that, correct, to the trial team?

A. According to Mr. Sindel's notes, yes.

Q. Okay.

A. My account was slightly different, but would also -- one can infer that it was physical.

Q. Your account was she did what she had to do to maintain control; is that right?

A. Yes.

Q. Okay. And then Shimeka Taylor described, according to

your notes, that she needs to control him, and a whipping and a punishment is what she inflicted?

A.   Okay.

Q.   Is that right?

A.   If that's what the notes say, then that's correct.

Q.   And do you remember the typed notes of Sam Moore that you took, that Bill was put on punishment and they'd kick his ass in the street, she would kick his ass in the street?

A.   From yesterday, yes.

Q.   And what I'm trying to clarify is that when you wrote Exhibit 505, "physical abuse and beatings," you know for certain that you are not considering any of those other statements by the witnesses.  You know for a fact that you were not considering those?

A.   I do, because if we were considering them, we would have put them on.

Q.   They did testify.

A.   We would have got that information out of them on the stand.

Q.   Okay.  So if you had remembered -- you're saying there was no decision made about this, it was just loss of memory by the entire trial team?

MR. MONTROY:  Objection.  You can't describe what happened with the other trial team, what happened in the minds of the other trial team.

THE COURT: Okay. Sustained.

BY MS. COSTANTIN:

Q.   You're saying no, there was no discussion. You recall specifically there was no discussion about putting on any other evidence except for Raymond Petty?

A.   I would have wanted to put on every single bit of evidence about that theme that we had.

Q.   And, in fact, you did have at least three other people to testify to that theme, correct?

A.   You're right, but mistakes were made because of the situation we were put in. I'm sorry.

Q.   But, Dr. Randall, what I'm not understanding is, you put down as a factor, "physical abuse and beatings," but you're denying the fact that when you wrote that back in 1998, that you had any consideration of Deborah Ruffin, Shimeka Taylor, or Sam Moore's statements to you about the physical punishment of Billie Allen by Juanita Allen?

A.   I'm saying that my recollection at the time was that it was obvious that Billie was physically abused and beaten multiple times in his life.

Q.   And you remember that right now?

A.   Yeah, that was my -- yes, I do.

Q.   Okay. Do you recall --

A.   That's my --

Q.   Do you recall in your declaration, which was completed

a couple years ago, stating that there was no concrete evidence from any family member about any physical abuse of Billie Allen?

A.   I told you that it was my impression of Juanita Allen that she was one angry woman with a short temper, hard drinking woman.  That was my impression.  I knew there was a lot going on in the house.  And then we learned about the Raymond Petty incident.  That was the most salient in my mind.  There was no conscious effort to suppress any kind of other information about physical abuse or beatings.  That's the kind of information that resonates with jurors.  We would never suppress that kind of information.

Q.   What I'm saying is, in your affidavit, in your declaration that you filed, and I'm directing you to Exhibit 254, paragraph 14, in your affidavit that you filed in order to get a hearing in this case, did you state, "Despite my suspecting family abuse and dysfunction, I was not able to obtain concrete information from any family member that this existed."  Is that correct?

A.   That's what I stated in this document.

Q.   And that is false, correct?

A.   It's inaccurate.

Q.   Okay.  It's not true?

A.   The Raymond Petty incident was the incident that I should have referenced here that stood out in my mind.

Q.    And did you just not remember when you completed that affidavit in 2009?

A.    I erred.

Q.    My question is, did you just not remember it or did you actually read your notes of the interview or the penalty phase testimony and choose not to put it in there?

A.    It should have been put in there.  It should have been couched in a way that said, except for this one incident, I was not able to obtain concrete information.  While that still would have been incorrect technically because of all the snippets you outlined yesterday, that would have been consistent with my recollection -- more consistent with my recollection.

Q.    Was this a conscious decision of you in completing this declaration to not put in Raymond Petty?

A.    No, it was not a conscious decision.

        MR. MONTROY:  Your Honor, I have an objection.  He stated several times that it was inaccurate and it was something he missed and he couldn't recollect.

        THE COURT:  Well, the cross-examination goes to whether he -- when he signed his declaration, whether he intentionally was listing false information or whether he did or did not have the notes, whether -- you know, I'm really interested in finding out a couple things.  First, he says that at the time -- now he recalls the events, but at the

time of the declaration he said something opposite. So it does need to be flushed out because there's some real inconsistencies here. Go ahead.

BY MS. COSTANTIN:

Q. And, Dr. Randall, that is exactly my question, which is right now you're saying you know for certain back in 1998 that when you wrote down "physical abuse and beatings," you were not referring to Deborah Ruffin, Shimeka Taylor, or Sam Moore, you were only referring to Raymond Petty. Yet in 2009, you write in a sworn declaration that states that you didn't have concrete information from any family member including Raymond Petty. How is it you can remember right now that these were not considered at the time when just a few years ago you've written something that's patently incorrect?

A. Okay. Because knowing my approach to -- we're talking about different time frames here, so let's talk about the first time frame. During 1998 when I wrote "physical abuse and beatings" as a mitigation theme, the factors affecting Billie's life, that is an area that we would want to expand on to the maximum extent possible, to the maximum extent that we knew, okay.

Apparently somewhere in the shuffle the only information, the most salient information that came out at that penalty phase was the testimony of Raymond Petty. Even

though I --

Q.     And can I --

A.     -- suspected abuse based on how the family presented to me.

Q.     But why is that "apparently"?  Why is it apparent that you forgot about that --

A.     Can I finish my --

Q.     -- as opposed to you considered it and chose not to go with it?

A.     Can I finish my thought?

          MR. MONTROY:  Objection.

          THE COURT:  Yeah, let him finish.

A.     What I'm saying is, it is essential in any mitigation investigation if there's evidence of physical abuse of the nature that happened to Billie that we present it in as full a way as possible at the penalty phase, okay.  We failed to do that.  Apparently you're pointing out to me correctly we were aware on some level that there were other people that could have potentially testified about that theme that we did not have testify to that at the hearing.  That was not an intentional suppression of that evidence.  That was an oversight, a mistake, a problem, okay.

          I can attribute that to -- I've been attributing it to the time constraints, the time pressure, and I believe that's correct, okay.

Now, in -- so that's that first phase, okay.

Now, with regard to the declaration, I know that I did not obtain any concrete information from any of Billie's nuclear family about the abuse, okay, in terms of from the sisters, from my recollection at least, and the nuclear family.  The only information that I remember is Raymond Petty.  So Raymond Petty should have been mentioned in this sentence.  I'm sorry he wasn't mentioned.  It was not an intention to mislead.  It was the one really salient piece that I remembered, and it should have been put in there.  It would not have dramatically changed the paragraph or sentence.

Q.    Would it have dramatically changed the paragraph and sentence if you said, "Despite my suspecting family abuse and dysfunction, I was only able to obtain concrete information from Raymond Petty, Deborah Ruffin, Shimeka Taylor, and Sam Moore"?

A.    No.  Raymond Petty was the only piece that was salient in my mind; the others were not.

Q.    And that's my question.  What did you do to prepare your declaration or to prepare for your testimony?  Did you look at the notes that you prepared of the interviews of these witnesses?

A.    I -- from what I recall, I was provided with the sentencing hearing transcripts.  And that's from my

recollection what I reviewed.

Q.   So you don't believe you were provided with your notes of your interviews of these witnesses?

A.   I know that during -- for the dep I believe I was provided with additional -- for the deposition I was provided with additional information.  That was later on.  But I don't think --

Q.   And for the depo, wasn't that Mr. Holtshouser that gave you that information, had that sent to you?

A.   Yes.

Q.   Okay.  So before your declaration, as far as you recall -- because this is different from what you said yesterday and I want to make sure I understand it.  Before your declaration, as far as you recall you were provided simply with the transcripts of the penalty phase?

A.   There were eight binders of information.  Some -- there were records as well, the records as well.

Q.   And those records were like the medical records, the school records?

A.   Correct.

Q.   Okay.

A.   And then there were transcripts of the penalty phase.

Q.   But there were no notes, any of the notes that you prepared about what you had done in this case, none of those were provided to you?

A.   If I recall, I don't believe so.  If they were, then I missed that information on the second pass as well.

Q.   And when this declaration was prepared, who prepared this declaration?

A.   I ultimately signed it and prepared it.

Q.   So you wrote these words, "Despite my suspecting family abuse and dysfunction, I was not able to obtain concrete information from any family member that this existed"?

A.   This, as I said yesterday, Mr. Wiseman prepared a draft of the declaration.  And I edited -- I spent time editing and correcting, to the extent I could, this draft.  And this sentence might have survived the edit.  But at the time I signed it, I endorsed it as being accurate.

Q.   Okay.  So Mr. Wiseman might have been the person who actually wrote that sentence, but you reviewed it --

A.   And I endorsed it.

Q.   -- and endorsed it?

A.   Yes.

Q.   Okay.  And before you reviewed it and endorsed it, apparently you didn't review any of your notes from the work that you did at that time; is that right?

A.   If I did review the notes, I missed that information again.  I don't believe I did review my notes.  I believe I reviewed, like I said, the sentencing hearing transcripts, what the jury learned, what the jury heard.

Q.   And you apparently didn't review your notes before testifying either back in June or today, is that correct -- or yesterday and today?

A.   Aside from the deposition information, the material that you reviewed with me yesterday, the snippets of material pointing out all these several people who talked about or alluded to physical abuse, I don't remember reviewing those.

Q.   So you didn't review your notes except what we've shown to you, and so everything else is just your memory of 14 years ago as far as what people said to you and didn't say to you and what you asked people and didn't ask people?

A.   Everything else is very broad.

Q.   All your statements that you've made in your declaration -- all the statements you made in your declaration, none of those were based on a review of your notes?

A.   I don't believe so.

Q.   Okay.  And all your testimony on direct examination, none of those were based on a review of your notes?

A.   Except the notes that were provided to me on the deposition.

Q.   By Mr. Holtshouser?

A.   The information that you went over with me, I -- that seemed -- that was out of my memory.

Q.   Okay.  So yesterday was the first time in 14 years that

you saw your notes or notes related to the interviews of Deborah Ruffin, Raymond Petty, Shimeka Taylor, and Sam Moore, for example?

A.   I'm not 100 percent sure.  What I am 100 percent sure is that the snippets of information that you highlighted, that information receded in my memory since the time -- I mean, I was surprised by that information.

Q.   Okay.  And my question is, now that you've seen those notes for the first time, the notes related to those people; Deborah Ruffin, Shimeka Taylor, and Sam Moore specifically, you haven't seen those for 14 years, but now you remember that when you wrote "physical abuse and beatings" 14 years ago, you definitely, definitely were not referring to what Deborah Ruffin, Shimeka Taylor, and Sam Moore had told you?

MR. MONTROY:  Your Honor, I would just object to the characterization of the evidence in that question as to what the witness actually has said in the past.

THE COURT:  Overruled.

A.   Can you please repeat the question?

Q.   My question is that you have seen the notes which I showed you yesterday of Deborah Ruffin, Shimeka Taylor, and Samuel Moore, the portions related to the physical punishment of Billie Allen by Juanita Allen, and I believe your testimony is you don't believe you've seen those for 14 years.  But now that you've seen them, it's your testimony

that you definitely, you're sure that when you wrote 14 years ago "physical abuse and beatings," you were not referring to anything that Deborah Ruffin, Shimeka Taylor, or Sam Moore told you?

A.    The only thing I can say is that at the time I wrote this outline, I was aware there was physical abuse and beatings.

Q.    And right now you don't remember exactly who the source was of that evidence, is that fair to say?

A.    At the minimum, it's Raymond Petty.

Q.    But at the maximum it also included Deborah Ruffin, Shimeka Taylor, and Samuel Moore, because you have notes of them telling you that, correct?

A.    I do have notes of them telling me that, yes.

Q.    So logically, just logically when you wrote that, wouldn't you have considered what Deborah Ruffin, Shimeka Taylor, and Samuel Moore told you about this?

A.    "Considered" means there was a deliberate, conscious recollection of that information.  I don't know if I had that conscious recollection at that time.

Q.    Okay.  So bottom line is you don't really remember what it was that caused you to write "physical abuse and beatings"?

A.    No.  I said that it was clear to me from my encounters with Billie's mother, his family, with Billie, that there was

a history of physical abuse there.  That was confirmed by Raymond Petty.  That incident with Raymond Petty happened when Billie was a teenager.  One can infer, and I did infer that there was a history of beatings like that that we were not aware of.  And so --

Q.   Well, let me ask it -- are you done?  I'm sorry.

A.   Go ahead.

Q.   Let me ask it a simple way.  When you wrote "physical abuse and beatings" there, what was your basis for writing "physical abuse and beatings" back in 1998 as a factor affecting Billie's life?

A.   We -- I knew that there was physical abuse and beatings in Billie's history.

Q.   How did you know that?

A.   Like I said, from my encounters with Juanita, her -- the impression -- my encounters with the grandfather.

Q.   Slow down.  Your encounters with Juanita.  Did she ever tell you that she had --

        MR. MONTROY:  Objection, Your Honor, he has answered this question several times what his understanding of this question, what his understanding of what the physical abuse and beatings was.

        MS. COSTANTIN:  Judge, I believe this is an evolving answer.

        THE COURT:  Overruled.

BY MS. COSTANTIN:

Q.    Okay.  So when you wrote "physical abuse and beatings" back in 1998, you said that your basis for writing that was your encounters with Juanita, which I believe you described as she was a hard woman and angry, right?

A.    Correct.

Q.    She never told you, is that correct, that she had beaten Billie Allen?

A.    I didn't ask her; and she didn't tell me.

Q.    And then the fact that Otha Petty, was that the second thing, said, "You have to take the bitter with the sweet"?

A.    No.  In addition, his demeanor, his level of detachment, the way he presented as well emotionally.

Q.    Okay.  And did Otha Petty ever tell you that he or anyone in the family had beaten Billie Allen?

A.    No.

Q.    And what else was your source for writing down "physical abuse and beatings" back in 1998?

A.    That we knew about Raymond Petty --

Q.    Okay.

A.    -- who testified at the hearing.

Q.    Okay.  And what else was your basis for writing "physical abuse and beatings"?

A.    As I sit here now, that -- all that would be consistent with physical abuse and beatings.

Q.    Okay.  And my question is, is it possible that when you wrote down "physical abuse and beatings," that you were also considering what Deborah Ruffin, Shimeka Taylor, and Sam Moore had told you?

A.    Is it possible?

Q.    Yes.

A.    It's possible.

Q.    Okay.  And, in fact, they had told you that -- well, when do you think you wrote this?

A.    When?  I'm not sure.  It had to be within the period from roughly the end of January to the beginning of the penalty phase, somewhere in that month.

Q.    So you had testified, I believe earlier, that you were sure that these three people; Ruffin, Taylor, and Moore, were not the basis for you writing this.  Now you're saying it's possible that they were?

A.    What I'm saying is had -- I'm just saying it's possible.

Q.    Okay.  Do you agree that many people think that there's nothing wrong with physically disciplining children?

        MR. MONTROY:  Objection, Your Honor, he can't testify what many people think.

        THE COURT:  I'm sorry?

        MR. MONTROY:  I would just object, he can't testify to what many people think.

MS. COSTANTIN:  I think he did testify in June about what he considered to be abuse.

THE COURT:  Well, I think in considering the Doctor's experiences and his knowledge of this area, that that is appropriate to inquire.  Overruled.

A.    Can you please repeat that?

Q.    Would you agree that many people think that there's nothing wrong with the physical discipline of children?

A.    Corporal punishment?

Q.    Right.

A.    Some people accept that as normal.

Q.    Okay.  And would you agree that some people would accept as normal even what's called a whooping?

A.    Some people would.

Q.    And do you agree that the evidence that Billie Allen was being physically disciplined by his mother would not be a sure winner in a mitigation with the jury?

A.    No, it would be a sure winner.

Q.    So if Deborah Ruffin said that she -- Juanita Allen did what she had to do to maintain control, that would be a sure winner?

A.    That is information that should not have stopped there. Had we had the time, we would have inquired more.  What do you mean by that?  Tell us more.  What do you mean?  We would have flushed that out.  And in conjunction with other

evidence from other people about that same theme, that would have been important for the jury to learn.

Q.    So you recall that she did tell you that and you chose not to pursue it because you didn't have time?

A.    I didn't say that.  What I said was she told me that based on what you showed me.

Q.    Uh-huh.

A.    Okay.

Q.    And I thought that you had said before that it just slipped your mind.  And now you're saying that you didn't have time to ask her, "What do you mean by that?"

A.    What I'm saying is we were put in a situation where we were doing roughly a year's worth of work in this period of time.  Mistakes happened.  Things got overlooked.  Things that needed to be followed up on were not followed up on.  And --

Q.    Do you recall that Raymond Petty said the reason that Juanita Allen had been striking Billie Allen, beating him with the extension cord, was that he was supposed to be in at a certain time or do something and he wasn't, and that's why she struck him?

A.    What I recall is something about him being beat like the beatings in slavery times, and no blood should be beaten like that.

Q.    I'm going to show you Exhibit 458, page 4.  Do you

recall him telling you, "One time she was getting on him. She was beating him. He was supposed to be in at a certain time, and do something, and he didn't do it." Do you recall that?

A.    That's what it says.

THE COURT:  What is Exhibit 458?  Is it a statement by --

MS. COSTANTIN:  458 is Raymond Petty's interview -- Dr. Randall's interview notes of Raymond Petty, 458, page 4.

THE COURT:  Okay.

BY MS. COSTANTIN:

Q.    And do you recall Shimeka Taylor describing that she and her -- her mother and Juanita have to control, that they need to control and take charge?  Do you recall that?  And that's why they need to have a whooping and a punishment?

A.    Where is that on this?

Q.    I'm going to find it for you.

A.    I see it, okay.

Q.    Right?  Remember?

A.    From what you --

Q.    She's talking about him being punished -- Billie Allen being punished because he got back at maybe at 10 o'clock, he was out too late, and they need to control their kids to a certain point, a whooping and a punishment.  Do you recall that statement being made by Shimeka Taylor, or it's in your

notes?

A.    It's in my notes, and I recall it from yesterday.

Q.    And do you recall Sam Moore talking about the basis of Juanita Allen --

A.    She'd mop him up.

Q.    Right, she'd mop him up.  He was on punishment just a little while back, right?  Tried to get him --

A.    She'd mop him up.

Q.    Right.  I'm sorry, that's 436, page 2.  "And everyone knew Bill was put on punishment."  Is that right?

A.    Yes.

Q.    "His mother would kick his ass in the street."

A.    Yes.

Q.    So these folks are describing Juanita Allen striking her son or whooping her son, and they are describing it in terms of punishment; is that right?

A.    While they are using that word, it's clearly abusive and it's troubling that as a government official that child abuse is being framed as punishment here.

Q.    No, I'm not framing it as a punishment.  Isn't that the words you wrote down?  Isn't that the words you wrote down, "Everyone knew Bill would put be on punishment"?  Isn't that your language?

A.    And they are talking about mopping him up and kicking his ass in the street.  That goes beyond punishment.

Q.    I'm asking you, isn't that what the words the witnesses were using when they spoke to you, they used the words "punishment," isn't that correct?

A.    Yes.

Q.    Okay.  Now, when you were considering whether or not to put on evidence along that line about them, put on their testimony, did you consider the fact that the witnesses were describing it as punishment instead of abuse and that might be a problem with the jury?

A.    That's absurd.  That contention that you're making is absurd.

Q.    Okay.  I'm asking you, did you consider that?

A.    Did we think that it would not --

Q.    That it wouldn't fly because the witnesses themselves were describing it as punishment.  Did you consider that?

A.    No, absolutely -- no, I mean, that would not preclude us from putting evidence like that on.

Q.    I'm asking you if you considered that.  Did the trial team discuss that?

A.    If we had discussed that, we would have put those people on.  I don't remember discussing that.

Q.    So you're saying there was never any discussion about putting those folks on?

A.    I would say that if those incidents stood out in my mind at the time, we would have discussed it and we would

have put those people on to talk about and relay those encounters, those experiences.

Q.   And when you wrote Exhibit 505, "physical abuse and beatings," is it possible that you were considering what those folks just -- what I just showed you, what Deborah Ruffin and Shimeka Taylor and Sam Moore had to say?

A.   What I said, that it was possible.  I don't know when I wrote that.  It might have been at some level of awareness that I was including what they told me that, I'm not sure. What I told you what I was sure of was my impressions of Juanita and the Raymond Petty incident.  There might have been some level of awareness here, some level of consciousness, but it did not reach the level of consciousness where I was so aware that it's -- because if I was at that level where I was really aware of it, those people would have been put on at the hearing to talk about specifically those incidents.

Q.   So you're saying you're certain that there was never a consideration that the fact that what they are describing as punishment, what those witnesses are describing as punishment might be a problem as far as mitigation evidence?  That was never discussed?

A.   If it was discussed, we would have put it on.

Q.   So you're -- but you're saying you don't know if it was discussed?

A.    No.  If it was discussed, we would have put it on.  I know it wasn't discussed because we didn't put it on.

Q.    Right.  That's my question.  You're saying that --

A.    I'm inferring that.  I'm inferring that.  I don't have a recollection, but I'm inferring that.  If we would have discussed it, we would have put it on.

Q.    Wait, what are you inferring, that you had discussed it or you didn't discuss it?

A.    I'm inferring that had we discussed it, we would have put that information on.

Q.    Wait, but I thought you just testified that you know you didn't discuss it.

A.    I inferred that we didn't discuss it because had we discussed it, we would have put it on.

Q.    Okay.  So your testimony here today is that if it's not in the penalty phase, you never even thought -- in the testimony in the penalty phase, you never even thought about putting it on?

A.    I would say that this information is so important and so important to present to a jury, that had it come into my awareness or my recollection at the time, we would have definitely put that on.

Q.    But you looked at these notes, and some of these notes are dated February 22nd and 21st, right?

A.    You know what, you were not in my shoes at that time.

Q.   Okay.  My question is, if you -- you're talking to some of these folks February 21st and 22nd, and they are telling you about whoopings and kicking his ass in the street and getting physical.  You're saying that even though it's critically important information, you just didn't use it?

A.   Some of those prep sessions were like a half hour long.  It was rapid fire; boom, boom, boom, boom, boom.  And then when those people were put on with minimal preparation, a lot of that questioning was, to be quite honest, he was winging it.  And he was there too and he didn't ask either.  But there was not a conscious decision not to ask those questions.

Q.   It was just like a space-out kind of thing?

A.   Correct.

Q.   Okay.  And you remember it was a space-out kind of thing?

A.   It would have to be.

Q.   No, I don't want to know it would have to be.  I want to know what you remember.  Testify, please, to what you actually remember.

A.   My conclusion is that had we remembered that information, and we would have asked those -- we would have had that information inquired about during direct.

Q.   But that's your conclusion, correct?

A.   Yes.

Q.   And, in fact, you didn't even know about this information until I showed it to you yesterday?

A.   I didn't recall it.

Q.   Right.

A.   Correct.

Q.   So you basically didn't recall it since the moment you wrote it down?  You're sure of that?

A.   Yes.

Q.   Okay.  So you're sure that you wrote it down and that trial was coming up, and you had this critical information about abuse, and you just forgot it?

A.   I'm sorry to say.

Q.   And that was true with all these witnesses?

A.   The three --

Q.   Deborah Ruffin, Shimeka Taylor, and Sam Moore?

A.   Regarding those incidents, yes.

Q.   I'm going to show you a document entitled, "Closing Ideas, Allen."  Is this something you prepared?

A.   It looks like it, yes.

        MS. CARLYLE:  Can we have an exhibit number?

        THE COURT:  502.

BY MS. COSTANTIN:

Q.   And these are suggestions about how to argue different evidence in the closing for the mitigation; is that right?

A.   Yes.

Q.    And going to page 3 of that, one of the things that you suggest that be argued is that his mother, Juanita, was a poor role model and ineffective parent; is that correct?

A.    Yes.

Q.    Now, yesterday we went -- so you were aware of evidence that Juanita was a poor role model and ineffective parent?

A.    At the time.

Q.    Okay.  And the idea that there was dysfunction in this family, that was also well known to the trial team; is that right?

A.    We knew there was dysfunction in the family.

Q.    And we looked at some of those folks yesterday; Nancy Harris, Sam Moore again, Lucy McLemore, and Carol Petty who described that, right?

A.    Yes.

Q.    Now, you made a conscious decision not to ask Juanita Allen about those topics; is that correct?

A.    I did not feel we had the rapport at the time to get into things directly with her.

Q.    And so you made a decision not to ask her about anything about dysfunction or abuse; is that right?

A.    At the time, yes.

Q.    Now, I want to go through with you relatively quickly some of your notes that you had taken involving different people.  Now, from what you had said before, your typed notes

or your handwritten notes for that matter were your best efforts at verbatim getting what a witness said; is that right?

A.    For the most part, yes.

Q.    I'm going to show you Exhibit 405.  And are those your notes from the interview of Angela Allen?

A.    Yes.

Q.    Just quickly, she indicates to you that we, referring to her and Billie Allen, used to argue all the time, especially when they were younger; is that right?

A.    That's what it says.

Q.    And she also told you that Billie Allen would brag about things that weren't true.  Tell people he had a car and shopped that he didn't have -- clothes that he didn't have. He'd brag about a herring bone that turned green.

A.    Yes.

Q.    Brag a lot about things he didn't have; is that right?

A.    Yes.

Q.    So you spoke to Angela Allen in connection with your mitigation investigation, right?

A.    I had a limited meeting with her.  I did speak with her, yes.

Q.    And there's a line there, so it looks like you spoke to her at least twice, is that fair to say?

A.    The first time was one time, and then under the line

would probably be the witness prep session.

Q.    So you spoke to her at least twice?

A.    One time briefly, and then one time during the witness prep session.

Q.    And that would be twice?

A.    One, two, yes.

Q.    Okay.  I'm going to show you 420.  Is that -- are those your interview notes with Yvette Allen?

A.    Yes.

Q.    And referring you to the fifth paragraph.  Did she tell you that Billie Allen used to take her to parties with him.  He used to pick her up from Wydown with his friend after school?

A.    Yes.

Q.    And were you aware that Wydown was a middle school?

A.    I believe so.

Q.    And you talked to Yvette Allen at least twice; is that correct?

A.    It looks like one time briefly, and then one time at the witness prep session.

Q.    And I'm showing you Exhibit 439.  Are those your notes of interview of Tyrone Jones, the basketball coach?

A.    Yes.

Q.    And going to the second page, is it correct that he told you that, "We had started playing ball, Raymond, he

coached with us a little bit.  Me and Jerome started coaching because his son, Jerome Jr., started playing ball."  Is that right?

A.    Okay, yes.

Q.    So Tyrone had told you that Billie's uncles, both Raymond and Jerome, were involved in coaching the basketball team; is that right?

A.    Apparently, yes.

Q.    And what I'm showing you is Exhibit 426.  Are those your typed interview notes of Claude Ed McLemore?

A.    Yes.

Q.    And is that Billie Allen's cousin?

A.    Yes.

Q.    And he told you that Billie Allen wasn't a troublemaker and stayed out of trouble; is that correct?

A.    I --

Q.    I'm sorry, I'll get you to the exact paragraph.

A.    Yes.

Q.    "I know he's scared to go to jail, the police.  He wasn't a troublemaker.  He stayed out of trouble."

A.    Correct.

Q.    Do you see that?

A.    I see that, yes.

Q.    And he also told you that the family, talking about the extended family I believe, is -- the "family is close."  Is

that right?

A.   Yes.

Q.   Now, Mr. McLemore did not tell you, according to your notes, that Billie Allen sold crack from the age of 14, did he?

A.   Not in those notes, no.

Q.   Are you aware of any other notes in which he told you that?

A.   Uh, no, these are my notes.

Q.   Do you have any other source that tells you that Mr. McLemore said that Billie Allen sold crack from the age of 14?

A.   I don't recall off the top of my head.

Q.   And Mr. McLemore didn't tell you that Billie Allen made 40 to $50 a day from his crack sales, did he?

A.   No.

Q.   Do you recall on February 9th of 1998 that you drove to Jefferson City to interview Mr. McLemore?

A.   Off the top of my head, I don't recall, but I could have.

Q.   So let's look at your time sheets.  Going to Exhibit 54, page 3.

A.   Okay.

Q.   "Travel to Jefferson City, interview potential mitigation witness.  Travel to St. Louis."

A.   Yes.

Q.   Is that correct?

A.   Yes.

Q.   And so you did go to Jefferson City to interview -- you took a day to go to Jefferson City to interview Claude McLemore; is that right?

A.   If that interview was on the 9th, then that's what I was doing on the 9th, and that would be correct.

Q.   Do you recall that he was a student at Lincoln University at the time?

A.   As I sit here right now, I don't recall.  But he very well may have been.

Q.   Do you recall testifying on direct that for a typical mitigation case, I'm talking about testifying back in June, that you had the time to drive throughout Missouri in order to talk to people and do interviews?

A.   Are you talking about in a typical case?

Q.   Yes.  Do you recall testifying to that?

A.   I had cases in Missouri where I have driven to different parts of Missouri to interview people.

Q.   And you did that in this case as well; is that right?

A.   It seems I did it on that occasion, yes.

Q.   Because it was important to show that a close family member like Mr. McLemore was a success and he cared about Billie; isn't that correct?

A.    I don't recall what my intention was going into that, except to find out information about the relationship and Billie's family.

Q.    And it was important enough for you to do that, to take a day and drive to Jeff City; is that right?

A.    I decided to do that.

Q.    I'm going to show you 459.  459 are your interview notes of Colette McLemore; is that correct?

A.    Yes.

Q.    And I'm showing you both pages of it.  And do you recall that you drove to Manhattan, Kansas to Kansas State, in order to interview her?

A.    I don't recall.

Q.    I'm going to 54.3.  Do you see?

A.    I see it, yes.

Q.    Okay.  So you took a day to drive to Manhattan, Kansas and interview that potential mitigation witness, which was Colette McLemore; is that right?

A.    Yes.

Q.    And do you recall that she was a student at Kansas State?

A.    She must have been.

Q.    Okay.  And looking at your notes that you wrote back when you interviewed her in 1998, do you recall her telling you that she was president of the black student union?

A. That's what I wrote.

Q. And did she tell you that she was a senior and was going to be graduating in May?

A. Yes.

Q. And did she tell you that Billie Allen had drawn some artwork for her, and that she had them saved at her house?

A. Yes.

Q. And did she tell you that the family was close?

A. Yes.

Q. And did she also tell you that she saw Billie, apparently while he was in jail, when she was home for Christmas break?

A. Yes.

Q. And that he also wrote her some letters?

A. Yes.

Q. Now, when you're working on mitigation, it's important to show that close family and friends like Claude McLemore or Colette McLemore were successful and care about the person on trial; is that correct?

A. I think that if -- if that's a feeling that family members have towards the client then it's helpful to convey that to a jury.

Q. And helpful to show that the family would stay in touch with him while he is in prison, is that right, and maintain a relationship with him?

A.    Yes.

Q.    And that was important enough for you to learn these from -- information from Colette McLemore to drive all the way to Manhattan, Kansas; is that right?

A.    Well, I felt that at the time -- I don't recall my decision-making process, but at the time it was important to see her.

Q.    So we've talked about time constraints and the total emersion.  You were able to find time to drive to Jefferson City to talk to one witness and drive to Manhattan, Kansas to talk to another witness; is that right?

A.    Yes.

Q.    And are you aware that the information about Colette McLemore and Claude McLemore, you know where they were at school, had been collected by Mr. Simon back in January, early January, when he had interviewed Lucy McLemore?

A.    Well, John Simon apparently did not interview Claude or Colette.

Q.    That's correct.  But you knew -- they knew about those two folks, right?

A.    They were aware of them.

Q.    Okay.  And then you took the effort to drive out there, both to Jefferson City and then later on to Manhattan, Kansas; is that right?

A.    Yes.

Q.   I'm going to show you 432.  Are those your notes of interview of Ahmed Oliver?

A.   They appear to be so, yes.

Q.   And that was February, is that 13th?

A.   It looks like the 13th.

Q.   And I'm going to go through the pages.  And I'm on page 6 of Exhibit 432.10.  And I want to go to the bottom and ask you if you can tell me what this says.

A.   It says -- in the parenthesis?

Q.   Right.

A.   "His mother, sisters are nice.  He comes from a good nice people.  His mother's family are nice people."

Q.   And those are your notes of what Ahmed Oliver told you?

A.   Yes.

Q.   I want to show you Exhibit 468.  Are those your notes of your interview with Nancy Harris?

A.   Yes.

Q.   And Nancy Harris was a neighbor of Billie Allen; is that right?

A.   I believe so.

Q.   And that's dated, is it correct, February 17th?

A.   Correct.

Q.   Of 1998?

A.   Yes.

Q.   And I'm going to go to the second page.  Does she

indicate that Raymond and Jerome, referring to Billie Allen's uncles, played basketball together with him?

A.   Correct.

Q.   Going to the bottom of page 5 of Exhibit 468, could you read that?

A.   Maybe.  Let's see.

MR. MONTROY:  Objection, Your Honor, I'm not sure whose document this is.

BY MS. COSTANTIN:

Q.   Well, these are your notes of the interview of Nancy Harris, right?

A.   Yes.

MR. MONTROY:  Very well, Your Honor, I thought it was another document.

A.   It says, "The girls are not -- blank -- themselves. Juanita -- blank --"  Meaning at this point I'm having trouble deciphering my handwriting.  The next, "Juanita herself not doing as well as the other adults.  The baby girl of the family.  She don't have the maturity for leading her children like the others.  Her father is the adult there. She is as sweet as can be."

Q.   Okay.  I'm going to go to the next page.

A.   "But as far as giving them the example that they need, to start a life on their own, I don't think that has been there."

Q.   And did she also indicate to you that Juanita Allen had worked for awhile at the library or at a library and also Walgreens?

A.   Yes.

Q.   And finally did she indicate that this is more of a dysfunctional family?

A.   Yes.

Q.   I'm going to show you Exhibit 434.  Are those Mr. Sindel's handwritten notes of Ahmed and Beverly Oliver?

A.   They appear to be, yes.

Q.   Okay.  I'm going to go to 383.2.  Is that the schedule, interview schedule for February 21st and February 22nd?

A.   Yes.

Q.   And do you show that Ahmed and Beverly are scheduled for Sunday, the 22nd, at 4:30, although it looks like they might have been moved up based on that arrow?

A.   Yes, exactly.

Q.   So you were present for the interviews of Ahmed and Beverly Oliver?

A.   Probably, yes.

Q.   Well, weren't you present for this whole prep session?

A.   I believe I was.

Q.   And looking at the last line of page 3, they write, "Bill had stole dollars and CDs from W"?

A.   Correct.

Q.   "Never had much in the way of jobs.  Very disappointed when Billie took dollars from him."

A.   Correct.  I'm not sure who "W" or "him" is, but --

Q.   "Helped him as friends.  Never talked about father."  Is that what is written there?

A.   Yes.

Q.   I'm showing you Exhibit 500, page 36.  Does this also indicate -- and these I will tell you have been admitted as the typed notes of John Simon.  Does this indicate part of the way through the page, "Olivers"?

A.   Yes.

Q.   And did Mr. Simon write, "When he took the dollars from you, it really disappointed me.  I caught him fair and square.  I knew then that he had lied about -- or that symbol -- about a lot of stuff"?

A.   That's what it says.

Q.   Now I want to go to 472.  These are your notes of an interview of Beverly Oliver; is that correct?

A.   Yes.

Q.   And they are typed?

A.   Yes.

Q.   And Beverly Oliver told you that, "He and my son have been friends since kindergarten, all through school.  I know his mother, met her at school functions.  She is really nice."  Correct?

A.    Yes.

Q.    I'm going to go to 473.  Are those your notes of the interview with -- an interview with Jerome Petty?

A.    Yes.

Q.    And did Jerome Petty tell you that, "Bill's father was not in the picture this whole time"?

A.    Yes.

Q.    And going to the last paragraph of 473, and then I'm going to move on to the next page.  Did he also tell you:

"I'm upset I missed Bill's problem.  I was working two jobs.  Operations manager.  He was going to move in with me at one point.  When I said, 'Bill, do something,' Bill jumped.  This was about '92 to '94.  I wanted him to focus on things he should focus on.  He was living with his mother and three sisters.  Bill was about 16.  He wasn't responsible, being 16.  They all got along like brothers and sisters.  Had their good days and their bad days."

Is that what he told you?

A.    Yes.

Q.    I'm showing you Exhibit 431.  Are those your handwritten notes of your interview with Nicole Petty?

A.    Yes.

Q.    And Nicole Petty is Billie Allen's oldest sister; is that right?

A.    Correct.

Q.   Let me go down to page 3.  I'm sorry, go to page 2, I apologize.  I'm going to highlight a portion here.  Do you recall, and you've headlined this portion, "Question, lived with father."  Is that what "F" means?

A.   Yes.

Q.   And do you recall her telling you, "We were happy that we left.  I was about fourth or fifth grade.  They didn't get along too good.  Arguments all the time, yelling all the time.  Whoopings, not often.  I remember one time Bill got a whooping here."  Now, "here" refers to Cote Brilliante, correct?

A.   Likely, yes.

Q.   Okay.  So back in 1998 Nicole Petty told you that when Juanita Allen was living with John Allen, there were whoopings, but not often; is that right?

A.   When you're saying that Nicole Petty has related to me that there are whoopings --

Q.   Whoopings --

A.   -- but not often.

Q.   -- but not often when they are living with the father; is that right?

A.   During this interview this is what she is relating to me.

Q.   Is that correct?

A.   Yes.

Q.   Okay.  And she also told you back in 1998 that she remembered one time that Bill got a whooping at Cote Brilliante?

A.   That's what that statement says, yes.

Q.   Okay.  And that's what you wrote down that she told you back in 1998?

A.   This is what she told me at this time, yes.

Q.   And she also -- Nicole Petty, his sister, also told you that back in 1998 that Billie Allen was close with Raymond and Jerome; is that right?

A.   Yes.

Q.   And Raymond and Jerome is referring to Billie Allen's uncles, Raymond and Jerome; is that right?

A.   Yes.

Q.   Now I'm going to 458.  Are those your typed notes of your interview of Raymond Petty?

A.   Yes, they are.

Q.   And did Raymond Petty tell you, referring to Billie Allen, "He used drugs"?

A.   Yes.

Q.   And that's what you wrote down in your notes; is that right?

A.   Yes.

Q.   And he also told you, back at that time that "Bill was smoking marijuana."  Is that right?

A.    Yes.

Q.    And he also told you that "Bill had played softball and basketball in high school for about one semester.  He played in CYC, Christian Youth Council, basketball.  I was assistant coach for that team.  Bill had begun using drugs back then."  Is that what he told you?

A.    Yes.

Q.    Now I'm showing you Exhibit 440.  Do those appear to be Mr. Sindel's handwritten notes concerning interview of Eric Taylor?

A.    Yes.

Q.    And go for a second to the schedule.  Can you see the Taylors on that schedule?  I'm sorry, 4:30 on 2/21, Shimeka, Eric, Ms. Taylor?

A.    Yes.

Q.    And what is Eric Taylor's relationship to Billie Allen?

A.    They are friends.  Eric was Marquis's brother, I believe.

Q.    And Marquis is Billie's friend who was killed in front of him; is that right?

A.    Yes.

Q.    And looking at Exhibit 440, I'm going down to the bottom.  It states that Eric Taylor says, "Knows Bill as joker -- smoke --" What does that say?  "Smoke some weed"?

A.    Most likely that's what it says.

Q.   Looking at 443.2.  Let me go up to the beginning. Those are your notes from your interviews of him, is that correct, of Eric Taylor?

A.   Yes.

Q.   And you wrote that Eric Taylor told you, "I know Bill always to be kidding around, playing around, joking.  Just wanted to chill, smoke some weed."  Is that right?

A.   Yes.

Q.   So is fair to say it appears that your notes and Mr. Sindel's notes are from the same interview of Eric Taylor?

A.   They appear to be, yes.

Q.   Now, going to --

A.   During that witness prep session, yeah.

Q.   Correct.

        THE COURT:  Is this a good stopping spot?

        MS. COSTANTIN:  Oh, sure.

        THE COURT:  Recess, 15 minutes.

        (Court in recess at 10:25 a.m. until 10:45 a.m.)

        MS. COSTANTIN:  Judge, may I proceed?

        THE COURT:  You may proceed.

BY MS. COSTANTIN:

Q.   Looking at what is in front of you, which is Exhibit 443, the second page, I want to go down to a portion right here that says, "I know Jay's mama smoke crack."  Is that

Q.   what Eric Taylor told you?

A.   Yes.

Q.   And Jay is Johnnie Grant?  Jay -- who was known as Jay, right?

A.   That's what I would assume here.

Q.   And Jay's mama was Shirlene Grant; is that right?

A.   I believe so.

Q.   Okay.  Now, is the fact that Eric Taylor told you that Shirlene Grant smoked crack, the reason that she was not called in the penalty phase?

A.   Was that the reason?  I can't pin that down.

Q.   Do you know why she wasn't called in the penalty phase?

A.   No, I don't.

Q.   I'm going to 443, the third page, because it's easier to look at your typed notes.  This is the third page of your typed notes of Eric Taylor.  Did he tell you that, "He" -- referring to Billie Allen -- "smoked blunts after Marquis died"?

A.   Yes.

Q.   And that "blunts" is a reference to marijuana, right?

A.   Yes.

Q.   And was that another reference that was made about the effect that Marquis's death had on Billie Allen?

A.   He's saying that he smoked blunts after Marquis died.  So he's saying, you know -- I'm not sure what he smoked

before Marquis died, but he's saying he smoked blunts after Marquis died.

Q.   Did any of the witnesses talk to you about the strong effect on Billie Allen of Marquis's death?

A.   Yes.

Q.   In fact, numerous witnesses told you that, right?

A.   Yes.

Q.   I want to go to Exhibit 452.  Are these your typed notes, your interview of Shimeka Taylor?

A.   On the top is preliminary, just brief notes of a preliminary discussion, and then I believe under the line is during the witness prep session.

Q.   So these are your typed notes of your interview notes of Shimeka Taylor?

A.   Yes.

Q.   And there were at least two?

A.   Yes.

Q.   And Shimeka Taylor is Marquis's and Eric's sister; is that right?

A.   Yes.

Q.   And going to the third page of your notes, Shimeka told you that if Billy and his mom got into it sometimes, Billie would crash on our floor.  Is that what she told you?

A.   That's what she told me.

Q.   So Shimeka had told you that Billie Allen would stay at

the Taylor's house after he had arguments with his mom; is that correct?

A.    Yes.

Q.    And Shimeka also told you -- hold on, let me get to the spot -- that "Bill needed discipline, he did need that. Juanita was great, but too lax when it came to Bill.  Boys need a stronger figure.  Juanita did not take that role in my opinion."  Is that right?

A.    That's what written, yes.

Q.    And there were several witnesses who had told you that Bill needed more discipline from his mom; is that right?

A.    There were some that said that she was sort of a laissez-faire and lax, yes.

Q.    I'm going to Exhibit 479, that's our interview with Monette Petty, also known as Nishelle Petty; is that correct?

A.    Yes.

Q.    Didn't she tell you that "When I was in high school, he would leave the house and spend it with his friends for two or three weeks."  Is that correct?

A.    Yes.

Q.    And she's talking about when she, Nishelle, was in high school, Billie Allen would leave the house and spend it with his friends for two to three weeks -- two or three weeks; is that right?

A.    Yes.

Q.    I want to talk to you a moment about portions of your declaration.  But if you could clarify, when this case was done back in 1998, when the trial was over, did you maintain these notes that we've seen or any other notes or work product from your work on the case?

A.    After the case I did retain my notes for a period of time.

Q.    And what happened to those notes?

A.    I believe that when I moved out of Chicago to Hawaii at the end of '99, I mistakenly discarded them along with notes from other cases.

Q.    And so at the time that -- between the time you moved from Hawaii to the present day, you have no work product, notes, nothing from this case; is that right?

A.    Except the materials that were provided to me after the trial, the transcripts and things like that.  I didn't have my own generated work product.

Q.    Did you -- so before you moved to Chicago, had you sent any of your notes or work product to appellate counsel or to any other counsel?

A.    You mean before I moved to Hawaii?

Q.    Right, I'm sorry.

A.    Did I send my notes to anybody?  Not that I recall, no.

Q.    Had you left a set of notes or work product as part of the trial file when you were done with the case in 1998?

A.    Only -- not -- after I was done, I took whatever I had with me.  Whatever I had given Rick in the course of the -- over the course of the trial itself, the penalty phase, whatever he had, he had had from me at that point, and I took my own stuff with me.

Q.    Okay.  So you left some -- the work product or the notes that you left behind were notes that you had given to Mr. Sindel during the preparation and the trial itself?

A.    Yes.

Q.    So you didn't send any material to 2255 counsel; is that correct?

A.    Correct.

Q.    And the trial obviously was in 1998.  Did you stay in contact with any of trial counsel after the trial was completed?

A.    After the trial, after a certain amount of time elapsed, Mr. Sindel had said that he had another federal death penalty case that he was thinking about bringing me on, and he did.

Q.    How about appellate counsel, did you stay in touch with appellate counsel on the case as it proceeded through the courts?

A.    "Appellate counsel" meaning whom?

Q.    Mr. Simon and I think Michael Gross.

A.    No, I don't believe so.

Q.   Okay.  So when were you first contacted about this case again after the trial was over?

A.   That would be hard to say.  I think I was contacted by previous counsel at a certain point before -- before the current counsel.  I don't believe I followed up with them. And then current counsel --

Q.   I'm sorry, what do you mean "previous counsel"?

A.   I believe there was another layer of appeal before this layer.

Q.   Do you remember the name of the people you were contacted by?

A.   Not -- I don't recall.

Q.   And you're not sure when that time period was?  Or when was that time period?

A.   It was some time after I moved to Hawaii.

Q.   So some time after 2002?

A.   Some time after I moved to Hawaii, I'm not sure when.

Q.   And you said you didn't follow up on that.  What does that mean?  Did you speak with the people or you didn't return the phone call or what happened?

A.   If anything, it was just real brief conversation -- or I don't remember any substantive conversation at all.  It could have been just a message.  I don't recall any substantive conversation.

Q.   So when's the next time you had contact with anyone

related to Billie Allen's case?

A.   When -- I believe it was when Mr. Wiseman called me.

Q.   And when roughly was that that Mr. Wiseman called?  And if it helps at all, we can look at your declaration and see that it was signed July 28th of 2009.

A.   Right.

Q.   Okay.  So when was it that Mr. Wiseman called?

A.   I don't recall specifically when that was.  It was before this -- before July.

Q.   Was it two weeks before July?  Was it seven months before July?  I mean, do you have any idea at all?

A.   I've told you, I don't recall specifically.

Q.   Okay.  And when he -- the first contact he had with you is a phone call, is that what you're saying?

A.   I believe so.

Q.   Okay.  And what transpired in that phone call?

A.   Well, I know what ultimately happened was I said I was coming back east because I have family in New Jersey, which is not too far from Philadelphia.  And I said to them, you know, I can come down to Philly if you want to discuss the case with me.

Q.   Okay.  And did you do that, did you meet in Philadelphia?

A.   Yes.

Q.   So was there any substantive conversation about the

case before that meeting in Philadelphia between you or anybody else in the 2255 team?

A.   Not that I recall.

Q.   So when you met with the 2255 counsel in Philadelphia, I'm sorry, I can't remember if I asked you this, when was that in relation to this July 28th signature?

A.   That's what I'm saying, it was before July.  I'm not quite sure.  It was several months before July.  I'm not sure how many months.

Q.   And before you met with 2255 counsel, what, if anything, had you reviewed?

A.   I don't recall reviewing anything.

Q.   And you didn't have anything to review, correct?

A.   Correct.

Q.   And had anything been sent to you to be reviewed before you met with them?

A.   I don't believe so.

Q.   And can you tell me, that meeting in Philadelphia who was present that you recall?

A.   There was a whole team of people there.

Q.   Do you remember who that team included?

A.   I think Mr. Montroy was there and Mr. Wiseman and a group of other people.  I'm not sure if Tim Kane was there. He might have been.

Q.   Do you recall any investigators being present?

A.   There were a group of people, which I believe were paralegals as well as attorneys.  I don't know who was an investigator, who was a paralegal.  I have no idea who was who.

Q.   Does the name James Monroe mean anything to you?  Did you ever speak with or meet with a James Monroe?

A.   Maybe, I'm not sure.

Q.   Would that have been simply with Mr. Monroe or would that have been part of a larger group?

A.   I met with a group of people in Philadelphia.

Q.   I'm asking you, did you ever meet or speak with James Monroe?

A.   What I'm saying is I don't know.

Q.   Okay.  But do you know that if it was, it was part of a group, not individually?

A.   I met with the group initially in Philadelphia.

Q.   And just to make sure I understand, you never met one-on-one with James Monroe?

A.   I'm saying I don't remember.

Q.   Okay.  All right.  So at that meeting, tell me what transpired at that meeting, please, in Philadelphia.

A.   We had a discussion about the case.

Q.   And what was the substance of that discussion?

A.   My understanding about what was involved, the situation that we found ourselves in due to the compressed time frame

of the case. My feeling that I thought Billie's situation was a legacy of slavery basically.

THE COURT: Was a what?

THE WITNESS: Was a legacy of slavery, multi-generational abuse.

A.    I told them that --

Q.    So were they interviewing you or were they providing information to you?

A.    It was a discussion.

Q.    At that -- go ahead, I'm sorry.

A.    It was a discussion.

Q.    Okay. At that discussion, was there any discussion of what the 2255 team had done concerning interviews or declarations from witnesses?

A.    I know that after that discussion that we had talked about me preparing a declaration.

Q.    No, my question is, did anyone tell you on the team about what other people interviewed by the 2255 counsel or investigators, their trial team, had said?

A.    I don't recall specifically.

Q.    And you're saying when you met with them back some time before July of 2009, you told them that there had been multi-generational abuse in this case?

A.    That's what I believed, yes.

Q.    So you told them you believed there was multi-

generational abuse?

A.   I told them that I believed there was multi-generational abuse.

Q.   And did you tell them what that was based upon?

A.   The grandfather's presentation, what he told me during our interview.  And it was my sense of the case.

Q.   And just to clarify, before you met with or even while you are meeting with them, are you reviewing any of your notes, any of your work product from the trial back in 1998?

A.   No.

Q.   So is it fair to say that these are your impressions of a trial that you worked on 11 years before you met with them?

A.   We talked about what I recalled and the predicament that we found ourselves in.

Q.   And what was that "predicament"?

A.   The fact that trial counsel had lost their mitigation expert at the eve -- at the beginning of trial, and due to that, we were basically compelled to prepare a case in a time frame that was severely truncated.

Q.   So did you talk at all about what witnesses had testified to or what witnesses had told you or anything like that during this meeting?

A.   Probably, but I don't recall specifics.

Q.   And whatever you would have told them would have been based solely from your memory of this trial 11 years before;

is that right?

A.    Yes.

Q.    Because you didn't make any attempt to prepare by going over documents you prepared during the trial?

A.    I didn't have access to them.  I had looked, but I could not find them.

Q.    Had you asked them to send them to you before you had the meeting?

A.    I don't believe so.

Q.    And at the meeting, was a declaration -- was it discussed that you were going to prepare a declaration?

A.    Towards the end of the meeting we talked about that, yes.

Q.    And what was the discussion?  Was the declaration prepared right then or was a draft of it prepared at that point, or how did that work at the end of the meeting?

A.    At the end of the meeting they said they would send me some materials to review, and that they asked me if I would be willing to prepare a declaration, and I said yes.  And they were going to be preparing a draft, I believe.

Q.    And to clarify, that you remember being at the meeting with Mr. Montroy, Mr. Wiseman, maybe Mr. Kane, and then some paralegals?

A.    Yes.

Q.    Anybody else?

A.    That's my recollection.

Q.    And who was to prepare the declaration?  What was the conclusion at the end of that meeting?

A.    I don't know how they decided.

Q.    You weren't told, someone didn't say to you, "I'll prepare that and send it to you," or do you recall?

A.    I don't recall specifically.

Q.    But -- so how long was that meeting roughly?

A.    A couple hours, I think.

Q.    Did you meet with them more than one time?

A.    That was our meeting, and then -- that was our sole meeting.

Q.    Okay.  And then you go back to Hawaii, is that right, or maybe you got to New Jersey and visit family first, but eventually you get back to Hawaii; is that correct?

A.    Yes.

Q.    And how is it -- what's the next thing that happens in preparation or in connection with this case?

A.    I get several volumes of the penalty phase transcripts, and at some point a draft declaration was sent to me.

Q.    Okay.  So you're sent volumes of the penalty phase transcript, a draft declaration.  And are you also sent those records, the school records, the medical records?

A.    That was part of the -- yes.

Q.    You said -- were there eight binders?

A.    There were eight binders.

Q.    And what were the contents of the eight binders?

A.    The penalty phase transcripts, the school records, and the declarations.

Q.    Now, you're not sure if the contents or the declarations themselves were discussed with you at the meeting?

A.    We probably discussed them, but I'm not certain.

Q.    Were you told that, hey, we found all these witnesses, and they say Juanita Allen physically abused or beat Billie Allen on a regular basis?  Were you told that during the meeting?

A.    We may have discussed that, I'm not sure.

Q.    So you have a draft declaration.  And this draft declaration that we're looking at is 20 pages long that you actually signed.  Do you recall how long the draft declaration was?

A.    Not offhand, no.

Q.    And then what did you do once you got the draft declaration?

A.    I reviewed it for about -- I spent about a day, day and a half on it, and then edited it and made it accurate as I felt I could.

Q.    And when you said you edited it, did you make major changes to it?

A.   Yes.

Q.   Okay.  And when you made those major changes, were you -- what were you referring to?

A.   Well, there was information that was given to me in the penalty phase transcripts and the declarations and the school records, so -- and then my recollection.  So I used those sources to make modifications.

Q.   And we've talked about this before, you did not have your notes; is that right?

A.   I don't believe I did.

Q.   And you didn't have notes from anybody else, as in Mr. Simon or Mr. Sindel?

A.   I don't believe so.

Q.   Did you have the Life History from Mr. Simon?

A.   I believe that was part of it.

Q.   So you think you were sent the Simon Life History?

A.   I believe.

Q.   I'm talking about by 2255 counsel.

A.   Yeah, yeah.  I would have to check.  I believe I was, yes.

Q.   So you had the Simon Life History when you wrote in your declaration that "No effort had been made to even begin --

A.   -- the laborious process," blah, blah, blah?

Q.   Right.

A.    As I said earlier, minimal effort had begun.  "No" was too strong a term.

Q.    And -- but you did have the Simon -- you recall as you sit here today that when you edited the declaration sent to you by 2255 counsel, you do recall you had the Life History?

A.    I recall being aware of the Life History, because I knew of it from the original hearing.  I got the information.  That's one of the first things I got from them, so --

Q.    Well, let me make sure, I think we're talking about two different events.  I'm sorry, I'm not trying to be confusing.

A.    Okay.

Q.    What I'm asking is that in those binders that were sent to you by 2255 counsel, you had the penalty phase transcript, you had declarations, you had school and medical records.  I'm not trying to be confusing.  Did the 2255 counsel send you a copy of the Simon Life History?

A.    Okay.  I'm not 100 percent sure that they sent it to me, but I was aware of that document from before.

Q.    But you're not sure they actually sent it to you?

A.    Correct.  They may have.

Q.    And when you wrote, "Only a few records on Mr. Allen and his family had been collected," you did, however, have all the school records, the medical records, all that from 2255 counsel?

A.    Yes.

Q.    So that was an incorrect statement that you had facts to know were incorrect?

A.    That was incorrect, yes.

Q.    Okay.  And did you know that was incorrect when you -- did you fail to revise it?  Were those the words of Mr. -- of the 2255 counsel, "Only a few records on Mr. Allen and his family have been collected," or were those your words?

A.    I believe that those were words that I failed to revise.

Q.    Okay.  So those are words that were sent to you by 2255 counsel?

A.    I believe so.

Q.    "Only a few records on Mr. Allen and his family had been collected," correct?

A.    Which is --

Q.    I'm just asking you, those were their words?

A.    I believe so.

Q.    Okay.  And along with that declaration, draft declaration they sent you, they also sent you a binder that had all the medical records and all the school records, correct?

A.    And I believe incarceration records as well.

Q.    Okay.  Now, after you -- you said you spent one to one and a half days to review the declaration that was sent to you?

A. About that, yes.

Q. And after you did that, what did you do with it?

A. I believe I sent it to them, and then I signed it.

Q. So you signed it and then you sent it to them?

A. I believe I sent it to them first.

Q. Okay.

A. And then I signed it.

Q. Now, why did you send it to them first and then sign it? I'm not understanding.

A. I believe I sent to them for their review, and then I signed it.

Q. And did they make any changes to what you had revised of their words?

A. I don't believe so.

Q. And during any of this process, whether it was the meeting in Philadelphia, the receipt of the documents from 2255 counsel, the one and a half days that you were reviewing the declaration, and before you signed it, during any of that time did you request to have any of the work product that you had prepared from your trial in 1998?

A. I don't believe I did, no.

Q. And you never -- 2255 counsel did not send it to you either during any of that time; is that correct?

A. Not from my recollection as I sit here.

Q. I want to go to page 19 of your declaration, and

specifically to paragraph 23, in which there's a quote from Juanita Allen's declaration; is that correct?

A.   Yes.

Q.   Now, Juanita Allen's declaration was sent to you by 2255 counsel; is that right?

A.   Yes.

Q.   And, in fact, this paragraph was written by 2255 counsel, right?

A.   That is incorrect.  This is one paragraph that I added.

Q.   So you added this yourself?

A.   Yes.

Q.   Okay.  And in doing so, you pulled a paragraph from Juanita Allen's declaration?

A.   Yes.

Q.   And is it correct that in that declaration that you quote of Juanita Allen that states, "They never really sat with me to hear my story.  I told them some information, and they seemed to focus on the story about Marquis Taylor and the shooting."  Is that right?

A.   Yes.

Q.   Now, you didn't cut off Juanita Allen and tell her that you only wanted to hear about Marquis Taylor's murder, did you?

A.   Did I deliberately cut her off?  No.

Q.   You talked about her background, didn't you?

A.    We met and had a discussion, a general discussion which you have the notes of, I believe.

Q.    And I'm going to go through those with you.  In that -- in your interview with her, first of all, you talked to her about her background, didn't you?

A.    I would have to see my notes, but I probably did.

Q.    And are you aware that Dr. Cuneo also interviewed Juanita Allen?

A.    I believe so.

Q.    And are you also aware that there are notes from Mr. Sindel and Mr. Simon's interviews of Juanita Allen?

A.    This paragraph was included to capture the feeling of the experience.

Q.    And I want to ask you about the facts of the experience and not the feeling of the experience.  So like if you had looked at the notes of the interviews of Juanita Allen, do you think that that might have informed your declaration?

A.    I believe that this paragraph captures the essence of what happened during this debacle in my opinion.

Q.    From your perspective or her perspective?

A.    I believe from both of our perspectives.

Q.    So from your perspective, you never really sat with her to hear her story?

A.    That's correct, because it would have required multiple interviews over a period of time, developing a rapport, and

eventually getting to the meaty information, the substantive information about her abuse, her firsthand account of her treatment of Billie, and the life contacts that she had, her marriage, the full picture.

Q.   So what was it you would have talked to her about?

A.   I would have gotten a richer firsthand information, richer, more detailed information over time about her life and about the impact of what she did on Billie and also her other children.

Q.   So let's talk about your notes, Exhibit 411.  These are your typed notes of your interviews of Juanita Allen; is that right?

A.   Yes.

Q.   And you had reduced handwritten notes to typed notes. Is that generally your practice?

A.   Yes.

Q.   But do you recall that not all the information from handwritten notes are put in the typed notes?  Do you recall that?

A.   No.  If there were handwritten notes, I would dictate the handwritten notes, and they would be verbatim from my handwritten notes.

Q.   So let's take a look, for example, at 410.

     THE COURT:  410?

     MS. COSTANTIN:  410.

THE COURT:  What is the exhibit?

MS. COSTANTIN:  The exhibit is 410.

THE COURT:  What is it?

BY MS. COSTANTIN:

Q.    These are your handwritten notes of interview of Juanita Allen on January 28, 1998; is that right?

A.    That's what it says.

Q.    And is that what they are?

A.    Yes.

Q.    And it indicates at the top, correct, that people had already written some character letters.  She told you that people had written character letters to the attorneys, and you have a question mark, "Do they exist?"  Is that right?

A.    Correct.

Q.    And do you know as you sit here today, do you recall those character letters?

A.    Not off the top of my head, no.

Q.    But do you have any reason to doubt they existed?

A.    I don't know if they do or not.

Q.    And in these handwritten notes, you got some contact information about Sam Moore, Billie's softball coach; is that right?

A.    Yes.

Q.    And were you aware that Mr. Simon had also gotten that information back in December of 1997 from Billie Allen?

A.    Good for Mr. Simon.  Yes.

Q.    You were aware of that?

A.    Uh-huh.

Q.    And then you start to discuss after that your disappointment -- or, I'm sorry, what her reaction was to the robbery; is that right?

A.    Yes, to the murder.

Q.    And we're looking at 410, is that right, Exhibit 410?

A.    Yes.

Q.    Now, when we look at 411, that's what that starts with; is that correct?

          THE COURT:  And what is 411?

Q.    411 is your typed notes of interview with Juanita Allen?

A.    It says, "When asked about her reaction, she said disappointment, frustration, a whole lot of anger.  I was really in disbelief for real.  And it still pops up in disbelief about it.  I found out on TV."

Q.    And my point is simply that there's parts of handwritten notes that you didn't bother to put in typed notes for whatever reason.  For example, a phone number for Sam Moore?

A.    I would like to see them side by side to see if they are the same interview.

Q.    Well, isn't 411 the typed notes, a summary of all your

interviews?  Isn't that what your practice was?

A.    I would dictate interview by interview.  So, no, it's not a summary.

Q.    So what about the times you had the lines on a page, and above the line was from one interview and below the line was from another interview?

A.    Usually what was below the line was from the witness prep session.

Q.    But isn't that the point, we're talking about two different times you talked to the witness?

A.    Yes.

Q.    Now, I'm going to go to the electronic version of 411. I may go to handwritten notes, because of what is -- because some of this is hard to read because of the underlining.  And you wrote that, "She told you the way I raised him.  Bill had got into an unknown world to him, a world he knew absolutely nothing about."  Is that right?

A.    Yes.

Q.    "Hanging around Holder.  An individual with power."

A.    Yes.

Q.    "Bill is" -- can you read what that says, the portion that's underlined?  Can you read that portion?

A.    I'm trying to see it.  "Bill is" -- it has a dark mark, it looks like a dark marker through it.  It was apparently a highlighter, and then it was copied and it's not showing

through.

Q.   Then let me show you a different portion that we can read.  "He's the type who's easily influenced in a world alien to him.  I think he just wanted to be 'street person' but he wasn't raised on the streets."  Is that right?  I'm sorry, I cut off the last portion.  "He's not a street smart kid."  Can you read that through the highlighting?

A.   Yes, I can see that part.

Q.   "He's over his head."

A.   I'm not sure what that says.

Q.   Now, those things that he was led by Holder, that he's not a street smart kid, that he's a follower, that these actions were out of character, those were all themes that were presented in mitigation; is that right?

A.   Yes.

Q.   I want to look at the third paragraph.  "When Bill was younger, he had lead poisoning.  Affects the brain."  Is that what she told you?

A.   Yes.

Q.   And there were already medical records that had been translated by a professional concerning his Pica and lead poisoning; is that right?

A.   Yes.

Q.   And evidence of that lead poisoning was presented at trial through the doctors; is that right?

A.    Yes.

Q.    And, I'm sorry, that's one portion.  She also told you that Bill Allen had checked himself into a psychiatric ward; is that correct?

A.    Yes.

Q.    And by that time, before you were involved, the trial team had already obtained those Metropolitan Psych records; is that right?

A.    He didn't actually check himself in.  He was brought by his girlfriend and the mother for a visit with Wuertz.  And he was not checked in.  He was offered to be admitted, but he declined.

Q.    So she told you that he had checked himself in, but, in fact, it was his girlfriend and girlfriend's mother who brought him there; is that right?

A.    They were concerned he was suicidal, yes.

Q.    And the trial team had already obtained those Metropolitan Psychiatric records, right?

A.    Yes.

Q.    Before you were involved?

A.    Yes.

Q.    And she also told you that, "When it happened, Bill and I hadn't had any contact with each other since January of 1997."  Is that correct?

A.    Yes.

Q.   She told you, "He was gone," right?

A.   Yes.

Q.   And she told you, "Someone had shot into our house at the door.  It's been a rough year.  Looking for Bill.  I was two inches away from being killed."  Is that what she told you?

A.   Yes.

Q.   She also told you, going to -- I'm showing you another portion of 411, the sixth paragraph.  That, "Before January he was living here.  He was living here up until that day he shot into the house.  And there should be a police report on this.  He wasn't home at the time."  Is that right?

A.   That's what she says.

Q.   And did she tell you, "I didn't see Bill after that, I put out a police report on him.  He never came back.  He knew how I felt about it."  Is that right?

A.   Yes.

Q.   So she told you that Bill Allen had left the house after the shooting; is that correct?

A.   I believe so.

Q.   She didn't tell you that she had kicked him out, did she?

A.   Not in this statement.

Q.   In fact, she told you she had put out a police report on him, a missing person's report; is that right?

A.    Can you please put --

Q.    Sure.

A.    Yes, uh-huh.

Q.    And she also told you that, "She had seen changes in Bill, that his freshman and sophomore year in high school, I notice different things about Bill."  Didn't she tell you that?

A.    Yes.

Q.    Now I'm going to go to 410.5, simply because they are more readable.  These are your handwritten notes of your interview of Juanita Allen; is that right?

A.    Yes.

Q.    And she told you that she had asked the counselor at Provident to talk to him; is that right?

A.    Yes.

Q.    And that, "Gradually I noticed his demeanor changed.  His room was a mess all the time."  Did she tell you that?

A.    Yes.

Q.    "His appearance started going down.  And she was gradually missing little things."  Is that right?

A.    Yes.

Q.    And then I'm going to go to -- you have an arrow that's drawn to "Not taking pride in himself before 1996."  Is that right?

A.    Yes.  I don't know if that's her statement or my

statement. But in terms of not taking pride in himself, that could be hers, it could be mine. But either way, he's going down. Either way his appearance is starting to go down, gradually missing things around the house. Things are deteriorating, that's what's being conveyed here.

Q. I'm going back to Exhibit 411, which are your typed notes of Juanita Allen; is that right?

A. Yes.

Q. And she told you, "We had our rules, abide by them. Up until that point, Bill was a perfect son. Me and my kids always hung out. People used to say he was a mama's boy, stuff like that. He was always under foot." Is that right?

A. That's what she's stating here, yes.

Q. And that's what you wrote she said to you?

A. Yes.

Q. Back in 1998?

A. Yes.

Q. And did she also tell you, "If I was to walk up, people would correct themselves in front of me"?

A. Yes.

Q. And did she also tell you, "The way my kids were raised, someone will come back and tell me what's going on"?

A. That's what she's saying.

Q. And did she also tell you that, "He definitely wasn't hanging out around the Brady Bunch. He was getting into this

world he knew nothing about"?

A.   Yes.

Q.   Now, would you agree that you had a wide range of topics that you talked about concerning Billie Allen, and not just Marquis's death, with Juanita Allen?

A.   I would say that there were other topics discussed besides the death of Marquis.

Q.   So if Juanita Allen stated in her declaration that all they were interested in was hearing about Marquis Taylor's death, that would not be correct?

A.   I think that would not be a hundred percent correct.

Q.   I'm on the second page of your typed notes of Juanita Allen, and that's Exhibit 411.  Did she tell you, "My kids went out to Clayton school.  Nicole, I pulled her out of Clayton, and Bill, coming back to the neighborhood schools was like a shock to them.  She wanted to be around 'their people.'  But they were never around the neighborhood"?

A.   Yes.

Q.   So she told you that Billie Allen had experienced basically a culture shock from going into the City schools; is that right?

A.   That's -- yes.

Q.   And did she tell you, "I'm going to back you, but not back you if you're wrong.  I'm there for my son, I love my son"?

A.   Yes.

Q.   So she expressed her love for her son to you; is that right?

A.   She's stating that, yes.

Q.   And that was consistent with your contact with her, correct?

A.   This is what she's saying to me during my talk with her.

Q.   And I'm asking you if that was consistent with your contact with her in general?

A.   I don't know what you mean by that.

Q.   What I mean is at any time did she ever express that she did not love her son?

A.   Not that I'm aware of.

Q.   And I refer you to the second page of Exhibit 411, that's your typed notes of her, of Juanita Allen's interview. She told you that, "Dennis Noble was a friend of Bill's who got killed around Garfield."  Is that right?

A.   Yes.

Q.   And she also told you, "Marquis Taylor, he got killed. I think after awhile Bill was on, quote, an I just don't care, end quote, mission.  Marquis's mother tried to comfort Bill.  She never blamed him."

A.   Yes.

Q.   And going to the next paragraph on Exhibit 411, she

told you that, "He" -- referring to Bill Allen -- "was usually an honest kid.  The last few years, during those last two or three years I used to ask him, quote, Who is your mother, end quote, it couldn't possibly be me.  We were like quote, boring, end quote.  Bill had this thing, he wanted to prove himself."  Is that what she told you?

A.    That's what she told me.

Q.    And that statement was consistent with what other witnesses had told you, that he had been a good kid and had gone down hill; is that right?

A.    In these initial interviews that's what people were relating.

Q.    In all the interviews that you did, that's what they --

A.    All initial early interviews, yes.

Q.    So -- well, in any interview.  What does that mean, "in these initial interviews"?  I mean, were there later interviews or no later interviews?

A.    Unfortunately there were no later interviews because we ran out of clock.

Q.    Okay.  In any interview, did anyone ever contradict this message that Billie Allen had been a good kid, but had gone down hill and was in with the wrong crowd the last few years?

A.    I think generally that the teachers and everybody consistently said that he tended not to be a violent kid,

that he was not aggressive, that he was sort of -- what's the word?

Q.    A follower?

A.    That was part of it, but I'm thinking more like sort of slow, and, you know, had trouble focusing and staying on top of things.  There was no -- so this is consistent in the sense that they did sense a deterioration towards the end.

Q.    And you did talk to her about her marriage; is that correct?

A.    Yes.

Q.    And specifically she told you, or you wrote that she told you, "John Allen, Bill's father, after I left him, he no longer wanted to deal with the children.  Bill was -- and then there's a blank -- when we separated.  All of them were in school at the time.  Yvette was just going to start school.  About the atmosphere, she stated that he was not a disciplinary person.  He drank.  He played little or no role in Bill's life.  He was a drinking man, on weekends gin.  If I didn't see him it was okay with me.  I felt I had outgrew him.  He was stuck in a place, mentally.  He wasn't a grown individual.  He never understood the functions of a family.  Most of the time he kept a job, sometimes not.  We lived down the street from his parents.  Haven't the slightest idea what he's doing now.  Said he'll get a job when my baby turns 18, he doesn't want to pay child support."  Is that what she told

you?

A.   Yes.

Q.   And this is her story, wouldn't you agree?

A.   I would say that she is in these early contacts telling some of the story but whitewashing a lot of her own -- or not being -- she's not volunteering here her own history of beating Billie, her angry temperament, her drinking, she's telling me about other things.  And this is early, you know, this is in a relatively early interview.

Q.   And in this she's telling you about her life with Billie Allen's father; is that right?

A.   Yes.

Q.   This is not a discussion of Marquis Taylor and the shooting; is that right?

A.   It's not limited to Marquis Taylor, you're correct.

Q.   Let's look at the next paragraph.  Is it correct, according to your typed notes from 1998, that she told you, "His mother was fair, with me.  His father was a butthole. He drank a whole lot.  I didn't care too much for him. Stayed away from him.  He was just mean.  He was a provider for his family.  Just mean though.  His mother just took it, she stayed there.  That side of the family is kind of rough."

            THE COURT:  Now, who is talking now?

            THE WITNESS:  Juanita.

Q.   Is that Juanita talking?

A.    Yes.  I think that she's talking about John Allen's father.

Q.    Correct.  Is that right?

A.    Yes.

Q.    Okay.  She's talking about that side of the family, meaning John Allen's side of the family is kind of rough. "We have cousins on that side of the family who are incarcerated, violent."  Is that correct?

A.    Yes.

Q.    And then she says, "His dad wasn't a violent person." She's telling you about John Allen, Billie Allen's father; is that correct?

A.    Yes.

Q.    And she says, "I'd be subject to get violent before his dad would."  Correct?

A.    Yes.

Q.    "Father was passive, leave the child rearing to me." She's talking about Billie Allen's father's attitude; is that right?

A.    Yes.

Q.    And then she told you, "My side of the family, we back each other.  Supportive.  I had dreams of Bill being in college at this time in his life.  Bill can work with things -- it will work out to something that will end up beautiful.  Erica has a drawing that Bill made.  He drew me a

picture.  Really deep, after he was incarcerated."

So you took notes concerning Juanita Allen's account of her family background as well as John Allen's family background; is that right?

A.   She was relating some things about her immediate family to the extent that she was willing to at the time, and then she goes into some detail about John Allen's family.

Q.   And she told you that she was more likely to be violent than John Allen; is that right?

A.   That she did.

Q.   Did that indicate to you that she had been violent with her son, Billie Allen?

A.   That would be something that should have been followed up on either there or in subsequent interviews.

Q.   And that's my question, did you ask her that?

A.   No, I did not.

Q.   Now, asking her that, at that point when she's volunteered that information, that's not going to alienate her, is it?

A.   I -- potentially it could, but maybe not.

Q.   So she told you that -- my question is, when she told you that, "I'm more likely to get violent than he is," did you make a conscious decision at that point, oh, I better not ask her about that?

A.   There was no conscious decision not to follow up there.

That would have been actually a good -- potentially good lead-in to that topic.

Q.    And you've testified that that was critical, family abuse or physical abuse would be critical?

A.    Yes.

Q.    I'm going to go to paragraph 9.  And this once again is Exhibit 411.  And these are your typed notes of interviews with Juanita Allen; is that correct?

A.    Yes, I believe so.

Q.    And she told you: "Bill had no respect for his father, none.  I think that, the last I heard, Bill was selling some drugs, his dad bought some from him.  There was no real bond between them.  This is the way I raised them, I made my bed, have to lie in it.  Whenever you saw me, you saw them."

Did that confirm information that you already had that John Allen was not involved in his son's life?

A.    It is consistent with some information that we had, but it's not fully consistent with what we now know about John Allen and his recruiting Billie into the drug subculture.

Q.    And we're going to get to that, but, first of all, at that time when she told you that -- and was that consistent with what the other people you talked to had said?

A.    I believe so.

Q.    Okay.  And you've referred to "we," information we have.  Who is we?  You said it's not consistent with

information we have.

A.   What we currently now know from the declarations from Billy Wayne Allen.

Q.   And have you read the deposition of Billy Wayne Allen?

A.   No.

Q.   We'll get to that in a little bit.  Let's keep going on this.  Let's go to the last paragraph of 411.  Did she tell you, and did you write that she told you:  "We came to live here after the separation.  My dad was here.  My mom died when I was younger.  My dad would see Bill doing things, he'd correct him.  We worked as a team, can't play one against the other."

     So she told you that Otha Petty, her father, had helped raise Bill; is that correct?

A.   The thing that would require followup here is what she meant by "he'd correct him."  But she is saying they worked in tandem together.

Q.   Did she ever tell you that Otha Petty had physically abused Billie Allen?

A.   No, she did not.  I didn't ask her.

Q.   Looking at Exhibit 410, page 11, these are your handwritten notes of an interview with Juanita Allen; is that correct?

A.   Yes.

Q.   And in it you list the -- her brothers and sisters in

birth order; is that right?

A.   Yes.

Q.   Now, all these people were already known to the trial team; is that right?

A.   I believe they were known, but minimally interviewed or if at all.

Q.   You don't know that?

A.   Well, I know that John talked to Raymond, I believe, and Lucy briefly.  But I never saw interviews from them.

THE COURT:  I'd like to leave about quarter till, not on that clock, it's five minute fast.  Another five minutes if that's a good time.

MS. COSTANTIN:  You want to stop here?

THE COURT:  No.

MS. COSTANTIN:  I can stop at any point.

BY MS. COSTANTIN:

Q.   Let's look at 411, Exhibit 411, the third page.  I think this was pointed out to you before.  Did you see that she told you -- these are your typed notes of the interview of Juanita Allen.  She told you, "You don't want to see me angry."  Is that correct?

A.   Yes.

Q.   Did you take that as an indication that she could be violent?

A.   Yes, I did.

Q.    Did you follow up with her on that?

A.    Not at this time, no.

Q.    So you never asked her at any time about physical discipline or her treatment of Billie Allen?

A.    What I said was, and I believe I said this yesterday, was I didn't close the loop on this lead, on these leads.

Q.    And I'm just asking you a direct question.  Forget about close the loop.  I'm asking you a direct question.  Are you testifying that you never asked her about physical discipline or her treatment of Billie Allen?

A.    I don't believe I did.

Q.    And why is that?

A.    I believe I felt I didn't want to alienate her.  And in hindsight, it looks like I could have pushed it a little further.  But at the time I felt otherwise.

Q.    I'm directing you back to 411, Exhibit 411, page 3.  Did she tell you that, "Monette and Billie and Erica, they played with Jerome and Raymond as if they were one of the kids.  Jerome, Raymond and Bill, they hung out."  Is that right?

A.    Yes.

Q.    And Jerome and Raymond are Billie Allen's uncles; is that right?

A.    Yes.

Q.    And she's describing them as playing with Billie Allen

and hanging out with Billie Allen; is that right?

A.   Yes.

Q.   And she also told you, referring you to 411, that she -- about Billie Allen's medical problems growing up, the fact that there was lead poisoning in the old house?

A.   Lead poisoning, asthma, kidney issues, that he was sickly when younger.

Q.   And that he had to take some steroids for that?

A.   For the kidney issue, I think.

Q.   And that he had personality changes, became extremely moody.  Threw temper tantrums.  The dose was too large.  And that that was in response to treatment for lead poisoning?

A.   That's what she's saying.

Q.   And that -- to go to the next one, that she then "Took him to Homer G. Phillips Hospital, to a Dr. Grabau, who is retired, off of Broadway to a private office?

A.   Yes.

Q.   Now, you never learned anything inconsistent with those statements that she had taken her son in for treatment of lead poisoning, did you?

A.   I believe these were consistent with the medical records that were obtained by counsel.

Q.   And she also told you about his schooling, both in the Clayton and in the City schools; is that correct?

A.   There's a paragraph on school.

Q.    Specifically she told you, "School, early years.  If he wanted to do his work, he did it, if not it didn't get done.  If he took his time, it came easy to him.  If he rushed through it, it was more complicated for him.  Don't know if he went to special ed.  He did okay at Turner Middle School, no complaints, no trouble.  Adjustment to Turner.  No one's any better than you, you're not better than anyone.  After awhile, Bill did want to go back to Clayton.  Sumner High School, started lapsing.  They wouldn't call me."  Is that what she told you?

A.    Yes, this is some of the information from her recollection of the early school years and the school years, yes.

Q.    And she was concerned, obviously, that Sumner was not calling her when he doesn't show up?

A.    And at the same time she doesn't even know if he's in special education or not, so --

Q.    Were you ever able to figure out if he was in special education?

A.    There were several teachers who alluded to him not qualifying for special education.  So that implied to me that he was tested for special education.  However, I was unable to obtain those records.

Q.    So when she said she doesn't know if he went to special ed, that's consistent with what you found out.  You have no

evidence he went to special ed; is that right?

A.   No, typically parents know if their kids qualify for special ed or not.

Q.   Typically the teachers would know that too, right?

A.   The teachers knew that.  The teachers said he didn't qualify.

Q.   So why were you looking for records if you knew he didn't qualify?

A.   Because if they knew he didn't qualify, that means he would have been tested.

Q.   So you wanted to get the records to show that he didn't qualify?

A.   I wanted to get the records on which the ineligibility decision was based, yes.

Q.   And those records didn't exist?

A.   They may exist; we just didn't get them.

Q.   And no one has found them; is that right?

A.   No one has found them.

Q.   I'm directing you to 410, Exhibit 410, page 14.  She gave you the names of some of Billie Allen's teachers; is that right?

A.   Yes.

Q.   Now, those names were also on the school records that had already been obtained; is that right?

A.   I believe so.

Q.   Now, right here we have a line, so this appears that this is a separate interview; is that correct?

A.   It could be phone, it could be in person.  But, yeah, it's a separate contact.

Q.   Okay.  And referring you to the bottom of that exhibit, which is 411, page 3, she told you she'd had headaches for three weeks and she went out to visit Billie Allen to boost his spirits and that he was really down and out; is that right?

A.   Yes.

Q.   So as we've gone through this interview, your notes of the first interview as well as the second one, very little of it actually related to Marquis Taylor's death; is that right?

A.   Correct.

Q.   So her statement that you weren't interested in anything other than Marquis Taylor's death would not be correct?

A.   Her statement?

Q.   Correct.

A.   It would not be totally correct, no.

Q.   And you, of course, would have listened to anything that she had to tell you about herself or Billie Allen; is that right?

A.   Would I have listened?  Yes, of course.

Q.   Now, are you aware that --

THE COURT:  Is this a good spot?

MS. COSTANTIN:  Oh, yeah.

THE COURT:  We'll be in recess until about 1:15.

(Court in recess from 11:51 a.m. until 1:20 p.m.)

THE COURT:  The last question was -- the last two questions:

"And you, of course, would have listened to anything she had to tell you about herself or Billie Allen; is that right?"

"Would I have listened?  Yes, of course."

"Now, are you aware of that --"

MS. COSTANTIN:  Yeah, I think I know exactly where we are.  We're going to take a very slight detour when he brings back copies.  We'll get that on the record and then we'll move back to where we were.  Judge, may I proceed?

THE COURT:  You may.

BY MS. COSTANTIN:

Q.    I'm going to take a detour for a minute because I've been given a letter and then two pages by 2255 counsel.  And I'm going to show it to you on the ELMO, okay?

A.    Okay.

THE COURT:  Has it been identified?

MS. COSTANTIN:  That's what I'm going to ask.

THE COURT:  Okay.

Q.    681, is that a letter from the Jenna Rosania of the

Federal Community Defender Office from the Eastern District
of Pennsylvania dated April 8th, 2009 to you?

A.    Yes, it's a cover letter that accompanied some
documents that they sent me.

Q.    And does that indicate specifically, "I'm sending you a
compilation of our background materials of Billie Allen.
Please review these at your convenience"?

A.    Yes.

Q.    And did that letter include -- I'm going to page 2 now,
and I'm going to go all the way through it.  But does that
letter include two pages of an index of the background
materials that were sent to you in April 2009?

A.    It does.

Q.    And as we go through those, as you indicated in your
prior testimony, you had transcripts of the penalty phase
proceedings; is that correct?

A.    Transcripts of the penalty phase proceedings, records,
and declarations.

Q.    Correct.  And you also had some reports from Dr. Cuneo,
Dr. Gelbort, and Dr. Yutsy; is that right?

A.    Yes.

Q.    And then you indicated that there were some
declarations, and that lists some of them on the bottom of
the page; is that right?

A.    Yes.

Q.    And then the top of the next page, it lists other declarations; is that correct?

A.    It does.

Q.    And to the best of your knowledge, are those the materials that you received from 2255 counsel?

A.    Yes.

Q.    And I'm not just talking about April of 2009, I'm talking about at any time.

A.    You mean prior to my declaration?

Q.    Yes.  I'm sorry, I should limit it that way, prior to your declaration.

A.    Yes.

Q.    So this would -- this confirms what you said before, which is that you did not have your notes, any of your notes or work product at the time that you completed your declaration?

A.    Yes.

Q.    Let me go back for a moment.  Let me go back for a moment to your declaration.  And, I'm sorry, that would be Exhibit 254.  And I'm on page 19 right now.  Paragraph 23, in which you state:

"Perhaps the one statement that most accurately synopsizes the failures of the defense team in this case are contained in Juanita Allen's declaration."

And then specifically I want to direct you to:  "I

told them some information, they seemed to focus on the story about Marquis Taylor and the shooting.  Had they spent more time with me, and asked about my background, problems and those of Billie's father, I would have told them.  But as I said, it's hard for me to discuss these topics."

Is that what she wrote in her declaration?

A.    Yes.

Q.    And we've talked about, based on your review of your notes from your interviews of Juanita Allen, it is not correct that the only discussion was Marquis Taylor and that no one asked about her background problems and those of Billie's father.

A.    Yes.

Q.    But you chose to put that in your declaration and describe it as accurate; is that right?

A.    What I said is, in the declaration this statement says it all.  And what I was capturing there was the feeling, tone of her declaration -- excuse me -- and my impressions of all the evidence, the new evidence that I had reviewed in the other declarations, and the dramatic nature of that evidence. And so literally she did say some things here that were not factually true.

Q.    So when you wrote, "This statement says it all," what it said was your feelings about what happened then and what you learned now.  It wasn't actually factually correct?

A.    In terms of literally correct?

Q.    Yeah, in terms of you only focused on Marquis Taylor and didn't ask about her background problems and those of Billie's father, that is not true?

A.    It captures the essence of what was missed by us during the first go-around.

Q.    Did you ask about her background?

A.    During the penalty phase or during my --

Q.    In your notes.

A.    Yes.

Q.    Do your notes reflect that you asked about her background?

A.    Yes.

Q.    Do your notes reflect that you asked about problems and those of Billie's father?

A.    There were several areas that were touched on in that interview --

Q.    Okay.

A.    -- that are over and above simply the Marquis Taylor information.

Q.    And specifically they included information about her background problems and those of Billie's father; is that right?

A.    That was part of it, yes.

Q.    Okay.  So it is incorrect that you all never talked to

her about those topics?

A.    Technically it is incorrect because we did talk to her about those topics.

Q.    Okay.  What does that mean "technically it's incorrect"?

A.    What I'm trying to capture here in this paragraph is the sense that there was a huge amount of information that was missed by us, really critical information during the first go -- during the penalty phase, during the preparation of the case, like the sort of bird's eye view or the insider's view of the abuse in the Allen home in particular.

Q.    So what you're saying, as you said before, you're trying to capture the feeling, but you weren't actually factually correct?

A.    Factually I would have to agree with you.

Q.    Okay.  Now, are you aware that Juanita Allen testified in her deposition that she had no reluctance to hold back or hide anything from the trial team?

A.    I recall that, yes.

Q.    And I'm going to refer you specifically to -- not that part, did you read her deposition?

A.    Yes, I did.  Yes.

Q.    So is it correct that in the deposition she was asked:

       "As you sit here today, you don't recall that you had any reluctance to hold back or hide anything from the old

team at the time?"

And her answer was:  "I'm not a hider, no."

And the question:  "That's even back in 1998?"

And her answer was:  "That's always been me."

A.   She in that deposition conveyed the fact that if she was asked, she would have told it.

Q.   And that's what she --

A.   In several places.

Q.   And I'm going to go to one of those other places.  I'm sorry, we're on page 132.  The exhibit is 529.  And she was asked in that deposition, and you've read that, she was asked:

"So if someone had asked you in 1998, did you used to beat Billie with a belt, or in your words get carried away, you would have readily told them yes?"

And her answer was, "Yes."

Is that correct?

A.   Yes.

Q.   And then she was asked, "That wouldn't have been hard for you to admit?"  And her answer was, "Not at all."

A.   Correct.

Q.   And she was asked, "Why not?"  And her answer was, "Because I'm even with drinking or not drinking, I'm a strong person of whatever is hidden in the dark is going to come to the light."  And the question was, "I'm sorry?"  And the

answer was, "Whatever is hidden in the dark is going to come to light. Therefore, that's who I am." Now, do you recall reading that that was her answer?

A. Yes, that's what she said in her deposition.

Q. Thinking back on the Juanita Allen that you knew and interacted with in 1998, do you believe that statement?

A. Do I believe what she's saying here, had I asked her, would she have told me?

Q. Right. Knowing her, the person you knew back in 1998, you described a hard woman?

A. Right.

Q. Do you believe that?

A. Do I believe that she was a hard woman or do I believe --

Q. Do you believe that statement, that if she had been asked, she would have readily told?

A. I'm accepting what she says here as her stance.

Q. So based on what you knew about her back then and your interaction with her, you believe that if you had just asked her, she would have told you?

A. I didn't say that. Oh, now? Knowing -- okay. I wasn't able to read her mind back then. But what I know now, that she has no shame about telling me what was going on, knowing now what I know, I would have asked her.

Q. So what you're saying is at that time based on all the

interaction that you had with her, you believe that she's the kind of person who if you had just asked her, she would have told you?

A.    Back in 1998, I didn't feel that way.  Now knowing what she says here, I see that my impression was mistaken back in 1998.

Q.    I'm sorry, I didn't mean to interrupt.  Go ahead, I'm sorry.

A.    My impression of her of someone -- my impression of her and how hard I could have pushed her back then in terms of revealing personal secrets and things like that, my impression of her back then was incorrect knowing what she's saying now.

Q.    Was it incorrect or was it at odds with what is being said here?

A.    Well, I felt -- most people feel a sense of shame when they are asked things about this.  And while she alluded to, I'm an angry -- what did she say?  She alluded to being an angry person in my interview, and she said something about --

Q.    She was more likely to get violent than her husband.

A.    More violent than her husband.  Okay.  I, at the time, did not want to alienate her and I did not pursue those leads.  I did not follow up with questions that could have been followed up on.  I think that in a typical case with a typical time frame, I would have gotten around to that.  But

at the time, I didn't calibrate -- given that this was a new situation for me, I did not calibrate my approach to the case effectively given the time frame involved.

Q.    And so you never asked her whether or not she had been violent with Billie Allen?

A.    Correct.

Q.    And your impression of her at that time was that asking her that question would alienate her?

A.    I thought it could potentially alienate her, yes.

Q.    Let me talk to you about an interview with Billie Allen.  I'm showing you 621.  Is that your handwritten notes --

A.    Yes.

Q.    -- of an interview with Billie Allen?

A.    It is.

Q.    I want to go to the second page.  Does that contain Billie Allen's description of boxing with his Uncle Jerome?

A.    It does.

Q.    And does it state:  "One time me and my Uncle Jerome boxing in back yard.  Fell and hit head on bench.  I had to go to the hospital.  Went to hospital, ask" -- was that mom -- "mom or Jerome.  Lost consciousness for a few seconds." Is that right?

A.    Yes.

Q.    So that was his description of what had occurred

between him and his Uncle Jerome in boxing and a head injury; is that right?

A.    Yes.

Q.    He did not tell you that Uncle Jerome had physically abused him or beaten him in that situation?

A.    Not during one of these early interviews, no.

Q.    Did he ever tell you?

A.    I don't believe he ever told me, no.

Q.    Did Billie Allen ever tell you that anyone physically abused him?

A.    I never asked him.

Q.    Did he ever tell you that anyone had physically abused him?

A.    No.

Q.    Now, you didn't get the sense that Billie Allen would shut down on you if you had asked him about abuse, did you?

A.    Not particularly, no.

Q.    Okay.  You just don't recall if you ever asked him about the abuse; is that right?

A.    I don't think I got around to, like I said earlier, closing the loop and getting into it with him, no.

Q.    And what I'm asking you is, do you recall that you never asked him or do you simply not remember if you asked him?

A.    If I asked him, I would have likely -- I would have

written it down.

Q. Even though we've seen those other things that people said, based on other people's notes that you did not write down, correct?

A. I believe I wrote down what people told me.

Q. Now, wait a second. We looked at those interviews in which Mr. Sindel was present and Mr. Simon was present; is that correct?

A. Yes.

Q. And there were statements written down there that were not within your notes; is that correct?

A. And vice versa, yes.

Q. Okay. So there were times when you did not write down everything that a person told you. I'm not saying there's something nefarious about it, I'm just saying, I mean, isn't that self evident?

A. In that case, yes.

Q. Okay. All right. So merely the fact that you didn't write something down doesn't mean that it didn't happen?

A. Technically correct.

Q. Okay. And, in fact, in your deposition, you were asked: "I'm not going to beat a dead horse, but you just don't remember whether or not you asked him about abuse?" And your answer was, "I don't remember." Is that right?

A. Yes.

Q.   But as I show you 368, which is your affidavit that you filed with the Court concerning what a mitigation specialist shall do, one of the things a mitigation specialist shall do is ask about abuse of the client, including physical, sexual, or emotional abuse; is that right?

A.   Those are areas you want to pursue, yes.

Q.   I mean, isn't it true, Dr. Randall, that you did ask him, and he said nothing happened, and there was nothing to pursue?

A.   I would not agree with that.

Q.   Okay.  You would just have completely ignored to go into an area that you told the Court that you were going to go into?  You filed this affidavit, Exhibit 368, and one of the things you told the Court you were going to inquire about with the client was abuse of the client, including physical, sexual, or emotional abuse, and you just didn't go there?  You just didn't -- even though you said you were going to do it, you just didn't do it?

A.   With the time frame allotted, I did not do it with the client.  However, some of those issues were touched upon with collaterals who testified.

Q.   And those would be?

A.   People like Raymond Petty and others who testified about the mitigation themes on the list.

Q.   About abuse of the client including physical, sexual,

or emotional abuse?  Is there someone who testified about that besides Raymond Petty?

A.    The physical abuse instance that Raymond Petty testified to is the one that stands out right now as I sit here.

Q.    Was there anybody else who testified about physical abuse?

A.    Not that I'm aware of.

Q.    Okay.  In fact, we talked about this morning how Deborah Ruffin, Shimeka Taylor, and Sam Moore had told you about what they are describing as physical punishment, and they never testified about that, correct?

A.    They are describing abusive situations that they did not testify about.

Q.    But they did tell you about?

A.    Yes.

Q.    Did any of the witnesses you interviewed tell you that Billie Allen started selling crack when he was 14 years old?

A.    Off the top of my head right now, I don't have a catalog of what everybody told me.

Q.    Do you recall asking anyone if Billie Allen sold drugs?

A.    I think that information came out through some -- in some of the interviews.  I don't recall specifically who.

Q.    Did any of the witnesses tell you how much money he was making from selling drugs?

A.    I believe that -- I recall somewhere now, having my memory refreshed, that it might have been Eric Taylor, it might have been -- where he allegedly stole some money from somebody, it might have been a drug dealer, so --

Q.    So did anyone that you recall tell you, any of those witnesses tell you how much money Billie Allen was making from selling crack, not from ripping off drug dealers, but from selling crack?

A.    As I sit here right now, I don't have that cross-reference in my mind, I don't recall.

Q.    I'm showing you Exhibit 634.5.  That's the fifth page of Exhibit 634, which has already been admitted as a transcript of the interview -- an interview of John Simon by Billie Allen.  Do you see that in front of you?

A.    I do, yes.

Q.    And he told him that -- Allen said that:  "He" -- referring to somebody else -- "had a little package for someone, you know and --"

        "A package?"

        "Yeah, I dropped something off."

        "Simon:  Dope?"

        "Allen:  I don't know what it was.  I didn't look in it, you know.  Somebody just said, drop this off for me, so I dropped it off."

        "Simon:  For $4,000?"

"Allen:  $4,000."

"Simon:  You figure it was china?"

"Allen:  It was $4,000.  All I was thinking about was getting my tape done.  I wasn't really tripping off of it."

Do you have an awareness that he had told John Simon that he made $4,000 as a mule for a drug dealer?

A.    I was not privy to this, but it would not surprise me.

Q.    And are you aware that Billie Allen told John Simon that the house had been shot up, his house had been shot up over a drug deal that went bad?

A.    I knew the house had been shot up, and I knew or suspected it was around the drugs.

Q.    And isn't it true that Billie Allen told John Simon that he was, in fact, selling drugs?

A.    It says so on page 38 here.

Q.    Right.  Is that correct?

A.    This is what this transcript says.

Q.    Right.  And that's what Mr. Allen told Mr. Simon?

A.    Yes.

Q.    And he explained to him about how -- this is Mr. Allen explaining to Mr. Simon.  "Let me see.  Okay, it was a -- okay, right down the street from my mom's house, there was this, there was this house.  I mean, they made so much money, obviously.  It was cars, different kind of cars in front of

their house.  And kind of things.  And they were selling little drugs.  And, you know, I could get the same thing they were getting except a little more."  Is that correct?

A.    That's what he's relating to Mr. Simon.

Q.    And did you ever ask him about that?

A.    No, I don't believe so.

Q.    And do you recall -- does the transcript reflect that the interview between Mr. Simon and Mr. Allen -- I'm referring now to Exhibit 635.4 -- Mr. Simon asked him:

         "Now, who, uh, so like, that was the first time that you got involved in selling drugs was at his down the street?"

         And Mr. Allen's response was:  "Yeah, because okay, the thing was, they were making a lot of money and, you know.  And a guy I knew had his, and he was like, (inaudible) you know, they, they doing something down the street, you know.  I can hook you up with this and we can, you know, we can make a lot of money down there.  So I was like cool, you know.  So (inaudible).  So he gave me (inaudible).  He gave me 200 and (inaudible) dollars worth.  He told me to bring back 275.  I made like 200 off it.  After that I started buying my own." Is that --

A.    That's what it says.

Q.    Is that true?

A.    That's what it says here.  I don't know if it's true,

but that's what it says.

Q.   Well, it's true that that's what he told John Simon; is that right?

A.   Yes.

Q.   Did you have a reason to doubt Billie Allen when he said that he was dealing drugs?

A.   Do I have reason to doubt Billie Allen when he said to John that he was using drugs?

Q.   Right.

A.   This account right here?  I believe that Billie was dealing drugs.

Q.   Okay.  Now, that's not the -- and let me just ask, and he also indicated -- Billie Allen indicated to John Simon that he was dealing drugs while he was in school; is that right?

A.   That's what it says here.

Q.   Okay.  "Just come home, do my homework, go outside and make a little money and come back in."  Is that his description?

A.   Yes.

Q.   So you knew that Billie Allen was a drug dealer?

A.   Yes.

Q.   Okay.  But that's not the evidence that was presented at trial, was it?

A.   At the guilt phase?

Q.    At the guilt or the penalty phase.

A.    I think that --

Q.    I'm showing you Exhibit 218, page 37 of 218.

A.    Okay.

Q.    Which is the -- here, we'll go to the closing argument by Mr. Dowd.

A.    Okay.

Q.    And then we'll get to the closing argument by Mr. Sindel.  Right.  Closing argument by Mr. Sindel?

A.    On page 65, right.

Q.    Right.  And I'm going to go to page 37 of Exhibit 218.

A.    Page 77?

Q.    Right.

A.    Okay.

Q.    It's page 77 of the transcript, it's page 37 of the exhibit.

A.    Okay.

Q.    Do you see that Mr. Sindel argued, "They couldn't find a single person that said Billie Allen ever sold drugs to him.  There may be some peppermint candy floating out there, but in terms of this significant criminal history, take a look at it and think about what you heard."  So specifically that evidence was not presented at trial, correct?

A.    The evidence that Billie was a drug dealer?

Q.    Right.  You kept that out.  Or do you just not

remember?

A.    I know that the -- if I recall, the information that I wanted to use from Dr. Wuertz did have a reference to Billie using or dealing drugs.

Q.    Right.  I showed that to you yesterday, right?  He said he told Dr. Wuertz he had been dealing drugs since he was an adolescent; is that right?  Do you remember?

A.    Right, yes.  So I wouldn't call it mitigation.  I mean, it's not a mitigation theme that he was dealing.

Q.    Right.  I mean, that's something you wanted to avoid, correct?

A.    To be quite honest, from my perspective, it's not -- this is going to sound potentially bad, but in the context of a death penalty case, when relatively speaking, I don't believe that is a significant criminal history.  It's not -- it's a nonviolent offense.

Q.    I'm not arguing -- I'm sorry, are you done?

A.    Yes.

Q.    I'm not arguing about whether it's a violent offense or if it's significant criminal history.  My point is just that there is information that you learn from witnesses or from Billie Allen that you made a decision not to put on.  And when I say "you," I mean the trial team.

A.    Okay.

Q.    Isn't that true?

A.    That would be probably accurate, yes.

Q.    Now, I want to talk to you for a moment about your activities as a mitigation expert.  I'm going to direct you to Exhibit 366, which is it correct that that is a fax from you to Mr. Simon on February 4th of 1998?

A.    Yes.

Q.    And does that indicate that you -- that you're telling him, "We need to get an MRI and neuropsychological assessment conducted on Billie because there have been events in his life that suggest the existence of brain impairment or injury"?

A.    Yes.

Q.    And, in fact, Dr. Gelbort was hired to do a neuropsychological assessment; is that correct?

A.    Yes.  Yes, he was.

Q.    And I'm going to show you 370, and then also 371.  Let's first go back to 370.  Does 370, is that a fax dated February 7th of 1998 from Mr. Simon to Kim at Radiology?

A.    Yes.

Q.    And is that the setting up of the MRI?  "Subject: Billie J. Allen, MRI."

A.    Either setting up or information about setting it up, or information -- yeah, it's about -- it's relevant to or pertaining to an MRI at some point.  I'm not quite sure about what point or what the rest of it says.

Q.    What, you're not sure what the rest of it says?  What do you mean?  "The radiologist's name for this job is Ronald I. Grams per Doris Lehman at Wash U."  Is that what that says?

A.    That's what it says.

Q.    So that appears to be setting up an MRI for Billie Allen; is that right?

A.    I'm not sure.  Possibly.

Q.    And I'm showing you 371.  Is that a notation to John, as in John Simon, indicating what the cost of a PET scan would be?

A.    Which is different than an MRI.

Q.    Correct.

A.    Yes.  It says $463 to have a doctor read it.  Don't know how much for the actual test.  Must be requested by an M.D.  Gelbort can't do it.

Q.    Now, in fact, the MRI and PET were canceled; is that right?

A.    I don't believe they were pursued.

Q.    And I'm directing you to Exhibit 379.  Does it indicate that the MRI -- I'm sorry, let me show you exactly what this is.  379, is that a letter from John Simon to Dr. Michael Gelbort?

A.    Yes, dated February 15th, 1998.

Q.    And does that indicate that based on Dr. Gelbort's

advice, the MRI was canceled?

A.    Correct.

Q.    And it was canceled because Dr. Gelbort believed that it would not show organic brain damage; is that right?

A.    He canceled -- he suggested canceling it because it wouldn't be the type of test that would be sensitive to the type of damage that Billie might have, therefore --

Q.    Right, an MRI -- I'm sorry.

A.    Therefore, it was canceled.

Q.    It was canceled because an MRI was not going to show organic brain damage?

A.    Not organic brain damage of the type that Billie potentially had.  It would show brain damage, let's say, if someone was in -- a more obvious brain damage like subsequent to a car accident or something, more severe head trauma.

Q.    Do you remember in your testimony back in June testifying that Dr. Gelbort believed that the impairments that Billie had would not be evident in an MRI even if there were impairments there; is that right?

A.    That's correct, yes.

Q.    And then the question was asked:  "Did Dr. Gelbort ever give an indication to you that Mr. Allen didn't have -- did not have brain impairments?"  "Did he give an indication he did not have brain impairments was your question, right?" You asked the question back; is that correct?

A.    Let me just look at this real quick.  I'm sorry.

Q.    I'm sorry, you want me to go back to the previous page?

A.    Yes, please.  Okay.

Q.    My question -- we can go through all this, my question is basically the reason the MRI was canceled was because of Dr. Gelbort's opinion that it wouldn't show the type of damage that he believed Billie Allen had; is that right?

A.    I would agree with that, yes.

Q.    It was not canceled because of time constraints?

A.    Correct.

Q.    Okay.  And you were the person who recommended Dr. Gelbort; is that right?

A.    I recommended Gelbort and another neuropsychologist, and ultimately the team went with Dr. Gelbort.

Q.    And you had recommended Dr. Gelbort based on his reputation for cases he'd worked on in Chicago; is that right?

A.    Yes.

Q.    And that's where you were working at that time was in Chicago at the time of this case, the Chicago area?

A.    I was based in Chicago, yes.

Q.    Now, you wouldn't have recommended him as an expert to the trial team if you thought he was incompetent, would you?

A.    Not if I was aware of that, no.

Q.    And when you saw Dr. Gelbort's report, there was

nothing in that report that said to you, this is incompetent, this is unprofessional?

A.   At the time --

Q.   That's what I'm talking about.  Let's leave hindsight out.

A.   I'm thinking to myself.  I didn't finish my thought. At the time when I looked at Gelbort's report, I was not putting a lot of energy into the experts per se, I was running around doing other things.  So I saw the report.  I knew that he, I believe, found some brain impairment, and then I was sort of off doing my thing in terms of continuing the mitigation investigation.

Q.   Do you recall stating at your deposition: "We were happy to get the report and the team went with the report"?

A.   We were happy to get a report, any report at that point.  And then, yes, we accepted the report as it was.

Q.   And you saw him testify at trial; is that correct?

A.   I'm not sure if I did or not.  I might have been running in and out at that point.  I'm not sure.

Q.   Let me go back to the very beginning just for a moment. It was your understanding that John Simon was primarily responsible for the mitigation; is that right?

A.   No, just in the very beginning.

Q.   I'm talking about when you first -- I said let me go back to the beginning.

A.    Oh, okay.

Q.    So when you first got involved, it was your understanding that he was primarily responsible for mitigation; is that right?

A.    Yeah, I thought they were going to split the phases.

Q.    But once you got involved in the case, you were the one who believed it would be more efficient if one person did all the interviews, which was you, correct?

A.    Yes.

Q.    I want to go to 254.8, which is your page 8, which is your declaration, paragraph 11.  I'm going to start on the bottom part.  Hold on.  We'll just do it with this, this is fine.  I'm starting with the portion that says, "Therefore."

A.    Okay.

Q.    "Therefore, because of the acrimony between Mr. Allen's mother and father, and the compressed time frame, my attempts to reach out to family members on the father's side were limited."  Is that right?

A.    Yes.

Q.    "This has proved to" -- and I'm going to go to the next page -- "This has proved to be a serious shortcoming, given what the current counsel have uncovered from the father's side."  Is that right?

A.    Yes.

Q.    Now, in fact, the only new information from the

father's side is from Billy Wayne Allen; is that correct?

A.    That's -- yes.

Q.    There's not any other person on dad's side that you're aware of who had new information besides Billy Wayne Allen?

A.    Not information that I was provided, no.

Q.    And you were provided -- well, first of all, let's talk back in 1998.  You had contact back with Billy Wayne Allen back in 1998, didn't you?

A.    I don't recall.

Q.    Would you ever -- let me ask you this:  Who else was contacting mitigation witnesses during the time you were in the case besides you?

A.    Well, I learned yesterday that Rackers was.

Q.    Right, those two folks.  So you think Rackers had contact with Billy Wayne Allen?

A.    I don't know.

Q.    Okay.  Would you ever tell a witness, if you don't have anything good to say, stay away from the trial?

A.    That's not what I would say to a witness.

Q.    So if Billy Wayne Allen testified in his deposition -- or I'm sorry -- if Billy Wayne Allen testified that someone had told him, "If you don't have anything good to say, stay away," it wasn't you?

A.    Correct.

Q.    Now, your only knowledge of any information from Billy

Wayne Allen was from his declaration; is that right?

A.    I believe so.

Q.    Are you aware that he was deposed?

A.    I am now.

Q.    Have you reviewed his deposition?

A.    No.

Q.    Are you aware that he's recanted statements from his declaration in his deposition?

A.    I'm not aware of that.

Q.    I'm going to Exhibit 528.50.  Do you see that he was asked the question -- and 528.50, I'm sorry, is the deposition of Billy Wayne Allen.  Do you see that he was asked the question: "When Juanita was living downstairs with Junior, did you ever see Juanita hit Billie?"  And Billy Wayne Allen stated, "Not that I was aware of."

A.    So when Juanita was living downstairs with Junior, which is John Allen, --

Q.    Right.

A.    -- did you ever see Juanita hit Billie?  And he says, "Not that I'm aware of."

Q.    Right.  So when she's living with Junior, Billy Wayne Allen is not aware of Juanita Allen hitting Billie Allen, right?

A.    Can you scroll up again?  Can I see what that statement was again, please?

Q.    Sure.

A.    That you highlighted.  Oh, okay, I see it.

Q.    I can't see it on this screen, so I can't tell.

A.    Yeah, I see it.

Q.    So he's saying when she was living with John Allen --

A.    "Did you ever see her hit Billy?"  And he says, "Not that I'm aware of."

Q.    Okay.  And then I'm going to direct you to 528 at page 59.  I'll have you look through the whole thing so I can see.

      "Now, when I look at that sentence" -- that's referring back to his declaration -- "it says you used straps, shoes, broom handles, pretty much anything that's around.  Now, that's what your parents were using?"

      And his answer is:  "Right."

      And the question is:  "You're not saying that's what you saw JR or Juanita --"

      "Exactly.  I'm just saying that he slapped him" -- meaning John slapped Billie -- "that I saw."

A.    Okay.

Q.    Okay.  And now I'm directing you to page 46 of Exhibit 528.  And the question was:  "Did you ever see JR" -- referring to John Allen -- "hit Billie with an extension cord?"

      And the answer was:  "Never, I never saw anything

like that.  I saw him slap him upside his head a couple times."

        Is that right?

A.    Yes.

        THE COURT:  This is the deposition?

        MS. COSTANTIN:  This is the deposition of Billy Wayne Allen, that's Exhibit 528.

BY MS. COSTANTIN:

Q.    And Billy Wayne Allen is the witness who you said had new information from the father's side; is that right?

A.    Yes.

Q.    And that was based on you reading the declaration?

A.    Correct.

Q.    And that new information was that Juanita Allen and John Allen had beaten Billy Wayne Allen; is that right?  Is that part of the information?

A.    That was only a segment of the information.

Q.    But now we see that Billy Wayne Allen in his deposition apparently has recanted that; is that correct?

A.    Recanted?

Q.    The fact that Juanita Allen hit --

        MR. MONTROY:  Your Honor, we just object to the characterization.  If it's different, it's different, whether he recanted or not.

        MS. COSTANTIN:  I'll rephrase.  I'm sorry.

BY MS. COSTANTIN:

Q.    But now we see Billy Wayne Allen testified under oath in a deposition that he never saw Juanita hit Billie Allen when she was living with Junior, John Allen, and he never saw Juanita Allen beat her kids?

A.    What he's saying is he saw his dad slap him upside the head.

Q.    That's it, correct?

A.    That's what he's saying.

Q.    So to rephrase, he's saying that he never saw Juanita Allen hit the children?

A.    That's what he's saying.

THE COURT:  I'm really confused.  I mean, are you saying this is Billy Wayne Allen's deposition?

MS. COSTANTIN:  Yes, I am, Your Honor.

THE COURT:  Because is he speaking of himself in the third person?

MS. COSTANTIN:  Billy Wayne Allen is the uncle.

THE COURT:  Okay.

MS. COSTANTIN:  I'm sorry.  I apologize.

BY MS. COSTANTIN:

Q.    Billy Wayne Allen was John Allen's brother; is that correct?

A.    Yes.

Q.    And when you said the only --

A.    Billie's uncle.

Q.    I'm sorry?

A.    His paternal uncle.

Q.    Right.  He was John Allen's brother?

A.    Yes.

Q.    Billy Wayne Allen is John Allen's brother.  And Billy Wayne Allen is Billie Allen's uncle?

A.    Correct.

Q.    Okay.  And you indicated in your declaration that your investigation of the father's side of the family was limited and was a serious shortcoming given what current counsel have uncovered from the father's side; is that correct?

A.    Yes.

Q.    And then you agree that the only new information that's been uncovered is information from Billy Wayne Allen; is that correct?

A.    Yes.

Q.    And that information that you believe was uncovered was contained within a declaration that was sent to you?

A.    Correct.

Q.    Now I am showing you a deposition of Billy Wayne Allen; is that correct?

A.    Yes.

Q.    Okay.  And in the deposition do you see that he states that he never saw Juanita Allen hit Billy Wayne Allen -- I'm

sorry, he never saw Juanita Allen hit Billie Allen?

A.    Okay.

Q.    Thank you.  I'm sorry.  That was not a trick question.

A.    Okay.

        MS. CARLYLE:  Billie Jerome.

        MS. COSTANTIN:  No, it doesn't help because we never referred to him as Jerome, so it doesn't help.

Q.    And he also states that he never saw John Allen strike his son, Billie Allen, with straps, shoes, or broom handles, that he saw him slap him a couple times; is that right?

A.    Slap him upside the head, yes.

Q.    And I'm now going to direct you to -- do you recall one of the things you referred to, I don't remember if it was on direct or cross, that Billy Wayne Allen had indicated -- that Billy Wayne Allen, the uncle, had indicated that Billie Allen, the defendant, had worked for him as a drug dealer; is that right?

A.    Yes.

Q.    And that was something that you recalled from the declaration of Billy Wayne Allen?

A.    Yes, I do.

Q.    So I'm showing you now page 54 of Billy Wayne Allen's deposition.  And do you see at the bottom?  Referring to -- the questions refer to Mr. Billy Wayne Allen's declaration. And the question is:

VIII - 131

"Then it says all we could think about was selling our drugs so that we could have enough to buy more drugs so we could stay high.  I just remember looking up one day, and Billie was working with us and for us.  This occurred before he was a teenager."

Do you recall that being part of Billy Wayne Allen's declaration?

A.    Yes, I do.

Q.    And then Mr. -- Billy Wayne Allen says to me:

"Where do you see that at?  Eight?"

And my questions is:  "Eight.  Yeah.  Sorry.  The last couple sentences of eight.  All we could think about selling our drugs, the last three lines?"

"Yes.  But Billie never worked for me or with us. That's wrong."

"So that's not correct, Billie never worked for you?"

"That's not correct."

So do you see that Billy Wayne Allen denies that Billie Allen ever worked for him or his brother selling drugs?

A.    I see that it says that there, yes.

Q.    So if that is true, what is stated in Mr. Billy Wayne Allen's deposition, would that cause you to reevaluate your statement in your declaration that your efforts to contact

Billie Allen's father's side resulted in what you described as a serious shortcoming given what current counsel have uncovered from father's side?

A.   I still believe that it is a serious or was a serious shortcoming not to have pursued witnesses on the father's side.

Q.   And what evidence do you know of that has been developed from Billie Allen's father's side?

A.   Based on Billie's exposure to the drug dealing subculture, his father and uncle being apparently drug addicts, and being around them, at the minimum, I would want to pursue that more.

Q.   Didn't Billie Allen tell you when you interviewed him that he had nothing to do with his father's side of the family?

A.   I didn't take that at face value.

Q.   And didn't Juanita Allen tell you that he had nothing to do with his father's side of the family?

A.   That's her account.

Q.   And --

A.   But that would not preclude me from investigating that side.

Q.   And didn't various other people that you talked to say that -- including his sister say they had nothing to do with the father's side of the family, except for the grandma?

A.    These -- Billy Wayne Allen is saying that Billie hung around with the father and him.  So there's different people saying different things.  And these are things that should have been pursued further in the investigation.

Q.    And Billy Wayne Allen is saying that he never saw Juanita hit, even though his declaration states that, is that correct?  Did we just see that from the deposition?

A.    Yeah.  We went over that, yes.

Q.    And he never saw either Juanita or Billie Allen's father hit with straps or cords or extension cords, right?

A.    Brooms, whatever, yeah.

Q.    Right.  Okay.  So it's your contention that even though all those things within his declaration are apparently not true, that that was still a serious shortcoming?

         MR. MONTROY:  Objection, Your Honor, not all those things that were just mentioned are actually in the declaration.  So if you just point to specific examples of things that are in the declaration that differ from the deposition testimony, that's fine, but to encompass everything that's been asked of this witness regarding Billy Wayne Allen, not everything is inconsistent.

         MS. COSTANTIN:  Judge, I believe I've listed what --

         THE COURT:  Well, I want to make sure I get this right.  I understand the question pertains to the fact that there was no -- that even though there was no evidence --

even though there was evidence from Billie Allen and his mother that Billie had nothing to do with the father's side, and that it's Dr. Randall's position nevertheless he should have further investigated the father's side.  But what was left out of the question, the example that Ms. Costantin asked that you think --

MR. MONTROY:  Sure.  Your Honor, there is nothing in Mr. Allen's -- Billy Wayne Allen's declaration that talks about -- I just want to be accurate on this, that talks about him seeing Juanita hit Mr. Allen.  And there's nothing in his declaration about seeing Junior, Billie's father, hit him with an extension cord.  That's not in his declaration, so it's not inconsistent with the testimony.

BY MS. COSTANTIN:

Q.    Okay.  I'm going to show you 261.  Is that the declaration of Billy Wayne Allen?

A.    Yes.

Q.    And is that the declaration that was sent to you?

A.    Yes.

Q.    I'm going to go to page 3 of that declaration, and I want to direct your attention to paragraph 7.  Does that declaration state, "She used to get the best of my brother when they fought," referring to Juanita Allen and John Allen; is that right?

A.    Yes.

Q.   "They fought in front of the children, drank and cussed, and Junior and I used drugs in front of them too." Is that what is written there?

A.   Yes.

Q.   "They also beat their kids, just like we got beat by our parents who would use straps, shoes, broom handles and pretty much anything that was around."  Is that what is contained within Billy Wayne Allen's declaration?

A.   Yes.

Q.   In fact, we just saw that Billy Wayne Allen in his deposition stated that he never saw Juanita Allen hit Billie Allen when -- either when she was living with John Allen or when she was on her own in the house with her father; is that correct?

A.   He's saying that he has never seen it.

Q.   That's correct.  Okay.  So in a declaration he states, "They also beat their kids just like we got beat by our parents who would use straps, shoes, broom handles and pretty much anything that was around."  And in his deposition, as we just read, he says that's not correct.  Didn't we just see that?

A.   He said that he didn't see it, right.

Q.   Ah, so is that your interpretation of it?

A.   Possible.

Q.   Possible.  So even though in his deposition he said he

never saw that, you still believe that the declaration is valid because he might have meant that he, what, heard it?

A.    There's a lot of other information in the declaration that goes to the domestic violence in the household and other things not necessarily related to beatings.  And I would want to pursue more, you know, how does he know, did he hear it, did he hear of it or did it not happen?  I mean, you know, I would want to explore it further.

Q.    So would you put a witness on the stand who just heard that something happened?  Would that be admissible evidence?

A.    Maybe at a hearing it might be.

Q.    What kind of hearing?

MR. MONTROY:  Your Honor, I'm just going to object as to whether or not it's admissible evidence.

THE COURT:  Well, you know, this is really troubling to me.  I mean, you have his declaration that says all these things.  And then you have the deposition under oath that says clearly to the contrary.  It just seems that the witnesses' answers ought to be more specific as to saying technically and maybe or something hearing, it's just -- I just don't believe what he's saying.  I'm telling you, I don't believe this man.  And I just wish he'd say, yeah, well, that's what it says or you know -- this business about trying to -- trying to reconcile these two totally inconsistent things just doesn't make any sense.  So proceed.

BY MS. COSTANTIN:

Q.    Dr. Randall, did you ever talk to Billy Wayne Allen that you recall?

A.    No.

Q.    So all you know -- and when you wrote your declaration about how important Billy Wayne Allen's evidence would be was this declaration; is that right?

A.    Yes.

Q.    You were not aware of a deposition where he makes statements to the contrary?

A.    That contradict parts of it, yes.  I was not aware of that deposition or I had not read it.

Q.    Now, I want to go to your declaration, 254.  And I want to go specifically to paragraph 16.  And the portion that states in your declaration, "And as Dr. Cuneo's report indicates, his sole contact with Mr. Allen was for the purpose of determining his trial competency, and not mitigation."  Is that what you wrote in there?

A.    Yes.

Q.    Okay.  Now, in fact, Dr. Cuneo conducted a mitigation evaluation of Billie Allen on February 22nd; isn't that true?

A.    I'm not sure if as I sit here --

Q.    Well, let me show you Exhibit 384.

A.    Okay.

Q.    Dated 2/22.  Are those Dr. Cuneo's notes of his

interview with Billie Allen?

A.    Yes.

Q.    So he did conduct a mitigation interview of Billie Allen on February 22nd?

A.    Okay.  To clarify, is this after his written report?

Q.    Yes, it is.

A.    Okay.  Okay.

Q.    His written report was February --

A.    -- 16th, I think.

Q.    Yeah.  Is that right?

A.    Yes, this is 2/22.

Q.    So when you wrote in your declaration that Dr. Cuneo's sole contact with Mr. Allen was for purpose of determining his trial competency and not mitigation, in fact, that is incorrect, that he did have an evaluation interview of Billie Allen regarding mitigation issues?

A.    Okay.  The report -- okay.  I might be confused on this, but the report on the 16th --

Q.    Let's do this, let's let you see the whole paragraph about what you said about --

A.    Okay.

Q.    My question is simply, in -- isn't it correct that you wrote in your declaration that Dr. Cuneo's sole contact with Mr. Allen was for the purpose of determining his trial competency?  And that, in fact, is not correct.

A.    You're correct, that is not correct.  He had two contacts.

Q.    And did you write that or did Mr. Wiseman write that statement?

A.    I think it was Mr. Wiseman.

Q.    And you, based on what I see -- let's go flip to the ELMO for a second, please.  Based on what I see, I'm showing on the ELMO, let me just call this Exhibit 681.  The background materials provided to you.  You were provided with Dr. Cuneo's report, but you were not provided with those notes from February 22nd; is that true?

A.    I believe so.  I believe that's true.

Q.    So you weren't provided with the material for you to verify or find incorrect the statement that "Dr. Cuneo's sole contact with Mr. Allen was for the purpose of determining trial competency and not mitigation"?

A.    It's probably something I should have known given that Dr. Cuneo's report was on January 16th, which was before or as I became involved.  And then I knew Dr. Cuneo saw him again.  So it's something that I should have known.

Q.    And you should have not put that in -- or how did you -- when you were revising the declaration, you should have caught that and corrected that incorrect information?

A.    Yes.

Q.    Now, I want to go back to -- but you did not do that,

right?

A.    You're right.

Q.    I'm showing you your declaration again, 254, Exhibit 254, paragraph 12.  "I recall that in subsequent discussions with Dr. Cuneo and counsel, it was decided to seize upon this fact" -- meaning the death of Marquis Taylor -- "as the underlying trauma for what would be the doctor's PTSD presentation."  Is that correct?  Is that what you wrote in there?

A.    That's what it says, yes.

Q.    But, in fact, that diagnosis by Dr. Cuneo was based on both the interview that he did of Billie Allen as well as those summaries of the collateral interviews that you gave to him; is that right?

A.    It was based on whatever limited information was given to him plus his contacts with Billie.

Q.    So it was based on his interview with Billie, right?

A.    Yes.

Q.    And all your notes, did you provide him with all your notes?

A.    I am not sure what he exactly got.

Q.    Okay.  Do you remember that being an issue, that because your notes, your typed notes at least had been provided to Dr. Cuneo at trial, they, therefore, had to be provided to the government?  Do you remember that being an

issue at all?

A.    I don't believe --

Q.    Does that jog your memory at all what was provided to him?

A.    No.

Q.    Now, the decision about whether or not an individual suffers from PTSD is not made by trial counsel, is that fair to say?

A.    Correct.

Q.    That would be made by Dr. Cuneo after an evaluation of all the factors; is that correct?

A.    Counsel might suspect something, but the ultimate diagnosis would be made by the mental health professional.

Q.    And --

        MR. MONTROY:  I'm sorry, Your Honor, I was just wondering if you might be able to take a five-minute break so Mr. Allen can take some medication.

        THE COURT:  Sure.  We'll be in recess for 15 minutes.  Yeah, 15, but if it takes 20, that's okay.

        MR. MONTROY:  Thank you.

        THE COURT:  Sure.

        (Court in recess at 2:31 p.m. until 2:53 p.m.)

        MS. COSTANTIN:  Thank you.

BY MS. COSTANTIN:

Q.    We were talking before we took the break about Marquis

Taylor's death.  Do you recall?

A.    Yes.

Q.    And the death of Marquis Taylor was very significant in terms of a diagnosis of PTSD for Billie Allen; is that right?

A.    Yes.

Q.    You had indicated in your direct testimony that there were some witnesses called at the penalty phase that Mr. Sindel had never met; is that right?

A.    I believe so, yes.

Q.    And who were they?

A.    I think Tasha Valentine was one.  Marvin Neals --

THE COURT:  What was that name?

THE WITNESS:  Marvin Neals.

A.    I believe was another one.  I'm not sure about the others.

Q.    And Tasha Valentine was the girlfriend at the time of the robbery; is that right?

A.    Yes.

Q.    And so she had no information about any sort of abuse that Billie Allen might have suffered when he was a child, correct?

A.    Correct.

Q.    And Marvin Neals was an educator at Sumner; is that right?

A.    Yes.

Q.    And he also had no information about any abuse that Billie Allen might have suffered as a child; is that correct?

A.    Yes.

Q.    Now, you also testified, I believe, is it correct that this trial with the over 30 witnesses, probably the most witnesses that were ever presented in a penalty phase of a case that you were involved in; is that right?

A.    Correct.

Q.    And you billed the court for 423 hours of work over a six-month period; is that right?

A.    Over less than six --

Q.    Six weeks, I apologize.  Over a six-week period.

A.    Yes.

Q.    I'm showing you Exhibit 54.  Is that your basically application to be paid by the court?

A.    Yes.

Q.    And as we go to page 6, we can see that the bill, total number of hours during that time was 423.30 hours; is that right?

A.    Yes.

Q.    And that's where the -- and then there were some expenses, correct?

A.    Correct.

Q.    And that's where the total came to 40 -- well, just the hourly cost alone was $42,330; is that right?

A.    That was originally billed, and then the hourly rate was reduced from $100 an hour to 90.  So I think someone wrote in $38,097.

Q.    But the work, the number of hours you put into it was 423 hours; is that right?

A.    Yes.

Q.    And I want to go to 394, Exhibit 394.  Do you recognize that as a letter that you sent to Mr. Sindel on April 13th of 1998?

A.    Yes.

Q.    And in it you enclosed your final bill; is that right?  Is that the first line, "Here is a final bill that provides an accurate accounting of my time and expenses"?

A.    Yes.

Q.    I want to go to the second paragraph.  Did you write to Mr. Sindel back in April of 1998, "As you will see from inspecting the hourly billing, I obviously went well over the estimated amount of time that we thought it might take to prepare mitigation for the case.  Nevertheless, I did what I believed needed to be done in the time frame involved, and I did spend this much time on the case.  As I had testified in court, developing mitigation is an" -- how did you say that word, iterative?

A.    Iterative.

Q.    "iterative process that builds upon itself.  As I

investigated mitigation leads, other leads came to light and needed to be pursued.  In addition, it was quite a challenge keeping up with the FBI's own investigation and following up with interviews with new witnesses that they uncovered.  The hearing took longer than I had anticipated.  In an attempt to prepare the mitigation adequately given the time frame involved, I had to totally immerse myself in the case.  All in all, this case turned out to be my most complicated mitigation case to date, both in terms of the number of witnesses and the work that was required to muster them and prepare them for testifying."  Is that right?

A.    Yes.

Q.    And you also stated, "I do feel very badly about the result."  Is that right?

A.    Yes.

Q.    And that was your feelings about the case back in April of 1998; is that right?

A.    Yes.

Q.    Now, eventually the Court authorized payment of your hourly bills and expenses, didn't they?

A.    Yes.

Q.    And do you recall receiving a letter from Mr. Sindel on June 17th, 1998, advising you of that fact?

A.    Yes.

Q.    I'm showing you an Exhibit 396.  And is that that

letter from Mr. Sindel to you?

A.    It is.

Q.    And does it state, "We have been advised by the court clerk that everything you have requested has been approved, except certain expenses such as toothpaste, mouthwash, Jujubes, M&Ms, et cetera.  Did you really put these things in your application for reimbursement?  Anyhow, at least there no drugs."

And then he wrote, "Furthermore, I have been contacted by another attorney about a capital case in Illinois which he has requested that I work on.  I have told him I want to bring you on board if that is the situation.  Let me know what you will need for a retainer fee.  This is a private case, not appointed, but the individual is quite wealthy."

Is that right?

A.    That's what it says.

Q.    Okay.  And that's the letter that you received from him back in June of 1998?

A.    Yes.

Q.    And, in fact, you took that case he referred to, correct?

A.    If the case that he's referring to here is a case regarding Richard Abeling, then I was preliminarily involved in that.

Q.    And Richard Abeling was another capital case; is that right?

A.    Yes.

Q.    And you worked with Mr. Sindel on another capital case after this one; is that correct?  Richard Abeling.

A.    Yeah.  I don't recall how extensively I worked on that case, but I did -- I think he did bring me in on the case.

Q.    And you respect his work as an attorney; is that right?

A.    Overall I would say yes.

Q.    And, in fact, you respected him enough to almost immediately go work with him on another capital case?

A.    Yes.

Q.    He visited you in Hawaii recently, didn't he?

A.    In Hawaii, yes.

Q.    Do you consider him to be your friend?

A.    I would consider him to be a friend.

Q.    Okay.  And did you discuss the Billie Allen case with him during that recent visit he made in Hawaii with you?

A.    Superficially, yes.

Q.    What was the content of that discussion?

A.    I don't recall specifically what the content was.  I think it was more about where the case is at and in terms of eventually having to testify and whatnot.

Q.    Did you discuss that you both felt badly that your client had received the death penalty?

A.    Yes.

Q.    Did you discuss anything more detailed other than that?

A.    I don't -- I don't believe -- I don't believe so.

Q.    Now, you had testified before that your typical approach and your experience from previous cases was that you usually had time to build rapport and then get around to asking those tough questions; is that right?

A.    Yeah, usually I had a much longer period of time to work on a case compared to this one.

Q.    Sometimes as much as two years; is that right?

A.    Sometimes as much as four years actually.

Q.    As much as four years to develop a mitigation case; is that right?

A.    Or four years from the time the case started to the case ended.  There's one particular case that there were a lot of different phases of it, post trial as well, so mitigation didn't take four years, but the case took four years to come to its ultimate conclusion.

Q.    And you had indicated that one of your lapses in this case was that you failed to calibrate your approach to the limited time frame; is that right?

A.    Yes.

Q.    So, I mean, from the time you entered in the case, you knew you weren't going to four years or two years?

A.    Oh, correct, yes.

Q.    Right?  And you knew you weren't going to have even your usual time frame, which was a multi-year time frame; is that right?

A.    I expected at most we would have 120 days on top of the trial date.  So I expected at most we would have until June.

Q.    And by January 30th when that -- when the Motion for Continuance was denied, you knew you weren't going to have even 120 days, right?

A.    At that point we knew that it was basically -- what is the word -- it was a go at that point.

Q.    Okay.  And you also knew because you told the Court in that affidavit we saw about what the areas you should be asking about, correct, as far as mitigation went?

A.    The areas that should be covered.

Q.    Right.  That the mitigation expert, mitigation specialist should be covering with both the client as well as with collateral witnesses; is that right?

A.    Yes.

Q.    Okay.  And those included covering whether there was parental alcohol or drug abuse, whether there was family violence, whether there was physical discipline; is that right?

A.    Yes.

Q.    And whether there was physical abuse of the client; is that right?

A.    Yes.

Q.    So at the very least, as of January 30th, you knew what you had to cover, and you knew that you weren't going to be able to have your usual year or time to build rapport and get around to asking the hard questions, right?

A.    Yes.

Q.    And by the time of February 21st and 22nd, those time periods when you're interviewing those witnesses we saw on the calendar, you also know that you're not going to be able to do this, ask questions, get around to more questions, and get around to even talk to other people again, and then get around to other questions, your usual practice, right?

A.    Correct.

Q.    So why did you not at that point just ask Juanita or Billie Allen whether or not abuse occurred?

A.    All I can say is there were things that got dropped here.  And there was a large amount of information coming in at once.  And there were some things that were not pursued in a manner that they should have been pursued.

Q.    My simple question is, why didn't you ask Billie or Juanita Allen at that point, especially after you'd gotten that information from Raymond Petty, and we saw from several other witnesses we talked about today from your notes, why didn't you just ask them if there was abuse?

A.    It was a lapse.  There was no rationale per se.

Q.    And by the way, in your letter to Mr. Sindel, you do discuss that you did use this -- you don't use the word "iterative," but you actually did use the word "iterative process," that you investigated leads, other leads came to light and needed to be pursued, right?

A.    I would say that in this case that process was more -- I guess there's -- there's different types of iterative process here.  One type is where one witness tells me the name of another witness, and then I go contact that witness and so on and so forth, in terms of increasing the number of witnesses.

Then there's the other type of process that involves a deeper exploration of things with particular witnesses.  So there's sheer number in terms of the iterative process, people leading to other people that might have information. And then there's, it's like a three dimensional thing where you dig deeper with the witnesses that you have.

And so I think that I was sort of focused on the number of witnesses per se and not the quality of the investigation per se.  It was more about the number.

Q.    And a number of those witnesses told you about what they are describing as physical punishment of Billie Allen; is that right?

A.    Yes.

Q.    Now, did you ever tell Rick Sindel or John Simon that

you weren't calibrating your approach to adjust to the limited time period?

A.   We were all working on all cylinders at that point.  I never told them such a thing, no.

Q.   Because, in fact, you were talk -- you were using this iterative approach that you talked about, which is talking to witnesses, getting that information, and talking to other witnesses.  I mean, that's what you said back in April of '98, right?

A.   Well, I just explained more fully what that means.  But, yes, I was using a process where I was trying to increase the number of witnesses.  And then that process would also ideally or adequately -- if it was adequate, it would have dealt more deeply with the witnesses that we had.

Q.   So you were using an iterative process to find more witnesses and get more information, but what you're saying is what you believe you were lacking was the getting in deeper with the specific witness?

A.   With witnesses, yes.

Q.   And "deeper" is that when, for example, Juanita Allen said to you, "I'm apt to get more violent than my husband," not asking the simple question, how violent are you?

A.   That would have been a deeper question, yes.

Q.   And you're sure that you never -- despite the fact that in your affidavit you say those are the areas you should

cover with both the client and the witnesses, you're sure you didn't ask Juanita Allen or Billie Allen about abuse as a child?

A.   Unfortunately I'm sure of that, yes.  Yes.

Q.   You are sure of that?

A.   (Nodding.)

Q.   You remember we looked in your deposition where you said you expect you would have asked him that?

A.   Yes.

Q.   But now you're saying you're sure you didn't ask Billie Allen or Juanita Allen that?

A.   I would say it's -- I'm not sure if I -- if I did.  I don't think I did.

Q.   Did you ever tell Rick Sindel or John Simon that you weren't going to ask, and you weren't asking Juanita Allen or Billie Allen about abuse even though in that affidavit you filed with the court you said that's what a mitigation specialist should do?

A.   Did I tell him I would not ask?

Q.   That you weren't covering that area.  Yeah, I filed that affidavit that says that's what a mitigation specialist would do, but I'm telling you two, Mr. Simon and Mr. Sindel, I'm not going there?

A.   No, we wanted to go there.  And we did go there with certain people, some of whom -- one of whom I remember, the

others I did not.  We did go in that area.  I never told him I would not.  I think it's essential that we explore that area.

Q.    Okay.  And I think we're back in this circle here.  So you never said you wouldn't explore abuse, it was critical to explore abuse, right?

A.    Correct.

Q.    Okay.  Raymond Petty told you about abuse, and you put him on, right?

A.    Yes.

Q.    And Deborah Ruffin, Shimeka Taylor, and Sam Moore told you about abuse or physical punishment as they called it, right?

A.    They told us about the punishment and abuse, yes.

Q.    And they all testified, right?

A.    They did.

Q.    But even though that was critical, you did not tell Mr. Sindel, hey, ask that question?

A.    I, like I said, don't remember those episodes where they told us that information.  And Rick was present at the time of those interviews, if I recall.

Q.    And so you're saying Mr. Sindel was aware that at least those three people had described what they called physical punishment of Billie Allen by Juanita Allen?

A.    They described abusive situations and physical

punishment.

Q.    And Mr. Sindel was aware of that, is that your testimony?

A.    If it was in his notes, then he was aware of it, and that's what I saw.

Q.    And are you aware as to why he did not ask Deborah Ruffin, Shimeka Taylor, or Sam Moore about this?

A.    I don't -- I don't know why he didn't do that.

Q.    Did you ever have a discussion with him about the fact that those three people had said that there was physical punishment or as you describe abuse of Billie Allen?

A.    I don't recall a specific conversation about that with him, about those three witnesses.

Q.    But to you that was critical information?

A.    Yes.

Q.    And, in fact, you were told that information?

A.    In fact, in my outline, I highlighted that that was one theme that we needed to explore.

Q.    Right.  Physical abuse and beatings, right?

A.    Yes.

Q.    Except that you told us earlier that the information that you had about physical abuse and beatings when you wrote that, that you had, that you recalled was simply the Raymond Petty description of the incident with the extension cord?

A.    What I said was the most salient incident was the

Raymond Petty incident.  I don't know what level of awareness I had at the time I wrote that bullet point about the other incidents, but I was -- how should I say, those incidents left my awareness.  Because had they been salient to me, I would have pushed Mr. Sindel to have them discussed during the hearing.

Q.    So -- okay, let's go back to this Exhibit 505.  When you wrote that one of the factors that affected Billie's life, physical abuse and beatings, when you wrote that --

A.    Uh-huh.

Q.    -- is it your testimony now that when you wrote that, you did recall the statements made to you by those three witnesses, specifically Deborah Ruffin, Shimeka Taylor, and Sam Moore, about abuse of Billie Allen by Juanita Allen?

A.    That's not what I said.

Q.    Okay.  What are you saying then?  The only one you remember was Raymond Petty?

        MR. MONTROY:  Objection, Your Honor, on the basis this has been asked and answered several times.

        THE COURT:  Well, yeah, it has.  And I think this is in a little different context, but it has been asked many, many, many times.  So, Counsel, what's your intention?

        MS. COSTANTIN:  Judge, what I'm trying to establish here is whether or not a decision was made concerning -- that there was a decision made by trial counsel or the trial team

concerning these items.  And I'm not getting a real answer about that.  And that's what I'm attempting to determine is what they knew at the time.  We already knew what they knew at the time, but was a decision made about what to put on and what not to put on.  And to do that I'm trying to establish what they knew, what Dr. Randall knew when he wrote "physical abuse and beatings."

THE COURT:  Overruled.

BY MS. COSTANTIN:

Q.    So I'll just get to the point.  When you're writing "physical abuse and beatings," do you have the knowledge of those -- what those four witnesses told you or you just don't remember?

A.    No.  And what I said before was the incident that was most salient to me was the Raymond Petty recollection when he related that Billie was beaten with this extension cord, like a slavery type beating.  I do not know what my mental state and what I recollected at the time I wrote this bullet point, physical abuse and beatings.  I know that -- I'm not sure when this was prepared.

I know that from our work here in this hearing now that there were three other people that touched on physical abuse and beatings, information that should have been even followed up even further, okay.  But as I -- when I was writing this, I do not know what my level of awareness was of

those three things.

Q. So you cannot say whether or not there was a discussion about what to ask those three people or not, because you don't remember if you even know what they told you?

A. No. That information is so important and the Raymond Petty information when we got it was so -- we were so excited about that, that had the information from the three witnesses been salient in my mind, there is a, I would say, a 100 percent probability that I would have pushed Rick to have those people questioned about their knowledge of the physical beatings and abuse.

Q. And as far as we can tell when those statements were made by those witnesses, you were present, Mr. Simon was present, and Mr. Sindel was present; is that right?

A. At least Mr. Sindel and I. And then I'm not sure if Simon was present for all of them, but I know he was present during some of those interviews.

Q. And the testimony that Raymond Petty witnessed Juanita Allen beating Billie Allen with the extension cord was so critical and important to the team; is that right?

A. Yes.

Q. Yet when you wrote in your declaration, you wrote that you had no concrete evidence, correct? You completely forgot about Raymond Petty, correct?

A. There should have been -- that statement should have

been more conditional, and Raymond Petty mentioned in that statement.

Q.    And, in fact, you had the penalty phase transcripts in which he testified?

A.    Correct.

Q.    And yet you still wrote that there was no concrete evidence of physical abuse, correct?

A.    In that -- yes.

Q.    In your declaration?

A.    Yes.

Q.    Now, let me ask you just very briefly about different testimony that you had given either in the past or in an affidavit or in your deposition.  You testified under oath back in June and then Wednesday of this week that you didn't talk to the jail guards; is that right?

A.    Yeah, I didn't recall talking to the jail guards.

Q.    But in fact --

        MR. MONTROY:  Objection, Your Honor, this has been asked and answered.

        THE COURT:  It has.  Sustained.

BY MS. COSTANTIN:

Q.    Back in January 30th of 1998, you testified under oath that 120 days was a sufficient time to prepare a mitigation case; is that right?

A.    At least 120 days.

MR. MONTROY:  Objection, for the same basis, Your Honor, this is ground that was covered.

THE COURT:  I'll see where it's going.

MS. COSTANTIN:  I'm just going to go through very quickly the contradictions between his sworn testimony and what he's testified to in the last day.

THE COURT:  I've made -- I'm up to page 61 of notes.

MS. COSTANTIN:  So you don't think you need anymore, Judge?

THE COURT:  I just have to rule based on the objections before me, and it has been covered.

MS. COSTANTIN:  Okay.

THE COURT:  But I'm going to sustain the last one. I mean, it's okay to ask the question, and then if there's no objection, fine.  But if there is, I have to rule based on what I hear.

BY MS. COSTANTIN:

Q.    Let me ask you this, Dr. Randall:  Do you believe there are significant portions of your declaration that are just incorrect?

MR. MONTROY:  Objection, we've gone through his affidavit or declaration at length.

THE COURT:  Overruled.

A.    Yes.

Q.    And you're aware that this declaration was used in part

VIII - 161

to obtain this hearing we've had today and back in June; is that right?

A.    Yes.

Q.    But you made no effort to correct those inaccuracies in your declaration until I asked you about them; is that right?

A.    Correct.

        MS. COSTANTIN:  Okay.  I have nothing more.

        THE COURT:  Whenever you're ready.

        MR. MONTROY:  Thank you, Your Honor.  If I can just have a second, Your Honor.  I'm sorry, Your Honor, if I could have just a moment.

        THE COURT:  That's fine.

                    REDIRECT EXAMINATION

BY MR. MONTROY:

Q.    Good afternoon, Dr. Randall.

A.    Hello.

Q.    Dr. Randall, in terms of not correcting errors in your declaration, is it fair to say that you didn't learn about several of the errors in your declaration until your testimony here today and yesterday?

A.    Yes.

Q.    And has anyone ever asked you to correct any errors in your declaration?

A.    No.

        MR. MONTROY:  Your Honor, I'm going to direct the

Court's attention and Dr. Randall's attention to Exhibit 383.

THE COURT: 383? Go ahead.

MR. MONTROY: That's correct.

BY MR. MONTROY:

Q. Dr. Randall, this document has been shown to you a number of times during this hearing, but can you identify this document?

A. Yes, this is a handwritten table that's entitled "Allen Weekend Interview Schedule Thus Far." And there's two columns on the table. One column is Saturday, 2/21, and the other column is Sunday, 2/22.

Q. Okay. And you had mentioned that this was a prep session -- or, I'm sorry, this was a prep session that was conducted on Saturday, February 21st, and Sunday, February 22nd?

A. Yes.

Q. So it was conducted on the weekend, right?

A. Yes.

Q. And was it a prep session or was it an interview session?

A. It was a prep session.

Q. Okay. And who was present for this?

A. I recalled Rick Sindel. I hadn't recalled John Simon being present, but apparently he was present for some of it. But Rick and I were present.

Q.   Okay.  And had Rick met -- had Rick Sindel met any of these witnesses before as far as you know?

A.   I knew he had met Juanita and the girls, I believe. And I don't think he met any of the others.  He might have met Deborah Ruffin, I'm not sure.

Q.   So can you just describe how this, let's start with Saturday, the 21st, can you describe how this process worked? How would you interview and prepare witnesses?

A.   Well, I had spoken to these people in advance, and I set up interview times to try to make efficient use of our time on the weekend.  And tried to schedule witnesses in a sequence.

So on Saturday there were one, two, three, four, five, six, seven, eight, nine, ten, eleven people set.  And Sunday; one, two, three, four, five, six, seven -- ten people noted on that side.  And then there were hour time slots given to most of the witnesses, although there's a half hour time slot for one set of witnesses.

Q.   Okay.  So the witness comes in, presumably you introduce them to Mr. Sindel?

A.   Yes.

Q.   And is this taking place at Mr. Sindel's office?

A.   I believe so.

Q.   And Mr. Sindel has never had an opportunity to ask any of these witnesses questions before; is that right?

A.    Correct.

Q.    He hasn't spoken with them on the phone as far as you know?

MS. COSTANTIN:  Judge, I would object unless he knows.

THE COURT:  Yeah, if he knows.  Yeah, because it says any of people, and he already mentioned that he's already talked to Rick and Juanita.  And I'm assuming the question means other than those two, but yes, he answered the question as if he knew, but I thought when he originally answered, he wasn't sure, maybe he had talked to Ruffin, so --

MR. MONTROY:  I'll try and be more specific, Your Honor, definitely.

BY MR. MONTROY:

Q.    What made you -- you had mentioned Juanita and the girls.  I assume you meant Nicole?

A.    Juanita, Nicole, Ann, and Yvette, I believe Rick had spoken to before, Rick and/or John.  And also Lucy McLemore and Raymond, I think John talked to in his notetaking for that so-called Life History.

Q.    Well, what led you to believe then that Mr. Sindel hadn't met any of these people before other than the ones that you've just identified?

A.    When I went into the world to meet them, that was the

first contact with the defense team.

Q.    And you were the person for the team that was as far as you knew going out and doing mitigation interviews?

A.    Yes.

Q.    So based on that, you inferred that Mr. Sindel had not met anybody?

A.    Except for the ones who I mentioned.

Q.    Okay.  Exactly.  Now, why do you recall was this being done on Saturday and Sunday?

A.    Because of the -- Mr. Sindel and John Simon were in trial at this point, so the weekends were the only time available or evenings.

Q.    The trial just started on February 17th --

A.    Right.

Q.    -- 1998; is that right?

A.    Yes, so four days prior.

Q.    And what was Mr. Sindel doing during the week?

A.    I wasn't there with him, but my assumption was that he was involved in the guilt phase of this case.

Q.    And to your knowledge was he spending any time at all other than this weekend working on the mitigation phase?

A.    His sole focus was the guilt phase up until this point.

Q.    And you had mentioned that this interview session was broken into hour, half hour slots.  Did this lend to a sort of chaotic situation?

A.    Well, as I said earlier, this was like an assembly line type of situation.  And many of these people had only been spoken to once.  And then the second time we're seeing them is during this witness prep session.  So we're going through some of the initial information that they had told me.  And then, you know, if there's other information that they are adding or if they are expanding on some things, then we're making note of that over the course of these meetings.

Q.    Okay.  And it appears, and correct me if I'm wrong, but based on the notes that we've seen from these sessions, your notes, Mr. Sindel's notes, Mr. Simon's notes, that you were writing down what the witnesses were saying during these prep sessions?

A.    I was attempting to write down what they were saying.

Q.    And Mr. Sindel and Mr. Simon were doing the same?

A.    Rick was and John was to the extent that I recall.

Q.    Okay.  Was anybody explaining to the witnesses what kind of questions they were going to be asked when they were on the stand?

A.    I think the assumption was that there was no set questions, like the questions were developed after -- after this.  So to my recollection, I don't believe there was questioning set for them per se.  But it was obvious that we'd be asking them information about what they had told us.

Q.    Okay.  Was there ever a point after Saturday,

February 21st, and Sunday, February 22nd, that Mr. Sindel saw these witnesses a second time for a prep session?

A. I don't believe so.

Q. So the next time that these witnesses, as far as you know, saw Mr. Sindel was when they were in the courtroom?

A. On the stand.

Q. And the guilt phase concluded on February 26th, 1998; is that right?

A. Okay. Yes.

Q. And then the following Monday the penalty phase began, that was on March 2nd?

A. March 2nd, I believe.

Q. So would you agree that there wasn't a great deal of time in between these prep sessions and when the penalty phase actually began?

A. Correct. In addition, this was not an exclusive list of witnesses. There were other witnesses as well that were being developed after this point, other potential mitigation witnesses.

Q. Okay. And did you have prep sessions for those witnesses?

A. I don't recall specific meetings that we had, but I'm pretty sure that we met on some evenings with some of these witnesses, similar to this.

Q. Okay. And do you know, did those sessions take place

before or after this weekend?

A.    After.  And I can't tell you on what day, how many we saw, who it was, or how many sessions there were, I don't recall.  And I don't have a list like this to refresh my memory.  Oh, this is more comprehensive.  Okay.

Q.    So there's two separate documents relating to this weekend, right?

A.    Yes.  This one looks like it was prepared after the first one, because there's more people on it.

MR. MONTROY:  This would be -- I'm sorry, Your Honor, 383.2.

THE COURT:  383.2?

MR. MONTROY:  I'm sorry, 383.2.

THE COURT:  383.2, okay.

BY MR. MONTROY:

Q.    Did you find this to be an effective way of preparing witnesses for their testimony?

A.    This is an even more compressed schedule than the one that you showed me previously.  This is an updated schedule, because I was able to fill in more bodies in more slots during this -- during these two days.  And so was it effective?  No, it was not effective.  It was -- it was sort of what we were dealt in terms of we had a limited amount of time and we had to schedule people boom, boom, boom, boom, boom, boom.  So --

Q.    Can you describe how this schedule and this process was not helpful or how it may have hindered your case?

MS. COSTANTIN:  Judge, I'm going to object to the leading nature of the question.

THE COURT:  Overruled on that one.

A.    Okay.  What we're doing here is we're scheduling witnesses based on some time constraints that we have in the case.  So instead of being able to spend a lot of time or enough time to develop what people say and to have, you know, followup questions and that kind of thing, it's like at a certain time it was like, all right, we got what we could from this person.  Next.  And then the next interviews would happen.  And then at the time that that would be done, then we would go on to the next one.  And then to the next one and then to the next one.

So, I mean, you want to have time to be able to get to know your witnesses, feel out what they are going to say.  If there's additional needs or followup questions that could have been asked to Shimeka and other people, we're not under that time pressure.  So we were more able to think.  This is sort of like doing things on the fly.

Q.    In any of your other cases that you've worked on, capital mitigation cases, have you ever had this sort of, using your words, assembly line process?

A.    Not like this.

Q.   Were there people who came to these sessions that you had never met in person before?

A.   Yes.  Can I just point out one thing about the way this was done?  Well, it's not directly related, so -- I'm sorry.

THE COURT:  The question is, did some people come to the sessions you had never met before?

A.   Yes.

Q.   And what was your communication with them prior to them coming to the session?

A.   By phone.  And --

Q.   Do you recall who some of those witnesses were?

A.   It's hard for me to say.  I believe the teachers, I never met.  I'm not sure which ones as I sit here right now were phoned first or those I saw in person first.  But I know that I didn't meet many of them.

Q.   So is it possible that at most these witnesses spent an hour physically in your presence before they testified?

A.   Some of them, yes.  I think -- most of them I think were in person, but there were a portion by phone here.  And there was a limited amount of time spent with them.

Q.   Now, is it fair to say that at most some of these people other than Juanita and Mr. Allen's sisters, spent an hour with Mr. Sindel prior to testifying?

A.   I don't know exactly how much time they spent before I got involved in the case, but in terms of preparing for their

testimony, this was it.

Q.   Well, let's take a look at Sunday, February 22nd.   You see the 4:30 slot?

A.   Yes.

Q.   All right.  And that has --

A.   There's some shifting that goes on there.

Q.   Sure.  There's two people meeting with you guys on 4:30 on that Sunday, right?

A.   Ahmed Oliver and Beverly Oliver.

Q.   Okay.  And then you had a five o'clock meeting right after that, right?

A.   With four people; Raymond, Carol, Monette, and Raymond, Jr.

Q.   Okay.  So you had a half hour with the Olivers; is that correct?

A.   According to this schedule, yes.

Q.   And then at five o'clock, you met with Raymond, Carol, Monette, and Raymond, Jr.; is that right?

A.   Yes.

Q.   Do you know how long you met with those people?

A.   I do not.

Q.   Do you know if you met with them all at the same time?

A.   I'm not sure if we did or not.  It's not the ideal way to conduct interviews or witness prep sessions.

Q.   Why is that?

A.     Because what you want to do is meet people one-on-one so they don't contaminate each other's interviews.  Typically at least when you start, you know, especially when you start.  So it's better to meet one-on-one where you can really drill on to the person and establish that connection and get that information without other people being biased as to what they might say.

Q.     Might a person be hesitant to talk about certain things about people in the room?

A.     Well, it depends.  But not only might they be hesitant to talk to people -- how should I say this.  In the beginning of any kind of investigation like this, it's better to meet with people one-on-one.  At a certain point down the road it might be okay to meet with them once you have the core of what they are going to say so that, you know, they might stimulate each other's recollections.

Q.     Okay.

A.     But this was really at the beginning of the initial mitigation phase at this point, the mitigation investigation.  It was always at the beginning, so to speak, with each person.

       So I'm not 100 percent sure if we met with them all at the same time, but according to the schedule, it looks like we may have.

Q.     Moving on, I want to ask you a couple questions about

your testimony that you took over the mitigation investigation in part because Mr. Simon was, I believe you used the word cerebral and socially awkward.  Is that essentially what your testimony is?

A.    That's --

Q.    At least in part?

A.    In part, that's correct.

Q.    And the letter that you state that in, that was sent out on January 19th, 1998; is that correct?

A.    Yes.

Q.    Before you sent that letter, you had an opportunity to meet with Mr. Sindel, right?

A.    Yes.

Q.    And when you met with Mr. Sindel, did you and Mr. Sindel discuss Mr. Simon at all?

A.    I don't recall.  But my sense was going into this case, given that I didn't know Mr. Simon, I didn't know Mr. Sindel, they had let the case get to a point that was at a really terrible and critical phase in terms of this dilemma, where this time dilemma that happened.  And so, you know, not having worked with him and given what had transpired, I wrote that statement in that letter saying, you know what, I'm going to take charge of the mitigation at this point, I'm going to do -- get into the world, get a lay of the land, and then at a certain point I'll bring you guys in.

So as my investigation went on, and Rick and I touched base, you know, over the course of it, it became a collegial working relationship. So he knew that the ball wasn't being dropped, that I was seeing people, that I was out there working. And then that left him time to focus on the guilt phase given the limited amount of time. And then I was handling the penalty phase.

And then after I met John, I was -- my impression was that, yes, he was cerebral, more professorial, very smart guy, caring guy, but I felt that I would be more effective interviewing people on my own because -- for a number of reasons. One was because of the way he is, but then also we had such a short time frame here that if two of us were out in the field interviewing people and one person said one thing, a certain mitigation lead or said something in a certain way and another person said it in another way or didn't say that, one person doing all the interviews, you know what everybody else is saying. So it would lend in a sort of paradoxal way to me being more efficient, to the process being more efficient because, you know, one person would be aware of everything that was going on and would be able to pursue leads generated by Person A. Oh, then I'll ask Person B this. Whereas if I hadn't interviewed Person A, I might not know what to ask Person B or to follow up on a certain thing. So I hope that explains a little bit my

approach.

Q.    Sure.  All right.  Right now I want to draw your attention to Exhibit 343.  And this is a letter dated January 20th of 1998; is that correct?

A.    Yes.

Q.    And it's addressed to Rick Sindel?

A.    Yes.  It looks like it's from John.

Q.    And that's correct, it's signed by John Simon.

A.    Yes.

Q.    And I just want to -- the last sentence in the third paragraph -- actually the sentence before that.  "I take Dr. Randall's fax of yesterday as an indication that I should not contact these witnesses or potential witnesses again until he has himself interviewed them.  Because I have to file a cert petition on the Steve Johns capital habeas corpus case this time week, and have to finish a traverse that I stopped working on to do the mitigation interview and firearms work which I have done over the past two or three weeks, I would find it useful if Dr. Randall *did* go to work on the mitigation witnesses instead of me."

A.    Okay.

Q.    Was it your understanding that Mr. Simon wanted you to be the one that did the mitigation interviews?

A.    I don't know if I got the sense that it was a desire on his part for me to do it, but I didn't get any resistance

from that.

Q.    Did you have the understanding that Mr. Simon had only been working on mitigation for the prior two to three weeks, as of January 20th?

A.    What I knew from John's work on mitigation was that so-called Life History document that was given to me when I entered the case.  So I didn't know what time frame he -- I didn't know what time frame he did that in.

Q.    Would it surprise you if he had only been working on the mitigation case for two or three weeks?

A.    No.

Q.    And why is that?

A.    Because there was a minimal amount of work done on the case, I'd say next to nothing, given where the case was in terms of the number of months that had transpired from the time that they were involved.  Much of the information that was in that so-called Life History was based on what Billie said, and then there were a couple of followup phone calls to other people like Lucy McLemore and Raymond Petty.  It was predominantly based on Billie's account.  And Billie is not going to be the one testifying.  So there was no witness development at all whatsoever when I came into the case.

Q.    Okay.  I know we've talked about this at length, but I just want to talk about the "at least 120 days" that was in your affidavit to the Court.  Why did you use the phrase "at

least" before you said 120 days?

A.    Because I felt that 120 days would be the bare minimum of what I would want or hope to obtain in terms of the continuance.

Q.    And did you come up with the number 120 or was that something that was discussed by yourself and the defense?

A.    We discussed that together, I believe.  And --

Q.    Do you remember how it was you came up with 120?

A.    Well, I went in with, I'm like, we need more time on the case.  In previous cases, this is how long I've had to work.  And then there was a discussion about what we might realistically obtain in terms of the continuance.  And so the team settled on 120 days as the number.  And so I reframed it as at least 120 days because I would like to have received more, more time.  But 120 was the amount of days we thought we might realistically obtain.

Q.    So 120 days was something that you could live with, it wasn't ideal in your mind?

A.    It was better than what was in existence.

Q.    And that was something that you and Mr. Sindel and Mr. Simon agreed upon?

A.    Yes.

Q.    Were you -- when you put that in that affidavit and when you testified to that at the motion hearing, were you lying or were you being disingenuous with the Court when you

said you needed at least 120 days, or was that based on what you just said, what you were really trying to get?

A.    Okay, if we got the continuance, it would have given me four months more time, yeah, to build on what was built on, to build on what had been done, you know, in the case.  Which would have led to a much more adequate sentencing hearing, because it not only affected me, it affected the experts that we used, how prepared they were for their own testimony.  It affected our planning of witnesses, our ability to reason and synthesize through all this information that we had, you know.  And we had been through before, you know, the domino effect of not having enough time.

So I believe that the 120 days would have been minimally adequate.  Would I have liked more time?  Of course.  But given the 11th hour that this request was being made of the Court, the team decided to use the 120 days as the number.

Q.    Okay.  Yesterday you were asked some questions about Mr. Allen in your interviews with him telling -- I'm sorry, strike that.

Yesterday you were questioned about Mr. Allen telling Mr. Simon during an interview that he had had a good childhood.  Do you recall being asked about that?

A.    I didn't hear you.  I'm sorry.

Q.    Yesterday you were asked some questions about an

interview that Mr. Simon had done with Mr. Allen.

A.    Okay.

Q.    And in that interview in his notes it indicated that Billie Allen had informed him that he had had a good childhood.

A.    Correct.

Q.    You recall that?

A.    Yes.

Q.    Would that information, if it had been given to you, would that information had precluded you from investigating potential mitigation that Mr. Allen, in fact, did not have a good childhood?

A.    I would go so far to say that in a previous case I had in Chicago, the client didn't want to talk to me at all, didn't want to give me any information at all.  But he did give me the list of people in his life that I could potentially talk to.

And the mitigation case was built around him.  So this particular client told me nothing except the names of people in his life.  And since he's not going to be testifying anyway at the hearing, his life story is going to be told through the eyes of collaterals.  We were able to build a mitigation case around that client.  So that's an extreme situation.

In Billie's case, you have some things that are

apparently true and some things that aren't true that he's reporting. Okay. Different degrees of truth. And regardless of what he says, the mitigation case is going to be based on not what he says. What he says informs the experts more, okay, because they are doing mental state exams. But in terms of the mitigation hearing itself, it's built through the eyes of others.

So he's an important source for leads and for, you know, potential areas to pursue. But regardless of what he says, it's the other people that are the most important people in terms of the presentation.

Q.    Okay. And if Mr. Allen's sisters or people in Mr. Allen's household initially told an investigator or an attorney that their life or their childhood or life in the house was good, would you continue to investigate for all possibilities or would you end your investigation and rely on that initial interview that, you know, the household was a good household or there was no abuse?

A.    No, I would consider that as information. I would not discount it or -- what's the word -- I would not throw it out the window. But it would not preclude me from investigating other sources of information, especially when I suspect that in our early encounters they might not be totally forthcoming about what went on.

Q.    Do people who have suffered abuse, who have grown up in

an abusive environment, have you found that they deny that or is that something that's commonly understood?

A.    I don't know if I would use the word "deny" per se, I would use the word -- well, some deny, but some aren't forthcoming with it, sometimes at first and sometimes they are not forthcoming with it even down the road.

Q.    So would it surprise you if somebody, Mr. Allen in this case, denied abuse and, in fact, he had been abused?

A.    Would it surprise me?  No.

Q.    When you talked to Mr. Sindel about joining the defense team in Mr. Allen's case, you had mentioned in your direct testimony awhile back that there was a certain amount of encouraging that Mr. Sindel did to get you to come on to the case; is that right?

A.    Well, our discussion was, you know, influenced by the compressed time frame involved, that they were in panic mode, and that they needed help on the case.  And so in my speaking with them, I went into the case and I said, "We're going to need to seek more time on the case, but I will help you to the extent that I can."

Q.    And in doing so, did they give you any indication where the mitigation investigation was at that point?

A.    All I -- the impression I had was that their previous mitigation expert when they had recently called them had essentially done nothing, and that they were close to ground

zero when it came to where they were at.

Q.   And that was the understanding that you got from speaking with Mr. Sindel; is that right?

A.   Yes.

Q.   I just want to ask you some questions about the declaration that you prepared for the habeas proceedings.

A.   Would I be able to take a five-minute quick break?

THE COURT:  Sure.  We'll be in recess for five minutes.

THE WITNESS:  Thank you.

MR. MONTROY:  Thank you.

(Court in recess from 3:54 p.m. until 3:57 p.m.)

THE COURT:  Ready?

MR. MONTROY:  I'm so sorry.  I didn't even realize he had come back.  I apologize.

THE COURT:  Your last question had to do with focusing on the declaration.

MR. MONTROY:  Thank you.  Let me just get back up to my page.

BY MR. MONTROY:

Q.   I would like to direct your attention to Exhibit 254, Dr. Randall.

A.   Okay.

Q.   You recognize this as your declaration, correct?

A.   Yes.

Q.    And I'm going to ask you to take a look at paragraph 24. And paragraph 24 says, "I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief." So when you were drafting the portions of this declaration, and you were reviewing it, and you ultimately signed it, were the items in the declaration true based on the best of your personal knowledge?

A.    I believed them to be true at the time I signed the document, yes.

Q.    And it's correct that you didn't review all of your notes from the trial prior to working on this declaration; is that right?

A.    Correct.

Q.    And is it true that you didn't review all your notes prior to signing this declaration; is that correct?

A.    That's correct.

Q.    All right. You did have some materials; is that right?

A.    I had the -- I had pretty much what the jury had. I had the penalty phase witnesses, the testimony at the penalty phase, and that sheet of paper that listed the other things that were included. I had some records. I had the records. I had the declarations.

Q.    Did you have -- there were several notes of John Simon and Richard Sindel that were referenced yesterday, some of

the witnesses that had described physical abuse.  Do you recall those?

A.    I recall going over those.

Q.    And would you agree that some of the notations in their notes were different than the notations in your notes?

A.    There was overlap.  Some of what they wrote down was different.  Where Rick wrote something to the effect, I think Ruffin said --

Q.    And actually this is a simple question, I worded awkwardly.  But you didn't have John Simon's notes when you worked on this declaration; is that right?

A.    No.

Q.    And you didn't have the notes of Richard Sindel when you did this either, did you?

A.    No.

Q.    When you worked on this declaration and signed this declaration, did you have any correspondence that was drafted between counsel and yourself?

A.    From the penalty phase?

Q.    At all.

A.    Just what came with this information packet from your office, and then whatever was prepared in terms of those binders, that's all I had.

Q.    Okay.  And those binders were the background packet; is that right?

A.    Yes.

Q.    And there was no correspondence between counsel and yourself in those binders, right?

A.    No.

Q.    Before the draft of the declaration was sent to you, did you have conversations with Mr. Wiseman?

A.    We had conversations at that meeting.  And then I believe there was one or two subsequent phone conversations.

Q.    Okay.  And was the draft declaration that you received, was that based on those conversations?

A.    Yes.

Q.    And in substance, when you received the draft, was it consistent with those conversations that you had?

A.    Yes.

Q.    And if there were inaccuracies, did you alter those inaccuracies?

A.    To the best of my ability at the time.

Q.    Now, you've testified here today that there were some mistakes that you made; is that correct?

A.    Yes.

Q.    Were those mistakes, were they genuine mistakes or were those attempts by yourself to try to get a hearing, an evidentiary hearing for Mr. Allen?

A.    It was not my intention to mislead the Court in any way.  There were definitely mistakes.

Q.   When you prepared this declaration, were you trying to be as complete and as accurate as possible?

A.   That was my attempt.

Q.   Since the preparation of this declaration, you've received some additional information; is that right?

A.   I received information prior to the deposition.  I also received -- I believe I received information from both your office and from Mr. Holtshouser.  And then I also received a copy of Juanita's deposition.  And that's what I recall right now.

Q.   Okay.  And has that information clarified some of the mistakes that you made in this initial declaration?

A.   Has that information that I received prior to this hearing?

Q.   Sure.  And even information that you received today in the hearing that you were unaware of previously.

A.   I think the deposition helped clarify some things and as well as the information that Ms. Costantin went over during the questioning of me.

Q.   Nothing in this declaration was an attempt to exaggerate or mislead; is that correct?

A.   That's correct.

Q.   I just want to draw your attention to paragraph 7 of your declaration.

A.   Okay.

Q.    That paragraph begins with the phrase, "Upon starting work..."

A.    Yes.

Q.    Is that right?

A.    Yes.

Q.    Is your description of what happens in paragraph 7, and you can take a look at it, and I'll flip the page in a second.

A.    Okay.

Q.    Was that what you remembered about, you know, the initial stages of your work in this case?

A.    Yeah, the initial stages -- you know, when I got into the case, it seemed like when I talked to Juanita, you know, her initial preoccupation was with the guilt/innocence phase, and that Billie was not guilty and all that.

Q.    But this paragraph relates directly to the case as you found it when you started; is that right?

A.    Correct.

Q.    Not how it was necessarily when you were actually at the penalty phase; is that right?

A.    The case was in terrible shape when I started given the time that had lapsed since he was charged.

Q.    Okay.  So when you were questioned yesterday about Deborah Ruffin and Sam Moore and Monette Petty, those witnesses as far as you know had not been contacted when you

started on the case; is that right?

A.    Sam Moore?

Q.    Sam Moore, Monette Petty, Deborah Ruffin, those witnesses had not been contacted when you started on the case; is that right?

A.    Which Petty is that?  I didn't hear you.

Q.    Monette.

A.    Monette, no, they hadn't been contacted to my knowledge.

Q.    When you started on the case, did Mr. Sindel ever indicate to you that a substantial amount of work on the penalty phase had been conducted?

A.    Not -- he never said that to me.  I mean, as far as I know, I had the interviews, information from Billie through John Simon through that Life History.  There was information in there about a couple contacts with Raymond Petty and Lucy McLemore.  I did have records from Mr. Simon.  He did not claim that he had done substantial work, and I did not believe it was substantial work.

Q.    Okay.  Talking about the records, did records, the school records, the medical records, prison records, Boy Scout records, are those all the records that you recall being involved in this case?  I'll go through them again. School records --

A.    Medical.

Q.    -- medical records, prison records, Boy Scout records. Were there any other records that you recall that were collected?

A.    I believe that's the universe of records.  I had said earlier I think there are some records out there that we haven't gotten, but in terms of most of the records, I think you described them.

Q.    And in terms of those records being introduced at the penalty phase and being argued as mitigation to the jury, did those records play a significant role at the penalty phase?

A.    I think that they -- I think the school records played a big role.  I believe that the medical records played a big role.  The school records -- I don't know if they were the foundation, but there was a lot of testimony at the hearing from teachers and counselors from the schools, so that was related to that.  There was also information that informed the experts' opinions from the medical records, like the febrile seizures, the Pica, the history of head injuries, things like that.  We also had prison records or incarceration records at a certain point.  That did not, I don't believe, play a role at the hearing.

Q.    The teachers actually testified themselves, right?

A.    Yes.

Q.    The records weren't actually referenced themselves at the penalty phase; is that right?  Or do you not recall?

A.    I don't -- there may have been some witnesses that referenced certain scores or certain grades or -- but the records --

Q.    You're referring to the experts?

A.    Primarily.  And there wasn't a lot of meat in the records about scores.  So I -- there weren't a big part of the teachers' testimony; it was more their recollections of Billie and how his performance was and behavior was at school.

Q.    In paragraph 7 where you're discussing your involvement and how you perceived the case when you first got involved in the case --

A.    Okay.

Q.    -- you mentioned that there was limited contact with the family prior to your involvement in the case.

A.    Yes.

Q.    Is that an accurate statement?

        MS. COSTANTIN:  Judge, I object as how he knows what contact there was with the family before he was even involved.

        THE COURT:  Well, he testified, you know, that he had certain things and that there was limited contact.  That seems inconsistent with what Simon testified to, but that's what he says, so overruled.

A.    Based on the written information, notes, which were

nonexistent except for the so-called Life History, there was not information about -- at least written notes, written information about the family.  As I testified yesterday, I'm sure I had discussions with Rick, what's Juanita like, what's Billie like, blah, blah, blah, you know, general types of discussions.  But in terms of work product, I had received nothing substantial at that time.

Q.    Okay.  So as far as you know, the contact with the family had been limited at that point; is that right?

A.    As far as I knew.  But like there were no interviews even to the extent that I had done them in my limited involvement in this case.  You know, I would have expected more information by the time I had entered, you know.

Q.    Okay.  And was your knowledge of -- when you entered the case, was your knowledge of the contact with witnesses based primarily on the Life History that was provided to you by Mr. Simon?

A.    The so-called Life History, the notes, yes.

Q.    When you entered the case, were there witnesses outside of the family that had been contacted that you were aware of?

A.    The only ones that I, as I sit here, I'm aware of were the ones that John had listed in his notes that were given to me; Lucy McLemore, Raymond Petty, I believe.  But in terms of all the other people who I had spoken to, none of those people that I am aware of were contacted beforehand.

Q.   Okay.  So no teachers had been contacted prior to your involvement?

A.   No.

Q.   And no family members other than the individuals that you mentioned and Juanita?

A.   And Juanita and perhaps the sisters.

Q.   So is it fair to say that there were witnesses that were identified, but those witnesses had not yet been contacted?

A.   Did you say there were witnesses that were identified but not contacted?

Q.   Speaking directly about the Life History, were there witnesses identified in the Life History that had not yet been contacted?

A.   I believe so, yes.

Q.   And you had received this on January 16th, 1998; is that right?

A.   Yes.

Q.   And that was less than a month before voir dire in the trial; is that correct?

A.   The voir dire started on February 9th?  I'm not sure.

Q.   Yes, February 9th, you're right.

A.   So it was three weeks about.

Q.   And is that problematic in your view that on January 16th, only the witnesses that you just identified had

been contacted as far as you knew?

A.   What I had said yesterday was given the point where I entered the case, I would have expected that all the work that I did on this case would have been done by the time I entered.  So --

Q.   On cross-examination yesterday you were asked to speculate about whether Mr. Sindel might have communicated with Juanita, had communications with Juanita that you did not know about.  And I believe your answer was that it might be possible, but you didn't know the answer to that question.

A.   Right.

Q.   Is that right?

A.   I believe so.

Q.   Did Mr. Sindel ever tell you that he had had conversations with Juanita that involved the subject of mitigation?

A.   Not that I recall.  I assumed that he had talked to Juanita because he had been involved since, you know, March.  And, you know, he related -- and I don't recall the specifics, but it's obvious that once I became involved in the case, he related whatever -- you know, whatever he knew at the time to me, or I hope he did.

Q.   Would discussing mitigation with the mother of your client be important?

A.   Discussing mitigation?

Q.    Yeah.

A.    That's a broad question.  In terms of touching on areas of his life, getting background, I think he was probably relying on Dr. Haney for that primarily.

Q.    Well, regardless of, you know, what happened with Dr. Haney and Mr. Sindel, if the lead counsel was having conversations with the mother of your client, would you want to know the contents of those conversations, especially if they related to mitigation?

A.    Absolutely, yes.

Q.    And would you have expected based on your relationship with Mr. Sindel, that he would have provided you with that information?

A.    Yes.

Q.    If he did not provide that information to you, would that be a problem?

A.    That would surprise me, and it would be helpful to have that information as part of my knowledge base, you know, going forward.

Q.    Would you want to have that information before you went out and spoke with Juanita Allen?

A.    Yes.

Q.    And why is that?

A.    Well, just not knowing what that information is, I could just answer in the most general terms.  I would want to

know as much as possible before going out into the world to start interviewing people, you know, so --

Q.    And did you make any attempts to find out what mitigation had been done prior to your involvement in the case?

A.    What mitigation had been done?  What I was presented with when I entered the case was these notes of John Simon, that's what I was given.

Q.    Okay.  You weren't told that there was anything else other than what you were given that you recall?

A.    All I can say is I would assume that Rick and I had conversations about the family and about Billie, but I was not given anything that I recall.

Q.    All right.  So if Mr. Sindel had had discussions with Juanita Allen about physical abuse or other mitigating evidence that he did not share with you, would you consider that to be problematic?

A.    Yes, I would.

Q.    And would you expect that Mr. Sindel would share that information with you?

A.    Obviously, yes.

Q.    Okay.  Now, you were asked on cross-examination several questions about presenting or not presenting evidence of physical abuse by Juanita Allen at the penalty phase; is that right?

A.    I recall those questions, yes.

Q.    And you were shown a document where you indicated that physical abuse was an important theme in Mr. Allen's life; is that correct?

A.    Physical abuse and beatings was one of the themes listed in that outline.

Q.    Okay.  Was it important for the defense team to find, if it existed, evidence that Mr. Allen had been physically abused?

A.    I think if it existed, it's absolutely critical that we find it and that we use it.

Q.    And this was not only your view but this was a view that you discussed with Mr. Sindel and Mr. Simon; is that correct?

A.    I believe that that is common.  I think that's what Mr. Simon -- I know Mr. Simon had a mitigation workbook at some point.  Those are areas that are part and parcel of mitigation investigations.

Q.    Did Mr. Simon -- I'm sorry, strike that.

        Did Mr. Sindel at any point in time tell you that it was no longer the plan to find evidence of physical abuse or present evidence of physical abuse?

A.    Did Mr. Sindel ever say that?

Q.    Yes.

A.    Absolutely not.

Q.    So as you sit here today, is it your understanding that at the time of Mr. Allen's penalty phase, the legal team wanted to present evidence of physical abuse?

A.    We did present evidence that we had, that obviously now I know more exists, but we presented that kind of evidence. And we would have wanted to present more of that kind of evidence.

Q.    And you're referring to Raymond Petty; is that right?

A.    We presented Raymond Petty. And then the three witnesses that were mentioned earlier, Ruffin and Shimeka Taylor and one other, at the minimum we would want to present. And then ideally, I mean, what we should have been doing was also presenting that information that was evidenced in the declarations that you gave me based on interviews with the nuclear family. So all that information was germane to that point, physical abuse and beatings. And had we not wanted to present it -- I mean, had I been told, I would have fought that. And the fact is we did present it. So it was incongruent that if that was the theory or if that was some fantasy, that Raymond Petty would have been asked those questions or even put on the stand.

Q.    So there was some witnesses that you presented or at least one witness that you presented who provided evidence of physical abuse?

A.    Yes.

Q.    And there were other witnesses who did not provide evidence of physical abuse but had expressed --

A.    Potentially could have, yes.

Q.    Okay.  Now, let's talk about Sam Moore.  He was one of the witnesses who you did not elicit or Mr. Sindel did not elicit evidence of physical abuse from at the penalty phase; is that right?

A.    I believe that's right.

Q.    And in Mr. Moore's notes, he had described Mrs. Allen "mopping him up"; is that right?

A.    That's correct.

Q.    All right.  Did you --

THE COURT:  Excuse me, would you give me some tablets?  I'm running out.  I'm sorry.  Go ahead.

MR. MONTROY:  Sure.  No problem.

BY MR. MONTROY:

Q.    Did you ever ask Sam Moore to give examples of what he meant by Juanita "mopping him up"?

A.    I did not.

Q.    Did you ask him if that was a reference to physical abuse?

A.    It was an obvious reference to physical abuse now that, you know, I see it, yes.

Q.    Did Mr. Sindel ever ask him to your knowledge about examples of what it means to mop up?

A.    To mop Billie up, no.

Q.    Mr. Moore had also indicated something along the lines of Juanita Allen kicking Billie's ass in the street; is that right?

A.    Yes, correct.

Q.    Did you ever ask Mr. Moore to give examples --

A.    Of what he had seen?

Q.    -- of when Mr. Allen had had his ass kicked by his mom in the street?

A.    I did not follow up on those.

Q.    Are you aware of anybody else following up on that?

A.    That -- if it wasn't followed up on in those witness prep sessions, then he was going on the stand and there would be no followup in between.

Q.    Did you ever -- strike that.  In the notes that were referenced on cross-examination, Shimeka Taylor talked about whoopings; is that right?

A.    I believe so.

Q.    Did you ever ask Shimeka Taylor for specific examples of what she meant by "whoopings"?

A.    I did not follow up with that unfortunately.

Q.    Did you ever ask her if she observed Mr. Allen receiving whoopings from his mother?

A.    I didn't follow up on that answer.

Q.    Did Mr. Sindel follow up on that answer, do you

remember?

A.    Not that I'm aware of.

Q.    So when Shimeka Taylor's interview was over that weekend in February, you had no actual examples of whoopings, of Mr. Allen being whooped by his mother from Shimeka?

A.    Not from her.  And the next time we saw her it was on the stand.

Q.    Okay.  Deborah Ruffin.  Deborah Ruffin had indicated in your notes that she was, quote, doing -- that -- I'm sorry, Deborah Ruffin had indicated in your notes as, quote, doing what she had to do; is that correct?

A.    Correct.

Q.    And that's a reference to Mrs. Allen doing what she had to do concerning Billie Allen; is that right?

A.    To -- yes.

Q.    Did you ever follow up with Deborah Ruffin as to what she meant by Mrs. Allen doing what she had to do?

A.    Unfortunately I did not, no.

Q.    Did you ever ask Deborah Ruffin if that was a reference to physical abuse?

A.    It appears to be a reference to physical abuse, and I did not follow up on it.

Q.    Did you ever ask Deborah Ruffin if she had observed Juanita Allen beating Mr. Allen?

A.    No, I didn't follow up on it.

Q.    Did Mr. Sindel ever ask Deborah Ruffin to your knowledge if she observed --

A.    Not to my knowledge.

Q.    -- Juanita Allen beating Billie Allen?

A.    Just from what's written in his notes, which was coincident in time with what I had written, I believe.

Q.    So Deborah Ruffin, that interview ended, and you didn't have any specific examples of physical abuse, of Juanita Allen beating Billie Allen?

A.    From Deborah Ruffin, no, we did not.

Q.    You mentioned just now that you didn't follow up with these references; is that right?

A.    Correct.

Q.    Do you believe that you should have followed up with these witnesses?

A.    I'm not proud that we didn't follow up.  We needed to follow up.

Q.    All right.  And do you have any explanation as to why you didn't follow up?

A.    I believe that we -- how should I say this?  I don't think we were operating at efficiency -- at peek efficiency, at an efficiency level that needed to be maintained in a case like this.  There was a lot of information coming out at once.  There were some obvious things that were missed and not pursued.

I was coming off of another penalty phase before I got into this. I don't know if that had an impact at all. But during this truncated period of time, I was just trying to see as many people as I could. And as I said earlier, the iterative process that occurred was more about numbers because there were people just sort of emerging that were important to talk to, but we were never able to drill deep enough with -- or spend enough sufficient time as indicated like on that weekend prep session, for instance, with these witnesses to really get a true picture, a full picture of what they could have potentially said.

Q. Was there ever a decision made by the defense team, either you or Mr. Sindel or Mr. Simon, to not follow up on these examples of -- that could potentially have been physical abuse expressed by Deborah Ruffin, Shimeka Taylor, and Samuel Moore?

A. That type of information was critical to pursue, and it would be ridiculous to say that there was a deliberate decision not to pursue that information.

Q. Okay. But was there ever a decision -- was there ever a decision made by the defense team not to pursue that information?

A. No, there was not.

Q. Did Mr. Sindel or Mr. Simon or yourself affirmatively decide not to present evidence of physical abuse testimony

from Deborah Ruffin, from Sam Moore, from Shimeka Taylor, from any witnesses at the penalty phase?

A. I can only speak to what was going on in my head. And I -- well, I received no information from Rick or John that that was an avenue that was shut to us. That's the type of information that we would want to present. So in my mind, I never made any decision not to pursue that information.

Q. Were you aware of that decision ever being made by Mr. Sindel or Mr. Simon?

A. No. Because we did, in fact, present that kind of information.

Q. Do you recall exactly what the evidence was that was presented by Raymond Petty?

A. He related an instance when Billie was a teenager where he found Juanita beating Billie severely with an extension cord in a manner that he described as being akin to the slavery days, a slave type beating.

Q. Was that a specific example of abuse that he related to you?

A. Yes.

Q. Would you say that that example of abuse differed from the kind of testimony, for lack of a better word, that Deborah Ruffin or Samuel Moore provided during that prep session?

A. It would be consistent with what Shimeka talked --

alluded to, to what all three of them alluded to, it would be consistent.

Q.   And you would agree that what Mr. Petty told you and ultimately testified to was a specific example of Juanita Allen beating Billie Allen; is that right?

A.   Yes.

Q.   All right.  And you never followed up to get specific examples from those other three witnesses that we talked about?

A.   No, I did not.

Q.   Do you recall that on cross-examination you were asked questions about Lucy McLemore?

A.   As I sit here right now, I don't recall specific questions about Lucy.

Q.   Do you remember Lucy McLemore -- well, let me rephrase that.  Do you remember an entry in some notes that were taken of an interview from Lucy McLemore where she wrote the word "dysfunction," and described Mr. Allen's family, "Dysfunction more than the usual case."  Do you remember talking about that yesterday?

A.   Was that notes that were reviewed by the government?

Q.   On cross-examination, that's correct.

A.   I recall seeing those notes to that effect.  I didn't recall that that was Lucy, but --

Q.   Was family dysfunction, or for lack of a better word

neglect, a type of mitigation that the defense team wanted to present at the penalty phase?

A.    Absolutely.

Q.    I'm presenting you with now, this is Exhibit 188.5, the testimony of Lucy McLemore at the penalty phase.  And Mr. Sindel asked the question, and this is on line 9:

        "Okay.  Now you talked a little bit about the situation with your children and what's going on.  Was there a difference between your household and Juanita's household in terms of how the children were raised and what they had to do?"

        And the answer given:  "No, we treated them -- we taught our children the same thing, to be well mannered, respectful, to do the right thing, to always tell the truth, not to get into any kind of trouble, try to do the best you can at school.  We're sisters.  We teach our kids the same things.  We have the same -- same values."

A.    Okay.

Q.    That's the testimony, correct?  Do you recognize Mr. Sindel's question as an effort to have Ms. McLemore testify to the evidence that she presented at the meeting that there was dysfunction in the household?

        MS. COSTANTIN:  Judge I'd object, that's complete speculation about what Mr. Sindel was attempting to elicit from this witness.

THE COURT:  Just a second.  As I understand what's happening, Mr. Montroy just read from the testimony of Ms. McLemore, who said nothing about dysfunction, but said, in fact, the two households treated their children the same, which would indicate something entirely differently than that.

MR. MONTROY:  That's right, Your Honor.  I'm not saying that Ms. McLemore is saying that there was dysfunction.  In fact, she's saying the exact opposite of it.

THE COURT:  Wait a minute.

MR. MONTROY:  I apologize.

THE COURT:  I'm trying to get a handle on her objection.

MR. MONTROY:  Sure.

THE COURT:  So the question goes to -- just a minute.  It asks for -- Mr. Sindel's question, what the effort was.  Now, he may or may not know that based upon conversations he had.  But you're not entitled to speculate as to what you think was going through Mr. Sindel's mind.

THE WITNESS:  Okay.

THE COURT:  Would you reask the question?

MR. MONTROY:  Sure.

BY MR. MONTROY:

Q.    Looking at Mr. Sindel's question and knowing that Lucy McLemore had expressed that there was dysfunction in the

Petty household --

A.    Right.

Q.    -- does that question to you, is that question consistent with a question that Mr. Sindel might have asked to elicit evidence of dysfunction?

MS. COSTANTIN:  Judge, I have the same objection unless he knows the answer as in talking to Mr. Sindel about it.  Appears as speculation.

THE COURT:  Well, unless he knows.  I think what is happening is there is -- what happened here initially, she said in an interview that the family was dysfunctional more than usual.  And the question Mr. Sindel asked not only shows that there was no effort made in the question to talk about the family being dysfunctional, but to the contrary, that the family was just the opposite, was raised to do right and not cause trouble and so forth.

I don't -- I don't want the witness to speculate as to what was going through Mr. Sindel's mind.  If he knows based on a conversation, then I'll permit him to answer. But, no, you can't guess or speculate.  The record is whatever it is.  Do you understand?

THE WITNESS:  The question itself, can I just speak freely?

THE COURT:  Sure.

THE WITNESS:  Okay.  The question itself is

eliciting whether or not there's a contrast between what's going on in Juanita's house versus what's going on in her house. So he's trying to elicit a description of the contrast.

THE COURT: Okay. Well, let's back up and see just a second. Because I didn't quite get that.

MS. COSTANTIN: Judge, I would object. The question is, was there a difference that Mr. Sindel asked. And I believe the witness is basically just going off the text of the question and speculating as to what Mr. Sindel's purpose was. And my objection is that that is speculation. If he had a conversation with Mr. Sindel where Mr. Sindel said, I'm going to elicit dysfunction in this family by this question, then I have no objection.

THE COURT: Wait a minute. The question is: "Was there a difference between your household and Juanita's household in terms of how the children were raised and what they had to do?" And the answer given. And so the problem is, the question is whatever it is. The answer is whatever it is. And the witness can't speculate as to what Mr. Sindel was trying to do unless he knows. Unless they were in some kind of a meeting before the question was asked about what the strategy was with the questioning. So he just can't speculate as to what --

MR. MONTROY: Okay. Very well, Your Honor. I'll

move on.

THE COURT:  Okay.

BY MR. MONTROY:

Q.    The testimony that Raymond Petty provided at the penalty phase about the beating that he observed on Mr. Allen from his mother, would you describe that as punishment or would you describe that as abuse?

A.    That was a whooping.  That was a serious abuse.

Q.    Is locking a child out of the house, would you consider that abuse or punishment?

A.    I would consider that to be abusive, especially with a younger child.

Q.    What if the child had done something, say, for instance, disobeyed a rule, broken something in the house, was playing the radio too loud, and in punishment for that action the mother locks the child out of the house.  Would you consider that to be punishment or physical abuse?

MS. COSTANTIN:  Judge, I'd object to the relevance of this witness's opinion about different practices by a parent unless this is setting something up relevant to this specific case.

THE COURT:  Overruled.  Based upon his training and knowledge, overruled.

A.    If a child is misbehaving, usually you want to supervise them and not leave them to run off on their own

doing their own thing. It doesn't seem to be effective parenting to do that -- to do that. If done repeatedly, it runs counter to what your -- as a parent what your intentions -- if you're trying to get more control over your child and teach your child, it runs counter to those purposes to lock them out of the house.

Q. If you were presented with that kind of conduct, would you report that to the authorities, a parent locking a child out of the house for misbehaving?

A. I know that there was a report of him being locked out overnight in the cold.

Q. I'm not asking that question right now.

A. That would be potentially reportable. Each individual instance of locking out, it really would depend on the extent of it, and if I was a neighbor or someone who was aware, a professional. If it was a pattern over a period of time, it could be potentially reportable.

Q. What about locking a child out of the house overnight in an area with a lot of crime?

A. That's a problem.

Q. Is hitting a child with extension cords, do you consider that to be punishment or do you consider that to be abuse?

A. That's abuse.

Q. What about punching a child in the face?

A.    That would be abusive as well.

Q.    What about routinely throwing objects at a child, sometimes for reasons, sometimes without reason, is that abuse or is that punishment?

A.    That would be abusive.

Q.    There was some questions yesterday about Dr. Cuneo writing in his notes that, "Juanita disciplined Billie to the end."  Do you recall that?

A.    Yes.

Q.    And these were notes that were provided to you prior to Dr. Cuneo's testimony?

A.    Were these from 2/22?

Q.    These were the notes, I believe, that were attached to his report.

A.    Okay.

Q.    The interview of Mr. Allen.

A.    I recall seeing them yesterday.

Q.    So February 16th.

A.    Okay.  Let me put on my glasses.  Okay.

Q.    And I'm not sure of the exact date of these notes, but these notes would have been prepared prior to Mr. Cuneo's ultimate report that was written on February 16th?

A.    January 16th?

Q.    Oh, I'm sorry, January 16th, that's right.  Do you recall the statement that "Juanita disciplined him to the

end"?

A.    I recall seeing that.

Q.    Okay.

A.    I don't see it right in front of me, but I do recall seeing that.

Q.    Did you ever follow up on that?

A.    I did not, no.

Q.    Did you ever go back to Billie and ask Billie, hey, you told this to Dr. Cuneo, what did you mean by that?

A.    I did not, no.

Q.    Did you ever go to any other family members or any other witness and said, hey, Billie said this happened or we have information that this is what Juanita was doing, can you confirm or deny it?

A.    I did not follow up on that lead.

Q.    Is that something that you should have done?

A.    Yes.

Q.    When you were determining which -- what type of evidence to present at the penalty phase, was John Simon the person that ultimately decided that or was that a decision that was made by you or was it a decision that was made by Mr. Sindel or was it not really a decision at all?

A.    I'm sure that we had discussions around what was going to be presented.  The themes of the mitigation were discussed at some point.  Also the list of mitigators, potential

mitigators that would be presented to the jury were also discussed. So there was at some point a discussion around these factors.

Q.   I just want to turn your attention to Claude and Colette McLemore. Do you know what their relationship is to Mr. Allen?

A.   I believe they are his cousins.

Q.   And these were the two witnesses that you took some time to travel outside of St. Louis to see?

A.   Yes.

Q.   And did you see both of them in the course of one trip?

A.   I believe they were two separate days.

Q.   Okay. If those days were back to back days, would that make sense to you? Would that refresh your recollection if it was one day and then --

A.   Was it the 8th and 9th of February?

Q.   Yeah, it was February 8th and February 9th.

A.   Okay.

Q.   And you had indicated that they were cousins of Mr. Allen; is that right?

A.   Yes.

Q.   When you decided to go and see them, did you know what kind of information you were going to get from them?

A.   No, I did not.

Q.   Did you know that the information that you were going

to get from them was what they ultimately told you during that interview?

A.    Did I know in advance?

Q.    Yeah, did you know in advance?

A.    No, I don't believe so.

Q.    So is it fair to say that when you went to go see them, you went to conduct a typical interview with two cousins of Mr. Allen?

A.    A face-to-face interview with the cousins, yes.

Q.    Would this be the kind of thing that you would normally do in a mitigation investigation?

A.    It's part of the normal operating --

Q.    And you had talked about having a bit of time crunch in this case; is that right?

A.    There was a severe time crunch here.

Q.    Was there something about Claude and Colette McLemore that despite the time crunch, you thought it was important to take two days and go and see them?

A.    Off the top of my head, in hindsight one could argue that time might have been better spent elsewhere.  But I did not know what I would be learning from them.  And they are the same age, peers, cousins that are, you know, potentially very important witnesses.  So I went out there.

Q.    Nicole Petty described whoopings.  Did you ever follow up on what she meant by "whoopings"?

A.     Unfortunately not.

Q.     Did you ever get any examples from her about what kind of whoopings she was referencing?

A.     I did not, no.

Q.     If she expressed an incident where there was a whooping, did you ever follow up on that incident to determine how old Mr. Allen was?

A.     No, unfortunately not.

Q.     Shirlene Grant, did you ever interview Shirlene Grant?

A.     I believe I did.

Q.     Did you ever determine whether or not she smoked crack?

A.     Honestly I don't recall as I sit here right now.

        THE COURT:  Is it Grant or Brandt?

        MR. MONTROY:  Crack as in crack cocaine, Your Honor.

        THE COURT:  Okay.  Well, her name, is it Shirlene Grant or Brandt?

        MR. MONTROY:  Yeah, Grant, G-r-a-n-t.

        THE COURT:  Got it.  Thanks.

BY MR. MONTROY:

Q.     How many meetings did you ultimately have with Juanita Allen, do you recall?

A.     I don't recall specifically.  There were at least two.

Q.     Okay.  I'm going to turn your attention to Exhibit 411. Do you recognize this document?

A.     Yes.

Q.    Are these your typed notes with Juanita Allen?

A.    They are.

Q.    I'm just going to scroll down here.  Does that line indicate two separate interviews on page 3?

A.    It does.  I would say it demarcates two separate contacts.  The second contact is very brief.  I don't know if I would call it an interview per se, but it was a contact.

Q.    And that appears to be all the contacts that you had with Juanita Allen; is that correct?

A.    I believe so.

Q.    So based on your notes, you had two meetings with Juanita Allen?

A.    I don't know if the second one was a meeting or a phone call, and I believe that we met during that weekend prep session as well.  At least they are listed, that nuclear family is listed there, Juanita and the sisters are listed there.  There's no time listed for them.

Q.    Would you have liked to have spent more time with Juanita Allen?

A.    Absolutely.

Q.    Do you think you would have felt more comfortable asking Juanita Allen about issues like abuse and neglect if you had seen her more than two times?

A.    Most definitely.

Q.    You were questioned about an incident involving

Mr. Allen boxing with Jerome Allen. Do you recall that?

A.   I do.

Q.   Were you aware when you -- I'm sorry, strike that. Are you aware that when this incident happened, Mr. Allen was a child?

A.   Yes.

Q.   And do you know what Jerome Allen's relationship, Jerome Petty's relationship is to Mr. Allen?

A.   Jerome is his paternal uncle.

Q.   Are you aware that Jerome is significantly older than Billie Allen?

A.   Yes.

Q.   Did it strike you as odd that someone significantly older than a child would be boxing with a child, especially when that resulted in injury to the child?

A.   I could -- I could see that happening in the course of play in a family, one uncle boxing with a younger boy perhaps. But this is -- he obviously got hit because he fell and hit his head. So --

Q.   Did you ever follow up on this to determine if the situation was maybe more than just boxing, friendly boxing, playing?

A.   I forgot who related that it was more than just simple playful boxing, but I later learned that. I forgot how. I think it was through you, but --

Q.    In like a declaration that you had seen?

A.    I think so.

Q.    Did you ever ask anybody during your investigation if they had witnessed this incident?

A.    Not that I recall.

Q.    Did you ever ask witnesses, family members, if Jerome was abusive towards Billie?

A.    What I did with this piece of information is I believe I went to get medical records or medical records already existed, I'm not sure.  But I think we followed up with the hospital.

Q.    Is this a red flag for potential abuse?

A.    It could be a red flag for abuse.

Q.    Is it something that mitigation investigators should follow up on?

A.    Yes.

Q.    And did that happen in this case?

A.    No.

Q.    Do you recall being asked a number of questions on cross-examination about a document that indicated the responsibilities of a mitigation investigator?

A.    The affidavit that I presented.

Q.    And that was presented at the motion; is that right?

A.    Yes.

Q.    The motion for the continuance?

A.    Yes.

MS. COSTANTIN:  That's to get an expert appointed.

MR. MONTROY:  Oh, is it?  I'm sorry.  I'm confusing -- do you know what number that is?

THE COURT:  I think it was attached to his statement in support of a continuance.

MR. HOLTSHOUSER:  That's a different affidavit.

MR. MONTROY:  That's how I remembered it as well, but apparently --

MR. HOLTSHOUSER:  There was an affidavit, but the affidavit is 368.

MR. MONTROY:  368.  Thank you.

MS. CARLYLE:  What about 565?  I think it might be 565.

MR. HOLTSHOUSER:  Page down.  368, page down.

MS. COSTANTIN:  Page down.  See.

MR. MONTROY:  Thank you very much.

BY MR. MONTROY:

Q.    Turning your attention to 368.  I wrote 638.  I'm not sure what that means.  Let's -- you recognize this document, right?

A.    Yes.

Q.    And this is -- you recognize this declaration as one that you submitted to the Court to get an additional expert; is that right?

A.    I believe for Dr. Gelbort.

Q.    Okay.  And in this document you describe some of the duties and functions of a mitigation expert; is that right?

A.    Yes.

Q.    And you were asked a number of questions about this on cross-examination?

A.    I was.

Q.    In your opinion did you carry out every duty that a mitigation investigator should carry out with conducting a mitigation investigation?  Did you do everything that you should have done?

A.    Did I do everything I should have done?  I don't believe so.

Q.    Did you do everything that you told the Court a mitigation investigator is supposed to do?

A.    I did what I could at the time.

Q.    Was it your intention to perform the full duties of a mitigation investigator?

A.    Yes.

Q.    Concerning evidence of Billie and drug dealing, if the trial team, meaning you and Mr. Sindel and Mr. Simon, had made the decision to not include information that Billie sold drugs, was that decision made knowing that Billie learned how to sell drugs from his father and uncle when he was a little kid?  So to simplify, was that decision made -- did you have

that information at the time that Mr. Allen learned to sell drugs from his father and his uncle?

A.   No, we didn't have that information at the time.

Q.   If you had had that information, might that have changed your decision about whether or not to present evidence that might have included or might have raised the issue of Billie's drug dealing?

A.   I personally am not afraid of that kind of evidence coming out.  Having that information that his relatives had co-opted his involvement in selling and using drugs, I would have wanted to pursue that for sure.

Q.   Do you consider that to be mitigating evidence?

A.   Very much so.  It helps create an understanding of how his life evolved in that area.

Q.   There was -- today during cross-examination there was some testimony about Billy Wayne Allen.  Do you recall that?

A.   Yes.

Q.   And there was some questions about whether or not Billy Wayne Allen recanted his declaration or testified differently at the deposition than he did at his declaration.  Do you recall that?

A.   He recanted parts of his declaration.

Q.   Okay.

        THE COURT:  Just a second.  Let me ask Ryan first. It's ordinarily quitting time, but do you have plans to be

VIII - 222

somewhere else if we go a few more minutes?

THE CLERK:  Judge, I have school.  It's not a problem.

THE COURT:  What time is school?

THE CLERK:  At six o'clock.  But it's Sal Cira and he works in the building.

MR. MONTROY:  And, Your Honor, for time, I'm nearly finished with my questioning.

MR. HOLTSHOUSER:  You're good.  You're covered.

MR. MONTROY:  Not to influence anything, just so you know.

THE COURT:  No, I understand.

MS. COSTANTIN:  Judge, I would be 20 minutes tops.

THE COURT:  Well, what we have is the situation, and I was going to ask Sue next, because last night you had to go pick up some kids.

THE REPORTER:  I'm fine tonight.

THE COURT:  You're fine tonight.  I'm perfectly willing to excuse your attendance here.

THE CLERK:  I'm fine.

THE COURT:  You will say that, but not if you're supposed to be in school.

THE CLERK:  He's actually understanding, I'm sure.  He'll understand what I'm doing.  He's fine.

THE COURT:  Well, you know --

THE CLERK:  It's good, Judge.

THE COURT:  I don't want to get anybody -- to cause anybody problems here.  You say he'll understand.  Can you make it up or what are you telling me?

THE CLERK:  He's very lenient in regards to attendance.  And I'll still make it tonight.  So tardiness is not an issue.  It goes until 10 o'clock.

THE COURT:  All right.  Then let's go ahead and proceed then if that's okay with everyone.

MR. MORENO:  We would prefer that.

THE COURT:  Pardon me?  Prefer to proceed?

MR. MORENO:  Yes.

MR. MONTROY:  That's correct, Your Honor.

THE COURT:  Then is that all right with --

MS. COSTANTIN:  Yes, Judge, that's fine.

THE COURT:  Then let's do that.

BY MR. MONTROY:

Q.   I just want to point your attention to Exhibit 261.  Do you recognize this as the declaration of Billy Wayne Allen?

A.   I do.

Q.   And this was a declaration that was provided to you by habeas counsel?

A.   Yes.

Q.   And specifically there was a question about Mr. Allen in his declaration saying the following:  "They also beat

their kids" -- referring to Juanita Allen and Mr. Allen's

father, JR.  "They also beat their kids, just like we got

beat by our parents who would use straps, shoes, broom

handles and pretty much anything that was around."

A.    Yes.

Q.    Do you remember seeing that from his declaration?

A.    I do.

Q.    And do you remember on cross-examination seeing some

testimony from a deposition where Billy Wayne Allen seemed to

contradict this?

A.    I believe that he said that he did not see Juanita beat

Billie.

Q.    I just want to point your attention to Exhibit 528.60.

This is the deposition testimony of Billy Wayne Allen.  And

just to clarify what Mr. Allen testified to on

cross-examination at the deposition:

        "QUESTION:  Just a couple questions.  Now, Billie,

you just said before that you heard that Juanita used to

physically beat Billie?"

        "ANSWER:  Uh-huh."

        "QUESTION:  Then in your affidavit, you say they

also beat their kids just like we got beat by my parents who

use straps, shoes, broom handles, thinking that was all

right?"

        "ANSWER:  Uh-huh."

"QUESTION:  Is that fair to say that you heard Juanita use items to beat Billie?"

"ANSWER:  Yes.  Yes."

"QUESTION:  You did hear that?"

"ANSWER:  Yes."

So it's fair to say that in his redirect testimony at the deposition, Mr. Allen clarified that he did, in fact, have information that Juanita used items to beat Billie; is that right?

A.    That's correct.

Q.    Those items being straps, shoes, broom handles?

A.    Yes.

Q.    Just going back to Exhibit 261.  Looking at the rest of the paragraph.  "During the time that Billie lived with his mother (Juanita) and Junior, and his sisters, I knew that my brother and Juanita fought all the time.  They were verbally and physically nasty to each other.  Juanita may have been a drug user, and she may have gotten into our PCP.  I'm certain however that she drank."

THE COURT:  A little bit slower, please.

BY MR. MONTROY:

Q.    "She could drink alcohol like a man.  She drank for as long as I knew her, including when she was pregnant with Billie and her other kids.  There is no way to describe her except to say that she was a heavy drinker who would drink

all day and every day.  And when she drank, she could fight and get nasty like a man.  She used to get the best of brother when they fought.  They fought in front of the children, drank and cussed, and Junior and I used drugs in front of them too."  Is this important mitigation?

A.    This is critically important mitigation in my opinion.

Q.    And is this mitigation that you would have presented at the penalty phase?

A.    Yes.

Q.    And did you ever interview Billy Wayne Allen?

A.    I did not.

Q.    Was there any reason why you did not interview Billy Wayne Allen?

A.    I didn't get to that side of the family during the course of my limited time on this case.

Q.    If Billie Allen, Billie Jerome Allen, had told you or Mr. Simon or Mr. Sindel that he had nothing to do with his father, would that have precluded you from investigating the paternal side of the family?

A.    That would have no bearing.  That paternal side of the family is a huge part of the picture potentially, and that would be something that I would pursue in every case.

Q.    And is it your opinion that you should have pursued the paternal side of the family in this case?

A.    That should have been done, yes.

Q.    Now, it was brought up that you worked with Mr. Sindel on another capital case after the Billie Allen case.  Is that right?

A.    Yes, I did some work on it.  And then at some point my work ended on it.

Q.    Well, before you took that case, before you agreed to work with Mr. Sindel on that case, did you and he talk about what had happened in the Billie Allen case at all?

A.    We both regretted how this case -- what transpired here.  He knew that the predicament that they got themselves into.  I mean, they knew it was a dropped ball.

Q.    Did he actually say that to you, "We dropped the ball," or what made you think that that's what he felt?

A.    I don't recall specific conversations like verbatim with him, but I know that we talked about that.

Q.    Okay.  And based on what had happened in Mr. Allen's case, did you have any concerns about working with Mr. Sindel again before, you know, starting another case?

A.    I think Mr. Sindel made a serious error in this case.  However, I respect him greatly.  Over the course of working with him on this, once I became involved, I developed a respect and a friendship with him, a rapport.  It was like going through a sort of trial by fire together in a sense.  We built a relationship through that shared experience.

Q.    And you -- I'm sorry.

A.   Even though I respect him, I believe that this case --
as I said earlier, he's a very smart attorney, he thinks
quickly on his feet.  A lot of the witness examinations were,
I felt, winged.  I felt because of the lack of preparation
that occurred, he had to wing it in a lot of ways.  And
because of the lack of preparation and because of the time
constraints, he wasn't attuned to what some of the witnesses
were saying in terms of followup questions that were obvious
to ask that he should have asked during his direct or during
cross.  It was -- it was a very intense situation.  So I
think it got sloppy because of that.

        Now, that did not preclude -- preclude me from
working with him again.  Because in a normal situation, I
know what his potential is.  I know how -- that he's an
excellent attorney.  But given the constraints of this case,
it caused performance detriments with everybody involved.
Me, him.

Q.   At any point in time during your work on this case, did
Mr. Sindel ever express to you, hey, we have a time crunch,
hey we don't have a lot of mitigation developed at this
point, go and talk to Billie Allen, go and talk to Juanita,
and go and talk to additional witnesses and ask them the
tough questions right from the start because we just don't
have time to do sort of involved mitigation investigation?

A.   Yeah, I don't think he knew really what this type of

investigation involved or working with this kind of expert involved because of what had transpired with the previous expert. So he never directed me to do certain things like that. I was like, he gave me this sort of broad lay of the land, this is what happened, can you help us, you know, blah blah, blah, blah, blah. And then I was like, send me what you got, I can come down tomorrow, let's get started on this thing, and let's go get more time. That was how this thing rolled out.

And then once I became involved, it was up to me to, you know, to basically do it.

MR. MONTROY: Your Honor, can I just have one moment?

THE COURT: Sure.

MR. MONTROY: I have just a couple more questions, Your Honor.

THE COURT: All right.

BY MR. MONTROY:

Q. Earlier you had mentioned and had seen on the schedule of the February 21st and February 22nd weekend that Juanita and her daughters had come in to -- had come in to be interviewed and prepared, right?

A. They were listed on that schedule. There was no time noted as to when they would come. I am not certain as to whether or not they came.

Q.   Okay.   Are you familiar with Mr. Allen's sister Yvette?

A.   She is -- there's, yeah, Yvette, yes.

Q.   Did you ever ask Yvette about instances of abuse or neglect in the household?

A.   Not that I recall.

Q.   Did you ever ask Yvette whether or not Juanita had an alcohol problem?

A.   Not that I recall.

Q.   Do you recall ever having any kind of serious mitigation-related conversation with Yvette?

A.   I didn't have those conversations with the nuclear family, with the sisters or with Juanita.

Q.   Is that something that you should have done?

A.   Absolutely, and would have done.

Q.   All right.   Did you present any evidence or develop any evidence and did the defense team present any evidence at the penalty phase that would explain to the jury the psychological significance of child abuse or neglect?

A.   Can you run that by me one more time?

Q.   Sure.   Was there any evidence presented -- was there any testimony presented to the jury at the penalty phase that would have explained to the jury the psychological significance of child abuse?

A.   Are you referring to the expert witnesses?

Q.   Sure, expert witnesses or lay witnesses, was there any

testimony in your mind that related to the psychological significance of child abuse?

A.    Not as I sit here now, not to my knowledge.

Q.    Given the testimony that was presented by Raymond Petty, would that have been something that you would have wanted to have done?

A.    To provide information to the experts and to have that type of information explained to a jury, absolutely.

Q.    Sure.  I mean, you present evidence, right, that Mr. Allen is severely beaten by his mother, right?

A.    Yes.

Q.    And you presented that evidence through Mr. Petty, right?

A.    Yes.  And what we should have done is have more fully developed the same type of information with the three witnesses who were referred to in earlier testimony, and also a fuller picture from the nuclear family, from Juanita, from the sisters, and also from Billy Wayne Allen from the father's side.

So that's the type of information that the experts should have prepared with a lot of information and they would have had time to have reasoned deliberations and reasoned, like time to put their report together.  It should have been done well in advance of the time I became involved in the case.  And so they were not on a strong footing during their

testimony. And they -- the jury also got deprived of hearing important information, interpretations regarding those causal influences.

MR. MONTROY: Thank you, Dr. Randall. Your Honor, I don't have any more questions.

THE COURT: Thank you. Recross.

MS. COSTANTIN: Thank you.

RECROSS-EXAMINATION

BY MS. COSTANTIN:

Q. I'll show you what's on the screen right now is still what's left over of Billy Wayne Allen's declaration, right?

A. Yes.

Q. And this statement, "they also beat their kids," we now know that he just heard that, right?

A. Yes.

Q. They didn't see any of that?

A. He didn't see it firsthand.

Q. And you don't know whether he saw or heard anything else -- whether he actually saw something or heard something else in that paragraph, right?

A. He's not -- well, he's not -- he's relating things that, he's claiming like he knows she drank. She drank alcohol like a man, but he doesn't say that in here, I saw that.

Q. Right. And he's not saying -- and specifically we now

know that he -- though he wrote, "they also beat their kids," he didn't really see that, he just heard about it, right?

A.   He said he knows about it.

Q.   He heard about, isn't that what they showed you?  The quote from his deposition was he heard about it?

A.   Yes.

Q.   Now, you also just testified, I believe, that you didn't have a conversation with any of Billie Allen's sisters or Juanita about abuse; is that right?

A.   I said that there were no -- I didn't ask specifically about that.

Q.   Did you have any conversations with them about it, whether or not you asked specifically?

A.   I don't believe so.  There might be a sentence or two where they brought it up, but it was never followed up on.

Q.   And these are your notes of Nicole Petty, Exhibit 431; is that right?

A.   Yes.

Q.   Okay.  Do you recall me asking you about this before, on, I believe it's page 3:

        "QUESTION:  Live with father?"

        She told you, "We were happy that we left."

A.   He left.

Q.   No, we left, because they left, moved out on him, didn't they?

VIII - 234

A.    Okay.

Q.    Right?  Didn't the family move out on John Allen?

A.    I believe so.

Q.    "I was about fourth, fifth grade.  They didn't get along too good.  Arguments all the time, yelling all the time.  Whoopings not often.  I remember one time Bill got a whooping here."  Do you remember me asking you about that?

A.    Yes.

Q.    So Nicole Petty did tell you about what you call a whooping is physical abuse; is that right?

A.    Yes.

Q.    So it's not correct that you didn't have a conversation with any of the sisters or Juanita Allen about physical abuse of Billie Allen.

A.    A conversation -- there was mention of the abuse.  Yes, I had a conversation.

Q.    Okay.  And you testified, I believe, that you didn't follow up on Nicole Petty's statement at another point during your redirect?

A.    Okay, yes.

Q.    You specifically remember that?

A.    Had I followed up, there would be notes underneath there with a description of the incidents.

Q.    So my question is, do you specifically remember that you did not ask a question like, "Tell me about the

whooping," you specifically remember that?

A.    I do not.

Q.    You talked about contact that you had or that the trial team and other people on the trial team had with Juanita Allen after you were involved in the case.  Do you recall that?

A.    Can you please reframe that or rephrase that?

Q.    I believe you testified that after you got involved in the case, you were the one who had the contact with Juanita Allen?

A.    After I got involved, I did have contact with Juanita Allen.

Q.    But you were the only one, was that your testimony or not?

A.    I don't know if I was the only one.

Q.    And so when we look at 412, and these notes, Exhibit 412, notes entitled "Juanita" that are Rick Sindel's handwriting, you can see that he at least took notes from some contact with Juanita Allen; is that right?

A.    They are undated, but, yes, those are notes that say "Juanita" on top, but there's no date on them.

Q.    And when we look at 413, and we see notes of Dr. Cuneo from his contact and interview of Juanita Allen on February 15th of 1998, that's what 413 is, correct?

A.    Correct, Dr. Cuneo had contact with her.

Q.    Okay.  And when we look at 414, handwritten notes entitled "Juanita, 2/23/98," those would be whose notes?  Are those Mr. Simon's notes?

A.    They don't look like Rick's handwriting, so this is probably Simon's.  I don't recognize his handwriting.

Q.    And 415, more handwritten notes entitled, "Juanita, 2/28/98," those are also Mr. Simon's handwritten notes; is that right?

A.    It appears to be.

Q.    So people besides you were having contact with Juanita Allen after you became involved in the case; is that right?

A.    Yes.

Q.    Now, let's just go back to the issue about your testimony at the hearing requesting an additional -- at least an additional 120 days.  Do you recall testifying, and I'm referring you to Exhibit 36, page 10.  Do you recall being asked, "Is 120 days a reasonable approximation of the time that you believe necessary to do your job according to the standards of your professional specialty?"  Do you recall that?

A.    I see that.

Q.    And you answered, "At this point I believe that would be sufficient."  Is that right?

A.    Yes.

Q.    Now, let's look at your declaration that you prepared

in connection with this case. Specifically where you state -- and I'm referring to page 6 of your declaration, it is Exhibit 254, paragraph 8. "Although my affidavit suggests the continuance of a 120 days, I actually did not consider this to be sufficient time to prepare a proper penalty phase defense." Is that correct?

A.    That's what it says.

Q.    Okay. And so in your sworn declaration, you stated that your testimony that 120 days was sufficient was not accurate, correct?

A.    Correct.

Q.    Now, let's go to the schedule, which I think is -- this is -- I'm going to Exhibit 383, page 2, which is the Allen weekend interview schedule for February 21st and February 22nd; is that right?

A.    Yes.

Q.    Okay. And you said that the problem, one of the problems with this schedule was that there was just one witness after another, and it was difficult to spend the time with them to get information from them, correct?

A.    To do an adequate job of that, yes.

Q.    Okay. But given this situation, what you have right here and your previous interviews, you learned from Deborah Ruffin of the physical abuse of Billie Allen, correct?

A.    Yes.

Q.    And you learned from Raymond Petty of physical abuse of Billie Allen by Juanita Allen, correct?

A.    Yes.

Q.    And you learned of physical abuse of Billie Allen by Juanita from Shimeka Taylor; is that right?

A.    Yes.

Q.    And even though Shimeka Taylor, as we can see 4:30 on Saturday was with Eric, her brother, and her mom, she flat out told you that he used to -- I think the phrase was kick -- that she would "kick the snot out of him"?

MR. MONTROY:  Objection, that's not in Dr. Randall's notes.  His notes I think describe something different.  It's a different wording.

THE COURT:  As I understand, it's notes -- well, maybe I don't understand.  Was this -- were these the notes that were taken on the 21st or 22nd when her brother was with -- and mother was with her?

Q.    Is that correct?

A.    That would be during the witness prep sessions at that time.

THE COURT:  Overruled.

BY MS. COSTANTIN:

Q.    So those statements were made despite the fact that there were two other people from the family in the room?

A.    Assuming that those were -- assuming that they were in

the room, which I'm not 100 percent sure of, but they probably were, because they are listed together, then your conclusion would be correct.

Q.    Okay.  So sometimes what you're saying is even though people are listed together, you would interview them separately?

A.    You know what, I don't remember.

Q.    Okay.  So this whole idea that people were together and that it actually in this case inhibited them from talking about sensitive subjects like abuse, you really don't have any idea that that happened?

A.    I never said that that would inhibit.  I said it would be ideal or the best practice to interview them separately and prepare for their testimony separately.

Q.    But you're not saying that any evidence was lost because of this; is that correct?

A.    I don't know that.

Q.    And you don't know that there was any lost?  You don't know one way or the other?

A.    Correct.

Q.    And, in fact, as we just talked about Deborah Ruffin, Raymond Petty, Shimeka Taylor, and then also I would add Sam Moore told you of physical abuse; is that right?

A.    Yes.

Q.    And then other people in this session here, these

two-day sessions, witnesses who were scheduled during this time, told you of dysfunction in the family; is that right?

A.   There were some that did, yes.

Q.   And that included Nancy Harris?

A.   Yes.

Q.   And that included Monette Petty, also known as Nishelle Petty; is that right?

A.   I believe so.

Q.   And Monette and Raymond and Carol and Raymond, Jr., like they were all scheduled together on a Sunday, right?

A.   That's what it appears to be.

Q.   And Carol Petty also told you about dysfunction; is that correct?  Do you remember me going through that with you?

A.   Right off the top of my head I don't, but --

Q.   Didn't Mr. Montroy just show you that clip about dysfunction, and then show you Carol Petty's testimony where the question was asked, how was your family any different from --

A.   I thought that was McLemore.

Q.   I believe that was Carol Petty.

A.   I thought it was Lucy McLemore.

        THE COURT:  I think it was Lucy.

        MS. COSTANTIN:  Okay.  I apologize.

BY MS. COSTANTIN:

Q.    And Carol Petty, let's go to your interview of Carol Petty then if you don't recall it.  Do you recall in your notes her telling you --

MS. CARLYLE:  Do you have the exhibit number?

MS. COSTANTIN:  Exhibit 503.

Q.    -- "I heard he had conflicts with his mother.  He was staying out late, wouldn't come home, things like that."  Do you recall that?

A.    I see that.

Q.    Do you recall her telling you, "Rules were not -- they might have been thrown out there, but not followed through.  No consequences came if they were broken.  And unstable.  They moved about from one place to another.  They were allowed to stay out of school for any reason"?

A.    Yes, I see that.

Q.    Would you describe that as dysfunctional?

A.    Yes.

Q.    So she's telling you pretty specific problems that were happening despite the fact that she's in this group of family members being interviewed; is that right?

A.    Assuming that those other people were there, then she was saying them in their presence.

Q.    Now, before you reviewed your or before you signed that declaration that was drafted by Mr. Wiseman, you didn't review any work that you had done; is that right?

A.    I reviewed the information that was presented to the jury, the jury transcripts, records, and the declarations.

Q.    And my question is, you didn't review any work that you had done?

A.    In terms of my notes.  That would be correct, in terms of the notes.

Q.    And when you signed that declaration, was it truly to the best of your personal knowledge, information, and belief if you hadn't reviewed any of your work product?

A.    At the time I believed it was to my best good faith effort there.

Q.    Did you read the penalty phase testimony before you signed that declaration?

A.    Yes.

Q.    And so you signed that declaration stating that you were not able to obtain concrete information from any family member that -- here, I'll highlight.

A.    I see it.

Q.    So you wrote, "Despite my suspecting family abuse and dysfunction, I was not able to obtain concrete information from any family member that this existed."  You signed that declaration under penalty of perjury despite the fact that you had read the penalty phase testimony of Raymond Petty?

A.    Yes.

Q.    Do you still contend that that was to your best of your

personal knowledge, information, and belief?

A.    All I can say is that was -- I prepared this in good faith, and I thought it was correct when I signed it.  Was it my best effort?  There were mistakes made in this document, so it was not my best effort.

Q.    I want to direct you to Exhibit 254, page 5.  You had indicated in paragraph 7 that your statements here are what things were like when you got into the case; is that right?

A.    Yes.

Q.    Is it still your contention that in their limited -- that this statement is correct:  "In their limited contact with Mr. Allen's family members, trial counsel had not discussed substantive mitigation-related topics and seemed to have not even explained what a mitigation investigation entailed."  Is that still your contention?

MR. MONTROY:  Objection, that actually is beyond the scope.  That wasn't a question.  The question was merely whether or not there was limited contact with Mr. Allen's family, not whether or not, you know, he still maintained that this statement was true or that even this statement taken in a whole -- he wasn't asked about this statement as a whole, he was just asked if there was limited contact with Mr. Allen's family.  And I think on cross-examination Dr. Randall was cross-examined extensively about whether or not he believed this paragraph to be true or to be

inaccurate.

THE COURT:  Well, I think it's been sufficiently covered, so let's move to something else.

BY MS. COSTANTIN:

Q.    Now, going to 505, which is your list of the factors that affected Billie's life, you just testified and you testified a couple times that it was absolutely critical to find and use evidence of abuse; is that right?

A.    Yes.

Q.    So if Rick Sindel testified that he had asked Juanita Allen whether she had abused Billie Allen and she denied it, do you have any reason to doubt his testimony?

MR. MONTROY:  Objection, Your Honor, calls for his speculation.

THE COURT:  It asks if he has any -- if he knows of any reason that that wouldn't be true.  Don't -- you're not permitted to examine the mind of Mr. Sindel, but based upon all of your contact, all of these meetings and everything else, and based upon that specific question, if you have any reason to believe that he -- his information is not accurate, you may testify, but don't speculate.

THE WITNESS:  Okay.

A.    So what you're saying is Rick --

Q.    You want me to restate it?  If Mr. Sindel testified that he had asked Juanita Allen whether she had abused Billie

Allen and she had denied it, do you have any reason to doubt Mr. Sindel's testimony?

A.    Mr. Sindel is claiming they asked Juanita about physical abuse and she denied it?

Q.    That's what he testified to.

A.    That could be true.

Q.    And you found this absolutely critical information about physical abuse from Deborah Ruffin, Shimeka Taylor, and Sam Moore; is that right?

A.    And Raymond Petty, yes.

Q.    And Raymond Petty.  And specifically about Deborah Ruffin, Shimeka Taylor, and Sam Moore, it was never used, correct?

A.    They didn't testify to it at the hearing.

Q.    And let me understand, is that because you just forgot about it?

A.    I said many times before --

MR. MONTROY:  Your Honor, I'm just going to object, this was covered.  It's asked and answered.

MS. COSTANTIN:  And, Judge, I'm using this to set up my next line of questions.

THE COURT:  Okay.  All right.  Overruled.  Proceed.

A.    I said that it was a lapse of some sort, that somehow that information got lost in the shuffle, and we didn't follow up on it.

Q.   But somehow that got lost in the shuffle.  You specifically remember that you didn't ask Samuel Moore about his phrase that "she used to mop him up," talking about Bill Allen?  You specifically remember that you didn't ask him that question?

A.   I don't understand your question.

Q.   Here's my question.  Your notes indicate that Sam Moore said, "She'd mop him up.  Billy was on punishment just a little while back, try to keep him stay in the house.  She'd mop him up."  You testified just on redirect that you remember that you did not ask Sam Moore any questions about that phrase, "She'd mop him up."  I'm asking you, is that true?

A.   Right.  What I'm saying is I don't believe I followed up about specifics for any of these witnesses.

Q.   Okay.  But you don't actually have any memory of it one way or the other, do you?  I mean, you didn't remember that they said these until I showed them to you.

A.   Right.  Correct.

Q.   Is that right, you don't actually remember whether or not you followed up?

A.   I would have to agree with that.

Q.   Okay.  And you don't actually remember whether or not Rick Sindel followed up with Sam Moore, Shimeka Taylor, or Deborah Ruffin on these issues?

A.    I think he was busy with the guilt phase.  And aside from our joint meeting, I don't believe he had contact with them until he put them on the stand.

Q.    Okay.  So when you testified that Rick Sindel -- well, first of all, weren't some of these statements made during that weekend session where Mr. Sindel was present?

A.    Some of these statements were.

Q.    Okay.  And you testified on redirect that Rick Sindel didn't ask about followup on any of these statements by Sam Moore, Shimeka Taylor, Deborah Ruffin.  And my question is, do you specifically remember that he did not follow up or you just don't remember?

A.    During the joint sessions?

Q.    Yes.

A.    I would have to say that I don't remember if he did follow up.  And if he followed up, I would expect some of my notes would correspond to the followup and some of his notes would correspond to the followup as well.

Q.    So I'm showing you Exhibit 452.  That's Shimeka Taylor's -- your notes from Shimeka Taylor's interview; is that correct?

A.    Okay.

Q.    And she told you, "I was there one time when we hung out too late.  It was around Christmas holiday.  He got back at maybe ten o'clock.  Bill has always been tall for his age.

She put him on punishment. His mother, my mother the type they need to control their kids up to a certain point. A whooping and a punishment. Early '90s, he was 12 to 13."

THE COURT: A little slower, please.

MS. COSTANTIN: I apologize.

Q. "Early '90s, he was 12 to 13." Is that what she told you?

A. Yes.

Q. And would you describe that as a specific incident?

A. She is mentioning a specific point in time.

Q. Okay. And didn't you make a distinction between Raymond Petty who described a specific incident and these other people who didn't describe specific incidents on redirect?

A. I don't understand your question.

Q. Okay. What I'm saying is, before I think you were explaining the reason you put Raymond Petty on was because he had a specific incident to describe, but these other folks were just talking about generally about how she used to kick his ass in the street or mop him up or that sort of thing. And my question is, isn't it true that Shimeka Taylor describes a specific incident?

A. This is a specific incident that occurred.

Q. And you said that no decision was made not to follow up on information provided by these witnesses?

A.   No decision was made not to follow up?

Q.   Right.

A.   Correct.

Q.   Okay.  So when she told you that, did you have to decide what your next question was going to be?

A.   Well, looking back on it now, I have a number of questions I would follow up with.  But at the time I did not follow up.

Q.   What I'm saying is when you're interviewing someone, you ask them questions.  The next question you ask is a decision you make, here's the next question I'm going to ask you, correct?

A.   When you -- these interviews were done under severe time pressure.  So there was some things that should have been followed up on that weren't.  Just like during the direct examination when he didn't follow up on real important things during that phase either.  So could I have followed up?  Should I have followed up?  Yes.

Q.   That's not my --

A.   I did not follow up.

Q.   That's not my question.

A.   There was no conscious decision to not follow up.

Q.   There was no conscious decision to ask another question on a different topic?

A.   There was no conscious decision not to follow up for

some reason, for some nefarious reason.

Q.    Despite the fact that it was absolutely critical that this information be put before the jury?

A.    Correct.

MS. COSTANTIN:  Judge, I don't have anything more.

THE COURT:  All right.  Just a moment.  I have -- would you pass those out for me, Ryan.  I have asked Ryan and he has complied, made copies of these, of my particular evidence sheets showing what I have identified.  Some early on on page 1 were received.  And then thereafter we agreed at that time that we would decide what were received.

I'm not confident that I have absolutely gotten every one listed.  And I am also confident that I've duplicated some.  So before we leave, I want you to go through and make sure we have them right, okay?

You may step down.

THE WITNESS:  Thank you.

MR. HOLTSHOUSER:  Judge, I'm prepared and ready to go through the exhibits.

THE COURT:  Okay.  Let me just take one more minute. I want to get that last question.  I'm not sure -- just a second.

Okay.  I'm ready.  Is there any reason the marshals could not take Mr. Allen back for his meal?

MR. HOLTSHOUSER:  I know of no reason.

MR. MONTROY:  I don't believe so, Your Honor.

MR. HOLTSHOUSER:  All we're going to do is make a record on the exhibits.

MR. MONTROY:  That's fine.  I can't --

MR. HOLTSHOUSER:  All right.  Judge, I think we can do this --

THE COURT:  Okay.

MR. HOLTSHOUSER:  -- relatively expeditiously.

THE COURT:  All right.

MR. HOLTSHOUSER:  If it doesn't bother the Court, there are so many lists to refer to --

THE COURT:  Right.

MR. HOLTSHOUSER:  -- I'm not going to refer to your list.

THE COURT:  That's fine.

MR. HOLTSHOUSER:  Okay.  Are you going to be trying to find on your list, though --

THE COURT:  Well, as far as I'm concerned, we don't have to coordinate these lists.  The important thing is that you identify on the record the ones that are received and that you agree.  And beyond that you don't have to check off on this.  This is just from my list.

MR. HOLTSHOUSER:  So these are the ones that the government is offering.  And I'm actually offering at the moment some exhibits that were -- at the moment I'm offering

some exhibits that started -- that came up on direct, the completion of the direct yesterday that have not previously been admitted.

So the first is 458. And do you want to indicate for the record whether you agree that they can be admitted or not?

MR. MORENO: We agree.

MR. HOLTSHOUSER: The next one is 411.

MR. MORENO: Yep.

MR. HOLTSHOUSER: The next one is 254.

MR. MORENO: Okay.

MR. HOLTSHOUSER: That's Randall's declaration. 680.

THE COURT: 680?

MR. HOLTSHOUSER: 6-8-0.

THE COURT: Okay.

MR. HOLTSHOUSER: Is Dr. Randall's notes of the Deputy Burns interview. 677, his notes for Boehm, B-o-e-h-m. 678 is for Prackt, P-r-a-c-k-t. And 679 is for Sinclair. Those are the deputies. Okay with those?

MR. MORENO: Yep.

MR. HOLTSHOUSER: Okay. 532, I don't have a description.

MS. COSTANTIN: The Randall deposition.

MR. HOLTSHOUSER: Oh, that's the Randall deposition,

okay.  So 532.

MR. MORENO:  Yep.

MR. HOLTSHOUSER:  357, which is the January 30, '98, Simon, Randall meeting notes.  Okay.

MR. MORENO:  Yes, that's correct.

MR. HOLTSHOUSER:  621 is Randall notes of his interview with Billie Allen.

MS. CARLYLE:  Yes.

MR. HOLTSHOUSER:  Okay.  Okay with that one?

MS. CARLYLE:  That's fine.

MR. HOLTSHOUSER:  133 is the FBI interview of Taylor.  131 is the 302 of Neals.

THE COURT:  131 and 132?

MR. MORENO:  Yes.

MR. HOLTSHOUSER:  And 134 is the FBI report concerning Walls.

THE COURT:  Okay.  Make sure -- wait a minute, 133, 131, 132, 134, all in, right?

MR. HOLTSHOUSER:  I don't have 132.

MR. MORENO:  We have 134.

THE COURT:  Scratch that.  Okay.

MR. HOLTSHOUSER:  Next is 334, which is a Supranowich fax to Dr. Haney that was used with Dr. Randall.

MR. MORENO:  All right.

MS. CARLYLE:  I've got that.

MR. HOLTSHOUSER:  388 is the fax to Dr. Wuertz dated March 6th, '98.  You okay with that, 388?

MR. MORENO:  Yes.

MR. HOLTSHOUSER:  Okay.  675 is Randall's handwritten draft of what he was going to say to Dr. Wuertz or handwritten set of notes concerning Dr. Wuertz.  That's 675.

MS. CARLYLE:  That was new, wasn't it?

MR. MORENO:  Yes.

MR. HOLTSHOUSER:  Well, no.  Actually, no, it's from last time.

MS. COSTANTIN:  I don't think it was new.

MR. HOLTSHOUSER:  It came up with someone else last time.  I think it came up with Sindel or Simon.

MR. MORENO:  I don't have it on here.

MS. CARLYLE:  It's okay.

MR. MORENO:  That's okay.

MS. COSTANTIN:  Maybe that wasn't.

MR. HOLTSHOUSER:  490 --

MS. CARLYLE:  I think you showed it to him.

MS. COSTANTIN:  Yeah, I used that.

MR. HOLTSHOUSER:  Okay.  496, that is notes of a team meeting.  485 is notes of interview of a witness, okay.

MR. MORENO:  We have that one as well.

MR. HOLTSHOUSER:  Okay.  488 is Randall's notes of

Ruffin.

MR. MORENO:  Okay.  Good.

MR. HOLTSHOUSER:  436, you have it?

MS. COSTANTIN:  That's typed notes of Sam Moore.

MR. HOLTSHOUSER:  Typed notes of Sam Moore.

MR. MORENO:  436.

MR. HOLTSHOUSER:  436.  That's come up several times.  Okay?  It actually came up in recross, but it's come up numerous times.

MS. COSTANTIN:  When I asked him about the mop him up.

MS. CARLYLE:  We certainty can't say it wasn't discussed.

MR. HOLTSHOUSER:  452, which is Shimeka Taylor notes.  These were just referenced, but they were referenced during an earlier stage of the cross, if you can't find it there.

MR. MORENO:  Okay.

MR. HOLTSHOUSER:  465, which are Mr. Sindel's notes of the Nancy Harris interview.

MS. CARLYLE:  Yes.

MR. HOLTSHOUSER:  479 is notes of Monette Petty, okay.  427 are Sindel's notes of Claude McLemore.

MR. MORENO:  Okay.

MR. HOLTSHOUSER:  503 is Carol Petty notes with

David Randall.

MR. MORENO: Yep.

MR. HOLTSHOUSER: 502 is the closing ideas memo from David Randall.

MR. MORENO: All right.

MR. HOLTSHOUSER: 405 is Angela Allen. 420 is Yvette Allen. 439 is Tyrone Jones, the basketball coach.

MR. MORENO: All right.

MR. HOLTSHOUSER: 459 is Colette McLemore. 432 is Ahmed Oliver. 468.

MR. MORENO: Nancy Harris.

MR. HOLTSHOUSER: 434.

MR. MORENO: Sindel's notes.

MR. HOLTSHOUSER: Beverly Oliver, Ahmed Oliver notes. 472. 431.

MR. MORENO: Notes of Nicole Petty.

MR. HOLTSHOUSER: 473.

MR. MORENO: I don't know what that is.

MR. HOLTSHOUSER: That is Jerome Petty, interview with Jerome Petty. These are all I think from the February weekend.

MR. MORENO: Yep.

MR. HOLTSHOUSER: 440, Sindel notes with Eric Taylor.

MR. MORENO: Yes.

MR. HOLTSHOUSER: Four -- no, that's already in. 681, that's your letter that just got added to the list today.

MR. MORENO: From our office to Randall.

MR. HOLTSHOUSER: 529 is the Juanita Allen deposition. 366. Actually that should be --

MR. MORENO: 368? That's 366, fax from Randall to Simon.

THE CLERK: And there's a 68.

MR. HOLTSHOUSER: What is it, 360?

MR. MONTROY: 368 was the one I thought was 638.

MR. HOLTSHOUSER: This is David Randall to -- asking for the Clayton records.

MS. COSTANTIN: No, 366 maybe.

MR. HOLTSHOUSER: 368.

MR. MORENO: That is Randall's affidavit in support of continuance.

MR. HOLTSHOUSER: No, that I got wrong then. So 368.

THE COURT: 368 is mitigation expert responsibility.

MR. HOLTSHOUSER: Yes, that should be --

THE COURT: 368.

MR. HOLTSHOUSER: I wrote 360 because I heard it, but it's actually 368.

THE COURT: Just a second. The last one was 529.

And I put down 366.  That should be 368?

MR. HOLTSHOUSER:  There actually is both, 366 and 368.

THE COURT:  Oh, okay, yeah, I see it now.  Okay.

MR. HOLTSHOUSER:  I misspoke with 360.

THE COURT:  Okay.  368, got it.  Okay.

MR. HOLTSHOUSER:  Then there's 370.

MR. MORENO:  That's the fax to Simon.

MR. HOLTSHOUSER:  Concerning the PET.  371.

MR. MORENO:  Notation about all the money for CAT scan.

MR. HOLTSHOUSER:  379.

MR. MORENO:  Letter from Simon to Gelbort.

MR. HOLTSHOUSER:  396.

MS. CARLYLE:  Did we use anything -- I don't think 379 is -- does not look familiar.

THE CLERK:  Simon's letter to Gelbort.

MS. COSTANTIN:  Yes, subsequently on your advice we canceled the MRI.  I asked him about that.

MS. CARLYLE:  I made a mistake reading.

MR. HOLTSHOUSER:  528.

MR. MORENO:  The Juanita Allen depo.

MR. HOLTSHOUSER:  503.

MR. MORENO:  Yep.

MR. HOLTSHOUSER:  Wait a second.  Stop that one for

a second and let's back up.  Before then 261.  It should be in order.  That's the declaration of Billy Wayne Allen.

MR. MORENO:  Yep.

MR. HOLTSHOUSER:  396.

THE COURT:  396?

MR. HOLTSHOUSER:  Yes, 396.  That is the letter in June from Randall to Sindel.

THE COURT:  Okay.  Now, I already have a 396.  You mentioned 396 a little while ago.

MS. CARLYLE:  Yeah.

MR. HOLTSHOUSER:  Okay.  Then 413, 414, and 415 were mentioned on recross.

MR. MORENO:  Yes.  Cuneo's notes of Juanita Allen. 414 was Simon's notes, right.

MR. HOLTSHOUSER:  443, notes of Eric Taylor.

THE COURT:  What is it?

MR. HOLTSHOUSER:  443, notes of Eric Taylor.

MR. MORENO:  Yep.

THE COURT:  Okay.

MR. HOLTSHOUSER:  Did I have 410?  I might have missed 410.

MS. COSTANTIN:  Yeah, 410 is definitely admitted.

THE COURT:  That's notes of Juanita Allen.

MR. MORENO:  Yeah, 410 is in.  411 is in.

MR. HOLTSHOUSER:  Did you do 412?  I don't think you

did.

MR. MORENO:  I don't see 412.

THE COURT:  Wait a minute.  I hear you say we've already done 411.  I haven't written down 411 yet.

MR. MORENO:  Yeah, 411 is in.

THE CLERK:  411, 410, I have both.  But the -- only one, 411, was admitted at the last hearing.  This hearing, 410 was the one that needed to be admitted.

MR. MORENO:  Right.  Okay.

MR. HOLTSHOUSER:  Right.  That actually was part of the direct.  It first came into the evidence on direct yesterday.  I have one more, and that was 503, which is the interview with -- the typed notes of the interview with Carol Petty.  Oh, I have that twice.  I'm sorry, I have that twice.

MR. MORENO:  I don't have it down.  It doesn't mean I didn't miss it, but I don't have it down.

MR. HOLTSHOUSER:  412 is, we'll take a look at it.  412 are handwritten notes of Juanita.

MS. COSTANTIN:  Yeah, Sindel's notes of -- yeah.

MR. HOLTSHOUSER:  So 412.

THE COURT:  412?

MR. HOLTSHOUSER:  Yes.  I have checked mine against what Ryan had, and I don't have anything else unless you see something else.

MR. MORENO:  No, I think we've covered it.

VIII - 261

MR. HOLTSHOUSER:  Okay.

THE COURT:  That's all of them?

MR. HOLTSHOUSER:  That's all of them.

MR. MORENO:  Eric, you didn't use anything new, right?

MR. HOLTSHOUSER:  Judge, as I mentioned yesterday, what I would propose to do is now that these are all in and we're up to here, we will submit an amended joint exhibit list --

THE COURT:  Okay.

MR. HOLTSHOUSER:  -- the parties will agree on that has in the last right column the letter A, the things that are already accepted.  And that way when we start in November, we'll be starting with an exhibit list that the clerk and you have that's a baseline.

THE COURT:  Okay.  That's fine.

MR. MORENO:  Okay.  What I would like to do, just to make sure, there were some exhibits that Eric used on redirect, and I'm not sure that 188 is in.

THE CLERK:  188?

MR. MORENO:  That would be McLemore's penalty phase testimony.

MR. HOLTSHOUSER:  No, those are all in.

MS. COSTANTIN:  We agreed, so let all that in.

MR. HOLTSHOUSER:  Those were all admitted in the

beginning in June.

MR. MORENO: How about 343?

MR. HOLTSHOUSER: That's already been admitted in the June hearing. That's Simon's letter to Sindel, re: Entry of Randall.

MR. MORENO: And then the interview schedule, 383. Was there more than one interview schedule?

MS. COSTANTIN: It's the second page.

MR. MORENO: Page 2.

MS. COSTANTIN: That's what I was trying to explain.

MR. MONTROY: No, I appreciate that.

MR. HOLTSHOUSER: I think we're good, Judge.

MR. MORENO: I think we're good, Your Honor.

THE COURT: Okay.

MR. MORENO: Your Honor, thank you for your time. And we'll see you on November 28th.

THE COURT: I believe that's correct. I think whatever Betty sent out.

MR. HOLTSHOUSER: And we also proposed conferring as far as what will be the order of presentation and remaining witnesses. We had a discussion of a couple potential stipulations today.

THE COURT: Okay.

MR. HOLTSHOUSER: And whatever progress we make on that, I think will --

THE COURT:  Well, I commend you all the way.  You've cooperated and the lack of acrimony among counsel, it's very refreshing to me.  Thank you very much.  And I appreciate it.

MR. HOLTSHOUSER:  Thank you for your patience, Judge.

MR. MORENO:  Thank you, Judge.  Thank you guys.

MR. MONTROY:  Thank you very much.

(Court in recess at 6:06 p.m.)

C E R T I F I C A T E

I, Susan R. Moran, Registered Merit Reporter, in and for the United States District Court for the Eastern District of Missouri, do hereby certify that I was present at and reported in machine shorthand the proceedings in the above-mentioned court; and that the foregoing transcript is a true, correct, and complete transcript of my stenographic notes.

I further certify that I am not attorney for, nor employed by, nor related to any of the parties or attorneys in this action, nor financially interested in the action.

I further certify that this transcript contains pages 1 – 264 and that this reporter takes no responsibility for missing or damaged pages of this transcript when same transcript is copied by any party other than this reporter.

IN WITNESS WHEREOF, I have hereunto set my hand at St. Louis, Missouri, this 28th day of February, 2013.

_____
/s/ Susan R. Moran
Registered Merit Reporter