UNITED STATES OF AMERICA
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

BILLIE JEROME ALLEN,            )
                                )
            Petitioner,         )
                                )
      vs.                       )   No. 4:07-CV-27 ERW
                                )
UNITED STATES OF AMERICA,        )
                                )
            Respondent.         )


TRANSCRIPT OF EVIDENTIARY HEARING

BEFORE THE HONORABLE E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE

November 28, 2012
Volume IX

APPEARANCES:

For Petitioner:      Ms. Elizabeth U. Carlyle
                     P.O. Box 30418
                     Kansas City, MO  64112

                     Mr. Eric John Montroy
                     Mr. James Henry Moreno
                     Mr. Timothy Kane
                     FEDERAL COMMUNITY DEFENDER OFFICE
                     The Curtis Center, Suite 545 West
                     Philadelphia, PA  19106

For Respondent:      Mr. Steven E. Holtshouser
                     Ms. Carrie Costantin
                     OFFICE OF U.S. ATTORNEY
                     111 S. 10th Street, 20th Floor
                     St. Louis, MO  63102


REPORTED BY:         SUSAN R. MORAN, RMR, FCRR
                     Official Court Reporter
                     111 South 10th Street
                     St. Louis, MO  63102
                     (314) 244-7983

IX      2

I N D E X

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|

PETITIONER'S WITNESSES

JUANITA PETTY ALLEN

| | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| (By Mr. Montroy) | 10 | | | |
| (By Ms. Costantin) | | 114 | | |
| (By Mr. Montroy) | | | 195 | |

(The following proceedings were held in open court on November 28, 2012 at 8:35 a.m.:)

THE COURT:  Could we have just a brief statement on the record as to where we ended the last time and where we begin today?

MR. HOLTSHOUSER:  A couple updates, Judge, since we last broke.  We filed a second amended joint exhibit list.

THE COURT:  Yes, I have it.

MR. HOLTSHOUSER:  And you'll note that in the right-hand column there is in some cases an A.

THE COURT:  Yes.

MR. HOLTSHOUSER:  It's been entered.  This is at least what the parties believe and agree are the exhibits that have been admitted as evidence.

THE COURT:  Okay.

MR. HOLTSHOUSER:  We tried to verify that with the clerk at the end of the last session, so I believe it's correct.

THE COURT:  Okay.

MR. HOLTSHOUSER:  I think that still there will be an occasional addition to that.  There's already been one for a witness who we think may be coming named Monette Petty, which we've added an Exhibit 685 to the list for her, Report of Interview, if it's needed.

We have had some discussions about scheduling.  We

thought it might be helpful to update the Court.

THE COURT: All right. Good.

MR. HOLTSHOUSER: And, Eric, jump in if you want to add anything.

MR. MONTROY: Sure. Go ahead.

MR. HOLTSHOUSER: Our understanding is that today and tomorrow primarily are going to be lay witnesses.

MR. MONTROY: That's correct.

MR. HOLTSHOUSER: If that's still the plan. There is an expert named Daniel Cuneo who is expected to testify on Friday. I think if all goes as planned, we're hoping maybe by the end of Friday we'll have Mr. Cuneo done.

THE COURT: Okay.

MR. HOLTSHOUSER: But possibly wouldn't, but he would be a substantial witness. Hopefully not as substantial as Mr. Sindel, Simon, or Mr. Randall were.

Next week if you want to give him the lineup.

MR. MONTROY: Sure. Good morning, Your Honor.

THE COURT: Good morning.

MR. MONTROY: Your Honor, next week we plan then to proceed with some more lay witnesses on Monday. And Tuesday we may have one additional lay witness. And then we're going to present an expert on behalf of Mr. Allen. That expert's name is Dr. Martell. That we think is probably going to go, what, into Wednesday at some point?

MR. HOLTSHOUSER:  Yes.

MR. MONTROY:  And then we should be able to by Thursday we feel, there's a decent chance we'll be able to wrap up all of our witnesses.  It might spill a little bit into Friday, but depending on the speed of witnesses, we think that there's a decent chance that that will work out.

THE COURT:  Okay.  Sounds good.

MR. HOLTSHOUSER:  There was -- I think there was another expert named Pablo Stewart, who had submitted a declaration, and we have taken his deposition.  We've been told at least that Mr. Allen is not going to call him as a witness.  If that's the case, that actually frees up a substantial period of time because he would have been a substantial witness.

If the plan is as Mr. Montroy suggested occurs, then we may end up with a period next week where between Thursday and Friday we may not have complete days.

THE COURT:  Okay.

MR. HOLTSHOUSER:  The government is intending to call essentially three witnesses; Dr. Wetzel, Dr. Zutzy, and then a neuropsychologist, Dr. Askenazi.  Dr. Yutzy and Askenazi wouldn't be here until the following Monday and Tuesday.

THE COURT:  Okay.

MR. HOLTSHOUSER:  But it's possible that we would

end up finishing Dr. Wetzel, whether it be Friday or some time on Thursday, into early Friday, that we would be left without a witness.  Is that acceptable to the Court?

THE COURT:  Sure.  That's great.

MR. MONTROY:  And, Your Honor, actually if I may, one additional thing.  We had -- concerning tomorrow, we had some scheduling problems, we were shifting some witnesses around based on their schedules.  And there is a possibility, we're not entirely sure yet, but there is a possibility depending on how long witnesses go, we might not be able to fill up the entire day tomorrow as well.

THE COURT:  Okay.

MR. MONTROY:  We've tried our best to sort of arrange so that didn't happen.  I just want to make the Court aware of that.

THE COURT:  I understand those things arise, and we'll do the best we can.

MR. MONTROY:  Thank you, Your Honor.

MR. HOLTSHOUSER:  But I think, Judge, the good news should be that we would think that by the Tuesday after next week, we would hope to be completed.  And that probably would include some down time in this schedule.

THE COURT:  Okay.  All right.  Very well.

MR. MONTROY:  Thank you.

THE COURT:  Whenever you're ready.

MR. HOLTSHOUSER: We have, Judge, also one housekeeping matter. We've entered into a stipulation.

THE COURT: Okay.

MR. HOLTSHOUSER: Since the testimony of Mr. Simon, an additional tape between him and Mr. Allen has been found. That tape has been enhanced and it has been transcribed. Rather than call Mr. Simon back, the parties have entered into a stipulation regarding that. And so it's a short stipulation. I'll read it into the record. And then I'll also admit -- move to admit this stipulation into the record.

MS. CARLYLE: Can we delineate one word? I'm sorry. That he had found a tape.

MR. HOLTSHOUSER: Okay. I'll end that when I read it. The parties filed this stipulation as to Exhibits 630-E, 637, 638-A --

THE COURT: I'm sorry, 630, what was the first one, E?

MR. HOLTSHOUSER: E, as in Edward.

THE COURT: Okay.

MR. HOLTSHOUSER: 637.

THE COURT: Okay.

MR. HOLTSHOUSER: 638-A and 638-B.

THE COURT: And those numbers represent?

MR. HOLTSHOUSER: I'm going -- this stipulation. I'll read it and describe it.

The parties stipulate that after John Simon had completed his testimony in June 2012, he contacted Movant's attorney and informed her that he had found a tape of his interview with Movant from January 7, 1998.  The parties stipulate that Exhibit 630-E is a tape from Mr. Simon's interview of Movant on January 7, 1998.

The parties stipulate that Exhibit 637 is a CD that contains a digital copy of that tape and an enhanced digital copy of that tape.

The parties stipulate that Exhibit 638-A and 638-B are the accurate transcripts of Exhibit 630-E.  The parties stipulate that these exhibits are admitted into evidence.

THE COURT:  Okay.  Just one second.  Very well. 630-E, 637, 638-A, 638-B are received.  And I'm assuming -- are those on this new list?

MS. COSTANTIN:  Yes.

MR. HOLTSHOUSER:  They are on the new list, yes. And then I have the actual stipulation itself which I will submit to the Court.

THE COURT:  All right.

MR. HOLTSHOUSER:  There's probably one other issue, Judge, but it could -- the actual resolution of that or the record on that can wait, but just to let you know, Mr. Allen's deposition, as you know, was taken in this case, and the parties have orally agreed to enter into a

stipulation with respect to how to get the testimony of Mr. Allen into the record.  And the parties are essentially stipulating that his deposition would be admitted into evidence in lieu of the government seeking to call him as a witness or the Movant presenting his testimony at the hearing.

THE COURT:  Okay.

MR. HOLTSHOUSER:  We haven't -- I don't think we have an actual stipulation of that yet.  We're waiting for a draft of one from the Movant and when we have that, that will also be added into the record.

THE COURT:  So I understand, if that is forthcoming, the deposition of Mr. Allen would be received, and that would satisfy -- well, satisfy is not the right word -- so he would neither be called in the Movant's case or in the Government's case?

MR. HOLTSHOUSER:  Correct.

MS. CARLYLE:  Just to be clear for the Court, we certainly have been discussing that.  Actually I don't think that counsel for Movant has committed to it, but we're heading in that direction, but I don't want the Court to think that's a done deal when it's actually not quite yet.

MR. HOLTSHOUSER:  And if for reason that is not a done deal, Judge, then we'll be faced with the issue of the government seeking to call Mr. Allen as a witness.

THE COURT:  I understand.  Okay.

MR. MONTROY:  Your Honor, may we proceed?

THE COURT:  Whenever you're ready, Mr. Montroy.

MR. MONTROY:  Your Honor, Petitioner, Mr. Allen, would call Juanita Allen as its next witness.

THE COURT:  Ms. Allen.  Very well.

Good morning.  There is some water there for you to your left.

THE WITNESS:  Thank you.

THE COURT:  Whenever you're ready.

MR. MONTROY:  Thank you, Your Honor.

JUANITA PETTY ALLEN,

Having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. MONTROY:

Q.   Good morning, Mrs. Allen.

A.   Good morning.

Q.   Mrs. Allen, what is your relationship to Billie Allen?

A.   Billie Allen is my son.

Q.   Is your son.  And do you have other children besides Billie?

A.   Yes, I do.

Q.   What are the names of your other children?

A.   My oldest is Nicole.  Billie is the next.

THE COURT: I'm sorry, could you pull that microphone --

THE WITNESS: Closer to me?

A.   My oldest is Nicole Petty, my second is Billie Allen, Angela Allen, and Yvette Allen.

Q.   So you have a total of four children?

A.   Correct.

Q.   Now, before we start talking about Billie, I just want to ask you some questions about your background and about your family.

A.   Okay.

Q.   Were you born in St. Louis?

A.   Yes, I was.

Q.   Where in St. Louis were you born?

A.   What do you mean?

Q.   When you were growing up, where did you live in St. Louis?

A.   I lived on the north side, the Ville.

THE COURT: I'm sorry, I'm really having trouble hearing you.

THE WITNESS: I lived on the -- oh, that's loud.

THE COURT: It needs to be so everyone can hear.

A.   I live on the north side of St. Louis in the Ville area. I stayed there most of my life.

Q.   Okay. And your parents, were they originally born in

St. Louis?

A.   No, they weren't.  They were actually born in West Point, Mississippi, both of them.

Q.   And at some point they moved to St. Louis?

A.   Correct.

Q.   Do you have siblings?

A.   Yes, I do.  I have five siblings.

Q.   Are your parents still alive?

A.   No, both of them are deceased.

Q.   How old were you when your mother died?

A.   I was 14.

Q.   You were 14 years old.  And did your mother's death when you were 14 years old, did that have an impact on your life?

A.   Yes, it did.

Q.   Could you describe that?

A.   I think at the time I felt as if it was abandonment.  I just felt like it was abandonment.

        THE COURT:  Wait.  We got to do something different. Your voice is fading.  I have to hear every word you're saying.  So you're going to have to do a better job of speaking right into that microphone.

        THE WITNESS:  Right into it?  Okay then.

        THE COURT:  That's good.

A.   At the time I felt as if I was abandoned.

Q.   So it was a difficult moment in your life?

A.   Yes, it was.

Q.   Now, who is Billie Allen's father?

A.   That's John Henry Allen.

Q.   And how old were you when you met Mr. Allen?

A.   I think I may have been like 16.

Q.   And did you initially have a dating relationship with Mr. Allen?

A.   Yes, I did.

Q.   Did you and Mr. Allen, Billie's father, did you ever get married?

A.   Yes, we did.

Q.   And do you remember when that was?

A.   I do not know.

Q.   Was that before or after Billie's birth?

A.   That was before Billie's birth.

Q.   Now, you said earlier that Billie has an older sister?

A.   Correct.

Q.   And that is Nikki?

A.   Right.

Q.   Were you married when Nikki was born?

A.   No, I was not.

Q.   Okay.  At some point in time prior to your marriage, did you and Mr. Allen start living together?

A.   Before we got married?  I would stay over there, but as

far as living in the household with him before I got married, no.

Q.   Did you decide to marry Mr. Allen after you became pregnant with Nikki?

A.   Yes, I did.

Q.   Now, what was -- prior to getting married to Mr. Allen, what was he like?

A.   Prior to getting married to him he was all right.  He was attentive, he was supportive.  He was all right then.

Q.   Okay.  And then you got married.  And where did you guys live once you got married?

A.   Once we got married, we lived on Garfield.

Q.   Okay.  And how long did you live there for?

A.   I really can't recall how long we lived there.

Q.   At some point in time did you move to Evans Street?

A.   Actually we moved on Alcott and then to Evans.

Q.   And where are these streets located?

A.   Evans is on -- still in the Ville.  Alcott is on the, I want to say Walnut Park area.

Q.   And so eventually you moved to Evans Street; is that right?

A.   Correct.

Q.   And the house that you moved into, who owned that house?

A.   On Evans?

Q.    That's right.

A.    I don't -- I can't recall the landlord's name, I can't.

Q.    And can you describe the house that was on Evans Street?

A.    Well, it was a small house.  I think that -- I think we had two bedrooms and a kitchen, a dinette set.  It was a small apartment building, apartment.

Q.    Was it a single house or were there --

A.    It wasn't a house; it was actually an apartment.

Q.    Now, what was the neighborhood like where the Evans Street home was when you moved there?

A.    The neighborhood, it was actually I think that was time when crack cocaine was coming into the area, so basically infested with drugs.

Q.    And was that something that was obvious to someone who was living in the neighborhood?

A.    Of course, yes, it was.

Q.    Now, did your husband, did he have family that lived on Evans Street?

A.    Yes, he did, his mother and his father actually lived down the street.

Q.    Talking about his mother and his father, did you spend time with his parents?  Did you know his parents?

A.    Yes.  Actually when he and I first got together, I thought they were really cool.  But as time went on, I didn't

come to see them as appealing.  His father was an alcoholic.
And like on a Friday or a Saturday, it was well known that
there was going to be fights on a Friday and Saturday.

Q.    So who would be involved in the fighting?

A.    In the fights would be his father and JR, Bill's
father.

Q.    They would fight each other or they would fight --

A.    Fight each other.

Q.    And did you see those fights?

A.    Yes, I did.

Q.    And your husband's father was intoxicated when he would
be fighting?

A.    Yes.

Q.    When you first moved to Evans Street, was Billie, your
son, was he -- had he been born yet?

A.    Yes, I think he had.

Q.    About how old -- I'm sorry.

A.    I can't recall how old he was.  But, in fact, all four
of them were born at the time when we moved over to Evans.

Q.    Okay.  So when you were living on Evans Street, about
what age range, if you could, was Billie?  Was he under ten
years old during that time?

A.    Yes, he was.  I think that Yvette had to been four or
five, so I'm pretty sure he was ten.

Q.    Okay.  Now, you had indicated that when you first met

Q.    your husband, that he was attentive and he was a good person?

A.    Uh-huh.

Q.    At some point did that change?

A.    Yes, it did.  He had actually started getting involved with drugs and couldn't keep a job, and his life just basically went down.

Q.    And when did that start?

A.    It had start -- we were still on Evans, that I recall we were still on Evans.  So I can't give you a specific date or time factor, but we were on Evans.

Q.    Okay.  So you were on Evans Street, and he develops a problem with drugs; is that right?

A.    Correct.

Q.    Do you know what kind of drugs that he was taking?

A.    Crack.

Q.    Now, to the best of your recollection, how often was he using drugs?

A.    I would want to say every day, but I don't know for sure.  But I'm thinking every day.

Q.    So it was pervasive?  He was regularly high?

A.    Right.

Q.    Did he also use alcohol?

A.    Yes, he did.

Q.    Was alcohol and drugs something that he used in and around the house?

A.    Yes, it was.

Q.    What kind of impact did that have on the house, him being, you know, intoxicated?

A.    Well, with the impact, he also had other individuals coming over to the house, which wasn't a good influence on my children.  Normally it was just that at that point in time with him doing the drugs, he probably had lost his job by then.  And we had then probably, I remember the electricity getting cut off at the time or the gas getting cut off.  Something was usually being cut off at some point in time.

Q.    So is it fair to say that you didn't have much money?

A.    Correct.

Q.    You had mentioned that other individuals were coming over to the house?

A.    Uh-huh.

Q.    Were these friends?  Who were these people that you described?

A.    They were -- I guess they were friends of his.  I just remember people coming over a whole lot.

Q.    Were these other people that, if you know, that he was using drugs with or drinking with?

A.    Yes.

Q.    And were your children present when these people would come over?

A.    Yes.

Q.   When your husband was using drugs, am I right he did not have a job, is that what your testimony is?

A.   I want to say that at some point in time when he was using, he lost his job.

Q.   During this time period that you're describing, during the time period when he's using drugs and he's using alcohol, what was your relationship with him like?

A.   I think at the first I think I kind of tolerated because of the kids.  But then after awhile it just got so out of hand that I went ahead and I said I just couldn't do it anymore.

Q.   Did your husband's problems cause arguments between you and he?

A.   Of course with not any money coming in and things like that, yes, it caused arguments.

Q.   And what were those arguments like?

A.   Money not coming in, him not being able to do what he said he was going to do for me and my children at the time that we got married.  So a whole lot of that factored in with the arguments.

Q.   So you would confront him about, you know, his behavior?

A.   Yes.

Q.   What was his response when you would, you know, raise these issues and argue with him?

A.   We just got into a whole lot of arguments.  I would just remember one altercation, but we did argue about no moneys coming into the house.

Q.   Now, when you say you remember one altercation, could you describe that?  Was that a physical altercation or a verbal altercation?

A.   That was a physical altercation.

Q.   And what happened in that instance?

A.   I think that he may have been using or -- but at that point in time I want to say that probably on the weekend I may be drinking too, so therefore we may have been into it and we got into a physical fight.

Q.   Okay.  You had just mentioned that you were drinking at this time; is that right?

A.   Correct.

Q.   Did you and your husband used to drink together?

A.   Yes, we did.

Q.   Did that precede your marriage?

A.   Yes, it did.

Q.   And how often would you drink together?

A.   Oh, we drank together all the time.

Q.   Would that be in the house or would that be out at a bar?

A.   We didn't usually go to bars.  It was basically in the house.

Q.   And when you would drink with him, would you drink to the point of intoxication?

A.   Yes.  Probably, yeah.

Q.   The verbal fights and the altercation, did those actually take place in the house on Evans Street?

A.   Some on Evans.  It basically started even before Evans Street, the arguments.  Because like I said, it may have started on Garfield.  Probably on Evans Street, it probably escalated to where they were just out-of-control arguments.

Q.   When you say escalated to out-of-control arguments, is it fair to say that the arguments that you had with him got worse as time went on?

A.   Yes, they did.

Q.   And when you say "out of control," what made the arguments out of control?

A.   Well, what made them out of control?  More so with me being so angry at what he said he was going to do, that I may have been more out of control than he was.

Q.   And do you think that your own drinking impacted the way you argued with him?

A.   Yes, I think I've been told numerous times that I was a mean drunk, so yeah.

Q.   When you had these arguments and these fights, were your children present for some of them or all of them that you can remember?

A.   Probably at some point in time I'm pretty sure they were there.  I can't say with all of them or whatever the case might be, but probably the majority of them they were there.

Q.   Do you recall if you ever made an effort when you were going to confront him or when you were arguing with him to not fight in front of the kids?

A.   Probably not, because at that point in time if I was angry about something, I was just angry about things.  So I wouldn't care who was in the way, so no.

Q.   Were you concerned about your children and the impact that, you know, this might have had on your children while you were living on Evans Street?

A.   I think at some point in time I did get concerned.  But if I was in that moment, I wasn't too much concerned.

THE COURT:  Wait, I didn't hear what you just said.

THE WITNESS:  I was just saying, if I was in that moment of anger, I wasn't too concerned about anybody.

THE COURT:  Okay.

BY MR. MONTROY:

Q.   And I'm talking like just sort of generally speaking, did you become concerned at the overall situation?

A.   At the overall, yes.  That's when I decided to leave, correct.

Q.   Okay.  What was -- and referring to your husband as JR,

that's what you called him, right?

A. Uh-huh.

Q. Referring to JR and his relationship, you know, with the children, and specifically Billie, what was JR's relationship like with Billie?

A. It was basically nonexistent. He really didn't have a relationship with him. Maybe when they were younger. But it wasn't so much as him, I think it was so much as his dad that wanted the relationship with Bill, but I kind of kept him away from his dad because his dad was always intoxicated. So it wasn't so much as they had a relationship, you know, because he wasn't -- he just wasn't a good parent at all.

Q. Okay. Now, you had mentioned that you eventually got concerned and decided to leave Evans Street; is that right?

A. Correct.

Q. And when you left Evans Street, did you also leave JR?

A. Yes, I did.

Q. And when you left, did you take your children with you?

A. Yes, I did.

Q. And where did you go?

A. We went to -- excuse me, we went to stay with my dad.

THE COURT: Went where?

THE WITNESS: Stay with my dad.

Q. And where was your dad living?

A. My dad was actually not too far from Evans, maybe about

three blocks or so.

Q.    And what street was he living on?

A.    On Cote Brilliante.

Q.    And is Cote Brilliante also in the Ville?

A.    Correct, it is.

Q.    Had you lived at the house on Cote Brilliante when you were younger, when you were growing up?

A.    Yes, I did.

Q.    So this was your family home?

A.    Correct.

Q.    Do you recall about what time it was, what year it was when you left and moved to Cote Brilliante?

A.    I think Yvette may have been in school at that time, so it had to be after she was five or something along in there.

Q.    Do you know offhand how much older Billie is than Yvette?  If I said about two years, would that make sense?

A.    No, because Ann -- no, I think they are about four years apart.

Q.    Okay.  And you think that Yvette was about five years old at the time?

A.    Uh-huh.  Five or six, somewhere along in there.

Q.    Okay.  Do you remember how old Nikki was when you moved?

A.    (Shaking head.)

Q.    Okay.  When you moved to Cote Brilliante, who was

living in the house at the time?

A.    At the time I think my brothers were there.  If I'm not mistaken, I don't think -- I think my sister had went away to college, so I think my brothers were there, Jerome and Raymond.

Q.    And is Raymond older or younger than you?

A.    Raymond is younger than me.  Raymond and Jerome are younger.  Both of them are younger.

Q.    Jerome is younger too.  Do you know how much younger Jerome is than you?

A.    I think if I'm not mistaken, he was born in '68.  If I'm not mistaken.  I don't know for sure.  Maybe it was '64.  I don't know when he was born.

Q.    What year were you born?

A.    I was born in '58.

Q.    So he's somewhere around ten years younger than you, does that make sense?

A.    Maybe.  I don't know for sure.

Q.    Sure.  Do you know how old you were when you moved to Cote Brilliante?

A.    No.

Q.    Okay.  What was the house -- what was the house like when you moved there?  I'm sorry -- strike that question.

      So it was your two brothers, Jerome and Raymond, who were living there?

A.    And my dad.

Q.    And what is your father's name?

A.    Otha Petty.

Q.    Where were people living in the house when you first moved there?

A.    When I first moved there, that I can recall, I think my dad was staying in the basement, and Raymond and Jerome were staying upstairs.  And I think we may had took -- when I moved in, we may have took the last room, all five of us.

Q.    So how many bedrooms are in the house?

A.    It's three bedrooms in the house.

Q.    And then the basement?

A.    Correct.

Q.    So Jerome was in one basement -- I mean, I'm sorry, Jerome was in one bedroom?

A.    Right.

Q.    And Raymond was in another bedroom?

A.    Yes.

Q.    And then you and your children were in the third bedroom?

A.    Correct.

Q.    Was it challenging living in a house -- a house with that many people in it?

A.    Yes, it was.  It was challenging.  And then too I think at some point in time they really didn't want us there.  So

I'm not speaking of my dad, I'm speaking of the boys, they really didn't want us there.

Q.    And why do you say that?

A.    I think because it was just because it was four of us adding on to other things of space and everything, and it was just basically congested for everyone.

Q.    And did that cause problems?

A.    I think there may have been a little bit of resentment with somebody giving up their space, yeah.

THE COURT:  I didn't hear.

THE WITNESS:  I said I think there may have been a little bit of resentment with people giving up their space, yes.

Q.    And when you say "people," are you referring to Jerome and Raymond?

A.    Correct.

Q.    When you moved to Cote Brilliante, did that basically mark the end of your relationship with JR?

A.    Yes, it did.

Q.    You know, over the years since you moved, have you had much contact with JR?

A.    Not in a way where we can sit down and talk about anything, no.

Q.    After you left, did he -- was he involved in the kids' life at all?

A.    He wasn't involved in the kids' life that I know of. The kids would like come over and try to have a relationship with him, but then they come to find out that wasn't in their best interest, so --

Q.    So your understanding is that there really wasn't much of a relationship after you moved out with your children and him?

A.    Not too much of one, no.  But there was never really one after awhile anyhow, so --

Q.    Did he ever pay you child support?

A.    No, he didn't.  He actually said he would not get a job to give me child support.  And right to this day he hasn't -- he doesn't have a job to get -- where I can get any child support from him.

Q.    So he told you that he was intentionally not going to get a job so he wouldn't have to be ordered to pay child support?

A.    Correct.

Q.    Did he ever come by and pick up the kids and, you know, take them out to eat or take them to a movie or anything like that?

A.    No.

Q.    What about JR's family, did you have any contact with them?  Did you stay in touch with them after you left?

A.    I think after -- maybe to the point maybe if they

stayed, they might be having something. I wasn't -- I wasn't like around them on a daily or anything like that. If they said they were having a party for maybe one of the kids or something like that, I might go over there.

Q. Okay. When you moved to Cote Brilliante initially speaking, did you feel like the quality of life, you know, for your children improved at all?

A. No, I didn't because, like I said, probably at that point in time I probably wasn't working at that point in time. It was congested in the house. The neighborhood itself wasn't the best. So, no, I didn't see it as being improvement for my children at all.

Q. How did the move affect you? Were you -- and what I mean by that is, were you happy about it, were you -- and I don't want to put words in your mouth, but were you happy about it? Were you stressed about it? Were you relieved? What was the impact?

A. To a degree I was relieved because we were no longer in that situation. But as far as it being stressful, yes, it was stressful because, like I said, it's a difference when you kind of had your own, although it wasn't the best of situations. And then going back to a place where it's, like I say, congested and people really don't want you there and stuff like that.

Q. Okay. So at this point you're in the house at Cote

Brilliante, and you have -- and you're with your four children; is that right?

A.   Correct.

Q.   And JR was not helping you with the children?

A.   Correct.

Q.   Was Jerome, did he -- was he helping out with the children?

A.   No.

Q.   What about Raymond?

A.   No.

Q.   And you had mentioned that your father was also living in the house at the time, right?

A.   Correct.

Q.   What was his role with the children?  Was he helping out with the children?

A.   Well, it was, like you say, helping out so much as that he was the provider for the family in the home at the time. So if that was helping out, yes.  But as far as discipline and things like that, no.

Q.   Okay.  So he was -- he basically -- did he have a job?

A.   Yes.

Q.   And would he be the person that bought the food?

A.   Correct.

Q.   Was he -- would he help get the kids ready for school in the morning?

A.   No.

Q.   Would he, you know, cook -- I'm sorry, would he cook meals for you or the children?

A.   Wouldn't so much cook meals for the children, but if he would cook, he would cook dinner, and if it was something the kids would eat, yes.

Q.   So the kids saw him and had interactions with him?

A.   Yes.

Q.   Was the basement -- was the basement a place where the family would go and hang out or was that more of his personal space?

A.   That was his personal space.  The basement was kind of made like a small studio where it had a kitchen and a living room set and everything in it, so it was basically his space.

Q.   Did your father spend most of the time down there or was he up in the house in the living --

A.   He actually even when we were younger, he never came upstairs a whole lot.

Q.   When you say you were younger, when you were a child?

A.   Right.

Q.   You had just -- you mentioned earlier when you were on Garfield and Evans Street, you would drink with JR?

A.   Uh-huh.

Q.   When did you -- when did you start drinking alcohol?

A.   Actually I started drinking alcohol after my mother did

her transition, so it was at a young age.

Q.   That was around when you were 14 years old?

A.   Correct.

Q.   And when you started drinking alcohol, I mean, did you start drinking alcohol because your mother had passed?

A.   I think at that time I wasn't aware that that's why I was drinking alcohol, but come to find out later on, that was a big reason behind me drinking alcohol.  I don't think that with me drinking alcohol, I never factored in, like I said, until later on that was the big cause of it.

Q.   Okay.  And to just jump ahead many years for a second. You eventually went to rehab for alcoholism; is that right?

A.   Correct.

Q.   And when was that?

A.   I want to say it's been at least six years ago, at least.

Q.   And what was that program like?  Was it an inpatient program or an outpatient program?

A.   It was an inpatient program, where I stayed there.  Is that what you're speaking of?

Q.   That's exactly what I'm speaking of.  How long did you stay at the rehab?

A.   I stayed there for 30 days.

Q.   And when you say that, you know, looking back you realized that you started drinking alcohol when you were 14

years old after your mother's death, was that when you came to that realization that that's why you started drinking was because of your mother's death?

A.   Correct.

Q.   Now, when you started drinking alcohol, did your father know that you were drinking alcohol when you were young?

A.   Yes, he did.

Q.   Did he try to stop you from drinking?

A.   No.  Actually if I wanted alcohol, he would buy it for me.

Q.   And would you drink right in the house?

A.   Yes, I would.

Q.   When you were that age, would you drink by yourself? Would you drink with friends?

A.   I remember having parties at the house at that time. But it was probably more so partying then, what it ended up at.

Q.   Okay.  And when you were from 14 through your teenage years, are you -- were you drinking to the point where you would be intoxicated?

A.   Well, I think me looking back on my life now, I come to realize that even with me drinking maybe two glasses of anything, that had got me intoxicated, so, therefore, not wanting to get intoxicated, but intoxication was always the first and foremost thing that basically happened.

Q.   Okay.  Was drinking when you were at that age, was that something that you did regularly?

A.   I'm not going to say regularly, but it was done.

Q.   Would -- well, how often do you think you drank when you were that age?  Like on a weekly basis?  A couple times a week?  Or is it hard to say?

A.   It might not have been every week.  It's -- I can't go back that far.

Q.   Sure, that's fine.  Did -- did your consumption of alcohol increase over time?

A.   Yes, it did.

Q.   Let's -- we talked a little bit about this, but when you were dating JR and when you got married to JR, you had said that you guys would drink together; is that right?

A.   Correct.

Q.   Was that like an important part of your relationship?  Was that, you know, sort of a common denominator between the two of you?

A.   Probably looking back, that was probably the only denominator we did have was the drinking.

Q.   And how frequently would you and JR drink?

A.   With him, we probably drunk whenever he had the money to buy something, I would put it like that.  Whenever he had money to buy something to drink.

Q.   So he would go to the liquor store, pick something up,

bring it home, and you guys would drink it?

A.    Uh-huh.  At that time I was probably drinking more so beer.  So I didn't think beer was that bad.  But as years went on, I didn't drink beer anymore, I just started drinking hard stuff.

Q.    Okay.  I think I may have asked you this question, but in case that I didn't, when you were living on Evans Street, would you go out to bars or you would drink at home?  I'm sorry if I asked you that.

A.    On Evans, I was actually basically at home on Evans.  When I was going to the bars, I was on Cote Brilliante.  I think I started really going out to bars on Cote Brilliante.

Q.    Did you drink alcohol when you were pregnant with Billie?

A.    Yes, I did.

Q.    Did you drink alcohol when you were pregnant with your other children?

A.    I drunk and smoked with all of them.

Q.    Now, when you say that you would drink alcohol, would you -- are we talking about one beer or would you drink to the point of intoxication when you were pregnant?

A.    Like I said, I don't think intoxication took me long to get to, so that would not be my intent, but it's a strong possibility that I drank until intoxication.

Q.    Was there anything that stopped you from drinking when

you were pregnant?

A.     No.

Q.     Was it something that you tried to stop?

A.     No.

Q.     So is it fair to say that your drinking habits didn't change when you were pregnant?

A.     Right.

Q.     Now, you're living at Cote Brilliante.  That is the time I want to talk about.  Did you continue to consume alcohol when you moved from Evans Street to Cote Brilliante?

A.     Yes, I did.

Q.     And when you first moved there, what kind of alcohol were you drinking?

A.     Right offhand I don't recall, but I know -- I think probably I didn't become too fond of beer after awhile, so I stopped drinking beer and began drinking alcohol.  But at what point in time it was, I really can't recall.

Q.     You had said earlier that your drinking increased as time went on.  Was there a specific time when that started to happen or was it a gradual -- was it a gradual thing?

A.     I think that it was a specific time.  I think -- my drinking really got out of control after the guy I was dealing with committed suicide.

            THE COURT:  Wait.  Got out of control when you got --

THE WITNESS:  Okay.  After a guy I was dealing with committed suicide.

Q.   Now, when you say it was a guy you were dealing with, what do you mean by that?

A.   That I thought I was in a relationship with.

Q.   Okay.  And you say that you thought you were in a relationship with.  What do you mean by that?

A.   I just thought at that point in time I was in a relationship with him.  When I came to find out later on some things were going on, that's why I said I thought it was in a relationship.

Q.   And when you say some things were going on, what do you mean by that?

A.   I came to find out later on he had been married, and other things that I found out about him that weren't true.

Q.   What was this person's name?

A.   Louis McClinton.

THE COURT:  Like McCritney?

THE WITNESS:  McClinton.

Q.   How long were you in a relationship with Louis for?

A.   I want to say maybe about three years.

Q.   Okay.  And that relationship took place while you were living on Cote Brilliante?

A.   Correct.

Q.   Do you remember how old your children were when you

were seeing Louis?

A.   They may had been -- Bill may have been going to junior high, I think, somewhere along in there.  Maybe.  I can't recall right offhand.

Q.   Okay.  That's fine.  Was Louis a drinker?

A.   Yes, he was.

Q.   Did he -- strike that.  Did you and Louis used to drink together?

A.   Yes, we did.

Q.   Was that something that you regularly did?

A.   Yes.

Q.   Where would you and Louis drink?

A.   Louis had his own apartment, so I would basically go down there and we would drink together.

Q.   Where did Louis live?

A.   Downtown on Gentry's Landing.

Q.   And would you and Louis get drunk together?

A.   Yes.

Q.   Now, when you would go to Louis's house, and you and he would drink together, was that something that you did at night?  Was that something that you did during the day?

A.   It was basically at nighttime.

Q.   Okay.  And you said that he lived downtown, right?

A.   Correct.

Q.   When you would go downtown, the children, I take it,

would still be at home?

A.   Yes.

Q.   Was somebody responsible for the children when you would be out of the house?

A.   No.

Q.   Did you hire a baby-sitter to watch them?

A.   No.

Q.   Did you ask Jerome or Raymond to watch the children?

A.   No.

Q.   Was there anybody in charge of the children or were they in charge of themselves?

A.   They were basically in charge of themselves.

Q.   Now, when -- you had said that when Louis -- well, what ultimately happened with Louis?  How did that relationship end?

A.   He committed suicide.

Q.   And when that happened, is it your testimony that your drinking became even worse?

A.   Yes, it is.

Q.   What was happening at that point in terms of your alcohol consumption?  Describe, you know, a day, a typical day.

A.   On a typical day I was basically, I was drinking a whole lot.  I think a fifth wouldn't do anything for me.  It was like --

Q.   Would you drink during the daytime?

A.   If I was -- I think I was working at that time, so if I wasn't, by the time I got home, I was drinking.

Q.   Okay.  So you'd go to work and then come home and start to drink?

A.   Uh-huh.

Q.   And when you say a fifth wasn't doing anything, what do you mean by that?

A.   I mean, I would drink a fifth.

Q.   A fifth of what?

A.   At that time I think I was drinking either gin or something along --

THE COURT:  What?

THE WITNESS:  Gin.

Q.   And when you would drink gin, would that be in the house?

A.   What do you mean?

Q.   I'm sorry, would you be consuming this alcohol -- would it be drinking in the house on Cote Brilliante?

A.   Let me say this, I've always drunk in the house since I turned 14.  I've always drunk in the house on Cote Brilliante.  So there wasn't a time that I didn't drink in the house on Cote Brilliante until I stopped drinking.  So I've always drunk on Cote Brilliante.  Are you asking did it escalate at that time, is that what you're asking me?

Q.   Yeah.  And I think that's what you're describing.  Did it escalate?

A.   Yes, it did.

Q.   During this time period, were you just drinking at home or were you going out to bars?  You had said earlier that you were going out to bars?

A.   I think at that time I was going out to bars.

Q.   When you would go out to bars, would you go out by yourself or did you --

A.   It depends.  Some of the time I would go out by myself.  And if I had the girls, I could tell them to come on, let's go on hang out.  Speaking of my associates that I was dealing with at the time.

Q.   Okay.  And who was that?

A.   I would get Cathy Toliver and Deborah Ruffin to hang out with me.

Q.   So those were two people that you went out drinking with?

A.   Correct.

Q.   Were there other people that you went out drinking with?

A.   I think that they were just my standbys that we could go out and drink.  But it was people that hung around me, yes, but they weren't what I called in the circle to go and kick it.

Q.    Okay.  Those were your closest friends or closest drinking partners?

A.    Correct.  Correct.

Q.    And did both Deborah and Cathy drink when you were out?

A.    Yes, they did.

Q.    Did they drink as much as you?

A.    Nobody drunk as much as me.

Q.    Was there a point in time where you were actually working in a bar?

A.    Yes, there was.

Q.    And what bar was that?

A.    Lucketts Lounge.

Q.    Where was Lucketts located?

A.    It was on Delmar.

Q.    Is it still there today?

A.    Yes, it is.

Q.    And when did you -- how long did you work there for?

A.    Maybe two years, two or three years, somewhere along in there.

Q.    How did you get the job there?

A.    Actually I think one day Deborah and I had went up there, and they said they needed a bartender.  So I just told them that I would try it.

Q.    Okay.  And when you worked at Lucketts, were you also drinking there while you were working?

A.   Yes, I was.

Q.   When you would go out to the bars, places like Lucketts, how late would you stay out?

A.   Oh, we were closing it down.

Q.   So two o'clock in the morning, somewhere around that time?

A.   Somewhere along in there.

Q.   Was there ever times that you went out at night with your friends where you didn't come back that night?

A.   If there were, there may have been times.  Yes, there probably were times like that.

Q.   Okay.  In addition to what you described as times that you went to Louis's place, right, there were nights when you went to Louis's place where you didn't come back?

A.   Correct.

Q.   You talked a little bit about this in terms of Louis, but if you would go out with Deborah, if you would go out with Cathy, if you would go out by yourself to Lucketts or another bar, did you leave anybody, any adults in charge of the children?

A.   No, there weren't any adults in charge.

Q.   Was there anybody who could help them with their homework, say for instance, when you were gone?

A.   No.

Q.   Do you have any idea of what they were doing when you

were out at a bar?

A.    No, I don't.

Q.    When you would go out with -- when you would go out with your friends or go out by yourself, would you get pretty intoxicated?

A.    Uh-huh, yes.

Q.    What kind of impact did alcohol have on you physically when you were drinking?

A.    Physically?  What do you mean physically?

Q.    Well, did you used to have trouble getting up in the morning?

A.    Things like that, okay.  Yeah, I had had times where I had trouble getting up.  Maybe a hangover or something like that.  Like I said, the only thing that I would say, that people would say I was a mean drunk, you know.  But other than that, it -- Nikki kind of helped out a whole lot with that, you know, if they need something along that line.

Q.    Nikki, your oldest daughter?

A.    Correct.

Q.    Would you ever drink to the point where you got physically ill from consuming alcohol?

A.    Oh, yes, I had numerous times, yes.

Q.    Did you ever have times where you had trouble getting home because you had had too much to drink?

A.    Yes.  And have I had blackouts where as when I got up

the next morning, I did not know how I got there? Is that what you're speaking of?

Q. I'm not sure --

A. If that's the question that you're posing, I would have to say, yes, I had numerous blackouts whereas I was not aware of what happened and how I got there.

Q. Do you think -- strike that. And this kind of drinking that you're describing, this -- when did this stop or did it stop?

A. What do you mean, when did it stop?

Q. How long did this go on for, this type --

A. From 14 up to six years ago, if that's what you're speaking of. From 14 up to six years ago. I started off mildly drinking, and it escalated and escalated until I had to get some service to help myself. Is that what you're asking me?

Q. Yeah, I'm just asking when you stopped drinking basically.

A. Six years ago.

Q. Do you think that drinking had an impact on your ability to be a good mother to Billie?

A. Yes, I do.

Q. Do you think drinking impacted the way you treated Billie?

A. I think that with me drinking, like I said, I have been

told numerous times that I was a mean drunk.  And with me being mean, I'm sure you knew if you got in my way of anything that I want to do or try to do that there was going to be some repercussions.

Q.   Let me ask you about that for a second.  When you were -- were you a mean drunk when you were out at the bars?

A.   Oh, yeah, I was mean across the board, it didn't make no difference where I was, I was just mean.

Q.   And when you say "mean," how would that come out?  What would happen?

A.   It would come out, it was like fighting, arguing, just being mean.

Q.   So you would get into fights and arguments out at the bar?

A.   I would get in a fight or argument with anybody anyplace when I was drinking, it wouldn't make me no difference.

Q.   Now, talking about being -- talking about being a mean drunk as you described, do you think that you were a mean drunk towards Billie?

A.   I think not only toward Billie, I think I was a mean drunk towards all my kids at the time.  Like I said, at any point in time when I got angry or something like that, it wasn't for me to jump down nobody's throat.  So they got -- everybody got the wrath.  Everybody just got it.  Some people

know how to get away from it.  Some people I may have put it on a little more.

THE COURT:  You say everybody got the what?

THE WITNESS:  The wrath.

THE COURT:  The rap?

THE WITNESS:  The wrath.

A.    Everybody at some point in time had got it.  I think Billie was targeted more so because in a way that he just reminded me so much of his dad, so -- and with him reminding me so much of his dad, it was just like, I don't like him today, I don't like him tomorrow, and so therefore with me being at that point in time in my life whereas I wasn't able to do what I needed to do, I had a whole lot of resentment towards him in which I probably displayed towards Bill.

Q.    When you say "a lot of resentment," you had a lot of resentment towards JR?

A.    Correct.

Q.    And you feel like that carried over to Billie?

A.    Yes.

Q.    Were there times that -- was there ever a time that you hit Billie?

A.    I've hit Bill on numerous occasions.

Q.    And what would prompt you to do that?  Why would you hit Billie?

A.    Some of the situations, it may have been my moment.  It

may have just been my moment to just lash out.  So --

Q.    Did you ever hit Billie because you thought he was messing up or doing something wrong?

A.    At points in time Bill did get a punishment for something that he may have did wrong, correct, yes, he did.  But if I was in my moment of like I'm-going-to-get-you moment, he didn't have to do anything wrong.  Yes, he was disciplined.  All of them were disciplined to some point in time.  But if something happened or if I was in that moment, it didn't make any difference what he may have did or what any of them may have did.

Q.    When you say "that moment," what do you mean by that?

A.    My anger moment.

Q.    Do you think that you were angry often?

A.    All my children say I'm still angry, but I don't think I am anymore.  But I don't think at that point in time with things the way they were, I think I displayed a whole lot of hostile anger towards people in general.

Q.    Was that -- strike that.  I mean, was that anger, did that have anything to do with your situation?

A.    Yes, it did.  Not only the situation, but it goes back into foreplay with me holding in a whole lot of things with my mother's death, and also with me having a very big detachment problem.  I have a problem whereas I detach myself very easily from situations and things.  So, therefore, with

me having a detachment problem, I come to find out that lashing out at someone isn't as bad as maybe someone else might think because I'm so able to detach myself from individuals.

Q.   So are you saying that when you have a detachment problem, does that make it difficult for you to form relationships, is that what you're saying?

A.   I think it does.  I think it does.  Looking back now over the years, I would say that I was probably a very selfish individual because I didn't factor them in in a whole lot of things that I did or what I could have possibly did for them to make their lives better.

Q.   You mean your children?

A.   Correct.

Q.   When you say you didn't factor them in to decisions you made, what sort of --

A.   I mean, decisions I made, for one not factoring them in is even drinking while I was pregnant with them.  Not knowing the consequences or anything like that.  When Bill was born and when Ann was born, Ann came out with a breathing problem. Bill came out with other problems.  I didn't factor all of that in.  So now when I look back, I just say I was a selfish individual because I didn't factor everything in that could have possibly happened to them.  I didn't factor in that maybe later on that they was going to get a

no-good-for-nothing daddy who didn't help me with anything. I didn't factor none of that in. Not factoring that in, that mean I had a very strong detachment, and that comes back from my mother's death.

MR. MONTROY: The Court's indulgence.

Q. The type of detachment that you're talking about, did that make it easier or did that --

A. What it made it do in my life, it made it easier for me to not get attached to anyone. It just made it easier for me.

Q. Do you think that in some ways you were able to not be attached to your children?

A. I think to a degree, yes.

Q. When you would be in your moment, when you would be in a state of anger and you would hit Billie as you described, do you think that the detachment that you're describing made it easier for you to do that sort of thing?

A. To lash out? There's a strong possibility that that's what was happening at the time, correct.

Q. How old was Billie when you first -- when you first started physically hitting him, if you can recall?

A. When I first started hitting Bill physically -- like I said, all of them got discipline. I think with Bill's -- when I got out of control with Bill is when maybe about -- going on teenage years. I can't be specific. But I know

that I remember a time that Bill may have been passing by and I was in that moment, and I just remember picking him up by his collar and throwing him against the wall. And Bill was taller than me. And that's the kinds of things I would do when I was in that moment of anger.

Q. Do you remember --

A. And I'm saying that because -- I'm saying that now because looking back, I couldn't -- I wouldn't had even thought about picking up my son to physically try to hurt him in that manner. But my detachment part just goes, I'm going to get you. Do you understand what I'm saying?

Q. Uh-huh. Do you recall ever striking Billie when you lived on Evans Street?

A. I may have been drinking at that point in time. On Evans Street, like I said, it was -- I was at my breaking point on Evans. I think that -- I mean, I started doing stuff to his dad, whereas I was just I'm-going-to-get-you mode, I'm going to get you. So therefore with me, I'm going to get you. Like I said, once I said I was going to get you, if you were there, you were going to get gotten.

Q. And when you say, "you were going to get gotten," are you talking like in a physical kind of way?

A. Yeah, any kind of physical kind of way. I don't think I was going to shoot nobody I don't think.

THE COURT: I didn't hear that last part.

THE WITNESS:  I just said I don't think I was going to shoot nobody.

Q.   Do you remember -- well, let's strike that for a second.

When you would hit Billie, what does that mean exactly?  How would you hit him?  Would it be just with your hands?  Would it be with objects?

A.   I think it's just something I just tried to demonstrate that if I was in my moment, it wouldn't make any difference what was there.  It was -- it was like a -- I may had to hit him.  I remember hitting him with an extension cord, maybe with a -- with my fist for sure.  With my fist.  I think I remember one time I was doing something, my brother came up on me and had to get me off of him, so --

Q.   You were "doing something," what do you mean by that?

A.   I mean, I was hitting him.  I was throwing something.  I remember one of my brothers coming by and getting me off of him.

Q.   So you hit him -- you remember hitting him with extension cords?

A.   I remember hitting him with anything that was possibly whereas I can get hold to him.

Q.   When you would hit Billie, where would you hit him?  What part of his --

A.   It didn't make any difference.  It didn't make me any

difference where I hit him.

Q.   Did you ever hit him in the face?

A.   Oh, if he -- I remember popping him in the mouth a couple times, yeah.

Q.   Did you hit him on other parts of his body?

A.   If I had the cord, I probably did.

Q.   When you hit him, would you hit him hard or you would sort of lay off a little because he was a kid?

A.   I think that when I went, it was to -- it wasn't no kid thing.  It was like I said, it was a part of that detachment that I had to know that -- not even know that I was physically hurting my son.

Q.   Do you think that you were physically hurting him?

A.   Looking back, yes, I do.

Q.   What was Billie's reaction when you would hit him?

A.   I don't know.  I can't really say because at that point in time my focus wasn't on Bill.  My focus was on my anger; it wasn't so much on Bill.

Q.   Was hitting children, was that something that was common in your family?

A.   I remember me getting whoopings, yes.

Q.   You remember yourself getting whoopings?

A.   Yes.

          THE COURT:  Getting what?

          THE WITNESS:  Whoopings.

Q.   And when you got whoopings, who gave you whoopings?

A.   I was always getting whoopings.  My mother, my brother.  My oldest brother, he was able to give us whoopings.  Otha, he was able to give us whoopings because he was the oldest.

Q.   When you would get a whooping, what did that consist of?  What was that like?

A.   Well, I remember one time Otha, I guess I did something and he blacked my eye, so -- so a whooping was like, I remember my mom and my dad whooping me when I was younger.

Q.   Was that with their hands or was that with objects?

A.   Probably a cord probably or -- a cord.

Q.   You remember getting hit with a cord?

A.   Yes.

Q.   What about your brothers and sisters, did they hit their children?

A.   Did my brothers and sisters hit their children?  I don't know.  I can't recall.  I can't say.

Q.   Did you consider yourself -- did you consider yourself a strict disciplinarian?

A.   Did I consider myself a strict disciplinarian?  I think what I considered myself is when I said do something, do it.

THE COURT:  You considered yourself what?

THE WITNESS:  If I said something, do it.

Q.   So if you told your children to do something, you expected it to be done?

A.    Correct.

Q.    If you told Billie to do something, you expected it to be done?

A.    Correct.

Q.    And in terms of your disciplinary style, what would happen if he didn't do it?  What was your response?

A.    He would probably get punished.  That I can recall, he would probably get punished.

Q.    Did that punishment, was that something that consisted of physical violence or was it something that --

A.    It depended on what was asked of him to do.

Q.    Did you ever use corporal punishment?

A.    What's corporal punishment?

Q.    A whooping.  Did you ever give Bill whoopings because you thought he did something wrong?

A.    Yeah, I used to tear it up.  Yeah, I used to whoop his butt.

Q.    Was that something that happened regularly?

A.    I'm not going to say if he was doing something, can't say he really did a whole lot.  Bill's punishments usually - I'm not even going to say punishments, Bill's abuse, if it was done, usually came from me in the heat of anger.  I can't say that Bill was just always doing something where he was getting punished, you know, like that.  But as far as just doing something where I said -- he may not have even had to

do anything, whereas I might just give it to him, so --

Q.   So there were times where Bill was hit or beaten because of -- because of your anger, and there were other times when he was hit or beaten because he -- you know, because of some kind of punishment, is that a fair assessment?

A.   Yes.  And I think a whole lot had to do with some of the time when Bill was younger, before I -- even before Evans, Bill was a very sickly kid, and with being so sickly, I think that with him having some of his sickness he had when he was younger, I think that kind of made him a little bit more -- you know, like when you got a sickly kid, either you going to be a little more patient with them or you're going to be a little bit more, okay, you can get better than this.

I'll give you an example.  Just like Nikki.  Nikki has conversion disorder.  And when she first got it, and I was going like -- and this is recently -- and I was going like, okay, is this really real or is this something?  Because, again, my mind detached itself from going like this couldn't possibly be happening.  So, therefore, with her being like that, it was hard for me as a parent to see her like that.  And with me seeing her like that, it's just becoming my reality, that's what it is, is what it is.

With Bill, it goes back to him being the sickly kid and him in a way being in the hospital and the times he was,

probably looking back didn't have a connection with me as a mother either because he was in the hospital a whole lot of times. So, therefore, to say that the bond was a hundred percent with both us disconnecting at some point in time in our lives, it wasn't going to be a hundred percent of us having a good relationship.

Q. And correct me if I'm wrong, but are you saying at least in part that you -- Bill was sickly, and you were trying to make him tougher, is that --

A. No, no, that's not what I'm saying. What I'm saying is when Bill was sick, okay, like I remember an instance when Bill was sick, when he came up out the hospital, he just seemed so different, that he was different and I think I was different. And I think some detachment started happening with me and not being able to be there at the hospital all the time.

Q. Bill's -- you know, the fact that Bill was a sickly kid, did that in any way prevent you from beating him later on in his life?

A. No.

MR. MONTROY: Your Honor, I'm pulling up an exhibit, it's a little faded on my screen. I don't know if you're able to see it.

Q. Ms. Allen, it's good?

A. I don't have my glasses, so I really can't see it.

Q.    Okay.

MS. COSTANTIN:  Judge, I'm going to object to showing a witness their own deposition unless there's some sort of impeachment.

THE COURT:  Yes, you can ask her questions.  This comes up a lot, and what I do is try to be consistent.  You can ask a question, and then if there's an inconsistent answer, you can use the deposition to impeach.  But you can't use it to form questions.

MR. MONTROY:  Okay.  That's fine, Your Honor.

BY MR. MONTROY:

Q.    When you talk about "whoopings," what does that word mean to you in terms of when you would give whoopings to Billie?

A.    It mean a whooping.  It mean that -- a whooping may be physical -- let me try to describe it to you.  Physical pain upon an individual.  That's the best way I can put it besides saying whoopings.  I'm really not understanding what you're asking me besides whoopings.  I mean, to me it might not be self explanatory to you, but a whooping is a whooping.  It's self explanatory to me.

Q.    So a whooping is -- the intent of a whooping is to cause physical pain?

A.    If that's the way -- that's the only way to describe it for you, yes.  But to me a whooping is a whooping.

Q.    And you would administer whoopings to Bill; is that right?

A.    Correct.

Q.    And sometimes that would be because, you know, he did something that you thought was wrong?

A.    At times it may have been I felt he was doing something wrong; and at times it may have been just me doing it.

Q.    Okay.  Do you feel that your whoopings ever went too far?

A.    Yes.

Q.    In what way?

A.    In what way?  I think I just said one whereas there was an altercation -- it wasn't so much an altercation, it was where my brother had to get me off of him.  I think Bill probably had some marks on him from maybe with the extension cord or something like that.  He may have had -- I guess it wouldn't be a whooping.  Probably if you want to say it might be an ass whooping, but it would be whereas if I had to hit him in the mouth or something like that.  So all of those I will still consider if you want to use underneath the term "whooping."

Q.    Okay.  Outside of yourself, did you ever see your father, Otha, ever beat Billie or give Billie whoopings?

A.    I think he may have, yes.

          THE COURT:  Is that spelled O-p-h-a?

MR. MONTROY: It's O-t-h-a.

THE COURT: Okay.

BY MR. MONTROY:

Q. Do you actually remember?

A. I think I recall whoopings, yes. Not so much whooping. I remember when we were younger he would just like going to like thump you across the head.

Q. Do you remember if he ever did anything beyond thumping Billie across the head?

A. I'm pretty sure that he may have given Bill a whooping or so.

THE COURT: Okay. You recall that maybe he did?

THE WITNESS: Yes.

THE COURT: Okay. Wait a minute. Okay. Go ahead.

MR. MONTROY: Thank you.

Q. What about your brother Jerome, did he -- well, strike that. Was Jerome a father figure to Billie in any way?

A. No, he wasn't.

Q. Did you ever see Jerome beat Billie?

A. I would say that I recall, no. I remember one time that it was a fire that got started and Jerome was getting ready to do something to Bill, but I told him no, that I recall. That I can recall.

Q. Okay. Now, just moving ahead to the time of Billie's arrest and Billie's trial, did anyone from Billie's trial

team, meaning Mr. Sindel, Mr. Simon, Dr. Randall, do you recall any of them ever coming to you and telling you that other witnesses had indicated that you were violent with Billie?

A.   I had a violent -- I've had a violent nature, so therefore I can imagine someone coming to tell him that. Yes, I could imagine someone.  I don't know if anyone did. Is that what you're asking me?

Q.   Yes.

A.   Am I aware of anyone did that?

Q.   Yes.

A.   The answer would be no, I'm not aware of it.  But just me knowing me, that's where I was at that point in time in my life.

Q.   But do you remember specifically anybody from the trial team ever talking to you about that?

A.   Not that I can recall, no.

Q.   Okay.  Now, Raymond, your brother Raymond -- strike that question.

     Were you present in the courtroom during the penalty phase -- were you present in the courtroom during the penalty phase of Billie's trial?

A.   I really can't say that -- I don't -- that was so long ago.  I don't know what phases were what phases to go was I there.  I would say at some point in time I was supposed to

testify and I didn't.  And at that point in time I couldn't go into the courtroom until I testified.  So whatever happened that I saw was after I was supposed to testify and didn't.

Q.   Okay.  So you were kept out of the courtroom during a portion of the trial, is that your recollection?

A.   Correct.

Q.   And during that period you didn't see any witnesses or hear the testimony of any witnesses; is that right?

A.   Correct.

Q.   All right.  So if any witnesses testified that you physically abused Billie or that you were an alcoholic or that you locked Billie out of the house, you would not have been present in the courtroom to hear that testimony; is that right?

A.   Correct.

Q.   When you were living on Cote Brilliante, was there ever a time that you locked Billie out of the house, meaning you wouldn't let him come back in the house, he was outside and you wouldn't let him come in?

A.   Yes, there was times.

Q.   Did that happen more than once?

A.   Maybe two or three times, maybe somewhere along there, two or three times.

Q.   When -- in those times when Billie was -- when he was

locked out, was it a situation that you made him leave the house or was it a situation where he was already out of the house and he was coming home and you wouldn't let him back in? If you recall.

A.   I would probably say both of them. Probably happened where maybe I put him out the house or maybe it was a situation where he thought he was going to come back into the house and didn't come back in.

Q.   Okay. Do you remember a specific time that you wouldn't let Billie come back into the house?

A.   I remember a time, but saying it was specific and what happened at that point in time, why I didn't let him come back, no, I can't say that.

Q.   Do you recall on that specific time how long he was gone for?

A.   No, I can't.

Q.   Do you remember how old he was?

A.   He may had to been maybe going on being a freshman, somewhere along in there.

Q.   Going on being a freshman in high school?

A.   Uh-huh.

Q.   So maybe about 14 years old?

A.   Somewhere along in there.

Q.   Do you remember how long he was out of the house for?

A.   No, I don't recall.

Q.    Do you recall, was that at night or was that during the day?

A.    If he was out the house, that mean he was out the house during the night.

Q.    Do you recall, were you concerned that he was locked out of the house at night?

A.    No, I can't say I was.

Q.    Do you know, was there ever an occasion that you made Billie leave the house, that he was in the house and you told him to get out?

A.    Oh, that happened a couple of times, but as far as instances why I did it, I can't recall right now.

Q.    Okay.  And so you don't remember why you made him leave?

A.    No.

Q.    Do you remember how long he was gone in those instances?

A.    No, I don't.

Q.    Was it -- do you know, was it more than a day, more than a night?

A.    It wasn't more than a day.  I could say that one time I think he stayed gone for awhile maybe when I put him out. And I thought he would had to return, and I think I did a missing report on him or something like that.  But as far as --

Q.    Do you know where he went when he was out?

A.    No, I don't.

Q.    The time that you filed -- you had mentioned filing a missing person's report. Do you recall, was that the time that your -- after your house had been shot?

A.    Maybe. I don't recall. I just remember filing a missing report. I don't recall at what time, what time it was then.

Q.    Were you aware at that period that Billie had checked himself into a psychiatric hospital?

A.    No, I wasn't.

MR. MONTROY: If I could have just a moment, Your Honor?

THE COURT: Sure.

Q.    Do you remember when Marquis Taylor was killed?

A.    Yes, I do.

Q.    Do you have any recollection of how that incident affected Billie?

A.    I think at that point in time in Bill's life, him and Marquis were really close.

And let me back up a little bit. To say that with Bill -- going back to Bill being younger. When Bill was younger, he was teased a whole lot. And so he had a whole lot of problems fitting into certain groups. He didn't fit into this group; he didn't fit into that group.

So therefore I think with him and Marquis, they kind of bonded a whole lot.  And that kind of affected him in a way after he left, because he was an outsider with everybody else.

Bill had real dry skin and people used to tease him about his dry skin.  And he never really fit in.  So therefore with him being teased a whole lot, with Marquis, I think him and Marquis had a rapport.  And with that rapport, they were just the neighborhood clique kids.  And with them being clique, in that only little clique, I think that after Marquis did his transition, Bill really didn't have anybody else in the neighborhood to deal with.

Q.    Okay.  Now, when you say when "Marquis did his transition," are you talking about the time that Marquis was shot and killed?

A.    Correct.

Q.    So you feel like it had an affect on him, is that fair to say?

A.    Yes, I do, I think it had an affect on him.  I'm pretty sure it did.  Because that was the only person that I think that in the neighborhood really accepted Bill who he was.  He wasn't a kid who was rough and tough in the neighborhood, so he couldn't hang out with the rough and tough kids.  He wasn't a kid who started stuff, so therefore he couldn't hang out with those kids.  He was just the kid who was trying to

find where to fit in.  And I think him and Marquis fit in good together.

Q.    Okay.  Did Billie have trouble fitting in when he switched schools?

A.    Oh, yeah.  He had trouble, most definitely trouble. Because what he was doing was coming from a European school to an all black school, and it was just totally different.

Q.    When was that?  What grade was he in?

A.    I don't recall.  But I remember him saying that they said he talked proper and did things like that.  So therefore he didn't -- Bill never really fit in any place too quickly, you know.  I mean, even playing basketball, he never really fit in.  He just never fit in in any place that he was able to find and call, this is where I belong and be comfortable in it.

Q.    Okay.  Well, let me ask you this:  When Marquis was killed, did you ever sit down with Bill and ask him how he felt about the whole situation?

A.    I'm pretty sure I didn't.

Q.    And why is that?  Why are you pretty sure you didn't?

A.    That's just who I am.  That's just who I am.  And it goes back to my detachment mode.  That's who I am.

Q.    When you say that's who you are, are you saying that you didn't have conversations about -- you didn't have conversations with your children?

A.   That I can recall, I don't remember having conversation with Bill about Eric's -- not Eric, Marquis's death.  Like I said, when I say that at the point in time I was detached individual, I mean, I was detached.  It wasn't so much that I was interested in as not knowing so much how to deal with it or cope with seeing somebody that was in pain to help them, when I knew for a fact that I may had been in some pain, and then no one helped me.  So therefore it was like, okay.

It was something I think that my family believed in very strongly is that no matter what, don't let them see you sweat.  And I think that I kind of had that embedded in me for so long that that's why the detachment and things like that and the separation is easier maybe for me than for someone else.

Q.   So in a situation like when Marquis was killed, you could see -- is this fair to say, you could see that it was difficult for Bill, that he was in pain because of it, but you didn't act on that?

A.   Right.

Q.   You ask him about it?

A.   That I can recall, I didn't.

Q.   Was -- did you have the relationship with Billie that you could share your feelings with him about, you know, what was going on in your life and that he could share his feelings with you about --

A.    No.

Q.    -- any problems that he was having in his life?

A.    No, I didn't.  I think that's only occurring now in my latter part of life whereas I'm able to tell you that, okay, I'm feeling like this.  But other than that, it was all -- I think I'm just getting that relationship with my children.

Q.    So was that the kind of relationship you also had with your daughters, you didn't share feelings?

A.    I said I'm just getting that relationship with my children, meaning all of them.

Q.    Do you think that you were -- strike that.  Were you affectionate with Billie?  Did you show him affection?

A.    I don't think I'm an affectionate individual.  Meaning I'm not going to come up and run into you if I see you and hug you or do anything like that, then.  And I'm saying "then" because it's different now.  But then, no, I wasn't.  I wasn't -- I wasn't a person that you just came up and hugged, you know.  You just came up and kissed, no.

Q.    Did you love Billie when he was a child?

A.    Yes, I loved Billie -- Bill as a child, what I considered love.  And I still love him today, yes.

Q.    Do you think you wanted the best for him when he was a child?

A.    I think that -- I think as any mother, whether I could get it for him or not, I think that any parent wants the best

for their child.

Q.   Did you -- at one point you enrolled him in Clayton schools; is that right?

A.   Bill was enrolled in Clayton school, but it was like a package deal.  And the reason they went out to Clayton is because Ann had a speech impairment, and with her having a speech impairment, I didn't want her to be down in the City whereas they were going to go ahead and lump her with people that might be a little bit slower than herself and was not able to get what she needed in the City.  So, therefore, Ann was the main factor why they went to Clayton.

Q.   Okay.  So you moved Ann and all of the children to Clayton; is that right?

A.   They weren't moved; they were bussed to Clayton.

Q.   Bussed to Clayton, all right.  At one point do you recall, did you try to get Billie some counseling?

A.   I think that was when he was maybe getting ready to go into high school or was at high school.  It was in his teenage years.  I can't say specifically when, but it was in his teenage years, where I just seen his -- I think it was something about him, maybe I had seen a drawing or something, and I was going like, excuse me, that's some deep shit, I'm going to have -- I had seen a drawing of his, and I went like, oh, that's some deep shit, I'm going to have to go and get some counseling for him or something like that.

Q.   What was it about, the drawing that you saw?

A.   It was just dark, very dark, gloomy, depressive, you know.  And I think that was after Eric's (sic) transition, so --

Q.   Do you recall --

A.   Or at the time I was going to get some for Ann too, because she was a little -- she was something else too.

Q.   Do you recall --

     MR. MONTROY:  The Court's indulgence.

Q.   Do you recall changes taking place in Billie's personality?

A.   Like I had said, I think I started noticing the drawings.  I started noticing drawings more so and stuff like that.  I can't say that -- looking back, I can't say --

Q.   Do you recall if that change in Bill took place when he was about 11 or 12 years old?

     MS. COSTANTIN:  Judge, I'd object to leading.

     THE COURT:  Sustained.

Q.   Do you recall how old Bill was when he started to change?

A.   Teenager years.

Q.   Do you recall being -- going to a deposition in this case not long ago?

A.   I recall being there, yes.

Q.   Do you recall testifying at that deposition?

A.     Yes.

Q.     And do you recall who was asking you the questions at that deposition?

A.     I'm looking at these two people over here, and I'm not even going to say, I don't even know if they were the same people that were there, so --

Q.     Do you recall if it was attorneys for the government that were asking you questions at the deposition?

A.     Yes.

Q.     And at that deposition, you were asked questions and you were under oath?

A.     Yes.

Q.     And you testified to the best of your recollection?

A.     Yes.

            MR. MONTROY:  And, Your Honor, I'm just calling up Exhibit 529.

            THE COURT:  Okay.

            MR. MONTROY:  I'm sorry, Your Honor, if I could have just a second.

            THE COURT:  We might take a ten-minute break at this time.  We'll be in recess for ten minutes.

            MR. MONTROY:  Thank you, Your Honor.

            (Court in recess from 10:18 a.m. until 10:28 a.m.)

            THE COURT:  You want to wait until Mr. Holtshouser returns?

MS. COSTANTIN:  Judge, we don't need to do that.  We can get started.

THE COURT:  Okay.  Just so everybody knows, I know you all have witnesses and this team has things to be doing.  So we may start -- I asked Steve if we should wait until you came back, and Ms. Costantin said it's okay to start.  And that applies to both sides.  There's a lot going on.  I've explained to the person, David, who is sitting as the clerk, we're pretty informal in terms of trying to accomplish the task, and don't be so concerned about formalities and that sort of thing.

Everybody has been very good throughout this proceeding, all phases of it to work together, and I appreciate it.  So if that becomes an issue, raise it with me and we'll take it up.  But otherwise feel free to leave and come back.  You don't have to wait until recesses.  If you need to go out and talk to a witness or take care of other business, that's fine with me.

Okay.  Go ahead.

MR. MONTROY:  Thank you, Your Honor.

MR. MORENO:  Thank you, Your Honor.

MR. MONTROY:  I'm sorry, Your Honor, I'm trying to find my spot here.

BY MR. MONTROY:

Q.   Ms. Allen, I think when we left I asked you some

questions about the deposition.  And my question before that was a question about Billie -- Bill, you recall Bill going through some changes?

A.    Uh-huh.

Q.    And the question was, when those changes in Bill started taking place, how old he was.  And I just want to turn your attention to Exhibit 529, page 24.  Can you see that on your screen?

          MS. COSTANTIN:  27?

A.    No, I don't have my glasses on.  I can't see that.  Can it be enlarged?

Q.    Yeah.  Can you see that?

A.    Yeah, I see that.

Q.    So you were asked the question:

          "You also had said to them that he was a perfect son, and that you and your children hung out; is that true?"

A.    Yes.

Q.    And you answered:  "I would say that it's something I said numerous times, I enjoyed them a whole lot better when they were younger."

A.    Correct.

Q.    "When they turned a certain age --"

          "QUESTION:  Teenagers?"

A.    Yes.

Q.    And your answer was:  "Not even starting with

teenagers.  They start doing the turn, well, I guess it would be teenager age, maybe about 11, 12, they start turning."

A.     Right.

Q.     Was that your testimony at the deposition?

A.     Yes.

Q.     And then on page 26, you were asked the question:

"What was it that was changing?"

And you answered the question:  "I think the changing was that, the change with Bill was Bill came from -- what I was seeing from him was that he came from Clayton to a City school."

The question was:  "Turner, was he at Turner?

"ANSWER:  Yes.  And I started seeing little differences in the way he was conducting himself and things like that."

And then the question was, going down the page:

"Let's talk about the change.  You said that change started to happen when he got, when he was at Turner or later when he was at Sumner.  I don't want to put words in your mouth.

"ANSWER:  I think more so at Turner; because at Turner, he had to toughen up and do different things that he wasn't -- but he also had a hard time at Clayton; because with Clayton, there was a big difference in the way the kids dressed, the homes they lived in, and you know."

And you were asked the question:  "I'm not saying Clayton was perfect or anything like that.  I'm not saying that at all.  I'm just asking when the change happened."

"ANSWER:  I would say between, the change --"

I'm sorry, strike that.

"ANSWER:  I would say between, the change may have been happening maybe about 11, 12."

"Is he getting into junior high at that point, whether he's at Clayton or back at Turner?"

"ANSWER:  I think he was getting into junior high."

That was your testimony at the deposition?

A.    That I can recall, yes.

Q.    So did Bill start changing when he was around 11 or 12 or was it later than that?

A.    11 and 12, I'm thinking what grade was he in.  I'm just thinking to myself.  I would say that it may have been -- when I say 11 and 12, it may have been in his teenager years, so I'm thinking teenager can start from 11 to 12 to 12 to 14.  So I'm just going to say his teenager years.  I can't pinpoint.  I said that in the deposition, but I can't pinpoint right today if that's the time.

Q.    Okay.  So just to be clear, when you say 11 or 12 -- I'm sorry, strike that.

To be clear, when you say "teenager years," teenager years, you're talking about the time period starting after

the age of ten?

A.    Right.

Q.    And that goes up until when?

A.    To me it goes up until --

THE COURT:  Up until when?

A.    I'm going to say until at least 16.

Q.    Did the change that you're talking about -- well, let me step back a second.  What was the change?  What started happening with Bill, do you recall?

A.    I think he just started -- his appearance, he started dressing a little bit differently.  His appearance wasn't a concern to him anymore.  Then when it was a concern, he was trying to be flashy or something that he wasn't, stuff like that.

Q.    Did this -- did this coincide, this change in Bill, did this coincide with anything that was going on in your life -- or strike that.  Let me reask the question.  What was going on in your life when Bill started to change?  What kind of point were you at?

A.    11 to 12, I think I was just trying to keep afloat with all my children, trying to make sure that they had everything that I could possibly give them at the time, that I thought I could possibly given them at the time.  I was still drinking at the time.  I don't know if at 11 or 12, I don't -- I'm maybe saying it may have been a time when Louis and I may

have been dealing with each other. Drinking. It was -- it was probably chaotic.

Q. Do you recall if that was around the time that Louis died?

A. Right offhand, I can't say. I don't recall right offhand.

Q. Okay. Talking about drinking for a second, getting back to that and getting back to this age that Billie was at, when Billie was 11 and 12 years old, was in junior high school, were you -- did you have a drinking problem at that time?

A. I would say me not being aware that I had a drinking problem, I had a drinking problem.

Q. Was this a time period where you were going out with your friends and staying out real late and getting drunk as you described earlier?

A. Right.

Q. Was that going on when Billie was 11 or 12?

A. I would say -- I would say yes. But also while you're asking that question, I'm also factoring in that I've always drunken -- I mean, I've always had something to drink. So at that point in time, to distinguish what I was doing at this point in time in my life when I was drinking and what I was doing at this point in time in my life when I was drinking, it really doesn't make any difference because the bottom

line, I was drinking and it wasn't beneficial to me and my children. So just to try to pinpoint, okay, I was doing this when Bill was 11, I was doing this when Bill was 12, I can't be specific like that.

Q. So were you drinking excessively and getting drunk when Bill was eight years old? Was that something that was going on at that age?

A. I could say maybe no. But I was drinking.

Q. Okay. How old was Billie when you started -- well, strike that.

MR. MONTROY: The Court's indulgence, Your Honor. Your Honor, I'd just turn the Court's attention to Exhibit 529, at page 39.

Q. Ms. Allen, I'm just going to point your attention back to the deposition.

MS. COSTANTIN: Judge, I'm going to object. I can see what's up there and that's not a contradiction to what she just testified. She was asked about drinking. This is about whippings.

THE COURT: Yeah, sustained.

MR. MONTROY: Actually, Your Honor, the first answer does talk about drinking, the end of the first answer.

THE COURT: Well, here's where I am. She's very unspecific about teenager, 11 or 12 or eight. I think I'm going to hear it because it may help me get it sorted out.

I'm having trouble understanding when it was she really thinks the change occurred and what the cause was.  I'm having trouble sorting all that out.  So I'll hear it.  Overruled.

MR. MONTROY:  Thank you, Your Honor.

BY MR. MONTROY:

Q.   You were asked the question:

"Let me talk to you first about the whippings.  How old was Bill when this would happen?"

And the answer you gave:  "I think Bill started maybe getting whoopings when he started, more whoopings when I had started drinking a whole lot.  It goes back to me drinking a whole lot.

"QUESTION:  Did you say that started when he was about nine; is that what you told me?

"ANSWER:  Like I said, it may have been about nine; because at that point in time, he was a pretty good kid."

Does that refresh your recollection?  Was it at nine that you were drinking a lot?  Was it later than that?  Or had you been drinking a lot his entire childhood?

A.   I think that with that, like I said, I initially said that my drinking started when I was 14.  So for me to describe, okay, that I was -- it progressed.  And with it progressing, I can't say that at nine I was drinking this.  But I know at 19 I was drinking a whole lot.  Do you

understand what I'm saying?  I can't say that -- and it escalated at times.  And like I say, I started off drinking beers and I ended up drinking hard liquor and plenty of it. So therefore at that period in time, I can't say how much or what I was drinking at that age.

And I think the reason what the Judge was trying to ask was for a reason why I was drinking at the point in time was like I said is when I initially started drinking it was because of my mother's death.  And I think with raising the children, everything was so much of a build-up to me, to me that was only the way I knew how to do it, you know.

Although my daddy used to tell me, you know, no matter how much you drink, your same problems are going to be there.  I think I didn't realize that until I got a whole lot older, that it's still going to be there.  And instead of dealing with the problem, I chose to do the bottle instead.

Q.    And I know you described that there's variations about how much you were drinking?

A.    Right.

Q.    And it's difficult to pinpoint the specific, you know, your specific age that Billie was in relationship to your alcohol consumption, but when you moved to Cote Brilliante, were you an alcoholic when you moved to Cote Brilliante?

A.    Actually before I got in rehab, at no point in time did I even think I was an alcoholic.  I really thought I was

doing fine.  I didn't think at that point in time until my last thing that I even thought that I was an alcoholic. Because I always felt that alcoholics were people that you saw on the corner, and alcoholics were people that drunk what I call rot gut liquor, and I never did that, so therefore I never considered myself an alcoholic.

Q.    Well, looking back, were you an alcoholic when you moved to Cote Brilliante?

A.    Yeah.  Looking back, yeah.

Q.    Looking back, were you an alcoholic when you lived on Evans Street?

A.    On Evans?  I think I may have just been beginning to the stage of alcoholism maybe.

Q.    Were you an alcoholic --

A.    When I say alcohol, somebody else might be able to drink like a bottle of liquor, and I was able to do that, but with me drinking that bottle of liquor, I was intoxicated within the three glasses that I had drunk.  But I kept on drinking.  So therefore with me, like I said, at no point in time did I think that I was even an alcoholic until I got into rehab.

Q.    Do you remember the -- was your relationship with your daughters in any way different than your relationship with Billie?

A.    I think with Ann it was a whole lot different.  Ann --

Ann is kind of like me.  Ann was like my difficult child.
And I think that when I was younger, I wasn't going to say I
was difficult, but I was just different from the rest of my
family.  You know, my sisters, they right today, everybody
else could be going left, and I'm going to go right.  I'm
just not the type of person that believe in going where
everybody else is going.

        And looking back now, it's not even a plus that I'm
looking at because it's something that if I would have did
what everybody else was doing, my life would have been a
whole lot better along with my kids.

Q.   Did -- but in terms of how you interacted with Billie
and the relationship that you had with Billie, was it
different than the relationship that you had with Yvette and
Nikki and Angela?

A.   I think that with -- with -- it was different, but I
would say between Bill and Ann, they had --

        THE COURT:  When you say Ann, is that Annette?

        THE WITNESS:  That's my Angela, that's my daughter.
Wait a minute, what did you ask me?

        THE COURT:  Okay.  Well, I just want to make sure.
You were talking about -- so Ann, when you say Ann, that's
Angela, right?

        THE WITNESS:  Correct.

        THE COURT:  Okay.  Go ahead.

A.    Ann was kind of like me, she was a little bit different and kind of headstrong.  And Bill wasn't headstrong, Bill was just somebody that I could probably target more so than anybody else.  Ann -- I mean, Yvette, she was just always the baby, you know.  And Nikki, she was just Nikki.  But it was like the two middle ones were that I target the most.

Q.    When you say "target," what do you mean by that?

A.    I meant Ann would -- to me, Ann was just difficult.

Q.    Well, I'm talking about Billie.  When you say you targeted Billie the most, what do you --

A.    Oh, okay.  Billie was just -- he was just easy prey.  You know, he was just somebody that was easy prey.

Q.    What do you mean by that?

A.    I mean, like he wasn't going to resist.  He wasn't going to do anything to -- to -- I don't want to say rock the boat, but he wouldn't, he would just go ahead and take it.  You know, Ann might say a little something smart back, but Bill wouldn't do that kind of stuff.

Q.    And so are you saying that in terms of when you would hit Billie or when you would discipline Billie, he wouldn't react, he wouldn't react in a negative way, is that what you're saying?

A.    Right, he wouldn't react in a negative way.  He never thought about -- well, he may have thought about it, but he would have never talked about, come up to me and tried to

challenge me in any kind of way. None of them would have did that. None of them still would do that.

Q. During the time that you were living on Cote Brilliante, were there occasions that you had sexual relationships with individuals in exchange for money?

A. Yes.

Q. And how often did that happen?

A. Periodically, you know.

Q. And did that take place right at the house?

A. Yes.

Q. Do you remember the legal team that represented Billie at trial?

A. When this first came about, there was several people that came. I think first it was somebody from the federal -- I can't recall the name, but they said they couldn't be used because that was a conflict of interest. And then it was more people. So I think I've encountered a whole lot of people. And I'm going to say some of them I recognize and some I may not recognize the names.

Q. Do you remember the name Rick Sindel?

A. Yes, I do.

Q. And do you remember the name John Simon?

A. Yes, I do.

Q. What about David Randall?

A. Vaguely, yes.

THE COURT:  David Randall?

MR. MONTROY:  Randall, yes, sir.

Q.   Do you recall that they were individuals who were involved in representing Billie at his trial?

A.   Excuse me, when the trial finally got started, those were supposed to be his two -- I mean, those were supposed to be his attorneys at the time, yes.

Q.   Okay.  Do you recall how many times in person you met with any of those guys?

A.   I can't say a number or anything like that, but I know we did meet at times.

Q.   Do you recall whether or not John Simon ever came to your house?

A.   John Simon did come to my house, yes, he did.

Q.   Do you remember how many times he came to your house?

A.   No, I do not.

Q.   Do you recall whether Mr. Sindel ever came to your house?

A.   Rick Sindel never came to my house.

Q.   Did you ever meet with Rick Sindel in person?

A.   I met with Rick Sindel, I don't know how many times, but he and I did meet, if he asked me to come to his office or something like that.

Q.   Do you remember what you discussed with Mr. Simon or Mr. Sindel or Mr. Randall?

A.   I can't give any details what were discussed, but I know that if a question was posed to me and I could answer it the best way I possibly could.  But as far as getting into details to what we discussed, no, I can't recall.

Q.   Okay.

MR. MONTROY:  Your Honor, I'm pointing the Court's attention to Exhibit 301.

Q.   Do you remember a time on April 16th, 1997 that you had a conversation about Billie and his case with Mr. Sindel?

A.   No, I don't recall it.

Q.   Okay.  I'm showing you a transcript of a conversation that you had with Mr. Sindel on April 16th, 1997.

A.   Okay.

Q.   I just want to ask you a couple questions about that.  You were asked the question by Rick, this is the fourth question down:

"Okay.  How did he do in school?  Tell me absolute 100 percent what happened.  Don't color it one way or the other.  Because I'll find out anyhow.  Did he do good, medium --"

And you answer -- you interrupt and answer:

"Excuse me.  First of all, okay, you represent my son."

And the answer is:  "That's right."

You say:  "It sounds like to me we have to be on a

good rapport, okay?"

And Rick says: "That's exactly right."

And then you say: "And I'm not going to lie to you, and I'm not expecting you to lie or fabricate to me."

And then Rick says: "That's perfect, that's our understanding."

And then you say: "Okay, so we got that about the system, so there's no need for that conversation again. Okay."

And Rick says: "Okay."

So when you told -- when you interrupted Rick and said, "And I'm not going to lie to you. I'm not expecting you to lie or fabricate to me," what did you mean by that and why did you say that to him?

A.   I don't know, but just reading right there I think that with the sentence where he said something about -- to me with the sentence you just read about what he said about the question that he asked to me, and it sound to me like he -- to me it sounded like he was getting ready to get some bullshit. And I don't do bullshit. So I wanted to make perfectly clear that he understood that I'm not the one to do it, and I was expecting him not to do the same.

Q.   Okay. When you say that you're not about to get into bullshit, what do you mean by that?

A.   I'm not a bullshitter. I'm not a person who -- to

me -- to me even with the question that was posed, it was like he thought that from my understanding maybe that's why I came to him, that a way he thought I was getting ready to start some lying. And I wasn't getting ready to start no lying. If you have my son's best interest at heart, that's what you're supposed to do. And to me if you have my son's best interest at heart, you shouldn't have even came to me that a way, so therefore, yeah, I probably did get defensive and tell him, let's stop this right now, we're going to have to start all over again.

Q. Did you make it clear to Rick that you were willing to tell Rick the truth?

A. I think that's what that just said, like I said, I'm going to tell the truth.

Q. Okay. Were you willing to answer questions that were posed to you by either Mr. Sindel or Mr. Simon, Dr. Randall?

A. I think that any point in time that I can recall if anyone asked me a question or anyone asked me for any information, that it was given to them.

MR. MONTROY: Sorry, Your Honor, I just lost my exhibit.

THE COURT: That's all right.

Q. In that same conversation, Mr. Sindel asked you:

"QUESTION: Do you know people that you could, could you send me a list of people you think he's close with,

people I can talk to?"

You said: "People you could talk to and --"

Rick: "Like a relative, friends, religious people, you know, people that can give me a good idea --"

You say: "A general overlook at Bill? Sure, I can, I can do that. He did give me your telephone number."

Do you recall, did you actually do that, did you give -- did you provide Mr. Sindel with names of witnesses?

A.   I think that goes back to what I initially said, anything that was asked of me, tell my son it was given. So, therefore, if he asked me to do that, it was done.

Q.   Okay. And the next day -- I'm showing you a letter from Mr. Sindel.

THE COURT: This is 305?

MR. MONTROY: Yeah, 305.

Q.   The next day Mr. Sindel sent you a letter confirming the conversation that you had the day before?

A.   Okay.

Q.   Right? And then in the second paragraph saying:

"Also, please provide me with the names, addresses and phone numbers of individuals that you think I can talk to to help me understand Billie's character and that can be used in court to present a strong and positive picture of his background."

Do you remember receiving this letter from

Mr. Sindel?

A.    No, I actually don't remember receiving that letter. But I'm pretty sure that he had to get people's name from someplace.  So I'm pretty sure he got them from me.  But I don't remember the letter.  That was in 1997.  Actually I thought all this happened in '98, so I don't --

Q.    Okay.

A.    I know I remember going over to Dr. Grabau's office to try and get medical records, because they used to go a Dr. Grabau.  That's when he had lead poisoning.  I think he was over at Dr. Grabau's office.  So I remember trying to go over there and get documentation of his medical.

Q.    Okay.  Now I'm going to point your attention and the Court's attention to Exhibit 309.  And this is also a letter dated May 7th, 1997, addressed to you, Juanita Allen, and signed by Mr. Sindel?

A.    Uh-huh.

Q.    And Mr. Sindel writes:  "We have received very warm and kind letters about Billie from a number of different people. Unfortunately, the letters haven't indicated their addresses or phone numbers.  Could you help us locate these individuals?"  And there's several names.

A.    Uh-huh.

Q.    Following Mr. Sindel's earlier letter on April 17th, did you go and ask people based on Mr. Sindel's request to

provide information to Mr. Sindel?  Do you recall doing that?

A.    I recall -- I don't recall doing it, but I know, like I said, that was just such a -- I don't recall doing it, no, I don't recall doing it.

Q.    You recall, as you said, going to Billie's doctor's office and asking for some medical records?

A.    I do recall that.  And I'm looking at the names on the paper.  And only way he could have possibly got the names and got this information was from me, so therefore I just don't recall doing it.

Q.    Okay.  But you know that he asked you to do this based on the letter, right?

A.    Okay.

Q.    And you know that ultimately he got a bunch of letters from people; is that right?

A.    Okay.

Q.    Was it Mr. Sindel who asked you to get medical records?

A.    I can't recall who asked me to get them.  I'm just knowing that whoever asked me to do something, that I tried to do it to the best of my ability.

Q.    Point your attention to --

A.    The letter itself, it says find positive people.  You could find something positive in anybody, but you could also find negative.  So to me he wasn't asking for the overall picture, he was just asking about some positive impact.

Q.   Do you recall if that's what you did, you went out --

A.   That's what the letter said.  I can't recall.  I'm just saying I'm just reading the letter.

Q.   Okay.  I'm pointing your attention and the Court's attention to Exhibit 407.  Again, this is a letter from Mr. Sindel dated April 30th, 1997 --

A.   Uh-huh.

Q.   -- addressed to Juanita Allen.  "Dear Ms. Allen, Could you please furnish me with a list which if possible includes addresses and phone numbers for all pediatricians or doctors that treated Billie in the past."  And he goes on to talk about hospitals.  "This information is necessary to investigate a possible penalty phase in this case."

Could this have been the letter, or do you remember, was this the letter that prompted you to get the medical records?

A.   I don't know if this was the letter or what.  But like I said, I know that if it was something that was asked of me, so maybe that's where it comes in.  I can't say.  I don't recall.  I don't recall who actually sent the letter or how the letter got to me or even if it was by via telephone.  I can't recall.  The only thing I can recall is someone asked me and it was done.

Q.   Okay.  Point your attention to Exhibit 306.

A.   Okay.

Q.    This is another letter from April of 1997, from Mr. Sindel addressed to Juanita Allen dated April 25th, 1997. And in this letter Mr. Sindel indicates that he got some names from Bill, your son, and asked if he could provide any background information on these individuals.

A.    Okay.

Q.    Do you recall this?

A.    No, I don't.

Q.    Going back to Exhibit 301.  Going back to 301, the transcript of the conversation between you and Mr. Sindel. Mr. Sindel asked you the question:

        "Well, I'm trying to compile information that can be used in mitigation, you know, trying to establish, what it is, it's not so much he's not guilty at this point in the stage, it's more that even if he is guilty, he shouldn't be put to death."

        And you answer:  "Okay."

        And Mr. Sindel continues:  "Primarily what he's got going for him is youth, and his relatively limited experience with the criminal justice system."

        And then Mr. Sindel goes on to talk about another case that involved a killing and a rape, unrelated case to Billie's case.

        And I'm showing you just what the rest of the conversation was that's transcribed.

Other than these letters that you received in April of 1997 and May -- May 7th, 1997, do you recall Mr. Sindel ever meeting with you or discussing mitigation with you?

A.   That I can say, I can't recall if he did.  And I probably need some more verification that what did you all do at mitigation.  What goes on, what stage is that and what goes on?

Q.   Do you recall that Mr. Sindel ever talked to you about mitigation?

A.   That I recall, I would have to say no.  I don't know. I can't say.

Q.   Okay.  But your testimony is that if Mr. Sindel asked you for some information, you would try -- you would provide that information or answer his questions?

A.   Correct.

Q.   Do you remember meeting with members of the trial team right before Mr. Allen's or Billie's trial?

A.   What do you mean "right before"?

Q.   Well, do you remember any meetings down at Mr. Sindel's office?

A.   I remember meetings, but I can't say how close they were to Bill's trial or anything like that.  But I do remember going down there for meetings.  I can't say I met with Bill two days before his trial or anything like that.  I would have -- probably have to say, no, I don't recall

anything like that happening.

Q.   And do you recall the content of any conversations that you had with any of the trial team?

A.   No, not really right offhand.  I'd say no.

Q.   You recall being asked about medical records; is that right?

A.   I recall -- I recall the medical records, because I had to go over there, but -- I remember going to Rick's office one time, but as far as what kind of conversations that we had, I can't recall.

Q.   Okay.  Do you recall ever having a discussion with anybody on the trial team about lead poisoning?  I think you were talking about that earlier.

A.   I can't recall.  I don't know.

Q.   Okay.

A.   I think that maybe if I said I was going to get his medical records, I don't know if they wanted me to elaborate that with Bill's lead poisoning, you know, he had nephrotic syndrome.  I don't know if all of that came up into his trial or nothing.  I don't even know if the case itself even heard of Bill's history of all the illnesses that he had when he was younger.  I'm not aware of that.  I don't know.

Q.   You don't know if that was introduced at trial?

A.   I don't know.

Q.   Do you recall if you were ever asked any questions

about your alcoholism?

A.   That I can say, I don't recall.

Q.   Do you recall if you were ever asked any questions about, you know, whether or not you liked to drink?

A.   Not that I recall.

Q.   Do you recall if you were ever asked any questions about, you know, violence that existed in your home?

A.   Not that I recall.  I don't remember a whole lot of conversations with them, that's why I'm going like "not that I recall."  It's not a conversation that we had, that they had that I can remember back from '97 that just stuck out and I remember, no.

Q.   Did you ever tell Mr. Sindel or Mr. Simon or Dr. Randall that there were certain things, certain topics that you would not or could not discuss with them?

A.   That I recall, no.  I mean, I wouldn't see why I was when I'm being open, even starting with Rick Sindel, I was open and to everyone trying to make sure Bill get the best that he could possibly do.  And I haven't shut down yet, so I don't even see whether drinking or whatever the case, I don't see that happening, no.

Q.   Were there any topics that you were unwilling to discuss?

A.   That I can recall, no.

Q.   So if you would have been asked questions about your

drinking habits, would you have told Mr. Sindel or Mr. Simon or whoever at the time of Billie's trial about those drinking habits?

A.    Yes, I would have.

THE COURT:  This may be a good break time.  As I explained earlier, this is an unusual break.  It will happen on a daily basis during this hearing because of a prearranged event, we're going to be taking a longer lunch break today, from now until about one o'clock.  Court will be in recess until then.  You may step down.  Court's in recess.

(Court in recess from 11:17 a.m. until 1:02 p.m.)

THE COURT:  Whenever you're ready, Mr. Montroy.

MR. MONTROY:  Thank you, Your Honor.

BY MR. MONTROY:

Q.    Good afternoon, Mrs. Allen.

A.    Good afternoon.  I forgot.  I apologize.  I was someplace else.

Q.    You okay?  You ready to start?

A.    Yes.

Q.    The testimony that you gave today regarding taking your anger out on Billie in terms of hitting him --

A.    Uh-huh.

Q.    -- as you described with your fists and with objects --

THE COURT:  I didn't hear her say with her fists.  I heard about the cord.  So maybe you ought to cover that.

MR. MONTROY:  Oh, okay.  I'm sorry, Your Honor, I thought I did.

Q.   Just going back to -- the times you described hitting Billie, how would you hit him?  Would you hit him with objects?  Would you hit him with your hands?

A.   I would hit him with my hands, objects, anything.  Like I said, I remember hitting him in the mouth with my fist, slaps.  It didn't make any difference.

Q.   And was that something that you did throughout his childhood?

A.   I would say not when he was younger, but correct.

Q.   When you say "younger," what do you mean by that?

A.   Maybe -- I was just thinking.  Maybe when he was five or six or something like that.

Q.   You did not hit him when he was five or six?

A.   No.

Q.   But after that, seven, eight, nine, is that when you hit him or was it later than that?

A.   It may have been later than that.

Q.   How old do you think he was when you were doing those things?

A.   It may have been, I'm going to say going on preteen or teen years, something along those lines.

Q.   Okay.  And just to be clear, because I know there was a little bit of confusion or possibly confusion, when you say

preteen or teen years, what does that mean exactly?

A.    Well, I'm saying preteen, but I would take teenager years between 11 to 16, somewhere along in there.

Q.    Okay.  So between 11 and 16, those are the years when you were talking about hitting Billie with extension cords or with your fists, that's the time period you're talking about, between 11 and 16 years old?

A.    Correct.

THE COURT:  One other thing, because I just want to make sure I get this right.  I thought the extension cord thing was a one-time thing.  Now you're saying extension cords.  You hit him repeatedly with cords?

THE WITNESS:  Yes.  It wasn't a one-time thing at all.  No, not at all.

Q.    The beatings that you have testified about and described, just to be clear, how frequently did that happen?  I know it might have altered, it might have changed, you know, from week to week or month to month, but on average, how often would that sort of thing happen, do you think?

A.    You mean on average, are you speaking of a week or a month?  Or an average, I don't -- I'm not understanding what you're saying.  What do you mean on average?  Do you want me to say a week's time or something an average or do you want me to go to month?

Q.    I mean, do you think that sort of activity, that the

beatings used to happen every day or once a week?

MS. COSTANTIN: Judge, I'm going to object to leading.

THE COURT: Leading. Sustained.

MR. MONTROY: I'm sorry, Your Honor, I'm just trying to get an idea of how often.

BY MR. MONTROY:

Q. How often did it happen?

A. If I would have to give a number, I would say maybe two to three times a week if I had to give a number.

Q. The beatings that you're talking about and that you've testified about today, if you had been asked about those incidents, was that something that you would have been able to discuss with Mr. Sindel or Mr. Simon or Dr. Randall?

A. Yes, it would have.

Q. Do you recall meeting with Dr. Randall and being -- having a conversation with Dr. Randall some time before Billie's trial?

A. Not right offhand. Like I said, it was numerous people that I met. I can't specifically say that I remember Dr. Randall at that time.

Q. Okay.

A. I mean, he may have been -- I can't say, like I said, it's been so many people that I talked to.

MR. MONTROY: Your Honor, I'm just identifying for

the Court and Mrs. Allen, Exhibit 411, which have been identified as interview notes of Juanita Petty Allen by Dr. Randall.

A.    I'm going to need that enlarged.

Q.    Specifically I'm looking at page 2 of Exhibit 411.  And this -- six paragraphs down, the paragraph begins with the word, "John Allen, Bill's father," right?

A.    Uh-huh.

Q.    And that's JR, who you were testifying about earlier; is that correct?

A.    Uh-huh.

Q.    And without, you know, reading that whole paragraph, I just want to point your attention to the second paragraph. When you say, "His mother was fair, with me.  He father was a butthole," are you still talking about JR's parents there?

A.    Yes.

Q.    And you say, "He drank a whole lot.  I didn't care too much for him.  Stayed away from him.  He was a provider for his family.  Just mean though.  His mother just took it, she stayed there.  That side of the family is kind of rough.  We have cousins on that side of the family who are incarcerated, violent.  His dad wasn't a violent person.  I'd be subject to get violent before his dad would."

Now, are you talking about Billie's father there or are you talking about JR's father, or do you not know?

A.    I was talking about Bill's father.

Q.    Okay.  JR?

A.    Uh-huh.

Q.    I'm interested in the line where you said -- I want to ask you a question about the sentence, "I'd be subject to get violent before his dad would."  Are you talking about yourself?

A.    Yes, I am.

Q.    What do you mean by that when you say, "I'd be subject to get violent before his dad would"?

A.    I think when I was younger, I had a real bad temper and a bad disposition, so therefore --

THE COURT:  You're just going to have to speak up, ma'am.  You just drift off.  And we got to hear what you have to say.

A.    Okay.  I think when I was younger, I had a bad disposition and had a bad attitude and would fight a whole lot.

Q.    And is that a true statement, you'd get violent before Billie's father would get violent?

A.    Yes.

Q.    Do you recall, did Dr. Randall ever ask you any followup to those questions about being violent, about getting into fights?  Did he ask you what you meant by that, if you recall?

A.    I don't even recall this.  So, therefore, I definitely wouldn't recall any other conversation.  I don't even recall this.

Q.    Same interview, Dr. Randall writes, and attributes to you, "You don't want to see me angry."

A.    At that time in my life, correct.

Q.    Is that something that you would have talked about back at that time period?

A.    If I told him that you don't want to see me angry, yeah, if he would have elaborated on it, I would have been more detailed about you don't want to see me angry.

Q.    Okay.  And talking about being more violent than JR, is that something that you would have been able to say to somebody interviewing back then?

        MS. COSTANTIN:  Judge, I'm going to object to this question.  She said she has no memory of any of this interview.

        MR. MONTROY:  Your Honor, actually my question is, would she -- is that consistent with something that she would have said to somebody who was interviewing her back then?

        THE COURT:  Well, but how could it be consistent if she doesn't remember?

        MR. MONTROY:  Well, okay, I understand -- I understand the Court's --

BY MR. MONTROY:

Q.   Were you an angry person back during -- back during the time at Billie's trial?

A.   Was I -- it wasn't Bill's trial that made me angry, the situation that we was in made me angrier, yes, it was.

Q.   Were you an angry person during Bill's childhood?

A.   I would have to say -- I was -- I was kind of mean, and if you want to put angry in there, I guess that would be part of all the meanness.  I was kind of mean.

Q.   Do you recall whether Dr. Randall asked you if you were an angry person?

A.   I don't recall.

Q.   Do you recall if Dr. Randall asked you any followup questions to the statement, "You don't want to see me angry"?

A.   I don't recall.

Q.   Back in the days when Billie was a child, why wouldn't someone want to see you get angry?  What did it mean?  Let me rephrase that.  What did it mean for you to get angry?

A.   Because if I got angry, I was out of control.  I was angry.  I was -- I would fight a whole lot.  If you made me mad, I was ready to go to blows.

Q.   I'm just going to turn your attention to Exhibit 411, page 2, the same.  Do you remember telling Dr. Randall the following:  "Marquis Taylor, he got killed.  I think after a while Bill was on 'an I just don't care' mission.  Marquis's mother tried to comfort Bill.  She never blamed him."  Do you

remember telling that to Dr. Randall?

A.   I don't remember telling him that.  But after just going back and thinking about it, I could say that was probably a conversation that would have happened.

Q.   Just turning to the third page of that.  "Bill and Marquis, Marquis was a good kid.  Billed called everyone his friend."  Do you remember talking to Dr. Randall about Marquis being a good friend of Bill's?

A.   No, I don't.

Q.   Do you have any recollections of whether or not Marquis and the death of Marquis was something that was talked a lot about during the time of Bill's trial by his trial team or by other people who you might have come in contact with?

        MS. COSTANTIN:  Judge, I'd object, she's already testified she has no memory of the content of any conversation with any member of the trial team.

        THE COURT:  That's true.  But he's asking her now about a specific question.  So overruled.

        Just a minute, I'll pull up the question for you.

        "Do you have any recollections of whether or not Marquis and the death of Marquis was something that was talked a lot about during the time of Bill's trial by his trial team or by any other people you might have come in contact with?"

A.   No, I don't have any recollection of it, no, I don't.

Q.   If Dr. Randall or Mr. Sindel or John Simon had asked you a question about your statement, "You were more likely to get violent than Billie's dad would," if they asked you what you meant by that, would you have discussed your history with violence?

A.   Yes, I would have.

Q.   If they had asked you about that, would you have told them that you'd gotten into fights?

A.   Yes, I would have.

Q.   If they had asked you about that statement, would you have told them about -- well, strike that.

     If Dr. Randall or Mr. Sindel or Mr. Simon had asked you a question about your statement, "You don't want to see me angry," would you have told them -- would you have explained to them as you've explained today what you meant by that?

A.   Yes, I would have.

Q.   Would you have explained to them how you were an angry person during Billie's childhood?

A.   I'll put it to you this way.  I think at any point in time when somebody came and asked me a question, I answered to the best of my ability.  And some of the things that are presented today is some of the things I just don't remember. But I know for sure with even just having a conversation saying that "You don't want to make me angry," if somebody

would have elaborated on the question, I would had to told them at some point in time how you don't want to make me angry.

Q.   You would have told them what you meant by that?

A.   Right.

Q.   Okay.  And would you have testified to what you had told them at trial?

A.   Yes, I would have.  If I would -- that I could remember I would have been asked some of these questions, yes.  If they asked me, yes, I would have.

Q.   Did you ever have a trust issue where you didn't trust Mr. Sindel or you didn't trust Mr. Simon or you didn't trust Dr. Randall because they were white?

A.   Did I have an issue that I didn't trust them because they are white?  No, that wouldn't have been an issue with me that I didn't trust them because they were European descendents.  It would have been an issue of what I seen some of the things that got done, whereas I might have said, okay, do you really have my son best interest at heart?

But as far as trusting them because they are white, no, because you all are white and the information that you all gotten from me would have been the same back in 1997 as it would have been today from the information that you all given -- that I have given you all.

Q.   You have testified today about having a serious alcohol

problem?

A.    Correct.

Q.    Is that right?  You've testified today about hitting your son?

A.    Correct.

Q.    You've testified today about locking your son out of your house, right?

A.    Correct.

Q.    You've testified today about not being able to show your son affection?

A.    Correct.

Q.    You've testified today about having sex for money?

A.    Correct.

Q.    Are these things, things that are difficult for you to talk about?

A.    No, they are not.  I mean, no, because I think that with me, I'm just a -- it is what it is.  You know, I'm going to say what I have to say, whether you like it or not.  That's what it is.  That's what it is.

Q.    So if you had been asked about these things -- these topics at the time of trial, about the beatings, about the lockouts, about the drinking, all this stuff that you testified today, would you have told all these things to Mr. Allen's legal team at the time of trial?

A.    Yes, I would have.  Just from the documents that I

showed you earlier, I don't recall them.  But I can say when Rick Sindel asked for documentation, he said he wanted positive documentation.  He didn't say anything about what people are asking me now.  Positive documentation is something positive.  He didn't ask me the full impact of what Bill's life was like.  Because if he would have asked me at any point in time, I would have gave him the whole story.

Q.    And is what Mr. Sindel asked you, is that based on your own recollection or is that based --

A.    No, I'm just going back to the letter.  Like I said, I'm going back to what he asked, just positive just stick out, so therefore --

Q.    But it's your testimony that if Mr. Sindel had asked you about negative stuff about your life --

A.    No, that's not what I said.

Q.    I'm just asking.

A.    That's not what I said.  What I said, from the letter that was up here earlier, the documentation that he asked for was for people to send out positive letters.  Like I said, with him sending out positive letters, he didn't say he wanted an overall picture of what Bill did, he just wanted positive letters.  Positive letter could have been from Boy Scouts or anything that might have been positive.  But it didn't tell the whole aspect of what was going on in Bill's life.

Q.    Okay.  Well, let me ask you this:

THE COURT:  Wait a minute, I need to interrupt, because I don't understand that to have been your former testimony.  What I understood was the letter that he said, these are the strong points and he described about his youth.  But I don't ever remember anything that I saw today that suggests that he asked you only for positive stuff.

THE WITNESS:  I think when the letters that came from the -- from -- that I think if I'm not mistaken that was written to -- he wanted Deborah Ruffin, and whoever that was on that letter, I think he said positive.

THE COURT:  If it is, then it will show it, okay.

MR. MONTROY:  Your Honor, I'm going to point the Court's attention to Exhibit 305, a letter -- just made it disappear -- dated April 17th, 1997, addressed to Juanita Allen.

Q.    The second paragraph.  I'm not sure, is this the paragraph that you're referring to?  "Also, please provide me with the names, addresses and phone numbers of individuals that you think I can talk to to help me understand Billie's character and that can be used in court to present a strong and positive picture of his background."

A.    Correct.

Q.    And your understanding, your recollection of this is based on seeing this letter today; is that right?

A.    I didn't hear you.

Q.    And your -- your recollection or your understanding that Mr. Sindel was looking for positive stuff is based on seeing this letter here today in court; is that right?  Or do you have a --

A.    I mean, that's -- back then and today, I'm just saying I don't recall, but just reading it, that would be the assumption I would get.

Q.    Okay.  Is there anything that you've testified about today that you would not -- you don't think you would have been able to talk to Billie's legal team at trial about or testify back at Billie's trial because you were embarrassed by it or it was too difficult to talk about?

A.    No, I don't.  I don't think that it would because I think even it's documented whereas I told Rick Sindel from jump street, there would not be no bullshit on my part, and I didn't want any bullshit to be on his part, so, no, I don't see that happening.

Q.    You were an alcoholic still at the time of Billie's trial, right, you were still drinking?

A.    Correct.

Q.    Would the fact that you were an alcoholic, the fact that you were still drinking, would that do you think in any way have prevented you or caused a problem for you in terms of disclosing the things that you've talked about here today

about the drinking, about the physical abuse, about the --

A.   I would say it like this, the best way I can say it. My children said the only that have changed since I've stopped drinking is that I've stopped drinking.  So, I mean, if I would have had to say it today, I'm going to say it tomorrow.

MR. MONTROY:  Thank you.  Your Honor, I don't have any further questions.

THE COURT:  All right.

MR. MONTROY:  I'm sorry, Your Honor, if we could have the Court's indulgence.

(There was a conference held off the record.)

MR. MONTROY:  I'm sorry, Your Honor, I just have a couple more questions.

THE COURT:  That's all right.

BY MR. MONTROY:

Q.   We talked a little bit about -- or you talked a little bit about not being in the courtroom during the portion of the trial where you thought you were going to be testifying; is that right?

A.   Correct.

Q.   Was it your understanding that you were going to testify?

A.   It was my understanding I was supposed to testify.  I think Rick and I went over I think either, I want to say I

remember a piece of paper given to me, some questions that he might go over.

Q.   Okay.  And you ultimately did not testify; is that right?

A.   Correct.

Q.   Do you have any understanding of why you did not testify?

A.   No.  Right to this day, I still don't have an understanding why I didn't.  No, I don't.

MR. MONTROY:  Thank you, Your Honor.  I don't have any further questions.

THE COURT:  Okay.  Thank you.

CROSS-EXAMINATION

BY MS. COSTANTIN:

Q.   Ms. Allen, I'm going to ask you some questions now.  I just want to go back to this letter that we have here in front of you.

A.   Okay.

Q.   And I want to look at the next paragraph.

A.   I need it enlarged.

Q.   That's what I'm going to do.

A.   Okay.

Q.   I want to show you the next paragraph.  And the next paragraph -- and to clarify, I'm talking about Exhibit 305; is that right?

A.    Yes.

Q.    And the next paragraph of the letter from Mr. Sindel to you says, "Of additional importance is any information you have concerning concussions, diseases or other mental problems that may have complicated Billie's reasoning ability."  Is that right?

A.    Right.

Q.    And, "We are presently exploring the issue concerning Homer G. Phillips and the lead poisoning."  Is that correct?

A.    Correct.

Q.    So he's interested in Billie's mental problems as well; is that right?

A.    From the letter, correct.

Q.    Right.  You have no -- absolutely no independent recollection of any conversation that you had with any member of the trial team; is that right?

A.    Not too much, no, I don't.

Q.    All right.  So when we show you things, you may not -- you're not denying that you said these things perhaps in the notes, but you really don't have any memory of it at all; is that right?

A.    Not too much, no, I don't.

Q.    Okay.  All right.  Let me go to 301 for a moment.  And I'm going to blow that up so you can see.  And this is what Mr. Montroy showed you earlier.  It's Mr. Sindel talking to

you or a transcript of Mr. Sindel talking to you on April 16th of 1997. That's Exhibit 301, the first page.

And Mr. Sindel says: "Okay, how did he do in school? Tell me the absolute 100 percent what happened. Don't color it one way or the other, because I'll find out anyhow." Correct?

A.    Correct.

Q.    So, I mean, when we look at these documents, we can see that Mr. Sindel is trying to find out what the truth is, he's not telling you only positive things, is that correct, only tell me positive things?

A.    Well, on this particular statement what he was asking about was school. And with school he was saying he would find out a hundred percent of what was going on. So, therefore, just asking about school with that being one specific question that he asked of, I wouldn't know that it would be a general request because he pinpointed school.

Q.    And do you have any memory of him ever saying to you, I only want to hear positive things?

A.    No, I just said, no, I don't remember. I said that's where I got the information from, from the letter that was sent out.

Q.    So the only thing you remember in that regard is that one sentence in the letter where he says, give us the names of some folks who can write something good about his

background?

A.    No, I didn't say I remembered it.  What I said, I just seen it on the teleprompter, whereas --

Q.    So you don't even remember that?

A.    I don't remember it.  No, I don't.

Q.    So you're not sitting here today telling us that Rick Sindel or the trial team only wanted positive information from you; is that correct?

A.    No, I'm not sitting here telling you, but what I am telling you is that from the letter that I'm just reading, if anybody would have read that letter, that would be the same impression that they got that I got, that they wanted positive information.

Q.    Okay.  And when -- your entire opinion on that is based on that one sentence in the letter; is that correct?

A.    Let me say it like this --

Q.    Because you have no memory.

A.    No, I have plenty of memories, just certain -- I don't recall what happened.  My memory has gotten a whole lot better since I stopped drinking, but I do have memory.  I just don't recall exactly from detail to detail of what happened at that point in time.  No, there's a whole lot I do not remember.  I remember the birth -- the documents for the medical records.  It's because I probably had to physically go and get those.  But as far as remembering every

conversation he and I had, no, I'm not going to remember, and I don't remember.

Q.    My question is simply, your statement that Rick Sindel only wanted positive information from you is based on that -- you reading today that one sentence in the letter; is that correct?

A.    Correct.

Q.    During the time that Billie Allen was growing up, you had several different jobs; is that correct?

A.    Correct.

Q.    You worked at the St. Louis City Library for four years; is that right?

A.    That I can recall, yes.

Q.    Okay.  And you also worked at Walgreens during that time; is that correct?

A.    Yes.

Q.    And did you -- and you also worked at Charter Communications during that time; is that correct?

A.    Correct.  I don't know if Charter was after Bill got incarcerated or what, but I worked at Charter, if that's what you're asking me.  I don't know if it was --

Q.    I'm going to show you what's been marked as Exhibit 666.  That's your employment application for St. Louis Transitional Hope House.  Do you see that up at the top?

A.    Okay.

Q.   And I'm going to go to --

THE COURT:  St. Louis what house?

MS. COSTANTIN:  Transitional Hope House.

THE COURT:  Okay.

Q.   And I'm going to go to the third page of that.  And I'll blow that up.

MS. CARLYLE:  Forgive me, Ms. Costantin, what exhibit number are we?

MS. COSTANTIN:  666.3, so page 3.

Q.   That indicates that you -- well, you indicated in your application, correct, that you worked at Charter Communications from, is that from '96 to 1998?

A.   Yes.

Q.   Okay.  So that's --

A.   That's what's on the application.

Q.   This was your application for Hope Transitional House?

A.   Right, correct.

Q.   And what I'm saying, is it correct that you worked for Charter Communications from I think that's July 1996 to 1998?

A.   That's what's on the application.  Let me say this.  I put in an application the other day, and they may not be the same dates because some of the time I forget those dates, so therefore I wouldn't know exactly what.  Because if you go and put a look in the application I might have just put in yesterday, it may not be the same date that I have right

here.  So I'm not going to say if I worked from that time to that time because it had meant the date that I may have, I'm like okay, I remember I worked from this.  Because like I say, just putting in the date from right here, right there, I put in an application the other day and I don't recall it being '96 to '98.

Q.   Did you work for Charter Communications?

A.   Yes, I did.

Q.   When?

A.   I don't -- Bill had -- Bill was incarcerated then, so I don't know.  I'll put it to you like that, I don't recall.

Q.   And did you also work for the Department of Family Services?

A.   Division of Family Services, yes, I did.

Q.   Okay.  And did you also work for the Human Development Corporation?

A.   Yes, I did.

Q.   And did you also work at the American Red Cross?

A.   Yes, I did.

Q.   Did you also work at Goodwill for about three years?

A.   Yes, I did.

Q.   I'm going to show you some letters.  This is Exhibit 493.  Do you recognize this?  First, do you need me to blow it up for you?

A.   Yes, please.

Q.    I'm going to just blow up part of it.  Do you recognize that as a letter that you received from Bill?

A.    This says, "Dear mom," so --

Q.    Is that a letter you received from Bill?  Is that his handwriting?

A.    That's his handwriting, yes.

Q.    Okay.  And this is a letter you received while he was in jail awaiting trial, do you recall?

A.    No, I don't recall.

Q.    So you don't recall the date on it?

A.    No, I don't.

Q.    Okay.  Well, I'd like you to look at that.  Do you see, is it correct that he wrote to you, "The other day I was reading this cartoon and it reminded me of you and I smiled. I love you so much and I know you feel the same."  Is that correct?

A.    That's what the letter says, correct.

Q.    That's what the letter says, correct?

A.    Yes.

Q.    Okay.  Was Bill saying the same things to you when he was talking to you from jail, that he loved you and knew that you felt the same way about him?  Was he telling you that when you talked to him on the phone when he was in jail?

A.    Yes.

Q.    And now I want to look at the next page of this.  I'm

showing you the second page of that letter.  And did he write to you, "Everything you tried to teach me, I went the other way, but I don't look at it as your fault, you did your part as a mother for me and I love you for that."  Did he write that to you?

A.   Yes.

Q.   And did he also write, "I'm sitting here about to cry cause I miss you and I know how you feel"?

A.   Okay.

Q.   Did he express those same feelings to you when you were talking to him on the phone when he was awaiting trial, that he knew you tried to teach him and he went the other way?

A.   Did he express it when he was in trial?

Q.   When he was awaiting trial, when he was in jail before his trial, during that year before his trial.

A.   I don't know.  I don't know when -- I don't know.

Q.   You don't remember --

A.   Let me say this.  I think it's something that he's always said, yes, after he got incarcerated.  I would say that.

Q.   This is something -- this is typical of the kind of thing that he would say to you?

A.   Correct.

Q.   Okay.  Not out of the ordinary?  I want to go to the bottom of that same page, so that's page 2 of Exhibit 493.

And I'm going to go to the top and blow that up for you. Does it read, this letter from Bill to you:  "To me you will still be the best mother in this world even though your son might be" -- and then I'm going to have to go to the next page -- if you remember it ended, "even though I might be locked up, like I said you did your part and I didn't do mine.  I'll always love you for being there for me when my so-called friends wasn't."  Is that what the letter was he wrote to you?

A.    Yes.  I mean, it's his handwriting, yes.  Love, Bill. Yes, love you mom.

Q.    And he wrote, "I love you mom, Love, Bill," right?

A.    Yes, right.

Q.    And that's the same thing he's telling you in phone conversations, he loves you, that you did your part, and he didn't do his part.  That's consistent with what he's telling you when he's talking to you on the phone before trial?

A.    Before trial?

Q.    During that year when he's locked up.

A.    That I can recall, I would say yes, because he always -- he still had his conversation, he always end his conversation with "love you," so therefore, you know.

Q.    I'm going to show you Exhibit 495.  And I'll blow this up a little bit, and then I'm going to go to smaller portion.

A.    Okay.

Q.    Is that another letter that you received from Bill?

A.    It has "Happy Mother's Day" on it.  I can read that part.

Q.    I'm sorry, I can't hear you.

A.    It has "Happy Mother's Day" on there, I can read that part.

Q.    You're going away from the mike again.  Sorry.

A.    Okay.  I'm going to need it a little bit larger for me to read it.

Q.    Okay.  I'm asking you simply, is this a letter from Bill to you?

A.    Yes, it is.

Q.    And I'm going to make it larger.  Does he write, "How are you doing?  The thing I've been thinking about is you, how you've been there for me through all my life no matter what, and that's why I love you so much.  I really think that your job of being a mom is perfect because you did your part. You raised me the right way, it was just my fault that I messed up, you kept me away from all this drama all my life, but I was the one who got myself in this.  Thanks to the love, from the one who was always in my corner."  Is that what is written there?

A.    Yes, it is.  Yes, it is.

Q.    I'm going to show you Exhibit 491.

        THE COURT:  491?

MS. COSTANTIN:  491.

Q.   Is that also a letter from Bill to you?

A.   It says, "Dear Mom."

Q.   That's correct then?

A.   Yes.

Q.   I'm going to show you 492.  Is that also a letter from Bill to you?

A.   Yes.

Q.   And 494, is that also a letter from Bill to you?

A.   Yes, it is.

Q.   Now, did you give copies of these letters or the -- either copies or the originals to the trial team?  And when I'm talking about the trial team, I'm talking about Mr. Sindel, Mr. Simon, or Mr. Randall.

A.   That I can recall, no.

THE COURT:  I didn't hear what you said.

THE WITNESS:  That I can recall, no.

THE COURT:  Just a second.  Let me catch up, please.

Q.   You don't have any recollection of who collected those from you, those letters from you?

A.   What you're showing them to me, I'm not even aware where they came from, so, no, I don't have any recollection.

Q.   Well, they came to you, correct?

A.   They came to me, but as far as me remembering handing them out to someone, no, I don't remember.

Q.    You don't remember that?

A.    No.

Q.    Now, your son's handwriting, has that been pretty much the same over the years?  Has it changed at all significantly?

A.    No, it's been pretty consistent.

Q.    And I want to talk to you for a moment about your -- Billie's time in school in his elementary grades.  He went to the Clayton schools for elementary school; is that correct?

A.    Correct.

Q.    And that involves him and also his siblings being bussed out to a school district in the suburbs; is that right?

A.    Correct.

Q.    And his attendance in the Clayton schools was pretty good; is that correct?

A.    That I can remember.

Q.    Okay.  He didn't have problems with attendance until he got into the City schools; is that right?

A.    Yes.

Q.    So you got him off to that bus and got him out to the Clayton schools during his elementary years; is that right?

A.    Yes, it is.

Q.    And you got Billie involved in Boy Scouts when he was young; is that correct?

A.   Correct.

Q.   And he was in Boy Scouts for at least several years; is that right?

A.   That I can remember, yes.  I remember him crossing over.

Q.   You remember that ceremony when he crossed over?

A.   Cross over, right.  That's what I said, I remember crossing over.

Q.   Okay.  I just want to make clear for the record that that's one of the ceremony's the Boy Scouts had.  Or actually I guess it's Cub Scouts maybe.  I'm not sure.

A.   Is it?

Q.   I don't know if it's Cub or Boy.

A.   Cub Scouts going into Boy Scouts.

Q.   I think that's right.  You also got Billie into Job Corps; is that correct?

A.   I don't know if it was me or Bill.  I can't recall.  I know I had to sign him in, but I don't know whose idea it was.

Q.   Whose idea it was, okay.  But he did go into Job Corps for at least a little while; is that right?

A.   Yes.

Q.   Now, you have never been hot-lined for child abuse; is that correct?

A.   No, I haven't.

Q.    No social worker ever came to your house to talk to you about the treatment of your children; is that right?

A.    No, they haven't.

Q.    And the police never came to talk to you about you doing anything wrong with your children; is that right?

A.    No, there was no insiders that did and came and said -- but like I said, I remember a time -- a point in time where my brother had to get me off of Bill. But as far as insiders coming into our territory, no, nothing like that was going to happen.

Q.    No. So no police ever came in and talked --

A.    No one would dare call the police on me.

Q.    Well, teachers might call the police if they saw bruises, right?

A.    Well, if they saw bruises, yeah. But as far as someone inside the house or something like that, no, nobody would do that.

Q.    But my question is simply that the police never came and talked to you, correct?

A.    No, they hadn't came and talked to me.

Q.    Let me talk to you for a moment about the time your brother pulled you off Billie. That was Raymond, right?

A.    Correct.

Q.    Okay. And by that time Raymond had moved out of the house, correct?

A.    Correct.

Q.    Okay.  And Billie at that point was 15, 16, 17 years old?

A.    I don't recall how old he was, but I know he was -- he wasn't preteen anymore.

Q.    Did you know that Raymond testified at the trial about that incident where he had to pull you off?

A.    No, I wasn't aware of that.

Q.    Are you aware that Raymond testified that you were 15 -- that Billie was 15, 16, or 17 years old when that happened?

A.    No, I didn't know that.

Q.    But that's the time we're talking about, is that correct, when the family got involved, when Raymond got involved?

A.    Oh, when Raymond pulled me off of him, yeah.

Q.    Right.  Okay.  Now, you don't remember ever leaving a mark on any of the kids; is that right?

A.    Probably Bill with the extension cord, because like I said, he used to get whipped with extension cords, but I'm pretty sure that left a mark on him, because when I got a whoopin' with an extension cord, it left a mark on me, so therefore --

Q.    Do you recall testifying at your deposition when you were asked the question:  "Do you remember leaving a mark on

any of your kids?"  Your answer being:  "That I can't recall.
I can't say.  I don't know."

A.    Right.  But then, like I said, I just went back to that
if it left a mark on me, and Bill had skin like me, whereas I
can get scratched up at any time, then I'm pretty sure it
left a mark on him.

Q.    Okay.  So you're saying you don't remember it
leaving --

A.    I don't remember.  I'll do it like that, I don't
remember.

Q.    But you've deduced that it would have left a mark?

A.    Correct.

Q.    I want to talk to you for a moment about your
declaration that you signed back in 2009.  And I've put
Exhibit 258 on the screen.

A.    Okay.

Q.    Is it correct that you don't recall signing this
declaration?

A.    No, I thought from my understanding that I could
remember, I thought it wasn't supposed to be signed until it
got to -- until it got typed up.  I don't recall.  I'll leave
it like that, I don't recall.

Q.    All right.  Did you -- how was that declaration
prepared?

A.    What do you mean how was it prepared?

Q.   Did you write something out longhand?  Did -- how was it prepared?

A.   Oh, okay.  Okay.  You know what I'm thinking about, I'm thinking about the deposition.  I apologize.

Q.   Oh, I'm sorry.

A.   No, that's my fault.  I was thinking about the deposition.  I think it was notes that were being given.  No, I did not type that out.

Q.   Did you handwrite anything?

A.   If I did, it's nothing that I recall handwriting.  I think that it was notes that -- if I'm not mistaken, it was notes that were being taken by one of the paralegals at the time.

Q.   Okay.  So the current group of attorneys came -- make sure I'm correct on this.  The current group of attorneys or someone from that group came and talked to you, they took notes, and then this got typed up from those notes?

A.   Correct.

Q.   And I want to show you specifically -- well, first of all, let me ask you this:  Today you testified that you both drank and smoked cigarettes while you were pregnant; is that correct?

A.   Correct.

Q.   Back in 2008 -- I'm sorry, back in 1998, before the trial, didn't you tell John Simon that you did not drink

while you were pregnant with Billie?

A.   I can't recall right now if I did or not.  But I know that for sure that I drunk with -- starting mostly with Bill.  I can't recall Nikki, because I was 16.  Maybe at that point in time, I may have stopped.  But from -- I don't recall having a conversation.

Q.   Okay.  I'm showing you the typed notes that Mr. Simon prepared, and that's specifically Exhibit 500.60, so page 60 of Exhibit 500.  Do you see that very bottom portion, "Didn't drink while carrying Bill, did smoke while carrying Bill"?

A.   Okay.

Q.   Isn't that what you told Mr. Simon back in 1998?

A.   It may had been information that I gave him at the time, yes.

Q.   Okay.  So you have no recollection, but it's not like you're saying that that's -- that that was wrong what he wrote down?

A.   No, I'm not saying that, because even with some things that I went over later on that I come to find out that I had correct.  But it's something in the deposition that had to be corrected when I found out that, oh, okay, wait a minute, after I thought about it, I went like, oh, wait a minute, that's not right.  So, therefore, I tried to correct it.  But they said there was no way.  So it's information that was not correct.  And if I would have had the opportunity to go back,

if somebody would have came back and asked me this question again, I could have answered it.

Q.   So what you're saying is that this was the answer you gave when Mr. Simon asked you?

A.   If that -- I'm going to have to say if that's what is documented to say, yes.  I don't recall.

Q.   What you're saying is now that's not true?

A.   Correct.

Q.   Okay.

THE COURT:  Okay.  Wait a minute.  Are you going to follow up?

MS. COSTANTIN:  No, I'm on to another topic.

THE COURT:  Are you saying so this isn't true, but that you drink when you were pregnant?

THE WITNESS:  Yes, I did.

MS. COSTANTIN:  Judge, I'm going to move on if that's okay.

THE COURT:  Yeah, go ahead.

BY MS. COSTANTIN:

Q.   As a teenager, Bill was running with the wrong crowd; is that correct?

A.   Yes.

Q.   And specifically I'm back at your declaration, so that's the thing that you signed for these attorneys back in 2009.  I'm going to this portion where you state that, "He

would talk back, yell, cuss and disobey me."  Is that right?

A.    Uh-huh.

Q.    And that's correct, that's what he was doing?

A.    He had to be far away for him to cuss at me.

Q.    Well, this is a declaration that you signed back in 2009.

A.    Okay.

Q.    In that declaration that you signed, it is written, "He," referring to Bill, "would talk back, yell, cuss and disobey me."

A.    If it was, it was a later point in time when he may have been a little bit older.

Q.    Okay.  I'm talking about when he was a teenager.  When was it that this would happen, the cussing, talking back and yelling and disobeying you?

A.    Right now, like I said, if he cursed at me, he was far enough away whereas I couldn't grab him or something like that.  But I can't give a specific of when that was done.  But I'm just picturing that if he cursed me, he had to be far away to curse me, whereas I couldn't get my hands on him.

Q.    So he would -- but he would do that, that's what I'm asking, that is correct, that he would yell at you, he would cuss at you, he would disobey you?

A.    Correct.

Q.    Okay.  And that change you've talked about with Bill,

that started when he left the Clayton schools and came back to the City or came to the City schools, not even back, came to the City schools?

A.    Correct.

Q.    Now, we had a lot of discussion about how old he was during that time, and I want to try and clarify that a little bit.  When was -- what's Bill's birthday?

A.    Bill was born June 18th, '78.

Q.    '77?

A.    Okay.  '77.

Q.    I'm sorry, that wasn't meant to be a trick question.

A.    That's okay, because I had to think about it.  I had to think about it.

Q.    Let's go up for one second.  Okay.  I'm showing you Exhibit 109.  The date of birth for Billie Jerome Allen is listed as June 18th, 1977; is that right?

A.    Okay.

Q.    And he left the Clayton schools after the seventh grade; is that right?

A.    Yes.

Q.    So I'm looking at page 2 of Exhibit 109.  And if we look at this portion right here, that's seventh grade; is that right?

A.    Yes, it is.

Q.    Now, and that is 1990 to 1991; is that correct?

A.    Okay.  I see the date up there.

Q.    So he left -- I'm sorry, you did or you didn't see?

A.    I saw it.

Q.    Okay, I'm sorry.  So he left the Clayton schools in the spring, at the end of that semester of 1991; is that right?

A.    Yes.

Q.    Okay.  And he would have turned 14 in June of 1991; is that right?

A.    Yes.

Q.    So the changes that we're talking about, when you said you noticed the changes in Billie, that that's happening after he left the Clayton schools and was back in the City, that's when he's 14 or so; is that right?

A.    If he was in junior high, I would say junior high is what, 14?  No, that's --

Q.    That's what we just talked about was that he left the Clayton schools just a little bit before his 14th birthday.

A.    Okay.

Q.    So that's the time period, some time after his 14th birthday when he's back in the City, that you're seeing these changes in him; is that right?

A.    Fourteen -- between that area, yeah.

Q.    I'm going to show you Exhibit 411.  And 411 are the notes from your interview with Dr. Randall.

A.    Okay.

Q.    And I'm going to go to the paragraph that says:  "Saw changes in Bill.  His freshman or sophomore year in high school, I noticed different things about Bill."  Is that right?

A.    Okay.

Q.    So the changes back at that time, back in 1998 when you're talking to Dr. Randall, you're telling him that the changes you saw in Billie were in his freshman or sophomore year at Sumner; is that right?

A.    That's what I'm telling -- that's what it says.

Q.    And do you have any reason to doubt that Dr. Randall wrote down what you said correctly?

A.    I would hope that he did.

Q.    And realistically you're going to have a better memory of what's going on in Bill's life back in 1998 than you are now in 2012, isn't that fair to say?

A.    No, it's not going to be fair to say, because like I said, when all of this situation happened, I actually thought it was in '98, so therefore with you all putting so much importance on dates, they might be important, but they are not important enough for me to go like, okay, this was this time, this was this time, this was this time.

Q.    And here's my question:  Do you think you would have been more accurate back in 1998 when you say you saw changes in Bill in his freshman or sophomore year at Sumner than

looking back at that time from 2012?

A.   No, because if you would look at the report card he just got, you could tell that there was some changes going back over at Clayton.  So, therefore, the changes -- if you would look at it, the changes were starting then.

Q.   I'm saying right -- when you talked to Dr. Randall back at that time, do you think your memory would have been more fresh back in 1998 than right now?

A.   I can't -- I can't even say, because like I said -- it would have been fresher, yes.  It would have been fresher.

Q.   And those changes in Bill were occurring -- that you recall and what you just testified to today were after he got back to the City schools, right, not taking care of himself, that sort of thing?

A.   I would say I don't know, because like I said, just looking at that report card, that was when he was in the Clayton area, and that was a bad report card.  So, therefore, I can't say right now that, okay, it was this year or that year.  Only thing I know is that there was a change.  As far as you wanting me to pinpoint a time, I can't do that.  And I'm not going to sit back and go, I may have said that back then and that, okay, fine.  But like I said, I don't recall a specific time.  I don't know whether Bill was 13, 12, 11.  I don't know.

Q.   Okay.  And my question is simply, your memory would be

better back in 1998, correct?

MR. MONTROY:  Objection, Your Honor, she just answered the question that her memory was better back in 1998.

THE COURT:  Well, she did awhile ago, but then after that there was a series of questions and it is a little confusing.  Overruled.

BY MS. COSTANTIN:

Q.   Your memory would be better back in 1998, right?

A.   From what happened in 1996 to '98, yeah, it would be better.  Yes, it would be better.

Q.   And let me just talk for a moment about the report card.  Now, Bill never did well academically, correct?

A.   No, he didn't.

Q.   So his report cards were uniformly not good?

A.   Well, they were not good.  But somewhere along the line you could see the difference.  And it's something that I had with the people in Clayton that I could remember is that how Bill was tested, because Bill and Nikki being two different individuals needed to be tested differently.  Nikki did better and a whole lot better in school than Bill did.  So, therefore, Bill went to different classes that were special needs classes.  So, therefore, he never really did really well in the classes, but at some point in time he was doing his best.  And with Clayton being a more achievement school,

he didn't succeed as well out there as he could have.

Q.    So now so I understand, did you intervene in Clayton to try and get him either in or out of special classes?

A.    No, no, he was in special classes.  No, I would never try to get him -- no.

Q.    So you wanted him to be in special classes?

A.    He needed to be in special classes.

Q.    And he was in special classes to your memory in Clayton?

A.    That I could recall.  He and Ann were in special classes that I recall.

Q.    Was that just a pullout thing or were they in a totally different classroom?  Do you recall?

A.    That I recall, I'm remembering Ann more so than Bill because she had the speech impairment.  I can't say right offhand.

Q.    Okay.  Let's go back to the changes in Bill.  And because you had saw changes in Bill, you asked a counselor at Providence to talk to him; is that right?

A.    Correct.

Q.    Now, I want to go back to your declaration.  And when I say "your declaration," that's the document that you signed for these attorneys back in 2009?

A.    Okay.

Q.    And I'm going to go to --

THE COURT: What number?

MS. COSTANTIN: I'm sorry?

THE COURT: What number is this?

MS. COSTANTIN: Sorry. 258, page 4.

Q. In that is it correct that you wrote or you signed a document that said, "By the time he was around 14 years old, Bill transformed into someone I didn't recognize. He was a drug user and seller."

A. Uh-huh, yes, I did.

Q. Okay. Do you recall testifying last year in your deposition that you didn't know Bill was selling drugs?

A. Yes, I do recall that.

Q. Okay. And, in fact, you testified that you wouldn't know anything about Bill selling crack; is that correct?

A. Correct. But what happened was when I got home, I really thought about it, and it was after a fact that I thought about it when like, oh, wait a minute, this did happen, I recall.

At that point in time I called Eric to let him know, wait a minute, Eric, something is wrong. I think that was after I got the transcripts and I was reading over them. I said, Eric, something is wrong. I say I do recall Bill selling drugs. I said can that be corrected? And he said, no, it couldn't be corrected. Only thing that he could do at this point in time with it being in the transcripts is to

just leave it alone. I said okay.

But at that point in time I wanted him to be aware that I had made the mistake. So I tried to correct that immediately.

Q. Okay. So when you got the transcript?

A. Correct.

Q. Now, when you were asked multiple times about that during the deposition, and you repeatedly said that you didn't know Bill was selling drugs; is that correct?

A. Correct. Like I said, and when I got home, when I read the transcripts, I said that's not right.

Q. And, in fact, Bill was selling crack cocaine when he was 14; is that right?

A. I don't know if he was selling crack cocaine when he was 14. I think that somebody had came and told me. See, me physically see Bill sell any drugs or anything like that, no, I never saw that. But with people coming to tell me that this is what Bill was doing, I would say it may had a been around that time or even maybe a little bit earlier. But I do remember people coming. But as far as me physically seeing Bill do that, no, I hadn't seen that.

Q. I'm simply asking you whether you knew Bill was selling drugs.

A. Did I know? People had told me, yes.

Q. And, in fact, you told Dr. Randall that at the time of

the trial.  Do you recall that?

A.    No, I don't.

Q.    Okay.  I'm going to show you Exhibit 411, the second page.  "I think that, that the last I heard, Bill was selling some drugs."  Do you have any reason to doubt that Dr. Randall wrote that correctly, that that's what you told him?

A.    No, I don't.

Q.    So when did Bill start selling drugs?

A.    I don't know when Bill started selling drugs.  I could -- like I said, that Bill was -- people came and told me Bill was selling drugs.  But as far as me knowing physically and seeing Bill sell drugs, I wouldn't know when he started selling drugs.  If I had said he started selling drugs at 16, but me not knowing, he may have started selling drugs when he was 11.  So as far as me knowing, I can't give a specific time to when Bill sold drugs because that was something that I physically did not know.

Q.    When did Bill -- when did people tell you Bill was selling drugs?

A.    The first I heard about Bill really selling drugs is something between him and JR, and then come to find out when the house got shot up, Bill was selling drugs.

Q.    Okay.  So it's your testimony that you did not -- no one had told you Bill was selling drugs until the house got shot up?

A.   No, that's not what I said.  I said with him and JR, I can't give you his age, but that wasn't the first time I heard about it, no.

Q.   What I'm asking you is how old was Bill, do you have any idea what grade he was in or what his age was?

A.   I don't recall.  No, I don't recall.

Q.   And do you know what he was -- well, what were you told he was selling?

A.   From my understanding, he was selling crack.

Q.   Did he ever give you any money from his drug sales?

A.   No, he did not.

Q.   I want to go back to your declaration, which is Exhibit 258.  That's the document that you signed for these attorneys.

A.   Okay.

Q.   And specifically I want to go to 258, the fourth page.  Specifically -- I'm talking about Bill's attorneys. "Billie's lawyers at trial did not spend very much time with me at all."  Is that what you wrote?

A.   Yes, I did.

Q.   And I'm going to go to the bottom portion.  "Had they spent more time with me -- had they spent more time with me, and asked" -- and I'm going to go to the next page -- "and asked about my background, problems and those of Billie's father, I would have told them.  But, as I said, it is hard

for me to discuss these topics.  I only came to do so with Billie's current lawyers after spending many hours over many days with them."

A.    Okay.

Q.    Is that what you signed, the declaration you signed back in 2009?

A.    Yes, I did.  And let me interject and say that still yet even with Bill's lawyers right today, it's still hard for me to talk about some of the subjects that we are talking about.  But at any given time, whether it would have been hard or not, if Rick Sindel or anyone else would have asked me those questions, no matter how hard they would had a been, I would have given them the answers.

Q.    So when you said in here, "I only came to do so" -- that is, talk about these topics -- "with Billie's current lawyers after spending many hours over many days with them," in reality if they'd asked you on the very first day, you would have told them?

A.    Yes, I would have.

Q.    But you said in there in your declaration, you said that it was only after spending many hours over many days that you were able to talk about it; is that right?

A.    Well, yes, with many hours and many days, meaning that I think when I first met them, if I'm not mistaken, it was just an intro.  It wasn't anything that we got into.  It

wasn't like, oh, okay, we're getting ready to do this, we're getting ready to do that. And what I mean by long periods of time, from what I can recall, it was the long periods of time because those were the times they spent with me. Do you understand what I'm saying?

Q. I understand. And I'm reading your sentence, which says: "I only came to do so" -- that is discuss those topics -- "after spending many hours over many days with them."

A. Correct.

Q. You're saying that really you could have talked to them about it on the very first day?

A. If they would have asked me something about it on the first day, correct.

Q. So you weren't hiding anything from the attorneys at the trial, were you?

A. No.

Q. Were you reluctant or holding back anything from the trial team?

A. No.

Q. It wouldn't have been hard for you to admit that you had beaten Billie?

A. Like I said today, it's not -- I'm not sitting here saying it's easy me divulging this information today. It was hard today and it would have been hard no matter how many years ago. But that's not the factor. The factor is that's

information that needs to be shared to help Billie out.  So hard has nothing to do with it.  Hard is what it is.  It's hard, it's hard, but it's still going to get done.

Q.    Well, I'm using --

A.    I understand what you're saying.

Q.    -- poor language, Ms. Allen.

A.    I understand what you're saying.

Q.    Okay.  And what you were asked before in a deposition is, "It wouldn't have been hard for you to admit that you used to beat Billie?"  And your answer was, "Not at all."  Do you recall that, it wouldn't have been hard at all?

THE COURT:  Wait a minute, this is page 132?

MS. COSTANTIN:  I'm sorry, it's page 132 of Exhibit 529.

Q.    You were asked:  "If someone had asked you in 1998, did you used to beat Billie with a belt or in your words get carried away, you would have readily told them yes?"

And your answer was:  "Yes."

And then you were asked:  "That wouldn't have been hard for you to admit?"

And your answer was:  "Not at all."

Right?

A.    Right.

Q.    Okay.  So it would not at all have been hard for you to admit that?

A.    And maybe you're taking the "hard" and taking it and running with it.  "Hard" is just a word.  It wouldn't had to have been hard for me to discuss what happened in 1998 or whenever the case came up, and 2012.  It wouldn't have been any different.  If the question was posed to me then, it would have been the same response I would have gave back in 2012.

Q.    Okay.  And what I'm asking is in your declaration, you're saying it's hard for you to talk about these topics. But yet in your deposition, you're saying not at all.  And I'm asking, which is it?

A.    It's both.  It's not at all hard because it's something -- it's not hard because it's something that has to be talked about.  And it's hard because it is something that has to be talked about.  It's 50 in one hand and 50 in the other.

Q.    Let's talk about what you talked to the trial team about back in 1998.  Isn't it true that you told John Simon that, "Bill don't come from a bad environment"?

A.    Yes.  But I'm just saying if that's what is written in there, like I say, some of the conversations, I think we've been over this, some of the conversations that I don't remember.  But if it's documented and I'm taking that hopefully that the individuals who documented told the truth about it.

Q.    That's what I'm going to show you.  I'm showing you Exhibit 500, page 60.

A.    Okay.

Q.    And we're going to go to the top.  These are John Simon's notes of an interview with you:  "Mom:  Bill don't come from bad environment."  That's what you told --

MR. MONTROY:  Your Honor, I have an objection to these being notes of an interview with Mrs. Allen.  In fact, I would suggest it's not clear at all who is being interviewed here.  If you look at the preceding pages --

MS. COSTANTIN:  That's fine.  I'll go right back up to it.

MR. MONTROY:  -- there's different individual's names, and they are underlined.  And I don't think it's clear.  I don't think it's clear that this is Mrs. Allen necessarily talking.  It's hard for me to tell who it is.

BY MS. COSTANTIN:

Q.    Let's look at page 58.  Is that entitled:  "Trip to 4535 Cote Brilliante"?  Is that right?  Do you see this right here?

MS. COSTANTIN:  Judge, I would also say Mr. Simon has testified to these notes and that she was present at it.

A.    Okay.

Q.    Is that correct?  And Mr. Simon, in fact, visited your house, correct?

A.    That's what the notes are saying.

Q.    No, but didn't you testify on direct that he did?

A.    Yeah, but what you want me to do is you want me to put a date with it, and I'm not able to do that.  So I'm saying that's what the note is saying.  And I will say that, yes, he did come out on several occasions.  But as far as this date, I can't say that this date.  But I will say, yes, he did come out.

Q.    Okay.  So Mr. Simon came out to your house on several occasions?

A.    Correct.

Q.    Okay.  All right.  And that's all I'm asking you is --

A.    Okay.

Q.    -- did he come to your house.  Not that specific date.

A.    Okay.

Q.    Now, I'm showing you a statement on the third page of those notes that says:  "Mom:  Bill don't come from bad environment."  Do you have any reason to doubt that you said that to Mr. Simon?

A.    No, I don't have any reason to doubt it.

Q.    Did you tell David Randall, Dr. Randall, back in 1998, and I'm going to Exhibit 411:  "We had our rules, abide by them.  Up until that point, Bill was a perfect son.  Me and my kids always hung out.  People used to say he was a mama's boy, stuff like that.  He was always under foot."

A.   Okay.

Q.   Do you have any reason to doubt that Dr. Randall wrote that correctly as to what you said?

A.   No, I have no doubt.

Q.   I'm sorry, you have no reason to doubt?

A.   No, I have no reason.  I apologize.  No, I have no reason to doubt it.  But I think that when it says a perfect child, like I said, Bill was a whole lot different before he started -- before his teenager years, so --

Q.   Before that time when, as it says up here, his freshman and sophomore year of high school?

A.   I don't know.

Q.   You didn't tell either Dr. Randall or Mr. Simon as you said in your declaration that my drinking was out of control; is that correct?

A.   I don't recall what was told to them.

Q.   Okay.  But you do know as we just saw that you told them that "Bill don't come from a bad environment," right?

A.   Right.  Meaning Bill don't come from a bad environment is what I was speaking of, being a bad environment at that point in time was me thinking that I was doing what I needed to do.  When I say "bad environment," what I tried to do was get him out the environment of dealing with the Allen side.  So that's what I was putting all that on me speaking of Bill don't come from bad environment.  Meaning that my -- the way

I was supposed to be raised was different from the Allen's way of being raised.

Q.    Now, Ms. Allen, you don't actually remember saying that to Mr. Simon?

A.    Okay.  No, I don't.  But I was just giving you a for instance.

Q.    Okay.  So you don't know that the translation you just gave us there is what you meant when you said that to Mr. Simon?

A.    No, I don't.  No, I don't.

Q.    Okay.  You never told the trial team that you'd use a belt and extension cord or any object within reach to hit Billie, did you?

A.    If it was something they would have asked me, I don't -- that I could recall, I would say, I don't recall.

Q.    But you did tell them as we can see on 4/11, "Bill was a perfect son.  Me and my kids always hung out.  People used to say he was a mama's boy, stuff like that.  He was always under foot."

A.    Right.

Q.    Not, he would -- I would beat him two to three times a week, correct?  That's not in that paragraph, is it?

A.    No, it's not.  But it's not in that paragraph -- no, it's not.

Q.    And isn't it true that you told Dr. Randall back in

1998, referring to your father, Otha Petty, "My dad would see Bill doing things, he'd correct him.  We worked as a team, can't play one against another -- against the other."  Excuse me.

A.    Okay.

Q.    Do you have any reason to doubt that that's what you said to Dr. Randall back in 1998?

A.    No, I have no reason to doubt that.  But I'm saying when that statement was made, and if it was made, the only person I could think about was Ann, because Ann would be the one who would try to play us against each other.  So I'm not saying that would be something I would say, yes.  But in the contents of Bill, no, I would see it more of it being in the contents of Ann.

Q.    But it says, "My dad would see Bill doing things, he'd correct him."

A.    Right.  He would correct -- my dad just turned 82.  He was still correcting me, so --

Q.    Okay.  You didn't tell him, as recorded here, my dad would see Bill doing things, he would beat him?

A.    Okay.

Q.    Is that right?

A.    No, I didn't tell them that.  But like I said, it was a general conversation.  If you would ask me something and you're not going to be specific with it, okay, fine.

Q.   So you don't think that was in any way misleading if you -- you know, saying that to the trial team?

A.   That -- misleading about what?

Q.   Misleading about his relationship, Bill's relationship with his grandfather.

A.   No, I don't see that as misleading.

Q.   And you don't think there's anything misleading when you said to Mr. Simon, "Bill came from a good environment"?

A.   In my mind it was a good environment.  I mean, in my mind it was an environment -- up until a certain age, it was a good environment.  That's when everything started getting rocky that you're like, oh, okay, fine.  But like I said, if it was asked of me with more specifics, yes, I could have been -- to me these were just general questions.

Q.   Okay.  So --

A.   These weren't --

Q.   So you're asked the general question, and the answer is, "Bill came from a good environment," but what you really meant was up until a certain age, and you got to ask me another question to find out what that age is, is that what you're saying?

A.   That's not what I'm saying.  But I would take it that if you as the attorney, and if it was just -- if my answer was as closed as they were now, and if you was as an attorney, it should have been a little bit more detailed.

See, this is it, this is my first time ever wanting to deal with the judicial system.  At no point in time did I ever choose or want to be here.  So therefore what happened back when Bill got in trouble was all anew to me.  So, therefore, what I was asked to do, that's exactly what I did.  I've never had any experience with the judicial system.  So therefore I didn't know what was what, what was supposed to be answer to this, how I was supposed to be answering that.

I took it that the individuals that was working for Bill were the ones who were supposed to come in and do what they needed to do.  Now, if they didn't ask me specific questions, it's only because they didn't ask.  If they asked me a question, the question was answered the best that I possibly could have answered it.

Q.   Do you remember that they didn't ask you specific questions?

A.   That's not what I said.  What I said was that if a question was posed to me, and it was a specific question, it was going to be answered, whether it be did the dog die, did the cat die.  Whatever the question that was asked of me and any information that I could apply to them, it was going to be given.

Q.   And my question is simply, you don't remember any specific questions?

A.   No, I do not remember any specific questions.

Q.   Okay.  You indicated that earlier it appeared that you didn't believe your son's attorneys were acting in his best interest?

A.   From my understanding, what I heard of Rick Sindel and the information that I was getting was that he did not have Bill's best interest at heart.  But like I said, that still did not stop me.  And that was later on when I started looking at Rick Sindel a little bit leery.

Q.   My question is when was it that you believed that Rick Sindel -- when did you come to believe that Rick Sindel did not have your son's best interest at heart?

A.   That was when we were able to go back into the -- finally able to go into the courtroom, and I seen some of the mannerism in which he was doing in the courtroom that I was going like -- here I go again, I'm not used to the judicial system, but I'm going like, I know for a fact some of the stuff that was being done, I was going like, nah, is this supposed to be like this?

Q.   Okay.  Is this during the trial you're talking about?

A.   This was when we were able to go into the courtroom.

Q.   And when was that?  What was going on at that time?

A.   Whatever part it was to going on after we were able to go into the courtroom.

Q.   Okay.  So the trial was -- this was after it was decided you weren't going to testify?

A.    Yes.

Q.    Okay.  So --

A.    And actually with the testifying, if I'm not mistaken, I think that the last day -- well, it couldn't have been. I'm going to leave that alone.  I'm just going to leave that alone because I don't remember for sure.

Q.    You don't remember when it was during the trial that you were allowed -- that you were able to go back in?

A.    Whenever they realized that I wasn't going to testify.

Q.    Right, I understand.  I'm just saying, you don't know whether that was the last day or several days before the end?

A.    No, I don't.

Q.    And what was it that Mr. Sindel was doing that made you believe that he did not have the best interest of Billie Allen in mind?

A.    Well, it was the courthouse was pretty packed, and I heard another lawyer say, "I've never heard a trial attorney call their client a liar."

Q.    So did you hear Rick Sindel call your son a liar?

A.    Yes, I did.

Q.    And in what situation was that, do you know?

A.    I think that's when the closing arguments were coming about.

Q.    So it was during the closing argument when Mr. Sindel called your son a liar, that you believed that he did not

have his best interest at heart?

A.   Correct.

Q.   Okay.  Any other reason you thought that he did not have your son's best interest at heart?

A.   Like I said, up at that point in time I've never dealt with the judicial system, so I wouldn't know whether -- who was doing something right or who was doing something wrong. So, therefore, I guess I kind of thought that he had Bill's -- he was for Bill.

Q.   I understand.  I'm just saying at some point -- you just testified that at some point you believed that Mr. Sindel did not have your son's best interest at heart.

A.   I think that's at the end of the trial.

Q.   Okay.  And you said that the reason for that was that Mr. Sindel called your son a liar during closing arguments?

A.   Correct.

Q.   I'm asking you, is there any other reason that you thought that Mr. Sindel did not have your son's best interest at heart?

A.   Is there any other reason?  Like I said, no, not really.

Q.   I'm going to go to your declaration, which is Exhibit 258.4, the fourth page.  Did you sign this statement that stated -- and in the statement did it state, "My brother, Jerome, would often rough him up.  Jerome was a rough man

during those years, and sometimes his treatment of Billie was abusive."  Is that what you signed on the declaration?

A.    Yes, but can I elaborate on that?

Q.    Well, I'm just asking, is that what you signed on the declaration?

A.    Yes, it is.

Q.    Okay.  And didn't you just testify that Jerome tried to do something once but you stopped him?

A.    Correct.  And let me say this, because even with the abuse, what I call abuse, Jerome is a big fella, and with him being a big fella, even with his own children, he did certain things that his children right to this day are -- would say that it was abusive.  So therefore -- in our family, they might have called it a right of passage, so -- but it was actually -- it was kind of trying to make him tough.

Q.    So the --

THE WITNESS:  Excuse me, could I use the rest room?

THE COURT:  Pardon?

THE WITNESS:  Could I use the rest room?

THE COURT:  Yeah.  We'll be in recess for ten minutes.

THE WITNESS:  Thank you.

THE COURT:  Actually 15 minutes.  We'll take the next break at four o'clock.

(Court in recess from 2:27 p.m. until the 2:46 p.m.)

THE COURT:  Do you want your last question?

MS. COSTANTIN:  Judge, I think I know where I am.  Are you ready?

MR. MONTROY:  Yes.  Thank you.

BY MS. COSTANTIN:

Q.   I want to direct you to the interview that you had with Dr. Randall back in 1998.  Let's look at the typed one.

THE COURT:  And that's number?

MS. COSTANTIN:  I'm sorry, I have to get it back.  411.

THE COURT:  Got it.

MS. COSTANTIN:  And that's going to be page 3 of 411.

Q.   We were talking about Jerome and Jerome's interaction with Billie before the break; is that right?

A.   Yes.

Q.   And going to page 3 of Exhibit 411, Dr. Randall wrote that you told him, "Monette and Billie and Erica, they played with Jerome and Raymond as if they were one of the kids. Jerome, Raymond and Bill, they hung out."  Is that correct, that's what's written there?

A.   Yes.

Q.   Do you have any reason to doubt that Dr. Randall correctly wrote down what you said?

A.   No.  No.

Q.   Okay.  So back in 1998, you didn't tell them anything about Jerome abusing or hurting Billie; is that right?

A.   No.

Q.   You told the trial team back then that he, Jerome, Raymond and Bill used to hang out; is that right?

A.   Yes.

Q.   Now, in your declaration, I'm going to 258, page 3. First of all, paragraph 9.  You indicated:  "There were periods of time when I would throw him" -- talking about Billie -- "out of the house and not let him back for days. During those times, I could often only guess about where he stayed (sometimes I know he went to stay with his father and Uncle Billy)."  Is that right?  That's what you signed in that declaration?

A.   Yes.

Q.   Now, first of all, you've told us that you think it was two, maybe three times that you locked Billie out, you testified to that earlier?

A.   Maybe around that.

Q.   Okay.  And John Allen actually played little or no role in Bill's life; is that correct?

A.   Correct.

Q.   And, in fact, you have no idea when he -- those two or three times that you locked him out, where Bill went to stay, do you?

A.     No, I don't.

Q.     So you don't know that he was at JR's house or Billy Wayne Allen's house, do you?

A.     No, I don't.

Q.     So that statement in the declaration is incorrect; is that right?

A.     Correct.

Q.     I want to talk to you for a moment about your relationship with Louis McClinton.

A.     Okay.

Q.     That lasted, I believe you testified, for three years; is that right?

A.     That I can recall maybe.

Q.     Okay.  Can you give me the spelling of his name, please?

A.     His first name?

Q.     First and last name.

A.     Louis, L-o-u-s-i-e (sic), and McClinton is M-c-C-l-i-n-t-o-n.  Just came to me, I apologize, when you asked me earlier.

Q.     I'm sorry, I can't hear.

A.     I was speaking to the young lady because she asked me earlier, and it came to me how to spell it.

Q.     Okay.  And at this time that you were in a relationship with Mr. McClinton, I believe you had testified this morning

was when Billie was in junior high school?

A. I'm going to say yes. Maybe, yes.

Q. And Mr. McClinton committed suicide; is that right?

A. Yes.

Q. And when was it that he committed suicide?

A. I don't know what year.

Q. Was Billie at Sumner by that time or was he at junior high or where was he?

A. I don't recall.

Q. And you testified earlier today that that's the point, that your drinking got out of control when Mr. McClinton had killed himself; is that right?

A. Like I said, I think I always had a problem, but did it escalate more, yes, it did.

Q. And I believe you testified this morning that that's when you got out of control with your -- physically with Billie after Louis died?

A. Not so much after Louis died, but it was probably during the time that he was still alive. Because like I said, it was a time -- I can't pinpoint his age or anything like that, but I can say it had been before Louis did his transition that I was getting rough with Bill. Because when Louis and I were together, I was still drinking with him too, so --

Q. I understand. I'm trying to understand the time period

for this.  And so that would have been a time when Bill was in junior high school because that's when you were dating him.  The time you're saying you got rougher --

A.    I'm just saying I'm just trying to think about it.

Q.    Oh, okay, I'm sorry, I thought you didn't understand my question.

A.    Uh-uh, I understand what you're saying.  Right now, you know what, I don't know.  I don't know what year it was.  I really don't.

Q.    And when you say you don't know what year it was, you don't know what time it was that Bill was in school either, what grade he was?

A.    I understand what you're asking me.  I'm just trying to think.  Right, I don't know.

Q.    Because you talked about two incidents this morning, the one time when Raymond pulled you off of him, and Raymond testified that that was when Bill was 15, 16, or 17.  Correct?

A.    Okay.  Go again.  I don't know what age he was because if you want to use 9 to 11 as a point, and then 15 to 17 to a point, to me those are still big time factors in there.  So who not to say it didn't happen from this point to this point.  Honestly, I apologize, I do not know any specific dates to too much of anything that was going on in that period of time.  I cannot pinpoint that Bill was in grade

school or in high school.  I just can't pinpoint.  I just don't recall it.

Q.    You took -- let me rephrase this.  You talked about two incidents this morning that you recall when you got rough with Bill.  Do you recall that?

A.    Yes, I do.

Q.    And one of those was when Raymond pulled you off of him?

A.    Correct.

Q.    Okay.  I'm showing you Exhibit 213, page 27, which is Raymond's trial testimony.

A.    Okay.

Q.    And I'm going to blow up that part.  And it says, "She was" -- this is your brother talking, Raymond.  "She was -- he had to be around 16, 17 something.  15, 16 or 17 and she was whooping him with an extension cord, and I think Bill called me on the phone -- this must have been my layoff period also and Bill --"

        And the question was:  "About how old would Bill have been at that time?"

        "I'm -- he had to be 15, 16, or 17."

        Is that right?

A.    See, okay, just reading that, just from that information, I don't recall that and I don't recall that time of this situation.  I recall another time when I had Bill

against the wall. And it goes back to again what age he is.
I don't recall any ages. I actually don't remember this one.

Q. Okay. There's a time when Raymond pulls you off; is that right?

A. So there's a time -- if that time, it must have been a couple time, because the time I was thinking of is not this time.

Q. So you think Raymond pulled you off two times, is that what you're saying?

A. It may a had to been two times, because like I say, this situation, I remember when I had Bill against the wall and Raymond came in. I knew nothing about Bill calling Raymond or anything like that.

Q. So you're saying that Raymond may have pulled you off two separate times?

A. Maybe.

Q. Now, he's testified to one time.

A. Well, and like I said, if he wouldn't have brought this one up, I would -- may not even remembered this one. So therefore -- I understand the significance of the times, but I really just can't pinpoint, okay, this happened when he was 16, this happened when he was 17, this happened --

Q. I'm sorry, go ahead.

A. This happened at a specific time. I wish I could, but I just can't be like at 13, I beat Bill; at 14, I beat him

more; at 16, I kicked his ass; at 17, I really fucked him up. I can't say that because I don't know at what time it really started generating from this. Only thing I know is that Bill did get his butt kicked sometimes.

Q. And that's what I'm trying to do is get an understanding of that. And the way I'm trying to do that is I'm trying to ask you about landmarks in your life like Mr. McClinton killing himself, okay, or the times when you were dating Mr. McClinton. And you indicated you were dating Mr. McClinton when Bill was in junior high school. And that's when the beatings began to get worse, correct?

MR. MONTROY: Objection, Your Honor, this has been asked and answered several times. She just doesn't remember specific --

A. And like I said --

THE COURT: Wait, we got three conversations going here. Hold up. The objection is that this has been gone into and answered. But there's a new series of questions now, and that is she's trying to identify certain time frames for this alleged abuse by her against the defendant. And so overruled on that point. She has repeatedly said she doesn't know about the times. Now, the question was -- well, why don't you ask it again.

BY MS. COSTANTIN:

Q. The question I believe is, it was during the time that

you were dating Mr. McClinton when Bill was in junior high school that you -- that the abuse got worse, correct?  That's what you testified to this morning, correct?

A.    I would say yes.

Q.    Okay.  This incident you testified to this morning where you threw Bill up against the wall --

A.    Okay.

Q.    -- he was taller than you.  Do you recall testifying to that this morning?

A.    Yes.  But let me just interject and say probably about the time Bill was 12 years, he was probably taller than me.

Q.    And you have no memory of how old he was when that happened; is that correct?

A.    No.

Q.    Now, your father, Otha Petty, Sr., lived at the house until he passed away.  Was that last year?

A.    Yes, it was.

Q.    So at times when you were out of the house, Mr. Petty is there; is that correct?

A.    Maybe some of the time he was and some of the time he wasn't.  My dad was seeing people at certain times in his life, so I can't say if I was there one night, if he was there, what nights he was there.

Q.    Okay.  And so when you say you were out, you can't say whether he was there or not?

A.    Correct.

Q.    Okay.  Are you aware -- and I'm going to show you Exhibit 638.  We talked about specific questions before, and I'm showing you Exhibit 638, which has been admitted as a transcript of an interview between John Simon and your son, Billie Allen.

A.    Okay.

Q.    And Mr. Simon asked your son, "Uh, one question that, that I had that I probably asked last time that we need to be absolutely sure on is whether when you were growing up, uh, were you the subject to physical abuse at any point by anyone?"  And his answer is, "No."  Is that correct?

A.    That's what it reads.

Q.    Were you aware that your son had told Mr. Simon back in January 7th, 1998, that he was not subjected to any physical abuse at any point by anyone?

A.    No, I was not aware of that.  But, I mean, I will say if you go by you all's statistics, that it has been known that people that are abused really don't come out and say that they are abused though.

Q.    And you apparently didn't tell the trial team that he was abused, correct?

A.    No, it wasn't asked of me that I can recall.

Q.    You don't recall anything about the conversations between the trial team and yourself; is that correct?

A.    That I recall that anything that if it was asked to me --

THE COURT:  I'm having trouble hearing you again.

THE WITNESS:  I apologize.

A.    Anything that was asked of me right off, I will say I don't recall.

Q.    I'm going to show you another portion of that same interview, 638-A.

A.    Okay.

Q.    Twelve.  This is page 12.

A.    Okay.

Q.    Mr. Simon asked Mr. Allen, your son:  "Was, uh, your father the only member of the household who used or had alcohol?"  And your son answers, "Yeah."  That's back in January of 1998.  Were you aware that your son had stated that?

A.    No, I wasn't.

THE COURT:  Just a second.  I can read it.  Okay.  I got it.

Q.    In regards to your other children, did you ever have occasion to strike Nikki and/or Yvette?

A.    Ann more so than Nikki.  Actually Yvette was --

THE COURT:  Please.

A.    Yvette, you know, Yvette I can't recall too much at all, because like I said, she was just -- after Yvette, I

probably just let her just do her own thing.

Q.   Do you recall striking Nikki and Ann?

A.   I think probably not as much as Bill, no.

Q.   When you say "not as much," how often was that?

A.   Nikki and Bill -- I mean, Nikki and Ann, like I say, Ann was a little bit different.  They got whoopings, but they -- they got whoopings.  I can't say how often they got whoopings.  They got whoopings.

Q.   And did they get whoopings as discipline as you described before?

A.   Probably Nikki and Yvette did, but Ann would have felt my wrath some of the time too.

Q.   So physical punishment was the practice in your household?

A.   Correct.

Q.   And in your parents' household?

A.   Correct.

Q.   And you're not aware whether it was or not in your siblings' household?

A.   I know my sister say my brother-in-law used to curse a whole lot, so I don't know --

Q.   I'm asking about physical discipline.

A.   What I'm trying to do is describe what I remember.  I can't say.  I would say no.  That I recall, no.

Q.   You don't know whether there was physical discipline?

A.    I never seen any physical.

Q.    Did any of the children ever tell you about physical discipline among your siblings' households?

A.    No.

Q.    And you testified today that you don't recall striking Billie when he lived on Evans -- when you lived on Evans; is that right?

A.    I don't recall.  I can't say -- pinpoint a time when it was, so, no, I don't recall it.

Q.    And can you pinpoint a time on Cote Brilliante when you struck Billie?

A.    I would say I remember that on Cote Brilliante it had to be instances with my brother that it was on Cote Brilliante.  But I'm pretty sure, like I said, on Cote Brilliante, I remember those.  Those are coming more to the forefront than anything else.

Q.    So the times you remember are the -- you believe there were two times when your brother had to come in and pull you off of Bill?

A.    I remember those two times.  I'm not saying those -- now that those are the only times.  But those are the two times when you asked about Cote Brilliante.  Those were the ones that specifically come out -- stick out in my mind.  I'm not saying it was more than that.  What I'm saying is that those are the two times that I can remember where it probably

got more out of control than anything else.

Q.   So those are the two times that you were out of control?

A.   Those are the two times that I recall.

Q.   Okay.  You don't recall any other times?

A.   That's not what -- if I -- right now I don't recall any other times.  But like I said, there was times that -- and I may not have to recall those times if it wasn't for people coming in to intervene.  Whereas I was going like, okay, this has gotten out of control.  I don't remember if I was -- I remember those two instances because, like I said, it was with my brother.  I can't remember if something happened with JR, if I was with JR.  I know that he would have been the individual to stop me from doing what I was doing.

Q.   No, I'm talking about Cote Brilliante.

A.   I understand what you're saying.  But I was just -- because to me you're trying to get -- to me this is what I'm picking up that you're trying to get, okay, was this done over here, was this done over there.  What I was basically trying to do is a comparison of those -- not saying that it didn't happen anyplace else, what I'm saying, I remember those two points because it was somebody there to stop me from doing what I was doing.  That's all I'm saying.

Q.   Are you saying that JR stopped you from --

A.   No, I didn't say that.  Because what I would say is JR

wouldn't have been able to stop me from doing what I wanted to do.

Q.   Okay.  But you don't recall hitting Billie on Evans, correct?  I mean, didn't you just testify to that just a moment ago?

A.   I don't recall hitting him on Evans.

Q.   Okay.  And on Cote Brilliante, the times you recall you hitting Billie were the two times you said that Raymond pulled you off?

          MR. MONTROY:  Objection.

A.   Right.  Because what I said, those are the times that stick out.  But I do remember, I can pinpoint that what I do remember is I said I hit Bill in the mouth.  I'm not going to say that that was that time.  I hit him with extension cords.  I'm not going to say it was that time.  Because all of them weren't on those two incidents that those things happened with the hitting.  What I'm saying is that these two particular times stick out, that's the only thing I'm saying.  I'm not saying no more or no less.  Those are the two times that just basically stick out.

Q.   And all I'm asking you is to make sure I'm not cutting you short --

A.   Okay.

Q.   -- and that there's not some other time that you specifically recall that you can tell us about.  That's all

I'm asking.  And I think the answer is no?

A.   Right.

Q.   Okay.  Now, you stated or testified that you had put Billie out two or three times; is that right?

A.   Yes.

Q.   All right.  And you put a missing person's report out on him -- actually you put missing person's reports out on him twice; is that right?

A.   Like I say, I thought I only did it once.  So, therefore, like I said, I don't know.

Q.   Okay.  Well, let's look at Exhibit 116.

A.   Okay.

Q.   Do you see the incident -- I'll highlight it for you.

A.   Thank you.

Q.   Do you see the incident -- this type is missing adult?

A.   Okay.

Q.   And that's May 16th of 1996; is that correct?

A.   Okay.

Q.   Is that --

A.   When I'm saying okay, I'm just acknowledging I'm hearing what you're saying.  I'm not agreeing.  I want to make sure I'm not agreeing.  But I'm hearing what you're saying.

Q.   Okay.  And I'm going to show you the summary.  Is it correct that it says:  "Reporting party, Juanita Allen,

mother, stated she had not seen or heard from her son since the indicated date and time." Is that right? Is that what that says?

A.   Yes.

Q.   So does that refresh your recollection that you put a missing person report out on your son in May of 1996?

A.   I can't be -- with the date, but if that's what the document says, I'm going to say yes. But as far as going when it was, I really don't know.

Q.   But you have no reason to doubt that this report would have the correct date on it?

A.   Right.

Q.   Okay. Let's look at the next report. And, I'm sorry, let me go back to that for a moment. If we're talking about 1996, Billie was 18, almost 19 years old, is that right, in May of '96?

A.   Okay.

THE COURT:  Was how old?  18 or 19, which was it?

MS. COSTANTIN:  It's 18, about to be 19.

THE COURT:  Okay.

Q.   His birthday is June of 1997 -- I'm sorry, 1977; is that right?

A.   Okay.

Q.   So that would have made him 18, almost 19 at that time; is that right?

A.    Okay.

Q.    I'm going to show you 118.  Another missing -- well, it says on the top another missing adult report; is that correct?  Is that what that reads?

A.    Yes.

Q.    And that's a report on January 20th of 1997, is that what that says?

A.    Yes, it does.

Q.    And does it indicate:  "Reporting party Allen stated she last saw her friend on the above date and time" -- her son I'm sorry -- "saw her son on the above date and time, accompanied by a friend only known as Prentiss."  Is that correct?

A.    That's what the report says.  I really don't recall it.

Q.    Do you have any reason to doubt that that's a missing report, a missing person report that you made on your son on January of '97?

A.    No, I have no reason to doubt it because I do remember a Prentiss, so --

Q.    And that -- in January of '97, he would have been 19 years old; is that right?

A.    Yes.

Q.    I think you were asked about this a little bit on direct exam.  At a certain point you would go out, this is after Louis had died, you would go out partying and drinking

with Cathy Toliver and some of your other friends; is that right?

A.    Correct.

Q.    And that was -- specifically you talked about doing that on weekends?

A.    We partied on the weekend, but I drunk at home.

Q.    But the times you're going out with Cathy Toliver and partying is on the weekends; is that right?

A.    Correct.

Q.    And you didn't put a white flag or handkerchief or anything out on your front porch to indicate that you were available for sex for money with men, did you?

A.    That's something I just don't recall.

Q.    Okay.  So you think you might have done that?

A.    You know what, I don't know.  Because what I want you to understand is that that was a part, a time in my life just looking back, half the things that I would have did, now I wouldn't have did.  So I can't say.  I don't know.

Q.    Do you recall being asked --

A.    Yes, I recall it.

Q.    Okay.  And you were asked:

      "Did you ever put a white handkerchief out on the front door handle or white cloth?"

      And you said:  "That's something I can't recall that."

A.    Right.

Q.    And the question was:

"Does that mean something if you did that, do you understand what that would mean?"

And you said:  "No, I wouldn't."

You wouldn't understand what that meant?

A.    Right.

Q.    So you're saying you don't recall putting it out, and if you did, you wouldn't have known what it was?

MR. MONTROY:  Objection, Your Honor, that's not what her testimony was.

THE COURT:  Okay.  Well, that's the way I understood the question.  But would you rephrase just to make sure. Maybe I got it wrong.

BY MS. COSTANTIN:

Q.    What is your testimony right now?  What is the meaning of putting a white handkerchief out on a front door handle or a white cloth?

A.    Right now I don't recall, because like I say, that was a point in time, I don't recall.

Q.    As you sit here today, is there any meaning to putting a white handkerchief or a white cloth on a front door handle? Does that have any meaning for you?  What would that signify?

A.    Today, no, I don't recall.

Q.    You don't recall?  As you sit here today, you don't

Q.   know what the meaning of that is?

A.   Correct.

Q.   But you might have known what the meaning of it was back then?

A.   Back then I didn't know what I knew.  Back then I was just "discomboomerated" with a whole lot of stuff back then. I don't know.

Q.   Did you ever have sex on the front porch with a man for money?

A.   Yes.

Q.   And how many times did that happen?

A.   I can't recall.

Q.   When you were not working, Otha was putting food on the table; is that right?

A.   Yes.

Q.   So the kids weren't starving, your father was there to make sure that they had food, correct?

A.   He was there to make sure.  I don't think that was his objective, but for them to have -- because those were my children.  And with them being my children, it's like he tried to provide for me.  I should have been trying to provide for mine.

Q.   Were your kids ever starving?

A.   No.

Q.   Were your kids ever without food?

A.    No.

Q.    I want to talk to you for a moment about your contact with the trial team.  And I just want to clarify, when I'm talking about the trial team right now, I'm talking about Rick Sindel.

A.    Okay.

Q.    John Simon.

A.    Okay.

Q.    David Randall, and the woman known as Connie Caspari back at that time.

A.    Okay.

Q.    To clarify, you have no recollection of the contents of any meeting or phone call that you had with any of those four people; is that right?

A.    Only recollection I have is that if something was asked of me, it got done.  And like I said, the doctor statements, they just stick out.

Q.    I'm asking, do you have any recollection --

A.    No.

Q.    -- of the content?

A.    No.

Q.    I'm going to go to 258 --

A.    Okay.

Q.    -- which is your declaration, the fourth page.  Let me do it differently.  When you wrote, and I'm looking at the

second -- I'm sorry, the third sentence right here.

A.    Uh-huh.

Q.    Talking about the trial team.  "But they really sat with me to hear my story."  You actually have no memory one way or the other about whether they sat with you to hear your story; is that right?

A.    Correct.  I don't have any memory of them sitting there reading -- for me to give my story.  But what I do remember is that the times that they were there, it was -- it probably wasn't long enough even for me to tell a story.

Q.    How many times were they there?

A.    I don't know.

Q.    Okay.  John Simon was at your house multiple times, right?  Didn't you just testify he was there several times?

A.    Yes.  But when you say "multiple," then I give it another definition.  So we're going to stick to the "several."

Q.    Okay.  John Simon was at your house several times?

A.    Okay.

Q.    You met with Rick Sindel how many times at his office?

A.    I really can't say, but I know I did meet with him.  I can't give a number.

Q.    Okay.  And how many times did you talk to him on the phone?

A.    Several.  Several times.

Q.    So if you don't know how many times -- is that correct, overall how many contacts they had with you?  Is that right?

A.    Correct.

Q.    And when the trial team asked you for things, and I think you've covered this a little bit, they asked you for people's names and numbers.  You gave that to them, correct?

A.    Correct.

Q.    And you got those medical records, Billie's medical records or helped get them; is that right?

A.    Yes.

Q.    And to go back to 301, which we've established is the transcript of a conversation that Mr. Sindel had with you back in April of 1997, you said to him specifically that you weren't going to lie to him, and you didn't expect him to lie or fabricate to you; is that right?

A.    Yes, that's what's written there.  I don't recall the conversation.

Q.    Was that your attitude in general towards your son's attorneys, that it's all on the table, I'm not going to lie to you, don't sugarcoat things with me?

A.    I think that's just my general attitude, but, yes, that was my attitude.

Q.    And your son was arrested for that robbery back in March of 1997; is that right?

A.    I really don't know, because like I said, I've always

told people it was '98.  So therefore I don't know exactly when it was.

Q.   Well, you're talking to Mr. Sindel back in April of 1997, so --

A.   Okay.  And like I said, I just always thought that the robbery happened in '98, so -- but it happened in '96 I take it?

Q.   '97.

A.   '97.

Q.   St. Patrick's Day 1997.

A.   Okay.

Q.   Does that ring a bell or really not?

A.   I remember it being St. Patrick's Day.  And I think what's happening is I think that as far as years, I don't know.

Q.   Okay.  In this conversation -- I'm going to go to the next page.

A.   Okay.

Q.   You told Mr. Sindel about Billie's schools; is that correct?

A.   Okay.

Q.   Where he had attended school, that he was at Clayton and then he was at Sumner?

A.   Okay.

Q.   And do you recall also -- I'm going to do it a

different way.  Do you also recall telling him that Billie had been -- gotten lead poisoning when he was younger?

A.    If it's on there.

Q.    And it is on there, correct?  You're stating he had lead poisoning.  There was a study done where sometimes it gives a chemical imbalance?

A.    Correct.

Q.    And you talked before about getting those records; is that right?

A.    Yes.  Well, I guess.

Q.    Or were you trying to get the records from Dr. Grabau?

A.    Yes.

Q.    And those are the records related to the lead poisoning?

A.    Yes.

Q.    And looking at page 6 of that same exhibit, 301, does it indicate that you told Mr. Sindel that, "He was younger," referring to Billie.  "He was a whole lot younger.  I don't think he was in school, but I'm saying he may have been about four or five because he used to have seizures."

A.    Okay.

Q.    Do you have any reason to doubt that's what you told Mr. Sindel?

A.    No, I have no reason to doubt it.  No, I have no reason.

Q. And back then in 1998, now I'm going to page 8, Mr. Sindel indicates -- it indicates that Mr. Sindel stated: "Was Billie ever treated at any kind of mental hospital or psychological facility?" And you indicated, "I had someone evaluate, try and evaluate Bill at Provident when he was at Sumner, so it must have been in the ninth grade, to just come out and talk to him and see what was going on." Is that right?

A. That I can recall, yes.

Q. That's what it says there, and you have no reason to doubt that that's correct?

A. No.

Q. I mean, you did try to have Billie evaluated at Provident, correct?

A. Yes, but I don't know if it was when he was at Sumner or when he was at Turner Middle, so --

Q. Now, you were going to a counselor during that time yourself; is that right?

A. Correct.

Q. All right. And it's that counselor that you wanted to have talk to Billie; is that right?

A. I think so.

Q. Okay. But Billie didn't want to have anything to do with the counselor; is that correct?

A. Correct.

Q.    Now, going to the next page, do you remember or do you see that it says, and I think you may have seen part of this this morning, Mr. Sindel asked you:

        "Do you know some people that you could, could you send me a list of people you think he's close with, people I can talk to?"

        And your response is:  "People you could talk to and --"

        And then his continuation is:  "Like a relative, friends, religious people, and you know, people that can give me a good idea --"

        And you interrupt him and say:  "A general outlook of Bill, sure I can do that.  He did give me your telephone number."

        Is that what you looked at this morning?

A.    I think so, yes.

Q.    And you have no reason to doubt that that was the conversation that you had with Mr. Sindel at that time, did you?

A.    Correct.

Q.    And you did, in fact, send him a list of people who were close to Billie; is that right?

A.    That I can recall.

Q.    Okay.  Anything he asked for, you gave it to him?

A.    That I can recall.

Q.   During the meetings that you had with the trial team, you weren't drunk at any of them, were you?

A.   No.

Q.   And you've now been sober for six years; is that right?

A.   I think six.  I have no -- I just don't keep dates, and I'm thinking six to seven, going on six or seven.

Q.   And that's after you went to a rehab facility; is that right?

A.   Correct.

Q.   Now, the insights that you've shared with us today about your behavior, those are insights that you gained during rehab and the following aftercare, is that fair to say?

A.   Yes.

Q.   So that issue you talked about, detachment, the issues you have with detachment, that's something that you learned about six or seven years ago; is that right?

A.   I think to a degree I may had unconsciously known about it because it was just the way I was raised with not so much attachment.  But as far as just coming to full terms with, okay, this was going on and this was going on in my life, I would say I think that's when it just -- it got right in my face.

Q.   And that's when you learned about that issue, correct?

A.   Correct.

Q.   Okay.  Was that was back in rehab?

A.   Correct.

Q.   All right.  And that was six years after trial or something like that, correct?

A.   Okay.

Q.   I mean, is that right?  I mean, the trial was back in 1998.

A.   Right.

Q.   Okay.  So these insights you've talked about today, you didn't have those insights back at the trial?

A.   I think whether the insights -- I think I did still have the insights because I think even with the records that you just read off, the information that anybody is going to need, I'm going to give them to them.  So is that what you're speaking of?

Q.   No, I'm talking about the insights that you had detachment and that sort of thing.

A.   Oh, okay.

Q.   I'm talking about that.

A.   Okay.

Q.   Your relationship, that sort of issue, those are the insights that you got only after going through rehab?

A.   Okay.

Q.   Okay.  When -- if you're talking about things that the attorneys asked for you to do back then, you gave it to them?

A.    Correct.

Q.    Okay.  I'm not talking about that related to insights.

A.    Okay.

Q.    Now, since that trial there have been a new set of attorneys involved in the last maybe five years; is that correct?

A.    Correct.

Q.    All right.  And you've sat down with these new attorneys at least 20 times in the last couple years, haven't you?

A.    Oh, I don't know if it's 20.  You know, I guess if I would have known the significance of times and how many things, I would have probably been more punctual with what was going on, but I can't say it was 20.  I don't know. There's been numerous times, I can say it like that.

Q.    It's been -- I'm sorry?

A.    It's been numerous times.

Q.    And looking at your deposition that you gave back last year, the question was:  "So actually physically sitting down and meeting, you think that was more than ten times; is that right?"  That was the question.

A.    Okay.

Q.    And your answer was, "Yes."  Is that right?

A.    Right.

Q.    Then the question was asked:  "More than 20 times?"

A.   Okay.  I mean, I know this is a deposition -- go ahead.

Q.   And your answer is:

"In the last couple years?"

And the question is:  "Yeah, as far as a team, we're not going to separate Jim" -- referring to Jim Moreno -- "has been over this many times, we're not going to do that."

And your answer was:  "Yes, I would say more than."

Talking about more than 20.  Is that right?

A.   I don't know.

Q.   Well, is that what you testified to back last year?

A.   I mean, yeah, it was something I testified to.  But even with trying to pinpoint, was it 20 or 10 times, I can go like I met with each individual maybe one time and then another time.  And with all of them together, they may be 20 times.  But as far as maybe, I can't say whether I met with them 10 times to 20 times.  Because the question was posed 10 times, and I went like, I don't know.  Twenty, okay, maybe 20.  I don't know, it could have been 15.  I don't know.

Q.   I believe the --

A.   I know 15 wasn't in there.  I was just using that hypothetical.

Q.   I think the question was posed:  "Actually physically sitting down and meeting you, you think there was more than ten times too?"  And you said, "Yes."

A.   Okay.

Q.   And then the question was asked:  "More than 20 times?" And your answer is:  "Yes, I would say more than."

A.   Okay.

Q.   Okay.  And that's what you testified to back then, right?

A.   Yes.

Q.   What you're saying as you sit here today is you're not really sure how many times it was?

A.   Correct.  Right now I could say maybe it was --

THE COURT:  You're --

THE WITNESS:  I keep on forgetting.  I apologize, Dr. Webber -- I mean, Judge Webber.

A.   I would say that just thinking about it, it may not have been more than 20 times.

Q.   And since your deposition, how many times have you met with them?

A.   That deposition would have -- back when?

Q.   That deposition, we'll go to the first page.

A.   You know, I don't even know why I'm having you do a date.  I really don't know.  I would say this, if they were in town --

Q.   It was November 18th of last year.

A.   Okay.  If they were in town, they would come and see me.

Q.   And how many times was that since this deposition?  In

other words, in the last year.

A.    This deposition, probably the last time -- well, the last time Bill was in court, I don't think they came over, so -- I don't think they came over.  So -- that I can recall -- I'm trying to think.  Just a minute.  If they didn't come anymore after the deposition or before the last date that they were here, physically I would say I don't recall them coming.

Q.    So you have not physically met with the new attorneys since that deposition?

A.    See, you lose me.

Q.    I'm asking you, since this deposition, have you physically met with the new attorneys, with these attorneys?

A.    Oh, okay, yes.

Q.    Okay.  How many times?

A.    I guess this week twice.  Well, actually it wasn't twice because one day I wasn't feeling well, so we'll say one time.

Q.    Any other times between this week and all the way back to the deposition a year ago?

A.    That I can say, I can't recall.

Q.    And talking to them on the telephone since they've been in the case, do you recall testifying that that was at least 20 times, may have been as many as 50 times?

A.    Maybe with all of them.  I mean, with the deposition,

not as much.

Q.    What does that mean, "with the deposition, not as much"?

A.    After the deposition, I haven't talked to them as much.

Q.    I'm talking about the whole long time period.

A.    I can't -- you know what, I really can't -- I can't pinpoint whether it was 20 times or 50 times.  That's just vast.  I don't know.  I know I spoke to them.  If they needed to speak to me, I spoke to them.

Q.    And what question was it that they asked you that caused you to state that you had beaten Billie when he was a child?

A.    I don't know that.  I don't know what question they posed to me to make that -- give them that information.  I don't know.

Q.    I mean, was it just, did he have a good childhood?  Was it -- I'm trying to understand what the difference was between 1998 and right now.

A.    I don't know.  I can't tell you.  I don't know.

Q.    You don't recall if it was a general question about how was Billie's childhood or a specific question, did you beat Billie?

A.    Right.

          MS. COSTANTIN:  Judge, if I could just have a moment?

THE COURT: Sure.

MS. COSTANTIN: Judge, that's all I've got.

THE COURT: Okay. Redirect.

REDIRECT EXAMINATION

BY MR. MONTROY:

Q.    I just want to ask you a couple questions about John Simon and when he came to your house.

A.    Okay.

Q.    And there were a couple questions that you were asked about on cross-examination, one of which was --

THE COURT: What's that exhibit number, please?

MR. MONTROY: I'm sorry, it is Exhibit 500.

THE COURT: Okay.

MR. MONTROY: And right now I'm on page 58.

THE COURT: Okay.

Q.    One of the questions was about whether or not you drank when you were pregnant with Billie. And the second one was the question about the bad environment, whether Billie grew up in a bad environment. And I just want to direct your attention to the line that says: "Trip to 4535 Cote Brilliante January 7th, 1998, nine o'clock." Do you live at that address?

A.    Yes, I do.

Q.    And who else lives there?

A.    Now or are you speaking in '98?

Q.    In 1998.

A.    I want to say me and my dad, Nikki.

Q.    I'm sorry, can you just speak a little bit louder?

A.    Me and my dad and Nikki.  I don't even know if Ann was there in '98 or Jerome, I can't recall.  I just recall right now me and Nikki.

Q.    So your dad was there, right?

A.    Correct.

Q.    And your dad's name is Otha, right?

A.    Correct.

Q.    And you see the name Otha right under the line that says, "Trip to 4535 Cote Brilliante"?

A.    Right.

Q.    Okay.  Do you know, do you remember was Otha in the house the day that John Simon came to your house?

A.    No, I don't remember.

Q.    I'm just going to go to the next page.  Do you see the name Ahmed Oliver?

A.    Who?

Q.    Do you know who Ahmed Oliver is?

A.    That was a friend of Bill's when he was in school.

Q.    Okay.  Is it possible that he would have been at your house?

A.    He came to my house?

Q.    Yeah, on that date?

A.    Not that I can recall, no.

Q.    What about Deborah Ruffin?  Who is Deborah Ruffin?

A.    That's one of my sister girls.

Q.    She's a friend of yours?

A.    Yes.

Q.    And you see her name is there and it's underlined?

A.    Yes.

Q.    Is it possible that she might have been there that day?

A.    I doubt it.  I don't know.  Not that I recall.

Q.    Okay.  Okay.  And then going to the next page.  So we're a couple pages, two pages after your address was listed.  Do you know who Harvey is?

A.    Harvey?

Q.    Do you know what Pleasant Green --

A.    It was a Mr. and Mrs. Harvey.  I think they were Den -- Cub leaders.

Q.    Okay.  Do you know what Pleasant Green is?

A.    Pleasant Green is a church that was around the corner.

Q.    Do you know who Scott was?

A.    I can't place a Scott.

Q.    Do you know if Mr. Simon interviewed them at some point?

A.    I don't know.

Q.    Okay.  And then at the bottom of the page is where this appears:  "Didn't drink while carrying Bill.  Did smoke."

Now, is it correct that you don't remember ever saying to Mr. Simon, "Didn't brink while carrying Bill"?

A.    Not that I recall.

Q.    Okay.  Did you drink alcohol when you were pregnant with Bill?

A.    I drunk alcohol, yes, I did.

Q.    Did you smoke cigarettes when you were pregnant with Bill?

A.    Yes, I did.

Q.    So is it fair to say you don't really know who it was who said, "Didn't drink while carrying Bill"?

A.    I don't know.

Q.    Do you know, was there ever a time when Mr. Simon came to your house where you were there and a bunch of other people were there?

A.    Not that I recall.  I don't -- not that I recall.

Q.    Okay.

A.    Where he had everybody come over to my house for a meeting, is that what you're asking me?

Q.    Or he came by your house, either that scenario where he called you up and said get a bunch of people over, did that ever happen?

A.    Not that I recall.

Q.    Did he ever come over to your house and you were hanging out with Deborah Ruffin and some other people, do you

recall that?

A.    No, I don't.

Q.    And do you recall if he ever talked to Otha?

A.    My dad?

Q.    Yes.

A.    No, I don't recall.

Q.    So it's possible that he spoke to him, but you just don't recall?

A.    It's possible, but I don't know.

Q.    Now, you were being asked some questions about a variety of jobs that you had?

A.    Correct.

Q.    And it sounded like Ms. Costantin mentioned about maybe seven or eight different jobs that you've had?

A.    Correct.

Q.    Did you -- did you have problems holding jobs down?

A.    Yes.

Q.    Why was that?  Why did you have a hard time keeping a job?

A.    I think part of the time it was -- some of the time it was with the drinking, and then some of the time with me being the kind of boisterous individual, it kind of got me into some situations where people terminated me.

Q.    Okay.  When you say that, what do you mean by that?  Can you give me an example?

A.    Being boisterous?

Q.    Yes.

A.    You want me to give you an example of me being boisterous?

Q.    Give me an example of something that happened where you lost your job.

A.    When I lost my job, I think that the last time a supervisor asked me to do something, and it wasn't something that I had to do, and she said her manager had told her to do it.  And I think I told her to -- you want me to tell you what I told her?

Q.    Sure, please.

A.    That he could have been standing in that building ass naked, I wouldn't get ready to do it and that he could kiss my ass.  But that's not why they fired me.  They fired me because I called the Department of Board of Labor on them.

Q.    And did you lose other jobs because you had problems with the management?

A.    Yeah.

Q.    And were these problems that you had, were they related to you having anger issues or was it something completely different?

A.    It was anger issues.  And the last one I had was with Hope House, I don't know what day, but with Hope House, I actually went to work intoxicated and ended up getting

terminated from that job.

Q.   Okay.  Was that something that you did with your jobs, you went to work intoxicated?

A.   To some of them, yes.

Q.   So that happened on more than one occasion?

A.   Yes.

Q.   Did you ever drink when you were at a job?

A.   Did I ever do what?

Q.   Were you ever working, actually at your job consuming alcohol?

A.   Yes.

Q.   Did that happen on multiple occasions?

A.   Yes.

Q.   Now, you talked about a couple occasions that you recall Raymond pulling you off of your son Billie; is that correct?

A.   Uh-huh.

Q.   And those were occasions where you were beating Billie; is that right?

A.   Yes.

Q.   You were -- what was the -- what were those beatings actually like?  What were you doing that you can remember?

A.   What do you mean what was I doing?

Q.   Well, how were you hitting Billie?

A.   I think one instance that she spoke of, I don't recall

it, but the one that I remember that I thought she was speaking of is when I had Bill against the wall, and I was -- I had him against the wall and I was jacking him up.

Q.   Okay.  So you had him against the wall.  How did you have him against the wall?

A.   Probably like this.  Probably with my right hand because I'm left-handed, and I usually start off swinging with my left hand.

Q.   Okay.  So you had you hand -- when you said that, you had your hand up to your throat.  Is that how you were holding him against the wall?

A.   Yes.

Q.   And with your other hand, you were striking him; is that right?

A.   Yes, because I'm left-handed, and I usually start off with my left hand.

Q.   Okay.  And were you hitting with your left hand on that particular occasion?

A.   It had to be, because I'm left-handed.  That's where the first swing is going to come is from the left.

Q.   Okay.  And where were you punching him?

A.   Probably a little bit of every place.

Q.   Do you remember punching him in the face?

A.   I mean, I'm pretty sure I did, because if I'm -- if I get into an altercation for somebody, that's where I'm going

first.

Q.    Do you remember what started that altercation?  Do you remember why you were doing that?

A.    Me and my children never had an altercation.  Me and my children never had whereas -- like I said with Bill saying that he cussing, I'm pretty sure he was far away because I always said that we wouldn't have any -- what I would call altercation because I was always going to win.  So, therefore, I don't call what happened between me and my children altercations.  Do you understand what I'm saying?

Q.    Sure.  But you did beat Billie, right?

A.    Yes.

Q.    So it wasn't an altercation because it wasn't a mutual fight; is that right?

A.    Right.

Q.    Did Billie ever fight you back?

A.    No.

Q.    So there were two instances where Raymond intervened, right?

A.    Okay, the instance that he spoke about, I don't recall.  I recall my instance.  So those are two different instances, so I'm taking it those were two different times.

Q.    Sure.  And one thing that I'm curious about is the times that you beat Billie, it wasn't just limited to those two occasions, right?

A.    Oh, no.

Q.    All right.  You had -- on direct examination today, you had testified about beating Billie with an extension cord?

A.    Correct.

Q.    Do you remember actually beating Billie with an extension cord?

A.    I remember whoopings with an extension cord, yes.

Q.    Okay.

A.    I remember whoopings.  I was a shoe thrower.  If I didn't feel like getting up, I would throw a shoe at you.

Q.    Okay.  So you remember occasions where you threw objects at Billie?

A.    Yes.  I was a good shoe thrower too.

Q.    Do you remember occasions where you threw shoes at Billie and actually hit him?

A.    I can't pinpoint like, okay, this happened on this day.  But I can say I was a shoe thrower, I had a good aim.

Q.    Yeah.  And I'm not asking you whether you can pinpoint a day or even an age, I'm just asking whether you remember, you remember times where this happened, where you threw shoes at Billie?

A.    Yes.

Q.    Do you remember any other times where you threw objects at Billie other than shoes?

A.    Anything I may have had in my hand.  Like I said, I was

just a good thrower.  I had a good aim when I was younger.

Q.    So that was something that you regularly did?

A.    Yes.

Q.    On cross-examination you were asked some questions about the interview that Dr. Randall did with you prior to Bill's trial.

A.    Okay.

Q.    And specifically when you were asked about this, and this is on page 1:  "Saw changes in Bill.  His freshman or sophomore year in high school, I noticed different things about Bill.  I asked the counselor at Providence to talk to him.  He gradually changed.  I noticed his demeanor" -- and then some of this was highlighted so it's difficult to read -- "his appearance started going down.  I was gradually missing little things.  He was not taking pride in himself.  He didn't bring a whole lot of people around us.  He kept that away.  This was before '96."

      All right.  So at least when you talked to Dr. Randall, you thought that this might have been in his freshman or sophomore year of high school; is that right?  Or is that at least possible?  I know you don't remember today, but is that at least possible?

A.    That's possible.  Like I said, it may have been before '96.  Eric, I just don't recall.  I can't pinpoint a time.  I can't pinpoint an age when all of this is happening.  Now, if

you weren't so specific, I can go like, okay, fine, this happened here. But you all want me to do pinpoints on dates that I just don't remember.

Q. Okay. The counselor at Providence, were you -- you were obviously concerned about Billie at this time; is that right?

A. Correct.

Q. Whenever this was, you were concerned about his --

A. Right.

Q. Were you concerned about his mental health?

A. I think I was more -- yes, I think that was one of my concerns. I think at some point in time Bill had started drawing some like to me crazy drawings. Bill always could draw. He was -- he always could draw, but he just started drawing crazy drawings to me.

Q. And I think you said on direct that they were like dark. Is that what you said? Is that your term?

A. To me they were.

Q. They were dark, okay. And here you're saying that his appearance started going down?

A. I think he stopped taking care of his self.

Q. Okay. Were you concerned -- and I don't want to put words in your mouth, but were you concerned that there was something wrong with him, that he was depressed or that there was something wrong with his --

IX -- 207

MS. COSTANTIN:  I'm going to object at this point to the leading nature here.

THE COURT:  Who were you concerned -- overruled.

A.   I think that with me being -- at that point in time I don't think I may have even knew what depressed was, because it was just -- isn't something I knew about.  But you could tell when there's a difference happening with somebody.  You know, you could just tell their demeanor or the way they, you know, the way they act.

Q.   And this was all -- what you're describing here, this is -- this all took place before Marquis Taylor was shot and killed, is that fair to say, these changes that you saw in him?

A.   Let me think about it for a minute.  I don't know.  I can't say.  I don't know.

Q.   Okay.

A.   I don't know, because I can't say -- I don't recall when Marquis did his transition.  And I don't recall when I asked for the counselor if Bill was actually going into junior high or high school.  I just don't recall.

Q.   You were asked some questions about, you know, the possibility that you might have indicated to John Simon that Bill did not come from a bad environment?

A.   Correct.

Q.   Do you recall those questions?  And you --

A.    Let me go ahead and interject and say, no, I don't recall them.  But if you're saying it's in black and white and you got it documented that it was a conversation that we had, I'll be willing to accept it.

Q.    Okay.  Well, you don't remember saying that, right?

A.    Correct.

Q.    Okay.  But as far as -- you started to answer the question, and you started to talk about the Allens, the Allen side of the family?

A.    Correct.

Q.    And that being a bad environment, and you taking Billie out of that bad environment.  And you didn't elaborate on that.  And I was wondering what you mean.  Why was the Allen family a bad environment?

A.    I think that they were just different from the environment that -- I mean, I was different from the rest of my family.  But they were like different to a degree where it was the drinking and the hustling and the stealing and stuff like that.  They were just different from me.  You know, their background was different from mine.  I mean, I got entangled with that once I got -- I'm not blaming them for my behavior at the time, but that's -- I think I kind of became like more of an Allen than a Petty.

Q.    When you said "hustling," what do you mean by hustling?

A.    JR was a hustler.  JR would get things and just hustle

them.  He was a hustler.

Q.    Just so we're all familiar with the term "hustler," what does that mean?  Does that mean he was doing something illegal?

A.    Yes.

Q.    What exactly was he doing that was illegal?

A.    He would -- he would steal stuff from people.  He was just a hustler.

Q.    And you had indicated on direct examination that he was a drug addict; is that right?

A.    Yes.

Q.    Did he have any involvement with drug dealing?

A.    That I don't know.

Q.    Okay.  And what about the rest of the Allen family, were they into the same stuff?

A.    His brother was for awhile.  I know his brother was into drugs for awhile.  His mom and dad, they drunk a whole lot, you know, so like I said --

Q.    And when you moved out of -- out of the living situation that you had with JR, did you think that you were going from a bad environment to a better environment?

A.    I think that I was going to a different environment, not so much -- an environment that probably was the same.  Because like I said, the house was congested, you know.  I think I will was still drinking.  It just escalated upon

years.  But I can't say that it was a better environment, no, I can't say that.

Q.    Because even when you went to Cote Brilliante, your drinking continued, right?

A.    Correct.

Q.    And your drinking even got worse when you were at Cote Brilliante; is that right?

A.    Correct.

Q.    Up until the -- up until the time of the trial, from the time that Billie got arrested and Rick Sindel was appointed as his attorney -- I'm sorry, let me start that all over.

      From the time that Mr. Sindel was appointed as Billie's attorney until the time of the trial and through most of the trial, did you place your trust in Mr. Sindel, and for that matter Mr. Simon that they were looking out for Billie's interests?

A.    I think I said this before, that with me not even having to deal with the judicial system again before in my lifetime, I had no recollection of what was going to happen, how it was going to happen, who was supposed to do this, who was supposed to do that.  Therefore, with me not knowing anything, the only thing I could do is trust them.  Because like I said, I had no idea of the kind of situation that was going on.

Q.    And so you did place your trust in them?

A.    Correct.

Q.    And you worked with both Mr. Sindel and Mr. Simon?

A.    I think that Rick Sindel would probably say the way I've spoken to you all is the way I spoke to him.  I'm just a direct speaking individual.  Some people can take it; some people can't.  But that's just me.  I'm just a direct speaking individual.  And with me being that, anything, like I said, that he would have asked, it was given to him.

Q.    On cross-examination you talked a little bit about Jerome, your brother Jerome.

A.    Okay.

Q.    And you said that, you know, he was -- I think you said he was a tough person, that he was tough with his children?

A.    Uh-huh.

Q.    And I was wondering if you could explain what you meant by that.

A.    Well, I guess what I meant was tough that, tough is that like you had to be able to stand up for yourself.  You had to be able to -- Bill was kind of passive.  With him being kind of passive, he was just tough, you know.  I mean, I'll give you an example.  My little brother Raymond would tell you in a minute, he didn't have to have a fight.

THE COURT:  He didn't have to have what?

THE WITNESS:  A fight.

A.   Because he would say, you know Juanita my sister.  So, therefore, it was like Raymond was kind of like Bill, he was kind of passive.  And so we would try to toughen them up.

Q.   Okay.  And did that happen with Billie?

A.   No.

Q.   Did Jerome try to toughen Billie up?

A.   Oh, yeah, Jerome tried to toughen all 'em.  It was what they called the right of passage.  Jerome tried to toughen everybody up.  That's what they called the right of passage.

Q.   Okay.  And what did the "right of passage" mean in terms of how did Jerome do the right of passage with Billie?  How did that work?

A.   He might be talking to him and he might just tag him in the chest, that mean hit him in the chest, something like that.

Q.   All right.  Hit him in the chest for no reason?

A.   Right.

Q.   Did it involve any kind of talking or was it just physical, the right of passage?

A.   Basically it may have been physical with Jerome, but Raymond may have talked to him.

Q.   Okay.

A.   I can see Raymond talking to him.  Not saying it happened.  But I can see Raymond talking to him some more than Jerome talking to him.

Q.    Well, I'm just curious how this right of passage works around the house.  I mean, what --

A.    How it happened and how it started, I don't know.  I really don't know.  That's what they just called it.  You had to be toughened up, you know.  You had to be -- in case you were going out in the streets, you had to -- that's what they just called it, the right of passage.  You know, you had to be tough and you weren't going to let nobody -- wasn't nobody going to punk you down or wasn't nobody going to do this to you.  So that's what they -- and I'm just calling it the right of passage.  But that's what they was.  You know, we were in a community where you couldn't be punked out.  You know, if you got punked out, that means that you were going to be a target for somebody every day.  So, therefore, I think and to that degree they tried to toughen him up.

Q.    So did this go on for a period of time where Jerome was trying to toughen up Billie?

A.    It went on for a time, yes.

Q.    And one of the examples that you just gave was he would punch him in the chest?

A.    Right.

Q.    Was that it or was there other things that would take place?

A.    Just right offhand that's what I can recall, just a punching in the chest or something like that.

Q.    You testified today that you remember locking Bill out of the house two to three times.  Is it possible that that happened more than two to three times?

A.    I can't say.  I can't recall.

Q.    Okay.  You were asked some questions on cross-examination about insights that you gained from going to alcohol rehab.

A.    Okay.

Q.    You recall those questions?

A.    Uh-huh.

Q.    And to clarify, at the time of Billie's trial, the time leading up to Billie's trial, the time that you were talking to Billie's lawyers, did you know that you used to beat Billie with extension cords?  Were you aware of that at the time of Billie's trial?

A.    At the time of Billie's trial was I aware of that?  I really can't say.  I don't know.

Q.    If Billie's lawyers asked you, did you beat Billie, at the time of Billie's trial when they are getting ready to go to trial, "Did you beat Billie?" what would your answer have been?

A.    I think I would have to say to someone -- I think I've said this.  I think what I said.

THE COURT:  A little closer.

THE WITNESS:  I apologize.

A.    I think what I said that, yeah, I will whoop a butt.

Q.    And did whipping Billie's butt include beating him with extension cords?

A.    Yeah, that was part of whooping butt.

Q.    So would you have told that to Billie's legal team?

A.    I would have said I would have whooped a butt, so --

Q.    Okay.  And if they asked you what you meant by that, would you have told them, you know, what you told the Court here today, that you used extension cords?

A.    Yes.

Q.    All right.  You didn't need to go to rehab to have that insight, is that fair to say?

A.    No, I didn't.

MR. MONTROY:  Your Honor, if I could have just two minutes to talk to co-counsel.

(There was a conference held off the record.)

MR. MONTROY:  I don't have any further questions, Your Honor.  Thank you.

THE COURT:  You may step down.  You are excused. We're going to take about a ten-minute break.  You may step down.  You are excused.

THE WITNESS:  Okay.

MR. MONTROY:  I'm sorry, Your Honor, did you say a ten-minute break?

THE COURT:  Ten-minute break.

MR. MONTROY:  Thank you.

(Court in recess at 4:01 p.m.)

C E R T I F I C A T E

I, Susan R. Moran, Registered Merit Reporter, in and for the United States District Court for the Eastern District of Missouri, do hereby certify that I was present at and reported in machine shorthand the proceedings in the above-mentioned court; and that the foregoing transcript is a true, correct, and complete transcript of my stenographic notes.

I further certify that I am not attorney for, nor employed by, nor related to any of the parties or attorneys in this action, nor financially interested in the action.

I further certify that this transcript contains pages 1 - 217 and that this reporter takes no responsibility for missing or damaged pages of this transcript when same transcript is copied by any party other than this reporter.

IN WITNESS WHEREOF, I have hereunto set my hand at St. Louis, Missouri, this 28th day of February, 2013.


_____
/s/ Susan R. Moran
Registered Merit Reporter