UNITED STATES OF AMERICA
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

BILLIE JEROME ALLEN,                )
                                    )
          Petitioner,               )
                                    )
     vs.                            )  No. 4:07-CV-27 ERW
                                    )
UNITED STATES OF AMERICA,           )
                                    )
          Respondent.               )


TRANSCRIPT OF EVIDENTIARY HEARING

BEFORE THE HONORABLE E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE

November 29, 2012
Volume X

APPEARANCES:

For Petitioner:      Ms. Elizabeth U. Carlyle
                     P.O. Box 30418
                     Kansas City, MO  64112

                     Mr. Eric John Montroy
                     Mr. James Henry Moreno
                     Mr. Timothy Kane
                     FEDERAL COMMUNITY DEFENDER OFFICE
                     The Curtis Center, Suite 545 West
                     Philadelphia, PA  19106

For Respondent:      Mr. Steven E. Holtshouser
                     Ms. Carrie Costantin
                     OFFICE OF U.S. ATTORNEY
                     111 S. 10th Street, 20th Floor
                     St. Louis, MO  63102


REPORTED BY:         SUSAN R. MORAN, RMR, FCRR
                     Official Court Reporter
                     111 South 10th Street
                     St. Louis, MO  63102
                     (314) 244-7983

I N D E X

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| PETITIONER'S WITNESSES | | | | |
| | | | | |
| YVETTE ALLEN | | | | |
| (By Mr. Montroy) | 3 | | | |
| (By Ms. Costantin) | | 51 | | |
| (By Mr. Montroy) | | | 73 | |
| | | | | |
| JOHNNIE GRANT | | | | |
| (By Mr. Kane) | 74 | | | |
| (By Ms. Holtshouser) | | 90 | | |
| (By Mr. Kane) | | | 267 | |

(The following proceedings were held in open court on November 29, 2012 at 8:34 a.m.:)

MR. MONTROY: Judge, my witness I guess is running a couple seconds late. I think she should be here any minute. I apologize for that.

THE COURT: That's fine.

MR. MONTROY: Your Honor, our witness is here. Should I have her come up to the stand?

THE COURT: Raise your right hand, please. You may affirm or swear the oath according to your own preference.

Whenever you're ready, Counsel.

MR. MONTROY: Thank you, Your Honor.

YVETTE ALLEN,

Having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. MONTROY:

Q. Good morning, Ms. Allen.

A. Good morning.

Q. Are you related to Billie Allen?

A. Yes.

Q. And how are you related to him?

A. Sister. I'm his youngest sister.

Q. I'm sorry?

A. Youngest sister.

Q.    You're his youngest sister?

A.    Uh-huh.

Q.    And do you have other brothers or sisters?

A.    Yes.

Q.    And how many siblings do you have?

A.    Two sisters, two other sisters and Billie.

Q.    And who are the other two sisters?

A.    Nicole Petty and Angela Allen.

Q.    And are you the youngest of the four children?

A.    Yes.

Q.    And who is your mother?

A.    Juanita Petty.

Q.    And your father?

A.    John Allen.

Q.    And is John also referred to as JR?

A.    Yes.

Q.    Did you grow up with your brother Billie?

A.    Yes.

Q.    And did you live in the same house or houses with your brother Billie while you were growing up?

A.    Yes.

Q.    And where were those houses?

A.    The first house we lived at was on Evans Street, and then we moved over to Cote Brilliante.

Q.    Let's talk about the house on Evans Street.  Who lived

in the house on Evans Street?

A.    It was myself, my mother, father, Billie, Nicole and Ann.

Q.    And Ann?

A.    Uh-huh, Angela.

Q.    And were your parents married at that point?

A.    Yes.

Q.    What -- about how old were you when you were living on Evans Street?

A.    I was over there from -- I think from -- I think we moved over there when I was probably 12.

Q.    So you --

A.    Lived over there from that time.

Q.    You moved over there to the time that you were about 12?

A.    Yeah, about 12.

Q.    And who did you live with on Evans Street?  I'm sorry, strike that.  I asked you that question.

       What was the neighborhood like where your house was on Evans Street?

A.    It was pretty rough; a lot of drugs, gangs.  We saw a lot.

Q.    When you say you "saw a lot," what do you mean by that?  What did you see?

A.    There were several shootings, things like that.  Drug

transactions and, you know, violence within the home, within the neighborhood.

Q.    When you say that there were drug transactions, were there drug transactions near your house?

A.    Yes.

Q.    Like in close proximity to your house or on the corner or in your house?  Where exactly did you see drug transactions?

A.    It was all throughout the neighborhood.  But we definitely saw it in the back of our home.  There was an alley where a lot of people used to hang out.  So we saw a lot of things happen back there.  And within the home.

Q.    Okay.  So you saw drug transactions within the home?

A.    Well, not inside the house, but definitely outside the home with my father.

Q.    Okay.  Let's talk about that for a second.  You said there's an alley right behind the house on Evans Street?

A.    Yes.

Q.    And how far is the alley from your house?

A.    Oh, like nowhere, maybe a hundred feet.

Q.    Okay.  So you walk out the back door?

A.    It's pretty much there.

Q.    The alley is right behind the back door?  Was there a back yard?

A.    No.

Q.    So you said you saw drug transactions in that alleyway?

A.    Yes.

Q.    And when these drug transactions were taking place, how far were the people from your house?

A.    Not far at all, right behind it.

Q.    Were -- well, how did you know they were drug transactions?

A.    We definitely knew.  We saw, you know, different hand passings.  And we definitely knew at that age.

Q.    Were these things that, you know, just living in the neighborhood you knew what a drug deal looked like?

A.    Yeah.

Q.    Okay.  You said with your father.  Was your father involved in drug dealing or drug using?

A.    Drug use.  I've never actually seen him sell drugs, but I've definitely seen him, you know, get drugs from other people.

Q.    Okay.  Where did you see him get drugs from other people?

A.    Behind the house.  And we would go with him.  They had a store like on the corner behind that alley right next to the home, and we would go to the store with him, and we would see different transactions when we were with him.

Q.    Okay.  And would he buy drugs at the store?

A.    No, not in the store.  But definitely everybody hung

out on that corner and he would buy.

Q.   So the drug transactions would be outside of the store?

A.   Yeah.

Q.   And when you say "we," who are you referring to?

A.   I'm talking about myself, but -- I'm not sure what happened when he was with other people, but it definitely happened with me.

Q.   And was Billie ever there when your father was -- would go outside the house and buy drugs?

A.   Oh, definitely.

Q.   So if you walked to the store and he would buy drugs, do you remember instances when Billie was with you?

A.   No.  Outside the house.  You know, just being in the back yard of the house, you know, we saw -- he would be there.

Q.   Okay.  So did you ever see your father when he was high on drugs?

A.   We saw him on several occasions.  It was probably a combination.  He drank, you know, heavily, so it was probably a combination.  I can't say, you know, it was solely drugs.

Q.   Okay.  So did you see him when he was, you know, inebriated, high or --

A.   Oh, yeah, definitely.

Q.   Okay.  You had mentioned just a second ago that your father drank alcohol; is that right?

A.    Uh-huh.

Q.    Did you think that he had an alcohol problem?

A.    Yes.

Q.    Let's talk about his alcohol consumption.  How often did he drink alcohol?

A.    Pretty much every day.  He didn't work so, you know, the time we went off to school, the time we got off of school, he had some type of alcoholic beverage in his hand.

Q.    Would he drink alcohol around the house?

A.    Yes.

Q.    And would he be drunk in the house?

A.    Yes.

Q.    What was your father and mother's relationship like when you were living on Evans Street?

A.    It was -- it was pretty rocky.  They had a lot of fights, you know, inside the house.

Q.    When you say -- when you say "they had a lot of fights," did they have verbal arguments?

A.    Yes.  Verbal, physical.

Q.    Let's talk about the verbal arguments for a second. Were those arguments, did they happen in front of you and Billie and your sisters?

A.    Yes.

Q.    And what were those like?  Were they -- I mean, if you could describe them.  Were they -- and I don't want to put

Q.   words in your mouth, but what was the tone of their voice?

A.   Definitely -- it was definitely loud.

Q.   Loud?  Were they screaming at each other?

A.   Yes, a lot of screaming.

Q.   And when they were arguing with each other, what were they arguing about?  What were they fighting about?

A.   Mostly drinking and -- yeah, it was mostly like drinking.  He would come home -- my dad would come home drunk, like I said, almost every day, so --

Q.   So they would fight about drinking.  Would they also fight about anything besides that or was it just drinking?  Let me step back for a second.  You had mentioned that your father didn't work?

A.   No.

Q.   Is that right?

A.   No.

Q.   Where did you -- do you know where your family's income came from if your father wasn't working?

A.   I do not remember, I don't.  I'm not sure if my mom was working at that time.  I don't know.

Q.   Do you remember, did your family have much money during that period?

A.   No.  I remember going out, you know, without a lot.  I remember going to school and, you know, having to go on field trips and we didn't have the money, so we would stay at home

those days because we couldn't afford to go.  Because if you --

THE COURT:  I don't know what it is, but I'm really having trouble hearing you.

THE WITNESS:  I'm sorry.

THE COURT:  If you pull that up so you're speaking right into the microphone.

THE WITNESS:  Okay.

THE COURT:  Thank you.

BY MR. MONTROY:

Q.    If you wouldn't mind repeating your answer.  You were saying how you didn't have a lot of money, and you were talking about that.

A.    Yes, we didn't have a lot of money at that time.  And I remember going on several field trips and not having money for that, so we would just stay at home.  Because if you were at school, if you didn't have money for field trips, you would have to stay at school.  And instead of staying at school, we would stay at home.

Q.    Okay.  So your classmates would go on a field trip, but you didn't have enough money to go on the field trip, so you would stay home from school?

A.    Yes.

Q.    Were there other things that you remember about living in the house on Evans Street where you didn't have money and

the effects of not having money as a family?

A.    No, I can't think of anything in particular.

Q.    That's the one thing that stands out to you?

A.    Yeah.  I mean, we didn't -- yeah -- we -- at that time, you know, both our parents didn't have a car or anything like that.  So I'm sure -- like I'm not really sure what the arguments and things like that were about, but I'm sure it was like money related and things like that.

Q.    Okay.  You had also mentioned that there were physical altercations --

A.    Yes.

Q.    -- between your parents; is that right?

A.    Yes.

Q.    What do you remember about the physical altercations?

A.    I remember there were several times that they would just fight.  They fought quite often.  One time in particular my dad and my mom were -- my mom cooked.  We were in the back in the kitchen.  And my dad came knocking on the door, but he was intoxicated.  So she wouldn't let him in.  So she went outside and they started fighting.  And she still didn't let him in.  They both started fighting with each other.

Q.    And that was a fight that took place -- and when you said that it was physical and that they were fighting, were punches being thrown?

A.    Yes.

Q.   And who was throwing the punches?

A.   Both.

Q.   And were either of them injured, do you remember?

A.   No.  I remember my dad being on the ground, not sure, you know, what injuries he sustained, but I remember him being on the ground.

Q.   And after that fight took place, did your father come back into the house?

A.   He did not.

Q.   Besides that instance, were there other physical altercations between your parents?

A.   There were several, I just can't pinpoint.

Q.   Sure.  And these -- when your parents would argue and they would get into physical fights, would these fights be in front of the children or were they -- would they try and go, you know, and fight privately?

A.   They were definitely in front of the children.  It was -- it was just a two-bedroom home, so, you know, we saw -- there's only so many places you can go.  So, yeah, we saw a lot of the fights.

Q.   Okay.  When you saw your parents fighting, how did that make you feel?

A.   You know, I didn't feel any way about it because it was something that just happened.  It happened so much that, you know, I was kind of numb to it.  So didn't feel --

Q.   The fighting happened so much that it became a normal part of life?

A.   Yes.

Q.   Do you -- well, strike that.

When you were growing up and you were a child, did you have a close relationship with your father?

A.   No.

Q.   Was he a father figure to you?  And what I mean by that is did he take you places?  Did he do things with you?

A.   He -- never, no.

Q.   He never took you to the zoo or never took you to the museums or anything?

A.   No.  No.

Q.   Did your father -- had your father ever stopped drinking alcohol?

A.   No.

Q.   Is he still drinking alcohol today, do you know?

A.   He is.  I don't have contact with him at all, but I definitely see him.  We're only a couple blocks away, and I pass by often.  And I see him, you know, stumbling.  So he's definitely still drinking.

Q.   When you were living on Evans Street, did your father used to have people come over and visit him at the house?

A.   I don't remember too much.  I don't remember company being over, a lot of people being over at the house.  I just

remember a lot of people being like in the back of the house.

Q.    Okay.  And is that the area where the drug dealing was going on?

A.    Yes.

Q.    And so your father would be back there with the people who were buying and selling drugs?

A.    Yes.

Q.    Did he spend a lot of time back there?

A.    Yes.  Or at the store like that was like right up the street.

Q.    And you said that people would hang out in front of the store; is that right?

A.    Yes.

Q.    And what would people do out in front of the store, do you recall?

A.    Just a lot of drugs and -- just drugs.

Q.    People just kind of hanging out in front of the store?

A.    Yeah, selling drugs, buying drugs, things like that.

Q.    Now, did there come a time when you moved from Evans Street?

A.    Yes.

Q.    And do you remember how old you were when you moved from Evans Street?

A.    It was probably -- it had to have been 11.  No, I'm not exactly sure what age it was.  I remember the last day we

were actually moving, they actually got in a fight.  It was snowing.  They got in a fight, and we were walking over to Cote Brilliante.  And we got robbed.  And I remember being really, really young.  And we got robbed at gunpoint.  And it was snowing out.  And I remember being really young.  I'm not sure what age it was actually.

Q.    Okay.  Let's talk about that for a second.  You were -- it was the day you were leaving Evans Street?

A.    Yes.

Q.    And where were you going?

A.    We were walking to Cote Brilliante.

Q.    How far is it from Evans Street to Cote Brilliante?

A.    Not far.  Maybe six blocks, not too far.

Q.    Is Evans Street and Cote Brilliante, are they in the same neighborhood?

A.    Yes.

Q.    And what neighborhood is that?

A.    Well, Ville.

Q.    The Ville?

A.    The Ville area.

Q.    Okay.  So you're getting ready to move.  And who is moving to Cote Brilliante?

A.    My sister, my brother, my mom, and Angela.

Q.    Okay.  And your dad is not moving?

A.    No.

Q.   You say they got into a fight.  Who did you mean by that?

A.   They got into not a physical, I think it was just a verbal that day.

Q.   Okay.

A.   And then that was the last time we lived on Evans.

Q.   And when you say "they," are you talking about --

A.   My mom and dad.

Q.   And where were they fighting?

A.   They were fighting in the house.

Q.   Okay.  And do you remember what the fight was about?

A.   I do not.

Q.   Were they yelling at each other?

A.   Yes.

Q.   So when you -- I take it you leave the house, you walk out of the house?

A.   Uh-huh.

Q.   And it's you, your brother, your sisters.  Is your mother with you at that point?

A.   Yes.

Q.   And you're walking over to Cote Brilliante; is that right?

A.   Uh-huh.

Q.   And you said a minute ago that you were robbed at gunpoint?

A.    Yes.

Q.    What exactly happened?

A.    They -- it was kind of quiet, because we were all there.  We didn't really know what was going on.  And he told my mom to give all her money in her purse and stuff like that.

Q.    And he had a gun you said?

A.    Yes.

Q.    And did you see the gun?

A.    Yes.

Q.    And was the gun pointed?

A.    It was pointed.

Q.    Did your mom turn her stuff over to him?

A.    Yes.

Q.    And after that happened, did your mom talk to you at all about what had happened?

A.    I don't recall, no.

Q.    And from there you continued walking to Cote Brilliante; is that right?

A.    Yes.

Q.    Was that something that you recall happening frequently in the Ville?  I mean, was it something that you either experienced or heard about, getting robbed at gunpoint?

A.    Yeah.  It definitely happened quite often in the Ville area.  I remember on one occasion my sister and I were

walking, coming from school, getting off the bus, and, you know, shots going right past us.  I remember having guns put up to my sister and I.  We were walking another time, it was kind of later, and we were walking, and we had a gun pulled out on us for not giving a number, giving our number away.

Q.    Like your phone number?

A.    Yeah.

Q.    And you just mentioned shots being fired?

A.    Yeah.

Q.    Was that seeing -- shooting or hearing gunfire, was that something that was, you know, common or --

A.    Yeah, it was common.  It wasn't that we didn't run, it was something that happened, so --

Q.    Okay.  And you don't recall whether or not your mom ever talked to you about the robbery on the move day?

A.    No.

Q.    Were you aware of why you were moving from Evans Street to Cote Brilliante?  Do you know what the reason was?

A.    No.

Q.    Did you find out at any point later on why your father didn't move with you?

A.    No, we never really talked about it.  It was just that last time that -- that last fight, we were gone.

Q.    When you moved, did you -- were you bringing stuff with you or was it just you left with --

A.    We left.  Nothing.

Q.    Prior to moving, did you have any idea that you were going to be moving?

A.    No.

Q.    So your mom never had a discussion with you in advance --

A.    Never.

Q.    -- saying we're going to move to Cote Brilliante?

A.    No.

Q.    Cote Brilliante, was that a house that you were familiar with that you moved into?

A.    Yes.

Q.    Whose house was that?

A.    My grandfather.

Q.    Was your grandfather living in that house when you moved there?

A.    Yes.

Q.    Who else lived in that house, do you recall?

A.    Just my grandfather.

Q.    Do you remember if any of your sister's brothers were living there at the time?

A.    I don't recall them living there.

Q.    Do you ever recall Jerome or Raymond living in that house?

A.    Not at the same time as us, but before, yes.

Q.    Okay.  Is it possible that they lived there when you were living there?

A.    It's possible, yeah.

Q.    Your grandfather, his name is Otha; is that right?

A.    Yes.

Q.    Where did your grandfather live in the house?  Where was his --

A.    He lived in the basement.  There was a -- it's not like an apartment, but he definitely had his own kitchen, bathroom, and things like that.  So he was in the basement.

Q.    Did your grandfather spend a lot of time there?

A.    Yes.

Q.    When you were growing up and living in Cote Brilliante, did your grandfather, did he have a girlfriend?

A.    Yes.

Q.    And where did the girlfriend -- where did his girlfriend live?

A.    She lived up the street on Cote Brilliante.

Q.    And did your grandfather used to spend a lot of time with her?

A.    Yes.

Q.    Did your grandfather ever stay over at her house?

A.    Yes.

Q.    When your grandfather was in your house, did he primarily stay in the basement or did he, you know, come up a

lot and spend time with the family?

A.    He stayed in the basement for the most part.  He would come up, but he spent a good majority of the time in the basement.

Q.    Did he have a job while you were living there?

A.    I do not recall.  I'm not sure.

Q.    When you -- after you moved to Cote Brilliante, did you ever go back to Evans Street?

A.    Yes.

Q.    And why would you go back there?

A.    We went to visit.  My grandmother lived on the street and my aunts and cousins and friends were still there.

Q.    Did you spend much time with your father after you moved to Cote Brilliante?

A.    No.

Q.    Did you ever go back to your old house on Evans Street?

A.    Yes.

Q.    Was your father living there?

A.    Yes.

Q.    And what was he like when you would go back and visit?

A.    He was still drinking.  Like I said, most of our time was spent with family and friends.  We weren't really there for him.

Q.    And did he ever make an effort after you moved out to come and pick you up or spend time with you?

A.   No, never.

Q.   What about your brother, did he have any kind of relationship with your brother after you moved?

A.   Did my dad?

Q.   Did your dad, yeah, did JR have any kind of a relationship with your brother?

A.   No.

Q.   He didn't pick your brother up and take him to play basketball or --

A.   No.

Q.   Your mother has -- your mother has brothers and sisters, right?

A.   Yes.

Q.   And is one of your -- I'm sorry, is one of your uncles, is his name Jerome?

A.   Yes.

Q.   Do you know, is Jerome younger or older than your mother?

A.   He's younger.

Q.   Do you know how much younger he is?

A.   I do not.  He's the youngest of six.

Q.   Do you know how much older Jerome is than you?

A.   No.

Q.   Okay.  Was there a time -- did Jerome spend a lot of time at the house on Cote Brilliante?

A.   Yes.

Q.   And what was Jerome's relationship like with your brother Billie?

A.   What was his relationship like?

Q.   Yeah.  Did they have a relationship?

A.   He definitely wasn't the father figure.  He didn't pick him up and, you know, teach him how to play basketball and things like that.

Q.   So they weren't close?

A.   No.

Q.   Did he -- did you see them interact?  Did you see -- did Billie and Jerome have any interactions that you observed?

A.   The only interactions that I remember were physical.  No.

Q.   So they weren't very friendly with each other, is that -- well, strike that.

     Well, did Jerome -- did Jerome ever take care of you guys?

THE COURT:  Did he ever do what?

Q.   Take care of you guys?

A.   No.

Q.   Did he ever cook dinner for you guys?

A.   No.

Q.   Did he ever do things for you when your mother wasn't

in the house?

A.    No.

Q.    Did -- now, you said a couple minutes ago that you said that you had seen some physical interactions before --

A.    Yes.

Q.    -- between Jerome and Billie?

A.    Yes.

Q.    What did you see?

A.    I remember him hitting on him a lot. But, yeah, things like that. But I don't remember him ever, you know, being that father figure.

Q.    Well, were these -- like when you said he was hitting on him, would he just -- were these fights or how would you describe them? If you can describe them in more detail actually.

A.    They weren't really fights. They were more of Jerome hitting on Bill. Bill wasn't a violent kid. And, you know, he was a really respectful kid. He would never hit an adult back.

Q.    Okay. When Jerome would hit Billie, would he punch him, would he slap him?

A.    Punch him, slap him.

Q.    And would he say anything when he did these things?

A.    I'm sure he did, but I don't know exactly what he was -- I would just imagine him just smacking him without

saying anything.

Q.    What does Jerome look like?

A.    He's a big guy.  He's tall.  He's about maybe six three.  He's big.  He's a big guy.

Q.    When you say "big," is he muscular or is he big like in terms of how much he weighs?

A.    Yeah, in terms of what he weighs.  He's a big guy.  He was a football player for Sumner.  He's a big guy.

Q.    Was he bigger than Billie?

A.    Yes.

Q.    Was he older than Billie?

A.    Yes.

Q.    Was this -- you know, how often did this interaction between Billie and Jerome take place where he would, you know -- where he would hit him and be rough with him?

A.    How long?

Q.    Yeah, did this go on for years or was this something that just happened a couple times?

A.    It went on for years when he was younger up until probably the time he was still in the home.

Q.    Was Jerome ever physical with you and your sisters?

A.    No.

Q.    Did you ever see Jerome be physical with anybody else?

A.    No, never.

Q.    Now, when you were living on Cote Brilliante, your

mother was living with you the entire time; is that right?

A.    Yes.

Q.    And do you still live on Cote Brilliante?

A.    Yes.

Q.    And does your mom still live there?

A.    Yes.

Q.    And who else lives with you on Cote Brilliante today?

A.    Nicole.

Q.    And that's your sister?

A.    Yes.

Q.    And so I want to ask you a couple questions about your mother.  When you were living on Cote Brilliante when you were a child, did your mother drink alcohol?

A.    On Cote Brilliante?

Q.    Yes.

A.    Yes.

Q.    Do you remember seeing her drink alcohol?

A.    Yes.

Q.    Did you ever see your mother intoxicated while you were living at Cote Brilliante?

A.    Yes, on several occasions.

Q.    Now, her being intoxicated, was this something that was a regular thing or was it something that happened, you know, once in awhile or just on the weekends?

A.    It was definitely on a regular basis.

Q.    When you say "regular basis," was it a daily occurrence?

A.    Daily, yes.

Q.    What was your mother like when she would drink alcohol?

A.    She was loud.  She would like fight a lot.  She got in a lot of fights when she was drinking.

Q.    When you say "fights," did you see her get into physical fights or verbal fights?

A.    She got in a lot of fights.  She would -- it wasn't fighting that -- she would hit on Billie a lot.  I know she would get in a lot of fights at bars and things like that with different people, yeah.

Q.    When she went out to bars, did you ever go out to bars with her?

A.    No.

Q.    Was her fighting at bars something that you heard about?

A.    Yes.

Q.    Your mom -- well, how did you know she was drinking around the house?

A.    We were used to it at that point.  You know, we lived on Evans with another alcoholic parent, my dad.

Q.    So you knew what an alcoholic looked like?

A.    Yeah.

Q.    Did you actually see her drinking alcohol in the house?

A.     Yes.

Q.     Okay.  What would she drink?

A.     Anything.  Anything and everything.  I'm not really sure what it was, but we saw her drink everything.

Q.     So describe this for me in terms of what you remember seeing.  She'd be in the house, right?

A.     Yes.

Q.     And would she have a drink in her hand or what did she -- you know, what did she drink and what did she look like when she was drinking?  Did you see beer bottles in her hand?

A.     I saw beer bottles everywhere.  We actually -- when I was younger, we shared a room.  I actually shared a room with my mom when I was younger, so we slept in the same room.  So I saw a lot of alcohol, a lot of drinks on the ground, in the bed, everywhere.

Q.     Okay.  So she would drink and then leave bottles laying around the house?

A.     Yes.

Q.     And did she keep a lot of alcohol in the house?

A.     Yes.

Q.     When your mom would drink, would it be by herself or would she drink with friends or other people?

A.     She would drink with friends.  She used to, you know, go to work intoxicated.  I went to work with her a couple of

times. She would drink at work with coworkers on the job, yeah.

Q. Do you remember your mom ever going to work drunk?

A. Yes.

Q. Did your mom ever have a hard time getting up and going to work because she was intoxicated the night before?

A. Yes.

Q. Was that something that happened regularly or every once in awhile?

A. It definitely happened on several occasions where my sister Nicole, she was the oldest, she would have to get us ready for school because my mom was intoxicated from the night before.

Q. Let's talk about that for a second. When your say your sister Nicole would get you ready for school, what would she, you know -- how would that work? How would she get you ready for school? Was Nicole herself going to school?

A. She was. She was going to school. She would get us up, get us dressed, do our hair, things like that. Sometimes we didn't get up because we didn't have to because we knew that she wouldn't be up until later. Half of the time she didn't know we were there until she got up.

Q. And when you say "she," are you referring to --

A. My mom.

Q. So your mom didn't know you didn't go to school?

A.   No.

Q.   Because she was still sleeping?

A.   Yes.

Q.   Did your mom drink in the house?  Did she drink out of the house?  Where would she -- strike that.  I think you described her drinking in the house.  Did she ever drink when she went out?

A.   Yes.

Q.   Where did your mom go?

A.   She went to a place called Lace, it's a club.

Q.   Lace?

A.   Uh-huh, on Martin Luther King.  It was just a couple of blocks over.

Q.   And who would she go there with?

A.   Cathy, Deborah, her two friends.  And LaTanya sometimes.

Q.   Did you know these people, Cathy and Deborah and LaTanya?

A.   Yes, they spent plenty of time at the house.  They would sit at the house and drink too.

Q.   Okay.  So they would drink at the house and sometimes they would drink outside of the house?

A.   Yes.

Q.   When your mom would go to Lace, when was that?  Was that during the day?  Was that at night?

A.    It was at night.  Well, probably at like five.  Like a happy hour and sometimes before.

Q.    Okay.  So you remember going out -- her going out around five o'clock?

A.    Yes.

Q.    And sometimes it would be later than that?

A.    Yeah.

Q.    And when she would go there, do you know how long she would stay out?

A.    She would be out until really late.  We were asleep by the time she would get in.

Q.    When your mom went out, you know, to a bar or club at night, who was watching you guys?

A.    No one.  Nicole.  She was the oldest, so --

Q.    So Nicole would watch you, your brother, and your two sisters?

A.    Yes.  Well, Ann, yeah.

Q.    I'm sorry, your one sister, that's right.  Well, I guess she was watching herself two, I imagine.

A.    Yeah.

Q.    Your sister was -- do you have any idea how old Nicole was at this point?

A.    I do not.

Q.    In terms of dinner, who would cook you dinner if your mom went out to a club at five o'clock?

A.   Nicole cooked sometimes.  But it's pretty much grab and go, whatever you got is what you ate.

Q.   Aside from Nicole, was there anybody else that watched you if your mom wasn't there?

A.   No.

Q.   Did your grandfather ever come upstairs and cook dinner or --

A.   No.

Q.   Was anybody there to make sure you guys did your homework?

A.   No.

Q.   So you had said that your mom would oftentimes stay out very late?

A.   Yes.

Q.   Was there times that you ever saw your mom come home from the bars?

A.   Come home?  Yes.

Q.   And was she intoxicated?

A.   Yes.

Q.   Do you remember any specific instances of your mom coming homing from the bar intoxicated?

A.   Yes.  I remember -- I remember several times, but I remember one time when she came in -- well, she didn't come in.  She was actually, the neighbors knocked on the door and said she was drunk, and she was at the wrong house.  She was

sleeping on the porch at the neighbor's house.

Q.    Okay.  And did you -- how did she get home?

A.    We had to help her home, help her in the house.

Q.    Was it frequent that when your mom came home late and you happened to be awake and you happened to see her that she was intoxicated?

A.    Yes.

Q.    Were there any nights where your mother did not come home at all?

A.    Yes.

Q.    And on those nights, did you have any idea where she was?

A.    No.  On some occasions she had a boyfriend later on, so she would stay with her boyfriend at the time.

Q.    Okay.  And who was her boyfriend?

A.    It was Louis.  I'm not sure what his last name was.

Q.    And what was Louis like?

A.    Louis, I remember him being -- he was pretty controlling.  He was controlling.

Q.    Controlling to your mother?

A.    Yes.

Q.    In what way, do you remember?

A.    I remember him yelling a lot.  I remember them having, you know, an altercation.

Q.    A physical altercation?

A.   Yes.

Q.   And where did that happen?

A.   That happened outside the house.  They were both drinking.  I think -- they were arguing over some car keys. He wanted to drive, and she didn't want to give him the keys. But he ended up driving anyway.  So they were fighting over that, though.

Q.   And was that a physical altercation as well as a verbal one?

A.   Yes.

Q.   So do you remember them, you know, slapping or punching or pushing?  What do you remember about it?

A.   Yeah, a lot of pushing and hitting.

Q.   So your mom was with Louis.  Do you remember how long they were together for?

A.   I do not.

Q.   Do you know where Louis lived?

A.   He lived downtown.  It was called Gentry's Landing.

Q.   Had you ever been to his house before?

A.   Yeah, I went there several times.

Q.   Okay.  And would your mother sometimes stay there overnight without you?

A.   Yes.

Q.   When your mother would stay with Louis overnight, would you guys stay at Cote Brilliante?

A.   Yes.

Q.   And during those times, was there anybody supervising you?

A.   No.

Q.   Was there anybody making sure that you had food to eat?

A.   No.

Q.   Was there anybody making sure you didn't leave the house and go someplace?

A.   No, that's something she told us not to do before she left sometimes.  And, of course, we were younger so we definitely got outside a lot.

Q.   And when you say "we," you're referring to yourself --

A.   And my sisters and brother.

Q.   Were there times when your mom would be gone for multiple days at a time?

A.   Yes.

Q.   Now, you had said a little while ago that when your mother was intoxicated, she would fight and she would hit on Bill?

A.   Uh-huh.

Q.   When you say that your mom used to "hit on Bill," do you have specific recollections of your mom hitting Bill?

A.   Yes.

Q.   Did that take place usually when she was intoxicated or did she do that when she was sober?

A.    It was when she was intoxicated.

Q.    What do you remember about your mom hitting Bill?  Did she hit Bill with her fists?  Did she hit with an object?  Did she hit with an open hand?

A.    Hit with anything.  She would hit him with her fists.  She would hit, you know, with a paddle.  She had a paddle that she would hit him with a lot of times.  I remember him having a lot of nose bleeds when he was younger.  She used to hit him in the face and stuff a lot.

Q.    You describe a paddle?

A.    Uh-huh.

Q.    What did the paddle look like?

A.    It was just a long wooden paddle.

Q.    All right.  So did it have a handle?

A.    Yes.

Q.    Like a baseball bat kind of handle or did it look like something else?

A.    No, it was flat.  It was a flat handle.

Q.    Did it get wider at some point or --

A.    Wider?

Q.    I'm just trying to imagine what the paddle looked like.

A.    It was just a long wooden handle, I believe, like maybe five inches.

Q.    And that was the handle or that was the paddle part?

A.    The paddle part.

Q.    Okay.  What was the paddle normally used for?  I mean, did it have a function outside of hitting people?

A.    No.

Q.    So the sole purpose of the paddle was to hit somebody?

A.    That's what she used it for.

Q.    You never saw it used for anything else?

A.    No.

Q.    Do you remember where she used to keep the paddle?

A.    I do not.

Q.    How many times did you see your mom -- if you can recall, how many times did you see your mom hit Bill with the paddle?

A.    I don't recall.  It was several times though.

Q.    And was this at a specific point in Billie's life or did it happen over a number of years?

A.    Over a number of years.

Q.    Do you remember why your mom would hit Bill with the paddle?

A.    No.

Q.    Was your mom a tough disciplinarian?  Would you think of her as a tough disciplinarian?

A.    I think when she wasn't drinking, I would say so.  She was definitely tough.  I remember when we were younger, like growing up, if you were in an altercation, or if you were about to be in an altercation.  I remember Bill was about

to -- some guys were trying to jump Bill.  And like I say, he's not a conversational person.  And he came home.  And my mom found out about it, and, you know, you're supposed to stay there and fight the person.  You know, that's what we were taught growing up.  You stay there and you fight the person.  So instead, you know, when you don't, you get beat up.  So she used to beat up on him for not fighting back.

Q.    So your mom wanted your brother to fight rather than run?

A.    Absolutely.

Q.    And so she beat Billie because he didn't fight?

A.    Yes.

Q.    When your mom -- I mean, that's one instance that you just described.  When your mom beat Billie, was it because he had done something wrong or did she just beat Billie without having a reason or both?

A.    Both.  Definitely both.

Q.    Do you remember any instances where your brother was beaten for something that he had done wrong?

A.    I remember one time when Bill came in late.  We had a curfew, we did have a curfew, and she was just -- she just so happened to be home this day.  And she -- he came home a little bit late, it wasn't like an hour or anything, it was just a few minutes late.  And I remember her beating him up that day, and making him stay on the porch.  She wouldn't let

him in the house.  She told him to sleep outside.

Q.    Okay.  So you remember a time when your mother wouldn't let Bill into the house because he had come home late?

A.    Yes.

Q.    Let's talk about that for a minute.  Was that -- was that something that was your mom not letting your brother into the house or kicking your brother out of the house, was that something that you saw your mom do?

A.    Yes.

Q.    And you described one instance just a minute ago?

A.    Uh-huh.

Q.    Were there other instances where your mom threw your brother out of the house or locked him out of the house?

A.    Yes.

Q.    Did this happen one or two times or did it happen more than that do you think?

A.    It happened more than that.

Q.    The night that you were just describing when Bill came home late --

A.    Uh-huh.

Q.    -- and you said that your mother told him to sleep on the porch --

A.    Uh-huh.

Q.    -- do you remember how long he had to stay outside that night?

A.    He was out there for awhile.  He later actually left, so --

Q.    Did he try to come back in at any point that night?

A.    Yeah, he stayed out there for a little while.  He kept ringing the doorbell, asking if he could come back in.  He apologized several times.  But she still wouldn't let him in, so he did leave.

Q.    Do you know where he went?

A.    I do not.  We actually later on went looking for him in the car, my mom and I and my sisters.

Q.    Did you find him?

A.    We did not.

Q.    So at some point did your mom, your mom wanted to let him back in the house?

A.    Yes.

Q.    But he was already gone by that point?

A.    Yes.

Q.    Do you remember how old Bill was when that happened?

A.    I do not.  Probably 13 or 14 maybe.  I'm not sure.

Q.    Okay.  Can you think of other times that Bill was locked out of the house that you specifically remember?

A.    Not specifically, but he was -- yeah, he was thrown out -- well, not thrown out, because he wasn't thrown out that night.  He just came in late and that was her way of disciplining him by making him stay outside.  So, yeah,

that's the only thing I can remember offhand.

Q.    Okay.  How could you be sure that there were other times that he was locked out?

A.    Oh, we definitely -- we were there, and I remember asking if she would let him in sometimes.

Q.    Okay.  So not that night, but another time you remember?

A.    Yeah.

Q.    What did she say when you asked if you could let him in again?

A.    No, she wouldn't let him in.

Q.    Was she intoxicated that you recall?

A.    Sometimes she was; sometimes she wasn't.

Q.    When Billie was locked out on those other occasions, do you recall whether he came back that night or was gone for a longer period of time?

A.    That night?  Can you say that one more time?

Q.    Yeah, that was kind of a weird question.  Let's talk about that night.  That night that you described when you and your mother and your sisters went out looking for him --

A.    Uh-huh.

Q.    -- how long was he gone for, do you remember?

A.    He was gone -- I think he actually came back.  He probably came back in the next day, I'm not really sure.  Since she was looking for him, I'm assuming that he came back

and she let him back in.

Q.    Do you remember other times when Bill was locked out, how long he might have been out for?

A.    No.  A couple of days.

Q.    Well, and when he was out of the house, do you have any idea of where he went or where he stayed?  Did you ever see him when he was -- during a period where he was not allowed to be in the house?

A.    No.

Q.    You talked about your mother hitting Billie with this paddle?

A.    Yes.

Q.    And you had said just before that that you remember her hitting him with anything she could get her hands on?

A.    Uh-huh.

Q.    What do you recall her hitting Billie with other than that paddle?

A.    Her fists, cords, shoes, anything.

Q.    Do you know, was there some sort of reason that led up to her doing this?

A.    No.

Q.    Do you recall?

A.    No.

Q.    Did your mother beat you?

A.    No.

Q.    Did you have any insight into why your mother specifically beat on Bill?

A.    I'm not sure.  I'm not exactly sure.  I think she used to kind of compare him to his dad, so --

Q.    Why do you think that?  Did she ever say anything like that?

A.    Yeah -- well, she used to tell him that he would be just like his dad and things like that.  So --

Q.    So did your mom in addition to beating him, did she used to say things to Bill that were hurtful or demeaning?

        MS. COSTANTIN:  Judge, I'm going to object to the leading at this point.

        THE COURT:  Sustained.

A.    Yes.

Q.    Would your mom when she was beating Bill, would she be saying anything?

A.    Again, she would tell him that he would be like his dad, which, you know, that wasn't a compliment since he was on drugs and drinking and things like that.  And he wasn't -- you know, like I say, he never provided for us, so that wasn't really a good thing.

Q.    Was that a common thing that she would say to him?

A.    Yes.

Q.    Did she say anything else to him along those lines?

A.    Not that I can recall.

Q.    When your brother was beaten by your mom, how did your brother react?

A.    He didn't really react.  He used to just kind of ball up and take it.  Like I said, he would never hit her back or anything like that.

Q.    Was he upset by it?

A.    We didn't really talk about it.

Q.    Just going back to Louis for a moment.  You had mentioned that Louis used to drink?

A.    Uh-huh.

Q.    Did your mother and Louis used to drink together?

A.    Yes.

Q.    Was that in the house?

A.    Yes.

Q.    Did they ever go out to bars and drink as far as you know?

A.    As far as I know.

Q.    Did Louis -- did Louis die at some point?

A.    Yes, he committed suicide.

Q.    And did that happen while he was dating your mom?

A.    Yes.

Q.    And how did your mom take that?

A.    She took it pretty hard.  He actually called her right before he was going to do it, jump off a bridge.  He called her right before that.

Q.    When -- after Louis died and you said your mom took it pretty hard, did that have any impact on her drinking as far as you could see?

A.    Yes.

Q.    And how so?

A.    It definitely -- her drinking definitely got worse after that.

Q.    And to be clear, was your mom drinking before she met Louis?

A.    Yes.

Q.    Was she drinking on a daily basis before she met Louis?

A.    Yes.

Q.    Was she getting intoxicated before she met Louis?

A.    Yes.

Q.    And was she going out with Deborah and Cathy and LaTanya before she met Louis?

A.    Yes.

Q.    And when she was with Louis, she kept drinking?

A.    Yes.

Q.    The beatings that you described of Billie, was that -- did that happen before Louis?

A.    It happened before and during, yeah.

Q.    Did it also happen after?

A.    After Louis?

Q.    After Louis died.

A.    Yes.

Q.    Was that something that you -- the beatings, was that something that you remember happening throughout the time you lived on Cote Brilliante, or was that something that just started up at some point later on?

A.    No, it definitely happened during my time on Cote Brilliante.

Q.    When you were younger?

A.    Yes.

Q.    Do you think Billie was treated differently by your mother than you and your sisters?

A.    Yes.

Q.    How so?

A.    Like I said, there was a lot of comparisons.  I think that she was -- it was a lot for her since she was a single parent.  You know, my grandfather was in the house but she didn't get much help from him.  So it was a lot having four kids on her own.  And, like I said, I didn't know at what point she began working because she did have several jobs.  So it was financially hard on her.

Q.    Do you think your mother was "stressed out" for lack of a better word by the situation?

        MS. COSTANTIN:  Judge, once again I'm going to object to leading.

A.    Yes.

THE COURT: Sustained.

Q.    Do you think your mother was an angry person?

MS. COSTANTIN: Once again, I'm going to object.

THE COURT: Sustained.

MR. MONTROY: Your Honor, it's an open-ended question -- that would be my position, Your Honor, that it's an open-ended question that she can certainly say yes or no to.

A.    I think she was out there --

THE COURT: Wait. I'll sustain. Ask another question.

THE WITNESS: Oh, I'm sorry.

Q.    What was your mother's demeanor like during the time that you were living on Cote Brilliante? What was her personality like?

A.    Most of the time she was drinking, so, again, it was pretty violent. She was pretty angry, I think, or bitter about, you know, the situation, her situation.

Q.    Was your mother the kind of person that you could go and, you know, share your feelings with?

A.    No.

Q.    Was your mother the kind of person, talking about when you were a child here or a teenager, was your mother the kind of person that you could go to and share your problems with?

A.    No.

Q.    Why is that?  Why do you say that?

A.    She just isn't that -- she wasn't that parent.

Q.    Did your mother ever share any of her problems with you when you were a child?

A.    No.

Q.    What about when you were a teenager?

A.    No.

Q.    Did you ever see your mom -- well, strike that.  Was your mother affectionate?

A.    No.

Q.    Was she affectionate with Bill?

A.    No.

Q.    Do you remember meeting with Billie's lawyers prior to Billie's trial?

A.    I do not.

Q.    Do you remember ever an incident or a time where you were at Mr. Sindel's office prior to trial?

A.    Yes.  The only time I remember is my mom was actually there, and I went up there.  It was my Homecoming night, so I went up there to show her my outfit, and then I left.

Q.    It was your Homecoming night.  Where were you going to school at the time?

A.    Clayton.

Q.    And was that nearby to Mr. Sindel's office?

A.    Yes.

Q.   So you went to Mr. Sindel's office and you showed your mother your outfit?

A.   Yes.

Q.   Do you remember if you had any conversations with any lawyers or anybody working on Billie's case that night?

A.   No.

Q.   Is it possible that it might have happened, and you just don't remember?

A.   I don't think so.  I had my friends with me.  We were actually on our way.  We were all there, so I don't remember being there for a long period of time.

Q.   You've testified about a number of different things today including your mother's drinking, including your mom beating on Bill, your father.  If you had been asked questions by Billie's lawyers, the trial team at the time of Billie's trial, are these things that you would have talked to them about?

A.   Yes, absolutely.

Q.   If you would have been asked to testify at trial about these things, would you have done so?

A.   Yes.

     MR. MONTROY:  Your Honor, if I could just have the Court's indulgence?

     THE COURT:  Sure.

     (There was a conference held off the record.)

MR. MONTROY: Your Honor, I don't have any additional questions.

THE COURT: All right. Ms. Costantin.

CROSS-EXAMINATION

BY MS. COSTANTIN:

Q. Ms. Allen, I want to make sure I understand some chronology, because I think there's a little confusion about the Evans to Cote Brilliante move.

A. Uh-huh.

Q. Okay. You were -- you described yourself as really, really young at the time that happened; is that right?

A. Yes.

Q. The move from Evans. Were you in kindergarten, do you think that was?

A. When I moved?

Q. Yes.

A. No.

Q. First grade?

A. No.

Q. Well, how much younger are you than Billie?

A. About two and a half years.

Q. Okay. And if your mom thought that you had moved when Billie was in third grade, you don't think that was correct, which would have made you first grade or kindergarten?

A. I think I was a little bit older. I'm not exactly

sure.

Q.    But it was definitely in the younger grades of elementary school that you moved; is that right?

A.    I'm not sure.

Q.    Okay.  Well, when you say "really, really young," what does that mean?

A.    When I moved?

Q.    Yeah.

A.    I never said really, really young when I moved.  I said I was young when I lived on Evans, not when I moved.

Q.    I believe you testified, and maybe I'm wrong, that you said the time you moved when you were robbed, you were really, really young?

A.    For my understanding I thought that I was maybe 12.  It could have been younger, I'm not exactly sure about age.

Q.    And 12 would have been like fifth or sixth grade for you?

A.    Yes.

Q.    Okay.  But you're not sure about that?

A.    No.

Q.    Okay.  And it could have been significantly younger than that?

A.    Yes.

Q.    Okay.  And after the time you moved to Evans, you had very little contact with your father; is that right?

A.    Yes.

Q.    And, in fact, when you go back to what you call "the house," it wasn't to see him?

A.    No.

Q.    And to explain the Evans house, the Evans house was actually a duplex or an apartment?

A.    Yes.

Q.    So when you're going back to the Evans house, it's to visit your grandmother; is that right?

A.    No.  I mean, we went over to the house, but we were there -- we had neighbors that were friends.  We had a grandmother on the street, and we had an aunt and cousins.  So we would -- we knew everybody, so we would just be on the street.

Q.    So once you moved, I believe you testified that neither you or Billie had any relationship with your dad?

A.    No, we didn't.

Q.    Okay.  Let me talk for a moment about Jerome.  Do you remember Jerome boxing with Billie?

A.    Boxing?  No.

Q.    You don't remember anything involving boxing, Jerome and Billie boxing, Jerome teaching Billie how to box?

A.    No, I don't remember that.

Q.    And you said that he would punch him.  Was he punching him in the chest?

A.    Yes.

Q.    And is it a "you got to toughen up boy" punch in the chest kind of thing?

A.    No.  There was several cases that he would just come into the house, and I'm not sure why, but he would just punch on him.

Q.    So it wasn't any sort of right of passage or anything like that with the family?

A.    No.

Q.    Now, at the time of the trial -- oh, let me ask you one other thing.  You indicated that you went to your mom's work sometimes with her?

A.    Yes.

Q.    What work was that?

A.    The public library.  And she worked at -- I can't think of the name right now, but it was like an energy assistance place not too far from here.

Q.    And those were jobs that she had when you were young?

A.    Yes.

Q.    When you were in elementary school?

A.    Yes.

Q.    At the time of the trial, you were 18 years old; is that correct?

A.    Yes.

Q.    Senior in high school?

A.     Yes.

Q.     Okay.  Now, you have no recollection of talking to anyone from the trial team; is that right?

A.     I do not, no.

Q.     Do you remember testifying?

A.     I do.

Q.     Okay.  So you recall that you did testify?

A.     Yes.

Q.     Okay.  Well, I want to talk to you a moment about some conversations that we have notes related to that you had with the trial team.  Your brother, I'm talking about Billie obviously, liked to do things to impress people when he was younger, correct?

A.     Yes.

Q.     And he would make stuff up sometimes in order to make people think he was more important than he was; is that right?

A.     Yes, I would agree with that.  We all did.  I said we all did.  Like I said, we came from a home where we didn't have much.  We all made ourself out to be more than what it was.

Q.     Okay.  So he would say things like he had a car or jewelry that he didn't really have; is that right?

A.     I'm not sure.

Q.     You don't remember him saying anything like that?

A.    No.

Q.    Do you remember him giving you money when you would go out?

A.    No.

Q.    I'm showing you what's been marked as Exhibit 420. These are notes, typed notes of interviews with you by Dr. David Randall --

A.    Uh-huh.

Q.    -- back before the trial.  And I'm directing you to -- I'm going to blow it up a little bit.  That last sentence states, "When I wanted to go out, he'd always give me money." Is that a correct statement or did Billie not give you money when you'd go out?

A.    I do not remember that.

Q.    Do you have any reason to doubt that these notes are incorrect statements of what you told him back in 1998?

A.    No.

Q.    And Billie used to take you to parties with him, didn't he?

A.    Yes.

Q.    And he used to pick you up from Wydown?

A.    Yes.

Q.    And Wydown is a middle school?

A.    Yes.  He was not driving.

Q.    So he was with a friend?

A.    Yes.

Q.    While you were in Wydown or was he in Wydown?

A.    I was in Wydown.

Q.    Okay.  So he's not driving because he doesn't have a car?

A.    Yes.

Q.    All right.  But he was old enough to drive by that point?  Or you're not sure?

A.    Yeah, I'm not sure.

Q.    So when you're in junior high school, he would pick you up and take you off to parties, right?

A.    Yes.

Q.    Now, did you know -- well, in fact, you did know that Billie was using drugs during this time?

A.    Absolutely not.

Q.    Okay.  You don't recall letting him into the house when he was stoned on marijuana?

A.    No.

Q.    I'm going to show you -- I'm going to show you Exhibit 638-A, which is a transcript of an interview between you and -- I'm sorry, between your brother and John Simon.  Hold on one second.  I want to make sure I've got it right.  Okay.  I'm looking at the transcript.  I'm going to blow up part of this.  And this is your brother talking about being intoxicated on marijuana.  And I'm going to read this to you.

Tell me if I'm reading it correctly:

"I was down the street from my mom's house and I was coming home and my little sister let me in the house 'cause my mom was gone.  And I had, I had came home and I called to ask for my mom, was she there, but she wasn't, so I said okay, well, I'm going to go home, if she wasn't there and sneak in the house, you know."

And then he continues:  "And my little sister let me in.  My little sister Yvette let me in.  And I was, my head was spinning and I was going up our steps.  We got a lot of steps to go upstairs.  And I was going upstairs to my room and I was trying to make it to the bed, and I -- just before I got to the bed, I just passed out, was out for a minute."

And the question:  "Do you know how long you had been smoking weed before that incident?"

"Like I said -- (inaudible).  I'm like -- no, no, I'm sorry, I misspoke."

And Mr. Simon says:  "Uh, I mean, how many hours, like how many hours straight had you been smoking before you passed out?"

Allen:  "All day.  And I started, I started like first thing when I get up."

Does reading that refresh your recollection about an incident when your brother came home stoned on marijuana and you let him in and your mom wasn't there, and he went up the

stairs and passed out?

A.    I kind of remember, but I don't remember it being marijuana.  I think I thought it was alcohol.

Q.    Okay.  So you thought he was drunk and not high?

A.    Yes.

Q.    Okay.  So during the time when -- well, when was it that you -- you're saying you had no idea at all that he ever used drugs at any time?

A.    Yes.

Q.    Okay.  But you believe that he was drinking during this time?

A.    Yes.

Q.    Okay.  And how old was he when you realized that he was drinking?

A.    How old?  He was -- maybe he was like 15 maybe.

Q.    But you never smelled marijuana on him or anything like that?

A.    No.

Q.    Did you know that he was selling drugs?

A.    No.

Q.    At any time?

A.    No.

Q.    You had no idea that Billie was selling crack cocaine?

        MR. MONTROY:  Objection, Your Honor, it was asked and answered.

THE COURT: Overruled.

A. No.

Q. Does that surprise you?

A. Surprise me?

Q. Yes.

A. No, because I heard about it in the past. I've heard people say things like that.

Q. And when did you hear that Billie was selling drugs?

A. Later on, like during the trial period, that's when I learned about it.

Q. Okay. So to clarify, you're saying when -- well, let me just ask you this specific question. Did you know that Billie Allen started selling crack cocaine when he was 14?

A. No.

Q. When did you learn that Billie had been selling crack?

A. During the trial.

Q. Okay. So until the trial, you weren't aware that he was selling any kind of drugs?

A. No.

Q. Remember when the house got shot up?

A. Yes.

Q. That's why the house got shot up, wasn't it, because he was in a bad drug deal?

A. We never knew exactly what happened.

Q. What was the discussion among the family as to what

happened or what the reason for the shooting was?

A.   There really wasn't a discussion.  When it happened, I remember the guys being at the house.  They came to the house several times.  They never said why they were there.  They just asked for Bill.  And we told them that he wasn't there. They never said that he owes us drug money or anything like that.

Q.   You never had any suspicions or anything like that?

A.   No, we -- no.

Q.   And no one in the family had any suspicions?

A.   No, they just knocked on the door.

        MR. MONTROY:  Objection, she can't testify what other people in the family --

        THE COURT:  Sustained.

        MS. COSTANTIN:  I'll rephrase.

BY MS. COSTANTIN:

Q.   No one in the family made a statement that the reason that -- what the reason was that the house got shot up?

A.   No.

Q.   Was your mother upset that the house got shot up?

A.   Yes.

Q.   And were there any consequences -- first of all, Billie wasn't even living at the house at that time; is that right?

A.   He -- he was not, not during the time the house was

shot up.

Q.    Okay.  That was a few months before the robbery, do you recall?

A.    Yes.

Q.    Were there any consequences -- did your mother have any consequences for Billie because they asked for him and then shot up the house?

A.    He wasn't in the home, so no.

Q.    Okay.  So she didn't tell him, you can't come back or anything like that?

A.    He wasn't living there.

Q.    I understand.  She didn't tell him -- you never -- you had no knowledge of her telling Billie, you can't come back or anything like that?

A.    No.

Q.    Did your mother know that Billie was selling drugs?

        MR. MONTROY:  Objection, Your Honor.

A.    I'm not sure.

        MR. MONTROY:  Objection as to what --

        MS. COSTANTIN:  I'll rephrase it.

        THE COURT:  Sustained.

Q.    Did your mother ever tell you that Billie was selling drugs?

A.    No.

Q.    Did she ever tell you any time up until today that

Billie was selling drugs?

A.   No.

Q.   Who has told you that Billie was selling drugs?

A.   I remember them bringing it out in the trial, in the last trial.

Q.   What do you mean them bringing it up?

A.   I remember them saying something about drugs during the last trial.

Q.   But who was "they" is what I'm asking?

A.   Oh, like the attorneys.

Q.   In the actual trial or in meeting with them before the trial or in what way?

A.   In the trial, in the actual trial.  When they brought up the shooting, they brought up that awhile ago.

Q.   I'm sorry, I didn't mean to interrupt you.

A.   Oh, no, you're fine.

Q.   Were you actually in the trial?  Did you watch the trial?

A.   Did I watch it?

Q.   Right.

A.   I was in the courtroom for a good part of the trial, yes.

Q.   And so you were able to hear evidence that Billie was selling drugs?

A.   Yes.

Q.    And that was -- was that the first time you had heard anything about it?

A.    Yes.

Q.    Now, there was never a child abuse investigation of your family, was there?

A.    No.

Q.    No DFS worker ever came to the house?

A.    No.

MR. MONTROY:  Objection, Your Honor, just to the extent that she would be able to know about that.

THE COURT:  You have to perhaps rephrase.

MS. COSTANTIN:  I'll just do to your knowledge.

Q.    Did you ever -- let me ask you this:  Did you ever have to talk to a social worker about what was going on at the house?

A.    No.

Q.    And you were never removed from the home by social workers; is that right?

A.    No.

Q.    The time period when your mother is dating Louis, do you have any idea what that time period was?

A.    I do not.

Q.    You don't know if Billie was in junior high school at that point?

A.    I don't recall.

Q.    What schools was it that Billie went to?

A.    He went to -- he went to Simmons, he went to Wydown, Glenridge, and --

THE COURT:  That was Glenridge?

THE WITNESS:  Glenridge.

A.    And Sumner.

Q.    I want to talk to you for a moment about the paddle. Is it correct that you saw your mother hit Billie with the paddle several times over a number of years?

A.    Yes.

Q.    Now, you also have used the term or perhaps counsel has used the term "beat."  I want to understand what that word means.

A.    Beat?

Q.    Yes, what does "beat" mean to you as in when you said that your mother beat Billie?

A.    A wooden paddle would be called beating.

Q.    Okay.  Is that what you're saying, when you're talking about when she beat him, you're talking about when she used the wooden paddle?

A.    The paddle, the extension cords, the shoes, the punches when he was younger, yes, that's beating.

Q.    So when -- you indicated before that some of these occurred when Billie had broken the rules?

A.    Yes.

Q.   Okay.  And some of them occurred when he had not; is that right?

A.   Yes.

Q.   What sort of things was he doing to break the rules? You gave the example of when he came home late and he got locked out, right?

A.   Yes.

Q.   What else?

A.   That's the only thing I can really think of.  I'm not really sure.

Q.   And how often was it that this would occur?

A.   The beatings?

Q.   Uh-huh.

A.   Often.

Q.   What does that mean?

A.   It happened not only with my mother, like I said, it happened with my uncle, he would hit him quite a bit.

Q.   Let's narrow it down to your mom.  How often would this happen?

A.   It happened often, not every day, but it definitely happened quite a bit.

Q.   And did this increase over time as Billie got older?

A.   Yes.

Q.   And was that because he had dropped out of school and wasn't going to school?  Was that a frustration to your mom?

A.   I'm not sure, because my sister Angela also stopped school, and she was a year younger, so they both weren't attending school at the time.  And we had all missed school, so I'm not really sure.

Q.   But he actually dropped out of school at Sumner; is that right?

A.   Yes, Angela did too at Clayton.

Q.   Did you ever tell a teacher that Billie was being, as you call it, beaten?

A.   No.

Q.   Did you ever tell anyone that?

A.   No.

Q.   What's the first person you told that?

A.   That he was beaten?

Q.   Right.

A.   Not sure.

Q.   Was it the attorneys, the new attorneys?  Was that the first time you ever told anyone about it?

A.   Yes, I guess so.  I'm not really sure.

Q.   You can't remember telling anyone before you told these new attorneys about any of the beatings; is that right?

A.   No, it wasn't anything we really spoke about, because it was kind of normal then.  It was just something that happened, so --

Q.   That's what I'm asking.  To understand, the first

person that you ever told about the beatings, that you can recall, are the attorneys here?

MR. MONTROY: Objection, Your Honor, she said she doesn't know the answer to that question.

THE COURT: Well, overruled. Cross-examination.

BY MS. COSTANTIN:

Q.    Is that right?

A.    Yes.

Q.    And you never told -- to clarify, you never told the attorneys at the trial anything about any sort of beatings; is that right?

A.    They never asked. Yes.

Q.    You don't actually remember any meetings with them, do you?

A.    I don't.

Q.    Okay. So you don't actually remember whether they asked or not, do you?

A.    Correct.

Q.    I'm showing you Exhibit 420. These are notes of Dr. Randall as noted -- as you can see at the top, "Interview with Yvette Allen." You have no memory at all of either of these conversations with Dr. Randall; is that right?

A.    I do not.

Q.    So to clarify, you have no memory of any questions that you were or were not asked?

A.     No.

Q.     Let's talk about the time you told the new attorneys about this.  When's the first time you met with the new attorneys?  I'm talking about this group of folks over here.

A.     It's been awhile.  I'm not really sure when.

Q.     Would that "awhile" be a year or two years or five years?

A.     Definitely it's been longer than two years.  I'm just not really sure.

Q.     And how many times is it that you've met with them?

A.     I saw them at the house a few times meeting up with my mom, but as far as me speaking to them, maybe just a couple of times.

Q.     And those couple times, were they just -- you're saying one was maybe over two years ago and the other one was just recently?  So it's only been a couple --

A.     Wait, speaking to them?

Q.     Yeah, speaking to them.

A.     That question I was meaning -- you asked me the first time we talked about the beatings, and I said that was --

Q.     Oh, I'm sorry, I'm not trying to be tricky here.  How many times did you talk to them about the case, whether it was an in-person meeting or on-the-phone meeting?

A.     It was probably a handful of times, it wasn't that often.

Q.    And did they ever ask you to give a written statement?

A.    No.

Q.    Did you ever write out anything about growing up or anything like that?

A.    No.

Q.    Did they ever show you anybody else's statements?

A.    No.

Q.    Did they show you anything at all?

A.    No.

Q.    When Billie was living at the house, would he get up in your mom's face and yell and cuss at her?

A.    Absolutely not.

Q.    So if your mom gave a statement -- I'm showing you Exhibit 258.  And I'll show you the first page so you can see what I'm talking about.  "Declaration of Juanita Petty Allen."  And now I'm going to go to the third page.

        THE COURT:  What number is that, please?

        MS. COSTANTIN:  258.  I'm going to page 3, paragraph 11.

Q.    And she's talking about -- can you see paragraph 11 on the screen?

A.    Uh-huh.

Q.    She's talking about the other side of Billie.  "He would talk back, yell, cuss and disobey me."  Does that refresh your recollection that Billie would talk back, yell,

cuss, and disobey your mother?

A.    No.

Q.    He never did that?

A.    No.

Q.    Let me talk for a moment about the times that you stated that your mom beat Billie.  Could you give me -- you've said "often."  Can you give me any better idea of how often, what often means?

A.    Several times a week.

Q.    And what was it that -- what would a beating consist of?

A.    Again, it was the punching, the --

Q.    And where would she punch him?

A.    In the face, in the chest.

Q.    And when she's punching him in the face, was he getting bruises in the face?

A.    No, I just remember nose bleeds.

Q.    He had a skin condition, didn't he?

A.    Yes.

Q.    Did that cause him to bruise easily?

A.    No.

Q.    So he's getting bloody noses from being punched in the face?

A.    Yes.

Q.    Any other injuries?

A.    No.

Q.    And you talked about the punching.  Was there any other way that she would strike him?

A.    She would hit him with the paddle, the extension cords. I remember her hitting him a lot where he would say that he couldn't breathe.  He had really bad asthma.

Q.    He would get upset and that would cause his asthma to kick in?

A.    No, it was from all the punching.

Q.    You said the paddle was several times over a number of years; is that right?

A.    Uh-huh, yes.

Q.    The extension cord, was that the same, several times over a number of years?

A.    Yes.

Q.    And then the hitting with the hand or the fist, was that several times over a number of years?

A.    Yes.

Q.    Did you ever see any injuries on Billie?

A.    No.

       THE COURT:  You want to take a minute and turn the phone off?

       THE WITNESS:  Yes.

       MS. COSTANTIN:  Oh, I was wondering what that was. Judge, I don't have anything more.

THE COURT: Okay. Redirect?

MR. MONTROY: Thank you, Your Honor.

THE COURT: Just a second. Before you start I want to check one thing here.

MR. MONTROY: Sure.

THE COURT: Whenever you're ready.

MR. MONTROY: Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. MONTROY:

Q.   Ms. Allen, just to be clear, your testimony was that Mr. Allen was beat by your mother a few times a week; is that right?

A.   Yes.

Q.   So when you say "over several years," is it fair to say that he was beat a few times a week over a several year period?

A.   Yes.

Q.   You said that Billie had a skin condition?

A.   Yes.

Q.   Could you describe that skin condition? What did it look like? What was it?

A.   I mean, they used to say it was like snake skin, so he used to like peel off a lot.

Q.   So his skin had the appearance that it was like coming off?

A.     Yeah.

Q.     And you don't know whether that would make it easier or harder to see the bruise, is that fair to say?

A.     Yes.

       MR. MONTROY:  Your Honor, I don't have any further questions.

       THE COURT:  All right.  You may step down.  You're excused.  We'll take a 15-minute break.

       (Court in recess from 10:08 a.m. until 10:26 a.m.)

       THE COURT:  You may call your next witness.

       MR. KANE:  Your Honor, we call Johnnie Grant.

       THE COURT:  Please get right up as close to the microphone as you comfortably can.

       THE WITNESS:  Okay.

       THE COURT:  Thank you, sir.  You may inquire.

                         JOHNNIE GRANT,

Having been first duly sworn, was examined and testified as follows:

                    DIRECT EXAMINATION

BY MR. KANE:

Q.     Good morning, Mr. Grant.

A.     Good morning.

Q.     You said your name is Johnnie Grant.  Do you go by Jay?

A.     Yes.

Q.     And do you live here in St. Louis?

A.    Yes.

Q.    Have you lived here your whole life?

A.    Yes.

Q.    Do you know the Petitioner in this case, Billie Allen?

A.    Yes.

Q.    How do you know him?

A.    He was my best friend.

Q.    When did you first meet Mr. Allen?

A.    I first met Billie at the age of 12 to 13 years of age --

Q.    Okay.

A.    -- at a softball tryout.

Q.    Okay.  Are you the same age as Bill or --

A.    No, I believe I'm a couple years older.

Q.    Okay.  And you met him you said at a softball tryout?

A.    Yes.

Q.    Where was that tryout?

A.    That tryout was located at Tandy Park.

Q.    Here in St. Louis?

A.    St. Louis, Missouri, uh-huh.

Q.    And was that an organized league?

A.    Yes.

Q.    And who organized it?

A.    A fellow by the name of Samuel Moore.

Q.    What do you remember about Billie?  And was it softball

or baseball?

A.    It was more so softball.

Q.    What do you remember about Billie's ability to play softball?

A.    Ability, none.  I mean, he did tryout, though, and he finally did make the team.

Q.    Okay.  Did he -- so when you say "ability, none," did he have difficulty with the skills needed for the game?

A.    Yes.

Q.    What type of difficulties?

A.    Actually there was one episode when he first tried out, and did hit the ball, and he ran directly to second base.  He couldn't tell from first, second base or anything, he just ran directly to second base.

Q.    After you got to know or met Billie, you said you became best friends at some point?

A.    Yes.  I mean, shortly after, you know, the tryout initially, you know, we, you know, stayed approximately like a block away.  And walked him home.  We just walked the same path actually.  And, you know, I discovered he stayed right down the street from me.  And after that, you know, we just started walking to baseball practice together and coming home together.

Q.    Okay.  And did your friendship develop beyond there to where you were spending time together --

A.    Yes.

Q.    -- outside of softball?

A.    Yes.

Q.    Did you ever visit Billie's house?

A.    Yes.

Q.    Could you please describe the house for us?

A.    Oh, God, the house, when I finally did go in the house, I mean, it was a mess.  I mean, it was real crappy.  I mean, it was roaches and rats around.  And he took me up to his bedroom.  And when I looked and saw the bed, the bed was nothing but springs, nothing but metal springs or whatnot.  And he covered it up with a comforter.  It was barbed wire from the material that's underneath, that's built inside the mattress, the springs, that's all it was was springs.

Q.    Okay.  And you said he covered something, the springs with something?

A.    Yes, with a comforter or a blanket.

Q.    Can you describe anything else about his room?

A.    It's just trashy, you know.  They didn't allow him to go in the refrigerator, so he kept food in his room, and clothes everywhere, dirty underwear everywhere.

Q.    When you say he kept food in his room, like did he have his own refrigerator or a cabinet or how was the food --

A.    No, he wasn't allowed to go in the refrigerator, so some way or another I can imagine that he actually tried to

store food, but it was rotten anyway.

Q.   Well, when you say he tried to -- you can imagine -- I guess I'm asking you for what you remember seeing or experiencing there in the room, and just to describe.

A.   It was a pig pen.  It was a pig pen.  You know, it had some roaches around and cups with eggs in them.  And it was just a pig pen.  That's about the best description I can give you.

Q.   Okay.  And the rest of the house, did you ever see any of the other bedrooms in the house?

A.   Yes.  The house wasn't up to par, period.

Q.   Okay.

A.   I mean, cracked floors, dirty.  You know, it was just filthy.

Q.   Did you have occasion to see Bill interact with other members of his family?

A.   Yes.

Q.   And who were the other members of his family who lived in that house?

A.   His mother -- his mom, Juanita; his grandfather, Otha; and his three sisters, Ann, Juanita -- Ann, Yvette, and Nikki.

Q.   Okay.  And did you see his family members interact with him when you were there?

A.   Yes.

Q.   Please describe for us what those interactions were like.

A.   I mean, just dogging him, talking about, you know, his skin, how ashy he was, how dirty he is, he's a bum, disrespecting him, cussing him out, hitting him upside the head.  On one occasion that I came over and visit him, just immediately when I came up the stairs, his sister Yvette just smacked him upside the head and asked me why was I his friend, he's dirty, don't be around him.  Then after she came back with some unclean underwear, some filthy underwear of his, and said why would you be a dirty dude friend like this and held up the underwear on a clothes hanger, you know, making fun of him.

Q.   Now, which sister was it that you remember this happening with?

A.   This was Yvette.

Q.   And which sister is that in terms of their ages?

A.   I think that's the middle age sister.

Q.   Okay.

A.   Or maybe the youngest sister.  I'm not sure, sir.

Q.   Do you remember at some point signing a declaration in this case?

A.   Yes.

Q.   And was that after you met with members of Mr. Allen's current legal team?

A.    Yes.

Q.    Okay.

MR. KANE:  Your Honor, I'm referring to Exhibit 266.

THE COURT:  Okay.

Q.    Can you see a copy of your declaration up on the screen there?

A.    Yes.

Q.    If you could look at paragraph 3, I'm going to blow it up so it's more clear.  Does this sound like the incident that you were just describing for us?

A.    Yes.

MR. HOLTSHOUSER:  I'm going to object to the leading form of the questions unless there's an inconsistency between his testimony and his declaration.

THE COURT:  Sustained as to leading.

BY MR. KANE:

Q.    Could you just read to yourself paragraph 3.

A.    "After we had been..."

Q.    Just to yourself is fine.

A.    Okay.  Fine.  Okay.

Q.    Does this refresh your recollection as to which sister it was that --

A.    Yes.

Q.    And who was it that this incident that you're describing was with?

A.   Yes, it was Ann, his sister Ann.

Q.   You had referred to, I believe you used the description of family members "dogging" Billie; is that correct?

A.   Uh-huh.

Q.   And which family members are you referring to?

A.   All of them.

Q.   All of them?

A.   All his family members who ever resided in that house, from grandfather to mother to all three sisters --

Q.   Okay.

A.   -- dogged him.

Q.   You personally observed them --

A.   Personally.

Q.   -- criticizing or disrespecting him verbally?

A.   Yes.

Q.   Okay.  Now, you also mentioned, if I understood you correctly, him being hit upside the head?

A.   Uh-huh, yes.

Q.   Who did you observe hitting him upside the head?

A.   All -- everyone that I just mentioned.

Q.   Okay.  Did you -- did you ever know an uncle he had named Jerome?

A.   I can't recollect.  I can't recollect at this minute.

Q.   Okay.  That's fine.

A.   I can't recollect.

Q.   You had mentioned his grandfather earlier?

A.   Uh-huh.

Q.   Where did his grandfather reside in the house?

A.   I believe the grandfather resided in the basement.

Q.   And what was Billie's relationship like with his grandfather?

A.   It was just like -- it was like any other, it was crappy.

THE COURT:  It was what?

THE WITNESS:  It was crappy.

A.   His grandfather, I just remember when Bill was hungry, there was a couple occasions when he asked his grandfather could he get something to eat because he was really hungry, and his grandfather just immediately told him no.  And when Bill did finally try to attempt to go get him something to eat, I mean, the grandfather pulled out a whip or a rope or a pot or pan or shoe and tried to him upside the head with it and run him away from the refrigerator.

Q.   You just mentioned a number of different objects that -- are those different incidents that you're remembering when things like that happened or you're just not sure what he picked up?

A.   Different incidents on occasions.  Even in the same situation, if the shoe misses then here come a pan.  If the belt don't connect, then here come a rope, I mean, on the

same occasion.  Just after him.

Q.   And what was Billie's reaction to these types of events with his family members either verbally or physically getting on him?

A.   Just pretty much just shaking his head, just making a comment like, that's a shame, that's a shame.  That's pretty much was his reaction.  Just asking me why my mom couldn't be his mother and why he couldn't stay at my house.

Q.   Did he, in fact, come to stay at your house at times?

A.   Yes.

Q.   Did he develop a relationship with your mother?

A.   Yes.

Q.   Was -- you had mentioned his mother, Juanita, before?

A.   Uh-huh.

Q.   Did you ever see her drink alcohol?

A.   Yes.

Q.   Did that happen inside the home when you were visiting Billie?

A.   Yes.

Q.   Tell us what you remember about her drinking habits.

A.   Her drinking habits, every -- well, I hung with him every day, so therefore when I went to the house, and we was in his room or whatnot, and we had to pass through her room in order to get to his room.  And she would be sitting up there drinking her bottle and smoking cigarettes.  And

shortly after that, here she come telling Bill to do something or just raging about something, maybe she didn't have a good day or anything, but she would come in that room and hit him upside the head and tell him to get out.

Q.   She would tell him to get out of the house?

A.   Uh-huh.

Q.   Did you know him -- did you actually observe him chased or forced out of the house by his mother?

A.   Yeah, I done saw him chased out the house with a belt before, and we both just running out the door.

Q.   Were there times when you came home or came to Billie's house with him and he could not get into his house?

A.   Yes, on several occasions.

Q.   What would happen?  Would he try to get in or --

A.   It was numerous of times where he tried to get in after he had been hanging -- we had been hanging out.  He's, "Let me go home."  I'd take him home.  I'd usually wait for him to get in the house.  I mean, his sisters, his grandfather, even his mother, they all be at the house, and he's knocking on the door, and they looking outside the window, raising up the blinds.  And they seeing him and they wouldn't let him in. On several occasions I seen that.

Also it's been times where I have just went to go pick him up with him not even knowing sometimes, and he's sleeping on the porch.

Q.   He was sleeping on his front porch?

A.   He was sleeping on his front porch.  And I asked him, "Have you been here all night?"  And he would say, "Yeah." And that was pretty much from that first time me seeing him doing that, that pretty much turned into a routine, he used to sleep on the front porch of his house.

Q.   And these -- you're saying -- you're describing some events where he's been locked out of his house.  And I think you said you got to know him around 12, 13, 14 years old?

A.   Uh-huh.

Q.   And you knew him up until the time of his arrest, correct?

A.   Yes.

Q.   During which period or periods of time in that span were those things happening of him being locked out of the house?

A.   From the age of 12 to 13.  I first noticed it when I was 12, 13, from that point on till the day of his arrest, I seen it.

Q.   Okay.  Do you remember when Billie got arrested?  I don't need a date, but do you remember the event that that happened?

A.   Yes.

Q.   And how did you find out about it?

A.   I was at work.

Q.    And someone told you or called you?

A.    Yes.

Q.    Do you remember after that point that you had to testify in this case on a number of occasions?

A.    Yes.

Q.    Do you remember testifying in a courtroom like this during his trial?

A.    Yes.

Q.    Did that happen more than once that you had to come in and testify, do you recall?

A.    I believe so, yes.

Q.    Do you remember one of the things you testifying about being Billie's habit of exaggerating or lying about things that were happening in his life?

A.    Yes.

Q.    But as you sit here today, what do you remember about that aspect of his personality?

A.    He fantasized a lot.  Him being a rapper, him having clothes, him having the best of shoes or anything, it was just a fib, it was a lie.  You pretty much couldn't believe anything he said being an outsider.  But me being as close as I was to him, I knew pretty much, you know, that some things was a lie.  Most things that he said was a lie.

Q.    When he was talking about having things like shoes or --

A.    When he was talking about -- yes.

Q.    -- nice clothes --

A.    Yes.

Q.    -- or a rap career?

A.    Yes.  And him having a vehicle and it's in the shop.

Q.    A vehicle what?

A.    Of him having a vehicle, and it's in the shop.  I mean, he would lie about that.

Q.    So he would say, I have a car, I just don't have it right now, it's in the shop?

A.    It's in the shop, right.

Q.    Did you ever know him to have a car?

A.    No.

Q.    Do you recall who -- which side you testified for at Billie's trial?

A.    I believe that -- I believe at that time it was the prosecuting attorneys.

Q.    Do you recall testifying about various letters that Bill had sent you before trial --

A.    Yes.

Q.    -- and that you turned over to the government?

A.    Yes.

Q.    Do you remember also -- strike that.  Have you had any contact with Billie, either by letters or phone or visits since his trial?

A.    No.

Q.    If you had been asked at trial the last time you were testifying in this case the questions that I asked you today, would you have provided the same information that you provided today?

A.    Yes.

Q.    If you had been asked before his trial by members of the people who -- members of his defense team then, would you have provided them the same information that you've provided here today?

A.    Yes.

Q.    Do you recall as you sit here today providing information about Billie being locked out of the house to anyone in this case back at the time of his trial?

A.    No one asked me those questions.  I can't recall no one asked me those particular questions.

Q.    And do you recall providing to anyone, to either side, information about Billie having been hit or whipped or whooped before, before or during the trial in this case?

A.    I can't recall no one -- no one asked me those questions in particular.  They wasn't -- none of those questions came about that I can recall.  None of those questions came about.

Q.    Now, you had mentioned before that Juanita, you would see her drinking or sitting in bed drinking and smoking?

A.    Uh-huh.  Yeah, she drunk all the time.

Q.    Do you recall --

A.    Yeah.

Q.    -- what she drank?

A.    No.

Q.    Do you recall -- you also recall her smoking cigarettes?

A.    Uh-huh.

Q.    Do you ever recall her asking Billie to go get her cigarettes?

A.    Yes.

Q.    Do you remember any of those specific times as you sit here right now?

A.    Oh, yes.  There's one particular time, I had just came down to visit him, and immediately as soon as I went upstairs to his room, she hollered his name, and said, "Bill, come here in my room, go get me a pack of cigarettes."  So we proceeded to go get her a pack of cigarettes.  And as soon as we returned and he went to knock on the door, the door was locked.  And she came to the door without opening it and she just said, "Throw the cigarettes through the mailbox."

Q.    And did she let him in after that?

A.    No.

Q.    When Billie was locked out of the house, do you know how long it would be before he'd be let back in?

A.    Sometimes days.  Sometimes three to four days.

MR. KANE:  Just a moment, please, Your Honor.  No further questions at this time, Your Honor.

THE COURT:  All right.  Thank you.  Mr. Holtshouser?

CROSS-EXAMINATION

BY MR. HOLTSHOUSER:

Q.    Good morning, Mr. Grant.

A.    Good morning.

Q.    My name is Steve Holtshouser.  I represent the government in this case.  Do you remember me?

A.    No.

Q.    Okay.  I was one of the attorneys that asked you some of the questions at the trial back in 1998.  So we're going to talk about some of that a little bit here.  Do you remember an individual named Joe Landolt who asked you questions when you were in the grand jury?

A.    No.

Q.    So would it be safe to say that there's some things about that time period that as you sit here today you don't remember that well?

A.    Correct.

Q.    Let's talk about how you first came into contact with Mr. Allen.  What age were you?

A.    Either 14 or 15.

Q.    Were you a year older than he was?  What's your birth

date?

A.   I believe I'm two years older.

Q.   What is your birth date?

A.   June 14, 1976.

Q.   Okay.  His is June 1977, so you would be one year older than him.

A.   Okay.

Q.   So if you were 14 or 15, the age you met Billie, he would have been 14, 13 going on 14?

A.   Thirteen.  He would have been 13 if I was 14, correct.

Q.   Right.  And if you were 15, he would have been 14?

A.   Correct.

Q.   Do you remember when you first met him where he was going to school?

A.   I don't remember.

Q.   You don't know where your best friend was going to school?

A.   I cannot --

Q.   Where were you going to school?

THE WITNESS:  Can I make this comment, Your Honor?

THE COURT:  Wait.  You'll just have to answer the question.

Q.   Do you have something you wish to say, I don't want to stop you from saying it.

A.   Yes.

X     92

Q.   Okay.  Tell us what you want to say.

THE WITNESS:  In '06, Your Honor, I was in a seriously, seriously life threatening car accident.  As my records reflect, I had brain trauma, a broken back, and I was fighting for my life.  So in '06, since then in '98 or whatnot, I don't remember quite a few things.

Q.   Okay.

A.   You may proceed.

Q.   Okay.  First of all, sir, I'm sorry to hear about the car accident that you were in.

A.   Uh-huh.

Q.   My recollection of you at the trial is that you were a very hard working man --

A.   Yes.

Q.   -- at the time?

A.   Yes.

Q.   And that you had been working since you were about age 14, when you first started working?

A.   I believe I was 15 or 16 when I first started working.

Q.   What was your first job?

A.   Hardee's Restaurant.

Q.   And where did you go to grade school and high school?

A.   Grade school or high school?

Q.   Well, did you attend schools in the city of St. Louis?

A.   Once upon a time, yes.

Q.    Did you eventually transfer to a school in the county under the voluntary transfer program?

A.    No, I actually attended the county before I came to the city.

Q.    Okay.  Where did you attend high school?

A.    I attended high school first at Affton Senior High in Affton, Missouri.  Then I transferred to Sumner, Sumner High School.

Q.    Okay.  Did you graduate from Sumner?

A.    Yes.

Q.    When you first met Mr. Allen and you're trying out for this -- is it a baseball team or softball team?

A.    Softball.

Q.    So even though you were 14 or 15, you were trying out for a softball team, not baseball?

A.    Right.

Q.    So do you think that back in 1997 and '98 when you were first talking to either law enforcement authorities or to the grand jury, or when you testified in this trial, was your memory better back then than it is now of some of these things?

A.    I would say so.

Q.    So is it possible the team, though, that you tried out was a baseball team, not a softball team initially, and you only later transitioned into softball?

A.    No, it was a softball team.  It was a PHL league, and they did this every summer.

Q.    So we're talking it was a summertime when you met Mr. Allen?

A.    Approximately it was, yes.

Q.    How long after you met him did you feel that you became close enough to him to call him your best friend?

A.    It was almost immediate, man.  It was almost immediate. Within -- to give you a time frame, from three to six months, I knew that was my best friend.

Q.    Okay.  And at the time that you met him -- let's go back to this question.  At the time that you met him, do you know where you were attending school?

A.    I was attending Affton.

Q.    Okay.  And hadn't transferred to Sumner yet?

A.    No.

Q.    And so did you go to Sumner for your sophomore year in high school?

A.    No.

Q.    Junior and senior?

A.    Yes.

Q.    Okay.  When you were a junior at Sumner, was Mr. Allen also at Sumner a year behind you as a sophomore?

A.    Yes, he did go to Sumner.  I'm not quite sure what grade he was in.

Q.   Okay.

A.   But he did attend Sumner once upon a time when I was also attending there.

Q.   Okay. You went on and finished at Sumner. He dropped out at some point or was expelled?

A.   I suppose so, yes.

Q.   By that time you were best friends, though, right?

A.   Yes.

Q.   And do you recall the circumstances of how he came to leave school?

A.   Not actually.

Q.   Okay. You were at Affton High School, though, as a freshman or a sophomore when you first met Mr. Allen?

A.   Yes.

Q.   So that would have made you 15 or 16?

A.   I was 14 when I first started going to Affton. As a freshman, I was 14.

Q.   And in the summer after your sophomore year, you would have turned 17?

A.   No, I would have been 16.

Q.   Sixteen, okay. So Mr. Allen, so his age when you first met him, he's definitely a teenager?

A.   Yes.

Q.   And when you first met Mr. Allen, do you recall whether or not he was a regular user of marijuana?

A.    I wasn't aware of that.

Q.    Okay.  How about you at that time, were you?

A.    At what age?

Q.    The time you met Mr. Allen.

A.    At the time I -- no.

Q.    That's something that came later?

A.    Yes.

Q.    In both of your lives?

A.    Yes.

Q.    Okay.  At the time that you met Mr. Allen, was he a regular drinker?

A.    I wasn't aware of that also.

Q.    And you weren't either?

A.    No.

Q.    The incident you describe, this is a team that he had to try out for and make; is that right?

A.    Yes.

Q.    Were there people who tried out who didn't make it?

A.    Sure.

Q.    Somehow or another his ability level was good enough so he could make it?

A.    No, I think what it was is that the coach, the coach at this time, I mean, he pretty much gave any kids a shot.  But by the time Billie made the team and the other individuals got cut, the roster was full.

Q.   Okay.  Now, one of the things that you emphasized at trial in your testimony was that Mr. Allen was a joker, liked to joke a lot, correct?

A.   I don't remember that, such as a joker, I just know he lied a lot.

Q.   Did he like to make other people laugh a lot and be the center of attention?

A.   I don't recall that.  I can't -- I don't know about making people laugh.  I don't think he was a comedian.

Q.   So you don't think he ran from home to second base to make people laugh?

A.   No, not at all.

Q.   Okay.  Now, how long had you known Mr. Allen when you first came to his home, the first time you came inside his house?

A.   The first time that I actually came inside of his home?

Q.   Wasn't that something that kind of -- your home wasn't like that, was it?

A.   No.  I mean, we had rats -- we had roaches and stuff, but it wasn't like Mr. Allen's.  It wasn't quite that bad. We only stayed a block away.

Q.   Your mother kept a neater home?

A.   Yes.

Q.   And you were raised to keep your room a bit neater?

A.   Yes.

Q.   And what happened if you didn't?

A.   I mean, hey, I had to suffer the consequences also.

Q.   What would those consequences be in your house?

A.   Punishment.

Q.   What kind of punishment?

A.   No TV.

Q.   Loss of privileges?

A.   Yes.

Q.   Did you ever get whoopings in your house?

A.   Yes, I did.

Q.   Describe what that was in your house.

        MR. KANE:  Objection, relevance, Your Honor.

        THE COURT:  Overruled.

Q.   What did that mean in your house?

A.   What did a whooping mean at my house?

Q.   To you, yeah.

A.   It was what it was, it was a whooping.

Q.   Okay.  Describe --

A.   For doing something that I wasn't supposed to do.

Q.   All right.  So let's just try to break it down a little bit.  Would a whooping, first of all, constitute some kind of physical striking of you?

A.   Can you say that again?

Q.   Would it involve a physical hitting, striking, contact between your parent and you?

A.   Did it involve that you're saying?

Q.   Yes.

A.   Yeah, I did get hit, yes, when I was younger, yes.

Q.   Did you ever get struck with a belt?

A.   Yes, I did.

Q.   Did you ever get struck with a -- were you ever asked to go out and pick a switch?  You ever heard of that phrase?

A.   Yeah, I remember that phrase, but my mom never asked me to go pick a switch.

Q.   What else besides a belt were you whooped with?

A.   That's all I pretty much was whooped with.

Q.   How often did that occur?

A.   I can't recall that.

Q.   Did it happen more often when you were younger than when you were older?

A.   I'm quite sure, yes.

Q.   Because as you got older, then your mother chose loss of privileges, reasoning, and talking with you to punish you?

A.   Of course.

Q.   Were there times that you were grounded, you couldn't leave the house?

A.   Yes.  As a teenager, yes.

Q.   Did you have a curfew, you had to be in by a certain time?

A.   No, I didn't have a curfew.

Q.   Ever?

A.   No, I didn't have a curfew.

Q.   You were never told to be home by a certain time?

A.   No.

Q.   Now, this first time that you went to Mr. Allen's house, had you ever been in a house like that before in your experience?

A.   Not prior to meeting -- to visiting Mr. Allen at his house, no.

Q.   So it came as kind of a shock to you, didn't it, something that made a lasting impression on you?

A.   I mean, I saw it on TV before.  I mean, so I wouldn't say it was a shock.  I mean, it's just -- I just looked at it that's the way they lived.

Q.   How about Mr. Allen, did he ever talk to you about how he -- did you ever say to him, how can you live like this?

A.   Of course.

Q.   What did he say to you?

A.   I mean, hey, what can he do?

Q.   Well, let's take his room, for example.  You came up and visited his room, correct?

A.   Yes, I did.

Q.   And you described the conditions in his room?

A.   Right.

Q.   And what were they?

A.    Like I said, a slob.

Q.    Who was a slob?

A.    The house was a slob.  The mess was a slob.  It was Billie's room, so he was a slob.

Q.    All right.  So the condition that was in his room was something that he was responsible for to some extent, correct?

A.    Oh, of course, yes.

Q.    And you said he kept some food in his room?

A.    Some rotten food.

Q.    What kind of rotten food?  Fruit?

A.    Bologna, eggs, whatever he had to eat, or can gather up to eat.

Q.    Did you ever eat a meal at his house?

A.    No.

Q.    So you were never there at a time, say, when the family ate dinner?

A.    Yeah, but I didn't eat.

Q.    You were there?

A.    Yeah, I was there, but I didn't eat.

Q.    Okay.  Did Mr. Allen eat?

A.    I didn't see him eat.

Q.    So describe what was happening then.  Where were you at that the family was eating dinner?

A.    I mean, the majority of the time when I came to visit

him, for one they wasn't cooking, pretty much like never.
And we was pretty much, I was in and out of there.  I was
coming to visit him, and, I mean, within 10, 20 minutes, we
were gone.

Q.    And how many times do you think you actually came and
went inside his house past the entrance to the house, past
the front door, where you would have been walking through the
rest of the house, how many times did that happen?

A.    I mean, several times.  I can't recall how many times,
to give you a number, I mean.

Q.    How about an approximation?

A.    I couldn't give you an approximation.  We're talking
about years.

Q.    Over the course of that time, do you think you've been
inside the house more than ten times?

A.    I mean, I been over in his house probably over a
hundred times.

Q.    Okay.  But each time it would be for 10 to 20 minutes?

A.    Yeah.

Q.    You would get in and get out as fast as you could?

A.    Yeah.

Q.    Because you didn't want to be there?

A.    Yeah, I didn't want to be there like that, no.  I mean,
that wasn't my house.  I just came for one reason.

Q.    So, for example, when you told -- when you said a few

Q.   minutes ago that Juanita was drunk all the time -- remember saying that a few minutes ago?

A.   Uh-huh, yes.

Q.   The times that you were aware of that would have been in the course of your 10- to 20-minute visit to the house. You weren't at the house all the time to say that she was drunk all the time, were you?

A.   Every time that I seen her.

Q.   But to say that she was drunk all the time, would you agree with me that based on your knowledge, that's an exaggeration?

A.   No.

Q.   It's not?

A.   No.

Q.   Were you at the house all the time to see what she was doing all the time?

A.   Every -- for years, seven days a week, for years, seven days a week, I was within that -- at that house from 10 to 20 minutes, for years, seven days a week.

Q.   Okay.  So now you're saying that you think you were at that house every day?

A.   I pretty much was.

Q.   For years?

A.   For years.

Q.   And during the 10 to 20 minutes you were there every

day, you saw Juanita Allen drunk?

A.    Every day, every time I seen her.

Q.    And so every time you went in the house, you went to Juanita's room?

A.    I got to go through -- I got to see the room and go through her room in order to get to Billie's room.

Q.    And would you address her?

A.    Yeah, of course, that's only respect.  I'm in her house.

Q.    Okay.  I'm just asking you.

A.    Okay.

Q.    I'm not saying you're disrespectful.  I'm asking you. We weren't there.  That's how we find out.

A.    I totally understand.  But in order for someone to come in my house and see my mom in a room and not speak, you're not welcome here.

Q.    Okay.  So you would speak to her, correct?

A.    Uh-huh.

Q.    Okay.  And how would you know she was drunk?

A.    The most influence that you get when an individual is drunk is slurred language, red, bloodshot eyes, et cetera. All the symptoms was there.  It wasn't an assumption she was drunk.

Q.    Okay.  And so that was something you saw seven days a week for years?

A.    For years.

Q.    And that was based on being in the house for 10 or 20 minutes.

A.    For years.

Q.    To your knowledge did she work?

A.    I can recall she -- yeah, she did work once upon a time, I can recall.

Q.    Okay.  Do you know what her job was?

A.    No.

Q.    Do you know how many jobs she had?

A.    Do I know how many?

Q.    Yeah.

A.    No.

Q.    Did you ever know her to work at Charter Communications?

A.    No.

Q.    Red Cross?

A.    No.

Q.    How about St. Louis City Library?

A.    No.

Q.    None of those you were ever aware of?

A.    No.

Q.    Did you ever know her when she had a boyfriend named Louis?

A.    No.  Never met a boyfriend named Louis.

Q.    Would you agree that anyone walking into that house would be able to see the conditions of the house?

A.    Yes.

Q.    So, for example, if any of Mr. Allen's attorneys had ever visited the home, it would have been plainly obvious to them how the house was kept, correct?

A.    Yes.

Q.    Now, you used this phrase that's in your declaration, we're going to talk a little bit about your testimony in a second, but "dogged him out," that's a phrase that you seem to come back to often, correct?

A.    Yes.

Q.    What do you mean when you say that someone dogs someone out?

A.    What I mean by somebody dogging you out, for no apparent reason just start hitting on you, punching on you, talking bad about you, disrespecting you, just don't even give you no type of recognition about anything, don't -- don't compliment you on anything, just -- you're just the scum of the earth to sum it up.

Q.    So when you say "dog him out," that's a term you use to cover both physical and verbal, let's call it abuse?

A.    Yes.

Q.    Okay.  And unless someone asked you what do you mean by "dog him out," they don't find out that you mean both

physical and verbal abuse, correct?

A.    I don't see it that way.

Q.    Okay.  You think that by using the term "dog him out," someone knows without asking you that you're meaning physical and verbal abuse?

A.    Yes.

Q.    So when you would use that term, you wouldn't feel the need to volunteer to somebody what you mean by that term?

A.    Right, it's automatic.

Q.    And "dog him out" applied to everyone in that house?

A.    Yep.  Yes.

Q.    So we're talking Yvette -- now, did you see Yvette here a short time ago?

A.    No.

Q.    Nicole?

A.    No.

Q.    Nikki?

A.    No.

Q.    No, she didn't dog him out or, no, you didn't see them?

A.    No, I didn't see them.  You asked me did I see them.

Q.    Yeah, I confused you there.  Let's take the sisters, there's Yvette, there's Nikki, and there's Angela, sometimes known as Ann, correct?

A.    Uh-huh, yes.

Q.    You've seen all three of those sisters physically abuse

Mr. Allen?

A.    Yes.

Q.    And you've seen all three of them verbally abuse Mr. Allen?

A.    Yes.

Q.    Now, how did they physically abuse Mr. Allen?

A.    Physically abuse him, by hitting him upside the head, punching on him and running, kicking him and running.  They always ran.

Q.    And why did they run?

A.    Maybe they was scared that he was going to retaliate.  But he never did.

Q.    So if you were sitting in his room with him, one of them would just dart in the room, kick him or hit him and run out?

A.    Yes.

Q.    And would there be any laughter associated with this or would Mr. Allen be crying in pain?  What accompanied it to give us the context?

A.    It was laughter on they part.  It was laughter on they part.  It was laughter on their part, the sister's part because they hit him and call him dirty and ugly and, you know, they'll run, they'll dart off, and Bill would be like, "Boy, they really get on my nerves."

Q.    Okay.  Because that would be kind of annoying and

something that you wouldn't like happening to you, would it?

A.     No, not at all.

Q.     And we're talking about Yvette is his younger sister, correct?

A.     Right.

Q.     So his little sister would run in and hit him upside the head or kick him and run out?

A.     Uh-huh.

Q.     And this is when he's a teenager?

A.     Yes.

Q.     When you say "hit somebody upside the head," can you give us a more particular idea of what you mean?

A.     Punching him upside the head.

Q.     Closed fist?  Open hand?

A.     However they see fit; closed fist, open hand, anything.

Q.     So you've seen his sister, younger sister Yvette, run in the room, punch him in the face with a closed fist and run?

A.     Yes.  She done did it, yes.

Q.     Did it leave any kind of a mark on Mr. Allen?

A.     I can't recall that.

Q.     I mean, if someone punches you in the face with a closed fist, it might leave a black eye, it might leave a bruise.

A.     It might.  But then again, like you just mentioned, we

just talking about a little sister, so maybe it wasn't as quite effective as it would be, you and I, if we hit somebody in the face.

Q.    Now.  This Uncle Jerome is not somebody that you recall particularly as being a member of the household, correct?

A.    I can't remember Jerome.

Q.    How about Raymond, do you remember him at all, another uncle?

A.    I can't remember Raymond neither.

Q.    Okay.  Otha is the grandfather, correct?

A.    Yes.

Q.    And was he retired or was he working at the time that you were --

A.    I'm not sure.  I'm not sure.  He was always at the house also.

Q.    Was one of the places that you worked in your working career, Chemisco?

A.    Chemisco?

Q.    Yeah.

A.    Yes.

Q.    And were you aware, did you know that Otha also actually worked there his entire life?

A.    I wasn't aware of that.

Q.    When you worked there, did Mr. Allen also work there?

A.    I believe once upon a time, yes.

Q.    Otha stayed in the basement, that's where he lived, isn't it?

A.    I believe so.

Q.    And when you came into the house, did you in your travels to the house, did you also go into the basement?  Did you go into Otha's space?

A.    Did I go into his space?

Q.    Yes.

A.    On occasion that Bill needed to wash some clothes.  It wasn't many occasions that I did go into Otha's space, but it was an occasion where Bill needed to wash some clothes, because everything was dirty, and he said, "We're going to go downstairs and I'm going to wash these clothes."  So as soon as he put his things in there, Otha came out.  And, I mean, he raised some Cain with him, he said, "Get your clothes out of there."  He got to hitting him with that belt.  "Get your clothes out of there, don't use this washing machine never." That's what he told him.  He said, "But grandaddy, I ain't got no clean clothes."  He said, "Too bad, that's on you."

Q.    Now, the times when you say you saw Otha chase him away from the refrigerator, we're talking on the first floor in the kitchen?

A.    That was on the first floor.

Q.    Not in Otha's kitchen in the basement?

A.    There wasn't a kitchen in the basement.

Q.   He didn't have a kitchen and a cooking area down there too?

A.   I don't recall seeing a kitchen in a basement, unless you made a corner out of a kitchen and called it a kitchen.

Q.   You don't recall him having basically an apartment down there?

A.   I just looked at it as a basement.  I mean, maybe it was a chair or something down there.  I don't recall there being like an apartment.

Q.   You indicated that Otha would try to hit him and that Bill would run away?

A.   Yes.

Q.   How many times that you witnessed that Otha succeeded in trying to hit Billie?

A.   I can't count the numbers that he did succeed.

Q.   And give us some idea of the nature of the success.  So in other words --

A.   All the success of him hitting him was he half struck him with a belt and caught him a couple of times before he did skirt off and get away.  He done caught him quite a few times.  He have connected with a shoe or two quite a few times.

Q.   What kind of a shoe?

A.   A boot or shoe, tennis shoe.

Q.   Did Otha -- where did the shoe come from?

A.    It was somewhere in the basement or around the house. It didn't matter whose shoe it was, who it belonged to or what kind of shoe it was, if that was the closest thing to me that I can throw to hit Bill, that's what I'm going to do.

Q.    So if he threw a tennis shoe at him, where would he be aiming for and where would he hit Bill with the shoe?

A.    I mean, wherever it connect.  Sometimes it hit him in the head, sometimes it hit him in the back on the leg, just grazed him on the arm.

Q.    Did it hit him hard enough to knock Bill down to the ground?

A.    No, it didn't hit him that hard.

Q.    How about when you saw Juanita hit him?

A.    The question is what about the times I saw Juanita hit him?

Q.    So you say you've seen Juanita hit him with a closed fist and punch him in the face?

A.    No, I saw her hit him with a belt, close fisted, it was just a hit.

Q.    It was just a what?

A.    It was a hit.

Q.    My question is --

A.    She never did knock him down that I can recall, never did knock him down.

Q.    Now, you've seen Juanita, you knew her, correct?

A.    Yes.

Q.    Have you ever seen her fight physically with anybody?

A.    No.

Q.    Did it seem to you like she was big enough and tough enough to knock somebody down if she wanted to?

A.    I can imagine.

Q.    Okay.  In the times that you saw her hit Billie with a closed fist, we're talking about this circumstance, not a belt at the moment, okay.

A.    Closed fist, open hand, uh-huh.

Q.    No, I'm just talking about closed fist.  Let's take it one thing at a time.

A.    Okay.

Q.    Where would she hit him with the closed fist, where about his body?

A.    Anywhere that it connected.  Anywhere it connected.  If it was in the head, she connected in the head.  If it was on the shoulder, it was a shoulder.  If it was the chest, it was the chest.

Q.    And how about in the face?

A.    If it was in the face, it was in the face, it was a punch in the face.

Q.    Did you ever see him have a black eye from being hit in the face or eye with a closed fist?

A.    I know the times that I did see her connect in the

X - 115

face, he didn't -- it didn't result into a black eye.

Q.    Did not result into a black eye?

A.    No, it didn't.

Q.    Did you ever see it result in breaking any skin or any bleeding?

A.    No, I did not.

Q.    Did you ever see any striking with a belt or a cord or any other object that resulted in breaking the skin or bleeding?

A.    Not to my knowledge.

Q.    The times that you saw him -- saw her strike him with a belt, was he clothed or unclothed?

A.    He was clothed, had clothes on.

Q.    So she was striking him through his clothes?

A.    Yes.

Q.    How did Mr. Allen react in these circumstances?

A.    Just he was running the majority of the time.  Just said that's a dog gone shame.

Q.    That's a --

A.    That's a shame and I didn't do nothing.

Q.    Was he ever crying in these circumstances?

A.    No, he wasn't crying.

Q.    And when we talk about -- when we talk about using the term "beating," you never saw a situation where his mother knocked him to the ground and continued to hit him while he

was on the ground?

A.    No.

Q.    Among the reactions were things that included, "Why can't I stay at your house?" or "Why can't I have your mother?"  Correct?

A.    Yes.

Q.    Now, the ages -- I want to talk for a second about the circumstances of him either being told to get out of the house or being locked out of the house.  Were there circumstances when you were with him when he came home that he was locked out of the house?

A.    Yes.

Q.    And why were you coming home -- why were you at the door with him to find that out?  Were you going in the house too?

A.    The majority of the time I was dropping him off.

Q.    What do you mean by "dropping him off"?

A.    Dropping him off at home from leaving.  I had a vehicle.

Q.    So you were 16, you had a vehicle, and you were driving?

A.    Yes.

Q.    So the time periods we're talking about is he's over 15?

A.    No.

Q.   Well, he's a year younger than you, and you were 16.

A.   He was 15.  I was older, I was 16.

Q.   Like I'm saying, he was at least 15.

A.   He was at least 15, yeah.

Q.   And in these circumstances, did you know why the door was locked?

A.   By this time I'd been knowing him for two years or so, and it was a routine.  It was like a routine.  I mean, they'd lock him out.  And I done dropped him off.  And, I mean, he was unaware of him being locked out.  And like I mentioned earlier in my statement, that they was looking dead at him through the window, through the blinds, and they just will not let him in.  And it's zero below.  It's 13 below.  It's cold outside.

Q.   And the porch that you described, the front porch or the back porch?

A.   It was the front porch.

Q.   Enclosed or not enclosed?

A.   It was steps in the front.  I mean, it had a shield over the top, if that's what you mean.

Q.   What did he sleep on on the front porch?

A.   He slept on the ground or on the edge.  On the ground of the front porch, the ground or on the ledge.

Q.   And the times that you were coming to the house, what time of the night or day was it?

A.   It was -- that I was coming to the house or dropping him off at the house?

Q.   When you were dropping him off at the house, was it usually nighttime?

A.   Yes.

Q.   And had the two of you been out?

A.   Sometimes.

Q.   Had you been like going places by that time like Cloud Nine and clubbing?

A.   Yes, sometimes.

Q.   Or the arcade or the mall?

A.   Sometimes, yes.

Q.   Parties?

A.   Sometimes, yes.

Q.   And did Mr. Allen ever tell you that he had a curfew, that he needed to be home by a certain time?

A.   I can't recall.

Q.   So he never shared with you that his mother had a curfew, and that the house was locked many times because he was coming home past the time he was supposed to be home?

A.   I can't recall.

Q.   It's nothing he ever related to you?

A.   I can't recall.

Q.   Well, when you say you can't recall, to your recollection that's not information that you had, is that

correct, or do you think that you had it --

A.    It's information that I don't remember.  That's it.  I don't remember.

Q.    The subject was already brought up about the fact that he was -- he sometimes told lies, do you recall that?

A.    Uh-huh.

Q.    That was actually something that you testified about at the trial?

A.    Yes.

Q.    Correct?

A.    Yes.

Q.    Were the things that he lied about the most material things, having material things that you knew he didn't have?

A.    Yes.

Q.    And why was he telling those lies?

        MR. KANE:  Objection, Your Honor, there's no way Mr. Grant can know why someone else --

        MR. HOLTSHOUSER:  I'll rephrase the question.

        THE COURT:  Sustained.

Q.    Who were these things being told to, these lies?

A.    Everyone.  Whoever asked him about something in that particular, sometimes for no apparent reason.

Q.    Males?  Females?

A.    Males, females.

Q.    Did they occur primarily at some of the clubs in

conversation with females?

A.    Yes.  Sometimes, yes.

Q.    Did you ever say things to females that weren't true trying to impress them?

A.    I'm pretty sure once upon a time.

Q.    Did you ever know Mr. Allen to tell a lie for a particular reason, in other words, to obtain a result or to get something that he wanted?

A.    Well, yeah.

Q.    Can you give us an example?

A.    I mean, you just thought of a prime example right there, such as a female.  You know, just dealing with a female, just to tell them a lie to get what you want out of them, yeah.

Q.    In the time periods that you were friends with Mr. Allen -- well, let me be clear about one thing.  Prior to -- the offense that we're talking about here occurred in March of 1997, okay?

A.    Uh-huh.  Prior to?

Q.    So you would have been, I guess, 19 going on 20 -- no, you would have turned 21 in June of 1977, because you were born in '76.

A.    I'm not understanding.

Q.    I'm confusing you.  1997, in March of 1997 you would have been how old?

X - 121

A.     March of 1997?

Q.     Well, but for me confusing you, you probably would have been turning 21.

A.     No, I was going on 21 coming that June, yeah.

Q.     In the year before, so you've been out of -- you graduated from high school in what year?

A.     '94.

Q.     Okay.  So you're in school still when Mr. Allen has left school, correct?

A.     Yes.

Q.     And during those years that you're finishing school and he's not in school, you're not with him during the day obviously because you're at school?

A.     Correct.

Q.     And you don't have personal knowledge of what he was doing during the day, do you?

A.     Sometimes.

Q.     Sometimes.  And how would you come by that knowledge?

A.     I mean -- I mean, I'd rather not say, but sometimes.

Q.     Because sometimes you skipped, correct, and were with him?

A.     No, I didn't skip school.  I probably have skipped before, but it wasn't on -- it wasn't an everyday thing for me, but I probably have skipped school quite a few -- a couple of days or so.

Q.    Even when Mr. Allen was in school, he skipped a lot, didn't he, at Sumner?

A.    I mean, I just noticed that he wasn't there at the time.  But sometime before school is out, he's in there.

Q.    So he would come in sometimes in the middle of the day?

A.    Correct.

Q.    Or sometimes be gone all day?

A.    Correct.

Q.    Were there times that you also took off school and spent the day with him?

A.    On a couple of occasions.  You say skip school, yeah.

Q.    And what would the two of you do during those days?

A.    We actually just set on the block and did what we did.

Q.    And "did what we did" --

A.    You know, I'm not perfect from a long shot.  We hustled and made money, you know what I'm saying.  By that time later on in life, you know, started drinking, you know, started smoking reefer.  You know, pretty much, I mean, we did -- that's what we did when I did skip school.

Q.    Okay.  And when you say --

A.    Or when I left school rather.

Q.    When you say "out hustling, selling things, making money," what are you referring to?

A.    Marijuana, drugs, I mean, heroin, cocaine, crack.

Q.    So those --

A.    We hustled.

Q.    -- were things that you and he were both selling?

A.    Yes.

Q.    So the concept of Mr. Allen selling drugs isn't a fantasy, is it?  That's something that really happened, isn't it?

A.    It really did happen.  That really did happen, yes.

Q.    And the things that you were selling along with him weren't fake drugs, it was real drugs?

A.    Some of the times they were.

Q.    Some of the times they weren't?

A.    Yes, some of the times they were.

Q.    So Mr. Allen's drug activity wasn't just limited to ganking, it included selling real narcotics?

A.    From time to time, yeah.

Q.    And you'd get them from whoever you could get them from in order to sell them for whatever you could sell them for?

A.    Correct.

Q.    And from that Mr. Allen was able to acquire some money, wasn't he?

A.    Sometimes, yeah.

Q.    And, in fact, I think you testified at trial you had seen him with as much as four or $500 at a time?

A.    Sometimes, yeah.

Q.    So there came a point in those years when Mr. Allen had

access to some material things, he had access to money, correct, because he was making it, although not legally but making it, right?

A. Well, just to say this, the money that he was making wasn't actually his money at the time.

Q. Whose money was it?

A. Whoever that he got the drugs from.

Q. Everybody adds something to it to make a little bit of profit, correct?

A. But if you -- if it's not enough for you -- sometimes it didn't be enough to -- for you to make a profit. Sometimes it just wasn't enough to make a profit, you just have to re-give them their money. And that's probably -- that's probably all that you made.

Q. So if you couldn't sell it for more than you paid for it, you didn't make any money?

A. Right.

Q. But sometimes you made money, didn't you?

A. Sometimes.

Q. I mean, that's the purpose of the activity, right?

A. Sometimes. Yeah, that's the whole -- yeah.

Q. You put yourself at risk out there on the corner, you put yourself at risk of being robbed, you put yourself at risk of being arrested, the point of the risk is to make some profit for yourself?

X - 125

A.    That's the whole objective.

Q.    And at times Billie was able to make that profit, wasn't he?

A.    Sometimes.

Q.    As were you?

A.    Sometimes.

Q.    Now, you recall at trial Mr. Allen's attorney suggesting that you obtained your drugs to sell from your mother?

A.    Pardon me?

Q.    Do you recall him suggesting that you were obtaining drugs from your mother?

A.    No -- I'm not following the question.

Q.    Okay.  Was your mother ever supplying you with drugs to sell?

A.    No.

Q.    Okay.  So any suggestion by Mr. Sindel, Mr. Allen's lawyer at trial, to that effect wouldn't have been true, would it?

A.    Not when it came to my mother supplying me with drugs, no.

Q.    Your mother used drugs on occasion, correct?

A.    Once upon a time, yes.

Q.    The times that you spent at the clubs, Cloud Nine became a focal point, didn't it, as a place, a destination to

go to?

A.    Yes.

Q.    What was so attractive about Cloud Nine?

A.    The females.

Q.    So that was a place that you and Billie would try to get to as often as you could?

A.    On a weekend, yes.

Q.    Not on the weeknights?

A.    No, very seldom.

Q.    How do you know that he didn't go there on weeknights without you?

A.    Well, good question.  I mean, I'm pretty sure he would have told me.  He probably would have told me that's where he wanted to go during the week.

Q.    Not getting there --

A.    But majority of the time, when I was -- when I get off work, majority, nine times out of ten --

Q.    That's where you headed?

A.    -- after I'm leaving work, he's meeting me at my house or wherever we decide to meet up.

Q.    To head over there?

A.    No, not necessarily.

Q.    Okay.  Just to get together?

A.    Yeah.

Q.    And Cloud Nine would be the primary place where you

would go?

A.    On the weekend.

Q.    Okay.  On the weeknights, though, when you got off work, you would still get together, you and Billie?

A.    Yeah.

Q.    Okay.  Just wouldn't head over to Cloud Nine?

A.    No, not necessarily, no.  Uh, no.

Q.    What would you do during the weeknights?

A.    Play cards, play spades, dominoes.  You know, hang out with some chicks and chill out with them.

Q.    And sometimes that would involve drinking?

A.    Of course, yeah.

Q.    Sometimes that would involve smoking marijuana?

A.    Of course.

Q.    And those things cost money, right, they weren't free, the alcohol, the weed?

A.    Sometimes we'd get lucky and it was free.

Q.    Sometimes what?

A.    We'd get lucky and it was free.

Q.    Sometimes it wasn't, though?

A.    And sometimes it wasn't.

Q.    And that had to be paid for?

A.    True.

Q.    Did Mr. Allen have the money to pay for it when it was needed?

A.    When it was needed?

Q.    Yes.

A.    No.

Q.    All right.  Who paid for it then?

A.    I did.

Q.    Did he ever pay for it?

A.    I'm quite sure, yeah.  I'm quite sure, yeah, he did a couple of times or two.

Q.    Do you recall something that was popular with Mr. Allen called Dom Perignon champagne?

A.    Well, popular -- yeah, I know the drink, though, yeah, the champagne.

Q.    Was that something you could get at Cloud Nine?

A.    Yes.

Q.    And what did it cost?

A.    At that time I'd say about probably $125 or so.

Q.    A bottle?

A.    Yeah.

Q.    And you've been at Cloud Nine observing Mr. Allen drinking that champagne from a bottle, correct?

A.    Yeah, we have been drinking it, yeah.

Q.    And was that done primarily to impress girls?

A.    Yeah, that was a celebration that night.

Q.    What were you celebrating?

A.    Me having a job.

Q.    Which job was that?

A.    It was still at Chemisco, you know, just little tedious reasons for celebrations, you know, to buy a bottle of that.

Q.    You worked at Hardee's for quite awhile, correct?

A.    Yes, uh-huh.

Q.    And getting the job at Chemisco was a move up for you?

A.    Yeah, I believe so at the time.

Q.    How long did you work at Chemisco?

A.    I'm going to estimate probably two to three years.

Q.    Now, the reason I was trying to take you back to the time period, orient you to the time period of the offense, in March of '97, in the year preceding the offense, were you not as close with Mr. Allen as you had been in prior years?

A.    I wasn't -- no, we were still close.

Q.    But you didn't see him or spend as much time with him?

A.    Because I was working, yes, but we were still close.

Q.    You were working a lot of hours, and there were a lot of hours when you were working and he was not, correct?

A.    Well, I mean, if you want to say 40 hours a week, eight hours a day is a lot of hours, I mean, hey.

Q.    And a lot of times did you work the night shift?

A.    No, I didn't work the night shift.  I worked from like one to nine or two to ten, which I believe that's the evening shift.

Q.    Okay.  Do you remember at the time of trial when you

testified that it took two days, and you actually had to work the night shift between the time you got off the stand and the time you came back the next morning to testify?

A.   I'm not -- can you repeat that?

Q.   When you testified at trial, you were working the night shift.  In other words, you had worked all night and not gone to bed in between the breaks in your testimony.

A.   Maybe what it was, by me knowing that I have to come to trial, I switched shifts, because that wasn't my schedule. My schedule at that time was two to ten.

Q.   Now, once the offense occurred, there was -- you had a series of contacts, just to kind of summarize these a little bit.  First of all, the FBI came and talked to you, correct?

A.   Uh-huh.

Q.   And you told the FBI some things that ultimately were used at Mr. Allen's trial, correct?

A.   I don't know.  I mean, if you can try to refresh my memory.

Q.   You remember, for example, providing the jury with information that connected Mr. Allen and Mr. Holder, Norris Holder, to each other, knowing each other at Cloud Nine back in December of '96.  Do you recall giving that testimony or having seen them together and Billie telling you, "Oh, that's Norris"?

A.   I believe so.  I believe so, yeah.

Q.    And you also provided them some information about where
Billie was living and staying immediately prior to the
offense, with some --

A.    I can't --

Q.    -- females?

A.    I don't know where he was staying like that.

Q.    You remember Marcia and Lakeshia that lived on --

A.    Well, I know we used to be over there, but I don't know
if he was staying there.

Q.    And do you recall that you actually saw him a couple of
nights before the offense occurred?

A.    Yes.

Q.    And the two of you went out?

A.    Yes.

Q.    You also recall that you told the FBI and later the
grand jury and ultimately testified at trial to some
conversations you had with Mr. Allen on the telephone shortly
after the offense.  Do you recall that?

A.    Shortly -- when you say shortly after the offense, was
he incarcerated or not by this time?

Q.    I believe you testified he had been calling you from
jail.

A.    Yes.

Q.    Talking to you about what had happened.

A.    Yes.

Q.    And advising you that he was there, but he had driven the van, and he hadn't gone in the bank, and he hadn't had anything to do with killing the guard.  Do you recall that?

A.    Vaguely.  Vaguely.

Q.    I mean, do you recall that that information, that evidence was fairly damaging to Mr. Allen at his trial?

MR. KANE:  Objection, Your Honor, Mr. Grant is in no position to discuss the probative value of evidence at the trial.

MR. HOLTSHOUSER:  I'll rephrase the question.

THE COURT:  Okay.

BY MR. HOLTSHOUSER:

Q.    Did you have an awareness of how this information that you were providing to the FBI and the grand jury and the jury, how it was important or useful?  Did you have any sense of that?

MR. KANE:  Your Honor, I'm going to object to this line of questioning as not relevant to the subject of this hearing.

THE COURT:  Well, perhaps to credibility. Overruled.

A.    I'm not understanding.

Q.    The question?

A.    Right.

Q.    Okay.  At the time that you were testifying at trial,

did you realize that the evidence that you were giving was damaging?  Was, in other words, helping convict Mr. Allen?

A.    You know what, at that time being honest with you, I didn't know, and didn't realize was I helping my best friend or was I damaging my best friend at that time.

Q.    Okay.  When did you come to the realization that it was damaging to your best friend?

A.    That it did damage him, is that what you're saying?

Q.    Yeah.

A.    I don't know if I came to it.  I mean, it was -- when I said damaging to him, I never did look at myself like that.

Q.    Now, you remember you also testified again in the penalty phase of the trial?

A.    That I don't remember.

Q.    You do not, okay.  Well, we'll look at a transcript here shortly so you can refresh your recollection a bit.  But you ultimately became aware of what the jury's verdict was, correct?

A.    Yes.  Sooner or later, yes.

Q.    And how did you feel when you found out about the verdict?

A.    I mean, I was disappointed.

Q.    And did you know at the time that you were talking to the government and talking to the FBI that there was a possibility that Mr. Allen could receive the death penalty

from this case?

A.    Yes.

Q.    You did realize that?

A.    Yes.

Q.    And when he did receive the death penalty from the jury, how did that make you feel?

A.    The same, you know, I mean, at a loss for words.  I was lost for words.

Q.    Okay.  Mr. Grant, there's a computer screen right in front of you there.  Can you see that okay?

A.    Uh-huh.  I mean, there's not anything up there as of yet.

Q.    Not yet.  I'm going to show you something.  I'm going to show you Exhibit 304.  You received letters from Mr. Allen while you were -- while he was in custody and before his trial.  Do you remember that?

A.    Uh-huh.

Q.    These are not those letters, but I'm asking you, do you recognize the handwriting here as Mr. Allen's handwriting?  You had seen his handwriting before, correct?

A.    Excuse me.  I seen it before, but once again, I mean, I really got to tell you, like I said, I've been in an accident, my mind, my memory isn't quite as sharp as it used to be.  It looks like it, but, I mean, I'm not sure.  It looks like it that I can last recall.  Because he used to

write rhymes or whatnot.  He used to write raps.  So it looks like it.

Q.    And that was something that was a goal of his, correct?

A.    Yeah.

Q.    I mean, he wanted to be a rapper, correct?

A.    Yeah.

Q.    Did you know a girlfriend of his named Tasha?

A.    Did I know her?  I knew of her, yeah.  Yeah.

Q.    How did you know of her?

A.    I mean, he used to talk to her on the phone or whatnot. I took him over her house a couple times or so.  I can't even remember how she looked.

Q.    Were you -- do you recall an incident when Mr. Allen and Marquis Taylor were arrested in a stolen car?

A.    I can't recall.

Q.    That certainly was -- was that activity you were involved in or engaged in with them together?

A.    No.

Q.    Did you ever ride in a stolen car with Marquis Taylor and Mr. Allen?

A.    No.

Q.    Did you ever steal a car with them?

A.    No.

Q.    Okay.  So if that happened in approximately early '95, that's something that occurred in Mr. Allen's life that you

weren't aware of or you just don't remember?

A.    I just don't remember.

Q.    You don't remember a circumstance in which your best friend got arrested and pled guilty to tampering with a vehicle?

A.    Nope, I don't remember.

Q.    Did you know that Mr. Allen was on probation for that offense?

A.    I don't remember.

Q.    Did you know that he had a probation officer?

A.    I don't remember.

Q.    Was there any point in time that Mr. Allen changed his, either his drinking or his marijuana use, his habits that you recall?

A.    Did you say did he?

Q.    Did he change?

A.    Did he change the habit of using --

Q.    Yes.

A.    -- alcohol or marijuana?

Q.    Correct.  From the time you first knew him to the time of this offense, was there ever any time when you said, boy, I notice he's changing, you know, he's like high all the time, drunk all the time, really smoking heavy?

A.    I can't recall.

Q.    Nothing that sticks out in your mind that before this

he was this way, but after this event changed?

A.    No, I can't recall.

Q.    How about his personality or his demeanor, anything change about him during the years that you were friends with him, like he went from being a happy person to being a depressed person, went from having plans for the future to talking about killing himself, anything like that that you recall?

A.    (Shaking head.)

Q.    Nothing sticks out?  You're shaking your head.

A.    When you're saying a change, no, I never did see him with a -- you know, go through some, you know, life changing situation where he said he have changed or I noticed a change for that matter, that I noticed a change.  No, I never noticed a change.

Q.    And just so this is clear, this a person you're seeing seven days a week.

A.    I never noticed a change.

Q.    Seven days a week, you're picking him up or at his house?

A.    I never noticed a change.

Q.    All right.

A.    He always been the same.

Q.    How about the death of Marquis Taylor, do you remember that?  I'm not asking you the year when that happened, but do

you remember that as an event?  Do you recall that event?

A.    Yeah.  Yeah, I remember -- yeah, I remember bits and pieces of that.

Q.    But you weren't there when it happened, correct?

A.    No, I wasn't there.

Q.    According to your -- you believed at least that Mr. Allen was there when Marquis Taylor was killed?

A.    Yes, he had actually just left my home.

Q.    Left your house?

A.    He just left my house.

Q.    "He" who?

A.    Mr. Allen, Bill.

Q.    Had just left Prentiss Church's house?

A.    I think he just had left my house.

Q.    All right.  Was Marquis Taylor with him when he left your house?

A.    No, he wasn't.

Q.    Okay.  How -- do you know how it is that Mr. Allen came to be with Marquis Taylor when he was killed then?

A.    I can imagine.

Q.    I'm not asking you to imagine.  Do you know?

A.    No, I don't know.  But, I mean, we stayed a block away, so -- and they stayed right next door to him, so.

Q.    How about Prentiss Church, where did he live at in relation to you and Mr. Taylor's house and Mr. Allen's house?

A.    He stayed in the middle of the -- put it like this, we had to pass his house in order to get to one another's house.

Q.    Prentiss Church's house?

A.    Prentiss Church, yeah.

Q.    Did Mr. Allen ever tell you how the death of Marquis Taylor affected him, how he felt?

A.    Yeah.

Q.    What did he say?

A.    Yeah, he was -- it was shock.  Yeah, it was shock. And, you know, he can't believe Marquis gone, you know. Yeah, it was kind of disturbing.

Q.    Was there any discussion amongst you, Mr. Allen, this group of individuals about why it happened, in other words, who the bullet was intended for?

A.    Yeah, it did come about.

Q.    And was there any speculation amongst you that it was actually Mr. Allen who was the one they were after?

A.    Yeah, that's true.

Q.    Was that -- did everyone agree that that was the case?

A.    Yeah, that was the spice around town that they was after Bill.

Q.    And does Mr. Allen agree with that too, that it was meant for him?

A.    At the time did he agree with that?

Q.    Yes.

A.   I don't recollect if he agreed with it, but, I mean, hey, he was listening, he was right there.  I don't recall whether he was like, yeah, that was meant for me or it wasn't meant for me, I don't recall that.

Q.   And did he ever express any feeling of guilt that Marquis had been killed as a result of something that perhaps --

A.   That was our friend.  You know, that was our friend.  So, yeah, I mean, of course, we kind of messed up that that did happen.  That was a sad occasion.

Q.   What was the reason that whoever killed Marquis Taylor was actually after Mr. Allen?  What was the motivation behind it?

A.   I don't know.

Q.   You've been shown this already, this is Exhibit 266.  This is your declaration.

A.   Uh-huh.

Q.   And down here at paragraph 4, can you read that screen okay or do I need to blow some of that up?

A.   Read?  What do you want me to -- to myself, correct?

Q.   No, I'm just showing this section that was shown to you by --

A.   Earlier?

Q.   Earlier, correct.  You are referring, I believe, to this paragraph above, when you talk about after you had been

there a couple minutes.  I think you're talking here about the first time you went over to his house.  You see this paragraph 2 here?

A.    Uh-huh.

Q.    Billie would come over to your house all the time. After a couple months you didn't want to, you said let's go over to your house.  So you did.  You're describing basically the first time you went to the house.

And earlier you testified that the first time you went to the house, his sister Yvette came into the room and said don't be friends with him and hit him upside the head and so forth, correct?  Is that what you testified to earlier today?

A.    Uh-huh.

Q.    Now, it was pointed out to you that in your declaration you actually said that that was his sister Ann was the one that came into the room.

A.    Right.

Q.    Now, if you go to the end of this, you actually put -- is that your signature there on June 22nd, 2009?

A.    Yes.

Q.    So can you -- as you sit here today, do you remember how this piece of paper came to be?

A.    Yes.

Q.    Tell us.

A.    Yes.  Well, I was -- I knew he had something coming up or whatnot and --

Q.    Describe what you mean.  You knew we had something coming up?

A.    Mr. Allen had another court date, a hearing or whatnot.

Q.    How did you know that?

A.    Through his attorneys.

Q.    Okay.  And so was the first time that you were contacted since the trial by anyone about this case, is when you were contacted by these attorneys?

A.    Can you repeat that?

Q.    Was the first -- since the trial ended, okay.

A.    Uh-huh.

Q.    You said you didn't have any contact with Mr. Allen in all these years, correct?

A.    Right.

Q.    And was the first time -- what was the first time that you knew that there was some later event occurring, some years after the trial?

A.    That it would be a later event occurring?

Q.    Yes.

A.    I can't recall.

Q.    And what was the next time that anyone talked to you about Mr. Allen in any official capacity, such as a lawyer, an investigator that said somebody is looking into Allen's

case?

A.   When was the last time prior to this in '09?

Q.   Yes.

A.   I can't remember the last time prior.

Q.   Let me try to get the sequence.  2006 is when you had your car accident, correct?

A.   Correct.

Q.   Okay.  Prior to your car accident, between the time of the trial, which happened in '98, to the time of the car accident, that's eight years?

A.   Right.

Q.   In those eight years after you walked out of the courtroom at the trial and finished testifying, after those eight years in that time period, anybody come back and ask you what was Billie's life like or can you tell us how you were friends with him?

A.   I can't recall.

Q.   Did you have any contacts with Mrs. Allen, Juanita, in those years before the car accident?

A.   Before my car accident?

Q.   Yes.

A.   Yes, I had occasion, a run-in with her before my accident, yeah.

Q.   What do you mean by a "run-in"?

A.   Well, she -- after Bill was incarcerated, I had a

run-in with her when I was at a Hardee's restaurant.  That was after I stopped working there and everything.

Q.    We might be confusing a couple things here, so let me just -- when you're saying run-in, during the trial you testified about and told the jury about an incident with Mrs. Allen at a Hardee's and an incident at a Schnucks?

A.    Uh-huh.

Q.    Where they talked about cosigning for Bill?

A.    They were talking about -- Ms. Allen talking to me about that, yeah.

Q.    Okay.  That is before the trial.  So I'm not asking about that.  After the trial is over, the trial is done, Mr. Allen has been convicted, he's received the death sentence, and he goes on to prison.

A.    Okay.

Q.    Okay.  After that whole trial is over, from that time until the car accident, was there any time in that time period where Mrs. Allen and you had any more run-ins or any more conversations about why did you do to that to Bill at the trial?

A.    Right after the trial, yeah.

Q.    So there's another --

A.    I can recall her even right after the trial.

Q.    Okay.  What happened?

A.    You know, she approached me, you know, telling me if I

was any kind of friend of his and whatnot, you know what I'm saying, I should have talked to him or something, you know what I'm saying, I mean, even -- I can't believe and I can't remember that, even the Schnucks incident.  I thought that was after the trial.

Q.    That was actually before the trial.

A.    See, I --

Q.    Because you testified about it at the trial.

A.    Uh-huh, okay.

Q.    But after the trial, did she ever contact you to talk to you about what you had testified about at the trial and say, why you did you say those things about Bill and anything of that sort where she was either --

A.    Not that I can recall since that date of the trial.

Q.    Now, at any time -- what I'm trying to get at, was there any time between the time of the trial and the car accident that anyone contacted you again to talk to you again about these same subjects we've been talking about here today?

A.    I can't recall.

Q.    Okay.  After the car accident --

A.    '06, okay.

Q.    And this paper is dated '09.

A.    '09, right.

Q.    So some time after the car accident and the paper, you

came to have contact with the attorneys?

A.    Right.

Q.    Before you had contact with the attorneys, did anyone else contact you letting you know that these attorneys would be calling you?

A.    I can't recall.

Q.    Okay.  How did they contact you, your very first communication?

A.    Through -- who did they call, my mom's house?  I'm not quite sure.

Q.    Telephone, in other words?

A.    Yeah.

Q.    No one just showed up at a door, knocked on a door like an investigator or lawyer?

A.    I can't recall, man, I'm telling you.

Q.    Okay.  Where were you living?

A.    At this time I was staying with my mom.

Q.    Now you're talking about?

A.    At this -- oh, I'm by myself now.  I'm talking about '09 when I signed, I was at my mom's house.

Q.    Okay.  So how many times did you have meetings with attorneys before you signed this?

A.    I can't -- I can't say how many times I saw them.  It wasn't no more than two, two or three.

Q.    Face-to-face meetings?

A.    Yeah.

Q.    Did they come to your mom's house and talk to you there?

A.    Yes.

Q.    And how many came to talk to you?  One person?  Three people?

A.    At that time it was two.

Q.    Do you remember who they were?

A.    Not last names, but Mr. Tim and Mr. Eric.

Q.    Tim and Eric?

A.    Yeah.

Q.    Okay.  Prior to that time, prior to the first time someone called your mom's house, had you heard from Juanita Allen at all?

A.    No.

Q.    Okay.  And any time in the time period that you're preparing this, had you heard from Juanita Allen?

A.    No.

Q.    And, again, you said you had no contact with Mr. Allen?

A.    No.

Q.    So seeing him here today is the first time you've seen him in the past 14 years?

A.    Yes.

Q.    This document here, did you write this?  Did you write anything on a piece of paper?

A.    On this here, I just signed my name.

Q.    Okay.  Did you ever write out anything for them?

A.    I think I did, but I can't recall.

Q.    Why do you think you did?

A.    I mean, because them are my words.  It's a declaration, and them are my words.  That's what I said.

Q.    And how is it that -- is this word for word what you said to them?

A.    Yeah.  Yeah, pretty much.  Yeah.

Q.    And there's no questions in here, correct?  There's no question and answer format, it's just a statement by you?

A.    Yeah, this is just a statement by me.  This is what I said.

Q.    Did the information that's contained here result from a period of questions and answers?

A.    Yes.

Q.    Now, when we get down to the bottom of this, we actually need to go -- it starts on the page up here.  The bottom here says:  "If I had been asked about any of these topics at Billie's trial, I would have testified to the same information contained in this declaration."  Is that right?

A.    Yes.

Q.    Okay.  So is it fair to say that you feel like you were asked some questions by these attorneys that you weren't asked by anyone at trial?

A.    Yes, I feel that way.  Yes.

Q.    Tell us what those questions were.

A.    I mean, when it came to, you know, such as everything. You know, I was more so at the time when I did testify -- like I said, like I stated earlier, I don't know whether against the prosecuting attorneys, they wasn't pretty much concerned about, you know, his personal life or really getting to know him as an individual like that.  You know, they just, you know, I mean, he did this crime and, hey, we just -- you know, we just trying to get rid of him.  I wasn't asked --

Q.    The question I asked you, though, is what were the questions that they asked you that were not asked of you at trial, that got you to say this information?  So what was the question that was put to you, tell us about Billie?

A.    Yeah.

Q.    That was it?

A.    Yeah, tell us about Billie.  I mean, you can keep going.  Tell us about Billie.

Q.    What was his home life?

A.    There you go right there.

Q.    Why didn't he want to be at home?  Were those the kind of questions they asked?

A.    They didn't ask why he didn't want to be home, they didn't ask that.  But prior to your other questions, yeah.

Q.    Just tell us about Billie, what his house was like, what was it like at his house?

A.    Uh-huh.

Q.    Questions like that.  Nothing more specific.  No one ever said, "Was Billie ever beaten or struck?"

A.    I mean, they asked that, but at the time when I first testified, some of those questions weren't asked.  They weren't asked at all.

Q.    What I'm focusing on here --

A.    I understand.

Q.    -- are the questions you were asked in 2009.

A.    I understand.  I understand.

Q.    Because you said -- make a point here at the end of this, that if you had been asked about these topics at trial, you would have testified to the information.  So you're basically saying, I wasn't asked about these topics at trial, right?

A.    I wasn't, right.

Q.    And in this declaration at paragraph 4 down at the bottom, you begin talking about he was mistreated by his family every time you went over to his house. And then you start about the sisters again.  "His sisters would dog him and get him in trouble with Juanita."  And then, "Juanita and his grandfather would cuss him and hit him and throw things at him.  Billie got picked on and whooped all the time for no

reason.  Sometimes would even turn it into a game and tell me, 'Watch this.'  And he'd approach his grandfather's room and say something like, 'Hey, grandpa,' and a shoe would just come flying out at Billie's head."  Is that what you said to them?  Are those your words?

A.    Yes.  Yeah, that's the whole conversation.

Q.    This got your words correct, in other words?

A.    Yes, that's true.

Q.    So the business here about he'd approach his grandfather's room, that's in the basement?

A.    Okay.

Q.    Okay.  So how did this happen, if he's in the basement?

A.    Like sometimes if he's in the basement, I mean, sometimes we even went to the basement because the back door was locked in the kitchen.  He didn't have a key to the house.  Sometimes the back door was locked in the kitchen, so we can go outside to go play basketball, and therefore Otha was in the basement, so we had to go through the basement to get out through the back.

Q.    Now, most people kept their doors locked in this neighborhood, correct?  It's a high crime area?

A.    Yeah, especially when -- yeah, I mean --

Q.    So it's not unusual for doors to be locked, is it?

A.    I mean, when you're at home.  When you're at home, I mean -- well, at my house, that I can only speak at my house.

You know, I mean, we didn't keep our doors locked all the time, especially if we was at home in the house.

Q.    Did your father live in your house?

A.    No.

Q.    Were there other men in the house?

A.    I was just -- I mean, I ain't --

Q.    Besides you?

A.    No.  No.

Q.    There were people, though, who would keep their doors locked because invasions would happen in the homes even during the day, wouldn't they?

A.    I'm pretty sure that's still to this day, yeah.

Q.    I mean, that's the way crack addicts are, aren't they?

A.    You don't have to be a crack head to break in somewhere.

          THE COURT:  Is this a good time to take a lunch break?  A couple things.  Is 45 minutes enough or do you need an hour?  What are you most comfortable with?

          MR. MORENO:  Whatever you're comfortable with.

          THE COURT:  Well, sometimes you need to answer e-mails and all that, I don't want to cut you short.

          MR. HOLTSHOUSER:  Please do.

          THE COURT:  Pardon?

          MR. HOLTSHOUSER:  I said, please do, cut us short from answering e-mails.  45 minutes is enough for the

government.

THE COURT: 45 minutes is enough, okay. Everyone knows once a witness is on the stand, they are not to talk to the lawyers, and the lawyers are not to talk to you. Do you understand?

Court is recess for 45 minutes. Well, let's say we'll be back here, let's do five minutes to one, how is that?

MR. HOLTSHOUSER: Thank you, Judge.

(Court in recess from 12:08 p.m. until 1:01 p.m.)

THE COURT: Whenever you're ready.

MR. HOLTSHOUSER: Thank you, Judge.

BY MR. HOLTSHOUSER:

Q.    Mr. Grant, before we broke, we were talking about this declaration that you signed, which you indicated contains -- is an accurate rendition of the things you told to Mr. Allen's current attorneys; is that right?

A.    Correct.

Q.    Now, when I first started asking you some questions and we started talking about your recollection of events, you made it a point to advise us and the Court that you had a serious car accident in 2006, and that your memory -- and you suffered a brain trauma, and that your memory has been impacted by that, correct?

A.    Correct.

Q.    Has it resulted in any other disabilities for you? Have you been able to return to work?

A.    Yes, I have been able to return to work, but my performance is limited.

Q.    And physical as well as mental?

A.    Both, yes.

Q.    You can't do some of the things you could do before?

A.    Correct.

Q.    When you were meeting with the attorneys, did you tell them about this accident in the time period this document was being prepared?

A.    I'm quite sure I did.

Q.    You're quite sure?

A.    Yes.

Q.    And did you see anywhere in this document where it indicates that -- and this includes -- first of all, this document represents your recollection of things that happened 10 years, 15 years earlier than this date, correct?

A.    Correct.

Q.    And do you see anywhere in this document where it pointed out to the Court or whoever might read it that your memory has been seriously impaired by this accident in 2006?

A.    No, I don't see that.

Q.    But that's something that you said?

A.    True.

Q.    Okay.  And that's something that got left out of the printed version of your statement, correct?

A.    I can suppose so.

Q.    So in terms of the accuracy of what's contained in here, would you agree that this is somewhat misleading in that it doesn't indicate that your memory has suffered some?

A.    Not by this letter, not by the declaration, no.

Q.    Not by the declaration, correct?

A.    No.

Q.    Is there any -- are there any other things that you said that were left out of this declaration?

A.    Only asked the following questions, only answered the following questions.

Q.    How many meetings did you have that went into producing this document?

A.    I'm not quite sure.

Q.    Do you remember when you were -- I mean, even as you sit here today, this is something that happened in the past, this is 2009, so three, four years ago?

A.    Correct.

Q.    You don't remember how many times you met with either Tim or Eric in the past four years?

A.    No.

Q.    Do you remember when this actually got put before you to put your signature on there?

A.   I don't remember a specific date, but I do remember it being presented in front of me and I'm signing it.  I do remember that.

Q.   The whole document got presented to you, not just the signature page?

A.   Pardon me?

Q.   The whole document got presented to you?

A.   Yes.

Q.   All the pages?

A.   Yes, I remember that.

Q.   And there's even like some corrections that occur on the bottom down here where the number of pages is corrected, and there's some initials that you initial every page, don't you?

A.   Uh-huh.

Q.   Now, if we look back at -- well, before we do that, and at least even with respect to one of the incidents that's described here, this one involving -- where in this document it says Ann, where earlier today you said Yvette, even as you sit here, you're not sure which is correct, Ann or Yvette, that this incident is referring to, are you?

A.   Yes, I'm quite sure.  I'm quite sure it was Ann.  But as you can recall, I do remember all three of his sisters. And as I stated earlier, I may have got that name wrong at that particular time, but like I mentioned earlier, all three

sisters, all three sisters have disrespected him and hit him and taunted him and everything else, so --

Q.   So the conduct described here is not unique to Ann. Ann wasn't just the bad one, all three of them treated him equally bad?

A.   Correct.

Q.   And we talked earlier about -- I want to just ask you again about this section here.  In terms of the treatment that Billie received, his reaction to it, its impact upon him, in one instance you said he would turn it into a game, and he told you, "Watch this."  He actually then went about doing something that he fully expected to get a rise out of his grandfather, right?

A.   It could be just as simple -- him saying "Watch this" is basically saying, watch this, I'm not going to do anything but call his name, and watch him hit me, watch him do something bad to me, watch him want to whoop me for just calling his name.  That's watching this.

Q.   So basically before it happened, Billie is saying to you, "Watch this," because I know when I say, "Hey, grandpa," what's going to happen, correct?

A.   Correct.

Q.   Okay.  And he said it -- did he tell you in advance what was going to happen?

A.   He said, "He going to try to hit me or something, and I

ain't do nothing.  And this is the type of abuse that I get right here."

Q.    And he wanted to show you?

A.    Of course.

Q.    It wasn't something that, I am afraid -- I am scared to death of shoes, and I just can't take the risk of having one come at me, and I just avoid that at all costs, he says, "Watch this," a shoe is going to come flying out at me?

A.    Watch this, correct.

Q.    And he did it, and as he predicted, a shoe came flying out?

A.    Correct.

Q.    Did it hit him or miss him on that occasion?

A.    Sometimes it did; sometimes it didn't.

Q.    On this occasion when he said, "Watch this," when he made a joke out of it, did it miss him or hit him?

A.    It probably missed him right there.

Q.    You're not sure?

A.    I'm not sure.

Q.    So in terms of Billie's reaction to the treatment that you observed in his home, he didn't appear to react in any traumatic or horrific -- his reaction to it wasn't the same as if something horrific or traumatic had happened, correct?

A.    Correct.

Q.    Such as someone dying?

A.    Correct.

Q.    I mean, he didn't feel that by saying this and this happening, that his life was in danger, did he?

A.    No.  It was more of a routine.  I'm speculating here, it was more such as a routine.

Q.    If you're speculating, that's --

A.    I'm speaking -- I mean, he was used to it after all these years, I can imagine, he just deals with it.

Q.    And what was his way of dealing with it?

A.    His way of dealing with it was we go hang out or something, you know, getting away from the house.

Q.    Now, the places where you would go hang out in the early years when you were friends, sometimes that was your house, correct?

A.    Uh-huh.

Q.    Because you didn't have a car?

A.    Well, I had a car when I was 16.

Q.    I'm talking about earlier, before you were 16.

A.    Before I was 16, gotcha.

Q.    So where you could go was limited, correct?

A.    Correct.

Q.    Once you had a vehicle, you had a little more range?

A.    Correct.

Q.    But you didn't go to your house on those occasions to hang out, did you?

A.    Yes.

Q.    You and Billie did?

A.    Yes.

Q.    But you also went other places such as the mall, the arcade, movies, Cloud Nine, places where there were no parents, correct?

A.    No, I can't agree with that at that age.  I mean, no, we weren't going to clubs at 13, 14.

Q.    I'm talking about once you were 16 and you could drive, and Billie was 15.

A.    I mean, you kind of switched -- just minutes you said before I had a car, now you're saying now I do have a car. I'm --

Q.    Let me go a little bit slower.  Before you had a vehicle.

A.    Before.

Q.    More likely than not when you and Billie would hang out would be your house?

A.    Yes.

Q.    After you had a vehicle --

A.    Okay.

Q.    You with me now?

A.    Right.

Q.    After you had a vehicle, more likely than not you would go somewhere else than your house?

A.    Correct.

Q.    Because you wanted to be away from your house as well?

A.    I wouldn't say that.  I mean, I wouldn't put it like that.  I mean, just getting out the house.  It ain't that I didn't want to be at home.

Q.    You were a typical 16, 17-year-old, right?

A.    Thank you.

Q.    You want to go out and see things, meet people, meet girls, do things, right?

A.    Just doing things, correct.

Q.    And you and Mr. Allen had that in common?

A.    Correct.

Q.    I want to talk to you a minute about the notion of locking him out.  And the words in your declaration were that "as he got older."  Now, when you first meet him he's about 14, you're about 15; is that right?

A.    Yeah, about 13 -- yeah, 13, 14 he was, yes.

Q.    Okay.  And you were 14, 15?

A.    14, 15, take it or leave it.

Q.    And when you say in paragraph 9 of your declaration, "As he got older, Billie was locked out of his house more and more."  What do you mean by "as he got older"?

A.    As he progressed in age, as he started growing up from 13, 14, 15, 16, 17, 18, more -- instead of getting locked out two times a week, the older he got, it turned into three to

four days a week.

Q.     So are we talking about --

A.     Whatever.

Q.     -- before or after he drops out of school?

A.     I mean, I'm pretty sure.  I mean, you can do the age. I mean, if he was in high school, he was getting locked out. I mean, till he dropped out he was getting locked out more and more.

Q.     But when you made this a couple years ago, you must have had something in mind, as he got older you saw a change occur in the pattern of being locked out, correct?

A.     I mean, I notice that instead of getting in the house from time to time, yeah, of course it had to be something. But I wouldn't say it was a change on him.

Q.     No, I said you are indicating in this declaration --

A.     Right.

Q.     -- that something increased.

A.     Something had to increase.

Q.     What I'm trying to find out from you, when you said "as he got older."

A.     Correct.

Q.     What age are you referring to when you saw this change in the frequency occur?

A.     I mean -- see, you're taking me back there years ago. Like I said, from -- I can't estimate what age as years to

come, as he got older, it happened more frequently.

Q.   Okay.  Isn't that what you're doing here, though, in this declaration, is you're taking us back to years and years ago?

A.   I mean, that's what I'm doing right now, yeah.

Q.   Paragraph 11, you address again how Billie reacted to some of the treatment that he got at home.  And you indicate that -- first of all, this word "abuse," okay, that I circled that in yellow there.  Was that your word?

A.   Yes.

Q.   When did you come to view the way Billie was treated at his house such that you would apply the word "abuse" to it?

A.   When did I come to that recollection?

Q.   When is the first time that you would talk to someone else and say, Mr. Allen was abused?

A.   You're losing me.  When was the first time?  Even as a -- when I first noticed it and I brung it to his attention himself.

Q.   What did you say to him?

A.   I used that word "abuse."

Q.   Abuse?

A.   Yeah.

Q.   What did you say to him when you brought it to his attention?

A.   I mean, man, they be abusing you, they be dogging you,

in the same sentence.

Q.    What did he say in response?

A.    "I know, it ain't fair."

Q.    It's not fair?

A.    "It's not fair.  It's not right how they treating me." That's right, that's what he said.

Q.    Did you talk to Eric Taylor, Marquis Taylor, your mother, anyone else that you knew about the situation and used the word "abuse"?

A.    Yes, I mean, we actually all used it.

Q.    Okay.  So any time that we'd be talking about Billie's life at home, the word that would immediately come to your mind back in 1998 would be "abuse"?

A.    I got several words, but abuse was one of the many.

Q.    It would be the main one, correct?

A.    It was many of them.

Q.    But in here you said Billie used to act like it didn't bother him, correct?

A.    Correct.

Q.    So at least on the outside Billie gave no indication that this, what was happening at home was having any sort of traumatic or horrific impact on him, correct?

A.    Not really.

Q.    I think in this same paragraph, we left it too soon here, you said that, "He acted real optimistic and acted like

X - 165

none of it bothered him."  But then you said, "A few times, though, when we had been drinking some beers, he would get sentimental and then he would say things like, 'Why did God give me this life and why couldn't I have your mother.'"  So in some situations he would complain to you that he didn't like it, right?

A.    Yeah.

Q.    Now, you describe an incident in paragraph 12 where you're walking along the street and you estimate that Billie was about 15 or 16.  So a couple years ago, this was still an incident that you recalled vividly, is that right, and you recall his age as being 15 or 16?

A.    Yeah.

Q.    And his mother -- saw his mother pull her car into the parking lot of the liquor store.  Were you and Billie both walking?

A.    Yeah.

Q.    Now, earlier you described how poor things were at his house when he was a teenager.  How was it that Mrs. Allen had a car?  You said you saw his mother pull her car --

A.    Okay.

Q.    -- into the parking lot?

A.    Well, it was the car she was driving.  But from what I knew, she drove Otha car.

Q.    Otha's car?

A.    It was Otha's station wagon that she used to drive.

Q.    Okay.

A.    Yes, her car, I mean, hey.

Q.    And she wanted him to get some money so that she could, I guess, go to the liquor store was your assumption, correct?

A.    I mean, yeah, we was at the liquor store.

Q.    And Billie's reaction was to get upset and start yelling at her; is that right?

A.    Correct.

Q.    So were there other instances when you saw Mr. Allen yell at his mother or cuss her out at home or out of the home?

A.    Well, yeah.  Yeah.  Yeah, a couple of times.  A couple of times, but not directly to her face.  I mean, if she tell him whatever, we didn't want to go get the cigarettes or something of that nature, and we get back and the door is locked and he need to change clothes or whatever the case may be --

Q.    Yeah.

A.    -- yes, he did yell.

Q.    And cuss her out?

A.    Yes.  He did yell, "Open this, the dog-gone door," yes, he did.

Q.    So would he call her names?

A.    I mean, not to her face.

Q.   But would he be yelling it to the house?

A.   Not to her face, not that I know of.  Not him calling her names to her face, no.

Q.   But in that paragraph as well, you said that most of the time Billie just shrugged it off, correct?

A.   Right.

Q.   I want to direct your attention to this paragraph 13. Because you're recalling in 2009 something that actually happened in '97.  "So a few nights before Billie got arrested," okay, you're referring to the arrest for the bank robbery, correct?

A.   Uh-huh.

Q.   In March of 1997?

A.   Uh-huh.

Q.   I know you probably don't remember that date, but that is the date when he was arrested, March of '97, okay?

A.   Okay.

Q.   So you're describing an incident a few nights before that arrest.  You were driving him around, and he wanted you to take him to his house to get some clothes; is that right?

A.   Uh-huh.

Q.   Okay.  So in 2009, could you still remember this event?

A.   Yep.

Q.   Because you also remembered it back at the time of the trial, and I think testified about it as well.  So you could

still remember this in 2009; is that right?

A.    Well, I can remember this moment, yeah.

Q.    Okay.  And at that time where was he living?  Was he still living at home?

A.    I'm not sure.

Q.    That part you don't remember?

A.    I don't remember that part.

Q.    Okay.  Do you recall there being a time -- now in 1997, Mr. Allen was 19 years old?

A.    Uh-huh.

Q.    Almost 20?

A.    Okay.

Q.    Okay.  You're 20, going on 21?

A.    Correct.

Q.    So at that time were you still living at home?

A.    Yes.

Q.    And you're working full-time?

A.    Yes.

Q.    Were you working more than one job?

A.    I can't remember.  Once upon a time I was working two jobs, though.  But I can't remember at this point in time right then and there that moment, I don't remember me working two jobs.  I can't recall.

Q.    Well, at least in the period the year before Mr. Allen got arrested, the year before March of '97, those months,

that period before then, did you have less opportunity to spend time with Mr. Allen than you had previously had because of your work commitments?

A.    I believe we went through this earlier.  Like I said, with working 40 hours a week, you know, five days, I can imagine, that was eight hours.  But after those eight hours were done, we usually hung out.

Q.    We're talking like up through continuously through December '96, January of '97, February of '97, March of '97?

A.    Yes.

Q.    And so where in those time periods was he living if you were together that much?

A.    Sometimes we can be together but I still don't know where he stayed, because he had girlfriends, he'd spend nights over there.  I done dropped him off over girlfriend's house.  He then stayed a couple of nights with me.  I mean, I would say -- I wouldn't say his residence was one specific place.  I couldn't say that.

Q.    By that time, we're talking like December through the time that he was arrested, had he actually moved out of the house?  He didn't want to live there anymore?

A.    I'm not sure.

Q.    What about what he was doing with his free time, did you know what he was doing during his days?

A.    No.  While I was at work?

Q.   Yeah.

A.   No, I didn't know what he was doing.

Q.   He didn't tell you?

A.   Sometimes he did.

Q.   Did he ever tell you anything about selling crack out of a house a block or two from his house, an abandoned house?

A.   I mean, we both did that, yeah.

Q.   But he in particular, did he tell you that he was getting pretty active doing that at a particular location near his house?

A.   I mean, that's what he did, yeah.

Q.   You knew that?

A.   Yeah, I didn't know he was staying there.

Q.   I didn't ask you if he was staying there.

A.   Okay.

Q.   That he was conducting business there --

A.   Okay.

Q.   -- on a regular basis, did you know that?  Did he tell you that?

A.   I mean, I knew that.

Q.   Did he tell you that someone had come by that place and threatened him and told him that he couldn't sell there anymore, and he needed to leave?

A.   No.

Q.   Did he tell you before January of '97 that he had been

threatened by anyone in connection with his drug trafficking activity?

A.    No.

Q.    Do you recall the time or the -- I'm not asking for the date again, okay, this is not a trick question.  Do you recall the event hearing about, knowing about his mother's house being shot up?

A.    Yes.

Q.    And I'm going to tell you that that happened January 9th, 1997.

A.    Okay.

Q.    Okay?

A.    Okay.

Q.    At the time that that happened, how did you find out about that?

A.    That his house got shot up?  He told me.

Q.    What did he tell you about that?  Was he there when it happened?

A.    Some guys that -- no, he wasn't there, I don't believe.

Q.    In fact, did he tell you that he hadn't been at his house for some time prior to that because he was trying to avoid letting those guys know where his family lived?

A.    I can't recall that.

Q.    Had he told you that he was trying to avoid being seen by these individuals because they were after him?

A.    Well, he told me that some individuals was after him, they shot up his mom's house, which I knew who the guys was.

Q.    He knew who the guys were?

A.    I knew who the guys was also, yeah.

Q.    And why were they after him according to Mr. Allen?

A.    I can't recall why they was after him.

Q.    Somehow or another it ended up, though, with them shooting his mother's house up, correct?

A.    Correct.

Q.    How did Mr. Allen react to that event?

A.    After them shooting his mom's house up?

Q.    Uh-huh.

A.    I mean, hey, it's messed up.

Q.    Was he really upset about that?

A.    It was messed up.  You keep asking me this question. Bill didn't really show a whole lot of emotions.  At times he frequently did, but he really didn't show emotions like that.

Q.    Did he show any emotions in connection with this event?

A.    I mean, he told me, "That's messed up, those guys shot up my house, man.  I mean, that's jacked up."

Q.    Was this one of these times, though, where you felt like he was showing more emotion than other times about something?

A.    Of course.

Q.    Even more emotion than let's say about what was

happening to him when he was younger at home?

A.    It was pretty much -- I mean, just the same emotions that he felt when he was at home also.

Q.    What was it about this event that brought out these emotions in him?  Did he tell you that?

A.    I mean, I guess under the same breath he still care about, that's my family.  You know, my family could have got killed when they shooting up my house when they after me supposedly.

Q.    Was there an element of guilt associated with this as well, though, similar to how Marquis Taylor had died, that as a result of his actions or his dealings, he'd almost gotten someone in his family hurt?

A.    I'm quite sure.  I'm quite sure.

Q.    So how often were you seeing him in the period, the week before or after that shooting event?

A.    After his mom's house after I dropped him off?  After I'm trying to -- after his mom's house got shot up?

Q.    When you saw him and first heard that his mom's house got shot up, did you see him the day after, a week after, or were you seeing him every single day?

A.    I was seeing him every single day.

Q.    Had you heard about his mom's house being shot up before you heard about it from him?  Or did you hear about it in the neighborhood?

A.    No.

Q.    You heard --

A.    We're going to take this back.  I had moved out of the neighborhood by this time.

Q.    Okay.

A.    I no longer resided just down the street from him no longer.

Q.    Okay.  So even though you didn't live in the neighborhood anymore, you didn't go by his house to pick him up then if he wasn't staying there, did you?

A.    Yes, I did.  Yes, I went by his house to pick him up.  Sometimes even after I had moved sometimes.

Q.    Okay.  Were there times when he wasn't living at his house anymore?

A.    I can't say that, that he wasn't living there.  Because I did pick him up from there sometimes.

Q.    Where were other places that you picked him up from?

A.    He used to be at the store down the street from me around the corner from the Central West End where at the time I was living with my mom.  He would call me on the pay phone and tell me to pick him up there.  Probably at a chick or two house that we both know.  I mean, it was different places.

Q.    So in that time period, was he basically staying from place to place?

A.    Yeah, that would be fair to say.

Q.   And was there a period of time after his mother's house was shot up that he was staying with one particular girl, a girl named Tasha and her mother?

A.   I just don't -- I remember Tasha, like I said, that he used to be over there.  But I don't recall him staying with her.

Q.   After his mother's house was shot up, was it known to you that he couldn't go back home?

A.   No, it wasn't known.

Q.   He wasn't allowed back to his house?

A.   No, I didn't know that.

Q.   He never told you that?

A.   No.

Q.   In the time period you're describing here in this paragraph 13 that's on the screen, this is a couple nights before Billie got arrested in March of '97.

A.   Okay.

Q.   So we're talking two months after his mother's house got shot up.  Were you aware of anything going on in February of '97 where he took himself to a psychiatric hospital or ended up at a psychiatric hospital?

A.   No, don't remember.

Q.   So if you're with him every night, I guess the question is, where were you on the night that he went to the Metropolitan Psych Hospital with Tasha and her mother?

A.    I mean, I -- I probably was --

Q.    You weren't there, were you?

A.    I was probably laying over with my baby mama or something.

Q.    You weren't there, were you?

A.    I wasn't there apparently.

Q.    You were not with him?

A.    Apparently I wasn't.

Q.    Because at that time did you have a child?

A.    Yes.

Q.    And were you also -- were you staying with the mother of the child?

A.    I was back and forth also between my -- I was staying with my mother, but --

Q.    Back and forth.  Were those two things taking up the majority of your time?

A.    That --

Q.    And work?

A.    With work and me having fun with Bill and going home, I mean, that's what my day consist of.

Q.    This night you're describing before he got arrested, you said, "I was driving him around, he asked me to take him to his house so he could get some clothes.  He walked up to the door and knocked.  I saw someone look through the blinds, and Billie asked to get in so he could some clothes.  They

told him no.  He pleaded with them and banged on the door but they told him to go away and that he was not welcome there ever again."

Who was it that said, he's "not welcome there ever again," which person?

A.    I was sitting in the car at that time.

Q.    Did you hear this?

A.    I was sitting in the car at that time so I couldn't see.

Q.    Could you hear?

A.    No, I couldn't hear neither.

Q.    Well, how do you know what --

A.    That's what he told me.  That's what he told me at the time when he got back inside my car.

Q.    Okay.  Did you indicate to the lawyers who were listening to you -- I take it you didn't type this up and you didn't write this up, someone else did it for you and presented it to you?

A.    Yeah, correct.

Q.    Did you tell them when you talked to them that you only heard this from Bill, you didn't hear this firsthand?

A.    That's -- well, no, I can't recall me telling them that.  But at the time, I mean, that's how it went though. You know, I don't see anything wrong with that, because that's exactly -- told him to go away and that he was never

welcome again.

Q.    But you didn't hear that?

A.    But Bill told me that.

Q.    That's what Mr. Allen told you?

A.    Yes.

Q.    And would that seem to be news to him, like did he say, well, I guess I'm not -- I mean, was that a surprise to him or was that something that he actually already knew about?

A.    I took it at that time it was a surprise.

Q.    And who was it that was looking through the blinds?

A.    Once again, I said I don't know.  I didn't even care to ask.

Q.    Did Mr. Allen tell you who was inside that --

A.    Like I said, I didn't even care to ask.

Q.    At this time, a couple nights before the offense occurred, was anything else bothering him that he told you about?  He wasn't at home, correct?

A.    Pardon me?

Q.    He wasn't at the house apparently with his mother and his sisters and his grandfather?

A.    Well, you -- I'm lost.

Q.    Well, in this -- in the weeks before this, okay, he basically says, I want you to take me by my house to get some clothes.  And he's not welcome there.  So, I mean, did it appear to you that he's not actually living there at the

time?

A.    I didn't know he wasn't welcome there until after I took him to his home.

Q.    Okay.  But I'm saying to you, at the time that you're in the car until you drive away --

A.    Uh-huh.

Q.    -- what did you do that night?

A.    I can't recall what we did that night.

Q.    He didn't tell you about anything that he had planned coming up in the near future?

A.    I can't remember.

Q.    Do you remember what his mood was?  Did he seem to be depressed?  Was he depressed or agitated or anxious?

A.    I can't remember.

Q.    You remember testifying in the grand jury, right?

A.    Well, I remember testifying in grand jury, yes, correct.

Q.    In this same page in the grand jury --

        MR. MORENO:  Is this an exhibit?  I'm sorry.

        MR. HOLTSHOUSER:  Exhibit 659.

        MR. MORENO:  Thank you.

Q.    Page 76 in this transcript, you were asked some questions about before Bill got locked up.  The last time you saw him.  I'm at line 8 and 9.  Do you see that question?

A.    Okay, yes.

Q.    "Before Bill got locked up, John, when was the last time you saw him?"

Your answer, "That Friday."

"Okay.  So if he got locked up, let's say on the early morning of March 18th, Friday would be the 14th.  Does that sound right?"

You said, "No.  More like the 15th."

"QUESTION:  Okay.  Anyway, you're sure it was the Friday before he got locked up?"

"Yes."

"And where were you two at that time?"

"We went out that night."

"To the clubs?"

"Yeah."

"Okay.  Did you see Lakeshia or Marcy Chowning that night?  Do you remember that?"

"No."

"You didn't see them?"

"No."

"You were with Bill that night?"

"Yeah."

"QUESTION:  He didn't go home to your house or stay with you that night?"

Your answer:  "Uh-uh."

"Where did you part company with him?"

You say:  "I mean, I don't understand."

"I mean, did you drop him off someplace, or did you leave the club separately?"

"We left the club separately that night."

"Okay.  So the last time you saw, you've not seen him since?"

"I've not seen him since."

So you're being asked several questions about the contacts that you had with Mr. Allen on that particular night.  Nowhere in there did you explain to the person who was asking you the questions of the grand jury about having gone by his mother's house to try and get some clothes and him being refused admittance and then leaving, correct?

A.    I still don't -- I don't even remember this for real. I don't remember everything that was -- I'm looking at it now, and I don't even remember half of this right here that you done read.

Q.    You don't remember going to the club that night with him?

A.    I remember going to the club that night.  But such as further wise what happened after that night, I can't even recall what happened after that night.

Q.    Well, all you're being asked about is what happened that night, the last night you saw him.

A.    Right.

Q.   You're being asked what happened that night?

A.   Right.  I'm looking at it.  I'm looking at it.

Q.   And this is what you said in 1997 when you came before the grand jury?

A.   Right.  Right.

Q.   This is actually like a couple, I believe this was a short time after the offense occurred.  I don't have the date on that page.  But it was part of the indictment.  Mr. Allen was indicted shortly after the offense?

A.   Uh-huh.

Q.   So this is when this is all pretty fresh in your mind, correct?

A.   Uh-huh.  I can imagine so.  Yeah, I'm looking at it now, yeah.

Q.   But you're saying that even though you didn't mention any of this other business about going to his house and being refused admittance in 1997 when it was pretty fresh in your mind, and it's many years before the car accident --

A.   Right.

Q.   -- somehow you think that in 2009 when you sat down with these lawyers, you remembered that the last time you saw him, you went to his house and he was refused admittance?

A.   Yeah.  Supposedly, yeah.

Q.   What do you mean that you left separately, left the club separately that night?

A.    Now, once again now this is in '97.  And as you can recall, in '09 I thought I remembered something else.  So I don't really know what -- I can't remember that night besides just going to the club.  I can't remember anything else after that.

Q.    Let me ask you this:  As you sit here right now are you positive that the occasion that you're describing when Bill went to get some clothes and wasn't let back in, was the same night as the last night that you saw him before he got arrested?

A.    Am I positive?

Q.    Yes, sir.

A.    That's what you're asking, am I positive?  Now to be sure to say that that was the last night that I did see Bill, the night when I took him to his house, I can say I am positive about that, yeah.

Q.    So you can sit here and say that 15 years ago, you're positive that that happened, but when you were in the grand jury describing the last time you saw him --

A.    Because I remember the last time that I did see him.  And I did -- because I actually was going over my mother -- my baby mama's house.

Q.    And you remember that now, but you didn't mention that in this --

A.    Yeah, I mean, hey, it's like that.

Q.    Okay.

A.    Yes, sir.

Q.    I'm just trying to figure out what it is like.

A.    Yeah.  I mean, it's -- like I said once again, I mean, my remembering something that -- like this, now trying to recall every moment that me and Bill shared and everything, it's a whole nother stature in my life now by me having to try to get my life together in '06 after my accident and me getting back on the right track.  I tried to put all of this behind me.  So I pretty much kind of blocked it all out, or, therefore, I don't remember honestly.

Q.    Okay.  I'm still going to show you a few things what you testified to in the grand jury.  And I understand you want to get this behind you and move on.  But this is page 65.  And without going through what's on these next three or four pages, as you sit here now, okay, looking back 15 some years ago, do you independently recall seeing the individual who you learned to be Norris Holder as someone that Mr. Allen spoke with, knew from Cloud Nine?

A.    Yes.

Q.    And you gave that testimony to the grand jury?

A.    Yes.

Q.    You gave it at trial as well, correct?

A.    Yes, I -- yes.

Q.    And you understand now and you understood then that

Q. that's the person he was accused of committing the bank robbery and the murder with?

A. Yes.

Q. And you also testified in the grand jury, and do you remember now as well that Mr. Allen called you from jail some time after this happened, a short time after it happened, let's say like in March, April '97, and talked to you about the offense, didn't he?

A. Yes, he did.

Q. And told you, for example, that he drove the van, but he didn't go in, and he didn't have anything to do with the guard being killed, correct?

A. Yes.

Q. And you testified to that in the grand jury; you testified to that at the trial?

A. Yes.

Q. And you understood that in doing so, you were connecting, by Mr. Allen's own words, himself to the bank robbery event?

A. I mean, that's what he was telling me. So, I mean, it is what it is, yeah.

Q. And just so we're clear, one of the things -- back in '97 when you appeared before the grand jury and when you testified twice at trial, you made it clear that you were going to tell the truth about what you knew, didn't you?

A.    That's right.

Q.    And you had these letters as well, and you didn't want to turn those over, but your mother said that you should, correct?

A.    Yes.

Q.    And you did do it?

A.    Yes.

Q.    Because among other things, those letters included some conversation by Mr. Allen, he wanted you to come to court and lie about something for him.  Do you recall that?

A.    Correct.

Q.    What I'm showing you now, Mr. Grant, is your testimony the first time at trial.  And --

      MS. CARLYLE:  Can you give an exhibit number, please?

      MR. HOLTSHOUSER:  It is Exhibit 175.  It's the transcript of the testimony at the guilt phase.

Q.    And on page 262 -- 260 rather, 2-6-0:

      "During the first part of the month of March, before March 17th, how often did you come in contact with Mr. Allen?  How often did you see him?"

      Your answer was, "Pretty much."

      "Before the middle of March did you know Lakeshia Williams?"

      And you met her at Cloud Nine, correct?

A.    Yes.

Q.    "And you introduced her to Mr. Allen?"

And you look there at line 15, you said, "Yes."

"And do you recall about what time frame that took place?"

You didn't really remember the time frame but it was before March of '97.  And then you actually had occasion with Mr. Allen to visit Lakeshia Williams' house, right?

A.    Yes.

Q.    And that was over -- she lived over on Oregon with a woman -- another woman named Marcy; is that right?  Does that ring a bell?

A.    Yes.  Yes.

Q.    And Marcy has -- had a little boy, she had a child?

A.    Yes.

Q.    The question you're asked here on page 261:

"Do you know on the first part of March of 1997 where Mr. Allen was living?"

And you said, "He was on -- before March?"

"Yes."

"Basically at the time he was really just, you know, iffy, off and on."

"Going -- staying from play to place?"

"Yeah, somewhere."

Was that a correct statement of where Mr. Allen was

living in the period before the robbery?

A.    Yes.

Q.    So you didn't say in there, well, he was living at his mother's house on Cote Brilliante.  He was living other places off and on?

A.    Yes.

Q.    Correct?

A.    Well, you can stay -- I mean, you can stay at home with your mom and still spend the night and stay at other places also.

Q.    But the places that -- you didn't include amongst the places that he lived the house where he had grown up.  He was staying at other places off and on?

A.    That too, yeah.  That too, yeah.

Q.    When you say "that too"?

A.    Right.  I mean, I have done it.  But even like during this time, I stayed with my mother.  But I didn't come home for like four or five days.  But I still stayed with my mother.

Q.    All right.  And then in the same -- in this same series of testimony, the letters were admitted, and you testified about the letters that you had received.  Do you remember that?

A.    Uh-huh, yes.

Q.    Now, I want to take you to -- if I can find it, this is

the part of the testimony where Mr. Allen's attorney is cross-examining you.  And you were asked the question -- again, his attorney is trying to focus on where Mr. Allen was living.

THE COURT:  285?

MR. HOLTSHOUSER:  Page 285 of Exhibit 175.

Q.    "Would you say" -- and it begins at the top:

"Would you say that in January, February and March he was pretty much scrounging around?"

"Yes."

"He moved out of his mother's house because it got shot up, right?"

Your answer, "I wouldn't say that."

And then, "His mother's house got shot up or not?"

"I heard rumors it did."

"Went over there, didn't you?"

"Nah, not after I heard the rumors."

So were you indicating there that after the house got shot up, you really hadn't been back to the house?

A.    Well, at that time, right.  At that time, no.

Q.    Well, you're testifying here in 1998.  And I guess the thing is that even in this question you didn't tell Mr. Allen's attorney that, well, yeah, I was back at the house one time when Billie tried to get his clothes and he was locked out.  You didn't tell him about that either, did

you?

A.    Correct.  Correct.

Q.    And then a little farther down:

"And did you from January '97 to March of '97 ever go over to his house?"

Your answer:  "He wasn't -- he wasn't really there. I mean, a couple occasions, I suppose."

And then, "On those occasions did you see any damage that had been caused when the house had been shot up?"

And you said, "No."

Then he says, "Now, when you say he wasn't there, he was staying at your house?"

"No."

"Did he ever stay at your house between January and March?

"Overnight?"

Your answer, "Nah."

"But he was just sort of bouncing around, staying where he could?"

"Yes."

Is all that correct, the answers that you gave?

A.    Well, yes.  At the time, yeah.

Q.    So in asking you these questions, clearly his attorneys at the time were aware that he wasn't living at home and he was living places where he could find to stay?

MR. KANE: Objection, he can't testify to what Mr. Allen's attorneys were aware of at the time.

THE COURT: Yeah, I think so. Sustained.

BY MR. HOLTSHOUSER:

Q. You're asked on this question, on this page here, still on page 286, about some of the lies that he told. And that he would brag about cars, fancy cars, Lexuses, money. And that was a total lie? Yes. And he bragged about having gold. And then the top of the next page, he bragged about making rap records.

And you say, "Well, I wouldn't say -- I mean brag about making --"

"Did he brag about having recording contracts?"

"Nah. I wouldn't say that. I wouldn't say that."

"Did Billie brag about a lot of things?"

And your answer is: "Well, I didn't say brag, I wouldn't call it brag. I'd just say lie."

"How about calling it a lie?"

"Yeah."

"And that was always to make himself look like a big man, right?"

"Yes."

That was correct also, right?

A. Yes.

Q. Now, in terms of money, I think you testified at

page 289, you were asked at the bottom:

"As far as you know, had he ever received a dime as a result of his efforts to try and make music?"

Your answer:  "No."  As far as you know.

"And had you ever seen him with more than $500 on him?"

And your answer:  "Once upon a time, yes."

"He's worked several jobs, right?"

"Right."

"When I said -- when he said he had ten Gs, did you believe it for a minute?"

"No."

Now, the time that you're referring to here when he had over $500, once upon a time, yes.  What are you referring to?

A.    Say that again?

Q.    You see at the top what we just went over, you were asked, "Had you ever seen him with more than $500?"

A.    Okay.

Q.    And your answer was, "Once upon a time, yes."

A.    Okay.

Q.    So I'm asking you, what is that time?  Once upon what time had you seen him with more than $500?

A.    What is -- I can't recall the particular time, but when he had in his hand $500, that's the time that I seen he had

$500.

Q. And then the next question that his attorney asked was:

"He's worked several jobs, right?"

You said, "Right."

Did the occasions when you saw him with more than $500, was that money that Mr. Allen got from working jobs?

A. I don't know. I don't know. I can't recall.

Q. Do you recall times that he had money like that from selling drugs?

A. Yes.

Q. And that wasn't fantasy, that wasn't made up, that was real?

A. Well, once again, like I said, just because he showed me $500 at that time, don't mean that it was his.

Q. You were asked some other questions here, at least in this phase of the trial about what Mr. Allen was like. And he's asking you about Cloud Nine in the middle of this page. And he's asking about Norris Holder. You see at the top, "You've seen his picture in the newspaper?" You see at the top it's referencing Mr. Holder?

A. Right.

Q. "You saw it on television?" "Yes."

A. Right.

Q. "You knew his name from the picture and everything else?"

"Yes."

"The first time you saw him at Cloud Nine was -- were he and Billie doing anything or did Billie just introduce you?"

"He didn't introduce me to him."

"Did he talk to him?"

"Yes."

And then he's asked:  "Did he talk to anyone else there?"

"I mean, he talked to Billie.  Yeah, he talked to numerous people."

"And is that kind of Billie's thing, to go and talk to people?"

"Yeah."

Is that true about Mr. Allen, that he was a pretty social person?

A.    Yeah, would say so.

Q.    Did you ever notice that like in social settings did he seem to have any impairment, any difficulty in communicating with people and striking up conversation, making acquaintances, friendships with girls, et cetera?

A.    Half the people that we hung around we knew, so even when we go out, you know, to the clubs or whatnot, I mean, he don't have a problem talking to females or anything, no.

Q.    He did not?

A.    No.

Q.    Was he pretty good at it?

A.    I don't know.  I have no clue if he was good at talking to females.  I don't know.

Q.    To your knowledge did Mr. Allen ever perform a rap in public at Cloud Nine and win an open mike contest?

A.    I can't remember.

Q.    Would it refresh your recollection if the subject matter was a rap about robbing the Casino Queen?

A.    Oh, I really can't remember that, no.

Q.    Okay.  Let me show you -- this is Exhibit 638-B, page 4.  A little smaller type.  I may have to blow it up for you here.  This Simon here on the left, that's one of Mr. Allen's attorneys.  And this recording was made back in January of 1998 before his case went to trial.  So this is a recorded conversation between Mr. Simon and Mr. Allen.  Okay.  You with me?

A.    Uh-huh.

Q.    And you haven't seen this before, have you?

A.    No.

Q.    I want to ask you some questions about this, though, because it mentions you.

A.    Okay.

Q.    Now, Mr. Simon:  "Let me ask you this, have you ever performed anything in public about robbing a river boat?"

"Yeah, I did.  Like I did something at Cloud Nine. They had an open mike night when I rapped up there one night."

And then Mr. Simon says:  "I remember when you talked about that."

"Allen:  Yes, I had, there an open mike night (inaudible) you know (inaudible) that's what they wanted to hear.  They heard it and, uh, I won.  I won the contest for it."

"Simon:  Uh (inaudible) who was an individual who you remember that was there?"

"Allen:  Johnnie Grant."

MR. KANE:  Your Honor, I want to object on relevance grounds as this being a conversation that Mr. Grant was not privy to, and because Mr. Grant has already said that he remembers no such event.  So it seems likes we're getting really far afield from his testimony.

THE COURT:  Well, I will take it for its weight. It's true, Mr. Grant -- this is not intended to show he was present.

MR. HOLTSHOUSER:  Judge, if I can articulate, what I'm offering it to show, though, is whether or not this refreshes his recollection.  And if it does or doesn't, whether or not what Mr. Allen is saying to Mr. Simon back at the time was truthful or not.  So, I mean, I think that is

relevant.

THE COURT:  All right.

MR. KANE:  That is not a relevant matter for Mr. Grant to comment on if he doesn't remember this event.

THE COURT:  Well, true, but he's going to ask him if it refreshes his recollection.  Then we'll see where you go from there.

BY MR. HOLTSHOUSER:

Q.    That was my next question, is having read this, and having heard Mr. Allen talk about it in more specifics, do you recall it?

A.    I don't recall this at all.

Q.    Okay.  Is it something that you can say positively in your memory did not happen?

A.    I can't say that it didn't happen.

Q.    Okay.

A.    I don't recall even being there that night.  I can't remember.

Q.    And as far as it being about robbing a river boat, it being at Cloud Nine, it being an open mike contest, it being that he won, none of that refreshes your recollection as something that you --

A.    No, sir.

Q.    And you never recall hearing Mr. Allen either talk to you about it or being there?

A.    No, sir.  I can't remember.

Q.    How about the next series of questions.  He asked, "Anybody else there?"  And Mr. Allen:  "There was this girl. I met this girl and like she rapped."

Does that refresh your recollection, a female rapper?

A.    No.

Q.    Okay.  Let me show you Exhibit 128.  You recall that you were interviewed by the FBI on April the 4th, 1997, that's the date down here, by an Agent Terry McGinnis?  Kind of a big guy, kind of a weight lifter guy?  Do you remember that agent talking to you at all?

A.    Describe him again for me.

Q.    Kind of a weight lifter guy, not a young guy.  Probably at that time he would have been about in his fifties?

A.    No.

THE COURT:  Is that the right date at the top, April 9th?

MR. HOLTSHOUSER:  That is the date of transcription. The date at the bottom is, investigation on April 4, 1997. That is the date of the interview.  The date of transcription would be the day it was typed or transcribed.

THE COURT:  Okay.

Q.    Do you recall being interviewed by the FBI during this time period?

A.    I don't remember the guy's face, but I remember interviewing with him, not what was said or nothing like that, I just do remember the interview.  I did have an interview with him.

Q.    And did they ask you as well many questions about Mr. Allen and about what you knew about him?

A.    I think they just asked me about -- I'm not sure.  I'm not sure about all the questions that they did ask me.

Q.    Well, if you look at the first paragraph after -- it talks about your personal information here.

A.    Okay.

Q.    In the next one, talked about that you're best friends, you've known each other for at least seven years.  You first met when you resided on Cote Brilliante.  You wanted to talk about the time you spent together on weekends, night clubs.  You said you were aware of Allen using drugs.  Are you referring to marijuana?

A.    Yeah.

Q.    He didn't use other drugs to your knowledge, did he?

A.    Not to my knowledge.

Q.    Did you ever see anyone try to get him to use other drugs?

A.    No.

Q.    Do you remember Mr. Allen discussing his view about using other drugs, discussing his personal view about whether

he would or wouldn't use anything harder than marijuana?

A.   Do I remember us having a conversation about that when we were younger?

Q.   At any time.  I'm not putting an age on it.

A.   Oh, I'm just trying to understand the question.  Yeah, we have had that conversation before.

Q.   I mean, did Mr. Allen say he wasn't going to use heroin, he wasn't going to use cocaine?

A.   Yeah.  We done both stated that, yeah.

Q.   So that was like -- it wasn't the case of like he would do what anybody asked him to do or wanted him to do, he said, I'm not doing that?

A.   I mean, we done talked about that, yeah.

Q.   Why didn't he do it?  Did he say why he was not going to do it?

A.   I mean, no, I can't recall why he said he wouldn't do it.  It was just a bad thing to do.

Q.   But you certainly knew people among --

A.   Of course.

Q.   -- your peers that used heroin, used cocaine?

A.   Of course.

Q.   And just because they were doing it, you and he weren't going to do it?

A.   Of course, right.

Q.   There's a series of paragraphs in this interview, and

I'm just going to show you page by page. But the topics, for example, in the first full paragraph on page 2, you're talking about girlfriends. In the next paragraph you're talking about dating two females who lived on Oregon, that's Lakeshia and Marcia. The next paragraph you're talking about Allen would not discuss criminal wrongdoing with him out of respect for your mother. Do you remember saying that?

A.    No.

Q.    In the next paragraph talking about whether Mr. Allen owned a car and where he would stay. He stayed at a variety of locations, as Allen was not the type to settle anywhere for any extended period of time. Was that the reason that he stayed in a variety of locations?

A.    That -- because he wasn't able to -- say that again.

Q.    Is it correct here that you told the FBI -- remember, this is what they wrote, okay? You with me?

A.    On the third paragraph?

Q.    You're on this paragraph right here.

A.    Right, okay.

Q.    This entire document is what they wrote summarizing what you said.

A.    Okay.

Q.    They can be wrong. They make mistakes.

A.    Yeah, we all do.

Q.    What I'm trying to find out from you, did they get it

right?

A.    Okay.

Q.    So, Grant advised that Allen did not own a vehicle and would stay at a variety of locations as Allen was not the type to settle anywhere for an extended period of time.  And that Allen had recently started work at a janitorial service operated by your next door neighbor.  Do you remember that?

A.    I'm trying to remember now.  As of right now I don't remember he was working at a janitorial service with my next door neighbor.

Q.    If you heard the name of the company, would it help?

A.    Probably so.

Q.    Let me show you Exhibit 609.

        THE COURT:  Pretrial Service Report?

        MR. HOLTSHOUSER:  Yes, sir.

Q.    This is Exhibit 609.  This is the Pretrial Service Report for Mr. Allen.  In paragraph 2, Billie Allen reported to this officer that he has been employed with a commericial cleaning company for about one month on a part-time basis.  Works 25 hours per week, is paid $6.  Is unable to recall the name of the business.  Allen stated he works for a person named Cleo, but he could not recall his phone number or address.  And he's been getting approximately $1,000 per month from a record producer named Flex.

        Does Cleo ring a bell to you as a neighbor that had

a cleaning company that he worked for?

A.    No.

Q.    Do you recall in the month before Mr. Allen's arrest that he had a job?

A.    No, because we had -- just now at our new location on Washington, he just had painted my mother's apartment.

Q.    "He" being who?

A.    Bill, Mr. Allen, Billie.  He just had painted my mother's apartment.

Q.    This Mr. Allen?

A.    Yes, Billie.  Yes, I'm unaware of the janitorial service that he was working.

Q.    Was he paid to paint your mother's apartment?

A.    I'm not sure.  I don't recall.  I don't remember.

Q.    And is that something that happened just before he was arrested?

A.    Yeah.

Q.    This cleaning company job is not anything that you recall as you sit here, correct?

A.    Correct.

Q.    Okay.  And what led us there was in the 302, this FBI report, that says that you advised the FBI agent that Allen had recently started working at a janitorial service operated by your next door neighbor.  So if that's something that you said and that was true at the time, it's something you don't

remember now; is that right?

A.    Right, I don't remember now.

Q.    So among the areas of Mr. Allen's life they are inquiring about is where he lived, why he lived there, whether he had employment, what vehicles he had, who his girlfriends were, who his associates were.  And then look at the bottom paragraph here.  You describe the type of person that Mr. Allen is.  You described him as a loaner type individual and is unsure as to who he would turn to if he needed help after committing a crime.  And you also said that he would not seek your help because of Allen's respect for you and your mother.

Would it be fair to say that whatever they asked, that you gave this information, they are asking what kind of a person Mr. Allen is and you would say he's a loaner type individual?

MR. KANE:  Objection, Your Honor.

A.    I mean, yeah, they done switch stuff up on there.

THE COURT:  Wait.  We've got to get this sorted out. What's your objection?

MR. KANE:  I don't believe that Mr. Grant can testify as to what they were attempting to question him about before recording whatever these answers were.  The document speaks for itself.

MR. HOLTSHOUSER:  That wasn't my question.

BY MR. HOLTSHOUSER:

Q.    My question was, given the information that was written down here, does it indicate that you were asked questions based on what answers you gave?  That the questions you were asked were about Mr. Allen, weren't they?

A.    Yes, they were -- they were about Mr. Allen, but they weren't asked in specific detail what they were -- what they were about.  So the majority of them I was pretty much on this, I'm making comments.

Q.    Okay.  Where Mr. Allen was living, okay, he didn't own a vehicle and he stayed at a variety of locations as he was not the type to settle anywhere for an extended period of time.  Now, that indicates he wasn't living at home, correct?

A.    Not necessarily.

Q.    Okay.  He was living places other than home, though?

A.    At times.

Q.    Okay.  And does that indicate why he would not want to be at his house?

A.    That's rough to say.  I mean, that's rough to say.  Sometimes you just don't want to be at home.

Q.    Did you tell the FBI, and maybe they didn't write it down, did you tell the FBI that one reason Mr. Allen wouldn't want to live at home is it was a bad place for him and they didn't treat him well, in fact, they abused him?

A.    I don't recall saying that.  Nevertheless did they care

to ask me that.

Q.    Let me show you Exhibit 2.  This is a letter dated April 15, 1997.  Does that also appear to be Mr. Allen's writing?

A.    I wouldn't know now.  I wouldn't know now.  The document that you showed earlier, that looked like his handwriting that I can remember.  This here --

Q.    How about this part here, "Thanks again, Billie Allen," does that look like him and his signature?

A.    I would believe that's his handwriting now, yes.

Q.    Let me direct your attention to the bottom down here.  It says, "I want you to check up on my family.  And you can see I come from a family that loved me and still does.  They support me to the fullest."

        Now, based upon your observations, what you've testified about Mr. Allen's home life, is that true what Mr. Allen is telling the judge there?

A.    What you're saying is that you're asking me is this statement here true that Mr. Allen is making?

Q.    Yes, that he comes from a family that loves him.

A.    Well, it might be true -- we talking about now.  When was this letter dated?

Q.    April 15th, 1997, one month after the offense.

A.    One month after the offense?

Q.    Yes.

A.    I have no comment on that.

Q.    One month after you said that you were at his house and he wanted to get in and get some clothes --

A.    Right.

Q.    -- and they said you can't come in and you're not welcome here.

A.    Yeah, I have no comment on that.

        THE COURT:  What's the number on this one, Mr. Holtshouser?

        MR. HOLTSHOUSER:  Pardon me?

        THE COURT:  What's the number on this one?

        MR. HOLTSHOUSER:  This is still Exhibit 2.  This is an attachment to it.  There is a section here that discusses Mr. Grant.

Q.    All right.  I'm going to move on, Mr. Grant, for now. I want to show you now Exhibit 176.  And this is when you testified for the second time in the trial.  This is the penalty phase of the trial.  And I want to direct your attention to page 217 of this transcript.

        And you're being asked here again about how you first came to know him.  And your answer -- let me back up a page.

        "The circumstances under which you meant Mr. Allen?"

        Down at the bottom, line 18.  "Sports."

        "What kind of sports?"

Your answer, "Baseball."

"You were on a baseball team together?"

"Yes."

"What team was it?  Where did you play at?"

"It was a baseball team at Tandy Recreation Center."

"And do you know how he came to be on the team?"

And you said it was organized, it had a coach and it had a schedule.

So a little while ago before lunch we had a discussion about whether it was a softball team or a baseball team.

A.    Right.

Q.    What you testified to in 1998, it was a baseball team. Does that refresh your recollection at all?

A.    Softball, baseball, a ball and a bat.

Q.    Okay.  So there's no difference in your mind between baseball and softball; is that right?

A.    A ball and a bat and a glove.  It's played the same way pretty much.

Q.    And the things that you and Mr. Allen did together, we asked you about that here, page 219.  And if you look down at the bottom:

What did you do together besides play baseball?

Saw movies, go to the mall, shop.

Is there a particular mall you liked?

No, I wouldn't say that, we basically went to a lot of malls.

So how did Mr. Allen go to movies or shop at the malls if he had no money?  Did you give him money?

A.    Sometimes.

Q.    Sometimes he have his own money?

A.    Sometimes I had a -- sometimes I had money.  Majority of the time I had the money.  He had a couple of bucks on him.  But when I say shop, we actually didn't go to literally shop.  The shopping in this instance is shopping for females. Because we rarely didn't go there for shopping for clothes or anything like that.

Q.    Okay.  See at the top of page 220 here, again, we're still on Exhibit 176.

"Can you describe the kind of person he was when you were close friends with him?  What was his personality like?"

Now, your answer is, "A fun person to be around with."

"What was fun about him?"

"I mean, such as he had a nice attitude.  Made me laugh."

"Liked to joke a lot?"

Your answer, "Liked to joke.  Compulsive liar," was also part of your answer.

"To you?"

"Yeah."

"And in a harmful way or in a joking way?"

"I mean, it wasn't harmful, I guess you could say joke."

"He liked to clown around a lot?"

"Yes."

"In a group of people, how did he behave?"

"I mean, you going -- it was a show.  He wanted his -- it was like I want to be seen.  You know what I'm saying?"

"He wanted to be the center of attention?"

"Yeah."

"In a group of people he didn't become shy and retire into the crowd, he wanted to be the focus of attention?"

Your answer, "Right."

"And how did he go about getting that attention?"

"Whatever -- I mean, not outrageous, just talking basically."

"Mainly humor?"

"Humor.  Nice sense of human I should say."

"And that would be the way he would try and draw that attention to himself would be to try to make other people laugh?"

And your answer, "Okay.  Yeah."

"You agree with that?"

"Yeah."

So you were asked an open question basically what was Mr. Allen like?

A.    About his attitude, how was his attitude, right.  I mean, that's how I took it.

Q.    "Can you describe what kind of a person he was when you were a close friend with him?"

A.    Right.

Q.    And these are the answers that you gave in describing the kind of person that he was, correct?

A.    Right.

Q.    And in describing the kind of person he was, you didn't describe him as person who was abused, picked on, depressed, upset or anxious, did you?

A.    That's what had happened to him.  That wasn't the type of person, he's an abused person.  At that time I didn't look at that question like that.

Q.    So in your mind at that time that question wasn't specific enough to mention anything about what already was in your head according to you, which is that he was abused?

A.    At that time, correct.

Q.    A couple of pages later you were asked about his attitude towards work.

It says:  "Were you working once you turned 16?"

            "Yes."  Referring to you when you worked at
Hardee's.

            "Did Mr. Allen work there with you?"

            "Yes, he did."

            "How long did he work there?"

            "About a week."

            "What happened?"

            "Didn't work out for him I suppose."

            "Did he get fired or did he get --"

            "Nah, he quit."

            "Do you know why he quit?"

            "I don't know the reason that he quit."

            "Did he express what his attitude was towards work?"

            "Yeah.  He just -- he don't like to work."

            "Of any kind?"

            Your answer, "Of any kind."

            "Did he say why?"

            "It took too much of his time, it take up too much
of his time."

            Was that correct?

A.    Yes.

Q.    So was it your view of Mr. Allen that Mr. Allen could
keep and hold a job if he wanted to, couldn't he?

A.    I suppose, yeah.

Q.    I mean, he was a capable enough person based upon how

well you knew him?

A.    Yeah.

Q.    He just didn't want to work?

A.    Yeah.

Q.    Now, do you see here on page 226, the next question that I asked you -- and remember, I want to take you back to earlier in your declaration that statement that you made at the end:  "If I had been asked about any of these topics at Billie's trial, I would have testified to the same information contained in this declaration."

So I want to take you back to 176 where we just were, if I can find it again.  Go up one.  There we go.

The question that I asked you at trial:  "Did he talk about his family much?"  There's no question that I'm asking you about his family, right?

A.    Well, okay, yeah.  Yeah.

Q.    And your answer was, "Yes.  He did talk about his family a lot -- or much."

"Did you know his family?"

Your answer was, "Yes."

"Mother, sisters?"

You answered, "Yes."

"Did you know any extended relatives such as cousins, aunts and uncles?"

"Yes."

And I asked you, "Was family important to Mr. Allen?"

Your answer is, "I suppose his family is important, but I mean he didn't never say anything such as, I mean, bad about them, you know, how you upset about your -- at your mom, you make a comment about it every now and then."

So let me ask you, Mr. Grant, when you're being asked the question about his family, and no one really asked you whether he ever said anything bad about them, but you volunteered that information, and that he didn't say anything bad about them.

Now, if you're someone sitting there with it in your mind that he was abused by his family and treated unfairly and beaten with belts and had shoes thrown at him and had his grandfather throw shoes at him and so on and so forth, you didn't say that at trial, did you?

A.    That wasn't -- that was the furthest thing from my mind as such.  Further wise is that personal business that we have shared and the things that I did see, I did mention them at that time.  But everything that I done said such as him getting beat, locked out the house, all of the above is true.

Q.    But in terms of what you were asked at trial, you were asked a question at trial about his family and his home life, weren't you?

A.    Right, I didn't remember that until you just recently

show me.

Q.    No, you didn't remember it when you prepared that declaration either, did you?

A.    Right.

Q.    You said if I had been asked these questions.

A.    I truly did not.

Q.    Now, the lawyers who were asking you these questions in 2009, did they indicate to you that they had access to your trial testimony and the transcript of the trial?

A.    I'm quite sure they did.

Q.    So that they knew the questions you were asked, right?

A.    I'm quite sure they did.

Q.    They didn't bother to tell you, oh, by the way, you were asked these questions at trial before you put that paragraph in there that says if I had been asked these questions at trial, I would have given this information?

MR. KANE:  Objection, Your Honor, he's completely mischaracterizing the questions that were asked at trial, did he know his family and so forth.  And clearly in his declaration it was about topics having to do with what we've discussed today, physical abuse.  And those are not the questions asked at trial.  It's very clear.  When Mr. Holtshouser asked him about verbal abuse later at trial, Mr. Grant testified about that.  He was not asked about being locked out of the house.  He was not asked about physical

abuse.

MR. HOLTSHOUSER:  He was asked about his family and home life.

THE COURT:  Overruled.  Cross-examination. Overruled.

BY MR. HOLTSHOUSER:

Q.    So when the lawyers were meeting with you, no one bothered to present that to you, correct, --

A.    Correct.

Q.    -- and had you sign it?  Didn't bother to tell you that you had touched on topics related to his family and his home life at trial, hadn't you?

A.    I did mention -- apparently I did mention his family.

Q.    Apparently you did.

A.    Apparently, right.

Q.    Now, in addition to that, even though it wasn't -- no one asked you in these questions here, did Mr. Allen ever say anything bad about his family, did they?  Look down here at the bottom.

A.    Yeah, I see that.

Q.    The question I asked, was family important to him?

A.    I see that.

Q.    You didn't actually say yes, but you said, "Well, I suppose his family is important."

A.    Right.

Q.    "But he didn't never say anything such as I mean bad about them."  Now, based upon what you've said here today, that isn't true.  That wasn't true, was it?

A.    It is true.

Q.    He has said things bad about them, hasn't he?

A.    It is true.  See, at the time -- like I said, at the time it wasn't -- I didn't feel it was a relevance to just for me to go all off on his life like that.

Q.    So was that something that you knew back at the trial when you testified, that you weren't going to sit there and bad mouth Mr. Allen's mother and sisters and grandfather?

A.    I mean, that's what I said on here, yeah.

Q.    Okay.  And you also told the jury that Mr. Allen never told you anything about what happened to him at home that was bad, he never said anything bad about his family, did he?  That's what you told the jury?

       MR. KANE:  Objection.

A.    I don't even remember this right here for real.

       THE COURT:  Do you understand the question?

Q.    Do you understand --

A.    Not really.  But like I say, I don't even remember half of this now.

Q.    Let me rephrase the question, because I want to make sure you understand.  You testified earlier, and I think it's in your declaration, that Mr. Allen would tell you, for

example, I'm going to say, "Hey, grandpa," and grandpa is going to throw a shoe at me?

A.    Oh, yeah.  Yeah.

Q.    Now, that's saying something bad about your family, isn't it?

A.    Well, such as "Watch this," he's going to throw a shoe at me?

Q.    That's not good, is it?

A.    If you want to look at it as bad, I mean --

Q.    Do you look at it as bad or good?

A.    I mean, it's just some things to do.  Keep in mind that we're young.  We're teenagers, man.  I mean --

Q.    Well, was it bad or was it just such a joke that --

A.    I mean, I think it's just horseplaying, man, just proving him to be right, "Watch this," you know.

Q.    And he was showing you something that was bad about his family?

A.    I guess you can say that's bad.  I mean, I don't look at it if it's good or bad.  I mean --

Q.    What about what you said earlier in your declaration, that sometimes when the two of you drank, he would complain, why can't I have a mother like yours or why did God give me this life?

A.    He have mentioned that.  He have mentioned that.

Q.    Wouldn't that be saying something bad about his family,

is that he's not happy with his mother, he wishes he had your mother?

A.    I mean, yeah, I'm supposing.  I'm supposing, yeah.

Q.    So when you say this answer here in the trial to the jury, "I mean, he never say anything I mean bad about them." At the time you testified to this in 1998, you weren't thinking about the things that you remembered in 2009 and put in that declaration, right?

A.    No, not at all.

Q.    But you did say, at your mom he made a comment -- no, that's the wrong one.  Let me back up.  The bottom of the same page, you're completing your statement.  And the question that started this series is:  How -- did he talk about his family much and was family important to him.  And you said, "I mean, he never said anything about them, you know, how you upset about your -- at your mom."  What were you referring to there when you said something when you're upset at your mom about something?

A.    I don't even -- I'm reading it now.  "How you upset about your mom," I don't even understand that.

Q.    At your mom -- well, I think if I back up one.  "At your mom.  You make a comment it every now and then."  Were you saying to the jury, you know, sometimes you might complain about something that your mom does or you don't like, that she punished you or did something that made you

Q.   mad or told you you couldn't do something.  I mean, you were telling the jury that basically other than typical complaints like that, you never heard Mr. Allen say anything bad about his mother?

A.   What, are you talking about at this time?

Q.   At this time in this trial.  Because this is the trial that the jury heard.

A.   Nah, I don't remember.  I'm getting lost now once again, because I'm getting lost between the two things that you have showed me, the two documents when I was in trial. I'm getting lost, man.

Q.   And you didn't remember these when you filled out that declaration; is that right?

A.   No, I was far from this.  This is '97 you say?  Yeah, I was far from this.

Q.   And when it came to things that you were asked by the lawyers at trial, no one bothered to give you the transcript to refresh your recollection of what you did testify to at the trial, did they?

A.   Repeat that.

Q.   No one gave you this transcript to look at before you filled out that declaration, saying if I had been asked certain questions at trial, I would have given this information?

A.   No, they didn't -- I didn't see this, no.

Q.    Until now?

A.    Until now.

Q.    You were asked -- and this is still the direct examination, me asking you questions in the penalty phase. You were asked about some things that Mr. Allen did in the neighborhood that actually interfered with his friendship with people in the neighborhood.  And that was ripping people off and ganking them, correct?

A.    Correct.

Q.    So those were things, though, that in that neighborhood, selling fake dope was something that kind of put a target on your back, didn't it?

A.    On who back?

Q.    The person who ganked.

A.    I guess at the time -- it depends on who you ganked.

Q.    I mean, you're basically --

A.    Yeah.  It depends on who you ganked, right.

Q.    So, I mean, if you sell fake drugs to somebody that's a crack addict, they are not going to be happy?

A.    Yeah, it depends.  Of course not, though, they are trying to, you know, get stoned or you sold them some fake drugs, no, they are not going to be happy at all.

Q.    That generated a fair amount of hostility toward Mr. Allen in the neighborhood, didn't it?

A.    Yeah.  I could imagine it did, yeah.

Q.   Did you know it or was it just rumors of it?  Because I think later on in your testimony you indicated, well, I just heard rumors of that.

A.   Yeah, I'm pretty sure.  You know, I heard some bad things in the neighborhood at that time about people selling fake dope, yeah.

        MR. KANE:  Your Honor, would it be okay if we take our afternoon break now?

        THE COURT:  Yeah, sure.  I was kind of waiting for a point.  That's a good time.  Yeah, court will be in recess for 15 minutes.  And recall, I'm going to have to leave a little before four today.

        (Court in recess from 2:33 p.m. until 2:48 p.m.)

        THE COURT:  It's okay.  Whenever you're ready.

BY MR. HOLTSHOUSER:

Q.   Mr. Grant, when we left off we were talking about ganking.  That's nothing you personally had personal knowledge of, is it?

A.   Yes.

Q.   Yes you did?

A.   Of course.

Q.   Is it rumors or personal knowledge?

A.   Ganking, personal knowledge of, yes.

Q.   So it's something --

A.   Rumors, ganking, yes.

Q.    So it's something you saw Mr. Allen do?

A.    Yes.

Q.    Not just something you heard about in the neighborhood?

A.    Yes.

Q.    Okay.  I'm still on your testimony here.  Take you to page 235.  And the topic you're being asked about here is Mr. Allen's practice of skipping school when he was still at Sumner.

      And do you see at the top of the page:  "You skipped with him sometimes?"

      "Yeah."

      "Frequently?"

      "Yeah, very frequent."

      "What would be the reason that you would want to skip?  Was there something else that he wanted to do, to get to?"

      And then your answer is, "I couldn't say on his behalf, but as when the couple things that I did, we didn't do much.  You know, go home, play a video game, may drink a couple of beers.  You know, basically that was it."

      "Smoke some marijuana?"

      "Probably."

      "At his house, or what place did you do that?"

      "Most likely my house."

      "And is that because no one was home there during

the day?"

"No.  Nah.  Not only that, it's just, it was just --
I had freedom."

"Okay.  So you had freedom?"

"Freedom.  I can like have company over and my mom
wouldn't be hounding me or nothing, you know."

"He did not have that freedom?"

"Not really."

And you were asked, "Why not?"

And you said, "I have no idea."

Is that your answer back then in trial?

A.    Yes.

Q.    And is that correct, was that a true answer?

A.    I mean, that's good.  I mean --

Q.    Did you, in fact, have --

A.    I said it.  I said it.  But I -- you know, I mean --

Q.    Okay.  Let me stop you right there.

A.    It's different.

Q.    You said it.  Clearly you said it?

A.    Yes.

Q.    My question is, though, would a more truthful and
complete answer to that question have been to say the reason
Billie didn't want to -- we didn't go to Billie's house to do
it was because of the things that happened there?

A.    I was actually just answering the questioning as I saw

X - 225

fit and being done with it.

Q.    Well -- I'm sorry?

A.    Just being done with it.  Just give them short answers, short simple answers.

Q.    So was it a conscious decision on your part not to elaborate about some of the things that you put in your declaration when you were asked why not, why Mr. Allen wouldn't want to go to his house on the day that you were skipping school?

        MR. KANE:  Your Honor, that mischaracterizes the questions.

        THE COURT:  Do you understand the question?

        THE WITNESS:  Besides just saying why -- when I just answered -- when he asked me why not, and I said I have no idea, I just didn't want to go into discussion with -- why we couldn't go to his house.

Q.    The answer at the bottom here:  "Freedom.  I can have company over and my mom wouldn't be hounding me or nothing, you know."  Okay.  Now --

A.    Right.

Q.    -- he did not have that freedom?  And, again, you're referring to being hounded, right?

A.    Right, that's all the freedom, period.

Q.    And you said, "Not really."

A.    Not really, no way could --

Q.    And I asked you why --

THE COURT:  Wait.  Please wait until the question, wait until the answer, because the court reporter is having a tough time.  She's really good and she can get both of them, but it's a lot of extra work.  Go ahead.

Q.    The next question then is why did Mr. Allen not have that freedom to be at his house without being hounded.  And I asked you why not, and your answer was, "I have no idea."

A.    I understand.

Q.    Now, the answer that you gave where you just said a minute ago you were trying to just give a short answer and be done with it?

A.    Correct.

Q.    And my question to you is, would a more correct and truthful and complete answer have been to explain based upon what you've said here today, that the reason Billie didn't have that freedom to be free from being hounded at his house is because all the things you've talked about here today that you characterize as abuse, correct?

A.    Correct.

Q.    And you didn't mention that to the jury in the trial, did you?

A.    Correct.

Q.    And that was in part -- I guess you're saying now that was in part because you were just giving short answers to get

it over with?

A.   Correct.

Q.   In this same page on 236, you were asked about what his attitude was about school.  What was it that he didn't like about school.  And your answer was, "I guess it takes up too much of his time.  He felt he was missing something on the street or something."  Now, why did you think that?

A.   The reason why most teenager to this day don't attend school, the same reason.  You think you're missing something out on the street besides going to school.

Q.   The only one I'm asked you about is Mr. Allen.  That's the only one that you're being asked about here.  Which was, I'm asking, was it something that Mr. Allen expressed to you, I don't want to be in school because I can be out here doing other things that I want to be doing?

A.   I mean, yeah, that's what I knew too, yeah.  Yeah.

Q.   Is that something he expressed to you, though, or is it just something that you interpreted, assumed?  Was it something that he -- was it based on something he said?

A.   Well, that clearly was an assumption.  I can be doing something, you know, better.  He did say I can be doing something better than this.  That was my assumption and from times he have made that comment too.

Q.   The next page, at 237, you were asked this question: "Were any of you in your circle of friends with Allen

involved in gang activity at any time?" And you weren't allowed to finish your answer, Mr. Sindel objected. You see here Sindel objects, and there's a discussion at the bench. That goes on for a couple of pages.

A.    Okay.

Q.    And you weren't allowed to give any answers about any involvement in gang activity at that time, were you?

A.    I suppose so, no.

Q.    Because you see when the court resumes, the Court had sustained Mr. Sindel's objection to any questions about gang activity, and I moved on to the next topic, which was to marijuana use, and the mall, the money. Okay. You see at the bottom of 239?

A.    Okay. Yeah.

Q.    Let me ask you this now, if you had been allowed to answer that question, what would your answer have been, was Mr. Allen involved in any gang activity?

A.    I can't say that he was involved in any gang activity, but he was a gang affiliate.

Q.    And what does that mean?

A.    Just knowing people that is in a gang.

Q.    Would that also describe you?

A.    Such as that I was gang affiliated also?

Q.    Do you consider yourself gang affiliated also?

A.    Yes.

Q.   And were you affiliated with any particular gang?

A.   I knew a bunch of gangs.  I mean, yeah.

Q.   How about Mr. Allen, let's just limit it to Mr. Allen.

A.   Yeah.  Knew a bunch of gangs, yeah.

Q.   Was there any one gang he was more affiliated with than another?

A.   I wouldn't -- I wouldn't know.

Q.   On the next page, after I asked you this question about getting money to buy things at the mall and buy marijuana to use and so forth, the question was:

"Where was Mr. Allen getting his money to afford that?"

And you said, "I guess he was self-employed."

My question was, "Self-employed doing what?"

And then again there was an objection, in that Mr. Sindel did not want any answers about drug dealing.

Would you have answered that question that self-employed doing what, what was Mr. Allen self-employed doing at the time?

A.   Like I mentioned earlier, from painting, selling, drugs, et cetera.

Q.   You knew a Dennis Noble, right?

A.   Dennis Noble?

Q.   Uh-huh.

A.   I can't remember.  I can't remember the guy.

X - 230

Q.    You see that here on page 240, the same page.

"Do you recall a person named Dennis Noble?"

"Yes."

"And he was someone that was a friend of yours and a friend of Allen's?"

"Yes."

"How close would you say he was either with you or Allen?"

"Well, he wasn't close to me."

"How about to Mr. Allen?"

"He might have been closer with him."

Do you remember him as somebody who was killed in a drive-by shooting in the neighborhood, Mr. Noble?

A.    No.

Q.    You don't remember him as somebody that Allen spent a lot of time with before he was killed?

A.    No.

Q.    Marquis Taylor is somebody we talked about earlier. You were asked some questions at trial about Marquis Taylor and the effects of his death on Mr. Allen.

A.    Yes.

Q.    Okay.  And I'm not going to go through every line here, but there's about four pages of testimony.  First of all, did Mr. Allen ever tell you the details of how Mr. Taylor died, the circumstances of his death?

A.    Like I said, I really can't remember, but I'm pretty sure he did.  I can't remember everything that he said.

Q.    If you look at the same page, page 241, line 20.  And I'm really not trying to trick you here with these questions.

But, "Did Mr. Allen ever tell you what happened during the incident?"

"Nah, he really didn't get into any detail."

"If you don't know what Mr. Allen -- so you don't know what Mr. Allen did during the shooting?"

Your answer is, "Right."

"You don't know who he saw, what he saw happen or anything like that?"

And your answer, "Right."

So is the answer you gave back then correct or did Mr. Allen ever tell you some details of how the death occurred?

A.    That's correct, I don't -- yeah, that's correct.

Q.    Which?

A.    I mean --

Q.    Did he or did he not tell you details?

A.    I mean, "You don't know who he saw, what he saw happened or anything like that?"  "Right."  I don't.

Q.    Do you know how close Mr. Allen was to Mr. Taylor when Marquis Taylor was shot and killed?

A.    No, I don't.  No.  I mean, I wasn't there, no.

Q.    And Mr. Allen never told you?

A.    I'm pretty sure he did tell me once upon a time, I just don't remember.

Q.    You just don't remember?

A.    Yeah.

Q.    But back here when you were asked those questions whether or not he told you any details, you said no.  So I guess the question is, you're sure now that he did tell you, but back then you said, no, he didn't tell you?

A.    I mean, like I'm answering the question here, "Were you all saddened by the death of Marquis?"  Where all of you?  No.  I mean, I wasn't saddened.

Q.    You're moving on to the next question.

A.    Oh, I'm just --

Q.    Back to the question we're on here, which is whether or not Mr. Allen ever gave you any of the details about how Marquis Taylor died.

A.    I'm pretty sure he --

Q.    Where Mr. Allen was in relation to Marquis --

A.    Yeah.  Once upon a time I'm pretty sure he did.

Q.    Do you remember what those details were?

A.    No.

Q.    When he told you -- and you're saying now that he did tell you, correct?

A.    Yeah, once upon a time he did tell me Marquis, what

happened, yeah.

Q.   And do you say here -- do you see here in the transcript you testified to in 1998, at the bottom, that I asked you:

"Did Mr. Allen ever -- do you know what the circumstances of the killing such as where Mr. Allen was in relation to it?"

"He was next to him."

"Did Mr. Allen ever tell you what happened during the incident?"

"Nah, he really didn't get into detail."

A.   Okay.

Q.   Now, your answer then was he didn't get into detail, and what I'm hearing from you saying now is there was a time when he got into detail, but I just don't remember the details.

A.   I'm pretty sure he did tell me.  Even at that time apparently I'm out of it.

Q.   So would this question back in 1998 that you gave, the answer that you gave have been incorrect?

A.   No, I'm not -- no, that would have been correct, but I'm just -- just knowing what I know now and what has tooken place, it seemed like he would have tell me, but apparently he didn't tell me if that's my statement.

Q.   Okay.  We're just going to leave it at that.  Now, you

were asked questions about how it affected all of you. And you said you were not saddened by it; is that right?

A.    Correct.

Q.    And is that true, that you were not saddened by the death of Marquis Taylor?

A.    I mean, correct.

Q.    Is that because you weren't that close to him?

A.    No. I mean, I knew him. I was close to him, but it just didn't affect me like that.

Q.    Okay. Do you know whether or not it affected Mr. Allen any differently than it affected you?

A.    Well, I mean, I don't -- it probably would have.

Q.    I'm not asking you to speculate.

A.    I mean, I'm saying --

Q.    I'm asking you anything that you observed, anything that he told you.

A.    Not that I can recall.

Q.    Was there any change in Mr. Allen from the way he was before Marquis Taylor died and the way he was after Marquis Taylor died and the years leading up to the offense in your observation?

A.    See, I can't remember that.

Q.    So are you saying that there wasn't any change in Mr. Allen that you observed or recall?

A.    Like I said earlier, Bill was just Bill. I couldn't

notice a change like that.

Q.   You see down at the bottom of page 243 here that I'm showing you:

"Can you describe what his demeanor was, how he was acting when you saw him?"  And this is the day after Marquis Taylor was killed.

"I mean, it was no change in his attitude.  He say, 'That's mess up,' you know.  And I mean, hey, you go on about the day.  I mean, nothing major."

"Was he crying?"

"Not that I can see."

"Did you notice any change in Mr. Allen in the way he acted and behaved in the time after Marquis died?"

"No."

"Did he change his lifestyle in any way?"

"No."

"Did he stop ganking people?"

"No."

"Did he continue to go to clubs?"

"Yes."

"Did his moods seem any different?"

"No."

"And by this time he'd already dropped out of Sumner?"

"Yes."

"Did he ever explain to you about suffering from nightmares about Marquis?"

"No."

"Hearing voices about Marquis?"

"No."

Were all those answers that you gave back in 1998 true to the best of your knowledge and ability?

A.   Yes.

Q.   And are those answers -- do you want to change any of those answers as you sit here today?

A.   No.

Q.   Did you ever notice any reluctance on Mr. Allen's part to go return to Prentiss Church's house, the location where -- near the location where Marquis Taylor died?

A.   Did I notice any reluctance?  Like I'm never going to go over there?

Q.   Like I don't want to go that way because I don't like walking by that place where Marquis died?

A.   I can't recall.

Q.   On the next page you were asked about how he seemed, Mr. Allen seemed to you during the weeks prior to the robbery, March 17, '97.

"What contact did you have with him during the weeks -- did you see him?"

"Yes, a couple weeks."

"Can you describe what he was like when you saw him?"

"The same.  Usual."

"Did he seem unusually depressed about anything to you?"

"No."

"Were there issues going on in his life at that time that he was worried about, anything that he expressed to you?"

And you said, "None other that he not really being at his mama house, you know, he place to place."

Now, in that answer, are you basically saying that if he was upset about anything, it was the fact that he couldn't go back to his mother's house?

A.    Not really being at my mom's house, right, correct.

Q.    And then you were asked:  "Okay.  By the first months of '97, he wasn't staying at home anymore, right?"  You said "Right" to that.  And that's talking about the incident at his mother's house where the door was shot up.  "Prior to that incident" -- prior to the shooting of his mother's house in January of '97 --

A.    Right.

Q.    -- "had he actually not been staying at his mother's house?"

And your answer was, "Yeah."

"Do you know what led to him not being there?"

"No."

"Did he want to be at his mother's house?"

"No."

And then we get into why not. Before we get into the why not answers here, --

A.    Okay.

Q.    -- do you recall that it's correct that he really wasn't living at his mother's house in the time period before his mother's house was shot up? In other words, he already wasn't living there when the house was shot up.

A.    Prior to?

Q.    Prior to.

A.    No, he was. He was back and forth there.

Q.    Okay. Look at the question you were asked here in 1998. Prior to that incident, and the question before, it was referring to the door was shot up.

"Prior to that incident, had he actually not been staying at his mother's house?"

And your answer is, "Yeah."

Then you're asked, "Do you know what led to him not being there?"

And your answer is, "No."

Back in '98 you said he was not living at his mother's house prior to the time it was shot up, and you

X - 239

didn't know why. Was that a correct answer back then or you want to change that answer now?

A.    If that's what I said back then, that was it.

Q.    And that's correct?

A.    I wouldn't change that answer now, no.

Q.    So when you were asked, do you know what led to him not being there, you didn't know, for example, at the time before the shooting occurred --

A.    Not at the time.

Q.    -- that Mr. Allen had been threatened and knew not to be going to his mother's house for fear someone would follow him --

A.    That's correct.

Q.    -- and bring the danger home?

A.    That's correct.

Q.    That's something that Mr. Allen didn't share with you during the every night of the week that you would gather?

A.    That's correct.

Q.    Now, at the bottom of this page, I elaborate on this a little bit. And I say, "Did he want to be at his mother's house?" "No." "Why not?"

        Is it fair to say that he really didn't want to be at his mother's house a lot?

A.    Yeah, that's fair to say.

Q.    That's correct?

A.    Yeah, that's fair.

Q.    And why?  Is one of the reasons he didn't want to be there supposedly because of the abuse that he was suffering there?

A.    Yes.

Q.    Even at age 19?  I mean, he's 19 at this time, right?

A.    Yeah, he's 19 at this time.

Q.    Going on 20.  He's a man, right?

A.    That's correct.

Q.    So you were asked, "Did he want to be at his mother's house?

       You did say, "No."

       Then you were asked, "Why not?"

       And your answer was, "He got chewed out a lot, basically every day."

       "Who chewed him out every day?"

       "Everybody."

       "Who is everybody?"

       "His mother, his sister.  His mother, his sisters, gripe at him."

       "What would they chew him out about?"

       "Not cleaning up, you know, not having any priorities.  I mean, he didn't do nothing around the house."

       "Was he complaining that his mother and his sisters were nagging him to finish school, go back to school?"

You asked, "Was he complaining?"

I said, "Yes, that's the question."

You said, "Nah, not to me."

"Were they complaining about the fact that he ate food at the house yet he didn't do anything to contribute to the house?"

Your answer was, "Yes."

Now, you see there you're asked a series of questions about what is the problem at home, and the only thing you say is "chewed out" and being criticized for not cleaning up his -- not having priorities, not going to school, not working getting any money in.  Anywhere in there did you say because he was being physically abused?

A.    No, nowhere in there.

Q.    You clearly had questions that were -- that should have elicited that answer if it was true, shouldn't you -- weren't there, rather?

A.    If the questions would have been asked, I would have answered them.

Q.    You don't think those questions were sufficiently specific enough when they asked why he didn't want to be at home, and you answer because he gets chewed out.  You don't mention because he gets physically abused, do you?

A.    Like I said once again earlier, getting the question over he get chewed out, they fussing and griping at him, left

out abused at the time.  But because I didn't say it at that time don't mean it didn't happened.  It happened every day.

Q.    My question to you, though, is, is that when you said in your declaration that you gave us --

A.    Oh, I totally understand.

Q.    It said, if they'd asked me questions, I would have said --

A.    I would have said that's true.

Q.    Now, you see here you're clearly being asked questions, aren't you?

A.    True.  I totally understand.

THE COURT:  Wait until the question is asked.

Q.    You didn't say in response to these questions that the reason he didn't want to be at home, the problems he had at home was physical abuse?  You didn't say that, did you?

A.    Not at that time, no, sir.

Q.    And so would you agree with me that this paragraph in this declaration where you say, "If I had been asked these questions at trial, I would have given this information," is not correct, because you were asked questions at trial that should have solicited that information?

A.    But if I was asked in a particular manner what was actually the for-real problem or put it in another detail form, I would have feel more than happy and freely to say he was abused at that time.

Q.    So a second ago when you said, I left out the part about physical abuse in response to that question -- do you remember that a minute ago?

A.    No, you lost me.

Q.    A minute ago I heard you say that in answering these questions you only included the part about being chewed out about these things we just went through?

A.    Right.

Q.    And you left out the part about physical abuse, correct?

A.    Okay.  Okay.

Q.    The question is, why did you leave that out?

A.    Because I -- let's keep in mind, I'm going through myself, you know what I'm saying, I'm just answering these questions, trying to get this over with, still can't believe that my best friend --

Q.    -- robs a bank and killed this guard?

A.    -- did this.  I mean, my mind is somewhere totally somewhere else, man.  I'm just answering.  I'm hearing things but then again I'm not.  I mean, I'm just answering questions, man.  And I know now how the system works.  And, yeah, you know, yeah, some way like I'm doing today.  Coming up -- like once again, I can't remember half of this.  Things has happened.  Those things that happened then are still the same thing that happened back then that I said here today, in

my declaration that was then, in my declaration now, it's the same. It's the truth.

Q. Would you agree that when you were asked the question, "Did he want to be at his mother's house?" "No." And then the next question is, "Why not?" That the question "Why not?" is broad enough to cover, a truthful answer should cover in your mind verbal and physical abuse, not be limited to just verbal abuse, would you agree with that?

A. It depends. Not necessarily. Just a, "Why not?" I mean -- I'm just -- pretty much know -- you didn't want to be -- just to wrap it all up, you know, at the time that's what I could have said. But I'm just, no --

Q. Just so we're clear, the problem isn't with the question, is it? The problem is with as you're saying it's what you were going through?

A. Yeah.

Q. You were giving as little information as you could to finish this episode and get out?

A. Pretty much.

Q. And get it behind you?

A. At that time, yes.

Q. And you weren't going to go out of your way, were you, to not only be talking -- giving testimony that's hurting your best friend, but then go on and call his mother a criminal child abuser, you weren't going to bring all that

into it, were you?

A.    No.  And I don't know nothing about being a child abuser though.

Q.    Okay.  Bottom of page 247, this topic didn't end there. The question was, after an objection, and the question was rephrased.  "What were the complaints that he made about the living arrangement at his mother's house?  What were the things he didn't like about it?"  Now, that's a little more specific than "Why not?" correct?

A.    Okay.

Q.    All right.  And would you agree that a complete, truthful correct answer to what the things were he didn't like about it, would have to include verbal and physical abuse if what you're saying is true, correct?

A.    Not necessarily.

Q.    You don't think that that would be one of the things he didn't like about living at his house?

A.    It is, yes, I'm pretty sure that was one of them also. Several.

Q.    This question says, "What were the things?"

A.    Okay.

Q.    And wouldn't the complete answer to that include this abuse you've described?

A.    If that's what I wanted to say at that time, yes.

Q.    So it depends on what you wanted to say at the time,

not what the question called for?

A.    I did answer the question.

Q.    Here's what you said.  "I mean, basically his sisters, okay, you know, I mean his sisters, the way they treat him as an individual."  Does that make any mention whatsoever of his mother?

A.    No, I just narrowed it as the sisters.

Q.    Does that make any mention to the fact that his mom is a falling down seven-day-a-week drunk as you've described?

A.    No, it says nothing about that there.

Q.    Does that make any mention of the fact that his mother would whip him with belts and extension cords and throw shoes and punch him in the face with a closed fist?

A.    No.

Q.    No?

A.    Says nothing about that.

Q.    And the next question is:  "Okay.  Since we weren't there, you need to tell us what he said about the way that they treated him."  You see we're getting even more specific now?

A.    I see.

Q.    Okay.  And your answer is, "I mean, they do me wrong. You know, it's not fair how they treat me."

The next question was, "What wasn't fair?"

"I mean, they -- they talk about him in front of

company, dog him out in front of company, say anything to him to hurt his feelings. You know, just dog him out."

Next question is, "Dog him out in what way?"

The series has very specific questions here, wouldn't you agree?

A.    I see.

Q.    Treat him bad. Here's your answer: "Just treat him bad such as verbally." You limited it to verbal, didn't you?

A.    I just narrowed it down to verbally, that's it. I ain't --

Q.    And those questions were clearly specific enough, weren't they, to require a truthful answer according to you of physical abuse? Do you agree with that?

A.    Oh, I agree.

Q.    Okay. Now, you were asked next about whether or not after the shooting occurred, his mother made it clear that he wasn't welcome there anymore. And you said you didn't know about that. Is that right?

A.    At the time I didn't know about it, correct.

Q.    But when you took him to the house, according to your declaration, a few nights before the robbery, and no one would let him in and they told him, "Don't come back, you're not welcome here," were you forgetting that?

A.    Yeah. Yeah.

Q.    All right. Mr. Grant, let's see if we can move ahead

here.  You received four letters from Mr. Allen that were admitted at trial.  There's only two that I want to ask you about and that you testified about during the trial.

In one of them without getting into the specifics of the document, Mr. Allen said he wanted you to come to the jail so that he could talk to you about something that he needed you to testify for him about.  That was one of the letters.  Okay.  Does that ring a bell?  I can show you the letter if you want to go into it.

A.    Yeah, let's go into the letter.

Q.    Let's go to the letter?

A.    Yeah.

Q.    Okay.

THE COURT:  Is that 2/9/97?

MR. HOLTSHOUSER:  It's 169.  Exhibit 169.

THE COURT:  But is the date 2/9/97, up in the right-hand corner?

MR. HOLTSHOUSER:  No, that date is the initials of someone who received it.  I think that's a chain of custody date, Judge.

THE COURT:  Okay.

MR. HOLTSHOUSER:  The letter itself is not dated. The envelope might be dated.

Q.    If you look here, I'm going to blow this up right here. There it goes.  Okay.  You start right there where I put the

yellow mark.  Follow with me?

"I wanted you to come out here with my cousin Ed."

Is that Claude McLemore, is that who "Ed" is?

A.    Pardon?

Q.    Is that Claude McLemore, Ed?  Did you know who Ed was, my cousin Ed?

A.    I'm not sure.  I can't remember.

Q.    Okay.  "...my cousin Ed, but I didn't have the number to call you at.  He going to be in town for a little while so call him and come and see me real soon because I need to tell you something about my case that I need you to testify for me about.  I don't want to say in the letter because you know how the feds are.  (Do you feel me?)  Man I got they ass beat and they don't even know it.  Man wait until you hear these verses."

Then he starts to talk about a rap that he's working on.  Does that refresh your recollection as to one of the letters you received from Mr. Allen --

A.    Yeah.

Q.    -- before his trial while he was incarcerated?

A.    Yes.

Q.    Did you know when he wrote that letter what it is he wanted you to come see him to testify about when he says, "Do you feel me?"  Do you know what he was referring to?  You didn't, did you?

A.    No.

Q.    The next one that you received after that is Exhibit 170.  This date up here that the Judge referenced, is that -- do you recognize the writing there?  Is that yours?  Those aren't your initials, are they?  2/9/98, do you see what I circled in yellow?

A.    I don't believe those are my initials, no.

Q.    I didn't think so.  But do you recall that you actually brought these letters with you to the government prosecutor at the time, Joe Landolt, during the first time you met with him prior to the trial?

A.    Me and my mom did, yeah.

Q.    Your mom came with you?

A.    Yeah.

Q.    And she brought them?

A.    Yeah.

Q.    Did you want to do that?

A.    I plead the Fifth.  I'm not going to comment on that.

Q.    Okay.  It kind of gets right into it right away here.  And I'll just blow this up and make it easier for you to read.  It begins, "Jay, you know I go to trial real soon and I called you for a witness.  The feds got when I called you and I told you I didn't go in the bank and just drove and they are trying to use it against me."  Did I read that correctly?

A.   Yes.  From what I see, yeah.

Q.   And the call that he's referring to there, that's the call you testified about in the grand jury and you testified about in the trial, that he called you and said I drove the van for the bank robbery, I didn't go in the bank, and I didn't kill the guard, that's what he's referring to, that call, correct?

A.   Yes, I suppose, yes.

Q.   And this is a letter that he's sending to you shortly before his case is going to trial, correct?

A.   I suppose so, yeah.

Q.   I mean, you received it?

A.   Right.

Q.   He mailed it to you, right?

A.   Of course, yeah, right.

Q.   And what I need you to do -- I blew up too much here. I'll try again.  Start right here.  "What I need you to say is that I told you that because I was trying to throw them off."  Again he says, "(Do you feel me?)  And what I -- and I want you to be there because you will see that with the help from God I will be out of here real soon."  And a little farther down, "I told them that I was never broke" -- right here, "I told them that I was never broke and I got my money from rapping with Flex.  And I told them that you never seen me with Norris, we just saw him at Cloud Nine and I -- all I

would say is what's up." My case can be won if you say the right things." Do you remember getting that letter from him?

A.   Yeah, I remember getting the letter.

Q.   So was it clear to you that in this letter he was asking you to come to court in this case and to testify falsely?

A.   True, correct.

Q.   He wanted you to lie for him?

A.   Correct.

Q.   But going back to your testimony at the trial, page 265. There's a discussion of these letters. And you're asked about recent contact that you had with Mrs. Allen. And this gets into the discussion of the meeting at Hardee's and the meeting at Schnucks. And as you sit here today, do you remember the two incidents that I'm describing to you?

A.   At Hardee's and at Schnucks, yeah.

Q.   Remember those?

A.   Yes.

Q.   Okay. And the first one was at Hardee's where you ran -- were you working or Mrs. Allen, you just happen to see Mrs. Allen there?

A.   I'm not sure. I'm not sure.

Q.   And do you recall that you testified that she said to you, "Jay, how come you won't -- you didn't cosign for Bill." And you testified at trial that that meant that she wanted --

why you didn't lie for Bill.  And that she seemed very upset; is that correct?

A.    Yes.

Q.    And is that true?

A.    Yes.

Q.    That happened?

A.    Yes, that did happen.

Q.    And that's also when she says, "You're not his friend"?

A.    That's correct.

Q.    Now, then you also testified that just a couple weeks before the trial when you were testifying at trial, you ran into her at Schnucks when she was with two other women?

A.    Okay.  True.

Q.    Do you remember that incident?

A.    Yes.

Q.    Okay.  And that Mrs. Allen was actually with Mrs. Taylor, Marquis's mother, and another woman?

A.    Okay.

Q.    Now, that woman is Deborah Ruffin, who testified later about this meeting.  But did you know who Deborah Ruffin was, one of Mrs. Allen's friends?

A.    I can't remember.

Q.    Okay.  And do you remember that Mrs. Allen asked you what you had told the feds?  And you said, "I really can't talk to you, I shouldn't be talking to you."

A.    Correct.

Q.    And that she then started going off on you, cussing you out.  In your words, acting outrageous and asking you to lie for Mr. Allen?

A.    Correct.  And cussing me out, right.

Q.    So not only was Mr. Allen in writing trying to ask you to lie for him, but his mother wanted you to do the same thing in order to help him, correct?

A.    At the time, yes.

Q.    You told her no, you wouldn't do that?

A.    Correct.

Q.    Now, when Mr. Allen's attorney cross -- began to cross-examine you, the very first topic he addressed -- you see down here at the bottom, cross-examination by Mr. Sindel, top of the next page.  The very first question is:  "What were the words she told you to use in court?"  And he's referring to Mrs. Allen, right, as to what she told you to say in court?

A.    Well, we up on four, line 4?

Q.    The top, line 1, see the question?

A.    Okay.  Got you.

Q.    And then you said, "Excuse me?"

      "What were the words she told you to use in court?"

      "What was the words?"

      "What were the words she told you to use in court?"

"She didn't tell me to use any word."

"What was the sentence she wanted you to use in court?"

"I have no idea."

Your answer, a little farther down, line 16.  "She wanted me to cosign for him.  Said that he was with me."

Is that referring to the time of the robbery, that he was with you?

A.    I'm quite sure it was, yes.

Q.    She wanted you to provide an alibi for him?

A.    I'm quite sure they did, yes.

Q.    Do you know what an "alibi" is, that word?

A.    Yeah.  That's false, right.  Yeah, it's a lie and saying he was somewhere which he wasn't.

Q.    And you don't have any knowledge, do you -- you never had any contact with Mr. Allen's defense attorneys at the time of trial, did you?

A.    I can't recall.

Q.    But were you aware that they had actually filed a Notice of Alibi under seal with the court indicating that there would be an alibi defense?

A.    I have no clue.

Q.    But what Mrs. Allen was saying to you is that she wanted you to be his alibi?

A.    Okay.

Q.    Is that correct?

A.    I -- yeah.

Q.    To say -- she wanted you to say that Bill was with you at the time of the robbery?

A.    I guess that's what she wanted me to say, yeah.

Q.    And see down at the bottom, "That's what she told you to say?"  "Yeah."

Now, Mr. Sindel asked you a series questions here, and there's a little bit of confusion about whether you're talking about the Hardee's meeting or the Schnucks meeting. Once the confusion is cleared up, then at page 272 of this transcript -- and, again, this is Exhibit 176 for the record -- in the middle of the page:

"It wasn't that she wanted me to kind of say something.  She was just throwing things at me.  What I should have did."

I don't recall is --

"What did she say you should do?"

And, "This is what, two, three weeks ago?"

"Yes."

"Okay."

And then you said, "I was hostile."

The other conversation, that was at Hardee's, and he goes into that.

Now, there was a question that they were trying to

get at, they wanted to find out where your mother worked. And I objected to that. And in the middle here, Mr. Sindel says that: "I don't believe she is working. I think she is at home at the time and she supplies him" -- you -- "with drugs and she is a crack addict."

And then you were required to say where your mother works. Waymark Industries at that time. Do you recall that? No?

A.    I was reading that Mr. Sindel was indicating that my mother was a crack addict at the time?

Q.    See that where it says Mr. Sindel? That's what he said.

A.    About my mother?

Q.    Yes.

A.    I'm just off the record with this. I'm wondering where did he get that from at that time. That's amazing.

Q.    Who -- having the information about your mother?

A.    About saying my mom is a crack addict.

Q.    Is that something that --

A.    See, I don't even remember that until me just --

Q.    Is that something Mr. Allen believed about your mom?

A.    Wow.

Q.    Is that --

A.    Wow.

Q.    I'm asking you, is that --

MR. KANE: Your Honor, objection, he's asking Mr. Grant to opine on what Mr. Allen believed.

THE COURT: Sustained.

BY MR. HOLTSHOUSER:

Q.    Let me rephrase the question.

A.    Okay.

Q.    Did Mr. Allen, this Mr. Allen ever indicate to you that's what he thought about your mother?

A.    No.

Q.    So you have no idea where Mr. Sindel might have gotten that belief, correct?

A.    Wow. Right. Right.

Q.    It's been awhile since you've seen this, right?

A.    Oh, man.

Q.    You come back to the topic in this cross-examination of your encounter with Mrs. Allen. And this is about something that occurred at court where she saw you coming to court. Do you remember this incident, not this testimony, but do you remember where she saw you coming to court on the day of the trial and had some words with you?

A.    See, I thought this was the Schnucks incident.

Q.    Well, I think that's where you do think that in the questions. You say down at the bottom, when she asked you what's going on, you say:

"I'm not going to tell you anything, right?"

And you say, "Yes."

"And that's when she blows up?"

"Yeah."

"And how far does she live from you?"

"About a quarter mile."

Okay. Now, Mr. Sindel isn't the only one that was inquiring about problems -- I mean, I wasn't the only one inquiring about Mr. Allen's circumstances at home. This is still Mr. Sindel asking you questions as Mr. Allen's attorney. And at the top of page 290 here. You talk about kicking it, okay. Then at the bottom at line 21:

"Did he ever tell -- he told you about the problems he had at home, that he didn't like it at home because he got dogged out. That was the expression?"

And you said, "I knew that. Yeah."

Question: "They basically verbally abused him is what I think you said, verbally?"

"Yeah. Yeah."

Now, didn't say physical there either, did you?

A.    No.

Q.    Even when Mr. Allen's attorney is asking you a very specific question whether or not it's just verbal, correct?

A.    Correct.

MR. KANE: Your Honor, the question speaks for itself. It does not say just verbal.

THE COURT:  Right.  Sustained.

Q.    The question says, "They basically verbally abused him is what I think you said, verbally?"

You said, "Yeah.  Yeah."

"They called him names.  They told him he was stupid.  They -- right?"

"Yes."

"They'd tease him about his skin?"

"Yes."

"Call him ugly?"

"Yes."

"So when he left in January of '97, that wasn't any big surprise, was it?"

"Oh, no."

"He'd been leaving before, hadn't he?"

"Yes."

Then he goes on to ask some questions about Billie exaggerating and lying about himself, correct?

A.    Right.

Q.    And he tried to suggest that Billie was lying and exaggerating about having had Dom Perignon champagne.  And I think you said, no, that wasn't a lie, that really happened, correct?

A.    That was true.  That was true.

Q.    And that sometimes you saw Billie with a couple hundred

bucks in his pocket?

A.   That was true.

Q.   Now, you had hoped for your testimony to end this day, but if you recall it did not, and you had to come back the next day.  Let's get to the bottom here.  Do this the hard way.

All right.  The transcript we've just been looking at occurred on March the 2nd in the afternoon.  They weren't -- he wasn't finished asking you questions, so you had to come back the next morning, March 3rd, 1998.  So you're back on the stand.  We're going to try and finish you today so that doesn't happen again to you, Mr. Grant.

A.   All right.

Q.   "Good morning," he says.  On this page Mr. Sindel immediately gets back to the topic about, "His mother and his sisters kind of dogged him out."  Okay.

"Yes."

"You've been over there and seen that, have you?"

"Yes."

"And that's why you knew it happened?"

"Right."

"It wasn't something Billie talked to you about, he didn't complain about it, it was just something you saw?"

"No, he complained about it also."

"Was it something he was happy about?"

"Of course not."

"Do you feel like it hurt his feelings?"

"I don't know how his feelings is.  But I mean, it seemed like it bothered him."

Then he goes on to talk to you about his class at Sumner.  But, again, there's no mention by you there, is there, of it being anything more than dogging him, calling him names, is there?

A.    Not there, no.

Q.    Okay.  The ganking we were talking about a second ago. You said that was something you knew of personally. Mr. Sindel is asking you some questions still about this ganking.

And, "what kind of things would Billie sell that he claimed were drugs that weren't?"

"I have no idea.  I just heard rumors that it was fake dope."

"So what you are telling us is based on rumor?"

"Yeah, pretty much."

"All the time you spent with Billie, you never saw that?"

"No."

So are the answers that you gave back then correct or is it something that you actually witnessed?  You see the difference between what you said today and what you said

then?

A.    Oh, yeah.

Q.    I'm just asking you the plain question, which is correct?

A.    I was trying to answer those questions and get the heck up out of there as soon as possible.

Q.    So you can't tell us which one is correct as you sit here today?

A.    Oh, it -- all of those questions that I answered then, it was true.

Q.    So you did not ever personally have knowledge of him ganking anyone, it's just something that you heard about, correct?

A.    Correct.

Q.    On the other hand, you had personal knowledge that he, in fact, sold real drugs, correct?

A.    Correct.

Q.    Okay.  No doubt about that?

A.    Correct.

Q.    The way your testimony ended, Mr. Grant, was that.

      "After Marquis died, was there any change in the way Mr. Allen lived, acted, behaved?"

      And your answer was, "No."

      "Still is the jokester?"

      "Yes."

And then you mentioned that you went home the night before and worked until 5:30 that morning. And that was the end of your testimony.

The abuse that you testified about today and in your declaration, you've indicated that -- well, let me ask you this: Are you sure that that happened, the way you say it happened?

A.    What's that?

Q.    The abuse, the physical abuse that you've described.

A.    Yeah. Yeah.

Q.    I'm going to direct your attention to Exhibit 638-A, page 1.

THE COURT: 638?

MR. HOLTSHOUSER: A, page 1.

Q.    This is a question from Mr. Allen's attorney to him at the bottom here:

"One question that I had probably asked last time that we need to be absolutely sure on is whether you when you were growing up, you were subject to physical abuse at any point by anybody?"

And Mr. Allen answered, "No."

So I ask you again, are you sure that what you've described --

A.    Oh, I'm sure. I'm sure.

Q.    As you sit here today, can you tell the Court whether

you have any feelings one way or the another about the punishment that the jury imposed on Mr. Allen in this case?

A.    Can you repeat that?

Q.    Do you have any feelings one way or the other about the punishment that the jury imposed, the death penalty, on Mr. Allen, your friend?

MR. KANE:  Your Honor, I'll object to the relevance.

MR. HOLTSHOUSER:  I think it's relevant to credibility, Your Honor.

THE COURT:  I'm not sure -- how could it be?

MR. HOLTSHOUSER:  Knowing that the outcome of this proceeding could impact that sentence --

THE COURT:  Overruled.

MR. HOLTSHOUSER:  -- and would color it.

THE COURT:  Overruled.

MR. HOLTSHOUSER:  Color or possibly lead to exaggeration.

BY MR. HOLTSHOUSER:

Q.    Do you have any feelings about the sentence that was imposed?

A.    Yeah.

Q.    What are they?

A.    I mean -- because I mean that's -- after all -- even though after all these years or whatnot, I mean, I still look at him as my best friend.  I mean, I don't want anything.  I

don't want his life to get tooken from a bad decision.

Q.   Do you have any -- do you in yourself harbor any doubts or guilt feelings that you, you and your testimony had anything to do with that outcome?

A.   Me personally?

Q.   Yes.

A.   I don't know.  It's rough.  I really can't say.

Q.   Now, you have had some memory -- you have some memory problems that you suffer from now as a result of the accident, correct?

A.   Yes.

Q.   In the time that you knew Mr. Allen, did he have any memory problems?

A.   I can't recall.

Q.   Don't recall any?

A.   I don't remember him having any memory problems.

        MR. HOLTSHOUSER:  No further questions, Your Honor.

        THE COURT:  Redirect?  Remember, I have absolutely got to get out of here in about ten minutes.

        MR. KANE:  About five before four?

        THE COURT:  Yeah.  I don't want you to feel restricted in your examination, it's just a unique problem to me, and I regret it.

        MR. KANE:  That's quite all right.  I think we'll be able to finish, Your Honor, but we'll see.

REDIRECT EXAMINATION

BY MR. KANE:

Q.    I'm referring your attention to the direct testimony you gave at the penalty phase of Mr. Allen's trial.  And at the top there at lines 5 and 6, you're asked how old were you at the time that you first met Mr. Allen.  Do you see that?

A.    Uh-huh, yes.

Q.    And what was the answer you gave?

A.    About 13 -- 13, 14.

Q.    And Mr. Holtshouser referred you to an FBI report, Exhibit 128.  I'm going to call your attention to that second paragraph there.  Can you see where it says Billie, that you stated that you and Billie are best friends, have known each other for at least seven years?

A.    Yes.

Q.    And do you see down at the bottom where it shows that date of that interview as 4/4/97?

A.    Yes.

Q.    And so if you had known him for at least seven years, that would have been -- I guess we established before that you were 20, going on 21 at this point?

A.    Yes.

Q.    So at least seven years would have been back to when you were 13 or younger; is that correct?

A.    Correct.

Q.   Do those refresh your recollection of about how old you were when you first met Billie?

A.   Yes.  12 or 13, yes.

Q.   Now, in your declaration, this is Exhibit 266, the first line of the first paragraph, it says, "I met Billie Allen when he was about 12 or 13 years old."  Is that correct?

A.   Correct.

Q.   Okay.  It also goes on to say that, "You became and remained close friends."  Is that true?

A.   Correct.

Q.   Down at the bottom of that paragraph?

A.   Correct.

Q.   Now, in this -- anywhere in this declaration did you say that none of the information in the declaration had ever been testified to before at trial?  Let me refer you to the last paragraph that Mr. Holtshouser spent a lot of time on, paragraph 15.  Could you just read paragraph 15 aloud, please?

A.   "If I had been asked about any of these topics at Billie's trial, I would have testified to the same information contained in this declaration."

Q.   Okay.  So are you saying there that, "I was not asked any of these topics at trial"?  Does it say that?

A.   No.

Q.    And, in fact, for instance, you had testified how old you were when you first met Billie, correct?

A.    Correct.

Q.    In fact, you had testified that you and Billie became close friends, correct?

A.    Correct.

Q.    In fact, you had testified about various verbal abuse or at least generally about verbal abuse that Billie had been subjected to, correct?

A.    Correct.

Q.    And all of those issues are addressed in your declaration, correct?

A.    Correct.

Q.    Okay.  So when you said this in paragraph 15, were you saying that if you had been asked anything at trial, you would have -- first of all, let me just ask it.  If you had been asked anything at trial, would you have answered it truthfully?

A.    Yes.

Q.    And if -- and in this declaration, all that we've gone through, all of these topics about abuse, being locked out of the house, his treatment at home and so forth, is there anything in there that after all this review, all these documents, is there anything in there that you now think is incorrect?

A.    No, none whatsoever.

Q.    In all of the documents that Mr. Holtshouser showed you, I believe there was an FBI report, there was -- do you remember that, the FBI report he showed you?

A.    That he showed me, yes.

Q.    Do you remember the grand jury testimony he showed you?

A.    Yes.

Q.    Do you remember the trial testimony that we were looking at?

A.    Yes.

Q.    In any of those -- in any of those records, did you see questions posed of you as to whether or not Billie had been physically abused at home?

A.    No.

Q.    Did you see any questions posed about whether or not Billie had been locked out of his house --

A.    No.

Q.    -- during the younger years when you knew him?

A.    Not that I can recall, no.

Q.    And he -- Mr. Holtshouser reviewed your grand jury testimony.  And do you remember that, having to do with the last time you had seen Billie before he was locked up?

A.    Yes.

Q.    You can refer to your screen, we're at Exhibit 659.  Do you see in about line 8, what was the last time you saw him?

A.    Yes, I see.

Q.    Now, on this page or the following page -- you can take a moment to review this.  On this page or the following page, do you see any questions asked of you asking where you where before you guys got to the club that night?  I can go back to the other page if you'd like me to.

A.    No.

Q.    You don't see that reflected anywhere that you were asked that?

A.    No.

Q.    But do you see anywhere asked how you got to the club that night?

A.    No.

Q.    Do you see anywhere asked what you did earlier that day?

A.    No.

Q.    Anywhere asked, had you stopped by Billie's house to pick up clothes or try to pick up clothes?

A.    No.

Q.    In addition to any of the documents that you've reviewed, have any of the questions about or has the fact that you were in a serious car accident, has that changed your confidence in your belief that the things set forth in your declaration actually did happen?

A.    No.

Q.    So when you say you have memory problems as a result of the accident, is that like you may have difficulty remembering certain things that happened?

A.    Yes.

Q.    But if you've testified here that you do remember it, you're confident that it's a true memory and it happened; is that correct?

A.    Yes.

Q.    You referenced at one point that at least at a young age you were subjected to some whippings with a belt at home as punishment for things you had done?

A.    Yes.  Yes.

Q.    And you've also described in your declaration and in your testimony various forms of beatings, whippings and so forth that Billie was subjected to by various people in his house.  Are those -- are those the same types of -- are those the same types of things -- were you subjected to the same types of things that Billie was subjected to?

A.    No.

Q.    And did you, in fact, in your declaration, do you recall saying that you'd never seen anything like the way that Billie was treated?

A.    Correct.

Q.    And that remains true in your experience, is it true that the way that Billie was treated at home is unique in

what you've seen in your entire life?

A.    Yes, other than movies.

Q.    Okay.

MR. KANE:  Thank you.  No further questions, Mr. Grant.

THE COURT:  Thank you, sir.  You are excused.

Court's in recess until 8:30 tomorrow morning.

(Court in recess at 3:58 p.m.)

                        C E R T I F I C A T E

           I, Susan R. Moran, Registered Merit Reporter, in

and for the United States District Court for the Eastern

District of Missouri, do hereby certify that I was present

at and reported in machine shorthand the proceedings in the

above-mentioned court; and that the foregoing transcript is

a true, correct, and complete transcript of my stenographic

notes.

           I further certify that I am not attorney for, nor

employed by, nor related to any of the parties or attorneys

in this action, nor financially interested in the action.

           I further certify that this transcript contains

pages 1 - 274 and that this reporter takes no responsibility

for missing or damaged pages of this transcript when same

transcript is copied by any party other than this reporter.

           IN WITNESS WHEREOF, I have hereunto set my hand

at St. Louis, Missouri, this 28th day of February, 2013.


                              _____
                              /s/ Susan R. Moran
                              Registered Merit Reporter