UNITED STATES OF AMERICA
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

BILLIE JEROME ALLEN,            )
                                )
        Petitioner,             )
                                )
   vs.                          )   No. 4:07-CV-27 ERW
                                )
UNITED STATES OF AMERICA,       )
                                )
        Respondent.             )


TRANSCRIPT OF EVIDENTIARY HEARING

BEFORE THE HONORABLE E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE

November 30, 2012
Volume XI

APPEARANCES:

For Petitioner:      Ms. Elizabeth U. Carlyle
                     P.O. Box 30418
                     Kansas City, MO   64112

                     Mr. Eric John Montroy
                     Mr. James Henry Moreno
                     Mr. Timothy Kane
                     FEDERAL COMMUNITY DEFENDER OFFICE
                     The Curtis Center, Suite 545 West
                     Philadelphia, PA   19106

For Respondent:      Mr. Steven E. Holtshouser
                     Ms. Carrie Costantin
                     OFFICE OF U.S. ATTORNEY
                     111 S. 10th Street, 20th Floor
                     St. Louis, MO   63102


REPORTED BY:         SUSAN R. MORAN, RMR, FCRR
                     Official Court Reporter
                     111 South 10th Street
                     St. Louis, MO   63102
                     (314) 244-7983

                              I N D E X

                    Direct    Cross    Redirect    Recross

PETITIONER'S WITNESSES


DANIEL J. CUNEO, Ph.D
     (By Ms. Carlyle)        6
     (By Mr. Holtshouser)            65

(The following proceedings were held in open court on November 30, 2012 at 8:35 a.m.:)

MR. HOLTSHOUSER:  Judge, if we can, before we begin the witness for today, we want to make a record on the exhibits for the past two days if we could.

THE COURT:  Okay.  Sure.  Let me get the latest version.  Okay.  All right.  Whenever you're ready.

MR. HOLTSHOUSER:  I'll go in numerical order of the exhibits.

THE COURT:  Okay.

MR. HOLTSHOUSER:  First would be 128.

THE COURT:  All right.

MR. HOLTSHOUSER:  That was --

THE COURT:  Johnnie Grant.

MR. HOLTSHOUSER:  -- the Johnnie Grant 302.

THE COURT:  And when you mention it, unless there's a prompt objection, I'm going to just say received.  128, received.

MR. HOLTSHOUSER:  258, the declaration.

THE COURT:  Okay.  Just a second.  Of Juanita Petty Allen.  Received.

MS. CARLYLE:  I think that was already received actually.

MR. HOLTSHOUSER:  No.

MS. CARLYLE:  Okay.

MR. HOLTSHOUSER:  529 is the deposition of Ms. Allen, I believe.

MS. COSTANTIN:  I think that was received.

MR. HOLTSHOUSER:  We decided that was --

THE COURT:  -- the deposition transcript.

MR. HOLTSHOUSER:  That actually already is in.

THE COURT:  It's in, yes.

MR. HOLTSHOUSER:  609 is the Pretrial Services Report.

THE COURT:  Received.

MR. HOLTSHOUSER:  659 is Johnnie Grant's grand jury testimony.

THE COURT:  Okay.  659, received.

MR. HOLTSHOUSER:  659.

THE COURT:  Yeah, it's received.

MR. HOLTSHOUSER:  And 666 is the employment application for Juanita Allen.

THE COURT:  Received.

MR. HOLTSHOUSER:  We also used the declaration of Johnnie Grant, 266.  I believe the other items of testimony that were used were already in evidence.

THE COURT:  266?

MS. CARLYLE:  What about 407?

THE COURT:  266 is received.

MR. HOLTSHOUSER:  Yeah, we missed that one.  407 is

the Sindel letter to Juanita Allen.  407.

MS. COSTANTIN:  No, actually I'm not sure that is right.  An April of '98 letter.

THE COURT:  407 is received.

MS. CARLYLE:  Yeah, I think you also referred to 638-A, which is the -- 638.

MR. HOLTSHOUSER:  That's already admitted in the stipulation.

MS. CARLYLE:  That's all I had.

MR. HOLTSHOUSER:  That's all we had.

THE COURT:  Is that what you have, David?

THE CLERK:  Yes, Judge, that's exactly what I had.

MR. HOLTSHOUSER:  That's all I have, Judge.

THE COURT:  Thank you.

MR. HOLTSHOUSER:  And as Ms. Costantin said, there's no need to take a break.

THE COURT:  Yes.  Mr. Callahan mentioned that Eric Holder was going to be in the courthouse, so I told him we would take a break at that time.

MR. HOLTSHOUSER:  And I overrode Mr. Callahan, but let's not tell him.

THE COURT:  All right.  He's used to getting kicked around.

Okay.  Whenever you're ready.

MS. CARLYLE:  Okay.  Can you hear me?  Is this a

good spot?

THE COURT:  I can hear you well.

MS. CARLYLE:  Great.  We call Dr. Dan Cuneo, please.

DANIEL J. CUNEO, PhD,

Having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. CARLYLE:

Q.    Will you tell us your name, please, sir.

A.    Daniel J. Cuneo.

Q.    And how are you employed, Dr. Cuneo?

A.    I'm a clinical psychologist.

Q.    Dr. Cuneo, I'm showing you a document that's been marked as Exhibit 682.  Can you tell us what that is?

A.    That's a copy of my curriculum vitae.

Q.    And is that current as of today?

A.    Yes, it is.

Q.    Can you briefly describe for us your experience as a forensic psychologist?

A.    I received my BA from University of Missouri, St. Louis, in '71.  1974, I received my master's in clinical psychology from SIU at Edwardsville.  From '74 to '77, I was at the University of South Dakota where I received my Ph.D in clinical psychology.  '76 to '77, I did my year's internship at Larue D. Carter Hospital, which is part of the Indiana

Medical Center.  I worked with the Illinois Department of Mental Health in surgery --

MR. HOLTSHOUSER:  Judge, maybe just to speed things along a little bit, the government will be happy to stipulate to Dr. Cuneo's credentials and his resume.

THE COURT:  All right.

MR. HOLTSHOUSER:  And he also actually already testified in the trial of this case and gave much of this same information, so I don't know that it's news to the Court.

THE COURT:  Okay.  The stipulation is --

MR. HOLTSHOUSER:  If she -- I'm not trying to stop you from going into it if you feel it's necessary, but I would stipulate to it.

THE COURT:  All right.

MS. CARLYLE:  Okay.  Then I think what we'll do is we won't go through his general experience as a forensic psychologist since he's been accepted.  There's some specific aspects of your experience I'd like to ask you about.

THE COURT:  Sure.  Go ahead.

BY MS. CARLYLE:

Q.    In particular, and I'm going to ask you to talk to -- at least some areas about your experience before you last testified in this trial, which was in March of 1998.

A.    Yes, ma'am.

Q.    Okay.  Before that time can you tell us what your experience had been and what your participation in the field had been dealing with the issue of child abuse?

A.    I had worked on a variety of different boards.  Before 1998, I had served on the board of CASA, Court Appointed Special Advocates.  And that was in the St. Clair County.  Most of my work has been in Illinois.  I had also --

Q.    Let me stop you for a minute.  Can you tell us what CASA is?

A.    Court Appointed Special Advocates.  It's a program that's designed where volunteers are trained to work with children who have been abused, and to serve as their voice in the courtroom.

THE COURT:  I'm incidentally just curious, because I've always been a strong advocate.  I was involved with the American Association of Family and Juvenile Court Judges when that concept was first raised back in the '70s, so I'm well familiar with it, and highly applaud it.

A.    In 19 -- pardon me, 1988, I put together a program called Children First, which is a program for divorcing parents and children.  And it has since been mandated in a variety of different states.  It is utilized in Illinois, Missouri.  I believe at this time, I'm not quite sure, I think 16 states utilize it.  And I had also served as a consultant at that time to St. Clair County Community Mental

Health Board and had worked with the Children's Home and Aid Society, and a variety of different children's issues.  In addition, I had served as a consultant at the St. Clair County Juvenile Detention Center.  This is all prior to 1998.

Q.    Okay.  And as a result of that work that you've done with children, let me ask you whether actually after this trial you were tasked with assisting the State of Illinois in determining what to do with children transitioning out of foster care?

A.    2003, I was asked by the governor to serve on a task force that would revise the Department of Children and Family Services.  There were seven of us.  One of the issues -- and then I was later placed -- I served on the National Governors Association Center for Best Practices Policy Academy for children transitioning out of foster care.

Q.    And was that because -- basically because of your recognition of your expertise in those areas?

A.    I had served in revising DCFS.  And I had also -- one of the big issues that -- Illinois was getting about 80 percent of their funds for children from the federal government.  And to do so we had to have what they would call a performance improvement program.  And we had to have one thing that we dealt with.  And at that time it was trauma.  And then later in '06 and '07, one of the things that had come is that we began -- not just Illinois, but across the

United States we were finding out what happens to kids when they get out of foster care, and what happened -- why do they go back home?

And when you look at the overall percentages of kids that were in foster care, you began seeing -- or were involved with Department of Children and Family Services, we were finding that they were two to three grades below what would have been consistent with someone else their age grade.

We're finding the greatest percentage were unemployed.  A wide variety of different mental health disorders.  And we began looking at different ways to do -- a great increase in the juvenile justice system.  And we were looking at ways of how we could revise that system to stop the continued trauma and to see if we could ease them into adulthood.

MS. CARLYLE:  Okay.  And just for the Court's information, these two entries in Dr. Cuneo's vita are on page 2.

Q.    Okay.  Let's shift gears here and start talking about 1997 and 1998 when you were working on Mr. Allen's case.  In 1998, was it common for you to be asked and to perform competency or fitness evaluations for people who were charged with crimes?

A.    Yes.  When I was with the -- I was the clinical director at that time at Chester Mental Health Center.  And

Chester Mental Health Center is the Illinois maximum secure facility. At that time we had roughly 300 individuals, all males. And these were individuals that -- 50 percent of those individuals were individuals that were either found -- in Illinois we say unfit to stand trial. I know the federal system says incompetent to stand trial. We had 50 percent that were roughly unfit to stand trial. Pardon me, 50 percent of these individuals were so violent, they couldn't be handled anywhere else. The other 50 percent were individuals that were either unfit to stand trial or not guilty by reason of insanity.

My role there was to continue evaluation and then writing the periodic reports to the Court, Your Honor, on these individuals. Supervising those reports that went out. And that was my role within the Department of Mental Health.

I had an office at that time in Belleville, and I would periodically do evaluations in different counties on a private basis, and then periodically in Missouri, but primarily in Illinois.

Q.   So at that point in early 1998, how many competency or fitness evaluations do you think you would do in, say, a given week?

A.   Because of my role within the Department of Mental Health, I was probably either participating in the evaluation or doing anywhere between eight to ten a week.

Q.   And have you ever written or spoken about performing competency or fitness evaluations and writing those reports?

A.   Yes.

MS. CARLYLE:  I guess I'm not clear, is this not working at all?

MR. HOLTSHOUSER:  Give us one second.

MS. COSTANTIN:  You want to go back to the Sanction?

MS. CARLYLE:  Yes, please.

MS. COSTANTIN:  We got it.

MR. HOLTSHOUSER:  Judge, we have a little technical difficulty.  I think we can resolve it quickly.

THE COURT:  That's fine.  And I know you all have worked well throughout this proceeding, and I really appreciate that.

BY MS. CARLYLE:

Q.   Okay.  Did you -- are you the coauthor of a forensic manual that was prepared for Illinois?

A.   Yes.  I cannot -- if I can go back to my vita, I can tell you when it first started.

Q.   Okay.  Do you have it there or do you need me to bring it to you?

A.   No, I have a hard copy of my vita here.

Q.   So you're looking at the same thing we just were talking about as Exhibit 682, correct?

A.   Yes.

Q. Okay.

A. First put it out in 1987 --

Q. Okay.

A. -- at the request of the Department of Mental Health. Put it out again in '94, and put it out again in '97. These were detailing out how to write forensic reports, how to -- what copies of court orders, so that people would just -- our judges could just fill in the blanks. Different procedures that happened with individuals that were either found unfit to stand trial and not guilty by reason of insanity.

Q. And you were indeed actually the first, the top author. But they may be in alphabetical order, so I don't know.

A. That's correct.

Q. And what I'm holding in my hand here, which I'm actually not offering into evidence, is, in fact, the whole handbook?

A. That's the one I gave you.

Q. That's the one you gave me.

MS. CARLYLE: I'm sorry, I forget how to not make it do that. Okay. Wait a minute.

MR. HOLTSHOUSER: Double click within the box.

MS. CARLYLE: There we go. I'm sorry. Okay. I promise I'll get good at this quickly.

THE COURT: That's all right. Take your time.

Q. Okay. Looking at the -- I'm showing you the cover.

Let me show you beginning on page 59, is this the section of that manual about making reports in fitness proceedings?

A.    Yes, it is.

Q.    And then does the manual also include a sample fitness report?

A.    Yes.

Q.    Now, have you been retained to -- have you been retained by the State to conduct evaluations of defendants charged with capital crimes?

A.    Yes.

Q.    And have you testified for the State in such cases?

A.    Yes.

Q.    Okay.  Have you also been retained by the defense in such cases?

A.    Yes.

Q.    Okay.  And did you testify at the capital murder penalty phase of Billie Allen in 1998?

A.    Yes, I did.

Q.    Who retained you to do that?

A.    I believe his name was Rick Sindel.

Q.    Okay.  And as you understood it, was he Mr. Allen's lawyer?

A.    Yes, he was.

Q.    Had you worked with Mr. Sindel before?

A.    Yes.

Q.   What work had you done with him before this case?

A.   I had been involved in doing competent -- I believe I had been asked to do competency evaluations before in the past.

Q.   Do you know when you were first -- when you were first contacted by Mr. Sindel?

A.   I believe it was in September of 1997.

Q.   Okay.  And I'm showing you what's been marked as Exhibit 314.  I'll make it a little bigger so we can deal with it here.  Is that a letter that you received from Connie Caspari, Mr. Sindel's paralegal?

A.   Yes, it is.

Q.   And in that letter she's telling you that you -- she's sending you a copy of the St. Louis Metropolitan Police Department report about Billie Allen, correct?

A.   That's correct.

Q.   And she's referencing a conversation that you had with Mr. Sindel.  Does that mean you must have talked to him before?

A.   Yes.

Q.   Okay.  You don't have a specific record of exactly when you talked to him, do you?

A.   No, I do not.

Q.   But there's no question in your mind that before she sent you this letter, you must have talked to him?

A.   Yes.

Q.   Do you remember anything about that conversation you had with Mr. Sindel in September of 1997?

A.   Just one thing.

Q.   And what's that?

A.   Well, he asked me to do a fitness evaluation or a competency evaluation on Mr. Allen.  And I just remember one line because it seemed strange.

Q.   And what was that?

A.   He said, "This guy can't tell me the truth to save his soul."

Q.   Now, back in September, do you remember whether Mr. Sindel told you there was a trial date and when it was?

A.   I thought he said it was in spring.  And later I found out it was in March.

Q.   And what was Mr. -- back in September, what was Mr. Sindel asking you to do specifically in Mr. Allen's case?

A.   To evaluate him as to competency to stand trial.

Q.   Did you do anything immediately after you received this letter?

A.   No.  Well, no.  I read the St. Louis police report, that's it.

Q.   Did you receive any other documents from Mr. Sindel at that point?

A.   I'm not sure.  I don't know what I received at that

time.  I know what I ended up receiving, but I can't remember specifically when I got them.

Q.   Okay.  So when did you -- after you -- after this letter, when did you next hear from Mr. Sindel?

A.   Some time in January.

Q.   Okay.

A.   Of '98.

Q.   And how was that contact made, do you remember?

A.   By phone.

Q.   Okay.  And what were you told?  Or who called you?

A.   Rick.

Q.   Okay.  And what did he tell you at that point?

A.   We need you to go do a fitness evaluation.

Q.   Okay.  And did he obtain a court order for you to do that?

A.   Yes.  The individual was at Franklin County Jail, I believe it was, and I was asked to go down to see him.  They had to get a court order to let me into there because it was a federal prisoner.

Q.   Okay.  And I'm showing you what's been marked as Exhibit 26.  Is that -- actually I guess I don't know if you've seen that, but is that the court order authorizing your visit?

A.   I'm not sure if I ever saw that court order.  I do know that I was allowed to go down on the 16th.

Q.   Okay.

A.   I do know I made a phone call to make sure somebody got it.

Q.   Now, did -- was there a reason why you didn't immediately start contacting Mr. Sindel regularly between September and January?

A.   What happens is I get a lot of people that call me to do evaluations, and then they are going to send me something. Then they do.  And then I tell them, okay, I need this, this, and this, and tell me when I can do it.  Some people never call back.  I didn't know if it was still something that needed to be done or not.

Q.   But you didn't feel based on your conversation in September that you were supposed to go to work on something immediately beyond reviewing what was sent you?

A.   No, I knew I couldn't get into the jail without a court order.

Q.   Okay.  And have you had a chance to review your -- well, first of all, when did you first meet Mr. Allen?

A.   I saw him on January 16th, 1998.

Q.   And have you had a chance to review your notes from the interviews you had with him before you testified today?

A.   Yes.  I did not have -- I did not have a copy of my notes.  They were sent to me when these proceedings first -- when I first heard back on these proceedings.

Q.    And I'm showing you what's been marked as Exhibit 501. We'll page down a little so we can make sure we're talking about the same thing.  Can you see that well enough to identify that those are your notes?  I'm not going to ask you to read what it says.

A.    Yes, those are my notes.

Q.    And then beginning on page 9, these are notes of a later -- these are notes of a later examination, are they not?

A.    On February 22nd, 1998.

Q.    Let me ask you, when you met with Mr. Allen on February -- on January 16th, did you ask him about his drug and alcohol history?

A.    Yes.  What I did was I went through a mental status exam.

Q.    And that included his drug and alcohol history?

A.    Yes.  What a mental status exam does is -- I was being asked to go in to do a competency exam.

Q.    Right.

A.    What happens on that is I saw it as a twofold issue. One to see if the individual has a mental illness.  And if he has a mental illness, that's the first step.  And that's hwy you see what are notes from a mental status exam.

Then the second thing that you do, once there's -- once you feel that there's a mental illness, the second prong

of that is that you have to see if that mental illness substantially either impairs the individual's ability to understand the nature and purpose of the proceedings against him, or to assist in his own defense.

So there's like two issues when you do a fitness. And, well, in Illinois there's a third one, we have to make a decision if the individual -- if the individual in your opinion is unfit, whether there is a substantial probability he could attain fitness within the course of one year if he's provided treatment.

Q.    And going back to Exhibit 683, which is your manual, that's exactly what you were telling psychologists in Illinois they had to do, correct?  You were telling them they need to make a diagnosis?

A.    Correct.

Q.    And you needed to describe their mental or physical disability?

A.    Correct.

Q.    So your mental status exam included information about his drug and alcohol history, I think you already said.  Did you also ask him about his prior involvement with the law?

A.    Yes.

Q.    With law enforcement system?

A.    Yes.

Q.    Ask him about any prior suicide attempts that he had?

A.   Yes.

Q.   His stress level at the time of the evaluation and the arrest?

A.   Yes.

Q.   Did you ask him whether he had hallucinations?

A.   Yes.

Q.   And did you ask him generally about his family and his school history?

A.   Yes.

Q.   Did you ask him about his musical interests?

A.   He volunteered his musical interests.

Q.   Did you ask him about his dating behavior?

A.   Yes.

Q.   Did ask him about his friend Marquis Taylor?

A.   Yes.

Q.   Did you -- was that something you were already -- was that an issue you were already familiar with before you saw him?

A.   Yes.

Q.   Now, why are all those questions relevant to his competence to stand trial?

A.   First thing I'm trying to do is find out if he has a diagnosis.  And then those -- usually when you do a mental -- I do a mental status exam and I do a mini history every time I do a fitness evaluation.  Because I want to see, is there a

diagnosis. And that's what you would do when you come up to find a diagnosis. Then -- so that's pretty standard on everything that I do. I probably have done 3,000, 3,500 fitness evaluations. And every report I do, details out pretty much the same thing.

Q.   Okay. Now, is any of the information you gathered on January 16th also relevant to mitigation?

A.   Yes.

Q.   But was that something you were focused on on January 16th?

A.   January 16th, I never knew I was going to do anything about mitigation.

Q.   Okay. Now, in addition to the interview on January 16th, did you give Mr. Allen any psychological tests?

A.   I gave him an MMPI.

Q.   And what's an MMPI?

A.   Minnesota Multiphasic Personality Inventory. I believe -- that was the MMPI, not the MMPI-2, but back then that's what I was using, the MMPI. And what that is is three clinical scales -- pardon me, ten clinical scales, three validity scales developed in 1954, and is one of the more researched psychological tests. I was doing it just to see if I could gather any additional information. Many times I'll do testing to see if it's consistent with the rest of the stuff I see.

Q.    Now, tell us kind of the mechanics of the MMPI.  I mean, what sort of things does a person taking the MMPI do?

A.    It's a true and false test.  All you're doing is filling in banks.

Q.    Okay.  Now, did you actually -- do you have any idea how many questions there are total?

A.    566 -- I believe it's either 566 or 567 on the MMPI.

Q.    Okay.  Now, did you actually wait for Mr. Allen to finish the MMPI while you were sitting there?

A.    No, I left it with him and told him that I needed -- that when he gets done, I will get it back.

Q.    Okay.  And is that unusual?

A.    No.  A lot of times in a correctional facility, I'll do that.  The MMPI is a pretty robust test.  If, in fact, the test -- I mean, you tell him to take it by himself.  You tell him, take it in a quiet spot the best you can in a correctional facility.  And then you get the test back and you score it.  MMPI is just one more piece of information, you know.  What you're doing is to see if the things are consistent.

When you do it -- when you do an evaluation, what you're doing is getting pieces of information.  And then later you have to put it together.  This is just one more piece of information.

Q.    Now, before you left this booklet with him, did you

find out whether he could read it or not?

A.   Yes, I went through probably the first six or seven questions with him, and had him read it out loud.  I also knew at that time he had an 82 IQ.  Not the highest, but I know that's enough he could have done an MMPI.

Q.   Okay.  Now, did you actually receive a set of answers back from the MMPI?

A.   Yes.  I believe I got those from Mr. Sindel's office.

Q.   And I'm showing you what's been marked as Exhibit 363.  Is that the cover letter that came with the answers?

A.   I guess.  I have no independent recollection, but that's certainly what it would appear to be.

Q.   Okay.

A.   I don't dispute that at all.

Q.   Okay.  Now, during your meeting on January 16th, you had -- did you have an initial impression of what a diagnosis might be?

A.   It's my opinion -- it was my impression at that time he had Post Traumatic Stress Disorder.

Q.   Which is sometimes called PTSD?

A.   Correct.  I thought he had -- at that time, again, I thought it was PTSD chronic.  I thought -- and it was my impression that he had cannabis dependence, I believe it was cannabis dependence in a controlled environment.  In other words, long-term marijuana abuse.  I also believed it was

dementia NOS, or rule out dementia NOS.

Q.   Okay.  And I'm showing you now what's been admitted as Exhibit 55.  Is this your, basically the bill you sent to the Court for your time in this case?

A.   Yes, it is.

Q.   See if we can get it a little bigger here.

THE COURT:  What's the number?

MS. CARLYLE:  Fifty-five, Your Honor.

Q.   Can you tell us on January -- on January 16th, how long did you spend with Mr. Allen?

A.   An hour and a half.

Q.   Okay.  Now, I notice your billing for that day includes four hours.  What's the rest of it?

A.   Travel time getting back and forth.

Q.   Okay.  Because he was in Franklin County Jail?

A.   That is correct.

Q.   Okay.  Do you normally separately bill for drive time or is this the way you do it?

A.   I just tell people I'm going to -- back then in 1998, back then I was charging people a hundred and a half an hour.

Q.   Now, when you got back those MMPI answers, did you notice anything unusual about them?

A.   There was a large number of questions that weren't answered.

Q.   Okay.  And in addition to that, after you'd visited

Mr. Allen, were you asked to do something else besides just evaluate his competence?

A.    Some time in February.  It's got meeting with Dr. Randall, so it might have been February 1st, I'm not sure.  I was told that there was difficulty with the mitigation, and that they were asking me to do mitigation too.

Q.    So when you said "they are asking you to do mitigation too," what did that mean to you that you were being asked to do?

A.    That they were going -- they were asking me to look at possible factors that might lead to mitigation if Mr. Allen were found guilty.

Q.    And what was your response to being -- initial response to being asked to do that?

A.    I think my first line was, "You're out of your mind.  You want me to do this in a month?  Are you crazy?"  That's not what usually happened.

Q.    Okay.  So what were you -- what was Mr. Sindel's response to that?

A.    He made me feel guilty.

Q.    What did he say to make you feel guilty?

A.    Well, if you don't do it, he's going to die.

Q.    Now, before -- you did write a report for -- in this case?

A.    Yes, I did.

Q.    Before you did that, did you speak with Mr. Allen's mother, Juanita Allen?

A.    Yes, I did.

Q.    And I'm showing you what's been marked as Exhibit 413. Are those the notes that you took from your meeting with Mrs. Allen?

A.    On February 15th, yes.

Q.    February 15th, right.  About -- was that a conversation you had in person or by phone?

A.    It was by phone.

Q.    About how long was it?

A.    About 20, 25 minutes.

Q.    And why did you talk to Mrs. Allen at that point?

A.    Because at that time I wanted to verify what the deaths of, at that time it was Dennis Noble and I believe it was Marquis Taylor that he talked about.  And I wanted to see her perceptions of what happened at that time.  And I wanted to gather some additional information.  There was a question at that time also as to whether he had any type of dementia. And I wanted to look at some issues there.

Q.    Did Mrs. Allen tell you that after her house was shot up that she put Billie Allen out?

A.    Yes.

Q.    Would you -- in your opinion was your conversation with

her sufficient to do what you needed to do to develop with her mitigating evidence in Mr. Allen's case?

A.     No.  I thought someone else was going down to get additional information.  I thought my role was to put this together.  I've been in subsequent where you go in for mitigation, my role has always been, they would bring information to me, we would look at it, we would meet.  I've never done anything like this in a month's time.

Q.     But I guess in terms of Mr. Allen's mother, would you have expected or wanted more information than you got in your 30-minute conversation?

A.     I was only looking at two things.  I was only looking at the PTSD at that time.

Q.     And do you remember whether you ever got any more reports of conversations with Mrs. Allen?

A.     Subsequent to all this, to after the trial, I've been sent her declaration.  I have been sent --

Q.     Let me interrupt you.  I'm actually asking for your memory before the trial.

A.     I have no independent memory that I got anything else from her.

Q.     But before we get to your report, I want to clear up something.  Sorry.  I'm showing you what's been marked as five -- as Exhibit 564.  And the reason I'm asking you about it is that it's marked on our exhibit list as your notes.

Are those your notes, in fact?

A.   No.   That handwriting is bad, but I think mine is even worse.   I don't know whose handwriting that is.

MR. HOLTSHOUSER:   It's on the exhibit list, which he has no knowledge of.

MS. CARLYLE:   I understand that, Mr. Holtshouser. The reason I'm asking him about them, since the exhibit list seems to suggest his notes, I wanted to establish they weren't.

Q.   And that's true as to 563 and 564, correct?

MR. HOLTSHOUSER:   I believe she's asking Dr. Cuneo about the exhibit list, which I don't think he has any knowledge of.   But if she's asking the government if there is an error in 564, we believe that 564 may say "Cuneo notes," but they are not.   I mean, they are Mr. Simon's notes of a conversation with someone.

THE COURT:   All right.   She just said 563 also.

MR. HOLTSHOUSER:   563 is --

MS. CARLYLE:   No, 563 --

Q.   And now I'm showing --

A.   Those are my notes.

Q.   Okay.   563 are your notes?

A.   Yes, ma'am.

Q.   Now, before you made the report in Mr. Allen's case, how long did you spend on the case?   And I'm showing you

again Exhibit 55, which is your bill, because I don't expect you to remember exactly.

A.    What was the date of my report, please?

Q.    The date of your report was February 16th.

A.    I don't know if it was written before or after the 16th.  I mean, what I'm saying is that I reviewed information on the 16th.  That may have been the date that I was told that they needed mitigation.  I can tell you probably ten hours.  It may have been -- pardon me --

Q.    It's about 15 hours?

A.    Yeah, about 15 hours.  But I don't know if the three hours there that says review of information, I don't know if that was done because I was told they wanted mitigation or not.  I don't know.

Q.    Well, that three hours on the 16th presumably includes the time you spent writing the report, does it not?  Because you didn't bill separately for that.

MR. HOLTSHOUSER:  I object to the leading form of the question.  She can ask him what it involves.

THE COURT:  Sustained.

A.    It may have.  I don't know.  I can't tell you one way or another.

Q.    Do you normally separately bill for writing a report?

A.    Sometimes, sometimes not.

Q.    And of that 15 hours, two and a half hours of it was

drive time?

A.    Yes.

Q.    Now, did you visit Billie Allen again?

A.    On February 22nd, 1998.

Q.    And why did you do that?

A.    Because I was told that they needed something for mitigation.

Q.    Was there any -- was there anything else that you thought you needed to do on February 22nd?

A.    Yes.  I had got a copy of the MMPI back.  There were, I believe, 70 some odd questions that were left blank, Your Honor.  And I wanted to go back and find out why the questions were left blank.

Q.    Okay.  Now, you gave a sworn declaration in this case in 2009, didn't you?

A.    That's correct.

Q.    And let me -- I've got in front of you what's been marked as Exhibit 257.  Is that your declaration?

A.    Yes, it is.

Q.    And you signed it?

A.    Yes, I did.

Q.    Okay.  And there's a mistake in it, isn't there?

A.    Yes, there is.

Q.    What's the mistake?

A.    I saw Mr. Allen twice, not once.

Q.   And let me refer you -- in paragraph 5 in particular you said in early February 1998, I was asked to consider mitigation.  "Due to the time constraints that the defense team was then working on, I did not have time for a second face-to-face interview with Mr. Allen that would have focused solely on mitigation."

But, in fact, you did have a second interview?

A.   Correct.  It did not focus solely on mitigation, but I had a second interview.

Q.   And as a matter of fact at trial you testified that you'd seen him twice?

A.   Yes, I did.

Q.   So there was no secret about it?

A.   Correct.

Q.   And you actually had your trial testimony when you did your declaration?

A.   Yes, I did.

Q.   So any idea how that happened?

A.   I wouldn't have put it that way.  Well, I did not write this declaration.  I reviewed it after it was done, and I made some changes in it, but I wouldn't have phrased it like that.  I saw him a second time, but it wasn't solely for mitigation.  I wanted to see also the MMPI.

Q.   So, I mean, did you just miss that when you were reviewing it?

A.    I wouldn't phrase it like that.  I missed it.

Q.    Okay.

A.    That's my mistake.

Q.    But let me just ask you again, did your second interview focus solely on mitigation?

A.    No.

Q.    Okay.

A.    But that statement is misleading.

Q.    Right.  Now, going back to Exhibit 501, beginning on page 9, are those your notes that you made with respect to your February 22nd visit?

A.    Yes.

Q.    And about how long did you spend with him that time?

A.    About an hour and a half.

Q.    Okay.  You made your first report on January 16th.  Did you make another report after that visit?

A.    No, I did not.

Q.    During that second visit, did Mr. Allen tell you about his activity selling drugs?

A.    Yes, he did.

Q.    Did you believe him?

A.    I believe he may have sold drugs, but I don't believe -- he had a tendency to paint himself in the best possible light.  You say, well, how can that be with drug dealing?  He tried to paint himself as a real player.  And he

tried to paint himself as a real player, whether it be in the music world, whether it be in drug dealing, whether it be anything. His mom had said -- pardon me, his mom had said he lived in la-la land. My belief was that he was often creating his own reality.

Q. Did you talk to him at one visit or another about his school performance?

A. Yes.

Q. And what did he say about that?

A. He said he was at Clayton. That was during the St. Louis deseg period.

Q. But what did he say about his grades?

A. He said they were real good, good grades.

Q. And did you have a chance to review his school records?

A. Yes. They weren't good grades. Then I pushed him. I said, "What do you mean good grades?" He said, "Well, good enough to pass."

Q. Okay. Now, in that second visit did you ask him about his blanks in the MMPI? What I mean by "blanks" is the items he didn't answer.

A. Yes, I did.

Q. What did he say about that?

A. I went through each one with him, and every time -- they were always -- the thing that was strange about it was that the ones he left blank primarily were ones that would

have put him in a bad light. Mr. Allen always wanted to put himself in the best possible light.

Q. Okay. Why do you think it was strange that he would not answer questions that would put him in a bad light?

A. I spend a lot of time in jails, probably more time in jails than in my office. A lot of times I see people, they try to malinger.

THE COURT: Try to do what?

A. Malinger. They try to look worse than what they are. Billie Allen was just the opposite. Billie Allen always wanted to paint himself as having, you know, as doing fine, as being a rap star, as being a music person, who had no difficulties, who did well in school, who came from a great family. But none of that appeared -- we later found out a lot of that appeared to be false.

Q. Now, was your second interview on February 22nd intended for you to develop new mitigation themes that you weren't already aware of?

A. No. What I wanted to do is if I was going to have to go in for mitigation, what I wanted to do was at least have additional support for what my opinions were at that time, and so we looked at issues that had already been dealt with.

Q. Now, you have testified in other cases as a mitigation -- or I guess have you testified in other cases as a mitigation witness?

A.     Yes.

Q.     And had you before 1998?

A.     I don't believe specifically I testified in mitigation cases before 1998.  I had been in cases where I had done a fitness evaluation, had done a sanity evaluation.  Then I was called in on the sanity evaluation as, you know, at what specific issues might not bring about a death penalty.  But not specifically as it came to mitigation.

        Since that time I've been asked to do specific mitigation cases in Illinois until Illinois ended their death penalty.

Q.     So but this was the first time you had done that or had been asked to do what you did or tried to do in this case?

A.     When I was told that I was the only one, yes, this is the first time I've ever been told that I was the only one, and that I had a month to do it.

Q.     So since then when you've been involved in cases where you've ended up talking about or when you've tried to mitigate for death penalty purposes, what do you do?

A.     Usually what happens is there's a forensic social worker involved or an individual and a private investigator.  Usually what happens is they are getting information.  They are funneling that information back to me.  Then usually we'll have meetings.  We'll have meetings with the attorneys involved.

MR. HOLTSHOUSER:  Judge, I think I'm going to object to this line of questioning and answers.  Can we get some clarification of what time period we're talking about?  Is it before trial or is this things he's experienced since trial?

THE COURT:  He said now.

MS. CARLYLE:  Yeah, this is experience since --

MR. HOLTSHOUSER:  In which case I would object because I think it goes beyond relevance in expertise.  We were given no notice that he's being offered as an expert on current mitigation practices, and those wouldn't be relevant in any event.

MS. CARLYLE:  I'm not offering him as an expert, I'm asking him what he does.  And I think that's relevant to this Court's determination of what happened in this chase.  He's not being offered to give an opinion about whether what he does is, you know, good or bad.

THE COURT:  I understand that the standards are different now than they were in 1998.  I understand that.  So I'm not sure what the relevance is.  I'm inclined to let it in and sort it out.  But in doing so, I do understand that the situations are different, the standards are different now than they were in 1998.  Go ahead.

BY MS. CARLYLE:

Q.    I'm sorry.  So I think you were saying that you would -- well, let me ask you to pick up where you were or if

you want to start over, you can do that.

A.   There would have been a variety of people involved. There would have been usually a forensic social worker that would have interviewed family members.

THE COURT:  Just to bring it up, he said that there would be an investigator, a forensic social worker, there would be meetings with lawyers and so forth.  That's where we were before the objection.  Go ahead.

Q.   I think we can stop there.  Now, there was one person besides the lawyers that you met with in this case, wasn't there?

A.   Dr. Randall.

Q.   And your bill indicates that you met with him at least once?

A.   That's correct.

Q.   Okay.  Did you meet with him more than once and just not specifically record it, do you think?

A.   No.

Q.   Okay.  Do you know how often you met with the attorneys in this case?

A.   Four times.

Q.   Okay.  And did that include actually preparing you to testify?

A.   The last three times were to prepare -- the last two times were to prepare to testify.

Q.    Let me just ask since there's been an issue about time. Do you remember after this case, when was the first time you actually did this -- the mitigation task for a capital case?

A.    It would have been after I left the Department of Mental Health.

Q.    And when was that?

A.    That would have been -- I retired from there in August 2001.  So probably it was 2002 is my guess.

Q.    And the amount of time you spent with Dr. Randall and the attorneys in this case, would that have been typical for your later work as a mitigation investigator?

A.    I've never been an investigator.

Q.    I'm sorry, witness.  Mitigation witness.

A.    No.

Q.    What would have been un-typical about it?

A.    I didn't have any information.  I didn't have --

Q.    I guess focusing for a minute on just how often you were talking with the attorneys and the investigator, was this the normal amount of time, more or less?

A.    This was crazy.  This is much less.

Q.    Okay.

A.    At least for a capital case.

Q.    Okay.  Now, before you made your report or testified, did you interview a man named Raymond Petty, Billie's uncle?

A.    I have no independent -- if I did, I have no

independent recollection that I ever did.

Q.    Do you -- did you learn what he had said to Dr. Randall and Mr. Sindel about witnessing Juanita Allen beating Billie?

A.    No.

Q.    Were you present during the penalty phase testimony in this case when you weren't testifying?

A.    No.  I believe at that time witnesses were excluded.

Q.    Okay.  If you had known that Raymond Petty had told counsel and, in fact, testified in court that he had seen Juanita Allen beating Billie Allen with an extension cord, would that have affected your conclusions or approach to this case?

A.    May not have affected my conclusions, but it would have affected the way I dealt with the case.  What I would have wanted to do was to have more independent verification that it happened.  Just because one person tells me something, doesn't make it true.  But what I would have wanted to do, is this would have been an area to explore.

Q.    Okay.

        MS. CARLYLE:  I might just tell the Court, one of the things that is crazy about this is I'm left-handed, and I keep hitting --

        THE COURT:  Don't worry about that at all.

        MS. CARLYLE:  Okay.

        THE COURT:  That's nothing I'm considering.

MS. CARLYLE: Okay. I'm working on it.

BY MS. CARLYLE:

Q. I'm showing you Exhibit 208, specifically page 24. Is that part of your testimony? If you want me to show you the first page, I can do that?

A. No, I reviewed this. That's part of my testimony.

Q. And the way you testified then in the court, did you talk about the need to get collateral information from people other than the client?

A. Yes.

Q. What did you say about that?

A. The more information you have, the better it is. It's the way you get verification. But it also gives you a more complete picture.

Q. Okay.

A. It's kind of like -- it's kind of like Wheel of Fortune, okay. I know that sounds crazy. But what happens is you're looking at a picture. In the real world you're never going to get all the letters. But the more letters I get, Your Honor, the better chance I have to get an accurate word or an accurate diagnosis or an accurate picture. So if I get five letters, I get so much. If I get nine letters. The more information you have, the better the chance. In the real world you're never going to get all the information, but the more information is possible.

And in this case if I would have had more information, he would have had a better shot.

Q.   Okay.  Well, in particular, based on what you knew about Billie Allen, was it particularly important to get collateral information and verification in his case?

A.   Yes.  Because in 1998, I knew Billie Allen often aggrandized his statements, was not completely truthful.  Well, truthful is a bad -- probably not completely actual.  Because I think many times he believed it himself or wanted to believe it himself.

Q.   Now, Billie Allen didn't tell you anything about being abused by his mother, did he?

A.   No, he did not.

Q.   I'm showing you what's been marked as Exhibit 491, which is a letter from --

MS. CARLYLE:  Wait a minute.  I'm sorry.  Mr. Holtshouser, why am I getting a line and not a box?

MR. HOLTSHOUSER:  You just hit draw on the screen.

MS. CARLYLE:  Well, I can live with a line as long as I can get a box.  Now we're not getting a box.

MR. HOLTSHOUSER:  Somehow you clicked the arrow instead of the box.

Q.   I'm showing you what's been marked as Exhibit 491.  And this is a letter from Mr. Allen to his mother.  Have you reviewed that?

A.     Yes.

Q.     And did you also review, I guess, four other letters which are marked as 492 through 495?

A.     Yes.

Q.     Did you review those before trial?

A.     No.

Q.     If you had reviewed them before trial -- well, let me ask you this:  Would it be fair to say that they are very affectionate letters from Mr. Allen to his mother?

A.     Yes.

Q.     If you'd reviewed them before trial and also heard that there was evidence of abuse, would it have surprised you that Mr. Allen wrote those letters to his mother?

A.     No.

Q.     Why not?

A.     That's what happens with abuse.  There's a couple things on this, okay.  That's why you see -- 50 percent of all people, when we were talking about kids transitioning out of foster homes that were abused, they end up going back to their original homes.  That's the only home that they know.  So this would not have surprised me.  It's also even a variation of a Stockholm syndrome, where an individual ends up aligning himself with the abuser or trying to please the abuser.

       Billie Allen throughout his life has tried to please

his mom, regardless of what happened.  It wouldn't tell me there was abuse.  But it wouldn't be inconsistent with abuse.

Q.   Okay.  I've showed you Exhibit 638-A.  And this is the beginning of an interview between Mr. Allen and Mr. Simon.  Have you had a chance to review that before today?

A.   I saw this yesterday for the first time.

Q.   Actually this is the first part, and I think you actually saw it a few days ago, correct?  Just to be clear, I sent you two different interviews, Part 1 and Part 2.  And this is Part 1.

A.   Okay.  It was within the last week.

Q.   Certainly, yeah.  I'm not sure I can lay my hands on it, but are you aware in the course of this discussion Mr. Allen was asked by Mr. Simon whether his mother abused him, and he said she did not?

A.   Correct.

Q.   In fact, you asked -- he was apparently asked, did anybody abuse you, and he said no?

A.   That is correct.

Q.   Was he later asked in that same interview -- he talked about his father using alcohol?

A.   Correct.

Q.   Was he later asked if his mother used alcohol?

A.   Yes.  He denied that she ever drank.  That she drank.

Q.   Does that response surprise you given what you know

now?

A.    Surprise me with what I know now?  No.  Because I have an individual who is abused, who -- who at least according to the records he's been abused.  And he's repeatedly denied that his mom did anything, despite the mom's declaration that she did, plus the mom's declaration that she abused alcohol consistently.  That's not uncommon with abused kids.

Q.    Now, Mr. Allen also told Mr. Simon about his nightmares, didn't he?

A.    That's correct.

Q.    And this is the beginning of that, but he went into a good bit of detail about the nightmares?

A.    That is correct.

Q.    Did Mr. Simon ever communicate that conversation to you before trial?

A.    No.

Q.    Would it have made a difference to you?

A.    It would have -- it wouldn't have changed the diagnosis.  Even after reviewing everything that's been given to me since, my belief is he still had Post Traumatic Stress Disorder chronic.  It's still my opinion that he would -- that he was fit to stand trial at the time.

          What it would have changed -- all of this would have changed is that this would have been another theme to present to the jury, and that would have been the history of abuse.

That also would have made sense of why the Post Traumatic Stress Disorder.  Because what happens with Post Traumatic Stress Disorder, you can have one single event trigger it, okay.  And in his case I thought there was two events.  I thought there was Dennis Noble and then later on Marquis Taylor.  Especially the Marquis Taylor triggered it.

But what would have happened if there had been a long-term pattern of abuse in his family home, that would have further confirmed that diagnosis, because it would have made him more susceptible.  What happens with PTSD or with trauma, it has an accumulative effect.  It also can cause morphological or changes in the brain, depending on how early it starts.

Now, that would not have changed my diagnosis there at all.  What it would have changed was would have been -- if I was asked to present something for mitigation, I would have presented that also.  Because it would have more humanized him and it would have showed how we got to this point.  I never presented any of that.  Didn't know it had happened.

Q.    I'm showing you -- I've got up on the screen the first page of Exhibit 103.  And that's the beginning of your report to Mr. Sindel, which was later shared with the government, I think presented in court, isn't it?

A.    That's correct, that was my report on competence or fitness to stand trial.

Q.    Now, in the report you refer to the fact that you had been asked to talk about mitigation?

A.    Yes.

Q.    But you state that the report itself doesn't really address the mitigation issue?

A.    Not at all.  What it does is it presents a diagnosis.  It presents the facts on which it was based.  It presents the criteria of why I think he's fit to stand or competent to stand trial.

Q.    And you talk in your report about what you had reviewed at the time that you made your report.

A.    That is correct.

Q.    You reviewed police reports and statements?

A.    Yes.

Q.    You reviewed school and a couple different sets of medical records?

A.    Correct.

Q.    And you conferred with -- you say you conferred with Dr. Randall?

A.    Yes.

Q.    Reviewed his prior conviction records?

A.    That is correct.

Q.    And you reviewed the reports about the time when his mother's house was shot up?

A.    That is correct.

Q.    You don't mention there that you reviewed any of the reports about Marquis Taylor's murder?

A.    I did not have them.

Q.    Okay.

A.    At least to my -- if it was not in that report, I did not have them up to that date.  And I can't tell you if I had them afterwards.

Q.    So at the time of the report you certainly didn't have them because you would have put them in your report if you had?

A.    That's correct.

Q.    Now, were all those things you reviewed in making your report relevant to your competency evaluation?

A.    Yes.

Q.    And you found Mr. Allen competent?

A.    That is correct.

Q.    But before you found him competent, you also made a diagnosis?

A.    That is correct.

Q.    Turning to page 5 of your report.

THE COURT:  Wait a second.  I had something in my notes.  When we were looking at 413, in his notes with Juanita, it was a phone call, there's a mention of Dennis Noble and Marquis Taylor.  I just want to make sure that that's not inconsistent with what he just said.  He didn't

have -- I got --

MS. CARLYLE:  I think I can clear that up.

THE COURT:  Okay.  All right.  Go ahead.

BY MS. CARLYLE:

Q.    I'm sorry, what I was asking you about just now was did you have any police reports about Marquis Taylor's murder?

A.    No, I did not.

Q.    And actually you spoke with -- well, okay.  So you certainly -- you're not saying you didn't know about Marquis Taylor's murder?

A.    No.  No.

Q.    In fact, you talked to Mr. Allen about it.

A.    In fact, I mention it in the report.  Those were the two -- I knew about them.  But, I'm sorry, I may have misunderstood.  I thought you were asking about the police reports.

Q.    I think I was asking about the police reports, but I probably wasn't clear.

MS. CARLYLE:  And now I hope the Court understands I'm asking about the police reports, not about knowledge of it, which he clearly had.

THE COURT:  All right.

Q.    Now, let me show you page 5 of your report.  Is that the diagnosis you made?

A.    Yes, it is.

Q.   And is your diagnosis any different today?

A.   As to what it was at that time?  No.

Q.   So you're not changing your diagnosis?

A.   All the additional information I had wouldn't change that diagnosis.

Q.   Okay.  Now, did you testify in Mr. Allen's trial?

A.   Yes, I did.

Q.   And do you remember how Mr. Sindel asked you what you did?  We can take a look.

A.   I had no memory of it until I saw it in the transcript, then I remembered.  Then I remembered that I thought it was strange.

Q.   Let me show you Exhibit 208, page 1.  That's your trial testimony, correct?

A.   That's correct.

Q.   Okay.  And what did Mr. Sindel ask you to start your testimony?

A.   "And will you tell them, please, what your trade or occupation is.  And watch their eyes as they roll their -- and watch their eyes as they roll back in their heads."  I answered, "I'm a clinical psychologist."

Q.   And what did he say then?

A.   He said, "Okay.  Now the thrill is over."

Q.   Was that a common way for you to be introduced in court?

MR. HOLTSHOUSER: I'll object to the relevance.

THE COURT: Overruled.

Q.   Was it a common way for you to be introduced?

A.   That's a first. I've never had anybody do that before or after.

Q.   Okay. And did you testify at trial about PTSD?

A.   Yes, I did.

Q.   And did you also talk about the cumulative effect of trauma on PTSD?

A.   Yes, I did.

Q.   How many traumatic events were you talking about?

A.   I thought there were two individual traumatic events. I thought there was the Dennis Noble death, and then I thought there was the Marquis Taylor death.

Q.   Have you received information since then suggesting that Mr. Allen may have undergone other traumatic experiences?

A.   Yes.

Q.   And what difference does that make?

A.   PTSD is accumulative. What happens is you have a greater chance of getting it, the more trauma that an individual has. What happened in -- if, in fact, Mr. Allen had had an experience where he grew up in an extremely dysfunctional family, where he was repeatedly physically abused by his mom and by others; if, in fact, Mr. Allen, this

abuse was done randomly, in other words, it was unpredictable; if, in fact, he grew up with both alcoholic parents where he never knew what was going on, that would have been an abusive family.

That extremely disfunctional family would have laid the groundwork and made him much more susceptible to Post Traumatic Stress Disorder.  And while the event that may have triggered it, in other words, tripped it to the diagnosis, may have been the shooting of Marquis Taylor.  You would have had all of the information beforehand.  So it -- what it would have done was it would have firmed up the diagnosis.

Q.   Would it have changed the picture you presented of Mr. Allen's life?

A.   I didn't really present a picture of Mr. Allen's life. What I presented was a picture of PTSD.  I didn't know anything about -- I knew very little about Mr. Allen's life, especially as it related to possible abuse.

MS. CARLYLE:  Judge, this is -- I mean, in terms of what I'm doing, this wouldn't be a bad time to take a break.

THE COURT:  All right.  Very well.  We'll take a break.  Fifteen minutes.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  Yes, sir.

(Court in recess 10:03 a.m. until 10:20 a.m.)

MS. CARLYLE:  Judge, I'm ready when you are.

THE COURT:  I'm sorry, whenever you're ready.

MS. CARLYLE:  Okay.

BY MS. CARLYLE:

Q.   Dr. Cuneo, what I'd like to talk about now is the additional information you've received since your testimony. So let's look first, I'm showing you a section of your sworn declaration, and I want to ask you, what did you review before you prepared your declaration?  And you can read it or say, however you want it.  I sort of put it in front of you so you could see it.  Go ahead.

A.    I read my transcripts.  Read the Eighth Circuit direct opinion.  I reviewed my 1998 report.  Dr. Richard Wetzel's plotting of raw data.  The Bureau of Prisons medical records. Reviewed the declaration of Juanita Petty Allen, the declaration of Nicole Petty, reviewed the declaration of Angela Allen, the declaration of Billy Wayne Allen, the declaration of Raymond Petty, the declaration of Cathy Toliver, the declaration of Brady Toliver, the declaration of Darletta Tabb, the declaration of Dr. Pablo Stewart, and the declaration of Dr. Daniel Martell.

Q.    Or report of his?

A.    Report of Dr. Daniel Martell.

Q.    Now, since you provided that declaration, have you also reviewed some other materials?

A.    I don't have a listing of everything I reviewed since then, but if you want it, I rolled it all in here today.

Q.    I have a list, so maybe he can go over that.

Dr. Cuneo, I'm showing you what's been marked as Exhibit 684.

      MS. CARLYLE:  And, Judge, I have provided this to Mr. Holtshouser in electronic form, but it hasn't been installed yet, so we're viewing it in hard copy today.

      THE COURT:  Okay.

Q.    And we can just quickly go through the items there, many of which we've talked about today.  The column at the left is the exhibit numbers in this case, to make that easy for everybody to reference.

      So did you -- you reviewed -- well, let me just ask you to take a look.

      MS. CARLYLE:  And, you know, it may be easier if I can approach the witness and just hand him this.

      THE COURT:  Sure.

A.    Ma'am, if you sent it to me, I reviewed it.

Q.    Okay.

A.    If this was sent -- if you sent that to me -- I don't know on the unredacted notes, I don't exactly know what those were, but if you sent it to me, I reviewed it.

Q.    Okay.  Well, let's do it this way.

      MS. CARLYLE:  Let me represent to the Court that Exhibit 684, in fact, reflects everything that counsel, the

habeas counsel has provided to Dr. Cuneo since the giving of the declaration.  And he's just said he reviewed it.  And each of those items is an exhibit in this case.  So it's all transparent.

Q.    Okay.

A.    Could --

Q.    Yes, sir.  Your articles aren't in evidence.  I didn't say they were all in evidence.

THE COURT:  Okay.

Q.    Now, in this -- in the material that you reviewed since your trial testimony, including what you reviewed before your declaration and what you reviewed since, did you obtain information suggesting that Mr. Allen was the victim of chronic child abuse?

A.    Yes.

Q.    Okay.  Did that information come from one source or from more than one?

A.    Multiple sources.

Q.    Okay.  Does that make any difference to you in deciding whether child abuse occurred or not?

A.    Yes.  What I would have wanted to do, I would have wanted to see multiple sources.  Because I have -- I have an individual who had told, I believe it was Mr. Simon, that he wasn't abused.  And --

Q.    And told you would he wasn't?

A.    Never told me specifically he was not abused.  When I asked him to describe his mom, if I remember right from my notes, it said she was very sweet.  He never said he was abused, but he painted a picture of where it all went well, other than the time where he was thrown out of the house, I believe it was in '97 after the shooting.  But he denied any other times being tossed out.

Now, if the declarations are correct, he had been repeatedly thrown out.  He had been raised in a home with alcoholic parents.  He had been repeatedly physically abused.  He possibly could have been hit by other people in the house.  And according to his mom, he was always the odd man out.  She always thought him different than his sisters.

If I would have known that beforehand, I would have painted a different picture.  At least -- what I would have done is I would have explored it because then I would have gone back and asked him -- if I had the time, I would have gone back and asked to have these people brought in so we could talk with them.  But I did not.

Q.    So what's the different picture you would have presented?

A.    If the information was correct, I would have gone back again and talked to Billie on it, and I would have talked with people.  But if the information was correct, I would have painted the picture of an individual who had a history

of child abuse, who had a history of physical abuse.  We knew according to the people that he had been raised in the home of both an alcoholic father and an alcoholic mother, lived in a home where everything was unpredictable, lived in a world where he ended up separating and living in his own little dream world.

And this would have been a pattern that existed up until at least the time I seen him.  And that would have been a picture we painted, or at least I would have testified to during mitigation.  It would not have changed my diagnosis at all.  It would not have changed the concept of PTSD.  But it would have been another factor to consider before imposing the death penalty.

Q.    And why does that kind of pattern of activity influence -- when someone has gotten to be 19, influence their judgment?  Does it impair it in any way?

A.    It could very well.  It would make him more of a follower, more easily led.  It would have caused difficulties -- further difficulty in his judgment.

While it clearly -- in my opinion, there was never an issue of sanity.  There was never an issue of competency.  At least I thought he was competent and I thought he was sane.  At the same time these would have been factors that the jury could have considered before imposing a death sentence.

Q.     So why do you think they are relevant to mitigation if they aren't relevant to sanity or competency?

A.     You're asking my opinion on that?

Q.     Yeah.

MR. HOLTSHOUSER:  Judge, I'm going to object to his opinion on what is important in mitigation.  I think that's for the Court and outside the realm of his expertise.

MS. CARLYLE:  Let me rephrase.

THE COURT:  Okay.

BY MS. CARLYLE:

Q.     Had you been -- had you had this information at the time that you testified, would you have wanted to include it in your testimony?

A.     Yes.

Q.     Okay.  How was it relevant to what you were talking about during your testimony?

A.     There would have been two factors there, one of which would have helped a jury further see Billie Allen as to how he got to where he was at that point when he was convicted of murder.  You would have seen his background.  The other thing that you would have seen is it would have further supported the diagnosis of Post Traumatic Stress Disorder, because it would have laid a framework of abuse beforehand, and trauma beforehand.

It would have also looked -- you know, it would have

been one of these things that we would have also pressed even harder to get some type of -- I'm not sure I could have got a PET scan in '98, I'm not sure when PET scans came out, but I would have wanted at least an MRI because the possibility of morphological changes in the brain due to repeated trauma.

But I didn't have any reason to say I'd recommend it back then.  If I would have had a history of trauma, we would have pushed for it.

Q.    Would it be fair to say that in Mr. Allen's life there are maybe three prongs; abuse, trauma, and substance abuse?

A.    That's correct, and they are all interrelated.

Q.    And how -- what can you tell us about that conjunction of factors in a child's life and how that affects him later?

A.    What happens with the series of abuse, that Mr. Allen may very well have used marijuana prior to this, but according to my notes and according to previous -- and according to I believe it was -- now I can't remember when it was, but it was one of the declarations I read, it said that he began his marijuana use and increased steadily after the Marquis Taylor murder.

What happens is marijuana in turn is a way to self medicate.  And he continued to self medicate.  That's what happens a lot of times with drugs, instead of seeking treatment and trying to deal with the issue, people end up becoming a substance abuser, they have a mental illness and

XI - 60

they medicate with that.  And what in turn happens is the drugs further impair one's judgment and further impair one's impulse control.

Q.    Does the fact that Mr. Allen didn't have a -- had, for want of a better term, a chaotic home affect the way he was able to deal with traumas like the murders of Dennis Noble and Marquis Taylor?

A.    He had no safe place to go home if the declarations are correct.

Q.    And I'm asking you to --

THE COURT:  I don't want two people talking.  Wait until he finishes his answer.  Wait until she finishes your question.

THE WITNESS:  Yes, Your Honor.

Q.    And I think I interrupted you, but let me finish my thought.  And I guess what I'm saying, you know, the Court will be -- I can tell you that the Court will be and has been hearing testimony about these specific -- these specific issues, and the Court, of course, will determine whether they are true or not.

But for the purpose of your testimony, I'm asking you to assume that, you know, the information you presented, you know, is what it is and that it's accurate.

A.    Assuming that they are correct, okay.

Q.    Yes.

A.    What happens is you have no safe place.  What happens with post traumatic stress is it's the unpredictability of violence.  Violence in itself causes difficulty.  If it's unpredictable, you're always waiting for the other shoe to drop, and you never know when it's going to occur, so you keep on a constant edge.

      If he had no safe place to go, he never had a place to deal with the trauma.  When you start looking at kids that came from horrendous neighborhoods, horrendous things, some survive.  And one of the big factors that they can survive even in a horrendous neighborhood is to have a strong family background or to have somebody, one adult figure they can trust.

      In this particular case, if the declarations are correct, Billie Allen had no safe home.  He had no haven.

Q.    Let me just clarify that you've been telling us today about the effect of abuse and the conjunction of abuse and trauma and substance abuse.  Is that information that was available, about that relationship that was available to you in 1998 when you testified?

A.    The concept of mental illness and substance abuse, the term was utilized in the mid nineties, so before this trial.  It was called MI/SA.  They'd call it mental illness slash substance abuse.  And it's a term that was relatively common, that and the term dual diagnosis.  So the relationship

between mental illness and substance abuse has been explored, especially the self-medicating has been explored well before this.

Q.    What about the relationship between mental illness and childhood trauma or child abuse?

A.    Child abuse and trauma have been explored well before this.  That's one of the reasons -- you know, when they talked about -- even before '98, we were -- it was one of the central features that you would look at in CASA, to say that if you provided this child with a network, if you provided this child with a stable adult, you had a much better chance for that child succeeding later on or dealing with the trauma or dealing with the abuse.

       So, I mean, this is not -- this is not -- it has been developed over the years.  And the physiological concepts of trauma, the morphological changes in the brain started -- that work I believe started -- well, I know it started after this trial because that's Bruce Perry's work. But the effects of trauma, the deleterious effects of trauma, the mental illness and substance abuse, the use of that, it was well known well before this.

Q.    So what you're telling us is you couldn't have -- you couldn't have testified in 1998 about morphological changes caused by trauma simply -- not because they weren't true, but they hadn't been found yet?

A.    That's correct.

Q.    Okay.  But you could have testified about simply as a matter of observation of behavior and symptoms how those factors affected a person?

A.    That is correct.

Q.    Let me ask you in terms of -- you know, we've sort of gone through a laundry list of declarations and depositions and other material that described the abuse that Billie Allen suffered.  Are there particular items or themes that you think are important or that should be emphasized about that?

A.    Things that I would have explored?  One would have been the unpredictability of violence.  The fact that Billie Allen had been abused by both his -- repeatedly by his mother, would have picked up the fact that he had been physically hit, and would have explored the fact that he not just been kicked out of the house after the shooting in '97, but this had been an ongoing thing.  It would have picked up on the fact that he was, according to the mother, she had always treated him different.  The two sisters were one thing, he was different.  And so those would have been explored.  It would have also been explored -- would have explored the use of alcohol in the home, and the violence that that brought about.

Q.    Did you have the opportunity to explore those in 1997 and 1998?

A.    No, I didn't do anything until 1998 other than read the police reports.  In the two and a half months that I worked on this case, I didn't do any of that, no.

Q.    Not that you didn't do anything, but you didn't do anything --

A.    I didn't know anything about this, and nobody ever brought me that information.

Q.    Okay.  Did you have an expectation that as information was gathered, you would get it?

A.    Yes.

Q.    Okay.  Did you get any information at all from Dr. Randall?

A.    This -- I saw subsequent -- I don't have any independent recollection of anything from Dr. Randall other than the meeting I had with him, I believe it was on the 1st -- I believe it was on the 1st of February.  But -- and then he may or may not have been in the meetings we had with the attorneys preparing for trial.  I do not remember.

Q.    Okay.  Do you have any independent recollection of any documents you got from reports of his interviews or anything like that?

A.    None.  I'm not saying they don't exist.  I don't have any independent recollection of them.

Q.    Okay.  You mentioned, Dr. Cuneo, that one of the things you'd reviewed in preparation for actually your declaration

and your testimony was Dr. Stewart's affidavit?

A.    Yes.

Q.    Did you rely on his affidavit for any of the testimony you've given today?

A.    No.

Q.    Okay.

        MS. CARLYLE:  I don't have anything further.

        THE COURT:  All right.  Thank you.  You may inquire, Mr. Holtshouser.

                        CROSS-EXAMINATION

BY MR. HOLTSHOUSER:

Q.    Good morning, Dr. Cuneo.

A.    Good morning.

Q.    I think I introduced myself earlier, I'm Steve Holtshouser.  Do you recall that I was the one who asked you the questions when you testified at trial?

A.    With the name and then I read the transcripts, yes.  I think we both kind of got older.

Q.    Yeah.

A.    I know I have; I'm completely gray now.

Q.    Let's start with just a couple of the topics that Ms. Carlyle touched on.  And then I have some other areas that we're going to get into in depth.

        So you indicate that -- and I think one of the last questions, you did not rely on Dr. Stewart's declaration,

correct?

A.    That is correct.

Q.    In the preparation of your declaration, though, you did rely on it, didn't you, because you mentioned it in your declaration?

A.    I read it.

Q.    You mentioned it in your declaration?

A.    I believe I said that those are things that I reviewed.

Q.    And at the time that you made your declaration, many of the facts that you believed to be new information in Billie Allen's history were coming from Dr. Stewart's affidavit, weren't they?

A.    I believe they were coming -- I'm sorry, I'm not sure I understand.  There was a lot of things that I was finding out that I didn't know.  Dr. Stewart's declaration had some; other places had other things.

Q.    Okay.

A.    I think the big one that I didn't know is that when -- the declaration of Juanita Allen when she said that this had all occurred.

Q.    You say you did not have that?

A.    No, I did have that at the time, but I did not have that at trial.

Q.    And I just want to make clear that you don't recall -- some things you don't recall from that period in 1998, and

there's some things that you do, correct?

A.   Some things I remember; some things I don't.  Some things if I see a report, I can say that's my handwriting. That triggers something.

Q.   But you apparently do recall that in 1998, Mr. Sindel said to you that he needs you to testify in this case as a mitigation -- to address mitigation as well as competency, correct?

A.   Not in the beginning.  That was done I believe not until February.  When I first got in, the only thing I thought I was doing was competency.

Q.   And you indicated, I think in your testimony today, that you agreed to do so only because Mr. Sindel made you feel guilty?

A.   That's absolutely correct.

Q.   And he did so by -- he said to you, "If you don't, Mr. Allen is going to die"?

A.   That is correct.

Q.   If you don't do what?

A.   If I don't do something.  In other words, if somebody doesn't do some type of mitigation, if he's convicted, he'll be sentenced to death.

Q.   Did you say, well, you need to find somebody else because I haven't had enough time to do an adequate job?

A.   I told him I didn't want to do it.

Q.   Why didn't you want to do it?

A.   Because I didn't have any time.  At that time I was also --

Q.   Well, what was the time when this conversation took place?

A.   Uh, again, I know it was in February.  I guess it was on February 1st, because that was the meeting I had with Randall, Dr. Randall.  But I can't tell you much more about it.

Q.   February 1st you think is the date that you had the conversation with Mr. Sindel because you're having a meeting with Dr. Randall?  I mean, you testified on direct as if you remember this conversation like it was yesterday.  It sticks out in your memory, correct?

A.   I remember the conversation.

Q.   Was it a face-to-face conversation?

A.   No, it was not.

Q.   It was a telephone conversation?

A.   It was on the telephone.

Q.   And so what does it have to do with February 1st or your meeting with Dr. Randall if it's a phone conversation with Mr. Sindel?

A.   Because he said, we're going to have Dr. Randall -- I thought he said we're going to have Dr. Randall at our office and you can take a look -- and you can speak with him then.

But I know it could not have been -- again, I'm guessing. I know January 16th, I knew nothing about it.

Q. And did you know when the trial was starting?

A. I believe the first part of March.

Q. And it actually began, I believe, on February the 3rd. You testified in the first part of March.

A. Yeah, I --

Q. A whole month after the trial started.

A. I'll tell you, I'm not disagreeing with you. I don't have any recollection of that at all.

Q. What I'm trying to get at is when was this conversation you had with Mr. Sindel where he said, "If you don't do something" -- and we're going to get into "something -- "Mr. Allen is going to die?"

A. It would have to be after January 16th. I thought it was -- I'm guessing, and this is a pure guess, it's February 1st, because that's when I met with Dr. Randall at Sindel's office, but I'm not -- I have no other recollection.

Q. So you were first contacted --

THE COURT: Wait, wait. I'm really confused. I thought you just said that you didn't meet Randall on the 1st, you had the telephone call with Sindel and you thought Randall was going to be at Sindel's office.

THE WITNESS: That's correct, Your Honor. What I thought was that -- I think Rick Sindel called me and told

me, and said can you come to my office tonight.  And I think that's when I met -- and, again, this was 14 years ago, closer to 15 now I guess.  I'm not exactly sure.

THE COURT:  Okay.

THE WITNESS:  And so --

THE COURT:  I understand.

THE WITNESS:  All I know is when I came in, I was not doing a competency -- I mean, pardon me, I was doing a competency.  That I was told about this in September.  I didn't hear anything about it again until the first part of January.  The appointment was set up for me to see the individual.  And then after I had seen him, I was told about a week later, two weeks later -- I'm thinking two weeks later, that we need you in court on this.

Q.   Okay.  So you at least know that you were contacted in September of '97, and we're going to look at the record about that in a minute.  What I want to talk about for right now is this conversation you have testified to with Mr. Sindel.  Okay?

A.   Correct.

Q.   And I want to try and place this in whatever context you can place it in.  Because in September you've testified you were first contacted, given a police report, and you believe -- were you told at the time that the contact was going to be limited to a competency exam or what were you

told about your role in the case?

A.    That I was doing -- that they wanted me to do a competency evaluation.  And that was all.

Q.    And that's usually because an attorney has a concern about whether or not his client is competent to stand trial?

A.    I can't speak for attorneys, for what the attorney does.  He told me he wanted to have an evaluation, and his line was, "Because he can't tell the truth to save his soul."  That line sticks out.  The rest I can't specifically remember.

Q.    That line actually came out in your testimony as well when you testified at the trial.  But the point is of a competency exam is whether or not they are competent to stand trial or were competent at the time of the offense.  There's a two-prong component, correct?  Ability to assist counsel or sanity or insanity at the time?

A.    There's two issues there.  I see competency -- pardon me.  I see competency and sanity as two specific issues. Competency is something that occurs -- what I'm looking at is to see if he's able to assist -- able to understand the nature and purpose of the proceedings against him and assist in his own defense.  And I see sanity as -- well, in Illinois we only use one prong anymore.  Insanity, where the individual's mental illness rendered him unable to appreciate criminality of one's conduct.

Q.   I got that.

A.   So I these those as two issues.

Q.   I think we all understand that, Dr. Cuneo.  So the point I'm asking you is when you were contacted in the fall of '97, did you believe that your role might relate to competency to stand trial, both competency to stand trial and the ultimate sanity question at the time of the offense, or what was your understanding as to why you were being contacted in September of '97?

A.   Just to do a competency evaluation.

Q.   And what you mean by that is competency to stand trial, am I correct?

A.   That is correct.

Q.   Okay.  And so you're talking in September of '97 about a trial that you believe is going to occur in the spring of '98, correct?

A.   Correct.

Q.   And it's your testimony that you received the police report concerning this offense, correct?

A.   Correct.

Q.   And had you worked with Mr. Sindel before?

A.   Once or twice before.

Q.   Had that been in the capacity of doing competency exams or had it been in the mitigation context of a capital case?

A.   I believe it was always competency.

Q.      Prior to this trial had you done a mitigation --
performed as a mitigation mental health expert in a capital
case?

A.      Only as to doing evaluations as to an individual's
fitness and sanity.

Q.      So would that be a no, that prior to this case you
hadn't actually been called upon to serve as a mental health
expert on issues related to mitigation in the penalty phase
of a death penalty trial?

A.      I had been called in areas of mitigation in death
penalty.

Q.      You had been.

A.      In other words, in Missouri at that time it had been
the second prong -- pardon me, the second section of a death
penalty, and I had testified in that.

Q.      And so you weren't inexperienced in the area of
mitigation in 1998, you had had some experience in that area?

A.      I had some experience.

Q.      Your primary area of expertise, though, was competency
to stand trial or dealing with individuals who had been
determined to be incompetent and required subsequent
treatment, release decisions, et cetera, in the jail system?

A.      Correct.

Q.      And that was primarily in Illinois, and I think you
were based in Chester, correct?

A.     Yes, but Chester was our max secure hospital.  So what happened was that we had individuals throughout the state.

Q.     And you live in South County, correct?

A.     That's correct.

Q.     Now, between the indictment of September of '97 and, let's say, January of 1998, you hadn't heard anything; is that correct?

A.     No.

Q.     So in January of 1998 when you get contacted, you realize that this is fairly imminent to the trial time, correct?

A.     Correct.

Q.     Which if we're looking solely at competency to stand trial, it's pretty late in the game, isn't it, to even deal with the issue of pure competence to stand trial?  You had a police report that told you this crime happened in March of '97, right?

A.     Right.

Q.     And here you are in January '98, the case is going to trial soon, and you're being asked to determine competency to stand trial?

A.     I would wonder why -- I wondered why it took so long to get to me, yeah.

Q.     Okay.  But you end up having an evaluation of him on January 16 of '98, correct?

A.    Correct.

Q.    All right.  And we'll get into that in a little bit. But then when in this context is this conversation with Mr. Sindel, that you must now go beyond the issue of competency and serve as a mitigation expert or Billie Allen is going to die?

A.    I have no specific recollection of the date.  I can remember certain things about it, as I told you the time that I told him I didn't want to do it, and then he made me feel guilty.  I can tell you that it had to be, if not on February 1st -- I know it had to be before February 1st.  It had to be after -- well, it clearly had to be after January 16th because I didn't know anything about it then. So maybe the last week of January or February 1st.  But, again, I have no independent recollection of the date.

Q.    But you made an agreement to do it, to serve in this capacity?

A.    Yes, I did agree.

Q.    Correct?

A.    Yes.

Q.    And you sent a bill to the Court for your services in that capacity ultimately, correct?

A.    Yes, I did.

Q.    And that bill was for about $5,500?

A.    That's for the competency and for my time reviewing the

files and my time in court, yes.

Q.    But you ultimately testified in this case in the mitigation section of this trial, the penalty phase?

A.    That is correct.

Q.    You knew that by the time you were testifying, and you knew that at some point the trial had already begun, hadn't it?

A.    When I had testified --

Q.    When you interviewed Billie the second time, for example, the trial was already three weeks into progress, correct?

A.    I have no -- if you say that, that is true, I have no independent recollection of that.

Q.    But the issue of competency to stand trial by that time, that ship had sailed because the trial had begun, correct?

A.    I had written my -- I had seen him on January 16th.

Q.    He wasn't in trial yet.  Trial began on February the 3rd.

A.    And it was my opinion then that he was fit.

Q.    Okay.  And so ultimately competency to stand trial really wasn't an issue in this case, was it?

A.    Not in my opinion it wasn't.

Q.    So you told Mr. Sindel you don't want to do it?

A.    Correct.

Q.    And you did, though, regardless of what he said, you agreed to do it, to serve in this capacity, didn't you?

A.    That's correct.

Q.    And so you knew at the point in time of agreeing, that you had your work cut out for you, you were on a bit of a short schedule, correct?  You didn't know exactly when you might be needed?

A.    If you're telling me the trial was already going on during this time period when I was notified of this, I would say that's a short time period to do mitigation during the time that the trial is going on.

Q.    But we haven't actually been able to pin down when you were first informed, as you said, that you were also going to serve as a mitigation expert.  But you don't know the date of this conversation with Mr. Sindel, correct?

A.    It would either be -- well, it would have to be after the 16th, and it would have to be before the 1st.

Q.    Why was the fact that Mr. Sindel told you that if you don't do this, Mr. Allen is going to die, something that made you feel guilty?  What had you done wrong?

A.    I hadn't done anything wrong in this case.  And I know this may sound bizarre to you --

Q.    I'm sorry, I didn't hear the last part.

A.    This may sound somewhat bizarre, but I tend to get guilty easily on the grounds that -- not guilty, but if

someone asks me something, I will try to get it done.

Q.    In terms of --

A.    And if somebody tells me if I don't do it, this can happen, this can happen, I will then try to get it done.

Q.    Did you have personal views at the time about the death penalty?

A.    Yes.

Q.    And what were those views?

A.    I believe that the death penalty should be reserved for the most egregious offenses.  And while I have testified in cases where because of my testimony an individual was put to death or at least I thought he was malingering and I was called in by the state -- he was being phony, and I was called in by the state, my personal feelings are is that it should be reserved for the most egregious cases.

Q.    And had you already formed an opinion that in your mind at that time that Mr. Allen's case didn't satisfy your standard of the most egregious cases?

A.    No, I had seen that there were factors involved that should be presented.  It's not my opinion at that point, it's the jury's decision that has to make whether, in fact, this case would fit the death penalty.

Q.    Well, in order to feel guilty about what Mr. Sindel allegedly said to you, wouldn't you have had to have an opinion that, well, Mr. Allen shouldn't die for this offense

to feel guilty about it?

A.     I'm not sure.

Q.     I didn't hear the first part.

A.     I'm not sure.

Q.     Okay.  Earlier today you used the phrase that you had one meeting with Dr. Randall, you had four meetings with the attorneys, you had two meetings with Mr. Allen, and in your words this was "crazy"?

A.     Correct.

Q.     Correct?  And that was never indicated, was it, in your testimony at trial, was it, that you had felt in your mind that you had an inadequate opportunity to investigate his background or reached any conclusions about mitigation topics, that was not communicated to the Court or to the jury at any time, was it?

A.     I can't -- I can't tell you.  I didn't communicate it. I was told by Mr. Sindel that when I said you have to get a delay, we need more time, I was told that he had asked and was told that he could not do it.  I have no independent where I talked to the Court, I was told that he did.

Q.     Okay.  Did you communicate in any way to any -- in any of your testimony to the jury that your opinions about mitigation and the relationship of Mr. Allen's mental state and the causal nexus to this offense was inadequate or crazy?

A.     No.  It's my opinion then, it's my opinion now that

Mr. Allen had Post Traumatic Stress Disorder, and he had it at the time of the alleged offense.

Q.   And I think you made it pretty clear in your testimony today, and just so we're clear about what you're saying, that even in light of all this alleged new information that you have been exposed to now, your actual mental diagnosis of Mr. Allen at trial would not change, would it?

A.   My diagnosis would not change.  If -- no, my diagnosis would not change.

Q.   Let's talk about your Wheel of Fortune analogy.  One of the "letters" that you say you did not have was the physical abuse letter, correct?  You did not have -- according to you, you did not have any information in 1998 --

A.   Oh, okay.  I was thinking of -- I'm sorry, I was thinking of the five letters that Billie had written when you said that.  Okay.  No, I did not.

Q.   I said your Wheel of Fortune analogy.

A.   Okay.  I did not have any information as to abuse.

Q.   We're on the final prize puzzle, and you're only going to get so many letters, and you got to figure it out, right?

A.   Correct.

Q.   So one of the "letters" you feel you didn't get that's missing, was missing to you back in 1998, and this is you saying this now, correct?

A.   Correct.

Q.    Is the physical abuse letter?

A.    That is correct.

Q.    And is it your testimony that you feel that you had no information whatsoever, no knowledge whatsoever of any sort of physical abuse of Mr. Allen by anyone in his family or anyone outside his home, et cetera?

A.    I'm saying that I did not have the extent of where I would have said there would have been child abuse.  I did not know that Juanita Allen was an alcoholic.  I did not know that Juanita Allen had emotionally and physically abused her son.

Q.    All right.  And when you say "physically abused," that would include what he calls, and I think even Ms. Allen would characterize as whoopings?

A.    That is correct.

Q.    And in your mind, either at that time or now -- well, let me ask you this:  Do you do a lot of work with defendants who come from the African American community?

A.    Yes.

Q.    And as -- have you commonly heard, particularly amongst that community, the phrase or the term "whoopings" --

A.    Yes.

Q.    -- to describe parental disciplinary styles?

A.    Yes.

Q.    And is it your view that "whoopings" constitute abuse,

as you understand that term?

A.    One has to define what the whoopings is.  If somebody slaps a child, does not leave a bruise, would I consider that abuse?  Depends on how often and when it occurred.  If an individual had hit the child with a cord repeatedly and left bruises, yes, that would be abuse.

Q.    So is the key element in abuse bruises or the marks that it leaves?  In other words, the severity of the strike?

A.    Not just the -- that's not the only element.  That's one of the factors you would look at.

Q.    So there's a lot -- would you agree, there's a lot of factors in what I guess the official term might be corporal punishment, correct?

A.    Correct.

Q.    So there are a lot of factors in corporal punishment that come into play in determining when it goes from being quasi acceptable practice to abuse?

A.    Could you define "quasi acceptable practice"?

Q.    Well, let me ask you this:  Do you feel that corporal punishment is ever acceptable?

A.    I don't feel corporal punishment is effective.

Q.    Do you feel that it is ever acceptable?  In other words, that -- not whether or not it's effective.  I asked you whether or not you believe it is an appropriate form of parental discipline?

A.   No, I don't believe it's an appropriate form.

Q.   And so would you characterize all forms of corporal punishment as abusive?

A.   No.

Q.   Okay.  So that's where I'm trying to figure out where is your dividing line is between corporal punishment that's not abusive and corporal punishment that is abusive.  So what are the factors that make it abusive?

A.   If he was beaten repeatedly with cords.

Q.   So you said -- you use the word "repeatedly."  So would frequency be a factor?

A.   Maybe.

Q.   Well, you know, "maybe" doesn't really help the Court here figure out what your -- when you use the word "abuse," what it means.

A.   When you look --

Q.   You just answered the question, though, if it happened repeatedly.  And my question is, is frequency a factor?

A.   You would look at frequency, intensity.  And frequency and intensity -- how do we say that?

Q.   Well, let's just stop right there.  Is your answer yes to the question that frequency would be a factor?

A.   Would be a factor?

Q.   Yes.

A.   Yes.

Q.    Okay.  Intensity?

A.    Would be a factor.

Q.    All right.  Would intensity, another word for intensity also be severity?

A.    Yes.

Q.    And how do you measure intensity or severity?  Force?  Marks?  Effects?

A.    Marks could be one; bruisings could be one.

Q.    Effects such as whether skin was broken?  Would you agree, for example, that, say, a child is eight years old and violates a rule that the child is well aware of.  And a parent swats him with a bare hand on the rear end.  But compare that with, say, a parent swats him on the rear end so hard the child is swept off his feet and ends up on the ground.  Those would be two different kinds of things of things, wouldn't they?

A.    Yes.

Q.    So that if someone is, let's say, being hit in the face with a closed fist, whether or not that person -- whether or not that leaves a mark, a bruise, a black eye, breaks skin, or whether or not the person remains standing and ends up flat on his back on the floor, those are all factors in intensity and severity, would you agree?

A.    If a parent hit an eight-year-old with a closed fist, I would pretty much say that was abuse.

Q.   And that's not actually anything that you've read that suggests that that is a fact here, that at eight years old Mr. Allen was struck in the face with a closed fist by his mother?

A.   No.

Q.   Okay.  So I wasn't actually giving you that as a hypothetical, I was using it previously, though, with just the simple concept of trying to determine what you mean by intensity or severity.  So anything else besides frequency, intensity slash severity?

A.   Emotional intent.

Q.   Emotional intent?

A.   Yes.

Q.   Intent of the parent or intent of the child?

A.   Intent of the parent.

Q.   So intent to harm versus intent to teach the child a lesson or intent to punish?

A.   If I had a parent who was drinking, who was just upset and striking out, whether the blows were hard or not, that would be abuse.

Q.   Are there situations in which abuse may have an effect on one child differently than it does on another?

A.   Yes.

Q.   And are factors in that, are there cultural and community factors that might impact that, the effect that it

has on an individual child?

A.    They may impact.

Q.    So would that include factors of whether or not it is commonplace, this type of corporal punishment that we're talking about, commonplace in the homes of other relatives or acquaintances that the child is aware of?  In other words, whether or not it's known to the child that his cousins and his friends are all receiving the similar time type of treatment?

A.    Culture of violence breeds violence.  I can't justify that.

Q.    I'm not asking you to justify it.  Let's make that clear, okay.  We're trying to -- I'm trying to get to determine what it is that becomes relevant and important in this concept.  So is the -- and one of the factors I think you said is the reaction or the effect of the impact that it has on the child beyond physical?

A.    Yes.

Q.    So there is an emotional impact as well, correct?

A.    Correct.

Q.    And would that emotional impact vary depending on the culture, the acceptance and/or the frequency of this type of behavior in which the community was raised?

A.    Yes, but that doesn't justify the behavior.

Q.    Didn't say "justify."  I'm saying would it impact --

would it affect the impact that this has on the child?

A.   It can.

Q.   So it seems as though we've identified four things here.  And just to sum up, frequency, intensity -- you used the word "intensity."  Let's call it severity.  Emotional intent of the parent, and the reaction of the child.  Those are four significant factors, correct?

A.   Yes.

Q.   In addition to lacking, as you said, any information about any physical abuse by in particular Juanita Allen?

A.   Correct.

Q.   And is it your understanding based upon what you know that she is the apparent focal point of -- she is the prime abuser according to the information that you've been given, correct?

A.   I believe she is the mother and that she had repeatedly abused her son.

Q.   So besides her, is there anyone else who repeatedly abused him that you're aware of according to the accounts that you've been given?

A.   Not that I can recall at this time.

Q.   Okay.  So she's the focal point.  And in terms of deciding what that abuse was, how frequent was the abuse that she meted out, how intense or severe, what her intent was, and what Mr. Allen's reaction was to it, that's the equation

we're looking at, correct?

A.    Those are the factors you put in.

Q.    All right.  And you indicate you didn't have any information at trial when you testified about her being an abuser of her son, correct?

A.    Correct.

Q.    And I think you also specifically testified that Mr. Allen never told you of any alleged abuse by his mother, correct?

A.    He -- I did not ask specifically if he was abused.  He described his mother as sweet -- I think sweet or very sweet.

Q.    So would that again be a yes, that Mr. Allen did not give you any information about his mother abusing him?

A.    His mother -- Mr. Allen did not give me any specific information.

Q.    So, again, I asked you a simple question.  Is the answer yes?

        MS. CARLYLE:  Objection, I don't think he needs to harass the witness.

        MR. HOLTSHOUSER:  I'm not harassing, Judge, I'm just trying to see if we can speed this along.

        THE COURT:  If you believe he's not being responsive, then just object that it's not responsive, then I'll have to get involved.

BY MR. HOLTSHOUSER:

Q.   The question was --

A.   He didn't give me --

Q.   Did Mr. Allen tell you anything about his mother abusing him?

A.   No, he did not.

Q.   And did I understand you in your answer to say that you also didn't inquire about whether or not he had been abused?

A.   I did not specifically inquire as to whether he was abused.

Q.   Did you ever tell Mr. Sindel or Mr. Simon that you did not specifically inquire of Mr. Allen about a fact, potential fact which makes one more or less susceptible to PTSD, your ultimate diagnosis?

A.   No, I did not.

Q.   So in 1998 had you already formed the opinion that prior abuse is a risk factor that increases the probability of PTSD upon exposure to a qualifying event?

A.   Did I already form that opinion?

Q.   Yeah, is that something you knew back in '98 or is that something that's new?

A.   I knew that in 1998.

Q.   Okay.  So if you knew that back in '98, can you tell us why you didn't ask Mr. Allen about any abuse or treatment that he received from his mother?

A.    Because Mr. Allen described his mother in glowing terms.

Q.    And you took it at that, that that was true, even though you already knew from Mr. Sindel, this guy couldn't tell the truth to save his soul?

A.    I had no other information that would have said otherwise.

Q.    You had information that he wasn't a reliable teller of facts, correct?

A.    But I had no information from other sources that he may have been abused.

Q.    So you would not ask him the question -- when he says that my mother was very sweet and loved me, is that what he told you?

A.    If you want, I have the specific -- my notes has a straight line if you'd like to go up to it.

Q.    We're going to get to them in a second.  But you did not ask him whether or not he had been abused, a risk factor you are aware of for PTSD --

A.    Yes.

Q.    -- because he told you his mother did not abuse him?

A.    Correct.  No, I did not say that.

Q.    Even though you knew you were talking to a person --

        MS. CARLYLE:  Could we ask Mr. Holtshouser --

        THE COURT:  Yeah, finish your answer.

THE WITNESS: Thank you, Your Honor.

A.   I did no not say that. I thought I said that I did not ask him if he was abused. I asked him to describe his mother.

Q.   And he did that?

A.   Yes, he did.

Q.   And even though you knew at the time in '98 that prior abuse was a risk factor for PTSD, and you also knew that Mr. Allen was perhaps an unreliable reporter, you took his answer and didn't inquire any further?

A.   That is correct.

Q.   I'm not sure of its importance, but you were shown the question that Mr. Sindel asked you at the very beginning of your testimony about introducing your trade or occupation, and then something about the jurors -- watch the jurors' eyes roll back in their head, and now the thrill is over. Did you take offense at that apparently?

A.   No.

Q.   No, okay. Had you worked with Mr. Sindel before?

A.   Yes.

Q.   And had you become familiar that he had an ability to relate to lay people on the jury better than some other defense attorneys did?

A.   I'm not going to tell you who I think is a good attorney or not a good attorney. I thought he was -- from

all my accountings with him, he was a good -- he worked well, and it was successful.

Q.    And do you think that that comment was an attempt maybe to inject a little levity or reduce tension on the part of the jury so that they relax at the beginning of your testimony?

A.    I can't tell you what his purpose was.

Q.    I would take it that as a psychologist, you are relatively self aware, are you not, that not all lay people are as impressed with the science of psychology as, say, psychologists are?  In other words, it's not uniformly respected, are you -- do you have that self awareness?

A.    Some people agree with me and some people don't.

Q.    But some people also might, the minute they hear the word "expert" or "psychologist" or "mental health testimony," et cetera, their eyes might roll back in their head and immediately they think hooie.  You are at least -- you've testified enough in court to realize that that sometimes is a factor, correct?

A.    Yes.

Q.    Okay.  I want to ask you about your view that -- you said PTSD is accumulative?

A.    Can be accumulative.

Q.    And that what prior abuse -- prior abuse makes someone -- makes it more likely is a risk factor in someone

later developing PTSD upon being exposed to a qualifying traumatic event, correct?

A.    It's one of the factors that does, yes.

Q.    And I think you used the phrase, "it firms up the diagnosis"?

A.    Correct.

Q.    And is there anywhere in the DSM criteria -- and I guess we're still dealing with DSM-IV, correct?

A.    Now or then?

Q.    Well, then, weren't we dealing with DSM-IV?

A.    Then we were, yes.  I don't believe we were in TR yet.

Q.    Okay.  And there's nothing in the criteria for PTSD about prior abuse confirming the diagnosis, is there?

A.    Not then.

Q.    And it isn't there now, is it?

A.    I believe DSM-V in the new --

Q.    It isn't out yet, right?

A.    But if you're asking me, are they changing it?  Yes.

Q.    But it has not been released yet, correct?

A.    No, it has not.

Q.    And so the debate over whether it should or should not be a criteria hasn't finished, has it?

A.    I believe that subcommittee has finished.

Q.    But the full committee has not accepted the recommendations yet, have they?

A.   I don't believe so.

Q.   But you point out something, which is that the criteria for PTSD is not a fixed scientific formula, is it?

A.   Fixed scientific -- no.

Q.   It's something that is voted on?

A.   It is firmed up.  You have experts in the field.  You look at the criteria.

Q.   And they vote, correct?

A.   The experts in the field, yes.

Q.   And, in fact, under DSM -- the proposed DSM-V, the criteria for PTSD may change?

A.   May change.

Q.   You've reviewed your trial testimony, I take it.  And you recall the cross-examination of you during the trial and your diagnosis of PTSD?

A.   Yes.

Q.   And the criteria for PTSD at the time, the DSM criteria, you recall that you and I went through those step by step?

A.   Correct.

Q.   And I asked you questions about facts which were known which were inconsistent with some of those criteria.  Do you recall that?

A.   Correct.

Q.   And you agreed with me on some of those, do you recall

that?

A.    Correct.

Q.    And so even though -- your diagnosis hasn't changed, has it?

A.    No, it has not.

Q.    So presumably the cross-examination, the facts which are inconsistent with the criteria for PTSD, that probably wouldn't change either, would it, just because you've identified a prior risk factor?

A.    I believe the issue at that time where the biggest cross-examination was, was on the area of persistence avoidance.  And I believe at that time I did not have a DSM-IV in front of me.  I have DSM-IV-TR now.  And I believe at that time you had picked the one area where all you needed -- and the current one, and I apologize, I can't remember what IV is versus TR, but I believe at that time you had pushed on that, when under that you had to have three out of six, and you said this -- and I had not included that one in my report, and you had kept saying that he -- he kept going back.

      With the additional information I had now, though, it would make sense.  Because what would happen is, is it gives me a reason why, in fact, he kept going back to the streets.  And the reason why is he went home, he got beat.  And so that would make some more sense.

I still believe -- it's still my opinion -- pardon me, it's still my opinion he has Post Traumatic Stress Disorder. And he had it then and he has it now. All the new information just further supports it.

Q. Okay. You have not examined Mr. Allen again, have you?

A. I have not. I have had nothing to do with this until 2009. And then I hadn't heard from anybody for close to two and a half years. And then I -- or two years, and then 2011 again or 2012.

Q. The extent of your personal contact with Mr. Allen in your life apparently was the hour and a half on January 16th, and another period of hours on February 22nd, 1998?

A. Personal contact, that is correct.

Q. You have not personally interviewed any of the third party reporters other than any interviews you did back in 1998, have you?

A. No, I have not.

Q. And other than your declaration, you haven't generated any new report either?

A. No, I have not.

Q. And, in fact, the only report that you produced in 1998 was the one based upon your January 16 contact, correct?

A. The only thing I did then was I thought I was supposed to do a competency evaluation. I did a competency evaluation.

Q.    You did a report?

A.    That is correct.

Q.    And then after that you found out that you were also going to be asked to be a mitigation expert.  And you examined some mitigation topics, you formed mitigation opinions, but you never prepared a report of those, did you?

A.    That is correct.

Q.    Why not?

A.    The attorney told me not to.

Q.    Which attorney told you don't prepare a report?

A.    I believe I asked Mr. Sindel, do you want a report?

Q.    What did he say?

A.    No.

Q.    Are you sure that was Mr. Sindel or was that Mr. Simon?

A.    I can't -- I asked somebody, but I am not sure which attorney.

Q.    So the only thing that -- the result of that was the only thing that the government had from you prior to your testimony was a report that purported to be solely a competency report?

A.    That is correct.

Q.    And you did that examination on January 16th, but you did that report on February 16th?

A.    That is correct.

Q.    And when you did that report on February 16, you

already knew you were being asked to render mitigation opinions in this case as well, didn't you?

A.    That is correct.

Q.    But you limited your report, didn't you, to just competency, and withheld from that your ultimate conclusions on mitigation, didn't you?

A.    I had not gone back to even seeing Mr. -- I had only seen him once, and so I -- the only information I had at that time really was competency and the information that I had received from Mr. Randall.

Q.    And so in your experience, do you perceive the tactical advantage that Mr. Allen's attorneys obtained over the government by characterizing your first interview in January 16 as solely a competency exam and not providing the government with any access to any report of yours concerning mitigation?

         MS. CARLYLE:  I'm going to object.  I don't think there's any evidence that Mr. -- that Dr. Cuneo was in any way competent to evaluate tactical advantages in trials. He's not an attorney.

         THE COURT:  Yeah, he's not an expert certainly on that.  I think the question was, he represented in the report that he had only done competency, and after he had examined him and before he made the report, he knew he was going to be the mitigation expert and was working on mitigation evidence

during that time, but didn't alert the government in any kind

of a report that he was.  And the question was would that

work in advantage to the defendant?  So if it's limited to

that, I'll overrule the objection.

BY MR. HOLTSHOUSER:

Q.    You know that means you can answer the question.

A.    Thank you.

        THE COURT:  But not that there's anything nefarious

about it.  As an objective fact.

A.    It might have been helpful.  But when I saw him

February 16th -- pardon me, I believe I testified the 4th of

March, 3rd, 4th, or 5th, somewhere in there.  I wouldn't have

got a report done in two weeks.

Q.    Pardon me?

A.    I don't think I would have been able to write a report

in two weeks.

Q.    In terms of the content of your testimony, though, as a

mitigation expert, was there anything that you testified to

in mitigation that was not actually contained in your

report --

A.    No.

Q.    -- that you did write?

A.    None.

Q.    No.

A.    That was the only information I had, what was in that

report.

Q.   You had some documentary evidence, did you not, back in 1998, things like police reports, some health records, some school records, some documents that had been gathered by the mitigation investigation?

A.   I'm not sure that was done by mitigation.  That was what I was -- that's the information I would use for competency, and that was sent to me.

Q.   You actually had some additional documents that you referred to when you testified at trial such as school records and things of that sort that you didn't necessarily have in January of 1998.  Do you remember that?

A.   I may have.  Yeah, I have no independent recollection.  But I would have looked at school records for competency if they were available.

Q.   But you also then testified about school records in your mitigation testimony, as to the fact he was flunking and having these problems as a youth, and other things like that.  There were things that you testified about that relied on documentation?

A.   Correct.

Q.   Are you aware as you sit here today of any documentary evidence -- I'm not talking about an interview of a person or a statement of a person, but any other document pertaining to Mr. Allen's life that's been discovered since the trial that

wasn't available at trial?

A.    You're not talking interviews?

Q.    Correct.  I'm not talking about a piece of paper that says on such and such a date that Juanita Allen told me this. I'm talking about third party documentary evidence of a school record, a medical record, a police report, something that documents an event in an official way.

A.    I'm not an attorney, so if I'm wrong on this, just correct me, okay.  The only thing I can think of is that I was given, it was either yesterday or the day before, a transcript of an interview that Mr. Simon had with Billie Allen.  And I didn't know that existed.  And that was done before the trial.

Q.    And that would have been a conversation that may have been protected by the attorney/client privilege at the time of trial.  But no other --

A.    I don't know.

Q.    But no other documentation by an outside source such as a school, a hospital, another mental health report that preexisted the offense.  I mean, for example, you had records pertaining to a visit to the Metropolitan Psychiatric Center --

A.    That's correct.

Q.    -- when you testified at trial?

A.    That is correct.

Q.    So that's something you reviewed as well?

A.    Yes.

Q.    So are you aware of anything as you sit here today that in all the years since the trial that the new team has uncovered that the first team did not?

A.    Not documents, just interviews is what I've been given.

Q.    So apparently would you agree that the investigation that was done by the trial team in '98, at least as to documentary evidence was 100 percent complete and thorough?

A.    I would say that the documents were there.  I don't believe the interviews were done.

Q.    All right.  I'm going to show you Exhibit 314.  This is this letter that was sent to you in September of '97 from Mr. Sindel's office.  And what we're going to do now, I'm going to take you through a few of these documents that I think at least develop the history of your contacts and communications with the defense team, okay?

A.    Just -- is it possible just to get that a little clearer?  There.

Q.    I'll blow things up where there's some content.

A.    I just want to make sure I could see it.

Q.    So when you got the police report, that's the police report of the entire investigation regarding the incident for which Mr. Allen was being prosecuted?

A.    That is correct.

Q.    That was a pretty lengthy report, wasn't it?

A.    You know, I don't have any independent -- I'm guessing it was, but I have no independent recollection.

Q.    With a homicide investigation, it contained actually collateral interviews that the police had done of a number of people, pertaining to actions both by Mr. Allen and Mr. Holder?

A.    I'm not disagreeing or agreeing.  I have no independent -- if they sent me the whole police file, it would be thick.

Q.    And do you recall that it had, for example, in there detailed information about the planning and preparation for the robbery according to various witnesses, evidence that had been discovered, evidence about what had occurred immediately following the entry into the bank, the escape, conversations that Mr. Allen had with two park workers afterwards, what he did afterwards that day, who he went to, things like that were -- all the evidence, in other words, that the law enforcement had developed was in that police report?

A.    Okay.

Q.    Correct?

A.    I have no independent recollection, but I'm not disagreeing with you.

Q.    And you would agree that kind of information gave you a lot of insight into Mr. Allen's activities, personality,

intelligence and so forth. I mean, that's at least clues, isn't it? It's relevant information?

A.    It's relevant information, but I wouldn't say that it gave me tons of information as to his personality, intelligence, whatever. But it gave me information.

Q.    Well, it gave you, for example, reports from witnesses as to how the act had been perpetrated, how the perpetrators behaved during the act, what they did afterwards, how they were behaving immediately afterwards, what they said to the police upon their arrest, how they were behaving and acting with the police in that circumstance. Those are all things that -- that's relevant information, isn't it?

A.    Yes.

Q.    I mean, whether or not it shows that he was crying or whether he was panicking, whether he could communicate, et cetera, at least says something about a person's mental state, doesn't it?

A.    At that time, yes.

Q.    I mean, if it said, for example, that he said to the police officers, you know, they asked him, well, what happened in the bank, and he responds, what did you do with my waffle iron? That might give you a little sense that he really is having a psychotic episode or not in touch with reality, correct?

A.    Correct.

Q.   Correct.  On the other hand, if he provides detailed explanations about his involvement in the robbery and what happened before and after and what his role was, that also says something about his mental state, doesn't it?

A.   Yes.

Q.   And at least somebody that ends up looking at PTSD, it tells you something about his mental state immediately following and personal involvement in a traumatic event, correct?

A.   Yes.

Q.   And in this case you had that as of September 1997?

A.   Yes.

Q.   Did you read this report in September of '97 when you got it?

A.   I'm not sure I read it in September '97.  Probably some time -- if I got it -- well, September 11th, I got it, is when it's sent out.  I probably read it some time in October.

Q.   So why is it that in your bill for your time, nowhere is there an entry for you -- for any hours you spent on this case before January of 1998?

A.   Because I don't bill people when I look at stuff in the beginning.  What I do is I get sent a ton of stuff, always have.  And then I kind of pick and choose in the beginning what I want to do.  This was just going to be a competency, I said I'd do it.  But I guess my office is stacks of things

that somebody wants me to look at to see if I would be willing to do.

Q.   I think you were already shown this, but we're going to look at it again.  This is your declaration that you filed, and it's signed by you some time in 2009, correct?

A.   I think this one is Dr. Randall's.

Q.   Oh, I'm sorry.  Well, actually it's the one I want to show you anyway.

A.   Okay.

Q.   You've seen this?

MS. CARLYLE:  I'm sorry, could we have an exhibit number?

MR. HOLTSHOUSER:  This is 254.

Q.   Let me just take you down to where he talks about you.  Have you seen this before?

A.   If it was sent to me, I've seen it.

Q.   Paragraph 16 of this Exhibit 254, it talks about Dr. Cuneo.  And says that, "Dr. Cuneo conducted an evaluation of Mr. Allen January 16, 1998."  And, "He went into the evaluation with extremely limited background information and literally no lay accounts of Mr. Allen's life."  Now, you had that lengthy police report that we just talked about, correct, when you went into that examination with Mr. Allen on January 1998?

MS. CARLYLE:  I'm going to object.  I don't think

we've really -- Dr. Cuneo doesn't have any recollection of exactly what he received.  It may have been lengthy, it may not have been.  He may have just got the incident report.

THE COURT:  I think he said already that it was lengthy and he thought he examined it in October.  Overruled.

MR. HOLTSHOUSER:  At this point, Judge, I'm just trying to see whether or not he's agreeing with things that Mr. Randall has sworn to.

THE COURT:  I understand.

BY MR. HOLTSHOUSER:

Q.    So he's here talking about things that you did and didn't do.  So when -- he says that you "went into the examination with extremely limited background information and literally no lay accounts of his life."  You did have the police report, am I correct?

A.    He said it was sent.  As I said from the beginning, I have no independent recollection of the police report.

Q.    Did you review it before you interviewed Mr. Allen?

A.    If it's in my report, said I reviewed it, I reviewed it.  But I don't know what was sent in the police report.

Q.    And it says, "As Dr. Cuneo's report indicates, his sole contact with Mr. Allen was for the purpose of determining trial competency and not mitigation."

Now, "sole contact," you actually had more than one, correct?

A.   I saw him twice.

Q.   Correct.  And you saw him on January 16th, and you saw him on February 22nd?

A.   Correct.  Now, my report said that I saw him only once because it was written -- you know, I hadn't seen him I believe on the second time yet.

Q.   And I want you to go down a sentence or two, and he said, "I recall that in subsequent discussions with Dr. Cuneo and counsel, it was decided to seize upon this fact..."  And I think he's referring to the 1995 killing of Marquis Taylor.  "It was decided to seize upon this fact as the underlying trauma for what would be the doctor's PTSD presentation."  Now, is that an accurate statement?

A.   I can only remember one discussion with him.  He's got plural there.  I know I met with him on February 1st.  I also don't know -- I cannot remember if he was with us on the two days where we were preparing for trial before I testified.

Q.   Let me ask you this:  In the course of making a PTSD determination, is the trauma that triggers the PTSD, is that like something that you seize upon, decide upon, select, choose?  Is it a discretionary thing?

A.   No, it's not discretionary.  But you would have to ask him why he used "seized."

Q.   Well, I'm asking -- he's characterizing a conversation and a discussion that was made in conjunction with you on

apparently a number of discussions. And I'm asking you, is that accurate?

A.   I don't know. I can guarantee I didn't say "seize." And as to discussions, I can't tell you how many times I talked with him.

Q.   And it says that --

A.   It may be one or it may be -- the most it could have been was three. But that would have been the two days right before I testified.

Q.   Do you see there in the next sentence where he says, "I was concerned about this strategy because while an event like the Taylor shooting can support a diagnosis of PTSD, it was apparent that Mr. Allen's trauma symptoms existed long before the shooting and were based upon a much richer trauma history and predisposition." Did Dr. Randall share that with you, that there was a much richer trauma history and that Mr. Allen was predisposed to PTSD?

A.   I have no -- I have no independent recollection of any of this, none.

Q.   So would that be that based upon your recollection as you sit here today, what Dr. Randall says was his concerns back in 1998, were never communicated to you?

A.   Not to my knowledge.

Q.   Okay. That's what I'm trying to figure out. The other thing that Dr. Randall in this same paragraph represented to

the Court in this declaration was that you had "literally no lay accounts of Mr. Allen's life."  Now, isn't it true that your report itself makes clear that when you wrote it, even at the time you wrote the report that you did have lay accounts, some lay accounts of his life?

A.    I believe I had -- I spoke with Juanita Allen once.

Q.    Did you have any accounts from anyone else?

A.    That's the only person I talked to.

Q.    Did you have a lengthy conversation with Mrs. Allen?

A.    20 to 25 minutes.

Q.    Did you ask all the questions of her that you wanted to ask?

A.    As it dealt with PTSD, yes.

Q.    So it wasn't a case if she says -- she had said, I can't talk to you anymore, I got to hang up.  You ended the conversation because you were finished asking her questions?

A.    Correct.

Q.    Correct?  And so the statement here by Dr. Randall that "literally no lay accounts of Mr. Allen's life" isn't true, is it?

A.    Yes.  I went into the evaluation, there was no mitigation that was given to me beforehand, none.

        MS. CARLYLE:  I believe the testimony has been that on January -- the conversation with Juanita Allen occurred on February 16th.  So if Dr. Randall was talking about the

evaluation on January 16th, certainly at that time Mr. Cuneo had not talked to Juanita Allen.

Q.    Do you see the next sentence where it says -- it refers to your report, that your "sole contact with Allen was for the purpose of determining trial competency and not mitigation"?

A.    Correct, that's what my report says.

Q.    Okay.  Your report actually itself mentions that at the time you wrote the report that you were aware that you were also being consulted as a mitigation expert?

A.    I was going to be consulted.  I didn't know if I was going to be used.

Q.    Your report itself has somewhat of a social history of Mr. Allen, doesn't it?

A.    It has a very, very, very limited history.

Q.    All right.  But it has an account of details of his life that you were aware of, correct, and that you found relevant?

A.    Correct.  I do that in every fitness report I've ever done.

Q.    And so all the facts that you list in there about his criminal history, his education, his experience in school, his drinking, his marijuana use, et cetera, those are things that actually had dual relevance, don't they?  They are relevant to competency and they relevant to mitigation,

aren't they?

A.    Could.

Q.    This is part of your -- you need a second?

A.    Yeah, just one second.  Okay.

Q.    You have water up there, right?

A.    Yes.  Thank you.

Q.    Look at -- this is page 209 of Exhibit 208.  This is your direct testimony transcript at trial.  And you were asked the question:

"Did you evaluate Billie Allen as to his competency?"

"Yes, I did."

Question:  "Basically, did you also do an evaluation to determine whether or not there existed certain mitigating factors surrounding his behavior during the course of the event that you understand he had committed?"

You said:  "Yes, but I didn't know I was supposed to do that until later."

"Okay.  Tell me a little bit about what the evaluation consisted of."

So by the time you actually testified, your evaluation of Mr. Allen was not limited solely to competency, was it?

A.    No, they wanted to take the findings that I had come with out of my fitness or competency evaluation, and they

wanted to use those as mitigating factors at trial.

Q.    So just so we're clear, is that an affirmative answer, that when you testified at trial, your evaluation of Mr. Allen had been by that time for both competency and mitigation?

A.    No.  Pardon me, on January 16th, the only thing I did was a competency evaluation.  The only thing I did --

Q.    Listen to my question, though.

A.    No.  But it's a split answer.  On January 16th, the only thing I did was for competency, because that's the only thing I knew at that time that I was to do.

Q.    And the question --

A.    On February 22nd, I, in turn, ended up seeing him also to look at some mitigation issues.  In other words, to firm up the factors that I was there.

So the question becomes, the report was done specifically for competency.  The first evaluation was done --

Q.    Doctor, I don't want to interrupt you, but my question is about your testimony, and the question you were asked by Mr. Sindel.  Right now that's the only question I'm directing your attention to.

A.    Okay.

Q.    Okay.  I'm asking you about line 5.  The question: "Did you evaluate Mr. Allen as to his competency to stand

trial?"  "Yes, I did."  Correct?

A.    Yes.

Q.    Okay.  Then his next question, are you with me?
Line 8:  "Basically, did you also do an evaluation to
determine whether or not there existed mitigating factors?"

A.    Yes.

Q.    Correct?

A.    But I didn't do that until later.

Q.    "Yes, but I didn't know I was supposed to do that until
later."  Correct?

A.    Yes.

Q.    Now, my question is:  By the time you testified at
trial -- are you with me as to the time of my question?  By
the time you testified at trial, your evaluation of Mr. Allen
had transcended purely a competency and had also been a
mitigation evaluation; is that correct?

A.    It was a competency evaluation that was used in part to
provide information for mitigation.

Q.    By the time you testified at trial -- I am not asking
you about what your viewpoint was on January 16th.  By the
time you testified at trial, was your evaluation of Mr. Allen
at that point a mitigation evaluation?

A.    I didn't know -- maybe I'm misunderstanding this,
because I did not know I was supposed to do any mitigation of
Mr. Allen until after I did the January 16th assessment.

Q.    That is -- we understand that very clear.  The question I'm asking you is:  As of the time you're testifying, March 4th or 5th, this is the time that he is asking you this question, that's the day he's asking you, and that's the time period I'm asking you about.  As of that time, he's already been found guilty and stood trial, you understood that, right?

A.    Correct.

Q.    You were in the penalty phase of a capital case?

A.    That is correct.

Q.    Competency to stand trial was no longer an issue, was it?

A.    January 16th?

Q.    No, March 4th.

A.    No, no, January 16th, it was an issue.  By March 4th, it was not.

Q.    I'm not asking you about January 16th, I'm asking you about March the 4th.

        MS. CARLYLE:  Your Honor, I'm going to object.

        THE COURT:  Let's do it this way.  Ask the question.  If he starts to give an answer, just say unresponsive, and I'll rule.  But we're arguing back and forth and we're not getting anywhere.

BY MR. HOLTSHOUSER:

Q.    My question is only about the time you testified,

because that's what this jury that imposed this verdict heard, heard you testify on March the 4th.  As of March the 4th, you were testifying as to the results of a mitigation evaluation, weren't you?

A.    I was providing information for mitigation.

Q.    So that your evaluation as of March the 4th and the time you were testifying was not limited solely to competency, was it?

A.    That is correct.

Q.    Back to the paragraph in Dr. Randall's declaration, though.  Dr. Randall describes your sole contact with Mr. Allen as being for the purpose of determining trial competency and not mitigation.  That is false, isn't it?  False in that you had more than one contact, and false in that as of March 1998 when you testified, by that time you conducted a mitigation evaluation, would you agree with that?

MS. CARLYLE:  I'm going to object.  I think what Dr. Randall's statement is is that based upon Dr. Cuneo's report, at which time his sole contact with Mr. Allen was for competency.  And so there's nothing inconsistent within that statement with what happened.

THE COURT:  It could be interpreted differently, so let's hear what the witness has to say about it.  Overruled.

Q.    My concern is what you have to say about it, because we already heard from Dr. Randall.  And I'm not asking you to

delve into the mind of Dr. Randall, I'm asking you to take a look at look at what Dr. Randall told this court. And I'm asking you, is what Dr. Randall told this court true based on what you know?

THE COURT: Now, could you go over specifically the part you want him to review, please.

MR. HOLTSHOUSER: Yes.

THE COURT: For my purpose, not necessarily for his answer.

Q.    As your report indicates, his sole contact with Mr. Allen was for the purpose of determining his trial competency and not mitigation. Now, that time frame is related to, as your report indicates -- and your report was prepared on February 16th, correct?

A.    Correct.

Q.    Now, your contact was not sole, was it?

A.    On January 16th it was.

Q.    Correct. As of the time you testified at trial, it was not sole, was it?

A.    That is correct, it was not.

Q.    And this paragraph that discusses you, paragraph 16, nowhere in that paragraph does it disclose to the Court that there was a second contact between you and Mr. Allen, does it? None that you saw?

A.    It doesn't in this, no.

Q.    Let me go to your declaration now.

THE COURT:  Is this a good place to --

MR. HOLTSHOUSER:  It can be.

THE COURT:  Well, I don't want to interrupt your flow.

MR. HOLTSHOUSER:  We have plenty of flow left.

THE COURT:  All right.  Court's in recess. Forty-five or an hour?  It doesn't matter to me.

MR. HOLTSHOUSER:  Forty-five is fine.

THE COURT:  Is that enough time for the marshals?

THE MARSHAL:  Yes, Judge.

THE COURT:  Forty-five minutes.  We'll be back at 12:45.

THE WITNESS:  Thank you, Your Honor.

(Court in recess from 11:59 a.m. until 12:55 p.m.)

THE COURT:  Okay.

MR. HOLTSHOUSER:  Ready, Judge?  Judge, if I can, I just need a second to organize a few papers here.

THE COURT:  Take your time.

BY MR. HOLTSHOUSER:

Q.    Dr. Cuneo, good afternoon.

A.    Good afternoon.

Q.    I'm going to try -- I want to give you like a clue as to what I'm going to cover here afternoon.  We're basically going to focus on three major topics.  And hopefully we can

try to get through this this afternoon.  No one wants you to have to come back Monday or anything of that sort.

But I want to talk about credibility, and how you go about finding facts when you are acting as an evaluator of someone's mental health.  We're going to talk a little bit more about some of the historical facts that occurred during the time period, back in 1998 when you were involved with this case, okay.  And, lastly, we're then going to talk about your diagnosis again, PTSD.  So we're going to revisit that a little bit.

So with that in mind, let's start with the historical facts first.  Back in 1998 when you had your evaluation on January 16th, you had a court order that permitted you to do that, correct?

A.    Correct.

Q.    And I have up on the screen Exhibit 26.  That's the Court order which was issued on January the 9th, as you can see, to permit you to evaluate Mr. Allen at the Franklin County Jail on January the 16th?

A.    That is correct.

Q.    Now, on January 16th when you went to visit him, did you go from your home to the Franklin County Jail?  Did you interview him in the morning, in the afternoon, when did you talk to him?

A.    It would have been in the evening.  I'm not sure if I

went from Chester, which is in Southern Illinois, or from my home.  That I can't remember.

Q.   So the time it took for you to drive from Chester to Franklin is time that you would have billed the government for as opposed to the time it would have taken you to, let's say, get from your home to --

A.   I usually --

MS. CARLYLE:  I object.  I don't think Dr. Cuneo billed the government for anything.  He submitted a CJA voucher to the Court.

THE COURT:  Well, I'm not sure that you're talking about owing anybody anything.  It's just a matter of how it was billed.  Okay.  Overruled.

Q.   Do you recall now whether --

A.   I don't know where I started.

Q.   But you had four hours charged there --

A.   Correct.

Q.   -- for an evaluation which you testified at trial lasted for an hour and a half?

A.   Right.

Q.   So the other two and a half hours, what is that for?

A.   I would have been traveling.

Q.   It wouldn't have been for any of the time you spent reviewing the police report --

A.   None.

Q.    -- in preparation for the interview?

A.    No.

Q.    Did you review the police report in preparation for the interview?

A.    Yes.

Q.    And when?

A.    Some time after I got it.

Q.    Any time in the close vicinity to January the 16th, 1998?

A.    Some time after -- I'm sure I wouldn't have done it before October.  And some time between October and January 16th.

Q.    So if you looked at it in October, you wouldn't have looked at it again before you talked to Mr. Allen in January, you would have just relied on your recollection of the report from October?

A.    I can't remember if I looked at it again.

Q.    I'm going to show you Exhibit 27.  Do you see here that on January the 13th, the government moved from the defendant for discovery of any expert mental health testimony pertaining to sentencing at trial.  And that was done on January the 13th?

A.    Okay.

Q.    Okay.  And that's three days before you talked to Mr. Allen, correct, by date?

A.     Yes.

Q.     Now, you had your interview with Mr. Allen on January 16th, and you took notes from that interview, correct?

A.     That is correct.

Q.     So this is the report that you ultimately prepared, Exhibit 565, dealing with your examination of Mr. Allen?

A.     Correct.

Q.     Correct?

MS. CARLYLE:  Just for the Court's information, I think I was referring to Exhibit 103, which is also the report.  Exhibit 565 also includes his notes and test data.  But the reports contained in 103 and 565 are the same as far as I can tell.

THE COURT:  Okay.  But what I understand Mr. Holtshouser is referring only to 565.  Is that correct?

MR. HOLTSHOUSER:  Right now I'm at the notes that were part of Dr. Cuneo's files were in 565.

THE COURT:  Okay.

MR. HOLTSHOUSER:  It is true that the report is in multiple exhibits in multiple places.

MS. CARLYLE:  The notes are also in multiple exhibits, including 501.  Including the notes in 565.

MR. HOLTSHOUSER:  The identical nature of the notes is something we're going to get into.  But the notes are also

located in multiple locations.

THE COURT:  Okay.  I think what I don't understand is the purpose of the objection.  Because --

MR. HOLTSHOUSER:  I don't know there is an objection.

THE COURT:  -- all you're addressing is 565.  And if there is something to do with the notes, that will be taken up later; is that correct?

MS. CARLYLE:  No, I'm sorry, I guess it wasn't exactly an objection, it was just a point of clarification.

THE COURT:  Okay.  All right.  Very well.

MS. CARLYLE:  Because I was referring to a document by one number, and I'm just trying to show the Court that I think we're now referring to the same document by different numbers.

THE COURT:  All right.

MR. HOLTSHOUSER:  And the only part I'm not conceding, Judge, is that the documents are the same. Because as you recall there was a rather controversial issue at trial regarding notes, which pages the government did and did not get, and that's something that we're going to address with Dr. Cuneo.

THE COURT:  All right.

MR. HOLTSHOUSER:  We looked at various versions of the notes that were provided.

THE COURT:  Very well.

BY MR. HOLTSHOUSER:

Q.    What I've put up here as part of Exhibit 565, Dr. Cuneo, do you recognize these as your notes of your interview of Billie Allen, January 16, 1998?

A.    Yes.

Q.    Okay.  And is that your writing?

A.    Yes.

Q.    So, for example, the location, Franklin County Jail?

A.    Yes.

Q.    And June 18, 1997, that's his birth date?

A.    Correct.

Q.    Right?  And can you read what this says up at the top here?  Is that history of Pica?

A.    History of Pica and history of seizures.

Q.    And down here is the date.  It looks like you first wrote a two, and then crossed it out and wrote a one?

A.    It was January 16th of 1998.

Q.    Now, we had trouble reading your notes.  Can you just read for us what these notes are on this page?

A.    Okay.

Q.    Beginning with "Why."

A.    Do you want me to tell you what the abbreviations mean or do you want me just to read what it says there?

Q.    Let's start right there with "Why," question mark.  And

if you come to abbreviations, would you, in fact, tell us what your shorthand means.

A.    Okay.  "Why?  Supposedly a bank robbery.  Murder."

Q.    Would it help if I blew this up a little larger for you?

A.    No.

Q.    No, okay.  We'll go back down then.

A.    "Supposedly a bank robbery.  Murder.  Two counts of armed criminal action.  'I wasn't involved.'  Somebody mentioned by name.  Norris Holder.  Knew him two weeks.  I said, 'Why?'  I guess he was afraid of the guy -- of the other guy."

Q.    Okay.  So so far in the first paragraph, Mr. Allen tells you that he was not involved in this bank robbery, correct?

A.    That's correct.

Q.    And then next he told you that he knew Norris Holder but had only known him for two weeks?

A.    That's what he said.

Q.    And what did you mean by "Why?"  And then something afraid of another guy?  I guess he's afraid of the other guy.  What did that mean?  What was Mr. Allen saying?

A.    I asked him why somebody mentioned him by name.  He said somebody mentioned him by name.

Q.    All right.  And Mr. Allen's response is, "I guess he's

XI - 126

afraid of other guy?"

A.   "Of the other guy," yeah.

Q.   So did you take from that that Mr. Allen was saying that basically he's being framed by someone else for something he didn't do, and Norris Holder or someone won't give the other person's real name because they are afraid of them?

A.   No, basically what I wanted to do was this was a fitness or a competency evaluation.  My first thing is, is I want to find out if the individual can tell me does he know what he's charged with.

Q.   What meaning did you take based upon your note from what Mr. Allen told you about, "I guess he's afraid of other guy"?

A.   That that's why they gave him up.

Q.   Pardon me?

A.   That's why they gave him up, mentioned him by name.

Q.   Was the impression that you were getting from this paragraph of information, though, that Mr. Allen wasn't involved, and that someone is saying he's involved to protect another person that they are afraid of, the real -- so-called real perpetrator?

A.   Possibly.  But the major that I asked him, I just wanted to know why the guy is in jail.

Q.   My question is not why you were asking him or what you

were doing.  My question is what was he saying to you?

A.    "Supposedly a bank robbery.  Murder.  Two counts of armed criminal action.  I wasn't involved.  Somebody mentioned by name.  Norris Holder.  Knew him two weeks.  I guess he's afraid of the other guy."

Q.    And aside from writing down and reading us your notes, you can't tell us what it was that Mr. Allen was indicating to you by those statements?

A.    No.

Q.    Okay.  Can you go on?

A.    Yes.  "MS."  That's the abbreviation I use for mental status.

Q.    Okay.

A.    First thing is, "Friday, January 1998, been here since March."  He could tell me that.

Q.    Oriented to time and place, correct?

A.    Right.

Q.    Okay.

A.    Next thing I look at, "MH," that means mental health treatment.  And it says, "I went to go get myself checked out at psychiatric center on Delmar and Union.  I had a friend died a few years ago and I messed up.  He killed -- he was killed in front of me.  Had nightmares since.  Got sleeping pills."  And I can't read the next word.

Q.    Okay.  So you knew in this first conversation, at least

according to Mr. Allen, that he had at some point gone to a psychiatric center?

A.    Correct.

Q.    So you knew you were dealing with someone who at least at one point had sought mental health help according to him?

A.    According to him I knew he had gone at least once after that.

Q.    Did you later see documentation that confirmed that?

A.    Yes.

Q.    How about the phrase, "I had a friend that died a few years ago and I messed up."  What was he indicating by that?

A.    He was messed up.

Q.    Okay.  Is it possible that he was telling you that his friend had died as a result of some mistake he had made, something that he had messed up?

A.    I guess it's possible, but that's not the way I read it, and that wasn't what had happened.

Q.    And you didn't inquire further as to, well, what you mean by "messed up"?

A.    No, he told me later.

Q.    Okay.  And at least this particular incident, the one he's mentioning, what's the question you asked him that elicits this information?

A.    Have you been hospitalized anywhere in the past?  Have you ever had any type of mental health treatment?

Q.   And so really you're inquiring about any prior mental health experience.  And he relates this incident to you.  And he then further in the course of that relates it to witnessing a friend of his killed, correct?

A.   Correct.

Q.   So right there in the first page, you know you have someone who potentially has a PTSD triggering event in their history, correct?

A.   I know that at least they are relating that, yes.

Q.   And you know from your experience with the DSM manual that witnessing a person, whether close to you or otherwise, killed in close proximity to you is, in fact, a potential PTSD triggering event?

A.   It could be a severe stressor.

Q.   Could be, correct?

A.   Could be.

Q.   Ultimately what determines whether or not it is their reaction to that event, correct?

A.   For PTSD, it's a reaction that occurs not just then but six months later.  I mean, you have to have a period of time.

Q.   And my question, though, is ultimately what determines whether or not an event is a PTSD triggering event for the DSM manual is what the reaction is to that event?

A.   That's correct.

Q.   Okay.  If we go to the next page, is that word "drink"?

A.    Correct.

Q.    Okay.  You asked the question here, I take it?

A.    Right.

Q.    What's the question you asked?

A.    How much do you -- how much do you drink?  And then depending upon the response, because sometimes somebody tells me soda, ice tea, or whatever.  I say, no, I mean alcohol.  And he says, "Wine, on weekends.  Two or three bottles on weekends.  Drunk on weekends."

Then the thing I want to look at after that is, I want to see if there's a possibility of -- it says, "He's had memory lapses, started two years ago, stress, drank until I couldn't drink anymore."

Q.    Now, the information that he's telling you, again, this "two years ago," that coincided with -- you already have a linkage between drinking and this event that occurred a couple years ago with the death of the friend, correct?

A.    Correct, that's why you'll see in my notes, PTSD, question mark, and a couple stars, something I'd want to look at.  So it confirms the possibility that it may be that.

Q.    Now, would you agree that giving you information that he gets drunk on the weekends, has memory lapses, has stress, first started having problems two years ago, sought psychiatric help at one point, was messed up as a result of seeing a friend die, that's not grandiose, self-

aggrandizement type statements, correct?

A.    No.

Q.    He's telling you some bad information about himself, isn't he?

A.    Yes, he is.

Q.    All right.  Next question is effect.  Is this a topic you cover?  You don't ask him, tell me what your effect is, right?

A.    No.

Q.    What do you ask him?

A.    I ask about -- we look at whether the individual has periods of mania, whether he has periods of anxiety, whether he has periods of depression.  He says he's stressed, he said right after his friend died.

Q.    Now, you note PTSD in the column of your notes, on the second page of your notes during your interview with him for the first time on January 16, 1998.  And you told us earlier that from what you knew back then, a prior history of child abuse would be a risk factor for later development of PTSD, correct?

A.    That is correct.

Q.    And you're focusing on PTSD very early on in your interview with him, correct?

A.    Correct.

Q.    And despite that, you don't ask him any questions about

X1 - 132

child abuse, correct?

A.    Not yet.

Q.    How about then the language you have written down here about stress.  Can you translate that for us?

A.    "Right after friend died, people trying to rob me.  Got robbed one time in front of mom's.  This is a little after Marquis died."

Q.    And what's in the left-hand column over there?

A.    Later on in the interview he had talked -- he had said that he tried to OD a couple, two to three times since Marquis's death.

Q.    Okay.  And did he elaborate on how he did that?

A.    That would be dealt with later in the notes.  That was brought over there so I'd remember it.

Q.    Okay.  You're talking more I guess about effect towards the bottom here, because it's still talking about stressed out?

A.    Right.

Q.    What are the words that follow after stressed out?

A.    "Mostly sits in a room and meditates.  Gets stuff off my mind.  Kept thinking of friend, cried.  Wouldn't tell nobody."  And I can't read what's underneath that at the very bottom of the page.

Q.    Okay.  Go to the next page.

A.    And "cry."

Q.   Okay.

A.   Next I want to look at legal.

Q.   Okay.

A.   "Said he was charged with tampering first."  It said in 1990 -- "this in 1996, police report said 4/10/95, tampering. This was before Marquis died.  Two stolen cars, a lot of us. Picked me up.  I said I'd drive as Marquis scared of workhouse.  Was there two days.  Pled guilty.  Got two years probation."

Q.   And on the left, you've got some more information?

A.   Yeah.  That was -- pardon me, yes.  That was from, I believe the information that I'd received because he was put on two years probation.  The requirements were that he go to school, drug testing and treatment if needed, and --

Q.   Some restitution?

A.   -- and restitution.  So that appears to have been --

          THE COURT:  Excuse me, thank you for coming.  Our schedule has been a little bit unusual, but we appreciate your attendance here today.  I wish we had more time to talk.

          (There was a brief recess.)

          THE COURT:  Do you want your last question read back?

          MR. HOLTSHOUSER:  No.

          THE COURT:  Just a second.

BY MR. HOLTSHOUSER:

Q.   Is the last phrase there that they circled, is that "tested dirty"?

A.   Tested dirty.

Q.   You took that to mean that he had been tested as using drugs by his probation office --

A.   Yeah.

Q.   -- and had some violation issues?

A.   Yeah.

Q.   Okay.  Again, most of the information he's giving you here, that's not positive information about himself, is it?

A.   No.

Q.   And even the information before about sitting in his room and crying and not going out much and thinking about his friend dying, not positive information either, is it?

A.   No.

Q.   Down at the bottom here there's some more information about drugs?

A.   Drugs.  It says, "Just weed.  Started at 15.  Smoked a lot.  About two-ounces a week.  Costing 100 to $200 a week," is what he said.  Then off to the side, I said, "Started smoking weed after Dennis Noble died, but before Marquis -- he started smoking weed after Dennis Noble died but before Marquis "died."

Q.   And if you go to the next page.  Can you -- what's the "Del, dash, no"?  And then take us on down.

A.    "Delusions, no.  But he has had periods of paranoia."  In other words, where he feels if someone is behind him, he's jumpy.

And then "Hal" is hallucinations.  "Hears voices occasionally since being there in the jail."  Then he later described them as one word voices, but that's not in the notes there.  I'm sorry.

Q.    He says, "He feels as if someone behind him"?

A.    "As if someone is behind him."

Q.    And then what's the next word, "jumpy"?

A.    "Jumpy."

Q.    Now, paranoia is an irrational belief that someone is after you, correct?

A.    Correct.

Q.    If someone is actually after you, it's rational, and you're not paranoid about it, correct?

A.    Correct.

Q.    Ultimately what you learned, isn't it, that the shooting that occurred that resulted in the death of Marquis Taylor, that the bullets may have been intended for Mr. Allen over something he had done, correct?

A.    If -- I have no recollection of that.

Q.    Okay.  If that was the case, though, that the Marquis Taylor incident actually involved something in which the bullets were being shot at Billie Allen but hit Marquis

XI - 136

Q. Taylor, that might give someone a rational belief that they were -- someone was after them, correct?

A. Correct.

Q. And then you were aware of the incident at his mother's house in January of '97 in which someone came to the house looking for him, and then ultimately ended up shooting up his mother's house, correct?

A. Correct.

Q. Again, someone really is after him, aren't they? And someone really does want to shoot and kill him, don't they?

A. In '97 they did.

Q. Okay. And that wouldn't be an example of paranoia, would it?

A. No, that specific incident would not be paranoia.

Q. Can you continue on? There's something before St. Louis.

A. "Feels as if someone is behind him, jumpy."

Q. No, see where it says St. Louis? Is it "no in," or "live in St. Louis"?

A. "Born in."

Q. "Born in St. Louis."

A. "Born in St. Louis. Three sisters. He two of four."

Q. What's "M"?

A. Mom.

Q. Okay. So at this point in time you're actually asking

him about his mother, correct?

A.    Correct.

Q.    Why?

A.    Because I want to see -- I want to take at least a limited history to see what is going on there.  I do that in every fitness or competency exam.

Q.    Did you know enough about him at that point to know that he did not have a father figure in the home?

A.    No.

Q.    So why focus on mom first?

A.    I always ask mom first.

Q.    Why?  Just because you always do, there's no reason for it?

A.    Yes, it's just I always do.

Q.    All right.  And what did he tell you about his mother?

A.    "Used to be a librarian downtown.  Real sweet.  Tried to give us everything.  Steered us out of trouble.  She knows I'm not a violent person."  Then I've got parenthesis, "He lived at home with his mom until January 1997.  Left -- left because he felt someone was out to get him."  And there's a line off to the side.

Q.    What's that say?

A.    "His mom said he was staying out of the house.  Mom physically disciplining --"

Q.    "Him"?

A.    I don't know.  "Till end."  But I don't know.

Q.    Does it look like h-i-m?

A.    That looks like it got cut off, and after 14 years I can't remember.

Q.    One of the problems with this electronic display is sometimes it cuts off the bottom.  Do you see there that your note actually says, "His mom said he sleeping out of the house, mom physically disciplined him till end"?

A.    Yeah, but I'm not quite sure what that one means.

Q.    Is that your handwriting, though?

A.    Yeah, but I don't know what was cut off from the "him."

Q.    Is it part of the "H" that's cut off from him?

A.    No, I don't know if there was another word there.

Q.    Do you have your original notes still?

A.    No.  I don't have them.  These are what was sent to me.

Q.    Well, the part that you have here says, "Mom physically disciplined him till end."  Now, we talked a little bit earlier this morning about corporal punishment being an example, potential example of child abuse, correct?

A.    Correct.

Q.    And you already know you're focusing on someone as a potential PTSD candidate because of the event, and you also said you were aware that child abuse was an increased risk factor for developing PTSD?

A.    Correct.

Q.    And you also told us today that you had no information at all of any physical abuse by his mother, correct?

A.    Correct.

Q.    Seeing that note there, does that refresh your recollection that you yourself developed from Mr. Allen evidence and indication of potential physical abuse of him by his mother?

A.    He described his mom as real sweet.  He never mentioned anything like it --

Q.    Do you see the word "sweet" in that note?

A.    If you take that up higher, you're going to see under the "M," that's the first thing, "real sweet."

Q.    In this note here --

A.    Okay.

Q.    -- does that -- did that, in fact, give you evidence and indication of potential physical abuse of Mr. Allen by his mother?

A.    I don't see it as that.

Q.    You do not?

A.    No.

Q.    Okay.  Even though it involves physically disciplining him?

A.    I don't see it as that.

Q.    All right.  Any doubt in your mind that physical discipline sounds like he's talking about corporal

punishment?

A.    Yeah.  I'm not saying that is child abuse after he described her as real sweet.  I had no other evidence to go on.

Q.    You had this, though, correct?

A.    That's correct.

Q.    And it's your testimony that despite having this, despite knowing that child abuse increased the risk of developing PTSD, you didn't inquire any further about this, did you?

A.    That's correct.

Q.    And when you had a chance to talk to his mother, you didn't ask his mother about the extent of her physical discipline of him, is that what you're saying?

A.    No, I did not.  No, I did not.

Q.    Is there any particular reason that you did not?

A.    Because I didn't think there was anything that was indicative of it.

Q.    The next page here, there's a word besides the "D." Does that say "twice"?

A.    I can't -- I don't know.  It looks like that Xerox did not work out well.

Q.    And then "D," is that dad?

A.    That's dad.

Q.    Okay.

A.    It says, "Know him, don't see.  Did not live with."

Q.    All right.  And next is grade school, correct?

A.    Correct.

Q.    And he told you what about grade school?

A.    "Went to Clayton.  That's deseg, went first through eighth, good grades, Bs and Cs.  Good."

Q.    Okay.  Sumner?

A.    There's a note off to -- I can't read that.  Something has been cut off, off to the very, very far left.

Q.    Okay.  Let's go back to the document cam.

A.    K, okay.  "K through eighth."

Q.    Does it say K and?

A.    "K through eighth he was in Clayton."

Q.    Does it say K and eighth and ninth, Sumner High School, as in the City schools?

A.    Yeah.  It might have meant he went to K -- I'm not sure what that means.  It could have meant -- I'm not sure what it means.

Q.    All right.  And then --

A.    "Sumner High School.  Sister there.  I ahead of everybody."  So he was more brilliant than anyone at school.

Q.    Started --

A.    "Started leaving school.  I leave by 12 o'clock.  Go home and sleep.  Missed too many days.  Missed nearly whole year.  Never brought report cards home.  They suspended me

and expelled me.  I was nearly 16.  Dropped out at" -- and I can't read that -- "dropped out at 15."  "Dropped out at 15."

Q.    Let's go to the next page on the document camera because there's too much cut off the side here.  So your next page.  Question mark, star?

A.    When he dropped out at 15, you can't drop out of school at 15, so I asked him --

Q.    I'm just asking you to read what your notes say. There's no other question.

A.    "ID said I was 19.  School accidentally messed up on it."

Q.    Okay.

A.    "At 15 started rising music."

Q.    Writing?

A.    "Writing music."

Q.    Okay.

A.    "A lot of short" -- I can't read -- "term jobs."

Q.    Okay.

A.    "I probably getting $500 a week for writing music.  Got from my producer, Wilson.  Never knew his last name.  Did this from 15 to 19."  I asked him, what instrument could he play.  He said, "Couldn't play instrument or read music."

Q.    Was there anything in there that indicated he wrote raps?

A.    Not in that.

Q.   You don't recall getting that from anything he told you?

A.   Not in that note.

Q.   You got question marks over on the side, correct?

A.   Correct.

Q.   All right.  And then what's the last entry on this page?

A.   "Dating.  Didn't really start dating till two years ago.  My mind in music.  I dedicated myself to music."

Q.   I'm showing you the next page.

A.   It said, "Started two years ago."

        THE COURT:  What started two years ago?

Q.   Is that sex?

A.   No.

Q.   No?

A.   I'm not sure what.

Q.   You started to talk about girls, 16 and 18?

A.   That would have been -- that would have been the first person he ever dated for any length of time just based on the way I do my notes.

Q.   Is "SD," started dating?

A.   No, said started dating two years -- "said started dating two years ago."

Q.   Okay.

A.   "Sixteen, Shonte, broke up at 18.  Eighteen, Tasha

Valentine. Met her on Metrolink. Spent a lot of time together."

Q. So he's indicating he had two girlfriends, correct, within the past two years?

A. Right. He had one from 16 to 18, and one at 18.

Q. And based upon the time frame he's giving you, those girlfriends would have come after the death of Marquis Taylor, correct?

A. Correct.

Q. And then he says something about Marquis?

A. "Marquis, moved next door to us when I was 15, 16. Became real close. 1995 dating." I'm not sure what that means. "We walking and he shot. My hands full of his blood. He fell on the steps. Blood coming out of his mouth." And off to the side it says, "Incident November --"

Q. 5/95?

A. "-- 5/95. PTSD." And there's something written after that '95, and I don't know what that is.

Q. Okay. And your last page of your interview on January 16.

A. "Marquis Taylor, friend. Would have been 20. He died in 1995. Around --" and I've got some scratching out -- "November, March, May. I don't know what was wrong with me. Like I'd hear a voice, just one word. I felt I ready to die. I went two times. They said they wanted me to stay.

Kingshighway and Delmar.  The other around February 1997.  Sherry, her mom took me.  And I took pills I wasn't supposed to.  It was somebody's prescription.  Pills trying to kill myself for real."  And then I've got off to the side, girlfriend Tasha Valentine.

Q.    You have?

A.    Do you want me to go on?

Q.    Yeah, finish this page.

A.    Off to the far left, I must have asked him his mother's name, and it was Juanita Allen.  And I asked for her phone number, and she gave me her phone number -- he gave me her phone number.  And then it says "Ed, ninth or tenth grade.  In Clayton school due to deseg.  Clayton.  And Sumner in City in ninth.  Drop out."  And I said why did you drop out?  "Stress, neighborhood, killings every day.  Did good but best thing, art and math."  And the next thing down there says, "Mem," which would be for memory, short-term memory.  "Five forward and four back."

Q.    Okay.  And is that the end of those notes?

A.    It looks like it says, I something on the bottom, but I have no idea, it's all cut off.  At least from the page I have.

Q.    Okay.  What happened to your original notes?

A.    I have no idea.

Q.    Go back to the ELMO.  I'm sorry, the Sanction.  I'm

directing your attention to your declaration. And you describe in paragraph 4 your contact with defense counsel, and you did an evaluation, you questioned about the crimes with which he was charged, correct?

A.    Correct.

Q.    And then, "As reflected in my report, I determined that he was competent to assist his attorneys and to stand trial"?

A.    Correct.

Q.    Now, you asked him about a lot more than the crimes that he was charged with during this interview, didn't you?

A.    Yes. I did a competency evaluation where I first did a mental status exam. Then what I did was to see if there was a diagnosis. Then I made -- I formed an opinion as to whether he could understand nature and purpose of proceedings against him or assist in his own defense.

Q.    Well, why didn't you say that in this sentence right here? Why did you limit yourself to, "I questioned him about the crimes with which he was charged." Why didn't you also state in the declaration all the other things you talked to him about that we've just gone over in these notes?

A.    I didn't write that. I signed it, but that --

Q.    You signed it's complete and accurate?

A.    But at the same time I read it and it says that I did a competency evaluation.

Q.    Well, can you tell us how this came to be, this

document?

A.   2009, I believe, I received a phone call.

Q.   From whom?

A.   Somebody in the federal public defender system, and I believe it was in Philadelphia.  I'm not sure.  Asking if I would -- that this was being revisited, and would I look at some materials if it was forwarded to me.  And then I was told that they were writing an affidavit for me to sign.  And I said --

Q.   Had they talked to you yet?

A.   Yeah.  Oh, we had talked.  We talked on the phone.

Q.   Who did you talk to?

A.   I'm not sure.

Q.   And did you write anything out for them?

A.   Yes.

Q.   What did you write out for them?

A.   I'm not sure.

Q.   Did you send it to them?

A.   I don't believe so.  I thought we worked it out on the phone.

Q.   So you wrote out something that you kept?

A.   What happens is when I talk, I write.  But I --

Q.   What did you do with that?

A.   It probably got shredded with everything else that's in my office that's old.

Q.    But you didn't send something that you wrote to them?

A.    No.

Q.    You just talked to them?

A.    Correct.

Q.    And how about in this paragraph 3 here when it talks about what you reviewed at the request of his current counsel?

A.    Must have been the information they forwarded to me. In fact, I know it's the information they forwarded to me then.

Q.    And one of the things they forwarded to you here is the transcript of my penalty phase testimony, correct?

A.    Correct.

Q.    And did you, in fact, review that before reviewing this?

A.    Yes, I did.

Q.    Okay.  Did you review all of the other things that are reflected there?

A.    Yes.

Q.    You indicated that you reviewed the declaration of Dr. Pablo Stewart, correct?

A.    Correct, I read it.

Q.    That's one of the things they wanted you to look at?

A.    Correct.

Q.    Did that have any impact on anything you said in the

rest of this declaration?

A.    No.

Q.    None.  So why did they have you look at it then?

A.    If somebody sends me something to look at, I'll look at it.  It doesn't mean I'll agree with it.

Q.    Okay.  So I guess the question is, whose choice was it to limit what you said about the extent of your evaluation on January 16, 1998, to, "In order to determine him" -- "In order to determine competency, I questioned him about the crimes with which he was charged."  I mean, you agree now having gone over these notes, that's just a tip of the iceberg of what you talked to him about on January 16th, correct?

A.    I did a competency evaluation.  I wrote a competency -- and the Court has a copy of my competency report.

Q.    My question is, is that incomplete, very incomplete in terms of what you talked to him about and asked him about on January 16, 1998?

        MS. CARLYLE:  I'm going to object.  The sentence we're looking at says, "as part of the evaluation."  It doesn't make any representation that it's complete.

        THE COURT:  The question I think that, as I understand it, Mr. Holtshouser is asking, earlier he had gone through the notes and this indicates what he reviewed, and so I think it's a fair question on cross.  Overruled.

BY MR. HOLTSHOUSER:

Q.    I mean, ultimately in the body of this declaration what you're telling the Court about, you're telling the Court things that relate to the penalty phase, aren't you?

A.    No.  What I put in that report was everything that I would put in every competency evaluation I've ever done.

Q.    Listen to the question.  This is where I think we're having the problem.  In this document, this declaration, this document, not your report, in this declaration, the paragraphs in here contain information that you're communicating to this Court about your views and recollections of your activities in the mitigation part of this trial, correct?

A.    And the competency part of this trial.  It talks about both.

Q.    And in talking about both -- and you knew that this was being submitted in connection with a capital habeas petition, correct, did you know that much?

A.    Correct.  I have to admit -- but I have to admit, I'm not familiar with capital habeas.  This is the first time I've ever been in a capital habeas proceeding.

Q.    My question is, in the language, "As part of the evaluation, in order to determine whether he was competent to assist, I questioned Mr. Allen about the crimes with which he was charged."

A.   Correct.  I would do that in every competency evaluation.

Q.   Correct.  But nowhere in that declaration did you tell the Court about the other things that you asked Mr. Allen about on January 16, 1998; is that correct?

A.   I did, I said I did a competency evaluation.  In a competency evaluation, you first got to find out if the individual has a mental illness.

Q.   So is there anywhere in this document where you told the Court that besides asking him about the crimes with which he's been charged, did you also ask him about his mental history, his mother, his father, his educational background, his extent of his involvement with the criminal justice system, et cetera, the other things we've just gone over in these notes?

A.   I would do that in every competency evaluation.  If I --

Q.   Is it mentioned anywhere in this document, sir?

         THE COURT:  Wait, wait, wait.  Go ahead and finish your question.  If it's not responsive, please make that objection.

Q.   Is the other information that I've just enumerated that we've just gone over in your notes mentioned in this declaration?

A.   Not specifically, but I do it in every competency

evaluation.

Q.    I understand that.  I'm asking about what you said and didn't say in this document, though.

A.    But if I say competency evaluation, and I did it, that would mean all that stuff is in it.

Q.    My question is, whose choice was it to limit what part of your competency evaluation that you talked to him about was limited to "the crimes with which he was charged," who chose those words?

A.    The attorney who wrote the declaration.

Q.    And you didn't change it, did you?

A.    No, I didn't.

Q.    You didn't add to it, did you?

A.    Yeah, I changed it in spots.  Yes.

Q.    Did you change it in this spot?

A.    No.

Q.    Okay.  And that's right what we're talking about right now.  So let's just keep our focus on that.  Now, look in the next paragraph.  "In early February after I had already completed my competency evaluation, trial counsel asked me to also consider possible mitigation factors."  Correct?

A.    Yes.

Q.    "Due to the time constraints that the defense team was then working under, I did not have time for a second face-to-face interview with Mr. Allen that would have focused

solely on mitigation."

A.    That's misleading.

Q.    Well, it's more than misleading, isn't it?  It's just out and out false, isn't it?

A.    No, it wasn't focused solely on mitigation.  I did see him, and it didn't focus solely on mitigation.  But that sentence is misleading.  I did see him a second time.

Q.    Okay.  And you also, if you actually evaluated your penalty phase testimony, it would have reminded you, as well as anyone reading that document, that you had a second face-to-face interview with him, correct?

A.    Correct.

Q.    So can you explain how this mistake occurred?

A.    No.

Q.    Ultimately you signed your name to this document certifying that the facts set above are true and correct to the best of your personal knowledge, information, and belief, subject to the penalties of perjury, correct?

A.    That is correct.

Q.    Now, you didn't limit yourself to that sentence because you go on to say that, "Instead, I rendered my mitigation opinion based on my competency-related interview, conversations with Randall, Dr. Gelbort, and a brief interview with Mrs. Allen."  Correct?

A.    Correct.

Q.   And, "I also reviewed some background documents provided to me by the defense team."

A.   Correct.

Q.   Correct?  Now, again, doesn't that, in fact, carry on the misrepresentation that you ever spoke to Mr. Allen a second time, in part about mitigation?

MS. CARLYLE:  I'm going to object.  I don't think there's been any testimony that there was a misrepresentation.  Misrepresentation involves an intentional desire to falsify something, and there's been no evidence of that.

MR. HOLTSHOUSER:  Well, my point, Judge, this document is evidence of that.

THE COURT:  I understand.  Overruled.  The question was, doesn't this carry on what was stated in the prior page?

A.   I didn't mean to mislead anybody.

Q.   That wasn't the question.

A.   If I did --

Q.   That wasn't the question.

A.   I never went back to see him a second time solely for that.  I went back to look at the MMPI and the other stuff.  It was clearly badly misworded.  I should have rewritten that when they sent it to me.

But as far my conversations with Mr. -- or Dr. Randall, I don't -- I met with him once, and I think the

other times that we were there were preparing testimony. In fact, I know I didn't see him any other time.

Q. When you talked to him that second time, it was -- were you still conducting a competency evaluation when you talked to him a second time?

A. No.

Q. Not at all, were you?

A. We were preparing for court.

Q. You were past that?

A. No, we were preparing for court.

Q. Well, you weren't actually preparing for court, the trial had already begun.

A. Well, we were preparing for my testimony --

Q. Correct.

A. -- because it was the 3rd and 4th, I met, and I think I testified on the 5th.

Q. But it says, "Due to time constraints, I did not have time for a second face-to-face interview with Mr. Allen that would have focused solely on mitigation."

A. Correct.

Q. Didn't your second interview, in fact, focus solely on mitigation?

A. No, it didn't.

Q. Because you're past competency, aren't you?

A. I was still looking at his MMPI.

Q.   But you're past competency, aren't you?

A.   I know he was competent.

Q.   Are you past it by February 22nd, 1998?

A.   Yes.

Q.   So it isn't so much that this is splitting hairs over whether or not that second interview was solely for mitigation, it was solely for mitigation, wasn't it, because you were past competency?

A.   It would have been solely for mitigation.  I did look some of the time at his MMPI, but I went back the second time because I was told that I had to go testify in court.

Q.   And I want you to focus then on this next sentence. Because that's where it says, "Instead."  Now, "instead," since you just talked about no time for a second face-to-face interview, instead of a second face-to-face interview, would that be a fair reading --

A.   Well, I'm sorry.

Q.   -- of that transition?

A.   I'm not disagreeing or agreeing.  I can't see where you're coming from.

Q.   I'm going to blow it up then here.  And do you see right here where I underlined, sir?  Do you see where I underlined?

A.   Yes.

Q.   Do you see the sentence before it says, it's telling

the Court that due to time constraints, you didn't have time for a second face-to-face interview that focused solely on mitigation.  "Instead --"

A.    But I didn't have a second face-to-face interview that focused solely on mitigation.  I only had one time that I saw him, and that was only partially on mitigation.

Q.    Would that also mean that on the first time you were partially focused on dual relevance topics?

A.    The first time that I saw him was completely for one reason, competency.  Second time I go in, I'm going to clean up the MMPI.  And the only reason I'm there is to try to firm something up to see if there's any type of mitigation.  So that's one time, possibly, I saw him half time for mitigation.  The other time -- but I have never had a second face-to-face interview with Mr. Allen that focused solely on mitigation.

Q.    And the only interview that this document talked about was the first one on January 16, 1998, correct?

A.    Correct.

Q.    And that one, while talking about competency, we already established earlier, everything you talked to him about on that day had dual relevancy, correct?

A.    But it wasn't said to have dual relevance.  The only reason I saw him the first time, the only reason I saw him was to see if he was competent.

Q.    I got that part.

A.    That's the only reason I saw him.

Q.    Once we get to the second interview, though, everything you talked to him about in the first interview, once you know that mitigation is now your role, everything you learned in that first interview actually is now relevant to mitigation, isn't it?

A.    It's what I'm going to be looking at.  Because I'm only going to have an hour and a half to go, and then end up looking at what mitigation is possible, if anything is possible.

Q.    All right.  And so this next sentence is, "Instead, I rendered my mitigation opinion based on my competency-related interview."

A.    That's wrong.  I also did it on the second interview.

Q.    So there's not just one, there's two things in here that are wrong.  And even a cursory reading of your report and/or your testimony at trial, if you studied it as you reflect here that you did, would have alerted you to, oh, this is what I did?

A.    I should have seen this.  I'm not going to make any excuses for it.  I should have seen it.

Q.    In 2009 when you were doing this, did you actually remember that much about the trial in '98?

A.    Not an awful lot.

Q.   So when you say that you went back and you were provided with these documents and you reviewed them in this declaration, had you actually done that?

A.   Yes.

Q.   Okay.  This reflection of the interview of Juanita Allen is brief.  Is that your word or is that someone else's word?

A.   I didn't write this.  So it was 20, 25 minutes.

Q.   So would it be fair to say that if you didn't write this, actually none of these words are yours?

A.   No, the words aren't mine.

Q.   Okay.  But until the point you signed your name under the penalties of perjury, you adopt all these words, don't you?

A.   That is correct.

Q.   Were you relying on the -- were you relying on the people supplying you with this to not mislead you as to what the records showed?

A.   I revised it once.

Q.   Were you relying on them?

A.   To some extent.

Q.   Paragraph 6 of this same document.  I'm going to read that to you.  "None of the information provided to me from those sources described any physical abuse, neglect, or other trauma that Mr. Allen suffered in his home or at the hands of

his family.  The only trauma revealed to me was violence that he experienced on the streets in his neighborhood, including, most notably, witnessing the shooting death of his friend Marquis Taylor."

At least the notation that you had during the first interview on January 16th regarding mom's administration of physical discipline to him till the end, was some evidence, was it not, from those sources of the potential for physical abuse?

A.    Not really, because you have to take that in context. Because in that same five, 10 minutes, 20-minute segment, he described his mom as real sweet and always behind him.  So I didn't see that as abuse.

Q.    So you said, though, that that's something that is very typical of child abuse survivors, isn't it?

A.    If I had checked collateral sources, that's one of the things I should have looked and would have looked at.

Q.    But in listening to someone who says that on the one hand my mom was sweet and on the other hand my mom physically disciplined me to the end, those are actually two potentially -- I mean, they are not actually -- how can she be sweet and apply physical discipline to him to the end?

A.    Could you throw that back up?

Q.    The note?

A.    Yeah, that note up.

Q.    Yes, sir.

A.    His mom said that -- his mom said, "He was staying out of the house and she physically disciplined -- she physically disciplining" -- and then something is cut off, and it looks like -- "him till end."

Q.    Okay.  And that information came from his mother?

A.    That information came from his mother.

Q.    So why would you add the notation from his mother onto your interview notes of Billie Allen from January 16, 1998?

A.    Because I had them all on the same page.

Q.    You did?

A.    Pardon me.  I had them all in the same notebook.  And what happens is if I'm seeing a mom, and there's something I want to go back to with the kid later, or if I want to talk about or I want to remind myself, I'll do -- what that would have been, if we could find the original notes, is this would have been in one color, and this would have been in another color, that note.  Because that would have reminded me to go back.

So what happens is on my original notes, you would have seen either that would have been in blue or black, the front page.  And these little marks off to the side where I would have gone back and read through the notes and then made the call, they would have been in a different colored ink.

Q.    So why would you write that on the page that is part of

a six-page spread of notes of an interview of Billie Allen?

A.    Because it had to do with his mom.  His mom said he was staying out of the house.  Can you move that over just a slight?  That -- no.

Q.    You want to go over here?

A.    No, the other way.  Go that way.  A little bit farther, please.

Q.    Okay.  I can just bring the whole thing up.  Does that help?

A.    Yeah.  He says, "Lived at home with his mom until January 1997."  That's what he said.  Left -- "Felt someone out to get him."  And then when I talked to his mom, his mom said he was staying out of the house periodically, and his mom physically disciplining, and I don't know what the next word is because there would have been another word, him till end.

Q.    You think there would have been -- why is it you think there is another word before "him"?

A.    There may have been, I --

Q.    You don't really know?

A.    I don't know.  I can't read that.

Q.    While we're there, where do you see the notation that he said his mom was sweet in this first interview with him?

A.    Okay.  Second, real sweet.

Q.    "Real sweet," is that right there?

A.    Yes.

Q.    Okay.  And why did you put that there, because it related to mom?

A.    Wait, the first --

Q.    You put the result of an interview with a statement from mom, you put that back into Billie Allen's interview?

A.    Right, because I wanted to go back, because that was a different statement, different from what he said.

Q.    Those two were like contradictory?

A.    Yes.

Q.    Okay.  And so what was contractually about "real sweet" and "physical discipline to the end"?

A.    No.  What was really -- can you put back the note and I'll show you.  He said he lived at home with his mom until January 1997.  Left as he felt someone was out to get him. Mom then said, he is staying out of the house.  Mom's physically disciplining, and then I'm not sure, till end. Maybe him till end.  But mom said that, so I wanted to put that word there.  That's why it was in a different color.

Q.    Okay.  You can go back to the document cam -- no, Sanction.  What are these?

A.    These are notes from Juanita Allen's February 15th, 1998 interview.

Q.    This is Exhibit 413 that I'm showing you.  Is this your writing?

A.    Yes, it is.

Q.    So you actually recorded the results of your interview with Mrs. Allen on a separate set of notes, correct?

A.    Yeah.

Q.    What's the date that you talked to her?

A.    February 15th, 1998.

Q.    And that's the day before you prepare your report, correct?

A.    Correct.

Q.    And what is the purpose of talking to her?

A.    Wanted to confirm that, in fact, that the incident did occur and her perceptions of what he was like after the incident.

Q.    And then what did that have to do with competency to stand trial?

A.    I had to come up with a diagnosis.

Q.    And you needed her to confirm a diagnosis of PTSD?

A.    No, I wanted to see if, in fact, he had the event.  I wanted to see her perception of the event, and I wanted to see her perception of how he changed.

Q.    And is there anywhere mentioned in these notes -- well, I guess can you just go ahead, and I think there are only two pages.  What did she tell you according to your notes?

A.    "After Marquis killed, Billie kind of distanced himself from the kids in the neighborhood.  Billie a dreamer in la-la

land. He's a follower to people he feels are important -- who he feels are important. He tries to introduce himself to a new world. Dennis Noble" -- and I put that in parenthesis -- "there was two major deaths. Dennis Noble died in 1993. Drive-by shooting. Billie idolized him. Dennis a year older. They lived in each other's world. He only 14. Thinks he's still in Clayton."

Q.   "Thinks he's still in Clayton." Who is in Clayton?

A.   Ms. Allen thought her son still thought he was at Clayton, that he lived in Clayton, not the rough parts of St. Louis. In other words, he was exposed to the Clayton life, still thought he was a Clayton kid, and not a kid in the inner city.

Q.   And then the last page, Job Corps?

A.   "Job Corps, late 1995, '96. This all happened -- six months before this all happened, this on Goodfellow, I felt he needed the structure, he'd call and say he wanted to come home. Kept in touch with counselor." Then later there's a note that would have been in a different color that says, "Mom's and my idea," because I asked Billie about it. And then after that it says, "Left, got out of my house after house shot up. As a kid skin conditions, kids made fun of him. He had seizures as a child."

Q.   The information that you're gathering there is relevant, is it not, to mitigation topics?

A.   Could be, yes.

Q.   Could be or is relevant?

A.   Could be relevant.

Q.   And that's on February 15, correct?

A.   Right.

Q.   The Job Corps, did you get the impression that was a residential program?

A.   Yes, because -- I did, because they said that he kept running away to go home.

Q.   Okay.  He lived somewhere other than home during the period he was in this program, and he kept leaving it?

A.   Correct.

Q.   To come home?

A.   Correct.

Q.   So he was in a place that provided some structure and provided some job training, but he wanted to leave it in order to come home?

A.   Correct.

Q.   Correct?  And in part it was his mother's idea that he do this?

A.   Correct.

Q.   Does that sound to you like a positive trait of hers, that she cared enough about her son to get him some intervention to help him?

A.   Could be.  Could be she also wanted him out of the

house and out of her life.

Q. Is there anything in your notes of your interview with Mrs. Allen about her physically disciplining him till the end?

A. No. I don't see it in this at all, and that was the specific interview with her.

Q. Okay. And any reason why you didn't write it down as part of your notes of your interview with her?

A. I have no idea why.

Q. She said it, though, during her interview; is that correct?

A. I believe so. Again, I --

Q. It's not something he said?

A. It's not something he said.

Q. So she had no problem telling you on February 15, 1998, that she had physically disciplined Mr. Allen, corporal punishment?

A. She didn't say corporal punishment, she said physically discipline.

Q. As a psychologist, would that raise questions in your mind as to whether or not that was -- she was talking about corporal punishment?

A. Could have been.

Q. Did you ask her what she meant by "physical punishment"?

A.   No, I did not.

Q.   And why not?

A.   Because I didn't see the element of abuse at that time.

Q.   It's right there, wasn't it?

A.   If I would have looked.

Q.   Well, you didn't have to look, it actually was there. You didn't have to look for it, she told?

A.   I was told she was sweet.

Q.   From Mr. Allen, who couldn't tell the truth to save his life, correct? You're saying you're giving him more credit than her?

A.   I had no background information.

Q.   Were you giving him more credit than her when it came to what kind of a mother she was?

A.   No, she didn't portray herself as a bad mother.

Q.   Were you giving him more credit to the statement that she was real sweet, than her statement to you that she physically disciplined him till the end?

A.   Possibly. I can't -- I don't know.

Q.   Let's -- I want to go back to sort of the course of your dealings with the trial team. Because here you are -- here is a fax from Mr. -- to Mr. Sindel from Dr. Randall on January the 20th, 1998. That's four days after you've interviewed Mr. Allen, correct?

A.   Yes.

Q.    And your understanding was that Dr. Randall's role was as a mitigation specialist, correct?

A.    Correct.

Q.    He was the one that was supposed to be doing the gathering of information to be given to a mental health expert to be considered for mitigation opinions?

A.    That was my understanding.  From reading his, that was not his understanding.

Q.    So on January 20, this document, Exhibit 344, indicates that he advised Mr. Sindel, "I need a general court order faxed to me so I can get contact visits with Billie Allen when the need arises.  I'll be seeing him again some time over the weekend.  I'm meeting with Juanita Petty, et al. on Saturday and Sunday.  I have a call into Dr. Cuneo so that I can coordinate my efforts with him."

Now, on January 20th, 1998, why would Dr. Randall be coordinating his efforts with you if your sole role at that time was simply to perform a competency exam?

A.    Because if he was going to do the mitigation, and that's what I thought he was doing --

Q.    The investigation?

A.    Yes.  Well, on January 20th, I still thought all I was doing was the competency evaluation.

Q.    As you sit here now, 15 years ago, how do you recall that so clearly, that as of January 20th, you only thought

you were doing a competency evaluation, if Dr. Randall is coordinating his efforts with you?

A.   The best memory I have is that it happened, that I was told that they needed somebody to do the mitigation.  And that was either the last week -- last week of January or February 1st.

Q.   Could it have been as early as January 20th, 1998 --

A.   No.

Q.   -- as reflected in Dr. Randall's fax?

A.   I doubt it, no.

MS. CARLYLE:  I believe the fax says only that he has a call in to Dr. Cuneo.  It doesn't reflect that there was any conversation that day.

MR. HOLTSHOUSER:  Is that an objection?

MS. CARLYLE:  Yes.

MR. HOLTSHOUSER:  What is the objection?  I don't know how to respond.

MS. CARLYLE:  The objection is the question misrepresents the document.

MR. HOLTSHOUSER:  I think it's a fair interpretation of the document, Judge.  And obviously you can read what the document says.  My question to him had to do with how certain he is of his recollections 15 years ago, and whether or not this refreshes his recollection as to the time.

THE COURT:  Overruled.

BY MR. HOLTSHOUSER:

Q.    I'm next showing you Exhibit 361, which moves us up to February the 2nd.

THE COURT:  Just a second, let me catch up on something I need to write down here.

A.    Yes.  This was after our February --

Q.    The Judge is making a note.

THE COURT:  Just a second.

THE WITNESS:  Sorry.

THE COURT:  Okay.  Go ahead.  The document is No. 361?

MR. HOLTSHOUSER:  Yes, Your Honor.

Q.    This is another fax from Dr. Randall to the -- I believe it was to Mr. Sindel and his assistant Connie Caspari.  Dr. Randall advises him, "I had spoken about the possibility of doing some follow through because of Billie's history of head injuries, seizures, headaches, Pica, et cetera.  Both Dr. Cuneo and I believe that it is critical that we get an MRI and neuropsychological testing done on Billie to elucidate the possibility of brain damage -- which has implications for personality traits such as impulsivity.  We need to do this ASAP.  Dr. Cuneo also suggested getting a toxicologist to talk about the behavioral/biological effects of lead poisoning.  That's important too."

So as of February the 2nd, 1998, does any of this

refresh your recollection as to your role in coordinating with Dr. Randall as to the mitigation investigation and the presentation of mitigation in the penalty phase?

A.    I thought that -- February 1st is when I met with Dr. Randall.  It was my --

Q.    Is there a document that reflects that?  Or are you just recalling that date?

A.    No, I've got a billing date where I met, meeting with Dr. Randall.  And I know that was on February 1st, 1998.

Q.    Okay.

A.    And this would have been February 2nd, so this would have come out of that meeting.

Q.    So February 1st, 1998, which was ten days after the earlier statement where Dr. Randall says, "I have a call in to Dr. Cuneo to coordinate my efforts with him," on February 1st you had a meeting or a conversation with Dr. Randall, correct?

A.    Correct -- no, it was a meeting, it was not a conversation.

Q.    What?

A.    It was a meeting.

Q.    Well, did you talk to each other at the meeting?

A.    Yes.

Q.    Was that a conversation?

A.    Okay.  We met in person.

Q.    And you talked?

A.    Yes.

Q.    Okay.  You conversed?

A.    Yes.

Q.    So when you did that, at that point in time does this refresh your recollection as to what you talked about?

A.    Somewhat.

Q.    Okay.  And do you doubt in terms of the accuracy what Dr. Randall is reporting to Mr. Sindel and Ms. Caspari as to what you and Dr. Randall discussed and the suggestions and input that you made?

A.    No, I would think that would be what I would have said.

Q.    So, given that, you think it's critical that you get an MRI and neuropsychological testing to elucidate the possibility of brain damage, which has implication for personality trait such a impulsivity, et cetera.  We need to do this ASAP.  Dr. Cuneo also suggested get a toxicologist to talk about lead poisoning, that's important too.

At that point in time, February 2nd, 1998, and actually this conversation you say took place on February the 1st, are you, in fact, focusing on mitigation, and do you, in fact, understand that one of your roles in this case is going to be mitigation?

A.    Yes.

Q.    Because this is February the 1st you had this meeting,

XI - 174

the trial is starting on February the 3rd?

A.    Yes.

Q.    Competency is out the window, isn't it?

A.    Though I had -- let's see, when did I get the report in for competency?  At that time I'm sure I would have conveyed my initial impression that he's competent to stand trial. Whether I had --

Q.    You didn't write your report, though, until February 16th, two weeks after this fax?

A.    No.  But I'm sure I would have had that in.  At least I would have told them, hey, I think he's competent.

Q.    So when you wrote your report on February 16th, does your report mention at all the topics of the possibility of brain damage, implications for personality traits such as impulsivity and the behavioral/biological effects of lead poisoning?

A.    Yes.

Q.    Your report does talk about those things?

A.    Yes.  If you flip down to the diagnosis on my report, and you'll see it.

Q.    In terms of mitigation?

A.    No.  I had to come up with a diagnosis.  That's what I'm doing is telling him, this is what I would diagnose, these are the things that you might want to look at.

Q.    For mitigation?

A.    Yes, for him to go into mitigation.  But if you will look at my report, you'll see those same things.

Q.    But at this point in time when you're having this conversation, the reason you're coordinating with Dr. Randall to have him do this investigation is so that he can get you the results so that you can perform in this case as a mitigation mental health expert?

A.    Correct.

Q.    You know that as of February the 1st, don't you?

MS. CARLYLE:  Objection, asked and answered.  I think he's answered that four times in the last ten minutes.

THE COURT:  Overruled.  Go ahead.

THE WITNESS:  Am I answering, Your Honor?

THE COURT:  Yes, you may.

A.    I'm sorry, I thought I was told I was going into mitigation.  You said did I had have independent memory?  I said no.  The best I can tell you is it would have been the last -- I thought it was February 1st, but it could have been the last week in January.  It would have been no earlier than that.  And this would have followed through with that.  And if you look -- and you had asked the previous question on whether I had diagnosed him as rule out dementia NOS, that's why we would have had the neuro-psych testing.  I talked about the history of seizures, that's in the report.  The history of Pica, that would have been in the report.  The

diagnosis of lead poisoning would have been in the report. So that's where this was coming from.

Q. So when you write your report, though, two weeks later, you write your report as a competency evaluation, don't you?

A. That's correct.

Q. So why do you write a report on February the 16th when the trial is already 13 days into its beginning, write a report dedicated to competency when on February 1st you're discussing these mitigation topics with Dr. Randall?

A. Because I was told that I had to have a report by February 16th. I have 30 days --

Q. Did anyone tell you, write a report limited to competency, don't write what your opinions are going to be regarding mitigation?

A. No.

Q. That was your decision to do that?

A. I wrote a report because that's what I was asked to do, competency.

Q. So who asked you to write a report and limit your report to competency? Who decided to limit it to competency?

A. I am not sure. I would imagine it would have been Rick Sindel.

Q. Let me show you Exhibit 363. This a letter, February the 3rd, 1998, in which Ms. Caspari encloses to you the MMPI booklet and response sheet from Billie Allen.

A.   Correct.

Q.   And was it your testimony that you left the booklet with him for him to fill out and read on his own?

A.   Correct.

Q.   Did you have concerns about his brain at the time of your initial interview?

A.   Pardon me?

Q.   Did you have some concerns about brain damage at the time as a result of your initial evaluation?

A.   Yes.

Q.   So you didn't think that any brain damage issues would impair him from reading and completing the MMPI alone?

A.   No, I had him read to me the first seven questions.

Q.   You had what?

A.   I had him read the first seven questions.

Q.   And he could do that?

A.   Yes, he could.  He had an 82 IQ, which means he's dull normal.

Q.   What's the minimum reading ability required for the MMPI results to be valid?

A.   Sixth to eighth grade.

Q.   Is there something in the MMPI known as a Keane scale? Do you know what a Keane scale is?

A.   You got me on that one.

Q.   You're not familiar with the Keane scale in --

A.    No.

Q.    -- the MMPI for the cutoff score for PTSD?

A.    Oh, that I am.  Yes.

Q.    So is your answer, you are familiar with the Keane scale?

A.    Somewhat familiar with it.

Q.    And did you actually score him on where he ranked on the Keane scale?

A.    No.

Q.    Why not if you suspected PTSD?

A.    Because research was rather inconsistent on whether it was worthwhile.

Q.    What was worthwhile?

A.    The Keane scale.  Because the research on the -- the MMPI was done to look at a variety of things.  No single test can tell me whether an individual has PTSD.  The MMPI was also done to see if, in fact, he was malingering.  And I wanted to see how he was presenting himself.  It was one more piece of information I wanted.

Q.    I'm showing you -- I pulled it up too fast, Exhibit 565, which includes among other things your report dated February 16, 1998.  Do you see here where you said that, "I administered to him a psychological test battery consisting of MMPI and the Quick Test."

A.    Correct.

XI - 179

Q.    You did not actually administer the MMPI to him, did you?

A.    Yes, I did.

Q.    Didn't you leave it with him to complete on his own?

A.    When you take an MMPI, you either put an individual in a room by himself and you leave him there.  I've done it often in jails.  And in prisons it's done often that way.

Q.    If you administer the test, don't you read him the questions and he records the answers?

A.    Never.

Q.    Okay.

A.    In fact, that's never done on an MMPI.  In fact, the validity of that is bad on the MMPI, and they tell you not to do it.

Q.    Your report at least doesn't indicate that you left it with him to complete, and that he gave it to the paralegal, and the paralegal mailed it to you?

A.    No.

Q.    And you weren't with him when he failed to answer certain questions?

A.    No.

Q.    Your report certainly indicates that you are -- by the time you're writing this report that you have conferred with Dr. Gelbort, you've also reviewed his criminal history.  Now, conferring with Dr. Gelbort, the neuropsychologist, is that

typical in a competency evaluation?

A.    It is on a murder -- when you have a murder case and you have a question of brain damage, yes, it is.

Q.    Let me show you Exhibit 37, just so you keep the chronology going here.  On February the 4th, all right, now, that's just a couple days after you've had your conversation with Dr. Randall.  Do you see that the government moved to compel you to produce a summary of your testimony, a report?

A.    Okay.

Q.    And do you see here on February 4th, Mr. Sindel had indicated to the Court -- or to counsel, rather, not the Court, that you were going to be presented, you may be presented during the penalty phase of this case in mitigation of punishment as of February the 4th?

A.    Yes.

Q.    And you were aware of that by February the 4th, were you not?

A.    I was -- I knew I was aware of it by February 1st, I stated earlier.  It may have been the week -- in fact, it may have been some time in the last week of January to February 1st.

Q.    And at the same time the government moved for Exhibit 39.  The government moved for an independent evaluation of the defendant that your role as a mitigation expert had been confirmed by talking to you.  Do you remember that I called

you and spoke to you?

A.    On February 4th?  I have no independent recollection of that.

Q.    Well, do you recall that I called you and asked questions about the examination that you conducted, whether or not it was limited to competency, whether or not you were going to testify in the mitigation, and what your opinions were going to be?

A.    I have no independent recollection of that.

Q.    Do you see that conversation is at least represented to the Court in this motion?

A.    I didn't make that motion.

Q.    I know that.  But do you see that that conversation is represented to the Court?

A.    Yes.

Q.    And that the government is seeking an independent exam to be in a position to potentially rebut your testimony?

A.    Yes.

Q.    This is an Exhibit 369, which is a fax from Dr. Randall to Mr. Sindel.  And it's suggesting a proposed meeting on mitigation.  And, "Will that work for you?  John?"  Do you know Mr. Simon, John Simon?

A.    Yes.

Q.    "Dr. Cuneo?"  That's you, correct?

A.    Uh-huh.

Q.    And, "Dr. Gelbort, if he's on board?  Please let me know."  Was there such a meeting between you, Dr. Randall, Dr. Gelbort, Mr. Sindel, Mr. Simon discussing mitigation as of February the 6th, 1998?

A.    Could you flip up my bill?  I'll tell you if I had a meeting then.

Q.    Okay.  I can.  Just a second here.  You had a meeting with Dr. Randall according to your bill on February the 1st.

A.    The only other possibility --

Q.    If the meeting occurred, you didn't bill for it during the week following February 6th.

A.    If anything, it would have been on February 22nd, because it says meeting.  So I met with the attorneys on February 22nd, and on March 3rd and March 4th.

Q.    Now, on February the 11th and February 15th, you've got four hours reviewing information, two hours reviewing information on February the 15th.  What information are you reviewing for six hours?  And there's three more on February 16th.

A.    Probably the hospital records, I got at that time.  Probably got his school records, I got at that time.  I'm not sure.

Q.    They total about 15 or 20 pages.

A.    Whatever information was being sent to me at that time, we would have been looking at.  We may have looked again at

the police reports at that time.

Q.    Did that information include typed interview results by investigation done by Dr. Randall of relatives, friends and associates of Mr. Allen that he had interviewed and prepared memoranda?

A.    I can't remember.

Q.    Is it possible that you received those?

A.    Is it -- it's possible, but I have no independent recollection one way or another.

Q.    Now, while we got the bill up here, let's just clear up a couple things.  On January 16, 1998, four hours is billed, and that says, "Evaluation at jail."

A.    Correct.

Q.    Is there anywhere in there that you indicate that four hours includes travel time?

A.    No.

Q.    So there wasn't anything that you communicated to the Court that you were seeking reimbursement for your travel time, was there?

A.    I told the people when I did the evaluation, it was $150 an hour, whether I reviewed it or traveled.

Q.    Is that included anywhere in the communications anywhere that you made to the Court?  See, this is actually a document signed and submitted to the Court in order to get you paid.  It doesn't say anything about travel time, though,

does it?

A.   I charge by the hour whether I'm traveling or seeing somebody.

Q.   Whether or not -- it's within the Court's discretion to pay you for that travel time if it knows that that's what you're billing for, are you aware of that?

A.   Rick Sindel told me that I was -- I told him, "You want me to do this, this is what it's going to cost you."

Q.   But this is a bill that ultimately you signed for submission to the Court, correct?

A.   Correct.

Q.   A CJA form, Criminal Justice Act?

A.   I would verify those hours.

Q.   And it only said evaluation at jail, it didn't tell the Court anything about travel time, did it?

A.   No.

Q.   There's no specification of what information you're reviewing on February 11th, 15th, and 16th, correct?

A.   Correct.

Q.   And, again, with the six-hour evaluation at the jail on February 22nd, a meeting and a review, who is the meeting with?

A.   The attorneys.  At that time we were back down at Sindel's office.

Q.   So does six hours of that include traveling from the

jail to meet with Mr. Allen, back to Mr. Sindel's office, and the time of the meeting, and then something called review?

A.    Correct.

Q.    So the time that you spent with Mr. Allen was what?

A.    About an hour and a half.

Q.    And, again, that doesn't indicate that that includes travel time, does it?

A.    No.  There was six hours involved there.

Q.    Now, there's more information reviewed for five hours on February 26th, for three hours on March the 4th.  What's the difference between review information and review?

A.    None as far as I'm concerned.

Q.    Okay.  So review information and meeting on March the 3rd and 4th, three and two hours, and then five hours for court appearance, correct?

A.    Correct.

Q.    So, again, you have no idea or no recollection of what information you're reviewing for these many hours?

A.    No.

        THE COURT:  I'm looking for a good place for a break somewhere in here.

        MR. HOLTSHOUSER:  This is fine, Judge.

        THE COURT:  We'll be in recess for 15 minutes.

        (Court in recess from 2:28 p.m. until 2:47 p.m.)

        MR. HOLTSHOUSER:  May I proceed, Judge?

THE COURT: Sure. Whenever you're ready.

BY MR. HOLTSHOUSER:

Q.   By the time you testified at trial, Dr. Cuneo, had you spoken to anyone besides Mr. Allen and Mrs. Allen, any other family member, friend, relative?

A.   Not that I recall, no.

Q.   And you had spoken to Mrs. Allen, we saw your notes with her earlier, including the note that you put into Mr. Allen's notes about physical discipline, correct?

A.   Correct.

Q.   And you relied in part on that interview when you testified at trial, didn't you?

A.   Yes.

Q.   All right. You have -- I'm showing you what is Exhibit 276. And it is --

THE COURT: What is 276?

MR. HOLTSHOUSER: I think I got the wrong one here, Judge. Hold on a second.

Q.   276 is Document 60 of the court file in this case. This is actually the Petition, the portion of the Petition filed on February 11th, 2008, that is essentially what we are here hearing today.

A.   Okay.

Q.   You've not seen this before; is that correct?

A.   Not to my knowledge.

Q.   And this is Issue J of that Petition, which claims that Mr. Allen was denied effective assistance because of failure to investigate and present evidence at the penalty phase of his trial.  And this is the Second Amended Petition, the one that the Court ultimately granted a hearing on.

And I want to show you page 4 of this document, which is actually page 35 of the document and 39 of the electronically filed document for the record.  And it is paragraph 2, concerning what Mr. Allen's jury heard.  And it describes that there were two penalty phase experts, Mr. Gelbort -- or Dr. Gelbort and Dr. Cuneo, a clinical psychologist.  "Except for a brief conversation between Dr. Cuneo and Mr. Allen's mother, which she does not recall, neither ever interviewed or spoke to Mr. Allen's family or friends.  Their testimony was based only on reports."

Your testimony at trial included as its basis for your opinions, did it not, your interview of Mrs. Allen?

A.   Yes, she -- yes, in part.

Q.   And it also included the interview, the two interviews of Mr. Allen, didn't it?

A.   With Mr. Allen, yes.  Mr. Allen, meaning Billie Allen, correct?

Q.   Correct.

A.   Yes.  Not Billy, Sr.

Q.   Correct.  In the course of your contact with the trial

team and Dr. Randall, I'm showing you Exhibit 303, this is a multi-page document prepared by Mr. Simon called the "Life History of Billie Jerome Allen." Did you ever see or receive this? Is this one of the things you received to review?

A.    Not to my knowledge have I seen this.

Q.    How about Exhibit 304? This is a three- or four-page handwritten -- it is referred to in the documents as a bio written by Billie Allen about himself. Did you ever receive this or view this before?

A.    I have no knowledge if I did. I have no independent recollection if I did.

Q.    We're going to go back to where we left off before the break in this chronology of events. And where we left off, you had seen -- we were looking at 369, which was this fax from Dr. Randall proposing a meeting, a joint meeting on mitigation. And the date of this fax is 2/6/98.

On February the 12th, the Court ordered you and Dr. Gelbort to provide copies of all reports and test results regarding Billie Jerome Allen to the United States providing copies of all said reports and test results to Mr. Sindel. Were you advised of this order and the need for a report?

A.    I may have been. I have no independent recollection. But I'm guessing that's -- I shouldn't say guess. My report was dated February 16th.

Q.    So until then, a report didn't exist, correct?

A.    That is correct.

Q.    That you prepared on February 16th?

A.    I believe it was -- wasn't the report, the date on the report February 16th?

Q.    That's the date.  When did you prepare it, though?

A.    Probably the 14th or 15th.

Q.    Would that have been in response to this order?

A.    I never saw a copy of this order, but --

Q.    Were you aware of the order?  Did Mr. Sindel or Mr. Simon --

A.    May have --

Q.    It says, we got to have a report because the Court ordered you to produce a report?

A.    That's my -- I have no independent recollection, but that would appear to be what happened.

Q.    And by that time, of course, February 14th and 15th, the trial had already started.  The guilt phase was going on. And the issue of competency was no longer relevant.  And you were required to produce a report of all reports and test results regarding Billie Allen.  Now, your report by your own words is limited to the issue of competency; is that correct?

A.    That is correct.

Q.    So your report did not disclose, did it, your opinions regarding mitigation?

A.    I testified as to what was in the report in mitigation.

But it did not specifically say mitigation.  No, it did not say mitigation at all.

Q.    You rendered opinions and gave opinions at the mitigation phase about this downward spiral that --

A.    Correct.

Q.    -- Mr. Allen experienced --

A.    Correct.

Q.    -- and how this lead to --

A.    That he had Post Traumatic Stress Disorder, yes.

Q.    How that could lead someone to believe and be involved in a bank robbery and so on and so forth.  You rendered opinions about those things at the trial when you testified in the mitigation phase, correct?

A.    Correct.

Q.    You never wrote and you never produced to the government a report of any of those opinions before you testified, did you?

        MS. CARLYLE:  I'm going to object to the relevance. If the government had wanted another report, they could have asked that Dr. Cuneo's trial testimony have been stricken or deferred until it was prepared.  This is all water under the bridge.  He prepared his report.  He wasn't under any order to do that.

        THE COURT:  Well, here's what I understand happened. He thinks that this report may have been prepared in response

to the Court's order. And so this is really a different question. It goes -- the question says you gave opinions at the trial about a downward spiral and so forth, and gave those opinions, but never wrote a report on mitigation. So overruled.

BY MR. HOLTSHOUSER:

Q.    You never authored any report setting forth your opinions regarding mitigation, some of those testified to at trial, did you?

A.    No, I did not.

Q.    And you knew from experience that the purpose of a report in part is so that the other side has some notice of what you're going to say and has something in writing to enable it to at least have some basis to cross-examine you and/or prepare rebuttal, correct? Correct?

A.    Correct.

Q.    Okay. Now, that order is February the 12th. Let me show you Exhibit 376. This is another fax from Dr. Randall to Mr. Sindel. "Gelbort, Cuneo, and myself need a copy of the police report from Marquis's murder. Gelbort needs a letter of engagement and some reassurance that he's going to be paid. I'd like to know how things went in court on Friday. Let's touch base some time later this morning, after ten if possible."

        Does this refresh your recollection at all regarding

a communication between you and Dr. Randall and Dr. Gelbort about the need for a copy of Marquis Taylor's murder report?

A.   Not at all.  That's from Dr. Randall?

Q.   To Mr. Sindel.

A.   No.

Q.   And his fax at least provides some written documentation of what was going on in the defense team at the time, particularly as it pertains to you on February the 14th, when you're preparing a report that's to be dated two days later?  There's a lot going on, isn't there, that relates to mitigation, correct?

A.   I need a copy of the police reports.  Yes.

Q.   And that relates to mitigation at this point in time, doesn't it?

A.   Well, I still had to get the report on competency in, though.

Q.   The trial had already started, right, Dr. Cuneo?  So what's the point of a competency report?

A.   Mr. Sindel had said that he needed a report on competency.  I was getting him a report on competency.

Q.   Did that make any sense to you when the trial had already started, and since February 1st you knew you were going to be called upon to be a mitigation expert?

A.   At that point Mr. Sindel had said he needed that report.  That's what I was focused on.  I also knew that I

was going to go in for mitigation.

Q.    And you were not aware from your conversations that there was a concerted effort to not produce to the government any report of what your mitigation opinions were going to be; is that correct?  Is that still your testimony?

A.    I didn't know that.  If that's the case, I didn't know that.  I'm not doubting it, but I --

Q.    I'm only asking about what you knew.

A.    I didn't know it.

Q.    Do you recognize, this is the handwriting of Mr. Sindel?

MS. CARLYLE:  I'm sorry, what are you looking at?

MR. HOLTSHOUSER:  Exhibit 378, I'm sorry.

Q.    This is dated February 14th, 1998.  I'm sorry, the handwriting of Mr. Simon concerning a phone call to you.

A.    Okay.  I don't recall the phone call.

Q.    Does it refresh your recollection of a phone conversation with Mr. Simon?

A.    No.

Q.    And this is February 14th, according to the notes, which, again, is two days before your report is dated, two days after the Court has ordered you to produce a report of any opinions regarding Billie Allen.  And if you notice in the second entry there, "My report will be faxed to us Monday."

A.    I'm guessing he's saying that I was going to fax the report to him and Mr. Sindel on Monday.

Q.    Okay.

A.    I don't understand "My report will be faxed to us," but okay.

THE COURT:  Now, is this Dr. Cuneo's handwriting?

THE WITNESS:  No.

MR. HOLTSHOUSER:  This is Mr. Simon's handwriting. This is Exhibit 378.  Simon's notes of a phone conversation with Dr. Cuneo on February 1/4/98.

THE COURT:  Okay.

Q.    Now, Mr. Simon, did you have contact with him?  This apparently says you did.

A.    I have no independent memory of this, but I'm not saying I didn't.  But I don't have any independent memory of this.

Q.    And did you have any understanding that in the division of duties between Mr. Simon and Mr. Sindel, that since Mr. Sindel was at that point in time defending Mr. Allen in the guilt phase, Mr. Simon was handling matters pertaining to mitigation?

A.    No, I didn't know that.

Q.    Now, we looked at those already, but these are your notes of your interview with Juanita Allen of February the 15th, 1998?

THE COURT:  That's 413?

MR. HOLTSHOUSER:  That's 413.

Q.    Correct?

A.    Correct.

Q.    So that's February 15th.  That's the day before your report is dated.  It's a couple days after the Court has ordered you to produce a report.  And it's in this same chronological sequence.  So you hadn't actually spoken to her in the course of any competency evaluation back in January of '98 until February 15, 1998, when you at that point in time know your focus here is a mitigation expert?

A.    And my focus also is to know I have to have the report out by the 16th.

Q.    Correct.  So that's the next day?

A.    Yeah.  So that means I had to talk to her that day.

Q.    Well, at the time that you talked to her on February 15th, 1998, almost two weeks into the trial, your purpose for talking to her at that point is solely related to mitigation, isn't it?

A.    And solely to confirm the diagnosis of Post Traumatic Stress Disorder.

Q.    But at that point in time, the sole purpose of that conversation is mitigation related?

A.    I guess it would be.

Q.    Show you Exhibit 416.  This is apparently an outline of

XI - 196

questions for Mrs. Allen were she to be called as a witness. Did you have any understanding about whether Juanita Allen was going to be called as a witness in the penalty phase of the trial?

A.    No.  This is the first time I've seen this.

Q.    Were you ever privy to any discussions regarding whether she should or shouldn't testify, and what the pros and cons of that might be?

A.    No.

Q.    The information in there in these questions concerns, among other things, "Drank a lot and was mean," I guess referring to either her or his father.  "Come around.  What about Billie's paternal grandfather.  What was he like. Billie as a child.  Lead poisoning.  Asthma.  Sickly. Febrile seizures.  Blows to the head.  School situation. Clayton."  Those are all things that you had -- were privy to, correct?

A.    No, that's the first time I saw that document.

Q.    No, I'm not talking about the document, I'm talking about the topics.

A.    Can you go back to the information?

Q.    You knew about lead poisoning?

A.    Yes.

Q.    You knew about asthma?

A.    Yes.

Q.    You knew about febrile seizures?

A.    Yes.

Q.    You knew about blows to the head?

A.    Yes.

Q.    You knew about school, particularly Clayton?

A.    Yes.  I didn't know about his grandfather or any of that information.

Q.    Okay.  How about the departure from Clayton and going to Sumner, the difficulty of that transition, was that something you had some information about?

A.    What Billie stated?

Q.    What he said, correct.

A.    Yeah.  He said he did good, because he was far above what the people at Sumner.

Q.    But then he also told you, though, he started skipping?

A.    Correct.

Q.    So that isn't good, is it?

A.    Because he was saying school was easy for him.

Q.    He skips?

A.    Correct.

Q.    He ultimately ends up being expelled or quits, correct?

A.    Correct.

Q.    That's not good, right?

A.    No.

Q.    "How did you raise your kids.  Is it hard for them to

talk about things like that.  How did you find out what happened.  How did you feel.  His impulsive behavior."  That was something that you had some information and some opinions about, correct, his impulsive behavior?

A.    Correct.  But I didn't write this, and this is the first time I've ever seen it.

Q.    And the questions weren't, did you write it.  You've already established you hadn't seen it.  Before but the topics that are on this list to cover with Mrs. Allen, are topics, the majority of which you were familiar with, correct?

A.    That I talked briefly to Billie about, yes.  But this is getting somebody's --

Q.    And to her, correct?

A.    Not on each of these topics, no.

Q.    And you also had documentary information related to some of these such as school records, lead poisoning, febrile seizures?

A.    That I had.

Q.    Criminal history, death of Marquis?

A.    That I had documentation on.

Q.    You had information about where Billie was living in late '96, early '97, didn't you?

A.    Yes.

Q.    You had information about how the Job Corps was working

out, correct?

A.    Yes.

Q.    You had information about something unusual that occurred in the house in January of '97?

A.    Yes.

Q.    Freshman or sophomore year in high school, anything different about Billie.  I mean, among other things, that's the time period when he admitted to you he began skipping?

A.    Yes.

Q.    And using marijuana, correct?

A.    Yes.  That was also the time of the death.

Q.    Now, you talked earlier about how use of marijuana is self medication?

A.    Yes.

Q.    How do you distinguish self medicating use of marijuana and using marijuana because you like to get high?

A.    Well, it becomes a circular effect.  What happens is if an individual is stressed, depressed mentally, a lot of times what they do is they use it to deal with it.  Drugs have -- many drugs have a rewarding effect in and of themselves, so that you begin using them more and more.  And then what happens is every time you're stressed, instead of trying to deal with anything else, you take a couple puffs or you take a couple drinks.  And then what that does in turn, is it stops you from getting treatment.

Or if you're on many times psychotropic drugs, you stop the psychotropic drugs and just keep up with the marijuana, usually it's cocaine or usually it's alcohol. Many times it's that. And then what that does is it exacerbates the symptoms, and then it just keeps getting worse and worse and worse.

It's not that the drugs aren't beneficial, but what happens is people that are mentally ill when you look at the studies on that, they are not any more violent than anybody else. That's the --

Q.    I think we've gone a little bit beyond what my question is here, so I don't want to --

A.    No, but wait, I'm going to hit you with the drugs in a second, though. But mental illness and drugs, you're five times as violent.

THE COURT:  Okay.  Wait, wait, wait.

MR. HOLTSHOUSER:  I'm going to object, I guess as nonresponsive.

THE COURT:  Sustained.  Go ahead.

MR. HOLTSHOUSER:  And running into a narrative then.

THE COURT:  Go ahead.  Next question.

BY MR. HOLTSHOUSER:

Q.    It's my practice, Dr. Cuneo, I'd like to try to let you speak, okay.  I don't want to object and stop you from speaking, but what I am trying to get to is answers to

questions so that we move on and finish this hearing, okay?

A.   Okay.

Q.   So my question is, comes back to is how do you tell when a person is using marijuana to self medicate as opposed to having some reasons to self medicate but really using because they like to get high or there are, in fact, some secondary benefits to using it such as it makes me more creative, it makes me more social, and it just helps me pass time when I'm bored.  I mean, how do you tell those two things apart?  Is there any way for you as a psychologist to just know for sure what the cause is?

A.   No.  If the individual is mentally ill and he doesn't take medication, and he says that the marijuana makes him sleep better, makes him happier, I would feel that he's self medicating.

Q.   And did Billie Allen tell you that's why he smoked?

A.   He said that it increased dramatically after the death of Marquis -- I believe it was Marquis Taylor.

Q.   Well, did he tell you why he smoked dramatically more after the death of Marquis Taylor?

A.   I believe that's in my notes, but if you'd like, I can go back and take a look.

Q.   Well, did he ever tell you or have you seen anything now which would indicate that one of the reasons that he smoked so much was because he felt it made him more creative,

it helped him deal with the boredom of the fact that his best friends had jobs and weren't around to do things with him, or that he simply just liked being high?

A.    All those things may be true.

Q.    Okay.  So is there -- are you aware of any information, though, at this point that points in different directions?

A.    May I look at my notes?

THE COURT:  Sure.

A.    I don't know how we --

Q.    I'll tell what we'll do.  Let's come back to it because I'll get to the more specifics when we get to it.

But you have no way of knowing, do you, with any crystal ball of what actually is driving a person to use marijuana at all or to excess, correct?

A.    I don't have a crystal ball.  I can tell you what the studies show.

Q.    Okay. February 16th in this chronology, this is the date you prepared the report, correct?

A.    Correct.

Q.    And these are the notes of your interview with Mr. Allen several days later?

A.    Correct.

Q.    About six days later?

A.    Correct.

Q.    And the purpose of this interview on February 22nd

didn't have anything at all to do with competency, did it?

A.     No, it did not.  I was going to firm up the MMPI, but I had already written the report on competency.

Q.     But if you wanted to talk to him on February 22nd about the MMPI, it would only be what light it might shed on mitigation issues, the results of the MMPI, correct?  Because it again could have dual relevance, the results of the MMPI, couldn't it?

A.     Yes, it could.

Q.     Okay.  So if you wanted to know the results of the MMPI on February 22nd or why he didn't answer certain questions, at that point in time it would only relate to mitigation?

A.     Yes.

Q.     Okay.  And the problem with his MMPI was it was invalid, correct?

A.     That is correct.

Q.     Because he didn't answer 78 of 366 questions?

A.     That is correct.

Q.     And we went over this at trial in your transcript in great detail, if you recall?

A.     Yes.

Q.     And we even talked about specific questions that he chose not to answer?

A.     That is correct.

Q.     And the MMPI has within it a validity scale as well as

a Keane scale, correct?

A.    Correct.

Q.    And so anything about the MMPI --

A.    Wait, the MMPI has three validity scales and ten clinical scales.  All the other scales are derived that were not from the original MMPI.

Q.    Okay.  And nothing about the MMPI was valid as it related to Billie Allen, correct?

A.    That's correct.

Q.    No valid inferences could be drawn from it?

A.    None.

Q.    This is Exhibit 384, which is a copy of your notes on February 22nd.  Now, have you reviewed your trial testimony in preparation for your testimony here today?

A.    Yes.

Q.    And having done that, without going back through it page by page, do you recall there being a significant issue at trial about pages of this interview of your notes that have been removed by you from these notes and not produced?

A.    Yes.

Q.    Okay.  And ultimately we have now -- since now some of them we saw at trial where the Court allowed the government ultimately to look at them but not ask questions about them, other pages we were not allowed to see until during the course of this hearing, correct?

A.   Correct.

Q.   So the Court had three pages, and it put the numbers one and two and three up in the top corner, and it put pencil marks around the sections that it would not permit inquiry. And those sections had to do with talking to Mr. Allen about the offense for the most part, correct?

A.   That's correct.

Q.   And you had actually gotten some information from him about the offense during the first interview, which was that he wasn't there, he didn't do it, somebody is framing him essentially, correct?

A.   Correct.

Q.   Were there, in fact, some different and contradictory statements about his role in the robbery during this second interview?

A.   Yes.

Q.   Like we did with the first notes, can you just read, translate your handwriting of your notes from February 22nd, 1998?  And this is a page of notes that we did get.

     MS. CARLYLE:  What is this?

     MR. HOLTSHOUSER:  This is 384.

A.   May I start now?

Q.   Yes, please.

A.   "February 22nd.  School -- Clayton -- real good -- 'good grades' -- well, good enough to pass.  States went to

City schools '93-'94 -- (it was eighth)."

"In City schools -- doing other things -- they didn't keep me in it -- nothing there."

"He in City schools when Dennis Noble killed -- shot in head -- he 17-18 -- he 1-2 years older than me -- it must have been '94 -- I was on my way to his house -- played basketball with him."

"Gang-related killing -- Dennis Noble in '83, Gangster Crips."

Q.   Go to the next -- and are there any notes along the left margin that --

A.   Yes.  "He horrible on dates."

Q.   Horrible on dates?

A.   "He has no concept of time."

Q.   Okay.

A.   "He in eighth grade '91-'92.  Ninth, '92-'93."  Then notes to me.  "Check when Dennis Noble died or when Marquis died."

Q.   Does that actually say, "15 when Dennis Noble died"?

A.   You're right.  "15 when Dennis Noble died.  17 when Marquis died."

Q.   That would be Mr. Allen's age you're referring to, correct?

A.   Yes.

Q.   I'm now going to page 2.

A.    "He denies he never in a gang."  He denied ever being in a gang.  "Dennis Noble died, I didn't feel safe" -- I have to get a little closer here.

Q.    Do you want me to blow any of that up?

A.    No, that's fine.  "Dennis Noble died, I didn't feel safe in neighborhood -- went to school a little bit and stayed in house, played basketball."

"Prentiss Church -- mostly basketball."

"After Dennis Noble died, mom tried to get him to see a counselor -- never did -- know I messed up mentally but I thought -- but I thought I put it aside.  I couldn't."

"Marquis, met '92-'93 -- met during time Dennis was alive."

"After he died, things not right -- didn't know who to trust -- who to turn to -- only two people I hung around with dead."

Q.    Going to the next page.

A.    "Hurt inside."

"Nightmares -- after Marquis being killed -- a lot -- lot of what me" -- I can't read that word -- "of what me being killed -- shot 20 to 30 times shot everywhere -- still have them -- keep on coming back."

"Didn't want to go to the funeral."

"Little bits and pieces come back."

"Figured I'd die -- always in my dreams."

"Remembers things as before or after Marquis died."

Then off to the side I have "Job Corps," and I'm not sure why.

Now, "95-'96? Job Corps -- I could have -- it a good place, but too much gang activity -- so much stuff -- I don't like being around it."

"My mom wanted me there. I'd leave for a weekend and come back -- I wanted out -- too many thugs."

Then there's something I can't read.

Q. Okay.

A. Go on?

Q. Yes.

A. "After Job Corps streets got worse, killings every day."

"Lived with my mom -- job two weeks or so, selling dope (cocaine) -- he not using -- getting it from a lot of people -- buying clothes -- I'd have girls buy clothes -- buy cloths -- mom knew I didn't have money -- I'd hide it (grass) In the vacant house."

"Stayed with mom till January."

And then I've got "peppermint candy" off to the side. I'm not sure what that means.

Q. Does that relate possibly to something that was ganking?

A. It may very well have been, selling candy for dope.

Q.    The peppermint candy with the color scraped off as crack?

A.    Yeah.  "Stayed with mom till January -- really into dope scene -- I only messing with big people (dope) -- I'd make 1 to 2,000 dollars a day -- (he still spins this massive tale.)"

"House shot up over deal somebody made -- deal went bad -- I was late."

"He says, 'I never tell anybody my business -- not even my best friend.'"

Q.    Go on to the next page.

A.    "So why attempt to kill self?"  He says, "Stressed out -- I had money, girls (grandiose)."

"So why kill self?  Stressed out -- just felt I really to go."

Q.    Next page, it's brief.

A.    "MMPI items -- not answered as concerned about how others might think."

"As a kid, kindergarten to seventh -- nickname -- 'Rusty Crusty Bill.'  Holiday Simmons."

I don't know what that means.

Q.    Okay.  Now, these were the extent of the notes that were -- and you recall from reviewing the transcript that were actually given to the government when the government asked for your notes since we never received a report of your

mitigation interviews.  Or you recall from the transcript, we didn't even know that there had been a second interview on February 22nd until you testified at the trial, correct?  Do you recall reading that from the transcript?

A.    Yes.  That's what was said in the transcripts.

MR. HOLTSHOUSER:  All right.  Go to the document camera, Carrie.

Q.    There were three pages that were removed from your notes.  And I'm showing you the first page, which is actually I think part of Exhibit 384.

THE COURT:  Does this have a separate number, this one page?

MR. HOLTSHOUSER:  No.

THE COURT:  Okay.

MR. HOLTSHOUSER:  I've pulled it out, though, in order to organize them.

Q.    Can you read what's written on this page?

A.    Yes.  This must have been in the first interview is my guess.

Q.    Pardon me?

A.    This must have been in the first interview I had with him.

Q.    These are part of your February 22nd -- we've already gone over your February 16th notes.

A.    "Crime -- I wasn't there.  Denies being in van.  Fit --

he understands.  Knows Sindel his attorney and John Simon in Jefferson City handling penalty phase.  States he not there."  In other words, at the scene of the crime.  And "He being set up."

Q.    So at least in this context, he's maintaining that he just wasn't there and wasn't involved at all?

A.    That's correct.

Q.    Correct?

MS. CARLYLE:  Just a point of clarification.  Are you saying that that's a page in Exhibit 384?  Because I'm not finding it there.

MR. HOLTSHOUSER:  It could be part of 565.  Hold on a second.  It's actually, Judge, part of 565.  And it is part of the notes from February 22nd.  And I'm going up.  You see where it's 2/22?

MS. CARLYLE:  Great.

MR. HOLTSHOUSER:  Till the end.

BY MR. HOLTSHOUSER:

Q.    And then we need to go to Exhibit 563 to get the unredacted notes, pages 2 and 3, which were ripped out of -- let's go back to Sanction.

And this was that page we looked at previously that had the MMPI, and then the rest of the page was blank?

A.    This had to be the second interview.

Q.    Yes, it is.

A.     Wasn't the first one the first interview?

Q.     It's included in your notes.

THE COURT:  Page 1, that we just saw, is that what you're asking?

THE WITNESS:  Yes, Your Honor.  I could have sworn that was from the first interview.

Q.     Or at least included in the materials that we were provided and the BA numbers on them, that they are part of the February 22nd interview.

A.     That wouldn't make -- well, it talks about fitness, that's why I'm saying.

Q.     Okay.  Since I didn't write the notes and I didn't put them together, I'm not representing to you one thing or the other.  I really just want to focus on these two pages.

A.     Okay.  I'm just telling you, it did talk about fitness, that's why I was saying that.

Q.     Okay.  These pages, I want to just point out to you, do you see there's a small handwritten two at the top right-hand corner that was written there by the Court during the trial?  And this, again, is Exhibit 563.  And we previously looked at a page of notes from this February 22nd interview that only had what I've circled at the top, and the rest of the page was blank.

MS. CARLYLE:  I need to interpose an objection here.  I believe earlier in these proceedings these pages had been

provided to Mr. Holtshouser in redacted form.  The Court ultimately directed that counsel for Mr. Allen unredact them and provide them that way.  I'm simply objecting now to indicate that we still -- we continue to object that those pages should not have been provided to the government.

THE COURT:  Well, I didn't understand there was any objection about these being provided in this proceeding, correct?

MR. HOLTSHOUSER:  There's probably a little more background here that I think is being confused.  And that is when this matter arose at trial, and as you can tell from the trial transcript of Dr. Cuneo --

THE COURT:  Right.

MR. HOLTSHOUSER:  -- there's about 30 pages in his transcript that is a lengthy discussion between you and me and Mr. Sindel --

THE COURT:  Right.

MR. HOLTSHOUSER:  -- in which Mr. Sindel believes that there had been a discussion in chambers that I was present for that it related to redacting or removing pages of his notes from them.  It became apparent that I actually wasn't there, and that then at some point the Court ordered that I would get to see those notes before cross began.  We got into cross, and we actually saw these notes at trial.

THE COURT:  Right.

MR. HOLTSHOUSER:  But the Court didn't give them to the government.  You can tell from the transcript, and I can probably find the page if you'd like, where this took place.  But if you see along the side here, there's this two at the top right-hand corner.

THE COURT:  Right.

MR. HOLTSHOUSER:  And these two parentheses drawn here are actually drawn by you, Judge, according to the transcript at the bench --

THE COURT:  Okay.

MR. HOLTSHOUSER:  -- trying to clarify what the government would and would not be permitted to inquire into.

THE COURT:  Okay.

MR. HOLTSHOUSER:  The outcome of the argument as best I can read the transcript and is consistent with my recollection is that you allowed us to see them but then there was specific rules as to what he could be questioned about.

THE COURT:  Okay.

MR. HOLTSHOUSER:  And there's this page, and then there is the next page.  And this three at the top refers to the third page of notes.  I can't explain it.  But what's missing from this record here is that the original page had the numeral one written by you at the top.  But this is -- we didn't get to keep them.  I don't know what became of them

other than they were returned to Mr. Sindel.  I don't know that they were filed as part of the record.

But at least from the transcript, I think the Court can tell that this two and the three at the top right-hand corner were actually placed here by the Court, and it reflects that in the record.  And you say something, I've drawn a circle to the left reflecting the parts that you may or may not inquire about.

So we had these notes.  We saw them.  I think that habeas counsel not having been present at trial, not having had the context, and perhaps not having read this portion of Dr. Cuneo's testimony, redacted these.  But truthfully we'd already had them.  And we were permitted to inquire as to what some of these said.

THE COURT:  Not all of them.

MR. HOLTSHOUSER:  Not all of them.

MS. CARLYLE:  I think our objection --

MR. HOLTSHOUSER:  So I'm not sure what the issue is here.

MS. CARLYLE:  Well, I think I can explain if you'll let me do that.

THE COURT:  Sure.

MS. CARLYLE:  The objection that was made at the time when we were providing discovery was that since this court had granted a hearing only on the issue of mitigation,

Mr. Allen's statements concerning the offense were not relevant to the subject matter of this hearing, and we redacted -- we, therefore, provided the documents in redacted form.

The Court directed that we not redact them. My objection today is to any questioning about those matters which have now been -- I mean, I've taken Mr. Holtshouser at his word that he's seen them, but my objection today is to any questioning about those matters, again, because they are not relevant to mitigation. What he said to Dr. Cuneo in 1997 about the offense was not presented at trial. This Court ruled that in the penalty phase he could not be questioned about it. And, therefore, it has no relevance to the issue about the penalty phase today. And I object to any questions about it. I can object question by question if you like.

THE COURT: All right. Well, so the real issue boils down to the two parenthetical paragraphs?

MR. HOLTSHOUSER: I believe so, Judge. The only thing that I would disagree with the recitation here is that, first of all, I think that at this point in time, these subjects actually are relevant, because one of the issues that is central here is who do you believe about Mr. Allen's history. And at least with respect to the offense, he's giving internally contradictory statements even to Dr. Cuneo.

One minute he says that he wasn't there, he's being set up. And the next minute he says something different. And he has other statements, for example, to Mr. Grant that were allowed to be admitted and gone into both at trial and in the penalty phase of this trial, these questions that were occurring at the penalty phase of the trial. So there were questions at the time that were not allowed to be answered because you felt that they were self-incriminating.

I think you determined that there were some answers that he gave to Dr. Cuneo that were exculpatory, and that the government was permitted to inquire as to those. Because what he says about the offense, at least is somewhat relevant to his state of mind and mental state.

THE COURT: All right. Here's what I'm going to do. Let's do it as you suggest. Object on a question by question basis so the record is protected. Okay. Go ahead.

But I want to make it clear, I do think that what Mr. Holtshouser says about relevance is accurate. There may be some other reason that this information should not be the source of an inquiry by this witness, but I don't know what that is yet, so let's just do it one at a time. Go ahead.

BY MR. HOLTSHOUSER:

Q. I want to juxtapose two documents here so you're oriented where we're at. Could we have the document camera for a second.

See this page here is a page that was produced at trial that -- regarding your -- this page of notes. "MMPI items," and it stops right here. You see that?

A.     Now, when you say "produced" -- I didn't produce this, correct?

Q.     You came to court with your --

A.     All my notes.

Q.     -- notes, and you had them in a pad of paper and you pulled them out, and certain parts of them were given to us and certain parts were not.

A.     Okay.

Q.     Do you recall, in fact, that you didn't want to produce your notes?

A.     No, I didn't. I don't recall that at all.

Q.     Okay.

A.     Otherwise why would I bring everything?

Q.     Go back to Sanction. Do you see that this -- it's this top half, is this the same page that we just looked at?

A.     Yes.

Q.     And that this page, Exhibit 563, now contains the information below it that was blacked out previously.

A.     Okay.

Q.     So what I'm asking you to do at this point, is can you simply read for the record, what is that information on that page in your handwriting?

MS. CARLYLE:  And my objection at this point is to his reading the line below the paragraph about the MMPI.  The paragraph, if we can call it that, below that with the brackets on it, and the paragraph below that bracketed on it, and my objection to that is twofold.  First, that it is irrelevant.  And, second, that it violates Mr. Allen's right against self-incrimination.

THE COURT:  Now, let's take the second objection first.  At this phase of the trial, how could that -- him -- him incriminating himself at this time having already been found guilty, how could that be a valid objection?

MS. CARLYLE:  Well, just as it was, I believe the Court found during the penalty phase of his original trial that it was a valid objection.

THE COURT:  Right, I did.

MS. CARLYLE:  And I think it's a valid objection for the same reason now.  As the Court is aware, we have made arguments in connection with this proceeding that Mr. Allen is entitled to a new trial as to guilt -- on guilt as well as penalty phase.  Now, this Court has rejected those arguments, but that's not necessarily a final decision.

Were Mr. Allen to be retried on the guilt phase, then I think I need to preserve his right to have these statements excluded from consideration at such a proceeding.

MR. HOLTSHOUSER:  Judge, if I could respond briefly.

First of all, until he reads what's on here, I'm not an expert in his handwriting.  I'm not sure that anyone is. Until we read what he's written here, I'm not really positive we know what he's written here.  So I think at least establishing for the record what is on these notes is important for any future discussion of what -- how they become relevant at any hypothetical future proceeding.

If Ms. Carlyle wants to preserve an objection to let's say hypothetically there's ever another guilt phase or a penalty phase, that these may or may not be used at that subsequent proceeding, I don't think they are waiving that by allowing them to come in at this point in time as they are relevant to Mr. Allen's credibility.  Because we are, as I understand, going to have a stipulation that his testimony is going to be presented to this Court by deposition.  And there are, in fact, some questions put to him in there about what he said at the time of the trial concerning this, his memory of what occurred, and other contradictory statements in determining what part of what Mr. Allen says about his life is actually believable.

And so I think it's definitely relevant to credibility as far as this Court determining what information in his history is factual that was not uncovered by the trial team as it relates to ineffective assistance or prejudice. And that's what the issue is here.

The other thing I point out is they keep referring to this right against self-incrimination.  There is no such right.  The only right is a right against compelled self-incrimination.  This is a voluntary interview that Mr. Allen submitted himself to with his own expert witness.  He is not being compelled to engage in this interview.  And the fact that it now exists, dealing with this does not involve or implicate a right against compelled self-incrimination.

THE COURT:  I understand.  The ruling will be certainly that by the Court considering this information, and I think it is relevant for the reason Mr. Holtshouser raises, will in no way be construed, could never be construed, will not be construed by me ever as waiving any right of self-incrimination by allowing the witness to testify as to the material in Exhibit 563 on either page 2 or 3.  So the objection otherwise will be overruled.

BY MR. HOLTSHOUSER:

Q.    Can you read what follows below the big part that you've already read that is circled in green at the top?  What follows after that?  What's the first word?

A.    "Only one gun fired -- I didn't do it."

Q.    Next.  This is a part that's bracketed, the first part that's bracketed by the Court at trial.  What's the next phrase?

A.    "We went to bank Wednesday – Thursday -- check it out -- met Friday here -- all you got to do is sit in these doors and 'I (Holder) do the rest.'"

Q.    Okay.  That ends the first bracketed phrase or section?

A.    Correct.

Q.    What is the next bracketed section on what is at the top right-hand corner page 2 in pencil of Exhibit 563?

A.    "If I'd known this, I'd never went."

       "I got my feelings inside me, no one knows me -- when Marquis died, I never cried then -- I just held it in."

Q.    Now, at least the second part of that last phrase that you read that's bracketed doesn't say anything, does it, about the offense?  He's talking about his feelings and Marquis and holding it inside.  I just held them.  Is that right?

A.    Correct.

Q.    It's the first line of that that says, "If I'd known this, I'd" -- you said -- "never went"?

A.    "I'd never went."

Q.    Okay.  On February 22nd, was this essentially a different version from Mr. Allen himself of what he told you on February -- on January 16th?

A.    Yes.

Q.    Okay.  Now we are on page 2, Exhibit 563.  At the top right-hand corner it's labeled BA_1649U.  And this is the one

that has the notation or the handwritten mark of No. 3.  And it also contains two hash marks around another section.

MR. HOLTSHOUSER:  And I would state for the record, Judge, without going to the page, that these hash marks and that number relate to statements that the Court makes on the record in the trial transcript where the Court says, "I'm putting the number three at the top right-hand corner.  I'm putting two hash marks here."  And then you proceeded to make a ruling about what the government could or could not.

Q.    So for the record, that's the document that you're looking at.  Can you read for us what you wrote on this page from your interview on February 22nd?

A.    "After 2/20/97 -- lived with Regina -- on Oregon and Minerva -- lived this other girl (couldn't remember her name)."

THE COURT:  That would be a street intersection, I guess.

Q.    You read that -- you see that as Minerva?

A.    I think so.

Q.    Okay.  It's your writing, so I never would have -- so go ahead.  And then that ends and begins the first hash mark. What was the second part of that up here at the top?

A.    "Lived with this other girl (couldn't remember name)."

Q.    And that's in parenthesis?

A.    Yes.

Q.    Now, next begins the first hash mark, and then there's a second hash mark.  Would you read your notes between those two hash marks?

A.    I robbed -- no.  "Why robbed a bank?"  There's a question mark.  I asked that.

Q.    Are you writing what you said?

A.    Yes.

Q.    Okay.

A.    "I don't know -- I didn't have to."

Q.    What's the line that follows after that?

A.    I just went to another subject.

Q.    And actually there it looks to me like there's actually a second hash mark there that is not your writing, correct?

A.    That is correct.

Q.    Okay.  And then there's another phrase that follows it which says what?

A.    "Robbery on Monday."

Q.    Okay.  Then there comes another hash mark, and I've also highlighted here in green the second hash mark that appears to bracket that phrase.  What is that phrase that you wrote?

A.    "I seen man on ground -- I got scared -- when gun went off and saw man on floor -- I didn't know what to think."

Q.    And then that follows the second hash mark, closing that particular --

A.    Right.

Q.    That's not your hash marks?

A.    That's correct.

Q.    And then what follows after that on this page?

A.    "Asthma."

Q.    Okay.  And then you have something?

A.    "Yet heavy duty pot smoking -- or heavy duty pot."

Q.    And that's a notation by you or is that a statement by him?  Is it an observation by you?

A.    Observation by me.

Q.    Now, besides this interview you did on February 22nd, do you recall having a conversation with Mr. Simon on the same day informing him of the results of that second interview?

A.    Yes.  Well, I'm saying I cannot remember if it was with Mr. Simon.  I do know that I had a meeting on that day.

Q.    Well, let me show you Exhibit 500.31, page 31.  Direct your attention at the bottom.

        THE COURT:  Now, identify it again.  500?

        MR. HOLTSHOUSER:  .31.  These have already been admitted into evidence.

Q.    And for your benefit, Dr. Cuneo, Mr. Simon had a lot of handwritten notes which were not legible to anyone else.  He translated and transcribed those notes into what you see here, these typed statements, okay.  So what I'm representing

to you is that it's been established in this hearing that this document reflects Mr. Simon's translation of his own notes from the period of the trial.  Okay.

A.     Okay.

Q.     You with me?

A.     Yes.

Q.     So at the bottom here, there's an entry in Mr. Simon's notes, "Cuneo, 2/22/98."  And that be would the same date that you interviewed Mr. Allen for the second time, correct?

A.     Yes.

Q.     Now, the page following, continuing in these notes, they are repeated a couple times in the copies that Mr. Simon gave us.  So, in other words, this starts one page, this starts another page, by virtue of this Bates number, okay.  So I just want to point out to you that what's up here seems to be repeated down here.  And it's not that you had two conversations, it's that Mr. Simon produced two copies of the same set of notes.  Do you follow me?

A.     Yes.

Q.     Or did I further confuse you?

A.     I'm trying to figure out, is this what I told him or is this what he told me or --

Q.     Well, this is his notes of his conversation with you on February 22nd, 1998, according to him.  So what I'm asking you to do is we're to go through these and see if this

actually refreshes your recollection of that conversation.

"I threatened to walk out." Is that something that you did during the interview -- second interview with Mr. Allen? Did you threaten to walk out at any time during the interview with Mr. Allen?

A.    Not with Mr. Allen.

Q.    Second interview. Nothing that you recall? That doesn't refresh your recollection?

A.    I may -- I'm guessing at this point.

Q.    Well, don't want you to do that. If it doesn't refresh your recollection, it doesn't. It's 15 years ago.

A.    No.

Q.    Okay. The next line is, "He is horrible on times. He's not lying on that; he just --" You're referring to Mr. Allen is horrible on times?

A.    Correct.

Q.    You actually had that notated yourself --

A.    Yes.

Q.    -- in those notes that he was bad on dates and times, right?

A.    Yes.

Q.    And, "He's not lying on that." Were you indicating to Mr. Simon that his inability with dates and times wasn't a made up inability, he just was bad on them; is that correct? You didn't think he was lying?

A.    I'm not stating that I don't believe that, but I have no independent recollection of any of this conversation.

Q.    Well, we haven't gone through it all yet.  Well, how about just that first part.  Do you think you had that conversation with Mr. Simon relating to him that Mr. Allen is horrible on times?

A.    I'm not doubting that I could have said that.  I have no memory of doing this.

Q.    Did you, in fact, believe he was horrible on times?

A.    Yes.

Q.    Did you, in fact, believe that he was truthful in his inability with times and dates?

A.    Yes.

Q.    He wasn't lying about that?

A.    Yes.

Q.    You felt he was lying about other things, though, correct?

A.    I'm saying he didn't tell me the truth.

Q.    You thought he -- did you think he was lying to you about things?

A.    See, I don't think he purposely lied all the time.  I think he didn't tell the truth, but I think he lives in a fantasy world sometimes where things he wants to be, and he says them so much he believes them.

Q.    "Marquis Taylor's death is a dividing line."  Is that

something that you believed and communicated to Mr. Simon following your interview with Mr. Allen?

A.   I can say I believed it, but I have no independent recollection that I communicated it.

Q.   Well, when you got done with your interview of Mr. Allen, who did you tell?  Did you just keep it to yourself, the results of that interview?

A.   I'm not saying that I didn't do this; I just don't have any memory of it.

Q.   Okay.  I know that.  But based upon what happened back then, you didn't write a report about it, we know that much.

A.   No.

Q.   Did you tell anybody on the trial team, whether it be Dr. Randall, Mr. Sindel, or Mr. Simon, about the results of that interview?

A.   I would have.  But I cannot -- but I have no independent recollection of this.

Q.   Dennis Noble's killing is a topic you talked about with Mr. Allen, correct?

A.   Yes.

Q.   "B. scared to death."  Are you possibly referring to Billie?  Did you have a belief that Billie was scared to death?

A.   I feel like -- I just don't remember doing this.  And I'm not doubting that I did this, I just have no independent

recollection of it. And those aren't my notes.

Q. I understand that.

THE COURT: Can we do it this way, because we're talking about the same thing. Can we come to a conclusion that you're not saying that whether or not you may have said these things, you just don't have a recollection of them, is that fair?

THE WITNESS: Yes, Your Honor.

Q. Let me try it this way. You see that the next line says, "B. scared to death." After your interview with Mr. Allen, did you feel that Billie Allen was scared to death? Forget this conversation. I'm just asking you that question.

A. I would have thought that "B. scared to death" was after Dennis Noble and Marquis Taylor's death.

Q. "Soulmates in each other's world."

A. That would have been Marquis Taylor. But, again, I can't remember this conversation. I'm not telling you any of that is incorrect, I can't remember the conversation.

Q. Did you believe after your evaluation of Mr. Allen on February 22nd, 1998, that after either Dennis or Marquis died, Billie Allen was never right again?

A. Yes.

Q. Did Mr. Allen not trust the feds? Is that something he ever communicated to you to your knowledge?

A.    Yes, but I cannot remember sharing this with Mr. Simon on 2/22.  I'm not telling you I didn't again, but I don't remember.

Q.    And, again, I'll tell you what, when I ask you these questions, you don't need to add that part because we got that.

A.    Okay.

Q.    I'm just simply using this as a framework to ask you each of these questions.  Did Mr. Allen tell you he had nightmares?

A.    Yes.

Q.    These nightmares that Mr. Allen talked about, they involved Mr. Allen being shot, correct?

A.    I believe so.  They were in my notes.  They specify out at that time.

Q.    And Mr. Allen had a recurring nightmare of himself being shot in his back yard at night, correct?

A.    I believe so.

Q.    Now, Mr. Allen -- if Mr. Allen had a belief that when Marquis Taylor was killed, the bullets were intended for him, and that the people that came and shot up his mother's house were coming for him, that would provide one with a rational basis at least that that might get into someone's sleep, correct?

A.    Yeah.  It might --

Q.    Would that necessarily be an example of reexperiencing the event of seeing Marquis Taylor killed?

A.    Even if he thought that that individual, that the bullet was meant for him --

Q.    Uh-huh.

A.    -- and he saw the other individual die in front of him and he experienced that trauma, he could have developed Post Traumatic Stress Disorder from that.

Q.    From what?

A.    From still seeing that person die in front of him, even if he thought that bullet was meant for him.

Q.    But if the bullet was meant for him actually, to recharacterize the incident, Mr. Allen was actually shot at, it missed, and it hit Marquis Taylor?

A.    Okay.

Q.    Now, would that -- are you saying that that would be an independent Post Traumatic Stress Disorder triggering event?

A.    I'm saying that still could have been trauma to cause a Post Traumatic Stress Event, especially if --

Q.    My question has to do with, are the nightmares about Billie Allen himself being shot?  Is that an example of reexperiencing the witnessing of Marquis Taylor being shot?

A.    Nightmares aren't always the same thing of what happened.  They are usually people dying, people being killed, many times not waking up before it occurred, or

having the shot there and then just immediately waking up. But it doesn't always have to be what happened at the event.

Q.   So is the answer a yes, that that nightmare about Billie Allen being shot is an example of reexperiencing --

A.   Nightmares --

Q.   -- the traumatic event?

A.   Nightmares are an example of reexperiencing.  It doesn't have to be the same specific thing.

Q.   So the content of the nightmare doesn't matter?

A.   It does, but it doesn't have to be specific.

Q.   Okay.  Did you see any trouble with the diagnosis of PTSD following your interview with Mr. Allen on the 22nd of February?

A.   No.

Q.   Did you have any understanding of what the house shooting was a result -- resulted from?

A.   A drug deal gone bad is what I was told.

Q.   So did you think that Mr. Allen's -- you knew that the shooting up at the house was a real event that happened, that was no fantasy, correct?

A.   That is correct.

Q.   Did you think that Mr. Allen's descriptions of his drug dealing activity were fantasy?

A.   I believe that he was blowing things up in a rather grandiose manner.  I don't believe that he was scoring a

thousand to 2,000 a day.

Q.   So what did you believe he was doing?

A.   Barely surviving.

Q.   Have you read or reviewed his deposition that he gave in this case?

A.   If it was sent to me, I reviewed it at some time, but I can't remember right now.

Q.   So to what extent did you review it then?

A.   If it was sent to me, I read it.

Q.   It was like over 400 pages.  Do you remember that?

A.   That I don't remember.

Q.   Did you read all that?

A.   Then I don't think I ever was sent anything that was over 400 pages.

MS. CARLYLE:  Judge, for the record, I don't believe we provided Mr. Allen's deposition to Dr. Cuneo.

MR. HOLTSHOUSER:  Isn't it on your list?

MS. CARLYLE:  I don't think so.  It is, you're right.

MR. HOLTSHOUSER:  That's the original one.

MS. CARLYLE:  I guess we did.

MR. HOLTSHOUSER:  You have the original one.  Not the original one, the expanded one.  Actually --

MS. CARLYLE:  You have it too, but here it is.

MR. HOLTSHOUSER:  You said this has been added to.

It's now two pages, right?

BY MR. HOLTSHOUSER:

Q.    See all these depositions here?

A.    Yeah.

Q.    Juanita, Billy Wayne Allen, Claude McLemore, Cathy Toliver, your notes from January and February.  Did the notes that you were provided include your unredacted notes from February?

A.    Yes, I have those in my file.

Q.    But what you were provided include those?

A.    Yes.

Q.    Okay.  And so I'm not sure we know what "background materials" is, but one of the things that you've received for sure was Exhibit 539, the Billie Allen deposition.  Did you read that?

A.    I print out -- I still don't read anything on the computer.  I print everything out.

Q.    Did you print out anything that was over 300 pages?

A.    I didn't print out anything that was 400 pages.

Q.    And if you didn't print it out, you didn't read it.

A.    If I didn't print it out, I didn't read it.

Q.    While we have this up, there are these articles here.  They haven't been specified or offered.  I don't think they were discussed in direct examination.  But of these articles, there's actually only two or three that existed at the time

of trial, isn't that correct?  Some of them are 2009, 2008 articles?

A.    Right.  Yes.

Q.    Correct?

MS. CARLYLE:  Just to be clear, I e-mailed you the original current one late last night, so you have it somewhere.

MR. HOLTSHOUSER:  I don't know that I've seen that. But we'll check for it.  I don't doubt that you did, though.

BY MR. HOLTSHOUSER:

Q.    Okay.  You were still talking about this right here. And what led us off into that tangent was the fact that I asked you whether or not you read Billie Allen's deposition that he gave in this case this past May, May of 2012.  So did you read or were you interested in seeing what Mr. Allen has to say about all these things today, in the present time period?

A.    I'd be interested in seeing it, but I'm not sure what it would do.

Q.    Did you read it?  Are you familiar with it?  Do you know what he says?

A.    I haven't read a 400-page deposition in this case.

Q.    So you don't know what he said in May of 2012 about the particulars of the circumstances of the deal or the transaction or the problem that led to the shooting at his

mom's house, correct?

A.    I haven't read it.

Q.    Or the details and the extent and a lot of particulars about who, what, where, when, and how of his drug trafficking activity, correct?

A.    I have not read the May 2000 -- I haven't read a 400-page deposition in this case.

Q.    You advised Mr. -- did you advise Mr. Simon that -- well -- strike that.

The notes that we just looked at from February 22nd were different than the ones from January 16th.  In January he denied having been involved in the robbery at all, he said he was being set up, correct?

A.    Correct.

Q.    In the conversation that you had on February 22nd, though, was he taking an entirely different approach?

A.    At the end he told me a different story completely.

Q.    And that story was not a denial of involvement, but he actually provided facts that he was there, a gun went off, someone was on the ground, he was inside the bank.  It was more than "I'm being set up, I wasn't there," correct?

A.    Correct.

Q.    Now, this -- if Mr. Simon wrote down from your conversation on February 22nd that Billie Allen denied again that he did the robbery, at least based upon your interview

XI - 238

Q.    of February 22nd, 1998, that would not be correct?

A.    I don't remember this conversation, so --

Q.    I know you don't remember the conversation.  I'm asking you to assume --

A.    I'm saying that --

Q.    -- if he wrote that down as a result of his conversation with you on February 22nd, 1998, that that would not be a correct characterization of what Billie Allen said to you on February 22nd.

A.    If I remember from the notes that we just put up, he denied originally that he did it.  And then I know I probably -- I can imagine me coming down hard and saying, it's time for me to leave, either let's -- you know, we don't have any time left, what happened?  And at that point he said he fell down, the gun went off, somebody got shot.  But --

Q.    Was that an example of perhaps threatening to walk out if you don't come clean with me?

A.    Possibly.  These aren't my words, so I don't know.

Q.    I understand that.  But you do, in fact -- are you saying that you do now recall a situation in which at first he said he wasn't involved, and at some point in the interview you said, look, and in your words you said, "I came down hard on him"?

A.    Yeah.  Now --

Q.    First of all, is that -- are you recalling that now?

A.    I don't have an independent recollection.  I'm saying when I look at my notes, I see a situation where all of a sudden from the notes, you have a denial on the 22nd, then you have an admission a little later.

Q.    I want to direct your attention to where these notes continue on to the top of another page.  Imagine handwritten notes that continue on to another page that are typed up here, okay.  "When he's lying his legs bounce back and forth.  They swing in and out."  Is that an observation that you ever made?

A.    No.

Q.    Okay.

A.    I don't know where that came from.  That's not something --

Q.    "MMPI -- it's a riot.  The only questions he doesn't answer are the ones that might put him --"  In terms of the questions that he didn't answer and the results of the MMPI, does "it's a riot" refresh your recollection as to your characterization of it?  Was it your --

A.    I can't remember -- I can't remember the thing.  I can tell --

Q.    So it doesn't refresh --

A.    I can't remember --

Q.    Here's the question pending before you.

A.    I can't remember speaking to him.  I can't tell you

what I --

Q.    Dr. Cuneo --

THE COURT:  Wait, wait, wait.

MR. HOLTSHOUSER:  I'm going to object as nonresponsive.  The question I asked is, does this refresh your recollection.

THE COURT:  Sustained.

A.    No.

Q.    Thank you.  "The only questions he doesn't answer are the ones that might put him."  Was it your belief that the MMPI questions that he didn't answer were the ones that might make him look bad?

A.    Right.

Q.    Okay.  In the next series of lines here, I just want to point out to you notations that Mr. Simon makes.  "I didn't cry when M. died, I just held it in.  Marijuana.  Didn't get into marijuana after Noble died.  Began being afraid of everything.  Scared of everybody.  Then missed so much school.  Soap and shaved peppermint.  Long standing" -- is that dysthymic?

A.    I would say dysthymic disorder is my guess.

Q.    "You're depressed your whole life, and never know what it's like not to be normal."

And then continuing on to another page.  "He has never known what it means to be happy.  You have to be set up

for PTSD. Started to go downhill with Dennis Noble. Drop out. Tampering. Marquis's death. Low-grade dope pusher. January 9 revenge on drug deal. Mom throws him out. Tasha's. ODs. Nine days, 2/20/97. Bounces from girl's house to girl's house. One and a half weeks go by, then meets Holder. He's scared to death. 'Alexothymic.'"

A.    I don't know what that is.

Q.    Several of the references in there, are they references similar to what we saw in your notes a few minutes ago? For example, references to peppermint, references to beginning of marijuana, references to when Noble died, correct?

A.    Yes.

Q.    Okay.

        MS. CARLYLE: Your Honor, could we take a break?

        THE COURT: Yeah. We'll take a ten-minute break. Court's in recess.

        (Court in recess from 4:06 p.m. until 4:18 p.m.)

        THE COURT: Go ahead.

BY MR. HOLTSHOUSER:

Q.    We're going to move on from these notes of John Simon, Dr. Cuneo. And I want to show you actually a different part of this, though.

        Direct your attention to the bottom there. You see where Mr. Simon had written in his notes, "February 23, 1998, and you see my last name. And then on to the next page

there's a reference to Cuneo report.  School records, City Hospital medical records.  Metro.  Randall memoranda.  Re: interviews.  Mom.  Teachers.  Keshia's mom.  CVs from both. From Cuneo's report it's clear he got all of David Randall's interviews."

My question for you, and I know these aren't your notes, and I know you don't recall a conversation with Mr. Simon, that's not what I'm asking you.  What I'm asking you is the entry of Mr. Simon there correct, that you got all of David Randall's interviews?

A.   I don't have any memory of getting David Randall's interviews.

Q.   Let me show you a couple to see if this refreshes --

A.   I've seen them because they were sent to me.

Q.   How about, for example, this is his format.  Typically the person's name, and then he has a typed statement.  This is 124-A, and I'm going to show you 124-B.

A.   These were sent to me in the records that I reviewed.

Q.   Okay.

A.   I had no memory of these.

Q.   Okay.  These were sent to you in the records that you reviewed back in 1998?

A.   No, these were sent to me, I believe by counsel.

Q.   All right.  So the one we saw before --

THE COURT:  Wait.  By habeas counsel or by trial

counsel?

THE WITNESS:  By habeas counsel.

Q.   So I want to keep your focus is 1998 now.  The interview we just saw, Martha Burns, is an example of a David Randall interview.  And this 124 series of exhibits, for example, these were all things that were produced to the government in discovery by Mr. Sindel and Mr. Simon during the trial, okay?

A.   Okay.

Q.   That is the work of Dr. Randall.  The note that we just saw by Mr. Simon indicates that it's clear from your report that you received all of Dr. Randall's memoranda of interview.  And if we go back to 565.

THE COURT:  For the record, which is?

MR. HOLTSHOUSER:  Dr. Cuneo's report.  The February 16, 1998 report.

A.   I remember getting information, verbal information from Dr. Randall.  I don't remember getting the written information.  I remember having conversations with Mr. Randall, but I don't remember getting the written information.

THE COURT:  Okay.  I need to ask something because my notes may be wrong.  I understood that the only contact you ever had with Randall was that January 1st meeting with Sindel.

THE WITNESS:  I think it was February 1st, Your Honor.

THE COURT:  February 1st.

THE WITNESS:  And I said I may have -- and Dr. Randall may have been there during the two days that -- right before I testified for the trial.

THE COURT:  Right.

THE WITNESS:  But --

BY MR. HOLTSHOUSER:

Q.    And just before -- we haven't finished going through the chronology of the trial period.  There are other meetings and other documents which may or may not refresh your recollection.  But you had several contacts, whether by telephone or in person with Dr. Randall, did you not?  We've seen several already regarding conversations that he had with you that he's reporting back to Mr. Sindel in a fax about, correct?  You're the one that told him, we need an MRI, we need a lead expert, we need a neuropsychologist.

A.    Now, I thought that was done February 2nd, which would have been after I met on February 1st.  I remember that meeting.  I don't have any independent recollection, other than he -- I'm saying he may -- I may have met with him on the nights we prepared for trial, but I have no memory of any meetings.  I'm not saying they -- I can't remember them.

Q.    This is your trial testimony.  I'm showing you parts of

Exhibit 208.  And the question that you are asked during the trial is:  "In addition to a competency evaluation, did you do an evaluation to determine whether there existed certain mitigating factors surrounding his behavior during the course of the event that you understood he had committed?"

A.    Yes.

Q.    And your answer was, "Yes."  And then, "Tell me a little bit about what the evaluation --"

A.    Wait.  Can you read the rest of that answer?

Q.    "Yes, but I didn't know I was supposed to do that until later."  We've already actually gone over that, correct?

A.    Okay.

Q.    What I want to get to is the next question.  "Tell me a little bit about what the evaluation consisted of."

And then you proceed to describe to him over the course of the next two or three pages the variety of sources of information that you considered in your mitigation evaluation.  Okay?

A.    Okay.

Q.    So let's go -- let me show you that.  And you talk here in the beginning:

"I want as much information as possible.  That way I can see what others say.  And I like to have information to check it out."

"When you talk about people that lie to you, is that

primarily the lawyers, or is that the defendants?

"I got a whole bunch of people that lie to me.  I was supposed to be testifying tomorrow morning."

Were you making a joke there about the fact that Mr. Sindel had lied to you about when you were going to testify?  Again, trying to create a little bit of a personal rapport with the jury?

A.    I'm not sure.

Q.    I mean, does it look to you like you're doing the same sort of thing that Mr. Sindel did upon introducing you?

A.    I'm not sure.  I have no independent recollection.

Q.    Mr. Sindel's response is:  "Your check is in the mail.  In connection with the evaluation, what did you review, what documents, papers, records, et cetera?"

He says:  "Okay.  I jotted them all down in one spot here.  Basically what I did was reviewing, I ended up reviewing the police reports and the statements that you forwarded to me.

"QUESTION:  Statements being statements that were made by the defendant?"

"ANSWER:  Defendants.  I also saw Mr. Holder's file.  You had forwarded that to me also.  I received his medical records, his mental health record from Metropolitan.  I conferred at the time with Dr. Randall, who was working as the mitigation expert in this case.  He had interviewed a

wide variety of different individuals, and he forwarded me -- this is pretty much my whole file here -- a copy of -- he would then have it transcribed so that I could read it."

Were you referring there to a whole file of interviews, transcribed interviews that Dr. Randall had done of various people he had talked to?

A.   I must have.  I had no independent recollection.

Q.   Does this refresh your recollection that you, in fact, received each of the interviews that Mr. Randall -- Dr. Randall had done with a variety of people?  Because you referred to it, "this is pretty much my whole file here."

A.   No, I would have said -- I would bring in my whole file, everything that I had.  And that would be part -- if I had them, that would have been part of it.

Q.   So do you think now -- does this refresh your recollection that you, in fact, received as part of your mitigation evaluation here all the collateral source interviews that Dr. Randall had done?

MS. CARLYLE:  I'm going to object.  I think he can say what he received, but I don't think he has any way of knowing whether it was all of Dr. Randall's interviews or not.  All he can possibly talk about is what he got.

THE COURT:  Okay.  The question goes to, does this refresh his recollection as to what he received.  That's the only question before him.

A.    I don't have any independent recollection.

Q.    Does this testimony back in 1998 when your memory was much fresher --

A.    That testimony would have been correct.

Q.    And does it reflect that you were forwarded transcribed memoranda of interview by Dr. Randall?

A.    Yes.

Q.    And the one I showed you before, 124-A, I'm going to show you a couple others here.  124-B.  124-A was Martha Burns.  124-B is Prentiss Church.  124-C, Susan Duke, a teacher.  124-D, Joyce Eaton, another teacher.

        THE COURT:  Joy or Joyce?

        MR. HOLTSHOUSER:  Joyce Eaton, E-a-t-o-n.

Q.    Ann Edmunds, E-d-m-o-n-d-s.

        THE COURT:  Is that 124-E?

        MR. HOLTSHOUSER:  Yes, this is 124-E, Ann Edmunds, another teacher.

        THE COURT:  I'm sorry, what's the first name on Edmunds?

        MR. HOLTSHOUSER:  Ann.  And it's E-d-m-o-n-d-s.

        THE COURT:  All right.

        MR. HOLTSHOUSER:  And the clerk corrects me, it's E-d-m-u-n-d-s.  He has much younger eyes than I do.

        I'm having trouble getting some of these to come up here, Judge.

Q.    There we go, 124-F, as in Frank.  That's John Lents, a third grade teacher.  124-G, Claude McLemore, a cousin of Mr. Allen.  124-H is Colette McLemore.  124-I --

THE COURT:  Wait just a second.  Okay.  124-I.  Go ahead.

Q.    That is a friend named Ahmed Oliver, age 19.  124-J, Beverly Oliver, Ahmed's mother.

THE COURT:  What's the first name?

MR. HOLTSHOUSER:  Beverly.

THE COURT:  Ederle?

MR. HOLTSHOUSER:  Beverly.

THE COURT:  Oh, Beverly, okay.

Q.    Now, a couple of these names that we mention should be familiar to you because they are at least contained in the information that Ms. Carlyle has sent to you recently.  So --

A.    I'm not saying that I haven't seen these.  I can't remember seeing them.  And if I said in my -- and if I said in my court testimony that I saw them, I saw them.  I don't have any independent recognition -- any independent memory of them.

Q.    All right.  I need to at least establish for the record here what those consist of.  They all appear to have the same format, which Dr. Randall has previously identified.  But this is 124-K, Melissa Petty.

THE COURT:  Melissa?

MR. HOLTSHOUSER:  Petty, a relative.

THE COURT:  All right.

Q.    124-L, Otha Petty, Jr., a brother of Juanita Allen. 124-M, as in Mary, that's Stephanie Stock, another teacher. Luveetra Taylor, L-u-v-e-e-t-r-a, Taylor.  This is Exhibit 124-N as in Nancy.  The mother of Marquis Taylor.  Shimeka Taylor, Exhibit 124-O.  Tasha Valentine, 124-P.

Now, among other things, that name is familiar to you because that's the girlfriend --

A.    She's the girlfriend.

Q.    -- that was involved in the visit to the Metropolitan Psych Center?

A.    It was also his girlfriend.

Q.    His girlfriend that he was supposed to move into shortly after the offense, correct?

A.    Yes.

Q.    In addition to the memoranda prepared by Dr. Randall, did you also receive and review some FBI 302s that --

MS. CARLYLE:  I'm going to object.  I don't think there was any question asked about A through P, and I certainly haven't heard an admission that he received those from Dr. Randall.

THE COURT:  Okay.  Sustained.

Q.    The exhibits that we just went through, 124-A through P, those appear to be the memoranda that you were referring

to when you testified at trial as far as what you had received from Dr. Randall?

A.    They would appear to be.  I don't remember.

Q.    Now, in your testimony at trial, and I'm not asking you about -- this question is independent of your testimony, I'm on to another question.

Do you recall that you received, amongst the material that you received were reports of interview that had been done by FBI agents who themselves were conducting a background investigation similar to a mitigation investigation concerning Mr. Allen?

A.    No, I don't remember.

Q.    Or not?

A.    No, I'm not saying that couldn't have happened.  I don't remember it.

Q.    Okay.  So if I show you -- I'm showing you Exhibit 125, which is an FBI interview by M.L. Willett and Dennis Rice on February 24,1998 of a W.P. Boykin, a security guard at the St. Louis Board of Education concerning the circumstances surrounding Mr. Allen's behavior at, I believe it is Sumner. Is it possible that you received this or are you saying definitively I didn't, or you just have no recollection?

A.    No, I'm saying it's possible I could have received it. I don't remember.

Q.    I'll show you Exhibit 129.  This is a memoranda by

Deputy U.S. Marshal Jeff Graue.  Subject:  Billie Allen.  To: File.  Dated May 19, '97.  So this would be about two months after the offense, correct?  The offense happened on March 17, 1997?

A.    Yes.

Q.    And do you recall receiving this information that on this date, Deputies Adler and Graue arrived at the Arnold Jail to move Billie Allen, and while there Allen asked to speak to Jeff Graue off on the side, out of the hearing of jail officials?  Allen stated that he was not the shooter and wanted to make a deal with someone, and that he could tell of narcotics coming through the airport.  He also stated that his family might be at risk if this information got out.  He indicated the amount of narcotics may be near 100, but he did not state whether it was kilos or pounds.  And Allen was told we would pass this information on.

A.    I knew that Billie Allen -- I did remember reading something that said Billie Allen tried to make a deal.  I can't tell you if this is the specific document.

Q.    Is this kind of activity, in other words, Mr. Allen's perception of his circumstances and offering to cooperate and make some sort of a deal for himself, is that anything that's at all relevant to you in evaluating his mental health and what's going on in his head?

A.    It's relevant.  But it's not -- it's not definitive.

It also tells me, you know, the same grandiosity that has been seen in him throughout.

Q.    And Exhibit 138, an interview with Sam Moore, who was a coach and an acquaintance from the neighborhood, is that something that you recall seeing or is that name familiar to you?

A.    The name is not familiar to me.

        THE COURT:  What was the name again, please?

        MR. HOLTSHOUSER:  Samuel Moore.

        THE COURT:  Samuel.  I got it.

Q.    I'm showing you page 2 of this interview.  And there's a reference to interviewing Mr. Moore about parental style. And here I'm asking if you recall this information being provided to you that Mr. Moore said that "Billie was on punishment.  Try to keep him stay in the house.  She'd mop him up."

        And then also down at the bottom, "Everybody knew Bill would be on punishment -- be put on punishment.  That his mother would kick his ass in the street."

        Do you recall seeing this information concerning -- developed by the trial team?

A.    No, not at all.

Q.    Do you recall who Raymond Petty was, a brother of Juanita and Billie Allen's uncle?

A.    Yes.

Q.    And why do you recall who he was?

A.    Didn't he have -- didn't I just read a deposition by him?

Q.    No.

A.    I thought --

Q.    I don't think he was deposed.  Well, do you remember him as he was somebody who testified at trial in the penalty phase?

A.    That I don't know.  I was excluded.

Q.    And Dr. Randall had an interview of him?

A.    I was excluded from anybody testifying at trial.

Q.    If we go back up to the first page of this, this is Exhibit 141.  It's another one of these typed interviews by Dr. Randall, correct, that you referred to having received at least some of in your trial testimony?

A.    Yes.

Q.    Directing your attention to this part here in the memo, "One time she was getting on him.  She was beating him.  He was supposed to be in a certain time, and do something, and he didn't do it.  He's 16-18-18, not too long ago.  Bill calls me, I drive to his house.  I jump in between them.  He broke out of the house and ran.  I never got beat like that before.  She was whooping him with an extension cord, just whacking at him.  It just went back to slavery times.  I couldn't see my blood getting beat like that.  I've never

seen that kind of beating before."

A.    I have no memory of ever seeing anything like that, no memory whatsoever.

Q.    In terms of the information that you admittedly did have, though, was that Juanita Allen physically disciplined Billie to the end, correct?

A.    That I had.  That I had.

Q.    And the example that Mr. Raymond Petty is describing is an example of her reaction to his, Billie Allen's, breaking of a rule, not being home at a certain time, correct?

A.    That's what it states here.

Q.    Now, one of the themes that you reference is this notion of abandonment, and that she would kick him out of the house and lock him out of the house, that he couldn't come back in and so forth.  Do you recall that?

A.    That's correct.

Q.    All right.  Does it make sense to you that that is correct and accurate, if she's beating him for not being home at a particular time?  Does that sound like a bit of a conflict in terms of what might be the true historical facts?

A.    No.  My belief is that she was an alcoholic.  And as an alcoholic, she was extremely unpredictable and she would explode in rage.  She would explode in rage if he was at home.  She would explode in rage if he wasn't at home.

Q.    So I guess the question is, though, which is it, is she

abandoning him by kicking him out of the house, or is she abusing him by beating him when he comes home late?

A.    Both.

Q.    Okay.  Do you ever recall seeing any of these memoranda by Andrew Rackers?  This is Exhibit 144, an interview of LaTasha Valentine on February 6, 1998.  That's Tasha, Billie's girlfriend.

A.    I don't know who Andrew Rackers is.

Q.    Pardon me?

A.    I don't know who Andrew Rackers is.

Q.    Okay.  My question was, have you ever seen his memorandum before?

A.    No.  I don't know.  I haven't seen it, and I don't know who he is.

Q.    But you know who Tasha Valentine is?

A.    Yes.

Q.    Okay.  The reason we got off onto this had to do with this entry in Mr. Simon's note, that from Cuneo's report, it's clear he got all of David Randall's interviews.

A.    I don't see how from my report would show that.

Q.    Is he perhaps referring to an oral report?

A.    No.

Q.    Okay.  And you're sure of that?

A.    Yes.

Q.    How are you sure?

A.    Because I -- I only wrote one report.  Now, I can't say what he's saying.  But, I mean, I can't tell you what he means because I didn't write down the stuff.  This is his perceptions.  But I only did one report.

Q.    And that report, this is a partial note in Mr. Simon's notes, "Cuneo says this report deals primarily with," and then it's blank.  The only report you wrote, as you said, deals primarily with competency, correct?

A.    Yes.

Q.    And then there's a question mark, "When's that report coming?"

A.    What's the date of this note?

Q.    This note is February 23, 1998.  That's -- we're going in sequence here.  We moved from the conversation where you had the interview with Billie Allen of February 22nd.  This is the day after.

A.    Okay.  I don't know when that report -- I have no idea what he's talking about.

Q.    The only other report, though, besides the competency report might be the report relating to what your opinions are going to be regarding mitigation, correct, the report you never prepared?

A.    I never did prepare a report for that.

Q.    That's the only possible report by you that could be coming, though, correct?

A.    Correct.

Q.    On February 23, 1998?

A.    Yes.

Q.    Then there's a reference in there to "Notes as Jencks." Your notes when you testify could possibly be considered Jencks material.  Do you know what Jencks material is?

A.    No, I do not.

Q.    Your prior written statements or your actual writings concerning the topic that you're testifying about, you're not familiar with that concept in the law?

A.    No.

Q.    "Cuneo's work product that formed the basis for his report."  Would that work product include things like any interviews that had been sent to you to consider, any medical records, hospital records, school records, criminal history records, things like that?

A.    But if you look at the next one, it says, "If all Cuneo did was talk to Randall."  See, I can't remember getting all that stuff.

Q.    "If all Cuneo did was talk to Randall," that might solve the problem of your work product forming the basis for your report and having to produce it, correct?

A.    I'm not following you.

Q.    Okay.  We'll move on.  And then there's a notation by Mr. Simon.  "What if I had interviewed witnesses and then

talked to Cuneo?"  Does it appear to you that there's an issue going on or a debate going on as to perhaps how to circumvent production of materials to the government?

MS. CARLYLE:  Objection, calls for speculation.

THE COURT:  Yeah, well, if he knows.  Don't guess or speculate.

Q.    Were you part of any such conversations?

A.    No.  I don't know what any of this is about.  No.

Q.    Then there's a notation, "Second report for Cuneo.  Not much" -- and then it's illegible.  "As a practical matter, a zero with a cross through it, to worry.  Need to close next week.  Middle of next week."

Were you aware that as of February 23rd, 1998, the week following, probably the guilt phase would end, and shortly after that the penalty phase would begin?

A.    No.

Q.    Were you being kept abreast of the progress of the trial --

A.    No.

Q.    -- knowing when you might be needed to testify?

A.    No.

Q.    Did you have any idea when you might be needed to testify?

A.    I think I was told I could testify that week if I was needed, and keep two or three days open.

Q.    Let me show you Exhibit 399.  Do you recognize the handwriting here?

A.    No.

Q.    Do you see this note references you, "Cuneo"?

A.    Yes.

Q.    "Cuneo says there will be no second report.  Should I call Holtshouser now, and tell him that?"

A.    Who --

Q.    So does this refresh your recollection at all as to who it was that decided, that made the decision that there would be no second report concerning your mitigation opinions?

A.    Who is writing that and who is it to?

Q.    I believe it's Mr. Simon.

A.    Who is it to?

Q.    To file, to himself, to Mr. Sindel, to Dr. Randall.  Probably to Mr. Sindel is my guess, but -- my question is does the notation in there by Mr. Simon refresh your recollection that it was you who made the decision that there would be no second report concerning your mitigation opinions?

A.    I can't make that decision.  That's the Court's decision.  I wouldn't even --

Q.    Do you know -- listen to the question.  Does this refresh your recollection --

A.    No.

XI - 261

Q.   -- as to who made that decision?

A.   No, not at all.  I know it wasn't me.  I don't make that decision.

Q.   That's the question.  You've answered the question.  Thank you.

We're going to move on to the next question.  Show you Exhibit 496.  I think we may need to blow this up.  "Meeting with Cuneo, John, Rick."

A.   Okay.

Q.   Do you recall having a meeting with Mr. Sindel and Mr. Simon together shortly before it appeared when you were going to -- the penalty phase was going to start and you were going to testify?

A.   I believe I did the 3rd and 4th.

Q.   The 3rd and 4th did what, had a meeting with them?

A.   Yeah.  I went and met with them two days in a row before I was to testify.

Q.   Do you see down here, there's a note, "Get Gelbort/Cuneo, Billie's statements"?

A.   Okay.

Q.   Did you ever receive any of that that you remember?  Does that refresh your recollection as anything you received?

A.   I have no independent memory at all.

Q.   Do these notes -- and, again, I'm going to go over what's in them.  And, again, we're still in Exhibit 496.  And

the question is, to what extent this refreshes your recollection as to discussion of these topics at your meeting with John and Rick.  Remorse or lack of.  Length of deliberation.  Ability to plan.  Cruelty of event.  Risk of harm to others.  Planned to rob bank when guard was not there."

A.    Pardon me?

Q.    "Some frontal lobe problems.  Attention deficit.  Impulsive."

A.    Whose notes are these?

Q.    I believe these are Mr. Simon's or Mr. Sindel's -- Dr. Randall's notes.  Dr. Randall has identified these as his notes of a meeting between you, John Simon, and Rick Sindel prior to the start of the penalty phase.

A.    Okay.

Q.    Let's go back to the top I guess of this.

A.    Is there a date?

Q.    They are not dated.  The context is, "Start Tuesday."  And then there are dates of February 26 and February 27.  There's also 2/25.  These are in the period during which the penalty phase is coming soon.

A.    I believe --

Q.    I don't have a specific date for you.  I don't know if that helps.

A.    I thought it was -- I thought according to my bill, we

had a meeting, was it the 22nd, or what's the date on there where I went down to the jail to see him a second time?  Was that the 24th or the 22nd?  It would have been the 22nd.  Yeah.  I'm guessing that meeting would have been on the 22nd or the 3rd or the 4th, because those are the only meetings we had.

Q.   Okay.  So we already saw that there were some notes that Mr. Simon took at a meeting on February 22nd.  And that -- this note reflects by Dr. Randall meeting with you, Mr. Simon, and Mr. Sindel.  You think it's on the 22nd.  So would these be Dr. Randall's version of his notes of that same meeting?

        MS. CARLYLE:  Objection to how he could possibly know that.

A.   I don't know.

        THE COURT:  He said he didn't know.

Q.   Okay.  So if we go back to what's in there, these topics that I was just showing you, you're the only mental health expert at this meeting.  It's you --

        MS. CARLYLE:  Objection, Dr. Randall is a psychologist.  He's also a mental health expert.

        MR. HOLTSHOUSER:  I'm not actually sure he's a psychologist at the time of trial, because the testimony says he didn't have his license at the time, but that's neither here nor there.

XI - 264

Q. But you at this point in time are going to be the mitigation expert at trial, correct?

A. I thought Dr. -- I thought I was and Dr. Gelbort.

Q. Dr. Gelbort isn't at that meeting according to those notes, correct?

A. Okay. You asked me who was going to be the mitigation expert at trial.

Q. At this meeting, are you the only person who is going to be a mitigation expert at trial?

A. Tell me when the meeting was. Those aren't my notes.

Q. You just figured out that that meeting was probably February 22nd by going back to your bill.

A. If it was February 22nd, I was going to be the mental health professional at the trial.

Q. And if these are Dr. Randall's notes, and the people who are present is Dr. Randall, the writer; you; Rick Sindel; and John Simon, you were the only one at this meeting that is a potential trial witness as a mitigation expert, correct?

A. If those assumptions are correct, yes.

Q. So are you giving input into these topics being discussed at this meeting? What was your role at the meeting?

A. I don't have any independent memory of the meeting. I'm not saying it didn't take place and I'm not saying those notes aren't accurate. I'm saying that I don't have any

independent knowledge of the meeting, memory of the meeting.

Q.    Why were you having a meeting with Dr. Randall, Mr. Simon, Mr. Sindel?

A.    Which date was I having -- tell me when I was having the meeting, and then I can tell you -- if it was on the 22nd, it would have been to prepare for mitigation.

Q.    And why would you be discussing mitigation with those individuals?

A.    Because in less than a week and a half away, we were going to trial, two weeks away we were going to trial.

Q.    So was the purpose of the meeting to be able to convey to them what your professional opinions are going to be at the trial?

A.    Based on the little bit of information that I had to date, yes.

Q.    And that included at that point in time, February 22nd, a completion of the interviews with Mr. Allen on February 6 -- on January 16, February 22nd.  And according to your report, a review of materials from Dr. Randall, correct?

A.    Some of it.  Because I'm saying some of that I know I didn't get.  But I'm also saying, this is -- you're taking a death penalty case, and you're trying to get all the information in a month, less than a month.

Q.    My question is to you at this meeting, is your role to receive information from them or are you conveying to them

what it is you think about the mitigation?

A.    It's both.  But what happened is that information I would get, and I'd say this is my opinion, this is what I've got.  They, of course, have final decision.  And then I'd say, well, you know, I need this.  And then they would come back and they would get me additional information.

Q.    They have final decision as to what?

A.    The trial attorney always has final decision of --

Q.    Of what?

A.    Of whether he's going to put me on or not put me on.  I have an opinion, whether he wants it or not, he may not want me there.

Q.    But he doesn't have final decision or he doesn't have authority over what your opinions are, correct?

A.    No, none whatsoever.

Q.    So in order to know whether to decide whether to put you on or not, doesn't the attorney need to know what your opinions are going to be?

A.    Yes.

Q.    And was there ever a point in time when you communicated what the mitigation opinions were going to be to Mr. Simon and Mr. Sindel and Dr. Randall?

A.    I don't know about Dr. Randall, but I do know on the 3rd and 4th we met.  And, again, I apologize for the lack of memory, but it was 14 and a half years ago.

Q.    And at some point in these meetings, obviously you can't say which meeting, you're communicating to counsel what your opinions are going to be regarding mitigation, correct?

A.    Correct.

Q.    Opinions which you never put into a report and never reduced to writing, correct, other than your competency report?

A.    That is correct.

          MS. CARLYLE:  I'm going to object to the relevance of that fact to this proceeding.  If there was a trial issue about whether Cuneo should have made another report, it needed to be raised at trial.

          MR. HOLTSHOUSER:  I think it is at least relevant to credibility, Your Honor.

          THE COURT:  Overruled.

BY MR. HOLTSHOUSER:

Q.    In your billings in March 1st, 3rd, 4th, you're still spending hours reviewing information, correct?

A.    Yes.

Q.    At that point in time --

A.    And going through my notes.

Q.    I mean, what information could you be reviewing for that many hours if not these memoranda of interview from Dr. Randall?

A.    Probably the police reports, I would have gone over

again.  I would have looked at my report again.  I would have looked at all my notes again.

Q.    What would the police report --

THE COURT:  Wait, let him finish.

A.    I would have gone through my notes again.  I would have gone through the different ways they thought things might have been effective in presenting.

Q.    What would you be reviewing at that point in time regarding ways that they would think things would be effective?

A.    Well, on the 3rd and the 4th, we would have probably known how they were going to present my testimony.

Q.    What would you be reviewing?  Did you have some written information from them as to what --

A.    I probably asked them to write me out the questions they are going to ask, so I knew what order they were going to be in.

Q.    Did they ever provide you with a written -- any writings as far as what themes they wanted to stress in the mitigation phase?

A.    No.  Rick Sindel doesn't do -- no.

Q.    Okay.  So the information that you're reviewing for these hours that we see here in the billing, as much as you're reviewing, does at this point seem -- and given your trial testimony, does it appear to you that you likely had

numerous memoranda of interview from Dr. Randall, the ones we just looked at?

A. I know I didn't get them all.

Q. Do you think you had some of them?

A. I may have had some of them.

Q. But you can't sit here and tell us which ones, correct?

A. I cannot.

THE COURT: Is this a good spot, jumping off place, or do you want to finish a line?

MR. HOLTSHOUSER: If I could just finish a little bit here, Judge, I think it might at least get us to a good point.

THE COURT: All right. Go ahead.

MR. HOLTSHOUSER: Anybody have any objection?

THE COURT: Well, it depends on -- I already told the court reporter we'd quit at five. So if it's just a couple more questions.

MR. HOLTSHOUSER: That's about all I have, Judge. I actually just want to get into one more exhibit.

BY MR. HOLTSHOUSER:

Q. You mentioned a minute ago reviewing what counsel was going to stress or thought would be important, correct?

A. Correct.

Q. I'll show you Exhibit 505. Do you ever recall seeing this document, "Factors that Affected Billie's Life,"

prepared by either Dr. Randall or Mr. Simon?

A.    I don't -- do you know who prepared that?

Q.    Well, you just indicated that Mr. Sindel doesn't do this kind of thing, so we can exclude him I guess based upon your testimony.

A.    I don't know who prepared that.

Q.    I think Dr. Randall identified this in his earlier testimony in this hearing that it was his work product.

A.    Okay.

Q.    So in your meetings, were you ever exposed to this?

A.    I have no independent recollection if I was.

Q.    "Factors that Affected Billie's Life."  "Febrile seizures and Phenobarbital."  Was that something you were aware of?

A.    I know he had febrile seizures.  I didn't know the Phenobarbital.

Q.    "Lead poisoning."

A.    That I knew.

Q.    "Poor maternal role model."

A.    Did not know that.

Q.    So what you're saying is that they had developed information concerning "Factors Affecting Billie's Life" that included information that Juanita Allen was a poor maternal role model, and they didn't share it with you; is that right?

A.    I'm saying that I didn't know this.

Q.    Okay.  So that you would infer from that, if they had this information, they didn't share it you, that you didn't know it?

A.    It would appear that there are a variety of things that a variety of people didn't share with each other.

Q.    How about "Genetic predisposition to addiction"?

A.    I'm not sure that was talked about, but yes.

Q.    You were aware of that in Billie Allen's Life History?

A.    Yes.

Q.    And that, again, is kind of like the PTSD thing, it's an increased risk factor, correct?

A.    That is correct.

Q.    Existence of a family member with alcoholism does not prove that someone is an alcoholic, does it?

A.    No.

Q.    And similarly, someone who has a history of child abuse, does not establish that they had PTSD, correct?

A.    That is correct.

Q.    "Severe learning and communication problems run in his family."  Were you aware of that?

A.    No.

Q.    "Difficulty learning in school."

A.    I knew that.

Q.    "No adequate intervention in school for learning problems."

A.    In Clayton there was.  His transition to Sumner, there was not.

Q.    There was not.  And that's the next topic is "Transition to Sumner dramatic."  That was something you were aware of?

A.    Yes.

Q.    "Physical abuse and beatings."

A.    I was completely unaware of that.

Q.    And that included the information you received in your own notes that Juanita Allen had physically disciplined Billie Allen to the end?

A.    I did not know the extent of this.

Q.    What exactly did your entry mean "to the end"?  To the end of what?

A.    I'm not sure.  I don't know.

Q.    "Brutal neighborhood."

A.    That I knew.

Q.    I mean, you've -- have you lived in St. Louis most of your life, most of your adult life?  I don't know if you're from here.

A.    Yeah, I'd say all of my adult life with the exception of one year I lived in Belleville.  And one year I lived -- I had an internship in Indianapolis, and two years in South Dakota.  Other than that I've been in St. Louis all my life.

Q.    Okay.  So you didn't need an expert to tell you that --

concerning the circumstances and conditions that existed in neighborhoods, particularly the Ville neighborhood in North St. Louis, did you?

A.    Did I need an expert to tell me that parts of it are bad?  No.

Q.    Yes.  And a lot of clients that you've dealt with came from that neighborhood, didn't they?

A.    Most of the clients I have are from Illinois, but we have similar neighborhoods in East St. Louis and Washington Park and Centreville.

Q.    Okay.  "Death of friends Dennis Noble and Marquis Taylor."  That was on your radar, correct?

A.    Yes.

THE COURT:  Let's --

MR. HOLTSHOUSER:  That would be the breaking point, Judge.

THE COURT:  Yes.  We'll be in recess until 8:30 Monday morning.  Do we know or can we tell Dr. Cuneo when --

MR. HOLTSHOUSER:  We're going to have probably five minutes to discuss.

THE COURT:  We'll be off the record now.  The record is closed.

(Court in recess at 5:07 p.m.)

                    C E R T I F I C A T E

          I, Susan R. Moran, Registered Merit Reporter, in

and for the United States District Court for the Eastern

District of Missouri, do hereby certify that I was present

at and reported in machine shorthand the proceedings in the

above-mentioned court; and that the foregoing transcript is

a true, correct, and complete transcript of my stenographic

notes.

          I further certify that I am not attorney for, nor

employed by, nor related to any of the parties or attorneys

in this action, nor financially interested in the action.

          I further certify that this transcript contains

pages 1 - 274 and that this reporter takes no responsibility

for missing or damaged pages of this transcript when same

transcript is copied by any party other than this reporter.

          IN WITNESS WHEREOF, I have hereunto set my hand

at St. Louis, Missouri, this 28th day of February, 2013.


                              _____
                              /s/ Susan R. Moran
                              Registered Merit Reporter