UNITED STATES OF AMERICA
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

BILLIE JEROME ALLEN,            )
                                )
          Petitioner,           )
                                )
     vs.                        )   No. 4:07-CV-27 ERW
                                )
UNITED STATES OF AMERICA,       )
                                )
          Respondent.           )


TRANSCRIPT OF EVIDENTIARY HEARING

BEFORE THE HONORABLE E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE

December 3, 2012
Volume XII

APPEARANCES:

For Petitioner:      Ms. Elizabeth U. Carlyle
                     P.O. Box 30418
                     Kansas City, MO  64112

                     Mr. Eric John Montroy
                     Mr. James Henry Moreno
                     Mr. Timothy Kane
                     FEDERAL COMMUNITY DEFENDER OFFICE
                     The Curtis Center, Suite 545 West
                     Philadelphia, PA  19106

For Respondent:      Mr. Steven E. Holtshouser
                     Ms. Carrie Costantin
                     OFFICE OF U.S. ATTORNEY
                     111 S. 10th Street, 20th Floor
                     St. Louis, MO  63102


REPORTED BY:         SUSAN R. MORAN, RMR, FCRR
                     Official Court Reporter
                     111 South 10th Street
                     St. Louis, MO  63102
                     (314) 244-7983

INDEX

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|

PETITIONER'S WITNESSES


NICOLE PETTY
    (By Mr. Montroy)      3

CHRISTOPHER WUERTZ, PhD
    (By Mr. Kane)      27
    (By Mr. Holtshouser)      39

DANIEL J. CUNEO, PhD
    (By Mr. Holtshouser)      68 (Cont'd)
    (By Ms. Carlyle)      247

(The following proceedings were held in open court on December 3, 2012 at 8:33 a.m.:)

MR. MONTROY:  Good morning, Your Honor.

THE COURT:  Will we be doing exhibits some time later this morning?

MR. HOLTSHOUSER:  Yes.

MS. COSTANTIN:  Yes, Judge.

THE COURT:  Good morning.

THE WITNESS:  Good morning.

THE COURT:  You may inquire.

NICOLE PETTY,

Having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. MONTROY:

Q.   Good morning, ma'am.

A.   Good morning.

Q.   Just a couple things, if you could take that microphone --

THE COURT:  Could I get the full name on the record.

MR. MONTROY:  Oh, yeah, sure.

Q.   Sure.  Could you please state your full name for the record, please.

A.   Yes.  Nicole Alice Petty.

Q.   And what I was saying before, if you could just speak

loudly into the microphones when answering the questions, that would be great.

A.    Okay.

Q.    Ms. Petty, besides Nicole, do you go by any nicknames?

A.    Yes, Nikki.

Q.    And, Ms. Petty, where do you live?

A.    4535 Cote Brilliante.

Q.    And who do you live with at that address?

A.    My mom and my sister, Yvette Allen.

Q.    And your mother is?

A.    Juanita Petty Allen.

Q.    And how long have you lived at that address?

A.    I moved back there in 2007.

Q.    Okay.  So there was a time period when you were away from that address?

A.    Yes.

Q.    And where were you living then?

A.    I don't remember the address.

    THE COURT:  Just a second.  The court reporter and I are really struggling.  You really need to be right up on that microphone, please.  It sounds really loud but -- that's good.  Just a little closer.  Thank you.  Let's try that.

Q.    What years were you living away from the address on Cote Brilliante?

A.    2007, for a --

Q.    For a year?

A.    For a couple months.

Q.    Okay.  Did you live on Cote Brilliante when you were a child?

A.    Yes.

Q.    And other than that period of time that you were away for a couple months in 2007, have you always lived at that address?

A.    I lived somewhere else in St. Andrews in, I believe in 2000 or 2002.

Q.    And where is St. Andrews?

A.    It's in Normandy, Missouri.

Q.    Okay.  When you were a child, did you always live on Cote Brilliante, or did you live at another address?

A.    We lived at a couple different places.

Q.    What were those places, do you recall?

A.    We lived right around the corner from Cote Brilliante, we lived on Garfield.  And when I was really young we lived somewhere else on Alcott.

Q.    Okay.  And were there any other addresses?  Did you ever live on Evans Street?

A.    Oh, yeah, 4608 Evans.

Q.    I'm sorry?

A.    4657, I believe, Evans.

Q.    Now, when you were living on Evans Street and when you

were living on Cote Brilliante, did you live with Billie
Allen?

A.    Yes.

Q.    And what is your relationship to Billie Allen?

A.    His sister.

Q.    And are you older or younger?

A.    I'm the oldest of four.

Q.    You're the oldest of four?

A.    Uh-huh.

Q.    How much older are you than Billie Allen?

A.    Two years.

Q.    When you were living on Evans Street -- well, let's
take a step back.  Where is Evans Street?

A.    Evans is between Cora and Taylor in St. Louis city.
It's between Cora and Marcus.

          THE COURT:  Could I get you to do this, kind of give
a little more power to your voice because she's really having
trouble hearing.  And the record has to be just exactly
right.

          THE WITNESS:  Okay.

          THE COURT:  Thank you.

BY MR. MONTROY:

Q.    And is that -- is Evans Street located in the Ville
neighborhood in St. Louis?

A.    I believe that is considered the Ville area.

Q.   When you were living on Evans Street, do you remember approximately how old you were when you were living there?

A.   I believe we left when I was ten years old.  I'm not for sure how long we lived there, but I know we left when I was ten.  So maybe -- I'm not sure --

Q.   Okay.

A.   -- how long we lived there.

Q.   Fair enough.  And I believe you testified Billie Allen lived at the Evans Street address with you; is that right?

A.   That's correct.

Q.   Who else lived on Evans Street?

A.   It was myself, my mom, my two sisters, and Bill.

Q.   And did your father live on Evans Street?

A.   Yes, my father too.

Q.   And what was that house like?  What did it look like?

A.   It was a little chaotic.  We didn't have much.  There was drugs all around.  I remember as a kid seeing -- next door there was a vacant house.  I remember seeing someone using drugs through my window, my bedroom window.

Q.   I'm sorry.  Just talking about the area around the house on Evans Street, just taking even a step back, was the house on Evans Street, was it a single house, was it a duplex, an apartment?

A.   It was a four-family flat.  There were three other apartments.

Q.   Okay.  And did you have any other family members living in those other flats that you recall?

A.   No.

Q.   Okay.  Now, you had said that there was a vacant house next door?

A.   Yes.

Q.   And how far was that vacant house from where you lived?

A.   It was right next door.

Q.   And, well, describe if you could from what you remember what the neighborhood was like at that time when you were living on Evans Street.

A.   There were a lot of people I guess not working because a lot of people were hanging out, lots of drugs, alcohol. There was a liquor store right on the corner, so there were bottles everywhere, people hanging out.  Lots of crime in the area.  One time leaving from there we were robbed at gunpoint walking through the alley.  So there were a lot of crime.

Q.   When you were robbed at gunpoint walking through the alley, who were you with?

A.   It was my mom, I believe Bill.  I believe we were all there because we would go from my grandfather's house on Cote Brilliante and walk over there, so we were walking in the alley, and we were robbed at gunpoint.

Q.   Where was the alley located?

A.   It's right behind the house.

Q.    And when -- what would go on in the alley?  Is that what you were saying, there were people hanging out in the alley?

A.    Yeah, there would be people.  We had kind of a -- there was a back yard I guess where you could park your cars.  So people would just hang out in the back yard.

Q.    Okay.  Did the back yard, was it a yard that had grass or was it just like a driveway?

A.    No, it was like concrete.

Q.    The people that would hang out in the driveway, were they people that you knew?

A.    Yes.

Q.    Who were those people, do you recall?

A.    I guess friends of my father's.

Q.    You had mentioned that there was a lot of, you know, drug use and alcohol use in the neighborhood that you observed.  Was that something that went on in your own household?

A.    My father, he did drugs and alcohol.

Q.    And was there a time that you saw your father either intoxicated or high?

A.    He was high or intoxicated -- I think as a kid I wasn't sure the difference.  I just knew that his mood was different.  I just knew when I was younger that it was alcohol.

Q.    And was that something that was regular --

A.    Yes.

Q.    -- or just once in awhile?

A.    No, it was regular.

Q.    How would your father act when he was intoxicated?

A.    He was very playful.  He was -- he was a totally different person when he was drinking than when he was not drinking.  When he was not drinking, he didn't want to be bothered.  He didn't do much.  Well, he didn't do much anyway, but he didn't want to be bothered when he was not intoxicated.

Q.    When you say he didn't do much anyway, what do you mean by that?

A.    I don't recall him working.  I know when we were younger and we lived on Alcott, we would talk about him going to work.  But I don't remember him going to work at all on Evans.

Q.    Do you recall seeing your father drink alcohol?

A.    Yes.

Q.    Would he drink alcohol in the house?

A.    Yes.

Q.    You testified that you would see your father hanging out in the back yard and the back driveway with people?

A.    Yes.

Q.    Did you ever recall what he was -- I'm sorry, do you

recall what he was doing back there?  Were they just hanging around?

A.    Just hanging around and drinking.

Q.    How did your -- how did your brother get along with your father back during that period?

A.    I guess it wasn't a good relationship.  I don't remember them doing much together, him taking him anywhere or doing any activities with him.  I don't remember much interaction.

Q.    Do you recall whether or not your father was ever physically abusive towards your brother?

A.    He would hit him.

Q.    Was that something that happened a lot or was that something that happened occasionally or do you not remember?

A.    It didn't happen that often.  The one time that I do remember was when Bill was playing with a teddy bear in the kitchen, and the teddy bear caught fire.  The stove was on and it caught fire.  And the teddy bear -- the fire made the curtains catch fire, and so that's one of the main times I remember like a beating.

Q.    So Bill was playing with the teddy bear and the teddy bear caught on fire and that led to the curtains being caught on fire?

A.    Yes.  And the fire department had to come.

Q.    And what happened with -- what happened with Bill?

A.   He was in trouble.  I guess he was hit.  He was hit for it, setting the kitchen fire, even though it was an accident.

Q.   Who hit your brother on that occasion?

A.   I remember my mom being home at the time, so I think he was in trouble with her first, and then my father came home later.

Q.   Okay.  And just to be specific, when you say he was "in trouble," are you saying that Bill was hit?

A.   Yes.

Q.   Do you specifically remember your mom hitting Bill --

A.   Yes.

Q.   -- for that occasion?  And where was she when she hit him?

A.   She was, I believe, in the living room or the bedroom at the time.

Q.   Okay.  And do you remember, did your mom hit Bill with her hand or did she hit him with an object?  How do you remember her hitting him?

A.   I just remember the sound.  I wasn't in the room, I believe, when it went on.

Q.   So what was the sound that you remember?

A.   I just remember him crying.

Q.   Okay.  And what led you to believe that he was being hit?

A.   I mean, you can hear it.  We lived in a really small

apartment, so you could still hear everything there.  You could hear the hitting.

Q.    So you could hear Bill actually being hit from a different room?

A.    Yes, he was screaming and crying.

Q.    And then at some point your father came home?

A.    Yes.

Q.    And what did your father do?

A.    I guess my mom -- well, she didn't have to tell him about it because he could see what went on.  But he was in trouble, which he was beaten for setting the kitchen on fire.

Q.    What was your dad's -- what was his demeanor like when he came home and found out what had happened, what was he like?

A.    I guess his reaction was like anyone's, he wasn't really happy with what happened.

Q.    And you said that he hit Bill; is that right?

A.    Yes.

Q.    How did he hit Bill?

A.    I'm not sure.

Q.    Okay.  Do you remember where he was hitting him?

A.    No.  You mean on his body or the place?

Q.    In the house, where he was hitting him on his body, anything that you can remember about it?

A.    No, I wasn't in the room either when he did.

Q.    Okay.  Where were you?

A.    In my bedroom.

Q.    Then how do you know that your father was beating Bill?

A.    You can hear it.  Like I said, it's a really small apartment, you can hear when someone is getting beat and, you know, they are crying and screaming.

Q.    Okay.  When you were living on Evans Street, were your mother and father married?

A.    Yes.

Q.    What was your parents' relationship like when they were married and living on Evans Street?

A.    It wasn't a good relationship.  My mother always thought that my father should do more.  He didn't work.  He didn't go to conferences.  He didn't go to any of the activities.  So it was always an argument or, you know, fight about things like that.

Q.    And when you say that your parents fought, was it a physical fight?  Was it a verbal fight?

A.    I remember there was always verbal fighting, but I remember a couple times, there weren't many, that physical fighting.  My father put his hands on my mom and she had to call my uncles over to come get us.

Q.    Okay.  And did they come over and get you guys?

A.    Yes.

Q.    Did they take you out of the house?

A.    Yes, we went to my grandfather's house.

Q.    When you say your father put his hands on your mother, what exactly did he do, do you recall?

A.    He -- I guess they were physically fighting.

Q.    Okay.  Do you remember whether or not your father hit your mother?

A.    Yes.

Q.    When your father hit your mother, did your mother hit your father back?

A.    Yes.

Q.    Did they punch each other?  Did they kick each other?  What do you remember seeing about it?

A.    I don't recall what went on, but I do remember the fight.

Q.    Okay.  Aside from that incident that you just described, do you remember any other fights between your mother and your father?

A.    I can't recall any others.

Q.    When your uncles came over and got you guys, do you remember if Billie was there?

A.    Yes.

Q.    Were there -- let me step back for a second.  You had said that there were always verbal fights?

A.    Uh-huh.

Q.    And what do you mean by that exactly?

A.   Arguments.  Like I said, arguments about my mom wanting him to do more.  We were in a household with two parents, so she felt like she was the only one doing something.

Q.   And these fights that you remember, were they -- how were your mom and dad acting during those fights?

A.   It was loud.  A lot of, you know, cursing and things like that.

Q.   Were you and your sisters and Bill present for those arguments?

A.   Yes.

Q.   Did your parents ever fight over your father's drug use?  Was that ever an issue between them?

A.   I believe so.  I can't recall any arguments about it, but those were some of the problems in the relationship, the alcohol and him not working and hanging out and not doing much.

Q.   Did there come a time when your family left Evans Street?

A.   Yes.

Q.   And I think you said you were about ten years old then?

A.   I believe so.  I was in the 5th grade.

Q.   And where did you go?

A.   We went to live with my grandfather on Cote Brilliante.

Q.   And is that the house that you live in today?

A.   Yes.

Q.    Do you recall when you -- when you moved there, why it was that you left Evans Street and moved to Cote Brilliante?

A.    I believe my mom was fed up with my father not doing much, and the drinking, drug use.

Q.    Did your mom ever have a conversation with you about why you left your father and his house?

A.    I don't recall a conversation about it.

Q.    When you moved to the house on Cote Brilliante, do you remember who was living in that house?

A.    My grandfather.  And I believe for a short time my uncle might have been living there.  He shortly moved out with his ex-wife.

Q.    Which uncle is that?

A.    Jerome.

Q.    And that is -- Jerome is a brother of your mom?

A.    Yes.

Q.    When you moved to Cote Brilliante, your uncle was living there -- I'm sorry, when you moved to Cote Brilliante, your grandfather was living there?

A.    Yes.

Q.    And what is his name?

A.    Otha Petty.

Q.    And where did Otha live in the house?

A.    He lived in the basement.

Q.    Was Otha working when you lived there?

A.    Yes.

Q.    Do you recall when you were living on Cote Brilliante, did Otha -- well, strike that.  Was Otha married when you moved to Cote Brilliante?

A.    No, my grandma died before I was born.

Q.    Do you recall whether Otha was involved in any relationships when you were living on Cote Brilliante?

A.    Yes.  There was a lady that lived down the street, her name was Miss Nancy.

Q.    Did Otha have a close relationship with Billie?

A.    I'm sorry, what did you say?

Q.    Did Otha have a close relationship with Billie?  And what I mean by that, just to put it in some context, was, you know, was Otha someone who was, you know, regularly present in Billie's life?

A.    He was physically there all the time.  He would drop him off, but he didn't have like really a relationship, like he would take him to the ball game or anything like that or help with homework or watch television together.  He didn't have a relationship like that.

Q.    So he was -- when you say he was physically present --

A.    Uh-huh.

Q.    -- do you mean he was like physically present in the house?

A.    Right.  He was physically there, but I'm not sure if he

had like any emotional connection.

Q.   What about with you and your sisters?

A.   I think it was the same, not really an emotional relationship until maybe later.

Q.   Okay.  Did you ever observe Otha hit Billie?

A.   Yes.

Q.   Was that something that happened regularly or occasionally?

A.   I don't want to say it happened -- it happened occasionally.  The couple times that I remember, he was told to wash the dishes.

THE COURT:  Told to do what?

THE WITNESS:  He was told to wash the dishes.

A.   And when Bill was washing the dishes, I guess he wasn't happy about washing the dishes, and my grandfather I guess felt that the dishes were too loud and he wasn't maybe happy with washing dishes, so he came upstairs and started punching him.

Q.   When you say he "started punching him," who was punching who?

A.   My grandfather was punching Bill.

Q.   And do you remember where on his body he was punching him?

A.   I guess on the arms and the chest.  It wasn't like the face or anything like that.

Q.   Okay.  And what was Billie's reaction to that?

A.   He was crying.  I mean, he was being hit, so I guess he was hurt.

Q.   And do you remember --

A.   That's it.

Q.   You remember him crying?

A.   Yes.

Q.   Did Billie ever fight back when he was hit by Otha?

A.   No.

Q.   You had mentioned that Jerome, your uncle, was also living there for a period of time; is that right?

A.   Yes.

Q.   When he wasn't living there, was he around the house?

A.   Yes, all the time.  He didn't live too far away, like walking distance from the house.

Q.   Jerome is your mother's younger brother; is that right?

A.   Yes, he's the youngest.

Q.   Do you know how much older he is than you?

A.   No.

Q.   Do you recall whether Jerome had a relationship with Billie or what their relationship was like?

A.   I'm sorry, I can't remember what you said.

Q.   That's okay.  And if you don't understand my question, you can always ask me to ask it again.

     Did Jerome have a relationship with Billie?  And if

so, what was that relationship like that you observed?

A.    Um --

Q.    Do you need to -- do you need to take a second?

        MR. MONTROY:  Your Honor, may I get a glass of water?

        THE COURT:  Yeah, there's some water right there to your left.

        MR. MONTROY:  Your Honor, do you think maybe we could take a five- or ten-minute recess?  Would that be okay?

        THE COURT:  Yeah, we'll be in recess for about five minutes.

        MR. MONTROY:  Thank you.

        THE COURT:  You may step down.  You want to call the nurse, please.

        (Court in recess from 8:58 a.m. until 9:08 a.m.)

        THE COURT:  We're going to be in recess for about 15 minutes.

        (Court in recess from 9:09 a.m. until 9:38 a.m.)

        THE COURT:  I might interrupt for just a moment, we're waiting for Mr. Montroy to return.

        During the testimony of Nicole Petty, she became ill.  She started her testimony about 8:33 and just now has been escorted by the nurse out of the courtroom.  There will be more on the record about this as soon as Mr. Montroy returns to the courtroom.

In the meantime we're going to make a record on receipt of exhibits.  Whenever you're ready.

MR. HOLTSHOUSER:  Thank you, Judge.  Judge, I'm going to try to do these in chronological order or numerical order as best I can.

THE COURT:  Sure.

MR. HOLTSHOUSER:  The first would be 124-A.

THE COURT:  Okay.  That's the Martha Burns memo from Sindel.

MR. HOLTSHOUSER:  Well, it's actually 124-A all the way through P.

THE COURT:  Okay.

MR. HOLTSHOUSER:  It's the 124 series of exhibits, which I believe I showed each one.

THE COURT:  I'm going to note the following:  124-A, 124-B, 124-C, 124-D, 124-E, 124-F, 124-G, 124-H, 124-I, 124-J, 124-K, 124-L, 124-M, 124-N, 124-O, 124-P.  Okay?

MR. HOLTSHOUSER:  Yes.  125.

THE COURT:  125, received.

MR. HOLTSHOUSER:  129.

THE COURT:  Received.  That's the Jeff Graue memo.

MR. HOLTSHOUSER:  Judge, I'm going to withdraw the 125.

THE COURT:  Okay.

MR. HOLTSHOUSER:  We're not sure which one that is.

But 129 is correct.

THE COURT: Okay. Just a second. Could I have your Wite-Out, please? 125, I previously announced it was received. I'm noting that will be reconsidered at a later time.

THE CLERK: 125, I have as Boykin, W.P., 302.

MR. HOLTSHOUSER: Actually I don't think we did show that to the witness. So that may be an error.

THE COURT: Okay.

MR. HOLTSHOUSER: So we're not offering that until we go back and check notes and clarify.

THE COURT: Okay.

MR. HOLTSHOUSER: It may have been a different number, but off the top of my head at this moment, I'm not sure what it could have been.

THE COURT: Okay.

MS. CARLYLE: 129?

MR. HOLTSHOUSER: That's the Jeff Graue memo. Mr. Allen's meeting with the marshals when he made the offer.

MS. CARLYLE: Oh, yes.

MR. HOLTSHOUSER: 138, that's the Sam Moore interview.

THE COURT: Received.

MR. HOLTSHOUSER: And 141.

THE COURT: Received.

MR. HOLTSHOUSER: 144 is the interview of LaTasha Valentine.

THE COURT: Received.

MR. HOLTSHOUSER: 369.

THE COURT: 369, received -- I show it already received.

MR. HOLTSHOUSER: Yes, so do we, Judge. I apologize for that.

399. Those are handwritten defense team note, Re: Cuneo.

THE COURT: Received.

MR. HOLTSHOUSER: The next one that I show is 4 -- no, I'm sorry, strike that. 501.

THE COURT: Okay. Received.

MR. HOLTSHOUSER: 563. Those are his unredacted notes.

THE COURT: 563, received.

MR. HOLTSHOUSER: Checking the list one more time, Judge.

THE COURT: Okay.

MR. HOLTSHOUSER: Then we have two more, 682 and 683. And I believe Ms. Carlyle offered those or showed those. That's the resume and the handbook.

THE COURT: 680?

MR. HOLTSHOUSER: 682 and 683.

THE COURT: Received.

MS. CARLYLE: 208.

MR. HOLTSHOUSER: 208 was already in. All the trial testimony is in.

MS. CARLYLE: Well, I know. I also showed him 564 and got him to identify that they were not his notes. So I don't know if we want to offer them. But they were referred to.

MR. HOLTSHOUSER: We have no objection to 564. The entry in the exhibit list is incorrect. It's Simon notes, not Cuneo notes. And that would be 564.

THE COURT: 564 would be what?

MR. HOLTSHOUSER: Simon notes.

THE COURT: So I'm going to mark out Dr. Daniel Cuneo, and put John Simon unredacted notes. Received.

MR. HOLTSHOUSER: Correct.

MS. CARLYLE: 45 was already in, right? That's his voucher.

MR. HOLTSHOUSER: Yeah, that's already in. Your 684, you're not offering?

MS. CARLYLE: I'm not offering.

MR. HOLTSHOUSER: Okay. That's all I have, Judge.

THE COURT: Okay.

Mr. Montroy, could we make a record on Ms. Petty's absence? Go ahead.

MR. MONTROY: Sure, Your Honor. And actually before I do that, I'd just like to thank the Court and your staff for the patience and the kindness that they showed Ms. Petty. I know it was a probably difficult situation for her.

But as to what happened, Ms. Petty suffers from Conversion Disorder, that's my understanding anyways. It appeared as though she had an episode and was unable to complete her testimony. I think -- well, the parties will speak on how to proceed with her, trying to complete her testimony in the near future.

THE COURT: And so there's no doubt about it, you will be given every opportunity to do that, whenever you believe she will be able to reappear.

MR. MONTROY: Thank you, Your Honor.

MS. COSTANTIN: Judge, I have nothing to add.

THE COURT: For the record also, the nurse was called up on two occasions. And it was just obvious that she was hyperventilating at times and then not breathing at times. So there's no question in my mind that it would have not been in anyone's best interest to try to pursue the testimony.

There was a time when she settled down a little bit, and we thought -- she said, in fact, she wanted to proceed, and we thought that she would be able to. And then all of a sudden the episode reoccurred and she was removed in a

wheelchair by the nurse and a court security officer.

Thank you.

MR. KANE:  Your Honor, Petitioner calls Christopher Wuertz.

CHRISTOPHER WUERTZ, PhD,

Having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. KANE:

Q.    Dr. Wuertz, could you pull that microphone up.  There you go.  Good morning, Dr. Wuertz.

A.    Good morning.

Q.    Could you please tell us your profession.

A.    I'm a psychiatrist.

Q.    And are you currently in practice?

A.    No.  I retired in September of 2000.

Q.    Okay.  When did you become a psychiatrist?

A.    I obtained my medical degree in 1984.  I attended Washington University Barnes Hospital School of Medicine Psychiatric Training, and I finished my training in '88.

Q.    Okay.  Did you say '88?

A.    Correct.

Q.    So between 1988 and 2000, you were a practicing psychiatrist?

A.    Yes.

Q. And as part of your practice, were you employed by the Metropolitan St. Louis Psychiatric Center?

A. I had gone into private practice, and then in or around 1994, I started working for the State at what was then called Malcolm Bliss. It eventually became called Metropolitan Psychiatric Center.

Q. And could you just for those of us who are not familiar, tell us what kind of services the Metropolitan Psychiatric Center provided at that time that you worked there?

A. It provides acute inpatient care for largely indigent patients. We tended to see individuals with acute psychotic illnesses like schizophrenia, bipolar illness. Also individuals with substance abuse. And a smattering of other psychiatric illnesses as well.

Q. And you said, if I understood you correctly, that it was an inpatient service?

A. Correct.

Q. Was there also an outpatient component to the center?

A. There was not. We did have an emergency room, and people would be evaluated whether -- as to whether they needed inpatient treatment. And if they did not, they would be referred to our collaborating services.

Q. And in your employment history at the Metropolitan Psychiatric Center, did you work in both the emergency room

and the inpatient area or just one or the other?

A.    I worked in both.

Q.    I'm going to show you what has been marked as Exhibit 119.  Does that appear on your screen?  Do you see some -- take your time.  Does that appear on the screen in front of you?

A.    Yes.

Q.    I'm just going to page through here.  It looks like six pages here.  Can you briefly describe what these are?

A.    Sure.  Every time a patient or an individual would come into our emergency room, they would be interviewed by an intake secretary, and basic information would be obtained; age, address, et cetera.  And then they would be referred on to me to be seen.

Q.    Okay.  And does this first page reflect that Billie J. Allen visited the Metropolitan St. Louis Psychiatric Center on February 11th, 1997?

A.    Yes.

Q.    And what times does it reflect that he came in and then left the Center?

A.    The time of intake was 11:23 p.m., and the time of discharge was 12:30 a.m.

Q.    And down about halfway on the right of that page, there's something indicated, "Interviewer," and then the name Carmen O'Hara.  Do you see that?

A.   Yes.

Q.   What would that reflect?

A.   She was the intake officer or secretary who obtained all the information that's on the sheet.

Q.   Okay.  And do you see your signature a little further below on the page?

A.   I don't see a signature.  I see my name.  It just indicated that I was the physician of record who saw Mr. Allen at that occasion.

Q.   And just above that, does it indicate that you made a diagnosis of Mr. Allen on that date?

A.   Yes, it does.

Q.   And what was that diagnosis?

A.   Depressive disorder, not otherwise specified.

Q.   And just returning briefly to the top when I asked you about the times in and out.  Would those times reflect the total amount of time that he was in the ER or total amount of time that you saw him?  What -- to the best of your knowledge, what would those reflect?

A.   I think it would reflect the entire time that he had spent in the facility.

Q.   And just based -- let me first ask you this:  Do you have any memory of this particular -- of seeing Mr. Allen?

A.   I do not.

Q.   And just from your general knowledge of having worked

at the Psychiatric Center, if he had come in and left an hour and seven minutes after he arrived, about how much time typically would you have actually spent with him?

A.    I would say probably 45 minutes or so.

Q.    Okay.

A.    And that would include interviewing him as well as any individuals that may have accompanied him to the emergency room.

Q.    Okay.  Moving to the second page, and noting before we go that this first page reflects a visit on February 11th. Moving to the second page, can you read for us the date that is reflected there?

A.    February 20th, 1997.

Q.    And this, again, refers to a visit by Mr. Allen?

A.    Correct.

Q.    And would this also be an emergency room visit at the psychiatric center?

A.    I would assume so.

Q.    At history of present illness, it indicates LWBS.  Is that correct?

A.    That is.

Q.    And what does that mean?

A.    It means that Mr. Allen left without being seen by the physician in the emergency room.

Q.    And is that -- is that signature that follows that, is

that your signature?

A.   No.

Q.   Do you recognize the signature?

A.   I do not.

THE COURT:  Nor could anybody in the civilized world, right?

THE WITNESS:  Correct.

Q.   Going to the third page, is this the screening admission note for the first visit that occurred on February 11th?

A.   Correct.

Q.   For the record, I'd like to go through and read what's written here.  But let me ask you first, is this your handwriting?

A.   It most certainly is.

Q.   Could you please read what it says under chief complaint here?

A.   When I interview a patient, I always ask what they are here for, and I quote them.  And apparently Mr. Allen said to me, "A lot of things have been happening to me."

Q.   And that's in quotes there?

A.   That's correct.

Q.   Okay.  Under history of present illness, could you please translate for us what is written there?

A.   Sure.  "21-year-old black male with no prior

psychiatric contact brought in by girlfriend and her mother. Patient states that he has been under a lot of psychosocial stressors. These include being put out of family house because he was selling drugs as well as the death of friends. Patient states he has been thinking about dying but denies any suicidal ideation, plan or intent. He is unable to articulate any other depressive symptoms. He denies psychotic symptoms as well as symptoms consistent with substance abuse. Girlfriend and mother unaware of any behaviors consistent with dangerousness to self or others."

Q. Let me just stop you there. That last phrase, "dangerousness to self or others," is that an important -- or does that reflect some sort of psychiatric standard that you were operating under?

A. Yes. It could be a busy emergency room, and the primary reason for admission would generally be a danger to self or others or inability to care for one self.

Q. And when you say "reason for admission," are you talking about admission to the inpatient part of the hospital?

A. Correct.

Q. And what would that generally involve? I mean, how long of a stay are you looking at if someone is admitted?

A. Well, it would depend on the illness that they were coming in for. In Mr. Allen's case, it may be a couple of

days for observation, but clearly people would spend much longer then.

Q.   And then if you could go down to the next section past psychiatric history, and please translate that for us.

A.   Sure.  "Denies, although may have ASPD, antisocial personality disorder traits, or versus traits.  Has history of suspension for truancy.  Support his self via drug sales since adolescence.  Denies other ASP symptoms but may be unreliable in this regard.  For example, girlfriend's mother told me that patient was put out of family home because he was -- or because, quote, someone was looking for him and shot up their home."

Q.   And then the next section is alcohol, substance use history; is that correct?

A.   Right.  And he denied alcohol or substance abuse.

Q.   And the next section is medical history or allergies?

A.   NKDA is not -- no known drug allergies.  And he had no significant medical conditions at that time.

Q.   Okay. Now, one part we skipped up there was vital signs were apparently taken.  Is that something that you or the intake person or someone else would have done?

A.   No.  So the individual would see the intake secretary. A nurse would then take vital signs.

Q.   Okay.

A.   And then he would be passed on to me.

Q.   Going to the next page, as we touched on before, you did reach a diagnosis for Mr. Allen; is that correct?

A.   Correct.

Q.   And what are those diagnoses?

A.   Depressive disorder, not otherwise specified.

Q.   And then that's under Axis I?

A.   Correct.

Q.   And under Axis II, what does that say?

A.   Diagnosis deferred.

Q.   And then under disposition and treatment, could you read for us the handwriting there?

A.   Sure.  At the very bottom, apparently I offered inpatient evaluation, but the patient refused.  Does not meet criteria for involuntary commitment.  That would be dangerousness to self or others.  Apparently we gave a referral sheet to outpatient clinic system at Provident Counseling.

Q.   Then the next page here, what is this page just generally speaking?

A.   This is our mental status exam.

Q.   Okay.  And if you could just review for us what's indicated on here.

A.   Sure.  It goes through a list of things we routinely ask or formulate an opinion about.  Regarding Mr. Allen, obviously we were most focused on affective symptoms.  The

things that I noted is that he had thoughts about dying, but he had no specific suicidal ideation, plan or intent. He denied any psychotic symptoms such as delusions, hallucinations and the like. He was also fully oriented. I didn't test his intellect. And in terms of insight and judgment, I thought it was normal.

Q. Under intellect, what is that word that you indicated in the comment section?

A. Untested.

Q. Okay. Okay. It looks like actually -- this last page that I'm at, is this also part of the mental status exam?

A. Correct.

Q. And is this actually what would have been the first page, and what we looked at a moment ago, the second page?

A. Correct.

Q. Okay. What is -- what is indicated on this page?

A. So as part of the mental status exam, we give an objective description of the patient. And he appeared to have good hygiene and grooming. In terms of his motor activity, I did not notice any agitation or retardation. His speech was quiet. His interview behavior I thought was normal. His content of thought was normal as well. His affect I thought was mildly restricted at times, but could smile.

Q. This is the last page of the records that we have here.

From your knowledge in an ER visit like this, does this look like all of the records that likely would have been generated in the course of such a visit?

A.    Yes.

Q.    And after reviewing these records, does this evaluation that you did reflect that you -- any assessment of Mr. Allen for Post Traumatic Stress Disorder?

A.    No.

Q.    Was there any screening done for that disorder in this evaluation?

A.    We would largely not look for those kinds of things. The nature of that illness is sufficiently difficult and diffuse to diagnose, and oftentimes does not require inpatient admission unless there are imminent danger to self or others.  So I would not really pursue those avenues.  I would pursue the presence or absence of other illnesses like psychotic or affective disorders.

Q.    In terms of the imminent danger standard that you just mentioned, was Post Traumatic Stress Disorder something that you commonly would diagnose in reaching a finding that this person -- that a patient posed imminent danger to himself or to others?

A.    Can you repeat the question?

Q.    Yeah, let me try that again.  For someone who came in to the ER like this and then was found to be in imminent

danger to self or others, would PTSD in your experience typically be a diagnostic basis for reaching such a finding?

A. Well, in our institution, most likely not. Most people who are admitted had other disorders. It is not unreasonable to think that an individual could have that.

Q. So it's possible but not something that you commonly dealt with?

A. Correct. Correct.

Q. Now, these records taken as a whole, and in your opinion do they either support or are they inconsistent with a diagnosis of PTSD in Mr. Allen?

A. I don't think they point towards one way or the other.

Q. I'm going to show you what is marked as Exhibit 399 -- no, I'm sorry, 388. This is a two-page exhibit. And it -- is it correct that it indicates that it's an extremely urgent fax transmission sent to you?

A. Yes.

Q. Or addressed to you?

A. Yes.

Q. And what is the date?

A. March 6th, 1998.

Q. Do you have any recollection of having received this facsimile?

A. I do not.

Q. Do you have any recollection of having received any

facsimile transmission from persons representing Mr. Allen in 1988?

A.    No, I don't.

Q.    Do you have any recollection of having any conversations or any contact regarding Mr. Allen's trial proceedings in 1998?

A.    I do not.

Q.    If in 1980 -- or, excuse me, in 1998 you had been asked to testify in Mr. Allen's trial, would you have provided the same information that you provided here today?

A.    Yes.

      MR. KANE:  No further questions, Your Honor.

      THE COURT:  Okay.

                    CROSS-EXAMINATION

BY MR. HOLTSHOUSER:

Q.    Good morning, Dr. Wuertz.

A.    Good morning.

Q.    My name is Steve Holtshouser.  I don't know if you recall my name, but you and I spoke on the phone a couple times last summer.

A.    Yes.

Q.    I know I promised that I would get together with you and speak to you in person, but never was able to get the opportunity to do that, so I apologize.

      You worked at the Metropolitan Psychiatric Center or

Malcolm Bliss for most of your career?

A.    I don't know most of my career.  I finished my residency in 1988.  I stayed on as chief resident for '89/'90, and then I went into private practice with another psychiatrist from then until September of 2000.  However, I significantly contracted that practice in 1994 and started working initially part-time for the State, and then eventually full-time.  And I don't remember when I went full-time.

Q.    Okay.  And in what year did you retire?

A.    September of 2000.

Q.    Okay.  Have you been working in the field since your retirement at all?

A.    No.

Q.    You've been fully retired?

A.    Correct.

Q.    Were you familiar with another psychiatrist by the name of Sean Yutzy?

A.    Yes.

Q.    And how do you know Dr. Yutzy?

A.    He trained at the same program I did.  I think he trained two or three years ahead of me.

Q.    And that's at Washington University School of Medicine?

A.    Correct.

Q.    Did you ever receive any instruction while there from a

Dr. Richard Wetzel, a neuropsychologist?

A.    Yes, I did.

Q.    And what kind of training did you receive from him?

A.    We -- as I best recall, we largely used Dr. Wetzel as a consultant who did neuropsychiatric testing on patients.

Q.    Now, as you can imagine, the primary focus of our inquiry is your contact with Mr. Allen, which is apparently reflected by records at this point on February the 11th, 1997.  Correct?

A.    Correct.

Q.    And you have no independent memory of that; that is, independent of these records?

A.    Correct.

Q.    I want to direct your attention to the first page of Exhibit 119.  Who fills out the information in this sheet? And I just want to direct your attention to the birthdate, 6/18/75.

A.    It would be Carmen O'Hara, the intake officer.

Q.    And do you know how does she -- what is her practice or procedure in gathering this information?

A.    I really don't know, except that she sat behind a desk and asked questions.

Q.    Is what?

A.    Sat behind the desk and asked questions.

Q.    Okay.  You don't know independently whether or not

that's actually Mr. Allen's correct birthdate?

A.    I do not.

Q.    And I want to direct your attention here that there's an entry "Referred By" actually "Luthern Hospital," and "Accompanied By, girlfriend and friend."  Indicates unemployed, Mr. Allen.  Do you know what it means that there's a referral from Lutheran Hospital?

A.    Well, it could be one of several things.  It could be that he had gone to Lutheran Hospital, and they had referred him on to us because he didn't have insurance.  I think that would be unlikely because I would have received -- by order of Medicare, you have to -- the doctor from that emergency room has to call to advise about the transfer.

The other way he could have been referred is that he or a family member could have called Lutheran Hospital, and they told him to come to our institution.

Q.    If a person was seeking -- if someone was seeking psychiatric assistance for someone else who was uninsured, for example, and had no means of paying, how -- in your experience, how would Lutheran Hospital handle that kind of inquiry or referral?

A.    Well, if they actually went to the emergency room, and they were deemed unable to pay but were eligible for psychiatric services from the State, they could be transferred, and by law would have to be transferred.

Q.   What if someone were to call on the telephone, speak to someone at Lutheran Hospital, and say I've got this situation, what should I do, but this person is uninsured and doesn't have any financial means?

A.   I really can't speak to what their --

Q.   Let me ask you this way:  Is that the way you often saw patients at Malcolm Bliss or at St. Louis Metropolitan Psychiatric Center?

A.   We would see them a number of different ways.  They could walk in on their own or be brought in by family members or referred by a hospital through direct transfer from their emergency room.  Or if they had called another institution, and were told to go to MPC.

Q.   Well, were you the kind of place that would turn patients away because they either didn't qualify for State benefits or lacked insurance?

A.   No, we were the institution of last resort.

Q.   Okay.  Is this your handwriting on page 2?

A.   No, it is not.

Q.   Okay.  Is that Ms. O'Hara's handwriting?

A.   I have no idea who wrote that.  I suspect it's not Carmen's, but I don't -- I have no idea.

Q.   How about on page 3?

A.   That is definitely my handwriting.

Q.   Okay.  And so the process of your examination of

Mr. Allen, does that entail any type of a physical examination?

A.    I'm sorry?

Q.    A physical examination?

A.    No.  The nurse would obtain vital signs, and clearly if there was something of note, we would address that.  But our exam was primarily doing a mental status exam.

Q.    And would a person -- when you're doing a mental status exam, would they usually be in the same clothes that they walked in that they were wearing?

A.    Correct.

Q.    This quote that you have here, "A lot of things have been happening to me," you wrote that in quotes.  This is in response to what would normally be your opening question?

A.    That's correct.

Q.    And what is your opening question in your practice or procedure?

A.    It might have been something like, what brings you in here this evening or what's happening, tell me why you came.

Q.    From these records, can you tell whether or not Mr. Allen brought himself or whether someone else brought him or convinced him to come?

A.    As far as I can recall looking at my notes, I get the impression that he was brought by -- or at the encouragement of his girlfriend and girlfriend's mother.

Q.   From your notes here, could you determine whether or not he was voluntarily or, I mean, or that it was his idea to come in and seek psychiatric help?

A.   From my notes, no.

THE COURT:  Could I ask a question?  I had a note earlier, it was his girlfriend and girlfriend's mother, and not his mother that brought him in?

THE WITNESS:  Correct.

THE COURT:  Okay.  Thank you.

BY MR. HOLTSHOUSER:

Q.   Let me bounce back up to the first page.  I'll blow this part back up.  From the intake information, the person's name who was given was Martha Burns, correct?

A.   That's what it says there.

Q.   And the relationship is friend?

A.   Correct.

Q.   And "Admitted From, friend's house," correct?

A.   Yes.

Q.   And then "Accompanied By, girlfriend and friend."  I assume that this "friend" equates to this Martha Burns, and then the other person accompanying is the girlfriend?

A.   I frankly don't know.  This would have been information that Carmen O'Hara obtained.  And whether she surmised correctly about what the relationships were or weren't, I don't know.

Q.   Okay.  Back to page 3 where your notes are.  And then there's another entry there that refers to stressors.  And was that a term that psycho -- a number of psychosocial stressors?

A.   Correct.

Q.   "Patient states he has been under a number of psychosocial stressors."  That's not a term he used, is it?

A.   No, no, that was something I wrote.

Q.   That's your term.  And psychosocial stressors, you itemize next in your notes as being put out of mom's house because selling drugs and death of friends, plural, correct?

A.   Correct.

Q.   "Patient states he has been thinking about dying but denies SI plan."

A.   Suicidal ideation, plan or intent.

Q.   Okay.  And he's unable to articulate any other depressive symptoms?

A.   Correct.

Q.   So how important is this denial of suicidal ideation, plan or intent?

A.   Well, as we talked about before, that's the ultimate criteria for admission.  If someone is a danger for harming themselves or others, they require admission, whether they want it or not.  Then -- I'll leave it at that.

Q.   So if someone says, I'm thinking about killing myself

or I want to kill myself, but I don't want to stay here, you're not letting them go, are you?

A.    Most likely not.

Q.    Okay.  And so at the outcome of this entire event that night, Mr. Allen was released, correct?

A.    Correct.

Q.    I mean, you didn't hold him?

A.    No.

Q.    And from the fact that you did not hold him, can you be fairly certainly that you had no reason to believe that either he had attempted to kill himself, was thinking about attempting to kill himself, or was going to kill himself?

A.    That is correct.

Q.    In this type of a situation in the middle -- I mean, I think you have either 11 or 1:23 -- 11:23 p.m.; is that right?

A.    Correct.

Q.    Time out, 12:30 p.m.?

A.    Correct.

Q.    Is it fair to say that that's your -- actually your primary focus in the situation like this is to make sure -- your ultimate responsibility is to make sure this person isn't, in fact, suicidal?

A.    Correct.

Q.    I mean, at this late hour of the night in this type of

situation, you're not attempting to do a full social history and figure out the source of any problems he's having and how to cope with them and strengths and weaknesses and so forth, correct?

A.    That's correct.

THE COURT:  Excuse me just a moment.  I didn't get the time in, time out.  What is that time in?

MR. HOLTSHOUSER:  I'm referring to the top.  And then I'll blow this up here.

Q.    Is that your writing?

A.    The time in is, I believe, Carmen O'Hara's writing. The time out is my writing.

Q.    So time in 11:23 p.m., and time out is 12:30 p.m., correct?

A.    Actually it was 12:30 a.m. the next morning, but --

Q.    Okay.  The inability to articulate other depressive symptoms right here, like what, would be my question?

A.    So to meet -- very often if an individual is suffering from a severe major depressive episode, in addition to having a pervasive sense of doom and gloom, patients will often have accompanying physical symptoms as well.  They will have alterations in their sleep habits, often having difficulty sleeping or sleeping too much.  They will have changes in their appetite with accompanying loss of weight.  They will have difficulty focusing and concentrating on material.  They

will have anxiety, as manifested by agitation, or slow down, which we would call psychomotor retardation.  They often express difficulty enjoying normally enjoyable things, and then they would have thoughts of dying and death.

Q.    And none of those symptoms were expressed by him according to your note?

A.    No.

Q.    Now, the next note, "Girlfriend and mother unaware of any behaviors" -- is that consistent with -- "C/W"?

A.    Yes.

Q.    "Dangerous --

A.    -- ness.

Q.    -- ness to self or others."  Girlfriend and mother. Now, mother, the entry thing said -- the entry form said a friend and girlfriend brought him in.  Those would have been the people that you had available to deal with, correct?

A.    Correct.

Q.    Do you think from that by "mother," you weren't referring to his mother?

A.    No, I most likely was referring to the girlfriend's mother.

Q.    So the pair that were accompanying him were his girlfriend and his girlfriend's mother?

A.    Correct.

Q.    And this you obtained by speaking to them as well?

A.    Yes.  It would be a routine matter for me to obtain collateral information.  Patients are notoriously unreliable in giving you the real truth.  So we often seek information from other individuals who are likely to tell you a more truthful version of what's been happening.

Q.    Would it be your practice to be talking to Mr. Allen alone or allowing the girlfriend and the mother to be accompanying him into the --

A.    What mostly happened is I initially interviewed him alone, and then went to talk to the girlfriend and her mother out of the presence of Mr. Allen.

Q.    And neither one of them when you spoke to them communicated to you any facts about any either behavior or awareness that he was a danger to himself?

A.    Correct.

Q.    So let's say, for example, that they thought that what brought -- the reason they brought him in is he had swallowed a quantity of unknown pills, that they thought he was trying to kill himself.  If they had conveyed that information to you, is it likely you would have made this entry?

A.    No, it would be likely that I would have noted that and pursued a different course of action.

Q.    Including perhaps --

A.    Involuntary admission.

Q.    -- involuntarily holding him.  You have a section here

called "Past Psychiatric History."  "Denies although may have ASPD traits."  And what's the significance of antisocial personality disorder traits to you in this circumstance?

A.    In this circumstance it was just notable that he had them.  I don't think it really had any bearing on anything in terms of my decision-making process.

Q.    Is it something that you often see in patients at Malcolm Bliss or at the Center there?

A.    Yes."

Q.    He indicated that he supported himself by drug sales. Is that "since adolescent"?

A.    Yes.  I probably meant since adolescence, but --

Q.    Right.  We're not correcting the grammar here.  "Denies other ASP"?

A.    Yeah, antisocial personality symptoms.

Q.    Drug sales, though, you put in a category of an antisocial personality symptom; is that correct?

A.    Correct.

Q.    I mean, it's a reference to lawlessness among other things, correct?

A.    Correct.

Q.    And then after that, other ASP, what are the words that follow after that?

A.    "But may be unreliable in this regard."

Q.    So you're thinking that in addition to admitting to you

that he is a -- supports himself selling drugs, there may be other things in that category that he is not telling you?

A.   Or that I asked about that I didn't think he was being truthful about.

Q.   Did you -- did you mean by that that you felt that he was somehow trying to impress you or bragging to you or boasting to you that he was a drug dealer?

A.   No.

Q.   The information -- are you familiar with the concept known as faking good?  Have you heard that phrase that someone would fake that they are healthier than they are?

A.   Yes.

Q.   Okay.  Coming to you here in this situation and saying that he had a number of psychosocial stressors, as you put it, acknowledging that he is supporting himself in drug sales, you wouldn't put that in the category of someone who was faking good, correct?

A.   Correct.

Q.   Now, there's -- you have in parenthesis there, for example -- and this is, I guess, an example of your -- he may be unreliable in this regard?

A.   Correct.

Q.   Let me just blow that up for you.  It's easier to read. And you have, (For example, girlfriend's mother told me that" -- is that patient, "PT"?

A.     Yes.

Q.     "was put out of family's home because 'someone was looking for him and shot up their home.'"  Why was that an example of the previous sentence?

A.     Because he didn't mention that to me, and that would be I think notable as a psychosocial stressor that someone coming to the emergency room would tell you about.

Q.     What does this signify to you that I circled?

A.     Denies alcohol -- ETOH is shorthand for ethanol and substance abuse.

Q.     So by -- is this meant to cover alcohol abuse?

A.     Correct.

Q.     And substance abuse, would that include marijuana?

A.     Correct.

Q.     And he denied both of those?

A.     Correct.

Q.     Do you often see in your practice -- even though you've been retired for 12 years, it's clear that you still haven't forgot much of your profession.  Do you often see patients at this particular center come in intoxicated from alcohol or who are intoxicated from substances?

A.     Yes.

Q.     And were you a trained observer at that point and experienced in detecting someone who is under the influence of either of those?

A.    I would have a good clue if they were intoxicated in some way.

Q.    Physical and other symptoms?

A.    Correct.

Q.    And would you have made any entry here if, in fact, you observed that on Mr. Allen?

A.    On my mental status exam I might.  For example, if he smelled of alcohol or marijuana, I would note that.  If he was slurring his words or was disoriented as to time and place.

Q.    So would it be fair to say the absence of those sort of entries, there wasn't anything about Mr. Allen's presentation that led you to believe that he was either drunk or high at the time?

A.    Correct.

Q.    You ultimately decided to -- as far as disposition and treatment, you decided to let him -- you weren't going to involuntarily keep him, correct?

A.    Correct.

Q.    And you gave him a referral for an outpatient clinic. You suggested this place, a Provident Counseling?

A.    Correct.

Q.    And what is Providence House?

A.    So if I can step back a minute.  Apparently -- looking at this note, apparently I offered him an inpatient

evaluation to assess if you needed -- or did indeed suffer from some treatable psychiatric illness.  But he refused that.  Because he did not meet criteria for involuntary commitment, he was given a referral to Provident Counseling.

And the way that the referrals work is that patients fall in certain catchment areas, and where you live is -- it's how you're directed to a particular agency.

Q.   The inpatient evaluation that was offered to him, was that signifying you were offering holding him there at this particular -- at the facility where you worked overnight?

A.   Correct.

Q.   And he refused that?

A.   He declined it.

Q.   Why under the circumstances if you didn't feel that he was a threat to himself or hadn't attempted to kill himself or wasn't going to, why would you offer him that?

A.   Because if someone is in distress, we want to assist in relieving that distress.  And --

Q.   So there's no other significance that can be drawn from the fact that you made that offer?

A.   No.

Q.   In the section here, "Suicidal; Attempt, Plan, Ideation/Threats," nothing is checked or written in?

A.   Correct.

Q.   And is that because you didn't have any either

suspicion or information at that point that there was any such -- any of these?

A.   Correct.

Q.   Is the next page that I'm showing you of Exhibit 119, this checklist, is this a standard part of an evaluation that you do?

A.   Correct.

Q.   Did?

A.   I would fill this out after I had interviewed the patient and made the disposition.

Q.   Okay.  The "Content of Thought," you've checked normal. And then there's a list of other things in here such as antisocial attitudes, suspiciousness, phobias, feels persecuted, thoughts of running away from home, ideas of helplessness, hopelessness, et cetera.  Are those all things that you would have gone through to leave them blank or --

A.   In some cursory fashion, yes.

Q.   Okay.  "Thoughts re dying but no suicidal ideation plan or intent," is an actual hand notation that you added there?

A.   Correct.

Q.   And that summarizes your impressions at the time?

A.   That was the most notable finding of his exam.

Q.   And then there were also denials of the things that you haven't bracketed, which are delusions of persecution, grandeur, influence.  Then there's a category,

hallucinations.  What is an auditory hallucination?

A.    It's when an individual feels that they are hearing voices that indeed are not there.

Q.    And he gave no indication or would have denied in your inquiry whether he was hearing voices?

A.    Correct.  And by the nature of our institution, we often focus on that because that could be an important factor in determining whether to admit someone or not.  And, of course, their diagnosis.

So most likely I would have during the course of the interview asked him, you know, have you been hearing voices or do you feel like people are out to get you, or other common psychiatric things, you feel like people are pulling thoughts from your head or putting thoughts in your head.

Q.    Those are common things that you saw at the Metropolitan Psych, and you were trained to question for those?

A.    Correct.

Q.    "Sensorium, normal orientation."  You would have gone through a checklist to do this as well?

A.    I would have asked him, you know, what day is it, you know, what day of the month and year, time of the day.

Q.    There's no entry on "Intellect."  Is that because this isn't something that you tested or felt was needed to be tested at that time?

A.    It wasn't part of the exam that I felt was important.

Q.    And then "Insight and Judgment" you also checked normal?

A.    Correct.

Q.    The next page here on Exhibit 119, "General Appearance."  Nothing is checked there, but you said, "Good hygiene and grooming."  Now, you don't remember Mr. Allen, correct?

A.    No.

Q.    If I directed your attention to look at the young man in the orange jumpsuit over here, you don't have a glimmer of recognition either, gee, I remember seeing him in February 1997 either, correct?

A.    No.

Q.    "Good hygiene and grooming," is that an entry you would have made, though, if Mr. Allen appeared disheveled, had clothes that were dirty, that he himself was dirty, or appeared to not be taking care of himself?

A.    Correct.  It's notable if an individual has those findings; it's also notable that they don't have them.

Q.    Is that because the ability to have good hygiene and groom oneself is, in fact, somewhat of an indication of mental functioning?

A.    Correct.

Q.    "Motor Activity," you noted as normal.  "Speech," you

have noted quiet, and then you also checked the box for soft, correct?

A.    Correct.

Q.    "Interview Behavior" was normal.  And "Flow of Thought" was normal.  Down at the bottom, "Mood and Affect."  "Affect mildly restricted but can smile at times."  Is that correct?

A.    That's correct.

Q.    All right.  Now, Dr. Wuertz, I'm going to show you next this fax that you were questioned about.  This has your -- the numbers that are atop there, there's a sticky obviously on here that has phone numbers.  Do you recognize those as some of your phone numbers?

A.    I recognize the 361-8566 number as our office number. I don't know the other number.  It could have been our fax number, but I don't know.

Q.    And at this time would you have still been working at the Metropolitan St. Louis Psychiatric Center in '98?

A.    I believe at this time I was -- I was definitely working full-time at MPC, Metropolitan Psychiatric Center, but I was also maintaining a very small private practice that I would see in the evenings, or see patients in the evenings. And I would come in at least four or five nights a week to see patients.  And, therefore, I would have almost daily contact with the secretaries and the office at that time. And they would have shown me things that came in.

Q.   Now, you have no independent recollection of receiving this, is that the gist of what I understand?

A.   That is correct.

Q.   Do you have any recollection of receiving any communication related to a pending death penalty trial?

A.   No.

Q.   And do you have any independent recollection of the sender, whose name is David M. Randall, Ph.D?

A.   No.  And I would have remembered that because David M. Randall is actually the name of a classmate of mine from college.

Q.   Okay.  It purported to contain your evaluation, a report by a psychologist named Dr. Daniel Cuneo, a report by Dr. Gelbort, a neuropsychologist, and then 15 pages of rough social history notes from family members, a client's friend who was murdered, the primary traumatic event, none of that rings a bell with you, correct?

A.   No, it does not.

Q.   And then there's a 16-page report by Dr. Yutzy, who among things sites your report in his report.  You don't recall that either, correct?

A.   Correct.

Q.   Now, how about this person, Robyn, the contact person in the defense attorney's office is named Robyn.  Any recollection of that?

A.    No.

Q.    The information that he purported to send you, he had a question, and which is that is, "If you had the additional social history interviews, above, would that have changed your opinion re: PTSD."

Now, you actually had no opinion regarding PTSD from your exposure to Mr. Allen in February '97, correct?

A.    That's correct.

Q.    So that it's not something that you specifically evaluated him for, correct?

A.    Correct.

Q.    And is there -- and why is that?

A.    It exceeded the purview of our duties in the emergency room.  Again, we were looking for dangerousness to self or others.

Q.    And so is PTSD something that is normally considered, I guess, sufficiently urgent or severe enough to screen for on a regular basis in the context that you're describing?

A.    No.  It may come up in the sense that if someone is suffering from PTSD is dangerous to themselves or others, we would admit them, and maybe then come to that diagnosis.  But we would not screen for PTSD independently.  We would not screen for PTSD independently in the emergency room.

Q.    Have you yourself had any experience with PTSD at a professional level?

A.    Minimal.

Q.    Okay.  Now, besides not having any information that Mr. Allen had ingested any pills of either identified or unidentified type, was any action taken at the Center to remove anything from Mr. Allen's stomach that he had ingested recently?

A.    No.

Q.    His stomach wasn't pumped, in other words, correct?

A.    No, we don't have facilities for that.  He would have been referred to an outside medical institution.

Q.    Are there situations where patients are brought in where they have, in fact, attempted to kill themselves by ingesting things, and your response is to call an ambulance?

A.    Then we refer them on to another emergency room.  We were not able to handle those circumstances.

Q.    Okay.  Does your Center actually handle the circumstances of getting that person to another center?

A.    Yes.

Q.    You'll call the ambulance --

A.    Yes.

Q.    -- in other words?

A.    By the law we have to.

Q.    If any, either the girlfriend, the mother, or Mr. Allen had claimed in his contact with you that he had been, was being or was going to be physically abused in any way, is

that something that you would have noted?

A.   Yes.

Q.   If you had seen any physical evidence, even if no one had mentioned it, of any injuries, would you have inquired into them?

A.   Yes.

Q.   Things like bruises, healing wounds, or recent scars?

A.   Yes.

Q.   Is the absence of those from your record -- or given that they are absent from your record, are you fairly confident that there wasn't any of those things present in your observations?

A.   Correct.

       MR. HOLTSHOUSER:  No other questions.  Thank you, Dr. Wuertz.

       THE COURT:  Redirect.

                    REDIRECT EXAMINATION

BY MR. KANE:

Q.   Looking back at your notes here, Mr. Holtshouser drew your attention to this sentence.  "He is unable to articulate any other depressive symptoms."  And I believe you gave some examples.  Is it correct that one example is -- of such a depressive symptom, would be alterations in sleep patterns?

A.   Correct.

Q.   And another one would be changes in appetite?

A.   Correct.

Q.   And I believe you referred to the depression as an episode, a major depressive episode; is that correct?

A.   Correct.

Q.   So is it possible then that someone who had been chronically suffering from issues with sleep or appetite or other depressive symptoms, but had -- that someone suffered from such things chronically, but would be unable to articulate any recent changes in those issues?

A.   I think it would be more likely that they would have said, gee, these things have been going on awhile, but maybe it's not been bad -- or a change recently, but it's been going on for quite some time.

Q.   And if you asked -- okay.  And if we -- down here in the past psychiatric history, you were saying -- you're speaking about ASP traits or symptoms?

A.   Yes.

Q.   And I believe Mr. Holtshouser referenced lawlessness?

A.   Correct.

Q.   Is that in itself, the lawlessness behavior, does that in itself qualify for it being an ASP symptom?

A.   It is one of several symptoms that is required for the diagnosis.  But an individual, I guess could be disrespectful of the law and still not be antisocial.

Q.   But in the situation that we're dealing with here where

he's discussing supporting himself via drug sales, that's antisocial personality symptom because it's unlawful; is that correct?

A.    Correct.

Q.    Could behavior like that nonetheless be adaptive in certain circumstances?

A.    So while it certainly is lawless, I could see it being seen as a normative behavior in socioeconomic classes.

Q.    Down bottom here, "Denies alcohol or substance abuse"?

A.    Uh-huh.

Q.    Is it uncommon in this setting for patients to minimize or deny alcohol or substance abuse when, in fact, they engage in it?

A.    Yes.

Q.    It is uncommon or common?

A.    Oh, it's common for them to minimize those problems.

Q.    Okay.  And is that an example of someone -- in minimizing or denying such a problem, is that an example of someone making himself or herself appear better than they actually are?

A.    I don't know if it's an example of that.  It's just that they -- people are often not truthful about that.

Q.    But is that something that would potentially motivate someone to deny such behavior?

        MR. HOLTSHOUSER:  Object to the question.  It calls

for speculation what might potentially motivate.

THE COURT:  If you know.

THE WITNESS:  If I know what?

THE COURT:  You want the question repeated?

THE WITNESS:  Yes, please.

THE COURT:  But is that something that would potentially motivate someone to deny such?

BY MR. KANE:

Q.    And that's something being -- to appear better to you?

A.    So in Mr. Allen's case, most often we would worry about people, quote, faking bad to get admitted to the hospital, and, therefore, use this as an excuse to avoid other ramifications of their behavior.  They may not see their alcohol or any substance abuse as related to this.  I don't know that that answers your question.

Q.    Okay.  But let me just follow up on your answer there. You said most commonly you would see people faking bad or exaggerating symptoms, I presume to get admitted to the hospital?

A.    Correct.

Q.    And do you see evidence of that in these records?

A.    No, I don't.

MR. KANE:  No further questions, Your Honor.

THE COURT:  You may step down.  Thank you, sir.  You are excused.

We're going to take about a ten-minute break. Court's in recess.

MR. HOLTSHOUSER:  Judge, could we have a moment?

MR. KANE:  Your Honor, we had discussed earlier or last week that we would break early for lunch and then Dr. Cuneo would begin testifying at noon --

THE COURT:  Oh, yes.

MR. KANE:  -- in the hope of completing his testimony.

THE COURT:  Right.

MR. KANE:  We have no further witnesses this morning, and it's almost 11, so I assume the parties would be fine with breaking for lunch now.

THE COURT:  Okay.

MR. KANE:  If that's okay with the Court.

THE COURT:  Sure.

MR. HOLTSHOUSER:  Judge, also just to advise you, the parties did some work over the weekend, and there's about a half dozen or so witnesses that I think we are in the process of reaching -- actually it might be more like eight, that we are in the process of reaching a stipulation as to their testimony.

THE COURT:  Okay.

MR. HOLTSHOUSER:  All with the purpose in mind to be able to complete this by a week from tomorrow.

THE COURT: Okay. By a week from tomorrow, by Tuesday.

MR. HOLTSHOUSER: We still anticipate we're still going to need all that time, but we're doing that in an effort to get it done by then.

MR. KANE: And I would anticipate we'll probably file those stipulations in the next day or two.

THE COURT: Okay. Fine. We'll be in recess until 12 o'clock.

(Court in recess from 10:55 a.m. until 12:06 p.m.)

THE COURT: Dr. Cuneo is chomping at the bit, ready to go.

MR. HOLTSHOUSER: You can take the stand again.

THE WITNESS: Whatever the Judge wants.

MR. MORENO: He's actually hoping he'll be back tomorrow.

THE WITNESS: No, I'm not.

MR. HOLTSHOUSER: Our schedule is open.

THE COURT: You're still under oath, sir.

THE WITNESS: Judge, would it be okay if I pour myself a glass of water?

THE COURT: Oh, absolutely. That's for your use.

Whenever you're ready, Mr. Holtshouser.

CROSS-EXAMINATION (Cont'd)

BY MR. HOLTSHOUSER:

Q.    Dr. Cuneo, you settled up there?

A.    Yes.

Q.    Okay.  I'm showing you on the screen, this is Exhibit 257, page 4, but this is part of your declaration.  And I'll take you to the end so you can see.  There's your signature.  There's the first page of this document.  This is your declaration, correct?

A.    Yes, sir.

Q.    Okay.  And the page that I'm showing you is paragraph 8.  There's a reference in your declaration to beatings and whippings at the hands of his mother and other family members.  And then there's also a reference to being locked out of his house from a very young age.  I want to ask you about those two parts of your declaration.

From what you have, can you tell us on what basis you concluded that he had suffered beatings and whippings at the hands of other family members, someone other than his mother?  As you sit here, do you know what that was based upon?

A.    Yes.  Now I have to remember.  In some of the declarations, the mother stated that she beat him.  Other family members, if I remember right, there was mention of that in other declarations.

Q.    Now, you refer in this paragraph to the declarations of other experts such as a Pablo Stewart and a Daniel Martell?

A.    No.

Q.    Were you relying on their conclusions drawn from having read other declarations?

A.    I've read Dr. Martell and Dr. Stewart's declarations. But if I remember right, there was also family members that had said that.  But unless I look --

Q.    At this time can you tell us which one in particular you're relying on there?

A.    Not at this time.

Q.    And the phrase "very young age," by what -- what age are you referring to there when you use the phrase "very young"?

A.    Four, five, six, I believe that's what it had stated in the declarations.

Q.    Age four through six?

A.    I thought it said very young age; four, five, six.  I thought that's what it said.  But I have to go back to the declaration.

Q.    And, again, you can cannot cite us as we sit here now a particular declaration that supported that statement in your declaration?

A.    No, I cannot.  If you want to take a break, I can look at the declarations.

Q.    Believe it or not, Doctor, we want to finish your testimony, so we won't take a break for that at this point in

time.

A. I would like for you to finish my testimony too.

Q. I'm now going to the next page and directing your attention to paragraph 10. In it, it indicates in your own declaration that in 1998, your expertise was not in the areas of capital mitigation. Now, I thought you had testified on Friday that prior to 1998, you had experience in dealing with capital mitigation, correct?

A. I had experience. But my experience was that I would do an evaluation, and the evaluation would be for fitness and sanity. And then the individual would come in, and then I would testify as to those findings.

Q. All right. So I guess what I'm trying to clarify here is that before 1998, before this case, this Billie Allen case, had you ever testified before as a mental health expert in the mitigation phase of a death penalty case?

A. Yes, I had.

Q. And had you ever done so -- I mean, what are you communicating here, "not in the areas of capital mitigation"?

A. I was never hired specifically to do mitigation.

Q. Prior to this case?

A. Prior to this case.

Q. So in this case, though, this would be your first, is that correct then?

A. Yes. And I did not know this was going to be my first

until I was involved in it.

Q.   And my question didn't go to when.  I think you made that clear on Friday as to when you believe that that became your duties.  But this case was the first case in which you had done that, correct, served as a mitigation expert?

A.   First time was ever told I would be "the" mitigation expert.

Q.   I'm looking now at paragraph 12 on page 6 of your declaration.  And this paragraph references your examination at trial and questions that were hard for you to answer because of limited information.  And then you indicate that had I possessed a comprehensive picture of his upbringing that I now possess, and what I take it that you now feel that you possess a "comprehensive picture" of Mr. Allen's upbringing?

A.   I have a much more comprehensive evaluation of his upbringing.

Q.   That you "could have shown his PTSD symptomology, including his social impairment, dated many years before the Marquis Taylor shooting."  So I thought on Friday you had made clear that Marquis Taylor's death and witnessing it, was, in fact, the PTSD triggering event for purposes of your diagnosis, correct?

A.   Yes.

Q.   And that for a diagnosis of PTSD, that event has to be

the cause of the enumerated effects, the persistent

reexperiencing, the avoidance, the social impairment,

occupational impairment, and so forth, correct?

A.    I believe I testified based upon --

Q.    First of all, my question is, is that correct about

PTSD?

A.    About there has to be a singular cause?

Q.    No, that the event, the triggering event is the cause

of those impairments in order for you to give a diagnosis of

PTSD.

A.    Yes.

Q.    All right.  And so your phrase here that his PTSD

symptomology predated the Marquis Taylor shooting, if that's

the case, then how could the shooting be the cause of his

symptomology?  Do you see the logical problem there?

A.    Yes, because prior to this -- trauma is cumulative.

And if there had been a history of trauma prior to this, he

would have had symptoms that would have been -- that would

have shown some difficulties.  But then there would have

been -- and I believe -- I believe I testified there were two

events, one, I thought it was the Dennis Noble shooting, and

then the one that caused the PTSD was the Marquis Taylor.

But I may be wrong, but I thought that's what I had testified

to.

        But then you have one event that pushes you over the

limit. It was my opinion that Marquis Taylor's shooting was the event that caused the PTSD.

Q. The other death you're referring to, the death of Dennis Noble, is it your understanding that Mr. Allen was present for that or witnessed it?

A. He was not present for it.

Q. And, again, my question is, is if there is symptomology that predates the event, how can you conclude that the symptomology that you find after the event or events -- let's go ahead and treat Dennis Noble and Marquis Taylor as together the events that caused the PTSD. If the symptomology predates those events, how can you conclude that the symptomology that flows from those events is caused by those events?

A. Because research has shown that what happens with an individual is trauma is cumulative. If you have been raised in a culture of violence, if you had a variety of different violent activities surrounding you, you become much more -- it is much -- it is a much greater probability that you will attain PTSD.

Q. Okay. And that is the role of those prior experiences, is that it increases the probability, that they are risk factors that someone exposed to an event later develops PTSD from that event, correct?

A. Not always. For example, if you have an individual who

has been repeatedly abused, there's certain characteristics of a child who is repeatedly abused, the fearfulness, the attempting to please, many of the other difficulties.

He, according to the declarations and the information that I received subsequent -- well, not until -- pardon me, not until 2009, those difficulties caused him problems. He had psychological difficulties due to those problems.

But the actual reexperiencing the nightmares, the other issues that would have -- that would have had me classify him as PTSD did not occur until the Marquis Taylor shooting.

Q.    Did not occur until after the shooting?

A.    That is correct.

Q.    All right. I'm going to move on to another topic here, Dr. Cuneo. Do you recall on Friday we were talking about -- I showed you some of those typed memos of interview from Dr. Randall. And there was some discussion about whether you could recall receiving those or not. Do you recall that?

A.    And I have no independent -- and -- yes.

Q.    Do you recall our discussion?

A.    Yes, I recall our discussion.

Q.    And so I want to show you -- I'm going to take you to your testimony at trial. And this is Exhibit 208. And I would direct your attention to -- if I go a page up, I want

you to see what question from Mr. Sindel introduced this line of answer from you.

You see at line 13: "In connection with the evaluation you did of Mr. Allen, what did you review, what documents, papers, records, et cetera?"

Okay. And then you begin your answer. "I jotted them all down in one spot here."

And then you proceed to answer on this page. And at least here you're talking about statements made by the defendant and Mr. Holder, correct?

A.    Correct.

Q.    And on the next page you continue your answer. And here we have medical records, Metropolitan Psych.

"I conferred at that time with Dr. Randall who was working as the mitigation expert."

And then I want you to look at line 7 through 11 there, and read what you said. I'll read it aloud for you:

"And he had interviewed a wide variety of different individuals, and he forwarded me -- this is pretty much my whole file here -- a copy of -- he would then have it transcribed so that I could read it."

Now, do you recall that when you testified, you brought with you to the stand a stack, a file of materials and papers?

A.    Yes. Whenever I testify, I always bring everything

that I reviewed with me.

Q.    So looking at your testimony here in 1998, when you're referring to Mr. Randall had interviewed a wide variety of different individuals, and then he forwarded to you something, this is pretty much my whole file here, he would then have it transcribed.  So does that refresh your recollection?

A.    As I said when I testified Friday, he may -- when you showed me the individual things that he had shown me, I don't have my file from 14 and a half years ago on this case.

Q.    What happened to it, by the way?

A.    I have no idea.  My guess is it was shredded, but I have no idea.

Q.    Did anyone ever contact you and ask you to send it to them?

A.    No.

Q.    Pass it on?

A.    No.  And so -- and so when you showed me the individual things that I reviewed, as I testified Friday, I cannot remember if I reviewed those specific things or did not review those specific things.  And so I have no independent recollection of what I reviewed since I don't have the specifics anymore.  I'm not telling you that I did not see it, but I'm not telling you that I did see it, because I have no independent recollection of the specific things that I

reviewed.

Q.    From your testimony here, coming from your -- this is coming from you back in 1998.  Would it appear that you, in fact, had at least a number of memos of interview from Dr. Randall, just not which ones?

A.    Yes, it is.

Q.    Okay.  A little farther in your testimony of this same Exhibit 208, beginning down here at line 21 -- and I believe that at this point you're being cross-examined.  Okay.  You're being questioned about the criteria or the basis upon which you rendered your diagnosis.  And at the bottom here, line 21, and this is page 311 of this transcript, but page 112 of the exhibit.

        "What he says not only fits that, but then one has to look at what the parents say, one has to look at -- pardon me -- what the mother says, what the friends say, what the girlfriend's mom says.  You gotta look at what everybody says."

        By your reference to the mother, the friend, the girlfriend's mom, would it be fair to say, at least among other things, you had reviewed memos of interviews of those individuals for you to be referring to them specifically?

A.    Yes.

Q.    Okay.  And the question you were being asked had to do with hearing voices specifically in this section.  No one

besides Mr. Allen himself ever told you that he heard voices. And that was true back in 1998, correct?

A.    As far as I know.

Q.    You weren't relying on any collateral source that said somehow they knew he was hearing voices?

A.    Based upon what I said there, no.

Q.    Okay.

A.    Because that says:  "Nobody besides Mr. Allen ever said -- ever told me he was hearing voices."

Q.    Back at your declaration, in describing -- now we're back to your declaration now, 2009.  And you're referring to what you did back in '98.  So in 2009 you're trying to basically describe or do a retrospective on what you did in '98.  And you described what you did with Juanita Allen, Mr. Allen's mother, as a brief interview.  Okay.  You got that part so far?

A.    Yes.

Q.    Because I'm going to go to your trial testimony, and direct your attention to line 22.

          THE COURT:  What page?

          MR. HOLTSHOUSER:  This is -- of the exhibit, Judge, just so -- this is Exhibit 208.12, so page 12 of Exhibit 208. But as you can see, this is page 211 of Volume 17 of the trial transcript.  In the exhibits, these are introduced or set in there as -- we've broken each witness up into separate

sections.

THE COURT: Okay.

MR. HOLTSHOUSER: Easier to handle that way. So that's where the confusion will come from the page references.

Q. You see here in your testimony at trial, and this is direct examination in response to Mr. Sindel's questions. Still answering basically what it is that you relied upon to reach your diagnosis, you looked at the police records, the assault, et cetera. "Then I interviewed his mom."

Now, my question is, back when you testified in trial, you didn't characterize your interview of his mother as brief; is that correct?

A. That is correct.

Q. So what was it in 19 -- in 2009 rather, in your declaration, that caused you to attribute the adjective "brief" to your interview of his mother?

A. Because when I found out all the additional information that was there, when I interviewed his mother in -- what was it, February 2000 -- pardon me, February 1998, I believe it was -- I believe it was. At that time I was looking at specifics that would confirm or get rid of a diagnosis of PTSD. And I wanted to look specifically at the incident. I did not follow through with any background history.

Q. Well, 11 years after you testified, when you're

preparing this declaration or signing it, is the word "brief" interview of Juanita Allen, was that your word to describe it or was that someone else's word that you were essentially willing to agree with?

A.    That was someone else's word.

Q.    Okay.  And at trial when you talked to the jury, you weren't trying to minimize the value of your interview with his mother by describing it as only brief, correct?

A.    No.

Q.    You were telling the jury that you had interviewed her?

A.    Yes.  I believed at that time that I interviewed Ms. Allen.  And the purpose for interviewing Ms. Allen at that time was to get additional information, but also to confirm my opinion at that time that he had a diagnosis of PTSD.

Q.    Did anyone stop you in your interview of Mrs. Allen and say, sorry, that's all the time we have, we can't talk to you anymore?

A.    No, just the fact of the time itself.

Q.    Did you ask her all the questions that you wanted to ask her?

A.    At that time I did.

Q.    Was there -- sorry, go back to your declaration.  In your description of what you considered back in 1998, the only live interview that you refer to here is the one of

Mrs. Allen, correct?

"I also reviewed some background documents provided to me by the defense team."  There's no other reference in here to having spoken to anyone else personally, correct?

A.    That is correct.

Q.    And you don't recall any?

A.    None that I recall now.

Q.    Let me show you your trial testimony.  This is back to 208, and page 42 of the electronic exhibit.  Beginning at line 7 on this page, you're being asked the question on direct about Mr. Allen's truthfulness and the fact that he does lie.  And you proceeded to then explain that you didn't just rely on his word, but that's why you had to go back and look at everything else.

"That's why I ended going back and speaking to Mrs. Taylor to find out what had happened.

"And she tells me that Billie goes back into her son's house after the death just to feel his presence.

"She tells me that he was sad, that he was crying.

"His mom tells me that he was starting to fall apart at this time.

"So I checked.  I wanted to make sure -- Checked the police reports, et cetera, checked with Mrs. Taylor to find out if that occurred."

A.    That's actually in my report.  I have no independent

recollection, though, of speaking to Mrs. Taylor, but if it's in my report and it's in my testimony, then it must have occurred.

Q. My point, though, Doctor, is that prior to preparing this declaration, you indicated that you had read your penalty phase trial testimony, correct?

A. That is correct.

Q. So you just -- you read what I just showed you on that other page. Yet when it came to describing for the Court in your declaration the extent of your work back in 1998, you didn't mention, did you, that you'd also spoken personally to Mrs. Taylor?

A. No, I did not.

Q. Going back to that same part of your trial testimony, you stated for the jury at least why you had done that. And your "belief is that you need to be able to document everything you have from a variety of sources; because otherwise you don't know if it's true."

Was that your thought process then and is that your thought process now?

A. I do believe it is extremely helpful to document from a variety of different sources because if you have a bunch -- if you have a variety of sources that agree, you have a much greater likelihood of it being true.

Q. All right. And when you say "document everything," by

"document" -- I mean, there's different types of documents, would you agree?  For example, medical records, school records, the report of the Metropolitan Psychiatric Center, those are records created in the course of business activity by professionals, correct?

A.    That is correct.

Q.    Then on the other hand there's memos of interview of witnesses, correct?

A.    That is correct.

Q.    Now, do you equate those two things in terms of being -- of something that is capable of corroborating or establishing the truth of something that a patient like Mr. Allen says?

A.    What do you mean "equate"?

Q.    Are those equal?

A.    It depends on the individual that I'm getting it from, the reason why the report was generated, and the individual that I'm talking to.

Q.    Now, with respect to PTSD, one of the things you told the jury in your testimony, the analogy that you used, I believe, is that it's like -- it's like a blackout drunk. You see here where it says:

        "Because they are recreating their memory.  They are trying to recreate things."

        And, "They are trying to make adjustments in it,

change it?"

"Right."

"It's kind of like -- it's nearly to the point of confabulating."

I don't know what that means.  What does "confabulate" mean?

A.    Confabulating, it means not lying.  But what happens is you have pieces of information, where you can't remember certain pieces of information, so you put things in it to make it fit.  And then what happens is you end up believing that.

Q.    All right.  And you gave the example here of going out and maybe having too much to drink.  Get up the next morning and somebody tells you, "Hey, you had a good time," you have no memory, and they tell you what happened, and all of a sudden you start putting it back together, and you go, "Yeah, I remember that."  And it may never have occurred, but you end up believing it.  And you say the same thing happened here; is that right?

A.    The same thing happens with PTSD too.

Q.    Now, do you recall we talked a little bit on Friday about this, you had your first interview January 16th, and you had your second interview February the 22nd.  And this second interview, do you recall at trial that there was a controversy because the second interview you had with

Mr. Allen was complete news to the government? In other words, that was the first we heard about it was when you testified about it on direct.

And Mr. Sindel was explaining what the purpose of the second interview was. Now, I think on Friday we established, did we not, that on February 22nd, by that time you knew you were going to be called as a mitigation expert?

A.    Yes, I --

Q.    You knew that the trial had already begun, so competency was no longer an issue, correct?

A.    Correct.

Q.    And your second interview with him actually went into a lot of different topics as we saw from your notes the other day, correct?

A.    I believe it dealt with different issues.

Q.    Okay.

A.    And we had talked about that Friday.

Q.    Mr. Sindel here advised the Court that, "The second interview with Allen was because at the first interview, there was a lot of questions he didn't answer, he didn't answer on the IQ test and the MMPI. So he went back to see if he could get answers. Basically he didn't get any answers." That particular representation there is at least not the complete truth, is it?

A.    There's certain things in there that are not correct.

For example, the IQ test, I never went back to get answers on the IQ test.

Q.   And the MMPI had incomplete answers?

A.   74, I believe it was.  It was over 70.

Q.   But as you saw from your notes from the 22nd interview, you spent very little time in the interview talking about the MMPI, you actually went into more detail firming up your diagnosis of PTSD, correct?

A.   That is correct.  What I did was I read the MMPI answers to him that he didn't answer.  And they all went the same way, he was always attempting to make himself look good.  At least that's what my notes state.  Again, I can only go on what my --

Q.   But beyond that, though, then you went into matters dealing with his social history, the experience with his mother's house, the visit to the Metropolitan Psychiatric Center, and, in fact, the circumstances of the offense?

A.   That is correct.

Q.   Because that's the interview where you basically finally said in the end, you say, "Look, you know, give it to me straight, okay."  You're basically saying, I'm not buying this "I wasn't there" routine, correct?

A.   That is correct.

Q.   And that's when you threatened to walk out?

A.   That is correct.

Q.    And that's when you got those additional statements from him, correct?

A.    That is correct.

Q.    Why did you -- why were you doing that?

A.    Because at that time on February 22nd, I didn't see that there would be ever a chance to go back to see him again.  I wanted to get whatever information I could.  First of all, to make sure -- again, at that point I had zeroed in on PTSD.  I did not have the information from his background. I had -- at that time I was told that we could have court -- you know, that I may be testifying either at the end of February or the beginning of March.  And I wanted to be able to at least firm up the PTSD so that it could be presented.

Q.    Well, my question goes more directly as to why as part of your evaluation of him, particularly with respect to PTSD, were you interested in finding out what had actually happened from his point of view during the offense?

A.    Because --

Q.    Did you feel that that was relevant?

A.    I wanted to see if there was any type of causal connection to the offense itself.

Q.    Is it -- is it actions, thought process, behavior, reactions, before, during, and after, information that would be relevant to any mental health diagnosis, particularly one dealing with PTSD?

A.    Not always, but it could be.

Q.    So it was something that was potentially relevant?

A.    It may be relevant.

Q.    I'm going to move on to another topic here.  Do you recall we looked at your bill on Friday?

A.    Okay.

Q.    And I showed you some notes, and there was some questions as to whether or not some of these notes by Dr. Randall of other contacts and so forth refreshed your recollection about any other meetings.

First of all, is it possible that you did not actually account for and charge every single contact or meeting or activity that occurred in this case?

A.    That is possible.

Q.    I'm going to show you Exhibit 68, which is the -- remember you filled out one of these things in order for you to get paid?  It's a CJA form.

A.    Yes.

Q.    You filled out one like this, okay.  This is Mr. Simon's CJA form, Exhibit 68.  So I know you haven't seen this before, but what I want to do is I want to ask you -- I'm going to show you a couple of entries in his records.

THE COURT:  You want to see if the clerk can straighten it up for you?

MR. HOLTSHOUSER:  No, I'm going to do it, Judge.  I

was just trying to find the right page.

Q.    Here we go.  I have to do this unfortunately for each page.  See here on February the 11th, I'm going to blow this up.  And this is Mr. Simon's entries.  On February 11th, he reflects a conference with Drs. Randall, Cuneo, Gelbort, and Sindel on February the 11th.  And this -- you can compare this with this earlier fax of Dr. Randall suggesting a meeting with that particular group as well.

And my question is, is that when we look at -- now I got to find it again.  Mr. Simon's entries in his records, would you agree that they at least coincide, the same time frame, between that fax and what Mr. Simon says is a meeting that actually occurred for 1.9 hours?

A.    Yes.

Q.    On February 14th, there's another entry of another, looks like .4 hours, conference with Sindel, Cuneo, and Randall.  And this is all well -- this is a week before your second interview with Mr. Allen, so on February the 14th.

And if I go back to Exhibit 376, which I showed you on Friday, February the 14th is the same date.  This reflects a fax of some things that you and Gelbort and Randall need.  Those two things coincide, correct, the same date?

A.    The only thing I can think of is that I never charge for phone calls.  And I saw it was for 15 minutes.  My -- and this is just a guess.  My guess is he called me and said, do

I need something.  But other than that, I have no independent recollection of that.  And it's --

Q.   Does it refresh your recollection, though, that perhaps your contacts with the defense team might have actually been more than reflected on your bill, your time records?  That there were phone conferences, that there were meetings that occurred that are not actually reflected on this?  Because Mr. Simon's records are reflecting meetings in which you are in attendance on dates other than the ones listed here.

A.   Did they say I was in attendance or did they say they were on the phone?

Q.   It doesn't specify.  It says conference, I agree with you.  But if you're attending by conference call --

A.   Okay.  If it was by phone for 10, 15 I don't charge.  I don't charge for that.  So is it possible?  Yes, it's possible.  But it's not on my bill.

Q.   Here on February the 20th, there's a --

THE COURT:  Still Simon's notes?

MR. HOLTSHOUSER:  Still Simon's notes.

Q.   And this is when he would have faxed to you the order giving you permission to go visit Mr. Allen on the next day, on the 22nd?

A.   On the 22nd, okay.

Q.   Okay.  Now, recall that we looked at some notes purported to be from Mr. Simon of a meeting, conversation

with you on the 22nd, the same day. And I want to direct your attention to -- hold on a second, it might be the next page. Yes. Conference on the 23rd of February. That among other things references you, David Brook, a Mr. Murphy re: discovery, exhibits, and issues. Then again on March the 2nd --

A.   I'm sorry, could you go back to that other. Did that say I met with him or talked to him? I thought it was a conference with you, sir.

Q.   Well, it's including you, Mr. Holtshouser, Dr. Cuneo, Mr. Brook, Mr. Murphy re: discovery, exhibits, and issues.

A.   I don't think we ever talked before trial, did we?

Q.   Well, I talked to you before trial, yeah.

A.   Did you?

Q.   We talked about that on Friday, that I had actually called and spoken to you ahead of time about what your opinions or what your report was going to be.

Going to the next one, which is going to be March the 2nd. We only have a couple of these left. And you have no -- I'm sorry, get the hours in over here. Your records don't have any entries for March the 2nd, but on March the 2nd, Mr. Simon reflects right here where the arrow is, a conference with -- I can't read that name, but Mr. Sindel, Dr. Randall, and Dr. Cuneo for 1.9 hours. That's on March the 2nd.

You have an entry for March the 3rd for review.

And then on March the 4th, on the next page, Mr. Simon has another conference with Gelbort, Randall, Cuneo, and Sindel, re: testimony.

A.    I believe the March 4th --

Q.    You don't have an entry on March 4th.

A.    Is March 4th noted on my bill?

Q.    It is not.  That's why I'm pointing them out to you. You have one on the 3rd.  You have one on the 5th.  You don't have one on March the 2nd or March the 4th?

MS. CARLYLE:  I suggest you look because there's one on the 4th too.  Page 2.

Q.    Oh, I stand corrected, you have one on the 4th.  You have one on the 3rd.  You don't have one on the 2nd.  You have one on the 5th.  Okay?

A.    The 5th, I was in court.  I believe I testified on March 5th in court.

Q.    And you were done testifying by that time, but then on March the 6th in Mr. Simon's records, and this does not appear on your bill, is a dinner meeting amongst ourselves and Dr. Cuneo.

A.    I thought it said they arranged one.

Q.    "Arranged dinner meeting among ourselves and Dr. Cuneo."  Do you recall such a dinner meeting?

A.    No.

Q.    So my question I guess is, my point of taking you through all these, is it possible that you had, based upon at least the entries Mr. Simon makes, more contacts with the defense team than simply reflected on your bill?

A.    If it was via phone, it would not have been reflected on my bill.

Q.    So would that be a yes, that your contacts with the defense team would perhaps have been more extensive than reflected on your bill?

A.    It would perhaps.

Q.    Okay.  All right.  Let's move on to another topic, and that is your interview of Mrs. Allen.  I want to ask you, were there any topics that you were afraid to ask her?

A.    No.

Q.    Were you worried about asking her a particular question that might alienate or anger her?

A.    No.

Q.    What were your impressions of her when you spoke to her?  Was it in person?

A.    No, it was on the phone.

Q.    Okay.  What were your impressions of her when you spoke to her?

A.    I have to be honest with you, I can't remember.

Q.    Did you ever meet with her in person?

A.    No.

Q.   Did you ask to?

A.   That I can't remember.

Q.   Okay.  Was there anything in her interview, your telephone interview with her that gave you the impression that she was drunk or intoxicated?

A.   No.

Q.   I want to direct your attention now to the entry in your notes.  You added them, it's the note that you put on the left-hand side, that physically -- "mother physically disciplined him to the end."  Do you recall the note I'm talking about --

A.   Correct.

Q.   -- without pulling it up?  And your testimony, just so I'm clear, is that that note reflects a statement by Mrs. Allen to you that you went back and wrote into your Billie Allen notes; is that correct?

A.   To the best of my recollection, yes.

Q.   Are the words -- the notation that you made there then "physically disciplined --"

A.   Would it be possible to put that up on the screen, please?

Q.   Well, let me try that again.

A.   I can see it there.

Q.   I just want to blow it up so we can make sure you see.  "His mom" -- is that an abbreviation for "stated"?

A.    Said.

Q.    Okay.  "He staying out of house -- mom physically disciplined."  And on Friday we thought that was "him till end."  You're talking about Billie Allen, correct?

A.    Yes.  I'm not sure what that is.  And the rest of it is "till end."

Q.    The word "physically disciplined" right here, the phrase "physically disciplined," my question is, are those her words you think, or would those have been your impression from what she said?

A.    I am not sure.

Q.    Do you have any recollection of what question you asked her in order to get this answer?

A.    No, I do not.

Q.    Now, just so we're clear, in your two interviews with Mr. Allen -- and your interview with Mrs. Allen came before you completed your report, because you reference it in your written report, correct?

A.    That is correct.

Q.    And that's February 16th?

A.    Correct.

Q.    So on February 15th, which is the day of your notes from your interview with her, that this notation that we're looking at right here is on your page of notes from your first interview of Billie Allen, not on your page of notes

Q.   from Mrs. Allen?

A.   Correct.

Q.   Right?  So when you wrote your report on February 16th, you already had this information because you talked to her on February the 15th?

A.   Correct.

Q.   So on February the 22nd, just so we're clear, on either the first interview on January 16th or the second interview on February 22nd, did you ever ask Billie Allen whether he was ever abused by anyone?

A.   No, I did not.

Q.   And did you ever ask him about this notation, your mom says she physically disciplined you to the end, tell me about that, without using the word "abuse"?

A.   I did not ask him that.

Q.   And why did you not ask him about that on February 22nd when you had this by February the 15th?

A.   I'm not sure what I meant by saying that at this point. At that point I was not thinking abuse.

Q.   Now, Mr. Simon from various recorded and transcribed interviews with Mr. Allen asked Mr. Allen that question a couple of times.  Mr. Sindel has testified that he's sure that he asked Mr. Allen and also asked Mrs. Allen, and that both denied it.  And Dr. Yutzy, who did the independent examination of Mr. Allen, asked it several times, and we have

that in a recorded transcript as well. But you, a psychologist, did not, is that what we're to understand?

A. Not specifically. Not to my recollection.

Q. Now, from -- Friday you were shown this. I believe Ms. Carlyle showed it to you on direct. This is 638-A, the first page. This is an interview between Mr. Simon and Mr. Allen on January the 7th, 1998. And it's this last question:

"One question that I had, I probably asked last time that we need to be absolutely sure on is whether when you were growing up, uh, you were subject to physical abuse at any point by anybody?"

And his answer is, "No."

So you recall being asked about this on Friday, right?

A. Yes.

Q. And I think you testified on direct that you said that, well, that wouldn't surprise you that someone who was abused would answer a question like this, correct?

A. That is correct.

Q. Okay. Now, conversely if someone denies that they were abused, is that evidence that they were abused?

A. No. You need to get corroborating information one way or another.

Q. So this explanation that you gave on Friday of, well,

this wouldn't surprise me if he was, in fact, abused, that still turns on that. And I think in a couple of your answers Friday you preface it by "if, in fact." That still -- everything still hinges on that including interpretation of this question and answer, hinges on if, in fact, he was abused, correct?

A.   That is correct.

Q.   So that no matter what, the issue remains, was he actually abused, if we're going to interpret what this question and answer meant?

A.   I'm sorry, I don't understand your -- what are you --

Q.   So still the ultimate issue to determine is was he, in fact, abused, correct?

A.   That is correct.

Q.   If he was, then this answer may be symptomatic or typical, correct, explainable?

A.   That is correct.

Q.   If he's not, if he was not, then actually this question and answer is a truthful statement, correct?

A.   That is correct.

Q.   Now, another of the things that you said quite often -- several times, I believe, was that Mr. Allen lied most frequently when it came to bragging or boasting, making himself appear bigger, grandiose claims I think you called it?

A.    That is correct.

Q.    And that would be things that made him look like a more successful and important person than he was, correct?

A.    Correct.

Q.    That included things like cars, rapping contracts, having done well in school, that he was good at art?

A.    I thought he said also $500 a week from a music producer named Wilson.

Q.    Okay.  That he sold drugs?

A.    Yes.

Q.    That he sold fake drugs?

A.    I don't believe he said he sold fake drugs to me.

Q.    You had that information from others?

A.    Yes.

Q.    Rode in stolen cars, he admitted that, correct?

A.    I can't remember if he admitted that to me.

Q.    If he admitted that to someone that he rode in stolen cars, would that be an example of lying to make himself look better?

A.    May be.  May be the truth.

Q.    How about the fact that people were trying to kill him on one or more occasions, would that be an example of lying to make himself look better?

A.    It could be.

Q.    Now, clearly the first answer he gave you about his

role in the offense was one that would make him look better, correct?

A.    That is correct.

Q.    But then ultimately he gave you a different answer when you pressed him, correct?

A.    That is correct.

Q.    Did you come to any conclusion whether which of those two was his honest answer?

A.    I believe he gave three answers.  I thought I went through it three or four times with him.

Q.    Okay.

A.    But I thought the last answer was probably the most correct.

Q.    And that answer -- was that answer something, an example of lying to make himself look better when he admitted that to you?

A.    I don't believe that was an example of lying to make himself look better.

Q.    Now, he admitted to you, didn't he, that he had had a couple of different jobs?

A.    Yes.

Q.    Didn't have them for long?

A.    Yes.

Q.    That wouldn't be an example of making himself out to be successful or important, would it?

A.   No.   He was telling me also he was getting $500 a week from this producer named Wilson.

Q.   He told you that he had asthma, he had a skin condition.  He thought he had lead poisoning when he was a child.  And he was able to account for you his health history, correct?

A.   I believe I may have been told that, and then asked him specifically about that.

Q.   All right.  And he had said, oh, no, he didn't tell you a lie that made him look better than those facts would actually make him to be, correct?

A.   Right.  He admitted that he had a skin difficulty.  He never said that people called him Rusty Crusty Billie.  That was in other reports.

Q.   How about having guilt feelings about Marquis Taylor's death because he thought that the bullet was intended for him?

A.   He did not tell me that.

Q.   Having nightmares about either his friend getting killed or him getting shot?

A.   He did say that.

Q.   That wouldn't be an example, would it, of lying to make himself look better, would it?

A.   No.

Q.   How about hearing voices, that's not something that

someone is going to tell somebody because they think it's going to make them look better, is it?

A.   No.  But at the same time he only said he would hear, I thought it was one word.  Most people that hear voices, especially people who try to malinger or pull a bug act on me, tell me the voices give them commands.

Q.   He also admitted to you a certain amount of excessive use of alcohol?

A.   Yes, he did.

Q.   Use -- extensive use of marijuana?

A.   Primarily marijuana, he stated.

Q.   He told you his father wasn't someone who he was particularly proud of, didn't he?

A.   I can't remember specifically on that.

Q.   Well, would you agree that in terms of the statements that Mr. Allen gave you, that really there's a mixed bag here, there's some good, there's some bad, there's some that might be true, there's some that might be questionable?

A.   That is correct.

Q.   And would you agree that the same is true of the statements of some of his friends and relatives, that they don't actually all paint a consistent story, they have different recollections, sometimes they disagree, sometimes they agree?

A.   I would say there's a recurrent theme that goes through

it.  But I would say that there are differences in their statements.

Q.   And when you testified on Friday, you described what you were doing in a mitigation testimony, is that you were painting a picture, correct?

A.   That is correct.

Q.   And would you agree before you can really diagnose someone or paint the accurate picture, you basically have to determine what facts you believe and what facts you don't believe, correct?

A.   To a certain extent that is true.

Q.   I mean, if you're going to paint a picture, you need to decide whether the color is true or not, isn't it?

A.   It depends if the symptoms are consistent.

Q.   Were you aware at the time of trial why Juanita Allen was not called as a witness to testify?  In any of the meetings you were at with Dr. Gelbort, Dr. Randall, Mr. Sindel, was that ever discussed?

A.   I was not privy to trial strategy like that.

Q.   Were you any part of the decision-making process?

A.   Not as to what witnesses to call or not to call.

Q.   How about as to what themes to stress or not to stress?

A.   I stated that he had a Post Traumatic Stress Disorder, and that was the primary diagnosis that I saw.  And I was told that's what I would be presenting.

Q. Did you have any opinion that at least based upon -- given this declaration now about what you believe is new information that you've been given, would you agree if you were going to present this theme of abuse at a trial, that Juanita Allen would need to testify?

A. If the --

MS. CARLYLE: I don't think he has any way of knowing what a lawyer decided or what lawyers would need to testify.

MR. HOLTSHOUSER: I'll rephrase the question.

BY MR. HOLTSHOUSER:

Q. Would you feel that in order for you to, say, testify at a new trial and provide a new opinion based upon what you believe is the new information that you have, you would have to rely to a great extent, would you not, on the information that comes from Mrs. Allen herself?

A. It would be one of the pieces of information I would look at.

Q. I mean, it would be a significant one if his mother herself were admitting to having physically abused Mr. Allen, correct?

A. And there was corroborating information, yes.

Q. At trial were you aware -- I think you were aware because you were asked some questions about it on cross-examination, that Mrs. Allen had tried to get Johnnie Grant

to lie for her son at the trial?

MS. CARLYLE: I'm going to object. I don't think the trial record really reflects that. I know the prosecutor attempted to demonstrate it. I think the cross-examination of Mr. Grant pretty much debunked it.

MR. HOLTSHOUSER: I don't think that's a fair characterization of the evidence of the record, but it's in writing and there's testimony uncontroverted from Mr. Grant that he had those meetings and conversations with Mrs. Allen, and there's not been any refutation of it.

THE COURT: That's as I recall. Overruled.

BY MR. HOLTSHOUSER:

Q. You're aware of that aspect of the evidence is that there was written letters from Mr. Allen to Johnnie Grant asking him to lie for him in court. Do you recall being asked about that?

A. I can't recall being asked about that. I'm not saying that it didn't happen, but I don't have any independent recollection of that.

Q. And even as you sit here right now with the body of information that you are considering, you're not aware of those letters written by Mr. Allen to Johnnie Grant?

A. Billie Allen, what's it --

Q. Billie Allen writing letters to Johnnie Grant asking him to lie for him in court at his trial back in 1998.

A.    If those -- if I have seen those letters, I don't remember seeing those letters at all.

Q.    And similarly then you probably -- do you recall -- let me ask you this:  Do you recall that Johnnie Grant testified that Mrs. Allen had had two encounters with him in which she was requesting him to do the same?

A.    I don't believe I've ever seen that testimony.

Q.    Would that have an impact on whether you believe what she tells you about her son?

A.    If I had corroborating information that said that she abused her child, beat her child, was an alcoholic, was having difficulties, and I had corroborating information, I would believe that.

Q.    You would believe that?

A.    If I had the corroborating information, yes.

Q.    Any corroborating information would suffice?

A.    Not any corroborating information.

Q.    All right.  I'm going to shift gears again on you here, Dr. Cuneo.  We're moving along, so just keep up if you would.

       Did Dr. Randall ever tell you that he suspected that Mr. Allen was a victim of life-long abuse, and that Mrs. Allen was his primary abuser?

A.    Not to -- I have no --

Q.    Do you recall?

A.    I don't recall anything like that at all.

Q.   Do you recall Dr. Randall ever telling you that he had spotted what he referred to as "red flags" of abuse?

A.   No.

Q.   Did he ever mention any concern he had about his observations of Mrs. Allen?

A.   Not that I recall.

Q.   Did he ever mention any concerns he had about his observations about Mr. Allen's grandfather, Otha Petty?

A.   Not that I recall.

Q.   Do you recall anyone in the trial team ever stating to you that as a matter of strategy, that it was not a good idea to, quote, trash the mother, closed quote?

A.   No.

Q.   Is that something that perhaps you expressed to the trial team?

A.   No, I would not make that statement.  At least I can't see myself making that statement.

Q.   Did you ever tell anyone on the trial team that your evaluation of Mr. Allen was inadequate, incomplete, or otherwise failed to meet the standard of care of a competent psychologist?

A.   I said repeatedly that my fitness evaluation and competency evaluation, I would stand by.  I said repeatedly I felt uncomfortable going in to testify on mitigation because I felt that the time limit was ludicrous.  I thought being

told that I was going to do mitigation on, if it was the last week in January, and I can't tell you if it was the last week in January or February 1st, with the trial starting February 9th, was appropriate.  If I had this to do all over again, I would have refused.

Q.    You evaluated Mr. Allen on February 22nd when you knew you were going to be needed as a mitigation specialist, correct?

A.    Sure did.  Yes, I did.

Q.    Did your conversation with Mr. Allen that day get cut short for any reason?

A.    No, it did not.

Q.    Did you have like a list of 30 questions and get through only 15 of them because of time constraints?

A.    No, I did not.

Q.    How did it end, and who ended it?

A.    I did.  I went through the issues that would firm up the issue of Post Traumatic Stress Disorder so I could present it at trial.  And I also went through the MMPI, the 74 questions again.  I believe it was 74.  It was in the seventies.

Q.    In terms of -- I understand the concerns that you expressed to the trial team, that you felt that you were being placed under difficult time constraints, correct?

A.    That is correct.

Q.    Nevertheless, by the time you testified, did you feel that your testimony was the work of a competent psychologist?

A.    I believe the issues as to Post Traumatic Stress Disorder were competently given.  I thought I had the information to present it.

Q.    And you did present it?

A.    Yes, I did.

Q.    And you presented it as confidently and persuasively as you could, correct?

A.    I tried.

Q.    You certainly did not give the jury any indication, did you, that there was anything inadequate or incomplete about your presentation, did you?

A.    No.  That would have weakened Mr. Allen's case.

Q.    Did you feel that in terms of forming your diagnosis and your opinions about PTSD and the downward spiral that you trace in his life based upon the historical information that you had, did you feel that that work of yours met an appropriate standard of care of a competent psychologist?

A.    I believe it was competent insofar as arriving at the diagnosis.  I stand by the diagnosis now.  I stand by the fact what my opinion was back then, that he was competent to stand trial.

Q.    And, in fact -- well, you stand by your opinion, don't you, that your diagnosis of him was that he had chronic PTSD

and was still suffering it at the time of the offense, correct?

A.    That is correct.

Q.    And today you still stand by that?

A.    That he was suffering from PTSD at the time of the offense and he had PTSD at that time.  I don't know what he has now; I haven't seen him --

Q.    You haven't examined him?

A.    -- since '98.

Q.    All right.  Let's go to that "if, in fact" question that we talked about earlier.  You've been working in the forensic area for most of your professional career; is that correct?

A.    That is correct.

Q.    And I take it you are familiar with how juries are instructed to reach credibility decisions?  Are you at all familiar with the factors that they are given to consider when deciding what they believe and what they don't believe?

A.    I don't believe -- I've never been on a jury.  I'm not sure I've been given those specifically.

Q.    All right.  Would you assume for purposes of these questions then that juries are told to consider the motivations of a witness, their prior inconsistent statements, any bias that they might have, any corroboration by other credible evidence, and anything else that they

consider relevant to credibility, okay.  Those are the primary factors that a jury is instructed to consider in reaching fact findings.

Is your decision-making process as a psychologist different than that?

A.    It would be similar.

Q.    Similar.  You'd consider those same factors?

A.    I would consider those factors.

Q.    Now, back in 1998, in making your diagnosis, did you rely on anything that Billie Allen told you?

A.    Yes.

Q.    And how did you know that what he told you about something was true?

A.    Can you give me an example?

Q.    Well, how about persistent reexperiencing of the event.  That's one of those criteria under the DSM for PTSD, correct?

A.    He had said he had nightmares.  I believe back then --

Q.    I know what he said, and that's not my question.  My question is, did you rely on him in concluding that he had that criteria?

A.    To a certain extent, yes.

Q.    Is there anyone that corroborated his testimony that he had nightmares and the content of those nightmares?

A.    No.

Q.    How about auditory hallucinations, voices, that was

another thing that you noted, ticked off one of the things under the DSM. Did he --

A. I believe I later described that in my testimony as an illusion, I believe. And because he only would hear one word.

Q. Okay.

A. It was never a command. And I thought when you read my testimony, I say it was -- then later I say it's more of an illusion.

Q. Okay. Do you see here, this is Exhibit 208, page 33 of the electronic exhibit. And you've been asked on direct the criteria, here at line 9, that -- and you're talking about the criteria for the DSM diagnosis of PTSD, correct?

A. Correct.

Q. And you have recurrent nightmares -- line 11, "reexperienced by recurrent nightmares." And when I spoke to him, he talked about how he had nightmares. So in order -- in reaching your diagnosis and satisfying that criteria, the only one that provided information is Mr. Allen, correct?

A. That is correct. But if you do look, I do believe later on I describe auditory hallucinations as more of an illusion in the testimony.

Q. Line 16 and 17, isn't this your words, though: "In addition, the onset of an auditory hallucination following the incident."

And then you went on to say, he had spoken to me about he would periodically hear one word, just thinking he was going to die, and that that was started after the death?

A.    Right.  Could you bounce to the next page, because I think that may be where it is.  If not it is when I talk about the hallucinations.

Q.    And you say, I'm not sure I would call it that, I think what you've got is just a concept of an illusion or reoccurrence, in other words, just extreme fear of what has happened is coming back to him, and this is fairly common in Post Traumatic Stress, correct?

A.    Correct.

Q.    So your recollection is correct that you added this phrase "illusion."  But the question I'm getting at, Doctor, is that this conclusion of yours, which you cited as a support for your diagnosis of PTSD, the only evidence you had to find that he, in fact, had these illusions or auditory hallucinations was his statement to you, correct?

A.    That is correct.

Q.    But you also had at the time, did you not, the records from Dr. Wuertz when he visited the Metropolitan Psychiatric Center back in February where there is a section there --

A.    I believe in that section it talks about how he denies any type of psychiatric difficulties or any type of substance

abuse, if you look at those records.

Q.   Yes, it does.  I'm pointing you to this section here, though, about auditory hallucination, denies.

A.   Correct.

Q.   So you had in front of you a record that a couple months before the incident, he denied this, before he was charged with a crime, to a psychiatrist at the Metropolitan Psych Center, but yet you accepted what Mr. Allen told you?

A.   If you also look at that whole record, during that time period he also denied any type of depressive difficulties, even though he had come in on an apparent suicide attempt. And if you look at those records, you will also find he denied any type of substance abuse.

Q.   I'm not going to argue with you about the suicide, because Dr. Wuertz actually testified a couple hours ago that wasn't the case here, but I don't want to get into that debate with you.

My point is you accepted the word of Mr. Allen that he had these illusions or voices over what he had told another mental health professional just months earlier, correct?

A.   That is correct.

Q.   And what I'm asking you is, what between the two made you give more credit to what Mr. Allen is telling you, an individual who you've been told can't tell the truth to save

his soul, and what he told a psychiatrist during a late night visit to a Metropolitan Psychiatric Center?

A.   Because his motivation -- well, part of the thing, he wanted to be released immediately there.  The other thing is that he wanted -- he presented himself as having no difficulties, including no substance abuse.  And when he talked to me about the possibility of hallucinations, he never talked about whether they had command hallucinations or visual hallucinations, he said he just heard one word.

What I felt he had was not specifically an auditory hallucination but an illusion, which is also defined under PTSD.

Q.   And it was enough to qualify as satisfying that criteria under that -- you could check that box, correct?

A.   Correct.

Q.   Now, there's also a -- you're still talking about the bases for your findings of PTSD.  And your line 10 here:

"Third, it could be seen by his inability to recall important aspects.  He talked about that, about how sometimes things just come back to him in bits and pieces."

So was that another example, though, of your diagnosis relied upon something that Mr. Allen told you?

A.   Correct.  And it also went into the history.  I could see he was having difficulties.

Q.   Did you have any way of determining when he was having

those difficulties, whether those difficulties were genuine?

A.    Just experience that I've had, at that time probably having 25 years in the field.

Q.    Did you ever ask him whether or not he'd ever had any conversations with anyone about the criteria for PTSD before he saw you?

A.    No, I did not.

Q.    Do you recall one of the issues that we talked about at trial was this notion of persistent avoidance?

A.    Correct.

Q.    And in your declaration, I believe, you indicated that one of the ways in which you felt ineffective in being able to answer this question was is that he lived in the neighborhood, he had nowhere else to go, he couldn't escape, correct?

A.    That is correct.

Q.    I want to point your attention to beginning here on Exhibit 208, 105.  And line 9, you understood the homicide occurred on the steps of Prentiss Church's house.

And you said yes.

And that afterwards he continued to go to his house.

And you said, yes, he did go back.

He had no problem going there?

No, I didn't say he had no problem.  He may have said that, but his mother spoke about how he wanted to stay

in the house and didn't want to go away.

Now, when you say "his mother," is this where you're actually referring to Marquis Taylor's mother in that Mr. Allen wanted to actually come to Marquis Taylor's house and not leave that house because he wanted to feel the presence of Marquis Taylor?

A.    I can't tell you which mother at this time.

Q.    He wanted to stay --

A.    I can't tell you -- I cannot tell you if that was Mr. Allen's mother or Marquis Taylor's mother.

Q.    And I asked you:

"Did he say that he avoided seeing or being with Prentiss Church anymore?"

"Did not say that."

"So he wasn't trying to avoid anything that might recall memories of Marquis, such as being with Prentiss. Wouldn't that bring up the memory of Marquis?"

"No.  In fact, many times, he wanted to do things to keep the memory of Marquis alive.  And that's why he would go back to his house."

And again here now, does this clarify for you that you're referring to Marquis Taylor's house?

A.    Yes.

Q.    "To feel a presence, and that is not uncommon with survivors of accidents."

"But that is not persistent avoidance, is it?"

And then you answered by asking me:  "Is that a persistent avoidance?"

I said, "Now you're repeating the questions."

And you said, "No.  That would be a real anal accounting.  But what happens is you have to understand the concept.  You just don't go --"

"But is it persistent avoidance, yes or no?"

"Is it persistent avoidance?"  You asked to repeat the question again.

"Yes.  To continue to go back to Prentiss Church's house, the scene of the crime, the scene of the death, or to associate with Prentiss.  Is that persistent avoidance?"

"In that particular case, that would not be persistent avoidance."

Now, my question here, Dr. Cuneo, is that you weren't being asked about whether or not he had nowhere else to go besides his own home, the question had to do with returning to the scene, the actual scene where Marquis Taylor had died, where the traumatic event had occurred.  There was nothing, was there, nor is there now anything which tells you that Mr. Allen had to visit Marquis Taylor's house, is there?

A.   That he had to?

Q.   Yes.

A.   It was my understanding back then that he went to the

house to reexperience his friend.  And that he would go back there, and that he would talk to his mom, and he would try to keep his memory alive.

Q.    By "his" mom, you're talking about Marquis's mom?

A.    That is correct.

Q.    And then you also acknowledged that he returned to Prentiss Church's house, which is actually where Marquis Taylor was killed, on the steps of Prentiss Church's house is where he died, correct?

A.    Correct.

Q.    All right.  So that's two houses; one is the scene of the crime, the other is associated with the memory of Marquis Taylor.  And that Mr. Allen would continue to return to both. And that that was not an example of persistent avoidance, and you agreed at trial that that would not be persistent avoidance, correct?

A.    That was not persistent avoidance.

Q.    Given the information that you have now, that doesn't change that, does it?

A.    That he wouldn't go back there or that he doesn't have persistent avoidance?

Q.    The fact of going back to both Marquis Taylor's house to feel his presence and be reminded of his existence, and to revisit the scene of the crime is inconsistent with persistent avoidance.  Nothing new changes that, does it?

A.   That would not change the persistent avoidance.  The issues it would have is why he kept going out to the streets where the violence would be.  You would have a persistent avoidance of that.  Except he had nowhere to go if he was being continually put out of his house, if according to the declarations and the depositions are correct.

Q.   If any of that is correct, when he's, quote, put out of his house, and this -- we're talking about after the death of Marquis Taylor, so that's May of '95 --

A.   No --

Q.   -- when that happens, correct?

A.   No, because it's my understanding he had been put out of his house before that time.

Q.   No, I understand that.  What I'm getting at is after the death of Marquis Taylor, and that's the PTSD triggering event, he's already by that time 17, 18 years old, correct?

A.   I thought the one death occurred when he was 15, that was Noble.  And I thought the other death occurred when he was 17, that was Marquis Taylor.

Q.   We're talking here about Marquis Taylor, and returning to the scene of Marquis Taylor's death and going back to Marquis Taylor's house to be reminded of his existence and reminded of his presence and so forth.

     The fact that his mom may have put him out and he had nowhere else to go but the streets, none of that

compelled him to go to Prentiss Church's house or to Marquis Taylor's house, did it?

A.    He went back there to try to put it back together for himself.  He had bits and pieces.

Q.    Yet none of that would require him to go to those places, would it?

A.    No.

Q.    One thing we talked about at trial quite a bit, if you recall, was his social life, which begins actually at line 7 here.  That you felt that his social life was impaired as a result of the PTSD that was triggered by the death of Marquis Taylor, correct?

A.    Back then or now?

Q.    That's what you testified to then, correct?

A.    Back then, that was the only information I had.

Q.    And you actually thought that he didn't have any real friends, correct?

A.    He had no real friends.

Q.    You thought that he actually was making up the amount of time that he went to Cloud Nine --

A.    I didn't say that.

Q.    -- and other clubs?

A.    I don't believe I testified to that.

Q.    You thought it was exaggerated and that it was some part of his dream world, correct?

A.    I believe the part of his dream world was Wilson and the music and the fact that he was making $500 a week.  I don't believe I ever mentioned Cloud Nine at all.

THE COURT:  While you're looking, I just received a note.  I need to take about a 15-minute break.  Court's in recess for 15 minutes.

THE WITNESS:  Thank you, Your Honor.

MR. HOLTSHOUSER:  Judge, so back here at 1:45?

THE COURT:  Quarter till.

MR. HOLTSHOUSER:  Thank you.

(Court in recess from 1:28 p.m. until 1:50 p.m.)

THE COURT:  Go ahead.

BY MR. HOLTSHOUSER:

Q.    Dr. Cuneo, we are on your trial testimony still.  And we're looking at the reasons and some of the cross-examination about those reasons that you gave in support of your PTSD diagnosis at the time of trial.  So just to reorient you to where we're at, okay?

A.    Correct.

Q.    And what you have up in front of you here is a page from your cross-examination.  Let me make sure we have the right one.

A.    17 - 307 or 306?

Q.    You need to start on 306.

THE COURT:  Is this still 208?

MR. HOLTSHOUSER:  Yes, Exhibit 208.

Q.    And I think we were beginning the topic of -- here we go, line 4, you're talking about impairment of social life, correct?

A.    Correct.

Q.    And remember I asked you before the break about you thought he didn't have any real friends.  You thought he didn't really go to Cloud Nine to be engaging in the social life there, and you also had serious doubts about whether or not he drank certain kinds of expensive or name brand liquors?

A.    Yes.

Q.    You see here at line 5, "I have difficulties believing that he was always hanging out at Cloud Nine or having this fantastic social life, drinking Moet and Chandon, it's one of the fancier wines."

A.    Correct.

Q.    And my question to you at the time was, Aside from your difficulty believing it, would it be inconsistent with impairment in his social life, if he was spending his time at night at Cloud Nine?

     And I'm not sure you answered that.  You said, "If he was spending his night at Cloud Nine, he could have done it by himself, with other people."

     Then I asked you about picking up a girl on

Metrolink, would that be an example of social impairment?

And you said, "No, that would be not be an example of social impairment.  Being able to keep and develop a relationship with her on an ongoing basis.  If he couldn't do that, that might cause some social impairment."

Now, did you have at the time of trial a report of an interview of Tasha Valentine and her mother Martha Burns, if you remember?

A.    I'm not saying if I or I didn't.  I have no independent recollection.

Q.    So if the facts were that, in fact, Mr. Allen was able -- had the social skills to spot and strike up a conversation with a young female on Metrolink and enter into a relationship with her to the point to where he was staying at her house, that would be something that it would be inconsistent with social impairment, correct?

A.    That he could have -- that he could have a girlfriend?

Q.    Those types of activities, abilities on his part would be inconsistent with social impairment, would they not?  They would be a sign of social success?

A.    If he could do it repeatedly, it would be success.  If he did it one time -- one time doesn't alone say social impairment.  If I remember right --

Q.    I understand that, but would the one time be contrary, inconsistent with social impairment?  In other words, you

have things are one side of the ledger and things on the other, correct?

A.    Yeah, but what you're giving me is one example.  Just because he can do it once doesn't mean he can do it all the time.

Q.    And that's not the question.  The question is, which side of the ledger is --

          MS. CARLYLE:  Can he be permitted to finish his answer?

          THE COURT:  Yes.  Sustained.  Go ahead.

A.    When you talk social impairment, that doesn't mean the individual is so socially impaired that he has no social skills.  Nor does it -- or if he has -- what it means is his social skills are less than what would be expected of an individual at that age grade.

Q.    And my question to you was then, is now, has been, in dealing with this fact -- because you have the facts presented to you about Mr. Allen's life.  This fact about Mr. Allen's life, which side of the ledger does that go on in terms of social impairment?  Is it an example of social impairment or is it an example perhaps of social functioning, unimpaired social functioning?

A.    If I remember right, he did spend time at her house, but it was also at that same house that he attempted to overdose and they had to take him to a hospital.  So I would

say that's pretty impaired.

Q.    Again, Doctor, I don't want to debate with you the overdose, because we've had testimony from the medical doctor that saw him at that time this morning, and there wasn't anything to support that at the time.  So let's set that aside.

MS. CARLYLE:  I'm going to object.  The doctor said --

THE COURT:  Wait, I can't hear both of you at the same time.  What's your objection?

MS. CARLYLE:  My objection is the doctor this morning testified that he didn't hear anything about an overdose.  That certainly does not mean that there is no evidence to support it.

THE COURT:  Okay.  Proceed.

BY MR. HOLTSHOUSER:

Q.    The question then and the question now is, the activity as far as you understood of how it is that Mr. Allen came to have a relationship with and be acquainted with Tasha Valentine to the extent where he could reside at her home when he needed to, would that be an example of social functioning?

A.    Depending.  Depending on why he had -- if he had no other place to go, I would wonder why were you socially impaired that you had no other place to go?  Or I would look

at the social impairment that may have brought about his not being able to go anywhere else.

Q.    You have not heard the testimony of Johnnie Grant; is that correct?

A.    Not to my knowledge.  I did not hear it at trial, that I can say.

Q.    So if he testified that -- both at trial and just last week that he was Mr. Allen's best friend, and the two of them regularly frequented Cloud Nine, frequently picked up girls there or at shopping malls or at other places and that they both had very active social lives, would that be information that's inconsistent with social impairment?

A.    It may be.

Q.    Among your other conclusions in your testimony at trial was that his employment record supported your diagnosis, correct?

A.    That is correct.

Q.    Because one of those areas of impairment that must result from the PTSD, from the traumatic event under the DSM is social, occupational, other important areas of functioning of life, correct?

A.    That's correct.  It's an R, so it can be any of those.

Q.    So one of the ones you relied on, though, was occupational impairment, correct?

A.    That is correct.

Q.    And if you notice at line 8 here of Exhibit 208, and this is page 41 of the -- and this is during the direct examination, you were asked this question by Mr. Sindel:

"Are there any other criteria for PTSD?"

"ANSWER:  Finally, it had to cause clinically significant distress or impairment in his social, occupational, and other important areas of his life, and it clearly did."

And he asked, "In what way?"

Your answer, "Billie Allen never could hold a job."

Now, by using the phrase he "never could hold a job," were you indicating that because of his PTSD or his reaction to this event, he was incapable of holding a job?

A.    It's one of the factors that entered into his bouncing from job to job and long periods of unemployment.

Q.    So were you at all familiar at the time with his employment at a place called Chemisco?  Do you recall that at all?

A.    Not offhand.

Q.    I'm going to show you 638.  This is page 17 of Mr. Simon's recorded interview with Mr. Allen back in 1998. And there begins here a discussion about his employment at a place called Chemisco.  And I'll blow up the bottom half.

A.    Okay.

Q.    "And now let's talk about your work at Chemisco.  Tell

me again what kind of work you worked on there."

And he says, "Bug spray, air freshener, things like that. But I pretty much couldn't work there because of the chemicals. You know, the chemicals would mess with my asthma and I told the guy there one day I got real sick and I told him I can't breathe."

And he goes on to discuss this further on page 10 -- on page 18, rather of this transcript.

A.    Okay.

Q.    And he was there for about a month and a half. He would take a break, some people wore masks, he talked about that.

A.    They didn't -- pardon me, could you bounce back to that one --

Q.    Okay.

A.    -- so I can read that.

Q.    And I'll blow it up for you again.

A.    Thank you. Just a second, please. Okay.

Q.    So down at the bottom there Mr. Allen was talking about what he actually did. "You would like lift up a box and put on the crane. So I would put the tops on them."

A.    Okay.

Q.    And then on to the next page. Okay. Mr. Simon is asking about his contacts with the chemicals or the raw materials. And I want to direct your attention to how he got

that job.

Mr. Allen says that his grandfather used to work there, and when he -- he's talking here about, found out he was like, he's retired from out there. He worked out there for a lot of years.

Did he help you get the job?

No, I went out there myself. But the lady knew him. And the guy that was up there knew him because he knew my grandfather. And I was talking to him about my grandfather and he was like, yeah, I remember him, so he would talk to him. I'm like, yeah, tell him I said hi, you know. And then not too long after -- long ago before I got locked up, I went out there and talked to him about getting my job back.

And I'll direct your attention to the bottom section here.

MS. CARLYLE: I'm going to object.

THE COURT: I'm sorry, there's an objection.

MS. CARLYLE: I thought you were finished. I'm sorry, you paused.

MR. HOLTSHOUSER: I was going to ask another question. I thought you had an objection.

MS. CARLYLE: I don't have an objection until you finish.

BY MR. HOLTSHOUSER:

Q. So he went back there, according to Mr. Allen telling

Mr. Simon in 1998, that he wanted to get the job back.

"Except I had to go to the studio that day so I couldn't get up there to talk to him, but they were going to hire me back.  So if I would have came up there that day (inaudible) you know, at least I did come to work on time.  I was never late.  I stayed over hours, you know, things like that.  I got hired because I sent a resume out there, a resume out there.  And then when I was in there talking -- and continue -- this conversation continues.  We have no openings right now, but I'll make sure you'll be the first person.  As soon as I was on my way out the door, the guy that my grandfather knew, he was like, well, we have a shift open at this time.  Stopped me.  And you can work and he came tomorrow."

So Mr. Allen is describing to Mr. Simon how he got the job, how he showed up on time, how he did the work.  And it sounded like he wanted the job back at one point in time before the offense occurred.

A.    But he couldn't do it --

Q.    But his problem was with the chemicals, correct?

A.    Well, I thought he didn't -- and, again, I wasn't at this conversation.  But I thought he said he had to go to the studio.  And what I find interesting on this, this kind of feeds into his statement to me that he was making $500 a week at the studio from Mr. Wilson -- pardon me, Wilson, he never

knew his last name.

Q.    Is it possible that you actually misinterpreted that and his name was actually Flex Wilson and Wilson was his last name?

A.    No, his statement to me was Wilson, he never knew his last name.  I believe that part is in my notes.  I don't have a lot of independent recollection, but if it was written down, I would remember -- you know, that's there.

Q.    But in terms of his recollection, though, of working there for a month and a half of showing up on time, except till he got to this point where he had something else that he preferred to be doing --

A.    I thought it was the chemicals, that he left after a month and a half.

Q.    One or the other.

A.    No, I thought --

Q.    It indicated he got fired because he didn't show up one day when he wanted to be somewhere else.

A.    Yeah.  And then I thought, according to this, I thought Mr. Allen says, and, again, this is his statements and I wasn't there, except I had to go to the studio that day, so I couldn't get up there to talk to them, but they were going to hire me back.  That's what he said.

Q.    And my question to you is, again, which side of the ledger does this fall on in your PTSD analysis when it comes

to occupational impairment?  You said at trial that he could not hold a job?

A.   He couldn't hold a job.

Q.   And so the question is, was this failure to hold a job caused by the PTSD or was it perhaps caused, he didn't like the chemicals, plus he says here he wanted the job back?

A.   Correct.

Q.   So where do you put that into your mix if you had this information at the time?

A.   Well, I would also like to know why he was going to the studio that day, because that was his big thing that he was making $500 a week.  But other than that --

Q.   How long was he --

A.   I don't see how this fits one way or another as to occupational impairment, other than the fact that he only worked there a month and a half, and he's never had any long-term employment.

Q.   Just let me show you Exhibit 539, page 228.  Now it's coming.  It's a long exhibit so it takes a little bit longer to pull up.  Let's try this again.

Well, while I'm pulling this up, do you recall there was some questions on Friday about whether or not you had reviewed Mr. Allen's deposition?

A.   That is correct.

Q.   And you indicated that, in fact, you had not, correct?

A.    I said that I did not review any deposition that was 400 pages long.  I did -- and I went back over this weekend and looked.  I did have a deposition from Billy Allen, who was his uncle.  But I did not have Billie Allen, the defendant.  At least I didn't see it.

Q.    Okay.  I'm showing you Exhibit 539, page 228, which is that deposition.  And I'm going to ask you if you recall talking to Mr. Allen back in the time of trial about a job he had held at a store in the Galleria mall called Express.  Does that ring a bell?

A.    No.

Q.    Okay.  I'm going to direct your attention to this deposition here taken in 2012, beginning on line 11.

        "A clothing store.  I can't remember the name.

        "Express?  Is Express a clothing store?

        "I think one of them.  I think it was.  I'm not sure.

        "Is there more than one clothing store?

        "The one at the Galleria.  I can't be sure of the name.

        "What was your job?

        "Basically inventorying everything.

        "In the stockroom?

        "Yeah.

        "Did you have that job for awhile?

"Yeah, until my PO called up there and asked for me."

Going on to the next page.

"You didn't want to lose that job, did you?

"No.

"Did you actually enjoy that job or think it was a good job for you?

"Yeah.

"Were you performing that job according to your boss's expectations?

"Yeah.

"Were you getting along with your co-workers?

"Yeah.

"Were you showing up on time?

"Early.

"No problems?

"No problems.

"When you say you showed up early, that kind of sends a little bit of a sense of eagerness, or you wanted to be there?

"Yeah.

"How long did you work there?

"Probably about a month or a month and a half. Something like that.

"And do you remember the name of your boss there?

"No.

"Any coworkers?

"Ed was the one who got me the job.

"Claude?  Was Claude working there too?

"Yeah."

That's a reference to Claude McLemore, his cousin.

"What did he do?

"I think he did the stockroom.  We didn't work on the same days."

And then he goes on.  "I also worked at Chemisco."

The one we just talked about.

Now, this job at Express, from what I just read to you and based upon his answers in 2012, that was a job which he had that he liked, that he kept, and that he was performing at.  And the thing that caused him to lose his job was his probation officer called and they were unaware that he was on probation, and they let him go.  You got the facts?

A.    No, that's -- the facts as far as he related it.

Q.    Correct.

A.    He's saying that he was not sure of the name, but when you said Express, he said it could be, according to that thing.

Q.    Yes.

A.    And that he says the reason he was let go, because his PO called.  But we don't have any records for that.  And he

stayed there a month and a half. I said he never was able to hold consistent jobs. He's never been able to hold a consistent job.

Q. And my question is, the connection between PTSD and occupational impairment, there has to be a connection between those two for it to support a PTSD diagnosis, correct?

A. It means that because of the difficulties he's had, he's had difficulties in the occupational areas. And he's had difficulty.

Q. His PTSD, it's his symptomology of the PTSD that is creating social and occupational impairments. It's the persistent reexperiencing, it's the nightmares and the other things that go along with it, correct?

A. Correct.

Q. There has to be a causal nexus between that event --

A. The difficulties that he had --

Q. -- the tragic event --

A. -- has some connection to what has happened.

Q. Doctor, you're familiar with the DSM-IV on PTSD, correct?

A. Yes.

Q. And, in fact, if you read it, it requires there to be a causal nexus between the traumatic event and the impairment that you are focusing on, am I correct?

A. Yes. Let me -- just a second, please. I had this

marked.  I apologize.  I thought I had this marked.

Q.   How about if I read it to you.  It's Criteria F.  Which book do you have there?

A.   I thought you were doing DSM-IV, so I brought DSM-IV.

Q.   All right.  I have DSM-IV-TR, which it appears on page 468 of DSM-IV-TR.  Maybe it appears on a different page of your volume.  But it is Criteria F.

MS. CARLYLE:  I'm going to ask that he use the version that he used at the time of his diagnosis insofar as there are any differences.

MR. HOLTSHOUSER:  There are no differences between those versions on that criteria.

Q.   So do you have it in front of you, Criteria F?

A.   Just a second, please.  Yes.

Q.   You have Criteria F?  Have you found it yet?

A.   Yes.

Q.   All right.  And doesn't Criteria F, in fact, state that, "The disturbance" -- is that the first two words, "The disturbance"?

A.   Correct.

Q.   And "the disturbance" its referring to is the event, correct, the PTSD occurring event?

A.   No, not the event.  It means PTSD.  The Post Traumatic Stress Disorder difficulties cause significant distress or impairment in social, occupational, or other areas of

functioning.

Q.    Does it use the word "disturbance"?

A.    Correct.

Q.    Causes?

A.    The Post Traumatic -- when they did say "disturbance," they are talking about the Post Traumatic Stress Disorder.

Q.    So it defines the disorder in terms of itself; is that correct?  I thought these were the criteria to find that this disorder exists.

A.    When you say "the disturbance" here, you mean that these symptoms cause clinically significant distress or impairment in social, occupational, or other important areas of functioning.

Q.    So these things have to cause, correct, there has to be a causal nexus between those things?

A.    These symptoms have to cause distress or impairment.

Q.    Now, the fact that his probation officer called to Express and alerted them to the fact that he was on probation, and that is what led to him losing a job that he was performing, that he wanted, is that an example of social impairment caused by the disturbance?

A.    If, in fact, that was the only reason he lost his job, not because of any other difficulties there, that would not in and of itself be consistent with -- just due to the problems of Post Traumatic Stress, if that was the only

thing.

Q.    Do you recall at trial that you agreed -- we were talking about the facts of the offense, and you agreed that going into a bank with a loaded firearm knowing there was an armed guard inside the bank was, in fact, inconsistent with PTSD?

A.    I believe I testified that an individual with PTSD could do that.

Q.    Let me show you Exhibit 208.

A.    Okay.

Q.    Okay.  If he knew that when he went in there that he was going to have to shoot somebody, it would be inconsistent with PTSD?

A.    Correct.

Q.    Is that correct?

A.    Yes.  Could you please go back to where we first started asking that question in that trial transcript?

Q.    Yes.

A.    Start with the question on, I guess it would be the page before.

Q.    Okay.  It actually starts about line 12.  And I asked, "Would going into the Lindell Bank and Trust, knowing there is an armed guard in there, and walking in with an SKS assault rifle and putting yourself in harm's way to be shot at, would that be consistent or inconsistent with PTSD?"

Your answer:  "If, in fact, he thought that there was going to be a guard there, that would --"

"That would be what?"

"That would be rather stupid," was your answer.

A.    But I'm not sure it would be consistent or inconsistent with PTSD.

Q.    But going in the bank if you were suffering from a traumatic experience or having witnessed a friend murdered and close to gunfire, going into a bank and putting yourself in harm's way would not be inconsistent with persistent avoidance of PTSD?

And your answer is, "That's like telling me that everybody with PTSD has never been involved in a crime. That's not true."

Again I asked, "Would the conduct of him going into the bank in that way be consistent or inconsistent with PTSD?"

Your answer, "Could be.  Could not be.  Do I think it's consistent with it?  But I don't think it necessarily rules it out."

A.    I don't think it automatically ruled it out.

Q.    That wasn't the question.  I didn't ask whether it would rule it out.  What I asked was, would it be, in fact, inconsistent with suffering from PTSD where the triggering event was this sort of traumatic witnessing of the violent

murder of a friend of yours close to you.  Do you recall that?

A.    Correct.

Q.    And then the next question I was going to ask you is, at trial you also testified that if he knew when going into the bank that he was going to have to shoot the guard when he went in, that that would be inconsistent with PTSD.

And at the bottom of this page, you, in fact, said it would be inconsistent with PTSD, correct?

A.    Yes.  If he knew he was going to shoot, it would be inconsistent with PTSD.  If he knew when he went in there that he was going to have to shoot somebody, it would be inconsistent with PTSD.

Q.    All right.  Doctor, I want to turn to another topic, actually back to a topic.  But that is an issue of Mr. Allen and trying to figure out what is, in fact -- what, in fact, you credit.  And I want to make sure I understand where we're at today with you.  You have not reexamined Mr. Allen, correct?

THE COURT:  Where are you now?

MR. HOLTSHOUSER:  I'm just asking him the question.

THE COURT:  Okay.

Q.    Where we're at today right now, you have not reexamined Mr. Allen since February 22nd, 1998?

A.    That is correct.

Q.   And according to you, you had an hour to an hour and a half with him in January, and another hour to an hour and a half with him in February, correct?

A.   That's correct.

Q.   And so you talked with him in the past 14 or 15 years for a total of three hours?

A.   That's correct.

Q.   And you're not sure what other collateral materials you were exposed to back then, correct?

A.   What I listed in my report, that's -- my report is probably the best thing I can give you that happened 14 and a half years ago.  I have no other independent recollection of anything else.

Q.   And that's the report that you prepared on February 16th that summarized essentially what you did on January 16th, correct?

A.   That and my additional information that I gained on, what was it, February 22nd, and what other additional information I had before I wrote the report -- no.

Q.   That was after your report.

A.   That would have been everything that I had up to then, and any information that I had up to that point.

Q.   Because the information that you gained after February 16th and the time you testified, including as you refer to in your trial testimony some of these transcribed

memos of interview from Dr. Randall, you've never been called upon to write a report about any of that, have you?

A.    No, I have not.

Q.    And you haven't done it?

A.    No, I have not.

Q.    And the closest thing you've done is you prepared this declaration that we've seen here and we're talking about several times, correct?

A.    That is correct.

Q.    And that was prepared in 2009?

A.    That is correct.

Q.    In terms of the things that you've been given to look at in connection with preparation of that declaration, have you reviewed -- do you feel like you've actually been given an opportunity to sit down and evaluate all of the current materials and collateral sources that exist in this case from whatever source?

A.    I don't think you ever get the opportunity to evaluate it all.  I have enough to form an opinion that it would have been one thing that I would have found helpful to explore back then.

Q.    But there's a lot of things we've talked about here that you've never actually looked at that do, in fact, currently exist in this case, such as the complete transcripts of Mr. Simon's interviews of Mr. Allen?

A.   Yeah, I did not know those existed.

Q.   The complete transcript of Dr. Yutzy's examination with Mr. Allen?

A.   I did not know they existed.

Q.   His complete deposition given last May, this year, 2012?

A.   Did not know that existed.

Q.   But the question is, you haven't reviewed those things, have you?

A.   No, I have not.

Q.   You haven't reviewed all the deposition testimony of any of the other collateral witnesses that have been called or may be called in this case?

A.   Reviewed some, not all.

Q.   Nor have you been sitting in the courtroom here listening to what information they provided to this Court?

A.   No, I have not.

Q.   So would it be fair to say that you're really not in any position, are you, to actually reach any findings of fact of what you believe or don't believe is the truth about any of these things at this point in time --

A.   Yes, I am --

Q.   -- because you haven't been given everything that exists out there, have you?

A.   When you say do I have -- could I come up with anything

that --

MS. CARLYLE:  I think there were two questions there, and I'm not sure which one the attorney for the government is asking.

MR. HOLTSHOUSER:  I thought there was one, but I can rephrase it, Judge, and make it clear.

THE COURT:  Okay.

BY MR. HOLTSHOUSER:

Q.   You haven't reached any -- you were not asked to sit down and make any findings of fact about what information you find credible or not credible and then -- in terms of considering a new diagnosis, correct?

A.   No, I was not asked.

Q.   And you haven't done that?

A.   No.

Q.   At best I guess we could characterize what you're saying here is that you've been made aware of things that exist now, that you would have been interested in knowing back in 1998; is that correct?

A.   If, in fact -- well, in 1998, when I was told in January -- last week in January some time, that I was going to be a mitigation expert, I would have hoped that there would have been months of interviews going back and forth, times for me to have talked to these people or at least to brought in the ones that are inconsistent and to look at so

that if there was an issue of child abuse -- and I say "if"

because I would have liked to look at both to find out if

someone is telling me the truth or not.  If there would have

been, I would have wanted to present that to the jury in the

mitigation phase.  It would not have changed my diagnosis,

though, at all.

Q.    And it has -- nothing that you have heard in any of

this so far actually changes your diagnosis, does it?  Am I

correct?  Like you're not changing your diagnosis based upon

anything you know, correct?

A.    I am not changing my diagnosis of anything that I've

heard of my diagnosis in 1998.  I have not seen Mr. Allen for

14 years, so I wouldn't give you a diagnosis of Mr. Allen

right now.

Q.    And you understand that the question is what his

diagnosis was in 1998, because that's the time of the trial?

A.    Correct.  In 1998, I would have diagnosed him the same.

Q.    Okay.  And just so we're clear, nothing that you've

heard would change what your diagnosis would be or was in

1998?

A.    No.

Q.    And while you said that you would have liked to have

presented certain information, the information you ultimately

presented would have actually been up to the trial attorneys,

would it not?

A.    That is correct, the trial attorney would be the one asking the question, and then we would go from there.

Q.    Because there could be information that you might want to present but which they might feel might open doors that they would rather not open?

A.    That is correct.

Q.    You recall, I asked you a few minutes before the last break that the areas that are commonly -- that you would consider in evaluating credibility are going to be motivations, prior inconsistent statements, bias, and corroboration by credible evidence, correct?  And I'm not going to make you memorize these.

A.    No, no, no, just when people give me a list, I have a tendency to write things down.

Q.    Let's take them one at a time.  Motivation.  Would you agree that Mr. Allen clearly has a motivation at this point in his stage of his proceedings to exaggerate or fabricate information that might help him in this proceeding?

A.    He would.

Q.    And you would have to take that into account in reaching any conclusions, wouldn't you?

A.    If the information came solely from him, yes.

Q.    Would the same also be true of his mother?

A.    It could be, unless the information puts her in such a negative light, then I'd have to look at why she's willing to

put herself in a negative light now and not before.  There would be other things we'd look at.

Q.    Well, even if she's willing to put herself in a negative light now, you can perceive why his mother might be willing to put herself in a negative light or to perhaps exaggerate circumstances which may have some basis in fact?

A.    It would be one of the things we'd look at.

Q.    And would the same be true generally of his friends and relatives?

A.    Correct.

Q.    In other words -- and generally speaking, would you agree that motivation is they all do not want to see the sentence in this case carried out as to Mr. Allen?

A.    That's correct.

Q.    In the category of prior inconsistent statements, is that something that you would have to look at even though you know that Mr. Allen is a poor -- is inconsistent in his reporting of numerous circumstances, you couldn't ignore that, could you?

A.    No.  I would have to look at corroborating information.

Q.    Would you likewise have to look at whether there were inconsistent statements having been given by the other corroborating sources, such as Mrs. Allen, or friends or relatives who had previously addressed these topics?

A.    That is correct.

Q.    Now, this concept of corroboration, I think in your profession it's sometimes referred to as I believe validation by secondary -- or conversion validity.  I've heard a number of phrases.  But I think you speak -- you speak words that a jury understands.  But you've talked about corroboration or collateral information that verifies something, correct?

A.    I find that if one person tells me one thing, then I hear it from somebody else, and I might hear it from another source, and then I check it from another source.  That's usually how I get things done.

Q.    Is it purely a matter of counting?  In other words, that if you've got four or five people saying something similar or close to the same thing, then you're going to be able to treat that as true in forming your diagnosis?

A.    No.

Q.    And in terms of finding what it is that you rely on to make a diagnosis, is there any standard that you say, well, I've got to be convinced that a fact is true by a certain degree or I really can't take it into account?

A.    Are we talking a diagnosis or are we talking any information?

Q.    Let's start with diagnosis, because I'm not sure --

A.    Diagnosis, what I do is I look to see if the symptoms run together.  In other words, if an individual has this, this, and this, I would expect him to have this.  In other

words, when you give a diagnosis, what happens is usually if you have this symptom, you have this symptom, you have this symptom, you have this symptom.

What happens sometimes, I get people in the jails where they admit to everything under the sun. Those individuals I have -- it's an inconsistent symptom pattern. It doesn't make sense. So if I was looking at a diagnosis, I'd want to make sure that I had -- it would be nice to have it verified from other places. It would be nice if there was previous mental health history. Sometimes there's not or sometimes it's just -- there's not enough data there to go on. Then I look to see if the symptom is consistent -- pardon me, if the constellation of symptoms are consistent.

Q.    When you used the word a second ago "verified," so tell me what it is that you would consider an example of something that would verify a fact that you rely on to reach a diagnosis.

A.    If a friend said that he was abused, if he said that he was abused, if -- well, he said he wasn't abused. If a friend said he was abused, if a mother originally says not and then she says he was. Then an uncle says it, then sisters say it, it would make me think that that's something we should look at.

Q.    Now, what if then you weighed into the mix those sorts of back and forth. You've got one time they said something

that was consistent with it, but then at an earlier time before a current circumstance they had said something exactly the opposite, and then add into that mix things like motivations and biases and other things like that. Can that constitute verification in your line of work?

A.    It could.

Q.    It still could?

A.    It still could.

Q.    So my original question, though, was, by what standard are you going to need to be convinced or is there any standard as a psychologist that you require the evidence, let's call it, to meet in order to reach a finding that this is a fact? I'm finding as a matter of fact that Billie Allen was abused to the following extent. Is there -- like do you need to be convinced like more likely than not, by a preponderance of the evidence?

A.    I'd have to see if the symptoms were consistent with an individual who was abused.

Q.    But do you have any standard? Is there a standard that if it doesn't meet this standard --

A.    I guess it's an internal standard. I don't know if I have written down, this is what I'm going to do.

Q.    And there's no such standard actually that's required in any sort of professional ethical guidelines for psychologists or psychiatrists in this type of activity, is

there?

A.    I guess there is for abuse, to a certain extent.  If an individual sees abuse.

Q.    What is that standard?

A.    If you're a mandated reporter, and you feel that an individual is being abused, you have to report it.

Q.    And what is that standard?

A.    Now, when they talk about that standard, legally they don't go there.  I mean, actually if you look at the standards for reporting abuse, they don't always specify out, this means that there's bruising, this means it's this, it's this.  So they leave that up to the individual.

Q.    But so I guess getting back to my question to you is, do you have any standard that you use, a standard of proof?

A.    If somebody had reported it to me, it would have -- I would have said it had -- it's something we have to look at.  And if I thought it was more than that, if it was outside this setting, if I would have thought that it's credible, that their accounting was credible, I would have called in DFS or DCFS in Illinois, Division of Children and Family Services over here.

Q.    Would you treat statements that are given under oath any differently than statements that are given in a memorandum of interview to an investigator?

A.    I probably would take -- I take statements that are

given under oath more.

Q.   Would you take statements that are made to a court or to a law enforcement authority any differently than you would give statements made to an acquaintance?

A.   Depends.

Q.   Let me give a couple examples here.  So have you ever seen Exhibit 2, which is a letter that Mr. Allen sent to Judge Mummert, a magistrate in this case, on April the 15th, 1997?  You ever seen that before?

A.   I'm not sure.

Q.   And I'm going to take you to the second page.  You look at the very bottom, I'll blow it up because at least on my screen it's a little unclear.  You see here that in 1997 in April, this is like less than a month after he's been arrested, he's writing to Judge Mummert and saying:

     "I told you so and I could show again, I'm no liar and I never lie.  I want you to check" -- something -- "on my family and you could see I come from a family" -- up at the top it carries on to the third page -- "that loved me and still does.  They support me to the fullest."

A.   Okay.

Q.   Okay.  And there's a little further on down here, I'm trying to find it, but there's a phrase in here that says his family said to stay away from drugs and he does not sell drugs.  So hold on just a second.  I can't find it at this

time.  We're going to move on.

But at least you see there that he's telling the Court that he comes from a family that loved him, not a family that abused him?

A.    In that same letter he also told the Court that he gets $75,000 a year from a record company.

Q.    Some things could be true and some things could not be true, correct?

A.    Could be.

Q.    Have you ever seen any of the letters that he wrote to his mother during the time that he was awaiting trial?

A.    I did not see them at trial.  I didn't know they existed at trial.

Q.    Uh-huh.

A.    I was sent those by Ms. Carlyle, I believe within the last week.

Q.    So have you studied them?

A.    Pardon me?

Q.    Have you studied them?

A.    I read them.

Q.    Are you familiar with their contents?

A.    I read them.

Q.    So you understand those are letters where Mr. Allen has written in his words something to his mother under circumstances where he likely thought they'd never see the

light of day, correct?  I mean, he's writing a private letter to his mother?

A.     Yeah, he's writing a private letter to his mother.  I'm not sure I know what you mean, he didn't think they'd see the light of day.

Q.     There might be reasons why he might tell Judge Mummert, for example, that he comes from a family that loved him and he had a source of income and that he didn't sell drugs or something to that effect.  I mean, you could see why there might be motivation to lie to Judge Mummert, correct?

A.     Correct.

Q.     So the circumstances change when he's writing to his own mother, would you agree?

A.     He wants her to love him and accept him because he may very well felt she never did.  I have abused people that once they max out or once they are released from the Department of Children and Family Services still go home --

Q.     The things that he said to his mother, though --

A.     -- to the family that abused them.

Q.     -- you can perceive that there might be different motivations in what he says to her than what he says to Judge Mummert, correct?

A.     Correct.

Q.     And would you be interested in 1998, I guess, of what he had told his mother in writing?

A.    Well, I would have liked to have seen a lot of the things that I haven't seen from 1998.  Yes, I would have.

Q.    Okay.  And I'm directing your attention to page 2 of Exhibit 491.  Beginning there:

"First I thought about all the things I did wrong messing up people's money, all the people I know that are dead now and with the money, I look at it this way the way I think God looks at me, God knows that you tried to keep me away from all that type of drama but being in that neighborhood he was just testing me to see what path would I go in, his way or the devil's way and he knew I would go to the devil's way so that's when he brought that girl in my life, when I used to go to church with her."

Now, and at least in terms of, he's talking there about the neighborhood, but he's also talking about his mother.  Isn't he saying to his mother there that he realizes that she tried to keep him away from all that drama, correct?

A.    That's what he says there.

Q.    Which would sound like that he feels that she was acting in a positive direction for him, correct?

A.    That's what he's stating.

Q.    And then there's a reference in his own letter to his mother about messing up people's money, correct?

A.    Correct.

Q.    In the other letters that you read from him to his

mother, did you note in there that he indicated that he loves her, that he knows she loves him, that he believes that she taught him the right way and he chose the wrong way, that his circumstances were not her fault, that he did -- that she did her part, and that he thought she was the best mother in the world?

A.   Correct.

Q.   And another one that was sent apparently on or about Mother's Day 1997, that he thought her job of being a mother was perfect, that she had again kept him away from the drama, he got himself into this, and he says, "I mean it as God as my witness"?

A.   That's what he says.

Q.   So in terms of when you're going about looking at what other information you later get, you have to weigh these in the balance, don't you, in terms of these are his written words to his mother in 1998, the time period we're talking about when he hadn't yet been convicted, he wasn't yet facing a death penalty, he wasn't yet pursuing a habeas petition, correct?

A.   Correct.

Q.   Would you, in fact, have to consider what he says in his writing in his own words to his mother about her treatment of him?

A.   If I -- if I had had information that stated that he

had been abused, that he had been beaten with cords, that if he had -- in turn, his mother was an alcoholic, and then he wrote -- and then if I had -- if I had received information like that, then I received this letter, when I looked at that kind of disparity, I would have either thought one or the other has to be wrong.

Q.    Correct.

A.    And then I would think, this is something that clearly needs to be looked at.

Q.    That's the same --

A.    Because if not, this is a letter that an abuser -- pardon me, an abused kid would write to his abused mother. This is not inconsistent.

Q.    And is it also possibly a letter that a person who has not been abused by his mother would write to his mother, and that there may be reasons later to claim that he was abused?

A.    Could be.

Q.    And the question still comes down to, isn't it, which is true?

A.    My belief in this whole thing is if I had information at the time of the trial, in those two and a half, three weeks that we were doing something, I would have -- the best thing I would have done was to walk away, but if I couldn't have walked away, I would have at least tried to explore the inconsistencies.

Q.    Because there are inconsistencies, are there not?

A.    There are large inconsistencies.

Q.    So you've got this data set, let's call it that, and in that data set are large inconsistencies.  And have you ever been faced with a data set that has so many inconsistencies that it's completely incapable of resolving to any degree of certainty?

A.    I have -- pardon me, I have had times when I have called the court or called a judge, because 99 percent of my stuff comes from the court, not from either attorney, just from the court, where I've called them and said, I don't have enough information, I need this, this, and this, who do I go to?  Because I wouldn't write a report.

So there are times when you don't have enough information, you say, I've got to have more because I can't give you -- you know, I don't know.

Q.    Well, I'm not asking you about a situation where you don't have enough, but where you feel like you've gotten all there is to get out there, and that there's so many inconsistencies in your data set that it simply is incapable of resolving with any degree of certainty what the truth is?  Have you ever had that situation?

A.    Where I said I have no idea?

Q.    There's too many inconsistencies.

A.    Well, unfortunately what happens is somebody keeps

coming back and they say, we will give you more, we will give you more, we will give you more. So then we have delays. But usually I keep asking for more stuff until finally I get what I need.

Q.    Well, let's say it's been 14 years, it's just got to come to an end at some point, right? There's not going to be anymore. If in looking at this data set there are so many inconsistencies, is there ever a situation where you look at it and say, there's too many here to reach any definitive conclusion?

A.    I -- if we were going to do --

Q.    Yes or no.

A.    I guess there could be.

Q.    Okay.

A.    But I would keep trying to ask for more. But if I couldn't get it, I might just say, it's time to walk away, I can't give you an answer.

Q.    Were you ever given -- actually I'll take that to the beginning of this. This document, which is a -- referred to as Billie Allen's handwritten bio prepared for Mr. Simon and Mr. Sindel and Connie Caspari. Do you recall ever seeing this during the time of the trial?

A.    No. I believe you showed this to me last Friday, and I said then, I had not seen that beforehand.

Q.    I don't know if I recall showing it to you last Friday.

If I did, I apologize. But the statements that he says in here about his mother are that they were real tight and that she loved him. Would that be another written statement by him that at least is -- it's a disparity between what he's claiming now and what he was claiming back then?

MS. CARLYLE: I'm going to object. I don't think there's any evidence that Billie Allen himself has ever said he was abused.

THE COURT: Ever said he was what?

MS. CARLYLE: Has ever said he was abused. So it's not a matter of an inconsistent statement that Billie Allen has made.

MR. HOLTSHOUSER: Judge, we have his -- we have the Petition and we have his deposition. I'm not sure what Ms. Carlyle is referring to --

THE COURT: Overruled.

MR. HOLTSHOUSER: -- but Mr. Allen is clearly claiming he was abused and is saying so, has said so to his current --

THE COURT: Overruled.

MR. HOLTSHOUSER: -- expert witnesses.

BY MR. HOLTSHOUSER:

Q.    That would be an example of another inconsistency in this data set, correct?

A.    Correct.

Q.    Again, in his hand, in writing.

A.    Again, it could be an individual who was never abused or it could be an individual who was abused.  And much like we said last Friday, the Stockholm Syndrome, where all of a sudden they align themselves with the abuser, and they want to keep making up to them.  You'll see this a lot of times with abused woman where they end up going on and on with the guy thinking that they want to please them.  And you see this also with kids.

Q.    And so we're still left, though, with the dilemma, aren't we?

A.    We are, and --

Q.    Besides --

A.    Okay.  I'm sorry, I was just saying with that inconsistent information, if I would have had that, that's when you would have gone back and taken a look at both issues.

Q.    Besides his written words, you also have many examples of his spoken words.  And I want to show you Exhibit 633, which is a transcript of Mr. Allen's statements to Mr. Simon in December of 1997.

THE COURT:  What was the date?

MR. HOLTSHOUSER:  December the 12th, 1997, I believe.  It's Exhibit 633.  And this is page 4 of that.

Q.    Mr. Allen describing for Mr. Simon, who is his

attorney -- you understand in December of '97, it's his attorney, a couple months before he's going to go to trial, and Mr. Simon is asking him these detailed questions. These transcripts go on for pages.

You know -- Mr. Allen says: "You know all since I was young, I always had a real good childhood. I had people that cared for me. People who cared and just wanted to be there for me. And I didn't know who was a mentor in my life growing up." And he mentions a lack of a father figure. "True enough, I have an uncle but I know he had his own kids so he'd spend most of his time with them. He would be there, you know, for certain things and I didn't have it, so. I was getting older, that's what I needed. I know I needed it."

Mr. Allen is focusing there on the concept that he felt he needed a stronger male figure in his life, correct?

A. He was stating that -- the way I read it was that he painted an extremely glowing picture of his family life. And if I had that coupled with the fact that other people telling me that the family life was a disaster and people had been horribly abused, and the mom was an alcoholic, I would look at the inconsistencies.

I'm not telling you that one or the other is correct. But you would have to look at the inconsistencies.

Q. And here is another one, which is Exhibit 634. Another part of this same conversation. And in reference to his

mother.

"Did you go through a phase like that where you were alienated from your father over and above" -- let me blow that up -- "the fact that you and your mother and sisters were living in another house?"

And he says, Well, I just couldn't mess with him. It wasn't no more rebellion against him. I cared about my mother more since she's there for me. So I just left my father alone.

And then this conversation continues again to what the one that we have seen a couple of times, this statement where Mr. Simon asks quite pointedly about -- there can't be any question here that he's asking about physical abuse. And Mr. Allen denies to his attorney that there ever was such abuse by anybody at any point, correct?

A.   That is correct.

Q.   Now, even in his oral statements to you, as you said before, he would characterize his mother as real sweet?

A.   That is correct.

Q.   Correct? Now, you didn't see at the time, but there was a recorded examination -- your examination with Mr. Allen, by the way, on both occasions, that was never recorded or transcribed, was it?

A.   No, it was not.

Q.   We don't have the benefit of knowing exactly who said

what during that, do you?

A.    That is correct.

Q.    Well, unlike yours, Dr. Yutzy was required to record his, and that was transcribed, and we have it, Exhibit 46, which occurred around the same time period actually that you were examining Mr. Allen.  So the same time period Mr. Allen is talking to you, he's talking to Mr. Yutzy.  And I direct your attention to Exhibit 46, page 11.  And if you look at line 11.

        "How did you get along with your mom?"

        His answer, "Great."

        "And how did you get along with your uncle?"

        "Great.  I mean, better than my father."

A.    Okay.  I would also have looked at -- yeah.

Q.    All right.  I'm going to show you a couple more, so just hang on.

A.    Can you go to six to ten on the other page too, please.

Q.    You want to go down; is that right?

A.    Where Mr. Allen says, can you tell me how you got along with the sisters in the home.

Q.    The bottom?

A.    No, right above that.

Q.    "It was good.  They were protective of me because I was the only boy.  It was like my sisters protected me more than I protected them for real.  So they made sure I stayed out of

trouble, made sure I was taken care of, you know, things like that."

So that would be perhaps in contrast that Johnnie Grant testified last week that his sisters consistently physically abused him by hitting him upside the head or kicking him and so forth, correct?

A.   It would also be inconsistent with the statements of the sisters' declarations that state that he was physically abused and singled out.  So one or the other is incorrect.

Q.   And anywhere in those statements by those sisters -- by the way, since you bring those up and you recall those so well where it says they were the source of that physical abuse?

A.   No, they do not.  They never said that they --

Q.   So if Johnnie Grant testified last week that the sisters were, in fact, among the abusers of Billie Allen, but nowhere in these declarations of the sisters is that sort of thing mentioned, that itself would be an inconsistency that you would have to add to the data set, wouldn't you?

A.   Correct.

Q.   In other words, they were more than willing to point a finger at the mother, but the question is whether there's abuse at all or whether they, in fact, were also the abusers, correct?

A.   That is correct.

Q.   All right.  Take you to the next place where I was --
if you begin at line 8 here.  This is one of several times
that Dr. Yutzy asked this question.

       "Next question I ask you is a question that eight
years ago I never used to ask anybody, but now I have to ask
it to get a complete exam of the situation, so don't take it
disrespectfully."

       "As a child or an adolescent, say up to age 18, do
you have any recollection of being verbally, physically, or
sexually abused in any way?"

       Now, would you agree, this is kind of just as
specific as the question that Mr. Simon asked in that other
transcript we just saw?

A.   Correct.

Q.   And Mr. Allen says, "Uh-uh."

       "Now, this being certain I'm going to have to
inquire a little further."

       So Dr. Yutzy doesn't stop at the "no," does he?

       "It means different things to different people.  Did
your mom -- how did your mom discipline you I guess is the
best way to say."

       And his answer is, "I had a lot of girlfriends and a
I had liked to go outside and play on the basketball court in
the back yard."

       "So it would be not going outside and talking on the

phone. I mean, those as punishment. Those are worse than getting whippings to me."

"Took away privileges?"

"Right."

"I mean, it was a killer for real. And I couldn't sneak outside when she was gone because my sisters would tell on me. So, I mean, it was like --"

"Sisters, you made the comment earlier on that. Okay. You have a recollection of being either by family member or anybody else verbally or physically abused?"

"No."

And then he switches gears.

So, again, would this be an example of oral statements by Mr. Allen specifically and clearly contradicting some of the information that you've read about recently?

A.    Yes. Mr. Allen consistently said here and in the statement to me that he was raised in a "Leave it to Beaver" family, you know, the Cleaver family, everything was great.

Q.    He said "Leave it to Beaver"?

A.    No, I just did.

Q.    Okay.

A.    I said he painted himself --

Q.    So where did that come from?

A.    I'm just saying that he painted himself as always being

in the perfect family where everybody cared for him.

THE COURT:   What was this exhibit?

MR. HOLTSHOUSER:   That was Exhibit 46, page 65 and 66.  This exhibit, Judge, and all the depositions, by the way, the page numbers correspond directly with the electronic page numbers.  So we don't have the same problems as we have with the trial transcripts.

Q.   One thing I wanted to bring to your attention here that Dr. Yutzy did, is he -- after not stopping at this notion of verbal, physical, sexual abuse, he then got a little more specific and actually narrowed it to his mother.

"How did your mom discipline you?"  And so in the nature of physical abuse, Dr. Yutzy was interested in knowing how his mother disciplined him, correct?

A.   Isn't that the same thing we just read?

Q.   It is.  And I want to ask you the question, though.  You had in your notes from your conversation with Mrs. Allen that she physically disciplined him, correct?

A.   Correct.

Q.   So I'm asking -- and you didn't follow up on it as seeing it as any sort of a question to be followed up on as a possible area of abuse, correct?

A.   It's 14 and a half years ago.  I should have followed up on it.  But I don't know the context exactly and why that was written.

Q.    Looking back on it now, do you feel that that was some sort of a deficiency on your part from a professional point of view?

A.    I should have looked at it.  I don't know the exact context that it was written.  The biggest deficiency I made was agreeing to continue on after I had -- when I was told there was three weeks to trial to do mitigation.  I should have walked away.

Q.    But you had that interview with her on February the 15th, and as you said, no one put a time limit on how long you could talk to her, you could ask her all the questions you wanted to ask, and you weren't afraid to ask any?

A.    That is correct.

Q.    When you received that information, and at that time you already had in your mind the notion that physical abuse was a risk factor for PTSD?

A.    We -- when you said, you had it in your mind?

Q.    You were aware --

A.    I knew the information.  I knew that --

Q.    The research.

A.    I knew the research, that abuse can be a risk factor for PTSD.

        MS. CARLYLE:  Your Honor, Mr. Allen needs to take his medication.  Could we have a break, please?

        THE COURT:  Okay.  Sure.  We'll be in recess for 15

minutes.

(Court in recess from 3:07 p.m. until 3:24 p.m.)

BY MR. HOLTSHOUSER:

Q.    Okay.  Mr. Cuneo, back at Dr. Yutzy's examination of Mr. Allen in 1998, before he testified at trial.  I'm taking you now to page 124 of that.  And there begins here another exchange between them about Mr. Allen and his mother.

And I believe that you've indicated that based upon what you've read and some things of that sort, that you've come to this notion that somehow or another Mr. Allen was abandoned by his mother and was put out of the house at an early age and forced to go on the streets, correct?  You know the general topic of what I'm referring to?

A.    Yes.

Q.    And what I want to direct your attention here is that Mr. Allen was asked about these sort of things back in 1998.  So at the bottom here he's beginning to tell Dr. Yutzy about the money he's making from selling drugs, okay.  And he's directing his attention to the house being shot up in January of '97.

"Something that happened before that was really stress, my mom's house got shot up."

And I'm at the top of the page here.

"Yeah, I saw that."

"Yeah, it was because of this deal that went down

there."

"It didn't come off just right?"

"It went right but they thought I was involved with something else that happened later on.  But, you know, one part was right but somebody, something happened, somebody got in and, you know, found out about it and robbed them after it happened.  And they thought we did it."

"Drug dealer involved?"

"Right.  (Inaudible)"

And Dr. Yutzy comments, "They are an interesting group."

"Mr. Allen:  Right.  It was like they came and shot up the house.  They stressed me out really."

"And apparently your mother put you out of the house because of that; is that right?"

"Mr. Allen:  I said that but I figured she didn't put me out.  I left before it all happened because I thought, you know -- you know, worried about the house.  So I moved out, found out and nothing I could do."

"So I understand what happened, they identified who you are and they identified the place and then they shot the house?"

"Right."

"Okay."

"I was going to say I knew -- I know to this day

exactly who it was.  Like I say, I'm not a violent person.  I mean, if I carried guns, I could have -- I saw the person five times."

I believe that's all I want to ask you about.  On page 127, which is the last one I'm going to direct your attention to, is that:

"That's the only thing that caused problems because no one knew.  No one really could know because I really wasn't doing anything around the house.  I never did any of that around the house, which is finally where I --"

A.   I'm sorry, could you tell me where I'm at?

Q.   Top of 127.  Mr. Allen is continuing to talk about this house shooting incident.

A.   Okay.

Q.   How it happened.  He's talking about how he couldn't figure out how they found his house because he didn't do anything around his house related to selling drugs.

"I never did any of that around the house which is finally where I stayed because of somebody --"

"Yutzy:  Sure.  Somebody fingered you --"

"Uh-huh.  That's the only thing that came back to the house."

"Okay.  What things revolved in you at that time?"

"Just that mostly, I mean, that situation there was stressing me out."

"In terms of drug dealing or in terms of how they shot the house up?"

"Both of them together.  I mean, I was like (Inaudible) make money and enjoy myself.  Because I had, like you said, I have some expensive habits."

"Yutzy:  I didn't say that exactly."

"Yeah, but that's how it is, you know."

Now, the event that he's describing here would lead Dr. Yutzy to believe, would it not, that he left the house before the shooting had occurred because he was trying -- he knew someone was after him and he was trying to avoid his house for fear that they would find out where he lived and might harm his family or their house, correct?

A.    That's what he tells Dr. Yutzy.  He also tells him, you know, that he had a lot of money because he had the record contract and he was buying $150 shirts and $150 shoes.

Q.    Well, where does he mention record contract?

A.    Right before where you cut me off before.  He said he had money, he was selling songs.

Q.    And he's also selling drugs, correct?

A.    That's what he's saying.  He's saying that he's a rap star and a drug dealer.

Q.    Was it on the first page that I showed you?

A.    I believe so.

Q.    You saw he said he was a rap star?

A.   "I mean, I had, like I said, I had plenty of girls, writing songs.  Everything, I mean, family, anything I wanted.  I just lost track of my world because of what I was doing."

Q.   "Meaning what?"

"How I was making my money then."

"So your money, girls, rap --"

A.   So he says, "So your money, girls, rap, family."  So he was making money through all of that.

Q.   Well, that's what Dr. Yutzy says.  And he says:

"I don't think so.  I had all that --"

"You say making money.  You mean in terms of drug dealing in this situation?"

"Yeah, money."

"How would you describe it?"

"I mean, it's just all the way to go around."

Now, is it clear there that what he's referring to in this topic is his drug dealing activities, the danger it brought to his home, the fact that he had left home before the shooting even occurred?

A.   That's what he's painting here.

Q.   Which would be different than what you understand he's painting now, which is that his mother kicked him out of the house after the shooting, correct?

A.   That's what he told me, and that's what we're finding

out afterwards from the other declarations.  Now, I cannot tell you what is exactly true.  But there is clearly a difference.

Q.   Okay.  And he's also indicating here that that's what was stressing him out before he went to the Metropolitan Psychiatric Center in early February, too, correct?  Because you see this whole topic is what was going on before you went to Metropolitan.  See, that's what introduces this discussion.  And it goes on, and I believe here, that's the only thing that caused problems because no one knew, it's the stress associated with that.

A.   Okay.  Could you bounce back to that first page where he talked about the stress, please.  Okay.  Hold that just one second.

Q.   Okay.

A.   Now, if you could bounce --

Q.   You see here as well that writing songs, refused to be paid for it?

THE COURT:  Wait a second, he just asked you to bounce back to something else.

Q.   You want me to bounce back before this?

A.   Please.  Could you bounce back to right before he went to Metropolitan.  And Dr. Yutzy had asked him why he went to Metropolitan.

Q.   I think it was at the top of the page I was just

showing you.

A.   I believe there was another statement there.  This is the first time I've ever seen this transcript.  But I thought there was something else there.

Q.   All right.  Let's go through here.

A.   Okay.

Q.   In terms of the sequence we're talking about, and I'm going to find you what you're looking for in just a second.  I want to just point out, do see that he says, "I moved out.  Found out, and there's nothing I could do."  Referring to the house shooting?

A.   Yeah, I was just looking for -- you had said why he had gone to Metropolitan.  And I thought that was because of the suicide attempt.  And I thought --

Q.   Well, there's no mention of suicide attempt in this.  I'm going to go now to the top of 127.  Okay.  You see it?  And I want to direct you to line 12, 13, 14, 15.  This all relates back to the conversation that began on 124, which is about what it is that led him to go to Metropolitan.  It's this stress --

A.   Okay, he says --

Q.   -- over the house shooting.  And that, in fact, would be consistent with what he told Dr. Wuertz when he went there too, wouldn't it?  So at least there's some consistency with what he said in early '97 at the time and what he's telling

Dr. Yutzy here at this time, isn't there?

A.   But that is not what he told his girlfriend's mother who brought him to the hospital.

Q.   There's consistency between what he told Dr. Wuertz, isn't there, and what he's telling Dr. Yutzy here?

A.   I'm not disagreeing.  Could you bounce up Dr. -- the hospital records again, please?  I'm not disagreeing.

Q.   I'm going to tell you I'm going to move on to another topic rather than beat this.

A.   Okay.

Q.   This is beginning the same interview on page 128.  And let me go up above, the page before so you can see what precedes it.  And it's what we just talked about is, "What other things resolved in you at that time?"  "The situation that was stressing me out."

Now, on the next page, the same conversation, page 128, he's asking him about what was stressing him.  In looking at what Mr. Allen says, for example, on line 15.

"I was thinking how I could be back close with my family.  And I knew it wasn't going to be easy after the house got shot up because it was like that's something closer to the family for real."

Yutzy says, "I read the report.  They were more than a little upset."

"Yeah."

"Go ahead.  I'm sorry."

"And that was another thing because, I mean, I never stayed away from my family long.  I was just like a family person.  I never stayed away from my family long.  So being away from them that long just stresses you out.  Because my mom gave me the type of love no one else can give you.  You know, it's like that motherly love."

"Unconditional love?"

"Right.  And another thing is after that happened, my friend had a minivan.  He used to let me use his minivan.  And we were riding one day and I seen my sister."

And then, "My sister told me about it."  Referring to the shooting.

So both in terms of his relationship with his mother and in terms of having been kicked out of the house repeatedly since an early age, what he is telling Dr. Yutzy is inconsistent with those claims, correct?

A.    He's either telling Dr. Yutzy a story or everyone else is being told a story.

Q.    Is one of the things that you consider in terms of abuse -- again, now for this question we're assuming that there was some abuse -- is what the impact was of the abuse on the individual?

A.    Yeah.

Q.    It can vary?

A.    If the individual is abused over a lengthy period of time, or was raised in a family of violence, or was -- you know, especially if he was involved with alcoholic, violent parents, there are long-term effects.

Q.    My question is, can this type of abuse have different effects on different people?

A.    Yes.

Q.    And is one of the things that you're looking at was what effect did it have on this individual?  In other words, we're not talking about the mean, the average, or the median, we're talking about what effect does it have on this particular person, correct?

A.    Correct.

Q.    That's who you're diagnosing, right?

A.    I'm not diagnosing him with abuse.  I'm just saying if he was abused, that was a factor that needed to be brought into the trial.

Q.    Okay.

A.    But there is no specific diagnosis of abuse.

Q.    My question is, though, if you're trying to look at what is the role of abuse in a person's mental health, you as a psychologist want to look at what is the impact of that abuse on this individual, how did they view it, correct?

A.    Correct.

Q.    Is that a yes?

A.    Yes.

Q.    Okay.  Now, I'm going to take you to -- this is Exhibit 539.  And this is Mr. Allen's deposition again given last May.

MR. MORENO:  I'm sorry, Steve, what page?

MR. HOLTSHOUSER:  29.

Q.    And I guess I'll go up a page -- no, that doesn't work good.  It's too big of a file, that's the problem.  Do you see at the bottom of page 28 here, the questions he's being asked about are the phrase "whoopings."  It's a phrase that he used.  And on the top of page 29 then, and, again, this is Exhibit 539.  This is Mr. Allen's deposition in May of 2012.

His answer:  "I mean it was always a joke amongst the kids.  Oh, you going to get a whoopin' today?  Or are you going to get a whoopin'?  So I mean you could say it was a term used."

"Is this something you used with your peers, those your age, in the neighborhood?"

"Yeah, I used whoopin'.  Like I said, it didn't matter whether it was an extension cord, with a belt, or you know, with the hand.  It would be considered a whoopin' to me."

"Okay.  When you say that it would be used amongst you, that you would talk about it as if it were a joke, that you are going to get a whoopin', or you got a whoppin', in

what sense was it referred to as a joke?"

"Well, I mean, you can say that nobody liked to get whoopin's, you know.  And you see a kid terrified to get a whoopin'.  So we joked about it.  Now, it wasn't a joking matter.  You kind of tried to make light of the situation, but you knew what was coming."

Next at page 34 of the same transcript, he was asked the question about how he perceived it at the time.  And he begins up at the top saying the one thing he perceived that bothered him, it was unfair that he got treated differently than his sisters.

"Did that add to the sense of unfairness?"

"Yeah."

"As far as the actual whipping you with the belt or extension cord, at the time did you feel like this is abuse?  This is something that is perhaps criminal or wrong?"

And he said, "I mean again, at the time --

And I said, "Let's just limit it to the time that you perceived it as abuse."

"I said I didn't know what abuse was.  I knew it was wrong."

"Was the thing that was foremost in your mind the notion that it was either excessive or unjustified, and also unfair because your sisters weren't receiving the same?"

"No, just because of that.  I mean the pain.  When

you feel pain, you know, it makes you feel something that wasn't good, and that's what I felt."

Those are at least two examples of Mr. Allen saying in May of 2012 how he perceived the impact of the abuse at the time. In one instance, it was a joke amongst his fellow peers, and another he didn't perceive it as abuse at the time. Correct?

A.    I did not --

MS. CARLYLE: I think that mischaracterizes what he said. He said it was made as a joke at the time, but it was not a joking matter. And then he said that it bothered him because it was painful.

MR. HOLTSHOUSER: Well, Judge, I think it's a fair question to ask him. If Ms. Carlyle wants to rephrase the question or argue at a later time, I think that that would be appropriate.

THE COURT: The important thing is, do you understand the question?

THE WITNESS: Yes, I did, Your Honor.

THE COURT: If you understand the question, you may answer. Go ahead.

A.    I think that it did affect him. First of all, he's been exposed to a period -- a series of violent activities at a very young age that are repetitive, that are painful, and that are unjust. Or at least in his perception are unjust.

Those types of things cause long-term problems. If this would have been reported, it would have been indicated as abuse. But there's -- if this is correct, there's no doubt this was abuse.

Q.    That wasn't my question. My question was, does his statements in May of 2012, is it something you would have to consider in assessing what its impact was, what he says about it, would it be something that you could ignore in terms of assessing its impact?

A.    No. If that had occurred when I did the evaluation, in 1998, it would have had to have been explored.

Q.    Would you have ignored what he said about its impact on him, how he viewed it at the time?

A.    No. And the reason why I wouldn't have ignored it is because I would have seen his perception. He's merely perceiving abuse and violence as normal. It's for that very same reason that the U.S. Attorney -- pardon me, the U.S. Attorney's Office when Janet Reno was involved started that "Safe from the Start," that Eric Holder ended up writing the preview to, and that whole concept of what happens to kids that are exposed to violence and the long-term effects. This is consistent with it.

        This is why the U.S. Attorney's Office, at least back then in 1999 when they had the summit, and 2000 when Eric Holder played it out, this has become the central issue,

the fact that what we have is a culture of violence where people are seeing violence in their homes, and the long-term effects on our kids.

Q.    I appreciate what you have to say, Dr. Cuneo.  My question is, would you -- and if you were in a position of evaluating this one individual, not looking at it from a societal point of view or a problem to be attacked from a societal point of view, in assessing this individual, would you ignore what he had to say about its impact on him --

A.    No, I wouldn't --

Q.    -- in ultimately determining a diagnosis?

A.    First of all, there is no diagnosis of abuse, which you would have looked at.  And abuse is not a diagnosis.

Q.    I understand that.  That's not my question.

A.    I thought you said, would you have considered it in your diagnosis of abuse?

Q.    No, would you have --

A.    I don't diagnosis abuse.

Q.    Would you have ignored this information of what he said its impact was on him in adding it to your data set of --

A.    I would not have ignored it.

Q.    Okay.  Do you see here also that at page 55, I'm asking him some questions about when and how it is he came to the conclusion or the realization that what had occurred to him as a youth was in his mind abusive, okay.

A.     Uh-huh.

Q.     And do you see here that he refers that when he was at Simmons, that there was a -- a program that dealt with the issue of abuse.

A.     May I -- pardon me, can you explain to me what Simmons is?

Q.     Simmons is a middle school or a junior high, the transition between grade school and Sumner, I believe.

A.     Is it a City school?

Q.     It's pre-Sumner, so it would be like eighth grade.

A.     Okay.  But is it a City school --

Q.     I believe it is.

A.     -- or Clayton?  Thank you.

Q.     Now, so that as early as the eighth grade, he says he saw a program that taught him what abuse was.  And that at that time he came to a realization that what was happening to him may be abusive, okay?

A.     Okay.

Q.     So at least by the time that he is 18, 19, when he's talking to you, Dr. Yutzy, his attorneys, and others who are asking him questions, specific questions about abuse, he knew at that time what he was concealing from them.  When they were referring to it as abuse, he'd already come to a conclusion in his mind that it was abusive, correct?

A.     No, that's not what it says.  If I may read it, it

says -- pardon me, 16.  If you go to 16.

Q.    I'm going to blow this up for you.

A.    "It wasn't like I just sat down and said --" pardon me.

Q.    "What did they teach you that you didn't know?

"Well, the only thing they really taught me was that if you feel abused or something like that, call the police or alert your counselor.  It wasn't like I just sat down and said, okay, I've been abused.  It was a regular thing to me.  So I didn't actually qualify it as me being abused, as being abused.  I just it as me getting whoopin's."

A.    So in other --

Q.    So in terms of evaluating its impact on him, he still viewed what was occurring as just a normal feature of home life, whoopin's?

A.    He saw violence as a normal part of life is what that's saying to me.  And, yes, that would have been explored.

Q.    Now, in the same transcript, I want to direct your attention to page 56.  And we're asking the question of, again, trying to get to this issue of when did you come to the realization that your individual treatment constituted abuse.  And you see here that we're referring at the top of the page to these pamphlets?  This is the page that follows the page we just looked at, okay.  So we're in the same discussion and train of thought.

A.    Okay.

Q.    Okay?

A.    Pardon me, I'm just -- I apologize for hitting that. I'll move it up closer.

Q.    I want to blow up these half at a time so you can read it.

A.    I'll move back.

Q.    And we're still talking about this pamphlet.

"Is there anything in the pamphlet that it leads you to believe that what had happened to you as child and how you had been treated by your parents was abuse?"

"Well, it made me see something was wrong.  You know, it wasn't right."

"Would you say that that was about the first time you came really to the conclusion in your mind that how you had been treated was abusive?"

And his answer:  "I mean I didn't even -- it took me until recently to realize that I was being abused, really.  I mean I saw it as something wrong.  I didn't say, okay, I was being abused.  It just happened recently, I mean."

Now, before I go on to the next page, in terms of what had happened to him, there was specific questions that had been asked of him about how he had been treated by his mother, how he had been disciplined and so forth.  He's referred in this deposition, hasn't he, to frequent whoopin's, correct?

A.    Correct.

Q.    He didn't mention whoopin's in any of those answers to Mr. Simon, to Dr. Yutzy, or anyone asking him those questions at that time, did he?

MR. KANE:  Object.

MS. CARLYLE:  You can't object actually.  I believe he did tell Dr. Yutzy about whoopings.

Q.    And Dr. Yutzy followed up on that topic about whoopings and explained what he meant.  Is what he meant is that what really bothered him, not the whoopings, which he didn't consider abusive, but that the withdrawal of privileges, couldn't go outside, couldn't see girls, et cetera, correct? That's what you just read?

A.    Right.

Q.    Remember those questions that were asked of him by Mr. Simon?

A.    He denied abuse at that time and painted his household as a fantastic place.

Q.    So what we're asking him here in this deposition is when did you come to this realization that you had been abused?  And his answer in May of 2012 is it happened just recently.

A.    I'm sorry, is there a question?

Q.    It's coming.

MR. HOLTSHOUSER:  Do you think it's coming up,

Carrie?

MS. COSTANTIN:  No.

MR. HOLTSHOUSER:  I'll put it back up here.

Q.   This the continuation of that page.

"Okay.  That's kind of what I wanted to find out, is when that realization occurred."

"Well, most recently, just going into details with your specialist and our specialist and people asking questions, finally asking questions and trying to get to the bottom of things, that's when I came to realize that."

"Now, before we get to that period, I want to still keep you focused on the period you raised, which was the period when you were at Simmons."

"All right."

"Prior to that time -- but prior to that time had you ever forgotten that you had been whooped?  Was it always something that you could remember?"

"It's something that I still hold onto.  So it's not something that you -- when a person I guess you can say hits you enough where there's flesh is torn, then it's not something you forget easily."

"You don't forget, do you?"

"No."

"And you hadn't forgotten this as of the time you were seeing the pamphlet at Simmons?"

"No.  I guess you could say --"

Let me see if it's going to let me go to the next page here.  Okay, here on page 59.

A.    Okay.

Q.    "You made reference to 'more recently.'  Can you elaborate on what you meant by 'more recently'?  What are you referring to?"

"Well, when people ask you more detailed questions, I guess you can say.  They ask, okay, did this ever happen?  Did this ever happen?  Then you come to realize that it wasn't right behavior by your parents."

"When was the first time that you -- the repeated asking of the questions, when did that process start?"

"It mostly happened on the 2255.  I guess you could say it mostly happened with the most questions asked about my life, and how life was, and the whoopin's, and the severity of the whoopin's and stuff like that."

"Who do you recall being the first person in connection with the 2255 to ask you in detail about those things?"

"My attorneys."

A.    Can you explain to me --

MS. CARLYLE:  Wait.  Judge, I need to interpose an objection.  In the deposition there is an objection that the following question and answer violates the attorney/client

privilege as to Mr. Allen and his present counsel. And I renew that objection.

THE COURT: All right. Do you care to respond?

MR. HOLTSHOUSER: Judge, in the context of this, we're trying to find out what it is, when he came -- how he came to these realizations. And this isn't a case of him conveying information to his attorney, but him testifying to the effect of repeated questioning by his attorneys and how he came to this realization.

I don't think that's protected by the attorney/client privilege. The objection that was made, I believe, was also work product or something to that effect. And I don't think that objection is valid either. But we did move on and we changed the topic here to mental health expert.

THE COURT: All right. But we'll move on --

MR. HOLTSHOUSER: It's in the deposition. And so if it's objectionable, we're offering the deposition, and the Court I think is capable of determining whether it's information that should be relied on or not.

THE COURT: Okay. Well, I'll try to sort it out in just a moment. As I understand, the issue isn't what did your attorneys tell you, the issue is when did you start to believe that what was recently -- what did recently mean in terms of when you started thinking that you were being

abused.  And he said, when I started talking to my attorneys.

So I don't think -- I don't think it qualifies as attorney/client privilege because he's not reciting what he was told by attorneys, but he identifies a period of time when he -- when there were conversations.

Now, what was the conversation --

MR. HOLTSHOUSER:  I've got the question here that I asked that elicited the response.  My question didn't intend to elicit specifically his attorneys.  I was just trying to find out who was the first person in connection with the 2255 to ask you in detail about those things to where you elaborated on them.  And I was thinking he was going to say one of these experts.  Now, he answered my attorneys.  And then in the transcript on the next page, I did ask him which attorney.  And that's when the objection was, is to identifying which attorney.  But my original question did not necessarily seek an attorney/client communication.

THE COURT:  All right.

MR. HOLTSHOUSER:  But then there's a series of questions that go on here that are directed at the experts.

THE COURT:  Okay.  The objection is noted.  For the record it is overruled at this time.

BY MR. HOLTSHOUSER:

Q.   And then I changed it, "Who would be the first mental health expert that you talked with in connection with this?"

"I can't remember the guy's name."

"If I said his name, do you think that would ring a bell?"

"You can try."

"Is it Pablo Stewart?"

"That sounds familiar."

He can't tell me what he looked like. And he talked to him at Terre Haute.

"How long did he talk to you?"

"For quite awhile."

"Was there more than one visit?"

"Not that I recall."

"Had you already -- did the information that you gave to him, you had already given to your attorneys?"

We objected to that. That question wasn't answered.

"The questions that he asked you" -- referring to the expert Pablo Stewart -- "and the answers that you gave him" -- and we were talking about Dr. Stewart -- "was it in the course of his questions that you first came to view what happened to you as abuse?"

Okay. I'm not going -- at this point my question simply is, can repeated questioning by a mental health expert as described here by Mr. Allen suggest to someone the kind of information that the expert is seeking that might be helpful to him?

A.    Is it possible?

Q.    Yes.

A.    May I first ask a question?  What is a 2255?

Q.    A habeas corpus petition.

A.    I didn't --

Q.    That's what we're here about.

A.    I apologize.  I did not know what that meant.

Q.    But it's what we're here hearing.

A.    I'm sorry.  I was trying to understand.

Q.    No need to apologize.

A.    Is it possible to where that they would assume -- in other words, try to please you, give the information, play along?  Yes.

Q.    In other words, repeated questioning about something, and especially detailed repeated questioning, some of these detailed questions were asked by Dr. Yutzy or by Mr. Simon in 1998 didn't elicit this information.  It apparently was elicited from Mr. Allen at a later time.

        Is it possible that repeated questioning can suggest what information might be helpful to a current legal situation?

A.    It is possible.  It's also possible back in 1997 and 1998, he didn't consider whoopings abuse, because that was the norm.

Q.    And just to address that explanation that you offered,

he was asked that specific question here in his deposition, if I can find it.  I can't find it at this time, and I'm not going to take the time.

MR. HOLTSHOUSER:  There's a point in this transcript, though, Your Honor, where Mr. Allen says he didn't tell Dr. Yutzy because he didn't feel like talking about it.  But I'll move on.

Q.    Now, you have not reviewed any of the statements that Mr. Allen has given to a Dr. Galit Askenazi, have you?

A.    No.

Q.    No?

A.    When was that done?

Q.    In October of 2011.

A.    No.  I don't believe those were ever forwarded to me.

Q.    In terms of the data set that you consider -- let me strike that.

This repeated questioning, is it possible that this type of repeated questioning by an examiner can also send cues to someone besides Mr. Allen, in other words, of what information might be helpful to his case?

A.    Do you mean --

Q.    Is that phenomenon limited to Mr. Allen --

A.    No.

Q.    -- or could it be anyone being questioned?

A.    And also if you keep asking the same question, and

sometimes people keep giving you different answers because they want to please you.  They figure you asked it twice, they are going to keep answering until they feel that they got it right.  You see that with kids all the time.

Q.    Now, he said to you -- at least in terms of what he said to you about his role in the robbery, to you alone he gave two inconsistent versions of that, correct?

A.    I believe it was three.

Q.    Three.  I stand corrected.  And as -- in his conversation with Dr. Yutzy, I know you haven't seen this, but show you which version he gave to Dr. Yutzy.  It's here at page 147.  And the answer is, "I wasn't involved in it.  I was stressed out during this but I wasn't in it.  I wasn't there at the bank."

        THE COURT:  Which exhibit is this?

        MR. HOLTSHOUSER:  Exhibit 46, page 147.

A.    Okay.

Q.    And Dr. Yutzy follows up on that.  And he says that he's going to file an alibi.  And Dr. Yutzy says he did not want to get into discussion about his conversations with his attorneys.  And Mr. Allen says his alibi has already been through the courts.

        Now, this reference to alibi, you were shown the letters, I believe at trial, that Mr. Allen had written to Johnnie Grant about coming to court and lying for him.  And

that Johnnie Grant testified as recently as last week that Mrs. Allen asked, "Why won't you cosign for Bill?" Meaning why won't you give him an alibi and say he was with you.

MS. CARLYLE: Objection, I don't think that's what Mr. Grant testified.

MR. HOLTSHOUSER: Well, I think it was.

THE COURT: And that's what I interpreted it to be.

Q.   If that were the case, the fact that Mr. Allen not only was giving Dr. Yutzy one version, but there was likewise at the time intending to create a false alibi, would that have anything at all to do with PTSD or his mental state?

A.   No, it wouldn't have anything to do with PTSD or whether or not he was abused.

Q.   I'm going to show you exhibit -- if I can type the numbers correctly here, 100. And does this look like anything you've seen before? It's a memorandum by the police.

A.   It looks like something out of a police report.

Q.   Correct.

A.   But I can't remember when I last saw it.

Q.   Well, it's not "the" report, but it's a report that references a contact between Mr. Allen and a St. Louis detective on March 19, 1997. Now, that's two days after the robbery. Do you realize that? The robbery occurred on March 17th, the robbery and murder. And this is March 19.

And that Billie Allen told him that Donte Frazier was part of the clique, which was eight individuals who had been planning to commit a series of bank robberies together.

"Allen said that he, Frazier, and Holder were all members of this 'clique.' And according to Allen, the 'clique' was planning to rob one or more banks, and had been gathering weapons in preparation for the robberies. They were utilizing a videotape entitled 'Set it Off' as a training aid, and had viewed it numerous times in order to learn the techniques necessary to carry off the robberies. The video purportedly involves a group of four females who pull off a series of robberies by using assault weapons, masks, vehicles and shooting a security guard. Allen and his group apparently planned to imitate this movie in the robbery."

That would be a much different version than any of the three he gave you, correct?

A.   That's correct.

Q.   And he's talking to you, and it would have been a year later in '98, correct?

A.   Correct.

Q.   And you talk about collateral sources here. You see here on March 18th, the day after the robbery, a Yolanda Curry, a cousin of Norris Holder, made a report to the police that she had been paged by Billie Allen following the

robbery. And that this is before Mr. Allen was arrested. That Curry had been holding drugs and guns for Holder, and Allen wanted to come get them from her so he could leave town. Curry became frightened when she heard of the murder of the bank guard and did not want to contact Allen again. And when interviewed, she was questioned about Donte Frazier's role in the robbery. And appeared to be surprised that the police were aware of Frazier and his association with Allen and Norris. Curry also indicated that two additional subjects had been waiting in Forest Park to assist with the escape.

And she also said that the group calls themselves the "GMP clique" and could identify several members.

At least in terms of what Mr. Allen told the police on March 19th, would this be an example of a collateral source by another individual corroborating what Mr. Allen himself had said?

A.    I'm not sure it would be that. It's another version -- I'm not sure I understand your question, I guess.

Q.    Well, isn't it a version which seems to be consistent with the version that Mr. Allen gave to the police, the one I just read to you the page before?

A.    Yes.

Q.    The "clique" -- reference to the "clique" and Norris Holder and so forth?

A.    It has much of the same information.

Q.    And she indicated to the police at that time that between the time the robbery and murder occurred and the time Mr. Allen was arrested, he contacted her to get from her drugs and guns that she was holding for Holder so he could leave town with them?

A.    That's what it states.

Q.    Now, in terms of a person who has just experienced a new violent traumatic event, how would -- what would this type of functioning say to you about their state of mind?

A.    I don't know what -- I'm getting a version of a conversation she had with him.  I don't know what his state of mind was at the time.

Q.    Well, let me ask you this:  Why don't you credit that version?  Why don't you credit that as being true?

A.    No, I'm not saying it's not true.

Q.    Okay.

A.    The only thing I'm saying, it doesn't say anything about his state of mind.

Q.    It doesn't?

A.    I don't see anything in there about it.

Q.    It doesn't say that he appeared panicky or unstable or depressed, kinds of things that you might associate with someone who suffers from PTSD as a result of experiencing a violent event up close, who then experiencing a second

traumatic event?

A.    But it's not written about that.  It's giving a description of what happened.  I don't see how that's relevant.

Q.    Doesn't it say that Mr. Allen has the presence of mind between the time that this event occurs and the time that he's arrested to be planning his escape from town by obtaining from her guns and drugs so he could leave town with them?

A.    It tells me --

Q.    He's functioning, in other words, correct?

A.    Maybe not well, but he's trying to get away, that's what it tells me.

Q.    "Not well" in terms of he didn't succeed, or "not well" is he's actually trying to form a plan to get away?  That's functioning, correct?

A.    He's trying to get away, yes.  But I don't see anything in there about his mental state or what it was like when he was talking to her.  You don't have any information in there.

Q.    One of the areas that you found significant, and we talked about earlier, was that he had social impairment, correct?

A.    Correct.

Q.    And I take it without going to the exhibit that he -- take it as true that he told Mr. Simon in 1998 that he had

many girlfriends, that he went clubbing, and that he had spent the year before the robbery partying with Johnnie Grant among others.

A.    Okay.

Q.    Okay.  And that at least in his testimony last week, Johnnie Grant corroborated much of that.

A.    Stated that --

Q.    -- that was true.

A.    That he had many girlfriends?

Q.    Yes.  That was true, the clubbing was true.

A.    But how about the many girlfriends and --

Q.    Yes.  Okay.  That's what they did.  So that even now after all this time, he says that wasn't made up, that was true.

        Yet a short time later when Mr. Allen talked to Dr. Yutzy -- this is Exhibit 46, page 173.  And we need to go up a page.

        He's asking about "loss of interest or pleasure in activities or almost activities every day, is that fair?"

        "(Inaudible.)"

        "From after Mr. Taylor got shot up until February."

        "I mean, all I did was stay home.  I wouldn't go back in my back yard.  My back yard was just about everybody comes, like the whole neighborhood.  It's like a park, that's how my back yard is."

"I'm sort of stuck here.  It's kind of a yes or no thing.  So a marked decreased interest or pleasure in all or almost all activities nearly every day from when Mr. Taylor was killed up until February?"

"I would say I had more fun from '95 back than I did from '95 to '97."

"That's taking care of this question.  But markedly diminished interest or pleasure in all or almost all activities most of the day, nearly every day?"

"Significant?"

A.    Did he understand what "markedly" meant?

Q.    Well, here he's explaining.

"So you can say you don't know if you want to say that."

"Right.  It's kind of, I mean, see you have to look (Inaudible).  From '95 on down I would play basketball every day, played for a basketball team, ran, stayed in my room, hung out, went to the mall, did everything.  When Marquis got shot I quit my basketball career, I slowed down my rapping a lot.  I used to write every day, so I slowed down my rapping a lot.  I quite going to the malls, quit hanging out, everything."

THE COURT:  A little bit slower.

MR. HOLTSHOUSER:  Pardon me?

THE COURT:  A little bit slower.

MR. HOLTSHOUSER:  I'm sorry.

Q.    "The only thing I turned to was we would drink.  So, I mean, there's really not, there's nothing fun about getting high and drinking, it's just something you do to get the stress out."

So do you see a difference in there between what he told Mr. Simon a month or so earlier and what he told Dr. Yutzy when he has this exam in '98, and compared to what Johnnie Grant said was going on back at that time when he testified last week that there was actually no change in his social activity after the death of Marquis Taylor?  There's a bit of discrepancy there, correct?

MS. CARLYLE:  Objection.  I don't think Johnnie Grant ever said there was no change in his activities.

MR. HOLTSHOUSER:  I think he specifically testified there was no change in his social activity after the death of Marquis Taylor, because I specifically recall asking him that.

MS. CARLYLE:  I think he may have said he didn't notice any.  That's different from saying there was none.

MR. HOLTSHOUSER:  I think he testified there was none because he was with him most of the time, when they went out clubbing, when they went to the girls, and they went to these malls and other places.  So, I mean, he testified in great detail.

And, again, I think that there's no valid objection here.  If Ms. Carlyle wants to argue this point later, we can review the testimony of Mr. Grant.

BY MR. HOLTSHOUSER:

Q.    I'm asking you to assume, Dr. Cuneo, that that was his testimony.  So there's a bit of a discrepancy there, wouldn't you agree?

A.    Yes.

Q.    Okay.  And so the time between he tells Mr. Simon that he spent the year before the robbery partying and the time when he tells Dr. Yutzy that he stopped going to the malls and all this right after the death of Marquis Taylor, there's a span there of about a month or so.  And my question is, what is it that happened between Mr. Simon's interview and Dr. Yutzy's interview?  Can you tell there what happened?

A.    No.  Dr. Yutzy appears at times to be asking him questions he doesn't understand.  And he answers, and he kind of sets the answer to what he thinks he should say.

Q.    Is there any doubt that Mr. Allen doesn't know what he's talking about here in this paragraph on 174 when he's describing what it was like before and after Marquis Taylor's death?  He's made it pretty clear, hasn't he, to Dr. Yutzy to where the marked change began?

A.    He said he slowed down his rapping, quit his basketball career.  "I used to write every day, so I slowed down my

rapping a lot."

Q.   "Quit going to the malls, quit hanging out, everything."  Correct?

A.   And the only thing he turned to was drink.

Q.   So the question is from the time that he told Mr. Simon to the time he's talking to Dr. Yutzy, do you have any indication of what occurred between those two that Mr. Allen would change his story so dramatically about his activities in the period after Marquis Taylor's death?

A.   Wait.  Do I have any -- do I have any idea of why he changed his answer to Dr. Yutzy versus -- pardon me, to Mr. Simon to Dr. Yutzy?

Q.   Correct.  Correct.

A.   Well, Mr. Simon, he painted a perfect life.  And so here he's saying something else.  Why he did that, I don't know.

Q.   And when you talked to him on January the 16th and evaluated him, by that time you had come up and -- you had come up and communicated to Mr. Sindel, Mr. Simon, and Dr. Randall your view that he suffered from PTSD, correct?

A.   Not before my first interview.

Q.   No, after your first interview.

A.   Yes, that was my --

Q.   And the time of your report.

A.   That was my initial assessment after my first

examination.

Q.   And Dr. Yutzy's examination of Mr. Allen takes place after your report is released?

A.   Okay.

Q.   Okay.  You at no time advised Mr. Allen what the requirements of PTSD were, did you?

A.   No.

Q.   Okay.  I had to ask.  I'm sorry.

A.   That would be unethical.

Q.   It would.  Now, you haven't reviewed in detail his deposition, but I ask you to assume that when he testified in his deposition last May that he testified that after the death of Marquis Taylor, he actually went out more than he ever did before, never stopped seeing girls or having relationships, continued to go to Marquis Taylor's house, and actually felt better when Marquis Taylor's mother told him that she did not blame him for Mr. Taylor's death.  That, again, would be in stark contrast to what he had told you and what he had told Dr. Yutzy back in 1998 about his social impairment, correct?

A.   Except wasn't it during that time period after Marquis Taylor's death, he may very well had the depression and anxiety and the PTSD, but he was also self-medicating with marijuana and alcohol and was saying that he was getting drunk and high every day.

Q.    Here's a question, Dr. Cuneo.  How do you tell that social impairment is due to Post Traumatic Stress Disorder as opposed to excessive use of marijuana and alcohol?

A.    I'm not sure I can do that.

Q.    You can't do that, can you?

A.    I can't do that.

Q.    Because excessive use of marijuana and alcohol would, in fact, impair social and occupational activities, correct?

A.    It could.

THE COURT:  Let me catch up on my notetaking.  Just a minute.

MS. CARLYLE:  Your Honor, could we take a brief break while we do that?

THE COURT:  Five minutes?  The only reason I'm even asking is I see the clock is ticking.  And so the answer is, yes, we can.

MS. CARLYLE:  Okay.

THE COURT:  Five-minute break.

(Court in recess from 4:18 p.m. until 4:22 p.m.)

MR. MORENO:  Thank you, Judge.

THE COURT:  Go ahead.

BY MR. HOLTSHOUSER:

Q.    You testified earlier that based on something you read, you felt that he was being kicked out of the house and forced to the streets at a very young age, correct?

A.      Correct.

Q.      And I think you placed that age as somewhere between --

A.      I thought it was four, five, or six.  I may be wrong.

Q.      And rather than -- I'm going to run through a couple of examples of collateral sources that we have here.  Do you know who Claude McLemore is?

A.      Yes.

Q.      That's his cousin.  He sometimes calls him Ed?

A.      Yes.

Q.      He's very close with him.  And he was also someone who was in the family and around a lot.  They used to spend a lot of time together when they were younger.

        He testified in his deposition that Mr. Allen had not been put out of the house before he was 15 or 16.  Okay.

        When he met with Dr. Wuertz in February of '97, he said he was put out of the house for selling drugs.  Do you recall that?

A.      Yes.

Q.      When he was interviewed by Mr. Simon in his transcripts with him, or actually it's his Life History, and I'll put this one up.  This is a document prepared by Mr. Simon based upon his interviews with Mr. Allen in 1997 and early '98.

        "Billie denies having run away or having been thrown out of his home at any time.  After the shooting he began staying at various girlfriends' place in part for his

family's safety.  In response to this move his mother filed a missing person's report."

And you were aware back in the trial there was a missing person's report filed after the shooting, correct?

A.    Correct.

Q.    That would at least be an indication that his mother wanted to find where he was at and wanted him back, correct?

A.    It would appear so, yes.

Q.    Why else would she do it, correct?

A.    Yes.

Q.    And the information here given to his attorney at the time that he denied ever having run away or been thrown out of his house at any time, was certainly inconsistent with any belief that he was forced to leave the house at age four to six, correct?

A.    Correct.  I believe I saw -- I thought -- I thought, and I apologize if I'm wrong, I thought that was in the Juanita Allen section.

Q.    And I guess the question is, well -- and one more, let me give you one more.  And that is that when he was interviewed by Dr. Askenazi in October of 2011, he said the first time that he was ever outside the house was at age 15.

A.    I have never seen that.

Q.    So if you had those things, would you still credit the one statement by Mrs. Allen that it started at a very young

age if you thought that existed compared to these others?

A.    What I would do is with that type of inconsistent information from never to 15 to 17 to, I believe it was six, I would need time to take a look at it, evaluate it, to see if, in fact, when it happened, if it happened.

Q.    How do you do that?

A.    I'd go back and interview the people myself.

Q.    Okay.  Let's say they give you the same answers.

A.    I'd see what their -- how -- I'd look at their demeanor.

Q.    Okay.  Then what?

A.    I'd probably try to seek collateral sources, probably go to the sisters at that time next.  Because what's happening is you got a big difference here.  You've got somebody telling me they've never been, you've got other people telling me 15.  You got a mom saying six.  If -- and the reason why you would do this, because if there is abuse, it usually survives best under secrecy.

Q.    Let's say the sisters confirm what the mother says.  So you've got that compared to what his cousin says, compared to what he says on a number of occasions to a variety of people, and you have other contradictory information.  Still, you still got the dilemma.  How do you figure out?

A.    I haven't talked to any of them yet.

Q.    No.  Take that as the hypothetical.  Now what do you

do?

A.    I'm going to go talk to him.

Q.    You talk to him.  You find that out.  So let's say --

A.    Then I would have a perception, my own perception.  I'd look at much of the things you've talked about, who has been inconsistent in the past, what can be corroborated.  I'd look at motivation.  I'd look at demeanor.  I'd look at many of the other issues.

Q.    Let me show you one thing.  You mentioned corroboration.  This is Exhibit 116.  This is a second -- actually an earlier missing person's report that Mrs. Allen filed with the police on May 19, 1996.  This is a little bit more than a year before the -- a little less than a year before the crime, the offense.  It's about half a year before the shooting.  About eight months before the shooting at the house.  It has nothing to do with the house shooting.

But that Mrs. Allen reports Billie Allen as missing, a missing person in May of '96.  Now, would this be the kind of -- the fact that that report was made, the kind of hard corroboration that you would resort to to conclude that perhaps these claims of having earlier been thrown out of the house weren't credible?

A.    She may have thrown him out of the house and tried to find him now.  If -- let's say that the --

Q.    She wants him back again, right?

A.    Right.  But let's say the information is correct.  Let's say that she was an alcoholic.  Let's say that, in fact, she was abusive.  Let's say she now becomes guilty and wants her kid back.  And then let's say she goes back to drinking again and becomes violent again and acts out.  I mean, you see this pattern repeatedly with abusers.

Q.    And the fact that you could see that pattern --

A.    And I'm not telling you she's abused.  I'm telling you the pattern is consistent with abuse.

Q.    It doesn't tell you the fact that there is a pattern which could be consistent with abusers.  Doesn't answer the ultimate question, does it?

A.    Of whether or not he was abused?

Q.    No, we're talking about the abandonment, having been kicked out of the house and put out on the street at an early age.

A.    No, this doesn't answer it one way or another.  This just tells me he was missing.  But it doesn't tell me if he was missing on his own accord or if, in fact, she kicked him out.

Q.    Wouldn't it actually corroborate, for example, what Claude McLemore says and what Mr. Allen says on a number of occasions, that he was not put out, never left the home before until advanced teen years?

A.    No, that wouldn't verify that.

Q.    Because how old would he have been in May of '96?

A.    This just tells me one time in May of '96.  This doesn't tell me what happened before.

Q.    When he's 19.  Actually 18 going on 19, correct?

A.    Yeah, but it doesn't tell me what happened when he -- I don't know anything that happened before.  This tells me, I know at that time he's out of the house.  But I don't know what happened before.

Q.    Let's talk about the shooting of the house.  In terms of what -- ask you to assume that in '97 before the crime occurred --

A.    Okay.

Q.    -- Mr. Allen told his probation officer that the reason the house was shot up was it had something to do with the fight that occurred at Northwest Plaza, okay.  That's the first version.

A.    Okay.

Q.    The second version is what he told Mr. Simon in his transcripts and conversations and Dr. Yutzy, that it actually related to a drug deal gone bad.

A.    Okay.

Q.    And in his conversations with Dr. Yutzy, he actually went into great detail that it involved lost drugs, a situation where he could not pay all the money back that he owed, and he needed to pay back nearly $20,000 of someone

else's money.

A.    Okay.

Q.    He provided a great number of details to Dr. Yutzy about that in 1998.

In 2012, when he took -- when his deposition was taken, he gave but yet a third version, which was that the shooting related to threats that he had received at a house where he was selling drugs, to not sell in that territory.

A.    Okay.

Q.    And that Mr. Allen doesn't recall anything about it involving a bad drug deal.

A.    Okay.

Q.    Given this just one incident, three versions for Mr. Allen.

A.    Okay.

Q.    There's no way that you can rely on anything that he's telling you about this circumstance, is there?

A.    About that incident?

Q.    Yes.

A.    Very little, if anything.

Q.    Would you agree that there are circumstances in which an individual lies to achieve a particular result?

A.    Yes.

Q.    And, for example, he claims that he lied under oath to the judge in state court back in '95 when he pled guilty to

the tampering offense, and said that he was driving the car. He claims now that he wasn't actually driving the car, that he was taking the case for Marquis Taylor?

A.   Yes.

Q.   So that's an admission, would it not be, that he had lied under oath?

A.   That is correct.

Q.   So you have, first of all, the fact that he's admitted at least being a perjurer, correct?

A.   Yes.

Q.   I'm going to show you 500, page 42.  These are transcriptions of Mr. Simon's notes with Mr. Simon, where he tells Mr. Simon, according to his notes, "I can't do life in jail.  Try the alibi."

You will see here also where he says he wants to testify?  And that "I could admit to meeting Norris at the bowling alley."

A.   Okay.

Q.   Does the combination of "Try the alibi" and "I could admit to meeting Norris at the bowling alley," draw any inference from those statements?

A.   He would say what he could to get out of the case.

Q.   Whether it was true or not, correct?

A.   Correct.

Q.   "If I feel that it's that bad, I'll confess that I

lied.  I didn't tell them I was the shooter.  I didn't want to say.  If I feel they have an open and shut case, I would show tears."  Another example of the same willingness?

A.    Yes.  But then I don't know the context of -- I mean, it is an example of that.  I don't know the context of this other than these are -- did you say John Simon's notes of his interviews with Billie?

Q.    Yes.

A.    Okay.

THE COURT:  What page was that last?

MR. HOLTSHOUSER:  This current page is page 45 of the same set of the notes.  And these are all part of Exhibit 500.  The last one was page 46 is "I would show tears."  And this is page 45.

THE COURT:  And this one is 45?

MR. HOLTSHOUSER:  Of Exhibit 500.

THE COURT:  Okay.

Q.    At least here in his notes with Mr. Simon, is Mr. Allen expressing confidence in his ability to lie?  "I'm a convincing person.  I can convince a person who saw a drug deal that he only saw somebody shaking hands."

A.    That's what it states here.

Q.    Would you consider that, if you heard that standing alone, to be just an example of boasting, that perhaps he wasn't that good, he thought he was, but he wasn't?

A.    It's clearly boasting.

Q.    But would you discount it based on what the other things you know about Mr. Allen, your dealing with him?

A.    No, I wouldn't discount it automatically.

Q.    Okay.  Let me show you Exhibit 219, which is a -- Mr. Woodard's testimony at trial, who was his probation officer.  Now I'm at page 25 of the electronic exhibit, which is page 189 of Volume 14 of the transcript.  And this is Mr. Sindel cross-examining him, I believe.

       "Did you have an opportunity to talk to" --

       No, next question, line 21:

       "Would it be fair to say that most of your assessment of Mr. Allen's capabilities came from conversation with him?"

       "Yes."

       "He knew how to talk, right?"

       "Yes."

       "He could run a talk out?"

       "Yes, he could."

       That's his probation officer based on his dealings with him, correct?

A.    That's a phrase -- I thought I was pretty familiar with slang.  What is "run a talk out"?

Q.    Be convincing.

A.    Okay.

Q.   Carry on a -- in other words, here his probation officer, though, at least is confirming what Billie Allen was telling Mr. Simon, that he can be a very convincing person.

A.   Okay.

Q.   And of course then you had the letters from Mr. Allen to Mr. Grant asking him to lie for him under oath at the trial, correct?

Now, would you agree that that's a different kind of lying than, say, lying about his background in his Life History?

A.   Yes.  That's purposeful lying.

Q.   That's purposeful lying.  Lying to achieve a goal that he wants, which in that case was his freedom, correct?

A.   Correct.

Q.   Which is different than, say, lying to a girl about what kind of car you have, or what property you have in order to get her to have sex with him, right?

A.   Correct.

Q.   Now, knowing that Mr. Allen is capable of trying to get someone to lie for him in court, and ask you to assume his mother assisted him in that effort with Mr. Grant, doesn't that raise for you serious questions about whether you can trust what he says now or what even his mother says now about his background given the present circumstances?

A.   So you're asking me would I discount his mother, his

three sisters because Billie Allen lies?

Q. Would it raise serious questions in your mind about whether or not -- you understand the connection between what is being claimed now and a goal? Do you understand what the relief is that's being sought?

A. It's my understanding it's -- again, correct me if I'm wrong, it's my understanding to go to another sentencing.

Q. And there's a goal that's attempted to be achieved here, correct?

A. Where he could or could not receive the death penalty again.

Q. Correct. So the first goal in the first instance is to have his current sentence of death set aside, correct?

A. Correct. To go to another sentencing, to have the evidence presented.

Q. Correct. And so, but that can't happen until that sentence is set aside. That's the immediate goal, correct?

A. That's correct.

Q. And so you understand that that's the goal of Mr. Allen, and it's likewise the goal of his mother, correct?

A. That would appear to be her goal too, or one of the things -- I'm not saying her goal, let's say that's what she wants.

Q. And you also likewise know the connection between what both Mr. Allen and Mrs. Allen and his friends and relatives

are claiming and that goal?

A.    Yes, they are saying that he was abused.

Q.    But you understand what the association is between that claim and that goal, do you?

A.    Yes, there's -- well, spell it out for me, maybe I'm missing it.

Q.    Ineffective assistance of counsel is the claim, that his attorneys were either deficient, and that that deficiency prejudiced his penalty phase trial, okay.  That's what they are seeking.

A.    Okay.

Q.    Okay.  Now, knowing what you know about Mr. Allen's goal-oriented behavior in 1998, and assuming what I've told you about the conversations between his mother and Mr. Grant concerning engaging in that same effort, the question was, doesn't that -- wouldn't that raise for you serious questions about whether you can trust what they are claiming now in terms of reaching any conclusions regarding the usefulness of this information from a mental health standpoint?

A.    It would be something that I would look at.  But I also had not heard any of this information back in '98.  And if I had seen it in '98, at least I could have assessed it then. I'm not telling you I would have thought he was abused or not abused, but I didn't have the option to look at it.

Q.    Are you aware of -- well, in his conversations with you

back in '98, the first one, he said he had no involvement in the robbery, he wasn't there, correct?

A.    That is correct.

Q.    But then, of course, you had some conversations with him at the end of the second --

MS. CARLYLE:  Asked and answered.  We've been over this ground several times.

MR. HOLTSHOUSER:  I'm trying to orient him to the topic I'm asking him about.

THE COURT:  All right.  Overruled.

Q.    So that we're clear about what it is I'm going to ask you next, he told you, did he not, clearly in the last conversations that you had with him in February 22nd, that he was involved in the offense and that he was guilty, do you agree with that?

MS. CARLYLE:  Again, asked and answered.

THE COURT:  Okay.  Well, again, I guess this is foundational.  Overruled.

Q.    Correct?

A.    Yes, I remember.

Q.    Okay. Are you aware of claims being made by him publically today?

A.    What claims being made publically today?

Q.    Have you seen or exposed yourself to any of the claims being made by him in postings on the Internet, in fliers, in

videos, in Facebook postings, et cetera?

A.    No.

Q.    No.  You have not, have you?

A.    I -- he has a Facebook page?

Q.    Yes.

A.    No, I -- I've never been on his Facebook page.

Q.    Are you aware -- never mind.  So let me show you, for example, Exhibit 642.  This is a "Free Billie Allen" video on YouTube, and in it are claims that he is an innocent man and was not involved.

But Exhibit 643, there is a posting here, "My Story by Billie Allen."

"I was arrested and charged with robbing a bank where a security guard was killed.  Later I was tried, convicted, and sentenced to death."

A.    Okay.

Q.    "I'm not asking anyone to take my word that I'm telling the truth about my innocence, and I'm not saying that my case, or my life is more important than the next person."

The conversations to you in February of 1998 didn't claim that he was innocent, did he?

A.    Did the first two times I saw him.  At the end he did not say he was innocent.

Q.    And that's the one that you felt was, you finally were getting close to the truth, correct?

A.     Correct.  May I ask when these were posted?

Q.     They are --

       MS. CARLYLE:  I'm going to object in that I don't think there's been any foundation that the postings actually emanated from Mr. Allen.  They appear to be in the first person, but that, of course, doesn't prove that he wrote them.

       MR. HOLTSHOUSER:  Well, Judge, they -- I'm not sure there's any way to ever show that with respect to Internet postings.  But they certainly contain and end with his name, his registration number, his address in Terre Haute, Indiana.  That certainly is him -- I keep on locking the lock -- in the video, which we're not taking the opportunity to play at this time, but which is -- can be played for the Court.  And --

       MS. CARLYLE:  My objection is there has been no foundation laid to show that Mr. Allen was responsible for this posting or made the statements.

       THE COURT:  Okay.  I'll overrule it at this time and we can sort it out later.

BY MR. HOLTSHOUSER:

Q.     Would it be fair to say that communications like this are things that you would want to ask him about were you inquiring about his claims and the truthfulness of his statements, correct?

A.     As to his innocence or guilt or what?

Q.    Well, as to anything that he is saying in the first person concerning the case and concerning his involvement in the case and his role in it.

A.    I'd want corroboration.

Q.    Of what?

A.    What is going on, why he did it, who put it up.

Q.    Would you ask him, for example, is this from you?

A.    Yeah, I'd ask him if it is from you.

Q.    So it's information that at least you would want to consider, correct?

A.    Yes.  I think when you made it bigger, I thought I saw on there that it said the thread started in 2007.  Why did it start in 2007?  How did you get it posted from death row?  Yeah, there would be a series of questions.

Q.    Those are all good questions.  I wish I had the answers for you, Dr. Cuneo.

      Let me show you Exhibit 664.  This is at least something that indicates it was last updated in September of '09, and it's a posting, talking about the kind of person that he is, his personality, his passions, and what he's looking for.

      Would all these kinds of -- I mean, would it be safe to say when you're talking about trying to assess the person, since there now exists in the world something known as a social networking information, that is at least an extension

of one's personality, correct? What they do on the Internet --

MS. CARLYLE: Same objection. I make the same objection. It would be if it emanated from him. I don't think there's any evidence before the Court that it does.

THE COURT: Overruled.

Q. If it did emanate from him, it would be an extension of his personality, something that nowadays you would have to consider in -- it would be part of the data set that you would want to look at, correct?

A. I would like to know more information about it. Now, but about how he is --

Q. Wait, just so we're clear, is that yes to that question I asked?

A. No, I'm saying is this -- not as to whether he was abused, this is to his -- why am I looking at this now? Why am I looking at him now?

Q. We're not really solely focused, are you, on just the question of whether or not he was abused. Aren't we looking at the entire person if we're talking about mitigation? We're looking at in terms of what the impact is on his personality, whether or not he suffers from a mental disease or defect, correct?

A. But this occurs now -- I'm sorry.

MS. CARLYLE: I was going to object that in terms of

the fact that we're trying to assess here what Dr. Cuneo could have testified in the mitigation hearing that occurred in 1998, he clearly could not have had available to him the data that was -- has been posted on the Internet in 2009.

THE COURT:  Well, that's true.

MR. HOLTSHOUSER:  Judge, what we're looking at what Mr. Allen has to say in 2009, 2010, '11, and '12 about things that happened in '98, so that to the extent that he is making statements in the social networking environment about those things, my question to Dr. Cuneo is, would you not want to consider that along with the other information you have.

MS. CARLYLE:  And my objection is that it's irrelevant whether he'd want to consider that because in 1998 he could not have possibly considered that.

THE COURT:  Okay.  Wait.  I'm guessing it would be relevant as to whether or not he was truthful in his declarations and in his deposition and all of those other things.  So I'll overrule it.  Proceed.

A.    I'd probably have some questions on it.  Not -- there is a lot more other questions I'd like to have answered before I would ever delve into this.  But --

Q.    But you would agree at least that some of these statements, if they are currently emanating from him being made publicly are in direct contravention of claims he made to you in February of '98 when you pressed him for what you

believe is you were getting close to the truth, correct?

A.    Yeah.  But when I was with the Department of Mental Health, Chester, which is a max secure hospital, and I was -- I dealt with Menard, which is one of our max secure prisons, we used to have people all the time that had pen pals and they would say things.  Now, that was written.  This is on the Internet.

Q.    Here's the point I guess, Doctor.  Do you realize in today, in the current time frame, the modern time setting, Mr. Allen and his relatives are making claims about what happened to him in '98?  And that the veracity of those claims is at issue, correct?

          THE COURT:  Wait.

          MS. CARLYLE:  I object.  I don't think there's any evidence that Mr. Allen or his relatives are making claims. I think we have these postings on the Internet.  We don't know who posted them.  We don't know whether Billie Allen asked anyone to post them.

          THE COURT:  He's making claims in his Petition --

          MR. HOLTSHOUSER:  As well as the declarations and the other things that are before the --

          MS. CARLYLE:  I think I believe the question referred to claims on the Internet.

          THE COURT:  I don't understand that to be the question.  Rephrase.

BY MR. HOLTSHOUSER:

Q.    It wasn't.  The question is in today's --

MR. HOLTSHOUSER:  May I?  I'm sorry, Judge.

THE COURT:  No, that's all right.  Go ahead.

Q.    You understand that we're not in 1998, that there are now today in the current time frame witnesses are making statements today which are consistent or inconsistent with what they were saying back in 1998, correct?

A.    Yes.

Q.    And Mr. Allen is likewise making those same statements about things happening --

MR. HOLTSHOUSER:  I'm not sure who is representing who over here, but can we complete this examination?

MR. MORENO:  Yes.  I'm sorry.

MR. HOLTSHOUSER:  And I apologize, Judge, I should not refer to counsel directly like that.

THE COURT:  Here's what I'm thinking about.  My experience teaches me that any time we go for this length of time to try to complete something, it usually results in behavior that just is not bad, it just happens because people are tired, and they've been working hard all day.

What I'm wondering, just to interrupt the flow of things here a bit, what is your best estimate of how much longer you have?

MR. HOLTSHOUSER:  If I can -- I think I can get to

the finish if we can be allowed to get there without the repeated interruptions.  But they have a right to object, I understand that.  But I think we're close.

THE COURT:  Okay.  I mean, within an hour you think?

MR. HOLTSHOUSER:  Much less than an hour, Judge.

MS. CARLYLE:  And I do have some redirect.

THE COURT:  And then we have redirect.  Well, my intention is to proceed tonight until we finish.  The court reporter has agreed to stay.  And, Ryan, I'm not sure what your situation is.

MR. HOLTSHOUSER:  Judge, I think I can wrap up in less than half an hour.

BY MR. HOLTSHOUSER:

Q.    So let's go back to this question now.

A.    Okay.

Q.    One of the things that is -- you understand that one of the things before the Court is what to believe is true, correct?

A.    That's one of the things, yes.

Q.    And that we're dealing now with factual statements being asserted by people in 2009, '10, '11, and '12, in this current time period, post trial?

A.    Yes.

Q.    You with me so far?  Okay.  And that they are talking -- all these witnesses are talking about things that

happened before trial, correct?

A. Yes.

Q. Okay. Mr. Allen is one of those who is making -- as you saw in his deposition, is providing information about that, and including his mother and so forth, correct?

A. Yes.

Q. All right. The point that I'm asking you here is that he told you in February of '98 some information that indicated he clearly was involved in the robbery, just as he had told the police. But he admitted it to you as well in the close of your February '98 interview, correct?

A. That is correct.

Q. But in terms of what Mr. Allen is saying today, don't you at least have to consider the truthfulness of what he's also saying today about things that happened that related to the crime? In other words, if he's telling something that's not true about some things in '98, don't you have to consider that as well in the data set that we talked about?

A. I would consider it. I'd also like to know -- I mean, there's all kinds of -- you know, when you say --

Q. I understand that.

A. I mean, when was it posted? Who posted it?

Q. Correct.

A. But my major issue is, I would have wanted the time to do the evaluation then. If this -- if there had been an

issue of abuse, I would like to have looked at it in '98 to find out if there was an issue of abuse.  There might not have been, or at least in my opinion there might not have been.

Q.    And I understand that, too.  You understand --

A.    I didn't have time.

Q.    Right now we're doing a retrospective.  We're having to look back.  But right now in today's time frame, Mr. Allen is saying things about abuse, correct?

A.    That -- yes, he is.

Q.    Okay.  And if these emanate from him, he's also saying things in this same time frame which you know to be untrue, correct?

A.    He's saying things -- I don't know when they are posted.  If these postings were from him and they were posted --

Q.    Anywhere after trial.

A.    Any time after trial, I know those are incorrect.

Q.    And you would have to consider that, wouldn't you?

A.    I'd have to clearly look at the motivation, why is he doing it, if he did it, and does he lie in other areas.

Q.    I asked you this question earlier about repeated -- the effect of repeated questioning.  This is the last page of Juanita Allen's declaration.  And did you ever read this?

A.    Yes.

Q.   Okay.  And what I want to particularly ask you about, the closing sentences here.  "As I said, it's hard for me to discuss these topics.  I only came to do so with Billie's current lawyers after spending many hours over many days with them.  Billie's current lawyers have also asked me a lot of different types of questions which have helped me to understand what information would be important to help Billie's case."

When you read that, did that raise any concerns in your mind as far as the veracity of what Mrs. Allen was saying?

A.   My guess is Juanita Allen didn't write that, that somebody wrote it --

Q.   That wasn't my question.  She signed it just like you signed yours --

A.   Sure did.

Q.   -- under oath and penalties of perjury?

A.   Sure did.  And --

Q.   And why do you -- well, just stop you right through.  Why do you think she didn't write that?  What do you know about who wrote this?  Are you just speculating?

A.   Speculating looking at the style of this, looking at the style of what was written for mine.

Q.   We're not asking you to do that.

A.   What I'm seeing here, if somebody would say that to me,

what I would wonder about, I'd probably take it into question.  Then I'd look at whether they can remember specifics.  I like specific examples.  And I'd want to see if it was consistent.  And then I'd again go back to your thing and look at motivation, prior inconsistencies, corroboration.

Q.   Do you see how many times there the word "many" is emphasized?  Many hours, many days, many meetings.  And you indicated earlier that repeated questioning about the same issue can send subtle cues of how the information would be -- would help Billie's legal case, correct?

A.   It could.  But then sometimes also when you deal with people who have been abused or if you deal with rape victims, people who have undergone trauma -- and I'm not saying she had undergone trauma, but painful issues, they don't launch into after the first time because they don't feel comfortable talking to you.

Q.   Now, you talked earlier about wanting independent --

THE COURT:  Excuse me.  I'm sorry to interrupt.  I have the page number, but just remind us, what is that?

MR. HOLTSHOUSER:  That was page 5 of Exhibit 250 --

THE COURT:  What's the exhibit number?

MR. HOLTSHOUSER:  258, page 5.

THE COURT:  All right.

MR. HOLTSHOUSER:  And 258 is --

THE COURT:  All right.

Q.    Are you aware, even as you speak, of any hotline information of anyone calling in a child abuse complaint about Billie Allen?

A.    No, I am not.

Q.    Are you aware of any report by a teacher, coach, counselor, physician, or other independent source of any suspicion of child abuse?

A.    No, I am not.

Q.    Are you aware of any photograph or other documentary evidence of a bruise, a cut, a scratch, a welt, a mark?

A.    No, I am not.

Q.    Do you know who Dr. Grabau was?

A.    Well, that name sounds familiar, but I can't --

Q.    Let me show you Exhibit 106.  These were introduced at the trial.  These are pages of health records for Billie Allen from St. Louis Children's Hospital.  And they go on for many pages.  I'm not going to show you every page.

A.    Okay.

Q.    But these records -- assume that these records show that Mr. Allen was seen by the same pediatrician, a Dr. Grabau, through at least age eight.

A.    Okay.

Q.    And that there's no notation in any of these records about any unexplained marks, bruises, scarring, et cetera. Given the type of abuse that's been suggested to you that has

occurred, would you expect that a pediatrician who is regularly seeing Mr. Allen for treatment might have noticed things like marks, scars, welts that could be produced by an extension cord, a belt, a shoe, a fist to the face?

A.   If he was seen -- I don't have the dates that he was -- I don't know the dates, and I'm not asking you to show me every one.  If he was seen on a regular basis by this pediatrician until he was eight years old, and -- and this is the big "and" -- and he was given a physical where you would have -- where you would have seen bruises, it should have been noted in his file.

Q.   Would the absence of such notation suggest to you that if he was seeing him, that there wasn't such abuse?

A.   Either that or I would wonder about the competence of the individual.

Q.   There was no mention of any abuse made to Dr. Wuertz when he saw him in February of '97, was there?

A.   No, but that was -- he was going -- didn't he just go into an ER room and --

Q.   Well, he went in enough to say that there's things, stressors that have been bothering me.  Among the stressors that he complained of, one of the them was not the way my mom's treated me all my life, was it?

A.   No.

Q.   And this business of being kicked out of the house for

days at a time from a young age to live on the streets?

A.    Uh-huh.

Q.    Ask you to assume that at least before he got to Sumner, that his attendance records in school were fairly good.  So explain to me how that works.  How is he getting to school every day if he's been kicked out of the house for extensive periods of time beginning at age four to six?

A.    I'd have to know where he went.  If he went -- so he would have had to go somewhere four to six.  Did he go to a cousin's house?  Did he go to his uncle's house?  That I don't know.

Q.    The question is, how did he get to school?  How did he get to Clayton School District?

A.    That would have been deseg.

Q.    How did he get on the voluntary transfer bus?

A.    Yeah, that's a deseg.

Q.    Yeah.

A.    I don't know.

Q.    I don't either.

A.    But I would have to look at his attendance records. I'm sure I have them somewhere.  I don't have them with me.

Q.    Well, I know I didn't want to go through with you, but I ask you to assume that before he got to Sumner, his attendance in school was fairly good.

A.    Okay.

Q.   Once he got to Sumner, way down.

A.   I can assume that, but I don't know if that's the facts.

Q.   Would that be, though, the kind of thing that if he's actually consistent with attending school through let's say seventh or eighth grade be documentary, independent evidence? That you wouldn't assume that the people who are taking attendance at school have any motivation to make things up, correct?

A.   No, they would not.

Q.   That's relatively trustworthy?

A.   They would not.

Q.   Would that at least be evidence to indicate to you that any claims concerning being kicked out of the house and living on the streets and so forth, he's either limited to the summer months or it's exaggerated or it's untrue?

A.   Especially since it was at Clayton, yes.

Q.   Okay.  And if someone had to spend the night outside on a bare concrete porch in the dead of winter without any warmth, wouldn't that potentially lead to hypothermia?

A.   It could.

Q.   Do you have any report of Mr. Allen suffering hypothermia?

A.   No.

Q.   Do you have any reports that he's lost any toes or

fingers as a result of hypothermia?

A.    No.

Q.    I want to ask you to assume some facts here.  First, in March of '97, Mr. Allen needed money to live on his own, move in with a girlfriend, and buy things he wanted and did not have.  Drug dealing was no longer a good option because of what had happened at his mother's house.  Work was not an option because he couldn't find a job that he thought was good enough for him, and he really didn't want to work.  That's first.

A.    I'm sorry, could you tell me the date I'm assuming this is?

Q.    March '97.

A.    Okay.

Q.    That with Norris Holder, after repeatedly watching the movie "Set It Off" for inspiration, he and Norris prepared to rob the Lindell Bank & Trust, guns, ammunition, clothing, disguises, and vehicles were acquired to use in the effort.

The bank was cased inside.  And Mr. Allen knew that there was an armed guard.  On March 17th, Mr. Allen and Norris Holder arrived at the bank in a van that had been previously soaked with gas, and other cars had been stashed nearby for getaways.  Both were heavily armed, and there was a shotgun in the van.

They entered the bank.  Mr. Allen shot Richard

Heflin, the security guard numerous times before he could draw his gun and continued to shoot him while he lay dying on the ground.  Mr. Holder jumped over the counter, got the money, and some time during the robbery, Mr. Allen and Mr. Holder communicated with each other about the passage of seconds, how many seconds had expired since they entered the bank.

They exited, got in the van, and drove away through Forest Park.  The van caught on fire and crashed.  Mr. Allen got away, but suffered some burns in the crash.  But he convinced two people in the park to drive him to the Metrolink.  From Metrolink he got to Northwest Plaza where he went shopping.  Called a girlfriend, bought that girlfriend's child a gift and delivered it.  He also stopped by Tasha Valentine's home and gave her some money to rent a moving truck.

And he stayed that night with two other girls on Oregon in St. Louis, watched the news about his robbery, and went to sleep.

And then the next day he was arrested and confessed to the police.

Now, do you remember at trial that you told the jury how a person with chronic PTSD resulting from witnessing a violent event, you would expect them to react during a second violent and traumatic event?

A.    Correct.

Q.    Do you remember what you said at trial?

A.    I'm guessing that I said that it would have been traumatic for him.

Q.    Specifically you said that you would have expected him to be panicky, impaired judgment, not thinking clearly, not calm, and you would expect impaired functioning.

A.    Correct.  That sounds correct.

Q.    Okay.  And here you would agree, would you not, that participating in a bank robbery where an armed guard was present, presented a risk of being shot at, correct?  At least the risk of being shot at by the guard?

A.    Correct.

Q.    That's the guard's job.  But that killing another person violently is itself a violent and traumatic event?

A.    Correct.

Q.    Fiery crash in a vehicle is a traumatic event?

A.    Yes.

Q.    Did you ever ask Mr. Allen how he was feeling before, during, or after this crime?

A.    Yes.  But the first two times I asked him, he told me he didn't do it.

Q.    Okay.  The second time he told you he was involved.  But did you ask him how he was feeling during it, getting ready for it, and the anticipation of the event, the

perpetration of the event, and then the events that happened afterwards, some of which were unexpected.  Certainly the crash wasn't expected?

A.    No, not that I recall specifically.

Q.    So even though you would expect a person with chronic PTSD to be behaving in a particular way following and experiencing these kinds of events, and by that time you believed he had experienced these events, correct?  You thought he was there, you thought he was involved?

A.    Correct.

Q.    You didn't ask him how he was feeling as a way of perhaps verifying or firming up the diagnosis?

A.    No.  I believes he has PTSD.

Q.    Do you think that any comprehensive, complete evaluation of his mental health could occur without a complete exploration of the circumstances and his state of mind before, during, and after this event?

A.    As to his competency, yes.  As to mitigation, I don't think I had enough time.  Because primarily what I was doing on mitigation was firming up a diagnosis of PTSD.  I think I had enough diagnosis -- I had enough information.  My opinion, he has Post Traumatic Stress Disorder.

Q.    But you weren't interested in looking at information -- because you said, well, if someone has it, I would expect them to react this way when experiencing this event.  You

didn't try and test the validity of your diagnosis to see whether or not you were correct by inquiring, how did you feel before, during, and after this event?

A.    No, I did not.

Q.    Do you think that you should have?

A.    No.

Q.    You think you could evaluate Mr. Allen in 2012, and be able to form a reliable diagnosis as to his mental health in 1997?  Tall order?

A.    It would be a tall order.  You're talking 14 years --

Q.    Yes, sir.

A.    -- subsequent.

Q.    Yes, sir.

A.    I mean, I'm not telling you it can't be done.  You would -- it would be much more difficult to do it now than it was -- if I had done it in 1998.

        MR. HOLTSHOUSER:  That's all the questions I have, Judge.

        THE COURT:  All right.  Do you need a brief recess before you inquire?

        MS. CARLYLE:  Yeah, I guess I do.

        THE COURT:  We'll be in recess a few minutes.

        (Court in he recess at 5:10 p.m. until 5:15 p.m.)

                    REDIRECT EXAMINATION

BY MS. CARLYLE:

Q. Hello, Dr. Cuneo.

A. Good evening.

Q. Good evening. I'm just going -- I'm going to try to go over a few issues that came up this afternoon that I think -- and yesterday that I think maybe need some clarification.

MS. CARLYLE: Am I alive here? If I put a number in, will something come up?

MS. COSTANTIN: You should be.

Q. Dr. Cuneo, I'm showing you Exhibit 124-A, which is the statement of Martha Burns, the mother of Mr. Allen's girlfriend. And I'd call your attention to the -- I didn't tighten this up particularly well, but I'd call your attention to the middle two paragraphs of what you see there.

A. Starting with "Well for --"

Q. "Well, for like a day or so."

A. And then, "I saw the pills," as it ends.

Q. Yes. So I believe you mentioned during your trial testimony, did you not, information from the mother of his girlfriend?

A. Yes.

Q. Okay. And is that information you had that suggested he had, in fact, tried to commit suicide?

A. Yes.

Q. You've been asked about a number of letters that

Mr. Allen wrote to his mother, and also to his -- to the judge in his case. First of all, with respect to the letters to his mother, Mr. Allen was in jail when he wrote those letters, was he not?

A.    I don't want to have a misconception. I'm not saying I ever saw this. I talked to, I thought it was the mother on this.

Q.    You talked to Mrs. Burns?

A.    I thought -- maybe I --

Q.    I think you talked about talking to Mrs. Taylor who is Marquis --

A.    Okay. I talked to Mrs. Taylor, yes. I'm sorry.

Q.    As I think I've said, you've been shown a letter that he wrote to the judge and also some letters that he wrote to his mother while he was in jail, correct?

A.    That is correct.

Q.    Now, with respect to letters that he wrote in jail, he really didn't have any expectation that those were private, did he?

A.    Well --

MR. HOLTSHOUSER: I'm going to object whether he can answer what his expectations were. It calls for Dr. Cuneo testifying as to what his expectations were in jail.

THE COURT: Well, here's the problem as I see it. There was one, which he thought was being -- was privileged,

and not being -- could not be seen, and turns out it was.

Do you know, are you familiar with jail standards sufficiently to answer the question based on your own knowledge?

A.    I know that -- you know -- I guess I'm at a jail every day.  I'm fairly familiar with jail procedures.  Most letters going in and out are opened and read and then resealed.

Q.    Okay.

A.    As are prisons.

Q.    And the letters that he wrote all talked about how good his family was.  He was telling his mother how sweet she was, and he was telling the judge what a good family he had?

A.    Correct.

Q.    Now, while that is inconsistent, and you said it was, with statements "I was abused by my mother every day," do those letters by themselves cause you to conclude that he could not have been abused?

A.    No, it -- he could very well -- many times I have individuals that have been abused that always want to get back with their abuser.

Q.    Now, in connection with a competency evaluation, you testified that you have to make a diagnosis, correct?

A.    That is correct.

Q.    In making --

A.    Well -- I'm sorry.  You have -- if there is a

diagnosis, you have to make a diagnosis. Your first job or your first role is to find out if the individual has a mental illness. They may not. But if they have a mental illness, then your next role is to see if it substantially impairs their ability to understand the nature and purpose and proceedings against them, assist in the proceedings against them.

Q.    But when you're giving psychological testing -- mitigation testimony at a death penalty trial, you don't have to have a diagnosis, do you?

A.    It's my understanding you don't.

Q.    Okay. And you've heard some statements by Mr. Allen that when he was younger he saw the violence in his life as normal?

A.    That is correct.

Q.    Does a child have to realize he's being abused to be negatively impacted by abuse?

A.    No, that's what's so hard about a cycle of abuse, because people end up believing that it is normal. And, therefore, what ends up happening is it goes on and on, and it goes from generation to generation. We talk about cultures. We talk about a cycle of violence.

        And that's why as we mentioned earlier, in 2000 Janet Reno -- pardon me, in 1999 Janet Reno had the "Safe from the Start" summit, and then each state was in turn in

2000 instructed, come up with a program, because violence in kids is killing us and killing our generation.

Q.    What Doctor -- what Mr. Allen told Dr. Yutzy was that after he, after Marquis Taylor died, he stopped playing basketball, he stopped rapping, he stopped doing various activities, and the only thing he did was drink.  Do you remember that?

A.    Correct.

Q.    Is that inconsistent with Johnnie Grant saying what they used to do together was go out and drink?

A.    No.

Q.    Do substance abuse and suffering from PTSD feed into each other?

A.    Yes, you have -- you have three issues that pretty much go hand in hand.  You have -- you would have trauma, substance abuse, and mental illness.  And the three of them kind of form a circle.  Many times people end up self-medicating.

Q.    Now, we've spent a lot of time on the age when Mr. Allen was first locked out of his house.  I know you said you recalled that it was about six.  If I were to tell you that his mother and sister and his friend Johnnie Grant testified that it was more like 10 to 12, would that refresh your recollection?

A.    That may be correct.  I can't give an exact age.  I

know it was when he was a young child.

Q.    Okay.  And if it were 10 to 12 rather than six to eight, would it still be abusive in your opinion?

A.    It still would be abusive.  You can't lock out a child.

Q.    Okay.  Let's take a look at your report one more time.

THE COURT:  What's that number?  What's that number?

MS. CARLYLE:  This is Exhibit 565 is the one I'm looking at.

Q.    And your report was made on February 16th; is that correct?

A.    That is correct.

Q.    Now, on February 16th, you said, "Two weeks ago I was also asked to look at possible mitigation factors."  Correct?

A.    Correct.

Q.    And does that coincide with your conversation that you had with Dr. Randall on February 1st?

A.    It would.

Q.    Okay.

A.    I can't tell you if it was the last week in January or February 1st.  But by February 1st, I knew I was involved.

Q.    Okay.  But on February 16th, 1998, you said it was two weeks ago?

A.    Okay.  So that would have been February 1st, February 2nd.

Q.    I mean, your memory of when it was I hope better then

than it is now, true?

MR. HOLTSHOUSER:  Judge, I'm going to object to leading.  Not proper redirect.

THE COURT:  Sustained.

Q.   Well, we're talking about the report.  Does the term "social history" have a technical meaning for you?

A.   Yes.

Q.   What is it?

A.   What it does is it gives me information about an individual's life.  Usually a social history is done -- I used to run a hospital, and we would employ social workers, and they would take a social history of all of our patients.  They would contact parents, relatives, siblings, to get information and feed it back.  They'd send out letters.  We'd get the information back, and they would give me a report.

Q.   So does your report contain a social history?

A.   Not especially.  What it does is give some historical aspects, but there's no social history in there.

Q.   Okay.  And you were asked, I think, whether your report contained -- was based on what Dr. Stewart -- on the information in Dr. Stewart's report.  And I think you said that it wasn't.  But let me ask you specifically --

MS. CARLYLE:  I just put in 536, and it said unable to locate file.

MR. HOLTSHOUSER:  What number?

MS. CARLYLE: 536. You have to exit?

MR. HOLTSHOUSER: Were you getting anything?

MS. CARLYLE: That's what I was getting.

MR. HOLTSHOUSER: Do you have a page?

MS. CARLYLE: Well, we'll start with the first page.

BY MS. CARLYLE:

Q. And this is Brady Toliver's deposition, is it not?

A. Yes, it is.

Q. And you've had a chance to review it, have you not?

A. Yes, I have.

Q. Now I'm directing your attention to page 19.

MR. HOLTSHOUSER: .19.

MS. CARLYLE: Back up? 536.19. Just when I'm done, I'll figure out how to do this.

Q. And what I want to turn your attention to particularly is evidence that people other than Mrs. Allen abused Billie Allen. I think I probably need to go back. You see here Mr. Allen is saying that he's witnessed Jerome --

A. His uncle.

Q. -- his uncle strike him on the rear end? And you're also indicating that he saw Jerome strike him with an open hand or a belt?

A. Yes.

Q. Let's take a look at Exhibit 528, and that's the exhibit -- that's the deposition of Billy Wayne Allen, which

I think you said you reviewed, correct?

A.    Yes, that one I did review.  That's 40 some odd pages I believe.

Q.    Now, turning to page 42 of that exhibit.

MR. HOLTSHOUSER:  Judge, I think I'm going to have to object.  No. 1, I think this is beyond the scope.  And No. 2, these witnesses haven't testified yet.  And No. 3, I'm not sure that he's testified that he's reviewed these before his testimony.

THE COURT:  He said he'd seen Billy Wayne's, but he said he hadn't the 400 pager.

MR. HOLTSHOUSER:  Declaration or --

THE COURT:  I'll overrule it.  I'll see what it says.

BY MS. CARLYLE:

Q.    Did Billy Wayne indicate in his deposition that he had heard of Billie Jerome Allen's father physically abusing him?

A.    He said he heard it.

Q.    I'm showing you Exhibit 527, the deposition of Claude McLemore.  Have you had a chance to review that?

A.    Yes.

MS. CARLYLE:  Something went wrong here.  Oh, 27.

Q.    Did Mr. McLemore talk about Mr. Allen's being disciplined with a belt by his grandfather?

A.    Yes.

Q.   So you had evidence other than what Dr. Stewart said that people other than Juanita Allen physically abused Billie Allen, didn't you?

A.   Yes.

Q.   Calling your attention to your testimony, in which you said that you had spoken with Juanita Allen?

A.   Yes.

Q.   Now, you didn't -- Mr. Holtshouser made a point of the fact that you didn't describe that interview as brief.  And you didn't, did you?

A.   No, I did not.

Q.   You didn't describe it as extensive either?

A.   No, I did not.

Q.   Was it brief?

A.   It was 25 minutes, 20 to 25 minutes.

Q.   Do you consider that brief?

A.   Yes.  But it depends on the information you are seeking.  At that point I was seeking information to confirm a Post Traumatic Stress Disorder.  Then it wouldn't have been brief.  If I wanted a history, that's brief.

Q.   Now, during Mr. Allen's trial, the government had access to all of your notes, correct?

A.   That's correct.

MR. HOLTSHOUSER:  Judge, I'm going to object to that.  That's clearly a misstatement of the record.  As the

record says in great detail, we did not have his notes, and that there was a fight over the notes.

MS. CARLYLE: You got them at trial.

MR. HOLTSHOUSER: There were some notes held back. We might have been allowed to look at them, but we never received them. I think that is a clear misrepresentation of the evidence.

THE COURT: That is true, they were -- the fact is, as I recall, the government did not know about the second examination. And there is an extensive record that they were produced, and some of them I ordered redacted. So you're both right. The government didn't know about them, the government did finally get to see them. Overruled. Proceed.

BY MS. CARLYLE:

Q.    But the record at trial clearly reflects that you saw Billie Allen twice?

A.    That is correct.

Q.    One of the things that was discussed I think on Friday was whether some particular conduct was abuse or was normal discipline, so I'd like to clarify that a little if I can. Is hitting a child with an extension cord abusive?

A.    Yes.

Q.    What about throwing shoes at him?

A.    Yes.

Q.    Punching him in the face with a closed fist?

A.    Clearly, yes.

Q.    Punching him until he gets a nose bleed?

A.    Yes.

Q.    Punching him until he can't breathe?

A.    Yes.

Q.    Beating him with a wooden paddle?

A.    Yes.

Q.    Hitting him for no reason at all?

A.    Yes.

Q.    Is the fact that a child is struck while the parent is intoxicated or out of control relevant to whether the punishment is abusive?

A.    Yes.

Q.    And how is that relevant?

A.    Because then it becomes -- what happens is they end up hitting a child many times harder.  It becomes much more unpredictable.  You start to teach the kid -- you're starting to teach the child the trigger could be alcohol, that fearing every time the parent drinks.  That can be much more abuse.

Q.    If you had known in 1998 that Raymond Petty had told Billie's lawyers that he pulled Juanita off of Billie Allen when she was hitting him, would you have confronted Billie Allen with that information?

A.    I would have gotten more information.  I would have tried to go back to talk to Billie.  Because, remember, to

get in to see Billie then, Mr. Allen, I always had to have a court order.  It's not like the St. Clair County Jail where I just go over and see him.  But I would have got a court order.  But more than that, I would have looked for more information.

Q.    Okay.  But, in fact, in your interactions with Mr. Allen, you, in fact, did confront him with inconsistencies between what you were telling him and what you knew?

A.    Correct.

Q.    Can you give us an example?

A.    The one we just talked about, on the offense itself, we confronted on that.  We confronted on the school grades. There were times when I had previous information where we said, we confronted on the $500 a day on -- at being a rap star with his producer -- pardon me, $500 a week.  I mean, we --

        MS. CARLYLE:  Can I have just a minute?

        (There was a conference held off the record.)

BY MS. CARLYLE:

Q.    Let's look at your report one more time.  I want to draw your attention to the last few sentences of the last full paragraph on this page.  What did you tell the Court about your mitigation assessment?

A.    That he had Post Traumatic Stress Disorder.

Q.    What did you tell the Court about your activities in completing this report and your -- the status of your assessment of mitigation factors?

A.    I said I hadn't finished the assessment and would still be working on receiving additional information.  Therefore, the report will primarily deal with Mr. Allen's competency.

Q.    So you didn't represent to the Court that the report you submitted on February 16th contained all the information you were going to consider, did you?

A.    No.

Q.    Mr. Holtshouser asked you on Friday about some notes from Mr. Simon about a conversation that occurred on February 23rd.  What I'd like to do is show you the original notes on that.  I'm going to show you Exhibit 499, page 21.  Now, keeping in mind that Mr. Simon's handwriting is relatively difficult to read, can you tell me what's on the top line there?

A.    It says, "February 23rd, 1998."  It looks likes "Holtshouser."

Q.    Okay.

A.    "Cuneo" -- and I can't tell what that is.

Q.    So, I mean, and Mr. Simon says it's "Cuneo RPT."  Would you say that that page of notes referenced a conversation with Mr. Holtshouser?

A.    It may have.  I don't know.

Q.   Would you conclude just from looking at it that it represented a conversation with you?

A.   Or he was talking to Mr. Holtshouser about my report.

Q.   Okay.  But you don't have a record in your -- strike that.  Now, you mentioned, I think, that you don't normally bill for -- for telephone calls --

A.   No.

Q.   -- in these cases.  If you had, say, a 45-minute conference call, would you bill for that?

A.   Maybe not.

Q.   Okay.

A.   Sometimes I have.  Usually, no.

Q.   Do you recall any long phone conferences that you had in this case?

     MR. HOLTSHOUSER:  I'm going to object unless we have some definition what "long" is.

     MS. CARLYLE:  I'll withdraw the question.  I'll withdraw the question and ask this question.

Q.   Do you think you had enough time in this case to do a good job for Billie Allen?

A.   I thought I --

     MR. HOLTSHOUSER:  I'm going to object to the relevance.  The question, I think it's beyond the scope.  I don't think there's any way he can express an opinion about that.

THE COURT:  He's mentioned at least 25 times in his testimony that he didn't have enough time.  So overruled. I'll hear it.

MR. HOLTSHOUSER:  Well, I guess I'm going to object to using "good job."  He's not capable of any definition or -- I mean, I don't understand the question, so I'm not sure how Dr. Cuneo can.

MS. CARLYLE:  I can rephrase.

THE COURT:  All right.

BY MS. CARLYLE:

Q.    Do you think that you had enough time to do the job that you wanted to do for Billie Allen?

A.    I think I --

Q.    You would have wanted to do?

A.    I think I had enough time -- I clearly had enough time to do a competency evaluation.  I don't feel whether it be nine days before a trial starts or two weeks before a trial starts on a death penalty, you have enough time to do mitigation.

MS. CARLYLE:  Thank you.  I don't have any further questions.

THE COURT:  You are excused, sir.  Thank you.  You may step down.

THE WITNESS:  Oh, I'm getting off here?

THE COURT:  Yeah, you better get out of here before

somebody changes their mind.

THE WITNESS:  Yeah, I was worried there was going to be a redirect.

MR. HOLTSHOUSER:  I have questions, but I don't think the Judge is going to allow anymore cross.

THE WITNESS:  May I leave, Your Honor?

THE COURT:  Yes, sir.  Okay.  8:30 tomorrow morning.

(Court in recess at 5:45 p.m.)

C E R T I F I C A T E

I, Susan R. Moran, Registered Merit Reporter, in and for the United States District Court for the Eastern District of Missouri, do hereby certify that I was present at and reported in machine shorthand the proceedings in the above-mentioned court; and that the foregoing transcript is a true, correct, and complete transcript of my stenographic notes.

I further certify that I am not attorney for, nor employed by, nor related to any of the parties or attorneys in this action, nor financially interested in the action.

I further certify that this transcript contains pages 1 - 264 and that this reporter takes no responsibility for missing or damaged pages of this transcript when same transcript is copied by any party other than this reporter.

IN WITNESS WHEREOF, I have hereunto set my hand at St. Louis, Missouri, this 28th day of February, 2013.

_____
/s/ Susan R. Moran
Registered Merit Reporter