UNITED STATES OF AMERICA
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

BILLIE JEROME ALLEN,                    )
                                        )
            Petitioner,                 )
                                        )
      vs.                               )   No. 4:07-CV-27 ERW
                                        )
UNITED STATES OF AMERICA,               )
                                        )
            Respondent.                 )


TRANSCRIPT OF EVIDENTIARY HEARING

BEFORE THE HONORABLE E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE

December 4, 2012
Volume XIII-B

APPEARANCES:

For Petitioner:       Ms. Elizabeth U. Carlyle
                      P.O. Box 30418
                      Kansas City, MO  64112

                      Mr. Eric John Montroy
                      Mr. James Henry Moreno
                      Mr. Timothy Kane
                      FEDERAL COMMUNITY DEFENDER OFFICE
                      The Curtis Center, Suite 545 West
                      Philadelphia, PA  19106

For Respondent:       Mr. Steven E. Holtshouser
                      Ms. Carrie Costantin
                      OFFICE OF U.S. ATTORNEY
                      111 S. 10th Street, 20th Floor
                      St. Louis, MO  63102


REPORTED BY:          SUSAN R. MORAN, RMR, FCRR
                      Official Court Reporter
                      111 South 10th Street
                      St. Louis, MO  63102
                      (314) 244-7983

I N D E X

Direct   Cross   Redirect   Recross

PETITIONER'S WITNESSES

DANIEL MARTELL
    (By Mr. Holtshouser)              3 (Cont'd)
    (By Mr. Moreno)                         82

(The following proceedings were held in open court on December 4, 2012 at 2:58 p.m.:)

CROSS-EXAMINATION (Cont'd)

BY MR. HOLTSHOUSER:

Q.    Dr. Martell, we eliminated the Stroop from your plus -- for memory impairment plus, and we're going to go on to the FAS.  And this is test of verbal fluency; is that correct?

A.    Yes.

Q.    And there also is something known that there is an element of perseveration in this as well.  This test that you gave actually has two components, and it's part of what it's known as the COWAT, C-O-W-A-T?

A.    Yes.

Q.    And one part is the FAS, and the other part is the animals test?

A.    Animal Naming.

Q.    Animal Naming Test, okay.  You reported the results of the FAS and concluded he was mildly impaired, correct?

A.    Yes.

Q.    Now, this -- which meant that he was in the zero to one standard deviation below the mean?

A.    That's right.

Q.    Let me show you Exhibit 570, page 14.  Is this at the top, FAS?

A.    That's correct.

Q.    And then over here is the Animal Naming part of the test, correct?

A.    That's correct.

Q.    And so you end up with a score of 29, correct, on the FAS?

A.    Yes.

Q.    That's because we go down here, we have 11, seven, and 11, equals 29?

A.    Yes.

Q.    Your math there was correct?

A.    This time.

Q.    And then there's two examples of perseveration listed there for the FAS?

A.    That's right.

Q.    So what's he supposed to do on this test, the FAS?

A.    He's supposed to say as many words as he can think of that begin with the target letter.

Q.    A, F, and S?

A.    That's correct.

Q.    So he got 11 words that he could think of after 15 seconds, 30 seconds, 45 seconds, and 60 seconds that begin with F?

A.    Yes.

Q.    And then A, perseveration meant that he said the same word twice?

A.    That's correct.

Q.    So he said the word "after" twice, and that constituted an example of perseveration?

A.    Yes.

Q.    So he could think of seven words that begin with the letter A in the 60 seconds?

A.    That's correct.

Q.    And then he could think of 11 words that begin with an S in 60 seconds on the third try, and one of those was a perseveration because he said "should" twice, right?

A.    Correct.

Q.    And on the animals, is he just supposed to name as many animals as he can think of?

A.    That's correct.

Q.    In 60 seconds?

A.    Yes.

Q.    And he could name 18, and he named one animal twice?

A.    That's right.

Q.    Now, you reported your results of giving the Animal Naming Test, didn't you?  I mean, you gave him that test, in other words?

A.    Yes.

Q.    And did you report the results of that test anywhere in your report?

A.    I don't think so.

Q.    Did you score it?

A.    I did.

Q.    Let me go back to your work papers.  That's a different test there, correct?

A.    That's a different test.

Q.    So is there anywhere in your data where you separately scored these tests, these results?

A.    Apparently not.

Q.    Okay.

A.    I may have just looked the numbers up on a table.

Q.    And the table that you're referring to, did you use the '91/'92 Heaton norms, which I'm showing you Exhibit 558, in order to come up with an appropriate score for this test?

A.    I believe I did.

Q.    And if I go to Appendix C.  Do you remember which page of Appendix C the FAS is on?

A.    It may not be in the Heaton norms.  I may have used Lezak's norms.  Yeah, it's not there.

Q.    Okay.

A.    I think it's in the newer version, but not in the old version.

Q.    Now, the newer version has a copyright of 2004, correct?

A.    Yes.

Q.    So these didn't exist in 1998, did they?

A.    They did not.

Q.    There we go.  And I'm showing you Exhibit 559.  Using these norms, a score of 29, raw score, translates to a scale score of eight; is that correct?

A.    Yes.

Q.    And it also has a section for the animals, a score of 18 on the animals, is a scale score of nine, correct?

A.    Yes.

Q.    And then we need to go to the next one, Appendix E, in order to come up with the T-score, and then determine how many standard deviations there are, correct?

A.    Well, I've got a problem here.

Q.    What's the problem?

A.    These are the African American norms, and they are really not appropriate for use in a capital case.

Q.    And who says so?

A.    Heaton, the author of the norms.

Q.    Okay.  And it matters what kind of a case you're using it in, how you evaluate these results?

A.    He specifically says not in capital.

Q.    And does he say why?

A.    Because of the issues we discussed earlier today, that the race norms will find someone not to be impaired when they really are impaired.  And because of the uncertainty about the norms and their propriety, they shouldn't be used in

high-stake situations like capital litigation.

Q.   Isn't it actually the other way around, that the norms might find them to be unimpaired as compared to their peers, where as compared to the general population, they might appear more impaired?

A.   I think that's the same thing.

Q.   It's the opposite, though.

A.   It would show a person not to be impaired if he was, in fact, impaired.

Q.   What does the normative data have to do with the type of case?

A.   The problem is that there's a concern that simply the fact of being African American is confounded with other societal variables that make the data not usable, biased in a way -- in the same way that you can't use, you know, separate race considerations in public benefits.

Q.   But it's okay to use sex variations, age variations?

A.   Yes.

Q.   Okay.

A.   Those have been shown to be valid.  So the current --

Q.   So in terms of --

A.   I'm sorry.

Q.   In terms of what the tests show, the results show with respect to the comparison against the norms, the norms are relatively blind to the nature of the proceeding, aren't

they?

A. Yes, but the norms are bad norms.

Q. What's bad about them?

A. They are bad because they make mistakes. They are culturally biased, and they don't give African Americans a fair shake.

Q. All right. And the recent -- what norms do you use then?

A. You go back to the blended norms that have the black folks and the white folks and everybody put together into one set.

Q. And how far back do you have to go to find those?

A. Those are the -- it's actually the same data. All they did for the second book was disaggregate the African Americans from everybody else.

Q. Okay.

A. So --

Q. Let me ask you a question about --

A. -- you go back to the first book.

MR. MORENO: Can I ask that he be allowed to finish his answer?

THE COURT: Sustained.

BY MR. HOLTSHOUSER:

Q. Let me ask you questions about this data, what your test results show according to this data --

A.      Sure.

Q.      -- in the compendium, correct?

A.      Okay.

Q.      You if you had a scale score we said on the FAS of eight, --

A.      Yes.

Q.      -- compared to his peers, which includes African American peers, he is a T-score of 47, correct?

A.      Yes.

Q.      Which is only .3 below the mean amongst his peers, which makes him normal compared to his peers, correct?

A.      It would.

Q.      You found, though, according to the norms that you used that he was a T-score of 41, correct, a scale score of seven and a T-score of 41?

A.      I don't recall.

Q.      Well, on what basis did you determine that he was mildly impaired, that he was more than one standard deviation off the mean?

A.      Well, if he scored a 41 would not be mildly impaired.

Q.      Okay.

A.      It would be at the very bottom end of normal.

Q.      So the question I have is on what basis did you reach a conclusion in your report at page 32 that he was mildly impaired on the FAS?  Because I can't figure it out.

A.    I think I used the Lezak norms, which were the norms that existed prior to the second iteration of the Heaton norms.

Q.    And how old are those?

A.    I don't know.  They were in existence at the time of trial.  They would have been contemporary at the time of trial.

Q.    On the animals, if you had a T-score or a scale score of nine --

THE COURT:  Wait a minute, let me catch up.  Okay. Go ahead.

Q.    On the animals part of this test, with the scale score of nine, his T-score on this data would show him at a 49, point one below the mean, again, in the normal range, correct?

A.    Yes.

Q.    So the statistics are -- the statistics themselves are what they are, correct?

A.    Well, his test performance is what it is.

Q.    Well, the statistics, though, themselves are neutral as to the nature of the proceeding in which the information is presented?

A.    They don't know anything about the proceeding, but the author of the statistics says, don't use them in a capital case, they are not reliable, they are not *Daubert* worthy.

Q.    And when you say *Daubert* worthy or reliable, he just says that there are societal issues, that they may be controversial?

A.    I think it's stronger language than that.  That, you know, they had a meta-conference on race norms in neuropsychology in serving minority populations, and one of the issues was the development of these norms and problems with these norms.  And recommendations came out of that that were published specifically saying you should not be using these norms in capital litigation.

Q.    And who was it that made that decision?

A.    Dr. Heaton, the author of the norms.

Q.    Okay.  And if this was a civil -- first of all, this is a civil case, okay.  This is a habeas civil proceeding.  But you said 58 percent or a large portion of your work is civil, correct?

A.    That's true.

Q.    If you were evaluating Mr. Allen in a civil context, would you use these norms?

A.    Probably not.

Q.    You would not?

A.    Just because of the concerns with them, I would probably rely on the blended norms.

Q.    Okay.  And can you tell us right now what the blended norms, the result would be, where he would be at on the --

A.   They weren't provided in the original book, that's why when we looked for it, we couldn't find it, they are not there.

Q.   Okay.  Well, what norms did you use?

A.   I used the norms in Muriel Lezak's Textbook of Neuropsychology.

Q.   What did you use to score the CVLT?

A.   I used the norms from the manual, I believe.

Q.   The CVLT manual?

A.   Yes, sir.

Q.   Have you received any requests from Dr. Askenazi for you to provide the normative data that you used to come up with a T-score and a standard deviation result for the CVLT?

A.   No.

Q.   You have not?

A.   I have not.

Q.   Did you include these Muriel Lezak norms in your report or in your data?

A.   I don't know.

Q.   Do you see anywhere in your data how you calculated the result of mildly impaired?

A.   I don't see it there.  It might have been on the back of the page and it didn't get copied, I don't know.

Q.   Well, as you sit here, is there any way of knowing with any certainty whether your calculations in that respect were

accurate?

A.    Well, I can think of one other occasion in 20 years where I've been caught in a mistake in a case like this.  I don't make them often, and I'm not proud of them when I do. I don't think I made any other mistakes, but I'm happy to hear what you have found.

Q.    All right.  Well, at least with respect to the FAS, can we put a question mark here because we don't have the normative data that you used to come to your conclusion of mild impairment?

A.    You can put a question mark there.  I'm confident that he's mildly impaired in that area.

Q.    And that's based upon his ability to recall words that begin with a particular letter?

A.    To spontaneously generate words, yes.

Q.    Do you know whether or not you concluded that he was impaired by virtue of the animals test?

A.    I think the animals test was within normal limits.

Q.    And why in your report again on page 32, if this is part of the same battery of tests here, did you report only the part about the FAS being mildly impaired, and not the part about the animals being in the normal range?

A.    Because I'm reporting the deficits I identified that support my diagnosis.

Q.    Did you indicate anywhere in your report that I'm going

to tell you how he did, but I'm only going to tell you the bad parts?

A.    No, that's not my purpose.  You're trying to paint me as in a biased way, where I don't feel that's what I was going to do.  I'm trying to just explain the deficits that were identified in a large battery of tests.  I make reference to normal functioning in some areas and shine a light on deficits I identified that become the basis for my diagnosis.

Q.    And I don't want you to think that I'm trying to attribute any sort of intent to what you did.  But the reality of what you did was to paint for the Court a one-sided picture, didn't you?

A.    No, I painted an accurate picture of what deficits I identified that form the basis to support my diagnosis.

Q.    But you don't include in your report how -- what positive results there were that weighed against those deficits and how you reached a balance of evaluating those to give more weight to the deficits than the positive results?

A.    The diagnosis is based on the deficits.

Q.    Not the positives?

A.    You expect positives.  You expect him to function normally.  When you find deficit areas, those are the areas that I focused upon.

Q.    But when you include -- when you conclude impairment,

that's a judgment, isn't it?

A.    It's a statistical determination.

Q.    But you base it then on only part of the statistics, the negative parts, not the -- all of the parts?

A.    Each of these tests stands independently and shows either normal functioning or abnormal functioning.  If you have objective test evidence of abnormal functioning in any of those five areas, that's supportive evidence for the diagnosis.

Q.    And you reach your diagnosis and you don't consider or weigh the positive results, the ones that show that he's actually functioning normal or above normal?

A.    They don't make the diagnosis go away.

Q.    This particular test, the FAS and the animals, it's part of the same sheet, it's part of the same battery known at the COWAT, isn't it?

A.    Yes.

Q.    And you only reported and relied upon one part of the that battery?

A.    Well, I don't really think of it as a battery.  I look at it as two different tests.  Animal Naming is actually more related to temporal lobe functioning, where the FAS is more related to frontal lobe functioning.

Q.    What real life skill would it manifest impairment as a result of this FAS deficiency that you identify?

A.    It reflects problems in verbal processing and accessing vocabulary and language.

Q.    Did he appear to have any difficulty communicating with you?

A.    No.

Q.    Could he communicate his thoughts?

A.    He did.

Q.    And did you receive information from him that not only is he an oral communicator, but a written communicator?

A.    He talked a lot about his writing, journaling.

Q.    Did he talk to you about screenplays he'd written?

A.    I think he mentioned something about that.

Q.    A children's book that he had written and hoped to get published?

A.    I think that was more illustrations.  I don't know that there was a text, but I did see the illustration.

Q.    And that he wrote letters?

A.    I'm aware of that.

Q.    You saw in the written communication that he clearly has the ability to communicate clearly, grammatically, spell words correctly?

A.    He does.  These are subtle deficits that are being detected by this test.  They are not always obvious to the lay person.

Q.    Do they really have much significance in terms of his

life functioning?

A.   They are mild to moderate impairments that have mild impacts on his functioning.

Q.   And I don't know whether that's a yes or no to my question, so let me ask it again.  Do these have any significant impact on his life functioning?

A.   Well, it depends whether you consider a mild impairment to be significant.  He can function despite these impairments.  So it's not really a yes or no answer.

Q.   Did you see any evidence in his history that this particular impairment impacted him in a negative way?

A.   No.

Q.   Let's move on to the BNT.  That's the Boston Naming Test, correct?

A.   Yes.

Q.   Now, I think you probably know what's coming here, don't you?

A.   I'm aware of this, yeah.

Q.   Okay.  And you indicated that you really only -- this is the first mistake of this sort that you've made in 20 or so years.  The mistake that you made on the Stroop was a fairly significant one, correct?

A.   That is a significant one.

Q.   I think in your direct you characterize Dr. Gelbort's work as careless and sloppy?

A.    I did.

Q.    Do you think it would be fair if he attributed that same label to your work now?

A.    That's a significant mistake.  You know, the color word trial is still impaired, but the real good stuff is in that interference trial.  It's a significant mistake.  It was not an intentional mistake.

Q.    Are you aware of any mistake of a similar magnitude that Dr. Gelbort made?

A.    Oh, I think his mistakes were far worse.

Q.    You do?

A.    Yes.

Q.    Do you think that he failed to accurately score a test that he gave and interpreted his results based upon that error?

A.    Some he did not score at all, and just interpreted impressionistically.

Q.    And Dr. Wetzel ultimately scored each of those, correct?

A.    I believe he did.

Q.    That he did not have the scoring results from?

A.    Yes.

Q.    And ultimately those results were in the positive area, weren't they?

A.    I don't know.

Q.   Showed that Mr. Allen was functioning at a high level?

A.   I don't recall.

Q.   So perhaps there might have been a reason that he didn't score those?

A.   You're asking me to speculate.  I don't know.

Q.   Now, in addition to the problem with the Stroop, there was another mistake you made with the Boston Naming, wasn't there?

A.   It was a mistake, but it doesn't change the outcome.

Q.   But it's a fairly significant mistake, wasn't it?

A.   Well, I looked at the wrong norms.  To give some background, when the first Heaton norms were published, it was based on a different version of the Boston Naming Test that had more items.

Q.   Well, the Boston Naming Test when it first came out was an experimental test based upon 85 questions, wasn't it?

A.   Correct.  Subsequently --

Q.   And what year was that?

A.   I don't recall.

Q.   And well before Mr. Allen went to trial, the Boston Naming Test had been standardized into a 60-question test, hadn't it?

A.   Yes.

Q.   And that that 60-question standard was included in the Compendium of Neuropsych?

A.    In the Second Edition, but not in the First Edition.

Q.    And the Second Edition existed at the time that Mr. Allen went to trial?

A.    It did not.

Q.    It did not?

A.    It did not.  My mistake was -- I used the right version of the test.  I looked it up on the old norms with the 85-item version.

Q.    Okay.

A.    So we throw that score out, and we go with the norms that were available in the test manual from the test publisher at that time, and he's still one and a half to two standard deviations impaired in his naming ability.

Q.    Your characterization of his results is that he has evidence of significant aphasia, correct?

A.    Yes.

Q.    And that's the interpretation you draw from the Boston Naming Test because his score was in the range of severe impairment falling four standard deviations below normal for his age and education, correct?

A.    That's incorrect.

Q.    That's what your report said, isn't it?

A.    That is what my report said.

Q.    That was the impression that the Court was left with when it was provided with your report?

A.    I'm sure it was.

Q.    And so aphasia, what does that mean?

A.    It's a disturbance in language.  There are two basic forms.  Expressive aphasia is an impairment in your ability to speak in a coherent way.  Receptive aphasia is in your ability to understand spoken language.

Q.    Did Mr. Allen demonstrate any such impairment, aphasia, in your dealings with him over 13 and a half hours?

A.    I think -- you know, I have to go back and look at my mental status exam.  There may have been some -- there may have been some unusual speech.  No, I didn't observe any.

Q.    You weren't made aware of any in his history, any of his writings or other communications.  I guess you didn't listen to any tape recordings of him communicating over hours and hours and hours with his attorney or Dr. Yutzy?

A.    I did not.

Q.    Now, in addition to not having actually not noticed any impairment in his real life setting, you, in fact, gave him a specific test, specifically directed to aphasia, didn't you?

A.    Well, the ability to generate names for common objects, yes.

Q.    You gave him a test called the Aphasia Screening Test, didn't you?

A.    Yes, I did.

Q.    All right.  Let me show you Exhibit 569, page 13.  This

is the Aphasia Screening Test, isn't it?

A.    It is.

Q.    And how does this test for aphasia?

A.    What this is it's a relatively simple test where any failure on this test would be a significant indicator of a language dysfunction that would indicate further assessment.

Q.    Okay.

A.    He's shown simple pictures and asked to name them or copy them.

Q.    So you show him a picture of an item?

A.    On some items like copy the square, you would show him a picture of a square.  There's a little booklet shown.

Q.    When you say "copy square," what does that mean?  What is he supposed to do, draw a square?

A.    You show him a picture of the square and he's supposed to reproduce it.

Q.    Okay.  And then he's supposed to like name the square, say what it is?

A.    What's this called?

Q.    What's it called?  Spell it?

A.    And the next one would be to spell the word.

Q.    Okay.  So that did that for square, cross, triangle, baby, clock, fork.  There's some reading here; is that correct?

A.    Yes.

Q.   And then there's some other -- there's another trial over here on the right?

A.   That's right.

Q.   And is there another page?  This is I guess the drawing part that he did?

A.   That's correct.

Q.   Was his score on the Aphasia Screening Test perfect?

A.   Yes.

Q.   And even though you reported to the Court in what we just looked at that he had a significant aphasia problem, you didn't tell the Court that he got a perfect score on a test specifically directed at screening for aphasia?

A.   Well, the Boston Naming Test is more sensitive to the language disturbance than this test is.

Q.   But you didn't explain that in your report or advise the Court of that, did you?

A.   No.

Q.   You again found something where he -- you believed at least based upon your results that he had a severe impairment, and you reported that part as it related to aphasia?

A.   Correct, I found evidence of aphasia, and I reported it.

Q.   Now --

         THE COURT:  Go ahead.

Q.   The Boston Naming Test is I think exhibit -- page 8 here, Exhibit 570.  This test asked him -- this is showing a picture, correct?

A.   Yes.

Q.   And you show him a picture, and he's supposed to say the name, the correct word name for the item in the picture?

A.   That's correct.

Q.   So on the first of these, the examples are bed, tree, pencil, but you don't have any entries here, correct, you went ahead -- jumped ahead and began at a certain number?

A.   Yes.

Q.   So let's show -- you didn't do the first page, the second page, and you actually started No. 30 on the third page.  And that's in accordance with proper procedure and practice, correct?

A.   Yes.

Q.   And is that because of what?

A.   That's just where you start with an adult.  The test can be used for children as well.

Q.   What's the age that you can jump to No. 30?

A.   I only see adults, so I always start at 30.

Q.   Okay.  What would you do -- what would you start at if you're dealing with an 18- or 19-year-old?

A.   I would start at 30.

Q.   Okay.  And so you show them a picture of a harmonica?

A.    Yes.

Q.    And he says harmonica, and you give him a score of one; is that right?

A.    No, that's actually the how long -- if you look at the columns, the checkmark is he got it right.  The one is how long it took him to answer, to respond.

Q.    That's how many seconds it took?

A.    Yes.

Q.    So it took a second to do that.  Rhinoceros.  Acorn. Now, acorn is the one where you wrote the word "nut"?

A.    Yes.

Q.    You showed him a picture of an acorn, and he said that's a nut?

A.    That's right.

Q.    Okay.  And that wasn't -- why didn't you put a checkmark there?

A.    Because nut is not the correct answer.  You want apricot -- I'm mean, I'm sorry, you want acorn.

Q.    You want acorn because it's a picture of an acorn, but he used the word nut to describe what he saw?

A.    Correct.

Q.    And you gave him a cue?

A.    Yes.

Q.    And that's because he didn't give the word you were looking for the first time?

A.    That's right.

Q.    And what's the cue you gave for acorn?

A.    It comes from a tree.

Q.    Okay.  And that was supposed to help him distinguish between acorn and nut, both of which come from trees?

A.    Yes.

Q.    Now, you don't have any -- you don't have any discretion, do you, in what cue you give them on what you say?  It's all written down there in the book?

A.    It's pretty clear how it's done.

Q.    It's pretty inflexible?

A.    It's standardized.

Q.    Okay.  His ultimate answer on that was apricot; is that correct?

A.    Well, the next thing after you give him the stimulus cue, "it comes from a tree," and he couldn't give me a different word.

Q.    And there's a second cue?

A.    A second cue, which we call a phonemic cue, the first sound of the word, and I say it starts with the sound "A."  And he said apricot, which was a perseveration from the California Verbal Learning Test we had done earlier.

Q.    Why was that a perseveration?

A.    Before he repeats -- first of all, it's incorrect, and he repeats an answer that starts with that "A" sound from a

previous test that we had done before this.

Q.    It wasn't a perseveration on this test, though?

A.    No, it's -- it's a behavioral observation that he's --

Q.    He didn't say rhinoceros?

A.    No.

Q.    Or another word that's been involved in this test?

A.    Right.

Q.    So the question of scoring "nut" wrong, and we talked a little about this in the deposition, about what's wrong with the word "nut" as applied to the picture of an acorn.  What does an acorn contain that a squirrel wants it for?

A.    A nut.

Q.    Okay.  So if you don't get the word "acorn" you're looking for, this is an example, you scored him as this is a wrong answer, correct?

A.    That's right.

Q.    He didn't get any credit for this?

A.    He did not.

Q.    So you go through the rest of these items, and the checks mean that he got it right, correct?

A.    That's right.

Q.    The absence of a check means that he got it wrong?

A.    That's right.

Q.    So the ones he got wrong were a picture of a harp?

A.    Yeah, he called it a xylophone.

Q.    Okay.

A.    And then he ultimately got that right with the stimulus cue.

Q.    And you didn't inquire as to the extent of his knowledge or sophistication with musical instruments, did you?

A.    No.  But he knew what a xylophone was.

Q.    Pardon me?

A.    He knew what a xylophone was.

Q.    He was -- but how do you know he's ever seen a harp before and heard someone attribute the word "harp" to it in order to learn the word for the picture?

A.    Because he gave me the right answer.

Q.    He ultimately gave you the right answer?

A.    Yes, he did.

Q.    Okay.  How about the next one, hammock?

A.    Yes.

Q.    Is that -- he didn't get that right?

A.    He did not.

Q.    So you showed him a picture of a hammock.  And how good are these pictures?  Are they drawings?

A.    They are pencil drawings.  They are line drawings.  He ultimately got it right with a phonemic cue.

Q.    But initially he didn't recognize hammock?

A.    That's right.

Q.   Okay.  And you didn't ask him whether or not anyone he's ever known in his life in the Cote Brilliante area had a hammock?

A.   That's not how the test is administered.

Q.   That wasn't the question.  You didn't ask him that, and you're required?

A.   Of course not.  Of course I didn't.

Q.   Another one that he got wrong apparently by the X is stethoscope?

A.   Yes.

Q.   Okay.  And he gave the word "dorscope"?

A.   That's correct.

Q.   And the cue is, used by doctors and nurses?

A.   Yes.

Q.   You didn't ask him what the extent of his knowledge or exposure was to medical devices?

A.   No.

Q.   47, he doesn't get a check there in the first one.  And that's an accordion, another musical instrument?

THE COURT:  Wait.  Did he get it right with the cue?  On the stethoscope, I mean, there's a check mark.

Q.   Ultimately there's incorrect -- I'm sorry, we keep it up.  With the stimulus cue he got it incorrect; is that right?

A.   Yes.

Q.    With a phonetic cue, you said what, it begins with a --

A.    It starts with the sound "steth," and then he said stethoscope.  Now, clinically we take note that he was able to get it right with that cue, but it does not contribute to his score.  So even though he got it right eventually, it counts as wrong in the scoring.

Q.    Does the hammock count as wrong?

A.    Yes.

Q.    Does the stethoscope count as wrong?

A.    Yes.

Q.    And does the accordion count as wrong?

A.    Yes.

Q.    So there's at least two musical instruments in here that he has trouble with, one of which you hold against him and he gets it wrong, correct?

A.    I don't understand, "I hold against him"?

Q.    Well, his unfamiliarity with an accordion -- let's say he, in fact, has never seen one before, has never heard the word before, and doesn't know what an accordion is.  That's not actually testing, is it, his memory or his ability to recall a name from his memory bank and apply it to an object he recognizes, does it?

A.    That's why we have norms for age and education.

Q.    Okay. Compass, is this going to be like the compass

that drawing a circle, not a compass that has north and south?

A.    Yes.

Q.    And at what part of an individual's educational background would one come in contact with a compass?

A.    I don't know anymore.  My kids are doing algebra in fourth grade.

Q.    Do you use a compass in algebra?

A.    No, but back in my day, I don't think I saw a compass until high school.

Q.    And that was geometry class?

A.    Probably.

Q.    Or unless you took drafting, correct?

A.    Yes.

Q.    So how far did Mr. Allen go in school?

A.    Tenth grade.

Q.    And he didn't do well either, did he?

A.    Not toward the end.

Q.    He wasn't there half the time, was he?

A.    I don't know about half the time, but he was absent.

Q.    So given what you know about Mr. Allen, does it surprise you in the least that he doesn't know what a compass is?

A.    It doesn't surprise me, but that's why we use norms for people who only went to ten years of school, to compare what

he knows to what they know.

Q.    And it's not okay in this context to use norms based upon any sort of socioeconomic status, cultural status, what they might be exposed to given where they live and how they are raised?

A.    There are no norms like that.

Q.    Tripod, is this what we're talking about, the tripod that holds a camera or a surveyor's equipment?

A.    Yes.

Q.    And the cue is photographs or surveyors use it?

A.    Yes.

Q.    That requires one to know what a surveyor is if that cue is going to be helpful, correct?

A.    It may be.  It's the standardized cue for that item.

Q.    He used a word that's similar, though, he called it "easel"?

A.    Yes.

Q.    So an easel is like a tripod, a three-legged thing. This might be an easel if it had legs, correct?

A.    Yes.

Q.    And he didn't get credit for that?

A.    He didn't.

Q.    He got that as wrong?

A.    He got that correct with the stimulus cue.  Up to the stimulus cue, you get credit.  The phonemic cue you don't get

credit, but we take clinical interest in the fact that you can find the word with a cue.

Q.   The Xs in the first column, how do you determine which ones are right and which ones are wrong from your note -- from your recordkeeping here?

A.   An X would be he didn't say the right thing or didn't know.

Q.   But the check is he got it right with the cue?

A.   Yes.

Q.   So is that a right answer or wrong answer?

A.   On tripod, he got it correct with the stimulus cue.

Q.   And then the scoring, is that a right answer or wrong answer?

A.   You score that as a right answer.

THE COURT:  Wait.  I thought he didn't get any points for it.

THE WITNESS:  He does get points.  It's only the third column, the phonemic cue.  That column you don't get points for.  But if you get it with the stimulus cue, you get points.

Q.   And ultimately the points, it's like 0 to 60 is your points, correct?

A.   Yes.

Q.   And you're only going to get -- the maximum you can get on any question is one?

A.   That's right.

Q.   Either you're going to count it as correct or you're going to count it as incorrect in the end.  And even if he gets it with cues, that can be a correct?

A.   That's right.

Q.   Ultimately -- I'm trying to get a sense of which ones you counted him incorrect.  So in this list right here, yoke?

A.   Yoke is incorrect.

Q.   What is this one next here, trellis?  A garden trellis.  He got that incorrect.  A yoke is something used on farm animals.  Does it surprise you at all given what you know about Mr. Allen's upbringing that he didn't know what a picture of a yoke was?

A.   Given his educational limitations, it might not be surprising.

Q.   But likewise his social environment wouldn't have exposed him to that either.  There are no farms nearby where he lives, are there?

A.   He's not going to see it out in the back yard.  But if he read Paul Bunyan or something like that, he might know what a yoke is.

Q.   Did you ask him whether he read Paul Bunyan?

A.   Of course not.

Q.   Trellis, used in a garden.  Again, no idea whether or not there was a garden, anyone near him had a garden, or if

they did, they had a trellis in it?

A.    I don't know.

Q.    That counts as wrong, correct, because he can't recognize a picture of a trellis?

A.    Correct.

Q.    And say the word "trellis"?

A.    That's right.

Q.    Protractor, correct?  He got that wrong, I mean?

A.    That's right.

Q.    And that -- a protractor is, again, you're talking about the thing that's like a half circle that's used to measure degrees?  Again, something you might encounter for the first time in your life in geometry class?

A.    Yes.

Q.    Abacus, how about that one?

A.    He didn't know what that was.

Q.    Okay.  And he said it's used for counting.  Do you think it likely given what you know about him that in any setting in which he went to school or was raised that an abacus would actually be used to count?

A.    Well, he generated the word "abaca," which was close enough to make me think that he encountered the thing somewhere in his life, but he couldn't produce the proper name.

Q.    But he's trying to recall the word for something that

he has limited, if any, exposure to, correct?

A.   Yes.

Q.   Okay.  Ultimately the result that you get is that out of these 60 questions -- and it is a 60-question test, correct?

A.   Yes.

Q.   There's not another page to this test?

A.   No.

Q.   He got 51 right?

A.   That's right.

Q.   He got nine wrong?

A.   That's right.

Q.   And really that's by starting at 30, he actually got 21 of the ones he was given right, nine wrong?

A.   It's assumed he would get all the prior ones correct.

Q.   And at least a few of these, such as things like protractor, abacus, compass, there's some similarities to those things relating to counting and math and education, correct?

A.   Yes.

Q.   Where one might encounter those.  And then there's some outdoor things like a yoke, a trellis, something used by a surveyor, a tripod.  Again, there's a certain pattern to some of these ones that he got wrong, correct?

A.   Perhaps.

Q.   Okay.  The one before, a hammock, another outdoor item.  Did that count as a yes?  Does that count as point or not a point?

A.   Not a point.

Q.   Not a point.  Stethoscope, another device, a medical device.  And accordion.  And there's a few musical instruments that he got wrong, correct?

A.   Yes.

Q.   A harp, an accordion.

A.   Harp he got right.

Q.   Harp he got what?

A.   He got correct.

Q.   Okay.  Now, initially what you do with this score of 51 correct, is you actually scored it three ways, didn't you?

A.   I scored it by education, I scored it by age, and then I looked it up in the Heaton norms, but unfortunately used the norms -- that book had the wrong norms and made the mistake.

Q.   And so we're clear, so what you did with the Heaton norms, this one over here that you're referring to, you ended up with a scale score, is that four?

A.   Yes.

Q.   And a T-score of 14, which would be 3.6 standard deviations below the mean?

A.   That's right.

Q.   That's the part of this score that puts him in that severe impairment category?

A.   That's correct.

Q.   This is the source of your claim that he is severely impaired?

A.   That's correct.

Q.   And so that particular norm, you went here for that, correct?  This is the old Heaton norms, is it not?

A.   Yeah, it does appear to be.

Q.   That's Exhibit 558, page 7?

A.   Yes.

Q.   His score of 51 is at the top of this range right here, produces a scale score of four, correct?

A.   Yes, but you can't rely on this.  This is inappropriate.  I should not have relied on this.

Q.   But look at this list.  This column, it goes up to a potential score of 85.  How could you have that in a test that had 60 questions?

A.   You wouldn't.

Q.   So you tell us you didn't notice that you were scoring him based upon a wrong norm?

A.   I didn't.  I had become accustomed to using the other book and forgot that this still had the old norm.

Q.   Well, let's go back to -- so that's the source, is it not, of the incorrect -- of the claim that he's 3.6 standard

deviations below the mean, the Heaton score?

A.    Correct.  That is not accurate and an overstatement.

Q.    Because ultimately the scale score of four, if we go a couple pages down, produces your T-score of 14, does it not?

A.    It does.

Q.    So that's where those come from.  The actual 60-question norm can be found -- if you go to the Exhibit 559, this actually describes in the Second Edition of the Compendium that originally the Boston Naming was an 85-question test, but it is now a 60, and the norms in here relate to the 60-question test, correct?

A.    That's right.

Q.    Blow up the bottom half of page 7.  A score of 51 produces a scaled score of eight, does it not?

A.    It does.

Q.    And a scaled score of eight on the Boston Naming from here, when we go across, produces actually a T-score, does it not, of 54?

A.    Using African American norms that are inappropriate in this setting.

Q.    So amongst his peers, he is .4 standard deviations above the mean, is he not?

A.    Maybe.

        THE COURT:  Okay.  Now, wait.  You said "maybe." Why did you say "maybe"?

THE WITNESS:  Because we can't trust these norms.

THE COURT:  Okay.

THE WITNESS:  That's what the book said.

THE COURT:  That wasn't the question.  The question was, what is it?  And you said 54.  And you said "maybe."  But it's 54.  You can explain this other stuff if you want to talk about it some other time, but this eight is 54.

THE WITNESS:  With the African American norms, yes, that's true.

BY MR. HOLTSHOUSER:

Q.   And you said that you can't use that because it's what?

A.   It's biased.

Q.   But you also said it's not trustworthy?

A.   Same thing.

Q.   Well, in terms of not trustworthy, there's no trust involved.  These are the statistics for his peer group, including the factor of race.  There isn't anything questionable about that.  These are the numbers, are they not?

A.   If Dr. Heaton says not to use them --

Q.   I didn't ask you that.  Are these the numbers including his category, including the category of race?

A.   They are the numbers in the book, yes.

Q.   Okay.  It's a separate question altogether as to whether or not in the field of neuropsychology that is or is

not an appropriate practice?

A.    Yes.

Q.    Correct?

A.    That's a separate question.

Q.    But in terms of the trustworthiness, statistics don't lie, do they?  Numbers are numbers?

A.    The numbers are the numbers.  But whether they accurately reflect impairment or lack of impairment is what's the concern.

Q.    In terms of comparing him to his peers, including the factor of race, the numbers, which do not lie, indicate that he is normal and above normal compared to his peers, including the factor of race, correct?

A.    Per that book, yes.

Q.    I want to go back to where you scored all this.  And I want to remind you that you took umbrage earlier at the suggestion of cherrypicking.  You scored this three ways.  Now, admittedly one of them turns out to be completely incorrect, and you admit that now, correct?

A.    Yes.

Q.    So in terms of your work, not only is what you have in your report wrong with respect to the Stroop, it's also wrong with respect to the Boston Naming, isn't it?

A.    It is.

Q.    In the same report?

A.    Two mistakes in the same report.

Q.    So in terms of the support that you garnered for your conclusion of memory impairment plus, what you have in your report, we can also cross out the Boston Naming, can't we, for the severe impairment?

A.    For severe, yes, I would revise that to mild to moderate.

Q.    Okay.  So now we have to revise that to mild to moderate?

A.    That's accurate.

Q.    And is that on the basis of these numbers?

A.    Yes.

Q.    Okay.  Now, again, getting back to this notion of cherrypicking, you scored him three ways; the Heaton way -- and is this the back of the Boston Naming Test booklet way?

A.    Yes.

Q.    In the test booklet itself, it had a set of statistical data, did it not?

A.    Norms, yes.

Q.    And those norms don't include the factor of race, correct?

A.    No, they don't.

Q.    One includes the factor of schooling, one includes the factor of age, correct?

A.    Yes.

Q.   Now, wouldn't you agree also that there are certainly -- that can be influenced by schooling, can be influenced by socioeconomic opportunities and fairness?

A.   Quality of the schooling, absolutely.

Q.   Okay.  But nevertheless it's not inappropriate in your view to use schooling and educational achievement as a norming measure?

A.   No.

Q.   Okay.  So one of the ways using schooling, which you would put him in the category of 12 years or less, is given a score of 51, which puts him in that range there; is that right?

A.   It does.

Q.   Okay.  He ends up being -- how do you get the number that he's minus 1.1 standard deviations below the mean looking at schooling?

A.   You subtract his score from the mean and divide it by the standard deviation.

Q.   Correct.  There's a formula that is used --

A.   Yes.

Q.   -- in order to do that.  And you did that calculation?

A.   I did.

Q.   Is your work shown here on that, by the way?

A.   Well, the result is shown.

Q.   But not the work?

A.    No.

Q.    Okay.

A.    I probably did the work on the calculator.

Q.    So assuming that the work is correct, that's what you get when you do that calculation for taking into account schooling, 1.1 standard deviation?

A.    Right.

Q.    Okay.  And just so we're clear, this part over here, this is 3.6 SD, correct?

A.    That would be, yeah.

THE COURT:  Where do you get 3.6?

Q.    That's because -- well, let me -- Dr. Martell, is that because a T-score of 14 is 36 points below 50?

A.    Yes.

Q.    And that translates into a standard deviation of 3.6?

A.    Yes.

Q.    That's your really bad standard deviation, correct?

A.    Well, that is not an accurate score.  But were it to be, it would be severe.  That's why I called it severe.

Q.    Of what you reported --

A.    Yes.

Q.    -- to get the label severe, you reported the worst of the three, correct?

A.    What I tried to do is be consistent in the norm set that I was using, which was the Heaton norms.  My mistake was

forgetting that they still had the 80-item version in the blended norms. And I reported the wrong score. I did score it all three ways, but I wanted to be consistent in using the same norm set across all the tests. That why I reported that.

Q. These norms right here in the back of the booklet, those relate to the 60-question test, don't they?

A. Yes, they do.

Q. This is the back of the test booklet that you gave?

A. Exactly.

Q. So these are correct. These are not influenced by your mistake going to the Heaton book and using an 85-question standard instead of a 60-question standard?

A. Correct.

Q. So you calculate a formula, which we won't go into that, but you get a formula and you get minus 1.1 standard deviations, which that would mean 11 points below 50?

A. Correct.

Q. So his T-score would be 39 --

A. That's right.

Q. -- by schooling?

A. That's right.

Q. Correct?

A. Yes.

Q. By age, compared to his peers, you circled the 30 to 39

category, did you not?

A.    Yes.

Q.    And his age in 1998, though, was 18, was it not?

A.    Yes, it was.

Q.    So why did you choose his age at the time of this test --

A.    Because --

Q.    -- but not the age at the time of the trial as you say you did for some of your other tests?

A.    That would be the only justifiable way to score the test.  I'm not going to score it -- I'm not going to take a 30-year-old's performance and then use norms for an 18-year-old.  I'm going to compare him to other 30-year-olds using tests that were available in the day, realizing that I don't have a time machine and can't go back and actually test him then.

Q.    So what you're actually doing is you're testing a 30-year-old, and applying norms that existed and were in use at the time he was 18 years old?

A.    Correct.

Q.    For most of what you're doing?

A.    Correct.  That's the best --

Q.    Now, weren't the norms that were available to him when he was 18, that were existing when he was 18 years old, for his age have been the top line, not the third line?

A.    Probably, yes.

Q.    Okay.  But you chose the ones for this test of what his current age was, and you performed that calculation, you ended up with a standard deviation of minus two, which means 20 points below 50, or a T-score of 30, correct?

A.    Yes.

Q.    So you've got three standard deviation results that you calculated here.  You've got 1.1, minus two, and minus 3.6?

A.    Correct.

Q.    They are all minuses because they are below the 50?

A.    Yes.

Q.    But they are actually 3.6, two, or 1.1 standard deviations below the mean?

A.    Correct.

Q.    To get to the category of severe you put in your report, you chose, did you not, the worst of these three, did you?

A.    I used the Heaton norms, and that did give the most severe score.  It wasn't an attempt to cherrypick the worst score, it was an attempt to be consistent in the norms used across all of the tests.

Q.    Did you explain in your report to the Court that by other standards that you, in fact, calculated and ran, that under one standard, he was only mildly impaired, under another he was moderately impaired, and under a third he was

severely impaired?

A.    I did not.

Q.    Are you aware of criticisms about the Boston Naming Test and its ability to draw reliable conclusions from it because of cultural issues?

A.    No.

Q.    Direct your -- are you familiar with the Third Edition of the Compendium of Neuropsychological Tests?

A.    Yes.

Q.    I'm going to direct your attention to Exhibit 590, page 905.  Can we go to the doc.  And at page 905, does it indicate that geographic region, ethnicity, and level of acculturation can affect performance?  In general Caucasians scored higher than African Americans.  Midwesterners outperformed people from the South, particularly African Americans in the South.  Even within a particular ethnic group those who were more familiar with the dominant American culture scored higher that those who were less acculturated.

The test itself depends on a person's familiarity with dominant American culture, would you agree, how you perform?

A.    You will perform better the closer you are to the dominant American culture.

Q.    And likewise, was it a surprise to you that he couldn't recall or he didn't know the words -- I mean, you don't know

when he can't give you the correct word, whether it's because he can't recall it from his memory bank or because he never put it in his memory bank because he's never even seen the item or never heard the word, correct?

A.   Well --

Q.   You don't know what you're dealing with, do you?

A.   -- in some cases we do, like the abacus/abaca example, the hardest item on the test.  And others we don't know whether he's seen an accordion before.

Q.   So you really don't know that?

A.   I don't know that.

Q.   And verbal intelligence according to the Compendium affects BNT-scores, correct?

A.   Yes.

Q.   And you already knew before you gave him this test, did you not, that he had some deficiencies based upon education in verbal ability?

A.   Well, I think it's referring there to verbal IQ, which was within normal limits, but not as strong as his performance IQ.

Q.   What life skill would negative performance on the Boston Naming Test manifest itself in?

A.   In his ability to express himself with language, define precisely the word that he's looking to use.

Q.   Did you read any of his stories?

A.    Not that I recall.

Q.    Did you read any of his lyrics?

A.    No.

Q.    Did you read some of his letters?

A.    I did.

Q.    You certainly listened to him for a number of hours, correct?

A.    I did.

Q.    Despite the results on this test, did it seem that he had any impairments in those areas, verbal expression?

A.    I didn't notice any impairments clinically.

Q.    So did you report at all in your results in concluding that he has dementia that your own personal observations and experience with him questioned the results of the tests, questioned the implications of the results?

A.    Well, the tests are more sensitive than what I can pick up in the course of a clinical examination.  If you could pick it up clinically, you wouldn't need the tests.  And I felt that the pattern of impairment that came out of the test battery was most consistent with the diagnosis of dementia because it hit on all of those factors.

Q.    Let me show you Exhibit 519, page 19, Neuropsychological Deficit Scale.  I guess my question is, on this one, where does this come from?

A.    It comes from a textbook by Ralph Reitan, that came out

in the 1980s.

Q.    And what is the name of that textbook?

A.    I don't recall the precise name.

Q.    Is it a scale that is in common use?

A.    Yes.

Q.    Is it something that is discussed in the Compendium of Neuropsychological Tests?

A.    I think it's probably in there.

Q.    You do?

A.    I haven't looked for it, but I wouldn't be surprised to find it there.

Q.    Is it in the Second or the Third Edition?

A.    I don't know.

Q.    And you had handwrote this out, correct?

A.    Yes.

Q.    So apparently there is no form, there is no table, there is no normative data?

A.    There -- I used to have a computer program, but as new versions of Windows have evolved, it became obsolete that would do the calculations for you.  But I just do them by hand.

Q.    Is the test itself in common use among neuropsychologists?

A.    What it is, you made reference earlier to the Halstead Impairment Index in the normative book.  That was criticized

as being insensitive.  And this was an effort to make it more sensitive to brain damage by looking at multiple indicators from not just the Halstead-Reitan battery but also the IQ test to come up with a more sensitive test for neuropsychological impairment.

Q.    My question was, is it in common use among neuropsychologists today?

A.    Yes.

Q.    And you base that on what?

A.    On my 20 years of experience and training seeing other people use it.

Q.    Who else uses it?

A.    Well, I guess mostly adherence to the neuro-psychological -- to the Halstead Reitan Neuropsychological Test Battery.

Q.    That's not a who.  I asked you who else you know that uses it?

A.    I can't give you names.

Q.    Okay.  What does this say?  Can you read your writing for us?

A.    Level of performance indicators, he got a score of 15.

Q.    And what is that based on?

A.    That's based on his overall level of performance on the testing.

Q.    What testing?

A.    On the Halstead-Reitan and the IQ.  Pathognomonic signs, these are physical signs that when they are found always indicate the presence of brain impairment.  He had a zero.

Q.    So he didn't have any of those signs?

A.    Correct.

Q.    Okay.

A.    Patterns and central processing.

Q.    Okay.

A.    So we have a verbal versus performance IQ difference of 18 points.

Q.    Okay.  So is he getting two points added into this total?

A.    Correct.

Q.    Is adding into the total a bad thing or a good thing for impairment?

A.    For impairment?

Q.    Well, is the total down here, is that a total number or is that a T-score?  What's the 29?

A.    29 is the total score added up.  There is no T-score for this.

Q.    Okay.

A.    And then you look up in the table in the book what a score of 29 relates to in terms of the degree of impairment.

Q.    Why is there no T-score for this?

A.    I don't know.  Ask Dr. Reitan.

Q.    Is there any normative data?  Is it based upon a statistical sampling?

A.    It is, yes.

Q.    And he's getting two points assessed against him because his performance IQ is stronger than his verbal IQ, is that the gist of it?

A.    This is looking for differences in the two sides of the brain and the way the patterns of scores in the test data. So it looks at the verbal performance IQ, and the Halstead Impairment Index versus the total IQ score.

Q.    Okay.  And then what about this next entry, what does that say?

A.    That's looking for right/left differences, differences between the right side and the left side of his body.

Q.    And there were no differences?

A.    He got a score of 12.

Q.    What's before that, with the zero up there?

A.    IQ.  That's HII is Halstead Impairment Index versus IQ.

Q.    And how do you compare those two?

A.    There's a table in the -- in the --

Q.    You haven't set out in your work of how you did that calculation, correct?

A.    Any neuropsychologist would access the literature as an access --

Q.   You haven't set out in your work as how to calculate this?

A.   I precisely set out in my work as to how I calculated this.

Q.   The calculation of the table you used, though, for the comparison of the HII to the -- which IQ, the full scale IQ?

A.   Yes.

Q.   That's not set out here, what numbers you drew from your previous tests, what numbers you used?

A.   I used his scores for the Halstead Impairment Index and his full scale IQ, and I looked it up on the table, and that's the score of zero.

Q.   Given the other errors that were in this particular report, without looking at your work, do we have anything to be certain that there aren't any errors in these calculations?

A.   You've got the author's book and the original tables.

Q.   Do we have anything to reflect what numbers you pulled out and from where to put into this formula?

A.   Any neuropsychologist with familiarity with this scale would know --

Q.   Do we have what you pulled to do this calculation?

A.   All my data are available and would know exactly what to put to do the calculation.

Q.   Can you show us where your data is where you did this

calculation, in other words, what number you drew for the HII to compare what IQ number to add up to zero, or what numbers you drew from the verbal IQ and performance IQ difference to get to 18 using these various tables?

A.   Well, the different scores, we just subtracted verbal IQ minus performance IQ to get 18.

Q.   And then how do you get the score of two?

A.   Then you take the 18, and you look it up on the table for the deficit scale, and it tells you what score is applied to that difference.

Q.   We have no way of knowing whether 18 actually results in an addition of two without going to the table to see whether or not you pulled the correct number from the table to put onto this paper?

A.   That's right.

Q.   Right/left differences, again, somehow you came up with a number of 12, correct?

A.   Yes.

Q.   And you add these up to a total of 29.  And 29 translates -- where do you get the word "mild impairment"? Is there a table that says 29 equals mild impairment?

A.   Yes.

Q.   Do you have that book with you?

A.   No.

Q.   So at this stage we pretty much have to go on your word

that this is correct to rely on that.  And that only results in a characterization of mild impairment, correct?

A.    That is correct.

Q.    And so what real life manifestations would there be of this calculation?

A.    Mild impairment in his brain functioning.

Q.    Translate that for us, Dr. Martell.

A.    I think this is sort of asked and answered, that, you know, these are mild, subtle impairments that may not --

Q.    How subtle?

A.    Subtle enough that the average person may not notice them, but they may impair his ability to do common, everyday things that --

Q.    See, that's what I'm trying to get at.

        MR. MORENO:  May I ask that the witness be allowed to answer?

        THE COURT:  Let him finish.  Subtle enough people of ordinary intelligence would not notice them.

Q.    I think I cut you off when you were talking about tasks, and that's what I'm trying to zero in on.  Some people couldn't pick up subtle impairments in doing what?

A.    Everyday things like making change, having a conversation, functioning in the world in terms of in adaptive ways.

Q.    Was this result of mild impairment consistent with any

real world experience that you had with Mr. Allen?

A.    No.

Q.    The last test that you relied on in your diagnosis of dementia, page 32 of your report, is this HII.  And that is the Halstead Impairment Index --

A.    Yes.

Q.    -- which we have here.  This particular test indicates that it's from Reitan with a copyright of 1959.  Is that correct?

A.    Yes.

Q.    Am I reading that right?

A.    You are.

Q.    There's no more updated version of this?

A.    No.

Q.    And so we've got Tables 1, 2, and 3.  Is this a fairly simple calculation that looks at only a few of the tests that you gave?

A.    Yes.  It looks at the tests in the Halstead-Reitan battery.

Q.    Okay.  So it is sort of self-focused on what the tests that are within its --

A.    This is way that the doctor could give this battery of tests and at the end of the day come out with an answer, is there suggested brain damage and how bad is it?

Q.    Category Test, 51 or more errors.  How many errors did

he have?

A.    17.

Q.    Is that a 17?

A.    Yes.

Q.    You sure that's not a seven in parenthesis?

A.    That's a 17.  I could go back to the original data.  I don't have it on the stand.

Q.    Okay.

A.    I believe that's a 17.

Q.    And what does the Category Test test?

A.    A Category Test is a test of abstract reasoning and problem solving.

Q.    Okay.  Now, this Table 1 is titled "Halstead Cutoff Scores Suggesting Brain Damage."  This is not a definitive conclusive test that he, in fact, has brain damage, correct?

A.    That's correct.

Q.    It is a measure that suggests the possibility of brain damage?

A.    That's correct.

Q.    The TPT Total Time, that's which test?

A.    That's where he puts the wooden blocks into the board while he's blindfolded.

Q.    And that's the feeling?

A.    Yes, it's a tactile.

Q.    Tactile?

A.    Tactual it's called, Tactual Performance Test.

Q.    So his ability for his brain to recognize things that his fingers are touching when blindfolded?

A.    And to put them on the right spots on the foam board.

Q.    Any real life skill that that relates to?

A.    Not directly.

Q.    Seashore Rhythm.  How does that -- how is that administered?

A.    It's administered with a tape recorder.  He hears pairs of rhythms and has to determine if they are the same or different.

Q.    Okay.  Speech-Sounds Perception.  I don't think we talked about that yet.  Speech-Sounds Perception.  What test is that?

A.    It's also administered on a tape.  He hears a person saying nonsense syllables --

Q.    Uh-huh.

A.    -- and then he's given choices on a paper and is asked to underline the spelled out word that's as close to the word he hears on the tape.

Q.    And eight or more errors, he had eight wrong?

A.    Yes.

Q.    So he was right at the cusp of having something counted against him?

A.    He was at the cutoff.

Q.   The other test that we see up here, the Category and the TPT and the Seashore, those don't go past the cutoff, so those were all ones that don't count as scores that suggest brain damage, correct?

A.   Correct.

Q.   This one because it's eight or more, that one apparently counts, correct?

A.   That counts.

Q.   That's why you circled it?

A.   Yes.

Q.   And then the other one -- and that's the ability to, like you said, recognize syllables that are nonsense?

A.   Yeah, like freep, f-r-e-e-p.  You would hear the tape said freep.  And then you've got different spellings; freep and freed and Greek and you'd have to underline the one you heard.

Q.   That you think you heard?

A.   Yes.

Q.   Okay.  Any real life skill of that test that you're aware of?

A.   It's really testing sustained attention, auditory attention.

Q.   Finger Oscillation Tapping.  Is that basically you have like a little Morse code type of tapper and they have to tap it as many times as they can within a certain period?

A.    That's correct.

Q.    And how many trials are there of that?

A.    Generally five, but they can go up to ten with each hand.

Q.    And so if you have 50 or less taps in ten seconds, is that on any -- how many trials did you give him?

A.    I'd have to go back and look at the paper.  You want to get five trials within five taps of each other.  So you keep going until you get that.  If you don't get that then you throw out the highest and the lowest and take an average over the ten.  It's the average score that needed to be 50 or less in order to be impaired.

Q.    So he, again, was very close to the cutoff of 48.2?

A.    Yes.

Q.    So on the two tests that count against him, he was at or near the cutoff?

A.    He was at or below the cutoff.

Q.    For being counted, correct?

A.    Yes.

Q.    So this is actually a relatively simple test, isn't it, that over here in Table 3, you basically take the number of Halstead tests that you gave, the number that got counted by these cutoff scores, and that ends up with a factor, correct?

A.    Exactly.

Q.    So you gave him seven Halstead tests; is that right?

A.    That's right.

Q.    And now some of those there's only a five in these cutoffs, correct?

A.    I'm sorry?

Q.    Well, there's only category TPT, Seashore --

A.    TPT has three scores.

Q.    Three scores, okay.  So it's one, two, three, six, seven.  Okay.  So out of seven tests, there were two that got held against him because he was just at or just over the cutoff, correct?

A.    He was at or below the cutoff, that's right.

Q.    And then that ends up on this table that I circled down here with the Halstead Impairment Index number of --

A.    .3.

Q.    -- .3.  And then over here, that somehow translates into mild; is that correct?

A.    Yes.

Q.    What is the significance of this line here, that the impairment index has to be .5 or above to suggest brain damage?

A.    That generally the cutoff before you're going to call the neurosurgeon and say I think we have brain damage is a score of .5 or higher.

Q.    So if you don't have .5 or higher in your index score, this particular table is saying you don't have brain damage?

A.    Correct.

Q.    So with the .3, would that translate into he does not have brain damage according to this table?

A.    It translates into he has mild neuropsychological deficits.

Q.    Is that what you actually said, though, in your report?

A.    Where?

Q.    Well, interestingly enough on page 32, you told us about the neurodeficit scale, but you omitted, did you not, the results from the HII that you calculated?

A.    The HII is incorporated within the neuropsychological deficit scale -- score, so I didn't report it separately. It's widely viewed as being unreliable anyway.  And it is best used in the context of the deficit scale.

Q.    So even though it has its cutoff suggesting brain damage of .5 or above, and he's at .3, you nevertheless calculated this, reached a result that pointed in the direction of no brain damage, and once again you chose to rely upon the neurodeficit scale, which was above some cutoff suggesting brain damage, but ignored in your report the one that suggested he didn't have brain damage, correct?

A.    No, that's not really correct.  They both indicate that he has mild impairment.  And that's what I reported.

Q.    Does this indicate he has brain damage?

A.    It's not a .5 or above suggesting brain damage.  I

didn't say anything about brain damage.

Q.    In this particular test in this table as well, does it also say:  "The following test, while not contributing to the Halstead Impairment Index has an established cutoff score for brain damage"?

A.    Yes.

Q.    And for the Trails A, that's 40 seconds or more, and his score was 26, solidly below the cutoff, correct?

A.    Yes.

Q.    For Trails B, 91 seconds or more, his score was 80. Again, solidly below the cutoff?

A.    That's right.

Q.    And you actually have now in the particular range, don't you, two separate Halstead indicators that he does not have brain damage.  And you did not include them in your report on page 32, did you?

A.    Because I don't think that's right.

Q.    And so you don't think that these things are an example of cherrypicking?

A.    I don't.

Q.    Okay.  On the Speech-Sounds Perception Test, you characterize it as mild impairment, correct?

A.    Yes.

Q.    Is that right?

A.    Yes.

Q.   Okay.  I'm sorry, that's not the one I want to show you.  This is the set of the norms for the Halstead-Reitan that existed at the time this case went to trial, correct?

A.   Yes.

Q.   These were 1991, which is about 30 years, 40 years after the -- 30 years after the 1959 test you used for the HII, correct?

A.   Correct.

THE COURT:  Now, where are you?  I'm lost.

MR. HOLTSHOUSER:  I'm on Exhibit 558.6.  I'm going to go to page 6.

THE COURT:  And what is this?

MR. HOLTSHOUSER:  And these are -- these are the norms that are actually in the book in existence at the time of Mr. Allen's trial that contained more particular information about the significance of the HII, the Halstead Impairment Index.  I'll put that down here.  HII.

BY MR. HOLTSHOUSER:

Q.   You see here the HII is right here in the first column?

A.   I see that.

Q.   Okay.  And you calculated an index of .3, correct?

A.   I did.

Q.   And that results in a scaled score of ten, correct?

A.   Yes, it does.

Q.   Now, if we go to the data that exists at the time of

Mr. Allen's trial in Exhibit 558.8, which is the other appendix, the same thing we're looking at, for the HII, this is for a male, education nine to 11 years, 20 to 34.  If you have a scale score of ten, it results in a T-score of 47, does it not?

A.    Yes.

Q.    And a T-score of 47 is only 3/10th below the mean, isn't it?

A.    It is.

Q.    And that is the area of no impairment, isn't it?

A.    It is.

Q.    So why is it that you went all the way back and used the 1959 version of that table rather than the one in existence in 1991 that contained more normative data in order to evaluate the significance of the HII result?

A.    Because I needed to calculate the HII in order to put it into the neuropsychological deficits.

Q.    If you calculated it, though, you would have seen that the HII result indicates no impairment according to the Compendium in existence at the time of Mr. Allen's trial?

A.    That's correct.  I didn't report any HII results.

Q.    And that was your choice?

A.    Yes, because I think that it's not a good measure.  And I think the field has recognized it as not a good measure that is no longer viewed as reliable.

Q.    But apparently it's good enough and reliable enough to be included within the neurodeficit scale calculation? There's no inconsistency there?

A.    I hear the inconsistency.  The problem is the neuropsychological deficit scale is an effort by Dr. Reitan to improve on the HII and supplanted it.

Q.    Dr. Martell, you have to know -- we're going to go away from testing for a moment.  During the time you evaluated Mr. Allen, you talked to him about the crime, correct, the offense?

A.    I did.

Q.    And I think you said you talked to him about it a bit. Is there anything in your report that contains a summary of his statement to you about the offense?

A.    No.

Q.    And did he try to in his conversations with you minimize his involvement in the offense?

A.    He did.

Q.    Pardon me?

A.    He did.

Q.    He did?  He claimed that he was in the car, but he had not actually been in the bank, and that he was actually innocent, correct?

A.    That's my recollection, yes.

Q.    Did you ask him about the extent of his functioning and

what he was like in the moments during and -- before, during, and after the offense?

A.   I did not.

Q.   You were aware that the claim at least in this case is that Mr. Allen suffered from PTSD at the time of the offense, correct?

A.   Yes.

Q.   What is the TSI?

A.   The Trauma Symptom Inventory.

Q.   And did you give Mr. Allen the Trauma Symptom Inventory?

A.   Not that I recall.  If I did, it would be listed in my report.

Q.   You mentioned in your direct testimony that one of the cases in which you previously worked was in a case involving Alphonso Rodriguez of Fargo, North Dakota?

A.   Yes.

Q.   And you referred to the firewall team, correct?

A.   Yes.

Q.   And that firewall team included myself and Ms. Costantin among others, you recall?

A.   Yes, it did.

Q.   You were not actually called to testify in that case, were you?

A.   I was not.

MR. MORENO:  Your Honor, could we take a short break, please?

THE COURT:  All right.  We'll be in recess for ten minutes.

MR. MORENO:  Thank you, Your Honor.

(Court in recess from 4:26 p.m. until 4:39 p.m.)

BY MR. HOLTSHOUSER:

Q.    I think when we left off, Dr. Martell, I was asking you about conversations you had with Mr. Allen about the offense. I think we exhausted that topic, but -- no, actually we were talking about Alphonso Rodriguez in North Dakota.

A.    Yes.

Q.    In the -- in that particular case, you examined Mr. Rodriguez and found he did not suffer from PTSD; is that correct?

A.    Honestly, I don't recall.

Q.    Okay.  If I told you that that's what you opined, would you doubt it?

A.    I wouldn't doubt it.

Q.    Okay.  And you know that Mr. -- do you know that Mr. Rodriguez is engaging in the same type of litigation that Mr. Allen is here; that is, he has filed a 2255 claim?

A.    I'm not aware of that.

Q.    Now, one of the experts that you ultimately became aware of in this case was a Dr. Pablo Stewart, correct?

A.    Yes.

Q.    And are you aware of or have you seen Dr. Stewart's criticism in an affidavit of your work in the case of Fargo, North Dakota?

MR. MORENO:  I'm going to object to relevance.

MR. HOLTSHOUSER:  Judge, I think it's relevant, and I can tie it up.  It has to do with tests that he did or did not perform.

MR. MORENO:  I still don't see how it's relevant to Dr. Martell's credibility or the issues before the Court in this case what another doctor said about Dr. Martell in another case.

THE COURT:  Yeah, I'm struggling with that.  How is it relevant?

MR. HOLTSHOUSER:  Well, Judge, I guess I can make a quick offer of proof that Dr. Stewart, who of course you know is someone who submitted a declaration in this case --

THE COURT:  Right.

MR. HOLTSHOUSER:  -- that in part formed the basis of the -- that the Court granted the hearing.  And I believe it's something that Dr. Martell has reviewed and taken into account.  That he has in the Rodriguez case filed an affidavit criticizing the quality of work done by Dr. Martell, particularly with respect to his analysis of PTSD and particularly critical of his failure to give a test

that I asked about earlier called TSI, Trauma Symptom Inventory.

I can ask the questions in a way that leaves Dr. Stewart out of it, though.

MR. MORENO:  And I thought that Dr. Martell testified earlier, and I could be wrong, I thought he testified that he had not read --

THE COURT:  That's what he said in this case, he said he had not --

MR. MORENO:  He had not read Dr. Stewart.

THE COURT:  I'm sorry.  We're on two different -- I thought earlier he said that he did not give the TSI inventory test in this case.

MR. HOLTSHOUSER:  He did say that.  I think he previously also said that at the time he wrote his report, he had not reviewed or was not aware of Dr. Stewart's examination or declaration.  I think he has seen it and been given it since then --

THE COURT:  Right.

MR. HOLTSHOUSER:  -- because we talked about it at his deposition.

THE COURT:  Right.  That's what I understand.

MR. HOLTSHOUSER:  Dr. Martell's deposition.

MR. MORENO:  I still don't see the relevance.

THE COURT:  I don't believe it is either.  Go ahead

and make your offer of proof.

MR. HOLTSHOUSER:  I'm just going to move on for the sake of time, Judge, and rephrase the question.  Because I think we're going to try to get this in as we predicted.

BY MR. HOLTSHOUSER:

Q.    You did not administer the TSI, correct?

A.    No.

Q.    Even though you knew that one of the features was a prominent issue here is the existence or nonexistence of PTSD?

A.    I don't think the TSI is a good instrument.  I use the PAI instead.

Q.    And when you say it's not a good instrument, would you be surprised that other professionals in your field disagree --

A.    No, I wouldn't --

Q.    -- and think it is a sensitive measure for PTSD?

A.    No, I disagree with that.

Q.    I'm going to direct your attention again to the Compendium of Neuropsychological Tests, Exhibit 590.  Does this appear to be a section of the Third Edition, which deals with the Trauma Symptom Inventory?

A.    It does.

Q.    And this is something that exists at the time you were examining Mr. Allen, correct?

A.   Yes.

Q.   Okay.  And the purpose of the test -- you have used it in the past, have you not?  Have you administered it?

A.   I have administered it in the past.  I've come to read criticisms of it in the professional literature, particularly the problem that it's face valid and easy to fake, despite the fact that it has built-in lie detector scales.  And I have discontinued using it --

Q.   Now --

A.   -- because of that.

Q.   -- in the Alphonso Rodriguez, did you, in fact, give it to him?

A.   I don't remember.

Q.   And, in fact, did you rely on it to conclude that he did not have PTSD, because his symptoms, his responses about symptoms was inconsistent?

A.   I may have, yes.

Q.   So is your use of the TSI selective?

A.   No, my use is informed by developments in the literature.  And those developments have occurred since that time.

Q.   Since 2006?

A.   Yes.

Q.   Does it describe the test as -- I'm pointing your direction here.  It consists of 100 items.  Nightmares, bad

dreams, irritability that tap four broad areas of distress, dysphoric mood, post traumatic stress, sexual difficulties, and self dysfunction.  That at least is a test that would have been specifically directed at the type of diagnosis here, correct?

A.   It could have been.

Q.   And there are scales in it, according to the Compendium, that are most relevant to Post Traumatic Stress Disorder, correct, the IE, the DA, and the AA?

A.   Those three are the most -- of the scales, they are the most relevant, yes.

Q.   In the commentary in this text, does it indicate the TSI exhibits reasonable convergent and incremental validity?

A.   Yes.

Q.   Now, even though you didn't give him the TSI, you did give him another test, correct?

A.   I did.

Q.   A detailed assessment -- well, I take that back.  Did you also give to Mr. Rodriguez a thing called the Detailed Assessment of PTS?

A.   DPTSD?

Q.   Detailed Assessment of PTS.

A.   Yes, I did.

Q.   Okay.  Did you give that to Mr. Allen?

A.   I did not.

Q.   I want to ask you if you agree with this statement, that your failure to specifically address the crime with Mr. Allen in detail made an accurate and reliable mental health assessment very difficult.

A.   I disagree with that entirely.

Q.   Okay.  And would you similarly disagree with it if you knew that it was an opinion expressed by Dr. Stewart about your work in the Alphonso Rodriguez case?

MR. MORENO:  I'm going to object to the relevance.

MR. HOLTSHOUSER:  I'm asking simply if he knew who the source of the criticism was, whether it would impact his view of it?

MR. MORENO:  I still object to relevance.

THE COURT:  It's tangential.  Overruled.

A.   I don't know Dr. Stewart.  His opinion is not particularly significant to me.

Q.   From the information that you had regarding abuse, did you come to the conclusion that the abuse of Mr. Allen began at a very young age and continued throughout his life until the time he was incarcerated?

A.   I think neglect started early and abuse came as he grew older, and got worse.

Q.   When you say "older," what age are you pinpointing?

A.   By -- certainly by teenage years.

Q.   So you're saying the abuse, the physical abuse that

you've described and labeled as abuse didn't start until he was a teenager?

A.    Well, it's unclear.  The declarations don't anchor to points in time.  So I'm going in part on what they say and in part on what he told me.

Q.    If any of the declarations were anchored to periods of time, let's say prior to age ten or nine, and I'll ask you to also assume for the purpose of this question, that during those years, from birth until eight or nine, he was seen by -- on a regular basis by the same pediatrician, a Dr. Grabau, and that that's reflected in the medical records that you yourself reviewed.

A.    It is.

Q.    If there were unexplained bruises, scars, marks, or other evidence of abuse, wouldn't you expect a pediatrician like Dr. Grabau to note it?

A.    Yes.

Q.    Is the absence of it from any of his notations on the times in which he evaluated and saw Mr. Allen suggests that it wasn't occurring in those years?

A.    That's harder to say.  He may or may not have looked for those signs because he's dealing with the presenting problem.  And there may not have been physical stigmata on those particular dates that he was seen.  So it's interesting, but I don't think compelling evidence that it

didn't occur.

Q.   You did give him -- while you didn't give him the TSI or the other test that we just referred to in connection with Mr. Rodriguez, you gave Mr. Allen a test called the PAI, correct?

A.   I did.

Q.   And it's a true and false test that asks him to state whether certain questions are true or false?

A.   That's not correct, it's actually a multiple choice test.

Q.   Okay.  Did the interpretive scales for the PAI include a PTSD scale?

A.   Not explicitly.  There's a traumatic stress subscale.

Q.   There is?

A.   Yes.

        MR. HOLTSHOUSER:  Let me go back to the Sanction. Maybe we're not.

        MS. COSTANTIN:  If you exit and go back in.

        MR. HOLTSHOUSER:  I did that already.

Q.   Do you recall what, if anything, that scale indicated with respect to PTSD for Mr. Allen?

A.   Let me refresh my recollection with my report if I may.

Q.   Okay.

A.   I don't have a notation here about that scale in particular, so I would need to see the test protocol.

Q.   Go back to the document camera, please.  This is part of exhibit -- at this point I'm not sure what exhibit number it is, but I'm going to label it 688 for the time being.  I'm going to show you page 4.  Is this the kind of indexes that are produced by the PAA?

A.   PAI.

Q.   PAI.

A.   Yes, they are.

Q.   And there's these things called Coefficients of Fit?

A.   Yes.

Q.   And there's one for Post Traumatic Stress Disorder?

A.   Yes.

Q.   .837?

A.   That's correct.

Q.   Are these things then indicated on graphs?

A.   I don't believe so.

Q.   All right.  And what would that coefficient indicate with respect to PTSD?

A.   It's fairly high on the list.  The larger the number, the closer his profile is to those known clinical groups.  So when you look at the list, he's closest to depression and PTSD, with some other things in the middle.

Q.   Did he, in fact, have more than 20 percent of the items unanswered?

A.   I don't believe so.

Q.    Look -- show you page 6.  You see here that the number of uncompleted items is within acceptable limits but any interpretation should therefore be viewed with caution?

A.    Well, the issue is on one or more specific scales he didn't answer all the questions.  My -- and it says right under that that those were alcohol and drug scales.  And that's not unusual in a prison setting where they ostensibly don't have access to alcohol and drugs.  They don't know how to answer the question, and they leave it blank.

Q.    Then the next paragraph, does it indicate that certain indicators fall outside of normal suggesting respondent may not have answered in a completely forthright manner?

A.    Yes.

Q.    The nature of responses might leave the evaluator to form a somewhat inaccurate impression of him?

A.    Yes.

Q.    And with respect to positive impression management, is that the notion of faking good?

A.    Yes.

Q.    There is no evidence to suggest that he was unduly defensive or motivated to portray himself as being relatively free of common shortcomings and minor faults.  That would indicate from the PAI he was not faking good?

A.    That's right.

Q.    In the next paragraph does it indicate that there are

subtle suggestions that the client attempted to portray himself in a negative or pathological manner in particular areas?

A.    Yes.

Q.    And that some concern about distortion of the clinical picture must be raised as a result?

A.    Yes.

Q.    That there are patterns of features that are unusual or atypical in clinical populations, but common among individuals feigning mental disorder?

A.    Relatively common, yes.

MR. HOLTSHOUSER:  If I can have just a second, Judge.  Those are all the questions I have.

THE COURT:  Redirect?

MR. MORENO:  Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. MORENO:

Q.    Dr. Martell, I just have a few more questions for you --

A.    Sure.

Q.    -- then you can be on your way.

Now, you were asked by our office to do a retrospective sort of evaluation looking back as best one can do in 1998, the time that Dr. Gelbort had done testing of Mr. Allen.  Is that correct?

A.   Yes.

Q.   All right.  And you were asked to use the tools that would have been available to him at that time; is that correct?

A.   That's correct.

Q.   Now, was the use of the norms that you used, the age appropriate norms, that he was 30 when you evaluated him --

A.   Yes.

Q.   -- give or take and used those norms as opposed to the norms at 19, would it have been improper and/or unethical to administer the norms for a 19-year-old when Mr. Allen was 30?

A.   It would have been improper, and it could have led to unreliable results.  I mean, this is a strange situation.  And I have to do my best to approximate in the most reliable and valid way I could what could have been found at the time.

Q.   Now -- I'm sorry, go ahead.

A.   At the time.

Q.   If you had been asked to do something in this context that you couldn't do properly as a neuropsychologist, would you have told Mr. Wiseman that I can't do that, that that's not proper and we're going to have to look for another way to go about this?

A.   Sure.

Q.   Now, the norms that you used, you were following the advice of Dr. Heaton?

A.    Well, with regard to my concerns about the race norms, yes.  But I used the norms that were available at the time of trial.  The race norms were not available at that time and could not have been used.

Q.    If you --

A.    On top of that is the issue that there's concerns about their reliability and validity.

Q.    Irrespective of whether or not you were being asked to go back in time and use instruments available at the time in 1998, if you got this case now at the trial level and you were asked to do a neuropsychological evaluation of Mr. Allen today, what norms would you use?

A.    I would use the same norms, the blended original norms because those are the only norms appropriate in a capital case for an African American defendant.

Q.    And is there literature that you're aware of that supports that position?

A.    Yes, there is.

Q.    And are there other neuropsychologists that you're aware who apply the same norms that you do in a capital context?

A.    Yes, there are.

Q.    Are you an outlier in that respect as far as you know?

A.    Well, it's a small community, and I think people are getting up to speed on this issue.  I was unaware of it until

a couple years ago where I got cross-examined as the prosecution expert and accused of using the wrong norms. The issue there, the woman was not African American and it did not really apply. But it is a relatively new issue, but one that is getting wider appreciation.

Q.   And do you feel confident to a reasonable degree of scientific certainty that you are applying the right norms by using the blended norms in a capital case?

A.   Absolutely.

Q.   Now, despite the errors that were made in this case in terms of scoring, is it your opinion as you sit here today that Mr. Allen indeed, as Dr. Gelbort found, has some brain dysfunction?

A.   Yes.

Q.   And do you believe despite the errors that he still meets the criteria for dementia?

A.   He does.

Q.   And can dementia be static over time, it stays the same?

A.   Yes, it can. This is one of the features that we use to classify what kind of dementia you have, the way it progresses. But it can be static and unchanging as it is in Mr. Allen's case.

Q.   That was my next question. So it is in Mr. Allen's case?

A.    I believe it's stable.  If he were to be tested again in five years, I would expect you'd see the same pattern, nothing much better, nothing much worse.

Q.    Is that uncommon with this type of diagnosis that you can have someone as young as Mr. Allen meet the criteria for dementia and have it sort of be a static course?

A.    Well, given what I believe are the risk factors that account for the brain dysfunction, those are things that, you know, recover and then stay stable.  So the damage is done, and he is what he is.

Q.    Now, you were asked a lot of questions about sort of the day-to-day practicality of the type of subtle impairments that you've talked about that your testing found.  Are there other type of impairments that this subtle type of brain damage can cause that relate to behavior?

A.    Well, I think his psychiatric problems created more distress.  I mean, the dealing with the child abuse issues, the risk-taking behaviors, the depression, the PTSD, those issues caused more direct behavioral impact.  And then the mild brain dysfunction just piles on in addition to that in making his behavior difficult.

Q.    Can you tell us whether or not the type of mild impairment that he has would have any impact on impulsivity?

A.    It certainly would.

Q.    And is that uncommon in brain dysfunction?

A.    It's very common in brain dysfunction.

Q.    Now, when you were talking earlier about additive burdens, and you have the additive burden of the -- I think you testified on direct examination that child abuse can cause impaired judgment, impulse control issues.  So would this be an additive burden, the type of impulsivity that can stem from this type of subtle dysfunction to the overall picture of impulsivity?

A.    It certainly contributes to the totality of who he was as a person.  You can't -- you know, it would be nice if we could tease it apart and say, well, it's 10 percent brain damage and 20 percent mom's alcohol.  But you can't do that.  Those things all get soaked in and become who the person is.

Q.    Now, when you administer -- let me ask you a question about the CLVT.  You were asked a lot of questions about the CLVT.  Is that a validated test?

A.    It is.

Q.    And is that a standardized test?

A.    It is.

Q.    So are there specific instructions that you cannot deviate from when you're administering that test?

A.    Yes.

Q.    And did you follow those protocols?

A.    I did.

Q.    Now, when a test -- you were asked a lot of questions

about a test.  It is alluding me right now, but it was the one where Mr. Allen was shown different musical instruments.

A.     Yes.

Q.     And you were asked given his education and his background and where he came from, he might not know what an accordion is.  Are you allowed as a matter of protocol to prescreen a particular testee to see if they actually know what the items are?

A.     No, of course not.

Q.     So you have no discretion in that?

A.     I have none.

Q.     So whether or not he came close with the, I think it was an accordion -- or, no, the abacus?

A.     Yes.

Q.     Yeah, he came close.  Or whether or not he may or may not have had exposure to those in the past, you had no discretion about how you would score them?

A.     That's right.

Q.     Would it have been a deviation from the standard of practice for you to have first checked with Mr. Allen as to whether or not he's familiar with these items?

A.     Yes, absolutely.  I mean, this is part of the reason that we have norms, so we can compare, you know, maybe people who get to eighth grade and never seen an accordion or a compass.  But that would be reflected in the school norms.

Q.   And the norms that you applied to that particular test, did they conform to his proper education and age?

A.   They did.

Q.   Now, you were asked questions about cherrypicking.

A.   Yes.

Q.   And whether or not you were leaving out the scores that showed average, normal functioning, if not even some a little above, versus reporting the scores that were only in the impaired range.  In writing your report, did you follow the standard practice of neuropsychologists and the information that you conveyed to the Court in your report?

A.   I believe that I did.  What I tried to convey were the problems that I found.  Another approach would be to list every test and every performance.  It's been my experience over time that that's difficult for lay people to read and comprehend, and that it's more helpful to have a precis that cuts to the chase and lists what the findings are.  And that's what I did here.

Q.   The findings of impairment you're talking about?

A.   Correct, the basis for the diagnosis.

Q.   Does the fact that he may have had an average score on one test, testing in a similar area, and impaired score on another, do they cancel each other out?

A.   Well, it depends.  Generally, for example, there was questions about that with regard to frontal lobe testing.

Frontal lobe subsumes a large variety of behaviors.  And you can be intact in some as he is and still impaired in others.  And it's still, the fact you are impaired in the others is evidence of frontal lobe executive dysfunction.

So you don't discount that.  Because he can do one thing, doesn't mean that you give less credit to the fact that he can't do the other.

Q.    So if you were to report both scores, the one that he had impairment on and the one that he functioned normally on, at the end of the day would you still say he's impaired?

A.    Yes.

Q.    And would that have been what you reported to the Court, that despite these two scores, he meets the DSM criteria for impairment?

A.    Yes.

Q.    You were asked about the PAI for PTSD as opposed to the Trauma Symptom Inventory?

A.    Yes.

Q.    And why do you prefer the PAI over the TSI?

A.    The PAI is the broad band of psychopathology.  It's not just PTSD symptoms, so it's less obvious to the test taker what the test is measuring.  It looks for impairment across a wide range of mental disorders.  The problem I have with trauma specific instruments or any diagnosis specific instrument is they can easily be figured out, and the people

that want to manipulate them, that want to look like they have PTSD can easily create that impression.

So I prefer to use a test that is less obvious on its face, and that only people who really have the symptoms are going to endorse, selectively endorse those symptoms and not the others.

Q.   Is the PAI a test that's widely accepted and used in the neuropsychological community?

A.   Yes, absolutely.

Q.   And how long has the PAI been around, if you know?

A.   Since the 1980s.

Q.   The PAI is also a validated test?

A.   Yes, it is.

Q.   And it's also standardized?

A.   Yes, it is.

Q.   Now, the CLVT, when you scored the CLVT and reported the scores, did you report them consistent with, and I may have already asked you this, the best practices?

A.   Yes, I did.

Q.   Now, you administered a number of tests for malingering that Mr. Holtshouser spoke with you about.  You administered the Rey 15, correct?

A.   Yes.

Q.   And you administered the TOMM?

A.   I did.

Q.    And were there -- in the other tests that you administered, are there embedded malingering scales in some of the other tests that you administered to Mr. Allen?

A.    Yes, there are.

Q.    And in what tests would those be included?

A.    In the IQ test, something called the Reliable Digit Span, that's widely relied on.  There are ways of looking at test performance on the Halstead-Reitan battery.  I don't know that I did that in this case because he passed on the other things.

Q.    Did you look at those other embedded measures for malingering in his testing?

A.    I don't believe so.

Q.    So I guess my question is, do you know whether or not they came out as non-malingering at all?

A.    I don't know.

Q.    You don't know?

A.    I don't know.

Q.    Now, you were asked why if the TOMM is a test for memory, you wouldn't report it as a memory test.  Showing that in contrary to some of the other testing you did and you reported that, in fact, on the TOMM he had done a very good job.  Is the TOMM an appropriate vehicle and appropriate instrument for assessing memory impairment?

A.    No, it's used for assessing memory malingering,

pretending to have a memory problem.

Q.    If you were to use the TOMM to test memory, to test for memory impairment, the same way you did the CLVT or the Boston Naming or some of the other tests, would that be --

MR. HOLTSHOUSER:  Judge, I'm going to object because I don't think there's any evidence that those are memory tests.  The only memory test that he relied on is from the WAIS and the WMS.

MR. MORENO:  That's fine.

MR. HOLTSHOUSER:  The CVLT is a verbal test.

MR. MORENO:  Correct.

A.    I'm sorry.  There's no question before me, but that's incorrect.

Q.    All right.  That's incorrect?  What would be correct? What would the memory tests --

A.    The CVLT, the WAIS Memory Index, and the Wechsler Memory Scale are all memory instruments.

Q.    If you had used the TOMM instead of any of those instruments, would that be professionally inappropriate?

A.    Yes, it would be malpractice.

Q.    Did you find any support for your conclusions about impairment in either Dr. Yutzy or Dr. Askenazi's data?

A.    I did.  I thought it was interesting.  And I think Dr. Cuneo as well may have mentioned rule out dementia as one of his concerns when he first evaluated him.

Q.    Right.  And I was going to go there, but go ahead.

A.    Oh, I'm sorry.

Q.    No.  Go ahead.

A.    As part of memory.  But there was also problems in Dr. Yutzy's mental status evaluation where he was asked to remember three words and then came back some time later and asked him to repeat the same three words.  He was unable to do that properly, which was an indicator at that time of memory impairment.

Q.    And how about Dr. Askenazi, was there perseveration in some of her data?

A.    There was evidence of perseverations and intrusions in her data set that she didn't score and she didn't report that were comparable to what I saw, and pointed out as indicia of frontal lobe impairment.

Q.    Now, you brought up Dr. Cuneo, and I had a little note to myself to bring up Dr. Cuneo as well.

A.    Okay.

Q.    So in his report he had indicated rule out dementia?

A.    Yes.

Q.    Is it fair to say back in 1998, dementia was actually on the mind of one of the experts who evaluated Mr. Allen?

A.    Yes, it is.

Q.    You were asked questions about why you chose the simple difference method over the predicted method.  Do you recall

those lines of questioning?

A.   Yes.

Q.   What overall test is that?

A.   I'm sorry?

Q.   What overall test is that a part of?

A.   That's part of the Wechsler Adult Intelligence Scale.

Q.   Is it improper to choose the simple difference method over the predicted method?

A.   No.

Q.   Does that fall outside the standard of care?

A.   It does not.  It was the standard of care.  This is an additional indicator, but where you find a deficit, you report a deficit.

Q.   Now, in terms of Mr. Allen's performance on the tests that you administered, not only do you do the tests for malingering that you administered, but can you tell us whether or not you make any observational assessments of Mr. Allen about either his effort, his concentration, demeanor.  You know, are those factors that you factor into whether or not he's putting out a reliable effort?

A.   Absolutely.

Q.   And do you have a recollection of what your observations were concerning Mr. Allen's test performance?

A.   They'd be in my behavioral observations.  And generally I found him to be engaged, effortful, focused, hard working.

I thought he did a good job, and the test validity measures supported that impression.

Q.   Did he appear to take the testing seriously?

A.   He did.

Q.   Did he ask questions if he had questions about what he was doing?

A.   Yeah.

Q.   Now, the impairment Dr. Cuneo found in 1998 and the impairments that you found in 2009, you testified earlier that they are pretty similar?

A.   Yes.

Q.   Is the --

MR. HOLTSHOUSER:  Did you say Cuneo?

MR. MORENO:  Gelbort, I'm sorry.  Yeah, I did say Cuneo.  I'm just trying to throw you off.

Q.   That Dr. Gelbort got back in 1998, is that evidence of sort of the static nature of the impairments that Mr. Allen does have?

A.   Yes, that they've been stable over time.

Q.   You were asked some questions about, you know, there really is quite a discrepancy between the IQ score found by Dr. Gelbort in his testing, I think what was it, an 82?

A.   I think that's right.

Q.   And the 100 that you found.  And I think Dr. Askenazi also scored him as 100, which is in the average range,

correct?

A.   Yes.

Q.   And I believe you were asked some questions about whether or not Mr. Allen's alcohol consumption or his marijuana use would have any impact on his IQ?

A.   Yes.

Q.   Did you see anything in the records that indicated that Mr. Allen drank to such an extent -- well, let me backtrack for a minute.  Let me withdraw that and backtrack.

In order to have alcohol consumption impact your IQ, what level of consumption would you have to be engaged in to actually cause that kind of damage where your IQ would drop?

A.   Chronic abuse.

Q.   And "chronic abuse," would it be chronic heavy abuse, chronic "I drink a beer a night"?

A.   It would be chronic heavy abuse, drunk, you know, every day of the week for extended period of time to take that toll on the brain.

Q.   And did you see any evidence whatsoever in any source you reviewed to indicate that Mr. Allen drank to that extent where he would damage his IQ?

A.   No.

Q.   And I think -- I'm sorry, go ahead.

A.   Okay.  And the fact that his IQ is 100 belies that, you know, that that would be an explanation for it.

Q.   And would a potential explanation, and I know we'll never know, but would a potential explanation be sort of situational factors that you alluded to earlier such as home life, stress on the street, the violence on the street, the other pressures Mr. Allen may have felt?

MR. HOLTSHOUSER:  Objection, leading.

THE COURT:  Yeah, it is a little bit.  Overruled.  I'll hear it.

A.   Those certainly played a role.  I think his immediate situation of being, you know, with trial pending and being arrested on federal murder charges was kind of the preemptive, the most salient thing in the room.

Q.   Is that uncommon, that situational factors such as that type of stress can impact scores on an IQ test?

A.   It's not uncommon.  It's actually very common.  It's one of the things we look for in trying to determine if a score is accurate.

Q.   Is it -- can someone put forth good effort on an IQ test but with those type of stressors still score much lower than their baseline should be?

A.   Yes.  There is a phenomenon that's widely recognized called pseudodementia, where people become depressed, and because of the depression, they perform more slowly on the testing, they don't put blocks together as quickly.  They aren't able to access memories and solve problems.  And as a

result, they get an artificially lowered IQ score that then resolves as the depression improves.

Q.   Now, I'm going to sort of mishmash different notes I wrote down as you were being asked questions by Mr. Holtshouser.  You were asked -- we had talked earlier on direct examination about some of the threads of history of abuse that sort of came out a little at the time of -- in 1997, '98, and the threads being somewhat -- you know, the consistency between that and the allegations that were reported to you in 2009.  Do you recall that?

A.   I do.

Q.   And I think you were asked, was there any of those witnesses who sort of fell into the independent category, you know, they weren't a family member, they weren't mother, they weren't cousins?  Do you recall that Mr. Sam Moore, who was, I believe, a coach of Mr. Allen's, was one of the people who reported that abuse back at that time?

A.   Yes, I do recall that.

Q.   And he would not fall in that supposed tainted area, would he?

A.   Well, certainly further removed, further peripheral.  I mean, he had a personal relationship with him as a coach, but not like a family member.

Q.   Now, you had talked earlier about the additive burdens, the different stresses, the affirmative brain dysfunction,

the lead, the Pica, the abuse at home, the violence in the neighborhood, and how risk factors can lead to negative outcomes.

A.   Yes.

Q.   And I think Mr. Holtshouser made the point that these are risk factors, and they may be outcome determinative, but they are not necessarily outcome determinative?

A.   Correct.

Q.   In this case did Mr. Allen in your opinion have a negative outcome?

A.   Yes.

Q.   You were asked some questions about Mr. Allen being run out of the house by Juanita.  The questions were along the lines of, if he had been coming home late and being out dealing drugs, the implication was would that somehow justify locking someone out of the house overnight?  Do you recall that?

A.   I do.

Q.   In your opinion, again, and I think we covered this on direct, but I just want to make sure.  In your opinion even let's assume for the purposes of this question that indeed he came home late, and that indeed he had been out dealing drugs, and he's 15, 16, 17, is it ever appropriate even under those circumstances to lock a child out of his house all night?

A.    I don't believe it is.

Q.    Are you aware that last week Yvette Allen testified that sometimes his mother would throw him out for no reason?

A.    Am I aware she testified to that?  I didn't hear her testimony.  I'm not aware of what her testimony was.

Q.    In terms of the unpredictability we were talking about earlier of some of the violence in the home, what's -- does the unpredictability of when you may or may not be locked out of your house sort of have the same psychological ramifications?

          MR. HOLTSHOUSER:  Judge, I'm going to object as leading and outside the scope.  I don't think that's anything I went into on cross-examination.

          THE COURT:  Leading.

          MR. MORENO:  I'm sorry, Your Honor?

          THE COURT:  Leading.  Sustained.

BY MR. MORENO:

Q.    You were asked questions about community standards concerning abuse?

A.    Yes.

Q.    Are you aware of any community in the United States, whether it be Hispanic, African American, Caucasian, Latino, where punching a child in the face with a closed fist is acceptable corporal punishment?

          MR. HOLTSHOUSER:  Judge, I'm going to object unless

he lays a foundation.  It does not involve all those communities, so it's outside the scope of his expertise.

THE COURT:  Overruled.

A.    I'm not aware of any place in the United States where that would be considered appropriate punishment.

Q.    In the late 1970s, early 1980s, early 1990s, are you aware of any community where punching a child in the face with a closed fist would be acceptable corporal punishment?

A.    No.

Q.    Are you aware of any communities in that same time frame where whipping a child with an extension cord would be acceptable corporal punishment?

A.    No.

Q.    How about beating a child with a wooden stick, is that acceptable corporal punishment in the same time in any community that you're aware of?

A.    I guess it goes to extent and severity of the beating. Generally not.

Q.    Now, is the abuse you testified, you know, that you found to be credible from your records review and from the review of the different witness statements, was that mere corporal punishment?

A.    It was much more than corporal punishment.

Q.    Now, at the time that you were asked some questions concerning the school testing, and that there was more of a

decline in Mr. Allen's standardized testing scores, which had been somewhat consistent in terms of where he had problems and where he had some strengths.  Is it fair to say they were relatively consistent over time?

A.    They were pretty stable throughout elementary school.

Q.    And then he hit a certain age, maybe the eighth grade, where they plummeted?

A.    That's correct.

Q.    Do you have any idea whether or not there's a correlation with those scores plummeting and Mr. Allen experiencing more trauma at home?

A.    I do based on his reports of his mother's alcoholism getting worse as he got older and the abuse getting worse.

Q.    Could that be a reason also that Mr. Allen may have turned to marijuana and alcohol?

A.    Absolutely.  That's what the research literature has shown.

          MR. HOLTSHOUSER:  Objection, leading.

          THE COURT:  Sustained.  It is sustained.

BY MR. MORENO:

Q.    Does Mr. Allen come from a family where there is potentially a genetic predisposition to alcoholism?

A.    Yes, I believe he does, both his parents had problems with alcohol.

Q.    And a predisposition, a genetic predisposition to

alcoholism, is that sort of along the same lines of potential risk factors we've talked about in other contexts --

A.    Yes.

Q.    -- where it may cause a problem?

A.    It may and it may not.  It kind of depends on your life experience whether that risk becomes expressed or not.

Q.    Do you have an opinion concerning whether or not Mr. Allen's particular life experiences would help flip that switch, that genetic predisposition, given the heavy alcohol abuse that went on in his home when he turned to alcohol at a relatively young age?

A.    I think those stressors would flip the switch, and I think they did flip the switch.

Q.    You were asked about sort of the reliance on Mr. Allen for meeting the criteria for PTSD.  Do you recall that?

A.    I'm not sure what you're referring to.

Q.    All right.  Well, let me ask you this:  Is it unusual to have when you're evaluating someone for PTSD, when you ultimately conclude that they meet the criteria, that the way in which you reach that conclusion is based on what that person actually tells you what their subjective experiences are?

A.    Well, that's certainly part of it.  Testing is another part.  Life history is another part.  And when all those things coincide, come together, converge, then you make the

diagnosis.

Q.   And did you have that type of evidence in this case --

A.   Absolutely.

Q.   -- to support the diagnosis of PTSD?

A.   Yes, without a doubt.

        MR. MORENO:  Can I have just a moment, Your Honor?

        THE COURT:  Sure.

        MR. MORENO:  Thank you.

BY MR. MORENO:

Q.   You were asked -- there was a discussion that you and Mr. Holtshouser were having concerning norms.  And you were sort of being asked, well, you know, he's learned -- you know, he's reading in prison, he's clean, you know, his intelligence is probably going up.  Can you account for that in the educational norms?

        Is it possible to take that into account, those factors into account, or are you guided strictly by the age classification in the norms irrespective of whether or not someone is no longer using drugs or alcohol or reading a lot?

A.   You're guided by what the norms say.  I mean, you can consider those things clinically, but at the end of the day you define the IQ based on the empirical scores.

Q.   One of the -- at least my interpretation was one of the themes when you were being questioned about Mr. Allen's lower scores and educational deficits was that they were brought on

by not going to school?

A.    Yes.

Q.    Is that -- could that be the reason or are there other contributing factors?  I mean, there's no doubt as he got older he didn't go to school, right?

A.    Yes.

Q.    So are there other factors that would also play a role in those educational deficits that are reflected either in standardized testing or the testing that you did?

A.    Well, I think there's a multiplicity of factors that play.  You've got him not attending school.  You've got whatever inherent limitations he might have.  You have the abuse experiences inside of the home.  They all go together to reduce his motivation to do well, to sit through a test, and give his best performance.  All those things can account for why test scores dropped as he got older.

Q.    Did you have an opportunity during your review of the records that were provided to you to look at any of Mr. Allen's incarceration records?

A.    I don't recall looking at incarceration records.

        THE COURT:  I think there was -- I think earlier there were Franklin County records.

A.    Oh, I may have had early jail records.  Yes, I did have those, but not since he's been in Terre Haute.

Q.    That's where I was going actually.  You have not had a

chance to review any records since he's been in Terre Haute?

A.    I don't believe I have, no.

Q.    Can you tell us whether or not people who have the type of mild brain impairment that you discussed concerning Mr. Allen and have had the abusive experiences that he ended up with, and end up in prison, does a structured environment work well for those type of folks?

A.    Yes, it does.

        MR. HOLTSHOUSER:  Objection, beyond the scope.

        THE COURT:  Well, it is, but I'm not sure I understand.  Are you saying that based upon what he has, that the environment is satisfactory to him or what's your --

        MR. MORENO:  That he does well in a structured environment.

        THE COURT:  That's what I thought you said.  Okay. Overruled.  I'll hear it.

A.    Yes, the structure definitely helps with people that have brain dysfunction and the kinds of problems he presents with.  Having structure imposed for him definitely helps him to function better.

Q.    Would it surprise you that in 15 years he's never received a disciplinary ticket?

A.    No, it wouldn't surprise me just based on my interaction with him.

        MR. MORENO:  Your Honor, I don't think I have any

further questions.  Thank you.

MR. HOLTSHOUSER:  Judge, may I be permitted one recross-examination to clarify some confusion I have?

THE COURT:  Well, let's hear it.  We haven't done that.  Let's hear it.

MR. HOLTSHOUSER:  Judge, I'm totally unclear at the point whether his testimony is there was physical abuse that was occurring before age 14 or whether it didn't begin to the point where it reached abuse until he was age 14.  We've had varying accounts of like he was beaten every day from the time he was a youngster to -- I'm not so sure where Dr. Martell is resolving this credibility at this point.

THE COURT:  I think based upon what he said, I can figure that out.

MR. HOLTSHOUSER:  Okay.

THE COURT:  I just need to ask one question.  What's your hourly rate?

THE WITNESS:  $400.

THE COURT:  Okay.  Thanks.  You may step down. You're excused.

MR. MORENO:  Thank you, Your Honor.

THE COURT:  Court is in recess until 8:30 tomorrow morning.

(There was a brief recess.)

MR. HOLTSHOUSER:  Can we put this on the record,

Judge?  We talked earlier about this record of Mr. Allen being absent.

THE COURT:  About what?

MR. HOLTSHOUSER:  Mr. Allen being absent tomorrow.

THE COURT:  Oh, yeah.

MR. HOLTSHOUSER:  And we didn't know at the time what the possible universe of witnesses who could be called while he's absent.  To supplement the record while Mr. Allen is still in the courtroom, let him know at least who they think could be called in his absence so that he still concurs.

THE COURT:  Okay.

MR. MORENO:  And while this isn't written in stone, it is possible that tomorrow morning we would have Deborah Ruffin.

THE COURT:  Okay.

MR. MORENO:  Billy Wayne Allen, although that can't be right -- and possibly in the afternoon Angela Allen.

THE COURT:  Okay.  Now, up until this time, Mr. Allen, you've been informed, and I make this statement just for Court of Appeals reviewing this record and the person reviewing will need to go back in time today to a point where we discussed this at length.

Basically you have a doctor's appointment in the morning, and you have consented to be away from here and not

be present when witnesses are presented from 8:30 until approximately 10 o'clock.  Is that true so far?

THE DEFENDANT:  Yeah.  Yes, sir.

THE COURT:  Now, as I told you, if overnight or any time or in the morning, I get word that you want to be present, we will wait until you get back.  You understand that?

You understand the names of these individuals that have been disclosed, Ruffin and Billy Wayne?

THE DEFENDANT:  Yes.  Well, those names are some of the people I want to be here for.

THE COURT:  Okay.  Well, we'll wait in the morning until you get here.

THE DEFENDANT:  Okay.

THE COURT:  Are there some other witnesses that could be called that he wouldn't care if he was here or not?

MR. MORENO:  Right now that's all I've been told.

MR. HOLTSHOUSER:  And, Judge, at least with one of these witnesses that we just heard, Deborah Ruffin, there's been a witness list filed in this case very early on. Deborah Ruffin was not on it.  We've conferred a number of times with counsel as to who their witnesses were going to be, including most recently leading up to this, the beginning of this installment of this hearing.  And Deborah Ruffin, we were advised was not going to be a witness.

And so we would object to calling her at this late stage.  There is -- we simply haven't had enough notice to be prepared for her.

THE COURT:  Was her deposition taken?

MS. COSTANTIN:  No.

MR. HOLTSHOUSER:  No, it was not.  Did she submit a declaration?

MR. MORENO:  Yes.

MR. HOLTSHOUSER:  Are you sure?  I'm not so sure about that either.  She testified at trial, but I'm not sure she submitted a declaration.  So we would probably ask that -- to take her deposition if she did.

MS. COSTANTIN:  No, there's no declaration.

THE COURT:  I'll tell you what we can do, we can have a court reporter here in the morning.  And while Mr. Allen is doing his doctor appointment, you can take her deposition.  How is that?

MS. COSTANTIN:  That's fine.

MR. MORENO:  We'll let Mr. Holtshouser know if we can have her here in the morning for sure.

THE COURT:  8:30, okay.

MR. MORENO:  If we can do that, we'll let him know.

THE COURT:  Very well.  Court's in recess.

MR. MORENO:  Thank you, Your Honor.

(Court in recess at 5:42 a.m.)

C E R T I F I C A T E

I, Susan R. Moran, Registered Merit Reporter, in and for the United States District Court for the Eastern District of Missouri, do hereby certify that I was present at and reported in machine shorthand the proceedings in the above-mentioned court; and that the foregoing transcript is a true, correct, and complete transcript of my stenographic notes.

I further certify that I am not attorney for, nor employed by, nor related to any of the parties or attorneys in this action, nor financially interested in the action.

I further certify that this transcript contains pages 1 - 112 and that this reporter takes no responsibility for missing or damaged pages of this transcript when same transcript is copied by any party other than this reporter.

IN WITNESS WHEREOF, I have hereunto set my hand at St. Louis, Missouri, this 28th day of February, 2013.

_____
/s/ Susan R. Moran
Registered Merit Reporter