UNITED STATES OF AMERICA
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

BILLIE JEROME ALLEN,                    )
                                        )
          Petitioner,                   )
                                        )
     vs.                                )   No. 4:07-CV-27 ERW
                                        )
UNITED STATES OF AMERICA,               )
                                        )
          Respondent.                   )


TRANSCRIPT OF EVIDENTIARY HEARING

BEFORE THE HONORABLE E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE

December 5, 2012
Volume XIV

APPEARANCES:

For Petitioner:       Ms. Elizabeth U. Carlyle
                      P.O. Box 30418
                      Kansas City, MO  64112

                      Mr. Eric John Montroy
                      Mr. James Henry Moreno
                      Mr. Timothy Kane
                      FEDERAL COMMUNITY DEFENDER OFFICE
                      The Curtis Center, Suite 545 West
                      Philadelphia, PA  19106

For Respondent:       Mr. Steven E. Holtshouser
                      Ms. Carrie Costantin
                      OFFICE OF U.S. ATTORNEY
                      111 S. 10th Street, 20th Floor
                      St. Louis, MO  63102


REPORTED BY:          SUSAN R. MORAN, RMR, FCRR
                      Official Court Reporter
                      111 South 10th Street
                      St. Louis, MO  63102
                      (314) 244-7983

I N D E X

|                        | Direct | Cross | Redirect | Recross |
|------------------------|--------|-------|----------|---------|
| PETITIONER'S WITNESSES |        |       |          |         |
| DEBORAH RUFFIN         |        |       |          |         |
| (By Mr. Montroy)       | 3      |       |          |         |
| (By Ms. Costantin)     |        | 29    |          |         |
| (By Mr. Montroy)       |        |       | 56       |         |
| MONETTE PETTY NELSON   |        |       |          |         |
| (By Mr. Kane)          | 64     |       |          |         |
| (By Ms. Costantin)     |        | 82    |          |         |
| (By Mr. Kane)          |        |       | 95       |         |
| ANGELA ALLEN           |        |       |          |         |
| (By Mr. Montroy)       | 99     |       |          |         |
| (By Ms. Costantin)     |        | 121   |          |         |
| (By Mr. Montroy)       |        |       | 137      |         |

(The following proceedings were held in open court on December 5, 2012 at 9:58 a.m.:)

THE COURT:  Are we ready?

MR. HOLTSHOUSER:  We're getting there.

MR. MONTROY:  I think we're ready to go.

THE COURT:  Ready to go?

MR. MONTROY:  Ms. Ruffin, would you mind coming up.

THE COURT:  Good morning.

THE WITNESS:  Good morning.

THE COURT:  There's some water for you to your left, whenever you would like some.

THE WITNESS:  Thank you.

MR. MONTROY:  May I proceed, Your Honor?

THE COURT:  Yes.

MR. MONTROY:  Thank you.

DEBORAH RUFFIN,

Having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. MONTROY:

Q.    Ma'am, would you mind stating your name for the record.

A.    My name is Deborah M. Ruffin.

Q.    Ms. Ruffin, do you know Billie Allen?

A.    Yes.

Q.    How do you know Mr. Allen?

A.    I am very close friends with his mother, Juanita.

Q.    How long have you known Mr. Allen for?

A.    Since he was about 12 years old.

Q.    Do you remember what year it was that you first met him?

A.    It was around '89, '90.

Q.    What kind of kid was Billie growing up?

A.    Billie was a sweetheart.  He was always smiling, lots of fun, very active physically.  On a basketball team.  I used to take him to practice sometimes.  We had a junior drum and bugle corps that he participated in.  He was learning to play drums.  He played baseball.  He was just a regular kid.

Q.    So you knew Billie -- did you know him primarily through the bugle and drum corps or that was just something that you did with him?

A.    Just an activity that he took part in.

Q.    Were you involved in that activity?

A.    Yes.

Q.    What was your role in that activity?

A.    I teach marching.  I teach equipment handling, saber, rifle, and flag.

Q.    And how long was Billie involved in the drum corps?

A.    For a couple of months.  I'd say six months.  It was less than a year.

Q.    Was there any reason why Billie stopped doing the bugle

and drum corps?

A.    I think Billie may have felt a little awkward because he was a beginner, and some of the other children were a bit more advanced.  But he did try very hard.

Q.    Was he good at it?

A.    He was good.  He was becoming good at it, yes.

Q.    When you say he was "awkward," what do you mean by that?

A.    Billie was larger than the others physically.  I think he had not come into his own physically in relationship to his growth.  I think that -- it seemed to me that he felt a bit awkward because he was larger.

Q.    You had mentioned that you are friends with Billie's mother, Juanita; is that right?

A.    Yes.

Q.    When did you meet Billie's mom, Juanita?

A.    I met Juan around 1989, 1990.

Q.    And where did you meet her?

A.    We both worked -- we were employees of the St. Louis Public Library.

Q.    Did you work at the same branch?

A.    No, not primarily.  I was on a loaner program to the main branch from the film library at Compton.

Q.    Was there a time that you actually worked at the same actual library, the same branch?

A.    Yes, when I was on the loaner program at main library for a couple of months, we met.

Q.    Was Juanita already working at that library when you moved over to that branch?

A.    Yes.

Q.    How long did you work together at the library for?

A.    Do you mean how long were we both employed there?

Q.    Well, yeah.  I guess let me specify.  How long did you work at that branch together?

A.    About three to four months.

Q.    And then did you move to a different branch?

A.    I went back to my own branch.

Q.    And do you know, did Juanita remain working at that location?

A.    Yes, for awhile.

Q.    So you met at the library; is that right?

A.    Yes.

Q.    And how did that come about?

A.    We were in the break area smoking cigarettes, and we just started talking to each other, and we became friends from there.

Q.    And you described yourself as being a close friend with Juanita?

A.    Yes.

Q.    Are you guys still friends today?

A.    Very much so.

Q.    At some point did you begin socializing with Juanita outside of the library?

A.    Yes.

Q.    And when was that?

A.    It was a couple of months after we met.  We would go clubbing.  We would go out.

Q.    All right.  When you say that you would "go clubbing," what exactly do you mean by that?

A.    Go out for drinks, laughs, dance, have fun.

Q.    Did you drink alcohol?

A.    Yes.

Q.    Did Juanita drink alcohol?

A.    Yes.

Q.    Did you drink alcohol together?

A.    Yes.

Q.    When you would go to clubs, were these place where you would drink?

A.    Yes.

Q.    Let me ask you this, what were the clubs that you went to, if you recall?

A.    One of the names, we would go to Lace's, we go to Lucketts, were two places we would go.

Q.    And is this the time period, 1989, 1990, is this the period that you're describing?

A.    Yes.

Q.    Now, you mentioned Lucketts.  Was there a time period when Juanita worked at Lucketts?

A.    Yes.

Q.    When was that, do you recall?

A.    That was around '92, '93.

Q.    When -- what did Juanita do at Lucketts, do you recall?

A.    She was the barmaid.

Q.    And would you go there when Juanita was working?

A.    Yes.

Q.    Do you remember how often Juanita worked at Lucketts?

A.    I believe two, maybe three nights a week, some Saturdays.

Q.    When you would go to Lucketts, was Juanita drinking?

A.    Yes.

Q.    And how do you know that she was drinking when you'd go there?

A.    She would be intoxicated.

Q.    And if you -- if you could describe for the Court how it was that you would know that she was intoxicated?

A.    Her words were slurred.  I would actually see her pour a drink for herself as well as the patrons.  At times it seemed to me that she was drinking more than she was pouring for the patrons herself.

Q.    Was this something that you regularly observed?

A.   Yes.

Q.   When you'd see Juanita working at Lucketts, was that during the day or was that at night?

A.   At night.

Q.   And you would be hanging out at Lucketts --

A.   Yes.

Q.   -- when this was happening?

A.   Yes.

Q.   How late did you stay at Lucketts generally?

A.   Maybe sometimes till midnight, one.

Q.   Did Juanita work until Lucketts closed for the night?

A.   Yes.

Q.   Now, just getting back to this idea of clubbing, when you would go clubbing with Juanita, when you would go to a place like Lace's or another bar or club, would you see Juanita get intoxicated there?

A.   Yes.

Q.   Would you get intoxicated when you went to those places?

A.   Off and on.  Not very often.  I don't like being out of control.

Q.   Was Juanita out of control?

A.   Frequently, yes.

Q.   And when you say "out of control," can you describe what you mean by that?

A.   Staggering, combative.  Sometimes she would urinate on herself.  Falling asleep.  Whatever you describe as intoxicated, she would qualify.

Q.   Okay.  When you say "combative," could you give an idea of what you mean by combative?

A.   One night when she was working behind the bar -- excuse me -- and I came into Lucketts and I saw that she was drunk.  And I was really afraid.  So I said, "Well, I'm going to take you home."  And she didn't want me to.  She didn't want to leave.  So I went behind the bar, and I grabbed her arm.  And she was tugging back and forth to get me to let her go.  But I wouldn't let her go.  And one time I must have tugged too hard, because she fell down.  And I felt so bad.  She hit her head on the side -- there's a dart machine there, and she actually fell down, slid and hit her head against the machine.  And I felt really badly because I wasn't trying to hurt her, I was trying to protect her from herself and get her away from that environment, because I didn't want her to try to drive home like that.

Q.   So you believe that she was too intoxicated to drive?

A.   Absolutely.

Q.   Did you ever see Juanita drive while she was intoxicated?

A.   I may have, yes.

Q.   Besides that incident that you described just now where

she hit her head on the dart machine, did you ever observe her be combative to anyone else in the bar or in that setting?

A.    She would perhaps have words with people if she had to to maybe try and settle a disagreement.  There were times when we would argue with each other when we were there about certain things.  It could have been something small, something large.

      But primarily people knew our relationship, and they knew not to interfere.  Although one time one young man did try to interfere, and we just sort of turned around and ate him up, and he went away.

Q.    And where was this?

A.    This was at Lucketts.

Q.    And when you say "ate him up," what do you mean by that?

A.    We let him know it was not his concern, that it was between us.

Q.    Well, did you yell at him, did you curse at him, what did you say to him or what did Juanita say?

A.    We both might have yelled and cursed at him, which I believe we did.

Q.    Did you ever visit Juanita at her house?

A.    Yes.

Q.    Where is her house?

A.    4535 Cote Brilliante.

Q.    So when you and Juanita first become friends, you know, around 1989, 1990, how often would you go over to her house would you say?

A.    It would vary, sometimes once a week, sometimes two, three, four times a week.

Q.    When you were at Juanita's house, did you have an opportunity to observe the way she interacted with her children?

A.    Yes.

Q.    When you were at Juanita's house in the early 1990s, did you have an opportunity to observe the way she interacted with Billie?

A.    Yes.

Q.    Do you think Juanita was a good mother to Billie back in the early 1990s?

A.    I think she tried to be.  I think she was -- at that time she was as good a mother as she knew how to be.

Q.    And when you say "she tried," what do you mean by that exactly?

A.    I think she tried her best to keep him from harm and put him on the right path.

Q.    Was her ability to be a good mother complicated in any way in your opinion?

A.    Yes.

Q.    How so?

A.    Sometimes she was mean to him.

Q.    When you say "mean to him," who are you referring to?

A.    She would curse him, hit him, throw things.

Q.    And are you referring to Billie Allen?

A.    Yes.

Q.    So you said that she would curse him?

A.    Yes.

Q.    Could you describe what you mean by that?

A.    She would tell him he was stupid or -- excuse me -- get the "F" out of her face, leave her alone.  She would sometimes chastise him for not keeping his curfew.  She would punish him by putting him out.

Q.    Let me ask you this:  When she would curse him out and tell him he was stupid, the things that you just described, was there something that would provoke this?  For instance, was Billie doing something?  What would get her to do this that you could observe, if you know?

A.    Sometimes he was just being the joker that he is.  He would play around a lot.  And I think sometimes she thought it was unnecessary.  She was trying to get him to be more serious, take his school work and his life more serious.  She didn't want him running the street with a certain kind of person.

Q.    You also testified that you saw Juanita hit Billie; is

that right?

A.    Yes.

Q.    What exactly did you see?

A.    She would punch him, kick him, throw things.

Q.    And where were you when you saw these things?

A.    In her home.

Q.    When Juanita punched Billie, do you recall where she punched him?

A.    In the head, the chest, the arm.

Q.    What was Billie's response when this happened?

A.    I could tell he wasn't happy, he didn't like it. Some --

Q.    Did he -- I'm sorry, go ahead.

A.    Sometimes he would ask her, "Why did you do that?"

Q.    Was there ever a time that you -- well, strike that. Were you at all troubled by what you saw Juanita doing?

A.    Very.

Q.    When you saw Juanita hitting Billie, did you think it was abusive?

A.    Yes.

Q.    Did you ever talk to her about it or confront her about it?

A.    Yes.  Sometimes we would argue.

Q.    What would you say to her or what did you say to her?

A.    I would ask her --

Q.    I'm sorry, what did you say to her?

A.    I would ask her, "Why are you treating him like this? Why did you hit him?  Why did you curse him?  You shouldn't do those things to him."  And she would become angry, and we would argue back and forth.

Q.    Did you ever see Juanita change her behavior as a result of you speaking with her?

A.    No.

Q.    Now, you testified that Juanita would throw things at Billie?

A.    Yes.

Q.    What did she throw at him?

A.    Whatever was at hand.

Q.    Do you have any specific memories of her throwing particular objects at Billie?

A.    Shoes, just whatever was at hand.  If he wasn't close enough for her to actually hit him, then whatever was there.

Q.    When Juanita would hit Billie, was she doing it because she was disciplining him?

A.    I thought so at the time, yes.

Q.    Were there times when she hit him for reasons that were not for discipline?

A.    Yes.  She seemed to be -- I could tell there was a difference between the way she was with the girls and the way she was with him.  She was harder on him.  I thought at the

time it was because he was a male, but -- and I still think at times it was because he was a male.

Q.   Do you think that -- well, strike that.  Did these beatings that you just described, did this happen throughout Billie's life when you were present?

A.   From the time I met them, yes.

Q.   You had mentioned just a moment ago about Juanita putting Billie out.  What exactly do you mean by that?

A.   She would tell him to leave home.  She would put him out on the street.

Q.   Do you have any idea where Billie would go when this would happen?

A.   No, I had no idea where he was, and it would bother me.

Q.   How do you know that Billie was put out?

A.   I would visit, and when I wouldn't see him, I would ask where he was.  And she would tell me she put him out.

Q.   Did she ever say why she put him out?

A.   He broke curfew, he got in trouble at school, things like that.

Q.   Do you think from what you observed, did Juanita love Billie?

A.   Yes, I think she does.

Q.   Did you testify at Billie Allen's trial?

A.   Yes.

Q.   And do you remember whether -- do you remember who Rick

Sindel is?

A.    Yes.

Q.    And who was he?

A.    He was Billie's lawyer at the first trial.

Q.    And do you remember --

MR. MONTROY:  And, Your Honor, I'm pointing the Court's attention to Exhibit 178.2, page 2.

THE COURT:  Okay.

Q.    -- Mr. Sindel asking you:  "Now we've met and we've talked a number of times in the past?"

You answered, "You and I?"

"Question:  Yeah."

"And then you answer:  "Once, maybe twice, yes."

Do you remember meeting with Mr. Sindel a couple times?

A.    Yes.

Q.    Where did you meet with him at?

A.    In his office.

Q.    Do you remember meeting anybody else from Billie Allen's legal team?

A.    There was another guy, Randolf or Randall or somebody.

Q.    David Randall?

A.    Yes.

Q.    And where did you meet with him at, do you recall?

A.    In Mr. Sindel's office.

Q.   Do you remember John Simon?

A.   Yes.

Q.   Did you meet with him?

A.   Yes.

Q.   And where did you meet with Mr. Simon at, do you recall?

A.   Also I believe in Mr. Sindel's office.

Q.   Do you recall, were they all in Mr. Sindel's office at the same time?  Was this a meeting where everybody was present?  I don't want to put words in your mouth.  What do you remember about the meeting?

A.   I don't remember a great deal, but I seem to recall that yes, we were all in Mr. Sindel's office individually and collectively with each of them.

Q.   When you say "collectively," are you talking about other witnesses or are you talking about the lawyers?

A.   The lawyers.

Q.   And do you remember that this meeting occurred after Billie's trial had already started?

A.   I believe so, yes.

MR. MONTROY:  And, Your Honor, I'm just pointing the Court's attention to Exhibit 500, page 8.

THE COURT:  Okay.

Q.   Now, Ms. Ruffin, these are some transcribed notes of John Simon, who was an attorney for Mr. Allen at the time.

You would agree that that's your name, right?

A.   Yes.

Q.   Deborah Ruffin.  And the notes indicate that this is February 21st, 1998 at 10:30 a.m., right?

A.   Right.

Q.   Now, on the first page there, Mr. Simon indicates in his interview of you, you saying:  "Things weren't great. There were problems."  And then something, "In spite of these problems."  It looks like it got cut off.

     Now, I guess the first thing is, do you have any independent recollection of saying this?

A.   Slightly, yes.

Q.   Do you have any idea what you were referring to when you said "Things weren't great.  There were problems."

A.   The drinking, the hitting, the screaming, the cursing.

Q.   Well, who -- going back before that, who were you talking about here?

A.   Juanita and Bill.

Q.   Now, do you know -- after you said this, do you have any recollection of whether or not you were asked what you meant by that?

A.   I don't think I was, no.

Q.   Just going to the next page, the next notation on the next page after you say that is:  "It is much more likely than not that he did it, even that he did it at all.  Jury

doesn't want to hear that he's wrong."  It sounds like that's talking about Bill, whether or not Bill was guilty or not; is that right?

A.   Yes.

Q.   Later on that page, you see the name Johnnie Grant, Eric Taylor, and Ahmed Oliver?

A.   Yes.

Q.   Do you recognize these names?

A.   No.

Q.   May you have recognized them at -- strike that.  Do you think you might have known who these people were at some point?

A.   Not that I recall now, no.

Q.   Okay.  Later on that same page it says:  "D: Mentally below teenager."  Do you know what you're talking about there?  Do you have any idea what that might be referring to?  Well, actually let me blow this up a little bit.  "Mentally below teenager."  Then it says underneath that, "Teenager."  And then in it has quotations, "Boy," and then in quotations, "The boy -- the only one in this family."

Do you have any -- does this refresh your recollection as to what you might have been talking about here?

A.   Yes, somewhat.  Billie, education wise he was sometimes a little slow to learn.  He seemed a little bit slower than

his sisters in picking up on things in school.  That's what I meant by that.

Q.    What about in your own experience?  I mean, you weren't in school with him, right?

A.    No.

Q.    What about in your own experience, was there anything that you ever observed that he might have been mentally below a teenager or mentally slow as you just stated?

A.    No, not usually.

Q.    So was that something you just heard from other people or --

A.    Yes.  I would have to say yes and no.  Sometimes I would be there when he would get his marks, and his mother was not very pleased.  And I would try to talk to him and tell him that he had to do better in school so he could do better in life, so he could go to college and maybe get married one day, have a family.  And in order to do that, he'd have to be successful in his school career so he could support his family.

        MR. MONTROY:  Your Honor, this is the same exhibit, but page 11.

Q.    It says:  "Does Juanita have a problem with alcohol?" And then under that it says:  "She drinks, to excess, when she is in trouble."  And the next line:  "What has she told you?"  "Angry.  Upset.  Disappointed in Bill."

When you say, "She drinks, to excess, when she is in trouble," are you referring to Juanita?

A.    Yes.

Q.    What did you mean by that statement?

A.    She would drink until she was totally intoxicated.

Q.    When you stated that, were you -- do you recall, were you asked any questions about what you meant by that?

A.    No.

Q.    Under that line, the next question is:  "What has she told you?"  And then it says:  "Angry.  Upset.  Disappointed in Bill."  Do you have any idea what you might have been referring to there?

A.    Juanita had a lot of anger.  A lot of times I wasn't sure why.  Sometimes I knew it was the job.  Sometimes it was her personal relationship.  Sometimes she would be displeased with Billie in what she suspected or may have known of the people that he chose to be with sometimes.  I think she thought he could make better choices for himself.

Q.    And just expanding on this a little bit, including the next paragraph down, "What has she told you?"  "Angry.  Upset.  Disappointed in Bill.  She's afraid for his life.  She's just starting to face reality."  "Has she talked to you more?"  It goes on.

Was Juanita angry, upset, and disappointed in Bill in what he had -- in the fact that he had been arrested and

charged with murder?

A.    Yes.

Q.    Still on Exhibit 500, but now to page 15.

THE COURT:  15?

MR. MONTROY:  Yes, 15, Your Honor.

Q.    Okay.  Page 15, there's a paragraph that starts:  "If he has any skills, what do you think they are?"  "He can talk a blue streak.  If he got help with that -- and then ADD is written in parenthesis."  And then it says:  "Ever seen him react violently to anything?"  "He tried to shake her off. She had to 'tighten Bill up' -- get physical.  I've never seen him angry."  "What this has done to his family." "Devastated.  A lot off-balance."

And I specifically want to focus on:  "She had to 'tighten Bill up' -- get physical."  And the "tighten Bill up" is in quotations.  Is "tighten," is "tighten up" an expression that you've ever used?

A.    Yes.

Q.    What does that mean, "tighten up"?

A.    That means to actually strike a person or threaten to strike a person, but mostly to lash out.

Q.    Okay.  So when you said:  "She had to 'tighten Bill up' -- get physical," what are you referring to there?

A.    Physical abuse, hitting him, cursing him.

Q.    And then the next line is:  "I've never seen him angry.

What this has done to his family."  When you say, "I've never seen him angry," who are you referring to, if you know?

A.    I never saw him get angry at his mom.

Q.    Just going back to the bigger paragraph:  "What this has done to his family.  Devastated.  A lot off-balance.  D. What ha.  Girls have slept a lot more.  Mother sleeps a lot more.  Doesn't want.  She was one of the most spiritual people I've ever met."

Those lines that follow, "She had to 'tighten Bill up' -- get physical.  I've never seen him angry," what do those -- what are you talking about there, do you know?  Do you have any idea what you're saying to the lawyers?  "What this has done to his family.  Devastated.  A lot off-balance," what are you talking about, if you know?

A.    I'm talking about how Billie was treated.  The fact that Billie mostly in my relationship with him, he was just a happy kid.  He was a smiler.  He was always smiling and joking around.  But after Billie got in trouble, things changed drastically in the household.  There was deep depression, a lot of sleep in, a lot of crying, just it was off-balance.

Q.    So when you're talking about off-balance, people sleeping, are you talking about his sisters' reaction to his arrest?

A.    Yes.

Q.    Do you recall if you were ever asked any questions about what you meant by, "She had to 'tighten Bill up' -- get physical"?

A.    No, they never asked.

Q.    This is Exhibit 484, page 4.  And I'm just referring you now to notes that were taken during an interview of you, of what purports to be an interview of you by David Randall. And Dr. Randall writes:  "Not having a father in the house. Her dad is an older man.  She has to do what she has to do to maintain control."  And then there's a little mark there made by somebody.  What do you mean by that, "She has to do what she has to do to maintain control"?

A.    What I meant was, she had to raise four kids alone. Her father was there and he helped as best he could, but he was an elderly man.  So a lot of times she would perhaps have to talk to them in a way I disagreed with.  She would curse them.  She -- and when I would ask her about it, she told me it was like a vow she made to herself when they were little, she would never do this to them.  But as they got older, she thought it was okay to curse them.  And I disagreed.  And I let her know.  I told her so, that I did not like it.

Q.    Does "She has to do what she has to do to maintain control," does that include any kind of physical action on her part or any physical beatings?

A.    Yes.  Even though I disagree with that, I don't like

hitting a kid.  Hitting a kid to me is a last resort, after I've talked to you, after I've taken away whatever is necessary, your television, your computer, whatever, to get your attention, to let you know that life is serious and I need you to straighten up and pay attention.

Q.   Well, let me ask you this:  Was physical beatings, was that an option of last resort for Juanita or was it something that she was quick to use?

A.   Sometimes she was quick to use.  Sometimes it was a last resort, but not always a last resort.

Q.   If Billie's lawyers, Mr. Sindel and Mr. Simon, or Dr. Randall had asked or anybody on Billie's legal team had asked questions about whether Juanita physically beat Billie and verbally abused him, would you have discussed it in detail with them?

A.   Yes.

Q.   Would you have told those lawyers the same thing that you've testified about today?

A.   Yes, absolutely.

Q.   Would you have discussed with those lawyers from Billie's trial team Juanita's drinking?

A.   Absolutely.

Q.   Would you have testified about Juanita's drinking at trial?

A.   Absolutely.

Q.   All the things that you've told this Court today, would you have been willing to discuss those things with Billie's legal team and then testified to those things at trial?

A.   Absolutely.

MR. MONTROY:  Court's indulgence, Your Honor, please.

(There was a conference held off the record.)

MR. MONTROY:  I just have a few more questions, Your Honor, if I may.

THE COURT:  Sure.

BY MR. MONTROY:

Q.   Do you remember any occasions when Juanita and you would be out at a club or a bar and she would be drunk and Billie would have to come and get her?

A.   Yes.

Q.   Do you remember specific details about that or just a general memory?

A.   Just a general memory.

Q.   What about the other kids, did the other kids have to come and pick her up?

A.   Yes.  There was a time that we worked at the Red Cross together, and I realized she was thoroughly intoxicated.  And she was becoming combative.  And I was afraid she'd lose her job, and I knew she really needed it.  And I called Yvette, the baby girl, to come get her.  And she refused, repeatedly.

She would not come get her mother.  She said she was tired, she was tired of her mother being drunk, and she was tired of having to rescue her mom.  And I literally had to beg her to come and get her.  And the only reason why she came and got her that night was for me.

Q.    When you observed what you've described as physical abuse by Juanita, did you ever call the police?

A.    No.

Q.    Did you ever call Children Services?

A.    No.

Q.    Did you ever talk to her father about it?

A.    No.

Q.    Why not?  Why didn't you take any of those steps?

A.    Because I was afraid.  I was afraid for her and for them.  I didn't feel it was right to separate her from the kids or them from her.  I knew -- I hoped that the things she would do when she was drinking, that it was because of the alcohol, and it was -- and I hoped and prayed it was something that she would not normally do otherwise.

Q.    In addition to drinking out at clubs and bars, did you ever drink with Juanita at the house?

A.    Yes.

Q.    Did you observe Juanita drinking in the house?

A.    Yes.

Q.    Was Juanita ever drunk when you came over to the house?

A.    Yes.  Frequently.

Q.    You described Billie being put out of the house by Juanita?

A.    Yes.

Q.    Was that something that happened throughout the time that you knew the Allens?

A.    I would say maybe from the time Billie was about 15 or 16.

        MR. MONTROY:  Thank you.  I don't have any further questions, Your Honor.

        THE COURT:  You may inquire.

        MS. COSTANTIN:  Thank you, Judge.

                        CROSS-EXAMINATION

BY MS. COSTANTIN:

Q.    Do you recall being asked about your relationship with Juanita Allen at the trial?

A.    Yes.

Q.    And specifically do you recall being asked what kind of relationship you had with her, and you stating that it was very close?

A.    Yes.

Q.    And do you recall when asked the question on -- I'm directing you to Exhibit 178.2, which is on the screen in front of you.  Do you recall being asked:

        "When you say 'very close,' what kind of things did

you and his mother do?"

And you testified under oath at that time that:

"Oh, we hung out together at work, we would go to lunch, we would visit other libraries together.  We would sometimes double-date together.  Visit each other's homes, go shopping.  You know, girl things."

Do you recall testifying to that?

A.    Yes.

Q.    You didn't testify that you would go out drinking, was that two to three times a week with Juanita?

A.    No, I did not.  I was never asked those questions.

Q.    So when you were asked the question, what kind of things did you and his mother, referring to Juanita, do, you did not answer, I went out drinking with her multiple times in a week; is that right?

A.    That's right.

Q.    And you didn't answer that we would get drunk when we went out multiple times a week, did you?

A.    No.  I was never asked those types of questions.

Q.    Were you asked the question, "What kind of things did you and his mother do?"

A.    Yes, I was.  And those are also some of the type of things that we would do.

Q.    But apparently you didn't answer completely at that time, is that what you're saying?

A.   Possibly not as completely as I could have.

Q.   Because if you were complete, you would have said, we used to go out drinking and would get drunk on a regular basis.  Is that your testimony today?

A.   I'm sorry, please repeat that.

Q.   Your testimony today is that you used to get drunk on a regular basis with Juanita; is that right?

A.   I would not say I got drunk on a regular basis.

Q.   Oh, she got drunk on a regular basis?

A.   Correct.

Q.   Okay.  And you don't mention that.  You didn't mention that back at the time when you were asked what sort of things you and his mother did?

A.   No, I did not.  I was never asked those types of questions.

Q.   Well, would the question, "What kind of things did you and his mother do," include we'd go clubbing, we'd go out for drinks?  Would that be a logical answer to that question?

A.   I suppose it would have if I were asked those type of questions.

Q.   If you were asked the type of question what kind of things did you and his mother do, referring to Juanita, that would be a logical answer, clubbing and going out for drinks?

A.   I suppose it would be to some people, but I was never asked those questions.

Q.   But you were asked the question, "What kind of things did you and his mother do?"  Is that right?

MR. MONTROY:  Objection, Your Honor, she's been asked this question a few times now.

THE COURT:  Well, but the witness hasn't altogether -- she refers to other things.  A little unresponsive.  Overruled.

BY MS. COSTANTIN:

Q.   My simple question is, were you asked the question at that time at trial, "What kind of things did you and his mother do?"

A.   Yes.

Q.   When you were working at the City library with Juanita, was she drinking on the job there?

A.   That's pretty difficult to say.

Q.   So you're not saying she was drinking on the job at the library?

A.   Again, that's pretty difficult for me to judge at this time.

Q.   During the time you knew her, all the time you knew her, was she drunk every day?

A.   I'm sorry, say that again, please.

Q.   During the time that you've known Juanita Allen, was she drunk every day?

A.   No, not during the whole time.  No.  For part of it,

yes.

Q.   So during part of the time that you knew Juanita Allen, she was drunk every day?

A.   Pretty much, yes.

Q.   And what time was that?  What time period was that?

A.   I would say from '90 -- approximately from '92, '93, until she stopped drinking.

Q.   And when did she stop drinking?

A.   Approximately maybe five, six years ago.

Q.   So from '92 or '93 up until five or six years ago, she was drunk every day?

A.   Yes.

Q.   And she was a mean drunk; is that right?

A.   She could be a mean drunk, yes.

Q.   I mean, she was always fighting, physically fighting people?

A.   I wouldn't say that she went out her front door and punched somebody, no.

Q.   Well, in the bars when you are at the clubs, is she physically fighting people when you're up there all the time? I mean, because you didn't describe any of that on direct.

A.   No.  Not all the time, no.

Q.   But was she fighting other people at work?

A.   She was about to one night, yeah.  She threatened him.

Q.   I'm sorry?

XIV - 34

A.     She threatened to actually attack this person at work, yes.

Q.     And this was at the bar?

A.     No.

Q.     Where?

A.     This was elsewhere.  This was at the Red Cross.

THE COURT:  You're talking about at work?

MS. COSTANTIN:  Right, at work.  But she worked at the bar too, Judge.  That's why I was trying to clarify.

THE COURT:  Okay.

Q.     So this was at the Red Cross.  But she did not actually fight anybody at the Red Cross; is that right?

A.     No, I would not allow it.

Q.     Did she ever get arrested for fighting?

A.     Not as I can recall now, no.

Q.     No, she never got arrested at any time for fighting, right?

A.     Not as I recall now, no.

Q.     Did she physically fight with you?

A.     We've had our little pushes and shoves, yeah.

Q.     Like when you're trying to pull her out, and you knocked her over?

A.     Yes.

Q.     And -- but she's a big fighter and she's a mean drunk?

A.     I wouldn't say necessarily that she is a big fighter.

Q.    Okay.

A.    But if you approached her when she was intoxicated and she took offense to it, you'd have trouble on your hands, yes.

Q.    What does that mean, "you'd have trouble on your hands"?

A.    You would have trouble getting her to cooperate, getting her to get in the car, things of that nature.

Q.    So if she testified that she was physically fighting people constantly or frequently, that wouldn't be correct?

A.    Repeat that, please.

Q.    If she testified, if Juanita Allen testified that she was physically fighting people on a regular basis, that would not be correct?

A.    That would be difficult for me to say since I did not spend every waking moment with Juanita.

Q.    Well, when you were with her, it does not sound like you observed her fighting with others, physically fighting with others on a regular basis since you haven't given us any example.  Is that true?

A.    I gave an example of her being combative with me when she fell down.

Q.    I'm talking about her physically fighting.  Is that the only example you have of her physically fighting in your sight?

A.    I wouldn't say it was the only example I may have. Right now it's one that is very clear to me.

Q.    And is there any other that you can think of?

A.    There was one time where the guy she was dating at the time, she was a bit combative with him.  But at that time they had both been drinking.

Q.    Are you talking about Louis?

A.    Louis is one person, yes.

Q.    When did -- what happened with Louis?

A.    Louis took his own life.

Q.    And when was that?

A.    In the nineties.

Q.    When in the nineties?

A.    It's pretty difficult to be exact at this point.  It was the early nineties.

Q.    And how did he take his life?

A.    I was told he drowned.

Q.    And how did he drown?

A.    I was told he jumped off a bridge.

Q.    But that's not the person you were talking about?

A.    No.

Q.    Now, you said that she would punch Billie; is that right?

A.    Yes.

Q.    And how often did that happen?

A.   Often enough.

Q.   Did that happen once a week, once a month, once a year?

A.   Again, that's pretty difficult to say since I was not with them every waking moment.

Q.   Well, during the times that you were with her, did it happen every time you were with her, once a week when you were with her, once a month when you were with her?

A.   I would say it happened often enough in my sight for me to take umbrage to it.  I didn't like it.

Q.   Can you give me any number at all?

A.   It's pretty difficult to say.  I'd say more than once.

Q.   So you can't say anything more specific than "more than once"?

A.   To be totally exact and tell you truthfully, no, I cannot give you an exact number.

Q.   How about with Yvette, did she --

A.   I never saw her strike the girls.

Q.   I'm sorry, say that again.

A.   I never saw her strike the girls, never.

Q.   And this -- when she struck Billie, you said that you thought it was discipline at the time; is that right?  Isn't that what you just testified to?

A.   I may have thought it was discipline at the time, but at the same time I thought it was a bit much.  And I also said I would let her know, and we would disagree.

Q.   And she was disciplining him because she didn't want him running the streets, isn't that what you just testified to?

A.   Yes.

Q.   She was worried about the people he was running around with; is that right?

A.   Yes.

Q.   And the people he was running around with were drug dealers?

A.   So I was told, yes.

Q.   Gang members?

A.   Gangs, I could not speak to.

Q.   Do you know if he was gang affiliated?

A.   To my knowledge, no.

Q.   So you remained friends with Juanita Allen for years despite the fact that she was drunk every day, a mean drunk who was combative; is that right?

A.   Yes.  Perhaps it's my shortcoming that I do so.

Q.   And you said you've known Billie since he was 12; is that right?

A.   Around that age, yes.

Q.   And do you recall telling the trial team that, and that you used to visit their house a couple times a week?

A.   Yes.

Q.   And that's correct?

A.   Yes.

Q.   Do you recall telling the trial team that Billie Allen was surrounded by love?

A.   Yes.

Q.   And I'm going to direct you to 488, Exhibit 488, the last -- I'm sorry, the third to last paragraph.  These are notes of Dr. Randall's interviews with you.  So you do recall telling Dr. Randall that, "Bill is surrounded by love"?

A.   Yes.

Q.   And do you recall telling Dr. Randall that, there was "A lot of love, and a lot of freedom to develop"?

A.   Yes.

Q.   Do you recall telling the trial team that Juanita Allen was a good person, they were good children, and their grandfather was a beautiful person?

A.   Yes.

Q.   I'm directing your attention to Exhibit 488.  Do you recall telling Dr. Randall specifically, "Their mother is a good person.  She's raised four children all by herself.  I know they're good children.  Their grandfather is a beautiful person.  The whole family, you couldn't find a better bunch of people.  Hard working, church going, open hearts."  Is that what you told the trial team, Dr. Randall in particular?

A.   Yes.

Q.   And do you recall telling Dr. Randall that Juanita

would talk to Billie until she was blue in his face -- until she was blue in the face to try and keep him out of trouble?

A.    Yes.

Q.    So you told the trial team that Billie Allen is surrounded by love and a mom who wants the best for him; is that right?

A.    That's right.

Q.    And she wanted to keep him out of trouble, and she talked to him until she was blue in the face?

A.    Yes.

Q.    And she's a good person, and the kids are good, and the grandfather is a beautiful person; is that right?

A.    That's right.

Q.    Now, you never saw Otha do anything?

A.    Excuse me?

Q.    You never saw Otha do anything abusive to Billie Allen, did you?

A.    The granddad?  No.

Q.    Do you know Jerome Petty?

A.    Yes.

Q.    You never saw him do anything abusive to Billie, did you?

A.    No.

Q.    Now, do you recall testifying at trial that Juanita would do regular parental things like telling Billie Allen to

straighten up his room and do his homework?  Do you remember that?

A.    Yes.

Q.    And Juanita was frustrated because Billie was not doing his homework and was much more interested in being out on the street; is that right?

A.    I'm sorry, you're referring to Billie wanted to be on the street?

Q.    Yes.

A.    I would say somewhat, yes.  He was curious.

Q.    I'm going to show you Exhibit 178, which is your trial testimony.

        THE COURT:  What number?

        MS. COSTANTIN:  178.  And this is .20.

Q.    Do you recall testifying:

        "Billie seemed like he was less interested in his home life for awhile, and he wanted to be elsewhere, like out on the street.  He wasn't concentrating on school anymore.  It was just like he had lost interest in things that he knew -- he was taught to do.

        "You know, like go to school, do your school work, come home, do your homework.  I would often hear his mother say, 'Look, you know, you need to clean up your room.  It's a pigsty.'  You know, 'Go and straighten up your room.  When you get done with that, I want you to do your homework.'  You

know, regular parental things."

Do you recall testifying to that?

A.    Yes.  Isn't that what a mother is supposed to do?

Q.    Correct.  You didn't testify that Juanita Allen was abusive to Billie Allen, did you?

A.    I did not.  I was not asked those type questions.

Q.    You said that she did regular parental things, didn't you?

A.    Yes, I did.

Q.    Okay.  You didn't say she --

A.    Again, I was not asked those type questions, ma'am. Had I been asked those type questions, I would have said the same thing that I said today.

Q.    So when asked the question:  "Could you tell me what kind of changes you were observing at that time," and your response is that she's doing regular parental things, that didn't leave anything out?

A.    Yes, it left quite a lot out.

Q.    And just to clarify, you only recall one time that Juanita hit Billie, is that what you just testified to?

A.    I did not say that.  I said it would be difficult to give you an absolute number.  To do so would make me a liar.

Q.    And you can't even give us even a range of numbers?

A.    I strongly hesitate to do that because I cannot give you an absolute number.  I'll tell you it was more than once.

Q.    Now, do you recall telling Dr. Randall, a member of the trial team, that Billie had a good relationship with his sisters?

A.    Yes.

Q.    Now, you didn't see Yvette punching him in the face, did you?

A.    Not as I can recall, no.

Q.    You didn't see Angela punching him in the face, did you?

A.    I never to my recollection at this time saw the girls strike their brother.

Q.    Okay.  In any way, whether punched, strike --

A.    I never to my recollection at this time saw the girls ever strike their brother as I can recall at this time.

Q.    Now, do you recall testifying that before Marquis had died, that Billie Allen would laugh and joke and play around the house with his mother and the girls?

A.    Yes.

Q.    And is that true?

A.    Yes.

Q.    Okay.  So the household is a household where he's laughing and joking and playing around with his mom and his sisters; is that right?

A.    Yes, they would do that.

Q.    And that's the household you described at trial; is

that right?

A.   Yes, that would occur.

Q.   And that is still your testimony as to what the household was like?

A.   Not absolutely, no.

Q.   Okay.

A.   I don't believe anybody's household is all sunshine and light.

Q.   And did you say that at trial?

A.   Did I say that they did those things at trial?

Q.   Correct.

A.   Yes, it was what I was asked.

Q.   And you were asked, how would you describe the change, meaning the change after Marquis died.  And your answer was: "Billie seemed sullen, a whole lot less communicative.  He would always laugh and joke and play around the house with his mother and the girls, he didn't seem to do much of that anymore."

     So before Marquis died, it's your testimony here that the house was a place where Billie would laugh and joke and play around the house with his mom and the girls, right?

A.   That's right.

Q.   Now, Juanita wanted the children to succeed, wanted her children to succeed, correct?

A.   Correct.

Q.    She wanted them to do their homework, correct?

A.    Correct.

Q.    Wanted them to go to school?

A.    Also correct.

Q.    Okay.  Wanted them to not run around on the streets, right?

A.    Correct.

Q.    And I want to direct you to something that you saw previously, a statement that you made to Dr. Randall.  You told Dr. Randall:  "Not having a father in the house.  Her dad is an older man.  She has to do what she has to do to maintain control."  Is that right?

A.    That's right.

            THE COURT:  What number is that, please?

            MS. COSTANTIN:  That is 488.4, so the fourth page of 488.

            THE COURT:  Okay.

BY MS. COSTANTIN:

Q.    And you told him there that Juanita "has to do what she has to do."  Is that right?

A.    That's right.

Q.    So in that statement, you're not indicating any sort of disapproval of what Juanita "has to do what she has to do," are you?

A.    I believe I said before that I know sometimes physical,

being chastised physically may be in order, although I may not always agree with it, sometimes I may not even agree with how it's done.  But sometimes in the heat of the moment, I know things happen.  People sometimes do things that they may or may not ordinarily do.

Q.    So when you said to Dr. Randall, "She has to do what she has to do to maintain control," what you really meant is sometimes people lose control and do things they don't mean to do?  That's what your testimony is?

A.    Repeat that, please.

Q.    My question is, when you said to Dr. Randall, "She" -- referring to Juanita -- "has to do what she has to do to maintain control," what you really meant was that sometimes Juanita would lose it and do things that she shouldn't have done?

A.    Yes.

Q.    That's your -- that's what that means, so when someone has to do something.  Is that correct?

A.    Repeat that, please.  I'm sorry, I lost my train of thought.

Q.    So when you said that she has to do something, "She has to do what she has to do," what you're really saying is she's out of the control and regrets it?

A.    I suppose she may have, yes.

Q.    My question is, what you meant when you said this, what

you meant when you said, "She has to do what she has to do," what you meant was --

A.   What I meant was, if she had to become a strong parent, be a strong single parent, then that was what she had to do.

Q.   Okay.  So this is about what -- her being a strong single parent?

A.   Right.

Q.   Okay.  And let me ask you this:  That problem with her where she's having to be a strong single parent, that's when Billie is really dropping out of school and, you know, dropping out of Sumner?  Isn't that when the problems really were?

A.   That may have been a part of it, but I don't think that was all of it.  But that was a big part of it.

Q.   That he wasn't going to school?

A.   Yes.

Q.   And he was dealing drugs?

A.   I was told that he was dealing drugs.  I myself personally never saw him deal drugs.

Q.   I'm showing you 485, page 2.  And this is a little hard to read, but these are Rick Sindel's notes.  Quote, Had to tighten Bill up, closed quote, get physical.  Do you recall that?

A.   Yes.

Q.   And then we have another -- and then we have another

account of the same interview from Mr. Simon.

THE COURT:  And that is which one?

MS. COSTANTIN:  Exhibit 500, page 15.

Q.   "She had to 'tighten Bill up' -- get physical."  Is that right?

A.   Yes.

Q.   So you did not hide from the trial team that she was physically disciplining him, did you?

A.   No, I did not.

Q.   Okay.  I mean, that's what you're telling them, she had to physically discipline him, that's what "tighten Bill up" means, right?

A.   Yes.  Although they did not expound on that.  Why they did not, I have no idea.  You'd have to take that up with them.

Q.   I'm sorry, go ahead.  I'm sorry.

A.   You'd have to take that up with them.  I have no idea why they did not.

Q.   But you're talking to them about physical discipline, right?

A.   Yes.

Q.   Tightening Bill up?

A.   Yes.

Q.   And to clarify, and this is a time when he has started to skip school, he's in the City schools and he's started to

skip school, right?

A.   Yes.

Q.   And as you said before, he's hanging out with people that she doesn't want him hanging out with, right?

A.   Yes.

Q.   Now, you also told the trial team about Juanita drinking; is that right?

A.   Yes.

Q.   Now, I'm showing you 489.2, the third paragraph.  These are Dr. Randall's notes of your interview.  And it states: "Juanita will drink when she's upset.  Sometimes to excess." Is that correct?

A.   Yes.

Q.   And that's what you told Dr. Randall?

A.   Yes.

Q.   You didn't tell Dr. Randall that Juanita was drunk on a daily basis, did you?

A.   No.

Q.   In fact, you're limiting it to a time, her drinking when she's upset; is that right?  That's what that statement is?

A.   That's right.  They never asked me to clarify exactly what I meant by that statement.

Q.   Okay.  And when you told them "sometimes to excess," you didn't tell them she was drunk every day?

A.    I would think "to excess" would qualify that.

Q.    Would "sometimes" qualify as every day?

A.    No.  At the time that's what I said.  I probably should have said daily, but I did not.

Q.    No, you said "sometimes."

A.    Yes.

Q.    Now, I'm going to show you Exhibit 500, page 11.  And you've seen part of this or you've seen this before, they just showed it to you.  These are John Simon's notes of an interview with you.  You're asked the question:  "Does Juanita have a problem with alcohol?"  And your answer was: "She drinks, to excess, when she is in trouble."  Is that right?

A.    Yes.

Q.    So your answer is that her drinking is when -- excess is when she's in trouble; is that correct?

A.    That was my answer, yes.  Again, that might have been my shortcoming.  I probably should have said she drinks to excess frequently, quite frequently.

Q.    Or maybe even daily, isn't what you just testified to?

A.    Daily, yes.

Q.    So it's not sometimes, it's not frequently, now your story is every day?

A.    No, now the truth is every day she would drink.

Q.    So now today you're telling the truth.  What you told

the trial team was not correct, was not the truth?

A.    No, I would not say it was a lie.

Q.    So when you said it was sometimes, that wasn't a lie --

A.    No.

Q.    -- when it was every day?

A.    Every day.  It got to be every day.

Q.    You told the trial team it was sometimes.  Isn't that a lie to them?

A.    Again, that is my shortcoming.  No, it is not a lie. The truth is Juanita is an alcoholic.

Q.    Why was it not a lie to say, "She drinks, to excess, sometimes when she's in trouble," if the reality is she drank every day and was drunk daily?

A.    Ma'am, have you ever misspoken in your life?  Ever?

Q.    Let me just clarify.  You're saying you misspoke when you said sometimes?

A.    Apparently, yes.

Q.    And you misspoke when you talked to Dr. Randall and told him Juanita will drink when she's upset, sometimes to excess.  That was misspeaking; is that right?

A.    I would not say it was absolutely misspeaking.  It was perhaps a poor choice of phrase.

Q.    And was it a poor choice of phrase when you said to Mr. Simon, "She drinks, to excess, when she is in trouble"?

MR. MONTROY:  I'm sorry, Your Honor, I'm just

confused what the exhibit was.

MS. COSTANTIN:  I'm sorry, this is 500.11.

MR. MONTROY:  And what was the exhibit before?

MS. COSTANTIN:  489.2.

MR. MONTROY:  Your Honor, just to clarify to the Court, my objection would be that these are part of the same interview.  They are the same date.  And it appears Dr. Randall and John Simon were -- it's part of the same conversations.  It's not two separate conversations, just to clarify.

THE COURT:  Different people taking different notes.

MR. MONTROY:  Yes, exactly.

BY MS. COSTANTIN:

Q.    Is that right, you told them both at the same time that it was a sometime thing that she was drunk?

A.    Juanita is an alcoholic.  Juanita drank incessantly, but she drank beyond belief when she was upset.

Q.    So your statement to the trial team that she will drink when she's upset, sometimes to excess, was that a correct or an incorrect statement?

A.    Juanita did do those things.  And Juanita was upset quite frequently.

Q.    Okay.  So when you said this, what you really meant was she's drunk every day?

A.    Well, what I meant is Juanita is an alcoholic.

Q.   Is that what you said to them?

A.   No, it doesn't appear to be.  But that's the truth.

Q.   But you didn't say that to them?

A.   They did not ask me that.

Q.   You're --

A.   They did not ask me, "Is Juanita an alcoholic?"  Had they asked me that, ma'am, I would have said yes, a chronic alcoholic.

Q.   And if they asked you, "Does Juanita have a problem with alcohol?"  Your answer would have been, "She's an alcoholic"?

A.   Yes.

Q.   "She's drunk daily"?

A.   Yes.

Q.   So when John Simon wrote in his notes, Exhibit 500, page 11, the question, "Does Juanita have a problem with alcohol?"  And your answer was:  "She drinks, to excess, when she is in trouble," isn't that what you told him?

A.   Would "to excess" qualify somewhat as an alcoholic?

Q.   "When she is in trouble," is that what your answer was?

A.   Juanita was in trouble quite frequently emotionally, and she drank to excess.  If to excess does not qualify someone as an alcoholic, the word "excess," then I don't know the definition of the word.

Q.   So when the answer was, "She drinks, to excess, when

she is in trouble," what you meant by that is she is an alcoholic and is drunk on a daily basis, is that your testimony?

A.    Juanita is an alcoholic.  She drank on a daily basis.

Q.    No, my question is, when you told the trial team, "She drinks, to excess, when she is in trouble," what that really meant is she is an alcoholic who is drunk daily?

A.    Yes.

Q.    Okay.  Now, you told the trial team that Billie would lie; is that correct?

A.    I'm sorry, say that again.

Q.    Do you recall telling the trial team that Billie would lie about things, he would lie to you, tell you fibs?

A.    I don't recall having said that.  I may have.

Q.    Well, let me ask you this:  Did Billie lie and tell fibs?

A.    Perhaps.  Just about every child does.

Q.    Okay.  So I'm directing you to Exhibit 488.4, the first paragraph.  These are Dr. Randall's notes of your interview.

"Billie will lie to you, tell you fibs.  The way you see something, if he and I saw the same incident, he might see one thing, I might see another.  I would listen to his mother talk, the things Bill lied to her about.  Like skipping school in the City schools."

Is that what you told Dr. Randall?

A.    Yes.

Q.    And Billie would lie to his mom about skipping school, right?

A.    Yes.  I don't see that as odd.

Q.    I'm just simply asking you, Billie lied, correct?

A.    And I answered, I said yes.  And I also don't see that as being odd.

Q.    And Billie selling drugs, you knew that, didn't you?

A.    I was told Billie sold drugs.  I myself through these poor eyes never saw him sell drugs.  I was told he sold drugs.

Q.    So as you sit here today, you're saying you don't know if he sold drugs?

A.    I was told Billie sold drugs.  I myself cannot testify to the fact that he did indeed sell drugs.  I never saw him sell drugs.

Q.    And you told the trial team that you heard he was selling drugs; is that right?

A.    Right.  I heard.

Q.    And remember when the house got shot up?

A.    Yes.

Q.    That was about drugs, wasn't it?

A.    Yes, that's what I was told.

Q.    Okay.  And that was about Billie selling drugs; is that right?

A.    That's right.

Q.    And you testified that she would -- and this is during this same time period when Billie has dropped out of school, and you've heard that he's selling drugs, right?

A.    That's right.

Q.    And this is, what, age 15 or 16, is that when you testified that she would put him out of the house?

A.    Yes.

          MS. COSTANTIN:  Judge, I don't have any more.

          THE COURT:  Redirect?

                    REDIRECT EXAMINATION

BY MR. MONTROY:

Q.    I'm sorry, Ms. Ruffin.  When you were being asked on direct examination the number of times that you saw Juanita hit Billie, I believe you used the word "often."  Is that right?

A.    I'm sorry, say that again.

Q.    When you were being asked on cross-examination for an exact number of times that you saw Juanita hitting Billie, you weren't able to give an exact number; is that right?

A.    That's right.

Q.    So you don't recall the exact number of times that Juanita hit Billie?

A.    No.

Q.    And I believe you used the word "often," is that fair

to say?

A.    Yes.

Q.    So is it fair to say that you saw Juanita hit Billie often?

A.    Yes.

Q.    So it was more than one time?

A.    Yes.

Q.    It was many more times than one time, is that fair?

A.    Yes.  But I couldn't give you an exact number, I'm sorry.

Q.    And I believe you testified on direct, and correct me if I'm wrong, but you saw Juanita hitting Billie throughout the entire time that you knew Billie; is that right?

        MS. COSTANTIN:  Judge, I'm going to object to the leading.

A.    Yes.

        THE COURT:  Sustained.

Q.    Did you see Juanita hit Billie when -- around the time that you first met Billie?

A.    Yes.

Q.    And did that continue throughout the time that you knew Billie?

        MS. COSTANTIN:  Same objection, Judge.

A.    Yes.

        THE COURT:  Sustained.  Leading.

MR. MONTROY: I'm sorry, Your Honor, I'll try to be more direct. Just a second, Your Honor.

BY MR. MONTROY:

Q. You said you first met Billie when he was around 12 years old; is that right?

A. Yes.

Q. Did Juanita hit Billie when he was around 12 years old?

A. Yes.

Q. Do you recall Juanita hitting Billie when he was 13, 14, 15 years old?

MS. COSTANTIN: Judge, I'm going to object once again to the leading nature.

THE COURT: Yes. If you want to ask her when she hit him, that's okay.

MR. MONTROY: Sure.

Q. Ms. Ruffin, do you ever remember a time period in Billie's life when he was not being hit by Juanita?

MS. COSTANTIN: Judge, it's the same objection.

MR. MONTROY: I'm sorry, Your Honor, I'm trying to ask an open-ended question. I think it --

THE COURT: Just ask her about when she hit him, and she can fill in the answer.

BY MR. MONTROY:

Q. Ms. Ruffin, when do you remember Juanita hitting Billie? What age was he at?

A.    From the time he was about 12 until he got in trouble with the bank robbery.

Q.    I think I asked you this question on direct examination, but did -- was it your impression that Juanita loved Billie?

A.    Yes.

Q.    Was it your impression that Juanita wanted the best for Billie?

A.    Yes.

Q.    And yet you also testified that she physically and verbally abused him; is that right?

A.    Yes.

        MS. COSTANTIN:  Judge, I'm going to object to the leading nature.

        THE COURT:  Yes.

Q.    Did Juanita also physically and verbally abuse Billie Allen?

        MS. COSTANTIN:  Same objection.

        THE COURT:  Overruled.

A.    Yes.

Q.    I'm sorry?

A.    Yes.

Q.    In your mind, thinking back to the time period that you knew the Allen family when Billie was living there, how do you reconcile those two concepts that seem to be at odds,

that she loved him and wanted the best for him, and yet she verbally and physically abused him?

A.   It's not easy to.  I think -- I know she loves Billie. I know she wanted the best for Billie then and she wants what's best for him now.  It's not easy to reconcile those two things.  I think possibly every adult, possibly every parent has the ability to be somewhat of a Jekyll and Hyde under certain circumstances.  You're trying to raise a decent human being, and at the same time you try to teach them that it's wrong to strike somebody, that violence doesn't work, but at times you may be driven to do things that you would not ordinarily do when they displease you in some way.  Or when they find themselves in certain situations, may have -- that's your last resort and your only way to deal with it.

Q.   And is that how you see Juanita?

A.   Yes.

Q.   On cross-examination you were asked some questions about your trial testimony, when you were asked to describe how Billie changed after Marquis died.  Do you recall that?

A.   Yes.

Q.   And you -- the answer to your question at trial was: "Billie seemed sullen, a whole lot less communicative.  He would always laugh and joke and play around the house with his mother and the girls, he didn't seem to do much of that anymore.  He wasn't as happy.  It's like he lost something

after Marquis died."  Do you recall testifying to that?

A.    Yes.  Billie changed after his friend died.

Q.    My question is, prior to this time, prior to Marquis being killed, was Billie being beaten in the house by Juanita?

A.    Yes, she would strike him.

Q.    I just want to go back to this comment that "She has to do what she has to do to maintain control."

THE COURT:  And this is what?

MR. MONTROY:  I'm sorry, Exhibit 488, page 4.

Q.    Now, I think -- well, strike that.

Did -- when you made this statement or at least when somebody wrote down that you had said this, did Rick Sindel ever ask you what you meant by "She has to do what she has to do to maintain control"?

A.    No.  No one ever elaborated, and they never asked me to.

Q.    So John Simon and Dr. Randall, they never asked you what you meant by that; is that right?

A.    No.

Q.    Now, you testified on cross-examination that you believe that Juanita felt like she had to be a strong single parent; is that right?

A.    Yes.

Q.    Do you have any opinion as to whether or not Juanita,

in her view that she had to be a strong single parent, whether that included physical beatings?

A.    Do I think she felt that way?  I think at times she must have.  Billie was a pretty big boy.

Q.    Now, my next question is going back to the "tighten Bill up" phrase that was written down in the notes as well. Do you remember that?

A.    Yes.

Q.    When you say "tighten Bill up," does that include Juanita hitting Billie with shoes?

A.    Yes.

Q.    Does that include Juanita punching Billie in the face?

A.    Yes.

Q.    Going back to Exhibit 500, page 11.  In John Simon's notes it says you were asked the question:  "Does Juanita have a problem with alcohol?"  And you -- and you said, "She drinks, to excess, when she is in trouble"?

A.    Yes.

Q.    That's what he wrote down there.  And in Dr. Randall's notes, Dr. Randall used the word "sometimes"?

A.    Yes.

Q.    "She drinks to excess sometimes."  Did John Simon or Dr. Randall ever ask you any other questions about Juanita drinking alcohol?

A.    No.

Q.   Did Dr. Randall, John Simon, or Rick Sindel ever ask you what you meant by "excess"?

A.   No.

Q.   Did Dr. Randall or Mr. Sindel or Mr. Simon ask you what you meant by "sometimes"?

A.   No.

Q.   Did Dr. Randall, Mr. Simon, or Mr. Sindel ever ask you what you meant by "when she is in trouble"?

A.   No.

Q.   So is it fair to say that no one asked you any additional questions about what you meant when you said: "She drinks, to excess, when she is in trouble"?

A.   No, not as I can recall.

Q.   When you say that Juanita felt like she needed to be a strong single parent, does that mean to you that she wasn't abusive?

A.   I'm sorry, are you asking me if I felt if she was abusive or not?

Q.   Yes.

A.   At times I feel she was, yes.  And I let her know it.

     MR. MONTROY:  I don't have any additional questions, Your Honor.  Thank you.

     THE COURT:  You may step down.  You are excused.

     THE WITNESS:  Thank you.

     THE COURT:  You may call your next witness.

MR. KANE:  Your Honor, Petitioner called Monette Petty Nelson.

MONETTE PETTY NELSON,

Having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. KANE:

Q.    Good morning, Ms. Petty Nelson.

A.    Good morning.

Q.    Could you please pull that microphone up to you and speak clearly into it so everyone can hear you?

A.    Okay.

Q.    Thank you.  Could you please tell us if you know the Petitioner in this case, Billie Allen?

A.    Yes.

Q.    And how do you know him?

A.    He's my cousin.

Q.    And how are you related through your parents?  Which parents are related?

A.    He is my aunt's -- my paternal first cousin.  His mom is my father's sister.

Q.    And who is your father?

A.    Raymond Petty.

Q.    What city do you currently reside in?

A.    Fishers.

Q.    In what state?

A.    Indiana.

Q.    How long have you lived in Indiana?

A.    Four years this last month.

Q.    Where did you live before that, what city and state?

A.    St. Louis, Missouri.

Q.    What is your educational background?

A.    I have a bachelor's in social work, and I have a master's in professional school counseling.

Q.    Are you currently employed?

A.    No.

Q.    Are you a stay-at-home mom?

A.    Yes.

Q.    When was the last time you were employed?

A.    It was in 2010.

Q.    And what was your position at that time?

A.    I was a Foster Care Licensing Specialist for the Children's Bureau of Indianapolis.

Q.    When you were a child -- well, let me ask you this, what year were you born in?

A.    I was born in 1977.

Q.    Do you know what year Billie Allen was born in?

A.    The same year, 1977.

Q.    Did you grow up near Billie Allen?

A.    Yes.

Q.   Was that for your entire childhood or were there particular times when you lived near him?

A.   I'm sorry?

Q.   You said you lived near him when you were a child?

A.   Yes.

Q.   Was that for your whole childhood?

A.   Oh, well, up until about 13.

Q.   Okay.  Where did he live at that time?

A.   45 --

Q.   I'm sorry?

A.   Well, for the majority of the time, I knew him to live at 4535 Cote Brilliante.

Q.   Do you recall a time before he moved to Cote Brilliante, when he lived on Evans Street?

A.   Yes.

Q.   Do you recall about how old he was when he moved with his family to Evans -- I'm sorry, to Cote Brilliante Street?

A.   I can probably say about seven or eight years old.

Q.   And where were you living at that time when he first moved to Cote Brilliante?

A.   4407 St. Ferdinand, probably about three or four blocks over.

Q.   Do you recall who lived in the house on Cote Brilliante with Billie Allen?

A.   Yes.

Q.   Can you please tell us?

A.   My grandfather, Otha Petty, Sr.; Juanita; his sister Nikki, Bill, Yvette, and --

Q.   Can you speak up.

A.   Nicole or Nikki, Angela, and Yvette.  And also my father, Raymond Petty.  And sometimes my uncle, I think he lived there also, Jerome Petty.

Q.   And can you describe for us the circumstances that led to your father to be living there on Cote Brilliante for a time?

A.   I guess he had lived there all his life until he got married.

Q.   And about how old were you when he got married?

A.   Nine.

Q.   And at that time did he continue living on Cote Brilliante or did he move elsewhere?

A.   He moved out.

Q.   And did he begin living in the same home as you at that point?

A.   Yes.

Q.   And you said up until about 13 years old.  Where did your family move when you were 13 that you were no longer close to Cote Brilliante?

A.   We moved out to University City.

Q.   Did you still visit Cote Brilliante from time to time?

A.   Yes.

Q.   How much time would you say, focusing your attention on the period of time between ages -- if I remember correctly, seven or eight and 13 when you were close to Cote Brilliante, living close there, how much time would you spend over there roughly, if you recall?

A.   Between seven -- seven and eight, I think the visits probably were for like family functions, and then I would go after school quite frequent.  So three or four times a week.  And then as I got older when we moved to University City, it was a little more frequent because I had to catch the bus and go there.

Q.   It was a little -- you saw him -- you visited more often or less often after you moved to University City?

A.   Probably a little more as I got older.  And even after -- probably about 11 through 13, it probably was more frequent.

Q.   Okay.  And after that did your contacts over there become less frequent?

A.   No.  Probably -- it would probably stay the same until high school.

Q.   Okay.  Were you close to Billie during those years?

A.   Yes, I would say.

Q.   Describe for us what you recall about his relationship with his mother during those years.

A.     As far as like a relationship as --

Q.     Well, let me ask you this:  Were there any problems in the home that you observed on Cote Brilliante?

A.     Yes.

Q.     And were there any problems in the relationship between Juanita and her son Billie?

A.     Yes.

Q.     What were those problems?

A.     Well, I could say like the household, the way -- like the way that he was maybe raised.  She was a lot less lenient, as the kids could kind of go as we pleased when we were there.  We were free to kind of -- there was no curfew. It was like a free-for-all.

Q.     Now, you said she was less lenient.  What were you referring to when you said that?

A.     I guess like I would say we were open to do whatever we wanted to.

Q.     Okay.  Now, focusing on how she interacted with Billie, what were -- were there -- you had said there were some problems there.  What were the problems just between her and Billie, her son?

A.     I guess I could say like disciplining.  Bill got more whoopings than the girls.  Or, you know, he would -- he would be disciplined more.

Q.     And when you say -- when you refer to "whoopings,"

what -- assume that we don't know what that means.  Can you explain to us what that would entail physically?

A.    I guess there would be different levels or different degrees.

Q.    Go ahead.  You can take your time and answer.

A.    If he would get in trouble, it could go from, anywhere from physical, like she could do like throw shoes or anything at him, like if he would do something, throw something at him, hitting, I mean, or just hitting physically.

Q.    Okay.  And were you signaling with your hands there, hitting him physically with her hands?

A.    Hands or the object that she had in her hand, a house shoe or anything that she had like close to her.

Q.    Okay.  Did you ever see her strike him with anything else other than a shoe or her hand?

A.    Like a spoon or like a utensil in the kitchen.

Q.    Can you speak up.  I didn't hear you.

A.    A utensil or a spoon or something out of the kitchen or something.

Q.    And are these whoopings that you personally observed, like that you saw?

A.    Yes.

Q.    Do you remember -- can you describe any of them specifically to us what you remember seeing, and, you know, what Bill's reaction was to it or just describe the

circumstances of any of these whoopings that you recall?

A.   This one in particular time that I guess I was kind of afraid.  When I guess -- it started out like she was hitting him with a house shoe.  And then I guess this was something that he did like was really wrong, and it continued like into his room.  But Bill was just, he was like shielding his self like in a corner as he was getting a whooping.

Q.   Was he standing or on the floor?

A.   No, he was like cradled like down on the floor.

Q.   As she hit him?

A.   Yes.

Q.   You referred to him getting in trouble as bringing that on; is that right?

A.   See, from what I knew, from what was going on, I would think that he did something, so I don't know like what could have happened before.  But, yes, it appeared to be something that he had done wrong.

Q.   Okay.  So then am I understanding you correctly, you assumed at the time that there was something that he had done to provoke it, but you wouldn't have necessarily known what that was?

A.   No.

Q.   Is it possible that he had not done something to provoke a beating like that?

A.   I wouldn't -- I wouldn't think so, I guess because -- I

guess because of a reaction like, that something would have to prompt it, I would think.

Q.   Was Juanita's response and were her whoopings, were they what you would consider appropriate responses?

A.   No.

Q.   Did you know Juanita to ever drink alcohol?

A.   Yes.

Q.   And if you could just keep your voice up so everyone can hear.

A.   Yes.

Q.   Did she have a problem with alcohol?

A.   I think so.

Q.   In terms of the whoopings that she gave Billie, were there ever times when she -- where the whoopings seemed connected to her drinking?

A.   Yes.

Q.   How so?

A.   It would seem like I guess the whoopings would be escalated by her like drinking.

Q.   Okay.  When you saw her hitting him, was it -- if you could tell, was it like she was hitting him hard or was she hitting him not hard?  I mean, if you know.

A.   From what I could see, it would seem like she was hitting him with all her might.

Q.   With all her might?

A.    Yes.

Q.    How did Billie respond?  You described that one incident where he was on the floor, but just generally speaking how would he respond to these whoopings?

A.    Fearful.  It was just -- he would try to shield his self, like cover his self.

Q.    Did you ever see him hit her back?

A.    No.

Q.    At times like this, when these things were happening, would she be saying anything to him?

A.    Yes.

Q.    How would she speak to him?

A.    Angrily.  Like yelling, maybe trying to get a point across.

Q.    Would she cuss at him?

A.    Yes.

Q.    Would she call him names?

A.    Like, I don't recall any names like -- I would just -- she would use profanity, but I don't recall any direct names.

Q.    Well, how would you describe -- how would you describe how she would speak to him or yell at him at those times?

A.    I guess like angrily.  Like what do you mean like --

Q.    Was it appropriate or was it not?

A.    I wouldn't see it as appropriate, no.

Q.    Do you recall earlier this year being contacted by the

FBI at your home in Indiana?

A.    Yes.

MR. KANE:  I'm calling up Exhibit 685, Your Honor.

MS. COSTANTIN:  Judge, I'm going to object to this as improper impeachment.  As far as we know she hasn't said anything differently, so it's not proper just to show an exhibit to her.

THE COURT:  Okay.  Well, ask -- let's do this, I want to take a little bit longer lunch today.  Let's stop now and we'll come back at 1:15, about an hour and 15 minutes. Be back at ten after, so it would be about an hour and 15 minutes.  Court's in recess.  You may step down.

(Court in recess from 11:54 a.m. until 1:18 p.m.)

THE COURT:  Just before lunch there was an attempt to place before the witness something and related in some way to the FBI.  I know nothing beyond that.  There was an objection.  You want to start there or --

MR. KANE:  Actually I'm going to come in from another direction, Your Honor.

THE COURT:  Okay.

MR. KANE:  And I'll see if we end up there or not.

THE COURT:  Okay.  Very well.  Thank you.

BY MR. KANE:

Q.    Ms. Petty Nelson, you had mentioned early on in your testimony that you did some foster care analysis for the

State of Indiana or for the City of Indianapolis; is that correct?

A.    Yes.

Q.    Do you have any professional background in evaluating homes for issues of abuse or neglect?

A.    Yes.

Q.    And I believe on direct testimony before lunch, you described some of the treatment that Billie Allen was subjected to as abusive; is that correct?

A.    Yes.

Q.    Now, at the time that you were a child, particularly in this seven to 13 age range where you were living nearby to Billie, did you at that point label that behavior as abuse? Is that how you would have described it then?

A.    I don't think so.  Probably younger, seven to ten, I probably wouldn't have known it as that.  Maybe older, may have had questioned.  But no, no, I wouldn't.

Q.    Did you consider the behavior that he was subjected to -- well, let me ask you this:  Was there similar type of abusive behavior in your own home?

A.    No.

Q.    And was the abusive conduct that you described earlier, was that normal for what you observed in the Cote Brilliante house or was it abnormal?

A.    Normal for that residence?

Q.     Yeah.

A.     Yes.

Q.     So is it something that you saw on a regular basis then?

A.     Yes.

Q.     We had touched briefly on Juanita Allen's alcohol drinking earlier, and I wanted to ask you a few more questions about that.  What was her drink of choice as far as you knew?

A.     Now, as far as I knew it was a clear, a clear drink.  I would probably say vodka or gin.

Q.     Okay.  Is that something she drank straight, from what you knew?

A.     Yes.

Q.     Would she drink at particular times of the day or at any time of day?

A.     Any time.

Q.     Was there ever in the time that you knew Billie, were there times when you knew him to be locked out of the house or thrown out of the house?

A.     Yes.

Q.     What do you remember about that?

A.     I could recall times when I would come over to visit and maybe say, "Where is Bill?"  And they -- like the sisters would say, "Well, he locked out right now.  He's locked out

right now or he can't come home right now."  And just maybe
didn't see him that visit.

Q.   What's the youngest age that you recall either hearing
about or seeing him locked out of the house?

A.   Probably -- probably say whatever age he was in between
like the eighth and ninth grade.

Q.   Okay.  Like junior high age?

A.   We were probably -- yeah.

Q.   Do you recall when Billie was arrested in this case?

A.   When he --

Q.   Do you recall when that happened and hearing about it?

A.   When he was locked out of the house?

Q.   No, no, I'm moving forward to the time he was actually
arrested in connection with this case.

A.   Oh, okay.  Do I recall hearing about it?

Q.   Yes.

A.   Yes.

Q.   And how old were you at that point, if you recall?

A.   I was 16.

Q.   Would it refresh your recollection if I told you at
trial you testified that you were in college at the time?

A.   Yeah, I was a freshman in college.

Q.   Okay.  Is it possible that you were actually older than
16, more like 19 at the time that this crime occurred?

        MS. COSTANTIN:  Judge, I have no objection to

leading to the date of the crime and date of birth.

MR. KANE: Thank you. That would make it easier.

Q. The crime in this case occurred in March of 1997. How long would you have been then? Were you 19, going on 20?

A. Right.

Q. Were you born in July of 1977?

A. Yes.

Q. And then the following year, about a year later in March of 1998, the trial took place, the penalty phase of the trial took place.

A. Okay. Yes.

Q. Do you recall that you testified at the penalty phase of the trial?

A. Yes.

Q. Do you recall that before trial, you met with members of the defense team that was representing Billie at that time?

A. Yes.

Q. To the best of your recollection, how many meetings did you have with them before trial?

A. I can recall one visit when I believe they came and kind of talked with us at the home, at Eastmont. And then I think we met again at an office, like closer, like days before trial, an office in Clayton.

Q. Okay. And do you recall whether or not at the time of

trial when you testified at trial, that you testified to abuse having happened in Billie's home to Billie?

A.    Do I remember?

Q.    If you testified about abuse in his home.

A.    No.

Q.    You don't recall or you did not testify to that?

A.    I didn't -- I did not testify to that.

Q.    Okay.

THE COURT:  You did not what?  Can you get a little closer?

THE WITNESS:  I did not testify to that.

Q.    Is there a reason that you did not testify about that?

A.    I was never asked any questions regarding abuse.

Q.    Okay.  I'm going to move to Exhibit 203.

MR. KANE:  Steve, can I get you to sign on here?  Thank you.

Q.    I'm showing you what has been marked as Exhibit 203. And this is a transcript of the testimony that you gave at Billie's trial in 1998.  And I'm going down to the fourth page of this exhibit, which is page 297 of the transcript. And I'd like you to read just to yourself to refresh your recollection at page -- I'm sorry, beginning at line 10 down to line 18, if you could, please.  Are you finished reading that?

A.    Yes.

Q.   Does that refresh your recollection to things you testified about at Billie's trial?

A.   Yes.

Q.   And looking at the first couple lines I drew your attention to, you were asked by Mr. Sindel if you know what the proceeding there was about.  And you answered: "Basically to find out more character about the family background."  Is that correct?

A.   Right.

Q.   Okay.  And then he asked a followup question:  "And do you know why?"  And then could you read the answer that you gave to that question starting on line 14 there?

A.   "I guess basically to kind of --

Q.   Can you could speak up?

A.   "I guess basically to kind of define, you know, what kind of person Bill is and what kind of family he came from."

Q.   And after that you were asked:  "What was Billie like growing up?"  Correct?

A.   Yes.

Q.   Why, if you can recall, in this question and answer series here did you not provide testimony about abuse that you had witnessed in the house that Billie had been subjected to?

A.   I really can't recall why.

Q.   Okay.  Were you asked any specific questions that you

recall about Billie being abused?

MS. COSTANTIN: Judge, I'd object, this is leading. The document speaks for itself.

THE COURT: Sustained.

BY MR. KANE:

Q. Do you recall testifying at trial -- well, let me ask you even before we get to that. Do you recall that Billie had a -- was Billie always truthful when he talked about himself as a child?

A. No.

Q. In what ways do you recall him not being truthful?

A. I guess he would kind of fabricate on like things that he owned or that he had, because I guess the schools that he went to, he was exposed to kids that had a lot more or came from different households. So I guess he kind of like overcompensated. He started like making up these lavish little tales about things that he had at home.

Q. So he would claim to have things that he didn't really have?

A. Yes.

Q. Did he talk about himself in ways that made him appear better than he really was?

A. Yes.

Q. Do you recall testifying about that at trial?

A. No.

Q.    Okay.  Are you saying you know you didn't testify about that or just that you don't recall one way or the other?

A.    I kind of remember I don't think I talked about that at all.

        MR. KANE:  No further questions, Your Honor.

        THE COURT:  Okay.  Thank you.  You may inquire.

                    CROSS-EXAMINATION

BY MS. COSTANTIN:

Q.    Ms. Petty, I just want to make sure we have all the family relationships clear, because sometimes it's not so clear because you all come from a large family.

A.    Okay.

Q.    Juanita and Raymond are brother and sister; is that right?

A.    Yes.

Q.    Okay.  And Juanita is Billie Allen's mom.  And then Raymond is your dad?

A.    Yes.

Q.    Okay.  And you were both born -- both you and Billie Allen were born in 1977, right?

A.    Yes.

Q.    And you were kind of what, the '77 -- what did you call yourselves?  I'm sorry, I can't remember.

A.    '77, they called us like the '77 crew or gang.

Q.    Crew or something like that.  I mean, it was meant to

be a joking thing, it was nothing serious, right?

A.    Yeah.

Q.    And you were close to Billie when you were younger, much younger or younger than high school, correct?

A.    Yes.

Q.    You had only seen him a couple times in the two years before the robbery; is that correct?

A.    Yes.

Q.    Because you were away at college, and you also even stayed up in Warrensburg during the summer, do you remember that?

A.    Briefly -- like my classes were like from four to six weeks, so I stayed for short periods throughout the summer. But I came home because I worked here in St. Louis through the summers.

Q.    Okay.  But in those years before the robbery, you really didn't know him, right?

A.    Well, we talked, but I didn't see them as much as I did before going to college, of course.

Q.    And I'm going to show you an interview that was done with you by Dr. David Randall, one of the people from the trial team back at the time.  It's Exhibit 479.  And I just want to show you the second paragraph.  This is an interview back in 1998.

        "The past few years I really didn't know Bill.  I

was in school, never home.  I even went to summer school.  I saw him two or three times in the last two years."

Is that what you told Dr. Randall?  Do you remember?

A.    I suppose.  I don't recall.

Q.    Do you remember one way or the other?  I'm sorry, I can't hear.

A.    I guess so, yeah.  Because I didn't -- we didn't see each other as much, but we still talked, so --

Q.    And you knew, however, that something bad was going on when Billie's house got shot up, correct?

A.    Yes.

Q.    Do you remember that that occurred in January of 1997, a couple months before the robbery?

A.    No, I don't recall like the dates.

Q.    Do you recall that it was just a couple months before the robbery?

A.    I suppose.  I don't remember exactly when.

Q.    And if you don't, that's fine.

A.    Yeah.

Q.    When that shooting of the house occurred, you suspected it was over a drug deal that had gone bad.  That's what the family thought, right?

A.    Well, yeah, that's what we heard through the family.  I couldn't really suspect anything.  I was getting information from them.

Q.    And the family -- the drug deal that had gone bad was with Billie, correct?  That's what the talk in the family was?

A.    See, I'm not sure.  I don't recall the -- I don't recall the plan or the details of that.  Because they were uncertain.

Q.    Were you aware that Billie had been selling crack from about the age of 14?

A.    No.

Q.    Does that surprise you?

A.    Yes.

Q.    And I say this because it's something that Billie Allen said in a recent deposition, which if we have a chance, we're going to see if it will load on the screen.  Were you aware he was selling crack?

A.    No.  I don't recall ever knowing.

Q.    You didn't know that?

A.    No, I don't recall every knowing.

Q.    That he was selling crack?

A.    That he -- no.

Q.    Okay.  Let's talk about a time before that time.  You spent time at your grandfather's house when you were younger, you just testified to, correct?

A.    Yes.

Q.    And your grandfather is Otha Petty; is that right?

A.    Yes.

Q.    Now, you believe that they -- "they" meaning Juanita and her children -- moved over there when Billie, and for that matter you were probably about eight years old?

A.    Right.

Q.    Okay.  And then your dad was there for maybe another year before he moved out, or less than that you think?

A.    Probably about -- probably about a year or so. Probably eight or nine he moved out.

Q.    Now, when you went over to your grandfather's house -- now, let me ask you this:  When you went over to your grandfather's house, you had testified earlier that there was no rules.  It wasn't like your house where there were rules?

A.    Right.

Q.    Now, that's a time when your dad was gone by that time, right?

A.    Well, yes.

Q.    Okay.  So -- and I'm not trying to trick you, I'm just trying to understand.  This is a time when you're talking about when your dad is living with you and you're going to visit your grandfather?

A.    Uh-huh.

Q.    Okay.  And when you went over to that house, you could stay outside, you could go to the park, you could have friends over, right?

A.   Well, yes.  Outside, yeah.

Q.   And you couldn't do that sort of thing at your house, it was more strict, right?

A.   Well, we could have friends over, but I guess the hours, the curfew -- a curfew was put in place.

Q.   At your house it was stricter like that?

A.   Right.

Q.   And Juanita would go out at nighttime; is that right?

A.   Yes.

Q.   And Otha was living in the basement at that point; is that right?

A.   Yes.

Q.   Okay.  In fact, he was living in the basement until he passed away relatively in the last year or so, right?

A.   Yes.

Q.   So he was at the Cote Brilliante house throughout all that time?

A.   Yes.

Q.   He was living there.  Now, everything that I've just said -- I'm going to show you Exhibit 479, which is the interview that you gave with Dr. Randall.  That's what you told Dr. Randall, right?

     "When I went over to Pop's house, I could do anything I want.  At my house, I had to go in.  Over there, no rules, not too much they couldn't do.  Juanita was pretty

much lenient on them.  Stay outside, walk the streets, go to the park, go outside the gate.  Over there I could visit, people could come over.  Not in my house.  I can't say it was neglect, but they kind of grew up on their own.  She'd go out a lot.  At night, she'd leave."

Is that what you told Dr. Randall?

A.   Yes.

Q.   Okay.  And you had testified, I believe, that you met -- that there was a visit at your home and then at least one visit at the office in Clayton; is that right?

A.   Yes, that I can recall.

Q.   That you remember?

A.   Yeah.

Q.   So looking at this at the time, and it's hard sometimes to do this, but at the time, putting yourself back in what you were thinking back at that time, back in the nineties, you're telling the trial team, "I can't say it was neglect," right?

A.   Well, I guess nicely put, I was I guess saying -- I guess as I look like now.

Q.   Absolutely.  And that's what I'm trying to do, I'm trying to separate out.  And I'm not trying to be rude here, but I'm trying to separate out the professional counselor --

A.   Right.

Q.   -- who's done a -- you know what I'm saying?

A.    Right.

Q.    I mean, really, I am.  I'm trying to go back to the 19- or 20-year-old who is being talked to at this point.

A.    Right.  Right.

Q.    Okay.  So what I'm saying is back when you're 19, back at that time, you're telling them that this -- that you're not -- you can't say it was neglect, right?

A.    Right.

Q.    Now, looking now, you're saying it was?

A.    Yeah.  Yes.

Q.    Well, I don't know if you are.  I shouldn't put those words in your mouth.  Are you saying it was neglect?

A.    I can say looking at it now and the way it was, it seemed as though it would define some level of neglect.

Q.    Okay.  Now, you never told the trial team that Juanita hit Billie, did you?

A.    The trial team?

Q.    The trial team, the attorneys, I'm sorry, back in 1998?

A.    I don't recall.

Q.    I mean, they asked you what it was like at pop's house, right, because that's what this paragraph is about.  And you didn't say to them, well, Juanita hits Billie, right?

A.    I don't recall ever.

Q.    Okay.  And my question is really, and that's because at the time you were just viewing it as nothing out of the

ordinary, right?

A.   At the time.

Q.   Back when you're 19 years old, not now with a degree in counseling and understanding everything.

A.   I guess if -- if then there's something that I saw as a norm there, maybe I wouldn't have tried to classify it as neglect.  Or are you asking my views on it now?

Q.   Right.  Right.  That's what I'm trying to separate out. What you're saying is your views on it now is this was abuse?

A.   Right.

Q.   You've also talked about it being discipline, though, right?  Not appropriate discipline, that's how you view it now, but back at the time you're looking at it as discipline, right?

A.   That's what I would appear to see it as then, yeah.

Q.   And even now you're talking about it happening when Billie did something wrong, like broke curfew or that sort of thing?

A.   I would assume that he was getting punished for something he had done prior.

Q.   Okay.  Let me just talk for just a moment about the discipline at your house when you were growing up.  When you were a child -- and you had a younger brother?

A.   Yes.

Q.   Okay.  And sister too or just a younger brother?

A.    A sister also.

Q.    Okay.  All right.  Were any of you physically disciplined growing up?

A.    Yes.

Q.    In what way?

A.    We got whoopings.

Q.    And what was a "whooping" at your house?

A.    Whooping at our house was a belt or to the bottom.

Q.    Now, when you look back at that as someone with all the education and training that you have, do you think that was abuse?

A.    Do I think that it was abuse?

Q.    Right.

A.    No.

Q.    Okay.  Is that the sort of discipline that you use with your own children?  I don't know how old they are, so that may not --

MR. KANE:  I object to the relevance of that question, Your Honor.

MS. COSTANTIN:  Judge, I think it is relevant because what we're trying to understand is the mindset at different time frames.

THE COURT:  Okay.  Overruled.

A.    I'm sorry?

Q.    How old are your children?  I'm sorry.

XIV - 92

A.   My daughter is eight and three years old.  So right now I wouldn't see --

Q.   Have you ever done that I guess, hit your children, either of your children with a belt?

A.   No.

Q.   Okay.  Is that something that you would view right now as inappropriate for you and your family?

A.   For me and my family, as the situations arise, I don't know.  She's eight now.  I don't know if a situation presented itself, I may have to take my hand to her bottom.  But I can't say right now.

Q.   It's hard to say because you don't know what someone is going to do when they are getting older, right?

A.   Right.

Q.   Right.  And you don't know if they are going to do -- perhaps be with people you don't want them with or doing things you don't want them to do, right?

A.   Right.

Q.   And sometimes it's very scary because they can get themselves into far more trouble than they can ever understand, is that fair to say?

A.   I would hope not, but --

Q.   I know you hope not, but when you're talking about teenagers?

A.   (Nodding.)

Q.   And sometimes you got to do what you got to do, is that fair to say?

A.   As far as a parent?

Q.   Yes.

A.   I don't know if I would say, you got to do -- you know.

Q.   Okay.  But you don't know at this point what you got to do?

A.   But I know -- I don't know her limits, but I would know mine.

Q.   Okay.  Fair enough?

A.   So --

Q.   And what you're saying at this point, you don't know whether or not at some future point when your daughter gets older or your children get older, if you would never use physical punishment?

A.   No, I wouldn't say that.

Q.   Okay.  All right.  I understand.

A.   No.  No.

Q.   Now, isn't it true that when Billie was getting older, he was always out on the streets?

A.   Yeah, as Bill got older, yes, he wandered a lot in the neighborhood.

Q.   I'm sorry, I can't hear.

A.   Yes, as Bill got older, yes, he wandered a lot in the neighborhood.

Q.    And it was kind of a joke when you'd call down there because he wouldn't be there, right?

A.    Well, now they were saying -- like one of my cousins was saying, like we'd call and ask where was Bill, and they'd be like -- but I mean, I think we would be genuinely concerned, like where is he?

Q.    Let me show you your interview with Dr. Randall.  I'm just going to highlight a portion.  "It was kind of like a joke down there, I'd call for Bill, they wouldn't know where he was."  Right?

A.    But not on my end as a joke.

Q.    They thought it was a joke?

A.    Right.  I'm saying their response may have been.

Q.    And Billie would lie a great deal, is that fair to say?

A.    And I guess I would say I guess about certain things, and when it came to certain situations.  Like if we were around talking about relationships, he'd say, you know, I have a girlfriend or, you know, I've got these things.  So I don't know like if I would say about everything.

Q.    Do you know if he lied to his mom about whether he was going to school?

A.    Oh, yes, I think he -- yeah.

Q.    That would be another area that he would lie in?

A.    Yes.

Q.    Now, you're morally opposed to the death penalty,

aren't you?

MR. KANE:  Objection, relevance, Your Honor.

THE COURT:  Overruled.

A.    You say morally?

Q.    Yes.  You personally don't believe in the death penalty.  Do you recall telling Mr. Simon that?

A.    Yes.

Q.    And that's correct?

A.    Yes.

Q.    Okay.

MS. COSTANTIN:  Judge, I don't have anything more.

THE COURT:  Redirect?

REDIRECT EXAMINATION

BY MR. KANE:

Q.    Just a few more questions.  You were being asked on cross-examination about limits, and I think you said, I would have limits in disciplining a child essentially.  Is that correct?

A.    Right, yes.

Q.    And would the limits -- would those limits stop you from beating a child when you were drunk?

A.    I guess if a person is intoxicated, I don't know if they -- they are not in the right frame of mind, so I don't know.  I don't know if they would have limits.  I mean --

Q.    Let me ask you this:  Would you consider it past the

appropriate limit to repeatedly beat a child who was cowering on the ground?

A.    Yes.

Q.    And that's something that you did see happen to Billie, is it not?

A.    Yes.

Q.    And was that sort of abuse visited on -- did Juanita treat her daughters that way also?

A.    From what I -- I never witnessed.  No, sir, I never witnessed that.

Q.    You testified on cross about the house being your grandfather's house?

A.    Yes.

Q.    And you also testified that Juanita at times would go out at night; is that correct?

A.    Yes.

Q.    Do you recall whether or not your grandfather had a girlfriend during certain times of your childhood?

A.    Yes.

Q.    And where did she live?  Not specifically, but just generally.

A.    Probably around the neighborhood.  Within close proximity.

Q.    Okay.  Were there times where he would stay at her house?

A.   Yes.

Q.   So were there times when Juanita would go out where the children would be left home alone unsupervised?

A.   Yes.

MR. KANE:  Just a moment, Your Honor.

(There was a conference held off the record.)

Q.   If you had been asked specific questions about the beatings that we've talked about today at trial or before trial in 1997, 1998, would you have told them what you had witnessed?

A.   If I was asked?

Q.   Yes.

A.   Yes.

MR. KANE:  No further questions, Your Honor.

THE COURT:  You may step down.  You are excused.

MR. KANE:  Your Honor, if I might just take a moment while the next witness comes in to update the Court --

THE COURT:  Sure.

MR. KANE:  -- on the schedule today.

THE COURT:  Sure.

MR. KANE:  We didn't do the best job scheduling, and it looks like we will end a fair bit early.  We only have one more lay witness this afternoon and then a number of stipulations that the parties plan to enter.

THE COURT:  All right.

MR. KANE:  Then tomorrow there's one more person we're finalizing, but we have three or four lay witnesses tomorrow.

THE COURT:  Okay.

MR. KANE:  And we would plan to finish some time in the afternoon and rest our case at that time.

THE COURT:  Okay.  Good.

MR. KANE:  And we touched base with the government about that.  And they are aware generally, and we're just finalizing the details of what to expect tomorrow.

THE COURT:  Okay.  Fine.

MR. HOLTSHOUSER:  Judge, if that happens as they predict, then I think Friday morning we would be prepared to present Dr. Wetzel.

THE COURT:  Okay.

MR. HOLTSHOUSER:  But then our remaining witnesses would both be flying in from out of town Saturday and would be ready to go Monday morning.

THE COURT:  Okay.

MR. HOLTSHOUSER:  Realistically I think that we could be finished with both of them Monday, but at worst spill over into Tuesday.

THE COURT:  Okay.

MR. HOLTSHOUSER:  That's the way it looks at the moment.

THE COURT: Okay. That's good.

MR. HOLTSHOUSER: We still have probably some loose end records to make on exhibits for the past couple of days. We're not actually ready to do that at the moment, and I think I need to check with --

THE COURT: Well, I've observed throughout this case that you all work really hard and work well together, and I appreciate it very much. We haven't had much down time, and there's always with this many witnesses and this long, that happens some, and that's okay. You know, everyone is doing the best they can, and I appreciate it.

Good afternoon. There's some water for you there in the pitcher right to your left.

THE WITNESS: I'm sorry, say that again?

THE COURT: There's some water to your left if you want some.

THE WITNESS: Thank you.

ANGELA ALLEN,

Having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. MONTROY:

Q.    Good morning, ma'am. Would you mind stating your name for the record, please?

A.    Angela Allen.

Q.    Good afternoon, Ms. Allen.  Ms. Allen, and I don't know if the Judge asked you to do this, but just to speak loudly into the microphone so everyone can hear.

A.    Okay.

Q.    That would be great.  Thank you.  Are you related to Billie Allen?

A.    Yes, I'm his baby sister, his little sister.

Q.    You're his little sister?

A.    Yes.

Q.    How much younger are you then?

A.    We're a year apart.

Q.    And do you have other sisters?

A.    Yes, I also have Nicole, Yvette, and then Rebecca.

Q.    And are you third on the line?

A.    On my mom's side, yeah, third.

Q.    And who is Rebecca?

A.    That's our dad's daughter.

Q.    And is that from a different marriage?

A.    Yeah, just a different lady.  Not a marriage, just a different lady.

Q.    So she's I guess technically what you'd call a half sister?

A.    I guess.

Q.    You don't call her a half sister?

A.    No.

Q.    Yeah, I understand.  I had a half brother and a half sister too.  Did you grow up with Billie Allen?

A.    Yes, sir.

Q.    And did you grow up with your sisters Nicole and Yvette?

A.    Yes, sir.

Q.    And have you always lived in the same house as your brother Billie and your sisters when you were a child?

A.    Yes.

Q.    Was there a time that you moved out?

A.    Out of --

Q.    Out of your family home.

A.    Yeah.

Q.    And when was that?

A.    Probably like when I was 16 or 17 years old I left the house.

Q.    Somewhere in that time period?

A.    Yeah.

Q.    And where had you been living when you moved out?

A.    I was staying with a boyfriend on the South Side. Well, I guess prior to that I had left and moved with my cousin, Sonya Banks.

Q.    And what was your -- before moving out, what was your permanent address?  Where were you living most of the time?

A.    On Cote Brilliante, 4535 Cote Brilliante.

Q.   And is that the family home where you lived with your mom and your brother and your sisters?

A.   Yes.

Q.   Now, you said that there was another time that you moved out with your cousins?

A.   Well, I had stayed with Sonya before.  I was like 16.

Q.   How long did you stay away from the house when you moved out for that time?

A.   Probably for about six, seven months.

Q.   Why did you move out of the house on Cote Brilliante when you were 16 years old?

A.   I didn't like -- I didn't like it.  The atmosphere, the environment.

Q.   Okay.  So are you saying that you specifically didn't like the atmosphere of the house on Cote Brilliante?

A.   Yeah.

Q.   When you moved out, who was living there at the time?

A.   I believe everyone; my mom, my grandfather, Nikki, Yvette, and Bill.

Q.   If you could explain what you mean when you say you didn't like the atmosphere, you didn't like the environment.  What exactly are you talking about that you didn't like?

A.   My mom, she was -- she was strict, mean.  Just strict and very mean.

Q.   Okay.  So your testimony is that your mother was mean?

A.   Yeah.

Q.   Was that just when you were 16 years old or was she always that way?

A.   I think she was always pretty mean.

Q.   When you say that she was mean, what would she do that would make you think she was mean?

A.   Probably not showed us a lot of attention.  She wasn't -- she wasn't there a lot.  She drank.

Q.   Okay.  Well, let's start with the first thing that you said, not a lot of attention.  When you say that your mom did not show you a lot of attention, was it because she was doing other things?  Or what do you mean by that exactly?

A.   She just probably wasn't either home a lot or else with her friends or drinking, something of that nature.

Q.   So do you remember your mom doing those things, the things that you just said, not being home a lot, being out with her friends drinking?

A.   Yeah.

Q.   And was that something that happened regularly or every once in awhile?

A.   Pretty -- as we got older, pretty regularly.

Q.   And by the time you turned 16, you decided that you didn't want to live there anymore?

A.   Uh-huh.

Q.   You said that your mother was out with her friends.

Who were her mother's friends?

A.    She would be out with Cathy or Deborah or -- I forgot the other lady's name.

Q.    When you say "Cathy," are you referring to Cathy Toliver?

A.    Yeah.

Q.    And when you say "Deborah"?

A.    Ruffin, I think it was.

Q.    Deborah Ruffin?

A.    Yeah.

Q.    Would your mom go out with Cathy and Deborah often?

A.    Yeah.

Q.    What would they do?

A.    Drink.  I guess go to the bars and drink.

Q.    Okay.

THE COURT:  Could you speak up just a little bit.

A.    Yes.  They would go to the -- I guess to the taverns or I guess to the bars and drink.

Q.    Do you know what bars they went to?

A.    I just know of one, and that was Lucketts Lounge.

Q.    And how do you know about Lucketts Lounge?

A.    My mom used to work there.

Q.    When your mom worked at Lucketts, do you remember, was it at night was it during the day?

A.    It was at nighttime.

Q.   When your mom would go to Lucketts or when she would go out with Cathy and Deborah, how late would they go out?

A.   I don't have a time precisely.  They would be out late. She would probably come back home three or four o'clock in the morning sometimes.

Q.   Do you remember when she would come home from being out with her friends?

A.   Oh, yeah.

Q.   When she came home from her friends, was she ever intoxicated?

A.   Yes.  Sometimes she would be very intoxicated where she couldn't unlock the door or make her way up the steps sometimes.  Sometimes even before she got -- when she got in, she would urinate or throw up all over the place, so --

Q.   Were there ever times when your mom didn't come home at night?

A.   There were a few times she didn't come home, yeah.

Q.   Do you know where she went?

A.   Not all the time.  She was probably with her boyfriend at the time, Louis.

Q.   Okay.  Let's talk about Louis for a second.  Who was Louis?

A.   He was just a guy my mom was dating.

Q.   Do you know how long they dated for?

A.   No, not sure of that time frame.

Q.   Did you have any kind of relationship with Louis?

A.   No, we didn't like him.  None of us liked him.

Q.   When you say "none of us," who are you talking about?

A.   None of my siblings, my sisters or Bill.

THE COURT:  I don't know what it is, but your voice just trails off until I can't hear you.

A.   None of us really cared -- none of us liked him, myself.  None of my siblings really cared for him.

Q.   Okay.  Why didn't you like Louis?

A.   Probably because he was taking more time, you know, from us with our mom.

Q.   What do you mean by that?

A.   And then drinking.  She spent more time with him than she would at home most of the time.

Q.   So your mom spent a lot of time with Louis?

A.   Yeah.

Q.   Do you know where Louis lived?

A.   Somewhere downtown.  I think it was like Gentry's Landing or something.

Q.   Had you ever been there before?

A.   Yeah, we used to go some weekends.

Q.   And you said something about Louis and drinking.  Louis, was he a drinker?

A.   Yeah, he drank.  But I don't ever remember seeing him intoxicated like where he was like how my mom would get.

Q.    Okay.  In addition to -- well, strike that.  Did you ever see your mom drinking in the house?

A.    Yeah, she used to drink in the house.

Q.    Do you remember what she used to drink?

A.    I think it was like Crown Royal.  I don't remember anything else.  I just remember Crown Royal.

Q.    Do you remember how often it was that your mom used to drink in the house?

A.    No, I don't remember.

Q.    Before you lived on Cote Brilliante, was there somewhere else that you lived?

A.    We lived on Evans with my dad.

Q.    How old were you when you left Evans Street, do you remember?

A.    We were probably like eight.  I was probably like eight or nine when we left off of Evans.

Q.    Who did you live at Evans Street with?

A.    My mom, my dad, Nicole, Yvette, Billie, and myself.

Q.    Did there come a time when you eventually left Evans Street?

A.    Yeah.  My mom and my dad separated, so we went back to Cote Brilliante to live with my grandfather.

Q.    And just keep trying to speak into the microphone.

A.    Okay.

Q.    Why -- do you know why you left Evans Street with your

mother?  Let me rephrase that.  Do you know why your parents got separated?

A.    Probably because of my dad's drinking and drug problem, they had separated.

Q.    When you were living on Evans Street, did your dad have a drinking problem?

A.    Yeah.

Q.    Did he also have a drug problem?

A.    Yes.

Q.    How do you know that your father had a drug problem? Did you see him use drugs?

       MS. COSTANTIN:  Judge, I'm going to object to the leading pattern here.

       THE COURT:  Well, not on the last question. Overruled.

BY MR. MONTROY:

Q.    How do you know that your father used drugs?

A.    One time my mom went to Chicago and left Nicole and I at his house, and we seen -- well, we didn't actually see them doing drugs, but we kind of knew that they were in the other room doing drug activities.

Q.    Where were you?

A.    We were in another room, another part of the house up front.  And during that time we were there, Nicole and I stayed in the closet a lot because we were scared because of

all of the noise and stuff that was going on in the house.

Q. And who was in the house besides your father?

A. We don't know who else was inside the house.

Q. How long were you in the closet for?

A. We were in there for a long time. Sometimes -- one day I think we were probably in there like the whole day. I don't think we had like anything to eat that day or anything.

Q. And this was when you were living on Cote Brilliante?

A. We were living on Cote Brilliante, but my mom had just took a trip to Chicago and left us with my dad.

Q. So your dad, was your dad watching you for the weekend?

A. Yeah, he was just watching us for the weekend.

Q. How old were you when that happened?

A. We were a little bit older, probably like 12, 13 years old.

Q. Had you seen your father intoxicated before ever or was it just something you suspected?

A. No, I seen him intoxicated plenty of times.

Q. So you said you think you were about eight or nine when you moved to Cote Brilliante?

A. Yeah, we were probably about eight or nine when we left.

Q. During your childhood when you were living at Cote Brilliante, what was the house like? What was the condition of the house?

A.    It was junkie all the time.  Very unorganized.

Q.    When you say "junkie," what do you mean by that?

A.    It wasn't kept clean.

Q.    And I'm just going to ask you maybe to describe that even a little further when you say it wasn't kept clean.  Can you describe what it actually looked like?

A.    Probably trashed.  It was like trash all over the place.  We had mice.  We had mice in the house.  Dishes not clean.  Just very filthy like.

Q.    Was it like that the entire time you lived there or did it ever change?

A.    Just about the entire time we stayed there.  The entire time we were there, yes.

Q.    When -- that period that you described where you were in the closet with your sister, do you remember where your -- you said your mom went to Chicago, right?

A.    Yeah.

Q.    Do you know who she went there with?

A.    No, I don't know.  Probably to visit my Aunt Melissa, but I'm not sure.

Q.    But she didn't take the kids with her?

A.    I don't know where Yvette and Billie were.

      THE COURT:  Excuse me just a second.  Go ahead.  Sorry.

      MR. MONTROY:  Sure, no problem.

BY MR. MONTROY:

Q.   When you talk about your mother going out and going to bars and drinking around the house, did that happen the entire time that you were living at Cote Brilliante or was that just during certain times?

A.   Just about the entire time.

THE COURT:  I'm sorry, what?

THE WITNESS:  Just about the entire time we were there.

Q.   What was it like to be around your mother when she was intoxicated?

A.   It wasn't fun.  She was -- it seemed like she was out of herself.  Like she really didn't know what was going on. It would be times even I would put bruises on myself and tell her that she did it so she can stop drinking, but it never made her stop or realize that she was hurting other people with the habit.

Q.   So is it fair to say you tried to get your mom to stop drinking?

A.   Yeah, I wanted her to stop.

Q.   Was it hard for you to see her drinking?

A.   Yeah, it was very hard.

Q.   When you say when she was intoxicated that she was out of herself, what was she like?  What does that mean?

A.   I really don't think she knew like a lot of stuff that

she would do.  She really -- like not focused.  She wasn't -- couldn't like take care of herself or really do for herself. She -- from the doorway to where she had to sleep was like up steps.  She kind of came in stumbling up steps sometimes or sometimes she couldn't make it even up the steps, she would go to the kitchen and, you know, sleep on the floor or on the table or in the chair or something.  So, yeah, it was hard seeing her like that.

Q.    You said you put bruises on yourself?

A.    I would try to like mark myself up to make her think that, you know, she did it.  And I would tell her, "Look what you did last night."  But she was never -- you know, she was never receptive to it.  So --

Q.    Did your mom ever beat you?

A.    I just remember just getting a whooping one time in my entire lifetime.

Q.    And what happened in that situation?

A.    I had snuck around the corner thinking she wasn't going to come home one night.  But come to find out that morning when I came home, she surprisingly was there.  And so she had made me go upstairs and take my clothes off.  And she kind of examined me to see, you know, like if I was I guess out having sex that night.  And then she took like a board and just, you know, hit me a few times with it.

Q.    How old were you when that happened?

A.   Probably like 15 years old or probably a little bit younger.  I'm not sure of how old I was.

Q.   Why didn't you think your mom was going to be home that night?

A.   Because sometimes she didn't come home.

Q.   How did your mother treat your brother Billie when he was a child?

A.   I always felt like she treated him like -- I guess like she didn't want him sometimes or -- basically unwanted most of the time.

Q.   What made you -- what made you feel that way, that she appeared as if he was unwanted?

A.   I don't know, it was just like always between Billie and I, treated us differently.  It seemed like Yvette and Nicole got to do a lot more stuff.  It seemed like she was a little -- well, a lot stricter on Billie and I.

Q.   Were there other things that made you think that Billie was unwanted in the way that your mom acted towards him?

A.   Right now I can't honestly think of a situation, but she just made him, from growing up like he was just unwanted.

Q.   So when you say "unwanted," are you talking about like emotionally how she would be?

A.   Oh, she wasn't affectionate at all, so I wouldn't even -- she wasn't affectionate.

Q.   You described a scenario where your mother beat you

with a board.  Did you ever see anything like that happen to your brother?

A.   I would just see him like get punched in the chest several times.  I never -- I don't ever recall witnessing like a whooping like I had, you know, gotten with the board. I'm pretty sure, but I've never witnessed it.

Q.   So when you saw -- when you saw -- you saw your brother getting punched?

A.   Yeah, she would punch him in the chest.  One time Billie was in the back yard -- well, in the alley, some guys were trying to jump him.  And he ran from the fight around the house to run back and, you know, kind of so he wouldn't have to fight the guys.  And I seen her jump on him for that because he wouldn't fight, you know.

She kind of -- she took it upon herself to kind of beat him up since he backed up out of the fight in the alley.

Q.   When you say "she," you're talking about your mother?

A.   Yeah.

Q.   And she beat Billie up?

A.   Yeah.

Q.   How did she beat him up?

A.   Just punching him and hitting him -- just punching him and hitting him and stuff.

Q.   Other than that incident that you just described, were there other incidents where that sort of thing happened?

A.    One time we were coming around the corner and Bill was supposed to be in school, and he had skipped school that day, and he got caught and she got out the car and started punching him.

Q.    Where was she punching him?

A.    Like in his chest, on his arm, wherever she could swing and hit him.

Q.    Was this something that happened often in your house or just once in awhile?

A.    Pretty often.

Q.    When your mom would punch Billie, was there a reason for it always?

A.    I don't think so.  I think sometimes just out of her anger.  I don't think sometimes -- I don't think it was always a reason that she just hit him.

Q.    When you say "it was out of her anger," was your mom an angry person?

A.    Yeah, to me she was very angry when we were growing up.

Q.    Would your -- I mean, you just described a situation where Bill was caught skipping school and your mother was punching him.  Were there other times that Billie got in trouble for doing or not doing something and he was punched?

A.    Not that I can remember right now.  I don't recall.

Q.    Are you saying that you don't remember specific incidents or are you saying that you don't remember this ever

happening?

A.    No, just specific incidents right now.

Q.    So is it fair to say you have a general recollection of him being beaten, but just not more specific times?

A.    Yeah, not anything specific.

Q.    Okay.  Did your mother ever throw Billie out of the house or lock him out of the house?

A.    Yeah.  Yeah, she threw him out.  I don't ever remember her putting him out, but I remember if he would come home late, she wouldn't let him in.

Q.    Do you remember any time specifically that happened?

A.    Yeah, one night he came home banging on the door, and he banged on it for awhile even before anyone answered.  And finally she started yelling, you know, telling him wherever he came from, to go back to wherever he came from.  Bill continued to knock on the door, you know, so he can get in.  And so I think she came down the steps, and she went to the kitchen and she got a knife.

        Well, by then Bill had went next door, I believe to the Taylor's house.  And when he came back, he started banging on the door again.  And she was about to open the door with the knife.  And I called the police because I thought just that night that he was -- that she was just going to kill him.  That was one incident with him being locked out of the house.

Q.    Do you remember if the police came that night?

A.    Honestly, I don't remember.  They did come because by the time he had came back, he was -- she was upset that the police had came.  And she was going off on them because she thought it was him who had called the police, but it was me.

Q.    So that night he did come back at some point?

A.    Yeah, he came back.

Q.    Did she let him in that night?

A.    I don't honestly remember whether she let him in or not.  But I know I was scared because I thought with her having that knife that she was going to kill him.

Q.    So did you really think that your mom might kill her that night?

A.    Honestly I was petrified, I thought she was going to really kill him.

Q.    How old was Billie when that happened?

A.    I'm not sure of how old he was, probably -- he was a teenager, but I'm not sure what age.

Q.    And that night you think Billie went to the Taylor's house?

A.    Yeah, I believe he went next door to the Taylor's.

Q.    Is that a place he would sometimes go?

A.    No, I don't think so.  I think he probably just went that night.  He would go over there and visit, but not too often.

Q.   Do you know where Billie would go when he'd get locked out of the house?

A.   No.  Probably sometimes down to Jay's house, but I'm really not too sure where he would go.

Q.   What was your relationship with Billie like growing up?

A.   We weren't -- we weren't close.  We weren't too close.

Q.   Did you get along?

A.   No.

Q.   Did that change after Billie was arrested?  Did you start to get a little closer?

A.   Probably after I had my oldest daughter we probably became a little closer.

Q.   Do you feel like your family, meaning your mom and your brother and your sisters, you were a close family when you were growing up?

A.   No, I wouldn't say we were.

Q.   And what makes you say that?

A.   I just don't feel like we were close.

Q.   Was your mother somebody that you could go and talk to with your problems?

A.   No.

Q.   Why is that?

A.   I just don't feel like she was a person to talk to.  She didn't -- she didn't inform us -- well, I would say for myself, she didn't inform us of a lot of stuff that

adolescents would go through from menstrual cycles, she didn't talk to us about a lot of stuff.  So I don't feel like she was a person to talk to.

Q.    So she never talked to you about that stuff?

A.    No.

Q.    Did she ever ask you what was going on in your life?

A.    I can't ever remember a time that she did.

Q.    Do you remember -- do you remember testifying at Billie's trial?

A.    I don't remember testifying.

Q.    Do you remember meeting with Billie's lawyers before trial?

A.    Honestly, I don't remember meeting with them.

Q.    So I guess it's fair to say you don't remember what they talked to you about or what kind of questions they asked you?

A.    No.

Q.    The stuff that you've talked about here today, the stuff that you've told this Court today, if you had been asked questions about these sorts of things, would you have discussed them with Billie's lawyers at the time of trial?

A.    Yes.

Q.    Would you have been willing to testify to the same things you testified here today in front of a jury at Billie's trial?

A.    Yes, sir.

MR. MONTROY:  Your Honor, can I just have one moment, please?

THE COURT:  Sure.

(There was a conference held off the record.)

MR. MONTROY:  Just a couple more questions.

BY MR. MONTROY:

Q.    You had talked about some times that your mother would come home from the clubs and she would have sometimes thrown up on herself or urinated on herself.  Would she -- would somebody have to clean her up when that happened?

A.    No.  I don't remember anyone ever cleaning her up. Sometimes we would help her out.  I do just remember just one occasion we helped put her in the tub.  But otherwise, no, I don't remember.

Q.    Did you ever have to go and -- go and get her from someplace because she was too drunk to get home?

A.    Not that I can recall right now.

Q.    When your mom was punching Billie the times you described, do you ever remember what Billie's reaction was?

A.    Besides crying, no.  Besides him crying or, you know, screaming because --

THE COURT:  I really can't hear you.

A.    Besides him crying because he's being abused, that's the only thing I can recall.

MR. MONTROY: Thank you. Your Honor, I don't have any additional questions.

THE COURT: Cross-examination?

MS. COSTANTIN: Thanks, Judge.

CROSS-EXAMINATION

BY MS. COSTANTIN:

Q. Let me make sure, Ms. Allen, I understand something. You talked about an incident where your mom went to Chicago and left you and Nikki -- I'm sorry, yeah, you and Nikki at your father's place, right?

A. Yes.

Q. Billie wasn't there, right?

A. No.

Q. You don't know if Billie was in Chicago or at somebody else's house?

A. I'm not sure. I know he wasn't in Chicago.

Q. Okay. But he wasn't there with you at your dad's?

A. No.

Q. And you indicated you were not close with Billie when you were growing up; is that right?

A. Yes, we weren't that close.

Q. And, in fact, you used to argue all the time, especially when you were younger, right?

A. We probably -- we argued like over the phone. I would say regular brother/sister rivalry, stuff like that. Arguing

over phones, or if he left a dish out and I had to clean it up or something like that.

Q.   Oh, so when you're saying argue over the phone, you're not talking about -- who is using the phone, not you're on the phone and he's on the phone and you're arguing over the phone.

A.   Yeah, trying --

Q.   You're arguing who could use the phone?

A.   Yeah.

Q.   Okay.  All right.  I want to make sure.  Or he leaves a dish out and it's dirty, and you're telling him, clean it up, that sort of thing?

A.   Yeah.

Q.   And he used to lie about all sorts of things, cars he didn't have and clothes he didn't have, that sort of stuff, right?

A.   He didn't lie to me about anything like that.

THE COURT:  He what?

A.   I said he did not lie to me about anything like that.

Q.   Did you ever know him to lie to anybody about having cars or clothes that he didn't have?

A.   Not that I know of.

Q.   I'm going to show you what's on the screen in front of you, it's Exhibit 197.  And it's your testimony.  We can go to the first page.  This is your testimony at trial.  I know

you stated that you didn't recall your testimony, so I'm going to show you part of it.

"What kind of things would he brag about?"

"He would brag about all kinds of stuff; cars he had and clothes he had that no one had ever seen."

Is that right?

A.    If that's what I testified to, yes, ma'am.

Q.    Okay.  Does that refresh your memory that he would talk about him saying he had cars or clothes that he actually didn't have?

A.    Right now, I honestly don't remember.

Q.    You don't remember one way or the other?

A.    No.

Q.    During the time that you were a child, your mom worked at the City library, right?

A.    Yes.

Q.    Walgreens, do you remember that?

A.    No.

Q.    Do you remember her working at the Department of Family Services?

A.    No.

Q.    Do you remember her working at the Human Development Corporation?

A.    Yes.

Q.    Do you remember her working at Charter Communications?

A.   Yes.

Q.   Now, when you were -- I'm sorry, when she was at work, you weren't supposed to be going outside; is that right?  She said you had to stay in the house.  Not just you, but the kids?

A.   Yeah, we had to -- we were supposed to stay in, yes.

Q.   And you'd still go outside, but then the neighbors would tell on you, right?

A.   Yeah.

Q.   Okay.  You moved to Cote Brilliante when you were, I believe you said eight or nine?

A.   I believe it was around eight or nine.

Q.   Okay.  So Yvette would have been, what, six or seven then?

A.   Yeah, around there.

Q.   Okay.  She's two years younger than you, right?

A.   Yes, I believe so.

Q.   Now, your mother didn't whip Billie Allen, your brother, with belts, did he -- did she?

A.   Yeah, I'm pretty sure.  Yeah, we used to get whoopings with belts.

Q.   Okay.  So you're saying your mom would hit Billie with belts?

A.   Yes.

Q.   And did she hit Billie with sticks?

A.    I don't ever recall.

Q.    Did she ever hit Billie with an extension cord?

A.    Not that I know of.

Q.    But your testimony here today is that she would hit him with belts and punch him in the chest; is that right?

A.    Yes.

Q.    And was that when he did something wrong or why was it?

A.    Sometimes when he did something wrong, and then sometimes I think she would just probably take her frustration.

Q.    Did your mother ever hit him with a broom?

A.    Not that I can recall right now.

Q.    A paddle?  A wooden paddle?  Did she ever hit him with a wooden paddle?

A.    There was a wooden paddle in the house, yes, ma'am.

Q.    Did she ever hit him with the wooden paddle?

A.    Yes.

Q.    And she -- these -- the hitting you're talking about, the punching, the hitting with the belts and the wooden paddle, you didn't tell any of Billie's attorneys about any of that before trial, did you?

A.    No.

Q.    You never told them that she used to beat Billie or give Billie whippings, did you?

A.    Yes.

Q.    You told the attorneys back before trial that she used to beat Billie and give him whippings?

A.    You said before the trial?

Q.    Right.

A.    I said he was disciplined with shoes or --

Q.    You're saying you told the attorneys before the trial, before the trial back in 1998, that she would hit him with shoes?

A.    Well, back in -- no, I don't remember -- I don't remember everything.

Q.    Let me understand.  Are you saying that you told the attorneys, the trial attorneys back in 1998, that your mother hit Billie with shoes?

A.    I honestly don't even remember --

MR. MONTROY:  I'm sorry.  Objection.  She just answered that she doesn't remember.

A.    I honestly don't even remember talking to --

THE COURT:  Wait.  Overruled.  Now, the question is, did you tell the attorneys before trial that your mother had hit Billie with shoes?

A.    I honestly don't remember talking to Bill's lawyers, his first lawyers, I honestly don't remember.

Q.    So is it fair to say you don't remember anything that you said --

A.    No, I remember most of our childhood and some

devastating stories, yes.  But everything about it, no, I do not remember about our childhood and about whoopings.

Q.    No, no, no.  I'm asking you simply, do you remember anything about what you told the trial attorneys back in 1998?

A.    No.

Q.    Okay.  Now, you signed a declaration back in 2009; is that right?  I'm going to show it on the screen to you, it's Exhibit 260.  "Declaration of Angela Allen."  Do you see that?

A.    Yes.

         THE COURT:  What's the number?

         MS. COSTANTIN:  It's 260.

         THE COURT:  Okay.

Q.    It's three pages long.  I'm going to go through each page just quickly so you can see it.  And then that's your signature on the last page; is that right?

A.    Yes, it is.

Q.    Did you read that before you signed it?

A.    I don't remember.

Q.    You don't remember if you read this before you signed it?

A.    No, I don't remember.

Q.    How did the declaration come to be written?

A.    The stuff on here is stuff that I remember, but --

THE COURT:  What?

A.    I said the stuff that I'm reading on it is stuff I remember, but I don't remember -- that's been years ago.  I don't remember everything about the trial or the lawyers or everything.

Q.    This is a declaration that was filed in this lawsuit --

A.    Okay.

Q.    -- back in 2009.  It's signed back in 2009.  You signed it back in 2009.  My question is, how did this declaration come to be written?  Did you write it?

A.    No.

Q.    Who wrote it?

A.    I guess the lawyers.

Q.    And when was the first time that you had any contact with this group of lawyers, this new group of lawyers?

A.    I'm not sure of the time.

Q.    Obviously it was some time before 2009, if that's when this was filed; is that correct?

A.    All right.  But I'm not sure of the time.

Q.    Do you have any idea how the contact was, was it by phone or in person?

A.    I'm not sure.

Q.    And how many times have you had contact with this new group of people?

A.    I'm not sure how often, but I spoke with him, Mr. Eric,

several times.  He came to the house several times.  How many times, I'm not sure.  How many phone conversations, I'm not sure.

Q.    But you know that Eric came to the house several times, and there were several phone calls?

A.    Yes.

Q.    And then at some point was this written declaration presented to you?

A.    Yes.

Q.    And when it was presented to you, did you make any changes in it?

A.    No, not that I -- no.

Q.    I'm going to go to the last page, which is page 3, paragraph 7.  I'm going to blow up something.  The declaration you signed states that:  "Billie's current legal team have spent many hours with me and my family over a long period of time, and have listened to my full description of what life was like for the family and for Billie when he was a kid."  Is that right?

A.    That's right.

Q.    And so your statement here that you're signing is your attempt to give a full description of what life was like for the family and for Billie when he was a kid; is that right?

A.    Okay.  Yes.

Q.    I'm sorry?

A.    Yes.

Q.    And nowhere in this declaration do you ever talk about your mother hitting or beating or whooping Billie, do you?

A.    I mean, who can go over a whole lifetime span just like -- just like that.  We talked.  I'm pretty sure I explained to them about getting whoopings.  You said this was in 1990 -- I mean, 2009.  It's 2012.  I can't remember everything from my childhood just by talking to somebody probably a few times.

Q.    Here's my question.  This declaration that you signed in 2009, is it correct that there's absolutely no mention --

A.    Okay, it's probably no mention, but he got -- we all got whoopings, so yes.

Q.    So it's correct that there's no mention --

        MR. MONTROY:  He needs to take his medication.

        THE COURT:  We're going to take a 15-minute recess.  Just wait there just a minute and then you can step down.  Court is in recess for 15 minutes.

        (Court in recess at 2:40 p.m. until 3:02 p.m.)

        MS. COSTANTIN:  Judge, may I proceed?

        THE COURT:  You may inquire.

BY MS. COSTANTIN:

Q.    I think we were at the point where I had asked you, isn't it true in your declaration, which is Exhibit 260, you don't say anything about your mother hitting or beating or

whooping Billie; is that correct?

A.    No, I didn't mention it.

Q.    Now, I want to look at paragraph 2 of that declaration, Exhibit 260.  You stated:  "Our mother Juanita was not a loving mother.  She was cruel to the children in the family and especially to my brother Billie and myself.  She never showed affection to us like a mother should.  She never spoke to us, she just yelled."  Is that right?

A.    Yes.

Q.    Nowhere in that paragraph does it make any statement about your mother hitting Billie; is that right?

A.    No, it doesn't say anything about hitting.

Q.    And going to the next page, paragraph 6 of your declaration:  "In all of the craziness, my mother became more and more cruel toward Billie.  She would yell and scream at him and call him terrible names.  She locked him out of the house all the time."  Nowhere in there does it say anything about your mother striking your brother?

A.    No, it doesn't.

Q.    Now, surely these attorneys here, these attorneys from the new proceeding asked you about abuse, didn't they?

A.    I don't remember them asking me about abuse.

Q.    So it's your testimony that you don't recall these attorneys ever asking you about any abuse in the household?

A.    When I spoke with -- I had explained to Mr. Eric that

we did get chastened, and, yes, I did, corporal abuse.  Is it in this segment from 2009?  No.  But I did tell them that we were abused.

Q.    So you told Mr. Eric that, in fact, you were abused?

A.    Well, yes, I told him about the situation with the stick, about me getting whooped that day, yes.

Q.    Did you tell any of the lawyers about your brother being struck?

A.    Not that I can recall right now, no, ma'am.

Q.    And going to the last page of your declaration, your declaration according to what you signed, is your full description of what life was like for the family and for Billie when he was a kid; is that right?

A.    Yes, that is correct.  That's what it says.

Q.    Now, there was never a child abuse investigation, the DFS never came and took the kids out of the house, took you kids out of the house, did they?

A.    No.

Q.    And Yvette didn't punch Billie in the face, did she?

A.    Not that I know of.

Q.    She didn't kick him that you know of?

A.    Not that I know of.

Q.    And Nikki, she didn't punch Billie in the face, did she?

A.    Not that I know of.

Q.   And didn't kick Billie either, did Nikki?

A.   No, not that I know of.

Q.   And did you punch Billie in the face?

A.   No.  I probably wanted to, but no.

Q.   Wanted to.  So if Johnnie Grant testified that you came in one day and punched him in the face when Johnnie Grant was sitting there, that would not be correct?

A.   Who is Johnnie Grant?

Q.   Jay.

A.   Oh, not that I remember.  I don't remember everything about the childhood just like, like it was yesterday.

Q.   And Otha didn't beat Billie, did he?

A.   My grandfather?

Q.   Right.

A.   There would be times that he would strike him, yes.

Q.   You didn't put that in your declaration, did you?

A.   No.

Q.   And you didn't tell those attorneys -- oh, we don't remember what you told the attorneys back in 1998, I withdraw the question.

     Jerome, your Uncle Jerome didn't beat Billie, did he?

A.   He would chastise him, yes.

Q.   He would --

A.   He would get on him.

Q.    What does that mean?

A.    He would get him, hit him, yes, punch him.

Q.    And you didn't put that in this declaration from 2009 either, did you?

A.    No, ma'am, I didn't.

Q.    Now, there were times when Billie would sneak out of the house or stay out too late; is that right?

A.    Stay out too late, yes.

Q.    Okay.  And then your mom would lock him out, right?

A.    Yes.

Q.    And what was she -- she'd say basically go back to where you came from, go back to where you were?

A.    Uh-huh.

Q.    And sometimes would he stay at Cory's house, your cousin Cory's house?

A.    I'm not sure where he stayed.

Q.    How about Jay's house, do you know if he stayed at Jay's house?

A.    I'm not sure where he stayed.

Q.    So none of these places, you're not sure where he stayed?

A.    No.

Q.    Now, did Billie talk back, yell, cuss, and disobey your mom?

A.    I don't remember him ever talking back, cursing.  Or

disobeying, yes, he would disobey.

Q.    So I'm going to go to Exhibit 258, and this is your mom's declaration filed back in 2009.  And I'm going to paragraph 11, talking about Billie.  And it says:  "He would talk back, yell, cuss and disobey me."  You don't recall any of that happening?

A.    No, I just said I didn't.

Q.    But you yourself didn't get along with him, did you?

A.    With Billie?

Q.    Yeah.

A.    Not all the time, no.

Q.    Now, you moved out of the house on Cote Brilliante back in June of 1996; is that correct?

A.    I don't remember like the exact time, but --

Q.    What I'm going to show you is your trial testimony back in 1998, and I'm -- which is Exhibit 197.  Page 172, which is actually 197.8.  I'm showing this to you, and asking -- the question asked of you was:

        "When did you move out of the house?"

        And your answer was:  "Probably like June."

        And the question was:  "June of what year?"

        And you said:  "It had to be like '97."

        And the question was:  "Was he under arrest or was he --"

        And your answer was:  "June of '96, I'm sorry."

Does that refresh your recollection as to it being June of '96 when you moved out of the house?

A.    It doesn't -- no, it doesn't.  That was 16 years ago. I don't remember.

Q.    You testified back in 1998 that you had moved out of the house in June of '96.  Would you have any reason to doubt your testimony?

A.    No.  I moved out, yes.  But I'm not sure of the actual time.

Q.    By the time that the house on Cote Brilliante was shot up in January of '97, Billie had quit coming around to the house by that time; is that right?

A.    Yeah.  And I wasn't living there.  Yes.

Q.    So by the time it was shot up, you were gone?

A.    Yes.

Q.    Now, you testified at trial, correct?

A.    Yeah, I was -- I don't remember testifying, but yeah.

Q.    Now, you had a brand new baby at that time, do you remember?

A.    Yeah.

Q.    Okay.  Do you have any memory of talking to David Randall, the mitigation investigator, a couple times?

A.    Yes.

Q.    And do you also recall talking to Rick Sindel, the attorney who asked you questions?

A.    Yes.

Q.    Now, you knew that Billie Allen was selling crack cocaine, didn't you?

A.    No, I didn't know that.

Q.    You had no idea he was selling drugs?

A.    No.

Q.    Did you -- had no idea he started selling drugs when he was 14?

A.    No, I didn't know that.

Q.    Does that surprise you to learn that he was selling drugs?

A.    This is honestly the first that I've heard of it.

Q.    So the first that you've heard at any time that Billie was selling drugs from age 14 was right now when I asked you that question?

A.    Age 14, yes, I never knew that he was selling drugs.

        MS. COSTANTIN:  I don't have anything more, Judge.

        THE COURT:  Redirect.

                    REDIRECT EXAMINATION

BY MR. MONTROY:

Q.    Did you ever see Juanita hit Billie with a tree (sic) from the pussy willow tree out in front of the house?

A.    No.

        MR. MONTROY:  Your Honor, I don't have any more questions.

THE COURT:  You may step down.  You're excused.

THE WITNESS:  Thank you.

MR. MONTROY:  Your Honor, we have a number of stipulations that we've been able to work out.  Would this be a good time to present those?

THE COURT:  Sure.

MR. HOLTSHOUSER:  Judge, I think we're ready to make a record on the stipulations.

THE COURT:  Okay.

MR. HOLTSHOUSER:  My proposal to do -- would be to actually offer the signed original stipulation to provide the clerk to actually file as a document in this case.

THE COURT:  Okay.

MR. HOLTSHOUSER:  Or if you want, we can electronically file a PDF later, if you don't want the original in the file.

The first one is a stipulation regarding the testimony of Billie Jerome Allen.  And it reads that:

"Petitioner, Billie Jerome Allen, through counsel, and the United States of America, through counsel, agree and stipulate if Petitioner, Billie Jerome Allen, were called as a witness by the government in this matter, he would testify to the statements contained in his deposition of May 8, 2012, which is Exhibit 539.  His deposition testimony may be considered by the Court as if Petitioner had testified in

person in this proceeding."

And entering into the stipulation, Petitioner asserts the same objections set forth in his Opposition to the Deposition, Document 166 in the file, and the objections preserved by counsel in the deposition transcript itself.

And it's signed by Mr. Moreno and by me.

THE COURT:  What I want to do on this one, I'd like to inform Ms. Carlyle at this time what I want to do is call him up where you're standing with you and -- not right now. I want to give you a preview of what I want to do, so you'll either have a chance to object or tell him to do something or not to do something.

I want to call him up, have him sworn under oath, and I want to ask him if this stipulation which is presented and will be received by me is done with his permission and consent, if he knows he has a right to testify, if he's discussed that with counsel, and if he approves this stipulation.

That's what I would like to do on the record if that's permissible with you.

MS. CARLYLE:  Generally speaking I think that's going to work, but let's not do it right now.  We kind of need -- we hadn't forewarned him that was coming.

THE COURT:  All right.  Very well.  You were starting to say something, Mr. Holtshouser?

MR. HOLTSHOUSER:  I was going to say that the government was going to request and move that such a record be made.

THE COURT:  Okay.  We will -- let's all keep it in mind and get it done before the evidence is closed.

MR. HOLTSHOUSER:  Okay.  In connection with the stipulation then, Judge, we would offer into evidence Exhibit 539.

THE COURT:  539 has been offered.  I'll not receive it at this time until after we make a record.

MS. CARLYLE:  And just to make sure that the record is preserved, it's offered subject to the objections contained in there.

THE COURT:  Yes.  And that's what he said, it's subject to all objections made.  Mr. Holtshouser mentioned that.

MS. CARLYLE:  Yes.

THE COURT:  He said subject to the same objections, right?

MR. HOLTSHOUSER:  Correct.

THE COURT:  Okay.

MR. HOLTSHOUSER:  The next is a stipulation regarding a Dr. Colin Gordon.

THE COURT:  How is that -- is that first name C-o-l-i-n?

MR. HOLTSHOUSER:  C-o-l-i-n.  And the last name is Gordon, G-o-r-d-o-n.

THE COURT:  Okay.

MR. HOLTSHOUSER:  If Dr. Colin Gordon were called as a witness in this matter, he would testify to the statements contained in his sworn declaration, Exhibit 253.  In support of this declaration, the parties stipulate to Exhibit 252 entitled North St. Louis Neighborhood Analysis, and Exhibit 552, Dr. Gordon's curriculum vitae may be admitted into evidence.  This evidence may be considered by the Court as if Dr. Gordon had testified in person in this proceeding.

And that evidence is being offered by Mr. Allen.

THE COURT:  Is Exhibit 252, an exhibit about the city?

MR. HOLTSHOUSER:  It is.

THE COURT:  And is the CV part of 252 or is that another --

MR. HOLTSHOUSER:  No, the CV is Exhibit 552.

THE COURT:  552, all right.

MR. HOLTSHOUSER:  I was a little confused when I read it.  And the parties are moving for the admission of 253, 252, and 552.

MS. CARLYLE:  The only comment I would make about that, and actually I'd kind of like some input from the Court.  The paper exhibit that's over there of Exhibit 252 is

in black and white, and it was originally in color and makes a lot more sense in color.

THE COURT: Okay.

MS. CARLYLE: Would you like an electronic color copy or a paper color copy or both?

THE COURT: Well, I suppose if it's your view the color copy is more readable or better, then I would like a color copy.

MR. HOLTSHOUSER: And, Judge, this might be putting the cart before the horse a little bit, but what I had suggested to Mr. Carlyle was perhaps wait till the conclusion of the hearing as to how you want to have exhibits given to you or available to you. You've been seeing them on the screen through Sanction.

THE COURT: Right.

MR. HOLTSHOUSER: There isn't -- what's on Sanction is some of the exhibits. Some of the exhibits are physical, as you've seen. All of the things that are on Sanction are in those boxes in hard copy and ultimately will consist of whatever ones you have received and accepted.

THE COURT: All right.

MR. HOLTSHOUSER: The color copy that she refers to would be in one of those folders by the time that that's available to you.

THE COURT: All right.

MR. HOLTSHOUSER:  If, though, you want all of the exhibits, other than physical exhibits, books or something like that, in an electronic form, that's something that the parties would have to endeavor to work on to give you a CD.  On one CD you have all the exhibits.  But that's possible as well.

THE COURT:  No, I don't want to do anything that will cause additional time commitment or expense commitment to either of the parties.  I do need availability of the exhibits.  And if they are available to me in hard copy, that's wonderful.

MR. HOLTSHOUSER:  And that's what we would propose.  And by that time the color copy would be substituted in there.

MS. CARLYLE:  Actually I should be able to do it before we leave.

THE COURT:  Okay.  253, 252, and 552 are received.  Now, will they be on the list?

MR. HOLTSHOUSER:  They will be.  They are all on the list.

THE COURT:  Let me take a moment and notice that they are received on the list.  252, 253, and 552 is received.  Okay.  Next.

MR. HOLTSHOUSER:  Next one is -- pertains to a witness named Tyrone, T-y-r-o-n-e, Jones.  If Tyrone Jones

were called as a witness in this matter, he would testify to the statements contained in the sworn declaration, Exhibit 271. These statements may be considered by the Court as if he had testified in person in this proceeding. And I think Ms. Carlyle wants Exhibit 272 admitted.

MS. CARLYLE: Correct.

THE COURT: And what is 272?

MR. HOLTSHOUSER: 271.

MS. CARLYLE: That's Mr. Tyrone Jones' declaration.

THE COURT: Right. But did I hear you say 272?

MR. HOLTSHOUSER: 271. I was persevering, or setting an example of perseverance.

THE COURT: 271 by consent --

MR. HOLTSHOUSER: Correct.

THE COURT: -- is received. And just a second. Received.

MR. HOLTSHOUSER: The next one is Shirlene Grant, C-h -- I'm sorry, S-h-i-r-l-e-n-e.

THE COURT: Wait a minute, S-h- --

MR. HOLTSHOUSER: -- i-r-l-e-n-e, Grant.

THE COURT: Okay.

MR. HOLTSHOUSER: If Shirlene Grant were called as a witness in this matter, she would testify to the statements contained in her sworn declaration, Exhibit 267. These may be considered by the Court as if she testified. And

Ms. Carlyle wishes to offer Exhibit 267.

MS. CARLYLE:  Correct.

THE COURT:  By consent, 267 is received.

MR. HOLTSHOUSER:  The next is Joyce Eaton, E-a-t-o-n.  If Joyce Eaton were called as a witness in this matter, she would testify to the statements contained in her sworn declaration, Exhibit 273, with the exception of paragraph 5, so that the exhibit that you will receive, Judge, will have that paragraph removed.  These statements may be considered by the Court as if she testified in person. And the parties would offer Exhibit 273 with the exception -- without paragraph 5 in it.

MS. CARLYLE:  That's correct.

THE COURT:  Okay.  I understand that this sworn declaration, 273, of Joyce Eaton when presented to me by consent will have a redaction so that paragraph 5 will not be considered by me.

MR. HOLTSHOUSER:  Correct, Your Honor.

MS. CARLYLE:  That's correct, Your Honor.

THE COURT:  Received.

MR. HOLTSHOUSER:  The next one is Raymond Petty, P-e-t-t-y.  If Raymond Petty were called as a witness in this matter, he would testify to the statements contained in his sworn declaration, Exhibit 262, with the exception of sentences four, five, and six of paragraph 4.  These

statements may be considered by the Court as if he testified. And the parties would offer Exhibit 262 with those sentences removed.

MS. CARLYLE: Correct.

THE COURT: All right. As to the sworn declaration of Raymond Petty, the Court shall receive it in all respects except for the sentences contained in four, five, and six of paragraph 4. And that material will be redacted and not considered by the Court. And that is received.

MR. HOLTSHOUSER: And, Judge, for clarity, that should be Raymond Petty, Sr., because there is another Raymond -- there are two Raymond Pettys that testified at trial. I didn't want the Court to have confusion.

THE COURT: If I look at the trial transcript, will I be able to discern which is which?

MR. HOLTSHOUSER: In the trial transcript you can, and I think in the declarations as well.

THE COURT: Okay.

MR. HOLTSHOUSER: It will probably be apparent by the age.

THE COURT: All right.

MR. HOLTSHOUSER: The next is Darletta Tab, T-a-b-b. And Darletta is D-a-r-l-e-t-t-a. If Darletta Tabb were called as a witness, she would testify to the statements contained in her sworn declaration, which is Exhibit 272.

These statements may be considered as if she had testified. And the parties would offer Exhibit 272 as is.

THE COURT: Agreed?

MS. CARLYLE: Agreed, yes.

THE COURT: By consent of the parties, the declaration of Darletta Tabb, Exhibit No. 272, is received.

MR. HOLTSHOUSER: Would the clerk prefer that we file these electronically as PDFs or give them to you to file?

THE CLERK: It doesn't make any difference.

MR. HOLTSHOUSER: Okay. I'll give you the originals.

THE CLERK: Okay.

THE COURT: Mr. Allen need to leave?

MR. MORENO: No, he's coming up.

MS. CARLYLE: He's coming up to make his record.

THE COURT: Okay. My intention is to proceed in the fashion I stated. I'm going to do it slowly, so after every word I say, if you want to object, or, Mr. Allen, if you want to talk to Ms. Carlyle or any of co-counsel, just raise your hand, give me a clue to stop. You understand?

THE PETITIONER: Yes, sir.

THE COURT: Would you raise your right hand, sir, and be sworn to tell the truth. You may affirm if you choose. Do you want to affirm or swear?

THE PETITIONER:  Either/or.

(Petitioner sworn.)

THE COURT:  Please state your full name, sir.

THE PETITIONER:  Billie Jerome Allen.

THE COURT:  And you are the plaintiff in this action now pending before this court, which is Billie J. Allen versus United States of America, No. 4:10-CR-002288; is that correct?

THE PETITIONER:  Yes.

THE COURT:  Is that the right number?  Okay.  That's what's on this exhibit list.  Yeah, that's right.  It didn't look right.  Sorry.  Here we go.  The number is 4:07-CV-00027.

THE PETITIONER:  I don't know the number, but I'll trust you on that one.

THE COURT:  You don't know about the number?

THE PETITIONER:  No.

THE COURT:  But the rest is correct, is that true?

THE PETITIONER:  Yes.

THE COURT:  All right.

MR. HOLTSHOUSER:  This is the actual stipulation, Judge, if you want that for making the record.

THE COURT:  Okay.  Very well.  You understand, Mr. Allen, that you have a right to testify at this hearing or proceeding if you would choose to do so after talking to

counsel and friends and neighbors and everyone else.  You understand you have a right to testify?

THE PETITIONER:  Yes.

THE COURT:  I have been presented with what is called a "Stipulation Regarding Testimony of Billie Jerome Allen."  And I want to read it in its entirety.

"Petitioner, Billie Jerome Allen, through counsel, and the United States of America, through counsel, agree and stipulate as follows:  If Petitioner, Billie Jerome Allen, were called as a witness by the government in this matter, he would testify to the statements contained in his deposition of May 8, 2012, Exhibit 539.  His deposition testimony may be considered by the Court as if Petitioner had testified in person in this proceeding."

In entering the stipulation, Petitioner asserts the same objections set forth in his opposition to the deposition, Docket No. 166, and the objections preserved by counsel in the deposition transcript itself.

Is that the nature of the stipulation that you signed -- that you believe is being presented by your counsel and the United States?

THE PETITIONER:  Yes.

THE COURT:  Do you -- it's my intention to accept this stipulation with the conditions set forth, and I understand by doing that you will not be testifying in this

case.  Is that true?

THE PETITIONER:  Right.

THE COURT:  Have you talked to your attorneys about your right to testify in this case?

THE PETITIONER:  Yes.

THE COURT:  Are you satisfied based upon your conversations with them and your own judgment that you prefer to have the stipulation presented instead of testifying in this case?

THE PETITIONER:  Yes.

THE COURT:  Okay.  Now, I don't intend to ask any more questions before I accept the stipulation, but I'll allow either party to supplement the record if they choose to do so.

MS. CARLYLE:  I'd like to ask just one.  You understand that under the stipulation, the Judge will consider everything you said in your deposition, correct?

THE PETITIONER:  Yes.

MR. HOLTSHOUSER:  Judge, I would also maybe add there's been some medical things going on today, and I understand from the marshals that he's under some medication. Maybe an inquiry can be made as to his condition at the present time.

THE COURT:  Okay.

MR. HOLTSHOUSER:  His state of mind, that he

understands what he's doing.

THE COURT:  Yesterday I noticed that there was a time when you were sitting at counsel table holding your head in your hands.  And then we took a couple of recesses, and then a doctor's appointment was made for you this morning at 8:30.  Are those statements correct as you recall them so far?

THE PETITIONER:  Yes.

THE COURT:  Now, I don't want you to tell me unless counsel wants me to hear it, the kind of medication you're taking.  Do you care to express that on the record, Ms. Carlyle, or prefer not to do so?

MS. CARLYLE:  I don't think we know what kind of medication he's taking.

THE COURT:  Okay.

MR. MONTROY:  Your Honor, it's up to the Court, he's free to answer those -- he's happy to answer those questions.

THE COURT:  Okay.  The reason I'm asking, before you answer, is there would be interest in knowing whether the medication you're taking makes you drowsy, makes you have any kind of unnatural feelings, so that you may not be understanding these proceedings.  That's the only reason I'm asking.  If you want to tell me what medication you're taking, I'd be happy to hear it if you care to.

THE PETITIONER:  I know I take blood pressure

medication.

THE COURT:  Okay.

THE PETITIONER:  And something for antacid.

THE COURT:  Okay.

THE PETITIONER:  And I also take Dicyclomine, it's a medication that helps I guess you would say my system sometimes shut down like it did the other day where I'll get dizzy at times, and this kind of helps me balance it out for hours, you know, for a period of time.  Like right now I'm here.  I'm here with you.  I understand everything that's been said.

THE COURT:  Great.  I do know the marshals have been very attentive to telling me when they believe you need to take -- have your medication administered, and I've always granted those recesses so that could happen.  All of the observations that I can make suggest to me that there's nothing at all about you being unsteady, nothing to indicate that you do not understand what's going on.  You're not shaking, your answers seem to me to be perfectly clear in every way.

So I'm about now to accept the stipulation, if everyone agrees it's time to do that.

MS. CARLYLE:  Yes, Your Honor.

THE COURT:  Okay.  The stipulation regarding the testimony of Billie Jerome Allen in Case No. 4:07-CV-00027 is

received in evidence. And the Court will consider it along with the objections in 166, and also the ones preserved by counsel in the deposition.

THE PETITIONER: All right. Thank you.

THE COURT: Thank you, sir. What was the number on that?

THE CLERK: 539.

THE COURT: Okay. 539 is received.

MS. CARLYLE: 539, yes.

MR. KANE: I believe that's all we have today, Your Honor.

THE COURT: Okay. Very well. Well, thank you. We've had a pretty good day. So we will begin in the morning at 8:30.

MR. KANE: Thank you, Your Honor.

MR. MONTROY: Thank you, Your Honor.

THE COURT: Yes. Thank you. Court's in recess.

(Court in recess at 3:47 p.m.)

C E R T I F I C A T E

I, Susan R. Moran, Registered Merit Reporter, in and for the United States District Court for the Eastern District of Missouri, do hereby certify that I was present at and reported in machine shorthand the proceedings in the above-mentioned court; and that the foregoing transcript is a true, correct, and complete transcript of my stenographic notes.

I further certify that I am not attorney for, nor employed by, nor related to any of the parties or attorneys in this action, nor financially interested in the action.

I further certify that this transcript contains pages 1 - 154 and that this reporter takes no responsibility for missing or damaged pages of this transcript when same transcript is copied by any party other than this reporter.

IN WITNESS WHEREOF, I have hereunto set my hand at St. Louis, Missouri, this 28th day of February, 2013.

_____
/s/ Susan R. Moran
Registered Merit Reporter