UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


BILLIE JEROME ALLEN,            )
                                )
            Petitioner,         )
                                )
     vs.                        ) No. 4:07-CV-27(ERW)
                                )
UNITED STATES OF AMERICA,       )
                                )
            Respondent.         )


EVIDENTIARY HEARING -- VOLUME I
BEFORE THE HONORABLE E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE


JUNE 4, 2012


APPEARANCES:

FOR PLAINTIFF:      ELIZABETH U. CARLYLE
                    P.O. Box 30418
                    Kansas City, MO  64112
                    (816) 525-6540

                    JOSEPH M. CLEARY
                    COLLIGNON & DIETRICK
                    310 N. Alabama, Suite 250
                    Indianapolis, IN  46204
                    (317) 637-1000

                    TIMOTHY P. KANE
                    ERIC JOHN MONTROY
                    JAMES HENRY MORENO
                    FEDERAL COMMUNITY DEFENDER OFFICE
                    EASTERN DISTRICT OF PENNSYLVANIA
                    The Curtis Center, Suite 545 West
                    Philadelphia, PA  19106
                    (215) 928-0520

FOR DEFENDANT:      STEVEN E. HOLTSHOUSER
                    CARRIE COSTANTIN
                    OFFICE OF U.S. ATTORNEY
                    111 S. Tenth Street, Suite 2000
                    St. Louis, MO  63102
                    (314) 539-2200

REPORTED BY:           DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR
                       Official Court Reporter
                       United States District Court
                       111 South Tenth Street, Third Floor
                       St. Louis, MO  63102
                       (314) 244-7449

INDEX

OPENING STATEMENT BY MR. KANE . . . . . . . . . .    10

OPENING STATEMENT BY MR. HOLTSHOUSER . . . . . .    20


RICHARD SINDEL --

    Direct Examination by Mr. Moreno  . . . . . . .    38

    Cross Examination by Mr. Holtshouser  . . . . .   140

(PROCEEDINGS BEGAN AT 9:00 AM.)

THE COURT:  *Billy J. Allen versus United States of America*, 4:07-CV-00027 ERW.

The matter comes before the Court today for an evidentiary hearing on Movant Billie Jerome Allen's Amended Motion under 128 United States Code, Section 2255, to Vacate, Set Aside or Correct Sentence By a Person In Federal Custody Under a Sentence of Death, ECF No. 60.

Movant made numerous claims of Constitutional error in his Section 2255 motion, including the claim that counsel provided ineffective assistance by failing to obtain readily-available evidence of a much more severe history of abuse than was actually depicted at sentencing.  In declarations submitted in support of Movant's amended motion, Movant's mother and uncle both represented that they would have offered information on this topic but were not asked.

Movant also presented broad allegations concerning additional or different mitigating evidence that could have been presented at hearing, including detailed expert reports containing numerous diagnoses and conclusions not offered at sentencing.

In its Amended Response to Movant's claim that counsel failed to investigate and present evidence properly at the penalty phase of the trial, the United States stated that a review of the actual mitigation case presented by Movant's

trial counsel demonstrates not only that Movant was not prejudiced but also that trial counsel put on a very thorough, strong mitigating case, fully developing numerous themes, including Movant's broken home, disadvantaged background, nonviolent nature, lack of leadership skills, and his tendency to follow others which were linked together by his experts in closing argument.

In a memorandum and order dated May 10, 2011, ECF No. 147, the Court concluded that with the exception of the ineffective assistance claim based on counsel's alleged failure to investigate and present mitigating evidence at sentencing, Movant's claims for relief under Section 2255 were either insufficient on their face or refuted by the record and the Court denied those claims without an evidentiary hearing. However, because Movant made the necessary threshold allegations with respect to the deficit performance prong concerning sentencing presentations, the Court concluded that an evidentiary hearing was necessary to permit the Court to assess the credibility of this evidence and to determine the extent to which it is relevant to whether counsel fulfilled their obligation to conduct a thorough investigation of Defendant's background.

Accordingly, the Court instructed respective counsel to make presentations addressing the totality of available mitigating evidence, including that adduced at trial and that

Case: 4:07-cv-00027-ERW    Doc. #: 334    Filed: 03/01/13    Page: 6 of 248 PageID #: 5274
VOLUME I                                                          6

offered by Movant in support of his amended motion to enable

the Court to reweigh the evidence against the aggravating

evidence offered at sentencing.

Is the United States ready?

MR. HOLTSHOUSER:  Yes, Your Honor.

THE COURT:  Is Defendant ready?  Strike that.  Let's do it the proper way.  Is -- Is Movant ready?

MS. CARLYLE:  Yes.

THE COURT:  Is the United States ready?

MR. HOLTSHOUSER:  Yes, Your Honor.

THE COURT:  Thank you.  All right.  I understand there are some preliminary matters.  Is that correct?

MS. CARLYLE:  I have a couple.

THE COURT:  All right.  You may proceed.

MS. CARLYLE:  First of all, we would like to invoke the rule as to witnesses so the witnesses are not in the courtroom when other witnesses are testifying.

THE COURT:  All right.

MS. CARLYLE:  We'd also ask the Court to take judicial notice of the trial in the criminal case and also the file in the Eighth Circuit.  And I don't know whether the briefs in the Eighth Circuit are in the Court's record.  We can certainly provide them, if the Court needs them.

THE COURT:  I believe they are not, but if they can be provided, the Court will take notice.

MS. CARLYLE:  Okay.

THE COURT:  If there's anyone in the audience or in the courtroom in any respect that may be called as a witness in this case, it will be necessary that you leave the room. Otherwise, you could be disqualified from testifying in the case.

I do not know the identity of those witnesses, so I'll rely upon respective counsel to identify them.  If there are those present, they should be instructed to vacate the courtroom.  Additionally, from time to time witnesses come in, and I have no way of knowing whether those persons would be testifying.  So I'll rely on respective counsel to survey the audience to make sure that witnesses ordered excluded have not inadvertently entered the courtroom.

MS. CARLYLE:  We will -- We will probably ask for an exception to that as to certain experts who may need to listen to each other, but we'll address that as to those particular witnesses, --

THE COURT:  All right.

MS. CARLYLE:  -- if that's all right.

MR. HOLTSHOUSER:  Likewise, we would request an exception to that as to the Government as the Case Agent will be assisting the Government from time to time and may testify. And that is David Herr with the FBI who's here.  He will be coming in and out of the courtroom, and we may need him to do

some things during the hearing, --

THE COURT:  All right.

MR. HOLTSHOUSER:  -- but he may also be a witness, so we ask that he be excepted.

THE COURT:  All right.

MS. CARLYLE:  No objection to that.

THE COURT:  All right, very well.  Just so -- Let me restate it.  It's ordinarily appropriate for expert witnesses to be present to listen to other experts testifying because they can base their opinions to some extent on what they hear, observe and so forth.  So it is my expectation that that exclusionary rule will not apply to expert witnesses, nor to the Case Agent in this case.

MS. CARLYLE:  I think the only other thing is I think the attorneys in the case have introduced themselves to you and Mr. Allen, of course, is here in person.

THE COURT:  They have.  Good morning, sir.

THE PETITIONER:  Good morning.

MS. CARLYLE:  Our paralegal Kathrin Hennig is back here at the back table.

THE COURT:  All right.

MS. CARLYLE:  With your permission, she'll sit at that table and assist us.

THE COURT:  Sure.  That's fine.

MS. CARLYLE:  Thank you, Your Honor.  That's all I

have.

THE COURT: Thank you. Okay.

Mr. Holtshouser?

MR. HOLTSHOUSER: Judge, we had indicated to the Court that we would provide an electronic copy of the exhibits that have been identified on the Joint Exhibit List. I have two copies for you. They are in numerical order as they appear on the exhibit list. They are in .tif form. You don't need any special software to open them or use them.

THE COURT: All right, very well.

MR. HOLTSHOUSER: If I can provide those to the Court.

THE COURT: Sure.

MR. HOLTSHOUSER: I've given a copy to Ms. Carlyle.

THE COURT: Thank you. All right.

MS. CARLYLE: That's correct, Your Honor. We received a copy.

THE COURT: All right.

MR. KANE: Good morning, Your Honor. Tim Kane. And if Your Honor is prepared, I will deliver Movant's opening statement.

THE COURT: All right. In that regard, I have indicated to respective counsel that there will be no limitation as to time on opening statement and expecting that those opening statements may be lengthy. We will be taking

recesses from time to time at your convenience or for the convenience of court personnel.

MR. KANE:  Your Honor, I do not expect our opening statement to be lengthy.  I'd probably guess I'll go for about 20 minutes or so.

THE COURT:  All right, very well.  Go ahead.

MR. KANE:  And, of course, if Your Honor has any questions, please interrupt at any time.

Your Honor, you presided over the penalty phase of this trial at which a mitigation case was presented in which Billie Allen's home life was described as being -- as him having a loving and supportive family who taught him good values.

The testimony you will hear during this hearing presents an entirely different account and a far more compelling account of Billie Allen's upbringing.  Witness after witness will testify to abuse he suffered at the hands of his mother and his father and other family members, a verbal abuse and of all manner of neglect he endured, including being locked out of the house in the ghetto from a young age overnight and for days at a time.  You will hear testimony about how those experiences shaped him and shaped the psychology and the character which he brought into early adulthood.

In his early life, when his parents were still

together, which was until he was about seven or eight years old, his father would subject him to beatings for just about anything.  Running in the house, closing a door too loud, saying the wrong thing could result in a beating.  Often it did not.  His father would be high.  He was a drug addict.  He would be high on PCP or crack, and he wouldn't really care what the kids were doing.  One day it was fine to run through the house.  The next day it was the type of -- type of thing that Billie was beaten for and cussed out for.

The evidence you will hear, Your Honor, is not about strict discipline.  There will not be evidence and the witnesses will explain that they are not talking about a house where there -- that was orderly and where rules were enforced through physical punishment.  They will describe a chaotic home where the parents were drunk and high or absent and where no one most of the time cared what the children were up to.  The violence that occurred was unpredictable and it was uncalled for, and it was a nearly daily occurrence.

Billie's mother, Juanita, and his father, John, who went by "Junior" in the family, had vicious fights.  One second they would be getting along fine; the next minute they would be arguing and cussing at each other, and shortly thereafter, it would often evolve into punching, throwing things at each other; an open fight.  It was not a usual situation of domestic abuse because Juanita was strong and she

was mean, and she often had the upper hand in the fights. Junior was such a drug addict that often he could barely stand up. During these fights, the children would try to get away from the house or would hide in a bedroom or under a bed.

Alcohol and drugs fueled a lot of this violence. Billie's father smoked crack and PCP; Juanita drank heavily. At five or six or seven years old, Billie would see his father and his Uncle Billy, after whom he was named, using drugs to the point where they would fall out, sink into a state of pathetic semi-consciousness which to young boys at the time seemed kind of funny.

Billie's father and uncle also dealt drugs to support their drug habits, and inevitably Billie was exposed to that. Street-level drug dealing was a normal, everyday family affair in those years.

Billie's mother, Juanita, was not only violent with her husband, she was also violent with Billie. She punched Billie. She would whip him with switches, with a belt, with extension cords. Like the beatings that his father subjected him to, the whippings and beatings his mother subjected him to were unpredictable and frequent. She would whip him in a bathtub with a switch for splashing too much. She would whip him for making too much noise. She would whip him for nothing at all except her own drunken rage.

Some of the worst whippings Billie got were after his

mother and father had had a fight. His father would be locked out or would leave the house for a few days. And during that time, Billie's mother would take out her rage at her husband on her son. She would call him the worst things a person could call another person. In language that was vile, she would essentially tell Billie that he was nothing but trash like her husband.

At seven or eight years old, Billie's parents separated, and Juanita and the children moved in with her father on Cote Brilliante. Juanita remained an alcoholic and her alcoholism, in fact, got worse. Witnesses will describe empty liquor bottles piled up in her bedroom or around the house. She would spend many of her days either at a bar or at a club or in her bedroom drinking. She often came home late at night so drunk that the next morning she would not be able to get up to help the kids get ready for school. But by the next evening she would often be out drinking again at dinnertime.

And she was a violent drunk. The whippings continued. Billie, her only son, took the brunt of it. When she came home after drinking until 2:00 and 3:00 in the morning, he may be subjected to a whipping for something he had or hadn't done. He would be cussed out. And eventually as he got older, she began locking him out of the house while he was still quite young; 12, 13, 14 years old; locked out of

the house with the chain bolted, locked.  And he would wander the streets and try to find a friend or a family member where he could sleep with or sometimes he slept on the porch.  This was in one of the most violent ghettos in the nation.

When Juanita was not around, Billie had little supervision.  He would wander the street, hang around the older boys who sold drugs on the corner, who shared liquor, and who lived in -- and who lived violent lives.

The abuse and trauma that characterized his upbringing, of course, grew into Billie's character and psychology.  And he lacked the personal resources and the support system to deal with it and to overcome it.

As he grew older, he learned how not to -- Excuse me.  As he grew older, he learned not to cry during whippings and, instead, he held his emotions in.  But he also became jumpy or, in the lingo of the street, scary in that a sudden noise or a sudden touch would cause him to startle or jump in fear.

And witnesses will describe how he lost himself in his imagination.  After a particularly vicious whipping, he would go into his room and draw and draw for hours without saying a word.

His home life left him with no self-esteem and he began to exaggerate constantly.  He made things up that those around him, his friends and family members, knew were not true and that were, obviously, not true, but that he simply could

not acknowledge.  He'd talk about having a Nintendo or some new game of the day, and then when someone asked to see it, he explained, "Oh, I took it to a friend's house," or, "It's broken; we can't see that right now."  He checked into an imaginary world and checked out of the day-to-day life that was so miserable inside his home.

Your Honor, there will be competing expert testimony at this hearing about labels; about whether and during what time period and to what degree some psychiatric or neuropsychological label precisely fits Mr. Allen's impairments and issues.  But the expert evidence will largely agree on a more fundamental and more common sense notion:  Your upbringing as a child shapes who you become.  An abusive upbringing can cause significant psychological and emotional damage.

Indeed, the Court will hear about research published through various agencies of the United States Government itself attesting that child abuse victims tend to suffer from life-long problems in establishing stable relationships; with drug and alcohol abuse, with cognitive impairments, with self-esteem, depression, and the list goes on.

Child-abuse victims have dramatically greater problems with delinquency as they grow into young adulthood, and they commit crimes and violent acts at a significantly greater rate than children who come from stable, healthy

homes.

For Billie, the abuse, the neglect, and the violence he suffered in his own home at the hands of his own family shaped his character.  It helped to make him who he is.  And you will hear evidence about his resulting problems with depression, PTSD, drug and alcohol abuse, and cognitive impairments.

What he suffered through and how his abusive upbringing helps explain his character are exactly the types of evidence that capital defense lawyers want to present to a jury charged with deciding whether a defendant lives or dies. The trial defense team will testify that because of the very real possibility that at least one juror would have empathized with Mr. Allen's upbringing enough to vote for life, that they would have presented this evidence of an abusive upbringing if they had known about it.

Yet, at trial two attorneys of the bar of this Court, Mr. Sindel and Mr. Simon, were given the responsibility of advocating for Mr. Allen's life.  Mr. Sindel and Mr. Simon were and are skillful and dedicated criminal defense lawyers, but even good lawyers make real mistakes.  And in the penalty phase investigation in this case, Mr. Sindel and Mr. Simon dropped the ball as they will both admit.

Mr. Sindel began representing Mr. Allen and learned in April, 1970 -- excuse me -- in April of 1997 that the U.S.

Attorney's Office intended to seek the death penalty.  In August, 1997, the Department of Justice formally authorized the death penalty.

In September Mr. Simon was appointed as co-counsel, and funding was granted for various expert and investigative services.  In early October a trial date was initially set as either January or February of 1998, and the Government subsequently elected for the latter date in February of 1998.

But from April, 1997, through the spring and summer and fall and until January of 1998, Mr. Sindel and Mr. Simon conducted virtually no mitigation investigation.  They did gather contact information for some potential witnesses.  They obtained some letters attesting to Billie's good character, and they obtained some medical and school records.  But during that time, they did not conduct a single mitigation interview.  And despite having information that clearly suggested the need for a mental health evaluation, they did not have Mr. Allen evaluated by any mental health expert.

When they did finally have him evaluated in January of 1998, it was a competency evaluation and not a mitigation evaluation.  Before January of 1998, in fact, before one month ahead of the trial date, neither Mr. Sindel, nor Mr. Simon had any direct contact with Dr. Haney, a mitigation expert they had retained, and Dr. Haney, in turn, had no contact with Mr. Allen or with any potential mitigation witness.

Mr. Sindel thought he had delegated responsibility to Mr. Simon for the penalty phase investigation and for working with Dr. Haney, and so Mr. Sindel focused on preparing for the guilt phase.

Mr. Simon, however, did not share Mr. Sindel's understanding that he had been delegated the responsibility for working with Dr. Haney and for conducting the penalty phase investigation. Indeed, Mr. Simon will testify that he had a sum total of zero experience conducting mitigation investigations.

Mr. Sindel will testify that regardless of the miscommunications or the lack of communication that caused the mitigation investigation to be ignored until a month before trial, that it was his ultimate responsibility as lead counsel to ensure that the investigation was conducted in a timely and thorough manner, and that he failed to meet that responsibility. Mr. Sindel and Mr. Simon will both testify that their failure was not the result of any strategic or tactical decision. When a month before trial they frantically realized that the mitigation investigation had not gotten off the ground, they had already painted themselves into a corner.

Billie had a large extended family. He had had numerous neighbors and acquaintances and friends. He had attended a number of different schools. He exhibited numerous red flags for mental health problems. The investigation that

counsel faced, in other words, was large and complex.

After squandering many months and leaving themselves only about one month, a thorough investigation ultimately proved impossible. Quickly identifying the mitigation themes that they would focus on -- Excuse me. They needed to quickly identify the mitigation themes that they would focus on, and those themes were simply the low-hanging fruit.

They described Billie as a follower, as being nonviolent, as being a good artist, and having an absent father. They focused on the part of Billie's life story that was immediate, the two to three-year period preceding the crime where Billie lost close friends to violence in the streets.

They presented little about Billie's early home life. They did not have time to speak even to all of the witnesses that they identified, and many of the witnesses that they did contact were reached either only on the telephone or only for a relatively cursory interview before they were brought into counsel's office for a final dress rehearsal of their penalty phase testimony in the midst of trial.

The transcripts of the penalty phase reveal that despite calling 36 witnesses, most of the witnesses testified curtly and in echo to each other that Billie was a follower; Billie was a good artist; Billie was a likeable, nonviolent guy; Billie's father wasn't around; Billie had skin problems

when he was a kid, and he got teased for it.

Counsel described Billie as coming from a loving family that taught him good values. Counsel presented a venire of normalcy. As the Court will hear, however, Billie's home life was anything but normal. His daily life was characterized by severe abuse and neglect, and those were the experiences that most shaped Billie's character, but the jury never heard that evidence because for months his lawyers' mitigation investigation sat dormant while trial approached.

Mr. Sindel and Mr. Simon failed in this case to learn and failed to present to the jury the most compelling and the most basic facts about Mr. Allen's upbringing and about how that depraved upbringing shaped his character.

Your Honor, after the Government's opening statement, our case this morning will begin with Mr. Sindel's sworn testimony about how that failure occurred.

Thank you.

THE COURT: All right. Thank you, Mr. Kane.

MR. HOLTSHOUSER: May it please the Court, Counsel.

THE COURT: Mr. Holtshouser.

MR. HOLTSHOUSER: Judge, as you know, this case was tried 14 years ago, and the only ones here now who were participants in the trial then are you, me, and Mr. Allen. Fourteen years ago a jury determined that Mr. Allen should be put to death for his role in viciously murdering

Richard Heflin, a decorated Vietnam veteran, a police officer, and a married father of three.  He was shot down by Mr. Allen with a high-powered assault rifle and shot again after he had fallen from the initial wounds.  As Mr. Dowd stated to the jury at the trial, Mr. Allen went into the bank prepared for war.

For 14 years now the supporters of Mr. Allen and other opponents of the dealt penalty have had a full opportunity to develop any evidence not developed by the Government or the defense.  Given an additional 14 years, anyone could find additional or different evidence not discovered by the original trial participants.  And it should not be forgotten that it was not just the defense who was investigating mitigation evidence, it was my role as firewall counsel, along with a firewall agent, to be investigating Mr. Allen's life and background as vigorously as the defense.

Nevertheless, after 14 years the habeas team has been unable to locate a single document that was not uncovered by the defense trial team and the Government in the trial.  In addition, most of the witnesses who will testify were known to trial counsel, had been investigated, and most of them testified at trial in mitigation.  This includes Billy Wayne Allen and Juanita Allen who did not testify but both of whom were known to the trial team.  And, in fact, Mrs. Allen was scheduled to be a witness but the decision was made not to

present her.

The only witnesses who had significant evidence of physical punishment who were not known to the trial team are Cathy Toliver and her son, Brady Toliver.  But neither Juanita Allen, nor Billie Allen, nor any other witness provided their names to trial counsel during the trial period. I submit that Mr. Allen cannot show that trial counsel was aware of any investigative lead which would have led to the Tolivers within any reasonable period of time.

What we do have here are lay witness accounts of alleged circumstances in Mr. Allen's childhood and background which certainly are different or in addition to evidence developed by the trial team's mitigation investigation.  As the evidence will show, these accounts are moving targets.

The starting place for this hearing has to be the law.  The burden is on Mr. Allen to demonstrate both deficient performance by his counsel and prejudice to be entitled to relief.

The Eighth Circuit applied the principles of *Strickland* very recently in *U.S. v. Ortiz*, a December 19, 2011, decision in a capital case in which the claim was also that counsel was ineffective in investigating and presenting mitigation evidence.  The claim there, too, was that the missed evidence was that Ortiz was raised in an abusive and poverished and dysfunctional setting and was a brain-damaged,

impaired person.  The Court in *Ortiz* held that counsel's performance was not deficient even though counsel in that case presented no mitigation evidence and did not obtain a single mental health evaluation.

To establish deficient performance, Mr. Allen has to show more than that trial counsel did not discover certain evidence.  To meet their burden, they have to show more than that a later investigation uncovered new or additional facts.  As the Court made clear in *Ortiz*, to establish Constitutionally-deficient performance, there must be an objective showing that counsel made errors so serious that counsel was not functioning as Sixth Amendment counsel.  The standard is whether the investigation that was conducted was reasonable according to an objective, wide-ranging standard.  This is a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time without the distorting effects of hindsight.

And the ABA standard which is relevant, although not controlling, is that a mitigation investigation must comprise efforts to discover all reasonably available mitigating evidence.  And the key word is "efforts."  It is not a "but for" test.  Failure to actually discover certain evidence does not equate to deficient performance.  The evidence here will be that the ABA standard was more than satisfied.

The issue in this case and the focus of the evidence

should not be whether and to what extent Mr. Allen had a bad childhood, a bad mother, a bad father, a bad neighborhood, or a bad education.  The focus should be what counsel did, what they discovered, what hurdles they faced in investigating and whether they failed to investigate or explore any reasonably available evidence that should have been actually -- that would have actually been mitigated.  And part of the mitigating analysis has to be what the potential cost of presenting the evidence would have been, and this is the strategy part of any capital defense trial.

The witnesses in this case really fall into three categories:  The trial team, the lay witnesses, and experts. The lay witnesses, of course, are the only witnesses who could possibly have any relevant information which the trial team failed to uncover.  The trial team are the only witnesses who can provide insight into what was done or not done and why. And the experts are experts.  And for every new expert, the Government can find a credible rebuttal expert.  What they add to this case is marginal at best and not worthy of much weight in the final analysis.  But, nevertheless, experts will be presented on both sides.  This Court has seen enough experts in its time to decide which ones are worthy of credibility.

With respect to the lay witnesses, the statements that you will hear are now in direct contravention to information they gave the trial team.  Declarations have been

prepared by habeas counsel and signed by some of the witnesses. The testimony that they will give will be that they currently do not agree with significant aspects of what is contained in those declarations. When actually confronted with contents of the declarations in depositions, some of them seemed genuinely surprised at what was stated in the declaration. And I anticipate in some cases we will hear, yet, another version when they testify in this hearing.

Testimony of the lay witnesses will also not be consistent with each other or with several of the theories put forward by the habeas petition. For example, Cathy Toliver maintains that Mrs. Allen was a prostitute and engaged in a sexual act for money within view of Mr. Allen on the front porch of their home. Both Mrs. Allen and Mr. Allen contradict this claim.

Another example is the claim by Dr. David Randall, the mitigation specialist, that they needed more time to develop a rapport with Mrs. Allen to broach the subject of abuse because she mistrusted the trial team based on their race and could not admit that she abused Mr. Allen.

Mrs. Allen will testify this is not the case. In fact, according to Mrs. Allen, Mr. Sindel built a rapport with her over the course of ten months. She trusted the trial team and would have admitted the abuse, if only asked, and did not distrust them because of their race.

According to Mr. Sindel, though, both Mr. Allen and Mrs. Allen were asked about the possibility of abuse, and both denied that there was abuse in Mrs. Allen's upbringing of Mr. Allen.

Mr. Allen also did not complain of recurring thoughts and nightmares about his mother or his father. His alleged nightmares were and still are about being shot in his backyard similar to the way he witnessed his friend, Marquis Taylor, die.

Another problem with the credibility of the witnesses will be that there is a complete absence of any objective corroboration of the claims.

Mr. Allen was educated during his grammar school years in the Clayton School District. Yet, no teacher noticed any evidence of abuse.

Mr. Allen was seen by the same pediatrician, a Dr. Grabau, for most of his younger years and never observed any evidence of abuse. No Scout leader, no one else testifies to observing or seeing signs of abuse that wasn't known to the trial team which brings us to the question of which the evidence is, again, a moving target. Did the trial team investigate the possibility of abuse or not?

The lay witnesses will claim that they were not asked and that the trial team was only interested in good things about Mr. Allen and pointed them to things to say and, in

fact, structured their testimony. The evidence will be that the trial team did ask and did not do so.

Also, the witnesses on whom Mr. Allen will rely are extremely biased in his favor and are motivated by the Jury's verdict to do anything they can to help Mr. Allen's legal case. This is demonstrated even in the declaration of Mrs. Allen at Paragraph 14 where she stated, "It is hard for me to discuss these topics. I only came to do so with Billie's current lawyers after spending many hours over many days with them. Billie's current lawyers have also asked me a lot of different types of questions which have helped me to understand what information would be important to help Billie's legal case."

You'll recall that there was evidence in this trial that Mrs. Allen was not above suborning perjury. Mr. Allen wanted Johnnie Grant to lie for him at trial. And Mrs. Allen approached Mr. Grant at a supermarket and criticized him for giving the Government letters that Billie had sent to him and asked Mr. Grant why he would not, quote, "co-sign" for Mr. Allen.

As pointed out in the Government's response to the traverse, the jury in this case heard evidence that Mrs. Allen sometimes employed corporal punishment in connection with Mr. Allen. This could not have been more clearer than in the testimony of Raymond Petty, Sr.; Mrs. Allen's brother. Prior

to trial, he told the trial team that Mrs. Allen, quote, "beat the crap out of Billie Allen real good."

The neighbor, Shimeka Taylor, told them that Mrs. Allen "kicked the snot out of Mr. Allen as punishment." Deborah Ruffin told them that Juanita Allen would get physical with Mr. Allen.  Sam Moore, the softball coach, told them that Mrs. Allen would "kick Mr. Allen's ass in the street." Mr. Allen himself told Dr. Cuneo, one of his experts at trial, that his mother physically disciplined him to the end.

Family members and friends also told the trial team that Mrs. Allen drank to excess at the time.  No one described the perpetual drunkenness and highness that is now part of the evidence presentation.

The jury also heard plenty of evidence about the neighborhood in which Mr. Allen grew up.  Mr. Kane described this as a "ghetto," but the witnesses who were available to the trial team at the time of trial didn't view their neighborhood as a ghetto.  It might be an abandoned ghetto today, but 14 years ago and, in fact, perhaps some 30 years ago it was not in the condition it is now.  They viewed their neighborhood, while it might have been surrounded by troublesome areas, as being a good neighborhood where children could play and neighbors knew each other.  Certainly, the neighborhood deteriorated over a period of time, particularly with the introduction of crack into the drug market, but that

was a gradual process.

However, none of this evidence was perceived by Mister -- by Mr. Allen as abuse based on his recorded answers to Dr. Yutzy in his examination in 1998. And, in fact, he told the trial team and experts at trial that he viewed his childhood as good and that he had a loving relationship with his mother.

Mr. Sindel, in particular, viewed Mrs. Allen as a credible and caring mother. Mr. Allen did not endorse to anyone at the time of trial that his mother's treatment of him had a traumatic impact on him. What he and every other person who the trial team talked to and stated at trial was that Mr. Allen had a traumatic reaction to the circumstances of the death of his friend, Marquis Taylor, by his side.

Even the Government's new expert, Dr. Askenazi, has concluded that for a time Mr. Allen probably suffered from PTSD as a result of witnessing that incident but it was only a short duration and did not further impact his functioning.

Now that her son is on death row, Mrs. Allen is more than willing to vilify herself, and she is the focal point of the present allegations. Those that care about her and about Mr. Allen have joined in this effort. What will be clear from the testimony of the witnesses now is the extent to which bias and motive have impacted recollections which are now exaggerated and embellished.

The Government is confident that the Court will apply the normal criteria for determining credibility and determine what facts are worthy of belief.  After the reasonableness of counsel's performance, credibility is the key issue in this hearing.  Unlike the new experts for Mr. Allen, I know this Court will not fail to account for the prior inconsistent statements of the lay witnesses, the internal and external inconsistency of the positions put forth by Mr. Allen, and the evidence of bias and motive by the witnesses whose recollections have fermented after 14 years.

The two key issues are deficiency and prejudice.  On the issue of deficiency, the evidence will be there was a substantial mitigation investigation and presentation.  The trial team did not fail to look for, look at, or find any reasonably available mitigating evidence.  There were clear themes and strategic choices of those themes designed to resonate with a juror base that counsel understood very well.  Residual doubt about who the shooter was was chief among those themes; that Mr. Allen was a follower-type personality as it related to Mr. Holder was another critical theme, themes which had a causal nexus to the offense.

Secondary to those themes, trial counsel offered evidence that Mr. Allen came from a loving, caring family that valued him; that Mr. Allen had positive attributes; that this conduct on his part was aberrational behavior; that Mr. Allen

lacked a father figure which itself is something that Mr. Allen himself articulated and verbalized as being chief amongst his concerns in his conversations with counsel and with experts.

Mr. Sindel and Mr. Simon also avoided putting on witnesses who the jury could not identify with; avoided any evidence that would make Mister -- they also sought to avoid any evidence that would make Mr. Allen an actual drug dealer or that he was a -- had an actual gang affiliation.  Both of those themes Mr. Sindel endeavored strongly to keep out of this trial.

The jury was left with the impression that Mr. Allen fantasized about the extent to which he was a drug dealer. Now looking at the newly-developed evidence, it would appear that Mr. Allen was, in fact, a real drug dealer and was in substantial drug transactions.  One problem with the so-called new evidence is that it would open the door to all of these issues which Mr. Sindel strove so hard to keep out.

In most instances the trial team knew about much of this so-called "new evidence" and either used it or chose not to for strategic reasons.  And there's no -- There will be no evidence that Mr. Sindel or Mr. Simon had any reason to question the adequacy of the expert that they chose.

Mr. Kane focused your attention on the Haney misunderstanding which we will call it.  This is a huge

component of the claimed deficiency, but this is a red herring. There was no misunderstanding. There was none claimed in 1998 and, in fact, Dr. Haney was never intended to be more than a consultant rather than the one who was actually conducting a field investigation. He was utilized as a consultant which explains why others were actually doing the field investigation long before the discovery of the so-called "misunderstanding."

It also explains why Dr. Randall was able to come in on such short notice and accomplish as much as he did because so much had already been done. Rather than a misunderstanding or failure to communicate, the real reason Dr. Haney had to get off the case was stated in his letter. He had two other conflicts with the timing of this trial. Now the habeas team claims that trial counsel were deficient in communicating with Dr. Haney. That is not what was claimed by counsel on the record to this Court in writing and orally in 1998.

I'll also submit that there may be a subtle effort here to suggest that the real error or real flaw was the Court's denial of the continuance on January 30, 1998. You'll recall that they were only asking for 120 additional days, not 14 years, to continue to investigate. This Court held a hearing on the motion, and it correctly concluded that substantial work had been done on mitigation and that sufficient time remained to complete the investigation. At no

time did counsel subsequently renew their request for a continuance. This issue was also raised on direct appeal and rejected by the Court of Appeals and has nothing to do with the claims here.

Not once did this Court ever deny any resource requested by Mr. Allen's team during the trial. And the trial team knew in October of 1997 that the trial was going to start February 6th, 1998. The mitigation evidence did not begin until the first week of March, 1998.

When asked for an estimate of what his consulting work would require in the Fall of '98 or '97 rather, Dr. Haney estimated 75 to 100 hours. Dr. Randall actually billed for 423 hours for work that he did between January 16th and the end of the trial; over four times the estimate of Dr. Haney. Plus the evidence will show that the focus on Dr. Haney is a red herring in an attempt to force a square peg into a round hole.

With respect to prejudice, the primary flaw's that none of the so-called "new evidence" bears a causal nexus to the crime. There's no mitigation evidence that what led Mr. Allen to commit the crime was the alleged abuse by his mother any more than the death of Marquis Taylor had anything to do with the crime. At the time he committed the offense, he did not have anything written about his mother or Marquis Taylor on his stomach. What was written on his stomach was

cash money.  His nickname was not "Beaten Billie."  It was "Dollar Bill" and later went by the nickname of "Mr. Scrilla" which is a slang term for cash.

The new experts, like the defense experts at trial, have not even explored the circumstances of the offense with Mr. Allen to determine his state of mind and mental functioning on March 17, 1998.  They even fail to take his actions into account in terms of what those actions say about his purported brain impairment, his PTSD, his bipolar condition, or his depression.  Regardless of any mental issues he had, Mr. Allen was clearly functioning in a stressful situation just fine on March 17th, 1998.

It is not enough for prejudice that evidence of a worse childhood than the trial jury heard might have been found mitigating or given weight by any juror.  Mr. Allen has a burden to show in this hearing that but for the deficient performance, the jury would likely have determined that Mr. Allen deserved life rather than death for the murder of Mr. Heflin.

The jury heard some evidence of the negative aspects of Mr. Allen's life.  And from the mitigators that they rejected, a pattern emerges that the ones which bore a causal nexus to the crime were the ones which they found and which they gave weight to.  Others which -- some of which were not even factually disputed were not found by most of them as

mitigating. The pattern again is that they lacked a causal nexus to the offense.

There were other issues that were more significant in mitigation than any facts of Mr. Allen's childhood, and that was residual doubt about Mr. Allen's role in the offense.

As the hearing proceeds, Your Honor, the issues that I would suggest the Court should focus on is the extent to which the trial team did conduct a thorough investigation. The fact that the trial team did explore the question of abuse, the fact that Mr. and Mrs. Allen consistently denied to the trial team that there was abuse, there will be hard, uncontroverted evidence on this point. Mr. Allen denied it in response to recorded inquiries by Mr. Simon. Mr. Allen also denied it on tape to Dr. Yutzy not once but several times during his examination on February 16, 1998. In addition, Mr. Sindel will testify that both Mr. and Mrs. Allen were questioned about possible abuse and both denied that there was any.

Also, focused on the role are what the clear, strategic choices by the trial team played in what they chose to present and not present as well as the issues they worked hard to keep from seeping into the case, issues that would have been clearly injected into the case if the trial team had put on the so-called "new evidence."

The credibility of the experts and the bias that they

clearly demonstrate and the manner in which they have approached their tasks and reached their conclusions should also be considered. There really is nothing new in the actual opinions expressed by them. The only thing that is different is the expansion of the bases for those opinions.

Dr. Cuneo diagnosed PTSD and depression and so does Dr. Stewart. Dr. Gelbort diagnosed brain damage and so does Dr. Martell. Dr. Martell gave more tests than Dr. Gelbort did but still came to the same opinion; that Mr. Allen shows impairments in some areas which could indicate brain damage.

As will be demonstrated particularly through the work done by Dr. Askenazi, Dr. Martell committed some egregious errors in the assessment of the test results, used outdated norms, demonstrated bias in the manner in which he drew his conclusions and essentially cherry-picked a few outlier test results to find impairment. His work actually exemplifies what is wrong with Mr. Allen's habeas case. The diagnosis of dementia in a 30-some-year-old man is particularly ridiculous and invites this Court to defy common sense.

Dr. Stewart is even more biased in his approach to the case. I think you will find him to be an interesting character. Among other things, he did not prepare a report, did not detail the results of his examination in his declaration, and he now claims that his notes are lost, even though he testified in his deposition that he had his notes.

One of the biggest flaws in his conclusions is that he worked from a data set that was similarly cherry-picked for him by habeas counsel and did not contain much of the evidence which contradicted the witness accounts on which he relied.  Out of nine mental health professionals to look at Mr. Allen over the course of the past 14 years, he's the only one, Dr. Stewart is, to come up with bipolar disorder, and Dr. Martell is the only one to come up with dementia.

In conclusion, Your Honor, having spent considerable time on investigating the investigations here, the relevant evidence is voluminous and complicated.  We'll do our best to expedite the presentation, but the patterns that emerge will be very simple despite the complexity and volume of the evidence.

In the final analysis, I'm confident this Court will find for a number of reasons that trial counsel did not render ineffective assistance in defending Mr. Allen.

Thank you, Your Honor.

THE COURT:  Thank you, Mr. Holtshouser.

We'll take about a ten-minute break and then begin with the evidence.

MS. CARLYLE:  Thank you, Your Honor.

THE COURT:  Court's in recess for -- Let's do 15 minutes.  But when we do recesses, I like to keep it on time.  So if we do 15 minutes, I really mean 15 minutes.

Court's in recess.

THE CLERK:  All rise.  Court is in temporary recess.

(Court recessed from 10:08 AM until 10:26 AM.)

THE COURT:  You may call your first witness.

MR. MORENO:  Your Honor, the defense would call Mr. Rick Sindel.

THE COURT:  All right.  Thank you.

THE CLERK:  Can you please state and spell your name for the record?

THE WITNESS:  Richard, S-I-N-D-E-L.

THE CLERK:  Thank you.  Have a seat up there.

MR. MORENO:  Your Honor, if it please the Court, may I begin?

THE COURT:  You may begin.

MR. MORENO:  Thank you.

RICHARD SINDEL,

having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

QUESTIONS BY MR. MORENO:

Q    Good morning, Mr. Sindel.

A    Good morning.

Q    Mr. Sindel, how long have you been a practicing attorney?

A    Since 1973.

Q    And how long have you been in private practice?

A     1976.

Q     And that private practice, has it been your practice?

A     Yes.

Q     All right.  And prior to 1976, how were you employed?

A     I was a public defender for the State of Missouri.

Q     Now since 1976, what has been your primary practice of law?

A     Certainly within the last 15 years, almost exclusively criminal defense.  It was strongly geared and directed towards criminal defense, but I did other work at the beginning, you know.

Q     Okay.  And how many attorneys are in your office?

A     Six.

Q     Six.  Now in the course of your practice, prior to this case in the state system, did you have an opportunity to handle death penalty cases?

A     I did.

Q     And how many of those do you think you handled before representing Mr. Allen?

A     Six state and one federal.

Q     Okay.  And did any of those cases go to a trial?  To a jury verdict?

A     Those are the ones that I handled that did go to trial except for the one federal, so all of the six went to trial.

Q     And the federal one?

A     It was negotiated through a plea.

Q     All right.  Now you were lead counsel for Mr. Allen.  Is that correct?

A     That's correct.

Q     Now at the time you were appointed which I believe was in April of 1997, does that sound about right?

A     That sounds right.

Q     Okay.  At the time you were appointed, did you have co-counsel at that time?

A     No.

Q     Now in the Eastern District of Missouri was this the first case to actually go -- the first capital case to actually go to trial?

A     Yes, sir, it was.

Q     All right.  Had there been -- There had been one other capital case in the Eastern District.  Is that correct?

A     I believe Andre Bonds, which I was appointed to, was the other capital case.  I don't believe there was any in the interim.  I may be wrong about that, but I don't believe there was.

Q     All right.  And Bonds is the one that settled.

A     Bonds was the one that worked out for a life sentence.

Q     Okay.  All right.  Now after your entry into this case, did you begin to file various pretrial motions?

A     I did.

Q    All right.  The motions practice in this case, was it -- was it heavy?

A    It was extensive.

Q    And when did that ---

A    It was ---

Q    Go ahead.

A    It was a lot of new research, a lot of exploring deficits that might be in the death penalty, the Federal Death Penalty Act.  There was a number of things, I think, that required a long, hard, tedious look.

Q    And that long, hard, tedious look took most of the summer.  Would that be fair to say?

A    It took an awful lot of time.

Q    All right.  And doing that work, did you have assistants?  Was there another attorney who was helping you draft motions?

A    I don't believe so.

Q    Okay.  I know it's been a long time, but to the best of your recollection, how much of your time do you think that took?

A    It's really hard to make an estimate on that.  There was a lot to do in terms of, you know, securing discovery, exploring discovery issues, trying to make sure that that was moving along.  I know that the Motion to Sever was an extensive motion.  I think it was maybe 40, 50 pages.  And the motion -- what I call the "ring motion," which was unique to

the federal capital system, took a lot of effort as well.

Q    All right.

A    So it was a lot of work.

Q    It was a lot of work.  And that was work you did by yourself.

A    Yes.

Q    Now were there arguments held on the motions?

A    There was definitely an argument in the Motion to Sever. I remember that distinctly.  I don't -- I think there may have been an argument on the ring motion at the same time.  So -- But I can't be positive.  Obviously, it will be in the record, but I think there was.

Q    Okay.

A    I know that there was extensive argument back and forth about the severance.

Q    And those arguments, would they have been handled by you?

A    Yes.

Q    Now at some point did you travel to Washington, DC, to present to the Review Committee?  The Capital Review Committee?

A    Yes.

Q    And would that have been in July or August of '97?

A    I'm going to rely on what the records reflect.  I don't recall.

Q    Okay.

A    It would have been sometime after the U.S. Attorney, Mr. Landolt, advised me that, you know, they were going to go to the Capital Review Committee, and there was a back and forth as to when it could be arranged, and I know I traveled there.

Q    Okay.  And ultimately, did you prepare a written presentation for that Committee?

A    I did.

Q    All right.  And did you then appear in person before them?

A    I did.

Q    Obviously, the case was authorized.

A    It was.

Q    And then at that point in time did you seek additional counsel?

A    I did.

Q    And who did you bring onto the case?

A    John Simon.

Q    All right.  I want to backtrack just for a minute. During the time frame from April of '97, after you get into the case, through September or before the -- prior to the authorization, did you have to engage in much factual investigation concerning the case at that time?

A    There was some.  There was some.

Q    And on the guilt phase?

A    I was -- In preparing for the proceeding in front of the Department of Justice, you know, it was always my belief that you had to look and determine what areas that might possibly have resonance with them.  So that those areas frequently dealt with the defendant's background and maybe weaknesses in the case.  So I mean I started out exploring whether or not there was anything to present.  It was the considered belief by most attorneys who were doing this work that you didn't want to present a whole lot of evidence in mitigation unless it was rock solid and extremely significant.  So I had not uncovered anything that I felt fell within those parameters.

Q    All right.  And would you consider the factual investigation considering mitigation that you did from April to September to have been a significant factual investigation?

A    No, I wouldn't say so.  It was -- It was primarily a cumulation of records, meeting with family, meeting with Mr. Allen, getting some background information and that sort of stuff, but I didn't beat the streets to find mitigation witnesses at that point.

Q    All right.

A    I didn't feel I had the time.

Q    Okay.  All right.  So it was mostly record gathering and some cursory interviews.  Would that be fair?

A    A lot of that.  When you're looking at those DOJ presentations, again, if you have something that's in the

medical records, maybe in the school records, other documented records from impartial individuals, that may be something that you want to present, but I would not have considered presenting declarations, affidavits, letters or anything from family or other people unless they had really contained significant indications of brain defects, mental retardation, that kind of stuff.

Q    Now who had the ultimate responsibility in this case for ensuring that both aspects of the case, the guilt phase and the penalty phase, were investigated and presented as best you could?

A    I was lead counsel.

Q    Okay.  Now did you have -- What was the -- What aspect of the case was your primary responsibility, if you recall?

A    I think one of my main talents as a lawyer, if I have any, is Cross Examination, and I primarily focused on the guilt phase investigation.  That had been what I thought was the thing I could bring best to the table.

Q    Okay.  Now when you brought Mr. Simon on the case, what was your intent?  What -- What did you see envisioned as his role in the case if you were going to be focusing on the guilt phase?

A    Well, I wanted him to be able to do mitigation investigation, help coordinate mitigation activities, help secure records, you know, develop mitigation themes, and also

to assist me in research and drafting pleadings, although for the most part that had been done already.  But Mr. Simon's -- Well, the motions, the pleadings, those things had been done pretty -- to a great extent prior to Mr. Simon coming on board.  But Mr. Simon is very articulate.  He writes well and he does considerably a lot of research.  And if you plug into him, it's like downloading an encyclopedia.

Q    And in this case did he help you then at the end of the day with jury instructions --

A    Yes.

Q    -- and things along those ---

A    Yes.

Q    Yeah.  Now did you also intend for Mr. Simon to investigate or explore the Government's case in aggravation and figure out ways to try to rebut that?

A    Yes.

Q    Now did you have an investigator who worked with you on the guilt phase?

A    Mr. Andy Rackers.

Q    All right.  And did he have much of a role in developing mitigation?

A    Not that I'm aware of.

Q    And you had a paralegal?

A    Yes.

Q    And who was that?

A     Her name at that time was Connie Caspari.  Her name is Connie Supranowich.

Q     And was she on your staff or was she sort of a free agent that you signed up for the case?

A     She started out as a free agent.  She later joined the staff.

Q     Now over the course of -- What was her role in the case? How did you see her role?

A     You know, she helped develop records.  She maintained regular contact with Billie.  She went with me to interview him.  She did some fact investigation in terms of the guilt phase, investigation concerning possible alibi defense, that sort of stuff.

Q     All right.  Now how much of your time, as best you can recall, was spent on the guilt phase aspect of the case, the guilt phase investigation, the motions, developing a defense?

A     Well, again, in terms of hours, I really couldn't say. I'm not much of a time keeper, but that was the significant focus that I had.  The guilt phase investigation, Mr. Allen had made it clear to me that that was the primary thrust of what he expected and wanted from an attorney.

Q     And would it be fair to say that from the time of your appointment through January 16th when Dr. Randall joined your defense team that that pretty much consumed most of your time?

A     It certainly consumed a great deal of it.  You know,

there were things that developed late in the game; that I switched hats.

Q    Right.  And that would be when Dr. Randall came on board.  Would that be correct?

A    Well, I think when we realized that there was significant communication problems with Dr. Haney.  I -- I -- I believe more than at any other time during the course of my representation, I believe I took over the reins to make sure that this case was moving along.

Q    Okay.  And we'll discuss that in greater detail as we go on.

Now during the course of the case and prior to trial, did Mr. Simon ever present you with potential mitigation themes?

A    I don't recall any.  I think Mr. Simon had -- was having contact with the family.  I seem to recall the preparation of some witnesses that might be pertinent to the mitigation but not much.  I think part of the problem was that -- And this is my fault.  Mr. Simon may not have been the best choice.  He -- I don't want to be critical of Mr. Simon, but I don't think that he is socially adept in many ways.  And also I think -- And I'm not critical of him.  He does a great job at what he does.

I also think that having him in Jefferson City was not the best choice because I don't think we were able to meet

face to face.  Our own schedules, you know, were often in conflict, so I think that was a problem.

Q    All right.  So the face-to-face meetings with Mr. Simon were few and far?

A    I -- I can't say how many they were or how frequent they were, but they certainly weren't enough.

Q    Now did you have any idea prior to bringing Mr. Simon onto the case his experience with developing mitigation in the capital context?

A    I would think that I would have attached to the motion his CV.  I knew he had worked at the Attorney General's Office.  I believe I had met him at several different conferences and talked with him.  I was aware of his writing skills and his legal research skills.  I don't know -- I knew he was what we'd call a true believer, but I don't know what his skills would have been within the trial arena or in specifically developing mitigation evidence.

There were books that I had -- that he had or I gave to him about themes and how to evaluate and investigate it, but his past background, I don't know.

Q    All right.  And you're referring to like the mitigation workbooks --

A    That's correct.

Q    -- the Capital Resource Center developed?

A    That's correct.

Q   Now I think you answered this, but did you believe that his -- part of his responsibility was to develop the mitigation themes to present to you --

A   Yes.

Q   -- for you to then decide where to go?

A   Yes.

Q   All right.  And did he ever provide to you, as best you can recall, with a list of potential mitigating -- mitigation witnesses?

A   I think he did.  I can't sit here with any certainty and say I looked at it or I remember it.  I certainly don't remember who was on it, but I think he at one point in time at least presented some.

Q   All right.

A   And we had secured letters from family members and stuff at that time through the assistance of Mrs. Allen.

Q   And the letters would have been the character letters?

A   More or less, yes.

Q   More or less?

A   A little background, a little character.

Q   Okay.  All right.  And did Mr. Simon then -- Did he collate them and then decide whether or not he thought they would be good witnesses?

A   I have no idea.

Q   Okay.  Now when you say you had no idea, did you feel

like you had your finger on the pulse of the preparation of the mitigation case?

A   I don't -- When I say, "I have no idea," I don't remember anything like that.  I certainly think that -- Let me put it to you the best way I can.  I had my pulse -- I had my finger all over the case in January.  I did not have that sort of work involved prior to that.

Q   All right.  So from April to January, you really wouldn't have had that kind of involvement in the mitigation case?

A   Not the extent that I should have.

Q   All right.  And you brought on a mitigation specialist?

A   I did.

Q   And who was that?

A   Dr. Craig Haney initially.

Q   All right.  And we're going to talk about the problem with Dr. Haney.  But was it your belief that once you brought Dr. Haney on board, that Mr. Simon would sort of supervise his work and help him with the preparation of the penalty phase defense?

A   It was.  Back then there wasn't the level of electronic communication that there is today.  And because he was in Jeff. City, it wasn't a -- I didn't have the opportunity to say, "Okay, what have you done here?  What's going on here?  What does Dr. Haney say about this;" all of those things.

Q   All right.  So it would be ---

A    I could have done it with a phone call if we would have been together. I don't think there were many letters in that regard. So things could have been done differently and should have been done differently.

Q    All right. Did you -- Do you feel as if you adequately supervised Mr. Simon in his work prior to January of '98?

A    I don't think so.

Q    All right. Do you recall having many meetings with Mr. Simon where you would discuss or check in with him as to where he was at and what the state of the mitigation case was?

A    We certainly had meetings, and I would think that they were relatively frequent, but I don't have a specific memory of like how many they were, whether it was once a week or -- I don't think it would have been more than that.

Q    All right. And do you feel like you had a good idea of what Mr. Simon was doing up until, you know, prior to January of 1998?

A    Certainly in hindsight, no.

Q    And what leads you to say that?

A    Well, a lot of things came to me as a shock towards the end of '97, the beginning of '98, and they became -- You know, they came to me as a shock because I hadn't done enough to make sure that the mitigation phase investigation was moving along and had a direction.

Q    So when you realized in late '97, early '98 that not much

had been done, is that what you're talking about?  Is that when you -- Is that the shock you were talking about?

A    That's right.

Q    Okay.  All right.  Now in '97, late '97, early '98, when you realized that, did you have an opportunity to sort of look at what Mr. Simon had been doing?

A    Well, I mean I -- I think that what I realized was that there wasn't much to look at.  I remember that there was -- And this is something I recently learned, but that there was a tape-recorded interview of Juanita Allen or maybe Billie Allen or maybe both.  I never heard it, seen it, transcribed it, any of that stuff.

Q    All right.  And do you recall that he did a -- he used the mitigation checklist with Mr. Allen?  Does that ring a bell?

A    I think that's correct.  I'm not -- I'm not totally comfortable saying that.

Q    All right.  Do you recall him providing you with any detailed witness summaries or interview memos?

A    No.

Q    Now shortly -- Sometime after your appointment in that spring, summer, did you have an opportunity to meet with Mrs. Allen?

A    Mrs., yes.

Q    All right.  And where do you recall you first met her?

A   I think the first face-to-face meeting was at my office.

Q   At your office, okay.  And would that have been shortly after your appointment as you recall?

A   Very shortly afterwards.

Q   Okay.  And was she alone or did she have family with her?

A   She may have brought her daughters.  I -- I met with them as a group on some occasions.  Whether it was the first one or not, I don't know, but I did meet with the family on a number of occasions.

Q   Okay.  Now your meetings with the family, were they in-depth mitigation interview meetings?

A   They were -- They were -- They were mitigation interviews.  The in-depth interviews occur as the case develops.  I would not have asked probing, pointed questions the first time I met this family, but I would have and I did explain to them how the process works and what I was going to be looking for and what assistance or help they could give me.

Q   Okay.  So you kind of gave them a broad spectrum of issues that your team would ultimately be investigating?

A   That's -- That's accurate.

Q   All right.  So would it be fair to say in the interviews, at least the first interview in April, your goal was really informational?  Tell them what might be coming?

A   It was giving them information and trying to get some back.

Q    Okay.  Now the "some back," what kind of information were you trying to get back?

A    School records, where he went to school; whether there was substance abuse problems; whether he'd seen psychiatrists, counselors, mental healthcare providers; whether he had issues as a child in terms of sickness; levels -- whether he had ever been knocked unconscious.  You know, I would have explored with them at least in a general setting the areas such as whether there was any sexual abuse or physical abuse, that kind of thing.

Q    All right.  And would you have asked them about that or would you have told them, "These are the areas we're going to be exploring when we get more into the case"?

A    I mean my practice was that I would talk in general terms about what a mitigation phase of a case was and a little bit about explaining to them how the legal process would work because most people did not have any idea how it worked.  And certainly, you know, people that didn't follow these kind of things on a regular basis didn't have any clue.  And then I would have asked them some questions, but it wouldn't have been piercing, pointed, "I know this; tell me."

Q    All right.  On any of the different interviews.

A    That's probably accurate.

Q    All right.  It would have been more general?

A    I know -- I know that there was pointed questions about

the schooling and there was some pointed questions about some of the information that would generally develop about his medical background, but we didn't ask specifics until we got his records.

Q   All right.  Now did you see your role in working with the family as the guy who was going to spend the time to develop the rapport to be able to ask those hard questions that you would have alluded to in your initial meeting with the family?

A   That was not the role that I took on, no.

Q   And is that a role that you performed in this case?

A   Not until towards the end.

Q   All right.  And -- All right.  Well, we'll talk about that in a little while.  But from September then until the end of December, January, that was not your role in the case. Your meetings with the family were not to delve in to ask the hard, pointed questions.

A   There were definitely times when certain questions were asked during that period of time.  Some of the inquiries had to do with information that we were getting from Mr. Allen and how -- you know, verifying that information, exploring that information, trying to see if there was anything that we could develop along the lines that we were getting from him and then also some of the information from Mrs. Allen.

Q   All right.  So your role was sort of then to spot-check on some of those issues while Mr. Simon's role was to really

develop the rapport to get to the -- to ask the harder

questions concerning the family history.

A     That's how I understood it, yes.

Q     Okay.  Now do you recall when Dr. Haney was brought into the case?

A     I -- Sometime right -- shortly after the authorization process.  I -- I recall going through a list of names.  I recall I may have talked to Kevin McNally at the Resource Center.  I can't be absolutely positive.  He was a friend of mine.  So it would have been someone, but somewhere in that area.

Q     Okay.  And what did you see as his role in this case? What were you hiring him to do?

A     Well, mitigation.  I had worked with one other mitigation specialist on the Andre Bonds case, and that was a fairly difficult experience for me.  I had done all the other cases doing my own mitigation work.  And there were times, I guess, I was somewhat skeptical about how a mitigation specialist might work with the team.

Q     All right.

A     But my hope was that he would -- The other mitigation specialist had certain -- very good qualities.  She had a staff that did investigation interviews, you know, perused the records, went for leads, tried to figure out other areas that, you know, might be developed and maintained consistent

contact.  So I guess that was my pipe dream.

Q    All right.  So you weren't hiring him as a mere consultant.

A    Not in my mind, no.

Q    All right.  Did you think that he would be responsible -- also responsible for developing relationships with important family members and important witnesses?

A    I -- I thought so, yes.

Q    All right.  And did you also believe that, you know, once preliminary work was done, he would be the one who would then go out and interview witnesses that you might be considering to testify?

A    Yeah.  I -- I think that I thought that there would be suggestions that would pass between him and Mr. Simon and maybe Ms. Caspari concerning other areas to look into, other records that might be developed, things that he could see from the police reports that might be appropriate to explore as they may pertain to mitigation, so all those things.

Q    All right.  So that was your expectation.

A    It was.

Q    All right.  And once Mr. Haney -- Dr. Haney was on the team, and your belief was he would be working with Mr. Simon on the mitigation, correct?

A    I thought that, yes.

Q    All right.  What did you see as your role then, now that

you had a mitigation specialist and a lawyer who in your mind was going to be responsible for the development of mitigation? Were you supervising?  Did you sort of supervise?

A    Well, I think I was -- I was doing much more in terms of preparing for the guilt phase portion of the trial, preparing for other things.  It had always been my belief that I was going to do virtually all the trial work, so that was a massive amount of work to prepare for that and ensure that I was adequately ready.

So I -- I sort of left that part of the case to Mr. Simon and -- and to Dr. Haney.  And I think Mr. Allen really wanted me to work hard on the guilt phase.

Q    And that's what you did?

A    Yes.

Q    All right.  So would it be fair to say that you sort of ceded the development of the penalty phase to Mr. Simon and Dr. Haney?

A    That's fair.

Q    All right.  Now in your deposition you described yourself as sort of on the periphery of the mitigation work.  And we're talking up until late, you know, late December, early 1998. Would that be fair as well?

A    That's fair.

Q    Now in your deposition you also testified that you delegated, as we just said, the penalty phase to Haney, Simon,

and Connie but did not supervise them well.  Would that be accurate?

A    Yes.  I mean I ---

THE COURT:  What I would like to do, if you don't mind, is ask the questions rather than say what did you say in the deposition because I view that as an improper use of depositions.  You can use the depositions to cross-examine, but just ask the question directly, please.

MR. MORENO:  That's fine.  Thank you, Your Honor.

Q    (By Mr. Montroy)  Did you feel that you adequately supervised them?

A    I did actually?

Q    Yeah.

A    Is that the word you used?

Q    Did you actually adequately supervise Dr. Haney, Mr. Simon and Connie on the mitigation?

A    I mean I feel comfortable saying that I didn't adequately supervise them.

Q    During the course of the months that went by from April to late December, early January, did you make inquiries of Mr. Simon and Dr. Haney as to the progress of the mitigation case?

A    I don't have a really specific memory of those things.  I know that Dr. Haney was extremely hard to get a hold of.  He was a very busy man and was traveling quite a bit in other

cases and working other cases up.  And I know that that could be frustrating, but I -- Put it this way, I don't remember specifically, okay, every week we're sitting down and seeing where this thing is headed.  And you know, that's exactly what needs to be done.

Q    All right.  And was that because you were focused on the guilt phase?

A    That's part of it.

Q    I'm sorry?

A    That's part of it.

Q    All right.  Is there another part?

A    I can't abrogate my responsibility and I won't.

Q    So that was your responsibility?

A    It was.

Q    All right.  And it didn't happen.

A    Not like it should have.

Q    All right.  Now were you aware prior to December of 1997, late December of 1997, that there was no contact between Dr. Haney and Mr. Simon?

A    I was not.

Q    All right.  Once you became aware of that, did that seem like a big problem?

A    Big problem.

Q    All right.  In what way?  Why was that?  You were shocked you said earlier.

A    Well, we were counting down to a February trial date and, you know, the person who -- the two people who I believe were most responsible for helping develop the mitigation phase of the case hadn't done it.

Q    Now do you recall having any phone conferences with Dr. Haney concerning his work on the case?

A    I know we had phone contact, but I don't -- I wouldn't say phone conferences as such.  I mean I know there was a contact that had to occur prior to his appointment and his accepting the appointment.

      There was a letter that Dr. Haney wrote sometime in January of '98 which I wish I had gotten in August or September of '97.

Q    What do you recall about that?

A    Well, it specifically outlined his approach and how he was going to approach the case, and it was distinct and different from the approach that I had when I used the other mitigation specialist.

Q    And was that the letter wherein he was saying he was surprised that you expected him to have a mitigation case at that point in time and was explaining what the steps were?

A    I think that was part of it, yes.

Q    All right.  Did that letter come as a shock?

A    It was scary.

Q    All right.  Can you explain that a little for me?

A    Well, I mean I felt like things that I had never expected of myself as an attorney were, you know -- I mean it was right there that there was this major communication issue with Mister -- Dr. Haney, Mr. Simon, and our office, and it was bad.

Q    All right.  Is that when you first realized that the mitigation case had not been going along as you would have hoped?

A    That's correct.  I won't say that's the first time, but that's certainly the big time.  I mean, you know, that's when the cartoon anvil came out of the sky.

Q    Okay.  Being a technological moron, I'm trying to ---

A    I certainly can't help you in that regard.

Q    All right.  Thank you.  Mr. Sindel, on the computer screen up there, I hope that is what is Exhibit -- Joint Exhibit 330.  Do you see that?

A    Yep.

Q    It's the January 13th, 1998, letter from Dr. Haney to yourself.  Is that correct?

A    Yes.

Q    All right.  Is this the letter you were just referring to?

A    Yes.

Q    Now have you had an opportunity prior to today to review that letter again?

A    I have.

Q    All right.  And is the sum and substance of what Doctor -- Dr. Haney's rendition of what he received and didn't receive, is that accurate to the best of your recollection?

A    I have no reason to dispute it.  I don't know in particular exactly what he had received from Mr. Simon.  I do know something about what he'd received from Ms. Caspari.

Q    Okay.  And we'll go back to that in a moment, but since we were talking about the letter I thought I'd pull it up.

In the first subsection in it Dr. Haney states that, "You've never once attempted to converse with me about the case."  Is that your recollection?

A    No, although the conversations or the context would have been early on and not a matter of continued communication.

Q    So does that mean that the conversation you had with him which you alluded to, you know, you had to have a conversation with him when he was retained?

A    I can't believe I didn't.  I don't think I could have asked him to do the case without talking to him.

Q    Right.  So you talked to him, but subsequent conversations -- Do you recall -- Is he accurate that there were not subsequent conversations about the substance of the mitigation case?

A    I -- I can't recall enough to say "yes" or "no."

Q    Okay.  All right.  He states there that there was no

contact through phone calls or letters.  And, again, I'm assuming that's about the substance of the mitigation.  Would that have been correct?

A    Any letters that would have been sent to him, I would assume, would have been -- from my office would have been in the files.

Q    Okay.  And if there aren't any, what would that indicate to you?

A    Well, if there are no letters, it either indicates that they were thrown away, they are lost, or they didn't get sent.

Q    Okay.

A    All three could be possible, considering my level of technical expertise, but --

Q    Is it fair to say that --

A    -- it would be fair to say that if they're not there, they're not there.

Q    Is it fair to say that if they're not there, they weren't sent?

A    I think that's fair to say.

Q    Now I know it's been a long time ago, but in Subsection 2 Dr. Haney states that he didn't receive a single document pertaining to the case until early October, 1997, and that consisted of a police report.  Is that your recollection?

A    I don't have a -- I would have -- I don't have any reason to dispute what he says.  I just don't have any real

recollection of what was being sent out and when.

Q   Okay.  And we'll go back through the ---

A   I mean I know that there was a police report.  I know that there were medical records.  I know there were school records.  I know that there were other things.  But when they occurred, it would be much more likely that those dates of those letters are much better than my own personal recollection.

Q   Okay.  Do you recall whether or not -- Well, let me ask you this:  Who do you recall was responsible for providing Dr. Haney with -- with records?

A   Well, I think Connie was the person who was, you know, receiving the records and collating them.  You know, I was responsible for securing the necessary medical releases.  I did those things.  I think Connie may have done those as well.  If they would have come into the office, it would have been Connie, I think, who would have reviewed them to see who they're from, and I -- I would have read them.

        MR. MORENO:  If I can have just a minute, Your Honor.

        (Pause)

Q   (By Mr. Moreno)  So in -- I have on the screen now Exhibit 320.

        THE COURT:  320?

        MR. MORENO:  Yes, 320.

Q   (By Mr. Moreno)  Which is a letter dated November 25th,

1997.  It's from Dr. Haney to Ms. Caspari.  I'd just ask you to take a quick look at that.  Do you recognize that letter?

A    I'm sorry.  What?

Q    Do you recognize that letter?

A    I've seen that letter, yes.

Q    Okay.

THE COURT:  Excuse me for interrupting.  What was the number of that last letter from Haney?

MR. MORENO:  330.

THE COURT:  330?

MR. MORENO:  Yes.

THE COURT:  Thank you.

A    I can't specifically remember seeing this letter in November of 1997, but I have seen it as part of the investigation in this case.

Q    (By Mr. Moreno)  All right.  That's fair.  And at the bottom it says, "Please send me whatever documents you have available.  I'm concerned as you -- I'm sure you're aware or I'm sure you are that time is beginning to slip away from us and that there's much to do."

Were you aware as of November 25th, 1997, that Dr. Haney at that point in time had only received a police report?

A    No.

Q    All right.  Turning to -- Is it Exhibit 321?  It's a

letter dated November 26th, 1997, the next day after Ms. Caspari receives Dr. Haney's letter and she encloses the following documents.  Have you seen this letter either -- Do you recall it from the time or during the course of the investigation in this case for the habeas?

A    Only in connection -- Only that I can recall in connection with the investigation of this case.

Q    All right.  That letter indicates a number of records that she was sending to Dr. Haney.  Is that correct?

A    Right.

Q    All right.  Were you aware that none of those records had been provided to him prior to November 26th, 1997?

A    No.

Q    In your mind, would that have been a problem that all that time had elapsed without Dr. Haney having records?

A    Yes.

Q    And I know these are difficult questions.

THE COURT:  Excuse me a second.  I need to catch up here.

(Pause)

Okay.  Go ahead.

MR. MORENO:  Thank you, Your Honor.

Q    (By Mr. Moreno)  I know these are difficult questions, and I do apologize in advance for the nature of some of them. But the fact that these records didn't get sent until

Thanksgiving of 1997, around Thanksgiving of '97, would that in part be a factor of sort of a lack of supervision on the people who were doing the -- developing the mitigation supposedly?

A   It would have been a failure on my part, Mr. Simon's part, and the both of us, yes.

Q   Okay.  All right.  I want to go back to Exhibit 330.  Do you recall having any direct contact with Dr. Haney prior to receiving this letter in January -- on January 13th of 1998 of any direct contact with him concerning the substance of his work in this case?

A   Not that I can -- Not that I can specifically recall.  I do remember having a difficult time reaching him; more than difficult, and I -- but I can't remember like on this date we got on the phone and we talked about this; on this date he said, "I'm flying into St. Louis and here's the work I'm going to do."

Q   Okay.

A   I don't remember that.

Q   All right.  And were you aware that -- that even before December of 1997 that Dr. Haney had not yet even been in to St. Louis to visit Mr. Allen?

A   I have to say I probably was because if he had come to visit, I'd have been with him.

Q   And at that time would you have been -- would you have

had to make the arrangements at the jail for Dr. Haney to see Mr. Allen?

A   Yeah, myself or Connie.  I mean -- I think that Dr. Haney, in the way that he conducts the mitigation work, he expects that there are a lot of soldiers out there and that they're doing all that stuff and they're meeting with people and they're funneling activities to him, and that was how it worked with the previous mitigation specialist I had.  And things would come to me and they would go to her, and there would be review of those things.

And I think that Dr. Haney's understanding of what and how the investigation would proceed was significantly different from what I -- how I thought it would proceed and, you know, it -- that was the communication issue and problem.

Q   All right.  The fact that Dr. Haney, however, had not been out to see Mr. Allen at all from when you retained him until when the, you know, the letter of January 13th came, do you think that was a red flag that there was something going on with the -- you know, wasn't going on with the mitigation investigation that should be?

A   Yes.

Q   Were there other red flags that the mitigation investigation was not -- not progressing, such as -- For instance, let me ask you:  Did Mr. Simon ever present you -- and I may have asked you this already -- with mitigation

witness interviews?

A    I mean I think all of those were haranguers of things to come. You know, part of the difficulty that I had and part of my own shortcoming was that I have tunnel vision when I'm working a case up and I didn't explore what were problems because I didn't believe that there were any until it was so late in the game. And like I said, once I realized that, I plunged into it like a teabag in boiling water.

Q    All right. So on the first page of Dr. Haney's report in Paragraph 2, he notes that he didn't receive a single document pertaining to the case until early October, '97, and that consisted only of a police report. Does that refresh your recollection? I know you said earlier you didn't ---

A    No, I don't have a reason to dispute it. I don't know for sure.

Q    Would that in your mind also be problematic, that the only record he received from October 1st to November 26th would have been a police report?

A    Yes.

Q    Is that sort of emblematic with the communication problem and what was ongoing?

A    Yes. I think Dr. Haney was used to, and in most cases that had been subject to federal trials at this point in time, was an extensive and expansive period of time between authorization and actual trial, and I -- I don't believe he

ever thought that it was going to go to trial in February.

Q    Okay.

A    So he probably was traveling around, doing his cases in Florida, whatever, without believing that, you know, the clock was ticking as quickly as it was.

Q    Now is that what you're surmising or is that based on a conversation you had with Dr. Haney?  Because I haven't seen any correspondence ---

A    It's based on a conversation I had with Dr. Haney.

Q    Okay.

THE COURT:  Well, the letter says or the one I saw said that he was expecting a lengthy continuance.  Somewhere in here I saw that.

MR. MORENO:  All right.

THE WITNESS:  That's -- That's -- That's accurate, Your Honor.

Q    (By Mr. Moreno)  All right.  Do you ---

THE WITNESS:  Now let me just make sure you understand.  That is a post-trial conversation.

Q    (By Mr. Moreno)  Okay.  Now did you ever tell Dr. Haney that you were going to be getting a lengthy continuance in this case?

A    No.

Q    As a matter of fact, you didn't believe you were going to get a lengthy continuance.  Is that correct?

A     I didn't think so.

Q     Okay.  So you wouldn't have told him ---

A     Judge Webber's reputation preceded him.

Q     So you didn't -- you didn't need to -- You wouldn't have told Dr. Haney to slow down and don't work because as far as you knew, you were going to trial in February.

A     No; no.  I wouldn't tell anybody that.

Q     Right, okay.  Now Dr. Haney also notes that he never received any -- and I believe it's on the second page, Subparagraph 4 -- he didn't receive any investigative -- not a single investigative report generated by your office.  To the best of your recollection, is that true?

A     You would have to really ask Mr. Simon that.  For example, I don't know if he sent him any of the tape recordings or any of those materials.  I just don't know.

Q     All right.  That's fair enough.  Would that be -- Did you ever see a single investigative report generated by Mr. Simon or Ms. Caspari concerning mitigation in this case?

A     Not that I can recall.  I wasn't sure whether there were any, but I don't recall seeing any.

Q     All right.  Now do you recall if anyone would have provided Dr. Haney with the prosecution's case in aggravation?

A     I would think and, again, I can't attest that this happened, but at least the -- My belief in terms of what the prosecution was going to present in their case in aggravation

was going to be the case in chief --

Q    Okay.

A    -- and that the aggravators that they had pled pretty well derived from the evidence that they anticipated to be able to produce in their case in chief and that any other evidence would not be an aggravation but in response to evidence in mitigation.

Q    Okay.  Now ---

A    But it would have been appropriate to provide him with the pleadings that listed -- at the very least that listed the aggravating circumstances.  I don't remember too much in the way of discovery that -- about the aggravating circumstances that they presented to -- they were going to present.

Q    Okay.  Now in this Subparagraph 4, he says he's received no information concerning the guilt phase case in chief or the prosecution case in aggravation.  Do you have any reason to doubt what Dr. Haney reports there?

A    Well, I know he's received some indication about the guilt phase, but I ---

Q    You're talking about the police report?

A    Yes, but -- but I don't know that he received the kind of information he anticipated or expected.

Q    All right.  And assuming the truth of that report by Dr. Haney, would that in your mind have been problematic?

A    Yes.  I mean I think that what's obvious here is that

there was a lack of communication to Dr. Haney and there was a lack of communication from Dr. Haney.  It would have been a lot -- It would have been a lot more productive if Dr. Haney had said, "Here's" -- and I'm not blaming the man, but "Here's how I perceive my role and here's how I want to try to work towards a specific goal which was present a good case in mitigation, and here's how I'd do it."  And that never happened.

Q    And do you ---

A    And that's my fault, too.

Q    Right.  And I -- I was just going to go there actually.

A    I saw that in your eyes.

Q    I don't recall seeing it.  Can you tell me:  Do you recall sending a letter to Dr. Haney where you outlined what you expected, what you were hoping he could accomplish, how on your end you were going to assist him with the case?

A    Not by me personally.

Q    Okay.  Do you recall that being done by anyone?

A    I don't know that Mr. Simon did it.  I doubt it.

Q    Okay.  So you haven't seen anything where there was a communication from the defense team to Dr. Haney stating, "This is what we expect; this is what we're hoping for.  If this is not, you know, consistent with what you do, please let us know."

A    I have not.  I -- There were times I got letters from

Mr. Simon, but I don't know what Mr. Simon's file had in it. I have no real idea of that.

Q    All right.  And would that -- You having been the one who retained Dr. Haney, would that have been your role, though, to convey to Dr. Haney what it was the defense was expecting?

A    My role was to do all of that.  You know, my responsibility was to do it or make sure it was done.

Q    Okay.  And in this case that didn't happen?

A    No.

Q    Now also on the second page of this document, Exhibit 330, Paragraph 5, the second paragraph within Subsection 5, he says, "In short, I have almost none of the information I or anyone would need to begin to develop mitigating themes in this case or any case."  When he sent you that letter, had that -- had you already realized that?

A    Yes.

Q    And that's earlier when you were talking about ---

A    I -- I believe I had even done an exploring as to who maybe we could find to try to replace Dr. Haney.

Q    Okay.  And is that when you were -- That time frame and the realization that nothing had been developed basically, was that what you were talking earlier about being shocked in December and January?

A    Yes.

Q    Okay.

MR. MORENO:  If I can just have one moment, Your Honor.

(Pause)

Q   (By Mr. Moreno)  Dr. Haney also stated that what had been provided to him was basically an extremely preliminary stage level of investigation.  Would that ---

A   That's what he described, yes.

Q   And would you agree with that?

A   Yes.

Q   Now the Government asked you during depositions, and they certainly alluded to it today in their opening, that it was a scheduling conflict that was a problem with Dr. Haney.  Was it a scheduling conflict or was that secondary to the fact that nothing had been developed by the defense team and provided to Dr. Haney?

MR. HOLTSHOUSER:  Judge, I'm going to object to the leading form of the question.

THE COURT:  Well, yeah, the first part is, but then he asks which was it.  Could you rephrase it?  The first part is leading.  Sustained.

MR. MORENO:  Sure.

Q   (By Mr. Moreno)  What was the true problem with Dr. Haney?  Was it that he had a conflict in his schedule or was it that information -- mitigation information had not been developed and provided to him in a timely manner?

A    Both of them may have been true.  I -- I don't -- I was asked about it at the deposition.  I don't specifically recall what the scheduling problem was.  I know he referred in the letter to cases in Florida.  I don't specifically recall having in mind that, you know, in February -- Well, they really would have been only important as to what he was doing in March in terms of coming in to testify or do something like that, but I think that the problem was that if he had a lousy schedule, it still wouldn't have meant that he'd done or we'd done the necessary footwork.

Q    Okay.  Now in terms of the -- the alleged conflict, if you look at Paragraph 1, I'll go back on this document. Dr. Haney reports that he wasn't able to return two recent calls by Ms. Caspari because he was in Florida working on another case and inaccessible for the entire week.  That, I believe, is the reference to Florida.  Did you see anywhere in this letter where he actually said he had a conflict and wasn't able to work on the case?

A    No.  I knew he did, though.  I knew -- When you can't reach somebody and there's all these gaps, there's definitely a scheduling issue.  I also was aware that Dr. Haney was traveling and working extensively on other cases, a lot of federal ones, and I was aware that he also had his obligations as a professor at the University of Santa Clara.

Q    And would it be fair to say you were aware of all that

prior to hiring him?

A    Not as much as I learned later on.  No, I wouldn't say that.

Q    Well, you knew ---

A    But I knew -- I knew to some extent of his reputation and I knew where he worked.  You know, I've always thought professors didn't have much to do but, you know, I may be wrong about that.

Q    But you knew, I would assume, from your contacts with Mr. McNally at the Resource -- the Capital Federal Resource Center that Dr. Haney was a mitigation expert who testified -- or was widely respected and testified in many cases?

A    Widely respected.  I can't really answer the question -- I don't recall the answer to the testimony, but widely respected, yes, and still is.

Q    All right.  And as it became clear that you were having problems reaching Dr. Haney, did you take any proactive step either by letter, Fed Ex, firing him and getting a new mitigation specialist earlier to sort of remedy the problems so that the case could be developed?

A    No.

Q    All right.  Now in this letter that he wrote you, do you recall if he indicates whether or not he was still willing to assist you?

A    I believe he was.

Q   Now in what practical way did the lack of communication with Dr. Haney undermine the penalty phase presentation -- preparation in this case, as best you can recall?  And if you're not going to give a good answer, ---

A   I'm having a hard time with the word "practical."

Q   Okay.  What was the -- How did it hurt the development of mitigation in this case?

A   Well, because there really wasn't one; that there -- You know, nothing -- It was -- You know, nothing had been developed from the information that we had.  What information we had secured had not been examined and evaluated for where it may go and what it might lead to --

Q   Now you ---

A   -- by an individual -- by individuals who have that as their expertise.  I mean I can look at something.  I can look at medical records, read them, try to make an assessment, but I'm not a psychologist; I'm not a psychiatrist.  Ninety percent of the time I don't understand what a psychologist says unless they've been drinking heavily.  And -- So it wouldn't have been something that I would have looked to to say, "Rick Sindel, you need to know exactly what this all means," but it would have been something that I should have filtered through.

Q   All right.  Now -- So when you realized in December or January -- December of '97, January of '98 that there had been

very little done in terms of developing mitigation, was that when you first realized that no one had -- had spent the time developing a rapport with the family and developing the sort of broad spectrum of issues you had discussed with the family in your initial meeting?

A    That would have been the first time that I realized it in terms of the extent of the problem that existed.

Q    In your experience ---

A    You know, I was -- I was talking to Mr. Simon about some of the things that he had developed and some of the things that he was exploring, but I -- I didn't debrief him.

Q    What do you mean?

A    Well, I didn't -- you know, I didn't say, you know, "I need to know all the specifics that you can tell me."  He would say, you know, "I saw Juanita and the family, and I did this and I did that."  And, you know, I would look for him to say, "Hey, there's something here that maybe we should look at."  I -- And we could have that back and forth about (A) how to develop it as a piece of evidence that becomes admissible and effective in a courtroom and (B) what investigation techniques do we need to utilize in order to get more information.

Q    All right.  So those conversations didn't happen.

A    Not like they should have.

Q    Okay.  Now in your experience, is it a long and difficult

process -- or is it a long and difficult process to elicit hard information from family members in the development of mitigation?

A    It can be.

Q    All right.  And is that something that -- Again, I think we talked about this earlier.  You expected either Dr. Haney or Mr. Simon to do that kind of legwork.

A    I would -- I knew that Mr. Simon was seeing Juanita and was seeing Billie's sisters and I think seeing other people, and I think I expected and anticipated that he was in regular communication with them.

Q    All right.  But beyond regular communication, did you expect that Mr. Simon was going to be sort of the on-the-ground guy who was going to be developing that rapport so that the tough issues could be addressed in sort of a healthy manner with the defense team?

A    Certainly that was one of his major roles.

Q    Okay.  So you foresaw that that's what he would be doing.

A    Yes.

Q    Okay.  Now were you aware that -- or are you aware, I guess, that Mr. Simon, his view on what his role in this case was different from yours?

A    I think he knew that his role had to do with working the mitigation aspect of the case.  I -- I can't speak for what Mr. Simon thought that meant.

Q    That's fine.  And I'm not asking you to comment on that. I guess what I'm getting at, and very inartfully, is:  If there was a misunderstanding between what you expected and what Mr. Simon heard you expected, would that also be a problem in terms of developing mitigation?

A    Yes.

Q    And would that be the kind of problem that really could derail a successful mitigation preparation?

A    It certainly could.

Q    All right.  And let's just assume for sake of this question right now that, in fact, there was an honest misunderstanding between you thinking that Mr. Simon was going to do development of mitigation, interview mitigation witnesses, develop the rapport, get the hard stuff, and Mr. Simon, who thought, "Well, that's not my role; that will be the mitigation specialist's role.  I'm going to meet family so that I can, you know, get to know them before they testify."  If there's that gap between the two of you, would that -- the responsibility for the failure of mitigation then to be developed fall to both you and Mr. Simon?

THE COURT:  Okay.  Wait a minute because I'm confused.  There's two or three questions.  Do you understand the question?

THE WITNESS:  I'm going to answer the question, and then you can decide if I understand it.

THE COURT: Okay; all right.

A    If you're really going to do your job on these kinds of cases, there shouldn't be any gaps. It should be seamless.

Q    (By Mr. Moreno) And to make something seamless, would that require --

A    Communication?

Q    Yes.

A    Effort? You know, a level of respect, yes.

Q    All right. Now do you think that the level of communication between you and Mr. Simon was adequate in this case regarding the development of mitigation?

A    I don't think it could have been. Otherwise, we might not be here.

Q    Okay. Now you were asked in your deposition to sort of describe the mitigation that you had developed, and you said ---

A    I'm sorry. Say that again.

Q    I'm sorry; yeah. During your deposition you were asked how would you describe the mitigation, and you answered, "It was bare bones."

THE COURT: Yeah, let's -- let's not do that.

MR. MORENO: Let's not do that? Okay.

A    He's going to stop you again.

Q    (By Mr. Moreno) All right. How would you describe the mitigation that you -- that you had developed prior to January

13th of 1998?

A    I mean I think that we had a framework, and that was about it.

Q    Okay.

     MR. MORENO:  I apologize, Your Honor.

Q    (By Mr. Moreno)  All right.  Now after Dr. Randall joined your team, how did you -- how did you foresee what you and he were going to -- how were you going to approach the monstrous task at hand with the short timeframe that you -- that you had?

A    Well, I think the first thing was to talk with Dr. Randall about, you know, how he planned or hoped to be able to handle his investigation to get from him a reasonable expectation of what he thought he could do within a certain timeframe and then return to court to see if we could get additional time in order to accomplish that task.

Q    Okay.  And we all know you didn't get additional time.

A    That's correct.

Q    Once that was clear, what sort of approach did you and Dr. Randall take to try and put together a mitigation case in a very short period of time?

A    We met regularly.  We talked regularly.  We -- He would inform me about what he was finding out, what he was developing, what he had secured from his review of the school records, some of the medical records.  He was interviewing

family.  So he was doing all the work that I had thought had been done.

Q    All right.  So he was doing a little catch-up at the time as well?

A    Major.

Q    Now given the short timeframe, was some of what you guys were doing -- "you guys" meaning you and Dr. Randall and maybe even John Simon; I don't know -- more sort of coordinating and consolidating information?

A    Well, I -- I wouldn't -- I wouldn't necessarily phrase it that way.  I mean I think that there was definitely discussions about where the mitigation case should be headed, what direction the evidence would point to.  So it wasn't just learning about it.  There were definite discussions.  I -- I don't remember Mr. Simon participating in many of those, but Randall and I -- Dr. Randall and I talked extensively.

Q    And you were quite pleased with Dr. Randall's work --

A    Yes.

Q    -- and effort in this case, correct?

A    He has a tremendous work ethic.

Q    Now given that you were still preparing for the guilt phase which was imminent, was Dr. Haney -- excuse me -- Dr. Randall the individual who was primarily responsible for conducting the interviews and then coming to discuss it with you?

A    I don't think anybody else besides he and I did that.

Q    Okay.  Now when you met with the witnesses, they were witnesses that Dr. Randall brought to you.  Is that correct?

A    That's correct.

Q    All right.  And those sessions would have been after Dr. Randall had first interviewed them?

A    I'm sure that's correct.

Q    Do you remember there being, I think, a weekend or so before the penalty phase?  There being a sort of interview scheduled for Saturday and Sunday where you and Dr. Randall brought in, you know, numerous witnesses to sort of meet and prep?

A    I do.

Q    All right.  And was that when you decided who you were going to call and who you weren't going to call based on how those sessions went?

A    That was certainly instrumental in making that decision. I don't know that we sat down and said, "We're going to jettison this person," or, "We need to see about talking to this person specifically," but we -- we had a significant sense of where we were going to direct the mitigation case and what goals we had in mind and who we were going to use to try to reach those goals.

Q    Okay.  And those meetings at your office, those weekend sessions and some of the weeknights when Dr. Randall would

bring witnesses to your office, that's when you got a feel or met the witnesses and got a feel for what they could provide.

A   Much more so than before his involvement.

Q   Okay.  So would it be fair to say that it was Dr. Randall who was out doing the interviews and then bringing the witnesses to you, given the short time constraints you guys were working under and your other responsibilities?

A   Say that again.

Q   Sure.  Would it be fair to say that Dr. Randall was the individual who was actually interviewing the witnesses and then bringing them to you for you to meet and interview?

A   Yes.  I mean during this time I was in court from 8:00 to 5:00, 5:30, 6:00.  We were picking a jury.  The Government was presenting its evidence.  So a lot of the contacts with Dr. Randall would occur over the lunch hour and would occur after the court session was over that day at my office or wherever he was staying to sort of see what the progress was.

Q   Okay.  So while you were in court, he was out sort of hitting the street and doing the investigation.

A   He was beating the bushes.

Q   Okay.  Now among the many things the Government is arguing, sort of a theme is that you guys presented 36 witnesses, 2 experts.  You know, you brought in a parade of people.  This is not deficient performance.  In your opinion, in your experience, does volume supplant substance in

mitigation presentation?

A    It doesn't in any presentation.

Q    All right.  How -- I think you even stated that -- Well, after Dr. Randall joined the case and hit the ground running and put in his 423 hours, had you been able to accomplish more than really scratching the surface even in that -- you know, at that time frame?

A    You're talking about today do I realize that?

Q    Yeah.

A    Yeah.

Q    Okay.

THE COURT:  Wait.  Let me -- I'm not sure I understood.  Just a second.

(An off-the-record discussion was held between The Court and the court reporter regarding Windows automatic computer update messages popping up on the realtime monitor.)

THE WITNESS:  May I supplement that answer?

THE COURT:  Wait a minute.

Now so I understand, the question was, "You were able to accomplish more than scratch the surface."  And then the answer was, "Now?  Do I understand that now?"  And you said, "Yes."  So you -- My question -- My problem I'm having, and maybe it's semantic, did you think you were able to more than scratch the surface or not?

THE WITNESS:  At the time?

THE COURT: Yeah.

THE WITNESS: Yes.

THE COURT: No, no, no. That wasn't the question. As of now.

THE WITNESS: As of today, I don't think that we developed the kind of mitigation evidence that the team that Mr. Moreno's on had developed for presentation to the jury. At the time of the penalty phase, my belief was not the same.

THE COURT: Okay. Okay. Go ahead.

MR. MORENO: Should I proceed?

THE COURT: Yeah.

MR. MORENO: Thank you.

Q   (By Mr. Moreno) Now looking back at the time of trial when you were doing this, you were sort of between a rock and a hard place when you were coming up with mitigation at the end. Would that be fair?

MR. HOLTSHOUSER: I'm going to object to that.

A   I'm not sure what you mean.

Q   (By Mr. Moreno) Okay.

MR. HOLTSHOUSER: Judge, I'm going to object to the continual leading form of the questions.

THE COURT: Yeah, it is leading. It is leading.

THE WITNESS: Well, I didn't understand it, anyhow, so ---

THE COURT: It is leading. Sustained.

Q    (By Mr. Moreno)   When you were involved in a difficult trial where there are difficult facts and you're in the moment of the hearing, do you believe that regardless of objectively how bad it might look, you can prevail?

A    Whew.

THE COURT:  Do you understand the question?

A    If you're asking me whether or not I have a certain level of confidence in what I can do in a courtroom, never until I'm there.

Q    (By Mr. Moreno)   I guess what I'm trying to ask is:  When you're doing a difficult task and it's daunting, and you accomplish some aspect of it, do you -- Well, let me rephrase it this way.  I'm trying to get at it.

When I'm doing a hearing, I get hearing psychosis; "We're going to win," and things come out well, and then you step back and you can see it a little differently.  Was that sort of -- You know, when you were in the moment and you had been able to put on a mitigation case and you came in with 36 witnesses, that felt good, given where you were at a month earlier.  Would that be fair to say?

A    That's true.

MR. HOLTSHOUSER:  I'm going to object.  It's a leading speech.

THE COURT:  It is leading, yes.

MR. HOLTSHOUSER:  It is a leading speech and not a

question.

THE COURT:  It is totally leading, yes.  Sustained. Please just ask -- Please don't lead.

MR. MORENO:  Sure.

Q    (By Mr. Moreno)  Did you have a -- Do you recall if you had a feeling of satisfaction when you were done with presenting the penalty phase?

A    I did.

Q    All right.  And do you recall whether or not some of that satisfaction derived from how hard you had to work in a short period of time to get there?

A    I don't think I derived any satisfaction from having worked 20 hours a day, but I derived some satisfaction believing that we had presented a good case in mitigation.

Q    All right.  And that case in mitigation, was that -- Well, what was the mitigation theme?

A    There are multiple themes.  We wanted to talk a little bit about the neighborhood that Billie grew up in, the kind of environment that he was subjected to by living there.  We wanted to develop the themes that occurred in terms of his educational failures.  And we had front-loaded into the case the argument that Billie wasn't the shooter, and I had worked during the guilt phase to make that an issue in the case, even though it would not have exonerated him from the criminal event.  So that was part of the mitigation theory.

So there was a lot that was presented about him being a follower. We wanted to get the concept across to the jury that Norris Holder was the brains behind the operation, had the inside person in the bank that helped coordinate with him exactly how to do it, what to do, where to find the money, all that kind of stuff. And we wanted to develop the idea that there were people that cared about Billie and that whose life would be affected if -- if he were to be executed. And we wanted to develop that there was more to Billie Allen than, you know, this guy who walked into this bank and committed this crime and that we wanted to try to develop what we could that told the jury that he was worth saving.

Q    And was a lot of that theme predicated on witnesses talking about what a -- you know, what a good guy Billie was basically?

A    Yeah. I mean I don't think we were looking to say, "He's a good guy." I think we were looking to say that here's some of the reasons he got to where he was and here's some of the decisions he's made at other aspects of his life, so that this was more of an aberration than it was a continuing pattern and that he had some benefit that he could give back.

Q    So his character was a prominent feature in your mitigation presentation.

A    Well, if you say "character" is his personality traits, I would agree with that.

Q    Okay.  All right.  In your experience, is it -- Well, in this case, given the timeframe that you and Dr. Randall were working in once Dr. Randall joined the defense team, did you have the time to do what you would consider to be a thorough, detailed mitigation investigation?

A    No.

Q    All right.  The evidence that you presented at the penalty phase, was that the result of the thorough and detailed mitigation investigation?

A    Say that -- Say that last part again.

Q    Was the evidence you presented at the penalty phase the result of a thorough and detailed penalty phase investigation?

A    The evidence we presented was the result of as thorough and as detailed an investigation that we humanly could conduct under the circumstances.

Q    So in 40 days or so.

A    That's what I believe, yes.

Q    All right.  Is it your belief that 40 days is an adequate amount of time to develop a thorough and detailed penalty phase mitigation case?

A    No.

Q    Okay.

A    And especially in light of some of the complications that existed in this particular case that were somewhat unusual to this defendant.

Q    Like what?

A    Well, I think the psychological components; you know, some of the communication issues that went on between Billie and I that made that timeframe even more compressed.

Q    The 40-day timeframe?

A    Yes.

Q    Okay.  Now do you recall getting from Mrs. Allen names and addresses of potential witnesses?

A    Yes.

Q    All right.  And do you recall receiving from some of those witnesses statements, you know, about Billie in support of a life sentence?

A    I'm going to say "yes," and the only reason I hesitate is because I don't know for sure what was on the list today as I talked to you and what statements that we secured.  But, obviously, if they participated in the trial, yeah, I got statements from them.

Q    Okay.  All right.  Looking at Joint Exhibit 306 which is up on the screen, --

A    Yep.

Q    -- it's dated April 25th, 1997.  It's to Ms. Juanita Allen and it's from you.

A    Yes.

Q    Does that look like information that -- You're asking her to provide you with information regarding those witnesses.  Is

that correct?

A    Yes.

Q    All right.  And to the best of your recollection, she was cooperative in those efforts, was she not?

A    I -- I don't recall.

Q    Okay.

A    In other words, I -- as I sit here today, I don't recall that she gave me contact information for Marquis Taylor.

Q    Okay.

A    I thought Marquis may have been the young man that was dead.

Q    He was.  I assumed it was the family address.

A    But I mean I can't specifically say, yeah, she called me up or wrote me a letter or came into my office and sat down and said, "Here's a Rachelle on the list."

Q    All right.  Now -- But you do recall getting some letters from friends of Mr. Allen, --

A    Yes.

Q    -- solicited by Mrs. -- Mrs. Allen.

A    Yes.

Q    All right.  And to the best of your recollection, were those -- the content of those letters consistent with the mitigation theme you presented at the time of trial?

A    I can't remember.

        MR. MORENO:  If I can have just a moment, Your Honor.

THE COURT: Sure. Why don't we take the lunch break now.

MR. MORENO: Okay. That's fine.

THE COURT: Court will be in recess until 1:00.

(Court recessed for lunch from 11:57 AM until 1:00 PM.)

THE COURT: Whenever you're ready.

MR. MORENO: Okay. We're waiting on the witness. I apologize for the delay.

THE COURT: That's all right.

(Pause)

THE COURT: Whenever you're ready, sir.

MR. MORENO: Thank you, Your Honor.

Q    (By Mr. Moreno)  Good afternoon, Mr. Sindel.

A    Good afternoon.

Q    I want to turn now and talk for a few minutes about Dr. Cuneo.

A    Okay.

Q    Dr. Cuneo, what was -- what did you hire him for?  What was his purpose when you first hired him?

A    You know, I -- I don't know what the motion that was filed with the Court expressed for the purpose of hiring him, but it was certainly for psychological input into the case, including competency.  I will tell you I didn't have any real significant belief that Billie Allen was incompetent, but I

had a belief that he was not psychologically free to make appropriate choices.

Q    Okay.  So the purpose of the evaluation, I think as reflected in Dr. Cuneo's report, is it was basically a fitness and competency?

A    And looking for various psychological issues that may be presented to address those concerns.

Q    Right, to address those particular concerns.  And would it be fair to say that the purpose of hiring Dr. Cuneo was not to do a mitigation interview evaluation?

A    It wasn't -- It certainly wasn't a specific area that we asked him to specifically address.

Q    All right.

A    Anything that folded into the mitigation would have been used or evaluated for use.

Q    All right.

A    But the -- I don't think he undertook the task with the idea of the kind of global issues that would be appropriate to address in a -- in a mitigation role.

Q    Okay.  Would it be fair to say that it wasn't your intent for him to do that?  Your intent for him was to evaluate fitness and competency?

        MR. HOLTSHOUSER:  I'm going to object unless we can have a specification of time period.

        MR. MORENO:  We're talking about I believe --

Q      (By Mr. Moreno) Do you recall when Dr. Cuneo went out to see ---

A      I don't.

Q      Does it reflect -- Do you believe that maybe it was in January of '98?

A      I don't know.

Q      So assume for this question that his report is issued or his report indicates that he saw Billie Allen on January 16 of 1998, and he saw him for a competency/fitness evaluation.  Do you believe that that was the purpose of what he went out to do?  Is that what you asked him to go do at that point in time?

A      I -- I think it's probably more accurate to label that what we asked him to do is to give us some information concerning the psychology of this man.  However, it was more directed to the issue of competency probably than the issue of mitigation.

Q      All right.  Would it be fair to say --

A      And I'm not ---

Q      I'm sorry.  Go ahead.

A      Anything that Dr. Cuneo developed that might be appropriate to mitigation, we would use.

Q      Sure.

A      It was not -- He was not in a separate container, but I don't know that he was sufficiently apprised of what we might

be able to use as opposed to what he was supposed to do.

Q    Do you recall that there came a point in time after he did the competency and fitness evaluation that then you asked him to consider potential mitigating factors after he had already done the evaluation?

A    Either I did or Dr. Randall did, and I think that Dr. Randall was the motivating factor behind that.

Q    Okay.  And would that lead you to believe that the initial purpose behind Dr. Cuneo really was fitness and competency?

A    I don't think it covered all the areas it could have covered.

Q    I'm sorry.  Can you explain that?

A    I mean it -- I think Dr. Cuneo went out to do an evaluation examination that was primarily focused on competency issues, but, again, it could have impacted and been relevant to the mitigation proceeding.  So it wasn't one or the other.  However, I don't think he was given enough direction to consider perhaps all the different tests, the WAIS, the WISC, the MMPI, the -- I can't even remember all the names of them, but there's a bunch of them that might have been appropriate to do in order to get a fuller evaluation of Billie earlier in the game.

Q    So if he's doing an evaluation on January 16th of 1998, would you consider that to be late in the game?

A    Yep; yes.

Q    Now when you asked -- later asked Dr. Cuneo to comment on potential areas of mitigation, do you recall whether or not he had an opportunity to actually go and do a mitigation evaluation of Mr. Allen?

A    Of Mr. Allen?

Q    Yes.

A    I do not recall that specifically.

Q    Okay.  So you're saying you don't recall whether he did or didn't, or you don't recall that he didn't?

A    I don't recall whether he went out and did a subsequent evaluation of Billie Allen or not.  I just don't remember. I'm sure he could tell you.

Q    I'm sorry?

A    I'm sure he could tell you.

Q    Yes.

A    I'm sorry, but I just don't remember.

Q    If the record reflects that Dr. Cuneo did not actually conduct any personal mitigation evaluation of Mr. Allen, would that have been, in your mind, a problem in presenting him as a mitigation expert?

A    It could have been.

Q    Is it a problem when an expert testifies about a particular subject area that they have not done an evaluation of a client on?

A    Yes.

Q    All right.  And that's what happened -- Assuming for this question that the record reflects that Dr. Cuneo did not conduct a second evaluation, a mitigation evaluation of Mr. Allen, is that then what would have happened in this case?

A    His testimony would not have been as effective.

Q    Now had you ever worked with Dr. Cuneo before this time?

A    I think I have, but I can't be sure.  I remember I had him evaluate the Missouri Sexual Offenders Program sort of as a lever to try to make sure that my client got released from that program, which wasn't happening, but not -- I don't remember using him in the same capacity as we had used him in Billie's case.

Q    Do you recall whether or not Dr. Cuneo's primary area of practice at that time was competency and fitness?

A    I did not know that was his primary area of practice, no. I knew he did a lot of it, but I didn't -- I didn't know he did one as opposed to another.

Q    And did the idea of retaining someone to do a competency and fitness evaluation of Mr. Allen in January of 1998, did that -- was that your idea or did that come as a recommendation from Dr. Randall?

A    I'm sure it was -- Well, I think Dr. Randall wasn't in the case on January 13th.  I'm not positive of that.  But if Dr. Randall was in the case, it would have been something he

and I discussed.

Q    So if Dr. Cuneo had not conducted a mitigation evaluation of Mr. Allen, would his testimony then have been based upon his competency evaluation and perhaps record review?

A    Yes.  It would have been based on the evaluation and anything he observed during the course of that evaluation and any records that he had.  Whether they touched upon competency or something else, I mean I didn't call him at the mitigation phase and say, "Billie's incompetent."  But I'm assuming, and I may be wrong, that a psychologist can evaluate people for things other than whether they understand how the legal system works, what a lawyer's role will be in court, what a judge's role will be in court, those kind of standard competency questions.  That's not what I was looking for.  But I mean -- And that may not be what I got, but that -- I didn't need answers to those questions.

Q    All right.  So even if Dr. Cuneo's report indicates that it was a competency and fitness exam, your testimony today would be that you hired him for a broader purpose?

A    I think what you're assuming in your question, and I'm not trying to battle with you here.

Q    No, no, no.  It's all good.

A    No; that's okay.  Is whether there were any specific directives to only determine competency.  I don't think that ever happened.  I think that that may have been more of his

focus, and that may be appropriate because of what he was told. And I don't recall those conversations. I don't remember Doctor -- whether Mr. Simon had him or not, but I didn't feel the need to get the answers to the basic questions that the Court would evaluate in determining whether or not this man can stand trial.

Q All right. Would you -- In your opinion, is waiting until a few weeks before the trial starts to retain a mental health expert in a case such as this, is that problematic for the proper and thorough presentation of mitigation?

A It could be and it was.

Q And it was, all right.

MR. MORENO: Can I have one moment, Your Honor?

THE COURT: Sure.

MR. MORENO: I'm sorry.

Q (By Mr. Moreno) All right. I have just put up on the screen Joint Exhibit 103. Do you see that?

A (Affirmative gesture). Yes.

Q That is a letter from Dr. Daniel J. Cuneo to you dated February 16th, 1998, and could you read the first line of the letter for us, please?

A "At your request, on January 16th, 1998, I evaluated Mr. Billie Allen at Franklin County Jail for the purpose of establishing an opinion as to his competency to stand trial."

Q All right. So at least from Dr. Cuneo's impression of

this phone conversation with you, is it fair to say he went there with the purpose of evaluating Mr. Allen for competency?

A    My problem with the question is that there's a lot of materials that are reviewed that don't specifically, I think, touch upon his competency.  And there's a reference towards the end of the letter, "I have not finished this assessment. Still will be reviewing additional information for that."  And so it is, obviously, a reference to Dr. Randall in this letter of February 16th.  So there -- Again, there may just have been an overlap of what we were thinking and what we were doing.

Q    Okay.  But ---

A    I don't -- I don't -- I'm not saying that he didn't go out there with the idea of assessing his competency, but I do think that we were anticipating just more than that simple inquiry.

Q    Okay.  But per his letter, you would agree he saw his task as evaluating for competency?

A    In his first sentence, yeah.  As it goes through the rest of the letter, I think it's a little softer.

Q    Well, you provided him with a lot of information.

A    Yes.

Q    You provided him with records you had, correct?

A    Yes.

Q    Now in your experience as a criminal defense lawyer in assessing a defendant's competency, do you rely just -- are

you comfortable relying just on the face-to-face evaluation a psychiatrist or psychologist may have as opposed to an evaluation coupled with records review?

A    Well, I think you want to produce the police reports. They're going to want those.  The evaluations I'm most familiar with that occur within the state hospital facility here, I'm not sure -- I can't remember offhand because I just do many competency cases, but what they generally get -- but I am assuming that they're going to rely primarily on their interview, their evaluation, any behavior they see in the police reports, and any testing that they can do of the individual's intellect or ability to understand.

Q    Okay.  Now would you agree that an assessment, a evaluation and an opinion is only as good as the material that's provided?

A    No.

Q    So you ---

A    Let me just explain.

Q    Okay.

A    When you ask that question, I think that certain doctors and psychologists and experts, you know, have a tremendous ability and tremendous grasp to go in places where you never even thought of.  But that being said, you don't specifically withhold data or information if you want a complete and reliable evaluation.

Q    I agree with you, but I wasn't asking about that.  I guess what I'm asking is:  Do you agree with the overall concept that a determination by a doctor of anything, be it a mental health diagnosis or whether or not someone is fit and competent to stand trial, is stronger with the more information they have to assess and evaluate?

A    Absolutely.

Q    Okay.  So -- And to that end, you provided Dr. Cuneo with what records you had available at that time?

A    I don't have any specific recollection other than from this letter of what he was provided, but I would assume that we provided him with all the records that may have touched upon those issues.

Q    Okay.  And on Page 2 of this report, Dr. Cuneo notes that his mental status exam revealed Mr. Allen to be oriented in all three spheres.

THE COURT:  Where are you on the page?

MR. MORENO:  First full paragraph on Page 2, Your Honor.

THE COURT:  All right.

MR. MORENO:  I'm sorry about that.

Q    (By Mr. Moreno)  And that he could identify the day of the week, the month, the year.  Does that sound like questions designed to assess fitness and competency?

A    Yes, it does.

Q    All right.  The third paragraph, he says, "His thinking itself is neither loose, nor tangential as he could rationally and coherently respond to questions."  That sounds like a competency and fitness question.  Would you agree?

A    Yes.

Q    All right.  It says, "His memory, both short-term and long-term, was somewhat impaired.  He could repeat numbers accurately; five numbers forward, four back."  Those sound like assessments for competency and fitness as well, correct?

A    Yes.

Q    Then it says, "He was functioning at the low end of the IQ range."  That would also be part of competency and fitness?

A    It would.

Q    Okay.  Then he sort of does a review of Mr. Allen's history concerning school, substance abuse, and prior mental health treatment.  Is that correct?

A    I'm sorry.  Say that again, please.  I was ---

Q    School, substance abuse, and mental health history.

A    There is a reference to some of the school's circumstances and the medical condition, the use of marijuana, the death of Marquis.  It also deals with his medication history.

Q    Okay, and then the mental health treatment.  And at the bottom, the last full paragraph, "his prior involvement with the law."

A    Say that again now.

Q    The last paragraph, full paragraph, "his prior involvement with the law."

A    That's correct.

Q    All right.  And these are pretty typical areas that are explored during the competency and fitness exam?

A    The reason I'm hesitating is because I'm trying to think of the last time I had a competency evaluation other than this one.  So I'm going to say the answer to that question is "yes," --

Q    Okay.

A    -- but I could be missing something.

Q    All right.  Now on Page 5 of this report, which is up on the screen right now, he diagnoses Mr. Allen with a number of diagnoses, correct?

A    Yes.

Q    Both Axis I, II, and III.  And then on the second full paragraph of that -- of this page, could you read the first sentence for us?

A    "It would be my opinion that Mr. Allen's mental illness, post-traumatic stress disorder, chronic cannabis-dependence in a controlled environment, rule out Dementia NOS, nor does" -- let's see -- "does not substantially impair his ability to understand the nature and purpose of the proceedings against him and assist in his own defense."

Q   Okay.  That's competency -- That's a conclusion that goes to his competency and fitness to stand trial.  Is that correct?

A   That's correct.

Q   He states that, "He does appreciate his presence in relation to person, place, and things insofar as he's oriented in all three spheres."  That would be competency and fitness, correct?

A   That is correct.

Q   It says, "He does know that he's charged with criminal offenses, can name them, and knows what he has to go to on trial on these charges."  That would be fitness and competency.

MR. HOLTSHOUSER:  Judge, I'm going to object.  I think the letter speaks for itself.  At this point Mr. Sindel has indicated he's not really an expert on competency hearings.  The letter says what it says, and the rest of this is leading and argumentative.

THE COURT:  Well, yes, I agree, but it is counsel's opportunity to try to show that this particular expert was only hired in the defense view for one limited purpose.  And so I'm going to overrule it, not because your objection is not legally correct, but I'm willing to hear it.  Overruled.

MR. HOLTSHOUSER:  Thank you, Your Honor.

Q   (By Mr. Moreno)  That would be a question that's geared

towards competency and fitness as well?

A    That's correct.

Q    Okay.  All right.  Do you see anything in this letter that we looked at so far that -- that indicates Dr. Cuneo was evaluating Mr. Allen for mitigation purposes?

THE COURT:  If you want, I'll -- I think it's roughly five pages.  If you want to take some time to look at the whole thing before you answer, you may do so.

A    Well, I guess I would probably have to read the entire thing.  I did read here a section on this page or the previous page that I think touched upon different areas other than competency.  But I -- I mean it -- I suppose cautiously, I'll say, that the -- certainly the primary thrust of the evaluation that he's reported here deals with the issue of competency.

Q    Okay.

A    I don't know what the next page says.

Q    Well, let's take a look.  The last sentence of that paragraph, can you read that, the "Therefore"?

A    That definitely deals with competency.

Q    Okay.  And that's his conclusion in his report?

A    Excuse me?

Q    Is that his conclusion in this report?

A    That is he's competent to proceed, that's correct.

Q    Okay.

MR. MORENO:  If I can have just a moment.

Q    (By Mr. Moreno)  Turning to this first page here.

A    He does indicate on the first page, "I was asked to look at possible mitigation factors."

Q    Right.  "Two weeks ago," right?

A    That's correct.

Q    So that would be February 7th, right?

A    Right.

Q    Okay.  He was asked to evaluate possible mitigating factors.  Then he says, "I've not finished this assessment and still will be receiving additional information.  Therefore, this report will primarily deal with his competency to stand trial."

A    Right.  And so I mean what I would say that I anticipated from reading this letter is that there would be a follow-up evaluation in that regard, but this letter dealt primarily with the competency.

Q    Okay.  And to the best of your recollection, was there ever a follow-up mitigation evaluation by Dr. Cuneo of Mr. Allen?

A    I don't recall a report.  I don't feel comfortable asking -- answering whether or not Cuneo did a complete, thorough or any evaluation for the mitigation.  I know that he was, in this letter at least, indicating that that was something that he was going to do, but we're too late in the

game.

Q    What do you mean "too late in the game"?

A    February 16th.

Q    The trial had already started?

A    Right.

Q    In your experience, is a mental health professional usually brought into a case, if one is going to be brought into a case, well before the start of trial?

A    Yes.

Q    All right.  And in this case who, in your opinion, would have had the responsibility of sort of identifying what potential mental health expert you might want to retain?

A    Well, the final responsibility as lead counsel falls on me.

Q    Right, okay.  And given you believed that prior to this, prior to the end of December, January, that Mr. Simon and Dr. Haney were conducting the mitigation development, in your practice, would it have been -- how would that have worked? Would you have expected Mr. Simon to make a recommendation to you, you know, with input from Dr. Haney that "We might need a mental health professional in these particular areas"?  How does that normally work?  How did you expect that to work in this case, I guess?

A    Well, I would have expected that Mr. Simon would have done one of two things, which either one of them would have

been appropriate:  "Consult with me and say what do you think about doing this," or, you know, "In my evaluation and interviewing Billie and talking to the people who've talked to me, I think we need a psych exam."  Either one would have been fine.

Q    All right.  And did either of those happen in this case?

A    No.

Q    Okay.  If Dr. Cuneo testified that he never evaluated, you know, did a personal evaluation of Mr. Allen for mitigation, would that be a failure in this case on the defense team's part?

A    Well, I think that certainly in light of what I know now, a more complete psychological examination could have been beneficial to our mitigation presentation.

Q    And even with what you knew -- Well, let me withdraw that.

A    If -- The answer may best be stated in that there's no such thing as too much information.

Q    All right.  Now at the time that Dr. Cuneo went out and saw Mr. Allen, did you feel at that point in time that the ship was sinking?

A    Let me just put it to you this way:  I felt like we were bailing water.  I had a lot of faith in Dr. Randall and, unfortunately, I had a lot of faith in myself.  My faith in Dr. Randall was not misplaced and certainly my faith in myself

was.

Q    Now do you recall whether or not you personally had an opportunity prior to December of 1997 to review some of the records about Billie, his medical records, maybe some of his school records?

A    I'm almost positive I did.

Q    All right.  So do you recall whether in your review of those records, as you sit here today, do you remember knowing before December and January that Billie -- Mr. Allen had been exposed to lead and had been treated for lead exposure?

A    Yes.

Q    And were you aware that he had been treated for Pica or Pica?

A    Yes.

Q    Would there have been a reason with that knowledge -- And, again, I'm not trying to be difficult, but with that knowledge, would there have been a reason why a neuropsychologist was not retained until trial was already under way?

A    No.

Q    Okay.  Would there have been a strategic and tactical reason for not bringing a neuropsychologist in until trial was already under way?

A    As I've testified, there's no such thing as too much information.

Q    So that's a "no"?

A    That's a "no."

Q    Okay.  Now who did you ultimately retain to do the neuropsychological evaluation?

A    Dr. Gelbort.

Q    Okay.  All right.  And Dr. Gelbort's from Chicago, correct?

A    I believe so, yes.

Q    Does that sound right?  Do you recall whether Dr. Gelbort was working within a truncated time frame?

A    Everybody was.

Q    And do you think that working within that truncated time frame in any way impacted his ability to do this -- do his job thoroughly?

A    He'd be the best person to answer that question, but I think that anyone who is working under intense pressure in a short time frame is -- the quality of their work is going to be affected.

Q    All right.  I'd like to talk to you for a few minutes about your contacts with Mr. Allen's family and, in particular, his mom, Juanita Allen.

A    Okay.

Q    So do you recall -- We talked about this briefly earlier, but do you recall after you were appointed to the case how long it was before you saw Mrs. Allen?

A    I -- I -- I would be surprised if it was maybe longer than a week after I was appointed.  It was -- It was early.

Q    All right.  And besides meeting her in person, did you also speak with her on the phone?

A    Yes.

Q    And did you correspond with her?

A    Yes.

Q    As a matter of fact, was a lot of your interactions with Mrs. Allen by correspondence?

A    A fair amount was, yes.

Q    Okay.  Now as best you can recall today, was Mrs. Allen cooperative with you?

A    I would say for the most part, yes.

Q    Okay.  She was cooperative with you about mitigation?

A    Yes.

Q    And do you recall if she provided you with the names and contact information for potential mitigation witnesses?

A    As -- As -- She certainly provided me with names and addresses of people that could be used in mitigation, sure.

Q    And some of that information, do you recall if it was provided at your request?  You asked her to do that and she did?

A    Yes.

Q    Do you recall if she provided you with information about where Mr. Allen attended schools?

A    Yes.

Q    Did she provide you with information about where he may have been hospitalized?

A    Yes.

Q    Did she provide you with information about medical problems?

A    Yes.

Q    Okay.  And I think Mr. Holtshouser referenced it in his opening, but did you find her to be credible?

A    To be what?  I'm sorry.

Q    Credible.

A    Yeah, I think so.

Q    Okay.  Do you recall a time when she ever refused to help you?

A    You had phrased that question, "Do I recall."  I know that there were some issues that developed because I think there was some concern about whether -- the level of our belief that Billie didn't commit this crime, and I remember there was a lot of back and forth about that, but I found her -- I don't think that's being uncooperative.

Q    All right.  So she was -- she was concerned that you weren't a true believer in Billie's innocence?

A    Yes, and she was concerned that our focus was not on complete exoneration.

Q    Okay.  That said, with the issues and questions you asked

her about mitigation, she cooperated with you?

A    Yes.

Q    All right.  I've put up on the screen Exhibit 309.  Do you see that there?  That's a letter from you to Mrs. Allen dated May 7th, 1997?

A    Yes.

Q    That would be early on in your representation of Mr. Allen, correct?

A    About a month.

Q    Okay.  And in that letter you indicate that you've received very warm and kind letters about Billie from a number of different people, correct?

A    That's correct.

Q    All right.  The names that are listed there, do you recall:  Are those the names of the people who you received letters from?

A    I don't recall.

Q    Okay.

A    I -- Within the context of the letter, that appears to be correct.  They may also be people I got letters from that did have names and addresses on them or this could have been information that I received from Billie about certain people.

Q    Okay.  But, in fact, with the help of Mrs. Allen, you did receive letters in support of Billie?

A    Yes.

Q    All right.  And that would have been per your request?

A    Yes.

Q    Now I think we talked about this a little earlier, but I want to make sure in my own mind that we've covered it.

Your role in your mind in terms of your dealings with Mrs. Allen and the family was more on the generalities and periphery of mitigation.  Is that correct?

MR. HOLTSHOUSER:  Objection; leading.

THE COURT:  Sustained.

Q    (By Mr. Moreno)  How would you characterize your role with Mrs. Allen?

A    Well, I think my initial role with her was to try to explain the system and determine if there were things that we could develop at that stage of the proceeding that we could use, you know, at both the guilt and mitigation investigation.

When Mr. Simon came on, I believed that he was going to take on that responsibility more.  I know that sometimes we did joint investigations and interviews with Mrs. Allen.  I know we did at least one or two at her house.

Q    When you say "joint," what do you mean?

A    Mr. Simon and I together.

Q    Okay.

A    And there were, I think, other family -- There's a group of the family there, but I would say that I relied on Mr. Simon to perform that role much more than I relied on

myself.

Q   Now the fact that those type of relationships had not been developed by Mr. Simon or, for that matter, Dr. Haney prior to the entry of Dr. Randall in the case, can you tell us how the lack of that relationship, the nine months that had expired between when you were on the case and when you realized that not much had been done with the mitigation, can you tell us how -- how the lack of that relationship with the defense team impacted the development -- your investigation in January of 1998 of the mitigation?

THE COURT:  Do you understand the question?

THE WITNESS:  Yeah, I do.

THE COURT:  Okay.

THE WITNESS:  Which surprises me, but ---

THE COURT:  Well, the first part of it sort of assumes -- It -- The first part of it seemed to me to assume facts that are contrary to what I've heard today.

Can you read it?  Again, I'm locked out.

COURT REPORTER:  "Now the fact that those type of relationships had not been developed by Mr. Simon or, for that matter, Dr. Haney prior to the entry of Dr. Randall in the case, can you tell us how the lack of that relationship, the nine months that had expired between when you were on the case and when you realized that not much had been done with the mitigation, can you tell us how -- how the lack of that

relationship with the defense team impacted the development --

your investigation in January of 1998 of the mitigation?"

THE COURT: Yeah, that's the part because there is

evidence that there was some development. If you can separate

it out, answer it. But if you can't ---

THE WITNESS: I'm sorry. Say that again.

MR. MORENO: I can rephrase the question, if you

would like.

THE COURT: All right, sure.

Q    (By Mr. Moreno) Had Mr. Simon developed the type of

relationship with Juanita and the other family members,

Juanita Allen and the other family members, necessary to delve

into difficult areas of family history based on what you know?

A    Okay. I don't know that you've asked this question, but

I know what I can tell you about that, and that is that part

of the process when you're dealing with family members with

difficult issues, and I had done that in another capital case,

is to establish with them a level of trust and to be able to

communicate with them effectively, you know. And you have to

convince them that, first of all, how the mitigation process

works, which takes time, and how important it is for you as a

lawyer to be -- to be able to present as total and a complete

picture as possible for an effective mitigation case.

Now you may come into a situation where the

information you got, you know, about torturing dogs and cats

and frogs you don't want in there, but if you know it, and that's the important thing, you got to know it and you have to learn it, and in order to do that, it takes time.

Q    And did the fact that that relationship -- that the depth of that relationship with the family and with Mrs. Allen, in particular, had not been developed by Mr. Simon impede your ---

MR. HOLTSHOUSER:  Judge, I'm going to object to the form of the question.  Again, it assumes facts that are not in evidence, and that's not the testimony that he just gave.

MR. MORENO:  I would disagree with you.

THE COURT:  Well, I think -- Yeah.  I think the question was if it had not been done.  So I think that difference -- Overruled.  Go ahead and finish the question.

Q    (By Mr. Moreno)  If the -- How did that, the lack of the relationship having been developed in the manner in which you just described, impact your ability to develop mitigation at the time in January of 1998 when you and Dr. Randall hit the ground running?

A    Well, there may have been important and pertinent information that wasn't revealed because that level of trust didn't exist.  I mean I can't speak to exactly when or if that would have occurred, but certainly in terms of trying to provide the petri dish where such information can be cultured is a responsibility that occurs over time.

Q    All right.  And did you have enough time to do that in this case?

A    No.

Q    And did that get done in this case?

A    Not -- Obviously, not based on the information I've seen.

Q    All right.  I'd like to switch gears for a few minutes and talk to you about your contacts with Billie.

A    Okay.

Q    Now you met with Mr. Allen on many occasions, I assume.

A    Yes.

Q    All right.  Did you also have an opportunity to speak with him on the telephone?

A    Yes.

Q    And did you correspond with Mr. Allen?

A    Yes.

Q    What was the primary focus of your interviews and meetings and correspondence with Mr. Allen?

A    It changed.

Q    Let's start -- Let's start from April to November of 1997.

A    Well, you know, initially, you want to go; you want to introduce yourself; you want to explain certain things.  "This is the indictment.  This is what you're being charged with. This is the range of punishment," kind of the nuts and bolts, the basics.  Then you want to try to determine as early as

possible if there are certain areas that he would like you to look into, investigate. You know, those would be things primarily like alibi witnesses, things that could disappear, things that you want to develop early.

I would have talked to him about his social history, his educational history, his medical history, his family history. I would have gotten -- tried to get as complete a picture during that first maybe eight weeks as I could.

When the discovery comes out, then there's a lot of intense discussions about the discovery, and there was a lot of -- there were a lot of things we had to try to track down based upon our conversation with Mr. Allen that were problematic.

Q    All right. And those areas, did they concern guilt phase? The problematic areas is what I'm talking about.

A    Not always.

Q    Not always. Now he cooperated with you on mitigation. Is that correct?

A    I -- There was no time that Billie just simply shut down, and I'm not trying -- I'm not trying to say anything about Billie. But when you talk about cooperation, there were certainly impediments, but our responsibility is to allow him to feel comfortable enough so we can get around those things. That's -- That's what you're supposed to do. You're supposed to do. You're supposed to -- It's very rare you're going to

get a criminal defendant that doesn't have some issues, and it's very rare in a capital case that you're not going to be dealing with somebody who, you know, doesn't always trust you and has a bunch of other things that are going on. And it's the goal of the attorney to get as close as you can to the core of the person you're representing so that they can believe in you and they can trust you because if you don't have that trust, you're not going to have that communication. And if you don't have that communication, you're not going to get the most information you can.

Q   Now your relationship with Mr. Allen, was it contentious about guilt phase issues?

A   It was a very difficult time for both of us.

Q   About guilt phase?

A   Many, many issues about guilt phase.

Q   All right. Was it less difficult about mitigation?

A   I don't recall that Billie sent us on the kind of wild goose chases we went on with the guilt phase in the mitigation phase.

Q   All right. And do you recall whether he provided you with the names of witnesses?

A   I'm sure he provided me with the names of witnesses and family members, yes.

Q   All right. And did he provide you with information about where he went to school? Might have been hospitalized?

A     All that stuff.

Q     All right.  So on the biographical information, he -- he was cooperative.

A     He was.

Q     All right.  And did he ever refuse to answer your questions about mitigation?

A     Gosh.  Did he ever say to me, "No, I'm not going to answer that"?  I don't think so.

Q     In your opinion, did he interfere with your efforts to develop mitigating evidence?

A     Actively?

Q     Yes.

A     No.

Q     Okay.  And he didn't, as you said, send you on any wild goose chases as far as mitigation goes?

A     Well, there were -- there were areas that sort of could touch upon that, but -- How can I say this?  It was pretty easy to realize that those areas didn't have any basis in fact.

Q     Okay.  Now who had the primary responsibility of talking to Billie about mitigation?

A     Again, Mr. Simon, his role was to investigate the mitigation.  I may have referred to the fact that I've learned there's a tape recording of an interview he had with him.  I didn't even know about that.  So I know that he would

interview Billie and obtain information.

It's very disquieting to me, for example, that Craig Haney refers to the three-page handwritten letter from Mr. Allen that gave some biological information, and he doesn't refer to anything from Mr. Simon after the tape-recorded interview. That's -- That's very disturbing.

Q   In that same letter, do you recall how Dr. Haney characterizes the three-page ---

A   Pretty unhelpful.

Q   I'm sorry?

A   He said it was unhelpful or it wasn't -- it wasn't going to produce much; meaning it was the same thing as you got from Mister -- when you first started. It didn't provide any real -- I mean I think there were some things a little bit about his personality that came through but not a lot.

Q   All right. So in your opinion, was that unhelpful?

Well, let me put it this way. Let me rephrase the question. Did it advance the ball in terms of mitigation?

A   Much better way to put it. No, it did not really advance the ball.

Q   Do you know whether, before writing that, he was given an idea of what -- what it was you were looking for or what Mr. Simon was looking for?

A   I don't know what the date of that letter is, and I only have kind of a vague memory of it. So I wouldn't -- I think

if it was written right at the time of my very first appointment or right before that for some reason, then he wouldn't have known, but I do think that he knew, based upon our conversations, what a mitigation phase was.

Q Okay. What a mitigation phase was, all right. So he understood that you would be trying to present evidence to the jury that would humanize him and put him in a context different than what the Government was presenting him.

A I don't think I ever used any kind of phrase like, "Billie, we're trying to humanize you." I think we may have used the phrase, "We want to know about your life. We want to know about the troubles you had." I asked him about situations in which you may have been knocked unconscious to determine if there was any reason to suspect that there was a brain defect or some biological basis for his behavior. All that stuff would have been early on. The social stuff would have come later. You know, initially I think what you want to look for is that material that may be relevant to mitigation that exists in documentary form.

Q And the social part of it was primarily the responsibility of Mr. Simon.

A Yes. I'd -- I'd say that's true.

Q Okay. Now have you had an opportunity to review any of the declarations or depositions in this case concerning Mr. Allen's history of severe child abuse?

A     I have.

Q     All right.  And is that the type of evidence you would have wanted to present to the jury?

A     The evidence that came in from Dr. Stewart and --

Q     Martell.

A     -- Martell, yeah.  That was -- It looked to me to be extremely valuable information.

Q     All right.  Now how about the information from Mrs. Allen, for instance, contained in both her declaration and her deposition?  Is that the type of evidence about his history of child abuse at home at her hand that you would have wanted to, for instance, present to a mental health expert?

A     I think that would have been information that we would have certainly considered it more likely than not and presented to the jury.

Q     Okay.  And that's the type of information you would want to present to a mental health expert when they're doing an evaluation of your client.

A     That's true.

Q     All right.  If you had available evidence through your mental health expert that the child abuse endured by Mr. Allen can cause life-long psychological consequences, is that the type of information you would have wanted to present to the jury?

A     I would think so, yes.

Q    If you had evidence that child abuse -- that you could present through an expert that child abuse can impair judgment, would you have wanted to present that to the jury?

A    Yes.

Q    In your opinion, based on what you know of his history and your interactions with him, did Mr. Allen at the time you were representing him, did you feel he exhibited some type of impaired judgment?

A    Yes.

Q    If you had evidence that child abuse impairs, and you could present it through an expert, impairs reasoning, is that the type of evidence you would have wanted to present to the jury?

A    Yes.

Q    In your experience with Mr. Allen, at the time you were representing him, did he exhibit, in your opinion, impaired reasoning?

A    Yes.

Q    If you had evidence that child abuse -- and, again, you can present through an expert -- can lead to high risk behaviors, is that the type of information you would have wanted to put before the jury?

A    Yes.

Q    If you have evidence that child abuse leads to impulsive behaviors that you could present through an expert, is that

also the type of evidence you would want to present to the jury?

A   Yes.

Q   Do you recall whether during the course of your representation of Mr. Allen or your awareness at that time of his background whether or not he exhibited impulsivity?

A   I would say "yes." To some extent, yes. It's hard to say because you don't know when a decision is made and when it's acted on, you know, but it would have -- there were things that led me to believe that he wasn't using a great deal of wisdom and reasoning in making decisions.

Q   All right. Now if you had been able, through an expert, to inform the jury that child abuse can lead to academic difficulties, is that something you would have wanted to present?

A   Yes. We presented evidence about academic difficulties.

Q   All right. And do you recall whether -- Well, there was. You presented evidence, so you were aware that he had academic difficulties.

A   Yes.

Q   All right. And would it have been useful to combat the State -- the Government's position that Mr. Allen just didn't try hard in school to be able to present evidence that child abuse can also impair academic functioning?

A   I think anything that could impair -- any outside

influence that could impair someone's performance in school or academic abilities or any of that stuff would be important.

Q    If, through an expert, you could have presented to the jury that child abuse leads to a significant increase in the risk of substance abuse, is that something you would have wanted to present?

A    That's a little more difficult question because we didn't put in a whole lot of information about substance abuse because most of the information we had from Billie was -- and from the evaluation of Dr. Cuneo was cannabis abuse which is not -- it's not the kind of mood-altering substances one would -- or addictive substances that -- at least as I perceive them, but it would have been something that I would have looked at.

Q    Okay.  If you had evidence that you could present through an expert that abuse and trauma can impair cognitive functioning, and I'm not talking about a head injury, I'm not talking about as a result of a head injury, but that abuse and trauma can impair cognitive functioning that results in behavioral difficulties, is that the type of evidence you would have wanted to present to the jury?

A    I would have tried to present that to the jury, yes.

Q    All right.  Do you recall either in your interactions with Mr. Allen or in your understanding of his background at that time whether or not there were behavioral difficulties

that he exhibited or displayed at some point?

A    I mean I don't think I could answer that, but, yes, I think his behavior got him into this situation.

Q    All right.  Was his -- Did you feel that during -- there were behavioral issues with him when you were representing him in terms of his interaction?

A    Yes.

Q    If you could have presented through your expert that child abuse increases the likelihood that someone might drop out of high school, is that information you would have wanted to present to the jury?

A    Yes.

Q    All right.  In fact, in this case do you recall whether or not Mr. Allen dropped out of high school?

A    Ninth grade, I believe.

Q    All right.  If you could have presented to the jury through your expert that child abuse and/or neglect increases the risk of being arrested for a violent crime, is that something you would have wanted to the present to the jury?

A    That, again, is a little bit of a two-edged sword because part of what the Government's case in aggravation is is that this gentleman's going to be prone to violence whether he's locked up or not.  So you always approach those things or at least I always approach those things with some degree of caution.  We -- I felt it was much more important to (A) make

Norris Holder the violent person, if we could, and (B) reduce violence as something that was a role in his life.  So I would have evaluated that in that perspective.

Q    Okay.  That's fair enough.  Now in your mind, would presenting evidence of his severe childhood abuse conflict with presenting evidence from family and friends that he had good character, that he was loved by family and friends, that, you know, he was sort of a misguided youth, that he was, you know -- the evidence that you presented at the time of penalty phase?

A    I don't think that they necessarily conflict, and I know more about child abuse now than I did then, and I certainly know more about child abuse after your examination than I did then, but I think the strange thing is a parent or a guardian or a relative can love a child and still beat them, and so I don't know that they're necessarily mutually exclusive.  Those of us who haven't endured a horrific childhood don't always understand that, how that can happen.  And the -- And the converse of that is the child can be completely in love with the abuser despite when, you know, when you think in terms of common sense, you go, "I don't know how that can be."  It's definitely true.

So I don't know that those two things are different or so exclusive that if you go down one path, you can't go down the other.

Q    Is there sort of a synergism between the two?

A    I'm sorry.  What?

Q    Is there sort of a synergism between the two different ideas of the presentations in that despite the abuse, Billie Allen was a good guy, he had good character, there were people who loved him?  I mean would that have sort of fed off on one another in your mind potentially?

A    They could.

Q    Okay.  Now at the time of trial, did you make a strategic decision not to present Mr. Allen's history of abuse and neglect?

A    I don't think we had significant information to support the fact that there was a history of abuse.

Q    Did you make a strategic -- reasonable strategic decision not to actively ---

        THE COURT:  Wait, wait, wait.  Just a second.

        MR. MORENO:  Okay.  I'm sorry.

        (Pause)

        THE COURT:  Okay.  Go ahead.

        MR. MORENO:  Thank you, Your Honor.

Q    (By Mr. Moreno)  Did you make a reasonable strategic decision not to actively investigate that aspect of Mr. Allen's history?

A    No.

        MR. MORENO:  Your Honor, can I have a moment to

consult with co-counsel?

THE COURT:  Sure.  Sure.

(Pause)

THE COURT:  We'll take a -- We'll take about a ten-minute break, and then you'll have time to talk.

MR. MORENO:  Okay.  Thank you, Your Honor.  That would be great.  I appreciate that.

THE CLERK:  Court's in recess.

(Court recessed from 2:04 PM until 2:17 PM.)

THE COURT:  Whenever you're ready.

MR. MORENO:  Thank you, Your Honor.  Your Honor, I have one question, not the usual lawyer's one question which often turns into ten.

THE COURT:  I learned a long time ago to pay no attention to that "one question left."  If you have a hundred, that's okay.  Don't worry about it.

MR. MORENO:  All right.  Thank you.  There's something I forgot to cover with Mr. Sindel earlier.

Q    (By Mr. Moreno)  Mr. Sindel, do you have any recollection of why you and the defense team did not call Juanita Allen as a witness?

MR. HOLTSHOUSER:  I'm sorry.  I didn't hear the question.

MR. MORENO:  You waived that objection.  The question is:  Is there a reason why he didn't -- Does he recall why

they didn't call Mrs. Allen as a witness.

MR. HOLTSHOUSER:  Call Mrs. Allen.

A    I have been contemplating that mostly since my deposition was taken in, I believe, January.  And, you know, in trying to think and remember back, and I said a number of times I didn't think I remembered, and I can't specifically remember a decision, but I realize, after reviewing some of the records, there was an issue concerning Ms. Allen and Johnnie Grant.

THE COURT:  Johnnie who?

THE WITNESS:  Grant.

THE COURT:  Okay.  Oh, yeah.  Okay.

A    And I think Mr. Grant may have been called as a witness in the penalty phase for the Government.  I don't know for sure.  And I thought that might have -- What Mr. Grant was claiming, as I recall, would have affected her credibility and might have moved the case backwards --

Q    (By Mr. Moreno)  Okay.

A    -- from where we wanted to be.

Q    All right.  Now is that -- I think when we discussed this, that's more of a surmise than an actual memory.  Is that correct?

A    I would say that's correct.

Q    Okay.

A    If I sat down with everybody and talked with them, it might trigger that memory, but I haven't done that.

Q    All right.  So you specifically don't have that memory.

A    I can't say that I can testify positively up here that that was what I remember as opposed to that appears to be what I did.

Q    Or what you guess might have happened.

A    Surmised.

Q    Surmised.  Surmised is better.  All right.

A    I wouldn't guess but I would conclude.

Q    All right.  But as you sit here today, there's no specific memory of that being the reason why Mrs. Allen wasn't called.

A    No.

Q    All right.  And given that -- If Mrs. Allen were available to you at the time of trial with the evidence we're hoping to present through her and that you saw in her deposition and declaration about her treatment of Billie Allen, would you have called her as a witness?

A    I believe I would have.

Q    Okay.  So despite the Johnnie Grant thing, you would have called her as a witness.

A    I believe that the Johnnie Grant thing would have been areas that were available for Cross Examination of Mrs. Allen and would have been something I would have discussed to be ready for, but that was a relatively isolated event compared to what she described as a long history of abuse of her son.

Q    I see.  So you would have presented it.

A    Yes.

MR. MORENO:  All right.  I have no further questions.

THE COURT:  All right.

MR. MORENO:  Thank you, Your Honor.  Thank you, Mr. Sindel.

THE COURT:  You may inquire.

CROSS-EXAMINATION

BY MR. HOLTSHOUSER:

Q    Good afternoon, Mr. Sindel.

A    Good afternoon.

Q    Mr. Sindel, I first want to show you Exhibit 620.  I'm going to blow it up for you just to make it a littler easier to read.  Let's try this again.

Do you recall this letter that I sent to you on March 12th, 1998?

A    Yes.

Q    And do you think that I sent that to you because I envisioned using it 14 years later in a habeas hearing?

MR. MORENO:  I'm going to object to this letter, Your Honor.  This letter is an attempt to bolster Mr. Sindel's standing with the opinion that Mr. Holtshouser offered about his performance in this case back in 1998.  I don't think it's proper as evidence as to whether or not he performed in a manner in which he needed to per *Strickland.*

THE COURT: All right. I haven't heard the question yet. Overruled. Let me hear the question.

Q   (By Mr. Holtshouser) Well, the first question was: Do you think that I sent that to you back then because I envisioned using it 14 years later in a habeas hearing?

MR. MORENO: Objection.

THE COURT: All right, overruled.

A   You may have wanted to be a magistrate by now, but, no, I don't believe you sent that to me ---

Q   (By Mr. Holtshouser) And at the time did you think that the sentiment expressed in there was genuine?

MR. MORENO: Objection.

THE COURT: Overruled. Overruled.

A   I did.

Q   (By Mr. Holtshouser) At the time did you have the same belief about your performance in the case as I expressed to you?

MR. MORENO: I'm going to object.

THE COURT: Overruled.

A   I -- This is a lot more than I would have said and it says "in my performance," but I knew I worked hard and tried hard.

Q   (By Mr. Holtshouser) All right. Did you feel that your determination during the penalty phase was heartfelt?

A   Absolutely.

Q    Did you conduct the trial to win?

A    I did.

Q    And for you, a win would have meant life without parole, correct?

A    That's correct.

Q    You never had any realistic hope of a "not guilty" on guilt, did you?

A    No.  There was, you know, obviously, a hope that there might have been a lesser included which I can't even remember at this point in time if one was instructed upon.  But, no, I didn't think we could win that guilt phase.

Q    And that -- that belief was part of the friction between you and Mr. Allen early on in the case, correct?

A    That's correct.

Q    And he wanted you to pursue an alibi defense, for example, correct?

A    That was one of the defenses, yes.

Q    And you did later, I think, in July file ex parte somehow a notice of your intent to rely on an alibi defense to the Government but you filed it ex parte.  But you did so basically at Mr. Allen's request, correct?

A    Well, and as a result of the investigation that we had conducted.

Q    Okay.  In this letter I expressed that I didn't think that anyone could have done a better job than you did.  Did

you feel the same way?

MR. MORENO:  I'm going to object again, Your Honor. This isn't relevant to his performance at the time of trial. It's relevant to Mr. Holtshouser's opinion which is not relevant to this Court's assessment.

THE COURT:  Well, no.  It is relevant because there's -- we've heard a lot of evidence about Mr. Sindel's view about what he would have done differently now.  And I will -- I will hear it for whatever possible relevance it has and on relevance of other issues presented and so forth.  I'll hear it.  Overruled.

Q   (By Mr. Holtshouser)  The sentence, "I don't think that anyone could have done a better job than you did or done more than you did in attempting to convince the jury to spare Mr. Allen," did you, likewise, at the time in March of '98 feel that way about your effort?

A   I would never feel that no one could do better than me --

Q   Okay.

A   -- about anything because I don't believe that that's true.  I -- I did feel that we had put on as good a penalty phase case as we could under the circumstances, and I felt like -- I knew the Government's sentiment was that we had put on a good case.

Q   And you did work hard for Mr. Allen.

A   I did.

Q    Very hard.

A    I did.

Q    In a case like this as a trial lawyer, do you generally live it and breathe it 24/7?

A    You do.

Q    And you did?

A    I always do.

Q    Then and now, do you view yourself as a competent and professional criminal defense trial attorney?

A    It's a little harder today than it has been in the past. I can tell you that I am grievously disappointed, and I have dreaded this day since I read the petition for the habeas corpus.

Q    And the petition that you read has had a great impact upon your hindsight assessment, correct?

A    Yes, it has.

Q    Okay.  And so based upon what at least you've seen in the petition, do you now believe that your representation of Mr. Allen was professionally and objectively deficient?

A    Based upon what I see in the declarations and evidence that they have presented to this Court or will present to this Court if the declarations are supported, I don't -- I think that there are absolutely areas that were not accurately and appropriately investigated in the course of the mitigation -- development of the mitigation case.

Q    You premised your answer there a little bit with in terms of if the evidence turns out to be what is purported in the petition, correct?

A    I think that's always the case, though.

Q    So to a great extent, it's -- it's whether or not those facts as alleged in the petition are true and credible is part and parcel of your judgment.

A    Well, I think -- I think that's accurate.  I think that not all of them have to be true but enough of them have to be true to further the premise that's being presented here.

Q    So your view that you were objectively deficient and unprofessional turns, in part, upon what has since been discovered.

A    I'm going to qualify your question a bit.  I don't think I was unprofessional.  I think I was deficient.

Q    Okay.

A    I never compromised my ethical obligations or my hopes or desire for Mr. Allen, but I made mistakes.

Q    Can you -- Can you articulate specifically what it is now in hindsight that you view as the objective -- as objectively as the deficiency in your role as an attorney?

A    Failure to perform as a supervising lead counsel and ensure that those that were working for me were doing that.

Q    So it's a failure of supervision.

A    That's part of it, yes.  I mean I could have gone out

there and done it myself, too.

Q   Would your opinion of your performance, looking back on it, be the same if the jury had actually returned a verdict of life without parole?

A   I wouldn't have to review it.

Q   But would it be the same?  Would you still look back and say, "You know what?  Objectively, I was deficient in not supervising good enough"?

A   The best way for me to answer that question, Mr. Holtshouser, is that I believed -- mistakenly, I think -- that up until I saw the declarations of Dr. Stewart and Dr. Martell, that I would have thought I did a pretty good job.

Q   So really it's the declarations of Dr. Stewart and Dr. Martell and statements by them in those declarations that were -- had the most impact on you.

A   They certainly had a significant impact.  I -- I had thought that, as Joe Landolt said, "You put on a damn good dog and pony show."  I thought we had done that, and I did not realize that we had missed the mother-load.

Q   And similarly, would your opinion of your performance as you sit here now be different if the habeas attorneys had not uncovered the so-called "new" evidence?

A   Well, the new evidence is part and parcel of what I have to look at to try to realize if I was deficient.

Q    Now you have represented habeas -- capital habeas petitioners yourself, haven't you?

A    Yes.

Q    And you have brought ineffective assistance claims on behalf of those habeas petitioners, haven't you?

A    I have.

Q    In state and federal court?

A    Yes.

Q    And you know that the context in which the effectiveness of counsel is evaluated is not hindsight but what the facts -- objective facts known to you at the time were.

A    That's part --

Q    Right.

A    -- of the calculation, yes.

Q    So that is, in fact, the focal point of the deficiency part of the *Strickland* analysis.

A    Well, I think another part of the analysis has to be strategic decisions and whether they are based upon a reasonable investigation.

Q    In part of your representation of capital habeas petitioners you often refer to or reference the ABA Standards of Conduct.

A    There are times I do, yes.

Q    The -- Were you familiar with what the ABA Standards of Conduct were in existence as applied -- would have applied to

you in 1998?

A    I'd have to say I don't think I could tell you that I was or was not.  I -- Most of the times when I look at the ABA guidelines, I say, "Well, you know, I haven't learned anything from this; I already knew this.  That's already the guideline of my attempts at legal representation."

Q    Assume, if you will, for purposes of this question that the ABA Standards at the time specify that what was required of mitigation counsel is to make efforts to discover all reasonably available mitigating evidence.  Okay?

A    Okay.

Q    Are you with me?

A    Okay.

Q    Did you make such efforts?

A    I made the efforts, yes.

Q    And there's nothing that you're aware of in the ABA Standards as they existed in 1998 that would have gotten specific in terms of, "Well, you must supervise in this capacity," or, "You must have this level of communication with your people to whom you delegate tasks," et cetera.

A    I don't think ---

Q    You're not aware of that, are you?

A    No.

Q    And in your view, the objective deficiency that is required was a failure to supervise on your part.

A    On my part, yes.

Q    All right.  I want to shift gears a little bit.  This case was tried in February and March of 1998, correct?  Do you recall that?

A    Yes.

Q    Okay.  By then, you had been a criminal defense attorney for almost 25 years, hadn't you?

A    I had; apparently true.

Q    All right.  And how many trials had you had by then?

A    I couldn't estimate.

Q    Hundreds?

A    I wouldn't say hundreds but I've had -- It's a significant number.

Q    Homicide trials?

A    Homicide trials.  The first trial I ever had in my life was a homicide trial.

Q    Most of your trials were in St. Louis, weren't they?

A    Yes.  Most of them, yes.

Q    And did you feel you had a good handle on the nature of people in St. Louis and the people that you faced on juries?

A    I did.

Q    And you would agree that St. Louis has been a unique place in terms of its people and its viewpoints, correct?

A    It's hard to say.  I don't know that I'm as widely and worldly as others that may be in this room, but I did feel

that I knew sort of how St. Louis jurors responded, and they're different in federal than in state court.

Q    Okay.  Had you received any awards prior to 1998 for your work as a trial attorney?  Had you been recognized by any other organizations?

A    I believe I have.

Q    A number?

A    I believe I have.

Q    You had an excellent reputation by both the bar and the bench, correct?

A    I don't know.

Q    You think you did.

A    But I think I might.

Q    And that would include the federal bench.

A    I hope it does.

Q    And it did, correct?

A    And did.

Q    You were someone who was frequently -- that the federal bench turned to to appoint in difficult cases, particularly capital cases.

A    I was.

Q    You were appointed in the Andre Bonds case?

A    I was.

Q    Which judge appointed you?

A    Judge Shaw.

Q    You had been appointed by Judge Perry on a number of habeas -- capital habeas cases.

A    Yes, I have.

Q    And you were appointed by Judge Webber in this case, were you not?

A    I was.

Q    In terms of capital experience, you actually tried the first capital case in Missouri after *Furman,* didn't you?

A    Yes.

Q    What year would that have been?

A    Excuse me?

Q    What year would that have been?

A    I think the case was tried in '78.  It ended up going through the appellate process and then finally to the U.S. Supreme Court and then sent back down for retrial in the early '80s.

Q    Did you represent the defendant on retrial?

A    I -- I think my representation of him stopped after the case was reversed in the U.S. Supreme Court.  Because he was indigent, I had been appointed by the Court on that case and then the public defender took over.

Q    And you were actually asked at one point to represent all death row inmates for the public defender's office, weren't you?

A    I was.

Q    You received some particular training in capital work at a center in Virginia.  Is that correct?

A    Yes.

Q    Is that a multi-week training session?

A    It's at least one full week, I think.

Q    That includes top -- included topics such as mitigation?

A    It did.

Q    How to investigate it, how to prepare for it, and how to present it?

A    Yes.

Q    Did you also attend periodic seminars, some of them put on by the Federal Capital Resource Council?

A    Yes.

Q    Capital work is a bit of a unique specialty, isn't it, in the criminal defense bar?

A    Yeah.  You have to be a certain kind of mule.

Q    And there is -- there is a certain label known as "capital-qualified" counsel.

A    There is within the statute, yes.

Q    And you fit that description.

A    I do.

Q    When Mr. Simon was appointed, he fit that description.

A    I believe he did.

Q    Prior to 1998, had you, in fact, had between six and seven capital trials?

A    Yes.

Q    And had any of those been federal?

A    There was no federal trial that I can recall before this one.

Q    Because Bonds pled.

A    Mr. Bonds pled.

Q    Now as you sit here, how many capital trials have you conducted, state and federal?

A    Oh, golly.  I think it's probably, and this is a sort of a guesstimate, maybe 12 or 13.  I've tried -- I think I did one state case and I think the rest have been federal.  There was Iowa, Tennessee, Michigan; that's three.  California, Illinois; that's five.  And there may have been one -- Iowa, yeah, that's right.

Q    In terms of sentencing success -- Let me -- Let me rephrase.

     In most capital cases, there's a strong case for guilt, isn't there?

A    Yes.

Q    In many instances what the -- what the so-called "fight" is about is what should the appropriate punishment be.

A    Oftentimes that's what it gets down to.

Q    All right.  In the 12 or 13 trials that you have had, what has been your success rate, viewing a life without parole as a success in a capital case?

A    This is the only case in which my client received a capital sentence.

Q    And as a practitioner, that's a heavy burden to bear, isn't it?

A    That you got life sentences?

Q    No.  That this one did not.

A    It's -- Yeah, it's very hard.

Q    Okay.  You used the phrase "true believer" to describe, I think, Mr. Simon.  What did you mean by that?

A    Well, as you know, on the other side of this case Mr. Shaw was one of the defense lawyers for Norris Holder.  I would not describe Charlie as a true believer.  I think there are certain lawyers, myself being one of them, who ever since the augment of the capital litigation have taken a strong, social and moral sense that the death penalty is not the right direction for this country to go.  So "true believers" really don't believe in the death penalty.

Q    And you put yourself in that category?

A    I do.

Q    And that's what you meant by your reference to Mr. Simon.

A    That is correct, although Mr. Simon came to it from a different route than I did.  He was with the A.G.'s Office, and he argued cases on the other side of that issue.

Q    As a ---

A    I don't know what pill he took to change, but ---

Q   As a true believer, is it part of the campaign, I guess, against the death penalty or one of the arguments against it is that it's too expensive to administer and carry out because of all the years of appeals and litigation and so forth?

MR. MORENO:  I'm going to object to the relevance as the issue before the Court is whether or not Mr. Sindel and Mr. Simon were effective.

THE COURT:  I'm not -- You know, I'm not sure, but since I'm the one hearing the evidence, I'll hear it.  And if I decide it's irrelevant, I'll excuse it, but it may be leading to something else.  Overruled.  You're right, from a -- just from what I know now, it does seem irrelevant but it may lead to something.  Overruled.

MR. HOLTSHOUSER:  Actually, Judge, I'm going to withdraw the question because I don't -- I don't want to mislead you and think that I have anywhere else to go with that question other than that point.  So I think the better thing to do is to move on.

THE COURT:  All right.

Q   (By Mr. Holtshouser)  You had prior experience prior to 1998 in using mental health expert evidence, correct?

A   Yes.

Q   In both capital and noncapital trials?

A   Yes.

Q   You presented actual mental defenses before?

A    Yes.

Q    Including diminished capacity defenses?

A    Yes.

Q    And in 1998, you certainly understood -- and, in fact, in '97 when you accepted this appointment, you understand and knew that mental health evidence was a standard and accepted component of most mitigation presentations, did you not?

A    Yes.

Q    And from an early stage, did you anticipate exploring mental health expert testimony, an early stage in representing Mr. Allen?

A    I -- I would say "yes."

Q    It wasn't something that was an afterthought that occurred in 1998.  It was something you knew that at some point would be inevitable, correct?

A    Yes.  I mean I believe I discussed it, you know, several times with Mr. Simon and Ms. Caspari as -- as something I thought was appropriate to evaluate in this case.

Q    Was it actually something, though, that you were thinking about as early as April of '97?

A    Yes.

Q    And that's many months before Mr. Simon had been appointed.

A    That's true, too.

Q    And you also understood that mental health experts, being

what they are, needed to be supplied with source materials to begin their work.

A    Yes.

Q    And that they would then probably examine Mr. Allen.

A    Yes.

Q    And that they also might conduct or recommend other investigative steps to be taken.

A    Yes.

Q    And that they might talk to third-party collateral sources.

A    Yes.

Q    And you also understood that any mental health expert wants to know everything they can about a particular subject's background.

A    Yeah.  I mean the better psychiatrists and psychologists, you know, spend usually multiple interviews and many hours and pour over materials.

Q    And they want to know everything.

A    Others, not so good.

Q    But they want to know everything, the good ones.

A    They want to know a lot.

Q    Okay.  And that information includes information about home life and upbringing.

A    It would.

Q    Relationship with parents and how the home environment

functioned.

A    It would.

Q    And that abuse was a topic that most experts would explore.  You knew all this in 1997, didn't you?

A    Yes.

Q    And you were also aware of certain increased probabilities or risk factors associated with certain family histories, were you not?

A    I would say "yes."

Q    Alcoholism?

A    Right.

Q    Drug addiction?

A    Right.

Q    And abuse?

A    Right.

Q    Now your general experience with St. Louis juries and their perception of mental health experts and mental health subjects, what has it been prior to 1998?

A    I think for the most part it can be, at least back in that era, was a pretty hard sell.

Q    And some jurors -- many jurors would view it kind of as psychobabble, correct?

A    I did at times because I didn't understand what the -- they were saying.  It's very difficult to make those tests translate into comprehensive English.

Q    So that's what you mean by "it's a hard sell."

A    Partly.  I also think that there exists the abuse excuse.

Q    There's jurors who tend to reject that.

A    There were jurors on this case.  I think one of the jurors who actually sat on the case had expressed skepticism about that as an offense.

Q    During voir dire?

A    Yes.

Q    Okay.  You're not talking about communications with the jury afterwards.

A    Well, not yet, but no.  No.  It was -- It was during voir dire.

Q    I think you brought it up, though, but you actually had had some communication with jurors?

A    I did.

Q    They contacted you?

A    Yes.

Q    And at least in the penalty phase, they gave you some indication of the initial -- where the initial vote started off?

         MR. MORENO:  I'm going to object.  It's not relevant.

         MR. HOLTSHOUSER:  I'll withdraw it, Your Honor.

         THE COURT:  Okay.

Q    (By Mr. Holtshouser)  Do many jurors, in your view, and I'm talking about -- Again, most of my questions at this point

are asking you from your perspective in 1998, the relevant perspective.

A    I'll consider it that way unless you say otherwise.

Q    Okay.  Many jurors were not going to give mental health evidence much weight in your view, especially when experts couldn't agree with each other.

MR. MORENO:  I'm going to object.  I'm not sure he can answer that question.

THE COURT:  Okay.  Well, we'll find out.  Overruled.

A    I mean I think ---

Q    (By Mr. Holtshouser)  Just so we're clear, we're talking about your ---

A    Can I ---

Q    Let's just make sure you understand the question.  I'm talking about your experience that taught you about St. Louis juries prior to 1998.

A    Well, I think, you know, in all -- in virtually every psych case, there's a psych on the other side.  There's a psychologist, there's a psychiatrist.  You know, someone says you interpreted the test wrong.  Someone says you weren't listening properly when this happened.  Someone -- You know, whatever it's going to be.  So those are -- those are problems.  I -- I was -- I believed, and so did Dr. Randall, that we had a certain momentum that we lost when we put on the psychological evidence because I don't think it was as strong

as it could have been.

Q   Prior to actually conducting the trial and seeing how it played, though, you would have been under the view that -- the fact that one side gets an expert, the other side can find a similarly qualified expert to say almost the opposite thing, that extreme variability causes jurors to tend to neutralize its value.

A   I think that's a fair statement.  You don't know -- Oftentimes we don't know that, but I think as trial lawyers, we sense it.

Q   And its value -- It might have value, though, where there are consistent facts, consistent opinions, and strong diagnoses?

MR. MORENO:  Calls for speculation; objection.

Q   (By Mr. Holtshouser)  Again, asking you your views and perceptions of what St. Louis jurors are responsive to.

THE COURT:  Overruled.

A   I think the most important thing that can be developed in terms of getting the jury to respond is brain defects and what, you know, 552 describes as defects and disorders.  I think ---

THE COURT:  Wait.  Brain defects and what?

THE WITNESS:  I'm trying to think of the language in Chapter 552, but there's -- you know, the distinction between, for example, mental retardation, things that can be traced to

actual dysfunction of the brain activity as opposed to
environmental factors.

Q    (By Mr. Holtshouser)  Okay.  Chapter 552, you're talking
about the Revised Statutes of Missouri?

A    It is.

Q    Okay.  You and Dr. Randall felt that you had some
momentum ---

A    Disease or defect.  I'm sorry to interrupt.

Q    Mental disease or defect?

A    Or defect.

Q    Okay.  You and Dr. Randall thought that the mitigation
case had lost momentum actually when you got to the expert
phase of the case.

A    In hindsight, yes.

Q    And there actually was a relatively significant gap then
between the time they had heard some of the family witnesses
and the experts and then went to deliberation.  Do you recall?

A    I'm trying -- I don't exactly remember the placement of
that evidence.

Q    There were some lay witnesses that you put on after the
experts, correct?

A    Yeah.  I remember we finished with some lay witnesses.

Q    You finished with, I believe, a young man, correct?

A    Was that Mr. Petty?

Q    Yes.

A    Yes.

Q    The young ---

A    Oh, the young -- the young, yeah.

Q    Ten or twelve-year-old?

A    Mr. Petty's son.

Q    Okay.  I want to ask you now about your prior experience regarding mitigation investigations and evidence.

In your prior capital cases, you had mainly presented family evidence, correct?

A    That's true.

Q    But you used a mitigational specialist in the *Bonds* case and were developing the mitigation evidence prior to that plea, were you not?

A    Yes.

Q    Was the *Bonds* case your first experience in using a mitigation specialist?

A    I believe it was.

Q    Was Mr. Allen a more difficult client to deal with from a mitigation perspective?

MR. MORENO:  Objection.

A    Than?

Q    (By Mr. Holtshouser) Prior clients.

MR. MORENO:  I'm going to object.

Q    (By Mr. Holtshouser)  Let me ask you -- Let's ask you differently.

Did you consider him to be a difficult client to deal with from a mitigation perspective?

THE COURT:  Yeah.  Are you -- Is there an objection?

MR. MORENO:  I'm fine with that question.

THE COURT:  Okay.

MR. MORENO:  Thank you, Your Honor.

A    I want to be careful about how I answer that question. Mr. Allen could be a difficult client to deal with.  He was -- He could be frustrating and exasperating.  And I don't believe that he was -- wanted me or -- well, wanted to focus on the mitigation case, and that definitely made it somewhat more difficult, but it certainly shouldn't have been a significant barricade to what we could produce given sufficient effort and time.

Q    What Mr. Allen wanted your focus on was the guilt phase, correct?

A    And -- And other -- other matters, extraneous matters.

Q    Focusing on developing penalty phase evidence, with prior acknowledgment that you may not prevail in the guilt phase, correct?

A    And that's not unusual, though, for a capital client.

Q    Was there also, though, the added problem with Mr. Allen a general lack of veracity?

A    That's true.

Q    And did you actually think at one point that Mr. Allen's

constant lying to you was a personality disorder?

A    I did.

        THE COURT:  What was the answer?  I didn't hear.

        THE WITNESS:  I did.  I'm sorry, Your Honor.

        THE COURT:  "I did," okay.  I got it.

Q    (By Mr. Holtshouser)  Now you had an appreciation, did you not, for the kind of life history issues that could be relevant in mitigation, particularly to a mental health expert?

A    I had a general knowledge of that, yes.

Q    And common ones would include any negative aspects of a defendant's upbringing?

A    Yes.

Q    Parental behavior and violence --

A    Yes.

Q    -- that is between each other?  Parents beating each other?

A    Obviously, yes.

Q    Sibling issues?

A    Yeah; yes.

Q    Attachment issues?

A    Yes.

Q    Exposure to toxic substances at a young age?

A    Yes.

Q    In utero exposure to toxic substances, correct?

A    That can be.

Q    And any kind of abuse, whether physical or sexual, correct?

A    Or mental, yes.

Q    Could even be verbal abuse.

A    That's correct.

Q    Any particular injuries or health conditions also play into a -- play into consideration?

A    They do.

Q    Nutritional concerns?

A    Yes.  I'd say in extreme cases.

Q    Particularly ---

A    I mean the Twinkie defense worked.

Q    The what?

A    The Twinkie defense worked.

Q    How about particular life experiences?  That certainly would be relevant?

A    Yes.

Q    And community conditions.

A    Yes.

Q    And by 1998 and '97 when you first got on, was it already part of your practice in capital cases to explore such issues with a defendant and his family?

A    Yes.

Q    Do you have any reason to doubt that you did so in this

case?

A    That was a pretty long list of materials, but I think that I -- I'm sure I made inquiries in that regard.  There is, you know -- Exploring, you know, to me may mean a little more than just making inquiries.

Q    Just like efforts may mean more than actually finding.

A    Well, a lot of times your efforts don't produce fruit.

Q    Correct.  And you are aware that the ABA standards and the law requires efforts, not fruit.

A    That's what you told me.

Q    And do you have a recollection of asking both Billie Allen and Juanita Allen about many of those issues?

A    Yes.

Q    Including specifically physical abuse?

A    I would have to say the answer to that question is "yes."

Q    The answers that you obtained from them concerning specifically physical abuse was what?

A    I didn't realize that it was an area that needed to be further investigated.

Q    So did that mean that they answered, "No"?  That there was none to investigate?

A    A blanket "no," I can't say I recall.  I do know that I did not have any belief that it was as significant as Ms. Allen now says it was.

Q    In terms of what Mrs. Allen told you when you asked her,

she did not convey to you the information you've now seen that is claimed by her and Dr. Stewart and Dr. Martell.

A    She did not.

Q    Nor did Mr. Allen.

A    He even less so than she.

Q    Okay.  And would that be that he was even more adamant than she that there was none?

A    He never identified any.

Q    Some of these things that I just listed off, in fact, you did explore and you did find some evidence of, correct?

A    I recall that there was at least one evidence of physical abuse.

Q    I'm talking to some of the other items now.

A    Yes.

Q    Like with Mrs. Allen -- I'm focusing on Mrs. Allen and with Mr. Allen.  There was information revealed about his health history, medical issues.

A    Yes.

Q    Things like lead exposure at a young age?

A    Yes.

Q    Some febrile seizures?

A    Yes; Pica.

Q    Information about the neighborhood?

A    Quite a bit.

Q    Gangs, drugs?

A    That was a big focus.

Q    Violence that surrounded the neighborhood?

A    Yes.

Q    Was there information about the specific street, Cote Brilliante, 4535 Cote Brilliante, that was conveyed to you by Mrs. Allen and Billie Allen that made it somewhat different than, say, the rest of the surrounding neighborhood?

A    I learned from somewhere, I think, that there were sort of like two competing gangs sort of at either end of the street, as I recall them, and, you know, you had to be very careful about what color you wore and where you wore it, and I remember that as being significant.

Q    Learned that then or learned that since?

A    No; then.

Q    Okay.  So those are things that you had explored, made efforts to discover and, in fact, discovered.

A    Right.  We worked hard in that regard.

Q    I'm going to come back to a few of these things later, but let's -- I want to shift gears for a second.

As an experienced criminal trial lawyer, prior to 1998, did you have an appreciation for the value of strategy?

A    Well, yes.

Q    And would you consider yourself -- have considered yourself then and now a bit of a strategist?

A    I don't think you go into a trial arena without thinking

that you're a strategist.  You may not be one but you certainly think you are.

Q    Okay.  You think about those things, in other words.

A    All the time.

Q    Okay.  There are those who do not but you do, correct?

A    I don't know, but I do a lot.

Q    There are facts and issues that both sides want to minimize and maximize in every case, isn't there?

A    Yes.

Q    Did you include strategy in your approach to the mitigation phase of a capital case prior to 1997?

A    Yes.

Q    And by the time of the trial in this case, were there facts and issues that you wanted to stress as well as ones you wanted to play down and/or eliminate or keep under the rug, so to speak?

A    Well, there were certainly facts and probably about in anybody's life that, you know, you want to maximize -- How do they say that phrase in that song?  Basically you want to play up what's good and play down what's bad.

Q    So in the "play down" side of things, did you have concerns about anything that might have increased Billie Allen's role in decisions and conduct as it related to the offense?

A    Absolutely.

Q    Would you say that was first and foremost in your strategy?

A    That was the strategy we developed based upon the investigation we conducted.

Q    Okay.  Prior violence on the part of Mr. Allen or prior possession and use of weapons would have been something that you wanted to keep out?

A    Yes.

Q    Actual drug dealing, there are issues that kind of floated with this, correct, in the trial that -- Do you recall that?

A    There was -- There were certainly issues, and mostly what I recall today is soap flakes; fake drugs.

Q    Right.  And ---

A    But I think that there were issues that centered around the possibility that there was drug activity, and we didn't want that.

        MS. CARLYLE:  Excuse me.  We're getting really warm over here.  Is it possible to close the curtains?

        THE COURT:  Oh, yes.  I can fix that; maybe.

        MR. HOLTSHOUSER:  It glares out the monitor over there, too.

        MS. CARLYLE:  Thank you, Your Honor.

        THE COURT:  We all hear much about the power of the federal court.  I've been searching for it for years, and the

only thing I found is this little box right here.  Go ahead.

Q    (By Mr. Holtshouser)  There were issues in connection with his probation officer, were there not, that concerned drug activity?

A    I remember obtaining the reports, and I remember actually going out and meeting with the probation officer, but it's really difficult, but I think there were certainly ups and downs, positives and negatives.

Q    Also, there was issues in this case whether or not -- of whether or not Mr. Allen had a motive to rob the bank, financial motive, correct?

A    Well, financial motive, obviously.

Q    But that would also be the same motive for drug dealing, correct?

A    There were -- There were issues surrounding Mr. Allen that were particularly difficult because they had to do with letters that he had sent with the cash with the dollar signs and stuff like that as I recall.

Q    And you recall that he had "cash money" tattooed or written on his stomach when he was arrested?

A    I seem to recall that, yes.

Q    Okay.  The drug dealing, actual drug sales on the part of Mr. Allen, that was an issue that you were able to leave the jury with the impression that any claims of drug dealing were a fantasy, correct?

A    That -- We were able to leave them with that impression, and that was what I believed was the truth.

Q    And there was also -- Probably the, I guess, the single fact that might have risked that -- that perception was a shooting incident that occurred at his mother's house in January of '97.  Do you recall that?

A    Yes.

Q    And is that the ---

A    I don't recall the date, but I do remember there was a shooting incident.  I believe he was out of the house at the time or something to that effect.

Q    And that the shooting was supposedly over a bad drug deal.  Although there were other explanations, that was one.

A    That was one of the explanations.

Q    Nevertheless, though, you felt that you were fairly successful in presenting to the jury the notion that Mr. Allen was at most someone who tried to sell fake drugs -- I think the word was "ganker," but really wasn't anything in terms of an actual drug dealer.

A    That's -- I mean that's what we were trying to do.

Q    Did you feel that you succeeded in doing that?

A    I believe so.

Q    And that was part of a strategy decision on your part is to keep out evidence of actual drug dealing on the part of Mr. Allen.

A    That would be true.

Q    And even as you sit here today, you have doubts as to whether or not Mr. Allen was or was not an actual legitimate drug dealer of any degree.

A    I do not mean to insult Mr. Allen or say anything bad about him, but at that time I think he felt it more important to convince me and the other members of the defense team that he was big into certain criminal activity which wasn't true.

Q    So you have not seen, for example, Mr. Allen's deposition in this case, have you?

A    I have not.

Q    And did you actually look at all the declarations submitted by all of the lay witnesses in the habeas petition?

A    No, I have not.

Q    So you haven't seen any -- Nor have you seen their depositions.  Is that correct?

A    I have seen the deposition of Juanita Allen and myself, and those are the only two.

Q    Along with this notion of fantasy, you also had the theory presented to the jury and left them with the impression that the clubbing, the champagne drinking, et cetera, that Mr. Allen purportedly did was pure fantasy.

A    That's correct.

Q    And so even as you sit here today, would you be surprised if some of these witnesses now indicate that, no, that really

happened and he really was selling drugs and had money to spend on those kinds of things?

A    I believe that we had interviewed and talked with the people that were closest to him and certainly in terms of his friends, and they expressed in no uncertain terms that all of that stuff was just fantasy; the Lexus automobile, the champagne, the Dom Perignon, all of that.

Q    The -- Another issue that you were successful in containing or controlling was the question of gang membership, correct?

A    That's correct.

Q    And you were asked a number of questions by Mr. Moreno regarding evidence that you would use if you had an opportunity to try the case again, et cetera.  Even if you did so, it would still be part of your strategy to keep out evidence of actual drug dealing, keep out evidence of any gang membership or gang affiliation, any prior possession of weapons, things of that sort.

A    Now as I sit here right now, without an entire global sense of all the declarations, all the other things, those would be things that I would not want to put in front of the jury.

Q    So many of these -- many of these questions that you were asked by Mr. Moreno, you don't actually have a global picture of what the so-called "new" evidence is, do you?

A    I have the picture that I've gained from the declarations I've read.  I have no reason to believe that those declarations aren't based on other declarations.

Q    And primarily you've been influenced by the declarations of Dr. Stewart and Dr. Martell.

A    Yes.  Those were very influential.

Q    So to the extent to which some of the factual assumptions that they have made in their declarations are not correct, that would impact your analysis, correct?

A    It could affect it.  I mean I couldn't tell you bottom line whether -- if it would change or not because some of the things may be really important and some not so.

Q    But in terms of strategy, are you always considering the benefits versus the costs?

A    Yes.

Q    Okay.  And you do that with respect to categories of evidence, specific testimony, and issues, correct?

A    Correct.

Q    And that's what a trial lawyer does.

A    That's one of the jobs.

Q    You don't have an approach in trying your cases of put everything on that you have, regardless of its benefit or cost, correct?

A    Never.

Q    That wouldn't be prudent trial practice, would it?

A    I don't think so, no.  I think it dilutes your presentation and causes the juries to lose their focus and causes you to lose yours as a trial lawyer.

Q    You have to keep in mind at all times as a trial lawyer, "I may gain this little bit that I want but at what risk," correct?

A    You have to evaluate and understand the evidence, understand the facts you can't change, and, you know, use that evaluation to develop a theme that you pursue relentlessly.

Q    And you have no doubt that if you did not do that, that would clearly be objectively unprofessional to not consider strategy and cost benefit.

A    Well, it -- it might not be prejudicial, but it's not the best way to practice.

Q    Well, for example, if you could have shown that Mr. Allen actually had no motive to commit the bank robbery to gain money because he was actually making more than enough money as a drug dealer, would you have done that?

A    I would have thought about it.

Q    Would you have done it?

A    If you combine the idea that he's got so much money that he doesn't need any more money with the idea that he's -- whether he's a drug dealer or not, he's not a cold stone criminal, then I would have done that.

Q    From your experience and training prior to 1998, had you

developed strategy theories about what you believed was the most effective in terms of themes or a theme or themes to stress in a capital case in St. Louis, Missouri?

A    And other states -- other places, yes.

Q    Would first and foremost among those, that hierarchy of themes, be residual doubt?

A    Absolutely.

Q    And by "residual doubt," just so we know what we're talking about for the record, we're talking about residual doubt about guilt or the role that particular person played in the guilt conduct?

A    Either one.

Q    And you used that here, didn't you?

A    Yes.

Q    In what way?

A    Well, I mean I think we wanted to stress a couple of things, and I think it played into what we believed was the best mitigation defense that we've been able to develop which was that Billie Allen wasn't the shooter; that Norris Holder was; that Billie Allen was a go-along/get-along and that, you know, he was just the easy guy for Holder to convince to go into the bank and assist him in getting him what he wanted. And I don't even think there was supposed to be an even split of whatever dough they recovered which wasn't burnt up.

Q    Do you feel you had done a good job of this so-called

front loading of that theme in the guilt phase?

A    I did.

Q    Did you do things in the mitigation phase that were specifically designed to carry on that theme?

A    Yes.

Q    All right.  And did those include the testimony from numerous witnesses as to -- as to Mr. Allen being a follower?

A    Yes.

Q    Did you feel that you had been successful in creating the impression to the jury that Mr. Allen was, in fact, a follower who did not plan or carry out anything that originated with him at the bank?

        THE COURT:  Initiated with what?

        MR. HOLTSHOUSER:  Initiated from him at the bank.

        THE COURT:  Okay.

A    I don't remember what the questionnaire from the jurors indicated about that particular mitigating factor, but we certainly tried our hardest to present that.

Q    (By Mr. Holtshouser)  In terms of the evidence that you presented, was that the primary thrust of what you put on in mitigation in your view?

A    Well, if we -- you know, if we had this multiple-headed beast, it was one of the heads.  It was certainly important.

Q    Okay.  In terms of mitigation themes and strategies, is it important that there be a certain consistency between the

position taken in guilt and the position taken in the penalty phase to be credible with the jury?

A    I -- I think it's something that you have to think about.

Q    And did -- Have you ever tried a capital case in which you took inconsistent positions between guilt and penalty phase?

A    You know, I really don't remember having done that. You're always faced with the fact that, you know, you sat up there and argued all these reasons why they should have reasonable doubt and they said, "No, you're wrong, and this guy over here, he's right."  But I don't remember ever saying, "You know what?  I kind of lied to you earlier."  That would be a real problem, and I don't think I should do that, you know.  But at the same time I'm not convinced that the jurors aren't sophisticated enough to understand that your role in the case can't have two slightly conflicting purposes.

Q    You did not choose to defend this case or try this case by stating, on the one hand, "He wasn't there and he didn't participate and didn't do the crime," but then in penalty phase say, "Well, he's sorry for doing it," right?

A    No, I didn't try it with that objective.

Q    That doesn't generally have credibility with a jury, does it?

A    It would certainly -- It could certainly affect it.

Q    Did you seriously question whether Mr. Allen was a

participant in the bank robbery with which he was charged?

MR. MORENO: I'm going to object. It's not relevant to the penalty phase question before the Court.

THE COURT: Overruled.

Q    (By Mr. Holtshouser) Maybe I didn't state my question so that you know what I'm getting at.

Did you seriously question in terms of the approach you took and the evidence you presented whether Mr. Allen was a participant in the robbery?

A    Well, I mean I had the opportunity to, I think, carefully evaluate and examine the evidence that was going to be presented in the Government's case. I had the opportunity to assess its credibility and what I believed the impact would be on the jury. And we presented evidence, I think, that tried to minimize Mr. Allen's involvement in the death of Mr. Heflin, correct, as opposed to "I wasn't even there." Now we did investigate the "I wasn't even there" defense.

Q    And it wouldn't hold water.

A    Excuse me?

Q    It wouldn't hold water.

A    It was close, but it did leak at the end.

Q    In fact, have you characterized the evidence of guilt as basically being devastating?

A    I may have.

Q    And there was a confession given to Lieutenant Henderson

that was evidence, correct?

A      That was a problem.

Q      There were tape-recorded statements between Mr. Allen and the young woman from -- while he was in custody that made admissions, correct?

A      That's correct.

MR. MORENO:  I'm going to object, Your Honor.  I understand, Your Honor, that -- I do want to object that this evidence is not relevant to what the considerations are that this Court is to determine.  I understand I have made similar objections before and you overruled them, but I do think for the record, I do want to note the defense does not think these are appropriate lines of questioning.  The issue of guilt is not before the Court.  This doesn't affect the residual that Mr. Sindel presented at the time of trial.

THE COURT:  No, I understand, and you should not hesitate to object.  I'm sure you will when you think you need to.  The objection in this case will be overruled.  It goes to overall strategy.  The general topic we are discussing now is strategy in the guilt phase as it turns into the mitigation phase, and so I'll hear it for its -- and weigh its relevance subsequently.  Overruled.

Q      (By Mr. Holtshouser)  Do you remember the question?

A      Not at all.

Q      Me neither.

A    She can read it back, though.

Q    That's okay.

A    I can almost read it from here.

Q    In terms of the -- I think the question was:  As you recall, there was also tape-recorded statements by Mr. Allen from jail to a young woman in which there were discussions and admissions about his role in the bank robbery.

A    Yes.

Q    Pretty hard to overcome that evidence, correct?

A    That's a problem.

Q    So your strategy that you approached in the mitigation case had to reflect what the evidence was in the guilt case, did it not?

A    It had to deal with that or else -- I mean those bells had been rung, yes.

Q    And you can't separate the two in terms of the positions you take in mitigation, can you?

A    You can't completely separate them, no.

Q    Now in this case you were appointed in April of '97, less than a month after the crime occurred.  Is that right?  Does that sound right?

A    April of -- Yeah.  I don't remember the date the crime occurred, but I'm sure you have the dates right.

Q    Before you, he had been represented by Kevin Curran of the Federal Public Defender's Office?

A    I thought that there must be a reason why the public defender wasn't in this case.

Q    And you knew from the start that it was likely to be a federal death case, did you not?

A    I certainly knew that -- I mean I did not think that the facts of this case were as aggravated as the other federal cases that I had handled or the other federal case I handled in this district, but I also knew that it was a possibility. And I knew that this office took a fairly vigorous stance in terms of pursuing possible capital punishment litigation.

Q    So you didn't -- you didn't first get wind of this in July or August when the notice to seek death was filed, correct?  You had it -- You had it in your mind from the start.

A    I had it in my mind certainly that it was a possibility. I mean I think during those periods of time, I was discussing it with various members of your office, you know, to see, you know, how serious and how dedicated they were to pursuing this as a capital case.

Q    From the -- From the evidence that you were afforded during the discovery process, in particular, that detailed confession that was given to Lieutenant Henderson, in it Mr. Allen admitted to participating in the planning with Mr. Holder, did he not?

A    He did.

Q    He admitted to entering the bank armed, and he admitted to shooting the guard when it looked like the guard was going to draw his gun.

MR. MORENO:  I'm going to object to that; again, same objection.

THE COURT:  Okay; overruled.

MR. MORENO:  I understand he's talking about strategies, but right now he's just going through Mr. Allen's confession which I don't see how it has any bearing on Mr. Sindel's strategy.

THE COURT:  Okay.  Well, it appears that it very well could pertain to how he handled mitigation based upon what he was faced with in guilt, so I'll hear it.  Overruled.

Q    (By Mr. Holtshouser)  That was part of the confession, correct?

A    I don't specifically remember that particular part.  I'm always concerned about confessions in cases because I believe that jurors sometimes give them undue weight under the circumstances.  My strategy was to develop through the objective facts information that indicated that that confession wasn't factual.  It wasn't historically factual.

Q    Is one of the issues that would or could impact mitigation from that confession, though -- we haven't gone into all of the details of it, but I think it's in the record -- be what the details of that confession said about

Mr. Allen's state of mind and mental functioning at the time of the crime?

A   That would be part of it.

Q   As part of that statement, did Mr. Allen advise Lieutenant Henderson that he had tried to actually establish an alibi at Northwest Plaza by shopping, applying for a job, and contacting the security guard that knew him and then taking a gift to a girl friend?

A   I -- I remember that.  I am not as clear on that, but I certainly remember that as part of our investigation.

THE COURT:  I think we'll -- I was going to wait till 3:30, but this might be a good break time.  We're going to take a 15-minute break.  Court's in recess for 15 minutes.

MR. MORENO:  Thank you, Your Honor.

(Court recessed from 3:22 PM until 3:34 PM.)

THE COURT:  Okay.  Are we ready to go?

MR. HOLTSHOUSER:  May I proceed, Judge?

THE COURT:  Yes, sir.

Q   (By Mr. Holtshouser)  We were still discussing some things, related factors in the guilt evidence that would have impacted your decision making in the mitigation.

Were you aware -- Do you recall being aware of Exhibit 100?  And specifically directing your attention to Page 3, that on March 19, 1997, in addition to having confessed to Lieutenant Henderson and having recorded

conversations, that he had contacted a detective and informed him that they, along with Donte Frazier, had been part of a gang known as "The Cliq" that had plans of committing a series of bank robberies together?

MR. MORENO:  I'm going to object again, Your Honor.

THE COURT:  Overruled.

A    It's hard for me to remember all the specifics, but I certainly remember some of the information in that paragraph.

Q    (By Mr. Holtshouser)  Including the information about the movie "Set it Off," that they had been utilizing that as a training aid?

A    I remember that specifically.

Q    And the movie -- the movie itself got frequent mention during the trial?

A    It did.

Q    And that there was a cousin of Mr. Holder who had given information that Mr. Allen had paged her after the robbery to obtain drugs and guns that she had been holding for Mr. Holder, and that he was -- wanted the items so he could leave town?

This is an example of the kind of thing that you did not want to have come out through your various strategy decisions, correct?

A    That would be true.

Q    And this is part of the reason that your main effort in

the entire case for that matter was to obtain a punishment of life in prison without parole?

A    Yes.

Q    And had you communicated that to Mr. Allen and his family fairly early on in the -- in the case?

A    I wouldn't say fairly early on.  My belief is that if you work in that direction too early without your defendant's, the acknowledgment of his guilt and saying, "I'm ready to accept my punishment," you're going to lose credibility.  You have to begin the process of demonstrating to them why the Government's evidence will be effective and why their proposed evidence won't be.

Q    So you needed to wait until you had gotten the Government's evidence, reviewed it, explored any information Mr. Allen had given you regarding such things as an alibi and so forth to be able to sit down and have that conversation with him.

A    That's true.

Q    Did you have that conversation with Mrs. Allen and with Billie Allen?

A    At times, yes.

Q    Do you recall ---

A    At different times and maybe once on a joint phone call.

Q    Do you recall whether or not -- Let's start with Mr. Allen since he's the defendant -- was the defendant.  Did

he accept your judgment?

A    No.

Q    Never did?

A    No.

Q    How about Mrs. Allen?

A    We did one time.

Q    Okay.  And "one time" being when?  Is that ---

A    Right at the -- Right ---

Q    It looks like it's something you recall specifically, so.

A    I do remember it specifically.

Q    Okay.  And when was it?  What was the context?

A    I'm hesitant to answer this question.  I don't know that it has anything to do with this, and it is a confidential communication.  I mean I know confidential communications are waived and everything.

MR. MORENO:  I'm going to object.

A    I probably would prefer to tell the Court.  I'm not sure about that.

THE COURT:  Can you do it -- Can we do it to start off as to when it happened?  I will allow it as to when it happened.  And then depending on how much further you want to go, we'll take it up one piece at a time.  So overruled as to when.

Q    (By Mr. Holtshouser)  Okay.  When did it happen?

A    During the trial.

Q     And there was a communication apparently between you and Mr. Allen in which Mr. Allen indicated that he accepted your judgment.

A     That's not what he -- That's not what he indicated.

MR. MORENO:  I'm going to object.

MR. HOLTSHOUSER:  I guess my only response would be: What is the objection?  I don't know what to respond to.

THE COURT:  Now I'm confused because I thought you were saying that there was one time Mrs. Allen accepted it.

THE WITNESS:  Mrs.?  Oh, I thought it was Mister.

Q     (By Mr. Holtshouser)  Mister.  I thought we were on Mister.

A     I'm sorry.  Then no.

Q     I tried to break it up.  Let's backtrack so we are all asking and answering the same questions.

So Mr. Allen -- Did Mr. Allen ever accept your judgment that the main effort needed to be to end up with a life without parole result?

A     Did Mister ---

THE COURT:  Okay, wait a minute.  Go ahead.

MR. MORENO:  I think the -- It implicates his privilege.

THE COURT:  Okay.  Overruled.

A     Is that Mr. Allen now?

Q     (By Mr. Holtshouser)  Yes, Mr. Allen, Billy Allen.  There

are a couple of Mr. Allens, so ---

A    Okay.  I understand.

Q    Including one named Billie Wayne Allen.

A    You know, within the context of the question that you've asked me, it wasn't framed -- the conversation wasn't framed, the idea, "Do you accept my judgment?"

Q    Mrs. Allen now, same question, did Mrs. Allen ever accept your judgment that you communicated to her?

A    I don't -- I can't recall her ever expressing that, no.

Q    Okay.

        THE COURT:  Okay.  Well, I need to -- I have a little conflict.  So I'm going to ask the question and then please object.  My question is:  Do you recall Mr. Holtshouser asking you if there was a time when Mr. Allen accepted your judgment that the strategy should be pursued life without parole?

        MR. HOLTSHOUSER:  That was the question.

        THE COURT:  Do you remember that question?  Mr. Allen.

        THE WITNESS:  I do now.  I don't believe so in any real context other than at the very, very tail end of either the guilt phase or the penalty phase of the trial.

        THE COURT:  Okay.

        THE WITNESS:  So it certainly would not have affected how I conducted the trial.

        THE COURT:  Okay.

Q    (By Mr. Holtshouser)  And when you said "one time," were you actually thinking of Mrs. Allen, not Billie Allen?

A    Billie.

Q    You were thinking of Billie.  There was one time where you felt that Mr. Allen accepted your judgment.

A    I said the phrase "accepted my judgment," I think, is distinct from the conversation that we had.

Q    Well, I'm still confused.

A    Good.

Q    Was there a time -- What was the one time?  What were you answering to when there was one time that what?  One time that he accepted your judgment?

MR. MORENO:  I'm going to object.  I think we're getting into an area that I think Mr. Holtshouser is aware of that would implicate Mr. Allen's privilege.

THE COURT:  Okay.

MR. HOLTSHOUSER:  I think the privilege is waived, so I don't agree with the objection.

THE COURT:  Well, I think it is waived.  But just so the record is complete and both sides have the right to object and to present evidence which is relevant, specifically I think where we're going with this:  Was there one time when you had a conversation with Mr. Allen about the strategy to pursue life without parole as opposed to exoneration?  And that he said that he agreed as opposed to accept your

judgment.

Now if -- if you can answer that or then subject to objection, I'll hear that.

THE WITNESS:  I don't believe that he ever expressed to me that he accepted my judgment that the best we could hope for out of this case was life without parole.

THE COURT:  Okay.

Q   (By Mr. Holtshouser)  Would that also be true of Mrs. Allen?

A   Yes.

Q   Okay.  And where I'm going with this, I'm not trying to be sneaky or camouflage this, but where I'm going with this is that:  Could that failure to accept that judgment have been another impediment to Mr. Allen and Mrs. Allen revealing to you information that may or that they have now claimed?

MR. MORENO:  I'm going to object to that.  It calls for him to speculate as to the state of mind of Mr. Allen and Mrs. Allen at that time regarding conveying relevant information pertaining to the litigation.

THE COURT:  Well, just so my ruling is clear, what it will be, it will be overruled.

If you can answer the question, was there a time when that was an impediment, if you can answer it without speculating, then you may answer.  Do you understand?

Was there a time in the -- in your defense of this

case when you concluded that Mr. Allen and his mother's unwillingness to accept a defense of pursuit of life without parole as opposed to the death penalty interfered with your ability to pursue mitigation defense or mitigation evidence.

So that -- It's your question, not mine, but if that is an acceptable substitute, I'm willing to overrule the objection to it. But do you understand?

THE WITNESS: I can try to answer that question --

THE COURT: All right.

THE WITNESS: -- that the Court propounded and also that Mr. Holtshouser did which is this: In my experience, those impediments exist in almost all capital cases. It's a very unusual defendant who will accept life without the possibility of release as an appropriate alternative, although you end up with pleas and you end up with deals. But I think once they decide that they're going to go to trial, that's a very hard thing to convince them, "Hey, this was really a win."

Q    So let's just -- Let me try it this way.

A    Okay.

Q    You did ask, and perhaps more than one occasion, you didn't -- whether or not there had been any physical abuse in Mr. Allen's background. You asked Billie that, correct?

A    Yes.

Q    The answer given to you by Mr. Allen was "no"?

A    Yes.

Q    You asked Mrs. Allen that, and the answer given by her was "no"?

A    Yes.

Q    If the information that is -- that you have now seen or become familiar with is true, would it be fair to say that at the time they were telling you, giving you those answers, they weren't truthful?

A    They -- They didn't tell me the facts as they have explained them now.

Q    And where I'm at -- Where I'm going with this is to ask you whether or not the fact that they never seemed to accept your judgment that a good outcome here -- the best outcome for Mr. Allen would be life without parole ultimately was an impediment to them realizing that, "Well then, we got to come clean with this information and tell him now so he can use it."

        MR. MORENO:  That calls for speculation.  I object.

        THE COURT:  Well, ---

        MR. MORENO:  He's asking -- He's asking Mr. Sindel to delve into their minds as to why they may or may not have conveyed the information.

        THE COURT:  If there -- I think it does.  If there's anything objectively that you can -- you recall from any of those conversations that suggest that they were -- that they

could overcome those feelings and, you know, offer mitigation evidence, then I'll -- I'll allow it, but don't speculate. You're not permitted to speculate as to the state of mind of Mr. Allen or Mrs. Allen.  Do you understand?

A    I think that the inability to accept that as a favorable result would have influenced all of our conversations and communications.

Q    (By Mr. Holtshouser)  And in that sense, been an impediment.

A    In the sense of the trial and the outcome.

Q    Okay.  Your --

MR. MORENO:  I'm going to move to strike that answer because I think that regardless of how carefully it was couched, the answer was about conversations, meaning Mr. Allen and Mrs. Allen.  He can't testify as to what an impediment is based on what they were feeling.

THE COURT:  As I understand it, the answer was their ability to accept the possibility or to accept life without parole affected all of their decisions.  So to that, I will overrule the objection.

Q    (By Mr. Holtshouser)  The business of asking Mr. Allen about abuse, was that limited to just one question the one time?

A    No.

Q    Multiple times?

A     I would say so, yes.

Q     Has it been your experience that sometimes you don't always get a frank answer the first time; you need to come back at it several times?

A     Yes.

Q     Same with Mrs. Allen?

A     I know that there were at least a couple of times; at least two or three times at least.

Q     Did your ---

A     And they would have -- There was also information that was kind of -- we kind of were developing that made us question more whether or not abuse may be part of his make-up, and I think then those questions would have been asked and were asked.

Q     And when they were ---

A     I don't remember getting any significant information other than from Sam Petty and maybe some other slight information about abuse; that I think Sam Petty was it as far as I remember.  I may be wrong, but as far as I remember.

Q     In terms of from them, though, you clearly made efforts to obtain it from them.  "Them" being Mrs. Allen and Mr. Allen.

A     We made efforts, yeah.  Not sufficient, but we made efforts.

Q     And your statement of not sufficient is your hindsight

evaluation based upon what you currently think to be true?

A    In part.

Q    All right.  We're still on the general topic of strategies and themes.  And had experience prior to 1997 taught you that a theme most likely to secure a life sentence was a theme that had a causal nexus to the crime?

A    Yes.

Q    Because the jury was being asked to decide what was an appropriate punishment for that crime, correct?

A    I think that things that may have been a motivating factor in committing the crime would be either something to explore or something to hopefully keep away from the jury, either one.

Q    And by "causal nexus," do you mean something that would explain why he committed the particular offense?

A    Why he acted the way he did, yes, sir.

Q    Okay.  And that included things like social background and mental health testimony about why he chose to commit the offense.

A    Yes, it could.

Q    In a bank robbery, is that particularly difficult because the motivation, obviously, is money?

A    Yes.

Q    This would have been a different case, wouldn't it, if the -- he had, for example, killed his mother?

A    Yes.

Q    In terms of the causal nexus themes that you put forward, though, the follower personality was one of those causal nexus themes, correct?

A    Yes.

Q    And it -- it juxtaposed him against Norris Holder who you portrayed as being older, stronger personality, who could manipulate and mislead Mr. Allen.

A    Yes.

Q    In your -- In your pecking order, so to speak, of themes or strategies, had your experience actually taught you that there was a third tier that fell under the umbrella of -- and I think this is your word -- "begging"?

A    Yes.

Q    And tell the Court what you mean by "begging."

A    Well, I mean that you can appeal in the most direct fashion to the emotions of the jury, and that the very first case that I tried, that was my strategy in the penalty phase. And it's one of those things where you try to resonate with the emotional impact with the jury that this whole thing can have on whoever you find.

Q    In terms of -- In addition to your residual doubt and your causal nexus themes, you actually did put on and develop some substantial evidence of -- that would fall under this category that you frankly described as begging, correct, for

lack of ---

A    I think primarily through the family members, that's the concept.

Q    Okay.  And that's where personal background information fell in your hierarchy of themes.

A    Yes.  I mean that's not the only place that that has some kind of bearing, but it was partially true.

Q    And here, those included such things as direct testimony from witnesses that this conduct was aberrational; nothing like this was in his background in the past.

A    That's correct.

Q    He lacked a father figure.  That was stressed, wasn't it?

A    Yes.

Q    And in that bio that Mr. Allen wrote in his own hand, it's a theme that he stressed without prompting as something he identified on his own as something that influenced him in his life.

A    It's something we had from the beginning of the case.

Q    There's nothing in that bio, is there, about any -- anything about -- anything negative about his mother, is there?

A    Not that I can recall.

Q    The complaints that he has about his father in that bio had to deal with his absence or his departure from his life, not with any physical or other abuse that he had imposed upon

Mr. Allen.

A     That's correct.

Q     There was quite a bit of evidence about difficulty that Mr. Allen had in school.

A     Yes.

Q     You put on pretty much every one of his teachers through grade school, correct?

A     We put on a number of them, yes.

Q     And what high school teachers there were that you could find.

A     Right.  Those were more difficult.

Q     You put on evidence about his difficulty in adjusting to the Clayton School system where he was confronted by people who clearly fell within the "have's" category and he was in the "have-not's" category.

A     That's true.

Q     That Clayton School system, that was part of the desegregation program where his mother had to take some steps to enroll him.  Isn't that -- Wasn't that true?

A     I believe that's true.  I'm not sure of the entire process of how a child gets into the deseg. program, but I know that there has to be some steps taken.

Q     And that step had been taken for his older sister and it was similarly taken for him.

A     I thought it was taken for the whole family, but I may be

wrong about that.  I thought the two sisters and he.

Q    And that said something to the jury about the value that his mother placed upon getting her children a quality education; that it was at least a value that she instilled.

A    I mean I don't know that that was anything that we stressed.  I think we stressed the schooling.  There were a couple of reasons.  Number one is because the teachers in the Clayton School District had a pretty distinct memory of Billie.

THE COURT:  What did you say?  You said Clayton?

THE WITNESS:  The Clayton School teachers had a good, distinct memory of Billie.  They, you know -- For whatever reason, he either stuck out in their mind or they were the kind of and quality teachers that, you know, do pay attention to their students.  We couldn't develop that kind of information in the city schools.

A    But I don't remember stressing to the jury in any way, "Well, you know, Juanita got him enrolled, and that has some real meaning."

Q    Another theme that fell under this category that you stressed was that the school system had somehow failed to intervene in any learning difficulties that he had.

A    I don't -- It seems to me that there was one woman who spoke to that and addressed that.

Q    Thought he needed Special School District services --

A    Yes.

Q    -- but didn't qualify?

A    Yeah.

Q    That was something you actually looked at and investigated, wasn't it, whether or not he had been tested?

A    Yes.

Q    None of the teachers that you had contact with as part of the mitigation investigation conveyed any information that suggested that there was any abuse of Mr. Allen within his home or by his mother?

A    Not that I recall.

Q    Was there testimony from some of the teachers about Mr. Allen -- Mrs. Allen, rather, attending parent/teacher conferences on his behalf?

A    I'm having a hard time remembering that there were or not.

Q    Well, if it's in the record, it's in the record.

A    It's in the record.

Q    Probably an area that you stressed a lot here for most of the family and friends and neighbors was that Mr. Allen came from both an immediate and an extended family that loved him.

A    That's what we believed.

Q    And you put on evidence to that because that's what they told you, wasn't it?

A    That's true.

Q    And do you -- do you doubt today that his aunts, his uncles, his cousins, his sisters loved him?

A    No.

Q    You have some doubt, I take it, with respect to his mother, correct, based upon what you've seen?

A    I don't -- I don't doubt that she loved him.  I just don't think she was loving towards him.

Q    The evidence that you presented to the jury, the evidence you discovered during your investigation, certainly supported this notion that Mr. Allen was loved by his family and then, therefore, he must have value as a person.

A    That's correct.

Q    That's the connect-the-dot part of that evidence and that issue, correct?

A    Right.

Q    The type of people that you put on as well, do you recall that they were selected in large part because they were people who the jury could identify with?

A    I mean that's part of the equation that you use.  You use the quality of information that they have.  You use their level of, you know, education in terms of being able to speak adequately and convey an idea, not get terribly scared or nervous.  You try to look at all those things.  But the primary thing you're looking at is:  Will this person be able to communicate effectively with the jury?

Q    The people that you chose, the people that you put on, at all age spectrums for the most part were working people?

A    Yes.

Q    Some of them had or were pursuing higher education?

A    Yes.

Q    Had achieved a certain amount of success in their fields?

A    Yes.

Q    Were raising intact families?

A    Yes.

Q    So they defied a lot of the so-called stereotypes that some jurors might have about the, quote, "ghetto," correct?

A    Yes.

Q    And so that the impression you gave to the jury was that Mr. Allen came from a place or a family where this kind of conduct is not -- it's aberrational for him.  It's aberrational for their family as well.

A    Yes, that's part of what we developed in the case.

Q    And these same people valued Mr. Allen and wanted Mr. Allen to continue to be a presence in their lives?

A    That's correct.

Q    Now you were not permitted to present execution impact evidence, were you?

A    No.

Q    Was it -- Did you make an attempt or was it your effort to kind of dance around that issue, for lack of a better

phrase, by getting that message across, anyway, that this would have an impact on these people?

A    I mean I think that it's -- You know, we didn't solicit it, but we knew that if we asked the questions in a certain way, we would be able to convey that to the jury.

Q    That (A) they loved him; they valued him.

A    They would have contact with him.

Q    They would be very saddened if he was taken from their lives.

A    Right.

Q    Now you did, in fact, though, portray Mr. Allen's family, immediate family I mean, as a broken family in a sense that both his father and his mother had been separated from an early age and were no longer living together.

A    Well, and more broken than that, but that was part of it.

Q    Yeah.  You actually put on some significant evidence that basically dad was a bum and an alcoholic.

A    That's right.

Q    And that is John Allen, correct?

A    I don't remember the name of the person in the evidence, but there was evidence that we put on that clearly made Billie's father, for all intents and purposes worthless.

Q    Okay.  Was a theme, an argument, a message that you communicated to the jury that one of the ways in which Billie Allen found himself in this situation was that -- What

separated him from those others in his family was that they each had a father figure in their lives, Billie did not, and that was the defining difference?

A    That was part of it.

Q    How did you portray his mother at trial?

A    I do not remember.

Q    She was going to testify at some point, wasn't she?

A    She was certainly always on the roll of people who could testify.

Q    Okay.  And does this refresh your recollection that in the transcript there's a break in Deborah Ruffin's testimony in which there's a conversation, a bench conference with the Court which indicated that Mrs. Allen is going to testify?

A    It may have had something to do with excluding her from the courtroom or something like that.  So I mean I'd stand by whatever is in the record.

Q    But she was on the short list to be called up till the very end.

A    I believe that's correct.

Q    And you're the one that made the decision to not call her, correct?

A    I'm sure it was a joint decision amongst the members of the team, but it was ultimately my decision.

Q    And was the primary reason that you -- Now the evidence about Mr. Grant and the conversation regarding co-signing for

Billie Allen, that evidence was out in front of the jury, wasn't it?

A    Yes.

Q    So you weren't risking exposing that evidence by putting her on.  It was out.

A    That's correct.

Q    Was it -- You had real concerns about her demeanor, if she would testify, that ultimately led to your decision to not present her.

A    That's part of the equation.

Q    Was it a significant part of the equation?

A    She was -- I mean that was a significant part of the equation.

Q    Did you view her as, in your words, a loose cannon?

        MR. MORENO:  I'm going to object to that.  On Direct Examination I believe he testified he doesn't really remember.  He doesn't have a good recollection of why he didn't call her.

        MR. HOLTSHOUSER:  I guess that's why this is Cross Examination, Judge.

        THE COURT:  Well, irrespective, overruled.

A    Did I use that phrase?

Q    (By Mr. Holtshouser)  Had you used that phrase in the past to describe her?

A    I don't recall.

Q    But you do recall that you had real concerns about her

demeanor.

A    I did have concerns about her demeanor.

Q    Do you also recall that David Randall, your mitigation expert, stressing to you that one thing that can't be done in the penalty phase as part of your strategy is you, quote, "can't trash Mom," closed quote?

A    I mean I think that that was -- that was the strategy that was developed around that period of time, that we weren't going to go there.

Q    And you agreed with that.

A    I -- I, obviously, had to if I didn't present evidence to "trash Mom."

Q    And that was your call.  You made the final decision in that regard, correct?

A    I think I was making all the final decisions.

Q    Now some of the evidence that you put on wasn't all positive about her, correct?

A    No.

Q    The jury heard evidence that she drank?

A    Some evidence to that effect, yes.

Q    And there was some evidence that Mr. Allen was physically punished?

A    That's correct.

Q    I think that -- Do you now better remember Raymond Petty testifying and what his testimony was or what he said about

that topic?

A     The electric cord?

Q     Yes.

A     Yes.

Q     And how is it that you remember that better now?

A     I asked for that portion of the transcript.

Q     You asked who for that?

A     The defense -- The habeas team.

Q     You're talking about after your deposition you asked for that.

A     Yes.

Q     Okay.  And that refreshed your recollection as to what he testified to and what you put on?

A     It did.

Q     But despite what he had related to you and related to the jury, Mr. Petty, though, still testified that Mr. Allen had a good relationship with his mother; a loving relationship?

A     At the penalty phase of the trial?

Q     Yes.  Yes.

A     That's what I recall, yes.

Q     They described Billie Allen as generally a good kid up until his teen years.

A     Yes.  It seemed to me he -- there was a change that was going on, but he was a good kid.

Q     And she indicated that his sister, Juanita Allen, had

done the best she could but that she didn't know how to deal with some of Mr. Allen's behavior, such as not coming home, skipping school, et cetera.

A    There was testimony to that effect.

Q    None of that testimony from Mr. Petty would have indicated to you that there had been any sort of complete abandonment of Mr. Allen by Juanita Allen at any time.

A    As I recall the testimony, it was also that Mr. Petty wasn't, you know, around a whole lot.  He had his own obligations, business, education, his own family.  I think he was a very directed goal-oriented person.  So I think that that would be qualified by the fact that, you know, he wouldn't have been able to answer the question, for example, as effectively as Billie's sisters.

Q    But his sisters were asked those types of issues, weren't they?

A    During the course of the penalty phase?

Q    Well, they were asked during the course of the penalty investigation, the mitigation investigation.  You asked them the same questions you asked Mr. Allen and Mrs. Allen.

A    I don't have as distinct a recollection of that conversation as I do the conversations that occurred with Billie.  I think they were there at the times I was at the house.  I think they came to the office once or twice.  They were part of the prep.  I remember one of his sisters had very

significant mental problems, I thought; not like retarded or anything; just issues, anxiety issues.

Q    Part of them related to Mr. Allen being in custody and being charged with this offense?

A    I don't know.

Q    The actual evidence that you discovered and presented supported your belief that Mrs. Allen was a caring mother and had a loving relationship with her son, Mr. Allen.

A    That was the part of the evidence we presented to convey the strategy we thought was appropriate, considering our investigation.

Q    And your -- The objective evidence that you had seen as a result of that investigation supported that, such as she saw that he got appropriate medical care when he needed it throughout his life.  There are numerous instances of her taking him to the Emergency Room or for pediatrician visits.

A    Yeah, but I -- I mean I couldn't comment on whether it was appropriate because I couldn't comment on what other issues, medical issues may have been developed and weren't looked at.

Q    Did you see anything, though, that contradicted that -- that belief that you had based upon your other objective observations and information?

A    Not specifically.

Q    You had direct evidence that she had attempted to steer

him away from drug usage and drug dealing, correct?

A    I believe so, yes.

Q    And that she had pushed him in positive directions, such as Job Corps, trying to keep him in high school?

A    I think that there were things that she attempted to do that would help Billie and there were things that she did that really, really harmed him.

Q    Are you talking now in hindsight or are you talking about what you knew then?

A    Both.

Q    I'm only asking about what you knew then.

A    I forgot.

Q    Okay.  So in terms of what you knew then, the objective evidence that you had in front of you at the time based upon your efforts and your investigation supported your belief that she was a caring, loving mother, did it not?

A    It supported a belief that she could be a caring and loving mother.

Q    Other witnesses that you talked to, neighbors, sisters, brothers, similarly supported that belief, correct?

MR. MORENO:  I'm going to object.  I don't think there's any evidence to support that question, nor does Mr. Allen's brother.

MR. HOLTSHOUSER:  Not Mr. Allen's brother; I'm talking Mrs. Allen's brother.

Q    (By Mr. Holtshouser)  I'm talking about Mrs. Allen --

A    Okay.

Q    -- and your impression of Mrs. Allen as well as the impression that you conveyed to the jury.

A    Well, I wouldn't -- I wouldn't necessarily say that.  I mean I didn't have an impression that told me that I was 180 degrees off, but I certainly had impressions of Mrs. Allen as a mother who on occasion or more than that was not satisfactory.

Q    Had you come into possession of correspondence between Mr. Allen and his mother?

A    I believe I had.

Q    And how did you get those?

A    I think I -- I think pretty, obviously, Mrs. Allen must have given them to me.

Q    All right.  Did those letters, at least on the part of Mr. Allen, indicate that he had a good, loving relationship with his mother from his point of view?

A    I'd have to really look at them.  I mean I don't want to guess as to what they said.

Q    Does this look like one of them?

A    That looks like Billie's handwriting, yes.

Q    Okay.  And you received this from his mother?

THE COURT:  What's the number, please?

MR. HOLTSHOUSER:  This is Exhibit 491.  I'm sorry,

Your Honor.  Exhibit 491.

A   That's where I would think it came from, yes, ma'am -- yes, sir.

Q   (By Mr. Holtshouser)  And you indicate that it looks to you like it was Billie's handwriting.

A   Yes.

Q   You had seen examples of his handwriting in the past --

A   Yes.

Q   -- during the time you were dealing with him?

A   Yes, I had.  Okay.  You went pretty fast for me.

Q   I'm just paging through.  Do you see -- And it closes with "Love, Bill," correct?

A   Right.

Q   I'll show you next 492.  Is this another one of the letters you received from Mrs. Allen that she had obtained -- she had received from her son?

A   I believe so.

Q   Why would she have been giving you these?

A   I think she probably had a couple of reasons.  I think, you know, to give me some idea of, you know, Billie and their relationship.  And also -- It seemed to me there were also letters that may have dealt with, "Everything is going great"; "The case is going great"; "Again, I'm going to be coming home soon," that kind of thing.  So I think she wanted to let me know that that's what they were counting on.

Q    Let me just show you -- there's a couple more -- 493.  Is this another one that you received from her?

A    Yes.

Q    This one even closes out, "I love you, Mom.  Love, Bill"?

A    Yes.

Q    Exhibit 494, is this another one?

A    Yes.

Q    Okay.  And 49 ---

A    Don't take that one off quite yet.  Okay?

Q    Okay.  We're probably going to come back to them, but I just want to at least get the ---

A    Oh, okay.  Okay.

Q    495 is the last one that we've been shown.  This one is to -- Again, is this another one of the letters that you received from Mrs. Allen that she received which relates to Happy Mothers Day '96 and '97?

A    I believe so, yes.

Q    Okay.  We may get into the content of them later, but these five letters that I've just shown you were letters that you received from Mrs. Allen that you recognize as the handwriting of Mr. Allen and that she endorsed as having come from Mr. Allen.

A    Yes.

Q    These letters, likewise, did they constitute at least objective evidence to you that what Mrs. Allen and Mr. Allen

were telling you about their relationship was true?

A     It -- It didn't cause me to further question it.

Q     It didn't contradict it, certainly.

A     Right.

Q     Had Mrs. Allen -- Was it known to you that Mrs. Allen had filed a "Missing Person Report" for Mr. Allen shortly after the shooting that took place at her home?

A     I -- I recall something to that effect, yes.

Q     Was it actually the second time in the discovery materials you received that Mr. Allen had been reported missing by his mother?

A     I wouldn't feel safe commenting on that.

Q     Do you recall that during the time that the mitigation and penalty phase investigation was being conducted, that the Government was similarly investigating Mr. Allen's background?

A     Yes.

Q     And you were given some discovery from the Government that was relevant to mitigation, correct?

A     If you could ---

Q     Okay.

A     It's Cross Examination.  You can lead me.

Q     That's what they're used to, not me.  But you had some information, did you not, police reports, more police reports, for example, one relating to the death of Dennis Noble, the death of Marquis Taylor, the Missing Person Reports, the

shooting at the house.

A    That's correct.

Q    You had all that, correct?

A    Yes, we had that.

Q    Okay.  There was an auto theft arrest by Mr. Allen that resulted in a conviction for which he was on probation at the time of the offense.  That's how Byron Woodard, the probation officer, came into the picture.

A    Right.

Q    And he had made home visits to the -- to the Allen home. Do you recall that?

A    Yes.

Q    This is an interview of a Sandy Sullivan at a company called "Chemisco" where Mr. Allen worked for a period of time?

        THE COURT:  What's that number, please?

        MR. HOLTSHOUSER:  That is Exhibit 115.

Q    (By Mr. Holtshouser)  Do you recall this as being something you received from the Government in discovery that was at least pertinent to Mr. Allen's background?  Had nothing to do with the offense, did it?

A    No, it did not.

Q    Okay.  Probably -- Why don't we -- Just to be clear for the record, let's go back.  I'm just going to go through these.

        106, these are St. Louis Children's Hospital records.

They were actually admitted by the Government as Exhibit 102, but these are records that you had obtained fairly early on in your investigation, had you not?

A   I think we had tried to obtain them.  February 6th, 1998, is the date of the letter.

Q   Okay.  You had been trying to obtain hospital/medical records, though, from very early on in your representation of Mr. Allen.

A   I -- I thought we had, yes.

Q   Okay.  107, these are St. Louis City records.  This actually is dated July of 1997.  So this is months before Mr. Simon has been appointed; months before Mr. Haney is in the picture.  These were obtained through efforts through you and your assistants, correct?

A   That's correct.

Q   And these records were multiple pages of medical records that existed with respect to treatment of Mr. Allen throughout his life, correct?

A   Correct.

Q   I think these are dated '83, '84.

A   I mean these were the records that we were able to secure from the hospital that had at least provided some treatment.

Q   Okay.  Exhibit 108, you had school records from St. Louis city schools, did you not, of his attendance at various city schools?

A    We did.

Q    109, you obtained records from the Clayton School District?

A    We did.

Q    And that included, among other things, some standardized testing results?

A    I believe that's accurate.

Q    And then there's a series of police reports.  This is Exhibit 110.

THE COURT:  Just a second.  Was 108 -- Yeah, I'm sorry.  108 is the city.  Just a second.

MR. HOLTSHOUSER:  Is the city.  And then 109 is the Clayton School records.

THE COURT:  All right.  Okay.  I got it.

Q    (By Mr. Holtshouser)  110 is the homicide report of Dennis Noble who was killed on December 16, '93.  It's not the best of copies, but ---

A    Okay.

Q    111, you were provided with a report, a loitering arrest by Mr. Allen on October 20, '94, --

A    Okay.

Q    -- correct?

A    Yes.

Q    112, ---

THE COURT:  Wait a minute.  Wait; I'm getting behind.

A    You said October 20, '94.  Is that the date?  I'm assuming that's the date that the case was presented, but it appears that ---

Q    It is the date he was arrested right here, 10/20/94.

A    All right.  All right.

MR. HOLTSHOUSER:  Judge, I'm on Page 5 of the exhibit list, and I'm actually just going to run through 112 through 123 --

THE COURT:  Okay.

MR. HOLTSHOUSER:  -- which ---

THE COURT:  What I need to do is show on my list for purposes of the record later that these are offered, who identified them.  So you're saying you're going to offer 112, 115 -- or you're going to identify 112 through 123.  115's already been identified, correct?

MR. HOLTSHOUSER:  Correct.

THE COURT:  So 112, 13, 14, 16, 17, 18, 19, 20, 21, 22, and 23, correct?

MR. HOLTSHOUSER:  Correct.

THE COURT:  Okay.  Just a second.  Let me make my notes.

(Pause)

MR. HOLTSHOUSER:  Judge, we're having a discussion.  At least we propose this for time-saving measure or at least posited the request of offering and admitting all of the

exhibits identified on the exhibit list.

THE COURT: Oh, okay.

MR. HOLTSHOUSER: However, they haven't had a chance to fully consider that.

THE COURT: Okay.

MR. HOLTSHOUSER: And then in terms of procedure, we would -- we would actually offer exhibits at a later time --

THE COURT: All right. I understand.

MR. HOLTSHOUSER: -- rather than just --

THE COURT: Okay. That's fine. I'm just -- And that's what concerns me is several days from now, I won't remember who identified them. And so all I'm doing right now is going through my list and note simple ID on them. That's all I'm doing.

MR. MORENO: Well, maybe at the end of the day today we could offer --

THE COURT: Okay, all right.

MR. MORENO: -- the exhibits that were used --

THE COURT: Sure, that's fine.

MR. MORENO: -- just so there's not a problem later on in the record.

THE COURT: That's fine. If that's true, we probably need to quit in about 15 minutes because I need to be out of here shortly after 5:00. Okay? Thank you.

MR. HOLTSHOUSER: All right. Next, Judge -- Can I

move ahead, Judge?

THE COURT:  Sure, yeah.

Q    (By Mr. Holtshouser)  112 is the next one that I'm showing you.  This is a -- the report regarding the auto theft that resulted in Mr. Allen's conviction, correct?

A    Correct.

Q    113 is the next one.  This is actually the homicide report of the shooting of Marquis Taylor.

A    Correct.

Q    And that's May 3rd, 1995, is when that occurred, less than two years before the offense, correct?

A    Yes.  Yeah.

Q    All right.  114 is a police report regarding an October of '95 tampering arrest, separate from the other arrest that resulted in a conviction.  And that's an arrest of Mr. Allen.

A    I don't see -- There it is over in the right-hand corner.

Q    Yeah.

A    Someone handwrote it.  I don't have any reason to believe it's not Mr. Allen.

Q    Let me show you.  There it is.

A    There it is.  Okay.

Q    115, --

A    Isn't that the one we saw already?

Q    -- yeah, that's the one we saw already.  116, is this a February 19, 1996, --

A    Missing Person Report?

Q    Yes.

A    Yes.

Q    Okay.  117, this is actually -- The attached report is the police report regarding the shooting at 4535 Cote Brilliante on January 9, 1997.  That was something that you received in discovery from the Government, correct?

A    Yes.

Q    And 118, the January 20 report submitted by Juanita Allen that Billie Jerome Allen was missing.

A    Yes.

Q    119, did you have the records from the Metropolitan St. Louis Psychiatric Center regarding a -- I believe this is -- Well, it's a series of visits, two visits.

A    Yes.

Q    Do you recall that there was actually two times that Mr. Allen went to the Metropolitan Psychiatric Center, one with Tasha Valentine and her mother, another time on his own?

A    That's what I recall.  I think one was a supposed suicide attempt and ---

Q    120 is a Franklin County Jail Visitor Log that the Government obtained; provided to you in discovery, correct?

A    Yes.

Q    121 were the medical records for Mr. Allen while incarcerated in Franklin County Jail?

A     Yes.

Q     122 was your effort to obtain records from the Boy Scouts of America which were limited to this letter, correct?

A     Correct.

Q     123, were these the St. Louis City School Disciplinary Records for Mr. Allen that the Government obtained and provided to you?

A     They appear to be.

Q     Okay.  In addition to what I have shown you in terms of documentary evidence, were there also a number of -- a combination of witness statements comprised of reports of interviews by Andy Rackers, memos of interview by David Randall, and FBI 302s by an FBI investigator who was also conducting a contemporaneous mitigation investigation?

A     That's correct.

Q     The Randall memos, do you recall those actually being the subject of some litigation during the trial regarding the fact that they had been supplied to either Dr. Cuneo and Dr. Gelbort or both and, having done so, had to be produced to the Government?

A     I recall that.

Q     And they -- they were produced to the Government, correct?

A     That, I don't recall, but you guys won most of the arguments, so.

Q    All right.  I want to shift gears again just so you know what I'm talking here about is basically what was done by you and others with you before Dr. Haney and before Mr. Simon were appointed.

A    Okay.

Q    So we're talking from the time you got in the case in April of '97 up until approximately the Fall of '97.  And whichever one of those two things occurred first, we'll get to that.

A    Okay.

Q    I'm going to show you a series of exhibits here, first 300.  Is this a letter by you to Billie Allen on April 10, 1997, regarding your acceptance of the appointment to represent him?

A    Yes.

Q    Would this coincide with the date of your first entry in the case?

A    I couldn't tell you that for sure, but it's certainly within that time frame.

Q    Now let me show you Exhibit 301.  Do you recognize this?

A    That may be Rackers and Juanita Allen.  I can't be positive about that.  I mean it says Juanita Allen.  And "R" could be Rackers.

Q    Could "R" also be "Rick"?

A    It could be.  I'm known by that sometimes.

Q    Now on April the 16th of '97, this document is captioned "USA vs. Billie Allen, Juanita Allen, April 16, 1997, Mitigation Notebook."

A    Okay.

Q    Were you even -- Andy Rackers, just to refresh your ---

A    I'm sure that this "R" is me.

Q    Okay.  So it said over there.  How did this come to be?

A    I'm guessing that we had a school conversation -- we were having a conversation and part of it was tape-recorded.

Q    Well, did you -- Was it your practice to tape-record your conversations with Mrs. Allen or other witnesses?

A    No, not really.  I mean, you know, if I was doing it, they would know, and it was only a matter of expediency and ensuring some degree of accuracy, but it was never ---

Q    As you sit here today, do you have a recollection of this conversation?

A    Well, I've only seen a little part of it.

Q    Well, that's my question.  Does it appear that it starts in mid-conversation?

A    It does.

Q    Was there -- In terms of the process of paper in this case, you ended up with a file of multiple boxes of documents and materials, electronic records in this case, correct, at the end of the case?

A    Yes.  I don't know how much electronic records, but yes.

Q   Was it as much then as there is now in terms of electronic records?

A   No.

Q   Okay.  You ultimately conveyed all of your materials, is that correct, to Mr. Simon?

A   I'm pretty sure I did.

Q   Because he continued on in the appeal; you did not?

A   Correct.

Q   Did you give everything that you had pertaining to the case to Mr. Simon?

A   To the best of my knowledge, I did, and I also checked our storage facility to see if they had anything there.  And their records showed there were, I believe, two boxes or three boxes of materials.  I don't know if those are the big boxes or the banker boxes that were turned over to Mr. Simon.

Q   And so you made that check after the deposition.  Is that correct?

A   Yes.

Q   And you basically confirmed you have nothing left.

A   That's correct.

Q   Okay.  And what you gave to Mr. Simon, do you have any recollection of there being any -- any cassette tapes or microcassettes of conversations?

A   I don't know, but if I had, let's say, for example, done this tape, it would have been transcribed by the secretary and

the tape would be gone.  I wouldn't keep it for evidentiary purposes.

Q    My question is:  Is this the whole -- We've never been provided with the tape.

A    I don't know that there is one.

Q    Is this the entire transcript of the conversation to your knowledge?

A    Is that the only piece of paper that you have about this?

Q    There's a continuation that goes on for a couple of pages and then it ends apparently mid-sentence.

A    Boy, you know, I wish I could tell you more.  The -- What's -- What's indicated there at the bottom is a -- that it was done by my secretary, RSO.

Q    Do you see the date here, though, is 4-16-09?

A    I didn't know what that meant, but now I do, yeah.

Q    What does that mean?

A    I don't have any clue.  The only thing I can think of is that it may have been -- I don't know.

Q    Who is "RSO"?

A    I don't know that that's a date.

Q    Well, "RHS" is you.

A    That's me.

Q    "RSO" is who?

A    That's Robin, my secretary at the time.

Q    Okay.  So that's a -- These are -- This is a specific

person in your office.

A   That's correct.

Q   You don't think that "041609" reflects the date that this was prepared?

A   No.  The best way -- I mean I really don't know what it means.  But if you'll look at the letters, I think you'll see a number on the bottom of some of the letters that were generated out of the office, and I think in those there may be a number there that doesn't coincide with the date of the letter.  So I'm speaking -- I mean I just don't really know, but I can't imagine how it could be 4-16-2009.

Q   The conversation that you're having with Mrs. Allen here, this would have been very early in your relationship with her, correct?

A   Yes.

Q   Less than a week after you've written to Mr. Allen, introducing yourself?

A   Yes.

Q   So this is entitled "Mitigation Notebook" up at the top.  So would it be fair to say that within one week of being in the case, that you were already thinking about investigating and developing mitigation?

A   Yes.

Q   And would it be an accurate statement that you were on -- you were investigating mitigation from the minute your boots

hit the ground, I think was your phrase?

A    I think that was part of what I was doing, yes.  I think that, you know, the first thing to do is to talk with the client and certain major people in his life and then begin the process of collecting records.

Q    But as an experienced capital criminal litigator and trial attorney, this was typical of your practice to begin focusing and thinking about mitigation this early in the case.

A    I mean I think that from -- to the family and -- And, again, the importance of working towards accumulation of these records, you have to start out early.

Q    Okay.  And that's what you were doing.

A    That's what I was trying ---

Q    And that's what you did do.

A    That's what I was trying to do.

Q    It's what you did do as well, correct?  This being one example.

A    On occasions, yeah.

Q    In the -- In this portion right here, you ask, "Okay. How did he do in school?"  This, of course, has nothing to do with guilt, correct?  How he did in school?

        At this point you're actually gathering background information about him as early as April 16, 1997, aren't you?

A    Yes.

Q    "Tell me the absolute 100 percent what happened.  Don't

color it one way or the other because I'll find out anyhow. Did he do good?  Medium?"  And what does she do in the next sentence?

A    Well, she's -- I think she's trying to make sure that I'm somebody that is on her husband's or on her son's side.

Q    Does she, in fact, basically cut you off mid-sentence and stop you and basically say, "Look, excuse me.  First of all, okay, you represent my son."  You say, "That's right."  You're letting her talk now at this point, correct?

        "It sounds like to me we have to be on good rapport. Okay?"  And this is from Mrs. Allen, isn't it?

A    That's correct.

Q    And you say, "That's exactly right."

        And she says, "And I'm not going to lie to you and I'm not expecting you to lie or fabricate to me."

A    That's what it says.

Q    You said, "That's perfect.  That's our understanding."

        Her response is, "Okay.  So we got that about the system" -- maybe it should be "out of the system" -- "so there's no need for that conversation again; okay?"  This is her telling this to you, correct?

A    Yes.

Q    And you say, "Okay."  And then she proceeds to answer your question, correct?

A    That's correct.

Q    So apparently, according to Ms. -- Would you agree that according to Mrs. Allen in the conversation you had with her, within one week of your being in the case, she felt that you and she had a good rapport and that she was going to tell you nothing but the truth and didn't want to be lectured to any more by you about not giving anything less than a hundred percent?  Is that a fair assessment?

MR. MORENO:  I'm going to object.  I don't think the evidence supports the question.  The letter certainly doesn't indicate that they had a good rapport.  I think that she agrees that they had to have a good rapport in order to have an honest exchange between each other.

THE COURT:  Okay.  I think that probably is the correct understanding of what is reflected; that a good rapport was needed.  And then she said, "I'll give you a hundred percent."  I think that -- Yeah.  So I agree that -- Okay.  I'm not sure how to sustain that objection.  I agree with what you said.

MR. HOLTSHOUSER:  I'll withdraw it and rephrase, --

THE COURT:  Okay, thanks.

MR. HOLTSHOUSER:  -- just to keep us moving here, Judge.

THE COURT:  Okay.

Q    (By Mr. Holtshouser)  Ms. Allen indicated to you here, did she not, that what she was going to tell you was going to

be a hundred percent true?

A    That's what she said in that conversation.

Q    And that what she's telling you, there's no need for that conversation again.

A    That was the import of what I've read there.

Q    Did you feel a little bit lectured to or put in your place?

A    What did you say?

Q    Did you feel a little bit lectured to or put in your place at that moment in time?

A    I enjoy that.  I think she wanted to make it clear to me where she was coming from at that point in time.

Q    What -- What impression did you take from that as to how she viewed you?

A    A victim.  I mean I think she just really wanted to find out, you know, where I was going to come from, and that "you don't need to question me about my integrity or honesty.  I'm going to be candid with you."

Q    She provided then to answer specific questions to you about his education, his experience at Clayton.

A    Correct.

Q    Then Sumner is discussed, --

A    Right.

Q    -- correct?

A    Yes.

Q    And it says that, "He actually went to Sumner and then went back to Clayton because he didn't like Sumner at all.  He was there for the whole year."

"So that was for 9th grade?"

"Right."

"Okay.  Then when was it that he stopped going to school?  Do you remember the grade?"

She says, "I think it was -- I have to think about that."

You asked, "Do you remember the day -- why it was he dropped out of school?"

And she said, "It wasn't that he was suspended or anything.  He just had no interest in school, and he started skipping whereas I didn't know he was basically skipping and stuff like that."

Again, here in the next page, 4 of this transcript, you are continuing to converse about school but then shift the topic to a recording contract.  She indicates she knows nothing about that, correct?

A    That's right.

Q    Now you indicate to her that you have his girlfriend's phone number.  You tried to call her.  "But where can I find records -- Let me ask you a couple other questions.  Where was he born?  What hospital?"

You asked that question, correct?

A    Yes.

Q    And the purpose for asking that question is that this is within a week of being on the case, you know.  You knew that one of the things you needed to do was be on the record hunt.  You needed to find out what documentation existed out there that pertained to Mr. Allen, amongst other things.

A    Yes.

Q    You get her address, her zip code.

Then you asked, "Apparently was he treated in any way for lead poisoning?"

And she said, "He did."

"Where was that at?"  She says, "Homer G."

Did you already have some information from some source that led you to ask that question or is that just a routine question that you ask?

A    Well, I think she volunteered that there was a chemical imbalance and lead poisoning.  I believe that I would have asked that question --

Q    You're correct.

A    -- of Mr. Allen.

Q    Okay.  There's this continued discussion of that on Page 6 as well as the age when that occurred.

A    I'm sorry.  You'll have to -- You said Page 6?

Q    See "6" at the bottom here?

A    Yeah.  Oh, yeah, I see it.

Q    Okay.

A    What did you ask me again, sir?

Q    A continuation of that conversation about lead poisoning, the age and the treatment --

A    Right.

Q    -- and so forth.  That goes on there.  All right.  Here on Page 7, "Were there any other people that treated him for lead poisoning besides Homer G.?"

     Her answer is, "Well, it wasn't so much he was treated, but the medication that he was on was really bad, and I took him to another particular doctor, and that was Dr. Grabau."

     "Do you know where he's located?"

     "He was on Broadway.  He just retired last year."

     And when you actually got these medical records, did you notice that the doctor that saw him the most when he was a younger person was this Dr. Grabau, a pediatrician?

A    The name is familiar, but I couldn't tell you offhand from my memory.

Q    You never saw anything in those records of examination by Dr. Grabau on a number of instances that would have indicated any notion that Mr. Allen was receiving any physical abuse, did you?

A    There was nothing that I recall.

Q    There's a discussion down at the bottom regarding

convulsions. You asked about head injury. These are all questions that you know to ask from your experience and training as it relates to mental functioning, correct?

A    That's correct.

Q    You ask about the addresses that they've been on; where they've lived before. And then she says that -- You ask, "Has there ever been any kind of mental hospital or psychological facility?"

And she says she had someone to try and evaluate Bill at a place called Provident when he was at Sumner. "So it must have been 9th grade. Just come out and talk to him and see what was going on."

So she was trying to actually get him examined by a mental health counselor, correct?

A    She certainly was exploring that, yes.

Q    "And is that when he was having trouble at school and wanting to leave and quit?"

She says, "Right."

"So you wanted to have somebody talk to him and say, 'Why are you doing this?'"

And she says, "Right."

And then you ask her, "Did you have any indication -- Was there anything else going on other than adolescent trouble?"

And she said, "No."

MR. MORENO:  Okay.  Your Honor, I'm going to -- with all due respect, I'm going to object.  He's just reading this into the record.  There's no question.  He hasn't been asking questions of Mr. Sindel about these incidents.  He's just reading them.

MR. HOLTSHOUSER:  I'm asking him is that correct in terms of ---

MR. MORENO:  No.  He didn't ask him anything.

THE COURT:  Okay.  Well, would you ask the question again?

MR. MORENO:  He doesn't have to ask -- I think the record speaks for itself.  He doesn't have to ask him if that's correct.  It's right there on the document.

THE COURT:  Well, as I understand what is going on here, he is trying to show several things; that he was well cared for by his mother because of all these things she did to take care of him, trying to find if there's anything in the records that were introduced that show physical abuse.  I don't know how else he's going to develop this unless he asks those questions.

MR. HOLTSHOUSER:  Judge, I can introduce this transcript, but I think what I'm trying to do actually is save you from having to find these needles in this haystack --

THE COURT:  All right.

MR. HOLTSHOUSER:  -- and to bring them to your

attention.

THE COURT:  Okay.

Q   (By Mr. Holtshouser)  To show that this is what you were doing one week after entering the case, correct?

A   Yeah.  And I think ---

THE COURT:  Okay.  Overruled.  Okay.

Q   (By Mr. Holtshouser)  Is that correct?

A   I think in terms of recording it, it was probably one of those conversations where I realized I just didn't want to have to write the notes so fast, so I wanted to memorialize it.  So I probably asked her, "Do you have a problem if I record it?"  Hit the recorder and off we went.

Q   And that way your conversation is a littler more personal.  You're not -- She's not being distracted by the fact that you have to say, "Wait a minute; let me write that down."

A   That's -- That's true.

Q   So this eliminated a barrier at least to conversation between the two of you --

A   Hopefully.

Q   -- as part of the process of building rapport with a person.

A   It's part of what makes it a little easier and also -- I mean when you hear an answer, then you can respond to it.  If you're not paying attention to the answer because you're

writing something down, then you may miss something that's important.

Q    And I think you ended this conversation, did you not, at the bottom of 9 regarding the next step in the criminal process, the hearing that's coming up, and the likely process that will take place in Washington, DC?  Do you see that in the middle here?

A    That's right.

Q    All right.  So would this have been the first time you were explaining to her the whole concept of this, the fact that this could be a death penalty case?

A    That's right.

Q    Now in the middle there there's a reference to "Okay." And she asked the question, "And is this where all these letters are going to be used?"  Now had you had a discussion with her about gathering letters from friends and family?

A    Yes, sir.  It was actually here in this transcript.

Q    Okay.  Did I miss it?

A    I thought you did.  I thought there was -- Yeah.  "Do you know -- Send me a list of people you think he's close with, people that I can talk to."

Q    There we go.  Okay.  "Do you know some people that you could -- Could you send me a list of people you think he is close with, people that I can talk to?"  You were asking -- And you gave examples of "religious, friends, relatives,

people that can give me a good idea."

And her response is, "A general overlook at Bill?"

She said, "Sure, I can do that."

Were those the letters that you're referring to?

A    I believe so.

Q    So you basically asked her to provide you with the names of these people and to ask them on her -- that she should ask them to send letters to you so you could start building a picture of Mr. Allen's background and what other people would say about him.

A    That's true.

Q    At this point you have no idea how he's known or viewed by friends, relatives and neighbors, correct?

A    No.  I don't anticipate that she's going to go out and get nasty letters, but it would give me a start.

Q    And at this point, this gathering what you could, that would be good and positive about Mr. Allen?

A    Yeah.  I would say so, yes.

Q    In response to her question on Page 10 about those letters, did you advise her that, "I'm going to compile information that can be used in mitigation; you know, trying to establish what it is.  It's not so much he's not guilty at this point in this stage.  It's more that even if he is guilty, he shouldn't be put to death."

And she indicates, "Okay."

And then you proceed to describe to her what you view as him having -- going for him in the process, correct?

A    That's true.

Q    Okay.  You're not trying to give her a completely negative picture in your first meeting with her?

A    That's true.  And I think I want to convey somewhat of the gravity of the circumstances, but I want to give her a little positive thing at the end.

Q    And the positive thing at the end that you gave her was the example; you're referring to a case about a 19-year-old boy.  Well, that's Mr. Allen.

You said, "I had another young man that was shot and killed and another one was raped."  Are you referring to a particular case there?

A    Andre Bonds.

Q    Okay.  It wasn't a young man that was raped, though?

A    That probably could have been mistake.  It was a mistake on my part, but ---

Q    The victims were actually two -- two women, correct?

A    Yeah.  It should have been a young man shot and killed, but that's correct.

Q    And you indicated to her that you eventually got a life sentence on that.  You're trying to end at least with a positive.

A    I would say so, yes.

Q   Do you know why it just ends in the middle of the sentence here?

A   That, I can't answer either.  It may have been at that point I accumulated the information I wanted.  I just don't know.

Q   Okay.

A   There was actually no strategy involved to say, "We'll start here and end here."  That's for sure.

Q   But there isn't, to your recollection, more of this transcript or more of this tape --

A   No.

Q   -- that existed in some form that we didn't get?

A   No.  Mister -- Mr. Simon got everything I had.

Q   Okay.

        MR. HOLTSHOUSER:  Judge, did you want to stop now?

        THE COURT:  Yeah, it's a good time.

        MR. HOLTSHOUSER:  Okay.

        THE COURT:  Are we finished with the witness for today?

        MR. HOLTSHOUSER:  Yes.  What time -- What time tomorrow?

        THE COURT:  8:30 tomorrow morning.

        THE WITNESS:  So I should be here at 8:30 tomorrow morning?

        MR. HOLTSHOUSER:  Well, Judge, we're going to have a

little conversation about that.

THE COURT:  Okay.

MR. HOLTSHOUSER:  Some other -- There's another witness, I believe, --

THE COURT:  Oh, okay.

MR. HOLTSHOUSER:  -- that may need to be accommodated --

THE COURT:  Okay.  That's fine.

MR. HOLTSHOUSER:  -- on their part.

THE COURT:  Do you care about that?  You can come a little later.  Is that okay?

THE WITNESS:  No.  I'd like to get here at 7:30, if I could.

MR. HOLTSHOUSER:  You all can communicate with Mr. Sindel when you want him here, right?

MS. CARLYLE:  We can tell Mr. Sindel when we want him here, and hopefully he'll be here then.

MR. HOLTSHOUSER:  We'll all be here ready to go with something at 8:30.

THE COURT:  8:30, all right.  That's fine.

MS. COSTANTIN:  Judge, I was talking to Mr. Kane. We're thinking the witness will be an hour tops.  So if you are trying to figure out your schedule.

THE WITNESS:  So like 9:30?

MS. COSTANTIN:  Yeah, tops.

MR. HOLTSHOUSER:  So like 9:00.

MS. COSTANTIN:  Yeah, I would say that.

THE COURT:  Okay.  Thank you.

THE WITNESS:  Thank you.

THE COURT:  Did you want to talk about exhibits or ---

MR. HOLTSHOUSER:  What we were just discussing, Judge, is that we'll either -- They're considering at least our suggestion.

THE COURT:  Okay.

MR. HOLTSHOUSER:  And if that's accepted, I think that will save you a great deal of work.

THE COURT:  Okay.  All right.

MR. HOLTSHOUSER:  But if -- The final decision has not been made, and we're not trying to force them to make it.

THE COURT:  Sure, okay.

MR. MORENO:  We'll talk about it.  We don't want to make a hasty decision, so.

THE COURT:  All right.  That's fine.  All right. That's good.  Thanks.

MR. MORENO:  Thank you, Your Honor.

MR. HOLTSHOUSER:  So we'll refrain from making a record on the exhibits that were commented on today by either side --

THE COURT:  Okay.

MR. HOLTSHOUSER:  -- until we know where we're at.

THE COURT:  Okay.  That's good.  Thank you.  Court is in recess.

(Court adjourned at 5:00 PM.)

CERTIFICATE

I, Deborah A. Kriegshauser, Registered Merit Reporter and Certified Realtime Reporter, hereby certify that I am a duly appointed Official Court Reporter of the United States District Court for the Eastern District of Missouri.

I further certify that the foregoing is a true and accurate transcript of the proceedings held in the above-entitled case and that said transcript is a true and correct transcription of my stenographic notes.

I further certify that this transcript contains pages 1 through 247 inclusive and that this reporter takes no responsibility for missing or damaged pages of this transcript when same transcript is copied by any party other than this reporter.

Dated at St. Louis, Missouri, this 28th day of December, 2012.

_____

/s/ Deborah A. Kriegshauser

DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR

Official Court Reporter