UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


BILLIE JEROME ALLEN,              )
                                  )
            Petitioner,           )
                                  )
    vs.                           ) No. 4:07-CV-27(ERW)
                                  )
UNITED STATES OF AMERICA,         )
                                  )
            Respondent.           )


EVIDENTIARY HEARING -- VOLUME II
BEFORE THE HONORABLE E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE

JUNE 5, 2012

APPEARANCES:

FOR PLAINTIFF:        ELIZABETH U. CARLYLE
                     P.O. Box 30418
                     Kansas City, MO  64112
                     (816) 525-6540

                     JOSEPH M. CLEARY
                     COLLIGNON & DIETRICK
                     310 N. Alabama, Suite 250
                     Indianapolis, IN  46204
                     (317) 637-1000

                     TIMOTHY P. KANE
                     ERIC JOHN MONTROY
                     JAMES HENRY MORENO
                     FEDERAL COMMUNITY DEFENDER OFFICE
                     EASTERN DISTRICT OF PENNSYLVANIA
                     The Curtis Center, Suite 545 West
                     Philadelphia, PA  19106
                     (215) 928-0520

FOR DEFENDANT:       STEVEN E. HOLTSHOUSER
                     CARRIE COSTANTIN
                     OFFICE OF U.S. ATTORNEY
                     111 S. Tenth Street, Suite 2000
                     St. Louis, MO  63102
                     (314) 539-2200

REPORTED BY:          DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR
                      Official Court Reporter
                      United States District Court
                      111 South Tenth Street, Third Floor
                      St. Louis, MO  63102
                      (314) 244-7449

INDEX

ADMISSION OF EXIBITS . . . . . . . . . . . . . . . .   4

CLAUDE McLEMORE --

   Direct Examination by Mr. Kane . . . . . . . . .   8

   Cross Examination by Ms. Costantin . . . . . . .   25

   Redirect Examination by Mr. Kane . . . . . . . .   55

   Recross Examination by Ms. Costantin . . . . . .   59


RICHARD SINDEL --

   Continued Cross Examination by Mr. Holtshouser .   60

(PROCEEDINGS BEGAN AT 8:30 AM.)

THE COURT:  Are you ready, Mr. Moreno?

MR. MORENO:  Yes, we are, Your Honor.

THE COURT:  All right.

MR. MORENO:  Your Honor, as a preliminary housekeeping matter, --

THE COURT:  Yes, sir.

MR. MORENO:  -- we have discussed amongst ourselves on Mr. Allen's team the issue of admitting all of the exhibits.  And although it may be more cumbersome, we're more comfortable with admitting them at the end of each day, --

THE COURT:  Okay.

MR. MORENO:  -- however the Court wishes; the ones that we're actually using, if that would be okay with the Court.

THE COURT:  Sure; sure.

MR. MORENO:  So at this time we would move in, if it's okay with the Court, the exhibits that we had used yesterday.

THE COURT:  Okay.  I can -- Let's go through them. According to the way I have them identified, the first one is 106, 107.  100 actually, also.

MR. HOLTSHOUSER:  Yes.  100 was used by the Government.  103 was used by Mr. Moreno, according to their list.

MR. MORENO: Right.

THE COURT: Okay. I missed that. 106, 107?

MR. HOLTSHOUSER: Actually 106 through 123 inclusive.

THE COURT: Yes, that's what I have. All those are received. Just a moment.

MR. MORENO: We have Exhibit 330.

THE COURT: Just a second, please. I'll mark these on my list as received.

All right. So far 100, 103, 106 through 123 are received in evidence.

MR. HOLTSHOUSER: Judge, the -- I know you have your system, but would it be more helpful to you for you to go through yours or what would be most efficient for you?

THE COURT: A new system today.

MR. HOLTSHOUSER: Okay.

THE COURT: What I did I'm using yours.

MR. HOLTSHOUSER: Okay. And if we go in numerical order, how about if I give them to you in numerical order?

THE COURT: Sure.

MR. HOLTSHOUSER: The next in numerical order would be 300 to 301.

THE COURT: Okay, just a second.

MR. HOLTSHOUSER: The Government used those.

THE COURT: 300, 301 received.

MR. HOLTSHOUSER: The next is 306 used by Mr. Moreno.

THE COURT:  What about -- I had 302, also.  It was identified by Mr. Sindel.

MR. HOLTSHOUSER:  Yeah.  It might have been at the very end.  I'm not sure we finished with that one, but it was brought up, so yes.

THE COURT:  Okay, received, 302.  And then the next one you mentioned was 306.

MR. MORENO:  306, correct, Your Honor.

THE COURT:  Just a second.  Received.

MR. HOLTSHOUSER:  Then 309 used by Mr. Moreno.

THE COURT:  Yes; received.

MR. HOLTSHOUSER:  Next in order would be 320 and 321 used by Mr. Moreno.

THE COURT:  Yes; received.

MR. HOLTSHOUSER:  330.

THE COURT:  Yes; received.

MR. HOLTSHOUSER:  Jumping to the 400s, 491 through 495.

THE COURT:  Hold on a second.  491 through 495 received.

MR. HOLTSHOUSER:  And the last one from yesterday was 620, 6-2-0.

THE COURT:  620 received.

MR. HOLTSHOUSER:  Judge, then at this time I would also move into admission Exhibits 1 through 75 inclusive.

They are all identified as coming from the criminal trial court file, and I think that they would be admissible under a theory of judicial notice. They are all represented by either transcripts, Court-certified transcripts or documents in the -- in the Court's file.

THE COURT: Do you need time to review those, Mr. Moreno?

MR. MORENO: Yes. I'd like to review 72 through 74.

THE COURT: Okay. The others are okay?

MR. MORENO: Yeah.

THE COURT: All right. I will receive 1 through 73 and 75. Acceptable?

MR. MORENO: Acceptable, Your Honor. Yes.

THE COURT: All right.

MR. MORENO: We'll -- We'll take a look at the lunch break on 72 through 74.

THE COURT: Okay.

MS. CARLYLE: Your Honor, I think he said it wrong. We're offering 1 through 71 but not 72, 73.

THE COURT: Yes.

MS. CARLYLE: Sorry. Just trying to make sure.

THE COURT: Okay. I understand that there's a witness called out of turn.

MR. KANE: Yes, Your Honor.

THE COURT: All right.

MR. KANE:  Petitioner calls Claude McLemore.

THE COURT:  Okay.

**CLAUDE McLEMORE,**

HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

THE COURT:  Whenever you're ready.

DIRECT EXAMINATION

QUESTIONS BY MR. KANE:

Q    Good morning, Mr. McLemore.

A    Good morning.

Q    Could you, please -- Could you, please, tell the Court where you currently live?

A    I live in Jefferson City, Missouri.

Q    Are you currently employed?

A    Yes, I am.

Q    And where are you employed?

A    I work for the Missouri House of Representatives, the State Capitol.

Q    And what do you do there?

A    I'm a computer technician.

Q    How long have you been employed there?

A    I've been there for 11 years.

Q    Are you related to Billie Allen, the petitioner in this case?

A    Yes.

Q    What is your relationship to him?

A    Billie Allen is my first cousin.

Q    And how is that?  How are your parents related to him?

A    My mother's is his -- his mother's sister, so.

Q    Okay.  How old are you compared to Billie?

A    Between a year and a half difference.

Q    Are you older or younger?

A    I am younger.

Q    And did you have contact with Mr. Allen as you were growing up?

A    Yes, I did.

Q    Please describe to the Court how often you saw him and under what circumstances.

A    We grew up as brothers.  I knew him from birth, and it was usually I'll probably see him three days a week as a -- as a youth.

Q    And what circumstances were those that you would see him three days a week?  Would you be at his house or he at your house or how did that work?

A    It would go both ways.  He'll come to my house or I would go to his house.

Q    Did that include spending the night at -- at his house?

A    Correct.

Q    Did it ever include spending whole weekends at his house?

A    Yes.

Q    When -- When -- Did you go to school -- to the same school as Mr. Allen?

A    No, we did not.

Q    Where did you attend school?

A    I attended school at University High School in University City Public -- Public School District.

Q    Do you know where Mr. Allen attended school?

A    Mr. Allen attended school in the Clayton District.  He also attended school at Sumner in St. Louis City.

Q    And do you -- Did you complete high school?

A    Yes, I did.

Q    Did you also attend college?

A    Yes, I did.

Q    Do you know if Mr. Allen completed high school?

A    No, he did not.

Q    You mentioned earlier that sometimes you would spend whole weekends at Mr. Allen's family's house.  During the summertime when you weren't in school, were there any more extended time periods that you spent with Mr. Allen?

A    We would pop up on a Friday, Saturdays and Sundays. We'll just pop up.  My mom would drop us off or we'll ask to go down to my grandfather's house; just have a good time.

Q    Who was living at your grandfather's house in those days?

A    In the early '80s, it was my grandfather; Bill's sisters Yvette, Ann and Nikki; his mother.

THE COURT: Okay. Wait, wait. Let me catch up. Just a second. Bill's sister is "Yvette"?

THE WITNESS: Yvette, correct.

THE COURT: Okay. And Nikki is also a sister?

THE WITNESS: Nikki is also a sister.

THE COURT: Okay. Thank you, sir. Go ahead.

Q    (By Mr. Kane)  And does he have a third sister?

A    His third sister is Angela.

Q    And so in terms of the people who lived at his grandfather's house, you mentioned, obviously, your grandfather, Bill and his sisters, and their mother. Is that correct?

A    Their mother. Different times, different periods, different people lived there. In the early '80s, my Uncle Raymond and my Uncle Jerome also lived there in the house.

Q    Okay. Do you recall that last year you gave a deposition in this case?

A    Yes.

Q    And do you recall a few years ago signing a declaration in this case?

A    Yes.

Q    Do you recall the topic of Juanita's alcohol drinking coming up in those matters?

A    Yes.

Q    Could you -- Could you explain or describe for the Court

Juanita's drinking habits as you knew them as a child?

A    Very abusive of alcohol.  I would consider her as an alcoholic, drinking a lot.  Like I said, she would drink like it was water.

Q    But what would she drink?  What would you see her drinking?

A    She would drink Miller Lites.  They would be like the 24-ounce cans.  She had like the cheap vodka with the red top, like a Smirnoff or something like that.

Q    So beer and vodka?

A    Correct.

Q    Where would you see her drinking alcohol?

A    Mainly it was near her bed.  Mainly she kept the beer and alcohol on the side of the bed.  When she was cooking, she had a beer in her hand, you know, just to keep her calm.  And mainly just in her room, but a lot of the times she kept the door closed.  But when the door was open, you know, the kids saw her drinking.

Q    Okay.  Did you -- Were there also empty bottles or empty alcohol containers around the house?

A    There were empty containers in the trash can near the bedside.

Q    What time of day would you generally -- or times of day would you generally see her drinking?

A    We used to wake up around 12:00.  So from 12:00 ---

Q    Is this on the weekends?

A    On the weekends.

Q    Okay.

A    12:00 in the noon -- 12:00 in the afternoon till about 9:00 when she was ready to go out.

Q    Okay.  And she would go out in the evening then?

A    Yes, she would.

Q    Okay.  Do you know where she would go?

A    She had a place called "Lucky's."  It's around on Delmar; not too far away from the house.  She would go out with a couple of friends and have a good time and leave us at the house to have a good time, too.

Q    It sounds like what you're describing is that she would drink most or all of the day and then go out drinking at night with her friends.

A    Correct.

Q    How did she behave when she drank alcohol?

A    Her reactions were snapping at people; snapping at Billie; get in a rage sometimes.

Q    I'm sorry.  Did you say "get in a rage"?

A    Get in a rage.

Q    Okay.  What did that entail, getting in a rage?

A    Yelling at the kids; throwing stuff.  It was just bad.

Q    When she would yell at the kids and specifically when she would yell at Billie, without -- you don't have to use all the

words that she would use, but could you describe what -- what that yelling was like?

A   "Get your MF and sit down somewhere"; "shut your A up"; just ---

Q   So she cussed at him.

A   Cursed at him, yes.

THE COURT:  Okay.  Wait.  I'm guessing you're saying, "Get your mother fucking" something.  What was it?

THE WITNESS:  Yeah.  I didn't want to say it, but, yeah, "Get your" -- "Set your mother fucking ass down."  "I'm about to kick your ass," stuff like that.

THE COURT:  Okay.

Q   (By Mr. Kane)  Anything else?  Obviously, with the Court's permission, any other words or -- or yellings that you recall or that comes to mind?

A   She would like curse him out and say, "You look like your bald-headed daddy," and stuff like that.  It was -- It's, I guess, sort of rage.  She would get so mad that she would say that, "You look like your father."

Q   You -- You laughed a little bit there when you were remembering this.  Was this -- Were these funny times?

A   Yeah, it was -- it was -- it was funny, but it was -- it was -- it was real.  You just -- You -- It seemed like it was bad.  I mean it was bad, but, you know, when somebody's cursing and somebody looks like somebody else, it's just a

funny moment, but they both looked alike, so I could see why she was mad all the time.

Q    Did it ever go beyond verbal rage that she expressed towards Billie?

A    Yes.  There was beatings, punchings, abuse with a -- anything that was in her surroundings; whatever she can grab. She just wanted to take it out on him.

Q    And in what way would she take it out on him?

A    If she had a shoe and Bill was -- If Bill needed to be disciplined, she would throw it at his head.  She would throw it at his back.  He was pretty fast when we was young.  So whatever she could grab, she would try to throw it at him, and he would try to duck and dive, and most of the time she hit him.  She never missed.  Like I said, if we were in the hallway and she had like a telephone cord and Bill was getting in trouble, she'll pull that cable -- telephone cord out of wall and beat him with that.

Q    Go ahead.

A    Little things with the belt.  If there wasn't a belt around, she would go tell him to find a belt and she would beat him with the belt.

Q    How -- How long would she beat him with the belt or whip him with these other things?

A    She would beat him until he started crying or yelling, "Momma, stop!  Stop, Momma, stop!"

Q    And did you actually observe some of these beatings?

A    Yes, I did.

Q    And could you tell from your observation whether she was hitting him hard?

A    She was full strength.  It was -- The arm would go back and like a thrower axe and try to knock the wind out of him; just beat the crap out of him.

Q    If you were -- I'm sorry.  If you were there for Friday, Saturday, Sunday like you said before, how often would this sort of thing happen?

A    It would happen during the three days I was there probably each day between two times a day.  There was never a clear day without him getting -- getting a spanking or whooping.  It was always something.  She always disciplined him.  It didn't matter.  It just -- Out of nowhere, just -- just would beat him.

Q    Okay.  Well, you just said "out of nowhere," and I think earlier you said, you know, when he would get in trouble, these things would happen.  What -- What were the types of things that would happen that would cause Juanita to start whipping him?

A    If he broke something in the house by accident.  He would explain, "I didn't try to do it."  She didn't believe him. She would come in the house and he didn't do his chores. Without giving his explanation, she would beat him.  If she

got into -- got into it with the girls -- The girls outnumbered him three to one, so it was like the girls versus him, and the girls always won.  So -- So she would always take the girls' side and that would be an issue, also.

Q    Did his sisters get beaten?

A    Not too much.  I really didn't see them get beat.  It was more of, "Don't do this again," and the girls were just let off easily.

Q    Can you think of any other things that would happen that would cause Juanita to whip Billie?

A    I would say just the alcohol in her system.  It was just -- It was just too much for her.

Q    Are you saying that there were sometimes where -- Were there times where he -- from where you stood, that it did not appear that he did anything to deserve a beating?

A    He didn't deserve it a lot of the times.  It was just out of nowhere.  He's just sitting there and then popped in the head or, you know, back-slapped.  I don't know where it came from; just -- we're just -- just being kids, and out of nowhere she would just do stuff.

Q    All right.  Did you see bruises or marks on him after any of these beatings?

A    He would rub his arms, rub his legs and rub his back, but due to having eczema, I can't really see him with bruises. The only thing I would see is him rub his arm because it would

hurt so bad.

Q    All right.  Did you -- Did you tell your mother or your father about what Juanita would do to Billie?

A    No, I did not.  It was like ---

Q    And why is that?

A    It was like whatever happens in their house stays in their house; whatever happens in my house stays in my house.

Q    All right.  Do you recall if Billie ever had a problem as a child with wetting himself?

A    Yes, he did.  As a youth, he would pee in the bed at nighttime.  He would out of nowhere just walk around and pee, pee on himself.  I remember we was at Glenridge in the first grade.  My father -- My father and I had to run out to Glenridge.  He was in the first grade or kindergarten, and he peed on himself, and we had to bring him a change of clothes while he was in the elementary school.

Q    If that sort of thing happened at home where he wet himself or wet his bed, how would Juanita respond to that?

A    She would beat him with a belt; tell him, "You better not do that shit again," or we would have to go wash the sheets.  Nobody wanted to sleep in the bed with him.  We'd rather sleep on the floor than be in the bed with him because he was a bed wetter.

Q    And to the best of your recollection, how long did that continue?

A    I'd say about till he was about 8; maybe about 7; 7 years old.

Q    You mentioned earlier some of the people who lived in the house with -- You had mentioned Jerome lived there for a time?

A    Yes.

Q    How old is Jerome compared to you and Billie?

A    I'd say about 12 years older than us; 12 -- 12 or 14 years older.

Q    And do you recall how -- Was Jerome ever involved in disciplining or whipping Billie?

A    Yes.

Q    And tell us -- tell us about that.

A    Jerome moved out probably about the '80s or sometime about then.  Nita used to beat him with belts and extension cables.  And ---

         THE COURT:  Belt and what?

         THE WITNESS:  Belt and ---

         THE COURT:  Some kind of cable.

A    Yeah, telephone cables.  Sorry about that.

Q    (By Mr. Kane)  Did you say maybe extension cables?

A    Extension cables.

Q    Or extension cords?

A    Extension cords.  Sorry about that.

Q    And did you say -- Just to clarify for the Judge, when you started that sentence, were you referring to Juanita?

A   Yes.  I want to start off and tell how it goes.

Q   Okay.  Go ahead.

THE COURT:  Yeah.  I have Jerome disciplining him. You're talking now about Juanita?

THE WITNESS:  Right.  I want to -- I want to go back from Juanita.  Somehow he began to beat him, also.

THE COURT:  Okay.

A   Once the beatings -- Once Billie was getting beat by Juanita with belts and the beatings weren't going anywhere, he was mad enough where he wasn't crying anymore.  Jerome came in, and Jerome would punch him in the chest and punch him in the arm to get his attention.

THE COURT:  Okay.  Now tell me again who's Jerome.

THE WITNESS:  Jerome Petty is my uncle and his uncle.

THE COURT:  Okay.  Now wait a minute.

Q   (By Mr. Kane)  Is that Juanita's brother?

A   Juanita's brother.

THE COURT:  Just a second, please.

A   So it went from belts ---

Q   (By Mr. Kane)  Hold on; just hold on a second.

THE COURT:  I'm getting behind here.  Just a second.

(Pause)

Okay.  Go ahead.

A   It went from belts to being punched.

Q   Okay.  Were there times -- Aside from when Juanita was

drinking or, you know, in -- You know, you've described this verbal abuse and the beatings and so forth. Were there times when you remember Juanita nurturing Billie or spending time with Billie, doing homework or with art or anything like that where there's a positive spending time together of mother and son that you recall?

A    I can't remember anything being positive. She had no transportation, so it was like they didn't go to many places. We probably walked to Boy Scouts probably about a couple of times, but that was just me and him, and she probably would attend some events. But other than that, no events or anything like that with Billie.

Q    From your perspective, did Juanita love Billie?

A    She loved him as a son, but love-love, I don't think so.

Q    From your perspective, did Billie love Juanita?

A    Billie loved her as a mother but not as a friend.

Q    You mentioned earlier that at some point Juanita's beatings would not cause him to cry and Jerome would come into the picture. Was there also a time where you were -- where Billie was locked out of the house or, you know, not permitted in the house as a punishment?

A    That was his teenage years. Like I said, Jerome issues. Staying late out on the corners; staying late out at the clubs and the skating rinks, he would be locked out because he disobeyed. It was like, "I can't beat you anymore. You're

too old to get beat.  I'm just going to lock you out."

Q    And if you were with him, were you ever both locked out?

A    Never.  Like I say, ---

Q    Explain that for us, please.

A    I don't think she would ever lock out her nephew.  It was like my mom would get on her for locking me out.  I think everybody -- That would be so disrespectful.  But she never locked me out.  That was because I was her nephew.

Q    Okay.

A    They made sure they took care of me, though.  So I was always took care of.

Q    So from your perspective, she would get in trouble with her sister if that happened.

A    Right.  Right.

Q    Do you remember when Billie was arrested in 1997?

A    Do I remember?  Yes, I do.

Q    And do you remember that you testified at his trial in 1998?

A    Yes.

Q    To the best of your recollection, please -- please tell the Court what you remember about being contacted by his lawyers and then eventually testifying at court.

A    In '98, Billie's lawyers contacted me while I was at Lincoln University and told me I needed to meet with them just to find out what I know about Billie and his background and

his character.  They didn't tell me what was going on, but they just wanted to get a feel for who Billie was.

Q    And do you recall testifying at his trial?

A    Yes, I do.

Q    Do you recall today and in your deposition there's a fair bit of discussion about Juanita's -- the whoopings and the verbal stuff and the drinking and so forth.  Do you recall that being a focus of what the lawyers asked you back in 1998?

A    No, they did not ask anything about it.

Q    If back in 1998 they had, before trial, asked you questions along the same lines that we've been talking about today, would you have provided them the same information that you've given the Court today?

A    Yes, I would have.

Q    And if you had been asked when you testified at trial the same questions that you had been asked today, would you have provided the same information then?

A    Yes, I would have.

        MR. KANE:  Your Honor, may I just take a moment to consult with counsel?

        THE COURT:  Sure.

        (Pause)

Q    (By Mr. Kane)  You received a subpoena last week, I believe, for some letters.  Is that correct?

A    Yes.

Q    For letters from Billie?

A    Anything Billie had wrote to me.

Q    Okay.  And did you provide, I guess, at the end of last week to us some -- some letters and some other materials that he had sent to you?

A    Yes.

Q    Is that -- Is what you provided everything that you could locate that you were in possession of that you received from Billie?

A    Yes, it is.

Q    All right.  At any time -- At any time since you were first contacted -- Well, do you remember I first contacted you maybe in approximately 2009?

A    Yes.

Q    At any time since -- since then, has -- in any communications that Billie has had with you, has he asked you to provide any type of information to us or to the Court?

A    No.

Q    In these letters that he sent you, do you recall just generally that he talked about some family and things of that nature?

A    Meaning asking how people were doing?

Q    Right.

A    That's about it.  He just -- When he wrote his letters, he wanted to check on my family in Jefferson City, see how his

family in St. Louis is doing; make sure we stayed out of trouble and made sure we had good health.

Q    And do you recall him also over the years sending you copies of drawings or pictures that he had done?

A    Yes.  He has a lot of -- He sends a lot of drawings.

Q    He also appears to have included in what he sent you some documents from his case?

A    Yes.

Q    And did he -- Has he expressed to you in these -- in these letters whether these -- he considers these to be -- Well, I'm going to withdraw that question.

Do you have any opinion one way or the other about Billie's guilt or innocence in this case?

A    No, I do not.

MR. KANE:  No further questions at this time, Your Honor.

THE COURT:  All right.  Thank you, sir. Ms. Costantin?

CROSS EXAMINATION

QUESTIONS BY MS. COSTANTIN:

Q    Let me just get this up and going in case I need it. Mr. McLemore?

A    Yes.

Q    Isn't it true that you also were beaten by your parents as a child?

A    I got whoopings.

Q    And specifically they beat you with a belt.  Is that correct?

A    Yes.

Q    Do you remember at the deposition telling me that the beatings to Billie Allen by Juanita were, quote, a little bit harsher than the ones your parents gave you?

A    Yes.

Q    And in another part when we were asking you questions, you indicated that the beatings that Juanita Allen had administered to Billie Allen were a shade above what you had received at your own home.  Is that right?

A    Correct.

Q    And do you recall describing that generally the beatings or the discipline that Juanita imposed on Billie was a result of him breaking something, refusing to turn down his music?  Those kinds of things would cause him to be disciplined by her?  Do you recall that?

A    Yes.

Q    And I believe at one point you described the beating as a cause and effect.  Billie would do something.  The effect would be that she would then discipline him.  Is that right?

A    Sometimes.

Q    Okay.  And you indicated today, I believe, that she would physically discipline him two or three times a day, is that

right, when you would be there on the weekends?

A    Yes.

Q    Do you recall at the deposition telling me, in fact, it was maybe one or two times during the entire weekend?  Do you recall that?

A    Two -- Two and three is almost the same thing, yes.

Q    Well, I'm talking about per day versus per weekend.  Did you testify today that it was two or three times a day?

A    Sometimes, yes.

Q    Okay.  Did you testify, however, at your deposition under oath that she had hit Billie one to two times a weekend?  Do you recall that?

A    Yes.

Q    And you yourself were being hit every day.  Is that right?

A    No.  I didn't say that at all.

Q    Do you recall telling me in your deposition that you probably got hit every day?

A    I said that?

Q    Yes.

A    That I got hit every day?

Q    Yes.

A    No, I did not say that.

Q    Can you see that screen on -- to your right?  Can you see that screen to your right or is it washed out?

Do you see at the bottom of that page I asked you: Did Billie ever tell you that -- Let me ask it this way: "If Billie is getting hit when you're over there, why do you and he stay over there as opposed to go to your parents?" Do you recall that question?

A    Yes.

Q    And do you recall your answer: "We had a full house, too"?

And then you recall my question: "All right. I mean were you getting hit every day -- every weekend? Excuse me."

And your answer: "I probably get hit every day."

Do you recall saying that under oath at your deposition?

A    I think that's reworded wrong. I don't get hit every day.

Q    Okay. So if you said that at your deposition, that would have been incorrect?

A    Correct.

Q    Do you recall saying that Billie Allen looked up to Jerome a little bit like a father figure, specifically that he would take -- Jerome would take Billie to play basketball?

A    Yes.

Q    And in your declaration, do you recall stating that you -- I'm sorry -- that Jerome actually hit Billie with a belt? Do you recall that?

A   Yes.

Q   Do you recall in your declaration, as I say in Paragraph 8, and that is Exhibit 269, you stated in your declaration that, "Jerome used belts to whip Billie."  Is that right?

A   Yes.

Q   But, in fact, Jerome did not use belts?

A   He did use belts, but he used belts, punched.  I seen it, so I have no reason to lie.

Q   So you said that in your declaration that Jerome used belts.  Is that right?

A   Correct.

Q   Do you recall in your deposition stating instead that Jerome only punched Billie; that he didn't use anything other than his fists?

A   I didn't -- I didn't say that he beat him with a belt.  I said he punched him, but I forgot to say he beat him with a belt, also.  That wasn't included.

Q   Do you see I'm directing you to your deposition which is Exhibit 527, Page 32.  Do you recall me asking you:  "Jerome was the one when you say Jerome was punching Billie?"

          And your answer:  "Correct."

          Question:  "Where was Jerome punching Billie?"

          "In the chest, in the arms."

          My question:  "That would be like you broke something, you shouldn't have done that, and he'd punch him in

the arm?"

Your answer: "Right or, you know, he's talking back to him, talking back to his mom, disrespecting them."

"Did you ever see Jerome hit him with anything other than punching him?"

And your answer was: "No."

Is that correct?

A    That's what I said.

Q    Okay. So in your declaration you said he hit him with a belt, but in your deposition you said he only punched him. Is that correct?

A    I can remember now that he beat him, also.

Q    Okay. So the deposition was approximately -- Was that last November?

A    Yes.

Q    So in the last six months you've now remembered that there was the belt as well.

A    Correct.

Q    Okay. And you also indicated in your declaration that Otha Petty who is the ---

A    I don't want to talk about that, my grandfather right now. He just passed. I don't want to talk about it.

Q    Okay. Well, sir, I'm going to have to ask you about that because you made some statements in your declaration about your grandfather.

A    Okay.

Q    Do you recall indicating that -- in your declaration that your grandfather Otha Petty disciplined Billie Allen?

A    Yes.

Q    And specifically that he struck him with a belt; is that right?

A    Yes.

Q    And you didn't think there was anything wrong with that, did you?

A    If he needed to be discipline, yes.

Q    Okay.  And, in fact, that's what you said in your deposition which is that if Billie needed to be disciplined, then Otha would do so.  Is that correct?

A    Correct.

Q    And do you recall in your deposition saying there was nothing wrong with how Otha handled it?  Is that correct?

A    Correct.

Q    Now let me go to your declaration for a moment, specifically Paragraph 3, and I think Mr. Kane may have already covered this.  The first sentence indicates that you stayed at the house on Cote Brilliante, which was Billie's house, for weekends and weeks at a time.  Is that right?

A    Correct.

Q    Okay.  But, in fact, what it would be would be weekends and then occasionally like one week during the summer you'd

stay there and one week he would stay out at your house.  Is that right?

A    Yes.

Q    And when you visited Billie Allen, you would stay in his room.  Is that right?

A    Yes.

Q    And there were two beds in his room.  Is that correct?

A    One bed.  I can't -- I can't remember, but I think it was one bed.  Sometimes we slept on the floor.  Sometimes we slept in the living room.

Q    Do you recall telling me at the deposition that there were two beds in there and the room was big enough for the two of you?

A    Sometimes there was two beds; sometimes one bed; sometimes it was the floor.

Q    Okay.  So over the time period that you were staying with Billie, that would change.

A    Correct.

Q    Okay.  Now I want to go back to Paragraph 3 of your declaration.  Did you write in Paragraph 3 -- Actually you didn't write the declaration.  Is that correct?

A    No, I did not.

Q    Okay.  It was brought to you and then you signed it.

A    He reported what I said and he wrote it, and -- and I signed it, yes.

Q    Okay.  And you looked it over before you signed it.  I'm not implying that you just signed something without looking at it.

A    Yes, I read it.

Q    Okay.  And in it you stated, "Juanita would not be home for days at a time.  Billie and I didn't know where she was.  Sometimes our grandfather wouldn't be home for days either and there would be no adults in the house at all."  Is that what you wrote in your declaration?

A    Yes.

Q    Okay.  Do you remember telling me in your deposition, and that's Exhibit 527, Page 61, do you recall telling me in your deposition that when Juanita was not there, Papa would be there?

A    That's correct, also.

Q    Okay.

A    I'm not saying that nobody was there completely.  You asked me two different questions at two different times.

Q    Okay.  And we're going to get to the second question.  So generally when Juanita was not there, then Papa was there.  Is that correct?

A    Yes.

Q    And then when Papa was not there, you had your older sister and cousin there.  Is that correct?

A    Correct.

Q    All right.  And you didn't think there was anything wrong with that, just you being there with your older sister and your cousin.  Is that right?

A    I didn't see anything wrong.

Q    And neither did your parents; is that right?

A    Correct.

Q    Because you really didn't need supervision at that age. Is that correct?

A    Correct.

Q    Now I want to talk to you for a moment about "put out" in the concept that Juanita would put out Billie.  Do -- You just testified that he -- the putting out, I believe, would be he was -- she would at times lock him out of the house when he would stay late because he was hanging out on corners or at clubs.  Is that right?

A    Correct.

Q    Okay.  And do you recall in your deposition indicating that there were times when Juanita would put Billie out and that it was a stress reliever for her and Billie considered it to be a getaway?

A    I wasn't there at the times when she put him out.

Q    Well, you indicated in your deposition that four or five of those times he would just come stay with you in U. City. Do you remember that?

A    I need to see it.

Q   I'm going to highlight that portion.  And I'm referring to Page 55 of your deposition which is Exhibit 527.  Your statement:  "I mean when he got put out, it was like more stress reliever for her.  So it was not really getting put out.  It was more of a getaway for him."

My question:  "Meaning she's not putting him out.  He wants to get away.  Is that what that means?"

Your answer:  "Yeah; saying, 'I'm going to put you out.  So go to your Auntie's house.'  So he would just stay with us; not like pack up your bags and get out."

Question:  "But just, 'You need to be away from me; go stay with your Auntie'?"

Answer:  "Correct."

"How often was it that he would stay out with you like that?"

"I'd say probably about four times; four or five times."

And I'm sorry.  I cut that off there.  Let me go down to -- "This is during what ages are we talking about?"

"Between 11 and 15."

Is that right?

A   (Affirmative gesture).

Q   And those ages passed then is when he was getting into trouble, like going to the clubs or dealing drugs.  Is that right?

A   We probably went to the clubs, skating rinks, stuff like that. So we've been going out for a while.

Q   But those other times, you're talking about when he's younger. It's times when he would -- it would be like a getaway for him, and he'd come stay with you.

A   Correct.

Q   And later on when he's 14, 15, 16, ---

A   A getaway doesn't mean like vacations; just to get out of their presence of, you know, of her being strict and setting the law.

Q   I understand. I understand. It's not like she's -- they're going to Jamaica or something.

A   Sounds like you're trying to reword it.

Q   Right. I get that. And then when he's older and he's 14, 15, 16, she's frustrated because he's selling drugs, not listening, out of school. Is that correct?

A   Correct.

Q   And during those later times, he's going down to his cousin Cory's. Is that correct?

A   Yes.

Q   Now you think that your parents knew that Juanita was drunk when you'd be dropped off at Billie's house? Is that right?

A   They would just drop us off, yeah. I don't know. I can't remember. I mean I don't know what I said in my

statement, but they would just drop her off -- drop us off, but they knew she drunk -- drinks.

Q    So that was not a surprise to them.

A    No.

Q    Now I'll direct you to your deposition.  Did you ever tell your parents that Juanita was drunk all the time when you were over there, and you indicated you thought that they knew that.  Is that correct?

A    Yes.

Q    And then ---

A    She drinks.

Q    And then I said, "So you think your parents knew she was drunk all the time."

     And your answer was:  "Yes."

     Is that correct?

A    "Drunk" and "drinking" to me are considered as the same thing.  They knew she was drinking.

Q    Okay.  So that's the same to you.

A    The same, yeah.

Q    Okay.  And do you remember I asked you:  "But they're going to -- They've dropped you off there for three days at a time."

     And I said -- And your answer was:  "Yes."

     And I asked you:  "Do you know why that was?"

     And it was because you wanted -- "We wanted -- The

kids wanted to go over there.  It was just where we wanted to be."

Is that right?

A    Correct.

Q    So despite all the description you've given about the household, that's where you wanted to be?

A    Yes.  That's where my family lives, so we wanted to be with the family.

Q    Now you were never hungry when you were at Billie Allen's and you never saw Billie hungry, did you?

A    Correct.

Q    And you never had a sense that Juanita Allen was having sex with men at the house for money, did you?

A    Never.

Q    And, in fact, no men were -- came through the house while you were there.  Is that correct?

A    She had a boyfriend.

Q    Okay.  But there weren't strange men.  Let me put it that way.

A    No, I don't think so.

Q    Now you said she would go out with her friends.  Would that include Cathy Toliver?

A    Yes.

Q    And you said sometimes they went to Lucky's Lounge.  Is that right?

A    Correct.

Q    And Juanita Allen worked at Lucky's Lounge, too.  Is that correct?

A    Correct.

Q    Now Billie Allen sent you some letters from prison on occasion.  Is that correct?

A    Correct.

Q    And as Mr. Kane indicated, we served you with a subpoena and asked you to bring in some letters which you provided to counsel, I guess, yesterday?  This morning?  Yesterday.  It doesn't matter.  You provided them to counsel.  Is that correct?

A    Correct.

Q    Okay.  I'm going to show you -- Once again on that screen I'm going to show you ---

THE COURT:  Do we have a number on that one?

MS. COSTANTIN:  Yeah.

Q    (By Ms. Costantin)  I'm going to show you what's been marked as 672.  I'm showing you what's been marked as 672.  Is this a copy of your letter or one of the letters and then a second letter dated January 28th of 2010 and then a drawing that was in that letter?  Is that correct?

A    Yes.

Q    And then I'm also going to show you 673.  Is this material that Billie Allen enclosed in that letter for you?

It's kind of an open letter and then some documents, some reports. Is that correct?

A    Yes.

MS. COSTANTIN: Judge, at this time I move to admit 672 and 673.

MR. KANE: Your Honor, I would just note that there's no showing of relevance as to the materials that Mr. Allen sent to Mr. McLemore regarding some FBI reports and so forth regarding guilt phase issues, and I object to the relevance of those documents as to this proceeding.

MS. COSTANTIN: Judge, it's my understanding that there's going to be some psychiatrists who are going to testify concerning Mr. Allen's ability to do certain things, and this is going to show his intellectual capacity and functioning.

MR. KANE: Mr. McLemore has no specialized knowledge in being able to comment one way or other.

THE COURT: Well, I assume he wouldn't be commenting.

MS. COSTANTIN: I'm absolutely not going to ask Mr. McLemore anything like that.

THE COURT: Okay, received, 672 and 673.

Q    (By Ms. Costantin)  Is it fair to say in these letters that Mr. Allen professes his innocence?

A    He was just talking about his trial.

Q    All right. And he -- He's saying basically he's not

guilty, that he didn't do this, and these are documents related to that.

MR. KANE:  If you could -- Your Honor, I'd object to -- If she's referring to something in the letter, I'd ask that she call the witness' attention to it because these are whole letters.

MS. COSTANTIN:  That's -- That's not a problem.

THE COURT:  All right.

Q   (By Ms. Costantin)  I'm showing you 673.  Do you see at the very top where it says, "My name is Billie Allen.  I'm 33 years old.  For almost half of those 33 years of my life I've been sentenced to death for a crime that I didn't commit."

Is that correct?

A    Yes.

Q    So is it fair to say in the letters or in the materials he's professing his innocence?

A    It doesn't say that.  It doesn't say, "I'm innocent."

Q    It says, "I've been sentenced to death for a crime I didn't commit."  Would that be that he's saying that he didn't -- that he's innocent?  That he didn't commit the crime?  I'm referring you up here.  Can you see on the screen?

A    I guess.  I don't know.  It's just a letter.

Q    And directing you to the bottom portion of Government's Exhibit 672, the first page, is he asking you to make up some business cards and flyers for him?

A    Yes.

Q    And did you do so?  Do you recall?

A    We never produced anything.

Q    Okay.  Did you set up a website for him?

A    No.

Q    I want to talk to you for a moment about your contacts with the trial team.  And when I'm talking about the trial team, I'm talking about the people back in 1998.  So that would have been the attorneys or any investigator that was working with them at the time.  Okay?

I believe you just testified that those attorneys or the people working with them wanted to know about Billie's background and character and who Billie Allen was.  Is that correct?

A    Correct.

Q    Okay.  And I believe you previously described it as they wanted to know -- At your deposition you described it as they wanted to know a description of Billie and his lifestyle.  Is that correct?

A    Correct.

Q    So they're asking you some very general questions about Billie's life, his background.  Is that correct?

A    Yes.

Q    And do you recall stating that you had told them that Billie Allen was a good kid and misunderstood?

A    They wanted to -- I wanted to give them the good side of his character.

Q    So is that what you told them was that he was a good kid and misunderstood?

A    Yes.

Q    And they never said to you, "All we want is the good stuff," did they?

A    The way they approached me, it seemed like that's all they wanted to hear.

Q    Did they ever say to you that, "All I want is the good stuff"?

A    No.

Q    But all you wanted to tell them was the good stuff.  Is that right?

A    Yes.

Q    All right.  You wanted your cousin out of prison and the only thing you wanted to do is tell them the good things about Billie.  Is that fair to say?

A    Yes.

Q    And your feeling was that who wants to tell about the bad stuff about somebody when they're on trial.  Is that correct?

A    Correct.

Q    You didn't want to make your family look dysfunctional; that there was beating and abuse.  You just wanted to make everything positive and nice.  Do you recall saying that?

A    Yes.

Q    Now when they were asking you those questions, those questions about Billie's life and lifestyle or, as you characterized it today, background and character, according to your testimony today, that would have included Juanita Allen's alleged beatings and her drinking.  Is that correct?

MR. KANE:  Object.  That misstates his prior testimony, Your Honor.

THE COURT:  Well, I don't know.  The question was: "Now when they were asking you those questions, those questions about Billie's life and lifestyle, or as you characterized it today, background and character, according to your testimony, that would have included" -- some other things.  How are you -- How are you claiming ---

MR. KANE:  She said, "According to your testimony today, that would have included these things."  Those prior questions would have included these things.  I don't have the question.  So by intimating that according to his testimony he has already endorsed at this point, I believe she is misrepresenting his testimony.

THE COURT:  All right.  Okay, sustained.  Ask the question again, please.

MS. COSTANTIN:  Okay, Judge.  I'm not -- I'll try.

Q    (By Ms. Costantin)  The attorneys -- You've testified that the attorneys back in 1998 asked you about Billie's life

and lifestyle.  Is that correct?

A    Yes.

Q    And today you've testified that the attorneys back in 1998 asked you about his background and character.  Is that correct?

A    Yes.

Q    And that would have included, according to your testimony today, beatings by Juanita Allen and excessive drinking by Juanita Allen.  Is that correct?

MR. KANE:  Your Honor, I'm just going to object again.  I know -- I know what the problem is.  By saying "that would have included," it's not clear whether she's referring to the categories she's identifying or she's referring to the prior testimony.  I'd ask that she rephrase the question so that it's clear she's not referring to something he already testified to.

THE COURT:  Okay.  Well, let me see if I can interpret it so you understand the ruling one way or the other.

As I understand, the question said back when he was initially questioned by counsel, that the -- certain matters were asked and then he answered back then, and now today Mr. McLemore has testified about all of these other things, beatings and so forth, that he didn't testify to earlier.  And as I understand the question she's asking now is:  "Well, that

would have included these matters."  And so it will be

overruled.  It's up to him to say "yes" or "no."  Overruled.

Q   (By Ms. Costantin)  Billie's background and character and

lifestyle and life would have been included, according to you,

beatings by Juanita Allen and excessive drinking by

Juanita Allen.  Is that correct?

A   You're talking about from when he asked me from '99 or

'98?

Q   '98.

A   '98?  If they asked me, I would have told them.

Q   And what I'm asking you is:  When you were being asked

about Billie's background and character and his lifestyle and

life, that would have included, according to you, beatings and

drinking by Juanita Allen.  Is that correct?

A   Correct.  But they wanted -- It seemed like they wanted

to show good character, not anything bad; nothing bad about --

They didn't even ask me anything about Juanita during that

time.

Q   So when they asked you about his background and his

life and lifestyle, that would not have included anything

about his mother?

A   It was like simple questions.  It wasn't as deep as it is

now.  Now you're asking deeper questions that weren't asked

before in '98.  Those questions were brief.  It was -- They

didn't dig too deep into it.  They wanted us -- They wanted --

They asked me questions about who he was as a kid, what type of jobs he held.

Q   But, Mr. McLemore, if they asked you what he was like as a kid, you didn't respond he was beaten by his mother, did you?

A   They were giving me incomplete questions.

Q   They were asking you broad questions, correct?

A   Right.

Q   And ---

A   He didn't say, "Go deeper into it."  He just asked simple questions.

Q   And you didn't want to tell them anything that was bad, correct?  You didn't want to make the family look dysfunctional, correct?

A   Correct.

Q   Okay.  So you're self-censoring?  Do you understand what I'm saying?

A   No, I'm not saying that I censored it out.  It was just that -- that he didn't ask the correct questions.

Q   But my question to you is:  Didn't they ask you, "Tell us about Billie's childhood"?  Didn't you just testify to that?

A   Yes.  And I told him that he was eight years old and he was a good kid.  He went to church.  That's the type of questions they asked me.

Q   Okay.  And when they asked you, "Tell me about his

childhood," you didn't say he was beaten by Juanita twice during the weekend or anything like that, did you?

A    They never asked me to go that deep into it.

Q    Okay.  They just asked you a general question, "Tell me about his childhood."

A    General questions on how he grew up.

Q    Okay.  "Tell me how he grew up."

A    What type of sports ---

MR. KANE:  Your Honor, I'm going to object as asked and answered.

THE COURT:  Well, I can't -- What I'm going to say is:  Please wait until the question is asked.  Please wait until the answer is given.  We're getting two people talking at the same time, and I'm having trouble writing, keeping my notes.

MS. COSTANTIN:  I apologize, Your Honor.

THE COURT:  So ask the question again, please.

MS. COSTANTIN:  Okay.

Q    (By Ms. Costantin)  So he's asking you about what he was like growing up.  Is that right?

A    Correct.

Q    It wasn't a problem talking to that -- those attorneys and the investigators back in 1998 that they were white, was it?

A    I talk to white -- white people every day.  I don't have

a problem with racism.

Q    Okay.  So that's not -- was not an issue as to why you didn't tell them about what was going on supposedly in Billie's life.

A    Those questions were never asked.

Q    Now hold on a second.  Didn't you just say that they asked you about ---

A    They never asked me about the beatings and they never asked me about her alcohol abuse.  They asked me about what did Bill do as a youth to high school; just asked me:  Did he go to school?  Did he go to church?  What type of organizations were he in?  Where did you guys work?  Stuff like that.  That's the type of questions they asked me.

Q    And they also asked you general questions as well, correct, about what was his childhood like; what was he like growing up; correct?

A    Yeah.  We played Transformers.  That's the type of questions they asked me.

Q    And did they ask you a question, "Did you play Transformers"?

A    Something like that; what did we do.

Q    So the question they asked you is what did you do and your answer would have been the specific answer.  Is that correct?

A    Correct.

Q   Okay.  And, in fact, what you're telling the trial team was that Billie wasn't a troublemaker?  He stayed out of trouble, correct?

A   If I can remember back that far.  I can't remember what I said.

Q   You recall telling him that he's easy-going and the family's close?  Is that correct?

A   He's a laid-back person.  That means easy-going.

Q   And that the family is close?

A   Yes.

Q   You never told them that Juanita Allen was an abusive drunk, did you?

A   They never asked me.

Q   And when you visited Billie on weekends, he was often gone selling crack.  Isn't that correct?

A   On occasions he would sell crack.

Q   And that started when he was about 14?  Is that right?

A   Sometime around that time, yes.

Q   And so you would sometimes come over.  He'd be gone or he'd leave to sell crack and then he'd come back and the two of you would spend that money.  Is that correct?

A   Yes.

Q   And you'd also go to clubs with some of that money.  Is that right?

A   It wasn't my money.  It was his money.

Q   Okay.  But you'd go to clubs spending his money.  Is that right?

A   I had my own money.

Q   Okay.  I thought you just said when you went to the clubs, it wasn't your money; it was his money.

A   I mean I had brought money, but you don't spend money at the clubs.  It was kiddy clubs, so it wasn't like we were drinking.

Q   All right.  He's making about 40 to 50 dollars a day selling crack.  Is that right?

A   Probably so.  I don't know the figures; around that much.

Q   Okay.  Do you recall testifying at the deposition that it was probably about 40 or 50 dollars a day?

A   Something around that, yeah.

Q   You didn't tell the trial team that he was selling crack, did you?

A   They never asked me.  The person in '98?  In '98?

Q   Yes.

A   They never asked me.

Q   Okay.  And Billie Allen used marijuana in front of you, didn't he?

A   Yes.

Q   And he also drank alcohol with you.  Is that correct?

A   When we grew later, yes.

Q   Now do you recall at trial testifying under oath that he

had never used -- that he never drank around you and he never used marijuana around you?

A    No, I do not.

Q    I'm going to show you Exhibit 183, Page 20 of Exhibit 123.  Do you recall testifying under oath, the question being asked of you:  "Okay.  Did you see him -- Were there situations when he was around you at least he drank?"

        Your answer:  "No, he never drank around me."

        Do you recall answering that?

A    Not that I remember.

Q    Okay.  But you were under oath in that trial.  Is that correct?

A    Correct.

Q    So they asked you a specific question, did he drink around you, and your answer was that he did not.

A    I didn't remember at that time of him -- I didn't remember at that time about that situation.

Q    So right now -- So right now in 2012 you remember the reason you answered that "no" was because you didn't remember him drinking around you back in 1998?  Is that what you're saying?

A    Correct.

Q    Okay.  And do you recall being asked the question:  "Were there situations where he smoked dope around you?"

        And your answer was:  "No."

Is that correct?

A    Correct.

Q    And that answer was false.  Is that correct?

A    I would say "yes," but it seemed like, like I said, family, you just ---

Q    Family, you don't want to talk bad about them?

A    Yes.

Q    Okay.  So under oath, you lied because you didn't want to talk bad about them.

A    I just -- The first question I can remember, but the second question, I just can't remember.

Q    Do you recall the third question:  "He knew you didn't do any of that stuff, right?"

And your answer was:  "No."

Is that correct?

A    Meaning -- Can you ---

Q    Do you see that on the screen, --

A    (Affirmative gesture).

Q    -- Exhibit 183?  That was the question asked you and that was your answer.  Is that right?

A    Yes.

Q    In fact, both you and Billie smoked marijuana using money that Billie had made selling crack.  Is that correct?

A    No.

Q    That's not correct?  Did you and Billie smoke marijuana?

A    We smoked marijuana, but I'm not saying that it was his money.  It could be -- It could have been anybody's money.

Q    Was it mainly his money?

A    I have my own money.  He had his money, so.

Q    Do you recall testifying at the deposition back in November, "He sometimes also" -- The question being asked: "He sometimes also used the money to buy marijuana?"

        Your answer:  "Yes."

        The question:  "Did you do any drinking or smoking with him?"

        "Yes."

        The question being asked:  "Did you pay for any of this?"

        Answer:  "No."

        Question:  "Or was it mainly Billie's money buying it?"

        And your answer was:  "His money."

        Is that correct?

A    His money -- I mean different occasions his money, my money, so.

Q    His money, your money used to buy marijuana and use marijuana.  Is that right?

A    Correct.

Q    In contradiction to what you testified under oath at trial; is that correct?

A    Correct, --

MS. COSTANTIN:  I don't have anything further, Judge.

A    -- but ---

MS. COSTANTIN:  Oh, I'm sorry.

THE WITNESS:  Go ahead.

MS. COSTANTIN:  Okay.  I have nothing further, Judge.

MR. KANE:  Your Honor, would it be okay if we took a short break --

THE COURT:  Sure.

MR. KANE:  -- so I could consult with co-counsel?

THE COURT:  Yeah.

MR. KANE:  Thank you.

THE COURT:  Court's in recess for ten minutes.

THE CLERK:  Court's in recess.

THE COURT:  You may step down, if you care to do so, Mr. McLemore.

(Court recessed from 9:54 AM until 10:05 AM.)

THE COURT:  Ready?  You may proceed.

REDIRECT EXAMINATION

QUESTIONS BY MR. KANE:

Q    Mr. McLemore, you testified earlier that you've known Billie Allen since birth.  Is that correct?

A    Correct.

Q    And you spent time with him throughout your childhood. Is that correct?

A    Yes.

Q    And you saw -- Did you see him every week or nearly every week?

A    Nearly every weekend.

Q    And you would spend -- often spend multiple times, multiples days with him over the course of the weekend?

A    Yes.

        MS. COSTANTIN:  I object to the leading.

        MR. KANE:  I'm just trying to orient the witness to his prior testimony.

        THE COURT:  Okay.  Overruled on that one then.

Q    (By Mr. Kane)  Given the length of time and the amount of contact you had with Billie, were there -- were there times when he was whooped by Juanita only one or two times over the course of a weekend?

A    Yes.

Q    Were there times when he was whooped more than that in a weekend?

A    Yes.

Q    Including times where it would be two or three times a day?

A    Yes.

Q    But were there times when the whoopings happened -- it seemed to happen for no other reason than -- well, for no -- for no -- for no reason that you could perceive?

MS. COSTANTIN: Judge, I'll object to the leading again.

THE COURT: It is leading; sustained.

Q    Don't answer that.

THE COURT: There will be a new question. Go ahead.

Q    (By Mr. Kane) When he was whooped, was there always a reason why he was whooped?

A    Not all the time. Sometimes he was just whooped because she was -- out of anger. Sometimes it was just because he needed to be disciplined.

Q    Okay. Were there -- Were there times when you spent the weekend over there that -- Did -- Did Otha, your grandfather, did he have a girl friend?

A    Yes.

Q    Did he spend significant time at her house?

A    Yes, about the street on Cote Brilliante.

Q    And when he was at the family house on Cote Brilliante, where did he stay? Where did he live?

A    He lived in the basement.

Q    In 1998 when you were a freshman in college, did you have any personal knowledge about what mitigating evidence in a capital case is?

A    No.

Q    Did you know at the time that mitigating evidence frequently includes evidence about abuse?

A    No.

Q    Did you know at the time that mitigating evidence includes evidence about verbal abuse?

A    No.

Q    Do you recall in your interactions with the defense team at trial in 1998 whether anyone explained to you that mitigating evidence in a case like this includes such things as abuse, beatings, verbal abuse, parental alcoholism and so forth?

A    No one approached me or asked any questions.

Q    When you were asked general questions by trial counsel about Billie's life and lifestyle, did you intentionally hide from your answers information about abuse?

A    No.  They never asked me about it, so I didn't go into -- into depth with it.

        MR. KANE:  No further questions, Your Honor.

        THE COURT:  All right.  Recross?

        MS. COSTANTIN:  Judge, I wasn't sure if you allowed Recross, so that's why I looked at you.

        THE COURT:  No.  My -- My intention in this case is to do that because of the gravity of the issues.  And so long as it doesn't become abusive, I am going to permit it.  It will only, of course, include the questions that came up on Redirect.

        MS. COSTANTIN:  Okay.

RECROSS EXAMINATION

QUESTIONS BY MS. COSTANTIN:

Q   First of all, you indicated when you were discussing the discipline by Juanita, did you indicate that she was strict or set the law?

A   Yes.

Q   What do you -- What do you mean by that?

A   Set the law means setting the rules.  "This is my house. I'll run it my way."

Q   And when you were meeting with the trial team, they were making efforts to find out about Billie's background.  Is that correct?

A   Yes.  His background and character, yes.

Q   Okay.  His background, his character, his life, his lifestyle; is that right?

A   Correct.

Q   And you did, in fact, decide that the only thing you wanted to tell them was the good stuff.  Is that correct?

A   Yes.  If they had asked me the bad stuff, I would have told them, but ---

Q   And that's my question.  Oh, I'm sorry.  I didn't mean to interrupt.  Are you finished?  I'm sorry.

A   Yes, I'm finished.

Q   Okay.  And that was going to be my next question.  So unless they asked you the right question, you weren't going to

tell them about that.  Is that right?

A    Yes.

MS. COSTANTIN:  Judge, I don't have anything more.

THE COURT:  You may step down, sir.

MR. KANE:  No further questions, Your Honor.

THE COURT:  You may step down.  Thank you, sir.

MS. CARLYLE:  May Mr. McLemore be finally excused?

MS. COSTANTIN:  Oh, certainly.

THE COURT:  Yes, he is excused.  Thank you, sir.  You are excused.

Is Mr. Sindel going to be recalled?  Will Mr. Sindel be recalled at this time?

MS. COSTANTIN:  Yes, Judge.  We're going to continue Cross Examination.

MS. CARLYLE:  Let me make sure he's here.  He's probably in that room.

(Attorney Rick Sindel took the stand.)

CONTINUED CROSS EXAMINATION

QUESTIONS BY MR. HOLTSHOUSER:

Q    Good morning, Mr. Sindel.

A    Good morning.

Q    Are you settled there or do you need to pour a glass of water or anything?

A    I don't know that I have ice.

Q    Okay.  We'll pour more water out for you.

THE COURT: Don't push it. We had a -- We had little thing going yesterday. I had ice and he was complaining, so I made sure he had some ice. But today, he doesn't.

THE WITNESS: A witness should be treated at least as well as a judge.

MR. HOLTSHOUSER: May I proceed, Judge.

THE COURT: Yes, sir.

Q  (By Mr. Holtshouser)  Mr. Sindel, do you remember some questions yesterday that were put to you by Mr. Moreno -- He cited to you several -- a long list of research relating to child abuse and the effects of child abuse and so forth. Do you recall those questions yesterday?

A  Yes.

Q  Generally?

A  Generally.

Q  Okay. At the time of the trial had you seen any of the research that he was referring to?

A  You mean the specific articles?

Q  Yes.

A  No.

Q  And do you know the date of any of the articles that he was actually questioning you about?

A  I -- I would know it if I reviewed his -- I would assume I would know it if I reviewed his declaration, but I offhand, no.

Q   Do you think that since 1998, through experience and otherwise, your -- your knowledge of some of these issues has increased?

A   Yes.

Q   And so would you say that you knew -- What you know now is not necessarily what you knew then?

A   Yes.  I think that's probably true of everyone.

Q   And I wanted to just clarify that yesterday in terms of the error or the deficiency that you think you can point to, it's a failure to supervise John Simon and Connie Supranowich. Is that correct?

A   Say that again.

Q   A failure to supervise John Simon and Connie Supranowich as to what they were doing?

A   Yes.

Q   When we left off yesterday, we were in -- we were focusing on the period of what was done by you and anyone working for you and with you before the time period that John Simon was appointed, before the time that you first had some contact with Professor Haney, so in that April, '97, to September, '97, time period.  And I want to start off today showing you Exhibit 302.  And this is a -- Is this a letter dated April 17, 1997, that you recognize?

A   I certainly recognize the stationery, and I didn't see the content too much but, yeah, I'm sure that's a letter I

wrote.

Q    All right.

A    You know, you can see down here, also, just for your information, there's two things I wanted to -- That number there?

Q    Yeah.  That's not a date.

A    Apparently that is not a date.

Q    Correct.  Okay.  I think we actually clarified that, figured that out ourselves.

A    And the second thing is you had asked me yesterday how many capital cases I tried in state court, and I had forgot one.  I had tried another one in St. Louis County with Joe Landolt as the prosecuting attorney, and that one was resolved prior to submission to the jury.

Q    There was ---

A    No penalty phase.

Q    There was no penalty phase?

A    There was no penalty phase, but that one did have a psychiatric component.

Q    In the guilt phase?

A    In the guilt phase and ---

Q    In the preparation?

A    Yes.

Q    Okay.  Turning back to this letter then on April 17, 1997, this is actually a letter that you sent to Billie Allen,

and this would have been very early after -- again, within the first week of you getting into the case, and you are referring to the last conversation that you had with him and that concerns that you don't want him writing letters and communicating with anyone else but you.  He was writing some letters to Judge Mummert, correct?

A    That's correct.

Q    And those had come to your attention.

A    That's correct.

Q    Towards the bottom here, there's a portion of this letter in which you ask some specific questions.  And I -- Is it fair to say that the basis of your questions was the content of the letters that he had sent to Judge Mummert, making some claims about having a recording opportunity with a man named "Flexx" and so forth?

A    That's correct.

Q    So you actually asked Mr. Allen in writing some specific questions, and then we see some handwriting on here.

A    Yes.

Q    Now this particular letter, how did it come back -- how did his handwriting get on this letter and then you, in turn, end up with the letter in which he's answered your questions?

A    I'm assuming I mailed it to him; that he wrote those answers on the -- That appears to be his handwriting, although I'm no expert in that, and he sent it back to me.

Q   Okay.  So one question you asked is:  "What's the name of the record company that wanted to sign you to a contract?"  You want names, phone numbers, addresses.

He says:  "Contact my producer Flexx on Cherokee."

Do you know whether or not through your investigation, your efforts and those of Mr. Simon later that a real person named "Flexx" was, in fact, identified that there was such a person?

A   I'm not sure if "Flexx" is the name of a company or person.

Q   Does "Flexx Wilson" refresh your recollection as someone who was identified and located as being -- as to having been -- as having moved out of town by the time of trial?

A   I can't remember.

Q   You asked -- You next asked him:  "Did you have a studio date?"

He says:  "It was a studio that my producer always goes to."

And this is Mr. Allen's handwriting, correct?

A   It appears to be.

Q   Now there appears to be no answer to -- You have 1, 2, top of the next page is 4.  Apparently, there was no Question 3, I'm assuming, because this is Page 2 of the letter.  But:  "Who was the coach that talked to you concerning your basketball skills and who has offered you $75,000 to sign with

them?"

These were claims that he was making to Judge Mummert and you were doubting the veracity of those claims, correct?

A    That's true.

Q    And you were looking to get some information from him in order to confront him with your suspicions?

A    That's true.

Q    And he didn't write anything in for those two questions, correct?

A    Apparently not.

Q    Now you also asked him to provide you with the address for your girl friend and then sign the enclosed authorization for release of school records from Clayton School District.

"Did you attend any other school district?  Please provide me with a list of all schools you attended in your lifetime."

This information is pertaining to your early efforts in the mitigation investigation, is it not?

A    To accumulate records, yes.

Q    Okay.  In other words, you weren't looking at the records in the Clayton School District that would exonerate him of the guilt in this particular charge.  You're looking for background information on Mr. Allen.

A    Correct.

Q    Starting to build a document base.

A    Correct.

Q    And the girl friend, do you recall her name?

A    It was one that was named "Tasha Valentine."

Q    And was she a significant girl friend in the Spring of 1997?

A    Yes.  That's my memory of it.  I know that there were two other ---

Q    You actually called her as a witness at trial.

A    Yes.

Q    And he cites here, "I, Billie Allen, give Richard H. Sindel the right to get my school records."

     You actually needed something more official than that and you eventually got it, correct?

A    There would have been a formal enclosed authorization.

Q    Okay.  Let me next show you Exhibit 305.  Again, this is the same date you send a letter to Mrs. Allen at her address.  Is that correct?

A    Yes.

Q    And this, again, confirms a conversation you had on April 16th, the day before, with her, and what is it that you tell her?

A    That I'm looking for names and contact information for individuals who can help us paint a ---

Q    And you indicate, "We will work hard to try and help Billie."

Now the conversation that you had with her, would that have been your first meeting with her?

A    I -- I couldn't safely answer that.

Q    Okay.  But you think after taking the time to talk with you, you also advised her of the next court appearance for Mr. Allen.  What you ask her for is names, addresses, phone numbers of individuals that "you think I can talk to to help me understand Billie's character and that can be used in court to present a strong and positive picture of his background."

A    True.

Q    All right.  Now why was that the focus of your inquiry at that time?  What are you looking for?

A    Well, I'm looking for people that may be able to testify in the mitigation phase to demonstrate that Billie Allen is worth saving.

Q    And you want to understand his character and then possibly use it in court.

A    That's correct.

Q    Now by saying the "strong and positive picture of his background," were you indicating to her that, "I only want to know good things; don't give me any of the bad stuff"?

A    Well, I certainly didn't suggest to her that I should hear the bad stuff in that sentence.  So that's, you know -- That -- I'm talking about a strong, positive picture and I'm not talking about the entire picture necessarily.

Q    Okay.  And why was that?

A    I -- I really couldn't speak to -- I -- If this is early on, I think my thoughts would have been that, you know, I want to just see where we're going and what she can provide me. And then if I was able to establish a sufficient rapport, I could explore some of the other negative things.

Q    And what you were focusing on was Billie's character.

A    That's correct.

Q    You actually were not wanting it just from her but you wanted -- you were looking for third-parties' collateral sources to go to individually and talk to him.  You weren't just going to stop at one person's version, his mother's version.

A    That's correct.

Q    Then, also, you stress the importance of "information concerning concussions, diseases, or mental health or mental problems that may have complicated his reasoning ability. We're exploring the issue concerning Homer G. Phillips and lead poisoning."  And then you thank her.  Those were also issues that you were already thinking about within the first week of representing Mr. Allen.

A    Yes.

Q    You already had some information within the first week because there had been an incident of lead poisoning in his background.

A    And seizures, yes.

Q    Okay.  All that evidence actually was presented to the jury here, wasn't it?

A    I'm going to take your word for it.  I haven't read the entire penalty phase --

Q    It's been 14 years ago, correct?

A    -- transcript.  Excuse me?

Q    It's been 14 years, correct?

A    Unfortunately, yes.

Q    In those questions there concerning concussions, diseases or other mental problems that may have complicated his reasoning ability, that's not necessarily strong and positive information, though, is it?

A    Well, I think that it is information that we could develop to show that there might be a basis for organic brain issues and problems.

Q    That's not a positive thing, is it?

A    It should not be, no.

Q    No.  So there wasn't -- You're actually looking at both sides of the picture in your request of Mrs. Allen, aren't you?

A    I'm thinking about both sides of the picture.

Q    All right.  You actually want the whole picture.

A    I didn't say that, those words in there, but I wanted as much information as I could get.

Q    Had you communicated that to her orally in your meetings with her?

A    I -- I think probably when I communicated to her, it was within the general idea of what occurs during the mitigation phase and what kind of evidence we might be looking for.

Q    All right.  You did communicate that to her?

A    I mean I have no -- I have specific memories of her coming into the office, sitting in the conference room, talking to her at length about what my role was going to be, what the situation with the Court was going to be, and about certain mitigation aspects.  My practice would have been to ask her a whole series of general questions that would have touched upon both the good and the bad.

Q    Besides asking questions, did you actually, though, make an effort to explain to her what happens in mitigation?

A    To some extent, yes.

Q    And how the evidence might work in his favor or against him perhaps?

A    Yes.

Q    So there was at least an effort to make her aware of those sorts of things?

A    Yes.

Q    It was not limited to just saying, "Well, gee, all I want to know is just the good things about Billie, and I'm not worried about what -- what might bite me later."  You wanted

it all.

A    I ---

MR. MORENO:  This is asked and answered.  I'm going to object.  This has been asked and answered a number of times already.

THE COURT:  Okay.  Overruled; not exactly in that phrasing.

Q    (By Mr. Holtshouser)  I think the last ---

A    I think that the message I would have tried to convey to her which was the message I've tried to convey here in court which is that there's no such thing as too much information.

Q    In your dealings with other mitigation witnesses, other family members, in this same time period you had a number of family meetings at the home, correct?

A    Yes.  When you say this time period, I don't know if it was before April 17th.

Q    I know, but did it seem like April, May, June, in those early months?

A    In the early months, yes.  But it would -- I specifically remember going there with Mr. Simon, so it would have been in September or October more likely.

Q    Rather than early on?  In Mr. Simon's role in the case?

A    Yes.  Yes.

Q    Was one of the purposes for that visit to introduce the family, who you already knew, to Mr. Simon?

A    Yes.

Q    Okay.  In those same meetings with the family members, did they include aunts, uncles, siblings?  Was there a lot of people there sometimes?

A    It seems that there were maybe four or five people.  I don't -- There were meetings where there were a lot of people, but oftentimes we met with them individually, and they were waiting in like the waiting room to come in and talk.

Q    In your office.

A    In my office.

Q    And some of them took place at the home.

A    Yes.

Q    Okay.  In those meetings with them as well, did you similarly try to explain to them what this was about that you were doing and why you wanted it and the fact that there wasn't too much information that you could get?

A    That's three questions in one.  I certainly told them why I was talking to them.  I certainly told them, you know, when they talked to me about what a mitigation phase is and what we're looking for to present to a jury.  I don't remember the specifics of the conversations, though.

Q    Okay.

A    I mean they knew why they were there.

Q    How do you know that?

A    Because we told them.

Q    Okay.  I got to ask that.

Let me go next to 305-A.  In this process, a meeting with Mrs. Allen, I think you alluded yesterday to the fact that you were collecting letters from her, asking her to tell other people to send you letters telling you about Billie, correct?

A    Yes.

Q    And do you know what's become of those letters?

A    One of them is here on the screen.

Q    I know.  The only one -- The only one we've seen.  Do you know -- How many did you receive do you think?

A    I referred to a list in a letter.  I think I refer to a list in a letter to Juanita Allen of who we received letters from, so it would be at least that number.

Q    Was there ever any instance that you recall in which you discarded any letters?

A    Absolutely not.

Q    This is an example, though, of one of which you received several?

A    It would have been close to it.

Q    Okay.  And this is from a man -- a person named "Royce" -- I assume that's a man -- "Caldwell"?

A    (Affirmative gesture).  Yes.

Q    "Have known Mr. Allen about five or six years; always laughing, polite, smiling young man."

THE COURT:  Is there a number on this one?

MR. HOLTSHOUSER:  This is 305-A.

THE COURT:  Okay.

A    Yes, that's what it says.

Q    (By Mr. Holtshouser)  He further -- Now can you tell from this who exactly he is?  Family member?  Relative?  Friend? Neighbor?

A    No.

Q    It says that, "Mr. Allen never failed to greet me and my daughter with a smile and a hug.  He was always mannerly in public.  Many young men are not these days."

And he, again, references he's a "young man with a big smile and a warm heart, always very low key and charming. My daughter attended a few" ---

MR. MORENO:  I'm going to object.  I don't know why we're reading this reference in the record as opposed to asking questions.  I think the document speaks for itself.

THE COURT:  Well, it does.  I'll take that -- I'll take a moment here to read the whole letter.  Just a second.

MR. HOLTSHOUSER:  Judge, I can blow this up for you.

(Pause)

THE COURT:  Okay.

Q    (By Mr. Holtshouser)  There's a specific reference in this letter to Drum & Bugle Corp. dances with which Mr. Allen participated in; that he's at least providing you with a fact

or a detail about his background and activity that Mr. Allen, apparently, participated in within the past five or six years, correct?

A    That's what it appears to be from the letter, yes.

Q    Next, I'm showing you Exhibit 306.  Is this another letter from you to Mrs. Allen on April 25, 1997?

A    Correct.

Q    The focus of this letter is acquaintances and relatives who died over the course of the last few years?

A    Yes.

Q    Now you notice -- you notice in the first sentence that you're referencing what -- something Billie has told you.

A    Correct.

Q    So you're having -- Are you having meetings with Billie on a pretty regular basis, conferences and/or telephone or in-person while representing him?

A    Yes.  This was a in-person conference.

Q    Okay.  And that's something that you made a habit of doing on a regular basis throughout your representation of Mr. Allen by phone or in person?

A    Yes, I would say so.

Q    Okay.  And those dates, those contacts were recorded by you and informed the Court in your CJA applications for payment, correct?

A    Probably some of them.  It's hard to say.  I wasn't a

very good recordkeeper; that when I start doing these cases, it was the first time I'd ever really kept hourly records.  It wasn't something that is done very often in the criminal practice.

Q    The -- So the records that you submitted to the Court, if anything, are probably under-inclusive?

A    I would say so.

Q    The names that you refer to here, you have several of them already, and you're asking Mrs. Allen for what?

A    Well, I mean the purpose of this is what we were exploring at the time, what we were considering as possible mitigation, was the level of violence that he had been exposed to.  He had told us of a number of people that he knew from the neighborhood and that were friends that had -- had violent -- met violent deaths, and we were considering using that as a -- one of the focal points of the mitigation phase to say to the jury, "Look, how many of you know anybody who has been killed violently?  And this guys knows a dozen."

So the idea was to begin trying to gather information about those violent deaths.

Q    All right.  Now these are acquaintances and relatives, and it's simply who have died over the course of the last few years.  Mr. Allen wasn't telling you that each of these individuals died from street violence.

A    I don't remember that.  I know we had -- I definitely

remember that that was part of what we were looking at early on, and it would have been violent deaths, but we might have even -- we might have included others to just sort of show that this guy had experienced more death than most people get a chance to experience unless they've been at war.

Q    So it wasn't so much -- It was both the concept of violent death and loss.

A    It was.

Q    Okay.  And when you say -- You referenced a couple of times in your answer "we."  Now in April of '97, who is "we"?

A    Well, it would really refer -- A lot of times in my letters I sort of think of the office as a collective group of people.

Q    So in other words -- In other words, when you are -- take on a case like this, was Connie Supranowich part of your -- you viewed her as part of your office and someone working on this case for you at that time?

A    Yes.

Q    What about any investigators that you used?

A    I don't think we had an investigator.  We certainly didn't have an investigator who worked with us on a regular basis.  Rackers worked on other things but not -- not as an employee.

Q    Was Rackers someone who you were engaging in this case early on?

A   I don't -- I don't remember when specifically I asked Mr. Rackers to do any work or when he started.  It might be within the records of the Court, requesting money to pay him on an hourly basis.

Q   And besides Connie Supranowich, was there a woman named "Melissa" who played any role in your office back in that time period?

A   I believe that would be Melissa Price.

Q   And what was she?

A   She was a law student, intern, employee.

Q   And was she someone who was capable of doing investigation and talking to people?  Talking to witnesses?

A   She was a capable young woman, yes.

Q   And did you ask her to do some of those things in this case on occasion?

A   I couldn't specifically tell you what I asked her to do. I mean I think she helped us on the case.

Q   Okay.  Anyone else?  Did your brother work on this case at all with you?

A   No, he didn't.

Q   How about the brains of the operation?  Mr. Noble?

A   Yeah, he wasn't there at that time.

Q   Okay.  Anyone else?

A   You struck me with that "brains of the operation."

Q   All right.

A    I'm trying to recover from that.

Q    That's what he told me.

A    You know, I'm just trying to remember if he was there around that time.  He -- He may have been because we got his name from Melissa, and then we got him in as a law student early on, knowing how brainy he was.

Q    Next, I want to go to Exhibit 307.  Is this another letter that you recognize and that's your signature?

A    Yes.

Q    And, again, you're requesting from Mrs. Allen addresses, phone numbers, pediatricians, doctors that treated Billie in the past?

A    That's -- That's right.

Q    "This information is necessary to investigate a possible penalty phase in this case."

     Again, this sets forth -- explains to her why you're getting this information.

A    Yes, to some extent.

Q    Next, 308.  Do you recall this?

A    Well, it certainly appears to be in the same font as everything else from my office, and it is indicated from me. So it would be a witness list that I had conceived of as possible mitigation.

Q    Is this a practice -- Is this consistent with your practice to occasionally make memos to the file?

A    Yes.  I mean it's not as consistent as I would like it to be, but yes.

Q    Okay.  I'll just direct your attention to these two holes up at the top up there.  Was it your practice in the way that you kept trial notebooks and mitigation notebooks to double punch documents at the top and keep them into growing files or binders?

A    Yeah.  What happened is that -- that initially they might be double-punched at the top.  And then as the file grew, they'd be three-hole punched and put into notebooks to be more manageable.

Q    Now the date of this is May 7th, 1997.  So you've been in this case for three weeks.  Does that sound about right?

A    Yes.

Q    Three or four weeks?

         MR. MORENO:  I'm going to object.

A    Well, about a month.

Q    (By Mr. Holtshouser)  Okay.  Okay, a month.  As a -- Within a month, you have assembled here a witness list.  Is that correct?

A    Yes.

Q    And would it be fair to say that this witness list is a mitigation witness list?

A    It's partially that, but there's -- there's Johnnie Grant.  There's Kesha Williams who apparently was at

a -- knew something about Norris. That could have gone either way. Dontay Frazier concerning Norris; conversations with Billie.

Q    Okay. Again, it could go either way?

A    Yes.

Q    Okay. You'd agree that evidence that relates to guilt can also be relevant to mitigation.

A    It can.

Q    There are things about guilt evidence that speak volumes about mental functioning, personality, character traits, et cetera.

A    They can.

Q    Other people on this list is Luther Isgriggs. He's a guard in the jail; knows how Billie acts; talking about his incarceration at that very moment in time.

A    That's correct.

Q    And that would be relevant to showing his manageability within prison which is often a mitigation theme in capital cases?

A    Yes.

Q    Jerome Petty, that is Mr. Allen's uncle, Juanita's brother; correct?

A    Yes.

Q    And already you've identified him as a potential mitigation witness; knows that Billie played for a basketball

team.

A    I mean he's identified pretty much, I think, because he's a relative, and I wouldn't know specifically anything about why a basketball team might be relevant other than he knows Billie.  In other words, he interacted with him.

Q    Okay.  And at this point in time, is the sources of your information these people?  Mrs. Allen?  Billie Allen?  Who?

A    I would say within a month it would have been the Allen family which I consider to be his sisters and his mother and Billie himself.

Q    You've also already identified a man named Sam Moore, a basketball coach?

A    Yes.

Q    Johnnie Grant is characterized as his best friend, correct?

A    That's how I understood it at that time.

Q    Okay.  Now "Raymond Petty," that's a uncle?

A    Yes.

Q    And that's -- That witness you actually called and presented at the penalty phase.

A    I'm sorry.  Say that again.

Q    A witness you actually called in and presented at the penalty phase.

A    I believe that's correct.

Q    Wilson Flexx, produces ---

A   His family owned a studio.

Q   Knows all music is -- Knows all music is entertainment. Donald Winters, ---

MR. MORENO:  Your Honor, I'm going to object to that. We're just reading the document again.

MR. HOLTSHOUSER:  We're asking questions about individuals.

MR. MORENO:  I haven't really heard questions.

THE COURT:  Well, as I understand, he's asking questions about individuals and whether they actually testified and whether they were mitigation witnesses.  So overruled.

Q   (By Mr. Holtshouser)  You have two names here under the category of inmate, and then you have a little phrase about what they -- what you know about them.  Billie told them about this case.  Shawn Midgett said his friend was going to lie about Billie to get his time down.  These are jail informants, for lack of a better word, that you're aware of at this time?

A   I mean that -- that's what I think they are, based upon what I put in there.  They were individuals who were claiming to have overheard conversations.

Q   So are they potential aggravation witnesses?

A   They could be guilt phase.  They could be aggravation, or they could be mitigation.  Shawn Midgett would have been somebody who said, "You know, I got this guy who's going to

lie about Billie to get his time cut." So that could have been either -- either part of the case.

Q This is part of your collection of all the information you can and knowing what's out there that could hurt you or that can help you.

A That's correct.

Q There's a woman or a person named "Carlos McIntosh," And you've identified that as Shawn Midgett's friend?

A That's correct. And I couldn't tell you what -- I would assume -- I would assume that she was somebody who knew what Shawn Midgett knew.

Q This "Dontay Frazier" is another inmate referencing Norris and saying he wanted Billie to drive. Is that the same Dontay Frazier that I showed you in a memo yesterday from a Detective about the group "The Cliq" and that Dontay Frazier was in "The Cliq" with Mr. Allen?

A I would assume so, yes.

Q Cory Roy is someone who you know about as of May 7, 1997. Is that right?

A Yes.

Q And you even have a phone number for him?

A Yes.

Q How about "Byron Woodard"? Who is he?

A I don't remember.

Q Is he a probation officer?

A    Yes.

Q    Did that refresh your recollection?

A    It did.

Q    Okay.  Next, I want to show you 309; same date.  May 7th is the date, but you sent the memo to file.  Do you recognize this letter?

A    Yes.

Q    All right.  And in this letter, are you advising Mrs. Allen that you have received -- referencing some letters you've received that you refer to as warm and kind letters about Billie Allen; not much negative information in those letters?

A    No.  I also -- I just wanted to let her know that we were finding out good things about Billie to keep her spirits up.

Q    Because her spirits were down as a result of this, were they not?

A    Certainly.

Q    Okay.  She appeared to be deeply affected by the fact that her son was incarcerated and charged with this crime.

A    I think it was a very emotional rollercoaster for her.

Q    Which would indicate that she had strong feelings for Mr. Allen.

        MR. MORENO:  I'm going to object and move to strike the question.

Q    (By Mr. Holtshouser)  Does it indicate that to you?

A   I -- I wouldn't -- It doesn't surprise me at all that she would have strong feelings for her son.

Q   I mean she didn't come in and say to you, you know, "I don't care what happens to him.  You know, I'm not helping you."

A   No.  She wasn't that ---

Q   "He's always been no good; never going to be any good."  She never said that, did she?

A   She wasn't that kind of parent that I understood.

Q   The names that you -- You're asking for help locating some people now.  Some of these, I'm not sure if any of these people are on the list of witnesses that you had on your memo.  So you got names -- Well, I guess Raymond Petty is.  You got names of some others.  Royce Caldwell, that's a Miss Royce Caldwell.  That's one of those people that we saw that you had a letter from them, correct?

A   Right.

Q   Then Nancy Harris, who is she?  Do you remember?

A   I don't.

Q   Okay.  Would it refresh your recollection that she was actually a neighbor who lived on Cote Brilliante in the same block as the Allens?

A   That could be true.  I just don't remember who she is.

Q   Do you recall that she's someone that you called as a witness at trial?

A    It would be in the transcript.  I'm sorry.

Q    There were a lot of people presented, correct?

A    There were a lot of people throughout the proceeding.

Q    Raymond Petty, Sr., that's the uncle.  He was on your witness list, though.

A    Yes.

Q    Deborah Ruffin, Ronald Ruffin, Thelma Ruffin; who were the Ruffins, if you remember?

A    If I remember correctly, and you can certainly correct me if I'm wrong, I thought they were family members and they were related, you know, sort of in the broader family aspect, and they were people that had spent time with Billie when he was growing up.

Q    Now it says here that you are "also enclosing a list of names that you received from Billie of possible witnesses.  Could you help us locate these individuals?  I need addresses and phone numbers."

     At least on this copy we have there's nothing attached.  Do you recall what that list was?

A    No, I do not recall what it was.  Probably would have been some kind of memo or something to that effect.

Q    Let me next show you Exhibit 310.  This moves us ahead about two or three weeks.  This is a -- Is this a memo to you from Connie?  Is that Connie Suprano -- It was "Connie Caspari" at the time, I believe, correct?

A   Yes.

Q   And now it's "Supranowich."  So is this an example, though, of you using her -- She's a paralegal for you, correct?

A   Yes.

Q   But she's also someone who is capable of conducting an investigative function.

A   She -- Yes, to some extent.  I mean I wouldn't call her an investigator as such, but she would go -- be able to go out, look for records, do those kind of things.

Q   Could she also conduct interviews of individuals?

A   Yeah, she could, but I don't know that she was used a great deal in that capacity.

Q   It was your opinion of her that she actually was quite good one on one with people?

A   I think she was quite good in many things that she did.

Q   One of the things that she's indicating that she's done for you here is that she's obtained medical records from Homer Phillips for the Allen case.  And then she sent a -- And she suggests that you need to send a written request to this director at this location; gives you the phone number, and turnaround time will be two weeks.  So the records you're going after here are the Homer G. Phillips hospital records.

A   Yes.

Q   Part of building the -- the information base that can be

-- that's relevant to mitigation in Billie's case.

A    Yes.

Q    I'm going to next show you three exhibits in a row.  They each have something in common.  This is a memo to you from Melissa; June 2, 1997.  Do you recognize this?

A    I mean I can't say that I recognize it from seeing it, but I see my handwriting on it where I'm complaining.

Q    All right.  "Details, details, details," is that your complaint?

A    I want more information.

Q    Okay.  This is concerning Marcella -- Marcella Chowning, correct?

A    Yes.

Q    And that's actually the woman who lives at 3164 Argon which is the place where Billie Allen was arrested on March 18, 1997.

A    Yes.  As I recall, yes.

        THE COURT:  What's the number on this?

        MR. HOLTSHOUSER:  That is 310.

        THE COURT:  Okay.

        MR. HOLTSHOUSER:  I'm sorry.  135.  135.

        THE COURT:  135, okay.

        MR. HOLTSHOUSER:  Judge, I'm -- If I fail to -- Correct me.  I'm trying to say them at the beginning, but I would also point out the actual number is in the lower

right-hand corner.  Is that visible on your screen?

THE COURT:  It is.

MR. HOLTSHOUSER:  Okay.

THE COURT:  I saw it.  I thought maybe that was a trial number or something, but ---

MR. HOLTSHOUSER:  We're just -- Because this is a Joint Exhibit List, they're just exhibits, not one party's exhibits --

THE COURT:  Okay.

MR. HOLTSHOUSER:  -- or another party's exhibits.

THE COURT:  Okay, great.  Thanks.

Q    (By Mr. Holtshouser)  This series -- This information here that is supplied that Melissa obtained from Marcella Chowning, correct?

A    I'm sorry.  Yes.

Q    Okay.  And that's on June 2, 1997.

A    Yes.

Q    Next is 136.  This is another one of those memos dated June 9, 1997, from Melissa to you, concerning an interview of Bobby Harris, correct?

A    I think, yes.  Bobby Harris, I think, may be the city employee.

Q    And this is someone who was involved in the -- was in Forest Park and is referencing when Mr. Allen came running to him for assistance immediately following the robbery.

MR. MORENO:  I'm going to object to this exhibit, exhibits like it that are really go to guilt phase.  This has nothing to do with the penalty phase or Mr. Sindel's efforts on the penalty phase.  These are guilt phase witnesses.

MR. HOLTSHOUSER:  Judge, you know, I think --

MR. MORENO:  They're not relevant to this proceeding.

MR. HOLTSHOUSER:  Judge, the fallacy that underlies that argument, which we categorically reject, is that guilt has no relationship to mitigation.  I think it is legally and factually incorrect.  The -- When a jury conducts a penalty phase assessment, they're asked to determine what's mitigating in the context of the crime.  Moreover, anything that occurred during -- in connection with the crime is certainly relevant to mitigation.  That's what -- That's what jurors are instructed to consider is all of the evidence, not just -- There are some things that are categorized, and, "Well, this is only for this and this is only for that."

And so the conduct described here that this witness describes of Mr. Allen is informative of his character, his mental functioning, and his conduct.  And it's all things that have to be taken into consideration in this strategy decision in terms of how bad is the guilt evidence and what is it that we can put on in mitigation?  I -- I think this is a ---

MR. MORENO:  That's such a broad brush.  Almost anything would be fair game.  This Court specifically limited

the hearing to penalty phase issues.  Whether or not the defense lawyer has to consider evidence that came out of the crime in terms of how it might apply to aggravation is a different story, but not every single document generated for guilt phase purposes is relevant to mitigation or is relevant to the Jury's consideration of culpability.  This is a -- This is Mr. Holtshouser's way of justifying the introduction of all sorts of evidence that has no bearing on either Mr. Sindel's strategies or his tactics concerning which theme he was using with the penalty phase.  This is so far afield on what the Court wanted for this hearing.

THE COURT:  Okay.

MR. MORENO:  We could be here all week just on these documents.

THE COURT:  Well, first of all, I haven't seen anything that suggests that the United States is just throwing in information that is not relevant.  A piece of evidence -- A piece of evidence that I think is relevant in this particular memo is the reaction of Mr. Allen at the time.  As I recall, he had on a jacket that was actually melted to the back of the seat, and he went up over the hill to this equestrian barn and was seeking transportation.  So it -- it could be relevant to his -- his behavior, his -- He was trying to get transportation; why he chose this ability.

So while it's true it apparently has very little

weight, I'll receive it and will continue to receive similar kinds of documents so long as it doesn't appear that they are being offered for improper reasons or just to overload the file. Overruled.

Q   (By Mr. Holtshouser)  The only thing I wanted to point out to you, Mr. Sindel -- and this is a bad copy, but it's the copy we've been given, and it was given to you by Melissa -- is Mr. Harris here reports to her a statement and a version of events that Mr. Allen provided to him at the moment of their interaction, correct?

A   Yes.

Q   And it does -- it does demonstrate, do you not agree, that in terms of his -- the extent to which he was functioning at that moment, in terms of his ability to come up with explanations for situations, such as his hair being singed, his -- the leather jacket and so forth.

A   I mean I was much more concerned with what it showed about his culpability and guilt in the crime than whether he was thinking clearly or not.

Q   You see here it states that Mr. Harris says that Allen said that the police were chasing somebody and that that person they were chasing ran into his car.  Allen told him that he ran when the police came because he did not have a driver's license, and he asked them where the bus station was. He's coming up with reasons to this individual to explain to

him why this individual should help him, correct?

A    That's according to the interview of that individual.

MR. MORENO:  I'm going to object again, Your Honor, because even under Mr. Holtshouser's expanded theory which would be admissible, there's no evidence that this has any bearing or weight on any strategy or mitigation theme or anything related to mitigation by Mr. Sindel.

THE COURT:  Well, as I indicated, it's very tangential, but it's -- it's in.  I'll hear it.  It -- It -- I can tell you I haven't even made a note on this.  It does seem like it's tangential.  Overruled.

Q    (By Mr. Holtshouser)  I'll show you next Exhibit 139.  Is this another memo from Melissa to you on June 9 -- and this is Exhibit 139 -- concerning an interview of an individual named Bruce Norman.

A    Yes.

Q    All right.  And he's another individual that encountered Mr. Allen in the -- in Forest Park area on the day of the robbery.

A    Yes.

Q    And he also describes Mr. Allen's conduct, statements and conversation at that time.

A    Yes.

MR. MORENO:  I'm going to object again, Your Honor. I don't mean to be obtrusive, and I understand the Court's

ruling.  If I could just have a standing objection, maybe then we can avoid this.

THE COURT:  Thank you.  What I find are standing objections lay traps for you and for me because you may think you have a particular objection, and it may relate entirely to something else.  So, no, no standing objections.  Let me look at this, and then I'll decide if it should be received.

MR. HOLTSHOUSER:  Judge, I'm going to blow it up; make it easier to read.

(Pause)

MR. MORENO:  Excuse me, Your Honor.  I don't mean to interrupt while you are reading that.  Mr. Allen requests a bathroom break.

THE COURT:  I'm sorry?

MR. MORENO:  Mr. Allen is requesting a bathroom break.

THE COURT:  Okay, sure; absolutely.  Yeah, we will take a 15-minute break at this time.

I'm going to have to leave today at about ten till noon.  We're having a court meeting at noon, so I'll be leaving at ten minutes till 12:00.  Court's in recess for 15 minutes.

MR. MORENO:  Thank you, Your Honor.

THE CLERK:  Court is in temporary recess.

(Court recessed from 11:00 AM until 11:15 AM.)

MR. MORENO:  Thank you, Your Honor.

THE COURT:  Excuse me just a moment.  There's an objection.  I am -- I have looked at this, and I am also considering the one that I approved.

Can you explain in any more detail why you think this is relevant?  It doesn't seem to me that it has much relevance at all.

MR. HOLTSHOUSER:  The relevance is, Judge, is that he is collecting information for investigative efforts which has a potential dual purpose.  One is to find out more information about the evidence that could convict Mr. Allen, but then also find out about evidence that relates to his state of mind and his functioning on the day of the offense.

It's not correct that guilt evidence is not relevant to mitigation which is why --

THE COURT:  I agree with that.

MR. HOLTSHOUSER:  -- which is why the mental health experts in this case at trial were given all of the guilt evidence and were given the police report.  And as the -- as the starting point is that in order to figure out what was -- And there was lots of Cross Examination of the mitigation experts even at trial about how he was functioning during the crime, before the crime, and after the crime, and what it spoke about things, such as PTSD and the causal nexus between any alleged mental impairments that he had and the -- and the

offense.

One of the -- One of the things established yesterday, I think, is that causal nexus themes in mitigation are the most powerful, and there was certainly an attempt at trial, just like there is a -- a -- somewhat of an attempt even in the current experts' opinions to try and draw a causal link between Mr. Allen's supposed mental maladies and the -- and the offense.

So I think this is -- I agree with you, Judge. This is tangential in the sense it is a small piece, but there is within this a ton of information about Mr. Allen's ability immediately after what would be considered a relatively stressful and traumatic event to be concocting false explanations for his presence and to be able to explain and manipulate the truth in order to convince others to take certain actions. He's thinking in a way which is, in fact, rational and is enabling him to escape from a very difficult situation. He's just experienced a car crash. He's bailed out of it because it's on fire and so forth.

I mean I think that's the -- that's the relevance, Your Honor, is that it shows that information is being received, being collected. It isn't simply single-focus purpose evidence, and it's being done by Mr. Sindel. It's relevant here to Mr. Sindel. It's being done at a point in time when he's only been in the case a little over a month and

a half.

THE COURT: All right. I'll give you a chance to respond, Mr. Moreno.

MR. MORENO: Sure, a few things. I think that there is no evidence that Mr. Sindel was looking at this evidence for purposes of ruling in or ruling out mitigation themes. He was collecting evidence about the guilt phase. Now, obviously, there's -- I agree. There's some relevance to some evidence from the guilt phase in the penalty phase, but this is not that type of evidence. Maybe this is the evidence you give to a mental health expert when you -- if and when you hire one, but it's not the kind of evidence Mr. Sindel was looking for at this point in time for purposes of mitigation.

Mr. Holtshouser would like us to believe that that's what he was doing, and there was this great broad plan that included looking at all the guilt phase statements at this point in time for purposes of mitigation, but I suggest to you there's been no testimony to that effect from Mr. Sindel.

Also, under 404(b) -- 403(b), I'm sorry, there's not much probative value to what this Court is considering at this point in time, and really we're rehashing guilt phase issues, not probing Mr. Sindel as to what actual real mitigation work he was doing at this point in time that Mr. Holtshouser is currently asking him about.

THE COURT: Okay. I'm interested in knowing: I mean

is this the beginning of a -- of a series of similar kinds of ---

MR. HOLTSHOUSER:  This is actually the last of three interviews done by Melissa.  And it also in part goes to show that there's a team of people working for him long before Mr. Haney and long before Mr. Simon come into the picture that are helping him gather as, in his words, "I want to know all the information, good and bad."

THE COURT:  All right.  Okay.

MR. HOLTSHOUSER:  And this is the last of the Melissa memos that I'm aware of that we have seen, but it's to him. There really no one else who can authenticate it.  It -- It has relevance perhaps to be used to cross-examine mental health professionals who were not given this information.

MR. MORENO:  And that's for another day.  That's for another witness.

THE COURT:  I'm going to overrule it, Mr. Moreno. Overruled.  Received.

MR. HOLTSHOUSER:  Thank you, Judge.

Q    (By Mr. Holtshouser)  All right.  I want to jump ahead from this to Exhibit 312.

Is this a memorandum from you to the file like the one we've seen before dated July 14, 1997, adding to the file more witness information?

A    Yes.

Q    And these two witnesses are relatives; Uncle Jerome and an aunt named Lois Allen?

A    Yes.

Q    All right.  And it says, "Supposedly knows Quinton."  Is that somebody that works in your office or that's -- Who's "Quinton"?

A    I don't remember.

Q    Okay.

A    It wasn't anybody that worked in my office.

Q    Uncle Jerome is Jerome Petty, correct?  And this is a -- Collecting this contact information was part of the mitigation investigation.

A    Yes.

Q    These people knew nothing specifically about guilt, correct?

A    Not that I knew of.

Q    So this would be singular purpose information as opposed to multi-purpose information?

A    Yes.

Q    Let me show you Exhibit 11.  Do you recall this application that you made to the Court on July 15, 1997?

      You've been in the case now a little over -- You've been there April, May ---

A    Three months.

Q    Three months, okay.  There's been no Notice of Death

filed by the Government, correct?

A    That's correct.

Q    And in the first paragraph of Exhibit 11, which is Document 112 of the Court's file, you summarize what you're asking for, and it's the authorization to hire investigators. What's the purpose that you advised the Court that you wanted investigators for?

A    Well, according to the document, to obtain copies of certain records pertaining to family, social background, et cetera; to organize those particular records and make them available to mental health professionals and qualified experts to investigate and interview witnesses necessary to present mitigating evidence at the penalty phase and to investigate and interview witnesses around the charged offense and to secure documents and other materials, like photographs, pertinent to any defense to the underlying charges.

Q    Okay.  So you are, in fact -- This is part of your continuing effort to prepare for what you expect may be a mitigation case.

A    That's correct.

Q    You're thinking way down the road, aren't you?

A    I'm thinking -- Yes, I guess you could -- I don't know about way down the road.  I thinking down the road.

Q    Okay.  I mean way down the road in terms of your assuming that there might be a guilt finding some day.  You haven't

even had the pretrial motions in this case to suppress evidence, have you?

A    No.

Q    There hasn't been a Notice of Death filed.

A    That's correct.

Q    Yet, you are thinking about these things early as part of your practice as a capital trial defense attorney.

A    I am trying to, yes.

Q    You're also already thinking about mental health professionals and qualified experts who might receive these types of records, correct?

A    It's part of the motion, yes.

Q    All right.  So part of what you're trying to do is to build a base of information, knowing that that's what mental health experts are going to want in a mitigation exploration.

A    Yes.

Q    In the body of this motion, you justify your request for these items.  On Page 2 you make reference to factors relating to the Defendant's character, background, and the circumstances of the offense which are -- That comes straight from the statute concerning mitigating circumstances, correct?

A    I believe so, yes.

Q    Okay.  The circumstances of the offense are, by statute, made relevant to mitigation and penalty phase, are they not?

A    Rephrase that or ask -- Just ask it again just like you

just did.

Q    The statute itself makes circumstances of the offense relevant to the penalty phase.

A    Yeah.  Yes, it does.

Q    And you're citing that statute as authorization for the expenditure of what you're requesting.

A    Right.

Q    You indicate here early on in July -- again, this is July 15th that you filed this -- that the records require the assistance -- "will probably require the assistance of a mitigation specialist, social worker or other mental health professional with expertise.  The initial process of interviewing and document gathering can be undertaken at lower costs by a nonprofessional investigator."

In terms of this request, are you concerned about how the Court -- the Court's reluctance to authorize expenditures of the resources you're requesting?

A    Well, I think you're -- Well, you're trying to justify spending this money in this way as opposed to spending money to have someone who's billing at a much higher hourly rate to do the same sort of things that someone else could do.

Q    In terms of the plan you communicated to the Court and the expectation that you communicated to the Court, your expectation was that you would use lower-cost nonprofessional investigators to gather information, actually do the field

investigation, put it together to supply to a mitigation specialist or a more expensive type of an individual, correct?

A    Yes.

Q    You also note that these are time-consuming tasks.  You want to begin them as quickly as possible to expedite the investigation of the Defendant's case in mitigation?

A    Yes.

Q    You didn't wait then for the authorization, the filing of the notice to seek death by the Government to begin this process, this investigation.

A    No.

Q    You also note that the identification of experts is to some degree determined by the initial findings concerning the Defendant's life history and background.

A    Yes.  That's what it says.

Q    The specific -- The first thing you asked for, and this is where you get specific, what you're asking for is a paralegal to secure, copy, compile and collate documents pertaining to both guilt and mitigation phases of the case, correct?

A    Right.

Q    Next, you want the services of a mitigation specialist to investigate, discover, and interview witnesses that may provide mitigation evidence at the penalty phase, correct?

A    Correct.

Q     And two private investigators to investigate, secure documents and interview witnesses pertaining to the mitigation phase of the case, correct?

A     Correct.

Q     So is this the lower-cost services that you're asking the Court to conduct the field investigation, the initial field investigation and gathering information?

A     Yes.

Q     And then the -- Your intent, your expectation was that that then would later be supplied to a more expensive mitigation specialist to provide his input or thoughts?

A     That was part of the plan, yes.

Q     And then there are dollar amounts for each one, correct?

A     Yes.

Q     You further ask for a psychiatrist and a psychologist, correct?

A     Yes.

Q     Let me show you Exhibit 611.  Did the Court grant your request on August 18, 1997?

A     I'd have to -- I don't know if they granted it -- if the Court granted it in its entirety.

Q     Let's go down to the order.  He denied your request for a jury expert, correct?

A     It appears that the -- the Court granted the request for the investigators, the mitigation specialist and the

paralegal.

Q   Okay.  So you got the paralegal, the mitigation specialist, and two investigators, correct?

A   Correct.

Q   And it indicates mitigation specialist, social worker or mental health professional.

A   That's right.

Q   So other than the jury expert, you -- the Court granted what you asked for.

A   Yes, although the hourly rate is at the low end of the request.  I think we talked about $200 an hour.  The 125 was -- would probably not have hired a psychiatrist.  And the -- I wasn't sure what the total amounts we requested for each, but the hourly rates on the other two are what we had requested.

Q   I'll next show you Exhibit 15.  This is your application to be paid essentially for the period from -- Just a second here.  Let's go to the second page.  Is that your signature on there?  Let me go a page down.  This covers a period that begins in April, and it actually goes to September 16th as the date that the Court signs it, but it's your submission for hours basically for the first portion, period of time in which you're representing Mr. Allen.

A   That's not my signature.

Q   Right here?

A    No.

Q    "No"?

A    Nope.

Q    Someone signed for you?

A    That's what it looks like.  That scribble there, if I could do it, that's mine.

Q    "Please find your request for payment" -- So someone else supplied your -- signed on your behalf.

A    I -- I had never done -- I don't ever remember doing that.

Q    That was sent to the Court, correct?

A    Yes.

Q    Now this covers the activities and services that you're billing for for the period of essentially the time you were first in the case through August.

A    I'm going to trust that it does.  I don't know.

Q    All right.  I want -- I'm only going to show you a couple portions of this, but I want to show you -- Directing your attention to some telephone conferences that you're having here in the first week or two of being on the case, you've actually had telephone contact with a studio, a girl friend, Mrs. Allen.  You reviewed letters from Mr. Allen.  You've actually had a telephone conference with house or at the house with Cory Roy?

A    Correct.

Q   All right.  "Letters to Kevin McNally and David Bruck." Who are they?

A   Those are two of the capital resource counsel.

Q   Had you had dealings with them before?

A   Excuse me; what?

Q   Had you had dealings with them before --

A   Yes.

Q   -- or is this your first?

A   No.  I've had lots of dealings with them.

Q   And they are a resource that you've been able to turn to in the past, and you were turning to in this case for what?

A   I might -- Sometimes what you do is you report to them specifically what's happening on the case so they can keep statistically on top of what is going on in capital cases throughout the country.  That may have been what that was, a letter reporting to them whether the -- whether the Government has indicated they're going to go after a capital case; whether notice has been filed; when the DOJ hearing is; those kind of things.  It could be that or it could be I'm looking for a mitigation person.  It could be either one.

Q   Do you generally -- Is it in your practice to generally discuss with them the nature of the case you have?

A   To some extent, yes, but not in great detail unless they ask for it.

Q   But to get their input.

A   What?

Q   To get their input?

A   Yes.

Q   All right.  And they are -- You consider them to be even more expert in the area than you.

A   They are -- There's no doubt about it.

Q   On the next page there's a number of other events here. At the top on April 28th, that's the letter to Juanita Allen regarding treating physicians and hospitals.  I direct your attention to the May 3rd entry.  "Letters from mitigation witnesses" -- you've gotten four in the parentheses -- "letter to Juanita re witnesses."  Would that be an indication you received four such letters from mitigation witnesses?

A   Yes.

Q   Down here on 5-10, you had a conference with Cory Roy -- Is that Cory Ray or Cory Roy's mother?

A   I would think that's probably Cory Roy with a misspelling.

Q   Okay.  Next one is a telephone conference with client's mother, Juanita, re mitigation?

A   Yes.

Q   And again, May 15, "telephone conference with mother and witness," correct?

A   Yes.  I guess so everybody's clear, we weren't very good at -- In the computer system that I had in effect at that

time, we had certain numerical listings that we would put on our bills. So for example, a phone call would be a 70. Then I would you write "W" and the person. That doesn't always fit into the scheme that the Government has for what you're doing. So that there's a lot of interviewing witnesses that don't necessarily appear as interviewing witnesses where that's what I'm doing. And because of our system, it doesn't actually coordinate very well, and I asked my staff to make sure, and I don't check it very well. So sometimes whatever this appears under may not be indicative of exactly what occurred.

Q   Okay. And you indicated earlier, if anything, these are under-inclusive of your ---

A   I would think so, yes.

Q   On May 26, '97, it references reviewing medical records and a letter to custodian. That would be a mitigation activity, correct?

A   Correct.

Q   Telephone conference with Defendant's mother?

A   Correct.

Q   July 1, a conference with Kevin McNally, and this is a -- actually leading up to your trip to Washington, DC, to appear before the Capital Crimes Review Committee, correct?

A   Yes.

Q   All right. And then in July there's several more contacts with this Aunt Lois who we saw previously in a memo

to your file; you talked with her?

A    Yes.

Q    A telephone conference with witnesses; another one with Kevin McNally.  So you're conferring with him pretty regularly, correct?

        MR. MORENO:  I'm going to object.

A    With Mr. McNally?

        THE COURT:  Wait, wait, wait.  What?

        MR. MORENO:  I'm going to object.  It's absolutely not clear that these telephone -- Where it just says "witnesses," 7-12-97, there's three of those.  They're actually mitigation witnesses.  Unlike the other entries which point out that it's either Mrs. Allen or Uncle or whoever or Roy, these particular entries just say "witnesses."  There was a guilt phase investigation going on at the same time.

        THE COURT:  All right.

Q    (By Mr. Holtshouser)  Were you having telephone conferences with guilt phase witnesses at this point in time?

A    I probably was to some extent, yes.

Q    To how much of an extent were guilt phase witnesses ---

A    Well, you know, the people like Tasha Valentine, her mother, the ---

Q    Now --

A    Johnnie Grant.

Q    -- let's just stop with Tasha and her mother.  Would you

have considered them both guilt and mitigation witnesses?

A   They could be.

Q   You actually called Tasha in the mitigation?

A   I did.

Q   Okay.

A   But I would also be talking to Tasha about the circumstances of the arrest, how it occurred, what they remember, how the police got in, all of that stuff.

Q   Now Tasha, though, is not the woman he was with when he was arrested.  That's Marcella Chowning.

A   If I used her name wrong, there was a woman he was with at the time he was arrested, and he was at the family home, I believe.

Q   Okay.  But as Mr. Moreno correctly pointed out, this entry on your records is not specific as to the name of the witness or whether it was guilt or mitigation or both, but you are actively investigating the case.  This relates to working for Mr. Allen.

A   That's correct.

Q   Telephone conferences with Kevin McNally, again, here's one on July 14th.  I think the last question I asked was:  You were actually conferring with Mr. McNally periodically.

A   That's true.

Q   And are you updating him on progress you're making on strategy decisions?  What are -- Are you asking for resources

from him?

A    I don't -- I'm not asking necessarily for resources. Again, I could be asking him a number of different things, including statistical information in preparation for things like how to get money.  And I don't remember specifically when the DC trip was, but it could be in preparation for that as well.

Q    Okay.  And then the last one on this page that I want to ask you about, there's a July 25th, '97, entry for "Contact family re meeting."

A    Correct.

Q    All right.  Would that be a mitigation activity?

A    It would certainly be partially related to that.

Q    I want to next show you Exhibit 313.  Is this a fax directed to you from Mr. McNally regarding the Allen case and the subject being "Request for mitigation experts/severance experts"?  And he provides a list of mitigation investigators as follows.  Three of them he refers to as the "Killer B's." Is this the type of information that you were asking for and receiving from Mr. McNally?

A    Yes.

Q    Next, I want to show you Exhibit 314.  Now this is September 11, 1997.  In September you had previously gotten this order from Judge Webber which he granted on August 18 for the appointment of a psychologist, a psychiatrist related to

mitigation, correct?

A    Yes.

Q    All right.  Is Dan Cuneo -- You contacted him in this letter of September 11, 1997.  First of all, is Dan Cuneo a psychologist that you've worked with and had worked with in the past?

A    Yes.

Q    You contacted him in this letter and it says -- Now this is actually from Connie Caspari.  She's sending it at your direction?

A    It would have been at my direction or Mr. Simon's direction.

Q    Now the extent of supervision that you had over Ms. Caspari, she worked in your office physically, correct?

A    Yes.

Q    And did she confer and report to you regularly as to each and every -- Well, strike that.

     Did she report to you regularly regarding her activities --

A    Yes.

Q    -- on this case and other cases?

A    Yes.

Q    She would do so in writing and orally?

A    Yes.

Q    Okay.  Did she, in fact, keep records of these things in

the -- in the various workbooks and files that you kept in the office on a case?

A   I'm sure she did to some extent, yes.

Q   Now this letter here, it says, "Per your conversation with Rick."  So had you had a conversation with Dr. Cuneo --

A   I don't --

Q   -- before receiving this letter?

A   I'm sure I did, but I don't remember it.

Q   Enclosed please find a copy of the St. Louis Metropolitan Police Report referencing the above matter.  You're sending to Dr. Cuneo the police report.

A   That's -- That's what the letter says.

Q   Presumably that's something that relates to guilt, correct?

A   It's my experience that individuals who do psychological evaluations in connection with forensic work want to see the police report.

Q   Because the evidence of what happened in the crime is relevant to any mental assessment.

A   It can be.

Q   And you knew that from experience?

A   I knew that from experience.

Q   It says, Dr. Cuneo on September 11, 1997, this psychologist that you were contacting in following up on and acting on the Order that Judge Webber had entered granting

your request for a psychologist.

A    That Order was granted in August.  Is that correct?

Q    August 18th.  Let me just show you.

A    Then that would be correct.

Q    So would it be fair to say that on September 11, 1997, which is before Dr. Haney has appeared on the scene and before Mr. Simon has been requested, you've reached out to Dr. Cuneo, conversed with him, and sent him a copy of the police report in connection with a potential mitigation look at Mr. Allen's case?

A    That appears to be the case.

        MR. MORENO:  I'm going to object.  It doesn't say anything about mitigation.

        THE COURT:  Well, it doesn't, but he asked him a question if -- if that was the purpose.

A    I think the purpose -- Oh, I'm sorry.

Q    (By Mr. Holtshouser)  I thought you answered the question "yes," did you not?

A    I heard the question as being whether we were sending him those materials.  There was an objection, and I didn't hear it, whether it was actually the mitigation portion.  I don't think there's a division between the two necessarily.

Q    Between the two of what?

A    Mitigation -- Psychological evaluations for mitigation and psychological evaluations that may pertain to the guilt

phase.

Q    Okay.  So the Order that you had gotten from Judge Webber seeking appointment of a psychologist, the application that you had made, had linked its purpose to mitigation investigation.

A    It seemed to me that they linked it to either one of the two.

Q    But the person you're reaching out to in connection with following up on that is Dr. Cuneo.

A    That's correct.

Q    And you're doing this in September of 1997.

A    According to the letter.

Q    All right.  In the application that you made to Judge Webber on July 15th, 1997, you didn't seek psychological or psychiatric services to explore a possible motion regarding Mr. Allen's competence to stand trial or competence at the time of the offense, did you?

A    And that motion would speak for itself in that regard.  I just don't remember the wording.

Q    But you would agree that in following up on and acting upon the authority you've been given by Judge Webber, ---

        MR. MORENO:  I'll object.  This is asked and answered.

        THE COURT:  I haven't heard it yet, so I don't know. Go ahead.

Q    (By Mr. Holtshouser)  You would agree that in following up on Judge Webber's -- acting on the authority Judge Webber had given you in that Order, that this contact with Dr. Cuneo is pursuant to that, correct?

MR. MORENO:  That's been asked and answered.

THE COURT:  Okay.  Overruled.

A    That Order made the use of a psychologist available to us if that person was going to charge us money.

Q    (By Mr. Holtshouser)  Okay.  For mental health issues, period.

A    For mental health issues, period.

Q    Next, I want to show you Exhibit 17.  This is actually your motion requesting appointment of a specific co-counsel, correct?

A    Correct.

Q    And you didn't file a motion --

MR. HOLTSHOUSER:  And if I didn't say it, Judge, it's Exhibit 17.

Q    (By Mr. Holtshouser)  You didn't file a motion saying, "I need second counsel."  You filed a motion asking for the appointment of John Simon in particular.

A    That's right.

Q    All right.  He's the -- He's the man you asked for as co-counsel and he's the man the Court gave you as co-counsel, correct?

A    Yes.

Q    And why did you ask for Mr. Simon?

A    Well, I think I've indicated earlier that I knew Mr. Simon was very intelligent.  I knew he could crank out a lot of work.  I knew he did great legal research, and I thought he would be a good fit.

Q    Exhibit 315, is this a letter you sent to Mr. Simon on October 1st, 1997, congratulating him with a question mark? "The Judge has appointed you as co-counsel."  So apparently that took place.  Your motion was granted, correct?

A    That's correct.

Q    And, "I'm enclosing a copy of the Order entered by the Judge on September 24, 1997."  I'm not sure we have the Order itself marked as an exhibit, but this is the approximate date that Mr. Simon was appointed in this case, September 24, 1997, correct?

A    That's as I understand it, yes.

Q    Okay.  And then it says, "Now that you are officially appointed, what great ideas do you have for me?"

A    I delegate easily.  Yes.

Q    You're expecting Mr. Simon to bring some great ideas to the case and to assist you or were you being sarcastic in your letter?

A    No.  I -- I want as much information as I can get.

Q    As much help as you can get, you'll take it.

A    Right.

Q    And you thought that Mr. Simon would be a helpful addition, a good complement to your skills.

A    Yeah, I believed that at the time.

Q    All right.  Before Mr. Simon was appointed and before Dr. Haney was contacted, would you agree that most of the mitigation witnesses that you used at the mitigation case had been identified?

A    No.

Q    Had a substantial number of them been identified?

A    The numbers are there, the count, and we had done some initial legwork concerning identifying those individuals.

Q    Okay.  And some of them had even been talked to.

A    Yes.

Q    Interviewed by you in person?

A    Yes.

Q    Interviewed by others, such as Melissa Price or ---

A    No, I didn't think we were using Mr. Harris or the other gentleman in mitigation.  Those were the only three interviews I saw, but there may have been others.

Q    And you'd also had substantial conversations between you and Mr. Allen by that time about his background, his life history.

A    Yes.

Q    You also had substantial conversation with Mrs. Allen

about Mr. Allen and his background and life history.

A    I had a number of conversations with her, yes.

Q    And that extended as well to what relatives, family members and neighbors that they could put you in contact with.

A    Yes.

Q    Did you feel that before Mr. Simon had been appointed and Dr. Haney had been contacted, that you already established a good rapport with Juanita Allen?

A    I would say our rapport at that time was -- was fair.  I think that Mrs. Allen always had some concerns about whether or not we were directing everything to the guilt phase and whether or not we were one hundred percent behind her son's innocence.

Q    Aside from that which Mr. Allen shared as well, correct?

A    He was very concerned about that.

Q    Yeah.  Aside from that, did you feel that you had established by that time a good rapport with her in which she would be forthcoming to you about facts and information relating to Billie's life?

A    We were on a first name basis, and I felt she could be forthcoming.

Q    So would that be a "yes"?

A    Yes.

Q    Had you actually also obtained much of the relevant documentation that you could identify?

A    We'd -- We'd done, you know, the beginning work in that regard.  There -- There probably was additional documents that could have been secured or should have been secured based upon an appropriate review of the documents we already had, but we had a start.

Q    So it's a continuing process?

A    It is.

Q    All right.  You've been to the house where Mr. Allen grew up, the neighborhood.  You had been in the neighborhood.

A    Several times.

Q    So you knew what that was like, correct?

A    Yes, I did.

Q    That wasn't the first time you had been in that neighborhood, was it?

A    No.

Q    So you knew -- you knew about the neighborhood and about other areas of the north part of the City of St. Louis long before you represented Mr. Allen in this case, did you not?

A    I -- I knew about it before I represented Mr. Allen.

        THE COURT:  Sorry.  I need to interrupt.  I need to -- For the record, there's been a meeting set by our Court for selection of a Magistrate Judge, and it's been scheduled for some time, and I'm required to attend at noon.  It's about ten minutes till 12:00.  So I regrettably interrupt the testimony to accommodate that meeting.

Court's in recess till 9:00 tomorrow morning.

MR. MORENO:  Thank you, Your Honor.

MR. HOLTSHOUSER:  Thank you, Judge.

(Court adjourned at 11:50 AM.)

CERTIFICATE

I, Deborah A. Kriegshauser, Registered Merit Reporter and Certified Realtime Reporter, hereby certify that I am a duly appointed Official Court Reporter of the United States District Court for the Eastern District of Missouri.

I further certify that the foregoing is a true and accurate transcript of the proceedings held in the above-entitled case and that said transcript is a true and correct transcription of my stenographic notes.

I further certify that this transcript contains pages 1 through 124 inclusive and that this reporter takes no responsibility for missing or damaged pages of this transcript when same transcript is copied by any party other than this reporter.

Dated at St. Louis, Missouri, this 30th day of December, 2012.

_____

/s/ Deborah A. Kriegshauser

DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR

Official Court Reporter