UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


BILLIE JEROME ALLEN,                )
                                    )
              Petitioner,           )
                                    )
     vs.                            ) No. 4:07-CV-27(ERW)
                                    )
UNITED STATES OF AMERICA,           )
                                    )
              Respondent.           )


EVIDENTIARY HEARING -- VOLUME III
BEFORE THE HONORABLE E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE

JUNE 6, 2012

APPEARANCES:

FOR PLAINTIFF:        ELIZABETH U. CARLYLE
                     P.O. Box 30418
                     Kansas City, MO  64112
                     (816) 525-6540

                     JOSEPH M. CLEARY
                     COLLIGNON & DIETRICK
                     310 N. Alabama, Suite 250
                     Indianapolis, IN  46204
                     (317) 637-1000

                     TIMOTHY P. KANE
                     ERIC JOHN MONTROY
                     JAMES HENRY MORENO
                     FEDERAL COMMUNITY DEFENDER OFFICE
                     EASTERN DISTRICT OF PENNSYLVANIA
                     The Curtis Center, Suite 545 West
                     Philadelphia, PA  19106
                     (215) 928-0520

FOR DEFENDANT:       STEVEN E. HOLTSHOUSER
                     CARRIE COSTANTIN
                     OFFICE OF U.S. ATTORNEY
                     111 S. Tenth Street, Suite 2000
                     St. Louis, MO  63102
                     (314) 539-2200

REPORTED BY:          DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR
                      Official Court Reporter
                      United States District Court
                      111 South Tenth Street, Third Floor
                      St. Louis, MO  63102
                      (314) 244-7449

INDEX

ADMISSION OF EXHIBITS . . . . . . . . . . . . . . . .    4


RICHARD SINDEL --

   Continued Cross Examination by Mr. Holtshouser  .   14

VOLUME III                                    4

(Proceedings began at 9:15 AM.)

MR. HOLTSHOUSER:  Judge, I think we are going to start by making a record on yesterday's exhibits.

THE COURT:  Yes.

MR. HOLTSHOUSER:  Judge, are we on the record?

THE COURT:  Yes; whenever you're ready.

MR. HOLTSHOUSER:  Do you need to call the case or anything?

THE COURT:  No.  We're ready.

MR. HOLTSHOUSER:  With respect to exhibits that were referenced yesterday with Claude McLemore, it was 672 and 673.

THE COURT:  Okay.  Just one second.

Yes.  On the sheets, I have your sheet, and so I just simply -- Anytime you want to look at this, it's right up here.  If you want to check it, you can at any time.  And I note that I just added 72 and 73 on the bottom.

MR. HOLTSHOUSER:  We had to add those on the bottom of -- They actually were in the body of the original exhibits list, I think it might have been 652 and 653.

THE COURT:  Okay.

MR. HOLTSHOUSER:  I guess they're now deleted.  But, anyway, 672 and 673 is what they were designated.

THE COURT:  All right.  Received.

MR. HOLTSHOUSER:  With Mr. Sindel yesterday, an exhibit that had not been admitted from a previous day was

135, --

THE COURT: Okay. Just a second.

MR. HOLTSHOUSER: -- 136 and 139.

THE COURT: Okay.

MS. CARLYLE: Those -- Those three, Judge, were admitted over objection, as I recall.

THE COURT: Okay. 135 and 130 -- Did you say 136?

MR. HOLTSHOUSER: 136 and 139.

MS. CARLYLE: Those were all objected to as irrelevant, and the Court overruled.

THE COURT: Yes. Yes. Subject to the objection made, they are received. Okay.

MR. HOLTSHOUSER: Next in order is 305 and 305-A.

THE COURT: Okay. Just a second. 305, 305-A received.

MR. HOLTSHOUSER: 307 and 308.

THE COURT: Received, received.

MR. HOLTSHOUSER: 310.

THE COURT: Received.

MR. HOLTSHOUSER: 312.

THE COURT: Received.

MR. HOLTSHOUSER: 313, 314, 315.

THE COURT: All received.

MR. HOLTSHOUSER: 611.

THE COURT: Okay. 611, received.

MR. HOLTSHOUSER: All right. There's three others that I'm having trouble reading my note, but I think it was 11, 15 and 17. I think they might have actually been admitted the day before.

THE COURT: Now what were the numbers?

MR. HOLTSHOUSER: 11, 15 and 17.

THE COURT: Oh, yes, they have been.

MR. HOLTSHOUSER: Those are already in? Okay.

THE COURT: But let's -- let's check them off. 11, 15 and 17. Yes, they've already been received.

Okay. Ms. Berg mentions what about 72? What were they?

THE CLERK: 72, 73 and 76 or 74.

72 through 74.

MR. HOLTSHOUSER: Correct.

MS. CARLYLE: I think those were -- We never got back to those.

MR. HOLTSHOUSER: Yeah, I know we didn't. I was saying we need to because we had offered them. You had asked for an opportunity to postpone response. I think Jim might have spoken to that, Mr. Moreno.

MR. MORENO: I'm sorry. I wasn't paying attention.

MR. HOLTSHOUSER: 72, 73 and 74 which are part of the court record which are correspondence from Mr. Allen in '05 and '06. I think they're handwritten letters by him

concerning a Request for Discovery to the Court. They are part of the court file, and we would ask that they'd be admitted.

MR. MORENO: Your Honor, I think with regard to court records, we can stipulate to their admissibility. The relevance is a different -- a different story.

THE COURT: Okay. Well, let's make sure that that doesn't become an issue. All right. Do you want to look at those first, consider them for relevance before I go ahead and receive them?

MR. MORENO: Those are the ones that Billie wrote to his mom?

MR. HOLTSHOUSER: No.

MS. COSTANTIN: No; that Billie wrote to the Court.

MR. HOLTSHOUSER: The ones to the Court were the '05 and '06 were his handwritten requests for discovery from the Court --

MR. MORENO: Okay. I don't see their ---

MR. HOLTSHOUSER: -- about mental functioning, et cetera.

MR. MORENO: Well, ---

MS. CARLYLE: Yeah. Since they were written seven years after the trial, I'm not sure how relevant they are to anything that happened at the time of the trial.

MR. HOLTSHOUSER: Well, they're relevant to the

testing that's done a year later by -- or two years later by -- The most recent testing is certainly done 12 years after the trial and somehow deemed relevant, so it's indicative of mental functioning, period.

MR. MORENO:  I think if an expert wants -- If he wants to ask an expert about what the meaning of that particular record might be, that might be fair game, but just to introduce it now without some kind of foundation and its relevance to the expert testimony seems to me a little premature.

THE COURT:  Well, ---

MR. HOLTSHOUSER:  Our position would be the Court can consider it for what value the Court gives it.  I think the Court's capable of drawing conclusions as to his apparent mental capabilities, particularly with the use of language.

THE COURT:  Okay.  If we can do this because, you know, I remember talking about them.  I didn't make any notes about admissibility.  So if those could be maybe at a recess pulled up so I can take another look at them, I'll make a ruling.

MR. MORENO:  Okay.  Thank you, Your Honor.

MR. HOLTSHOUSER:  Then, also, Judge, with -- used with Claude McLemore was his trial testimony, Exhibit 188, his declaration, Exhibit 269, and his deposition, 35.

THE COURT:  Okay, wait.  Okay, just a second.  Wait a

minute.  188?

MS. CARLYLE:  183 is his trial testimony.

MR. HOLTSHOUSER:  183 or 188?

MS. CARLYLE:  This is your list.

MR. HOLTSHOUSER:  Yes, you're correct.  It's 183, not 188.

THE COURT:  Okay.  183 is received.

MR. HOLTSHOUSER:  Actually, Judge, we would offer 175 through 212 inclusive which, other than a couple of deletions, are all transcripts from the trial record.

MS. CARLYLE:  I think ---

MR. HOLTSHOUSER:  I think they're part of the record in this case.

MS. CARLYLE:  Sure.  I think the Court took judicial notice of the transcripts.

THE COURT:  Okay.

MS. CARLYLE:  I don't even know that they need to be exhibits, but we don't -- we don't object to the trial transcripts being received.

THE COURT:  Okay.  Those will be -- just a second -- received.  That's ---

MR. HOLTSHOUSER:  Exhibit 175 --

THE COURT:  To 212?

MR. HOLTSHOUSER:  -- through 212.  And I will state within that number range which ones are actually not actual

exhibits. They're deletions. 177.

THE COURT: Wait just a second, please.

MR. HOLTSHOUSER: In other words, there is no 177 in that number range.

THE COURT: Okay, just a second.

(Pause)

Okay. Looking at No. 177, should that one -- just leave that one -- leave that -- Oh, I see. That's -- That's deleted.

MR. HOLTSHOUSER: Yeah. There's no exhibit that goes with 177. The same is the case with 215 and 217.

MS. CARLYLE: You were only going to 212.

MR. HOLTSHOUSER: I went to 219, I thought.

THE COURT: Go all the way to 219?

MR. HOLTSHOUSER: Yeah. That's the entire section that's criminal trial transcript.

THE COURT: Okay.

MR. HOLTSHOUSER: If I misstated, if I stated 212, that was a misstatement. It's 219. Okay.

THE COURT: Okay. And -- But that would not include 215 --

MR. HOLTSHOUSER: 217 --

THE COURT: -- or 217.

MR. HOLTSHOUSER: -- for which there is no exhibit.

THE COURT: Okay. Okay. 175 through 219, excluding

177 and 215 and 217, are received.

MR. HOLTSHOUSER:  Okay.  Then the next is 269 which is the Declaration of Claude McLemore which was used with him.

THE COURT:  Just a second.  269?

MS. COSTANTIN:  Yes, Your Honor.

MR. HOLTSHOUSER:  269.

THE COURT:  Okay, received.

MR. HOLTSHOUSER:  And his deposition, 527.

THE COURT:  527, received.

MR. HOLTSHOUSER:  I think that's all at this time, Judge.

THE COURT:  Okay.

MS. CARLYLE:  I don't think we used any other exhibits than those.  I'm sorry, Judge.  I don't believe we -- the Petitioner used any other exhibits with any witnesses yesterday.  So I think that takes care of it.

THE COURT:  Okay.  Thank you.

Whenever you're ready.

MR. HOLTSHOUSER:  I think we're waiting for Mr. Sindel, I think.

THE COURT:  Okay.

MR. HOLTSHOUSER:  Just maybe while we're waiting, I can give the Court a preview of what we discussed in terms of what we envision coming.

THE COURT:  Okay.  Good morning, sir.

MR. SINDEL:  Good morning, Judge.

MR. HOLTSHOUSER:  I think we anticipate most, if not all of today, which we end today at 3:30?

THE COURT:  Yes, sir.

MR. HOLTSHOUSER:  With Mr. Sindel, and we'll endeavor to complete him today.  Tomorrow then, if we do so, it would be expected that Mr. Simon will come next.

MR. MORENO:  Mr. Simon.

THE COURT:  All right, very well.

MR. HOLTSHOUSER:  And I would anticipate that Mr. Simon will probably be all of tomorrow.

THE COURT:  Yes.

MR. HOLTSHOUSER:  And it would be doubtful whether he would be finished.  Friday morning, we're asking to call an expert, Dr. Askenazi, first thing out of order so that she can return.  She has some child care issues.

THE COURT:  Okay.

MR. HOLTSHOUSER:  And then if you're agreeable with that, then we'll continue with Mr. Simon.  And if we completed him, I believe --

MR. MORENO:  We would put on some lay witnesses.

MR. HOLTSHOUSER:  -- we'd put on some lay witnesses.

THE COURT:  All right.  That's fine.  I appreciate your cooperation.

MR. HOLTSHOUSER:  Monday, looking ahead to Monday, I

think we're anticipating probably starting the day with two, Dr. Yutzy and Dr. Cuneo, who were both experts from the previous ---

MR. MORENO:  Well, I think we're going to do Dr. Randall.

MR. HOLTSHOUSER:  Or Randall.

MR. MORENO:  Dr. Yutzy is being taken out of order. He was -- He was involved in the case at the trial.

MR. HOLTSHOUSER:  Correct.

MR. MORENO:  So he'll be the morning probably.

THE COURT:  Okay.

MR. MORENO:  And then we'll -- we'll present Dr. Randall.

THE COURT:  All right, good.

MR. MORENO:  That's what we have for now.

THE COURT:  Sounds like a good plan.

MR. MORENO:  And Randall, Dr. Randall will probably go into Tuesday, if not most of Tuesday.

THE COURT:  Okay.

MR. HOLTSHOUSER:  From our -- From our point of view, Judge, we are at least optimistic that while this is going very slowly, I think probably from the Court's perception, but I think we'll be able to get through some of the other witnesses quickly --

THE COURT:  Yeah.

MR. HOLTSHOUSER:  -- once we hit some various stages.

THE COURT:  No.  No.  No, it hasn't -- hasn't occurred to me as an issue.  I do realize that sometimes, you know, there is an appearance that things are going slowly in view of the number of witnesses, but that number has very little to do with the time we have.  And I can assure you you will be given the time you need.  So I -- As long as the parties are cooperating as well as they have, I know that everything's being done to get this done expeditiously for everyone's benefit, and I appreciate it.

So I'm ready whenever you are.

MR. HOLTSHOUSER:  Thank you, Judge.

MR. MORENO:  Thank you, Your Honor.

CONTINUED CROSS EXAMINATION

QUESTIONS BY MR. HOLTSHOUSER:

Q   Good morning, Mr. Sindel.

A   Good morning.

Q   If I can orient you to where we left off yesterday.  We were in the period around the time that Mr. Simon is coming into the case, around the time that -- this is before you contacted Professor Haney to bring him in as a mitigation specialist.  Do you recall where we kind of ended yesterday?

A   Yes, I do.

Q   And we were -- we were covering what had taken place by you and others on your team prior to the entry into the case

of Mr. Simon and Professor Haney.

A    Correct.

Q    Okay.  At any time did Mrs. Allen or Mr. Allen, meaning Billie Allen, ever give you the names, that you recall, of Brady Toliver or Cathy Toliver as being witnesses who had relevant information about either of their lives?

A    I don't recall.

Q    You had also conducted by that time what investigation you could into the guilt phase, correct?

A    Correct.

Q    Familiarized yourself with the guilt evidence as it was contained within discovery materials and what you could obtain on your own?

A    Yes.  And the discovery materials continued basically throughout the process.

Q    And that put you in contact with people who were not strangers to Mr. Allen either, correct?

A    Correct.

Q    Some of the people who had background -- relevant background information about him and his life.

A    Yes.

Q    Tasha Valentine, for example; Marcella Chowing when he was arrested, for example.

A    Correct.

Q    Okay.  You also had a team in place before Mr. Simon came

into the picture, and that included Connie Lynn Casperi, now Supranowich, right?

A    Yes.

Q    And she was actually spending a lot of time with Mr. Allen in person as well, wasn't she?

A    Yes.

Q    What was she doing or what was her role?  What were you telling her to do in the time she was spending with Mr. Allen?

A    She was -- She was maintaining contact, being there to answer questions and to filter questions to me, keeping him abreast of what was happening, delivering certain documents and materials to him, talking to him, interviewing him, seeing what his response was to the investigation that we were conducting; trying to establish additional rapport so that he had another contact point in the case besides myself.

Q    And you -- Besides her, you also were spending considerable time, having contact with him either by telephone or in person, were you not?

A    As I recall, yes.

Q    Okay.  I think we mentioned you also had -- you were using the services of Melissa Price?

A    Yes.

Q    And Andy Rackers, particularly after you obtained permission from the Court to pay Mr. Rackers.

A    Yes.

THE COURT:  What was Rackers' first name?

MR. HOLTSHOUSER:  Andrew; Andy.

A    You may call him "Andy."

Q    (By Mr. Holtshouser)  All right.  And did he do business under the name of "Litigation Consultants, Inc."?

A    That's what I've seen.  That's what I seen lately.  I wouldn't have recalled it without seeing that information.

Q    But he was a private investigator.

A    Yes.

Q    Someone you had used before?

A    Yes.

Q    Trusted him and thought he was a good investigator?

A    Yes.

Q    Okay.  Now let's move to the point in time of what happened after Professor Haney and Mr. Simon appeared on the scene.  Mr. Simon actually had a couple of roles, did he not?

A    Yes.

Q    One of being he was viewed as kind of a book guy.

A    Yes.

Q    He helped you with pretrial motions, preparing them, researching them, and talking about the substantive and procedural pretrial motions?

A    There were some.  I remember -- My memory is that a great deal of the pretrial motions had been either prepared or pretty well finished by the time Mr. Simon came on, but he

would have been a resource I would have looked to to flush those out, if they hadn't been filed, and to do other legal research.

Q    In addition, one of his roles was to assist with the mitigation.

A    That's correct.

Q    It wasn't his exclusive role, though, was it?

A    I don't think any of us had an exclusive role, but, no, it was not his exclusive role, no.

Q    And he was also not the exclusive person responsible for the mitigation investigation, was he?

A    No.

Q    You shared that responsibility with him, correct?

A    Yes.

Q    And when I say "responsibility," I mean you actually shared active duties with him and talked with him at times, correct, --

A    Yes.

Q    -- about what progress was being made?  Do you recall that the pretrial motions were actually held in the Fall of 1997?  I believe it was early November.

A    Whatever the docket sheet says.

Q    All right.

A    I mean the one I remember the most was the severance motion and the dismissal motion which I believe was also the

*Ring* motion.  Those are the ones that really took a lot of time.

Q    Okay.

A    I think the severance motion was 40 pages long or something like that.

Q    Now *Ring* hadn't been decided yet.

A    Yeah, but it had the *Ring* component to it.

Q    Correct.  How is it that Mister -- Professor Haney got hired?

A    I mean when you say "how is it," I don't know what you mean.

Q    Well, who communicated with him to retain him?

A    I would -- I don't have a memory of that it was me, but I'm almost positive it was.

Q    Would that have been an initial contact by telephone?

A    Yes.

Q    I mean you never met the man before, correct?

A    No.

Q    And he was located where?

A    California.

Q    Who recommended him to you?  Where did you get his name from?

A    I either got it from the list of experts that was available in the Capital Resource Center or I could have gotten it from Mr. McNally or Mr. Bruck.  I just don't recall.

Q    If it came ---

A    I also was familiar with some articles he had written. It may have been a combination of those factors.

Q    Okay.  And was he primarily a prison condition consultant or expert prior to ---

A    I don't know -- I wouldn't know how to characterize him back then.  Presently, I have used him again in that capacity.

Q    Okay.  And just while we're on that point, after this *Allen* case was over for you, you had another capital case that you were appointed to in the Southern District of Illinois, correct?

A    That's correct.

Q    And for lack of a better name, that was known as the *Sahakian* case.  Did I say that right?

A    *Sahakian*, yes.

Q    *Sahakian*.

A    S-A-H-A-K-I-A-N.

Q    All right.  And that was a prison gang case, a white supremacist gang case?

A    That was part of the component.

Q    You actually hired Mister or Professor Haney to assist you in that case, and that immediately followed the *Allen* case in terms of your ---

A    I don't know if I'd use the word "immediately" because I just don't have the dates in my mind, but I did use him.

Q    There wasn't anything that occurred in the *Allen* case that caused you to not want to ever have anything to do with him again?

A    No.

Q    So is it -- Would it be your best recollection that you probably got his name from the Federal Capital Resource Center?  And you mentioned Bruck and McNally.  They are part of that.

A    I'm sure that his name came to me through one of those -- one of those resources, either the books or an actual contact.

Q    And if it came through one of those resources, would that be -- you'd view that as a stamp of approval or a vouching for his credibility to ---

A    That's correct.

Q    Okay.  So in choosing him, you don't certainly see anything that you did as being deficient or unprofessional in choosing him, do you?

A    I think that it would have been more advantageous in light of the -- my belief that there was a potential fast track on this case to get somebody who was closer and who did not have the level of multiple obligations that Dr. Haney had.  I don't know that I was aware of that at the time I made the initial decision.

Q    Okay.  Maybe -- Let me make sure you're clear on the question.  The question is not in hindsight whether you think

you could have done something better based on what you know now.  At the time do you think your selection of him, based on what you knew then, was appropriate?

A    At the moment of selection, yes, but hindsight also occurred during the course of this proceeding and trial, not just this hearing.

Q    How -- Did you have -- at some point have a conversation with him on the telephone --

A    I'm sure I did.

Q    -- after you hired him?

A    I'm sure I did.

Q    And what was the terms of the arrangement with him?

A    I -- I do not remember.

Q    Okay.  Have you seen in the course of this litigation any letter, any memo, any communications setting forth what the terms of your understanding were?

A    I haven't seen anything that set forth the terms financially or the terms of -- certainly no contract.

Q    So if -- if you viewed Dr. Haney, and I take it based upon what you said in your declaration and what's been presented here as being the one who you thought was going to be doing the -- have the primary role for the mitigation investigation, how is it that -- For example, Mr. Simon, there's documentation regarding his compensation, was there not?

A     I'm sorry.  Say that again.

Q     With respect to Mr. Simon, there's documentation regarding his compensation, how he would be paid?

A     Yes.  Yes.

Q     Same with Ms. Caspari?

A     Yes.

Q     In fact, you went to the Court to get an order to authorize it?

A     Yes.

Q     You had some arrangement with Dr. Cuneo?

A     Yes.

Q     All right.  Those sorts of things are documented because in order to get them paid, you need to have front-end approval, correct?

A     Yes.

Q     So where is any of that for Professor Haney?

A     I do not know.

Q     Have you seen any since this case has gone on?

A     I mean there was the -- there was the order that I looked at yesterday and the motion I looked at yesterday, seeking the services of a mitigation specialist.  But if that's it, that's it.

Q     Nothing ever designating an individual as being that person in your case at that time.

A     No order that I'm aware of.

Q     Okay.  So when Dr. Haney was first contacted by you, there was no documentation to commit the Court or the Government to pay him for his services in the case?

A     Not that I'm aware of.

Q     Let me show you Exhibit 316.  Do you recognize this as a letter from Ms. Caspari in your office to Dr. Haney?

A     Yes.

Q     At any time during the *Allen* case, from the time the case was indicted till the time Mr. Allen was tried and convicted, did you ever meet Dr. Haney?

A     No.

Q     So would it be fair to say that throughout the course of the case, you knew that Dr. Haney had never even been to St. Louis, did you not?

A     Yes.

Q     If he did come to St. Louis, would it be a fair statement that you would have been his -- you would have had contact with him and would have met with him and introduced him to the family, for example?

A     Yes.

Q     Okay.  So on October 1, '97, Ms. Caspari sends Professor Haney the St. Louis Metropolitan Police report in the above-referenced matter.  Would that be the main police report containing the guilt evidence?

A     I would assume so, yes.

Q    So why are you -- why -- Did you cause Ms. Caspari to do this?

A    Yes.

Q    And if she did so, she would have, you know, reported to you that she had done it?

A    I mean I counted on Connie to do what I asked.

Q    And did she regularly report to you or come back to you with results or follow-up or questions, "What should I do next"?

A    Yes.

Q    Now she says here, "I apologize for the delay in getting this to you."  So as of October 1, '97, would it be your -- your conclusion from that letter that actually he had been waiting for it for some time prior to October 1 of '97?

A    Whether he was waiting for it or not, I can't say, but apparently it never had been sent to him till that day.

Q    Okay.  And this, apparently, is the first documentation of contact between your office and him.  Given the fact that there's an apology for delay, would you expect then that the oral communication with him between you and him took place prior to this date?

A    Yes.

Q    Okay.  What was the extent of your oral communication with him?  What did you talk about?

A    I -- I just don't remember.  I mean I -- I'm sure I gave

him background, you know, a slight picture of the case and what was going on and what was -- the ideas of what we might be looking for.

Q    Did you apprise him --

A    I remember ---

Q    -- of what you discovered so far about Mr. Allen and his family and his background?

A    In a general sense.

Q    The ---

A    I remember -- I remember a conversation about an investigator's interviewing people that might potentially be mitigation witnesses, some discussions of that, but that's -- I really don't have many memories of the specifics.

Q    The last sentence of the first paragraph, Ms. Caspari says, "Let me know if you need anything else to get started on the mitigation process."  This is the role in which he was envisioned being used, correct?

A    Yes.

Q    And the question was:  What do you need to get started? Now you already actually by that time, as I think we've established so far, done much to get started and get into the mitigation process, hadn't you?

A    I had started trying to gather information for the mitigation process.

Q    And more than trying to gather, you had actually gathered

quite a bit of information, documents?

A    I gathered documents.  I gathered the -- what I thought was an appropriate step towards beginning the mitigation investigation.

Q    And you had -- And that included having already talked to many of the family members and Mr. Allen himself about his character and background.

A    Yes.

Q    In terms of the document trail, let me show you next 320. This is a -- Does this appear to be a letter from Mr. Haney to Ms. Caspari on November 25, 1997?  In other words, about six, seven weeks later after the last letter we saw?

A    Okay.

Q    And do you notice that he opens with that, sorry, he's been difficult to contact as well?  So Ms. Caspari had started out apologizing to him in her delay in getting something to him.  He's apologizing here in this letter for the delay in getting back to her, correct?

A    Yes.

Q    Was -- This business about the hours estimate, do you recall that being something that needed to be obtained in order to give some estimate to someone?

A    You know, it is something that you want to secure.  You want to find out generally what kind of hours you're talking about so that you can maintain communication with the Court.

And you know, I believe in this case there was a budget and sort of things like that. So that's something that would be appropriate. I think it also gives us a perspective of what kind of time frame he's operating under.

Q    And the estimate he gives is that, "It will take me somewhere between 75 and 100 hours total to assemble a social history, including review of documents, several witness -- several interviews with the client, key family members, and any other folks who can provide relevant information, conferences with you and the attorney in advance of trial and testimony." His estimate was 75 to 100 hours to do this, correct?

A    Yes.

Q    And based upon your experience, would you agree that not all mitigation cases are created equal? In other words, some are more complicated than others?

A    Yes, that's true. And this -- this estimate may be based on what he would be reviewing as opposed to boots on the ground. I mean Dr. Randall was boots on the ground.

Q    But Dr. Haney never was, was he?

A    He was not.

Q    And that's something you're always aware of as well, correct?

A    That's correct.

Q    And what you told the Court in July was that the process

you envisioned was to use lower-cost investigators to do the boots on the ground work and to give that information to the mitigation specialist to give their input and work with?

A    That would have been ---

Q    That was the plan?

A    That would have been something that we would have certainly calculated in doing, thought about doing.

Q    And that was the plan presented to the Court as far as how you envisioned the mitigation investigation proceeding.

A    That's correct.

Q    Was it a practice of Ms. Caspari to pass either the facts or the documents on to you so that you knew what was going on in the case?

A    Either me or Mr. Simon.

Q    And, again, this is another one with the two holes at the top for going into the mitigation workbook or the correspondence file?

A    Yes.  It's also for -- three holes on the side for a notebook.

Q    Okay.  Do you notice there in the first part of this paragraph that he also seems to be a pretty busy fellow?

A    Yes.

Q    Talks about traveling, overburdened with university duties when in town and that he's -- that he still has little information about the case or the client?

A    I heard the first part.  I didn't quite catch the second part.

Q    The last part is he's still -- he still has very little information about the case or the client.

A    Right.

Q    Let me show you 321 -- this was actually the next day -- from Ms. Caspari, November 26th, '97.  And Ms. Caspari follows up in this letter somewhat responsive to Dr. Haney's letter about lacking information about the client.  He already has the police report, correct?

A    Yes.

Q    Okay.  Now she's sending him elementary and junior high school cumulative record, psych. records from the Metropolitan St. Louis Psychiatric Center, Inmate Medical Records from Franklin County where Mr. Allen is now incarcerated, medical records from the City of St. Louis.  Those were all things that she's enclosing them that had already been obtained by your team.

A    Yes.

Q    And then she says there's a couple of documents that she's still waiting for and will forward them on.  One is probation and parole records, pediatric -- general practitioner medical records.  Would that be that Dr. Grabau?

A    Yes.

Q    Okay.  And bios from Billie and Juanita Allen.  She puts

in parentheses "mother."  "Let me know if there are any other documents you will need," and she thanks him.

A    Yes.

Q    Let me ask you while we're on this subject of this bio: Have you ever seen at any time a bio in the -- in the hand, written in the hand or by Mrs. Allen?

A    Not that I can recall.

Q    There was one for Mr. Allen, wasn't there?

A    There was.

Q    Do you know how that came to be?

A    I'm assuming it was something that we asked him to produce in connection with our contacts with him.

Q    Did he do so?

A    Yeah.  Yes.

Q    Do you know whether or not Dr. Haney ever got back to you or to Ms. Caspari and said, "Well, yeah, there are some other things that I still need"?

A    Not by letter that I recall.  At ---

Q    By any other means?

A    At this time, I mean this letter is generating because I am really upset because things have stalled.

Q    All right.  Are you aware of that by November 26?

A    By the November 25th letter.

Q    Okay.

A    So I'm realizing that there's this gap that's -- that has

occurred in the communications, and I am trying to balance what I think I have to do to deal with the guilt phase issues with the problems that have occurred because documents that we had secured had not been forwarded on to Mr. Haney, Dr. Haney.

Q    The probation and parole records were -- had been requested, I assume, if you're waiting on them, correct?

A    Yes.

Q    Same with the Dr. Grabau records and the same with the bios, correct?

A    Yes.

Q    That wasn't Dr. Haney's responsibility to get those things.  You were getting them for him.

A    That's correct.

Q    With respect to the bio, let me show you Exhibit 304.  Do you recognize this as the bio that Mr. Allen wrote?

A    Yes.

Q    And for the record, is it one, two, three, four pages long?

A    Three pages and a sentence.

Q    Okay.  Thank you.  Did anyone -- Did you give any direction to Mr. Allen in preparing this?

A    No.

Q    When did you think -- When do you think you first saw it?

A    I -- I just can't say for sure when I first saw it.

Q    Have you reviewed it since then?  Had a chance?

A    I have.

Q    Okay.  Is the information that's contained in this bio consistent with the information that Mr. Allen had been giving to you orally in your meetings with him and telephone conversations from the time you had been in the case?

A    It has been a while since I've seen it, but I remember when I read it, that it was, I thought, consistent with the information we had.

Q    So no shocking new information?

A    No.

Q    Similarly consistent with the information you had gotten from Mrs. Allen during your contacts with her?

A    I don't think the question -- the information so much about Marquis or whatever was in that, but some of the generalized information was consistent with what we had been finding out during our investigation.

Q    On the subject of deaths, he includes Marquis Taylor, Dennis Noble.  There's a person named Ray who's a friend of the family and John Allen is a grandfather, and over here is, "I only smoked weed."  Was Billie Allen given the opportunity just to basically write what he thought he wanted to communicate to the -- to the trial team?

A    I -- I certainly didn't place any restrictions on what he would write.  That was not the goal.  I didn't think you'd ever see it, but --

Q    You didn't think what?

A    -- but that was not the goal.

Q    What?

A    I didn't think it was something I was going to turn over to the State, but the idea was -- I mean I think from the first four lines of the letter, that was part of what we were looking at is the deaths that surrounded this young man.

Q    That was one thing that he had articulated in the past as something that had an impact on him.

A    Very early on.

Q    Similarly, the lack of a father figure in his life was something he had articulated, and he articulates it in this document.

A    He had, yeah.

Q    For example, the middle of Page 2, "I never had a father figure in my life, and the father I had taught me to sell dope."

A    That's what it says.

Q    So that was something -- Was that news to you?

A    I knew he had never had a father figure.  He had told me about an uncle that he had that was very wealthy, a very wealthy drug dealer.

Q    Would that be Billy Wayne Allen?

A    I'm -- I don't think I have ---

Q    Don't have a name?

A    In fact, I know I did not have a name because that was part of what I wanted to try to find out.  I wanted to break through and find out if there was anything to that.  And his -- The way he had broached me on that particular matter was that this guy was going to hire the dream team for him and I didn't need to worry about his case anymore because he had $400,000 to spend on the defense, and I then went to Juanita to try to check this out.

Q    And it didn't check out.

A    It didn't check out.

Q    However, the existence of this uncle, this brother, I guess, of John Allen, was something that had been communicated to you early?

A    That's correct.

Q    And he was someone that it had been communicated to you that whatever money he did have came from selling drugs?

A    That's what -- That's what I understood.  I don't want to say it's early.  I don't -- It was sort of a continuing thing that occurred between myself and Mr. Allen about financial resources.

Q    And was it something that was relevant to you because there was discussions about, "Oh, you're going to get replaced eventually, anyway"?

A    Yes, it had relevance, but what was important to me was try to break through to Mr. Allen so that we wouldn't spend a

lot of time focusing on things that were part of his fantasy life.

Q    Was one of those with respect to his representation communications to Judge Mummert, the Magistrate, who -- to asking for another attorney besides you?  Do you recall those?

A    You know, I -- I -- I generally -- I recall generally dealing with that as an issue with Mr. Allen.  I know he had indicated he hired someone else at one point in time.  I called that attorney up.  It was just a ---

Q    And he said "no"?

A    He said "no."

Q    With respect to the paragraph about the father, that "he had taught me to sell dope," the word's D-O-P-E, correct?  Not S-O-A-P?

A    Yes.

Q    Okay.  So was Mr. Allen communicating at least in his bio that he actually did sell dope at one point?

A    That's what he was referencing.

Q    He also referenced in subsequent paragraphs situations where guns were pulled on him and playing basketball as being topics that he wanted to communicate about himself?

A    Yes.  I think that, you know, those things had to do with the neighborhood and the -- the violence that was surrounding his life.

Q    This third page, there's a paragraph that discusses

"smoking weed every day because I had so much stress and I needed someone to talk to, but I didn't feel right talking to my mom about it.  Me and my mom were real tight, but it's just a lot better when you have a father there to love you and spend time, spend real time with you."

Are those consistent themes in your talks with Mr. Allen in terms of what -- what was bothering him?  What the source of his stress was?

A    As I recall, part of the information we had was that there was a considerable change in Mr. Allen in both -- for example, in his use of marijuana and other factors of life after Marquis Taylor's death.

Q    Okay.  It was something he articulated ---

A    It's wholly consistent with that.

Q    And it's something he articulated in this letter, and this document is something he articulated to you early?

A    Correct.

Q    Others you had spoken with corroborated that, didn't they?

A    They did.

Q    He also talks here about having gone to a mental hospital.  That was a situation that occurred in February of '97, about a month before the offense, correct?

A    I believe so, correct.

Q    That wasn't something you were unaware of.

A    No.

Q    After talking about the mental hospital, he says -- well, he says, "I went there because of my stress was taking over and I would think -- and all I would think about was Marquis and all the things he had going on for hisself.  He would never be able to do the things he wanted to do again."

Is this part of his -- of a continuing theme in his conversation that what was bothering him was the death of Marquis and how that made him look at life?

A    That was part of it, yes.

Q    "I felt alone like nobody loved me even though my mom loved me to death."

MR. MORENO:  Your Honor, I'm going to object at this point.  I don't know why we're just reading a document.  If he wants to ask specific questions about the record, perhaps that would be fine, but he's just reading the document.

MR. HOLTSHOUSER:  Well, I'm asking questions following each sentence which is in handwriting and then asking if that's consistent.

THE COURT:  Right; overruled.

Q    (By Mr. Holtshouser)  Is the statement here previously we noted one that -- he's real tight with his mom and then "even though my mom loved me to death," was that also consistent with what information you were getting from Mr. Allen or Mrs. Allen and from members of the family?

A     Yes.

Q     In terms of social life, did he indicate that he had the girls and, "Those never made me happy on the inside," correct?

A     Yes.

Q     He was indicating he had a social life?

A     I -- I believed and I came to believe more firmly that this was Billie Allen trying to project to me an image of success that just wasn't there.

Q     In terms of your -- how you viewed what he was telling you and your interpretation of it, the claims of having had girl friends, having been to clubs, having sold drugs, you thought that was all part of a fantasy land?

A     I mean I knew that he had girl friends.  He, obviously, had them, you know, right before he was arrested.  I knew that that was true.

Q     That was real.

A     I just never -- I mean I -- From my investigation and when I received this information, then I would sort of say, "Okay, let's check this out."  And I knew that he was not a Romeo.  I knew that he didn't go clubbing a lot; that that was not part of what I understood was his actual history.

Q     Exhibit 323, is this where Ms. Caspari on December 5, 1997, sends this bio to Dr. Haney?

A     And that would, I would assume, correspond to the general date of that particular written document.

Q   So the document had to have existed prior to sending it between November 26th and December 5th.

A   Yes.

Q   That helps narrow when that was written or obtained.

A   It certainly does unless it just sat there for a while.

Q   Well, November 26th and the letter we saw a few minutes ago, '97, Ms. Caspari says, "We're still waiting on it," correct?

A   Okay.  You're right.  You're correct.

Q   Now in addition to having -- being in the process of sending things to Dr. Haney in this period which was consistent with the plan you had represented to the Court, you also knew relatively early in the fall when this case was going to go to trial, didn't you?

A   I don't remember when I knew it was going to go to trial. I may have known when it was set.  I don't remember when the Court entered its initial Order.  But I -- It's, obviously, on the docket sheets.

Q   Let me show you.  Okay?

A   I'm so glad.

Q   Exhibit 19, we'll just kind of run through it so we're working on the same -- same page.  Is this a memorandum from the Court regarding the trial schedule?

A   Yes.

Q   All right.  And it indicates that the -- First of all,

preceding this, the Government was given an election by the Court to proceed against Mr. Holder or Mr. Allen first because the Court had granted your request for severance, correct?

A    That's correct.

Q    The Court provided a schedule here that was in the alternative; that if the Government proceeded to try Mr. Allen first, then -- and counsel continued to have a scheduling conflict on February 9th, then jury selection would begin on the 12th of January, be recessed, and then Defendant Holder's jury would be selected, and then the jury would be instructed to return on February 9th to proceed with Mr. Holder's case and then Allen's jury would return and be seated immediately after.  So there was this conflict, apparently, of yours that the Court was taking into account on whether -- when things were going to happen in February.

A    That's correct.

Q    Does that ring a bell?

A    I don't remember what the conflict was, but it's been discussed a few times which made that all a little closer in my head.

Q    Okay.  On Exhibit 20, the Government actually elected to proceed against Mr. Allen first, correct?

A    Yes, and that's what happened.

Q    Okay.  And Exhibit 21 then, this is -- the date of this is October 15, '97.  The Court, having received that election

from the Government, set forth this Order that jury selection in the case would begin on February 9th, and Allen's case will be recessed and the jury selection for Holder's case would begin on February the 12th. And then after jury selection is complete, Allen's jury would then be returned and seated and his trial would begin immediately.

Now you knew then, at least in early October, that this case was going in February of '97.

A    That case was set to go on February 9th, --

Q    And ---

A    -- '98.

Q    '98, correct. And this -- these machinations were occurring. There's a clear schedule, and there's one thing dependent upon another thing, and there's a sequence that the Court set out here that it, obviously, intended to follow.

A    I wasn't -- I couldn't speak for the Court.

Q    You treated it, though, as a realistic date because you immediately filed a motion for sentencing discovery from the Government, did you not?

A    I did.

Q    Exhibit 22?

A    I did.

Q    And that's filed on October 20th of '97.

A    Yes.

Q    Now at the same time that this is going on, the rest of

your team is still active, are they not, in terms of investigating the mitigation?

A    I'm assuming so, but I believe ---

Q    Let me show you Exhibit 318.

        MR. MORENO:  I'm going to object.  I believe Mr. Sindel was still speaking.

        THE COURT:  Okay.  Did you finish, Mr. Sindel?

Q    (By Mr. Holtshouser)  I thought you had concluded with "I assume so."

A    No.  I ---

        THE COURT:  He said "I believe" and then it sounded like ---

A    Basically what I was going to say is that I really pushed off some of the matters concerning mitigation onto Mr. Simon, and I believed that those things were going on.  I didn't ignore anything.  I just wanted to be able to focus where I thought my focus was best placed.

Q    It's that allocation of time and prioritizing, correct?

A    Trying to.

Q    Something that you always do in every trial.

A    Yes.  I mean part of the complications, if I may speak to this, even though you haven't asked this, is when you're in private practice, you have all the other obligations that you have to maintain that practice.  You have to make sufficient money to pay your overhead.  You have to handle other clients.

So you don't have 10 hours, 12 hours a day to devote to a particular case.  You try to -- You try to organize your time as best you can.

Q    Directing your attention to Exhibit 318, is this a memo that was sent to you by Connie on November the 4th of '97 regarding communication that she's having with -- with Billie? I assume that's Mr. Allen, correct?

        MS. CARLYLE:  Which exhibit is this?

        MR. HOLTSHOUSER:  That was 318.

        MS. CARLYLE:  Thank you.

A    Are you talking about the exhibit number?

Q    (By Mr. Holtshouser)  No.  She asked me.  It's right there in the lower right-hand corner.  This will make it easier for us to read.

A    Oh, yes, especially at my age.  Okay.  All right.

Q    This is part of the thing -- This is an example of what Ms. Caspari is doing to assist with the mitigation investigation, is she not?

A    It also has to do with the guilt phase, though.

        THE COURT:  With the what?

        THE WITNESS:  The guilt phase.

Q    (By Mr. Holtshouser)  So it's a dual purpose?

A    That's right.

Q    Another example of something that has no -- doesn't fall neatly within one category or another, correct?

A    It falls in both categories.

Q    All right.  And this concerns claims of asthma?

A    Correct.

Q    And he's also relating the circumstances regarding asthma at the time he was arrested.  This related to guilt in that it perhaps could refute the claim that he ran from Forest Park, correct?

A    Correct.

Q    She then follows up on that; is conducting an independent investigation of that claim by Mr. Allen, correct?

A    Correct.

Q    And she comes to and reviews medical records, talks to a nurse, and also school records and basically provides you with information that somewhat contradicts Mr. Allen's claims, correct?

A    Partially.

Q    Is that handwriting on the bottom yours?

A    It is.

Q    "Follow up on this.  School records.  What about handwriting expert?"  Then also as part of this Ms. Caspari called Juanita who said she should have received his medical records a while ago and Juanita is following up with Billie's doctor.  You're receiving these memos from Ms. Caspari, aren't you?

A    Yes.

Q    You're then responding to them with a handwritten note to her as to what to do next in the follow-up.

A    Yes.

Q    All right.  So you're -- you're actively supervising her activities, aren't you?

A    Well, I'm partially supervising her activities.  I mean that's -- that is a -- Right here, I'm supervising her.  I don't know -- I don't recognize the handwriting on the date.

Q    Let me show you ---

A    November 4th.

Q    I'm sorry?

A    I do not recognize --

Q    That?

A    -- that.

Q    Okay.  The first date that's typed in there, is that October 30, '97?

A    October 20.

Q    20.  It's been handwritten in November 4th.  So you don't know who wrote that?

A    It doesn't make any sense to do that.

Q    This down here is yours.

A    That's definitely mine.

Q    And "follow up on this, school records," is that a direction back to Connie?

A    Yes.  That's a direction back to Connie.

Q    Let me show you next Exhibit 319.  Do you recognize the handwriting here?

A    I'm going to say I think it may be Mr. Simon's.  It's not mine.

Q    And is there a date up here, 11-5-97?

A    Yes.

Q    Okay.  Is Mr. Simon making a note about a meeting or a conversation he had with Mr. Allen on the 5th of November?

A    I -- I couldn't speak to that, but he has "Billie Allen, November 5th."  Whether it was a face-to-face or a phone call, I don't know.

Q    There's a reference to Cloud 9.  That's the night club that has been discussed a couple of times?

A    That's what I recall.

        MR. MORENO:  I'm just going to object to that.  These are not his notes, and I'm not sure he can actually, other than affirm that what Mr. Holtshouser is reading into the record that that's actually in the document, he can't really comment on Mr. Simon's notes.

        THE COURT:  Okay.  Well, as I understood what he was doing, he wasn't asking for authenticity of the document.  He had underlined "Cloud 9" which was a night club at the time, as I recall, over in eastern Illinois.  So so long as he is asking questions from it and Mr. Sindel can respond without guessing, then I'll overrule the objection.

MR. MORENO:  Well, Your Honor, ---

MR. HOLTSHOUSER:  Let me ask it -- I will withdraw the question, Judge, and I'll ask a different question.

THE COURT:  Okay.

MR. MORENO:  That sounds good.

Q   (By Mr. Holtshouser)  Assuming these are Mr. Simon's notes of an interview contact with Mr. Allen on November the 5th, 1997, would this be consistent with Mr. Simon taking a role in the mitigation investigation process?

A   Investigation and taking a role, yes.

Q   And the date of that, November 5, '97, that's shortly after his appointment in the case?

A   That's accurate.

Q   Let me show you next Exhibit 324.  There's a memo here from Connie to Nancy, and I'm not asking you to authenticate this memo but simply that is this -- because it's already been authenticated by stipulation, but is this Ms. Caspari reaching out to a nurse expert to translate the medical records and the medical notes that you have?

A   It is.

Q   And, again, that would be consistent with something that you needed for mitigation to, "Can anybody read these doctor's notes?"  And she found someone who could, correct?

A   Yes.  I mean not only read them because they're illegible but also tell us what the abbreviations stand for, what the

characterizations are and how to interpret that in terms of what it means about the individual's health.

Q    Including the medications, the diagnoses, et cetera.

A    Yes.

Q    Let me show you next Exhibit 26.  Now we've -- I think we established yesterday that you had actually had contact with Dr. Cuneo because his -- he was sent the police report back in early September of '97.  And between that time and January of '98, you never made a motion in this case asking for a competency evaluation of Mr. Allen or challenging his competency to stand trial, did you?

A    No.

Q    On -- On this Order that I have shown you, Exhibit 26, you got a Court Order on January the 9th of '98 for Dr. Cuneo to actually visit Mr. Allen on January 16, 1998?

A    I don't know if I got it or not, but there was one that was entered.

Q    Okay.  And what was the reason at that point in time that Dr. Cuneo was going to go visit with Mr. Allen at that point, less than a month prior to the trial?

A    You know, to do -- do some psychiatric/psychological evaluation.

Q    And were you thinking that, "I'm going to file a motion for comp -- challenging his competency a week before trial"?

           THE COURT:  Wait a minute.  A week before?

MR. HOLTSHOUSER:  I'm saying within a couple of weeks before trial.

THE COURT:  Well, this is January 9th.

MR. HOLTSHOUSER:  Let me back -- Let me back this up this way.

Q    (By Mr. Holtshouser)  This Order is January 9th.  It's for Dr. Cuneo to visit with Mr. Allen on January 16th.  I would assume that he would need to prepare a report.  Any motion that you might make in response to that evaluation would probably come within a week or two of trial, correct?

A    That would probably be true.

Q    Looking at the logical sequence of things.  So is that why Dr. Cuneo was going to go visit him on January 16th?

A    I did not have it in my mind that there was going to be a competency issue in this case unless there were developed evidence that some of the fantasies were more delusional.

Q    And that hadn't been developed yet.

A    No.

Q    Is your -- Is the intention for Dr. Cuneo to see Mr. Allen on January 16, 1998, to take a look at him for mitigation purposes?

A    I believe that's probably part of the issue.

Q    The significance of this date of January 9 of 1998, to look ahead a little bit, there is a letter that you sent to Professor Haney and a letter that he sent back to you that is

a marked event in the case, correct?

A    Correct.

Q    And without getting into that document yet, the date that Dr. Haney writes back is January 13th of '98.  Assume that fact.

A    I'll assume that fact.

Q    We're going to get there.  But on January 9th, '98, at that point in time you haven't written a letter to Dr. Haney expressing your concerns that you haven't gotten his response from him, have you?

A    No.

Q    But on January the 9th, 1998, regardless of Dr. Haney, you -- you and your team are having Mr. Allen seen by Dr. Cuneo on January 16th.

A    That's correct.

Q    There were some letters that were in your possession, letters that had been written by Mr. Allen to Mr. Grant purportedly, correct?

A    Those were not in my possession in January.  They were in my possession right before we started voir dire.

Q    Let me show you Exhibit 329.  Who's Chris in your office?  Is that your legal assistant?

A    It was probably Christina Nixon.

Q    Is she your accountant or ---

A    She is now, but she served kind of multiple purposes.

Q    My question is is that on January 12th of '98, with respect to the *Allen* case, ---

A    That would have been in her position as an accountant.

Q    Okay.  $550 to pay Mr. Storer, William Storer, to examine handwriting.

A    Right.

Q    What handwriting is at issue at that point in time?

A    I don't specifically remember.  There were letters that were attributable to Mr. Allen.  What I recall was that on the first day of voir dire, this is how I remember it, I saw Mr. Grant at the courthouse.

Q    Mister who?

A    Mr. Grant, Johnnie Grant.

Q    Okay.

A    And I had recognized him from interviewing him.

Q    How did you recognize him from interviewing him?

A    Seeing him.

Q    Why did you interview him if you didn't know about the letters until that time?

A    Well, there were other things.  Mr. Grant was also considered on the list because he was a good friend and a possible mitigation person.

Q    He's somebody you recognized because you talked to him --

A    Yes.

Q    -- previous to the start of the trial.

A    Yes.  And I asked him why he was there, and then he indicated to me that he had been subpoenaed.  And then I went up to Mr. Landolt, and I said, "Why is Johnnie Grant here?"  And there was some discussion.  And this is how I recall it; that Mr. Landolt had then advised me there were some very damaging letters that Mr. Allen had sent to Mr. Grant that were -- that Mr. Grant, as I remember it, had turned over to the Government.

Q    So you had also received 302s, interviews of Mr. Grant from the Government in discovery well prior to that, had you not?

A    I couldn't give you the date, but I knew that Mr. Grant was in the case.

Q    Okay.  As both a guilt and then for you, a potential mitigation witness.

A    I'm sorry.

          MR. HOLTSHOUSER:  I'm sorry.

          MR. MORENO:  I'm sorry about that.  He was inquiring about whether the gentleman in the front row was one of our witnesses.  I apologize.

Q    (By Mr. Holtshouser)  Exhibit 331, let me show you that next.  Is this a memo to you from Connie on January 13, 1998, that -- regarding a contact with Mr. Allen and guards that like him and will testify in his behalf in the penalty phase of the trial?

A   Correct.

Q   Is this your handwriting?

A   Yes.  Part of it is; part of it is not.

Q   Okay.  How about the Connie interview?  Is that yours or someone else's?

A   That's mine.

Q   That's yours?

A   Yes.

Q   Okay.  So you're directing Connie to go interview these guards?

A   Yes, or interview them over the phone or whatever; more than likely face to face.

Q   That would be another example, though, of not only supervising her but giving her direction of what to do as it pertained to the penalty phase?

A   Yes.

Q   All right.  Who wrote "or give to Simon"?

A   Me.

Q   And then who wrote "gave to Randall"?

A   I believe that's Connie.  She's the only one of us who had decent handwriting.

Q   Now each of these notes aren't dated, but at least as of January 13, 1998, which is the date you received the letter from Dr. Haney, this concerns activity taken by Ms. Caspari prior to that date, correct?

A    Correct.

Q    The same day, did you also receive a memo from Ms. Caspari that I think you recall -- The word "Notes" up at the top here, is that your handwriting?

A    That's correct.

Q    Okay.  And she ---

A    That -- Just so everything's clear, that's a note -- There was another thing I had written correspondence.  We keep separate folders or places where we try to store things, so that if I want to go through all my notes, they're in one spot.  So that's a note to my secretary saying, "Put that in that file."

Q    Okay.  The "Notes" file?

A    Yes.

Q    Okay.  But ---

      MS. CARLYLE:  Mr. Holtshouser, can we have a exhibit number?

      MR. HOLTSHOUSER:  It was 332.

      MS. CARLYLE:  Thank you.

Q    (By Mr. Holtshouser)  This memorandum is Mrs. Caspari communicating with Mr. Allen or communicating to you regarding a particular series of exchanges, correct?

A    That's correct.

Q    Now she's referencing what Billie told the Judge in his letters regarding having a baby on the way, correct?

A     That's what the memo says, yes.

Q     And then you knew what she was referring to, "told the Judge in his letters"?

A     I knew that he had sent letters to the Court.  I wasn't sure if this was to Judge Mummert or Judge Webber.  I don't remember or -- and I don't specifically remember a letter about a baby on its way.

Q     And then she followed up with him and asked him about what he claimed in the letter.  He gave her the name of "Shontay," and then she makes reference to, "I remember in John Simon's life history that Billie said he never had sex with Shontay."  Do you know what she was referring to when she wrote this to you on January 13, 1998?

A     Not specifically.

Q     Do you recall the 16-page document by Mr. Simon that's titled "Billie Allen Life History"?

A     I wish I could say I did.  I just don't.

Q     Now in this letter as well, he tells her that Johnnie Grant knows who she is.  That's that same Grant -- Mr. Grant you were just referring to, correct?

A     Yes.

Q     And that there's a discussion here more of what Billie told her.  And then she says, "To make a long story short, she called Juanita who indicated she knows nothing of Shontay or getting anyone pregnant except Tasha."  But then she notes, "I

specifically asked Billie about Tasha.  He didn't mention anything."  Is what Ms. Caspari is doing here, this following up on and going from lead to lead, et cetera, and trying to determine the truth, part of why you trusted her to do this type of investigation?

A    I'm sorry?

Q    Is it part of why you trusted her to do this sort of investigation?

A    Give me that first part again.

Q    The way ---

A    I was reading this and not listening.  I apologize.

Q    The way she's basically getting a fact and running with it and running down potential problems or trying to verify its truth and running into discrepancies, following those up, she's a good investigator, in other words.

A    Yes.

Q    And that's why you trusted her with these types of tasks.

        MR. MORENO:  I'm going to object unless he specifies what type of tasks.

A    You know, ---

        THE COURT:  Well, wait.  Okay.  Just a second.  The objection is what kind of tasks.  And the question was "these kind of tasks" referring to the letter.  So he's talking about -- She is going from talking to -- mentioning Simon's history to talking to Juanita about Tasha.  If that's the

task, then it's overruled.  Did you have in mind other tasks?

MR. MORENO:  I'm asking him.  Do you have other tasks?

MR. HOLTSHOUSER:  I'm just talking about this letter; why he trusted her to do this type of activity.

THE COURT:  Okay.  Okay.  Overruled.

MR. MORENO:  Well, this type of activity, are you talking about ---

MR. HOLTSHOUSER:  This letter; what she's -- what she's recounting.

MR. MORENO:  What she's recounting in this letter?

MR. HOLTSHOUSER:  What she's recounting having done in this letter.

THE COURT:  Okay.  Overruled.

A    The way I read this memorandum is that this is something that she sort of did on her own.

Q    (By Mr. Holtshouser)  And is that typical of how she approached the assignments you gave her?

A    It was typical of how we approached the case.

Q    And is this typical of, for example, what you would have done had you been given that information by Billie?

MR. MORENO:  I'm going to object.

MR. HOLTSHOUSER:  What's the objection?

MR. MORENO:  Speculation.  You can't speculate as to what you would have done in 1998.

THE COURT:  If it's typical of what he did.  Okay, overruled.  If -- If it demonstrates a pattern of what you would have done, overruled.  If it -- If you are guessing, then ---

THE WITNESS:  It would have been consistent with what I would have done.

THE COURT:  Okay.  Overruled.

Q   (By Mr. Holtshouser)  She was doing things the way you would have done them yourself if you had had this task, correct?

MR. MORENO:  Asked and answered.

THE COURT:  Overruled.

Q   (By Mr. Holtshouser)  Correct?

A   Yes.

Q   You didn't -- She didn't come to you and say, "Billie told me this.  What should I do next?"

MR. MORENO:  I'm going to object.  We just covered that.

A   On this memo?

THE COURT:  Wait, wait, wait.  Yeah.  This is really getting confusing.  Now I'm getting the impression that we're getting into sort of a tit for tat argument here about objections, and I don't want -- I don't want to get into just constant objections unless there's a good reason for it.  The objection specifically was -- just a moment.  Let's take a

couple of minutes.

Can you fix my screen? It's split and I can't -- I can only get a very brief readback.

(Pause)

Oh, okay. Okay, that was it.

MR. MORENO: I'm going to object. We just covered that.

THE COURT: Well, the problem is the objections come in, and that's okay. I'm not saying, "Don't object," but I'm just saying in that one, it was started. There was an objection, and so I don't think he gave a full answer. Can you ask the question again, please.

Q    (By Mr. Holtshouser) I think the question was: Ms. Caspari did not come to you and ask you for direction of what to do at each step of the process she has described in this letter?

A    It does not appear she did by the memo, no.

MR. HOLTSHOUSER: May I proceed, Judge?

THE COURT: Yeah. Go ahead. Ask the next question.

Q    (By Mr. Holtshouser) You described Ms. Caspari as somewhat of a self-starter, correct?

A    Yes.

Q    Very intelligent?

A    Bright and a good worker.

Q    Getting to the conclusion of her efforts, she followed up

with Billie again, confronted him with this, and after he was backed into a corner, he hung up on her.  Was that your experience at times with Mr. Allen?

A    With what?  That he hung up on me?

Q    If you backed him into a corner with facts, he would hang up on you or stop talking to you or something -- a similar reaction?  I'm talking about your experience with him.

A    Yes.

Q    And had you had that -- And when she told you this on January 13, 1998, it wasn't a shock to you, was it?

A    No.

Q    It was consistent with your own experience.

A    It was.

Q    At the bottom it says, "I know this is not a big deal, but I had to vent my frustration with Billie's complete inability to tell the truth."  She's giving you her impression of her dealing with him, correct?

A    I think she's venting her frustrations.

Q    Is that consistent, her -- her -- Is that consistent with your experience with Mr. Allen, complete inability to tell the truth?

A    I mean I wouldn't characterize it as a complete inability, but I shared in those frustrations.

Q    Let me show you next Exhibit 333.  Ms. Caspari is writing to Wehrenberg Theaters regarding the dates of when the movie

"Set It Off" was featured at the Halls Ferry theater.  Did the movie "Set It Off" play a role in this case?

A    It did.

Q    And do you recall what it was?

A    As I recall, there was testimony from young women that Mr. Allen and Mr. Holder had either rented the movie -- I thought they had rented the movie in a VCR format and watched it, and the Government's theory of the case was that that movie was the genesis of the plan that was used to rob the Lindell Bank.

MR. MORENO:  I'm going to object unless this is somehow tied into mitigation because that's what we're here for.  Rehashing what happened in the guilt phase, what role this movie could have played, I don't see how it's relevant to Mr. Sindel's actions on the mitigation phase.

MR. HOLTSHOUSER:  The relevance of the movie is that it depicts -- I think as we'll hear later, it's a depiction of a violent takeover-style bank robbery with a violent discharge of assault weapons and so forth.  There's a later claim of PTSD as a result of witnessing violence close to him.  There's an issue whether or not, if they watched that movie, what it contained and what reaction he had to it being consistent or not consistent with someone on -- who has PTSD.

MR. MORENO:  Which has not been addressed by any expert report that Mr. Holtshouser has presented to this

Court.

MR. HOLTSHOUSER:  It is relevant.  It was -- It's the subject of Cross Examination at trial of the mitigation case. And the relevance here is that it's part of -- it's part of the investigation being conducted by the trial team prior to the start of the trial, and it has no -- no connection to the Dr. Haney's situation.

THE COURT:  Okay.

MR. MORENO:  It also has no connection to the mitigation investigation which is the subject of this hearing; not a general overall where they investigate -- where they investigate it as a mitigation.

THE COURT:  Okay.  Here's the only limited relevance I see:  The issue of Mr. Sindel early on gave testimony that he believed he was deficient in representing Mr. Allen because he failed to supervise various individuals.  And there -- We have been hearing testimony now for probably an hour about various individuals of the team, the trial team.  Now Mr. Moreno is correct that this does certainly have to do with the guilt phase.  The only relevance it has is to show that the confidence Mr. Sindel has in Ms. Caspari in her role as one of the team.  So I'll receive it for that very limited purpose and for no other purpose.  Overruled.

MR. HOLTSHOUSER:  Thank you, Judge.

Q    (By Mr. Holtshouser)  I want to move on next to Exhibit

23.

THE COURT:  What was this last one?

MR. HOLTSHOUSER:  That was Exhibit 333.

THE COURT:  333, all right.

Q    (By Mr. Holtshouser)  Perhaps if we can go back to it, the date of this is January 14 of 1998.  Ms. Caspari, did she do this on her own or would someone have directed her to do it?

A    I directed her to do follow-up on the movie.

Q    And this is actually the day after you've learned of the problem with Dr. Haney, but it's two days before you've even had any contact with Dr. Randall.  My question to you is: Your directing her to do this has -- had nothing to do with any situation involving Dr. Haney or Dr. Randall, correct?

A    No.  No.

Q    All right.  Exhibit 23 I want to go to next.  That actually is your CJA billing records for the time period we've just covered in the case, September of '97 through November of '97.  So are you with me?

A    Yes.

Q    Okay.  And is this actually your signature down here?

A    That is.

Q    Okay.  The -- I'll take you to Page 2 and note, "Consultation with investigation and experts."  Does this reflect two consultations between you and Ms. Caspari, one on

September 10, '97, and one on November 6, '97, re:

Developments on investigation, correct?

A    That's what it says, yes.

Q    No delineation as to whether it's guilt phase or mitigation, but as you indicated, some aspects of the case had a dual purpose, correct?

A    Correct.

Q    On the next page, there's an October 27, '97, entry for "Review medical records."  That is a mitigation-related act, is it not?

A    I would -- In all probability, yes.

Q    Okay.  If not, solely a dual purpose.

A    For sure.

Q    Okay.  And this is you doing these things.  You're reviewing medical -- the medical records; not Ms. Caspari, not Mr. Simon, not Andy Rackers.

A    That's correct.

Q    And if we could go to Page 6 of this, there's several telephone conferences here and communications.  There are several in September with David Bruck.  This one is "re: severance," the first one.  The second one is with co-counsel, AUSA and David Bruck.  I assume that's maybe three telephone calls in a row.

A    Yes.  It could have been more than that.  It could have been back and forth.  Sometimes I just -- Like I said, I'm not

a -- I'm a better recordkeeper now than I was then.  For example, you can look at Connie Caspari and see there were things that I was talking to her about all through that time.

Q    There's a telephone conference with client's mother on October 6th, '97.  That is Juanita Allen, correct?

A    That's correct.

Q    November 5 and 6 of '97, who is Steve Shannon?  And it's "Re: budget."

A    I -- I don't remember whether he was, you know, in the CJA Office at that time.  I don't know.

Q    In addition to -- You've got on October -- November the 6th, "A consultation with co-counsel; review witness notes, consult with detectives."  Then also in later November you have, "Letters from Mr. Allen and to Mr. Allen," correct?

A    Yes.

Q    I'm going to ask you to keep in mind -- and actually I'll just put it side by side here -- this November 6th consultation with counsel; then on the right side I'm going to show you -- let me blow this up so you can see it -- this is Mr. Simon's CJA records.  And that's not going to do it.

MS. CARLYLE:  Mr. Holtshouser, could we have the exhibit number, please?

MR. HOLTSHOUSER:  It's 498.

THE COURT:  Exhibit 498?

MR. HOLTSHOUSER:  Correct.

Q      (By Mr. Holtshouser)  And I'm just going to have to blow it up individually here so you can read it, I think.

On November 6th, according to Mr. Simon's entry for that same date, it says, "Conference with Mr. Sindel and Ms. Caspari re: client mitigation issues and discovery," correct?

A      That's what it says, yes.

Q      So the conference that you had on November the 6th with Mr. Simon and Ms. Caspari was regarding discovery.

A      From the notes of Mr. Simon, yes.

Q      And mitigation issues.

A      Correct.

Q      Had you had any conversation in this time period around mitigation issues, would you have had -- would that have given you notice of what they were doing and what progress was being made?

A      That would have been part of the conversation.  It would also be part of that conversation to discuss direction they might go.

Q      And would you agree that that at least constitutes an act of supervision?

A      According to Mr. Simon, it may.

MR. MORENO:  Well, I'm going to object to that.  I don't think that notation indicates an act of supervision.  It indicates that they discussed something related to mitigation.

THE COURT: Well, I don't think -- I don't think -- If he's saying according to Mr. Simon, if he's interpreting Mr. Simon's mental state, then I'd have to sustain the objection, but I didn't understand that to be the objection. The -- The message does say "mitigation." Now tell me exactly what the objection is.

MR. MORENO: Well, I would agree that he's commenting on what Mr. Simon thought on whether or not this constitutes supervision.

THE COURT: All right. Sustained.

Q   (By Mr. Holtshouser)  I wasn't asking you about Mr. Simon's state of mind. I'm asking you if Mr. Simon's notation is correct as to the subject you discussed on that date. And your CJA records, in fact, do have a corresponding meeting on November 6th with co-counsel, correct?

A   Correct.

Q   And the subject -- the subjects are more detailed in his itemization and included mitigation issues. That would have constituted on your part an act of supervision, would it not?

A   If those notes are accurate.

Q   Then that's a "yes" then?

A   Yes.

Q   So during your Direct Examination -- Is that week or that was probably Monday, wasn't it?

I think you were asked the question that nothing had

been developed prior to January 13, 1998, the date of receiving Dr. Haney's letter.  I think perhaps -- Would you agree that what we confirmed, the documents we've gone over over the past day or so is that isn't true, was it?

A    Well, I don't believe I said nothing had been developed.

Q    Okay.  Maybe I misunderstood the question.  You would agree that much had been developed in mitigation by that date, had it not?

A    We had done work in mitigation.  It's very difficult to classify in some sort of percentage term what it means unless you've done a complete evaluation and investigation.

Q    All right.

A    I know we had secured records, but I don't think that we had secured all the data and all the information that was out there that we would have needed to present an effective penalty phase case.

Q    Not everything had been obtained, but you had obtained by that time almost all of the documentary evidence, correct?

A    We had obtained the documentary evidence that we were aware of that we felt we needed in order to pursue the investigation.

Q    You had obtained the information from Mrs. Allen and Mr. Allen on a number of occasions, and they provided about his background and his life.

A    We had.

Q    And as you sit here, you don't recall when Mr. Simon conducted -- prepared his 16-page life history of Mr. Allen, and we'll get to that, but if that document existed, that would have been done prior to this date as well, correct?

A    Correct.

Q    You had followed at that point in time through Ms. Caspari.

MR. MORENO:  Judge, I'm going to object.  I don't think that he can testify that that occurred prior to that date.  Mr. Holtshouser is ---

THE COURT:  Okay.  As I understood -- As I understood what he said, the representation -- if I represent to you that Mr. Simon prepared his 16-page report before this date and then he was asking the question.  So the representation is that it existed, and the answer was based on that assumption, not on what actually happened as I understand.

MR. MORENO:  And what's the date we're referring to?

MR. HOLTSHOUSER:  January 13 of '98 is the date.

MR. MORENO:  Oh, January 13, okay.

THE COURT:  All right.

Q    (By Mr. Holtshouser)  One of the memos that we just looked at from Ms. Caspari, and I think it probably was 332 --

A    It referenced the.

Q    -- it referenced John Simon's life history --

A    That's correct.

Q    -- as having been in existence prior to the date of his discovery of any problem with Dr. Haney.

A    Yes.

Q    That had been done prior to the discovery of any problem with Dr. Haney, correct?

A    Yes.

Q    Ms. Caspari or Mr. Rackers at your direction were also following any leads that they were presented with.

A    They were following some leads for sure.

Q    Ms. Caspari's memo being an example of if she was presented with a lead, she pursued it.

A    She pursued it in that instance, yes.

Q    And then reported to you on it in a memorandum.

A    Yes.

Q    Do you have -- recall whether or not in 1998 the ABA guidelines for capital counsel were so specific that they actually required the use of a mitigation specialist in a capital case?

A    I don't recall.

Q    All right.  Let's focus for a minute then on Dr. Haney and the communication that you had.

THE COURT:  Is this maybe a good place to take about a 15-minute break?

MR. HOLTSHOUSER:  Sure, Judge.

THE COURT:  All right.  We'll be in recess for 15

minutes.

(Court recessed from 10:50 AM until 11:05 AM.)

THE COURT:  Okay.  We're ready to rock and roll.

Q    (By Mr. Holtshouser)  Mr. Sindel, I'm going to show you Exhibit 398.  This is a declaration that you prepared on August 27th of 2007.  Do you recall this?

A    I do.

Q    Taking you back to the first page and directing your attention to this paragraph here.  The purpose of this declaration, do you recall this being in order to justify appointment of counsel for Mr. Allen to pursue a post -- post-conviction relief?

A    The purpose of the declaration?

Q    Yeah.  Let me take you to the end down here.  "As a result, --

A    I understand.

Q    -- I believe it's important for post-conviction counsel to investigate fully all the mitigation evidence available in Mr. Allen's case and have the resources to do so."

A    Correct.

Q    So would the purpose of this declaration have been to support those requests being made by habeas counsel?

A    Yes.

Q    We'll refer to this as your 2007 declaration.

A    Okay.

Q    This is Exhibit 398.  In this declaration you reference the events that we've been talking about which is the September, '97, retention of the services of Dr. Haney as a mitigation investigator for Mr. Allen.  You indicate at the last sentence that, "While you and co-counsel began the collection of mitigation information, we anticipated that Dr. Haney would be the primary investigator in the mitigation area."

This indication here in this declaration that he'd be the primary investigator in the mitigation area, that was somewhat in contravention of what had been represented to the Court in July of '97 in your motion regarding the use of lower-cost investigators, such as Ms. Caspari and Mr. Rackers, to actually conduct the interviews and collection of evidence to then provide to a mitigation specialist to review.

A    That -- I can tell you that I don't know that I believed that the characterization would necessarily mean that he would be the person that did all the investigation, but I did understand that to be part of his role.

Q    As to be the primary investigator.

A    It's hard -- I mean I think what happens is you get the information.  It's collected.  Then you go and you investigate the facts that you develop from the information that you have, but that's probably not the best wording I could have used for what I understood Mr. Haney was going to do or Dr. Haney.

Q    It says, "As we saw in practice, most of the actual investigating, the boots-on-the-ground investigating was being done by you, Mr. Simon, Ms. Caspari and Mr. Rackers," correct?

A    That's correct.

Q    Because as you indicated, Dr. Haney had never even came to St. Louis, and you knew this throughout the period that he had been retained, correct?

A    Well, I believed that when we retained him there would be a lot more activity than there was.

Q    So in terms of what he actually did, he never was the actual primary investigator, correct?

A    He never did that, no.

Q    And in terms of what your expectation was, in other words, you use the word here "we anticipated," your anticipation and what you told the Court in July of '97 in order to get authorization for the appointment of other individuals was that the majority of the actual investigation was going to be done by lower-cost people, such as Ms. Caspari and Mr. Rackers, who would then provide the information to a mitigation specialist to consult and review it.

A    Well, as I recall that, there was kind of a laundry list of what the investigations -- investigators would do, and they weren't specified to one particular task or one particular area of investigation.  But my experience with the previous mitigation specialists was that they had an investigative team

that they worked with.

Q    You see the first sentence of this paragraph in your motion in July of '97?

A    Yes.

Q    It says, "The interpretation of some of these records will probably require the assistance of a mitigation specialist."  That's what Dr. Haney was, correct?

A    That's correct.

Q    And you used the category of specialist, social worker or mental health professional because as of July of '97, you hadn't yet settled on who that person would be, correct?

A    Correct.

Q    It would require the assistance of that person with expertise.  The initial process of interviewing, gathering -- document gathering can be undertaken at lower costs by a nonprofessional investigator.  That's what you had in mind when you made this motion to the Court, correct?  And that's what you anticipated?

A    Part of that process, yes.

Q    Okay.

        THE COURT:  What's the number on that one that's up on the screen?

        MR. HOLTSHOUSER:  That, again, was Exhibit -- I'm sorry, Judge -- 11.  That has been admitted, I believe.

        THE COURT:  Yes.

MR. HOLTSHOUSER:  That's Document 112 of the Court's file.

Q    (By Mr. Holtshouser)  If we go back to your declaration, in Paragraph 5 you're referring to something that happened in January of 1980 -- of 1998 rather.  "He" -- being Dr. Haney -- "informed me that he had not had sufficient information to conduct an investigation and had not done so and was unable to do an effective job in the time available, and he resigned."  Is that accurate in terms of his -- what he did?

A    I mean I certainly interpreted what he did as saying, "I can't do it within the time frame involved.  If you get more time, I'm willing to work on the case."  So whether he said, "I resign," he certainly indicated that if he was -- if it was going to go in February, he wasn't going to do it.

Q    He had conflicts then with that time period for sure, correct?

A    I don't remember exactly.  I understand from some of the things, the records, that that may be the case, but I also think from his letter it was pretty clear that, "I can't do it in the time that's allotted."

Q    Do you recall your deposition in this case?

A    Excuse me?

Q    Do you recall your deposition?

A    I do sometimes in my sleep.

Q    In terms of what Dr. Haney was telling you, you were

asked:  "He's not actually saying I don't want to work on your case at all.  He's saying, 'If you get more time, I can work on your case, but within the time frame that's presently set, I can't do it,' correct?"

Your response is:  "That's correct."

A    Yes.

Q    He wasn't resigning.

A    He said he can't do it within the time frame that we had.  Whether that is properly interpreted as resigning or quitting or whatever, he clearly wasn't going to do it within the time frame we had.

Q    Then back to your -- You're referencing at the end of this declaration, again, we're back to Exhibit 398, Page 2, "In my experience, a complete mitigation investigation takes much longer than 45 days."  By the time of January of 1998, things had been done by you, and we've gone over it over the past day or so, from April of '97 up until the time you wrote to Dr. Haney.  Isn't that correct?

A    I'm sorry.  I was just reading that.  I apologize.

Q    Okay.  We've established over the course of looking at many documents over the past day or so that between April of '97 and January of '98 when you wrote to Dr. Haney your letter, much had been done on the mitigation investigation by you and members of your team prior to the time you wrote to him.

A    There had been mitigation work that had been done.

Q    Okay.  So the statement, "a complete mitigation investigation takes much longer than 45 days," 45 days wasn't actually the correct time period that had been -- that had been available and during which time a mitigation investigation had been done.

A    I had took that to mean that the 45 days was in that January date when he basically said, "I can't do it," until the date of the trial which was February 9th, and the penalty phase would have been somewhere -- weeks after that date.

Q    Okay.  Certainly it would be correct that a complete mitigation investigation couldn't be done in 45 days, correct?

A    I'd say that's accurate.

Q    Well, is it also accurate that you had had much more than 45 days to conduct the mitigation investigation and, in fact, one had been ongoing since the time you entered the case in April of '97?

A    But the mitigation specialist who eventually did the work that was necessary did not.

Q    Okay.  You had actually, though, been investigating since the time you came in the case, correct?

A    That's correct.

Q    Mr. Simon had been investigating since the time he came in the case.

A    I can't speak for Mr. Simon.

Q    You knew Ms. Caspari was.

A    Yes.

Q    And you knew that Andy Rackers was.

A    Not so much mitigation but he was working with us to prepare the case.

Q    So it's not accurate, though, to suggest that you only had 45 days to conduct a complete mitigation investigation, is it?

A    I think that it's accurate in terms of what Dr. Randall was facing.  It took a lot to convince Dr. Randall to get on.

Q    Who authored this declaration, Exhibit 398?

A    I did not.  I don't known who did.

Q    But you signed it?

A    I did.

Q    So someone else prepared it, presented it to you and asked you to review it and sign it?

A    Yes.

Q    And who was that?

A    I believe it was Elizabeth Carlyle.

Q    Okay.  Did you make any changes to what was presented to you?

A    I can't remember.  If I would have, I would have sent them back.  They would have been handwritten.

Q    Would they have been made -- I think this has a fax date up at the top of May 27, '07.  On May 27th of '07 -- August

27th of '07 -- I'm sorry -- would you -- In other words, in connection with preparing this, did you have an opportunity to go back and review the file or review any of the records?

A   No, I did not.  I hadn't seen any portion of the file at all when I made this declaration.

Q   Including the records we've looked at over the past day or so?

A   I had not.  They were not in my possession.

Q   Did you actually have specific recollection as to the correctness of everything that was being represented in here then regarding what had transpired in the course of the case?

A   Say that again, please.

Q   Did you actually have at the time you signed this the specific recollection as to the correctness of everything that was represented in here or were you relying on Ms. Carlyle that what she put together was supported by the documentary evidence?

A   Well, I think I relied on Ms. Carlyle concerning things like the dates and the number of days and those kind of periods because I didn't have those available.  But my -- The impressions that I had were consistent with what I've said in the declaration.  I certainly -- I didn't have the details and the specifics, but -- and I relied on her in that regard.

Q   And that was not indicated in this declaration, was it?

A   I'm sorry?

Q    That you were relying on her for some of the -- the correctness of some of the information in here.

A    No, that wasn't in the declaration.

Q    Okay.  The larger declaration that you submitted is Exhibit 250, and I'm showing you that now.  Do you recognize this?

A    Yes.

Q    And this consists of nine pages, correct?

A    I'll take your word for it.  Yes, it does.

Q    If we go to Page 3, Paragraph 7, you, again, reference in this declaration your expectations at the time that you retained Dr. Haney.  And you indicate here in this declaration that you -- your expectations were that he would assume responsibility for the day-to-day preparation of the penalty phase, and you instructed your assistant to provide him with whatever documents we had gathered and to assist him in whatever ways he requested, correct?

A    That's what it says.

Q    Okay.  Now you knew that within the time period of the Fall of '97, he wasn't doing day-to-day preparation of the penalty phase, didn't you?

A    If I -- I knew.

Q    And because you knew he had never been here, correct?

A    Correct.

Q    You knew from the correspondence and the memos that you

had from Ms. Caspari that he wasn't involved in what she was doing.  She was reporting to you, not him.

A    I don't know if she reported to him or not.  I did not -- I wasn't aware of all the particulars that were going on about reporting back to Dr. Haney until sometime closer to January of '98.

Q    So during that entire fall period, the memos you received from Ms. Caspari that we've looked at over the past day or so, we looked at some of them today, the correspondence that went out, the things that were being done there, she's reporting to you, and nowhere did you see in those memos that Ms. Caspari copied Dr. Haney, did she?

A    It doesn't appear in those memos.

Q    And the meeting that took place on November 6th of '97 with you, Ms. Caspari and Mr. Simon in which Mr. Simon's records indicate that mitigation issues were discussed, Dr. Haney isn't present on your records or on Simon's records for that meeting, is he?

A    He is not.

Q    And you knew he wasn't present because he never actually came to St. Louis --

A    That's correct.

Q    -- ever as far as you're concerned?

A    That's correct, in connection with this case.  I can't speak for his lifetime.

Q    In connection with working for you.

A    Correct.  Well, no.  I think he came here working for me on the other case.

Q    Paragraph 8 of the next page of this same declaration, and we're still looking at Exhibit 250, I believe -- yes -- the last sentence of this Paragraph 8 concerns your request to Ms. Caspari to check on the status of Dr. Haney's work.  Now even up to that time, you knew that work didn't include coming to St. Louis and talking face to face with Mr. Allen, Mrs. Allen, anyone that you knew of.

A    I did.

Q    You knew a lot of that had been done by you.

A    It -- It had.

Q    And you faxed him a letter on January 12th, expressing your concern that he had not returned your calls, given that the trial date was scheduled to start in less than a month.  So that's actually something you had known about since October, correct?

A    The trial date?

Q    Yes.

A    Yes.

Q    Had you ever communicated to Dr. Haney that trial date?

A    I don't specifically recall one way or the other.

Q    On the same page, you received a letter -- you referenced a letter you received back from Dr. Haney, and, "His letter

accurately recounted the materials that were provided to him by my office.  It also accurately stated he and I never spoke up until that time."  Is that true?

A    No.

Q    And why not?

A    You know, I think I probably was talking about the time that had occurred, you know, during that period when he was appointed, but I -- There's no doubt we spoke.

Q    Okay.  Who prepared this declaration?

A    I do not know.

Q    Did you prepare it?

A    No.

Q    Was it prepared in much the same way as the earlier declaration we looked at?  Exhibit ---

A    It was -- It was given to me to review, correct.

Q    Do you know who gave you this declaration to review?

A    Elizabeth Carlyle.

Q    Did you make any changes to it?

A    I did.

Q    Did you actually have an opportunity to review the documentary records that covered many of these issues prior to signing the declaration?

A    I did not.

Q    Were you, again, relying on Ms. Carlyle's review of that documentary evidence as to the correctness of what's in the

declaration?

A   And my own memory.

Q   But including partial reliance on Ms. Carlyle?

A   That's correct.

Q   Is that indicated in this declaration to your knowledge?

A   No.

Q   "He also stated" -- you're referring to "he" being Dr. Haney -- "stated in this letter that, 'I've never seen a single investigative report generated by your office.  That is, I have no information concerning the guilt phase case in chief, potential mitigation witnesses, the prosecution case in aggravation,' and so on."  Now you're viewing him at this point as being a mitigation specialist, correct?

A   Correct.

Q   And is the mitigation specialist telling you in his letter that guilt phase evidence and prosecution aggravation evidence is relevant to a mitigation specialist's work?

A   He is.

Q   All right.  Do you agree with that?

A   Yes.

Q   So this notion that guilt phase evidence has no bearing on mitigation is -- is not true, correct?

A   I've already testified to that.

Q   Okay.  Is what Dr. Haney purportedly said in his letter, and we'll get to the actual letter in a second, correct?  That

he's never seen a single investigative report generated by your office?

A    No.

Q    You knew that much in his letter wasn't true.

A    I knew that he had received documents, but, again, I had nothing to review to recount what he had or had not seen at the time I signed the declaration.

Q    Okay.  And you didn't indicate in your declaration here when quoting Mr. Haney's letter that what he was saying in his letter wasn't correct?

A    I don't know that I had a specific memory of whether it was accurate or not as to what he was saying in his letter.

Q    Because, again, you hadn't had the opportunity to review the documents before you prepared this declaration.

A    I had not.

Q    Page 5 of this is -- I direct your attention to Paragraph 10.  Actually if we go back to the top, there's a sentence here which starts with "Finally" at the bottom and carries over to the next page.  He pointed out that he would require significant additional time to do his work and "advised me to secure the needed investigative services to generate the type of mitigation investigation that is required."  Was that correct?

A    I don't recall even whether I saw his letter at that time.  I think I did, but.

Q    The notion of security the needed investigation services, that actually had been done by you back in July of '97, hadn't it?

A    Well, I think the letter indicates that he wanted a lot more than was actually he received or, you know, his claim was he hadn't received anything.

Q    But you had secured investigative services from the Court back in July of '97, hadn't you?

A    Yes.

Q    And he's saying to you even in -- according to you in his letter is that he's not going to do the investigation.  He wants you to secure needed investigation services to do the on-the-ground work.

A    That's how I recall the content of the letter.

Q    And then in the next paragraph, Paragraph 10, this, again, focuses on what you believed, per your declaration, concerning Mr. Haney's or Dr. Haney's role, and you reference in this declaration that the source of the problem is a misunderstanding that you and Dr. Haney had.  Is that correct?

A    Yes.

Q    That misunderstanding had to do, according to you, with his role?

A    I'm not sure exactly what you mean, but there was a misunderstanding, I think, in terms of what he -- what acts he would actually perform in terms of conducting the mitigation

case and what acts he would request or demanded that we perform.

Q   Do you recall the discussion we had during the deposition at some length about the concept of reviewers and getters?

A   No.

Q   Okay.  That there are --

A   Hunters and getters?

Q   -- reviewers and getters, being your phrase; that there were those who were going to go out into the field and get things such as contact information, memorandum of interview, make that initial contact and so forth.  Those are the getters.

A   Right.

Q   The reviewer would be someone who takes that material and applies some professional expertise to it and to then explain to you what it all means.

A   Correct.

Q   And do you recall that you testified at your deposition that actually you viewed Dr. Haney as a reviewer, not a getter?

A   Dr. Haney himself, yes.

Q   As a reviewer, not a getter.

A   More or less, yes.

Q   That the getters were you, Mr. Simon, Ms. Caspari and in some cases Mrs. Rackers, to the extent you needed him.

A    And any people that Dr. Haney used on his staff.

Q    Okay.  And there was -- there was permission from the Court to use Mr. Rackers, to use Ms. Caspari as investigators, correct?

A    There was.

MR. MORENO:  I'm going to object.  I don't think the record supports that.  The record supports that Ms. Caspari was retained -- The request was for her to be a paralegal. She was not requested as a mitigation investigator, and I think the testimony at the deposition was she wasn't an investigator.  Apparently, there's no -- The request that was made was for her to be a paralegal, not an investigator.

THE COURT:  Okay.

MR. MORENO:  The record doesn't support that question.

THE COURT:  Okay.  I don't know, and I see Mr. Holtshouser looking for something.

MR. HOLTSHOUSER:  Judge, I think that for the sake of time, Exhibit 11 is the motion for investigators, --

THE COURT:  Okay.

MR. HOLTSHOUSER:  -- and it speaks for itself.  We've gone over it.  I think it refutes what Mr. Moreno is saying. I think that's for the Court to decide.

THE COURT:  Okay.

MR. HOLTSHOUSER:  So I don't know that there's a need

to resolve that issue or to rule on the objection.  I'll withdraw the question and move on --

THE COURT:  All right.

MR. HOLTSHOUSER:  -- at this point.  The document will speak for itself --

THE COURT:  All right.

MR. HOLTSHOUSER:  -- as will your Order.  And for the record, I think your Order was Exhibit 611.

THE COURT:  Okay.

Q    (By Mr. Holtshouser)  You certainly believed in terms of your expectation, though, that Dr. Haney was going to be a reviewer, not a getter?

A    I mean if I can -- Can I clarify a little bit?

Q    If you need to.

A    Okay.

Q    Take all the time you need.

A    I'll see you tomorrow.  The way I look at it is this: You know, I'm a reviewer and I'm a gatherer both.  And that what happens is when you are a reviewer, you're going through the documents.  You're going through the reports.  You're going through the interviews.  You're going through the police reports, everything, you know.  This sort of thing needs to be followed up on, and this maybe doesn't or it can be -- It's on the periphery.  Whether or not Mr. Allen has an appointment at Flexx Studio is on the periphery.  I don't need to do that.

So I will be reviewing things. But when it comes down to crunch time, I'm going to be a gatherer as well because every time I interview someone, I'm looking for a piece of information either to confirm a piece of information we do have or to get another piece of information that we want.

Q     In other words, ---

A     So it's a -- You can't just say one or the other. And I think good, qualified mitigation specialists do the same thing. They review and then they gather and then they review again and then they sit down with me and they say, "Here's what you need to do or focus on," or whatever.

Q     Your statement in your declaration here that, "I believe that he would be the person responsible for performing the mitigation investigation, including interviews, obtaining documents, finding witnesses and the like," when you signed this declaration which, as you indicated, was prepared by Ms. Carlyle, again, it was before you had ---

A     I don't know that she prepared it. I did not testify to that.

Q     She gave it to you; she gave it to you.

A     Okay.

Q     All right. You had not had an opportunity to review many of the documents we have reviewed here, including your motion to the Court, what you told the Court in July of '97, correct?

A     I had not.

Q    Okay.  So in terms of what it says here about your belief concerning obtaining documents, you knew that Ms. Caspari was doing those things.  You were doing those things.  Mr. Rackers was doing those things, correct?

A    Yes.

MR. MORENO:  I'm going to object.  There's no evidence that Mr. Rackers did anything.

A    I don't know that Rackers was doing it.  I agree.  I don't think he had much to do with the mitigation that I recall.

Q    All right.  We may get into that, but for the most part, Ms. Caspari was getting whatever records she was asked to get?

A    She was.  And -- And --

Q    And we also ---

A    Go ahead.  I'm sorry.

MR. MORENO:  Let him finish.

A    This phraseology is -- is not the best because I don't expect the mitigation specialists necessarily to go about and obtain the documents.  It would be -- He would direct someone else to obtain the documents.  He would have reviewed the documents and he might say, "You know what?  This refers to another hospitalization.  We need to go out and get those records as well."

Q    When you say it's not perhaps -- the wording is not perhaps the best, --

A    That's correct.

Q    -- when it says that "I believed" and the "I" being you, ---

A    I take credit for the fact that it's -- You know, I acknowledge what it says and that I signed it.

Q    And what I'm asking you is:  What it says is not a correct statement of what your belief was with respect to Dr. Haney and his role in gathering documents, obtaining documents?

A    It is -- That is not what I understood his role to be, to obtain the documents.

Q    So in that respect, is this statement inaccurate besides not being the best choice of words?

A    In that it's not the best choice of words.

Q    Is it also inaccurate as a description of your belief?

A    That's correct; it's inaccurate.

Q    Thank you.  Now in terms of including interviews, finding witnesses, those sorts of things had been done by you and Ms. Caspari from the time you got in the case in April of '97 before Dr. Haney and before Mr. Simon were even thoughts in your mind, correct?

A    They were being done.

Q    They were continuing to be getting done during the Fall of '97 as you concede from Ms. Caspari's memorandum, correct?

        MR. MORENO:  I would ask that he refer to the

specific memorandum that he is alleging suggesting doing mitigation investigation in the Fall of 1997.

THE COURT:  All right.  If he needs it for -- to answer, he may do so.  If he can answer it without it, then it would be his -- his privilege to do that.

Do you want the question rephrased or ---

THE WITNESS:  Yeah, please.

MR. HOLTSHOUSER:  I'll rephrase the question.

Q   (By Mr. Holtshouser)  With respect to the documents, we can do it again, but we spent part of this morning and much of yesterday afternoon going over some of those documents.  You saw several memorandum from Ms. Caspari to you, including some today --

A    Correct.

Q    -- that -- in which you followed up on both documents and witness interviews as following the leads, --

A    Correct.

Q    -- correct?  Some of those memorandums included notations by you as to further follow-ups, correct?

A    Correct.

Q    So at least some aspect of that in the mitigation investigation was being done by you and Ms. Caspari, and you knew that --

A    That's correct.  But that doesn't ---

Q    -- during the Fall of '97.

A    But that doesn't speak to whether that -- whether a partial effort to secure those documents is a sufficient one.

Q    That wasn't the question.

A    Okay.

Q    The question you're answering, which wasn't asked, is your offering an after-the-fact hindsight -- hindsight judgment evaluation.

MR. MORENO:  I'm going to object to Mr. Holtshouser's characterization of Mr. Sindel's testimony.

THE COURT:  Sustained.

Q    (By Mr. Holtshouser)  Okay.  The question is:  In terms of -- We're looking at this declaration which is on the screen and the statement of your belief and the accuracy of this sentence.  We've already established that it's not accurate with respect to documents.

With respect to finding witnesses and interviewing witnesses, that -- some of those activities had been -- had been done by you, had been done by Ms. Caspari both before and after Dr. Haney is in the case, so to speak.

A    That is correct.

Q    So the actual conduct of what is occurring in the Summer and the Fall of '97, would you agree that it's contrary to what is expressed as your belief here in Paragraph 10?

A    I think that the opinion documents is contrary to what I believe.  I think in terms of doing interviews, that's not --

And terms like "finding" witnesses is, once again, not the best phrase to use because that could be interpreted as locating.  I think it should have been "identifying."

Q    The question was in terms of what was actually occurring.

A    Okay.

Q    Would you agree?

A    I apologize if I didn't hear the question.

Q    Would you agree that what was actually occurring was different than what you here in 2009 were stating was your belief regarding Dr. Haney some 12 or 13 years earlier?  I guess 12 years earlier.

A    Yes, but I don't indicate that he would be the only person.

Q    That wasn't my question.  Okay?

A    All right.  Well, ---

Q    The question was in terms of ---

        MR. MORENO:  I ask that he be allowed to finish.  He was speaking when Mr. Holtshouser was asking a question.

        THE COURT:  Well, let's sort it out.  The question was asked.  He made an answer.  Mr. Holtshouser said, "That wasn't the question."  So I would ask Mr. Holtshouser to repeat the question so it's clear exactly what it is that he is requesting.

Q    (By Mr. Holtshouser)  What I'm focusing you on is that you're here in 2009 expressing what supposedly was your

belief.

A    I'm here in 2012.  Okay, I got you.

Q    This document in 2009, the one that was submitted to the Court in support of this habeas petition; what your belief was back in 1997, 1998.  My question to you is:  Besides documents, when it came to interviewing and locating witnesses, that activity was being done by you and by Ms. Caspari, correct?

A    To some extent, yes, that's correct.

Q    We saw yesterday on May 7th, 1997, you had a list of witnesses and contacts already.  While not complete, you had begun one, had you not?

A    That's correct.

Q    You had talked to those people already.

A    I can't remember if I talked to all of them, but ---

Q    But you were doing that.

A    Yes.

Q    Okay.  And even after Dr. Haney is in the case and you have contact with him which occurred sometime in September of '97, correct?

A    Correct.

Q    Throughout the Fall then of '97, still the time period that we are stuck in, okay, throughout that fall, what was actually occurring is contrary to what you are saying here you believed would happen.

A    I -- I just don't think it's necessarily contrary.  It is certainly -- I did not -- For example, I did not expect Dr. Haney to be the only person to take on those tasks at any time.  I did expect and anticipate a lot more leadership and a lot more input.

Q    This memo from Ms. Caspari we looked at, which is Exhibit 318, includes notes by you to Ms. Caspari, "Follow up on this."

A    Correct.

Q    And this -- this regards her interview of a nurse; her contact with Billie Allen at the jail; other statements that he had made, correct?

A    Correct.

Q    Anywhere in this do you say, "Well, this should go to Dr. Haney because he's the one primarily responsible for these activities"?

A    I didn't say that in that memo.  I didn't say that to Connie.

        MR. HOLTSHOUSER:  Just a second, Judge.

        (Pause)

Q    (By Mr. Holtshouser)  Do you recall your deposition in this case?

        And I'm showing you Page 167 of your deposition.  And we were looking, I think, at Dr. Haney's estimate of his hours.

A   Yes.

Q   And there's a question at the bottom regarding, "It was Ms. Caspari's practice to bring letters like this to your attention?"

And you indicated, I think so, but she may have given it to John Simon because he was working on that part of the case.

And the question was:  "He's estimating, even though he hasn't done any of these things here yet, basically his total number of hours needed would be 75 to 100 hours."

And you indicate, "That's what he says in the letter."

Now -- I'm going to move on.

What brought about your letter to Dr. Haney was, in fact, a letter that you received from Mr. Simon, correct, dated January 9, 1998?

A   That -- I -- I would say "yes," but I don't know, but I am looking at this letter now.

MS. CARLYLE:  Can we have an exhibit number, please?

MR. HOLTSHOUSER:  This is Exhibit No. 325.  I'm sorry.

MR. MORENO:  No problem.

Q   (By Mr. Holtshouser)  I'm going to blow it up to make that a little bit easier.  Does that help?

A   Yeah.  I could read it, though, but, yeah, it does.

Q    I'm sorry.  What was the ---

A    No.  I was just commenting it makes it easier.

Q    Okay.  First of all, these were kind of in conversation with Billie, correct?

A    That's correct.

Q    And he was threatening to take you off the case?

A    From the -- From the letter, yes.

Q    He also -- Mr. Simon also indicated that he discussed with Billie the appellate and post-conviction relief background from hundreds of cases, capital and noncapital, that you brought to the case and stressed that this background is good for a member of the team but inadequate for trial counsel, correct?

A    I think he's referring to himself.

Q    To himself, correct.

A    Correct.

Q    And he said he had discussed with Billie appellate and post-conviction relief as early as January of '98, the date of this letter, which is January the 9th of '98.

A    That's correct.

Q    Okay.  There's a reference here to "Dante Frazier discovery."  Do you recall when we looked at -- I think it was either yesterday or Monday -- that FBI memo regarding a contact between Mr. Allen and Yolanda Curry and a gang called the Clique and Dante Frazier?

MR. MORENO:  I'm going to object to the relevance.

A    Yes.

MR. MORENO:  I'm going to object to the relevance.

MR. HOLTSHOUSER:  The relevance is given the context of this reference to Dante Frazier discovery.

A    Refresh my memory, please, to Dante Frazier or don't do anything.

MR. MORENO:  Well, I'm going to object.

THE COURT:  I don't know -- I don't know unless I hear the question.

MR. MORENO:  All right.  Ask the question.

THE COURT:  Okay.

Q    (By Mr. Holtshouser)  The question is:  To give you context to the next paragraph you're reading in Mr. Simon's letter when it references Dante Frazier discovery, do you see that portion of the letter.

A    Yes.

THE COURT:  And Mr. Sindel was asking for ---

THE WITNESS:  No.  I think I remember enough now.

A    If I get it wrong, though, then I will ask you to refresh me because there's a lot of information I've seen --

Q    (By Mr. Holtshouser)  There is, isn't there?

A    -- in the last two days.

Q    Okay.  He's recounting in great detail his conversation with Billie but, also, he's talked with a Sergeant named

"Karen" at the jail about some of the circumstances.  And the letter goes on as Mr. Simon does, I believe, but expresses some concern on a different subject down here at the bottom. So this is actually not the first thing he proceeds to tell you about in the letter.  He's mainly recounting his dealings with Billie, but then on a different subject, he indicates he's concerned about the lack of contact with Dr. Haney.

A    That's correct.

Q    He says, "As you're aware, I am doing a good deal of work on mitigation and need to coordinate it with our psychiatrist or psychologist."  Were you aware that he was doing a good deal of work on mitigation?  "He" being Mr. Simon.

A    If you mean by aware, had I seen work product in that regard, I had not.

Q    Well, the question is:  Do you agree with Mr. Simon's statement in the letter that you're aware that he's doing a good deal of work on mitigation?

          MR. MORENO:  I'm going to object.  I think he just answered that and said if you're ---

A    I ---

          THE COURT:  Wait, wait, wait.  No.  What he said was he hadn't seen a lot of --

          THE WITNESS:  The work product.

          THE COURT:  -- the work product.

          MR. MORENO:  He hadn't seen any work product.

THE COURT:  Well, anyway, overruled.  Go ahead.

A    As I take it, this is Mr. Simon commenting on my awareness.

Q    (By Mr. Holtshouser)  Correct.  I'm asking you:  Do you agree with his comment on your awareness?

A    If awareness means that I have had an opportunity to review and see and touch the work he had done, then I was not aware.

Q    Okay.

A    I was aware that I believed that that was a significant part of his responsibility.

Q    Okay.

A    So ---

Q    Let me ask you something.

A    Okay.

Q    Did you hear what Mr. Moreno said a moment ago that as of this date, you hadn't seen any of the work product of Mr. Simon?  Would that be correct?

A    I don't know because there was a 16-page biography --

Q    Correct?

A    -- that I don't remember.  I may have seen it.  It would be unusual if I hadn't, but I don't remember it.  There -- There may have been exchanges in phone calls about his contacts.  I know there was definitely phone calls and consultations with him about his contacts with Juanita, and I

specifically remember Juanita.  I cannot remember specifically other family members by name.  So there was definitely information I had received from him that he was working on the case.

Q    So then the question again then is:  Do you agree with Mr. Simon's comment on your awareness at the time?

A    I mean I -- All I can say is I was aware of what I was aware.

Q    Okay.

A    I'm not trying to battle with you.  It's just that ---

Q    And I'm going to give up at this point, so let's move on to the next question.

A    I know you don't and you shouldn't.

Q    The "need to coordinate it with our psychiatrist or psychologist," at that point in time Dr. Cuneo had been a -- a -- in the case, so to speak, as early as September of '97 when you sent -- had him sent the police report, correct?

A    That -- Yes.

Q    No other psychologist or psychiatrist had been -- become a part of the Allen team, so to speak, had they?

A    That's correct.  That's correct to my memory.

Q    Okay.  But then Mr. Simon says, "I assume that when we have Billie psyched, it will be by Dr. Haney.  Have you or Connie heard anything from him?"

        Mr. Simon maybe has a different understanding of

who's going to psych. Billie, correct?

A    Yeah, he -- he has a different understanding of who was going to psych.

Q    All right.  And as of this date, January 9, it's anticipated that he's going to be psyched with regard to mitigation.  There's no reference to competency in that conversation, is there?

        MR. MORENO:  I'm going to object.  There's no reference to anything in that conversation.

A    It don't say mitigation or --

Q    It does not say ---

A    -- or competency.  It just says "psyched."

        THE COURT:  Wait a minute.  There's an objection, but I don't understand the objection.  Could you restate it, Mr. Moreno?

        MR. MORENO:  Yeah, sure.  I was objecting in that it doesn't say "mitigation" as referenced by Mr. Holtshouser, and Mr. Sindel cleared that up.

        THE COURT:  Okay.  Thank you.

Q    (By Mr. Holtshouser)  The sentence before mentioned "mitigation," correct?

A    It does.

Q    And that paragraph -- And the top paragraph concerns Dr. Haney, the mitigation specialist, does it not?

A    I'm sorry.  Repeat that again.

Q     The paragraph itself references Dr. Haney, the mitigation specialist at that point in time, correct?

      The paragraph is ---

A     Wait!  Whoa, whoa, whoa.  I'll answer it.

Q     Okay.

A     It references Dr. Haney.  I was just looking for the words "mitigation specialist," but it certainly references Dr. Haney who was the mitigation specialist.

Q     The point being that the paragraph is about mitigation.

A     That's correct.

Q     Okay.

A     Part of it or maybe all of it.  I can't speak to that, Mr. Holtshouser, but it's all in there.  It's easy to read.

Q     And there's no reference to competency.

A     No.

Q     The last sentence there, the type that's blown up, is that Mr. Simon is setting up an interview with Billie -- Billie's Aunt Lucy for late that afternoon, --

A     Yes.

Q     -- January the 11th.  Now that would be, again, an example of what Mr. Simon is doing, is it not?

A     It would be.

Q     Aunt Lucy is not a guilt phase witness, is she?

A     No.

Q     And the date of this is January 9th of '98.  This is

before you've gotten a letter from Dr. Haney which gave you the -- the information you needed to switch to Dr. Randall, correct?

A     Yeah.  I mean I think that this was -- made me certainly aware that Doctor -- that Mr. Simon had not had communications with Dr. Haney and things began to unfold from there.

Q     My question, though, is that Mr. Simon is actively setting up, before knowing that there's any problem with Dr. Haney, an interview on his own with Billie's Aunt Lucy --

A     Yeah, that's true.

Q     -- for mitigation.

A     For mitigation.

Q     The actual letter that you sent to Dr. Haney is Exhibit 327 which I've shown to you, correct?

THE COURT:  Are we -- Are we heading into a new territory?

MS. COSTANTIN:  It's noon.

MR. HOLTSHOUSER:  I can probably cover this and then stop, Judge.

THE COURT:  Okay.

MR. HOLTSHOUSER:  It's a short letter.

Q     (By Mr. Holtshouser)  You write shorter letters than Mr. Simon does, don't you?

You write to Dr. Haney here on January the 12th of '98 that the above matter is set for trial on February 9th

which is less than one month away.  Now that's the date you've known about since October, correct?

A    Yes.

Q    Did you think this was the first time that you were telling Dr. Haney that's when it's set for trial?

A    It's certainly the first time I'm aware of that it's memorialized.  I do not know when the first time Dr. Haney learned of the trial date.

Q    It references, "We have made several unsuccessful attempts to contact you regarding the status of your review of mitigation materials," correct?

A    Reviewer and gatherer.

Q    A reviewer and what?

A    Gatherer.

Q    Where does it say "gatherer"?

A    It doesn't.

Q    It doesn't, does it?

A    I know what you're talking about.

Q    Okay.  So, again, the letter that you wrote to him on January 12th before you received his letter back that alerted you to a problem, and as it relates to your expectations about Dr. Haney right here that were memorialized, as you put it, as "review materials," correct?

A    Yeah, but I didn't say, "You're a reviewer."  I just said, "I hadn't heard anything about your review of what we

sent."

Q    And by omission, it doesn't mention anything about the boots-on-the-ground investigation that we haven't seen you do.

A    It doesn't mention that we are aware of anything.

Q    "The mitigation aspect of this case may be the only hope we have of saving Mr. Allen's life, and I'm concerned it's not being investigated to the extent it needs to be."

The prior context, had you been -- made any of those yourself?  These unsuccessful attempts?

A    Yes.

Q    You had?

A    Yes.

Q    And beginning when?

A    I can't tell you.

Q    Before you got the letter from Mr. Simon even?

A    I think there were -- I think Connie and I were both trying to contact him, leaving messages.  I think that -- My best memory is that, you know, Connie was trying to contact him and say he wasn't -- she wasn't getting a response and I tried to.

Q    Do you think you made any of those calls yourself?

A    I believe I did.

Q    They're just not memorialized, correct?

A    I -- Yeah, I didn't talk to him.

Q    Okay.  But the fact of making the call isn't

memorialized.

A    I didn't, no, from voice mails.

Q    Okay.  You reference in here at the end that the loss of a miti -- you refer to a mitigation consultant.  So in this -- You don't refer to him as a mitigation investigator, do you?

A    No.

Q    You close the letter, "If you are on, let me know.  If not, I need to make immediate steps and must confirm your response in writing to the Court."  When you mean "on," you mean on the team?

A    Are you going to work?

Q    Pardon me?

A    Are you going to work?  Are you going to do it?

Q    And if I need to take immediate -- "If not, I need to take immediate steps," correct?

A    Correct.

Q    What would those steps be?  Get somebody else?

A    Try to secure someone else and to make the Court aware of what was happening.

Q    And this particular letter, the fact that you had sent it was also faxed to Mr. Simon.

A    Yes.

Q    Okay.  In that fax, though, on that same date, Ms. Caspari says, "Also, please fax me letters from Juanita." And she sends that to John.  That's John Simon, correct?

A    Yes.

Q    So what letters was John in possession of that -- from Juanita?

A    I do not remember.

MR. HOLTSHOUSER:  I think this would be a good breaking point, Judge.

THE COURT:  Okay.  Court's in recess for one hour.

(Court recessed from 12:01 PM until 1:00 PM.)

Q    (By Mr. Holtshouser)  Mr. Sindel, we were at the point of discussing Dr. Haney's letter.  You responded back to the one you had sent to him.

A    Correct.

Q    So let's look at that, Exhibit 330.  This is actually the fax of it that Connie sent to Mr. Simon.  But do you recognize this as a letter you received from Dr. Haney on January 13, 1998?

A    Yes.

Q    Okay.

THE COURT:  What was that?  I'm sorry.  What was the number?

MR. HOLTSHOUSER:  330.

THE COURT:  330; got it.

MR. HOLTSHOUSER:  This is a duplicate of this.  In the exhibit list, the duplicate is 613.  Okay?

No.  I'm sorry.  Strike what I just said.  That was

with respect to the last letter.  This is 330.

        THE COURT:  All right.

Q    (By Mr. Holtshouser)  In the first paragraph, I want to direct your attention to -- Mr. Haney opens the letter.  We had this issue come up earlier whether or not Dr. Haney knew when the trial was set.  Do you see here he says, "Although I knew the trial was originally scheduled for sometime around" -- Is that "February"?

A    I see that, yes.

Q    How was it that he knew that if there had been no communication between you and Mr. Haney?

A    I've already disputed the fact that there was no communication.  There was communication.

Q    Okay.

A    I also over lunch of a banana, at your suggestion, I thought a little bit more about this, too, and I understood a little bit about the process of how he wanted to work in terms of providing people that did some -- or direction to people doing investigation but also being a reviewer, and I had to have had a conversation with him to know that.

Q    To know what?

A    That he -- he viewed his role as primarily someone who would review documents and other things as they were gathered and sent to him, and I had to have a conversation to know somewhat of how his process worked.

Q    I got to ask this question.

A    Sure.

Q    Were you eating your banana alone?

A    No.  I was with the members of the team here.

Q    Okay.

A    But I ---

Q    Not our team.

A    You could have asked me.  I would have gladly joined you.

Q    I would have brought you a banana.  But did you have this -- this conversation?

A    Not at all.  This was right up here only, and I didn't talk them about it either.

Q    Okay.  Like I said, I just had to ask.

A    No.  That's okay.

Q    Let's make sure I understand what you're saying because previously before the lunch break, we looked at some declarations that were signed by you, one in '07 and one in '09, that referenced things such as your belief at the time of the trial, your expectations.  Is it your -- And I think earlier before lunch you had acknowledged that some parts of that expectation were not correct.

A    That's correct.

Q    Now you are -- Is what you're saying now that in furtherance of that, that there must have actually been a communication between you and Dr. Haney in which you learned

from him that his expectation, his role would be as a
reviewer, not a getter.

A    His role would -- I never thought it was one or the
other, but I know -- I know that his role would be to review
what we had been able to do and obtain and then provide
direction --

Q    And input?

A    -- and strategies, correct.

Q    Okay.

A    I never ---

Q    In terms of ---

A    I'm sorry.

Q    I just want to be clear.  In terms of the -- And I didn't
mean to cut you off.

A    No.  That's okay.

Q    Is there anything you wanted to add?

A    I mean it was -- It would have been somewhat consistent
with the work that I had done with the previous mitigation
specialist except that she had a staff that flew in from
New York and did the stuff.

Q    Dr. Haney, though, at some point must have told you he
didn't have a staff --

A    He didn't really ---

Q    -- and he was reviewing what you generated.

A    We didn't talk about his staff or if he had, for example,

a mitigation investigator of sort, but I knew that part of how he perceived his role was above the fray maybe a little bit.

Q   And that's consistent with what actually was occurring because the fray was being actually dealt with by you and Mr. Simon, Ms. Caspari, to maybe a lesser extent Mr. Rackers. Is that accurate?

A   Only in part.

Q   Okay.  And that is also consistent with what you represented to the Court in your motion in July of '97.

A   That's -- That's accurate.

Q   And so I'm clear as to what the import is of the recollection that you had over the lunch hour, it makes what is represented in these two declarations that we looked at even more clearer that they are not accurate.

A   They -- I believe it's a poor choice of words, but I certainly never misled or deliberately tried to mislead anyone, and I know that.  I know that.  You don't have to say anything, but it's -- it's not as accurate as I would have liked.

Q   Okay.  Back to the letter then, clearly Dr. Simon or Dr. Haney knew, according to his own letter to you, that he knew approximately when the trial was going to start, correct?

A   That's correct.

Q   He spends a few paragraphs in this letter going over what he perceived to be the course of dealing in terms of what he

had received as the reviewer from you and your team and the others. He's talking about ---

A    He's talks about it at length, yes.

Q    Okay. And that he hadn't gotten from you yet what he perceived to be enough to begin taking a serious look at mitigation.

A    That's what he says.

Q    Now no one had provided to him, clearly from his letter and from what we know that happened, no one had provided to him any memoranda regarding your conversations with Billie Allen or Mrs. Allen or their relatives, correct?

A    Yes. From this letter, yes, that's correct.

Q    Did you ever -- Other than that transcript we saw with Juanita Allen, did you actually ever prepare a memoranda to the file of your conversations with Billie Allen --

A    No.

Q    -- regarding mitigation issues?

A    No. I might have had handwritten notes. I can't be positive. I mean I certainly would take notes whenever I saw him. I would take notes whenever I talked to him on the phone, if they had areas, but I don't know that I routinely reduced them to memorandums to the file.

Q    So in terms of what you would have had prepared from your own mitigation investigation to send to Dr. Haney, you would have only had your notes.

A    Handwritten notes.

Q    And you weren't going to send those to him in their form. Is that correct?

A    No.  I should have -- I would have reduced them properly to a memo or something, you know.

Q    And you're not sure as to what extent you knew that an entire five or six weeks prior to the date of this letter, that Mr. Simon had begun the process of a very detailed exploration with Mr. Simon of his life.  You're not sure ---

A    Mr. Allen of his life?

Q    Yeah.  You're not sure what you knew or when you knew it in that regard.  Is that correct?

A    That's right.  I -- I -- Today, I have no specific memory of seeing that 16-page bio.

Q    In your declaration, the one that you've submitted in 2009, there's a lot of discussion of a misunderstanding that you had with Dr. Haney.

A    Yes.

Q    Okay.  That misunderstanding had to do with what his role would be, according to the declaration.

A    I would -- I'd actually characterize it more as a misperception.

Q    As I understand what you're saying after lunch, based upon the -- your further -- giving further thought and perhaps some of my questions in the morning focused your attention on

this subject a little bit more, but that there actually wasn't any misunderstanding; that you knew that his role was going to be that of a reviewer and that you were going to supply him with what you could produce.

A    No.  I believe there was a misunderstanding.  Mostly what I was reviewing in my mind was this idea that he never talked to me or never heard from me.  And I was thinking how would I know what his process would be if I hadn't talked to him.

Q    Okay.  And you just ---

A    I absolutely have.

Q    Okay.  So in that respect, there couldn't have been an actual misunderstanding in terms of his role because you had had communication with him and you came to a realization over the noon hour that you knew what his expectation and his role was.

A    Well, I -- I can only speak to the fact that I believed that there was a misunderstanding because I was operating with an assumption that wasn't accurate as far as Dr. Haney was concerned, and I felt I understood what he was going to do and what the rest of our team was going to do and I, obviously, didn't.

Q    All right.  Well then, I'm somewhat completely confused because I thought that you started out here saying that over the lunch hour you came to the realization that you had had a conversation with Dr. Haney and you had realized from that

conversation that he viewed himself as a reviewer or a consultant and was waiting for things to be sent to him.

A    I -- What I'm trying to say is that I realized that he had sort of two hats, if you will, and that part of his hat was, you know, to review the information that we sent to him. I believe that that includes providing us with ideas and strategies as to where to go with that information.  You know, I think you for sure, as I understand the role of a mitigation specialist, starts as a reviewer and then may and properly should end up as an investigator.  So I ---

Q    Something that you knew now or something that you knew then?

A    No.  I think that's what I thought then.

Q    He goes on in his letter at some length to describe a staged process but he concludes, "Where does this leave us?"

A    Right.

Q    And this paragraph which extends onto the top of the next page, he says, "I'm sending you by mail a copy of this letter;" includes an article of his about mitigation, a transcript of his testimony in another case.  Did you have -- Did you receive that?

A    I have no memory of that at all.

Q    Okay.  Then he says, "In any event, you must get a substantial continuance.  Although I believe the above-stated tasks are clearly your responsibility, use me as an excuse

with the Judge, if you like.  You can tell him I misunderstood the timetable, was overcommitted, have become unavailable and incompetent, or whatever you need to in order to get the time you must have to do the things I have outlined."

In that sentence, is he suggesting to you that you should tell the Court anything that you need to tell the Court to get a continuance, whether it's true or not?

A    I don't believe so.  That certainly was not my intent and I don't know that it was his.

Q    No.  I'm asking you:  Is that what Dr. Haney appears to be communicating to you?

A    His words speak for themselves, but he does talk in here about, you know, "I don't know how or why we would have miscommunicated."

Q    Do you see here, "If you get the continuance and want me to continue, I am certainly willing to do so"?

A    Let me -- Just give me a second.  I'm trying to find exactly where you're reading from.  Okay, there you are.  All right.  Okay.  I see that.

Q    He's not resigning, is he?

MR. MORENO:  Is that a question?  I'm sorry.

MR. HOLTSHOUSER:  It is.

Q    (By Mr. Holtshouser)  He's not resigning, is he?

A    You know, first of all, he says, "If you can get the continuance."  So if we can't get the continuance, and I

thought that our chances were certainly less than 50/50 in that regard, as far as I'm concerned, his task is over with, and I did not believe that, considering the level of miscommunications, misunderstanding, whatever label you put on it, that it was going to be sufficient to work with Dr. Haney in this case.

And I -- I also believed that even with the continuance, which I did not believe would be -- he refers to a lengthy continuance, that he would be able to devote the kind of time and energy that was necessary.

Q    Because he referenced several conflicts, time conflicts that he had not only with the current trial date.

A    Correct.  I knew he was quite busy.

Q    Because he's a university professor.

A    He was.

Q    He didn't run a private company that specialized in mitigation investigations.

A    I didn't -- No, he did not.

Q    Okay.  Let me show you next Exhibit 345.  Just -- I may have cut it off.  This is January 20, 1998.  Do you see that up at the top?

A    Yes.

Q    It's a fax from Mr. Simon to you?

A    Yes.

Q    This is the beginning, I believe, of a draft of your

Motion for Continuance, and this is the communication between you and Mr. Simon.  First of all, he references the fact that he's been on a three-day trip to Southwest Missouri.

A    This is January 20th --

Q    Yes.

A    -- of '98?

Q    Yes.

A    Okay.  All right.

Q    "And I would cut this down.  I have included as much detail that you can say what the problem is.  We should include Wayne Simon's case.  We should probably include his register number as well."

Is he referring to another matter that he was handling at the time?

A    I don't remember.

Q    The draft that is attached is a discussion of his conflict in another case, correct?

A    Is this the second -- Is this the first page of the fax?

Q    Yes.

A    All right.  And you asked me what?

Q    He's including a lot of detailed information about another case that he's handling as a -- one of the bases in support of the Motion for Continuance, correct?

A    Yeah.  He's referring to multiple cases.

Q    Correct.  And after two-and-a-half pages, he actually

gets to Mr. Allen's case, and he's saying that the Eighth

Circuit is taking action on this other case, and he's weaving

in and out the conflicts with Mr. Allen's case, correct?

A   I -- This is the first time I've seen that.  I've looked

at it quickly, but it appears that what he's talking about is

certain action he's taking in connection with a case called

*Stephen Johns* who was on death row at the time.

Q   So this is part of what his -- He has time conflicts that

he references here on the last page of this, the part -- what

he's been working on in addition to the *Allen* case.

A   That's correct.

Q   In other words, the *Allen* case isn't the only case he

has.

A   Right.

Q   Now Exhibit 352, this is actually a week later on January

27, 1998.  Again, do you see the date there?

A   Yeah.

Q   And it's to you?

A   Yes.

Q   And it says that he's received the fax from a Dr. David

Randall.  Now by January the 27th, Dr. Randall was in the

case, was he not?

A   From this letter, I would say "yes."

Q   And what -- what is being discussed here is the

preparation of a Motion for Continuance.  Is that right?

MR. HOLTSHOUSER:  That is 352.

MR. MORENO:  Thank you.

A    I don't see where he's specifically discussing it in -- in what you have on the screen unless I missed it.

Q    (By Mr. Holtshouser)  Okay.  Let me go down.

Here he's talking about the main body of the motion. There's some discussion about who's preparing the Motion for Continuance, correct?

A    That's what the letter says.

Q    Okay.  And in addition here, Mr. Simon is referencing the fact that he has a few other conflicts.  He cannot work at all on the penalty phase "except to review general texts, such as the body of the mitigation workbook of which we received copies from Kevin McNally, and to review my trial practice and evidence law materials."

Do you recall getting this from him?

A    I don't recall this letter, but I assume it was part of the file because it's directed to me.

Q    Okay.  And it says, "If this is what I should be doing at this point, I will do so.  But eventually I need to get back to meeting potential witnesses and building rapport with them."

The reference to getting back to meeting potential witnesses, you knew that he had been meeting with potential mitigation witnesses, correct?

A    I knew that that was what his obligations were.

Q    Right.  And did you know that he had been doing so?

A    I knew that there was some meetings he had.  I didn't know the details of them or who it was or what he had learned.

Q    Okay.  It came to no surprise to you when he said in this letter that he's going to need to get back to meeting those witnesses.

A    No.

Q    You didn't say to yourself, "Well, wait a minute; what do you mean you've been doing that?  I thought Dr. Haney was doing that all along."

A    No.  I -- I thought he was doing it all.

Q    Okay.  And apparently, by this letter, he's confirming that he had been doing some meeting with mitigation witnesses.

A    Some.

Q    And he's -- What he's concerned with is being confronted with a list of witnesses or the lack of witnesses at the last minute, --

A    That's correct.

Q    -- correct?

     Now as to the motion itself, the Motion for Continuance, do you see this first paragraph is, "I do not know what we want to say in an open pleading about Dr. Haney.  Regardless who prepares the bulk of the pleading, however, I think the two points need to be integrated as long as we can

do so without being too cheeky.  I think we should also provide the facts on the late disclosure of the previously blacked-out names of witnesses."

I think he's referring there to the Government disclosure, correct?

A    Correct.

Q    What would be the concern about what you say in an opening pleading about Dr. Haney?

A    I have no idea.

Q    Did not know what he was -- what his concern might have been.

A    I'm going to think for a second.

Q    Okay.  You have seen this before, correct?

A    I'm not even sure what he's -- Oh, I think "open pleading," I'm assuming, means public.

Q    Okay.  You've seen this before, correct?  Because we talked about it at length at the deposition.

A    You know, I'm trying to remember that, but I'm not disputing what you're saying.

Q    Okay.  Was there any concern in your mind about what would be said or not be said about Dr. Haney in an opening pleading?

A    The only concern I can think of is that it would be critical of him.

Q    Be what?

A    Critical.

Q    Critical of him.  How about the -- How about the reference to being "too cheeky"?

A    I don't know what that -- he meant by that.

Q    Okay.  The next paragraph, "Consistent with what I learned from calling Connie yesterday, I will proceed to create a Motion for Continuance."

Does it -- Does it refresh your recollection that what he learned from Connie was that he needed to actually do the first draft of the motion?

A    I don't know.

Q    Okay.  "Please fax or e-mail me the party line on Dr. Haney."

What -- What was he referring to as the "party line" --

A    Well, I would assume ---

Q    -- for Dr. Haney?

A    I would assume he would be dealing with what -- the position that I believed should be taken concerning the Motion to Continue.

Q    Now this is January the 27th of '98 which is just a couple of weeks before the trial, correct?

A    Right.

Q    Mr. Simon notes that he has two depositions in Springfield on Friday morning.  Those depositions didn't

concern this case, did they?

A    No.

Q    And he'll come to St. Louis, if that is indicated, after those depositions are done.  "I would still like to meet with Dr. Randall."

A    Yes.

Q    "And if he has come to the St. Louis Area, please ask him to give me a call so that I can arrange to meet with him and to get back to work with the penalty phase witnesses."

A    That's what he says.

Q    This notion of getting back to work with the penalty phase witnesses, again, that was consistent with what you thought he was supposed to be doing, correct?

A    Yes.

Q    And he's apparently confirming in this letter that that's what he had been doing?

A    He's certainly saying that he's got to get back to doing it.

Q    Okay.  Let me show you Exhibit 353.  Does this appear to be a fax from Mr. Simon to you and Connie on January the 28th of '98?

A    Yes.

Q    Which is the day after the one we just looked at?

A    Yes.

Q    "Here's a draft of an --

A    "Amalgamated."

Q    -- amalgamated Motion for Continuance.  Should we ask for a time by which we want it continued?"

And then attached is a -- is a draft, correct?

A    That is correct.

Q    Okay.  In the Paragraph 3, it says, "As defense counsel for Mr. Allen have divided their work, appointed lead counsel for Defendant Allen, Mr. Sindel, Richard H. Sindel, is concentrating on the guilt or innocence phase, and appointed co-counsel is concentrating on the penalty phase."

Is that an accurate statement as to the state of affairs at that time?

A    I was certainly -- I was concentrating on the guilt phase.

Q    So there had been a division of labor?

A    Yes.

Q    Even prior to that division of labor, though, which didn't occur until Mr. Simon was in the case, you were handling both mitigation and guilt, weren't you?

A    That's true.

Q    Even after Mr. Simon came into the case, you took some steps with regard to mitigation, correct?

A    I did.

Q    In Paragraph 4 it discusses Dr. Haney.  This is going to be the opening pleading, correct?

A    Yes.

Q    And it says in early September he was hired by you?

A    I don't think he was hired -- Well, you're right it does say Mr. Sindel hired him.  That -- I don't think that's accurate.

Q    You don't think that's accurate?

A    Well, I'm trying to remember all the different things. It would have been accurate in the context of when I think we got court approval to hire him.  But I -- It would have been -- That would have been accurate in terms of when we were -- Mr. Haney -- Dr. Haney and I had some discussions.  I don't -- As I sit here right now, I'm just -- I'm just not positive when those things occurred and when Dr. Haney was initially, but it would have been around the time that he got sent the police report.

Q    I think we saw from that it was October the 1st is the letter.  We saw that.

A    And that, I just don't ---

Q    Okay.

A    And it ain't in here.

Q    The information as to early September, that would have been prior to Mr. Simon's appointment, correct?

A    That is correct.

Q    Now have you ever seen any court order or document that actually named -- by name appointed Craig Haney as the

mitigation specialist?

A    Not today or yesterday or at the deposition.

Q    In terms of what Mr. Simon put in this draft for at the time you hired Craig Haney, "Dr. Haney agreed to consult with" -- and we'll go down to the next page -- "counsel regarding mitigation.  Mr. Sindel sent Dr. Haney numerous documents, reports and records following the initial contact."

Was the information in that paragraph correct?

A    Which paragraph?  We're talking on the end of 4?

Q    The one we just read, Paragraph 4.

A    All right.

Q    Starts on Page 1.

A    Okay.  I got it.  Switch it over.

Q    Top of Page 2.

A    You know, there were definitely documents and reports that were sent to him, yes.

Q    Would you agree that it was numerous?

A    That's a -- You know, "numerous" is an adjective that has multiple meanings.

Q    All right.  I'm asking you whether you agree with its use in the pleadings that you all filed?

A    I think the letters and documents that were sent to him have been introduced as to what was sent.  So that would be -- Whether you count each page of the documents or the number of documents by characterization, we sent him those.

Q    When Mr. Simon sent you this draft of this continuance motion, did you change that word?

A    I don't remember.

Q    All right.  And in terms of Dr. Haney's role, as we saw in the previous page, it was to consult counsel regarding mitigation in this case.

A    That's what he used as a descriptor, yes.

Q    Did you change that description of Dr. Haney's role?

A    I -- I think it's accurate.  It's not inaccurate.

Q    Consultant?

A    Correct.

Q    Regarding Dr. Haney's response, the response that was brought to the Court's attention in this draft, and we'll look at the actual motion filed in a second, was that Dr. Haney had stated that two trials -- he had two trials within the following two months and did not feel that he could contribute to Mr. Allen's defense within those time constraints, thus forcing you to locate, screen and hire a new mitigation expert.  So the only information provided to the Court was that the problem was Dr. Haney having a conflict with two trials.

A    Well, I don't think that's accurate because we talk about the fact that there's been a failure to respond and there hasn't been any activity concerning the materials that were sent to him.  So I think that's part of the component of what

we're telling the Court is (A) this -- this -- we haven't gotten the kind of responses and we haven't done the kind of investigation that needs to be done in order to properly present the penalty phase case and ---

Q   Where is that in here?

A   It doesn't say those words.

Q   Okay.

A   That's -- That's what we're trying to ---

Q   Then where are you reading from?

A   It says it up here.

Q   Okay.  And what was being drafted to file with the Court, things had been sent to Mr. Haney.  There had been a failure by him to respond to recent calls.  Then you got this faxed letter, and the faxed letter had a concern about contact, and the contact finally received was that there were two trials that were in conflict with his schedule, correct?

MR. MORENO:  I don't believe any contact was received, but there were two trials coming up for Mr. Haney.  Certainly the letter of January 13th, 1997 -- 1998 says nothing about two trials in it.

MR. HOLTSHOUSER:  I'm not actually talking about what the letter says.  I'm talking about what this document says.

MR. MORENO:  What that document says is fine.

A   All right.  Ask me the question again.

Q   (By Mr. Holtshouser)  In terms of what this document

says, this document doesn't express anything regarding what Dr. Haney had failed to do with the materials that you had sent to him.  What it's telling the Court is that when contacted, when you heard from him, he had a time conflict; two trials?

A    I think there were two -- I think there were two things we're talking about here; you know, the fact that apparently Haney had a conflict and that there was a failure to respond. And I think -- I did not argue this motion, but I think probably in oral argument those things could be made clearer.

Q    Okay.  We will get to that so you'll see what was represented to the Court.  But in this draft of this motion, the part that is being referenced is Dr. Haney having a time conflict.

A    That's part of what's in there, yes, that's correct.

Q    Okay.  Where's the other part in this motion?

A    I think 5.  I think 4 also indicates that there's a communication issue.  That's what I think.

Q    Okay.  Now you indicated that Dr. Randall was hired on -- and this is Mr. Simon's draft sent to you -- Dr. Randall was hired on the 16th; that there's a volume of potential mitigating evidence that needs to be investigated; interviews that need to be conducted; need a continuance.

A    That's what it says.

Q    What proceeds then, also, is a detailed discussion of a

conflict that Mr. Simon has with another appellate matter.  I could go through it.

A    No, no, no.  Don't do that, please.  That appears to be sort of a consolidation of what appeared in that earlier exhibit.

Q    Okay.  Exhibit 32, which I've shown you here, is the actual filed motion which was filed on January 29.

A    All right.

Q    And, again, you see the same Paragraph 3, that there's been a division of labor.

A    Correct.

Q    So you didn't change that.  Paragraph 4, there's a description of Dr. Haney as a consultant.  You didn't change that, correct?

A    That's correct.

Q    There's a description of the materials that had been sent to him as "numerous."  You didn't change that?

A    I don't think so, no.

Q    And actually the rest of the draft motion is actually what was filed after you had an opportunity to review it.

A    Yes.

Q    Does it appear that way?

A    I don't think that I need to review it in its entirety, no.

Q    Along with the description of the conflict that Mr. Simon

had?

A    That's correct.

Q    Okay.  And it is ---

A    Go back.

Q    Is it signed by you?

A    No.

Q    It is signed by Mr. Simon on your behalf, though, isn't it?

A    Yes.

Q    And you were actually at the continuance hearing that took place and knew what the motion that was under consideration was, correct?

A    That is correct.

Q    There's a hearing that the Court holds on this motion.  I'm sorry.  Let me back up.

In support of the motion, there's an affidavit submitted, is there not, from Dr. Randall?

A    Yes.

Q    And Dr. Randall proceeds to describe his role as a mitigation specialist?

MS. CARLYLE:  Do we have an exhibit number?

MR. HOLTSHOUSER:  That is 35.

A    Yes.

Q    (By Mr. Holtshouser)  There's a lengthy description in this affidavit by Dr. Randall of the role of a mitigation

specialist and his experience.  Do you see that on Page 2

without going into the details?

A    Yeah, I see that generally, yes.

Q    Okay.  All right.  And then on the last paragraph or the

last page is a description at Paragraph 9 I want to direct

your attention to.

A    Okay.

Q    In the sentence above that, Dr. Randall says, "In most

capital cases a mitigation expert typically has six months to

a year, often longer, to prepare for a potential death penalty

sentencing hearing," correct?

A    Yes.

Q    Now at this point in time you had been representing

Mr. Allen for approximately nine months; since April of '97?

A    Yes.

Q    Okay.  Mister -- Dr. Randall has been in the case with

you for about two weeks at the time this affidavit is -- is

prepared.

A    Yes, that's correct.

Q    You contacted him immediately after hearing from

Dr. Haney, correct?

A    Right.

Q    Dr. Randall says in his affidavit, "Realistically, I

believe that a continuance of at least 120 days would allow

for the adequate preparation of mitigation for a potential

death penalty sentencing hearing based on my appraisal of the work that remains to be completed in the *Allen* case."

That's based on his appraisal, correct?

A    Yes.  It was something that -- That was something we consulted about.

Q    This number of 120 days?

A    Yes.

Q    Which is approximately four months?

A    Yes.

Q    And so what was being asked for in this continuance is telling the Court you need a minimum of 120 days.

A    That's what we felt would be the bare minimum we could get the job down.

Q    Okay.  Did you believe that that was true?

A    That we couldn't get it done in less than 120 days?

Q    Did you believe that a 120-day extension was adequate?

A    No.

Q    Okay.  Well, why was Dr. Randall permitted to sign and submit this if you didn't believe this was accurate?

A    Well, I believed it was accurate that we needed at least that amount of time, but I also believed that we needed to present the Court with something that realistically could face the possibility of being granted.  A six-month, eight-month, ten-month wasn't going to happen.  So we had to -- Our strategy was based on multiple factors, including the idea of:

"What do you think we can get?"

Q    In the representation to the Court in this affidavit by Mister -- Dr. Randall, he indicates 120 days, at least 120 days.  120 days is the minimum, correct?

A    That's what he represented, yes.

Q    Would allow for adequate preparation; is that right?

A    That's what it says.

Q    All right.  Now the question is:  You knew that's what it said, correct?

A    When?

Q    At the time it was submitted to the Court.

A    Yes.

Q    Okay.  Did you agree with that sentence?

    MR. MORENO:  I think we just went through all of this.  I'm going to object.  He just answered this.

A    All I can tell you ---

    THE COURT:  No.  Go ahead.  I'm not sure.  Go ahead.

A    It's the words "at least," I think, are significant, number one.  Number two is:  I'm trying to make a decision of what's realistic.  And I don't believe that if we asked for more time, there was much, if any, of a chance to get it.  So am I tailoring what Dr. Randall says in light of what he tells me he's going to need?  Yes.  If he could have had more, we would have taken it.

Q    You'd always take more if you could get it, correct?

A    Well, it depends.  If you guys aren't ready, no.  But, yeah, you're right.  You want to kick that can down the road.

Q    I understand your -- I believe I understand your answer as to what your thinking was, but I'm not sure you've actually answered the question.  Did you believe the representation in this paragraph that was given to the Court was true at the time it was given to the Court, that a minimum of 120 days would allow for adequate preparation of mitigation?

A    I believe we could have done it in a 120 days, if that's the question.

Q    Is that a "yes" that you believed it was true?

A    Yeah, I believe we could have got it done in 120 days.  I mean I don't know how else to say it, Steve.  I mean Mr. Holtshouser.

Q    The question has to do with a belief as to the adequacy of what you were asking for.  Did you believe that would be adequate?

A    I believe we could have done an adequate job in 120 days.

Q    Okay.  Did Dr. Randall ever tell you that he did not believe that he could do an adequate job in 120 days before this was submitted?

A    I don't remember this, any specific conversation, but I do remember me being the person who said, "This is all I think we can get."  I do remember that.

Q    Okay.  You were the one who said that.

A     I'm the one who's making the decision of what I think is in our best interest strategically.

Q     And you're not telling the -- As I hear you, you weren't telling the Court something you didn't believe to be true because you thought it was strategically advantageous.

A     I certainly ---

Q     You actually believed this was true.

A     I didn't believe it was false.  I did -- I did believe that we could do it.

Q     Did Dr. Randall ever communicate to you that he didn't believe this was true, even though he ---

            MR. MORENO:  I'll object.  It calls for hearsay.

            THE COURT:  No.  No.  It -- Well, wait a minute. Maybe it does.

            MR. HOLTSHOUSER:  If I could, ---

            THE COURT:  I'm trying to think if there's an exception.  I can't think of one right offhand in this.

            MR. HOLTSHOUSER:  Well, my response would be, Judge, it's not hearsay because it's not being offered for the truth of the matter.  It's whether or not he was given any knowledge or basis for believing that this wasn't correct.  Did Dr. Randall ever apprise him that, "I don't believe that what I say in my affidavit is true," because then I don't think Mr. Sindel would have submitted it to the Court.  So it isn't actually being used for hearsay purposes and, therefore, is

not hearsay.

THE COURT: Okay.

MR. HOLTSHOUSER: I'm not offering it for the truth of what Mr. Randall did or did not say but as to what impact it had on Doctor -- Dr. Sindel.

MR. MORENO: We're going to hear from Dr. Randall.

MR. HOLTSHOUSER: Yes, we are.

THE COURT: Okay.

MR. MORENO: This question is more properly asked of Dr. Randall than it is of Mr. Sindel.

THE COURT: Overruled.

A    Let me try to answer this question as candidly as I can which is that I am sure that Dr. Randall wanted more time. This affidavit is being submitted to get us what I think is the bare bones amount of time that we will need to do an adequate job. And I'm positive that that figure of 120 days was there because of my strategic concerns.

Q    Do you see who signs this?

A    I know who signs it.

Q    Okay. Did Dr. Randall ever tell you that he didn't believe what he was signing was true?

MR. MORENO: I think we've been over this.

MR. HOLTSHOUSER: We have, but we haven't ---

MR. MORENO: He just hasn't gotten the answer he likes.

MR. HOLTSHOUSER:  No, we haven't gotten an answer to it.

THE COURT:  No.  Overruled.  Let's hear it.  He's coming.  He's coming.  We'll get it straightened out.  Go ahead.  Overruled.

A    I don't recall him saying, "This is a false affidavit."

Q    (By Mr. Holtshouser)  Okay.  So your answer would be "no."

A    I don't recall him saying that to me, no.

Q    Okay.  Thank you.  Let me show you Exhibit 36.  This is the transcript of the hearing that was held on January 30 of 1998.  Do you recall this hearing?

A    Yes, I do.

Q    You were there?

A    Yes.

Q    Mr. Simon generally conducted most of it and presented the testimony of Dr. Randall.  Do you recall that?

A    That's what I recall.

Q    Let me show you Page 2 where Mr. Simon lays out the problem; says that the situation -- And I'm referring here to the middle of the page.  "Mr. Sindel, lead counsel for the Defendant, thought he had hired a mitigation expert and as detailed in the motion, the expert did not respond.  As trial approached, we became agitated; received a communication from him to the effect that he simply could not do the work."

This is what Mr. Simon said, correct?

A    That's correct.

Q    Okay.  Which is consistent with what was in the motion which was that the problem was a conflict on the part of Mister -- Dr. Haney that he could not do the work between the time he was communicating with you and the time of trial.

A    I don't know that it references a conflict, but it does accurately reflect the fact that he felt he couldn't get the work done in the time involved.

Q    Okay.  Then it says, "Within a few days, Mr. Sindel hired another mitigation expert who's in court today."

And that's Dr. Randall, correct?

A    That's correct.

Q    Do you see at the bottom there that Mr. Simon represented to the Court, "At the same time, Your Honor, I was doing some of the work that the first mitigation expert, Dr. Haney, either should have done or expected other people to do"?

A    Yes.

Q    You had no reason to believe that wasn't true, correct?

A    No, I did not have a reason to believe that wasn't true.

Q    He then proceeds to say how he was pulled off due to this other cert. petition in this other case?

A    Yes.

Q    All right.  He actually says further down that, "This is an extraordinary situation."  And I blow this paragraph up.  I

have -- (1) is that "I think it might be my client's narrow personal interest for me to be held ineffective in presenting the penalty phase of this case, but I choose -- I do not choose to do that as a tactic," even though he just mentioned it, correct?

A    That's what the transcript says.

Q    "I want to do a good job as I assume you the Government wants to do a good job."

At the bottom of this, "And I want the Court and the jury to decide the case on the merits rather than because there was some third-party out there that left us holding the bag."

Now you're in court, correct?

A    Yes.

Q    Who's the third-party that you thought he was referring to that left this out there that left you all holding the bag?

A    Well, there was three of us, and one of them was Dr. Haney.

Q    And that's who he was referring to as to who ---

A    I believe so.

Q    That's the third-party.

A    I believe so, but I mean I'm sure Mr. Simon can remember -- know better than I did, but I -- that's what I assumed he was referring to.

Q    In this presentation, you didn't stand up and correct or

modify anything Mr. Simon said, did you?

A    I -- I don't know that I necessarily felt the necessity of doing so.

Q    The Court wasn't told at that point in time that what really had occurred here was that there was a failure to supervise or a huge misunderstanding that took place between you and Dr. Haney, was there?

A    I don't -- I haven't seen the entire transcript, but in the motion there was reference to the fact that there was a failure to communicate effectively with Dr. Haney, but this phrase seems to be a combination in terms of the entire context of it, but it certainly tries to keep some blame on Dr. Haney.

Q    No blame is being assumed by you in this hearing, was there?

A    I didn't stand up and say, "Blame me, Your Honor."  I would have if I'd been asked.

Q    And there wasn't any reference to the fact that, "What really happened here, Judge, is -- is no one's at fault, but I just failed to supervise Mr. Simon and Ms. Caspari well enough."  That was not said, was it?

A    It was not said.

Q    Nor was it said ---

A    Well, I -- I haven't seen the whole transcript.

Q    Okay.

A   But I'm trusting they ---

Q   Well, that was gist on here.  Okay?

A   I understand.

Q   Okay.  If there's something else in the other -- the rest of the transcript where that comes up, we may get to it or I'm sure it will be pointed out.

But in addition, it's also not represented in this that what there's been here is a huge misunderstanding; that you view Dr. Haney's role one way and he viewed his role as another way, is there?

A   Not in that sentence, no.

Q   Okay.  What's occurring here on January 30, 1998, was, in fact, the context of what you believed and knew at the time that this was going on, correct?

What's happening here, this is what's occurring in January of '98.

A   Well, if the transcript is accurate, yes, if that's what you're asking me.

Q   Correct.

A   Okay.

Q   I'm asking if you recall this without having to go through it in detail.  But at the hearing, there is a -- there is testimony by Dr. Randall.

A   I recall there was testimony.

Q   And he testified to the fact that almost immediately

after you learned of Dr. Haney's reasons for not being able to continue in that letter of January 13th, you immediately contacted Dr. Randall. Dr. Randall immediately agreed to participate.

A     That's -- I think that's accurate.

Q     Okay. He, in fact, flew down the next day after being contacted and met with Mr. Allen and met with you.

A     That -- I can't say that for a fact, but I -- I have no doubt that -- you don't need to show it to me. I have no doubt that when he testified to that, that that was true.

Q     Just direct your attention to the first paragraph on Page 7 here. This is Dr. Randall testifying he came down the next day, flying down to St. Louis to meet with the client. That's Mr. Allen, correct?

A     That is correct.

Q     "And meet with the attorney and start checking some records and things of that nature which is what I did."

A     That's correct.

Q     So there's really no delay between the time you learned of Dr. Haney's letter and moving to solve the situation.

A     I referred yesterday or Monday that I plunged head first into this case.

Q     And would you agree that what Dr. Randall was faced with and received was -- having come down and met Mr. Allen and looked at everything you had, in a matter of days he was

already well passed where Dr. Haney was?

A     From all the evidence I had, yes.

Q     Dr. Haney had never come down and talked to Mr. Allen in the first place.

A     Yes.

Q     He couldn't have done so without going through you, could he?

A     No.

Q     On the other hand, Dr. Randall did almost immediately.

A     Yes.

Q     In terms of the work that Dr. Randall anticipated, as of the date of this hearing -- Let me strike that.

      At the top of the page there, can you read that without me blowing it up or you want me to blow it up?

A     No.  That's okay.

Q     Okay.  "There are additional records that need to be sought.  There are some 60 potential witnesses that need to be contacted, and that's a lot of people to contact in a short period of time."

      Now these 60 witnesses, did you know who those 60 witnesses were on January 30, 1998?

A     I certainly knew who some of them were.  I knew what Dr. Randall had been hoping to focus on and some of the things that he hoped to develop.  Whether I could identify them by name even then, I don't think so.

Q    Okay.  If he had the number of 60, though, at that point in time, he would have had to have gotten it from your team, correct?

A    No, I wouldn't think so.  For example, he might say, which he did do, "I want to contact the teachers."  Well, he could figure out that there were -- if the guy went through 12th grade, he had probably maybe 60 teachers.  But I -- That figure, I think, was based upon what we had and what he believed we needed.

Q    In terms of the additional records that needed to be sought, how voluminous were the records that Dr. Randall obtained after he got in the case?  Do you know?

A    I -- I just don't remember.

Q    You and Ms. Caspari had actually been pursuing all of the records that you could find by leads since you started in the case, correct?

A    I've testified to that, yes.

Q    Okay.  As of January 30, 1998, two weeks after he's entered the case, he's asked as to how many hours has he worked on the case so far.  He's already worked 30 to 40 hours, correct?

A    Yes.

Q    And he says, "If this were to go to trial on the 9th or the 16th, I've been practically living down here working on this case," and time won't permit him to do the case the way

he likes to do, correct?

A    In the way that would be adequate, correct.

Q    Now this is Mr. Simon's question at the top of Page 10: "Is 120 days a reasonable approximation of the time that you believe necessary to do your job according to the standards of your professional specialty?"

Mr Randall -- Dr. Randall:  "At this point I believe that would be sufficient."

That's the information that Mr. Simon presented to the Court.  That's the answer that Dr. Randall gave, --

A    Yes.

Q    -- correct?  And you were there.

A    Yes.

Q    Okay.  Do you see on Page 11 where Mr. Landolt is cross-examining Dr. Randall?  Dr. Randall acknowledges that he's not started from scratch.  He's not starting from ground zero because he's been provided with information when he came into this case.

A    Yes.

Q    And in terms of the challenge and the number of witnesses and addresses, he's indicated that he has some of them.  And he says:  "Have you been provided with statements of those witnesses?"

"Some.  Well, a very small number."

"And we're talking about 60 witnesses in the

St. Louis Area?"

And he says:  "Primarily."

Those are his answers and throws are the -- Well, that was accurate, correct?

A    As far as I knew, yes, sir.

Q    Just in terms of the challenge that one might be faced with, even if they were starting from ground zero in investigating Mr. Allen's life, Mr. Allen lived -- at that point he had lived 19 years, hadn't he?

A    Yes.

Q    All of it in St. Louis.

A    Yes.

Q    The majority of it at one address, on one street in St. Louis.

A    Yes.

Q    The -- The early years, a couple of blocks in another neighborhood, blocks away in the same city.

A    In that general area, yes.

Q    He attended all of his grade schooling at -- in one district for the most part, and that would be Clayton.

A    For the most part in Clayton, yes.

Q    Okay.  And the only other educational contact that he had was with the St. Louis city school system as far as junior high until he dropped out, correct?

A    Correct.

Q    The records that were available from both of those schools were not voluminous, were they?

A    I don't remember how many pages there were.  I just don't.

Q    Mr. Allen's immediate and extended family on both sides also primarily lived in St. Louis.

A    Most of them did.

Q    There was an aunt in Chicago.

A    You're going to tell me that and I'm going to say you're right, but I don't remember.

Q    I'm not tripping you, but there was one that someone -- there was an aunt, I think, that was brought down from Chicago, correct?

A    There was a -- There was one family in particular that I specifically recall, and it was an aunt and it was a daughter, and I think they were from out of town, and that may be the ones you're referring to.

Q    Was there actually a daughter who was in college out of town?

A    Yes.

Q    In Kansas.

A    Very, very impressive young woman.

Q    And Dr. Randall took the time in the course of his investigation to actually travel there and interview her in person.

A    I'm assuming he did.  I don't know for sure.

Q    As opposed to interviewing her over the telephone.

A    Yes.

Q    Doctor or Mr. Allen had not had an extensive medical history either, correct?

A    Not extensive, no.

Q    He had not been in and out of the hospital or in and out of mental institutions throughout his life?

A    Well, he had been in and out of them, but I wouldn't say throughout his life.

Q    Okay.  And he hadn't been in the care of the Department of Family Services where they document the heck out of stuff?

A    There was no Division of Family Services -- which is what it was called then -- records that I recall developing.

Q    And his contact with the law enforcement system was relatively minor, correct?

A    Yes, sir, it was.

Q    He had an incident that occurred in '95, I believe it was, involving a stolen automobile?  He pled guilty to --

A    There was a guilty charge as I remember.

Q    -- tampering and was on probation.

A    That's accurate.

Q    And had one or two probation officers during the entire time he was on supervision.

A    That's true.

Q    Very limited, if any, time spent incarcerated up to that point in time, too.

A    That's true.

Q    So there weren't jail records, contacts, the kind of records you might have with a person who's been institutionalized for a lot of their adult life and then released and committing a crime, for example.

A    Other than Franklin County, that's true.

            THE COURT:  Other than what?

            THE WITNESS:  Franklin County.

            THE COURT:  Okay.

Q    (By Mr. Holtshouser)  That's the time he spent in jail since he was arrested for this charge.

A    That's right.

Q    The witnesses and the family and the friends and so forth also -- The friends, witnesses, non-family witnesses, neighbors, friends of his when he was younger, they were also, likewise, available in St. Louis to be located and contacted.

A    For the most part.

Q    Some of those same people you'd identified as early as May of '97.

A    There were people that were on that list, yes.

Q    And some of them you'd talked to yourself.

A    Yes.

Q    In addition, Mr. Simon may have talked to some of them.

A    He may have.  I don't -- I'm not sure of that.

Q    Okay.  You had already made an attempt to talk to any females that were in Mr. Allen's life yourself, including Tasha Valentine?

A    A few of them.

Q    Okay.  Do you recall how many actual witnesses you presented at trial?

A    36.

Q    Did you present most of the witnesses that you had information on -- from that would -- that fit your themes?

A    I believe so.

Q    Okay.

A    There were some witnesses I don't think we presented, but I think we presented most of them.

Q    This estimate of needing to talk to 60 witnesses, based upon what you've seen in the habeas petition and what you saw that you used at trial, nothing ever approximated that number of people that had any relevant information about Mr. Allen, did it?

A    Well, I know that, for example, we tried to secure interviews with his teachers in the St. Louis City school district.  That didn't go anywhere.  Those were part of that calculus in terms of how many people.  I think there were definitely people that we didn't talk to that we could have and probably should have.

Q    I'm asking, too, though -- You've now had an opportunity to review the habeas -- some of the habeas materials in terms of the number of witnesses that have been located that you didn't locate during your period of representation.  It still doesn't approximate 60, does it?

A    Well, I guess -- I don't know exactly how many that they have, but if you have 36 people and you add 24 to it, you're at 60.  So if there's 24, 25 witnesses, then, yeah, you're at 60.

Q    Correct.  You did the math correct.

A    Finally.

Q    But have you done -- have you done a determination of how many have been, quote, "added" to the witnesses that you located and interviewed who have anything pertinent to say about Billie's background?

A    I have not.

Q    Okay.

A    For example, you might have multiple medical experts, psychological, psychiatric.  You might develop experts concerning PET scans, MRIs, all that sort of stuff that really wasn't presented there at the penalty phase.  So there could be a lot of people.

Q    Okay.  The lay witnesses who had knowledge, historical knowledge, not expert witnesses, --

A    Okay.

Q    -- certainly didn't approximate 60, did they?

A    In terms of who we presented?  How many we presented?  I'm sorry.

Q    In terms of who had relevant information either then or now, if you know.

A    I don't know.  I really -- I couldn't say and be accurate.

Q    At Page 17, after the conclusion of Dr. Randall's testimony, just so you see the context, Mr. Simon begins a period of argument here on the motion, correct?

A    It appears so.

Q    All right.  There is a repetition of this theme expressed in the beginning that "Dr. Randall's testimony established that the defense has been left in the lurch in a capital case and that we have done the best we could, given what happened to us.  It's been a situation where a third-party to this case has actually betrayed the Government and the Court as well as the defense."

         Who is it that he's referring to as far as you know that's perpetrated this betrayal?

A    I'm assuming that this is more of Mr. Simon's rhetoric concerning Dr. Haney.  But there's also -- In the next paragraph down, there is definitely -- I believe I saw a reference to the fact that the 120-day figure came in part from the lead counsel.

Q    Is that what you're referring to?  The next paragraph?

A    Yes, sir.

Q    Okay.  There's a reference to the fact that now 120 days is Dr. Randall's approximation of what he needs.

A    Yes.

Q    Is that correct?

A    But also it reflects the opinion of lead counsel.

Q    Okay.

A    I mean I'm just telling you I was part of that.

Q    It says "as well," correct?

A    Right.

Q    Not that that number that Dr. Randall approximates is based upon counsel's opinion but that it's a combination. Dr. Randall thinks so; you think so; Mr. Simon thinks so.

A    That's correct.

Q    In the paragraph above that I blew up prior to that, though, again, in terms of this betrayal by a third-party, there's no mention in there, is there, that what's the situation -- Okay.  "It's been a situation where" -- He didn't say, "It's been a situation where Mr. Sindel failed to supervise me and Ms. Caspari properly," or, "Mr. Sindel failed to communicate clearly enough with Dr. Haney," --

         MR. MORENO:  This has been asked and answered.

Q    -- correct.

         MR. MORENO:  This has been asked and answered.

THE COURT:  Well, earlier it did but not in this particular document.  Overruled.

A    It doesn't mention the failures on my part.

Q    (By Mr. Holtshouser)  There is a -- The Court speaks here at Page 21 and makes certain -- Strike that.

Mr. Simon is speaking again here at the top.  This is now the third time in this transcript in which Mr. Simon makes reference to the fact that it is someone who is not in this room is responsible for where we are.  Correct?

A    As part of his rhetoric, yes, sir.

Q    Okay.  And the presentation to the Court, was this an accurate representation of what your state of mind and Mr. Simon's state -- Strike that.

Was that an accurate representation of your state of mind as to the situation in January of 1998?

A    I think that it was partially accurate in terms of our feelings concerning the assistance that we had received from Dr. Haney.

Q    Was it partially inaccurate?

A    Well, I mean I don't think we said anything inaccurate about what Dr. Haney did or did not do.

Q    When it says, "This really is something where" ---

A    I'm sorry.

Q    The "something" that he's referring to is the situation that you all find yourselves in, correct, as being the subject

of this hearing?

A    Yes.

Q    And, "This really is something where it's someone who's not in this room is responsible for where we are."

A    I may have left.  I think he's referring to Dr. Haney.

Q    Well, my question is not what he's referring to.

A    Okay.  I'm sorry.

Q    I'm not asking about his state of mind.  I'm asking you: Did you agree with this statement when he made it to the Court?

     Is this an accurate representation of what your state of mind was as to what you knew and believed as of January 30, 1998?

A    No.

Q    Okay.  You did not correct it at the time, though, did you?

A    I did not.

Q    The Court concludes that based upon what it's heard is that substantial work had been done previous to this time and that there was sufficient time remaining to complete what was needed to be done, correct?

A    That's what the Court said.

Q    And that what the Court anticipates is that Dr. Randall will be able to apply his knowledge and input to the work that's already been done in the remaining amount of time.  I

think it's right here.

A    Okay.

Q    "Will be able to apply his knowledge and input to the work that's already been done," --

A    That's what the Court said.

Q    -- correct?  Did you ever again renew a request for continuance to the Court after this motion was denied?

A    I did not.

Q    On February 6th, '98, do you recall that at that point in time you came before the Court and you asked for some additional expert services?

A    I don't remember, but I -- that's certainly -- it's in the record.

Q    Here's a report of pretrial proceedings that occurred on February the 6th of '98 which I believe was the Friday before trial was to start, correct?

        THE COURT:  Is there a number?

        MR. HOLTSHOUSER:  That is Exhibit 43-A.

        THE COURT:  Is what, please?

        MR. HOLTSHOUSER:  43-A.

        THE COURT:  43-A, okay.  Thanks.

A    Yes.

Q    (By Mr. Holtshouser)  At the bottom here the Government has filed a motion for psychiatric examination.  That's the motion that's being heard before the -- one of the motions

being heard before the Court this date, February 6th.  So Dr. Cuneo has been someone who you anticipated might be used as a psychologist for mitigation since September of '97 when you sent him a copy of the police report.  The Government for the first ---

MR. MORENO:  I object to that characterization because Mr. Sindel has not endorsed him.

MR. HOLTSHOUSER:  I think he has.

Q    (By Mr. Holtshouser)  But do you recall?

A    I sent him a letter in September of 1997 with the police report.

Q    Containing the police report, okay.  And I think you testified earlier that it was your anticipation that he would play a role in the mitigation in this case; a potential role.

A    A potential role.

Q    Yes.  You had that in mind when you contacted him.

A    Whenever you're contacting someone who has expertise in the field of mental health on a capital case, you're always thinking that there's a -- there's an option to perhaps choose that person in both or either --

Q    Either.

A    -- phase.

Q    The other being what?

A    The penalty phase or the guilt phase, depending on their findings.

Q    Okay.  There was certainly nothing that -- in your mind, "Well, I'm only contacting him exclusively for competency," correct?

A    No, there was not.

Q    The Government filed a motion for a psychiatric examination, and I want to point your attention to what is stated by Mister -- I didn't blow it up well enough there -- Mr. Landolt who says that, "Earlier this week in a conversation with Mr. Sindel, he indicated to me that Dr. Cuneo has apparently spent some time with his client, has arrived at a diagnosis of post-traumatic stress disorder."

And he says, "I expect this information to be presented in the second phase."

That -- Would you agree that that was the first notice that you had given to the Government of any mental health information you were going to present in the penalty phase is February 6th, 1998?

A    I'm only going to say this:  I don't see where it says this is the first time they learned of it, but I don't know of any other time that any notice was provided.

Q    And, in fact, you hadn't filed any such notice --

A    No.

Q    -- at that point in time?

A    No.  Because the notice would be required if it was going to be presented to -- as either diminished capacity or some

mental health -- mental defense.

Q   Not competency.

A   Well, competency wouldn't necessarily be a defense as I understand it.

Q   Not competency to stand trial.

A   That's correct.

Q   There's a discussion that goes on in this transcript, and I won't go through the detail, but that the Government is basically asking for an opportunity for an independent examination that ultimately led to the examination by Dr. Yutzy.

A   That's correct.

Q   Now on Page 33 of this transcript, though, you have an ex parte communication with the Court which the Government was aware of, that you were going to do.  And in this you actually and Mr. Simon, if we can get to it here -- There's a discussion here at Page 34 that the conversation with the defense is going to be ex parte, and then Mr. Simon argues the reason why it needs to be ex parte.  Then the Court ultimately agrees to hear it ex parte.  Do you recall that?

     See at the bottom it says, The Court:  "Let's take a brief recess"?

A   Do I recall that particular conversation?  No.  Do I think that this is accurate?  Yes.

Q   Okay.  All right.  At the bottom of 37 here, the Court

takes a break, I believe, and then Simon says, "We're ready to proceed on that."

Now he then provides a declaration of Dr. Randall, the mitigation expert, who was in court a week ago indicating traumas or other forms of harm to the Defendant that go beyond the pistol whipping incident.

A    I see that.

MR. MORENO:  Is there a question?

MR. HOLTSHOUSER:  I'm getting to it.  Not just yet.

THE WITNESS:  Don't encourage him to ask more questions.

Q    (By Mr. Holtshouser)  Do you see at Page 39 where you begin to speak?  It says "Mr. Sindel," and you're referencing Homer G. Phillips records?

A    Yes.

Q    Okay.  And you say there's at least 25 pages of documents and you haven't gotten those, but you anticipate getting them that day.

A    Yes.  That's what I say.

Q    Now the Court actually brings up the question down here: "When do you think Dr. Cuneo's final report will be forthcoming?"

The Court is asking this on February 6th of '98, correct?

A    Correct.

Q    Your answer:  "I talked to him yesterday.  I told him that I wanted to give him -- I wanted him to give a preliminary report.  Every single thing he generated, I wanted it go to directly to the Government at the same time it came to me, and he was faxing things directly to them as of yesterday."

The report that ends up being the only report from Dr. Cuneo is the one that was shown to you on Direct Examination that is a -- I believe references a January 16, 1998, examination.  There's only one report that you received from Dr. Cuneo.  Do you recall that?

A    I recall seeing the report.

Q    Okay.

A    I don't specifically recall another report as I sit here today or the conversation.

Q    The context of this conversation, though, would you agree is about the penalty phase?

A    That's correct.

Q    It's not about whether or not he's competent to stand trial, is it?

A    Well, I was looking for a report that I think dealt more with the post-traumatic stress disorder and not some of the other issues concerning what might have been more appropriate to determine in a competency evaluation.

Q    Did you have a report in your hands yet?

A    I said I didn't.

Q    Okay.  Let me ask you one other question about this before we move.  Do you recall there being an issue regarding a possibility of an MRI being done of Mr. Allen?

A    I do remember some -- some concerns about that.

Q    I'm directing you to Page 51 of the transcript which is 43-A.  There's a discussion of this here, and February the 6th of '98 there's a reference to the doctor's name as Gelbort.  You spell it down at the bottom.

      "We have talked to him today.  He indicated he might be able to come down tomorrow, but we haven't contacted him since coming here to court," correct?

A    That's what it says.

Q    Okay.  Do you recall why it was that an MRI was not done?

A    The only thing I can recall is that the team or maybe me believed there wasn't going to be sufficient time.

Q    You haven't seen one that's been done since, have you?

A    I am not privy to anything other than the declarations in terms of the mental health of Mr. Allen.

Q    During the time that you were representing Mr. Allen, you never failed to ask Mr. Allen and Mrs. Allen about abuse.  Is that correct?

      MR. MORENO:  Objection.  This has been asked and answered.

      THE COURT:  Well, it's getting -- changing gears back

to foundation.  Overruled.

A    I believe I testified that that would be part of the general questions I would ask anyone in reviewing materials concerning the possibility of a penalty phase presentation.

Q    (By Mr. Holtshouser)  Okay.  So whether there was a misunderstanding with Dr. Haney or not or whether you adequately supervised Mr. Simon and Ms. Caspari, that didn't keep you from actually personally talking to Mr. Allen and Mrs. Allen about those topics, did it?

A    No.

Q    In the course of your representation, you did not ever ignore -- deliberately ignore any issue, did you?

A    Well, I don't -- I don't remember specifically enough to answer that question concerning the MRI that you just brought up, but give me just a second.  Let me just say there were things that I did ignore.

Q    Is that a hindsight evaluation or is that --

A    No.  I mean ---

Q    -- you're telling me you made a conscious decision to not do something because you didn't have time?

A    Well, I think the MRI may have been a conscious decision because I didn't have time, but there were other things.

Q    And the MRI is not anything that you seen as actually been determined relevant?

A    No.  I'm not going to ---

Q    So we can set that aside.

A    Okay.

Q    Okay.  Anything that you're aware of that's relevant here that you actually turned a blind eye to because you didn't have time.

A    Well, when you say a blind eye, that's different from the way you first phrased the question, but there were definitely things I didn't do.

Q    And that isn't either of the questions.  The question is: Did you deliberately ignore a lead into a particular area or topic relevant to mitigation because you didn't have enough time?

A    Not relevant to mitigation.

Q    Are you actually aware even as you sit here now of any witness, fact witness, about Mr. Allen's life that you didn't get to talk to or didn't identify because you didn't have time?

A    Well, I believe that there, you know -- The idea of time is not just the time to walk out your office door and go to their house and talk to them or pick up the telephone.  The idea of time is to be able to do enough interviews to break down some of the barriers that often exist both on racial situations, socioeconomic, and just whatever in order to try and explore as fully as possible what information they can provide.  So that's the way.

Q    So as you sit here now, is there any witness that you can think of that you had a lead to talk to them and if only you had gotten time to talk to them, it would have been a break-through?

A    That's a lot of question.

Q    It's a big bust as you would say.

A    Yeah.

Q    So ---

A    It's aimed right at me.  Here's what I can tell you is that I don't recall deliberately deciding not to contact any particular witness that we were aware of.

Q    Is there any witness that you didn't ---

        MR. MORENO:  Your Honor, I'll ask that he be allowed to finish.

        MR. HOLTSHOUSER:  I'm sorry.  He's correct.

A    There are definitely witnesses that I believe that have been developed in connection with this current litigation that we didn't talk to, --

Q    (By Mr. Holtshouser)  Correct.

A    -- but ---

Q    I'm asking you:  As of the time that you were in this case, was there -- did you know of Brady Toliver and Cathy Toliver?  I think you said you didn't know of them, correct?

A    I don't believe I did.

Q    And it wasn't like someone told you, "Well, you know, who was a good friend of Juanita is Cathy Toliver."  And Billy said, "Well, Brady Toliver was a good friend of mine."  And you just chose not to talk to them because you ran out of time.  That's not the situation, is it?

A    Not that I can recall.

Q    Billy Wayne Allen is not somebody that you didn't know about him and just chose to not talk to him because you didn't have time.

A    It's hard for me to remember the circumstances behind what we knew or didn't know about the Allen family because that was distinct from what we did or didn't know about the Petty family, but I don't recall Billy Wayne Allen being on my radar.

Q    Here's a different question:  Is there any witness who you did not put on in the mitigation phase of the trial because you didn't have time to talk with them or prepare them?

A    Not that I can identify.

Q    In terms of strategy risks, I want to ask you about three particular witnesses.  Putting on evidence that Mr. Allen had -- First of all, you did put on some evidence of physical abuse of Mister -- physical punishment of Mr. Allen, correct?  Raymond Petty?

A    Raymond Petty was -- testified --

Q    You remember that one now, right?

A    -- to an incident of an electrical cord.

Q    Okay.  Raymond Petty for the most part, though, brought no other baggage to Billie Allen's case, did he?

He didn't say, "Well, my nephew was also a drug dealer.  I knew he was in a gang, and I saw him use a gun one time."  None of the negative things you were trying to keep out of the case came with Ray Petty, did they?

A    No.

Q    Billy Wayne Allen, on the other hand, is someone that if you put him on, would also have the risk of providing very detailed specific information about Billie Allen's actual drug sales activity, would he not?

A    From what I understand.  I have not read his declaration or if you took his deposition, I haven't read his deposition.

Q    From which you understand it would have brought that baggage.

A    If -- If ---

MR. MORENO:  Your Honor, I'm going to object.  I think the inquiry is what he understood at the time, and I think at the time he hadn't spoken to him.  What he understands now I don't think is relevant.  What he understood at the time would be the relevant question, and I don't think they interviewed him.

THE COURT:  Well, my concern is he said he didn't

know or he didn't look -- he didn't read his declaration, didn't view his declaration or whether there was a deposition. If during the course of this litigation he has learned either through the current team that there is a witness that had valuable information but at the same time he now knows that person would have also known about some issues that would have been incriminating or adverse to Mr. Allen, then I think what he actually knows he can testify to, even though he knows about it now as opposed to then, if it's asked that way.  Does that make any sense?

MR. HOLTSHOUSER:  Yes, it does, I think, Judge.

Q    (By Mr. Holtshouser)  Do you understand the question as clarified by the Judge?

A    Yes.

Q    Or you want me to restate it?  I can.

A    Well, if I understand the question, I'll preface it with the idea is that:  Was there things that I'm aware of that Billy Wayne Allen has -- I mean, yeah, Allen as provided ---

Q    That's not the question.

A    Oh, okay.

Q    I want to ask it in a hypothetical sense.

A    Can I make up the question I want?

Q    Let me ask it in a hypothetical sense to make it clear.

If putting on Billy Wayne Allen meant, also, and bringing with him -- If putting on Billy Wayne Allen to, say,

corroborate Raymond Petty as to physical punishment that Mr. Allen underwent, that's the "if." Okay?

A    Okay.

Q    If doing so also meant that (A) you would be putting on someone who himself was a drug dealer and (B) who would also testify that Billie Allen was an actual drug dealer, not a fantasy drug dealer, would you have had to think twice about using Billy Wayne Allen?

A    Well, the answer to the question is, I think, a little more complicated than thinking twice, but you would definitely have to think about it because you have to determine what the theme is that you're trying to present. And -- And sometimes the theme can be, you know, all the horrible things or terrible things that have go on in someone's life and what they have contributed to his present circumstances, and sometimes the theme can be, you know, what I think we were trying to present which was there was a good, strong, positive reason to spare Billie's life. The point really is what you know controls what your theme is.

Q    Did you call any witness who -- who got up there and admitted that they were a drug dealer?

A    Not that I recall.

Q    A jury would have a difficult time identifying with that individual, would they not?

A    In this -- Normally, yes.

Q    As opposed to Raymond Petty who, I believe, if my recollection is correct, worked full time at the GM plant.

A    He worked full-time; had his own barber shop; was going to school.  He was a very positive character.

Q    Brady Toliver, you know who that is, correct, now?

A    I know the name because it's been mentioned.  I also -- I believe I've seen references to Toliver in the declarations of Martell and/or Stewart.

Q    And he -- Would you use a witness -- Would you have used a witness, such as Brady Toliver, if doing so also meant that he might answer questions by reference to astrology or to espouse a theory that music changes the molecular composition of water?

A    I certainly wouldn't want to ask him those questions, but, again, you have to look -- sometimes you have to put on what you have because you want to try to develop the facts as best you can.  But would he be subject to Cross Examination and would people look at him slightly differently if he didn't have those beliefs?  Yes.

Q    As far as you believed at the time, there was no racial barrier between you and this family, the Allen family, in terms of communication, was there?

A    I think there was -- there were -- there was a barrier, yes.

Q    You do?

A    Yes, I think so.  I think it's a barrier that we were working through, but it's difficult to really know what someone else thinks is a barrier.

Q    I'm directing your attention to your deposition and ask if you recall:  "Did you sense that there was any problem in communicating with Billie Allen's family?  That they didn't want to talk to you about things because you were white?"

     Your answer:  "Yeah.  I don't recall that."

     Do you recall that question and answer?

A    Well, I think what you're asking me is whether or not they wouldn't want to talk to you about things because you were white.  I didn't know that they didn't want to talk to me about things because I was white.  I don't think that means I necessarily understood all the stuff that goes on in their lives because I don't believe that people can readily understand the racial complexities of an entirely different race, period.

Q    In terms of the communication and rapport that you had with the Allen family, though, did you feel that you could communicate with them and that they would share -- Did you feel that they were sharing with you truthfully and openly at the time?

A    I thought -- I thought they were.

Q    Okay.  All right.  We're shifting gears here again. And ---

THE COURT: Is this a -- Let's take about a ten-minute break.

MR. HOLTSHOUSER: Okay.

THE COURT: During that time, I would appreciate if counsel would talk, and just for Mr. Sindel's benefit, give him some kind of idea about how much more time he needs to take away from his life for this hearing. And I make that statement not -- not because of anything I'm considering about time. That's not it. He's been very patient in my view. And if you can give him some information that would be helpful to him in making calls and so forth, it would be helpful.

So Court's in recess for ten minutes.

MR. HOLTSHOUSER: Are we ending today, Judge, at ---

THE COURT: 3:30, yeah. There's a Judges' Meeting at 3:30.

THE CLERK: Court is in temporary recess.

(Court recessed from 2:32 PM until 2:44 PM.)

MR. HOLTSHOUSER: Ready?

THE COURT: Ready.

Q   (By Mr. Holtshouser) All right. Mr. Sindel, the place where we're shifting to is we're actually moving back just a couple of weeks. We're talking about the entry of Dr. Haney. What I want to focus on is actually what got done -- I'm sorry; not Dr. Haney; Dr. Randall -- what got done from the time Dr. Randall was in the case till the end of the trial.

A    All right.

Q    We've covered the period before Dr. Haney, Mr. Simon came in.  We've covered the period in which we've got an overlap there between Haney and Simon.  Now you've got the team consisting of ---

A    You mean Haney and Simon or Haney and Randall?

Q    Well, Haney and Simon were there from like September of '97 --

A    Oh, I see what you're talking about.  Okay.  I understand.

Q    -- through the January 13th letter.

A    Okay.

Q    And then Dr. Randall comes into the picture from there.  Now he's part of the team, correct?

A    Correct.

Q    And the team consists of you, Mr. Simon, Ms. Caspari.  Andy Rackers is still available?

A    Well, I don't remember him doing anything in terms of the penalty phase.

Q    Okay.  And then Dr. Randall is now added to the team.

A    That's correct.

Q    So there -- While you don't remember him doing anything, he certainly -- Andy Rackers was certainly available.

A    I don't even remember that to tell you the truth.  I mean I'm not sure if he used all his money up or whatever, but he

wasn't -- we didn't use him.

Q    Okay.

A    Andy Rackers is not a touchy, feely kind of guy.

Q    Exhibit 28 is the application that you made on January 16th.  And I say "you," the big you, but actually that is your signature, correct?

A    That.

Q    And this is the application to actually now appoint Dr. Randall in lieu of Dr. Haney, to replace him as the mitigation specialist.  Again, this is your motion now.  In it, you characterize Dr. Haney's role as having agreed to consult with counsel.  You reference again what's been sent to him.  And the Paragraph 4 -- Maybe I'll blow it up so you can see it better.

A    I see it.

Q    All right.  The only thing referenced in the justification and the circumstances leading up to this is the fact that Dr. Haney says that the -- he can't -- he has two trials within the next two months; can't adequately contribute within the given time constraints, correct?

A    Correct.

Q    And then you requested Dr. Randall be hired and appointed.

A    Yes.

Q    And the Court immediately did so, correct?

A    I can't say the time -- Yeah, absolutely.

Q    Exhibit 29, Randall is appointed immediately.  This is filed January 16th, same day.

Let me show you Exhibit 335.  Is this a fax from Ms. Caspari to Dr. Randall on the same day, January 16, 1998?  Is it?

A    It is.

Q    Okay.  And she tells Dr. Randall that she's enclosing phone numbers for Juanita Petty and Otha Petty, the grandfather, correct?

A    Correct.

Q    Providing you with information; they live in the same household; have separate phone lines.  "And I've also included the life history completed by our co-counsel, John Simon," and it provides his number.  Had you received this life history by this time?

A    I have to assume I did.  I just don't have any memory.  I tell you what, if you could show it to me and I could read a bit of it, I would know.  I mean that's how I function best.

Q    I'm just going to show it to you, 303; Exhibit 303.

A    Okay.

Q    Do you recognize it?

A    I'm looking.

Q    It might help if I page through it a little bit and you see it.

A    Yes, a little bit more.

Q    First of all, first page, "Early Years, Family."

A    Yeah, I read that.  I read it all.

Q    I'm going to page through here.

A    All right.

Q    Church.

A    All right.

Q    Scouting.  That's not your handwriting there, is it?

A    It is not.

Q    See how the paragraphs are numbered?  See how the paragraphs are sequentially numbered?

A    I do.

Q    Sports, school and music.

A    Right.

Q    Friendships and sexuality.

A    Right.

Q    Employment, traumas.

A    Okay.

Q    Prior adjudications/convictions.

A    All right.

Q    Substance abuse.

A    Okay.

Q    Pages:  14 in length, 91 paragraphs, correct?

A    Yes.

Q    All right.  It appears Mr. Simon had done quite a bit of

work with Mr. Allen, he had not?

A    He had.

Q    Did you know that his conversations with Mr. Allen that led to the preparation of this were actually tape-recorded by him?

A    No, I did not.  I didn't -- I know today.

Q    You didn't know it then.

A    No.  And I -- I still don't have a specific recollection of this document, but I have a recollection of the facts that are contained in the document.

Q    When you looked at the document, is there anything in the document that you are aware of, as you sit here now, that is contrary to something that Mr. Allen or Mrs. Allen told you?

A    I'd have to read it all in its entirety.  If you want me to tonight, ---

Q    We're not going to do that.

A    Huh?

Q    We're not going to do that at this point in time.

A    No, no.  Tonight I'll do it.

Q    Okay.  Let me move on, though.

A    Okay.

Q    Because the way this came up was on Exhibit 335, on January 16 of '98 --

A    Right.  I got it.

Q    -- Ms. Caspari is sending Dr. Randall a copy of this.

A    Yes.

Q    Would it be fair to say that if Dr. Randall was being given a copy of this by Ms. Caspari on January 16th, 1998, you had a copy?

A    There was a copy available to me.

Q    Do you think Ms. Caspari would have given it to Dr. Randall without consulting with you first?

A    I mean she could have got the instructions from Mr. Simon.

Q    Dr. Randall, did it turn out that he was somebody that jumped on this case?

A    He did.

Q    And, in fact, he agreed to -- I'm showing you next Exhibit 336.  This is the same day.  There's several communications on the 16th of January.  He says, "I can fly down and meet with you and your client as soon as tomorrow," correct?

A    Yes.

Q    And in another case -- And he has no conflict because in another case, the mitigation is 99 percent prepared.

A    Right.

Q    And he says, "Let me know your intentions so I can organize my weekend."  He's willing to come down and work on the weekend on this case on short notice.

A    He's a hard worker.

Q    He also references his past experience.  Then I'll show you Exhibit 30.  You actually obtained an order that same day, did you not, for Dr. Randall to actually meet with Mr. Allen at the Franklin County Jail on January 17, 1998, that morning he's referring to flying down.

A    Yes.

Q    So in a matter of days, if not hours of this taking place, Dr. Randall is flying down here, meeting with you and your staff, and meeting with Mr. Allen at the jail.

A    Yes.

Q    Did you go to the jail with Mr. Randall -- Dr. Randall to meet with Mr. Allen and introduce him?

A    I don't recall.

Q    There would have been some communication with Mr. Allen explaining who this man was and that he should talk to him and could talk to him freely, correct?

A    There would have been.

Q    This is Dr. Randall -- Exhibit 337 -- confirming his flight arrangements, and then he also encloses a retention letter to show that he's working under your auspices and that his work's covered by the attorney/client privilege, correct?

A    Yes.

Q    And did you have any of that documentation with Dr. Haney?

A    No.

Q   Do you recognize the handwriting on this?

A   No.

Q   Do you see it's dated January 17, 1998, in this Exhibit 338, by the way?

A   It looks familiar --

Q   The handwriting?

A   -- to David -- Yes, to David Randall, but I can't say it's his for sure.

Q   This is Exhibit 338.  The day corresponds to the date that we just saw on these other documents; that Dr. Randall was flying to St. Louis and you had got an order for him to meet with Mr. Allen.

A   Right.

Q   No one else met with Mr. Allen that day to your knowledge under court order, did they?

A   Oh, on the court order?  Not to my knowledge.

Q   These notes -- Well, let's go back up.  Basic pedigree background information that he obtained.  There's a Sergeant Karen Burns, a Corporal -- Lieutenant.  These are jail -- employees at the Franklin County Jail, correct?

A   Correct.

Q   Do these appear to be a list of family names and phone numbers?

A   Yes.

Q   Okay.  And it says "Juanita Allen;" gives a phone number.

"Check if she's working."  Do you recall if Juanita Allen was employed during the time that this case was pending?

A    Not that I recall.

Q    There is an Otha Petty.  It says -- That's his grandfather, correct?  "GF"?

A    Yes.

Q    Used to work at Chemisco chemical place?

A    Yes.

Q    "I worked there for a while, two months; seven dollars an hour; assembly line for chemicals."

A    That's my memory of it.

Q    Jerome Petty, name, number here.

A    Right.

Q    Does it say "uncle"?  "UM"?  Perhaps "uncle maternal"?

A    That's probably right.

Q    Okay.  He also works.

A    Right.

Q    Raymond Petty works at GM Motors.

A    Right.

MR. MORENO:  Your Honor, I'm going to object to just reading this into the record.  There's no question.  He can say, "Did Dr. Randall do this?"

THE COURT:  Okay.  Well, here's -- here's the problem.  If this is just offered for me to look at later without the reference that Mr. Sindel is seeing it and then

later somebody's going to come back and say, "Well, there's no evidence that Sindel knew this existed or that he had -- that this information available," so we just have to do it. There's no other way.  I know what you're saying, and you're right.  It's -- It's repeating it, but I don't know of any other way to get this in.  It's significant, and so I'm going to overrule it, but I want you to know why.  There's -- Ordinarily you would be correct.  He would identify it.  It would come into evidence, and that would be the end of it. But a lot of these names I've already heard about, and I'm not sure where -- what it's going to lead to.  So I'm going to overrule it, but I hope you understand why.  Okay, overruled.

MR. MORENO:  Thank you, Your Honor.

Q    (By Mr. Holtshouser)  You don't recall whether you were there at the time Dr. Randall met with Mr. Allen and took this -- obtained this information, do you?

A    I'd be almost positive I wasn't there for this interview.

Q    Do you see all of the names that are listed here, though?

A    Yes.

Q    Are those all names that were familiar to you long before Dr. Randall came into the picture?

A    That is correct.

Q    How about Sam Moore, basketball coach?  Was he someone whose name you had identified --

A    All the ---

Q    -- prior to this?

A    All the people on that particular page are familiar to me. I'm not quite positive about Rachelle Allen, but all the other people that are named I'm familiar with.

Q    All right. With respect to Tasha Valentine, met her on MetroLink?

A    Yes.

Q    Is that consistent with what both she and Mr. Allen told you?

A    I believe so.

Q    The three sisters, you knew of those, correct?

A    Yes, I did.

Q    Yvette, Angela, Nicole?

A    Yes, I definitely knew them.

Q    All right. "John Allen, me and my dad didn't -- don't get along. I don't associate with him." Again, consistent with what Mr. Allen had told you well before Dr. Randall was in the case?

A    Right.

Q    There's a discussion here, notes about an incident that had occurred on January 12th or 13th of '97; "moved out; different girls." Again, were those facts that were known to you long before Dr. Randall came into the picture?

A    As I recall, yes.

Q    Okay. The names Eric Taylor, who he was, Marquis Taylor,

Johnnie Grant, all known to you?

A    Yes.

Q    You even met with -- for sure with Johnnie Grant, correct?

A    That was all three of those.

Q    Before Dr. Randall?

A    I believe so.

Q    And I'm just paging through here.  There's a discussion of tampering, criminal history, Byron Woodard, Wilson Flexx, correct?

A    Yes.

Q    All right.  So far have you seen any information in there that -- any reference, anything that was, say, "Well, I didn't know that before Dr. Randall came down"?

A    No.  That pretty much is what we had been able to develop at that point.

Q    Shortly after Dr. Randall came in, he developed a plan, did he not?  I'm showing you Exhibit 340.

A    Yeah.  I think he hit the ground running with the plan.

Q    All right.  Let me give you Exhibit 341 which is actually your version of the facts from David Randall to you and Ms. Caspari.  It's dated January 19 of '98.  That would be Monday.  The 17th was Saturday, according to the earlier documents.  Sunday -- Monday now on the 19th, he's on the case after interviewing Billie Allen on the 17th, correct --

A    That's correct.

Q    -- and he tells you -- advises you that he's going to be phoning Billie Allen's family members today and tomorrow and set up appointments with them, correct?

A    Yes.

Q    Okay.  And then he tells you -- gives you from his experience what's best is for him to "discuss, arrange and conducts initial interviews with the family members by myself to develop a rapport.  It gives me a better feel for the mitigation case," correct?

A    Correct.

Q    "And then following this initial round of interviews, we can sketch out a rough direct of each potential mitigation witness and then conduct follow-up interviews soon thereafter."

       That's the plan of attack he's proposing, correct?

A    That's what he proposes.

Q    Did you have any objection to that plan of attack?

A    No.

Q    Now this is January the 19th of '98, correct?

A    Yes.

Q    The trial's going to start February the 9th of '98, at least with voir dire, correct?

A    Yes.

Q    So at the time, given the situation as you understood it,

did you feel -- did you agree with this approach to the mitigation case? That he would -- That he would conduct the initial interviews by himself?

A I -- I think I agreed with it for several reasons.

Number one is I think that Dr. Randall was good at what he did.

Number two is that it would have been impossible for me to go, except in the unusual circumstances, to each one of these interviews because they were going to be all over the place. It would take days. And when you're preparing for a trial as complicated as this one, I thought this one would be, I just didn't have the time.

Q You didn't have the time to do it personally, correct?

A I did not.

Q All right. But, also, basically it was what had been going on up to that point in time; that is, Mr. Simon meeting with potential mitigation witnesses and talking to them, correct?

A Yes.

Q Dr. Randall was putting a stop to that, wasn't he?

A I don't know if he was putting a stop to it, but I think he's indicating that he wants to meet with them by himself so he could develop a rapport.

Q All right. And the level of crisis, the level of time crisis that existed at that point was not such that the amount

of time did not afford you the luxury of allowing Dr. Randall to start from scratch and begin initial interviews with people, correct?

A    I'm sorry.  Repeat that question again.

Q    The focus is --

A    I got the part about the time.

Q    -- the extent of the time crisis, the time crunch --

A    All right.

Q    -- that you've alluded to, correct?

A    I've talked about that.

Q    All right.  That time crunch in terms of what you perceived needed to be done was not so great as to prohibit the plan that Dr. Randall was proposing.

A    I mean that was the only plan I think we could utilize.

Q    Was it?

A    I believe so, yeah.

Q    What about permitting Mr. Simon to continue his meetings with witnesses and to have Dr. Randall supplement what Mr. Simon and you had already started?

A    Well, I -- I think that Dr. Randall would have been a better person, considering the time frame that things were happening, to focus on the conduct of those interviews.  I wouldn't have said that, you know, Mr. Simon would be prohibited from it, but I think that Mr. Simon had been out there, and we had not, thus far, been successful in securing

the memorandums of interview and the other information that I

felt would establish a sufficient rapport to really move

forward in a better manner.

Q    The time crunch that you were under, though, if this had

been February the 6th of '98, the trial starting Monday, would

you have agreed with this plan of attack?

A    I couldn't speculate on that.

Q    Okay.  He says then following each round of interviews,

he'll sketch out a rough Direct of each witness and follow up

with interviews soon thereafter.  So he was going to take over

the role of actually preparing the Direct Examination of each

witness?

A    I don't know that he means that exactly.  I mean I think

I did that.

Q    Well, what does a "rough Direct" mean then?

A    I'm not -- I don't know that I can comment on it.  I mean

I don't think he -- We worked together every day, and I think

that he gave me an outline that might be useful on Direct, but

he didn't -- he certainly didn't write out the questions or

anything like that.  That never happens.

Q    Okay.  He also says he's going to apprise John Simon of

his involvement and discuss the mitigation witnesses with him

before conducting the interviews, correct?

A    That's right.

Q    So he was actually saying, "I'm going to get from

John Simon the results of what information he has obtained from these witnesses," correct?

A    I'm sure that would be part of the process.

Q    Did you supply to him in any way the results of the information that you had obtained from your own contacts with any of these witnesses?

A    I would assume I did or I would assume that would have been more like a task for Connie to do.

Q    Okay.  Because up to that point in time, the only extent that you documented -- When you met with Johnnie Grant, Eric Taylor, some of these other family members, did you -- did you take notes with them?

A    Yes.

Q    Did you reduce those notes to memoranda?

A    Not usually.

Q    Okay.  So you had your notes which, as we've seen, your notes are pretty legible.  You would have then provided those notes to Dr. Randall so he had something to start with?

A    I -- I really can't answer specifically what he was provided with, and it also could have been through just discussions and conversations and -- and conferences as to how we approached it.  But anything that I could give him that was in a tangible form that would help him, I would have done so.

Q    And you'd been collecting that kind of information since you came into the case --

A    Yes.

Q    -- in April of '97?

    I think as we saw on 340, Dr. Randall's fax was also sent to Mr. Simon.

A    It does indicate that at the bottom or actually it's sent to Mr. Simon.

Q    Correct.  This is Mr. Simon's -- He sent one to Mr. Simon and he sent one to you with a separate fax.

A    Oh, this is a different exhibit.  I'm sorry.

Q    This is 340.  I'll show you 341.  Yours is different, but it's the same date, same document.

A    Okay.  I got it.

Q    Okay.  Now 343 is what I want to show you next.  This is a letter that Mr. Simon wrote to you essentially commenting on Dr. Randall's proposed plan.  Do you recall this letter at all?

A    No.

Q    Okay.  It's January 20th.  It's to you.  I'll blow this text up here.  First of all, does he reference the one-page fax from Randall at the top right here?

A    Yes, okay.  I'm sorry.

Q    And he says, "Although I was heading off on a brief road trip on some other cases, I called him to touch bases with him."

A    Okay.

Q    Other than to state the obvious, again, the time crisis or crunch that you all felt you were in as a result of the information from Dr. Haney, at this point in time not only was it not seen as prohibitive of Dr. Randall starting from scratch with initial interviews but also not prohibitive of Mr. Simon handling other cases, working on other cases.

A    I don't want to comment on what Simon -- Mr. Simon could or could not do.

Q    Because up here he's telling you that he has been working on some other cases?

A    I believe he ---

Q    First paragraph.

A    Oh, I'm sorry.  Yes.

Q    Okay.  And you didn't -- When you read this letter, you didn't pick up the phone with him and start saying, "John, what are you doing?  I need you working on this case and nothing but this case."  You didn't do that, did you?

A    That's not going to work.

Q    He references in quotes then the facts from Dr. Randall, right?

A    Right.

Q    All right.  The next paragraph is what I want to direct your attention to.  He says, "Of course, it is too late for Dr. Randall to conduct an *initial* "-- and he emphasizes it in Italics -- "interview with several of the family mitigation

witnesses as I interviewed them on Dr. Haney's dubious watch." Now was this news to you that Mr. Simon had done this?

A    I certainly don't recall any specific notes or memorandum to that effect.

Q    Okay.

A    And I don't know who he's talking about when he gives a general characterization of family mitigation witnesses.

Q    But that's what Mr. Simon is telling you on January the 20th is he's actually already done what it is that Dr. Randall says he's going to.

A    He's -- He's saying, "I've done an initial interview with several" -- not all -- "several of the family mitigation witnesses."

Q    All right.  And do you see that he says that, "I take Dr. Randall's fax as an indication that I should not contact these witnesses or potential witnesses again" until he has interviewed -- has himself interviewed them?

A    That's what he says.

Q    Is that the way you interpreted Dr. Randall's fax as well?  Is that consistent with how you read it?

A    No.

Q    But Mr. Simon is telling up that's how he reads it.

A    But let me just -- let me recharacterize my answer.  I didn't think anybody was going to tell me who I could talk to.

Q    Okay.  There's certainly no mitigation ---

A     That's me, though.  That's me.

Q     Certainly no mitigation expert was going to tell you who to talk to.

A     Well, it's not because of a mitigation expert.  It's just that, you know, I'm the one that's primarily responsible.

Q     You're the trial lawyer.

A     Yeah.  And I also think that at that point in time, Dr. Randall and I had had, even though a limited amount of time, I think we understood each other.  We had a good rapport and a good connection, a good synergy.

Q     I probably have to straddle a page here for you to see this, but at the bottom it says -- do you notice where he says, "I have a cert. petition to file and had to -- and have to finish a traverse that I had stopped working on to do the mitigation interviews"?

A     Correct.  I see that.

Q     Okay.  And were you aware of those interviews that he had been doing?

A     Not the -- Not the product of them, no, or the schedule.

Q     And he says, "I would find it useful if Dr. Randall did go to work on the mitigation witnesses instead of me," correct?

A     He says that.

Q     Now here's where Doctor or Mr. Simon actually proposes that we need to file a motion for a continuance, correct?

A    He does.

Q    Okay.  I want to direct your attention -- This letter has a few things I want to point out to you.

Do you see in here that Mr. Simon -- This is January 20th of '98.  "I realize you do not believe the motion will be granted."  He's referring to the Motion for Continuance.

A    That's right.

Q    Is that correct?

"That would be the Court's responsibility.  If we file such a motion and it is denied, we can cite the denial of the continuance as undermining subsequent decision makers' confidence in the likely result of the trial.  Section 2255 counsel can point to the denial of the continuance, along with the acts and omissions of trial counsel as cause for a failure to present additional evidence if any emerges or occurs to someone later."

He then goes on to discuss this.  "Because this would be external to the defense, it's his belief that counsel would not have to prove that we were constitutionally ineffective in order to establish cause.  Giving them this second option would be in our client's interest."  Do you see that?

A    Yes.

Q    Did you have any comment on that or response to Mr. Simon at the time?

A    I just -- My basic memory was I wasn't going to spend the

time, the energy, or the effort to file another Motion for

Continuance that had already been denied.

Q    Well, this is January 20th.  It hadn't been denied yet.

A    Oh, I'm sorry.  Well, that is pre -- I filed a Motion for

Continuance because I wanted it.

Q    Okay.  This is being filed -- This is Mr. Simon giving

you his thoughts ten days before the motion has been filed and

that he's viewing it as an opportunity to create a second

option for Section 2255 counsel, correct?

A    I believe that that's what it says there, and I also

believe that, you know, attorneys always look to the record

and make a determination as to whether or not an issue might

be appropriate on appeal.

Q    Okay. And it references, "present additional evidence if

any emerges or occurs to someone later."  It's not referencing

that we're currently aware of evidence that we don't have time

to get to.

A    Well, we wouldn't have been aware of any evidence that we

hadn't gotten to.

Q    Exactly.  Thank you.  Now the reference here, the likely

result of the trial, what did you interpret that to mean when

he wrote it to you, "the likely result of the trial"?

A    I'm assuming that he's referring to the fact that a

likely result could be guilty and/or a death penalty verdict.

Q    Well, to be in a position of having 2255 counsel, you're

discussing the penalty phase here, correct?

A    I'm not discussing anything here.

Q    He's discussing the penalty phase, right?

A    That's correct.  I want that to be clear.

Q    It's a letter sent to you.  It's a letter sent to you about Dr. Randall's -- This is in response to Dr. Randall's fax.  Dr. Randall is the mitigation consultant, correct?

A    It's partially in response to that, yes.

Q    Okay.  And the topic of this letter is about mitigation, not anything else, correct?

A    The whole letter I haven't read.  I'm going to assume that at least in part that's true.

Q    Okay.  The likely result ---

A    In other words, he's not here to do guilt phase investigation.

Q    The context of the letter then, the likely result of the trial, is he's referring to his belief that the likely result of the trial is going to be death?

A    That's what he's referring to.

Q    Did you and he ever have a discussion about that?

A    No.

Q    The next paragraph here, does this refresh your recollection any as to the role of Andy Rackers?  Because Mr. Simon says, "I see no way that Dr. Randall, Andy Rackers and we can do our work between now and February 9."

A    Not really.

Q    Okay.

A    I mean I -- I don't remember him doing mitigation work. If he was, ---

Q    Would it be fair to say, though, --

MR. MORENO:  Can you let him finish.

THE COURT:  Yeah, you're right, yeah.

MR. HOLTSHOUSER:  I'm sorry.

A    If he was, if he had done anything at John Simon's request, Mr. Simon or Mr. Rackers would be more able to address that.  I just don't remember using him for mitigation.

Q    Whether he did -- Whether he was or was not used and what you recall, at least in this letter Mr. Simon is viewing Andy Rackers as a potential soldier available on the team, correct?

A    Correct.

Q    In addition to Dr. Randall, you, Ms. Caspari and anything you might ask the Court for in addition, correct?

A    Well, he doesn't mention any of those things there.

Q    Okay.

A    He says he doesn't see how we can do it.

Q    Between the time that the continuance was denied, did you ask the Court for any more investigators because of the number of witnesses that needed to be talked to?

A    No.

Q    And I direct your attention to the close here.  Mr. Simon thanks you for the opportunity of working with you in this exciting matter, and he wants to know which witnesses he'll be doing and which motions he should be prepared to argue, correct?

A    That's what he says.

Q    Now between January 16 of '98 and the time that the trial was concluded, would it surprise you that Dr. Randall put in his CJA application for 423 hours of work?

A    No.

Q    And you -- That doesn't surprise you based on the way you saw him work.

A    Yes.

Q    What do you think his average hours per day were that he put into this case?

A    Average dollars per day?

Q    Hours, not dollars.

A    I couldn't comment on that.  He seemed to -- He worked very hard.

Q    Night and day?

A    Very hard.  What?

Q    Night and day?

A    He worked -- We were all working long hours.

Q    Every weekend?

A    I believe so, but I don't -- I'm not looking at his

records.  I don't want to try to pin him down as to what my memory is from 14 years ago, but I know that I was working around the clock, and I would also often meet with him after he had a full day in the field.

Q   On this same day, January 20th of '98, Mister -- Dr. Randall faxes you and says a reminder that he wants a general court order to get contact visits with Billie Allen when the need arises, and "I'll be seeing him again sometime over the weekend;" the weekend, I guess, following the 20th of January.  "I'm meeting with Juanita Petty, et al., on Saturday and Sunday, and I have a call to Dr. Cuneo so that I can coordinate my efforts with him;" correct?

A   That's right.

Q   Now coordinating his efforts with Dr. Cuneo, that's strictly with respect to mitigation, isn't it?

A   Yes.

Q   On January the 23rd, it looks like, you asked for 30 subpoenas to be issued by the Court, correct?

A   Yes.

Q   And then on the same day Dr. Randall indicated to you that he'd be coming -- actually it's to Simon rather; I'm sorry; indicated to Simon that he would be traveling to St. Louis on Tuesday and is going to be interviewing as many folks as possible, and he wants to meet with Mr. Simon while he's here, correct?

A    That's what it says.

Q    And that was Exhibit 346?

A    Yes.

Q    Exhibit 347, this is a letter that you had sent to Dr. Randall on January 23rd which I -- basically retaining him.

A    What was the date on that?

Q    January 23rd.

A    Okay.

Q    Basically retaining him.  This is signed for you by RSO.

A    Right.

Q    She has the authority to do that, right?

A    Sure.

Q    Okay.  You're making a request to him about keeping his notes and keeping track of things and that he is covered by the attorney/client privilege, correct?

A    That's -- That was my interpretation of the law.

Q    And that there's a maximum of 150 hours that have been authorized without further authorization of the Court.

A    That's what I say in the letter.

Q    Okay.  Why was there no similar letter with Dr. Haney?

A    I can't answer that question.  It was a failure on my part.

Q    To your knowledge, there was none, though.  Is that correct?

A     That's correct.

Q     There was never any documentation to the fact that anything he did was covered by the attorney/client privilege?

A     I don't recall that, but he's an attorney.

Q     But you were hiring him as a mitigation consultant, correct?

A     Correct.

Q     Not to represent Mr. Allen as an attorney.

A     That's correct, but he understands work product.

Q     Okay.  However, though, you had no communication with him that he would be covered by attorney/client privilege.

      Let me ask you this:  Is the fact that you do not have any documentation that he would be covered by the attorney/client privilege an indication that you weren't actually anticipating him speaking with Mr. Allen?

A     No.

Q     Ms. Caspari was supplying Mr. Randall with documents as well in this time, between the time he came into the case and leading up to the Motion for Continuance on January 30th, correct?

A     Correct.  Just -- Just please remind me:  What is the date of the motion that we filed for continuance?  The 23rd?

Q     January 30th.

A     The 30th.

Q     That's the date of the hearing.

A    All right.  What's the date of the motion?

Q    The 29th.

A    Okay.

Q    The day before.

A    All right.

Q    So Ms. Caspari is sending materials to Dr. Randall, correct?

A    That's correct.

Q    Part of her role as being a member of the team?

A    That's right.

Q    Within this same time period, Exhibit 356, is this an example of Dr. Randall writing to one of Billie's former teachers?

A    Yeah.  I think that's sort of a draft idea of a letter. I don't know if he sent it to him, but ---

Q    It's actually a form letter to be sent to all of his former teachers, correct?

A    Right.

Q    In Exhibit 358, do you recognize this, "Billie Allen Contact List"?

A    Excuse me.  Do I recognize the heading?

Q    Yes.  Well, do you recognize the list which has an update date of January 30th of '98, the same day as the --

A    Okay.

Q    -- Motion for Continuance?

A    Okay.  Is that the -- Is that the entire page?  Entire document?

Q    No.  I'm going to go through more, but I'm saying:  Does the cover of it look familiar to you?  Does it look like a list you've seen before from the ---

A    No, I don't think this is part of my records, no.

Q    All right.  As of the January 30, '98, date, though, we've got contact information here for Allen, you and Connie, John Simon, Dan Cuneo, psychologist, who's also apparently included on this list, and Andy Rackers, investigator, correct?

A    Yes.

Q    So does this first page here kind of describe some of the members of the team?

A    It does.

Q    And it looks like Dan Cuneo is on the team?

A    He's listed in the contact information.

Q    As well as Andy Rackers?

A    Yes.

Q    You've got contact information for Judge Webber and then there's a section of family members, correct?

A    Yes.

Q    More family on Page 3, including Corey Roy, Jerome Petty.

A    Oops.  You went through a little --

Q    I'm sorry?

A    They look to be all family members.

Q    Okay.  Next one is family, friends, Deborah Ruffin, Darney Taylor, Vernon Young, Tyrone Jones, Darren Lee.

A    Okay.

Q    Then there's a category that starts "Friends," correct?

A    Yes.

Q    Sam Moore, Johnnie Grant.  Under the topic of Johnnie Grant, friend, via Sam Moore's softball team.  His mother knows Billie's mother.  It gives an address for her, correct?

A    (Affirmative gesture).

Q    Jay (?); Ahmed Oliver, also in the friend category, along with Prentiss Church, correct?

A    Yes.

Q    There's a whole section on girl friends, and there's a section "Other Contacts," one of whom is Byron Woodard, correct?

A    Right.

Q    And then as to schools, it looks like Carol Bishop, she actually was the first probation officer.  Schools, there's a list of the names of the schools, the address, the phone numbers, along with names of people who ultimately end up being teachers that you presented at trial, correct?

A    Correct.

Q    "Jobs," there's a category of jobs.  And then "Officers"

is the jail officers at Franklin County Jail, correct?

A    Yes.

Q    So in whatever -- This list existed somewhere as of January 30 of '98, correct?

A    I'm sorry.  Say that again now.

Q    This list existed as of January 30, '98.

A    It's not my list, but it's dated that date.

Q    Do you know whose list it was?

A    I believe it's Dr. Randall's.

Q    As of January 30, '98, this is the list that Dr. Randall had been able to put together?

A    Yeah.  I would think that it's either Dr. Randall's or John Simon's, but I don't think I had a list of me as a contact.

Q    Okay.  Would you agree, though, that as of January 30, 1998, a fairly detailed list of potential witnesses with relevant information had existed in Dr. Randall's hands, correct?

A    You know, it's a list that's -- that has a number of people that are listed on it.  So it's a fairly significant number.

Q    Almost all of these people on this list were known to you well before Dr. Randall came into the case, weren't they?

A    I can't say about the guards.  I can say about the family members.  I -- As a -- I would say generally most of them are.

THE COURT:  I notice that you're looking at the clock.  Here's what I'm intending to do.  I told you we'd be quitting at 3:30 and you all may have made other plans.  With your permission and with your acquiescence, I'm going to --  This is a meeting that I can avoid, and I would -- I'm going to be available to continue, if that's what you all want to do.  And if it isn't, just tell me because I told you I had a different plan this morning.  If you want to take a few minutes and talk about it, ---

MR. HOLTSHOUSER:  We're fine with it, Judge.  If they want a chance to talk about it.

MR. MORENO:  No.  We're good.

THE COURT:  We'll go ahead?

MR. MORENO:  Yeah.

THE COURT:  All right.

MS. CARLYLE:  Could we close the curtain, though?

THE COURT:  Oh, yeah.  Yeah, I'll do that.  Just a second.

Q   (By Mr. Holtshouser)  Mr. Sindel, I'm going to try to quickly show you a series of documents that all have occurred between February the 6th of '98, the start of the trial, and March the 3rd of '98, the approximate date that the mitigation began.

A    Okay.

Q    First of all, there's communication occurring with

Dr. Gelbort by that time, correct?  That he can test Billy as early as Saturday?

A    That's what it says.

Q    And he's a neuropsychologist, correct?

A    He was.

Q    368, ---

THE COURT:  Just a second, I got behind.  What was the first one?

MR. HOLTSHOUSER:  367.  These are actually going to be in numerical order.

THE COURT:  Okay.

MR. HOLTSHOUSER:  367 is the first one.  368 is the next one.

Q    (By Mr. Holtshouser)  And this is a communication from Dr. Randall containing a declaration to support a request for additional experts.  Is that correct?

A    It appears to be, yes.  I didn't read the declaration, but ---

Q    This is being sent to -- This is being sent to Mr. Simon, --

A    Okay.

Q    -- correct?

A    Well, you know, these are things that I don't think were in my file, but ---

Q    You certainly knew, though, who Dr. Gelbort was.

A    I knew about Dr. Gelbort, yeah.  I saw that.

Q    You were being apprised of those things, correct?

A    Yeah.  I think that Dr. Randall may have been apprising John Simon of certain things in reference to the mitigation stuff, but I don't believe I had these in my file.

Q    This is to you, Exhibit 369, same date, February 6th of '98 which is the Friday before trial about a proposed meeting on mitigation.  He's suggesting the following Thursday evening after court, and it's going to be a meeting apparently with you, Dr. Randall, John Simon, Dr. Cuneo and Dr. Gelbort if he's on board, correct?

A    Correct.

Q    So was this -- Did this meeting occur, if you recall?

A    I don't remember.

Q    Did meetings like it occur?

A    Yes.

Q    And what would be the purpose for meeting with -- as a group like that with the -- each of the individual experts?

A    Well, I think at any time when there's going to be a sense of interlocking information, you want to have an idea concerning what the experts are going to be looking for.  You want to give them an idea maybe what our concerns are and how they may fit into the puzzle and that, I think, a group meeting on those things is the best way to handle it.  That's the way I believe.

Q    All right.  372 is the next one.

THE COURT:  You're skipping 70, 71?

MR. HOLTSHOUSER:  Yes, sir.

THE COURT:  Okay.

MR. HOLTSHOUSER:  For the time being.

Q    (By Mr. Holtshouser)  We're on 372.  Do you recognize these notes?  And maybe if I put this up at the top.  I'll blow it up who it's from.

A    That's my -- That's my phone number.

Q    Do you see a date here of 2-8-98, Billie Allen?

A    I do.

Q    Does it refresh your recollection that these are the notes of Dr. Gelbort's examination of Mr. Allen?

A    They appear to be a physician's notes because of the abbreviations that are used.  I do not have a specific memory of looking at them, although I presented him as a witness, so I would have looked at them.

Q    And I'm skipping 373, 374.  I'm going to now go to 375.  This is on February the 13th.  Is the handwriting that's down here, do you recognize that?

A    I believe that's David's; Dr. Randall's.

Q    And this is to Mike Gelbort.  That's Dr. Gelbort, the neuropsychologist.  Says, "Mike, here's some additional information that will be helpful."  And it's regarding FBI prosecutions, attempt to undercut the PTSD diagnosis,

et cetera.  And, "I'll be in Evanston tonight, returning to St. Louis; want to get together this weekend to discuss the case.  If so, let me know a day or time as soon as possible."  And then it says, "PS:  Here's additional -- Have additional medical records from St. Louis Children's Hospital."

Mister -- Dr. Randall is communicating with Dr. Gelbort while you're in trial, correct?

A    It appears that that's correct.

Q    Let me show you Exhibit 3 -- here it is down in the corner -- Exhibit 376, some kind of a sideways fax.  This is to -- on February the 14th of '98 to you from Dr. Randall.  It says, "Gelbort, Cuneo and myself need a copy of the police record from Marquis' murder.  Gelbort needs a Letter of Engagement, some reassurance that he's going to be paid."  He wants to know how things went in court on Friday.  Dr. Randall is out in the field actively working on this case, is he not, while you're in trial?

A    Yes.

Q    And Gelbort and Cuneo and Dr. Randall appear to be working in tandem on the case, correct?

A    He's certainly conveying information that he wants and they want as well.

MR. HOLTSHOUSER:  Do we need a ---

MR. MORENO:  Your Honor?

THE COURT:  Yes.

MR. MORENO:  Mr. Allen needs to take some medication. They thought he was going to be done at 3:00.  They were going to give it to him then.

THE COURT:  Oh, yeah, sure.  Yeah, we can take a break.

MR. MORENO:  Can we take a short break?

THE COURT:  Yeah, we'll be in break, sure; 15 minutes, absolutely.  Yeah.

MR. MORENO:  Thank you, Your Honor.

THE COURT:  Anytime anybody needs a break, just let me know.

MR. MORENO:  I appreciate it.

THE COURT:  Yeah.

(Court recessed from 3:35 PM until 3:45 PM.)

THE COURT:  Okay.  Let's go.

Q    (By Mr. Holtshouser)  I'm showing you, Mr. Sindel, Exhibit 381.  This is a fax from Dr. Randall to you on February the 20th of '98 where he's actually sending to you two things; his schedule for witness prep sessions on Saturday and he's also providing you with some suggestions about closing argument, correct?

A    Yes.  That's what he says in that letter.

Q    Exhibit 382, this is a fax to you regarding the raw data from Dr. Gelbort concerning his examination of Mr. Allen.  I'm going to page through this.  There was data that was sent to

you that was supposed to be passed on and disclosed to the Government's expert, correct?

A    I don't remember the context of this letter.  I don't necessarily even remember the letter, so -- but I mean I read the letter today.

Q    Do you recall -- Do you recall an issue regarding discovery, having to produce to the Government Mister -- Dr. Gelbort's raw data?

A    I remember that there were a number of issues that were developing because of the time consequences as to, you know, different evaluations, examinations of Billie, the Chinese wall, all the other things.  So if there were motions or proceedings in court concerning those, then I have no reason to doubt that they occurred, and at least here that the Doctor did not want to disclose those records unless it was to another psychiatrist.

Q    Okay.  Now showing you an exhibit here of 383, this is an "Allen Weekend Interview Schedule" being provided to you in terms of the witnesses that you were going to meet with and interview to prepare for mitigation.

A    That's correct.

Q    And your being able to do so on Saturday, the 21st, and Sunday, the 22nd?

A    That's correct.

Q    Next I want to show you 442 and ---

THE COURT: 442?

MR. HOLTSHOUSER: 442.

Q   (By Mr. Holtshouser)  This might answer your -- your question about the role of Andy Rackers that we've had come up a couple of times.  Is this a memorandum of an interview done by Mr. Rackers on February 14th of '98 with Eric Taylor?

A   Okay.  It is.

Q   And Eric Taylor was a mitigation witness, was he not?

A   He was.

Q   He was, also, someone that the FBI interviewed, and you had background information about him as well.

A   Yes.

Q   449, is this an interview that Mr. Rackers did on February 14th of '98 of Luveetra Taylor?  Was she also a mitigation witness?

A   She was.

Q   Were Eric Taylor and Luveetra Taylor significant mitigation witnesses because Eric was the brother, Luveetra was the mother of Marquis Taylor?

A   I think they were.

Q   Okay.  And that was someone who you understood from the information that had been developed during the case, that was a significant event, his death, Marquis Taylor's event was a significant -- Marquis Taylor's death was a significant event in Mr. Allen's life?

A    That's how we portrayed it in the penalty phase, yes. And that's all I understood it.

Q    Okay.  You portrayed it in the penalty phase that way and, in fact, that's the way Mr. Allen had always consistently presented it to you.

A    That's correct.

Q    As if the divining -- dividing incident in his life from his perspective was the death of Marquis Taylor?

A    That was one of the things he had presented to us.

Q    Okay.  Did other witnesses actually corroborate that as well?

A    It seems that -- It seems to me that I believe that was actually true the way that Mr. Allen told it.  Now I don't remember the police report on the incident which might have reflected whether Mr. Allen was present.

Q    Well, I'm actually -- The police report -- Not the police work so much as the third-party witnesses you contacted, neighbors, family members, et cetera, all recall that this incident was a changing point for Mr. Allen's life.

A    Oh.  I thought you were talking about whether he was actually present for the shooting.

Q    The corroboration as to the effect of his death on Mr. Allen, that was corroborated by witnesses you talked to.

A    That's essentially true.

Q    All right.  And are you aware of any instance in which a

witness contradicted that?  Says, "Well, no; actually he was kind of messed up before that happened; there really was no change in him afterwards."

A    There were people, I think, that said that he was sort of messed up before that happened.  But I think there was consistent evidence that we had discovered that that circumstance certainly had a profound effect on Mr. Allen.

Q    And all the witnesses that you identified and talked with as well as the other members of the investigative team corroborated that that was when the change occurred.

A    I'm not going to say when the change occurred.  I said it the way I think it's more accurate which is everyone corroborated that that had a profound effect on him.

Q    Okay.  Now Exhibit 48, by February 18th of 1998, Dr. Randall had exceeded ---

        THE COURT:  Excuse me.  I'm sorry to interrupt.  What number?

        MR. HOLTSHOUSER:  48.

        THE COURT:  48, okay.  Go ahead.

Q    (By Mr. Holtshouser)  Dr. Randall had exceeded the budget and needed Court approval to make additional payments to him as a mitigation expert, correct?

A    That's correct.

        MR. HOLTSHOUSER:  Just one second, Judge.

        (Pause)

Q    (By Mr. Holtshouser)  You were shown this previously by Mr. Moreno.  This is his February 16, 1998, report by Dr. Cuneo, correct?

A    Yes.

        MS. CARLYLE:  What exhibit number?

        MR. HOLTSHOUSER:  That is 565.

Q    (By Mr. Holtshouser)  Do you remember being asked a number of questions about this by Mr. Moreno?

A    I do.

Q    Okay.  And the -- This was the only report that Dr. Cuneo ever prepared, correct?

A    I don't know that.

Q    It references that he did an evaluation on January 16, 1998.

A    Was the date on this February 16th?  Did I see that?

Q    Yeah.  This is February 16th the report's prepared.  The evaluation is ---

A    I understand.

Q    Okay.  And he says this was for the purpose of establishing an opinion as to competency to stand trial.  I think you've already testified a number of times or we've established today that Dr. Cuneo's role on the team at this point by the time he did that examination was as a mitigation investigator, as a mitigation psychologist, correct?

A    I believe that the roles were subsumed.  So he could have

both roles.

Q    He could have --

A    Yes.

Q    -- and he did have as of January 16, '98, correct?

A    Well, he certainly doesn't seem to be saying that in that letter.

Q    He doesn't.

A    Right.

Q    But my point is is that as to the characterization of his role as of the time he did the examination or February 16th, as of the time he wrote his report, that wasn't his role anymore, was it?

A    Well, I believe that somewhere in there and through the maze of exhibits I've looked at, there's some references to contacts with Dr. Randall and stuff.  So I think that there would have been -- A dual function would have been part of Dr. Cuneo's information.

Q    All right.  Let's just refresh your recollection of what we've gone through today.  All right?

        The problem with Dr. Haney arose in the letter of January 13th.  That's when you indicate.

A    Right.

Q    January 9th, if you recall, is when you asked the Court for an order so that Dr. Cuneo could have a contact visit with Mr. Allen on January 16th.

A    Okay.

Q    Okay?  Then you had a conversation in court on February the 6th, talking about Dr. Cuneo wherein that was with the Court, Mr. Landolt, Mr. Dowd.  Do you recall that?  We went through that transcript.

A    About Dr. Cuneo's report?

Q    Yes -- No; about the fact that you had had a conversation with Mr. Landolt, apprising him that Dr. Cuneo has diagnosed Mr. Allen with PTSD.  And Mr. Landolt, the purpose for that hearing, was because the Government was seeking an independent psychiatric examination for mitigation.

A    Okay.

Q    That's February the 6th of '98, --

A    Okay.

Q    -- correct?

        And you've already had that communication with Mr. Landolt.  You've already somehow been apprised by Dr. Cuneo that he diagnoses him with PTSD before this report is even prepared, correct?

A    Correct.

Q    And so when he prepares his report and characterizes his findings nearly ten days after you've had this discussion in court pertaining to mitigation and Dr. Cuneo being a likely mitigation witness, he writes this report stating that it deals primarily with his competency to stand trial, correct?

A    He writes a report that details his findings concerning the competency to stand trial, but he also in his report discusses the fact that he's made a determination, I think an Axis 1 determination of PTSD.

Q    He actually went through and does a complete diagnosis, doesn't he?

A    I'm sorry.  Say that again.

Q    He did a complete diagnosis.

A    Yeah, I think so.  I would characterize it in that -- to that extent, yes.

Q    And you provided this report to the Government when ordered to do so by the Court as discovery of what Dr. Cuneo's testimony was going to be in the mitigation phase as a mitigation witness.

A    Well, I think he did discover -- he did testify concerning PTSD.

Q    And my question was:  You provided this report to the Government as discovery of that opinion, what his opinions were going to be at the mitigation phase.

A    I don't know if I did or not, but if you said I did, I take your word for it.

Q    Okay.  And the ---

A    I mean -- Go ahead.

Q    See down here the Y-331?  If I told you that was Dr. Yutzy's Bates number placed on there, ---

A    No.  I'm not suggesting that it didn't happen.  I just don't have any independent recollection of turning this over. If I had an obligation to turn it over, I would turn it over. And I, obviously, did turn it over based upon the Yutzy numerals.

Q    And this -- this report, the date of this report also is subsequent to the joint meetings that had been held between Dr. Randall, Dr. Gelbort and Dr. Cuneo regarding mitigation.

A    Correct.

Q    So that Dr. Cuneo knew when he wrote this report that he was going to be a mitigation witness and was on the mitigation team, --

A    I think so.

Q    -- correct?

MR. MORENO:  Objection, Your Honor; speculation as to what Dr. Cuneo knew.

THE COURT:  Yeah, sustained.

Q    (By Mr. Holtshouser)  Based on your communication with him, was he aware that that was his role at that point in time, at the time he wrote this ---

MR. MORENO:  Same objection.

THE COURT:  Well, no; wait.  Is this after -- After the meeting, did they communicate?  So that's different.  As I understand the question is if it was after the meeting, did the two of them communicate and then did he have an

understanding.  Am I correct?

MR. HOLTSHOUSER:  I premised it with based on his communications --

THE COURT:  Right.

MR. HOLTSHOUSER:  -- with Dr. Cuneo.

THE COURT:  Right.  Okay, overruled.

A    I -- I don't remember specifically communicating, but I believe we subpoenaed him and all the other stuff for the mitigation phase.

Q    (By Mr. Holtshouser)  I'm going to go back to 376, the fax that Dr. Randall sent to you on February 14, 1998, two days before Dr. Cuneo prepares this report we were just looking at.  And he's referring to conversations between Mr. Gelbort, Dr. Cuneo and himself, and the fact that they need a copy of the police report of Marquis' murder.  That's strictly with respect to mitigation, isn't it?

A    That's correct.

Q    Let me show you 378.  Do you recognize those -- the handwriting there?

A    It looks most like John's, I believe.

Q    Phone calls to Dr. Cuneo, 2-14-98.

A    That's what -- Yeah, but I can't say for sure.

Q    PTSD?

A    Yeah.  I see all that.

Q    "Mike," Mike Gelbort?

A    Say that again.

Q    Is Dr. Gelbort the only "Mike" involved in the case that you're aware of?

A    No, that doesn't say "Mike."  It says "make."

Q    It says who?

A    "Make," M-A-K-E.

Q    Make, okay.

A    Something about when do I get Dr. Wetzel's report or Yutzy's.  Isn't that ---

Q    Yes, Yutzy.

A    That's what it looks like to me.

Q    The date of this, February 14 of 1998, again, referencing a phone call to Dr. Cuneo two days before he writes that report saying his report's going to deal primarily with competency.

A    Say that last part again.

Q    Two days before he writes a report saying his -- premising his report is going to deal primarily with competency to stand trial.

A    That's what it says in that report.

Q    The trial's already underway.

A    Yes.

Q    Okay.  This is February 14th.  He writes the report February 16th, correct?

A    Yes, that's correct.

Q    Okay.  At that point in time there's no longer any pending issue of competency.  Dr. Cuneo's role in this case is clearly that of a mitigation psychologist expert, correct?

A    I don't know what he understood his role to be, but I understood his role to be that he was going to appear in mitigation.

Q    Okay.

MR. HOLTSHOUSER:  Just a second, Judge.

(Pause)

Q    (By Mr. Holtshouser)  Okay.  The report that we were just looking at, 565, this reflects an interview of Mr. Allen of January 16 of '98, correct?

A    Yes.

Q    And was there, in fact -- I'm sorry.  It talks about a mental status exam.  And when we page through here, he actually does a complete diagnosis, does he not, on Page 5, referring to post-traumatic stress disorder, borderline intellectual functioning, history of head trauma?

A    He has three axises that were available on the DSM at that time.

Q    Do you recall that ---

A    He does note in the report that this report deals primarily with Mr. Allen's competency to stand trial, but he's not finished his assessment.

Q    Do you also see here that, "I conferred with Dr. Michael

Gelbort, the neuropsychologist who had evaluated Mr. Allen, but I have not yet received his report"?  And I'm right here.

A    Right.

Q    "Two weeks ago I was also asked to look at the possible mitigation factors as I may be called upon to testify in the penalty phase," correct?

A    Correct.

Q    He'd actually been asked that, had he not, by you and discussed with him by you in September of '97 when you first sent him the police record?

MR. MORENO:  I'm going to object.  There's no evidence of that, and the letter reflects that he was asked two weeks ago from February 16th, not September of 1997.

MR. HOLTSHOUSER:  I know what the letter says.  I'm asking him what the fact was.

Q    (By Mr. Holtshouser)  This is not your letter -- This is not your report, is it, Mr. Sindel?

A    This report?

Q    Yes.

A    No.

Q    Dr. Cuneo's.  And I'm asking you, based upon your recollection and conversations with him, whether or not you had expressed to him that he would be playing a mitigation role in this case well before this time period?

A    I know we sent him the police report in September of

1997. I -- I do not have any specific recollection of what the contents of our conversations were. I know there were some. I just don't feel comfortable saying something was said or wasn't said.

Q    There was a series of memoranda, were there not, that were supplied to Dr. Cuneo and to Dr. Gelbort by Dr. Randall?

A    There were.

Q    And because they had been supplied to them, and I believe they were referenced -- It says here, for example, I reviewed the police reports and the statements that you forwarded to me. Those statements that you're referring to, those are statements taken in connection with the mitigation investigation, were they not?

A    I don't know that I can answer that question.

Q    Were there any statements taken in connection with competency to stand trial?

A    No.

Q    In addition, Dr. Randall's memorandum of interview and what had been received from the FBI was sent to Dr. Cuneo and Dr. Gelbort for their review, were they not?

A    I'm sorry. Say that again one more time.

Q    The memorandum of interview that Dr. Randall put together, remember him typing up the ---

A    Yes; yes.

Q    Those all got sent to your mitigation experts, Dr. Cuneo

and Dr. Gelbort, for their review which is why you had to turn them over to the Government.  Do you recall that?

A    I think that's correct.

Q    Let me show you Exhibit 51.  This is dated February 24, a motion by the Government that the Government has received the report of Clinical Psychologist Daniel Cuneo, and the first paragraph sets forth in detail the information and the records which were provided and which he utilized in his diagnosis. In the second paragraph, "I confer with Randall who is working as a mitigation expert in the case as to the information that he had received."  And it goes on to state at the end of the first paragraph on Page 2, he says, "The interviews of Mr. Allen's teachers, friends and family were given to me by Dr. Randall.  All spoke of Mr. Allen's demeanor.  Upon information and belief, Dr. Randall had interviewed numerous individuals and collected information concerning his background."

        That -- Those memoranda of interview, those were the mitigation interviews that Dr. Randall did, weren't they?

A    That's what's referred to in this document, yes.

Q    And those were given to Dr. Cuneo as referred to in his report.

A    Can you give me one second and go back to the first page?

Q    The first page of that?

A    No, no.  The first page of your -- of the motion you

filed. Oops. That's what it says in this pleading that detailed the information in the records. I just ---

Q    Let me go back to the report then.

A    I don't see any reference in detail to those letters of -- memoranda of interviews in this.

Q    Do you see the last sentence of that first full paragraph which is what I had quoted in my motion?

A    Okay.

Q    The interviews of his teachers, friends and family?

A    I see that.

Q    Okay. Those had to be then turned over to the Government because they had been given to Dr. Cuneo, correct? Do you recall that?

A    That's correct.

Q    And do you recall those being a voluminous stack of memoranda of interview?

A    No.

Q    Okay. Do you recall you yourself received those memoranda of interview --

A    I would have.

Q    -- from Dr. Randall, correct?

A    I would have.

Q    Based on the motion, the Court ordered you to produce those to the Government, correct, on February 20?

A    The Judge said?

Q    "Turn them over."

A    What?

Q    The Judge said, "Turn them over."

A    He said, "Turn them over."

         MS. CARLYLE:  Is that an exhibit?

         MR. HOLTSHOUSER:  That's Exhibit 52.

Q    (By Mr. Holtshouser)  I'm going to show you Exhibit 69. This is your CJA submission for your hours between December of '97 and June of '98.  This is the major one for most of the work you did in the case.  And you see the date period right there?

A    Yes.

Q    Okay.  In December of '97 and into January of '98 were you having regular telephone conferences with Mr. Allen?

A    I was.

Q    In any of those conferences with Mr. Allen, did Mr. Allen and you discuss meetings he was then concurrently having, in many cases day-long meetings, with Mr. Simon?

         MR. MORENO:  Objection.  I don't think there's any evidence of day-long meetings with Mr. Simon; certainly not in that time period.

         MR. HOLTSHOUSER:  Well, there will ---

         MR. MORENO:  There's no reference to it in the testimony.

         THE COURT:  Okay.  The question is:  Do you know?

A    Steve, I couldn't -- I could not remember --

Q    (By Mr. Holtshouser)  Okay.

A    -- what we discussed in these phone calls.  I really just couldn't.

Q    Let me ask you this hypothetical:  If the evidence shows ---

A    Mr. Holtshouser.  I shouldn't call you "Steve."  I apologize.

Q    That's okay.  During the evidence, if the evidence were to disclose that during this time period, some days in December and some in January, Mr. Simon was meeting with Mr. Allen and recording his conversations and there are transcripts now of those, did -- would that have been something that you and Mr. Allen would have discussed?

A    I'm not sure about that.

Q    Okay.  This record at least, though, reflects not only telephone conversations but then, of course, consultations as well; this one for three hours on January 14th.

A    That's correct.

Q    More throughout January and February; more -- more consultations on this page, correct?

A    Correct.

Q    Directing your attention to the page -- I guess that's 5 of this exhibit, "Witness Interviews," --

A    Okay.

Q    -- at least one is specific as to "Interview witnesses for penalty phase," correct?

A    Correct.

Q    The other "Interview Witnesses" aren't specific, but there is another one on February 28th, "Interview witnesses for penalty phase," correct?

A    Correct.

Q    Okay.  You're also consulting with Connie Caspari --

A    Right.

Q    -- in January?  January 16th, mitigation specialist. There's a number of entries in here, would you -- would you agree, on this page that concern mitigation consultations?

A    There are.

Q    Now is there a difference between a consultation with Dr. Randall and one with a mitigation expert?

A    I wouldn't think so, no.

Q    Could there also -- Could that have also referred to Dr. Cuneo, the psychologist?

A    It could.

Q    On this one on February the 3rd, it's a conference with neuropsychologist?

A    Correct.

Q    That's Dr. Gelbort, correct?

A    I would assume so, yes.

Q    Some of the consultations that you have are with both

Connie Caspari and co-counsel. That would be you, Simon and Caspari together.

A    Right.

Q    March 2 is "Consultation with psychologist." That would be both Mister -- Dr. Cuneo and Dr. Gelbort together, correct?

A    It would be.

Q    On the next page, directing your attention to January 10, 1998, this is, of course, three days before you receive the letter from Dr. Haney, correct?

A    Correct.

Q    And you spent five hours reviewing discovery materials, prepare mitigation materials, according to your record.

A    Yes.

Q    Okay. January 13th, hour-and-a-half reviewing Boy Scout records.

A    No. I actually think a half hour.

Q    Oh, a half hour; I apologize.

A    Those Boy Scouts, they just go on, don't they?

Q    These consultations, would those have been conversations about strategy as well as specific evidence?

A    They would have been. And I would -- I would -- Those went on a lot all during the day.

Q    Strategy conversations.

A    We would -- She would be coming in to see me. I might be going in to see her. I don't write down every time I have a

ten-minute conversation.  I wished today I had.

Q    We actually thank you that you didn't.  Next page is Page 9.  There's a lot of work being done for trial preparation here, correct?

A    That is right.

Q    And on February 23rd, ten hours, "Review materials and prepare for trial, trial penalty phase."

A    Correct.

Q    Again, on -- Another two-and-a-half hours on the same day, "Prepare for penalty phase."

A    Correct.

Q    Twelve-and-a-half-hour Saturday, correct?

A    Right.

Q    February 26th, same two hours; "Review for penalty phase; consult with expert."  There's more of these entries throughout the period of the rest of the trial, correct?

A    There would be.

Q    Directing your attention to Page 10 on January 17 of '98, there's research being done for three hours; "Notice of mental health defense specifically at penalty phase."

A    Correct.

Q    Directing your attention to the top one on Page 13, that's a telephone conference with counsel, co-counsel, re: mitigation on January the 7th of '98, correct?

A    Correct.

Q    Now that's before there's been a letter sent to Dr. Haney and that's before there's been a letter received from Dr. Haney, correct?

A    Right.

Q    You're also talking with Juanita Allen and co-counsel on a regular basis during -- during these days.  Is that true?

MR. MORENO:  I'm going to object to the regular basis during these days.  There's two entries here; one for Mr. Simon, one for Ms. Allen.

THE COURT:  Okay.  So the objection is to "regular," correct?

MR. MORENO:  Yes.

THE COURT:  Okay.  Well, ---

MR. MORENO:  The form of the question, I guess, because he's making a conclusionary statement about what these records show that is not supported by the records.

THE COURT:  Okay.  Sustained.

Q    (By Mr. Holtshouser)  There's a conference here on the 12th with Juanita Allen, correct?

A    Correct.

Q    There's also a conference on the 13th with co-counsel, correct?

A    Correct.

Q    The contact that's occurring between you and co-counsel, there's opportunity, wouldn't you agree, for you to talk to

Mr. Simon about what he's doing when you're having a conversation regarding mitigation, correct?

A    Yes.

Q    On the 27th of February there's an actual consultation with Mr. Allen's family?

A    Correct.

Q    There's a -- Page 17, this is just out of curiosity, but you're getting mileage and meals?  Is that correct?

A    It appears that I billed something for meals, but I don't know.  That wouldn't have been something from my meal that I can think of.

Q    Okay.

A    Mileage, though, I was allowed.

Q    Now in addition to Ms. Caspari, Mr. Rackers, Mr. Simon, yourself and eventually Dr. Randall, is there also a law clerk whose time that you're billing that you have at your disposal?

A    I'm sorry.  Say that again.

Q    Do you, also, have a law clerk whose time you're including in here for the charges on this document who is pick up -- picks up records, runs errands --

A    Oh, okay.

Q    -- and so forth for you?

A    Yes.  I didn't see the heading.  Yes.

Q    In other words, this is not a one-man operation, is it?

A    No.

Q    These people do things, and they get their direction from you for the most part, correct?

A    They do.

Q    Let me show you Exhibit 416.  Do you recognize this as an outline of a Direct Examination for Juanita Allen?

A    Yes.

Q    And is this the way you prepare Direct Examinations?

A    It is.

Q    Is it yours?

A    I'm pretty sure it is.

Q    Okay.  How about -- Is this your handwriting?

A    Yes.

Q    Okay.  The topics that you have noted here include a lot about Mr. Allen's childhood and his background.  For example, "What about Billie's paternal grandfather?  Conditions, talk about background and Billie's family, background with husband. Billie as a child:  Lead poisoning, asthma, sickly child, febrile seizures, blows to head, school situation (Clayton)." Those were all topics that you intended to discuss with her if she testified, correct?

A    Correct.

Q    And they were also then topics that you were aware of in the case.

A    Correct.

Q    Simmons, do you know what that -- recall what that's a

reference to?

A    It looks like it may be a teacher of some sort.  I can't say for sure.

Q    "Leaving Clayton was a shock to him."  That was something that had been consistently endorsed by Mr. Allen and Mrs. Allen, correct?

A    Correct.

Q    "Wanted to be around people but they were never around the neighborhood."  Is that also based upon information that had been imparted to you by both Mr. Allen and Mrs. Allen?

A    I'm not sure where that is.  I'm sorry.

Q    Right here.

A    Oh, okay.  Yeah.

Q    All right.  There wasn't -- You weren't intending to cover a topic that he really shied away from people and was withdrawn from people and huddled in his room?

A    I don't remember that as part of the penalty phase we presented.

Q    Or as far as -- Not only for the presentment but as far as the information you had at the time about Billie Allen.

A    That's correct.

Q    What happened at -- Maybe Simmons is a school, isn't it?

A    You know, I'm not sure if that was just a typo or something where I was referring to Sumner.  I don't know.

Q    Does it refresh your recollection that Mr. Allen actually

left Clayton in 8th Grade to briefly attend Simmons in the city but then was able to get back to Clayton, subsequently left again, and then couldn't return to Clayton?  Do you recall that at all?

A    Okay.  This may -- Is this part of the Juanita Allen?

Q    Well, ---

A    Oh, okay.  Well then, I understand it.

Q    Yes.

A    I thought "Simmons" was the witness name.

Q    No.

A    Okay.  I understand now.  I understand what this is.

Q    You're continuing on with --

A    Right, okay.

Q    -- your Direct of Juanita Allen.

A    Okay.

Q    So what I'm asking is is that:  Simmons -- The next line is, "Leaving Clayton was a shock to him."  In other words, there's a connection between Simmons and leaving Clayton.  "It was a junior high in St. Louis City --

A    I know what it is.

Q    -- where you went before you went to Sumner."

A    Right.  I know what it is.

Q    Okay.  Something about Sumner's policy about calling home when kids miss school.  You knew that truancy was an issue in Mr. Allen's life to cover with her, correct?

A    Yes.

Q    And then talk about dropping out of school and after dropping out of school, what he did and what she was doing, correct?

A    Correct.

Q    Okay.  So to have asked those questions, you must have had information as to what she was going to say in response to them, I trust, correct?

A    That's correct.

Q    "Talk a little about your family when you grow up, what you were taught about emotions and showing feelings."  You wouldn't have asked that question unless you knew something about what she was going to say, would you?

A    That wouldn't be my practice, no.

Q    So would it be fair to say that in order to know what she was going to say that you had discussed with her her family life, her upbringing and what it had been like?

A    Yes.

Q    It seems as though you've gone into some more detail; you're referencing here at this line:  "When something happens that is sad, that you act in a way that looks other than sad."  And you say:  "Tell us about that.  And it's also true in your family, and how did you raise your kids?"

         Now first of all, the first two questions seem to relate to -- the first three here -- "Tell us your family."

You're talking about her upbringing?

A   Correct.

Q   But then, "How did you raise your kids?"  You're talking about how she ran her family, correct?

A   Correct.

Q   And what did you expect her to say as to how she raised her kids?

A   Well, I think she was going to say because the next follow-up is that, "Raised them like I was raised.  We held it in and we didn't talk about it.  We didn't show our emotions."

Q   Okay.  Then it says, "How did you find out what happened?  How did you feel?"  Was there a specific instance that you thought you were going to question her about there?

A   I think in terms of this case, when she found out that Billie was arrested.

Q   This event, correct?

A   Yes.

Q   All right.  Can you read your note here?

A   "Would he do things for people in the neighborhood?"

Q   Would Billie do things for people in the neighborhood?

A   That's right.

Q   So that's a positive topic you were trying to bring out through her.

A   Yes.

Q   You then ask -- would have proceeded to ask her a series

of questions about Billie regarding street smarts, aggressive. You're trying to bring out, aren't you, that he's not aggressive, the kind of act that someone engaged in inside the bank would not be an act that he would engage in, correct?

A    Correct.

Q    "Where was Billie living in late '96 and early '97?"  It looks likes the follow-up to that is:  "How is that working?" What were you expecting her to say regarding where he was living in late '96, early '97?

        MR. MORENO:  Your Honor, I'll object.  It calls for a hearsay response.

        THE COURT:  Okay.  It does.  If -- If he's asking what were you expecting to extract from her, then that's permissible.  If it asks what you expected her to say, I guess -- I think it is.  Sustained.

        MR. HOLTSHOUSER:  I'm not sure I understand the difference, but I'll ask it.

Q    (By Mr. Holtshouser)  What were you expecting to get from her by that question?

A    Where he's living in late ---

Q    The question is:  "Where was Billy living in late '96, early '97?"

A    Right.  That's what I expected to get is an answer, --

Q    What, though?

A    -- the answer is "where."

Q    Okay.  What were you expecting her to say in response to that question?

A    The best I can recollect is not at home.

Q    Okay.  And then there's a reference to what happened.  I think -- Were you intending to elicit the shooting that occurred at the house in early January of '97?

A    Yes.

Q    "Freshman and sophomore year in high school, did you notice anything different about Billie?"  Was this a time period that, based upon what you knew at the time, was a turning point in Mr. Allen's life?

A    If that correlates to the Marquis death -- Taylor death at that part of his schooling, then that would be what I was referring to.

Q    Okay.

A    I think there was a combination, though.  I think that it's pretty clear that returning to the city schools was a really bad idea, and so that was pretty difficult for Billie as well.

Q    Moving down here, you were going to cover Dennis Noble, Billie's response to the death of the Dennis Noble; Marquis Taylor, Billie's response to the death of the Marquis Taylor; a notion that Billie was always trying to prove himself.  These were all topics you were intending to elicit from Mrs. Allen, correct?  Information and answers?

A    Yes.

Q    The bottom comments here -- The bottom questions, "trying to boost her spirits; good, kind-hearted person; put a protective mode around myself," are you trying -- were you intending to elicit from her how she felt now that this was going on?

A    Well, no.  It had to do with how Billie was reacting and responding to the stress that was on her and a little bit about how she was responding to that stress.

Q    To the trial.

A    Yes.  And -- Well, the entire situation since he had been arrested.

Q    All right.  "Trying to boost her spirits," who did you expect her to say was trying to boost her spirits?

A    I would anticipate that that information would have been about Billie.

Q    Okay.  What's the note down here, something "for neighbor"?

A    Do things for neighbors.  I kept --

Q    Again, ---

A    -- hammering that one.

Q    The period while he was gone, reported missing to police, you were intending to bring out the fact that she had filed a Missing Person Report?

A    I think so, yes.

Q    That was something you knew about, correct?

A    Yes.

Q    "Billie is a compulsive liar."  Were you expecting her to endorse this concept?

A    I don't know that.

Q    Why would it be in your Direct outline?

A    It would have been -- I would think that there were certainly circumstances in which he had deliberately misled his mother about what was going on.  That may have been what I was trying to elicit.  I mean it's in there, and I would have asked the question at least within that parameter, --

Q    Okay.

A    -- if I had decided it was appropriate to.  I mean these are -- these are outlines.  Oftentimes I use a phrase.  They're -- They're kind of memory things for me.

Q    To jog your memory of what you want to bring out.

A    Yes.  But I don't sit there and read them.  I do an entire examination oftentimes, and then I look over and say, "Did I miss something?"

Q    The notes that you have here, can you -- It says, "Visited jail; talk about level" -- What is this word right here?

A    This is talk -- This, again, is a question about:  How did you hear about this?

Q    Okay.

A    So I'm sort of repeating something that I've already done.

Q    "Changes in him since locked up," --

A    Right.

Q    -- were you expecting her to address that topic?

A    Yes.

Q    And then you're talking about the future, and you're laying the foundation for the notion that a sense of life imprisonment without parole, she would support him and maintain a relationship with him, correct?

A    Correct.

Q    This is part of trying to -- not to present direct execution and fact evidence but something that gives the jury the message, correct?

A    That's correct.

Q    "Can you tell the jury anything else about Billie?  Help them understand him as a person."

A    To help the jury.

Q    And then, "How do you feel about Billie," what did you expect her to say to that?

A    She loved him.  She cared about him.  She worried for him, that kind of stuff.

Q    This is April 13th of '98, Exhibit 394.  This is a letter from Dr. Randall to you, giving his accounting of time and expenses.  There's a paragraph in here justifying why he went

over his estimate, correct?

A    That's correct.

Q    And he says, "I, obviously, went well over the estimate of the time we thought it might take to prepare mitigation for the case."  So he's indicating that -- Well, let me ask you this:  What did you interpret that to mean?

A    Interpret what portion again?

Q    That he went -- There was an estimate about how much time they needed to prepare the case.

A    Right.

Q    And not only did he do that, but he went well over that, correct?

A    That's correct.

Q    And then he says, "Nevertheless, I did what I believed needed to be done in the time frame involved, and I did spend this much time on the case."  He's vouching for what he's reporting as his actual hours, correct?

A    Right.

Q    And he did what he believed needed to be done in the time frame involved.  He references his prior testimony during the hearing, and then he's recapping a little bit of what actually has occurred, correct?

A    Correct.

Q    "As I interviewed -- As I investigated leads, other leads came to light; needed to be pursued."  To your knowledge, did

he do that?

A    Yes.

Q    "In addition, it was quite a challenge keeping up with the FBI's own investigation and following up with interviews with new witnesses that they uncovered."  Do you know what he's referring to there?

A    Well, I believe there's some materials that were the discovery that we had been provided as the case was unfolding about interviews that the FBI had conducted.  I know that there were interviews of the Sumner teachers, for example.

Q    So in other words, at the same time you and your team were trying to investigate Mr. Allen's background, the FBI was doing the same thing pursuant to that firewall order that you had, correct?  Remember the firewall order that you got?

A    The Chinese wall?

Q    Yes.

A    Yeah.  Yes, I remember that.  And they were -- they were investigating the mitigation witnesses and were developing things in connection with that, yes.

Q    Okay.  In addition to the work you and your team were doing?

A    Yes.

Q    Okay.

A    But they weren't working in the same direction as we were.

Q   But it says, "I investigated leads; others came to light and needed to be pursued, and it was a challenge keeping up with the FBI's own investigation."  In other words, was he indicating to you and was it your understanding that in some cases the FBI was beating him to mitigation witnesses?

A   I think it's best to ask him that, you know.

Q   Okay.  "The hearing took longer than I anticipated.  In an attempt to prepare the mitigation adequately, given the time frame involved, I had to totally immerse myself in the case," correct?

A   That's what it says.

Q   He says, "All in all, this case turned out to be my most complicated mitigation case to date both in terms of the number of witnesses and the work that was required to muster them and prepare them for testifying," but he feels badly about the result.

Was the impression you got from Dr. Allen -- I'm sorry -- Dr. Randall that within the time frame that he came into the case, he gave it his hundred and ten percent effort?

A   He gave it considerable effort within the time frame that was allotted to him.

Q   In this letter is there any indication by him as to any matters, issues, facts, witnesses that there never was time to get to?

A   I don't think that that was the purpose of the letter,

but there's no reference to that.

Q    Did Dr. Randall ever communicate to you during the period of time he was working with you that there were red flags -- that he had seen red flags which indicated to him that Billie Allen was a victim of severe abuse?

A    Not that I know other than perhaps the Petty information. I don't remember him specifically pointing out to me things that he had discovered that indicated abuse.  He may have seen them.  It may have been something that he didn't bring to my attention.

Q    I'm not asking you to speculate about anything he may or may not have done but in terms of what he told you, what he brought to your attention.

A    I don't recall any specifics about a pattern of abuse that he told me about.

Q    Or anything that indicated to him it was a red flag that Mr. Allen was a victim?

A    I don't remember red flags.

Q    Okay.  All of the witnesses that you were aware of pointed to Marquis Taylor as being the source of any potential PTSD.  Is that a fair statement?

A    That's based on the witnesses, yes.

Q    Based on the witnesses you knew of, correct?

A    The ones that I knew of.

Q    We saw this Direct outline that you had for

Juanita Allen.  You ultimately chose not to present her, correct?

A    That's correct.

Q    And that was a strategic decision?

A    I didn't forget who she was.  I knew who she was.  I had to make a strategic decision about whether to call her or not.

Q    Was one of the reasons you did not call her that her personality suggested she was very aggressive?

A    That probably went into the calculus.

Q    And that you were afraid that on Cross she might be a, in your words, a loose canon?

A    That could be part of it.

Q    Did you have that view of her?

A    I was aware that she could be volatile.  You always try to assess the information that can be presented to the jury with, you know, what kind of negatives that may accompany that information.  So you have to make those choices.  I felt like there was a lot of people who had given testimony that Juanita would simply corroborate, and I'm sure I made choices about whether or not there would be a problem if she testified.

Q    In terms of the information that you had about her and her relationship with Mr. Allen, though, did you at least have documentary evidence which indicated that the relationship between the two and how Billie felt about her was a loving relationship?

A    That's pretty much what I had.

Q    I want to show you Exhibit 491.  This is one of those letters that you ended up with from Mr. Allen to his mother.

A    That's right.

Q    I want to direct your attention to, "I want you to realize this, too, because I know you're thinking:  How can he say -- How can he be chilling and cool?  I'm going to tell you why.  First, I thought about all the things I did wrong, messing up people's money, all the people I know that are dead now, and with the money, I look at it this way, the way I think God looks at me."

What I want to ask ---

MR. MORENO:  I'm going to object.  I'm not sure what the relevance is as to -- He already stated he got letters indicating Mr. Allen loved his mother.  Reading sections of it, I don't think, is relevant.

MR. HOLTSHOUSER:  I'm reading the section in order to lay the foundation for the questions so that Mr. Sindel is oriented to what I'm going to ask him.

THE COURT:  All right.  Overruled.

Q    (By Mr. Holtshouser)  This reference in here to "things I did wrong, messing up people's money," do you know what that was in reference to?

A    No.

Q    In the next section he completes that thought, referring

to his mother.  "You" -- and he underlines "you" -- "tried to keep me away from all that type of drama, but being in that neighborhood, he was" -- "he," I guess, referring to God -- "was testing me to see what path would I go, his way or the devil's way, and he knew I would go the devil's way."

With respect to the comment by him on his mother, "you tried to keep me away from all that type of drama," would that have -- would you have read that as an indication that Mrs. Allen was at least trying to keep Billie in a positive direction?

A    I would read that that's what Billie said.

Q    Let me show you Exhibit 493.  It's right here in the top section.  See here where he says, "I was reading this cartoon. It reminded me of you and I smiled.  I love you so much, and I know you feel the same."  Again, is that -- was that documentary corroboration to you of the relationship that Billie thought existed between him and his mother?

A    I mean that's what Billie put down on this piece of paper.  I don't know what his motivation was or whether he was being truthful or accurate about what he was saying.

Q    Page 2 of this same letter, there's a discussion about a baby.  And he says, "As I finish this letter, I'm mostly worried about how you feel.  My eyes hurt to think about what you're going through, your only son locked up at 19 and about to die.  Everything you tried to teach me, I went the other

way, but I don't look at it as your fault.  You did your part as a mother for me, and I love you for that.  I'm sitting here about to cry because I miss you and I know how you feel."

Again, another expression by him of how he felt about his mother in writing, correct?

A    Just give me a second.  Okay?

Q    Yeah.

A    I mean part of this has to do with "I don't look at it as if it was your fault."  And part of the process that I understood that we needed to be able to work with Billie and his mother on was it didn't -- it wasn't a fault concern.  It was a fact concern.  So when he refers to "it's not your fault," I don't know if he's talking about how she treated him or something different.

Q    Okay.  Is that something you understood at the time?

A    At the time I would not have read this as an indication that she had -- that he believed it was her fault or someone else's fault.  He may not know.  He may not be psychologically equipped to make those determinations.

Q    But you had the opportunity to ask him and to ask others and to talk to her, correct?

A    And I should have done that --

Q    You did talk to her, didn't you?

A    -- in more detail.  More in detail.

Q    And only if you had talked to her in more detail, it

would have all come out.  Is that correct?

A    There's no way for me to know that.

Q    Do you see down at the bottom in this section here, it says -- there's a reference to the day -- "that day when they shot at me in front of the house, and he was right by me." And, again, I think he's referring to God here.

A    Right.

Q    But are you at all aware of what he's referring to even now as the day that they shot at me in front of the house?

          MR. MORENO:  I'm going to object to relevance.

          THE COURT:  Overruled.  Overruled.  If you know.

A    I'm trying to think that there seemed to be some indication where he was pistol whipped or something and that may have included a shooting.

Q    (By Mr. Holtshouser)  Okay.  He continues on, "and trying to tell me to come into his hands, but I didn't listen or try to reach for him like I should have.  To me, you will still be the best mother in this world even though your son might be locked up.  Like I said, you did your part and I didn't do mine.  I'll always love you for being there for me when my so-called friends wasn't."  And he ends with, "Love you, Mom. Love, Bill."

          I'll show you the last letter, Exhibit 495.  This letter -- Most of this letter is about how he views his mother.  So I'm going to just ask you if you'd take a look

here, read along with me, and I'll ask you if this is one of the letters that you had and part of the documentary information that you had.

"The thing I've really been thinking about is you, how you've been there for me through all of my life, no matter what, and that's why I love you so much. I really think that your job of being a mom is perfect because you did your part. You raised me the right way. It was just my fault that I messed up. You kept me away from all this drama all my life, but I was the one who got myself in this. Thanks to the love from the one who always was in my corner. I know I'm going to pull through this."

Have I read it correct?

A   You have.

Q   "Seeing you when you come up here makes me feel like things are going to get better. And with your support and God with me, can't nothing stop me. Even if last year I didn't wish you a Happy Mother's Day, I was still happy to have a mother like you. That's why when I got out -- when I get out with the help of God and you, I'll show you how much it means to me to have a loving mother like you. I love you. Everything I say I mean, and God is my witness."

And then that's enclosed, "Love, Bill. Happy Mother's Day '96 and '97."

Mother's Day of '97, he was in custody on this

charge, correct?

A    Yes.

Q    Did you have any reason to confront Mr. Allen and say, "Billie, I've got information that contradicts what you're saying here in this letter about you and your mother; what's the truth"?  Did you ever have any of that that you recall?

A    I don't recall any.

Q    Okay.  You did have, though, did you not, Exhibit 167 which was Exhibit 82-A, the letter sent to Jay, which is Johnnie Grant, correct?

A    I believe so, correct.

Q    Okay.

        MR. MORENO:  Your Honor, I'm going to object that this letter to Johnnie Grant is not relevant to mitigation or ---

        THE COURT:  Just a second.

        MR. HOLTSHOUSER:  It was actually offered in the mitigation phase of the case.

        THE COURT:  Okay.  Just a second.

        MR. MORENO:  Not by the Government.

        THE COURT:  Is that 167?

        MR. HOLTSHOUSER:  It's 167.

        THE COURT:  Okay, just a second.

        THE WITNESS:  Did I offer it in mitigation?

        MR. HOLTSHOUSER:  Well, no, not mitigation.  It was

offered in the penalty phase.

MS. CARLYLE:  By the Government.

MR. HOLTSHOUSER:  Correct.

MR. MORENO:  I still don't see the relevance, Your Honor.

MR. HOLTSHOUSER:  Judge, I think the relevance is that it's showing the documentary evidence that Mr. Sindel had showing one side -- Mr. Allen is talking one way and at the same time he's writing a letter that, if you look at it, shows a completely different person.

THE COURT:  All right.  Overruled.

A    Okay.

Q    (By Mr. Holtshouser)  First of all, this one starts up ---

THE COURT:  Okay.  Could we establish -- Can we establish to whom -- to whom -- from whom?  It's from Allen to Grant.  Is that right?

MR. HOLTSHOUSER:  It is from Allen to Jay, Johnnie Grant.  And I can go to the end.

THE COURT:  Okay.

MR. MORENO:  Your Honor, I have to object to the reading of this into the record.  That's all he's doing is reading these documents into the record.

THE COURT:  Okay.

MR. MORENO:  It's not to establish any type of effort

on the part of Mr. Sindel regarding mitigation and any deficiency on the part of Mr. Sindel regarding mitigation. He's just reading inflammatory guilt phase evidence into the record that has no bearing in this case -- on this aspect of the case.

THE COURT:  Okay.  Well, here's what I understand to be the purpose.  There is -- There are allegations that Mr. Sindel performed in a way that was ineffective in representing his client, and the basis of that is that he, for several things, did not perhaps discover what is now claimed as the relationship between Mr. Allen and his mother; that she was really a monster that beat him and unmercifully locked him out and so forth.  And I don't know any other way other than for the evidence to be presented in this way to present it to Mr. Sindel and then asking him questions about it.  So overruled.

MR. HOLTSHOUSER:  Judge, I'd also ask that these records -- These letters are already actually in this record because they were admitted as part of the --

THE COURT:  Okay.

MR. HOLTSHOUSER:  -- exhibits earlier in the week.

THE COURT:  Okay.  Proceed.

Q   (By Mr. Holtshouser)  Would it be fair to say, without reading all of this out loud, that in terms of the person that Mr. Allen is presenting himself to be, it's a far different

person than the one he presented in the letter to his mother, correct?

A    You know, I think -- I think he was doing his little "I'm a tough guy and I'm cool and I got it together" for this guy, a street guy, and I would think he was telling his mother he was breaking apart.

Q    He was what?

A    Breaking apart, missing her, wanting her to make sure he connected with her so she'd come to visit him and stay by his side.

Q    And this is not a side that he showed to his mother apparently, correct?

A    I don't know if he showed that to his mother.  I don't know.

Q    And do you recall that in one of these letters from Mr. Allen, that he had requested Mr. Grant to come to court and say something, in particular, for him at his trial and that his case "could be won if Mr. Grant said the right things and I know you know what to say."  Does that ring a bell?

A    I remember that letter.

Q    Yeah.  Would it be fair to say that your investigation of the mitigation evidence actually did, in fact, reveal some evidence of physical discipline, correct?

A    Of what?

Q    Revealed some evidence of physical discipline, right?

A    Yes.

Q    Ray Petty testified about some incidents, correct?

A    Correct.

Q    And you asked him the questions --

A    I did.

Q    -- on Direct Examination that elicited that evidence.

A    I did.

Q    For example, I'll show you 506.  Is this a Direct Examination of Raymond Petty prepared for you by Mr. Randall -- Dr. Randall?

A    I don't know if Dr. Randall prepared it or I did, but yes.

Q    It's a little bit different style than the earlier one we saw, but it could also be yours.  Is that correct?

A    It could be mine, but it's more probably his because it's not my style.

Q    Now your questions included questions about Billie's father's side of the family.  It wasn't an issue that was being ignored by you, correct?

A    No.

Q    Talking about what was Juanita like herself as a child, you weren't ignoring Mrs. Allen's childhood and upbringing, were you?

A    I'm trying to.

Q    Trying to or not trying to?

A    Not trying to.

Q    Not trying to, okay.  "Does she drink?"  You weren't trying to ignore that issue, correct?

A    No.  It certainly wasn't expanded upon, though.

Q    Talks about her father, meaning her grandfather Otha.

MR. MORENO:  I'm going to object.

Q    (By Mr. Holtshouser)  A lot of these questions on this page, you weren't ignoring that issue either, were you?

MR. MORENO:  I'm going to object, Your Honor, not to be obtrusive, but this isn't even a document that Mr. Sindel generated.  And I think the best record of what transpired with this particular witness is the trial transcript.

THE COURT:  There was a moment ago a reference that he said it was more likely someone else's because this wasn't his style.  If -- I think the objection is sound unless it's -- unless he can say that he followed the outline in some respect or adopted the outline and used it.  So without that, I'll have to sustain the objection.

Q    (By Mr. Holtshouser)  Do you remember receiving it as part of preparing for the Direct Examination of Raymond Petty?

There's another one besides this one I can show you.

A    Well, no.  I'm not trying to fight with you.  I'm just trying to think.  I mean I looked to see if there's a three-hole punch.  I don't see that, but I'm sure it would have been part of the information that Dr. Randall provided me

that kind of gives a context to his interviews.

Q   Let's look at 507.  This is actually another page of this.  Do you see these notes up at the top here?

A   Yeah.  That -- That probably is my copy.

Q   Is what?

A   My copy.  Isn't that the same page we just looked at --

Q   It is.

A   -- without the notes?

Q   Do you recognize the handwritten notes on this page?

A   Yes.

Q   Is that your writing?

A   It is.

Q   All right.  So you received this, at least this page.

A   I never said I didn't.

Q   Okay.  And I'm not saying you didn't.  We're trying to establish for the record in order to satisfy the objection. You did at some point receive this --

A   Yes.

Q   -- and made notes on it?

A   Yes.

Q   Okay.  And used it in connection with asking the questions you ultimately asked to Raymond Petty.

A   Raymond Petty, what I asked him would be best from the transcript, but this is something that I reviewed for sure.

Q   We're going to get to that, but I want to make sure that

it's clear that the questions you asked and the answers you got weren't surprises to you.

A    I don't believe they were.

Q    Okay.  Let me show you Exhibit 457 on Page 8.

MR. HOLTSHOUSER:  We're going to move on, Judge.

THE COURT:  Pardon me?

MR. HOLTSHOUSER:  I'm going to move on from this exhibit.

Q    (By Mr. Holtshouser)  These are not your notes, correct?

A    No.

Q    All right.  Do you see the words here that "she beat the crap out of him real good"?

A    I do see that.

Q    Okay.  Now these -- If I tell you this is a typewritten transcription of Mr. Simon's notes -- Mr. Simon, as you said, was engaging in a good deal of mitigation investigation himself, correct?

A    He was, I hope.

THE COURT:  What's the number on this one?

MR. HOLTSHOUSER:  Exhibit 500.38.

Q    (By Mr. Holtshouser)  There's actually two pages here.  This is Page BA-3279.  There's a reference to Juanita.  Then I want to direct your attention to this line down here that -- at 16, 17, 18, "She was beating him up.  Billie called me.  I got in between, whipping him with extension cords.  You talk

and you talk and you talk." Did you ever receive any of these notes from Mr. Simon?

A    I don't recall them.

Q    Okay.  Now I want to show you the transcript of Mr. Petty's testimony.

MR. MORENO:  Your Honor, I think there's no evidence that Mr. Simon -- excuse me -- Mr. Sindel actually saw the notes.  The transcription was transcribed because no one could read it.

MR. HOLTSHOUSER:  That's correct.

THE COURT:  Now we're talking about the notes in 500?

MR. HOLTSHOUSER:  Yes.

MR. MORENO:  The ones that were up on the screen.

MR. HOLTSHOUSER:  The question I asked him was:  Did Mr. Simon ever communicate to him the information --

THE COURT:  Right.

MR. HOLTSHOUSER:  -- that's contained in that note?

THE COURT:  Right.  Thank you.  Overruled.

MR. HOLTSHOUSER:  And asked him whether he saw that typewritten transcription which has only been produced recently.

THE COURT:  And this transcription that's on now, what exhibit is this?

MR. HOLTSHOUSER:  This is Exhibit 213.  This is the trial testimony of Raymond Petty.

THE COURT: Okay.

A   All right. So just so I know, what I think is going on here is that Mr. Simon typed up -- transcribed his notes.

Q   (By Mr. Holtshouser) Correct.

A   And so I would never have seen ---

Q   No, you didn't. The question wasn't whether you had seen them. The question was: Had you ever received that information from Mr. Simon --

A   Okay.

Q   -- about Raymond Petty's whipping him with an extension cord?

A   I don't remember it, but it wouldn't have been inconsistent if I had; in other words, if I got that from David or I got it from him or I got it from both.

Q   You got it from someone on the team, in other words.

A   That's right.

Q   All right. Back to this transcript, you asked this question. This is your Direct Examination of Raymond Petty.

"Have you seen her sometimes behave in ways towards Billie that are scary for you?"

And Raymond Petty proceeded to testify: "One time, and she and I fell out over this. That's my blood, and it didn't make sense to me."

First of all, he's answering that he seen it one time, correct?

THE COURT: Now he's talking about she being his mother.

MR. HOLTSHOUSER: Right, Juanita Allen.

A   Right. That's what he says there.

Q   (By Mr. Holtshouser) Her brother, Raymond Petty, is testifying "one time," correct?

A   That's correct.

Q   And your answer was: "What was it?"

Now my question to you, first of all, is when you asked that question about something scary, were you intending to elicit from Raymond Petty this testimony that came about physical discipline or contact between Mrs. Allen and Billie Allen?

A   Yes.

Q   Okay. It wasn't a surprise that happened here, correct?

A   No.

Q   All right. His answer was: "She was -- He had been around 16, 17 -- 15, 16 or 17. She was whooping him with an extension cord, and I think Bill called me on the phone."

And he proceeds to describe this incident which is at Page 38 of this transcript. It is Exhibit 213; actually Page 27 of this particular exhibit, and it goes on for another page. And he testifies in some detail about the incident, correct?

A   That's correct.

MR. MORENO: Your Honor, if I can inquire, Mr. Sindel has been on the witness stand for all day.

THE WITNESS: I can go on.

MR. MORENO: You can go on?

THE WITNESS: If I don't have to come back.

MR. MORENO: You have to come back one way or the other. We're not going to finish Direct.

THE WITNESS: I know that.

MR. HOLTSHOUSER: Yeah.

THE WITNESS: I can dream.

MR. MORENO: That's fine, Your Honor. I'm just concerned about Mr. Sindel.

THE COURT: Okay. Okay. Yeah, I -- I guess maybe we should talk about it. As you know, my bad behavior is a matter of record in some corridors in terms of going too long. I don't want to promote that reputation anymore.

MR. MORENO: Well, we're happy to do that.

THE COURT: No, I know, and I appreciate that. I'm just saying as far as I'm concerned, it's always a matter of what's best for you. If you want to go ahead, that's fine.

MR. HOLTSHOUSER: Actually we would probably propose just going ahead one or two more questions.

THE COURT: Okay.

MR. HOLTSHOUSER: And then I think we'll reach a breaking point.

THE COURT: All right.

A    A breaking point?

Q    (By Mr. Holtshouser)  A break-through.

Mr. Sindel, just the topic that I'm asking you about is: You did have from your team and from yourself directly some information which pointed to the existence of physical discipline being used with respect to Mr. Allen, correct?

A    Yes.

Q    Whether you characterize it as abuse or how you label it, you had some evidence of the activity.

A    Yes.

Q    All right. Did you also -- Had you been privy to any notes from Dr. Cuneo who examined Mr. Allen?

A    I don't recall seeing his notes, but if they were something that I turned over to the Government, I think I would have seen them.

Q    Without getting into the machinations to show you, do you recall -- does this refresh your recollection that during trial, during Dr. Cuneo's testimony, the subject came up of his notes and that there was an issue regarding what notes needed to be turned over to the Government and an issue regarding redaction of those notes having been conducted without the knowledge of the Government?

A    If it's in the trial transcript, --

Q    Okay.

A    -- I have no reason to dispute it.

Q    Now I think Mr. Moreno asked you on a couple of occasions about the examination that took place of Dr. Cuneo on January 16, 1998.  Do you recall that?

A    Yes.

Q    I'm going to show you Exhibit 565, part of it, which is part of the material that you had from Dr. Cuneo.  These are -- I'll put it back up.  These are part of the notes that you produced to the Government in response to the Court's order during the trial.  Do you recall that at all, about having to produce Dr. Cuneo's notes?

A    I -- I'm sure it's in the transcript, so.

Q    And do you see this date here, January 16, 1998, --

A    Correct.

Q    -- corresponding to the date that's in Dr. Cuneo's February 16th, 1998, report as being the date he examined Billie Allen?

A    Right.

Q    Now I want to page down to this.  Do you see here that in these same notes, that there's a second set of notes for an examination of Mr. Allen that took place on February 22nd, 1998?

A    I see the number 2-22.

Q    Okay.

         MR. MORENO:  I would object to that as being

characterized as another examination.  There's no evidence of that.

MR. HOLTSHOUSER:  Okay.  Well, we'll get to the trial transcript in a second.

Q    (By Mr. Holtshouser)  The particular reference I want to point to you is in the January 16th portion of these; if we can blow that up.  Do you see the notation here in Dr. Cuneo's notes that his -- "his mom" -- something -- "out of the house.  Mom physically disciplined till the -- till end."  Do you see that, "physically disciplined"?  Correct?

A    That would be hard for me to read it, but I -- I mean that's a reasonable interpretation of what it says.  I don't see a "P" at the beginning of ---

Q    Now these are notes that -- Did you have the benefit of these notes?  If they were given to the Government, you would have reviewed them, correct?

A    I would have had the opportunity to review them, correct.

Q    This is Exhibit 384 which is the -- the habeas discovery portion of these notes on 2-22.  Do you see the reference to the name Dennis Noble, Prentiss Church, Job Corp?  "He says," and then there's something in quotes.  There's a final answer there.  "So why kill?"  "Stressed out; just felt I ready to go."  And it may be a reference to a -- killing himself.

A    I think it's suicide, yes.

Q    Correct.  And these notes, do you recall having to turn

these notes over to the Government during the trial from your custody?

A    I don't recall that, but if it occurred, it's in the transcript, so.

Q    All right.

        MR. HOLTSHOUSER:  That would be probably be a good breaking point, Judge --

        THE COURT:  Okay.

        MR. HOLTSHOUSER:  -- and we can pick up from there.

        THE COURT:  What time do we start in the morning, Brittany?

        THE CLERK:  9:00.

        THE COURT:  What?

        THE CLERK:  9:00.

        THE COURT:  9:00, okay.  Court's in recess.

        MR. MORENO:  Thank you, Your Honor.

        MR. HOLTSHOUSER:  Thank you, Judge.

        THE COURT:  Yeah, you're welcome.  Court's in recess.
And is there -- Irrespective of where we are tomorrow,
Mr. Sindel has an appointment with eight different lawyers at
3:30.  And so irrespective of where we are, I'm going to
excuse him, if we're not finished with him, so he can attend
that.  Does everybody understand?

        MR. MORENO:  Yes, we understand.  And we have another witness that we'll anticipate then starting.

THE COURT:  Thank you.

(Court adjourned at 5:25 PM.)

CERTIFICATE

I, Deborah A. Kriegshauser, Registered Merit Reporter and Certified Realtime Reporter, hereby certify that I am a duly appointed Official Court Reporter of the United States District Court for the Eastern District of Missouri.

I further certify that the foregoing is a true and accurate transcript of the proceedings held in the above-entitled case and that said transcript is a true and correct transcription of my stenographic notes.

I further certify that this transcript contains pages 1 through 277 inclusive and that this reporter takes no responsibility for missing or damaged pages of this transcript when same transcript is copied by any party other than this reporter.

Dated at St. Louis, Missouri, this 24th day of January, 2013.

_____

/s/ Deborah A. Kriegshauser

DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR

Official Court Reporter