UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

BILLIE JEROME ALLEN,              )
                                  )
              Petitioner,         )
                                  )
     vs.                          ) No. 4:07-CV-27(ERW)
                                  )
UNITED STATES OF AMERICA,         )
                                  )
              Respondent.         )

EVIDENTIARY HEARING -- VOLUME IV
BEFORE THE HONORABLE E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE

JUNE 7, 2012

APPEARANCES:

FOR PLAINTIFF:        ELIZABETH U. CARLYLE
                      P.O. Box 30418
                      Kansas City, MO  64112
                      (816) 525-6540

                      JOSEPH M. CLEARY
                      COLLIGNON & DIETRICK
                      310 N. Alabama, Suite 250
                      Indianapolis, IN  46204
                      (317) 637-1000

                      TIMOTHY P. KANE
                      ERIC JOHN MONTROY
                      JAMES HENRY MORENO
                      FEDERAL COMMUNITY DEFENDER OFFICE
                      EASTERN DISTRICT OF PENNSYLVANIA
                      The Curtis Center, Suite 545 West
                      Philadelphia, PA  19106
                      (215) 928-0520

FOR DEFENDANT:        STEVEN E. HOLTSHOUSER
                      CARRIE COSTANTIN
                      OFFICE OF U.S. ATTORNEY
                      111 S. Tenth Street, Suite 2000
                      St. Louis, MO  63102
                      (314) 539-2200

REPORTED BY:          DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR
                      Official Court Reporter
                      United States District Court
                      111 South Tenth Street, Third Floor
                      St. Louis, MO  63102
                      (314) 244-7449

INDEX

ADMISION OF EXHIBITS . . . . . . . . . . . . . . .    4


RICHARD SINDEL --

  Continued Cross Examination by Mr. Holtshouser .   14

  Redirect Examination by Mr. Moreno . . . . . . . 100

  Recross Examination by Mr. Holtshouser . . . . . 211

  Redirect Examination by Mr. Moreno . . . . . . . 239


JOHN WILLIAM SIMON --

  Direct Examination by Mr. Moreno . . . . . . . . 242

(Proceedings began at 9:00 AM.)

MR. HOLTSHOUSER:  I don't want to interrupt you, Judge.

THE COURT:  No.

MR. HOLTSHOUSER:  It's difficult to text and talk, too, Judge, at the same time.

THE COURT:  No; that's okay.  I was just cleaning up some e-mail.  We're going to start off with the record on --

MR. HOLTSHOUSER:  Yes.

THE COURT:  -- exhibits?

MR. HOLTSHOUSER:  Yes.

THE COURT:  Go ahead.

MR. HOLTSHOUSER:  These are from -- I think there -- First of all, Melanie brought to our attention that there's -- 426 is an exhibit that was used with Claude McLemore.

THE COURT:  Which one?

MR. HOLTSHOUSER:  426 --

THE COURT:  Okay.  Just a second.

MR. HOLTSHOUSER:  -- that are his -- that are actually notes.

THE CLERK:  From Tuesday, Judge.

THE COURT:  Okay.  426, okay.  That one is received.

MR. HOLTSHOUSER:  304.  I just have a list of numbers here.  I can just give them one by one and give you a chance to ---

THE COURT: Okay. That's all right. 304, 304 is received.

MR. HOLTSHOUSER: 327.

THE COURT: Received.

MR. HOLTSHOUSER: 328.

THE COURT: Received.

MR. HOLTSHOUSER: 323.

THE COURT: Received.

MR. HOLTSHOUSER: 318 and 319.

THE COURT: 17 -- I'm sorry. 318?

MR. HOLTSHOUSER: 319.

THE COURT: 319 received. Just a second.

THE CLERK: And 318.

THE COURT: 17, 18 and 19 did I hear you say?

THE CLERK: I don't think 17, Your Honor.

THE COURT: Okay.

MR. HOLTSHOUSER: I don't think we did 317.

THE COURT: Okay. Just a second. I hit the wrong switch. Okay. Go ahead. 18 and 19 are received.

MR. HOLTSHOUSER: 324.

THE COURT: Received.

MR. HOLTSHOUSER: 329.

THE COURT: Received.

MR. HOLTSHOUSER: 331.

THE COURT: Received.

MR. HOLTSHOUSER:  332.

THE COURT:  Received.

MR. HOLTSHOUSER:  333.

THE COURT:  Received.

MR. HOLTSHOUSER:  325.

THE COURT:  Received.

MR. HOLTSHOUSER:  I'm just trying to keep these in some numerical order for you, Judge.  336 and 338, 339.

THE COURT:  336, --

MR. HOLTSHOUSER:  338.

THE COURT:  -- 338 and 339 received.

MR. HOLTSHOUSER:  340.

THE COURT:  Received.

MR. HOLTSHOUSER:  343.

THE COURT:  Received.

MR. HOLTSHOUSER:  344.

THE COURT:  Received.

MR. HOLTSHOUSER:  346.

THE COURT:  Received.

MR. HOLTSHOUSER:  347.

THE COURT:  Received.

MR. HOLTSHOUSER:  341.

THE COURT:  Received.

MR. HOLTSHOUSER:  345.

THE COURT:  Received.

MR. HOLTSHOUSER:  Backing up a little bit, 333 and 335.

THE COURT:  Okay.  I show 333 already received.

MR. HOLTSHOUSER:  All right.  335 then.

THE COURT:  335 received.

MR. HOLTSHOUSER:  350.

THE COURT:  Received.

MR. HOLTSHOUSER:  352.

THE COURT:  Received.

MR. HOLTSHOUSER:  353.

THE COURT:  Received.

MR. HOLTSHOUSER:  356.

THE COURT:  Received.

MR. HOLTSHOUSER:  358.

THE COURT:  Received.

MR. HOLTSHOUSER:  367.

THE COURT:  Received.

MR. HOLTSHOUSER:  368.

THE COURT:  Received.

MR. HOLTSHOUSER:  369.

THE COURT:  Received.

MR. HOLTSHOUSER:  372.

THE COURT:  Received.

MR. HOLTSHOUSER:  376.

THE COURT:  Received.

MR. HOLTSHOUSER: 381.

THE COURT: Received.

MR. HOLTSHOUSER: 383.

THE COURT: Received.

MR. HOLTSHOUSER: 398.

THE COURT: Received.

MR. HOLTSHOUSER: 384.

THE COURT: Received.

MR. HOLTSHOUSER: Before leaving the 300s, I missed one; 303.

THE COURT: Received.

MR. HOLTSHOUSER: 378.

THE COURT: Received.

MR. HOLTSHOUSER: All right. And then I'm into the 400s now. 442.

THE COURT: Received.

MR. HOLTSHOUSER: 498.

THE COURT: Received.

MR. HOLTSHOUSER: 449.

THE COURT: Received.

MR. HOLTSHOUSER: 416.

THE COURT: Received.

MR. HOLTSHOUSER: 457.

THE COURT: Received.

MR. HOLTSHOUSER: 394. Back to the 300s.

THE COURT: 394, received.

MR. HOLTSHOUSER: 506.

THE COURT: Received.

MR. HOLTSHOUSER: 507.

THE COURT: Received.

MR. HOLTSHOUSER: 500.

THE COURT: Received.

MR. HOLTSHOUSER: 565.

THE COURT: Okay. Just a second. 565 received.

MR. HOLTSHOUSER: 534.

THE COURT: 534?

MR. HOLTSHOUSER: Correct.

THE COURT: Received.

MR. HOLTSHOUSER: 250.

THE COURT: 250?

MR. HOLTSHOUSER: 2-5-0.

THE COURT: Okay. Just a second. 250 received.

MR. HOLTSHOUSER: 213-A; 213-A.

THE COURT: 213, okay. Just a second. I don't show a 213. Was there a 213-A on here?

MR. HOLTSHOUSER: Do I got the wrong one?

THE COURT: I'll make a new line there.

MR. HOLTSHOUSER: Actually I think ---

THE COURT: How is that identified?

MR. HOLTSHOUSER: I can figure that out. I'll figure

that one out, Judge.

THE COURT:  Okay.

MR. HOLTSHOUSER:  And then 167.

THE COURT:  Received.

MR. HOLTSHOUSER:  For the record, I used 491, 493 and 495, but they're already admitted.

THE COURT:  Okay.

MR. HOLTSHOUSER:  There is, I think, still -- We still have this open:  72, 73 and 74.

MS. CARLYLE:  Yes.

MS. COSTANTIN:  Judge, did you have a chance to review 72, 73 and 74?

THE COURT:  You know, I didn't.  I have them before me.  I just -- I'll do that today.

MS. COSTANTIN:  Okay.

MR. HOLTSHOUSER:  Then in the court file there are documents -- there are document numbers, and they are the document numbers that are contained in the exhibit list. There was also, I think, one -- The criminal trial exhibits, which are Exhibits 154 through 170, haven't been admitted.  I thought that the Allen letters to Mr. Grant had been, but Ms. Costantin says that they have not been.  But those exhibits, which are 154 through 170 with 164 being a deleted exhibit, we would offer those at this time.

THE COURT:  Okay.

MR. HOLTSHOUSER: They were actually either defense or Government exhibits offered during the -- during the penalty phase.

THE COURT: Okay. I show 167 was received. So hearing no objection, I'll receive 154, other than 164, all the way to 170 received.

MR. HOLTSHOUSER: Judge, the one that I missed was 213-A. It's is actually 213, no "A."

THE COURT: Okay. Just a second.

MR. HOLTSHOUSER: It actually is already admitted. The "A" was already accepted.

THE COURT: 213-A has already been received.

MR. HOLTSHOUSER: 213. There is no 213-A. That's my mistake?

THE COURT: Okay.

MR. HOLTSHOUSER: Yeah. 316, that's the Caspari letter to Dr. Haney on October 1. That's actually the duplicate of 315, so.

THE COURT: You're offering 316?

MR. HOLTSHOUSER: Yes. It's -- 316 is the Caspari version, and 315 is the one that was sent -- copy that was sent of this same letter.

THE COURT: Received.

MS. CARLYLE: What about 320?

MR. HOLTSHOUSER: That's already been admitted, the

Haney letter to Caspari.

THE COURT:  320, I don't show it received.

MR. HOLTSHOUSER:  You do not?

THE COURT:  No.

MR. HOLTSHOUSER:  All right.  Then we would offer 320.

THE COURT:  Received.

MS. CARLYLE:  321?

MR. HOLTSHOUSER:  We show that admitted.

THE COURT:  Okay, I don't.  I show it identified but not received.  321.  It may be some time -- As I mentioned, --

MR. HOLTSHOUSER:  We'll go over the whole list.

THE COURT:  -- if you want to go through, either side is free to pick this up at any time and look at it.

MR. HOLTSHOUSER:  Thanks, Judge.

MS. CARLYLE:  304, you said that.

THE COURT:  304 is received.

MS. CARLYLE:  Yes.  What about 324?

THE COURT:  324 is received.

MR. HOLTSHOUSER:  Yeah, that's already in.

MS. CARLYLE:  Sindel's deposition, 536, I don't think you mentioned.

MR. HOLTSHOUSER:  Do you show 534 in, Judge?

THE COURT:  I'll take a look.  Yes, 534 is in.

MS. CARLYLE:  Okay, sorry.

THE COURT:  While we're on those, maybe this is a good time, but can I hear briefly again defense objections to 72, '3 and '4?

I believe they're letters written by Mr. Allen.  One is -- It looks like it has a February 21, '06, stamp.  That's 74.

73 is a letter by Mr. Allen.  It looks like an '05 stamp.

And 72 is a -- has a written date of 7-25 also written by Mr. Allen.  72 has a written date of 7-25-05.  It's written by Mr. Allen.

MR. MORENO:  Your Honor, I'll -- I'll take the bullet for the team on this one.  We really haven't sat down to discuss that.

THE COURT:  Okay.

MR. MORENO:  I apologize for that.

THE COURT:  That's all right.  We'll do it later.

MR. MORENO:  I appreciate you bringing it up, and we'll make sure we look at it.

MR. HOLTSHOUSER:  That's been our conversation as well, Judge.  We hadn't pushed the issue, and I think we've discussed maybe hopefully by the end of tomorrow that we would be able to --

THE COURT:  Yeah, that's fine.

MR. HOLTSHOUSER:  -- not only check the exhibits for

the week against your list but then, also, take care of that loose end.

THE COURT:  That's fine.  Thanks.  All right.

MR. MORENO:  Yes.  Thanks.

**RICHARD SINDEL**,

HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

CONTINUED CROSS EXAMINATION

QUESTIONS BY MR. HOLTSHOUSER:

Q    Good morning, Mr. Sindel.

A    Good morning, Mr. Holtshouser.

Q    Let me try to conclude this sometime this morning.  Okay?

A    That would be ideal.

Q    I understand.  I'm going to show you Exhibit 250, and specifically that's your declaration.  You recall that, correct?

A    Correct.

Q    This would be your second declaration, the one in 2009?

A    Yes, sir.

Q    I'm going to take you to Page 7 of that, and it's Paragraph 15 down here at the bottom.  This is beginning to conclude your comments in this declaration.  And, again, the language that we see here was not drafted by you.  Is that correct?

A    Not in its entirety, no.

Q    Okay.

A    I did not draft this document.

Q    Did you draft any part of it?

A    I think I made some editing changes.  I couldn't remember today, but -- what they were, but they were not of any real significance.

Q    Didn't originate with you, in other words.

A    No.

Q    Okay.  And I want to direct your attention to this first line of Paragraph 15 which says, "As a result of my misunderstanding with Dr. Haney, Mr. Allen was deprived of an adequate opportunity to present to the jury far more significant mitigating evidence than I was able to muster;" correct?

A    Correct.

Q    And what I want to ask you is:  This language here, "as a result of," would you agree that in that statement you're indicating by signing this, that the causal nexus, the causation of this alleged failure to obtain more evidence than you did, was, in fact, this misunderstanding with Dr. Haney?

A    Well, I think that that was a part -- a component of it, certainly.

Q    Okay.  Can you show me where in this declaration you indicated that there was another component that was the causal nexus to this failure to discover additional evidence?

A    You want me to read the entire ---

Q    You can read the entire thing, if you want to look at it.

A    I have it here.

Q    Okay.

A    And the question is:  Is there another place where I say there's something other than the misunderstanding?

Q    Correct.  My -- My question is that here you've indicated to the Court that it's as a result of that understanding with Doctor --misunderstanding with Dr. Haney that caused this inability to obtain additional information, and I just want to clarify that it was your statement in this declaration that that was, according to your statement at the time, the cause.

A    There's a reference in Paragraph 10 to the fact that neither Mr. Simon or I were in direct communication with Dr. Haney which permitted this misunderstanding to undermine the penalty phase preparation.

Q    Correct.  And that's -- That is what -- your position in the declaration as to what led to the misunderstanding.  It's still your position in Paragraph 15 that that resulting misunderstanding, in turn, resulted in the inability to discover additional mitigating evidence; sort of a cause that ---

A    One thing led to another which led to another.

Q    Correct.  But the one thing that led to another thing, it's that misunderstanding with Dr. Haney that's pivotable,

according to your declaration, to the failure to discover additional mitigating evidence.  Is that correct?

A    If I understand the correction -- the question correctly, basically what we're talking about here is the fact that the misunderstanding allowed for us to fail to gather appropriate evidence that would have been effective to present to the penalty phase.

Q    That's correct; is that right?  Am I understanding your declaration correctly?

A    I guess what I'm trying to say is I think that there was a misunderstanding or miscommunication between my office and my staff and Mr. Simon and Dr. Haney about what his role would be.  And as a result, neither one of us, Dr. Haney or the people that were on my defense team, had done the sufficient investigation of possible evidentiary matters that could have been brought up at the penalty phase.

Q    Okay.

A    But I haven't finished reading.

Q    Okay.  And if you would focus your attention on that Paragraph 15.  I'm going to ask you a couple more questions about that paragraph.

A    Okay.

        (Pause)

A    In terms of that particular phraseology, the question that you've asked me is accurate, but I think the entirety of

Paragraph 15 lists other shortcomings that I think were contributing to the penalty phase deficiencies.

Q    Okay.  And let me just ask you this:  Have you -- Did you review this declaration before you came to court this week to testify?

A    Yes.

Q    Did you review it, say, as close as you've reviewed it now before you signed it in 2009?

A    Did I review it in 2009 as close as I have today?

Q    Yes.

A    I would hope so, but I don't -- I mean I read it for sure.  I read it, I'm sure, at least twice because I read it after I made the changes.

Q    Okay.

A    But I ---

Q    Let's go ahead to Paragraph 10, the one referred to a second ago.

A    Okay.

Q    And in this Paragraph 10, again, there's a use of the word "misunderstanding," particularly down here at the bottom of the paragraph.  And you are -- You begin this Paragraph 10 by focusing on a -- you're referring to, "It is obvious from his recollection and my recollection of the circumstances." That "his" is Dr. Haney you're referring to, and you're referring to what he thought and what you thought, correct?

A    Correct.

Q    And you said that, "He and I did not have a common understanding of what his role was to be," correct?

A    That's what it says.

Q    And then you go on to describe what you believed.

A    Yes.

Q    And when you signed this, prior to signing it, had you read what we've shown -- what I showed you yesterday and the day before?  Namely, your motion to the Court in July of '97 regarding what your expected usage of Dr. Haney and your other lower-cost investigators would be?

A    I had not.

Q    Okay.

A    I mean, obviously, I read it 14 years ago.

Q    Correct.  But prior to this declaration in 2009, you had not.

A    The only thing that I read prior to executing this declaration, as I recall, would have been the Memorandum and Order that was entered by this Court, either all or significant portions of the federal habeas petition, which I believe was an amended petition, if I recall correctly, and the declarations of Dr. Stewart and Dr. Martell.  That's what I recall reading prior to executing ---

Q    The only thing -- The only thing about your recollection that I want to ask you about is that the Memorandum and Order

of the Court that you're referring to didn't really come out until after the traverse, the affidavits or the declarations submitted with that traverse, the Government's response to that.  So is there maybe an earlier Memorandum and Order you're referring to or the one that ruled on the substance?

A    I thought -- Oh, I'm sorry.  I thought I had read that before executing that declaration because I thought the Memorandum and Order that I reviewed had to do with obtaining an evidentiary hearing.  That's how I remember it.

Q    Okay.  Before the hearing ---

A    But the dates, ---

Q    You could have that mixed up.

A    I could have.

Q    You for sure, though, recall that when you read this, you had seen either a final or a draft report or a declaration of Dr. Stewart and Dr. Martell?

A    I know I had seen that.

Q    Okay.  Other than that, though, you haven't had a chance to go back and review anything from 13 -- 12, 13 years prior.  I guess it would be 11 years.

A    I don't know if it's fair to say "a chance" because I did have a chance, but I had not done ---

Q    You had not done so.

A    And I had no -- none of the files in my office that I can recall.

THE COURT:  I can -- I can see Ms. Kriegshauser's shoulders popping up and down.  Please wait until one finishes before another one speaks, please.

THE WITNESS:  And that's my fault, Your Honor.  I apologize.

THE COURT:  Well, I'm not being critical.  I just know how -- how much care she puts into getting everything right, and it's -- it makes it extra work for her.  Thank you.

Q    (By Mr. Holtshouser)  In this Paragraph 10, you are then referring to what he apparently saw his role as, correct?

A    Correct.

Q    And when you signed this, when it was presented to you, you hadn't gone back and reviewed any of the correspondence between you and Dr. Haney, correct?

A    I believe I had seen the January, 1998, letter from Dr. Haney prior to signing this declaration.

Q    Okay.  And that was shown to you by whom?

A    One of the lawyers that were there presenting me with the declaration.

Q    In this Paragraph 10 then, after discussing what you -- stating what you thought Dr. Haney's apparent belief was, then, again, you make reference to the misunderstanding.  And then it says at the bottom, "The fact that neither Simon or I were in direct communication with Dr. Haney permitted this misunderstanding to undermine the penalty phase presentation

-- preparation," correct?

A    Correct.

Q    Now you and Mr. Simon were in direct communication with each other.

A    We had the ability to do that, yes.

Q    You were in actual direct communication.  You had more than the ability.  You had actual direct communications throughout the Fall of '97, didn't you?

A    Yes.

Q    Okay.  And as we -- I think as we saw yesterday, and including there was an entry on November the 6th of 1997 in Mr. Simon's CJA time records, that one of those meetings concerned mitigation.

A    Correct.

Q    In going down to Paragraph 15 where we started this conversation, the misunderstanding that you're referring to here in Paragraph 15 that caused the lack of an opportunity to present to the jury more significant mitigating evidence is the misunderstanding between you and Dr. Haney regarding roles, harkening back to Paragraph 10 that we just looked at.  That's what you're talking about, --

A    Yes.

Q    -- the obvious misunderstanding.

A    I think that's an accurate assessment.

Q    There's no other misunderstanding with Dr. Haney that

you're referring to there.

A    Just so -- Just so we're on the same page, what I perceive as the misunderstanding would be that who was going to be responsible for trying to secure the information and evidence that would form the mitigation phase of the case.

Q    That boots-on-the-ground field investigation, correct?

A    Pretty much, yes.

Q    Okay.

A    Not quite exactly that but close to that; who was really going to be with their fingers in the guts.

Q    Okay.  Is there anything about this misunderstanding with Dr. Haney that impacted the choice of who you used as experts in this case?

A    No.

Q    You already had Dr. Cuneo from September of '97.  You chose him because you liked his work, I presume.

A    Yes.

Q    At the moment you tried this case, was your opinion of his work that it had been adequate and professional?

A    It's a tough question because I'm not trained in that field.

Q    I'm not -- I understand that.

A    No, I understand what you're saying.  I believe that we had secured from Dr. Cuneo information that we could use in the penalty phase that I hoped would be effective.  There

was -- It's awfully hard for me to answer the question in hindsight, Mr. Holtshouser, because I've also seen and digested the Martell and Stewart reports.

Q    Okay.  Well, let's try and put yourself back in the position you were in --

A    It's very hard for me to do that.

Q    -- in March of '98 when you said, "The defense calls Dr. Cuneo to the stand," and you put him on.  And you knew before putting him on what you expected him to testify to, correct?

A    That is correct.

Q    He didn't get up there and testify about opinions and diagnoses that surprised you.

A    No, he did not.

Q    You prepared him ahead of time, I presume, correct?

A    I did.

Q    All right.  And so you put him on because you thought that the testimony and opinions he was going to express were correct?

A    Well, I certainly thought that they were his findings that he believed were scientifically justified.

Q    Okay.  Did you have any reason to think otherwise?

A    In other words, to think that he was either lying or --

Q    Fudging.

A    -- fudging or something?

Q    Yes.

A    No, I did not.

Q    Did you have any reason to think that he was relying upon untrue facts about Mr. Allen's life in reaching his diagnosis?

A    I had no reason to think that.

Q    Okay.

A    It may have been accurate, but I had no reason to think that at the time I called him to testify.

Q    Okay.  When you put him on before the jury and presented him, in fact, argued to the jury the credibility of his testimony, you did that because you thought -- you did believe in the accuracy of what he testified to and his credibility.

A    Yes.  I thought it furthered our goal in terms of presenting the mitigation case.

Q    And Dr. Gelbort, the neuropsychologist, that individual was the recommendation of Dr. Randall, correct?

A    He was.  He was.

Q    He vouched for his -- the quality of Dr. Gelbort's work?

A    As I recall, yes.

Q    You had your own opportunity to deal with Dr. Gelbort. Is that right?

A    Yes.  Yes.

Q    And we saw, I think, without going back to the specific exhibits, there were meetings, joint meetings between Dr. Randall, Dr. Cuneo and Dr. Gelbort that included you and

Mr. Simon that were strategy meetings, correct?

A    Yes.

Q    Okay.  So not only did you seek the input of Doctor ---

A    Let me just rephrase that.  Okay?

     Strategy meetings, they were more debriefing and discussing, you know, the testimony and what they had learned and how it would be presented at the mitigation phase.  I don't believe that Dr. Gelbort participated in any strategic decisions I made.

Q    How about Dr. Cuneo?

A    I don't believe either; either one.

Q    Either one of them offer their input or insight into how Mr. Allen's mental health might assist his mitigation case?

A    Both of them did.

Q    Now Dr. Gelbort, in addition to Dr. Randall, having vouched for him, based upon the -- your experience with Dr. Gelbort at the time, did you have any reason to doubt his professionalism, his credentials or the accuracy of his work?

A    I knew of no factual reason to suggest that he had not done what he had said he had done and not made the determinations that he said he had made.  I -- Again, not being an expert in the field, ---

Q    You're not.

A    You're not.  You don't -- You have to rely on those people to be able to make the decisions and to understand

where you want to go with your case and assist you in finding out the facts and then presenting those facts.  So I wouldn't know, for example -- I know like -- I know psychological tests.  I know their names.  Sometimes I know what they mean.  Oftentimes I don't.  So you, you know -- At least me, I'm not as bright as some other people in this room.  I rely on them to help me interpret them to make them into the English language that a jury might understand.

Q    That a jury can understand, correct?

A    Correct.

Q    Did Dr. Randall at any time tell you that even though he had initially recommended Dr. Gelbort, by the time of trial, he was having second thoughts about Dr. Gelbort and didn't think that Dr. Gelbort had done a thorough job?

A    You know, I remember -- I remember discussions concerning where Gelbort's testimony was going to go.  I remember in-depth discussions, but I don't remember Dr. Randall at the time saying, "Let's just jettison this portion of the case," or anything to that effect.

Q    Well, did he ever say to you more specifically, "Dr. Gelbort just didn't do enough tests"?

A    He may have said if we had more time, we could do more tests, but I don't remember a specific conversation where he said Dr. Gelbort didn't do enough tests; in other words, he just dropped the ball.  I don't remember a drop-the-ball

conversation.

Q     And at the time you put Dr. Gelbort on, did you have any reason to believe that the work that he had done was less than adequate in his profession?

A     I don't think so, no.

Q     You had no reason to believe that he hadn't done -- he hadn't done tests that he should have for any reason?

A     I don't think I had the knowledge to make that determination, but I didn't go in there with the belief that he didn't know what he was doing.

Q     When Dr. Gelbort got the opportunity to examine Mr. Allen and give him some tests, he did so in the Franklin County Jail, correct?

A     That's what I recall, yes.

Q     Did you or anyone else place any arbitrary limits on Dr. Gelbort and say, "You got this much amount of time; give him as many tests as you can, and then you got to get out of there"?

A     Not -- Not in terms of a particular visit.  We were always -- We were under a time crunch, period, because of the necessity, you know, to conduct the trial, prepare for the next day and meet with everybody.  I mean there was a time crunch for all of us, but I didn't say, "You got 45 minutes in the Franklin County Jail.  That's it."

Q     Did Dr. Gelbort ever express to you that, "Well, I wish I

had time to do more tests because I really haven't -- my diagnosis of Mr. Allen is really tentative and partial"?

A    You got to have two questions in that one question.

Q    Well, let me break it up into one question at a time then.

Did Dr. Gelbort ever express to you any -- his own feelings about any inadequacy in his work?

A    No.

Q    Did he ever say to you, "Can you get me a court order because there's some more tests I need to give him that I didn't get a chance to give him"?

A    I don't remember.

Q    Okay.  If anyone had come to you and said, "Dr. Gelbort needs more time to give him more tests," what would you have done?

A    I would have shook my head, buried my head in my hands and said, "Let's go do that then."

Q    Okay.  You would have gone -- Would you have gone to Judge Webber and said, "We need an order for another day, not only Saturday but Sunday, for Dr. Gelbort to meet with Mr. Allen and administer more tests"?

A    I would have done that.

Q    And you would have expected that Judge Webber would have granted that order, too, correct?

A    I would anticipate that he would.

Q   Because at no time did Judge Webber ever deny your requests or any other sort of resources aside from a continuance.

A   You figured that one out.  Yes, you're correct, as far as I can recall.

Q   So back up then to this misunderstanding between you and Dr. Haney and the causal effect of that misunderstanding.  That misunderstanding had nothing to do with the selection of Dr. Cuneo and the selection of Dr. Gelbort or their involvement in the case, did it?

A   The misunderstanding with Dr. Haney, he didn't have anything to do with their selection.

Q   What it might have provided, though, as you indicated here, is that you might have had an opportunity to have either -- that would have led -- Well, let's strike that.

        The misunderstanding, as you've described it, added to a time crunch.  Would that be a fair statement?

A   Exacerbated?

Q   Okay.  Is that your word?

A   Yes.

Q   Okay.  It exacerbated the time crunch that was already there?

A   Absolutely.

Q   Okay.  And that's the -- that's the connection you see between the misunderstanding and what you see as the

difference between what the habeas team has developed and what you were able to develop, correct?

A    Well, I think the time period exacerbated, but the time prior to the Haney disappearance was also not utilized in the most efficient manner to secure the information that we needed to present an effective penalty -- penalty phase argument.

Q    How much more time would have made a difference in your view?

A    How much more time would have been different?

Q    (Affirmative gesture.)

A    I'm not sure I understand what you mean, "different."

Q    Well, you've made your comparison between what -- based on reading Dr. Stewart and Dr. Martell's reports.  And it's --
Those are your sources, are they not, for your knowledge of what fact witnesses might say now as opposed to what they were saying to you then?

A    I mean for the most part, those are the documents that gave me the facts.  I learned some facts from the habeas team, you know, in discussions.  So I mean that's the source of most of the facts that I have.  I haven't read -- I've read Juanita Allen's deposition, and I think I've read -- I read her declaration.  I've read the Randall declaration, the Simon declaration.  Those are where I pulled the facts from as I sit here today for the most part.

Q    In terms of the historical fact witnesses who actually

have eyewitness accounts and knowledge of Mr. Allen's life, the only one that you actually looked at yourself is the declaration of Juanita Allen.  Is that right?

A    I believe that's correct.

Q    And you say you also read her deposition?

A    I have.

Q    Okay.  Did -- Was that because you asked to see it?

A    Yes.

Q    Did you ask to see any others?

A    Any other depositions?  No, I don't believe so.

Q    Any other declarations?  Fact witnesses.

A    I mean I did not see the fact witnesses that substantiated Mr. Allen and Mrs. Allen, Juanita Allen's references to child abuse.  I did not.

Q    And where have you -- where have you seen Mr. Allen's references to child abuse?

A    In the Stewart and the Martell reports.

Q    So in terms of what the facts -- Let's call them the new facts.  In terms of the purportedly new facts that we have, as you sit here -- And you've indicated that those have caused you to feel badly that you did not discover these other things, correct?

A    More than badly.

Q    All right.  And your basis for believing that those facts are true comes primarily from -- and came primarily prior to

this declaration from reading Dr. Stewart's report and
Dr. Martell's report, correct?

A    And discussions with the habeas defense team.  I mean
I ---

Q    What they told you.

A    I never talked to any of the witnesses.  I never had an
opportunity to assess from a one on one were they credible or
not.

Q    You never ---

A    So I ---

Q    Okay.  I'm sorry.

A    No; that's all right.  Watch the shoulders now.

Q    It's actually more than shoulders at this point.  She's
giving me daggers.

A    So I -- I don't think that I was in a position to assess
their credibility other than, you know, obviously, some of the
things that they were talking about would have been painful to
divulge.

Q    So going back to the statement in terms of -- the
question rather in terms of this declaration and your
conclusion that there had been this misunderstanding and that
there had been a grievous misunderstanding, that caused --
that had had a causal effect in the case --

A    That's what I believed.

Q    -- from you uncovering new facts; prevented you from

uncovering new facts.

A    I -- The misunderstanding didn't prevent us from uncovering the facts.

Q    Okay.

A    The misunderstanding contributed to the fact that those new facts --

Q    Other things ---

A    -- were not discovered.

Q    Other things had a causal nexus to your inability to discover the so-called new facts.

A    Other than -- Yeah.

Q    You just said the misunderstanding wasn't the only thing.

A    That's correct.

Q    What were the other things?

A    The fact that there wasn't enough effort that was put in to, you know, communicate with Dr. Haney.  There wasn't enough effort that was put in to ensure ---

Q    Well, that's the -- that's the misunderstanding.

        MR. MORENO:  I would ask that he be allowed to finish his answer.

        THE COURT:  Yeah; sustained.

A    That there wasn't enough effort to develop the kind of relationship with -- certainly with Juanita Allen and hopefully with Billie Allen where they felt comfortable divulging these family secrets.

Q    (By Mr. Holtshouser)  And that is again, a hindsight assessment, correct?

A    I mean I -- Yeah.

Q    You built into your -- Your conclusion is the assumption that these family secrets are, in fact, true, correct?

A    That's part of it, yes.

Q    And at the time, not in hindsight, at the time you didn't believe there were such family secrets that you had been unable to divulge, correct?

A    Factually, I did not know of them.

Q    I'm still getting back to what led you to create this declaration.  The basis of what you had in terms of any belief about the new facts prior to this declaration came from communications and conversations with habeas counsel, correct? Not solely but partially?

A    Yes.

Q    And from reviewing Dr. Stewart and Dr. Martell's reports.

A    As I recall, yes.

Q    You haven't actually ever seen a report of Dr. Stewart, have you?

A    Not a report, no.

Q    Just a declaration?

A    Just a declaration.

Q    You've never seen his notes, have you?

A    I have not.

Q    Okay.

A    Nor have I -- I haven't seen the test protocols or any of that.

Q    And you haven't seen their deposition testimony either?

A    I have not seen it.

Q    Okay.  You haven't -- didn't -- hadn't actually read prior to preparing this declaration each of the individual declarations of the various fact witnesses, --

A    I had not.

Q    -- historical fact witnesses.

A    I had not.

Q    Okay.  Nor have you seen their depositions.

A    I have not.

Q    Would it be fair to say that if the facts turn out to be different than they are portrayed by Dr. Stewart, that your perception of the effect of this misunderstanding might change?

A    I think the misunderstanding exists no matter what.  If the facts turn out not to be facts, then it, obviously, would affect some of my judgments as to what would have been effective at the penalty phase.

Q    Directing your attention to this Paragraph 15 of the declaration and then hopefully we'll move on, the -- you state here, "It is now clear we did not investigate and present a thorough case, the mitigation case.  Rather, once Dr. Haney

dropped out of the case and Dr. Randall came into it, we did
the best we could under the exigent circumstances presented by
the Haney misunderstanding to put together a presentation that
had already been significantly impaired by the length of time
allotted to us."

The exigent circumstances that you're referring to
here, again, it's time, isn't it?

A    Time, correct.

Q    Regardless of that, under the circumstances that you had,
you agree in this declaration and you agree now, do you not,
that you did the best you could under the circumstances?

In other words, do you still ---

A    I've never done the best I could.

Q    Well, do you still agree with this statement in your
declaration that I've circled there?

A    We worked really hard with what we had.  I had terrific
assistance from Dr. Randall.  I tried my hardest.

Q    Would it be a "yes" that you still agree with that
statement in your declaration?

A    I just don't -- You know, that's a phrase that people
use, but when you think about the word "best," it's in my
declaration.

Q    The question is:  Do you still agree with it?

A    We did everything we could.  I don't know -- I -- It's in
my declaration.  I didn't sign it because I didn't agree with

it.

Q    We'll try one more time, defer to buses.  You're going to get on the bus or get off the bus.

A    I did the best I could.

Q    All right.  There were other things that contributed to -- Besides the misunderstanding, there were other things that were contributing to and obstacles to uncovering what you referred to as family secrets or the so-called "new evidence," correct?

A    Did you say "obstacles"?

Q    There were other obstacles and hurdles.

A    Yes.

Q    Okay.  And we've covered a few of them.  They included, for example, Mrs. Allen, what she was telling you wasn't consistent with what she's saying now, was it?

A    No.

Q    What Mr. Allen was telling you isn't -- wasn't consistent with what Mrs. Allen is saying now, correct?

A    No.

Q    In fact, there were also witnesses who you presented at trial who testified under oath to positive information about the manner in which Juanita Allen raised Mr. Allen.  Would you agree with that?

A    Yes.

Q    Do you recall a woman by the name of "Nancy Harris" who

had testified that Mrs. Allen was a caring mother and was very good with her kids?

A   I don't remember her specifically.

Q   I'm showing you an exhibit.

A   Can you go back to the very first part?  It might help me remember who she is.

Q   Okay.  This is your exhibit -- First of all, for the record Exhibit 202.

A   All right.

Q   This is the Direct Examination by you of Nancy Harris.

A   Nancy Harris is the neighbor?

Q   Neighbor, 4586 Cote Brilliante.  She's lived there since 1963.  You brought out from her some information about the neighborhood and what the street was like growing up when Mr. Allen would have been a youth, correct?

A   I remember her to some extent.

Q   Okay.  Do you remember that she actually had some positive things to say about the particular block that they lived on?  That the surrounding area was deteriorating?

A   As I recall, one of the things she talked about was the change that had occurred over the course of her living there in the 30 years or 30 plus years she had been there and how it was changed from the neighborhood that had communications and values into sort of this isolated pocket kind of surrounding. As I remember the picture we planted, it was surrounded by

kind of a war zone.

Q    I direct your attention to Page 292 of this transcript or actually the page before you elicit specific information about the neighborhood that you're referring to.  Look at Line 7.

"When you first moved there, the type of people that lived there, most of the people there worked" was your question.

She said:  "Yes."

"Is that different now?"

"Yeah."

MR. MORENO:  I object.  The record speaks for itself. He doesn't have to read it for the penalty phase testimony.

MR. HOLTSHOUSER:  Okay.  I just ---

MR. MORENO:  He asked the relevant question, "Do you recall?"  And he answered the question.  I don't think there's anything gained by reading the testimony into the record.

THE COURT:  Well, let's approach it this way.  The deposition was -- customarily is used, after the witness is asked a question, to clarify his answer or to impeach him. And so I think the objection has to be sustained.

MR. HOLTSHOUSER:  Can I just -- This is actually not her deposition.  This is trial testimony --

THE COURT:  Right.

MR. HOLTSHOUSER:  -- on Nancy Harris.  The Direct would be conducted by Mr. Sindel.

THE COURT:  Yeah.  I misspoke.  I understand now.

MR. HOLTSHOUSER:  So I think it's in evidence actually, but I will move on to the next page where my question is.

THE COURT:  All right.

MR. HOLTSHOUSER:  I wanted to orient Mr. Sindel to the statement he had just made.

MR. MORENO:  Well, I'm still going to object to reading it.

THE COURT:  Well, no.  He said to orient him, so overruled.  So that's correct.

MR. HOLTSHOUSER:  Okay.

Q   (By Mr. Holtshouser)  My question here is:  Do you recall putting on evidence, the specific evidence that Ms. Allen was a caring mother and was good with kids and, in fact, you see that on Page 292 you asked her those questions and that she gave those answers in front of the jury?  Ms. Harris.

A    That's correct.

Q    And do you recall Deborah Ruffin?  Presenting her as a witness?

I'm showing you Exhibit 178 which is her Direct testimony.

A    Yes, I do, but not with the same specificity as I recall Nancy Harris.

Q    Nancy Harris, okay.  Page 38 of her transcript, and

that's exhibit 178 for the record, she was describing an incident that occurred where they ran into Johnnie Grant at the supermarket?

A   Yes.

Q   You see the top of Page 41 of this, you asked about -- you said, "I think she testified that Mr. Grant was yelling at Mrs. Allen."  And you asked or ---

MR. MORENO:  I'm going to object to this again.  This is no longer just giving him context.  He's just reading what was damaging testimony at the penalty phase into the record.

THE COURT:  Okay.  Well, I thought we covered it sufficiently, but let's talk about it again.

Mr. Sindel has signed a declaration in which he states that he gave ineffective assistance of counsel in very specific ways, and this is the opportunity of the United States to challenge him by explaining what he did under the circumstances to differentiate what he knows now from what he knew then.  So I know of -- There's just no other way I know to do this.  So I'm going to overrule the objection.  Go ahead.

Q   (By Mr. Holtshouser)  You got a minute to look at Page 41.  Do you -- Do you note here that Mrs. Allen or that Ms. Ruffin testifies that during the conversation, the encounter, Mrs. Allen, on the other hand, did not raise her voice or lose her temper?

A    I haven't read the entire page.  I was trying to divide my attention, but there is reference in the upper -- the upper portion of the page, top half of the page, to the conversation that occurred at Schnucks and whether Juanita yelled at Mr. Grant and whether she used foul direction directed at him.

Q    Do you also recall that you put on the testimony of several teachers that were Mr. Allen's teachers at -- from Clayton, amongst other places?

A    Yes.

Q    And that several of those teachers testified to Mrs. Allen attending parent/teacher conferences on occasion?

A    As I recall.

Q    Do you recall Melissa Petty testifying that Mrs. Allen was somewhat strict and had rules for Mr. Allen to be followed?

A    I remember there was testimony to that effect.  I couldn't attribute it to one person or another.

Q    Okay.  Tasha Valentine, you recall her, correct?

A    Yes.

Q    I'm showing you Exhibit 190.  Do you recall here that you called her as a witness and this is you beginning your Direct Examination of her?

A    Yes.

Q    You see at the bottom of the page there?  I would ask you:  Do you recall that Mrs. -- that Ms. Valentine testified

about her contacts with Ms. Allen?

A    There was a reference to a phone call?

Q    Correct.  That Mr. Allen, "Did you at time during that time period try and contact his mother?"

She testified that she said -- "Well, he had told me to call his mother and talk to her and see if he could come home, but when -- I think when he called one time, his sister or someone said that she wasn't there.  And then I called back, and his mother said that she wanted Bill to call her and talk to her."  Do you recall that testimony?

A    That's -- That's what's in the transcript.

Q    Did you have any indication from either the witnesses who testified for you at trial or that you had discovered during the mitigation investigation, any notion that Mrs. Allen abandoned Mr. Allen?

A    I mean I think there were indications periodically that he left the house, but I wouldn't say that there was evidence that we had developed that she would abandon him either inside the house or outside the house.  In other words, I didn't have any indication.  When you used world "abandon," I take it to mean absent herself from his presence, and I don't recall any significant testimony in that regard.

Q    Besides testimony, do you recall any evidence that you discovered during your investigation that would have led you to believe or have reason to suspect that Mrs. Allen had

abandoned Mr. Allen at any point in his life?

A    Any -- I mean there was certainly the incident where the house was shot up.  There were things like that, but I ---

Q    And how does that -- how does that play into abandonment?

A    Well, I'm just trying to -- I don't have any recollection of developing evidence that she had abandoned him for any significant period of time.

Q    You had evidence, though, did you not, that she had gotten him medical care on a number of occasions?

A    We had evidence of medical care.

Q    And evidence from teachers that she had attended parent/teacher conferences?

A    We had that evidence.

Q    And he was attending Clayton School District.

A    We had that evidence.

Q    And you had information from neighbors and family members about her role as a mother?

A    We did.

Q    All right.  And you also had your interaction with her and Mr. Allen.

A    I did.

Q    Did any of that point you in the direction of the abandonment?

A    No.

Q    Okay.  And you also had two instances of police reports

in which she had reported him as a missing person.

A    Yes.

Q    And one usually does that because they want to get that person back.

A    I couldn't speak to her motivations.

Q    Okay.  At the time of the incident, how old was Mr. Allen?

A    I believe 19.

Q    And he would have been 19 as well at the time of the shooting at his mother's house.

A    Yes.

Q    Regarding his father, Mr. Allen, do you recall that you even had evidence from one of your trial witnesses that Mr. Allen was, in fact, a good father?

A    That came as quite a surprise, yes.

Q    And that actually came from Otha Petty, Jr., one of Mrs. Allen's brothers.

A    I thought it came from a different individual, but I may be mixing the two up.  I remember there was something to the effect that he wasn't such a bad guy or something.

Q    I'm showing you Exhibit 185.  It's the first page of the Direct testimony of Otha Petty, Jr.; Otha Petty, Sr., being the grandfather.  Do you recall that?  The relationships rather.  Do you recall the relationship?  Who was who?

A    Yes, I do.

Q    Okay.  I just want to orient you so that -- to make sure that you remembered who was which person.

THE COURT:  Was that -- Could I get those names?  Is it Petty, Jr.?  Petty, Sr.?

MR. HOLTSHOUSER:  Otha, O-T-H-A, Petty, Sr., is the grandfather.  Otha Petty, Jr., is the son and is the brother of Juanita Allen.

Q    (By Mr. Holtshouser)  Did I get that correct, Mr. Sindel?  Otha Petty, Jr., is the brother of Juanita Allen, the best you recall?

A    Yes.

Q    Maybe if we look at the second page of this, do you see Line 10 of Page 198 of Exhibit 185?

"Are you related to Juanita Allen?"

"Yes, I am."

"How are you related to her?"

"She's my sister."

Okay?

A    Correct.

Q    Do we got that right?

A    Yes.

Q    And then if we go to Page 207, this is Mr. Dowd conducting Cross Examination.  With respect to his father, Otha, Sr., he testified that his father, the grandfather, was a good role model for Mr. Allen.  Do you recall that?

A    Okay.  Wait a minute.  I don't -- Where?

Q    I'll go to the next page, referring to his father.

A    When you say his father, are you talking about ---

Q    First of all, he's talking about "your father," and that's Otha Petty, Sr., correct?

A    Okay.

Q    All right.  He testified that he was a good role model, meaning Otha Petty, Sr.

A    Okay.

Q    A good man, a good hard-working man.  At the beginning, though, up here, I direct your attention to the part I've circled.  Mr. Dowd asked -- I circled the wrong thing.

        "And you said that his father" -- and, again, we're referring to Mr. Allen -- "saw a big change in the defendant in the time he knew him."

        And he says:  "No, not really."

        "And you said his father, at least when they were together, was a good father?"

        Otha Petty, Jr., said:  "Yes, he was."

        "And he cared about Billie?"

        "Yes."

        "And as far as you're concerned, he drinks but he's not an alcoholic?"

        "Yeah.  Yeah."

A    That's the testimony.

Q    That's the testimony.  And that really wasn't consistent with some of the other testimony that you had about John Allen correct?

A    Correct.

Q    So is one of the things that you deal with as a trial lawyer is not everything is all one way, is it?

A    Well, what you deal with sometimes is you may have either someone who jumps off the reservation or who, you know, you've gotten six answers from them, all the same, and they get on the witness stand for four days, and they -- it's a tough place to be, and all of a sudden something happens that totally shocks you.  Did I believe that testimony?  Definitely not.

Q    Would you say that -- Would it be correct to say that the majority of the evidence that you discovered pointed you in the direction you followed?

A    That's correct.

Q    And the majority of the evidence you presented supported the themes that you presented.

A    That's correct.

Q    And you also had to make some strategic choices, did you not, about what to do with the evidence that did not fit, like this?

A    Well, I -- I can only tell you if I thought that Otha Petty would have testified this way, I don't know what I

would have done, but you do make strategic choices about presenting evidence that don't fit the theme that you're trying to present.

Q   Okay.  With respect to the theme that this impacted, one of your themes, was it not, that Mr. Allen lacked a role model and a father and that his father was, in fact, an alcoholic bum?

A   That's right.

Q   And if you had known that Otha Petty, Jr., was going to say this, you might have thought twice about putting him on?

A   I would have thought twice.

Q   Because why?

A   Well, you have to decide whether or not you're getting -- you're moving forward or you're walking backwards, and you don't want to -- I mean I think one of the things that attorneys oftentimes don't do, and I've discussed in seminar presentations, is, you know, you have to continue to move the ball forward.  And just putting somebody on to get a little fact that doesn't mean anything and then have it move backwards is no good.

Q   That's that cost benefit analysis, correct?

A   It is just that.

Q   Okay.  And these are things that you give seminars and presentations on?

A   Yeah, I have.

Q    To groups of capital defense attorneys as well as practicing criminal defense attorneys?

A    Both.

Q    Had you given any presentations to capital defense bar groups prior to the trial of Billie Allen?

A    Yes.

Q    And you have given many since then, correct?

A    Yes.

Q    Would you say that -- Strike that.

The cost benefit analysis you do with evidence that fits and doesn't fit your themes, was there anything that you discovered that you deliberately ignored or failed to consider using or failed to consider how it fit in your theme line-up?

A    Okay.  Well, I don't think you can deliberately ignore something you've discovered, but if I understand your question without that in it, was there something that I said, "We're not going to use that because it doesn't fit our theme"?  I say "yes."

Q    Okay.  And in terms of investigation by deliberately ignore, would you agree that you could have a fact, such as a fact like Otha Petty, Jr., could have told you this during your investigation and say, "Actually, you know, John Allen wasn't a bad dad.  And John Allen wasn't -- while he drank, he wasn't an alcoholic, at least while he was in Mr. Allen's life."  That would have been then a fact just sitting out

there that's sort of an outlier compared to all of the other accounts you have of John Allen, correct?

A    Correct.

Q    You could have still have a choice, would you not, of saying, "Well, I'm going to ignore that one and not even see whether anyone else corroborates that, and I'm only going to pretend that it's like this over here."  I mean you could deliberately ignore that, that line-up, that lead, correct?

A    I could but I didn't.

Q    But you didn't, correct?

A    Right; no.

Q    And you didn't do that with respect to any fact that you had developed during the investigation, deliberately ignore it, where it might lead you?

A    Not that I can deliberately recall.

Q    Let me show you Exhibit 505 and ask if you recognize this.  It's not necessarily a part of your file but it's part of the discovery that came to us from the habeas petitioner.

A    All right.

Q    Do you see this list of factors that affected Billie Allen's life?

A    Yes.

Q    Do you recognize it?

A    I can recognize it as a -- sort of an outline, if you want to call it that, of the themes that were developed in the

mitigation phase.  I would -- If I had to guess, it would come from Dr. Randall's --

Q    So --

A    -- material.

Q    -- was it something that was circulated?  May not have been actually typed by your fingers or dictated by you but something that circulated?

A    I would think so, yes.

Q    The factors that had been identified listed here febrile seizures, lead poisoning, poor maternal role model.  That would be his mother, correct?

A    Yes.

Q    So would it be safe to say that you ---

A    I don't believe -- I'm going to -- I didn't read the entire document, but ---

Q    I'm going to go through them one by one.

A    No, no.  You don't have to.

Q    Okay.

A    I'll read it one by one, and we'll save ourselves all that time.  There were things in here that were developed and there were things in here that were not.

Q    What I want to ask you about is this one right here.

A    I see it.  I also don't remember developing evidence about genetic predisposition to addiction.

Q    What would that refer to?

A    Well, the concept that -- that certain people genetically -- certain groups -- certain people who, you know, with family members or whatever, the science is tending to believe that there can be genetic predisposition towards addiction, whether to drugs or alcohol.

Q    And that genetic predisposition is another way to describe probabilities.

A    That is correct.

Q    That someone who is genetically linked to a person who is an alcoholic has a higher statistical probability of themself becoming an alcoholic.  Is that what you're referring to?

A    That's correct.

Q    That's not -- That's research you were not unfamiliar with even prior to 1998?

A    I have to assume I was not.

Q    Okay.  That you were not unfamiliar with it.

A    That I was aware of it.

Q    You were aware of it.  You had some -- some information that Mr. Allen was perhaps an alcoholic.

A    Correct.

Q    And you had information that other members of his family were perhaps either alcoholics or drug addicted.

A    Correct.

Q    So that would have presented in Mr. Allen's list of factors or risk factors a genetic predisposition to that

himself, correct?

A    Yeah, but I don't believe that we had developed much in the way of significant drug or alcohol abuse by Mr. Allen other than a pretty consistent consumption of marijuana.

Q    You had not developed evidence of extensive use of alcohol?

A    I don't recall thinking that he was an alcoholic.

Q    Would Dr. Cuneo or Dr. Gelbort or Dr. Randall perhaps be the best ones to address that, whether or not it had been developed?

A    That's correct.

Q    Or in the notes of others doing investigation?

A    Yes.

Q    How about this physical abuse and beatings factor here? How did that come to be on the list of factors that affected Mr. Allen's life --

A    I don't ---

Q    -- if not for the fact that someone knew about it?

MR. MORENO:  Well, I'm going to object in that he didn't draft this document.  He can't speak to how it got there.

THE COURT:  Well, okay.  What we have here is what you say is true, but he has referred to some other things on the list that he did consider.  And so I don't think the list is what's being offered as substantive evidence but what he

did from examining the list or using the list.  So overruled.

A    Okay.  Ask the question again, please.

Q    (By Mr. Holtshouser)  If this was a list that was circulated or that was discussed amongst -- Let me ask you this:  Let's make it a little bit clearer for the Court.

The extent of your knowledge of this list, while you didn't create it, is it something that would have been used in meetings with Dr. Randall or Dr. Cuneo, Dr. Gelbort or Mr. Simon, strategy sessions of what factors to stress?

A    I don't -- I don't remember this list.  So these are topics or areas that might be utilized to help focus the group of individuals as to what we thought was developed, but I just don't remember this list.

Q    Each of the things that you see on this list here ---

A    I mean I know I didn't generate this list.

Q    Each of the things you see on this list here, though, would you agree that they had some factual evidence to support them that you were aware of as a result of the mitigation investigation?

A    I mean I think that we had indication that he had been beaten up and I think there was a pistol whipping and stuff.

Q    I'm asking about the other things in the list now.

A    The whole other things?

Q    Most of the other things -- Well, ---

A    We had evidence of most of the other things that are on

the list.

Q   Right.  So did you have some evidence of physical abuse and beatings?

A   I mean I knew that he had had -- been beaten up by the neighborhood kids and had been -- had some run-ins with the kids when he played baseball, I think it was, and basketball. And that's what I remember about in terms of physical abuse; discussions about him being knocked unconscious, that kind of thing.

Q   The phrase "physical abuse," is that how you would use that to describe incidents of -- of those kinds of altercations?

A   No.

Q   You would use that to describe, for example, ---

A   A pattern.

Q   A pattern; something that's happening somewhere to him in some setting, whether it's at school or at home.

A   Or, you know, it could be a number of different settings, but a pattern of physical abuse.

Q   Dr. Cuneo and Dr. Gelbort, let's talk about them for a second.  Dr. Gelbort did, in fact, give an opinion at trial that Mr. Allen was brain damaged, did he not?

A   I believe so.

Q   So regardless of the extent of the tests that he gave, was there any doubt or any doubt in his opinion which

expressed to the jury that Mr. Allen was, in fact, brain damaged?

A    I don't recall him wavering while he was testifying.

Q    There was nothing tentative about his testimony or opinion or diagnosis, was there?

A    I don't believe there was.

Q    Now Dr. Cuneo, there's a couple of exhibits I need to show you in discussing his -- his testimony and how you -- how he came to be in your case.

        Let's go back to Exhibit 565 which is the report dated February 16, 1998, reflecting an evaluation that took place on January 16th, 1998.  Do you recall that?

A    Yes.

Q    Okay.  And according to this report itself, one of the things that Dr. Cuneo had done was to speak with Mrs. Allen, correct?

A    Yes.

Q    Himself directly and personally.

A    That's what I assume from the reading of the report.

Q    At the time that this report was written, February 16 of 1998, you were -- you requested Dr. Cuneo to prepare this report.  Is that right?

A    I believe so.  I don't want to ---

Q    And was that, in part, due to requests by the Government for discovery about the potential experts that the defense was

going to use in mitigation?

A   There was -- There was proceedings before the Court in which I made a statement to the Court that I was requesting a report as soon as possible.

Q   And that statement was made in a hearing that took place on February the 6th, 1998, ten days before this.

A   That -- That -- You're better at the dates than I am, but I think that's accurate.  I saw some ---

Q   We looked at that yesterday.

A   Yes.

Q   All right.  With respect to strategy, capital defense strategy, let me ask you this:  Is there an advantage to the defense to -- "conceal" is not the right word but to withhold the opinions of your mitigation experts and the content of your mitigation evidence from the Government as long as possible?

A   I mean that's sort of a two-headed dragon.  Obviously, you have your ethical responsibilities, your responsibilities under the rules, your responsibilities to comply with the Court Orders.  I have for the most part believed that if you want open disclosure, you need to give open disclosure.  Rule 16 disclosure requirements in federal court, if interpreted within the terminology of that rule, can be awfully restrictive from a defense attorney's viewpoint.

Q   Now -- And you know, though, that in penalty phase, those

-- those are not -- those are not generally applicable.  The
Rule 12.2 governs.

A    I understand that, but what I'm saying is that I don't
think concealing evidence is ever appropriate --

Q    Okay.  And I ---

A    -- unless -- I mean unless you have an ethical obligation
in that regard.  However, everybody likes to hold their cards
close to their chest, if they can.

Q    And so, in particular, in capital defense and in the
mitigation phase, is it advantageous, an advantageous strategy
to pursue for the defense, to withhold, not conceal, but to
withhold from the Government that evidence as long as
possible?

A    It can be.  It doesn't have to be.  And when we talk
about withholding, that's also kind of an uncomfortable word,
but I prefer sort of not openly disclose perhaps.

Q    Okay.

        THE COURT:  I think we might -- This is a good spot
to take a break, 15-minute break.  Court's in recess.

        (Court recessed from 10:23 AM until 10:44 AM.)

        MR. HOLTSHOUSER:  May I proceed, Judge?

        THE COURT:  Yes, sir.

        MR. HOLTSHOUSER:  Okay.

Q    (By Mr. Holtshouser)  Mr. Sindel, still talking about
Dr. Cuneo, still talking about his report, and Exhibit 43-A,

just to orient you again, is the transcript of the hearing

that took place on February 6th, 1998.

A     Yes.

Q     And so to orient you chronologically, according to the

report that Dr. Cuneo ultimately prepared, January 16th is

when he conducted his examination.

A     Correct.

Q     Okay.  In this hearing -- In this transcript which we saw

yesterday, Mr. Landolt references a conversation in which you

had told him earlier in the week that Mr. Allen has been

diagnosed with PTSD.

A     Correct.

Q     You knew that because you had conversations with

Dr. Cuneo following his examination of Mr. Allen.

A     That's correct.

Q     Those were mitigation conversations as well, correct?

A     Correct.

Q     Not competency conversations.

A     Oh, yes.

Q     In this hearing at Page 39 of the exhibit, there's a

conversation in which you speak with the Court and Mister --

This is not ex parte, I do not believe.  And the subject which

the Court brings up is:  "When do you think Dr. Cuneo's final

report will be forthcoming?"  Now at that point in time there

was actually no report, but he's referring to the final report

is the -- or there isn't one prior to this yet, correct?

A    As far as I remember.

Q    A preliminary report and say, "Well, I'm preparing a final one."  It's just going to be the report of Dr. Cuneo.

A    I don't remember any written preliminary report, but if you could pull one out.

Q    And then at the top of the next page, "Do you have any feeling for that?"

And your answer was:  "I talked to him just yesterday.  I told him that I wanted him to give a preliminary report.  Every single thing he generated comes to me.  And I said, 'Get it done.'"

A    No, that's not what I said, though.  I said it comes to me and the Government.

Q    Okay.  That you will give it to the Government as soon as you get it, correct?

MR. MORENO:  I'm going to object.  Not to be difficult, but I think we did this exact review of these transcripts yesterday about the same issue yesterday.

MR. HOLTSHOUSER:  Well, we're actually focusing on a different issue.  I'm setting -- I'm orienting Mr. Sindel.  Again, this happened 14 years ago, and I don't want to be asking him questions in which he has no ability to recall without having given him the context.

THE COURT:  Yeah.  I don't remember the part about

the Court being involved in that question. Go ahead. Yeah, overruled.

Q   (By Mr. Holtshouser)  As you sit here, do you have a recollection that after February 6th of '98, you produced that February 16, 1998, report by Dr. Cuneo to the Government when you got it?

A   I don't have a recollection of doing that, but that's what I said I would do.

Q   Do you have any recollection, after that report was produced to the Government, that Dr. Cuneo, in fact, did a second examination of Mr. Allen?

A   I don't -- I don't -- I can't really answer that.  I don't know.

Q   Let me show you Exhibit 257 which is the declaration of Dr. Cuneo.  What I want to ask you about is on Page 2, --

A   Okay.

Q   -- Paragraph 5.  He refers to the examination that he conducted on January 16th as a competency evaluation.  Now you've just testified that the conversation that you were having with Dr. Cuneo in late January and early February were mitigation conversations, correct?

A   They touched upon the mitigation issues in those, specifically the diagnosis of post-traumatic stress disorder which was the diagnosis that I related to Mr. Landolt.

Q   And that diagnosis, though, at the time you were having

those conversations, you're anticipating this case is going to go to trial, and Mister -- that there's going to be a penalty phase and that Dr. Cuneo is going to be used as an expert in the penalty phase potentially.

A    Potentially.

Q    Okay.  You're not thinking, "I'm going to raise at the very last minute a competency claim."

A    If I had had the indication that he was not competent, then we would have presented that to the Court and had the Court determine it, but that's not what was determined by Dr. Cuneo and that's not what I believed would be the results of Dr. Cuneo's evaluation and examination of Mr. Allen.

Q    Okay.  And you believed that the examination that he had done in January of 1998, while it might have addressed competency, was mainly focused at what information could he develop that would be for mitigation.

A    I mean I believe it was mainly focused on any psychological issues that would arise during the course of his evaluation.

Q    Okay.  You see here in the last part of this, it says that, "In early February, after I completed my evaluation, trial counsel asked" -- "Trial counsel" would be you, correct?

A    That would -- It could be either one of us.

Q    Or Mr. Simon.

A    Right.

Q    "Asked me to consider possible mitigating factors present in Mr. Allen's psychological profile."

Now would it be fair to say that that isn't true? That Mister -- Dr. Cuneo, in fact, mentioned mitigation in the report that he prepared regarding his January examination?

A    Did he use that word, "mitigation"?

Q    In his report.

A    Then he used that word in his report.

Q    It says, "Due to the time constraints that the defense team was then working under, I do not have time for a second face-to-face interview with Mr. Allen that would have focused solely on mitigation."

A    He says that.

Q    Do you see that?  Now as you sit here, do you -- do you have a recollection of whether or not what he is attesting to in his declaration was true or not?  Whether or not there ever was a second face-to-face interview with Mr. Allen?

A    Oh, I -- I don't know if there was a second face-to-face interview of Mr. Allen by Dr. Cuneo.  I didn't think there was, but I hesitate to say one way or the other.  It would be -- It would be apparent from the Franklin County records.

Q    Let me show you Exhibit 55.  Dr. Cuneo was an expert that you were retaining that was going to be paid through CJA funds as part of your appointment, correct?

A    Yes.

Q    Okay.  Mr. Allen was an indigent person and was entitled to have these -- these services paid for by the Government.

A    Yes.

Q    And Exhibit 55, which I have shown you, do you recognize that as the CJA form that Mr. Cuneo ultimately submitted and that you would have submitted to the Court on his behalf?

A    I don't recognize it, but I have no reason to doubt that that's what it is.  My signature is on it.  His name is on it.  His -- Apparently his signature is on it.

Q    Okay.  Do you -- Directing your attention to Page 2 which contains a summary of Dr. Cuneo's contact with Mr. Allen, first of all, on January 16th, there's a four-hour evaluation at the jail.  That's the evaluation that is referred to in his report and that he gave that you -- the report on which you ultimately gave to the Government, correct?

A    Yes.

Q    And even subsequent then, there's a two-hour meeting on February 1st of '98 with Dr. Randall, correct?

A    That's what is referenced there.

Q    Now Dr. Randall was your mitigation specialist, correct?

A    He is.

Q    Would it be fair to say that that meeting with Dr. Randall was directed toward mitigation, not competency?

        MR. MORENO:  I object since he wasn't there.

        THE COURT:  Would it be fair to assume.  Overruled.

You're not -- Certainly your counsel is correct.

A    Obviously, I wasn't there.  I don't know what they discussed during the course of that meeting.

Q    (By Mr. Holtshouser)  Are you sure you weren't there?

A    No, I'm not.

Q    Okay.  Since it only says, "Meeting with Dr. Randall," let's assume you weren't there.  But Dr. Randall's role in the case was as a mitigation specialist, correct?

A    That's correct.

Q    He wasn't an attorney.

A    No.

Q    He wasn't helping you prepare a motion to -- to find that Mr. Allen was not competent to stand trial in order to avoid or obviate the need for a trial, correct?

A    No.  I think -- I think we had the understanding that part of his obligation was to examine the psychological profile for Mr. Allen.

Q    For mitigation.

A    For -- As part of the overall look at the case, yes.

Q    Which included mitigation.

A    It did.

Q    And that's what Dr. Randall's role was.

A    His role was as a mitigation consultant.

Q    Do you have any doubt that Dr. Cuneo's meeting with Dr. Randall on February 1st, that that meeting concerned his

opinions as they pertained to mitigation?

A    I have to assume that that meeting had to do with the psychological profile that Dr. Cuneo had developed as a result of his interview and testing of Mr. Allen.

Q    And the reason he would be sharing it with Dr. Randall would be in Dr. Randall's role to determine what to do with it in mitigation.

A    He would be examining and evaluating that.

Q    Okay.  And reporting to you?

A    He would.

Q    There are more reviews and information that took place on the 11th, the 15th and the 16th.  Do you have any recollection of what additional information Dr. Cuneo was supplied with that he reviewed?

A    I'm assuming that if he requested anything in terms of medical records, hospital records, school records, any of that stuff, it would have been provided and he could have reviewed it.

Q    Do you see here on February 22nd, 1998, that there is a six-hour evaluation at jail, meeting and review that took place subsequent to the January 16?

A    Yes.

Q    An evaluation at jail would refer to Mr. Allen, would it not?

A    I would think so.

Q    So would it be fair to say from Dr. Cuneo's own CJA records, his statement within his declaration that I showed you a few moments ago, that he never had time to conduct a second face-to-face interview was false?

A    One -- One of those two documents could be mistaken or they could be -- Put it this way, they're not the same.

Q    All right.  And at least the way your declaration was presented to you as it was prepared by the habeas counsel, you were supplied with selected information by habeas counsel, --

        MR. MORENO:  And I'm going to object to the characterization.

Q    -- and you agreed with it, correct?

        THE COURT:  Okay.  Wait a minute.  Let me hear the whole question.  Ask the whole question.

Q    (By Mr. Holtshouser)  At least with respect to your declaration, the way in which it came to be was that it was drafted by habeas counsel first, correct?

A    That's correct.

Q    Presented to you.

A    Correct.

Q    Okay.  And the documents that you were presented with were partial of the complete set of documents that are part of the habeas petition.

A    I didn't get the entire package.  I have since then received it on a disk.

Q    Have you looked at it?

A    Pieces.

Q    Okay.

A    It's a ---

Q    Prior to the declaration ---

A    There it is.

Q    Prior to the declaration, I think we've established that ---

A    I have not looked at it, but I want to -- don't want to leave the impression with the Court that they cherry-picked what they were going to give me or wouldn't give me what I wanted.

Q    Did you ask for anything more?

A    I don't remember that I did.

Q    You felt that you saw enough -- You felt that you saw enough in what you read of Dr. Cuneo or Dr. Martell and Dr. Stewart's reports.

A    I thought that those were particularly relevant to what I would be stating in my declaration.

Q    So even with respect to those reports, you weren't given the -- you did not, in fact, examine the extent to which what's in Dr. Stewart's report, for example, is different than what's in the actual declarations of some of the witnesses who he is referring to.

A    I have no idea of whether or not his report accurately

paraphrases the declarations or testimony or interviews he conducted.

Q    And you, likewise, don't have any knowledge as to how Dr. Cuneo's declaration came to be prepared either, do you?

A    No, I do not.

Q    Directing your attention to Exhibit 20 -- oops, that didn't work -- 208, do you see that this is the first page of Dr. Cuneo's trial testimony in which you are presenting -- which you were presenting and conducting the Direct Examination?

A    That's correct.

Q    So beginning on Line 5 you ask him whether or not he evaluated Mr. Allen as to his competency to stand trial.  He says:  "Yes, I did," correct?

A    Yes.

Q    And then you also then ask the question:  "Basically did you also do an evaluation to determine whether or not there existed certain mitigating factors surrounding his behavior during the course of the event that you understood he had committed," correct?

A    I asked him that question.

Q    And your question related to during the course of the event, and the event you're referring is what?

A    The criminal act.

Q    Okay.  He says: "Yes, but I didn't know I was supposed

to do that until later."

And you said, "Okay.  Tell me a little bit about what the evaluation consisted of."

At that point, the evaluation, are you referring to one, two or both of the evaluations?

A    I can't tell you that.

Q    Directing your attention to Page 211 of this same exhibit, again the Direct Examination of Dr. Cuneo, you asking the questions, Dr. Cuneo has in the first part here discussed some of what he looked at.

A    That's correct.

Q    And then it says, "Then I" -- It also says, "Then I interviewed his mom."

A    Right.

Q    So it was clear in his trial testimony that he had interviewed Mrs. Allen.

A    That's what he testified to.

Q    Your question:  "Did you also interview Mr. Allen?"  And his answer is what?

A    Twice.

Q    "Saw him on January 16th."  Is he referring then to the first time he saw him?

A    That would be consistent with his report.

Q    And then that there must have been a second time as well.

A    I'm sorry.  Say that again.

Q    Then there must have been a second time as well other than January 16th if he said, "I interviewed him twice."

A    That's what he testified to.

Q    Okay.  And it appears that's what his CJA records reflect as well.

A    That's also accurate.

MR. MORENO:  Mr. Holtshouser?

MR. HOLTSHOUSER:  Yes.

MR. MORENO:  What page is that?

MR. HOLTSHOUSER:  Let me put it back up.  That's actually -- Of the exhibit, it's Page 12.  Of the transcript, it's Page 211.

MR. MORENO:  Thank you.

Q    (By Mr. Holtshouser)  Do you have a recollection that the revelation that Mister -- Dr. Cuneo had examined Mr. Allen a second time for which there was no report prepared became an issue in the case in the middle of Dr. Cuneo's testimony?

A    Do I remember if that became an issue?

Q    Yeah.

A    I just -- I don't.

Q    All right.  Let's go to the next page and see if that helps your recollection.  Do you see here that at that point in time I asked to approach the bench?

A    Yes.

Q    And the question raised is one -- He said he received

some information about Holder.  "All we have been provided is a report concerning his first examination," correct?

A    Yes.

Q    And you indicate -- And the question is:  "Are the opinions that he is going to give contained in the first report that we have?  Is he going to give any opinions not in the first report?"

          And your answer is:  "No other opinions."

          Then the question is:  "Do we have any notes?"

          And then there's a discussion of notes.  And then you said:  "He has his notes."

          Now do you recall -- Does this refresh your recollection at all that there was a bit of a controversy regarding the notes in the middle of Dr. Cuneo's examination?

A    Okay.  I'm reading it.

          (Pause)

A    Okay.

Q    Do you recall that -- Does this refresh your recollection that there became an issue regarding Dr. Cuneo's notes?  It was ultimately resolved with the Court requiring that Dr. Cuneo's notes be turned over to the Government from both examinations.

A    I am aware that that's what's in the transcripts.

Q    And if the Court did that, then that was also complied with by you?

A    I'm sure it was.  When you say "complied with," I mean if the Court ordered Dr. Cuneo to turn over the notes, and then sometimes, you know, with psychologists and psychiatrists there's ethical concerns about turning over the notes to someone and test results to someone who's not a psychologist and psychiatrist.  I -- There may have been some concerns in that regard for Dr. Cuneo, but ---

Q    In this -- In this discussion here regarding the second interview, would it -- would it be clear -- is it apparent to you that prior to Dr. Cuneo mentioning it, the Government actually had not been given any notice of a second interview?

A    That -- That appears to be what was -- what happened there.

Q    That was resolved by producing his notes for both interviews, correct?  And I'm showing you Exhibit 565.

A    This is the one I saw yesterday?

Q    This is the notes from 1-16-98, the first interview.

A    All right.

Q    All right.  And if I page down through these, we get to a second --

A    Okay.

Q    -- section of these that is labeled 2-22.  And do you recall these as having been the notes from the examination and evaluation that took place on February 22nd that is referred to in his Direct testimony and also in his CJA records?

A    I have no reason to believe that they aren't.  I don't recall the notes in particular, but they certainly appear to be from February 22nd.

Q    And do you recall that as a result of those notes and there being further controversy in the transcript about redaction of some of those notes, that there had been a redaction from them of certain words and certain discussions?  Do you recall that at all?

A    I don't recall the issue concerning the redactions.

Q    Would it refresh your recollection that the redactions concerned what Mr. Holder -- I'm sorry -- what Mr. Allen said to Dr. Cuneo about the offense itself and that you had sought to keep that out of the notes by redacting them?

A    I don't remember if I thought to keep that out of the notes, but there is certainly words about the crime and that "I wasn't there."

Q    Okay.  "What it ended up being in the full set of notes was that there's the word 'crime' and there's a dash, and what does it say after that?"

        "I wasn't there."

        "And then below that, it says, 'Denies being,' and I can't read the next word, can you?"

        And Dr. Cuneo says, "in van."

A    Correct.

Q    "And down at the very bottom can you read the last line?"

He states, "He not there and being set up."

That is what his notes from that evaluation reflected as being the statements of Mr. Allen.

A    They appear in quotation marks here, and they would be consistent with something that Mr. Allen might have told him.

Q    Okay.  In the trial in the mitigation phase, would it be fair to say that you attempted to keep out of trial any direct evidence of Mr. Allen's membership in a gang?

THE COURT:  Membership in what?

MR. HOLTSHOUSER:  A gang.

THE COURT:  Oh.

A    That would -- That would be one of our objectives.

Q    (By Mr. Holtshouser)  Okay.  And I'm showing you Exhibit 195 which is part of the testimony of Shimeka Taylor.  Do you remember her?  Does her name ring a bell?

A    Yeah.  She was Marquis Taylor's sister.  Is that right?

Q    And there's a discussion -- You're questioning the witness about 45 Field Gang on Garfield.  At some point Mr. Dowd objects to the questioning, and then the Court begins at the bottom of Page 131 here.  Do you see there that the Court starts, "Throughout the earlier part of trial, the Government, under agreement, was precluded from mentioning the word 'gang' or anything associated with gang activity."

Do you recall -- Does that refresh your recollection that you actually sought protection from the Court that the

Government be prohibited from mentioning the word "gang" or anything associated with gang activity in the trial?

A    I don't remember the specifics, but I think it would have been to do with whether or not Mr. Allen was a member or an associate of a gang, not just the fact that there could be some testimony that gangs exist in that area.  But my goal would have been not to connect Mr. Allen by membership or association with any gang.

Q    That was your objective was to keep out that particular -- any evidence of that nature.

A    I didn't think it would be beneficial if the jury thought that he was a member of a gang.

Q    Which is that that's the reason why you sought to keep it out.

A    That's correct.

Q    And the Court's understanding was that there was an agreement that the word not even be mentioned or anything associated with gang activity not come in, and the Court asked you for some explanation of why you have noted here.  It says here, "In the trial the Defendant has repeatedly referred to this; sort of give us some explanation."  And you proceed to give an explanation concerning your concern and what you were attempting to do.  And ultimately -- ultimately, the Court overruled the Government's objection at the bottom there but then directed you to move on to something else.  See at the

top there?

A    Okay.

Q    You were trying to keep out evidence of Mr. Allen's membership in a gang, but you were actually trying to bring in some gang evidence as it related to the surrounding neighborhood and the environment, correct?

A    I don't believe that I had any specific knowledge that Mr. Allen belonged to a gang, but I was trying to keep out any inference --

Q    That he was?

A    -- that he was.

Q    At the same time, though, you were trying to -- and the reason that this came up is that through Shimeka Taylor, you were trying to get in evidence that the area surrounding where Mr. Allen lived was infested with gangs.

A    That is correct.

Q    Okay.

A    As I recall, the evidence was that there was sort of like two gangs fighting over turf and that, you know, if you went, for example, north, you would run into one gang and if you went south, you ran into the other.  Now that might not be the right direction of travel, but ---

Q    And you saw that the Court overruled the Government's objection, and you were actually permitted to -- that evidence was permitted to stand before the jury that the area

surrounding Mr. Allen was infested with gangs even though there was not to be any evidence of Mr. Allen's membership in a gang.

A    But, again, I did not know of any specific evidence that demonstrated he was a member of a gang.

Q    Okay.  And that wasn't my question.  The question was: You succeeded in doing what you were attempting to do, did you not?

A    I did.

Q    Okay.  You got before this jury evidence that the neighborhood surrounding where Mr. Allen lived was infested with gangs.

A    I did.

Q    Without having to risk any inference that he was a member of any of those gangs.

A    I have to explain the answer just a bit because I think if there would have been direct testimony that he was a member of one of those gangs, I'm not sure the Court would have made the same ruling.  I think my -- And I don't recall the motion *in limine* or how it was raised, but if it was a motion *in limine*, it would have been that we didn't have any direct evidence.  I don't recall any evidence in discovery that he was a member of any particular gang.  So that would have been -- I think that would have been part of the Court's calculus in making the decision as to whether it was

admissible or not.

Q   Okay.  And I accept your -- I think maybe you're thinking about it too much.  The question really is is that you succeeded in doing what you were seeking to do which was prove that there was gangs around where he lived but make sure there wasn't going to be any spillover that Allen might be a member of those gangs.

A   That's correct.  I'm glad you think I'm thinking too much.

Q   Now I want to talk to you about the jury's verdict for a second.  In terms of the actual verdict form, do you recall that there were issues that you presented as mitigators which -- about which there was no serious factual dispute?  In other words, the Government didn't put on contrary evidence.  The Government didn't even argue that they weren't -- hadn't been established factually.  Do you recall that?

A   Yes.

Q   And that despite the fact there was no factual dispute about the facts underlying the claimed mitigator, the jury, nevertheless, didn't find those as being mitigating factors, did they?

A   Yeah.  I believe that if I remember the instructions right, they have to find whether they exist and then determine whether they are mitigating.

Q   Correct.

A    So I -- I believe there were things that we thought that they had to find existed --

Q    Factually.

A    -- factually.  And -- And based upon the -- if you want to call it "questionnaire" or the interrogatories that were part of the jury verdict, they did not find those.

Q    All right.  So that did it appear to you that based upon the jury instruction, that there was actually something more going on in the jury's assessment that simply determining whether or not the mitigators were proven factually?

A    I don't know how to answer that question.

        MR. MORENO:  I'm going to object.

Q    (By Mr. Holtshouser)  Do you recall answering it at your deposition?

A    I mean ---

        MR. MORENO:  I'm going to object again.

A    I'm not trying to avoid it.  I'm just -- When you say did I have an assessment of what the jury -- I had a guess.  I had a speculation.

Q    (By Mr. Holtshouser)  Okay.  And in terms of what you believed was occurring, you believed that the jury was following the Court's instruction to do a two-part analysis of mitigating circumstances.  One ---

        MR. MORENO:  I'm going to object.  He can't testify as to what the jury was doing.

THE COURT: If the question was: In terms of whatever you believed was occurring, the jury was following the Court's instruction to do a two-part analysis of mitigating circumstances. That's not quite right, but, yeah, I'm not -- I'm just not sure. I mean, obviously, he cannot speculate as to what the jurors were thinking. So I think based on that question, I'll sustain the objection.

MR. HOLTSHOUSER: But, Judge, if I could be heard just a second on that is that, obviously, the law, and I think you've noted this in your Order, requires you to some extent to ultimately make some speculation as to what -- how the jury might have treated this new evidence in terms of assessing prejudice. My purpose in asking Mr. Sindel this is that as the defense trial attorney, any insight that he had into his assessment of the jury's verdict compared with what the evidence was before them may offer the Court some guidance in that respect.

MR. MORENO: But I don't think that's this witness' function. That's the Court's function. You know, having him speculate as to what the jury may or may not have decided, how they may have weighed things, what -- what tests they applied is -- and to have that evidence impacted by the post-conviction evidence would have perhaps changed the jurors' vote is your call and not Mr. Sindel's.

THE COURT: Well, overruled. What I'm trying to

figure out here is:  How -- How is it relevant?

MR. HOLTSHOUSER:  I think it's relevant to your assessment of the prejudice component of the ineffective assistance claim.  And if I can make an Offer of Proof, what I think that Mr. Sindel would say, based upon his deposition testimony, would be that ---

MR. MORENO:  Well, I'll object to that.

THE COURT:  Okay.  Well, you know, he's entitled to make an Offer of Proof.  Go ahead.  You know, I -- If this were a jury issue, I'm a fact finder and if I find some significance, I'll consider it, and if I don't, I won't.

Okay.  Go ahead.

MR. HOLTSHOUSER:  The -- What I would anticipate that Mr. Sindel would say is that based upon his review of the verdict form at the time, that it appeared that there'd be a pattern in terms of the jury's assessment that mitigating factors, even though they were not factually disputed, if they didn't have a causal nexus to the offense, they weren't found mitigating a punishment.  And I think this aids the Court in determining what ultimately might have been prejudicial because the issue may be what was or was not provided a causal nexus to the offense to explain why the offense conduct occurred; that if it didn't, regardless of whether it was factually proven ten times over or not, the jury wasn't finding it mitigating a punishment.

MR. MORENO:  I don't think it's proper for this witness to talk about whether or not the jury was persuaded this was a causal nexus type mitigation.  You know, that's --  Ultimately, any -- this issue about what weight the jury gave, what weight the jury would give, and I quote the evidence presented at the trial and the evidence presented here, is your call.  Mr. Sindel's, you know, speculation as to what may have happened or his educated guess I don't think is relevant to this Court's analysis.

THE COURT:  Yeah.  I tend to agree with you, Mr. Moreno.  I don't see it either.  It is a mitigating factor, but I'm still having trouble processing exactly what the purpose of the Offer of Proof was.  Maybe it will make more sense later, but I -- I -- I'm telling you I tend to agree that what you say is true.

MR. HOLTSHOUSER:  All right.  Thank you, Judge.  I'll move on.

Q    (By Mr. Holtshouser)  Would it be fair to say, Mr. Sindel, that what your experience had taught you prior to 1998 and what it has taught you since 1998 is that mitigating factors which have a causal nexus to the offense are more effective with juries than those that do not?

A    Depending to some extent on the severity of the ones that fall within the latter category, I would agree with that.  I mean if you have someone who's -- I don't know -- a major

mental mess without any causal connection, you still may be able to find those to be pretty effective.  But I would agree that a causal nexus is something that a mitigating -- a lawyer preparing for the penalty phase would search out and look for and try to prove.

Q    Did you place any limitations on the mental health experts at trial in terms of the extent to which they questioned Mr. Allen about the specific circumstances of the offense, what he was thinking the week before or the day of, during and after the offense conduct?

A    You know, I -- I don't remember those kinds of conversations, but it wouldn't surprise me if I had said, "Look, I'm not really concerned about what he was thinking at the time of the offense.  I'm much more concerned about, you know, other facts and other issues than his statements about the offense activities or his statements denying any role in the offense."

Q    In terms of your directions to a mental health expert in a capital case, do you have a -- has your experience left you with an impression of what you should or should not do when it comes to the subject of the circumstances of the offense?

A    About the only direction that I give them is to say, "Don't try to satisfy your own curiosity; that your role is not to get to the bottom of the facts in this case.  Your role is to get to the bottom of the psychology of the individual

that you're assessing."

Q   All right.  In terms of -- Now then, go back to that belief that you have about the importance and value of a causal nexus and mitigating factors.

How -- Would you agree that in order to provide through a mental health expert an opinion that has a causal nexus to the offense, that they need to speak to the defendant about the circumstances of the offense.

A   They may' have to speak to them about some of the circumstances, yes.  You know, things like maybe his role or if something happened to him during the course of it, whatever.  I mean that all may be appropriate.  I -- I'm not one to give specific instructions to anyone who's an expert in the field that I'm not an expert in.

Q   You've been given that disk that purportedly contains the other declarations of some of the other fact witnesses, correct?

A   I'm sorry.  You said?

Q   You've been given that -- a disk, you said, that contains --

A   I've looked at -- I'm sorry.  I've looked at ---

Q   -- that contains other declarations?

A   I haven't investigated the entire disk.  It's a -- It's a lot of material.

Q   Okay.  All right.  Well, I'm going to ask you a couple of

questions, and you may have read this particular witness'

declaration or not, but what my question has to do with is

what your recollection of the truth is about these -- these

circumstances.  Okay?

A    I don't know if I can give a recollection about the

truth.  I can give a recollection about what I knew.

Q    Well, what -- what you remember about what you did.

A    Oh, okay.

Q    Okay?  Mr. Billy Wayne Allen, is he one -- is he one of

the ones you've read or not read?

A    I have not read Billy Wayne Allen.

Q    All right.  If his declaration and/or testimony were to

say that he was told by the trial team to stay away from the

trial if he had nothing good to say about Billie, did that

occur?

A    I don't recall that.

Q    Okay.  Raymond Petty, have you looked at his declaration?

A    I don't believe so.

Q    If he indicated that no one was interested in any abuse

or physical discipline that Mr. Allen had -- had suffered, do

you agree with that?

A    Well, I don't agree with his use of the term "interested"

because he couldn't make that assessment.  I -- I don't

believe we ever told him not to tell us.

Q    And you were interested.

A    I would have been.

Q    Okay.  You were interested in anything you could find out.

A    The more information, the better.

Q    Okay.  And that's information not only for your use to decide what to use but also to decide what might ultimately be used against you.

A    You're looking for land mines.

Q    Okay.  According to what -- Did you read Juanita Allen's declaration?

        THE COURT:  Who?

A    I believe so.

        MR. HOLTSHOUSER:  Juanita Allen.

        THE COURT:  Oh.

A    I believe so.

Q    (By Mr. Holtshouser)  Okay.  And do you recall the portion of her declaration where she indicated that no one ever sat to hear her story?  Do you agree with that or not?

A    Okay.  Do I agree with -- that she said that?  Yes, she said that.

Q    No.  Do you agree -- Well, you were the one -- You were dealing with her back in 1997 and 1998 to a great extent, correct?

A    I was one of the people, yes.

Q    Other people dealt with her as well, including Mr. Simon,

Dr. Randall.

A    Connie.

Q    Connie.

A    Yes.

Q    Would it be a fair assessment of the situation on the trial team that no one either was interested in her story or no one ever took the time to listen to her story?

A    I know I took the time to listen to her story.

Q    Okay.  And did she, in fact, convey to you what you perceived to be her story of her life?

A    To some extent, yes.

Q    Angela ---

A    I believe there was -- You had showed me yesterday some notes about a Direct Examination that would have come from at least one of those multiple interviews and contacts.

Q    Which included information -- You had direct questions outlined ahead of time that would have covered her life, her background, and how she grew up.

A    That's true.

Q    Angela is a sister of Mr. Allen, do you recall her?

A    I don't recall which of the two sisters.  I recall two sisters.  Erica, I believe, and Angela.

Q    Okay.  You put her on the witness stand, right?

A    Yes.

Q    All right.  And would it be true or not that you told her

what to say about Mr. Allen's background?

A     I did not tell her what to say.  I told her -- I'm sure I told every witness why they were there, what we trying to present to the jury.  I never instructed her, "Don't say this," or, "You must say that."

Q     Joyce Eaton, do you recall her?  That she was a teacher at Clayton?

A     I do.

Q     Okay.  And do you agree with the statement that all that the trial team wanted from the teachers was anything good about Billie?

A     No.

Q     There's another sister named Nickie.  Would you, likewise, disagree with her that the trial team pointed her to what to say?

A     That's her choice of words.  I certainly think we tried to indicate to her what our strategy was and how we wanted to present our mitigation case.

Q     Regarding the family, the Allen family, there was a maternal and a paternal side, obviously.  The paternal side, was it accessible?  Did you view it as inaccessible to the trial team?

A     I wouldn't say so, no.

Q     Okay.  Billy Wayne Allen would be an example of the paternal side of the family, correct?

A    Correct.

Q    You also knew where Mr. Allen -- Billie Allen's other paternal grandparent lived, correct?

A    I believe so, but I -- I can't be sure.

Q    Did you have information that John Allen, Mr. Allen's father, still resided at the time of the trial with his parents?

A    What I can recall is it seemed to me that we had a hard time trying to either locate or interview John Allen.  That's all -- That's about all I remember about that -- that effort.

Q    But there wasn't anything about either the, for lack of a better word, the politics of the family that -- that any one side -- that the maternal side said, "Well, if you go talking to that side, that's it; we're not working with you"?

A    I don't recall that.

Q    Okay.  And Mrs. Allen, Juanita Allen, never barred you or the trial team from interviewing anyone you wanted to interview on either side of the family.

A    No.  She couldn't.

Q    And would it be incorrect to say that you weren't interested in the paternal side of Mr. Allen's life as opposed to just the maternal side?

A    I don't think that would be fair to say.  I -- I definitely -- It would definitely be fair to say that our focus remained on the maternal side of the family, and that's

either where we got the most cooperation or we did the most effort.

Q    Were there any parts of the family that were not cooperative?

A    Parts of the total family?

Q    Anyone in particular you recall that said, "I'm not going to help you"?

A    Not that I can think of offhand.  I mean I think that our efforts to try to talk with or reach or deal with John Allen met with some obstacles, but I can't remember the specifics.

Q    You were not unaware at the time of the trial of the demographic and other data regarding the City of St. Louis, were you?

A    Not specifically, no.

Q    And have you -- Has your practice as a defense attorney been in St. Louis the majority of your career?

A    Yes.

Q    You had some cases out of St. Louis, but you've always maintained your home and your practice here.

A    Yes.

Q    Let me show you Exhibit 610.  Do you recall this as the submission that you made to the Department of Justice in July of '97 to the Capital Crimes Review Committee?

A    I don't recall it in specific, but that's, apparently, what it is.  I have no reason to ---

Q   Just going to the end just to show you the other -- end of the document, that's your signature?

A   No.

Q   It's not?

A   It's not.  It's too neat.  I had someone probably -- I absolutely drafted this document.

Q   Okay.  That's someone else's version of your signature?

A   It's pretty close, though.

Q   Okay.  This particular document, I note that you copied Congressman Clay and Congressman Gebhardt on it.  Is there a reason for that?

A   I think I had, you know, approached both of their offices in terms of, you know, trying to get, if I could, at whatever coin of the realm that might help me succeed.

Q   Okay.  You also copied on this, I notice, Kevin McNally and David Bruck, correct?

A   Correct.

Q   And they are the Federal Capital Resource Council.

A   Right.

Q   And why were they being copied?

A   Well, I think that -- You'll remember that or you don't remember because you didn't know them, but they often and frequently want capital counsel to share with them certain documents and certain aspects of the case for purposes of statistics and also for purposes of compiling documents that

can be used and generated out to other people who are facing the same problems. Like Andre Bonds, for example, I would use other presentations in front of the Department of Justice since I had none to try to assess, you know, certain ways to approach them and, you know, whatever I could get from those documents. So that would be part of why I sent it to them.

Q    And then finally, you copied Mrs. Allen.

A    I did.

Q    Okay. And directing your attention to Page 6 of this, you're referring to the racial aspects of this case. And is there an entire page here in which you note certain demographic data about the City of St. Louis?

A    Yes.

Q    Let me show you Exhibit 643. Have you ever seen this document? Exhibit 633, entitled "My Story" by Billie Allen?

        MR. MORENO:  I'm going to object.

        THE COURT:  You say it's 643 or 33?

        MR. HOLTSHOUSER:  643.

        THE COURT:  Okay.

        MR. HOLTSHOUSER:  6-4-3.

        THE COURT:  What's the objection?

        MR. MORENO:  The objection is that a Facebook status it's not relevant with regards to anything that went on regarding the development of the mitigation back in 1998 -- '97, '98.

MR. HOLTSHOUSER:  My -- The relevance, Judge, is that, first of all, this is not a Facebook page.  I don't believe it's a posting on a particular website.  Purportedly, it's "My Story" by Billie Allen.  By title, it contains some representations in it that I want to ask Mr. Sindel as to whether or not the allegations in this story are true or not because they are actually about Mr. Sindel.

THE COURT:  Oh, okay.  All right.

MR. MORENO:  Well, I still object.  I'm not sure what the relevance is of what Mr. Allen may have written about Mr. Sindel 12 years after the trial -- 14 years after the trial.

THE COURT:  Well, I don't know until I hear it.  Overruled.

Q   (By Mr. Holtshouser)  The question was:  Had you ever seen this before?

A   The answer is:  No.

MR. MORENO:  You know, Your Honor, I'm not even sure we know who wrote this.

THE COURT:  I'm sorry?

MR. MORENO:  Does it say, Mr. Holtshouser, who wrote this?

MR. HOLTSHOUSER:  It says "by Billie Allen."  "My Story by Billie Allen."

MR. MORENO:  I mean anybody could put that up on a

website.  There's no actual indication that Mr. Allen wrote this.  Someone put it up on the website; anybody can do that.

THE COURT:  Well, I know, but so much of this, you know, there may be some relevance.  I just don't know until I -- until I hear it.  But if -- I assure you if it's -- if it's not relevant, I won't, you know -- it won't -- it won't affect the ruling.  Overruled.

Q   (By Mr. Holtshouser)  I'm going to direct your attention to the section I've blown up.

"At trial I had an attorney who was appointed by the Court."  That would be you, correct?

A   It would be me or Mr. Simon, but I'm going to bet it's me.

Q   Okay.  And "While not" -- It says, "While not all Court-appointed attorneys are bad, I guess it was my turn to get one who was incapable of doing his job.  He failed to interview witnesses, investigate the facts of the case, and he failed to present favorable evidence that could have helped me at my trial."

Is that true?

MR. MORENO:  I'm going to object to what the relevance of what Mr. Allen's opinion is, if these are his opinions, because we don't even know, about Mr. Sindel expressed in an article written by we don't know who, dated 2007.  It's a threat on a website as to these proceedings.

THE COURT: Well, I know what you're saying. I mean -- And, you know, maybe there's something that will connect it. I don't know either, but, you know, there may be relevance about, you know -- Already he's talking about he failed to investigate, interview witnesses, and that's a big issue in this case.

MR. MORENO: But that's his opinion.

THE COURT: I know. I'm going to overrule it. Let's -- Let's see what it says.

Q   (By Mr. Holtshouser)  Does it appear that he's actually stating here, a matter of fact, not just opinion, that you failed to interview witnesses, correct?

A   That apparently is his belief.

Q   All right. And you -- That isn't true, is it?

A   No, it's not true.

Q   That you failed to investigate facts of the case. That isn't true, is it?

A   No, that's not true. But, you know, when he says the facts of the case, there may be facts that he felt I should have interviewed or should have investigated that I didn't.

Q   Okay.

A   But I investigated the facts that I thought were pertinent and that, you know -- I followed what I thought was an appropriate factual investigation.

Q   And he failed to present favorable evidence that could

have helped me at my trial.  At least at the time of trial, did you feel that that was true?

A    In the guilt phase or the ---

Q    Yes.

A    In the guilt phase, I did not feel that that was probably true.

Q    Okay.  Because he's referred to here as an innocent man.  Did you view Mr. Allen as innocent based upon the evidence?

MR. MORENO:  I'm going to object.

MR. HOLTSHOUSER:  I'll withdraw the question, Judge.

Q    (By Mr. Holtshouser)  Have you had any correspondence with Mr. Allen over the years?

A    I don't believe I have.

Q    Okay.  Have you ever -- Do you know whether or not that is his registration number at the Bureau of Prisons?

A    I don't -- I couldn't be able to answer from memory.

Q    Okay.

A    044 is the designation of the Department of -- I mean the Bureau of Prisons for people from St. Louis.

MR. HOLTSHOUSER:  Okay.  Can I have just a moment, Judge?

THE COURT:  Sure.

(Pause)

MR. HOLTSHOUSER:  Those are all the questions I have at this time, Your Honor.

THE COURT:  All right.

MR. MORENO:  I'm sorry?

MR. HOLTSHOUSER:  Those are all the questions I have at this time.  Do I need to say it again?

MR. MORENO:  Yeah.  You might.

THE COURT:  We can -- We can do one of two or three things.  We can take an early lunch or we can proceed with ---

MR. MORENO:  It's at the Court's beckon.

THE COURT:  If you're ready, we'll proceed.  Okay?  Good.

MR. MORENO:  Sure.

THE COURT:  Redirect.

MR. HOLTSHOUSER:  If you're not ready, I can ask some more.

MR. MORENO:  I'm sure you can.

MR. HOLTSHOUSER:  Okay.

REDIRECT EXAMINATION

QUESTIONS BY MR. MORENO:

Q    Good morning, Mr. Sindel.  It's been a long time.

A    Since I talked to you?

Q    Yes.

A    From this position, yes.

Q    From that position, absolutely.

Now Mr. Sindel, the problems in this case, were they more than just a misunderstanding as it's been phrased with

Dr. Haney?

A    Yes.

Q    All right.  Let's start with when -- I want to start our discussion with when Dr. Randall joined your defense team.

A    Okay.

Q    And he joined your defense team in January, January 16th, give or take, of 1998?

A    Correct.

Q    All right.  And when he joined your defense team, what was the state of the mitigation case at that time?

A    I don't think it had been properly developed.

Q    All right.  Now when you say it hadn't been properly developed, what -- Well, let me ask you this:  Mr. Simon, he was responsible in part for the development of mitigating evidence?

A    He had been designated in the team as the person who was going to develop the case in mitigation.

Q    In January of 1998, had -- do you recall whether or not you had seen from Mr. Simon any investigative mitigation interview reports?

A    I've seen some stuff here.  There was a 16-page memorandum of his interview with --

Q    And we'll talk about that.  We're going to get there.

A    -- with Billie, but I -- I don't have a specific memory of receiving those.

Q    All right.  And do you recall whether or not you prepared -- I think you testified yesterday you yourself did not prepare any witness interview memos from your contacts with various people.

A    Certainly not a lot of them.  I may have prepared a few. I just don't remember, but I -- you know, it wasn't my practice then to reduce my written notes to a memorandum.

Q    All right.  And thus far, Mr. Holtshouser certainly hasn't presented you with any memos that you wrote of eyewitness interviews, has he?

        MR. HOLTSHOUSER:  Objection; leading.

        THE COURT:  Sustained.

Q    (By Mr. Moreno)  Do you recall seeing any memos during the course of these proceedings that you wrote concerning witness interviews?

A    I don't recall seeing any.

Q    All right.  Do you recall generating any in this case?

A    Like I said, it was not my practice at that time --

Q    All right.

A    -- to reduce them; to dictate them and reduce them to typewritten form.

Q    Now in your opinion, was the state of mitigation in January of 1998 a crisis state?

A    It was definitely in significant difficulties.

Q    How far from trial were you on January 16th, 1998?

A    Three weeks.

Q    Three weeks.  And at that time when Dr. Randall joined the case, do you recall what information you actually had in hand that you could convey to him so he could begin work on this case?

A    Not that I specifically recall to be able to list it or categorize it here.

Q    All right.  Now you saw -- We talked -- We talked about it and Mr. Holtshouser talked about the letter that Ms. Caspari wrote to Dr. Haney in November, I think November 26th of 1997, where she sent him a bunch of records and materials.  Do you recall that?

A    Yes.

Q    All right.  I have up what is Exhibit 321.  It's on the screen there.  Do you see that?

A    Yes.

Q    All right.  Now the first four documents listed in that letter, at that time, on November 26th, 1997, those were the records, the complete sum of the records you had at that time concerning Mr. Allen.  Is that correct?

A    I couldn't say that.

Q    All right.  Do you believe that you would have sent to Mr. Haney every record -- Dr. Haney every record you would have had in your possession?

A    I remember -- The best way I can put it is freaking out

when I discovered what hadn't been done in the aspect of records and contacts, and I remember basically telling Connie, "Get right on it."

Q    And ---

A    So I don't have any memory of saying, "But don't send this," you know, but she may have been operating, trying to compile things and put things together and not everything went out in that letter.  I couldn't say.

Q    All right.  And do you recall that the only other correspondence indicating any material was sent to Dr. Haney was a letter dated December 5th, 1997, when Mr. Allen's three-page life history was sent to him?

        MR. HOLTSHOUSER:  I'm going to object.  It's leading and an improper statement of the evidence.

        MR. MORENO:  It's absolutely not.

        THE COURT:  Overruled.

Q    (By Mr. Moreno)  Other than the police report that was sent on October 1st, 1997.

A    I have to rely on the letters to tell you if anything else was sent.

Q    So those -- Would you ---

A    I'm not disagreeing with the letters or anything like that.  I'm just -- You're asking me one thing from memory and one thing from documents.

Q    All right.  The documents that you reviewed during the

course of these hearings, did you see -- do you recall any other -- at your instruction any other documents being sent to Mr. Haney -- Dr. Haney after the December 5th letter where Mr. Allen's three-page bio was sent to him?

A    I don't recall seeing any letters to that effect.

Q    Oh, you don't?  Okay.  There was a December 5th letter, I believe.  Let's see if I can find it.

MR. MORENO:  Could I have a moment, Your Honor?

THE COURT:  Sure.

(Pause)

Q    (By Mr. Moreno)  All right.  Do you see Exhibit 323 up here?

A    I do.

Q    Okay.  Do you recall whether or not after that document, the biography written by Billie Allen was sent to Dr. Haney, whether any other records were provided to him?

A    I don't recall one way or the other.

Q    All right.  And if the file reflected no other correspondence to Dr. Haney concerning the -- sending him records, would that make you believe that none had been sent other than this?

A    Yes.

Q    Looking back at the letter that you sent on November 26th or that Ms. Caspari sent on November 26th, this is Exhibit 321, are there any witness interview summaries contained in

that letter that were sent to Dr. Haney?

A    No.

Q    Are you aware at any time, other than the correspondence we've already talked, if any witness interview summaries were sent to Dr. Haney?

A    No.

Q    And in your mind, is that a problem that as of November 26th, 1997, Dr. Haney had nothing about witness interviews?

        MR. HOLTSHOUSER:  Judge, I'm going to object unless you can have a clarification as to what time period he's asking from his perspective.  Is he asking him to render an opinion today looking back or is he asking his opinion as of the time that this was occurring?

Q    (By Mr. Moreno)  At the time that this was occurring.

        Well, let me ask you this:  Did you know at the time that this was occurring that Dr. Haney had not received any witness summaries or witness interviews or memos about what witnesses had to say?

A    Sometime in November I think I realized that there wasn't the information going out to Dr. Haney that was appropriate.

Q    What do you mean "appropriate"?  What are you -- What are you ---

A    Necessary.

Q    Necessary.

A    Sufficient, effective.

Q    So the evidence that had been provided to Dr. Haney in your mind as of that time was not yet effective.

A    It was certainly not enough.

Q    All right.  And in this letter you then -- Ms. Caspari notes three other types of records that will be -- will be sent to Dr. Haney in the near future; probation and parole records, pediatric/general practitioner medical records, and bios from Billie and Juanita Allen.  Are you aware of whether those records actually made it to Dr. Haney?

A    Again, I -- You'd have to ask Connie that or John that.

Q    Okay.  Based on the correspondence -- I'm sorry.  Go ahead.

A    Based on whatever correspondence there is, if it's all been presented to me, then I didn't -- haven't seen any indication that those items were sent other than the bio.

Q    So more than a misunderstanding, is a -- is a factor in the problem in this case also that the relevant mitigating evidence hadn't been developed at least as of November 26th, 1997, to provide to Dr. Haney?

        MR. HOLTSHOUSER:  Objection; leading and argumentative.

        THE COURT:  It is.  Yes, it is; sustained.  Leading; not -- not argumentative; leading.

Q    (By Mr. Moreno)  In addition to the misunderstanding with Dr. Haney, how would you characterize the fact that he did not

have records other than what is reflected in this memo?

A    He should have had more information.

Q    All right.  And in your experience, does the lack of information impact the investigation?

A    Yes.

Q    Does it -- In your opinion, in your experience, does it limit the investigation?

A    Yes.

Q    In your experience, can the lack of information generated, such as records or interview summaries, stymie an investigation?

        MR. HOLTSHOUSER:  Judge, this is all leading.  I realize that, but I mean this is Redirect Examination, not Cross.

        THE COURT:  Well, I know that.  I like to allow a certain amount of leeway just to get through this so Mr. Sindel can get to a meeting at 3:30, but at the same time I can't allow leading questions.

        MR. MORENO:  Sure.

        THE COURT:  The only leading thing, I thought about this, is the word "stymie."  But let's go ahead.

        THE WITNESS:  May I say something to the Court?

        I have discussed with the my office staff their presence at that meeting.  I would prefer to try to end this, if possible, today, and I do have someone who can cover me on

that meeting.  If we can get this over with, I'll go to that meeting with bells on, but I'd rather try to end this today.

THE COURT:  Yeah, okay.  Well then, I'll make a commitment right now.  We'll stay till midnight if we have to end it today.  Is that okay?

THE WITNESS:  Oh, I'm so thrilled to hear you say that.

THE COURT:  All right.

MR. MORENO:  We might be here till midnight.

THE COURT:  Well, if we are, we are.

MR. MORENO:  All right.

THE WITNESS:  You said midnight, right?

Q   (By Mr. Moreno)  When did you first realize that Mr. Simon had not conveyed any information?

A   I can't tell you.  I can't answer that.

Q   All right.  Are you aware ---

A   I know that in November, like I said, that it was -- the phrase I'd like to use I won't use, but there was definitely a situation where I said, "We need to get going."

Q   Do you believe that the ball had been dropped in mitigation?

A   Yes.

Q   Are you aware of -- You were questioned yesterday about interviews that Mr. Simon had conducted, potential mitigation witness interviews.  Do you recall having any discussions with

Mr. Simon about who he was interviewing and what information he was learning?

A     Well, that's two questions, but I -- I did have discussions with Mr. Simon about some of his contacts.  I remember specific details about some of the conversations I had.

Q    Okay.  And were you aware that Mr. Simon did not believe that his role in the case was as the person responsible for developing mitigation?

       MR. HOLTSHOUSER:  Judge, I'm going to object.  As of when or based on what?  There's no context to the question.

Q    (By Mr. Moreno)  Did you -- When you -- When you brought Mr. Simon onto the case, did you provide any kind of writing or letter detailing and outlining what his duties in the case were going to be?

A     No.

Q    Okay.  Now Mr. Simon -- If Mr. Simon thought that it was not his direct responsibility to be responsible for the development of mitigation, that would be a communication breakdown between you and him, would it not?

       MR. HOLTSHOUSER:  Objection; leading.

       THE COURT:  It is; sustained.

A     It would have been death.

       THE COURT:  Wait; no.  It's leading.

Q    (By Mr. Moreno) Now it would have been death.

THE COURT: Well, wait a minute. There's no question. That answer won't be considered. It's leading; sustained. Please ask the proper question.

MR. MORENO: Okay.

THE COURT: Yeah, and avoid leading, you know. I know the temptation, but I'm going to sustain leading objections because he's testifying, not you.

MR. MORENO: All right.

Q    (By Mr. Moreno)  I'm going to backtrack for a moment. When you -- You testified a moment ago that you did not -- at least it wasn't your practice at the time and you don't recall preparing investigative memos, witness memos in this case.

A    What I testified to was that -- And my experience has been oftentimes in terms of turning over materials that those interview memorandums can sometimes contain conclusions and other things where my notes are my mental reminders of what happened. So I was not -- It was not part of my practice to reduce my notes to dictated typewritten memorandums.

Q    All right. Now your notes, do you recall whether or not your notes actually reflect any indication about your witness interviews?

A    My witness ---

Q    Your notes. Do your notes contain any evidence about -- that you interviewed witnesses?

A    The notes would have notes that I took either from

telephone conferences or face to face.  That's as far as I know.  I write notes when I talk to people.

Q   And how do you convey to a mitigation specialist, such as Dr. Haney or Dr. Randall, the work that you had done, that you testified on Cross Examination that you had done, if you don't put it in writing and, frankly, it's not in your ---

A   No.  I put it in writing.

Q   Well, where do you put it?

A   I write; take a pen, put the pen to paper, and I write notes.  In situations where people like Dr. Haney or Dr. Randall -- With Dr. Randall, it was pretty much face to face.  "Here is what I found out; here's what I know."  In terms of Dr. Haney, he did not receive from me any memorandums of interviews I conducted.

Q   And he didn't receive any notes from the interviews that you had conducted.

A   I would not have probably sent him notes.  I probably would have reduced them to some other format where he wouldn't have to struggle to read my writing or understand my shorthand.

Q   And you didn't provide that type of document to Dr. Haney, did you?

A   No.

Q   No.  Now you were asked some questions about Doctor -- or excuse me -- Mr. Rackers yesterday, the investigator.

A    Yes.

Q    What was his primary role in the case?

A    Well, I considered him primarily involved in the guilt phase investigation, but, clearly, you know, according to at least two memos that I saw yesterday, he did some evaluation of witnesses for possible mitigation use.

Q    All right.  And would that have been unusual for Mr. Rackers?

A    It's hard for me to remember specifically instructions or whatever to Mr. Rackers and then label, you know, the types of communication, but I would have -- The two people that he interviewed, I thought sort of they were interviews that I thought he would be best able to conduct because of who they were, where they were, that kind of thing.  But I think he would have done anything I assigned him.

Q    Sure.  Do you believe that was the only assignment on mitigation you gave to Mr. Rackers?

A    I don't remember.  I mean I didn't even remember those two interviews that he had conducted.

Q    All right.  Mr. Rackers, do you recall whether or not he was part of the mitigation team?

A    I wouldn't call him part of the mitigation team.

Q    I have up on the screen Exhibit 308.  This is a document that was shown to you Monday of this week by Mr. Holtshouser.  It's the memorandum dated May 7th, 1997.  That's the witness

list that you had dictated earlier on or early in the case.
Is that correct?

A    That is correct.

Q    All right.  Did you convey this document to Dr. Haney?

A    No.

Q    And why not?

A    I can't answer that.  I don't know why not.

Q    Is that the type of information you would normally want
to provide to a mitigation specialist?

A    Certainly, I think you would want to provide them with
people who could be interviewed, yes.

Q    So this would have been a useful document to send to
Dr. Haney.

A    I would think so.

Q    All right.  Now the names on this list here, do you
recall who gave you those names?

A    Well, I would assume that some of the names came from
Juanita, but I -- and some of the names came from Billie.

Q    All right.  So this memo then is the result of
information provided to you by both Mrs. Allen and
Billie Allen.

A    And I think probably the majority of it would be from
Billie.  For example, the first name is a guard in the jail.

Q    Okay.

A    I doubt whether Juanita knew their names, at least this

early on.

Q    Now -- So this -- this memo, can you tell us whether or not this was the result of sort of what you've been referring to during your testimony as boots-to-the-ground investigation?

A    It would have been the preliminary investigation that you do, yes.

Q    Well, my question is:  Was it boots to the ground?  Were you out gathering this information or was this information you asked Ms. Allen for or Mrs. Allen for and she provided it to you?

A    Yes.

Q    Now the record-gathering that took place in the case, Mr. Holtshouser had talked a lot about how early on in the case you were doing that.  In your experience, is it standard practice for a capital defense lawyer to begin to gather records as soon as he or she enters the case?

        MR. HOLTSHOUSER:  Object again unless there's a time frame.

        MR. MORENO:  We're talking April -- April, May.

        MR. HOLTSHOUSER:  Or now.

        MR. MORENO:  Well, we're not talking now.  April or May of 1997.

A    Yeah, I think it would be appropriate to begin that practice earlier.

Q    (By Mr. Moreno)  And that's standard practice in the

capital defense realm?

A    I can't speak to standard practice, but it would have been an assumption that other lawyers who were doing their job would do it that way.

Q    All right.  So in your opinion, was that an unusual step for you to take at that time?

A    No.

Q    Now who provided you the name of schools and hospitals and things of that nature?

A    Juanita.

Q    Do you recall?

A    Juanita and Billie primarily.

Q    Juanita and Billie primarily, all right.  I'm showing you a document that's a memo from Ms. Caspari to you.  It's dated November 4th, 1997.  You were shown this record yesterday, but I want to look at the very bottom of the page.  It says, "I called Juanita."  Well, hang on.  I'm sorry.

     "I called Juanita who said we should have received his medical records a while ago.  I haven't come across any.  Juanita is following up with Billie's doctor."

     Was it -- Do you recall if it was Juanita who was actually going out and actually collecting the records?

A    No.

Q    What does this indicate?

A    This indicates that she probably had communication skills

with the doctor and called and said, "Why haven't you sent the records?"  As far as I know, Juanita never had either authorizations to receive the record or never like brought us a package of medical records.

Q    Would she have brought them to you or would she have brought them to Ms. Caspari?  Do you know?

A    She would have brought them to who?  Me or her, if I was there.

Q    Okay.  But in this instance, it looked like she's following up with the doctor to get the records.  Is that correct?

A    The memo says that, "I called Juanita who said we should have received his medical records a while ago."

Q    Okay.  So ---

A    And I haven't come across any.  Juanita is following up with Billie's doctor.

Q    All right.  Now as of November 4th, 1997, you had not yet received Mr. Allen's medical records, based on this memo.  Is that correct?

A    Part of them, yes, that's correct.

Q    All right.  Are you aware of any that you had received prior to this?  I know it's a long time ago.

A    I can't remember.

Q    Okay.

A    I saw yesterday there was a billing for reviewing medical

records. Obviously, we would have them at that time of that billing. Whether we got them ---

Q Sure. That was January 4th, 1998, but we'll talk about that later.

Now this also notes that follow-up on school records.

MR. MORENO: Oops! How do you erase? Well, it's not undoing.

Q (By Mr. Moreno) But, anyway, do you see the hand -- handwritten note at the bottom?

A Yes.

Q Is that your handwriting?

A Yes.

Q All right. And what does that say?

A "Follow up on school records."

Q All right. So as of November 4th, 1997, the school records hadn't yet been received.

A I'm assuming. I don't know if we had received Clayton, if we received Sumner or neither. All right?

I think what I was saying is that if we're having a records problem, these are some other records we need to make sure we're going to get. I know we had records problems, securing records from the city hospitals. I don't recall if we had problems securing records from both school districts or from one or the other.

Q All right. Now although you got the names of records or,

you know, the names of institutions where Mr. Allen -- where records might -- might lie, is there a reason why in November of 1997, you wouldn't have had his medical report or at least some medical records, as you state and we don't know, or his school records?  Is that unusual?

A    Now say that again.  Is that ---

Q    Is it unusual that as of November -- In your opinion, in your experience, is it unusual that six or seven months after getting the names of institutions where records could be found, the records still weren't in-house?  You didn't have them to work with.

        MR. HOLTSHOUSER:  Well, Judge, I'm going to object unless there's going to be some specification of which records since there are actually multiple sources of medical records in the -- in the record in this case already, multiple hospitals as well as doctors.

        THE COURT:  Well, as I understand the question, is it unusual for this much time to pass, and he mentions a date, not to have medical records in-house.  That assumes that all -- that there were none.

        So can you answer that question as it's -- as it's stated?

A    It would have been unusual.

Q    (By Mr. Moreno)  All right.  And not having records that late in the game, would that in any way have impeded your

mitigation investigation?

A    Yes.

THE COURT:  This sounds like a good stopping place. Can we get by on 45 minutes for lunch or do we need a -- or does everybody need an hour?

MS. COSTANTIN:  That's fine.

MR. MORENO:  Whatever you want, Your Honor.

THE COURT:  Yeah, 45 minutes.  We'll be here at quarter till, well ten till; be back at ten till.

(Court recessed from 12:02 PM until 12:55 PM.)

THE COURT:  Check and see the state of readiness, please.

(Pause)

MR. MORENO:  Thank you, Your Honor.

Q    (By Mr. Moreno)  Good afternoon, Mr. Sindel.

A    Good afternoon.

Q    Now do you recall if you learned early in your investigation that Mr. Allen had suffered from lead poisoning as a child?

A    I believe that there was information we had about lead poisoning.

Q    Okay.  And do you believe that you learned that information earlier -- early in your investigation?

A    Yes.

Q    All right.  And did you -- Do you recall whether or not

you learned that Mr. Allen also suffered from Pica or Pica?

A    I believe so.

Q    Okay.  Would that also have been early in the investigation?

A    I -- I can recall that it's in the physician's notes.  I don't recall if we learned of Pica prior to the physician notes, but I did know about lead intoxication.

Q    Okay.  I'm showing you Exhibit 324.  I think this was discussed yesterday, and I think we referenced it earlier when we were speaking.  This is a -- Can you tell us what this memo is?

A    It's a memo from -- It's the same thing it was yesterday.  It's a memo from a nurse practitioner who helped translate the documents.

Q    The medical records.

A    The medical records.

Q    And what was the purpose of that?  I know that sounds stupid, but what was the purpose of that?

A    Well, there were abbreviations or other things that we didn't understand or weren't sure that they were legible so that we had an accurate assessment of the -- what the medical record contained.

Q    All right.  And what's the date of that memo?

A    January 4th, 1998.

Q    All right.  So can you tell us why it took till January

of 1998 to have these records reviewed and interpreted like that?

A    I don't know.  I don't even know what records they're referring to, but the answer is:  I don't know.

Q    Okay.  In your opinion, is that something that should have been done earlier in the case?

A    I think it should have been done, you know, ---

MR. HOLTSHOUSER:  Object again in terms of context. Is he saying he had that opinion then or now?

THE COURT:  Well, the real problem is he said he didn't know what they were.  So how can he know if it should be done sooner or later?  Can we get a little more foundation on that?

MR. MORENO:  Sure.

Q    (By Mr. Moreno)  Let's turn to the next page.

A    All right.

Q    Does this look like it's talking about -- These are medical records?

A    Yes.

Q    "No longer eats extraneous material but does put it in his mouth."  Is that referencing Pica or Pica?

A    Well, it says "Pica patient."

Q    Okay.  Well, that's a good hint.  The next page discusses asthma.

A    "There's no more asthma, no more Pica."

Q    Okay.  Next page talks about cobalt chloride.  So these are medical records.  Is that what this appears to be?

A    This appears to be translations from entries made on medical records.

Q    All right.  And, again, this was so that you would understand what the medical records actually meant?

A    It would fill in the gaps we had.

Q    Okay.  Now do you do that -- What's the purpose of doing that?  Is it to -- so you can figure out what kind of expert you might want to retain, if you need one?

A    I mean that's not the purpose of translating the records, if that's what you're asking me, no.

Q    Okay.  What's the purpose of translating the records?

A    To give us a -- To make sure we don't miss something, so that we see what's in there.  And so there are abbreviations that are used like DPT No. 3 or whatever.  We can ask questions about what is that.  We know what that is, but there are certain things sometimes that appear in records, medical abbreviations, that I don't know what they mean.

Q    Okay.  And is this something that you normally in your practice do earlier in a case?

A    I mean I do it commiserate with when we get the records, if we can, and I also do it when I think they might be important.  So I may have medical records that I've looked through that I don't think there's much to and I don't think

it's going to be an issue in the case.  You know, a guy gets punched in the head, and we acknowledge, "Yeah, my client punched him in the head."  For the most part, you know, I got a stack of records, 300 pages long.  I'm not going to go through them very much.  I might look at the initial entry to see what he said had happened and stop there.

Q   Now in this case, the fact that you had the records interpreted like that, what does that indicate?

A   It indicates I wanted to know what the records said.

Q   All right.  In the context of this case, is January 4th, 1998, pretty late in the game in terms of when this trial started?

A   I'd say so, yes.

Q   All right.  And having these records interpreted in January of 1998, what does that reflect, in your opinion, about what you found when you took a hard look at the mitigation case?

A   Well, I think that the mitigation case had stalled.

Q   I'm sorry?

A   Stalled.

Q   Stalled, okay.

A   I mean I said that --

Q   I'm sorry.

A   -- all throughout; the mitigation case had stalled.

Q   That it stalled, okay.

Now you hired Dr. Gelbort at the recommendation of Dr. Randall, I believe.  Is that correct?

A     Yes.

Q     All right.  And do you recall what Dr. Gelbort was tasked with?

Well, he's a neuropsychiatrist, right?

A     Yes.  So would have been tasked with pretty much trying to determine whether or not there was any organic brain damage and -- and other things that would have fallen within his area of expertise.

Q     And do you recall whether the reason Dr. Randall suggested this was because of Mr. Allen's history of Pica and lead poisoning?

A     I do not recall exactly what the reason.  I do recall that Dr. Randall felt it was appropriate to have that evaluation.  It may also have to do with the fact that he claimed that he was pistol whipped and then had been knocked unconscious.

Q     Would you have wanted to have him -- Does the fact that he had lead poisoning and Pica, would that raise a red flag in your mind that you might want to have him looked at by a neuropsychologist?

A     I mean I believe that I might have -- I'm trying to think whether or not I would have -- I'm not sure how positive I would have equated Pica and lead toxins to needing a

neuropsychologist, but I certainly would have evaluated that in terms of that making that decision.

Q    Okay.  And in this case do you recall when Dr. Gelbort was retained?

A    I do not.

Q    Was it in mid to late February of 1998?

A    It probably was.

Q    All right.  At that point in time how far into the trial were you?

A    Well, it depends on the date, but we were into the trial.

Q    The date of his report was February 23rd, 1998.  Was that pretty far into the trial do you recall?

A    That was significantly into the trial.

Q    In terms of the developing mitigation, is that your normal practice to have an evaluation -- to retain an expert and have an evaluation?  And I'm not trying to be smart or flippant with you, but is that your -- your ---

A    No, it's not.

Q    Okay.  So what is -- what is that reflective of in your mind of where you were at with the Billie Allen case?

A    We were not pursuing the mitigation case as effectively as we should have.

Q    Prior to David Randall.

A    Prior to David Randall.

Q    Okay.  All right.  So prior to Mister -- Dr. Randall's

entry into the case, had any mental health professional on your watch, when you were representing Mr. Allen, conducted a evaluation of him?

A    No.

Q    And why?

A    I don't believe there was any tactical reason why.

Q    Okay.  So in your mind, would that be a failure on your part?  On the defense team's part?

A    Yes.

Q    And that would include the late entry or the late -- the last-minute use of Dr. Cuneo who would actually go out and do an evaluation?

MR. HOLTSHOUSER:  I'm going to object to the characterization as being argumentative and leading.

THE COURT:  Leading; sustained.

Q    (By Mr. Moreno)  Do you recall when Dr. Cuneo went out to see Mr. Allen?

A    January 16th.

Q    And in your opinion, is that also very late in the game in a capital case to be having a client evaluated?

A    Yes.

Q    How far out from trial was that?  Do you recall?

A    Three weeks.

Q    Three weeks, all right.  And not to beat a dead horse, but what -- what is that indicia of in terms of the state of

the mitigation case when you found out Dr. Haney had not done any work?

A    It had stalled.

Q    All right.  When you say "stalled," what do you mean? Let's ---

A    It had -- You know, it wasn't climbing.  It wasn't really working.  There was a period of time between when it started and when things became obvious that there were issues where it hadn't progressed.

Q    All right.  And hadn't progressed beyond what?

A    Hadn't progressed into the point where, you know -- There were witness interviews that were going on.  There were things like that, but we hadn't exhausted all the areas that we needed to investigate.

Q    All right.  Now we'll talk about the witness interviews in a moment.  Do you remember whether or not you received any witness interview memos from, say, Ms. Caspari?

A    Yes.

Q    You did?

A    I believe so, yes.

Q    Okay.  Do you remember who?

A    Not off the top of my head, no.

Q    All right.  Was she responding to assignments that you would give her?

A    She could have been responding to assignments from me.

She could have been responding to assignments from Mr. Simon, or she could have been taking it on herself.

Q   Now what was her main role in this case?

A   She was a paralegal, and she was a liaison, and she was someone that I used in maintaining contact with Mr. Allen, and she was someone that I used at times in an investigative capacity.

Q   All right, now at times.  So was her main role in this case as a mitigation investigator?

A   I -- There was -- There was no person in this case that had as their main role a mitigation investigator.

Q   All right.  Was Ms. Caspari's role in this case, be it guilt phase or penalty phase, one of leaning more towards investigation as opposed to paralegal work?

        MR. HOLTSHOUSER:  I'm going to object to leaning towards more one than the other as leading.

Q   (By Mr. Moreno)  What did you -- What actually did Ms. Caspari do mostly if you can -- if you can quantify that if you recall?

A   I can't, and you can ask Ms. Caspari.  I mean she filled a lot of shoes, and she would be there as a person who was there at my office that I could send out on various tasks or ask her to, you know, work on completing, you know, record examination, evaluation, collection, all that stuff.

Q   All right.  Now she did a -- an interview of a guilt

phase witnesses.  Is that correct?

A    I believe so.

Q    The one at the -- The one at the mall on the alibi; is that correct?

A    Well, she did -- Yeah.  There was a series of investigations we did at the mall surrounding the possible alibi defense.

Q    And she participated in that.

A    She did.

Q    All right.  And she wrote a memo to you about what she had found out regarding that investigation.

A    I recall knowing what she found out.  I can't tell you if it was in written format or not.

Q    All right.  Do you recall whether or not any information provided to you by Ms. Caspari was conveyed to Dr. Haney?

A    I don't know that.

Q    All right.  In the letters we looked at earlier, did you see anything?

A    There were not.

Q    Okay.  Now you testified over the last few days that you and Mr. Simon had some contact about the mitigation case over the course of his participation.

A    That's correct.

Q    All right.  Now would you expect in your normal practice -- Well, would you expect in your normal practice that you

would have discovered from Mr. Simon before December or January -- December, '97, January, '98, that his -- that he had not done much mitigation work?

MR. HOLTSHOUSER: Judge, I'm going to object to the relevance of "normal case;" that the only thing before this Court is what happened in this case and its impact.

Q    (By Mr. Moreno)  In this case, would you have expected in your conversations with Mr. Simon to have discovered before December of 1997, January, 1998, that he had actually not really produced much mitigation work?

A    I should have discovered it, yes.

Q    All right.  And is it fair ---

A    I mean I ---

Q    Go ahead.  I'm sorry.

A    I will admit, I have admitted, and I will continue to admit that I failed to supervise the collection of the material necessary for the mitigation penalty phase presentation.

Q    So when -- After the Haney debacle, did you take a look at what Mr. Simon had -- had been doing all those months?

MR. HOLTSHOUSER: I'm going to object to the characterization of "debacle" as argumentative.

THE COURT: Yeah, argumentative; sustained.

MR. MORENO: I wasn't meaning to be argumentative.  I apologize, Your Honor.

Q    (By Mr. Moreno)  After the -- After Haney was no longer in the case, did you have an opportunity to ask -- did you ask Mr. Simon to produce to you what he had been doing all those months?

A    I don't recall that conversation or I don't recall any of the production of the materials.  I recall, you know, pretty much saying -- You know, my mental state at that time was I'm taking this over.

Q    All right.  And was that -- Why -- Why were you taking it over?

A    Because I believed that it needed, rather than supervision, someone actually steering the boat.

Q    Okay.  Now in January of 1998 when Dr. Haney joined your team, right before he joined your team, ---

A    Dr. Haney didn't join the team.

Q    No, no.  I'm sorry.  I'm sorry; my bad.

A    Dr. Randall?

Q    Dr. Randall, yes.  Thank you.

    After Dr. Randall joined your team -- Well, prior -- Right before Dr. Randall joined your team, did you -- had you already developed a mitigation theme?

A    To some extent, yes.

Q    And what was it?

A    Well, I think we were -- we were gearing towards the information that we had secured from Billie and Juanita and

some of the other information that, you know, Billie had people that cared about him, had family that cared about him, you know. Similarly, you know, the neighborhood theme concerning the neighborhood environment, those kinds of things had been certainly examined.

Q   Do you recall ---

A   Those were -- Those were the themes that I recall that I was looking at as possible mitigation themes. I hadn't foreclosed nothing.

Q   Now is there anything in your file that you've reviewed that indicates -- that shows the results of any investigation supporting the theme you're now -- you're stating that you had formulated prior to Dr. Haney or Randall coming into the case?

A   Well, I haven't reviewed the file.

Q   Okay.

A   I haven't had the file for 14 years probably. You know, what I've reviewed and seen here, there are some things that definitely pointed in that direction, but after this period of time on the witness stand, everything sort of blurs a bit.

Q   All right. Did you ever have a conversation -- Do you recall Mr. Simon ever discussing with you what he thought the mitigation theme should be in this case?

A   I mean I'm positive that we discussed those sort of things with each other. I don't remember a specific conversation in which John Simon said to me, "This is the

theme I think we should develop," or say to me, "I don't think we should go towards this theme." I don't recall that conversation. Now if Mr. Simon does, then he does.

Q    Now we talked earlier and I think Mr. Holtshouser talked a lot with you about the life history that Mr. Simon put together. Do you recall that?

A    Yes.

Q    All right.

        MR. HOLTSHOUSER: Judge, we may need a minute to pull this up. Somehow the power cord got disconnected and it shut the power down.

        THE WITNESS: Was that what I was pulling on under here?

        MR. HOLTSHOUSER: Yeah.

        (Pause)

Q    (By Mr. Moreno) All right. I'm showing you what has been marked -- well, what is Exhibit 303, and that's the document that you saw earlier, the life history prepared by Mr. Simon. Is that correct?

A    That's correct.

Q    All right. Now ---

        MR. MORENO: Your Honor, may I have a moment to consult with co-counsel?

        THE COURT: Sure.

        (Pause)

MR. MORENO:  Your Honor, this apparently is a different copy of the same exhibit.

THE COURT:  Okay.  Okay.

MR. MORENO:  This one was faxed.  We'll have to mark it as a separate exhibit.

THE COURT:  Sure.

THE CLERK:  You want to go to the Elmo?

MR. MORENO:  Can we just call it 303-A?

THE COURT:  Why don't you call it 303 --

MR. MORENO:  A?

THE COURT:  -- A.  Okay.  I'm going to put it on the last page.

Q    (By Mr. Moreno)  All right.  I have in front of you what is now Exhibit 303-A.  Ignore my scribble on the top.  Do you see the fax notation on the -- on the top left-hand corner?

A    Yes.

Q    All right.  And that is a fax that would have been received in your office?

A    I'm assuming that's what it means.  I don't see the number, but ---

MR. HOLTSHOUSER:  I'll object to the characterization unless he knows because I think it's the sender's, not the recipient's.

Q    (By Mr. Moreno)  Well, let's go down this way and turn it around.  On the bottom of the same page, I think, ---

A    I saw the bottom.

Q    Okay.  Can you read the date on that?

A    January 16th, 1998.

Q    And who did that come from?

A    Mr. Simon.

Q    All right.  And did it go to you?

A    If that's what the top of the page indicates who received it, I would say yes.

Q    Okay.

A    I'm used to seeing numbers rather than a name.  I can't say that that's not accurate.

Q    All right.  So this life history, do you recall it?  Do you recall having seen it at the time of your representation of Mr. Allen?

A    I don't have any specific memory of seeing this document, but I -- more than likely I did.

Q    All right.  January 16th, how far out is that from trial?

A    About three weeks.

Q    About three weeks.  In your mind, in a capital case, is it pretty late in the game to be putting together a social history three weeks from trial?

        MR. HOLTSHOUSER:  Your Honor, I'm going to object to that, this "pretty late in the game" characterization.

        MR. MORENO:  All right.  I'll change it.  That's fine.

MR. HOLTSHOUSER:  The date is the date.  Whether it's late or early I think is irrelevant.

MR. MORENO:  It's absolutely not irrelevant.

Q   (By Mr. Moreno)  Is the fact ---

THE COURT:  Wait, wait.  Please don't argue.  The objection is overruled.

MR. MORENO:  All right.

A    If I take your question right, I believe that I have tried as much as I can during the course of these three days to acknowledge the shortcomings that I believe interfered with this case, but that is not the first life history of Billie Allen, and your implication that it is is not accurate.

Q    And so where would the other one be?  Where's another?

A    Right here.

Q    Okay.

A    And in the notes I took and in the information I had and in the investigation I tried to conduct.

Q    Now where -- Your notes don't reflect any -- any interviews.  Are you aware of that?

MR. HOLTSHOUSER:  Well, Judge, I'm objecting unless he can show him what notes he's referring to.  Since we haven't been provided any, I don't know what he's asking about in his question.

THE COURT:  All right.

Q    (By Mr. Moreno)  So if the -- I'm sorry.

THE COURT: Sustained. If -- If -- If there are notes that you're referencing, then they should be provided to him.

MR. MORENO: Fair enough.

Q    (By Mr. Moreno) So let's backtrack for a minute and let's talk about this document and not what's in your head. Okay?

So this document is provided to you on January 16th. Is that correct?

A    That's what it says, yes.

Q    All right. That's what it says. And that's the work product of Mr. Simon.

A    Apparently so.

Q    And is that the first time -- Do you recall if that's the first time you would have seen this work product by Mr. Simon?

A    I couldn't answer that.

Q    All right.

A    I mean he could have given me this as a follow-up to discussions we had because of Dr. Randall. This is very close to the time that Dr. Randall was coming into the case. This document could have been prepared months before.

Q    Okay. Now the life history that's in your head, ---

A    I'm sure it was also on notes.

Q    Okay.

A    I mean I -- I don't think I would have given -- gone out

to get certain records, Homer G. Phillips, other things like that, without having written down something.

Q But the life history that's in your head, how do you work with your team on developing mitigation?

A We talk about it.

MR. HOLTSHOUSER: Well, Judge, I'm going to object. He just said that it wasn't just in his head; that it was on notes and papers that he had maintained.

THE COURT: Well, that's true. He said that he specifically was referring to what the oral history was in his head and didn't -- Then there may be another question about notes. So right now the inquiry is: Was the oral history in your head? How is that shared with the team? All right, overruled.

A Through the use of words.

Q Through the use of words.

A We talk about it. We meet about it. We discuss it.

Q And did you convey this life history in your head to Dr. Haney?

A I don't believe so.

Q All right. And that's a problem when you hire a mitigation specialist if you don't give them the information that's in your head, isn't it?

A That's correct.

Q All right. So that's a problem.

A    That's correct.

Q    All right.  Now did you convey the life history that was in your head to Dr. Randall?

A    I'm positive I did.

Q    All right.  If Dr. Randall comes in and testifies that there wasn't a life history that he could rely upon when he came into the case, would you have reason to doubt his testimony?

MR. HOLTSHOUSER:  Well, Judge, I'm going to object to the form of the question.

MR. MORENO:  I'll ask it in a hypothetical.

MR. HOLTSHOUSER:  Would he have reason to doubt his testimony?

MR. MORENO:  Yeah.

MR. HOLTSHOUSER:  If he wants to ask the hypothetical whether or not he would agree or disagree with something that Dr. Randall supposedly would say, ---

MR. MORENO:  Hypothetically.

Q    (By Mr. Moreno)  If Dr. Randall would have testified that when he came into this case there was not a life history of Billie Allen that he could work from, would you agree or disagree with him?

A    I not sure what he's referring to as a life history.  I am sure that we discussed together many times what I knew about Billie Allen and what I understood about his life

history.

Q    And if -- Hypothetically, if Dr. Randall were to come in and testify that what was conveyed to him, be it through the records you had gathered or any conversations, did not constitute a life history, would you have a reason to doubt that?

A    I don't know how he defines the term.

        MR. HOLTSHOUSER:  Judge, again, I'm going to object to the same ---

        THE COURT:  Yeah, sustained; sustained; sustained. Go ahead.

Q    (By Mr. Moreno)  So there was nothing in writing concerning his life history.

A    I'm sorry.  Concerning what?

Q    There was nothing in writing that you could give Dr. Randall concerning his life history.

A    I mean there was no memorandum, typed-up memorandum of any kind of interview as far as I can recall.

Q    All right.

        MR. MORENO:  If I can have just a moment, Your Honor.

        THE COURT:  Sure.

        (Pause)

Q    (By Mr. Moreno)  All right, Mr. Sindel.  I'm showing you Exhibit 403.  You were asked questions about this yesterday during your examination with Mr. Holtshouser.  Do you recall

this briefly?  It's one of Doctor ---

MS. COSTANTIN:  It's 498.

MR. MORENO:  Oh, 498. I'm sorry.

THE COURT:  498?

MR. MORENO:  Yes.  I'm sorry, Your Honor.

A    I recall testimony concerning Mr. Simon's billing entries.

Q    (By Mr. Moreno)  Right.  And so that's what -- that's what this is, and I just want to go to Page 2.  Do you see an entry -- Let me see; where is it?  You were asked about the mitigation conference.  Well, hang on.  Let me do something else.

MR. HOLTSHOUSER:  It's November 6.

MR. MORENO:  I'm sorry?

MR. HOLTSHOUSER:  It's November 6th.

MR. MORENO:  Yeah.

Q    (By Mr. Moreno)  Okay.  We're looking at Page 7 here, and we were just looking at Mr. Simon's life history that he wrote.  Do you recall, and you probably don't, but do you recall when he would have prepared this?

A    Prepared what?

Q    The life history that we talked about earlier.

A    I don't know when he prepared it.

Q    All right.  So I would like you to look at -- There's an entry on 11-8 right here.  Do you see that?

A    Conference with Ms. Caspari?

Q    No; the one below it.

A    Okay.  "Prepared life history."

Q    Right.  "Of client," correct?

A    Correct.

Q    All right.  And what's the date on that?

A    It looks -- The entry is January the 8th.

Q    January the 8th, all right.  So Mr. Simon began his work on the life history on -- on January the 8th, correct?

A    According to this.

Q    All right, according to this.  And is that a task you would have expected him to engage in earlier on in the process?

A    Yes.

Q    And that was part of his responsibility as being the lawyer responsible for mitigation.

A    Yes, I believe it was.

Q    All right.  And I'm not trying to get you angry, but would you agree that ---

A    I'm not angry.  I'm tired.

Q    Okay.  Do you agree that or would you agree that his waiting until January 8th could handicap a case --

A    Yes.

Q    -- to develop a social history?

A    Yes.

Q    Okay.  And that was his -- I'll withdraw that.

A    But -- The only thing I do want to make clear is January 8th was a date that Mr. Simon may have done certain things, but it wasn't necessarily the date that I did certain things. I'm not trying to duck my responsibility.

Q    I know you're not.

A    No, no.  No, no.  But what Mr. Simon did and how he prepares his stuff is different than I -- how I do it.  Okay?

        So that is not the first date that some information about Billie Allen's life history was developed.  It was the date, apparently, that Mr. Simon did prepare the draft of what he had learned.

Q    Okay.  Now it's not -- I agree, you know.  I'm not contesting with you -- contesting the fact that this is not the first date that some information about Mr. Allen's life history was gathered or was collected.

A    I understand that.

Q    All right.  But prior to Dr. Randall entering the case, had you developed a comprehensive, thorough, detailed social history of Mr. Allen?

A    I felt that we had developed a number of areas.  For example, when I look at what he has developed on January 8th, most of those things, it's my memory, that I knew already. And I -- I have to go through each one of those, but in glancing at it when I was shown to it in the Cross Examination

conducted by Mr. Holtshouser and the brief look at it I had here just now, those were things that I -- they were definitely areas that I knew about.  I may not have known a specific phone number or something like that, but those were things that I was aware of.

Q    So then are you referring more to biographical information?  You had names and some addresses and phone numbers.  You had some records.  Is that what you're referring to?

A    Biographical, school, medical, instances of injuries, drug use, alcohol use, stuff like that.

Q    All right.  So that's the kind of stuff you're talking about when you had in your mind a social history.  That's the type of material you're talking about.

MR. HOLTSHOUSER:  Objection; leading.

THE COURT:  Sustained.

MR. MORENO:  Is that the type of evidence ---

MR. HOLTSHOUSER:  It's a misstatement of the evidence.

A    Let me ---

MR. MORENO:  It's not a misstatement of the evidence, but ---

A    You know, if you want me to try and characterize ---

THE COURT:  Wait, wait, wait.  There's no question.

THE WITNESS:  Oh, I'm sorry.

THE COURT:  It was sustained.

Q   (By Mr. Moreno)  Now, obviously, you recall your deposition in this case.  It was almost as long -- well not quite as long and painful as your appearance here, but ---

MR. HOLTSHOUSER:  I'm not sure if that's a question, Judge.

MR. MORENO:  A question is coming.

MR. HOLTSHOUSER:  I move to strike the characterization as "painful."

THE COURT:  It's no question yet.

MR. MORENO:  Yeah.  The question is coming.  I was looking for a particular page I was going to jump to based on what just happened.

Q   (By Mr. Moreno)  Do you recall testifying at your deposition that the work that you and your office had done prior to the entry of Dr. Randall was, quote, "bare bones"?

A   Yes.

Q   And do you agree with that?

A   Yes.

Q   All right.  So Dr. Randall, during his deposition, he described the state of the investigation as next to nothing. Would you take issue with that?

MR. HOLTSHOUSER:  Judge, I'm going to -- I'm going to object to him testifying to Mr. Rick Sindel about what Dr. Randall testified to somewhere else.  If he wants to show

him an exhibit and ask him a specific question about it, I have no objection to that.

THE COURT: Well, ---

MR. HOLTSHOUSER: It's just been simply him testifying to Mr. Sindel.

THE COURT: Well, there's a certain amount of, you know, going from one category to another and, you know, there's no problem if he's going to refer to the testimony, and then he can ask if he knows. But the question was -- Just a second.

MR. MORENO: I'm sorry?

THE COURT: Just a minute.

MR. MORENO: I'll move on, Your Honor. It's not a problem.

THE COURT: Okay. Okay. Go ahead.

MR. MORENO: Yeah. It's not a problem.

Q   (By Mr. Moreno) So you don't take issue with the "bare bones" description of the work that had been done.

A   That was one I used.

Q   All right. I want to look at this page, Page 2 of Mr. Simon's out-of-court hourly worksheet. He -- You were questioned during Cross Examination about various interviews, witness interviews that Mr. Simon was conducting. Do you recall that?

A   I remember some testimony -- some questions about

interviews, yes.

Q    Okay.  Now on 11-6, right here, --

A    All right.

Q    -- can you read that entry?

A    Well, one of them -- the ones says, "Interviewed Mr. Allen before hearing."

Q    Then the next one?  I'm sorry.

A    It says -- I think that's probably, "Discussed case with Mrs. Allen's mother and sister."

Q    All right.  Now what is ".2" in terms of time?  Do you know?

A    Two-tenths of an hour.

Q    Two-tenths of an hour.

A    Twelve minutes.

Q    Twelve minutes.  So that's a very short interview.

A    Well, I mean this is a question probably best for Mr. Simon, but it's clear that this is what's occurring after a hearing in court.  So I think what is -- would be happening would be we would be telling the family members sort of what happened in court and what the legal aspects were that were being developed and what the -- you know, whatever it was that we were doing in court on November the 6th --

Q    Okay.

A    -- to explain it to them.  And oftentimes -- I would not have characterized that as a "witness interview," but that's

how Mr. Simon characterized it.

Q   All right.  Now this is the page where -- I think 11-6, also, right here you had the conference with Mr. Sindel and Ms. Caspari, and it was about the client mitigating issues in discovery.  Is that correct?

A   Right.

Q   All right.  At the end it says ".8."  How long is ".8"?

A   Eight-tenths of an hour.

Q   All right.  So that meeting was less than an hour?

A   That meeting -- According to Mr. Simon's notes, that meeting was less than an hour.

Q   All right.  And it -- And it concerned a number of different issues.

A   It concerned mitigation issues in discovery.

Q   Do you recall that Mr. Simon worked from -- or sometimes worked from a mitigation workbook?

A   I think to some extent we all used resources such as the mitigation notebooks and whatever in order to help educate us and guide us on what we were doing.

Q   Okay.  On Page 6 of this he notes here on 1-6 that he gave the copy -- gave a copy of the mitigation workbook for copy, right?

A   "Gave mitigation workbook copy."  I don't know what that means, but, yeah, that's what it says.

Q   All right.  And then down on 1-7, he reviews the

mitigation workbook.  Is that correct?

A    That's what it says there, yes.

Q    All right.  Would you have expected Mr. Simon to have done that kind of self-education earlier in the course of his representation of Mr. Allen?

MR. HOLTSHOUSER:  Judge, I'm going to object to the characterization.  I think he said self-education.  That's not clear from the record that that's what it is.

MR. MORENO:  That's fine.  I'll ask the question differently.

MR. HOLTSHOUSER:  The record says what it says --

THE COURT:  Okay.

MR. HOLTSHOUSER:  -- and he can ask Mr. Simon.

Q    (By Mr. Moreno)  Would you have expected Mr. Simon to have reviewed the mitigation checklist prior to January 6th of 1998?

MR. HOLTSHOUSER:  Well, I'm going to have to object again because now he's using "checklist" with "workbook" which is two different things.

MR. MORENO:  I'll change it to "workbook."  I'm sorry.  I'm not being as precise as I should; my bad.

THE COURT:  All right.

A    The problem I have with your question is two-fold.  First of all, I would have expected when Mr. Simon accepted the assignment to the office that he would have said to me, "I

have no clue what mitigation evidence was."  I don't think that was the case.  I think he knew.

I don't know whether -- what this mitigation workbook is.  I don't have any clue as to what it is, and I don't have any clue as to whether or not this is the first time he's ever reviewed materials that came from Capital Resource Centers or anything else in that regard about mitigation.

Mr. Simon, I believed, understood what mitigation was and how the mitigation figured into the case.  You'll have to ask him whether or not he knew before January 7.

Q    What did you know about his experience in capital cases prior to bringing him on this case?

A    I -- I don't remember exactly.  I don't think he had ever tried one.  I don't know that Mr. Simon has ever tried a case to a jury.  That was not his function or role.  I was looking for someone I felt gave me the best support I could have.  I knew where my strengths were or I thought I did, and I, you know, wanted to try to utilize his strengths.

Q    Now when you bring an attorney on to be responsible for the development of mitigation in the case, would you agree that's a big responsibility?

A    The whole case is a big responsibility, but yes.

Q    Okay.  And would you want to bring on somebody in that role who has experience developing mitigation?

MR. HOLTSHOUSER:  I'm going to object to the

relevance of what he wants in some hypothetical time period.

There's just no connection to the context --

Q    (By Mr. Moreno)  At the time ---

        THE COURT:  Wait, wait, wait; overruled.

        MR. HOLTSHOUSER:  -- of this case.

        THE COURT:  Overruled.

A    I think you, you know -- I'd love to have brought David Bruck on or Kevin McNally or someone else who had had, you know, --

Q    That's not my question.

A    -- an amazing number of experiences, but I tried to bring on someone who I felt could work with me and could add things to the case.

Q    I understand that.  But would you want to have brought in somebody who was going to be responsible for the mitigation case who had actual experience doing a mitigation case?

A    I would have brought -- wanted to bring someone who would have done a good job on the mitigation case.  I wouldn't ---

Q    You're not answering the question.

A    If I understand, your question is:  Would I have brought someone on who was not experienced?  I would not have used experience as the sole determiner of who I put on.  But, yes, that would have been one of the factors, absolutely.

Q    All right.  So experience in capital -- developing capital mitigation would be a big factor in who you brought on

to develop mitigation in this case.

MR. HOLTSHOUSER: Judge, I have to object to this question, "would be" and then "who you did bring on." There's a -- two -- It's a meaningless question in terms of how it's phrased. I'm not sure it's a hypothetical asking an opinion or is a reflection of asking for his opinion reflecting on the choice he did make or what he'd like in the hypothetical perfect world. I don't know -- I can't understand the question, so I object to it.

THE COURT: Okay. I understand the question to be: Was it a big factor to bring someone on with knowledge about a mitigation case? I thought that was the question.

MR. MORENO: That was the question.

THE COURT: Okay. Overruled.

MR. MORENO: I'll rephrase it.

THE COURT: Overruled. Okay.

Q   (By Mr. Moreno) Would you want to bring in someone who has -- Or did you want to bring into this case someone who had experience developing capital mitigation as your person responsible for that task?

A   Ideally, I would want to do that, but that is -- it's not fair to say that that's the only factor. But I understand what you're saying, and certainly you would want someone -- I would want someone more experienced. I would have wanted a better attorney than I am. I would want someone whose skills

made me look like "Pleb."

Q   Wouldn't we all.  But did you want -- In this case were you aware that Mr. Simon had no capital -- he had never developed capital mitigation?

A   I think I was aware that he had never tried anything in that regard.  I do know that he had, you know, done a fair amount of federal habeas work where he had probably secured statements, declarations, other things, just like you have, but I cannot tell you that I was hiring him solely because of his talents as a mitigation consultant.

Q   All right.  Did you -- Did he have talents as a mitigation consultant --

A   No.

Q   -- as far as you were concerned?  Okay.  So he had no such talents as far as you were concerned.

A   I didn't say that.  I don't believe -- I believe he has talents.

Q   I agree with that.  I wasn't ---

        THE COURT:  Wait, wait, wait.  Let him finish now.

        MR. MORENO:  I'm sorry.

        THE COURT:  Let him finish.

A   I believe he has talents.  I also believe that he has talents that probably weren't effectively used in this particular case.  I do not want to demean Mr. Simon.  I do not want to criticize him, but there were definite shortcomings

that came to light.

Q    All right.  We're looking at Page 7.  I think this will be the last entry we look at in -- on Mr. Simon's timesheet. On 1-8 -- Let's see.  See this entry right here?  I can use this to save my life.  I'll try that again.  Do you see that entry on 1-8?

A    What?

Q    There's an entry on 1-8 --

A    Okay.

Q    -- where he says he called Ms. Lucy McLemore to arrange for an interview.  Do you remember who Lucy McLemore was?

A    I believe Ms. McLemore was one of the penalty phase witnesses.

Q    Okay.  Did you know at that time what he would have been interviewing her about?

A    I would assume about what she knew about Billie Allen, but, you know, I don't know what he was going to interview her about.

Q    Okay.  Did he ever convey to you what he learned from Mrs. McLemore?

A    Not that I can recall.

Q    All right.  If the information he was seeking from Ms. McLemore was a fax regarding when Mr. Allen was baptized, would that be the kind of information you would expect him to be developing?

A    I cannot tell you what I -- Okay.  I guess I could try to tell you what I would expect him to develop.  Unless she held him under water, I wouldn't think the information about how he was baptized would be particularly important.  That's not to say that Mr. Simon wouldn't think it was particularly important, but I don't see, you know -- The only thing I can see that it does is it says that, you know, Billie came from a religious background and was baptized, and that's it.

Q    Now he also interviewed Mr. Raymond Petty.  That's a name that rings a bell.  Is that correct?

A    That rings a bell, yes, sir.

Q    All right.  And was Mr. Petty one of the mitigation witnesses?

A    He was.

Q    All right.  And did he tell you why he was going to talk to Mr. Petty?

A    I don't recall that he did.

Q    All right.  So were you aware that he was going to talk to Mr. Petty to find out some facts about whether or not Mr. Petty was a Scout leader?

A    Mr. Petty was a what?

Q    Scout leader.

A    I believe there was definitely information we had developed concerning Boy Scouts.  There was some records, I think, we were trying to secure about Boy Scouts.  So I wasn't

aware that he was going to talk to him about Boy Scouts, but that wouldn't surprise me, if he did.

Q    All right.  Now I know there was a conversation with Mrs. Allen and -- or I mean a meeting with Mr. Simon and Mrs. Allen that I think he discussed with you.  I think other people were there as well where he noticed the smell of alcohol on her breath.

A    That's correct.

Q    All right.  And that interview was a -- Do you recall if it was a group interview?

A    No, I don't remember.

Q    Okay.  And if that were the universe of witnesses that -- that Mr. Simon interviewed in this case, would you be surprised to learn that?

A    I would be -- It's hard for me to answer that question, and I'm not trying to be evasive.  I don't remember in this particular scheme of things where I found out where the mitigation investigation had gone, but if Mr. Simon were to testify that he only interviewed those three people, I certainly would -- that would not be good.

Q    Okay.  And that would be a ball dropped.

A    It stalled just like I said.

Q    All right.  Now you testified on Direct and I think you did some on Cross Examination that your main focus, and I know you were, you know, the jack of all trades, but your main

focus was the guilt phase. That was where you were primarily putting the bulk of your energies.

A    Yes.

Q    Was the guilt phase complicated? Was that a very complicated case that you had to investigate and put together?

A    There were -- There were certainly factors that were complicating it. There was a lot of concern about like, for example, you know, who fired what gun where; you know, went through the trajectory; went to the bank to evaluate and examine the scene. I mean there were things that were of concern. It wasn't complicated in the same way that a paper case can be complicated, but it wasn't an easy case, and it was sort of shifting sand. We were constantly unaware of where -- Things kept changing.

Q    Okay. And your relationship with Mr. Allen related to guilt phase, how would you describe that?

A    Complicated.

Q    It was complicated.

A    Difficult.

Q    Time consuming.

A    Very much so.

Q    Now in your deposition and I think even in your testimony over the last number of days you noted that you would block out distractions and you were focusing on -- on issues. Do you recall testifying to that?

A    I tried to, yes.

Q    Okay. And in your deposition, when asked about blocking out everything else and not knowing what was going on exactly with the mitigation, you said, "Ignorance is bliss." Do you remember that?

A    Yes.

Q    Okay. What did you mean by "ignorance is bliss"?

A    Well, I think when you try to block things out, when you try to maintain focus, you don't want those interruptions. And so sometimes those interruptions can be, you know, kind of distracting. So you're just -- I mean what I'm saying by that is that I want to be able to move forward in the direction I feel where I can accomplish the best I can do and I don't want to be diverted from that task. But, you know, it's -- it's not the best way to be supervising.

Q    So you had brought Mister -- You brought Mr. Simon on, obviously, to do mitigation.

A    That's correct.

Q    And was part of your thought process there so that it would free you up to spend more time on the guilt phase --

A    Yes.

Q    -- which you needed to do? Okay. And when you say ignorance is bliss, being that -- because Mr. Simon was doing the guilt phase or the penalty phase, you were focusing on the guilt phase.

A     What I -- What I had hoped to be able to do was by bringing on Mr. Simon to, you know, do some of the work on that case and I hoped communicate and develop certain things and pass those things on along, that it wouldn't have to be something that I would have to do.

Q     Okay.

A     And what we all know is it became something that I had to do.

Q     Do you recall how long, roughly, you had between when you were appointed to the case and when the case went to trial?

A     Well, it was April and February, so that would have been ten months.

Q     Ten months.  And after you realized the state of the mitigation case, the bare bones as you said it, how much time did you have to develop a mitigation case?

A     I think things began to fall apart in my mind in terms of knowledge I got somewhere in late November or early December.  That's -- That's -- But don't hold me to it or you're going to pop some document on me, but I'm just telling you that's where I remember, you know, feeling that there was a really stressful situation here that we had to begin to correct.

Q     And would that have started with realizing records hadn't actually been collected, even though you knew about them?

A     That's correct.

Q     All right.

A    Not collected, but they certainly hadn't been sent to Dr. Haney.

Q    Well, we knew with the medical records that some of the school records hadn't actually been received yet, based on that one memo.

A    Right.

Q    But others may have.

A    Other things needed to be done.

Q    Okay.  And then when you received the Haney, the Dr. Haney letter of January 13th, 1998, is that when you realized the extent of the problem you had?

A    Well, that's -- What I realized more than anything from that letter was that we weren't -- there was no calvary coming in from the West Coast; that we had a lot of work to do, and we weren't going to get any help from Dr. Haney.

Q    Now when Dr. Randall joined your team in January, I think around the 16th -- Does that sound about right?  January 16th of '98?

A    That sounds about right.

Q    How much time did Dr. Randall have to develop the mitigation case?

A    He had until we put it on.

Q    So he had about 40, 45 days?

A    I don't remember exactly when we started the mitigation. It has penalty phase March 2nd.  So that would have been six

weeks.

Q    So about 35 days.

A    Well, no.  It's more like 40, 43.

        MR. HOLTSHOUSER:  What's the question?

A    I mean we can all do the math.

Q    (By Mr. Moreno)  I'm sorry?

A    We can all do the math.  I just need a pencil and a couple of hours.

Q    All right.  Now Mr. Holtshouser was going through a bunch of the records that you had at least identified early on in the process and then at same point in time acquired.  Do you recall that?

A    I'm sorry.  Say that again now.

Q    During the Cross Examination, Mr. Holtshouser had gone through with you some of the records that you had identified from either Mrs. Allen and Billie Allen and then you later acquired those records.  Is that correct?

A    You mean -- Oh, Okay.  There were certain -- I guess what you're saying to me was there were certain things about records that -- information about which we received from Juanita or Billie and then we were going about acquiring those records?

Q    And that you kept.

A    Yeah.

Q    Do you remember the Metropolitan Psychiatric Center

records?

A    I remember them but not in detail.

Q    Okay.  All right.  This is Exhibit 123.  And do you recall what the incident was that Mr. Allen -- why Mr. Allen had been up at the Metropolitan Psychiatric Center?

MR. HOLTSHOUSER:  Judge, I'm going to object.

A    There was a -- There was one that, I think, was sort of a suicide attempt.

MR. HOLTSHOUSER:  Actually, Judge, I'm going to object.  He's testifying.  Since he actually doesn't have personal knowledge of what happened, the reports speak for themselves.

MR. MORENO:  I asked if he recalls.

MR. HOLTSHOUSER:  Plus these records are -- some of these are high school records.

THE COURT:  What he said was he remembers the records.  He doesn't remember what was in them.

MR. MORENO:  This is 123, right?

MR. KANE:  No, 119.

MR. MORENO:  I'm sorry.

Q    (By Mr. Moreno)  Do you have a recollection of why Mr. Allen went to the Metropolitan Psychiatric Center?

A    I mean I remember the one that I think had to do with a suicide attempt that, as I recall, was pretty close to the event.  The first one, I don't have a clear memory.

Q   Okay.  And close to the event was the incident here up in the upper right-hand corner, 2-11-97?

A   It could have been.

THE COURT:  Do you mean the bank robbery?

MR. MORENO:  No, no, no.  When he -- When he came into the hospital.

A   That's what the records say, yes.

Q   All right.  And you received those records at some point in time during the course of your representation of Mr. Allen.

A   Yes.

Q   All right.  Now do you recall there being an issue during the penalty phase where the Government was trying to undermine Dr. Cuneo's testimony concerning PTSD by asserting that the physician who had evaluated Mr. Allen at the Metropolitan Psychiatric Center did not diagnose him with PTSD?

A   I do remember there was Cross Examination of Dr. Cuneo, and that may be part of it.  I'm sure that you have the record there.  And if it was, I don't have any reason to challenge that.

Q   Do you recall whether or not Dr. Randall on the last day of the penalty phase made a -- made attempts to locate Dr. Wuertz?

A   I don't recall.  I mean, you know, he was the kind of guy that would try to do that.

Q   All right.  Can you think of a reason why you would not

have sent someone earlier within the proximity in time from this incident to the bank robbery to try and find and interview the people who worked with Billie, treated Billie at the Metropolitan Psychiatric Center before the last day of the penalty phase?

A   I can't think that there -- unless I knew what the entire record said, I can't think that there was any particular strategy behind that.  So I mean there could have been, but I can't think of one and I'm certainly not going to speculate.

Q   Is it your practice to follow up on records such as this to develop potential witnesses such as Dr. Wuertz?

A   I try to do that.

Q   All right.  And that did not happen with this particular witness.

A   Apparently not.

Q   Now if -- Hypothetically, if Dr. Wuertz would have been able to testify that he did not evaluate Mr. Allen for PTSD, is that the type of evidence you would have wanted to present to kind of ---

MR. HOLTSHOUSER:  Judge, I object to the hypothetical.  There's been no evidence of what Dr. Wuertz would or would not testify to.  We've been given no notice of any potential testimony or declaration from him.  He's not been ---

MR. MORENO:  He's on the witness list.  He will be

testifying.  We don't have a declaration from him.

MR. HOLTSHOUSER:  We haven't had any discovery regarding Dr. Wuertz from the -- from the trial.

MR. MORENO:  There's no report.  He's just a fact witness.

MR. HOLTSHOUSER:  Well, at this point, Judge, there's been no foundation as far as what this witness knows or doesn't know about anything that Dr. Wuertz would or would not say.

MR. MORENO:  I just put it in the hypothetical.  I'll do it again.

THE COURT:  Okay.  Go ahead.  Do you know -- Do you remember the question?

A    Say it again.

Q    (By Mr. Moreno)  Sure.  Hypothetically, if you had been able to present Dr. Wuertz in rebuttal to come into court and testify that he did not evaluate Mr. Allen for PTSD and that's why there's not a PTSD diagnosis in his report, would that have been the type of evidence you would have wanted to present?

A    It certainly would have been evidence that I would have considered putting on and probably would have put on.

Q    Do you recall Raymond Petty's testimony at the penalty phase?  It's been -- I know you've been asked about this before, but where he testified about seeing Juanita beat

Billie with an extension cord?

A    Yes.

Q    All right.  And do you recall that that information was elicited by Dr. Randall in February of 1998?

A    I have no idea when that was elicited for the first time. I just don't have a memory of that.

Q    I'm sorry?

A    I do not have a memory of that in my -- I believe that we had -- We interviewed a bunch of witnesses, one after another after another after another.

Q    You're talking about with Dr. Randall.

A    Well, myself as well.  I don't know where Raymond Petty fit into that.

Q    Okay.  So he was in that.  You're talking about a -- Let me just clarify.  You're talking about that weekend, the weekends where you and Dr. Randall brought people into your office?

A    We did it on the weekend, and we also tried to do it after court, but there was, you know, at least one weekend that I can recall where it was a series of witnesses one after the other.

Q    And that is when Mister -- when Mr. Petty was interviewed.

A    Okay.

Q    Is that the type of information that you would have liked

to have learned from Mr. Petty well before February of 1998?

A We would have liked to have learned whatever information there was about Billie whenever we could.

Q Would information from a family member that Mrs. Allen had beaten Mr. Allen with an extension cord the type of information you would have wanted to pursue?

A Well, yes and no. I mean it would -- We put it on, so it was there. I didn't -- I didn't have any belief that there was anything else at that point in time other than the statement from Mr. Petty as he testified. At that point in time, perhaps mistakenly, I did not believe that there was a history of child abuse.

Q I understand.

A And I -- I did not have any information that would have confirmed that. I -- I'm well aware from being out in the world sometimes that people hit their kids when they're in a store for no reason, all kinds of stuff, but I didn't have anything that I could hang my hat on that said, "Okay, child abuse was a pattern in Billie's life." And that's the most important thing that would have assisted me in that regard.

Q And -- And I guess I inartfully asked that. What I'm -- What I'm trying to get at is: You knew of Mr. Petty well before February of 1998.

A Yeah.

Q All right. If Mr. Petty had been interviewed in the

summer or fall and had given that you information, is that the type of information that you would have investigated further? You would have gone to other witnesses to see if other witnesses had seen the same thing early on in your investigation.  Is that the kind of information that would have led you to do further investigation?

A    I don't know -- I don't recall what the interview of Mr. Petty was in the summer.  I think that if I had information to indicate that there was a pattern of abuse, I would have gone further with it.

Q    But is it true ---

A    I mean I wouldn't go -- I wouldn't necessarily conclude that a single whooping would be a pattern of child abuse, but I wouldn't have ignored it.  It wouldn't have been something that I said, "Whatever."  And I think the complication was that if, in fact, it was going to be disclosed, it's a process to try to get that information disclosed.  Because from what I understand of the Martell and Martin declarations, that most of this information is coming from Juanita and Billie who we did have contact with.

Q    Well, some of the information is coming from other witnesses, is it not?

A    I understand that.

Q    So ---

A    But, you know, the people that were there, if it's true,

we know who they are.

Q    If you had had that information from Mr. Petty in the spring or summer or early fall that he had witnessed this kind of abuse, ---

MR. HOLTSHOUSER:  I'm sorry.  Spring of which year?

MR. MORENO:  1997.  It's the only year we're talking about.

MR. HOLTSHOUSER:  The case was ---

MR. MORENO:  April, May, June.  You know what I'm talking about.

MR. HOLTSHOUSER:  Is there one period?  Is there multiple periods?  I'm not sure which period you're asking about.

Q    (By Mr. Moreno)  If you had had that information early on in your investigation or in the fall, September, October, November, would you have pursued other witnesses who might have been able to tell you the same thing?  Isn't that how you develop whether or not there's a pattern of abuse?  You interview numerous witnesses and find that out?  That would have been a clue that you could go further with that now.

A    It could definitely be considered a clue.

Q    All right.  And learning that clue in February of 1998 was late in the game in terms of the investigation.

A    I've already testified to that.

Q    Okay.  Would there have been a strategical, tactical

reason for not interviewing Mr. Petty prior to February of 1998?

A    I -- No.

Q    Okay.  Back to Exhibit 308.  We talked about this one earlier.  This is the witness list that you had generated, you know, after you received names from Billie and Mrs. Allen.  And at the top here there's a guard in a jail.  In your experience, is adjustment to incarceration evidence the kind of evidence, if it's positive, you would want to present to a capital jury?

A    It can be, yes.

Q    All right.  Do you recall whether or not in this case, prior to Dr. Randall entering the case, any investigation took place concerning Mr. Allen's adjustment to incarceration?

A    Well, I think we had records from Franklin County Jail.  I know that when I would visit, I would talk to the guards in particular about Billie and his behavior and his adjustment.  I don't know that -- In light of the entire view of the Hitchcock kind of evidence, this is a pretty isolated period of time.  It's not a very long period of time.  You know, the ideas really -- And I don't think the Government was beating that drum that he was going to be a danger to someone if he got locked up.  So it wasn't a focus because I don't think that there was enough of a history other than what we had developed, but it is something I talked to the people about

and learned about.  I didn't have any indication that Billie was a problem while he was at Franklin County Jail.

MR. MORENO:  Your Honor, could I have just a quick moment?

THE COURT:  Sure.

(Pause)

MR. MORENO:  Thank you, Your Honor.

THE COURT:  Okay.

MR. MORENO:  I'm sorry; one more moment.

THE COURT:  Sure.

MR. KANE:  Sorry, Your Honor.

(Pause)

Q    (By Mr. Moreno)  Do you know whether or not Dr. Randall interviewed guards as potential witnesses for adjustment to incarceration?

A    I don't know that for a fact.  I thought he did, but I don't want to say I know one way or the other.

Q    All right.  So if he did, he was investigating that aspect.

A    Well, if he did, he would be investigating that aspect then.

Q    Okay.  And that aspect of the case had not been investigated.  I mean you talked to guards and what not, but you had not identified guards who could come in to testify on Mr. Allen's behalf prior to Dr. Randall entering the case in

1998.

A    If I ---

MR. HOLTSHOUSER:  Judge, I'm going to object to the question.  First of all, it's leading and argumentative, but it's a misstatement of the evidence.  We already saw records in the trial this week of memos, taking notes by Ms. Caspari and others, guards' names and referrals of the names that were testified to by Billie well before Dr. Randall came into the case.

MR. MORENO:  I don't think that's an accurate reflection of the evidence.

THE COURT:  Wait a minute.

MR. MORENO:  I think those memos were in January.

THE COURT:  All right.  I have to go back to the question.

(Pause)

THE COURT:  Okay.  It says, "And that aspect of the case had not been investigated and you talked to guards and what not and you had not identified guards to come in to testify," and there's an untranslate; "prior to Dr. Randall entering the case."  Well, okay.  Overruled.

Do you understand the question?

THE WITNESS:  Can read it to me again?

Q    (By Mr. Moreno)  Yeah.  I'll say it.  I'll just rephrase it.

Had you identified the names of guards who were willing to come in and testify to Billie's good behavior in prison prior to Dr. Randall --

A    Well, --

Q    -- entering the case?

A    -- I'm only going to hesitate to answer that question because I don't know that we had specifically identified them for the purpose to determine if they were willing to testify. I know that we had talked to people and there had been some conversations with the guards about his behavior. I don't know whether we said to them, "Would you be willing to come in and testify?"

You know, those -- Sometimes in those situations, it's a little bit touchy, but -- because, you know, they have to get their approval and they may not want to be labeled as somebody who came in to testify in this kind of case, and they, also, I think, can be subject to pretty strict Cross Examination, but it is definitely an area you want to explore. And the longer the record you have of someone being incarcerated and conforming their conduct to the rules and staying out of violent events and things like that, the better off that testimony or the more effective that testimony can be.

Q    And would you think, in your opinion, that that testimony would be important in a case where the Government's portraying

your client as a -- as a drug dealer?

A    No.

Q    You don't think that would be important?

A    Not his -- Not his -- conforming his behavior to his environment.  I -- I don't see that in a drug context.  It may be important in every single case, but I wouldn't think it would be more important in a drug case than a case in which there was prison homicide.

Q    Well, a drug case where a murder occurs like in this case.  I'm talking about Billie's case.

A    There was no drug.

Q    Well, you're right.  But weren't they alleging that a -- and insinuating that Mr. Allen was dealing drugs?

MR. HOLTSHOUSER:  Judge, I'm going to object.  There's no evidence of that at all in the record.  In fact, there was evidence of a motion to keep it out of the record.  It only came in in response to some -- some of the penalty phase mitigation evidence that might have been discussed.  It was never an allegation or an argument before the jury.

THE COURT:  Well, to the -- Let's do it this way.  Why don't you rephrase the question, if you would, please.  Ask him if there was such evidence of drugs because we heard earlier where that kind of evidence was purposely tried -- was purposely screened.  So let's start over.

MR. MORENO:  I'll just move on.

THE COURT:  All right.

MR. MORENO:  That's fine.

Q    (By Mr. Moreno)  Now turning again to your deposition, I want to turn your attention to Line 13.

THE COURT:  What page?

MR. MORENO:  On Page 37 --

THE COURT:  Okay, thanks.

MR. MORENO:  -- of Exhibit 534.

Q    (By Mr. Moreno)  Mr. Holtshouser had asked you or had suggested that you had already done some substantial mitigation in the case prior to the falling out with Dr. Haney.  And you responded, "I tried to lay what I thought was an appropriate groundwork, but I wasn't interviewing people until after the Haney letter specifically concerning mitigation."  Do you see that?

A    That's what I said.

Q    Okay.  And do you agree with that?

A    I think that's ---

MR. HOLTSHOUSER:  I object --

A    I think that's fairly accurate.

MR. HOLTSHOUSER:  -- unless he's going to read the whole answer or the answer that came before it as well.  This is just partial selection of the answer to the question.  The Court can see the whole question.

THE COURT:  Well, that can be -- I'll allow it on

Redirect.  Go ahead and answer the question.

Q    (By Mr. Moreno)  All right.  Well, let's go ahead.  The rest of it says, "I probably -- I probably picked up some information and followed through with it, that kind of thing, but I don't really recall burrowing in until after the Haney letter."  Is that accurate?

A    That's -- That's fairly accurate.

Q    Okay.

A    I never, you know -- I did the things.  I did some groundwork.  I investigated some things, whatever, but I realized at the end of '97 and the beginning of '98 that the tasks that I think were appropriate and needed to be performed had not been performed.

Q    Thank you.  You were asked questions about the ABA Guidelines by Mr. Holtshouser.  He was emphasizing that in his view, what was required was an effort -- an effort to develop mitigation.  Do you recall that question?

A    Yes.

MR. HOLTSHOUSER:  I'm going to object to the characterization as my view, Judge.  That was represented to be the Eighth Circuit's view of the ABA Guidelines in effect at the time.

Q    (By Mr. Moreno)  Is it your understanding of the ABA Guidelines that they require more than just effort of an attorney in a capital case?

A    You're talking about the present ones?

Q    Even the ones in 1998, the ones that Wiggins and Terry Williams were ---

A    I don't really feel comfortable reciting to the ABA Guidelines.  I mean I don't see -- I doubt that I would have a great disagreement with them, but ---

Q    Okay.

A    They're not in my pocket.  I don't feel safe saying what they say.

Q    Do you feel that -- Well, let me ask you this.  Are you familiar at all or were you familiar at the time, if you recall, with the 1998 ABA Guidelines?

A    I'd have to say that I was familiar with them only in a general sense, though.

Q    Okay.

A    I couldn't have cited them, any particular portion of them or any quotations or anything to that effect.

         MR. MORENO:  Your Honor, would now be a good time to take a short break?

         THE COURT:  All right, sure.

         MR. MORENO:  Would that be okay?

         THE COURT:  Yeah.

         MR. MORENO:  All right.

         THE COURT:  We'll be in recess for 15 minutes.

         (Court recessed from 2:20 PM until 2:35 PM.)

MR. MORENO:  Thank you, Your Honor.

THE COURT:  Yes, sir.

MR. MORENO:  I appreciate it.

Q   (By Mr. Moreno)  Mr. Sindel, I think we might be closing in.

All right.  Now what I'd like to talk to you about is -- Well, do you recall testifying yesterday that the issue of abuse would have been in the normal questions you asked a witness?

A   Correct.

Q   All right.  And when meeting a client's mother early on a case, is it your practice to tell them about the broad spectrum of issues that the team is going to be investigating during the course of the case, the various mitigation themes or issues or things you need to look into, such as substance abuse or alcoholism or mental illness or abuse, to give them a broad spectrum of issues that you will ultimately be talking to them about?

A   Yes.

Q   All right.  And did you do that with Mrs. Allen in this case?

A   As I recall, yes.

Q   Now do you recall testifying yesterday that you did not talk to Mrs. Allen in detail about abuse?

A   I don't know that I -- I recall testifying that I didn't

ask her, "Did you abuse Billie?"  I certainly asked her whether there was any physical abuse that occurred or been inflicted upon him.

Q    I'm sorry.  That occurred or?

A    Or been inflicted upon him, you know, whatever.

Q    Okay.

A    In dealing -- In dealing with what I know now compared to what I believed I knew then, I mean that's -- that's part of the complication of this case.  That's part of my beginning to understand my -- the deficiencies that occurred, and it's very disturbing, and I don't want to think I missed it, but I -- Before I reviewed those materials, I felt like I had done a pretty good job, and I -- I'm not so sure now.

Q    Okay.  Now in your experience, does it take -- Do you have to -- Can you go in after a couple of meetings and ask those questions or do you have to develop a rapport over time?

A    You generally have to develop a rapport.

Q    And was that John Simon's job in this case to develop the rapport with the family?

A    I -- I had thought so.

Q    All right.

A    But, yeah.  I mean I would say, yes, it was part of the team's job to try and develop a rapport.  I never had a lot of problems in securing information about abuse from a client, if you meet with them sufficiently.  And a lot of times I've had

it divulged very early on, maybe even the initial contact, but it's a lot harder to deal with the family because sometimes it's a hidden secret.

Q    And in this case, I think you've noted that you didn't -- it wasn't your role -- you didn't see that as your role in this case to develop that rapport with her, to have those discussions, because that was going to be Mr. Simon's role.

A    I mean I don't ---

MR. HOLTSHOUSER:  I'll object to that as a mischaracterization of the evidence.

THE COURT:  Not on the evidence.  It is leading, but overruled on the evidence.

A    I don't -- I don't think that that's a fair assessment for me as to what my job was to do.  Everybody tried to develop -- I tried to develop a rapport with Juanita from the very first time I met her.  I saw -- It's my role to do that just like it is anyone else.  Sometimes you have people who don't have -- I mean the best of all possible worlds is you have somebody and that's their job, period, but I didn't have that luxury.

Q    Well, you had Mr. Simon.  No?

A    Well, I don't think he had that luxury either.  I mean you saw that he had this long laundry list he put in the continuance motion about what he was doing.  So nobody had that job, period.  There are people that you can hire.  There

are people probably that maybe work for certain agencies that have the luxury of funding; that that's what they do all day long, and that's great and they do a good job.

And I, you know -- If I -- If there was more rapport to be developed, I wished we had developed it. I don't know if I could have.

Q   Now Mr. Simon was hired to do the mitigation, so that was his primary role in this case.

A   That's what I understood.

Q   Okay. And as part of that role, you foresaw that he would be the one who ---

A   You have to pick up just a bit.

Q   I'm sorry. As part of that role, you -- you planned that he would be the one who would be the boots-on-the-ground guy, interviewing witnesses, developing a rapport, and asking the hard questions because you were going to be doing guilt phase.

A   That's -- That's what I envisioned.

Q   All right. And that's how it worked, at least you thought it was working, until November or December of 1997, correct?

A   That's correct.

Q   All right. So until November, December, January of 1997, '98, you were not out there developing the rapport necessary to have the hard conversations with the family.

A   I'm not trying to fight with you.

Q   No.  I understand.

A   But, you know, every time you have a telephone conference with someone and every time that you meet with them, as an attorney in these kinds of cases, I believe you're always trying to develop a rapport.  I just -- Based on what I know now, I'm not sure that I did.

Q   Now do you recall testifying at your deposition that you don't have a specific memory of whether or not you asked Mrs. Allen about abuse?

A   I don't recall.

Q   All right.  I'll bring it up.  I'll bring it up.  I'm not trying to ambush you.  I'll bring it up.  Hang on a minute.

You were asked:  "At some point I think you indicated you did ask Juanita whether any of these things were pertinent here," which was abuse.

And your answer:  "I don't have any specific memory. I believe that I would have."

But you don't have a specific memory.  Is that correct?  Is that what you said at the deposition?

A   I think that what I was saying is I don't have a specific memory that on this day or at this particular time I asked her point blank, "Did you abuse Billie?"  I don't know what's the lead-in to that abuse, neglect, abandonment.

Q   Let's see.

A   Okay.  Is this the preceding page?

Q    Yeah.

A    Because I'm referring to the earlier question, isn't it? Isn't that what I'm doing?  Or you just flipped it on me. Where am I?

        THE COURT:  Can you pull up Page 26?

        MR. HOLTSHOUSER:  28.

        MR. MORENO:  28.

Q    (By Mr. Moreno)  Yeah.  I was looking at the previous page.  This is the page before.

A    Oh, okay.  All right.

Q    Because you were talking about a context that I don't think is in -- The question wasn't about a specific date, was it?

A    No, no.  I didn't see this specific -- What I was referring to was the fact that I didn't know what the question was because I was answering the question that was only partially on the page.

Q    Okay.  All right.

A    Now you moved it again or somebody did.

Q    I did.

A    Okay.  All right.

Q    All right.  "Now I want to make sure that -- We just talked a minute ago about the subject of abuse and neglect and abandonment.  You had a conscious awareness that those are relevant issues in some capital cases.  At some point I think

you indicated you did ask Juanita whether any of these things were pertinent here."

And you answer:  I don't have a specific memory.

A    And I didn't remember any particular conversation.

Q    Since you don't have a specific memory of asking her those -- discussing those issues with her, isn't that ---

A    I'm sorry.  What?

Q    Doesn't that indicate you didn't have a specific memory of such conversations?

A    I believe throughout the deposition at least I said that there were things that I do; there were practices that I had, you know.  I don't -- I can't specifically say, "I remember that it was the third meeting with her when I asked her that question."  But I believe I said in my deposition, as I've said in my testimony, that that was a practice and that I was certainly aware that those were issues that were appropriate for mitigation.  So I was telling you I can't say specifically -- or I wasn't telling you.  I was telling Mr. Holtshouser.  I don't have any specific memory of that occurring at a particular space and time, but I -- I mean it's beyond my imagination that I wouldn't have asked some questions in that regard.

Q    Well, whether or not you would have beyond your imagination, you say here -- And it doesn't talk about a specific time.

A    Well, I won't ---

It talks about:  Do you have a specific memory of asking her those issues?  And that's -- And I don't have a problem with that statement.

Q    All right.  We're on Page 65 now.

You were asked:  "In her declaration, Juanita says" -- and I'm starting on Line 13 -- "that if she had just been asked by the trial team about whether or not she had abused Billie, she would have readily told them she had.  Do you believe that based on your dealings with Juanita back then?"

Your answer:  "I wish I knew if we had asked her.  That would be a lot easier question to answer."

A    Correct.  I don't recall saying to Juanita, "Did you ever beat the crap out of Billie?"  I do recall that there were questions that would have touched upon those areas of abuse, but I do not recall ever saying to her because I candidly didn't have anything other than a single event that referred to Mr. Petty that that was life within that household.

Q    But you didn't have that event with Mr. Petty until February 22nd of 1998.

A    I didn't have it at any time that that was anything that was going on in that household.  I didn't have that information.  That's the reality.

Q    Well, I understand that, but ---

A    And that easily could be my fault, but I didn't have it, and that's the accurate statement.

Q    All right.  But what this says, this doesn't indicate -- This says you wish -- I have to find it.  I'm sorry.  I lost it.  "I wish I knew if we had asked her."

MR. HOLTSHOUSER:  Judge, I'm going to object.  It says what is says.

MR. MORENO:  It does.

MR. HOLTSHOUSER:  But I think this is now being argumentative.  This is his witness.

MR. MORENO:  That would be an easier question to answer.

THE COURT:  He's answered it over and over and over and over and over at least ten or twelve times.  The -- What I clearly understand from it is that, you know, like you said, just like you said, it says what it says.  You know, it -- it seems to me he's answered the question.  I don't know what else he can say, so.

MR. MORENO:  Okay.

A    I think like at the bottom of that page, there was -- it starts to go into, I don't remember any specific conversation with her where I said -- and I'm going to look it up and see what it is.

Q    Here.  I'll turn the page.

A    I may have asked her about abuse, but I did not ask her

whether she was a perpetrator.

Q    Okay.  "I may have asked her about abuse."  All right.  So you really weren't sure.  You're just kind of along the lines today, you can't imagine that you wouldn't have.

MR. HOLTSHOUSER:  Same objection.  This is leading and argumentative.

THE COURT:  Overruled.

A    You asked her:  "Has anyone ever abused him?"

I think I would have gone there for sure.  I'm just not trying to fight with you, but I mean I'd like it at least to be put into the perspective of the whole answer.

Q    (By Mr. Moreno)  That's fine.  I not trying to -- What that indicates -- That doesn't indicate that you remember that you did that.  It indicates that you think you would have done that; that that's what you would have done.  You don't remember.  Is that fair?

A    That's accurate.  I do not remember the specific conversation.

Q    All right.  We're going to have some more timesheet fun.  I know we did -- You did this with Mr. Holtshouser, but I'm going to turn to Exhibit 15.  And do you recognize this document?

A    I've seen it before, yes.

Q    Okay.  And that would be the payment voucher you submitted?

A    I'm sorry; what?

Q    That would be the payment voucher you submitted in this case, at least one of them.  This may be the internal one.

A    This is one of them, yes, sir.

Q    Yeah, okay.  All right.  I'm on Page 6 of Exhibit 15.  And do you see the entry at 4-16-97, "Telephone conference with client's mother"?

A    Yes.

Q    All right.  That corresponds with the -- Do you remember the transcript of a conversation you had with Mrs. Allen --

A    Yes.

Q    -- that Mr. Holtshouser talked to you about?

A    Yes.

Q    All right.  That corresponds with the 4-16 date here on the timesheet.  So it was a telephone conference when that tape was made.

A    That's what I believe it was, yes.

Q    Okay.  And that's early on in your representation of the case, correct?

A    Yes.

Q    4-16.  All right.  And do you recall -- You probably don't, but do you have any recollection of what you talked to her about at that point in time?

A    I think there was a lot of general information.

Q    Okay.  That's fair.

A    I mean my memory -- Well, my practice at sometimes would be that if I was on a phone call, I had a little button on my dictating equipment; that I could press it and it would record from the phone.  So I would say, you know, "Do you have a problem?"  Because I'm trying to write and do everything.  If I record it, then that way it's preserved.

Q    Okay.

A    It would not have been for any purposes to tape her and then use it later.

Q    Oh, of course not.  I wasn't suggesting that.

A    No.  But I'm just saying that's why there's no tape.

Q    All right.  Now on the bottom of this 4-23-97, it's a telephone conference with mother and Joe Vaughn.  That's for a half hour it looks like, correct?

A    I think it says .3.

Q    .3, okay.  Yep.  So who is "Joe Vaughn"?  Do you know?

A    Joe Vaughn was at the Marshals Office here, and he's primarily involved with handling of a number of matters surrounding prisoners, especially in surrounding counties, for arranging transportation.  He is the go-to guy.

Q    Okay.  So, obviously, that phone conference was probably about issues related to Billie and the jail.

A    My guess would be that based upon what I see there, is that his mother called me up and said, "There's something going on and you need," you know -- whether it's health or

something else.  And I would then place the call with Joe Vaughn to see if I can get the issue resolved.

Q    Okay.  Thank you.  Now I'm on Page 7; trying to get rid of that.  At the top of the page, 4-28-97, and I think this is consistent with documents that were shown to you on -- on Cross Examination.  "A letter to Juanita Allen re:  Treating physicians and hospitals," correct?

A    Yes.

Q    All right.  And she provided you with that information.  I think we've already established that.

A    I believe so.

Q    Yeah, okay.  Now 5-10 -- Oops!  Not that one.

       This one:  "Telephone conference with client's mother, Juanita, re:  Mitigation."  And that one is for two-tenths of an hour?

A    That's correct.

Q    All right.  And then 5-15, you have another telephone conference with Juanita, Mrs. Allen, "with mother and a witness."  And that was for about a half hour?

A    That's what it says, yes.

Q    Okay.  And if it doesn't note mitigation on the phone call, is it safe to assume it was probably something else?

A    No.

Q    No, okay.

A    I mean I'm not trying to say it wasn't.  I'm just

saying -- I guess the best way is if you would allow me to explain just how our billing process works, you know, which is:  There's a sheet that we have.  And on that sheet we can put a date and the name of the client.  And the really good attorneys put on the file number, but I don't because I don't take the time to look it up.  And there's a code that indicates what we did, appeared in court, motions, whatever it is.  We'll write that numerical code in there, and then you write the time, and then you will describe what you do.  So if I write a "70," that means "telephone conference," and I'll put "with" and "mother."  And I seldom will put what the conference is about.  You know, on a good day I might, --

Q    All right.

A    -- but the fact that it's there or not there is really not of significance.

Q    Let's turn to the next page.  There's another telephone conference with -- with Juanita, Mrs. Allen, on 6-5-97. That's for two-tenths of an hour.  That's a pretty short conversation.  Yes?

A    It's 12 minutes.

Q    Twelve minutes. All right.  I'm going to turn to what I think was your -- your final payment voucher.  It's Exhibit 69.  Obviously, this was discussed the other day.  You're familiar with this document.

A    I am.

Q    Now on Page 3 of this document at the very bottom, there's a consultation with client and family on 3-10-98. Would that have been after the conclusion of the guilt phase? Do you recall?

A    At the conclusion of?

Q    Of the penalty phase.  I'm sorry.

A    I'll trust you to know the dates.  I know the date it started.  I don't know the date it ended.

Q    Okay.  And that would have been six minutes, roughly?

A    That was an hour --

Q    Oh, that's an hour?

A    -- over an hour and a half.

Q    Oh, yes.  Yes, okay.  I'm sorry.  I was looking at the wrong line.

Okay.  Looking at Page 5, there is a category on your billing sheet called "Witness Interviews."  And on 2-21-98 you have there that you interviewed witnesses for penalty phase for 3.5 hours, correct?

A    That's the second entry.  There's an earlier one for nine hours.

Q    Okay.  And, yes, there is.  And those entries, would they have been, do you recall, when you were meeting witnesses with David Randall?

A    If those are weekend dates, that's probably what it is.

Q    Okay.

A   I would imagine that during the trial, it would be pretty hard to find nine hours.

Q   Right; right.  Okay.  So those dates, the 21st, the 9 hours and then, again, the 21st, the 3.5 hours, those were the interviews most likely with David Randall and the other -- and the witnesses.

A   Yeah.  The practice that David and I had was to try to put some space in there so we could talk about what we learned, what we, you know -- what was coming out, those kind of things --

Q   Right.

A   -- we could discuss, you know, what was happening.

Q   All right.  And some of the factor, that was also because you were under a time crunch, correct?

A   Everything was because we were under a time crunch.

Q   Now on 2-28-98 there's another entry for interview for penalty phase witnesses.  That's three hours, correct?
       That, also, corresponds with ---

A   Oh, I see, down there.  2-28, yes.

Q   Yes.  That corresponds with when David Randall was working on the case with you?

A   I'm sorry.  What?

Q   Does that also correspond with working with David Randall on witness interviews?

A   I would assume so.  I mean I would think that 2-22, 2-23,

2-26, 2-26, March 1st, March 3rd, and March 5th probably all had to do with working with David Randall.

Q   Okay.  And the ones that occurred in what appears to be the guilt phase of the trial were most likely trial witnesses; guilt phase witnesses.

A   Yes.

Q   All right.  So on this final timesheet, this is what is reflected for interview witnesses for the penalty phase.  Is that correct?

A   You're talking about Page 5?

Q   Yes.

A   I'm sorry.  Say that question -- It says -- I don't think it's all -- I don't know if it's all about penalty phase or not.

Q   No, no, not all of it.  I know not all of it.  I'm sorry.  I'll repeat the question.

        Does the entries that are on here that we talked about that are for the penalty phase witnesses, this reflects the interviews that you did on mitigation witnesses.

A   I don't -- Well, what I'm saying to you is I don't know that the other witnesses were or were not penalty phase because there's no entry there.

Q   Okay.  But there is an entry for the ones that say "penalty phase," correct?

A   Oh, absolutely.  You can see it.

Q    Wouldn't that make you think that the ones that don't say "penalty phase," given the pattern in this particular timesheet, would not have been for penalty phase?

A    March 5th, I don't think that's a guilt phase witness. March 3rd, I don't think that's a guilt phase witness.  March 1st, I don't think that's a guilt phase witness.

MR. HOLTSHOUSER:  Judge, I'm going to object as this is probably rank speculation as to who's being interviewed on which day.  There are actually dated notes of interviews with respect to all witnesses, so it's capable of being determined who's being interviewed on which day.  I think my objection is that this line of questioning is calling for clear speculation as to who was being interviewed on that day.

MR. MORENO:  I wasn't asking specifics of who's being interviewed.

THE COURT:  Okay.  I think it does as to ---

MR. MORENO:  I'll just move on, Your Honor.

THE COURT:  Okay.

MR. MORENO:  It's not a problem.

Q    (By Mr. Moreno)  On this timesheet where there's the category for "Witness Interviews" -- I'll withdraw that. Never mind.

MR. MORENO:  If I can have just a moment, Your Honor. I'm trying to weed out what I don't need to ask.

THE COURT:  That's all right.  Take your time.

(Pause)

Q    (By Mr. Moreno)  I think you testified yesterday that when Dave Randall got involved in the case, you were doing the guilt phase, he was out doing the interviews, and then in the evening he would bring witnesses to you or on weekends.  Is that correct?  Is that how it worked?

A    That's how I recall it, yes.

Q    Okay.  Now with great trepidation, I'm going to talk briefly about Dr. Cuneo again.

At the bottom, starting on Line 24, you say, "Although we had a competency exam, we did not have any exam that was focused on mitigation issues."

MR. HOLTSHOUSER:  Whose depo is this?

MR. MORENO:  I'm sorry?

MR. HOLTSHOUSER:  Whose depo is that, please?

MR. MORENO:  Oh, this is -- I'm sorry.  This is 534 --

MR. HOLTSHOUSER:  Okay.

MR. MORENO:  -- at Page 231 and 232.  This is Mr. Sindel's deposition.

A    That's correct.  I may not -- Are you on 232?

Q    (By Mr. Moreno)  I am now.  That's the top one.

A    Is that the circle?

Q    I'm trying to get rid of that but it won't go away; down here at the bottom.

"Although we had a competency exam, we did not have an exam that was focused on mitigation issues."  Is that a accurate statement?

A    I don't think we had an exam that was completely focused on mitigation issues.  I think after we got the competency exam, we realized from talking to Dr. Cuneo that there were issues there.  I did not recall his second evaluation.  I do not recall a report, and that may be why I answered the question the way I did.

Q    Well -- I'm sorry.

A    But -- But no matter what, February 16th's too late.

Q    Yeah.  Now about the report, whether or not there was a second report, ---

A    I didn't say a second report.  I said a second evaluation.

Q    A second evaluation.  Do you recall that the issue of the second evaluation that was raised by Mr. Holtshouser at the time of trial you actually answered during court what had happened?  Do you recall that the issue was that Dr. Cuneo went back because Mr. Allen had not completed numerous questions on the MMPI?  Had not answered numerous questions on the MMPI?

A    That was part of my response in court, yes.

Q    Yes.  And that was why he went back to go over those questions and answers again with Mr. Allen.

A   That's how much I answered the inquiry in court.

Q   Okay.

A   That's how -- I'm assuming that that's what I understood.

Q   Okay.  And you would have no reason to believe that wasn't accurate.

A   That's what I said in front of the Judge.  I don't want to tell him I said something that wasn't accurate.  I mean I think that that was, obviously, part of it, yes.  And that may have been all of it.  I just don't have any specific memory. But there wasn't, I don't think, any question after we got the PTSD diagnosis that we were going to use that in mitigation.

Q   Absolutely.  I understand.  You were asked some questions on Cross Examination concerning Dr. Gelbort, and I think the questions dealt -- addressed whether or not Dr. Gelbort ever told you that he needed more time.  Do you recall that?

A   I believe I recall the questions.

Q   And I think your answer was you didn't recall; you couldn't recall that.

A   I mean I don't think that anybody that was helping us on the mitigation phase of the case would have said, "You know what?  I don't need any more time."  So -- But I don't remember a specific conversation where Dr. Gelbort said, "I can't do this test because I ran out of time."  But I think everybody would have liked more time.

        MR. MORENO:  Sure.  Your Honor, could I stop here for

a minute, please?

THE COURT:  Sure.

(Pause)

Q    (By Mr. Moreno)  All right.  Do you see this is Exhibit 400?  And it's a note that says, "Do you want to get on the record that Gelbort would have liked more time?"  Do you recall that note being handed to you?

A    I don't.

Q    Okay.  Do you know whose handwriting that is?

A    I think it's David Randall's.

Q    All right.  And then it says "scary."  Do you have any idea what ---

A    That looks like my handwriting with a question mark after it.

Q    Okay.  And any idea what you were referring to?  Scary idea to ask for more?

A    You know, I really don't remember.

Q    Okay.

A    I don't even remember if there was a request made on the record to give him more time.  This may have been -- I'm sure this was in the trial.

Q    How about at the continuance?  Was it during the continuance motion?

A    There was no continuance motion after the one in January.

Q    Okay.  And that was before -- That was after

David Randall's time.  But David Randall was on the case when you did the continuance motion.

A    That's correct.

Q    Okay.  And could this note have been handed to you during the continuance argument?

A    I don't think so.

Q    You don't think so?  All right.

A    I don't think we identified Gelbort.  Now I'm ---

Q    Not till later?

A    I don't think that that was what it was talking about.  I think that if we had an indication that there was an expert that we had secured, and it seems to me that that didn't happen till later, that said, "I needed more time," we would have included that in the Motion for Continuance because it would have been, you know, kind of a factual reason.

Q    Sure, a concrete reason.  The reason I wondered if it was part of the -- during the litigation on the continuance is because it said, "Do you want to get in on the record -- to get on the record," which makes it sound like you might have been in court and David is asking you, "Do you want to put this fact on the record?"

A    I don't doubt that we're in court.  It's a 3 X 5 card or one of those stickies and that's what he would hand me --

Q    Okay.

A    -- and that's how those things would work.  You know, he

might give me a note.

Q    Does this refresh your recollection, though, whether or not Dr. Gelbort would have liked more time?

A    Well, I think certainly David was expressing that Dr. Gelbort would have liked more time, and I'm not saying he never said that.

Q    Right.  I understand.

A    I just don't remember it.

Q    You were asked questions about what would or would not appeal to a St. Louis jury.  Do you recall that?

A    Yes.  I was asked questions about what I thought.

Q    Right.  What you thought, right.  Is there any type of mitigation you would choose not to investigate because of concern that it might not appeal to a St. Louis jury?

A    I would say probably not.  I mean if it's mitigation evidence, if it's junk --

Q    Mitigation.

A    -- I mean I'd go after it, but if it's -- I'm just saying if -- if it's just whether he was baptized, I don't know that I would investigate that any further.

Q    If he was abused?

A    I would investigate that further.

Q    Now you were asked about strategies and how it's important to incorporate the evidence from the guilt phase into your strategic thinking about the penalty phase.  Do you

recall those questions?

A     Yes.

Q     All right.  Taking strategies into account -- Or would the -- the -- Let me -- Let me rephrase the question.

Would the evidence that was presented in the guilt phase in this case have prevented you from putting on evidence of abuse at the penalty phase?

A     You mean -- Okay.  Not in any legal sense it wouldn't have prevented me.  And I don't think that the evidence in this case would have been enhanced, for example, if we put on evidence that he had been subject to a pattern of abuse.

Q     So you would -- I'm sorry.

A     So I mean what I'm saying to you is I don't see, as I sit here right now, "Well, I don't want to put that pattern of abuse on because that would mean he probably went out and robbed a bank," you know.

Q     It would be something you would consider mitigating in these cases.

A     That's correct.  I would not consider that that meant he did or did not do what -- the offense that he was charged with.  And I think it would be pretty hard -- If he killed his mom, that's a causal connection.

Q     Now you testified yesterday you worked again with Dr. Haney, is that correct, shortly after this case?

A     That is correct.

Q    All right.  Did you discuss with Dr. Haney what had happened in this case?

A    You know, I really don't think I did except in -- maybe in passing, but I don't recall that.  I mean I just don't recall it, a conversation.  I probably, you know -- I probably think it's probably ---

MR. HOLTSHOUSER:  Your Honor, I'm not sure where he's going, but I'm just going to object to any testimony of what Dr. Haney told him to do at this point in time as hearsay.

MR. MORENO:  I didn't ask him that.

MR. HOLTSHOUSER:  I know that, but I'm just ---

A    I'm not going ---

MR. HOLTSHOUSER:  Going to ---

THE COURT:  Wait, wait, wait.  You know, she is really good.  She can get always one and sometimes two but three is a real challenge.  Overruled.

A    I don't believe so.  I don't recall a conversation with him, and there were many, many, many conversations I had with him.

Q    Do you recall whether or not you -- when you spoke with Dr. Haney after this case that you apologized to him for what had happened?

MR. HOLTSHOUSER:  Judge, I'm going to object.  This calls for hearsay.

MR. MORENO:  It's not calling for hearsay.  I'm

asking him what he did.

THE COURT: Yeah.

MR. HOLTSHOUSER: I think he's asking him does he recall a conversation with Dr. Haney, and he's clearly intending to inject a conversation with Dr. Haney when he's already said he doesn't recall one.

MR. MORENO: That is not the question. The question I asked him ---

THE COURT: The next question is: Did this witness apologize to Dr. Haney?

MR. HOLTSHOUSER: Did this witness or did Dr. Haney apologize?

THE COURT: No. I understood him to ask if Mr. Sindel apologized.

MR. MORENO: Yeah.

Q    (By Mr. Moreno) And I'm not being flippant.

A    And I'm not suggesting that you are. If I could -- Can I answer that question a little more completely?

Q    Sure.

A    There was a conference that I went to immediately after the Eighth Circuit came out with its opinions, and I was approached by a number of the attorneys to ask who the mitigation person was in the case because I don't believe the Eighth Circuit opinion identified him by name, and I wouldn't answer that question. And I do not -- and partly because I --

I didn't think it was appropriate to answer that question. And I don't recall, you know, specifically apologizing, but I will tell you, you know, that if I did, I meant it. I just don't recall specifically apologizing. I think that it was probably -- I think it was a more difficult time for me than him, but I can't imagine not understanding sometimes -- I mean, you know, here this guy is back on the phone again.

Q    All right. Thank you. Do you remember at the penalty phase closing argument that the Government argued that Mr. Allen had all the good things in his life and a loving family? That that was the Government's argument?

A    I have no reason to dispute that.

Q    And do you recall that they basically used the mitigation evidence you had presented to argue that Mr. Allen went bad despite all the good things he had in his life. Does that sound familiar?

MR. HOLTSHOUSER: Judge, I'll object to basically the characterization as leading. There's a -- There's an entire closing argument there with many arguments on both sides. So to characterize it as one or another is leading and a mischaracterization of the argument.

MR. MORENO: I'm talking about this aspect of the closing argument.

THE COURT: Overruled. Listen to the question. If you understand it, you may answer it. Don't guess or

speculate.

A   I don't recall that particular argument, but it wouldn't at all surprise me that the Government tries to use every argument that they think they can unload in their arsenal. And every time -- I mean, you know, every argument that you make, you try to make the argument that, "You know what? There's another way you can interpret what their evidence is."

We interpreted, for example, the fact that Heflin was a great father in terms of how Billie Allen didn't have one. We argued that Heflin flew to Hawaii to see his son play in a baseball game, and Allen wouldn't walk around the block to give his kid a birthday card. So that doing that is just the way you argue cases.

Q   Sure.  Sure.  Do you think that if you had been able to present the mitigation evidence of abuse, that that would have somehow tempered the Government's ability to make those arguments of turning the good guy evidence into -- into -- so-called good guy evidence into negative evidence?

MR. HOLTSHOUSER:  Judge, I'm going to object.  This calls for the same speculation that they had objected to, and I think it was sustained regarding ---

THE COURT:  I think so.  Sustained.

THE WITNESS:  I'm sorry?

THE COURT:  Sustained; speculation.

THE WITNESS:  Oh.

MR. MORENO:  All right.  Can I have a moment, Your Honor?

THE COURT:  Yes.

MR. MORENO:  So would the Court mind if we took five minutes?

THE COURT:  I'm sorry?

MR. MORENO:  Would the Court mind if we took five minutes?  I just wanted to consult with counsel --

THE COURT:  Okay.  Go ahead.  Sure.

MR. MORENO:  -- because I think I'm just about done.

(Pause)

MR. MORENO:  Your Honor, Mr. Allen has asked that I consult with him a minute.  Would that be okay?

THE COURT:  Yeah, sure.

(Pause)

MR. MORENO:  Thank you for your indulgence, Your Honor.

THE COURT:  Yes, sir.

Q    (By Mr. Moreno)  Now you were asked -- There was some testimony on Cross Examination about witnesses with baggage.  Do you recall that?  You know, witnesses who ---

A    Sort of.

Q    Yeah.  So in your experience, would you still interview witnesses with baggage to get information?

A    I -- Obviously, it depends on a couple of things.  It

depends on what I'm interviewing them for and the extent of the baggage, but I wouldn't -- would not interview someone because they had problems in their background or behaviors or, you know, crazy or bizarre notions or whatever.

Q   So it's still an information -- a source of information that you would utilize.

A   It can be.  I mean ---

Q   All right.  Then you can take that information and look for witnesses, talk to other witnesses about it who might be able to testify without that baggage.

A   You can.  I mean you -- Whenever you're dealing with that, it depends on what the baggage is.  Prior convictions, not so bad.  Twenty-five convictions for perjury, maybe want to think about whether you want to waste your time. Competency, maybe -- I don't know if I need to go there because I don't know what's going to come out.  But that being said, I don't think you preclude interviewing or investigating someone simply because there may be down sides to who they are.

Q   Because it could provide you with information you could use.

A   It could.

Q   Okay.  I have one last question for you.  It's about the -- when you were arguing for the continuance or when Mr. Simon was arguing for the continuance after Dr. Haney was

no longer on the case.  Did you consider telling the Court what had happened?

A    You mean in terms of where we were in our investigation and stuff like that?

Q    Yeah, and what had really happened, you know.  I mean do you think that would have ---

MR. HOLTSHOUSER:  I didn't hear the question.  Whether it what?

MR. MORENO:  I didn't say that.  Let me start over.

Q    (By Mr. Moreno)  Would that have -- Would that have been to Billie's interest, better in terms of just telling the Court that, you know, "Here we are this far out from trial and, you know, we dropped the ball"?

A    I don't think that it would have been to his detriment.

Q    Okay.

MR. MORENO:  Okay.  I have no further questions.  Thank you, Mr. Sindel.

THE WITNESS:  Thank you.

THE COURT:  Recross.

MR. HOLTSHOUSER:  Thank you, Judge.

RECROSS EXAMINATION

QUESTIONS BY MR. HOLTSHOUSER:

Q   Mr. Sindel, let's see if we can kind of bring this to a conclusion here --

A   I'm starting now -- I'm starting to have fun.

Q   -- quickly as possible?  Are you?  Okay.  Well, ---

A   Finally some sparring.

Q   All right.  Let's just try some questions and some answers.  Okay?

A   Okay.

Q   All right.  There's been a lot of analogies being used here, such as drop the ball, shifting sands, bare bones, et cetera.  Let's just say in terms of social history, by the -- by the -- Before Mr. Simon even came into the case and before you had ever even heard of Dr. Haney, you had already put a fair amount of meat on the bones of the social history of Mr. Allen, correct?

A   I was trying to.

Q   Is that a fair statement?

A   I was trying to.

Q   Okay.  Did you have an outline or a framework or a basic understanding of Mr. Allen's life before the time of Dr. Haney and Mr. Simon even came to the case?

A   Yes.

Q   Okay.  And then that was added to, was it not, by

additional things that were occurring in the Fall of '97, including what you now know to be a rather lengthy interview process between Mr. Simon and Mr. Allen to produce that life history?

A    I mean we were adding -- Yes.  We were adding things as it went along.

Q    The notes -- Your process, the notes and interviews that you made -- that you took of the witnesses who you had been talking to during the Spring of '97 and the Summer of '97, those were kept by you, correct?

A    You mean -- When you say kept by me, you mean in my possession?

Q    They were your notes.

A    Yes.

Q    At that point in time you did not reduce them to memoranda intending it to be distributed to another person.

A    That's -- I think that's accurate.

Q    And you would have known from your experience that what you give to an expert has to be eventually turned over to the Government, correct?

A    Well, a lot of times you do not, but for strategic reasons, either get a written report or else, you know, do a number of memorandums of the expert because they can be an embarrassing or a piece of information that you may not want to be distributed to the other side.

Q    Okay.  So it's to your advantage at some point in order to keep that in a format that you've got it in your head or you've got it in your notes but it's not necessarily in a form that's going to be, "Here, Dr. Cuneo, let me give you my notes."  You didn't do that here, did you?

A    No.

Q    And as we saw, what notes and documents were given to Dr. Haney, Dr. Cuneo, had to, in fact, be turned over to the Government.

A    That's correct.

Q    And that included the memoranda of Dr. Randall.

A    It did.

Q    All right.  Because he gave those memoranda to Dr. Cuneo to consider.

A    That's correct.

Q    Is there a certain amount of duplication actually going on with respect to gathering the social history of Mr. Allen?  There's you talking to Mr. Allen and his mother and the family, correct?

A    Yes.

Q    Ms. Caspari is developing a relationship and a rapport with Mr. Allen during her visits to him at the jail.

A    She is trying to.

Q    Okay.  Is she also having contact and communication with Mrs. Allen?

A    I would assume she had.

Q    When Mr. Simon comes into the case, he's also then talking with Mrs. Allen and Mr. Allen sometimes with you, sometimes independent of you.

A    I believe that's correct.

Q    And he -- These meetings that we know he had in December and January -- December of '97 and the early part of January of '98 that produced this life history, you weren't there for those.

A    Not that I recall.

Q    Now did you ever give to Mr. Simon your notes and say, "Well, here's what I got on paper so far.  Let's go over this with Mr. Allen"?

A    I may have given him information about historical data but not necessarily the notes themselves.  I may have talked to him about where he went to school, what the schooling situation was, hospitals, those kind of things, but I don't know that I would have turned over my notes as such.  I think they would have been not very valuable to him.

Q    Would you have given him an introduction to Mr. Allen's background and life as you mentioned by use of words?

A    I believe I would have.

Q    Okay.  But ---

        MR. MORENO:  I'll object.  If he remembers, fine.  If it's just he believes he did, I think the answer then is he

doesn't recall.

THE COURT:  Yeah.  You raise a good point.  Yes, sustained.

Q    (By Mr. Holtshouser)  Do you recall?

A    Again, I cannot remember a specific conversation where those things occurred, but ---

Q    Let me ask you about that.

A    It would be my practice to talk to my co-counsel about the case.

Q    And is there any reason to doubt that you deviated from your usual practice and habits -- practice habits in this case?

A    Not that I can think of.

Q    Now this phraseology which has become significant and specific recollection of a specific conversation, if you were asked, for example, are there -- do you recall discussing with Juanita Allen whether or not there had been any physical abuse by anyone of Mr. Allen, as you sit here now, do you recall discussing that topic with her in some sense?

A    In some sense, yes.

Q    When I -- If I were to say to you, Now do you recall whether or not you talked to her about it on May 11th, 1997, what would your answer be?

A    I don't recall.

Q    That's a specific conversation.

A    That's correct.

Q    Do you have any doubt, as you sit here today, that you, in fact, had those conversations with Mrs. Allen?

A    No.

Q    Do you have any doubt, as you sit here today, that you had those conversations with Mr. Allen?

A    No.

Q    All right.  On more than one occasion with each?

MR. MORENO:  What conversations are we talking about?

MR. HOLTSHOUSER:  Inquiring about abuse in his life.

A    I believe there was more than one time.

Q    (By Mr. Holtshouser)  Okay.  And that's what some of these -- these mitigation specialists refer to as this "iterative process," I believe is the word.

A    What is it?

Q    "Iterative," I believe.

A    Okay.

Q    It's a -- It's a word, I guess, for meaning you actually come at the question a couple of different times --

A    Right.

Q    -- and see if you keep getting the same answer --

A    You reiterate.

Q    -- and whether they -- That's part of essentially what you're doing.  Whether you would have used that term or not, that's what you were doing.

A     Yes.

Q     In comparing what Mrs. Allen or Mr. Allen said the previous time with what they said the subsequent time.

A     Always listening to those things to see if there's changes.

Q     Okay.  And taking notes.

A     Taking notes or sometimes -- I mean there were many conversations with Mr. Allen where I didn't take a lot of notes.

Q     And is there -- You talked to family members.

A     Yes.

Q     You talked to some coaches, like a Sam Moore and some others, on occasion, correct?

A     Mr. Petty, yes.

Q     All right.  When you talked to those people, in other words, not Mr. Allen, you didn't take a note of every conversation you had with them, correct?

A     No.

Q     When you were talking to the other people, though, you realized you're probably going to have a limited number of contacts with them.  You would have taken notes to record what they had to say?

A     Say that again.

Q     You would have taken notes to record for your own benefit what they added to the picture of Billie Allen's life.

A    Yes.  I mean I would probably, you know, the original jots in terms of who this person was.  The best place to find the notes is to look at my Direct Examination notes from my trial notebook which would have told you what I, you know, took from my handwritten notes as well as what I derived from my memory.

Q    The original jotted notes, do you know what happened to those?

A    I really don't.

Q    Do you have a specific recollection of whether when you transferred the file to Mr. Simon, they were in the file?

A    I would have to assume they were -- they would have been kept in a separate folder.  My understanding of the transfer of the file, I mean Mr. Allen had requested that Mr. Simon do -- participate in the appeal.  And I checked -- When I talked with Mr. Moreno and Ms. Carlyle I guess a couple of years ago it seems, but -- it was last week because I wanted to find out what had happened to the file in our storage facility.  Was it still available?  Because there were questions that had come up during the course of the deposition about things that I couldn't answer and whether that had been turned over.  So we contacted the storage facility, and they said there was a record that a Mr. Simon had checked out the two boxes.  That's what I remember.

Q    From the storage facility?

A    From the storage facility.

Q    Okay.  And there was -- You don't have any recollection of any occasion in which you had a section of notes that you segregated from the file that went to Mr. Allen and held them yourself for a period of time.

A    I don't have a memory of that.

Q    And do you -- Nor do you have a memory of ever actually having notes, still notes in your possession and destroying them.

A    I certainly didn't destroy them.  There is -- If the materials that they received -- I don't think we used red files back then.  We have a main file, and a lot of stuff can go in there.  And initially what happens is the notes go in the main file.  And then all of sudden I go, you know, "What?  This is way too big."  So it's going to go in a subfile notebook, whatever.  That's how it would have gone.  When I write on the top of something "Notes," that means we got a subfile.

Q    When this case first began in April of '97 for you, at that point in time had you made a decision that "I'm going to use a mitigation specialist in this case"?

A    I would assume that I would have -- that would always be in the back of my mind, depending on what happened at the Department of Justice.

Q    And you had only used one once before in your capital

experience.

A    That's correct.

Q    You had tried a number of capital cases previously where you didn't use a mitigation specialist.

A    I had serious reservations about them based on my experiences.

Q    Serious reservations about whom?

A    Mitigation specialists.

Q    Reservations in what respect?

A    In the previous circumstance when I had used a mitigation specialist who, you know, was more of a boots-on-the-ground person was the *Andre Bonds* case, and that was a particularly horrible case from my perspective. And we were working, trying to contact, not surreptitiously but through various sources, families of the two victims in the case. And we had managed to secure an offer to plead Mr. Bonds to a life sentence and also to a life sentence in the case that was pending in the state court. There were two concurrent jurisdictions that were pursuing it. And one, the state court, was by a particularly aggressive prosecutor. And we got a life offer, and it turned out that our mitigation specialist was continually telling Mr. Bond that there was no way he could lose his case. And in my assessment and the other assessments from the other two attorneys on the case, there was no possible way he could win it. So that was a

really difficult deep division that I carried with me after that event.

Q    Let me just get the upshot of that.  The upshot would have been that you had serious reservations about how you control a mitigation specialist in communicating with your client.

A    That was part of it, yes.

Q    Okay.  And you are the client's attorney --

A    That's right.

Q    -- in these situations.

A    That's right.

Q    All right.  You wanted to be having a common -- make sure there was a single message being delivered to the client, correct?

A    That's right, and one that is in that client's best interest.

Q    Okay.  Other than that experience in your prior capital cases, you had not used a mitigation specialist.

A    No.

Q    And you were not aware in 1998 of any ABA standards which specified that you must use a mitigation specialist to be professional or competent by ABA standards, were you?

A    I was certainly not aware of one.

Q    And you've never -- you've never seen or heard of a federal Supreme Court decision holding that use of a

mitigation specialist is mandatory to not have ineffective assistance, have you?

A    It's not mandatory, no.

Q    What the focus is on is the conduct of the attorneys, correct, in an ineffective assistance claim?

A    There is no constitutional right to a mitigation specialist.

Q    All right.

MR. MORENO:  I object to the relevance of this discussion.

THE COURT:  The relevance of what?

MR. MORENO:  This discussion.

THE COURT:  Oh.

MR. MORENO:  He's talking about the, you know, whether or not you need to have a mitigation specialist, what the U.S. Supreme Court says about mitigation specialists. We're going now into other areas related to the law and have no bearing on the issues before the Court.

THE COURT:  Overruled.

Q    (By Mr. Holtshouser)  In terms of focusing on what you did, you had actually, before Mr. Simon came to the case, had yourself conducted a significant mitigation investigation already, had you not?

A    I had conducted some mitigation investigations.

Q    Had you by that time revealed most, if not all, of the

information that ended up being contained within Mr. Simon's life history document when he prepared it as a result of interviews with Mr. Allen?

A    No.  I would say when I -- You know, I hadn't read that in its entirety carefully, but when I -- as I -- as it was shown to me, a lot of that information we already had.

Q    All right.  Including -- And you say, "We already had." You're talking about before Mr. Simon came to the case.

A    Correct.

Q    All right.  So this analogy that before Dr. Haney's letter of January 13th you had nothing but bare bones, you actually had the gist of the mitigation topics discovered and known to you, correct?

A    There were topics that were discovered, but there definitely was work that needed to be done.

Q    And I'm not disagreeing with you there.  But in terms of developing the social history, the gist of that had been done, correct?

A    The majority of that in terms of the social history had been done.  The major shortcoming that is apparent to me today is the inability to secure the information about whether Billie had been abused.  That's the stuff that crushed me.

Q    Okay.  And I -- And I think we understand that.  But to your -- to your knowledge, prior to getting Dr. Haney's letter, what really lacked being done was preparing some of

these mitigation witnesses for testimony at trial.  Would you agree with that?

A    Say that again.

Q    They hadn't been prepared to testify yet.

A    Well, that's true.

Q    The relatives of Billie Allen.

A    That's true.

Q    Someone needed yet between January 13th and the time they were going to testify to sit down with them and go over again what you had already learned during your previous meetings with them.

A    But -- But there was more than that.  There were the teachers and things like that who I did not interview.

Q    Correct.

A    And some of the family members and the closer family members we had talked to.

Q    The real obstacle with respect to the part that you've noted continued to be, would it not, that Mrs. Allen and Mr. Allen were not admitting any abuse?

A    Well, I don't think that I bore down on them either.

Q    But that would have been at that point in time the obstacle, correct, based upon how you view it now?

A    It certainly would have been helpful if that information had been disclosed.

Q    But you needed to bear down on them.

A    Well, sometimes what happens is you get the information from one person and you bear down on the other.  With Mr. Allen, part of the problem was if you bore down on him, he shut down.

Q    And that was a problem in communicating with him, correct?

A    That's correct.

Q    In terms of the people who had had that opportunity, there was you for one, correct?

A    Correct.

Q    Mr. Simon for another.

A    Right.

Q    We also know that Dr. Wuertz talked to him before there was even a crime with which he was charged, correct?

A    Right.

Q    Okay.  And in that contact, there was no revelation by Mr. Allen of any past history of abuse.

A    I don't remember seeing anything in the medical records or police records.

Q    Okay.  Mr. Allen wasn't articulating that to Dr. Wuertz as being the source of his anxiety, correct?

A    Not that I know of.

Q    Okay.  In addition then, Ms. Caspari had a -- had a great deal of contact with him at the jail, correct?

A    Correct.

Q    You also then had Dr. Randall.  When he came in the picture, the first thing he did was talk to Mr. Allen.

A    Yes.

Q    Did he continue to talk to Mr. Allen over the course of acting as the mitigation specialist?

A    I mean I believe that there were probably conversations that occurred at the courthouse because it was, obviously, a lot more convenient than the hour-and-a-half or two-hour drives to and from Franklin County, but I -- I can't speak for sure if he did or not.  I would -- Well, he can speak for himself.

Q    And this -- that notion that Mr. Simon's -- somehow that Mr. Simon's role was mitigation and your role was guilt, there was never such a sharp division of roles, was there?  To say that when he came in the case, you abandoned the ---

A    No, that's -- I wouldn't say that.

Q    You continued to actually have your hand in the entire case.

A    I tried to, but I didn't do as good a job as I should have.

Q    Okay.  And he did what you wanted him to do.  If he's meeting with Mr. Allen for hours at a time, taking a detailed life history and reducing it to writing between December and early January of '98, Mr. Simon was actually doing what you wanted him to be doing, correct?

A    Some of the things.

Q    Okay, some of the things.  Other things might have been going back and meeting with the people you had already met with?

A    That would have been part of it.

        MR. MORENO:  I object.  There's no evidence to support that.

        MR. HOLTSHOUSER:  Well, I'm asking him that question.

        THE COURT:  Wait a minute.  Overruled.

Q    (By Mr. Holtshouser)  Your answer?

A    That would have been part of it.  I mean I think that anything he developed within the life history would also be something to look at.

Q    All right.  And it wasn't his job to locate a psychologist to use because you had already done that back in September of '97 when you sent the police report to Dr. Cuneo.

A    That was one of the things that had been done, yes.

Q    When you had contacted him, you were thinking that, "He would be my psychologist of choice -- psychologist of choice if I presented one in the mitigation phase;" correct?

A    That's what I was thinking.

Q    All right.  And that's what you did.

A    Yes.

Q    All right.  And then to add to the people who are talking to Mr. Allen and to Mrs. Allen, we can add Dr. Cuneo, can't

we?

A    We can.

Q    He asked him not once but twice, correct?

A    From the records I saw.

Q    All right.  And that second one, without going back to the record, the second contact on February 22nd was actually longer than the one on January the 16th, was it not?

A    I believe so.

Q    Okay.  So if -- if the problem with the first was, "Well, he just hadn't answered all of the questions on the MMPI," which -- the results of which Dr. Cuneo reported in his report of February 16th, when he's going back on February 22nd, he's actually going back to gather more information to be ready to testify as a mitigation expert, isn't he?

          MR. MORENO:  I'm going to object.  There's no evidence of that.

          THE COURT:  Object to what?

          MR. MORENO:  There's no evidence of that.  He's saying that the purpose of that -- He said that Dr. Cuneo went back to get evidence for mitigation.  There's no evidence of that.

          MR. HOLTSHOUSER:  I'm asking what he went back to him for.

          THE COURT:  If you know, you may answer.

A    I don't think I have an accurate memory of why he went

back other than what I said in court.  He would know better than I do.

Q    (By Mr. Holtshouser)  So can you distinguish even -- I think you have said in Redirect that you agreed with Mr. Moreno's statement that the reason he went back was to complete the MMPI.

A    No, I don't think I said that.  I said that that's what I said on the record was a reason for him going back.  I'm not going to say that was the reason, but it certainly was a reason, and that was the reason I said to the Court.

Q    After that, there was no second report ever prepared by Dr. Cuneo to produce to the Government or the Government's experts, was there?

A    Not that I can recall.

Q    So would you be able to conclude from that that then the results of that second interview didn't have anything to add to his diagnosis from the first interview?  There wasn't any new diagnosis.

A    I -- I didn't see any new -- I don't recall any new diagnosis.

Q    Okay.  So that's a mental health expert there that's had two opportunities to examine Mr. Allen and, in fact, had just spoken directly to Mrs. Allen.  He, also, did not discover any widespread pattern of abuse, correct?

A    Not that I can recall.

Q    And then to add to that, we have Dr. Gelbort, who is another psychologist and a specialist in Neuropsychology, examine Mr. Allen, --

A    That's true.

Q    -- correct?  He, also, did not discover anything that contradicted your previous belief that there was no widespread patterns of abuse in Mr. Allen's life.

A    Not that I -- He did not that I know of.

Q    When Dr. Randall came in the case, was Dr. Randall in a position to know everything you had done in the case since you started representing Mr. Allen in April of '97?

A    Was he in a position to know?

Q    Was he in any position to express any opinion about what you had or had not done from April of '97 till the time he came into the case?

A    I would -- I mean Dr. Randall and I had a good relationship and a sharing relationship, and we talked to each other I think in many ways both as friends and as the functions we served within the trial and the investigation. So we shared with each other whatever information we could.

Q    My question, though, was:  When he came into the case, did you give him a copy of all the notes in your files?

A    I can't say that I remember specifically handing them to him and saying, "These are my notes."  But he had access to anything that we had.

Q    Okay.  Did you give him anything and say, "This is what I did on this day; this is what I did on that day," before he came here?

A    Before he came here?

Q    Yeah.

A    I don't believe that.  I believe when he came here, he worked out of my office.  That was his hub.  And so he had access to anything we had.

Q    But he really wasn't present from April of '97 until early January of '98 to know what you were or were not doing, was he?

MR. MORENO:  I object.

THE COURT:  Wait a minute.

A    Oh, I see.

THE COURT:  Wait, wait, wait.

MR. MORENO:  Of course, he wasn't there in April of '97.  I mean this should be obvious.  I think we're beating a dead horse at this point in time.  These questions have not gone to anything that's relevant to the mitigation.

THE COURT:  Okay.  It's Cross Examination.  Overruled.

Q    (By Mr. Holtshouser)  Do you recall Mr. Moreno asking you about this on Redirect in terms of that Doctor -- whether or not it would surprise you that Dr. Randall said that nothing had been done before he came into the case?

A    I believe that was the general phraseology of the question.

Q    So the first time Mr. Moreno hit horse, so to speak -- now I'm getting back to the specific -- was Dr. Randall in any position to even know the full extent of what you did or didn't do in that time period?

A    Well, just to be sure, I feel more like a Government mule, but he would have known only from what -- from talking to me, talking to Mr. Simon.  I'm sure there were things that we talked about on the phone when we were trying to solicit him to help us in that regard.  So the extent of his knowledge I wouldn't -- I couldn't comment on exactly.

Q    Mr. Simon, whether, in retrospect, he was or was not the best choice in 1997, he was your choice, wasn't he?

A    He was.

Q    He's who you asked for.  He's who you thought your team needed, and he's who the Court gave you, correct?

A    That's correct.

Q    Were there any shortcomings about Mr. Simon that you were aware of in 1997 when you suggested his name to the Court?

A    Taking that phrase in its broadest interpretation, I knew that Mr. Simon was a character.

Q    You knew that he had also represented -- He knew his way around capital cases, correct?

A    As far as I knew, he knew his way around capital cases,

yes, sir.

Q    Including representing defendants in habeas petitions in capital cases.

A    Yes.

Q    Which included alleging ineffective assistance of counsel.

A    It did.

Q    Okay.  And one of the -- one of the frequent areas of allegation relates to the extent of the mitigation investigation in ineffective assistance claims, does it not?

A    In capital cases, yes.

Q    So would you have any reason to believe that Mr. Simon wasn't intimately familiar with the obligations of counsel in conducting an adequate mitigation investigation?

A    I mean I would assume that he knew from his research as well as from building facts on other cases.

Q    Building facts on other cases.  You believed that he had the ability to build facts on other cases, correct?

A    Well, I mean I believe he had the opportunity or the ability to look at a case and put it within the federal habeas context and supply the necessary materials to convince a Court to either grant an evidentiary hearing or grant relief on the petition.

Q    Which would include interviewing witnesses, gathering affidavits or declarations?

MR. MORENO:  I'm going to object.  He has no idea whether or not Mr. Simon did those things.  That may be what's included sometimes in his other representations, but he has no idea what Mr. Simon did.

MR. HOLTSHOUSER:  That's the question.

A    Some habeas ---

THE COURT:  Wait, wait, wait.

THE WITNESS:  Oops, I'm sorry.

THE COURT:  I don't -- I'm sorry.  I was writing and I didn't hear the question.

MR. HOLTSHOUSER:  I'll repeat the question, Judge.  I'll withdraw the previous question and ask a new question.

THE COURT:  All right.

Q    (By Mr. Holtshouser)  The topic we're talking about is any shortcomings that you knew of Mr. Simon and why you chose him.  Based upon your knowledge of his experience, did it include preparing habeas petitions alleging ineffective assistance of counsel in mitigation?

A    It did.

Q    All right.  Did it, also, include gathering and putting together witness accounts which would support those allegations.

A    It can.

Q    Based on that, did you have a reason to believe that Mr. Simon had the ability to gather such facts from witnesses

who had that type of information?

A    I -- I don't specifically recall if I went back and looked through his habeas petitions to see if he filed declarations from other individuals.  I did believe that he could do the tasks that were asked of him.

Q    Or you wouldn't have asked him for him.

A    Excuse me?

Q    Or you would not have asked for him.

A    I would not have asked for him.

Q    And you would not have assigned to him the task of continuing to carry on the mitigation work you'd started.

A    In reality, I don't know whether I assigned it or he volunteered or a little bit of both.

Q    Okay.  Mr. Moreno seemed to suggest that -- inquiry into Mr. Allen's experience with church or activities in such groups as the Boy Scouts, whether or not that was relevant to mitigation and social history.  Would that, in fact, be relevant in your view to mitigation and social history?

A    Well, it's a social history.  I mean I wouldn't want to spend the time trying to find people who were there at the time of his baptism.  The Boy Scouts may or may not have something a little more to add because he's a teenager at that time, but ---

Q    When you got Mr. Simon's life history and reviewed it, first of all, did you ever do so?

A    I'm pretty sure that I did, but I can't sit down and say, "This date I did this."

Q    Do you recall noticing that many of the lines in there are footnoted and in the footnotes are efforts by Mr. Simon to follow up with third parties to verify or contradict the claims being made by Mr. Allen in the life history?

A    There's -- there were some footnotes in there, yes.

Q    That included that activity by Mr. Simon.

A    Correct.

Q    Is that the same kind of thing you would do if you were in his position?

A    Well, yes.  I'd like to try to find things that I can verify.

Q    And if you find things that contradict, you make note of those and follow up on those, correct?

A    If I understand your question, I mean what you do sometimes with contradiction is you try to establish some control over the client.  If it's a client giving you the information, you want the client to believe that you're going to find out everything that you're going to need to find out so that some of the barriers are breached and you are able to, you know, get the facts that you need.

Q    Is that part of that bearing-down process?

A    That is.

Q    All right.  And is there -- is there any fact which you

thought you could have used to bear down on either Mr. Allen or Mrs. Allen that you ignored?

A    No, there was none that I ignored.

Q    When this case went to trial, you still did not have any reason to suspect a history of child abuse, correct?

A    That's right.

Q    And that included factoring in the information of an incident described by Raymond Petty.

A    That's right.

Q    Did that description -- Do you recall whether that was one incident or having witnessed multiple incidents?

A    I don't remember but the reference to the one incident. That's all I remember.

Q    Your -- This may be a complicated question, but your failure to have any reason to suspect a history of child abuse was not due to your failure to make any efforts to discover it.  Would you agree with that?

A    Well, I think making the effort to discover it is important, but I think that -- I mean it's hard to answer that question.  I do believe that we tried to discover what evidence that there was out there.  I also believe that I probably could have done it better.

Q    Just so I understand what you mean by that, is that:  As you sit here today --

A    As I sit here today.

Q    -- in hindsight, --

A    As I sit here.

Q    -- you agree, you would agree that you think you could have done a better job than you did.

A    If the facts that are in the declarations that I've seen are accurate, then I could have done a better job.

Q    Given what you knew at the time, do you think the job that you performed was not reasonable?

MR. HOLTSHOUSER:  I'm going to object because that calls for a legal conclusion.

THE COURT:  Well, it does call for the ultimate conclusion, I guess.

MR. HOLTSHOUSER:  I don't think there's any prohibition on the witness giving that ultimate conclusion, but I defer to the Court.

THE COURT:  All right.

MR. HOLTSHOUSER:  Whether you would.

THE COURT:  You can answer.

A    It's very hard for me to filter an answer to that question without the knowledge that I have today.

Q    (By Mr. Holtshouser)  So would it be fair to say that you can't answer it?

A    The first time Ms. Carlyle came to see me about this case, I told her I thought we had done a really good job.

Q    Okay.  Thank you.

A    And she confronted me and proved me wrong.

Q    Your initial answer to her would have been your view of your work without the benefit of hindsight, correct?

A    I mean in part, yes.

MR. HOLTSHOUSER:  Can I have a minute, Judge?

(Pause)

MR. HOLTSHOUSER:  Nothing further.

THE COURT:  All right.  You get the final word, if you want it.

MR. MORENO:  I'm sorry?

THE COURT:  You get the final question, if you want it.

MR. MORENO:  Okay.

THE COURT:  Very brief, please.

MR. MORENO:  Yes.

REDIRECT EXAMINATION

QUESTIONS BY MR. MORENO:

Q    All right, just a few more questions.

A    Shoot.

Q    Did you need Dr. Randall because only a minimal amount of mitigation at the point that Dr. Haney ---

MR. HOLTSHOUSER:  I'm sorry.  I can't hear the question.

MR. MORENO:  I'm sorry.

Q    (By Mr. Moreno)  Did you need Dr. Randall because only a

minimal amount of investigation, mitigation investigation, had been done when Dr. Haney was no longer -- removed himself from the case?

A    We needed Dr. Randall to help us do a sufficient mitigation investigation.

Q    Dr. Randall -- Hypothetically, Dr. Randall is going to testify that after speaking with you, after reviewing the evidence that you had gathered, after speaking with you about your recollections of whatever you conveyed to him about your -- your -- the social history that was in your head, that there was next to nothing developed in mitigation. Do you agree with that?

A    I don't agree with that. But if that's Dr. Randall's belief, he's certainly well capable of expressing it and explaining it.

Q    Is it your position still that it was bare bones that was done?

A    I've never retracted that.

Q    Did you need to convince Dr. Randall to take the case because there was such a short period of time and so much to do because not much had been done?

A    I believe there was an effort on my part to convince him to take the case. I don't remember the specifics of the conversation, but I think he was well aware that what he was taking on was a fairly significant task.

Q    And he was hesitant because he didn't think he could complete the tasks given what had been done in the 40 or 45 days he had to work.

MR. HOLTSHOUSER:  I know this is Redirect, but this is leading and argumentative.

THE COURT:  Yeah.  What I'd really like to do is not go through the same thing again.  There are points that -- specific points that I had in mind.  Usually there's no Recross and then Redirect; only given one chance.  But, please, hit the points that were discussed by Mr. Holtshouser in his Recross.

MR. MORENO:  Okay.  I have nothing further.

THE COURT:  Okay.

THE WITNESS:  Can't I stay for a little bit longer?

THE COURT:  Well, you've made history.  I've been doing this for a while, and I've never had anyone on the stand for four days or the better part of four days.  So thank you, sir.

MR. HOLTSHOUSER:  We're done.

THE COURT:  You may call your next witness.

MR. MORENO:  All right, Your Honor.  I forgot we had another witness.  We've been here so long with this witness.

(Marshals approached the bench in regards to medication that the Plaintiff needed to take.)

THE COURT:  We're going to take about a -- well,

however long it takes for Mr. Allen to get back, and I'm guessing that will be in the range of 10 or 15 minutes.

MR. MORENO: Thank you, Your Honor. That's fine.

(Court recessed from 4:08 PM until 4:20 PM.)

**JOHN WILLIAM SIMON**,

HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

THE CLERK: Have a seat over there.

DIRECT EXAMINATION

QUESTIONS BY MR. MORENO:

Q    Are you all set, Mr. Simon?

A    Yes, sir.

Q    All right.

MR. MORENO: Your Honor, may I proceed?

THE COURT: Yes, sir.

MR. MORENO: Thank you.

Q    (By Mr. Moreno) Mr. Simon, how are you currently employed?

A    I'm the principal of Constitutional Advocacy, LLC.

Q    And where is that located? Is that here in St. Louis?

A    Yes, sir.

Q    And how long have you been in private practice?

A    I've been in private practice since 1996, but I have been -- I've had -- I've been in solo practice since 19 -- from 1999 until 2006 and then again from 2008 until the

present.

Q    And what were you doing from 2006 to 2008?

A    I was an Associate Trial Counsel in the Capital Division of the Missouri State Public Defender system in Kansas City, Missouri.

Q    All right.  Now how long have you been licensed?

A    Since 1985.

Q    And where are you licensed?

A    In the -- In Missouri and in the Bars of the United States Supreme Court, the United States Courts of Appeals for the Seventh Circuit -- Seventh and Eighth Circuits, for the -- both of the districts of the -- in the State of Missouri and the Southern District of Illinois.

Q    Now prior to your appointment in this case, how had you been employed?

A    I had been an Assistant Attorney General for 11 years.  I had been doing capital litigation on the prosecution side from 1991 until 1996.

Q    And what type of cases did you handle?  What type of capital cases did you handle for the Attorney General's Office?

A    I handled capital cases from the filing of the federal habeas corpus petition and other capital cases as well in which the person who had been convicted of a capital crime and sentenced to death was seeking some kind of extraordinary

relief other than filing a petition under 28 U.S. Code Section 2254.

Q    Did any of this work involve state court?

A    Yes, it involved state.  Some of that work involved state court.

Q    All right.  And did you do appellate work as well?

A    Yes, sir.

Q    And what was the nature of that?  Was that also capital appeals, defending death sentences and convictions?

A    Both capital and noncapital as well as before 1991, I did appellate work in purely civil cases as well.

Q    Now have any of the capital cases wherein you represented the State of Missouri ended in a defendant's execution?

A    Yes, sir.

Q    And do you recall how many?

A    Four.  Those were the four in which I drafted the response to show cause.  There were others resulting in execution in which I played smaller roles.

Q    Now you were appointed to represent Mr. Allen in September of 1997, correct?

A    Yes, sir.

Q    How did you become involved in this case?

A    Mr. Sindel approached me at a cocktail party on the Thursday of the annual meeting of the Missouri Association of Criminal Defense Lawyers at, I believe, One Metropolitan

Square and said that he was -- had been appointed to represent the accused in a case where the Federal Government might seek the death penalty and that would -- he asked me if I would be interested in being co-counsel to him on that case.

Q    And since you're here, obviously, you accepted.

A    Yes, sir.

Q    Now what were your responsibilities?  What did you understand your role to be in working on Mr. Allen's case as co-counsel with Mr. Sindel?

A    My -- The core of my understanding was that I would be the law man; that I would be the person who would do legal research, who would draft legal pleadings, and who would argue those pleadings before the Court.  It was also my understanding that I would have something to do with the penalty phase.  I thought that I would be a barrister in that respect; that I would be presenting witnesses in open court.

Q    And did you -- And you thought you would be presenting witnesses at the penalty phase.

A    Yes, sir, and only in the penalty phase.

Q    Now was your role in this case also to draft and argue motions?

A    Yes, sir.

Q    And did you do that?

A    Yes, sir; penalty and guilt.

Q    Now you had an expectation that you were going to present

witnesses.  What was that expectation based upon?

A    I really don't have a clear recollection because there was never a meeting or a document at which the respective roles were set out.  All I knew was that I knew I did not have the background to be a mitigation specialist and that I was confident that Mr. Sindel never had the impression that I had the background to be a mitigation specialist.  So when you take away what I can't do and you add what I could do, I thought that I would be presenting witnesses in open court.

Q    Now who did you believe was in charge of developing the mitigation in this case?

A    Dr. Craig Haney.

Q    Now prior to Dr. Haney coming on -- Well, let me ask you this:  Was Dr. Haney involved in the case when you became involved?

A    Sir, I do not know that Dr. Haney was involved in the case at all.

Q    Well, for purposes of the argument for these questions, Dr. Haney at some point in time was retained by Mr. Sindel. Is that correct?

A    Yes, sir.

Q    All right.

A    Before I was.

Q    So before you.

         MS. COSTANTIN:  Judge, I'm going to object if he's

talking about things he really does not know about it; the witness is being asked questions about something he doesn't know about.

THE COURT: Well, he said he didn't know -- First of all, he said he didn't know if he was involved at all, and then there was a follow-up question. I'll hear it. Overruled.

Q    (By Mr. Moreno)  Were you aware that Mister -- Dr. Haney had been retained to do mitigation in this case?

A    Yes.

Q    Now what did you understand your role to be regarding Dr. Haney?

A    My understanding was that I would be receiving information from Dr. Haney that Dr. Haney would develop on the basis of interviews and other correspondence with potential mitigation witnesses.

Q    And what would you be doing with that information once you received it?

A    I would review it.  I would selectively meet with respective witnesses.  I would prepare the witnesses, and then I would call them at trial.

Q    All right.  So you thought that Dr. Haney was going to -- Well, who did you think was going to be doing the investigation in the case?  The actual going out and interviewing witnesses.  Who did you understand would be

responsible for that aspect of the case?

A    Either Dr. Haney or his designees.

Q    And what led you to that conclusion, if you recall?

A    That was the impression I had of how penalty phases were developed from my work on the other side.

Q    Did you understand your role to be supervising Dr. Haney in any way?

A    No, sir.

Q    In your mind, was it your responsibility to conduct a substantive mitigation interview of witnesses?

A    Absolutely not.

Q    Did you understand your role to be that of contact person with Dr. Haney in this case?

A    No.

Q    Did you ever have a phone conversation with Dr. Haney at any time in this case?

A    No.

Q    Did you understand your responsibility to be to provide Dr. Haney with mitigation witness interviews?  That you would be sending him witness interviews?

A    No.

Q    Now prior to January of 1998, did you have any discussions with Mr. Sindel about Dr. Haney's work on this case?

A    Prior to ---

Q    Prior to January of 1998, --

A    No, sir.

Q    -- did you talk with Mr. Sindel about Dr. Haney's work?

A    No, sir.

Q    Did you ultimately send him a letter expressing concern in this case about Dr. Haney?

A    Yes, sir.  It was a fax.

Q    And do you recall when that was?

A    January 9th, 1998.

Q    And what was your concern?

A    My concern was that I had not received any information and that we had a trial date approaching.

Q    Did you then -- After you sent that fax on January 9th, 1998, did you subsequently have a conversation with Mr. Sindel about Dr. Haney?

A    I don't recall a conversation with Mr. Sindel in person.

Q    Now prior to this case, had you ever interviewed the family of a defendant in order to elicit mitigating evidence?

A    No.

Q    Prior to this case, had you ever spent time developing a rapport with the defendant's family so you could get to know them in order to discuss difficult issues?

A    No.

Q    Did you do that in this case?  Did you develop that kind of rapport with the family where you could discuss with them

difficult issues?

A    I attempted to do that once it became obvious that nothing was happening, but I do not believe I succeeded.

Q    And when would that have been?

A    I -- I recall asking some spot questions and having what I would call "meet-and-greet opportunities" with some family members toward the close of the Calendar Year 1997 and the beginning of the Calendar Year 1998.

Q    And when you say "spot questions," what do you mean? Explain who -- how you mean that or what you meant.

A    I can give you two examples. Because I had never taken a course in social work or a course called the "Psychology" course, I really didn't have any professional background to do what I was doing. There were, however, a couple areas where I could bond with the -- the potential witnesses because we had common roots other than academic training to do what I was doing. One of these was Scouting.

At a given point, I was not receiving anything, so I felt that I had to meet with Mr. Allen. I met with Mr. Allen, and it turned out that one of the common experiences Mr. Allen and I had was with the Boy Scouts of America. So I asked him questions about that. And in order to answer -- in order to put a fine point on one detail, I needed to talk to a relative of his who had also been a Scout leader when he was a Scout. And I don't remember whether I met with that man in person or

called him on the phone, but I was able to resolve that question.

Q    Now the one point, what are you referring to?  Why did you need to -- What were you working on that you needed to talk to him about a particular point about Boy Scouts?  I take it that was related to Mr. Allen.

A    Mr. Allen, yes.

Q    So at what point ---

A    I wanted to ascertain the highest rank he had achieved in Scouting.  There had been some confusion, and I resolved that confusion by talking with a relative who had been a Scouter.

Q    And what was that -- What were you using that information for?  What were you going to do with that information about -- You -- You confirmed something about Scouting and Mr. Allen.  What were you doing with that information?

A    There were two purposes.  One was that I would turn it over to the mitigation specialist who would know what to do with it to develop the substantive case.  The other thing was to humanize myself to Mr. Allen and vice versa so that if, for example, Mr. Allen were to be a penalty phase witness and I were to be doing his Direct, Mr. Allen could talk to me and would not be talking to a stranger but to someone that he had developed a reasonable level of personal confidence.

Q    Let me backtrack for a minute because I think -- I think we've strayed a little.

What I'm wondering is:  You said you went out to interview a witness, be it by phone or in person, about Scouting.  What were you doing?  Were you working on a particular document or a project that you needed?  Were you corroborating anything?  What were you working on that you needed that particular information?

A    I -- I made verbal contact with a small number of individuals to answer questions for the -- that -- for the purpose of completing a document that I believe I characterized as a life history.

Q    Okay.

A    And one of the questions was how far Mr. Allen had gone in Scouting.  The other question was:  At what church was he baptized and when?  Those were both facts that were, obviously, beyond my knowledge.  And so I -- I had conversations that went beyond simply calling someone up out of the blue and saying, "When was your nephew baptized and where?"

But the point of it was to find out particular pieces of data as collateral benefits to this.  I believed and I still believe that contacting them tended to personalize them to me and me to them so that if I had occasion to call them as witnesses in court, they would, once more, not be talking to a complete stranger but talking to someone that -- that they knew valued them as a human being and vice versa.

Q    The interviews that you had, was it -- do you recall who you interviewed to corroborate something about Boy Scouts for Mr. Allen's life history that you drafted?

A    I -- I -- I'm not sure.

Q    Okay.  Does "Raymond Petty" ring a bell?

A    That's the name I would have said, but I just wasn't sure.

Q    Okay.  Now about corroborating information concerning when Mr. Allen was baptized, do you know who you spoke to in that regard?

A    I believe that was Lucy McLemore.

Q    Now with either -- Let me start with Lucy.  When you spoke with Lucy McLemore, did you interview her for any other purpose -- did you ask her questions about anything other than where was he baptized?

A    It would be my evidence that I did not interview her at all.

Q    Okay.  So what ---

A    However, I would have gone beyond that one question in order to lay a foundation for why I was asking that one question, and I would also have taken advantage of the opportunity.  But the latter part -- the latter reference, taking advantage of the opportunity, that was for purposes of acclimating her to me and me to her as a trial advocate, not as a panty waste mitigation investigator.

Q    Okay.  And that was so that in case you ended up calling that witness, you were responsible for presenting her testimony, she would know you.

A    Yes, sir.

Q    All right.  And how about Raymond Petty?

A    Same thing, sir.

Q    Okay.  Were there any other witnesses -- Well, who else did you interview besides Raymond Petty and Lucy McLemore?

A    I had verbal interactions with several other people but no interviews except with Mr. Allen.  There was a meeting at Miss -- at the home of Otha Petty, Sr., which was also the home of Ms. Juanita Allen, at which I met approximately six people.  And even at that early stage in my career as a capital defense advocate, I would never have interviewed anyone with that many people in the room.  I would have done it one on one.  So I had the same similar -- I had the same pattern of humanizing interaction as a prospective trial advocate with them as witnesses falling far short of what I would categorize as an interview.

Q    Did you meet with those individuals as a group or did you sit down and meet with each one of them individually?

A    No.  It was only -- It was only as a group.

Q    All right.  And is that where you also met Mrs. Allen?

A    Yes, sir.  I would have also met Ms. Allen in court, but the most -- the least trivial interaction that I had with

Ms. Allen was the time at Mr. Petty's which was also Ms. Allen's residence.

Q    I'm sorry?

A    The least trivial interaction that I had with Ms. Allen was at Otha Petty, Sr.'s residence which was also Ms. Allen's residence.

Q    Okay.  Now did you -- Were there any other witnesses who you interviewed besides -- or met with besides Mrs. Allen, four or five other people who were there that day, Lucy McLemore and Raymond Petty?

A    If there are any, I can't think of them now.

Q    Would they be reflected in your timesheet?

A    Yes, sir.

Q    And is your timesheet -- Let me ask you this:  How do you do your timesheet?  Is your timesheet an accurate reflection of what you actually do?  Because mine isn't, so.

A    The answer to the latter part is that I believe it is.  I believe it was.  However, to answer the first part of the question, we have to go back.  We have to go back 15 years.  I was then a member of a small firm in Jefferson City.

Q    Well, let me interrupt you just for a minute just because we're -- In terms of -- Well, go ahead.  I'm sorry.

A    I would fill out a manual sheet, a slip, that was part of a small -- well, part of a notebook.  It was on NCR paper, so that I would turn in the original to a secretary and keep the

copy.  The secretary's name was Mary, and I believe her last name was either "Wilkinson" or "Worthington" or some long name beginning with "W."

Q    That's okay.  We don't need to -- We don't need to know that.

A    She would then create a computerized record of those time entries.  I would receive a copy of that, and I would be able to edit it.  At some later point she manually filled in the contents of the computer record onto forms that came from the Court.

Q    So let me interrupt for just a minute because I want to -- I want to ask a clarifying question.

        Is the timesheet that you filled out in this case for Billie Allen, does that accurately reflect the work you did in in case?  Does it, you know -- Did you -- Were you pretty diligent about putting down what you did, who you saw, what motions you filed?  Your timesheets seem detailed, but is it a pretty accurate reflection of the work you conducted in this case?

A    Short of infallible but diligent for sure.

Q    Okay.  Now at the time of your representation of Mr. Allen, did you have any experience developing a social history?

A    No.

Q    Did you have any experience at the time you represented

Mr. Allen with reviewing collateral records, such as school records, medical records and institutional records, things of that nature?  Had you ever done that looking for either witness names or issues?

A    No.

Q    Prior to your working on this case, did you have any experience developing mitigation themes in a capital case?

A    No.

Q    Your experience was opposing mitigation themes.

A    Yes, sir, when they had any.

Q    Now prior to this case, your work on this case, had you ever received any training in capital defense work, not from when you were with the A.G.'s Office but any training in capital defense work?

A    No, sir.

Q    Never been to a seminar before the Billie Allen case or anything like that related to death penalty cases or --

A    No.

Q    -- capital litigation?

    Okay.  Now during the course of your work on this case, do you recall whether or not you provided Mr. Sindel with potential mitigation themes?

A    No, sir.  No, I did not.

Q    Okay.  And why not?

A    I did not believe that was my role.

Q    Now you did understand that your role included some work on mitigation.  Is that correct?

A    Yes.

Q    So you were going to do some work on mitigation and then work -- be the low man and work on motions and pleadings and things of that nature.

A    Yes, sir.  And the work on mitigation that I contemplated was work in a room like this.

Q    A courtroom.

A    Yes, sir.

Q    All right.  So you -- You're talking about you thought, again, that you would be presenting some witnesses in mitigation.

A    I thought that I would be a mitigation barrister, not a mitigation solicitor and certainly not a mitigation specialist.

Q    All right.  Now based on what interviews or contacts you did have with witnesses, did you provide Mr. Sindel with any witness interview summaries?

A    No, sir.

Q    At the time you were involved in this case or prior to your involvement in this case, did you have any experience working with mental health experts in a criminal case on the defense side?

A    No, sir.

Q    Had you ever worked with mental health experts in your days at the A.G.'s Office, the Attorney General's Office?

A    Yes, sir.

Q    All right.  In what context was that?

A    Defending them against charges of deliberate indifference to serious medical need.

Q    I see.  Was that in the Civil Division of the Attorney General's Office?

A    It was in cases of a civil nature, cases brought under 42 U.S. Code Section 1983.

Q    All right.

A    And I don't mean to exaggerate.  There was one case that sticks in my mind.  By answering as I did, I don't mean to imply that there was a large number of cases.

Q    No; that's fine.  Don't worry about it.  Now did you meet with any potential mitigation witnesses prior to the entry of Dr. Randall in this case with the intent to interview them and try to elicit mitigation?

A    No.

Q    So between your entering the case at the end of September of 1997 through January of 1998, you recall meeting with three witnesses other than the group?

A    As I sit here right now, that's my recollection, yes, sir.

Q    Okay.

A    Unless, of course, we count Mr. Allen.

Q    Right.  And you met with Mr. Allen on a number of occasions.  Isn't that correct?

A    Yes, sir.

Q    Separate and distinct from drafting this social history, you met with Mr. Allen on a number of occasions.

A    I wouldn't say it was separate and distinct.  I don't mean to put too fine a point on it, but one of the products of the substantial meetings that I had with Mr. Allen was that short life history.

Q    All right.  And do you recall when you drafted that short life history?

A    It would have been toward the end of -- It would have been December of 1997 or January of 1998.  I do not remember the specific day, but that would be the span of time in which it would have occurred.

Q    Okay.  All right.  Up on the screen is Exhibit 303.  Can you see that?

A    Yes, sir.

Q    All right.  And that is the document that you created, correct?

A    Yes, sir.

Q    All right.  And is it about 14 pages long?  Is that correct?

A    Yes, sir.

Q    Now given that you had never done this before, what was the genesis behind doing it in this case?

A    By this time, I had become exceptionally concerned about the fact that I was not hearing anything from Dr. Haney or anyone purporting to act for Dr. Haney.  I thought that by priming the pump somehow, I could get some action going.

Q    When you say "priming the pump," by doing this outline?

A    Yes, sir.

Q    All right.  The first thing you did was to write -- send a fax to Mr. Sindel expressing concern about Dr. Haney, correct?  Not in this -- Not in this document, but ---

A    Well, a date that I remembered clearly is the date of the fax, and that was January 9th.

Q    All right.

A    As I've testified, my recollection of the specific date of this life history is not clear.

Q    Okay.  If your timesheet reflected that you worked on this life history around January 8th of 1998, does that sound reasonable?

A    Yeah, that sounds reasonable, yes.  That's clearly within the time frame I -- I would have said.

Q    Now when you finished this life history, what did you do with it?

A    I would have faxed it to Sindel, Sindel & Noble.

Q    And do you recall if you would have forwarded a copy to

Dr. Haney?

A   I am -- I do not believe that I had Dr. Haney's contact information.

Q   Do you recall if you asked Rick to forward it to -- excuse me -- Mr. Sindel to forward it to Dr. Haney?

A   I don't believe that I was in contact -- I was not in contact with Mr. Sindel directly about -- about what I was doing.  I would have forwarded it -- forwarded this -- I would have directed this to -- to Ms. Supranowich who was then Ms. Caspari, to Connie.  And it -- it was my understanding that Ms. Supranowich was the conduit with Dr. Haney.

Q   All right.  Now what would -- What did you -- Given that you had never developed a life history before, what was your format?  What did -- How did this come to be?

A   Well, when I was a high school and college debater, we called it "logic."

Q   Logic, okay.  And did you have any guidance -- You used a mitigation checklist or workbook, did you not?

A   Yes.  I used -- I used the mitigation checklist which is the first several pages of the mitigation workbook developed by the defense bar in Tennessee.

Q   All right.  And do you recall when you got that, that book?

A   I received that from Kevin McNally, and that would have been after I was appointed to the case, but I don't recall

exactly when I received it.

Q    All right.  So you took the mitigation checklist which was contained within the mitigation workbook, and then you went to work on Mr. Allen's life history.

A    That would be the chronological order, yes.

Q    Okay.  And how much time did you spend with Mr. Allen drafting this?  Do you know?  It was many hours, I think.

A    Oh.  I would defer to my timesheets.  The -- The timesheets would -- would say how much or little time I -- I worked on it.

Q    Now do you see in the -- on the bottom of Page 1 on this document there's a footnote?  Do you see that?

A    Yes, sir.

Q    And were you corroborating or looking to corroborate information that Mr. Allen was providing to you in -- while doing the mitigation checklist?

A    No.

Q    No.  Well, how about the baptism?  That was for the mitigation checklist; "yes"?

A    That was specifying information, but, for example, my purpose in asking that question was simply to line up the fact in time and place.  I did not, for example, try to impeach what Mr. Allen had told me.  I was simply filling in gaps, gaps that existed in Mr. Allen's memory.  So the source of the document was self-reporting.

Q   All right.  Now Page 2, there's a -- there's another footnote about the source of proof with respect to the hospital records.  Were you -- Obviously, it looks like you were checking records for an independent source from what Mr. Allen was telling you.  Is that correct?

A   That's what the record shows.

Q   All right.  And what was the purpose for doing that, if you remember?

I'll withdraw that question.

Other than the interview -- the conversations with Lucy McLemore and Raymond Petty concerning this document, the life history, was there any other outside source of information that you relied upon?

A   I cannot think of anything that's not reflected by the text of the footnotes.

Q   Do you know whether or not Dr. Randall received a copy of this when he came on the case?

A   I believe he did.

Q   Now in terms of the mitigation work you did on the case, was this the biggest project you had engaged in while working on the mitigation aspect during the course of Billie Allen's trial or pretrial presentations?

A   Absolutely not.

Q   For mitigation.

A   Oh.  It was -- I'm -- I'm sorry.  I misunderstood the

question.

Q   I'm sorry.  For mitigation.  In your mitigation work on this case, was this the biggest project that you had undertook?

A   Yes.

Q   You also were responsible for writing jury instructions.  I assume that was a massive undertaking.

MS. COSTANTIN:  Judge, I'm going object to the leading nature of his questions.

THE COURT:  Sustained.

MR. MORENO:  That's fine.

Q   (By Mr. Moreno)  What other big tasks did you engage in while representing Mr. Allen on this case?

A   I was primarily responsible for the pretrial motions in the case.

Q   Now -- I'm sorry.  Go ahead.

A   I'm sorry.

Q   No.

A   Well, for pretrial motions in the case.  In the trial, we used the Eighth Circuit Model Jury Instructions, so it was not a question of starting from scratch and writing jury instructions, but as in most cases, there was a process of negotiating with the other side about the specific instructions and then discussing those with the Court and the other side.

In addition to that, I -- I engaged in some activities concerning discovery that led me to do, yet, more legal research on top of the pretrial motions.

Q    Okay.  I'm showing you a letter or fax that you sent to Mr. Sindel on January 9th, 1998.  Is this the one you were referring to earlier?

A    Yes, sir.

Q    All right.

         MS. CARLYLE:  What is the exhibit number?

         MR. MORENO:  325.  I'm sorry.

Q    (By Mr. Moreno)  Looking at Page 2, which is the page I just put up here, the fifth paragraph -- I'll try to get that off of there -- you state, "As you are aware, I'm doing a good deal of work on mitigation.  I need to coordinate it with our psychologist or -- our psychiatrist or psychologist."  What work were you talking about that you had done that you needed to coordinate with a psychologist or psychiatrist?

A    It's precisely what I've testified to at this hearing so far.

Q    Refresh my recollection, if you would.

A    That -- My meetings with -- with Mr. Allen, the spot checking of facts based on my -- the holes left in the conversation with Mr. Allen, the meet-and-greets with the people I considered to be potential mitigation witnesses, and the preparation of the life history based on self-reporting

from Mr. Allen and occasional exceptions to that rule about my characterization of the life history.

If there was anything else about mitigation, it would have been in the -- in the form of parts of my pretrial motions that dealt with mitigation as a general principle, but that did not involve the development of mitigation evidence which I knew at that time I was incompetent to perform.

Q   So that's what you just described as the good deal of work you were doing on mitigation.

A   Yes.

Q   Okay.  So what was the work you were doing that you needed to coordinate with a psychiatrist or a psychologist?

A   I thought that the information that I was getting was the kind of thing that someone with the training to process it properly should be processing.

Q   And that would be the life history.

A   Yes.

Q   Okay.

A   Well, not limited to the life history but the -- the products of the -- of the detailed question-and-answer sessions with Mr. Allen himself.  I -- I knew that I was out of my depth.  No one had to tell me that.  That's why I thought we had to get this to Dr. Haney.

Q   Now how often, if you recall -- I realize it was 14 years ago, but how often did you and Mr. Sindel meet to discuss

various mitigation issues?

THE COURT:  This might be a good place to take a break.  It's 5:00, unless you want to particularly finish that line of inquiry.  That's fine, too, if you want to.

MR. MORENO:  No.  We can wait.

THE COURT:  Okay.

MR. MORENO:  That's fine.  I don't have much more with this witness, though.

THE COURT:  Okay.  What time do we start in the morning?

THE CLERK:  8:30.

THE COURT:  8:30.  8:30 in the morning.

MR. MORENO:  8:30.  Thank you, Your Honor.

THE COURT:  Court's in recess until 8:30 AM tomorrow morning.

MR. MORENO:  Thank you, Mr. Simon.

THE COURT:  You have some water over there, John, if you need it.  There's water over there, if you need it.

THE WITNESS:  Thank you, sir.

THE COURT:  Yes, sir.

(Court adjourned at 5:00 PM.)

CERTIFICATE


I, Deborah A. Kriegshauser, Registered Merit Reporter
and Certified Realtime Reporter, hereby certify that I am a
duly appointed Official Court Reporter of the United States
District Court for the Eastern District of Missouri.

I further certify that the foregoing is a true and
accurate transcript of the proceedings held in the
above-entitled case and that said transcript is a true and
correct transcription of my stenographic notes.

I further certify that this transcript contains pages
1 through 268 inclusive and that this reporter takes no
responsibility for missing or damaged pages of this transcript
when same transcript is copied by any party other than this
reporter.

Dated at St. Louis, Missouri, this 31st day of
January, 2013.


_____

                    /s/ Deborah A. Kriegshauser

         DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR

                    Official Court Reporter