UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


BILLIE JEROME ALLEN,               )
                                   )
             Petitioner,           )
                                   )
    vs.                            ) No. 4:07-CV-27(ERW)
                                   )
UNITED STATES OF AMERICA,          )
                                   )
             Respondent.           )


EVIDENTIARY HEARING -- VOLUME V
BEFORE THE HONORABLE E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE

JUNE 8, 2012

APPEARANCES:

FOR PLAINTIFF:        ELIZABETH U. CARLYLE
                      P.O. Box 30418
                      Kansas City, MO   64112
                      (816) 525-6540

                      JOSEPH M. CLEARY
                      COLLIGNON & DIETRICK
                      310 N. Alabama, Suite 250
                      Indianapolis, IN   46204
                      (317) 637-1000

                      TIMOTHY P. KANE
                      ERIC JOHN MONTROY
                      JAMES HENRY MORENO
                      FEDERAL COMMUNITY DEFENDER OFFICE
                      EASTERN DISTRICT OF PENNSYLVANIA
                      The Curtis Center, Suite 545 West
                      Philadelphia, PA   19106
                      (215) 928-0520

FOR DEFENDANT:        STEVEN E. HOLTSHOUSER
                      CARRIE COSTANTIN
                      OFFICE OF U.S. ATTORNEY
                      111 S. Tenth Street, Suite 2000
                      St. Louis, MO   63102
                      (314) 539-2200

REPORTED BY:              DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR
                          Official Court Reporter
                          United States District Court
                          111 South Tenth Street, Third Floor
                          St. Louis, MO  63102
                          (314) 244-7449

INDEX

ADMISSION OF EXHIBITS . . . . . . . . . . . . . .    4


JOHN WILLIAM SIMON --

   Continued Direct Examination by Mr. Moreno  .    9

   Cross Examination by Ms. Costantin  . . . . .   15

(Proceedings began at 8:30 AM.)

THE COURT:  Good morning.

MR. HOLTSHOUSER:  Good morning, Judge.

MS. CARLYLE:  Good morning.

MR. HOLTSHOUSER:  Judge, we're on the record?

THE COURT:  Yes, we are.

MR. HOLTSHOUSER:  I would ask to make a brief record on the exhibits from yesterday.

THE COURT:  All right.  Proceed.

MR. HOLTSHOUSER:  There were three exhibits that we missed from -- that were mentioned on Wednesday that we failed to offer yesterday.

THE COURT:  All right.

MR. HOLTSHOUSER:  They are 337, 375 and 382.

THE COURT:  Okay.  I'll put them in reverse order. 382 is received.  What was the other?

MR. HOLTSHOUSER:  337 and 375.

THE COURT:  375 is received.  337, received.

MR. HOLTSHOUSER:  And 375 you said received as well?

THE COURT:  Correct.

MR. HOLTSHOUSER:  Okay.  From yesterday, there are four exhibits.  257.

THE COURT:  Okay, just a second.  Let me get there. 257, received.

MR. HOLTSHOUSER:  505.

THE COURT:  Just a second.  505 is received.

MR. HOLTSHOUSER:  610.

THE COURT:  610 is received.

MR. HOLTSHOUSER:  643.

MS. CARLYLE:  Your Honor, 643 should show that it was received over objection.

THE COURT:  Okay.  And would you state the objection?

MS. CARLYLE:  The objection was -- had to do with relevance.  That was the website that was --

THE COURT:  Oh, yes.

MS. CARLYLE:  -- done in 2005 or 2007 or something like that.

THE COURT:  Okay.  643 is received subject to the objection made.

MR. HOLTSHOUSER:  We think we may have missed one, but I'm not going to waste the Court's time right now actually figuring out which one it is.  We'll come back to it, if we have to.

THE COURT:  Okay.  Was it 325?

MR. HOLTSHOUSER:  You have one?

THE COURT:  I'm just -- I just -- That's one that shows up on my list.

MR. HOLTSHOUSER:  I show that as being offered and accepted before today.

THE COURT:  Okay.  Okay.  All right.  Well, when you

find it, I'll look at my notes from yesterday.  I always put them in the margin, and ---

MR. HOLTSHOUSER:  It's in that -- It's the third to last exhibit that would have been mentioned yesterday, but --

THE COURT:  Okay.

MR. HOLTSHOUSER:  -- right now we -- Well, let's see. Melanie has a suggestion here.  303-A has already been accepted and offered and accepted I show.

THE COURT:  Okay.

MR. HOLTSHOUSER:  So I don't think it could have been that.

THE COURT:  Just on my margin notes, I see 321, 320.

MR. HOLTSHOUSER:  320 and 321 I show as having been offered and accepted previously.

THE COURT:  Okay.  Okay.  Well, we can figure it out.

MR. HOLTSHOUSER:  We'll figure it out.

MS. CARLYLE:  303-A, though, as I recall, is the second copy of the life history.

MR. HOLTSHOUSER:  No.

MS. CARLYLE:  It's not on the list.

MR. HOLTSHOUSER:  Well, I think 303-A was --

MS. CARLYLE:  Was Mr. Moreno's ---

MR. HOLTSHOUSER:  -- Mr. Moreno's version of the life history that is not on the list.

THE COURT:  Right, yeah.  I added it on the bottom.

It's a fax -- faxed copy.

MS. CARLYLE:  Yes.  We offer that.

THE COURT:  You want it received now?

MS. CARLYLE:  Yes, please.

MR. HOLTSHOUSER:  Sure.

THE COURT:  Received.

(Pause)

MR. HOLTSHOUSER:  Judge, I think I'm ready.

Okay.  There's three exhibits that are still outstanding.  It's 72, 73 and 74.  We would renew our request to admit those.

MS. CARLYLE:  And the objection to them was -- continues to be that these are letters that Mr. Allen wrote to the Court after the case was completely over.  And we would contend that the Government ---

THE COURT:  I'm having troubling hearing you.

MS. CARLYLE:  Sorry.  Let me get over to the microphone here.

These were letters that were written to the Court by Mr. Allen pro se after -- after the trial was over.  I think, at least in some cases, after the appeal was over and before, you know, was under submission and before habeas counsel were appointed.  And the Government has suggested that they are relevant to Mr. Allen's state of mind because he was evaluated in 2009 and, I guess, probably more recently in 2012.  I think

the only relevant state of mind in this case is his state of mind at the time of the offense and the time of trial.  And while later evaluations can evaluate that retrospectively, I don't see how what Mr. Allen did in 2005, '7, '9 is relevant to that evaluation in any way.  And that's our objection to those documents.

THE COURT:  Okay.

MR. HOLTSHOUSER:  I can respond, Judge, if you care.

THE COURT:  Sure.

MR. HOLTSHOUSER:  Dr. Martell, in particular, examined him in 2009 and gave him tests in 2009 and, based on those tests, determined, among other things, that he had impairments in language abilities and verbal skills and suffers from dementia.  I think the letters are, amongst other things, relevant to demonstrate that he shows capabilities that were not taken into account by Dr. Martell.  He wasn't given these letters to consider or evaluate, nor was Dr. Stewart.  So that at the time he's being -- They are relevant because they are close in time to the time that he was, in fact, evaluated in this case for purposes of this hearing.

THE COURT:  All right.

MS. CARLYLE:  I don't have anything further.

THE COURT:  Okay.  Noting the objection, I'll receive 72, 73 and 74.

MR. HOLTSHOUSER:  Thank you, Judge.  Nothing further this morning, Judge.

THE COURT:  All right.  Whenever you're ready, Mr. Moreno.

MR. MORENO:  Thank you, Your Honor.

**JOHN WILLIAM SIMON**,

HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

CONTINUED DIRECT EXAMINATION

QUESTIONS BY MR. MORENO:

Q    Good morning, Mr. Simon.

A    Good morning, Mr. Moreno, Your Honor, everyone.

Q    Mr. Simon, what information -- Well, let me back up.

Well, what information did Mr. Sindel share with you about Mr. Allen's life history that he was aware of?

A    I am not aware of anything with the exception of a reference in the life history to some medical records.  There is a reference in -- I believe it's in Footnote 1 to the -- to records.  And there -- That was a document that I prepared close in time to the representation.  And while I have no contemporaneous -- I have no contemporary recollection of having received those documents, I -- I do not doubt that I prepared the life history.  And I would certainly not have put anything in there that I didn't -- that -- where I'm talking about what I had that I thought was inaccurate.  So I had to

have received something.

Q    So your answer is you received -- That's -- The information you received from Mr. Sindel about Mr. Allen were records?

A    That the -- Yeah, the specific records referred to in the life history.

Q    All right.  Did he convey to you orally what information he had learned during his work on the case about Mr. Allen's life history?

A    No.

Q    Did Mr. Sindel share with you -- ever share with you any written product, notes, memorandum, reports, concerning any witness interviews he had conducted concerning mitigation related to Mr. Allen?

A    No, sir.

Q    Did Mr. Sindel share with you either orally or in writing potentially -- a list of potential mitigating witnesses that he had developed?

A    No, sir.

Q    Your -- Was there a so-called "mitigation notebook" put together by the team in this case concerning Mr. Allen?

A    Based on my view of -- review of the record, I would have to answer, "Yes," but I do not have a personal recollection of having seen that notebook at the time that -- of the representation.

Q    Do you recall if a copy of that notebook was provided to you by Mr. Sindel?

A    Absolutely not.

Q    Did you have any idea of what was contained in that mitigation notebook?

A    Not at the time.

Q    Did Mr. Sindel convey to you orally any information he may have learned concerning potential abuse in Mr. Allen's background?

A    Not at all.

Q    How was your rapport with Mr. Allen?

A    I believed that I had good rapport with Mr. Allen.

Q    And you met with him on numerous occasions.  Would that be fair?

A    I think "several" would be a little more accurate.

Q    What was the purpose -- Other than the -- Well, what was the purpose of your interviews with Mr. Allen?  What were you hoping to accomplish?

A    I had at least two purposes.  One was that if Mr. Allen were called in the penalty phase, I wanted to be personally familiar with him so that I would be able to do an effective job as a trial advocate in doing his Direct testimony and defending the -- defending against objections or making objections during Cross.  That was the -- That was the first and primary purpose.

In light of the fact that we were receiving nothing from Dr. Haney, I also gathered information that I thought would be useful for mitigation investigation by the person who was supposed to be doing it. To that extent, I had to ask some of the same questions that I believed a mitigation investigator would ask, but at no point was I qualified or self-perceived to be a mitigation investigator.

Q   How would you describe Mr. Allen? Was he cooperative with you?

A   Yes. Yes, sir.

Q   Do you recall any point in time when he refused to answer your questions?

A   No, sir.

Q   Mr. Simon, was there any strategic or tactical reason on your part for not conducting a more detailed investigation other than what you've testified to here today --

A   No, sir.

Q   -- and yesterday?

A   No.

Q   Was there a strategic or tactical reason for not developing a rapport with Mrs. Allen in order to elicit mitigating evidence?

        MS. COSTANTIN: Judge, I'm going to object. I don't think he's testified about any rapport or lack of rapport with Mrs. Allen.

THE COURT:  Yeah, sustained.

Q   (By Mr. Moreno)  During the course of your work on this case, did you spend time with Mrs. Allen to develop a rapport with her, the type of rapport necessary for delving into difficult issues in someone's background?

A   Not at that level.

Q   What do you mean?

A   At the -- I -- I did meet with her in a group of family and friends -- family and -- family members and family friends for the purpose of developing some kind of human contact so that if any of them were witnesses that I would be adducing in court, that I would not be a stranger to them.  I, obviously, had my -- my ears on during that meeting, but it was a group meeting, and I would not have attempted to develop the kind of -- I would not have gone into anything about the dark side of Mr. Allen's youth with that many people in the room.  I would have done it one on one.  So I did not seek to develop that as a mitigation investigation or a mitigation interview, but I cannot deny that the meeting was intended to develop a rapport.

Q   Sure.

A   Just a different kind of rapport.

Q   Did you ever go back and interview Mrs. Allen individually --

A   No.

Q   -- about mitigation?

A   No, sir.

Q   Did you ever interview any other member of Mr. Allen's family independent -- individually to develop mitigation?

A   I participated in some interviews, both individual and group, after Dr. Randall came onto the case, but as of that point, I was -- I was subordinate to Dr. Randall on that part of the case.

Q   Prior to Dr. Randall's involvement, had you participated in many individual -- had you conducted any individual interviews with family members in an attempt to elicit mitigation?

A   Other than this spot checking we discussed yesterday, no, sir.

        MR. MORENO:  Can I have just a moment, Your Honor?

        THE COURT:  Sure.

        (Pause)

Q   (By Mr. Moreno)  Mr. Simon, I'm showing you what's Exhibit 308.  It's a memorandum to the file from Mr. Sindel, dated May 7, 1997.  It's a witness list.  It's a witness list that Mr. Sindel testified he received the names from Mrs. Allen and Mr. Allen.  Do you recall having received a copy of this Witness List?

A   Yes.

Q   Okay.  And when did you -- Do you recall when you

received this witness list?

A    This week.

Q    This week.  Did you receive a copy of this witness list from Mr. Sindel during the time that you were representing Mr. Allen?

A    No, sir.

Q    All right.  Do you recall receiving any assignments from Mr. Sindel concerning particular witnesses he wanted you to go out and interview?

A    No, sir.

       MR. MORENO:  Your Honor, I don't think I have any further questions.

       THE COURT:  Okay.

       MR. MORENO:  Thank you, Mr. Simon.

       MS. COSTANTIN:  Judge, may I proceed?

       THE COURT:  You may proceed.

                    CROSS EXAMINATION

QUESTIONS BY MS. COSTANTIN:

Q    Mr. Simon, you're on the Board of Directors of the Missouri Association of Criminal Defense Attorneys, correct?

A    Missouri Association of Criminal Defense Lawyers.

Q    You are; is that correct?

A    Yes.

Q    Okay.  And you've received awards for your work involving the death penalty.  Is that correct?

A    Lethal injection, yes.

Q    Okay.  Specifically, you received in 2006 "Litigator Of The Year Award" by the Missourians for Abolition of the Death Penalty.  Is that correct?

A    Yes.

Q    And in 2010 you received the "Spotlight Award" from the Missourians for the Alternatives to the Death Penalty.  Is that correct?

A    Missourians for Alternatives to the Death Penalty, yes.

Q    Okay.  And in 2008, you received the "Atticus Finch Award" from the Missouri Association of Criminal Defense Attorneys.  Is that right?

A    Missouri Association of Criminal Defense Lawyers, MACDL.

Q    Lawyers.

A    And the answer is:  Yes.

Q    Okay.

        THE COURT:  Just a second.  I'm getting way behind.

        MS. COSTANTIN:  I'm sorry, Judge.

        THE COURT:  That's all right.

        (Pause)

        THE COURT:  Okay.  And your -- The last response was Missouri Association of Criminal Defense Lawyers.  And then you started to ask another question and I interrupted you.

        MS. COSTANTIN:  Okay.  No problem, Judge.

Q    (By Ms. Costantin)  That "Atticus Finch Award," that is

for the unflinching representation of unpopular individuals. Is that correct?

A    Yes.

Q    And you have a Ph.D. from Harvard.  Is that right?

A    Yes.

Q    And you have a law degree from Yale.  Is that correct?

A    Yes.

Q    And that law degree was what year?

A    1984.

Q    Okay.  So at the time that you took on your duties in this case, you had been a lawyer for 13 years.  Is that right?

A    The -- The final exams at the Yale Law School conflicted with the Missouri BARBRI course.  So I did not take the bar exam at the very first opportunity.  So I haven't been a lawyer -- I became a lawyer in the Spring of 1985.  That may affect the math, but you're essentially correct.

Q    So it would have been 12 years.

A    Whatever.

Q    Okay.  And you worked on approximately 20 habeas capital cases either as an Assistant Attorney General or as a defense attorney between 1991 and 2012.  Is that correct?

A    Yeah.

Q    And you also worked from 2006 to 2008 as a Trial Attorney in the Capital Division of the Missouri Public Defenders.  Is that right?

A     Yes.

Q     And since the *Allen* case, you have worked with Mr. Sindel on other death penalty cases.  Is that correct?

A     Yes.

Q     And that would be, for example, *Earl Ringo* and *John Middleton*?

A     Yes.

Q     And do you recall that you were appointed on this case on September 24th of 1997?  Is that right?

A     That is what the record reflects.

Q     And you began to bill on this case in -- on the -- on Mr. Allen's case in October of 1997.  Is that right?

A     Yes.

Q     I'm going to show you on your screen a copy of Exhibit 498.  Is that one of the pages or have you already seen this before?  Do you want me to page through it all or do you recognize this as your out-of-court hourly worksheet that was submitted to the Court?

A     I recognize this as the worksheet filled out in longhand by a secretary at Inglish & Monaco.

Q     Okay.  And you explained yesterday the process for that.

A     Yes.

Q     Is that correct?

A     Yes, ma'am.

Q     Okay.  And you signed the submission on this as being

correct.  Is that right?

A    Yes.

Q    What I'm going to try and do is blow some of this up so we're not all squinting.

So is it correct that on October 27th you had a telephone conversation with Mr. Allen considering the status -- concerning the status of the case and then factual issues? Is that what that says?

A    Yes.

Q    And is that correct?

A    Three-tenths of an hour.

Q    And then moving down, on October 29th you had two more telephone calls with Mr. Allen to discuss the case.  Is that right?  Do you see where I am?

A    Yes.

Q    And that was .6 hours.  Is that right?

A    Yes.

Q    And then on October 30th you had a telephone call with Mr. Allen to discuss an upcoming motion hearing.  Is that right?

A    Yes.

Q    And then moving down to November 6th, you interviewed Mr. Allen before that hearing.  Is that correct?

A    Four-tenths of an hour, yes.

Q    Okay.  And then you also interviewed him after the

hearing.  Is that right?

A    That's what the entry says, yes.  That's the word it uses.

Q    Okay.  And that was seven-tenths of an hour?

A    Yes.

Q    I'm going to show you what's been marked as Exhibit 319. Are those the first pages of your notes of your interview with Billie Allen after the hearing?

A    That's what it says, and it does use the word "interview."

Q    Okay.  And I'm just going to go down through these, if you could just look along with me.  And that last page, is that also the interview with -- notes of your interview with Mr. Allen on November 5th of 1997 that occurred before the hearing?

A    That is what it reflects.

Q    Now looking at the first page of your notes, does that indicate that you discussed with Mr. Allen Cloud 9?  A friend who owns Cloud 9?

A    Yes.

Q    Do you recall from your subsequent interviews with the Defendant that he had told you that he had won a rap contest there at Cloud 9?

A    I believe so, yes.

Q    And that was not evidence that was relevant to guilt, was

it, him winning a rap contest at Cloud 9?

A    Yes, it was relevant to guilt.

Q    And how was it relevant to guilt?

A    One of the points that the prosecution made in the first phase of the trial was that Mr. Allen was money hungry. They had a picture of him with the term "cash money" written on his belly. I don't remember whether they got that in or not. But the -- the idea that he was involved in what he referred to as "clubbin'" -- C-L-U-B-B-I-N-(') -- went to the -- went to the motive of why this man would have been engaged in conduct that was completely out of character with him. So, yes, it was relevant to guilt.

Q    Let me ask you this: Did you -- Are you saying that evidence was put on by the defense at the trial that Billie Allen was a successful rap singer and had won money at Cloud 9 and, therefore, didn't have to commit a robbery?

A    No, but that's not the only way one could use that evidence.

Q    But that was not put on. Is that correct?

A    The evidence you have hypothesized was never put on.

Q    Let me move to the second page of your notes. Does that indicate you discussed with him the offense?

And if you could read into the record the top portion so we can be clear about what I'm saying or asking you.

A    "Norris is bringing cousin into this. She puts you in

trick bag."  Is that enough?

Q   No.  If you could keep going because I want to go to the transition when you stop talking about the offense and start talking about other items.

A   I know for a fact that I never talked with her.

Rick:  "Your (illegible) self and all of us, whatever you tell me."

MR. MORENO:  Your Honor, perhaps we could move on to the part that is not dealing with mitigation, it would be easier.  I'm not sure what relevance the other part has.

THE COURT:  Overruled.

THE WITNESS:  I'm sorry.  I didn't hear you, Your Honor.

THE COURT:  No.  You go ahead.  I overruled the objection.

A   "Whenever you tell me any little lie, it hurts us."

Billie:  "Since last interview, everything has been (illegible).  Alibi - job interviews, asthma; Mark Crook, guard who is (illegible) buddy.

Q   The Mark Crook guard who is buddy, is that a reference to a guard who he was friendly with in the jail?

A   I believe so.  I must say that I do not have a contemporary recollection of this, and I'm simply trying to read my handwriting.

Q   A guard who is friendly in the jail, would that be

relevant to mitigation?

A    Yes.

Q    Then at the bottom portion is -- is discussion concerning his pro basketball -- potential pro basketball career?  Is that correct?

A    That's what the record indicates.

Q    However, he didn't play in school, Clayton High School. Is that right?

A    My recent transcription of my notes indicates that he played junior varsity but he was not varsity.  I do not -- I can't -- I cannot recite in detail on his basketball record as of this moment.

Q    I'm asking you to read your notes, the bottom portion.

A    "I was going to be a pro basketball player.  Jail; when checked in, didn't say he had asthma.  Landolt felt the pain and said, 'Shit, this witness is adult and is screwing up my case,'" that latter being a quotation.  "Reason you didn't stay in school; a good player but not a great player. Didn't" -- and then the selection is cut off.

Q    Okay.  And the information concerning his basketball playing in high school or lack of basketball playing in high school, that would be information that possibly could be relevant to mitigation.  Is that correct?

A    Or guilt based on the theory the prosecution was using to attribute some motive to him for an act that was completely

out of character, given everything that everyone knew about him.

Q   So if he was really going to be a pro -- Are you saying that the defense put on evidence that he was going to be a pro basketball player to combat the motive evidence?

A   No.  What I'm talking about are defenses.  I'm talking about defenses to the greed motive of -- of the greed theory of motive as opposed to affirmative defenses that he didn't need to commit the robbery because he was doing so well in basketball or rapping.

Q   And was that considered as a defense by the trial team, that he was going to be a pro basketball player and, therefore, didn't need the money for the robbery?

A   I -- I don't think we're connecting on what the word "defense" means.  The reason I think that this was relevant to both guilt and mitigation is that the prosecution was putting on a theory of motive, why this young man, who had no analogous record of the offense with which he was charged, was doing this out of greed.  And so the -- the kinds of ideations that he had were relevant to guilt as well as mitigation.

Q   Was any evidence presented by the defense that you recall in the guilt phase that the Defendant was going to be a pro basketball player?

A   No.

Q   Now on the third page of your notes, you record

information concerning where the Defendant went to school.  Is that correct?

A     It says Clayton.

Q     And that's where he went to school.  Is that correct?

A     That's the municipality where he went to at least two schools.

Q     That's the school district that he attended for at least part of his school career.  Is that right?

A     Yes.

Q     Okay.  The next portion that starts with "Norris' cousin," what does that state?

A     "Norris' cousin – put some pressure on."

Q     Could you continue to read that portion?

A     "She said it was guns and drugs in the bag.  She says the van she went to pick up.  Ignition was peeled.  Little T was supposed to just supply the guns.  Supposed to be" ---

        MR. MORENO:  I object.  What's the relevance of reading this into the record, Your Honor?

        MS. COSTANTIN:  Well, Judge, first of all, the relevance is I can't read it otherwise.  I'm having great difficulty reading his handwriting.  Second of all, it's to demonstrate that interviews often combine both guilt and mitigation conversations.

        MR. MORENO:  You can ask that question without reading extraneous information into the record.

THE COURT:  Well, I've been trying to follow, too. It is really kind of hard to read.  Overruled.

Q    (By Ms. Costantin)  Could you continue?

A    "Little T was supposed to just supply the guns.  Supposed to be two others in the park.  If he can't go, I'm supposed to go and do his."  Paragraph.

"You're trying to peel to close to the core.  Quote, 'It was somebody else,' unquote.  Little T, J -- could be 'John' -- somebody else."

Q    Now looking at the next page of the exhibit which is 319, is that your notes or notes from -- that you made before you -- the hearing of your interview with Billie Allen?

A    That's what they say.

Q    Okay.  And does that also contain school information concerning where he attended both Clayton School District schools as well as City of St. Louis schools?

A    Yes.

Q    And does it indicate why he left school?

A    Toward the bottom of the page it says, "Quit going to school; bad environment; quit going to school because I couldn't" -- and then the copy leaves off.

Q    And then it's cut off.  The information concerning his school was relevant to mitigation.  Is that correct?

A    Yes.

Q    And so at least a portion of those interviews that you

did with the Defendant on November 6th of 1997 concern

mitigation. Is that correct?

A    There was an overlap between mitigation and the other

subject we covered, yes.

Q    Let me go back to -- to your timesheets. I want to focus

you down on the entry for November 6th. On that date did you

have a conference with Mr. Sindel and Ms. Caspari concerning

the client -- that is, Mr. Allen -- mitigation issues as well

as discovery?

A    That shows that I spent a total of .8 hours discussing

that there. And given the dynamic, it would have included

Mr. Sindel some of the time but probably Ms. Caspari the bulk

of the time.

Q    So you actually remember this meeting from November 6th

of 1997?

A    No. I only remember the general course of dealings.

Q    Okay. And what you're saying is generally you would meet

with Mr. Sindel and Ms. Caspari.

A    It was very difficult to meet with Mr. Sindel at all.

One would have to compete with the speaker phone. I had more

of an entree with Ms. Caspari. She was more likely to meet

with me about anything. And so when I see a timesheet entry

that refers to .8 hours discussing anything, I -- given my

general experience in dealing with Mr. Sindel, I would assume

that the portion dealing with Mr. Sindel was at most half of

that time and probably less.

Q   Did you ever break those out?  Did you ever break out your meetings with Mr. Sindel, the time for that, compared to your meetings for Ms. Caspari -- with Ms. Caspari?

A   I'm sure one can find one entry in which I did.

Q   But in this situation, you did not.  Is that correct?

A   That's correct.

Q   Now during this time, you were also researching some legal issues.  Is that correct?

A   Yes.

Q   And I want to direct your attention to entries on November -- an entry on November 27th.  And that was not the entry I wanted to direct your attention to.

Now I'm on Page 3 of your records which is Exhibit 498.  Did you on November 27th download, shepardize and obtain cases concerning no fault ineffective assistance of counsel.

A   In the context of a discovery dispute, I did do that.

Q   Okay.  I'm going to go to the next page.  And on that next day, November 28th, did you resume your review of what you characterize as no fault ineffective assistance of counsel cases?

A   In the same context, yes, I did.

Q   And in -- You have defined, is this correct, no fault ineffective assistance of counsel as, quote, "Acts or omissions by third-parties that would create a claim of

ineffective assistance of counsel irrespective of the diligence of counsel themselves"?  Is that correct?

A   That's how the United States Supreme Court defined it.  I probably summarized it that way.

Q   I'm asking you:  Is that how you define it?

A   That sounds like the words I used in my deposition, but I did not make it up.

Q   I'm asking you:  Is that your definition of something that you have called "no fault ineffective assistance of counsel"?  "Acts or omissions by third-parties that would create a claim of ineffective assistance of counsel irrespective of the diligence of counsel themselves"?

A   I've testified that I thought that was what I said in my deposition.  My point is that I didn't make it up.  The United States Supreme Court did.

Q   My question isn't what you said in your deposition.  My question is:  As you sit here today, is that what your definition of "no fault ineffective assistance of counsel" is?

A   I would revise that because it would generally involve fault by the third-party that prevented counsel from doing their job.

Q   So what would your definition today be of the "no fault ineffective assistance of counsel" research that you did back in November of 1997?

A   I would define it operationally as *Geders, Herring*

ineffective assistance of counsel.

Q   As what?  I'm sorry?

A   Again, *Geders, Herring*.

Q   No.  Don't -- I'm asking you to use words to describe -- your words to describe what "no fault ineffective of assistance of counsel" is.  Is it what you stated previously?

A   Ma'am, I'm not changing my position.  I'm just suggesting that no fault ineffective assistance of counsel is a misnomer because there's fault on the part on the fault -- there's fault on the part of the third-party that causes counsel, who are personally diligent, to fail to deliver the effective assistance of counsel they want to deliver.  So we're not talking about the definition.  We're talking about the name. The definition stays the same.  The name I suggested would be *Geders, Herring* ineffective assistance of counsel.

Q   And the name that you put or the phrase that you put on your timesheet was "no fault ineffective assistance of counsel."  Is that correct?

A   As I have never denied, that is correct.

Q   Now moving to Page 5 of your timesheets, I want to direct your attention to 12-12 of 1997.  On December 12th of 1997 you interviewed Mr. Allen at the Franklin County Jail.  Is that correct?

A   I used the term "interview" in my timesheet and I did, in fact, meet with Mr. Allen at that time.

Q    Did you interview Mr. Allen on December 12th of 1997?

A    I -- I met with Mr. Allen and characterized that meeting as an interview in my timesheet, yes.

Q    Okay.  And you interviewed him for a total of 3.9 hours. Is that correct?

A    Yes.

Q    And ---

A    Those time, of course, in prison interviews include the time it takes me to be processed in and processed out.  So the actual time spent with the client is substantially less than what's shown on the timesheet.

Q    So you billed for a 3.9 interview, but what you're saying is it took some time to get through Security.

A    Yes, ma'am, and to wait for the client.

Q    And you tape that interview.  Is that correct?

A    That is my recollection.

Q    And you used two microcassettes to tape that interview. Is that right?

A    We're now getting beyond my recollection, and I would have to see the evidence and the dates.

Q    Well, let me ask you this:  Do you recall that you had to take one of those microcassettes and re-record it onto a larger cassette?

A    Because of the poor quality of the recording, I had to engage in that procedure for it to be useful to the mitigation

investigator.

Q    So that is correct?

A    Yes.

Q    And does the original microcassette exist?

A    I'm sorry.  I didn't hear the question.

Q    Does the original microcassette that you taped -- used to tape onto the larger cassette exist?

A    I -- I can barely see it.  I know that I testified about the physical facts of this at my deposition, and I don't think things have changed since then.

Q    Does the microcassette that you used to copy onto the larger cassette exist or did you throw it out or destroy it or re-record it after you copied it onto the larger one?  Do you recall?

A    As of this very moment, I don't recall, but when I had -- when I had the collection of cassettes in front of me at the deposition, I gave the best answers I could then.  I have seen one cassette so far today.  That's all I'm seeing.

Q    Okay.  I'm simply asking you or am I understanding correctly:  You don't remember if you saved the cassette, the small cassette that you then put onto the larger cassette?

A    I think that I did, but this is the kind of question that I could answer a lot better if I could see the physical evidence.

Q    Okay.  I'm going to show you what's been marked as 630-A,

630-B and 630-C.  630-A, 630-B and 630-C, did you subsequently provide those to 2255 counsel?

A    I provided all of the sound recordings I had made or in the case of the re-recorded cassette remade to 2255 counsel in -- in or about the year 2007.

Q    And, in fact, you packed up, am I correct, everything that you believed you had in the file, whether tapes or paper, back in 2007 into an SUV and gave it to -- loaded it up and drove it to 2255 counsel.  Is that correct?

A    Yes, ma'am, not simply what I had but also what direct -- what lead counsel on direct appeal, Michael Gross, had.

Q    And you had previously received all material from Mr. Sindel.  Is that correct?

A    No.

Q    Did Mr. Sindel have -- Does Mr. Sindel have material that you never received?

A    He -- My information is that he did but that he subsequently provided that to 2255 counsel independently.

Q    Now looking in front of you, 630-A through C, those are the tapes that you provided to 2255 counsel, correct?

A    I believe so, yes.

Q    And that first tape, 630-A, that's marked as being taped on December 12th of 1997.  Is that correct?  The large one.

A    12-11-97, yes.

Q    And the next -- You're saying it says 12-11-97?

A    I'm looking at -- at what I believe to be my handwriting in which I have printed 12/11/ and then I use a caret to insert '97 and it says "No. 1" on it.

Q    And then looking at 630-B, is that your handwriting on that?

A    I recognize the handwriting on the outside of 630-B as my handwriting.

Q    And that is dated December 11th of 1997?

A    Yes, ma'am.  It follows that with No. 2.

Q    Okay.  And then looking at 630-C, what is the date on 630-C?

A    There are two dates on it.  On the front or Side A, it says BA-1/7/98 No. 2.  Then on the back in fine print at the bottom it says 11/21/11.

Q    And the date January 7th of '98, it's followed by the No. 2.  Is that correct?

A    Yes, ma'am.

Q    Is there a No. 1 from January 7th of 1998?

A    Not here.

Q    Do you recall a No. 1?

A    No.

Q    Okay.

A    I don't recall one way or the other.  I'm not denying the existence of a No. 1.  The way I keep track of things, the fact that there was a No. 2 implies to me that there was a No.

1.

Q    Do you know where No. 1 is?

A    Absolutely not.

Q    If you had No. 1, would you have provided it to 2255 counsel?

A    Of course.

Q    And these tapes that are in front of you, are these more likely than not the tapes of your interview with Billie Allen on -- in December and January of 1998?

A    I cannot agree to that under oath in light of my study of Imwinkelried's *Evidentiary Foundation*, Sixth Edition.  There are nine points to laying the foundation.  I've reviewed those nine points.  On the majority, the answer is either "no" or "I don't know."  I have agreed that these appear to be the physical objects, but I have no knowledge of what's been done to the insides of these.  They've been in the exclusive custody of two parties, each of whom have equal and opposite motives to alter the contents of them.  I cannot -- I cannot lay a chain of custody for them, and I have no -- I have no training in preparing them.  I did not know that the equipment was working well.  I know that they were bad recordings. That's even reflected by the prosecution's secretary's transcription of them.

So I -- I -- I have to say when I consider all of the factors, including the incentive to fabricate and the lack of

quality, my own lack of training at sound recording, and the

fact that I can't even say what the equipment was, let alone

that it was in good working order, I have to say "no" in

response to your answer, and that's why.

Q    Do you recall testifying in your deposition, as shown on the screen, Exhibit 533, the question being asked:  "I'm not asking you to take it at face value.  Under all the circumstances here, including the fact that the dates of the interviews coincide with the date of your CJA application of dates you interviewed Billie as well as the preparation of the written life history, the dates coincide with the dates, is there any doubt in your mind that the tapes are more likely than not your tapes of your interview with Billie Allen?"

Do you recall your answer being:  "Oh, more likely than not standard.  I would have to agree with that."

Do you recall that being your testimony at your deposition?

A    I can -- I can read what's on the screen.  Was that after I had been grilled for six-and-a-half hours?

Q    Was that your answer at your deposition?

A    I'm not denying that's what's on the screen.  This is before I had reviewed Imwinkelried.

Q    So that was -- that is your answer at your deposition. Is that correct?

A    I believe so.

MS. COSTANTIN: Your Honor, at this time I would move to admit 630-A, 630-B and 630-C. I would also note that 2255 counsel stipulated at the deposition that these tapes had been received by -- from them by Mr. Simon.

THE COURT: All right. Received.

Q   (By Ms. Costantin)  Before your deposition -- Let me get those tapes. Before your deposition in January of 2012, do you recall that I had mailed you a CD that contained the audio of these tapes --

A   Yes.

Q   -- and five transcripts?

A   Yes.

Q   Have you reviewed those audio recordings?

A   I have not listened to the entire CD, but I have reviewed them for the poor quality they reflect.

Q   I'm going to play a portion of Government's Exhibit 630-A as reduced to CD.

MS. CARLYLE: Ms. Costantin, is there an exhibit number for the CD?

MS. COSTANTIN: The CD is 631.

MS. CARLYLE: Thank you.

Q   (By Ms. Costantin)  I'm playing 631 which contains digital versions of the tapes. I'm going to play a short portion of this, and I want to ask you if this is the beginning of the interview that you had with Mr. Allen.

(Ms. Costantin played a portion of the CD referred to.)

Q    (By Ms. Costantin)  Is that the beginning of your interview with Mr. Allen at the jail?

A    Those words are consistent with my general recollection of that meeting.

Q    And that's your voice on there.  Is that correct?

A    It sounds like me, but I don't know that it was.

Q    So you don't recognize your voice?

A    I recognize the ability of human beings to sound like someone else.

Q    Do you recognize your voice?

A    I recognize my voice.

Q    Do you recognize Mr. Allen's voice?

A    I recognize Mr. Allen's voice.

Q    Has 2255 counsel provided you with copies of 632, 633, 634 and 635 which are the transcripts of those tapes?

A    I believe that the attorneys for both sides have provided me those.

MS. COSTANTIN:  Judge, at this time I would move to admit the Exhibit 632, 633, 634 and 635.

THE COURT:  Received.

Q    (By Ms. Costantin)  Now the purpose of your interview with Mr. Allen was to learn information for the penalty portion of the trial.  Is that correct?

A    As I've testified on Direct, there were two purposes. One was to familiarize Mr. Allen with myself and myself with Mr. Allen.  I was also attempting to prime the pump by getting some information that the mitigation specialist could use to prepare the penalty phase.

Q    I'm going to play a portion of Exhibit 630-A as reflected on Exhibit 632, the transcript.

(Ms. Costantin played a portion of the CD referred to.)

Q    (By Ms. Costantin)  So is it correct that you told Mr. Allen that the focus was going to be on everything -- everything that happened in your life and lives of the people very close to you?  Is that correct?

A    During that set of two meetings adding up to less than 3.9 hours, yes.

MR. MORENO:  Excuse me.  Can I look at the -- on the CD.

(A discussion was held off the record amongst counsel of record.)

MS. COSTANTIN:  Judge, for the record, Mr. Moreno has asked me to make a record.  That starts at 45 seconds, and that's 630-A, and ends at 1 minute and 54 seconds.

THE COURT:  Okay.  Starts when?

MS. COSTANTIN:  At 54 -- 45 seconds.  I'm sorry.  And ends at 1 minute and 54 seconds.

THE COURT: Thank you. And that was from?

MS. COSTANTIN: That was from 630-A.

THE COURT: 630-A, okay. Thank you.

MS. COSTANTIN: Right.

MS. CARLYLE: But you're not playing it from 630-A.

MR. MORENO: It's an extract.

MS. COSTANTIN: It's 630-A, 45 through 1 minute and 54 seconds.

MS. CARLYLE: Can I ask one more thing? I'm sorry. Then I'll be done bothering everybody. So this is not ---

THE COURT: I can't hear you.

MS. CARLYLE: This is not 1 minute or 45 seconds into the CD, into the cassette. It's into the tape? I'm sorry. It's not 1 minute and 45 -- It's not 45 seconds into the CD. It's into the tape.

MS. COSTANTIN: The CD has each tape separately.

MS. CARLYLE: Okay.

MS. COSTANTIN: This is QF Side 1 -- Side A which is the same as 630-A, and it starts at 45 seconds and ends at a minute 54.

MS. CARLYLE: Okay.

THE COURT: So something less than a minute.

MS. COSTANTIN: A minute; a minute 9.

THE COURT: A minute 9. Yeah, okay. I see. Yeah, a minute nine, yeah.

Q     (By Ms. Costantin)  And as part of that interview, do you recall telling the Defendant that, "See, what I'm focusing on more is I guess you could call it our constructive case in the penalty phase, and that is, can -- you can -- can put the jury in a position where they cannot vote to kill you because they see you as a human being the way your girl friend and your mother and your uncles do."  Is that correct?  Is that what you told him?

A     In my capacity as his trial lawyer, yes, I told him that.

Q     Now you were also concerned about evidence that the Government could possibly present in the penalty phase.  Is that correct?

A     *Rompilla*, yes.  I was concerned about that.  The *Rompilla* had yet to be decided.

Q     Okay.  Aside from any case, were you concerned about evidence that the Government could put on in the penalty phase?

A     Yes.

Q     Because you, obviously, couldn't be concerned about *Rompilla* since it hadn't been decided yet.

A     Yes.

Q     So what you really were concerned about was key evidence the Government could put on in the penalty phase.

A     Yes, which *Rompilla* subsequently confirmed.

Q     Okay.  But back in 1989 when you're talking -- or excuse

me -- 1997 when you were talking to Billie Allen, you were not concerned about a case that had not yet been decided.  Is that correct?

A     You're talking about *Ring versus Arizona*?

Q     No.  I'm asking you if back in 1997 you were talking to Billie Allen about evidence that governed your concern about evidence the Government could present in the penalty phase.  Is that correct?

A     I was concerned about that, yes.

Q     And the specific ---

A     Meting it at trial.

Q     I'm sorry?

A     Meting it at trial.

        THE COURT:  Wait a minute.  I didn't hear you.  What's that?

        THE WITNESS:  Meting it at trial, Your Honor.

        THE COURT:  Meeting at trial?

        MS. COSTANTIN:  Meting it at the trial.  In other words, meting extra -- I'm sorry.  Sorry, Deb.

        THE WITNESS:  As a barrister, responding at trial to aggravating evidence that the prosecution would present.

Q     (By Ms. Costantin)  And specifically, you were concerned that the Government was going to put on evidence that Mr. Allen was a drug dealer.  Is that correct?

A     Yes.

Q    I'm going to play right now a clip from 630-B that starts at 4105 and ends at 4140.

(Ms. Costantin played a portion of the CD referred to.)

Q    So is it fair to say that you were attempting to gather information from Mr. Allen concerning what possible evidence the Government could put on concerning his activities as a drug dealer?

A    Yes.

Q    Now when you interviewed Mr. Allen at the Franklin County Jail, you had a mitigation checklist with you that had been provided by Kevin McNally.  Is that correct?

A    Yes.

Q    And that mitigation -- I'm sorry.  Kevin McNally, just to clarify, is one of the National Resource Capital Counsel for federal capital defense.  Is that correct?

A    Yes.  That was the only instruction or training I received concerning mitigation.

Q    My question is:  Is Mr. McNally one of Resource Capital Counsel for federal capital defense?

A    He certainly was then.

Q    Okay.  And at the time that he supplies you with the mitigation checklist, was he in that role?

A    Yes.

Q    And you referred to that mitigation checklist when you

interviewed Mr. Allen.  Is that correct?

A    Yes.

Q    And I'm going to show you Exhibit 628, and we'll just page down through it or we won't page down through it actually.  I'm going to page down through it.  Can you tell me if this is what comprised the mitigation checklist that you used with Billie Allen in those interviews?

A    Yes.

Q    Now looking to these portions, let's use this as an example.  There's some portions off to the right.  There's some listings of certain factors and then there's some listings off to the right, Roman Numeral II-B Roman Numeral II-A, for example.  Is that correct?  Can you see that?

A    Yes.

Q    Those are references to portions of the mitigation notebook that's provided by the National Resource Capital Counsel for federal capital defendants.  Is that correct?

A    I believe the name is "workbook," and that's -- I -- That simply is my recollection.  I have not used this version since the next version came out in 2002.

Q    I'm sorry.  I guess I used an incorrect phrase.  That's a workbook?

A    I believe that's the name.

Q    Okay.

A    I didn't mean to nitpick.  I just wanted to keep a clean

record.

Q    I understand.  And so -- But I think it's important because we've been talking about a notebook versus a workbook?

A    Absolutely, yes.

Q    Okay.  And the workbook is something that was provided by the Capital Defense?

A    By Mr. McNally.

Q    By Mr. McNally.  The notebook is the material that's being maintained with specific reference to this -- to Mr. Allen's case.  Is that right?

A    That's what I'm told now.

Q    Okay.  So let's go back to my question which is:  The references off on the right-hand side of Exhibit 628 refer back to portions of the mitigation notebook provided by Mr. McNally.  Is that right?

A    Yes.

Q    And the idea is if you get a hit, in other words, if it's a positive for one of these factors on the left side, then you can refer to the mitigation workbook.  Is that right?

A    Right.

Q    And then there's some sources there to look at.  Is that right?

A    Yes.

Q    Now let's just go through relative quickly what some of the topics are on the very first page of the mitigation

checklist.  And let me just take a moment and show how it's meant to be used.  It indicates that, "Listed below are symptoms and indicators which may be helpful in identifying mitigation.  The number off to the left refers to the section of the mitigation workbook which deals with that particular indicator."  Is that right?

A    Yes.

Q    Okay.  And then it's got different categories.  Page 1 is neurological.  Is that right?

A    I'm sorry?

Q    Page 1, that category on the mitigation checklist, is neurological?

A    Yes, ma'am.

Q    And then it has subcategories; for example, "prenatal" that includes alcoholic mother, mother physically abused.  Is that correct?

A    Yes.

Q    And once again, this is the checklist you were using with Mr. Allen during the interview, is that correct, you're referring to?

A    Yes.  A cookbook for someone who had no background or training for the exercise.

Q    Okay.  But you were referring to it.  Is that correct?

A    I'm sorry?

Q    You were referring to it when you were doing your

interview with Mr. Allen?

A    Yes.

Q    And one of the next categories I want to refer you to is this "Childhood Illness and Accident."  Is that right?

A    Yes.

Q    And so that would include things like head trauma or loss of consciousness.  Is that right?

A    Yes.

Q    Another category would be "Drugs or Toxic Chemicals."  Is that right?

A    Yes.

Q    So if he's -- If the individual you're talking to is a substance abuser, for example, or had -- an industrial worker; is that right?

A    Yes.

Q    And then we also have a section on the mitigation checklist for "School Performance."  Is that correct?

A    Yes.

Q    And did you with this notebook -- One of the last portions on this page involved "Chronic Illnesses and Conditions."  Is that right?

A    Yes.

Q    And then moving on, is it correct that the mitigation checklist that you used also covered "Social History"?  Is that right?

A      That's what it says.

Q      Okay.  And that's what you were referring to, correct?  It's not just what it says.

A      Yes.

Q      Okay.  And so it would include being a victim of violence or trauma or any suicidal episodes or truancy or runaway.  Is that right?

A      Yes.  Would you like me to just read it into the record, too?

Q      I just want to make sure that this is the same mitigation checklist that you used with Mr. Allen when you were doing the interviews.

A      Yes.

Q      Okay.

A      That, unlike the current status of the tapes, is something that I will stipulate is what I used.

Q      Okay.  And I just want to review because we have an enormous number of documents in this case, directing the Court's attention to specific areas.  Okay?

       Looking at the "Parent Profile" on the mitigation checklist, did that also include whether the parent was alcoholic or criminal?

A      Yes.

Q      And did it also include domestic violence, including physical, sexual, psychological or parental violence?

A     Yes.

Q     And there's a portion that you covered on the mitigation checklist concerning "Neglect and Tragedy."  Is that right?

A     I'm not sure I could answer to the word "covered," but I'm sure that I dealt with it to the best of my ability at the time.

Q     Okay.  So you dealt with a portion of the checklist concerning "Neglect and Tragedy."  Is that right?

A     Yes, ma'am.

Q     And did you also deal with a portion of the checklist concerning "Drug Use"?

A     I remember that, yes, ma'am.

Q     And then the checklist also has you look at issues such as the race and sex of the Defendant.  Is that right?

A     That's what I recall of the checklist.

Q     And, obviously, you didn't have to ask Mr. Allen those questions, did you?

A     In 1997, '98, I did not think so.

Q     And you, also -- On the checklist it also covers poverty, is that right, and urban background or urban residence?

A     Yes.

Q     And does it also cover incarceration?  Whether family's maintaining contact and whether guards or anyone in the prison community is supportive?  Is that correct?

A     The checklist does include that, yes.

Q    And then moving to Page -- to the next page of the mitigation checklist, it also covers areas such as -- well, it's a general category -- excuse me -- general category called "Good Person."  Is that right?

A    That's what it says, yes.

Q    Okay.  And that would include a lack of criminal history or acts or incidents that are out of character.  Is that right?

A    Yes, ma'am, the third subdivision under "Good Person."

Q    And it also covers religious involvement.  Is that correct?

A    Yes, ma'am, the fifth subdivision under "Good Person."

Q    And these areas that I've covered with you, are these all areas that you attempted to cover with Mr. Allen in those December, 1997 interviews?  Is that correct?

A    That is what my notes indicate.

Q    Now at the time that you met with Mr. Allen on December 12th of 1997, you already had quite a number of his medical records.  Is that correct?

A    That is what the -- the documents I've been provided indicate, but I have no subjective contemporary recollection of those records, but that is what -- that is what documents that I believe I prepared say that I had.

Q    Well, do you remember telling Mr. Allen, "As you can see, I've got -- I have a bunch of medical records on you, and I

reviewed them and I'm going to be referring to them"?  Do you recall that?

A    Yes, ma'am.  That's what I meant by my previous answer.

Q    So referring to the transcript has refreshed your recollection that you did, in fact, have, as you referred to, a bunch of medical records.  Is that right?

MR. MORENO:  I would object.  His recollection didn't need to be refreshed.  He said he had them.

MS. COSTANTIN:  No.  I thought -- Your Honor, I thought he just said he didn't.

THE COURT:  Yeah, I thought he said he did.  Would you reask it?  Because I thought he said he did.

MR. MORENO:  I'm bad or my bad.

Q    (By Ms. Costantin)  So referring to the transcript before you got here today, is that what refreshed your recollection or is that the documents you're referring to when you said, yes, you did have quite a number of medical records?

A    I believe it was -- I believe it was my note.  All I'm saying is that I'm not denying that at that point -- I'm not denying the existence of evidence that I had seen medical records.  What I'm saying is that sitting here today, I do not have a present -- I do not have a present recollection of having seen those medical records.

Q    Do you recall that those medical records that you did see included records from the Defendant's visit to the

Metropolitan Psychiatric Center in February of 1997?

A    I simply don't recall one way or the other.

Q    Would it refresh your recollection, referring you to Exhibit 634, "I found the document that referred to your being thrown out of the house and what" -- this was the psychological admission in February of 1997.  Does that refresh your recollection that you did, in fact, have records from that February of '97 visit to the Metropolitan Psychiatric Center by the Defendant?

A    As to this specific statement, all I can say is that that is what the text on the screen says.  It does not refresh my recollection.

Q    So it doesn't refresh your recollection that you did, in fact, have those?

A    Right.

Q    In your interview on December 12th of 1997, didn't Billie Allen tell you that his father was drunk all the time, they didn't get along, and he pretty much ignored him?

A    That -- That -- That is what I recall having reviewed the life history, the life history I prepared for the mitigation investigator.

Q    You recall that's what he told you?

A    I -- I'm being -- I am being as accurate and honest as I can about this, and I recall that that's what the life history says, but I do not recall hearing those words from Mr. Allen's

mouth.

Q   I'm going to play 630 -- an excerpt from 630-A starting at 48 and ending at 141.

(Ms. Costantin played a portion of the CD referred to.)

Q   (By Ms. Costantin)  So do you recall the Defendant, Mr. Allen, telling you that his father was drunk all the time and that he pretty much just ignored him?

A   I remember having reviewed that part of the compact disk. I remember having read that part of the transcript.  I do not remember the conversation with Mr. Allen in that respect.

Q   Okay.  But that tape we just heard is the conversation with Mr. Allen.  Is that correct?

A   Well, the parties have agreed that it is, but I haven't.

THE COURT:  Now wait a minute.  Wait; wait.  I can't -- I got to figure this out.  We have a transcript of your voice, but you really -- Earlier on you said you weren't sure it was your voice.  The parties have agreed that it's accurate.  You're not agreeing that it's accurate.  What am I missing?

THE WITNESS:  I'm sorry, Your Honor?

THE COURT:  Okay.  Well, here's what I understand where we are.  When we first started this, you weren't willing to say that this was your voice on the tape.  And then later you said that you're not -- you realize the parties have

agreed that this is the transcript, but you're not willing to do that.  Is that what I understand?

THE WITNESS:  Yes, sir.

THE COURT:  Okay.  Wait.  Let me -- Let me make some notes here.

(Pause)

Okay.  Go ahead.

Q    (By Ms. Costantin)  Do you recall -- Oops, I cut it off. Hold on.

MS. CARLYLE:  Excuse me.  Sorry, Your Honor.

Q    (By Ms. Costantin)  Do you recall Mister -- your asking Billie Allen about his father John Allen and him responding, "We really didn't mess around; I mean it was like when I was -- when I was at my mom's, but when we lived on Evans, so my father, he was like -- they got into so much"?

A    That's the same answer as before.  It was 14 or 15 years ago.  I do not remember any -- one swath of conversation, and I have Imwinkelried-based foundational objection to the -- to the audio production that was tendered to me and the transcript that I understand had been made from it.

Q    I'm showing you what's 632.3.  Did Billie Allen tell you concerning his father that, "He was drunk all the time, so we pretty much didn't get along"?

A    That sounds consistent with the life history, and the life history, unlike my testimony this morning, was prepared

when my recollection of the meeting with Mr. Allen was fresh.

Q   So the statement that John Allen was drunk all the time -- the statement by Mr. Allen that John Allen was drunk all the time and he and his father pretty much didn't get along, is consistent with what you recall back from that time. Is that correct?

A   Are those words from the audio production or are they from my life history?

Q   What's on your screen right now is the transcript, 632, from the interview of December 12th of 1997.  I'm asking you: Is it consistent, the statement on there, Mr. Allen's statement, Mr. Billie Allen's statement that, "He," referring to John Allen, "was drunk all the time, so we pretty much didn't get along"?

A   The substance of that statement is consistent with my general recollection as contemporaneously reflected in the life history.

Q   Do you recall Billie Allen telling you -- Let me ask it a different way.  Isn't it true that Billie Allen told you that he had nothing to do with his father?

A   That is generally consistent with my recollections reflected on the life history.

        THE COURT:  Okay.  Well now, I'm not sure. Mr. Simon, are you saying that it's consistent with your recollection of the life history but not of the actual

interview?

THE WITNESS:  Yes, Your Honor.  And the reason is that because it was 14 or 15 years ago, I honestly can't say what words were said.

THE COURT:  Okay.

THE WITNESS:  On the life history, the life history was prepared when it was fresh in my mind.  And that, I am quite comfortable relying on.  But I -- I -- Honestly, Your Honor, I couldn't hear the Court's ruling on the foundational question.  I understand the parties have stipulated to it.  I understand that that might bind the Court, but I, as a witness, am sworn to tell the truth.  And as a lawyer, that includes my knowledge of the law of evidence.  And if this case involved money, those tapes and that transcript would never come in.

MS. COSTANTIN:  Judge, I think Mr. Moreno would like a ten-minute break.

MR. MORENO:  Can we take a break, Your Honor?

THE COURT:  Okay, yeah.  That will give me time to sort this out, if I can; yeah.  Court's in recess.

MR. MORENO:  Thank you, Your Honor.  How long?

THE COURT:  You said ten minutes?

MR. MORENO:  Yeah.

THE COURT:  Sure.

THE CLERK:  Court is in temporary recess.

(Court recessed from 10:00 AM until 10:12 AM.)

MS. COSTANTIN:  Judge, we can just get started.

Q   (By Ms. Costantin)  I don't recall exactly where we left off, so I may repeat.

Mr. Allen told you -- Mr. Billie Allen told you that he had nothing to do with his father, John Allen.  Is that correct?

A   That's consistent with my recollection.

Q   And he told you that his mother cared for him and was there for him.  Is that correct?

A   That also is consistent with my recollection.

Q   Did he ever express to you anything other than that his mother cared for him and was there for him?  Any contrary emotions that you recall?

A   Having reviewed multiple documents, including my own notes, I recall that she had thrown him out of the family home.

Q   Did Billie Allen ever express to you anything other than that his mother cared for him and that she was there for him?

A   I thought that my previous answer was responsive because if she threw him out of his home, that would indicate some lack of care on her part or perhaps I'm missing something.

Q   Did Billie Allen tell you, in fact, that he had left the house to protect his family?

A   I don't remember.

Q     Okay.  If that is what he, in fact, told you, and we'll get to that later on, would that be consistent with his mother caring for him and not his mother throwing him out of the house?

A     I'm sorry.  I missed the ---

Q     Is it your testimony that Billie Allen told you that his mother threw him out of the house?

A     It's my testimony that based on reviewing multiple records of the representation 14 or 15 years ago, that a statement to that effect was made.

Q     That Billie Allen told you that he was thrown out of the house.  That's the question.  Did Billie Allen tell you that he was thrown out of the house by his mother?

A     As to those specific words, I don't remember.  I -- I have testified to what I can within the limits of my memory and my review of the records that have been presented to me.  It is exhausted as of this point.

Q     So when you said before that you reviewed records that indicated that she threw him out of the house, you're saying records apart from your interviews of Billie Allen?  Records that didn't relate to his statements?

A     I am having to put together various sources to reconstruct what happened 14 or 15 years ago.  And sitting here, without records in front of me, I can't be more specific than I've been already.  I remember that that was something

that came out at the time. I don't remember the precise words, and I don't remember the precise source.

Q    Okay. So in other words, you're not sure Billie Allen is the source of the information that you have that his mother threw him out of the house. Is that right?

A    Unless it was in the life history in which case that would -- that is a more -- that is a superior source of my perception at the time than my recollection 14 or 15 years ago --

Q    Okay.

A    -- or 14 or 15 years in the future.

Q    In the interview, do you recall you questioning Mr. Allen concerning whether he was alienated from his father over and above the fact that he and his mother and sisters were living in another house?

A    I don't remember, but that sounds like it would be in character for me.

Q    I'm directing you to Exhibit 634, Page 36. Does it indicate that you asked him, "Did you go through a phase like that where you were alienated from your father over and above the fact that you and your mother and sisters were living in another house"? Is that correct? Is that what 634 shows?

A    That what's -- That's what the paper shows.

Q    Okay. And 634 has been admitted as a transcript of your interview. Is that correct?

A    I believe it has.  That's -- My hearing, there was problem with my hearing.

Q    And that indicates that Mr. Allen told you, "I mean I just -- All together, I just couldn't mess with him, you know."  Is that correct?

A    Again, that's what the document says.

Q    And then he said to you, "You know, it wasn't no more rebellion against him.  I just, you know, I cared about my mother more since she's there for me."  Is that correct?

A    Again, I am reading the document, and those are the words in the document.

Q    And is that consistent with what Billie Allen told you at any time?

A    I believe it is.

Q    And concerning John Allen, isn't it true that at trial various witnesses, including Mr. Allen's sisters, testified that John Allen was a drunk who had nothing to do with the family?  Is that correct?

A    That's my general recollection, but I couldn't go beyond that.

Q    In that December, '97, interview, with Billie Allen at the Franklin County Jail, did he provide -- he provided you with names, addresses and phone numbers of both Otha Petty, his maternal grandfather as well as Rachel Allen, his paternal grandmother.  Is that correct?

A    I recall having received addresses and other contact information like that.  As to the specifics, I -- I would have to see my own notes.

Q    I'm showing you Exhibit 632, Page 7, and then subsequently I'll show you Page 8.  Does that indicate that in that December interview, Mr. Allen provided the name, address and phone number of Otha Petty?

A    The image on the screen so reflects.

Q    Does that refresh your recollection -- I'm sorry?

A    That the image on the screen so reflects.  I -- I have in the last month or so transcribed my own notes, and I believe that my own notes would reflect a "yes" answer to what you're asking me.

Q    And onto the next page, did Billie Allen also provide you with contact information for Rachel Allen?

A    That is what this document says.

Q    And does that refresh your recollection that Billie Allen, in fact, provided you with contact information for his father's mother?

A    No, but if my own notes say the same thing, then I would acknowledge that that refreshed my recollection.

Q    So that does not refresh your recollection.

A    Not independently of my own notes.  My own notes are the best evidence as opposed to the tapes concerning which I dispute the foundation.  And the transcripts, I understand,

were -- were parasitic on the tapes.

Q   In that December 12th interview, did -- isn't it true that Billie Allen told you about attending Bible school at his Uncle Raymond Petty's church and also provided you with contact information for him?

A   I -- I do recall that.  I'm not saying every detail of that.  I do recall his discussing his church life with me. That was one of the two areas that we had in common that I felt that I could communicate with him in my amateur efforts in lieu of a mitigation investigator.

Q   My simple question is:  Did Billie Allen tell you that he had attended Bible school at his Uncle Raymond Petty's church and did he provide you with contact information?

A   Sitting here today, I don't remember the term "Bible school."  I do recall the contact about his church life that I already agreed occurred.

Q   Showing you what's Exhibit 632, does that indicate that Mr. Allen told you, "When I was going to church with my Uncle Raymond, it was like this Bible -- Bible school"?

A   This document does contain the term "Bible school."

Q   And is that consistent with what your recollection is of what Billie Allen told you?

A   My honest answer is:  I -- This is one area that I was familiar with.  I made a distinction in my own mind between Bible school, which was something that occurred in the summer,

Sunday school which is something that occurred year round, and other kinds of activities of an instructional nature conducted by religious institutions for young people. I -- Until I saw this on the screen or heard your question, I did not remember that either he or I had used the term "Bible school."

Q   Do you recall -- Having read that, does that refresh your recollection that he said he attended a Bible school at the church with his Uncle Raymond?

A   I can't say that it does. My review of my own notes may.

Q   In fact, photographs were admitted at trial of Billie Allen at church. Do you recall that?

A   No. One thing that hasn't been covered so far is that I did not -- I did not do any of the trial work, any of the witnesses' Crosses, Directs, openings, closings with the penalty phase. I was frequently doing other things connected with the case, such as negotiating on discovery and instructions or preparing legal -- doing straight legal work.

Q   Did you handle the ---

A   So the fact that I didn't remember it doesn't mean that it wasn't said.

Q   Did you handle the appeal in this case?

A   Yes. I was second chair counsel on the appeal.

Q   As part of the -- handling the appeal, did you review the trial transcript?

A   Yes.

Q    Okay.  I'm going to direct you to Exhibit 183 of the testimony of Claude Ed McLemore.  Can you look at that page and tell me if it refreshes your recollection that photographs of Billie Allen in church and involved in church were introduced at the trial?

A    Yes.  What I'm saying is I -- I agree -- I -- I -- I do not remember this happening in trial, but I can read the transcript as well as anyone else.

Q    Do you dispute this transcript?

A    I can't understand you.

Q    Do you dispute the accuracy of this transcript?

A    No, not this transcript.  It's the other one.

Q    So you would agree that at trial, that there was photographs of Billie Allen in church introduced into evidence?

A    Yes.

Q    Now in that December, 1997 -- December 12th, 1997, interview, Mr. Allen told you in great detail about his Boy Scout activities.  Is that correct?

A    Yes.

Q    And that included ---

A    Well, wait; wait.  Let me correct that.  He told me in some detail about it.

Q    Did that detail uncover -- include where they met, who the Scout Master was, other Scouts who were involved in the

troop?

A    It included those items, yes.

Q    Did it also include a discussion of badges that he might or might not have earned?

A    Yes.

Q    In that interview, did -- of December 12th of 1997, you also sought information about Mr. Allen's illnesses.  Is that correct?

A    Yes.

Q    I'm directing you to 6 -- Exhibit 632.21.  In that, did you -- do you recall indicating that you were "trying to find or trying to look for some -- for as many people as I can who remember from the time that you were in Scouts about asthma limiting your activities"?  Do you recall that?

A    I do not recall it, but I mean I'm reading the document. I understand the document contains those words.

Q    Did you seek information about Mr. Allen's asthma and people who could testify to the effect asthma had on his life in that interview of December 12th, 1997?

A    I certainly believe I would have done that.

Q    Did you do that?

A    I believe I would have done it.  I can't go beyond that because I have no presence -- I have no present recollection of what happened because of the long passage of time between now and that meeting.

Q    Isn't it true that in that interview on December 12th of 1997 he told you about an asthma attack that was so severe at his sixth grade camp, that he had to go to the hospital?

A    I remember from my own notes something to the effect of a severe asthma attack.  When I was doing the transcription in the last month or so, I thought that that was something that had happened at the jail.

Q    Directing you to the bottom of Page 30 on Exhibit 632, would it refresh your recollection that Mr. Allen said, "We went out for sixth grade camp and I got really sick out there. I had an asthma attack at sixth grade camp.  That's when it was at Wydown, when they transferred to Wydown."

And moving to the next page, "I got sick at sixth grade camp and had to go to the hospital, you know, out there because I -- I wasn't -- I almost died out there.  I almost died, and I had to get -- I had to get a shot to stop my breathing so fast.  And me and a guy named Ahmed Oliver, he got sick, too, on the same day I got sick; Ahmed Oliver," and he spells it.  Is that right?

A    What this does refresh my recollection of is my own notes, and my own notes, which I recently transcribed, refreshed my recollection, but I do not acknowledge that this document refreshes my recollection of what occurred 14 to 15 years ago.

Q    Did Billie Allen tell you in the December 12th interview

that he had an asthma attack so severe at sixth grade camp that he had to go to the hospital?

A    As to the sixth grade camp timing, I do not remember.

Q    Does this -- Did Billie Allen give you the name of someone who could confirm that he had gotten sick at sixth grade camp?

A    I do remember that he gave me the name of Ahmed Oliver.

Q    And isn't it true that Ahmed Oliver testified at trial concerning Billie Allen's problems with asthma and that trip to the hospital?

A    That, sitting here today, I don't remember.

Q    I'm showing you what's been -- what is Government's or the Exhibit 187, Page 29 of the exhibit, the testimony of Ahmed Oliver.  Does the transcript read -- Mr. Oliver states: "We were in sixth grade camp.  Both of us had gotten sick.  I had lost my asthma inhaler, and Bill was breathing real, you know, he was having a hard time breathing, so they had to take him to the hospital"?

A    That -- I'm not denying that that's what the transcript says.

Q    Does that refresh your recollection that Mr. Oliver actually testified at trial concerning Mr. Allen's problems with asthma?

A    As to the testimony, yes.  As to my hearing it, no.

Q    It refreshes your recollection that the testimony

actually occurred.

A     Yes.

Q     Is that right?

A     Yes.  Yes.

Q     Okay.  So information that you were told by Mr. Allen in that December 12th interview was presented in the mitigation portion of the trial.  Is that correct?

A     After I had presented it to the new mitigation investigator.

Q     And information that you had obtained concerning Billie Allen's involvement in church was presented through photographs in the mitigation portion of the trial.  Is that correct?

A     Yes, after I presented the underlying premises to the new mitigation investigator.

Q     And Mr. Allen also told you in that December 12th, 1997, interview about being on a softball team that was coached by Sam Moore.  Is that correct?

A     I have a recollection of that based on my recent transcription of my own notes.

Q     And is that a positive recollection --

A     Yes.

Q     -- that he did, in fact, tell you about Sam Moore and playing on the softball team?

A     Based on notes that I recognize as my own, I -- that -- I

can say that that did happen, that I was told that.

Q    And he gave you the name and contact information for Mr. Moore.  Is that correct?

A    Without seeing my own notes, I can't answer about the contact information, but I do remember -- I can answer positively about the name.

Q    Referring you to Exhibit 632, Page 23, does that indicate that Mr. Allen told you the contact information for Mr. Moore?

A    That is what this transcript says.

Q    And did -- Does it also indicate that Mr. Allen said, "You can call my mom.  My mom knows it," referring to the number by heart?  "She knows it."

A    That is what this document says.

Q    Is that consistent with Mister -- your memory of Mr. Allen telling you about the softball team and providing contact information for Mr. Moore?

A    It's consistent with my recollection of transcribing my own notes of the same meeting.

Q    So that would be a "yes"?

A    It would be "yes" to the substance but not to the exhibit.

Q    I'm asking you about the substance.  So Mr. Allen told you about Mr. Moore, his softball coach, and provided contact information for him, correct?

A    I would have to see my own notes before answering about

the contact information.

Q    But Mr. Allen told you about Sam Moore.  You can say that.

A    Yes.  Yes, I've already said he told me about Sam Moore. I'm simply trying to be accurate and honest in giving my answers.

Q    And in that December 12th, 1997, interview, Billie Allen told you that his mother wanted him to stay with that softball team because the coach helped keep kids out of trouble.  Is that correct?

A    I certainly have no recollection of that.

Q    Would it refresh your memory if I show you what is Exhibit 632.25 which states that Mr. Allen said, "She made sure that's one place I always stayed because that -- that's where like kept black kids out of trouble for real, man.  The coach was so good with everybody.  I mean he made sure we did all kind of things; went -- went, you know, to the park, you know, did all kinds of stuff."

       Does that refresh your recollection that Mr. Allen told you that his mom wanted him to stay with the softball team because it kept kids out of trouble?

A    No.

Q    Is that consistent with what the Defendant had told you concerning the softball team and his mother?

A    Did that question end with "his mother"?

Q    Yes.

A    No, I have no recollection of that.

Q    Okay.  So you have no recollection at all as to his mom's involvement with the softball team.

A    That's correct.

Q    Mr. Moore, Mr. Sam Moore testified at trial concerning Mr. Allen's participation in that team, didn't he?

A    Sitting here today, I don't remember, but I think he did. I mean I -- I -- I would say that my recollection is that there was a greater than 50 percent probability that he did, but I cannot -- I did not memorize the trial transcript.

Q    So you believe there's a greater than 50 percent possibility that Mr. Moore testified concerning his participation -- Billie Allen's participation in that softball team that Mr. Moore had.

A    Yes.

Q    In that December 12th interview -- of 1997 interview, Mr. Allen told you that Johnnie Grant was his best friend.  Is that correct?

A    At that level of detail, I -- I -- I would have to see my own notes.  It is not inconsistent -- it is not inconsistent with my general recollection.  I know that Johnnie Grant was a friend of Mr. Allen's, and I probably learned that from Mr. Allen.  What I am concerned about are the specific words, but that's not inconsistent with my recollection.

Q    I'm going to show you what is Exhibit 632, Page 25.  It's on the screen right now.  Would it refresh your recollection that Mr. Allen told you, "Friends who are on the team, my best friend because of that is a guy named Johnnie Grant.  That's how we got real close friends because of that, because of baseball.  We played on the same team.  He was like the -- just the all star of the team, and I was the bomb of the team, and you know."

Does that refresh your recollection that Mr. Allen told you in that December 12th interview that Johnnie Grant was his best friend?

A    I believe that my recent transcription of my own notes is consistent with that, and that transcription occurred in the last month.  And on that basis, I -- I can generally agree with this, but I would need to see my own notes to answer that definitively.

Q    Mr. Allen in that interview told you that the teachers at his school liked him.  Is that correct?

A    That -- That is my recollection.

Q    Do you recall him giving you the name of "Joyce Eaton" as a teacher that he was close to and who he did artwork for?

A    My -- My recent transcription of my own notes refreshed my recollection of Ms. Eaton's name, and so the statement is substantially correct; your statement.

Q    And do you recall or isn't it true that he told you that

he liked his classes and teachers in the Clayton School District?  Is that correct?

A    On the same basis, yes.

Q    And isn't it true that Ms. Eaton, as well as several other -- approximately seven other teachers, testified in the mitigation portion of Billie Allen's trial?

A    Yes.  That is true.

Q    Now Billie Allen told you that his father did not beat his mother or the children.  Isn't that true?

A    Yes.

Q    And he told you that he had a good childhood.  Is that correct?

A    I have a vague recollection to that effect.

Q    He told you that he had people who cared for him.  Is that correct?

A    I don't remember those specific words, but if it's in my notes, my own notes, then that's what happened.  That's what was said.

Q    I'm going to play 630, starting at 440 and ending at 639 -- 638 -- I'm sorry -- and ask you to listen to the following and then I'll have some questions about it.

        (Ms. Costantin played the audio recording referred to.)

        THE COURT:  Could you play that very first part of the transcript?  I was trying to take notes --

MS. COSTANTIN: Absolutely, Judge.

THE COURT: -- and I didn't get it.

(Ms. Costantin played the audio recording referred to.)

THE COURT: Okay. That's good.

MS. COSTANTIN: Okay.

THE COURT: Just a second. Let me catch up here.

MS. COSTANTIN: Okay.

(Pause)

Q   (By Ms. Costantin) So does this refresh your recollection that Mr. Allen told you that he had a good childhood and people who cared for him?

A   No.

Q   Do you recognize your voice on that transcript -- on that tape?

A   I recognize someone's speech that sounds like me, but as I testified in the deposition, one person can sound like another. And I am simply -- My recollection is that I recently transcribed many of these same pages of my own notes, and I defer to them and to the life history as to what actually occurred in the meeting because I do not have a present recollection of what occurred in the meeting, and I do not have faith in the audio production that was just tendered to the Court.

Q   Is that your voice? Yes, no, or I don't know?

A    I don't know.

Q    Is that Mr. Allen's voice?  Yes, no, or I don't know?

A    I don't know.

Q    Does that transcript refresh your recollection in any way that Mr. Allen told you that he had people who cared for him?

A    No.

Q    Does it -- But you've already testified that you recall that Mr. Allen told you he had a good childhood.  Is that right?

A    I think that he said something to that effect.  I -- I know that faking good was in his modus operandi at that time.

Q    I'm asking you a simple question.  Did Billie Allen tell you that he had a good childhood?

A    I believe he said something to that effect.

Q    Did Billie Allen tell that you his uncles helped to keep him out of trouble and to say stay positive?

A    I think so.

Q    Do you recall Raymond Petty, his uncle, testifying at trial that he tried to be a role model for Billie Allen and that he was involved in Boy Scouts with Billie Allen?

A    Yes.

Q    Billie Allen told you that he had left the Clayton School District when his sister Nicole left Clayton and went back to the city schools.  Is that correct?

A    Yes.  That's what my notes indicate.

Q    And Mr. Allen told you that when he got back to Sumner, he was ahead of the students there and had lost interest in school.  Isn't that what he told you?

A    Certainly the first part, that he was ahead; that the materials that were being covered in his classes at Sumner were more elementary than he had already covered.  As to the general proposition that he had lost interest in school, I don't have a present recollection.

Q    I'm showing you what is Exhibit 633, Page 7.  It states, Mr. Allen said, "Because I was -- When I was at Sumner, I was ahead of the students.  I was always ahead of the students because I knew things that they were already doing and, therefore, I started losing interest in the class because you know how the teacher just blabs and blabs on, you know."

     Does that refresh your recollection that Mr. Allen told you that he lost interest in school because he was ahead of the other students at Sumner?

A    First of all, you're aware of my foundational objection to this text.  However, taking the text as I see it on the screen, it doesn't say that he lost interest in school.  He says that he lost interest in one unspecified class, but there's more to going to school than any one class.  It would be equally consistent with this text to say that he was very interested in some extracurricular activity or in girls or in some program at school other than the class that he's

referring to.

Q    Did he tell you ---

A    It is used in the singular.  It is used in the singular.

Q    Did he -- Well, you dispute the accuracy of this, correct?

A    I -- I dispute the foundation of the transcript and of the audio production on the basis of which it is based.  I am not saying that everything in it is wrong.  Some of it --

Q    Did Billie Allen ---

A    Some of it would have to be correct in order for it to pass for the authentic thing.

Q    Mr. Simon, I'm not asking you for legal rulings and your legal objections.  You're a witness in this case.  Is that correct?

A    And sworn to tell the whole truth which includes what I learned in evidence law from the Honorable Ralph Winter of the Second Circuit.

Q    And so it's your testimony today that it's part of your role here to educate us on evidence law?

A    For me to tell the truth about a document, to evaluate the document, I have to evaluate it as a lawyer and not just as someone you pull in off the street.  I mean we have laws to determine what happened in the past.  We have laws of evidence, and you're saying that this is right, and I'm saying that I know what's legal, --

Q     Mr. Simon, what I'm asking you ---

A     -- not what's right.

Q     Mr. Simon, what I'm asking you is:  Did Billie Allen tell you he lost interest in school because he was ahead of the other students?  And you responded by referring me to a transcript that you dispute the accuracy of.  I'm asking you a simple question.

A     Well, wait, wait, wait.  Let's back up.

Q     Did Mr. Allen ask you or tell you that he lost interest in school because he was ahead of the other students?

A     I would assent to general proposition.

Q     Okay.  And Mr. Allen told you that he had two friends, Dennis Noble and a Neiman who had been killed, didn't he?

I'm not referring you to any transcript.  I'm simply asking you:  Didn't Mr. Allen tell you that he had two friends, Dennis Noble and a man named Neiman or Me'Man who had been killed?

A     As to Dennis Noble, the answer is definitely yes.  As to Neiman, I recently transcribed my own notes.  And if you could put them up, I could give you a definitive answer.  Indeed, that would be true of all of these situations that you're putting -- in which you're putting up a transcript of your audio production as opposed to the notes that I took and then transcribed for you.

Q     Mr. Simon, I'm asking you to answer these questions to

the best of your memory.

A    To the best to my memory, I remember no one by the name of "Neiman," but my notes might indicate that there was a Neiman.

Q    And I'm going to show you an Exhibit 633.11.  Does that reflect that Mr. Allen stated that he had "two friends got killed within that time, like when I was going to school, a guy named Dennis Noble and a guy named Neiman.  That's what I know him as, Neiman.  His mom -- His mom and my mom were kind of, you know, real close, and she managed a softball team from a long, long time ago.  I forgot how old I was."

Does that refresh your recollection that he indicated that two people, a Dennis Noble and another individual named "Neiman" or "Me'Man," had been killed?

A    Well, I remembered that there were two people and one of them was Dennis Noble.  What I'm sticking on is "Neiman," and I'm simply asking to see my own notes.

Q    I'm going to hand you what's been marked as Exhibit 499.  You want to review those?

THE COURT:  What is 499?

MS. COSTANTIN:  Exhibit 499.

THE COURT:  No.  What is 499?

MS. COSTANTIN:  I'm sorry, Judge.  That's copies of Mr. Simon's notes.

A    For everyone's convenience, I would ask if you have a BA

number corresponding ---

Q    No, Mr. Simon, I do not.

A    I can't understand you.

Q    I do not have a BA number, Mr. Simon.  You were the one who requested the notes, and I am now providing them to you.

(Pause)

THE WITNESS:  Your Honor, I have found the portion of the notes that I believe relate to this meeting.

THE COURT:  Okay.

Q    (By Ms. Costantin)  And does that indicate that Mr. Allen told you that he had two friends killed, Dennis Noble and a guy named Neiman or Me'Man?

A    I haven't gotten to that page yet.  I just wanted to report that I have -- have gotten to what I believe is that part of the record.

THE WITNESS:  Your Honor, please excuse me.

THE COURT:  Yes, sir.

THE WITNESS:  It's been difficult to find these in the condition they were in, but I have now located BA-5528.

THE COURT:  Okay.

A    And there's a notation in the next to last paragraph of the notes, "two" -- that's Arabic -- "two friends," Dennis Noble and then Me'Man, M-e-(')-M-a-n.  "His mom and mine were close."  So my -- Less there be any doubt, my initial failure, if that's the right word, to corroborate the

video -- the audio product and the resulting transcript is that my notes show something other than Me'Man.

Q    Mr. Simon, my question is:  Did Billie Allen tell you -- And my question before was:  Did Billie Allen tell you that two friends were killed of his, Dennis Noble and a guy named "Neiman" or "Me'Man"?  That was my question; that is my question.  Did Billie Allen tell you ---

A    You used the second name the first time you asked it?

Q    Yes.  Yes, I did, Mr. Simon.

A    I -- Now that I see my own notes, I can answer "yes."

Q    And was a possible mitigation theme discussed or considered that several people close to Billie Allen had been killed?

A    That was one of the first things Dr. Randall brought to our attention.

Q    Was that one of the possible themes that was considered, --

A    Yes.

Q    -- that several people close to Billie Allen had been killed?

A    Again, yes.

Q    And that was for mitigation.  Is that correct?

A    Yes.

Q    Do you recall Mr. Allen telling you about the trauma of Marquis Taylor's death?

A     Yes.

Q     I'm going to play 630-A.  It's Transcript 633, Pages 24 to 25.

MS. CARLYLE:  What's the time?

MS. COSTANTIN:  I'm sorry.  The time is 4218 to 43 ---

THE COURT:  The time is what?

MS. COSTANTIN:  I'm sorry.  The time is 4218 to 4359.

(Ms. Costantin played the audio recording referred to.)

Q     (By Ms. Costantin)  Do you recall Mr. Allen telling you that since Marquis Taylor's death, he hadn't been right since?

A     Yes, I remember the general gist of that.

Q     And Marquis' death had a profound effect on Mr. Allen, according to Mr. Allen.  Is that fair to say?

A     Yes.

Q     And, in fact, many witnesses testified at trial about that significant effect that Marquis' death had on Billie.  Is that correct?

A     That's my recollection.

Q     And Dr. Cuneo testified that Mr. Allen suffered from PTSD because of the profound effect that Mr. Taylor's death had on him.  Is that right?

A     In conjunction with the previous deaths.  Dr. Cuneo -- Neither Dr. Cuneo, nor the defense team, including

Dr. Randall, pegged the post-traumatic stress disorder on the death of one individual but on the concatenation of deaths.

Q    So that would have been the death of Me'Man, ---

A    Dennis Noble, Me'Man and Marquis Taylor.  And those were not the only deaths that occurred within Billie Allen's knowledge and -- of people close to him, physically or personally.

Q    So -- And that was evidence that was put on at trial.  Is that correct?

A    Yes.

Q    And those were items concerning Mr. Noble's death, Me'Man's death, and Mr. Taylor's death that Billie Allen told you about on December 12th of 1997.  Is that correct?

A    I'm sorry.  The question was?

Q    The question was:  Mr. Noble's death, Me'Man's death, and Mr. Taylor's death, those were all incidents that Mr. Allen told you about on December 12th of '97 when you interviewed him.  Is that correct?

A    Me'Man -- Me'Man is the second person.  Yes.

Q    "Yes" as to he told you about all of those deaths in that interview, correct?

A    Ma'am, I'm trying to make a distinction between saying "yes," which is what I would like to do, and correcting the name of the second person.

Q    And I'm saying Me'Man.

A    I'm sorry?

Q    I said Me'Man.  My question is simply:  Mr. Allen told you during that December 12th, 1997, interview about the death of Dennis Noble, the death of Me'Man, and the death of Marquis Taylor, correct?

A    Yes.

Q    And there was later testimony at trial concerning those deaths.  Is that correct?

A    After I presented this information to the mitigation investigator, yes.

Q    Was there testimony at trial concerning those deaths?

A    Yes, though the transcript is the best evidence.

Q    Did Billie Allen tell you that he had had girl friends throughout his life?

A    Yes.

Q    Now when you're doing this interview with Mr. Allen on December 12th of 1997, is it fair to say that you're working your way through that mitigation worksheet or checklist?

A    Checklist, yes.

Q    Excuse me; the mitigation checklist.

A    Yes.

Q    And in that interview in December, he told you that he used marijuana only.  Is that correct?

A    That's my recollection both from my own notes and I -- I -- The short answer is:  Yes.

Q    And you questioned him during that December interview about his employment history, didn't you?

A    Yes.

Q    And he indicated to you that he had had numerous short-term jobs.  Is that correct?

A    Yes.

Q    Did he also tell you that he had a job at Chemisco that he had left for medical reasons?  Do you recall that?

A    I -- I recall distinctly that he told me he had a job at Chemisco.  As of this moment, I don't remember what the reasons for leaving that he gave me were.  I was more concerned with the potential causal relationship between his employment at a chemical plant and neurological disorders that I personally was incompetent to evaluate.

Q    So you learned he worked at a chemical plant, and that made you think that perhaps there was some sort of causal relationship between that and what?

A    Brain damage per the mitigation checklist.

Q    So you were alerted to the fact that that was a potential issue by that checklist.  Is that correct?

A    Yes, ma'am.

Q    Do you -- Looking at Exhibit 634, does it refresh your recollection that Mr. Allen indicated that he basically left Chemisco for medical reasons?

A    That is certainly -- Well, here's a good example --

Q    Mr. Simon, I'm asking ---

A    -- BA-5534.

Q    Mr. Simon, I'm asking a simple question.

THE COURT:  Hey, wait, wait, wait.  You asked a question.  Let him finish, and then you can reask the question.

MS. COSTANTIN:  Okay.  Thanks, Judge.

A    "Chemisco, I walked out on them because my asthma acted up."  Sounds like a medical reason.  So I'll answer "yes," but this doesn't help me a bit.

Q    (By Ms. Costantin)  So the transcript that's been admitted into evidence without objection does not help you in the least as to your interview on December 12th of 1997?

A    I have BA-5534 in front of me that states the same general proposition but uses substantially different words.

Q    Mr. Simon, my question is:  Are you aware that the transcript has been admitted without objection?

A    Yes.

Q    Does the transcript refresh your recollection that Mister -- Mr. Allen left Chemisco for medical reasons?

A    No.

Q    I ask you to assume for the purpose of the question that the transcript is accurate since it has, in fact, been admitted into evidence.  Given that, does the transcript refresh your recollection that Mr. Allen left Chemisco for

medical reasons?

A   No, because BA-5534 has already refreshed my recollection, and there is no foundational problem with it because I recognize it as my own handwriting.

Q   Mr. Simon, you're a witness in this case, and the evidence has been admitted; the transcript has been admitted. Is that correct?

A   Yes.

Q   I will refer to the transcript in the future and ask you questions concerning it.  It is not my concern about your evidentiary objections.  Mr. Allen's in trial here.  He has attorneys to represent him and a Court to help protect those rights.  So please answer my question without constantly referring to your concerns about an exhibit that has already been admitted.

A   Which part of "whole truth" don't you understand?

THE COURT:  No; wait.  Yeah, we're not here -- We're not getting anywhere.  Just ask the question, and let him do whatever he wants to do and we'll go from there.  Neither of you are going to make any progress with the other on this, and so there's no point in talking about it further.  Go ahead.

Q   (By Ms. Costantin)  At trial did Dr. Gelbort testify that Billie Allen was exposed to chemicals with toxic properties based on the employment that he had?

A   I believe so.

Q   Billie Allen told you that he had worked as a drug mule delivering packages of drugs, didn't he?

A   I know that he told me he was mixed up in drugs, including selling them.  I don't remember the exact -- I don't remember the term "mule" being used, but it may have been used.  I'm not denying it.  I'm not affirming it.

Q   Do you recall that he told you that he delivered a package for $4000?

A   I remember -- I remember a statement to that effect based on my recent transcription of my own notes, yes.

Q   Referring you to Exhibit 635, Page 5, assuming for the purpose of my question the accuracy of this transcript, does it indicate that Mr. Allen said, "I" -- "He had a little package for somebody, you know, and I dropped something off. I don't know what it was.  I didn't look in it.  Someone just said, 'Drop this off,' so I dropped it off; $4000.  If it was $4000, all -- all I was thinking about was getting my tape done.  I wasn't really tripping off of it."

        Do you recall -- Does that refresh your recollection?

A   No.

Q   Do you recall him telling you that he took it to -- that package for $4000 to an address at Euclid and Delmar?

A   No.

Q   When you completed the life history of Billie Allen, isn't it true that you did not put in any information about

Billie Allen delivering a package for $4000?

A    If the document doesn't include that, then the answer is, yes, I did not put it in.

Q    Well, let's look through that document.  Is 303 your life history?

A    Yes.

Q    Tell me when to turn the page.  My question is:  Is there anything that you put in the life history about Billie Allen delivering a package for $4000?

A    I'm -- I'm trying to turn the pages.

Q    No; I'll turn the pages.  You just tell me.  We're on Page 2 now.

A    Next.  Next.  Next.  Next.  Next.  Next.  Next.  Next. Next.  Next.  Next.  Next.  Next.  I agree that the 14-page document does not contain a reference to that -- to that package.

Q    And information that Billie Allen was working as a drug mule would not have been helpful to mitigation, would it?

A    Well, it would have been necessary for the mitigation case for the reasons stated after the fact of *Rompilla*.

Q    Would you have presented evidence that Billie Allen worked as a drug mule in your mitigation case?

A    If I had been formulating a mitigation case with an expert, I would have wanted the expert to know about that because there are many things that people who have a distinct

ideological bias on one side see as mitigating that the other side would see as aggravating and vice versa.

Q   So that was important to have that in there.

A   Oh, yes, it was important -- very important to have that in there.

Q   But you didn't put it in there.

A   That's right.  First time I'd ever done it.  What do you expect?

Q   And that would have been useful in your mind to mitigation evidence?

A   Yes, ma'am.

Q   It would have been helpful to Billie's mitigation case.

A   Well now, wait.  Let's -- Let's be -- Let's make a distinction here.  I'm not saying that putting on a witness just in isolation to say that Mr. Allen was a drug mule would help his case.  What I'm saying is that's the kind of information that needed to go to a mitigation specialist so that they could possibly combine that with something else to make something mitigating out of it.  And then the second reason and the more important reason was that developed after the fact of *Rompilla*; that someone who is preparing a penalty phase has to know what's coming in terms of aggravation.

Q   Was the information that Billie Allen was a drug mule positive information for his mitigation case?

A   No.

Q   Billie Allen ---

A   Standing alone.

Q   Was evidence that Billie Allen was a drug mule presented in his mitigation case?

A   Sitting here right now, I don't remember.

Q   Billie Allen told you in that December 12th interview that he was working on rap music with a producer named "Flexx," and he told you where Flexx was located, didn't he?

A   Yes.

Q   And you later tracked down that location and found out that Flexx had since moved to Atlanta.  Is that right?

A   I don't remember the exact date, but I distinctly remember having followed up on that because music, along with Scouting and church, was about all that I had going into this where I -- I believed that I could relate to Mr. Allen at an operational level.

Q   Referring you to your life history, Exhibit 303, Page 9, Footnote 10, does it indicate that you learned that Wilson Hankins, who is apparently "Flexx," has moved to Atlanta to join the crew of Baby Face and that Hankins is a sound mixer?

A   Yes, ma'am.  And that document refreshes my recollection as to that fact.

Q   So you did, in fact, track down that information that Mr. Allen gave you and found out that Flexx had moved to

Atlanta.

A   Yes, ma'am.

Q   And Billie Allen also told you in that interview of December 12th that Ahmed Oliver had been working with his group, Unlawful Entry, to make a rap tape.  Is that correct?

A   That's my recollection based on my recent transcription.

Q   And Ahmed Oliver did testify at trial that he had worked as a producer.  Is that right?

A   I believe so, deferring to the transcript for the exact words.

Q   And Mr. Oliver also testified that he had been working with Billie Allen, putting together music in the studio.  Is that correct?

A   I -- I believe so, yes.

Q   Now Mr. Allen told you that he had moved out of his mother's house in January of 1997 and not been thrown out by his mother because he didn't want to bring trouble to the house.  Is that correct?

A   That's -- I don't remember who said what to whom, but that is certainly one of the explanations for why he left. And who said what to whom and when, I -- I ---

Q   Referring you to your deposition, Exhibit 533, Page 157, do you recall being asked the question:  "Now that we've looked at it, do you recall that he told you he left home before the shooting because he didn't want to bring trouble to

the house?"

And your answer was: "Yes. I remember that explanation of why he wasn't living at home. That's independently of those documents."

A   Yes, and that's -- that is correct. I'm just trying to be precise about who said what to whom and when.

Q   And Billie said to you that he left house -- the house before the shooting and did not get kicked out. Is that correct?

A   If -- If that's the context of this comment, yes. I -- I -- I certainly know that I was told that by Billie Allen at some time. Whether he changed or not, I -- I -- I just don't remember. But if the statement in the deposition is correct and the general statement, regardless of whether it's written down, is correct, I simply don't remember who said what to whom and when.

Q   The general statement that Billie Allen told you that he moved out and his mother did not throw him out, is that what you're saying? Is that correct?

A   I know -- I know that he told me that on at least one occasion.

Q   And he also told you that, in fact, his mother had put out a Missing Person Report. Is that correct?

A   I recall that, yes.

Q   Now going back to your interview on December 12th of

1997, after the lunch break, do you recall telling

Billie Allen that if he had any changes to his answers from

the morning, that he -- now that he had more time to think

about it, that he should tell you that?  Is that correct?

A    Personally, I don't remember that, but that would have

been my modus operandi.

Q    I'm referring you to 634, bottom of Page 18, and then

we'll go to the top of Page 19.  I ask you to assume for the

purpose of this question that the transcript has been admitted

into evidence because it has and that it is accurate.  Do you

see it states, "Was there any point -- Was there anything

there that you can think of that we were talking about where,

having had a little break for lunch, you think that your

answer would be different now if you had more time to think

about it?"

          Do you recall or is that accurate that you would have

said that or you did, in fact, say that to him?

A    On the assumption on which the question is predicated, I

think that I said that.

Q    And, in fact, you told him that you weren't trying to

create a certain posture in the case.  Is that right?

A    This is going well beyond what I can recall.  I am

looking for my notes.

Q    Do you recall telling him that you want to know -- get

information from him?  You're just trying to figure out what

cards you have in the deck?

A   I -- I remember having seen that expression somewhere, and that is also consistent with -- with my recollection of what I was thinking.

Q   I'm going to show you -- It's 630-B, 2617 to 2718, and that's from Transcript Exhibit 634.  I'm going to play this for you and then I'm going to ask, first of all, if you recall.

        (Ms. Costantin played the audio recording referred to.)

Q   (By Ms. Costantin)  Do you recall, first of all, that exchange between yourself and Mr. Allen on December 12th of '97?

A   No.

Q   Is it consistent with what you would have told him or what you did tell him, that you wanted him to be forthcoming with you?

A   Yes.

Q   And that if he wanted to change any of his answers from the morning, that you're willing to hear that?

A   Yes, which was consistent with my practice in the Attorney General's Office.

Q   And do you recall that he indicated that he did not want to change any of those answers?

A   I -- I have no independent recollection of that.

Q   And listening to that tape does not refresh your recollection of that?

A   No, but I have no recollection.  When I say I have no recollection, I'm neither denying it or confirming it.  I simply don't recall.

Q   After you had that conversation with him, he became open with you concerning his actual drug dealing.  Is that correct?

A   I -- I don't remember the conversation well enough to be specific about the chronology, about the relationship.  I -- I do recall, and it is without having to look at anything.  I do recall that he talked to me candidly about activities that he knew -- I knew were unlawfully connected with drugs.

Q   Specifically, he told you that he had been dealing drugs.  Is that correct?

A   He told me that he had been dealing drugs, yes.

Q   And what kind of drugs was it that he told you he was dealing?

A   That, I don't remember.

Q   And he told you that the house had been shot up after a drug deal had gone bad.  Is that correct?

A   That's -- That's -- That's correct, yes.

Q   He told you he started dealing drugs because of the success of a drug house down the street from his house.  Is that correct?

A   I recall that from the recent transcription I prepared.

Q    And that he then began to -- Someone fronted him some drugs, and he then began to make money of his own.  Is that correct?

A    Yes; same answer.

Q    In light of that, I'm going to play 630-B which starts at 351 to 642 and ask you if you recall this conversation between you and Mr. Allen on December 12th of 1997.

(Ms. Costantin played the audio recording referred to.)

Q    (By Ms. Costantin)  Now do you recall Mr. Allen telling you that he had been selling crack for basically all the year of 1996?

A    I don't recall that, but I'm not surprised by that material.  That material that I had just heard is not inconsistent with my independent recollection.

Q    So it's consistent with your independent recollection that Mr. Allen was selling crack from -- for all of '96.

A    I -- I wouldn't be that specific.  It's consistent with my recollection that he was selling both marijuana and -- and hard drugs.

Q    And do you recall or isn't it true that he told you that he was dealing drugs while he was in school?

A    I don't recall that.

Q    Referring you to Exhibit 635, Page 6, would it refresh your recollection to see the admitted transcript that

states -- Your question: "Okay. You were dealing drugs when you were in school?"

And Mr. Allen answered: "Yeah, because I just come home, do my homework, go outside and make a little money and come back in."

A   I have no recollection of that exchange, but I am not going to sit here and deny it.

Q   Is it consistent with what you recall of your interview of the Defendant back in December, that he was dealing drugs while he was still in school?

A   Yes.

Q   You did not put anything about Mr. Allen's drug dealing in your life history. Is that correct?

A   That's correct.

Q   That information would have been quite helpful to the Government, is that correct, in mitigation?

A   Oh, yes. It -- It was necessary -- necessary for the defense. It would also have been helpful to the prosecution.

Q   And do you recall the defense making efforts to keep out evidence of any gang activity or drug dealing by Mr. Allen in the mitigation portion of the trial?

A   As to the -- As to the gang activity, I have a distinct recollection of that. There was a motion *in limine* to that effect. The motion was granted and subsequently violated.

Q   Do you recall it concerning the drug dealing?

A     No, I don't recall that either way.

Q     Do you recall evidence being put on by the defense concerning the fact that Mr. Allen lived in a gang-infested neighborhood?

A     Yes.

Q     And that was evidence put on by the defense, correct?

A     Yes.   The -- The Order -- the Order *in limine* related to gang activity on the part of Mr. Allen, not the presence of gangs in the environment he had to deal with.

Q     Did Mr. Allen talk to you or isn't it true that he had spoken to you in that December 12th interview about his admission to the Metropolitan St. Louis Psychiatric Center?

A     I know that he told me about an admission to a mental health facility.  I am -- I have no present recollection of the details of that, but that is certainly the kind of thing that should have been passed on to the mitigation investigator.  Indeed, by this time, it should have been discovered by the mitigation investigator rather than someone who is desperate because he wasn't receiving any mitigation investigation.

Q     Mr. Simon, I'm just asking a simple question.  And the question is simply:  Did he talk to you about his admission to the Metropolitan St. Louis Psychiatric Center in the December 12th interview?

A     Deferring to my own notes, I believe he did.

Q    And did he tell you that he was stressed out from the house being shot up?

A    That is certainly consistent with -- with my subjective recollection.

Q    And at trial there was some testimony concerning his visit to the Psychiatric Unit.  Is that correct?

A    I believe so, yes.

Q    Do you recall that both his girl friend, Tasha, and her mother testified about that admission in mitigation?

A    I -- I -- I believe so.

Q    And those records, the Metropolitan Psychiatric records, do you recall that those were provided to Dr. Cuneo and Dr. Gelbort for preparation -- review and preparation of their reports?

A    I have no personal recollection of that.  It would have been done by Dr. Randall.  But if I had had anything to say about it, they would have been provided, yes.

Q    Do you recall in their testimony any reference to them making to the Defendant's admission to the Metropolitan Psychiatric Center?

A    To making what?

Q    Any testimony about Mr. Allen's admission to the Metropolitan Psychiatric Center.

A    I -- I do not recall that right now.

Q    I want to go back to your timesheets.

MR. MORENO:  Which exhibit?

MS. COSTANTIN:  498.  I'm sorry.

Q    (By Ms. Costantin)  On January 7th of 1998 it indicates that you reviewed the mitigation workbook.  Is that correct?

A    Yes.

Q    And that's the workbook we're talking about that's tied back to that checklist, Exhibit 628.  Is that correct?

A    Yes.  And can you also show how little time I spent doing that?

Q    0.8?

A    Eight-tenths of an hour.

Q    Okay.  So you spent eight-tenths of an hour on January 7th reviewing the mitigation workbook.  Is that correct?

A    Yes, which is half-an-inch thick, both -- double-sided.

Q    Referring you to Exhibit 628, is that what you used to guide your interview with Mr. Allen on December 12th of 1997?

A    Yes.

Q    And after you interviewed Mr. Allen, did you then refer back to the mitigation workbook, these portions?

A    Not that I recall.  Specifically, I don't know if this came out the first time we covered it, but the bulk of the -- the bulk of the substance referred to by the Roman numerals and the letters, it's not text.  It's bibliography.  So first of all, I mean I do not have an eidetic memory, so I can't swear what each page of it is.  But my recollection of at

least this version of the mitigation workbook was that what those things cite the reader to are other things that need to be looked up which was beyond my professional competence to interpret.

Q   So your answer was:  You didn't refer back to those.  Is that -- Wasn't that what your answer was?

A   That's -- Yes, that's correct.

Q   Okay.  Moving on to your timesheets, 498, the sixth page, on January 7th you discussed case with witnesses.  Is that correct?

A   Yes.

Q   And did you -- You took handwritten notes of those interviews and meetings during the case in general.  Is that correct?

A   Yes.

Q   And in connection with this case, the 2255 case, you transcribed certain of those notes.  Is that right?

A   Yes, the ones requested by the prosecution.

Q   And I'm showing you Exhibit 500.  Are those the transcribed notes that you prepared --

A   Yes.

Q   -- of some of your handwritten notes?

A   Yes.

Q   And you took handwritten notes of that January 7th, 1998, meeting you had with witnesses.  Is that correct?

A    I'm sorry.  What -- What date was that again?

Q    January 7th, 1998, meeting with witnesses.

A    Yeah; yeah.  Wait, wait; just a minute.

Q    I'm referring to ---

THE WITNESS:  The reason -- The reason I'm taking time, Your Honor, is that I'm finding the notes.

THE COURT:  That's okay.

Q    (By Ms. Costantin)  And the notes are up on the screen, so you can look at that.  I'm showing you Exhibit 499.455.

THE COURT:  499. ---

MS. COSTANTIN:  .455.

THE COURT:  Okay.

Q    (By Ms. Costantin)  Is that the first page of the handwritten notes that you took of that January 7th, 1998, meeting?

A    Yes.

Q    And I'm going to page down through those.  Are those the notes of -- your handwritten notes from that January 7th, 1998, meeting?

A    Yes.

Q    Now I'm going to go to 500.58.  Is that the first page of your transcription of those handwritten notes?

A    It -- Yes.  Now it's what I -- This -- This was from what I was assigned to transcribe.

Q    Okay.  And that's what I'm asking you.

A    Yes.

Q    Does that Page 58 of that reflect, halfway down the page, start of your transcription of trip to 4535 Cote Brilliante, 1-7-98?

A    Yes.

Q    And these are the next pages, correct, of your transcribed notes?

A    As -- As long as I received a page of handwritten notes to transcribe, I transcribed it in this document.

MR. MORENO:  Your Honor, can I ask for a clarification?

MS. COSTANTIN:  Sure.

MR. MORENO:  The events you're talking about, they're not all from the January 8th interview.

MS. COSTANTIN:  What I'm showing right now is January 7th.  I'm not going passed January 7th.

MR. MORENO:  Thank you.

Q    (By Ms. Costantin)  And on that day -- Just to clarify, on January 7th, 1998, you went to 4535 Cote Brilliante to talk to some witnesses.  Is that correct?

A    Yes.

Q    And that's the Defendant's residence?

A    I -- I -- I believe so, but I did not commit that street address to memory at least well enough that I remember it now.

Q    Do you recall going to Juanita Allen's house on January

7th of 1998?

A     Yes.

Q     Did you prepare a diagram of the people that you met with that day?

A     Yes.

Q     And is that what Government's Exhibit or -- I'm sorry -- Exhibit 499.371 is?

A     Yes.

Q     So who does that indicate you met with that day?

A     "Mama" would be Ms. Juanita Allen.  Ruffin would be Deborah Allen -- Deborah Ruffin.  "Grandpa" would be Otha Petty, Sr.  The -- The character "Y." in parentheses, that indicates to me that I thought it was Yvette, but at this point I did not know the family members well enough to be sure that it was Yvette.  That's what I believe I meant to indicate by the parentheses.

Q     And "Yvette" would be Yvette Allen, Mr. Allen's sister?

A     Yes, ma'am, Mr. Allen's sister.

Q     Okay.  And that last person?

A     I draw a complete blank on that, the last person.  I do not know who "Oreo" was.

Q     Now for clarity, I'm going to refer to your transcribed notes concerning that meeting on January 7th of 1998.  You met with them at approximately 9:00 in the morning.  Is that correct?

A    I don't know whether that was 9:00 AM or 9:00 PM.  I believe that my timesheets would show that I met with Mr. Allen that same day in which case it would be more likely that I met with them at 9:00 PM rather than 9:00 AM.

Q    So you believe that you actually -- Well, take a look at that and see if that indicates one way or the other whether you believe you met with Mr. Allen before or after that.

THE COURT:  When you say "that," you have up on the screen the CJA voucher?

MS. COSTANTIN:  I'm sorry.  Yes.  I'm sorry, Judge.  I'm referring to Exhibit 498.

A    I -- I would now change my opinion because I see that the contact with the Franklin County Jail was a telephone call to set up a visit with -- with Mr. Allen.  Consequently -- Well, no; wait; wait.

First of all, this is -- this is one thing that, in spite of the passage of time, I have some recollection about, and I think it was after dark.  I think it was 9:00 PM.  Keep in mind that I -- I would -- Here we have, "Interview client on mitigation issues, 3.1 hours.  Drive from English Monaco to Franklin County Jail."  The time would be somewhere else, but I will assure you that that's a substantial drive.  I think the meeting with the family had to be at 9:00 PM.

Q    And that meeting with the family was with Otha Petty, Deborah Ruffin, Juanita Allen, perhaps Yvette Allen.

A    Well, probably -- probably Yvette Allen.  It was certainly either Yvette or -- or her sister, yes.

Q    And then someone you're not sure.

A    Sure; someone that I draw a complete blank on.  They would not have been introduced to me as a family member or else I would have noted that.

Q    And at that meeting Juanita Allen told you, "Bill don't come from bad environment."  Is that correct?

A    That's what my notes indicate.

Q    And is that what she told you?

A    Oh, yes; yeah, yeah.  There's -- I mean I -- I have no question about these documents.  I mean, please, keep in mind that we're talking about a very narrow problem here.  These, I don't have any problem with this.  If it's in those notes, then that's what I was told.

Q    And Juanita Allen told you that she didn't drink while carrying Bill.  Is that correct?

A    That's right, and didn't smoke while carrying Bill.  That's the function of the quotation marks.

Q    To be clear, she said she did smoke while she was carrying Bill.

A    Oh, I'm sorry, did.  Yeah, did.  Did not -- Did not drink; did smoke.

Q    And at that meeting she indicated, "You're looking for something extremely negative.  There is no complete diagram

for any situation," didn't she?

A    That's what my notes say, yes.

THE COURT:  Okay.  Just a minute.

(Pause)

THE COURT:  Okay.

Q    (By Ms. Costantin)  You've stated previously that that day in that meeting you noticed an odor of alcoholic beverages in the room.  Is that correct?

A    Yes.

Q    But you were unable to tie it to any specific person.  Is that correct?

A    The odor I was not able to tie to any specific person.

Q    That is correct?

A    That's correct.  I could not tie the odor to any one specific person.

Q    However, you stated that based on your observations of Ms. Allen's speech that day, you believe she was impaired that day due to alcohol.  Is that correct?

A    That is correct.

Q    Is it correct that you don't recall any other time that you believed she was impaired in your contacts with her?  Isn't that true?

A    I -- I have no recollection of any other time, but I have a very clear and distinct recollection of that one time.

Q    Okay.  So -- And that's all it is is one time.  Is that

correct?

A   It was only the time she was meeting with her son's lawyer for the first time when he was on trial for his life.

Q   You observed that you believed she was impaired during the one time that you saw her.  Is that correct?

A   Yes.

Q   Okay.  And approximately how many times do you believe you interacted with Ms. Allen in person?

A   Four or five.

Q   You didn't see her in the courtroom?

A   Oh, oh.  But that includes in the courtroom.

Q   Did you talk to her on the phone?

A   I -- I probably did, but it would have been a small number.  I'm -- I'm still thinking to -- If it's -- If it's not four or five, it would only be a marginally larger quantity than that.

Q   And on January 7th of 1998, you interviewed Billie Allen at the Franklin County Jail again on mitigation issues.  Is that correct?

A   That's -- Yes.  Yes.

Q   And that's specifically looking at 498.7, the seventh page of your timesheets.  That's how you described your contact with Mr. Allen that day; that you interviewed him on mitigation issues.  Is that correct?

A   Yes.

Q    And once again, you had that mitigation checklist with you, correct?

A    If -- If that's what my notes indicate, then I did.  It -- It -- Because I had no background for doing it, I would have been using that as a crutch regardless of the specific purpose of the visit.

Q    And in that mitigation checklist, one of the things I'm showing you, 628, the third page, one of the issues is parent profile; if they're an alcoholic.  Is that right?

A    Yes.

Q    Now that January 7th, 1998, interview was taped.  Is that correct?

A    I -- I believe so.

Q    We already looked at that tape earlier today, 630-C.

A    Well, I don't remember the number, but I do believe that I taped it.

Q    And that's the one that has handwritten on it January 7th, '98, No. 2.

A    I remember having seen that object.

Q    And do you remember this handwritten No. 2?

A    I believe we're talking about the same object.

Q    And it's your practice or your recollection of your practice that if you had written No. 2, there would be a No. 1.

A    That's certainly my perception.

Q    And you have no knowledge as to where a No. 1 is.  Is that correct?

A    That's correct.  My -- My recollection is that I gathered everything that I could find and sent -- and drove them to 2255 co-counsel in Indiana, Mr. Joe Cleary, as soon as the Supreme Court of the United States denied our petition for rehearing on the second certiorari petition.

Q    And did you tell -- On January 7th of 1998, do you recall telling Mr. Allen that you wanted to finish going through the checklist?

A    That is -- That is certainly -- That certainly makes sense.  I -- I personally don't remember having said that, but it would have been my intention.

Q    And the checklist you would be referring to or that we're referring to is the mitigation checklist, correct?

A    Oh, yes.  That -- That I'm confident of.

Q    And you took handwritten notes of those -- that interview with Billie Allen on January 7th.  Is that correct?

A    Yes, ma'am.

Q    Now we've already established we have a No. 2 tape and we don't appear to have a No. 1 tape.  Is that right?

A    Yes.

Q    So do some of those handwritten notes cover times that are not covered by a tape?  Do you know?

A    Yes, ma'am.

Q   And I want to refer you to, first of all, your handwritten notes.  I'm showing Exhibit 499.403, and it goes all the way to 417.  Are those your handwritten notes of your interview of Billie Allen on January 7th of 1998?

A   Yes.  Yes, ma'am.

Q   And to make it easier, did you transcribe those notes?  Referring you to the very bottom.

A   Yes.  Based on seeing the bottom of Page 48 of my recent transcription, I would say yes.

Q   And that recent transcription would have covered in regards to the interview on January 7th of 1998, Exhibit 548, and I'm working through ---

A   Yes.  I -- I -- I recognize that, and I recently prepared that.

Q   Okay.  Now referring you to 549, Billie Allen told you that his father still drinks vodka, playing a lot of times, and he's drunk from the way he walked.  Is that correct?

A   That's correct.

Q   And he told you that his family or his mom and his sisters moved out on his father when he was 8 or 9, still in elementary school.  Is that correct?

A   Yes.

Q   And he described for you a situation in which he had some sort of head trauma?  Is that right?

A   Yes.

Q    Specifically, he told you that he had been hit in the head with a nine millimeter Ruger?

A    Yes.

Q    And it broke the skin?

A    Yes.

Q    Did he also tell you that he only smoked weed -- I'm at the very bottom.  "All the stuff he smoked was weed, and he could get high every day."

A    Yes.

Q    And did he explain to you how to make blunts or marijuana in a cigar?

A    Yeah.  He gave a vague description of it.  I didn't try it at home.

Q    Did he explain to you that a couple of times he had passed out from using marijuana?

A    Yes.

Q    And this is all information that would be relevant on the mitigation checklist.  Is that correct?

A    Yes.

Q    Did he also indicate to you that his mom had had periods of depression where she couldn't do certain things?

A    Yes.

Q    And did he also indicate to you that there was a situation where he had been boxing with an uncle and he apparently slipped in the wet grass and hit his head on a

gate?

A    Yes.

Q    And did he indicate that there was still a scar from that injury?

A    Yes.

Q    Now Billie Allen never told you that his uncle had beaten him, did he?

A    I certainly don't recall.  This is -- This is the closest thing that I recall to that proposition.

Q    Okay.  And the closest thing you recall to that proposition is Billie Allen telling you he used to box with his uncle on the street.  The grass was wet and he hit his head on a gate?

A    That is what my notes reflect, and I have confidence in my notes.  I'm also aware that people who are domestically abused come up with excuses like that to avoid getting their family members into trouble.

Q    Did Billie Allen tell you that his uncle had physically beaten him?

A    No.

Q    On January 7th of 1998 in that interview ---

THE COURT:  I think this is a good place to stop.  It's noon.

MS. COSTANTIN:  Oh, okay.

THE COURT:  Is this a good place?

MS. COSTANTIN: Yes, that's fine.

THE COURT: We'll be in recess for one hour.

(Court recessed from 12:00 PM until 1:00 PM.)

THE COURT: Whenever you're ready.

Q   (By Ms. Costantin)  I'm going back to your January 7th, 1998, interview of Billie Allen at the Franklin County Jail. Now that was a time period before Dr. Randall was involved. Is that correct?

A   One week, yes.

Q   And similarly, of course, the December interview that you had with Mr. Allen was also before Dr. Randall was involved, correct?

A   Yes, a little less than one month or right about one month.

Q   And that January 7th, 1998, interview, part of it appears -- well, we have a tape from part of it and part of it we have your notes, just your notes. Is that correct?

A   That's right.

Q   Okay. I want to go to a portion of Exhibit 636, Page 12. Do you recall that Billie Allen told you that he did not start drinking alcohol until 1996 because he was too strong minded, correct?

A   If I may, I'll go to my own notes for that because there should be -- there should be corresponding notes. That's the type of thing that I would have taken down.

Q    Well, let me refer you, first of all, to 636.12 and see if that refreshes your memory.  Do you recall asking him, "Tell me" -- or saying to him, "Tell me about your drinking; when -- how -- how old were you when you began drinking beverage alcohol?"

And he told you, "Last year."

And you repeated, "Last year."

And then he said, "I didn't drink young."

And then you wanted to clarify with him.  "And by last year, you mean the 12 months before January of -- before March 17th of 1997?"

Response, "Yes."

And you -- Then you responded, "Well now, you don't have to be a Ph.D. sociologist to know that most kids start drinking fairly early in the United States now."

"Yeah."

"How come you didn't start drinking early?"

His answer, "Too strong mind.  I mean the person couldn't talk me into doing anything."

Do you recall -- Does that refresh your recollection as to him telling you that he didn't start drinking until 1996?

A    No, ma'am.  And I'm looking through my own notes, and I don't see -- I've been looking at this diligently since the topic came up, and I -- I don't see -- I have something about,

"When you -- When you smoke weed, you get to feel paranoid."

I mean there is no doubt that -- that we had this conversation, but I simply don't remember what's on the screen there.

Q    Okay.  And a lot of this stuff that you're asking him, as you indicate, you don't have to be a Ph.D. sociologist to -- to know.  Is that fair to say?

A    That's the kind of expression I would use.

Q    And Billie Allen denied to you that he was -- that he sniffed glue or used prescription medicine improperly or used acid or PCP or any drug that would use a needle mark.  Is that correct?

A    I -- I have no recollection of that as an affirmative matter, but it is consistent with my general recollection that those were all negatives.  Those were not hits.

Q    Okay.  I'm referring you to 636, Page 13.  Do you recall you asking him, "Did you ever sniff glue?"

And he said, "No.  I don't know what people got out of that.  I couldn't see that."

You then asked him, "Have you ever used a prescription medicine in a way other than was intended?"

And his response is, "Uh-huh."

And you asked him, "Have you ever used acid?"

His response, "No, I ain't ever seen that before."

And you asked him, "What about PCP?"

And then his response, "I never seen that one. I heard about it but I never."

And then you asked him, "Have you ever used any kind of drug that would leave a needle mark?"

And his response was, "No."

A I have no recollection of those questions or answers, and viewing the document on the screen does not refresh my recollection, --

Q Okay.

A -- nor do they appear in my -- in my notes that I have been reviewing.

Q Now questions like that would be tracking -- I'm showing you 628, Page 3. Questions like that would be tracking the mitigation checklist that you received from Kevin McNally. Is that correct?

A Yes, ma'am.

Q Okay. And as we can see on there, there's questions about marijuana, LSD, inhalants including glue, PCP, sedatives; that is, prescription drugs. Is that right?

A That's correct.

Q And also questions about needle marks. Is that correct?

A That's correct.

Q And on this 628.3, the mitigation checklist, it also has questions or has areas of concern for mitigation concerning blackouts. Is that correct?

A    Oh, yes.  Yes.  That's certainly correct.

Q    And you covered blackouts and hallucinations with Billie Allen in your interview.  Is that correct?

A    I asked him about them.

Q    And do you recall we looked at something earlier where he said he passed out twice using marijuana?

A    I -- I -- Yes, I believe I do.

Q    So that's another area of the mitigation checklist that you -- you covered.

A    It's something that I asked about and took notes on.

Q    Okay.  And he told you -- I think you made reference before to you remember he said something to you about marijuana and being paranoid.  He told you that there were times when he smoked marijuana and felt so paranoid that he would have his mother pick him up from his friend Johnnie Grant's house and bring him home.  Is that correct?

A    Well now, I have no present recollection of that, but I'm going back to the point in my notes.  After -- No.  I -- I see nothing in there about that.

Q    I'm going to refer you to 636.14.  Does that indicate that Mr. Allen told you, "This was when my momma last year -- last year when I started smoking weed because I used to always call my mom when I didn't feel safe walking home, I would call my mom.  Even though John's house is right down the street, I still -- she wouldn't want me walking home sometimes.  You

know, I would call her after she gets off work and tell her to come pick me up."

A    I have no recollection of that particular exchange, but I do distinctly recall those facts.

Q    Okay.  And is that -- that's consistent with what you knew from Billie Allen, that his mother would take care of him in ways like this.  Is that correct?

A    I knew that he said that.

Q    That's -- My question is:  That was consistent with what Billie Allen -- information you had received from Billie Allen that his mother would take care of him?

A    Oh, yes.  There's no doubt that Mr. Allen made positive statements about his mother during this period of the case.

Q    And, in fact, he made no negative statements about his mother in these interviews in December and January.  Is that correct?

A    Not that I can think of.

Q    He consistently described his mother as someone who was there for him.  Remember we saw that earlier?

A    Well, I don't know about consistent, but I'm not going to deny that he made that statement on one or more occasions.

Q    And I want to move you to your timesheets, 598.7.  Does this indicate that the next day on January 8th you had -- you spent 1.4 hours?

A    I'm sorry.  Oh, yeah, I see 1.4 now.

MS. CARLYLE:  This is 498, isn't it?

MS. COSTANTIN:  Yeah, 498.

MS. CARLYLE:  I think you said 598.

MS. COSTANTIN:  I'm sorry.  I apologize.  No.  It's 498, Page 7.

Q    (By Ms. Costantin)  I'm looking at January 8th.  You had a conference with the client -- that is, Mr. Allen -- concerning mitigation and discovery.  Is that correct?

A    Yes.

Q    And that was for 1.4 hours?

A    Yes.

Q    Now there is no difference between your characterization of an interview with Billie Allen on January 7th and the conference with Billie Allen on January 8th.  Is that correct?

A    Yes.  That was before I learned how to do mitigation.

Q    And something about learning how to do mitigation made you distinguish between a conference and an interview.

A    Yes.

Q    You did distinguish them.  One is an interview and one is a conference on your timesheet.  Is that correct?

A    Yes, before I had attended a single "Life in the Balance."

Q    When you were with Billie Allen in jail on January 7th and January 8th, did you ask him questions about his life?

A    Yes.

Q    And did he answer those questions?

A    Yes.

Q    And when asking those questions, were you guided by a mitigation checklist provided to you by the capital defenders?

A    Yes.

Q    Now you did not tape or did you tape the January 8th conference with Billie Allen?

A    Well, I mean I -- I seemed to have lost control of these tapes years ago, so perhaps you can tell me whether I taped it.

Q    I'm asking you:  Did you tape it?

A    I do not know.

Q    Did you take handwritten notes of your conference with Billie Allen on January 8th of 1998?

A    Yes.

Q    And I'm showing you what's been -- is Exhibit 499.419. Is that the first page of your interview notes --

A    Yes.

Q    -- with Billie Allen?  And I'm going through some other pages with you, concluding with 5516.  Are those your notes of the interview of Billie Allen on January 8th of 1998?  Your handwritten notes.

A    Yes.  I -- I'm not sure that I saw 5514, but yes.  Yes.

Q    There it is.  I'm sorry.

A    Yes.  5514, yes, those are my notes.

Q    And now I'm going to move to 500.55.  500.55, Page 55. Starting at about the top third of the page or about a third of the way down the page, is that your transcribed interview notes of the interview on January 8th with Mr. Allen?

A    Yes.  This is what I called an "interview" in 1998.

Q    And I'm just simply asking you:  Are these -- As I go down, are these the transcribed notes of that interview?

A    Yes, they are.

Q    And in your interview with Billie Allen, did you ask him if his mom drank and he indicated, "She stays stressed out"?

A    That -- That's what my notes reflect.

Q    And that's what would have occurred if that's what your notes reflect?

A    Oh, yes.

Q    Okay.  So you were aware of alcohol use by Juanita Allen based on your meeting with her on January 7th and then this indication from Billie Allen on January 8th that she stays stressed out in response to your question about whether his mother drank.  Is that correct?

A    I believe that I would assent to all of those individual statements, but the conclusion I draw is that she's stressed out instead of drinking.

Q    So you believe that Billie Allen was denying that his mother drank.  Is that correct?

A    Well, keep in mind we're looking back 14 or 15 years.

I'm going by this text.  This text says to me that instead of drinking, she stays stressed out.

Q    Okay.  So Billie Allen was denying to you at that time that his mother drank.

A    That's simply how I interpret the text, but the answer is yes.

Q    Okay.  And that's -- that's what I'm asking you.  And is your interpretation based on your interaction with Billie Allen on January 8th of 1998?

A    No.  It's simply based on my knowledge of English prose.

Q    And what you wrote.

A    That's what I mean.

Q    Okay.  And what you wrote was you asked Billie Allen did his mom drink.

A    Yes.

Q    And you wrote, "stays stressed out," which your interpretation was of your notes that he's denying that she drinks and says, instead, she just stays stressed out.

A    That's correct.

Q    So Billie Allen never gave you any indication that his mother drank even when asked that direct question.  Is that correct?

A    Well, I'm not sure about the word "never," given the long passage of time and the large number of documents.  But my direct answer here is that I -- I believe that I know how I

use the English language and that if I wrote "stays stressed out" in answer to the question, "Mom drink?"  It means instead of getting drunk, she would do the alternative which would be to not -- not self-medicate with alcohol.

Q    And to your recollection, did Billie Allen ever tell you anything differently?

A    Not that I recall sitting here right now.

Q    I'm going to go back to your timesheets, 598.7.  Any number I enter as "a point" just means it's the page number of the document.

I'm looking at your timesheet, and I'll highlight a portion of it.  Do you see this portion where I have -- I've got the arrow, January 8th, "Prepare life history of client"?  Is that ---

A    Yes.

Q    Am I reading that correctly?

A    Yes.

Q    And you spent 3.4 hours doing that.  Is that correct?

A    Yes.

Q    And I'm going to show you 303, and we've been through this before.  This is the life history that you prepared, correct?

A    Yes.

Q    And in preparing that life history, you were using information from your interviews with Billie Allen on December

12th, January 7th, and January 8th.  Is that correct?

A    Yes, including spot checks that I did of witnesses for purposes of filling in blanks.

Q    We're going to get to that subsequently, but -- but when you were filling this out or you're completing this, not filling it out, when you're completing it, --

A    Composing it.

Q    -- you're getting it from -- composing it, you're getting information on that from Billie Allen and specifically those interviews you had with Billie Allen on December 12th of '97 and January 7th and 8th of '98.

A    That's correct.

Q    Okay.  And as we've talked before, you were using 628, the checklist.  Is that correct?

A    Yes.

Q    And that checklist covers -- Well, referring to Page 3, that checklist covers if the parent is alcoholic or if there has been parental violence.  Is that correct?

A    Yes.

Q    Now in your life history, 303, you do not indicate that Juanita Allen is an alcoholic.  Is that correct?

A    Yes.

Q    And you do indicate, however, that his father is an alcoholic, correct?

A    I say that he -- he drank vodka all the time and he was

always drunk.  I'm not sure I used the word "alcoholic," but that's close enough for Government work.

Q   Okay.  In the life history, you did not indicate that Billie Allen was a victim of physical violence from his mother.  Is that correct?

A   That's correct.

Q   Now we -- You made reference to this, but you talked to other people in preparing the life history.  Is that right?

A   Yes; a small number as we've identified.

Q   And I want to kind of go through those again, if I may. I'm referring you to Page 4 of the life history.  This indicates you had -- you spoke with Lucy McLemore.  Is that who the "Lucy" is, referred to in the notes?

A   Yes, ma'am.

Q   And these handwritten notes are made at some point after you've prepared the life history.  Is that correct?

A   Actually because it's -- it's labeled as a "draft," it's conceivable that I generated this and then almost immediately added the handwritten annotations and faxed it to Sindel, Sindel & Noble.

     In short, it's obvious if I had these ideations all at one time, I would have included them in the word processing document.  What I'm simply trying to say is I have no idea what the time delay between the generation of the word processing document and the addition of the handwritten

annotations was.

Q    Well, we looked and saw that you prepared the life history on January 8th.  Is that correct?

A    Well, I remember that.  What I'm trying to say is that could have been included in the same time period.  I simply don't remember.

Q    And we can see from the notes that you spoke with Lucy McLemore on January 11th.  Is that right?

A    Yes.

Q    The handwritten notes.

A    Yes.

Q    Okay.

A    And also with Raymond on the 11th.

Q    Right; right.  So my point is you have a typewritten item prepared and then you're adding some handwritten notes regarding interviews of, for example, Lucy McLemore or Raymond Petty.  Is that right?

A    Yes, and that's correct.

Q    And you also spoke to Otha Petty, is that right, his grandfather?  Looking at Footnote --

A    Yes.

Q    -- 8.  And you also spoke to the secretary of the sponsoring church for the Boy Scouts.  Is that right?

         And that was in an attempt to figure out where the Boy Scouts -- who the Scout Leader was or Scout Master was?

A    Yes.  And that's -- that's because Scouts rarely have their own turf.  So in order to find out information about the organizational structure of the troop, I had to contact the secretary for the hosting church.

Q    And you did that, and that's noted on the life history, correct?

A    Yes.

Q    And moving to Page 9, you also made some sort or obtained information some way to determine who "Flexx" was, the producer that Mr. Allen references in his interview.  Is that right?

A    Yes.

Q    And you're able to determine that he, in fact, had moved to Atlanta to join the crew of a rap group.  Is that right?

A    Well, I -- I personally don't know that "Baby Face" is a rap group.

Q    So you knew that he had moved to Atlanta to join the crew of --

A    "Baby Face."

Q    -- "Baby Face."  Okay.  And you talked to people I just listed in order to prepare that life history, correct?

A    Yes.  That's what I referred to as "spot checking."

Q    And when you wrote the life history, were you attempting to put in everything that you believed was going to be important?

A     No, I -- I can't say that.  I -- I was simply trying to get something to the mitigation investigator so that we would get rolling on that.

Q     So when you talked to Billie Allen and you reduced those hours of interview to the life history, it's your testimony that you were not attempting to put in what you believed to be important?

A     I was not attempting to put in everything that might be relevant.

Q     You're trying to put in important items, however, weren't you?  Items that would be important to mitigation?

A     Well, having reviewed this, I can't say that everything in there was important to mitigation or anything else. What -- What this was was a document prepared by someone who had never done anything like it before who had no training in how to do it and had no example in front of him about how it was done.  And I put this together to try to move the mitigation investigation from zero to at least some measurable miles per hour before the trial date.

Q     So your time to obtain information from Billie Allen as well as these other witnesses concerning mitigation; is that correct?

A     Yes.

Q     And the information that you were obtaining from Billie Allen was placed in this life history.  Is that right?

A    Not one hundred percent of it.

Q    The important -- The items that you believed were important were placed in the life history?

A    As of this point I really can't explain why some of the things that we've discussed today were not in the life history, and the only explanation is that this was the first time I had ever done this before.  I had no professional qualifications to do it, and it -- it was a desperate attempt to avoid having nothing at all when the gavel came down at the beginning of trial.

Q    What was left out of the life history that is important that Billie Allen told you?

A    There were some things we covered this morning that I -- I -- I can't recall right now, but I myself was surprised that they were not in the life history.

Q    You mean that he was a drug mule and a drug dealer?

You're surprised that you didn't put that in his life history?

A    Those are the only items I recall.

Q    Was there something other than those two items?

A    I can't -- I can't remember any others, but those were enough.

Q    Okay.  So the ones that you remember that were left out was that -- of his life history was that Billie Allen was a drug dealer and a drug mule.  Is that correct?

A    That's -- That's -- That's what I recall from what we established in this morning's testimony.

Q    And you can't think -- As you sit here and after you've gone through your life history and your notes, you can't think of anything else important that was left out of the life history.  Is that your testimony?

A    As of this very moment, those are the things that I focus on.  I -- I -- I don't know that those are the only things I left out that I should have included, but I do know that given my lack of background for doing this piece of the case, there had to be additional things, given the bulk of material that came out in the conferences I had with Billy and the follow-up conversations I had to fill in the blanks from those conferences.

Q    And that's my question.  What was there that was left out of the life history that should have been in there that Billie Allen told you or any of these witnesses that you talked to up to this point?  What was left out?

A    Well, I think just to go back in the last half hour, I -- I think I should have included the question and answer about his mother drinking.

Q    You should have included that the Defendant denied that his mother was drinking?

A    Yes.

Q    Okay.

A    And there are two reasons for that.  One is ---

Q    Mr. Simon, all I want to know is what information you should have included.  So you should have included that -- that Billie Allen said that Juanita, she didn't drink.

A    Stayed stressed out.

Q    And that she didn't drink, correct?

A    I should have put in that my conclusion from his answer was that she did not drink.

Q    Okay.  Anything else that you should have included in that life history that you didn't?

And we already covered the drug dealer and the drug mule stuff.

A    Could I ---

Q    Oh, you want me to page down?

A    Am I supposed to be able to?

Q    Which way you want to go?  Just tell me and I'll do it.

A    To the beginning; to the beginning --

Q    Okay.

A    -- but going through it slowly.

I -- I can say that as of this point, sitting here this afternoon, I would need to compare my records of the conferences with Billie to the document in order to give a complete answer.  But I think that the drug business was by itself enough -- that's all the evidence one needs to know; that I did not prepare this in -- in a -- in an adequate or a

professionally reasonable manner; that should have been done by a mitigation investigator months before.

Q   So your answer is the things that you left out of the life history that should have been in there was that Billie Allen was a drug dealer, that Billie Allen was a drug mule, and that Billie Allen said that Juanita didn't drink but stay stressed out.

A   And my answer ---

Q   Those are the only items, as you sit here today right now, that you can think of.

A   No, but that's limited to what I can think of right now. That's not a -- That's not a never -- That's not an always. It's simply what I can think of right now.

Q   That was my question.

A   Okay.

Q   That's the only thing you can think of right now.  Is that correct?

A   We're in agreement.

Q   Okay.  Now the life history of Billie Allen, information about Billie Allen's background, is that something that in your experience is often given to an expert in order to evaluate a defendant?

A   It is more likely developed by an expert.  The -- The standard practice as I have learned both from handling federal habeas corpus actions involving death penalty cases from

working in -- in -- in a unit that tried capital cases and in the seminars that I've attended since working on this case, which is one hundred percent of the defense seminars I've attended, is that someone with a degree or certification in Social Work or Psychology would conduct an investigation with or without agents or employees and would prepare a social history as distinguished from this amateur life history; would present that to counsel.  Counsel would then make strategic judgments about what to include in the case they presented to the Court and jury.

Q    Let me -- Let me explain or narrow down what I'm asking you.  Is information concerning a defendant's background information that is frequently given to a psychologist or a psychiatrist who is going to render an opinion in court?

A    Yes.

Q    And something like a life history is something that would be typically given to a psychiatrist or psychologist who is going to render an opinion concerning perhaps mitigation?

A    The norm in the profession, both before and after the trial in this case, would be that that would be developed by a mitigation specialist.

Q    That's not my question.  My question is simply: Background information, such as a life history, that is information that is typically given to a psychiatrist or a psychologist in order that they have background information on

a defendant in order to render an opinion relevant to mitigation.

A     The answer is:  Yes.  Jill Miller would have given this to Dan Cuneo.

Q     Okay.  And if information, documents are given to a psychiatrist or psychologist who renders an opinion on mitigation, those documents must be produced to the other side; to the Government.  Isn't that correct?

A     At some point.

Q     All right.  So if the life history is given to a psychiatrist or a psychologist, then that information will have to be produced to the Government at some point, correct?

A     Agreed.

Q     And if you had put in information that Billie Allen was a drug dealer and a drug mule, that information would have had to have been produced to the Government, correct?

A     Yes.

Q     Going to the first page of the life history, Exhibit 303, on that life history you indicate Billie Allen is the son of John and Juanita Allen.  Is that correct?

A     Yes.

Q     And you also indicate the names of his sisters and their ages.

A     Yes.

Q     And is that based on your interviews from December 12th

and January 7th and 8th?

A    Yes.

Q    And you also indicate that John Allen had fathered a child out of wedlock.

A    Yes.

Q    And that's also based on your interviews of Billie Allen in December and January.  Is that right?

A    Yes.

Q    You also indicate that Billie Allen's father was drunk and drank vodka all the time.  Is that correct?

A    Yes.

Q    And was that relevant to mitigation?

A    Yes.

Q    And specifically looking at the Mitigation Checklist, Page 3, one of the questions or one of the topics that you're supposed to be talking about is parental alcoholism.  Is that right?

A    Yes.

Q    And going back to your life history, you indicate in Paragraph 6 that Billie's father did not abuse his mother.  Is that correct?

A    That's what it says.

Q    And that's what he told you, correct?

A    Oh, yes; yes, and for the reason that he told me.

Q    And that was also relevant to mitigation, correct, if

Billie's mother had been ---

A    If she had been beaten, it would have been relevant.

Q    Okay.  And that's a topic that you're covering on the
Mitigation Checklist, parental violence.  Is that correct?

A    Well, I -- I see the correspondence, but simply owning a
television set would have been an adequate basis for my asking
those questions.

Q    Are you following the mitigation checklist when you're
talking to Billie Allen?

A    Yes.

Q    Okay.  And is one of the points on the mitigation
checklist whether there is any domestic violence?

A    Yes.

Q    And that's because it's relevant to mitigation.  Is that
correct?

A    Yes.

Q    Did you also indicate in your life history that at the
age of three or four Billie ingested lead?

A    Yes.

Q    And that was relevant to mitigation, wasn't it?

A    Yes.

Q    An ingestion of toxic substances is one of the points to
cover on the mitigation checklist under "Childhood Illness and
Accident."  Is that right?

A    Yes.

Q    And you did cover that.

A    Yes.

Q    And did you follow up with Billie Allen's hospital records to confirm that he had Pica?

A    I believe I did, but I would have to see it in the document.

Q    Okay.  And isn't that shown on the life history, 303.2?  Footnote 2?

A    Yes.  That's -- That's what I was asking for.

Q    All right.  And that, in fact, you were -- had reviewed the hospital records and quote from the hospital records showing that there was a diagnosis of Pica.

A    Oh -- Well now, wait.  I probably looked up Pica on my own.  The quotation there, I -- I -- I -- I doubt if the hospital record would have defined the term.  I imagine that I looked that up in a -- in a -- in either a medical dictionary or in a regular dictionary.

Q    Do you recall that the medical records were at some point transcribed and that a nurse also gave some interpretation of terms within it?

A    Not at this point.

Q    Okay.  But one way or the other, you found out what Pica was, whether it was from those nurse's notes or your own investigation, and you included that in your life history.  Is that right?

A     Yes, I did.

Q     And that's because it was relevant to mitigation as reflected on the checklist you're going through.

A     Yes, which I had just received.

Q     And you also indicate that -- That you just received? You had the checklist for the December interview, correct?

A     That's what I mean.

Q     Okay.

A     In the context of a -- of a -- of a preparation of a capital case, it is a much longer period.  Receiving something from Kevin McNally a few weeks before generating this amateur document is not professionally reasonable.

Q     Mr. Simon, I appreciate your interpretation.  My questions, however, are very simple which is to make sure that I understand.  You had the Mitigation Checklist when you were talking to Billie Allen in December and in January and when you prepared the life history, right?

A     That's correct.

Q     And in the life history you indicate that Billie Allen's mom moved out and -- with the children.  Is that correct?

A     Yes.

Q     And going to the Mitigation Checklist, it is correct that it's important to know if the family is -- if the parents are divorced, for example.  Is that right?

A     Yes.

Q    Now Mr. Allen's parents never formally divorced.  Is that your memory?

A    Yes.  Yes, ma'am.

Q    Okay.  But you felt this separation, even though it doesn't say "separation" on the -- on the checklist, was equally important to record in his life history.  Is that fair to say?

A    Well, I don't know about equally important.  But given the fact that I had no -- no skill or credentials for creating the document, I would say that it was a good idea that I put it in.

Q    Okay.  So it was a good idea that even though the checklist only said "divorce," that you had put it down even if they were separated.

A    I would say that they had a common law divorce.

Q    But they had a natural marriage, didn't they?

A    Oh, yes.  But just like -- That's the first time I ever heard that term, and that's exactly what I was doing in this life history, making it up as I went along because I wasn't a mitigation investigator.

Q    Now were you making it up or were you writing down what Billie Allen told you?

A    It was a combination.

Q    You made up stuff about Billie Allen's life?

A    No.  I -- I -- I made up the methodology.

Q    Did you have the Mitigation Checklist that you were using?

A    Yes.

Q    Okay.  So you're going through, and we're going to continue to go through the Mitigation Checklist and compare it to the life history.  So that's what you were doing is making up your life history from what Billie Allen told you with reference to the Mitigation Checklist, correct?

A    Yes.

Q    Okay.  You know that the separation occurred because -- I'm going back to your life history, 303.2, because his mother had moved out because of arguing with his father over friends. Is that right?

A    Yes.

Q    And is that relevant to mitigation that there's instability in the family life?

A    Yes.

Q    And you also note that Billie Allen's father sold drugs. Is that correct?

A    Yes.

Q    And is that relevant?  That was relevant to mitigation, too, wasn't it?

A    Yes.

Q    And specifically on the checklist, there's a portion related to the parent profile whether they are criminals.  Is

that right?

A    Yes.

Q    And you noted in the life history that Billie Allen's uncles played some of the role that a father would normally have played.  However, one of them had -- was also selling drugs.  Is that right?

A    Yes.

Q    And is the fact that there are uncles who have a role in Billie' life, is that something that's relevant to mitigation?

A    Yes.

Q    And would the role of his uncle show strong family support for him?

A    I'm sorry?

Q    Would the role that his uncles took in his life show strong family support for him?

A    The reason I'm thinking is that part of the influence of the uncles was negative, and so I don't think that that's a clear "yes" or "no."  I -- I do think it's the kind of thing that a mitigation investigator needed.

Q    And so it's -- The witnesses, the uncles who testified at trial, were the ones who had provided a strong role for Billie.  Is that fair to say?

A    Yes, --

Q    Okay.

A    -- a positive role.  Let's say a positive role.

Q    A positive role, okay.  The uncle who sold drugs was not called as a witness.  Is that correct?

A    That's my recollection.

Q    And did you then list on your life history contact information for Billie's mother as well as grandfather?

A    Yes, for the mitigation investigator.

Q    And that's helpful information to follow up on, correct? To have that to be able to contact them?

A    Yes.

Q    And did you indicate on your life history that the neighborhood had drug problems?

A    Yes.

Q    And is that relevant to mitigation?

A    Yes.

Q    In other words, that Billie Allen lives in a crime-infested or a drug-infested neighborhood would be something that would be relevant to mitigation, correct?

A    Yes.

Q    And was there evidence presented at trial that there were gangs or drugs in the neighborhood that Billie Allen lived in?

A    Yes.

Q    But you didn't write in here that Billie Allen was one of the people who sold drugs, did you?

A    That's right.

Q    Did you write in here that Billie Allen denied running

away or having been thrown out of his home at any time?

I'm looking at Paragraph 16.

A    Yes; yes.  Paragraph 16, that's what it says.

Q    And that is relevant to mitigation?

A    Yes.  It was later falsified, but that's -- it was the information I had at the time.

Q    Mr. Simon, Mr. Allen never told you that his mother kicked him out.  Isn't -- Haven't we gone over that?  Is that correct?

A    I have a hard time with the word "never."  I -- I -- There's been -- There are so many materials in this, and I've had so many contacts with so many people that I -- I -- I would rather say that I don't remember than make a mistake of omission and say that I was never told that.

Q    I'm talking about Billie Allen.  To your recollection, did Billie Allen ever tell you he was thrown out of the house?

A    I don't remember that right now.

Q    And one of the questions in -- One of the issues in -- on the mitigation checklist, 628, Page 2, is whether he's run away for no apparent purpose.  Is that correct?

A    That's what it says.

Q    Another issue would be if he fears abandonment.  Is that correct?

A    Yes.

Q    And what he told you was, as reflected on your life

history, was that he had not run away or been thrown out of his house at any time.

A   Yes.  What Paragraph 16 says is what I was told.

Q   Now you indicate that there was a shooting incident on January -- in January, 1997, and that he began to stay at various places because -- various girl friends' residences in part for his family's safety.  Is that correct?

A   That's what it says, and that reflects what he told me at the time.

Q   That was my next question.  What he told you was that he left for his family's safety.

A   Correct.

Q   You also wrote concerning -- In your life history you also wrote concerning Billie Allen's church involvement.  Is that correct?

A   Yes.

Q   And that included the churches he attended, Sunday School, baptism, Bible school camp.  Is that right?

A   Yes.

Q   And you spoke to both Lucy McLemore and his grandfather about his church involvement.  Is that correct?

A   Yes.

Q   Now religious involvement, that is something that is relevant to mitigation.  Is that correct?

A   Yes.

Q    And looking at the Mitigation Checklist, Page 5, one of those items to inquire about is religion, pre-offense religious involvement.  Is that correct?

A    Yes.

Q    And you did that with Mr. Allen.  Is that right?

A    Yes.

Q    Now you also wrote concerning Mr. Allen's involvement in Boy Scouts.  Is that right?

A    Yes.

Q    And he told you about a Scout Master he had that had died.  Is that right?

A    Yes.

Q    And this is something we talked about before.  There was an idea, a theme, a possible theme for mitigation that many people close to Billie Allen had died.  Is that correct?

A    Yes.

Q    And was this something that fit into that theme?

A    Yes.

Q    And concerning the Boy Scouts, you spoke with Raymond Petty to try and get some more information -- Raymond Petty, his uncle -- to try and get some more information.  Is that right?

A    Yes.

Q    And you, also, as we discussed, checked with the sponsoring church, correct?

A    Yes.

Q    And that's all follow-up that you're doing for possible mitigation, correct?

A    Yes, for the mitigation investigator.

Q    And going to the bottom of this page and more to the top -- oh, I'm sorry -- the bottom of this page which is 303.5 and then the top of 303.6, you also listed other boys who were involved in Boy Scouts, correct?

A    Yes.

Q    Okay.  And the purpose of that is to allow follow-up for possible mitigation.  Is that correct?

A    Yes.

Q    And is it fair to say that a history of stability or good works is something that's relevant to mitigation?

A    Yes.  It could, also, be aggravating.  Was Timothy McVey an Eagle Scout?

Q    I don't know.  Is that something, however, that is listed on the Mitigation Checklist, the history of stability and good works?

A    The history of stability and good works sounds like it should be there and it isn't.

Q    And it is, isn't it?  Look at 628, Page 5.

A    Yes.

Q    One of the things to look at "per the Mitigation Checklist," correct?

A     Yes.  However, Scouting and church and music were all low-hanging fruit.  I went for them because I'm a musician, a Scout and former Scouter, and I'm active in my church.  The fact is I didn't have a degree to do this.  I didn't have a certificate to do this.  I had to do it because nobody else was doing it, and in the long run it was a mistake.

Q     And, Mr. Simon, you had an undergraduate degree, correct?

A     Philosophy and Political Science.

Q     You have a Ph.D.  Is that correct?

A     Political Science.

Q     You have a J.D. from Yale.  Is that correct?

A     Yes.

Q     And you were a practicing lawyer for -- Did we figure out it was 12 or 13 years?

A     '85 to '97.

Q     And during that time, some of the items that you handled included habeas cases.

A     Yes.

Q     Is that correct?

A     Yes.

Q     You had a Mitigation Checklist that was provided to you by the Capital Defense Unit, correct?

A     A few weeks before this document was drafted.

Q     When you were interviewing Billie Allen, you had a Mitigation Checklist that you used that was provided by the

Capital Defense team, right?

A    Yes.

Q    And you used that Mitigation Checklist.

A    Yes.

Q    Now going back to 303.5, which is your life history, did you also indicate that he had some struggles with asthma?

A    I do recall that.

Q    And limitations placed on his activities by something like asthma would be relevant to mitigation.  Is that correct?

A    Yes.

Q    And going to the Mitigation Checklist, chronic illnesses or conditions are something that is listed on the Mitigation Checklist, correct?

A    Yes.

Q    Now asthma is not actually listed there, is it?

A    That's correct.

Q    But you knew enough to ask about asthma as a chronic illness or condition.  Is that fair to say?

A    As a matter of simple English literacy, yes.

Q    And, in fact, you told Billie Allen -- Didn't we see that earlier?  You told Billie Allen, "I need to know people who can say that you were limited due to your asthma"?  Do you recall that?

A    Yes.

Q    Now going back to the life history that you generated,

does it also indicate the schools that Billie Allen attended both in the Clayton School District as well as Sumner High School in the city?

A    Yes.

Q    And Billie Allen told you that he was a talented artist. Is that correct?

A    I'm sorry?

Q    Billie Allen told you -- I'm sorry -- that he was a talented artist, correct?

A    I -- I believe that would be a fair summary of what I recall.

Q    Okay.  And his school history, where he went to school, that's something that's relevant to mitigation.  Is that correct?

A    Yes.

Q    And his art talents, that would also be something that would be relevant to mitigation?

A    Marginally.

Q    Okay.  Well, do you recall some of his drawings being introduced in the mitigation portion of the case?

A    Sitting right here today, I don't.  It would be another example of low-hanging fruit.

Q    And things like school performance, whether it's low-hanging fruit or not, is something that's listed on the Mitigation Checklist, correct?

A    Yes.

Q    And that's at 628.  And something like his talents in art is something that would show that he's a good person.  Is that correct.  A valuable person?

A    Yes.

Q    And that's something that would be relevant to mitigation.

A    Yes, together with something serious.

Q    So the fact that he was a good artist is not something serious?  Something his family valued about him?

A    I -- Look, I -- I'm not here as an advocate against art, but where you're dealing with an offense like this, the fact that somebody can draw himself smoking a cigar isn't worth a single vote on the jury.

Q    So you're able to evaluate what would be powerful mitigation evidence and what would not be powerful mitigation evidence.  Is that your testimony?

A    Well, I can today.

Q    Okay.  And back then, you had no idea?

A    I'm not saying I had no idea.

Q    You did have an idea.  I mean you had a pretty good idea because you've been practicing law for 12 years, one would think, or am I incorrect about that?

A    Well, capital litigation since '91; all of it on the other side.

Q    And when you're on the other side, you see the kind of evidence that people put on.  Is that fair to say?

A    Yes.

Q    And you see how the other side or the Government or the State tends to respond to that, correct?

A    Well, I responded to it.

Q    Right.  So you --

A    Okay.

Q    -- you responded to mitigation evidence that had been put on.  Is that what you're saying?

A    Yes.

Q    Okay.  So as you sat there back in 1998, you weren't completely clueless about what could be powerful mitigation evidence and what would not.  Is that fair to say?

A    I was neither completely clueless, nor degreed and certified to make those judgments.

Q    And is there a degree in Capital Litigation?

A    There is a degree in Psychology.  There's also -- There's also board certification in Psychiatry once one has a degree in Medicine.

Q    So is it your testimony that only someone with a degree in Psychology could decide what would be powerful mitigation evidence before a jury?

A    Far from it.  After the evidence had been collected by a social worker or psychologist and presented to counsel,

counsel would then make a strategic decision what should be presented to the particular jury, --

Q    And, Mr. Simon, ---

A    -- given that case.

Q    And, Mr. Simon, I'm sorry.  You were collecting information from Billie Allen on December 12th, January 7th and January 8th, correct?

A    Collecting it for the mitigation specialist.

Q    You were collecting information from Billie Allen about his background or as you put it, I believe, "your whole life."

A    That's right.

Q    Now going back to your life history of Billie Allen, you indicated that Billie had left Clayton and gone to Sumner.  Is that correct?

A    Yes.

Q    And he was picked on there at Sumner.  Is that correct?

A    Yes.

Q    And then he tried to transfer back to Clayton but could not do that.

A    I didn't remember that last part.

Q    You don't remember whether or not he was actually able to transfer back to the Clayton School District?

A    I remember that he did not transfer back to Clayton.

Q    Okay.  But the fact that he tried to transfer back you have in Paragraph 42.  Is that right?

A    Look, if it says it here, then that's what he told me.  I simply don't remember it at this moment.

Q    Okay.  And he ended up dropping out of school, --

A    Yes.

Q    -- right?  And the fact that he dropped out of school, that would be something that would be relevant to mitigation.  Is that correct?

A    Yes.

Q    And the Mitigation Checklist, in fact, includes that you should ask questions concerning his social history and truancy.  Is that right?

A    Yes.  I'm not sure that dropping out and truancy would be the same thing.

Q    Well, do you think that dropping out of high school would be relevant information to put into a mitigation?

A    Yes.

Q    Would it perhaps fit under "School Performance, Flunked Grades"?

A    Yes.

Q    Okay.  So that's ---

A    Or it could also fit *Rompilla*.

Q    So that's also part of the Mitigation Checklist.  Is that correct?

A    Yes.

Q    And he told you that, in fact, the reason he dropped out

of school was because there was an incident in which another student was shot.  Is that right?

Do you see Paragraph 45?  Is that what he told you?

A    It says it was related to an incident, yes.  The way I -- The way I constructed that sentence, I can tell you that that was not the -- that was not the sole cause.

Q    Okay.  But it was related to the fact that there was a student actually shot at the school.

A    Well, yes.  I mean when you combine that with the fact that he was way ahead of the other students and was bored in class and then the guy sitting next to you gets popped off, I mean that might be anybody in this room to drop out of that particular school.

Q    And that's something that's going to be relevant to mitigation, correct?

A    Yes.

Q    Okay.

MS. COSTANTIN:  Judge, can we take a brief break?

THE COURT:  Sure.  15 minutes.

MR. MORENO:  Mr. Allen needs to take some medication.

THE COURT:  15 minutes.

MR. MORENO:  Thank you, Your Honor.

THE CLERK:  Court's in temporary recess.

(Court recessed from 2:00 PM until 2:20 PM.)

MS. COSTANTIN:  May I proceed?

THE COURT: Sure.

Q   (By Ms. Costantin)  I believe we were talking about Paragraph 45 of your life history in which you indicated that at least part of the reason Billie dropped out was related to an incident in which another student was shot.  Is that right?

A   Yes.

Q   Okay.  And we -- And that was something that would be relevant to mitigation?

A   Yes.  It also has a question mark in parentheses afterwards.

Q   And what does that indicate?

A   That it -- Well, it's a chess notation.  It means I don't know that that -- whether that was true or not.

Q   Okay.  So Billie told you something, but you weren't sure that it was correct.

A   Precisely.

Q   Okay.  So that's something, therefore, that would be -- have to be followed up on.

A   Yes.

Q   You wrote also that Billie told you -- Billie Allen told you that his mother had gotten him into a Job Corp. program. Is that right?

A   Yes.

Q   And -- However, he was dismissed for failure to conform to the rules of the program.  Is that right?

A    Yes.

Q    And his involvement in this program and then his dismissal for it, is that something that would be relevant to mitigation?

A    Yes.

Q    And going to the checklist, that's something that might be characterized as a self-destructive practice, not following the rules and getting kicked out of something like Job Corp.?

A    Yes.

Q    And Ms. Allen's role, according to Billie Allen, was that she got him into a Job Corp. program. Is that right?

A    The document indicates that's what he told me.

Q    And that's something that would indicate a parent who is involved in their child's future. Is that fair to say?

A    That's what the underlying premise would reflect, yes.

Q    You also wrote that Billie Allen was, according to him, the kind of student who would do anything that teachers or administrators asked him to do. Is that right?

A    That's what he said.

Q    And would that be useful information to indicate that teachers are possible witnesses for mitigation?

A    If one believed that, yes.

Q    Okay. And, in fact, teachers did testify, correct?

A    Yes.

Q    And they testified that they were fond of Billie. He was

cheerful; always willing to help them. Is that fair to say?

A     Yes.

Q     So their testimony was consistent with what you had found in your interview and put in your life history.

A     Their testimony was, yes.

Q     Now we discussed this. I just want to go back to it for a moment. In 303.8 you indicated that Billie Allen had had an asthma attack and had to go to the hospital. Is that right?

A     Oh.

Q     I'm sorry. Paragraph 50.

A     Yes; yes.

Q     And you list Ahmed Oliver as somebody -- and his phone number as someone to talk to you about that.

A     Yes.

Q     And we already talked about the fact that Ahmed Oliver had, in fact, testified at trial to Billie having an asthma attack and having to go to the hospital. Is that right?

A     Yes.

Q     And ---

THE COURT: Wait a minute. Wait a minute. I'm really getting hopelessly behind here.

MS. COSTANTIN: Okay. I'm sorry. I'm sorry.

THE COURT: Let's just take a minute and let me catch up. Sorry.

(Pause)

THE COURT: Okay. I'm there. Thanks.

Q    (By Ms. Costantin) And asthma is something that would be a chronic illness or condition as listed on the Mitigation Checklist. Is that correct?

A    Yes.

Q    Now going back to your life history of Billie Allen, it indicates that Billie Allen told you that he had played softball for a while and lists his coach, Sam Moore. Is that right?

A    Yes.

Q    And he says specifically, "Sam got Billie to go outside which he had previously dreaded." Is that right?

A    Yes.

Q    And it lists a contact number for him?

A    Yes.

Q    For Mr. Moore?

A    Yes.

Q    And that involvement and those positive activities such as that, that's something that's relevant to mitigation. Is that correct?

A    Yes.

Q    And that's something that conceivably could show a history of stability or good works as listed on the Mitigation Checklist, 628, Page 5?

A    Yes.

Q    Now going back to the life history, you also indicate that Billie played basketball as well.  Is that correct?

A    Yes.

Q    And you spoke to Raymond Petty about that.

A    Yes.

Q    Okay.  And I believe yesterday you testified you had only spoke to Mr. Petty about Scouts but, in fact, it was more than just the Boy Scout involvement.  Is that right?

A    Evidently.  I certainly -- I had no recollection of this, but I recognize my hand printing.

Q    And he apparently, according to your handwriting on 303.8, Raymond Petty told you that Billie had actually outgrown his asthma.  Is that right?

A    Yes.  That's what this note says.

Q    And it also indicates that Mr. Petty had some information concerning Billie Allen's basketball history.  Is that right?

A    Yes.

Q    Now you have a footnote there that indicates that Billie provided an address for you -- an address for you for Raymond Petty.  Is that right?

A    No.  That was for Johnnie Grant.

Q    I'm sorry; for Johnnie Grant.  On 8 -- on 9?

A    Footnote 9.

Q    Yes, for Johnnie Grant.  I'm sorry.  And then does it indicate that, "RHS notes" -- that would be -- "RHS" would be

Mr. Sindel's notes.  Is that right?

A    Yes.

Q    Okay.  So Mr. Sindel's notes indicated that there was a different address that he had for Johnnie Grant.

A    That's what it looks like.

Q    Okay.  So Mr. Sindel apparently had given you some sort of list of -- of witnesses or people and their contact information.  Is that correct?

A    I don't -- I don't -- I don't think that was a list.  I'm looking at one data point.

Q    So Mr. Sindel had given you at the very least some notes, correct?

A    Yes, notes on -- on Johnnie Grant.

Q    And that those notes indicated a different address for Johnnie Grant.

A    Yes.

Q    Does that refresh your recollection that Mr. Sindel actually did give you a list that had some witness contact information on it?

A    I'm not sure, but I think that this was a -- simply notes of an interview with Johnnie Grant.  I have no recollection of having received any list from Mr. Sindel, but I -- I do remember that Johnnie Grant was someone who figured early in -- I think it was on both sides of the case, --

Q    So you believe?

A   -- both guilt and penalty.

Q   I'm sorry.  I keep thinking you're done and then you're not.

A   I'm sorry?

Q   I keep thinking you're done and then you're not.  I'm driving Ms. Kriegshauser crazy.

Are you saying that Mr. Sindel gave you some notes concerning his interview of Johnnie Grant?

A   I -- I think that that's what this document shows.

Q   Okay.  So when you said Mr. Sindel didn't give you any notes, it does appear now that at the very least he gave you some notes concerning an interview of Johnnie Grant.

A   It -- It at least reflects that I got something in writing with an alternate address for Johnnie Grant.

Q   Okay.  And going to Paragraph 54, it reports having boxed with his uncles in the street.  We discussed that briefly previously.  That was a -- referring to your notes, if you recall, he had been boxing with Jerome and slipped on the grass.  Is that correct?

A   Yes.

Q   Okay.  And then he -- That accident caused him to fall and hit his head.  Is that right?

A   That was the account he gave to me.

Q   Okay.  And you note in here that he denies actually having been hit in the head.  It was a slip and fall that

caused him to hit his head.  Is that right?

A    That's the way I wrote it up.

Q    Okay.  And that's based on what Billie Allen told you, correct?

A    Yes.

Q    Now going to the next page which is 303.9 of your life history, you list Billie Allen's involvement in music.  Is that correct?

A    Yes.

Q    And the group he was involved in was a group called "Unlawful Entry."  Is that right?

A    Yes.

Q    That -- That, as you noted in your interview with him, was not a useful name.  Is that fair to say?

A    That's fair to say.

Q    Okay.  And this group, he listed producers for the group as both Ahmed Oliver and this Flexx.  Is that right?

A    Yes.

Q    And in your life history you provide some contact information.  You got the phone number of Ahmed Oliver up there, correct?

A    Yes.

Q    Okay.  And that's handwritten; that's added later.  Is that from information that -- that Mr. Sindel gave you?  Is that where you're getting the phone numbers?  Or where are you

getting those phone numbers? Or was that something that Mr. Allen had given to you in the interview? Do you recall?

A  Where there's no source attributed to it, my -- Well, if I -- I think that I would have to speculate to give an answer to that.

Q  And are you comfortable speculating or is it just out of the air? Is it based on your practice? What -- Where do you think that came from?

A  As of 1998, it would have been from the phone book.

Q  Okay. So you think you just looked up Ahmed Oliver.

A  Yeah. I think that that is a sufficiently unusual name; that if I found it in the phone book, I would credit that.

Q  Now if Ahmed lived with his mom --

A  Yes.

Q  -- and was 17 years old, he's probably not going to be listed in the phone book.

A  Understood.

Q  Okay.

A  I did use the phone book when everybody else did.

Q  No. So what I'm saying is Ahmed probably wasn't in the phone book. Isn't that fair to say?

A  What I'm -- What I'm saying is that if this had come from a spot interview or a phone call to someone, it would say, "Per Joe Blow."

Q  Okay. And if it had come from Billie Allen, you wouldn't

necessarily --

A    If it had ---

Q    -- indicate that.

A    If it had come from Mr. Allen, I believe it would have been in the word processing document rather than in my annotations.

Q    Did you go back and listen to the tapes to get more information from them in order to complete the life history?

A    My recollection is that my listening to the tapes was testing for the use of the mitigation investigator.  However, I -- I would not have considered them absolutely worthless.  So I mean it -- You know, it wouldn't shock me if I did.

Q    So in other words, you might have gone back and listened to them.  You're not -- You just don't have any recollection of them.

A    That's right.  I don't have any recollection one way or the other.

Q    And you provided some contact information -- or I'm sorry; not contact information.  You tracked down some information concerning "Flexx" to determine that his name was truly Wilson Hankins.  Is that right?

A    Yes.

Q    Now Mr. Allen's musical talents, those are also relevant to mitigation.  Is that correct?

A    Yes, with the same qualification about his artwork.

Q    There are ways to show that he has worth.  Is that fair to say?

A    Yes.

Q    And both his music and his art were evidence that was put on in mitigation.  Is that correct?

A    Yes.

Q    Now both -- The music here, that didn't fit neatly into that Mitigation Checklist that we saw, 628.  Is that correct?

A    Yes.

Q    But you knew that that was something that -- that could be relevant to mitigation.  Is that correct?

A    "Know" is too strong a verb, but I wanted to error on the side of inclusiveness rather than exclusivity in preparing this document because it was intended for someone who would know what to do with it.

Q    So you included as much information as you could that might be relevant to mitigation.  Is that correct?

A    Well, with the obvious exception of the *Rompilla* material.

Q    And when we're talking about the *Rompilla* material, could you tell me factually what information you're talking about?

A    The drug mule business.

        THE COURT:  The what?

        THE WITNESS:  Drug mule, Your Honor.

        THE COURT:  Oh.

Q    (By Ms. Costantin)  And you indicated that you did not include the drug mule information intentionally?

A    No.  I didn't -- I -- I did not indicate one way or the other.

Q    You just know you didn't include it.

A    Well, I know that it's not there because I can read.

Q    Okay.  And we discussed the fact that if a life history was produced to a psychologist who testified, that information -- that life history would likely have to be produced to the Government.  Is that correct?

A    That's correct, but this document was not intended for a testifying expert.  This was intended for Dr. Haney.

Q    And ---

A    Actually by Dr. Haney, I really don't mean Dr. Haney.  I mean Jill Miller because I did not realize at that time that Dr. Haney wanted to receive everything else from other people and was not undertaking a social -- an investigation on his own.

Q    And "Jill Miller" is who?

A    Jill Miller is someone who typifies mitigation specialists or mitigation investigators, someone whose work I had seen on both sides of the "V" or who I have seen on both sides of the "V" as of this point.  Jill -- Jill Miller is from -- I believe Wisconsin.

Q    Mr. Simon, before we hear the life history of

Jill Miller, Jill Miller was not involved in this case in any way, shape or form, correct?

A    That's why we're here.

Q    Okay.  Jill Miller was not involved in this case in any way, shape or form, correct?

A    Yes, ma'am.

Q    Okay.  And so you had no expectation -- you couldn't possibly have an expectation that this life history was going to be given to Jill Miller.

A    What I was expecting was that this life history would be given to a mitigation investigator or mitigation specialist who would be part of the defense team and protected by the attorney/client privilege and attorney work product immunity. That way -- That's why I have absolutely no reason for leaving out the *Rompilla* material.

Q    So it was not your understanding at one point that Dr. Randall, in fact, had been endorsed as an expert witness. Do you recall that?

A    Well, I -- I -- I remember that he eventually did have to do that.  However, that was against -- that was against my intention.

Q    My question is simply:  Dr. Randall was endorsed as an expert witness.  Is that correct?

A    There was a point at which he was.

Q    And if Dr. Randall had rendered opinions as an expert and

testified based upon the life history, it would have had to be produced to the Government, correct?

A    That's correct.

Q    Okay.  Going to Page 303 ---

THE COURT:  Wait a minute.  There's a reference to "Ron" something or other, and I don't know what we're talking about.  What's that all about?  Ron ---

THE WITNESS:  Rompilla.

THE COURT:  Okay.  Spell it for me.

THE WITNESS:  Capital R–O–M–P–I–L–L–A.  It's one word, Your Honor.

THE COURT:  And what is that?

THE WITNESS:  That's the United States Supreme Court decision saying that -- that in developing mitigation evidence, one must look at unfavorable material as well as favorable.

THE COURT:  Yeah, okay.  All right.

Q    (By Ms. Costantin)  And what's the date of that decision?

A    2003.

Q    Okay.  So that decision was rendered five years after this case was tried.  Is that correct?

A    And it's retrospective under *Teague versus Lane*.

Q    Was that case decided five years after this case was tried?

A    Yes, and it's retrospective under *Teague versus Lane*.

Q   Okay this life history, referring you to Page 10 which is 303.10, you indicated that Mr. Allen wrote or performed in public a piece about robbing the Casino Queen.  Is that correct?

A   Yes.

Q   And the Casino Queen is a gambling boat across the river in East St. Louis.  Is that right?

A   It's a gambling boat.  I do not frequent them, so I do not know which side of the river it's on.

Q   Okay.  You don't know where the Casino Queen is?

A   I don't know which side of the river it's on.

Q   And you indicate in there that the lyrics for that song were on the kitchen table when the Defendant was arrested.  Is that right?

A   That's what it -- That's what I was told.

Q   But fortunately, according to Mr. Allen, the police never seized those.  Is that right?

A   Yes.

Q   So is it fair to say that in this Paragraph 65, you're indicating that there's some information that could be negative for Mr. Allen but that, fortunately, the lyrics, the specifics of that, are not known to the Government.

A   Yes, which makes it more inexplicable than ever why I omitted the *Rompilla* information.

Q   In this situation right here there are no lyrics.  Is

that correct?

A    I don't know.

Q    There are no lyrics the Government has.  Is that right?

A    I don't know.

Q    Okay.  Well, isn't that what you say?  "It does not appear the police seized those lyrics when they arrested him and searched the residence."

A    I did not know how much material the prosecution had until I received it from 2255 counsel.

Q    My question is simply:  In your life history, you're indicating that, "Although the Defendant wrote a song about robbing the Casino Queen, the lyrics do not appear to have been found by the Government."

A    Nor by co-counsel.  I never saw any lyrics.  I'm simply reporting what I was told.

Q    And that's what Billie is telling you is that they never seized them; the police never seized them, right?

A    Yes.

Q    Now you wrote that he did not have a large number of friends and kept to himself.  Is that right?

A    Yes.

Q    And is that information that might be relevant to mitigation?

A    Yes, in a Janus-faced way.

Q    In a what?  Excuse me?

A    Janus-faced; a two-edged sword.

Q    Specifically, one of the things listed is whether the person is withdrawn, is that right, --

A    Yes.

Q    -- on the Mitigation Checklist?

So this is something that the Mitigation Checklist is telling you to look at; see if a person is withdrawn.  Is that correct?

A    Yes.

Q    Okay.  And that's one of the things that you spoke to him about was his friendships, whether he had a lot of friendships or whether he was withdrawn.

A    Yes.

Q    Now you wrote that Marquis was his principal friend.  Is that correct?

A    Yes.

Q    And Marquis was shot to death in front of him.

A    Yes.

Q    Now that's something that was relevant to mitigation, correct?

A    Yes.

Q    And specifically as we look on the checklist and we look at tragedy, the checklist, 628, one of the things that's listed is "Significant Other Death."  Is that right?

A    Yes.

Q    Okay.  Now that's something -- That shooting of Marquis, the fact that Marquis literally died, bled to death in front of the Defendant, that's something that you knew would be important to Billie's life, correct?

A    Yes.

Q    You didn't need a mitigation checklist to tell you that.

A    Yes.

Q    Now you wrote in your life history that Marquis' stepfather was a drug dealer, and he taught Marquis and Billie how to sell drugs.  Is that right?

A    Yes.

Q    Okay.  Now you didn't indicate in your life history at all that John Allen, his father, taught him to sell drugs, did you?

A    I don't believe so.

Q    Okay.

A    We -- We had that up there about an hour ago.

Q    Okay.  And you didn't indicate that his uncle taught him how to sell drugs.  Is that correct?

A    That's my recollection.

Q    And you wrote that Billie Allen reported that he had lots of girl friends.  Is that right?

A    Yes.

Q    And one of the things that you're looking at on the Mitigation Checklist is the area of sexual, what his practices

are.  Is that correct?

A    Yes.

Q    Now moving to Page 11 of your life history, you discussed the fact that Billie Allen did not have steady employment.  Is that correct?

A    Yes.

Q    And the fact that he's had numerous jobs, is that something that's relevant to mitigation?

A    Yes.

Q    And specifically, I'm going to direct you to the Mitigation Checklist.  Is one of the things to look at on the Mitigation Checklist whether a person has a history of steady employment?

A    Yes.

Q    Now you also wrote in your life history that he was -- Billie Allen had been exposed or may have been exposed to toxic chemicals, correct?

A    Yes.

Q    And that is something -- And that he could not keep his job because of his asthma.  Is that right?

A    That was in the notes.  The text here is more general, but it's consistent with the notes.

Q    Okay.  The job didn't work out due to limits on his activities stemming from his asthma.

A    Yes.

Q    Is that what 628 says?

A    Yes.  That's -- That's -- Yes, that's a correct reading.

Q    Now the fact that he's exposed or potentially exposed to toxic chemicals and problems with the asthma, those are both relevant to mitigation.  Is that right?

A    Yes.

Q    And looking at the Mitigation Checklist that you have when you're doing the interview, at the bottom, "Chronic Illnesses and Conditions" is something that would be asthma would be relevant to.  Is that right?  "Chronic Illnesses"?

A    Oh, yes.  Yes.

Q    Okay.  And then looking at the drugs, toxic chemical portion, if you're an industrial worker, have a chemical exposure, that's something that's listed on the checklist as -- as something that you should cover.  Is that correct?

A    Yes.

Q    Now you have a section of your life history of Mr. Allen that is entitled "Traumas."  Is that right?

A    (Affirmative gesture).

Q    And that discusses an incident about three years ago in which a man struck Billie Allen in the back of the head with a Ruger 39 or .9 millimeter handgun.  Is that right?

A    Yes.

Q    Okay.  And you indicate that Mr. Allen may have -- that he fell to the ground and he may have been unconscious.  Is

that correct?

A    Yes.

Q    And head injuries are something that's relevant to mitigation, correct?

A    Yes.

Q    Now you knew that without having to look at the Mitigation Checklist, didn't you?

A    I -- I knew it in a kind of popular culture sense because there's the expression of someone who is on trial for some horrific crime and there's a kind of joke among the lay public that his lawyer is going to argue that he was hit on the head as a child.  So I -- I realized that it needed to be forwarded to someone who was qualified to make a decision about it and, therefore, I included it in the life history.

Q    And you also knew that it was listed on Page 1 of the Mitigation Checklist as shown on the screen right now.

A    Yes.

Q    Childhood -- "A head trauma or loss of consciousness;" is that right?

A    Yeah; yeah, and I included it.

Q    Okay.  And going back to that life history, you also indicated -- I'm on Page 12 of Exhibit 303.  You also indicate that he had not previously had chronic headaches but then he began to have chronic headaches.  Is that right?

A    Yes.

Q   And that's something that would be relevant to mitigation because it would show that the head injury was actually severe.  Is that right?

A   Yes, and especially that there was somatic damage.

Q   That it affected his consciousness.

A   Yes, and that it was physical as opposed to simply psychological.

Q   And you indicate on Page 12 of your life history that Billie Allen knew or knew of several people who had been killed in acts of violence in or near his neighborhood.  Is that right?

A   Yes.

Q   And that was also relevant to mitigation, correct?

A   Yes.

Q   And you had discussed the idea with the trial team that Billie's experience of death of many people was a potential mitigation theme.  Is that right?

A   I do not remember a meeting of anything approximating a trial team until Dr. Randall was on the case.

Q   And subsequently, did you have a discussion in which one of the potential themes was that Billie Allen had experienced the death of many?

A   Yes.

Q   And that's something that you included in your life history.

A    Yes.

Q    You also included in the life history that someone had shot at him three years ago.  Is that right?  Looking at Paragraph 81.

A    Yes.  Yes.

Q    And I'm going to the portion of the Mitigation Checklist under "Social History."  That would be when they indicate when a person was a victim of violence or trauma.  Is that right?

A    Yes.

Q    And being shot at would be that he was a victim of violence of trauma -- or trauma.  Is that correct?

A    Generally, yes.

Q    And that's something that was listed on the Mitigation Checklist.

A    Yes.

Q    And you did not describe in his Social History, one, that Billie Allen was a victim of violence from his mother.  Is that correct?

A    That's correct.

Q    And Billie Allen did not tell you that he was a victim of violence from his mother.  Is that correct?

A    Yes, that's correct.

Q    Now going to your -- back to your life history, Page 12, is it correct that you indicated the principal trauma in Billie's life was the shooting death of his closest friend,

Marquis, in front of Billie's friend's house.  Is that correct?

A    Yes.

Q    And that was based on Billie Allen's report.  Is that correct?

A    Yes.  With the exceptions noted, this was all based on self-reporting.

Q    Okay.  And he told you in your interviews that he had not been right since.  Do you remember listening to that or seeing that this morning?

A    Well, that's something that I remember independently.

Q    Okay.  You remember independently that Billie Allen told you he hadn't been right since Marquis was killed.

A    Marquis' death.

Q    Okay.  And that is something that is very relevant to mitigation.  Is that fair to say?

A    Yes.

Q    And that's something that would be listed under "Tragedy" on the Mitigation Checklist, "Significant Other Death."  Is that right?

A    Yes.

Q    Now another trauma that you described on Page 12 is that in January of 1997 some people shot up his mother's house over a drug deal gone bad.  Is that right?

A    Yes.

Q    And that shooting is something that could be listed as him being a victim of violence or trauma even though he wasn't there.  Is that fair to say or not?

A    Well, I know if you were charging him, you could put it that way.

Q    I'm sorry?

A    If you were charging it, he wouldn't have to be there.

Q    Okay.

A    So, yeah, that's something that I think adds an element of trauma to a person's life.

Q    Okay.  Whether you're there or not, the fact that your house got shot up with your mother home --

A    Yeah.

Q    -- and sisters would be something that could be traumatic.  Is that correct?

A    Yes.

Q    All right.  In your life history, moving to the next page, Page 13 of the life history, you indicated that since well before the bank robbery, Billie has had nightmares about getting shot.  Is that right?

A    Yes.

Q    Okay.  And that's what Billie Allen told you, correct?

A    Yes.

Q    Now he didn't tell you that he was having nightmares about his mother beating him.  Is that correct?

A    No.

Q    And he didn't tell you that he was having nightmares about Jerome Petty or Otha Petty beating him, did he?

A    No.

Q    He told you his recurrent nightmares were about being shot.  Is that correct?

A    Yes.

Q    And going to -- back to the Mitigation Checklist, under the category of "Sleep", "consistent nightmare" is something that's important to mitigation.  Is that correct?

A    Yes.

Q    Now in your life history you have a section on his prior adjudications.  Is that right?

A    Yes.

Q    And he indicated to you that he had no juvenile adjudications.  Is that right?

A    No, that's not what it says.  Quoting Paragraph 86, "Billie referred to a juvenile record but denied having been institutionalized as a juvenile delinquent."

Q    So he told you that he had never been locked up as a juvenile.  Is that fair to say?

A    Yes.

Q    And he also told you that he had a tampering conviction as an adult for which he received two years' probation.  Is that right?

A    Yes.

Q    Now a limited criminal history is something that's relevant to mitigation.  Is that correct?

A    Yes.

Q    And particularly a nonviolent criminal history is something that would be relevant to mitigation.  Is that true?

A    Yes, discounted by the gravity of the charge on trial.

Q    Was there an effort at trial to show that -- directing you to 628, the Mitigation Checklist -- to show that Billie Allen's actions in the robbery were out of character?

A    Yes.

Q    Okay.  And the tampering conviction would not be anything that would dispute the fact that a violent act was out of character.  Is that fair to say?

A    That is fair to say.

Q    Now in your -- in your life history, going to Page 13, you also included Billie Allen's substance abuse.  Is that right?

A    Yes.

Q    And he told you he hadn't started drinking till 12 months before the robbery.  Is that right?

A    That's what it says.

Q    And that's what he told you, correct?

A    Yes.

Q    Okay.  And he also told you that he did not use hard

drugs.  Is that right?

A    That's right.

Q    And he also -- And that's in your life history?

A    Oh, yes.

Q    And he also told you that he was smoking about an ounce of marijuana a week.  Is that right?

A    Yes.

Q    Now that information is all relevant information to mitigation.  Is that correct?

A    Yes.

Q    And going to the Mitigation Checklist that you were using, the section concerning psychoactive substances has those items on there.  Is that correct?

A    Yes.

Q    Alcohol, marijuana, harder drugs; is that correct?

A    Yes.

Q    And then finally in your life history you've included two incidents in which he passed out from having smoked marijuana.  Is that correct?

A    Yes.

Q    And the fact that someone is actually passed out, that's something that's relevant to mitigation as well.  Is that correct?

A    Based on my subsequent work, I would say that any -- any form of unconsciousness, whether from drugs or head trauma or

otherwise, is relevant.

Q    Okay.  And specifically directing your attention to the Mitigation Checklist, Exhibit 628, Page 3, one of the things you're looking at is blackouts.  Is that correct?

A    Yes.

Q    All right.  And those blackouts specifically are related to use of psychoactive substances.  Is that right?

A    Yes.

Q    Now I want to direct your attention to Exhibit 251, the declaration that you filed in this case.  Is that what's on the page in front of you?

A    Yes.

Q    And I'm going to page through it to make sure -- I can see -- I can see some of your initials on the side.

A    Yeah.

Q    Is 251 your declaration?

A    Yes.

Q    And I want to look down on Paragraph 3 of your declaration.  I'm going to pull up a section.  You indicate in that declaration that, "Prior to the mid-January exchange of letters with Dr. Haney, I did not generate or assist in generating a social history for Mr. Allen."  Is that correct?

A    Yes.

Q    Okay.  Now, in fact, you had generated a 14-page typed life history of Billie Allen based on hours of interview with

him on December 12th of 1997, January 1st -- I'm sorry --

January 7th and January 8th.  Is that correct?

A    Yes.

Q    And you had also had conversations in creating that life

history with at least four other people; Lucy McLemore,

Otha Petty, Raymond Petty, the church secretary.

A    Wait, wait.  Let's leave out the church secretary.  That

was just to find out who the Scout Master was.

Q    Okay.  And someone related to tracking down Flexx,

correct?

A    Yes.

Q    And that's not even counting that January 7th meeting

that you had with Juanita Allen and Yvette.  You think it was

Yvette as well as Deborah Ruffin.

A    The group -- The group report.

Q    Okay.  All of that had occurred, and then you generated

the social -- I'm sorry -- the life history.  Is that correct?

A    Yes, and that's a big distinction.  The life history was

not a social history.  First of all, it isn't just -- it isn't

the same objectively, regardless of what year you're looking

at.

Q    Did you ---

A    This declaration was executed in 2009 after I had handled

multiple federal case -- multiple federal habeas corpus cases

and capital cases and after I had worked on three capital

cases to conclusion in the Missouri State Public Defender system at the trial level.

Q    Did you ---

A    The life history is not a social history.

Q    Did you in your declaration indicate that it wasn't -- that you had completed a life history but not a social history?

A    There are many things I did not put in the declaration, but the life history was not a social history.  That's lipstick on a pig.

Q    You simply stated you didn't generate or assist in generating a social history from Mr. Allen.  Is that correct?

A    And that's -- And it's as correct today as it was the day I signed it.

Q    You didn't indicate that you had generated something you called a "life history" based on hours of interviews with Billie Allen as well as with Lucy -- talking to Lucy McLemore, Otha Petty, Raymond Petty, and that meeting with Juanita Allen, Yvette Allen and Deborah Ruffin.

A    Nor did I list in it all of the seminars that I had attended between the amateur effort in the *Billie Allen* case and my successful conclusion of three capital cases in the Missouri State Public Defender system.

Q    And you didn't indicate that, "Well, I didn't do a social history, but I did do a 14-page written life history;" did

you?

A    No, I did not draw that distinction, but it doesn't falsify what's in the statement.

Q    Well, does it make that sentence somewhat misleading?

A    Not to someone who understands a social history.

Q    Okay.

THE COURT:  Wait, wait, wait.  You know, wait a minute.  I've had a lot of hairs split today, and you talk about you want to do the truth and you want it absolutely right.  So, you know, the hide goes with the hair on this, so be careful what you say.  You're cutting it awful fine as far as I'm concerned.

Q    (By Ms. Costantin)  So in your declaration, when you wrote, "I'm not generating or assisting in generating a social history for Mr. Allen," you remembered that you had done this life history, correct?

A    I'm not sure whether I did.  I certainly remembered that I had not done a social history.

Q    Did you remember when you wrote that sentence that you had talked to Billie Allen for hours in December of 1997 and January of 1998?

A    I certainly remembered that I had talked with him at some length.  As you'll note that in the next sentence, it says, "I did not conduct mitigation interviews with those who knew Mr. Allen as a child or a young man."

Q    And, Mr. Simon, we're going to get to that next sentence in a moment.

A    Okay.

Q    Let's talk about the first sentence.  When you wrote, "I did not generate or assist in generating a social history for Mr. Allen," did you remember that you had interviewed Billie Allen on mitigation issues for hours in December of '97 and January of '98?

A    I knew that I had interviewed him, Mr. Allen.  I also knew the distinction between a social history and the document that I prepared.

Q    Okay.  And in the document you prepared, the life history you prepared, is that right?  You're talking about?

A    Yes.

Q    So you did remember when you wrote this sentence that you had prepared a life history.

A    No.  My testimony was just the opposite.  I did not remember preparing that document.

Q    I thought you just said when you wrote this here, you remembered the distinction between a life history and a social history.  If you didn't remember writing a life history, how could you have remembered there was a distinction?

A    I believe I said that I knew the distinction.  I -- I -- I -- I have and most people who do mitigation work on both sides understand the difference between a social history and

some chronology that goes through events in somebody's life and has leads here and there.

Q    And I guess I'm a little confused, and let me make sure I understand this seriously.  When you wrote this sentence, did you remember that you had written that 14-page what you titled "Life History"?

A    No.  And -- But --

Q    Okay.

A    -- I got to add:  I did not write that sentence.

Q    Okay.  When you adopted that, when signed that declaration, --

A    I understand.

Q    -- did you remember -- When you signed the declaration, did you remember that you, in fact, had generated a 14-page life history of Billie Allen?

A    No.

Q    Okay.  So this distinction between a social history and life history was not in your mind at all when you wrote this --

A    That's correct.

Q    -- because you did not even remember writing a life history.

A    And if I had the life history right in front of me, I would have said it's not a social history.

Q    And perhaps if you had that, if you had remembered that

you had the life history, would you perhaps have written this

sentence differently and said, "I did not generate or assist

in generating a social history for Mr. Allen, but I did

generate a 14-page life history"?

A    Well, that is possible.

Q    Okay.  Would you think that would have been a more

complete statement of your activities?

A    Oh, yes, it would have been more complete, along with

the -- the record of my work in between the *Billie Allen* case

and the execution of the declaration.

Q    And -- And I'm talking about the specific sentence.  That

would have been more complete if you included that.  Is that

fair to say?

A    It would have been more complete, yes.

Q    Now that January 7th meeting that you had with

Juanita Petty -- I'm sorry -- Juanita Allen -- excuse me --

Deborah Ruffin, perhaps Yvette and Otha Petty, you discussed

mitigation issues with them.  Is that correct?

A    I don't remember.

Q    Well, do you remember in the notes that you read that it

said that Juanita Allen said that she didn't drink while she

was carrying Billie Allen but she did smoke?

A    My inclination -- My -- My perception is that would have

been something she volunteered.

Q    Okay.  So ---

A    There was something in there that said that I was looking for negative stuff, and I don't know where she got that.

Q    Okay.  So looking at the Mitigation Checklist, 628, one of the -- the very first item to look at is "prenatal alcoholic mother."  Is that correct?

A    Yes.

Q    So it's your memory that on January 7th, you're meeting with Juanita Allen and the other folks, and she just spontaneously tells you, "I didn't drink when I was carrying Billie, but I did smoke when I was carrying Billie."

A    That -- That is my recollection.

Q    It had nothing to do with the fact that the very first thing on the Mitigation Checklist is "prenatal alcoholic mother."

A    No, because I would not have brought up any of those subjects in a group meeting.

Q    Okay.  So she just brought that up on her own, correct?

A    Well, it's not completely on her own because as I understand the documents that I've seen recently, Mr. Sindel had interviewed her.

Q    Mr. Sindel wasn't present for the January 7th meeting --

A    That's correct.

Q    -- because he was with Oreo.  Is that right?

A    That's correct.

Q    Okay.  And we still don't know who "Oreo" is.

A    Exactly.

Q    But we know it wasn't Mr. Sindel.

A    Oh, yes.

Q    Okay.  All right.  So at that ---

A    Mr. Sindel was not there, --

Q    Okay.

A    -- but the record shows that he had interviewed her before the meeting that I had to brief the people on the status of the case.

Q    And so you think that when Mr. Sindel had interviewed Juanita Allen, she had also told him that she didn't drink while she was carrying Billie?

A    Well, from the record that I have seen now, I understand that they got into some of these issues that I would only have raised with her in private; Mr. Sindel and Ms. Allen.

Q    Okay.  And so what you're saying is some records -- What records are you saying now?  I'm talking about back in 1998.

A    Well, back in 1998, I had not seen it, but in the last few weeks I have seen something where there was -- there were notes of an interview between Mr. Sindel and Ms. Allen in which they got into some of these things about what you might call the dark side of the -- of the -- of Mr. Allen's past.

Q    So you've seen notes that Mr. Sindel took of an interview or meeting he had with Juanita Allen in which they discussed what you characterize as the "dark side"?

A    Yes.  It was before I was appointed.  I just saw these documents in the last two weeks.

Q    Okay.  So -- And these are handwritten notes of Mr. Sindel?

A    No.  They're -- They're typewritten.  They're word processed.

Q    Okay.  They're word processed copies of notes that he took?

A    Considering that I wasn't there and wasn't even on the case, I have no way of knowing exactly how they were produced except what I saw were word processed.

Q    Okay.  So you're saying that what you saw was some sort of word processing notes of Mr. Sindel meeting with Juanita Allen --

A    Yes.

Q    -- or talking to Juanita Allen.

A    Yes.

Q    Okay.  And they discussed that you recall or she stated to Mr. Sindel that you recall that she didn't drink when she was carrying Mr. Allen.

A    No, I -- I did not say that.  I'm simply saying that I, too, find it highly suspect that this came up.  The fact is that -- I mean even when I was representing guards in the Department of Corrections, if there was something like this to be asked, I would only ask it of someone as an individual.  I

would not do this in a group meeting.  My purpose was to convey information, not to collect it.

Q    And what she absolutely said to you, whether you elicited it or she just spontaneously said it, was that she didn't drink while she was carrying Billie but she did smoke.  Is that right?

A    That's -- That's what my notes reflect.

Q    Okay.  And what you're speculating perhaps -- is that the right word -- is that she was primed to talk about those issues because she had already talked about the dark side with Mr. Sindel?

A    Extrapolating is the word.

Q    Okay.

A    I was extrapolating from what I've seen to try to explain what I am surprised by.

Q    Okay.  From the notes that you saw of this conversation between Mr. Sindel and Ms. Allen, what do you recall was discussed?

A    I recall a statement by Ms. Allen that she did not want Mr. Sindel to fabricate to her; that she -- she wanted him to be truthful to her.  And I -- I did not commit this to memory, but I -- I -- that was something that did stick out in my memory.

Q    So are you perhaps referring to what appeared to be a transcript of a partial phone call on April 17th of 1997?

A    If I could see it, I could say for sure.

Q    I'm sorry.  I'm sorry.  I apologize.  Could you say that again?

A    If I could see it, I could say for sure.

Q    Yeah.  Well, we're trying to figure out the number.

A    Very good.

Q    This is 301.  Is this what you're talking about?

A    Yes.

Q    So this is Exhibit 301 that's already been discussed with Mr. Sindel.  You weren't present for this conversation because you, obviously, hadn't entered the case.  Is that right?

A    That's correct.

Q    Okay.  When is it that you were shown this document?

A    About three days ago.

Q    Okay.  And was that -- 2255 counsel showed that to you?

A    Yes.

Q    Okay.  And your memory of it was that they were discussing the dark side or just that they basically were telling each other, "You got to be straight with me"?

A    My impression of it was that -- that -- that's the only way I can explain why she would have brought up something like Mr. Allen's in utero experience when I was there for what amounts to a social call with multiple people around.

Q    Okay.  So what you're saying is simply that your -- I can't remember which word you used; deduction?  Extrapolation?

A     Oh, I'm sorry.

Q     Extrapolation.

A     Extrapolation.

Q     Your extrapolation was that when she volunteered -- that she volunteered this because months before, in April of '97 Mr. Sindel and she had exchanged the idea that, "We're going to be straight with each other."

A     That's the only explanation I can come up with because I -- I -- I mean I simply would not have brought up topics like that in front of other people.

Q     Okay.  And she -- Did she express that to you, that she was going to be straight with you in that meeting or in any meeting?

A     I -- I would have to look at my notes.  I don't -- I don't recall.  My own experience with Ms. Allen was that that went without saying.

Q     It went without saying that she would be ---

A     That she was going to be straight with me.

Q     Okay.

A     I -- I mean I have had to observe that, that one -- on that one occasion, I believe, that she was under the influence.  However, that is not to dispute her honesty or good will.

Q     Okay.  And that one occasion, just to clarify because I think you clarified for us at, was at 9:00 at night.

A    Yes.

Q    Okay.  Let me go to your timesheets which is 498.7, so Page 7.  On January 8th you called Lucy McLemore to set up what you described as an interview.  Is that correct?

A    Yes.

Q    Okay.  And on January 9th is when you did further review of mitigation workbooks and copied that microcassette that we were talking about that had to go to a larger one of the December 12th interview?

A    Yes.

Q    Now I'm going to show you Exhibit 325.  Is this a letter that you faxed to Mr. Sindel on January 9th of 1998?

A    Yeah.  This is a memorandum I faxed to him on January 9th.

Q    And going to the second paragraph from the bottom, which I'm going to blow up, did you indicate, "As you are aware, I am doing a good deal of work on mitigation"?

A    Yes.

Q    And was that a true statement at that time?

A    "Good deal" reflected what we've talked about today here. I had conducted the -- what -- what I agreed to be interviews with Mr. Allen.  I had done the spot checking with the other people.  As of this point, I would have done the first draft of the life history, and I had arranged for a phone call with Ms. McLemore, possibly an in-person meeting, but it looks more

from the record like it was a phone call on the 11th, to answer spot questions. So it -- A "good deal" is not an objective term. "Good deal" is what we've already talked about today --

Q    Okay.

A    -- and what we talked about yesterday.

Q    My question was simply: Was that statement true? "I am doing a good deal of work on mitigation"?

A    As long as "good deal" is defined the way I've defined it, yes.

Q    And since about 9:00 or so this morning or maybe even 8:30, a break for lunch, what we've been talking about encompasses that good deal of work. Is that --

A    Yes.

Q    -- fair to say?

A    That is -- is co-extensive and co-intensive.

Q    Okay. Now further down you indicate, "I am setting up an interview of Billie's Aunt Lucy for late that afternoon," referring to January 11th. Is that correct?

A    Yes.

Q    So once again, you indicated you'd be setting up an interview of Billie's Aunt Lucy. Is that correct?

A    I used the word "interview" for the mock-up that was reflected on the marked-up version of the life history.

Q    And what we see is back at that time on your timesheets

and your correspondence, you're referring to these verbal interactions with individuals as interviews or conferences. Is that fair to say?

A    Yes.

Q    And now you're referring to them in 2012 as spot questions and what was the other phrase you used?

A    Meet and greet.

Q    Meet and greets, okay.

        THE COURT:  Okay, wait.  Wait a minute.  Let me catch up.

        (Pause)

        THE COURT:  Okay.

A    This difference in nomenclature reflected the knowledge that I had gained between Mr. Allen's trial and the present time.

Q    (By Ms. Costantin)  And what I'm asking you simply is: Back at the time you considered these to be interviews and conferences, and now you consider them to be spot interviews -- spot questions and meet and greets.  Is that correct?

A    Yes.

Q    Okay.

A    Based on the intervening experience and education, that's a very reasonable difference in nomenclature.

Q    I'm showing you what is 499, Page 400, and I'm going to show you a couple more pages of that.  My question is simply:

Are these notes from your -- what you described at the time as your conference with Ms. Lucy McLemore on January 11th of 1998?

A     Yes.

Q     And I'm going to show you the next couple of pages as well.  Is that correct?  Are those your notes?

A     Yes.

Q     And to make our life easier, I am now going to show you your transcribed version of those notes.  Looking at Page or Exhibit 500.47 and down to 48, would those be your transcribed notes of your interview with -- or your conference with Lucy McLemore?

A     Yes; denominated as a conference in the notes taken in 1998.

Q     And did you testify on Direct either this morning or yesterday that you just talked to Lucy McLemore about the baptism?  Was that my memory or am I incorrect about what your testimony was concerning your contact with Lucy McLemore?

A     That's -- That was my recollection, and you'll see that that is covered by this -- by this conference.

Q     But you talked to her about more than just where or when Billie Allen was baptized.  Is that correct?

A     Well, as I think I explained yesterday, I -- I couldn't just call somebody up out of the cold and ask them one factoid.  I -- I -- I laid a foundation for that.  I got the

information I needed, and that was the end of the conference.

Q    And let's talk about some of that information that you got from Lucy McLemore on January the 11th of 1998.  First of all, you got her whole -- "her" meaning Juanita Allen's family history as far as brothers and sisters and when they got married and that sort of information.  Is that correct?

A    That would have been volunteered.

Q    You didn't ask those questions?

A    I don't think so.

Q    Okay.

A    My -- My objective was exactly as I've described it here. It was to fill in the blank in the life history.  If the lady was willing to give me more information, I was willing to write it down.

Q    Okay.  So let's run through how this interview went. Like she -- You knock on the door.  She answers the door.  You say, "Hello."  She says, "Hello."  And then she says, "I have six siblings, three each.  Juanita is the youngest.  The males in our family are Otha Petty, Jr., Raymond Petty and Jerome Petty.  The females are Lucy McLemore, Melissa McLemore and Juanita Allen."  Or did you actually ask questions about Lucy McLemore's familial relationship with Juanita Allen and the rest of her family?

A    I would have introduced myself and explained what I was doing.  There are some of these questions that I think an

average person would expect to be asked.  There were some of these topics one would want to discuss.  What I was zeroing in on was the baptism factor, and I got that information.

Q    And you also got information concerning her three brothers.  Is that right?

A    Yes.

Q    And you also got information concerning her two sisters, including Juanita Allen.

A    Yes.

Q    Okay.  And you got information concerning when they got married and the fact that -- when Juanita Allen moved out on John Allen.  Is that right?

A    Yes.

Q    And then you got information concerning where they had lived on Evans.  Is that correct?

A    Yes.

Q    And then you also got some information concerning the minister at the New Home Missionary Baptist Church.  Is that correct?

A    Yes, and that indicates where I was going.

Q    Now the information concerning Juanita Allen's family background, her siblings, would that be information that would be useful to mitigation?

A    Yes.

Q    Okay.  And that -- Those -- Those folks, as we look at

them, do you recall how many of those folks actually testified

at trial in the mitigation phase?

A    I think four.

Q    Okay.  And who would they be?

A    Otha, Jr., Raymond, Jerome and Lucy.

Q    Okay.  And do you remember Melissa Petty, I believe,

actually came down from Chicago and testified?

A    No, I didn't remember that.

Q    Okay.  But of those people, when you had this conference

with Ms. McLemore, she ended up giving you information about

either four or five people who testified in the mitigation

phase.  Is that correct?

A    That's what it shows, yes.

Q    As we said before, it looks like at the bottom you got

some information about the minister at her church.  You also

got some contact information for Raymond Petty.  Is that

right?

A    Yes.

Q    You also obtained some information about Lucy McLemore's

children.  Is that correct?

A    Yes.

Q    And they, according to her, all were in college.  Is that

correct?

A    Yes.

Q    And do you recall those folks testifying in the

mitigation phase?

A    I don't recall one way or the other.

Q    Do you remember Ed McLemore testifying or Colette testifying?  You don't remember one way or the other?

A    No.

Q    Okay.  Would it surprise you if the transcript showed that some of those individuals testified in the mitigation phase?

A    No.

Q    And then you had some more information concerning the other church that Billie Allen attended.  Is that correct?

A    Yes.  That was the object of the mission.

Q    Okay.  And it's your testimony that the sole object of meeting with Lucy McLemore was to find out where Billie Allen was baptized.

A    That was the reason I set up the conference.  I was willing to take the other information and pass it on which I did.

Q    But you decided that you would set up -- call on the phone, set up a meeting, go to her house just to find out where he was baptized; no other reason.

A    As of this point, I don't know whether I did this over the phone or in person.

Q    Well, we've seen previously that you -- Well, okay.  Then we'll look at it again.

You called Lucy McLemore on January 8th to arrange for an interview.  Is that correct?

A     Yes.

Q     Okay.  So you had a six-minute conversation with her to set up an interview.  Is that right?

A     Those are the words that are used, but, to me, that could either be a phone call or an in-person meeting.

Q     So you think it's possible on January 8th that you called her to set up a phone call.

A     Yes.

Q     Okay.

A     Remember, I was dealing with people who were complete strangers.

Q     And do -- I'm showing you Exhibit 325, that letter that you sent to Mr. Sindel, dated January 9th.  Did you indicate in that that you looked forward to seeing him again at noon on Sunday, January 11th, at your office, and you're setting up an interview of Billie's Aunt Lucy for late that afternoon and will return to Columbia that evening?

A     Yes.

Q     Does that indicate to you that there was an in-person interview?

A     That certainly makes it appear to me like it was an in-person interview, but what I'm -- what I'm telling you is that I don't remember.

Q    And what I'm asking you is:  If all you wanted to find out was if or where -- excuse me -- Billie Allen was baptized, why it would take a phone call to set up an interview and a separate interview to find out that one fact.

A    Well, look, I agree that based on these documents, it looks like the more reasonable account is that I met with her. I simply don't remember.

Q    And isn't the more reasonable account that you met with her and discussed other topics relevant to mitigation, such as the family history, Juanita's family history --

A    Well, as I ---

Q    -- and possible mitigation witnesses?

A    Again, I did not think it was good technique to simply -- to simply ask one isolated question.  The lady had to know why I was doing what I was doing, and I thought it was reasonable to proceed in the way that I did, not having any training in the area.

Q    And when you wrote down this information concerning Juanita Allen's family history and Lucy McLemore's children and their attendance at college, did you write that down because you thought there was value to it?

A    There would be two reasons for writing it down.  One is, as you've suggested, that the mitigation specialist would be able to make good use of it.  The other was to disabuse the other person; that I was wasting their time.

Q    So it might have just been like faking it and writing it down so that she'd think that it was important that you were talking to her?

A    I would not consider that faking it.  I think that would be a -- a physical demonstration that one was taking it seriously.

Q    And this information that you wrote down, you retained it.  Is that correct?

A    Yes.

Q    Now you also met with Billie Allen's Uncle Raymond Petty that day.  Is that correct?

A    Yes.

Q    I'm showing you your handwritten notes, which is Exhibit 454, and it goes down three pages.  Are those your handwritten notes, --

A    Yes.

Q    -- Exhibit 454?

A    Yes.

Q    Now these handwritten notes were not transcribed by you later on.  Is that correct?  They were not provided to you to be transcribed.  Is that correct?

A    I -- I -- I don't recall that they were.

Q    And in this interview of Raymond Petty on January 11th of 1998, you received information from him concerning the Boy Scout troop.  Is that correct?

A    Yes.   That was my purpose.

Q    And Mr. Petty told you that he had joined the troop after Billie Allen had joined it.   Is that correct?

A    Yes.

Q    And he also told you that Billie Allen hadn't been involved in Boy Scouts after he crossed the bridge from -- what's the word?   Webelos?   Webelos?

A    Webelos.   Actually I can tell you, based on subsequent work that Ms. -- Ms. Supranowich did, that that's not an accurate statement; that Billy became a Tenderfoot Scout.

Q    But Mr. Petty -- Let's just talk about what happened on January 11th?

A    Yeah.

Q    Okay.   Mr. Petty told you that he hadn't been involved after crossing the bridge from Webelos to Scouts.   Is that right?

A    Yes.   That's what these notes -- That's what these notes say.

Q    But Ms. Caspari followed up on that and actually got Boy Scout records.   Is that right?

A    Yes.

Q    And she determined that, in fact, he had become a Boy Scout.

A    Yes.

Q    Okay.   So Mr. Petty had -- was mistaken about what he

told you on January 11th.  Is that right?

A    Yes.

Q    But then Ms. Caspari followed up and got the correct information.

A    Yes.  And part of the confusion was that I was unfamiliar with this right of crossing the bridge.  It was something that was simply outside of my experience and perhaps unique to the Cub Pack that Mr. Allen was in.

Q    Moving to the second page, Mr. Petty told you that Billie Allen had turned his interests to basketball.  Is that right?

A    Yes.

Q    Okay.  And about halfway down the page, it says, "Bill" -- What does that say underneath the underlined portion?

A    Well, I'm surprised you didn't send this to me to be transcribed.  I can't read it myself.

Q    Does it say, "Bill would curse; could be wild; I could tame him down; would still have temper tantrums; missed games because of attitude"?  Is that what you wrote?

A    Yes.  That -- Your reading of that makes sense.

Q    Okay.  And that's what Mr. Petty told you about the Defendant's or Mr. Allen's involvement in basketball.  That's one of the things he told you?

A    Actually I don't know whether it was about basketball or

just some general comment.

Q    Okay.  So it may not have been basketball.  It may have been just generally that Bill would curse, would be wild and that Mr. Petty could calm him down, but he'd still have temper tantrums.

A    Yeah.  That's -- That's consistent with my interpretation of it.

Q    Okay.  So it was more general problems, what Mr. Petty was telling you about, with Mr. Allen?

A    Yes.  And I might add that that would have -- that would have been volunteered, I can say for sure, --

Q    Okay.

A    -- because I was there on a specific mission, and I had accomplished it by that time.

Q    And what was your specific mission with Mr. Petty?

A    To find out the data on Scouting --

Q    Okay.

A    -- for my life history.

Q    And you did not inquire anything about the basketball?

A    I'm not saying I didn't inquire.  All I'm saying is my mission was to spot check and the mission was accomplished.

Q    Okay.

A    The data was wrong, but I did perform the function.

Q    And once again, you set up an interview with him despite the fact that all you wanted to know was did he make it to --

how high did he get in Boy Scouts?

A    That was my purpose.

Q    And moving to the last page of your handwritten notes, didn't Mr. Petty tell you that Bill and Jerome were very close?

A    That's what it says.

Q    And Jerome is a reference to --

A    Jerome Petty.

Q    -- Jerome Petty, his uncle.  Is that right?

A    Yes.

Q    Okay.  So Raymond Petty told you that Bill, meaning Billie Allen, and Jerome Petty were very close.  Is that correct?

A    That's what it says.

Q    And he -- Mr. Petty also indicated that Bill had outgrown his asthma.  Is that right?

A    Yes.

Q    Now you remember you made that notation on the life history, didn't you?

A    Yes.

Q    Okay.  So you used more than just Boy Scout information from Mr. Petty.  Is that fair to say?

A    Given where we were, I really couldn't ignore anything that I was told.

Q    Okay.  So -- So when -- And that's kind of the point.

People tell you stuff.  You're not going to ignore it, correct?

A    Yes.

Q    You're going to write it down, and if it's helpful, then -- or whether or not it's helpful, it's going to get passed on.  Is that fair to say?

A    That's -- That's it, and that -- that was the reason for preparing the life history, to get that back to the mitigation specialist.

Q    And when we're talking about the life history, those interviews that you had, as I'm showing you Page 4 of Exhibit 303, you are making notations concerning this life history based on talking to Lucy McLemore and Raymond Petty.  Is that right?

A    Yes.

        THE COURT:  Let's take about a ten-minute break.

        MS. COSTANTIN:  Okay.

        THE COURT:  Court's in recess.

        (Court recessed from 3:40 PM until 3:50 PM.)

Q    (By Ms. Costantin)  Let me go back to your declaration.  First of all, could you tell me how this was prepared?

A    Mr. Wiseman from the Philadelphia office of the Federal Public Defender or someone working with him would have prepared this and tendered it to me.  I suggested certain edits, and I believe those edits were made, and then I signed

it.  It would have been at Mr. Sindel's office --

Q    Now ---

A    -- which was then at 8008 Carondelet.

Q    And you said they prepared it.  Did you speak with them ahead of time?  Were you interviewed by them ahead of time?

A    I know that I was interviewed by Mrs. Carlyle in 2007, but I don't remember whether there was any intervening interview.

Q    And this declaration here, Exhibit 251, was presented to you in 2009.  Is that right?

A    Yes, --

Q    Okay.

A    -- after I had had the bulk of the experience that we've discussed at Continuing Legal Education and successful penalty phase development.

Q    But you -- But you didn't prepare this.

A    No.

Q    Okay.  So all that, you know, all that experience you've had since then, that meant nothing into you preparing this because you were not the one who prepared it.

A    No, but it --

Q    Okay.  All right.

A    -- but it did form my definition of certain terms in it.

Q    And it appears that -- or am I correct that it was prepared without an interview of you near the time that it was

presented to you?

A    Well, first of all, I -- I don't remember "yes" or "no," but the interview Mrs. Carlyle conducted of me in 2007 was a very thorough interview.  And I -- I -- I mean -- Assuming there was no intervening interview, I don't think that's any foul on the 2255 attorneys.

Q    I'm not asking if it's a foul.  I'm just trying to understand if you were interviewed in 2007 and then a declaration was produced to you two years later.  That's all I'm trying to figure out.

A    That is possible, but I do not have a clear recollection that would exclude an intervening interview.

Q    And then you reviewed it.  Is that correct?

A    Yes.

Q    And you made some edits?

A    Yes.

Q    And then you signed it.  Is that right?

A    Yes.

Q    Now I want to go to Paragraph 3 which is the second page of your declaration.  We discussed for a moment the sentence, "Prior to the mid-January exchange of letters with Dr. Haney, I did not generate or assist in generating a social history for Mr. Allen."  Is that correct?

A    Yes, that is correct, --

Q    Now ---

A    -- based on my definition of "social history."

Q    Okay.  And is that your definition of "social history" as of 2009?

A    Yes.

Q    Okay.  Did you have a definition of "social history" back in 1998 as opposed to a life history?

A    I -- I don't know for sure because -- because ---

Q    The Judge is catching up.

A    I'm sorry.

        THE COURT:  All right.  Just a second.

A    I had so little experience in 1998 that I don't know how I would have defined "social history," but I do know that it would have involved going farther out into the family tree than I did in the life history.

Q    (By Ms. Costantin)  Okay.  My question is:  Back in 1998, when you wrote on your timesheets that you created the life history for Billie Allen, did that have a specific meaning for you distinct from "social history"?

A    Yes.

Q    Okay.  And what is your difference -- Back in 1998, I'm talking about you had in your mind a difference between a social history and a life history.  Is that your testimony?

A    Yes.

Q    Okay.

        THE COURT:  Okay, wait.  I want to make sure now.  I

want to make sure.  You're saying in -- You're saying in 1997, '98, you referred to -- that you knew a distinction between social history and work history.

THE WITNESS:  Yes, sir.

THE COURT:  All right.  Go ahead.

THE WITNESS:  The life history would be narrower, sir.

THE COURT:  All right.  Wait a minute.  Let me catch up here.

Q    (By Ms. Costantin)  And a ---

THE COURT:  All right.  Just a second.

(Pause)

THE COURT:  Okay.  Go ahead.

THE WITNESS:  Narrower and shallower.

THE COURT:  Wait, wait, wait; no question.  There's no question.

Q    (By Ms. Costantin)  Let's refer to Exhibit 303.  What is in your concept of a social history back in 1998 that was not within your life history?

A    Years of -- Years of documentation of the extended family, a genogram that included both sides of the family, both the Allen side and the Petty side.

Q    So ---

A    That would have been involved in a social history.

Q    Okay.  So a social history would have included the

extended family. Is that right?

A    Exactly; exactly.

Q    Okay. And that's what you got from Lucy McLemore, isn't it, on January 11th was the extended family on Juanita's side? Is that correct?

A    I got names and possibly a little more information as a -- as a collateral benefit of getting a spot question answered.

Q    And ---

A    A social history would be done by a social worker.

Q    No, no, no. I'm not talking about who would do it. Okay? I'm asking you: When you wrote "life history" on those timesheets back in 1998, what was your rationale, your difference between a life history and a social history?

A    Among other things, as I was trying to say, I believe a social history would have been written by a social worker.

Q    So it's impossible for you to do a social history.

A    Well, I mean if I put my life on hold and went back -- went back to school and got an MSW or the equivalent training instead of working as an attorney, then I think I would be able to do that a year in the future.

Q    So your -- So your concept of a social history is a social history can only -- only be done by someone who is a social worker, who has a social work background.

A    Or a mitigation specialist with a Psychology

background, --

Q    Okay.

A    -- such as Dr. Haney.

Q    So by definition, you could never do a social history because you're not a social worker or a psychologist.  Is that right?

A    I would hesitate to say "never," but the answer in 1998 or in 2012 would be "no."

Q    Okay.  And in 19 ---

A    I do not have the skills.

Q    In 1998, you know that the ABA Guidelines did not require social or a mitigation specialist to be involved in a capital case.  Is that correct?

A    I -- I really don't know that, but I do know that Wiggins applies retroactively under *Teague versus Lane*.

Q    You don't know what the ABA Guidelines were back in 1998. Is that correct?

A    That's correct.

Q    Okay.  So you don't know ---

A    Wait, wait.  I don't remember.  I'm not saying I never knew.

Q    Okay, you don't recall.  So you don't recall whether or not only a mitigation specialist can do the mitigation portion of the case.

A    What I do know is that Mr. Sindel had retained Dr. Haney

to develop that part of the case.

Q   And that's not my question.  Okay?

A   We -- On the definition of "social history," I considered that to be something deeper and broader than the life history that I prepared.

Q   So even if you remembered, when you completed -- Now it's your testimony -- make sure I understand -- in 2009, when you signed off on that declaration that said that you did not do a social history, --

A   Yes.

Q   -- you didn't recall that you had done a life history? Is that your testimony?

A   That is my testimony, but it doesn't change the facts.

Q   But the -- And what you're saying is that even if you did remember that you had done this 14-page life history, you would have written that sentence the same way.

A   In retrospect, I would have written it in such a way as to dismiss the life history.

Q   So in retrospect, you would have actually told the Court that you did a life history.

A   All of these materials were disclosed, anyway.  Why wouldn't I?

Q   I'm just asking you what you put -- what you would put in your declaration.

A   Okay.  Okay.  I'll say it again.  If I had been

assigned -- If I had been provided the data that I have now and I had been assigned to draft a declaration, I would have put in a reference to the life history and I would have dismissed it as an amateurish effort by someone who is desperate to trigger the mitigation investigator to go to work.

Q    Did you ask the 2255 counsel if you could draft your own declaration?

A    No.

Q    Did you ask 2255 counsel if you could review any records before you signed off on the declaration?

A    I'm sure that I did review some records.  I simply couldn't review everything.

Q    And you didn't review your life history.  Is that your testimony?

A    That's correct.

Q    Okay.

A    That's my recollection.

Q    And so when you wrote that sentence, you had not reviewed the life history.  Is that right?

A    That's right, but there's still a hard and fast distinction between this minimal amateur life history and the kind of social history that by 2009 I had come to rely on in my work as a capital defense attorney.

Q    Now in a social history would you expect it to tell you,

looking at Exhibit 303, who Billie Allen's brothers and sisters were?

A    Well -- Well, yes, but that's at a bare minimum.

Q    And would you expect it to tell you who his parents were?

A    Again, at a bare minimum.

Q    And would you expect it to tell you whether or not Billie Allen's father was an alcoholic?

A    As to that and every other detail that's in the life history, I think that the social history would include that, but it would run to ground the open questions that were left in the life history, and it would go farther out and longer back in the -- in both sides of the family.

Q    And what specifically besides finding out additional people in the extended family would the social history include that's not in the life history?

A    For one thing, it would include documentation.  It would not rely on self-reporting among other things.

Q    Now ---

A    That's one of the main distinctions between this life history and the social history.  A social history does not rely on self-reporting.  It includes that as data.

Q    And you also had the hospital records you recite on Page 2 of your life history.  Is that right?

A    I remember that citation.

Q    Okay.  And in your life history you also indicate the

fact that, according to Mr. Allen, that his mother had moved out on his father; his father sold drugs; his uncles played some of the role of a father.  Those are all information you would expect in a social history, right?

A    There's no doubt that there's overlap, but this was an amateur effort at something that I recognized as early as 1998 to be something other than and less than a social history.

Q    Was this part of the good deal of work you were doing on mitigation?

A    Yes.

Q    Okay.  And was this also containing information concerning church and not being kicked out of the house and a shooting at the house that you would expect it to be included in a social history?

A    It included self-reporting that overlaps with what would be in a social history, some of which would be omitted in a social history.

Q    And this life history, of course, is being prepared with reference to a Mitigation Checklist that's provided to you by the capital public defenders.  Is that right?

A    Yes.

Q    So when we talk about this amateurish thing, I mean you're not just out there making it up on your own.  You're using a checklist that's developed by the National Capital Public Defenders Organization, correct?

A    Using a cookbook instead of having attended culinary school.

Q    Okay.  And at this point are you trying to attend culinary school --

A    No.

Q    -- or are you trying to obtain information?

A    I am trying to obtain a mitigation specialist.

Q    Is that what you're doing right there?

A    Yes.

Q    Right here you're -- you're obtaining a mitigation specialist?

A    Trying to.

Q    Okay.  So by -- by ---

A    It had that effect.

Q    So by interviewing Billie Allen on December 12th and January 7th and 8th, that was your attempt to obtain a mitigation specialist?

A    It was the best that I could do under the circumstances.

Q    And ---

A    I -- I was -- The expression I believe I used this morning was "priming the pump."

Q    Okay.  This was your -- your efforts to obtain mitigation information from Billie Allen and the other people we've talked about, correct?

A    Those were means to an end.  The end was to get

Craig Haney into the game.

Q    So none -- Now did you ever call Craig Haney?

A    Okay.

Q    So instead of just calling Craig Haney and saying, What are you doing," you decided to interview Billie Allen for hours on December 12th, January 7th and January 8th?

A    One thing we haven't discussed, at least to my recollection, ---

Q    No, no.  Mr. Simon, my question was:  Rather than just call Mr. Haney, you chose to interview Billie Allen for hours on December 12th, January 7th and January 8th.  Is that correct?

A    That's correct --

Q    Okay.  And that was your attempt ---

A    -- for witness preparation purposes.

Q    Your attempt to obtain a mitigation specialist was by talking to Billie Allen for hours, as well as some other folks, to obtain mitigation information.

A    Which I put into a document and which eventually triggered the hiring of a mitigation specialist.

Q    Your meetings with Billie Allen was to obtain mitigation information, correct?

A    And to do witness preparation in the event that he were called in the penalty phase.

Q    Okay.  That was your purpose, correct?

A    I believe I testified yesterday and I'm testifying again that I thought that I would be conducting Direct Examinations of various penalty phase witnesses.

Q    But here's the problem I'm having because I think now you're bringing in a third purpose, and that is that the reason you're interviewing Billie Allen was that somehow that was going to get a mitigation specialist.  Is that your testimony?

A    That is -- That was one of the purposes for going through these procedures.

Q    Okay.  So -- So you interviewed Billy Allen to obtain mitigation information.

A    And prepare him as a witness --

Q    Prepare him as a witness.

A    -- if I were to -- to adduce his testimony.

Q    And somehow to hire a mitigation specialist?  Get a mitigation specialist by talking to Billie Allen?

A    Let me -- Let me back up.  I sense the incredulousness in your voice, --

Q    This is trying.

A    -- and I'm trying to -- I was trying to address that a minute ago.  One thing we have not talked about was the nonstructure of the defense team.  I did not believe that I had the authority to contact Craig Haney.  No one had given me his contact information.  You'll see from the fax of January

9th that I misspelled his name.  That indicates to me that I did not have a working relationship with Dr. Haney.  Miss -- Ms. Supranowich was the one who had the working relationship with Dr. Haney.

What I did was prepare this document and get it into the mill.  That, combined with the facts -- the facts of January 9th, resulted in the confrontation between Mr. Sindel and Dr. Haney that resulted in the hiring of Dr. Randall and the fact that there was any mitigation specialist at all.

Q    Mr. Simon, incredulity stems from the fact that I don't understand why, since you were adept to using the phone book, that you couldn't simply call Mr. Haney or call Ms. Caspari and get Mr. Haney's phone number; that instead, you would spend hours interviewing Billie Allen just to trigger activity by a mitigation specialist.

A    There had been no activity to date.  There was a certain element of provocation or shaming to what I was doing, and eventually it worked.

Q    But it was more effective in your mind to do that rather than to simply call him.  Is that right?

A    I was laboring under the misapprehension that I would be used at trial and that I would be doing the Direct of some of these witnesses.  I, therefore, thought it appropriate to talk with them and introduce myself to them.  I did that.  The net effect of that was to get David Randall onto the case.

Q    Okay.  So that was your secret plan all along?

A    I wouldn't use the word "secret" and I wouldn't use the word "all along."  I was desperate.  I was desperate.

Q    But, Mr. Simon, here's what I'm not understanding:  If you were desperate, why didn't you just call Dr. Haney?

A    I did not believe I had the authority to do that.

Q    Did you think of calling Mr. Sindel and asking for Mr. Haney's phone number?

A    In retrospect, I should have been much more aggressive in my dealings with Mr. Sindel than I was.  I was cowed.  I was subservient in this.  I was new to the defense side.  My immediate supervisor as to most of my work in the Attorney General's Office had, in fact, recommended Mr. Sindel.  I believed that Mr. Sindel had everything in charge and that Dr. Haney was one of the best mitigation specialists in the country.  What I misunderstood as of that point was that Dr. Haney, though I've had him as an instructor subsequently and have a great deal of admiration for him, had an idiosyncratic view of what it meant to be a mitigation specialist.

Q    Okay.  Now let's go back.  You had no contact with Dr. Haney, correct?

A    That's -- That's correct.

Q    So you can't testify concerning any communications between Mr. Sindel and Dr. Haney, is that correct, from

personal knowledge?

A    I can testify to the lack of them; --

Q    Okay.

A    -- that they didn't occur.

Q    It's your testimony that there was no communication at all between Dr. Haney and Mr. Sindel?

A    I can't testify to that there was no communication.  What I'm trying to say is that the -- the ordinary mitigation specialist goes in and finds facts, prepares social histories, submits this data to counsel, and gets counsel to hire mental health experts, as needed, and they are the boots on the ground.

Q    And here's my question:  In 1998 was there any requirement by the ABA that that format you just described be used in capital cases?  There was not, was there?

A    I don't know that there was.

Q    Let's go back to your life history, 303, and I'm just going to go through these pages as to the Scouting, as to the activities at school, sports and music.  Are those all items that would be included in a social history?

A    Unless they were based on self-reporting as was the case with virtually everything here.

Q    So if something was included in self-reporting, then it wouldn't be in a social history?  Is that your testimony now?

A    It would be vetted.

Q    So ---

A    If it appeared at all, it would have been vetted.

Q    So your definition -- Let me make sure I'm understanding because I thought your definition of the difference between a social history and a life history was that a social history went through years of extended family, but now what you're saying is the difference is if it's a life history, it's based on what the defendant told you, but if it's a social history, it's based on other information.

A    You're focusing on one data point at a time.  The difference between a social history and any other document is it's multi-variant.  This was an amateur attempt to follow a story line based on a cookbook.  It was not a social history.  I have seen social histories prepared by mitigation specialists.  This was not a social history; never was.

Q    And, Mr. Simon, what I'm trying to do is look at your life history and -- that you prepared, and you tell me what's in your life history that would not be in a social history.

A    That is not a way to falsify the proposition that this was not a social history.

Q    No.  I'm not asking you to falsify it.  I'm asking you: What is in your life history that would not be in a social history?

A    The bulk of the self-reporting would not be in a social history.

Q    Okay.

A    The important thing is what would be in a social history that was not in the life history.

Q    Okay.  And what would it be?  What would be in the social history that was not in the life history?

A    Vetted third-party information, such as actual analyses of hospital records and school records, rather than occasional citations to individual data points supplemented by the client's self reporting that he -- about his being a good student, a great artist and a great musician.

Q    Now this life history, is this your effort to write down what you had -- the information you had obtained related to mitigation?

A    This was my -- This was my effort to prime the pump on getting a mitigation specialist working on the case.

Q    So this was not your effort to write down information that you had obtained that was relevant to mitigation.

A    That statement is correct.  My original answer is also correct.

Q    Okay.  Let's try and figure out -- Let's unpack that. Was your life history your effort to write down information that you had obtained related to mitigation?

A    The life history contains what you have just described, plus my effort to get a mitigation specialist involved in the case for the first time.

Q    Okay.  Your life history says nothing about a mitigation specialist in it, does it?  Is that correct?

A    Yes.

Q    Okay.  Your life history is you writing down information relevant to mitigation.  Is that correct?

A    Yes.

Q    Now I want to direct your attention to the second sentence -- I'm sorry -- the final sentence in your declaration, in that paragraph which is Paragraph 3, and that's Exhibit 251.

Did you state that you did not conduct mitigation interviews with those who knew Mr. Allen as a child or a young man?

A    Yes.

Q    Okay.  Now you did make efforts to investigate the information that Mr. Allen had provided you.  Is that correct?

A    Oh, yes.  Yes.  Those were the spot checks and the meet and greets.

Q    And we see that you in your timesheets, as well as in your correspondence with Mr. Sindel, describe interviews with Lucy McLemore and Raymond Petty.  Is that correct?

A    Yes.

Q    And you had a meeting with Juanita Allen, Otha Petty, probably Yvette Allen and Deborah Ruffin.  Is that right?

A    Yes.

Q     And at those meetings and interviews, you had discussed Billie Allen's childhood, his illnesses, specifically the asthma, his church attendance, his Boy Scouts, basketball, the prenatal actions of Juanita Allen, and Juanita Allen's family history.  Is that correct?

A     I took notes to that effect.  As we've noted, some of those were volunteered.

Q     Now in light of -- of that -- those facts, do you consider the sentence, "I did not conduct mitigation interviews with those who knew Mr. Allen as a child or a young man," to perhaps be an incomplete statement of your actions as of mid-January of 1998?

A     Not in light of my intervening experience and my conduct of numerous mitigation interviews in which I did the entire Mitigation Checklist, plus the next edition of the Mitigation Checklist which I converted into a Word template so that I could go through it entirely with each family member in private.

Q     And did you indicate when you signed that declaration in 2009 that qualification so the Judge would understand that a mitigation interview involved going through the checklist provided to you by the Capital Public Defenders that you had converted to a word processing template?

A     No, I did not.  There were many facts I did not go into in there.

Q   And did you -- Do you believe that the way it's written right now was a perhaps incomplete statement of your actions to the Court when that was filed?

A   I believe that it's a statement that is liable to misconstruction.

Q   And the misconstruction would be that you didn't talk to anybody.  Isn't that what that implies?

A   That would be an extreme form of reading it.  The way I define mitigation interviews, the statement is correct.  I now realize -- Again, I'll say -- I'll say the same thing that I said about the distinction between the life history and the social history.  If someone had assigned me to draft this from scratch, I would have acknowledged the spot questioning and the meet and greets.  As it -- As it was in 2009, I interpreted a mitigation interview to be what as of that time I had within the last year completed several of in cases to which I had been newly appointed or reappointed in 2008.

Q   Now no one prevented you from drafting your own declaration, did they?

A   Oh, that's correct.

Q   Okay.  And at the end of your declaration, you certified that the facts set forth were true and correct to the best of your personal knowledge, information and belief, subject to the penalties of perjury.  Is that right?

A   Yes.  And belief includes my definitions and "mitigation

interview" and "social history."

Q    I want to make clear:  I'm not saying that you lied.  I'm just asking if you believed that this was an incomplete statement of your actions in the case as of mid-January?

A    I believed the declaration was incomplete but nowhere near as incomplete as the life history.

Q    I want to show you 328.  Is this a fax that Connie Caspari sent to you on January 12th of 1998?

A    Yes.

Q    And it indicates that she wants you to fax her some letters from Juanita.  Is that right?

A    Yes.

Q    Okay.  And what letters are those?

A    I have no idea.

Q    Had you been gathering letters from Juanita Allen?

A    I -- I simply don't remember one way or the other.

Q    Okay.  I guess I'm asking you:  Why would you have letters from Juanita?

A    I don't know.

Q    Okay.  I mean you were responsible -- Part of your responsibilities included mitigation.  Is that correct?

A    My responsibilities as to mitigation consisted of presenting the mitigation case in court.  That was how I interpreted it.

Q    Your concept of your role in mitigation was solely to put

on witnesses.  Is that your testimony?

A    It was my understanding that I would assist in other functions, but my view of this was not that I was a substitute for a mitigation specialist.  My view -- My understanding going into this was that Mr. Sindel would do the bulk of the questioning, if not all of the questioning, in the first phase and that I would do a substantial proportion of the questioning in the second phase.

Q    So that comes back to my question.  Your concept of the your mitigation role was simply to put on witnesses in the second phase.

A    That was the core of it.

Q    Okay.

A    Now I came to understand that I would be helping and I did help as the case developed.  However, my understanding was that there would be two trial lawyers, a mitigation specialist, a paralegal, and a fact investigator.  And if that -- If there wasn't a document from the ABA that said we had to do it that way, that was still -- those were still the warm bodies that we had on the team.

Q    And by December 12th of 1998, clearly, you understood that your role involved obtaining information from Billie Allen that was relevant to mitigation.

A    I was doing that to assist the mitigation specialist as well as to humanize myself to Mr. Allen and vice versa.

Q    Okay.  But, clearly, you knew your role was to gather that information.

A    I felt or thought that that was my role.  I did not know it because our roles were never defined in a meeting or document.

Q    So you felt it enough to actually go out, using a mitigation checklist, to talk to Billie Allen for several hours on December 12th.

A    Yes.

Q    Okay.  And you still felt that your role was to gather mitigation, enough that you went back on January 7th and January 8th and gathered more mitigation information.  Is that right?

A    Yes, as well as to humanize myself to Mr. Allen and vice versa.

Q    Which brings me back to the letters from Juanita.  Did she -- Do you recall -- Did she give you letters that Billie Allen had written to her?

A    I -- I -- I mean it may be that you have something in the computer that would refresh my recollection, --

Q    Okay.

A    -- but I do not remember anything about the content of those letters.

Q    Well, let me show you what's been marked as Exhibit 491. Do you recognize that letter?

A   I cannot identify this for sure, but if you tell me that this was signed by Billie Allen, I would not be surprised.

Q   And you can see on the last page it is, in fact, signed by Billie Allen.  Is that right?

A   "Love, Bill."

Q   "Love, Bill."  Okay.  I'm -- I'm simply asking you if these are the letters you were forwarding -- does this refresh your recollection that these are the letters that you were forwarding to Ms. Caspari?

A   Is there any question that I did as I was requested?

Q   I don't know the answer to that.  I'm asking you.

A   Well, what I'm -- what I'm saying is:  I -- I -- I have no present recollection of this letter.  My -- My -- The -- The implication is that I was requested to do something, and my experience, having worked on other cases, is whenever I was requested to do something, I did it.

Q   Looking at 491, did you collect that letter from Juanita Allen?

A   I don't remember.

Q   And looking at 492, do you recall if you collected that letter from Juanita Allen?

A   I don't remember that either.

Q   Looking at 493, do you recall whether you collected that letter from Juanita Allen?

A   I -- I don't remember.

Q    494, did you collect that letter from Juanita Allen?

A    I don't remember.

Q    Do you recall seeing these letters?

A    I don't remember seeing them until just now.

Q    Okay.  Can we look at 495?  How about 495?  Do you recall seeing that letter or collecting it from Juanita Allen?

A    No; same answer.

Q    Talking about Dr. Haney for a moment, to clarify, you had no personal contact at all with Dr. Haney.  Is that correct?

A    During this case, that's correct.

Q    And then Dr. Randall became involved in the case as a mitigation specialist on January 15th of 1998.  Is that right?

A    That date sounds correct.  It was certainly at about that time.

Q    And I'm showing you what's been marked as Exhibit 335, and I'll blow up the portion so that we can read it a little better.

Is that a fax from Connie Caspari to David Randall on January 16th of 1998?

A    Yes.

Q    Okay.  And does that indicate that your life history was sent to Mister -- to Dr. Randall?

A    Yes.

Q    Now I'm showing you Government or Exhibit 340, a fax to you from Dr. Randall dated January 19th of 1998.  Is that

correct?

A    Yes.

Q    I want to focus you on a portion right in here.  "I have found from my experience that it's best for me to discuss, arrange and conduct initial interviews with the family members by myself as it gives me a chance to develop a rapport with these people and gives me a better feel for the mitigation case."  Is that what he wrote?

A    Yes.

Q    And then did he write to you that, "Following this initial round of interviews, we can sketch out a rough Direct of each potential mitigation witness and then conduct follow-up interviews soon thereafter."

A    Yes.

Q    Is that right?

A    Yes.

Q    Do you recall sending in response a letter dated -- or not in response -- a letter to Mr. Sindel that discusses that fax from Mister -- from Dr. Randall?

A    Yes, I do.  I -- I -- I could tell from the fax of Dr. Randall that Dr. Randall wanted to be the first person to talk to any of these people, and by that time it was too late.

Q    Okay.

A    I had already talked to them.

Q    And you stated in this January 20th letter, "Of course,

it is too late for Dr. Randall to conduct an initial interview with several of the family mitigation witnesses as I interviewed them on Dr. Haney's dubious watch."  Is that correct?

A    Yes.  I used the word "interviewed" then in 1989.

THE COURT:  Let's -- Let's -- Let's don't -- Let's don't -- You know, I'm wearing out on that.  Forget that, you know.

MS. COSTANTIN:  We're passed that, Judge.

THE COURT:  I just -- Okay.  This business about interviewing and spot checking and the *Rompilla* readings and all that stuff is wearing on me pretty thin, I'll tell you.

MS. COSTANTIN:  We're passed that.

Q    (By Ms. Costantin)  You then wrote, "I take" -- You then wrote -- I'm sorry -- "I take Dr. Randall's fax of yesterday as an indication that I should not contact these witnesses or potential witnesses again until he has himself interviewed them."  Is that what you wrote?

A    Yes.

Q    And did you follow that plan?

A    My recollection is that from that point on, whenever I met with somebody, it was along with Dr. Randall, sometimes with Mr. Sindel as well.  It's conceivable that I talked with somebody else, but it would have been at Dr. Randall's direction.  In other words, once we had a mitigation

specialist on the case, I became second chair to that person in terms of the development.

Q   Okay.  But you're never second chair to a non-attorney on the case.  Is that correct?

A   Well, I'm using that term loosely.  What -- What I'm saying is that this was a person who was trained to do these things.  So when we met together, let's say that we have a three-person meeting, and there's David Randall and then there's the potential witness and then there's me.  I would let David Randall take the lead because he was trained and experienced to do that.

Q   I understand that.  And you took notes of those interviews.

A   Yes.

Q   Is that correct?

A   Yes, ma'am.

Q   And we'll get to those notes probably Monday.  But my question is:  From this point on, the interviews were generally being done by Dr. Randall because that's how Dr. Randall wanted it done.

A   Exactly.

Q   Okay.  Now then let's go back to this letter of January 20th, 1998.  I want to direct you to the second page.  And you indicate after discussing the entry by Dr. Randall, "For this reason, I suggest that we file a Motion for Continuance."  Is

that correct?  Is that what you wrote?

A    Yes.

Q    "I realize you do not believe the motion will be granted. That would be the Court's responsibility.  Did you then write, "If we file such a motion and it is denied, we can cite the denial of the continuance as undermining subsequent decision maker's confidence in the likely result of the trial"?  Is that what you wrote?

A    Yes.

Q    And did you also write, "Section 2255 counsel can point to the denial of continuance, along with acts or omissions of trial counsel, as cause for failure to present additional evidence if any emerges or occurs to someone later."  Is that what you wrote?

A    Yes.

Q    "Because the Judge's decision would be, quote, 'external to the defense,' Section 2255 counsel would not have to prove that we were constitutionally ineffective in order to establish cause.  Giving them this second option would be in our client's interest."  Is that what you wrote?

A    Yes, based on the *Geders* and *Herring* decisions by the United States Supreme Court.

Q    And in your opinion, this, which you've described here, would be an example of what you've called "no fault ineffective assistance of counsel."  Is that correct?

A   Yes.  And I acknowledge that that's a misnomer because there would be fault on the part of someone else.

Q   And that would be the Judge in this situation.  Is that what you're saying?

A   Of course, we did not -- we did not go straight to court with the motion for -- straight to the Court with the motion for a continuance.  It's the kind of motion that I would have recommended, state prosecutors agree to, in order to get a conviction and death sentence that would be upheld at least without 15 years of appellate and post-conviction --

Q   Okay, Mr. Simon.  That ---

A   -- notification.

Q   Let's -- Let's get back to the question.  Okay?

The question was:  You said -- Your statement was, "While this is an example of no fault ineffective assistance of counsel, that is a misnomer because there's really a third-party who's at fault."

And my question is:  In this paragraph you're describing here, is the third-party that would be at fault the Court for denying the continuance?

A   Yes.  In the context of this paragraph, that would be the third-party, --

Q   So ---

A   -- as in *Geders* and *Herring*.

Q   Mr. Simon, I'm just asking you a simple factual question.

When you prepared this letter, did you believe that the denial of a continuance would create ineffective assistance of counsel without there being deficient performance by counsel?

A    No, because I expected the continuance would be granted.

Q    No.  My question was:  Did you believe when you prepared this letter that a denial of a continuance would create ineffective assistance of counsel without there being deficient performance?

A    I believed that the text of the letter allows for additional acts or omissions of counsel that would be grounds for meritorious claims under Section 2255.

Q    Okay.

A    But I do agree that standing by itself, the denial of the continuance would be an action external to the defense that would deny Mr. Allen the effective assistance of counsel without there being fault on the part of trial counsel.

Q    And that's what you believed when you wrote this letter back in 1998.  Is that correct?

A    And what I believe today.

Q    That's my next question.  And that's what you believe today is that the simple denial of the continuance, without any deficient performance by the defense counsel, would create ineffective assistance of counsel.  Is that your position?

A    Hang on.  I think I might have spoken a little hastily there.  I believe I was talking about cause for overcoming a

procedural default. Cause for overcoming a procedural default, that -- See, there are two things we're talking about here. One is ineffective assistance of counsel which would be a ground for relief under 2255 in and of itself.

Q    And that's what you're writing about here, correct?

      We're not talking about procedural default in this paragraph. Is that correct?

A    Well, I'm -- I'm afraid we are because the counsel would not have to prove that we were constitutionally ineffective in order to establish cause. What that would mean is that if -- if -- if additional evidence were to come to light later, the denial of the continuance would have been action by a third-party that would be cause for purposes of the procedural -- overcoming the procedural default that the late presentation of the evidence would constitute. The prejudice would be that Mr. Allen did not receive the benefit of that evidence.

Q    You wrote ---

A    The cause would be the third-party.

Q    You wrote, "Because the Judge's decision would be external to the defense, Section 2255 counsel would not have to prove that we were constitutionally ineffective in order to establish cause. This is no fault ineffective assistance of counsel." Isn't that your description of this?

A    Only as applied to cause, not as applied to the

underlying ground for relief.

Q    Which means what?

A    Well, may I answer?

Q    Yes.  That's why I asked you.

A    Okay.  When one is dealing with a late-presented claim, something ---

Q    Well, Mr. Simon, we're not dealing with a late-presented claim.  Okay?  We're not dealing with that.  I'm talking about what you wrote back in 1998.  And isn't it correct that what you wrote back in 1998 is that if the Court denied the continuance, that would create ineffective assistance of counsel without actually showing that counsel did anything wrong?

A    As you state it right now, I think I would agree with that.

Q    Okay.  And is that --

A    I'm simply trying to draw distinction.

Q    -- what you believe right now?

A    That?

Q    In Billie Allen's case, do you believe right now that the denial of the continuance back in January of 1998 created ineffective assistance of counsel without actually having to show that counsel was deficient?

A    Right now, I -- I think that our performance was deficient as it was.

Q    I'm asking you simply:  Do you believe that the mere denial of the continuance back at that time, without deficient performance by counsel, would create ineffective assistance of counsel?  Is that what you believe today?

A    Yes, but I also believe that we were deficient.

Q    Are you aware that the Eighth Circuit Court of Appeals had not abused its discretion in denying the continuance?

A    Yes.

Q    Now ---

THE COURT:  Is this a good breaking point?

MS. COSTANTIN:  Yes.  That's fine, Judge.

THE COURT:  All right.  Court will be in recess.  I'd like to talk to counsel about our schedule for next week, please.  I need to go down and meet some folks here real quickly for just a couple of minutes.

I show next week we'll be starting every day at 8:30.

There is a ceremony for Judge Filippine that I'm required to attend starting at 2:30 on Tuesday.  I think that's my only conflict all week.

Then the parties asked for some more time because there is the appearance we're not going to finish this case next week.  Is the expectation that an additional one week is required?  Is that what is expected?

MR. MORENO:  I would think so.  It could be a little more.  I think we'll have a better feel at the end of next

week as to how much time will be left.

THE COURT:  The problem is that, you know, there are other cases coming in, and to get something set -- I'll think about it over the weekend.  If it's one week, we need the -- we have the week of August 27th, the week of October 15th.  And I shoot those dates out now, and we can talk on Monday perhaps and conclude that.

MR. HOLTSHOUSER:  Did you say anything beyond the week of October 15th?

THE COURT:  Pardon me?  Beyond?

MR. HOLTSHOUSER:  You said August 27th or October 15th.

THE COURT:  Those would be blocks of one week each.

MR. HOLTSHOUSER:  And I know the week of -- the week of August 27th wouldn't work because that's the week for the *Olson* trial.

THE COURT:  Okay.  Okay.  So we can scratch that one off.

MR. HOLTSHOUSER:  I believe that the week of October 15th would probably work from the Government's point of view.  I'm trying to get from Michael Gans a clear indication of when the *Holder* --

THE COURT:  Sure.

MR. HOLTSHOUSER:  -- oral argument is going to be set, --

THE COURT:  Sure.

MR. HOLTSHOUSER:  -- and the best answer I'm getting is sometime in September, --

THE COURT:  Okay.

MR. HOLTSHOUSER:  -- but I don't have a final answer yet.

THE COURT:  Okay.  Well, we'll talk more on Monday.

MS. CARLYLE:  The only thing I wanted to say about scheduling, Your Honor, is Mr. Simon has a commitment out of town beginning next Wednesday.  Ms. Costantin has just assured me that she would be finished Monday, but she -- I think she thought in good faith that she would be finished today.

THE COURT:  Yes.

MS. CARLYLE:  But -- But I just wanted to alert the Court that it might be necessary for us to go late on Monday or Tuesday in order to get him out of here.

THE COURT:  And we can -- we can do that certainly on Monday.  On Tuesday, there's a -- because of the Filippine ceremony, there's also a dinner, I think, that night.  So we couldn't go -- Tuesday would be out, but Monday, certainly we can work late.

MS. CARLYLE:  Okay.  Well, I guess we'll see where we are.

THE COURT:  Yeah, okay.

MR. HOLTSHOUSER:  And your schedule doesn't permit

right now just to make a record on a couple of exhibits or ---

THE COURT:  No.  We can go ahead.  We got time.

MR. HOLTSHOUSER:  There's just a few actually.

THE COURT:  Pardon me?

MR. HOLTSHOUSER:  There's just a few of them.  We were going to try to make a record on the exhibits, --

THE COURT:  Okay.  That's good.

MR. HOLTSHOUSER:  -- exhibits from today, so that we're not trying to recall what they were --

THE COURT:  All right.

MR. HOLTSHOUSER:  -- after a two-day weekend.

THE COURT:  Okay.

MR. HOLTSHOUSER:  Going in numerical order, as best I can tell here, Exhibit 251 which is the declaration of Mr. Simon.

THE COURT:  Received.

MR. HOLTSHOUSER:  Then there is 303.  Already in; I'm sorry.  The next would be 533 which is Mr. Simon's deposition.

THE COURT:  533, received.

MR. HOLTSHOUSER:  The next would be -- I'm sorry.  Back up one; would be 499 which are notes, Mr. Simon's handwritten notes.

THE COURT:  499, received.

MR. HOLTSHOUSER:  500, I believe 500 is already in which is the --

THE COURT: It is.

MR. HOLTSHOUSER: -- transcription of the notes.

THE COURT: It is.

MR. HOLTSHOUSER: Then 628, the Mitigation Checklist.

THE COURT: Received.

MR. HOLTSHOUSER: 630 -- 630-A through C was already offered and received.

THE COURT: I show 638 as deleted.

MR. HOLTSHOUSER: 630, 6-3-0. 630-A through C --

THE COURT: Oh, okay; yeah.

MR. HOLTSHOUSER: -- I show has already been offered and received through the testimony.

THE COURT: It has been received.

MR. HOLTSHOUSER: 631 is the enhanced CD from which the clips are played. That, I don't believe, was received during testimony, so I would offer it now.

THE COURT: Received.

MR. HOLTSHOUSER: Then 632 through 635 I show as having been received during testimony, --

THE COURT: Correct.

MR. HOLTSHOUSER: -- the transcripts. 636 was this last transcript. I didn't show that as being offered during the testimony, so we would offer it now.

THE COURT: Received.

THE CLERK: What number was that? I'm sorry.

MR. HOLTSHOUSER: 636. And I believe that is all that I have on my list. And I have looked at Mr. Allen's list and it seemed that we were in sync.

THE COURT: Okay. Melanie was looking for those we thought we might have missed. There were two or three we thought we missed this morning. Did you find those, Melanie?

THE CLERK: It was 400. It was from yesterday.

THE COURT: Right.

MR. HOLTSHOUSER: 400 is one? Handwritten defense note?

MR. MORENO: That's the note about Dr. Gelbort.

MR. HOLTSHOUSER: The MRI note or ---

MR. MORENO: No; the one about more time.

MR. HOLTSHOUSER: All right.

THE COURT: Was it 400?

THE CLERK: Just 400.

THE COURT: Received.

MR. HOLTSHOUSER: Is there another one?

THE CLERK: That's all I found from this morning. I haven't looked from this afternoon.

MR. HOLTSHOUSER: Then we have nothing else to offer at this time. If something else comes up Monday, we will.

THE COURT: Okay.

MR. HOLTSHOUSER: And we'll have a stipulation on one witness, I think, that we will put on the record on Monday.

That should obviate one witness.

THE COURT:  Okay.  That's good.

MR. MORENO:  Thank you, Your Honor.

MR. HOLTSHOUSER:  It's a small good, but ---

THE CLERK:  I just found one.  454, handwritten interview notes of Raymond Petty.  It was identified today but it was not received.

MR. HOLTSHOUSER:  Then we would offer it.

THE COURT:  454, received.  Okay.

MR. HOLTSHOUSER:  Thank you.  Have a good weekend.

THE COURT:  And to all of you the same.

(Court adjourned at 4:50 PM.)

CERTIFICATE


I, Deborah A. Kriegshauser, Registered Merit Reporter and Certified Realtime Reporter, hereby certify that I am a duly appointed Official Court Reporter of the United States District Court for the Eastern District of Missouri.

I further certify that the foregoing is a true and accurate transcript of the proceedings held in the above-entitled case and that said transcript is a true and correct transcription of my stenographic notes.

I further certify that this transcript contains pages 1 through 254 inclusive and that this reporter takes no responsibility for missing or damaged pages of this transcript when same transcript is copied by any party other than this reporter.

Dated at St. Louis, Missouri, this 6th day of February, 2013.


_____

/s/ Deborah A. Kriegshauser

DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR

Official Court Reporter