UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

BILLIE JEROME ALLEN,               )
                                   )
            Petitioner,            )
                                   )
    vs.                            ) No. 4:07-CV-27(ERW)
                                   )
UNITED STATES OF AMERICA,          )
                                   )
            Respondent.            )

EVIDENTIARY HEARING -- VOLUME XIII-A
BEFORE THE HONORABLE E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE

DECEMBER 4, 2012

APPEARANCES:

FOR PLAINTIFF:        ELIZABETH U. CARLYLE
                     P.O. Box 30418
                     Kansas City, MO  64112
                     (816) 525-6540

                     TIMOTHY P. KANE
                     ERIC JOHN MONTROY
                     JAMES HENRY MORENO
                     KATHRIN HENNIG
                     FEDERAL COMMUNITY DEFENDER OFFICE
                     EASTERN DISTRICT OF PENNSYLVANIA
                     The Curtis Center, Suite 545 West
                     Philadelphia, PA  19106
                     (215) 928-0520

FOR DEFENDANT:       STEVEN E. HOLTSHOUSER
                     CARRIE COSTANTIN
                     OFFICE OF U.S. ATTORNEY
                     111 S. Tenth Street, Suite 2000
                     St. Louis, MO  63102
                     (314) 539-2200

REPORTED BY:         DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR
                     Official Court Reporter
                     United States District Court
                     111 South Tenth Street, Third Floor
                     St. Louis, MO  63102
                     (314) 244-7449

**INDEX**


DR. DANIEL MARTELL --

   Direct Examination by Mr. Moreno . . . . . . . . .   3

   Cross Examination by Mr. Holtshouser . . . . . . .  53

(PROCEEDINGS BEGAN AT 8:30 AM.)

THE COURT:  All set?

MR. MORENO:  Yes, Your Honor.  Good morning, and thank you for your patience.  Your Honor, if we can call the next witness, we will call Dr. Daniel Martell.

**DR. DANIEL MARTELL**,

HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

DIRECT EXAMINATION

QUESTIONS BY MR. MORENO:

Q    Good morning, Dr. Martell.

A    Good morning.

Q    Dr. Martell, can you tell us how you're currently employed?

A    I'm employed as a Forensic Neuropsychologist.

Q    All right.  Are you also a Forensic Psychologist?

A    Yes.  Neuropsychology is a subset of broader Forensic Psychology.

Q    And how long have you been practicing as a Forensic Psychologist, Forensic Neuropsychologist?

A    About 23 years.

Q    And prior to your -- Well, who -- Currently, how are you employed?

A    I'm self-employed.  I have a company called Forensic Neuroscience Consultants, --

Q    Okay.

A    -- and I contract with various attorneys, and also I do quite a bit of work with one particular practice group called Park Dietz & Associates.

Q    And where are they located out of?

A    In Newport Beach, California.

Q    And how long have you been associated with Park Dietz & Associates?

A    Since 1994.

Q    Now can you give us a little background on your educational history?

A    Sure.  I got my undergraduate degree at Washington and Jefferson College in Washington, Pennsylvania, where I graduated with Honors in Psychology.  Then I went to the University of Virginia for my Master's Degree and my Ph.D. While I was at Virginia, I did a minor specialization in Mental Health Law at the University of Virginia Law School. They had an Institute of Law and Psychiatry and Public Policy. I took courses there and participated in research there.

After I finished my graduate training, I went to New York City to New York University, Bellevue Hospital, where I did my clinical internship.  I was their first Forensic Psychology intern.  I would spend half my time at Bellevue and half my time at a maximum security hospital for mentally disordered offenders that's on an island in the East River in

New York. And after I finished my internship year, I did a post-doctoral fellowship also at NYU and at the maximum security hospital where I specialized in Forensic Neuropsychology.

Q Can you tell us a little about the training in Forensic Neuropsychology?

A Sure. You know, at that time there wasn't much going on in the way of Neuropsychology and court. Neuropsychology was mostly coming up in civil cases where someone was in an accident and had a head injury and was used to show damages, but it really wasn't being used in criminal cases in 1994.

I got interested in brain damage and its effects on violent criminal behavior, and that was my research interest. And -- So there was no Neuropsychology at the maximum security hospital, so I got supervision from the doctors at NYU and studied the patients at the maximum security hospital and developed research and expertise in brain damage in violent criminal behavior. And so that became -- The research paper that I produced as a product at the end of my fellowship year then became the specialization that I pursued the rest of my career.

Q All right. Thank you. Dr. Martell, I am showing you what has yet to be marked.

MR. MORENO: Your Honor, we're going to have to mark this as an exhibit. It's not currently on the ---

MR. HOLTSHOUSER:  It's 688.

MR. MORENO:  We have it as 688?  Okay.  Thank you.

THE COURT:  688?

Q    (By Mr. Moreno)  I'm showing you what's been marked as Defendant's 688.  Do you recognize that?

A    I do.

Q    And can you tell us what that is?

A    That's my curriculum vitae.

Q    And it is current as of June of 2012?  Up at the top.

A    That's correct.

Q    All right.  Going to the last page, it is an 18-page document.  Is that correct?

A    Yes.

Q    And does this document include publications that you have authored or helped author?

A    Yes.

Q    And it lays out your clinical experience as well as your professional experience.

A    It does.

Q    Now, Doctor, do you currently hold any board certifications?

A    Yes.  I'm board certified in Forensic Psychology by the American Board of Forensic Psychology.

Q    And what does that entail to become board certified? Well, what is board certification?  I'll start with that

first.

A    It's a way to demonstrate an advanced level of expertise in a particular subject area in Psychology.  There's an overarching board called the ABPP, American Board of Professional Psychology, and it has subboards in different areas, like Clinical Psychology, Assessment, Forensic Psychology, Neuropsychology.  In order to become board certified in Forensic Psychology, when I did it -- they've changed the rules somewhat since then -- you had to have been practicing for five years after your doctorate.  You needed to have 2000 hours of experience in forensic work at which point you could become eligible to submit work samples to the Board. The Board would review the work samples, and on the basis of that, either admit you to the examination or not.

If you were admitted to the examination, you sat for a full day, oral examination in front of three examiners who would ask you about all the relevant case law in mental health law, would ask you about ethical issues in the practice, and would ask you specific questions about the work samples that you provided.  At the end of that process, you would either then be voted in or out.

Q    Okay.  Now do you hold board certification in Neuropsychology?

A    I do not.

Q    Okay.  Now you're a Fellow in the American Academy of

Forensic Psychology?

A    I am.

Q    And how did you become a Fellow in that organization?

A    By becoming board certified.

Q    Okay.  Now what is the American Academy of Forensic Science?

A    The American Academy of Forensic Sciences is the oldest and largest group of forensic scientists in the world.  It encompasses all areas of forensic science; medical examiners, criminalists, fingerprint experts, DNA experts, forensic psychologists.  The whole gamut is represented by the Academy.

Q    And do you hold any positions of leadership in that organization?

A    I've held -- I've held many positions.  I've been the Chair of the Psychiatry and Behavioral Sciences section.  I'm currently -- In February, I'll become the President-Elect for the entire Academy, and a year after that, I'll become President of the Academy.  I'll be the first psychologist to be a President of the AAFS.

Q    That's great.  Now what other relevant professional organizations are you a member of?

A    I'm a Fellow in the National Academy of Neuropsychology. I also belong to, you know, the American Academy on -- the American Psychology Law Society which is a group of academic psychologists interested in the interface of law and

psychology; the American Psychological Association; California Psychological Association; the AAIDD, the Association on Intellectual and Developmental Disabilities which is essentially mental retardation; and the American Society of Criminology.

Q    Now in the course of your career, have you had an opportunity to provide training or lectures relevant to Forensic Psychology or Forensic Neuropsychology to various prosecutorial agencies?

A    Yes.

Q    All right.  And for whom, if you recall?  Or just give us a couple.

A    I've done quite a bit.  There's -- It would be helpful to have my C.V. in front of me to get all the initials straight.

        MR. MORENO:  Your Honor, may I approach?

        THE COURT:  Sure.

Q    (By Mr. Moreno)  You can just give us a couple.

A    Sure.  I don't want to belabor the issue.  The group I've spoken the most for is the Association of Government Attorneys in Capital Litigation.  They are a national group, and they meet every year.  I've spoken for them -- I don't know -- five or six times over the last 20 years.

        I've spoken for the New York Prosecution or District Attorneys Association.  I've spoken for the U.S. Attorney's Office.  I've spoken for the California District Attorney's

Office and other similar groups.

Q    All right.  Now in 1996 you received an award from the New York State District Attorneys Association?

A    I did.

Q    And what was that award for?

A    I think it was just a kindness in exchange for coming and speaking to them.

Q    Okay.

A    I -- I -- I had come a couple of times and after the second one, they gave me an award for meritorious speaking.

Q    Now have you ever provided a similar type of lectures for defense-oriented organizations?

A    I have, not as frequently, but I've spoken for the Los Angeles Public Defenders Office.  Last month I spoke for the Delaware Capital Defenders in Wilmington.

Q    Do you hold currently any teaching appointments?

A    I do.

Q    And where?

A    At UCLA School of Medicine.

Q    And how long have you had that appointment?

A    Since I moved to California in 1994.

Q    And what does that work entail for you?

A    I'm on the clinical faculty.  It's a voluntary position. I'm not paid.

Q    Okay.

A     I supervise Forensic Psychiatry and Psychology Fellows that are doing their advanced training in forensics. Generally, they come down to our office in Newport Beach, and I do lectures to them there, and we work on cases together and go over old cases to help them learn about what we do.

Q     Now I'm sure it's going to be hard to put a finger on a number, but, roughly, can you give a rough estimate of the number of forensic neuropsychological evaluations you've conducted?

A     It's over a thousand.

Q     And how about forensic psychological evaluations or do they kind of go at times hand in hand?

A     Every Neuropsychology evaluation is a psychological evaluation.  Some forensic issues, Neuropsychology may not be relevant in a particular case, but, you know, it's also in the thousands.

Q     Now do you have any idea -- Can you give us a rough estimate of how much of that work has been in capital litigation?

A     Oh, it's a minority, small minority.  I've probably consulted over the last 20 years between 50 and 60 capital cases.

Q     And how many times, if you have an idea, have you testified in capital cases as an expert?

A     Maybe 25 or 30 times.  I'm giving my best estimate.  I

really haven't counted.

Q    Sure.  Now your testimony, has it been for both the prosecution and the defense?

A    Yes.

Q    Over the course of your career, percentage-wise, how has it weighed out?

A    Well, over the years I've always worked for both sides, but the proportions have changed.  Early in my career, I did more defense work when I moved to California and started working with Park Dietz & Associates.  It was much more heavily prosecution oriented.  And in the last five or six years, it's kind of evened out to where now it's about 50/50.  But I'd say, you know, overall, it's probably 70 percent prosecution and 30 percent defense.

Q    All right.  Now in -- Do you have a rough idea of how many states you've been retained as an expert witness by the United States Attorney's Office?

A    Again, I'd have to guess.  I would say maybe ten states.

Q    And have you ever been retained by the U.S. Attorney's Office here for the Eastern District of Missouri?

A    I have to admit I don't know how extensive the Eastern District is.  I've done cases in Kansas City.

Q    Okay.

A    And I can't recall if I've done a case here.  I know I worked with attorneys here that were the trial team for a case

in North Dakota.

Q    Over the past 20 years has there ever been a year where you were not retained by the U.S. Attorney's Office on a capital case?

A    No.

Q    Now prior to your testimony here today on behalf of Mr. Allen, have you ever testified for my office before as a defense expert?

A    Yes.

Q    During the course of your work as an expert witness, have you ever had to tell a prosecutor's office that the opinions you've reached are not favorable to them?

A    Many times.

Q    And how about for the defense?  Have you ever had to tell a defense lawyer that the findings that you've made are not helpful to them?

A    Yes.  That's why -- That's why the number of cases I've done is smaller than the number -- is larger than the number of cases where I've testified.

MR. MORENO:  Your Honor, I would move for the admission of Dr. Martell as an expert in Neuropsychology and Forensic Psychology.

MR. HOLTSHOUSER:  No objection.

THE COURT:  You may proceed.

MR. HOLTSHOUSER:  Thank you.

Q     (By Mr. Holtshouser)  Dr. Martell, can you tell us when you conducted your evaluation of Mr. Allen?

A     Yes, I can.  I saw him over three days, first for two days in February of 2009.

Q     Okay.

A     I saw him on the 5th and the 6th.  And then I returned and saw him again on May 1st of 2009.

Q     Now approximately how many hours total do you think you spent with him?

A     I think I spent about 13-and-a-half hours with him --

Q     How much of that -- Oh, I'm sorry.

A     -- over those three days.

Q     Okay.  How much of that time was spent administering neuropsychological tests?

A     More than half.

Q     More than half.  And the rest of that time was a clinical interview?

A     That's correct.

Q     All right.  Now when you met with Mr. Allen, did you explain to him that the results of your evaluation would not be confidential?

A     I did.

Q     What do you generally tell an individual in Mr. Allen's position when you're doing an evaluation?

A     I like to start the evaluation by letting them know why

I'm there, who's retained me; that in the forensic context, it's not confidential; that I might be asked to write a report; that I might be asked to come in court and testify; that I'm not there to treat them for any disorder they might have; and that I try and be an open book and want to learn as much about them as I can.

Q    All right.  Now do you have your report in front of you?

A    I do.

MR. MORENO:  Can I go back to the ---

MR. HOLTSHOUSER:  Yes.

MR. MORENO:  Thank you, Steve.

Q    (By Mr. Moreno)  Dr. Martell, I have up on the screen what is marked as Defendant's Exhibit 256.  Do you recognize that document?

A    I do.

Q    And is that your report?

A    Yes, it is.

Q    All right.  And what's the date of that report?

A    June 30th of 2009.

Q    All right.  Now you were asked a number of referral questions.  Is that correct?

A    Yes.

Q    And the first two referral questions are here on the screen.  One of them concerns a review of Dr. Gelbort's testing.  Is that correct?

A    That's correct.

Q    And the other question was to elaborate, if elaboration was necessary, on problems there may have been with Dr. Gelbort's testimony.  Is that correct?

A    Yes; to -- to essentially go back and re-evaluate him, trying to do the best possible job with the tools that would have been available at the time of trial.

Q    And was that part of the referral request, that you utilize the tools that would have been available back at the time of trial?

A    Yes.

Q    Going to the next page, there is the third and final referral question.  "Please provide the Court with opinions regarding any mitigating evidence identified during the course of your examination that was either not presented or not fully addressed at the time of his capital sentencing proceeding."

        In the course of your evaluation of Mr. Allen, did you answer all three questions?

A    Yes, I did.

Q    Now can you tell us:  Did Dr. Gelbort conclude, based on his testing, that Mr. Allen suffered from some brain damage?

A    Yes, he did.

Q    All right.  And did you -- You administered your own series of neuropsychological testing?

A    I did.

Q    And can you tell us whether or not you found some impairments as well?

A    I did.

Q    Now did you find -- I'm not asking you for specifics, but did you find some problems with Dr. Gelbort's testing?

A    I did find problems, yes.

Q    All right.  Now those problems, putting those problems aside for one moment, are what you found or your findings on neuropsychological testing and Dr. Gelbort's findings on neuropsychological testing significantly different?  Is there really a difference between what you found and what Dr. Gelbort found?

A    At the end of the day, there's not.

Q    Okay.

        THE COURT:  What's that?

        THE WITNESS:  There is not a difference.

A    Even though I feel Dr. Gelbort wasn't given a lot of time or adequate time and did a quick and sloppy job, I think he got the right answer.  And I went back and did a careful, thorough job and got the same answer.

Q    (By Mr. Moreno)  All right.  Now -- So basically you found he might have done it wrong, but he got the correct answer.

A    He got there.

Q    Okay.  So the three referral questions that you were

asked, for our purposes here today and for the Court's purpose, what's the salient referral question that we're going to discuss here today?

A   It's really No. 3, whether there's other issues that didn't get presented or did not get fully presented at trial or at the penalty phase.

Q   All right.  Now let's talk about your evaluation of Mr. Allen for a moment.  Did you do a mental status exam?

A   I did.

Q   Can you tell us what that is and what it entails?

A   It's essentially trying to assess the person's psychiatric condition at the time you're seeing them; looking for active evidence of Psychopathology, signs and symptoms of mental illness that would be present as he sits before you in the room.

Q   And what do you do to make that assessment?

A   It's an interview process.  You observe him.  I -- I take some history.  I ask about psychotic symptoms.  I look for evidence that he's responding to unseen visions or unheard voices.  I look for evidence that he might be encumbered by a false belief system, a delusional belief system, things like that that help me to understand if he is suffering a mental disorder.

Q   Now how did he do on that mental status exam overall?

A   Overall, he did fairly well.  He had some evidence of

depression.  That would be the most salient thing that came out of it.

Q   Now during the course of your clinical evaluation, did you also inquire as to his family history?

A   Yes.

Q   And how about -- Is there a difference between -- in your mind between family history and social history?

A   Well, I think the family history would be part of a social history.  Social history encompasses a broader scope.

Q   All right.  And so did you inquire as to his social history?

A   Yes.

Q   And how about his educational background?

A   I did.

Q   And any childhood illnesses he may have suffered?

A   Yes.

Q   And any potential psychiatric history?

A   Correct.

Q   Now I think on Page -- Starting here, I'll go down the page.  On Page 3, you begin a list of the materials that you reviewed.  Is that correct?

A   Yes, it is.

Q   All right.  And so in your evaluation, do you recall whether or not you had reviewed this material beforehand or is it material -- and I think it goes onto the next page -- is it

material that you reviewed after your evaluation of Mr. Allen?

A    I believe I had all of that before I saw him.  I think I did get some things after the evaluation was completed that may not be on the list.

Q    Okay.  And had you had an opportunity to go through that -- What's -- What's your procedure, I guess, when you're going to do an evaluation?  Do you like to go in sort of with a blank slate or do you like to go in having read a bunch of things?  What -- What works for you?  What do you find to be best?

A    I find it to be best to know as much about the person as I can before I see them.  That helps me to some extent in assessing credibility.  Are they telling me things that are in sync with the records or are they telling me things that are different from what I already know about them going in?  It also gives me things to think about and to pursue during the course of the examination.

Q    So in coming to, you know, what's documented in your report as to the family history, social history, the sources were both Mr. Allen and these other sources --

A    That's correct.

Q    -- that are reflected in your report.

A    Yes.

Q    Now we're going to just touch on this briefly, but what did you learn about Mr. Allen's history of childhood illness?

A    He had a couple of significant things.  In terms of medical illnesses, he had a behavior disorder called "Pica," P-I-C-A.

Q    Can I stop you for one minute and ask: --

A    Sure.

Q    -- Why is that a behavioral disorder?  That's eating like paint chips and other items?

A    It's eating non-nutritive items like paint or dirt or soap or hair, things that aren't normally thought of as food products.

Q    Right.

A    It's a behavioral disorder because it's a -- you know, at its base, it is a behavior they're engaging in that often is driven by situational circumstances.  There's, frankly, not a lot of research on Pica, but the research tends to suggest one driving force may be nutritional deficiencies and the body craves iron, for example, or craves things or the person may just be hungry and they're looking for something to eat.

        THE COURT:  What -- What -- Do those letters have a meaning?  P-I-C-A?

        THE WITNESS:  No.  That's just the name of the disorder.  They don't have a special meaning.

Q    (By Mr. Moreno)  It's not an acronym?

A    It's not an acronym, no.  And, you know, what's significant about it, particularly in Mr. Allen's case, is one

of the things that he would eat was lead paint, and that led to lead poisoning that required him to be seen in the hospital, to be treated with medications, and may have led or contributed to seizures.  He had multiple incidents of febrile seizures in childhood that the doctors thought potentially could be related to that.

Q    Now he -- You say he was treated.  What is the treatment for lead poisoning?

A    They treat him with -- I believe it's cobalts, liquid cobalt that binds to the lead molecules and eliminates it from the body.

Q    And do you recall how old he was when he was treated for this?

A    I have a record here.  I can tell you precisely.  He was three years old the first time he was treated, although it appears that the onset was well before age 3.

Q    All right.  Now despite treatment for -- for lead poisoning, can there still be potentially negative outcomes?

A    There can be, yeah.  You know, lead -- lead is not good for the developing brain.  I would view it as one of multiple risk factors for brain dysfunction in Mr. Allen's history.

Q    Now you also found that he suffered from diurnal enuresis when he was growing up.

A    Yes.

Q    What is -- Is there any psychological significance to

having development -- having developed daytime enuresis?

A    Generally that's a more severe form.  It's not unusual for normal children to wet the bed, you know, into, you know, even into preschool and first grade.  The older they get, the more abnormal it is.  To wet yourself during the day is of greater concern.

Q    And -- And why is that?

A    Just because you're not doing it in your sleep.  It shows -- It may be a behavior that's done to draw attention to oneself; you know, to make up for feeling unrecognized or, you know, to otherwise draw attention.  It may reflect some neural developmental delay in the ability to control and to sense the fullness of the bladder.  But in general, there's -- children that are doing that during the daytime have a more severe form of the disorder.

Q    Are there any sort of psychosocial issues related to potentially developing daytime enuresis?

A    Well, it can certainly be associated with abuse and neglect, other psychiatric problems that a child may be having.

Q    What did you learn about Mr. Allen's history of asthma, just briefly?

A    He had a history of asthma attacks.  It started when he was about one-and-a-half years old.  They became serious enough.  He had attacks where he had to be taken to the

Emergency Room because he had been having an attack for 12 hours.  Generally, you know, asthma is relatively benign if treated well, but the lack of oxygen to the developing brain is another insult.  Eventually, you know, we talk about the additive burden of multiple insults on brain development, and the same thing is true of multiple stressors on psychological development.  The more of these burdens a person is ladened with, the more likely it is that there will be adverse consequences in terms of brain development, cognitive functioning, and behavior and psychiatric disorder.

Q   Now in terms of his asthma, it was successfully treated.  "Yes"?

A   Yes.

Q   And he also has a history of eczema.  Can you just briefly tell us what that is?

A   Eczema is a skin condition with flaking and peeling and reddened patches on the skin.

Q   And can you tell us if in Mr. Allen's case it was severe?

A   It was severe.  It was disfiguring to the extent that other children, other people could clearly see it on him; would make fun of him for it; would call him names like "crusty" or "ashy" because of it, and I think for him it became a sense -- a source of embarrassment and shame.

Q   And from a psychological standpoint, can you tell us whether or not that type of persistent teasing in school for a

medical condition can be damaging to a child's self esteem?

A   Absolutely.

Q   Now what did you learn about Mr. Allen's educational history?

A   He had a somewhat complicated educational history in that he went to a neighborhood school initially.  There's indications that he had problems as early as kindergarten.  I -- I have to state that it's unclear from the records, and the records are very difficult to read and I think maybe incomplete, but I found some evidence that he repeated kindergarten twice.  When he was older, he transferred to a more suburban school.

Q   Was that the desegregation?

A   Under desegregation which I think he found to be both a blessing and a challenge; a blessing because he was exposed to very good teachers and exposed to just a better school environment but a challenge in that he was one of a few minority students.  He was called names because of his race.  He may have experienced some discrimination in that setting, and he also got to see how -- he made friends with those kids and got to see how they lived and, you know, wished for a lifestyle like they had which was quite different from the lifestyle that he had at home.

Q   Do you know -- Were you able to ascertain whether or not Mr. Allen had any learning problems or learning difficulties

while in school?

A    Well, the school records are somewhat difficult on this because there's nothing in the school records that indicates that he ever was identified as having a learning disability. However, he was taken by his family to a medical doctor because of problems he was having paying attention in school and problems with reading, and that doctor felt it was significant enough that he prescribed a medication called "Imipramine" to help treat his attentional problems, help him focus and help him improve his reading abilities.

Q    Okay.

A    In addition, there was standardized testing administered on an almost yearly basis.  And although he did quite well in some areas, he had a consistent deficit area in expressive language where, you know, this is measured on a scale they call "stanines", and he consistently had scores at the third stanine or below in that area while having normal or even above-average scores in other areas.  It's not unusual for people to have strengths and weaknesses, but this was a consistent weakness area for him.  And then, you know, when he was seen before trial by Dr. Gelbort, Dr. Gelbort did some achievement testing that also showed impaired achievement, suggesting a learning disability.

Q    But he had never been previously diagnosed with a learning disability?

A    There's no record of that.  Like I say, the school records are skimpy, --

Q    Okay.

A    -- but I think that's the sum totality of the evidence that suggests that there is something, was something going on with him in terms of a specific learning disability.

Q    Now Imipramine, is that an antidepressant?

A    Its major use is antidepression.

THE COURT:  How is that spelled?

THE WITNESS:  I-M-I-P-R-I-M ---

THE COURT:  Wait, wait.  I-M-I ---

THE WITNESS:  I-M-I-P-R-I-M-I-N-E, Imipramine.

THE COURT:  Okay.

Q    (By Mr. Moreno)  I'll take your word for it.

A    I hope I did it right.  It's always easier to see it on the page.

Q    Right.  So why would -- Why was that the drug that would have been prescribed, if you know, at that time?

A    In addition to treating depression, it also has some effects in focusing attention.

Q    And that was the primary concern at that time?

A    According to the notes that are there.  I can read you the note, if it helps.

Q    Now what did you learn about Mr. Allen's family history?

A    Well, I think the most salient thing about his family

history has to do with his mother and the fact that she had a problem with alcohol and, you know, in the vernacular, was a mean drunk who was excessively -- I mean cruelly abusive to Mr. Allen, particularly as he got older. But there's also evidence in the record that she was neglectful, you know, when he was an infant; that she wouldn't respond to him when he cried; that he would be left in his crib in soiled diapers and not changed and cared for; that she would stand over the crib and cigarette ashes would fall on -- into his crib as he's laying there in some distress. You know, that's -- that's pretty serious neglect.

Q   Did you get an idea from the sources that you reviewed, the other witness statements that are listed in your report, as to the severity of Mrs. Allen's alcohol consumption when Mr. Allen was growing up?

A   It -- One quote that seems to stick out to me is she drank like a man; that she was enthusiastic in her drinking and she got drunk often, and that when she got drunk, she became cruel.

Q   What is the psychological significance, if any, to a child growing up in a home where the caregiver is a heavy drinker?

A   Well, there are a lot of them. First and foremost, if a mother drinks during pregnancy, this can cause birth defects, abnormal brain development in particular. It could cause

cognitive deficits and mental retardation.  This is why the Surgeon General puts warnings on every bottle of alcohol not to drink during pregnancy.  Then there's huge literature about children of alcoholics and the problems that they grow up with that include, you know, abuse and neglect from a mother who's busy drinking rather than caregiving as well as the social modeling.  You know, one learns -- a child learns that the way you cope with life is through alcohol and substance use.  It's not the kind of role model that's good for kids.  And as a result, kids grow up with a range of psychological problems that stem both from observing the behavior of the parent and that stem from the bad behaviors that the parent exhibits in child rearing.

Q    All right.  And what else did you learn about the family history?  For instance, what did you learn about Mr. Allen's father?

A    Well, the father was also an alcoholic but left early. So he was raised without a father in the home.

Q    What did you learn, if anything, about some of the behaviors that Mrs. Allen engaged in when Mr. Allen was growing up, aside from the drinking?

A    Well, the most salient thing that I see across multiple declarations and statements and I think even there's a passing reference in the penalty phase testimony was how abusive she was to him; that she beat him excessively; that she used a

range of things that wouldn't normally be used to -- for corporal punishment with a child. She would throw high-heeled shoes at him. She threw an iron at him. She's reported to have thrown a pan off the stove at him; to beat him with extension cords; to have him pick a switch or a stick from the yard that she would subsequently beat him with; that she would punch him with a closed fist in the face, bloodying his nose. All of these are excessive examples of punishment, and they're made worse by the fact that it appears that they were administered for no obvious reason or for the most minute reason which becomes very difficult for the child to process and understand. You know, it's one thing if you do something bad and you get a spanking on the bottom. It's something else if you do nothing and somebody beats you with an extension cord, and that causes psychological distress.

Q   Now were there some instances where ostensively some of Mrs. Allen's actions were, you know, quote, "discipline"?

A   I think there were. There were times where he would stay out later than he should or he may not respond immediately when asked to do something, and that would trigger an abusive incident.

Q   Did you learn from any of the sources you reviewed whether or not Mrs. Allen would at times lock Mr. Allen out of the house overnight?

A   Yes.

Q    Now is it appropriate punishment for a mother, regardless of what the provocation may have been, coming home late, failing to do a chore in the house, whatever, to lock a 14-year-old out of the house overnight?

A    Absolutely not.  I mean, you know, if it was my child, I'd be so worried for their safety.  It's just not an appropriate form of punishment.  Maybe lock them out for, you know, ten minutes to learn a lesson and then let them in and speak to them about what they did, but you know don't leave them in the street overnight.

Q    How about for a 15-year-old?  Is it any better to lock a 15-year-old out?

A    It's no better for a 15-year-old.

Q    16-year-old?

A    Still not appropriate.

Q    How about for a 17-year-old?  To lock out a 17-year-old out overnight?

A    It's still not appropriate.

Q    In your mind, does that kind of behavior, regardless of what any justification one could have, coming home late, whatever, does that kind of behavior on the part of Mrs. Allen constitute abuse?

A    It does.  It's cruel and it's out of proportion.

Q    Now Mrs. Allen testified last week that she had sex for money and at least one occasion had sex on her front porch.

What's the psychological significance, if any, to a child of this type of behavior by -- by -- by the caregiver?

A    It's obvious that this is not normative behavior, and the impact on the child can range, depending on the age of the child.  To a young child, it's extremely confusing; you know, premature sexualization, seeing things that the child shouldn't see.  To an older child, it's a source of shame, embarrassment; can lead to psychiatric problems like depression, anxiety, and, you know, just that loss of a normal mother/child relationship.

Q    All right.  And what does this type of behavior tell you about the mother's judgment?

A    It's grossly impaired.  You know, all of these things, locking your child out of the house, beating them at an inappropriate -- in an inappropriate way to an inappropriate extent, all these things are evidence of her poor judgment that I would lay at the feet of her substance abuse.

Q    Now Johnnie Grant, a friend of Mr. Allen's who also testified against him at trial, was here last week, and he told us -- described the Allen home as a pigsty; roaches, rats, trash everywhere.  Assuming this to be true, does that give you any insight into Mr. Allen's home life?

A    Well, it reflects his mother's dysfunction; the lack of leadership, the lack of cleanliness.  I think it was particularly difficult because he also spent time with the

kids at the -- Was it the Clayton school?

Q    Yes.

A    And, you know, kind of saw how those children lived and what their homes looked like, and it was a very different picture from what he would return to at home.  And that challenges one's self-esteem and a sense of where one comes from in a detrimental way.

Q    Now you had touched on this a few minutes ago, but last week Mrs. Allen testified that often she would lash out at Mr. Allen for no reason.  The unpredictability of that type of violence on a child, is that a psychological stressor?

A    Absolutely.  Unpredictability, you know, it leads to something we call "learned helplessness."

They had one classic study with rats where they would put the rat in a cage, and they had one where it would get a regular electric shock, and it learned that, you know, every one minute or so, if it ran over to the other side of the cage, it wouldn't get a shock, but the other rats got random, unpredictable shocks, and they didn't know when to expect it.  They didn't have any way to know how to go to safety, and they would become helpless and just lay there and take the shock.

Unpredictable violence like that is extremely detrimental to -- to mental health and leads to those kind of withdrawn, depressed deficits in one's coping.

Q    Is hitting a child for no reason abuse?

A   Yes.

Q   Now Mr. Allen's sister Yvette Allen testified last week that their mother would punch Mr. Allen in the face with a closed fist.  Does that constitute abuse?

A   Absolutely.

Q   To give him a bloody nose according to Yvette, is that abuse?

A   Yes.

Q   She also told this Court that Mrs. Allen would hit Mr. Allen.  She had like a wooden handle.  Is beating a child with a wooden handle or hitting a child with a wooden handle, is that abuse?

A   Yes.  I mean there was a time in America when it might not have been viewed that way, but by the time Billy Allen was raised, that period in our history had passed.

Q   And I think you testified earlier that hitting a child with an extension cord, would that also be abuse?

A   Yes.

Q   Can you think of any circumstance where it would not be abusive, despite perhaps rule breaking, coming in late, some type of provocation on the part of the child, any situation where it would, in fact, be appropriate to beat a child with an extension cord?

A   No.

        MS. CARLYLE:  Excuse me.  There's a spectator in the

courtroom.  I'm just checking to make sure.

THE COURT:  He's safe.

MS. CARLYLE:  Thank you.  Sorry to interrupt.

Q    (By Mr. Moreno)  What are some of the problems, the psychological problems that can be associated with having been exposed to the type of violence and abuse that Mr. Allen was exposed to?

A    There's very good research that's existed for a long time about the negative effects of child abuse on children.  The best research was funded by the Department of Health and Human Services and the Federal Government.  They started a longitudinal study in 1980 following, I think, 1500 abused children for decades to look at the long-term consequences. So, for example, these might be children who were removed from their home and placed in foster care because of abuse and neglect; other kids with known histories of abuse and neglect. And there's a range of things that come as a result.  One of the most distressing findings is just the fact of being abused causes impaired brain development.  The brain physically does not grow and develop in a normal fashion.  This, in turn, leads to cognitive deficits; learning disabilities, poor academic performance.  So one level of impairment is brain function.

Q    Can I stop you right there just for a minute?

Now in this case we did a -- there's been

neuropsychological testing by both you and Dr. Gelbort.

A    Yes.

Q    Would it be fair to say that there -- Is there evidence of any sort of the abnormal brain growth in -- in ---

THE COURT:  Sorry; what?

Q    (By Mr. Moreno)  Any evidence of abnormal brain development in this case?

A    Well, there's evidence of brain dysfunction.  I don't know of any scan of his brain to show that it didn't structurally develop normally, --

Q    Okay.

A    -- but there is evidence of brain impairment.

Q    And that's the evidence that Dr. Gelbort found and that you found that are pretty much the same?

A    Yes.

Q    Okay.  I'm sorry.  I didn't mean to interrupt you.  Go on.

A    The second thing that this longitudinal research has shown is poor mental health outcomes.  For example, 80 percent of abused children placed out of the home developed a diagnosable mental disorder by the time they were 21.  It creates poor self-esteem.  It puts them at increased risk for depressive disorders, anxiety disorders, eating disorders, a range -- not the entire DSM.  It doesn't make children psychotic, but these kind of affective disorders and

adjustment disorders are extremely common in abused children.

MR. HOLTSHOUSER: Judge, I'm going to have to object. It appears to me that Dr. Martell is reading from something he has in front of him, and I'm not sure we know what it is.

THE COURT: I think it's his report.

MR. HOLTSHOUSER: Well, I don't know what it is.

THE COURT: Okay.

MR. HOLTSHOUSER: Because some of the comments he's saying is not in his report. I'm saying what is it? And he can testify without reference to reading.

THE COURT: Yes. Have the -- Have the witness identify what he's reading from.

Q (By Mr. Moreno) Dr. Martell, what do you have in front of you?

A I have a notebook with -- with my report, reports of some of the other experts. I do have a page of written notes about these longitudinal studies. I'm happy to not use it or to share it. I just want to be sure my testimony is accurate.

MR. MORENO: Your Honor, I don't think there's -- should be a problem with him referring to notes.

MR. HOLTSHOUSER: Well, Judge, if he's going to refer to notes and they're written out, I think we're entitled to have them in addition to the report. If he's going to rely on them, he has to produce them.

THE COURT: Yes. The rule is -- The rule is if he

relies on them, then they must be disclosed to the other side.

Q    (By Mr. Moreno)  All right.  Dr. Martell, are you able to continue your testimony without reliance on those notes?

A    Certainly.

Q    Okay.  We will do that.

A    Okay.

MR. MORENO:  Now, Your Honor, if I can ask for clarification purposes:  When it comes to his report, he can reference his report during the course of his testimony.

MR. HOLTSHOUSER:  No objection unless he's going to read his report.

MR. MORENO:  Yeah.  We won't do that.

MR. HOLTSHOUSER:  We have a copy of his report, and there's no objection there.

MR. MORENO:  Yeah, okay.

MR. HOLTSHOUSER:  The question was:  What did he have in front of him?

THE COURT:  He can refresh his recollection, certainly.

MR. MORENO:  Okay.  Thank you.

Q    (By Mr. Moreno)  All right, Doctor.  You were talking about the implications, the psychological implications or potential ramifications of child abuse.

A    Correct.

Q    Can you continue for us?

A    So I think, you know, I made the point about brain development and cognitive impairment.  I made the point about psychological distress and diagnosable mental disorder, and the third area is impaired socialization; that children that come out of abusive environments tend to become involved in high risk behaviors.  They will -- are more prone to drug and alcohol abuse; more prone to delinquency and violent behavior; more prone to sexual indiscretion, teenage pregnancy which then puts them at risk for sexually-transmitted diseases.  So that's -- kind of the third area is impaired social development, particularly in the direction of risky behavior.

Q    Now are you aware -- Does -- Can you tell us whether or not people who have endured child abuse, such as that of Mr. Allen, can suffer from poor judgment?

A    Absolutely.

Q    Does that type of exposure to violence in the home directed towards him, can that impact reasoning?

A    Yes, because, you know, it's basically social modeling. What -- What is his model for how to respond to stress or to events that he encounters in life?  And the model is drink and get angry and act out in crazy ways.

Q    Now I think you touched on this earlier.  Child abuse can also impact self-esteem?

A    Yes.

Q    Does that have any impact on social functioning?

A    Well, it certainly does. If you don't have self worth, then you -- you know, I think in Mr. Allen's case there was always this tension between being a good person and trying to advance himself in life or just succumbing to low self-esteem and doing bad things and being a drug dealer and getting into trouble.

Q    Now in the course of your review of the various materials, did you come across anything indicating that Mr. Allen would often talk about how he was a well-paid rapper? Was making money being a rapper?

A    I did see reference to that.

Q    All right. And did you come across any evidence that indicated to you whether or not that was actually true?

A    No.

Q    That it wasn't true.

A    I didn't see evidence that that was true.

Q    Would that be an example of low self-esteem, saying things like that to puff yourself up and make it look like you actually are a success?

A    Absolutely. It's, you know, compensation for your inner feelings of inadequacy; actually overcompensation in an effort to feel like you're good at something; that you're respected for being good at something.

Q    Now during the course of your review of records and documents, did you have an opportunity to review the penalty

phase transcripts in this case?

A    What transcripts?

Q    The penalty phase.

A    I did.

Q    Okay.  Now can you tell us whether or not, from your review of those transcripts, the type of abuse and ramifications, potential ramifications that we've been talking about here today, did that make its way to the jury back in 1998?

A    I only saw one passing reference to a single abusive incident.

Q    And was that by Mr. Raymond Petty?

A    I believe so.  I think the incident that I recall is that he came to the house and had to physically pull Juanita off of Mr. Allen as she was beating him with an extension cord.

Q    Okay.  Now are you aware of any other psychologically significant exposure to violence that Mr. Allen endured while growing up?

A    Yes.

Q    Can you -- Can you describe that for us?

A    Well, it would be violence in the community, violence that he observed or was the victim of while in the community.  The earliest account that I'm aware of is witnessing -- I think he was four years old and was at the liquor store and witnessed a man get shot in the liquor store.  There's an

account of that.

Q   That account was contained in one of the witness declarations you reviewed?

A   Correct.  I think at age 7 he was walking with his mother in an alley and was -- they were stuck up at gunpoint.  I don't think anyone was shot, but that has a profound effect on him as it would on anyone.

When he got into his teens, he had a cousin who was shot and killed in the neighborhood as well as a friend.  I have to look in my report to tell you their names.

Q   Dennis Noble --

A   Yes.

Q   -- is one of them.  I'm not sure he was a cousin but he was a friend.  He was one of the ones.

A   Yes.

Q   And how about -- Does the name "Marquis Taylor" ---

A   And Marquis Taylor was the coup de gras, if you will, because that was Mr. Allen's closest friend at the time, and that triggered lasting psychological damage that continues to this day.

Q   Can you tell us what would be the potential psychological ramifications of exposure to the community violence?

We know about the, you know, the -- what happened with Marquis Taylor and Dennis Noble and what that led to in terms of what was testified to at trial about post-traumatic

stress disorder, but are there other deleterious psychological impacts from witnessing that type of violence in the community?

A    There's also strong research literature tying the witnessing of violence; not just being the victim of violence but observing violence by others to poor psychological and behavioral outcomes, particularly in that kind of socialization sphere of risk-taking behaviors.  Children who witness gun violence in the community are at increased risk for psychiatric disorders and for becoming involved in violent, delinquent or criminal behavior themselves as a function simply of having witnessed it.

Q    All right.  Now what is a "buffering factor"?

A    In psychological theories of how people deal with stress and how they cope, the best models that we have are that you deal with the additive burden of multiple stressors to the extent that you have adequate buffering resources.  They call it "buffering" because the things like social support, friends and family, tight family, nurturing environment, good school system, caring teachers, mental health help, strong neighborhood buffer people from the effects of life stress that they encounter in their lives.

To the extent that those buffers are absent, the effects of the life stress are actually exacerbated.  And the model -- Generally the idea is you have a reservoir of

resilience that you're born with.  And the amount of stress and buffering, the balance between those things helps to predict what your outcome will be.  So the more stress you have and the less buffering you have to protect you from that stress, the more likely you are to encounter negative behavioral and psychological outcomes.

Q    Are you aware -- In your opinion, based on what you've reviewed, did Mr. Allen have adequate buffering to help him combat some of the stressors that were a daily part of his life?

A    He had minimal to no buffers.  I mean his -- his greatest buffer was his friend Marquis Taylor who was killed in front of him, and that was devastating to him because that was the one place he went for social support to protect him from his -- what's happening in his home, from what's happening at school, what's happening in the community.

Q    Now, you know, there's evidence that Mrs. Allen would take Mr. Allen to the hospital, for instance, for treatment of lead poisoning, treatment for asthma.  Is that a buffering or ---

A    For all of her faults and her poor judgment, you know, it's unfair to draw a caricature of her as a wicked evil person.  She was at some level a caring mother who did do the right thing, particularly in regard to those incidents.  You know, human beings are complicated and his reactions to her

are complicated.  He loves her and he hates her.  She cared for him and she neglected him.  The fact that she on occasion did the right thing doesn't really make up for the number of bad things and the bad judgment that she showed.

Q   All right.

MR. MORENO:  Your Honor, if I could just have a moment, please.

THE COURT:  Sure.

(Pause)

Q   (By Mr. Moreno)  Now, Doctor, do you credit the history of abuse provided by the witnesses whose declarations you reviewed?

A   I do.

Q   Can you tell us why?

THE COURT:  Wait, wait.  I didn't -- I don't understand the question.  What was it?

MR. MORENO:  Does he credit the history of abuse that was provided to him through the various witness statements and Mr. Allen's interview and the other evidence that was presented to you?

A   I do believe that he was abused.

Q   (By Mr. Moreno)  And can you tell us why -- why is that?  Why do you -- You know, I'm going to steal a phrase that I think Mr. Holtshouser stole from you at the deposition.  He used it here the other day with great effect:  Convergent

validity.

A   Yes.

Q   Can you tell us:  Is there convergent validity?  Does that play a role in your determination?

A    It does.  You know, when I look at a case, what I'm looking for is threads of evidence that all point in the same direction and lend increased credence to a set of behaviors or to an event; in this case, abuse by Mrs. Allen on Billy Allen. And what I find is there are multiple accounts from multiple witnesses that tell the same story.  I'm aware that there may be credibility issues with some of the witness statements, with things that they've said in the past, you know; their willingness to be less than honest.  But at the end of the day, for me, looking at all of the data before me, I believe it's true that he was abused.

Q   Now in considering the reliability of the accounts of the abuse provided for purposes of these proceedings, did you review anything dating back to 1997, '98 that's supportive and consistent with the evidence that -- that's been developed in post-conviction?

A    Well, there are -- I'll call them "short threads" that I don't think ever got fully developed, but I know in the records from the attorneys' interviews with people, --

Q   Right.

A   -- there are references to Mrs. Allen abusing

Billie Allen.  And I know -- I think I've already testified about the one example that was brought out in testimony during the penalty phase.

Q    We have up on the screen Exhibit 436 which is a copy of Dr. Randall's notes from his interview with Mr. Sam Moore who at the time -- he may still be -- was a City Councilman.

THE COURT:  I thought he was a coach.

MR. HOLTSHOUSER:  Yes.

MR. MORENO:  Yes.  He was one of Mr. Allen's coaches.

Q    (By Mr. Moreno)  On Page 2 of these notes which is, again, Exhibit 436, and right here, "Billie was on punishment just a little while back; tried to keep him to stay in the house.  She'd mop him up.  Everyone wanted to use Bill and talk about Bill.  Bill didn't do the cool things; that he wasn't accepted."

THE COURT:  I'm having trouble hearing you.

MR. MORENO:  I'm sorry.

Q    (By Mr. Moreno)  "Bill didn't do the cool things.  He wasn't accepted.  She'd mop him up."  Is that -- How do you interpret that statement that was given back at the time of trial?

A    Well, generally, I think that's a reference to "I'll mop the floor with you;" in other words, do something violent to you.

Q    So that's an indication back in 1997, '98 that there was

potentially something amiss at home.

A    Yes.

Q    I'm sorry.  Now in this paragraph at the bottom here, second sentence down, it says, "Everybody" -- starting on the first line actually at the end -- "Everybody knew Bill would be put on punishment, that his mother would kick his ass in the street."  Is that another indication that there was violence in the home that was reflected in what people were saying back at the time of trial?

A    Yes.  I mean he used the term or phrase "kick his ass --

Q    Right.

A    -- in the street."  That might refer to kicking him out of the house and locking the door or it might refer to physical abuse.  Out of the context, I think he might be referring to the lockouts.

MR. HOLTSHOUSER:  I'm going to object unless there's any way that he has to know what Mr. Moore meant by the words that Dr. Randall put down.

THE COURT:  Sustained.

Q    (By Mr. Moreno)  So the bottom line, though, is that this would be additional evidence available that -- stemming from the time of trial that has a thread of consistency with what you've reviewed for these proceedings.

A    That's correct.

Q    All right.  This is Dr. Randall's interview notes.

MR. MORENO:  Your Honor, this is Exhibit 500.15.

THE COURT:  Okay.

Q    (By Mr. Moreno)  These are Dr. Randall's who was a mitigation specialist at the time of trial.  These are his interview notes from a discussion he had with a Ms. Deborah ---

MR. HOLTSHOUSER:  Simon's.

MR. MORENO:  Oh, these are Simon's notes?  I'm sorry.

MR. HOLTSHOUSER:  500, yes.

Q    (By Mr. Moreno)  From John Simon; Mr. Simon's notes.  Mr. Simon was one of Mr. Allen's attorneys back at the time of trial.  And she notes there that she had to tighten Bill up; "she" meaning Mrs. Allen; get physical.  Is that another indication or at least a hint back from the time of trial that Mrs. Allen would be physical with her son, Billie Allen?

A    Yes.

Q    And is there a thread of consistency at least in terms of the general concept of physical behavior against Mr. Allen by Mrs. Allen from the time of trial to the current time?

A    Yes.

Q    She also notes in there ---

THE COURT:  "She"?  You mean Simon?

MR. MORENO:  This is Mr. Simon's notes, yes.

THE COURT:  I thought you were saying "she notes."

MR. MORENO:  Yeah.  I was referring to -- He was

interviewing Deborah Ruffin.

THE COURT: Okay. Okay.

MR. MORENO: I'm sorry, Your Honor.

Q    (By Mr. Moreno)  That Juanita's a fighter, is that consistent with some of the evidence that you've reviewed in terms of her behavior when -- when drunk, when angry and being a mean drunk?

A    Yes, it is.

Q    When you're considering the credibility or the reliability of some of the witness accounts that have been presented to you and outlined in your report, do the snippets we've talked about that you discussed earlier from Raymond Petty at the penalty phase about having to pull Juanita off of Billie when she was beating him with an extension cord and then Mr. Moore's statement and Ms. Ruffin's statement, do they help in terms of connecting threads or in helping you move towards believing that the evidence is credible?  The evidence of abuse is credible?

A    Yes, they do because, you know, it provides some evidence back in time that this was being at least alluded to in these witness statements, so that it's not something that's just being made up out of whole cloth in an effort to save him at this point but that it actually dates back to the time of trial, and I find some credibility there.  I mean they're -- they're threads; they're small points, but they're important

points.

Q    Okay.

MR. MORENO:  Your Honor, Mr. Allen needs to take a bit of a break.  He's feeling a little ill.  Can we take a break?

THE COURT:  Sure.

MR. MORENO:  I'm sorry.

THE COURT:  Court will be in recess for 15 minutes.  You may step down.

MR. MORENO:  Thank you, Your Honor.

(Court recessed from 10:00 AM until 10:25 AM.)

THE COURT:  You may continue.

MR. MORENO:  Thank you, Your Honor.

THE COURT:  Your last question was being -- being -- Oh, there was a request for -- The witness was talking about the credibility thread, prior testimony.  His last statement was:  "I mean there are threads, there are small points.  They are important points."  And then you the next question, he was not feeling well.  That's where you were.

MR. MORENO:  Okay.  Thank you, Your Honor.

Q    (By Mr. Moreno)  Now, Dr. Martell, in crediting this history of abuse, let's talk about Mr. Allen first.  Did you factor into your consideration the inconsistent statements he's made over time to a number of different reporters about whether or not he was -- he was abused at home?

A    I did, and he has been inconsistent.  He's told some people there was no abuse.  He told me there was.  He's not a reliable informant.

Q    Did you take into the consideration the different statements he's made to different reporters over time about his role or lack thereof in the offense in this case?

A    I did.

Q    And is he inconsistent in that context as well?

A    He is.

Q    Now did you consider the letters he wrote to his mother while he was incarcerated pretrial wherein he praised her mothering basically?

A    Yes.

Q    Is that -- Are those letters inconsistent with a history of child abuse?

A    No, they're not.  You know, everybody wants to love their parents, even if their parents are alcoholics and abusive and create problems.  I think he had, as he described to me, you know, two sets of feelings:  Loving and attachment to her and at the same time hate for her and what she did to him.

Q    All right.  So did you also consider potential motivation of some of the witnesses who gave the declarations that you reviewed as well as Juanita Allen's potential motivation and, of course, Billie Allen's motivation?

A    That's always going to be a consideration in this

situation where there's so much at stake and there is a incentive to say whatever you think is going to help, and I considered that. At the end of the day, for me, it's the fact that so many people tell the same story and that the threads date all the way back to the time of trial; that I find at the end of the day in my credibility assessment, if we can call it that, that I believe he was abused.

Q    Now does the child have to consider himself -- in this case, Mr. Allen -- does Mr. Allen have to consider himself abused to have been abused for the behaviors of his mother to be abusive?

A    No.

MR. MORENO:  I have no further questions.  Thank you, Your Honor.  Thank you, Dr. Martell.

THE COURT:  All right.

CROSS EXAMINATION

QUESTIONS BY MR. HOLTSHOUSER:

Q    Good morning, Dr. Martell.

A    Good morning, Mr. Holtshouser.

Q    I have some questions that we're going to get into, but I always find it helpful to maybe like start with the last question and go back --

A    Okay.

Q    -- so things are more recent in memory, for example.

A    Sure.

Q   You indicated that whether or not Mr. Allen felt that he was abused, that doesn't necessarily mean that his mother's conduct constituted abuse, correct?

A   Did not.

Q   I mean the fact that how -- what Mr. Allen thought about it is not actually something that is important to whether or not her conduct was appropriate or not appropriate, --

A   Correct.

Q   -- correct?  Now if we're talking, though, about the impacts of that behavior, his mother's behavior on him and what -- what it did to his mental health by the time, let's say, the time of the offense, don't we need to at least consider, well, how he viewed it, what impact it had on him in reality as opposed to potential impact?

A   Yes.

Q   Okay.  You indicated and, again, I'm just going to kind of go backwards here, just go over some of the more recent questions.  You considered motive, and at the end of the day you came to the conclusion that -- I'm not real clear as to what actual particular statements you're crediting.

A   I'm crediting the testimony of Mr. Petty regarding the electrical cord.

Q   Well, you say the testimony of Mr. Petty.  He hasn't -- We're talking about ---

A   In the penalty phase.

Q    Who is Mr. Petty?  Raymond Petty?

A    The Senior.

Q    Okay.  So you've read his trial testimony.

A    It was part of the penalty phase material, yes.

Q    Okay.  It always was there.  It's what the jury heard, correct?

A    They heard about one incident.

Q    Right.  They heard his testimony.

A    They did.

Q    And it is what it is.

A    It is what it is.

Q    We need to only look at that record.  Now you weren't here to see him and view his demeanor, and you've never spoken to him personally, have you?

A    No.

Q    All right.  So beyond reading the cold record, you have no other way of evaluating his credibility, do you?

A    Only to the extent of what he describes is what others describe.

Q    Okay.  And in terms of -- Who else do you see specifically describe the incident that he described?

A    They're all enumerated in my report.  If I can refer to it, I can tell you the exactly who they are.

Q    Well, in terms of what's in your report, are you enumerating declarations that you've read?

A    Yes.

Q    Okay.  You've not read any depositions that any of those witnesses have given subsequent to their declarations?  Is that correct?

A    I think I've seen -- I can't rather now -- Juanita Allen's deposition I may have reviewed.  I ---

Q    You're not sure?

A    I'm not sure.  It would have been around the time of my deposition.

Q    Okay.  And certainly you haven't been here in court to witness any of those witnesses, if they've testified, what their trial testimony -- what their testimony has been in front of this Court either.

A    I have not.

Q    And so you haven't been -- You haven't familiarized yourself, let's say, with circumstances raised in their depositions regarding statements in their declarations which they have determined to be wrong or taken back or disagreed with or no longer believed to be true, have you?

A    No.

Q    And, likewise, you haven't been in this hearing to hear what they have to say at this point in time about either what they said in their declaration, the circumstances of the preparation, who prepared it, who wrote it, how it came to -- how they came to be, as opposed to what their present day

recollection of these events are.  You haven't been exposed to any of that, have you?

A    I have not.

Q    Okay.  So would it be fair to say that in terms of making that credibility determination, the Court has a far greater data set than you do?

A    Absolutely.  I'm not attempting to substitute my judgment for the Court's.  I'm just working with the database that's in front of me.

Q    Okay.  And one of the things that you said is you considered motive, correct?

A    Yes.

Q    And how did you consider it?

A    Well, I think everybody knows, you know, in the context that we're in that the mom might have an incentive to want to say things that would help her son.

Q    Okay.  Who else would have such incentives?

A    His family members.

Q    Okay.  That would include sisters, aunts, uncles, cousins?

A    Sure.

Q    Okay.  Friends?

A    Yes.

Q    Friends of his mother?

A    Yes.

Q    Okay.  Anyone else that falls into what you would consider to be an independent category that provides that convergent validity for you?

A    I don't think so, but they're, also -- those are the people that were there to witness it.  You know, the people outside the family system and their immediate friends weren't there to see it.

Q    And what do you do with the things that those particular people say now versus contradictory statements they've made in the past or at the time this case was being prepared for trial?

MR. MORENO:  Your Honor, I would object in that if he wants to ask him about contradictory statements, he should present him with those contradictory statements.  He can't answer a questions like that.

Q    (By Mr. Holtshouser)  Well, I'm asking you:  Have you -- Have you seen the notes?  That there are any contradictions between what -- what is said and stated in some of these declarations versus what were the facts at trial or what they said to the defense team at trial or to Mr. Simon and others?

A    Well, I'm not aware of inconsistencies.

Q    If there were, though, those are not things you've taken into account.

A    No.  I'm not aware of them.

Q    I take it that beyond your report, you've received some

things since then which are now forming the basis for your testimony?  You've been asked to look at some things that you didn't have at the time your report was prepared in 2009?

A    I think there are a few things.

Q    Okay.  Can you enumerate those for us?

A    I can try.  I think they would have been work products from Dr. Wetzel and from Dr. Askenazi.

Q    Okay.

A    Deposition transcripts.

Q    Which ones?

A    I think I have Dr. Wetzel's deposition and I have his notes.

Q    Okay.

A    Both his trial notes and his notes on ---

Q    How about any fact witnesses that would have -- who conveyed historical knowledge of any underlying facts?  Have you seen any of their depositions?

A    Well, I've looked at some of the exhibits that were shown on the screen here today in terms of trial counsel's notes, and I've looked at some of the -- revisited the penalty phase testimony of ---

Q    Okay.

A    I'm forgetting his name.  I have it written here somewhere.

Q    My particular question, though, is:  For example, you

were shown one page of John Simon's notes.

A    Correct.

Q    And that particular body of notes is many, many pages.

A    I have not reviewed the whole body of notes.

Q    With respect to the -- let's call them the historians, the lay witnesses who provide factual testimony.  I mean suffice it to say, you were not there in Mr. Allen's life, were you?

A    Well, I think that's obvious.

Q    Okay.  So in part, we have to rely on either independent, corroborating information, and would you put in that category things like medical records, school records, police records, things that were created at the time before there was an offense that they've been charged with?  That he had been charged with?

A    Yes.

Q    Okay.  We could -- We could generally trust those as being, "Well, these are snippets of information that we can rely on because they existed prior to there being any motive to fabricate or exaggerate or embellish."

A    Correct.

Q    And besides fabrication, exaggeration and embellishment is a concern, isn't it?

A    Certainly.

Q    Okay.  So historians, okay, beyond declarations, have

you -- whose deposition have you reviewed and weighed in the balance?

A    There are no others.

Q    There are no depositions that you've reviewed?

A    There are no other historians.

Q    Okay.  Now my question is:  You've read -- You were given declarations, correct?

A    Yes.

Q    And did you inquire -- You never spoke to any of these people personally.

A    That's correct.

Q    You were handed them by whom?  An attorney, I take it.

A    They came in a box of materials from the Federal Defender.

Q    And was your contact at that point a Mr. Wiseman?

A    It was.

Q    Did you question him about who wrote these and whether or not it contains the words of the witness?  Anything about how they were prepared or came to be?

A    No.

Q    Okay.

A    I mean I think it was obvious who wrote them.  I mean they've got a name on them.  If you're saying did the person who signed it --

Q    Well, they're not written, are they?

A    -- actually write it, that -- that, I don't know.

Q    They're not written, are they?  They're typed.

A    They are.

Q    And then they're signed.

A    Yes.

Q    And did you ask Mr. Wiseman, "Well, who typed these? What were they typed from?  And how were they presented to the witness to sign?  How were they prepared?"

A    I did not.

Q    Or, "What was the witness told before these were prepared?"

A    I did not.

Q    Okay.  Might those be factors that you would take into consideration in determining the weight to be given to those declarations, if you knew them?

A    I'd give them the weight that I do in any case to declarations from family members.

Q    Okay.  So referring to this group of family members and friends who were there in Billie Allen's life, okay, have you reviewed any of the depositions taken from those historians, family and friends?

A    No.

Q    Have you ---

A    With the possibility -- I'm sorry to interrupt you.

Q    Except for the one of Juanita?

A    Juanita, yes.

Q    And that, you're not sure.

A    I think I might have seen portions of it around the time of my deposition, but I don't think I have the whole thing.

Q    And aside from the question that Mr. Moreno asked you which asked you to assume the content of Johnnie Grant's testimony last week, you're not privy to any actual testimony of any historian, family member or friend who's testified so far at least in this hearing?

A    That's correct.

Q    And you, obviously, can't be here for the ones who haven't testified yet who are coming Wednesday and Thursday, right?

A    That's right.

Q    Okay.  So in terms of historian -- history and the facts that you believe, you pretty much relied solely upon those declarations.

A    That's correct.

Q    Okay.  You said you factored in some of Billie Allen's inconsistencies.  Were you given a transcript of Dr. Yutzy's examination of Mr. Allen from 1998?

A    I was.

Q    Okay.  When did you get that?

A    I don't recall.

Q    Before or after your report?

A    I think it was after, but I don't -- If it's not listed in my report, I got it after my report.

Q    Okay.  And you noticed in there that Mister -- Dr. Yutzy, like any good mental health examiner, inquired on a number of occasions and a number of ways about any abuse that Mr. Allen may have suffered.

A    He did ask about it.

Q    And in each instance Mr. Allen denied it, --

A    He did.

Q    -- correct?  Have you reviewed any of Mr. Allen's tape-recorded conversations with his attorney, John Simon, from December of '97 and January of '98?

A    I don't believe so.

Q    All right.  And so you've not been made aware of the statements that he made to his own attorney when being questioned in great detail about issues of abuse either, have you?

A    If I do, it would only be in passing conversation with defense counsel.

Q    So in terms of some of the inconsistencies by Mr. Allen, and I think you indicated you were provided with the letters that he wrote to his mother, correct?

A    Yes.

Q    Now you've -- You had to have been given those since your report was prepared, correct?

A    That's correct.

Q    Is there anything that you asked to see that you were denied access to?

A    No.

Q    You were shown earlier this morning a page of a typed memorandum of interview of an interview with Sam Moore that's prepared by a Dr. David Randall.

A    Yes.

Q    Do you remember that?

A    I do.

Q    And then you were, also -- I think you referred to a note by John Simon of the conversation with Deborah Ruffin back at the time the trial was being prepared, --

A    Yes.

Q    -- correct?  Now in addition, you saw that Raymond Petty testified at trial, was asked questions about having witnessed an incident of abuse, correct?

A    Yes.

Q    Okay.  Have you -- Have you been -- Have you been shown a note that Dr. Cuneo -- Do you know who he is?

A    I do.

Q    That Dr. Cuneo made from his interview with Mrs. Allen in 1989 in which she described that she had physically disciplined Mr. Allen till the end?

A    I don't recall seeing that.

Q    Okay.  If any mother told you, as a competent psychologist, that she had physically disciplined her child till the end and at that time he was an adult, would that raise some obvious issues for you to pursue and inquire about the potential for abuse?

A    Yes.

Q    So if this information was available to members of the trial team back in 1998, there would be -- there are potential ramifications, wouldn't there, to the strategy at trial to making this evidence a -- a component of the mitigation presentation, correct?

A    I guess its turns on the extent to which they recognize this as an issue.

Q    Would it turn on whether or not you were going to call Mrs. Allen as a witness to admit or acknowledge the activity?

A    I think I'm getting outside of my expertise.  I don't know what a lawyer would decide about calling a witness.

Q    But would it be fair to say that the information for -- to use a phrase that's been attributed to at least one of the attorneys here is that this information would potentially, quote, "trash" mom?  It is information that, if used in mitigation, would potentially paint Mrs. Allen in a very bad light, correct?

A    It is negative information about her, yes, but it's true. I believe it's true.

Q    The information that you have in order to look at this full picture involves examining, among other things, the extent of Mr. Allen's drug -- actual drug dealing activity, correct?

A    To some extent, yes.

Q    And based upon your conversations with Mr. Allen, did he convince you that he was, in fact, an active dealer of drugs in a period -- in a year or two preceding the offense?

A    Yes.

Q    Did you inquire of him about any gang activity?

A    I don't recall asking him about gang activity or him telling me about gang activity.

Q    Let me show you Exhibit 100.3; ask you if you recall receiving this in the materials that you were provided to consider, a memorandum from -- let me go to the beginning here -- March of '97, just days, three days after the offense; that Mr. Allen contacted a detective and advised him that he had been part of a gang known as the "Cliq"; individuals who had been planning to commit a series of bank robberies and that they were planning to rob other banks; had been gathering weapons in preparation for the robberies.  They were using a videotape called "Set It Off" for inspiration and that in the movie, a security guard was shot and that the group planned to imitate the movie in their robberies.  You didn't see this, did you?

A    I don't believe I did.

Q    How about the next paragraph which is information received from a woman named Yolanda Curry, a cousin of Norris Holder?  You know who "Norris Holder" is, right?

A    I believe so.

Q    And she -- I'm sorry?

A    I think I do.

Q    Yeah.  He was -- Okay.  The day after the offense, she had been paged by Billie Allen who wanted to get from her drugs and guns that she had been keeping for Holder and that he wanted the items so he could leave town.  Were you given any of this information?

A    No.

Q    You used the -- You referenced these buffers.  Would you have considered the friendship and the closeness that he had with his cousin Claude McLemore and on the time that he spent at McLemore's home on weekends as being a potential buffer?

A    Yes.

Q    His relationship with his Uncle Raymond Petty as potential buffer?

A    Yes.

Q    What about?

A    Bad role model.

Q    What about -- Why is Ray Petty a bad role model?

A    Well, maybe I'm thinking of the wrong uncle.  I'm

thinking of Uncle Jerome.

Q    Yeah.

A    Sorry.

Q    Ray Petty worked at a GM plant.

A    I don't know much about him.

Q    Okay.  Could that be a potential buffer?

A    Yes.

Q    Involvement in Boy Scouts?

A    Yes.

Q    Organized sports?

A    Yes.

Q    Attending church?

A    Yes.

Q    Friendship with an individual named "Ahmed Oliver"?  Is that a potential buffer?

A    Could be.

Q    How about his friendship with Marquis Taylor up until the time he died?

A    Absolutely.

Q    And the time that he spent with -- at Marquis Taylor's house?

A    Yes.

Q    Johnnie Grant, are you familiar with him and his relationship with Johnnie Grant's mother?

A    To a limited extent, yes.

Q    When you say to a limited extent, you know, were you not aware that at least Johnnie Grant claimed and Mr. Allen also claimed that at one time they were best friends?

A    I don't recall that.

Q    Now this buffer concept, that's actually something that you referred to -- that's known as the "diathesis stress model," correct?

A    We generally pronounce it "diathesis."

Q    "Diathesis," okay.  It's spelled D-I-A-T-H-E-S-I-S?

A    Yes.

Q    Okay.  And that is where this concept of buffer comes into play, correct?

A    Yes.

Q    Okay.  And that is a theory, isn't it?

A    It is a theory.

Q    It is a theoretical model for looking at human behavior and development.

A    Correct.

Q    You did not give a declaration in this case, did you, other than writing your report?

A    No.

Q    Were you asked to?

A    No.

Q    You referenced research and the effects of -- of certain types of abuse.  You mentioned -- You listed three things.  I

forget the first two, but the third was impaired socialization, correct?

A    Yes.

Q    Now -- And you use phrases like "more prone", "higher risk", "higher probability."  Is that an accurate way to refer to exposure to this type of activity and then the outcomes?

A    Yes.  Not everyone that's exposed experiences a negative outcome because of buffers and other factors.

Q    Okay.  And so someone who has been exposed to what you would characterize as inappropriate parental style or abuse is at a higher risk for certain things, correct?

A    Yes.

Q    And that does not answer the question, though, does it: Has that person, in fact, been impaired socially due to the abuse?

A    That's an assessment that's made based on the entire history, the totality of the circumstances.

Q    But you're still left with the question, aren't you, whether or not the -- Let's say social.  Can social impairment, occupational impairment, poor performance in school, poor attendance at school be a result of excessive marijuana and alcohol use?

A    Sure.

Q    And that's -- that's something that commonly occurs among some teenagers?

A    It does.

Q    Okay.  Because by the time they're in their teen years, they're venturing from the home more; more independently, correct?

A    Testing the limits, if you will.

Q    And they're also outside of that protective envelope of where a parent might be trying to keep them away from certain negative influences.

A    That occurs.

Q    And now they're being exposed to opportunities for individual choices from peers, correct?

A    Yes.

Q    So they see peers using marijuana or drinking.  They try it, like it, and it can -- it can -- and in certain individuals it can become excessive, correct?

A    It can.  I mean I think there's other pathways or other driving forces that push some kids to drugs and alcohol where maybe other kids aren't.

Q    So when if -- when if -- When you have an individual who has excessively abused marijuana or alcohol who becomes either socially impaired or occupationally impaired, do you have any way of defining whether the impairment is the result of the excessive marijuana and alcohol use or the result of exposure to the abuse behavior you described?

A    Well, it's probably not -- it's not possible to separate

them.  That -- The abusive behavior leads to the self-medication.  The effects of the drug and alcohol use impair the functioning in the school setting.  So it's a -- it's kind of a feedback loop rather than only one thing or only another thing.  They're co-mingled.

Q    But there's not -- there's no necessary connection between the two, is there?

As you say, there are those who might be exposed to abuse who do not develop these impairments, correct?

A    That's correct.

Q    And so -- But the ultimate question is:  What is the cause and effect, correct?

A    Well, we can never know with a hundred percent certainty.

Q    You can't, can you?

A    No.

Q    You talked about -- You were asked about a variety of behavior, and I assume -- given the example of Mrs. Allen, and you talked about neglect, and the example of neglect you gave was not changing his diaper and smoking cigarettes and dropping ashes over him when he was a baby, correct?

A    I think I also mentioned not -- not picking him up or responding when he cried.

Q    Okay.  Now his mother smoking a cigarette over him and ashes falling on the child when he was a baby, what impact do you think that would have on later development of the child?

A     Well, it's not going to have -- He's going to have no recollection of that.

Q     Well, why did you mention it then?

A     Because it speaks to her child rearing skills and abilities, and that lack of nurturing and caring does have real impacts on children.  There's a ---

Q     It can have, correct?

A     Yes.

Q     Okay.

A     I mean there's -- Go ahead.

Q     Okay.  And so that particular behavior -- And then, also, I think you said -- Well, who is it that you rely on for that example that you gave?  The dropping of the ashes or the leaving him in his diaper when he was a child, not picking him up when he was crying?

A     Cathy Toliver.

Q     Cathy Toliver, okay.  And do you know anything about Cathy Toliver that would influence your credibility evaluation of what she has to say?

A     No.

Q     Have any familiarity with her criminal history?

A     No.

Q     Now you got the impression that she's the one who is giving you this information about Juanita Allen's parental style, correct?

A    Yes.

Q    In a disapproving way.

A    Yes.

Q    And you have no -- You've never spoken to her to ask her about her own behavior, correct?

A    I have not.

Q    So for that -- for that, is there anyone else besides her that you rely on for those -- for evidence of that particular activity?  And is there any thread of consistency from the earlier reports developed by the trial team for that piece of information?

A    No.

Q    The other one you quoted was the thing you remembered about his mother's drinking was she drank like a man.

A    Yes.

Q    Okay.  Who said that?

A    I don't remember.  I would have to look.

Q    All right.  And if you -- To determine whether or not you believe that, wouldn't you have to evaluate the individual who said it?

A    I think it was a memorable description.

Q    It's an anecdote, correct?

A    I'm sorry?

Q    It's an anecdote, correct?

A    It's an anecdote.

Q    Does it -- Does it give you any indication of how frequently she drank?  What she drank?  At what age?  Where she did it?

A    Not at that level of detail, no.

Q    You indicated that dad left early.  What do you -- What age are you -- What age in your view was Mr. Allen -- Mr. Billie Allen's father no longer living with him?

A    I don't recall the precise age.  I know that he and Uncle Jerome got to dealing drugs and fell into that subculture.

Q    Would that actually be he and Uncle Billy Wayne Allen? Not Jerome?

A    I'm sorry.  I'm not keeping the uncles straight.

Q    Okay.  But, yet, you have given us, as I think you told us up at the beginning, a very thorough and careful -- you've done a careful and thorough job, correct?

A    I've done to the best of my ability.  I did most of this work in 2009, so my memory isn't as good as it could be for things that I reviewed back then.

Q    And your recollection is that the father left and abandoned the family?

A    I don't remember.

Q    Now there's a variety of behaviors that I think Mr. Moreno described and attributed to Juanita Allen, and you labeled them as abusive and some of them could cause

psychological stress, correct, in an individual?

A    Yes.

Q    Would you agree that if we're evaluating that individual, the ultimate issue is:  Did they cause stress?

A    Yes.

Q    You were asked some examples about locking out.  Do you have a -- Have you reached a conclusion, based upon the data set you have, as to what age Mrs. Allen locked him out of the house and for what reason?

A    My impression was it occurred in his teenage years.

Q    And you indicated several ages at which you thought that a parent locking a child out, locking their child out, would constitute abuse because it would be cruel and out of proportion I think were your words.

A    Yes.

Q    And you said that that would be true even at age 17.

A    Yes.

Q    And you know that in the State of Missouri that age 17 is the age of majority?

A    I don't know that.

Q    That that's considered -- they're considered an adult at age 17?

A    I don't know that.  Most places it's 18.

Q    And so if -- if Mrs. Allen had set a curfew for Mr. Allen and say, "Be -- I want you home at a certain time," and he

repeatedly ignored that curfew, and she learned that he was selling drugs while he was out or that he was coming home high and drunk, would that ---

MR. MORENO: I'm going to object. I'm going to object to the characterization because I don't think there's a linkage that I recall from the records or any of the testimony about Mrs. Allen throwing Billie Allen out and an alleged drug deal or coming home high or an alcoholic. I think that's a misstatement of the evidence, with all due respect, Mr. Holtshouser.

THE COURT: I'm trying to think back. I do know there's been all kinds of evidence from sisters and others that -- and witnesses that he was selling drugs and so forth. And the -- the -- the issue is whether the mother knew about it, and it's her testimony that she knew about it and locked him out for that reason. I'm not -- I don't recall any specific evidence about that, but ---

MR. HOLTSHOUSER: I can refer the Court --

THE COURT: All right.

MR. HOLTSHOUSER: -- specifically. It's in the Metropolitan Psych. Records.

THE COURT: Okay.

MR. HOLTSHOUSER: It's in statements that Mr. Allen made to Dr. Yutzy. It's in statements and it's in other places in notes that exist in the record that, among other

reasons, that his mom put him out for selling drugs.  I think it's in Martha Burn's, the memo of interview and so forth.  So that there was this problem that she disapproved of this, and it's in his own statements to others.

THE COURT:  Okay.

MR. MORENO:  Well, Your Honor, ---

THE COURT:  Okay.  All right.

MR. HOLTSHOUSER:  But it's not a critical component of the question, so.

THE COURT:  It is a hypothetical question.  Overruled.  Go ahead.

Q    (By Mr. Holtshouser)  If that was the case, wouldn't there be a proportionality between the punishment?  That is, "Well, if you're going to stay out passed the time I wanted you to be home and if you're engaged in these behaviors, then you're not coming in."

MR. MORENO:  Well, again, Your Honor, I object to that.  There's no evidence that he was out beyond his curfew, engaging in these behaviors, and that's the reason why she kept him out.

MR. HOLTSHOUSER:  Well, I think there's definitely evidence of that.

THE COURT:  All right.  Well, ---

MR. HOLTSHOUSER:  So I'm asking him to assume that that's the case.

THE COURT:  Okay.  It's a hypothetical question. Assume it's true.  If, in fact, upon development of the findings, I find that there's nothing to support it, then I won't consider it.  Overruled.

Q    That would be proportional, wouldn't it, or some connection between the misbehavior and the punishment? Because, obviously, he wants to be out later; wants to be out as late as he wants to be; --

A    Right.

Q    -- correct?  And she can't -- She's having difficulty and frustration controlling that because he does what he wants to do, correct?

A    Perhaps.

Q    Now there's several of these labels that you've applied, such as abuse and not appropriate.  Is that a -- The phrase "not appropriate punishment," is that a subject of psychological expertise?  Is that something that the DSM has weighed in on and characterizes -- this is characterized as psychologically not appropriate punishment?

A    I don't think the DSM says anything about what's appropriate and what's not appropriate punishment.

Q    Is it a matter of your subjective standard?

A    I think it's a matter of modern culture and what society views as appropriate.

Q    And so is the concept of abuse something that is a

question of community standards --

A    Yes.

Q    -- and culture?

A    Yes.

Q    And are you familiar with the phrase "whoopings"?

A    I am.

Q    And are you familiar with its use in practice, particularly in the African-American urban culture?

A    Well, across all cultures.

Q    And have you noticed the continuation of that practice, say, well beyond the point in time where other cultures in society have decided that various forms of corporal punishment are inappropriate kind of with the rise of time-outs as being appropriate uses and types of punishment, correct?

A    I don't know that I -- that I have expertise to direct to that, whether a certain subculture was more likely to stick to old patterns as other cultures moved beyond them.  I think it may be true, but I don't have any special knowledge about that.

Q    Okay.  And you haven't studied what the particular prevailing practices were in the culture in which Mr. Allen was raised during the time he was raised as to the late '70s and early '80s?

A    No, I have not.

Q    But what constitutes abuse is something that -- It's not

a matter of science.  It's a matter of cultural standards, isn't it?

A    Societal standards, yes.

Q    In terms of what you would actually in your own standard qualify as abuse, would you take into account factors such as frequency, severity, impact and the intent of the person giving the abuse?

A    Yes.

Q    Those are all things you would need to determine, what the facts are with respect to those, before you could label something as abuse, correct?

A    I think that's reasonable.

Q    In your -- In your judgment, is corporal punishment ever an appropriate means of -- of disciplining a child?

A    It's not a preferred means.  I think it's effective in some situations when it's an open hand against the clothed bottom.

Q    Do you have children?

A    I do.

Q    Have you ever employed corporal punishment in disciplining your children?

A    I have.

Q    Okay.  Would you agree that in any credibility determination of the statements of some of the historians, family members and friends, that among the factors you need to

consider are their motivation, any prior statements they've made and the extent to which they are consistent or inconsistent, any conflict between various reporters, and the demeanor of each reporter?

A    Those are all things that are important.  They may be more important to a judge on the bench observing someone testifying.  I don't have the opportunity, for example, to observe the demeanor of any of the witnesses in this case.

Q    So are they less important to a psychologist as a -- you're basically performing in the role of a quasi fact finder, aren't you?

A    Well, I'm coming to an opinion to support a diagnosis, to support testimony.

Q    Can you do that without deciding what facts you believe?

A    No.  You have to -- You have to decide what you believe.

Q    So for example, a person who's diagnosed with PTSD who says, "I experienced a traumatic event," you need to know whether or not you believe they experienced that event, correct?

A    Yes.

Q    So in someone who says, "I'm experiencing nightmares," or, "I'm hearing voices," you need to determine whether those are true; if you're going to attribute that diagnosis based upon those -- those facts, correct?

A    As best you can.

Q    And when it comes to the causal nexus between the trauma and social or occupational impairment, that is a component of the diagnosis, correct?  You need to come to a conclusion as to what causes impairment and if impairment exists, correct?

A    Correct.  If impairment exists, it would be the -- it would be caused by the symptomatology, not by the original trauma.  I mean the trauma causes the symptomatology which subsequently causes the social or occupational impairment.

Q    So there's actually a two-part factual component to that last requirement; one is:  Is there impairment, period?

A    Yes.

Q    And second, is it caused by the symptomatology as opposed to caused by something else.

A    Correct.

Q    Now one of your phrases -- one of your phrases that you used is "additive burdens."

A    What is it?

Q    Additive burdens.

A    Yes.

Q    Okay.  And is that another way of basically -- And I think you said in your report and you said in your deposition that he was burdened -- he had to function under the additive burdens of certain risk factors, correct?

A    Correct.  That's the way I look at this case.

Q    All right.  And so among those risk factors or additive

burdens, you included things like -- I think you believe that his mother drank in utero?

A    That's my understanding.

Q    And tell me what it is that you base that on.

A    I don't recall now.  I'm sure it's something in the record, --

Q    Okay.

A    -- a report of someone.

Q    Have you seen any reports of a statement by Mrs. Allen taken back at the time of the trial period that -- where she was asked that question and denied that she had drank while pregnant?

A    I have not seen that.

Q    If you were -- If that were the case, would that cause you to question that particular additive burden?

A    It -- It would raise a red flag that would require further inquiry then.  Is she -- Who's telling the truth, when, where.  You know, it would be something to look into.

Q    Okay.  And among the other things you described were febrile seizures; lead -- he had lead poisoning when he was a child, correct?

A    Yes.

Q    Asthma; a skin condition; other things of this sort.

A    Correct; those are.

Q    Are you aware of any of these health issues, as you

described them, additive burdens that the trial -- the trial team and Dr. Gelbort were not aware of?  Have you found something in the medical records that they didn't have?

A    I don't think so.  There may be some things like treatment with Imipramine.  I don't remember seeing that in the ---

Q    Okay.  Where did you get it from?

A    From the medical record.

Q    You don't think they had the medical record back then?

A    Well, I don't know what they had exactly.

Q    Okay.  Where did you get it from?

A    From the medical record, but I don't know if that was something that was available then or something that's been discovered since.

Q    So if it was reflected in the reports of Dr. Gelbort or Dr. Cuneo or Dr. Yutzy or Dr. Wetzel that they had all of those medical records from St. Louis City Hospital and that there was entries in there for Imipramine and I think, in fact, Dr. Yutzy testified about it, you haven't found anything new, have you?

A    No.

Q    And these additive burdens, I mean there are certainly negative effects that can come from lead poisoning, correct?

A    Yes.

Q    There are negative effects that can come from febrile

seizures?

A    Yes.

Q    And in this -- in Mr. Allen's particular case, you believe that there were multiple seizures?  Is that correct?

A    The record reflects more than one.

Q    And does the record reflect that he received an EEG following those that determined that the seizures were benign?

A    There was a negative EEG.  That doesn't mean that there was a determination that the seizures were benign.  He was put on medication to treat the seizures; Phenobarbital.

Q    And there is no indication, though -- There's no evidence in the record that the febrile seizures or the treatment produced any negative effects, was there?

A    There's nothing in the record that shows that he suffered because of the treatment or, for that matter, because of the seizures.  But ---

Q    And the same would be true of lead poisoning, isn't it?  Like if you -- Lead poisoning depends on the amount of exposure, the amount that's present in the blood, et cetera?

A    Yes.

Q    Do you remember testifying in deposition that you weren't even aware of what the actual quantities of lead were as Dr. Yutzy had determined during his trial testimony?

A    That's correct.  It was not in the records I had.

Q    But those are the kinds of things that you characterize

as additive burdens, and they are -- To the extent that they are burdens -- I guess when one thing's a burden, I guess we think of like someone carrying a weight on their back, correct?

A     Straws on the camel's back.

Q     Okay.  And -- But what you're really saying is that these are risk factors; that there are -- these are factors in his life which are capable of producing negative outcomes, correct?

A     Yes, precisely.

Q     But the question is:  Ultimately, did they produce any negative effects, correct?

A     Yes.

Q     And that's only -- that's only when it becomes a burden is when there is, in fact, a negative effect that results in a negative outcome?

A     Yes.

Q     Up until then, these, quote, "additive burdens" are nothing more than risk factors that you need to determine: Did they come to fruition and impact him?

A     Correct.  They put him at risk.  And then we have to wait to see if that risk is expressed.

Q     For example, if I have parents who are alcoholics, I'm at an increased risk of developing alcoholism --

A     Right.

Q    -- statistically and genetically, correct?

A    Yes.

Q    That's what you believe.

A    I do.

Q    Okay.  But in terms of the burden that that places on me, if I don't become an alcoholic, somehow I've evaded that burden, that risk factor.

A    Right.

Q    It hasn't come to fruition, has it?

A    Correct.

Q    So really the ultimate issue is whether or not any of these additive burdens ended up having any impact on Mr. Allen's mental or brain function, correct?

A    Yes.

Q    Now you can look at a person who has these factors or features in their life and then you can evaluate them 15 years later or 20 years later and find that they function at a level that is here as opposed to here, correct?

A    Yes.

Q    And you can speculate, can't you, that the reason he's here and not here -- and I'm putting my hand low and now my hand high for the record -- is because he was exposed to these things earlier in his life.  You can -- You can say that's a possibility, correct?

A    That's generally how doctors do it.

Q    Okay.  But the connection between those two is not certain, is it?  I mean it's possible -- just as possible, isn't it, that these things didn't actually produce this, the lower functioning?  That he just was lower functioning to begin with and these other factors never actually caused that?

A    Well, that's an issue that's best evaluated by looking at the history.  Perhaps he was damaged to begin with, you know.

Q    Well, is there any -- The only way you would know for sure is if you had pre-exposure baseline, looked at the exposure, and then there's an afterwards.

A    Correct.

Q    We don't have that here, do we?

A    No.

Q    Okay.  And when we talk about here, up high, and here, middle, and here, low, the only thing that we have to compare with are norms.

A    Correct.

Q    Norms of other individuals of certain statistical samples that have been taken to look at, well, what -- what is the general population of that age, that education, that sex, that culture, that race, et cetera, how did they perform?

A    Yes.

Q    And then we compare an individual's later results against those norms, and that tells us how they compare to the rest of their peers, correct?

A    Precisely.

Q    You characterized today, I believe, the work that Dr. Gelbort did as quick and sloppy, correct?

A    Yes.

Q    Are you aware of any actual -- He's a neuropsychologist, correct?

A    That's my understanding, yes.

Q    And that's your primary specialty as well.

A    It is.

Q    And Neuropsychology involves giving paper and pencil tests or performance tests and reaching conclusions from those as to where they fit in these norms, correct?

A    Yes.

Q    I just kind of summarized your entire profession in a few simplistic terms, correct?

A    That's the gist of it.

Q    Okay.  Did he make any professional mistakes in either the tests that he administered, the scoring, the norms, or in his interpretation of the results?

A    Yes, I believe he did.

Q    Okay.  And we'll get to that.

A    Well, I'll leave off the interpretation of the results.

Q    Okay.

A    Because he got to the right answer, but his -- he didn't follow standard practice, and he didn't use the appropriate

norms.

Q    Is the primary problem with him that he -- you felt that he didn't give as many tests as he should have and that he used norms that were outdated?

A    Well, in many cases he didn't use norms at all.

THE COURT:  He didn't use what?

THE WITNESS:  Did not use norms at all.

A    And he did not give -- For example, he gave portions of the Halstead-Reitan neuropsychological test battery.

Q    But not the whole thing.

A    But not the whole thing which limits what you can then say about the findings because it's meant to be given in its entirety.

Q    Okay.  And there are other tests that he chose not to give but -- didn't give, correct?  I mean he didn't give every test in the book, did he?

A    Well, no, he did not.

Q    You didn't either.

A    You can't give every test in the book.

Q    You give -- You made selections and judgments about which tests to give.

A    Yes.

Q    Dr. Askenazi did the same thing?

A    I'm sure she did.

Q    And were some of the tests that you gave Mr. Allen the

same tests that Dr. Gelbort had given him?

A    Yes.

Q    All right.  I want to turn briefly, if we can, to your background.  You completed college in 1980, correct?

A    Yes.

Q    And it was nine years later, though, that you obtained your Ph.D.  Is that correct?

A    That's correct.

Q    And your -- Both your Master's Degree and your Ph.D. is in -- well, your Master's is in Clinical and Community Psychology, but your Ph. D was in Research in Clinical Psychology, correct?

A    Correct.

Q    So neither one was actually in the particular field of Neuropsychology?

A    No.  That was not offered at that time.

Q    Okay.  Now you graduated from college in 1980.  You were not actually licensed as a psychologist until 1991, correct?

A    I think it might have been '89.  I don't have my -- Oh, I do have my C.V.

Q    And so in the meantime, up until '94 at least, most of your professional work was in the area of research, wasn't it?

A    Yes, research and treatment.

Q    So you were fairly heavy into what we call the statistical side of Psychology.

A    Yes.

Q    And you began working with Park Dietz & Associates in 1994.

A    That's correct.

Q    Now you are not board certified in Neuropsychology.  Is that correct?

A    Yes.

Q    But much of the work that you did in this case is in the field of Neuropsychology.

A    Yes.

Q    You talked a little bit about the balance of your work. When was the last time that you spoke to AGACL, the Association of Government Attorneys in Capital Litigation?

A    I'd have to look on my C.V.  I can just guess that it's been probably a good five years, maybe six years.

Q    Five or six years?

A    Yes.

Q    How about the last time that you gave one of those presentations to a U.S. Attorney's Office or to a group of prosecutors?  About the same?

A    Probably longer.

Q    Longer?

A    Longer --

Q    Okay.

A    -- ago.

Q    And you said that in the past five or six -- I think you -- Mr. Moreno used the period of the past 20 years.  In the past five or six years, have you been retained as an expert in a federal capital case by the prosecution?

A    Yes.

Q    And which cases were those?

A    Two that I can think of off the top of my head are *U.S. versus Nelson* and *U.S. versus Angela* -- Oh, what's her last name?  I'm having a senior moment.

Q    Okay.

A    Yeah.  They're at least those two.

Q    Probably dementia?

A    Yeah.  Maybe a third.  I am -- I am 55.

Q    Okay.  In the past five to six years, though, would it be fair to say that the balance of your work has shifted dramatically to the defense side?

A    In capital cases, yes.

Q    Okay.  And is there a reason that that shift occurred?

A    Well, I think the genesis of it, I did a case for the U.S. Attorney in Pennsylvania, *United States versus Hammer*, in which some of the attorneys here today from the Federal Community Defender in Philadelphia were on the opposite side. And after that case was completed, they reached out to me and asked if I might be interested in working on a case for them. And I did one case and that led to another case and, you know,

so then I've done a number of cases with them and with other defense bar people.  I've always done defense work.  I haven't always done capital defense work.

Q    Okay.  Did you work on a case in New Mexico called *Edward Spivey*?

A    Yes, I did.

Q    And were you hired there by the Government to evaluate a capital defendant?

A    I was.

Q    Now that case was subject to a firewall in that you were to examine him and not communicate any of your -- results of your examination to the prosecution team, the trial team, --

A    Correct.

Q    -- correct?  You did examine him, and then later you attended a party of the trial team before the case went to trial, correct?

A    That's correct.

Q    And was there a controversy in that case over conversations between you and one of the prosecutors regarding whether the firewall was breached?

A    There was.

Q    Okay.  Did that become the subject of both a District Court investigation, a hearing, and then later an investigation by the Office of Professional Responsibility of the Department of Justice?

A     I wrote to the office of Professional Responsibility.

Q     You wrote?

A     I wrote a letter to them that started an investigation of that incident.  I'm not aware of any hearing.  I know there was a *Kastigar* hearing in the -- with the judge in that case that was on an unrelated issue.

Q     And did you, in fact, submit an affidavit in connection with that *Kastigar* hearing?

A     Yes, I did.

Q     And wasn't the issue at that hearing what you had or had not communicated to the trial team at this party and whether or not it had breached the firewall?

A     There was, although it was -- the issue at that time was because I had requested additional information in order to complete my evaluation, there was a concern that I had told the U.S. Attorney something about my opinions or findings.

Q     I'm going to show you Exhibit 593.  That should be on the screen there.  Is this a copy of your affidavit that you submitted in the *Spivey* case?  And I don't know if you signed it.  I'm sorry.  I just want to show you the date you signed it so you're not in the dark.  There you go.  Is that your signature?

A     It is.

Q     "Sworn to under oath on April the 8th, 1997?"

A     Yes.

Q    Okay.  And that's the cover of it.  I'm just going to direct your attention to Page 8, Paragraph 10.  One of the salient representations you made here is that, "I swear that I have not disclosed any of the statements made by Mr. Spivey or test results obtained during my exam on March 28th to Ms. Martinez or any other Government representative."  Ms. Martinez was the trial attorney, correct?

A    Yes.

Q    And then, "I also swear that I have not discussed the results of my exam with Ms. Martinez or any other Government representative.  My communications with Ms. Martinez and the other members of the Government's prosecution team have been limited to asking them to provide me with information I require to conduct my examination and prepare my report and evaluation of Mr. Spivey."

That particular representation in that paragraph, portions of those representations were not true, were they?

A    They are true.  I mean it's -- it's complicated.  This was prepared by Ms. Martinez.  She wrote it.

Q    Okay.  You signed it.

A    She asked me to sign it after we discussed it.

Q    Okay.  Did you sign it?

A    I did sign it.

Q    Okay.  When you signed it, did you realize you were swearing under oath that all of it was true?

A    Yes, and it is true.

Q    All right.  And, in fact, at the -- at the -- at the time of your examination of Mr. Spivey, you had a conversation with him during -- during the time you were in his presence about his views towards the prosecution team, correct?

A    He made an unsolicited comment --

Q    Okay.

A    -- after the examination was over while we were waiting for the corrections officer to let us out of the examination room.

Q    So would it be fair to say he told you something?

A    He told me something.

Q    Okay.  Did you convey that something to Ms. Martinez and the trial team at the party that I referred to?

A    Only after asking them if it was protected by the Court's Order and being advised that it would not have been.

Q    Okay.  And they advised you that it was okay to tell them, correct?

A    Yes, that's correct.

Q    But in this subsequent affidavit here, when it became a controversy and when the District Court ordered a hearing and an inquiry, you told the Court that your communications to the trial team "were limited to asking them to provide me with information I required to conduct my examination."  That wasn't true, was it?

A    That is true.

Q    It was not limited to that.  Your communications with them ---

A    You're taking the sentence out of context because I -- I did not tell them anything about my examination or my findings, and I did ask them to provide information to conduct my exam.  The issue of this comment at the party was not a issue at the time of this hearing; only came to light later. And before signing this declaration, I had a discussion with Ms. Martinez about that incident, and she advised me it didn't need to be in the declaration that she wrote.

Q    So she advised you that it was okay to tell the Court that your communications with them, the trial team, was limited to asking them to provide you with information.

A    Correct.

Q    Okay.  And as you testified -- As you said earlier, actually you had received from Mr. Spivey a statement that he gave to you, as you said "unsolicited," which you had passed on to the trial team, --

A    Yes.

Q    -- correct?

A    That ---

Q    And is it mentioned anywhere in this affidavit?

A    No, it is not.

Q    Okay.  Ultimately, were you investigated by the Office of

Professional Responsibility?

A    No.  Ms. Martinez and her co-counsel were investigated.

Q    Okay.  So you're not aware of a finding by the Office of Professional Responsibility that your affidavit was intentionally false?

A    They've never shared any of their findings with me.

Q    Would it be fair to say that shortly after this period, this controversy here, is when your work for -- your work with the Government began to diminish?

A    There were cases that went away because of this, but I've continued to work for the Government, both the federal government and state government, ever since.  I don't think there's been a year when I haven't worked for the U.S. Attorney's Office since that time.

Q    What proportion of your current income derives from defense capital work, either trial or habeas?

A    That's hard to estimate.  If I'm doing about -- Of my criminal work, I do about half of it for the defense now, but I do quite a bit of civil work presently that pays a higher rate.  So I'd say maybe between 30 and 40 percent of my income is from capital defense work.

Q    All right.  I'm going to shift gears, Dr. Martell.  Let's talk about neuropsychological tests.  There's like a whole bunch of them, correct?

A    Yes, there are.

Q    And I'm holding up here Exhibit 590.  This is actually a *Compendium*, is it not, *of Neuropsychological Tests*?  This is the Third Edition?

A    Yes.

MR. MORENO:  Your Honor -- I'm sorry, Steve.  Can I interpose an objection, please?

THE COURT:  Sure.

MR. MORENO:  My objection would be that the issue before this Court isn't whether or not there's any neuropsychological evidence that the defense team didn't uncover.  I think Dr. Martell has testified that basically Dr. Gelbort and Dr. Martell got the same result.  So there isn't an issue before this Court as to whether or not counsel was ineffective in any way or how they presented neuropsychological evidence at the time of trial.  So Dr. Martell did not testify about either his results, his testing or comment in any detail about Dr. Gelbort's testing because those aren't issues that are before the Court.

The issue in terms of new evidence that's before the Court has to do with the child abuse evidence that we've been presenting through the numerous lay witnesses and today through Dr. Martell.  The neuropsychological testing issue is not before the Court right now.  You know, Dr. Gelbort found brain damage.  Dr. Martell says they basically found the same thing.  So we believe there isn't anything new to present to

the Court on this issue of brain damage.  So it's really not an issue, in our opinion, that is currently before the Court.

MR. HOLTSHOUSER:  Judge, it is clearly before the Court.  It was made an issue in the petitions that are -- are the basis for the -- our being here.  I believe it's Item (J).  If the Court reviews both the first and the amended petition as well as the traverse, there could be no doubt that they are attacking the presentation of Doctor -- the defense trial team's presentation of Dr. Gelbort.  There's a large amount of material in the traverse and in the petition that's devoted to attacking the adequacy of his report, of his evaluation; that he didn't test enough, and that the attorneys should have realized that.  The fact that -- And Mr. Moreno listed it on Direct Examination that Dr. Gelbort's work was quick and sloppy.

Dr. Martell was, in fact, engaged in this case to conduct a new battery of neuropsychological examinations; has submitted a report that's 30 some pages long that includes a basis for concluding that there has been brain damage effects from these various additive burdens that he's been exposed to that we've heard about today.  Now even though Mr. Moreno did not go into great detail on Direct Examination to the particulars and the results of these tests, that doesn't make them irrelevant to the petition and the claim.  It still was before this Court.  It's the reason that we've had an

independent examination by Dr. Askenazi that this Court approved, and it was certainly a part of the testimony at trial.

So to somehow now recast and recharacterize this out of an effort to narrow the issue being presented by Dr. Martell is -- is, I think, a failed effort. It's clearly before this Court. It's in the petitions. It's referenced in the Court's Order granting the hearing.

MR. MORENO: That may be true that it's in the petition and it's referenced in the Court's Order granting the hearing, but, you know, the bottom line is Dr. Martell can't offer evidence, neuropsychological evidence, that is substantially different from what was offered at the time of trial. So practically speaking, you know, whether or not Dr. Gelbort didn't have enough time or his tests were sloppy, at the end of the day, even as, you know, assuming the truth of that, they got to the same point. So there's not an issue really of: Is there new, better brain damage to present to this Court?

MR. HOLTSHOUSER: Well, they're not on the same point, Judge, because Mister -- Dr. Martell has, in fact, opined in his report that he has found brain damage beyond that which Dr. Gelbort found because he gave him tests that Dr. Gelbort did not give him. He criticizes in his report and he's criticized in his testimony the lack of tests that Mister

-- that Dr. Gelbort gave to Mr. Allen.  And he's clearly drawn the connection between abuse of various additive burdens and later impairment.  And the issue before this Court is:  Is there any impairment?

And I think, among other things, Dr. Martell has attempted to present in his report a picture that he was more brain damaged than Dr. Gelbort led the jury to believe and that because of the pressures of time and so forth, Dr. Gelbort didn't have enough time to fully explore these issues.  And I think we're entitled to explore this and to point out to this Court the ways in which those evaluations and results by Dr. Martell are flawed and that Mr. Allen is, in fact, far from impaired in intellectual and brain functioning.

There's -- There's been testimony from other witnesses in this case.  I think Dr. Cuneo said that abuse physiologically changes the brain and so forth.  These are issues before this Court.  I mean you just can't somehow just now say, "I want to -- I only want to ask this witness about this, and I don't want to let him be cross-examined about the other matters in his report that's been referred to as an exhibit or the other matters that he's referred to in Direct Examination, including the sloppiness and quickness of Dr. Gelbort's work.

MR. MORENO:  And I think ---

MR. HOLTSHOUSER:  This is Cross Examination.  I think we're entitled to explore these areas.

MR. MORENO:  And I think with all due respect to Mr. Holtshouser, the evidence comes from the witness, and the witness has testified here today that the testing he did, you know, while perhaps more thorough and had been done more properly and with more time, reached essentially the same result.  Dr. Martell did not come in here and testify that he found significantly more brain damage than Dr. Gelbort did.  So the issue of is there anything new from a neuropsychological standpoint is -- is moot because Dr. Martell has not testified that he has new and better brain damage that Dr. Gelbort didn't find because of the flaws in either his testing procedures or given the amount of time he had within which to work.  So, you know, the evidence comes from the witness, and the witness has testified that he and Dr. Gelbort essentially reached the same result, albeit through different methods.  So ---

MR. HOLTSHOUSER:  That doesn't -- That doesn't render the issue moot, Judge.

THE COURT:  I think I've heard enough.  Yeah.  What I want to do is hear it and then sort it out.  I can strike it if I conclude that it's irrelevant, but there -- there have been some testimony early on that, you know, it was -- it was sloppy, not well done, and there's always -- There has been

raised by several witnesses that there was not enough time to do certain things. And so I want to hear it. And if -- Again, that's always subject to having it stricken at a later time. He's here. If I don't hear it and there's something that's later used from a report or something else and there wasn't enough -- and the United States didn't have an opportunity to challenge it, then it's too late to do anything about it. So overruled.

MR. MORENO: All right.

THE COURT: I understand basically what there is; that it goes beyond the scope of the Direct. Is that ---

MR. MORENO: Well, that's part of it, too, sure.

THE COURT: Okay. Overruled at this time.

MR. MORENO: All right.

Q    (By Mr. Holtshouser) All right, Dr. Martell. I just showed you this book of *Compendium of Neuropsychological Tests*. You, in -- You, in the course of your examination of Mr. Allen, gave him a battery of these tests, correct?

A    Yes.

Q    And why did you do that?

A    Because that's what neuropsychologists do. We try to test a broad range of brain functions, looking for areas of strength and weakness.

Q    So it was clearly part of your evaluation of Mr. Allen, wasn't it?

A    Yes.

Q    You spent, I believe, a total of 13 hours with him?

THE COURT:  13-and-a-half I think he said.

Q    (By Mr. Holtshouser)  Thirteen-and-a-half?

MR. HOLTSHOUSER:  Thank you, Judge.

A    That's correct.

Q    (By Mr. Holtshouser)  How much of that time was spent on testing?  Administering tests?

A    At least half; maybe a little more.

Q    And that occurred over two days?

A    Yes.

Q    Okay.  Now before we get into some of these tests and to help the Court understand what these tests are, I think that we need to like do a little bit of basic explanation of how these work, --

A    Okay.

Q    -- correct?  So is it fair to say that with each of these tests, you develop ---

MR. HOLTSHOUSER:  Do I -- I can move this back.

MR. MORENO:  That's fine.  I can just come stand over there.

Q    (By Mr. Holtshouser)  You can see that from here, can't you?

A    I can.

THE COURT:  It depends on how big you write.

MR. HOLTSHOUSER:  I'll write big.  All right.  So ---

MR. MORENO:  Your Honor, is it okay if I stand here?

THE COURT:  Sure; sure.  In fact, pull up a chair, if you want.  That's fine.  You can sit in the jury box.  It's a interesting perspective.  You should try it sometimes.

MR. MORENO:  "Not guilty."

Q   (By Mr. Holtshouser)  First of all, you always end up with a raw score of your test result, correct?

A   Yes.

Q   And these tests are usually things that involve either a scoring, so you end up with a score, or there's a time.  In other words, you give them tasks to do, and you time them with a clock, --

A   Yes.

Q   -- how long does it take them to do it; how many answers do they get right.  Somehow that ends up being a raw score for a particular test, --

A   Correct.

Q   -- right?  And these tests then, these raw scores, is converted to a scaled score, correct?

A   Yes.

Q   Okay.  And a scaled score then, in turn, is converted to a T score, correct?

A   Correct.

Q   Okay.  And then ultimately, a T score is -- all T scores

are zero to 100, correct?

A     Yes.

Q     And the median of a T score is always 50, isn't it?

A     Yes.

Q     All right.  And so 50 is always going to be the middle T score of how the norms are for these test scores, correct?

A     Yes.

Q     Okay.  And ultimately, you are interested and what you want to find out is how many standard deviations, if any, does a person's test results vary from that 50, --

A     Exactly.

Q     -- correct?  And is one standard deviation equal to 10 on the T score?

A     Yes.

Q     Okay.  So if I have a score of -- T score -- end up with a T score of 40, is that person one standard deviation off the -- is the mean or the median?

A     Mean.

Q     Mean, okay.  If a person has a score of 30, are they two standard deviations off the mean?

A     Yes.

Q     If they have a score of 50 or above, they're above the mean, correct?

A     Correct.

Q     Okay.  Then ultimately, what is the importance of

figuring out standard deviations from the mean?

A    So you can understand how abnormal a person's score is; how far do they fall from the general population average.

Q    Okay.  And are there, in fact, published research validated norms for making that comparison for each of these tests?

A    The norms are what are used to convert the scaled scores to T scores.

Q    Okay.  And these norms, though, are based upon experience by some researcher with a normative population, correct?

A    Correct.

Q    So they might give this particular test -- let's just call it, say, the Speech Sounds Perception Test or the Seashore Rhythm Test.  They give this test to a group of people, a sample size, correct?

A    Yes.

Q    And they score their results, and they spread them out statistically, and they look at where the mean number comes in and one standard deviation, two, so forth below.

A    That's right.

Q    And over time these norms grow, don't they?  Like they -- In other words, they are validated.  The sample size can change.  They are updated as time goes on?

A    That's generally true.  Sometimes an independent set of norms is developed.  Sometimes old norms are updated.

Q    Okay.  These norms vary by factors, too, don't they?

A    I'm not sure what you're asking.

Q    Well, are -- are -- are norms -- Do you look at -- In the final analysis, do you need to like take these standard norms and then convert them to the particular characteristics of the individual that you tested?

A    Oh, that's the process.  When you convert to T scores, it's based on norms that best fit the person before you.

Q    All right.  And are those factors age?

A    Yes.

Q    Education?

A    Yes.

Q    Sex?

A    In some cases, yes.

Q    Race?

A    That's controversial in this context.

Q    Controversial in where?

A    In the capital litigation context.

Q    Okay.  But in the world of neuropsychological tests, in order to have valid normative comparatives, I mean it is known that certain ethnic groups perform better or worse than others on these tests, right?

A    Well, that is not -- That's the controversy.  That is not known because the only real separate norms we have are for African-Americans, and the argument is that being black serves

as a proxy for other things, like socioeconomic status, educational opportunity. And so you end up with things that don't really have to do with race but have to do with other ---

Q    Have to do with fairness.

A    Fairness and cultural factors. And so there's been -- There was -- There was great interest in developing race norms, and now there's great interest in backing off and going back to blended norms that reflect the general population.

Q    Is it considered professional practice at least in the neuropsychological field and this blue book I showed you, Exhibit 590, that's one of these books that contain -- it's a handy reference, isn't it, for -- contains the norms for most of these tests?

A    It's a very good reference for norms. It doesn't contain everything.

Q    Correct. But it contains most of them.

A    Yes.

Q    And is it -- Does it include the work of a person named "Heaton"?

A    There's reference to it, but the Heaton norms are actually a separate volume.

Q    Okay. And so there are actually multiple versions of these things that you can use to score these tests, aren't there?

A    Yes.

Q    So in the final analysis when we're talking about what the meaning of some of these tests are, we're always interested in how many standard deviations from the mean, and you learn the mean from the T score.

A    Correct.

Q    Okay.  So what's the importance of knowing the standard deviations?

A    Because -- I think I answered that.  It's to know how far away from average this person is.

Q    All right.  Well, are there, in fact, labels that can be attributed based upon where a person meets certain cutoffs of one standard deviation?

A    Yes.

Q    Okay.  So if a person is, say, zero to one standard deviation or one to two or two to three or more than three, are there various labels that are useful in neuropsychological testing for evaluating a person?

A    Yes.

Q    What are those labels?

A    Well, it would be "normal" for the first one.

Q    Normal, okay.

A    "Mild" impairment.

Q    "Mild" impairment?

A    Yeah.

Q    Okay.

A    "Moderate" impairment.

Q    Okay.  And is this "severe"?

A    And "severe" impairment.

Q    Okay.

A    And some people will further differentiate "mild" to "moderate" or "moderate" to "severe" for things that fall in the middle of those ranges.

THE COURT:  Now what -- what are these things you just listed?

MR. HOLTSHOUSER:  These are labels that accompany various standard deviation conclusions, correct?

THE WITNESS:  How many standard deviations below the mean the patient falls on a particular test score.

Q    (By Mr. Holtshouser)  So going back to our original page, once we go from a raw score to a scaled score to a T score, we can finally arrive at a standard deviation for that score, correct?

A    Correct.

Q    And we use norms in order to do that.

A    We use norms to get to the T score.

Q    And then we use the T score to get to the standard deviation?

A    Right.

Q    We use the standard deviations, though, to get to the

labels.

A    Correct.

Q    Okay.  And just so that we're clear on the use of the standard deviations and the labels, if your -- if your T score is 47, you are .3 standard deviations below the mean, correct?

A    Yes.  You're normal.

Q    So .3 would fall between 0 and 1, wouldn't it?

A    Yes.

Q    You're normal.

A    Correct.

Q    Okay.  You're normal -- That label says you're normal because of how you compare to people -- other people like you who have taken the test.

A    That's right.

Q    Okay.  Some of these tests are education dependent?

A    Yes, they are.

Q    Some of them are life experience dependent?

A    Yes.

Q    And some of them are culture dependent.

A    To some degree.

Q    So would it do any good to compare like an 80-year-old male who had a Ph.D. with a 20-year-old college student who was still, obviously, still in school?

A    No.  That's why we have norms.

Q    They're going to -- They're going to perform differently.

We know that before they even take the tests, correct?

A    Correct.

Q    So if a T score is 36, that is 14 points below the mean which translates to 1.4 standard deviations, correct?

A    Correct.

Q    And 1.4 would fall in this field, correct?  Which would mean that would be an example of "mild" impairment.

A    Exactly.

Q    Now what is the significance of the word "impairment" attributed to someone's test results?

A    It's an indication that they are not functioning adequately; that they're impaired for their score on that particular task.

Q    Okay.  As compared to people like them, correct?

A    Correct.

Q    Okay.  Now that is not an indication that, well, at one time, they were -- they were operating at a higher level and then something happened and they became impaired as a result of that, and now this is where they're at.

A    Well, ---

Q    This is only looking at where they're at at the time they take the test as compared to people like them, correct?

A    Correct.  You would have to do serial assessments in order to look for changes over time.

Q    So if we tested a person when they were sober and then we

got them drunk and we tested them when they were drunk, we could do a before and after comparison and be fairly certain that the change in score is attributable to the variable we introduced, which would be alcohol, correct?

A    Yes.

Q    But when you're doing these tests, you're really only testing on the back end.  For example, Mr. Allen, you're only testing him as he was in 2009, correct?

A    Correct.

Q    You don't have -- You have -- You had the results of how he did in 1998, --

A    Yes.

Q    -- correct?  But you're trying to do a retrospective and determine based upon results in 2009, what impact his life experience has had on what his tests results would have been in '98.  Is that a fair statement of what you did?

A    No.  I think what I tried to do was recreate what Dr. Gelbort could have done if he did a more comprehensive evaluation.

Q    Okay.  And when you tested him, how old was Mr. Allen?

A    I have to look to see.

Q    Was he in his thirties?

A    I think so, yes.

Q    And in 1998 he would have been?

A    19.

Q    Well, 20.

A    Maybe 20.

Q    Going on 20 or 20 going on 21 in regards to '98.  Okay?

So the intervening ten years, what he has been doing with himself, whether or not he's been educating himself any further, and just ten more years of living makes him different than a 20-year-old with a 9th grade education.  Would you agree?

A    Well, certainly he's older.

Q    Okay.  And he perhaps might be more educated by experience, by activities, by formal classes that he could be taking.

A    I don't know.  He's been in jail or prison ever since that time, so.

Q    And you're not aware of any -- either -- You're not aware of any educational or reading opportunities that there exists with ---

A    I'm just not aware of which ones he may have taken advantage of.

Q    And you didn't inquire?

A    I don't believe so.

Q    Okay.  But the person you're testing isn't the person that he was in 1998, is he?

A    He's ten years older.

Q    So he's not the same.

A    Correct.

Q    Okay.  Let me show you Exhibit 558; give the Court an example.

MR. HOLTSHOUSER:  We'll be going back and forth, so.

MR. MORENO:  Okay.

Q    (By Mr. Holtshouser)  Is this the front page of the Comprehensive Norms for an Expanded Halstead-Reitan Battery by three authors?

A    Yes.

Q    Okay.  And this particular one, if I blow it up, this has a copyright of '91.

A    Yes.

Q    Is this the norms that would have existed in '98 at the time that Dr. Gelbort or Dr. Yutzy or Dr. Wetzel evaluated Mr. Allen?

A    Yes.

Q    And so there are norms that were published after this.  I believe it was either in 2001 or 2004, --

A    Correct.

Q    -- correct?  And then there are some tests that the norms aren't in this book.  You have to go other places to find them, correct?

A    Precisely.

Q    And they were revised at different points in time.

A    That's right, too.

Q    This is Appendix C.  It is -- There's a test here.  Just to give an example, here is the -- I'm sorry -- here is the Speech Perception, the Seashore Rhythm, the aphasia screening. Did I say those right?

A    You did.

Q    Trails A and B, and then there's a Category Test?

A    Yes.

Q    And then there's a thing over here, "HII."  Is that the "Halstead Impairment Index"?

A    It is.

Q    Okay.  This particular Appendix C is the one that you use in order to take a raw score, is it not, and convert it to a scaled score?

A    That's correct.

Q    All right.  So in this column -- in these columns here, are these raw scores that one might get on these tests?

A    They are.

Q    Like for example, TPT time, is that the finger tapping test?

A    Yes.

Q    And this would be ---

A    No.  That's the Tactual Performance Test.

Q    Tactual Performance, okay.  This would be the time in which they performed those tests?

A    Correct.

Q    Okay.  And the Tactual Perception Test, that's a test -- Are they blind-folded and given things to feel and they have to tell you what it is, --

A    Yeah, different shapes.

Q    -- based upon point, touch and feel?

Okay.  The scaled score over here, you read these across-ways.  You find your test and you zero in on that?  Is that right?

A    Well, you start in the column, find the test score, and then go over to find the corresponding scaled score.

Q    All right.  So let's say this person had a 27 on the Seashore Rhythm Test.  Would that translate over here to a scaled score of 11?

A    Yes.

Q    Okay.  And then do you need to go next to the next appendix which is D in this book in order to get the T score?

A    Correct.

Q    All right.  And so this particular one is for males, education 9 to 11 years, age 20 to 34.  So actually they lump Mr. Allen at the beginning of this time frame in '98 with including the year -- his age when you saw him, correct?

A    Correct.

Q    And this assumes 9 -- only 9 to 11 years of education, though?

A    Right.  There's another page that will have 12 years and

another page that will have 13 to 14, et cetera.

Q    Okay.  So here, do you start with a scaled score on the left?  Like we said 11 for that Seashore Rhythm, correct?

A    That's correct.

Q    And then you go across to here, the Seashore Rhythm, and find that 51.  Is that the T score?

A    That is the T score.

Q    Now in this book we use a combination of Appendix C and D in order to come up with finally the T score?

A    That's right.

Q    And 51 is that T score.  What does that tell us about standard deviations?  Let's get our labels.

A    Well, that would put him right in the average spot, a T score of 51.

Q    One above average?

A    One above average.

Q    So he's like actually point -- +.1 --

A    Yes.

Q    -- standard deviation above.  So one-tenth of a standard deviation above because one standard deviation is 10 points on the T scale.

A    Correct.

        THE COURT:  Point -- Plus point -- Plus .1 standard deviation above what?

        MR. HOLTSHOUSER:  The 50.

Q    (By Mr. Holtshouser)   So 51 is, on a scale of 1 to 100, 50 being in the middle, a single digit of 1 is 1 -- .1 above the middle, correct?

A    Above the mean, yes.

Q    That's because a T -- a standard deviation -- one standard deviation is 10.  So every single 1 point on a T score is .1, up or down?

A    Yes.

Q    Okay.  So in the case of someone who had that original raw score, that converts -- that scaled score would have a T score of 51 on a Seashore Rhythm, and the label that we get for that performance then by standard deviation would be -- he's actually above normal, --

A    Yes.

Q    -- correct?  Okay.  Now do these labels say anything about the phrase "brain damage"?

A    No, not in and of themselves.

Q    All right.  Is that a -- When you use the phrase "brain damage," okay, that seems to connotate the notion that there once was an intact brain, an accident happened, it became damaged, and here we are with the aftereffects, correct?

A    It does.  It's an imprecise term.

Q    And brain damage is an imprecise term.

A    Yes.

Q    Okay.  And really by using "brain damage," what we

actually might be referring to is this sense of notion of impairment where they fall as compared to their peers.

A    Well, it's more sophisticated than that, you know.  Here, we're really talking about their brain functioning and the degree to which their brain is not functioning normally. Brain damage would be better if you had an MRI that would show the physical structure of the brain and where there might be a lesion from a stroke or from a head injury.  That is more consistent with the term "brain damage."  This has to do with brain function.

MR. HOLTSHOUSER:  Can I go to the document camera?

THE COURT:  Is this a fair breaking point?

MR. HOLTSHOUSER:  Yes.

THE COURT:  We'll be in recess for one hour.

(Court recessed from 12:00 PM until 1:00 PM.)

THE COURT:  The last thing you said is:  Can I go to the document camera?

MS. COSTANTIN:  Oh, yeah.  Do you want to go to the document camera or did you change your mind?

MR. HOLTSHOUSER:  No.  Let's go.

Q    (By Mr. Holtshouser)  I'm going to show you ---

MR. HOLTSHOUSER:  There are two exhibits we're going to be referring to, Judge, that are not on the current exhibit list.  They are 686 and 687.

THE COURT:  Okay.

MR. HOLTSHOUSER: 686 is an excerpt from the Second Edition of the *Compendium of Neuropsych. Tests*. And 687 ---

THE COURT: Okay. Just a second; *Neuropsychological Tests*. Okay. And 687? Wait a minute. Okay, 687. Go ahead.

MR. HOLTSHOUSER: 687 is called *Golden's* -- G-O-L-D-E-N-(')-S -- *Manual*. It's one page.

THE COURT: Okay.

MR. HOLTSHOUSER: And we're not referring to that yet. I'm going to show him what's -- part of what's been marked as Exhibit 686 on the document camera.

Q   (By Mr. Holtshouser) I'm showing you, Dr. Martell, Exhibit 686. Is this the Second Edition of this big blue book that I just showed you back here?

A   Yes. I think the Third Edition is the blue version.

Q   Okay. And you note that this has a copyright date of -- I think it's 1998 down here.

A   Yes.

Q   Okay. When we were talking previously, we were talking about labels attributed to various scores. I'm just going to show you here, "Profile of Test Results and Meaning of Scores." In the 1998 Second Edition of the *Compendium*, it used different labels than labels like "mild" impairment, "moderate" and "severe." It used words like "superior", "above average" and "average" to describe T scores in standard deviations, correct?

A    Well, that's going above 50.  We're talking about below 50.

Q    All right.  And I'm just showing you examples of below 50 would use words like "low average", "borderline" and "very poor."

A    Yes.

Q    Okay.  And these -- these labels, though, are essentially the same, are they not?  Like, for example, here is 50 which is a standard deviation of zero, correct?

A    Yes.

Q    And everything is -- When we say "standard deviation," we're talking about deviation, meaning the number of points away from 50, up or down.

A    Yes.

Q    Okay.  And so 50 is the absolute center point.

A    Yes, it is.

Q    Okay.  And so, for example, six points above it is average.  Thirteen points above it or 1.3 standard deviations becomes the cutoff for "above average."  Anything over that is "above average"?

A    Yes.

Q    Okay.  And these ranges then sort of demark borders of these various labels.

A    There are multiple ways to break it out.  Here, they're not tied to specific standard deviations but more to ranges of

ability.

Q    But even these labels being used in '98 didn't speak in terms of brain damage, did they?

A    No.

Q    Is there something known as "tester bias"?

A    Yes.

Q    And these are objective tests, though, correct?

A    Yes.

Q    How can tester bias enter into the picture?

A    Well, there can be situations.  If you are somehow personally connected to the patient that you're evaluating, that may color the way you administer or score the test. There can be -- Certainly in forensic work you're always hired by one side or another, and there can be a pull to one side or the other in the process of your work.

Q    Not all of these tests necessarily involve, "Here, take this test and fill it out."  There's interaction between the test giver and the test taker quite often.

A    Yes.  I mean some are just paper and pencil, "fill this out," but others do require an interaction process.

Q    And does the interaction process include things like, "Okay, I'm going to show you a picture; you tell me the word of that picture"?

A    Yes.

Q    And then if they can't do it at first, you're allowed to

give them a cue or a clue.

A    Right, yes.

Q    And then you have to evaluate or judge their response as to whether or not that is a correct answer or incorrect answer or whether or not what they've said entitles them to a cue or not.

A    That's right.

Q    And then those types of tests, you might score a 0, a 1 or a 2; 2 being if they got it right the first time without any cues; a 1 being if they got it right after a cue, and 0 being if they got -- couldn't get it wrong even after a clue or a cue, correct?

A    That particular score -- test is just scored 0 to 1.  But in general, yes, that's how it works.

Q    Okay.  So can an awareness of these kinds of risk factors that you've described earlier, if you have an awareness as a test giver that certain risk factors might increase the probability of impaired results, can that impact tester bias?

A    It shouldn't.

Q    Can it?

A    It's possible, sure.

Q    So that because of the increased probability, does it heighten your own expectation of deficits?

In other words, if you know that someone has been, say, in a traumatic brain injury car accident, you might be

expecting deficits.

A    You might be expecting them, but, you know, the tests are given in a standardized fashion.  You know, you really have to consciously try to cheat the scores one way or another.

Q    Okay.

MR. HOLTSHOUSER:  Can we go back to the Sanctions, Carrie?

Q    (By Mr. Holtshouser)  Let meet show you 567.  This is the cover page of your report, correct?

A    Yes.

Q    And you were actually given -- You did not submit a declaration, but were you aware that your report was actually submitted as an exhibit in support of Mr. Allen's -- in support of his petition for relief?

A    I -- I don't know that.

Q    All right.  And you understand that the proceeding that we're here hearing has to do with a claim of ineffective assistance of counsel during the mitigation investigation in support of a request for relief from a death sentence?

A    I do understand that.

Q    That's the context in which we are existing.

A    Yes.

Q    Okay.  You were given three questions, were you not, in your report?  Is that right?

A    Yes.

Q    And the first was to review Dr. Gelbort's testing and give an opinion as to the scope and adequacy of the testing that he performed.

A    That's right.

Q    So that was, in fact, the first focus of your inquiry was to evaluate the adequacy of Dr. Gelbort.

A    Yes.

Q    Were you given any information ahead of time that led you to believe that the attorneys hiring you believed that his testing had been inadequate?

A    No.

Q    And then the second question had do with conducting your own examination of him, correct?

A    Yes.

Q    And then the third was the -- provide opinions regarding any mitigating evidence that you identified that was either not presented or not fully addressed at the time of his capital sentencing proceedings, correct?

A    Yes.

Q    Okay.  Now your expertise is in the area of Neuropsychology and Psychology, correct?

A    Yes.

Q    Are you an expert in the -- in trials?

A    No.

Q    Okay.  Are you an expert in determining the adequacy of

evidence presented by attorneys to a jury?

A    No.

Q    Okay.  The tests that you administered begin to be listed here on the bottom of the second page, carry over to the third page, and then there is a list of materials that you were given to review at the time you performed your examination, correct?

A    Yes.

Q    And this test is dated June 30, 2009.

A    Yes.

Q    Report rather.

A    That's correct.

Q    So you had the transcript of the penalty phase testimony, correct?

A    Yes.

Q    The school records, medical records, Franklin County prison records, school records, and then you had a variety of declarations.

A    That's right.

Q    And is that -- is that the sum total of what you had at the time you prepared your report?

A    Yes, it is.

Q    I want to back up just a second here.

        THE COURT:  I think there was a deposition of Mrs. -- deposition of Mrs. Allen, also.

MR. HOLTSHOUSER:  Not at the time of ---

THE COURT:  Oh, okay.

Q    (By Mr. Holtshouser)  You did not have the deposition of anyone at the time you conducted your examination and prepared your report, did you?

A    I did not.

Q    That at least is something that you think has been given to you since the date that this report was prepared.

A    Yes.

Q    Do you have a -- somewhere or anywhere a complete list of what you looked at since then?

A    I haven't prepared such a list.

Q    Okay.  So you can't really tell us with any specificity what you have in addition to what you included in your written report.

A    Not as I sit here, no, I can't.

Q    Okay.  Now you indicated that the work that you did was careful and thorough, correct?

A    As careful and thorough as I could be.

Q    Among the materials that you reviewed, do you see here that you listed the raw data and C.V. from Richard Wetzel?

A    Yes.

Q    Was that correct?

A    Well, I think -- I wrote "raw data."  What I had, I think, were notes that he had prepared, not actual test data.

Q    Because he didn't give any tests to Mr. Allen back in 1998, did he?

A    He did not.

Q    In other words, the existence of Dr. Gelbort was disclosed so late in the trial to the Government, the Government didn't actually have an opportunity to conduct an independent neuropsych. exam during the trial, correct?

MR. MORENO:  I'm going to object.  He wouldn't have any knowledge of that.

MR. HOLTSHOUSER:  He would if he read the penalty phase transcript.

THE COURT:  Okay.  Well, if you know, go ahead. Don't guess or speculate.

Q    (By Mr. Holtshouser)  Do you?

A    I don't know.

Q    You didn't notice that from having read the penalty phase transcript?

A    If I noticed it, I don't recall it.

Q    Okay.  But you do recall, from having read the penalty phase transcript, that Dr. Wetzel didn't do any independent testing, correct?

A    Correct.

Q    He only received the raw data generated by Dr. Gelbort and then applied his own interpretation to that data and checked it.

A    That's right.

Q    Doctor -- Dr. Wetzel didn't have the opportunity to conduct any other testing of his own.

A    That's my understanding.

Q    So is it -- In terms of the raw data from Richard Wetzel, there was no raw data from Richard Wetzel, was there?

A    Just his notes.

Q    Not any test data.

A    No test data.

Q    And is that usually what "raw data" refers to --

A    It is.

Q    -- is test data?

A    It is.

Q    So is this an error in your report?

A    I think so.

Q    Okay.  I want to direct your attention to Page 31 of your report.  Is this the portion of your report where you actually set forth and summarize the results of your neuropsychological testing?

A    Yes.

Q    And you gave Mr. Allen a great number of tests, didn't you?

A    I did.

Q    Your conclusions, are they introduced -- do they begin to be introduced at the bottom of this page here in that,

"He's -- He's functioning within the average range intellectually with a full scale IQ of 100, although his visual spatial problem solving skills are operating at a significantly higher level than his verbal skills."  That was the results of your IQ testing?

A    That's right.

Q    Now this PIQ is a Performance IQ of 110?

A    That's right.

Q    And a Verbal IQ of 92?

A    Yes.

Q    And the full scale is combining those scores, the full scale of 100.

A    Yes.

Q    Okay.  Was that considerably higher than the IQ of Mr. Allen when he was tested in 1998?

A    It was.

Q    The kinds of deficits normally associated with the kinds of additive burdens that you described, such as fetal alcohol syndrome, lead poisoning, febrile seizures, things like that are not the kind of injuries to the brain that one recovers from, are they?

A    Well, not between age 19 and age 30.

Q    If you got them, you got them, right?

A    Yes.  They would be permanent and stationary.

Q    And they're like governors on a motor, aren't they, or on

an engine?

A    Yes.

Q    So if someone had these insults to their brain, had these problems as a result of those sorts of exposures, no matter how hard one tries, one is never going to be able to do better than a certain level.

A    That's correct.

Q    Much like a governor will keep a motor from running no higher than a certain speed.

A    That's right.

Q    So how is it -- If -- How is it that you can explain the increase -- the significant increase in Mr. Allen's IQ from when he was tested in '98?  Can you recall those numbers?

A    Not off the top of my head.  I think they're in my report.

Q    But they're considerably lower in '98.

A    Yes.

Q    Okay.  I think they're considerably higher when you tested him in 2009.  How do you explain the fact that he appears to have gotten smarter intellectually in those intervening years?

A    Well, I don't think he's gotten any smarter intellectually.  I think that there were situational factors at play at the time he was evaluated by Dr. Gelbort that are artificially lowered, the scores that he obtained at that

time.

Q    What would those be?

A    They would be the stress of trial starting imminently; being arrested; facing federal prosecution; depression at that time.  And based on -- I'd have to go back to look.  The other issue that you always are concerned about is level of effort, and there may be indicators regarding his level of effort, but I don't know what they are as I sit here.  I'd have to look.

Q    Do you think then that the scores that Dr. Gelbort obtained back in 1998 weren't actually true indicators of his intellectual ability?

A    Well, I think you -- I think they underestimate his true ability.

Q    Okay.  Now if Dr. Gelbort testified at the trial that they were a reliable and correct measure of his intellectual ability, then would that be something you'd disagree with, based on your testing?

A    Well, based on the fact that he did better subsequently, yes.

Q    And do you think that in terms of the limitations on his intelligence as a result of permanent exposure to the kinds of neurotoxins that we described, --

A    Yes.

Q    -- that that testing results of his IQ tends to suggest that he hasn't suffered any impairments as a result of those?

A    Well, IQ is only one part of comprehensive neuropsychological functioning.

Q    And that's the only part I'm asking you about at the moment.

A    Right.  Well, those things aren't immediately apparent here.

Q    Okay.  And the kinds of problems associated with fetal alcohol syndrome, lead poisoning, brain injury, development of the febrile seizures, are those things that show themselves relatively close in time to the exposure to the insult?

A    You would expect that, yes.

Q    It's not something that sort of planted in him and shows up much later in life.

A    Well, you know, our understanding of how these things work is imperfect, but generally you'd expect to see the impairment close in time to the exposure.

Q    And one generally doesn't get better from them, correct? Those types of insults.

A    Correct.

Q    And would the same also be true of head injuries?

A    Head injuries recover over a period of six to nine months, maybe up to a year, and then they plateau, and you don't always regain your full level of premorbid functioning.

Q    Are there effects -- Are there implications for IQ from excessive marijuana and alcohol use?

A    Marijuana is actually fairly benign in terms of its effects on IQ and cognitive functioning. Other things like alcohol and cocaine and heroin are more -- are more caustic to the brain.

Q    So if those sorts -- If you say alcohol, excessive alcohol use is somewhat holding one's actual intellectual ability down, is that something that they can recover from once the alcohol is -- as time dissipates from their system?

A    To some extent. It can actually cause structural damage to the brain.

Q    Which can't get better.

A    Which can't get better. The brain tissue actually dies off. It shrinks away. The ventricles become enlarged.

Q    Okay. Your -- Your summary sentence here is that in the context of overall average intellectual functioning, which would that be where he falls with those scores? That he is in overall average intellectual functioning range?

A    He has a -- He has a normal IQ.

Q    Okay. "He demonstrated a number of deficit areas consistent with his history of exposure to neurotoxins, febrile convulsions, asthma and mild head injuries." Is the intent that you were -- of your communication here to suggest that you have found deficits which you attribute their causal nexus between those deficits and these exposures?

A    I think that it was and I think that it is still. One --

One tries to understand why you get a pattern of impairment. You look to the history, and those are the significant factors in his history that could account for the impairments seen.

Q    Now is the next page, Page 32 of your report -- You see on Page 33 begins your summary and forensic opinions.  Page 32 is really the page of your report that contains the summary of the bases for your conclusions that he actually has brain impairments, correct?

A    Yes.

Q    Okay.  So let's just kind of go through this page, if we can, in terms of the various tests that you relied upon to reach your conclusion.

The first here is you gave him the WAIS-III and the WMS-III.  Is that correct?

A    Yes.

Q    All right.  And that's -- That's that battery of tests that actually ends up with IQ, correct?

A    Well, the WAIS-III is the IQ test.  The Wechsler Memory Scale III is like an IQ test but it tests memory function.

Q    But it is part of a battery, correct?

A    They can be done together.

Q    All right.

A    They were normed together.

Q    And your evaluation data in this treated them together.

A    Yes.

Q    The same computer program evaluated them and printed out the results that you relied on.

A    That's correct.

Q    The next one that you have in this report, and that's Paragraph 1 and the first sentence of Paragraph 2, deal with the WAIS-III and the WMS-III.

A    Yes.

Q    And the next sentence of Paragraph 2, you rely on the results from something called the CVLT, correct?

A    That's right.

Q    And that's the California Verbal Learning Test?

A    That's right.

Q    And you got some results from that that indicated to you that he was -- he had problems, correct?

A    Yes.

Q    The next paragraph deals with matters pertaining to executive functioning, and you mention two tests in here.  One is the "Stroop" and the other is the "FAS," correct?

A    Yes.

Q    In the next paragraph you rely on the Boston Naming Test, correct?

A    Yes.

Q    That's the "BNT"?

A    That's right.

Q    Then the next one you rely on something called the

"Neurodeficit Scale," correct?

A    Yes.

Q    And I'm right here.  Is that where we're at on this page of your report?

A    Yes.

Q    There's a reference here to impairments on the left side for motor strength, manual dexterity, hand dynamometer, grooved pegboard test that are in excess of one standard deviation below the mean, tactile form recognition.  And then there's mild impairment and auditory attention in the Speech Sounds Perception Test.

A    Yes.

Q    And the Speech Sounds Perception Test is SSP?

A    I don't think -- I don't use that abbreviation, but we can use it today.

Q    Okay.  And then lastly, you have a diagnosis on the base of these test results that he meets a diagnosis of dementia due to multiple etiologies.  Did I say that word right?

A    Yes.

Q    And those etiologies, is that another -- is that a fancy word for "causes"?

A    Yes.

Q    Okay.  Maternal cigarette smoking, maternal alcohol abuse, lead poisoning, recurrent febrile convulsions, uncontrolled asthma and one or more mild head injuries,

correct?

A    Yes.

Q    Now this diagnosis of dementia due to multiple etiologies, did Dr. Gelbort reach that diagnosis?

A    I don't think so.

Q    So your diagnosis is not essentially the same as Dr. Gelbort's, is it?

A    Well, in terms of the implications for his functioning, I think we're on the same page.  He didn't use that diagnosis.

Q    He didn't find that he suffered from dementia.

A    That's correct.

Q    Okay.

        THE COURT:  Just -- Could I have that back a minute?  Could I have that one back again?

        MR. HOLTSHOUSER:  It is right here.  I can blow the bottom up again.

        THE COURT:  No.  No.  It was --

        MR. HOLTSHOUSER:  And we're going to go through this page.

        THE COURT:  Yeah, that's what I want.

        MR. HOLTSHOUSER:  It's the bottom of Page 32.

        THE COURT:  Yeah.  Just a second.  Let me catch up.

        (Pause)

        THE COURT:  Now let me make a little note here and then I'm ready.

MR. HOLTSHOUSER:  Okay.

(Pause)

Q    (By Mr. Holtshouser)  So I want to still focus -- I'm going to ask you some questions.  And they're all emanating from this page --

A    Okay.

Q    -- and these tests.  Okay?

A    I understand.

Q    So the first one I want to talk to you about is the WAIS-III, WMS which is this first one up here.  And if I go to Exhibit 568, Page 11, is this your data, computer printout data for that test?  Those three -- Those tests?

A    Yes, the first page.

Q    So they're combined together, this -- this battery of tests, correct, by The Psychological Corporation?

A    They're both published by them.  They were normed together.  You can give one, you can give the other, or you can give both.

Q    Okay.  And this is Exhibit 568, Page 11.  The IQ scores that you gave are actually found right here, aren't they?

A    Yes, they are.

Q    Verbal:  92; Performance:  110; Full Scale:  100.  There is something on the right-hand side called "Qualitative Description" of each of these, correct?

A    Yes.

Q    His Verbal IQ is in the "average" range?

A    Correct.

Q    His Performance IQ is in the "high average" range, and his Full Scale is "average," correct?

A    Yes.

Q    One of the points that you make in that paragraph on 32 is that the Working Memory Index -- So included within these IQ scores, are there indexes?

A    Yes.

Q    Is it all part of one test?

A    It is.

Q    Okay.  And so there are indexes that are there that are not really visible to the test take -- to the test taker, correct?

A    Correct.  They have no idea.  These are all composites based on multiple subtests.

Q    There isn't like a thing that says, "Okay, now we're taking the Working Memory Test."

A    No.

Q    Okay.  So that's hidden to the test taker, but it's known to the computer programmer and the makers of the test.

A    Yes.

Q    So on the Working Memory Index, you noted that that was impaired relative to his overall performance.

A    That's correct.

Q    And you noted that that was in part due to his arithmetic weakness?

A    Yes.

Q    Arithmetic?

A    Arithmetic.

Q    Okay.  That's a learned skill, correct?  Arithmetic?

A    Yes.

Q    Okay.  It's something that you get in school.

A    That's right.

Q    And so it's an education dependent factor, isn't it?

A    It is.

Q    This index that you're referring to, are you, in fact, referring to -- I'm sorry.  Let's blow this up.

    These indexes appear on this same page, Page 11.  And are you referring to this Working Memory Index, index score of 84?

A    Yes.

Q    Are the index scores for the other indexes, verbal, perceptual, processing, speed, any problems with those?

A    No.  They're all normal or perceptual organization is actually "above average."

Q    Okay.  By itself, is a Working Memory score of 84 -- Where does that fall in the range of average, above average, low average?

A    It falls 1.1 standard deviations below the mean.

Q    Okay.  And that would make it "below average"?  "Low average"?

A    "Low average."

Q    Okay.  It is a -- How much -- What percentage of the population do you, according to some of these statistics generally, have that particular Working Memory score?

A    Well, --

Q    More than -- More than 40.

A    -- the bottom 14 -- 14 percent down.  So there would be -- Eighty-six percent of people would score better than he did on that.

Q    So you said it's how many standard deviations?

A    Well, the percentage of 15 or 16 is one standard deviation.  So he's just ---

Q    From 50; 50 is the mean.

A    Well, not here.

Q    Okay.  Not here?

A    Not ---

Q    Okay.

A    Well, for -- 50 is the mean for T scores.  So in terms of T scores, he would be like at a 39.

Q    Okay.  So he's like 1.1 standard deviations below the mean.

A    Exactly.

Q    So he's actually in that category, according to standard

deviations, that result standing alone, he's just one-tenth below normal.

A    And in the range of "mild" impairment.

Q    And just -- just across the border of "mild" impairment, correct?

A    Correct.  One -- One toe in the water.

Q    Compared to his peers.

A    Well, this is compared to a national sample.

Q    Okay.  Is this compared to a national sample of 33-year-olds with a ninth grade education or 18, 19-year-olds in 1998?

A    This is compared to people of his age and education at the time of testing.

Q    2009.

A    Yes.

Q    Okay.  So this wouldn't be his testing as he existed in 1998.

A    It's impossible to do that.

Q    These show the subtest scores in the various parts of the IQ test, correct?

A    Yes.

Q    And that's Page 13 of Exhibit 568.  Let's go to Page 19. Is this the summary of the primary indexes buried within the Working Memory Scale test?

A    Yes.

Q    So even within the Working Memory Index, there are further sub-indexes, correct?

A    Let me correct.  The Working Memory Index at the beginning that we've been talking about so far, --

Q    The 84?

A    -- that is part of -- that comes from the IQ test data alone, irrelevant and irrespective of the Wechsler Memory Scale.

Q    Okay.

A    So this is new tests, new data; just looking at memory functioning across the board, independent of that Working Memory Scale.

Q    Okay.  And so is this a -- Are each of these indexes memory indexes?

A    Yes.

Q    Okay.  And so it tested things like auditory, visual, immediate, auditory delayed, visual delayed, auditory recognition delayed, general memory and working memory.

A    Yes.

Q    And the word "delayed," is there -- are they exposed to material and they're asked to immediately recall it?

A    Well, that would be immediate memory.

Q    And then there's a -- there's a delay factor that comes in between, time goes by, and then they're asked, "Okay, how much do you remember now after the passage of time"?

A    That's correct.

Q    Is there something that comes in between that's called "interference"?

A    Yes.

Q    And that's in order to sort of like throw something else into their mind so that ---

A    Well, so they can't rehearse.

Q    Okay.  And so ---

A    They aren't told that they're going to get retested, so.

Q    Okay.  All of his results for each of these separate sub-indexes of the Wechsler Memory Scale, are they in the "average" to "low average" range?

A    Yes, they are.

Q    Is it -- Is it fair to say that your opinion on this -- the results of this one test has to do with the difference between what his IQ says his ability is and what the Working Memory Scale says his memory function is?  It's that difference.

A    Yes.  What you expect in a man of his age is everything's going to be normal, and his IQ would tell you to expect everything to be normal because his IQ is normal.  When you find something that deviates significantly from that normal IQ, it's a cause for concern and an issue to be explored.

Q    At Page 26 of Exhibit 568, does the computer program, in fact, calculate for you the differences between the various

indexes?

A    It does.

Q    And if I compare this page with Page 27, first of all, ability memory differences, this is the difference that you're focusing on, correct?

A    Yes.

Q    The difference between ability and memory.

A    Yes.

Q    And there is a certain sort of predicted memory ability associated with a certain type of intellectual ability.  Is that right?

A    That's right.

Q    This is that Predicted Memory Method.  Is that correct?

A    Yes.

Q    Okay.

        THE COURT:  That's on Page 27?

        MR. HOLTSHOUSER:  26.

Q    (By Mr. Holtshouser)  If I go to the next page, Page 27, is there, in fact, another method to calculate the same ability memory difference?

A    Yes.

Q    The program gives you two methods to evaluate this relationship, correct?

A    Yes.

Q    Under the Predicted Memory method, in this column there's

an entry -- there's a column called "Significance."  Is that what "signifi." is?  "Significance"?

A    Statistical significance, yes.

Q    Statistical significance of the difference.  And "NS," is that "no significance"?

A    Not -- Not significant.

Q    Not significant.  So for each of these -- On the Predicted Memory Method, on each of these, is it determined that there is no statistical significance to the differences between his ability and his memory?

A    Yes.

Q    And for the cumulative percentage of where each of these differences falls for each of these primary indexes, is he over 25 percent, 20 percent, 15 to 20?  Do these relate to where he falls compared to the population?

A    Yes.

Q    So he's a -- he's in -- he's in plenty of company in terms of those differences, correct?  That's not a unique feature?

A    Using the predicted method, a statistical method.

Q    Then there is the next method which is the simple difference method.  And in this column for significance, it looks at the same indexes, correct?

A    Yes.

Q    And of that, it finds all of them not statistically

significant with the exception of three, and that is .05, and that is the point at which significance begins, correct?

A Correct. Anything above a .06 would not be significant statistically.

Q Okay. But even with those, he is amongst 20 to 25 percent of the population or 15 to 20 percent of the population, correct?

A Yes.

Q Now is it this difference, this statistical difference, is this what you reported in your report?

A It is.

Q Okay. So you had two methods here; one of which said that there really wasn't any significance to the difference, one of which said there was, correct?

A Yes.

Q Okay. Why is it that you chose to report the one that said there was a significance?

A Well, there's two reasons. The first reason is this is the way I was trained. This simple difference method uses his actual scores and looks statistically for a difference between them. That's the reason I went with that because that's what I know and that's how I was trained. That's what I'm comfortable with.

The Predicted Method is a new method that uses statistical population data to predict what you would expect

the score to be.  And it didn't find the differences, but there are differences there, and that's what I reported.

Q   Okay.  Now you didn't report in your report that there were two methods that looked at the significance of this difference and that one of the two told you that there was an issue and one of the two told you that there wasn't.  You only reported the bad information, correct?

A   That's true.

Q   Is that something that you were trained to do?  Only report the bad information that helps his particular position?

A   No.

Q   The data norms that you're using for these tests, were they 2009 norms?

A   I think they're earlier than 2009.  They're the norms available at the time the test was published.

Q   Okay.  Not at the time that the trial occurred in 1998.

A   These tests ---

Q   May not have existed.

A   I think these actually -- Well, I'm not certain.

Q   Okay.  We're not going to get into that.  Would it be fair to say that in conducting testing from an ethical and professional point of view, you're required to use data that is current at the time you are testing in order to interpret the results of tests given in that time frame?

A   Well, you know, that's -- I won't say it's a loaded

question, but I think I see where you're going with this, and it goes to the heart of the issue of why forensics is different than everyday clinical practice.

We have a strange situation here where we want to know or where I was asked to inform the Court what could somebody have found in the past and what -- using the tools that were available to him at that time. And so I made a specific decision to use tests that were older, tests that were available at that time, rather than the newest, best current tests.

Q   When you use tests that are older, you also use normative data that was older to score them.

A   Yes.  I used norms that were available to Dr. Gelbort at the time of trial.

Q   So you gave tests to a 31 or 32-year-old man as if he was 18.

A   Well -- And there's the rough.  That's the one place where you can't reconcile the two things.

Q   Is that what you did?

A   No.  I used tests that were available then, but I used the -- I interpreted his performance comparing him to people of his current age.  It wouldn't be fair to test him at 30 and then use norms for 19-year-olds.  So I used norms for 30-year-olds but used the tests that were available then.

Q   But at the time he's 30, what we know about 30-year-olds

is contained in present day normative data, --

A    It is.

Q    -- not at the time he was 18.

A    No.  There were norms for 30-year-olds then as well.

Q    But he wasn't 30 then, was he?  You didn't get the results of a 30-year-old back in '98, did you?

A    This is the conundrum.

Q    It is a conundrum, isn't it?

A    There is no perfect way to do it.

Q    Okay.

A    I tried to do the best approximation to what could have been found.

Q    Are you trying -- Were you trying to force ---

        MR. MORENO:  Objection.  He cut him off.

Q    (By Mr. Holtshouser)  I'm sorry.  Did I cut you off?

A    I tried to provide the best approximation that I could to what could have been done then.

Q    Are you trying to squeeze a square peg through a round hole?

A    I don't think so.

Q    Okay.  Now you ultimately -- At the bottom of this Page 32, everything that's there was used to support your ultimate diagnosis of dementia, correct?

A    It is.

Q    Now you can't have dementia, can you, without memory

impairment?

A    That's right.

Q    So dementia, a diagnosis of dementia under the DSM requires memory impairment plus some other impairment of some other area of intellectual functioning, correct?

A    Yes.

Q    So I think you agreed at your deposition that an easy way to define "dementia" is memory impairment plus.

A    Yes.

Q    This discussion that we just had about the difference between his performance on the Working Memory Scale as compared to his IQ, is that the basis for your memory impairment?

A    It's one of multiple bases.

Q    Okay.  But that's one of them.

A    Yes.

        THE COURT:  Okay.  Just a second.  I got to catch up with my notes here.

        (Pause)

        THE COURT:  All right.

Q    (By Mr. Holtshouser)  Do you recall that during your deposition we had a discussion about what the records showed with respect to his performance in school?

A    We did.

Q    Okay.  And you agreed, I think, that up until the time --

up until 8th grade, his performance in school, which we really only had his ERB scores to go on, correct?

A    Yes.

Q    So, for example, Dr. Cuneo says that if you looked at his grades from Clayton, he flunked all the time.  He actually didn't have any grades from Clayton, did he?

A    Not that I say.

Q    All right.  We had grades from Sumner, and by that time in high school, most of his grades besides Art were Fs.

A    That's my recollection.

Q    And in many of those in those -- in those -- in those semesters, one of his big problems was attendance.

A    That's true.

Q    Okay.  His attendance, though, in grade school was relatively good, wasn't it?

A    I don't know if we have records for that either.

Q    Okay.  His grades and his test scores on the ERBs, that was information that was summarized at trial, but at times they were good, at times they were bad; correct?

A    Well, I think he persistently had a problem in verbal expression across all those testings, but he also had strengths and normal performance.  So there was a lot of what we call "scatter" in his test performance.

Q    So I'm showing you Exhibit 165 which was Exhibit 103 at trial that shows his ERB aptitude scores for Clayton School

District in '87 when he was 10, '88 when he was 11, '89 when he was 12, and the last being '91 when he would have been 14, 13 or 14, and that his Quantitative Scores went from 50 -- went from 57, 54th, 19th to 55th, so that this represents his skills achievement tests on the latest -- when he was 13, 14. Okay?

A    That's right.

Q    Okay.  Now the up and down in the math there, I think you agreed at your deposition, I mean if his math scores were good that's not something he can fake, correct?

A    No.  You can't pretend to be smarter than you are.

Q    You can't fake good scores.  You can maybe fake bad scores, but you can't fake good ones, right?

A    That's right.

Q    They are what they are.  Similarly, his verbal -- his verbal shows a -- somewhat of a consistent pattern in the thirties but then a decline in 8th grade, correct, to the 25th?

A    Yes.

Q    Okay.  And so there is a fluctuation, isn't there, between some of these scores during those years?

A    Well, particularly his Quantitative Scores when he was tested in 1999, an enormous drop and then a recovery.  And when I see a pattern like that, it suggests situational factors that were impairing his performance rather than

ability or true achievement factors.

Q His test scores, though, in '91 at least reflect, don't they, that he has ability?

A Yes. He's within normal limits.

Q Okay. And so there might be other factors that might be inhibiting his performance, but brain function and brain ability isn't one of them at the time he's a teenager.

A Well, in terms of his ability to learn in school, no.

Q And you recall that his scores kind of take a nose dive after that when he gets to Sumner. And from your social history, does that also correspond with his increased use of marijuana and alcohol?

A Well, that's one of the things. I mean I think there were also things happening in the home. His mother's drinking was getting worse. I think her boyfriend committed suicide, and then she ---

Q Do you know when that happened?

A I don't have the exact date, but I know it was around this time.

Q Okay. How do you know it was around this time?

A Just based on my recollection.

Q Of what?

A I'd have to go back and look.

Q Okay. I mean is there something that you think you looked at that gave you some indication of when he died?

A    It was -- It was from his -- from his account to me from my exam of him; what he told me during my exam.

Q    That he had committed suicide?

A    That after that suicide, his mother's drinking got worse and her behavior got worse.

Q    Okay.  But I think you agreed at your deposition that certainly his grades took a nose dive after the 8th grade.

A    Yes.

Q    And so that there was something going on in that time period that attributed to his poor performance in school.

A    Yes.

Q    Is it your understanding that the -- Well, strike that.

There are several tests that Dr. Gelbort gave that are strong indicators one way or the other of frontal lobe damage, correct?

A    Yes.

Q    And those include the Category tests and then the Trails A and B tests?

A    Yes.

Q    And isn't it true that Mr. Allen performed very well, exceedingly well in those tests in 1998?

A    He did do well.

Q    In the "very high average" range.

A    Yes.

Q    And that that would be an indication that his fluid

intellect was intact?

A    Well, we're really talking more about executive functioning, problem solving and, you know, it's the frontal lobes of the brain which are huge and subsume a wide variety of abilities.  Those tests are very specific to sequencing and problem solving which he could do very well.

Q    Okay.  Verbal IQ, though, on the other hand, is an education -- more of an education dependent intelligence, correct?

A    That's correct.  Going to college can add five or ten points to your Verbal IQ.

Q    So if you look at any sort of impaired verbal ability, it's either -- the possibilities are either brain impairment or poor education, correct?

A    Those would be two.

Q    Do you recall that when you spoke with Mr. Allen in 2009, did he seem very versed in psychological terms?

A    I -- I didn't think so.  I know I recall from our deposition that I think he used the word "traumatized," and you asked me about his use of that word, and I think my response was I didn't feel he was leading me down any primrose path to a diagnosis.

Q    Do you recall at Page 170, Exhibit 532 -- this is your deposition -- that Mr. Allen told you that memory has not been one of his strong suits, and he clarified this to mean that he

meant his auditory memory because he thought his visual memory would be 10 out of 10?

A    Yes.

Q    And you agree that that would show a relatively sophisticated awareness of those concepts, and you said, "Yes. That makes my wonder."

A    Well, it makes me wonder because, you know, I think this was from the report of Dr. Gelbort that we're talking about here.  It's not my examination.  We're reviewing what he told someone else.

Q    How about the word -- You said the word "traumatized," correct?

A    Yes.

Q    Where would he have learned that term?

A    Well, he's -- he's not stupid.  He does have a vocabulary.

Q    Did you ask him where he heard that term?

A    No.  I didn't find it shocking or out of context to his functioning.

Q    Do you know whether Mr. Allen had read any reports of interviews or declarations before you examined him?

A    I don't know.

Q    I think you also indicated that at some point Mr. Allen told you that he was self-medicating himself when he was using marijuana and alcohol?  You have it in quotes, I think, in ---

A    I'd like to see it.  I know -- I know that term has been used.  Whether he used the term or whether I used the term or someone else used the term, I don't recall.

Q    Do you recall that it was in the -- your notes for the PCLR interview?  And you had it in quotes.

A    Well, ---

Q    And my question is:  If it came from Mr. Allen in quotes, did you ask him where did he learn those phrases?

MR. MORENO:  I'm going to object.  I'm asking that Mr. Martell be shown the quotes so we can put it in context.

THE COURT:  All right.

Q    (By Mr. Holtshouser)  Do you find that necessary to answer the question, Dr. Martell?

A    Well, here's -- here's where I think the trouble may lie, and I'm not sure I can resolve it.  I -- I'm perhaps a little inconsistent in my use of quotations.  Generally, I use quotations to indicate the verbatim words that come out of the patient's mouth.  On occasion I'll put a term in quotes that's sort of a term of art like "self-medication" as a way of shorthand to myself of what he was doing.  As I sit here now, I don't recall which of those two things I did during my exam of him, but I suspect it was my shorthand rather than something that he said, but I can't say for sure.

Q    Okay.  Did you know when you examined Mr. Allen in 2009 that he had previously been examined by and spoken with a

Dr. Pablo Stewart?

A    I did not know that.

Q    And you also -- You knew that he had been examined by Dr. Gelbort, Dr. Cuneo, Dr. Yutzy prior to trial, correct?

A    Yes.

Q    And repeated asking in psychological interviews, the more of these you go through, the more they become a little bit predictable and routine, correct?  You know what to expect?

A    Well, it can be a problem, you know, and bad forensic practice.  You know, you can ask leading questions and teach symptoms that then get reiterated to subsequent examiners.

Q    There are -- There are checklists that are out there that psychologists are suggested -- that are suggested to use correct?  Topics to cover?

A    Psychiatrists tend to use those more than psychologists, symptom checklist kind of things.

Q    So you do not know when you spoke to Mr. Allen that he had previously been examined by a Dr. Stewart?

A    No, I didn't know that.

Q    And so you have no knowledge as far as what Dr. Stewart said to Mr. Allen or vice versa.

A    That's correct.  I don't to this day.

Q    And you've never read a report prepared by Dr. Stewart of his examination of Mr. Allen, have you?

A    No.

Q    By the time you talked to him, did you have any idea how many times in the course of his case since it began in 1997 Mr. Allen had been asked questions about whether or not he had ever been the victim of physical abuse of any kind?

A    I don't think I know -- I knew then.  I think I've subsequently, you know, as that's emerged as ---

Q    A fair number of times, correct?

A    It's been -- Yeah.  I think it's been pretty much every mental health professional that's seen him.

Q    When you examined Mr. Allen in 2009, would you like to have known that he had been recently examined by another psychologist?

A    Well, I think Dr. Stewart is a psychiatrist.

        MR. MORENO:  I'm going to object.

        THE WITNESS:  Pardon me?

        THE COURT:  I think there's an objection.  He says ---

        MR. MORENO:  And the basis of the objection is I don't know and I'm sure Dr. Martell doesn't know whether, in fact, Dr. Stewart evaluated him first or Dr. Martell evaluated him first.  And if we can establish that on the record, then I would have no objection to the question.  But if we can't, then I don't think that the question has a proper foundation.

        THE COURT:  The question was:  Would you like to know if he had been recently examined by another psychologist?  Can

you have a time frame, Mr. Holtshouser?

MR. HOLTSHOUSER:  According to depositions and according to the discovery that we've been provided, Dr. Stewart examined him in 2008 but was subsequently given the report of Dr. Martell, but Dr. Martell has not given any information about Dr. Stewart's examination.

MR. MORENO:  All right.  So if Mr. Holtshouser is representing that Dr. Stewart evaluated him in 2008, and I have no independent knowledge of that as I stand here today, ---

MR. HOLTSHOUSER:  My recollection is that's what he testified in his deposition and that there -- he had no -- Well, we've never been provided a report.  He said he's never written one.  He did submit a declaration which is at this point not in evidence before this Court, but it doesn't address, I don't think, the date that he ---

MR. MORENO:  Yeah.

MR. HOLTSHOUSER:  Because he talked to him a number of times.

MR. MORENO:  Yeah.  I don't know when that would have been.  I don't know what the date of that would have been.

MR. HOLTSHOUSER:  But I want to limit my question to simply if someone -- Let's put it in a hypothetical.

MR. MORENO:  That's fine.

Q    (By Mr. Holtshouser)  If someone had -- If another

psychologist had examined Mr. Allen relatively close in time to the time you examined him, would that be something you would have liked to have known?

A    Yes.

Q    And why?

A    Well, because I would want to know what that doctor found, what -- what he learned, and --

Q    How he learned it?

A    -- how he learned it as much as I could.  I mean in this kind of situation, the more you have to work with, the better off you're going to be.  So if there is important data from a psychiatrist that had evaluated him that might have informed my choice of what tests to give or possible diagnoses that need to be explored, that would have been helpful to know.

Q    And when you spoke to Mr. Allen in 2009, he conveyed to you information about what you characterize as abuse, correct?

A    He did.

Q    And did you ask him -- And you also knew from the information you received that in earlier versions he had denied such abuse, correct?

A    I -- I did know that, although I'm not sure -- I think I knew that later.  I'm not sure that was salient in my mind when I saw him.

Q    Did you raise with him the question of:  "Who is it that you first told?  Who is it -- To whom is it that you first

changed your story?"

A    No.

Q    Was that something that you were interested as to when and how this, quote, "revelation" first occurred?

A    It would be something I would be interested in now, but it wasn't anything that I was aware of at the time.

Q    Okay.  These tests that you gave, among them you gave certain validity tests, correct?

A    Yes.

Q    And you gave him three -- I think it's the Rey, R-E Y, 15, the Tomm, T-O-M-M, and the VIP, correct?

A    Yes.

Q    Although you did not give the full VIP.

A    That's correct.

Q    You only gave the nonverbal part?

A    That's right.

Q    Why did you not give the verbal part?

A    You don't have to give both parts.  I gave that part because, you know -- I don't know if it was time constraints. I tend to salt the effort tests through the testing.  Instead of putting them all together at the front, I spread them out. So I don't know if I ran out of time to do the verbal part or what.

Q    Didn't you know from your review of the history that he perhaps had some erratic performance in verbal areas?

A    No.

Q    Okay.  Those tests, what they confirm, though, is that he exerted sufficient effort on those tests to determine that he's making good effort on those tests, adequate effort, correct?

A    He was trying his best.

Q    For example, he thinks the TOMM, the test of memory and malingering, he thinks he's taking a memory test but he isn't really, is he?  He's taking an effort test.

A    Well, it's an effort test that is essentially a memory test.  He has to look at pictures and remember them later, so it does test memory.

Q    Okay.  And was his -- was his score on the TOMM perfect?

A    It was.

Q    So that memory test at least, he got a perfect score.

A    Well, that's true, but it's ---

Q    Why is that funny?

A    People with -- People with real brain damage can get a perfect score.  A perfect score is what is expected.

Q    Okay.  But you said a second ago it's a test of both memory and effort.

A    Well, it's really a test of effort in memory test clothing, but, you know, if you've got some profound memory impairment, I could see that you might produce an impaired score that wouldn't be faking.  It would be because of a

profound memory impairment.

Q    Okay.  But in choosing what to report in your report in terms of what supports your conclusions that he had memory impairment, you chose not to include in that section any analysis of the TOMM results?

A    I'd don't know any neuropsychologist in the country that would consider the TOMM as a test of memory.

Q    Is that a "no"?

A    I guess so, yes.

Q    Okay.  Thank you.  These validity tests, while they confirm that he's providing adequate effort, that he's not faking his effort on those particular tests, ---

THE COURT:  Wait a minute.  Wait a minute.  Just a second.  It wasn't included.  Why was it -- Why was the TOMM test given to him in the first place?

THE WITNESS:  It's given as a test of effort to see if he's trying.  I'm looking to weed out a person who is malingering or faking.

Q    (By Mr. Holtshouser)  And the faking or malingering that you're trying to weed out is whether or not they're not trying their best on these tests.

A    Precisely.

Q    Okay.  It is not -- They are not tests to determine that what he is claiming about his social history is true or not?

A    No.  These are tests specific to an effort to manipulate

the testing to look like he's brain damaged.

Q   Okay.  So just so there's no confusion, there isn't anything about these validity tests that lends any credibility to his claims of abuse, correct?

A   Not specifically, no.

Q   Okay.  Back to the next one, the CVLT, the other test which you relied on on Page 32 to reach your diagnosis, is that a component of the plus or of the memory impairment?

A   No.  That's memory impairment.

Q   Okay.  And I think you used the word -- We can go back to -- I think that was 256.  Yep.

With respect to that test, he "displayed substantial impairment in verbal learning with scores on the major measures falling two to three standard deviations below the mean," correct?  "And with significant intrusions of erroneous material and a mild degree of perseveration."

A   Correct.

Q   P-E-R-S-E-V-E-R-A-T-I-O-N, correct?

A   Yes.

Q   Where does the -- Where does the -- Where's the measure for the label "substantial" before "impairment"?

A   That's my word.  That's not a, you know -- It's characterizing the fact that's two to three standard deviations.  This isn't "mild" impairment.  It's "substantial."  I could have said "moderate" to "severe."

Q    Because if it's two to three standard deviations, it's actually within the "moderate" range of impairment, correct?

A    Well, ---

Q    Compared to his peers.

A    Some were -- Some were two standard deviations.  Some were actually three or more standard deviations; hence, "moderate" to "severe."  I could have used that language.

Q    All right.  And it is a test of verbal learning, correct?

A    Yes.  It's a test of your ability to learn, memorize a list of grocery items and then repeat them over multiple exposures and after a substantial delay.

Q    So in terms of a real life skill, is the thing that this test tests the ability actually to remember a shopping list given to them orally?

A    Yes.

Q    Okay.  And do you know whether or not that's an activity that Mr. Allen ever engaged in in his life?

        MR. MORENO:  I'm going to object.  It's a test, not a test of life skills.  It's a neuropsychological instrument designed to test a particular area of the brain for potential for impairment.  It's not a fair comparison to equate it to a grocery list he would use in his day-to-day life.

        MR. HOLTSHOUSER:  Well, Judge, I -- I fully appreciate the speaking objection.

        THE COURT:  Wait, wait, wait.  The question said:  Do

you know whether or not that's an activity Mr. Allen ever engaged in in his life? I'm missing -- What's the objection?

MR. HOLTSHOUSER: I don't know.

MR. MORENO: Well, I thought the analogy was that the testing went to -- just went to whether or not he would use a shopping list and whether or not he did in his regular life. That's what I thought.

THE COURT: Okay. Proceed. You want an answer on that question?

MR. HOLTSHOUSER: Yes.

Q   (By Mr. Holtshouser) Do you know whether that's a life skill?

A   I can't -- I can't give the Court a specific example of a time that his mom said, "Go get me a bottle of milk," and he went and got a bottle of milk, but that's fairly routine behavior for most people.

Q   Do you recall at your deposition at Page 273 I asked you this question in reference to the CVLT, and you said -- I'm asking about this impairment, if you can relate this to a real life skill episode: "It's working memory where you need to remember a sequence of things, whether it's key strokes for your computer, whether it's your bank account number, whether it's directions to get somewhere; go down here two blocks, turn left, go one block, then turn right on McArthur; to remember things like that effectively."

So in your deposition, you actually indicated the CVLT was, in fact, a test that had a relationship to life skills, isn't it?

A    Sure.

Q    Okay.  And as far as these life skills, things like computer strokes, a bank account, directions and so forth, did you talk to Billie Allen about whether that's anything he had any life experience with?

A    No.  And, you know, we're kind of getting away from -- There's an issue in Neuropsychology we call "ecological validity."  That has to do with how well do these artificial tests in a laboratory really map on to everyday behavior in the real world, and we hope that they would map.  And this is a test that, I think, maps to some extent.

Q    Matters?

A    It matters.

Q    Okay.  And if we look -- And this -- this page I've shown you, Exhibit 570.4, this is actually your scoring sheet for the CVLT, isn't it?

A    It is.

Q    And this sticky page you use here from the Academy of Forensic Sciences, is that your handwritten calculations there?

A    Yes.

Q    Okay.  So on the next page, is this actually the test?

The first part of the test?

A    Yes.

Q    Tell me if I've got this wrong, but what you do is you give him this list orally and say this out loud.

A    That's right.

Q    And then you ask him to in Trial 1:  "Repeat back to me as many of the things I just said."

A    That's right.

Q    You do it again?

A    You do it five times.

Q    So each time do you read the list and then ask him to recall it back?

A    Yes.

Q    And so we see there's a kind of -- there's a bit of a growing that goes on where, as he hears it more often, he remembers more, correct?

A    That's the expected pattern.

Q    Down here we've got correct 7, 9, 12, 10, 10.  So out of 16 items, a drill -- Is that word "plums"?

A    It is.

Q    Vest, parsley, grapes, paprika, sweater, wrench, chives, tangerines, chisel, jacket, nutmeg, apricots, pliers, slacks, this is a test of his ability to hear that series of words and recall it?

A    That's right.

Q    Five times you give him that test?

A    That's right.

Q    Okay.  Next, you do what's called an "Interference Trial", correct?

A    That's right.

Q    You give him an entirely different list, called the "Tuesday List."  These things that you're giving him, these words, did you do any discussion with him whether these are words or terms that he either -- he either knew what they were or he had experience with them?  He had seen them visually?  He had ever held them in his hand?  He'd ever had them on a list of any kind before?

A    No.

Q    So you didn't ask Mr. Allen whether he knew what halibut or flounder were.

A    No.

Q    Okay.  So these -- When they say "interference," is the purpose of giving these actually to get an actual memory score or is it actually just to throw some 16 other words in?  Because your real purpose is to go back to the original list and see how many he still remembers.

A    That's basically what's going on.  We're looking for both proactive and retroactive interference.  So does new -- Does remembering the old information interfere with his ability to learn new information?  And then does new information

interfere with his ability to recall the old information?

Q   Okay.  And so then after this list, you then give him and go back to the Monday List and say, "Okay."  Now do you repeat the Monday List?

A   No.

Q   You say -- And how much time passes between the last time you heard the Monday List and the time you ask him, "Okay, tell me everything you can remember on the Monday List."

A   The length of time it takes to do the Tuesday List.

Q   Okay.  So about 20 minutes.

A   Oh, no.  No.

Q   Like 15?

A   Two minutes, three minutes.

Q   Okay.  And then after having the interference trial, he can still remember seven out of the 16 items from the original Monday List without having the Monday List repeated.

A   That's right.

Q   He's still retaining that, correct?

A   Yes.

Q   Okay.  Then you actually take a different tactic and you ask him, "Okay.  Tell people how many items from the Monday List fall into various categories."

A   Correct.

Q   How many are tools, clothing, fruits, spices and herbs, --

A    That's correct.

Q    -- correct?  And you didn't ask him whether he ever used or knew what paprika was, did you?

A    No.

Q    Whether or not he had ever bought plums at a store?

A    It's not the way the test is given.

Q    Okay.  He actually could get 10 of the items and put them in the right category out of 16, though, correct?

A    He did.

Q    Is there two more trials where there's a little bit longer amount of time that passes?

A    Yes; about a 20-minute delay.

Q    So 20 minutes after the last time he's heard the Monday List, he's asked to give it again and, of that, he gets 1 incorrect and 8 correct.

A    Well, he has one intrusion.

Q    Okay.  He still remembers eight of the original items; one from the Tuesday List just slipped into the Monday List, correct?

A    Correct.

Q    And this -- There's perseveration.  What is that?

A    That is repeating the same word more than once in recalling the list.

Q    Okay.  He didn't have any of those in those two trials, correct?

A   Not on this trial, no.

Q   Not after 20 minutes had elapsed.

A   Correct.

Q   And he still could get 10 and put them in categories.

A   Yes.

Q   Now then lastly, what happens on this last trial over here?

A   He's read a list of items, and he needs to identify if they were on the Monday List or not on the Monday List.

Q   So you go through this entire list and say these words and say to him, "Was that on the Monday List or not?"

A   That's correct.

Q   He got 16 out of 16 correct, didn't he?

A   He did.

Q   He got a perfect score on that, didn't he?

A   Yes.

Q   Okay.  And that's 30 minutes after the last time he last heard the Monday List read, isn't it?

A   Well, at least 20 minutes after.

Q   Why not report that?  Is that significant in terms of his verbal learning skill?

A   It's -- It's easier to identify them in that fashion. What's more significant is if there had been significant items missing, and what's also significant is the fact that he intruded -- he identified items as being on the list that

weren't on the list.

Q    Let me go to Exhibit 559.6.  559 is part of that *Compendium*.  Does this describe essentially what you do in the CVLT?

It's a verbal list -- learning task involving a 16-item shopping list presented five times, correct?

A    Yes.

Q    Okay.  Now beginning in the next part of your Page 32, is this where you begin to get your pluses?  The Stroop, FAS, the BNT, et cetera?

A    Yes.

Q    Those are the pluses?

A    Yes.

Q    So to establish memory impairment, you rely on the difference between the Working Memory Scale and his Overall IQ and the results of his CVLT, this shopping list test?

A    For the memory impairment, it's two to three standard deviations below "average" On the CLVT, plus the Working Memory Index from the WAIS, plus the relatively bad performance on the Wechsler Memory Scale.

Q    Okay.  And is the only way that you know that he's giving his best effort on that CVLT is because he gave his best effort on the TOMM?

A    That's one of the ways.

Q    Okay.  Any other way?

A    Not in that version of the test.

Q    Okay.

A    They've incorporated something since, but it's not present there.

Q    So let's talk about the -- the next one in your Page 32 of your report, and that's the Stroop.  And just to go back to what you said about that, you're talking here about a test of executive functioning, correct?

A    Yes.

Q    Now you mentioned two tests.  How many tests do you think you gave him that dealt with the test of executive functioning, decision making, problem solving?

A    Multiple.  I think I gave him the Wisconsin Card Sort and the Category test.

Q    Trails A and B?

A    Trails -- Well, Trails B is really a -- the frontal lobe test.

Q    Okay.

A    And then the Stroop and the FAS.

Q    Okay.  Any others?

A    Not that are specific.  I mean some things like the intrusions and perseverations and lack of clustering that was seen on the CVLT is significant for frontal lobe.

Q    To begin to get your plus, you rely on the results of two of these tests, the Stroop and the FAS, because you found

"moderate" or "mild" impairment between the two of those.

A    That's correct.

Q    And the results on the other tests, though, were he was operating in the "above average" or "superior" range, correct?

A    I don't know about "superior" or certainly "average" to "above average."

Q    "High average"?

A    Yes.

Q    Okay.  Why did you choose not to report that when evaluating executive functioning?

A    Well, I thought that I did.

Q    Really?

A    If you'll look at the first paragraph on the test of the executive functioning, "Although he performed within normal limits on some measures, his scores on both the Color Word and interference trials of the Stroop, et cetera."

Q    Didn't he actually -- Isn't saying that he performed within normal limits an understatement?

A    I don't think so.

Q    Not when he tests "high average"?

A    No.

Q    You don't think that that minimizes the significance of his success on those tests as it relates to executive functioning?

A    Well, because the point here is not about his successes.

It's -- You expect the successes.  The point is that he has impairments, and it's not across all areas of executive functioning.  It's across specific areas that have to do with impulse control and verbal fluencing.

Q    It's not about -- You don't think that to some extent here you are giving the Court a less than complete view of your testing results and that you are cherry-picking the tests that produce negative results to make him appear more impaired than he really is?

MR. MORENO:  I'm going to object to that because I don't think that is a fair interpretation of what he wrote in his test.  He put quite clearly that Mr. Allen had performed within normal limits.

MR. HOLTSHOUSER:  Well, Judge, I'm going to ---

MR. MORENO:  I don't think that's ---

THE COURT:  Wait, wait.  He can give an explanation.  You know, as I sit here listening to this, I'm getting an impression that he's not getting a fair shake; that he's reporting all these tests that show what he was hired to do.  I'm worried about that.  So I'd like to let him explain it.  Maybe he can explain it, but it's not giving me a good impression of his conclusions.  I'm concerned about that.

MR. HOLTSHOUSER:  Judge, I would also just have to interpose an objection to the speaking nature of these objections because I mean they seem to be intended to

communicate to the witness what he needs to say and respond to the question I ask.

THE COURT:  Well, no.

MR. HOLTSHOUSER:  The witness is a very capable expert witness who's capable of testifying on his own and explaining this if, in fact, there's an explanation.

THE COURT:  Well, I didn't pick up on that.

MR. HOLTSHOUSER:  Okay.

THE COURT:  Overruled.

Q   (By Mr. Holtshouser)  Do you remember the question?

A   I do, and I take umbrage --

Q   Okay.

A   -- to the notion that I'm cherry-picking.

Q   Okay.

A   I do not feel I'm doing that.

Q   All right.

A   What I'm doing is, you know, what's significant here, you expect normal performance in this person.  And when you get things that are not normal that fit a pattern of dementia, that's -- that's the gold; that's the useful clinical information here; not gold for the defense, gold from a neuropsychological perspective.  It's the stuff that you can work with to come to a decision; to come a diagnosis.

Q   Does it make any sense whatsoever that calling someone demented who can remember what's on a 16-item shopping list 30

minutes after the last time they heard it, does that make any sense whatsoever to you from a common sense point of view?

A    Statistically, he's three standard deviations below the mean.

Q    Does it make any sense to you --

A    The impairment ---

Q    -- to label that ---

THE COURT:  Wait, wait.  Let him answer.  Let him answer.

Q    (By Mr. Holtshouser)  Does it make any sense to you to label that demented?

A    It does.

Q    Okay.

A    I think, you know, ---

Q    In your world it does.

A    Well, there's a -- there's a colloquial view of what dementia is.  And you think of Alzheimers disease or Parkinson's disease in an elderly person, but dementia is broader than that, and he meets all of the criteria for the diagnosis of dementia.  You don't have to be a drooling idiot that's incapable of remembering what he had for breakfast to qualify for the diagnosis.

Q    So give me an example of some way in which your view of dementia as applied to Mr. Allen would manifest itself in his life.

A    Well, I think that we've talked about things like functioning in the read world.  The shopping list example, he may have trouble with that.  We went over a lot of this in the deposition in terms of real world.

Q    Well, not here and the Judge wasn't there.  So in the real world, can you give us some example of an experience he did have in which his memory impairment, his dementia, manifests itself?

A    I -- I didn't get a chance to go back and pursue that with him, so I can't.

Q    I mean do you think that there's something on a list that he forgot to bring with him to the bank robbery?

        MR. MORENO:  Objection.

        MR. HOLTSHOUSER:  Which is?

        MR. MORENO:  Which is I think that was argumentative and certainly not a realistic question to ask.

        THE COURT:  Yeah.  I'm not sure how that ---

        MR. MORENO:  Related to the bank robbery?

        MR. HOLTSHOUSER:  I would disagree, but ---

        THE COURT:  Sustained.

        MR. HOLTSHOUSER:  Sustained?

        THE COURT:  Yes.

        MR. HOLTSHOUSER:  Okay.  Thank you, Judge.

Q    (By Mr. Holtshouser)  Anything else that you aware of? Either any -- any collateral source?  For example,

Johnnie Grant, you know that he was one of his best friends?

A    Yes.

Q    Okay.  They spent a lot of time together socializing, going to malls, going to clubs, drinking, picking up girls, being friends.  Have you seen anything from Johnnie Grant which indicated that Mr. Allen had a bad memory and would forget things?

A    No.

Q    Okay.  What if you were aware of testimony to the exact opposite?  That he had no memory impairment that Johnnie Grant ever saw?  Would that at all influence your diagnosis here that he has dementia?

A    Well, it -- it might or might not.  I would characterize his dementia as "mild" to "moderate."  And it's not significantly impairing, you know.  We would -- We would not treat him for this level of dementia.

Q    Okay.  Where do you quantify objectively his level of dementia?

A    By how impaired his scores are overall.

Q    All right.  But as you sit here, you're not aware of any instance, anecdote, episode in his life where his memory impairment that you have found manifests itself?

A    I'm not aware of a real world example.

Q    Okay.  We're onto the plus now of executive functioning, and we're looking at the Stroop, first of all.  Your

characterization of his results on the Stroop were that he was moderately impaired which is two standard deviations below the mean.  And just to refresh the Court, we are -- "moderate" impairment would mean we're somewhere between that two to three, correct?

A    Correct.

Q    Okay, in this range.  Let me show you Exhibit 570, Page 19.  This is part of your data set, correct?

A    Yes.

Q    Is there -- Is this the first part of the Stroop?

A    Yes, it is.

Q    Okay.  And the Stroop is an indicator, is it not, of frontal lobe damage?

A    Yes.

Q    Can be?

A    Yes.

Q    Okay.  Are there three parts to this test?

A    There are.

Q    Okay.  And so on the Stroop there is the "Color," the "Word" and the "Color Word" part, correct?

A    And "Interference."

Q    Okay, Color, Word and Color Word.  Now that "I" that you referred to, is that actually a calculation that you make after these three tests are given?

A    Yes.

Q    All right.  So these are the three tests that are given. Is the page that I have up for you, is this the Color test?

A    I think this is the Word test unless it's the Color test copied in black and white.

Q    I think it's the Color test copied in black and white.

A    Okay.

Q    This is the order in which you -- the data appeared in your data set.  The second page is the one with the Xs on it, the one after this.

A    Okay.  There should be ---

Q    There's three all together.

A    There should be two pages with words on them.

Q    Okay.  Well, this one, tell us what happens on this page.

A    Generally the way this test works, first, they're asked to just read the names of the colors -- red, green, blue, green red -- as quickly as they can in 90 seconds.

Q    Okay.  So they just look at this page.  And are the words on this page, if this is the Color version, ---

A    This is the Word version.

Q    The Word version.  Are you sure?

A    Yes.

Q    Okay.  Okay.  So this is the Word version.  Let me just reverse these here.  So we're looking at the Word version first and then the Color version.  So the Word version is -- When he sees these, are these all in black and white?

A    Yes, they're all black.

Q    So he just reads the words.

A    That's right.

Q    Red, green, blue, green, red, blue; correct?

A    Correct.

Q    And so you time him?

A    I do.

Q    Okay.  So he reads down the first column, second column, third column, fourth column.  Right here, you circle here; why?

A    That's where time ran out.

Q    Time ran out at green.  So all together, is there 90 -- did he get 93?

A    I would have to count them.  I don't recall now.

Q    There's 20 in a column, isn't there?

A    Yes.

Q    20, 40, 60, 80 and then 2, 4, 6 -- 2, 4, 6, 8, 10, 12. Do you count the last one circled?

A    Yes.

Q    13.  That's 93, correct?

A    Yes.

Q    Okay.  So then on the next page, is this the Color test?

A    Yes.

Q    So these are just Xs.  Are they in different colors on the test that he's given?

A    Yes.

Q    What's he supposed to do?

A    Name the color of the ink.

Q    Okay.  So he goes down one column, two columns, three columns and then 2, 4, 6, 8, 9, 10.

A    Correct.

Q    So is that 20, 40, 60, 70?

A    Yes.

Q    So his score on the Word is 93.  The score on the Color is 70, correct?

A    Yes.

Q    Okay.  Then the next page is known as the what?

A    Is the Color Word page.

Q    Okay.  And this sticky here, is that again the way you calculate the results?

A    Yes.

Q    So what do you do on this page?

A    Here, he sees the word "red" printed, for example, in green ink.

Q    Okay.

A    He has to ignore the written word and name the color of the ink.

Q    Name the color.  And you time it.

A    This is timed.

Q    Okay.

A    And it's very challenging to ignore the impulse to read the word and, instead, name the color of the ink.

Q    And that's what it tests is your ability to control your frontal lobe and resist that impulse, correct?

A    Exactly.

Q    All right.  And so that's why this is usually, is it not, a lower number than the other two.  The other two are easier, aren't they?

A    They're very easy and this is the hard one.

Q    This is the hard one.  So he goes down one column, two column and then one, two, correct?

A    Yes.

Q    That's 42, isn't it?

A    Yes.

Q    You see a problem, don't you?

A    I just saw it, yeah.

Q    What is it?

A    I have 22.  It should be 42.

Q    Okay.  Let's see what the implications of that mistake are because by getting 22, in order to get this "I," I guess we got to go to another page here.  This "I" is actually a formula, is it not?

A    It is.

Q    All right.  And the formula is you take the score on the Color times the score on the Word, divide it by the Color plus

the Word, and that equals a number, correct?

A    Yes.

Q    And then you take that number, take the number you get from the CW, and you subtract this number, correct?

A    Right.

Q    And that equals your "I"?

A    Right.

Q    Did I do that right?

A    Yes.

Q    Is that essentially what you are reflecting down here?

A    Yes.

Q    Okay.  So when you did this, you took the 70 times the 93 over 70 plus -- plus the 93 which is 6510 over 163 to get 39.9, correct?

A    Yep.

Q    That part of your work is correct, isn't it?

A    It sure is.

Q    Then that's your "X."  So that's 39.9.  Now you skipped a column and came to a result of 22 for the CW.

A    I did.

Q    And the effect of that is you take 22, put it here, subtract 39.9, and you end up with a negative number, don't you?

A    Yes.

Q    You ended up with negative 17.9, didn't you?

A    I did.

Q    For the Stroop -- Well, before we get to there, the correct number is actually 42 for the CW, isn't it?

A    (Affirmative gesture).

Q    If you subtract 39.9 from that, you actually end up with a positive number, don't you, of 2.1?  Correct?

A    That's correct.

Q    Let me show you Exhibit 687.  Is this a page from what's called *Golden's Manual* that you use in order to interpret the results on the Stroop?

A    Yes.

Q    And the T scores for Stroop data, let's zero in on that part over here, I guess, so it's visible.  Your ultimate measure that you're after here is this "I," isn't it?

A    Yes.

Q    Okay.  Because that's the measure of how well your -- how well your brain can resist that impulse of what happens in that last test, --

A    Correct.

Q    -- correct?  So if we end up with a -- in your original calculation of an "I" of minus 17.9, that actually falls right down there, correct?

A    That's right.

Q    And in order to get the T score, you go across and you end up with a T score of what?  33?

A    Yes.

Q    And that's what your work shows, doesn't it?

A    That is.

Q    And when you're at a T score of 33, that's 17 points below 50 which means you are 1.7 standard deviations below the mean?

A    Yes.

Q    You're squarely within that range of "moderate" impairment, aren't you?

A    "Mild" to "moderate."

Q    If, in fact, the correct number is 2.1, you are right here on the "I" number, and your T score is 53, is it not?

A    Probably closer to 52 but "normal."

Q    Okay.  52 is actually .2 above "normal," isn't it?

A    Not a significant difference from "normal."

Q    Okay.  But it's a long way from impairment, isn't it?

A    It is.  It was a -- It was a mistake, and you've opened my eyes to it.

Q    In terms of the plus, can we cross out the Stroop?

A    Absolutely.

Q    Okay.  We're still dealing with the FAS, aren't we?

A    Yes.

        THE COURT:  We might take about a 15-minute break.

        MR. HOLTSHOUSER:  Sure.

        THE COURT:  Court's in recess.

(Court recessed from 2:32 PM until 2:50 PM.)

MR. MORENO:  Your Honor, Mr. Allen has informed me that he has a medic; the Marshals have set up a doctor appointment for him tomorrow at 8:30 and that he would probably be back here around 10:00.  Mr. Allen's willing to waive his presence in the morning, you know, because he will be back close to 10:00, and so we could continue.  Mr. Allen would have his doctor appointment.  They would address some of the issues he was having today, and he would be back here sometime in the morning.

THE COURT:  All right.

MR. MORENO:  If it's okay with the Court and you want to colloquy Mr. Allen on that, we certainly are comfortable with proceeding, if he's comfortable.

THE COURT:  All right.  Well, as I understand, he has no right to be present at a 2255 hearing in the first place.  Am I correct about that?

MR. MORENO:  That, I'm not sure of.

THE COURT:  Okay.  And -- And so we'll start with that as the bottom line.  The real important thing is is his comfort level in being here or going to the doctor's appointment and not being present when witnesses -- when people are testifying.  If he feels that he needs to be present when witnesses are testifying, I'll just recess court in the morning until he gets back.

And I'm looking at him. So are you understanding what I'm saying, Mr. Allen?

THE PETITIONER: Yes.

THE COURT: If you -- If you agree that you may be gone in the morning and we can take witnesses when you're not here, I'll do that. But you can't later come back and claim a constitutional violation because witnesses were on when you weren't here. Do you understand?

THE PETITIONER: Right.

THE COURT: So if -- if something happens ---

THE PETITIONER: I mean I would want to -- I don't want to inconvenience the Court. I know everybody wants to get things done and get it over with, so.

THE COURT: Well, that's -- that's the least important thing in the world is my convenience in this case, honestly. And I think we've all demonstrated. Everybody's working hard, and I'm not trying to talk you out of what you want to do. I just want to make sure you understand what you're doing. And what you're doing is saying -- you're telling your lawyer, you're telling me that it's okay to proceed in the morning from 8:30 until you get back from the doctor's office without you being here. Is that what you're saying.

THE PETITIONER: Right; yes, sir.

THE COURT: Okay. All right.

MR. HOLTSHOUSER:  Judge, can the record reflect what witnesses counsel expects that he might miss so he's aware of what -- who might be called in his absence?

MR. MORENO:  Well, that's actually a moving target, and I might have an idea of that before the end of the day.  I know Mr. Montroy is out seeing witnesses right now --

THE COURT:  Okay.

MR. MORENO:  -- as is Mr. Kane.  So we would certainly communicate somehow with Mr. Allen --

THE COURT:  All right.

MR. MORENO:  -- who those witnesses are.

MR. HOLTSHOUSER:  Is there like a universe of possibilities?

MR. MORENO:  There is a universe of possibilities, and I will try to get you a list.

MR. HOLTSHOUSER:  Okay.  I'm just more -- I'm more interested in it being given to him --

MR. MORENO:  Yeah; yeah.

MR. HOLTSHOUSER:  -- on the record.

MR. MORENO:  Yeah.  We'll ---

MR. HOLTSHOUSER:  Okay.

THE COURT:  All right.  There's one other -- There's one other thing.  In the course of doing this over a period of time, I can't explain it, but I'm about the only one who works late.  And the Marshal Service, it causes enormous problems

for them.  And so I need to have a clearance that working till 6:00, I know it's an imposition but whether or not it's something that can be reasonably worked out.

Will you find out and let me know before -- I'm looking over here -- before the next recess?

THE CLERK:  Yes, sir.

THE COURT:  Okay.  Now back to Mr. Allen.  If you change your mind -- The record has been made.  If you change your mind in ten minutes or in the evening or in the morning that you want to be present, we're going to be in recess till you get back.  Do you understand that?

THE PETITIONER:  Yes, sir.

MR. MORENO:  Thank you, Your Honor.

THE PETITIONER:  Thank you.

(At this point Court Reporter Sue Moran took over the reporting duties for Judge Webber for the rest of the day, and the transcript of the proceedings prepared by Sue Moran is labeled Volume XIII-B.)

CERTIFICATE


        I, Deborah A. Kriegshauser, Registered Merit Reporter

and Certified Realtime Reporter, hereby certify that I am a

duly appointed Official Court Reporter of the United States

District Court for the Eastern District of Missouri.

        I further certify that the foregoing is a true and

accurate transcript of the proceedings held in the

above-entitled case and that said transcript is a true and

correct transcription of my stenographic notes.

        I further certify that this transcript contains pages

1 through 201 inclusive and that this reporter takes no

responsibility for missing or damaged pages of this transcript

when same transcript is copied by any party other than this

reporter.

        Dated at St. Louis, Missouri, this 11th day of

February, 2013.


                        _____

                                /s/ Deborah A. Kriegshauser

                        DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR

                             Official Court Reporter