UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

BILLIE JEROME ALLEN,    )
            )
    Petitioner,  )
            )
 vs.        ) No. 4:07-CV-27(ERW)
            )
UNITED STATES OF AMERICA,  )
            )
    Respondent.  )

EVIDENTIARY HEARING -- VOLUME XV
BEFORE THE HONORABLE E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE

DECEMBER 6, 2012

APPEARANCES:

FOR PLAINTIFF:  ELIZABETH U. CARLYLE
        P.O. Box 30418
        Kansas City, MO  64112
        (816) 525-6540

        TIMOTHY P. KANE
        ERIC JOHN MONTROY
        JAMES HENRY MORENO
        KATHRIN HENNIG
        FEDERAL COMMUNITY DEFENDER OFFICE
        EASTERN DISTRICT OF PENNSYLVANIA
        The Curtis Center, Suite 545 West
        Philadelphia, PA  19106
        (215) 928-0520

FOR DEFENDANT:  STEVEN E. HOLTSHOUSER
        CARRIE COSTANTIN
        OFFICE OF U.S. ATTORNEY
        111 S. Tenth Street, Suite 2000
        St. Louis, MO  63102
        (314) 539-2200

REPORTED BY:   DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR
        Official Court Reporter
        United States District Court
        111 South Tenth Street, Third Floor
        St. Louis, MO  63102
        (314) 244-7449

**INDEX**

ADMISSION OF EXHIBITS . . . . . . . . . . . . . . . .  3


COREY ALLEN --

  Direct Examination by Mr. Kane . . . . . . . . .  10

  Cross Examination by Ms. Costantin . . . . . . .  29

  Redirect Examination by Mr. Kane . . . . . . . .  49


BRADY TOLIVER --

  Direct Examination by Mr. Kane . . . . . . . . .  55

  Cross Examination by Mr. Costantin . . . . . . .  65

(PROCEEDINGS BEGAN AT 8:30 AM.)

MS. COSTANTIN:  Good morning.

MR. MORENO:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. MORENO:  Judge, are you ready to go on the record?

THE COURT:  Ready, Debbie?

COURT REPORTER:  Ready.

MR. HOLTSHOUSER:  Judge, if the Court would permit, we would start today with making a record on some exhibits.

THE COURT:  All right.

MR. HOLTSHOUSER:  And I've checked against the record that the Clerk provided me at the end of the day yesterday, and I think it's consistent with ours with probably one exception, but I'll go in numerical order of the ones that we're offering that have been used --

THE COURT:  Okay.

MR. HOLTSHOUSER:  -- that have not yet been admitted, according to our records.  So I want to begin with 256.

THE COURT:  Report by Daniel Martell?

MR. HOLTSHOUSER:  Correct.

THE COURT:  Received.

MR. HOLTSHOUSER:  The next is 260.

THE COURT:  Declaration of Angela Allen?

MR. HOLTSHOUSER:  Correct.

THE COURT: Received.

MR. HOLTSHOUSER: 484, those are typed interview notes of Otha Petty, Sr.

THE COURT: Received.

MR. HOLTSHOUSER: 489 are handwritten notes of Deborah Ruffin or handwritten notes -- interview notes of interviewing Deborah Ruffin.

THE COURT: Received.

MR. HOLTSHOUSER: 531.

THE COURT: 531?

MR. HOLTSHOUSER: 531 is the deposition of Mister or Dr. Martell.

THE COURT: Received.

MR. HOLTSHOUSER: 484 and 489.

THE COURT: Which one?

MR. HOLTSHOUSER: We just had a little confusion here. Exhibit 531 was the last one.

THE COURT: Yeah.

MR. HOLTSHOUSER: I think you said received on that one.

THE COURT: Yes.

MR. HOLTSHOUSER: 536.

THE COURT: Toliver deposition?

MR. HOLTSHOUSER: Correct.

THE COURT: Received.

MR. HOLTSHOUSER:  I think that was used with Dr. Cuneo.

558 is excerpts from the 1990, '91 Halstead-Reitan norms.

THE COURT:  Battery?  Yes, received.

MR. HOLTSHOUSER:  559 is the Heaton 2004 Manual.

THE COURT:  Received.

MR. HOLTSHOUSER:  Back up just a little bit.  550 is the, I believe, background materials provided to Drs. Cuneo, Stewart and Martell.

THE COURT:  Received.

MR. HOLTSHOUSER:  568 is -- And actually, Judge, it's going to be 568 through 575 which is all the data of Dr. Martell and it is in various parts.

THE COURT:  Okay.  I'm receiving 568, 569, 570, 571, 572, 573, 574 and 575.

MR. HOLTSHOUSER:  Correct.  590 is the actual *Compendium* -- Third Edition, *Compendium of Neuropsych. Tests.*

THE COURT:  Received.

MR. HOLTSHOUSER:  593 is the affidavit of Dr. Martell in the *Spivey* case.

THE COURT:  Received.

MR. HOLTSHOUSER:  Then I'm going through the 600s. 642 and 643 were two of the Internet-related materials pertaining to Mr. Allen that were used with Dr. Cuneo.

MR. KANE:  And, Your Honor, those are -- are things that we've objected to, I believe, when they were brought up and that we would continue to object to on relevance and foundational grounds.

THE COURT:  I could do this:  I could do what's called "take it to the legal file" so they're in the record, but it wouldn't be considered without further opportunity to object.  My only problem is I don't know, based on what I've seen so far, whether he had any role in ---

MR. HOLTSHOUSER:  Can I address that just briefly, Judge?

THE COURT:  Sure.

MR. HOLTSHOUSER:  We have a -- We have a -- As to the exhibits that are on this list, we have a stipulation as to authenticity.

THE COURT:  Okay.

MR. HOLTSHOUSER:  Relevance, though, clearly, I think is subject to debate.  And the question they brought up with Dr. Cuneo as to whether or not in the course of reaching his opinions that he gave as to who he believed, would he -- would this be something he would want to consider and inquire about.  It was something he didn't have and hadn't been exposed to, and the relevance is simply that there are things that he has that he's forming his opinions without a complete data set or opportunity to answer all the possible questions.  So that is

the relevance, not that they're actually considered the statements of Mr. Allen or otherwise directly attributed to him other than, say, perhaps by order of what their content might reveal.

THE COURT:  All right.

MR. KANE:  Your Honor, I would just point out:  It's true that we did stipulate to authenticity, though I'm not sure and I do not believe that we stipulated to the idea that these -- that these websites, while authentic reproductions of what's on the website, that those accurately reflect statements of Mr. Allen.  But given what Mr. Holtshouser just said, it doesn't sound like they're being offered directly for that purpose.

MR. HOLTSHOUSER:  Correct.

THE COURT:  All right, very well.

MR. HOLTSHOUSER:  And that would be the same with respect to -- I thought there was one more.

THE COURT:  Was it 641-A and 642?  Or what were the numbers?

MR. HOLTSHOUSER:  Actually it's just 642.

THE COURT:  All right, received.

MR. HOLTSHOUSER:  Ms. Costantin reminds me that 643 is already in evidence.

THE COURT:  Yes.

MR. HOLTSHOUSER:  There was one more that's in this

same category, and that's 664 which was a page from

"Justice-for-org: Billie Allen" which, again, contains more

statements about the offense that these doctors -- that were

shown to Dr. Cuneo and asked whether or not he --

THE COURT:  All right.

MR. HOLTSHOUSER:  -- had seen that before, would find

it relevant to consider, and I believe he said he would.

THE COURT:  All right, received.

MR. HOLTSHOUSER:  Then the last is 686 which is

excerpts from the Second Edition of the *Compendium of*

*Neuropsychological Tests*.

687 -- Maybe I shouldn't go ahead to the next one.

686 is the first one, Judge.

THE COURT:  Okay.  And it's Second Edition?

MR. HOLTSHOUSER:  Of the *Compendium*.

THE COURT:  Of the *Compendium*.

MR. HOLTSHOUSER:  It's the pages from it, not the

actual ---

THE COURT:  Do you know which pages?

MR. HOLTSHOUSER:  No, Your Honor, but it was -- it is

a paper exhibit --

THE COURT:  Okay.

MR. HOLTSHOUSER:  -- that was marked and used and

shown on the document camera.

THE COURT:  All right.

MR. HOLTSHOUSER:  687.

THE COURT:  686, received.  687?

MR. HOLTSHOUSER:  That is the one-page excerpt from *Golden's Manual.*

THE COURT:  Right.

MR. HOLTSHOUSER:  G-O-L-D-E-N-(')-S on the Stroop, S-T-R-O-O-P, exam.

THE COURT:  Okay.  Just a second.  Okay, received.

MR. HOLTSHOUSER:  And 688 was Dr. Martell's C.V.  I think that was used and offered by Mr. Allen.

THE COURT:  Received.

MR. KANE:  One clarification, I believe, Your Honor. There are two -- Dr. Martell's report, I believe, the same report appears as both Exhibit 256 and Exhibit 567.  It may in the record be referred to at different times by a different number.  I don't think that Mr. Holtshouser mentioned 567, that version of it, though it may be referred to.

THE COURT:  Okay.

MR. HOLTSHOUSER:  I think that the only version referred to was 256, but ---

MR. KANE:  Okay.

MR. HOLTSHOUSER:  Unless -- Unless ---

MR. KANE:  Just -- Just from what would we had in our notes, but ---

MR. HOLTSHOUSER:  Okay.

THE COURT:  Okay.  567, if I make a note on here, that 567 is the same as 256?

MR. KANE:  Correct.

THE COURT:  Thank you.  All right.  Thank you.  So 567 has never been offered.

MR. HOLTSHOUSER:  Pardon me, Judge?

THE COURT:  567 has not been offered.

MR. HOLTSHOUSER:  No.

THE COURT:  Okay.  All right.  Thank you.

MR. HOLTSHOUSER:  I think that brings us up to where we're at.

THE COURT:  Okay, good.  Thank you.

MR. HOLTSHOUSER:  Are we on the -- Are we on?

THE CLERK:  The computer one, yes.

MR. KANE:  Your Honor, Petitioner calls Corey Allen.

THE CLERK:  Please raise your right hand.

**COREY ALLEN**,

HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

DIRECT EXAMINATION

QUESTIONS BY MR. KANE:

Q    Good morning, Mr. Allen.

A    Good morning.

Q    Are you related to the Petitioner in this case, Billie Allen?

A     Yes, I am.

Q     And how are you related?

A     First cousin.

Q     And how are your parents related?  Like explain how you're cousins.

A     His dad is my mom's brother.

Q     Okay.  And what is your mom's name?

A     Darlene Roy.

Q     And what is his father's name?

A     John Allen.

Q     Okay.  Does -- Does John go by "Junior" among the family?

A     Yes, sir.

Q     All right.  Do you know approximately what -- how close in age you are to Billie?

A     Bill is probably like two years older than me.

Q     Okay.  What's your -- What's your birth date?

A     12-30-78.

Q     Okay.  Did you -- Do you live in St. Louis now?

A     Yes, sir.

Q     Have you lived here your whole life?

A     Yes, sir.

Q     During your childhood, were there times when you lived near Billie's family?

A     Yes, sir.

Q     What's the earliest time that you remember living near

Billie's family?  How old?

A     Around 6, 7.

Q     Okay.  And where was Billie's family living at that time?

A     On Evans.

Q     And can you describe -- Well, let me ask you this first: How old -- Did there come a time when they moved -- Billie's family moved off of Evans?

A     Yes, sir.

Q     And how old were you around -- when that happened?

A     Probably like 8.

Q     Okay.  And where did they move?

A     On Cote Brilliante.

Q     Now at the time that they were living on Evans Street, were Billie's father and mother together?

A     Yes.

Q     Describe for us what the living situation was on Evans, like where was their family living?

A     Well, it was a four-family flat, and they had an apartment like next to my grandma.

Q     Okay.  And were there other family members -- You mentioned your grandmother.  Were there other family members that lived on Evans Street?

A     Yes, sir.

Q     Who were some of those family members that you recall who lived with or near you?

A     My Uncle Billy and my Auntie Lois, Dolores Allen.

Q     And your family -- Your mother lived there as well for a time on Evans?

A     Yes.  My mom stayed with my grandma full-time.

Q     Do you have any siblings?

A     Yes, sir.

Q     How many?

A     One brother.

Q     And is he older or younger?

A     He's younger.

Q     Describe for us from what you remember what the living situation was like on Evans Street, focusing on -- on Billie's family; like what it was like where he lives.

A     Growing up?

Q     Yes.

A     It was -- I mean it was something every day, you know. There was a lot of family members in one house, you know, drinking, a lot of drinking, partying, arguing, whoopings.  I mean it was something every day.

Q     And did you and Billie spend a fair bit of time together?

A     Yeah, pretty much.  We was about the only two boys in the house as far as the girls that was there.

Q     So you guys would play together and --

A     Yeah.

Q     -- do things together?  You mentioning drinking and

partying. Who was -- Who was doing the drinking and the partying?

A    Well, it would be Juanita, my Uncle Junior, Billie.

THE COURT: Who? Who?

THE WITNESS: My Uncle Junior as we would call him.

THE COURT: Okay.

THE WITNESS: Juanita which is Bill's mom; you know, my mom, my Uncle Billy. You know, basically the grown-ups that was in the house.

Q    (By Mr. Kane) Okay. And were there other friends or associates of theirs also around?

A    Oh, yeah. It was pretty much people on the weekends, parties all the time. My granddaddy, he drunk a lot.

Q    Is that your mother's father --

A    Yes, sir.

Q    -- you're referring to?

A    Yes, sir.

Q    Do you, also, remember any drug use in the house?

A    Yeah, pretty much.

Q    What do you remember about that?

A    My Uncle Junior, my Uncle Billy, you know, they getting high all the time, smoking and doing heroin in the basement. Yeah, we was prone to that all the time.

Q    When you refer to those things, are those things that you actually observed yourself?

A    Yes, sir.

Q    Describe for us what you observed when you saw them using heroin.

A    I mean it's just sitting in the basement, you know, as kids going down there; seeing them tie their arm up, you know; get the needle, put it into their neck, leg or whatever and, you know, nodding off like, you know, they was asleep.  We really didn't understand what it was, but you know, we seen that on a regular basis.

Q    And you said -- you said, "We didn't understand what it was."  Who are you referring to?  Who was seeing these things with you?

A    Me and Bill.

Q    Earlier you -- you made a mention of whoopings, and I want to ask you about that.  Focusing on Billie and his treatment by the adults in the home, was he ever subject to whoopings?

A    Oh, yeah.

Q    We've -- Different people might understand different things by the term "whoopings."  Can you just explain to us and describe the types of things that you observed when Billie was subject to whoopings?

A    Well, I say, you know, some people, you know, don't understand, but living in my household, some was whoopings and some was like abuse.  You know, some was just horrific

whoopings, you know.  He getting whooped for no reason.  You know, by him being the only boy with girls, you know, it was like, you know, they're not going to take it out on the girls; "I'm going to take it out on you."  Him looking like his father, you know; whoopings in the tub.  You know, it was just random whoopings.

Q    Okay.  You just said "whoopings in the tub."  I want to sort of break this down.  What are you referring to?  Who was whooping who in the tub and -- and with what?  Describe what you observed.  Is this something you actually observed?

A    Yeah.  I can recall, you know, Juanita whooping Bill in the tub before.  You know, chest wet with an extension cord.  I can Uncle Junior hitting him with brooms and just things, just anything that was around the house, off being mad, and, you know, didn't deserve whoopings, you know.  This was like a random thing.  This could have happened every day all day.

Q    When you say it happened every day all day, are you saying that it could happen at any time or you're saying that he would be beaten the whole day long?

A    No.  It could just happen at any time.  You know, it could be a time where, you know, if my Uncle or Juanita was just happy at that time and, you know, an hour later, he would be obsessed with beatings, whoppings just out of nowhere.

Q    What was -- What was -- Let me ask you this:  You referred to -- I think you said there was whoopings and then

there's abuse.  And you mentioned the -- Well, let me ask you this:  Were there times when it was clear to you that something had -- something Billie had done caused him to get a whooping?

A    I mean, yeah, at times; you know, might have not taken out the trash or, you know, not doing something he was asked at times, yeah, but other times it was just uncalled for, you know.  Other times it was just getting, you know, I mean assessed with beatings for nothing.

Q    And describe what you remember about Junior and Juanita's relationship.

A    I recall, you know, partying all the time, drinking; my uncle getting high; fights, you know; hitting, fights; police.

Q    Do you remember the police coming to the house?

A    Oh, yeah.

Q    Because -- Why would they be called to the house?

A    I mean excessive fights; bloodshed, you know; knives pulled.  I mean it was big fights in my grandma's house.

Q    Big fights between Juanita and Junior?

A    Yeah.

Q    What sorts of things would they fight about that you recall?

A    I mean it could be anything.  It could be the drinking you know.  If Juanita thought Junior did anything or Junior felt she did anything, it was constant arguing, and the next

thing you know it lead to fighting and bottles broken, knives pulled, pushing down the steps.

Q   You saw knives pulled?

A   Oh, yeah.  Growing up in the house, yes.  Knives pulled, bottles broken, pushed-over furniture.

Q   When things like that were going on, what do you recall about Billie, how he would respond or what would you two do when those things were going on?

A   I mean when it first happened, you know, we cried, you know, screamed, just to see it, but after a while, you know, you got used to it where we'd probably just go in the basement or find some corner to go to and just, you know, deal with it because it was just so random, you know.  You just had to deal with it.

Q   You mentioned a whooping in the bathtub.  Just focusing on Billie and what you specifically recall, are there other whoopings or beatings of Billie that you can describe?

A   Yeah.  I remember one time we was up at my grandma's house and we was just sitting down.  We was in the back room playing or whatever, and my grandma had asked us to do a couple of chores, and we did them.  And Juanita came in and, I guess, one of my cousins did something, you know.  I'm not sure, but one of them did something, and Juanita came in and we was just sitting, playing a game or something, and she came up and smacked Bill, you know, for no reason.  He was like,

you know, "What was that for?"  It didn't have no explanation.  So she walked out.  Then my Uncle Junior came in and was like -- with a belt buckle, you know, not the belt but the belt buckle and starting hitting like for no reason.  He hollered like, "What did I do?  What did I do?  I made the chores, cleaned."  It was just random, you know.  I guess -- I don't know if it was because, you know, they got mad; Juanita, you know -- Bill resembled my uncle and when he wasn't around, they got into it.  She took it out on Bill and Junior.  I don't know.  I don't know.  It was just random.  It wasn't called for.

Q    This time that you remember when Juanita came in.  I think you said she slapped him.  Where -- Where did she slap him?

A    In his face.

Q    With an open hand?

A    Yeah.

Q    Let me just ask if you can clarify.  Who was slapped when Juanita came in the room?

A    Bill was slapped.  We was playing games.

Q    Okay.  Were you also slapped or ---

A    No.  We was playing games, you know, after doing chores, sitting in the room, and Juanita came in to slap Bill for no reason with an open hand.

Q    Okay.  At times when he was subjected to these whoopings

or after that happened and they left or let him go, what would Bill do?  How would -- How was Bill's reaction?  Can you describe that for us?

A    Well, Bill didn't cry too much.  Bill made things and his outlet was drawing.  That's what he did.  He would draw a lot, you know.  He expressed his feelings on paper.

Q    Okay.  Are you saying that after a whooping, he would go draw?

A    Yeah.  He would just, you know, can't just -- You know, he would take it, you know.  He'll cry, but it wasn't, you know, out loud screams, you know.  It was just, you know, inside and, you know, he'll just go find a drawing pad or something and just express it on paper.

Q    Did you two -- And I'm still focused on this time on Evans.  Do you remember talking about whoopings?  Billie saying anything about -- about it to you?

A    Yeah, we talked all the time.  He never know why he was getting whoopings like that, you know.  He was like, "Man, what did I do?"  You know.  "Why do I get whoopings all the time," you know.  "Is it because I'm the only boy?"  You know, we talked all the time.

Q    Yeah.  Did his sisters also get whoopings?

A    I mean they got whoopings, but I don't think it was as much as Bill got them.

Q    Did you observe from your recollection on Evans Street

the girls getting whoopings?

A     Yeah, I seen them get whoopings before.

Q     Do you recall eventually that -- we touched on this before -- that Juanita left Evans Street with the children?

A     (Affirmative gesture).

Q     After that time, were Juanita and Junior still together?

A     No, not after that time.

Q     Okay.  Do you recall why -- specifically why they split up or what happened immediately before that?

A     I guess they couldn't take it no more.  I guess it was just done.

Q     Where did -- And Juanita left with all of her children?

A     (Affirmative gesture).

Q     And where did they go?

A     On Cote Brilliante.

Q     And who did they live with there?

A     I recall their grandfather; her father.

Q     Okay.  How far away was the house on Cote Brilliante from where your side of the family was on Evans?

A     On Evans?  About two blocks.

Q     Did you continue to see Billie during childhood after they moved to Cote Brilliante?

A     Every day.

Q     Describe for us what you remember about the condition of the house where they lived on Cote Brilliante.

A    It was in pretty good shape.  It wasn't no condemned house or anything.  You know, everybody had a room.  I mean it was pretty good.

Q    Was -- Were some of the problems that you described earlier in terms of a whooping and -- or let me ask you this first.  You had mentioned earlier about the adults drinking and partying on Evans.  After Juanita and the kids moved to Cote Brilliante, did you observe Juanita drinking after that?

A    Yes.  It still went on.

Q    How would you -- Describe to us what you recall about her alcohol use.

A    I mean, to me, it probably got worse on the simple fact because, you know, her and my uncle split up after they had been together for so long.  So as Bill and them got into teenagers, it kind of got worse and it kind of probably got worse with Bill.

Q    What kind of got worse with Bill?

A    I mean more beatings and getting hollered at on the simple fact because she reminded him of my uncle.

Q    Are those things that you actually observed?

A    Yeah.

Q    What kind of -- I think you mentioned something about her yelling at him or -- What -- What were the things that she would say and how would she say them to Bill in those years?  I'm focusing now on Cote Brilliante, what you remember from

there.

A    It probably could be anything.  "I can't stand you."  You know what I'm saying?  "Get the hell out of my house."  "Wish you wasn't here."  You know what I'm saying?  There's a whole lot of stuff.  "You remind me of your damn daddy," and you know.

Q    Did her -- Did the things she say include profanity directed at Billie?

A    Oh, yeah.

Q    How common was that?

A    That was common all the time, you know; probably every time she speaked to him.

Q    Well, do you recall times when she spoke with him in a loving way?

A    Oh, yeah.  Yeah.

Q    Do you -- Describe to us what you remember -- Do you remember any specific whoopings that you can describe for us that happened on Cote Brilliante?  I'm talking about Billie still.

A    Not specifically, but I can recall, you know, going over there regularly and Bill getting things thrown at him; being kicked out of the house, not let back in; you know, anything she could put her hand on, it was at Bill, you know.  I can recall that every day.  He was getting cussed out for something.

Q    And again, during those years, were -- were there times where he had done something that you knew about that caused her to react that way?

A    No, not really.  Like I say, I think it probably got worse once they moved away.

Q    You mentioned that she would lock Billy out of the house or throw him out and not let him back in.  Do you -- Do you know where he would go at times like that?

A    He would come to my mom's house on Marcus.

Q    Would he stay with you there sometimes?

A    Yeah.

Q    What was the atmosphere like at your mom's house at that time?

A    I mean it was -- it was fine as far as the household, but the outside was -- it was hectic, you know.  The inside was okay, but once you get outdoors, it was like a jungle.

Q    And you're talking about issues in the neighborhood.  Is that right?

A    Yes.

Q    Was there -- Was there violence in the neighborhood?

A    Yeah; violence, rape, drugs, everything.

Q    Were -- Did you become involved in -- in the drug -- drug culture on the streets?

A    Yes, sir.

Q    Were you -- Did Billie become involved in the drug

culture on the street?

A    Yes, sir.

Q    Did you -- Did you ever suffer or become the victim of any violence?

A    Yes, sir.

Q    And was that related to the drug issues?

A    Yes, sir.

Q    And what -- what happened?

A    Well, in 1997 I got shot five times.

Q    And do you remember when in 1997 that was?

A    It was in the summertime.  Probably around -- I don't know -- probably June or something.  I don't know.  I'm not for sure, but it was in the summertime.

Q    Okay.  And what is your -- Have you ever been convicted of a crime?

A    I had pled guilty to like --

Q    Okay.

A    -- stealing under 500 or something; nothing serious.

Q    Well, when was this that you pled guilty to a theft crime?

A    This was probably like seven years ago, eight years ago.  It's been a while.

Q    Okay.  Are you still involved in drug dealing?

A    No, sir.

Q    Are you still involved in any illegal activity?

A    No, sir.

THE COURT:  What was the crime you pled guilty to?

THE WITNESS:  Stealing under five hundred or something like that.

Q    (By Mr. Kane)  Stealing under five hundred dollars?  Is that what you're saying?

A    Yes.

Q    Some sort of -- Was it petty larceny possibly?

A    Yeah.  Yeah.  That's exactly what it was.

Q    Do you recall if Billie began using drugs or alcohol at any point?

A    No.  We probably drunk alcohol, yeah, but as far as any -- you know, marijuana, something like that, but as far as any hard drugs, no.

Q    Okay.  So -- So you recall him using alcohol and marijuana --

A    Yes.

Q    -- but not -- not harder drugs.

A    Yeah, not no hard drugs.

Q    Do you recall about how old he was when he began using those things, alcohol and marijuana?

A    We was probably young; 14, 13.

Q    Okay.  You mentioned that in 1997 you had been shot at some point in the summer.  Obviously, you recovered.

A    Yeah.

Q    How long were you in the hospital?  Do you recall?

A    I was in the hospital for probably almost a year.  I had my lungs collapse.  I had to learn how to walk again.  Bullets severed in my bone at the top of my head.  So I was in there for a pretty long while.

Q    Okay.  If -- If during the time that you were in the hospital, during that year, attorneys had come and asked you questions like we're asking you today, would you have answered their questions?

A    Yeah.

Q    Before the time -- Before you were shot in the summer when you were still living the street life, if Billie's attorneys then had come and talked to you, would you have described the things about your family that you've told us today?

A    Yeah.  For my cousin, yeah.

        MR. KANE:  Just a moment, please, Your Honor.

        THE COURT:  Sure.

        (Pause)

Q    (By Mr. Kane)  You had mentioned your Uncle Billy and Uncle Junior using drugs on Evans Street.

A    (Affirmative gesture).

Q    Do you know if they also dealt drugs?

A    Oh, yeah.

Q    What kind of drugs did they deal?

A    Crack, heroin, Ts and blues.

Q    What are those?  What are Ts and blues?

A    Ts and blues are an uppers and a downer.  It's a heroin and cocaine mixture --

Q    Okay.

A    -- and -- and water; that they used to call it embalming fluid.

Q    Used to call it what fluid?

A    It's called water, but it was embalming fluid from the funeral home --

Q    I see?

A    -- that they sold.

Q    And did you actually observe them selling these things?

A    Yeah; sold it for them.

Q    Did Billie observe them selling those things?

A    Yeah; yeah.

Q    Did he also help them sell it?

A    Yes, sir.

Q    From -- From how young of an age did your uncles involve you in that?

A    I'd say from about 14 on up to about, I'd say, 21.

Q    At -- In younger ages when Billie was still living at Evans Street, were they, to your knowledge, selling drugs then?

A    Oh, yeah.  They probably was selling drugs from the time

we was born.

Q    Were those things that you -- And I'm focused on what you specifically remember.  Do you specifically remember seeing them in that kind of activity --

A    Oh, yeah.

Q    -- at that time?

A    Every day.

Q    And -- And was Billie also exposed to that?

A    Yes, sir.

MR. KANE:  No further questions at this time, Your Honor.

THE COURT:  All right.  You may inquire.

CROSS EXAMINATION

QUESTIONS BY MS. COSTANTIN:

Q    What's your middle name?

A    Dontenelle.

Q    I'm sorry?

A    Dontenelle.

Q    Okay.  And you stated that you pled guilty to a misdemeanor theft under five hundred dollars.  Is that right?

A    (Affirmative gesture).

Q    I want to talk to you for a moment about what I think you described as the bloodshed over on Evans.

A    (Affirmative gesture).

Q    Is it your testimony that either Juanita or John Allen

stabbed the other?

A    No, ma'am.

Q    Okay.

A    That was knives pulled.

Q    Okay.  So bloodshed was what?

A    From the fists, fights, pushing over furniture.

Q    Okay.  So the bloodshed you're talking about is fistfights, not a knife fight.

A    Yes.

Q    Let me talk in general about the whoopings that Billie -- that you say Billy received.  You -- I believe you testified that that happened on a daily basis?

A    Yes, ma'am.

Q    And that happened on a daily basis both at Evans and on Cote Brilliante?

A    Yes, ma'am.

Q    Were you over at his house on a daily basis?

A    On Cote Brilliante?

Q    On both places.

A    Every day.

Q    Okay.  So both on Evans and Cote Brilliante you were at Billie's house every day.

A    Yes, ma'am.

Q    Okay.  And every day he was getting beaten?

A    On a random.

Q    And did he ever -- When he was beaten, was it hard enough to cause any sort of injuries?

A    Yes, ma'am.

Q    Tell me about some of those injuries.

A    Well, on Evans, as a child, yeah, he had plenty of knots and bruises, days where he can't go to school.

Q    So there are days when he was so bad that he couldn't go to school.

A    Yes, ma'am.

Q    And where were those bruises?  On his face?  On his -- Where were they?

A    They could be on his back, his face, his legs.

Q    So all over the place.

A    Yes, ma'am.

Q    All over his body.  And that was on a daily basis.

A    Yes, ma'am.

Q    Okay.  And the same thing on Cote Brilliante?  Those injuries were all over his body on a daily basis?

A    Well, on Cote Brilliante, he was older.  So, yeah, it could be a knife, from a broom being thrown, or, you know, I'm saying a pie pan, whatever was there.

Q    What I'm focusing on is the injuries.  I'm just trying to understand that he's having injuries from these whippings.

A    Oh, yeah.

Q    Okay.  And those injuries are happening daily.

A    Yeah.

Q    And they're all over his body.

A    Most likely.

Q    Okay.  Including his face, his hands, --

A    Most likely.

Q    -- his arms?

A    Most likely.  Probably face, hands.

Q    Where did he go to school?

A    As of high school?  Sumner High.

Q    No.  Where did he go for elementary school?

A    Marshall Elementary?  I mean I'm not for sure.  I was just as young as he was.

Q    So he went to, you think, Marshall Elementary in the city?

A    Yeah.

Q    Oh, okay.  All right.  And he did -- And after Marshall, do you remember where he went for junior high school?

A    Not that I recall.

Q    Okay.  But he went to the city schools.

A    He went to a county school for a while.

Q    Okay.  And how long was it he went to a county school?

A    I'm not for sure, ma'am.

Q    Okay.  You don't know if it was a year or five years or seven years?

A    It was a while.

Q    Okay.  And do you remember what school it was he went to? What county school he went to?

A    No, ma'am.

Q    And as far as you know, there was never any hotline from any of those schools, correct?

A    From the school?

Q    Right.  No one ever came and took Billie out of the house, did he -- did they?

A    No.

Q    Okay.  So despite the fact that he's having injuries all over his body on a daily basis, no one ever hotlined it.

A    No, ma'am.  At that time there wasn't a hotline, but teachers have came by the house and called concerning it, you know.  At that time there wasn't no hotline at that time.

Q    Okay.  So you're saying you believe that teachers came by the house.

A    I don't believe.  I know they have.  I witnessed them.

Q    You witnessed teachers come by the house.

A    Yes, ma'am.

Q    And who were those teachers who came by the house?

A    I have -- I don't -- I can't recall no names at that time ago, ma'am.

Q    Were those teachers from Marshall?

A    It was -- I'm not for sure, but it was -- it was teachers that was concerned, counselors that was concerned even in high

school.

Q    So there were teachers that were concerned enough to come by his house.  What were they concerned about?

A    Wanted to know why he withdraw from school; why he would have a certain bruise on him; why he would act out.

Q    Oh, okay.  So you know that teachers saw bruises on him.

A    For sure.

Q    For sure.  And they came and talked to him -- to -- to who at the house?

A    Any party.  It could have been my grandma, my granddad.

Q    Okay.  So you're saying teachers actually came to the house because he had physical injuries from whippings, but there were no hotlines.

A    At that time, ma'am, there wasn't any hotline.

Q    Oh.  They weren't mandated reporters?

A    At that time, ma'am, you can whoop your kids in the streets --

Q    So back in ---

A    -- where I -- where I was from.

Q    Back when -- From the -- You were born in, what, 19 ---

A    78.

Q    So from 1978, from that time -- When did they have to start reporting abuse?  When did teachers mandate reporters have to start reporting abuse?

A    Ma'am, it's probably when -- after I had kids.

Q    Okay.  And when was it you had kids?  How old are your kids?

A    Probably at the age 19.

Q    Okay.  How old are your kids?

A    My kids is 14, 9, 7 and 11.

Q    So it's your understanding it's only in the last 14 years that teachers had to report physical abuse that they saw on children?

A    I mean, ma'am, I don't know if they had to, but at the time when I was growing up, there wasn't any hotline.

Q    Okay.  And so there's no requirement that they hotline for abuse?

A    I mean not where I came from.  It wasn't -- I mean where I came from, the teachers would beat us in school.

Q    And did that happen to Billie, too?

A    Yes, ma'am.

Q    So he was being beaten by the teachers at school?

A    I mean if you get -- if you got discipline as far as the city schools, I'm not going to say the county schools but the city schools for sure.

Q    That's what I'm asking you.  Was Billie being beaten by the teachers?

A    Well, I would say whooped, disciplined, yeah, --

Q    Okay.

A    -- if anything would happen.

Q    Okay.  So you know that; you know that Billie was being whipped by the teachers.

A    Yes.

Q    Okay.  You said that Billie would stay over at your house sometimes.  Is that right?

A    Yes, ma'am.

Q    Did he also stay over at the Taylors'?

A    The Taylors?

Q    Yeah.  Do you know the Taylors?

A    Not that I recall.

Q    Do you recall an individual named Marquis Taylor?

A    Oh, yes, ma'am.

Q    Okay.

A    Close friend.

Q    All right.  And do you know what happened to Marquis Taylor?

A    Yes, ma'am.

Q    What happened?

A    He got shot.

Q    Okay.  And where was Billie when that happened?

A    I think Bill was with him at the time.

Q    Okay.  And what was Bill's reaction after that happened?

A    He withdraw-ed.  He was a close friend.  He was sad, crying.

Q    So he was very sad and upset after --

A      (Affirmative gesture).

Q      -- after that happened?  At that point when Marquis was shot, wasn't there talk that he was shot because people were coming after Billie?

A      Yeah.  It was -- It was that way, but it wasn't true.

Q      Okay.  But that was the talk?

A      Yeah, that was the talk.

Q      Okay.  Do you know why Marquis was shot?

A      Marquis was shot because of the way we was living.  The enemies we had around us; the people we was into it with.

Q      And was that related to drugs?

A      That was related to drugs, gangs, different neighborhoods we was from.

Q      Okay.  So it was a drug and gang-related shooting.

A      Yeah.

Q      Okay.  And they were after Marquis or they were after Billie or just after everybody?

A      I mean they was just after anybody that was from around Cote Brilliante, from where we was from.

Q      Did Billie ever spend any weekends with his cousin Ed McLemore.  Do you -- Do you know?

A      I'm pretty sure he did.  I'm not recalling it.

Q      You don't recall that?

A      No, ma'am.

Q      Okay.  Do you know Ahmed Oliver?

A    Probably not by his name but by face I probably do.

Q    Okay.  You don't -- But that name doesn't ring a bell?

A    (Negative gesture).

Q    How about Johnnie Grant?

A    Yeah, I heard that name before.

Q    Do you know the person or you just heard the name?

A    I just heard the name.  I'm not really familiar with names.

Q    You don't know that Johnnie Grant described himself as Billie's best friend?

A    I mean like I say, when we was growing up, I probably -- if I know his name -- I don't recall, you know, real first name basis.

Q    Okay.  Brady Toliver, also known as "Buck," did you ever know Brady Toliver?

A    No, ma'am.

Q    Okay.  Do you know Brady Toliver also described himself as Billie's best friend?  Does that ring a bell with you?

A    He probably did.  Me and Bill have different friends.

Q    But you didn't know him.  That's all I'm asking.

A    I mean I probably knew him by face but not by name.

Q    Okay.  You, obviously, didn't spend much time with them, though.

A    No, not his friends.

Q    Okay.  You didn't spend time with his friends in general?

A    I mean I'm pretty much sure we would have hung out from being from where I was from on Marcus to Cote Brilliante.

Q    You hung out with Billie or you hung out with Brady Toliver, Johnnie Grant and Ahmed Oliver?

A    I mean I probably hung out with all of them; Marquis Taylor, before he died; Bill.  I mean it was a group of us.

Q    Was -- And I'm asking you:  Was Johnnie Grant or Ahmed Oliver or Brady Toliver?  You don't recall that.

A    What I'm saying, I don't recall those -- their real name. I probably knew them by face if I seen them.

Q    Or "Buck" or "Jay", other names they go by?  You don't know that either.

A    Not by the names.

Q    Okay.  And Billie started smoking marijuana at about what age?

A    I would say early teens.

Q    Okay.  13, 14?

A    Yeah, around that time.

Q    And that's when he started selling crack, too, right?

A    Yeah, around that time.

Q    And where was he selling it?

A    From Cote Brilliante to Marcus to Evans.

Q    Was he selling it out of the house on Cote Brilliante?

A    No.  It was never out of the house.

Q    Okay.  Where was it then?

A    On the street corner.

Q    And how much was he selling?  He's doing that on a daily basis?

A    I mean, yeah, we was doing it on a daily basis.

Q    Were you selling with him?

A    Yes, sometimes.

Q    Were you working together?

A    I mean sometimes.

Q    Okay.  Was he getting the crack from you?

A    No, ma'am.

Q    Where were you getting your crack from?

A    From older guys in the neighborhood.

Q    And is that where he was getting his crack from?  Older guys in the neighborhood?

A    Pretty much.

Q    Okay.  Any names of any of those older guys that you know?

A    No, ma'am.

Q    How much was he making?

A    Probably -- On a daily basis, probably five hundred to almost a thousand dollars a day.

Q    Okay.  So he was -- Billie was making about five hundred to a thousand dollars a day in crack sales.

A    Yes.

Q    That was starting at about age 13, 14, or when was he starting.

A    Well, about 14, 15.

Q    Okay.  So that's about how much he was making and how much you were making?

A    Yes.

Q    Okay.  Five hundred to a thousand dollars a day; is that right?  I'm sorry.

A    Yes, ma'am.

Q    Okay.  Did -- I think you actually answered this question.  He had problems with other drug dealers who didn't want him in that area, right?

A    I mean that came with the territory.

Q    Okay.  Do you have those same problems?

A    Yes, ma'am.

Q    All right.  And those were the some of the problems that led to Marquis getting killed, right?

A    What?  As far as, yeah, territory boundary, yeah.

Q    Right, territory boundaries.  And that's what led to you getting shot, right?

A    Yes, ma'am.

Q    Were you part of a gang?

A    Yes, ma'am, at that time.

Q    What gang was that?

A    Six Deuce Crips.

Q     Okay.  And how about Billie?  Was he part of the same Six Deuce Crips?

A     No.  Bill wasn't in no gang.

Q     Was he gang affiliated with the Six Deuce?

A     No, ma'am.

Q     So if Johnnie Grant, who I guess you don't know, testified that Billie was gang affiliated, that would not be correct?

A     I mean that probably was his recollection of it.  I mean it probably was his opinion.

Q     But that wasn't your opinion.  That's not your opinion.

A     No, ma'am.

Q     And who specifically was upset with Billie because he was selling in their territory?  Do you know?

A     I mean it was just surrounding areas.  We was from Marcus.  It was streets, decorated to Garfield.  I mean I could name streets all day that we didn't -- we didn't get along with certain people.  That just come with part of the territory of the things you do.

Q     Was there a specific gang that shot and killed Marquis?

A     Yes, sir -- Yes, ma'am.

Q     And what gang was that?

A     Outre' Crips.

Q     Say it again.

A     Outre' Crips from Garfield.

Q     Okay.  So it was the Garfield Crips that shot Marquis.

A     Yes, ma'am.

Q     How about who shot you?  What gang was that?

A     The same.

Q     Okay.  How about who shot up Billie's house?

A     Ma'am, I don't know who that was.

Q     Okay.  But you do know his house got shot up.

A     Yes, ma'am.

Q     And you know it got shot up -- Well, do you recall that that was in January of 1997?

A     I don't recall the date, but I remember.

Q     Okay.  You remember it being shot up.

A     Yes, ma'am.

Q     Okay.  Was that -- You said -- Wasn't that same gang -- Was it because Billie had -- Did the shooting occur because he owed money on a drug deal?

A     No, not that I know of.

Q     What do you know of his -- why that house got shot up?

A     I just knew it got shot up.  I didn't -- Nobody never gave a specific reason why.

Q     There was no talk on the street about it?

A     Not -- Not -- I mean if it was from another gang, there wouldn't have been no talk, but not hearing anything from the reason why it got shot up.

Q     Did you ever talk to Billie about it?

A     No, ma'am.

Q     Were you talking to Billie at that time?

A     At the time his house got shot up?

Q     Right.

A     No, ma'am.

Q     Okay.  When did you stop seeing Billy?

A     Probably after this little incident happened.

Q     And what would that little incident be?

A     The case that he's on now.

Q     Okay.  So if I told you that he got locked up or that the robbery occurred in March of 1997, it's when he got locked up on that, which was basically the same day, that you stopped having contact with him?

A     No.  I talked to him on the phone before.

Q     Okay.  Well, that's what I'm trying to understand.  In January of '97, that shooting -- shooting up of the house was several months before the robbery.  So my question was:  Were you still having contact with him several months before the robbery?

A     Yes, ma'am, but not every day.

Q     Okay.  But you didn't during that time ask him about why the house got shot up or what that was about or anything like that?

A     I mean he didn't even understand what it was about.

Q     Okay.  So you did talk to him about it, and he said he

didn't understand why it happened.

A    No.  I'm saying he didn't specifically tell me he didn't understand.  I'm saying there wasn't no talk which makes me say that he didn't understand.  There was never no discussion of me asking him what happened to the house or him telling me the reason why the house got shot up.  I mean I was talking to his sisters around that time, and it still never came up, what was the reason for it.

Q    And to make sure I'm following the chronology here, in March of '97 is when the robbery occurred, and then you got shot in the Summer of 1997?

A    Yes, ma'am.

Q    And in the Summer of 1997, you were -- after that, you were in the hospital for a year.  Is that right?

A    Probably almost; about seven months at the most; six, seven months.

Q    Okay.  So you don't think it was a year; you think it was six or seven months.

A    Yeah.

Q    Were you in the hospital when the trial occurred?

A    No, I was not.

Q    Did you attend the trial?

A    No, ma'am.

Q    Did you ever talk to any of the attorneys connected with Billie Allen's case?

A     Not that I recall of.

Q     Did your mother ever talk to any of the attorneys connected with the case?

A     Not that I recall.

Q     I'm going to show you -- And let me go to the very first page.  This is a -- basically a billing page from Mr. Richard Sindel.

THE COURT:  Is this -- What number?

MS. COSTANTIN:  I'm sorry.  This is Exhibit 15.

Q     (By Ms. Costantin)  A page in which he bills the Court for his time, and I want to direct your attention to Page 8 of that and specifically to a portion 4-21 of 1997.  It indicates there's a telephone conference with the house, and it says "Corey Roy."  Do you have any memory of Mr. Sindel talking to you on April 21st of 1997?

A     I don't even know who that is.

Q     Okay.  That was his attorney at the time.

A     Oh, no.  And my name is Allen.

Q     Your name is "Allen"?

A     Yes, ma'am.

Q     Okay.  So if these attorneys had listed you as a witness under the name of "Corey Roy," that would have been wrong?

A     That's not my name.

Q     Okay.  Let me go to the next page, and specifically I want to go to May 10th of 1997.  It indicates that Mr. Sindel

had a telephone conference with Corey -- this time "Ray's" mother. To your knowledge, did anyone ever speak to your mom?

A     Not that I know of.

MS. COSTANTIN:  Judge, I believe these are already in evidence.

Q     (By Ms. Costantin)  Do you have -- If anyone had contacted you back at that time, would you have told them about dealing drugs with Billie Allen from the age of 13 or 14?

A     If it was for my cousin, yes.

Q     Okay.  So you would have told them about that.

A     Yes, ma'am.

Q     And you would have told them about -- that you were a member of a gang.

A     Yes, ma'am.

Q     And that you -- that Marquis was shot by another gang.

A     Yes, ma'am.

Q     And you would have told them that Billie -- gangs were upset because Billie was selling in his territory.

A     Yes, ma'am.

Q     And you would have told them that you were shot --

A     Yes, ma'am.

Q     -- as well because of gang and drug-related ---

A     Yes, ma'am.

Q     Now the attorneys, I want to talk to you for a moment

about -- Well, let me just ask one other quick question.

You said you had four children.  Do you live with those children?

A    I live with two.

Q    And where do you work?

A    I'm not.  I'm unemployed right now.

Q    Okay.  So you're not financially supporting your children right now.  Is that correct?

A    Yes, ma'am, I am.

Q    Even though you're not employed?

A    I do odd jobs.

Q    Okay.  So your employment is odd jobs?

A    Self-employed.

Q    Okay.  I want to talk to you about your contact with these attorneys.  When's the first time you met with these attorneys?

A    I don't recall the date specifically.

Q    Can you give me an idea if it was a week ago?  A month ago?  A year ago?  Five years ago?

A    It been a while ago.

Q    And "a while," would that be more than a year?

A    I could say, yeah.

Q    Was it more than three years?

A    No.

Q    Did you ever prepare a declaration?  That is, a written

statement in this case?

A    No, ma'am.

Q    Were you ever given anything to sign?

A    No, ma'am.

Q    How often did you meet with the attorneys?

A    Not often.

Q    And how often would "not often" be?

A    Probably every month or something, every other month.

Q    So you think you met with them every other month.

A    If I could say, yes, ma'am.

Q    Okay.  And those meetings started over a year ago?

A    Yeah.  It wasn't every month of the whole year, though.

Q    It was every other month, right?

A    Probably so.

Q    Okay.

        MS. COSTANTIN:  Judge, I don't have anything more.

        THE COURT:  All right.  Redirect?

                    REDIRECT EXAMINATION

QUESTIONS BY MR. KANE:

Q    On Cross Examination you were asked some questions about hotlining and legal requirements for reporting abuse.

A    (Affirmative gesture).

Q    Do you actually know what the law provides in regards to those legal requirements?

A    No, sir.

Q    Do you know when the law adopted whatever requirements it does have?

A    No, sir.

Q    So when you were responding to those questions, were you basing your responses on what you observed and experienced in your life?

A    Yes, sir; just how we grew up.

Q    The -- You had mentioned some money figures about dealing drugs on the street.  If you got drugs from older people, older guys on the street and then sold them, was the money that you got yours or did you have to pay someone?

A    Basically it was half and half.  It was -- As far as selling Ts and blues, the pills was $10 a piece; may get a hundred pills and then you split it 50/50.

Q    She asked you about a meeting with our -- the current legal team of Mr. Allen, and do you recall meeting me a couple of years ago?  More than a year ago when you first ---

        MS. COSTANTIN:  Judge, I'm going to object to the leading.

        THE COURT:  Yeah, it is.

Q    (By Mr. Kane)  Are you sure that -- Do you know where I'm -- Do you know where I live?

A    No, sir.

Q    Do you know if I live here in St. Louis?

A    I know -- I know you don't live in St. Louis.

Q    Okay.  Do you recall meeting with any of us earlier this year?  At a time earlier this year?

A    (Affirmative gesture).

Q    And do you recall that you were going to be a witness at some point earlier in the year?

A    Yes, sir.

MS. COSTANTIN:  Judge, I'm going to object to the leading nature.

THE COURT:  Last question leading; sustained.

Q    (By Mr. Kane)  Do you remember whether you were going to be involved in this case earlier in this year?

A    Yes, sir.

Q    And before that time, when you were going to be involved in this case earlier in the year, about how long had it been, if you can recall, since anyone from this team had -- had contacted you or visited you?

A    It had been a while.

Q    And can you give us a sense of what "a while" is?  Are we talking months?  Years?

A    Probably a year.

Q    So -- So before that time that this was happening, that you thought you were going to be involved in this case earlier this year, before that time, were you -- were you seeing us every other month?

A    Before that time?  No, not -- not every other month, no.

Q    Okay.  So -- So that answer then or seeing us every other month, have you been doing that since?  More recently this year?

A    No.

Q    Okay.  About how many times total do you think -- Since we first came to your house, about how many times total do you think you've met with one of us in person?

A    About four times.

Q    Okay.

MR. KANE:  No further questions, Your Honor.

THE COURT:  About when was it or can you recall any specific events when you stopped dealing drugs?

THE WITNESS:  What time frame?

THE COURT:  Yeah.  How long ago was that?

THE WITNESS:  It probably would have been probably at the age of probably 21, 22.

THE COURT:  And what caused -- What was -- Were there some causes or, what, did you just decide to quit or what -- how did that happen?

THE WITNESS:  Yeah.  Basically probably like after I had my first child, probably at the age of 18, and I kept on doing it because I wasn't employed then.  So after a while, just running in with the police and guys on the street shooting at me and, you know, getting into altercations, I just, you know -- my grandma was getting sick, so I just

decided just to leave it alone.

THE COURT: Okay. All right. Yeah, you may step down. You are excused.

THE WITNESS: All right.

MR. KANE: Your Honor, could we take a short recess?

THE COURT: Sure. Court will be in recess for 15 minutes.

(Court recessed from 9:40 AM until 10:00 AM.)

MR. KANE: Your Honor, it turns out we're only going to be presenting one more witness who had been scheduled for this afternoon.

THE COURT: Okay.

MR. KANE: We're trying to rope him in and get him here as soon as he can, but it looks like it will be at least another hour, hour and fifteen minutes before we can get him to the witness stand.

THE COURT: Okay.

MR. KANE: So that witness will be another lay witness. We're not sure -- We've talked -- We'll see if we can finish that before 12:00 or 12:15.

THE COURT: Okay.

MR. KANE: But, otherwise, it would only be a short while after lunch before we close our case.

THE COURT: Okay.

MS. COSTANTIN: So, Judge, is it fine if we can just

sort of reconvene at 11:15 and see where we are?

THE COURT: We'll come back at 11:15. I do have a lunch across the street from 12:00 to 1:00.

MR. KANE: Okay.

MS. COSTANTIN: Well, Judge, in light of that, do you want to just reconvene at 1:00?

MR. KANE: We could do 1:00.

MS. COSTANTIN: Why don't we just reconvene at 1:00 rather than have him rush down, be on the stand and have to come back at 1:00. Why don't we do that?

MR. HOLTSHOUSER: It also probably would be easier.

COURT REPORTER: Do you want all this on the record?

THE COURT: No.

(The Court and counsel had a discussion off the record.)

THE COURT: Okay. 1:15.

MR. KANE: Okay. Thank you, Your Honor.

(Court recessed from 10:00 AM until 1:15 PM.)

MR. KANE: We are ready to proceed, Your Honor.

THE COURT: Are you ready?

MS. COSTANTIN: Judge, we are. Mr. Holtshouser will be down later on.

THE COURT: Okay. I think we are ready.

MR. KANE: Your Honor, Petitioner calls Brady Toliver.

**BRADY TOLIVER**,

HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

THE COURT:  Good afternoon.  There's some water up there over on your left.

THE WITNESS:  Thank you, Your Honor.

DIRECT EXAMINATION

QUESTIONS BY MR. KANE:

Q    Good afternoon, Mr. Toliver.

A    How are you doing today, sir?

Q    Good.  Do you reside here in St. Louis?

A    Yes, I do.

Q    Are you employed?

A    Yes.

Q    What is your profession?

A    I'm an insurance and financial planner.

Q    And what is your educational background?

A    I went to DePauw University in Greencastle, Indiana, and I have an Advanced Certificate in Financial Planning.

Q    Did you grow up here in St. Louis?

A    Yes.

Q    Did you know the Petitioner in this case, Billie Allen?

A    Yes.

Q    How did you come to know Mr. Allen?

A    Billie and I, our parents our moms were best friends

growing up.

THE COURT:  Could you get a little closer to the microphone, sir?

THE WITNESS:  No problem, Your Honor.

THE COURT:  Thanks.

A    Billie and I, our parents, moms, were best friends growing up, and we met at an early age.

Q    (By Mr. Kane)  Okay.  In your earliest memories of seeing Billie Allen, where was he living?

A    Off of Cote Brilliante.

Q    Okay.  And so you don't remember a time before he moved there with -- with the rest of his family?

A    No.

Q    What year were you born in?

A    1978.

Q    And so did you become friends with Billy as you were growing up?

A    Yes.

Q    Was that -- Was that constant or was there a particular time when you were close friends with Billie?

A    I think we were very close probably from age 7 through 13.

Q    After that, what happened?

A    Time and distance.  Once I entered high school, I played football, and it took up a lot of my time.  And we still kept

in touch but not -- not like it was between the early ages.

Q    Focusing on that earlier time when you were close with Mr. Allen, how frequently would you see him?

A    Just about every weekend.  My mom was always visiting Juanita, his mom, and so we would hang out; sometimes during the school week but definitely just about every weekend.

Q    Did you give a deposition in this case earlier this year?

A    Yes.

MR. KANE:  Your Honor, I'm going to call the Court's attention to -- I'm sorry.  That's not what I asked.

Q    (By Mr. Kane)  Did you sign a declaration in this case a few years ago?

A    Yes.

MR. KANE:  Your Honor, I'm calling the Court's attention to Exhibit 264.

THE COURT:  Okay.

Q    (By Mr. Kane)  And at Paragraph 2, Mr. Toliver -- I'm going to -- I'm going to blow this up.  Your declaration states that you were best friends until you started high school and that you spent almost every day together when you were growing up.  Is that correct?  That's what it says?

A    Yes, that's what I said at that time.

Q    And is it -- You've just testified that you spent weekends and some school nights, but is that -- Is it true that you spent almost every day together with him when you

were growing up?

A    The statement that I've made today is accurate.  The statement that I made -- I believe this was in 2009, it was a very emotional time with bringing all this back, and I didn't have, I guess, the emotional stability to really think through and really sort it out, but the statement that was made today is accurate.

Q    All right.  When you made this statement in 2009 that you spent almost every day together, was that your sense at the time?

A    Yeah.  It seemed like that.  I mean that was the first time I really thought back to those days, and wow!  And it all meshed together.  It just seemed like we were together all the time.

Q    Did you consider Billie your best friend in those -- in those years?

A    Yes.

Q    And did you have occasion to -- to visit Billie and spend time at his house on Cote Brilliante?

A    Yes.

Q    What do you remember about the house?

A    It was not very clean.  There was roaches all around.  It was just kind of unfit for -- for living sometimes.

Q    Who -- Who was living there at that time?

A    His grandfather, his mom, and his three sisters.

Q   Did you know any of his uncles or any other family members of Mr. Allen?

A   Yeah, I recall some family members.  Uncle Jerome, he used to take us to play basketball.  I know the Uncle Raymond, but Jerome was the one that used to take us to play basketball.

Q   Okay.  You mentioned earlier that your mother and Billie's mother had been best friends for some time?

A   For a long time.  They grew up together and went to high school together.

Q   Did you ever know them to drink alcohol together?

A   Yes.

Q   What do you remember about -- about that?

A   My mom would go to Juanita's house, drop me off, and they would go out, and it seemed like they would be gone all night. They would come home and they'd both be intoxicated.

Q   In addition to times when they would go out and come back intoxicated, did you ever see them drinking together in the house?

A   Yes.

Q   Was that a frequent thing?

A   Yes.

Q   Describe for us what you recall about Juanita's interactions with Billie from those years.

A   It was abusive, you know; verbal abuse, physical abuse.

Q    Well, okay.  Let's take those one at a time.  When you say "verbal abuse," what -- specifically what types of interactions do you recall observing that you characterize as verbal abuse?

A    Calling him all types of names outside of his God-given name or parental-given name.  You know, talking down to him, not building him up during those -- I guess you could call them formational periods of a child.  It just wasn't very supportive.

Q    And you mentioned physical abuse as well.  What did you witness that you would characterize as physical abuse?

A    Throwing a pan, shoes; physically abusing him with a belt or extension cord, things of that matter.

Q    Were -- Were those types of things ever done in -- as a punishment for something that Billie had done?

A    Sometimes, but most of the times I couldn't think of anything that a person could do to get abused like that.

Q    How would Billie react when his mother would treat him like that verbally and physically?

A    He would be distraught.  I mean I could see it on his face, and we would talk about it.

Q    What sort of things would he say?

A    "I don't know why she treats me this way."  "I didn't do anything to deserve that."  And, you know, just his facial expressions as well.  I could see the hurt.

Q    How frequently would this type of physical abuse happen when you would go over there?

A    It's hard for me to quantify it objectively, but subjectively, what I can say, I have more memories of that than I do of an uplifting or caring version of interaction.

Q    So are you -- are you saying that most of the time that you were over there this would happen or that you really don't have a sense of how frequently it was?  It's just that those are the more frequent ---

A    No.  I have a sense.  It's just hard for me to quantify it objectively.

Q    Okay.

A    But if we're going to use subjective terms, I would say it's more often than not.

Q    Okay.  Do you recall when you were first contacted about this case?

A    Four years ago maybe.

Q    And is that around the time that you signed the declaration that we looked at?

A    That may have came a little after but right around the same time period, three-and-a-half, four years ago.

Q    And had you been contacted about this case when Billie's trial was happening?

A    No.

Q    In 1997 he was arrested and then his trial took place in

1998.  Do you recall being contacted at any time by someone working on his behalf?

A    No, I was not contacted.

Q    If you had been contacted at that time, would you have provided the information that you've provided here today?

A    Without a doubt.

Q    Do you recall giving a deposition in this case earlier this year?

A    Yes.

MR. KANE:  Your Honor, this is Exhibit 536, the transcript of Mr. Toliver's deposition from -- from May of this year.

THE COURT:  Okay.

Q    (By Mr. Kane)  Were you asked about -- And I'm going to blow this up.

MS. COSTANTIN:  Judge, I'm going to object again, improper impeachment.  If he wants to ask him the questions in there and if he says something different, then he can show him.

THE COURT:  Right, yeah; yeah.  I will let -- I will let you first ask the question and then if you need to -- Well, usually it happens -- This would be the impeachment part.

MR. KANE:  Okay.  I'm not trying to impeach him, Your Honor.  I'm trying to remind him of a circumstance, but

we'll -- I'll just -- let me try to approach it without the deposition.

THE COURT: All right.

Q    (By Mr. Kane)  Do you recall being asked about various letters that you had received over the years from Mr. Allen?

A    Yes.

Q    And have you ever visited Billie since he was arrested?

A    No.

Q    But you have received some letters from him?

A    Correct.

Q    After you got involved in this case, did you receive a subpoena from the Government to bring to this hearing letters that you had received from Billie?

A    Yes.

Q    After receiving the subpoena, did you make any efforts to find letters that he had sent you?

A    Yes.

Q    Could you, please -- Well, how many times do you think you looked for the letters?

A    Probably about five times.

Q    And how long, roughly, do you think you spent looking?

A    Total of about two hours.

Q    Were you able to locate any letters?

A    No, but I was able to find a painting.

Q    Do you have any idea what happened to the letters that

you had received from Mr. Allen?

A   No.  I recently moved, so it's a possibility that it was thrown away on accident.

Q   When was the last time you think you received a letter from Mr. Allen?

A   Probably before this -- this process started.  So maybe before 2009.

Q   Do you recall whether those letters informed you of this process?  That this case was happening?

A   No.

Q   Do you recall if the letters in any way suggested that you should provide some sort of information in this process?

A   No.  The letters were more personal.

        MR. KANE:  Just a moment, Your Honor.

        (Pause)

Q   (By Mr. Kane)  Mr. Toliver, you had mentioned Juanita drinking alcohol.  Did you see her intoxicated?

A   Yes.

Q   Did that happen more than once?

A   Yes.

Q   Was it frequent?

A   Yes.

        MS. COSTANTIN:  I'm going to object, once again, to the leading.

        THE COURT:  Sustained.

Q    (By Mr. Kane)  How often would you see her intoxicated?

A    I would say I was down there ten times.  In the course of ten times, I would probably say she was intoxicated seven.

Q    At times when she was -- Would any of the times that you described earlier of physical abuse occur when she was intoxicated?

A    Yes.

        MR. KANE:  No further questions, Your Honor.

        THE COURT:  All right.

                    CROSS EXAMINATION

QUESTIONS BY MS. COSTANTIN:

Q    Mr. Toliver, I'm Carrie Costantin.  I'm an Assistant U.S. Attorney.  I'll be asking you questions this afternoon.

        You indicated that you signed a declaration back in 2009.  Is that right?

A    Correct.  If that's the date on there, yes, ma'am.

Q    And I'm showing you Exhibit 264.  It's three pages.  I just want to go down so you can see all the pages, and it's signed March 9th of 2009.  Is that right?

A    Correct.

Q    Now you wrote this out in your own words.  Is that correct?

A    No, that is not correct.

Q    How was it prepared then?

A    We sat on my couch at 2713 Lyndhurst, the attorneys and

I, and I jotted some notes on my notepad, and they took notes from what I was saying and prepared it. So there is a discrepancy, if that's what you're trying to point out.

Q    Yeah. I was going to exactly point that out because in your deposition you indicated that -- I'm going go to 536, Page 64, when you were asked the question, if I can find it: "This declaration we have here, did you write this?"

And the answer -- or you asked then: "Did I write it?"

And the question was: "Ah-huh."

And your answer was: "Yes."

And the question was: "How did you write it?"

And your answer was: "I wrote it on a piece of paper, then read it to the other attorney. I believe it was Tim."

But, in fact, you gave some notes to Tim, and then he from prepared the declaration. Is that what you're saying now?

A    No. What I'm saying is very clear. One, I did not sign what's on this screen. You notice there's no signature or date to what's on the screen now. What was signed was in 2009. When I read this, I noticed the discrepancy. That's why I was able to tell you. I knew you were going to point it out.

Q    So what's the discrepancy?

A    The discrepancy is that I did not write what was originally signed.  I jotted some notes down.  They took their notes and then composed it and got it back to me and I signed off on it.

Q    Right.  So that's my question.  You said something different about how it was prepared during the deposition than you're saying today.

A    No, no.  Make sure I'm being very clear with you today.

Q    Okay.

A    What I'm saying is:  I did not write it.  That's clear.  And I did not sign what's on here.  So this is incorrect.  I did not write it is what's correct.  Is that clear?

        THE COURT:  I think he thinks this is a declaration.

        MS. COSTANTIN:  Yeah, I'm not sure.

        THE WITNESS:  No.  The first thing that was on the screen; no.

Q    (By Ms. Costantin)  This is -- Right here is your deposition.

A    Correct.

Q    Okay.

A    The deposition -- What's on -- What I'm saying to you, making sure I'm being clear and you're following me:  This is not accurate.

Q    You're saying the deposition, they did not write down correctly what you said.

A    Correct.  If you notice, you don't have it signed.  I was supposed to sign and send it back to you.  I did not sign it because there was discrepancies in here, and that's one of the discrepancies, ma'am.

Q    So ---

A    Is that clear?

Q    I understand what you're saying.

A    Okay.

Q    Let me go to the next page.  The question is asked:  "Did anyone assist you in preparing your words?"

         And your answer was:  "No."

         Is that correct?

A    No one -- When you say "prepare," what are you referring to?

Q    I'm asking you the question, first of all:  At the deposition were you asked the question:  "Did anyone assist you in preparing your words?"

         And your answer was:  "No."

A    And I'm saying again:  Did I sign this for this accuracy?  No, I did not.  I was asked by the young lady who typed it out, "We're going to send this to you.  Sign this if this is accurate and send it back."  You never got anything back from me, did you?

Q    Here's my question.

A    Ma'am, did you get something back from me?

Q    Sir, ---

THE COURT:  Wait, yeah.  She gets to ask the questions.  You get to answer them.  You'll have a chance to clear this up with your attorney, but you just listen to her questions and answer her questions.

Q    (By Ms. Costantin)  Were you asked the question:  "Did anyone assist you in preparing your words?"

Were you asked that question at the deposition?

A    Yes.

Q    Was your answer:  "No"?

A    I don't recall.

Q    I want to go to the declaration that you signed, correct?

A    Correct.

Q    All right.  And this is a declaration you signed back in March of 2009?

A    Yes.

Q    And in the declaration that you signed, you stated, "Billie and I were best friends until we started high school.  We spent almost every day together when we were growing up."  Is that right?

A    Correct.  I said that.

Q    Okay.  But, in fact, you did not spend every day together when you were growing up, did you?

A    Not every day.

Q    Okay.  You have no memory of any of the time that

Billie Allen lived on Evans with his father.  Is that correct?

A     No, I don't recall that.

Q     And when he lived on Cote Brilliante, you visited on weekends and just an occasional school night.  Is that right?

A     Correct.

Q     Do you know Ed McLemore?

A     The name sounds familiar.

Q     Okay.  Are you aware that Ed McLemore has testified that he spent every other weekend at Billie Allen's house and that Billie Allen spent the other weekends at Ed's house?

A     Possibly.

Q     Okay.  But you're saying you spent every weekend at Billie Allen's house.

A     Correct.

Q     Okay.  And Billie Allen was there?

A     Billie was there.  We would go other places as well.

Q     I want to direct your attention to the first or the second sentence of the third paragraph.  This is your declaration, 264, and it was talking about Juanita Allen.  You wrote, "She was a drunk and always had different men in the house."  Is that your testimony today?

A     Yes, ma'am.

Q     Okay.  Are you aware that Ed McLemore testified that he never saw any men in the house?

A     No, I'm not aware of that.

Q    You have no reason to believe that Juanita Allen was working as a prostitute, do you?

A    That I know of as a fact?  No, I have no idea of that.

Q    Now going to this last portion of Paragraph 3 of Exhibit 264, you're talking about when Juanita and your mom used to go out drinking.  Do you recall that?

A    Yes, ma'am.

Q    And you wrote, "We were usually left alone in the house when Juanita was out."  Do you -- Do you see that on your declaration?

A    Yes, ma'am.

Q    Okay.  Now, in fact, Billie Allen's grandfather, Otha, was in the basement and you went to him if you needed anything.  Isn't that true?

A    From time to time Mr. Petty could be in the house, yes.

Q    Okay.  Do you recall testifying at your deposition that if you needed anything -- if you needed something, "we went to the basement"?

A    No, I don't recall.

Q    Okay.  I'm going to go to 536 which is your deposition. Do you recall the question -- I'm going to read this portion to you, the question:  "The behavior that you -- There were times that you said you and Billie were left at the house, at Billie's grandfather's house.  What did you mean 'left'?"

     And your answer was:  "Her and Juanita would go out."

Question:  "Who was there at the home?"

Answer:  "His grandfather was probably in the basement most of the time."

Question:  "Was he watching you or supervising you or providing you parental guidance?"

Answer:  "If we need something, we went to the basement.  Other than that, we were free to run upstairs."

Is that what you testified to at your deposition?

A    That sounds about right.

Q    Now you've talked about, what you stated, abuse that you saw that Juanita Allen performed on Billie Allen.  You told your mother about this.  Is that correct?

A    Yes.

Q    And she was actually present some of the times, you stated previously, when Juanita Allen hit Billie.  Is that right?

A    Yes.

Q    And did you tell her it was wrong?

A    Probably not.

Q    You don't recall telling your mom that it was wrong?

A    It depends on the situation because if I was involved with it, I probably wouldn't want to say anything.

Q    Do you recall testifying at your deposition that you would sit in the kitchen with your mom and you would tell her, "That's wrong.  It's kind of wrong what's happening."  And she

just responding, "Well, we'll talk about it on the way home?"

A    I remember my mom saying stuff like that, being there, yeah.

Q    Okay.  So you do remember telling your mom it was wrong and her telling you that, "We'll just talk about it on the way home."

A    I don't recall her saying "wrong" because I could see myself getting in trouble, but I'm sure I probably tapped her or said something, "Hey, what's going on?"  I can see that, but, again, you know, that -- that sounds like something my mom would say over there.

Q    And as far as you saying -- telling her that it was wrong, I mean is that something you were communicating with her at the time?

A    It's a possibility.

Q    Okay.  And you also told your father about what you stated Juanita had done, hitting Billie, didn't you?

A    I know I talked to my dad about it.

Q    Okay.  But neither your mom or your dad ever called the police or the Child Abuse Hotline, did they?

A    My mom didn't because I was -- I got whooped, too.  And my dad, knowing him, he -- he didn't want to hear about it.

Q    So your mom -- I guess my question is simply:  Neither of them called the police or the Child Abuse Hotline, right?

            MR. KANE:  I would object, Your Honor, as beyond the

scope of the witness' knowledge.

MS. COSTANTIN: If he knows.

THE COURT: Yeah, if you know. Don't guess or speculate.

A    No, I have no recollection of that.

Q    (By Ms. Costantin) Okay. You say your mom didn't call because she was whooping you herself.

MR. KANE: Objection again. It's just asking about the motivations of another person.

THE COURT: Well, it actually goes to his -- his recollection. Earlier on, he said that he may not have reported some of the abuse to his mother because he might have been involved in it, and this is pretty much the same question, a little bit differently.

Do you understand the question? You want me to read it back to you?

THE WITNESS: You can re-read it, Your Honor.

THE COURT: Okay. Just a second.

The question is: "You say your mom didn't call because she was whooping you herself."

Do you understand the question?

THE WITNESS: I understand what she's asking, yes.

THE COURT: Do you want to rephrase it, please?

Q    (By Ms. Costantin) So my question is: Are you saying your mom didn't call for what was happening to Billie because

she was whipping you?

A    No.  I don't know if my mom called or not.

Q    Okay.  Was your mom whipping you?

A    That has nothing to do with anything.

Q    Was your mom whipping you?

A    That has nothing to do with anything, ma'am.  Again, I don't know if my mom -- I'm going to be clear again.  I don't know if my mom called or not.

Q    Were you physically disciplined by your mother?

A    Have I ever been spanked?  Is that what you're asking me?

Q    I'm asking if you were ever physically disciplined by your mother.

A    Define "physically disciplined."

Q    Okay.  Were you ever whooped by your mother?

A    Define "whooping."

Q    You tell me what a whooping is in your mind.

A    I just asked you a question, ma'am.

        THE COURT:  No; wait.

Q    (By Ms. Costantin)  Sir, I am the one who ---

        THE COURT:  Wait, wait, wait.  Let's get this -- You know, here's the deal.

        THE WITNESS:  I -- Your Honor, with all due respect, I ---

        THE COURT:  No; wait.  Listen to me.

        THE WITNESS:  Yes, sir.

THE COURT: Okay? Are you listening?

THE WITNESS: Yes, sir.

THE COURT: Listen real clear. Are you? Well?

THE WITNESS: I'm listening, sir.

THE COURT: All right. Well, none of this smirky, smiling stuff.

She's going to ask you some questions and you're going to answer them. And then if you don't like what you need to say, be truthful and give your answer. These lawyers are extraordinarily capable of readdressing it, but you don't get to ask her questions. It doesn't work that way. Do you understand?

THE WITNESS: Even for clarification, Your Honor?

THE COURT: Absolutely, you can ask her that.

THE WITNESS: That's all I was asking for, so no disrespect, sir.

THE COURT: Then that's fine.

Now would you again ask the question?

MS. COSTANTIN: Yes, I will.

Q    (By Ms. Costantin) And let me preface it by saying: I believe you stated previously that your mom whooped you. And my question is: What does that mean?

A    And all I asked, ma'am, is: Please define "whooping," and I'll be more than happy to answer it.

Q    When you previously testified about ten minutes ago that

your mom whooped you, what did you mean?

A    A spanking.

Q    Okay.  And a spanking, was that -- is that with a hand or with an object?

A    It could be either one.

Q    And when your mom whooped you, what objects did she use?

A    If she used an object, it would be an extension cord.

Q    So your mother struck you with an extension cord?

A    She has, yes.

Q    Did you observe Jerome Petty, Billie Allen's uncle, discipline him?

A    Yes.

Q    And you did not consider that to be abuse, did you?

A    It could be sometimes.

Q    Do you recall testifying at your deposition when asked the question:  "Did you consider what you saw Jerome do to be physical abuse?"

        And your answer being:  "No"?

A    I recall saying that.

Q    You never saw Otha Petty physically punish Billie, did you?

A    Not that I can recall.

Q    Now you stopped seeing Billie Allen when you were 12 or 13 because you could see that you and he were heading in different directions.  Is that right?

A    That's not what I said.  I said I stopped seeing him every weekend at the age of around 13.  We would still bump into each other from time to time.

Q    So you stopped seeing Billie Allen that often -- that frequently because you could see that the two of you were heading in different directions, correct?

A    Yes, ma'am.

Q    Billie was more into the street life.  Is that right?

A    Yes.

Q    The thug life as you described it?

A    Yes.

Q    Were you aware that Billie had started smoking marijuana when he was 13 or 14?

A    No, I didn't know.

Q    Were you aware that Billie Allen had started selling crack when he was 13 or 14?

A    No, I did not know that.

Q    Did you know he was making five hundred to a thousand dollars a day?

A    I definitely didn't know that.

Q    Does that surprise you?

     I'm not talking about the amount of money.  I'm talking about that he was selling crack, to be clear.

A    Being on Cote Brilliante, nothing would surprise me.

Q    That's the street life or the thug life that you didn't

want to have any part of.  Is that right?

A    I was playing football and setting myself up to play college sports.  So all my focus and time was dedicated to my education and playing sports.

Q    And that was -- At that time you were living out in Creve Coeur and Chesterfield.  Is that right?

A    Yes, ma'am.

Q    And you went to the Parkway School District, elementary through high school, right?

A    Correct.

Q    And at that time we're talking about 12, 13 years old. You're living in West County and he's still living in North St. Louis.  Is that right?

A    Correct.

Q    You didn't know Billie Allen's friends Ahmed Oliver, Prentiss Church, Johnnie Grant or Marquis Taylor, did you?

A    I would probably have to see some of those people.

Q    But you were aware that Billie Allen's house got shot up and that he stole something from his grandfather.  Do you recall that?

A    I recall the conversation my mom and I had after the house was shot up, yes.

Q    And that's what it involved?

A    Say that again.  I'm sorry.

Q    Did it involve her telling you that the house had been

shot up and that he had stolen something out of the house from his grandfather?

A    Yes.

Q    And you don't recall Billie Allen ever talking to you about Marquis Taylor being a significant person in his life, do you?

A    I don't recall any names from that time period.  When we would bump into each other and talk, we were in different directions, so.  I would say, you know, when we would talk, it would be more just us catching up and not really anything else outside of that.

Q    Okay.  Your only knowledge that Marquis was killed in front of Billie Allen came from your mother.  Is that right?

A    If I remember correctly.

Q    And you don't recall having any conversation with Billie about Marquis' death, do you?

A    No.  Again, that -- Can you tell me what year that was?

Q    1995 -- 1996.

A    Football, school, that's all it was.

Q    You really -- I'm sorry.  I didn't mean to interrupt.  Go ahead.

A    No.  Go right ahead, ma'am.

Q    So at that time period you're just not having contact with him much.

A    Again, if you read what I put down, it went from us being

around each other a lot to about 70 percent on the phone, 30 percent in person.  And when we would meet, it wouldn't be like that.  It was just us talking, you know, as young kids, young teenagers.

Q    And he never talked to you -- You don't recall any conversation about him talking to you about Marquis Taylor being shot to death in front of him?

A    I don't remember that.

Q    You heard about the robbery and the death of the bank guard from the news and people calling.  Is that correct?

A    More about people calling.  I was in Greencastle, Indiana where DePauw University was.

Q    Right.  You were in a -- at DePauw University in -- starting in the Fall of 1996.  Is that right?

A    Correct.  Went out there in August, so before the Fall.

Q    So you were actually there from the Summer of '96.

A    Yes, ma'am, for two-a-days.

Q    And are you aware that the robbery was in the Spring of 1997?

A    It was brought to my attention St. Patrick's Day.

Q    Right.  So you were away -- had been away at college for somewhere six to nine months before the robbery.  Is that right?

A    Correct.

Q    And you didn't have any contact with Billie Allen between

the time he was arrested and the trial, did you?

A   No, ma'am.

Q   And, in fact, you didn't call him or write him or visit him between the arrest and the trial, did you?

A   No.  I didn't know how to.

Q   And -- You didn't know how to get a hold of him?

A   No.

Q   You didn't know how to get a hold of Juanita?

A   Again, Juanita and I, our relationship is not necessarily a good one.

Q   Did you know how to get a hold of any of his sisters?

A   No.

Q   You had no contact with Billie basically from your high school graduation in May of '96 through -- passed the trial. Is that right?

A   I would say probably before I went away for two-a-days. I might have caught up with him a couple of times.

Q   Okay.  So at least the Summer of '96 through the trial.

A   Correct.

Q   And you never contacted him or anyone in the family to see if there was anything you could do for him after he was arrested, did you?

A   Not that I can recall, no.

Q   Did you ever contact his lawyers to offer your help?

A   Didn't know who they were.

Q   Didn't try and find out?

A   Talked to my mom about it.

Q   And when you talked to your mom about it, did you find out from your mom who the lawyers were?

A   No.  She said she really didn't know either, if I remember correctly.

Q   And as far as you know, no one ever gave your name to Billie Allen's lawyers as someone who could provide useful information, correct?

A   No, ma'am.

Q   You have no idea if anyone ever gave your name to them.

A   I have no idea.

Q   Now do you recall at the deposition being asked about the letters that Billie Allen had written --

A   Sure.

Q   -- to you?  And do you recall refusing to produce those letters?

A   No.  I probably didn't refuse to produce.  I said that it's personal, and ---

Q   Do you remember being -- I'm sorry.

A   No.  Go ahead.  You cut me off.  Go ahead.

Q   Well, I don't want to cut you off.  So if there's something more you want to say, ---

A   That's the second time you have, so that's natural.  Go ahead, ma'am.

Q     Was your answer complete?

A     Go ahead.  I'm listening, ma'am.

Q     No.  Was your answer complete, sir?

A     No, but I'm listening.  Go ahead.

Q     Okay.  Well then, let's look at Page ---

THE COURT:  Wait.  Let's take a recess.  Here's the deal:  I've written here on my margin, "Contrary to a lot of evidence I've heard, he's honest."  This whole proceeding is about trying to get to the truth.  It's not about being interrupted.  It's about trying to get to the truth of all the things that happened in this very important case.  And when you do things like this, "No; you interrupted me twice; that's the way you are," I credit you with being hostile and not being helpful.

Now I'm going to take a ten-minute recess.  And when I come back, we're going to start over with this question because I'm upset right now, and I don't want to be.

THE WITNESS:  Your Honor, can I --

THE COURT:  So Court's in recess.

THE WITNESS:  -- can I ask you a question?

THE COURT:  Court's in recess for ten minutes.  You can step down and go outside.

(Whereupon, the witness left the stand and exited the courtroom.)

(Court recessed from 1:54 PM until 1:55 PM.)

MR. KANE:  Your Honor, I just want to offer in case the Court would find it helpful that I, as Mr. Allen's attorney, would be willing, if the Court asked me to, to go speak with Mr. Toliver and simply to re-enforce the message that you have given without, of course, addressing at all the substance of his testimony.

THE COURT:  Yeah, I think -- I think that would be a good idea.  You know, what -- And tell him this:  What I had planned to do, when he was finished testifying, I wanted to talk to him a little bit just between he and I about his career.  He seems like a -- He's a very intelligent guy.  He -- He has some information that would be helpful, but what he's doing, he's discrediting himself before me by this nonsense he's carrying on.  So I think that's a good idea.

MR. KANE:  Okay.  I did -- Just so you know, I suggested that to counsel for the Government, and I think they preferred that I -- that I not do that.  So I don't know if they want to be heard before I go speak to him.

MS. COSTANTIN:  Judge, it's just to whether it would be effective or not.  That is really our only objection.  We're not sure it would be effective.

THE COURT:  I think it would helpful just to say, you know, "Just listen to the questions."  There's nobody here wanting to cause him any grief.

MR. KANE:  Right.

THE COURT:  He seems like he has a chip on his shoulder, and I don't really know why, what's that all about.

MR. KANE:  Okay.  I'll speak with him very briefly --

THE COURT:  All right.

MR. KANE:  -- and impart that message.

THE COURT:  All right.  Thank you.

(Court recessed from 1:56 PM until 2:00 PM.)

MR. KANE:  Your Honor, I spoke briefly with Mr. Toliver.  When you're ready to proceed, I'll go get him.

THE COURT:  That's fine.  I appreciate it.

MR. KANE:  Okay.

(The witness returned to the stand and the proceedings continued at 2:00 PM.)

THE COURT:  Sometime when this hearing is over I'd be interested in talking to you about your career and your football career and your financial career and everything else. You have a lot of interesting things in your life.  So let's get on with it.

THE WITNESS:  Okay.  Thank you, Your Honor.

MS. COSTANTIN:  Thank you, Your Honor.

Q    (By Ms. Costantin)  We were at the point where I was asking you about letters that Mr. Allen had written to you, and I asked you:  Isn't it true that you refused to give up the letters or turn over letters when asked at the deposition?

A     Pardon me.  I don't recall refusing to cooperate.

Q     I am going to show you Exhibit 536, Page 74.  Do you recall being asked:  "Would you be willing to provide copies of your letters from Billie?"

And your answer:  "That's personal."

And the question:  "Is that a 'no'?"

And your answer was:  "Without a doubt."

A     I remembering saying that it's personal.

Q     Do you recall saying in response to the question, "Is that a 'no'," your answer being, "Without a doubt"?

A     I don't recall that.

Q     Let me go back to a moment about -- a time period around the time of the trial or between the arrest and the trial. Were you talking to your mother about what was going on during that time?

A     After the incident -- Are you referring to 1998?

Q     Yeah.  I'm sorry.  Let me be clear.  I'm talking about between the robbery and the trial.  Were you talking to your mom about what was going on?

A     I remember bringing something up to her once.  I received a couple of phone calls about what had happened, just asking if it was true.

Q     And she was talking to Juanita Allen during this time period.  Is that right?

A     I'm -- I'm not sure.  I was at school.

Q    Okay.  You don't know if they were still friends at that time?

A    I'm sure they talked, but I can't say.

Q    You were gone?

A    I was gone.

Q    Okay.  The times that you were over at the house on Cote Brilliante, Billie's sisters weren't punching him in the face, were they?

A    I do recall his sisters picking on him and -- and ---

Q    Do you recall them physically punching him in the face?

A    I recall them jumping on him a couple of occasions, yes, ma'am.

Q    And "jumping on him" means what?

A    Physical abuse.

Q    Okay.  So you recall them physically abusing him.

A    Yes.

Q    Okay.  I'm going to go to the second page of your declaration.  Do you recall writing that, "The sisters probably picked up on their mother's abuse of Billie, also, because they would call him names and tell him he was stupid, also"?  Do you recall that in your declaration?

A    Yes, ma'am.

Q    And in your declaration you never mentioned any physical abuse by his sisters, did you?

A    No, I did not.

Q    Was Billie Allen affiliated with a gang or did he cross lines between them?

A    If I remember correctly, my deposition was all speculation in this area.  I don't know exactly if he was in a gang or not in a gang, but I do know that Cote Brilliante was a notorious gang spot, and that's one of the reasons why when I was in high school I stopped going down there as much.

Q    Do you remember in your deposition when Mr. Holtshouser asked you if Billie Allen was in a gang, that you asked him what Billie Allen's date of birth was so that you could give a more accurate answer --

A    Yes.

Q    -- based on what his zodiac sign was?

A    Yes, ma'am, without a doubt.

Q    And do you recall telling Mr. Holtshouser that you would stand by your analysis of Billie Allen's zodiac sign in answering that question?

A    I do recall that.  That sounds like something I would say.

Q    So do you believe that Billie Allen's zodiac sign is an explanation for his behavior?

A    When you say "behavior," as it -- as it relates to what part?

Q    As to whether or not he would join a gang.

A    I would stand by that based on knowing where he had to

live and knowing what I know about Geminis being a two-bodied symbol. Having two different distinct personalities, I could see that happening, yes, to survive.

Q And that's what Billie Allen was was a Gemini? A two-bodied symbol?

A If -- If the date of birth that was given to me is correct because I can't remember his birthday.

Q Okay. His birthday was -- is July 18th of 1977.

A July?

MR. HOLTSHOUSER: June.

Q (By Ms. Costantin) I'm sorry, June. I apologize. June; June 18th.

A I would say, yeah. Then he's a Gemini, yes, ma'am.

Q Okay. And that's something that needs to be taken into account in determining whether or not he would be a gang member.

A In that situation and what -- the young gentleman who was in front of me -- I can't remember your name, sir -- but based on what he said, the way it was set up, it made sense.

Q And do you recall being asked in your deposition whether you saw any changes in Billie Allen during 1995 and '96?

A I do recall.

Q And I'm going to Exhibit 536, Page 84. Do you recall your answer being: "That was like the sum total of everything that had happened up to that point. You got that argument

nature versus nurture. At some point that nurture takes over; how you give energy. It's a proven fact that if you put water on the table and you play certain types of music to it, the molecular structure of water changes over time based on the type of music. Since our bodies are made up of 85 percent of water, if you're constantly nurturing it, at some point it's going to manifest itself. I would say based on my understanding of how energy is transferred by '95, '96, that's when the sum total of the abuse had finally taken place."

Do you recall that being your answer?

A    Yes, and I stand by that.

MS. COSTANTIN:  Judge, I don't have anything else.

THE COURT:  Okay.  You may inquire.

MR. KANE:  Your Honor, we have no further questions.

THE COURT:  All right.  Thank you, sir.  I appreciate you being here.

THE WITNESS:  Sorry for being disrespectful.

THE COURT:  That's all right.  By the way, the market's up about 11 points, so that's good.

MR. KANE:  Your Honor, before we rest, we're going to just go over the -- the last few exhibits that were done since -- since we last did this.

THE COURT:  All right.

MR. HOLTSHOUSER:  The only -- The only witness, I think, from today that had any exhibits was Mr. Toliver and

there were two:  Exhibit 264, his declaration, and Exhibit 536, his deposition.

THE COURT:  I see Corey.  Were there any during Corey Allen's?

MR. HOLTSHOUSER:  We don't believe so.

MR. KANE:  We referred to an exhibit that had -- or they referred to an exhibit that had already been admitted, Your Honor.

THE COURT:  Okay.

MS. COSTANTIN:  Right.

MR. HOLTSHOUSER:  Do you show any others?

THE CLERK:  No, I don't see any for Corey Allen.

THE COURT:  So we had 264 and 536?

MS. COSTANTIN:  That's correct.

MR. HOLTSHOUSER:  264 and 536.

THE COURT:  Okay.  264, received.  536, it's already received.  It has already been received.

MR. HOLTSHOUSER:  Correct.

THE COURT:  It's checked.  Okay.

MR. HOLTSHOUSER:  And I just want that record to show that he referred to me as "young."

THE COURT:  To what?  I missed the humor there.

MR. HOLTSHOUSER:  Mr. Toliver referred to me as "young," and I would like the record to note that.

THE COURT:  Oh, okay.  Will there be a motion?  I

guess there's been no formal announcement of resting.

MS. CARLYLE:  Your Honor, at this time the Petitioner rests.

THE COURT:  Petitioner rests.

MR. HOLTSHOUSER:  Judge, without waiving anything, I don't think that we want to -- I mean we want to put on our evidence.  I think that would be important for the record on appeal that -- the evidence that we're going to put on.  And I just think, quite frankly, not being a regular civil practitioner and having been over 30 years since I was Judge Nangle's law clerk, I don't even remember what the motion is that you make at the close of a civil case.  So ---

THE COURT:  Generally it is that the party plaintiff has failed to produce sufficient evidence to satisfy any or all of the allegations in their claims.

MR. HOLTSHOUSER:  I would expect the Court's going to deny that motion, but for the record, I would make that motion without any detail or argument.  But for the sake of preserving that issue, I would make it.  However, I expect the Court to deny it, and we plan to proceed with presenting evidence tomorrow and Monday and Tuesday.

THE COURT:  All right.

MR. HOLTSHOUSER:  And I do think that for the sake of the ultimate record that the Court of Appeals might look at, it would be beneficial to have that evidence in the record.

THE COURT: Okay. The Court will note the motion, and it is denied.

MR. HOLTSHOUSER: And, again, Judge, I apologize for the confusion, but it is a unique type of civil case.

THE COURT: All right. Are we ready to ---

MR. HOLTSHOUSER: No. I think we have discussed the -- We're going to -- we're going to have three witnesses, Judge.

THE COURT: Okay.

MR. HOLTSHOUSER: They're going to be Dr. Richard Wetzel, Dr. Sean Yutzy and Dr. Galit Askenazi. Dr. Yutzy and Askenazi will not be available to testify until Monday morning. They'll be ready to go first thing, but Dr. Wetzel will not be available till tomorrow morning.

THE COURT: All right.

MR. HOLTSHOUSER: And so I would ask that we recess until tomorrow morning. I don't think it will take -- It will take all morning, and then there would be -- we would ask for the Court to recess for the afternoon and then resume Monday morning. We could finish Monday. It could spill over into Tuesday morning.

THE COURT: Okay. No; that's fine. We all have things we can do in the meantime.

MR. MORENO: That's correct, Your Honor. Thank you.

MR. HOLTSHOUSER: And, Judge, I'm sure 8:30 is the

time for tomorrow.  I just wanted to let you know: Dr. Wetzel, he will be -- he's been told to be here at 8:30. He moves a little slower than he used to.  He has a leg brace. He walks with a walker.  He has some other health issues.  So it takes him a little bit longer to get into the building, get through Security --

THE COURT:  Sure.

MR. HOLTSHOUSER:  -- and so forth.  So he did indicate he'll be -- he'll do his best, but sometimes he's ---

THE COURT:  We'll gather at that time.  If he shows up later, don't -- make sure he understands that we're not counting minutes, so.

MR. HOLTSHOUSER:  I told him that was the case, but I just wanted to let you know that he's alerted me that there's that possibility.

THE COURT:  All right.  Thank you.

MR. HOLTSHOUSER:  Thank you, Judge.

MR. MORENO:  Thank you, Your Honor.

MR. KANE:  Thank you, Your Honor.

THE COURT:  Okay.  Court's in recess until 8:30 tomorrow morning.

(Court adjourned at 2:15 PM.)

VOLUME XV

96

CERTIFICATE

I, Deborah A. Kriegshauser, Registered Merit Reporter and Certified Realtime Reporter, hereby certify that I am a duly appointed Official Court Reporter of the United States District Court for the Eastern District of Missouri.

I further certify that the foregoing is a true and accurate transcript of the proceedings held in the above-entitled case and that said transcript is a true and correct transcription of my stenographic notes.

I further certify that this transcript contains pages 1 through 95 inclusive and that this reporter takes no responsibility for missing or damaged pages of this transcript when same transcript is copied by any party other than this reporter.

Dated at St. Louis, Missouri, this 12th day of February, 2013.

_____

/s/ Deborah A. Kriegshauser

DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR

Official Court Reporter