UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

BILLIE JEROME ALLEN,            )
                                )
              Petitioner,       )
                                )
     vs.                        ) No. 4:07-CV-27(ERW)
                                )
UNITED STATES OF AMERICA,       )
                                )
              Respondent.       )

EVIDENTIARY HEARING -- VOLUME XVI
BEFORE THE HONORABLE E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE

DECEMBER 7, 2012

APPEARANCES:

FOR PLAINTIFF:        ELIZABETH U. CARLYLE
                      P.O. Box 30418
                      Kansas City, MO   64112
                      (816) 525-6540

                      TIMOTHY P. KANE
                      ERIC JOHN MONTROY
                      JAMES HENRY MORENO
                      KATHRIN HENNIG
                      FEDERAL COMMUNITY DEFENDER OFFICE
                      EASTERN DISTRICT OF PENNSYLVANIA
                      The Curtis Center, Suite 545 West
                      Philadelphia, PA   19106
                      (215) 928-0520

FOR DEFENDANT:        STEVEN E. HOLTSHOUSER
                      CARRIE COSTANTIN
                      OFFICE OF U.S. ATTORNEY
                      111 S. Tenth Street, Suite 2000
                      St. Louis, MO   63102
                      (314) 539-2200

REPORTED BY:          DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR
                      Official Court Reporter
                      United States District Court
                      111 South Tenth Street, Third Floor
                      St. Louis, MO   63102
                      (314) 244-7449

**INDEX**

DR. RICHARD D. WETZEL --

   Direct Examination by Mr. Holtshouser . . . . . . .  3

   Cross Examination by Mr. Montroy  . . . . . . . . . 73

   Redirect Examination by Mr. Holtshouser . . . . . . 129

VOLUME XVI                    3

(Petitioner's counsel met with Defendant from 8:30 AM until 9:00 AM.)

(Proceedings began at 9:00 AM.)

MR. MORENO:  Your Honor, Mr. Allen has requested that we speak with him again.  Would you mind if we take five or ten minutes?

THE COURT:  No.  Take your time.

MR. MORENO:  Thank you.

(Court recessed from 9:00 AM until 9:15 AM.)

MR. MONTROY:  Your Honor, thank you for the extra time.  I appreciate it.

THE COURT:  Sure.  Whenever you're ready.  Would you just raise your right hand?

**DR. RICHARD D. WETZEL**,

HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

DIRECT EXAMINATION

QUESTIONS BY MR. HOLTSHOUSER:

Q    Good morning, Dr. Wetzel.

A    Good morning.

Q    Could you -- You've previously testified in a courtroom in front of -- of this particular Court, but for the record, could you just briefly summarize your career as a neuropsychologist?

MR. MONTROY:  Excuse me.  I'm sorry to interrupt.

I'm going to stipulate to his expertise.

Q    (By Mr. Holtshouser)  We're only looking here for a brief summary of --

A    Okay.

Q    -- how many years and where you -- what kind of work you've done.

A    I was on the faculty at Washington University from October, 1970, until the end of June this year as a faculty member with appointments in Psychiatry and in Neurology and Neurological Surgery.  And I ran a testing service during that period of time from about '77 on in which I looked at people and said whether or not they were being treated by the right doctor.  The neurologist usually sent me people when they wanted Psychiatry to treat them, and Psychiatry sent me people when they wanted Neurology to treat them.  And I also would do testing for neurosurgeons to tell them where in the brain certain abilities and skills were and whether or not people had improved or gone down in their abilities before and after brain surgery.  And so I did all sorts of testing and I did all sorts of personality testing.  I've tested over 2000 people for some sort of forensic purpose in the course of my career.

Q    Has all of this work been under the auspices of Washington University School of Medicine?

A    Yes, it has until June 30th.  I've taken a few cases

since then, but, yes, up till then it was, yes.

Q    All right.  And your -- your status at the present time is what?

A    My status at the present time is mildly complicated.  I have three cases that I started while I was there that aren't finished.  And so for those, I'm still their employee and they still get the money, this case being one of the three.  New cases I take after June 31st, the money comes to me.

Q    Okay.  And this is not one of them, unfortunately.

A    Or fortunately.

Q    Okay.  Is the specific area of expertise that you have had over your career, is it in -- would it be fair to say that it is in the field of Neuropsychology?

A    It would be fair to say that it is in the field of Psychology and in addition to doing General Clinical Psychology, I -- I do a great deal of Neuropsychology, yeah.  I do both.

Q    Okay.  And in terms of both practical experience and teaching, have you done both?

A    Yeah.  I've, you know, taught Psychotherapy.  I've taught Statistics.  I've taught about psychological testing.  I've taught about neuropsychological testing.  I've consulted when people threatened to hurt somebody; you know, a variety of things.

Q    The students that you have taught to at Washington

University School of Medicine, have they included individuals pursuing a path in Psychiatry?  That is, where they're pursuing an M.D., other M.D.s as well as individuals pursuing degrees and upper degrees in Psychology?

A    Let me be slightly nonresponsive.  I have taught medical students, but most of the people I have taught have been residents and fellows in Psychiatry and in Neurology and in Neurosurgery and in Neuroradiology who are two, three or four years after they have their M.D. degrees.  And I've also done a lot of teaching to younger faculty members in a variety of departments.  So most of the people I've taught have not been going for a degree.  That was the problem with your question.

Q    Okay.  I'm going to show you Exhibit 579, if we go to the -- I got it.  Does this appear to be a copy of your curriculum vitae as of September, 2008?

A    Yes, it does, but I will say that it's rather blurry, given my current vision.  There, that's better.  Thank you. Yes, it is.

Q    Okay.  And please remind me to do that every time, if I put anything up there, to blow it up for you.

Can you briefly describe what your expertise and experience has been working in capital cases, federal or state?

A    I have evaluated about 65 people that have been charged with murder where I've been a primary opinion giver.  When I

was -- Earlier in my career, I did some testing, assisting other people, but I wasn't responsible for the opinion, but I've done 65 where I'm responsible for the opinion. Fifty of those involved -- were people who had been charged with capital murder. Some of the others committed felony murders, but they weren't charged with that.

Q    Prior to 1998, had you done any work in this field?

A    I had done about 20 cases before then. I'm including, Your Honor, competency to be executed cases, although they're technically, I understand, a civil matter. It certainly involves the death penalty, so. But I've done 20.

Q    And was that for -- Was there any sort of distribution between whether you worked for the defense or the prosecution in those cases before 1998?

A    Well, like almost everybody, you have more opportunities to work for the defense than the prosecution because if the defense doesn't like your opinion, they can get another person to give an opinion. So they -- they're not risking as much as the prosecution. So I started off and I did a lot of work for the Capital Defense Resource Foundation, Sean O'Brien's group, before they lost their funding, and I did about, I think, 19 post-conviction reviews for them.

Q    Were most of those in the State of Missouri?

A    For Sean, they were all in the State of Missouri, yes.

Q    Okay.

A    But I've done it in other states; Illinois, Wyoming, Vermont, California, Ohio.

Q    Was this case in 1998 one of the first cases in which you had been -- your services had been utilized by the prosecution in a capital case?

A    No.  It was the first where it was used by the prosecution in a federal case, --

Q    Okay.

A    -- but I had done four or five for the prosecution in state cases.

Q    And since then, I think the number you had indicated earlier was 65 total.  You said there was about 20 before 1998.

A    Yeah.

Q    The subsequent 45, that is, the ones that came after *Allen*, what -- what's the general distribution there between defense and prosecution?

A    Well, I mean people develop reputations.  In the City of St. Louis at the state level, I'm considered a defense expert. In the western part of Missouri, I'm regarded as a prosecution expert.  In here, I tend to be called 3:1 by the prosecution.

Q    Okay.

A    So it depends on which court you're talking about.

Q    Okay.  Now still in the state system, you are primarily a defense expert?

A    Yes.  I did a lot of work for the capital defense people and also for the appeals for the -- Sean O'Brien's group.

Q    And throughout -- Up until June of this year, the funds that you would earn and charge for your services, were those all inured to the benefit of Washington University?

A    When you're employed by Washington University Medical School, they own your practice and they get your income.  You get a salary and your expenses, but that's it.  They get the money.

Q    Okay.  What, if any, benefit do you derive personally from working as an expert in these types of cases when the funds went to Washington University?

A    Well, it counts, of course, towards your salary, and I enjoyed the work and I enjoyed trying to do it well and I enjoyed the fact that I didn't have to quit because I was -- ran out of a contract.

Q    Okay.  Now directing your attention to the work that you did in this case in 1998, were you asked sometime in February of 1998 to get involved in this case and take a look at the work done by Dr. Michael Gelbort?

A    Of my own memory, I can say 1998, but I can't say what month it was, but yes.

Q    Okay.  And did you come to learn that Dr. Gelbort had done neuropsychological testing and evaluation of Mr. Allen?

A    Yes, I did.

Q    And did you come to learn that a Dr. Cuneo had done a psychological evaluation of him?

A    Yes.

Q    And was a Dr. Sean Yutzy, a psychiatrist at Washington University, also utilized by the Government to perform an independent psychological evaluation?

A    Yes.  He was -- had a Forensic Psychiatry services in our department and, theoretically, he was my boss, although usually I told him what to do.

Q    Okay.  And he actually was considerably younger than you as well, correct?

A    He had been my student when he was a resident, yes.

Q    Okay.  Did you -- In the course of this case in 1998 did you actually personally meet with or evaluate Mr. Allen?

A    No, I did not.

Q    Have you ever?

A    No, I have not.

Q    All right.  So was your work in 1998 limited to reviewing the data, notes and report of Dr. Gelbort and then also Dr. Cuneo and Yutzy and then -- Was that the basis of what you had to look at?

A    Well, I'll answer that this way:  My job was to review materials that were provided to me.  I'm not sure that the list you just gave me was exhaustive, but I did not do my personal examination.  I was asked, as I understood it, to

supplement the examination of Dr. Yutzy by commenting on the testing material that was available in the case.

Q   And was the focus of your attention to comment on whether or not there was any evidence from the testing of any brain impairment on the part of Mr. Allen?

A   I think it was -- included learning disability and brain impairment and cognitive impairment which wouldn't necessarily have been brain impairment.

Q   Now you -- As you correctly indicated, the list that I stated was not exhaustive.  You had also received discovery materials about the underlying offense, any other materials that the Government had received from the defense.

A   Right.  I -- I received materials from you, and I also received materials from Dr. Yutzy, and he and I discussed the case.  So I don't know every exact source of what I got, but I understood generally what happened in the crime or at least what --

THE COURT:  Excuse me a minute.

A   -- their statement was.

THE COURT:  You need a break.  Is that correct?

MR. HOLTSHOUSER:  That's what they're requesting.

THE COURT:  The break is granted.

There's been a significant case being tried in this District.  The jury has reached a verdict, and all Marshals are expected to be downstairs for that, so we're going to be

taking a break of unknown duration.

MR. MORENO:  That's fine, Your Honor.  Thank you.

THE COURT:  I apologize.

(Court recessed from 9:24 AM until 10:40 AM.)

MR. HOLTSHOUSER:  May I proceed, Your Honor?

THE COURT:  Just one second.

(Pause)

THE COURT:  I think we're ready.

The last statement made was an answer:  "I received materials from you and I also received materials from Dr. Yutzy, and he and I discussed the case.  So I don't know every exact source of what I got, but I understood generally what happened in the crime or at least what their statement was."  And then that's where we had to break.

Q    (By Mr. Holtshouser)  Dr. Wetzel, would it be fair to say the primary focus of what you were looking at was the report and the data of Dr. Gelbort?

A    Yes.  I was to supplement his report by evaluating the testing, yes.

Q    Okay.  I'm going to show you Exhibit 101, and I will blow that up.  Is this the first page of the Neuropsychological Evaluation Report that Dr. Gelbort did that was part of what you reviewed?

A    Yeah, it certainly looks like it.  It has all the right names and dates on it.

Q    Okay.  And then that goes on for a couple of pages.

A    Yes.

Q    Discuss tests that were given, and then has a -- has his signature.

A    Yes.

Q    And then Exhibit 102 I'm showing you.  Is this data, and I'm flipping through the pages here, that you received, including notes of Mister -- of Dr. Gelbort's clinical interview with Mr. Allen?

A    Yes.  I received ---

Q    This is the Halstead Category Test, correct?

A    That is the Halstead Category Test, the one with seven different columns of varying lengths, yes.

Q    Okay.  This is -- I think this is the -- You recognize this as some of the data that you reviewed that Dr. Gelbort had actually done the testing and that you didn't give these tests to get this data.

A    No.  He -- Dr. Gelbort said that he gave it and produced it on that basis.

Q    According to the data, had Dr. Gelbort given portions of the Wechsler Memory Scale Test?

A    According to what his report said, yes.

Q    All right.  Could you find it in his data that he supplied to you?

A    To the best of my recollection, there was -- it was

partially done, and that was contained in the records given to me.  It was not completely done.

Q    There's parts of the Halstead-Reitan Battery, correct?

A    As far as I remember, he did all seven of those tests that go into what's called the Halstead-Reitan Index, yes.

Q    There was a -- the Category Test, the sheet we just saw.

A    Right.

Q    And then a test called "Trails A" and "Trails B."

A    Yes.

Q    And then there was -- Was there an IQ test of sorts given?

A    Yes.

Q    And that was the Wechsler?

A    Wechsler, yes.

Q    Wechsler, okay.  In the data that you had, go back to the Halstead Category Test, and I want to just ask you about a portion of this.  Is the seventh battery of the Halstead Category Test a memory test?

A    It can be construed that way.  The first six tests each ask you to guess what the right answer is based on a different principle, and you can learn that principle.  The seventh test presents all six of those principles in varying order mixed up.  And if you remember what the principle was you learned before, you can get the right answer.  And he got the right answer on 19 of the 20.

Q    These first subtests then, in the course of these tests, does it require him to actually figure out and learn what is going on?

A    Yes.  This is all visual spatial material.

Q    Okay.  It is not presented verbally.

A    Well, it's presented that you're supposed to come up with an answer.  The number is between 1 and 4 and that there is -- there are instructions that the principle is the same throughout each test, but when it changes, it may be a different principle.  Other than that, it's visual spatial only.

Q    When you get to the seventh test, then it requires you to recall what you've learned --

A    That is correct.

Q    -- and apply it.

A    That's correct.

Q    Okay.  And in terms of his ability to recall what he learned on this seventh battery of the Halstead Category Test, how did he do?

A    Well, 95 percent correct is an excellent score.

Q    Going back, just directing your attention to the notes, have you reviewed other neuropsychologists' notes in the course of your work?

A    Yes, hundreds of times.

Q    And are there amongst professionals common abbreviations

that you see used by various individuals in your field?

A    There are some common abbreviations.  Some people use some uncommon ones.  I don't know how to respond more accurately than that.

Q    All right.  I'm going to direct your attention to the portion of the notes here that I've highlighted.  Do these notes appear to say that "mom now smokes"?

A    Yes.

Q    And the next, after a comma, "okay"?

A    Yeah.

Q    The symbol for "at"?

A    Yes.

Q    And then "pg."?

A    Yes.

Q    And is that an abbreviation you see for "parenting"?

A    Or "pregnancy," one of the two, depending on who's writing it.

Q    Okay.

        MR. MONTROY:  And, Your Honor, I would just object to -- These are not his notes, so I would just object to any speculation as to what these words might or might not mean.

        THE COURT:  As I understand, he has said he's reviewed hundreds of reports.  And I realize that in the medical field there are common notes.  In this case, he correctly pointed out he couldn't say which one that was.

Some, I think, doctors can pretty much -- they use the same -- same language, but you are correct.  If it appears he is unable to properly decipher those, then the objection is proper.  This one is overruled.

MR. MONTROY:  And, Your Honor, just one other point actually.  If Mr. Holtshouser could just be careful in terms of when he asks the question not to inadvertently lead the witness or suggest what these abbreviations might be.

THE COURT:  Yes.  If it is leading, then I will expect an objection.  Go ahead.

MR. MONTROY:  Thank you.

Q    (By Mr. Holtshouser)  The next -- After the "okay" and "pg.", what do you read there?

A    That she was a social drinker.  Everybody uses "ETOH" for alcohol.

Q    And what is it an abbreviation for?  How do you get "ETOH" out of alcohol?

A    It's related to the chemical formula.

Q    Okay.  The next entry on that line, there's a circle with a line through it.

A    Yeah.  That's standard for "no."

Q    And then what's the word after that?

A    Drugs.

Q    Besides not actually independently testing Mr. Allen and not actually conducting a clinical exam with Mr. Allen, did

you yourself talk to any collateral sources of information?

A    No, I did not.

Q    You also had, I think you said, the reports of Dr. Cuneo and Dr. Yutzy before reaching your final conclusions, correct?

A    Yes.  And I know I saw additional reports besides those.

Q    Directing your attention to Dr. Cuneo's report -- Well, let's just go -- This is dated February 16, Exhibit 565.  This is the first page.  Do you recognize this as ---

A    Could I ask you to blow it up?

Q    Yeah.

A    Yes.

Q    Okay.  And then directing your attention to -- Well, first of all, could you tell from the content of the report that among the things that Dr. Cuneo reviewed were "police reports and statements that you forwarded to me," according to Dr. Randall's or Dr. Cuneo's report?

A    Yes.  Those are mentioned specifically.

Q    On the second page of his report, the first full paragraph, did Dr. Cuneo actually elaborate more specifically as to the interviews that he had received from Dr. Randall, including interviews of his teachers, friends and family given to him by Dr. Randall concerning -- and these would be considered collateral sources?

        MR. MONTROY:  Your Honor, I'm just going to object on relevancy grounds.

THE COURT: Okay. Overruled.

A    Yeah.  He certainly claimed to have received and reviewed those materials.

Q    (By Mr. Holtshouser)  Besides the actual report and evaluation of Dr. Gelbort, did you also conduct some analysis of what school records were available of Mr. Allen's school history?

A    I reviewed his school records, and then I did some analyses, yes.

Q    And were you analyzing them for what information you could glean from them regarding his performance in school and the -- any indications that might have for his mental functioning?

A    Correct.

Q    Let me show you Exhibit -- what's now marked Exhibit 165. Is this an exhibit that was introduced at trial as 103 that you prepared?

A    It's -- It certainly looks like the one I prepared or the type face that I use and the organization that I use, yes.

Q    And this -- Was this presented to the jury during your testimony?

A    It -- This or something very much like this was presented 14 years ago.

Q    What did -- What, according to this, did you have to -- What data -- What were you using as a source for the data you

were summarizing here?

A     I lifted all the results from his school records and simply put them together side by side so they could be compared.

Q     And you looked at his standardized test scores --

A     That is correct.

Q     -- for each of these years?

A     Yes.

Q     And these came from records of the Clayton School District.

A     That is correct.

Q     What is -- What conclusions or inferences did you draw from the fact of his aptitude numbers here between 87 and 91 which in here he would be 10 years old; in '91, he would be 14, going on 15?

A     The normal range is usually regarded as anything that falls between the 25th percentile and the 75th percentile. These were all in the "average" range.  Some of them were in the "low average" range.

Q     What about the variability of the scores?

A     Most people are more consistent from test to test.  I concluded he was a little bit inconsistent, and the usual reason when people are inconsistent is that they're not terribly motivated to do well on the test.

Q     Or something else is going on.

A    Something else could be going on, but that's the most likely reason.

Q    In Dr. Gelbort's report did he address the issues of learning and memory?

A    Yes.

Q    And directing your attention -- When it says here that Mr. Allen consistently -- that the data consistently showed that Mr. Allen encodes incoming material more slowly than is normal, that was noted by Dr. Gelbort, correct?

A    That is -- That is what he said, yes.

Q    Okay.  With respect to the next sentence, did he indicate his ability to learn under certain conditions?

A    Yes, he did.  Some people learn on the first trial; some people require repetition.  He said with repetition he did okay.

Q    And his characterization was he was able to learn without difficulty based upon repeated presentations and the opportunity to orient.

A    Yes.

         THE COURT:  Just a second, please.  I need to catch up.  I'm getting behind.

         MR. HOLTSHOUSER:  Okay.  I'm on -- This is Exhibit 101, Page 3.

         THE COURT:  Okay.  You said 101?

         MR. HOLTSHOUSER:  This is Exhibit 101 and it is Page

3, bottom paragraph.

THE COURT:  Okay.

(Pause)

THE COURT:  Okay.

Q    (By Mr. Holtshouser)  Had Dr. Gelbort taken the data and then scored it and then reached conclusions based upon those scores?

A    As far as I know, he did.  I mean I don't know if he had a technician assistant at some phase of this, but, yeah, he -- he resumed responsibility for scoring it and interpreting the results.

Q    And he reported those results out.

A    That's right.

Q    And you looked at those.

A    Yeah.  I mean he did say he had two technicians in his office, so I don't know how the work was divided up.

Q    Based upon the results that Dr. Gelbort reported, did you reach an opinion as to whether or not there was any indication of brain damage?

A    Yes, I did.

Q    And what was that?

A    That there was no indication of brain damage in the data that he acquired and reported.

Q    Was Dr. Gelbort, in fact, opining that there was indication of some brain impairment?

A    He did say that there was some, but my reading of the same data was that he didn't do those parts of the memory test that were most relevant to the point he was making, so he couldn't say what he said on the basis of the testing.  It might or might not have been true.  He just didn't have the data to allow him to make that opinion.

Q    Was there any problems with the -- his interpretation of the data that he did have?

A    Well, he misinterpreted what some of the tests were measuring.

Q    And how did that happen?

A    I don't know.  I mean ---

Q    Well, what did he ---

A    I didn't examine him, so I don't know if he just plummets or what.

Q    Was there an issue with respect to the choice of norms that he used?

A    At the moment I don't recall that.  Mainly I recall that he didn't do all the parts of the test, and he commented as if he had done the whole test when he had only done part of the test.  The other thing was that there were a number of tests he said he did, but he didn't report any numbers and he didn't include those in his -- with his data so that I could evaluate whether or not he was interpreting them correctly or not.

Q    Let me show you Exhibit 558, and I know this is a little

dark.  Is this what is known as a *Comprehensive Norms For An Expanded Halstead-Reitan Battery* by authors, among others, including a Robert Heaton?

A    Right.  They're all people from the University of Oklahoma.

Q    And I'm looking at this Exhibit 558 still.  This particular exhibit, is this the one that would have been in use -- that would have existed in '91 and '92 --

A    Well, --

Q    -- based upon ---

A    -- since it's copyrighted in '92, certainly '92.

Q    Okay.  Did you make -- take some of the scores that Dr. Gelbort had found and make some adjustments to the norms, adjusting for age and education --

A    Yes.

Q    -- and sex.

A    I put it through the program that goes with this textbook, the computer program, and generated -- adjusted scores adjusted for age and for education level.

Q    Now we went through this with Dr. Martell, but there's this process of looking at raw scores and finding scaled scores, using Appendix C, and then converting those into T scores, using Appendix D.  And then -- You're familiar with that process, correct?

A    Well, yeah.  I haven't -- I haven't done that since --

Heaton just sold a package of software that you could put in your computer and you just feed the numbers, and it does it automatically, but it agrees with this, yes.

Q    All right.  Directing your attention then to this portion of Appendix D, does this contain the norms adjusted for male, education of 9 to 11 years and age 20 to 34 years?

A    Yes, it does.

Q    Okay.  Had Dr. Gelbort used norms comparing Mr. Allen's results to the general population, not the specifics of his sex, his education and his age?

A    I'm sorry.  I'm not sure I understood the question as you put it.

Q    Well, let me -- let me show you this exhibit and see if this will help.

Did you -- Is one of the things that you did in -- with Dr. Gelbort's data was to actually adjust the norms for age, sex and education?

A    Yes.

Q    And is that because Dr. Gelbort had not done so?

A    That is correct, he had not done so.

Q    So what norms had Dr. Gelbort used?

A    He used the ones that don't relate to any of these demographic variables; that don't relate to how old you are, how much you've been in school.  But as everybody knows, things change.  People who have been in school for 20 years

know more generally than people who have been in school for 16

who know more than people who have been in school for 12 or

10.

Q    And are -- Is performance on these tests variable

depending on age, education and sex, among other things?

A    Most of them are.  Most of them are.  Some are only

related to one, like physical strength is related more to sex

than it is to years in school.  But, in general, these scores

are affected by one or more of these variables.

Q    In the body of people of the norms that Dr. Gelbort used,

did it include people who had greater education, were

older, --

A    Right.

Q    -- and were the general population?

A    And had very few or no blacks in them.

Q    All right.  These particular norms that you had available

in '98, were they adjusted for age, sex and education?

A    Right.  And they were based on a much larger number of

people, a much better sample of the general population.

Q    So by -- by evaluating Mr. Allen according to general

norms, not adjusted, was Doctor -- is that one way in which

Dr. Gelbort got results which showed him to be more impaired

than he was as compared to his peers?

A    Well, since people who come from a lower socioeconomic

class and have the deprivation that's associated with that,

they don't do as well on educational tests as people who grow up in upper middle class neighborhoods.  So they -- they're -- you're more likely to get a false positive or to say that somebody has brain damage when they don't when the problem is the environment they've grown up in and the experiences they've had.  You can't learn something unless you've dealt with it, and we deal with different things in different neighborhoods.

Q    You prepared two exhibits at trial, and I'm showing you what's now marked 163, at trial was Exhibit 101 that took the scores, took the available tests, the ones that you had data for, and did this conversion of raw to scaled to T scores without adjusting them for age, education and sex, correct?

A    I'm sorry.  I still -- I didn't -- I was looking at this and I missed the question.  If you can just repeat it.

Q    Well, this up at the top here, ---

A    That's what -- That's certainly what I presented, but I missed the rest of the question.

Q    This is unedited, correct?  These are -- These are unadjusted for age, sex and education.  This is just simply raw score transforming ---

A    No; no.  This is -- This is what Heaton's program put out --

Q    Okay.

A    -- and I didn't change that.  I just wrote it down.

Q    And you got to T scores.

A    Yes.

Q    Okay.  And then in the next exhibit I'm showing you, which is 162 which at trial was 100, did you translate these adjusted scores which -- for age, sex and education to percentiles?

A    Yes, I did.

Q    What was the purpose of doing that?

A    Very few people understand what T scores mean and a lot of people understand what percentiles mean.

Q    You organized this by frontal lobe tests and other tests.

A    Right.

Q    And what was the significance of focusing on frontal lobe?

A    Well, it's the biggest part of the brain.  It's in the front of your head which is why it's called the "frontal lobe," and it's the place that does two things.  One is it does planning and problem solving and, two, it does the things that mothers usually do for children.  It tells you how you're doing.  It tells you when you need to get started on things.  It tells you whether or not you're doing it well.  It tells you if you're being too loud, too noisy, too rowdy or whatever.  You know, it controls your behavior.  And so it's very important because it's related to problem solving and controlled behavior.

Q    In the area of frontal lobe tests, there was the -- there was the Picture Arrangement Test and then Trail Making B, correct?

A    Yes.

Q    Okay.  You have two columns here.  One compares to the average person, the ones Dr. Gelbort used, and then the ones that compare to a male, 20 years old, 9th grade education.

A    Correct.

Q    In the category of the average person on the left and the adjusted peer group on the right, does this show the difference achieved by both?

A    Yeah, it does.  You know, as I said, the "normal" range is the 25th percentile to the 75th percentile.

Q    So even in -- even in the unadjusted column, --

A    Yeah.

Q    -- Mr. Allen, according to your data trial, was within the "normal" range.

A    Yeah, he was.  But if -- But if you adjust it, he's a little -- Well, he -- all right.  Technically, the bottom one, the 84th percentile is above the 75th percentile, so that's "above average," and the 93rd is even more "above average." So -- But -- So they're not in the "average" range.  They're in the "above average" range, but the other two are clearly in the "average" range whether or not you correct them.

Q    This 93rd was on the Category Test which relates to the

area of executive functioning.

A    Right.

Q    The -- The 93rd percentile in that test as compared to males 20 years old with a 9th grade education, what was the significance of being ---

A    Well, it means (A) he's better than 93 out of 100 people of the same racial group with the same environment and the same age.  The Category Test is a frontal lobe test only if there's no brain damage anyplace else.  You have to see in order to do it.  So if there's damage to that part of the brain, you can't do it.  You have to understand the directions.  So if there's any damage there, you can get a bad score.  So it's a -- it's a good frontal lobe test only if there's nothing wrong anywhere else in the brain.  And the fact that he scored at the 93rd percentile means there's nothing anywhere in his brain, according to this test.

Q    Was the result of being in the 93rd percentile -- Can performance on this test be affected by situational factors, such as facing criminal charges, being depressed over your current situation, --

A    Yes.

Q    -- et cetera?

A    I mean he theoretically could really have been at the 95th or the 97th.

Q    So given his situational factors at the time this test

was administered, ---

A    Yes.  Situational factors can't improve his scores.

        MR. MONTROY:  Judge, I would just object as to the speculation as to what he could have done.

        THE COURT:  Okay, sustained.  Reask the question.

Q    (By Mr. Holtshouser)  At trial, did you indicate in your testimony that given his situation, that achievement of a 93rd percentile was even more impressive?

A    I don't remember exactly what I said.  I'm sure I said it was impressive.  I don't know about the rest of the question.

Q    So based upon your evaluation at trial, did you see any evidence from a Neuropsychology standpoint that any factor in his life had produced a negative outcome in terms of brain function?

A    No.

Q    Now let's move to this case, this proceeding, and this proceeding is some 14 years later.  Were you asked to review the results of what neuropsychological expert information there was here?

A    Yes.

Q    And did that include the work done by Dr. Martell?

A    Yes.

Q    Were you subsequently provided with a report and some work done by a Dr. Galit Askenazi?

A    Certainly by Dr. Askenazi.  I don't remember her first

name right off the top of my head.

Q    Okay.  Did you agree for the most part with Dr. Askenazi's findings?

A    Yes.

Q    Among other things, between the testing that Dr. Martell did and Dr. Askenazi did, did you notice that there had been a significant increase in IQ scores from 1998 to now?

A    Yes.

Q    Was there particularly an increase in his verbal score from 1998 to now?

A    Yes.

Q    What was the significance to you of those increases?

A    Well, it means either that his score in 19 -- There's only two logical possibilities.  Either his score in 1998 was too low and he was brighter than the score he got or (B) it was artificially depressed by his environment and that in the prison environment he has learned enough and improved enough to improve his score.

Q    And what would that tell you about any impairment in his ability.

A    It would tell you that ---

Q    To learn verbally?

A    It would tell you that his verbal skills and the part of his brain that serves verbal skills is operating really well.

Q    You are aware, are you not, that there is a difference

between his current scores on the verbal portions of the IQ test he was given and the performance portion as well as the working memory portion, correct?

A    Right.

Q    Do you have an opinion as to what the significance is of that difference currently?

A    Well, Verbal IQ measures what you've learned in the past, and it's simply you have the information pretty much or don't you and can you express it.  The Performance IQ is:  Can you apply it to the situations at hand?  Can you do the right things using it?  So that's sometimes referred to as fluid intelligence.  That's much more important for functioning in life generally.

Q    In life?

A    Yes.

Q    Okay.  And what about the difference between the working -- the score on the Working Memory Scale Test as compared to higher scores on the Verbal and Performance IQ? Is that difference ---

A    I don't know how to answer that.  You mean the difference between what ---

Q    The Working Memory Score --

A    Okay.  All right.

Q    -- and the Performance --

A    Well, --

Q     -- IQ.

A     -- his working memory is normal and he's learning, so it has to be working for him to learn something.

Q     Approximately what percentage of the population has the difference between their Working Memory Score and their Performance and Verbal IQs?

A     I'm sorry.  Do you mean verbal or do you mean working memory?

Q     Working memory.  So ---

A     But there's a Verbal IQ and a Performance IQ.  Is that what you're asking about?

Q     Well, there are those numbers, --

A     Yeah.

Q     -- and then those numbers can result in a Full Scale IQ of a particular number over 100 or something.

A     Right.

Q     He has a Working Memory Score of 84.

A     Yeah.

Q     So there's a difference between those of 16 or so points. What's the significance of that difference is the first question?  And the second is:  What percentage of the population would have a similar difference?

A     I would -- I would have to see the output that they were, but it's relatively common.

Q     Does it have any implications -- significant implications

for brain impairment?

A   Well, everybody is better at one thing than they are at another thing, and the fact that you're better at golf than you are at baseball doesn't mean you're impaired.  It means you're better at one thing than the other.  That some people are more verbal than they are physical or, you know, able to use their hands means that's true, but it doesn't mean that they're impaired.  None of the scores here are low enough that they indicate that he has any brain impairment, but he is better at some things than others.

Q   Is one of the things that he's good at is applying what he learns?

A   Oh, he's very good at that.

Q   Is he better at that than acquiring?

A   Apparently he doesn't pick things up always on the first trial, so he's better -- He requires some repetition.  So he needs some repetition, and he's -- but he's great at using what he does know within limits, obviously, of his history.

Q   Are you familiar in the Working Memory Scale Index calculation that there is a simple method for calculating the statistical significance of the difference and the predicted --

A   Yeah.

Q   -- method?

A   I'm having trouble with your question.  The Wechsler

Memory Scale ---

Q   Wechsler Memory Scale; I'm sorry; not Working Memory Scale.

A   Okay.  All right, yeah.  Working memory is just how many things can you have in your mind at the same time plus or minus two is usual.  Wechsler Memory Scale measures a number of different things about your memory ability, and there's several ways of predicting it.  One is just taking the scores and the other is to do some fancier calculations.  They both generally work out fairly well.

Q   In terms of what the computer -- computer data would indicate to you about the significance of the difference between, let's say, the Wechsler Memory Scale scores and the Verbal, Performance and Full Scale IQ scores, is there any reason that you would choose the simple method over the predicted method?

A   No, I wouldn't.  They don't really -- Neither one of them shows significant impairment.  There's nothing there that would suggest that he's impaired either way.

Q   All right.  I want to shift gears and ask you about the neurotoxin issues.

A   Okay.

Q   There are claims here at least that he was perhaps subjected to alcohol in utero.  There is -- You knew back in '98 that there was a history of lead exposure, correct?

A    Yes.

Q    There is also a history of an occurrence of a seizure?

A    Yeah.  I think more than one.

Q    More than one?

A    Yeah.

Q    Pica --

A    Yes.

Q    -- is another factor, correct?

A    Yeah.  I think that's included in eating lead.  Yeah, that's what Pica means.

Q    Asthma?

A    Yes.

Q    He had a skin condition as well?

A    Yes.

Q    Or dry skin condition?  Those sorts of things, what -- what sorts of impacts would you expect to see in terms of brain functioning and when would you see them if they were a causal factor?

A    Well, exposure to anything that can cause brain damage works if you are exposed to enough of it long enough and you have the right susceptible gene pattern.  So it's a combination.  Most people who are exposed to alcohol don't show anything, but I think it's about 52 out of 100,000 bursts or something like that.  So it takes a combination of a susceptible genetic background and sufficient exposure for

long enough.  And, you know, there's always an interactive kind of process.  But if it has an effect, it has an effect, and then you can pick -- If you have brain damage, it doesn't go away, you know.  It's there.  You may learn to live with it.  You may learn to cope with it, but it doesn't go away.  And so if he had brain damage from eating lead or if he had brain damage from his mother drinking alcohol or if he had brain damage from having low oxygen levels with asthma, any of these things would have had an effect that you could have picked up when he was 20.  And if there's no effect at 20, he didn't have it.

Q    In terms of at the time -- near -- at or near the time that he was -- could have been exposed to these -- these issues, do they -- what is the association between the time in which impairments will manifest themselves and exposure?

A    Well, when you have brain damage, you have an effect that is observable if the person can talk.  You know.  So that if somebody gets brain damage when they get hit in the head, they wake up.  They're confused.  They say silly things.  They don't know their name.  They don't where they're at.  They don't know what day it is.  You ask them questions, and they can't answer them.  You can see that their brain is not working right, and that persists usually for at least an hour.

If that happens, then there's a possibility that longer term, the kinds of tests that we use will pick up the

fact that there's still continuing damage.  But if there is no effect immediately when you're exposed to one of these things, there's no effect and, you know, you're not going to pick it up later.  And if you pick something up later, it didn't come from that.  It came from something else.

Q    You are familiar with the practices of treating physicians as a member of the Washington University School of Medicine, correct?  Generally.

A    I guess I am of many treating physicians, yes.

Q    Okay.  Would you expect that a pediatrician that would have been examining or treating Mr. Allen in his youth for any of these issues would have been attuned to looking for those signs that you've just described?

MR. MONTROY:  Objection, Your Honor.  It calls for him to speculate.  It's outside of the scope.

THE COURT:  If there is a common practice for pediatricians in that time frame of which you're aware, you may testify, but don't guess or speculate certainly as to what any particular individual pediatrician might have done.

A    Well, I'm familiar with the practices of pediatric neurologists since I've worked with them for years, and he was seen by a pediatric neurologist when he had seizures.  They look for that, and I would expect them to pick up fetal alcohol syndrome or other things like that right away.

Q    Did you also back in '98 have access to his medical

records, particularly from a pediatrician, a Dr. Grabau, who had treated him during the first eight or nine years?

A    No, but I did later.

Q    Okay.  And do any of those records indicate any observations or notations by that -- by Dr. Grabau of any ---

A    The ones that I reviewed for this hearing did not indicate such things.

Q    And similarly, did you notice, amongst those examinations or notes, any indications or concerns about unexplained bruises, marks or scars on his body?

A    I do not remember any such thing.

Q    Are you familiar with something known as the "neurodeficit scale"?

A    Yes.

Q    And when was it -- When was it in common use?  Was it ever in common use?  Let's put it that way.

A    Well, it was, I guess, common enough that I used it, and I used it in the late '70s and in the -- for some period of time in the '80s.  I don't know when I stopped using it.  It was simply a way of turning the results of the complete Halstead-Reitan Battery, not just the seven that go into the Halstead-Reitan Index, but there's another 13, and it comes up with a number that says how likely you are to have brain damage.  The problem that it had was it was -- didn't make any adjustments that allowed for education, sex or race.  It

treated everybody as if they were exactly the same.

Q   So it didn't have any normative data?

A   It -- It had normative date, but the normative data was not refined by variables that we know affect scores very much.

THE COURT:  What was the name of it?  Something "deficit."

MR. HOLTSHOUSER:  Neurodeficit scale.

THE COURT:  Neuro.

MR. HOLTSHOUSER:  That was the handwritten -- one of the handwritten things that Dr. Martell -- was shown to him in -- as part of his -- his data.

Q   (By Mr. Holtshouser)  Was there other -- Was there other problems with the neurodeficit scale in terms of over -- over false positives or overdiagnosing impairment?

A   Yeah.  I mean it's -- It, you know -- It's important to be intelligent.  So if you have somebody who's got a bad hand for some reason, there was no way of allowing for that.  I mean you can have a bad hand because you have carpal tunnel syndrome and it doesn't have to be because your brain isn't right.  There was no way with a neurodeficit scale to include what you knew clinically.  It just gave you a score and it gave you a result.  It was sort of a blunt instrument.

Q   Was it validated for use with respect to any particular demographic or educational group?

A   Not that I'm ever aware of.  I don't recall any such

article.  It was done by Reitan and his assistants after he retired from the University of Arizona, and they had some data on a number of people, but they didn't delineate the population so that you could pick out the effects of education or sex or whatever.

Q    Do you still use it?

A    No.

Q    When did you stop using it?

A    When the Heaton norms came out.

Q    Which would that have been in '91, '92?

A    Something like that.

Q    All right.  Amongst your peers, has it continued to be generally accepted or used by neuropsychologists?

A    I don't know of anybody at Washington University who uses it anymore.

Q    Is it also not -- no longer included or not even mentioned in the *Compendium Of Neuropsychological Tests*, the Second or Third Editions?

A    I -- I haven't checked that independently.

Q    Okay.  And is it no longer in use for the reasons that you've described?

A    Yeah, as far as I know.

Q    Okay.  I'm showing you Exhibit 256, Page 32, which purports to be Dr. Martell's summary page of what he finds to be wrong with Mr. Allen and deficits.  And on that page, he

discusses the results of the WAIS-III, the Wechsler Memory Scale III, CVLT, the Stroop, although during testimony he threw out the Stroop. The FAS, the Boston Naming Test, but there were problems with that; the neurodeficit scale, the Speech Sound Perceptions and the Halstead Impairment Index are all discussed on that page. You've reviewed his -- his report, have you not?

A    Yes.

Q    What is your -- Let me -- I'm going to come back to that. Let me -- Let me move on to another topic just for the time being.

What is the significance from your point of view of Dr. Martell not giving any validity tests in the area of verbal performance?

A    Well, it's the standard of care in Forensic Neuropsychology to give at least two different tests of effort to see if you're really trying hard to do your best when you take the scores. And it has always been my practice that if there's an area in which somebody is likely to have a problem or is claiming to have a problem, that I give them two that specifically relate to that area to see if they're trying hard in that area, and then I give one that goes into the other areas that don't seem to be in question just to make sure that people are trying hard so that I can assure the Court they were.

It is remarkable to me that Dr. Martell, who is an excellent psychologist and who knows a great deal, only gave half of one of the validity tests he gave, omitting the part that dealt with verbal effort, and that he didn't give anything else to get at that. He has no real basis for saying whether or not he tried hard on the verbal material. He did give the Rey 15-item test, and that does have some verbal material on it and asks if you can remember 15 items, and six of those are verbal: Capital A, Capital B, Capital C, little a, little b, little c. But that is so easy that it's of -- not informative for effort on tests, on verbal tests. So he didn't really do anything to measure effort in this area. And since that's where he thought there was going to be problems, I would have made sure I could have assured the Court he tried hard in that area.

Q   Okay. Now I want to next talk to you about the choice of norms generally. And directing your attention to the screen that you have, I'm showing you Page 44 of what we've marked as Exhibit 590 which is the Third Edition, *Compendium Of Neuropsychological Tests*. Are you familiar with this text?

A   I'm familiar with some versions of it, others more than -- other earlier editions perhaps more than this one.

Q   And at Page 44, does this discuss basic principles for selecting norms?

A   Well, I guess that means I have to read this.

Q    Well, let me -- let me direct your attention to the highlighted material and ask you if you agree with this?

A    Yeah.  Well, I would agree a hundred percent with the first sentence, you know.  The most crucial decision a neuropsychologist has to make is what norms to use.  When you decide how good somebody should be, I mean that's what you're testing, to see if they're as good as you think they should be.  And if you don't pick the right set of norms, you know, if you pick something that was only held by doctors who had M.D. Ph.D.s, almost everybody would flunk, you know.  So you have to pick the right set of norms that are appropriate for the clinical problem you're dealing with.

Q    If you're evaluating an individual in 2009, are there norms that exist that have replaced -- updated norms that existed -- that would have been in existence in 1998?

A    It depends on the test, but frequently, yes.

Q    All right.  And what is the issue from your point of view with using outdated norms rather than current norms to draw any conclusions from a subject performance?

A    Well, the key issue is always what questions are you trying to answer?  If you're trying to answer the question of, "Does this person have a medical disease or do they have brain damage," or something like that, you want to use the very best tools you possibly can, and that means the latest, most up-to-date norms.  If the issue was, "Did Dr. Gelbort commit

malpractice back then," then it would make some sense to use the norms and the tools that were available back then to see if (A) use of those would have come to the right conclusion. But the issue -- If the issue is, "Does he have brain damage," then you use the best thing you can use.  You use an MRI now. You don't use an X-ray of the brain because MRIs are more accurate.  You use the best thing you can for the decision you're trying to reach.

Q    Over time do -- are norms updated because sample populations are re-sampled, updated, expanded, and more research is done?

A    It's partly that and it's partly because times change. My ten-year-old daughter -- granddaughter can do things with a computer I never could do and, you know, and what she is exposed to and what she talks to her parents about, what's news with her, what the geography of the world is now is quite different from what it was when I was a kid.  Things change. The answers change, and you need to compare people to relevant things that relate to their life and their life experiences. You need to know what's happening to people who live in the ghetto because they live in the ghetto and they have different experiences.  They learn different things.  You need norms that take that into consideration.  Doing people in Ladue, you need a different set.  You need to use the best norms where you're comparing people to the people that are most like them.

It's very simple.

Q    Is there an issue with using race-adjusted norms in the profession?

A    There is not, as far as I can tell, a real issue.  There are some things that are not much affected for it.  Muriel Lezak, for example, was part of the Boston group that looked at aphasia, and she was looking at the technical aspects of speech and articulation.  And if you've had a stroke, you've had a stroke, you know.  It affects your ability to pronounce, to use your lips and things like that.  You know, there are very highly specialized areas like Wernicke's area and Broca's for specific kinds of speech deficits.  But for most things, education and -- education and race and sex make a difference.  But selected things, they don't make so much a difference.

Q    The name of the person that you were talking about a minute ago, was that "Muriel Lezak"?

A    Yes.

Q    Okay.

A    She's written a great deal on -- on aphasia.  She's responsible for the Boston Naming Test, the Boston Diagnostic Aphasia Test, and she's written books on Forensic Neuropsychology.

Q    And that's spelled L-E-A-Z-A-K?

A    Pardon?

Q   L-E-A-Z-A-K?

A   Yeah, that's her.  And she was well known when I was very young.

Q   The -- In 1998 did the Heaton norms, the ones you used that adjusted for age, sex and education, did norms exist that took into account the issue of ethnicity?

        THE COURT:  That took into account what?

        MR. HOLTSHOUSER:  The issue of ethnicity.

A   You mean race?  Black -- African-American versus white?

Q   (By Mr. Holtshouser)  Yes.

A   Not that I'm aware of.

Q   Okay.  So they weren't -- they weren't available at that time because they ---

A   No.  They came out shortly after that.

Q   Okay.  Did they actually come out, I believe, in approximately 2004?

A   Something like that.

Q   Okay.  In connection with -- Directing your attention again to Exhibit 590, the *Compendium* at Page 46, it indicates that, "Outdated norms can interact with demographic factors to raise the risk of misinterpretation of test results and that use of older norms may differentially penalize individuals from minority groups because of limited minority representation compared with more contemporary norms."  Do you agree with that?

A    Yeah.  And it almost always causes overdiagnosis of problems of brain damage rather than -- it doesn't go the other way.

Q    Because older norms contain a smaller sample size --

A    Right.

Q    -- of minorities.

A    Yeah, right.

Q    Okay.

A    And the effects of discrimination are real.

Q    Page 47, this refers to that there are two schools of thought, though, with respect to demographically-adjusted norms, and they are diametrically opposed.  What school of thought do you believe is generally accepted within your profession?  And which one do you ---

A    Well, I haven't done a general survey.  I know the people that I work with, and we use the most detailed norms that we can get.  That's the best I can say to that question.

Q    So is -- is -- is the practice of your peers at Washington University School of Medicine in what you teach to use race-adjusted norms?

A    Yes.

Q    Now many people would focus on the fact that in using those norms, that some -- in some of those norms on some of these tests, African-Americans do less -- perform not as well as Caucasians, correct?

A    That is correct.

Q    If you were not to race adjust norms, might it also use, if you were comparing -- If you're using norms to evaluate a Caucasian individual for brain impairment and you use norms that included Asians, might there be a similar effect on the results that you got from Caucasians?

A    Well, it's always appropriate to use the best norms.  I think there would be a difference, but I don't know that, and I don't want to offer that as an opinion to the Court.

Q    Now is there any sort of -- of societal reason or -- that neuropsychologists wants to use race?  Or is race something that is present because it's been known to produce variability in results?

A    It's been known; that studies have been done in some southern towns where they evaluated everybody who was in the county council and the major business people, and they found that 60 percent of them were impaired using norms that did not correct for education and race.  And that was, obviously, wrong since they were successful either in business or politically.  We know you make bad mistakes that way.  That's why they're used.

Q    According to the *Compendium*, most neuropsychologists assume that the later is preferable; that is, using race-adjusted norms.

A    Yeah.

Q    And that the risk is false positives, correct, of not using ---

A    Yeah.  If you don't use them, you're likely to say that a minority individual has brain damage when, in fact, they don't.

Q    Okay.  So that's what's meant by a "false positive."

A    Right.

Q    And, again, in this same text, it indicates that, and I'm on Page 51, that, "The provision of normative data for minority groups is a step in the right direction."  Do you agree with that?

A    Yeah.  I mean we -- An important thing is that people have to understand what they're doing and use the whole person -- the person's whole history and all of the results that you have, and it all has to make sense.  You can't apply the scores blindly or numbly without considering who the person is, what their situation is, et cetera.  I mean -- And this is part of that process.

Q    Since 2004, have you used race-adjusted norms in reaching conclusions from test results?

A    Yes.

Q    Do you do so in your work in capital cases as well?

A    Yes.

Q    Are you aware of any direction from Heaton to not use them in capital settings?

A    I'm not aware of anything he said like that.

Q    The adjustments that you did at trial back in '98 did not include race-adjusted factors, correct?

A    Correct.  You know, he, obviously, didn't have any impairment, you know.

Q    Based upon the results that you got, --

A    Right.

Q    -- not including race-adjusted factors, --

A    Yeah.

Q    -- did the results even that you got produce results that were actually lower than they should have been?

A    They could have been a little lower than they should have been, but they didn't show any impairment.

Q    Are there particular tests that are known to have more variability with respect to ethnicity than others?

A    Of course.

Q    Directing your attention to Page 1044, there's a test that Dr. Martell used to apply in the Heaton Impairment Index known as the Finger Tapping Test.  And according to the *Compendium*, is it known that performance on the Finger Tapping Test tends to be somewhat better in Caucasians than in African-Americans?

A    I don't know that.

Q    Okay.  This text indicates that, though, correct?  I'm going to direct you right there.

A     Yeah, it does say that.

Q     And because of that, using conventional cutoff scores, such as 85 scores from Reitan and Wolfson, produce high false positive rates.  Do you agree with that.

A     Yeah.  I know they do.

MR. MONTROY:  And, Your Honor, if we could -- I'd just object.  If Mr. Holtshouser could just ask questions and then, if there's a problem, show him the text without showing him the text and then asking him if he agrees with it.

MR. HOLTSHOUSER:  I don't know that there's anything inappropriate with the method with which I'm asking him the questions.  So I -- I don't believe it's objectionable.

MR. MONTROY:  I would object that it's leading, Your Honor.

THE COURT:  Well, let's sort it out.  As I understand, what the witness -- What I'm having a little trouble understanding is what is his opinion and what he's just reading from the text.  I know earlier he -- he said, "I don't know that," and then the question was, "Well, what does it -- Is it true that the *Compendium* says that?"  And he said, "Yes."  So that really isn't his opinion.  I -- I don't believe the questions are inappropriate.  I just am having trouble sorting out what is his opinion and what is he reading.

MR. HOLTSHOUSER:  Okay.

Q    (By Mr. Holtshouser)  With respect to the Finger Tapping Test alone, okay, the statement in the text that the results on the Finger Tapping Test have been shown to be a variability between -- particular variability between Caucasians and African-Americans, --

A    Yes.

Q    -- and I asked you whether or not you agree with that or -- and you said ---

A    I said I really don't have a -- I have never found that that made any difference to deciding whether or not somebody had brain damage or peripheral nervous system damage.  So it's never -- I don't recall any case where it's ever had any effect on what I decided except one case.

Q    In your -- In your practice, have you found the *Compendium* that you're looking at to be a trustworthy and reliable source?

A    It's an authoritative source, and I -- I use it.

Q    Now my next question, the second one had to do with the second comment about the Finger Tapping Test and the distinction between using conventional cutoff scores which did not include race-adjusted norms; that the risk is that it produces a high false positive.  And then I asked you did you agree with that part of it, and I think you said "yes."  Is that my ---

A    Well, I agreed with that as a general statement --

Q    Okay.

A    -- that using the conventional cutoff scores, such as those that were proposed by Dr. Ralph Reitan and Dr. or Mrs. Wolfson, lead to a lot -- lead to a lot of mistakes.

MR. HOLTSHOUSER:  Does that help clarify, Judge?

THE COURT:  Yes.

MR. HOLTSHOUSER:  Okay.

Q    (By Mr. Holtshouser)  I want to next ask you about the *DSM*.  You use it, correct?

A    I do.

Q    *DSM-IV* contains a large number of disorders and criteria for various diagnoses, correct?

A    That is correct.

Q    Is there a great deal of variability as far as the extent of study, scientific study and research that underlies the -- those diagnoses?

A    Yes.

MR. MONTROY:  I would just object on the grounds of relevancy.

THE COURT:  Overruled.

Q    (By Mr. Holtshouser)  Is there a great deal of variability?

A    Yes, there is a great deal of variability.

Q    Are there a vast majority that have received little or no scientific research or study backing them up?

A    Right.  They're -- The *DSM* has a variety of chapters, and each chapter has one or two disorders that everybody believes to be a major psychiatric or psychological disorder, and then it has a number of partial forms where it's not fully expressed but that you see sometimes.  And the reason that they're in there is because one of the things it serves for is as a way of communicating to insurance companies, "I spent time with this patient, and this is what they had.  Please pay me."  And if you did -- What first happened when they came out with criteria which was the Feighner criteria back in the '70s, there was a 20 percent undiagnosed rate, and insurance companies wouldn't pay if you were called "undiagnosed."  So you come up with ---

Q    Wouldn't pay who?

A    The doctor.

Q    Okay.

A    So they've come up with these other things.  They've expanded it from -- I think there were 17 in the Feighner criteria, and they've expanded that so that it covers most of the things that we see.  And it includes some things in there like just what's the reason for the visit.  It's not a diagnosis; it's just an explanation.  "This guy came to see me, and this is what we talked about."

So, you know, they're not all diagnoses.  Some of them are defined wholly on the basis of bad acts and nothing

else, like kleptomania.  And so, you know, there's a variety

of things, and it's a way of communicating to insurance

companies or to your boss about what you're spending your time

on.

Q    Are all the diagnoses listed in *DSM* -- have they been

proven to be scientifically valid in your opinion?

A    No.  They're some where there's only been four or five

studies done in 20 years.  Obviously, it's not a matter of

interest.  On the other hand, if you look at schizophrenia and

depression and bipolar disease, there's been 20,000.

Q    Well, do mental health professionals have a motivation to

expand the scope of diagnoses that are covered by the *DSM*?

         MR. MONTROY:  Objection, Your Honor.

         THE COURT:  On what basis?

         MR. MONTROY:  Oh, I'm sorry.  The objection is

whether or not -- he can testify whether or not medical or

mental health professionals generally have a motivation to

want to expand the *DSM*.  It's beyond the scope of his

knowledge.

         MR. HOLTSHOUSER:  I think as one, he would seem to

have knowledge of that and as a member of the profession for

40 some years.

         THE COURT:  Yeah, I think so.  But could you examine

a little bit more about how he came to that conclusion?

Because as presently posited, it does seem that he makes it

without laying a foundation as to why he believes it other than, you know, ---

MR. HOLTSHOUSER:  I'll try that, Judge.

Q   Okay.  You indicated that one of the primary reasons that the *DSM* exists is to provide a documentary basis for mental health professionals.

A   If I can provide a short history.  The Feighner criteria were produced in St. Louis in the Department of Psychiatry by my colleagues while I was a member of the faculty.  And then *DSM-III* came out, and that expanded it to about 300, and 35 of my colleagues and my students and my mentors were on those committees.  And when they did that, one of the things they came to me and said was, "Wetzel, is there anything we left out?  Is there anything we should add?"  And they mentioned some of the things I've done research on, like premenstrual depression.  And the same thing happened when they revised *DSM-III* and the same thing happened when they revised *DSM-IV* and *IV-R*, and now they're coming out with *DSM-V*.  But, you know, the people that I -- you know, St. Louis has been -- the people have been pushing diagnosis, and so we've been on all the committees, and so I've heard all the scuttlebutt, and that's the basis for my opinion.

THE COURT:  Okay.

Q   (By Mr. Holtshouser)  So regarding the *DSM*, are there diagnoses that have been included that have not been

scientifically validated?

A    Correct.

Q    And what is -- what is the reason that those are included despite the lack of scientific validating?

A    It's because the people come to you with those problems, and people want to be paid.  I mean if somebody comes to you with a problem and it doesn't quite fit in a niche, I've seen lots of people who wouldn't take their medicine.  That's not a psychiatric disease, but I sent in a bill for it because I spent time with them.  People want to be paid for what they do.

Q    And the people who want to be paid are the mental health professionals.

A    Right.

Q    And it's the mental health professionals who actually are dictating this.

A    It's used by psychiatrists, psychologists, social workers and professional counselors.  We all use the same one.

Q    And it's to use it to get paid by insurance companies.

A    Right.

Q    And the people who are deciding what goes in the *DSM* are, in fact, those professionals.

A    The committee is 95 percent psychiatrists and five percent psychologists.

Q    Okay.  And you mentioned *DSM-V* that's about to come out

in 2013.  Does that add new diagnoses, such as hoarding and nocturnal eating disorder?

MR. MONTROY:  Objection, Your Honor.  The *DSM-V* has no relevance to this case.

MR. HOLTSHOUSER:  I think ---

THE COURT:  Well, only insofar as it supports his conclusions about changes, but you're right.

A     I don't know the answer to that of my own knowledge.

Q     (By Mr. Holtshouser) Okay.

THE COURT:  That settles it.

Q     (By Mr. Holtshouser)  Of your own knowledge, have there been members of the committee preparing *DSM* -- who prepared *DSM-IV* and are now working on *DSM-V* who were insisting on scientific validation?

A     Not anymore.

Q     What happened to them?

A     The people who wanted changes in criteria to be supported by research, literature were dropped from the committee.

Q     All right.  Of your own knowledge, do you know that the *DSM-V* coming out is going to make changes to the criteria for post-traumatic stress disorder?

MR. MONTROY:  Objection, Your Honor.  Again, it's not relevant to this case.

THE COURT:  Yeah.  How is it relevant?

MR. HOLTSHOUSER:  I think it is relevant, Judge,

because, among other things, it will support Dr. Yutzy's testimony who will testify, among other things, that PTSD is one of those nonvalidated diagnoses.  And it's -- it's subject to -- It's a variable diagnoses.

THE COURT:  Okay.  The problem I have, I'm not sure -- I'm not sure that -- He mentioned a number of people have been dropped from the committee.  I'm just not sure he is the right witness to testify as to what's going to come out on *DSM-V*.

MR. HOLTSHOUSER:  I'll move on, Judge.  It's -- It's not that important --

THE COURT:  All right.

MR. HOLTSHOUSER:  -- at this point.

Q    (By Mr. Holtshouser)  Is there any scientific validity to the claim that the diagnosis of PTSD physiologically alters the brain?

A    No.  Obviously, one forms memories and that's encoded in the brain, but that it changes it in any other way than listening to a pleasant symphony, no, nobody knows that.

Q    I want to now direct your attention to the issue of report writing done by neuropsychologists and generally-accepted practices within the field.

What is the practice with respect to reporting both strengths and weaknesses in reporting results on tests?

A    Well, what you put in your report depends on what you

think is helpful to the person you're addressing the report to. And ordinarily, clinically, you list what somebody is good at and what they are weak at, and you talk about how what they're good at might be used to help with what they're weak at. There are other situations where that's less relevant to what people want to know, like they want to know just where is the lesion in somebody's brain if they're going to do surgery. So it depends on the situation, what you're -- you know, who you're trying to help, and what they want to know and that you know they want to know.

Q   Do you have an opinion about Dr. Martell's reporting in this case of tests -- only tests where he showed a deficit and not similar tests where it showed a stronger performance?

A   Well, I think his report presented evidence that was not there for some of the verbal abilities. I have no opinion about whether or not he made a mistake or anything else. I didn't examine him.

Q   The -- What is the role of clinical and other information that you gather in interpreting test -- test results?

A   Well, there's a logic to a neuropsychological examination. You have to know whether or not somebody might have suffered brain damage. And if they might have suffered brain damage, you need to know what brain damage they might have suffered and what the cause was. And then you need to know what that sort of thing does, and then you have some idea

of what to look for and how that should have affected somebody

over time.  And then you look in the history and the medical

records to see if the things that should have been there, if

that had happened, were there or if they're missing.  And then

you also look to see whether or not the things that should be

there with this kind of damage are shown in your test results.

There's a lot of people in forensic cases who claim to be

retarded, and there's no evidence before they're charged with

a crime.  You have to make sure that the whole life history

and all the events reported to you all come together and

match.  And -- And that's the purpose.  You have to make it

all fit together, and it has to fit the person's history, the

medical records along the way, the school records along the

way, the interview that you take and what you see during the

interview, and then the norms that you use.

Q    In connection with considering that clinical experience

and what you know independently about a person's performance

in the real world.

A    Yeah.

Q    In reaching a conclusion based upon just test results,

that is, in contrast to what you know to be the reality, is it

appropriate to ignore the reality in interpreting the test

results?

A    Well, if I can rephrase your question, the whole thing

has to make sense.  Now if I get a story and it all makes

sense, I'm still not God and I don't know that it's reality, but I know I've got a story and I know that it makes sense and I know that it's likely to be true, but I don't know, you know -- "Reality" is a little strong from my point of view. Sorry.

Q   What about the -- the test results that, let's say, show -- one test result would show some level of impairment, if it does, in memory?

A   Yeah.

Q   Yet, you know from your personal experience that this person has no trouble remembering things in real life.  Do you ignore that information?

A   Well, yeah, you ignore the test score because it can't possibly be right.

Q   Okay.  So you do not ignore the common sense information in interpreting the test results?

A   Life history always wins.

Q   In evaluating test results, are you looking for patterns?

A   Yes.

Q   Why?

A   Because injuries happen to certain parts of the brain and we know something about where different functions or abilities are.  And if that function works one time and it doesn't work another time, that isn't brain damage.  That's psychological motivational malingering or whatever.  But, you know, brain

damage is sort of like a governor on a car.  That part can't do any better than that because it's damaged.  You can't get an impossibly good score unless somebody hands you a cheat sheet.

THE COURT:  Is this a good spot to break for lunch?

MR. HOLTSHOUSER:  Sure.

THE COURT:  Is 45 minutes enough today?

MR. HOLTSHOUSER:  Yes.

MR. MONTROY:  Yeah, that's fine.  Thank you.

THE COURT:  We'll be back at 12:45.

(Court recessed from 12:00 PM until 12:47 PM.)

THE COURT:  Sorry for being late.  There was a presentation to be made to a probation officer, and I got to fill in for that.  So that's why I'm late.

Anytime you're -- Are we ready?

MR. MONTROY:  We're just missing Mr. Allen.  That's all.

THE COURT:  Okay.  Okay, sure.

(Court recessed from 12:47 PM until 12:51 PM.)

MR. HOLTSHOUSER:  Are we ready, Judge?

THE COURT:  Whenever you're ready.

Q   (By Mr. Holtshouser)  Dr. Wetzel, I just have a couple more questions for you.  You are aware that Dr. Martell opined that Mr. Allen suffers from dementia?

A   Yes.

Q   Do you have an opinion with respect to the propriety of that diagnosis?

A   Well, I'm offering an opinion based on what his scores show.  There's no evidence in the scores that show that he's anything but of normal or average intellectual abilities. There's no sign of dementia in his scores.

Q   Between what you knew about the information that Dr. Gelbort presented at the trial and what the latest round of testing shows, do you have an opinion as to -- Well, let me put it this way:  Did Mr. Allen, in your opinion, benefit from the testimony of Dr. Gelbort more than he should have?

        MR. MONTROY:  Objection, your Honor.  I'm not sure what that question means.

        MR. HOLTSHOUSER:  I'm asking -- Let me rephrase the question.

Q   (By Mr. Holtshouser)  In respect to neuropsychological testing and what the test results indicate both then and now, and you know that Dr. Gelbort presented testimony to the jury that Mr. Allen had some brain impairment, some brain damage, --

A   Yes.

Q   -- in terms of the information the jury received compared to the latest round of testing and adding it to all the data, do you have an opinion as to the propriety of that diagnosis and opinion?

A    Well, that Dr. Gelbort claimed that he had a number of things that led him to have brain damage, and that could have been weighed positively by a jury, I guess.  I'm not an expert on that, but ---

MR. MONTROY:  I'm just going to object, Your Honor. It calls for speculation as to, you know, how that might affect him.

THE COURT:  Yeah, as to how it might affect.

Q    (By Mr. Holtshouser)  And I'm not asking you as to how it might have affected the jury, but in terms of the testimony offered.

A    Yeah.  He claimed things for him that the data didn't support that I would have been happy to claim for somebody if the data did support it.

Q    Does the recent data indicate that -- What does the recent data add to that opinion?

A    It doesn't change anything except that his Verbal IQ has gone up, and he continues not to show any significant signs of cognitive decline or dementia.

Q    All right.  I want to ask you one final question with respect to Neuropsychology, and that is this:  What is the significance from a neuropsychological standpoint of the circumstances and the behavior of Mr. Allen both before, during and after the offense?

A    Of?

Q    The offense back in 1998.

A    Oh, the offense.  I'm sorry.  I misheard you.

MR. MONTROY:  And, Your Honor, my only objection to this part would be to part of the question and that is how -- how he may have acted at the time of the offense.  That, I would suggest, is a guilt phase question, and that's not before this Court.

THE COURT:  Okay.  Well, yeah, as to how he acted, but I don't think the question covered that, how he was acting during the offense.

MR. HOLTSHOUSER:  No.

Q    (By Mr. Holtshouser)  The question is:  What would be the significance of knowing that information to -- to Neuropsychology?

A    Well, the -- What he did, according to all the police reports that I read, involved having normal cognitive abilities.  He reasoned; he planned; he problem solved; he remembered what they had agreed on.  He communicated with his partner.  Those sort of things all indicated themselves that at that time he had normal cognitive abilities.

Q    But those kinds of things do have implications for mental health?

A    Yeah.  Well, they have implications.  You know, when you're looking for something that you can present confidently to the trier of fact, you want to make sure that everything

fits. And if the testing is much, much worse than the abilities shown at the time of the crime, then you instantly suspect malingering or something has happened to them like the guy here in town who got shot in the head while he committed the crime, you know. There has to be a medical explanation for the scores not to match up and not to remain at the same level.

Q   All right. In that sense, is the offense itself a neuropsychological test?

A   Yes, it is.

Q   You're aware, are you not, that there's a question in this case at the present time as to whether or to what extent Mr. Allen may have been subjected to physical discipline, poor parenting or abuse?

A   Yes.

Q   You're aware that that's an issue, correct?

A   Yes.

Q   And you -- Are you also -- The evidence that you have seen from both as it existed in '98 and now, have you seen -- Has the evidence which you've been exposed to been consistent or conflicting with respect to those issues?

A   The stories have not matched up very well. They've been logically inconsistent. Some people reported some things; others others.

MR. MONTROY: Your Honor, I object. It's asking him

to form a conclusion that's outside the basis of the

psychiatric or neuropsychological testimony that he's giving.

MR. HOLTSHOUSER:  I'm actually not asking him --

THE COURT:  Okay.

MR. HOLTSHOUSER:  -- about an opinion about those things at this point, and I'm not going to either.

THE COURT:  I understand.  The -- What he was saying, the stories do not match, and I don't see anything objectionable about that.  But I want to make sure I understand the objection exactly, Mr. Montroy.

MR. MONTROY:  Yes.  It's two-fold, Your Honor.  On -- On the firsthand, I'm not sure it's his testimony -- Strike that.

There's been no clarification as to what stories he's talking about.  So the question itself that elicited the answer is vague.

Second of all, his -- the testimony that he's -- the answer that's given goes outside the scope of what he's actually here to testify about and what his expertise is which -- which is to provide testimony about the neuropsychological implications in the case.

THE COURT:  All right.  All right.  First of all, I think you raised one valid point, and that is that you don't know about the stories.  So if a little further foundation could be made about what he considered, but the balance of the

objection will be overruled.

MR. HOLTSHOUSER: Okay. I actually don't need to do that in order to ---

THE COURT: Okay; all right.

MR. HOLTSHOUSER: I'm laying the foundation for the next question which simply is this:

Q   (By Mr. Holtshouser) Do you think that you have reviewed or studied all of the information, all of the data, all of the accounts that Judge Webber has heard? Do you think you've seen everything that there is?

A   I haven't the foggiest. I reviewed everything that you sent to me.

Q   But you haven't been here throughout the testimony of the hearing for days.

A   Absolutely not.

Q   And you haven't looked at every deposition that every witness has previously given or every declaration.

A   No, I have not.

Q   Okay. So do you think that you are in a position to give an opinion as to what -- what the facts actually are?

A   I'm in a position to give some limited opinions of limited utility.

Q   All right. But not -- not anything that is -- equates to the level of knowledge that, say, Judge Webber has.

A   You know, I have not heard what the trier of fact has

heard, and I would not substitute my judgment for his under any circumstance, given the knowledge base.

Q   When it comes to -- Have you been in a situation before as a clinical psychologist where you have accounts from an individual that are either conflicting over time or that conflict with information from collateral sources or you have information from collateral sources that is internally inconsistent?  Have you had that?

A   Frequently.

Q   And do you -- As a neuropsychologist, do you possess any greater expertise in resolving matters of credibility than Judge Webber processes?

A   There's a very interesting study that's been done on the ability of people to detect when people are fabricating, and it shows that psychologists and police officers are no better than the average person and not much better than chance.

Q   Okay.

        MR. HOLTSHOUSER:  That's all the questions I have, Judge.

        THE COURT:  Okay.  Thank you.  Cross Examination?

        MR. MONTROY:  If I may, Your Honor.

        THE COURT:  Yes, sir.

CROSS EXAMINATION

QUESTIONS BY MR. MONTROY:

Q    Good afternoon, Dr. Wetzel.

A    Good afternoon.

Q    Dr. Wetzel, you never examined Mr. Allen.  Is that correct?

A    That is absolutely correct and fundamental.

Q    You never asked to examine him prior to his trial back in 1998?

A    No.

Q    And you never conducted any neuropsychological testing of Mr. Allen in this case.

A    Absolutely correct.

Q    And is it fair to say you also did not evaluate him in conjunction with these habeas proceedings?

A    I haven't evaluated him in conjunction with any proceedings.

Q    And you might have testified to this on Direct.  You've never actually spoken with Mr. Allen.  Is that correct?

A    I -- He may have said "hello" to me and I may have said "hello" back, but other than that, no.

Q    Never had any -- any extensive conversations with Mr. Allen.

A    No.

Q    Under the Code of Ethics by which you're bound, forensic

experts are not supposed to comment on people who they have not examined. Is that a fair statement?

A    That's right. And I certainly hope that what I say has only been taken as commenting on what scores show, not on what he has.

Q    Sure. So is it fair to say that you can't render an opinion on whether or not Mr. Allen has brain damage?

A    No. I can only render an opinion on what the test scores show or don't show.

Q    Have you ever testified in another capital case where you could not comment on the defendant? Meaning this similar situation that was here where you just looked at, you know, test scores.

A    Once.

Q    And when was that?

A    It was an insurance case related to a murder/suicide. The reason why I couldn't examine him was obvious.

Q    Okay. But that was an actual capital trial or capital case?

A    No. It was a murder/suicide.

Q    Okay. So from your own experience, would you agree with me that your role in this case is not the typical role that a neuropsychologist usually plays in a capital case?

A    I'm not -- I'm not a neuropsychological examiner in this case. We do comment on scores sometimes in addition to that,

but people usually have an examiner for you to comment on.  So I'm just saying that you need an examiner.  I wasn't the examiner.  I didn't do an examination.  It's not that unusual to ask somebody what they think about scores.

Q    And you've -- you've testified in about 50 capital cases.  Is that right?

A    Yeah.

Q    And this is the only -- only case where you've ever had this sort of role.  Is that right?

A    To the best of my recollection, yes.

Q    Your role in this case and the limited role that you've had both at trial and in these habeas proceedings, would you consider it an ideal way to talk about -- Well, strike that question.

In the other 49 or so capital cases that you testified, what role did you have in those cases?

A    I examined the person usually for two days and gave them multiple tests, obtained multiple hours' worth of interviews, sometimes videotape, sometimes not, and reviewed thousands to a hundred thousand pages of material.

Q    So it's pretty extensive what you -- your normal ---

A    Yeah.  I ordinarily want to see everything.

Q    All right.  And I think you said it was -- you usually do about two days' worth of evaluations?

A    After I've read all the material and know what questions

I want answered, yes.

Q   So in terms of the amount that you spend conducting evaluations, would you say that's 15, 16, 17 hours' worth of evaluations, generally speaking?

A   It's that amount that's pretty much face to face with the person.  Then I usually talk to other people, family members, informants, school teachers, if I can, and hours reviewing the forms and reports and, you know, whatever.

Q   Now you mentioned speaking with teachers and family members.  Is it fair to say that those are collateral sources of information?

A   Yeah.  Anybody other than the person, you know, that you're examining is a collateral source by definition.

Q   And as a part of collecting collateral information, interviews with family members, school teachers, that's -- that's a normal part of that process.  Is that right?

A   It depends.  It's a normal part of what's usually done in a capital case.  Who does it varies from case to case.  I always did things related to educational stuff myself, but -- don't necessarily do everything.

Q   But general speaking, you would agree that you would want to have collateral sources of information when you were --

A   Yes.

Q   -- in your role as a neuropsychologist.

A   Yes.  And as I said, as a general rule, you want to know

everything and the more you know, the better.

Q    All right.  You would agree that if you didn't have collateral information, you might be forced to speculate?

A    I would do my darndest to avoid it.

Q    All right.  Is that a danger, --

A    Of course.

Q    -- speculating because you don't have all the information?

A    Of course.

Q    And is it also a danger when you don't have collateral information that you might omit something or miss something?

A    Yeah.  And you don't always -- You need all the information you get so you ask the right questions and you ask them in the right detail.

Q    And I think on Direct Examination you said life history always wins.  Is that correct?

A    That's right.

Q    And life history always wins, you're referring to information that you -- you obtain through collateral sources?

A    Any -- Anywhere in medical art, you know, if you have funny scores that don't make any sense, given the person's life history or clinical history, clinical history wins. That's always a better, you know -- One's life is always a better test than an individual score.  If you give 35 tests, almost two of them on average are going to be incorrect just

by the five-percent level.  You trust, you know, the whole

thing put together much more than any individual small piece

of it.

Q    Okay.  And if you had had your sort of regular role, for

lack of a better word, as a neuropsychologist in dealing with

Mr. Allen's case, you would want to have any important

information pertaining to Mr. Allen's life.  Is that fair?

A    If I had been doing a full independent neuropsych.

evaluation, yes, sir, I would have wanted that; just making

sure that Dr. Yutzy and I understood what the scores said.  I

had enough for that.

Q    And that's true whether you're a Government -- you're an

expert who's been retained by the Government or whether you're

an expert retained by the defendant.  Is that fair to say?

A    Yeah.  I would say generally that's a fair thing to say.

Q    So if there were records that shed light on some of the

issues related to Mr. Allen's social history, you would want

to have that information, correct?

A    I said I want everything, --

Q    Okay.

A    -- you know, and I'll be glad to repeat that.

Q    Okay.  I apologize if I'm being a little repetitive.

        Either at the trial or in these habeas proceedings

that we're currently engaged in, did anybody from the

Government ever ask you to conduct an evaluation of Mr. Allen?

A     I have done everything that I was asked to do, and I was not asked to do more than I did then and am doing now.

Q     Did you ever suggest to anyone that it might be beneficial if you were permitted to conduct a full evaluation of Mr. Allen?

A     I can be accused frequently of being perhaps too forthright.  I don't remember having said that, but it's the kind of thing I might say.

THE COURT:  Okay.  Now just so the record is clear, I don't think the question was -- The first question was, "Did anyone ask you," and then there was some other testimony.  But the last question:  "Did you ever suggest to anyone that it might be beneficial if you were permitted to conduct a full evaluation of Mr. Allen?"  That was the last question.

THE WITNESS:  Yeah.  And I said, "No, I don't remember having said that," --

THE COURT:  Okay.

THE WITNESS:  -- but it's -- I might have said that because I say that sort of thing.  But I don't remember that. I have no such memory.

Q     (By Mr. Montroy)  Okay.  Do you recall or was it your understanding when you became involved in this case that you would look at the data and that you wouldn't actually be able to comment on Mr. Allen or render a diagnoses or an opinion?

A     No.  It was my understanding that I was to examine a part

of what was involved in the case and to supplement what Dr. Yutzy said.

Q    Okay.  Now at the time of trial it was your opinion that, from the records that you looked at, there was no evidence to support Dr. Gelbort's conclusion that Mr. Allen had brain impairment.

A    Correct.

Q    And in part, you reached this conclusion based on Mr. Allen's school records.  Is that right?

A    In part.

Q    What else did you -- did you use besides the school records?

A    I used the reports that I reviewed from Dr. Cuneo and from Dr. Gelbort, the test data that Dr. Gelbort provided, and some information about the crime itself that I obtained from the Government or Dr. Yutzy.  I don't know the exact conduit anymore, whether or not they gave it to him and he gave it to me or they gave it to me directly, but I reviewed some material about the offense or the alleged offense, whatever the right terminology is.

Q    Let's talk about the school records.  On Direct Examination you talked a little bit about the aptitude scores.  Is that right?

A    That's correct.

Q    And these were based on Mr. Allen's school records from

Clayton. Is that correct?

A    That's correct.

Q    All right. These scores in this exhibit -- I'm sorry. These scores that are reflected in Exhibit 165, are the -- are the Clayton school records sufficient in and of themselves to rule out brain damage?

A    They are sufficient to say there's no evidence in them of brain damage.

Q    But as a neuropsychologist, you can't -- you can't look at the Clayton school records and say, "Mr. Allen definitively does not have brain damage or brain impairment"?

A    No, because you can only say that up to the date of the last testing, he doesn't show any sign of brain damage and, of course, anything could have happened after that date. We wouldn't pick it up because he wasn't tested again.

Q    Okay. But the school records themselves, if you took a look at them at a given time, all right, and -- and imagine for a second that this is -- time stops when you have these school records. Just looking at these school records alone, is it fair to say that you can't be certain that Mr. Allen did or did not have brain damage based on these records?

A    I say I can be certain that there's no evidence in these records of brain damage. You know, I cannot offer an opinion about anything they didn't look for.

Q    Okay. Your opinion based on the Clayton school records

that there was no evidence to support Dr. Gelbort's conclusion that Mr. Allen had brain damage, was that because there was a fluctuation in the scores?  In Mr. Allen's test scores?

A    That was something I considered, but the fact is that if he had a bad score, he later had a good one that was normal.  And that's -- that's the real issue, not just that they went up and down.

Q    Well, taking a look at these -- at the ERB aptitude scores, --

A    All right.

Q    -- when you -- when you looked at the record and you compiled this exhibit, what about these scores made you think -- made you believe that they did not support Dr. Gelbort's conclusion that Mr. Allen had brain damage?

A    Well, they're all in the normal range.  None of them are down at the level of one percent or the second percentile, the fifth percentile.  These are all reasonably good scores for an African-American kid being taken out of the city and into a suburban district.  Based on my experience with reviewing lots of school records, there's nothing remarkable about these.

        MR. MONTROY:  I'm sorry.  I'll ask for the Court's indulgence.

        (Pause)

Q    (By Mr. Montroy)  When you looked at the Clayton school records, were you concerned that the -- that there were

fluctuations in the test scores?

A    I noticed that there were fluctuations in the test scores because that's always something you consider.  If people before an event or an injury have their scores go up and down, you're less worried about variability when you test them than if they're always consistent and now they're down.  The pattern is important.

Q    Sure.  So if they were always down, for instance, that would indicate?

A    If they were always going down, you would think something was going down or if they were all here and they went like this, then you'd be much more concerned.  But when they go down, like his math calculation, he has a 51 and 87, and then he goes to down to a 13 and 11, but he comes up to the 45th percentile in 1991.  That doesn't indicate that he had problems with math calculations because of brain damage.  It indicates there's something else.

Q    Okay.  And on -- on Direct Examination, you interpreted -- you interpreted these scores that there was something else other than brain damage, right?

A    Well, I interpreted it as not brain damage, and so he either tried less hard or something.  They were the same test.

Q    Do you recall testifying on Direct Examination that the conclusion you reached from looking at these scores was that -- that Mr. Allen was an indifferent student?

A    I know I've said that.

Q    Is that the conclusion that you reached based on the fluctuations in these scores?

A    No.  I based it on the fact that his achievement scores were always lower than his aptitude scores.  And based on the fact that he missed as many as 57 days of school a year, I decided that he was not totally committed to school or was an indifferent student.  I like "indifferent student" better.

Q    Okay.  And that's what you -- that's actually what you said in your report, right?

A    I believe so.  I think so.

MR. MONTROY:  Your Honor, I'm pointing the Court's attention to Exhibit 580.

Q    (By Mr. Montroy)  You submitted a declaration in this case.  Is that correct?

A    That's correct.

Q    And this declaration was written for the habeas proceedings.  Is that right?

A    It was written for these proceedings, and I guess this is -- that's what this is, you know.

Q    Sure.  To clarify, it wasn't -- this wasn't a report that you did at the time of trial.

A    No.  It was for this.

Q    And Point No. 5 on the first page, you indicate, "I reviewed his school records which show the following:

Mr. Allen was an indifferent student at best. Mr. Allen had a poor school attendance record. Mr. Allen was thought to have more potential for educational achievement than he actually achieved."

A    Yes.

Q    So in looking at Mr. Allen's school records, these are -- these are the conclusions that you reached, correct?

A    The major ones. The other one I reached was that there was no evidence for significant brain damage.

Q    Okay. And on Direct Examination, you -- you said that there could be a number of reasons that would lead to variations in poor testing that Mr. Allen has exhibited, correct?

A    Right. When -- When things go up and down, but when they do come back, there can be any -- any of multiple motivational or psychological or situational causes.

Q    And your conclusion was that the most likely reason was that he was an indifferent student. Is that right?

A    Or that -- I think I also suggested or that he didn't care about the testing which is slightly different but not much.

Q    And you recall testifying at Mr. Allen's trial, correct?

A    Not very strongly, no.

Q    Okay.

A    I remember some of it.

Q    Do you recall testifying to these general themes that the ERB scores showed fluctuations?

A    I certainly believe I did testify to that, yes.

Q    All right.  And do you remember on Cross Examination Mr. Sindel asked you questions about other factors besides being a bad student that could have contributed to the fluctuating test scores?

A    Yes.

Q    All right.  You'll note at the bottom of this -- this is Exhibit 216; this is your trial testimony -- you were asked the question:  "There was a considerable amount (goes over to the next page) of variability in Billie's tests from Clayton on the ERB tests, right?"

        And you answered:  "That's correct."

        Then you were asked the question:  "And certain factors would influence that?"

        Answer:  "Yes."

        "Family factors?"

        Answer:  "Yes."

        Question:  "Sleep factors?"

        Answer:  "Yes."

        Question:  "Nutrition factors?"

        Answer:  "I don't know that that is that important but a little bit, yes.  Being hungry would."

        All right.  Do you recall that testimony?

A    Yeah.  Those are some of the many different things that can affect people's performance on any given day.

Q    All right.  And these subjects that -- that Mr. Sindel asked you about, they're non -- non-brain damage explanations for Mr. Allen's fluctuating scores.  Is that right?

A    Right, because brain damage stays, and these are all things that come and go.  And anything that makes your scores go up and go down is something that comes and goes.

Q    And when you agreed with Mr. Sindel on these points, you were essentially endorsing your opinions that these scores, these ERB scores, do not support brain damage.  Is that fair to say?

A    Yeah, and that these are some of the factors that can make scores go up and down.

Q    Okay.  So you were agreeing that with your position alone, that the scores reflect something other than brain damage.

A    Right.

Q    Okay.  And is this still your opinion, that the school testing that you reviewed at trial suggests that Mr. Allen's fluctuating test scores are not evidence of brain damage but evidence of something else?

A    When they fluctuate and come back, they're not evidence of brain damage, no.

Q    All right.  So for instance, in addition to what

Mr. Sindel had suggested, meaning the nutritional factors, the family factors, these fluctuating test scores could show that Mr. Allen was a bad student perhaps?

A    Well, if you mean poor motivation, absolutely, yes.

Q    As you had earlier suggested?

A    Yes.

Q    It could also suggest that, you know, he didn't get enough sleep the night before the test?

A    I certainly said that was one of the possibilities.

Q    All right. You would agree that Mr. Allen's fluctuating test scores could also be the result of living with an alcoholic mother, right?

A    When scores fluctuate, family problems can be a cause of it, and that's one of the family problems that could be the cause of it.

Q    And Mr. Allen's fluctuating test scores could also be the result of living with a mother who's physically abusive. Is that right?

A    That's one of the many things that could account for it.

Q    Would you agree that Mr. Allen's fluctuating test scores could also be the result of being thrown out -- him being thrown out of his house when he was a child?

A    Well, within limits. It would depend, of course, on the temporal sequencing. If he took the test right after that happened or while it was going on, yes, it could. If it

happened a month before, no, it couldn't, you know.  It just depends on the timing.

Q    Okay.  So would you agree that abuse and neglect, generally speaking, without going through, you know, numerous examples, would abuse and neglect, generally speaking -- could be the cause for fluctuations in the test scores that you reviewed?

A    If they occur in the right time and the right way and if there's no other explanation, of course.

Q    Would -- Would being physically -- Oh, I'm sorry.  Would being repeatedly beaten by your mother, sometimes with objects, constitute abuse and neglect in your opinion?

A    Well, abuse is ---

MR. HOLTSHOUSER:  I'm going to -- I'm going to object unless there's some -- either some expertise established or some objective criteria for which he's basing the question on or labeling something "abuse."

THE COURT:  Well, ---

MR. HOLTSHOUSER:  Otherwise, we're just like -- we could ---

THE COURT:  I'm not sure I understand.  Are you saying if he says if somebody threw a telephone at him or if that would be okay?  Or what -- what -- I'm not sure.

MR. HOLTSHOUSER:  Well, my objection really is Dr. Wetzel's a neuropsychologist.

THE COURT:  Right.

MR. HOLTSHOUSER:  I'm not sure what qualifies him to apply labels of abuse because there are no objective labels or standards, scientific standards --

THE COURT:  Right.

MR. HOLTSHOUSER:  -- for labeling something as "abuse."

THE COURT:  Okay.  I understand.

MR. HOLTSHOUSER:  If we're collecting a vote or subjective opinions, that's --

THE COURT:  I understand.  If you can lay further foundation, I'll hear it, --

MR. MONTROY:  Sure.

THE COURT:  -- but I'll sustain the objection.

MR. MONTROY:  Well, Your Honor, there is -- there are studies, which I'm going to get to, that suggest that abuse and neglect with -- on children can cause life-long psychiatric complications.  It can also cause brain impairments.

THE COURT:  Sure.  And if you want to develop that, I'll hear it.

MR. MONTROY:  Okay, sure.

THE COURT:  I just believe that the last -- I'm not sure that the last question asked, he was qualified to answer it in a general way.  But go ahead.

MR. MONTROY:  Okay.

Q    (By Mr. Montroy)  Doctor, you would agree that physical abuse can result in brain damage, correct?

A    If there is enough force administered to your head, yes.

Q    And you would, also, agree that physical abuse and neglect can cause life-long psychiatric complications, correct?

A    I would agree with it is a stressor and that that stressor has a wide variety of effects and that some people have problems like that after being abused.  Many people do not.

Q    Okay.  Well, just to define what you consider to be abuse and neglect and how that may or may not result in potential brain -- brain damage ---

MR. HOLTSHOUSER:  Judge, this is, I guess, the area of questioning that I think is outside his expertise and there's been no foundation laid.  There's no objective criteria.  We're going to get his subjective standards for abuse.  I don't think that falls within the category of his expertise as a neuropsychologist any more than ---

THE COURT:  Yeah, sustained.  He can testify as to any objective standards that he relies on in making a diagnosis of abuse, if that's something he does.  I'm just not sure it is.  Go ahead.

MR. MONTROY:  Sure, Your Honor.  Just a second.

Q     (By Mr. Montroy)  Doctor, I'd like to point your attention to Exhibit 600, and this is a report from United States Department of Health and Human Services.  Do you see that?

A     I see that.

Q     Administration for Children and Families?

A     Yes.

Q     And do you see that this was published in 2009?

A     Yes.

Q     And the title of this paper is "Understanding the Effects of Maltreatment on Brain Development"?

A     Yes.

Q     Are you familiar with this document?

A     I'm not familiar with that particular one, no.  I have not read it.

Q     Okay.  Well, I'm just going to point you to some sections of this -- of this document and see if -- if you agree with the standards set forth in this regarding abuse and neglect. Pointing your attention to Page 7, "Abuse can refer to physical abuse, such as hitting, shaking, burning or other forms of maltreatment that a parent or other caregiver might inflict."

        Is that consistent with physical abuse as you understand it?

        MR. HOLTSHOUSER:  Judge, I'm going to have to impose

the same objection because there's -- there's -- Dr. Wetzel is here as a scientist and an expert.  This paper says "Abuse can refer."  It doesn't -- This doesn't indicate that it's based on any scientific research or study or that there's any objective standards.  The fact that something -- a label can be applied to certain behavior, given other circumstances, I don't think makes him -- false within his area of expertise or that he's otherwise qualified to begin expressing opinions.  He hasn't done so in this case.  And unless there can be some foundation laid that there's some scientific basis for this expertise to begin labeling behavior as abuse, that it's a scientific concept or that it's a subject of expertise, then I would object.

THE COURT:  Did you understand the question when it was asked?

THE WITNESS:  Yeah, I understand.

THE COURT:  Okay.  All right.  I'll overrule it at this time.

Q   (By Mr. Montroy)  Is this -- Is this, Doctor, consistent with your understanding of abuse?

A   Well, my understanding of physical abuse is -- comes from my work with the Medical Examiner's Office, and I know the severity of the physical abuse, the extreme severity of the physical abuse that leads to a child dying or an adult dying or an elder dying, and it is extreme.  And when that happens,

there are always things that one can detect in the body. One gets shearing injuries in the brain. The axons are broken. That can be seen under the microscope with staining.

Severe blows to the head repeatedly can result in brain damage that leads to death, and that can be demonstrated when there is a great deal of shearing in the brain from a blow to the head. One sees a cloud of blood at the point where it happens, and that can be picked up by an MRI. So there's physical evidence for it, but it's extreme. It doesn't happen very easily. It doesn't happen from slapping somebody. You have to let them have it, really let them have it, and it's usually repeated on a number -- more than once or twice.

Q   So is it your testimony then that abuse is only abuse when it results in somebody's death?

A   Well, abuse is a stressor, and I was trying to describe where I run into it with so that the Court would appreciate what I know about it. But, you know, abuse is a stressor, and it can have effects, but if it has effects, you can see the effects. You know, there's changes in the brain that you can pick up on MRI or you can pick up with CT because that's particularly good at picking up blood in the brain or you can pick it up on autopsy, you know. There are things that you can see when there's physical damage to the brain --

Q   Okay.

A    -- from this sort of thing.

Q    All right.  So is it your testimony then that it's only physical abuse if you can pick up blood on the brain in an MRI?

A    No.  I'm saying that's -- But unless you -- You don't know about it.  I mean you have -- Person "A" says, "I did;" Person "B" says, "I didn't."  Unless there's some way of telling the truth, you don't have anywhere to go with it.  That's what I'm saying.

Q    What about -- What about emotional abuse?

MR. HOLTSHOUSER:  Judge, I guess I'm going to continue to object because I think that the answers are indicating there isn't any objective expertise-based, scientific notion that's involved here in quizzing Dr. Wetzel about, "Well, would you consider this abuse?  Would you consider that abuse?"  Unless there's some benchmark that is derived from scientific research or expertise to define "abuse," I think we're going outside his area of expertise.  We're talking, again, about a subjective concept of what one considers to label as "abuse" where the issue is:  What was the conduct?

THE COURT:  Well, the thing I find about it objectionable is he says, "What about emotional abuse," without saying, "What about emotional abuse as it applies to something else?"

MR. MONTROY: Okay.

THE COURT: So just that alone, I think I'll have to sustain it. But if you want to reask it, I'll hear it.

MR. MONTROY: Sure. Okay.

Q   (By Mr. Montroy)  The exhibit that we're referring to goes on to say, "while emotional abuse generally refers to any injury to a child's psychological or emotional stability." So are you familiar with emotional abuse?

A   I have seen people that I thought have been emotionally abused because they told a story and the effects of what they believed happened to them over time, and it made sense, and sometimes it was supported by collaterals and sometimes it wasn't. I've also heard people tell me stories that didn't make any sense.

Q   Well, you would agree then that emotional abuse can result in brain damage and life-long psychiatric complications.

A   Excuse me. No, I would not. I didn't say that.

Q   Oh. I'm asking just that.

A   I said that emotional abuse can cause people to have psychological or psychiatric problems. The duration of those problems is much more questionable. PTSD or rape, the average term of the effect is 11 months, according to all the research that's been done. That doesn't mean that people forget about it completely, but people are upset by it for a relatively

limited period of time ordinarily.  Some people have it more chronically, but that's the minority.  It can happen.  I don't know what you can say.  It can happen, and the only thing is you believe them or you don't believe them because they have the right set of symptoms and they have the right disease.  But, you know, people -- We don't treat people because somebody was mean to you or insulted you.  We treat them because they have a disorder.

Q    And that's not my question, Doctor.

A    I know.

Q    My question is:  Can emotional abuse cause brain damage or life-long psychiatric complications?

A    Given the compound nature of the question, the answer is:  No.  If you said may cause psychiatric problems and some of those may last for life, I would agree with that.

Q    Okay.  Thank you.  Would you agree with -- with the statement that physical abuse can cause direct damage to a baby or child's developing brain?

A    Yeah.  If you hit them in the head enough times, yes, of course.

Q    Would you agree with the statement:  "Babies and children who suffer abuse may also experience trauma that is unrelated to direct physician damage; exposure to violence, disaster or other traumatic events"?

A    Well, there's no probability attached to that.  The

answer generally to it is it possible?  Yes, it's possible.
The more reasonable question:  Is it likely?  And that, again,
depends on how much, how long, by whom, and what else is going
on at the same time.  It's complicated.

Q    Okay.  Would you agree with the statement:  "We know that
children who experience the stress of abuse will focus their
brain's resources on survival and responding to threats in
their environment"?

A    No, I do not know that is true.  I know that some people
will and some people won't.

Q    The report goes on to say that:  "Research on children
who suffer early emotional abuse or severe deprivation
indicates that such maltreatment may permanently alter the
brain's ability to use serotonin which helps produce feelings
of well being and emotional stability."  And it cites Healy,
2004.  Are you familiar with that research, Doctor?

A    With my regrets to the Court, David Healy is an idiot.

Q    But are you familiar with --

A    Yes.

Q    -- his research?

A    He's an idiot.

Q    Do you disagree with ---

A    His research is very poor.

Q    So you disagree with his statement.

A    I disagree with almost everything he's written, and I've

read a great deal of it.

Q    Okay.  And are you familiar with the scientific studies that suggest that this is not correct?

A    Yeah.  There are many; several hundred.

Q    This record goes on to state, "Although neglect is often thought of as a failure to meet a child's physical needs" ---

THE COURT:  Just a -- Just a little bit slower; not for the Doctor's but for mine.  Just follow the question.  Go ahead.

MR. MONTROY:  I'm sorry.  I have a tendency to do that.  I apologize.

Q    (By Mr. Montroy)  "Although neglect often is thought of as a failure to meet a child's physical needs for food, shelter and safety, neglect also can be a failure to meet a child's cognitive, emotional or social needs."

Is that consistent with neglect?

MR. HOLTSHOUSER:  Judge, I'm going to object again because here we're now using this article to quiz him on -- we've gone from "abuse;" now we're going to the word "neglect."  There isn't -- This isn't rooted in anything that could be considered expert scientific research or expertise.  It's just -- There's no framework for this question.  So I don't know how the Doctor can answer it.  I don't know how there's been a foundation laid that he has the expertise to answer it.

THE COURT: Is there anything in there about the kind of neglect and the severity of it? If neglect is such a nebulous concept, I'm not sure that it's -- that anyone could answer it. Is there any more objective information that he could analyze?

MR. MONTROY: Well, Your Honor, in -- if I could just have a moment here.

THE COURT: I mean, you know, my -- my take on this is this witness is, obviously, very well versed in -- in brain trauma and also in various psychological diagnoses and so forth. I just want to make sure that the record is protected in terms of precisely what it is that he's being asked as it relates to this particular case. There's a lot of -- lot of evidence in this case that -- by different witnesses about neglect and abuse and so forth. But I thought -- I didn't -- I just didn't think the last question had parameters that would be a proper basis for him to respond. I thought it was too general.

MR. MONTROY: Okay.

Q   (By Mr. Montroy) Doctor, are you familiar with persistent fear response?

A   No.

Q   "Persistent" -- According to this report, "Persistent fear response is chronic stress or repeated traumas; can result in a number of biological reactions, including a

persistent fear state;" citing Perry, 2006.

A    I said I'm not familiar with it.  I've never seen it.  I am not familiar with it.  I've never seen it.

Q    So are you saying that you would disagree that that would -- that persistent fear response is something that can be the result of abuse or are you just saying you're not familiar with it?

A    I said I'm not familiar with it and I've never seen it.

Q    Okay.

A    So I cannot offer an intelligent comment about it.

Q    Are you familiar with the concept of hyperarousal?

A    Yes.

Q    And would you agree that hyperarousal is when children are exposed to chronic, traumatic stress, their brains sensitize the pathways for fear response and create memories that automatically trigger that response without conscious thought?

A    Well, hyperarousal is a matter of degree, and you haven't defined the degree.  And people respond to any condition in a variety of ways, depending on their coping skills, the support they have, the situational conduct, you know.  This is -- And it is sort of a vocabulary test rather than a science test.  I know what "hyperarousal" means.

Q    Well, hyperarousal, can that -- can that result from somebody who is physically abused?

A    It can arise from a lot of things; too much to drink, drugs, a really pretty woman who seems interested.  It can arouse from a lot of things, you know.  It means anything, you know.  You got to do something more for me before I can give you an intelligent answer.

Q    Well, if you -- if you look at the exhibit, it's referring to a specific scenario when children are exposed to chronic traumatic stress.  You're familiar with chronic ---

A    The question is how they would measure hyperarousal?  Are they measuring neurotransmitters?  How are they measuring neurotransmitters?  Where are they measuring neurotransmitters?  How long are they measuring them, you know.

Q    Certainly there's variables, right?

A    All over the place.

Q    Sure.  But this is something you would agree that hyperarousal is something that can occur in somebody who's physically abused.

A    No, I'm not agreeing to that.  I'm just -- because I don't know what it means in this context.  This is vaguer than the other ones.  I know it may be difficult to believe but it is.

Q    So is it your testimony that hyperarousal is something that does not exist in someone who is physically abused?

A    Hyperarousal exists, but you haven't asked me a question

that I can give you an answer to.

Q   Okay.  So do you want examples of -- Strike that.

If -- If -- If a child is repeatedly beaten for -- sometimes for reasons, sometimes for no reasons, can that result in hyperarousal?

A   All right.  Hyperarousal is an effect, you know.  And, you know, so tell me how you're measuring the effect, what extent to the effect it is, and then maybe I'll have a shot at answering the question, but I don't really think I can really add to the Court's thinking in this area.

Q   Have you seen people with hyperarousal before?

A   Of course.

Q   Have you ever seen children suffer from hyperarousal?

A   No, because I deal with adults.  I haven't seen any.

Q   So you can't opine then if a -- if a child suffered regular physical abuse, whether or not they might suffer from hyperarousal?

MR. HOLTSHOUSER:  Judge, again, I mean the objection is I think that his answers have developed over time a basis for objection.  There isn't any foundation laid either for the scientific basis of this paper, which doesn't even have an author, or the scientific basis upon which he is being asked to answer these questions.

THE COURT:  Okay.

MR. HOLTSHOUSER:  The terms are subjective.  They're

undefined, and the process of -- and as he describes, it's a vocabulary test and/or 20 questions of "Would you consider this", "Would a subjective term apply to this", et cetera. This is improper Cross Examination of an expert.

THE COURT: Well, he's not asked to agree or disagree with the article. He's just being asked about various at this time emotional kinds of reasons that might conceivably result in some kind of conclusion. So long as it doesn't -- It doesn't ask him to agree or disagree. So overruled.

If you -- If you understand the question, listen to it carefully, you may answer it if you understand it. And if you have knowledge that would bear upon something relevant to this case, I'll hear it.

Overruled.

A    With all due respect, I can say that chronic stress could be bad for a child, but hyperarousal I really can't give you an intelligent answer on.

Q    (By Mr. Montroy)  If you had collateral information when you were reviewing the ERB test scores that Mr. Allen was being hit with belts or punched in the face by his mother the day before the tests, would you consider that a factor that might have affected his ERB test scores?

A    Yes.  It might have made him worse than they would have been if that hadn't happened as a hypothetical.

Q    And would you agree that being hit with belts or punched

in the face could be a risk factor for brain impairment?

A    Again, it depends on the blow, where it's hit. Neurosurgeons have a very crass phrase but it's true:  Break the face and save the brain.  It depends on where you're hit, how you're hit, the rotation, all sorts of things like this. I've done research on the effects on brain chemistry in boxing, you know.  It all depends on a lot of things.

Q    But you would agree that it's a risk factor.

A    It could be a risk factor, depending on all sorts of things.

Q    Would you agree that a child doing poorly in school, is that -- I'm sorry.  Would you agree that a child who's doing poorly in school, it -- it could be a sign that the child might be enduring physical emotional abuse?

A    It could be a sign of one of many things, yes.

Q    Is a child missing school frequently or coming to school late frequently a sign of possible abuse and neglect?

A    That's one of the possibilities; conduct disorder, antisocial behavior, substance abuse or other possibilities. It could be almost anything.

Q    If there was evidence that Mr. Allen was missing school because his mother was getting drunk and staying out all night and not making sure that he went to school in the morning, would that be a possible indication of neglect?

A    I wouldn't call it that.  If she was keeping him from

going to school?  I would call it -- I think it was more abuse than neglect, but I don't know of such evidence.

Q    Okay.  Could that have been -- Could that have -- Could that scenario have affected Mr. Allen's ERB test scores?

A    Sure.  Things like that can make his scores worse and which would imply that his brain was even better.

Q    At the time of Mr. Allen's trial, if there was evidence of abuse and neglect, would you have wanted to have that information?

A    I've -- Like I said, I always want to know everything because I want to preclude as much as I can in my opinions. Yes, I would have.

Q    And you would agree that at the time of Mr. Allen's trial, you had no information pertaining to abuse and neglect.

A    I -- I'm not sure that that is true.  I am sure I did not have a lot of information, but I don't know that I had none.

Q    Okay.  You certainly don't recall having any information on it.

A    I don't -- I do not recall that I had none.  I don't recall that I had a lot.

Q    Now talking about ---

A    It's been 14 years.

Q    I'm sorry.  Talking about Dr. Gelbort for a time, Dr. Gelbort believed that Mr. Allen was impaired.  Is that right?

A    Yes.

Q    And at the time of the trial, you would agree that you had serious problems with Dr. Gelbort's work in this case?

A    Yes.

Q    And those problems consisted of the fact that his -- his test battery was limited?

A    Yes.  He could have done more, and he didn't do complete tests, and he didn't send all the tests he said he did to me.

Q    Okay.  And would you, also, agree that one of your problems with Dr. Gelbort's tests was that he did a -- he did a clinical evaluation?

A    He did what is typical for people doing clinical referrals and not with the thoroughness and the documentation that is the standard of care in a forensic situation where you're going to come to court and try to help the trier of fact.

Q    Okay.  So Dr. Gelbort's clinical approach involved a five-hour evaluation.  Is that right?

A    Correct.  That's what he said.

Q    Okay.  And a forensic evaluation usually takes about two days.  Is that right?

A    It's more thorough.  Some people can get it in in one day, but that's really hard on the person you're doing it to.

Q    When you do ---

A    Ten hours or twelve hours.

Q    I'm sorry.  When you do a forensic evaluation, you usually take two days.  Is that right?

A    Or three.

Q    Part of your problem with Dr. Gelbort's conclusions was that when Dr. Gelbort used a test, he only used parts of certain tests.  Is that right?

A    Yes.  I always believe in using the entire test.

Q    He only used -- I'm sorry.  He only used parts of the Wechsler?

A    Yes, the Wechsler Memory Scale.

Q    Okay.  And he also used the wrong parts of the memory test.  Is that right?

A    No.  He interpreted one part of the test as meaning something that another part means.

Q    Would you agree that when you're -- when you're doing a memory test, when you're using a memory test, you expose the subject to the test and then come back to it later after a delay to determine how much the subject remembers?

A    I -- I don't know how to respond to that.  You're -- You're describing how one ordinarily does the Wechsler Memory Test, but it wasn't done that way.

Q    Okay.

A    Your question doesn't help me answer you.

Q    Okay.  Well, I think you -- I think you just described it.  But Dr. Gelbort didn't do the Wechsler Memory Test,

correct?

A    He did do the Wechsler Memory Test but only part of it, and he didn't do the part after a delay, or at least that part of it was not marked on the material he sent to me.

Q    All right.  He was -- So he -- As far as you know, he only did a short-term memory test.

A    Assuming he marked everything he did, he only did short-term memory.

Q    And that was also a part of Dr. Gelbort's problem, right? He didn't -- He didn't give you any data on a number of tests, right?

A    There were four or five tests that he said he gave that he did not give me either the raw data or the scores from.

Q    Is it fair to say that Dr. Gelbort did not put in an adequate amount of time to do an adequate evaluation of Mr. Allen?

A    I think I would limit my opinion to:  He didn't do what I would do and what I would think was appropriate, and the Court can go from there.

Q    So in the tests where -- I'm sorry.  In the scenario where he said he did a number of tests and did not provide numerical scores to you, in those situations, he only provided conclusions.  Is that correct?

A    Yes.

Q    So you didn't have any way of knowing -- You had -- You

had no way of knowing what norms he used on those tests.  Is that correct?

A    Or what results he had or anything else.

Q    There was no way essentially to test the validity of the testing that he had done on Mr. Allen.  Is that correct?

A    There's no way to check on the validity or reliability of what he had done.

Q    And when you testified at Mr. Allen's trial, you testified to these inadequacies of Dr. Gelbort.  Is that right?

A    I think I did but, again, I don't remember that point with clarity.  I'm sure I did, but I don't know that.

Q    Is your main criticism of Dr. Gelbort was that he was not comprehensive and did not do everything that you would have done when you conduct an evaluation?

A    Well, my -- my main criticism of Dr. Gelbort is that he said there was evidence of brain damage there when I didn't see any, period.

Q    Okay.

A    That's my main one.  The others are there, but they're not the main ones.

Q    If Dr. Gelbort did his evaluation at the start of Mr. Allen's trial, would that be problematic to you?

A    Well, obviously, I think that we do our best work when we have adequate time to review everything and we have adequate

time to administer things, to analyze it, and then come back if we have any questions we don't have answered or if testing suggests something we didn't do, do it again.  I like to make sure that I'm thorough and comprehensive.  And if you're under timed pressure, it's difficult to do that.

Q    All right.  So you -- you would agree then that a lack of time can cause a neuropsychologist problems in --

A    Yes.

Q    -- when they're conducting their evaluation.

A    The emphasis is it could but it might not.

Q    Sure.

A    If you were adequately prepared, maybe you'd get lucky. I don't know.  I don't like depending on luck.

Q    Were you aware that Dr. Gelbort wanted more time to do his work in this case?

A    I don't remember seeing that anyplace.  I don't remember that.

Q    The jury ultimately rejected Doctor -- Well, strike that.

The jury ultimately concluded that there was no brain damage to Mr. Allen, correct?

MR. HOLTSHOUSER:  I'm going to object unless there's some basis upon which Dr. Wetzel can speculate on what the jury decided.

THE COURT:  Yeah, I think so.  Sustained.

MR. MONTROY:  Okay.

Q     (By Mr. Montroy)  You were familiar with Dr. Martell prior to being asked to write a declaration for Mr. Allen's current habeas proceedings.

A     That's correct.

Q     And your impression of Dr. Martell is that he generally does fine work, correct?

A     In the other case that I was involved with, yes, he did.

Q     And your impression of Dr. Martell is that he's honest, correct?

A     It was in the other case I was involved in, yes.

Q     And, in fact, you note that Dr. Martell found Mr. Allen to have a higher IQ score than Dr. Gelbort.

A     Yes.

Q     When you reviewed Dr. Martell's report, there was nothing to indicate to you that Dr. Martell was burying scores that might have been more favorable to the prosecution, correct?

A     Well, I don't know exactly how to respond to that.  He, obviously, made two mistakes that made his results look impaired.  But other than that, no, I -- I didn't see anything where he was shading the scores other than those two rather major errors he made.

Q     All right.  If you had reviewed Dr. Martell's report and believed that he was hiding scores that were favorable to the Government, you would have indicated that in your declaration, right?

A    I think I indicated in my declaration that I didn't agree with his conclusions which is --

Q    Sure.

A    -- gets close.

Q    I'm not talking about that.  I'm saying:  Did you ever -- Did you ever see anything in Dr. Martell's report where you thought he purposely -- purposely hid something?

A    Well, he emphasized things that I wouldn't emphasize.  I do not wish to make any inferences about why he emphasized some things that I think aren't there or are weak.

        THE WITNESS:  Your Honor, can -- do I have to make inferences about somebody I haven't examined?

Q    (By Mr. Montroy)  I'm just asking you if you recall putting anything in your declaration.

A    No.  I didn't understand the question then.  No, I didn't put that in my declaration.

Q    And the problems that you're talking about with Dr. Martell, you're indicating that -- Well, what are your problems with Dr. Martell?

A    He made a mistake on the Wisconsin Card Sorting Test and he made a mistake on the Boston Naming Test, and the differences were major.

Q    And when you say that Dr. Martell made a mistake, what was the mistake that he made?  What was the nature of his mistake?

A    One he counted wrong and the other is he used the wrong set of norms.

Q    When you looked at Dr. Martell's report, you -- did you notice that he reported that Mr. Allen actually did well in some areas of testing?

And when I say "did well," meaning he was, you know "average" or "above average."

A    Yes, he did.

Q    So when -- when Mr. Allen actually did well on testing, meaning he was at "average" or "above average," Dr. Martell didn't leave those off of his report, correct?

A    Well, I think he did well in the area of problem solving, and that he didn't put in.  And I think he did perfectly well in verbal performance, and he didn't put that in because of the mistakes he made.  Other than that, my answer to your question would be:  Yes, I would agree with that except those two things.

Q    And those two things are the mistakes that you identified.

A    They're related to mistakes, yeah.

Q    All right.

A    And the other thing is that he didn't do any test of effort and verbal -- the area of verbal ability.  Those are my criticisms.

Q    Okay.  And you looked at Dr. Martell's raw data?

A    Yes.

Q    All right.  And you looked at it carefully?

A    I think I did, yes.

Q    And you ultimately concluded that Dr. Martell did good work, right?

A    Well, I -- He -- On most tests he did good work.  There was those exceptions.  Yeah, I don't want to say anything negative about him.  He made some mistakes, and that's not good work, but other than that, ---

Q    In your opinion, Dr. Martell should have used the Heaton norms that accounted for race.  Is that correct?

A    I think that is -- would have been the best -- better procedure, yes.

Q    And you agree that there is a lack of consistency on that issue?  Some people use the Heaton norms, the demographic norms, and some people don't?

A    I agree that there is a minority that don't.  I don't understand the cogency of their arguments, but there is a minority.

Q    Are you aware that Heaton himself says not to use the race norms for African-Americans, particularly in capital cases?

A    I'm not aware that he says that.

Q    Are you aware of literature that stands for that proposition?

A    I have seen some people who said that, but, again, I don't find their position cogent.  The argument is simply that they're of correlated variables and that you, you know, when you use all the groups, he may be getting into the problems with correlations and, you know, which is which.  That's all.

Q    Okay.

A    You know, the best work uses the adjustments.

Q    Now on Direct Examination you described some issues with Dr. Martell using tests that were commonly used back at the time of Mr. Allen's trial.  Is that right?

A    Yeah.

Q    As opposed to tests that are used today.

A    That's correct.

Q    And you believe that that's not the typical standard of care?

A    No.  You know, when you're -- when you're trying to find out what is the truth now, you use the best means available.  If you are trying to find out if somebody could have found it out some umpteen years ago in a malpractice suit, that would have been a different problem and a different answer would have been given.

Q    You would agree that when Dr. Martell used the tests that were common back at the time of Mr. Allen's trial, that that decision served a legitimate forensic purpose?

A    I would agree that as far as I know, he thought it did.

THE WITNESS: Excuse me, Your Honor. I need to stand up.

THE COURT: Yes, sir. Go ahead.

THE WITNESS: Thank you.

MR. MONTROY: And this is, Your Honor, Exhibit 535.

THE COURT: Okay.

Q   (By Mr. Montroy) So do you recall saying, "But his technical work is pretty good except for that one thing, and I regard the Heaton thing as important"?

A   Yes.

Q   "Now there's another issue and that's whether or not you're using the most current versions."

A   Right.

Q   "And, you know, he tried, I think, to do what the tests were back then, and that's really not the standard of care in Neuropsychology."

A   Yep.

Q   And that's what you've testified to today.

A   That's what I just said, yeah.

Q   "And I understand why he did it, but you can criticize that. Since I understand what's he's doing and I think it's legitimate forensic purpose" -- I'm sorry. I apologize.

"I understand why he did it, but you can criticize that. Since I understand what he's doing and I think it's a legitimate forensic purpose, I wouldn't criticize it very

hard, but it definitely can be criticized and it's definitely not in keeping with the ethical standards for testing."

All right.  So you would agree that his decision to use those tests served a legitimate forensic purpose.

A    Yeah.  And, again, if his purpose was to see if Gelbort committed malpractice, that, you know, is the way to go.  But in determining whether or not the Defendant has brain damage, it's not the way to go.  I understood that he was trying to evaluate Gelbort as well as the Defendant, so I said I did not criticize him very hard, but I also said there's an ethical standard that you use --

Q    Sure.

A    -- current tests.  I don't know if I'm being inconsistent.  It sounds to me like I am being consistent.

Q    Sure.  That's fine.  And his use of those older tests, they didn't ultimately affect the results very much, correct?

A    No.  And if he -- if he wanted just to use that to describe Gelbort and not to describe the Defendant, that I would -- it would be okay.

Q    Okay.  One of the areas that you testified on Direct is that Dr. Martell didn't do any validity testing in the verbal area.

A    Correct.

Q    Is that right?

A    Yes, more or less.

Q    And the purpose of validity testing is to know whether or not a person is putting in a good effort --

A    Right.

Q    -- on the tests?

A    That's correct.

Q    You're aware that Dr. Askenazi found that Mr. Allen's effort was generally good on the testing that he did.  Is that right?

A    I think that's right.  I don't recall independently at the moment.

Q    And there's nothing that you saw to suggest that on any of the testing that Mr. Allen did for Dr. Martell or Dr. Askenazi that he was not putting in a good effort on any of the testing.

A    No.  I'm just saying, you know, that's one of the most likely explanations if you do find a problem is that the person isn't trying hard or they're malingering in order to escape the consequences, and it's just standard of care to do that.  That's the criticism.

Q    Okay.  Now you would agree that Billie Allen had risk factors for brain damage, correct?

A    I agree things happened; that if they had been severe enough and bad enough and frequent enough and a large enough dose could have done something, yes.

Q    And one of those things that we talked about today was

potential abuse and neglect.  That could be a risk factor.

I'm not saying it is a risk here.

A    If people were hit or hit in the head hard enough by a car or a hammer or something else, bad things can happen, absolutely.

Q    And you haven't seen any -- or you haven't been given any collateral information pertaining to abuse and neglect in -- in these proceedings concerning Mr. Allen.  Is that right?

A    I -- I have been given a number of declarations by a number of people that I believe are either in his family or family friends or relatives.  I certainly don't know what I haven't been given.

Q    Sure.  And you -- you -- It's fair to say you haven't actually been here in court listening to any testimony that's been given over the last two weeks here.

A    That's absolutely true.

Q    Okay.  In addition -- or strike that.

You would agree that Mr. Allen had several concussions with loss of consciousness.  Is that right?

A    I agree there's such a report, yes.

Q    Okay.  And concussions and head injuries alone, those can cause brain damage, right?

A    Usually concussions do if when there -- The best predictor of the effect of a concussion is the period of peritraumatic amnesia.  The second best is the period of

unconsciousness.  There's no information in any of these reports that describe either of those factors.

Q   Okay.  Concussions are a risk factor, right?

A   Concussions, --

Q   Generally speaking.

A   -- being knocked out, means there's something that interfered with the way the brain was functioning very transitorily.  And the question is how long it interfered with it, and if it interferes with it long enough, --

Q   Sure.

A   -- then the blow was likely to be severe enough to do something.

Q   And lead poisoning, that can be a risk factor for brain damage, right?

A   It certainly is.

Q   Seizures can cause brain damage, right?

A   With -- Depends on what kind of seizure it is and the duration of it.  Epilepsy of the ordinary kind where the average seizure last 45 seconds to a minute and a half takes hundreds of minutes of seizure to result in brain damage.  Status epilepticus can cause it much more rapidly.

Q   All right.  So ---

A   The requirements of the brain for oxygen and glucose goes down during a seizure, and it's brain preserving generally.

Q   I'm just asking you generally.  I know you're getting

into great detail, and that's fine, but, generally speaking, seizures and the kind of seizures you're describing can cause brain damage, right?

A    If you have hundreds of them, yes.

Q    Okay.  Asthma, lack of oxygen to the brain, that can cause it?

A    Again, hypoxia, if it gets low enough and stays low enough long enough, yes.

Q    Alcohol and drug use that can cause brain damage?

A    Yes, particularly ---

Q    Alcohol -- ingesting alcohol and drug use and ---

        THE COURT:  Wait.  Did you finish your answer?

        MR. MONTROY:  Oh, I'm sorry.

        THE WITNESS:  No.

A    I was going to say especially if you fall and hit your head or drive badly or other things, you know, but it takes years of drinking badly or hepatic encephalopathy to cause much brain damage.

Q    You would agree that ingesting alcohol and drug use in preteen and early teenager years can be a risk factor for brain damage.

A    I would advise against it on moral grounds and the fact that you're not ready to handle it yet.  It depends, again, on dose and frequency just like with an older person.

Q    Your declaration does not include as a possible risk

factor exposure to alcohol in utero.  Is that right?

A    I don't remember.  If you say it doesn't, I'll take your word for it.

Q    Well, let me ask you this:  Is -- Is exposure to alcohol in utero a risk factor for brain damage?

A    There are a number of things that are bad for the fetus, and it's a combination of the amount, the dose, the duration, and the genetic characteristics of the embryo.  And, you know, fetal alcohol syndrome occurs about 52 times per hundred thousand in people who are doing severe drinking, daily drinking.

Q    It is a risk --- Drinking alcohol when you're pregnant is a -- it's a risk factor for brain damage.  Is that right?

A    It depends on -- It's not clear that social drinking, one drink, is bad for you.  It's not clear that it's not.  It's clear that very large amounts are not good for the baby.  It's just not real clear yet.  There's an extensive literature on it.

Q    Yeah.  Other than the -- Other than possible abuse and neglect and other than potential in utero alcohol exposure, these other risk factors, the seizures, the asthma, alcohol and drug use, these were risks factors that were considered by Dr. Gelbort or at least noted by Dr. Gelbort, right?

A    Yes.  And he reported them in his testimony, yes.

Q    If you were in a clinical setting and someone came to you

describing each of these risk factors, would you be concerned that the person might be at risk for potential brain damage?

A    It certainly would be a reason for doing a careful evaluation and it certainly would be a reason for doing counseling on "cut it out."

Q    Okay.  And you would -- you would want to test that person probably, right?

A    It would depend on the exact fact base, but I might, yes.

Q    So -- And even though Dr. Gelbort identified all of these risk factors in his report, in his testimony, you ultimately found that there was no brain damage, not because of the risk factors but because of Dr. Gelbort's testing.

A    I found -- came to those conclusions because of the test results and because no history was given that supported that those risk factors, in fact, did anything.

Q    Is chronic depression an indication of frontal lobe brain damage?

A    Not ordinarily.  It can be.

Q    Looking at Exhibit 216, this is your testimony from trial.  Do you remember testifying:  "We know that damage to your frontal lobes can interfere with your mood and make you chronically depressed"?

A    Yeah.

Q    Is that -- Is that fair?

A    Yeah, it can.  I said it can.  It's not the usual cause.

Q    Okay.  Thank you.

MR. HOLTSHOUSER:  Judge, I'm just going to object and move that the last question be stricken just because the question was "could depression cause frontal lobe damage." The quote he showed is that frontal lobe damage could cause depression.

MR. MONTROY:  Yeah.

THE WITNESS:  I'm sorry.

MR. MONTROY:  If I -- If I stated it that way, I just ---

MR. HOLTSHOUSER:  He's not impeaching him with the answer, so.

THE WITNESS:  I did not mean to say that depression caused frontal lobe damage.  If I said that, I didn't mean it. I misspoke myself.

THE COURT:  Wait.

MR. MONTROY:  I think it might have been me.

THE COURT:  Wait.  The question is:  "Is chronic depression an indicator of frontal lobe brain damage?"

And you said, "Not ordinarily.  It can be."

A    Yes, that's right.  That's what I meant to say.

THE COURT:  No; wait a minute.  I may have missed something here.  Wait a minute.

MR. HOLTSHOUSER:  My point is ---

THE COURT:  I think he was looking at 216.  Do you

remember testifying, you know, that damage to the frontal lobe can interfere with your ability to make -- Why don't you ask the question again.

MR. MONTROY:  Sure.

MR. HOLTSHOUSER:  It's Line 12 through 14 is where you want to focus, Judge.

MR. MONTROY:  Yeah.  This is -- This is what -- This is the part of Dr. Wetzel's testimony that I read from trial.

MR. HOLTSHOUSER:  And the point I'm trying to object to is that this is not impeaching of his answer because it's the -- it's the reverse.  It's the cause and effect versus the effect of the cause.

THE COURT:  I'm not sure ---

MR. HOLTSHOUSER:  On the one hand, the question was "can chronic depression cause frontal lobe damage?

He says that it can, but then the quote here is, "Can damage to your frontal lobes cause depression?"

MR. MONTROY:  I don't think that was the question actually.  I think was it an indicator.

THE COURT:  Yeah.  He's going to ask it again.

Q   (By Mr. Montroy)  Okay.  Is -- Is chronic depression an indication of frontal lobe brain damage?  That was the question that I asked.

A   You know, and the answer I gave is:  Not ordinarily, but sometimes it is.

Q    Okay.

A    It's a rare cause of that.

Q    And -- And at trial you testified:  "We know that damage to your frontal lobes can interfere with your mood and make you chronically depressed."

A    Yeah, it can.

Q    Okay.

A    That doesn't mean it's frequent.

Q    Hypothetically speaking, if a child or a teenager was exhibiting symptoms of depressive behavior, such as not taking care of himself, withdrawing from family and friends, and that same person had been exposed to all of the risk factors for brain damage that Mr. Allen had been exposed to, would you be concerned that that person might have brain damage?

A    Theoretically, but you've described an unfortunate home situation.  I would go there first.

Q    Okay.  When you say "unfortunate home situation," ---

A    You're saying that he's not getting a lot of support and, you know, things are going on in the family that you don't approve of.  That would be much -- statistically much more likely as an explanation for depression.

Q    Than brain damage.

A    Yes.

Q    Okay.  I just want to talk to you about -- ask a couple quick questions about the *DSM*.

THE COURT: Okay. I think we'll take about a 15-minute break. Court's in recess.

MR. MONTROY: Okay.

(Court recessed from 2:20 PM until 2:30 PM.)

MR. MONTROY: Ready to go?

THE COURT: I think we're ready.

MR. MONTROY: You guys ready?

I actually have just a few more questions, Doctor.

Q   (By Mr. Montroy) Doctor, you would agree that PTSD is a valid diagnosis, right?

A   What?

MR. MONTROY: Oh, I'm sorry.

THE COURT: Go ahead.

MR. MONTROY: I'm sorry.

THE COURT: Go ahead. We're going.

Q   (By Mr. Montroy) You would agree that PTSD is a valid diagnosis, correct?

A   Some people certainly do have it, yes. Some people certainly do have it, yes.

Q   Thank you. You're on staff at -- You teach, correct? Or you did?

A   Theoretically, I've -- I've -- I retired from Washington University and Barnes Hospital and no longer have privileges there as of the end of June. I still teach for free at St. Louis University in the medical school.

Q    You would agree that -- that medical schools routinely use the *DSM* as a manual for teaching their students, correct?

A    I don't know that I could agree with that.  I agree that everybody uses it, but I don't think it's a textbook.  We use simpler textbooks that don't cover 400 things.

Q    It's used in medical schools, though, right?

A    Yes.  It's used by the staff, yeah, and the Billing Departments.

Q    Would you agree that the *DSM* is used as a way for doctors and mental health providers to communicate with one another?

A    Yes.

Q    And you're not saying that mental health professionals fabricated mental health disorders and put them in the *DSM* so they can get money from health insurance companies, right?

A    I'm saying that they put in things that are well founded and they put in things that are less well founded in order to cover everything they do.

        MR. MONTROY:  Thank you.  I don't have any other questions, your Honor.  Thank you.

        THE COURT:  Redirect?

                REDIRECT EXAMINATION

QUESTIONS BY MR. HOLTSHOUSER:

Q    Did Dr. Martell give every neuropsychological test available?

A    No.

Q    Did Dr. Askenazi?

A    No.

Q    Dr. Gelbort gave a selection of tests as well, correct?

A    Correct.

Q    Okay.  Based on what you know now from the testing of Dr. Martell and Dr. Askenazi, would additional testing by Dr. Gelbort have made any difference?

A    Not in my opinion, no.

Q    The testing that he did do, by interpreting it the way that he did, did it enable him to present to the jury on Mr. Allen's behalf a claim of brain damage?

A    Yes.

Q    And in your view, that claim was not well founded by what was done then or now.

A    Correct.

Q    These risk factors that you were asked about, for example, in utero exposure to alcohol, in dealing with risk factors, are there -- are you looking at two questions?  One, did the conduct that exposed him to the risk factor occur, and, two, has there been an effect?

A    Yeah.  When you say something is a risk factor, you simply mean that the probability of developing a disorder is higher if you have this than if you don't.  That's all it means.  It doesn't mean it's a lot higher.

Q    Okay.

A    It just means it's higher.

Q    Before -- Before you can consider whether a risk factor has played any role in causing an effect, you first have to know whether or not the risk -- risky situation occurred.

A    And whether or not there's an effect.  If there's no effect, it didn't cause it.

Q    But there can also be no effect from the cause if there wasn't the event.

A    Right.

Q    So if Mrs. Allen claimed at one point that she did not drink when she was pregnant, that would at least be one indication that that effect -- that cause rather never occurred.

A    If somebody doesn't drink, drinking can't cause it.

Q    True.  Anything that you have seen that would indicate that Mr. Allen showed effects of fetal alcohol syndrome?

A    Nothing that I have seen from just looking at him across the room, no, but that's not ---

Q    Now there are other risk factors that were mentioned, and the evidence on some of these risk factors is voluminous and sometimes conflicting in this case.  I'm not going to go through each one.  One that you were asked about related to -- I think the question was:  There are several examples of concussions with loss of consciousness.  As you sit here today, do you have a photographic recollection of what any of

the medical records or other information related as to the claims of concussion or loss of consciousness?

A    I certainly don't have a photographic record of it.  I remember a report of a concussion but no reports of supporting things like a period of unconsciousness or a period of peritraumatic amnesia or a period of disordered cognitive functioning.

Q    Okay.  And so if there were subsequent accounts of any of those events which brought into question whether or not there had actually been a loss of consciousness, that would be something you would have to take into account in deciding whether or not, first of all, the event, which could be a risk factor, ever occurred?

A    Yeah.  I should say just to be really clear, Your Honor, that if you receive a blow to the head and your consciousness is altered, even though you don't pass out, that can be a concussion according to some but not all neurologists.  But ordinarily when they're talking about it, they're talking about being knocked out and then being knocked out for a period of time.

Q    The quote that you were reminded of in your deposition was you had an ethical problem with using outdated tests to determine if Mr. Allen has brain damage as of 2009, correct?

A    Yeah.  I mean it's just flat out in the ethical standards that we won't use outdated tests.

Q    Is there any way that a tester in 2009 can retrospectively decide, based upon his test results in 2009, that an individual had a particular mental functioning in 1998?  In other words, can you extrapolate back from present results to what the same results would have been 14 years earlier?

A    When it comes to something that is static, yes.

Q    Okay.

A    I mean if, you know, become severely brain damaged, you know, that will persist over time.  It depends on what you find and how severe it is, you know, but sometimes it's possible and sometimes it isn't.

Q    Now just as Dr. Gelbort was able to present to the jury an impression of Mr. Allen as being more impaired than you found that he was, did Dr. Martell's use of outdated norms have the same effect?

A    Well, I don't know exactly how he came to the conclusion that he had what he has because I didn't see it in his data, so I'm having a hard time.  If you say do I understand how he came to the conclusion that he has dementia, no, I don't.

Q    How about ---

A    Do I know that it was because of the norms used?  No, I don't.

Q    Okay.  With respect to the fairness and completeness of reporting, let me show you Exhibit 256, and I'll blow up this

section.  Let's say, for example, this paragraph dealing with, In addition, there was evidence of significant aphasia on the Boston Naming Test where his score was in the range of "severe" impairment, falling four standard deviations below normal for his age and education, Heaton norms.  So first of all, that indicates to you, does it not, that he's using norms which are not current norms which would be race adjusted, correct?

A    Yeah.

Q    And this is also one of the ones where he made the mistake --

A    Right.

Q    -- in order to get to four standard deviations.

A    Right.

Q    Now when reporting a significant aphasia which is an impairment of a sort, correct?

A    Yeah.  It means that he had, in particular, something that's called dysnomia, inability to name things, yes.

Q    Right.  Is -- Is it fair to make this paragraph in a report while at the same time not report in that report that he had a perfect score on the Aphasia Screening Test?

A    If he didn't mention it at all, it's poor writing.

        THE COURT:  It's what?

Q    (By Mr. Holtshouser)  It's what?

A    Poor writing or poor reporting.  You have to present all

data that bears on a point.

Q    What was the last part?

A    I say you have to present all the data that bears on a point.

Q    Would that be true with respect to most of the impairments which he mentions on this page?  For example, in Paragraph 1, he's referring to memory impairment.  Should he report all data that reflects on memory performance, not just the data on which he determined there was an impairment?

A    That's a matter of writing style, not necessarily in the same place, but he should report it all.

Q    Okay.  And this report that you were shown, Exhibit 600, purports to come from a Child Welfare Information Gateway and it purports to be published under the auspices of a Children's Bureau, ACYF, in Washington, DC, and is somehow associated with U.S. Department of Health and Human Services.  This particular paper is entitled "Issue Brief."  Do you see here indicated anywhere -- shoot; let's try that again -- an author?

A    I didn't.  But as I said, I haven't read it.

Q    The claims that Mr. Montroy went over with you in here, do -- is there any indication that they're based upon any scientific research or studies that have been validated by professionals in the field such as yourself?

A    This is typical for a lot of the informational stuff that

the Government puts out, and they -- they're written by

staffers, and they cite things, and how good they are depends

on them and you have to read them carefully.  Some of them are

very good; some of them aren't, you know.  It's a position

paper sort of.

Q    So without knowing who the author is, you could have

someone who is a bureau employee reading the work of a

professional in your field and not understanding what they're

reading and reporting, correct?

A    Well, you always have to read the stuff they cite to see

if it says what they say it says.  You know, they do that with

any professional, not just people who do this.

Q    Can a nonprofessional misinterpret or misunderstand

professional research?

A    Yes.  Also professionals can.

Q    You were asked several questions about notions of abuse.

To your knowledge, are there any objective or scientific

standards for the term "abuse" used within your field?

A    No.  There are some consensus position statements, but

there are no standards or criteria like there is with the --

the Classification of Disease 10 or 9 or like there is with

*DSM-IV*.  There is a consensus opinion that it's culturally

inappropriate and that it causes some damage, and it's not

acceptable to the people around, the person who does it, or to

the person who receives it, but --

Q    Is there ---

A    -- still no -- there's no gold standard.  There's no way you can say, "This person was abused."  You can just say, "This person reports abuse, and I happen to believe them."

Q    Well, for example, is there one school of thought which suggests that all forms of corporal punishment are abusive and never appropriate?

A    I've heard that said.

Q    And likewise, there's a school of thought that -- that in the view of others, it is appropriate in some circumstances.

A    Yeah, I agree with that.

Q    Is it generally accepted by you and professionals in your field that the kinds of things you want to look at, aside from labels, is conduct and then looking at the frequency, the severity, the impact and the intent of the actor?

A    Right, and the perception of the intent by the recipient.

Q    And likewise, are cultural attitudes a subfactor?

A    Right.  There's some things that are acceptable in some cultures that aren't -- or subcultures that aren't in others.

Q    So are there forms of disciplining children that are acceptable in other countries of the world that would not be considered generally accepted by the majority of people in the United States?

A    Yes.

Q    From the standpoint of clinical significance, rather than

what labels someone might attribute according to their individual standards, are you most interested in these other factors that I just described?

A    I don't know how to answer that question.  If I was looking for mitigation, I would like to see something that had a significant effect on a child because it occurred repeatedly and it was somewhat apparently malevolent in intent and that other people didn't approve of it and that somehow it explains something or other; whether or not it would explain the crime or explain the pathway they got on or something that made some sense somewhere.

Q    And that would include the severity of the particular conduct --

A    Right.

Q    -- and the impact on the -- the effect on the -- on the child or adolescent.

A    Right.

Q    So ultimately at the end of the day is your focus going to be on what happened?

A    Yes, and what effect it had.

Q    The ERBs that you -- you studied, your question about the role of variability, at the end of the day on the ERBs, at trial and now, is there -- is there any indication that they -- in them of any brain damage going on in Mr. Allen's life up till '91?

A   Not -- Not in anything they measured up until the date of the last testing.

Q   With respect to the collateral sources in 1998, your role was to supplement, you said, Dr. Yutzy's ---

A   That's what I understood my role to be, yes.

Q   Dr. Yutzy was the psychiatrist, you understood, to be actually examining Mr. Allen, looking and studying at all of the collateral information, such as police reports, statements of witnesses, family information --

A   Right.

Q   -- that had been provided by Dr. Randall, et cetera.

A   Yes.

Q   Your role was to evaluate the test scores obtained by Dr. Gelbort for what they said or didn't say about brain damage.

A   Yeah.  I think that was a good part of it, yes.

Q   Based on what you have since learned then regarding the results of the testing by Dr. Martell and the results of the testing by Dr. Askenazi, you've added those to your data set of looking at what information we have regarding Mr. Allen's brain function, correct?

A   (Affirmative gesture).

Q   And at the end of the day what is your opinion regarding Mr. Allen's brain function based on these tests?

A   He has a significant ability to learn new material, if he

wants to do it, and he has, and he apparently has learned some things.  And he has a significant ability to apply what he has learned to the problems he faces and, you know, that's good.

Q    In terms of any issues regarding his brain functioning that would have a causal nexus to the offense, are there any deficits?

A    I don't see any connections.

Q    And, in fact, do you see strengths that he has?

A    Well, yeah, but I don't see the strengths as having a causal nexus.

Q    Not a causal nexus but that he has strengths.

A    He certainly has strengths, and he's a little better at some things than others, but he's perfectly okay.  He can learn.  He can change.  He can grow.

MR. HOLTSHOUSER:  I think those are all the questions I have, Judge.

THE COURT:  Okay.  You may step down.  You are excused.  Thank you, sir.

THE WITNESS:  Thank you, sir.

THE COURT:  I know -- I've heard something about a plane trip.  And so if there's not anything further, Court will be in recess.

MR. HOLTSHOUSER:  One thing further, Judge, is we didn't do this with -- because Mr. Allen wasn't in the courtroom earlier.  The Government has a motion to strike the

testimony of Nicole Petty.

THE COURT: Yes, and that is confessed as I understand.

MR. HOLTSHOUSER: That's my understanding as well.

THE COURT: It is stricken. It will be transcribed, but it is stricken. It won't be considered by me, although it should be transcribed.

MR. HOLTSHOUSER: Nothing else from the Government, Judge.

THE COURT: All right. Anything from the Plaintiff?

MR. MONTROY: Your Honor, I believe Mr. Allen would like to address the Court, if that's possible.

THE COURT: In -- In what respect? The reason -- The reason I say, "In what respect," I don't want to appear that I'm not being attentive or want to dismiss what you want to say. It's just there are all kinds of dangers in doing that. The usual way I would do it is for you to stand there and tell your attorney what you want to tell me first. If they say it's okay, that's great. Do you understand why I'm saying that?

I don't want you to say something that will incriminate you or something that could be damaging to you in this or in any other proceeding. Do you understand?

THE PETITIONER: Yes.

THE COURT: Okay. Let's do it that way. Come to the

podium.

MR. HOLTSHOUSER:  Judge, I don't know what Mr. Allen intends to say either.

THE COURT:  I'm sorry?

MR. HOLTSHOUSER:  I don't know what he intends to say either, but we would object to him making any statements that are relevant to the issues before the Court --

THE COURT:  Right.

MR. HOLTSHOUSER:  -- without an opportunity for Cross Examination.

THE COURT:  Sure, yeah.  The agreement has been made that his deposition testimony will be considered in lieu of his testifying.

And certainly, Mr. Allen, do not say anything about the facts of the case, your opinions about anything.  If you want to just say something -- Let's do it this way.  Come to the podium.  Tell your attorney, and then if your attorney says it's okay and if it isn't related to anything that would be testimonial, I'll hear it.

(Pause)

THE COURT:  You know, if you want to say, "Judge, I think you're ugly," or anything like that, that's okay.

THE PETITIONER:  No, no, no, not at all.

MR. MORENO:  He does that to us in private.

So, what Mr. Allen has expressed to us is that he has

some frustration.  He's a little curious as to what the bounds of the evidentiary hearing is supposed to be.  He has concerns that issues related to guilt phase have come in when he didn't think this was a hearing about guilt phase.  We have discussed these issues with him, and we have given him what we thought to be, you know, the reasons why certain things came in and for what purpose, but he still is expressing some concern about that.  I'm not sure he actually wants an answer.

But I think you wanted to put on the record that those were some of your concerns.

THE COURT:  All right.

MR. MORENO:  Would that be fair?

THE COURT:  Okay.  And that has been done.  And that will have to be something between you and your attorneys.  I won't be interfering with that.  I'm confident or I'm assuming that it's all part of their trial strategy, and I won't interfere with that.  So I don't want to hear anything separately apart from that.  You take that up with your attorneys and persuade them one way or the other, and then they will react accordingly.  Do you understand?

MR. MORENO:  I think the concern was not so much that we weren't doing -- He was concerned that the Government was putting in things about guilt phase.  And even though we gave him explanations as to why, we may not like it, but why it still may, you know, have a reason for coming in, he wasn't

happy about that, and he wanted us to express that to the Court --

THE COURT:  All right.

MR. MORENO:  -- because he thought in some way it went beyond the bounds of the hearing that the Court had set, and he just wanted the Court to be aware of his concern in that respect.  Is that -- Is that accurate?

THE PETITIONER:  Yes.

THE COURT:  Okay.  All right.

MR. MORENO:  That's all.

THE COURT:  All right, very well.  And I will rely on your counsel.  If something comes up that you think is inappropriate -- that they think it's inappropriate, then they have a duty to object, and I'm sure they will.  All right?

MR. MORENO:  Yep.  Thank you, Your Honor.

THE COURT:  If nothing further, Court's in recess until 8:30 Monday morning.

MR. MORENO:  Okay.  Thank you.

THE COURT:  Yes.  You're welcome.

(Court adjourned at 2:55 PM.)

CERTIFICATE


I, Deborah A. Kriegshauser, Registered Merit Reporter and Certified Realtime Reporter, hereby certify that I am a duly appointed Official Court Reporter of the United States District Court for the Eastern District of Missouri.

I further certify that the foregoing is a true and accurate transcript of the proceedings held in the above-entitled case and that said transcript is a true and correct transcription of my stenographic notes.

I further certify that this transcript contains pages 1 through 144 inclusive and that this reporter takes no responsibility for missing or damaged pages of this transcript when same transcript is copied by any party other than this reporter.

Dated at St. Louis, Missouri, this 14th day of February, 2013.


_____

/s/ Deborah A. Kriegshauser

DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR

Official Court Reporter