UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

BILLIE JEROME ALLEN,                    )
                                        )
                    Petitioner,         )
                                        )
    vs.                                 ) No. 4:07-CV-27(ERW)
                                        )
UNITED STATES OF AMERICA,               )
                                        )
                    Respondent.         )

EVIDENTIARY HEARING -- VOLUME XVII
BEFORE THE HONORABLE E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE

DECEMBER 10, 2012

APPEARANCES:

FOR PLAINTIFF:      ELIZABETH U. CARLYLE
                    P.O. Box 30418
                    Kansas City, MO  64112
                    (816) 525-6540

                    TIMOTHY P. KANE
                    ERIC JOHN MONTROY
                    JAMES HENRY MORENO
                    KATHRIN HENNIG
                    FEDERAL COMMUNITY DEFENDER OFFICE
                    EASTERN DISTRICT OF PENNSYLVANIA
                    The Curtis Center, Suite 545 West
                    Philadelphia, PA  19106
                    (215) 928-0520

FOR DEFENDANT:      STEVEN E. HOLTSHOUSER
                    CARRIE COSTANTIN
                    OFFICE OF U.S. ATTORNEY
                    111 S. Tenth Street, Suite 2000
                    St. Louis, MO  63102
                    (314) 539-2200

REPORTED BY:        DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR
                    Official Court Reporter
                    United States District Court
                    111 South Tenth Street, Third Floor
                    St. Louis, MO  63102
                    (314) 244-7449

**INDEX**

ADMISSION OF EXHIBITS . . . . . . . . . . . . . . . . .   3


DR. SEAN YUTZY --

  Direct Examination by Mr. Holtshouser . . . . . .   6

  Cross Examination by Mr. Kane . . . . . . . . . .  94

  Redirect Examination by Mr. Holtshouser . . . . . 125


DR. GALIT ASKENAZI --

  Direct Examination by Mr. Holtshouser . . . . . . 130

  Cross Examination by Mr. Moreno . . . . . . . . . 235

  Redirect Examination by Mr. Holtshouser . . . . . 273


ADMISSION OF EXHIBITS . . . . . . . . . . . . . . . . 288

MR. HOLTSHOUSER:  Are we ready to proceed?  Go on the record?

THE COURT:  (Affirmative gesture).

MR. HOLTSHOUSER:  Okay.  Judge, we were going to begin with going over exhibits from Friday.

THE COURT:  Okay.

MR. HOLTSHOUSER:  Debbie's ready?  Okay.

The first would be Exhibits 101 and 102 which are the report of Dr. Gelbort and Dr. Gelbort's testing which Dr. Wetzel had reviewed.

MS. CARLYLE:  Hang on just a second.

MR. MORENO:  I'm sorry, Steve.  What is that again?

MR. HOLTSHOUSER:  101 and 102.  They're both Gelbort's report and Gelbort's testing Dr. Wetzel reviewed.

MS. CARLYLE:  Is there another one of Dr. Gelbort's notes?

MR. HOLTSHOUSER:  There is, but I don't think that ---

MS. CARLYLE:  Hang on just a second.  I'm sorry.

If you could, could we -- if we could leave those and do the others.  There was a question raised to me about one of the Gelbort exhibits, and I want to make sure I express it.  We can do the rest of them.

THE COURT:  Okay.

MR. HOLTSHOUSER:  Just a second, Judge.  579 is

Dr. Wetzel's C.V.

MS. CARLYLE:  No objection.

MR. HOLTSHOUSER:  579.

THE COURT:  Okay, yeah; just a second.  579, received.

MR. HOLTSHOUSER:  And then 580 is Dr. Wetzel's 2011 report.

THE COURT:  How about 579-A?

MR. HOLTSHOUSER:  No.

THE COURT:  Okay.  579, 580 received.

MR. HOLTSHOUSER:  Then one other thing, Judge, is we've entered into an additional stipulation.

THE COURT:  Okay.

MR. HOLTSHOUSER:  And I'll read it into the record, and then I'll offer the original, signed original, to the Clerk.

THE COURT:  Is there -- Is there a number on it?

MR. HOLTSHOUSER:  No; just a stipulation that will be part of the record; a factual stipulation.

THE COURT:  Okay.

MR. HOLTSHOUSER:  It's the stipulation that in 2002 Corey Allen provided the name of his mother, Darlene Roy, and the telephone number of 361-2304 to authorities.  The telephone number 361-2304 is the same telephone number listed next to the name Corey Roy on Exhibit 308, Rick Sindel Witness

List Memo.

THE COURT:  Okay.  Could you read the first part?  In 2002 Corey Allen, and that's as far as I got.

MR. HOLTSHOUSER:  Corey Allen essentially provided the name of his mother and a phone number as contact information to authorities, law enforcement authorities.  The phone number then is the same as the phone number that's listed next to the name "Corey Roy."

THE COURT:  Right.  I got that.

MR. HOLTSHOUSER:  Rick Sindel's Witness List in 1997.

THE COURT:  I got it.  Thank you.

MR. HOLTSHOUSER:  So it just draws the -- establishes the connection between those two numbers.

THE COURT:  Right.  Okay.  Thank you.

MR. HOLTSHOUSER:  And the actual text of the stipulation I'll give to the Clerk.

Other than that, Judge, if -- We're ready to proceed with our next witness.

THE COURT:  Okay.  So we only had two exhibits received this morning?

MR. HOLTSHOUSER:  Yes.  There are three on which Ms. Carlyle is going to get back to us with their position --

THE COURT:  All right.

MR. HOLTSHOUSER:  -- by the end of today.

THE COURT:  All right.

MR. HOLTSHOUSER:  If we're good to proceed, Judge, we'll call the next witness then?

THE COURT:  Yes.

MR. HOLTSHOUSER:  Okay.  The Government calls Dr. Sean Yutzy.

**DR.  SEAN YUTZY**,

HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

THE COURT:  Good morning.

THE WITNESS:  Nice to see you, Judge.

THE COURT:  There's some water over there to your left.

THE WITNESS:  Thank you.

DIRECT EXAMINATION

QUESTIONS BY MR. HOLTSHOUSER:

Q    Good morning, Doctor.

A    Good morning, sir.

Q    Would you state your name for the record, please?

A    Sean Hearn Yutzy, Y-U-T-Z-Y.

Q    And what's your occupation or profession?

A    I'm a physician specializing in Psychiatry, subspecializing in Forensic Psychiatry.

Q    Okay.  Everything has to be picked up in the recorder, so if you can pull that microphone closer to you, that will assist the court reporter in getting down the transcript as

well.

A    Very good.  Let me know if I ---

Q    Could you just briefly just give us an overview of your career following your education?

A    I completed medical school in 1982 in Virginia, and I trained in General Psychiatry here in St. Louis at Washington University School of Medicine from 1983 to 1987.

Then I was in an internship and residency.  I did a Fellowship in Forensic Psychology in Cleveland, Ohio, in '87, '88.  And subsequent to that time, I became a tenure of record at Washington University School of Medicine from basically 1989 until 2001 I was at the University.

2001, I moved to the University of New Mexico and became an Associate Professor and later Full Professor of Psychiatry at that University in the Department of Psychiatry, and at both facilities I ran the -- was the Director of Forensic Services as far as the Psychiatric Department was concerned at both medical schools.

Q    During the time that you were at Washington University, were you head of the Department of Forensic Services, a component of the Department of Psychiatry?

A    I was.

Q    Presently, where are you working?

A    Currently, I actually for the last 15 months work at Presbyterian Hospital in Albuquerque, New Mexico, and I'm a

hospitalist there.

Q    All right.  And you deal with inpatient psychiatric patients?

A    I deal with inpatient and also outpatient as far as the Emergency Room is concerned.

Q    Okay.

A    I remain also an Adjunct Professor of Psychiatry at Washington University School of Medicine as well.

Q    So you are presently working in a hospital setting, and are you still teaching?

A    I do.

Q    Now during the period that you participated in this case in 1998, were you then at Washington University?

A    That's correct.

Q    Prior to this case, what, if any, experience had you had in performing forensic psychiatric services in a capital case?

A    I guess my first contact would have been in capital cases when I was a Fellow in Cleveland at Case Western Reserve where I would have been involved in capital cases in that -- both in the state and I believe the federal circumstance or situation. That's where I was trained, and I sat in on a number of evaluations at that time.

Subsequent to that time, I returned to St. Louis.  I would have been involved in evaluations, high-level evaluations, some of which entailed murder cases.

Q    The -- Your role in testifying as an expert for one side or the other in the penalty phase of a capital case, was the *Billie* Allen trial the first example of that in your -- in your career?

A    No.  I would have been involved in the *Timothy Johnston* case which was a competency, sanity and death matter on the defense side in St. Louis prior to this.

Q    Okay.  How extensive has your experience been in capital cases since 1998?

A    I would say that it's not extremely common, but I usually have one or two cases open or running over the years.

Q    Okay.  It does not form the basis of your practice or your profession, though, over the course of your career.

A    I would say "no."

Q    Okay.  You are familiar, are you not, with the *Diagnostic and Statistical Manual of Mental Disorders*?

A    I am.

Q    Did you have any role in this text prior to 1998?

A    Yes.

Q    And what was that?

A    I was involved, as Wash. U was, in the development of the criteria for the *DSM-IV* which is the forerunner of the text you have in your hand.  I specifically was involved in field trials, looking at somatization disorder for the development of the criteria which actually were formally memorialized in

1994.

And in the text you have in your hand, I was on a committee that listened to all of the major psychiatric diagnoses, the descriptors as far as the information leading up to the actual assignment of the diagnosis and also reviewed the criteria for many or most of the major diagnoses in the *DSM-IV* text revision.

Q    The book that I have in front of me is the *DSM-IV-TR*, correct?

A    Correct.

Q    And that's the one that's currently in use until the publication of *DSM-V* which is anticipated sometime next year.

A    That's my understanding.

Q    At the time of the trial in 1998, was *DSM-IV* the governing manual for mental diseases and disorders?

A    That's correct.

Q    Directing your attention to this particular text, there is -- Can you go to the Elmo?

We've marked this as Exhibit 589 for purposes of identification, but included in the back of the *DSM-IV-TR* is a list of contributors, and highlighted there in yellow do you see your name as being among those contributing to the preparation of this particular text?

A    Well, this would have been contributors to the *DSM-IV* text.

Q    Okay.  Not the *TR*.

A    Correct.

Q    And the *IV* would have been the one that was in use in 1998?

A    That's correct.

Q    Now I want to shift gears here and just go to review a few basic principles that are -- by which you operate in your profession.  First of all, how is -- how is a text like this used in either reaching diagnoses or conducting clinical interviews?

A    Well, I think you used the proper language in terms of the governing text.  It is a guideline that we use to establish diagnoses.  That's the way I was trained and that's the way I've taught residents and fellows subsequent to that time.

The information in the text is -- some of it quite valid and reliable and there's other information that was developed by expert consensus, various experts, and I look at those as perhaps less valid and less reliable.

Q    Okay.  Now you use the term "valid."  What does validation have to do with the various disorders and diseases listed in the *DSM*?

A    Well, one would like them, the diagnoses as put forward in the text, to be considered valid and reliable.  In other words, it is a true diagnosis that is being observed and that

it appears the same in various circumstances and situations.

Q How does that -- How does that happen or how can that take place with respect to these kinds of disorders?

A Well, in terms of the major disorders, there's a historical precedent on most of them that's described in the literature going back 4000 years, particularly somatization disorder and hysteria. It's important, in my opinion, to look at the descriptions and to look at how these diagnosed -- how these illnesses have flowed over time as far as how they're considered by various authors and whether they're valid and reliable in terms of trying to apply them to the individuals that present in various circumstances; Emergency Room treatment and forensic evaluations.

Q Is there a concept of scientific validation?

A Certainly.

Q You described the major mental illnesses.

A Yes.

Q Approximately how many various disorders are described in the *DSM-IV* or *DSM-IV-TR*?

A Recently written, I think there's about 400 -- over 450 in the *DSM-IV* text revision.

Q And of those, how many would you categorize in major mental illnesses?

A I would kind -- I wouldn't phrase it quite that way.

Q All right. Is there a much smaller number that you would

characterize as a major mental illness or mental illnesses which are -- have been scientifically validated through scientific process?

A    That's correct; a much smaller number, along the order of about 14 as far as the major categories are concerned.

Q    Now is there -- Are you familiar with the phrase "Nosology"?

A    I am.

Q    And what does that mean?

A    Nosology is the medical term for the classification of disease.  It's how the psychiatrists and physicians really -- and it grows from general medicine -- assess, identify validity and reliability of certain illnesses and how they classify them and structure them as far as the diagnostic manuals are concerned.

Q    Now there are -- Are there two schools of thought in Psychiatry and Mental Health?  One known as the psychoanalytical school and the other the diagnostic school?

A    I think that that's fair.  I think that the psychoanalytic theories have fallen much by the wayside and there is a substantial movement towards what I refer to as the biological school or the descriptive school.  I prefer that term.

Q    And in terms of practice, what are the implications for practice of the fact that the psychoanalytic method has fallen

by the wayside and the diagnostic has prevailed?

A    Well, the diagnostic actually preceded the psychoanalytic rise.  And I guess just as a topical comment, I would say that the diagnostic really tries to adhere to looking at whether the individual has a mental illness and to try to treat that mental illness which is analogous with general medicine in terms of what's the diagnosis, what are the symptoms, and how does this drive you to a diagnosis.  Once you get to the diagnosis, then the issue is then prognosis, and you treat the individual's underlying illness.

Q    In terms of reaching a diagnosis, do you examine symptoms -- symptomology along with the developmental history and the life experiences of the individual?

A    I think that that's fair.  It's the overall package.

Q    So do you try to understand what the symptoms mean in the context of their experiences?

A    "Mean" in the sense of how they flow from the illness versus a psychoanalytic school which identifies a symptom as the primary issue.

Q    Is there a certain subjectivity to that process?

A    Yes, there is.

Q    Is there something known as "tester bias"?

A    Certainly.

Q    And how does tester bias come into play in a clinical evaluation?

A     Well, tester bias may be a reflection of how the physician or psychiatrist or evaluator was trained in terms of what they're attempting to look for, and that bias may prejudice them as far as specifics that they're looking for and moving forward towards, trying to construct a psychiatric diagnosis.

Q     Are you -- Are there instances in which a patient has been examined by a number of mental health experts over a period of time?  In other words, there are frequent contacts with various Mental Health experts --

A     Yes.

Q     -- in a history?  What is the effect of -- or can there be an effect rather on the patient, sort of an educational process by repeated questioning along various topics and lines?

A     Certainly.  I think that patients and evaluees can be educated by the process in terms of moving towards answers which the evaluator or the evaluee may think that the evaluator is looking for.

Q     Among Mental Health experts in dealing with the same patient often, is there a high degree of variability?

A     I'm sorry?

Q     High degree of variability?

A     In terms of the report?

Q     No; in terms of the ultimate diagnosis by -- In other

words, if you have multiple Mental Health experts looking at the same patient, doing the same -- conducting their own clinical interview, looking at the same underlying historical records, is it uncommon that you end up with different opinions and diagnoses?

A    It is not uncommon, particularly when the fact base is different.

Q    Now I want to direct your attention more specifically to Post-Traumatic Stress Disorder.  You mentioned that there are approximately 14 major mental illnesses in the *DSM* that have been scientifically validated.  In your opinion, is PTSD one of those?

A    It is not one of those.

Q    Can you describe for the Court what type of a disorder PTSD is?

A    Well, PTSD is a -- historically was a disorder developed by expert consensus in the late '70s and was memorialized originally in 1980 in the *DSM-III* to try to include the Vietnam vets and the experiences that they had experienced over time.

The diagnosis has changed in 1980.  It was solely dependent on the psychiatrist's interpretation of the stressors.  In 1987 the *DSM-III-R*, the diagnosis changed, and it was more of a discussion between the patient and the psychiatrist as to whether the stressor would qualify as far

as the entry stressor.  And in 1994, it actually moved to the patient was the one that determined or the evaluee was the one that determined what a stressor was.  So the actual entry criteria in terms of interpretation has changed over time.

Q   Has it fallen in the family of illnesses known as an anxiety disorder?

A   It does.  I mean it's -- Technically, it's in the text. It can be identified as a mental disorder, but it's not a primary illness.  It's not a primary onset of a psychosis or schizophrenia.  It's not the primary onset of a depression. It is technically a reaction to a stressor which is thought to meet the criteria as determined by the APA at the time.  So the -- It is highly dependent upon the individual and the individual's genetics and temperament and character style about how they will react to this situation and whether it will actually take form as a true mental disorder or not.

Q   So if you have a triggering event in PTSD, different people are going to react to it differently?

A   Correct.

Q   And in terms of the illness that is described in *DSM-IV* or *DSM-IV-TR*, it is a former variety of anxieties that are produced by the event in some people as opposed to others?  Is that accurate?  Does that accurately describe in a broad way what PTSD is?

A   In fact, I think it was placed there because there wasn't

really a good sense of where to put the disorder as a matter of fact because it is a reaction, and there's very few reactions which are actually identified in any of the *DSM* series because it's thought to be theoretical.  So the issue was it was thought to be an anxiety disorder broadly and, therefore, they decided to place it in that category.

Q    Along with the event then, does the *DSM* criteria require certain reactions, certain symptomology that is indicative of the anxiety?

A    Correct; that allows the diagnosis to be made.

Q    All right.  And then ultimately in order to have -- for it to be clinically significant, does it require a certain impact on an individual's functioning capabilities, sort of a before and after change?

A    Certainly.  There should be interference with social, occupational, interpersonal functioning.

Q    I'm going to put on the document camera here Exhibit 588. First of all, ask you if you recognize this text?

A    Yes, I do.

Q    And what is this?

A    This is the sixth version of *Psychiatric Diagnosis* originally published by -- or originally written by Goodwin and Guze, and it's my version, along with Carol North.

Q    Okay.

A    The sixth came out in 2011.

Q    And who is "Carol North"?

A    Carol North was an attending of record with me in St. Louis.

Q    Is she at the University of Texas?

A    She is.

Q    And among other things, is she director of the Trauma and Disaster Center at the University of Texas?

A    She is.

Q    So the views that are expressed in this book, are they shared by her as well as you?

A    They are.

Q    How is this -- How is this text used?  What is it -- Who is it written for?

A    It's written for primary education of medical students and residents in terms of how diagnosis is established and can be used by really anybody, but those are the main target -- target audience that we would be looking at as far as educational text is concerned.

Q    This is what is used in various departments of Psychiatry to educate medical students about Psychiatry?

A    That's correct.

Q    I'm going to show you Chapter 5.  Is this the chapter that deals with Post-Traumatic Stress disorder?

A    Yes, sir.

Q    Now this particular text, the sixth edition and your

co-authorship of it, it has a copyright, I believe the last date is 2010, but when did -- when did your contributions to it come into the picture?

A    That text was started in about 1999.

Q    Okay.  Among other things, are your views about -- your and Dr. North's views about PTSD contained in Chapter 5, particularly the lack of validation of the illness?

A    That certainly is contained in that chapter, and we certainly very carefully groomed it.

Q    Very carefully what?

A    Groomed it.

Q    Okay.  And on Page 136, is this expressed in the phrase, "Validation and reliability of PTSD as a psychiatric diagnosis awaits more definitive research, especially determination that the symptoms correlate more with each other than with other disorders"?

A    Correct.

Q    And is there -- Does it -- On Page 139, does it summarize your -- the state of the research with respect to PTSD, describing it as "an uncertain validity of the current state of development of diagnostic criteria for the disorder"?

A    Yes, it does state that.

Q    Okay.  In fact, are the criteria for PTSD, have they been proposed to change that again in *DSM-V*?

A    I believe so.

Q    So it still remains an illness who's diagnosis is in flux.

A    In evolution for sure.

Q    Now without going into too much detail, this concept of scientific validation, is there something known as "Guze's five phases for establishing validity and reliability of a psychiatric diagnosis"?

A    Yes, sir.  That was what was alluded to earlier as Reference 174.

Q    All right.  And those five phases include clinical description, lab studies to delimit it from other disorders.

THE COURT:  How do you spell it?  What did you call it?

Q    (By Mr. Holtshouser)  Is it Guze's?

A    It's Guze.

Q    G-U-Z-E-(')-S.

A    Correct.

Q    G-U-Z-E-(')-S.  As well as follow-up studies and family studies, including genetic or environmental studies?

A    Those are the five phases, correct.

Q    And that's lacking at this -- as far as PTSD is concerned with the current state of research.

A    That is the gold standard for validity and reliability, and they are lacking in this diagnosis, correct.

Q    The concept of delimiting it from other disorders, what

does that mean?

A    Exactly as you identified earlier.  You can't tell whether the symptom flows or the symptom pattern flows from a reaction to a stressor versus a different disorder, panic disorder, versus a generalized anxiety disorder.  In other words, the diagnoses and the illness need to be separated.  For example, you can easily separate schizophrenia and antisocial personality disorder based on a symptom pattern from the early history and evolving over time.  PTSD being a -- or sorry -- Post-Traumatic Stress Disorder being a reaction to a situation makes it quite difficult, particularly if there's pre-existing problems, pre-existing diagnoses.  So one needs to be able to clearly separate out the actual illness from co-morbid factors.

Q    Meaning other illnesses that are listed.

A    Yes.  Yes.

Q    And is there any science which supports the validity of PTSD as a delimited disorder?

A    No.  I would say that it's the exact opposite.  It's hard to delimit from other disorders.

Q    What is the connection, if any, between the illness of PTSD as described in *DSM-IV* and *TR* and the concept of impaired judgment?  In other words, what is the impact that PTSD, if one has it, on -- on questions of judgment and rationality?

A    Well, I guess -- I guess my position would be that PTSD

is identified as an anxiety disorder, and it's a reaction to a stressor. So by definition, as a Forensic Psychiatrist, I would not look at it as a -- as an entity which would interfere with an individual's rationality and ability to weigh various options as far as behavior is concerned as you might expect in psychosis or delusions or as you might expect in other states where the individual has difficulties with rationality. Anorexia nervosa would be another one.

Q    So in connection with PTSD, are irrational belief systems considered a hallmark of PTSD or is that something that you commonly see? Irrational belief systems.

A    No, you would not see irrational belief systems in PTSD, generally speaking.

Q    Okay. So generally speaking, anxiety disorders, of which PTSD is one, don't interfere with perception of reality.

A    Correct.

Q    Is there -- We talked -- When Mental Health experts talk about the concept of impaired judgment, from a clinically significant impaired judgment, are you usually talking about irrational belief systems?

A    Of significance, correct.

Q    All right. Now is there, likewise, in -- in, I guess, nonprofessional terms a judgment concept that relates to what might be called "good common sense" by conventional thinking standards?

A    I'm sorry.  State that question again.

Q    Is that in contrast, though, to like when -- When lay people talk about judgment, they're often referring to using good common sense by what we would -- normal majority of people consider conventional thinking.

A    Correct.  I understand.

Q    But those are two different things, correct?

A    In my opinion, they are.

MR. HOLTSHOUSER:  I'm sorry?  Oh, I thought I ---

THE COURT:  We got some kind of a feedback.  I don't know what it was.

MR. HOLTSHOUSER:  Oh, okay.

Q    (By Mr. Holtshouser)  Is there any relationship as far as you know between someone who suffers from PTSD and their ability to engage in sort of cost benefit analysis in making decisions or to choose a goal and engage in behavior to achieve that goal?

A    No.  It's -- Again, it's a reaction to a -- or can be a reaction to a stressor.  It does not ---

THE COURT:  Are we getting ---

MR. HOLTSHOUSER:  A little buzz or feedback there.

THE COURT:  Somewhere.

THE WITNESS:  Shall I finish or ---

THE COURT:  Pardon me?

THE WITNESS:  Shall I finish?

THE COURT: Yes, sir. You said, "No. It's a reaction to or can be a reaction to a stressor. It does not," and then that's where we stopped.

A    All right. The disorder should not interfere with the individual's realistic appraisal of various options in terms of moving forward either in thought or in behaviors in a situation. It shouldn't have any effect that way.

Q    (By Mr. Holtshouser) Okay. Now let me direct your attention to -- All right. I'm showing you Exhibit 589-A, and these are the diagnostic criteria for Post-Traumatic Stress Disorder which is 309.81. And just beginning with the first component, the first thing you have to have is -- the first thing that's required is a triggering event, correct?

A    Entry criteria, correct.

Q    And the triggering event has to be of a certain type. Is that right?

A    Yes, sir.

Q    It has to produce intense fear, helplessness or horror, correct?

A    That's correct.

Q    Okay.

THE COURT: Okay, just a second. I'm getting behind here. It has to produce intense fear, helplessness or horror?

MR. HOLTSHOUSER: Correct.

THE COURT: Just a second.

(Pause)

THE COURT: Okay. Go ahead.

Q  (By Mr. Holtshouser) The *DSM* gives in the first section here some further description to the types of events that would qualify, including actual or threatened death or serious injury to another person or to himself.

A  That's my understanding.

Q  So someone having a brush with death, it might impact someone with these sorts of reactions. Then you would look possibly for whether there's any clinically significant anxiety associated with it, correct?

A  Again, it may or may not, but, yes, that would be -- Once they meet one of the criteria, then you move into exploring further.

Q  All right. And so even if you have all of these other symptomology, which we're going to look at in a second, if you don't have this, you don't have -- you don't meet the criteria for this illness.

A  Again as I testified, it's entry criteria. So if you don't meet the entry criteria, you actually don't go through the algorithm to look for the other downstream issues as far as trying to confirm or not the diagnosis.

Q  And this diagnosis is a label to describe particular situations and symptoms, correct? A collection of symptoms brought upon by a particular event?

A   It's a constellation of symptoms which may be flowing from and after a traumatic situation.

Q   If you don't meet these criteria, you don't get this label?

A   You would not get this label.

Q   I'm showing you this next page which contains more of the requirements for PTSD.  There is this category of persistent re-experiencing, correct?

A   Correct.

Q   There's a category of persistent avoidance of stimuli associated with the trauma.

A   That's correct.

Q   And then there's persistent symptoms of increased arousal, and there are examples below.  The re-experiencing, all that's required is one or more.  The persistent avoidance, three or more; and arousal, two or more, correct?

A   Yes, sir.

Q   So the choice of these -- these numbers, is that based upon any scientific research or validation, or how does one -- how -- how are those arrived at?

A   The original criteria for *DSM-III* in 1980 were not done with field trial.  They were actually done by expert consensus.  These were some of the issues that were raised at that time.  They were codified in the *DSM-III* in 1980. Research subsequent to that time identified some of these

symptoms as helpful and in driving the diagnoses.  They were thought to be supportive of the diagnosis.

Q   So are there -- Is the diagnosis criteria for PTSD really just a construct or way of describing a group of symptoms associated with an event?

A   Correct.

Q   Now the persistent re-experiencing, among the examples include things like recurrent or intrusive recollections, dreams, a feeling as if it's recurring, intense distress at exposure to cues that symbolize or resemble the event, and physiological reactivity on exposure to cues that symbolize or resemble an aspect of the traumatic event.  In dealing with the type of event which you know to be an issue here, that is, the witnessing close by the murder of a friend, Marquis Taylor, in the case of the Mr. Allen, what types of re-experiencing would qualify for this -- this aspect of the diagnosis?

A   What types?  So I mean ---

Q   How specific to the event would they need to be to be -- to qualify under this -- this heading?

A   In my opinion, they would need to be very specific because it's a situation-dependent matter.  Again, the diagnosis is related to something that happens.  So the trauma and the symptoms have to be related to that trauma.  If they are not, then they would not be associated with this, and they

would be, as you referred to or I'll use the word, "confounders."  They would be part of another process in this situation.  So in my opinion, the death of Mr. Taylor would have to be specifically giving rise to these issues and these criteria.

Q    If -- With respect to dreams or nightmares, if the dreams were about Mr. Allen himself being killed in his backyard as opposed to dreams about again seeing Marquis Taylor get killed, would -- would that qualify?  Is that an example of persistent re-experiencing?

A    Well, it may or may not be.  If it's in regards to the drug dealing aspect of things and a realistic concern about this situation, then, no, that's not part of this criteria.

Q    The persistent avoidance of stimuli associated with the trauma, what would be examples of stimuli associated with the trauma related to seeing a friend murdered?

A    It would be things that led up to the situation; the issue of guns; the issue of how it may have come about.

Q    Would it include place?  Location?

A    Place, circumstance situation.

Q    People involved?

A    Correct.

Q    Personnel?  Time of day?

A    Can be.  Here, probably not.

Q    And persistence avoidance -- persistent avoidance, what

is generally required in terms of the type of behavior to meet that criteria?

A   Again, I mean for my interpretation of this, it would be that the individual continued to try to avoid placing themselves at risk in the same or similar circumstance as they -- as the traumatic event arose.

Q   Would it include avoiding the location where it took place?

A   Could be.

Q   Avoiding associating with the people who were associated with the event?

A   Certainly.

Q   This concept of increased arousal, difficulty falling or staying asleep, outburst of anger, can't concentrate, hypervigilance, exaggerated startle response, these first three are, I think, easy concepts to understand.  What is it about hypervigilance or exaggerated startle response that -- that relates to PTSD?

A   Only in the sense that it's related to the original stressor in terms of hypervigilance of an individual that doesn't want to be in the same or similar circumstance. Really it's almost better here in terms of like rape situations where females will try to be very aware of their circumstance and their situation and try to not place themselves at risk.  Usually rape is a particularly traumatic

situation.

And exaggerated startle response is a noise or something or a loss of control of the circumstance may lead to a jump or something like that if a noise or a door is slammed or something of that nature.

Q    Even though it's at the end -- First of all, there's a concept of duration; has to be more than a month, and then there's (f).  Even though it's at the end, is (f) particularly important in the diagnosis of PTSD?

A    Certainly, it is.

Q    And it requires -- There has to be a causal nexus between the disturbance and distresser impairment in social, occupational or other important areas of functioning.  And then there's the concept of acute or chronic delayed onset. The clinically significant distresser impairment, what is it you're looking for there in terms of a "before" and a "after" the event?

A    Well, whatever the change is should not precede the incident, the situation.  So if the individual was avoiding certain circumstances prior to the incident, it would not qualify as being directly related to the trauma in the situation.

Similarly, individuals can have -- meet the earlier criteria, but the issue is it has to be -- it has to be significant in terms of social or occupational.  So if it

doesn't make any change in their behavior, then it would not qualify as PTSD as far as the label is -- is considered.  So there's many individuals that have something bad happen to them and -- car wrecks or whatever, have their life at risk, but the issue is -- has to -- after a month, the symptoms need to be in place, and it has to interfere with their ability to function.  Just because they have an occasional nightmare six months later is not significant in the situation.

Q    So in terms of social impairment, if the individual had a social life related with family, friends, sought out entertainment, engaged in social activity outside of the home before the event, what would you be looking for after the event?

A    Well, I mean the way the diagnosis is constructed, they should withdraw.  They should keep to themselves.  They should not place themselves in any sort of circumstance or risk to have a recurrence of the situation.

Similarly, the -- a lot of the symptoms address issues of interpersonal relatedness, and it's most consistent with this type of diagnosis for the individual, again, to withdraw, not to go out and not to place themselves in the same sort of circumstance as well as to interfere directly with other relationships which are collateral in terms of just that they just don't have the same feeling, focus and future as far as their life is concerned.

Q    Occupational impairment, in order to find that, would there need to be a period of occupational success before the event followed by occupational failure after the event?

A    Yes, that's correct.

Q    So if the individual was sporadically employed or having problems with employment or not interested in employment before the event and some of that continued after that, if there's no change there, that would not be attributed to the disturbance?

A    It can't definitely be attributed to the disturbance.

Q    Now assuming that someone actually has PTSD and meets these criteria, do you have any expectation of how an individual with acute or chronic PTSD would react in a -- in a situation where they're exposed to a new traumatic event?

A    Well, the literature identifies that if it's a new traumatic event similar to the situation, one would identify that they may have significant difficulties that they -- that they had prior to or after the first event.

Q    So if someone was experiencing PTSD from -- If they had met these criteria as a result of experiencing gun violence firsthand, would planning to commit an armed robbery where there was a risk of getting shot be consistent or inconsistent with the existence of PTSD?

A    In my opinion, based on a reasonable degree of medical certainty, it would be very inconsistent.

Q    Would participating in an event where the individual with the PTSD allegedly from gun violence was going to be the source of new gun violence or experiences, would that be a -- how would you expect someone to be functioning if they had PTSD from a previous gun violence event?

Is that question not clear enough?  Let me try that again.

So again, we're assuming that an individual has PTSD as a result from experiencing close hand, firsthand gun violence to someone close to them.

A    Yes, sir.

Q    Participating in a new event where this individual with this PTSD was going to be the source of new gun violence, how would that factor into your analysis?

A    Well, as the criteria identify avoidance of the circumstance that led to the anxiety would be the primary -- one of the primary issues that I would be concerned about.  If violence had -- death had come close to home in the situation, inviting the risk of the same situation specifically related to you would be wholly inconsistent, in my opinion, with the -- an alleged anxiety disorder in which you were worried this was going to be revisited on you.

Q    Is PTSD primarily a self-report subjective diagnosis?

A    In my opinion, it is.

Q    So it requires the individual to articulate these

criteria are affecting him or her to even begin to determine whether it's a valid diagnosis.

A    That, and it's an anxiety disorder.  And individuals who have anxiety disorder generally have the ability to communicate the information.  So the primary source of information would be the individual complaining, "I have anxiety and this is the reason why."

Q    Now some of the symptoms that are here, described here, such as the hypervigilance, exaggerated startle response or social or occupational impairment, can those kinds of things also result from excessive abuse of alcohol or marijuana?

A    Certainly.

Q    And if you have an individual who is abusing alcohol and marijuana at the same time, claiming to be suffering from some of these symptoms as a result of witnessing a traumatic event, is there any way to know whether the job and social impairment is the result of one and not the other?

A    It's very difficult to tell.

Q    Is there in your -- in the -- in the practice an average duration of someone with true PTSD?

A    Yes.

Q    What is the average duration?

A    And the average duration is very short.  Number one, the issue of the diagnosis of PTSD is very -- It's uncommon if the individual, after a month, will continue to have these

symptoms and meet the criteria, even though a rather traumatic situation has been visited upon them. The earlier literature, in particular, is clear about it's -- it's uncommon after one year for the individual to still meet the core criteria or to meet the criteria going forward.

Q    And does it usually weigh in with time? Passage of time?

A    In my opinion, it certainly does.

Q    Is chronic PTSD very unusual?

A    The complaint of chronic PTSD is not very unusual. The actual true disorder, in my opinion, is quite unusual.

Q    Are you aware of any scientific research which links child abuse or adolescent abuse with susceptibility or higher risk of developing PTSD from exposure to a later qualifying event?

A    I'm aware of some of the literature.

Q    Your views regarding -- that you've expressed here regarding the questions -- the questionable validity of the disorder, are those views shared by your peers?

What is the level of acceptance of those views by your peers?

A    In my opinion, as far as my peers, as far as Forensic Psychiatry, I think there's a significant concern about this label. As far as General Psychiatry, I think it's much more broadly applied and with often not much attention to the criteria. And unfortunately, in the private practice now, you

see the issue about all you have to say is something happened and, therefore, there's an automatic inference that something did happen and without ever any re-investigation of the situation and how it was given.  It's all, also, considered almost improper to ask about the original trauma in certain situations.

Q    And why is that?

A    It's considered to be indelicate in certain matters in regards to rape and what not and the circumstances that led the individual into it.

Q    Let me show you -- Is this an article, Exhibit 657, published in 2005 that discusses, obviously, the empirical limits of forensic health assessment in *Law and Human Behavior* with specific focus, among other things, on PTSD litigants?

A    Correct.

Q    And that's *Law and Human Behavior*, Volume 29, No. 1, February, 2005.

Let me show you Exhibit 658.  This is a more particular article in 2005 in *Law and Human Behavior* dealing with the empirical limits for forensic assessment of PTSD litigants in particular.

A    Yes.  I'm familiar with this article.

Q    And do you -- Are you -- Do you endorse the views expressed in both of these articles?

A    Without going through, generally I would say "yes."

There may be items in there which I may not agree with in a situation, but since we provided them to your office, I think they're ---

Q    In particular, does this article discuss that they're -- regarding measures of PTSD, that they've not been evaluated sufficiently within litigating samples and are infrequently used by forensic assessors?  "Common methods for trauma screening are insensitive," which means -- Does that mean that they're not actually capable of detecting legitimate claims of PTSD from illegitimate claims?

A    I think that's correct.

Q    Is that what "insensitive" means?

A    Yes, sir.

Q    Okay.  "Opinions about causation of PTSD are complicated by retrospective memory biases."  And then does it go on to have other criticisms of the state of knowledge about PTSD?

A    It does.

Q    All right.  Dr. Yutzy, we're going to shift gears here a little bit, and I want to focus your attention to 1998 and what you did in this case which brings you back here 14 years later.

First of all, you were asked to participate in this case and to provide an examination of Mr. Allen and to conduct a diagnosis and express your opinions regarding his mental health, correct?

A    That's fair.

Q    When you went into it, were you looking to limit your inquiry into a particular area?

A    I was not.

Q    Okay.  Prior to examining him, were you aware that Dr. Cuneo had examined him, written a report that he labeled a Competency Report, and had explored various areas of his social history and diagnosis and so forth?

A    I was.

Q    And in that report Dr. Cuneo, in fact, had rendered an actual mental health diagnosis, correct?

A    Several, I believe.

Q    He did not limit his opinions to just a question of whether or not Mr. Allen was competent to stand trial.

A    No.  There were diagnostic tests within that document.

Q    Now do you recall that Dr. Cuneo gave Mr. Allen something called the "MMPI"?

A    Yes, I do.

Q    All right.  Are you -- Is there within the MMPI any scale or screening mechanism for PTSD?  Something known as the "Keane Scale"?

A    Not as originally developed.  It was developed secondarily.  The Keane Scale was a re-application in looking at the symptoms which may overlap PTSD, correct.

Q    All right.  So maybe a correct -- I might be confused,

but was that in existence in the MMPI that Dr. Cuneo used in 1998 or was that developed later?

A    It would have -- Actually it would have been developed earlier, but it's been in evolution over time because the diagnosis has changed.

Q    As you sit here today, do you recall what the cutoff score was for PTSD under the MMPI and under the Keane Scale at that time and what Mr. Allen's score was against that scale?

A    In all honesty, I do not.

Q    Okay.  You were provided a variety of materials to review, both prior to and after your examination of Mr. Allen, correct?

A    I certainly was.  I certainly have been.

Q    Okay.  At the time back in the trial, let's just limit our focus to 1998, you had been given a variety of materials that related to the offense, police reports, materials that the Government provided you, correct?

A    That's correct.

Q    And you were provided with whatever mental health or life history materials that the Government had received from the defense.

A    That's correct.

Q    Were those very limited?

A    As I recall, they were.

Q    You proceeded to conduct an examination of Mr. Allen,

correct?

A    I did.

Q    Now did that -- That primary focus of that examination was a clinical interview.

A    That's correct.

Q    You weren't there to give a battery of tests and score them and draw conclusions from the test scores as, say, Dr. Gelbort did or others have done since then within the field of Neuropsychology, were you?

A    No, I was not.

Q    Your examination of Mr. Allen, was it recorded?  Do you recall that it was recorded?

A    It was.

Q    And you recall that at the time of the exam, you know, that there was a -- that there was an issue rather; that it was actually Mr. Allen's team that wanted it recorded for future purposes?

A    As I recall, there was a hearing on this matter, and his team did request that.

Q    Initially, was it your request that it not be recorded?

A    That's correct.

Q    And you had reasons for not wanting it -- for wanting it to not be recorded that had to do with the effectiveness of the examination, correct?  Your abilities to function as an expert in the examination.

A    I don't know that that's exactly -- It would have been that it may distort the actual interview process is probably what I testified to at the time.

Q    So it actually -- You felt that from the -- from the standpoint of not being able to get the best interview results, it would have interfered.

A    In my opinion, it could have distorted the process.

Q    But it was Mr. Allen and his -- his attorneys which insisted and prevailed that they succeeded in getting it recorded.

A    I don't know that, but I suspect it's true.

Q    Do you recall how it was recorded and whether or not in your view it actually did distort any aspect of the examination?

Did it have the -- any interference with your ability to examine him in your view?

A    It had some difficulty with my ability to use a tape recorder at the time in the situation and some frustrations with trying to make sure that everything was on the tape. As far as Mr. Allen's responses, I did not have the sense that -- that it interfered materially in the situation, although in reviewing the transcript, because of the "inaudibles," it did interfere somewhat with the information recorded.

Q    It may have failed to record all of the statements in some places because it just didn't pick them up clear enough

to transcribe them, right?

A    Certainly.

Q    But in terms of the intrusiveness of the recording process, it was simply a tape recorder in the room with the two of you.

A    That's correct.

Q    There was no third party in the room operating any equipment or otherwise interfering with your ability to get candid answers from him?

A    No.  I do not think that the process, other than my frustration with it, interfered with the actual information.

Q    You've since become aware that there was a transcript prepared of that examination, correct?

A    That's correct.

Q    I'll show you Exhibit 46.  Is this the first page of that transcript?

A    Yes.

Q    Showing that it was transcribed by Court Reporters Susan Moran and Patti Dunn-Wecke.  And this is an introduction by a Special Agent Johnson and you're present.  John Simon is present.  I'm present.  Mr. Allen is present in that first paragraph.  Do you see that?

A    I do.

Q    There was an acknowledgment and waiver of rights that was provided to Mr. Allen at the beginning by Agent Johnson.

Mr. Allen indicated that he understood.  There was a description to Mr. Allen of what was referred to as the "Chinese wall."  And then at that point all departed the room with the exception of yourself and Mr. Allen, correct?

A    That is correct.

Q    And then on Page 5 there, you actually begin the examination of Mr. Allen.

A    That's correct.

Q    Okay.  Now approximately how long did you examine Mr. Allen?

A    It was approximately five-and-a-half hours.

Q    Was there a break?

A    There was.

Q    Were there -- Were there -- Was there a lunch break and was there other breaks taken as needed?

A    There was a lunch break.  I believe that there was one other pause, but I don't recall for -- after 14 years.

Q    Can you give the Court some sense of your having -- You've read this again more recently, correct?

A    I have.

Q    And does it refresh your recollection as far as the circumstances of the -- of the examination and your interaction with Mr. Allen?

A    It certainly does.

Q    How would you describe, in retrospect, I suppose now, the

quality of your clinical interview of Mr. Allen from a psychiatric point of view?

A    The quality of the interaction, I mean it's a fairly routine approach to the situation in terms of the gathering of information, trying to establish psychiatric diagnoses, being cordial and also somewhat deferential in a high profile matter regarding Mr. Allen.  There are a few light moments in the situation to make sure that he did not -- was not concerned and in an effort to try to get him to tell me his story.

Q    So did you feel that you established a rapport with him?

A    In my opinion, in that circumstance, in that situation, I do.

Q    Did you feel that he understood the conversation the two of you were having?

A    I certainly did.  I had no concerns which was one of the issues about his ability to receive and process information and to respond appropriately.

Q    I'm going to just bring to your attention and then ask -- ask you about several points in the transcript, the first being the issue which appears to be relevant now, and that is questions that you asked him regarding any abuse to which he had been subject to during his life.  Did you ask him questions about that?

A    I did.

Q    Why did you do that?

A    Well, as is on the tape, that was a routine Q & A at that time as far as from a general psychiatric point of view and from a forensic standpoint.  So it would have been part of the process.  I tended not to front load in certain cases, although it's a little unclear to me as to why it didn't hear, and to make sure that you establish rapport with the individual before you intruded in those particular areas.

Q    Did you ask him more than once?

A    I did.

Q    Is that because you felt that you hadn't gotten a truthful or honest answer the first time or why did you revisit the subject?

A    Well, it wasn't that.  It was, I guess, two issues.  One was I just wanted to make sure.  And then the second issue, I cannot recall why.  There was something that had tipped or had alerted me in some way that I needed to make sure about this issue.

Q    All right.  I'm going to show you Page 11 and directing your attention to Line 11.  If you look above that, you're at this point, I believe, just covering with him a -- his -- a bit of a social history with him as far as where he lived, when he moved out of the particular house into the house he lived in the rest of his later years, and then asking about his sisters.

A    Yes.

Q    So beginning up there at Line 2, you -- it looks like you verbalize "yawning" as far as "okay."  Were you making a comment on the fact that Mr. Allen appeared to be yawning at the time?

A    That's right.

Q    Trying to make, again, inject some levity or ---

A    Well, just for ---

MR. KANE:  Your Honor, I'm going to object to the leading nature.

MR. HOLTSHOUSER:  I'll rephrase the question.

Q    (By Mr. Holtshouser)  Why did you say in this particular line "yawning"?

A    Well, again, this goes to the rapport issue.  If I -- I can't recall it specifically, but more than likely it was in the morning.  He did yawn, and I was attempting to be human and reflect the situation.

Q    All right.  In this next line he says -- you mention moving out of the house at age 7 or 8.  You're referring to the first house where he lived with his father before he moved to the second house on Cote Brilliante where he lived with his mother and grandfather.  Is that right?

A    I believe so.

Q    Okay.  The question, "Can you tell me how you got along with your sisters," his response is what?

A    His response was it was good.  They were protective -- I

mean I can read it, but he was positive about his sisters.

Q   Specifically, he said that his sisters made sure he stayed out of trouble, made sure he was taken care of, you know, things like that.

A   Correct.

Q   Nothing negative; no negative information was conveyed about the sisters in that exchange, correct?

A   It was a positive response to siblings.

Q   Now did you know by that point in time that for -- up until a certain age, he lived with his father and mother but then after that it was a single-parent home?

A   I believe I did.

Q   All right.  And so is that something that you inquire about, generally speaking, is, you know, the -- who the influence is in his life when there's no longer a male role model in his -- a father in the picture?

A   I may.

Q   Here, though, at Line 11 you focused on his mother.  You asked him, "How did you get along with your mom when you were younger?"  And his answer is, "Great"?

A   Correct.

Q   And, "How did you get along -- How did you get along with your uncle when you were younger especially?"  And he said, "Great.  I mean better than my father, I would say."

Now did you know what specific uncle you were

referring to at that stage or how many he had?  Did you have anyone in particular in mind?

A    Gosh.  I believe that was Billy Jerome.

Q    Okay.

A    That would have been his mother's brother.

Q    Now a bit later you come back to the topic at Page 65, beginning at Line 8.  The discussion previously had to do with his art and his drawing.  So starting at Line 8, what was your question?  Can you read that or do I need to blow it up?

A    Sure.  I can read it.

Q    Okay.

A    "All right.  Now the next question I ask you is a question that eight years ago I never used to ask anybody, but if I don't ask now, I have not done a complete exam of the situation.  So I don't want you to take it disrespectfully or anything."

Q    And he says, "Okay"?

A    Correct.

Q    All right.  Then you go on.

A    "As a child or as an adolescent" ---

Q    Here, let me blow that up a little bit.

A    Thanks; sorry.  It's just a little -- "say up to the age --

Q    18?

A    -- 18, do you have any recollection of being verbally,

physically or sexually abused in any way?"

Q   And his response is, "Uh-huh"?

A   That's correct.

Q   So a negative response.

A   That was my interpretation.

Q   You go on -- It appears you didn't stop at that answer. Is that correct?

A   That is correct.

Q   And why not?

A   Again, as I've testified separately, I'm not exactly sure why I continued other than maybe I -- Well, I'm not exactly sure.

Q   Okay. But you did continue on and ask, "Now this being certain, I'm going to have to inquire a little further. I mean it means different things to different people."

And by "it," are you referring to this word up here, "abused"?

A   Correct.

Q   "Did your mom" -- And was there any reason that you were focusing -- limiting this question to his mother?

A   Well, she was the primary parent at that time, as I understood it.

Q   You did not have any information at that time that would have led you to believe that his mother was, did or could have abused him; no particular information. Is that right?

A   No, I did not.

Q   "Did your mom -- how did your mom discipline you, I guess is the best way to say?"

And why -- What were you looking for here by focusing on the concept of discipline?

A   Just in terms of exactly that, in terms of how he was disciplined in the home, particularly as a young male.

Q   And so was your concern that in some situations excessive or improper discipline could be considered to be abuse by others or by -- by -- at least conduct you might be interested in?

A   I don't think I was going that far with it.  I think this was a general discovery situation in which I was just trying to see how discipline was meted out in the home with a single parent, a mother, and a young male.

Q   And so his response is, "Well, I had a lot of girl friends, and I liked to go outside and play on the basketball court in the backyard."  And you're following along with the answer at this point and then onto the next page.

He continues, "So it would not be going outside and talking on the phone."

You understood this to be in response to your question about how his mother disciplined him?

A   I did.

Q   "I mean those as punishment.  Those are worse than

getting whippings to me."

And your response, "Took away privileges?"

His answer, "Right. I mean it was a killer for real, ah-huh. And I couldn't sneak outside when she was gone because my sisters would tell on me. So I mean it was like," and then you follow up with that.

"Sisters, you made comment earlier on that. Okay. All right. You don't have any recollection of being, either by family member or anybody else, verbally or physically abused?"

His response, "No."

Then it appears that you then go on and switch gears to another topic.

THE COURT: Okay. Let me -- Let me catch up. I'm getting behind.

MR. HOLTSHOUSER: Yeah. This is Page 65 of Exhibit 46, Lines ---

THE COURT: We're on 66. Wait a minute.

MR. HOLTSHOUSER: We're on 65.

THE COURT: Okay.

MR. HOLTSHOUSER: Well, ---

THE WITNESS: 66.

THE COURT: 66.

MR. HOLTSHOUSER: It is 66, correct.

THE COURT: Yeah; just a second.

MR. HOLTSHOUSER:  I'm sorry.  It is 66.  I was reading my notes wrong.

THE COURT:  Okay.  Just a second.

MR. HOLTSHOUSER:  No problem, Judge.

(Pause)

THE COURT:  Okay.

Q    (By Mr. Holtshouser)  The only thing I want to point out to you in this exchange, he did use the word that this is worse than whippings, correct?

A    That's how he prioritized it, correct.

Q    Okay.  Now at that point in time did you -- did you take it that there was any reason -- Well, you did follow up down here about whether or not anything he had experienced was verbally or physically abusive, correct?

A    I did.

Q    And he indicated in the negative.

A    That is correct.

Q    All right.  Another topic -- And you know -- Based upon what you know now, you know that at least this discussion has taken on some significance, given what the current claims are, correct?

A    I certainly do.

Q    Let's turn to another topic that you discussed that's taken on significance as well, and that is the issue of him either being put on -- put out of the house or having been --

having left the house and at what age.

Directing your attention to Page 71 of this transcript, just to follow with the top to orient you to the topics, at Line 7 you're asking about him ever breaking or entering into a house.  There's a change of tapes that occurs right here.  And you're asking, I guess, about generally various criminal behavior here, shoplifting and going through a list of possible items, correct?

A    These are conduct disorder symptom questions and looking at the forerunner of psychopathy, and I was going through each one of those and trying to identify whether he had had them prior to age 18.

Q    Okay.  At the bottom of this page, this is where the relevant discussion begins, directing your attention to Line 25.  You begin the question here of, "Do you recall prior to age 13" -- then it continues on the top -- "staying out overnight even though your mother didn't want you to stay out overnight prior to age 13?"

And his answer is, "No."

"Did you ever run away from home more than twice?"

"No."

And you indicated being truant in school.  "Did that begin before age 13?"  His answer is inaudible.  And then you begin talking about a break.  Is that correct?

A    I do.

Q   Okay.  Now you come back to this topic then at Page 124 and have a little bit longer discussion about it.  And just to orient you, do you see up at the top here you're referencing "Metropolitan"?

A   That's correct.

Q   Okay.  And does that refer to an incident that occurred in early February of '97, just a little -- well, almost a month before the offense in this case in which he went to the Metropolitan Psychiatric Center with a girl friend, Tasha, and her mother?

A   I believe so.

Q   Are you inquiring in this section regarding the source of why he went there, what was bothering him, along those lines? What was stressing him?

A   I'd have to go back to the prior page to look at the continuity, but ---

Q   Let's see if that helps.

A   Yes.

Q   You're talking here about stress.

A   I see it.  Yes, that's correct.  That's the lead I've been trying to follow through in a time course.

Q   Okay.  So then at Page 124, you're asking or he's referring to stress, and he's saying, "I had everything.  I had plenty of girls.  I was writing -- writing songs; refused to be paid for it.  Family, anything I wanted, but I lost

track of my world because of what I was doing."

Do you see that at Line 12 on Page 124?

A   I do.

Q   Okay.  And then you ask, "Meaning what?"

And his answer is, "How I was making my money then."

Now you follow up and say, So your money, girls, rap, family; was there anything else?"

"I don't think so.  I had all that, but" ---

"All right.  You say making money.  You mean in terms of drug dealing in this situation?"

His answer is, "Yeah, money."

"And how would you describe it?"

"I mean it's just all the way to go around."

All right.  And then beginning at Line 4 is the discussion concerning how his mom's house was shot up, correct?

A   That's correct.

Q   Now can you -- I'll read the parts of Mr. Allen just on this page and the next page or two, and you, obviously, say your questions.

So you said, "Yeah, I saw that."

Then Mr. Allen says, "Yeah, it was because of this deal that went down there."

And this is -- they're describing the incident where the house got shot up.

And you follow up with the question?

A    "It didn't come off just right?"

Q    Let me blow this up so it's easier.

A    Thanks.

Q    All right.  Allen says, "Well, it went right, but they thought I was involved with something else that happened later on but, you know, our part was right, but somebody -- something happened.  Somebody got in and, you know, found out about it and robbed them after it sometime and they thought we did it."

If you would carry on and read your part.

A    Sure; sorry.  I was just reading, following along.  "Drug dealer involved?"

Q    "Right."

MR. KANE:  Your Honor, I object because there's no question being posed here other than reading in the transcript of what is an exhibit that's not objected to.  And so I would suggest that it's leading and -- and he's not being asked any question in which to respond to.

MR. HOLTSHOUSER:  Well, Judge, specifically, I think that this is a hundred and some page transcript.  Part of our purpose of pointing out these relevant sections is to inquire of Dr. Yutzy about what he asked, didn't ask, and why he asked it.  But similarly, the purpose of this hearing, as I see it, is to inform and educate the Court of what is in these

transcripts that might be relevant without having to find it on its own.

THE COURT: Yeah. I -- I agree. Both sides will be allowed to make reference to particular parts, and there have been questions about what each said. I think -- This -- This sometimes becomes confusing in terms of using a transcript for impeachment, and that's not what we're doing here. It's trying to highlight information to try to get Plaintiff's state of mind at particular times, what he was doing. So I'll overrule it at this time.

Q    (By Mr. Holtshouser)  And just so we're oriented to time and place, Dr. Yutzy, this is an examination by you on February 16th, 1998. This is what he's saying to you back during the time period in which he was going to trial and the penalty phase was approaching, --

A    That's correct.

Q    -- correct?  Now you don't necessarily -- are not an authority on what other versions he has given in other transcripts and in other contexts both back then and now, for example, of why his mother's house was shot up.

A    I certainly am not.

Q    This is what he was explaining to you in February of '98, though.

A    Correct.

Q    Now this -- this section that we just read, did you fully

comprehend what he was describing to you other -- beyond just saying that the shooting somehow related to a drug dealer involved?  A drug deal gone bad?

A    I had some idea of what was going on.

Q    Now you comment that, "They are an interesting group."  I guess referring to drug dealers, right?

A    No.

Q    Who are you referring to?

A    I'm referring to what I'll refer to later here as the individuals that learn of drug deals; that show up, steal the money and the drugs, and then take off.

Q    Okay.  And so individuals who are praying on those engaged in drug trafficking.

A    Later on I will use the opinion parasite.

Q    Okay.  "Guys who specialize in nothing but that?"

And then Mr. Allen says, "Right.  It was like they came and shot up the house.  They stressed me out really."

A    "Apparently your mother put you out of the house because of that.  Is that right?"

Q    Okay.  Mr. Allen says, "I said that, but I figured she didn't put me out."

Now when he says, "I said that," do you -- are you -- do you know what he was referring to as to whom he had said that, even though he was now telling you something different?

A    I presumed he had said that to somebody else.  I did not

know who.

Q    Okay.  One of them could have been Dr. Wuertz, --

A    It could have been Wuertz.

Q    -- focusing on what led to the Metropolitan visit?

A    My apologies for interrupting.  Dr. Wuertz or others.

Q    Okay.  Mr. Allen continues, "I left before it all happened because I thought, you know, (inaudible).  You know, worry about the house.  So I moved out, found out, and nothing I can do."

    All right.  And you follow up?

A    "So I understand what happened, they identified who you are and they identified the place, and then they shot the house?"

Q    Allen says:  "Right."

A    I say, "Okay."

Q    All right.  Mr. Allen says, "I was going to say I knew -- I know to this day exactly who it was.  Like I say, I'm not a violent person.  I mean if I carried guns, I could have.  I saw the person five times."

A    And I respond, "Ah-huh."

Q    All right.  At the top of 127, does he continue on with explaining this, that -- that he says, "Not for real.  That's the only thing that caused problems because no one knew.  No one really could know because I really wasn't doing anything around the house."

Was he referring to how -- finding -- them finding out where he and his family live?

A    That's my suspicion, yes, sir.

Q    "I never did any of that around of the house which is finally where I stayed because of somebody" ---

A    Sure.

Q    And you said, "Somebody fingered you?"

"That's the only thing that came back to the house."

Okay.  Then you go on to say, "What other things revolved in you at that time?"

Again, referring to the time that led you to -- led him to the Metropolitan visit, correct?

A    Correct.

Q    All right.  Starting at the next page, 128, beginning there at Line 15, this discussion about the incident leading up to the visit to Metropolitan and being put out of his mother's house, and the house shooting, this discussion goes on for a couple of pages.  But this picks up here in the middle of the page at Line 15 with Mr. Allen stating, "I was thinking how I could get back closer to my family, and I knew it wasn't going to be easy after the house got shot up because it was like that's something closer to the family for real."

And your response?

A    "I read the police report.  They were more than a little upset."

Q    Meaning his family was upset by their house having been shot up.

A    That's correct.

Q    And that's indicated in the police report taken from his mother when the police were called.

Mr. Allen says, "Yeah."

And you say, "Go ahead.  I'm sorry."

And he says, "And that was another thing because I mean I never stayed away from my family long.  I was just like a family person.  I never stayed away from my family long.  So being away from them that long just stresses you out because my mom gave me the type of love no one else can give you.  You know, it's like that motherly love is" ---

And you respond, "Unconditional love."

He says, "Right.  And then another thing is after that happened, my friend had a minivan; used to let me use his minivan.  And we were riding one day, and I seen my sisters somewhere.  My sister told me about it.  The way she sounded, I was like, you know, I was hurt inside because of what happened and how they told -- my mom was right there by the door when all this stuff happened.  And it kind of scared me because I almost got my mom killed.  I wish it never happened.  After you see so many people get killed, that's stress.  I mean all I was thinking, you know, another person could have been dead, you know, that I know."

And you inquire at Line 21?

A    "You were worried about your family?"

Q    "Right, because, like I say, the only way it was to protect them was to give you those other people, but I'm not like that.  Like I said, I'm not like that.  So I just have to find some way as far as they coming."

And then there's a tape change.

And then you bring back that, "You were stressed in a relationship with your family."

A    Correct.

Q    Okay.  So backing up a bit here, there's comments within the context of this discussion about both what had happened at the house, how he found out about it, the fact that he wasn't living there when it happened.  He found out about it from his sister driving by in a minivan.  He was driving by in a minivan, and then there's some comments here about his mother as well, correct?

A    That's correct.

Q    And were the comments here consistent with the answers he had given you earlier, that he'd never either been the victim of physical or verbal abuse by anyone and that the nature of the discipline from his mother was loss of privileges?

A    It was certainly consistent.

THE COURT:  What lines are those?

MR. HOLTSHOUSER:  This is Page 128, Line 11, through

Page 130, Line 2.

Q   (By Mr. Holtshouser)  Still on this topic, going to Page 168, you're still talking here some pages later about the shooting that took place in relation to your mother's house. And you ask him, "Do you remember?"  And you ask, "How were you doing in December?  Do you remember?"

And you're talking about before the shooting.  Is that correct?

A   That is correct.

Q   And you even make that clearer at the bottom of this page, "But this is before the shooting attempt, right?"

And he says, "Right."

And in terms of how he was doing in December, he says, "Me and my mom were real close.  As far as the depression, I always stayed depressed, like I said, but I never brought it to her attention, you know.  That's when I starting messing with a girl named Tasha Lakeshia."

And then an inaudible.

"I really started getting close to her, and she was somebody I could talk to.  I spent a lot of time with her and her family, did a lot of things with her, so I had somebody to talk to."

"And this is before the shooting?"

And he says, "Right."

He goes on here to talk about Tasha.

All right.  Let me move on then to another topic.

Is one of the topics that you touched on briefly with him have to do concerning his role, if any, in the robbery which was the offense that he was charged with?

A    Yes.

Q    And at Page 147, you were asking him questions, I believe, here based upon the visit to Metropolitan.  You're asking him about severe mental or emotional disturbance.  Are you actually asking questions here that might relate to a claim of insanity or incompetency at the time of the offense?

A    Extreme emotional distress, I believe.

Q    Okay.  And in terms of his response -- And you said, "I'm sorry.  In terms of the alleged bank robbery and murder."

His response to you is, "I mean I wasn't -- I wasn't involved in these."

You said, "Okay."

"I wasn't involved in it.  I was stressed out during this, but I wasn't involved in it.  I wasn't there at the bank."

And you said, "Got it, okay.  Well, we never did talk about this, so okay.  That's -- Okay.  That's fine.  I probably should have led in and asked you what your stance was on the situation.  Since Mr. Sindel hadn't put forth a defense, I don't know where you stand on this, so okay.  So the position is" ---

Mr. Allen says, "I mean we filed for an alibi defense because" ---

And then you stopped him and said, "Okay. Let's not get into discussions you had with your attorney."

And that ended that discussion.

A   Correct.

Q   So his position during the interview was he wasn't there, he wasn't involved, and he had an alibi.

A   That's correct.

Q   But he didn't elaborate on who that particular alibi was that he was counting on.

A   He did not. I did not inquire.

Q   At the time that you were talking to him on February 16, 1998, had you ever seen this particular exhibit which is now referred to as Exhibit 100 in which Billie Allen had contacted a detective on March 19th and made statements to the detective about his membership in a group called the "Cliq" that was planning to commit bank robberies with Holder and Dontay Frazier and describing in detail the preparations for the robbery, what inspired it, the movie "Set It Off," et cetera. You didn't have this, did you?

A   I did not. I was aware of the movie "Set It Off," however.

THE COURT: I need to take a break. I need to go down to the Probation Office for about 15 minutes. I'll try

to be back in 15 minutes.  I might be a couple of minutes late.

MR. HOLTSHOUSER:  Okay.

THE COURT:  Court's in recess for 15 minutes.

MR. HOLTSHOUSER:  Thank you, Judge.

(Court recessed from 10:12 AM until 10:28 AM.)

THE CLERK:  All rise.

THE COURT:  Do you want to wait until Ms. Costantin gets back?

MR. HOLTSHOUSER:  No.

THE COURT:  Okay.  Whenever you're ready. Dr. Yutzy, where we left off here, we had covered the version of his involvement or lack of involvement in the offense, and I'm showing you Exhibit 100 which you said you didn't have.  Also, let me show you Exhibit 563.  This is a page of unredacted notes from Dr. Cuneo from February 22nd, 1998, which would be six days after you examined him and he made those statements to you.  Just to be clear, at the time you talked to him, you didn't have this version either, that, "We went to the bank, checked it out, met Friday before, got to do -- sit in there," and there's a reference to Holder.  "If I'd know this, I'd never went."

And then another entry, "Why rob a bank?  I don't know.  I didn't have to."

And then, "Robbery on Monday."

In contrast to the statements that you had, you did not have access to these either -- at any time during the trial, did you?

A    I never did.

Q    Okay.  Did you also inquire, when you're speaking with Mr. Allen, about his mental health at various points in his life?  That being an area of inquiry, his mental health, how he's feeling, depression, not depressed at different points in time?

A    Throughout his life to the current time of the exam.

Q    Let me show you Page 160 of your examination. Specifically with respect to prior to the death of Marquis Taylor, you asked, "Prior to Marquis dying, do you think you were depressed then, too?"

His answer, "Not for real.  I mean it's hard to explain.  I don't know how I would explain.  I wouldn't say I was depressed."

Then it goes on to -- It begins a new tape.

You're back on the tape.  And then this carries on to asking him specifically about the week before March 17th, the robbery.

"Let's just move to the week before the bank robbery, the alleged bank robbery.  How were you functioning that week before?"

Was his answer that, "I was pretty much in a good

mood because we finally got the break we were talking about in the record business. We were just going to sign a contract, and I was kind of happy about that because (inaudible) is somebody I was rapping with, and that was my main goal (inaudible), a song for him that me and him were supposed to do together, and I finally got a chance to record it. And the record label, it came through, so I was in a good mood, you know."

That was his explanation to you of how he was feeling in the week before the robbery, correct?

A    That is correct.

Q    Now there's no indication in this answer, is there, that he is actually saying that he received or was going to receive money in connection with rapping, is there?

A    No, I don't see that there.

Q    Okay. Now to record it -- To record something, he might need to pay someone to do that, but he'd finally had gotten the opportunity to do so, correct?

A    In certain situations, I believe so.

Q    And that might be something he was saying in the week before. He was happy that it was about to occur but it also required some money.

A    Yes.

Q    His social functioning, was that another aspect of your examination of him, knowing that PTSD was an issue?

A    Correct.

Q    Turn to Page 173.  It probably begins on 172.  You're inquiring of him about his activities before and after the death of Marquis Taylor, correct?

A    I did.

Q    At the top of the page he begins with discussing stress. He indicates that he knew he could talk to his mom and that she had even told him that he could talk to her about any issues, "but it was like I just didn't feel like talking to my mom.  If I had a father (inaudible), it would have been better."

During your overall examination of him, was the lack of a father a theme or an issue that Mr. Allen articulated on several occasions?

A    It did arise.

Q    Line 14, did he indicate that, "There's this girl, and now that I have a baby, you know, have a baby by me, that depressed me somewhat now because I can't be there for him." He's referring to "now" as being in February of '98; he's depressed about that.

A    Correct.

Q    And at least claiming that he believes that he's fathered a child.

A    He thought so.

Q    Now your question at the bottom of 172, "Your position is

that you have a loss of interest or pleasure in activities or almost all activities nearly every day.  Is that fair?"

Unfortunately, his answer is inaudible.

"But from after Mr. Taylor got shot up until February?"

His answer, "I mean all I did was stay home.  I wouldn't go back in my backyard.  My backyard was just about -- everybody comes, like the whole neighborhood.  It's like a park.  That's how my backyard is."  And he said, "I'm sort of stuck here.  It's kind of a 'yes' or 'no' thing."

"So a marked decreased interest or pleasure in all or almost all activities nearly every day from when after Mr. Taylor was killed up until February?"

And he says, "I would say I had more fun from '95 back than I did from '95 to '97."

That's what he was telling you, correct?

A    That was his response at that time.

Q    Now when you're getting these answers from him on February 16, 1998, you were not aware, were you, that there existed tape-recorded interviews between his attorney John Simon and Mr. Allen.

A    I did not know that at that time, correct.

Q    I'm going to show you Exhibit 638-B, Page 14, which is part of a transcript between Mr. Simon and Mr. Allen on January the 7th of 1998, so just five weeks before you

examined him in February.  And at that time he indicated to Mr. Simon before incident -- before the incident -- Let me see.  I want to get the right place here.

Okay.  There's a description here that begins on Page 13 of this transcript in January of '98 describing his social activities to Mr. Simon; referencing seeing people at clubs. "You know, he would always see me talk to a lot of girls.  Me and Johnnie were always talking to half of the club, you know, and have all the girls around us; just be talking to a lot of the girls.  I had met somebody, so he would have to do his own (inaudible) for a girl."

So he's referencing -- Mr. Allen is referencing Johnnie Grant testifying in front of the Grand Jury.  "But I don't talk to a lot of guys because I don't trust them.  I'm a person; I like to be by myself.  If it's not me and him, I just be by myself."

But then he says, "You know, some girl, you know, that's all.  I had a lot of girl friends but, you know, why I didn't hang around with guys would be him," referring to Johnnie Grant.

"Now before the incident, did you -- how frequently did you have trouble breathing at night?"

"Well, when I used to get high and (inaudible), I mean couldn't (inaudible) up, you know, get tired."

"So that was like a year before the incident?  Which

one?  The year before your arrest?  Like go back.  Would you say that what you were describing when you were high, you'd get to sleep right away, was that -- was that the whole 12 months before March of '97?"

        And then he references Chemisco.  And let me just move on to Page 20 where this picks up again.

        MR. KANE:  Your Honor, I renew the objection.  We're now outside of the transcript of the evaluation that Dr. Yutzy conducted, and this is a transcript of confidential attorney/client communications.  It's obvious that Dr. Yutzy did not have access to those communications at the time of trial, and I -- I object on the grounds that this is leading and irrelevant.

        THE COURT:  It seems that as -- As I understood earlier, there was an attempt to show that you didn't have certain information, and it might reflect upon his inability to ask questions or something like that.  But I have this in another -- in another context.  Is there -- What's the -- What's the purpose here?

        MR. HOLTSHOUSER:  Well, Judge, the purpose is I'm leading up to zeroing in on the question and the answer that relates to what Mr. Allen tells Mr. Simon regarding his social activities in the period before the offense and then what he says five weeks later to Dr. Yutzy; that in between those five weeks, there's been a diametric change in his accounts.

THE COURT: Okay. All right.

MR. HOLTSHOUSER: And Dr. Yutzy was not aware of any of this prior that -- but it shows the contrast between the two.

THE COURT: All right. All right. Overruled.

Q    (By Mr. Holtshouser)  In this same transcript here, if I direct your attention to -- He's focusing on a year before the incident, referring to the offense, asking about sleeping. Mr. Allen describes in terms of the year before the incident, "I was partying -- I was pretty much partying a lot. I mean I would -- When I would wake up, I would be just stressed out for no reason at all."

Now in terms of the description that he gave you five weeks later, did he indicate to you that he was actually out partying in the year before the offense? In the period after the death of Marquis Taylor?

A    In following with the Marquis Taylor information, no, I did not get that impression at all. He portrayed a history of significant depression and lack of function.

Q    So somehow between the time he talked to John Simon on January 7, 1998, and February 16, 1998, when he talked to you, his accounts of his social life changed dramatically.

A    Significant variance.

Q    Is one of the things that you asked Mr. Allen about include covering the topic of drinking and drug dealing?

A    Yes.

Q    And beginning on Page 74 at Line 8, Mr. Allen indicates here at Line 14 that he didn't start drinking until 16, and you reference, "Okay.  Beer, wine or" ---

And his answer, "My first drink was MD 20/20.  That's the first thing I started to drink."

And then you go on to describe, "When did you drink the first time you got intoxicated or when is the first time you got intoxicated?"

And he says, "The first time I really got just MD 20/20 and, what you call it, St. Ives beer."

"Did you drink them both at the same time?"

Then he goes on to describe that.  So at that point in time he's telling you that the first thing he's ever drunk is MD 20/20 and that the first age was age 16, correct?

A    That's what he told me.

Q    On Page 85, did you discuss with him the progress of his drinking, specifically talking to Mr. Allen about when he began to drink more and that Mr. Allen identified the period of December of '96?

"That's when I started picking up on my drinking, and that's when I would drink all at the same time or drink Tanqueray and Everclear, beer, wine, all at the same time."

So December of '96 was -- When you were speaking to him back in 1998, he's identifying that period, December of

'96, was also the period right before his mother's house was shot, is when his drinking actually accelerated.

A     That's what he related.

Q     And you asked, "What was the reason you were drinking all that?"

      And he identified, "Stress.  I don't know what happened in my life.  It was like someone knew I was missing out my life and I'd just drink.  I had everything; money, girls, the family that loved me, everything, but it was just something that's my life that I was missing."

A     That's what he stated.

Q     That was 85.  Again on Page 90, did you get into the question of why he drank, whether or not he had ever made attempts to cut down or "just keep drinking because you kind of enjoyed it"?  That was your question, correct?

A     Yes, I did.

Q     His answer, "It was like I did it because I enjoyed it because I would be writing a lot.  And, you know, when you're buzzed or anything, you think towards everything, you know.  You just -- Your mind spreads out.  You can remember some things; you forget some things.  See, when I write," and then does he go on at the rest of this page to describe his creative activities in terms of writing songs and lyrics and so forth?

A     Correct.

Q   And his conversations with you, he never used phrases like, "I was self-medicating"?

A   He did not use that term, correct.

Q   Would that have been noteworthy to you if he would have articulated to you the words, "I was self-medicating by my drinking"?

A   It would have been.

Q   Why?

A   It's -- It shows a very sophisticated approach to his situation, particularly at that time; that the individual was coming up with an explanation for the behavior.  It's a concept that came up in the early '90s and pre-existed that, but this idea that if anybody uses substances because they're self-medicating; self-medicating some underlying psychiatric issue as opposed to choice.

Q   Based on your conversation with him in February of 1998, he didn't have that level of sophistication in those sorts of mental health concepts.  Is that correct?

A   In my -- I'm sorry.  In my opinion, he did not at that time.

Q   I think we -- I think we covered this one already.  This is Page 124 where he indicated that he had lost track -- prior to going to Metropolitan, he had lost track of himself and his way due to how he was making his money.

And you said, "In reference to drug dealing?"

And he said, "Yes."

Is that correct?

A    That's correct.

Q    You also got a little more specific with him about the incident of the shooting at his mother's house.  Is that correct?

A    I did.

Q    On the bottom of Page 136 were you talking to Mr. Allen about the circumstances again leading up to that visit to Metropolitan Psychiatric Center but what was going on with him before the house shooting occurred?  Is that right?

A    That's -- That's correct.

Q    Okay.  You reference there, "Okay," and, "All right.  And you went back but you didn't stay?"

And Mr. Allen says, "Right.  My mind was telling me to stay there to get some help to relieve the stress."

And he's referring to visiting Metropolitan Psychiatric Center, --

A    I believe so.

Q    -- not home.  And you asked, "Where were you living at?  Around?"

And he said, "Yeah, around."

You asked, "Were you essentially on the run at that time from these guys?  Is that the deal?"

His answer is, "Not for real.  After we -- I just

felt I couldn't go home after it all happened.  I wouldn't feel anything."

And you asked, "So what happened subsequently?"

(Inaudible).

"You didn't see a psychiatrist or go back there," referring to the Metropolitan site.

And his answer is, "No.  (Inaudible) started making money again."

"Ah-huh.  So basically (inaudible).  Okay."

Then he went back to smoking weed again.

So at least at that point in time he said that in the time period before Metropolitan Psych. visit and in the time period of his mother's house shooting, he knew there were guys looking for him.

A   That was my understanding.

Q   He felt that he had a target on his back.

A   That was my understanding.

Q   Now we earlier looked at the conversation you had with him regarding the particulars of the drug deal that had gone bad.  There was some reference to somebody had something and something lost something and somebody didn't have the money and needed to come up with the money and so on and so forth. At the time you were talking to him, did he seem to be describing a fairly specific occurrence that he had a knowledge and recollection of at that time?

A   It certainly was my understanding that he had an understanding of what happened.

Q   He was providing you with some very specific details, albeit using some slang language to describe them?

A   Correct; being vague.

Q   Now is one of the things that you've examined since 1998, has it included the deposition of Mr. Allen?

A   I have.

Q   All right.  I'm going to direct your attention to Page 271 of that deposition and see if it comes up, and it did.

MR. HOLTSHOUSER:  I'm sorry, Judge.  I'm having a difficult time reading it on the screen here.  I think I don't have the right page.  Let me look.  Okay.

THE COURT:  374?

MR. HOLTSHOUSER:  374.

Q   (By Mr. Holtshouser)  You see here that in this section -- Did you recall reading in this section of the deposition that Mr. Allen is being reminded of this series of questions and answers in your examination that we just went over, the specifics of this drug deal that led to the house shooting.  And you see here that he -- his testimony at the deposition was that whatever it was he was describing to you, he says, "I can't remember exactly."

And he was asked, "You don't remember anymore?"

"I can't remember exactly, you know, in what context

I was explaining. All I see is what's in front of me."

The question was: "Forget the context with Dr. Yutzy. Do you remember as you sit here today?"

His answer is, "I don't remember anything."

"Any transaction in which you screwed up a drug deal involving $20,000?"

Answer, "I think so; close to it or around that. I'm not sure."

"What were the circumstances of that transaction?"

"I can't really remember the specifics."

"Well, how was 20,000 involved?"

"A drug deal gone bad," is his answer.

"What does that mean?"

"Somebody didn't get paid, you know, what they were owed or something like that."

"What was your role in it?"

"I can't recall."

At least in 1998, did Mr. Allen describe any difficulty in recalling what he was describing to you?

A     Not at that time in my opinion.

Q     Okay. Do you recall in talking to Mr. Allen that there was this issue of a pistol whipping that had occurred in his life in which he had suffered some injury?

A     Yes, sir.

Q     And you talked to him about what the circumstances of

that incident were?

A    I did.

Q    And directing your attention to Page 23 of Exhibit 46 which is the transcript of your examination.

THE COURT:  23?

MR. HOLTSHOUSER:  23.

Q    (By Mr. Holtshouser)  And actually at the beginning at the top of 24 -- 23, he describes being hit, and 24, you're asking why it happened or what it was about, correct?

A    I believe I did.

Q    All right.  His answer was, "We were outside playing a basketball game.  We won and they got mad, so we bet money on it.  So they got their guns out of the car and ran up on me in front of my mom's house and hit me with the gun.  (Inaudible).  I was out.  I was out.  The money was gone out of my pockets, so I guess it had to be a while because the money was gone out of my pocket, so."

In terms of in February of '98, he was describing to you that this pistol whipping occurred after over a specific basketball game in which there had been a bet.  Some money had been won, and they were mad and they got their money back?

A    That's what he reported to me.

Q    And again, referring your attention back to Mr. Allen's deposition in 2012, Exhibit 539, being asked about the same incident, ---

MS. CARLYLE:  Can we have a page number?

MR. HOLTSHOUSER:  Actually Page 203 is what I'm looking for.  It begins on Page 203.

Q    (By Mr. Holtshouser)  "Was there an incident where you were pistol whipped?"

"Yeah."

"How old were you when that happened?"

"That was when I got robbed.  One of the times I got robbed."

And then continuing on to the top of the next page, 204, "When you got robbed, meaning selling drugs?"

"Yeah."

"Were you alone?"

"What, when I got hit?"

"Yeah."

"No.  My little sister came outside."

"Was it right out in front of your house?"

"Yeah."

"Were you selling right out in front of your house?"

"No.  I was coming home."

"Coming back with money?"

"Yeah."

"Do you remember what you were pistol whipped with?"

"No, I can't recall."

And in terms of the timing of this pistol whipping

incident, he was asked, "When did it happen?"

"In relation to when, how the house -- how it was shot up; not too long before that."

"As far as the situation when they were used -- when they were going to come back, the pistol whipping was by one person, correct?"

"No."

"Was it by more than one person?"

So the pistol whipping incident, when he talked to you, he described to you that it related to an argument over a basketball game, correct?

A    That was my understanding.

Q    And here in his deposition in 2012, he's saying it was a robbery of drug proceeds from him, right?  And shortly before the house was shot up?

A    That's what it appears to be, yes.

Q    Now besides the questions that you asked him that are in this transcript that we referred to about the robbery where he indicated to you that basically, "I wasn't there, I wasn't involved and I have an alibi," there really wasn't much more to talk to him about.  Is that correct, given that posture?

A    Well, I could not inquire about the incident.  I could inquire about his emotional state around that time but not about the incident in particular.

Q    Would any assessment of Mr. Allen's mental health be

incomplete without detailed questioning regarding his state of mind before, during and after an offense like the robbery and murder in this case?

A    Well, mental health, I'm -- it would be part in parcel of any forensic evaluation is to explore the individual's thinking at the time of the situation, to conduct a review for the purposes of either mitigation in a situation or to look at competency and sanity issues.

Q    Would it be particularly relevant to a complete evaluation of whether or not Mr. Allen was suffering from PTSD at the time?

A    Certainly.

Q    You wrote a report back in 1998.  Is that right?

A    I did.

Q    And is that Exhibit 584?

THE COURT:  A few minutes ago you were referring to a report, No. 46.

MR. HOLTSHOUSER:  That was his transcript.

THE COURT:  Oh, that was ---

MR. HOLTSHOUSER:  The transcript of the examination is 46.

THE COURT:  Okay.  Just a second.  Okay.

MR. HOLTSHOUSER:  This is Exhibit 584, and this is the report.

THE COURT:  Report.

Q   (By Mr. Holtshouser)   That you dated March 2, 1998, directed to me?

A   I did.

Q   The report begins by describing the materials that you had available to you, that you examined before writing the report?

A   That's correct.

Q   You felt -- You had a -- quite a few medical records from both St. Louis City Hospital, Homer Phillips, St. Louis Children's Hospital, Metropolitan St. Louis Psychiatric Center?

A   I had a substantial number of records, correct.

Q   Of those who examined Mr. Allen back in 1998, were you the only one who was a medical doctor?

A   That is correct.

Q   Might that also be true to date?

A   I guess it is correct.

Q   Okay.  So you evaluated and discussed in detail in your report what you could glean from the medical records about issues such as febrile seizures and lead exposure.  You discussed the amount of lead that the records indicated and its significance and so forth, correct?

A   I did.

Q   Okay.  And it goes on Page 2 to describe the additional things that you had, but among other things, you had the one

report done by Dr. Cuneo, the one and only report written by Dr. Cuneo. You also had the neuropsych. report by Dr. Gelbort. You visited Lindell Bank and Trust. Is that correct?

A    I did go to the bank.

Q    You had letters written by Mr. Allen to various individuals. Primarily that was Johnnie Grant. Do you recall those?

A    They were limited, but I do recall, but I don't remember whether Grant was the recipient.

Q    All right. There is -- In this hearing at least there are letters that he's written to either the Court or to his mother that have been made available in the course of this proceeding. You don't have any recollection of having access to any of those back in 1998, do you?

A    Not at that time, no, sir.

Q    You actually reviewed the movie "Set It Off" as well?

A    I did.

Q    Can you summarize for the Court essentially what your findings were? Remind the Court what your findings were with respect to your ability to diagnose Mr. Allen? I can take you to the end of the report.

A    Sure.

Q    One page up. You had three basic opinions, correct? The first dealing with Post-Traumatic Stress Disorder on -- would

be Page 13 of your report?

A    Right.

Q    That should be on the screen here.

A    Right.  I mean I had a number of opinions, but just to be complete.

THE COURT:  What page is this?  13?

MR. HOLTSHOUSER:  Page 13 of Exhibit 584.

Q    (By Mr. Holtshouser)  Your diagnosis with respect to PTSD was what?

A    It was my opinion to a reasonable degree of medical certainty, and I testified in the original trial, that I was unable to identify whether Mr. Allen had ever manifested the necessary and sufficient symptoms to qualify for the anxiety disorder diagnosis labeled Post-Traumatic Stress Disorder.

Q    Okay.  Did that include an evaluation of the information that you had, his conduct and behavior leading up to the offense and following the death of Marquis Taylor as well?

A    It did as well as my background, education, training and experience.

Q    Did you have any concerns about the reliability of Mr. Allen in reporting some of these symptomology for PTSD?

A    I had significant concerns.

Q    And is that something that impacted your inability to say whether he had PTSD?

A    It directly impacted my opinion about whether he had it

or not.

Q    Why is reliability an issue or significant to a diagnosis of PTSD?

A    Well, for PTSD and for all psychiatric illnesses, the psychiatrist has to look at the reliability of the complaints as far as the psychiatric and sometimes physical complaints and has to decide how to give weight to them in terms of looking at basically what the individual tells you as well as other collateral information that comes in.  Here, I identified a number of reasons why I was quite concerned about the provision of information just was not -- it would not support the diagnosis.

Q    Is there a concept in evaluating symptomology known as "psychiatric reliability" or "psychiatrically reliable"?

A    That's correct.

Q    And what does that mean to you?

A    Well, as a psychiatrist, I would -- Just because you offer a complaint, that doesn't mean that it's necessarily there.  One looks at the complaint itself in terms of how it's provided as well as whether it's consistent from a psychiatrist point of view with, say, the social or occupational history that's been provided through other records.  So it has to be reliable in addition to just being a complaint or a claim at the time.

Q    In the remainder of your report there are opinions

expressed about the existence or nonexistence of a major depression as well as mitigation factors, correct?

A    That is correct.

Q    And then the last being whether or not there was any causal nexus between the medical issues raised and the offense in the -- described, correct?

A    That is correct, also.

Q    And your opinion was that there was none.

A    That was my opinion.

Q    Now you testified to these opinions at the trial, correct?

A    I did.

Q    All right.  And then just since the trial, there's been some activity.  Sometime in 2011, I believe, you were provided with some additional new materials that have arisen in this case and asked to take a look at those.  Is that right?

A    I have, yes.

Q    Exhibit 595, is this a list of the background materials provided to you initially in connection with your latest involvement in this case?

A    Yes.

Q    You had a number of CDs that were provided to you?

A    I did.

Q    And this information was contained on those CDs.  Were they quite voluminous?

A     Yes, they were.

Q     All right.  Did they include, for example, the transcripts of the penalty phase of the trial, the declarations that had been collected by habeas counsel and submitted to the Court, things you had had back during the time of the trial such as Dr. Cuneo's reports, all of these records, Exhibits 1 through 15, as well as Dr. Gelbort's report, your previous report, Dr. Wetzel's previous analysis?  You were provided with the 2255 actual claim with respect to the mitigation investigation, correct?

A     Yes, I was.

Q     And you were provided with the Government's response and then the portion of the Court's order granting the hearing, correct?

A     I was provided that.

Q     Now you generated, as a result of examining those materials, a new -- a brief report, did you not?  Exhibit 587 here?

A     I did.

Q     That was in November of 2011.  Based upon the new materials that you looked at, did you -- You did not subsequently re-examine Mr. Allen.  Is that right?

A     I did not.

Q     Okay.  Did you reach any -- Has anything that you observed in the new information caused you to change or alter

your original diagnosis and opinions in 1998?

A    My opinions remain the same.

Q    All right.  What, if any, effect did the new information have on those opinions?

A    Well, they substantially bolstered them from my perspective in terms of identifying difficulties with the reliability of the information that I had had difficulty with in the original evaluation and original report.

Q    But were you even less impressed in 2011 with the reliability of Mr. Allen's claims of symptoms that might qualify him for PTSD?

A    Yes.

Q    Are you aware of any scientific evidence which suggests that PTSD impacts or alters the organic condition of the brain?

A    No.  I'm not impressed that the scientific literature supports that there's actually a brain physiology change.

Q    Okay.  Have you had during your career experience with individuals who are claiming various types of abuse, whether it be child abuse, sexual abuse, adult abuse, elder abuse?

A    I have.

Q    In your experience, is it typical or atypical for victims of abuse to deny that the abuse occurred when asked?

A    In my opinion, it's atypical.

Q    Can you explain to the Court what you mean by that?

A    I would say that if it -- if the individual perceives themself as being abused, in my opinion, a memory as long as its memory trace is laid down such that the person should be able to relate the information at least factually.  Now under age 3, that doesn't apply.

Q    Under age 3.

A    Under age 3.  After age 3, it would apply.  From 3 up to about 7 or 8 it may be fact -- it may be somewhat distorted as far as the recollection is concerned in terms of the emotion that's attached to it, but factually there should be some substance to it.

Q    How about by the time a person is 18 or 19?

A    Well, they should be able to articulate what they recall happening.

Q    And in your experience in dealing with an individual that age who has been the victim of some actual form of physical or sexual abuse, is it atypical for them to deny that it took place?

A    In my opinion, it would be atypical.

Q    Now as a physician and someone familiar and practicing in St. Louis for a number of years, were you familiar with the practices of pediatricians in St. Louis and particularly those at St. Louis Children's Hospital, the other hospitals, Homer G. Phillips, St. Louis City Hospital?

A    I was familiar with -- with St. Louis Children's.  I was

somewhat familiar with Homer G. Phillips.

Q    Okay.  And as a physician, would you expect a pediatrician who was examining Mr. Allen on a regular basis for the first eight to nine years of his life to have noticed, at least in the late '70s, early '80s, be on the lookout for any evidence of unexplained injuries, evidence of abuse, welts, cuts, scratches, scars, healed -- healed injuries, et cetera?

A    In my opinion at that time, there was a big issue to try to identify abuse in the home.  And I was in training at the time and know that the child psychiatrists and the pediatricians were cued into that issue.

Q    It wasn't something that became -- that came into vogue later.

A    No, it did not.

        MR. HOLTSHOUSER:  That's all the questions I have, Your Honor.

        THE COURT:  All right.  Cross Examination?

                    CROSS EXAMINATION

QUESTIONS BY MR. KANE:

Q    Good morning, Dr. Yutzy.

A    Good morning, sir.

Q    Just to follow up on what Mr. Holtshouser was just asking you regarding how typical it is of abuse victims to report what they're being subjected to, do you recall testifying at

your deposition that it was not common for children to report being abused?

A     State that first part of that again.

Q     Do you recall stating at your deposition that it was not common for children -- for abused children not to report their abuse?

A     I guess the question I've got is:  At that time or subsequent to that time?  I'm not following you.

Q     Well, let me see if I can refresh your recollection, Doctor.

A     Sure.

Q     This is Exhibit 538, the deposition you gave in this case back in May.  Do you recall giving that deposition?

A     I do.

Q     And if you look up at the screen, I asked you, "Are there subjective reasons that abused people have for not reporting their abuser?"

You agreed that, "Yes, there are -- there can be reasons"?

A     Correct.

Q     And I asked you, "Is that common?"

And then there's a little back and forth.  And at Line 12 I say, "Is it common when a parent is abusing a child?"

You testified, "They cannot report as long as they

are children."

And then further down, "It's fairly common that they won't report as children."

A   Yes.

Q   Okay.

A   As children to the doctors, but the way you phrased the question, the issue was "report later."  So that's the reason why I wasn't following what you were asking.

Q   On Direct Examination -- And I'm going to go now to the transcript of your evaluation of Mr. Allen.  And on Direct Examination, Mr. Holtshouser asked you some questions about alcohol use, and I think he actually directed you to this page.  Do you see at Line 12 where you -- where you asked Mr. Allen, "What was the reason you were drinking all that," after he's described the types of alcohol he was drinking?

A   I do.

Q   And you see his -- his answer was about stress?  "It was just stress."  And he goes on and talks some more about ---

A   I see it, and I recall the Q & A.

Q   Okay.  Now do you recall that you found -- spent a fair bit of time discussing issues of alcohol and substance abuse during your evaluation of Mr. Allen in 1998?

A   I recall that.

Q   And you ended up diagnosing him at least by history as having substance abuse issues with alcohol and marijuana.  Is

that correct?

A    I did.

Q    Now at Page 75 of the -- Well, let me just move one page up to 74 so we get the end of that question you asked.

        "And over the years, did you develop much of a taste for alcohol over the last five years?"

A    I'm sorry.  Could you direct me just slightly there?

Q    Sorry; I just switched pages on you.  Down at the very bottom of this page, 74, you're asking him about his alcohol use.  And the question that straddles this page and the next page, you're asking about, "Have you developed much of a taste for alcohol over the years?"

A    I see it.

Q    Okay.  And then he gives a long answer, but, again, you can see just from the beginning here he talks about being depressed and depression several times.  Is that correct?

A    That is correct.

Q    You return to this topic later at Page 82.  And if you see your question starting at Line 14, you're asking him -- and Mister -- Mr. Holtshouser touched on this earlier when -- having to do with social and occupational difficulties that might arise from PTSD or they might arise from alcohol abuse or they might arise from marijuana abuse.  Do you remember that --

A    Sure.

Q    -- discussion on Direct?

A    Sure.

Q    And here, you're asking Mr. Allen about that, starting at Line 14.  And he responds at Line 20 and discussed -- discusses again being -- being depressed, drinking by himself, really getting to drinking.  Is that correct?

A    I see that.

Q    And on Page 99, now you've shifted gears and you're discussing his marijuana use.

A    Yes, I would have.

Q    And then if you look down at the bottom of Page 99, you're asking him did he ever try to cut down on his marijuana use.

A    Yes.  That was one of the standard questions.

Q    And he explains, "I tried; I tried, but it's like stress just got me.  Stress was the problem all my life," and so forth.  Is that correct?

A    I see it.

        MR. KANE:  Your Honor, our -- one of the exhibits, the exhibit of his -- Dr. Yutzy's actual trial testimony is out of order --

        THE COURT:  Okay.

        MR. KANE:  -- on the computer, so I'm going to be using the overhead when I refer to it.

        THE COURT:  Okay.

Q    (By Mr. Kane)  But before I get there, Dr. Yutzy, let me ask you if you recall at the time of trial testifying about the relationship between Mr. Allen's depression and stress and his drug and alcohol use?

A    As I sit here, I don't recall the testimony, but I -- if it came up, I would have spoken about it, if I could.

Q    This is Page 18-75 of your trial testimony.

        MR. KANE:  And this is Exhibit 214, Your Honor.

        THE COURT:  Okay.

Q    (By Mr. Kane)  And you see here you're being asked -- And this is on Direct Examination by Mr. Holtshouser.  I'll show you that, 18-75.  You're being asked about his alcohol and marijuana use.  Is that correct?

A    I see that.

Q    And then Mr. Holtshouser asked you the question at Line 17, "Did he describe to you the reasons why he used large amounts of alcohol and marijuana?"

        And you state, "He didn't indicate that.  Well, he didn't indicate about why he used large amounts.  He indicated he used those substances to -- alcohol a little bit more than marijuana, as I recall, to enhance his creative abilities as far as writing is concerned, as far as writing the verses that he was attempting to sell for money."

A    I see that.

Q    Okay.  Anywhere in this answer does it -- does it relate

the multiple instances where he responded to your questions by describing the stress and depression related to his marijuana and alcohol use?

A    I don't see it here in this response.

Q    Okay.  Let's look at the next page.  This is the top of 18-76.  It moves on to another topic.  Is that correct?

A    It appears to.

Q    Do you recall anywhere else in your testimony at trial where you related what you had learned from Mr. Allen regarding the relationship between his stress and depression and his alcohol and drug abuse?

A    No, sir, I don't remember my testimony from 14 years ago.

Q    Is there a reason why you would have omitted that from your testimony?

A    Other than I wasn't asked.  I don't have a reason.

Q    Well, you were asked here what were the reasons, correct?

A    Right.

Q    Is there a reason why you would omit his depression and stress and those issues from your response at trial?

A    Other than not being asked on point, I can't think of another reason.

Q    Is it possible that relating Mr. Allen's depression and stress would make him more sympathetic?

A    No.  I wouldn't -- not include it for that reason.

Q    Excuse me?

A    I would not -- I would not include it.  No, I would not have omitted it for that reason.

Q    In another section that ---

MR. KANE:  Can we switch back to the -- Thank you.

Q    (By Mr. Kane)  In another section that Mr. Holtshouser had asked you about regarding the drinking habits of Mr. Allen, this is where he's talking about MD 20/20 and St. Ives beer.  Is that correct?

A    I see that.

Q    Bottom half of the page.

A    Yes, sir.

MR. KANE:  We're back on Exhibit 46, Your Honor.

THE COURT:  Correct.

Q    (By Mr. Kane)  And then, again, at Page 76 he's describing this St. Ives beer as 40 ounces.  Do you know if that's -- he might have been referring to St. Ides beer with a "d" instead of a "v"?

A    No.  This came up in my deposition.  I do not know the answer to that.

Q    Okay.  Now further along, this comes up again; talking about things that he drinks.  Now he's talking more recently, December of '96.  Mr. Holtshouser went over this with you.  He named Tanqueray, Everclear, beer, wine, and that he'd be drinking these things all at the same time.  Is that correct?

A    That appears to be correct.

Q    Do you recall telling the jury at trial what types of things Mr. Allen liked to drink?

A    As I sit here, I don't remember my trial testimony.

Q    Okay.  Is there a reason why you would have omitted any of these things you see here from -- from what he likes to drink?

A    Other than I wasn't asked.  I don't have any particular reason that comes to mind.

MR. KANE:  If we could switch back to the overhead.

Q    (By Mr. Kane)  This is the same area of your testimony except one page earlier, 18-74.  Do you see that?

A    I do.

Q    You were asked the question by Mr. Holtshouser -- Do you see up there at Line 2 he asks you what Mr. Allen's lifestyle was like in the years prior to the bank robbery, correct?

A    Yes.

Q    And then he asked you, "And can you give us some sense what that lifestyle was according to Mr. Allen?"  And I assume he's asking here according to Mr. Allen that you learned in your evaluation of him.  Is that correct?

A    I think that's fair.

Q    And then if you look at your answer, it talks about rap first.  And you say, "I think his interests in kind of living the high life in the situation and drinking expensive wine and champagne and spending time at the clubs that he frequented."

Is there a reason why you omitted from that answer MD 20/20 or St. Ives beer or Everclear or any of the inexpensive wines that he -- or excuse me -- types of alcohol that he had described using?

A    I don't have a particular reason.  I didn't know what St. Ives beer was, and I didn't put MD 20/20 in because I wouldn't have enumerated literally everything that he told me.

Q    Were you trying to paint a picture of Mr. Allen for the jury that Mr. Allen was living the high life?  He was just this gangster/rapper who had everything he needed?

A    I don't think I was trying to paint a picture at all.  I think that that's what he had explained to me; Mr. Allen, although the word "gangster" is a little bit harsh, but the other, that's what he told me; expensive wines, going to the clubs, champagne.

Q    Well, he told you more than that, though, right?  He told you about being on the street, drinking inexpensive ---

A    He told me what's there.  I mean I think the only quibble I would have is I don't remember the gangster issue.  There was no gang affiliation that I was aware of.

Q    Do you recall that in your evaluation of Mr. Allen he didn't -- he described that he liked to drink Tanqueray?

A    He did mention that, yes.

Q    And -- And do you recall that he didn't seem to recognize that Tanqueray was gin?

A    Yes.  It's also a vodka, but, yes, he did not seem to recognize that.

Q    Okay.  So he would say -- So at 46, Exhibit 46, 91, he says, "You know, I just" -- he was cutting down on his alcohol till he'd just be drinking probably Tanqueray and gin.

A    Yes, I see that.

Q    When you told the jury about him liking to drink expensive liquor like Tanqueray, did you mention to them that he didn't seem to realize it was gin?

A    No.  I don't recall being asked that question.  I don't think I would have inserted it.

Q    Mr. Holtshouser also directed your attention to a portion of Exhibit 46, your evaluation of Mr. Allen where you began touching on the statutory mitigators.  Do you recall this?

A    Yes.

Q    And you recall him drawing your attention to Mr. Allen's first answer down at Line 20 of this page -- we're on Page 147 -- where he denies being involved in the bank robbery and says -- and then says, "I was stressed out during this, but I wasn't involved in it."  Do you recall Mr. Yutzy or -- excuse me -- Mr. Holtshouser went over this with you on Direct?

A    I do recall that.

Q    On the next page, at the very bottom, you're probing on this second mitigator which is whether Mr. Allen was under severe mental or emotional disturbance at the time of the

crime.  I'm down at the very bottom three lines of the page here.

A    I see where you are.

Q    Okay.  What's the question on those three lines that you asked Mr. Allen?

A    Do you have a -- Do you want me to read it into the record or ---

Q    Yes, please.

A    Okay.  "Do you have a personal opinion that at the time, around that time, that you were under severe mental or emotional disturbance?"

Q    So you asked him if he had a personal opinion on the statutory mitigators.  Is that right?

A    Certainly.

Q    Okay.  Now looking at the next page, he responds, "Not for real.  I mean the days -- the days, you know," ---

You interject, "Was it May or March?"

"March, right."

Then he says, "Well, that week I was staying in a good mood.  I was so -- I stayed high.  I mean my depression, I don't know how depression kicked in, but the day it all happened, I was high, too.  I was thinking about my family and stuff.  After that, I mean I thought about my family every day.  I just didn't know how to talk to my mom about it.  I was depressed.  I thought about my family every day."

Do you remember him responding to that when you asked him whether he had a personal opinion about whether he met the statutory mitigator or not?

A    I'm not sure what your questions is there.  Do I remember it?  I've read it.  I don't have a recollection as I sit here.

Q    You don't have any independent recollection of it as you -- as you sit here.

A    As I sit here, I do not, sir.

Q    Okay.  But you don't dispute that -- that this is the transcript of the discussion you were having with Mr. Allen about that, correct?

A    No.  I'm sorry.  No, I don't.

Q    Okay.  Is there a reason why at trial when you were asked about this statutory mitigator that you did not tell the jury about Mr. Allen's report of being under stress or being depressed, speaking -- of thinking about his family every day or any of the -- the full answer that he gave?  Is there -- Is there a reason why you would have omitted parts of that?

A    Well, I don't know how the question was posed of me at the time and whether it would have required that or required that information to come in.

Q    Assume that it was.  Assume that it was just a direct question of how he responded when you asked him about this statutory mitigator.

MR. HOLTSHOUSER:  Judge, I'm going to object to the

hypothetical since there is a transcript of what he was asked and answered at trial. I don't know what the purpose of any other hypothetical omission would be.

MR. KANE: Your Honor, ---

MR. HOLTSHOUSER: He can ask why -- would he have a reason for omitting something in a hypothetical sense. I don't understand the question.

MR. KANE: Your Honor, it goes to the question of whether there's a standard of care that Dr. Yutzy had in reporting to the jury what Mr. Allen had reported to him. And I think that when we get to the transcript, which we'll obviously get to, we'll see some issues there. But ---

MR. HOLTSHOUSER: Well, Judge, first of all, he wasn't reporting to the jury. He was answering questions that were asked of him by both sides. But the hypothetical is what I object to; that there's an assumption that hasn't been established in the record that there's any evidence that he's omitted something or that he was asked a question to which a complete answer required inclusion of this information if he recalled it at the time.

THE COURT: Assume that you -- it was just a direct question of how you responded when you asked him about this. Is a -- I can't read it. Would you ask the question again?

Q    (By Mr. Kane)  If you were asked a direct question about how Mr. Allen had responded to your inquiry about this

statutory mitigator, can you identify for us any reason why you would have omitted the information that indicated he was having problems?

MR. HOLTSHOUSER:  Judge, again, I'm going to have to object because he's asking him to articulate a reason for omission; that it hasn't been established that he did.

MR. KANE:  It's -- It's a hypothetical.

THE COURT:  You can answer if you recall.  Do you understand the question?

Don't guess or speculate.  If you understand it, you may answer it.

A    I understand it, but I would go with the answers that I gave earlier in the situation.  I don't have any recollection as to why I would omit any information.

THE COURT:  Okay.

Q    (By Mr. Kane)  Okay.  We're going to 18-A, Page 6.  This is your -- Thank you.  This is your continuing testimony.  See at Line 2 there you're asked, "Did you ask him about the second one" -- this is statutory mitigators, second statutory mitigators -- "namely, whether or not he was under any severe mental or emotional disturbance at the time of the offense?"

And you said, "Yes, I did," right?

A    I said that.

Q    And then you were asked, "And how did he -- Again, how did he describe his mood during that time period?"

And then you gave a -- looks like a six-line answer. Do you see anywhere in your six-line answer where you identified the stress, the depression and the constant thoughts about his family that he identified in answering that question for you?

A    No, I don't see it there.

Q    In your report -- And now we're going to ---

MR. KANE:  Can we switch back one more time?

Q    (By Mr. Kane)  We're going to Exhibit 584.  Looking down here at the disturbance mitigator, you reached an opinion, correct, with a reasonable degree of medical certainty that Mr. Allen did not meet the statutory mitigators?  Is that correct?

A    That is correct.

Q    And you actually reported part of what he said, correct?

A    I did.

Q    Which part of what he told you did you report?

A    Well, this is a -- It's a hypothetical answer since he wasn't there, and he identified he was not present.  And when I asked him about the disturbance, he said, "Not for real," and explained that he stayed in a good mood as he identified.

Q    And he also explained that he was depressed, didn't he, in what we just looked at?

A    Right.  He did identify what's in there.

Q    And he also explained that he was stressed out, right,

and what Mr. Holtshouser referred your attention to?

A    He did identify that he was stressed at the time.

Q    He, also, at least three times, if I recall correctly, talked about having constant thoughts of his family and the problems that he was having with his family, right?

A    And the problems he had caused, yes.

Q    You didn't mention any of those in your report.  Why not?

A    I don't have a recollection of why there was some or -- there was some specific idea or specific thought.  I do recall that I didn't get into this information too much because it was hypothetical, and he had an alibi defense in the thing, and I did not include that.

Q    You had enough information, though, that you reached an opinion that you reported to the jury, correct?

A    I did.

Q    As part of your evaluation of Mr. Allen, did you do a mental status examination?

A    I did.

Q    As part of that mental status examination, did you do a test called the "Serial 7s"?

A    I did.

Q    And when you were trained in this test -- When you were trained in this test, it was -- You were trained that doing the Serial 7 Test in, roughly, a minute was normal, correct?

A    Within the norm, yes.

Q    Say that again.  I'm sorry.

A    Within the norm.  That's the way I was trained classically.  Over time it's changed a little bit.

Q    And Serial 7s is a test where you start at a 100, you subtract 7.  Hopefully the person gets 93.  You subtract 7 again; get 86, until you get down to zeros or until you get down to 2 as it were, right?

A    2, correct.

Q    Yeah.  Do you recall how long it took Mr. Allen to complete that test in the mental status examination?

A    As I recall, it was two to three minutes.

Q    Do you recall that he made some errors in that test?

A    I believe he made two sequencing errors.

Q    In your report, did you note that he made three errors?

A    It could have been three.  I don't recall.

Q    But despite his errors and despite taking two to three minutes, you reported that he did fairly good.  Is that correct?

A    Fairly good is within the range, sure.

Q    Now this Mental Status Exam, that's intended to test --
The Mental Status Exam is intended to test for memory and concentration.  Is that correct?

A    It tests for many different things.

Q    All right.  Did you tell Mr. Allen in your examination that it was -- you were about to test his memory and

concentration abilities?

A    I did.

Q    Okay.  Was that accurate?  I mean that is two of the things that they test, right?  Memory and concentration?

A    Yes, it is.

Q    You also did a Three Word Recall Test.  Is that correct?

A    I did.

Q    And he only got one of the words right on recall and described the other two.  Is that correct?

A    He described the other two in off-point commentary, that's correct.

Q    So in only getting one of the three words correct on the Word Recall Test, is that a good score?

A    It's not a good score.  It's not a bad score.

Q    What would be a bad score?

A    Zero.

Q    Are you familiar with literature showing that advanced Alzheimers patients generally recall either zero or one of the Three Word Recall?

A    They can.

Q    Mr. Holtshouser earlier this morning asked you quite a few questions about PTSD, looking at some articles that apparently you sent -- you had sent him?

A    That I may have provided, yes.

Q    Sorry?

A     Yes.

Q     And also at your textbook chapter on PTSD, correct?

A     That's correct.

Q     And the bottom line of that, as I understand it, is that you believe the PTSD diagnosis is of questionable validity. Is that right?

A     Validity and reliability, that's correct.

Q     Did you tell the jury at the time of trial that you so believed?

A     I have no recollection of what I told them at the time concerning that diagnosis.

Q     What about in your report to Mr. Holtshouser?  Did you -- Do you recall if you set it forth in your report that the diagnosis was of questionable validity?

A     As I sit here, I don't recall putting it in the report.

Q     Are you ---

A     In 1998?  I'm sorry.

Q     Go ahead.

A     In the 1998 report or --

Q     Yes, the 1998 report.

A     No, I don't recall putting it in there.

Q     Now I think you told Mr. Holtshouser on Direct Examination that after reviewing the transcript of your evaluation of Mr. Allen, you see it as a routine evaluation and nothing extraordinary about it one way or the other.  Is

that -- Is that correct?

A    Not at all.

Q    It's not correct or ---

A    It's not correct.

Q    Okay.  Tell me how that's not correct.

A    Well, it's a -- it's routine in terms of the structure of the approach --

Q    Okay.

A    -- in terms of the information, the dialogue, the inquiry, the diagnostic, but it's not a routine evaluation by any stretch of the imagination.

Q    Okay.  And -- But in terms of including an inquiry into possible abuse, that was routine for you at that point.  Is that correct?

A    As is in the transcript I generated at the time, that's correct.

Q    And in your report -- Looking at your 1998 report, the last full paragraph that's only three lines, do you see that down towards the bottom?

A    No.  If it's only three lines, I've got six lines on the ---

Q    The last full paragraph.

A    Okay.

Q    So the one above that; "When questioned about the possibility."

A    Yes, I see that.

Q    Okay.  You reported that Mr. Allen explicitly indicated no form of abuse in his early life.  Is that correct?

A    Okay.  I'm sorry.  I was at the bottom.  "When questioned about the possibility of verbal, physical or sexual abuse as a child or an adolescent, Mr. Allen explicitly indicated no form of abuse in his early life."

Q    That's what you wrote in your report, correct?

A    That's what I wrote.

Q    But you did understand at the time of your evaluation that he had been subjected to whippings, correct?

A    He mentioned that, correct.

Q    And you took the statement to mean that he was whipped by his mother, correct?

A    Because it's in the context of the mother question.  Yes, I did.

Q    At -- When you learned that he had been subjected to whippings, did you ask him specifically, "Well, who whipped you"?

A    I don't -- I don't think that I did, but I took it that the mother was the primary person in the house.

Q    Did you ask what he was whipped with?

A    No.

Q    Did you ask how often he was whipped?

A    I did not.

Q    Did you ask what he was whipped for?

A    I did not.

Q    Did you ask whether his mother was drunk when she whipped him?

A    I did not.

Q    You -- You recognize now, do you not, that whippings can be criminal behavior.  Is that correct?

A    As a general matter, yes.

Q    And assuming that at the time of your evaluation of Mr. Allen you also knew that multiple people from his life reported that he had been subjected to physical abuse as a child, would you have followed up and inquired more about the whippings he was subjected to?

A    I'm sorry.  I lost the continuity.  Could you ask it again?

Q    Sure.  Let's assume that at the time of your evaluation of Billie, when he tells you that he had received whippings, that you also knew at that time that multiple people from his life reported that he had been subjected to physical abuse as a child.  In that case, would you have followed up and inquired more about the whippings he had received?

A    I may have.

Q    Do you recall testifying in your deposition that you would have?

A    I could have testified that way based on the way the

question was asked.

Q    Now you also knew about an incident where Billie Allen went to the hospital as a 7-year-old with a head injury.  Is that correct?

A    A scalp injury, yes.

Q    And that was at the age of 7?  Do you recall that?

A    He was young.  I don't remember the exact age, but that's fair enough.

Q    And you recall that it was after some sort of boxing activity with his uncle?

A    That's correct.  He said he slipped; he, Mr. Allen.

Q    And you understood at the time of your evaluation that Billie was quite young and his uncle was quite large at the time of this incident, correct?

A    That was my reconstructed recollection of the interview at the time.

Q    Okay.  And -- But you did not at the time of your evaluation of Billie or at the time of your testimony at trial have information suggesting that this Uncle Jerome had had a habit of punching Billie and other young family members.  Is that correct?

A    I was not aware at the time that I evaluated him in 1998 that this issue was out there.

Q    And if you had had more -- If you had had such information, then you would have followed up more on this

incident, right?

A    Again, I may have.  I did follow up at the time because of -- it's a little unusual with the boxing, but he, Mr. Allen, identified that there was nothing other than he slipped and hit his head.

Q    Do you recall Mr. Allen telling you during the course of his evaluation that he had been bullied and intimidated?

A    He identified -- When asking the questions about conduct disorder about the bullying and intimidation, he identified that that had happened to him.  Contextually, I don't remember.  I'd have to go back to it as to whether it was a school issue or outside of school.

Q    Well, let's go back to it, but let's -- I need to clarify your last answer there.  You say that he denied that it had happened to him?  Bullying?

A    No.

Q    Okay.  He, in fact, told you that he had been bullied, correct?

A    The question is set up in conduct disorder about whether you've been a bully or not.  That's what you're looking for, and he identified that he had been -- I don't remember the exact language, but it's in the transcript, but he had been the focus of that.  But as I recall, that question usually relates to school and whether it happened at school.

Q    Well, let's look at the question at Line 3 of Page 68 of

your evaluation of Mr. Allen.  You asked him, "Do you have a recollection of bullying, threatening or intimidating others?"  Correct?

A     That -- That's correct.

Q     And he said, "I would be the one getting bullied or getting intimidated;" correct?

A     That is correct.  But you need to go back upstream to identify the context of the situation, if you want, because that's a conduct disorder question.

Q     Did you ask him who bullied him?

A     I did not because it was in the context of school, and that was not an unremarkable thing at the time.

Q     Did you ask him who intimidated him?

A     I don't see that I did.

Q     Now as a psychiatrist, you do not believe that having a terrible or abusive childhood will shape who a person is, correct?

A     By "shape," it certainly can have certain aspects of the personality which is what I testified in the deposition.

Q     So it can shape certain aspects of a person's personality when they have a terrible or abusive upbringing.

A     It could play a part.

Q     But you do not believe that an abusive childhood significantly raises the likelihood of future delinquency and criminality.  Is that correct?

A    You have to give me what you mean by "significantly."  It certainly can increase the likelihood.  "Significantly" would be an academic argument.

Q    Are you aware of whether the National Institute of Justice has entered that academic argument?

A    I'm aware that they have.

Q    And -- And their position is that it does significantly raise the likelihood.  Is that correct?

A    I don't know what the document says.

Q    You don't know what the document says?

A    I don't know whether it says "significantly" increases or not.

Q    But that's the gist of what they -- of that report, correct?

A    I think "increased" likelihood.  I don't remember "significantly."

Q    And the most common difficulty or at least one of the most common difficulties that will follow a difficult upbringing is difficulty in forming meaningful relationships.  Is that correct?

A    I don't know about most common, but I think that is common.

Q    It is common.  You testified at trial that -- Strike that.

        You mentioned on Direct Examination that you've been

involved in, if I understood correctly, one or two capital cases per year over the years.  Is that -- Is that correct?

A    I think that that's correct since about the mid '90s.

Q    Okay.  Have -- Go ahead.

A    They're not individual cases.  They're ongoing cases such as this, so.

Q    Okay.  Have you ever -- Other than this case, have you ever testified in a capital case where you did your evaluation after trial had already begun?

A    I can't recall.

Q    You can't recall any cases where that happened?

A    As I sit here, I can't.

Q    I'm going to refer you to your more recent report of November 14th, 2011.

MR. KANE:  This is Exhibit 587, Your Honor.

Q    (By Mr. Kane)  I'm going to -- I'm going to go down to the last page here and the last full paragraph there that begins with "Perhaps most telling."  Do you see where I'm at?

A    Yes, sir, I do.

Q    I want to draw your attention to your statement that -- in the second sentence that, "Mr. Allen was receiving no treatment, neither psychotherapeutic, nor pharmacologic, while in federal custody."  Do you know whether psychotherapeutic treatment is available on death row?

A    As I testified at deposition, I don't know for a fact

whether it is or it isn't.

Q    And do you know what the pharmacological practice is --
for prescribing various medications is on death row?

MR. HOLTSHOUSER:  Object to the relevance.

MR. KANE:  It's in his report, Your Honor.

THE COURT:  Yeah, overruled.  Overruled.

A    Well, he had access to it because when he was transferred
there in the early 2000s he was actually seen, evaluated and
placed on medications.  So I would not think it would be
denied of him.

Q    (By Mr. Kane)  Okay.  And when you're referring to he was
actually seen, you're talking about the diagnosis of
depression he got in 2001 and a prescription of Prozac.  Is
that correct?

A    That is -- I'm sorry.

Q    About half-way through that paragraph.

A    That is correct.

Q    Okay.  Do you know whether or not he was on death row at
that time?

A    Well, I guess -- I don't know about the transfer issue.
He had been -- So you're correct.  I don't know whether
specifically that he was on death row at that time, but I take
it that you would not deny somebody on death row access to
medications.

Q    And you also relate here that Mr. Allen had not been the

subject of any disciplinary action while on death row. Is that correct?

A    While there. That's from Dr. Askenazi's report on Page 16, correct.

Q    And that lack of a disciplinary record you believe cuts against any personality disorder, label or diagnosis. Is that correct?

A    That was correct. That was folded into one of the reasons why this report was generated.

THE COURT:  Is this a good spot to break?

MR. KANE:  Sure.

THE COURT:  All right. We'll take the noon hour. Is 45 minutes enough time or does anybody need an hour?

MR. KANE:  Yes.

THE COURT:  Okay, 45 minutes.

THE WITNESS:  Thank you.

THE COURT:  You may step down.

(Court recessed for lunch from 12:00 PM until 12:45 PM.)

THE COURT:  Whenever you're ready.

MR. KANE:  Your Honor, I have no further questions for Dr. Yutzy.

THE COURT:  All right. Redirect?

MR. HOLTSHOUSER:  We're doing Redirect here by committee apparently.

THE COURT:  All right.

REDIRECT EXAMINATION

QUESTIONS BY MR. HOLTSHOUSER:

Q    Just a couple of questions, Mr. Yutzy.

You were asked some questions on Cross Examination about your answers in deposition regarding children reporting abuse.  And I think as you pointed out, your answers were limited to accounts given by children, correct?

A    Yes, that is exactly right.  It was children at the time of the abuse as opposed to reporting later; correct.

Q    At the time that you were examining Mr. Allen in 1998, he was actually a 20-year-old man, almost 21.

A    Yes, he was.

Q    With respect to depression, in your report that you submitted which I think is 587 -- There we go; that one.  This is the 1998 report.  When you got down to the part of your report that described -- First of all, you had a section dealing with alcohol and substance abuse history, correct?

A    I did.

Q    Then you began on Page 7 of your report, and this is Exhibit 584.  You began a section called "Psychiatric History" which went on from this page to Page 8, into Page 9, and then ended on Page 10.  In these pages, among other things, did you cover topics that had been discussed with Mr. Allen regarding his accounts of his thoughts and feelings at various times?

A    Certainly.

Q    And for example, in your report itself, is there a section regarding his -- his complaints about depression specifically.

A    Sure.

Q    Okay.  So there was no attempt to conceal or hide what Mr. Allen had said to you regarding depression.  He had indicated to you some symptoms of depression, correct?

A    It's throughout the report.

Q    Now at the time that you answered questions at trial, did you have the benefit of this Exhibit 46 which is now -- Of course, we now have a verbatim transcription of your examination of Mr. Allen on February 16th, 1998.

A    No.  No, sir, I did not.

Q    All right.  And did you consider your role in testifying at trial to provide a word-for-word account of each of Mr. Allen's statements and answers regarding each of the topics that you were asked about at trial?

A    No, that was not my role.

Q    Was your role at trial, as you viewed it, to provide your clinical evaluation of collectively all of his answers during the examination and your conclusions from those.

A    As well as all the information that came to me, that's correct.

Q    The questions that you posed to him concerning the offense and his -- The questions that related to the statutory

mitigators, do you recall being asked that on Cross Examination?

A    I do.

Q    You stated that those were essentially hypothetical, correct?

A    They had to be.

Q    And why is that?

A    Because I -- I was not in a position to be able to discuss with him his thoughts and feelings around the time and leading up to the crime for which he was charged.

Q    Okay.  And would it be difficult to describe with him whether or not he was suffering from any severe mental or emotional disturbance at the time of the crime when he had indicated to you he wasn't involved in the crime and wasn't there?

A    Well, that's true.  But, also, I had identified that I could not identify major depression in him, anyway.  So I could not identify Post-Traumatic Stress Disorder, so. Because he makes one comment specifically that, "I was depressed at the time," that does not -- is not supported by the evidence.  That led me to conclude that I could not identify that he had major depression.  So his one statement is not that meritorious to me.

Q    So even if at the time he endorsed to you that he continued to be depressed about long-standing issues but that

his mood in the week preceding the time period of the offense was good, would that essentially rule out for you any -- any claim of a severe mental or emotional disturbance?

A    Sure.

Q    And that was the question you were answering.

A    It was one I was trying to get him to answer, yes.

Q    With respect to Mr. Allen's -- In this entire transcript of the examination, he references whippings as transcribed by the court reporters once.  Is that correct?

        THE COURT:  Okay.  I got it.  Go ahead.

Q    (By Mr. Holtshouser)  This is the transcript of your evaluation in 1998.

A    One time.

Q    And that reference came up in response to a question about, "How did your mother discipline you?"

A    That's correct.

Q    And he began his answer with references to being denied privileges and how that was worse than whippings for real.

A    That is correct.

Q    Now in that, did you -- did you take it to be that he was affirmatively endorsing that -- Since your question was limited to his mother and was limited to how she disciplined him, that that somehow put you on notice that he had been subjected -- in fact, subjected to whippings by his mother?

        MR. KANE:  Objection; leading, Your Honor.

THE COURT: Overruled.

A    It doesn't follow necessarily, that's true.

Q    (By Mr. Holtshouser) And in the context of what you were asking about and his -- his overall response to the question, whatever he was referring to by "whippings," is there anything in anything that he said at that time that indicated that they were in any way significant to him?

A    In my opinion, no.

Q    And so by his -- by his consideration or mentioning of them, would it have raised the possibility in your mind that what he was describing was something that -- by his mother that was criminal?

A    He did not at the time for sure.

Q    Or that something -- some behavior -- He never linked in any of his answers, did he, that his mother's disciplining of him had any relation to her use of alcohol?

A    I don't recall anything to that nature.

Q    You were asked about the -- as you refer to it, the scalp injury that involved a 7-year-old boxing with his uncle.

A    That's correct.

Q    Now you noted that at the time he described this, you were curious about this because -- simply because of the relationship between an older person, an uncle, and a 7-year-old boxing, correct?

A    That's correct.

Q   Now based upon what Mr. Allen described to you, was that a benign circumstance?

A   It was insignificant in his way of looking at it.

Q   All right.  Was there anything in what Mr. Allen said that indicated that his uncle was landing punches on Mr. Allen when he was 7 years old in the course of boxing?

A   No, there's nothing in the information that I received from him.  There's nothing in the medical record from the hospital where he went.

Q   Right.  Would there be anything about the behavior of an uncle introducing a 7-year-old to the mechanics or the activities of boxing that would be considered abusive in and of itself?

A   You introduced the term "introducing."  I don't know what really the circumstance was.

Q   Okay.  Was there anything about -- given Mr. Allen's description of it, that made the size of the uncle relevant to the way in which the scalp injury had occurred?

A   No.

Q   So did Mister -- Did his uncle's size in any way play a role in Mr. Allen's description to you that he had slipped?

A   No.

Q   Or that the slip was the result of having been struck at any time by his uncle?

A   No.  I don't recall that at all.

MR. HOLTSHOUSER:  Those are all the questions I have, Your Honor.

THE COURT:  All right.  You may step down.  You are excused, sir.

THE WITNESS:  Thank you.

THE COURT:  Thank you.

MR. HOLTSHOUSER:  I'll need to get the next witness.

THE COURT:  Sure.

**DR. GALIT ASKENAZI**,

HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

DIRECT EXAMINATION

QUESTIONS BY MR. HOLTSHOUSER:

Q    Dr. Askenazi, there's a pitcher there with water and a cup if you need it at any time.  Feel free to ask for a break.

Would you state your name for the record?

A    My name's Galit Askenazi.

Q    Would you pull that microphone closer to you and then make sure that you speak into it clearly so that the court reporter can get everything down?

Now you brought with you several bags containing several written materials and periodicals and reference books, correct?

A    Yes, I did.

Q    All right.  If you need to refer to any of those to

answer any of the questions, let us know and we'll retrieve those. But for now we'll see if we can get through this without needing to refer to those, and a lot of it will be on this computer screen in front of you. Okay?

A    Okay.

Q    Can you give the Court briefly an overview of your educational and work experience, background?

A    Yes. I completed my Bachelor's Degree in Psychology from Princeton University in 1994, Magna Cum Lauda. I then spent a couple of years of training in Neuropsychiatry at Massachusetts General Hospital and Harvard Medical School. I then went to the Ph.D. program at Case Western Reserve University. It's a General Degree in Clinical Psychology, but I specialized in Neuropsychology at that time.

I then completed a year-long internship in Neuropsychology through the V.A. Medical Center in Cleveland. And after that, I went straight into private practice while also doing a post-Doctoral program in Clinical Neuropsychology.

Q    All right. Then you've obtained your Ph.D.?

A    Yes.

Q    And that is in what field?

A    That's in -- It's General Psychology, Clinical Psychology.

Q    All right. And then have you attained any advanced

degrees in any other fields?

A    They're not called degrees.  They're board certifications both in Clinical Neuropsychology and Forensic Psychology.

Q    Are there relatively few people in your profession in the country that are board certified in both Clinical Psychology and the second one was Forensic Neuropsychology?

A    It's Clinical Neuropsychology and Forensic Psychology.  There's eight of us in the country who are dually certified.

Q    Okay.  So relatively rare.

A    Yes.

Q    All right.  And your occupation and profession at the present time, you're practicing as a neuropsychologist?

A    Yes.

Q    I'm going to show you Exhibit 555.  Is this a copy of one of your recent curriculum vitaes?

A    Yes, it is.

Q    Okay.  The current name under which you operate, what is the name of your firm or practice?

A    It's Neuropsychology and Forensic Psychology Specialty Services.

Q    All right.  And are you a solo practitioner?

A    Yes, I am.

Q    Okay.  And you're located in Cleveland, Ohio.

A    Yes, in one of the suburbs.

Q    What is the general nature of your current practice?

A    In regards to the private practice, it's pretty equally split with General Neuropsychology, meaning in terms of treatment assessment, and forensic work, meaning civil and criminal assessments.

Q    Okay.  And in the area of Forensic Neuropsychology, what's the usual breakdown between the number of times you are called by the defense and the number of times you're called by the prosecution?

A    It's pretty equally split, especially in the capital cases.  Most of the times I've actually testified has been as a consultant for the court systems.  So I'm not necessarily hired by either side.  I'm an independent consultant for the courts.

Q    Okay.  Prior to working on this case, what had been your experience in capital cases, state or federal?  The extent of your experience.

A    Okay.  Prior to this, there were seven other cases that I've worked on.  Three of them have been federal.  At that time it would have been -- Well, including this.  Five would have been state cases.

Q    And in those -- In capital cases, is there -- what is the breakdown between prosecution versus defense?

A    It was three for the prosecution, four for defense, and one was through the court systems as well, so neither side.

Q    So as part of your work in this case, did you review the

work product and the report generated by Dr. Daniel Martell?

A    Yes, I did.

Q    And you reviewed his C.V. as well, correct?

A    I never actually received, I believe, his full C.V., but I did have some questions regarding his qualifications.

Q    And in terms of board certifications, how do you differ from him?

A    He is board certified in Forensic Psychology, but I'm not sure about his general training in Neuropsychology.  I do know that he isn't boarded in Neuropsychology.

Q    Okay.  And what does it mean to be "boarded" in Neuropsychology?

A    Well, it means you pass a three-stage exam that is evaluated by peers in the area, meaning that you have documented that you've received the knowledge that you need to -- to be at the top of the field.

Q    And when we're talking about Neuropsychology, it is the use and interpretation of these various testing procedures that are available, correct?

A    It's using tests to try to understand how a person's brain functioning is affecting their behaviors and emotional functioning.

Q    And it's in that capacity that you are board certified?

A    Yes.

Q    Okay.  Now we're -- Just to briefly refresh the Court a

little bit about Neuropsychology, and you just described a little bit what a neuropsychologist does, first of all, is -- is a neuropsychologist like yourself also a psychologist?

A    Yes.  All of us have general training as psychologists first.

Q    So in that respect, you are like Dr. Cuneo in this case.

A    Yes.

Q    How do you generally go about conducting your work if you are called in and asked to do a neuropsychological evaluation of a subject?

A    When I do a general neuropsychological evaluation, what I try to do is obtain as much available information that already exists on the person that might be pertinent, especially if they've had previous testing; specifically find out what is the referral question, what is it that a person may be concerned about, and then look at test selection that would be appropriate for that particular evaluation.

Q    So in each individual case, do you make individual judgments and decisions about what tests you're going to administer?

A    Yes.

Q    Does part of your work then involve a clinical interview?

A    Yes.  It always starts with a clinical interview when I work with a person.

Q    And what -- Why do you need -- Why don't you just sit

someone down and say, "I'm going to give you these tests and see how you do"?  Why do you need that clinical interview?

A    Well, you need the historical information, everything from education to medical history to mental health history to substance abuse history as well as you want to see how they present in that setting with you.  Are you noticing any deficits working with them?  You need to always use your clinical judgment in interpreting any test data, and you get that from the interview and from the records.

Q    Is -- Besides the reported history from the subject, are you also interested in collateral sources?  That is, reports from third-parties who also know the subject or had experience with the subject?

A    You are in all cases, not just forensic cases, because sometimes, for example, in a medical evaluation a person may not know the exact results of their medical testing, let's say.

Q    When you are testing, are you testing for different strengths, different abilities that are related to brain function?

A    As a neuropsychologist, what you do is you test a person's comprehensive abilities.  So you look at all different types of functioning, whether it be attention, memory, language, visual skills.  You're trying to understand their strengths and weaknesses as a whole and what those might

mean.

Q    Through testing, are you trying to use your tests to reach opinions or diagnoses about whether or not there are any organic issues?

A    Yes.

Q    Are you familiar with the use of MRIs?

A    Yes.

Q    And are MRIs of any utility in dealing with the type of issues that you are inquiring about?

A    In general, yes.  They can be very helpful for things like stroke or brain injury, things that help pinpoint an area of the brain that has been affected.

Q    You're familiar as a psychologist and a neuropsychologist with the concept of the Post-Traumatic Stress Disorder?

A    Yes, I am.

Q    Is an MRI of any utility when it comes to diagnosing and determining PTSD?

A    Not at this point.

Q    Are there any -- To your knowledge, based upon your expertise and awareness of studies, is there any connection between PTSD and organic brain function?

A    You mean in either direction?

Q    In either direction.

A    Okay.  Because people who may have, let's say, had a brain injury might experience PTSD differently than someone

who has not because of some complicating factors, but in terms of someone who has PTSD, we know it might affect attention when they're having symptoms. But in terms of do we know if there are any physical changes in the brain, no.

Q   All right. So you're not aware of any scientific research which would support the notion that PTSD leads to organic changes in the brain?

A   Not that I'm aware of.

Q   Generally speaking, these tests that you administer, have they gone through -- is there a genesis and an evolution of these tests to the point where we are today in their use and availability?

A   There certainly is. The goal is always to make them as sound as possible, as valid, as reliable, and that means you have to update it with changing society and the demographics of our society as well as try to increase the population that you're standardizing any tests on.

Q   Do most of these tests -- historically, have they originated with research by individuals in the field?

A   Yes.

Q   Have -- Nowadays, are they -- is that research, that focus, generally dominated by organizations?

A   There are certain like test publication organizations that they really focus on a lot of the normalization, standardization of new tests.

Q    And these tests, their use is licensed and sold.  Is that correct?

A    Yes.

Q    They -- They incur fees for their use?

A    Yes.  They're all copyrighted and have trademarks.

Q    Okay.  When you're -- When you give an individual tests and let's say you give multiple tests in multiple areas, such as attention, executive functioning, motor strength, verbal skills, et cetera, how do you -- do you go through a process of picking and choosing which test you -- you consider?  In other words, do you have a deficit centered approach or are you looking at the whole picture?

A    My approach is that you have to at least assess every different area of functioning.  When I know or suspect even once testing starts that a person is showing a particular deficit in an area, I will typically add more tests in that particular area to try to tease apart where exactly the deficit is and what is still intact.

Q    Okay.  Do you have some sense from a clinical interview what a person's strengths, their weaknesses is just based upon observation and knowing what to look for?

A    You can have a general sense, but a lot of times even what you see in front of you isn't exactly what will show up on testing.  For example, a lot of people complain of memory problems but it's really an attentional problem.

Q    Well, let's say you have impressions that you reach in the clinical interview.  You give a battery of tests and both your clinical impressions and certain of the tests point to the direction of there not being any problem, but then you have one or two outlier tests in which -- that indicates that the performance isn't as good as on other tests.  What do you do with that apparent difference in results?

A    Well, you have to use your clinical judgment and the collateral information that you have.  A person might have a very discrete impairment, let's say, because of a stroke or they might have done poorly on one single test because they were really tired at that moment in the testing day or they become emotional at that point.  So you have to use that clinical judgment to help try to interpret what an individual test result means.

Q    I'm going to direct your attention to something that we've already established.  When you're doing your actual testing, is there a four-step process that you go through, arriving at raw scores from a test, and then you do a conversion through various other means?

A    Yes.

Q    And so like is a raw score going to be how many they got right or how many seconds it took them to do something?

A    Exactly.

Q    And then what is -- what is the process you go through

briefly, if you could explain that to the Court?

A    Okay.  Raw scores are then converted into scaled scores. And scaled scores are then converted either into what we call an index score or a T score.  One norms itself with an average being 100.  One norms itself with an average being 50.  There actually is some norms with it being 10.  But the main thing is once you know what scale it is, you can also determine what we call the "standard deviation" which would tell you, based on whatever scoring system you use, what range would get it outside of a normal range.

Q    And so when you say "normal range," are you usually referring -- is the center of the normal the mean?

A    Yes, the center would be the mean.

Q    That's the perfect, 50?

A    Yes.

Q    Okay.  And when you say "standard deviations," are you talking about the number of points that something varies up or down from 50?

A    If you're using 50, which is what we call a "T score," then a difference of 10, yes, would be a standard deviation.

Q    So 10 is one standard deviation.

A    Yes.

Q    And 1 would be one-tenth of a standard deviation.

A    Yes.

Q    Okay.  Going above 50, is that good and going below 50,

is that bad, generally speaking?

A    Yes.  It means you have above the average abilities, if it's above 50, and below would mean below average abilities.

Q    Now you mentioned earlier that there are norms that are used.  Can you explain to the Court what you mean by "norms" and norms for whom?

A    Okay.  For any test that's been developed, they have what are called "norms" which is the comparison group to interpret what the test data means.  So for example, you wouldn't want to compare someone who's 20 years old with someone who's 80 years old in terms of how quickly their hand -- they can function in terms of hand or motor functioning.

Q    Why not?

A    Because you would ---

Q    Why wouldn't you want to compare them to the whole world at large?

A    Because it doesn't provide any utility to do that if you don't know what would be expected for that given individual or the group that that individual is in.

Q    Now is it -- Do you -- Do you find these things that matter or make a difference, such as age, education and other factors?  Is that something that is learned through research?

A    Yes.

Q    And so the research is that they give these tests to various focus groups, study groups, and then they determine

their characteristics and determine whether or not there's variation in test results based upon how old you are, how far you went in school, whether you're a man or a woman, things of that sort.

A    Exactly.

Q    And is one of those that has been identified that is variable in terms of test scores is race?

A    Yes.

        THE COURT:  Is what?

        MR. HOLTSHOUSER:  Race.

        THE COURT:  Oh, okay.

Q    (By Mr. Holtshouser)  And is that something that has been developed or come into practice in the -- since 2000, let's say?

A    Yes.

Q    Okay.  Once you have notions on a particular test how many standard deviations, if any, there are from the norm for that person with those criteria, then is there a point in time when you can start to begin to apply labels based upon the number of standard deviations that help you understand what it means?

A    There are.  In general, a standard deviation helps us psychologists look at the percentages, how many people are falling into that category.  A general guideline that we use for Neuropsychology is -- Plus or minus one standard deviation

is the broadly average range.

Q    So anywhere from 50 down to 40 is broadly average?

A    It would actually go from 60 to 40 would be considered the broadly average range.

Q    That's ten points either side of 50.

A    Yes.

Q    Then what about once you cross over that ten-point either -- spread either way?

A    Once you get above those ten points, it would be above average, and once you get below those ten points which would be below 40, that would be below average.

Q    Is there -- Has there come into use in your field the use of terms such as "impairment" or "brain damage"?

A    Well, a general guideline would be "impairment" would be below one standard deviation.  A lot of times, to be more conservative, we go more to one-and-a-half standard deviations or one-and-a-third like below a 37 or below a 35.  We wouldn't use the term "brain damage" because a person can be impaired for reasons other than brain damage or being scored in an impaired range other than brain damage.

Q    So is it actually incorrect or -- or not good practice to characterize someone as say one-and-a-half standard deviations below the mean and say, "Well, they're brain damaged in this area"?

A    You wouldn't use -- We wouldn't use the term "brain

damaged."

Q    It's just that they are impaired as compared to the norms.

A    Exactly.  And that would be between one and two standard deviations we refer to as "mild" impairment, between two and three as "moderate" impairment, and anything greater than three standard deviations is "severe" which is the lowest one percent of people.

Q    And would that be indicated here?  0 to 1 is normal; once you go below a whole standard deviation or more, ten points, then you get into "mild", "moderate" and "severe"?

A    Yes, that's a pretty standard interpretation of standard deviations.

Q    These labels of "mild" -- "average", "mild" or "moderate", do they tell you anything about causation?  In other words, what caused them to be five points, ten points below the norm in their performance on a particular test.

A    No.  A test in and of itself can't do that.  You need to impart your clinical judgment.

Q    Then we talked a little bit about score adjusting and that is, you -- you want to look to norms for your test results for age, sex and race.  Are we talking -- Are you talking about what the practice is now in the -- in modern -- in this present time period?  Today?

A    Yeah.  The main factors today are age, sex, education and

race.  Those are the main demographics that we score on.

Q    All right.  And so that is not just limited to a particular race but, for example, there are variables that might be -- exist on a particular test, say, between Caucasians and Asians?

A    Yes, there could be.  And there could even be on some tests that we know are, let's say, developed for forensic population, incarcerated versus not incarcerated.

Q    Because that has -- Is incarceration known to be a factor that can influence test performance?

A    It can influence some test performance.

Q    The -- The body of material that is drawn from to develop these norms, are these statistical samples that the researchers and the others develop and validate through practice?

A    Yes.

Q    So in terms of you as a private practitioner evaluating a real person, are these things that are now found in computer programs?  That you basically plug in the results of your tests, the norms are automatically compared, and it tells you what this person with these features, how they're performing compared to their peers?

A    Yes.

Q    So by "peers," it's people like them.

A    Exactly.

Q    Okay.  And the main criteria -- the main factors being age, sex, education and race.

A    Yes, those are the four main.

Q    When you get these, is it -- is it a breakout of like, okay, "Well, this is the adjustment for age.  This is the adjustment for education, and this is the influence of the race factor"?

A    Most tests do not say the difference.  You can oftentimes look up research, and they can say, "Well, it might be a difference of four points based on this one factor."  But when you yourself are looking at the norms, it is not broken down.

Q    They're all lumped together.

A    Yes.

Q    So there's actually no way of telling whether -- how much of a particular factor, whether it be ninth grade education or college degree, actually alters the norm?

A    Not from like the standard norming manuals that you would use.

Q    Okay.  And the same would be true of race.

A    Yes.

Q    What is the generally-accepted practice within your profession, let's say, since 2004 regarding the use of race-adjusted norms or norms that include adjustments for race?

A    Okay.  You know, the standard of practice, whether it be

race or any other factor, is if there are adequate norms,

well-validated norms that include reasonably impacting

demographic variables, you use those norms for your scoring.

Q    Is that anything that's controversial in your field?

A    The only thing that's controversial is when results are

not well validated, and that usually happens when sample sizes

are small.

Q    Okay.  For most tests at this point in time, are the

sample sizes adequate and statistically significant?

A    Now you can almost not get anything published unless you

have adequate studies with adequate size samples.

Q    Is there a man named "Heaton" who -- who has over the

years published various sets of norms?

A    Yes, he has.

Q    And they're in books, correct?

A    Yes.

Q    Okay.  In 1998 when this case went to trial, was there

then in effect a book of Heaton norms?  And he has other

authors that are --

A    Yes.

Q    -- put those together with him, but are they typically

referred to by the shorthand "the Heaton norms"?

A    Yes, that's how they're referred to.

Q    Okay.  In 1998 were there such things as Heaton norms?

A    Yes, there were.  There was one that came out in 1991,

'92.

Q    All right.  So as of '98, the norms that were in use by neuropsychologists such as, say, Dr. Gelbort or Dr. Wetzel, were norms that had been published by Heaton and his group in '91 or '92.

A    For a specific test, yes, he had done that.

Q    Did Heaton cover all tests that were out there or were there still some tests that required use of specific norms provided by the test maker?

A    Just a small fraction does his book actually cover.

Q    Okay.  In 2004 were those Heaton norms revised?

A    Yes, they were.

Q    And what is the primary difference between the norms in 2004 and the ones in '91, '92?

A    The primary difference is that race, specifically between Caucasians and African-Americans, were separated.

Q    And is -- Was that based upon the research that had been done between '91 and '92 and 2004?

A    Yes.  It was learned that a lot of times there were discrepant scores that were indicating impairment when functionally the person was not impaired, and that race was also one of those important factors.

Q    So there were particular tests where the results were noted that there was a difference in performance on the test by race.

A      Yes.

Q      And they included things that may or may not be due to socioeconomic factors like -- such as the finger tapping test.

A      Yes.

Q      And the finger tapping test has to do with how fast your finger pushes a telegraph key?

A      Exactly.  It looks at your motor functioning, and ultimately motor functioning is controlled by the brain.

Q      Now the norms don't attempt to explain these differences, do they?  They just note them and apply them.

A      In general, I mean a lot of the research from around that time and since then do explain that it can be cultural and an ethnic issue, not just a race, per se, issue, but that that's how there their norms work.

Q      And so I just want to be clear that when -- when the norms that were applied to adjust scores in 1998 for Mr. Allen's trial, those norms did not include race-adjusted norms because they didn't exist at that time.

A      If you're referencing the Heaton norms, that is correct.

Q      Okay.  So this whole issue of race-adjusting norms actually wasn't even a factor at Mr. Allen's trial.

A      No, not in 1998.

Q      Does it become a factor because you're examining him in 2011?

A      It is a factor just like it's a factor that some tests

that exist now didn't even exist then.

Q    Okay.  If you're examining an individual today -- First of all, these -- these norms that are race adjusted today, there is a category that if you're of age -- if you meet a certain age, a certain education, certain sex, and you're African-American, there is one set of norms.  If you are the same age, same education, same sex, and you are Asian or you are Caucasian, there are two other sets of norms.  Is that right?

A    Well, there isn't actually specifically for Asian in that regard, if we're talking about the tests that were utilized in this case, but there are alternate versions of some tests, like the Wechsler Intelligence Scales, that are specifically made for, let's say, Hispanic populations, things like that.

Q    Okay.  So what would you do if you were testing in 2011 an individual who was of African decent but who came from Africa, not America?

A    You have to be very thoughtful and understand what those norms mean.  So if this is someone who is literally coming from Africa, you'd want to know:  When did they come to this country?  Were they educated in this country or in another country?  What was their living environment here?

        In a case like that, what I typically would do would be report both norms and actually interpret which ones I would think would be the most accurate based on the person's

individual characteristics.

Q    Are you familiar at all with any practice or advice or guidance given by Heaton or any other professional in your field with respect to the use of 2004 race-adjusted norms in the context of conducting an evaluation in a capital case?

A    The only opinions that I'm familiar with in that regard is against using any race-adjusted norms in IQ testings for possible *Atkins* mitigation.

Q    And you understand by "*Atkins*," that has to do with the claim that an individual is mentally retarded and whether or not they are even legally eligible to face a charge where the death penalty might be involved.

A    Yes.

Q    And is the -- Since that is -- Is there a cutoff or a mental retardation cutoff under IQ scores for *Atkins'* purposes?

A    There is.  And then there's a lot of other factors not just, let's say, race that's of concern but something we call the "Flynn effect" that's of concern and the adjustment as to how long ago you were tested and what version of the test.

Q    So do -- In the context of an Atkins hearing or an Atkins issue, race-adjusting scores so that when compared to the general population, they might appear to be below -- lower than -- lower than the general population but when compared to a particular ethnic population, you would get a different

result or a different IQ, is that a problem?

A    Yes.  And the whole notion is is that when you're talking about a capital case, that you should be comparing that individual with the entire general population.

Q    Which relates to the issue of who is then included within the pool of people that might be subject to capital punishment for a particular offense.

A    Yes.

Q    It's not with respect to questions of mitigation or brain impairment and functioning and so forth.

A    No.

Q    Okay.  And when it comes to assessing impairment, is there anything about a capital case that makes it different than any other criminal case?

A    In my opinion, no.

Q    Is one of the risks of not race adjusting the score results the risk of a higher percentage of false positive results?  That meaning that an indication that someone is impaired when, compared to their peers, they're not?

A    That is definitely a possibility.

Q    Are there generally-accepted principles for choosing tests, applying norms and reaching impairment conclusions?

A    Yes.  There's both by the APA, the American Psychological Association, they have guidelines and ethical considerations as well as the Forensic Psychology organization.  They have

recommendations.

Q    I direct your attention to 561, is this exhibit the "Ethical Principles of Psychologists and the Code of Conduct?"

A    Yes, it is.

Q    I'm going to take you to Section 9.08 which is actually Page 15 of this and blow this up for you to see.  First of all, do these principles specify from an ethical point of view which tests and results a psychologist or neuropsychologist should rely upon?

A    Yes.

Q    And what is the issue with respect to obsolete tests?

A    Basically any test that's obsolete or outdated which in our world usually means within a year or two of the publication of the new version, you should not be using it.

Q    So if -- And what about test scoring and interpretation in the use of norms?  Is that covered in 9.09?

A    Yes.  It says you really need to use norms that are as valid and reliable as possible for the individual.

Q    Now did you have the opportunity to examine the work that Dr. Martell did in this case?

A    Yes, I did.

Q    And in your opinion, did he follow these generally-accepted principles and these ethical guidelines in selecting tests, scoring the results and drawing his conclusions from them?

A    No, I didn't think he did.

Q    All right.  And how -- how is it that -- How is what
Dr. Martell did implicated by these rules and principles?

A    Could you be more specific what you mean by that?

Q    Well, with respect to obsolete tests, Mister or
Dr. Martell evaluated Mr. Allen in 2009, --

A    Yes.

Q    -- according to his -- his report, correct?

A    Yes.

Q    Did -- In 2009, did Dr. Martell give and administer tests
to Mr. Allen which were obsolete in 2009?

A    Yes, he definitely did.  He used very old versions of
some of the tests that would have not been considered
appropriate to use in 2009.

Q    Likewise, in evaluating the man he was testing in 2009
who was then thirty some years old, did he apply norms which
were outdated?

A    He applied the correct age norms, but the norms
themselves were outdated in the fact that they went with the
outdated tests.

Q    Okay.  So he had -- In order to score outdated tests
properly, he needed to use outdated norms?

A    Yes, that's correct.

Q    Is it possible to do what Dr. Martell was attempting to
do which was to provide a retrospective -- that is, test a

31-year-old man who has spent 14 years in prison -- using tests available when he was 19 or 20 years old?

A    It's considered completely inappropriate.  Whenever we are asked to do a retrospective assessment, you do that from looking at records and any testing at the time.  You cannot use any test now to estimate how a person was functioning back then.

Q    Can test results in 2009 provide any sort of an estimate of how he was functioning 14 years earlier?

A    It can't provide an estimate, but you hope that maybe it can indicate what needed to be at least the base functioning or close to that.  But that far after the fact, you wouldn't want to make any sort of guess as to how the person was functioning.

Q    What about -- Are there possible neuropsychological effects of maximum security incarceration for 14 years?

A    Any single life circumstance can have an impact on neuropsychological functioning, whether positive or negative.

Q    Could that be -- Could that be a negative effect -- a negative impact on mental functioning?

A    It could be a negative.  I've seen it actually a positive a lot of times when people who were substance abusing in the community, once they're clean and sober, actually their thinking is much better once they're incarcerated.

Q    Now I want to shift gears and direct your attention to

the process that you used here, and that is -- First of all, you understood that when you examined Mr. Allen, which you did in October of 2011, correct?

A    Yes.

Q    That at that point in time you knew that your evaluation was in connection with a habeas petition that had been filed by Mr. Allen.

A    Yes.

Q    Now were you asked to focus on any particular issue or look for anything in particular or did you just do a wide open evaluation and give your overall assessment and results?

A    I was asked to do a general and comprehensive psychological and neuropsychological evaluation to see how he's functioning now and any possible historical diagnoses he might have had.

Q    You were provided with some background materials to review before, during and after the examination?

A    Yes, I was.

Q    Let me show you Exhibit 553.  Is this the letter that you received providing you with those materials and requesting you to conduct your examination?

A    Yes, it is.

Q    And it referenced in closing five disks of material which had been scanned, correct?

A    Yes.

Q    Now the disk did not include Dr. Martell's testing data at that point in time.  You got that subsequently under a Court order.

A    Yes.  The raw data from his testing I received later.

Q    Okay.  And then I show Exhibit 595.  Is this a listing of the materials that were provided to you in that first -- those first five disks?

A    Yeah.  That's the first page of the list, yes.

Q    And then the second page --

A    Yes.

Q    -- continues over here.  So you had the benefit of the prior work of Dr. Cuneo, Dr. Gelbort, Dr. Yutzy, Dr. Wetzel, Dr. Martell, and then also a Dr. Stewart had done some work. You had those declarations.  You had all that information before you talked to Billie Allen.

A    Yes, I did.

Q    And then there was an additional mental health expert, a Dr. Wuertz who had seen Mr. Allen in February of 1997.  You could add him to the list among the mental health experts who have seen Mr. Allen.

A    Yes, he saw him.  I don't believe any report was generated by him.

Q    It was an Emergency Room visit, correct?

A    Oh, the one he went to the hospital?  Yes.

Q    So that's one, two, three, four, five, six, seven other

mental experts had questioned at one point or not Mr. Allen about his state of mind and functioning prior to your opportunity to speak to him.

THE COURT:  You said consulted?  That Dr. Yutzy didn't consult?

MR. HOLTSHOUSER:  I'm not sure.  I don't think I said that.  Let me rephrase the question.

Q    (By Mr. Holtshouser)  Prior to your speaking to Mr. Allen in October of 2011, Mr. Allen had already been questioned and examined by or evaluated by, let's say, whether in person or through records, Dr. Cuneo, Gelbort, Yutzy.  Dr. Wetzel had never personally examined him but had reviewed the work of Dr. Gelbort and then Dr. Martell.  You also are familiar with a declaration by Dr. Stewart, and then you also had this report from '97 from Dr. Wuertz.

A    Yes.

Q    Okay.  So you enter the picture in October, 2011, correct?

A    Yes.

Q    Did you have a sense that you were speaking to an individual who had had a fair amount of contact already with mental health professionals?

MR. MORENO:  Your Honor, I'm going to object only to the very lenient -- We have tons of leading.  I think if we just maybe ask her a question and not have it be so leading.

THE COURT:  Rephrase that last question.

MR. HOLTSHOUSER:  Okay.

Q    (By Mr. Holtshouser)  How much of those materials were you able to review before you examined Mr. Allen?

A    I reviewed all the previous psychological, medical, educational records.  The only thing I didn't review prior to seeing him were transcripts from the original trial and some of the declarations.

Q    You were able to read those later?

A    Yes.

Q    And you ultimately were able to obtain Dr. Martell's complete testing data or what were provided to you was his complete testing data, correct?

A    Yes.

Q    Have you considered any materials since your testing and examination in October of 2011 or at least become aware of them?

A    I'm sorry.  What do you mean?

Q    Have you -- Have you seen other materials since your work in October of 2011 in the preparation of your report, such as the deposition of Mr. Allen?

A    Yes.  There were some additional depositions that were forwarded to me.

Q    Okay. Now let's talk about your examination.  Where did you actually examine Mr. Allen?

A    I actually examined him at the jail in Clayton.

Q    That's the St. Louis County Jail?

A    Yes.

Q    Okay.  Was there -- What were the circumstances?  If you can just describe the room where you interviewed him.

A    Sure.  It was just he and I in the room.  Everything was videotaped, so however -- however long the person working it had to come in and flip it, but otherwise it was the two of us.

Q    Was the videotaping -- Was there a tripod with a videotape recorder in the room?

A    Yes.

Q    And it was obvious that it was recording your interaction with him?

A    Yes.

Q    The person operating the equipment, how were they present, if at all, during the evaluation?

A    Not during the evaluation.  When he was setting it up as well as when he would change the tape or the disk, we stopped the evaluation.  I wasn't continuing with the evaluation during those times.

Q    Was there a lunch break or any other breaks?

A    We took one lunch break.

Q    On the day that you examined him, was he experiencing any health issues?

A   He had reported to me that for the last couple of months he'd been having some problems, some chest pain, although he said there wasn't a cardiac condition; that he had lost a significant amount of weight and that he was still being medically examined to determine exactly what it was, but he didn't want to discuss whatever he might have known at the time was happening.

Q   Did you give some consideration to what tests you were going to give -- administer to him before you got there that day?

A   (Affirmative gesture).  I had a basic selection of tests as well as additional extra tests that if I wanted to give more tests in a particular area, I could do so.

Q   Did you essentially give the same tests as Dr. Martell?

A   No, I didn't.  The only test, I believe, that overlapped was a test of malingering.

Q   Okay.  Why did you not give the same tests as Dr. Martell if you're trying to see if -- compare your results to his test results?

A   When you administer the same exact tests, there is an artificial increase in scores because of the learning of the actual test.  So even though you need to still test the same areas, you like to try to avoid giving the exact same tests so that the scorers can be considered more independent than the original tests.

Q    Were the tests that you administered other --
generally -- were the tests -- were they generally accepted
and used in your field?

A    Yes.

Q    They were just different tests but focusing on some of
the same strengths of brain function.

A    Focused on the same areas of brain functioning, yes.

Q    How long do you think you spent with him?  Was it one
day?  Two days?

A    It was one day.  It was over six hours that we spent
together.

Q    Did you ultimately prepare a report of your testing and
examination results and render a diagnosis?

A    Yes, I did.

Q    All right.  And is that contained in Exhibit 554 which
I'm putting on the screen here?

A    Yes, that's my final report.

Q    And the date of your examination was actually October
20 -- Well, the date of your report is October 24, 2011.  Do
you recall the date of the actual evaluation?

A    I believe it's on the next page.  It was October 11th.

Q    Yeah, at the top here.  Is that the date of your
examination?  October 11, 2011?

A    Yes.

Q    Okay.  The section that begins "Background Information"

on Page 2, is this -- I'm flipping through Page 3, Page 4,

Relationship History, Education History, Occupation History,

Medical History, Psychiatric, Psychological History, Violence

History, Substance Use History, Family, Legal, Prior Testing,

you evaluated and summarized in your report what you could

glean from the prior testing, correct?

A    Yes.

Q    Up until the point where there's a discussion there of

testing, did most of that information from Pages 3 through 12,

was that the results of your conversation and clinical

interview with Mr. Allen?

A    It was a summary of that in combination as well as the

collateral information that I had.

Q    And did -- In some cases did you use the collateral

information that you had to form the basis for questions and

follow up with him?

A    Yes.

Q    Did you attempt to record verbatim what he said on every

topic in response to every question in this report?

A    No.

Q    Was it -- What was your intent in preparing the report?

A    You put down in general the answer to the questions that

may not be verbatim.  I do like to quote a person a lot

because I think sometimes their own words conveys the

information better than any interpretation that I might make.

Q    All right.  If you need to refer to your report in answering these next questions, let me know what section of the report you want to look at --

A    Okay.

Q    -- or if you want to have a copy in front of you, but I want to just go through a couple of the topics that you raised with him.  The first deals with his early home life, the earlier years of his life.  Did you understand that there's a period when he lived with both of his parents at an address on Evans in St. Louis City?

A    Yes.

Q    Did he -- Was he able to relate to you that his father had worked at a furniture store and that his mother worked later?

A    Yes, that's what he conveyed to me.

Q    Were there -- Was there some negative information about his dad's use of drugs?  That -- The fact that, as he recalled it, his father was abusive towards him?

A    Yes, he told me that himself.

Q    In his experiences in school, did he indicate that he was troubled by material differences that he saw between him and other people that he was exposed to at school?

A    For him, especially since he was in a desegregation program, he felt very different from a lot of the other children there very much about the things he was able or his

family was able to afford and where things even like uniforms for the basketball team.

Q    Now knowing what you knew going into the examination, was one area that you explored with him his reports of, for lack of a better label, "abuse"?

A    I always ask questions of potential physical, emotional and psychological abuse of anyone I might see, but I certainly did take into consideration different reports prior to even meeting with him.

Q    And in his conversations with you, was there a term that he used to describe his treatment by his parents?

A    I don't specifically recall him ever using the word abuse himself.  He did reference "whoopings."  He did reference "behavior", "increasing violence."  There were certain terms that he used.

Q    Did you ask him whether or not he had -- had -- anyone had been violent toward him other than his mother or father?

A    Yes, I did ask him that.

Q    And what was his response?

A    He stated that his Uncle Billy Allen would sometimes punish him, but he would think it was appropriate in those cases.

Q    Mr. Allen said he thought it was appropriate.

A    Yes.

Q    Billie Allen, not his uncle.

A      Yes.

Q      How about issues regarding leaving the house?  Was his first recollection of leaving the house during his teen years when he began sneaking out and staying out?

A      What he reported to me was that at around age 15 he would start staying out late, staying out passed curfew, things like that.

Q      And was there a response that his mother employed when he did that?

A      My understanding, from what he told me, is that at different times she would then lock him out so he could not come back home.

Q      You're familiar with the significance of a date, January 9, 1997, as being a date when his mother's home was fired upon by some individuals?

A      Yes.

Q      Did you question with him the circumstances of that and where he was living immediately prior to that offense?

A      I did ask him some questions about that event.

Q      And what did he relate the event to?  What circumstances?

A      When I spoke with him, he had informed me that it was due to a drug territorial issue and that there were some people that were after him, and so he had left the house.

Q      He did not articulate to you anything -- Did you see that here at Page 4?

I've highlighted it.  Well, above that is the paragraph about when he started sneaking out at age 15.  Then below that is the paragraph dealing with his explanation for the shooting at his mother's house.

A    Yes.

Q    There wasn't any reference to any complicated drug transaction, loss of money and a drug deal gone bad?

A    No.  He didn't tell me that at that time.

Q    It was clearly, according to him to you, a territorial dispute.

A    That's what he told me on that date.

Q    Okay.  Did he indicate what his reasons were for having been out of the house prior to the shooting?

A    He -- I believe he was concerned that if they knew where he lived, that they could come get him and harm him and his family.

Q    So did you get the impression that he had left voluntarily to protect his family?

A    It sounded like he left not only voluntarily but very suddenly so that his family didn't even know where he was.

Q    Was that for self protection as well as protection of his family?

A    That was my understanding.

Q    Did he have a theory that he expressed to you as to how the shooters located his home, despite the fact that he wasn't

living there anymore?

A    He had said to me that he must have been followed when he went back to visit one day, and he didn't realize that he was followed, and that's how they located the house.

Q    All right.  So did he deny that his mother had actually kicked him out of the house in response to the shooting?

A    Yes, he did.  And he actually even cited that his mom had filed a Missing Person Report.

Q    I'm going to direct your attention to the last paragraph here, talking about family.  You indicate that he is close to his mother and that she apologizes to him for how she treated him, despite the fact she does not remember a lot because of being drunk when violent towards him.  Is that what Mr. Allen indicated?

A    Yes.

Q    And his relationships with his sisters, likewise, very close?

A    Yes.

Q    Was there anything that he ever indicated to you that would suggest that his sisters were a source of physical abuse towards them?

A    No.  He never reported any of that to me.

Q    You had access to and could review, did you not, his Standardized Testing Scores from the Clayton School District where he was attending during grade school?

A    Yes, I had those.

Q    I believe you discussed those on Page 6 of your report, correct?

A    Yes.

Q    And your assessment of those, is it contained in this paragraph towards the bottom that there was a noticeable shift in test performance for the years up until and including 7th grade and 8th grade, suggesting that nonacademic factors were making an impact on academic performance and it was at this age, 13, 14, that he started -- Mr. Allen started using alcohol and marijuana?

A    Yes.

Q    Did he offer any explanation for the sharp drop in his school performance?

A    He had said that once he had started using particularly marijuana, that school didn't matter as much as well as the fact that when you're on the streets, sometimes being smart is not a benefit to you.

Q    Do these scores say anything to you about the existence of any organic brain impairment as a result of any issues in his life?

A    Well, given that for the most part his scores from the 1st through 7th grade were in the average range nationally, although they were lower than was expected for a specific school would argue against any specific learning disability or

any sort of brain dysfunction.

Q    So the grades that were in the average to above average category of grades -- not grades, but you actually had no grades from grade school, did you?  You had Standardized --

A    I didn't ---

Q    -- Test Scores.

A    I only had for one year grades or scores, yes.

Q    When he does well, that's not something he could fake, is it?

A    No.  It's very hard to fake doing well.

Q    Okay.  You covered with him the -- the subject of his occupational history.  Do you particularly recall a discussion with him about a job that he had at a clothing store called "Express"?  And I'll blow up this lower part here, if you can see better.

A    Yes, I do.

Q    And he said he liked that job, and he was in Shipping & Receiving at Express Clothing Store?

A    Yes, he was.

        MR. MORENO:  Object to the leading again, Your Honor.

        THE COURT:  Sustained.

Q    (By Mr. Holtshouser)  Is that what it says in your report?

A    Yes.

Q    Okay.  The next sentence here, what did he describe to

you as the reason why that job ended?

A    He informed me that his probation officer had called the store to check that he was working there, and when they found out he was on probation, he was fired.

Q    So it wasn't due to his -- any lack of performance or desire or other problem with him.

A    He did not report any other reason for not being able to maintain that job.

Q    Now the issue of this -- of his rapping, was that something you talked to him about?

A    Yes.

Q    What did he tell you with regards to the extent to which that was a real or successful activity?

A    It was something he greatly enjoyed.  In terms of success, when I saw him, he was very questionable as to if any significant money was really made from that endeavor.

Q    Well, when you talked to him, what was he telling you with respect to any money that had ever been made?

         I'll just direct your attention to that last line there.

A    Yeah.  I mean he said that he didn't know if any money had been made from it.

Q    He wasn't -- Was he trying to then impress you with the extent of his success as a rapper?

A    No, he wasn't.

Q    What was the primary source of his income after dropping out of high school?

A    He was very clear that most of his money came from the selling of drugs.

Q    At the top of Page 7, did he indicate that he received some financial support from his mother and uncle?

A    As necessary, especially when he was still living at the family home.

Q    In terms of what he conveyed to you, was he satisfied with either that support or the amount of money he could make from selling drugs overall?

A    He felt like he still wasn't making enough to live the kind of lifestyle he wanted to be living.

Q    You review his medical history in detail on Pages 7 through 9 of your report.  Is that correct?

A    Yes.

Q    I want to direct your attention to his discussion of an incident involving hitting his head on a fence when he was 7. Is that part of the paragraph I've blown up here?

A    Yes, it is.

Q    And what was Mr. Allen telling you with respect to this incident as it related to whether it was or was not an example of violence towards him by a family member?

A    He described it as an incident that he and his uncle were play boxing, and he fell and hit his head on a gate and got

injured.

Q    The falling and getting injured, did it have anything to do, according to Mr. Allen, of being struck in the course of boxing?  That it was related to that or that it was an accident?

A    I actually specifically asked if his uncle purposely harmed him and he vehemently said that, "No, it wasn't."  And when, in fact, his mother had maybe suspected it, he had to tell her that that wasn't the case.

Q    And why?

A    Because she said that she was going to "bust" him if she thought that he had done it to him on purpose.

Q    "Him" being who?

A    The uncle.

Q    So at least according to Mr. Allen, in that instance she was protective of him.

A    Yes.

Q    Directing your attention to this next paragraph, during your conversations with him, was there any examples in which he seemed to express an awareness of higher level psychological concepts or brain functioning concepts?

A    Well, when I was asking about the head injuries, what's important to me is:  Were there any brain changes at any of those times?  So I specifically asked if there was any notable change after any of these events.  And in describing those, he

was saying, well, memory was never one of his strong suits, and then he actually went on spontaneously to tell me that he specifically meant memory for auditory information because he said he was always very good in terms of visual memory.

Q    That was a concept that he expressed to you.

A    Yes.

Q    And he rated that as 10 out of 10.

A    Yes.  That's what he said.

Q    In the area of the Psychiatric/Psychological History that begins on Page 9, did you have an extended discussion with him about concepts of depression --

A    I asked ---

Q    -- or what might be depressing him?

A    I asked a lot of very specific questions about things that might have been difficult or sad for him throughout his life.

Q    And this paragraph here, did he indicate to you that he was depressed all the time?  That it was based on fear and frustration that he felt?

A    I mean he described that he always felt depressed because he always had an issue of not really feeling like he belonged truly in any one place.

Q    All right.  Did you elaborate on those statements by him in this paragraph regarding what you have in quotes there?

A    Yes.  I mean he specifically says, "From a kid growing

up, I felt empty," and then went on to say that he was a kid who smiled with his mouth but didn't smile with his eyes.

Q All right. And the sentence above that, did he indicate what it -- why he felt that way?

A He did because he could see in the school that he was going to that people really valued money and power, and those were not things that he had himself.

Q You explored with him, did you not, the circumstances regarding the death of Marquis Taylor?

A Yes, I did.

Q And does that begin at the bottom of Page 9 and then carry over to the next page?

A Yes, it does.

Q Did he articulate to you sort of a before and after? "There's a -- There's the way I was before and there's the way I was immediately after," and that there was a difference?

A Well, I specifically asked questions as to if there were certain changes that he experienced after the event.

Q And did he endorse any?

A Yes, he did.

Q Okay. Such as what?

A He would -- He would start withdrawing more from other people. He was avoiding places that he used to go with Marquis Taylor; that he was avoidant of thinking about the events and his friend, and so he was increasing his substance

use, things like that.

Q    Throughout your conversation with him, did he keep coming back to this issue of Marquis Taylor?  Was it a prominent feature in his answers to you?

A    It came up -- Other than when specifically asking about the events, it did come up at one point when he was saying that, you know, one of the things that has been one of his greatest burdens throughout his life is, you know, the emotional burden of having lost him.

Q    And that he indicated to you at least that that was something that still was bothering him.

A    It was because he and Marquis had a plan to actually get out of the community, make more of themselves, and he felt like, you know, he was a strong motivator.  And I almost got the sense that he thought his friend was more likely to get out than he was, and his friend didn't get out.

Q    Did you ask him whether or not he had ever been involved in any gang activity or in a gang?

A    Yes, I did.

Q    And did he deny?

A    He stated that there were two gangs locally, and he refused to join either one.

Q    At the time that you spoke to him, did you have the benefit of this document, Exhibit 100, which purports to be statements by Mr. Allen to a detective on March 19, 1997,

concerning his membership in a ---

MR. MORENO:  I'm going to object to the relevance.

THE COURT:  Okay, overruled.  The question was simply:  Did you have access to it, and then it's overruled on it at this time; maybe later.  Go ahead.

Q    (By Mr. Holtshouser)  Did you have access to this in order to say, "Follow up or confront him with this apparent contradiction"?

A    No.  I hadn't seen this.

Q    Okay.  You also covered with him the topics of substance abuse, correct?

A    Yes, I did.

Q    If you want to pour that, you have to push the little top thing in for it to come out.  Okay?

(Witness retrieving water from pitcher.)

THE COURT:  What was that number on that police report?

MR. HOLTSHOUSER:  100, Page 3.

THE COURT:  I'm going to need to break at 2:15.  I told you this morning it was 10:15.  I was mistaken.

MR. HOLTSHOUSER:  Okay.

THE COURT:  So it should be about 15, 20 at the max.

MR. HOLTSHOUSER:  So another five minutes, Judge?

THE COURT:  Yeah, another five minutes.

MR. HOLTSHOUSER:  Okay.

Q    (By Mr. Holtshouser)  All right.  Based on your clinical examination of Mr. Allen and your review of the other materials that you had been given, were you able to reach any diagnosis to a reasonable degree of psychological certainty from the standpoint of diagnosing him?

A    My opinion at the time that I saw him was that he was not actively suffering from any mental health diagnoses.

Q    All right.  Did that include Major Depressive Disorder?

A    Yes.

Q    And what was your opinion regarding any depression?

A    My opinion was that he had truly suffered from depression, probably a low grade depression, throughout much of his later childhood to early adulthood with some instances of more significant depression but that that had abated during the time he had been in prison.

Q    Had it returned at the time, say, of the shooting of his mother's house?  Was he depressed over that event?

A    Based on the medical records from that time when he presented twice at a hospital, it did suggest that he was at increased stress and most likely some symptoms of depression.

Q    Would you have characterized it as a Major Depressive Disorder?

A    There's not enough information at this time to know for certain at that time.

Q    What about any opinions you have with respect to PTSD?

A    Based on the information he told me, I believed that he did meet full criteria for PTSD for at least several months after the shooting death of Marquis Taylor.

Q    And does that -- By your answer, was it -- did it stop after a point in time or what was the -- what was the duration?

A    Well, by his report, because I specifically asked time length because that's something that's important for the diagnosis of PTSD, he no longer met full criteria within several months after the event which is typical because it is a short-lived diagnosis in most cases.

Q    So did you have an opinion then whether or not he was suffering from PTSD by February of '97 when he went to the Metropolitan Psychiatric Center?

A    My opinion is that he was not at that point.  He had resumed very normal life activities, such as having a girl friend and making future plans.

Q    Now even regarding the history of whether or not he had it temporarily for a shorter duration back at -- shortly after the death of Marquis Taylor, is that largely based upon his self reports of symptoms?

A    It's based on his self report of symptoms as well as his report of his general functioning.

Q    I want to ask you some questions about that and what you do with -- when you encounter circumstances where there's a

conflict between what he -- either what he has said on one occasion and what he's saying on another occasion about the relevant issues or whether what he's saying versus what others might have to say.  How do you, as a psychologist, deal with those conflicts in -- in reporting and credibility?

A    Well, what I do is try to report the information.  And if I know at the time of the evaluation that there's a discrepancy, I will ask about it or ask questions; will try to get into why there might be some sort of discrepancy.  But what's most important to me to form an opinion is what does the data at the time, if you have it, indicate?  Because, retrospectively, it's much harder to state what was happening then because you lose track of time periods.  It's tainted by events that have occurred since that time.

THE COURT:  Okay.  We'll take a 15-minute break.

MR. HOLTSHOUSER:  Okay.

THE COURT:  You may step down.  We'll be back in about 15 minutes.

(Court recessed from 2:13 PM until 2:32 PM.)

THE COURT:  I think where we left off, Dr. Askenazi, I was asking you about:  You are aware, are you not, that there are at least conflicts in some materials regarding the reports by Mr. Allen concerning some of the topics that you talked to him about as well as conflicts between collateral sources as well?

A    Yes, that's correct.

Q    Now do you consider it your job to try and resolve those credibility problems in order to reach a diagnosis?

A    The only time where it's really my job is if I consider a person is faking illness or cognitive deficits.  Then it is important to me but, otherwise, that's not my job.

Q    All right.  And you have not been able to be here in court and listen to the testimony of the evidence that the Court has heard from these various sources either, have you?

A    No, I haven't.

Q    At this point would the Court be in a far better position to resolve those credibility issues than you?

A    Yes, definitely.

Q    When you are evaluating a subject like Mr. Allen in reaching conclusions regarding PTSD, do you essentially -- to the extent you can challenge them but essentially need to take what he reports as true?

A    Yes.  I mean -- And especially with a diagnosis like PTSD when so many of the criteria for diagnosis are subjective, meaning they're internal to him.

Q    So there's no way to actually know for sure whether he's experiencing the nightmares he describes, is there?

A    No, there isn't.

Q    All right.  I want to move past the clinical examination and get back to the neural testing that we talked about in the

beginning.

Were there basically three problems that you identified with the work done by Dr. Martell?

A    Yes.

Q    And what were those three, if you recall?

A    The main issue was the tests that he selected and the norms which were both outdated.  There were scoring errors on top of that, and then there was extreme, in my opinion, bias in reporting the results.

Q    All right.  Is one of the things that you did in approaching his test results, along with evaluating yours, was to look at what he used to score his tests?

A    Yes, I did.

Q    All right.  Were there a series of his tests that you proceeded to do a rescoring of them?

A    Yes, I did.

Q    And why did you feel that was necessary?

A    Whenever I'm actually consulting on a case in which someone else has done testing, I always look at the raw scores, try to determine if there are any errors any which way, and I do independent scoring in order to determine if there were errors, what they mean, and not just because of their testing but in order to then contrast it to my testing.

Q    Were there some tests that he gave which the versions that he gave are still considered in use?  They're not

outdated, in other words.  They haven't been replaced by later versions of these same tests?

A    Like at the time, I think he gave an appropriate like Wechsler Intelligence Scale.

Q    Okay.  In some other tests, though, did he use tests which, while not yet obsolete, he used norms which were obsolete to score them?

A    Yes, he did.

Q    And did you have to go back and use those -- using his test results, norm them appropriately for the time period when he was testing, namely 2009?

A    Yes.  I rescored them using what would be appropriate norms for testing administered in 2009.

Q    And that would basically be the norms that were published by Heaton in 2004?

A    Yes.

Q    They're still -- They're still in existence and still in use, correct?

A    Yes.  Those are considered the most current in terms of the Heaton norms, yes.

Q    Including today.

A    Yes, even today.

Q    Let me show you Exhibit 562-A.  Is this a two-page document that you prepared that attempts to set out and demonstrate to the Court what you did with respect to a number

of the tests that Dr. Martell administered?

A    Yes.

Q    All right.  In order to see it better, I'm going to blow up each of the rows.  And beginning with what's called the California Verbal Learning Test, and I know the words in the left appear a little bit shaded because they're over a shaded background, but this is -- this document is the relevant rescoring of Dr. Martell's data, correct?

A    Yes, it is.

Q    And you prepared this?

A    Yes, I did.

Q    So in the -- in the first column, does the name of the test appear?

A    Yes.  The California Verbal Learning Test, we refer to it as the "CVLT."

Q    Is the information that's contained there regarding the average scaled score and the average T score -- Usually an average T score is always going to be 50, correct?

A    Yes.

Q    Okay.  So that information is less important to be able to see it in the screen.  Is the information in the next two columns what's the important information that you related?

A    Yes.

Q    Okay.  So in this -- What's in the first column that I circled here?

A   Okay.  In that first column it's the data that was reported by Dr. Martell.  He actually in his report did not report raw scores but did report there being severe impairment in memory based on the CVLT.  And on his actual scoring materials that were then sent to me, these were the scores he had.

Q   So you had to go back to his actual raw data which you had obtained and which we've already introduced as exhibits in this hearing in order to dig out the raw score, convert it to a -- and determine whether or not he had calculated the correct standard deviation and then the correct percentage of impairment.

A   Yes.

Q   So the first column, does that indicate the raw score that Dr. Martell got on each of these parts of the CVLT, the standard deviations or T score, and then where that score, if it was correct, would place Mr. Allen in the percentage of the population?

A   That's correct.

Q   Now what's the problem with the way in which he reported and scored the CVLT?

A   Well, just first off, he, you know, which jumped at me on this test is he actually administered the original CVLT, and the CVLT-II had come out prior to this date that he should have been using.  But this original CVLT, which was created in

1983 and then formally normed in 1987, the norms that are in

the Heaton booklet do not -- are not consistent with what he

reports. I don't know where he got this scoring material

from.

Q    Is there information available in the 2004 Heaton norms

the ones that were in effect and not obsolete in 2009 for --

that you can correlate to the CVLT?

A    Yes. I mean the norms actually in the 2004 Heaton book

are for the original CVLT and that actually is what Heaton did

when he pulled his book together, he didn't necessarily renorm

all these tests but he gathered norms in existence and pulled

them into his book. So they should be the same ones that are

from the manual from the original CVLT.

Q    So this over here, the first problem is he -- he

administered in 2009 a test that was already outdated.

A    Yes.

Q    The CVLT-II was already the one that was then replaced --

had replaced the CVLT in 2009.

A    Yes.

Q    Using the 2004 Heaton norms that were available for the

original --

A    Yes.

Q    -- outdated CVLT, were you able to take his raw data and

score it according to current norms that would be appropriate

for the time during which Mister -- Dr. Martell was testing

Mr. Allen?

A    Yes.  So the rightmost box, you'll see they are the exact same raw scores.

Q    And that's just what I've circled --

A    Yes.

Q    -- as your rescoring?  So the first column is as reported by Dr. Martell; second column is your rescoring of his results.

A    Yes.  So it gives you the raw scores, the scaled scores.  And again, the scaled scores, those are where 10 is average, followed by the T score with 50 being average and how that falls out in terms of percentage to his peer group.

Q    So with respect to the results on the CVLT, and we previously identified during Dr. Martell's testimony that these tests are the ones which he found to be areas of impairment, and the CVLT is one of them.

A    Yes, it was.

Q    So this first one, you have a rescoring for each of the separate parts of the CVLT.  Is that correct?

A    Yes, that's correct.

Q    So, for example, with a T score of 51, that's actually one above the median.  That's in the "normal" range, correct?

A    Yes.

Q    And that puts him within 54 percent of the population?

A    Yes.

Q   Is that -- Is that what that percentage is intended to indicate?

A   What that means is that he scored better than 54 percent of the population.

Q   Okay.  Now on the next one, which was a T score of 43, he had that score of 10 out of 16 was four standard deviations below the mean which is in the range of "severe impairment," correct?

A   Yes, which jumped out at me immediately because a 10 out of 16 you would never think that that would be an "impaired" range if you're familiar with the test.

Q   So it should have -- it should have been apparent to Dr. Martell that based upon the raw score alone, that a score of four standard deviations just didn't make any sense.

A   Yes, that's correct.

Q   Okay.  That actual score of 10 out of 16, according to the 2004 Heaton norms, produced a T score of 43 which, again, is still in the "normal" range?

A   Yes, it is.

Q   And a -- He is -- The percentage, again, if you were to articulate it -- I'll probably say it wrong.

A   Okay.  So the 24 percent means that his score was better than 24 percent of the population.

Q   Okay.  You do this then with respect to the total for Trials 1 through 5.  Again, on the T score it's 47; 38 percent

population equivalency, correct?

A    Yes, exactly.  And those are the five learning trial totals.

Q    On the "Recall," this is the part of the CVLT that implicates memory, correct?

A    Yes, exactly.

Q    So on the Short-Delay Free Recall Score, was his T score 39 a 1.1 standard deviations below the mean?

A    Exactly; that's right.

Q    Now that's just across the border of "normal" and beginning into the area of "mild impairment," correct?

A    Yes, that's correct.

Q    But even at that level, he is within 14 percent of the population.

A    Yes.

Q    Whereas Dr. Martell had made that -- those results appear far worse; is that correct?

A    Yes.

Q    On the "Long Recall," did he actually do better?

A    He did do better.

Q    So that ends up with a T score of 43 which actually is in the "normal" range, correct?

A    Yes, that's correct.

Q    Not any impairment.

A    Yes.

Q    Yet, how did Dr. Martell characterize that same result as three standard deviations below the mean or well into the category of "severe impairment"?

A    I have no idea.  I actually requested what manual he used.  I never got any scoring materials.  I suspect that the same thing that happened on another test might have happened here; that the standardization sample data that was used in 1983 might have been where he was pulling these scores from, but I myself requested from many people if they had any of that data for me to check, and I wasn't able to obtain that.

Q    All right.  Regardless of what he used, is there any doubt that your scoring of the CVLT in 2009, according to the 2004 Heaton norms, was appropriate and met the standard of care in your profession?

A    Yes.

Q    And these would be the correct results?

A    Yes.

Q    All right.  Now next is the Boston Naming Test.  There were two problems with this, correct, besides the -- he used the old norms which were outdated as of 2009, correct?

A    Yes.

Q    Was there a compounding problem by using those old norms?

A    Yes.  The problem with using those norms is the norms in the manual was actually the test version of the test.  It wasn't the final version.  So he scored it as if there were 85

items on it which is what was in sort of the testing sample version.  But when the test was finalized, there were only 60 items.

Q    So he used norms in the '91-'92 Heaton book which would have been in existence at the time of Mr. Allen's trial.

A    Yes.

Q    The norms in the Heaton book were of the experimental version of the Boston Naming Test.  Is that correct?

A    That's correct.

Q    And that experimental version had 85 questions, not 60.

A    Yes.

Q    How many -- Which version of the Boston Naming Test did Dr. Martell give Mr. Allen in 2009?

A    I believe this was the original Boston Naming Test-1. There is a Boston Naming Test-2 that's out as well that he probably should have been giving at that time, but he gave the 60-item Boston Naming original Test.

Q    Which was a 60-question test.

A    Yes.

Q    Now the Boston Naming Test-1, would there be differences in the Boston Naming Test-2 that would have -- Was that in existence in 2009?

A    Yes.

Q    And would the differences between the 2009 version and the earlier version be that it puts up pictures, correct?

A     That's right.

        MR. MORENO:  Object to the leading.

        THE COURT:  Sustained.

Q     (By Mr. Holtshouser)  And what are you supposed to do with the pictures?

A     What this is is that an individual is shown pictures that they need to name.  And if they have difficulty naming it, they can be given clues; either the beginning sound of the word or a semantic clue that this is like this type of item, and you're trying to see if they can then generate the word themselves.

Q     What's the significance of giving them an older version of the test versus the current version of the test?  What -- What would change in the versions?

A     What -- And I don't know the specific differences between the original and the current one, but as with most tests, what they do is they throw out items that are no longer considered to be adequate or valid in today's population and either introduce new items or perhaps even make the test shorter. The test, though, is still 60 items long.

Q     The test that Mister or Dr. Martell gave included a picture for an abacus?

A     Yes.

Q     A yoke?

A     Yes.

Q    Other items that -- Other items related to farming or outdoor?

A    Trellis, things like that.

Q    So, for example, would a yoke be something that most people were ---

MR. MORENO:  Your Honor, I object.

MR. HOLTSHOUSER:  Strike that.  I'll rephrase.

Q    (By Mr. Holtshouser)  What would be the difference of, say, no longer including a yoke, of a picture of a yoke in a test given in the modern era?

A    It's important because if an item cannot be used for all of the populations that the test is administered, that it's no longer considered particularly helpful.  And that's, again, another reason why in this case that the Boston Naming Test, that it's very important to use like age norms because someone who is 70 might be much more familiar than someone who's 30 with some of these items.

Q    Besides using the wrong version of the test and using a version which scored it compared to an 85-question test, those -- first of all, are those the two primary problems with what -- initially the primary problems with what Dr. Martell did with the Boston Naming?

A    Yes.

Q    And did you rescore it according to the 2004 norms?

A    Yes, I did.

Q    And I notice that that's 51 out of 60.  So is the norms that you used for a 60-question test the one that Dr. Martell actually administered?

A    Yes.

Q    And then what do you get when you -- in terms of his performance when compared to norms?

A    That his naming ability is completely within normal limits.

Q    0.4 standard deviations above the median?

A    Yes.

Q    When looking at the actual scoring data sheet of Dr. Martell, was there anything else that you noticed about it that raised your attention?

A    It did because on the actual last page of the Boston Naming, there are some ways that you can score it.  One of them is by -- by education and one is by age.  And Dr. Martell had circled both of the associated scores there and determined the standard deviation for both of those.  And then also written on the same page was the score that he had determined using the incorrect Heaton norms, so he actually calculated three different scores.  And his report only reported the worst one.

Q    This sheet right here, this page of norms, is that a page that comes from the '91-'92 manual or from the test booklet?

A    That's actually the Boston Naming Test booklet.  It's the

last page of it.

Q    Okay.  And where are the three calculations?  And you can circle them on your screen.  It should show up with your finger, if you touch the screen.

A    Okay.

Q    Show the Court where the three calculations are that you're referring to that he engaged in.

A    Okay.  So the first one is using this, and that's based on his education, schooling, 12 or less years of schooling.

Q    Is that one circled to the right then?  That's one point?

A    Yes.  So that's showing that he's approximately minus 1.1 standard deviation.

Then he also calculated it based on the age, right here, and that ends up being the minus two standard deviations.

Now what's important about these two scores and why most of us do not use the last page of the Boston Naming but do, in fact, use the Heaton norms is that if you look over here under "N", "N" means sample size.  He is being compared in terms of schooling to 15 people in an entire norming population in the entire country.  That's where that number is coming from.

Q    What's the significance of that sample size?

A    That's very, very small.  I mean when you look in the Heaton norms from 2004, I think it's like over a thousand

people in general were used for the Boston Naming to normalize it.

Q    Okay.  Is the third -- Is the third scoring circled there in the lower right-hand corner?

A    Yes, and that's the third scoring, and that is from the Heaton 1991-'92 book.

Q    Now this -- these two norms here that he scored first, since they're in the back of a book that's a 60-question test, were those actually not reflective of a 60- versus an 85-question mistake?

A    No.  That would -- That would not have the mistake in it. That's only out of the 60 items.

Q    Okay.  By going to the third method of calculation, by going to the '91-'92, is that -- by doing that, was that where he was injecting the 85-question error?

A    Yes, exactly.

Q    And that's where he -- Of these three norms, which of these is the worst of these results?

A    The Heaton norms are the worst because if you're, again, looking at a T score of 14 with 50 being "average," that's over -- that would be 3.6 standard deviations below.

Q    So of the three numbers that he got, the first would be minus 1.1, the second minus 2, and the third would be minus 3.6?

A    Yes.

Q    And that's the one he chose to report.

A    That's correct.

Q    Okay.  Let's move on from the Boston Naming Test then.
This is the -- got in parentheses The Controlled Oral Word
Association Test or "COWAT."  Is that actually known by "FAS"
or "Animals"?

A    Those are the two subtests for it, yes.

Q    So in his raw data, is there a column with "F" and a
column with "A" and a column with "S"?

A    Yes.

Q    What is the person supposed to do, just to refresh the
Court?

A    Okay.  What this is, this is a language-based test, and
you want to see how many words they can generate in the course
of a minute.  So in this case they're given the letters "F",
"A" and "S," and there are alternate versions, and they -- you
see how many words they can generate beginning with those
letters in the course of one minute.

Q    In giving this test in 2009, was this a -- is the version
that he gave any problem with the version of the test that he
used?  Was it still in use in 2009?

A    On the FAS, it was the same; still using the same
letters.

Q    Okay.  So "F" is "F," regardless of when it's given.

A    Yes.

Q    "How many words can you give me beginning with the letter 'F'?"

A    Yeah.

Q    The norms that were used, though, by using the older norms, what was the significance of that for interpreting the results?

A    Well, there was a slight difference being that the T score was higher using the more current norms, but if you even look at the original scores, it's still a T score of 41 which is in the average range, and he reported it as being "impaired."

Q    So is the error in his report at Page -- When he states in his report that, "A test of verbal fluency, FAS, was mildly impaired," based upon even the way he scored it and the result he got and the T score he got, is that a correct representation?

A    No.  That's not even true even with his own scoring.

Q    And is that -- A T score of 41 is only 0.9 standard deviations.  That's within the range of "normal" --

A    Yes.

Q    -- still.  Using the later norms, if you're using the same letters, what is the effect of the passage of time?  How do you end up with a different norm result just because 12 years has passed since the norms were developed?

A    Well, the main difference between those two norms is the

2004 now incorporates race as a demographic variable, and this is one of the tests that did have significant differences between Caucasians and African-Americans in the norming population.

Q    All right.  Even -- Even -- He still has the same raw score of 29.

A    Yes.

Q    That doesn't change, but the scaled score goes up a point, and the T score goes up as compared to other African-Americans who are males of his age with his education.

A    Exactly.

Q    Either way, are both of these scores normal and not "mildly impaired"?

A    Yes.

Q    All right.  What about the -- this "animals" raw score? What did that indicate to you?

A    Well, that's interesting because that's the second half of the test, and he administered it but he couldn't score it because he used the old version of the Heaton norms; that it wasn't part of the test back then, so he couldn't even score it.

Q    So he didn't -- He was giving a test which was current in 2009 but didn't score it because he went to the old norms to do so.

A    Exactly.

Q    When you did so, with A raw score of 18, there isn't any T score that is produced from the old norms but there is from the new norms?

A    Yes.

Q    And that is 49; again, almost in the middle of "average."

A    Yes.

Q    The last one on your first page is the Speech Sounds Perception Test.  That was one of those two that were on his -- Page 32 of his report.  What was -- Was the problem -- What was the problem with the Speech Sounds Perception Test scoring?

A    Again, the main issue is that he used the outdated norms versus what would have been current norms at the time to do the scoring.  So, again, there's a slight shift in how he was doing -- using the comprehensive demographic variables.

Q    All right.  So is the difference between -- the significance of using the old versus the current is that the old produced a T score of 39?  That's 1.1 standard deviations below the mean?

A    Yes.

Q    Just across the border or the beginning of "mild impairment"?

A    Yes.

Q    And 44 is within the "average" or "normal" range?

A    Yes, that's correct.

Q    Either way, one is within -- he's within 14 percent of the population; the other, he's within 27 percent of the population.

A    Yes.

Q    All right.  Going to the second page of this exhibit, on the Stroop -- The Stroop, what is that?  There's three parts to the Stroop, correct?

A    Yes.

Q    What is -- What are the parts?

A    This is a test that looks like -- that looks at focused attention in the presence of distraction.  It can also be what we call "executive functioning" which is a higher level of attention.

In the first part, you're asked to just read words that are names of colors.  The second part, you just say the colors that these X's are in.  And the third part you have to say the color of the word that is a color word that's mismatched with a different color ink.

Q    So on the third one, would you have the word "green" spelled out?

A    You'd have the word "green" spelled out in red ink.

Q    And what are you supposed to do to get a correct answer?

A    You have to override the natural tendency to want to read the word and just say the color ink.

Q    Just say the color you see, not the word you see.

A    Yes, exactly.

Q    It tests your ability to resist the impulse to read the word -- to say the word you read as opposed to the color you see.

A    Yes, which we know is the natural tendency.

Q    Okay.  There was a -- Was there a problem -- Well, first of all, with respect to the scores on the word part and the color part, --

A    Yes.

Q    -- you had the exact same results, correct?

A    That's correct.  I didn't see any problems with that, with how he was scoring it or ---

Q    Both are -- Both are in the "average" range, --

A    Yes.

Q    -- not a range of impairment.

A    That's correct.

Q    And is there any Heaton 1991-'92 versus 2004 issue here?

A    No, no.  This is the actual Stroop manual.

Q    And is that still -- Is that a valid test or an outdated test in 2009?

A    Yes.

Q    Okay.  It's valid or outdated?

A    It's valid.  I'm sorry.

Q    Okay.  And the norms wouldn't be any different than they were in 1998.

A     No.  Well, I don't -- I don't actually know when this version of this test came out, if it was in existence in 1998.

Q     Okay.  So he may have used a test that wasn't in existence in 1998.

A     It's possible.  I think the Stroop is old enough, this version of it, that it was, but I just am not sure.

Q     These particular scores also don't -- aren't implicated by any norming for any -- any -- any race issues.

A     No.

Q     Was there a problem when you got to score -- when you got to scoring -- when Dr. Martell got to scoring the color word raw score, the one where you have to resist the impulse to say the word you read as opposed to the color of the ink that the word is written in?

A     Yes.  He reported that his total raw score was 22 when it was, in fact, 42.

Q     So was that purely a matter of he counted the score wrong?

A     Yes.

Q     And then he carried it through into the calculation.

A     Yes.

Q     And this interference score, is that actually what you're after, the outcome that you're after from this whole test?

A     That's what you want to know.  It's the difference between a person's baseline level of functioning from the

first two tests and how they performed when those -- the necessary ability to inhibit yourself was being tested.

Q    And is this part of a relatively -- Well, it's part of a mathematical formula --

A    Yes.

Q    -- which has to be done in order to calculate that interference score.

A    That's right.

Q    And does it use the raw score number on the color word?

A    Yes.

Q    So if that -- If he counted that number wrong, then, obviously, his calculations in calculating the interference score came out wrong.

A    Yes, that's correct.

Q    All right.  Besides the fact that you got the same results of "average" performance on the color and word, what did you come up with as far as the score on the color word raw score and then ultimately on the interference score, the thing you're after?

A    When I rescored them both, the raw score and the interference score were "normal"; did not show any impairment.

Q    All right.  And both met a T score -- One had a T score of 47, the other 52; both well within the "normal" range of performance.

A    Yes, that's correct.

Q    Not a problem at all.

A    Not a problem at all.

Q    Is there a significant difference between using the old Heaton norms and the norms in effect in 2009 for interpreting the results of the Grooved Peg Board Test?

A    Again, the scores went up slightly more using the newer norms.  The time was the same.  The scaled score was actually the same, but because the T score went up, particularly with the left hand, it was showing that there was no longer a scored deficit in the left hand.

Q    Is the same true -- Well, actually you got a different effect on the -- by rescoring the Grip Strength Test.  The Heaton norm is the norms that were current as of 2009.  The T score went from 53 to 47.  You actually -- Your rescoring resulted in a reduction.

        MR. MORENO:  Your Honor, I'm going to object again to the leading.

        THE COURT:  Sustained.

Q    (By Mr. Holtshouser)  What was the effect of rescoring his norms according to the proper two thousand -- the ones in force in 2009?

A    With using the updated norms, you see the score and the comparative percentile actually went down with the right hand but went up with the left.  So not only is the left no longer impaired but there is less of a discrepancy between that right

and left hand.

Q    And what is the effect, though, of your rescoring on the right hand from Dr. Martell's score to the one you've got by using the updated norms?

A    It actually went down somewhat.

Q    And you reported it?

A    Yes.

THE COURT:  But still normal?

THE WITNESS:  It's still in the "normal" range, yes.

Q    (By Mr. Holtshouser)  The Tactual Performance, this is blind-folded test?

A    Yes.

Q    And what do you do?

A    You need to feel different objects with your right hand and with your left hand and recall where they were.

Q    When you rescored this using the norms that were in effect on the date that Dr. Martell tested Mr. Allen, did you get slight variations but within the range -- a similar range of what he got?

A    Yes.  The scaled scores actually stayed the same, but there was some fluctuations in the T scores for the location and how quickly he was able do it.

Q    All right.  With forties over here and forties and a 55 over here, are they either way both within the "normal" range?

A    All the scores are in the "normal" range here.  So

Dr. Martell didn't even detect any impairment on this test.

Q   Is this an example of a test where the main difference is that the 2004 is -- includes race-adjusted factors, correct?

A   Yes, that's correct.

Q   Is this a test where race-adjusted factors actually don't have any significant impact?

A   It's showing some impact but not as much as something like the Boston Naming would.

Q   Now you looked at all of the test scores that Dr. Martell got.  Were there test scores that he performed and obtained but did not discuss in this section on Page 32 where he's discussing the bases for his conclusions of dementia?

A   Yes.  Most notable to me were tests that he administered of executive functioning, those higher order reasoning abilities, which Mr. Allen actually did quite well on those tests, and it's not reported how well he did on those.

Q   And with respect to aphasia, there's a -- Among the problems -- There's several problems with the Boston Naming, but in addition to citing it as significant evidence of aphasia, was there other evidence of performance on aphasia that was ignored by Dr. Martell?

A   There actually was a specific test of aphasia in which the score -- Mr. Allen achieved a perfect score on it, and that wasn't reported either.

Q   All right.  And so from -- from the standpoint of the

standard of care in your profession, what is your opinion with respect to what's going on here in Dr. Martell's report?

A    To me, it seemed he was being very selective in only reporting things that he interpreted as being impaired versus being the standard of care that you report all tests you administer and the results to all tests because our job is to paint a comprehensive picture of who this individual is.

Q    All right.  I next want to direct your attention to Exhibit 556.  Did you prepare, using PowerPoint, a display that attempts to summarize or demonstrate to the Court the results of all of the neuropsychological testing available for Mr. Allen, taking into account what Dr. Gelbort did in '98, what Dr. Martell did in 2009, and what you did in 2011?

A    Yes.

Q    Did you break down your presentation here by topic?

A    I did; different areas of cognitive abilities.

Q    All right.  So in one place, does this provide the Court with access to the results of the mental functioning testing on Mr. Allen by topic across the board in terms of his results?

A    Yes.  And I tried to line it up so if we administered similar tests, you would see for that area what were our various results.

Q    Now when we get to the other tests that are in here, such as the Boston Naming and the CVLT, when you -- in the column

that you devote to Dr. Martell's results, do you, in fact, include your rescored results?

A    Yes, --

Q    Not Doctor ---

A    -- it is my rescored results, not his reported ones.

Q    Not his original reported results.

A    Yes.

Q    Okay.  So this first page, what does it deal with?  And if you can just kind of walk us through this and we'll kind of go through this page by page and get through it pretty quickly, I think.

A    This first page looks at the IQ test results.  We all administer different versions of the Wechsler, and each one of them was actually the proper one to administer at that time.  The main thing you'll notice is when you look at the Full Scale IQ whereas in 1998 the full scale IQ was 82, in 2009 it was 100.  And in -- When I administered it in 2011, it was 96.

Q    Now I notice that Dr. Gelbort did the WAIS-R.

A    Yes.

Q    Martell did WAIS-III and you did the WAIS-IV.

A    (Affirmative gesture).

Q    In 2009, which would have been the IQ test that was then in current use?

A    The WAIS-III was still acceptable to be used at that point.

Q    So was the WAIS-III in existence in 1998?

A    No.

Q    All right.  So actually Dr. Martell used the -- used a 2009 test to test Mr. Allen in 2009 in this instance.

A    Yes, he did.

Q    Your Full Scale IQ ends up being four points lower than what Dr. Martell obtained, correct?

A    Yes.

Q    What's the significance, though, of the fact that Full Scale IQ goes from 82 to 100 or 96 over the course of the intervening years?

A    The difference between 100 and 96 is considered a nonsignificant clinical difference.  People won't have the exact same score over time.  There's a normal fluctuation of scores over time.  A difference of four points is considered completely normal fluctuation.  What's interesting is that leap in the 11 years from 1998 to 2009 from 82 to 100 which is broadly been maintained over time.  And when you look and see that there's an increase in both the verbal area as well as the performance area, it suggests that he has been learning during that time.

Q    What does that suggest -- What are the implications of that for brain impairment or brain damage?

A    Well, it suggests that he is capable of learning information over time, and it's not just factual data which is

more of the verbal, but the performance is also visual abstraction and how quickly he completes different tests, so.

Q    From '98 to 2009 or '11, are there improvements in both the Verbal and the Performance IQ?

A    Yes, there's performances in both areas that are both clinically significant.

Q    Did Dr. Gelbort end up diagnosing that Mr. Allen had verbal deficits, verbal learning deficits?

A    He did not diagnose a specific verbal learning disability.

Q    But that he had weaknesses in verbal learning.

A    Yes.

Q    What is the implication of the fact that his Verbal IQ went from 78 to 96 or 100 during those intervening years?

A    What it shows to me is that it's more of a factor of learning.  We do know that the typical profile of someone with less than a high school education is that their Verbal IQ suffers because that's mostly school-learned information whereas Performance IQ tends to be more in an "average" range because these are more hands-on learned types of functions.

Q    Are the -- Based upon the 2009 testing, both of these in the "average" category?

A    Yes.

Q    All right.  And these numbers here, these are the numbers that Dr. Martell got as reported.  This does not involve any

rescoring or renorming.

A    That's correct.

Q    There is a category of achievement tests.  Neither you or Dr. Martell administered achievement tests, correct?

A    That's correct.

Q    Dr. Gelbort administered a -- a version of an achievement test known as the "WRAT3"?

A    That's correct.

Q    The results you characterize here as "low average" to "borderline" academic abilities commensurate with IQ test results at the time.  What does that mean?

A    What that means is scores in the 80s would be considered "low average."  Scores in the 70s we call "borderline" on these type of tests.  So they are -- The ones in the 70s are definitely lower than "average," but the thing is at that time his IQ was also scoring at an 82.  So these scores, 82, 73, 75, are not significantly different from that IQ of 82.

Q    Are these education-related tests?

A    Yes.

Q    Based on the records you saw, he was achieving in school up until the 7th or 8th grade, correct?

A    Yes; probably through the 7th grade.

Q    Other than Art in high school for the three semesters he completed, was there any achievement that he made during high school years?

A     No substantial achievement that I could see.

Q     Even though he went to high school for freshman and sophomore year, there's no indication that he actually successfully ---

MR. MORENO:  I'm going to object to the leading again.

THE COURT:  Sustained.

MR. HOLTSHOUSER:  I'm going to move on, Judge.

Q     (By Mr. Holtshouser)  The next category that you have is "Memory."  Is that right?

A     Yes, that's correct.

Q     Okay.  Do these scores involve any -- Well, up till here, just these here, those are Dr. Martell's scores as reported?

A     Yes.

Q     No rescoring involved there.

A     No rescoring.

Q     And so what is different about intelligence and memory?

A     Because -- Intelligence is someone's basic ability to function.  It's in a broad range of abilities.  Memory specifically looks at how you learn and recall new information.

Q     Was there -- And you report here the CVLT results rescored.

A     Yes.  That's the rescored when I redid it, not his reported.

Q    Now you're aware from Dr. Martell's report that he found that there was a deficit or an impairment in Mr. Allen's memory, correct?

A    Yes.

Q    And in order to have a diagnosis of dementia, you have to have memory impairment plus some other impairment, correct?

A    That's correct.

Q    Okay.  So the beginning of this is memory impairment.

A    That's right.

Q    And are you able to -- Are you able to discern on what basis Dr. Martell concluded that there was a memory impairment on these scores?

A    From my reading of his report, it was mostly based on the CVLT, which was misscored, and the one other score of Working Memory of 84 that he chose to say was significantly lower than his intellectual abilities, despite the fact that he also had a Working Memory Score of 91.  So there were two available scores for him to choose from and he, again, chose the lower one.

Q    All right.  So is this the one that he focused on?

A    Yes.

Q    And this is the one -- The score of 91 --

A    Yes.

Q    -- he ignored?

A    That's right.  And the thing is the difference between

one of them is from an intelligence test, the WAIS.  One's from a memory test, the WMS, and the issue -- the one on the WAIS actually has an arithmetic section and it was singularly on that one arithmetic test that he did more poorly, and it brought the whole score down.

Q    So is this WMS actually a memory -- specific memory-directed battery of tests?

A    Yes.  It stands for the "Wechsler Memory Scale."

Q    And is there -- is there an arithmetic component to the working memory part of the WMS?

A    No.

Q    What are the -- What is the -- your assessment of his result on the WMS regarding the -- any presence of memory impairment?

A    All of his scores are considered within the average range.

Q    Okay.  You gave the WAIS-IV which you got a Working Memory Score of 92.  Is that right?

A    Yes, that's correct.

Q    Now you also then used the thing called the KBNA.  And why did you select the KBNA?

A    The KBNA is a comprehensive neuropsychological assessment tool that assesses in one battery attention, memory, language, visual spatial skills, and executive functioning.  And it had not been administered to him previously.

Q    I want to take you back for just a second to this part of the -- These are the indexes that were produced from Dr. Martell's data, correct?

A    Yes.

Q    And these are indexes that a computer compares the memory component of the WAIS and the WMS.  Is that right?

A    It compares the Full Scale IQ from the WAIS to the Predicted Memory Functioning on the WMS.

Q    Okay.  And it looks at the difference between those two numbers?

A    That's correct.

Q    Now on this page, is there -- this is the calculation of the difference -- the significance of the difference according to the Predicted Memory Method.

A    Yes.

Q    What is the -- What does this column mean to you when it has "NS" in each of those entries?

A    Okay.  What it's doing is the column before, that it says "DIFF" which is the difference between the scores, so let's say 94 -- the difference between 94 and 100 here is 6.  It's saying that that is not a statistically significant difference.

Q    On the second page of this, which we're at Exhibit 568, Page 26 and 27, there is a second method that's provided called the Simple Difference Method.

A    Yes.

Q    And did it find that there was a 0.05 significance to three of the scores -- three of the same scores using a different method?

A    Yes, it does.

Q    Now is there any instruction or advice in your field that deals with preferring one method over the other in assessing the difference?

A    Not that I know of.  It would be your preference, which one you would prefer.  But what's important is the significance means it's statistically significant; meaning that if you re-administered, you would still see as great a difference on the re-administration 95 out 100 times.  That's what that significance means, .05.  What's important to us clinically is even if this is a statistically real difference, is it clinically meaningful?  Does it indicate real impairment we should be concerned about clinically?

      That's the last column, the cumulative percentage.  So, for example, on the third one where it says "Immediate Memory" which was .05 significant, it says accumulative percentage is 20 to 25 percent.  That means that one-fourth to one-fifth of the population normally has that big of a difference between those two scores.  So it's not suggestive of impairment.

Q    So if Dr. Martell relied upon -- First of all, in

choosing the Simple Difference Method over the Predicted Difference Method, what is that an example of in your view?

A    In my opinion it seems to fall into the pattern of having multiple choices of scores to report and only reporting the worst one.

Q    Even by choosing that one, is his conclusions that he draws from it, that it is somehow significant for finding memory impairment for purposes of diagnosing dementia, what is your opinion with respect to that inference?

A    You wouldn't -- You wouldn't be able to base that on these results.

Q    In terms of interpreting results like this and coming to some indication in your mind that you have a memory impairment, what's the role of, say, any real world indications that you have from either dealing with him, talking with him or other information you know about him that he does or does not have a memory problem?

A    Well, you must make comparisons to what you see and what's been documented to see if it's -- what's showing up on testing is consistent with what's known about the individual otherwise.

Q    You don't just ignore what common sense tells you.

A    No, not at all.

Q    Okay.  From the -- And likewise, your results from the KBNA, they were all -- your T scores were all well above the

mean and then in the "higher average" ranges, correct?

A    That's right.  It showed good memory functions.

Q    Do you summarize in the second page after "Memory" in narrative fashion the nature of your conclusions about the scores in each column?

A    Yes, I did.

Q    Okay.  Let's go now to "Processing Speed."  Any issues there other than the fact that you -- you included it out of completeness?

A    No significant issues.  I mean the only thing that jumps out at me is that he actually was slower at my time than he was with Dr. Martell, and that I attributed to how he reported his physical health was that day.

Q    Okay.  The next is "Language Tests" which included things likes the Boston Naming, the Controlled Oral Word.  That's that FAS and animals thing, correct?

A    Yes.

Q    "Aphasia Screen," these are the tests that Dr. Martell gave that fall into the category of language tests, and these are the ones you gave, correct?

A    That's correct.

Q    And rescoring the result on the Boston Naming Test, no issues there, correct?

A    No problems.

Q    How about with the FAS or the animals?

A    No problems there.

Q    Okay.  And this reference here to the scaled score of 13, T score of 80 on the Aphasia Screening, is that the test that you referred to earlier?

A    Yes, the one that he got a perfect score on it.

Q    And that puts him within 99.9 percent of the population.

A    The top one of one thousand people, yes.

Q    You gave versions of the -- portions of the KBNA which implicated language here.  And, similarly, there's a -- Is there a picture naming test that is much like the Boston Naming?

A    It's the exact same type of format of the Boston Naming. It's shorter in length.

Q    It's 20 pictures.

A    It's 20 items, and he got all 20 of those correct.

Q    Now when you say "shorter in length," the one that Dr. Martell gave, he actually skipped the first 30 and started with No. 30 out of 60.  So he really only gave 10 more than you.

A    He did.  But if the person, let's say, got the four -- any of the first six wrong, you actually do go back, but if a person does well, you assume they would have gotten the first 30 correct.

Q    And with a raw score -- The Picture Naming Test with you, he got a perfect score?

A    Yes.

Q    And in terms of -- What's -- What's the percentage there, greater than 16 percent?  What does that mean?

A    That's how it's scored in the manual.  It's not given a specific percentage because it only gives you whether or not a person's impaired on that measure or not.  An impairment would mean greater than one standard deviation below which would be less than 16 percent.

Q    So there's no actual way to get a score higher than 20 out of 20 on the test, right?

A    No, there isn't.

Q    Okay.  And then the "Verbal Fluency" part, that translates to this T score which puts him in the "average" range again.

A    Yes, which is entirely consistent with the rescored COWAT of Dr. Martell.

Q    So what is your conclusions that you draw with respect to whether or not Mr. Allen has any problems with language?

A    My overall conclusion is that there were no deficits on Dr. Martell's testing or on my testing.

Q    Next is "Visual Spatial Skills."  Any issues there on either the tests given by Dr. Martell or by you?

A    He did not report any impairment, Dr. Martell.  I actually found it to be an area of strength.  He scored in the 96th percentile, meaning the top four percent in terms of

visual spatial abilities.

Q   So it's a strength.

A   Yes, that's a strength for him.

Q   All right.  Next is "Attention."  You listed -- First of all, there's a commonality between the test that Dr. Gelbort gave and Dr. Martell gave.  It appears that he got a similar score on both -- both times on the Trails A.

A   Yes, he did.

Q   He also then gave the Seashore Rhythm, Speech Sound Perception and the Stroop.  Is that correct?

A   That's correct.

Q   Before -- I forgot one other point to ask you about. Your inclusion of the Boston Naming Test in the category of "Language Tests," why is that?

A   Because it's primarily considered a test of language. It's a test of potential aphasia.

Q   Has it subsequently been reclassified as a -- by other manuals?

A   It is considered a crossover test; that it can be both language and sometimes it's referred to as executive functions.

Q   Okay.

A   But it's primarily a language test.  It comes from a comprehensive measure called the Boston Diagnostic Aphasia Examination is the name of the comprehensive test it comes

from.

Q    It does not involve any decision making or problem solving, does it?

A    No.

Q    Back to the "Attention" scores then, there's four tests that he gave; one of those with respect to attention was, of course, the big problem with the Stroop, and you have the rescored results there.

A    Yes.

Q    You gave an attention score -- attention test under the KBNA, and you got an "average" result?

A    Yes, and that was a combination of several subtests for the KBNA.

Q    Okay.  And explain this test.

A    Okay.  That's a separate attentional test that looks at your ability to divide attention, to go back and forth between two tasks.  And he actually scored right below the cutoff of "average" functioning on that test.

Q    And your conclusions with respect to attention, are they stated here on this next page?  That they are within the "average" range, all scores, especially once you take out the misscored Stroop?

A    For Dr. Martell, that was my opinion.  All of the tests he administered were within the "average" range.  And in regards to my testing, similar to some of the speed testing, I

did attribute that one test being slightly below average due to a change in functioning in the afternoon.

Q    Okay.  Next is executive function.  This Trails B and the Category Test, you recall from reviewing the penalty phase transcript that there was a significant emphasis placed upon the results of those tests by Dr. Wetzel during his testimony, correct, for what -- what they indicated about Mr. Allen's functioning?

A    My recollection is that in talking about the Category Test, that it's saying it's one of the best measures of executive functioning that there is.

Q    And you agree with that?

A    It's definitely one that's up there.

Q    All right.  In both the -- In both Dr. Martell's score and yours -- I mean -- I'm sorry -- in Dr. Gelbort's, he was in the 93rd of the 97th percentile in that area.

A    Yes, that's correct.

Q    On the Trails B, according to Dr. Gelbort's test results, he had a T score of 44 which, again, would be in the "normal" range?

A    Yes, that's correct.

Q    And 48 by Dr. Martell, "normal" and almost at the center of average, correct?

A    Yes, that's correct.

Q    You gave a version of this test that's found in the KBNA,

correct?

A    That's correct.  That's actually a combination of a couple of tests, looking at reasoning abilities as well as one of them is a Category Test, also.

Q    What is the prevalence in terms of the standard of care or the practice amongst neuropsychologists regarding selection of tests in 2009, '10 and '11 as opposed to the use of the KBNA versus some of these ones that Dr. Martell gave?

A    It's just a preference of what tests you want to administer.  They all still look at the same type of abilities.

Q    And your results on the reasoning and perceptual shifting score is what?

A    I got a T score of 53 which is in the "average" range at the 62nd percentile.

Q    Now you have a comment here in this exhibit regarding the test results that Dr. Martell reported and those which he does not.  What is the pattern that you noticed here with respect to executive function tests?

A    On the tests he did "above average," those scores were not reported which should have raised, in my eyes, some concern to any interpretation of other tests in that area.

Q    So the -- the "exceptional" result on the Category or the "average" result on the Trails B, he did not report those?

A    No, he did not.

Q   Okay.  What was it that he used to report -- relied upon to report any problems with executive functioning?

A   I believe that was the Stroop.

Q   Okay.  Which isn't even an executive functioning test.

A   It can be considered, but I use it as a test of focused attention.

Q   All right.  Then there's this Composite Score Category. This KBNA, describe how you got a composite score regarding overall brain functioning.

A   That's actually the total scores of all the subtests combined:  Attention, Memory, Language, Executive Function and Visual Spatial.  So it combines all the scores and places Mr. Allen's ability at the 79th percentile which is towards the high end of the "average" range.

Q   And that's averaging all the abilities that are tested here.

A   All of them.

Q   Did you examine how it was that Dr. Martell came to different conclusions using different measures?

A   I did.  I'm familiar with the Halstead Impairment Index which, to me, was interesting because he even reported that that score was within an "average" range, but then there was this other scale that I couldn't find any information about it.  I've since learned that it's a highly outdated measure. It's about 40 years old, that scale, and it's not standardized

and not accepted in the neuropsychological community. So --
And I -- I couldn't even independently verify that. But,
again, it's one of those things that he reported a measure
that he's saying is mildly impaired, and I couldn't verify it.
Then also reports another one as "mildly impaired" when the
data clearly says it's not.

Q    Okay. And that is the Halstead Impairment Index?

A    Yes.

Q    Directing your attention to Exhibit 569, Page 18, is this
the scoring page that Dr. Martell appears to have used for
coming up with this Halstead Impairment Index?

A    Yes, it is.

Q    And then Table 1, does it take the results of certain
selected tests, examine the results on those? It has cutoffs
for whether or not you count points, and then you use that to
come up with this Impairment Index Number?

A    Yes, that's correct.

Q    Okay. And he came up with 0.3 for that, correct?

A    Yes.

Q    Now that is in, according to this chart down here, 0.3 is
in the category of "mild." What is the significance, though,
of this Impairment Index of 0.5 or above?

A    That seems to suggest some contradictory information;
basically saying, "Well, you could say he has mild impairment
starting at 0.3," but you really shouldn't say they're

impaired unless it's 0.5 or above.

Q    So Dr. Martell ignored that but reported this as "mild impairment."

A    Yes, he did.

Q    All right.  Then is there another category -- another guidance on this sheet itself which the sheet he's using here, is this dating to 1959?

A    Yes, that's what it says.

Q    That the test should not -- that the test has an established cutoff score for brain damage based upon results of the Trail Making A and B.

A    Yes.

Q    And did Dr. Martell actually calculate that cutoff?

A    He compared, and he saw that both of the numbers were below the cutoff.

Q    So according to this itself, is there a second contradictory indication in this calculation done by Dr. Martell that this score should not be treated as an indication of brain damage?

A    I don't know if that actually feeds into that score at all, but it's definitely an indication that he's not showing brain damage.

Q    And that's not reported anywhere in Dr. Martell's report.

A    No, it's not.

Q    Is there, in fact, within the old Heaton norms, the ones

Dr. Martell was using, a more specific assessment of the results of the Halstead Impairment Index that's 0.3?

A     There is.  You can go back to the '91-'92 norms and plug that number in and get a scaled score and a T score.

Q     All right.  Is what I'm showing you here as Exhibit 558, is this the cover page of the Heaton norms that Dr. Martell apparently was using, the '91'92 version?

A     Yes, it is.

Q     And if you go to Page 6, and I'll blow this up, does this have a column for obtaining a scaled score from the Halstead Impairment Index?

A     Yes.  It's exactly -- You see that 0.3 is a scaled score of 10.

Q     And then when you go to Page 8 with that scaled score of 10, does that translate into a T score?

A     Yes.  You now have that scaled score of 10 translate into this T score of 47.3 below the mean of 50.

Q     So even -- According to the Heaton norms in use that Dr. Martell was using, the result on the Halstead Impairment Index actually put Mr. Allen in the "normal" range.

A     Yes, it did.

Q     And these would have been -- These came into existence in '91-'92; yet, he went back to something dated 19 ---

        MR. MORENO:  Object to the leading.

        THE COURT:  Okay.

Q    (By Mr. Holtshouser)  What's the date of what he used in order to come up with any indication of impairment?

A    Well, he seemed to, again, choose not to select the book he was using to score most of his other tests and went back even, you know, 30 years earlier to find some place to say it was impaired.

Q    All right.  And lastly, there's an analysis of motor functions, correct?

A    Yes.

Q    Anything significant here as far as you're concerned with respect to any indication of brain damage or brain impairment?

A    He's not showing any brain-based motor dysfunction based on any of these scores.

Q    Your testing showed that it was within normal limits?

A    Yes.

Q    And then this is the section covering the tests of effort.  These are the -- You gave the same tests as Dr. Martell did, and then he gave the nonverbal part of the VIP and the Rey 15?

A    Yes.  And there was no indication that at either time of testing that Mr. Allen wasn't giving adequate effort on these tests which means we can interpret tests -- other tests given at the same time as being valid as well.

Q    All right.  I direct your attention then in the same PowerPoint that you prepared for risk factors.  These are

issues that you know to be -- at least be claimed, correct, in the present information --

A    Yes.  That's my understanding.

Q    -- by Dr. Martell?

A    From all the different records, these are the things that came to mind as potential risk factors.

Q    All right.  So things like in utero teratogens, did I say that correctly?

A    Teratogens.  That means anything that a baby might have been exposed to when his mother was pregnant with him.

Q    Okay.  Lead poisoning, febrile seizures, asthma, head injuries.  Are these all things -- and substance abuse.  Are these all things which constitute risk factors for brain impairment, brain functioning impairment or brain damage?

A    Yes.  That's what it means, for risk factors.  That means to negatively impact the brain.

Q    All right.  And with respect to risk factors, can you describe to the Court what is meant by a "risk factor"?

A    It means that these different factors, these different variables have in some way been associated with change in brain functioning.  It doesn't guarantee that there is, but these are the things he was exposed to that could have potentially had an impact on his thinking abilities.

Q    Based on your testing and your evaluation of the information that you have, do you see any evidence that any of

these potential risk factors, without deciding whether as a matter of fact his mother drank when she was pregnant or how much lead he might have been exposed to, et cetera, has actually produced any impairments of changes in his cognitive functioning?

A    Given educational records I've seen, given the testing I did and the rescoring of Dr. Martell's, there's no indication he has any cognitive impairment which means even though he may have been exposed to some or all of these risk factors, they have not caused any permanent cognitive impairment in him.

Q    On the last page of your PowerPoint to aid the Court, have you summarized here the various diagnoses obtained by the various mental health experts who examined Mr. Allen --

A    Yes.

Q    -- over the past ten, twelve years?

A    To me, this was just helpful in terms of summarizing what previous people diagnosed and what I myself diagnosed as being -- either it was current at the time or, in my case, historical; that people are very consistent regarding the substance use but there's no consistency even across all of us in terms of PTSD or even depression.

Q    At the end of the day, what is your conclusions with respect to whether or not there's any evidence of any organic brain function deficits in Mr. Allen?

A    There's no indication that Mr. Allen has any organic

brain deficits.

MR. HOLTSHOUSER:  Those are all the questions I have, Your Honor.

THE COURT:  Okay.  We'll take a ten-minute stretch break.

MR. HOLTSHOUSER:  Thank you.

(Court recessed from 3:42 PM until 3:55 PM.)

THE COURT:  Whenever you're ready.

MR. MORENO:  Thank you, Your Honor.

CROSS EXAMINATION

QUESTIONS BY MR. MORENO:

Q    Good afternoon, Doctor.

A    Good afternoon.

Q    Doctor, I want to ask you briefly just a couple of questions about your practice.  I believe in your deposition you told us that the vast majority of your work involves neuropsychological evaluations and testing.  Would that be fair?

A    Yes.

Q    And in the context of capital cases, your work has primarily been, as it was in this case, to assess either the presence or absence of any type of a brain impairment and/or in other cases *Atkins*-type evaluations to determine whether or not someone meets or does not meet the criteria for mental retardation under *Atkins*.

A    Yes.

Q    Is that fair?

A    I mean Neuropsych. also includes to me general psychological assessment, but yes.

Q    Now you were board certified in 2011 in Forensic Psychology.  Is that correct?

A    Yes.

Q    All right.  And 2011 is also the year you evaluated Mr. Allen?

A    Yes.

Q    Were you board certified before or after?  I know you saw him, I think, in October, right?

A    The certification --

Q    If you know.

A    -- exam was in October.  I don't know when in October.

Q    Okay.

A    It was the same month.

Q    Now do you have any publications in the field of Forensic Psychology?

A    In terms of research, no; just review of some books that exist on Forensic Neuropsychology and Courtroom Psychology.

Q    Okay.  And where would those be published?

A    I don't -- Oh, they're both in the same journal, and I can't recall the name of it.

Q    That's fine.

A    It's on my C.V.

Q    And how about any publications in the field of Neuropsychology?

A    Yes.

Q    And what subject area would that be on?  Is that new? Because I think at the time of your deposition you said you didn't have any publications in Forensic or -- excuse me -- in Neuropsychology.

A    No.  In Neuropsychology, yes.  You asked in Forensic Neuropsychology, and I said "no."

Q    No, okay.  So what realm of Neuropsychology?

A    In Neuropsychology, looking at discrepancies between intellectual functioning and memory functioning in general individuals based on education as well as in populations with multiple sclerosis, and then also looking at people suffering from PTSD with the absence of memory for amnesia of the actual event.

Q    Okay.  And where would -- Was that one article or is that ---

A    Those are two different articles.

Q    And where were they published?

A    One was in *Psychological Assessment*.  The other one was originally in a journal and then was republished in a book on assessment of PTSD.

Q    Okay.  Now you noted on questioning from Mr. Holtshouser

and in your report that both you and Dr. Martell conducted validity testing and the validity testing showed no malingering.

A    Yes.

Q    And did you find in your testing that he put forth good effort as well from your observations of Mr. Allen during the testing?

A    Yes, I did.  I mean there were times I was concerned that he might be getting tired, but he persisted and he kept giving adequate effort.

Q    You found no -- You took no issue with his -- with his effort on the tests.

A    No.

Q    Now on the last page of your report you note that to a reasonable degree of psychological certainty, Mr. Allen has suffered from and you say "dysthymia"?

A    Yes.

Q    Major depression?

A    Yes.

Q    PTSD?

A    Yes.

Q    And alcohol abuse, alcohol and cannabis dependence.

A    Yes.

Q    All right.  And those are all diagnoses you reached concerning Mr. Allen.

A    Yes.

Q    Or that you reached, okay.

Now there was some talk about the Heaton norms and whether or not race norms are appropriate to be used in a capital case.  Do you recall those questions from Mr. Holtshouser earlier?

A    Yes.

Q    And just so I'm clear because maybe I'm not, in terms of -- one of your big problems with Dr. Martell's testing, it was the -- his failure to use the race-based norms, the norms that had both age, ethnicity and gender.  Is that correct?

A    It wasn't because it was race-based.  It was because it was the current updated norms in the field.

Q    I'm sorry?

A    It wasn't -- It's -- Yes, I had issue that he was using the wrong norms but not because it included race but because he was using norms that were 13 years old -- older.

Q    That did not include those factors.

A    Yes.

Q    Is that correct?  Okay.  I just wanted to make sure I was correct.

And I think you testified that in terms of whether or not there is a dispute or some concern in the field about the use of the race norms, for lack of a better descriptive term, in capital cases it's primarily in the context of an *Atkins*

determination.

A    Yes.

Q    Now you are, obviously, familiar with Robert Heaton, Dr. Heaton.

A    Well, his norm books, yes --

Q    Norm books.

A    -- and some of his contributions, yes.

Q    All right.  And he's well known in the field?

A    Yes.

Q    And well respected?

A    Yes.

Q    Are you familiar with a symposium that took place that was called "Challenges in Neuropsychological Assessment of Ethnic Minorities" and "Summit Proceedings"?  It took place in 2008.

A    No.

Q    All right.  Dr. Heaton spoke at that.  There were a number of sessions, and he spoke in ---

          MR. HOLTSHOUSER:  Judge, I'm going to object to Mr. Moreno testifying.  She said she's not familiar with this symposium.

          MR. MORENO:  And I'm about to show her and ask her some questions based on what Dr. Heaton said.

          THE COURT:  All right.  She said she wasn't familiar.

          MR. HOLTSHOUSER:  We don't have any new exhibits that

I'm aware of that have been provided to Government, and so the way it's going, I would object to it.

MR. MORENO:  I can ask her if she -- I can ask her, I believe, Your Honor, if she agrees with statements that Dr. Heaton makes about the -- the use of race norms in capital cases.

MR. HOLTSHOUSER:  I guess the problem is there hasn't been any authentication that Dr. Heaton has made these statements.  This exhibit, it's not introduced into evidence.  She's not familiar with it.  It hasn't been authenticated.  We haven't stipulated to it or agreed to it.

THE COURT:  What about the fact that it hasn't been disclosed and so forth.

MR. MORENO:  Well, it's something I just recently came across, and I can certainly show it to the Government.  I -- You know, there's a session; the article is titled "Challenges in Neuropsychological Assessment of Ethnic Minorities" and "Summit Proceedings," and it was published in 2009, June 15th of 2009, and it is in -- Let's see the text. I can't see.

MR. HOLTSHOUSER:  But, Judge, I would say regardless of what Mr. Moreno describes it as, it certainly was an issue at least since the time Dr. Martell has testified.  There's been plenty of times to provide this to the Government or give us notice that they intended to use it and give us an

opportunity to review it and determine whether or not it is authentic.  We haven't been given that opportunity.  This is not the time to be springing surprises, so we're going to object to it strenuously.

MR. MORENO:  I just want to ask her as an expert in the field of Neuropsychology whether or not she is familiar with Dr. Heaton's positions on a couple of -- a couple of issues.

MR. HOLTSHOUSER:  Well, it hasn't been established these are Dr. Heaton's positions on these issues because this exhibit hasn't been authenticated or admitted into evidence.

MR. MORENO:  Well, we can have it marked for purposes of identification.

THE COURT:  Wait, wait, wait; whoa.  I can't hear both of you.  Continue your objection.

MR. HOLTSHOUSER:  The premise of the question is improper because it assumes that these are the positions of Dr. Heaton.  If he wants to read a statement and say, "Do you agree with this statement," that's fine.  But as far as his attribution and who spoke, there's been no authentication, and we haven't had a chance to review it.  We haven't been -- It hasn't been provided to us in discovery.  This is a civil case.  We've had open discovery in this case up till now.  I mean it's just -- I'll object to it.  It's a deviation from our practice and procedures that we've had up to this point,

and so for that reason I think it's objectionable.

MR. MORENO:  Your Honor, I can make an Offer of Proof --

THE COURT:  All right, go ahead.  You can make an Offer of Proof.

MR. MORENO:  -- in terms of what this is and ---

THE COURT:  Go ahead.

MR. MORENO:  So, again, it's from the *Clinical Neurologist*, Neuropsychology.

Can you turn on the Elmo, please?  I'll just put it up so the Court can see it.

"Challenges in Neuropsychological Assessment of Ethnic Minorities" and "Summit," and then Section 2, "Development and Proper Use of Ethnic Norms," and the presentation by Dr. Heaton is "When It Is Not Appropriate to Use Demographic Adjustments and Why."

So that is the Offer of Proof in terms of validating -- In fact, these are the opinions of Dr. Heaton on this particular issue.

And I apologize to the Government.  We're certainly not trying to sandbag them, and I understand Mister -- Mr. Holtshouser's ire, but I would ask that I be allowed to inquire as to her opinion or, you know, agreement or disagreement with Dr. Heaton's concerns about the use of demographic adjustments in certain types of situations.

MR. HOLTSHOUSER:  And, Judge, ---

THE COURT:  Wait, wait, wait.  As I understand, his objection really is:  There's no way to know that this is really his -- his position.

MR. MORENO:  Right.  I understand that's his objection, but I think the article -- And I certainly didn't create this on our own.  It shows the journal.  The symposium, I think, took place on December 8th of 2012.  It has the publisher.  It has the website where -- where it comes off of.  It lists a number of other people who participated in the seminar.  I think it's a fair representation of what Dr. Heaton said at this particular summit.  It's something that given Dr. Heaton's prominence in the field of Neuropsychology, I would think it's not unreasonable to expect that someone practicing Forensic Neuropsychology would have awareness of Dr. Heaton's position on an issue that's quite critical and, you know, is sort of a growing concern among Forensic Neuropsychologists, particularly in capital cases.

MR. HOLTSHOUSER:  Well, Judge, there's been a lot of testimony in what Mr. Moreno just said, and the way to -- the way to establish any of these facts is through evidence.  They had Dr. Martell here.  They knew this was an issue even before Dr. Martell testified.  If they wanted to establish this issue or raise it, they could have authenticated this through Dr. Martell and say, "This is a periodical I relied upon."  So

we would have been given notice of it. Just like the articles that I showed to Dr. Yutzy today, they've had these for quite a long time. There's about 30 different articles in the exhibits, all of which the parties have exchanged over time so that we knew that they were relevant, including the U.S. Health & Human Services report that Mr. Montroy used last week. So that -- But maybe of the things that have been stated here simply haven't been established; that this is, in fact, what Dr. Heaton said at any particular time and place; that it's been peer reviewed; that it represents the -- the views of a growing number of psychologists. There's many assumptions here that are not established. Dr. Galit Askenazi said she's not familiar with this item. I think if they want to call some -- another witness, then that's -- that would be the way to do it, but that's not -- We're at the conclusion of this hearing, and this isn't the time to be bringing in new exhibits and for which we haven't been given any notice.

THE COURT: Well, you know, one of the things I'm concerned about, you know, the witness says -- has been deposed and, you know -- Let's do it this way: You can make an Offer of Proof if allowed to do so. I'm not going to let you do it because I -- it -- I don't think it's properly been presented; hasn't been given to them for examination. She said she's not familiar with it. I will let you on the record state what questions you would ask her if allowed to do so, if

you care to.

MR. MORENO:  Okay.  Thank you, Your Honor.  If I can have just a moment.

THE COURT:  Sure.

(Pause)

THE COURT:  What number will it be?

MR. MORENO:  689, Your Honor, for identification.

THE COURT:  Okay.  And it is a summit?

MR. MORENO:  Yes.  It's titled "Challenges in Neuropsychological Assessment of Ethnic Minorities, Summit Proceedings."

THE COURT:  Okay.

MR. MORENO:  So, Your Honor, how -- how would you like me to proceed with this?  I can -- I can ---

THE COURT:  Well, just go ahead and state on the record, you know -- You're not permitted to ask her the questions, but if -- if allowed to do so, you would ask the following questions of the witness.

MR. MORENO:  All right.  If allowed to do so, I would show Dr. Askenazi Dr. Heaton's statements, his comments in Session 2 concerning when ethnic norms are appropriate or not appropriate.  Amongst the items I would ask her about is that there are -- there's a section where the Doctor -- Dr. Heaton states when correct demographic corrections are useful, when they're sometimes useful, and then when they're not useful and

not recommended.  I would ask her if she agrees with or --

with Dr. Heaton's conclusion that they're not recommended to

identify or characterize possible acquired impairment in

capital punishment cases or when determining qualification for

special services?  I would note that in Paragraph 3, he notes,

as Dr. Askenazi noted, that it is not proper to use them in

the case of assessing mental retardation.

I would ask her, if given the opportunity, whether

she is familiar with that concern amongst some forensic

neuropsychologists and whether or not she has any basis of

knowledge of why Dr. Heaton might have that concern from her

familiarity with literature or other sources that would be

familiar to her within the realm of Forensic Neuropsychology.

THE COURT:  Okay.  Without regard to what she thinks

about this particular document, if he -- if he cites from her

conclusions separate and apart from the document, you can

inquire of her about those conclusions.

MR. MORENO:  Okay.  Thank you, Your Honor.

THE COURT:  Sure.

Q   (By Mr. Moreno)  All right, Doctor.  That was a

long-winded way to get to ask you a question.  And the

question is:  Do you agree or do you have an understanding of

why Dr. Heaton might have concerns about or why he would

recommend not to use demographic norms in capital cases?

MR. HOLTSHOUSER:  Judge, I'm just going to have to

object to the form of the question since it has been established in this case that he does object.  There's no evidence to that effect in this case.

THE COURT:  Okay.  Yeah, what I don't ---

MR. MORENO:  That's fine.  I'll rephrase the question.

THE COURT:  What I had in mind was if she has made these statements in the past, you can inquire of her, you know, what she made and what's her view and so forth without regard to what Heaton says because that's the problem.  There's no authentication of the -- of the document.  So ---

MR. MORENO:  Well, I don't have anything that indicates that Dr. Askenazi has ever said anything like that in the past.

THE COURT:  Oh, I thought you meant it said in the document he was referring to something she had said.

MR. MORENO:  Oh, no, no.  I'm sorry.  That was my fault in the way I phrased it, I guess.  She had acknowledged earlier that there is some dispute or some concern in the community about whether or not you should use demographic norms when assessing mental retardation cases and capital cases.

THE COURT:  Yeah.  And I think you're -- that's fair game.  You can ask her whatever you want to about that.

Q    (By Mr. Moreno)  Doctor, aside from your awareness that

there's a dispute -- not a dispute, I guess, but a concern in the Forensic Neuropsychological community about the use of demographic norms with *Atkins*-type determinations, are you familiar whether or not there is a similar concern in other areas of the use of demographic norms in capital cases?

A    I am familiar with Heaton's article in 2009 that says that demographic norms is something we need to be thoughtful of in all considerations.  That article specifically said he would only recommend not doing it in MR populations.  And a summary of his article as well as the arguments in the field that came out this July, 2012, that only addressed *Atkins* and does not address any limitations in general neuropsychological assessment.

Q    All right.  So you're not aware of the article I was referring to earlier, and I think you already said you were not aware of it.

A    I'm not aware of the article summarizing a summit.  I'm aware of his actual article on the issue.

Q    Okay.  And in that article you're saying he just refers to *Atkins* cases?

A    He refers to special services, not to adjust IQs in *Atkins* and special services.  He does not actually make any recommendations or not, that I'm aware of, of any adjustments or lack thereof on general neuropsychological tests.

Q    Okay.  Now I want to talk to you briefly about the

testing that you did in this case.  And I think you had -- I know you administered a number of tests, but I think the sort of big one, the one that assessed a number of areas across a broad spectrum was the KBNA?

A    That's correct.

Q    Okay.  And what does that stand for again?  That's the ---

A    Kaplan Baycrest Neuropsychological Assessment.

Q    Okay.  Now are you familiar with the text, *The Compendium of Neuropsychological Tests*?

A    Yes.

Q    Now, Doctor, the KBNA came out in around 2006.  Is that fair?

A    That sounds about right.  I don't know the exact year.

Q    Sure.  Are you aware of any concerns about the KBNA?  Any concerns about maybe its psychometrics or whether or not it adequately accounts for race or whether or not race is a concern in how this test is scored?  Are you aware of any such concerns?

A    No.

Q    All right.  So this is Exhibit 598.  This is the front page, *The Compendium Of Neuropsychological Tests*, and on Page 159 begins the review of the Kaplan Baycrest Neurocognitive Assessment.  Do you see that?

A    Yes.

Q    Is there a short version of this test?

A    Not that I'm aware of.

Q    Okay.  So you -- I know there's 25 subsets, subtests.

A    Subtests to it, yes.

Q    Right, okay.  And it's not required that you administer all of them.  Is that correct?

A    No.

Q    Okay.  Because you administered 13 of the 25, correct?

A    Yes.  I would actually have to count.  I don't know how many --

Q    Okay.

A    -- exactly I administered.

Q    Now the authors of *The Compendium*, let's start right here, note that -- Do you see where I am?  The nice yellow?

A    Yes.

Q    "However, the KBNA is a new tool, and some of its psychometric properties are less than optimal.  Although age-based normative data are provided, users cannot evaluate test performance in the context of both age and education.  Further, information on the impact of other demographic variables" -- and then in parentheses -- "(e.g., sex, ethnicity, culture) is not reported.  The lack of data on the impact of ethnicity suggests considerable caution in the use of this test with members of minority groups."

A    Yes.

Q    Are you familiar with that concern?

A    This is the same general concern that was raised earlier; that you would have a high number of false positives of impairment if you don't adjust, but the fact that Mr. Allen actually didn't show any impairments, any adjustment would have even made his scores higher.

Q    Well, this suggests that you need to be very careful and use considerable caution in the use of this test with minority -- members of minority groups, does it not?

A    That's what it says.

Q    And isn't it suggesting that the use of this test, given that you can't really account for ethnicity and culture, should be prohibited -- not prohibited but should, you know, it should be used with great caution?

A    That's what it says.

Q    Now you took Dr. Martell to task on a number of issues, but, in particular, one of the areas you took him to task on was not reporting tests that showed impairment.  Would that be fair?

A    Yes.

Q    All right.  Did you do anything like that in this case? Did you not report or highlight to the Court any tests that you gave to Mr. Allen that showed impairment?

A    Not that I'm aware of.

Q    "No"?  Okay.  Can you tell us:  What is a

"perseveration"?

A    A perseveration is when someone repeats themselves. That's the simplest definition.

Q    And what's the significance of it?

A    People who suffer from dementia tend to perseverate, say the same things over and over again or have trouble when sets shift, shifting with those sets.  So they get stuck on earlier, let's say, problem-solving sets.

Q    I see, okay.  And how about an intrusion in the realm of Neuropsychology?  What is an "intrusion"?

A    An intrusion is when someone on a memory test provides some bit of information that was not in the original data that they were shown to learn.

Q    All right.  And is another word for that "confabulation"?

A    I wouldn't use them interchangeably.

Q    Wouldn't use them interchangeably?

A    No.

Q    Okay.  And what is the significance of an intrusion in the context of a neuropsychological evaluation?

A    You tend to see intrusions when people have attentional difficulties that materials get confused, and they get -- you have intrusions or if they have some memory difficulties and they, let's say, provide something similar but not completely accurate.

Q    Okay.  I'm going to be going to Exhibit 554-B which is

your raw data in the case, if we can briefly.

Now can you tell us what the "Verbal Fluency Test" is?

MR. MORENO:  Actually, hold on.  Well, Your Honor, can I have a moment?

THE COURT:  Sure.

(Pause)

Q    (By Mr. Moreno)  Doctor, tell us about the Verbal Fluency Test.  What do you -- What does that test seek to learn?

A    It looks at a person's ability to spontaneously generate verbal information in a time limited format.

Q    Okay.  So how do you do this test?  I see it's given in -- It's a minute, right?  Each -- Each ---

A    Each one is a minute.

Q    Okay.

A    So for the first one, you ask them to generate as many words as they can beginning with the letter "C."  There are some limitations, things that they're not allowed to do.  They are given a minute to generate all the words with the letter "C."  Then they need to provide the names of any animal.  Again, they're given a minute.

Q    Okay.

A    And then they provide first names of people, and they're given a minute.

Q    Now when we look up at the "C," as many words with "C,"

Mr. Allen says "conscious."  Is that correct?

A   (Affirmative gesture).

Q   And then over here in the 16 to 30, he does it again.  So he gets a zero on that, right?

A   Yes.

Q   Because that would be a perseveration.

A   That's correct.

Q   Okay.  Now he had -- The "can" and the "can't," they're close, so he doesn't get credit, but he doesn't get a mark for perseveration, right?  Is that how that's scored?

A   You know what?  Can you enlarge it?  It's hard to ---

Q   Sorry.

A   This screen is fuzzy here, so I can't actually see my own writing.

        (Elmo screen was put into focus.)

A   Okay.

Q   Okay.  So "conscious" was a perseveration, right?

A   Yes.

Q   All right.  And then over here he has "can" and "can't."

A   Yeah.

Q   But since they're similar, he doesn't get a score, but it doesn't count as a perseveration.  Is that correct?

A   Yes.

Q   Okay.  Now in the -- the animals, it's the same idea, say as many animals as you can.  Is that correct?

A    Yes.

Q    And in that one, he doesn't have any perseverations.  Is that correct?

A    That's correct.

Q    All right.  Now can I ask a question:  What is the significance of the fact that he has one, two, three, four, five, six -- eight in the first 15 seconds, two in the 16 to 30?  Is there any significance in terms of how you score or interpret the data, the number of responses he gets in a 15-second interval?

A    Well, you expect people to actually get more in the first 15 to 30 seconds.  People tend to slow down over time.  It can -- It can be descriptive of a person's pattern.

Q    Okay.  In terms of its utility, though, that would pretty much be it?  You're looking for the total number they get in a minute?

A    I mean the score is based on the total number and the interpretation.

Q    And is there what's considered in the "normal" range for a score?

A    Yes.

Q    And what would that be?

A    I would have to look this one up specifically.

Q    Not a problem.

A    But for this test, it is the total or it's a separate of

the -- The first one's considered verbal and the next two are considered semantic.

Q    Okay.  Now in the First Names Test, I take it it's a similar theory.  He's to give as many names as he can in a minute.

A    Yes.

Q    And you scored or you keep track by the 15-second intervals.

A    Yes.

Q    That must have been difficult to do writing it all down all the time.  All right.

A    You see how messy it is.

Q    Okay.  So he says "Eric" here, correct?  And then in Column 2 he says "Eric" again.

A    Well, just so you know, if I didn't score it as a zero, one was probably "Eric," one was probably "Erica," just so you know because I don't write out whole names as you can see.

Q    All right.

A    Just like there's "Michelle" and then there's another that says "Mich."  That might actually be "Mitch."

Q    Right.  But you gave him a zero there.

A    I gave him a zero, but then under 46 to 60 you see a zero, but then under it I actually wrote "Michelle" and gave it a 1.  So the earlier "Miches" are not Michelles.

Q    Okay. okay.  So even though it's spelled the same,

M-I-C-H, M-I-C-H, one is "Michelle" and one is "Mitch."

A    Yeah.  One's a different one, yeah.

Q    And over here he gives "Mitch" again, right?

A    Yes.

Q    M-I-C-H?

A    Yeah.

Q    So he gives one, two, three M-I-C-Hs.  He gives two Erics, E-R-I-C, in both of them, but you're saying one of them is actually "Erica" without the A?

A    Yeah.  I would have given it a zero if it was actually the exact same name.

Q    Could you have made a mistake?  Because you spelled them the same.

A    I'm sure.

Q    You spelled all the other names.

A    No.  A lot of these, if you see how I spelled "George," G-R-G-E, a lot of these are abbreviations.

Q    All right.  But "Brian" is not abbreviated.  "Eric" is "Eric."  I mean you spelled it the same way two times.  You spelled Mich, M-I-C-H, the same way three times.  So are you suggesting that there's no perseveration on this page even though based on your own writing, he says "Eric" twice and "Mich" three times?

A    I never said there was no perseverations on this page, but I'm saying "Eric" could be an "Erica."  I mean I could

have made a mistake and it was both "Erics," but I typically score as I go along, but it certainly could be an error.

Q    Okay.

A    We'd have to go back to look at the video to know that.

Q    But just looking at the score sheet, you have "Eric" twice, so that could be one perseveration, correct?

A    I mean if it's actually "Eric," yeah.

Q    Right.  Well, that's what it says, right?

A    Yeah, I can't go on that because I know how I abbreviate things.

Q    And "Mich," M-I-C-H, that's three times?

A    (Affirmative gesture).

Q    So that would be an additional two perseverations.  So three on that page, correct?

A    Yes.

Q    And when we get to the bottom where it says "Total Perseverations," you have zero.

A    Yeah.  I didn't do the subscoring of any of the items, just the formal scoring of the total.

Q    Okay.  So I think you were -- you stated earlier the perseveration is something that can be seen in dementia.

A    Yes.

Q    All right.  And that was, obviously, an issue in this case, given Dr. Martell's diagnoses, correct?

A    It wasn't -- Yes.

Q    All right.  And would there be a reason why, when he perseverates a number of times in this overall test, that you would leave that blank?

A    It's not one of the basic scores that you do.  But if I was concerned, I would have calculated it.  These aren't a significantly high number of perseverations.

Q    Well, how many total are there?  Let's see.

A    Was there -- I'd have to see the whole page again.

Q    All right.  So there were four, and you reported zero.  And in your opinion, four isn't worthy ---

A    Well, I didn't report zero.  I just didn't calculate the scaled score on it.

Q    Well, it certainly looks like when you're reading the score sheet that when you have total perseverations, it has a block to put in all the perseverations.

A    Yes.  If you want to calculate it, that's correct.

Q    Okay.  And you did not calculate it in this case?

A    No, I didn't.

Q    All right.  And that would be something that was -- you didn't report that in your report either, that there were a number of perseverations.

A    No.  I didn't report anything I didn't calculate.

Q    Bear with me for a minute while I try to find ---

        THE COURT:  Nate, can you erase those circles?

        MR. MORENO:  Yeah.  You don't like them?

Q    (By Mr. Moreno)  All right.  This is the Word Lists.

A    Yes.

Q    What is the -- What is that test and how does that work?

A    That's the learning portion of the memory test.

Q    Okay.  And what's the idea behind it?

A    You repeatedly give the individual the list of words and give them several trials to learn the words.

Q    Okay.  And how many trials do you give them?

A    Four.

Q    Four, all right.  And so you give them the list, and then they're to repeat back to you as many as they can?

A    Yes.

Q    All right.  What is -- Like we have "asparagus" and the number "1" and "milk" and the number "6."  Is that the order in which he gave it to you?

A    Exactly.

Q    Okay.  All right.  Now -- Can you see this clearly enough or should I enlarge it?

A    No.  I can see this, yeah.

Q    Okay.  So where he has "apples," --

A    Yes.

Q    -- is that an intrusion?

A    Yes.

Q    And how about "lettuce"?

A    Yes.

Q    And "pencil"?

A    Yes.

Q    All right.  And what is an "intrusion" again?  What's the significance of an intrusion?

A    An intrusion is a word that wasn't on the original list that they're inserting.  So it can be due to attentional issues or people who have memory problems, that it can show a -- like the make-up of the information, they can't remember the exact information properly.

Q    All right.  So there were three intrusions in that particular test.

A    Yes.

Q    And he said "apples" twice and "lettuce" twice.

A    Yes.

Q    So that would be two perseverations; he perseverated twice on that as well?

A    Yes.

Q    Now going down to Trail -- to Trial 2 -- excuse me -- he did "lettuce" and "apple" again.  Is that correct?

A    Yes.

Q    So that would be two additional intrusions as well.

A    Yes.

Q    When we go to Trial 3, "lettuce" is here again as well as "pencil."  Is it an intrusion still, even though he had already put those in earlier?

A    Yes, it is.

Q    Okay.  And the "5" and "10," that would be the order.  So he only told those to you once in that one.

A    Yes.

Q    All right.  And in Trial 4, he added "letter" -- excuse me -- "lettuce" and "pencil" again.

A    Yes.

Q    Okay.  Now there's a test -- there's a test, the Word List 2.  Is that significantly different than the Word List 1 or is it the same idea?

A    The Word List 2 is -- on this measure you do ---

Q    I'm going to go down here.

A    Okay.  The Word List 2 here, there's two portions to it.  This is actually the Delayed Recall.

Q    Okay.

A    So this is what they're spontaneously giving you.  Don't read them the list again.  They're spontaneously giving you what they recall after a 20- to 30-minute delay, and you can see he's recalling almost every single word he learned initially, --

Q    Okay.

A    -- arguing against memory impairment.

Q    And the three intrusions, they are -- you say they go to sort of an intentional -- attention, not intentional, but attentional ---

A    It could be, yeah, attentional or if a person is showing memory impairment, it could be that they're substituting words.

Q    Now on the Cued Recall, were there words that he intruded as well?

A    Yes.  It's the same words from earlier.

Q    Okay.  Now is there significance to the number of the perseverations and intrusions in the course of this testing given what was at issue in the -- in the case?

A    Well, given that there's no evidence of memory impairment, I would have attributed those to attentional fluctuations which would be consistent with some of the discrepancies I saw that day.

Q    What do you mean?

A    Where he actually performed worse in the afternoon on a test of attention as well as processing speed.

Q    And these -- these type of errors, the intrusions and the perseverations, they didn't make it into your report.  Is that fair?

A    Yes.

Q    Now you testified on Direct Examination that you -- you had received a number of affidavits from Mr. Allen's family members and friends and what not concerning sort of his background and home history?

A    Yes.

Q    And you had reviewed some depositions as well?

A    Yes.

Q    All right.  And in your deposition, you stated that you did not see any significant discrepancies between what Mr. Allen told you about his home life and the information you had received from the affidavits or you would have asked him if you saw such discrepancies.  Is that fair?

A    At the time I saw him I didn't see the discrepancies, yes, that's correct, because I hadn't had a chance to review those yet.

Q    Now you had Dr. Martell's report at the time that you read -- you did your evaluation of Mr. Allen.

A    Yes, I did.

Q    And you had Dr. Stewart's report.

A    Yes.

Q    And Dr. Martell's report contained a fair amount of detail, did it not, about some of the particular incidences of abuse that were -- that were alleged to have occurred over time?

A    I need to see those specifically to know which ones you're referencing.

Q    I'm not referencing a specific one.  I'm just stating in general Dr. Martell's report contained a lot of information about abuse in the home.

A    Yes.

Q   Okay.  And I think you noted -- You testified that, "If he had denied abuse, since he was seen in Dr. Martell's report that he was hit by these things, when I asked him what the violence is, he gave me a whole list of what the violence was.  It was consistent."

You didn't see a discrepancy with what he had told Dr. Martell versus what he had told you.

A   Yes.

Q   Is that correct?  Okay.  Now during the deposition we had sort of gone back and forth a little on what was abuse, what is abuse, and some of the different instances, I guess, examples that I had thrown out trying to get your opinion on some of those issues.  Do you recall testifying in the deposition that in the inner city environment it might be considered absolutely normal to throw an iron at a child?

A   I don't recall saying that specifically.  I know saying that there were differences in terms of what you could do physically.  I don't recall saying that it was normal to thrown an iron at someone.

Q   Okay.  This is kind of faint.  Let me blow it up a little.  Hang on.

(Pause)

Q   All right.  So at the bottom I've asked you a question.  It starts out and, you know, it says:  "That's different.  How about if you pick up an iron?  You're angry at your child and

you throw it at them?  You take an iron and throw it at them in anger?"

"In the environment I'm in, in the inner city environment, it might be considered absolutely normal."

Do you really believe that?  That it could be considered absolutely normal in any environment, whether it's inner city or otherwise, to throw an iron at your child?

A   Do I -- You're asking if it's normal.  I'm not saying whether it's right or not, but it might be considered something that happens normally.  I don't know.  In my world, it wouldn't be.

Q   Okay.  But as a Forensic Psychologist, do you -- is it your opinion that it could be perfectly normal in the inner city to throw an iron at a child in anger?

A   Well, you can see later on the page I wrote, "Psychologically knowing that your parent wants to hurt you, I don't think that's ever a good thing."

Q   Right.  But do you actually believe in the inner city where Mr. Allen grew up, that it could be normal to throw an iron at somebody?

MR. HOLTSHOUSER:  Judge, I'm going to object.  It keeps going back and forth here.  Is the question asking for her personal opinion or it's a question directed to her as an expert in Neuropsychology?

THE COURT:  Overruled.  It's Cross Examination.

A    I'm sorry.  Would you say it again?

Q    (By Mr. Moreno)  That's okay.  In your -- In your capacity as an expert in Forensic Psychology, --

A    Yes.

Q    -- Neuropsychology, is it your position that in the inner city environment it could be normal to throw an iron at anybody, at a child in anger?

A    I think it might happen normally.  Do I think it's ever a healthy thing?  No.

Q    All right.  And what do you base your belief that it might happen on a normal basis in the inner city?

A    Because I consult at two local court systems where I work on a weekly basis, and I hear things like that all the time.

Q    Throwing irons at children.

A    Throwing -- Throwing hot irons, throwing pans, throwing knives.  You hear a lot of things like that too often in my opinion.

Q    Now does it matter in your mind what the intent of the parent was when they throw an iron in anger at a child?

A    Yes, of course.

Q    So if the parent is angry and they think throwing an iron at a child is going to serve some legitimate disciplinary purpose in their mind, is that, as a Forensic Psychologist, an acceptable practice?

A    I'm not going to make a judgment on acceptability, but

the intent for the person and the -- the person who's doing it and the person at the receiving end, those are important; the person.

Q   Can you ever foresee a situation where it is appropriate to throw an iron at a child in anger?

MR. HOLTSHOUSER:  Judge, I'm going to renew my earlier line of objections.  Now we're into the area of appropriate, and I'm not sure what the standards are.  The question is assuming -- The question can't be answered as asked --

MR. MORENO:  I think it certainly can, Your Honor.

MR. HOLTSHOUSER:  -- unless some frame of reference or context as to what it is in reference to that's appropriate.

MR. MORENO:  I think it -- it, you know -- it's -- it's not difficult to assess whether or not throwing an iron in anger at a child is appropriate.  That's a -- That's a defined word.  It's not -- You know, it's not nebulous.  It's not ---

THE COURT:  Overruled; Cross Examination.  Go ahead and ask your question.  She can answer it one way or the other.

A   My personal opinion is that it is not appropriate, but people do things they regret all the time.

Q   (By Mr. Moreno)  And would your professional opinion also

be that it's not appropriate?

MR. HOLTSHOUSER: I'll object to the form of the question of professional opinion. He clearly elicited and got what her personal opinion is which we're outside the area of expertise. We could bring in a host of people and take a vote as to what they personally view as appropriate. So I think this is where we're getting into improper Cross Examination.

THE COURT: Overruled.

Q   (By Mr. Moreno) From -- In a professional opinion as a Forensic Psychologist.

A   I mean this is not my specialty area. I don't think I should be giving an opinion on it.

Q   Okay. But you evaluate people for potential abuse, do you not, as a forensic psychologist?

A   Yes, and I typically go on their report if there was violence, if they think it rose to the level of abuse. That is how I ask the questions.

Q   So what if a child is raised in an environment where, you know, discipline is administered through an extension cord or a bat or a club, but it's the norm? So when you ask them if they feel like they're abused, they say "no." Does that end the inquiry?

A   If they never felt like it was abusive and it was meant to harm them and it was discipline, then I wouldn't feel comfortable labeling it abuse. I would describe the violence,

though.

Q    So you would describe the violence.

A    Yes.

Q    All right.  Now in your experience, given what you were just saying about how often you hear this in your work as a court consultant, I assume you also hear that for many people, many of the people you're evaluating, that they consider that type of behavior normal.

A    Yes, they do, and they've perpetuated it.

Q    Right.

A    Yes.

Q    Right.  And so the fact that someone might say to you, "I didn't see anything abnormal about what they were doing to me. I mean it was just the way it is.  It's normal;" that doesn't end the inquiry, does it?

A    Inquiry for what?

Q    The inquiry as to whether or not how they were being hit or, in your mind, the thought process of how they were being hit.  Did it rise to the level of abuse that I, as a forensic psychologist, need to be concerned about?

A    Given that I only work with adults, if they're not -- reporting it's not abuse, then that is it in terms of their experience of it.  If I was, let's say, treating them or talking about healthy ways to then interact with others, that would definitely be a treatment focus.

Q    Okay.  Have you done these type of forensic assessments with teenagers?

A    No.

Q    Children?

A    No.

Q    Just adults?

A    Yes.

Q    All right.

MR. MORENO:  If I can have just a moment, Your Honor.

THE COURT:  Sure.

(Pause)

MR. MORENO:  Your Honor, can I consult with co-counsel?

THE COURT:  Sure, absolutely.

(Pause)

Q    (By Mr. Moreno)  Doctor just a couple more questions.  On the day that you tested -- you conducted your evaluation and testing of Mr. Allen, do you recall any time pressures that came up in the afternoon of your testing?

A    Yes, there was definitely time pressure.

Q    And what was that?

A    We were running out of time to complete ---

Q    Had a finite period of time for your evaluation?

A    Yes.

Q    Okay.  And so what is the -- What was, in your mind, the

impact of that time pressure?  Did it in any way put sort of a pressure on Mr. Allen?

A    What I would like to do, and this, again, it's not necessarily for a diagnosis but actually would be more for my curiosity sake and to help -- help bolster his improvement over time would have been to do repeat achievement testing. Given his IQ that increased over time, I would have liked to have seen what he would have been doing in terms of spelling and reading and arithmetic.

Q    Were there any incomplete tests, tests that you were not able to complete, that you either started or weren't able to complete based on the time pressure?

A    No.

Q    No.  Now, Doctor, I think you -- Correct me if I'm wrong, but I -- you were asked some questions about the lead levels, whether or not anyone knew about the lead levels, the actual lead levels in Mr. Allen's blood.

A    Are you talking about during deposition?

Q    No.  I thought today Mr. Holtshouser had said something to the effect of, "We don't really know how much lead was in his system."

MR. HOLTSHOUSER:  I don't think that's a correct statement.  I think that the opposite is true; that Dr. Yutzy had thoroughly analyzed the medical records.

MR. MORENO:  Well, yeah, that's what I thought, too.

MR. HOLTSHOUSER: And so I don't know where he heard this.

MR. MORENO: Okay. So then I -- then I misheard. That's fine.

Q   (By Mr. Moreno) Your report, you lay out exactly how much.

A   I remember seeing numbers listed twice; two numbers listed.

Q   Okay.

MR. MORENO: Your Honor, I have no further questions.

THE COURT: All right. Redirect?

REDIRECT EXAMINATION

QUESTIONS BY MR. HOLTSHOUSER:

Q   Working backwards, with respect to -- You were asked a number of questions about normal, appropriate. When it comes to questions of appropriateness, is that something that is a -- is there any standards that come from the profession of Neuropsychology that deal with appropriateness of particular parenting styles?

A   Not that I'm familiar with.

Q   Okay. You are familiar with evaluating the question of abuse. Is that correct?

A   Yes.

Q   And is there a scientific definition in the DSM of "abuse"?

A    No.

Q    Are there in your practice, though, factors that you typically would like to look at in evaluating whether or not you want to label something as "abuse" from a clinically significant point of view?

A    There are several factors.

Q    What are some of those?

A    For example, if someone -- something happens once or it happens repeatedly over an extended period of time.

Q    So can we call that "frequency"?

A    (Affirmative gesture).  Frequency.  How significant is it?  Is it something that's a smack?  Is it a punch?  Does it leave marks?  Cause bleeding?  So how intense or severe it is.

Q    Okay.  So can we call the second one "severity"?

A    Okay.  What was the intent of the person who was acting out.

Q    The one -- The one administering the --

A    Yes.

Q    -- the action?

A    Yes.  Was it an accident?  Was it purposeful?  Also, what sort of state they were in.  Were they drunk, were they sober, things like that.  Then also sort of what -- you used -- we've heard the term "normal," what's considered "normal" in that environment?  Is this a society or a location where corporal punishment is acceptable or not?  And what degree of corporal

punishment?

And then, of course, to me, the most important thing is: What's the person's perception of what's going on? I sometimes hear stories of things that I would think are abusive, but the person says, "Well, I really deserved it. I was really pushing their buttons. I was doing inappropriate things. I deserved to be hit." And to me, that's really central to the term "abuse," and that's why I always ask after they've described the events, "Do you say that rises to the level of abuse?" Because I've had the reverse as well. People talk about abuse, and then they report the events, and they sound very minimal. So you have to, I think, report the events as well as their perception of what it is.

Q   So on that latter issue, you have questions of how sensitive the person is.

A   Yeah.

Q   So someone might feel abused by the way someone looked at them, whereas someone else might not feel abused by the fact that someone threw a shoe at them.

A   Yes.

Q   And you -- Is it that impact on the individual that you feel is most significant in your view?

A   I believe it is.

Q   Now by evaluating abuse that way, you're not condoning, for example, a parent striking a child with an extension cord

or a belt to hurt the child for no other reason?  You're not condoning that even if it might be accepted behavior within a community.

A    No, I don't.

Q    Okay.  You mentioned the example of whether or not the actor was intoxicated or not.  If, in fact, the behavior or action got more severe during intoxication than, say, during periods of sobriety, to the recipient -- Well, which way would that weigh, I guess?  The fact that they're more abusive when they're intoxicated and not necessarily responsible for the actions as opposed to when they're completely sober and aware of their -- of what's going on?

A    I'm not saying it negates it, but the person on the receiving end might be able to explain it away better; saying it wasn't really them.  So, again, I think it impacts the perception of the person who's receiving it.

        MR. MORENO:  I'll object; speculation.  With all due respect to the Doctor, I think that's speculation.

        THE COURT:  I interpret it as part of her evaluation process.  Earlier she said she would want to know -- We were talking about intent.  She would want to know the person being disciplined, whether they were pushing buttons and so forth, and I thought this was the same -- same kind of thing.  Now how would that differ?

        MR. MORENO:  I thought she was saying -- the question

was more along the lines of where does it fall on the scale, and I thought she was saying if the person who is being abused might, you know, interpret it as being, you know, not so -- the abuser wasn't in their right mind and sort of downplayed it that way, that's speculation.  I don't think that fits into, you know, what she wants to know about ---

MR. HOLTSHOUSER:  Well, I think, Judge, what I'm asking her is:  Since she mentioned in the course of her criteria that it weighs one way or the other in evaluating it, whether the actor is intoxicated or not, trying to determine, well, how -- which way does that actually cut?

THE COURT:  And what she was saying is the person receiving it would be in a better position to know than the person who is intoxicated based on the circumstances.  That's what I understood her to be saying.  Am I missing something here?

Q    (By Mr. Holtshouser)  Is that correct?

A    That is correct.

THE COURT:  Okay.  Thank you.

Q    (By Mr. Holtshouser)  That a person in those circumstances who had experience with that might realize or might perceive it as, "Well, it's the alcohol doing it, not necessarily the actor's intent."

A    Again -- Yes.  And, again, it's just one of those factors is:  How are you interpreting what's happening to you if

you're in this situation.

Q   Now you indicated there wasn't any serious discrepancies between what Mr. Allen reported to Dr. Martell in terms of his history and what he reported to you, correct?

A   Well, I'm not going to say general history.  I'm just saying that both of us, I think, got listed sort of an act of violence, and both of us -- with both of us, Mr. Allen did not use the word "abuse."

Q   Okay.  Were there, though -- Did you notice that there were significant discrepancies between the accounts given to either you and Dr. Martell and those given back in 1998 when asked about it?

A   Yeah, I did notice because the ones from the time around the trial, there was -- from what I saw, he wasn't indicating abuse to anyone doing psychological evaluations of him.

Q   The Word Lists that you went through, the Word list 1 and 2, --

A   Yeah.

Q   -- what are the real life skills that are implicated by the results in those Word Lists?

A   I mean you want to see if a person is capable of learning something.  Do they learn better with repetition.  And the things that they do learn, are they able to recall that over time?  So it's initial learning, it's attention, and it's memory functions.

Q    Okay.  Did you fail to report anything in your report or your analysis of your reports that was clinically significant in terms of either what is said about memory impairment or his brain functioning?

A    No, there wasn't.  And, in fact, you can look at Dr. Martell's data as well.  He didn't report in his report perseverations or intrusions, and he actually did very well in terms of perseveration on the Wisconsin Card Sort.

Q    So with respect to perseverations or intrusions, is there any issue that's -- of brain functioning significance based upon what you have in your results?

A    No.  There's no clinical significance.  Now if he was repeating himself and not realizing he was repeating himself during the interview, during the day I spent with him, I might have been concerned, but I didn't see that.  And the numbers and types of intrusions and repetitions did not appear to be clinically significant, and I didn't even score them.

Q    And do things like perseverations and intrusions only become important if there is actual evidence of memory impairment?

A    It could be independently important.  Let's say someone with high anxiety may repeat themselves over and over and over again, and you may want to note that.  So that could occur even without memory impairment.

Q    Okay.  The concerns -- The language in *The Compendium*

regarding the KBNA, --

A    Yes.

Q    -- you needed to choose another set of tests that had not been given to Mr. Allen in order to perform ---

MR. MORENO:  Your Honor, object to the leading.

THE COURT:  Sustained.

Q    (By Mr. Holtshouser)  Why did you choose the KBNA rather than, say, "Let's just repeat the tests that Dr. Martell gave"?

A    Because the KBNA is considered at this point the most comprehensive single test that thoroughly looks at all different areas of brain functioning.

Q    Okay.  And the Third Edition of *The Compendium* came out when?

A    I'm not sure.  At least four years ago, I think.

Q    2006, according to this; eight years ago.

A    Yes.  So I mean its use has definitely increased since that time, and I certainly appreciate whenever a new test comes out there are concerns, but, again, the concerns that are at least listed suggest under-appreciating impairments that in this case, if there were adjustments, Mr. Allen would have even scored higher.

Q    Okay.  I want to -- That concept, I want to see if you can try and explain that.

A    Okay.

THE COURT:  I think -- I think I understand it.

MR. HOLTSHOUSER:  Okay, Judge.  I just wanted to make sure because it wasn't -- it was kind of confusing to me, so I just want to make sure.

THE COURT:  No.  I think what you're saying is that *The Compendiums* that -- there are concerns in using it with minorities.  The concern would be that they -- they would -- they would test lower, but since he tests within normal limits, actually by using this test, he would -- his score should be considered higher than it might, otherwise, have been reflected.  Is that generally ---

THE WITNESS:  That's absolutely correct, yes.

THE COURT:  Okay.

Q    (By Mr. Holtshouser)  You're familiar that when Dr. Gelbort did this at trial, he did not adjust his scores for age and education but Dr. Wetzel did.  Do you recall that?

A    No, I don't.  I'm sorry.

Q    Okay.  The issue of race norms, you used the phrase that with respect to *Atkins*, that MR populations; I think you used that abbreviation.

A    Yes.

Q    Just so -- "MR populations" refers to what?

A    That refers to mental retardation.  The term used nowadays is intellectual deficiency.  So we do "MR" or "ID."

Q    And in terms of published material that you could find,

including on the Internet, the only thing that you found pertaining to Dr. Heaton was this article that came out in -- more recently that dealt with using the race-adjusted norms for MR populations for *Atkins* purposes of who falls into the group of people subject to capital punishment versus those who do not.

A     This article that came out summarizing the debate in the field, that specifically looked at race norming in death penalty cases, came out in July of this year, and it did reference an article from Heaton from 2009 who did specifically say that the concern is that it may adjust upwards too much IQ in minority populations for death penalty as well as to receive special services like MRDD or Social Security services if it adjusted the scores up, and it was adjusted for IQ.

Q     Now when the Heaton norms changed from '91-'92 to 2004, those reflect changes in a variety of factors.  What are the factors that were taken into account in the 2004 norms?

A     I'm sorry.  I'm not sure exactly what you're asking.

Q     Well, in '91-'92, they were adjusted for what factors?

A     Oh.

          MR. MORENO:  I'm going to object again.  This is beyond the scope of Cross Examination.

          MR. HOLTSHOUSER:  Well, this goes into the significance of the differences by using the race norms.

THE COURT:  Well, I don't think -- I don't think she -- I don't think there was testimony about what was included in the '91-'92, but I think what you're trying to get at is the difference between '91-'92 and 2004, isn't it?

MR. HOLTSHOUSER:  Correct.

Q    (By Mr. Holtshouser)  And the question I'm trying to -- the point I'm trying to establish is that:  There's -- There's age, education and sex included in '91-'92, but in 2004, there's an addition of a fourth factor in the 2004 norms.

Let me just ask this question.  The 2004 norms, are they based exclusively on race?

A    No.  No.  That was -- became the fourth demographic variable.

Q    Okay.  The way they are published in Heaton's manual, is there any way to isolate and control how much of an increase is arrived at in any of the scores by adding that -- solely that first -- that fourth factor?

A    I mean what you would do, you could actually isolate any one of the four by holding constant the other three and looking at the two tables that just differs between, let's say, the sexes or differs between the age or education, and that could -- that difference would let you know.

Q    Is one of the reasons for updating norms, though, is that between the passage of time, such as from '91 to 2004, other norms for age, education and sex change as well?

A    They do change significantly.  You do not expect norms that took place, let's say, with the original Wechsler in the 1950s to be the same in terms of people who are taking IQ tests in 2000.  The expectation of what is known by different individuals at different ages is going to be very different between those two periods.

Q    So the rescoring that you did of Dr. Martell's and those particular tests which you did not rescore all of his tests, in other words, race was not implicated in all of the tests that Dr. Martell gave.

A    What I did, I mean I rescored all of his tests to see if they were accurate.

Q    Okay.

A    So the ones -- I'm reporting the ones that I noticed discrepancies.

Q    And most -- And most of those discrepancies -- Some of those discrepancies arise from the choice of norms because he's using outdated norms in 2009.

A    Yes.

Q    Those changes in scores from '91-'92 are not due exclusively to race, though.  Is that true?

A    Yes.  That is not true.  It would be expected changes in the actual norming populations.

Q    Across the four categories.

A    Yes, exactly, because it was a lot less likely to, let's

say, test a 35-year-old in 1990 than a 35-year-old in 2005 to have a college degree versus just the high school degree. Things like that would have changed.

Q    All right.  And lastly, you were asked about the validity testing that was done, and the question that you were asked was:  Did that show that he was not malingering?  Now malingering is a broader -- is a broad term, and one of the ---

THE COURT:  Didn't he -- Didn't he actually say "faking"?

MR. HOLTSHOUSER:  I think he said "malingering."

Q    (By Mr. Holtshouser)  Whether or not the validity testing showed he was not malingering.

A    Yeah.

Q    Now is that, in fact, what the results on those validity tests shows?

A    No, and I probably overspoke when I said "yes."  It's the test used in conjunction with everything else; that you would determine whether or not you believe someone is malingering or not.  So the test was a part of that determination.

Q    Those tests, though, do they test the effort that he is exerting on tests?

A    Yes.

Q    Do they say anything about whether or not what he is recalling -- what he is accounting in terms of a social

history is true or not?

A    No.

MR. HOLTSHOUSER:  All right.  That's all I have, Judge.

THE COURT:  Okay.  You may step down.  Thank you.

THE WITNESS:  Thank you.

THE COURT:  One thing that I want to do before we leave, we talked the other day about briefing and -- and transcripts.  What I would like to do is to make sure we're all on the same page.  And we're going to put it on the record, and I'm going to draft an order, but let's -- let's talk about it.

And as I understand, the -- the transcripts will not be available until March 1st, and so we're going to put a strict time limit on the court reporter.  They will be available by March 1st.

Then Plaintiff will have 60 days.  Defendant will have 60 days, and then a 20-day period for response.  And the briefs will be 150-page limits.  And that will be subject to, good cause, changing.

Does that encompass what we discussed?

MR. HOLTSHOUSER:  I think so, Judge.

MS. CARLYLE:  Yes, Your Honor.

MR. MORENO:  I believe so.

THE COURT:  Okay.  I'll be making -- Debbie, just --

will you just print that part out for me tomorrow?  And I'll -- I'll make an order.

MR. HOLTSHOUSER:  On the issue of exhibits, we wanted to make a record on the exhibits that were covered today.

THE COURT:  Yes.

MR. HOLTSHOUSER:  There were some exhibits that were left over, and then I would like to discuss with the Court the process of ultimately providing to you the hard copy of the ---

THE COURT:  Right, okay.  We had 101 and 102.

MR. HOLTSHOUSER:  That's still outstanding.

MS. CARLYLE:  Okay.  Let's see.  We have no objection to 101.

THE COURT:  101 is received.

MS. CARLYLE:  On 102 and 566, 102 is the raw data and notes of -- handwritten notes of Dr. Gelbort.  566 is the report raw data and notes of Dr. Gelbort.  We object to Pages 5 through 8 of 102.  We object to Pages 10 through 13 of 566.  Those are two copies of the same thing.  So I'm not objecting to two different things, but I'm objecting to the same -- the same data in two different exhibits.  Are you with me so far?

THE COURT:  Well, you're not objecting to any substance that's in the reports, only that they are -- there's duplicate data reported?  Is that ---

MS. CARLYLE:  No.  No.  No.  That's not right.  I

have a substantive objection to those sets of pages, but what I'm trying to make clear just right now is that 5 through 8 of 102 and 10 through 13 of 566 are the same thing, and I have the same objection to both of them.

THE COURT:  Oh, I see.  Okay.

MS. CARLYLE:  Okay.  Now I'm about to tell you what the objection is, if that's okay.

THE COURT:  Okay.  Go ahead.

MS. CARLYLE:  Our objection to those, they are -- they are -- they purport to be at least handwritten notes by Dr. Gelbort.  We would object to those being considered for the truth of the matter stated in them because Dr. Gelbort never testified about them.  He never testified about the sources of the information in them, and so insofar as anyone would like to argue that, for example, according to Dr. Wetzel, Dr. Gelbort wrote down that Mrs. Allen did not smoke while she was pregnant, we would object to being -- to that being considered for the fact of whether she's -- whether or not Mrs. Allen smoked when she was pregnant because Dr. Gelbort has never been examined about the basis for writing that down.  So that's our objection to Exhibits 102 and 566 in part.

MR. HOLTSHOUSER:  Judge, I think it's not a valid objection because the data -- all of the notes and the data were admitted at trial because they were considered by

Dr. Yutzy and they were considered by Dr. Wetzel. Dr. Wetzel and both Dr. Yutzy testified that they received and considered all of the information that was produced by Dr. Gelbort in accordance with part of their evaluation. Dr. Wetzel, in particular, acknowledged these -- these -- the entirety of these exhibits as being what he received and looked at in reaching his opinions in '98 and testifying currently that his opinions haven't changed. So he at least is relying upon, among other things, on the truth of the information asserted and that as an expert. So I think it is appropriate to consider those notes and that data for the truth just as the test results are being considered for their truth; that he, in fact, gave this answer on this day to this test question. There's really no difference than if he's asking questions or collecting collateral sources.

There's all kinds of hearsay that's contained within a variety of these documents by people who didn't necessarily testify, but that's the collateral information. That's what they considered as experts. So I don't think there's any valid basis to segregate out that particular set of notes and not consider it.

MS. CARLYLE: Can I respond, briefly?

THE COURT: Sure.

MS. CARLYLE: So far as you know, the notes were not ever admitted into evidence at trial. It was -- So they were

certainly -- Dr. Gelbort certainly was asked some things about them. He wasn't asked about the particular things Dr. Wetzel was asked about. So it's not a matter that they were admitted as substantive evidence at trial. And I think considering them as evidence that experts considered is one thing. In considering them as evidence of the facts of them is another, and I make that distinction and I ask that the Court not consider them as substantive evidence of the assertions in them. Although for whatever they're worth, the experts apparently were willing to consider them, I don't think the Court needs to take them as substantive evidence of what Dr. Gelbort wrote down 14 years ago is a true fact.

MR. HOLTSHOUSER: Judge, Dr. Gelbort testified to what he testified to at the trial. He was cross-examined, I believe, regarding what was in his notes. They were produced to the Government. He did, in fact, I believe, when questioned about them said, "Yes, these are my notes and these contain my notes of my conversations with Mr. Allen or any third-parties that -- on whom I rely for my analysis." So the record reflects what it reflects with respect to that.

But Dr. Yutzy and Dr. Gelbort both testified this is the data set that they were given to consider in reaching their conclusions, and the record has to be clear that that's what they considered. You can't excise from that that they can't -- couldn't have considered these pages of these notes

because they, in fact, did do so.

MS. CARLYLE: I'm not suggesting that we should -- I'm not suggesting that the Court rule that they didn't or couldn't consider them. I'm just asking that the Court not base factual conclusions on them.

MR. HOLTSHOUSER: I think it's appropriate to do so, given the standard of proof in this case and given the nature of the issues --

THE COURT: Okay.

MR. HOLTSHOUSER: -- in terms of drawing a social history.

THE COURT: Okay. I'll come back to that in a minute. Let's -- Let's consider all of it because I know the Marshal needs to be moving along here with the -- with Mr. Allen.

What's next?

MR. HOLTSHOUSER: Is it my understanding that 102 and 566 are admitted at this point with the exception of those pages in which there's an issue?

THE COURT: No. I'm going to -- I'm going to make a ruling before we leave in a minute, but I haven't decided yet. Go ahead; next?

MR. HOLTSHOUSER: With respect to Dr. Yutzy, if I can ---

THE COURT: Is there any reason why Mr. Allen cannot

be excused at this time?

MS. CARLYLE:  I guess it depends on if he's willing to be excused.  I don't ---

MR. HOLTSHOUSER:  Let me go through here.  We haven't had time to -- I want to make sure I'm not offering things that are already in evidence, Judge.

535 which is the -- Was the deposition Dr. Wetzel used at all?  I don't think it was.  No, okay.  So it's not being offered.

Exhibit 584.

THE COURT:  Wait a minute.  535 is the deposition?

MR. HOLTSHOUSER:  It's not being offered.

THE COURT:  That's of Wetzel.  It's not being offered?

MR. HOLTSHOUSER:  Correct.

THE COURT:  Okay.

MR. HOLTSHOUSER:  Exhibit 584 is Dr. Yutzy's 1998 report.  That's being offered.

THE COURT:  584, okay, received.

MR. HOLTSHOUSER:  585 is his C.V.

THE COURT:  Received.

MR. HOLTSHOUSER:  I had a question whether or not 586 was identified which are his notes of his exam of Billie Allen.

MR. KANE:  I don't believe so.

MR. HOLTSHOUSER:  I don't believe so either, so those are not being offered.

THE COURT:  Okay.

MR. HOLTSHOUSER:  587 is the current report of Dr. Yutzy in November of '11.  That's Exhibit 587.

THE COURT:  Yes.  You're offering it now?

MR. HOLTSHOUSER:  Yes.

THE COURT:  Received.

MR. HOLTSHOUSER:  Exhibit 588 is the text, Goodwin and Guze, *Psychiatric Diagnosis*, which was covered with him.

THE COURT:  Received.

MR. HOLTSHOUSER:  589-A are the excerpts that were put on the screen from the *Diagnostic Statistical Manual* of -- I believe it's IV.

THE COURT:  Received.  589-A, yeah, okay.

MR. HOLTSHOUSER:  595 is the list of materials sent to Government experts in connection with ---

THE COURT:  Wait a minute.  What about 589?  That's the *DSM-IV-TR*?

MR. HOLTSHOUSER:  That's the actual whole book. We're not offering that.

THE COURT:  Has it been offered?

MR. HOLTSHOUSER:  No.

THE COURT:  Are you offering it?

MR. HOLTSHOUSER:  No.

THE COURT: Okay. And what was your next one?

MR. HOLTSHOUSER: After 589-A, it was 595.

THE COURT: 595, list of materials sent to Government experts.

MR. HOLTSHOUSER: Yes, sir.

THE COURT: Received.

MR. HOLTSHOUSER: The two articles, 657 and 658, to be identified, "Empirical Limits of Forensic Mental Health and Forensic Assessment of PTSD." That's 657 and 658.

THE COURT: Okay. 657, here it is. Okay, received. 658, received.

MR. HOLTSHOUSER: All right. Now I'm shifting to Dr. Askenazi.

MR. KANE: Before you do that, did you already get 46 or has that already been ---

MR. HOLTSHOUSER: 46 has already been admitted and used a couple of times.

MR. KANE: Okay.

MR. HOLTSHOUSER: That whole series is in.

With respect to Dr. Askenazi, Exhibit 553 is the letter sent to her to begin her work.

THE COURT: Okay. 553, I show -- Oh, wait a minute. No; wait a minute. That's 563. 553, it's -- It's 533?

MR. HOLTSHOUSER: Yeah, 553, 5-5-3.

THE COURT: Wait a minute. Okay. I'll get it right

in a minute.  Received.

MR. HOLTSHOUSER:  554 which is her report.

THE COURT:  Received.

MR. HOLTSHOUSER:  We didn't use the notes of her examination of Billie Allen.

MR. MORENO:  We did not.

MR. HOLTSHOUSER:  Okay.  We're not offering that. Mr. Moreno went into 554-B which is her testing data.  You want to offer that?

MR. MORENO:  Sure.

MR. HOLTSHOUSER:  Okay, 554-B.

THE COURT:  Received.

MR. HOLTSHOUSER:  555 is her C.V.

THE COURT:  Received.

MR. HOLTSHOUSER:  556 is the PowerPoint shown.

THE COURT:  Received.

MR. HOLTSHOUSER:  561 is the *Ethical Principles of Psychologists, Code of Conduct*.

THE COURT:  Received.

MR. HOLTSHOUSER:  562-A is the relevant rescoring of Dr. Martell's data.

THE COURT:  Received.

MR. HOLTSHOUSER:  I think that's all I have, Judge. Let me just double-check.

MS. CARLYLE:  Judge, I think -- I think 689 was the

disputed article that was identified and made part of the Offer of Proof.

THE COURT:  Oh, yeah.  That was on the Offer of Proof?

MS. CARLYLE:  Correct.

THE COURT:  I'll receive it to the legal file, so it will be in the record.  I won't -- I won't consider it in my opinion, but I'll send it to the legal file so it's -- Wait a minute.  We need to make a note; 689.

MR. HOLTSHOUSER:  I'm just going to put down the "Summit, Heaton."

By my reckoning, Judge, that's all that there is to offer with the exception of the pending issue on this Gelbort --

THE COURT:  Yeah.

MR. HOLTSHOUSER:  -- notes.

THE COURT:  What I'm inclined to do, I'm -- I'm inclined to send it to the legal file so we don't lose track of it and then do my own research to see if there was anything in that trial transcript indicating that it had been received. Certainly ---

MR. HOLTSHOUSER:  I don't think the notes themselves were admitted, --

THE COURT:  Right.

MR. HOLTSHOUSER:  -- but I think they were

authenticated by the Doctor or he wouldn't have been questioned about them.

THE COURT:  Right.

MR. HOLTSHOUSER:  If he wasn't questioned about them and they didn't come up, then they weren't discussed there in which case our argument would be they're admissible as a basis for Dr. Yutzy and Dr. Wetzel to consider them.

THE COURT:  Right.  Certainly they're admissible for those purposes, and that's why I've been hesitant.  There's no way to -- If I don't receive them, there's no way to go back and excise that from the memory and the testimony of all these witnesses who say they reviewed them or considered them.  So, you know, two things:  What Ms. Carlyle does not want me to do is decide my opinion and put in parentheses Dr. Gelbort reports the evidence is in the record that Mrs. Allen did not consume alcohol during the time of her pregnancy.

MR. HOLTSHOUSER:  I think it's -- I think it's the smoking.

MS. CARLYLE:  Yeah.  Actually he didn't say -- she didn't say it, but --

THE COURT:  Pardon me?

MS. CARLYLE:  -- that's an example.

MR. HOLTSHOUSER:  Yeah.  She said somewhere else actually she didn't drink during -- when she was pregnant.

THE COURT:  Right.  I remember that testimony.  So

that's ---

MR. HOLTSHOUSER: I'm not sure this has actually ever been highlighted that there was a discrepancy in the reporting regarding tobacco, nor have I heard --

THE COURT: Yeah.

MR. HOLTSHOUSER: -- up till now that tobacco was much of an issue.

THE COURT: Yeah. So what I'm going to do, I'm just going to make a note on 5 -- on 102. I'm receiving it, and then I want to make a subnote, Pages 5 to 8 to the legal file.

Then on 566 -- on 566, I'm receiving 566, and then I want to say subject to Pages 10 through 13 to legal file.

MR. HOLTSHOUSER: And I think that 102, --

MS. CARLYLE: 102, the relevant pages ---

MR. HOLTSHOUSER: -- actually just -- actually just the testing data. I don't think his notes.

MS. CARLYLE: No. You're wrong.

MR. HOLTSHOUSER: Notes, also?

MS. CARLYLE: Yes. 5 through 8 are notes.

THE COURT: I've already received 102 subject to Pages 5 to 8 --

MS. CARLYLE: Yes.

THE COURT: -- to the legal file.

MR. HOLTSHOUSER: The only -- The only purpose that I think it's admissible to, Judge, is that 102 represents the

discovery that the Government received from the defense in connection with mitigation at trial. If 102 is not received in its entirety, then there's no record that this, in fact, was discovered or that the trial team had information to this effect at the time. So that it's -- That is the issue; that is part of the issue as opposed to whether or not Mr. Allen ever said his mother did or did not smoke when she was pregnant with him which I'm not sure how he could know that, but it's offered for a variety of purposes, all of which I think are valid. I'm willing to stipulate that we're not offering it for the -- on that ultimate issue, but it is relevant to the issue of what did the trial team have in front of them from Dr. Gelbort.

THE COURT: Yeah.

MR. HOLTSHOUSER: It does represent the truth of that.

MS. CARLYLE: Just -- Just ---

THE COURT: Let's do this: Let me see those pages right now. Let me see what they say, and I'll just -- I'll decide one way or the other.

MS. CARLYLE: And just to be clear, I'm not saying that they're inadmissible for any purpose. So I'm not saying, you know, "Judge, you can't look at them." I think -- I think Mister -- Mr. Holtshouser is right. There are a number of purposes for which they are admissible. They're admissible as

discovery. They're admissible as the basis for expert opinion. The question is: Are they admissible as substantive evidence of the statements contained therein? And that's my only question. So I'm not saying, "Judge, you can't look at them." I'm saying -- I'm arguing that they should -- that you should not be permitted to draw factual conclusions from them.

THE COURT: I understand. I understand the distinction.

MS. CARLYLE: Okay.

MR. HOLTSHOUSER: And I know that this portion right here was highlighted and gone into by me during Cross Examination, and Ms. Costantin has informed me that in the trial transcript at Volume 17, Page 11?

MS. COSTANTIN: 111.

MR. HOLTSHOUSER: 111 is where Gelbort identified these as his notes --

THE COURT: Okay.

MR. HOLTSHOUSER: -- and he was questioned about them.

THE COURT: Okay.

MR. HOLTSHOUSER: But the Court can see that from the transcript itself, but I know I used these during examination of either Dr. Wetzel or Doctor -- I think it was Dr. Wetzel because he deciphered the okay at parenting and social alcohol, no drugs; born in St. Louis. I'm not sure where it

says anything about smoking to tell you the truth, but ---

MS. CARLYLE: "Mom now smokes; okay at pg."

THE COURT: Okay.

MR. HOLTSHOUSER: "Okay at parenting." It doesn't say ---

MS. CARLYLE: He said he didn't know.

MR. HOLTSHOUSER: But I don't know that ---

THE COURT: Okay. Well, it ---

MR. HOLTSHOUSER: These were -- These were -- These were used with Dr. Wetzel. He testified to the abbreviations used by professionals, so.

THE COURT: Yeah, okay. I'm going to ---

MR. HOLTSHOUSER: There are a couple more pages to these.

THE COURT: I'm going to receive 102 in its entirety. Now let's look at 566.

MS. CARLYLE: It's the same thing.

MR. HOLTSHOUSER: It's the same thing. It's another copy of the same thing.

THE COURT: Okay. I see what you're saying. Yeah, okay. Those are received subject to objection made.

MS. CARLYLE: Thank you.

THE COURT: Let me make changes in my notes here.

What I would like to do, also, is have the Clerk copy this copy since we relied on them and send them to respective

counsel so you can double-check and make sure that there have not been any incorrect ---

MR. HOLTSHOUSER: I would appreciate that, Judge.

MS. CARLYLE: Yes.

MR. HOLTSHOUSER: And then I will -- we will confer --

THE COURT: Right.

MR. HOLTSHOUSER: -- along with our list.

THE COURT: Right.

MR. HOLTSHOUSER: And then I would propose that the parties submit to the Court a stipulated agreement that this is the exhibit list as it represents what was offered and received. And then I would also -- We discussed earlier with the Court that -- providing you with the hard copies. There are some errors in some of the deposition transcripts in terms of the copying that we noticed in going through this. We would like the opportunity to remove form these boxes --

THE COURT: Okay.

MR. HOLTSHOUSER: -- exhibits not received.

THE COURT: Right.

MR. HOLTSHOUSER: Make sure that the boxes contain a correct copy of -- Some of the declarations were edited. We're going to substitute the edited and the originals and clean up the exhibits so the Court has a reliable set of exhibits to -- a hard copy to look at. And I would propose to

have that to you within a matter of a week or two.

THE COURT:  Okay.

MR. HOLTSHOUSER:  By the end of the year at the latest.

THE COURT:  All right.  Well, let's just say by January 2nd.  How's that?

MR. HOLTSHOUSER:  That would be great, Judge.

MS. CARLYLE:  There was one other -- one exhibit that I discussed earlier which was Dr. Gordon's report, and I had proposed that the Court needed to review a colored copy of that.  I've done a little -- I know the Court was concerned about costs.  Probably the least expensive way to do that is for me to go back to my office and print it on my color printer.

THE COURT:  Okay.

MS. CARLYLE:  If I tried to do it here, I would have to pay someone probably a significant amount of money to print it.  So I will do that and coordinate with the -- with the Government about getting that in the box.

THE COURT:  Okay.  Okay.  I think what I'm going to do is just take these two lists for the record.  I earlier said the Clerk.  I'm just going to take them down, prepare an order, have Betty do the copying, and send them out, and then she'll coordinate it with the Clerk on how to -- on sending them out, but there's, obviously, quite a few pages here.

MR. HOLTSHOUSER:  And just for the record, Judge, the Government rests.

THE COURT:  Okay.

MS. CARLYLE:  For the record, the Petitioner now closes.

THE COURT:  Right, okay.  All right.  The evidence is closed.

MR. MORENO:  Your Honor, thank you very much for your time.

THE COURT:  Well, yeah.  It's been a ---

MR. HOLTSHOUSER:  Thank you for your unending patience here.

MS. CARLYLE:  Right.

(Hearing adjourned at 5:30 PM.)

CERTIFICATE

I, Deborah A. Kriegshauser, Registered Merit Reporter and Certified Realtime Reporter, hereby certify that I am a duly appointed Official Court Reporter of the United States District Court for the Eastern District of Missouri.

I further certify that the foregoing is a true and accurate transcript of the proceedings held in the above-entitled case and that said transcript is a true and correct transcription of my stenographic notes.

I further certify that this transcript contains pages 1 through 305 inclusive and that this reporter takes no responsibility for missing or damaged pages of this transcript when same transcript is copied by any party other than this reporter.

Dated at St. Louis, Missouri, this 25th day of February, 2013.

_____

/s/ Deborah A. Kriegshauser

DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR

Official Court Reporter