## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

_____
                                                          :
BILLIE JEROME ALLEN,                      :        No. 4:07-CV-27 ERW
                                                          :
              Petitioner,                         :        **Capital 2255 Case**
                                                          :
              -v-                                      :        Hon. E. Richard Webber, U.S.D.J.
                                                          :
UNITED STATES OF AMERICA,          :
                                                          :
              Respondent.                        :
_____  :


### PETITIONER'S POST-HEARING BRIEF


Timothy Patrick Kane
Eric John Montroy
James Henry Moreno
Assistant Federal Defenders
Capital Habeas Unit
Federal Community Defender Office
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106


Counsel for Petitioner

June 6, 2013

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

PRELIMINARY STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

I.     Legal Principles.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
       A.   Deficient Performance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
       B.   Prejudice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

II.    Trial Counsel's Penalty Phase Investigation Was Deficient. . . . . . . . . . . . 6
       A.   April to September 1997.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
       B.   September to November 1997. . . . . . . . . . . . . . . . . . . . . . . . . 11
       C.   December 1997.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
       D.   January & February 1998.. . . . . . . . . . . . . . . . . . . . . . . . . . . 19
       E.   Mental Health Mitigation.. . . . . . . . . . . . . . . . . . . . . . . . . . . 28
       F.   Penalty Phase Presentation.. . . . . . . . . . . . . . . . . . . . . . . . . . 31

III.   Petitioner Was Prejudiced by Counsel's Errors.. . . . . . . . . . . . . . . . . 33
       A.   Physical Abuse & Domestic Violence.. . . . . . . . . . . . . . . . . . . . 34
       B.   Verbal Abuse. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
       C.   Parental Alcohol & Drug Abuse.. . . . . . . . . . . . . . . . . . . . . . . . 38
       D.   Neglect. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
       E.   Dysfunction.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
       F.   Mental Health Impacts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

IV.    Analysis.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
       A.   The Unpresented Evidence Was "Reasonably Available".. . . . . . . 44
       B.   Trial Counsel Did Not Make a Reasonable Strategic Decision
            to Limit the Scope of the Mitigation Investigation. . . . . . . . . . . . . 45
       C.   Consideration of All the Available Evidence Establishes a
            Reasonable Probability of a Different Outcome. . . . . . . . . . . . . . 46

## TABLE OF AUTHORITIES

*Antwine v. Delo*, 54 F. 3d 1357 (8th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Eddings v. Oklahoma*, 455 U.S. 104 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Elmore v. Ozmint*, 661 F.3d 783 (4th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . 6

*Foster v. Lockhart*, 9 F.3d 722 (8th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Jermyn v. Horn*, 266 F.3d 257 (3d Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Johnson v. Bagley*, 544 F.3d 592 (6th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . 4

*Kenley v. Armontrout*, 937 F.2d 1298 (8th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . 4

*Kyles v. Whitley*, 514 U.S. 419 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Penry v. Lynaugh*, 492 U.S. 302 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Porter v.  McCollum*, 558 U.S. 30 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . 3, passim

*Rompilla v. Beard*, 545  U.S. 374 (2005). . . . . . . . . . . . . . . . . . . . . . . . 2, passim

*Simmons v. Luebbers*, 299 F.3d 929 (8th Cir. 2002). . . . . . . . . . . . . . . . . 3, 34, 47

*Sinesterra v. United States*, 600 F.3d 900 (8th Cir. 2010). . . . . . . . . . . . . . . . 1, 44

*Strickland v. Washington*, 466 U.S. 668 (1984). . . . . . . . . . . . . . . . . . . . . . 1, 4, 6

*United States v. Dominguez Benitez*, 542 U.S. 74 (2004). . . . . . . . . . . . . . . . . . 4

*United States v. Wisecarver*, 598 F.3d 982 (8th Cir. 2010). . . . . . . . . . . . . . . . 47

*Wiggins v. Smith*, 539 U.S. 510 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . 1, passim

*Williams v. Taylor*, 529 U.S. 362 (2000). . . . . . . . . . . . . . . . . . . . . . . . . 1, passim

*Woodson v. North Carolina*, 428 U.S. 280 (1976). . . . . . . . . . . . . . . . . . . . . . . . 5

## PRELIMINARY STATEMENT

All emphasis in this brief is supplied unless otherwise indicated.   Parallel citations generally are omitted.

Petitioner, Billie Jerome Allen, is referred to as Petitioner or by name.  For the sake of clarity, Petitioner and other persons, especially family members, are frequently referred to by first name when recounting biographical events.

Transcripts from the evidentiary hearing are cited by volume number and page number(s) and, when not clear by reference, the witness' name is indicated, for example: "XIV-73, 75-76 (Nelson)."  For witnesses who share a last name, the first name is also included, as in: "XIV-103 (Angela Allen)."

Stipulated declarations are cited by exhibit number, followed by the relevant paragraph number(s). Other hearing exhibits are cited by reference to page number(s) of the entire exhibit; the pagination indicated on letters, transcripts, or other documents within an exhibit typically is not cited.

Petitioner, Billie Jerome Allen, through counsel, respectfully submits this post-hearing brief on the issue of trial counsel's ineffective assistance at the penalty phase of trial.

## I.    Legal Principles

The Sixth Amendment right to effective assistance of counsel is violated when counsel's representation is deficient, in that it falls below "an objective standard of reasonableness," and when the defendant is prejudiced, meaning that confidence is undermined in the outcome of the proceeding.  *See Wiggins v. Smith*, 539 U.S. 510, 521 (2003); *Strickland v. Washington*, 466 U.S. 668, 694 (1984).

### A.    Deficient Performance

Capital defense counsel have an "obligation to conduct a thorough investigation of the defendant's background" for "all reasonably available mitigating evidence." *Wiggins*, 539 U.S. at 522, 524; *Sinesterra v. United States*, 600 F.3d 900, 907 (8th Cir. 2010).  As part of a "thorough investigation" for "all reasonably available" mitigation, counsel should, well before trial, seek out and thoroughly interview family members and others familiar with the client's life history and background. *See, e.g., Williams v. Taylor*, 529 U.S. 362, 395-96, 416 (2000) (counsel performed deficiently where, despite obtaining three mental health evaluations of defendant and interviewing his family members, counsel failed to discover available

1

evidence of his difficult childhood); *Foster v. Lockhart*, 9 F.3d 722, 726 (8th Cir. 1993) ("Although we generally give great deference to an attorney's informed strategic choices, we closely scrutinize an attorney's preparatory choices.").

Counsel must begin investigation promptly upon entry into the case; it is deficient representation to wait until trial to conduct "the difficult and time consuming task of assembling mitigation witnesses." *Jermyn v. Horn*, 266 F.3d 257, 308 (3d Cir. 2001); *accord Williams*, 529 U.S. at 395 (counsel "fell short of professional standards" when they "did not begin to prepare for [the penalty phase] until a week before trial"); 1989 ABA Guideline 11.8.3. (A) ("[P]reparation for the sentencing phase, in the form of investigation, should begin immediately upon counsel's entry into the case.").

In analyzing counsel's performance, the dispositive inquiry is whether counsel failed to discover mitigating evidence that was "reasonably available"; counsel's performance can therefore be deficient even where they have made significant efforts. *See Williams*, 529 U.S. 362 (counsel deficient where they interviewed family members and had defendant evaluated by three mental health experts); *Wiggins*, 539 U.S. 510 (counsel deficient where they tracked down DSS records on defendant and his family, obtained a PSI report that included an account of defendant's personal history, and had investigators interview defendant's family); *Rompilla v. Beard*, 545

U.S. 374 (2005) (counsel deficient where they extensively interviewed defendant's family members and obtained three mental health evaluations); *accord Antwine v. Delo*, 54 F. 3d 1357, 1367 (8th Cir. 1995) ("Given the severity of the potential sentence and the reality that the life of [the defendant is] at stake, . . . it [is counsel's] duty . . . to collect as much information as possible about [the defendant] for use at the penalty phase"); *Simmons v. Luebbers*, 299 F.3d 929, 936-938 (8th Cir. 2002) ("there [is] no justifiable reason [for trial counsel] to prevent the jury from learning about [petitioner's] childhood experiences," including a parent's alcoholism, domestic violence between the parents, and physical abuse of the petitioner).

Counsel's duty to investigate abides even when the defendant is uncooperative or "actively obstructive" of counsel's efforts:

> Rompilla's own contributions to any mitigation case were minimal. Counsel found him uninterested in helping, as on their visit to his prison to go over a proposed mitigation strategy, when Rompilla told them he was "bored being here listening" and returned to his cell. To questions about childhood and schooling, his answers indicated they had been normal, save for quitting school in the ninth grade. There were times when Rompilla was even actively obstructive by sending counsel off on false leads.

*Rompilla*, 545 U.S. at 381. Similarly, a "fatalistic or uncooperative" defendant does not relieve counsel of the duty to conduct a thorough mitigation investigation, even where the defendant has instructed counsel not to talk to family witnesses. *Porter v.*

3

*McCollum*, 558 U.S. 30, 39 (2009); *see also Adams v. Quarterman*, 324 Fed.Appx. 340, 2009 WL 1069330 (5th Cir. 2009) (even if defendant instructed counsel not to contact family members or present mitigating evidence derived from them, counsel was not relieved of duty to conduct a thorough mitigation investigation); *Johnson v. Bagley*, 544 F.3d 592, 603 (6th Cir. 2008) ("Uncooperative defendants and family members, [] do not shield a mitigation investigation. . . if the attorneys unreasonably failed to utilize other available sources").

**B.     Prejudice**

For prejudice, the "undermines confidence" standard requires only "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. " *Strickland*, 466 U.S. at 694.  This standard is not a stringent one, and is less demanding than the preponderance standard.  *See Williams*, 529 U.S. at 405-06; *Kyles v. Whitley*, 514 U.S. 419, 434 (1995); *Kenley v. Armontrout*, 937 F.2d 1298, 1304 n.5 (8th Cir. 1991); *see also United States v. Dominguez Benitez*, 542 U.S. 74, 83 n.9 (2004) ("The reasonable-probability standard is not the same as, and should not be confused with, a requirement that a defendant prove by a preponderance of the evidence that but for error things would have been different.") (citing *Kyles*).

Evidence that the defendant suffered abuse, neglect, and other childhood

hardships has been a key component of capital mitigation for decades.  *See, e.g., Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982) ("Evidence of a difficult family history and of emotional disturbance is typically introduced by defendants in mitigation.").  Such evidence enables the capital sentencer to appreciate the forces "stemming from the diverse frailties of humankind," *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976), that have shaped a defendant's character, and to treat the defendant as a "'uniquely individual human bein[g],'" so that there can be a constitutionally "reliable determination of the sentence," *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (quoting *Woodson*).

Counsel's failure to uncover and present such evidence establishes prejudice. *See, e.g., Porter*, 558 U.S. at 42 (prejudice found where counsel failed to present evidence of, *inter alia*, childhood physical abuse); *Rompilla*, 545 U.S. at 390-92 (same as to parental alcoholism, abuse, and neglect); *Wiggins*, 539 U.S. at 534-35 (same as to childhood privation and physical and sexual abuse); *Williams*, 529 U.S. at 396 (same as to childhood neglect and abuse); *see also Penry*, 492 U.S. at 319 ("[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable") (internal quotation omitted).

In weighing unpresented mitigation evidence, a post-conviction court must "evaluate the totality of the evidence – both that adduced at trial, *and the evidence adduced in the habeas proceedings*." *Wiggins*, 539 U.S. at 536 (internal quotation omitted; emphasis in *Wiggins*).  Accordingly, a court is unreasonable "insofar as it fail[s] to evaluate the totality of the available mitigation evidence." *Williams*, 529 U.S. at 397; *accord Porter*, 558 U.S. at 42; *Elmore v. Ozmint*, 661 F.3d 783, 868 (4th Cir. 2011).

Finally, the "assessment of prejudice . . . should not depend on the idiosyncracies of the particular decisionmaker." *Strickland*, 466 U.S. at 695, 700. Rather, prejudice is an objective inquiry, which asks whether it is reasonably probable that the outcome would have been different had counsel performed adequately, as opposed to a subjective and outcome-determinative one, which would ask what a particular fact finder would have done. *See id.*  Prejudice is therefore established where there is a reasonable probability that an objective sentencing jury, after hearing the unpresented mitigating evidence, "would have struck a different balance." *Wiggins*, 539 U.S. at 537; *see also Porter*, 558 U.S. at 42.

## II.   Trial Counsel's Penalty Phase Investigation Was Deficient

Petitioner was formally charged on March 18, 1997.  The Court appointed Mr. Sindel to represent Petitioner on or about April 4, 1997.  *See* Ex. 300; I-226 (Sindel).

The Court appointed Mr. Simon as co-counsel on September 24, 1997. Ex. 17. Craig Haney was retained as a mitigation expert in September 1997. *See* Exs. 313, 316; III-97. On January 16, 1998, David Randall was retained as a mitigation expert to replace Dr. Haney. Ex. 29.

Jury selection began on Monday, February 9, 1998. The guilt phase began on Tuesday, February 17, 1998, and concluded on Thursday, February 26, 1998. The penalty phase began on Monday, March 2, 1998, and concluded on Tuesday, March 10, 1998.

**A.     April to September 1997**

During these 5 months when Mr. Sindel was the only lawyer representing Petitioner, CJA records indicate that he spent 176 hours working on the case. Ex. 15. Although the CJA records may not capture every minute that Mr. Sindel spent on the case, they do provide a detailed, contemporaneous account of the content and duration of his work. These records and the hearing testimony establish that Mr. Sindel was focused on guilt phase issues and motions practice, and that any work related to mitigation investigation was quite limited. *See* I-44, 51 (Sindel).

About 64 of the 176 hours, or 36 percent, involved reviewing records – primarily guilt phase pleadings and discovery. Ex. 15 at 1, 4-6. This also included a half-hour reviewing witness notes on June 3, 1997 (without reference to guilt or

7

penalty phase)[1] and nearly 20 hours in July 1997 reviewing documents in preparation for asking DOJ not to seek the death penalty. *Id.* at 5. The DOJ presentation, however, did not include either the type or detail of mitigation evidence that would be expected in a penalty phase. *See* Ex. 610 (Mr. Sindel's written submission to DOJ, identifying only two mitigating factors: the presence of "another at least equally culpable co-defendant" and Petitioner's youth, and stating that "counsel is not presently prepared . . . to present evidence to support the existence of mitigating factors"); *see also* I-44-45 (Sindel).

About 53 of the 176 hours, or 30 percent, was for legal research and brief writing. Ex. 15. Again, the vast majority of this time was for guilt phase issues. *See id.* at 4-5; I-43-44 (Sindel). The research and writing related to penalty phase issues – *e.g.*, drafting the DOJ submission and requesting funds for the defense – did not include substantive mitigation investigation. *See id.*

Interviews and conferences with Petitioner and others took up 17 hours. Ex. 15 at 3-4. Only one of these interviews clearly involved a potential penalty phase

---

[1] Although not indicated in Mr. Sindel's time entry, the review of witness notes was almost certainly related to guilt phase. Exhibit 135 is a memorandum dated June 2, 1997, to Mr. Sindel from an intern, and the memorandum concerns guilt phase and suppression issues. The exhibit bears Mr. Sindel's handwritten notes, which presumably correspond with his timesheet entry the day after the memorandum was drafted. *Compare* Ex. 15 at 5 *with* Ex. 135; *see also* II-90 (Sindel).

witness – a "consultation" with Johnnie Grant for 1.2 hours – but Mr. Grant was also a potential guilt phase witness. *See* II-81-82 (Sindel).  Another 18 hours was divided between travel time and in-court hearings.  Ex. 15 at 1.

The remaining 14.8 hours, less than 10 percent of Mr. Sindel's recorded hours, was spent on "[i]nvestigative and other work."  *Id.* at 8-11.  Many of these entries plainly did not involve mitigation investigation, but several entries – including contacts with Juanita Allen and other family members – were related to mitigation investigation.  *See id.; see also* I-226-27, II-67-68, 72, 86, 90-91, 95 (Sindel); Exs. 135-36, 139, 301, 305, 306, 308, 309.  Assuming that all of the ambiguous witness entries concerned mitigation, Mr. Sindel recorded about 8 hours of mitigation investigative activity in the 5 months between April and August 1997.

Mr. Sindel's work was supplemented by Connie Caspari-Supranowich's work as a paralegal, *see* Ex. 14, and by interns, *see* Ex. 15 at 20-22.  Most or all of the interns' work was related to guilt phase issues and focused primarily on legal research and drafting.  *See id.*; *see also* Exs. 135-36, 139 (memoranda of interviews with guilt phase witnesses); II-90-91, 95 (Sindel).  Meanwhile, Ms. Caspari-Supranowich's main contribution to the mitigation investigation during this time period was in helping to collect medical records, *see*, *e.g.*, Exs. 107, 310, and in identifying witnesses, *see* Ex. 14.  She also located and interviewed witnesses on a number of

9

occasions, but these efforts related predominantly to guilt phase investigation. *See id.*; *see also* Ex. 525 at 35 (Ms. Caspari-Supranowich's stipulated deposition testimony that "I know we were investigating a possible alibi" in July 1997).

All told, the testimony and evidence presented at the hearing reflects that counsel had conducted only a minimal mitigation investigation by the beginning of September 1997. Mr. Sindel had opened lines of communication with Petitioner and Juanita Allen, and had obtained basic social history information from them. *See* IV-211 (Sindel). Counsel was thus able to create a witness list, which included names of some potential penalty phase witnesses. *See* Ex. 308 (witness list dated May 7, 1997, containing 13 names, some of whom related to penalty phase); IV-114 (Mr. Sindel testifying that Exhibit 308 contains names obtained from Petitioner and Juanita Allen); II-81-82 (Mr. Sindel testifying that Exhibit 308 contains names of witnesses that could be related to guilt phase and/or penalty phase); *see also* Ex. 312 (July 14, 1997, memorandum identifying two family members).

The defense team also began collecting medical records. *See* Ex. 107 (City Hospital medical records received in July 1997); *see also* Ex. 301 (transcript of telephone call in which Mr. Sindel and Juanita Allen discussed Petitioner's medical and education history); Ex. 307 (April 30, 1997, letter from Mr. Sindel to Juanita Allen requesting information on Petitioner's medical history).

Counsel did not, however, conduct a thorough mitigation investigation in this time period.  I-44, 94 (Sindel).  The team's mitigation work consisted of collecting records and meeting with Petitioner and some family members; Mr. Sindel "didn't beat the streets to find mitigation witnesses at that point."  I-44 (Sindel).  The witness list remained sparse, and no memoranda of mitigation interviews were generated.  No mitigation specialist was consulted or retained, and no mental health experts were consulted or retained.

**B.      September to November 1997**

By early fall 1997, the parties knew that trial would begin in January or February of 1998.  *See* Exs. 19, 20.  The fall months were therefore crucial for counsel's  mitigation investigation.  Yet, the investigation came to a near standstill as the team expanded and the team members' roles and responsibilities became confused.

On September 24, 1997, the Court appointed Mr. Simon as co-counsel.  Ex. 17. Craig Haney was also retained as a mitigation expert in September 1997.  *See* Exs. 313, 316; III-97 (Sindel).  Mr. Simon lived and worked in Jefferson City, Missouri, and Dr. Haney lived and worked in Santa Cruz, California.  *See* Exs. 68, 316.

According to Mr. Sindel, after Mr. Simon and Dr. Haney joined the team, Mr. Sindel was to focus primarily on guilt phase preparation, while Mr. Simon would "do

11

mitigation investigation, help coordinate mitigation activities, help secure records, you know, develop mitigation themes, and also to assist me in research and drafting pleadings, although for the most part that had been done already." I-45-46. Mr. Sindel thus recalled that he "really pushed off some matters concerning mitigation onto Mr. Simon." III-43. Mr. Sindel did not take the role of developing rapport with the family in order to ask the hard questions; he expected Mr. Simon and Dr. Haney to do that. I-56, 58-59, 82.

Mr. Simon's account of their respective roles was quite different. He recalled that he was expected to be a "law man" and that he would be only a "barrister" for some penalty phase witnesses, *i.e.*, that he "would be presenting witnesses in open court." IV-245. Mr. Simon believed he did not have either the experience or the assigned role of conducting substantive mitigation interviews with witnesses. IV-246-48; V-235.

Contemporaneous records tend to support the accuracy of Mr. Sindel's account. For example, in the continuance motion the defense filed with the Court in January 1998, counsel stated that "lead counsel for Defendant Allen, Richard H. Sindel, is concentrating on the guilt or innocence phase, and appointed co-counsel, John William Simon, is concentrating on the penalty phase." Ex. 32 at 1; *see also* VI-20 (Simon). Internal defense communications likewise reflected this understanding. Ex.

354 at 2 (indicating that Mr. Simon "has assumed responsibility for handling the penalty phase of the trial while Richard Sindel is handling the guilt phase."); *see also* VI-17 (Simon).

The team's work product and CJA time records, however, reflect that *no one* was "concentrating on the penalty phase" during these crucial months. Exhibit 23 contains Mr. Sindel's CJA records for September through November, 1997, and the records are nearly devoid of mitigation work. Mr. Sindel recorded 140 hours working on the case, and more than half of that time involved researching and drafting motions on severance and on legal challenges to the federal death penalty. *Id.* at 4-5. Another 43 hours involved document and evidence review but, with the exception of a single hour spent reviewing medical records, this time also concerned guilt phase preparation. *See id.* at 3-4. Much of the remaining 20 hours was divided among in-court time, client conferences, travel, and contacts unrelated to mitigation. During these three crucial months, Mr. Sindel recorded just 4.5 hours of work that *may have been partly related* to mitigation investigation: the 1 hour of medical record review, 1.6 hours of consultations with Ms. Caspari-Supranowich, and 1.9 hours of telephone conferences with co-counsel, Juanita Allen, and a psychologist (presumably Dr.

13

Cuneo).[2]  *See id.* at 3-6.

Meanwhile, during these same three months, Mr. Simon recorded just under 30 hours of work on the case.  Ex. 68 at 4, 6-9.  A little more than half of this time was spent researching and drafting legal pleadings unrelated to the mitigation investigation.  *See id.*  Another 6.4 hours was for travel.  *Id.* at 7.  Most of the remaining 8 hours was divided among reviewing discovery, conferences with Mr. Sindel, and preparation for and attendance at the November 6, 1997, court hearing.  *Id.* at 4, 6-9.  Only 2.2 hours of conferences and calls with Petitioner and 0.2 hours of discussion with Petitioner's family could have been even partially related to mitigation investigation.  *See id.* at 7.

Thus, during the crucial fall months of 1997, neither Mr. Sindel nor Mr. Simon performed more than *de minimus* work on the mitigation investigation.  Although Mr. Sindel retained Dr. Cuneo in September, the defense team did not meaningfully consult with, or have Petitioner evaluated by, a mental health expert.  They did not conduct mitigation interviews with family members or other witnesses who could testify about Petitioner's childhood and upbringing.

This void was not filled by others on the defense team.  Interns recorded 16

---

[2] This does not include 6.3 hours of consultations and telephone conferences with Petitioner himself, most of which lasted only 0.1 or 0.2 hours.  *See id.* at 2-3; *see also infra* at 18-19 (discussing defense team's concerns about Petitioner's reliability).

hours of work during this time, but all of it was for legal research. Ex. 23 at 17. Ms. Caspari-Supranowich billed 184 hours, but more than 127 of those hours were spent on matters plainly relating to guilt phase, including reviewing discovery, investigating a possible alibi defense and potential *Brady* witnesses, and preparing various motions and charts. *See* Exs. 317, 322, 53. Only a few of her time entries clearly involve mitigation-related work. *E.g.*, Ex. 317 at 1-2 (two entries indicating contact with mitigation experts and Dr. Cuneo). Other entries, including conferences with Petitioner, meetings and calls with Mr. Simon and Mr. Sindel, and generic entries for document review and investigation may have related in part to mitigation. *See* Exs. 317, 322, 53. To be sure, Ms. Caspari-Supranowich sent records to Drs. Haney and Cuneo, continued to collect records, and otherwise filled a supporting role for the defense team. *See* Exs. 314, 316, 318, 321. But she did not undertake substantive mitigation interviews with key witnesses or otherwise begin to prepare a penalty phase presentation for Mr. Sindel and Mr. Simon. Her supporting role certainly did not amount to a thorough mitigation investigation on counsel's behalf.

Nor did Dr. Haney fill the void during the fall of 1997, or at any other time. All of his work on the mitigation case can be quickly summarized: he did nothing. He never submitted a bill, never met Petitioner or any potential witnesses, never came to St. Louis to meet the defense team, never had a substantive consultation with the

15

defense team, and never generated any work product. The defense team did not send him a witness list, any memoranda of witness interviews, or all of the records promised in the letter of November 26, 1997. IV-106-07, 114 (Sindel). Dr. Haney did receive four letters containing some records from the defense team (Exs. 316, 321, 323, 327); he sent two letters to the defense team (Exs. 320, 330); and he may have had an initial telephone conversation with Mr. Sindel when he was retained (*see* III-19, 24 (Sindel)). These contacts, however, were preliminary and achieved nothing.

There was contradictory testimony at the hearing regarding whether Dr. Haney and his staff were actually expected to perform the "boots on the ground" mitigation investigation. *See* I-58, I-70; III-28-29; III-74-75; III-112-16; III-118-19 (Sindel); IV-246-48 (Simon). But regardless of what the arrangement was, and regardless of the "significant communication problems with Dr. Haney," I-48 (Sindel), from September 1997 through the end of the year, *no one* on the defense team conducted the "boots on the ground," difficult, time-consuming, and indispensable process of finding and interviewing the witnesses who could testify at the penalty phase of trial about Billie Allen's character and upbringing. *See* IV-30-31 (Sindel).

## C.   December 1997

In December, with trial fast approaching, Mr. Sindel recorded only 7.9 hours of work on the case, mostly on voir dire and discovery issues. Ex. 69 at 3-13. Only

16

6 telephone calls with Petitioner totaling 1 hour, and three telephone calls with co-counsel totaling 1.2 hours, could have related even in part to mitigation issues. *See id.* He again conducted no interviews of mitigation witnesses and had no contact with Dr. Cuneo, Dr. Haney, or any other mitigation expert.

Mr. Simon recorded 31 hours in December, almost all of which entailed research, drafting, and discussion of discovery motions. Ex. 68 at 9-11. The only reported activity related to mitigation was a 3.9 hour interview with Petitioner on December 12. *Id.* at 10; *see also* Exs. 630-35 (audio tapes and transcript of December 12 meeting); V-38-39, 173-80 (Simon).

Ms. Caspari-Supranowich's December time records show only two mitigation-related entries – for organizing mitigation documents and reviewing medical records – the former of which coincided with her sending to Dr. Haney the "Biography" drafted by Petitioner. *See* Ex. 53 at 2; Ex. 323.

This handwritten "Biography," just over three pages long, illuminates the inadequacy of defense counsel's mitigation investigation. Petitioner provided the "Biography" to Ms. Caspari-Supranowich at the defense team's request. *See* Exs. 304, 321. The "Biography" focused on the deaths of Marquise Taylor and other close friends. It also touched on the absence of a father figure from Petitioner's life, the violence in the neighborhood where he grew up, his marijuana use, his skill as an

17

artist, his visits to a mental hospital, and his close relationships with his mother and others.  Ex. 304; *see also* III-32-38, III-181-84 (Sindel); V-67-68; V-82 (Simon).

These themes are striking because they would soon account for much of counsel's presentation at the penalty phase of trial.  Indeed, by the end of 1997, aside from the records they had collected, counsel's only sources for substantive mitigation evidence were Petitioner himself and, to a lesser extent, Juanita Allen.  Family witnesses, neighbors, friends, teachers, experts, and others would not be interviewed and consulted in depth until immediately before and during trial.

Counsel's heavy reliance on Petitioner's self-reporting was not the result of sound practice or conscious strategy; it was a necessity born of the extreme time crunch they put themselves in by squandering the last four months of 1997.  Counsel's dependence on Petitioner's autobiographical account was also remarkable given their recognition that he was not at all a reliable self-reporter.  By September 1997, Mr. Sindel was of the view that, as he told Dr. Cuneo, Petitioner "can't tell me the truth to save his soul."  XI-16 (Cuneo).  Mr. Sindel was well-acquainted with Petitioner's unreliability and believed that it may derive from a mental problem.  *See* I-164-65 (Sindel).  Mr. Simon likewise knew Petitioner to be untruthful.  VI-27-28, 41 (Simon).  Shortly after joining the defense team in January 1998, Dr. Randall would learn that Petitioner was unreliable and that "his lying was symptomatic of a

18

problem." VI-178; Ex. 357. This issue was well known to witnesses as well. *E.g.*, Ex. 500 at 9 (Ruffin); X-86 (Grant).

Nonetheless, given the size of the mitigation investigation left undone and the extreme haste with which the defense team would attempt to "catch up" in January and February 1998, Petitioner's own accounts would provide the outline for counsel's penalty phase presentation. But it was an outline that omitted the most compelling and tragic evidence about his life.

### D.    January & February 1998

With the new year, Mr. Sindel and Mr. Simon faced a daunting task. Trial would begin on February 9, and preparation for jury selection and the guilt phase would continue to consume the bulk of Mr. Sindel's and Ms. Caspari-Supranowich's time. *See generally* Ex. 69 at 2-11 (Sindel CJA records); Ex. 53 at 2-4 (Caspari-Supranowich CJA records). Dr. Haney had done no mitigation work; Dr. Cuneo had not been consulted since his initial retention; lay witnesses who would testify at penalty phase had not been identified, interviewed, or prepared.

Against this backdrop, Mr. Simon finally turned to the mitigation work that Mr. Sindel believed he had been doing all along. During the week of January 5, Mr. Simon traveled to Petitioner's childhood home where he met with family members for 0.7 hours; he obtained a "mitigation workbook" and used it as a guide to interview

19

Petitioner for 4.5 hours; he spent 3.4 hours preparing a written "Life History" based on interviews with Petitioner and three family members; and he engaged in various communications with Mr. Sindel and Ms. Caspari-Supranovich.  Ex. 68. at 9-11 (Simon CJA records); IV-254-55 (Simon) (testifying about interviews of family members); Ex. 303 ("Life History").  Excluding  travel time, he recorded about 23 hours working on the case that week, almost all of it related to mitigation, although he would not lead any significant mitigation investigation thereafter.  *See* Ex. 68. at 9-12; *see also id.* at 13 (from the end of this week, Mr. Simon recorded just 0.2 hours of case work in the next two weeks, during which Dr. Randall joined the team and took over the mitigation investigation).

Most significantly, on January 9, 1998, Mr. Simon faxed a letter to Mr. Sindel expressing his "concern[] about the lack of contact with Craig Heaney [sic], J.D., Ph.D." and asking if "you or Connie [have] heard anything from him?"  Ex. 325 at 2; *see also* III-99, 104 (Sindel).  In Mr. Sindel's words, the fax from Mr. Simon made him aware that "Mr. Simon had not had communications with Dr. Haney and things began to unfold from there."  III-107.  Indeed, on the following Monday, Mr. Sindel faxed a letter to Dr. Haney asking him to contact the defense team immediately and stating that "[t]he mitigation aspect of this case may be the only hope we have of saving Mr. Allen's life and I am concerned it is not being investigated to the extent

20

it needs to be."  Ex. 327.

The following day, Dr. Haney responded by letter.  Dr. Haney recounted that Mr. Sindel had "never once attempted to converse with me about the case"; that he had received "relatively sparse" records, including the "not very helpful biographical statement from the client"; that he had "never seen a single investigative report generated by your office" and had received "no information" concerning potential mitigation witnesses; and that, overall, he did not have "anywhere near the amount of information" necessary to develop a mitigation case.  Ex. 330 at 2-3 (emphasis in original); *see also* I-63-66, 76 (Sindel).

These long overdue communications among the defense team were as though, in Mr. Sindel's words, "the cartoon anvil came out of the sky."  I-63.  He recognized that he had not been adequately supervising the mitigation case, and that the mitigation investigation had not been developed.  I-59-62; *see also* IV-131.  Mr. Sindel variously described the investigation as "stalled," "bare bones" and "preliminary."  IV-124, 146; I-77.  Whatever the characterization, it came as "a shock" to Mr. Sindel "because [he] hadn't done enough to make sure that the mitigation phase investigation was moving along and had a direction."  I-52.

On January 16, 1998, the defense requested, and the Court approved, the replacement of Dr. Haney with Dr. David Randall.  Exs. 28, 29; III-180-81 (Sindel);

VI-158 (Randall). Dr. Randall led the mitigation investigation from that date forward. VI-215-17 (Randall); Ex. 340. When Dr. Randall joined the team, he consulted with Mr. Sindel, reviewed records, and met with Petitioner. Ex. 340; VI-162-65 (Randall). Mr. Sindel gave him an overview of the case, but did not provide detailed information, and gave him no information about any investigation into possible childhood abuse. VII-44-47, VII-98 (Randall).

Most importantly, as with Dr. Haney, Dr. Randall received no memoranda or notes of witness interviews. IV-141 (Sindel). As Dr. Randall recounted, "there was no witness development at all whatsoever when I came into the case." VIII-176. Given that trial was scheduled to begin in three weeks, this was a "highly unusual situation." VI-161. Dr. Randall had "never encountered in [his] career a case in such bad shape . . . at such a late stage." V-180.

A penalty phase presentation is "built through the eyes of others," and not based on what the defendant says. VIII-179-80 (Randall). Mitigation investigation primarily required "developing a nexus of people who can tell Billie Allen's life story through their eyes." VI-187. This is "the most basic, important piece" of social history investigation, but it had not been done as of mid-January 1998.

Dr. Randall's primary role was thus to identify, locate and interview potential penalty phase witnesses. I-86-88 (Sindel). Given the time constraints, the defense

22

team adopted a plan by which Dr. Randall would contact or meet each potential witness, either in person or by phone, then draft an anticipated direct examination for the witness, then have one prep session with the lawyers and the witness in which they rehearsed the anticipated testimony. *See* Exs. 340, 341; VI-200-06 (Randall), VI-102-03 (Simon). Although neither a typical nor effective plan, it was necessary on account of the time crunch, and it was the approach taken with most of the witnesses here. VI-200-06 (Randall). As most of the mitigation investigation took place during jury selection and the guilt phase of trial, Dr. Randall typically consulted with Mr. Sindel and other members of the team in the evenings. III-216, IV-197 (Sindel); VIII-165 (Randall).

Dr. Randall began contacting "witnesses from different cross-sections of Billie's life, teachers, people in the community, et cetera, and it was sort of a rapid-fire process." VII-40 (Randall). School teachers were a good example of how the mitigation investigation worked. When Dr. Randall joined the defense team, he was provided Petitioner's school records. With the records in hand and based on information received from Juanita Allen, he began contacting and interviewing teachers and counselors, none of whom had been previously contacted by the defense team. *See* VII-71, 96 (Randall); *accord* IV-224 (Sindel); Ex. 273 ¶1 (Eaton). A number of these interviews occurred over the phone. VIII-170 (Randall). Some of

23

the teachers then participated in the witness prep sessions on the last weekend in February. *See* Ex. 383. At trial, the teachers testified about various aspects of Petitioner's character, particularly his nonviolence and his "follower" attributes, and this evidence was integrated into the mitigation presentation.[3] VIII-85-86 (Randall).

A similar process took place with family members and friends, but there the "rapid-fire" interview process proved entirely inadequate to uncover and follow up on the painful and troubling aspects of Petitioner's upbringing. Instead, the defense team heard only fragments of information about Juanita Allen's alcoholism and about her abuse and neglect of Petitioner. Most of this information came out *after* Dr. Randall's initial contact with the witnesses and during the final prep session with witnesses on February 21 and 22. Receiving this information literally days before the penalty phase meant that the defense team did not have time to follow up on the information.[4]

For example, during the weekend prep session, Deborah Ruffin told the

---

[3] The defense called eight school teachers and counselors to testify at the penalty phase.

[4] It was anticipated that any penalty phase would begin during the week following the weekend prep session. However, after the jury reached its guilt verdicts on Thursday, February 26, 1998, the Government requested and was granted a continuance until the following Monday, March 2, 1998, to prepare for the penalty phase. *See* Trial Tr. Vol. 12 at 122-32.

24

defense team that Juanita would "tighten" Billie up, which Mr. Sindel interpreted as meaning that she would "get physical" with him. Ex. 485 at 2; VI-13, 47-50 (Simon); VII-214, 220 (Randall); XIV-62 (Ruffin). Ms. Ruffin also told them that Juanita would "drink to excess." Ex. 500 at 11; VI-49 (Simon); XIV-62 (Ruffin).

Later that same weekend, Shimeka Taylor told the defense team that Billie "got the snot kicked out of him" and was subjected to "whipping" by Juanita. Ex. 500 at 22; VI-14, 52-53 (Simon); VIII-199-200 (Randall). Similarly, Samuel Moore stated that Juanita would "mop [Billie] up" and "kick his ass in the street." VII-223-24 (Randall).[5]

Nancy Harris, a neighbor, told the defense team during the same prep session that Billie was "scared of" his mother. Ex. 465 at 2; VII-247 (Randall). On the Monday following the weekend prep session, Lucy McLemore, Juanita's sister, told the defense team that Juanita's family was "dysfunctional." Ex. 500 at 6; VI-14, 51-52 (Simon).

---

[5] The date of Mr. Moore's statement was not established at the hearing, though it also appears to have been made during the weekend prep session. *See* VIII-199 (Randall). Mr. Moore's name appears on the prep session schedule, *see* Ex. 383, VI-43 (Simon), and the statement is memorialized in the second and last entry in Dr. Randall's notes for Mr. Moore, *see* Ex. 436.

Given the late and hurried nature of these testimony prep sessions,[6] the defense team conducted no follow up investigation on this information, did not present this evidence at the penalty phase, and did not provide this information to the mental health experts. *See* VI-127-32 (Simon); VI-205-10, 213-14; VIII-7, 166-72, 237-38 (Randall).

Meanwhile, Raymond Petty, Juanita's brother, described some of the abuse issues to Dr. Randall sometime *before* the weekend prep session. *See* VII-217-18 (Randall); Ex. 458.[7]  Mr. Petty then expanded on the topic at the weekend prep session, reporting that Juanita had problems with alcohol, used her fists on Billie, beat and hit Billie repeatedly, whipped him with an extension cord, and "put out" Billie repeatedly. Ex. 500 at 38-39.[8]

Mr. Sindel elicited some of this information from Mr. Petty at trial. Mr. Petty's

---

[6] *See* Ex. 383 (indicating that the defense team scheduled meetings with 21 to 24 witnesses during this weekend in one-half to one hour time slots); *see also* VI-206 (Randall) (describing the weekend session as being "like an assembly line of people. . . . One would come in, we would talk, they would leave. One would come in, they'd talk, they'd leave.").

[7] Raymond Petty was one of the three witnesses that Mr. Simon had also contacted in January. *See* Ex. 303 at 4-5.

[8]  According to the weekend schedule, Mr. Petty's prep session occurred after the prep sessions of the other witnesses who described or alluded to these problems. *See* Ex. 383.

testimony alluded to Juanita "cursing and drinking" and needing to "put that glass down." Ex. 213 at 26-27 (Trial Tr. Vol. 18 at 37-38). Mr. Petty also described an incident where he pulled Juanita off of Billie as she whipped him with an extension cord. *Id.* This occurred when Billie was in his mid to late teen years. *Id.*; *see also* Ex. 500 at 38-39. This was the only evidence about physical abuse that the defense team presented to the jury, and the evidence was not shared with the mental health experts. *See* XI-40, 56-57 (Cuneo).

Thus, the defense had statements from various friends and family members strongly suggesting that Juanita Allen abused alcohol, and that she neglected and physically abused Petitioner. The only witness who provided testimony about these issues, however, was Raymond Petty, who had begun to disclose this information to the defense team before the final weekend prep session.

As Raymond Petty's trial testimony reflects, the defense team did not make a strategic decision to not present evidence of abuse. *See* I-130-33, 36 (Sindel); VI-74-75, 119 (Simon); VII-10-14; VIII-10-13, 197 (Randall). The defense team likewise did not make a strategic decision to not further investigate this evidence. *See* VIII-196 (Randall). Indeed, a defense document entitled "Factors that Affected Billie's Life" included "Physical abuse and beatings" as one of the relevant factors. *See* Ex. 505. Unfortunately, the time crunch that counsel had put themselves into

prevented them from thoroughly investigating the leads and red flags they learned indicating abuse, neglect, and dysfunction.  *See* IV-170-71, 202 (Sindel).

Abuse can be a "hidden secret" in families, IV-180-81 (Sindel), and the "idea of time is to be able to do enough interviews to break down some of the barriers that often exist both on racial situations, socioeconomic, and just whatever in order to try and explore as fully as possible what information" witnesses can provide, III-170 (Sindel).  The time "to be able to do enough interviews to break down" the natural barriers to disclosure of abuse had passed by February 1998, when, in the midst of trial, counsel first learned information that could have earlier led them to discover the "hidden secrets" of Billie Allen's upbringing. *See also* VI-96-97 (Simon) (explaining that mitigation investigation is a cyclical process that builds on itself); VI-200, 228-29 (Randall) (same).

### E.   Mental Health Mitigation

In September 1997, the defense retained Dr. Daniel Cuneo to perform a competency evaluation of Petitioner.  I-98-99 (Sindel); XI-16-17 (Cuneo).  At the time, Mr. Sindel and Dr. Cuneo conferred about the case, and Dr. Cuneo was sent a police report relating to the crime.  II-17 (Sindel); XI-17 (Cuneo).

Dr. Cuneo heard nothing more from Mr. Sindel until January 1998.  XI-17 (Cuneo).  On January 16, 1998, the same day that Dr. Randall joined the defense

28

team, Dr. Cuneo evaluated Petitioner for 1.5 hours at the jail. XI-25 (Cuneo). Although this brief evaluation focused on competency, by the beginning of February, the defense team intended to use Dr. Cuneo as its testifying mitigation expert. XI-22-26 (Cuneo). Dr. Cuneo had prior no experience in this role. XI-36, XII-71 (Cuneo).

Dr. Cuneo diagnosed Petitioner with PTSD, marijuana dependence, "Rule Out Dementia, NOS," and borderline intellectual functioning. Ex. 103 at 5. The PTSD diagnosis was based on the shooting death of Marquise Taylor, Petitioner's close friend. *Id.* Dr. Cuneo also noted Dr. Michael Gelbort's finding that Petitioner was brain damaged, and Dr. Cuneo reported "indications in his history" that "would be supportive" of the finding. *Id*. at 3.

The defense had retained Dr. Gelbort, a neuropsychologist, in early February, and Dr. Gelbort evaluated Petitioner on February 8, 1998, the evening before jury selection began. *See* Ex. 101. Dr. Gelbort reported a "high correlation" between Petitioner's test results and "frontal lobe and/or temporal lobe dysfunction." *Id.* at 5. Dr. Cuneo again visited and evaluated Petitioner at the jail on February 22, 1998, in preparation for his penalty phase testimony. *See* Ex. 55 at 2; Ex. 384; XI-113 (Cuneo). Drs. Cuneo and Gelbort testified at the penalty phase consistent with their reported findings. *See* Exs. 207-08.

Dr. Sean Yutzy, a psychiatrist, evaluated Petitioner for the Government on

February 16, 1998, after jury selection and the day before opening statements.  *See*

Ex. 584.  Dr. Yutzy reported and testified at trial that he was "unable to identify"

whether Petitioner had ever met the diagnostic criteria for PTSD or Depression.[9]  *Id*.

at 13-14; Ex. 214.  Dr. Richard Wetzel also testified for the Government, and he

disputed Dr. Gelbort's neuropsychological findings and opined that Petitioner did not

suffer from brain damage.  *See* Ex. 216.

The experts acknowledged that the time constraints at trial were highly

unusual.  *See* XI-28, 39; X-II-262 (Cuneo); VI-239-40 (Randall) (describing Dr.

Gelbort's concerns); Ex. 400 (same); XVII-121 (Yutzy) (testifying that he could not

recall any other capital case where his evaluation was not conducted until after trial

had already begun); *see also* XVI-110-11 (Wetzel); I-103, 115-16 (Sindel).

None of the experts were provided with information about abuse and neglect

in Petitioner's childhood,[10] and the experts recognized that they should have been

---

[9] Although the defense offered Depression as a mitigating factor, the defense experts at trial did not diagnose Petitioner with Depression.  Dr. Christopher Wuertz, a psychiatrist, had previously diagnosed Petitioner with "Depression, NOS."  XII-30 (Wuertz); Ex. 119.  Toward the end of the penalty phase, the defense attempted to contact Dr. Wuertz and would have called him as a witness, but they were unable to reach him.  IV-165-66, 180-81, 245-47 (Randall).  Dr. Wuertz could have testified both to the contents of his report and to his opinion that the report did not contradict a PTSD diagnosis, as Dr. Yutzy claimed.  *See* XII-37-39, 60-61 (Wuertz).

[10] Either Juanita or Billie Allen informed Dr. Cuneo that Juanita "physically disciplined [Billie] until [the] end."  Ex. 565 at 22; VII-193-94 (Randall); XI-160-63

30

given all of the available information and should have had time to incorporate all of the available information into their evaluations. *See* VIII-231-32 (Cuneo); *see also* XVI-104-06 (Wetzel); XVII-116-18 (Yutzy); VI-188, 229 (Randall).

### F.   Penalty Phase Presentation

At the penalty phase, the defense presented 34 lay witnesses and 2 expert witnesses over the course of about three days of testimony.  The testimony of most of the lay witnesses was quite short.  On March 2 and March 3, for example, the defense presented 12 and 15 lay witnesses, respectively.  The witnesses testified repetitiously that Petitioner was a follower, a good artist, non-violent, suffered from a skin condition, lacked a father figure, and was from a violent neighborhood where he had been traumatized by the shooting death of his close friend at his side.  The Government mocked the defense witnesses' near-uniform recitations about Petitioner's character.  *See*, *e.g.*, Trial Tr. Vol. 19 at 64 ("They can have 5,000 people come in here and say he's a follower not a leader. It did get ridiculous.").  But jurors were nonetheless receptive to some of the mitigating evidence.  *See* Exs. 57-58 (10 jurors finding that "Billie Allen has consistently demonstrated . . . the personality

---

(Cuneo).  In addition, Billie Allen told Dr. Yutzy that he had been subjected to "whippings" by his mother.  XVII-115-16 (Yutzy); Ex. 46 at 68.  Neither doctor followed up on these statements, and neither received the full extent of the information counsel learned in late February regarding abuse and neglect.

characteristics of a 'follower'").

With the exception of Raymond Petty Sr.'s testimony, described above, the penalty phase witnesses did not present evidence of childhood abuse and neglect. Rather, the defense portrayed Petitioner as having been raised by "a loving family"and a "caring mother," who taught him good values at home.  Trial Tr. Vol 14 at 58, Vol. 16 at 292, Vol. 15 at 267.  In addition, the defense presented the testimony of Drs. Cuneo and Gelbort, whose testimony was rebutted by Government experts Drs. Yutzy and Wetzel, as described above.

On both counts, the jury found each of the alleged statutory aggravators – grave risk and pecuniary gain –  and one of the three alleged non-statutory aggravators – finding that Petitioner's conduct was of a "substantially greater degree" than the crime as charged, while rejecting future dangerousness and victim impact.  Exs. 57-58.  Two of the statutory mitigators were found by some jurors, while one was rejected by all 12 jurors and one was found by all 12 jurors.  *See id.*  For present purposes, the most pertinent non-statutory mitigator findings were:

- only two jurors found, "Billie Allen's family was unable to assist him in dealing with his problems in making the transition from childhood to adulthood";

- only one juror found, "Billie Allen was born with a predisposition toward alcoholism or other substance abuse";

32

- only five jurors found, "Billie Allen has suffered from long-standing depression";

- only one juror found, "Billie Allen has an impaired ability to cope with stress."

- zero jurors found, "At the time of the offenses . . . Billie Allen suffered from post-traumatic stress disorder resulting from the shooting death of his best friend."

- only one juror found, "At the time of the offenses . . . Billie Allen was abusing marijuana in an effort to self-medicate for depression or other symptoms of post-traumatic stress disorder."

*Id.* No mitigators were submitted to the jury – and the jury found none – relating to abuse in Petitioner's childhood home. After reaching identical underlying findings on the two counts, the jury sentenced Petitioner to life imprisonment on Count 1 and death on Count 2. *Id.*

## III. Petitioner Was Prejudiced by Counsel's Errors

If counsel had begun meaningful witness interviews months before trial, they would have left themselves enough time to investigate further when mitigation witnesses began telling them about abuse and dysfunction in Petitioner's upbringing. Following those leads, numerous witnesses would have attested to their personal observations of Juanita Allen and other family members abusing, neglecting, and demeaning Billie throughout his childhood. Counsel could have provided this information to their mental health experts, who in turn could have followed up and

33

incorporated the information into their evaluations.  Because such unpresented evidence of a defendant's depraved childhood "may have influenced the jury's assessment of his moral culpability," confidence in the outcome of the penalty phase is undermined.  *Simmons*, 299 F.3d at 939.

As the Court is aware, Billie Allen's parents, Juanita and "Junior," had four children together – Billie and his three sisters, Nicki, Angela and Yvette.  Juanita and Junior lived together until Billie was about 8 or 9 years old.  For the last few years the parents were together, they lived on Evans Street near other members of Junior's family.  When they split up, Juanita took the children to her father's house on Cote Brilliante, where they stayed for the remainder of Billie's upbringing.  *See generally* IX-13-17 (Juanita Allen); XIV-85-86 (Nelson); XIV-107-08 (Angela Allen).

Both before and after Juanita and Junior split up, Billie Allen's upbringing was characterized by physical abuse, verbal abuse, parental alcoholism and drug abuse, neglect, and dysfunction.  Inevitably, these hardships affected Billie's emotional and psychological well-being.

### A.    Physical Abuse & Domestic Violence

In Billie's younger years, when the family lived together on Evans Street, he and his siblings were frequently exposed to loud arguments and domestic violence. IX-20-22 (Juanita Allen); X-9-13 (Yvette Allen); XV-16-19 (Corey Allen).  Yvette

described a fistfight between the parents that spilled out into the street, where Juanita knocked Junior down. X-12-13 (Yvette Allen). The violence was not limited to the parents; Billie endured whippings with belt buckles, extension cords, and his parents' bare hands. XV-16-19 (Corey Allen).

When Juanita moved with the children to Cote Brilliante, Billie's lot did not improve. Juanita would hit him with her fists and with an extension cord, a paddle, or a belt; she would throw at him anything she could grab – shoes, kitchen utensils, and other objects. II-15-16 (McLemore); IX-51-52, 99-100, 204 (Juanita Allen); X-37, 43, 65, 72 (Yvette Allen); X-114 (Johnnie Grant); XIV-13-14 (Ruffin); XIV-70 (Nelson); XIV-116-17, 124-25 (Angela Allen); XV-23 (Corey Allen); XV-60, 65 (Toliver). She would throw him up against the wall, she hit him in his head, chest, and arms, and she once threatened him with a knife. IX-51 (Juanita Allen); XIV-14 (Ruffin); XIV-116-17 (Angela Allen).

Sometimes Juanita beat Billie for a particular reason, in response to something he had or had not done. For example, when Billie was young, she beat him for wetting his bed or for wetting his pants. II-18-19 (McLemore). When other children picked on him and Billie failed to fight back, she also beat him. X-39 (Yvette Allen). Other times, she simply beat him out of rage, without apparent provocation, especially when she was intoxicated. II-17-18, II-57 (McLemore); X-39, 65-66

35

(Yvette Allen); XIV-115, 125 (Angela Allen); XV-17 (Corey Allen); XV-60 (Toliver); IX-47-48 (Juanita Allen).

There was nothing restrained or measured about these beatings. Juanita hit Billie "with all her might." XIV-72 (Nelson). She hit him "full strength" to "knock the wind out of him," and "just beat the crap out of him." X-16 (McLemore). She would hit him so hard that he couldn't breathe. X-72 (Yvette Allen). The beatings were plainly abusive and in fact were unlike anything else these witnesses had seen in their entire lives, "other than [in] movies." X-272 (Johnnie Grant); *see also* II-15 (McLemore); XIV-14 (Ruffin); XIV-75-76, 95-96 (Nelson).

Juanita's physical abuse of Billie occurred on a regular basis, not every day but multiple times per week. *See* II-17, 56 (McLemore); IX-101 (Juanita Allen); X-66, 71 (Yvette Allen); XIV-56-57 (Ruffin); XV-23 (Corey Allen); XV-61 (Toliver).

In response to the beatings, Billie would cry, beg her to stop, cower in a corner, and ball up and take it. II-15 (McLemore); X-45 (Yvette Allen); XIV-71, 73, 96 (Nelson); XV-20 (Corey Allen). Billie never fought back and never cursed at her. X-70 (Yvette Allen); XIV134-35 (Angela Allen). He sometimes suffered nose bleeds, X-71 (Yvette Allen), but possibly due to his eczema, witnesses did not observe bruises. *See* II-17 (McLemore); *see also* X-71 (Yvette Allen).

Juanita targeted Billie with her rage more than Billie's sisters. Juanita treated

the girls differently, and far better.  *See* X-47 (Yvette Allen); XIV-15-16 (Ruffin); XIV-69, 96 (Nelson).  In Juanita's words, Billie was "easy prey."  IX-84.

Billie's uncle, Jerome Petty, and grandfather, Otha Petty, also beat Billie. Jerome would punch Billie in the chest and arm.  II-20 (McLemore); IX-212-13 (Juanita Allen); X-25 (Yvette Allen); XIV-134 (Angela Allen).  Otha would strike him and  throw objects at him.  X-82, 111-12 (Johnnie Grant); XIV-133 (Angela Allen).

### B.    Verbal Abuse

Throughout Billie's childhood, Juanita had problems with emotional detachment, punctuated by episodes of rage, which were particularly severe when she was drinking alcohol.  *E.g.*, II-13 (McLemore); IX-47-49, 105 (Juanita Allen).  In her daughter's words, "I think she was always pretty mean."  XIV-103 (Angela Allen). Both when she was beating Billie and at other times, Juanita yelled, cursed, and demeaned him verbally.  II-14 (McLemore); X-81 (Johnnie Grant); XIV-13-14 (Ruffin); XIV-73 (Nelson); XV-14-15 (Corey Allen); XV-60 (Toliver).  Her verbal abuse included threats to "kick your ass" and accusations that Billie reminded her of Junior.  II-13-15 (McLemore).  Billie's sisters picked up on this behavior and also verbally "dogged" Billie.  X-81 (Johnnie Grant); *see also* XV-88 (Toliver).

37

## C.   Parental Alcohol & Drug Abuse

When the family still lived together on Evans, Billie and his siblings were directly exposed to drug and alcohol abuse, and the chaos that accompanied such conduct. *E.g.*, XV-13 (Corey Allen). The children regularly observed their father and other adults dealing and using drugs in the back alley. IX-16-18, 20-21 (Juanita Allen); X-6-8, 14 (Yvette Allen); XIV 108-09 (Angela Allen); XV-14-15, 27-29 (Corey Allen). Junior and his brother, (Uncle) Billy Wayne Allen, injected drugs right in front of young Billie, even nodding off into unconsciousness from drug intoxication. XV-14-15, 27-29 (Corey Allen).

While not a drug abuser, Juanita Allen abused alcohol, and her alcoholism grew worse over the course of Billie's childhood. She reached the point where she drank nearly every day, all day, and well past the point of intoxication. *E.g.*, II-11-12 (McLemore); IX-31–36, 39-45, 178, 201 (Juanita Allen); X-27 (Yvette Allen); X-83-84, 104 (Grant); XIV-76 (Nelson); *see also* XV-59, 64-65 (Toliver); Ex. 267 ¶4 (Shirlene Grant); Ex. 262 ¶4 (Raymond Petty), Ex. 272 ¶¶2-6 (Tabb). She was loud and belligerent when drunk. X-28 (Yvette Allen); XIV-10 (Ruffin).

Empty beer bottles littered her bedroom and much of the house. X-29 (Yvette Allen). She sometimes came home late at night so drunk that she went to the wrong house and would end up sleeping on a neighbor's porch or on the kitchen floor. X-

38

33-34 (Yvette Allen); XIV-112 (Angela Allen). She drank to the point of urinating and vomiting on herself. XIV-10 (Ruffin); XIV-105 (Angela Allen). In the morning, she would sometimes be too drunk or hungover to wake up and get the children ready for school. X-30 (Yvette Allen).

### D.    Neglect

Monette Petty Nelson, Petitioner's cousin, described the house on Cote Brilliante as a "free-for-all." XIV-69. The children were sometimes left alone overnight without adult supervision while Juanita went out drinking. X-21, 34-36 (Yvette Allen); XIV-96-97 (Nelson); XIV-105 (Angela Allen); IX-39, IX-168 (Juanita Allen). The house was often a mess, filthy and infested with bugs and rodents. X-77-78 (Johnnie Grant); XIV-110 (Angela Allen); XV-58 (Toliver). For a time, Billie slept on exposed mattress springs laid on the floor. X-77 (Johnnie Grant); Ex. 267 ¶6 (Shirlene Grant).

The house on Cote Brilliante, like the house on Evans, is in the Greater Ville neighborhood of St. Louis. In the 1980s and 1990s, socioeconomic, public safety, and public health risk factors in that neighborhood were as great or greater than anywhere else in St. Louis, and among the worst in the country. *See* Ex. 253 ¶ 3 (Stipulated Decl. of Colin Gordon, Ph.D.) His neighborhood was hyper-segregated, and devastated by population loss, physical decay, and poverty. Unsurprisingly, the

economic and demographic challenges led to high rates of violent crime, and low rates of educational attainment. *See* Ex. 253; Ex. 252 at 37-76.

Depopulation caused a high rate of vacant and abandoned property in the neighborhood. By 1989, when Billie was 12, barely a third of the housing stock in the neighborhood was sound. On Billie's block alone in the 1990s, there were seventeen vacant properties. *See* Ex. 252 at 59-62. In 1995, when Marquise Taylor was killed, the neighborhood was placed in the City's highest category for rates of homicide and violent crime with child victims. *See id.* at 66, 72-74.

In this harsh and violent neighborhood environment, Juanita locked Billie out of the house for real or perceived transgressions. X-39-42 (Yvette Allen); XIV-13, 15 (Ruffin); XIV-116 (Angela Allen); XV-23-24 (Corey Allen); Ex. 267 ¶6 (Shirlene Grant). Despite his pleading, Juanita would refuse to let him back into the house, and Billie would be forced him to sleep on the porch or to find another place to stay. X-39-42 (Yvette Allen); X-84-85 (Johnnie Grant). These incidents began when Billie was still in junior high school. XIV-76-77 (Nelson); X-84-85 (Johnnie Grant).

### E.    Dysfunction

The pernicious aspects of Billie's upbringing were not offset by nurturing or affection. When not acting and speaking to Billie in an abusive way, Juanita was emotionally (or physically) absent. *See* X-48-49 (Yvette Allen); XIV-113, 118-19

40

(Angela Allen); IX-47-49, 105 (Juanita Allen). Billie's sister Angela recounted a time when, expecting her mother not to come home that night, Angela left the house, but Juanita was home when Angela returned. Juanita forced Angela to strip naked, examined her to see if she had had sex, and then hit her with a board. XIV-112-13 (Angela Allen). Such was the parenting in Billie's home, and it left him and his siblings numb to violence and without a safe haven. *See* X-13, 48-49 (Yvette Allen).

### F.   Mental Health Impacts

As a matter of common sense and well-accepted science, childhood abuse, neglect, and exposure to violence can cause life-long mental health problems, and can increase an individual's susceptibility to Posttraumatic Stress Disorder (PTSD) and Depression. *See* XVI-88-91, 127 (Dr. Wetzel); XVII-36 (Yutzy); XI-45-46, 51-52 (Cuneo); XII-73-75, 182, 185-86, 251 (Cuneo); XIII-A-35-44 (Martell).

Indeed, contrary to its expert's testimony at trial, the Government's post-conviction expert now acknowledges that Petitioner suffered from depression "throughout much of his later childhood," XVII-180, 238 (Askenazi),[11] and met the criteria for a PTSD diagnosis after Marquise Taylor's death, XVII-181, 238

---

[11] At trial, the Government succeeded in persuading most of the jurors to reject the mitigating factor that "Billie Allen has suffered from long-standing depression." Ex. 57 at 9 (only five jurors finding this mitigating factor); Ex. 58 at 10 (same).

(Askenazi).[12] These are significant mental disturbances that Petitioner endured in the

midst of a bleak and depraved upbringing.

Dr. Cuneo testified in detail about how the mental health defense presentation

at trial was impacted by not having information about abuse, trauma, and parental

substance abuse:

> There would have been two factors there, one of which would have helped a jury further see Billie Allen as to how he got to where he was at that point when he was convicted of murder. You would have seen his background. The other thing that you would have seen is it would have further supported the diagnosis of Post Traumatic Stress Disorder, because it would have laid a framework of abuse beforehand, and trauma beforehand. . . .
>
> What happens is marijuana in turn is a way to self medicate. And he continued to self medicate. That's what happens a lot of times with drugs, instead of seeking treatment and trying to deal with the issue, people end up  becoming a substance abuser, they have a mental illness and they medicate with that. And what in turn happens is the drugs further impair one's judgment and further impair one's impulse control. . . .
>
> What happens with post traumatic stress is it's the unpredictability of violence. Violence in itself causes difficulty. If it's unpredictable, you're always waiting for the other shoe to drop, and you never know when it's going to occur, so you keep on a constant edge.  If he had no safe place to go, he never had a place to deal with the trauma. When you start looking at kids that came from horrendous neighborhoods, horrendous

---

[12] At trial, the Government succeeded in persuading all twelve jurors to reject the mitigating circumstance that, "At the time of the offenses for which he stands convicted, Billie Allen suffered from post-traumatic stress disorder resulting from the shooting death of his best friend." Ex. 57 at 9-10; Ex. 58 at 10.

things, some survive. And one of the big factors that they can survive even in a horrendous neighborhood is to have a strong family background or to have somebody, one adult figure they can trust.

XI-58-61. Dr. Cuneo explained that "trauma is cumulative" and that abuse, neglect and exposure to violence can have psychological impacts, especially on children, aside from PTSD. XII-73-75. He explained that Petitioner's childhood would have led him to perceive abuse and violence as normal, and to minimize them. XII-185-86.

The unpresented testimony would have shown that, contrary to defense presentation, Petitioner had neither "a strong family background" nor the "one adult figure" he could trust. Instead, at home and on the streets, Billie Allen was surrounded and shaped by unconscionable violence and neglect. The jury should not have been required to decide his fate without first hearing this evidence.

## IV.   Analysis

Three questions are dispositive of the issue before the Court:

- whether the evidence of childhood abuse and neglect was "reasonably available" to trial counsel;

- whether trial counsel made a reasonable strategic decision not to follow investigative leads about, and not to present, such evidence; and

- whether, considering the unpresented evidence together with the evidence presented at trial, there is a reasonable probability that at least one juror would have voted for life.

43

Answering these questions demonstrates that relief is warranted.

**A.    The Unpresented Evidence Was "Reasonably Available"**

Trial counsel had a duty to investigate Petitioner's background for "all reasonably available mitigating evidence." *Wiggins*, 539 U.S. at 524; *Sinesterra*, 600 F.3d at 907. The evidence of abuse and neglect was available to them. During the weekend prep session, multiple witnesses revealed information indicating that Juanita Allen abused alcohol and had subjected Petitioner to physical abuse and neglect as a child. This information obviously opened "pertinent avenues for investigation," *Porter*, 558 U.S. at 40, that counsel should have followed up on, but did not. The lack of follow up was directly attributable to counsel's failure to utilize most of 1997, or at a minimum the last 4 months of 1997, to begin meaningful interviews of potential penalty phase witnesses. Had counsel interviewed those same witnesses in the fall of 1997, their initial disclosures would have led to the wealth of mitigating information now before the Court. *E.g.*, IV-170-71, 202 (Sindel); XIV-20-27 (Ruffin). But by obtaining these leads just days before penalty phase began, counsel could not complete the thorough investigation that the Sixth Amendment required.

This conclusion is unaffected by evidence that Juanita Allen and Petitioner denied or failed to disclose their troubled history. *See* I-167-68, III-169, IV-179-80, 185, 215-16 (Sindel); V-48-50, 73, 107, 144-45 (Simon). First, as an issue of fact,

these denials did not affect scope of counsel's investigation and did not lead counsel to limit their investigation into issues of abuse. *See* VII-51, 196 (Randall). Indeed, such denials are not unexpected when dealing with issues of abuse. XI-45, XII-98-99, 249-50 (Cuneo); VII-83, VIII-180-81 (Randall). Second, as a matter of Supreme Court precedent, counsel's duty to investigate thoroughly is not excused even where a client is "actively obstructive" and sends counsel on "false leads," *Rompilla*, 545 U.S. at 381, or where the client is "fatalistic or uncooperative" and directs counsel not to talk to important witnesses, *Porter*, 558 U.S. at 40. Any denials of abuse here gave counsel nothing more than rudimentary information about Petitioner's "history from a narrow set of sources." *Wiggins*, 539 U.S. at 524. Investigation that is limited to a narrow set of sources does not fulfill counsel's duty to investigate thoroughly. *See id.*

## B. Trial Counsel Did Not Make a Reasonable Strategic Decision to Limit the Scope of the Mitigation Investigation

The evidence presented at the hearing clearly demonstrates that counsel's mitigation investigation was limited only by the time constraints in which they put themselves. Counsel made no strategic decision to not present evidence of abuse. *See* I-130-33, 36 (Sindel); VI-74-75, 119 (Simon); VII-10-14; VIII-10-13, 197 (Randall). Mr. Sindel's elicitation of Raymond Petty's testimony plainly refutes any

45

suggestion that counsel made such a decision. *See* Ex. 213 at 26-27 (Trial Tr. Vol. 18 at 37-38).

In any event, the more precise legal issue is whether counsel made a reasonable strategic decision to not "investigate further" the evidence of abuse, neglect, and dysfunction. *Wiggins*, 539 U.S. at 527. Again, the evidence adduced at the hearing shows that no such decision was made. *See* IV-170-71, 202 (Sindel); VIII-196 (Randall); Ex. 505. Moreover, any such decision would have been unreasonable. "In assessing the reasonableness of an attorney's investigation," the Court "must consider not only the quantum of evidence already known to counsel, but also *whether the known evidence would lead a reasonable attorney to investigate further*." *Wiggins*, 539 U.S. at 527. The information that counsel learned at the witness prep sessions at the end of February 1998 was precisely the type that "would lead a reasonable attorney to investigate further." *Id*.

## C.      Consideration of All the Available Evidence Establishes a Reasonable Probability of a Different Outcome

The unpresented evidence here is precisely the type of evidence that the Supreme Court and Eighth Circuit have relied on to find prejudice in a legion of cases. *See Porter*, 558 U.S. 30 (prejudice based in part on counsel's failure to present evidence of childhood physical abuse); *Rompilla*, 545 U.S. at 390-92 (same as to

46

parental alcoholism, abuse, and neglect); *Wiggins*, 539 U.S. at 534-35 (same as to childhood privation and physical and sexual abuse); *Williams*, 529 U.S. at 396 (same as to childhood neglect and abuse); *Simmons*, 299 F.3d at 939 (same as to childhood abuse and trauma). As the Eighth Circuit has explained:

> During the penalty phase, Simmons's attorneys could have presented evidence of Simmons's background to demonstrate that his compulsive, violent reactions were the result of an abusive and traumatic childhood. Further, a vivid description of Simmons's poverty stricken childhood, particularly the physical abuse, and the assault in Chicago, may have influenced the jury's assessment of his moral culpability. Our confidence in the outcome of the McClendon trial has been undermined by Simmons's attorneys' failure to include the details of Simmons's background during their penalty phase presentation.

*Simmons*, 299 F.3d at 939.

Further, this was an unusually close case. In weighing two capital charges for a single homicide, the exact same number of jurors voted for each statutory and non-statutory aggravating and mitigating factor on each count. *See* Exs. 57-58. Only when confronted with the final determination – "whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist" so as to warrant a death sentence – did the jury's findings diverge. *See id.* Then, the jury voted for life on Count 1 and death on Count 2. *Id.* These split findings certainly suggest a close case at the penalty phase and thus undermine confidence in the outcome here. *See, e.g., United States v. Wisecarver*, 598 F.3d 982, 990 (8th Cir.

47

2010) (relying in part on the record of a "somewhat close case" to find prejudice).

There is also a reasonable likelihood of a different outcome because the unpresented evidence would have explained and rebutted a number of problems that plagued the defense case. For example, the Government exploited the defense's misleading portrayal of Petitioner as having "a loving family"and a "caring mother," who taught him good values at home. Trial Tr. Vol 14 at 58, Vol. 16 at 292, Vol. 15 at 267. The Government argued that:

> This defendant had a lot of choices, he had a lot of support, he had a lot of help. At Clayton grade school, his family, his cousins, he had a lot of friends, and he always made the wrong choices, always, from selling drugs to using drugs, to quitting school, to refusing to work, to committing the crimes that have been described here to you . . .

Trial Tr. Vol 19 at 110. Against the backdrop of this supposed family support system, the Government portrayed Petitioner as ungrateful and obsessed only with selfish pleasures. *See id.*; *see also id.* at 64. ("He smoked pot to self-medicate. I think he smoked pot because he liked to get high. And he always did what he wanted to do, not what he should do.").

The Government also exploited the portrayal of Petitioner's loving and supportive upbringing to contest the defense mental health presentation. For example, the Government contended that Petitioner did not meet the PTSD diagnostic criterium of "persistent avoidance," because Petitioner did not avoid the streets

48

around his home after the Marquise Taylor shooting. *See id.* at 61-62; Trial Tr. Vol. 18a at 10; Ex. 584 at 13; *see also* fn.8, *supra*. An accurate description of Petitioner's upbringing would have demonstrated that he had no safe haven – certainly not at home – that would have enabled him to avoid the violence on the streets. XI-61 (Cuneo). Indeed, the Government's own expert now concedes Petitioner's history of mental illness, *see* XVII-180-81, 238 – evidence that the Government at trial vehemently and successfully urged the jury to reject. *See* Trial Tr. Vol 19 at 104 ("Post-traumatic stress disorder does not exist. The diagnosis in this case is not PTSD; it is cold-blooded killer."); *see also id.* at 61-64; Exs. 57-58.

Under all of these circumstances, there is a reasonable likelihood that at least one juror would have voted for life on both counts, if the defense had collected and presented the available evidence of Petitioner's troubled upbringing.

WHEREFORE, for the above reasons and the reasons set forth in Petitioner's prior

pleadings, this Court should vacate Petitioner's death sentence and grant relief.


Respectfully Submitted,


/s/ Timothy Patrick Kane
Timothy Patrick Kane
James Henry Moreno
Eric John Montroy
Assistant Federal Defenders
Capital Habeas Unit
Federal Community Defender Office
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
 (215) 928-0520



Dated:       June 6, 2013

## CERTIFICATE OF SERVICE

I hereby certify that on June 6, 2013, the foregoing *Petitioner's Post-Hearing Brief* was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the following:

Ms. Carrie Constantin
Assistant United States Attorney
111 South 10th Street, 20th Floor
St. Louis, Missouri 63102

Mr. Steven Holtshouser
Assistant United States Attorney
111 South 10th Street, 20th Floor
St. Louis, Missouri 63102.


/s/ Timothy Patrick Kane
Timothy Patrick Kane
Counsel for Petitioner