**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| BILLIE JEROME ALLEN, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 4:07 CV 27 ERW |
| | ) | [This is A Capital 2255 Case] |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

**GOVERNMENT'S POST-HEARING BRIEF**

COMES NOW the United States of America, by and through the United States Attorney

for the Eastern District of Missouri, Richard G. Callahan, and Steve Holtshouser and Carrie

Costantin, Assistant United States Attorneys for said district, and files its Post-Hearing Brief[1]:

## I.    PROCEDURAL HISTORY

In 1998, defendants Norris Holder and Billie Allen were convicted after separate trials of

killing a security guard, Richard Heflin, during the commission of an armed bank robbery, in

violation of 18 U.S.C. §2113(a) and (e) (Count I), and using and carrying a firearm during the

commission of a crime of violence that resulted in the death of another person under

circumstances constituting first-degree murder, in violation of 18 U.S.C. §924(j) (Count II). In

accordance with the jury's recommendation, defendant Allen was sentenced to life imprisonment

without parole on Count I and death on Count II.

In a decision that predated the Supreme Court's decision in *Ring v. Arizona*, 536 U.S. 584

(2002), the Eighth Circuit affirmed the defendants' convictions and death sentences, expressly

rejecting defendant Allen's claim that the indictment, which failed to allege the capital eligibility

facts of at least one aggravating factor and one mental intent factor, violated the Fifth

---

[1] The Government incorporates by reference its Sur-Reply re Allen's Petition, Doc. 110, pages 76-129.

1

Amendment. *United States v. Allen*, 247 F.3d 741, 761-764 (8th Cir. 2001)(*Allen I*).

Subsequently, *Ring* overruled precedent and held that statutory aggravators factors were the

functional equivalent of elements in a capital case and therefore needed to be found unanimously

and beyond a reasonable doubt by the petit jury. *Ring* also required such elements to be

considered by the Grand Jury and alleged in the indictment. Supreme Court granted defendant

Allen's certiorari petition, vacated the Eighth Circuit decision, and remanded the case for

reconsideration in light of *Ring*. *United States v. Allen*, 536 U.S. 953 (2002). On reconsideration,

a divided panel of the Eighth Circuit held that the indictment error was not harmless and vacated

Allen's death sentence. *United States v. Allen*, 357 F.3d at 745 (8th Cir. 2004) (*Allen II*). The

majority therefore ordered that the death penalty be vacated. In a rehearing en banc, the Eighth

Circuit affirmed the convictions and sentence, holding that the Fifth Amendment defect in

Allen's indictment was non-structural and the error was harmless. *United States v. Allen*, 406

F.3d 940 (8th Cir. 2005) (*en banc*) (*Allen III*). Thereafter, the Supreme Court denied Allen's

petition for a writ of certiorari, *United States v. Allen*, 127 S.Ct. 826 (2006), and further denied

his petition for rehearing, *United States v. Allen*, 127 S.Ct. 1361 (2007).

Allen timely filed a petition for relief under Title 28, U.S.C., § 2255. This Court granted a

hearing on the singular issue of whether Allen's trial counsel were ineffective in connection with

the mitigation investigation. Memorandum and Order (Doc. 147). More specifically, this Court

reviewed "what actually took place during the sentencing proceedings" by reviewing the penalty

phase evidence and the mitigators submitted to the jury. *Id*. at 45-49. This Court then reviewed

the particular factual claims in support of Allen's ineffective assistance claim and determined

that Allen was entitled to a hearing "assuming the veracity of Allen's factual allegations and of

the statements in the declarations he has submitted in support of his Motion." *Id*. at 59. The

2

declarations which the Court found worthy of discussion in granting the hearing were those of trial counsel, Dr. David Randall[2], Dr. Pablo Stewart[3], and Dr. Daniel Martell[4]. More importantly, this Court found that Allen was entitled to a hearing based on two declarations as the "primary sources of evidence" that "counsel failed to obtain readily available evidence of a much more severe history of abuse than was actually depicted at sentencing". *Id*. at 60. These were the declarations of Juanita Allen and Billy Wayne Allen[5]. The order granting a hearing was premised on their recollections being "accurate and not misleading." *Id*. at 61.

The hearing was conducted in phases over a total of approximately 6 weeks during 2012. Allen filed his post-hearing brief on June 6, 2013 (Doc. 351). Had this Court known prior to the hearing that Dr. Randall was not credible, that Dr. Stewart would not actually testify, that Dr. Martell's results would be eviscerated on cross-examination, that Billy Wayne Allen would not actually testify and that Mrs. Allen would contradict much of her declaration, this Court might not have granted the hearing in the first instance.

## II.    **LEGAL STANDARDS**

To prevail on an ineffective assistance of counsel claim, Allen must satisfy both requirements set forth in *Strickland v. Washington*, 466 U.S. 668 (1984): (1) that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by

---

[2] A series of specific allegations by Dr. Randall were highlighted by the Court at pages 51-53 of its Memorandum and Order, Doc. 147. The Government submits that the evidence at the hearing established that the majority of these were proven to be inaccurate, misleading or the result of failing to review the trial record and defense file prior to preparing his declaration. At the hearing, this Court expressed serious misgivings, putting it mildly, about Dr. Randall's credibility. Vol. III at 136. In addition, at the hearing Dr. Randall essentially admitted that he had perjured himself during the hearing in support of Allen's motion for a continuance when he stated that a continuance of 120 days would be an adequate extension.

[3] Dr. Stewart's declaration was a major contributor to this Court's determination that a hearing was warranted. Yet, Dr. Stewart was not called by Allen at the hearing and none of his opinions constitute evidence in this case.

[4] Suffice it to say that by the end of his testimony, Dr. Martell's significant conclusions were proven to be wrong, inaccurate or the result of sloppy errors.

[5] Billy Wayne Allen was another key witness relied upon by this Court to grant a hearing but then Billy Wayne Allen was not called to testify at the hearing. Among his statements, he claimed that a member of the trial team told him to not attend the trial and stay away. During the hearing, no member of the trial team admitted making such at statement to Billy Wayne Allen.

3

the Sixth Amendment"; and (2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 687, 694. The Eighth Circuit recently revisited these principles in Allen's companion case, *Holder v. United States*, ___ F.3d ___, 2013 WL 394321 at 4-5 (8th Cir. 2013). In *Holder*, the Court held that the District Court had not erred in refusing to even conduct an evidentiary hearing on a claim of ineffective assistance for failing to investigate and present additional mental health expert evidence.

### A.  Deficient Performance

The first requirement is that Allen must show that counsel's performance was deficient, measured by an objective standard of reasonableness "in light of professional norms prevailing when the representation took place." *Sinisterra v. United States*, 600 F.3d 900, 906 (8th Cir. 2010). There is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *United States v. Rice*, 449 F.3d 887, 897 (8th Cir. 2006). The Supreme Court held that "[s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," and "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91.

With respect to "failure-to-investigate" claims, the Eighth Circuit in *Holder* turned to *Strickland* for the "framework for evaluating counsel's actions":

> [S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

4

*Holder*, 2013 WL 3924321 at 12 (quoting *Strickland*, 466 U.S. at 690-91). The issue is whether undiscovered evidence was not simply discovered despite a reasonable investigation or whether the non-discovery was the result of "'inadequate trial preparation and investigation'" and "'neglect'". *Id.* (quoting *Laws v. Armontrout*, 863 F.2d 1377, 1385 (8th Cir. 1988).

The Supreme Court also stated that "[i]n light of the 'variety of circumstances faced by defense counsel [and] the range of legitimate decisions regarding how best to represent a criminal defendant,' the performance inquiry necessarily turns on 'whether counsel's assistance was *reasonable* considering all of the circumstances.'" *Wong v. Belmontes*, 130 S.Ct. 383, 384-5 (2009) (emphasis added). When there is a challenge to the adequacy of counsel's investigation, the Supreme Court stated: "In assessing the reasonableness of an attorney's investigation . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." Wiggins v. Smith, 539 U.S. 510, 527 (2003). The Eighth Circuit Court of Appeals stated "we must assess reasonableness on all the facts of the particular case, we must view the facts as they existed at the time of counsel's conduct, and we must evaluate counsel's performance with a view to whether counsel functioned to assure adversarial testing of the state's case." *Macrum v. Luebbers*, 509 F.3d 489, 502 (8th Cir. 2007).

Another instructive Eighth Circuit decision is *Ortiz v. United States*, 664 F.3d 1151 (8th Cir. 2011). The defendant in *Ortiz* claimed that his counsel were ineffective in failing to fully investigate and uncover evidence of his background in Colombia. In affirming the District Court's denial of relief under a § 2255 claim, the Eighth Circuit stated that the "focus is on whether the investigation was reasonable" based on "an objective review, measured against the prevailing professional norms at the time of the investigation." *Id.* at 15 (citations omitted). "It is

5

'a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time' without 'the distorting effects of hindsight.'" *Id*. (quoting *Strickland*, 466 U.S. at 689). Despite the lack of an investigation in Colombia and the lack of a single mental health examination, *Ortiz* held that the investigation was adequate where unsuccessful attempts to contact defendant's family had been made and there was no indication of mental or psychological problems. *Id*. at 16-17.

In sum, the touchstone for evaluating Allen's claim that his trial counsel failed to discover certain evidence of his background is *reasonableness* in light of all the circumstances known to counsel at the time.

### B. Prejudice

The second requirement under *Strickland* is that Allen show prejudice; that is, there is a reasonable probability of a different outcome if counsel had not rendered professionally deficient representation. The standard of "a reasonable probability" of a different outcome" is less than a preponderance of the evidence but greater than just a possibility; it "is a probability sufficient to undermine confidence in the outcome." *Paul v. United States*, 534 F.3d 832, 837 (8th Cir. 2008). In *Odem v. Hopkins*, 382 F.3d 846, 851 (8th Cir. 2004), the Eighth Circuit Court of Appeals held that "It is not sufficient for a defendant to show that the error has some 'conceivable effect' on the result of the proceeding because not every error that influences a proceeding undermines the reliability of the outcome of the proceeding."

As to any evidence that was not discovered or presented in trial, Allen must show that "'had the jury been confronted with this . . . evidence, there is a reasonable probability that [the jury] would have returned with a different sentence.' " *Wong,* 130 S. Ct. at 386 (quoting *Wiggins v. Smith*, 539 U.S. 510, 535-36 (2003)) (emphasis added). To evaluate this question, a court must

"consider *all* the relevant evidence that the jury would have had before it" rather than just the questioned evidence. *Id*. (emphasis in original). Allen must "show a reasonable probability that the jury would have rejected a capital sentence after it weighed the entire body of evidence (including the additional testimony . . .) against the entire body of aggravating evidence." *Id*. Allen has not met this burden.

### III.    SUMMARY OF FACTS

On March 17, 1997, Allen Allen and Norris Holder robbed the Lindell Bank and Trust and killed Richard Heflin. On March 18, 1997, a criminal complaint was filed against Allen. On March 19, 1997, the Federal Public Defender's office was appointed to represent Allen. On April 1, 1997, the Federal Public Defender withdrew and Richard Sindel was appointed. On April 16, 1997, Mr. Sindel spoke with Juanita Allen about mitigation topics including her son Billie Allen's school performance, dropping out of Sumner High School, school discipline, lead poisoning, convulsions, hospitalizations, and her attempt to have Allen evaluated at Providence Counseling. Ex. 301, pp. 1-8. In that conversation, Ms. Allen indicated that she expected Mr. Sindel to be forthright with her and that she would be forthright with him. Ex. 301, p. 1.

Mr. Sindel followed up with several letters to Ms. Allen seeking mitigation information. On April 25, 1997, he requested that she provide him with background information on the deaths of seven people close to Allen. Ex. 306. On April 30, 1997, Mr. Sindel asked Ms. Allen to provide him with names and contact information for doctors who treated Allen. He indicated that such information was necessary for a possible penalty phase. Ex. 307. On May 7, 1997, Mr. Sindel wrote a memorandum to the file listing some possible mitigation witnesses. Ex. 308. The same day, Mr. Sindel wrote to Ms. Allen requesting contact information on six mitigation

witnesses who had already sent letters in support of Allen. He also enclosed a list of names of possible witnesses provided by Allen and asked her assistance in locating them. Ex. 309.

On June 19, 1997, after being notified by the U.S. Attorney's Office of their intent to seek the death penalty, Mr. Sindel wrote to Mr. Kirby Heller at the Department of Justice formally requesting an opportunity to present to the Attorney General's Review Committee the reasons that the death penalty should not be sought against Allen. Ex. 311. Mr. Sindel identified additional mitigation witnesses in a July 14, 1997 memorandum. Ex. 312. Mr. Sindel submitted a twelve page memorandum to the Committee that argued against the Government seeking the death penalty. Ex. 610.

On August 8, 1997, the Government filed its Notice of Intent to Seek the Death Penalty against Allen. [Document 131].

On August 18, 1997, the Court issued an order that authorized Mr. Sindel to hire investigators, a paralegal and a mitigation specialist. Ex. 611. Connie Caspari-Supranovich was the paralegal on the case. Andy Rackers was the investigator.

In a later affidavit, Mr. Simon told the Court:

> As part of his representation of Mr. Allen, Mr. Sindel hired Craig Haney, J.D., Ph.D., in early September 1997, at which time Dr. Haney agreed to consult with counsel regarding mitigation in this case. Mr. Sindel sent Dr. Haney numerous documents, reports, and records following the initial contact.

Ex. 32, para. 4.

On September 24, 1997, John Simon was appointed as co-counsel. At the time, Mr. Simon was in private practice. He had been an Assistant Missouri Attorney General for eleven years. He was involved in habeas capital litigation for five years and handled over 700 habeas corpus cases. Vol. IV, p. 243; Vol. VI, pp. 8-9. Mr. Simon was the chair of the Missouri Bar

Committee on Criminal Law from 1995 to 1997. He was on the board of the Missouri Association of Criminal Defense Lawyers from 1998 to 2002. In 1996, he moderated two sessions for the Missouri Bar on ethical considerations for defense counsel in ineffective assistance of counsel proceedings. Vol. VI, pp. 6-8. Except for Allen, none of the persons he has represented as trial counsel received the death penalty. Vol. VI, p. 9.

After Allen's trial, Mr. Simon was a trial attorney for the Missouri Capital Public Defenders from 2006 to 2008. Vol. V, p. 18. In 2006, he received the Litigator of the Year award from the Missourians for the Abolition of the Death Penalty. Vol. V, p. 16. In 2008 he received the Atticus Finch Award from the Missouri Association of Criminal Defense Attorneys for his unflinching representation of unpopular individuals. Vol. V, p. 16-17. Mr. Simon received his J.D. from Yale University and his Ph.D from Harvard University. Vol. V., p. 17.

Mr. Simon told the Court that the attorneys had split responsibility for the case:

> As defense counsel for Mr. Allen have divided their work, appointed lead counsel for defendant Allen, Richard H. Sindel, is concentrating on the guilt-or-innocence phase, and appointed co-counsel John William Simon, is concentrating on the penalty phase (if any).

Ex. 32, para. 3.

On October 27, 29, and 30, Mr. Simon interviewed Allen by phone. Ex. 498, p. 2. On November 5, 1997, Mr. Simon interviewed Allen concerning mitigation issues. Ex. 319; Vol. V, pp. 20-27. By November 26, 1997, the trial team had obtained Allen's school records, psychiatric records from his admission to the Metropolitan St. Louis Psychiatric Center, inmate medical records, and St. Louis City Department of Health and Hospital records. Ex. 321. Dr. Randall, later hired as a mitigation specialist, testified that he was not aware of any additional records that were obtained after he entered the case in January 1998 or of any records later found

9

by the habeas attorneys. Vol. VII, p. 175. Dr. Randall testified that his statement in his declaration that "only a few records on Mr. Allen and his family had been collected" before he was in the case was a mistake. Vol. VII, p. 186.

By December 5, 1997, Allen had completed his autobiography and it was sent to Dr. Haney. Ex. 304, 323. In his autobiography, Allen stated that "Me and my mom were real tight" and that "my mom loved me to death." Ex. 304, pp. 2-3.

On December 12, 1997, John Simon interviewed Allen at the Franklin County Jail for 3.9 hours. Ex. 498, p. 5. He taped the interviews. Mr. Simon told Allen that he was interviewing him concerning mitigation issues. Mr. Simon stated:

> I'm gonna ask you to make an assumption for purposes of this conference that we're in trial and that the jury has found you guilty and that we are going to do, be doing the penalty phase. And what I'm gonna be focusing on is not what happened on St. Patrick's Day of 1997, but what hap-, everything, everything that happened in your life and in the lives of people very close to you. Uh, so that when, so that we will be able to do the best job we can of presenting our case to the jury if that same jury has found that you were one of the people who participated in, in the, uh, the bank robbery for which you're charged.

Ex. 632, p. 1.

Mr. Simon told Allen that his focus was the penalty phase:

> See, what I'm, what I'm focusing on more is, uh, I, I guess you could call it the, our constructive case in the penalty phase. And that is, can, can put the jury in a position where they cannot vote to kill you because they see you as a human being, the way your girlfriend and your mother and your, your uncles do.

Ex. 635, p. 25.

Mr. Simon was concerned about potential aggravating evidence as well. He told Allen:

> Simon: Now, see, of, of course, keep in mind that the focus of, of this discussion, the focus of the inquiry that I'm working on as of this point, is not on, on whodunnit.

10

> Allen:  Right.
>
> Simon: It's, it's not on the bank robbery. Uh, it uh, the stuff that, I mean, I need to know what, what the government is gonna be able to develop in the penalty phase concerning your involvement with drugs. And, I mean, now keep in mind that I'm trying to figure out what cards are in the deck now.

Ex. 634, p. 28.

When interviewing Allen, Mr. Simon used the Mitigation Checklist provided to him by Kevin McNally, one of the National Resource Capital Counsel for Federal Capital Defense. Vol. V, p. 43. The Mitigation Checklist is a six-page list of "symptoms and indicators which may be helpful in identifying mitigation." Ex. 628, p. 1. It contains references to the mitigation workbook provided by the National Resource Capital Counsel. Vol. V, p. 44. The mitigation workbook contains sources to look at concerning the specific mitigation factors. Vol. V, p. 45.

The Mitigation Checklist covered topics such as prenatal (alcoholic mother, mother physically abused), birth complications, childhood illnesses/accident (ingestion of toxic substances, head trauma/loss of consciousness), drugs/toxic chemicals (substance abuser, industrial worker (chemical exposure)), school performance, physical features, chronic illnesses/conditions, social history (suicidal episodes, victim of violence/trauma, truancy, travel/runaway for no apparent purpose, periods of depression), sexual, sleep (insomnia, consistent nightmare), personality and behavior (depressed demeanor), interpersonal (fears abandonment), parent profile (alcoholic, intermittent parent, instability), domestic violence (physical, sexual, psychological, parental violence), neglect (childhood malnutrition, no medical help for serious illness, no child caretaker for long periods), tragedy (significant other death), psychoactive substances (admitted use, physical issues including blackouts, behavioral), race/sex of defendant, poverty, age, incarceration (no disciplinary reports, family contact maintained, guard/counselor/warden support), lingering doubt, intention, domination or duress by co-

11

defendant (defendant dependent personality), good person (remorse, confession, lack of criminal history, religion). Ex. 628, pp. 1-6.   Mr. Simon testified that he covered the areas on the Mitigation Checklist with Allen. Vol. V, p. 50.

During the December 12, 1997 interview, Allen told Mr. Simon that his father was drunk all the time. Ex. 632, pp. 2-3. He stated that he did not associate with his father and that he cared about his mother more because she was there for him. Ex. 634, p. 36. Evidence that Allen's father was an alcoholic who did not have contact with the family was presented at trial. Ex. 196, p. 9 (trial testimony of Yvette Allen); Ex. 197, p. 4 (trial testimony of Angela Allen).  Allen told Mr. Simon about his church involvement and directed Mr. Simon to his aunt Lucy McLemore for details. Ex. 632, pp. 9-10. Allen also told Mr. Simon that he attended bible school with his uncle Raymond Petty. Ex. 632, p. 12. At trial, evidence of Allen's church participation was introduced. Ex. 183, p. 4 (trial testimony of Claude McLemore). Allen explained his involvement in the Boy Scouts to Mr. Simon. Ex. 632, pp. 14-19.

Mr. Simon questioned Allen about his chronic illnesses. Ex. 632, p. 21. Allen recounted his problems with asthma, including an attack at camp that led to his hospitalization. Ex. 632, p. 30-31. Ahmed Oliver, who was at camp with Allen, testified concerning the asthma attack. Ex. 187, p. 29 (Trial testimony of Ahmed Oliver). Allen told Mr. Simon about his softball team, his friends, and his teachers,   Ex. 632, pp. 22-23, 25, 28; Ex. 633, p. 4. Many of these people testified in the penalty phase of the trial. Ex. 179 (John Lents), 180 (Ann Edmonds), 184 (Susan Duke), 189 (Joyce Eaton), 194 (Stephanie Stock), 201 (Julie Ellis), 206 (Russell Vanecek), 211 (Barbara Murrell), 209 (Sam Moore).

Allen denied that his father beat his mother or the children. Ex. 633, p. 3; 638A, p. 3. He told Mr. Simon that he had a positive childhood:

12

> That's what, I mean, every, everybody who knows me says I had a good childhood…You know all since I was, you know, young, I always had a real good childhood. I had people that cared for me. People who cared and just wanted to be there for me, you know.

Ex. 633, p. 4.

Allen told Mr. Simon about the murders of two other friends: Dennis Noble and Me'man." Ex. 633, p. 11; Vol. V, p. 84. He described in detail the murder of his friend Marquis Taylor that occurred in front of him. Ex. 633, pp. 24-25. Allen told Mr. Simon that "I just haven't been right since then." Ex. 633, p. 25. He told him that he smoked marijuana and had worked as a drug mule. Ex. 633, p. 30; Ex. 634, pp. 5-6. He described his work on rap music. Ex. 634, pp. 2, 3, 14.

During the December 12, 1997 interview, Mr. Simon made it clear to Allen that he was gathering as much information as possible and was not creating a certain narrative at this point. Mr. Simon stated:

> Because of, this, this, this is not some kind of deal where we're gonna create a posture or whatever. We're, we're trying to find, figure out what we have to go on and, you know, then we'll…Decide what cards we play. But I'm just trying to find out what, what cards we are in the deck.

Ex. 634, p. 19.

Allen then bluntly described his drug dealing. He said that drug dealing occurred from a house down the street from his mother's house and that the dealer fronted Allen drugs. Ex. 635, pp. 3-4. He stated that he started to deal drugs while he was in school. Ex. 635, p. 6. Allen's defense counsel did not present evidence of his drug dealing during the mitigation phase; in fact, in closing arguments Mr. Sindel argued that Allen was not a drug dealer:

> They couldn't find a single person who said that Billie Allen ever sold drugs to him. There may be some peppermint candy floating

13

out there, but in terms of this significant criminal history, take a look at it and think about what you heard.

Ex. 218, p. 37.

In the December 12, 1997 interview, Allen told Mr. Simon about his visit to the Metropolitan Psychiatric Unit. He told him that he had been stressed about his mother's house being shot up. Ex. 635, p. 9; Vol. V, p. 99-100. Both Allen's girlfriend Tasha and her mother testified about his admission to the Metropolitan Psychiatric Unit. Ex. 190 (trial testimony of Latasha Valentine); Ex. 191(trial testimony of Martha Burns).

On January 7, 1998, Mr. Simon interviewed Allen again about mitigation for 3.1 hours at the Franklin County jail. Vol. V, pp. 106, 109; Ex. 498, p. 7. Mr. Simon told Allen "we are gonna continue talking about some of the mitigation evidence that we talked about two weeks ago." Ex. 638A, p. 1. Mr. Simon had the mitigation checklist with him for the interview. Vol. V, p. 110; Ex. 636, p. 8. The interview was taped. Vol. V, p. 110. Mr. Simon asked Allen again if he had been physically abused:

> Simon: Uh, one question that, that I had that I probably asked last time that we need to be absolutely sure on is whether when you were growing up, uh, you were subject to physical abuse at any point by anybody?
> Allen: No.

Ex. 638A, p. 1.

Allen denied that his father had abused anyone in the household:

> Now, during that period when you and your mother and your father lived in the same house, did, did he abu-, did he physically abuse anyone else in the household?
> Allen: Uh uh. He, like I said, he was pretty much scared of my uncle, so.

Ex. 638A, p. 3.

Allen stated that his father was the only family member who used alcohol.

> Simon: Was your uh, your father the only member of the
> household who uh, used or had alcohol?
> Allen: Yeah.

Ex. 638A, p. 12.

He stated that his father moved out when Allen was 8 or 9 years old. Ex. 638A, p. 3. Allen told Mr. Simon that he had left his job at Chemsico because the chemicals made him sick. Ex. 638A, p. 18. He said that he had smoked about an ounce of marijuana a week. Ex. 638A, p. 22. He denied using heroin or cocaine stating that "No, I'm, I'm a strong-minded person. (inaudible), I'm a real strong-minded person. A person can't talk me into doing anything. I don't care if the whole group was doing it. I wouldn't do it." Ex. 638A, p. 23. Allen told Mr. Simon that he had written a rap song about robbing the Casino Queen gambling riverboat. Ex. 638A, p. 32. Allen stated that he had slipped on the grass while boxing with his uncle and had struck his head on a gate. Vol. V, p. 113-14. He never told Mr. Simon that his uncle had physically abused him. Vol. V, p. 114.

Allen told Mr. Simon that he had never been sexually abused. Ex. 638B, p. 10. He stated that all his nightmares were about Marquis getting shot and Allen being shot. Ex. 638B, p. 16. Mr. Simon's questions tracked the topics of the mitigation checklist provided by Kevin McNally of the Capital Federal Public Defenders. Vol. V, p. 118. Allen made only positive statements about his mother to Mr. Simon during the December and January interviews. Vol. V, p. 120.

On the night of January 7, 1998, Mr. Simon met with potential mitigation witnesses at Juanita Allen's residence. Vol. V, pp. 104-5. He met with Juanita Allen, Deborah Ruffin, Otha Petty, Sr., and Yvette Allen or another sister at 9 p.m. Vol. V, pp. 105-6. He took notes of his meeting. Vol. V, pp. 103-4. Juanita Allen told Mr. Simon that she did not drink while pregnant

15

with Allen but did smoke. Vol. V, p. 107; Ex. 500, p. 60. She told him that Allen did not come from a bad environment. Ex. 500 p. 60. Juanita Allen chided Mr. Simon during the meeting, stating "You're looking for something extremely negative. There is no complete diagram for any situation." Ex. 500, p. 60. Mr. Simon believed that Ms. Allen was impaired due to alcohol in that meeting; he did not recall any other time that he observed that she was impaired. Vol. V, p. 108. Mr. Simon testified that it was his experience that Ms. Allen was going to be straight with him. Vol. V, p. 197. He did not dispute her honesty or good will. Vol. V, p. 197.

On January 8, 1998, Mr. Simon met with Allen concerning mitigation for 1.4 hours. Ex. 498, p. 7; Vol. V, p. 121. When Mr. Simon interviewed Allen on January 7 and 8, 1998, he was guided by the mitigation checklist provided to him by the Capital Public Defenders. Vol. V, p. 122. Mr. Simon did not know if he taped the meeting on January 8 but he did take notes. Vol. V, p. 122. According to Mr. Simon's notes, Mr. Simon specifically asked Allen "Mom drink?" Ex. 500, p. 57; Vol. V, p. 123. Allen denied that his mother drank and said that she "stays stressed out" instead of drinking alcohol. Ex. 500, p. 57; Vol. V, p. 123-5.

On January 8, 1998, Mr. Simon prepared the "Life History" of Allen. Ex. 498, p. 7. In preparing the life history, Mr. Simon used information from his interviews of Allen on December 12, 1997, and January 7 and 8, 1998. He also used information from other witnesses he contacted. Vol. V, p. 125-6; Ex. 303 (life history). The mitigation checklist included parental alcohol abuse. Vol. V, p. 126. Mr. Simon's life history stated that Allen's father was always drunk; it did not indicate that his mother was an alcoholic. Vol. V, p. 126-7. The life history did not indicate that Allen was a victim of violence from his mother. Vol. V., p. 127.

In preparing the life history, Mr. Simon also interviewed Lucy McLemore (aunt), Raymond Petty (uncle), Otha Petty Sr. (grandfather), a church secretary, and a person who

16

indicated that Flexx, the producer, had moved to Atlanta. Vol. V, p. 128-129. The only items that Mr. Simon recalled that he left out of Allen's life history were that Allen was a drug mule and drug dealer and that Allen denied that his mother drank. Vol. V, p. 134. Background information, such as a life history, is typically given to a psychiatrist or psychologist in order to render an opinion on mitigation factors. Vol. V, p. 135-6. Any information provided to the psychiatrist or psychologist would have to be produced to the Government. Vol. V, p. 136. Thus, Mr. Simon had a vested interest in omitting negative information about Allen—such as his drug dealing— since the life history would be provided to the defense mental health expert and would be discoverable by the Government.

The life history prepared by Mr. Simon included information about Allen's parents and sisters and his sisters' ages, that his father had a child out of wedlock, that his father was a drunk, that his father did not abuse his mother, that he ingested lead at an early age, that his mother left with the children when Allen was 8 or 9, that his father sold drugs, that his uncle played some of the role a father would have, that one uncle sold drugs, that the neighborhood had drug problems, that Allen denied running away or being thrown out of his home, that there was a shooting incident in January 1997 and he stayed away from his house in part for his family's safety. Ex. 303, pp. 1-3; Vol. V, pp. 136-146. Mr. Simon wrote the life history based on information from Allen and with reference to the Mitigation Checklist provided by the Capital Public Defenders. Vol. V, p. 142.

The life history also details Allen's involvement in church and the Boy Scouts, and lists other boys in Boy Scouts. Ex. 303, pp. 3-6. The life history includes Allen's problems with asthma, his school history—including dropping out from Sumner after being picked on and after another student was shot—his talents as an artist, his enrollment in Job Corps and subsequent

17

dismissal, and that he would do anything his teachers asked him to do. Ex. 303, pp. 5-7; Vol. V, pp. 150-158. Allen's teachers testified at trial that they were fond of him and that he was always willing to help. Vol. V, pp. 158-9. Mr. Simon's life history stated that he was hospitalized after an asthma attack, as witnessed by Ahmed Oliver. Ex. 303, p. 8. It describes Sam Moore's positive influence on Allen as coach of Allen's baseball team. Vol. V, p. 160. Raymond Petty provided Mr. Simon with information about Allen's involvement in Boy Scouts and basketball and that Allen had outgrown his asthma. Ex. 303, p. 8; Vol. V, p. 161. Johnnie Grant also was on the baseball team with Allen. Ex. 303, p. 8. Mr. Sindel gave Mr. Simon his notes from his interview with Johnnie Grant, including an alternate address. Vol. V, pp. 162-163.

The life history contains information about Allen's participation in the music group Unlawful Entry. Mr. Simon listed contact information for producers Ahmed Oliver and Flexx. Ex. 303, p. 9; Vol. V, p. 164. The life history notes that Allen wrote and performed a rap song about robbing a gambling boat but that the police did not find the lyrics when Allen was arrested. Ex. 303, p. 10; Vol. V, p. 171.

In following the mitigation checklist provided by the Capital Federal Defenders, the life history states that Allen did not have a large number of friends. Ex. 303, p. 10; Vol. V, pp. 172-173. The life history stated that Marquis Taylor was his principal friend and was shot to death in front of him. Marquis' stepfather was a drug dealer who taught Marquis and Allen to sell drugs. Ex. 303, p. 10; Vol. V, pp. 173-4. Allen did not tell Mr. Simon that his father or uncle had taught him to sell drugs. Vol. V, p. 174. Following the mitigation checklist, Mr. Simon wrote in the life history that Allen did not have steady employment, may have been exposed to toxic chemicals, and had problems with asthma. Ex. 303, p. 11; Vol. V, p. 175.

18

The life history listed "Traumas" to Allen. Ex. 303, pp. 11-13. It included being struck in the head with a handgun three years ago, having chronic headaches, knowing people who had been violently killed in the neighborhood, being shot at three years ago, witnessing the murder of his closest friend Marquis Taylor, and his mother's house being shot up over a drug deal gone bad. Vol. V, pp. 176-180. Allen never told Mr. Simon that his mother had been violent with him. Vol. V, p. 179. The life history stated that the principal trauma to Allen's life was Marquis' death, that he had not been right since then, that he had nightmares of being shot, that he had no juvenile adjudications, and that he had a tampering conviction. Vol. V, p. 179-182; Ex. 303, pp. 12-13. It listed Allen's substance abuse history which included blackouts. Ex. 303, p. 13.

In his memorandum to Mr. Sindel on January 9, 1998, Mr. Simon stated that he was "doing a good deal of work on mitigation." Ex. 325. Mr. Simon had a conference with Lucy McLemore, Juanita Allen's sister, on January 11, 1998. Ex. 325; Ex. 499, p. 400; Ex. 500, pp. 47-48. Lucy McLemore outlined Juanita Allen's family history: her siblings' ages and dates of marriage. Vol. V, p. 202. Four of Juanita Allen's siblings testified during the penalty phase. Vol. V, p. 204; Ex. 185 (trial testimony of Otha Petty, Jr.); Ex. 188 (trial testimony of Lucy McLemore); Ex. 182 (trial testimony of Melissa Petty); Ex. 213 (trial testimony of Raymond Petty, Sr.) . Ms. McLemore related that Juanita Allen had left her husband when Yvette was approximately 5 years old. Ex. 500, p. 47. Ms. McLemore told Mr. Simon about Allen's involvement in church, gave him contact information for Raymond Petty, and provided background on her children Claude (Ed), Erica and Colette. Ex. 500, pp. 47-48. Ed, Erica, and Colette testified during the penalty phase of the trial. Ex. 183 (trial testimony of Claude McLemore); Ex. 200 (trial testimony of Colette McLemore); Ex. 204 (trial testimony of Erica McLemore).

19

On January 11, 1998, Mr. Simon also met with Raymond Petty, Juanita Allen's brother. Ex. 454. Mr. Petty told Mr. Simon that Allen had not been involved in Boy Scouts after he crossed the bridge from Webelos. Ex. 454, p.1; Vol. V, p. 209. However, later, Connie Supranovich followed up and obtained Boy Scout records indicating Allen did continue with the Boy Scouts. Vol. V, p. 209-210. Mr. Petty told Mr. Simon that Allen had turned his interests to basketball but Allen would curse, be wild, have temper tantrums, and miss games because of his attitude. Mr. Petty said that he was able to calm down Allen. Ex. 454, p. 2; Vol. V, p. 210. Mr. Petty told Mr. Simon that Allen and Jerome Petty, Allen's uncle, were very close. He also said that Allen had outgrown his asthma. Ex. 454, p. 3. Vol. V, p. 212. Mr. Simon made notations on the life history to add information provided to him by Lucy McLemore and Raymond Petty. Vol. V, p. 213.

On January 12, 1998, Mr. Sindel sent a letter to Dr. Craig Haney, the mitigation consultant, that requested Dr. Haney notify him if he was unable to assist in the case. Ex. 327. Dr. Haney responded that he was not prepared to proceed. He stated that he would not remain in the case unless a continuance was granted. Ex. 330. On January 15, 1998, Connie Supranovich then contacted Dr. David Randall, another mitigation expert. Vol. VII, p. 90. At the time of the trial, Dr. Randall had consulted on over sixty capital cases in Illinois, Indiana, Michigan and California in both state and federal court. Vol. VII, p. 88. He had worked on death penalty mitigation since April 1989. Vol. VII, p. 89. On January 16, 1998, Mr. Sindel spoke to Dr. Randall about working on the case. Vol. VII, p. 91. The same day, Dr. Randall faxed a letter to Mr. Sindel indicating that he was very interested in working on the case and that he could fly down the next day to meet with Mr. Sindel and his client. Ex. 336. Dr. Randall also faxed a retention letter to Mr. Sindel dated January 16, 1998 which indicated that Allen had been

20

referred to him for a social history investigation in connection with possible mitigation. Ex. 337. Nothing in the retention letter conditioned Dr. Randall's involvement upon a continuance being granted. Vol. VII, p. 93. Dr. Randall knew the trial date when he agreed to work on the case and he had time to work on a case. Vol. VII, p. 93.

The life history was sent to Dr. David Randall, the mitigation specialist, on January 16, 1998 along with contact information for Juanita Allen and Allen's grandfather and the court order setting compensation at $100 per hour.  Ex. 335. On January 17, 1998, Dr. Randall went to St. Louis and met with Allen, Mr. Sindel, and Connie Supranovich and "perused numerous documents." Ex. 340; Vol. VII, pp. 95-6.  Those documents included medical records, police reports and educational records. Vol. VII, p. 97. The penalty phase of the case started on March 2, 1998. Vol. VII, p. 95. Dr. Randall is sure that in that first meeting Mr. Sindel gave him a rundown on the case and background on Allen and his family, including his insights concerning Allen and Juanita Allen. Vol. VII, pp. 97-98. Dr. Randall is sure that Mr. Sindel provided information to him upon his entry into the case such as Allen's medical history including lead poisoning, Allen's house being shot up before the robbery and murder, and Allen's visit to the Metropolitan Psychiatric Unit. Vol. VII, p. 152. Dr. Randall never intended to create a narrative life history. Vol. VII, p. 158.

On January 16, 1998, Dr. Cuneo met with Allen as part of his evaluation for possible mitigation.  According to Dr. Cuneo's notes, Allen told Dr. Cuneo that his mother used to be a librarian downtown, that she was real sweet and tried to give him and his sisters everything and steered them out of trouble. Ex. 565, p. 22. Dr. Cuneo also noted that "Mom physically disciplined him till end." Ex. 565, p. 22.

Allen wrote several letters to his mother Juanita Allen from jail. In the letters, he repeatedly expressed his love for his mother. He wrote "They [sic] other day I was reading this cartoon and it reminded me of you and I smiled I love you so much, and I know you feel the same." Ex. 493, p. 1. In the same letter he stated "Everything you tried to teach me I went the other way but I don't look at it as your fault you did your part as a mother for me and I Love you for that." Ex. 493, p. 2. Allen wrote "To me you will still be the best mother in this world even though your son might be locked up like I said you did your part and I didn't do mine I'll Allway's [sic] love you for being there for me when my so called friend's wasn't. I Love You Mom." Ex. 493, pp. 2-3. In a Mother's Day letter, Allen wrote:

> The thing I really been thinking about is you, how you been there for me threw all of my life no matter what, and that's why I love you so much. I really think that your job of being a mom is perfect because you did your part. You raised me the right way it was just my fault that I messed up, you kept me away from all this drama all my life but I was the one who got myself in this. Thanks to the love, from the one who always was in my corner.

Ex. 495.

Dr. Randall sent a fax to Mr. Simon on January 19, 1998, that stated that he "had found from my experience that it's best for me" to arrange and conduct the initial interviews with family members by himself, that they would then sketch out rough direct examinations and conduct follow-up interviews thereafter. Ex. 340. In a January 20, 1998 letter to Mr. Sindel, Mr. Simon stated that it was too late for Dr. Randall to conduct the initial interviews because Mr. Simon had already interviewed the potential mitigation witnesses. Ex. 343, p. 1; Vol. V, p. 240-1. From that point on, the mitigation interviews were conducted by Dr. Randall because that was the way Dr. Randall wished to proceed. Vol. V, p. 242; Vol. VII, p. 103. Dr. Randall did not condition his involvement upon obtaining a continuance. Vol. VII, p. 106. Nobody ever told Dr.

22

Randall that a continuance would be granted. Vol. VII, p. 106. He was aware that Mr. Simon had done interviews of mitigation witnesses because he had received the life history. Vol. VII, pp. 125-126. Dr. Randall conceded that his statement in his declaration that "No attempts had been made to begin the laborious process of generating Mr. Allen's social history" was an exaggeration and was incorrect. Vol. VII, p. 167.

In that same January 20, 1998 letter to Mr. Sindel, Mr. Simon suggested that the defense file a motion for a continuance of the trial, even though it was expected that such a request would be denied. Ex. 343, p. 2. Mr. Simon wrote:

> If we file such a motion, and it is denied, we can cite the denial of the continuance as undermining subsequent decisionmakers' confidence in the likely result of the trial. Section 2255 counsel can point to the denial of continuance along with acts or omissions of trial counsel as "cause" for failure to present additional evidence if any emerges or occurs to someone later. Because the judge's decision would be "external to the defense" section 2255 counsel would not have to prove that we were constitutionally ineffective in order to establish "cause." Giving them this second option would be in our client's interest.

Ex. 343, p. 2.

Mr. Simon testified that this would be an example of what he called "no fault ineffective assistance of counsel," although, in fact, the fault would be committed by the Court. Vol. V, pp. 243-4, 247. The denial of a continuance, according to Mr. Simon, created ineffective assistance of counsel without actually having to show that counsel's performance was deficient. Vol. V, p. 248. His timesheets show that Mr. Simon researched "no fault ineffective assistance of counsel in November 1997. Ex. 498, pp. 3-4; Vol. V, p. 28.

On January 20, 1998, Dr. Randall contacted potential mitigation witnesses including Dr. Cuneo, a psychologist who testified in the penalty phase for the defense. Vol. VII, p. 126. Dr. Randall met with Juanita Allen "et al" on Saturday and Sunday, January 24 and 25, 1998. Ex.

344. He coordinated his mitigation efforts with Dr. Cuneo by providing his witness interviews to him to inform Dr. Cuneo's opinion on mitigation. Vol. VII, pp. 126-127.

On January 20, 1998, Dr. Randall completed an affidavit in connection with a request for a trial continuance. Ex. 35; Vol. VII, p. 127. In the affidavit he stated:

> Realistically, I believe that a continuance of at least 120 days would allow for the adequate preparation of mitigation for a potential death penalty sentencing hearing, based on my appraisal of the work that remains to be completed in the Allen case.

Ex. 35.

Juanita Allen was interviewed by Mr. Sindel, Mr. Simon, Dr. Cuneo and Dr. Randall separately on multiple occasions. Ex. 410, 411, 412, 413, 414, 415; Vol. VIII, pp. 235-236. On January 28, 1998, Dr. Randall interviewed Juanita Allen. Ex. 410. He obtained contact information for Sam Moore, Allen's coach, which had already been obtained by Mr. Simon. Vol. VIII, p. 75. She told Dr. Randall that her son was easily influenced and wanted to be a "street" person but that he was not raised on the streets. Ex. 411, p. 1. She described her son's lead poisoning, asthma and kidney issues as a child. Ex. 411, p. 3. She told him that Allen had checked himself into a psychiatric unit, that she had not seen her son since January of 1997 when someone shot into their house looking for Allen, and that Allen was using drugs. She said that her son lived with her at the house on Cote Brilliante until that shooting. Ex. 411, p. 1; Vol. VIII, pp. 79-80.

In the January 28, 1998 interview, Juanita Allen told Dr. Randall that Allen had been a perfect son and a mama's boy until about his freshman or sophomore year of high school. At that time, his demeanor and appearance deteriorated, he lost weight, and items began disappearing around the house. Ex. 411, pp. 1, 3. She said that the last few years, Allen had changed so much that she used to say "Who is your mother? It couldn't possibly be me." He thought that the

family was boring and he wanted to prove himself. Ex. 411, p. 2; Vol. VIII, p. 85. She told Dr. Randall that "I'm going to back you, but not back you if you're wrong. I'm there for my son, I love my son." Ex. 411, p. 2. Juanita Allen never expressed that she did not love Allen. Vol. VIII, p. 84.

In the January 28, 1998 interview, Juanita Allen also told Dr. Randall about her marriage, her estranged husband and his alcoholism, and her relationship with her husband's family. Ex. 411, p. 2. She said that Allen's father was not a violent person and that she was "subject to get violent before his dad would." Ex. 411, p. 2. She also stated that "you don't want to see me angry." Ex. 411, p. 3. She stated that her son and his father had no relationship and that "the last I heard, Bill was selling some drugs, his dad bought some from him." Ex. 411, p. 2. She stated that she and her father (Allen's grandfather) worked as a team raising the children. Ex. 411, p. 2. She never said that her father had physically abused Allen. Vol. VIII, p. 91. She told Dr. Randall about Allen's schooling in Clayton and St. Louis City. Ex. 411, p. 3. Dr. Randall testified that Ms. Allen's statement in her declaration that the trial team was not interested in anything other than Marquis Taylor's death was not correct. Vol. VIII, p. 101.

In an undated interview, Ms. Allen told Mr. Sindel that Allen was a good kid with a kind heart. She stated that she could not believe that he had committed the robbery and murder. Ex. 412.

On January 30, 1998, at the hearing on the motion for a continuance of the trial date, Dr. Randall testified and the following exchange occurred between him and Mr. Simon:

> Mr. Simon: Is 120 days a reasonable approximation of the time that you believe necessary to do your job according to the standards of your professional speciality?
> Dr. Randall: At this point I believe that would be sufficient.

25

Ex. 36, p. 10.  Dr. Randall testified at the 2255 hearing that his answer was not accurate at the time and he knew it was not accurate. Vol. VII, p. 133. In his declaration in support of the Section 2255 motion, Dr. Randall stated that "Although my affidavit [in 1998] suggested a continuance of 120 days, I actually did not consider this to be sufficient time to prepare a proper penalty phase defense." Ex. 254, p. 6.

On January 30, 1998, Dr. Randall met with Mr. Simon. Mr. Simon told him that Allen lied. Ex. 357; Vol. VII, pp. 134-135. He told Dr. Randall that Allen has sustained a head injury in a boxing accident. Ex. 357; Vol. VII, p. 135. Dr. Randall referred Mr. Simon to a book entitled *From Pain to Violence* which posits the relationship between childhood trauma and later criminally violent actions. Vol. VII, p. 135. They discussed this book because Dr. Randall believed it was potentially relevant to Allen's case. Vol. VII, p. 136. As a mitigation expert, he was alert to evidence of child abuse. Vol. VII, p. 136. At the Section 2255 hearing, Dr. Randall testified that Allen never told him that he had been physically abused and that he did not believe that he ever asked Allen if he had been physically abused. Vol. VII, p. 136. Dr. Randall testified that he interviewed many of Allen's teachers and none of them said they had seen any signs of physical abuse of Allen. Vol. VII, p. 176.

Andy Rackers, the investigator, did some mitigation interviews. He interviewed Eric Taylor, Marquis Taylor's brother, about the impact of Marquis' death on Allen. Ex. 442; Vol. VII, p. 147. In a separate interview, Eric Taylor told Dr. Randall that Allen smoked "some weed." Ex. 443, p. 2. Andy Rackers also interviewed Luveetra Taylor, Marquis' mother, on mitigation topics. Ex. 449; Vol. VII, p. 148. Both testified in the penalty phase for Allen. Ex. 199 (trial testimony of Eric Taylor), Ex. 210 (trial testimony of Luvetta Taylor).

26

On February 6, 1998, Dr. Randall sent a fax to John Simon that contained an affidavit in support of the appointment of additional experts. Ex. 368; Vol. VII, p. 191. The affidavit recited the duties of a mitigation specialist, which was Dr. Randall's role on the case. Ex. 368, p. 4. Dr. Randall's affidavit stated that the mitigation specialist shall obtain from the client the history of "discipline in the home, including the form of discipline, how administered, frequency, by whom, and for what." Ex. 368, p. 4. In his February 6, 1998 affidavit, he stated that the mitigation specialist shall ask the client about "any significant childhood experiences, including… family violence, parental alcohol or drug abuse, or abuse of the client, including physical, sexual, or emotional abuse." Ex. 368, p. 4. Dr. Randall stated that collateral interviews should be conducted with family members and others on the same topics. Vol. VII, p. 197.

On February 8, 1998, Dr. Randall drove to Manhattan, Kansas to interview Colette McLemore, Allen's cousin, who was a student at Kansas State University. Ex. 54, p. 3; Ex. 459; Vol. VIII, p. 42. She told Dr. Randall that Allen had drawn pictures for her and that the family was close. Ex. 459, pp. 1-2.

On February 9, 1998, Dr. Randall drove to Jefferson City, Missouri to interview Claude (Ed) McLemore, Allen's cousin. Ex. 326; Ex. 54, p. 3. Mr. McLemore told him that Allen was not a troublemaker and stayed out of trouble. He also told Dr. Randall that Allen's family was close. Ex. 426. At the 2255 hearing, Mr. McLemore testified that Allen was selling crack from age 14 and make $40 to $50 each day. Vol. II, pp. 50-51. He did not tell the trial team that Allen was a drug dealer. Vol. II, p. 51; Vol. VIII, p. 40. At trial, Mr. McLemore testified that Allen did not use alcohol or marijuana in front of him. Ex. 183, p. 20. At the 2255 hearing, Mr. McLemore testified that, in fact, Allen drank alcohol and used marijuana in front of Mr. McLemore. Vol. II, p. 51. At the 2255 hearing, he also testified that he used marijuana with Allen. Vol. II, p. 54.

27

Dr. Randall interviewed four jail guards who had contact with Allen: Lt. Dave Boehm (Ex. 677), Deputy Mark Prackt (Ex. 678), Deputy Todd Sinclair (Ex. 679), and Deputy Karen Burns (Ex. 680). At the 2255 hearing, Dr. Randall initially testified that he had not interviewed any jail guards because Mr. Sindel directed him not to do so. Vol. VII, pp. 19-20, 22. When confronted with his handwritten and typed notes of the interviews, Dr. Randall conceded that he had, in fact, interviewed the four jail guards. Vol. VII, pp. 107-108, 115-117. None of the guards were called as witnesses.

On February 15, 1998, Dr. Cuneo interviewed Juanita Allen to prepare for his testimony in the mitigation portion of the trial. Ex. 413. She told him that Allen had distanced himself after the deaths of Marquis Taylor and Dennis Noble. Ex. 413, p. 1. She explained that she had gotten Allen into the Job Corps program but that he insisted on coming home. She said that he had left their house after it was shot up. Ex. 413, p. 2. She said that he suffered seizures as a child and had been teased for his skin condition. Ex. 413, p. 2.

On February 16, 1998, Dr. Yutzy, the Government psychiatrist, interviewed Allen in jail. Ex. 46. Allen told Dr. Yutzy that his mother had difficulties with depression when he was young. Ex. 46, pp. 39-40. He stated his father's family had trouble with alcohol but that "everybody on my mom's side is straight." Ex. 46, p. 43. He told Dr. Yutzy that he got along with his mother "great" when he was younger. Ex. 46, p. 13. He denied being verbally, physically or sexually abused as a child, adolescent up to eighteen years old. Ex. 46, p. 67. He reiterated that he did not recall being verbally or physically abused by either a family member or anyone else. Ex. 46, p. 68. He told Dr. Yutzy that his mother gave him the type of love that no one else can give a person. Ex. 46, p. 130. He stated that he and his mother were "real close." Ex. 46, p. 169.

28

On February 23, 1998, Ms. Allen was interviewed by Mr. Simon. Ex. 414; Vol. VIII, p. 236. She told him that Allen was a people pleaser. She said he never got away with anything because he was black and he was being tried in a "white man's court." Ex. 414. On February 28, 1998, Mr. Simon interviewed Ms. Allen again. Ex. 415. Vol. VIII, p. 236. She told him that Allen was a habitual liar who did not feel he was important and who felt he did not have a life. Ex. 415.

Multiple family members and friends told the trial team of Juanita Allen's physical discipline of Allen and her use of alcohol. Deborah Ruffin, Juanita Allen's friend, told Mr. Sindel, Mr. Simon and Dr. Randall that Ms. Allen "has to do what she has to do to maintain control" and that she "had to tighten Bill up—get physical." Ex. 485, p. 2; 488, p. 4; 500, p. 15. In response to the question "Does Juanita have a problem with alcohol," Ms. Ruffin told Mr. Simon and Dr. Randall that "she drinks to excess, when she is in trouble." Ex. 500, p. 11. Deborah Ruffin testified at trial but not about Ms. Allen's physical discipline of Allen or her alcohol use. Ex. 178.

Nancy Harris, a neighbor of the Allens, was interviewed by the trial team. Mr. Sindel's notes indicate that she told them that she had not seen Juanita Allen drunk. Mr. Sindel wrote "Juanita would not show this woman her bad behaviors." Ex. 465, p. 5. This note indicates that the trial team was aware of the issue of Ms. Allen's alcohol use. Ms. Harris told Mr. Sindel that Allen was afraid of his mother: "Juanita and her children – Boy scared of her – had to make him into young man." Ex. 465, p. 2.

Raymond Petty, Sr., Ms. Allen's brother, told Dr. Randall that "She was really on him one time, I broke her off him. He was a big kid. I couldn't see her punishing him like that, doing

29

the things she was doing. She'd beat the crap out of him real good." Ex. 457, p. 8. Mr. Petty told

Dr. Randall that:

> One time she was getting on him. She was beating him. He was supposed to be in a certain time, and do something, and he didn't do it. He's 16-18-18, not too long ago. Bill calls me, I drive to his house. I jump in between them. He broke out of the house and ran. I never got beat like that before. She was whooping him with an extension cord, just wacking [sic] at him. It just went back to slavery times. I couldn't see my blood getting beat like that. I've never seen that kind of beating before. (Like a slavery beating.)

Ex. 458, p. 4. Mr. Petty told Dr. Randall about this incident in the two-to-three week time frame

before the general week-end preparation session before the penalty phase. Vol. VII, p. 218. Mr.

Simon's notes indicate that Mr. Petty told him that Juanita Allen "would use her fists on him. 16-

17-18 and she was beating him up. B. called me. I got in betw. Whipping him w/ extension

cord." Ex. 500, p. 38. Mr. Petty testified at trial about an incident when Allen was 15-17 years

old and Ms. Allen "whooped" Allen with an extension cord. Ex. 213.

Mr. Petty told Dr. Randall that "When problems arise Juanita [Allen] will drink. She

would drink to cover up what's going on. When she gets depressed, she'll drink." Ex. 458, p. 4.

Mr. Petty testified during the penalty phase about his sister's alcohol use:

> My sister, I think she -- she doesn't -- she curse a lot, and cursing and drinking and -- it's not going to alleviate the problem. When you are done cursing, when you put that glass down, the problem's still there.

Ex. 213, p. 6.

Mr. Petty told Dr. Randall that Juanita Allen had been a poor parent. He said:

> I think she failed at the time she should be there knowing what Bill was doing. When he started his slide, he was out to one or two in the morning. I'd call, mom wouldn't be there, doing her thing. She had just gotten a new boyfriend. That's when Bill got loose. She didn't move out, but she might go over there and not come back till the next day 11 or 12 o'clock. No one to supervise Bill.

Ex. 458, p. 3. Dr. Randall considered this to be dysfunctional. Vol. VII, p. 247.

Raymond Petty also told Dr. Randall that Allen use drugs. Allen smoked

marijuana back when he was playing Christian Youth Council basketball. Ex.

458, pp. 1-2.

> Shimeka Taylor, Marquis Taylor's sister, told Dr. Randall that:

>> I was there one time when we hung out too late. It was around Christmas holiday. He got back at maybe ten o'clock. Bill had always been tall for his age. She put him on punishment. His mother, my mother the type they need to control their kids up to a certain point. A whooping and a punishment. Early '90s. He was 12, 13.

Ex. 452, p. 2.

John Simon's notes of the interview of Shimeka Taylor indicate that she told the trial

team: "If Bill did something, he got the snot kicked out of him. Got back around ten. Bill cried.

Whipping and a punishment, early 90's, 12-13." Ex. 500, p. 22. Dr. Randall knew from Shimeka

Taylor that Juanita Allen physically whipped and punished Allen. Vol. VII, p. 223. Ms. Taylor

testified in the penalty phase but was not asked about these events. Ex. 195. In fact, Ms. Taylor

indicated that she believed that Ms. Allen needed to be firmer with Allen. She told Dr. Randall

that "Bill needed discipline, he did need that. Juanita was great, but too lax when it came to Bill.

Boys need a stronger figure. Juanita did not take that role in my opinion." Ex. 452, p. 3.

Samuel Moore, Allen's coach, told Dr. Randall that "Billie was on punishment just a

little while back. Try to keep him stay in the house. She'd mop him up." He also told Dr. Randall

that "Everybody knew Bill would be on punishment. That his mother would kick his ass in the

street. He had to sneak out when his mama was at work." Ex. 436, p. 2. Mr. Moore testified in

the penalty phase that Allen was still being put on punishment as a teenager . Ex. 209, p. 8.

Dr. Randall testified at the 2255 hearing that the statements by Deborah Ruffin, Raymond Petty, Nancy Harris, Shimeka Taylor and Samuel Moore about Ms. Allen's physical punishment of Allen, her use of alcohol, and the dysfunction in the family made them important potential mitigation witnesses. Vol. VII, p. 239. He stated that Juanita Allen had no control over access to these witnesses. Vol. VII, p. 240. All these witnesses testified at trial.

Other family members told the trial team about the dysfunction at the Allen household. Monette (Nishelle) Petty, a cousin of Allen, told Dr. Randall:

> When I went over to Pop's [Otha Petty Sr. and Juanita Allen's] house, I could do anything I want. At my house, I had to go in. Over there, no rules, not too much they couldn't do. Juanita was pretty much lenient on them. Stay outside, walk the streets, go to the park, go outside the gate. Over there I could visit, people could come over. Not in my house. I can't say it was neglect, but they kind of grew up on their own. She'd go out a lot. At night, she'd leave.

Ex. 479, p. 1. Dr. Randall testified that he considered this behavior to be neglect. Vol. VII, p. 241.

Claude McLemore, Allen's cousin, told Mr. Sindel that "Mother had problems with staying out." Ex. 427, p. 1. Vol. VII, p. 241. On February 23, 1998, Lucy McLemore, Juanita Allen's sister, told the trial team that her sister's family was "dysfunctional. More subtle than in usual case." Ex. 500, p. 7. Carol Petty, Juanita's sister-in-law, told Dr. Randall that at Juanita Allen's house, "They could come and go as they please. He didn't have to report. Didn't know a lot of whereabouts. I didn't condone that. They were free to run the neighborhood. My children weren't allowed to do that." Ex. 503, p. 1; Vol. VII, p. 245. Dr. Randall considered this parenting style to be dysfunctional. Vol. VII, p. 246.  Ms. Petty also told Dr. Randall that Ms. Allen was

"more loose, more lax. Rules were not, they might have been thrown out there, but not followed through. No consequences if they were broken." Ex. 503, p. 2.

Dr. Randall testified at the 2255 hearing that the trial team was aware from interviews of collaterals—family and friends—that there was dysfunction and abuse in the family. Vol. VII, pp. 248-249. He stated that he learned this information over the course of the investigation. Vol. VII, p. 251.

To assist the trial attorneys, Dr. Randall prepared a document entitled "Factors that Affected Billie's Life." Vol. VII, p. 252; Ex. 505. One of the factors listed is "Physical abuse and beatings." Ex. 505. There was a discussion among the trial team concerning the factors that affected Allen, including physical abuse and beatings. Vol. VIII, p. 4. Dr. Randall knew information concerning physical abuse and beatings of Allen. Vol. VIII, p. 4. Mr. Simon testified that Dr. Randall told him that they could not present the "trash the mom" defense because it would alienate Juanita Allen and limit access to other witnesses. Vol. VI, pp. 77-78; Ex. 533, p. 171. At the 2255 hearing, Dr. Randall conceded that Juanita Allen only controlled access to Allen's sisters and that other important mitigation witnesses were independent of Ms. Allen. Vol. VII, pp. 237-238.

Dr. Randall denied ever telling Mr. Simon that the defense team could not present the "trash the mom" defense. Vol. VIII, p. 6. Dr. Randall testified that the trial team discussed presenting evidence of physical abuse and beatings of Allen by Juanita Allen. Vol. VIII, p. 6. He testified that a decision was made to present Raymond Petty's testimony concerning Ms. Allen's beating of Allen. Dr. Randall testified that it was obvious that Allen had been physically abused and beaten multiple times in his life. Vol. VIII, p. 13. He testified that it was possible that when he wrote that "physical abuse and beatings" affected Allen that he was considering information

33

provided to him by Deborah Ruffin, Shimeka Taylor, and Samuel Moore about Juanita Allen's

physical punishment of Allen. Vol. VIII, p. 26.

Dr. Randall also prepared a document entitled "Closing Ideas, Allen" which were his

suggestions about mitigation closing arguments. Ex. 502; Vol. VIII, p. 35. One of his suggestions

was to argue that Allen's mother was a poor role model and ineffective parent. Ex. 502, p. 3;

Vol. VIII, p. 36. The trial team knew that there was dysfunction in the family. According to his

testimony at the 2255 hearing, Dr. Randall decided not to ask Ms. Allen about those topics

because he did not feel he had sufficient rapport with her. Vol. VIII, p. 36.

Dr. Randall interviewed Angela Allen, Allen's sister, twice. Vol. VIII, pp. 37-38. She

told him that she and her brother argued all the time when they were younger and that Allen

bragged about things that were not true. Ex. 405. Dr. Randall spoke to Yvette Allen, Allen's

sister twice. Vol. VIII, p. 38. She told him that Allen would take her to parties when she was in

middle school. Nicole Petty, Allen's sister, was also interviewed by Dr. Randall. She told him

that her mother and sisters moved out from her father's residence:

> We were happy that we left. I was about fourth or fifth grade. They
> didn't get along too good. Arguments all the time, yelling all the
> time. Whoopings, not often. I remember one time Bill got a
> whooping here.

Ex. 431, p. 2. "Here" referred to the address on Cote Brilliante where Allen lived with his

mother, grandfather and sisters until his arrest. Vol. VIII, p. 50. At the time of the trial, Nicole

Petty recalled *one time* that Allen "got a whooping" when he lived with his mother and

grandfather. Vol. VIII, p. 51.

Dr. Randall interviewed Tyrone Jones, Allen's basketball coach, who stated that Allen's

uncle Jerome helped coached Allen's basketball team. Vol. VIII, p. 39. He also interviewed

34

Jerome Petty who told Dr. Randall that he was upset that he had missed Allen's problems because Jerome was working two jobs. Ex. 473.

Mr. Sindel, Mr. Simon and Dr. Randall interviewed Ahmed Oliver, Allen's childhood friend and record producer, and Beverly Oliver, Ahmed's mother. Ex. 434; 500, p. 36; 472. Ms. Oliver told them that Allen had stolen money from Ahmed and that she knew then that he had lied about a lot of stuff. Ex. 500, p. 36.

Dr. Randall, the mitigation specialist, billed the Court for 423 hours of work over a six week period for a total hourly bill of $42,330. This amount corresponds to over ten and a half weeks of normal working hours. When submitting his bill to Mr. Sindel, Dr. Randall wrote:

> As you will see from inspecting the hourly billing, I obviously went well over the estimated amount of time that we thought it might take to prepare mitigation for the case. Nevertheless, I did what I believed needed to be done in the time frame involved and I did spend this much time on the case. As I had testified in court, developing mitigation is an iterative process that builds upon itself. As I investigated mitigation leads, other leads came to light and needed to be pursued. In addition, it was quite a challenge keeping up with the FBI's own investigation and following up with interviews with new witnesses that they uncovered. The hearing took longer than I had anticipated. In an attempt to prepare the mitigation adequately given the time frame involved I had to totally immerse myself in the case. All in all, this case turned out to be my most complicated mitigation case to date, both in terms of the number of witnesses and the work that was required to muster them and prepare them for testifying. I do feel very badly about the result.

Ex. 394.

Subsequently, Mr. Sindel hired Dr. Randall to work on another death penalty case. Vol. VIII, p. 147. Dr. Randall testified that he respects Mr. Sindel's work as an attorney and considers him to be a friend. Vol. VIII, p. 147.

## IV.    ANALYSIS AND ARGUMENT

Allen failed to meet his burden of proving that his counsel were deficient and that he was constitutionally prejudiced by said deficiency. Allen's arguments to the contrary are based on evidence which was not credible and several false premises. The Government will discuss primarily the testimony of Mr. Sindel. Unless completely corroborated by a document or other credible evidence, the testimony of Mr. Simon and Dr. Randall lacks credibility. Vol. V at 187-88 (Mr. Simon denies that his 14-page written life history of Allen was a social history); Vol. VI at 85 (Court states that Mr. Simon is "trying to get to a point in this case that [he] think[s] [he] want[s] to pursue without answering the questions"); Vol. VIII at 136 (Dr. Randall deposition under oath clearly contradicts declaration and Court states "I just don't believe what he's saying. I'm telling you, I don't believe this man")[6].

### A. Allen's Trial Counsel Were Not Deficient

The burden of proving deficient performance was on Allen and he failed to meet his burden. The ABA standard for capital defense counsel in effect at the time of Allen's trial was the same as that in effect during the trial of the defendant in *Ortiz,* namely: "efforts to discover all reasonably available mitigating evidence." *Ortiz*, 664 F.3d at 1170 (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(A) and (C) (1989) (emphasis added)). There is no doubt here that substantial efforts were made by trial counsel and others working for counsel to discover all reasonably available mitigation evidence. At the conclusion of the trial, Mr. Sindel was satisfied with the efforts that had been made. Vol. I at 92. He felt that the "evidence [the defense] presented [in the mitigation phase] was the result of as thorough and as detailed an investigation that [h]e humanly could conduct under the

---

[6]This Court's comments on Dr. Randall's credibility during the hearing were understated, because it became that obvious that Dr. Randall committed perjury either in January, 1998, or in his declaration and hearing testimony concerning whether he believed that 120 days was adequate to complete the mitigation investigation.

circumstances." Vol. I at 94. At the conclusion, he felt that he had worked hard for Allen and agreed with a post-verdict letter from Government counsel acknowledging the extent of his *efforts* on behalf of Allen. Vol. I at 140-43. In fact, Mr. Sindel testified that he believed his *efforts* on behalf of Allen met the ABA's standards[7]. Vol. I at 148:7-15.

Post-hearing, and after 15 years of subsequent investigation, the record is precisely where the Government's Opening Statement claimed it would: 1) Allen cannot identify a single *document* his trial team did not discover; and 2) Allen can identify only one *witness* who testified at the hearing about abuse who was not discovered by the trial team (Brady Tolliver[8]). As proof of deficient performance, Allen rests on the fact that the trial team did not discover all of the content now before this Court from the *known* witnesses. But the fact they did not discover said information (assuming they did not and assuming it is truthful information) does not answer the question whether trial counsel's non-discovery was the result of unprofessional neglect or whether habeas counsel's discovery was the result of witness bias or witness education from habeas counsel's[9] repeated inquiries about topics that now support Allen's quest for relief from a death sentence. Allen's argument that he met his burden of proving deficiency rests on several false premises.

---

[7] What changed Mr. Sindel's mind about his efforts was Allen's habeas petition, the contents of which he assumed to be accurate. Vol. I at 198.The parts that influenced him the most were not the lay declarations, but the opinions of Drs. Stewart and Martell. Vol. I at 176. Because Dr. Stewart did not testify at the hearing and Dr. Martell's opinions were demonstrably flawed, perhaps Mr. Sindel's confidence in the adequacy of his efforts, if viewed properly in the context of what he knew in 1998, might be restored given the benefit of the evidence actually adduced at the hearing.

[8] Mr. Sindel testified at the hearing that he believed he was aware of the Tollivers. Vol. III at 171. Even if he is mistaken in his belief, Allen fails to establish how any member of the trial team could have discovered the Tolliver family during trial given that neither Juanita Allen nor Allen provided their names to any member of the trial team. Trial counsel are not mind readers. Moreover, given the content of his testimony and his demeanor at the hearing, had he testified at trial he may have done more damage than aid to Allen's cause. Brady Tolliver was simply not a credible witness and his testimony could not have altered the outcome.

[9] The starkest example of this is Juanita Allen's declaration in which she clearly stated that she learned from repeated questioning by habeas counsel what type of information would now help Allen's cause. In addition, it should not be forgotten that Mrs. Allen is the same woman who wanted Johnnie Grant to "co-sign" or lie for

**False Premise #1:  The Mitigation Investigation Did Not Begin Until
Dr. Randall Joined The Defense Team**

The timeliness of trial counsel's investigation rests at the heart of Allen's claim. Essentially, he argues that the trial team, and Mr. Sindel and Mr. Simon in particular, did not do enough soon enough and that resulted in a failure to uncover certain alleged facts in Allen's background. He argues that the evidence shows that counsel had a misunderstanding with Dr. Haney which resulted in essentially not beginning the mitigation investigation in earnest until the eve of trial. However, the credible evidence proves that the mitigation investigation was begun timely in April, 1997, and continued through the end of 1997, long before Dr. Randall joined the team in early 1998. The mitigation investigation was already constitutionally sufficient, standing alone, prior to Dr. Randall joining the case. It became substantially more than adequate based on the joint team effort following Dr. Randall's appearance in the case.

The starting point is that Allen's life was not particularly difficult to investigate. He lived all of 19 years in one general area of St. Louis, Missouri, attended local schools, and almost all of his relatives and acquaintances lived in St. Louis. At the time of the offense, his background had already been investigated by the state criminal justice system and he was on probation for a prior offense. He did not have a particularly complicated medical and psychiatric history nor were there a large volume of documents pertaining to him. Mr. Sindel admitted that these were the circumstances he faced during the mitigation investigation. Vol. III at 152-155. Allen had a significant girlfriend in his life at the time of the offense who was another important source of information. Vol. III at 156. At trial, Allen presented 36 mitigation witnesses and Mr. Sindel that these were chosen from approximately 60 people who had information about Allen. Vol. III at 156-157. The mitigation investigation did not warrant years of work and by January, 1998, the

38

defense team was unanimous in its belief that another 120 days would be more than enough to finish the job as completely as they wanted. Vol. III at 159.

Mr. Sindel was an experienced capital defense attorney on April 10, 1997, when he accepted the appointment to represent Allen. Vol. I at 38-40; 149-58. He taught other capital defense counsel how to defend capital cases both before and after 1998. Vol. IV at 50-52. *His* mitigation investigation began almost from the moment the representation began. Vol. 1 at 230; Vol. II at 108; Vol. III at 27. During the first week, Mr. Sindel was already considering issues such as concussions, diseases, mental health, lead poisoning and organic brain damage. Vol. II at 69. He also had conversations with Allen and his mother. Vol. 1 at 234-244. Mrs. Allen assured him that she would be 100% truthful with him. Vol. 1 at 232-234. He began, as early as April 16, 1997, to compile a Mitigation Notebook. Vol. 1 at 227.

He solicited from them Allen and his mother additional names of witnesses who could provide information about Allen's background and he began the process of acquiring personal, education and medical records. Vol. I at 44, 50, 53-56; 95-96; 117-129. But, Allen was a difficult client who had veracity issues. Vol. 1 at 164. His meetings with Mrs. Allen were frequent and she appeared to be cooperative concerning mitigation information. Vol. 1 at 117; Vol. III at 16. He explained the role of mitigation to Mrs. Allen and how certain evidence could help or hurt Allen. Vol. II at 71. Mr. Sindel had the benefit of mitigation information from them, which included denials of abuse by both Allen and his mother, by the time of the capital authorization submission to DOJ in July, 1997. He also eventually amassed other relevant information depicting Allen's life. Vol. 1 at 215-225.

Mr. Sindel had a team of three assistants prior to Mr. Simon even joining the team. Vol. II at 79. He had meetings with family members on the phone and in person at his office and in

39

their homes. Vol. II at 72, 73. He met with Allen on a regular basis. Vol. II at 76. He identified and explored between April and July, 1997, the following potential mitigation witnesses: Tasha Valentine (Vol. II at 67), Johnnie Grant (Vol. II at 81), Keisha Williams (Vol. II at 81), Dontay Frazier (Vol. II at 82), Luther Isgriggs (Vol. II at 82), Jerome Petty (Vol. II at 82, 101), Sam Moore (Vol. II at 83), Raymond Petty (Vol. II at 83, 87), Wilson Flexx (Vol. II at 83), Donald Winters (Vol. II at 84), Shawn Midgett (Vol. II at 84), Carlos McIntosh (Vol. II at 85), Cory Roy (Vol. II at 85) and Byron Woodward (Vol. II at 85), Royce Caldwell (Vol. II at 87), Nancy Harris (Vol. II at 87), Deborah Ruffin (Vol. II at 88), Ronald Ruffin (Vol. II at 88), Thelma Ruffin (Vol. II at 88), Marcella Chowning (Vol. II at 90), Bobby Harris (Vol. II at 91), Bruce Norman (Vol. II at 95), Lois Allen (Vol. II at 101). Some of these witnesses may have been relevant to the guilt phase, but they also possessed relevant mitigation background or lead Mr. Sindel to other mitigation witnesses. Vol. III at 15. All of this information was organized in trial and mitigation notebooks. Vol. II at 81. At the same time, available documentary evidence was being gathered, such as medical and school records. Vol. II at 80, 89. Within a month of being appointed to represent Allen, Mr. Sindel was developing a witness list. Vol. II at 81.

Mr. Sindel was clearly preparing for mitigation and meeting his investigation duties by requesting Court authority to hire investigators to obtain mitigation information, a mental health expert, a mitigation specialist, and a social worker. Vol. II at 102-106. Mr. Sindel did not wait for these authorizations to begin the mitigation investigation. Vol. II at 105. He was obtaining professional guidance during the Summer of 1997 from Capital Resource Counsel Kevin McNally and David Bruck to assist his efforts. Vol. II at 109, 111. Mr. Sindel's billing detail in the months prior to Mr. Simon joining the team provides a veritable roadmap of efforts by Mr. Sindel to begin and conduct the mitigation investigation.

Dr. Cuneo was contacted in September, 1997, as part of the mitigation investigation. There can be no doubt that Dr. Cuneo was brought into the case for mitigation. His hiring immediately followed the Court granting the motion to hire a psychologist *for mitigation*. Vol. II at 118. Mr. Sindel admitted that in September, 1997, Dr. Cuneo was going to play a role in the mitigation investigation and presentation. Vol. III at 163. Even though Dr. Cuneo's January, 1998 report was couched in terms of competency, Mr. Sindel admitted that the purpose of the examination at that time was to prepare for the penalty phase. Vol. III at 167; Vol. IV at 61. Any contact that Dr. Randall had with Dr. Cuneo was exclusively related to mitigation. Vol. III at 205. Dr. Cuneo also received the benefit of Dr. Randall's written memoranda of interview from the witnesses he contacted. Vol. III at 222-231.

The record is clear that Dr. Cuneo's role was always to serve as a mitigation expert. Camouflaging his efforts as "competency" served merely to conceal his opinions and the bases therefor as long as possible. Mr. Sindel knew how to ask for a Court-authorized competency examination if he wanted one, but none was ever requested. Normally, competency claims are evaluated as soon as problems are suspected. After the pre-trial motions hearings in the fall of 1997, which did not include an incompetency claim, Dr. Cuneo's only possible role was to provide an expert evaluation of Allen's mental health and life history as it related to mitigation. His primary role was always to support a claim of PTSD stemming from the death of Marquis Taylor. When Dr. Cuneo first examined Allen on January 16, 1998, it was less than a month before trial. Mr. Sindel had to agree that at that time the only real purpose for the examination was mitigation. Vol. III at 49-50.

In addition, even though the real purpose for Dr. Cuneo's examination was mitigation, he couched his only report in terms of competency. This aided the trial team in withholding Dr.

Cuneo's opinions from disclosure until the last possible moment. Even the "competency" report was withheld until the Government successfully obtained an order compelling production of a report by Dr. Cuneo. A second examination was conducted by Dr. Cuneo, but no report was ever prepared, the Government learned of the second examination only at trial, and Allen attempted to redact or withhold Dr. Cuneo's notes from production. More importantly, even though Allen initially claimed in his habeas petition that Dr. Cuneo never spoke to any mitigation sources, the record established that Dr. Cuneo directly received information from Allen *and his mother.* This included information that Mrs. Allen physically punished Allen, but Dr. Cuneo did not then find it clinically relevant or feel that it needed to be explored further. Nothing prevented Dr. Cuneo from inquiring about so-called "abuse" further if he suspected that is was present or relevant. The bottom line was that Dr. Cuneo succeeded in testifying to mitigation opinions without ever having to reduce them to writing or state in writing the bases for said opinions even though his "competency" report stated that a follow-up report would be prepared. Vol. 1 at 112.

When Mr. Simon was added to the team, he was introduced to the Allen family. Vol. II at 72. Mr. Sindel admitted that by that time his team had already interviewed several mitigation witnesses and had discussions with Allen and his mother about his background and life history. Vol. II at 121. After September, 1997, Mr. Sindel and Mr. Simon shared responsibility for the mitigation investigation. Vol. III at 18. Mr. Sindel claimed at the hearing that his only error was failing to supervise Mr. Simon's activities more closely. Vol. II at 62. Yet, neither Mr. Sindel nor Allen identifies what facts known to Mr. Sindel in 1997 should have alerted him to the need to supervise Mr. Simon more closely. In the absence of said facts, Mr. Sindel's claim is simple hindsight.

Moreover, the record showed that such supervision was actively taking place and that Mr. Sindel was actively engaged in the mitigation investigation and preparation during all of 1997. For example, on November 6, 1997, Mr. Sindel, Mr. Simon and Ms. Caspari met regarding the status of discovery and mitigation issues. Vol. III at 67. Mr. Sindel testified that they would have discussed what mitigation work had been done to date and what was going to come. *Id*. It is noteworthy that Dr. Haney was not part of that meeting nor was there any discussion of why he had not come to St. Louis to conduct field work. Mr. Sindel agreed that the meeting constituted supervision of the mitigation investigation. Vol. III at 68. In fact, by January 13, 1998, Mr. Sindel reasonably believed that most of the known documentation for mitigation had been obtained and prepared. Vol. III at 69. Mr. Sindel was investigating mitigation himself both before and after Mr. Simon joined the team. Vol. III at 129.

Among the mitigation work done by Mr. Simon in December, 1997 and early January, 1998, he spent many hours with Allen and conducted a very methodical, detailed exploration of the topics in Allen's life. Vol. III at 71; 183. He also prepared an easy-to-use social life history.[10] This was done before anyone believed there was an issue with Dr. Haney. Ms. Caspari and Mr. Rackers were following leads as well. *Id*.; Vol. III at 74. Mr. Simon's meetings with Allen served to confirm and probe information that was already known to the trial team, particularly Mr. Sindel. Allen does not point to any revelations that came about as a result of Mr. Simon's interviews with him. Mr. Sindel admitted that a good deal of mitigation work had been done long before the exchanges with Dr. Haney which led to the hiring of Dr. Randall. Vol. III at 79. Mr.

---

[10] Mr. Simon's hair-splitting distinctions between his "life history" and a "social history", as well as his protestations that he was not qualified to take a life history, went beyond disingenuous. His demeanor did little to conceal his bias and the extent to which he colored his testimony and recollection to aid Allen without regard to the truth or common sense. For a member of the bar who readily received large sums of taxpayer dollars to defend Allen, his performance during the hearing was shocking and the Government invites this Court to take any steps it feels appropriate to sanction Mr. Simon. If Mr. Simon's life history was not a social history, then why was it provided to Dr. Randall and why did Dr. Randall never prepare a document improving on Mr. Simon's work? Vol. III at 181.

Sindel acknowledged that he had been investigating mitigation since April, 1997, aided by a team of investigators and eventually Mr. Simon. Vol. III at 79. See also, Vol. III at 94 (mitigation work being done by Mr. Sindel during Fall, 1997); 96-97 (Mr. Sindel and Ms. Caspari locating and interviewing witnesses); 98 (Ms. Caspari memos documenting follow-up by her on mitigation leads); 101-102 (Mr. Simon doing a "good deal of work on mitigation" and coordinating with "our psychologist"); 103 (Mr. Simon communicating with Juanita Allen); 106 (Mr. Simon setting up interview with Allen's Aunt Lucy). The work that had been done by Mr. Sindel and his team was consistent with Mr. Sindel's representations to this Court in July, 1997 and January, 1998. Vol. III at 115. Mr. Sindel's team also included a law clerk. Vol. III at 240.

The thoroughness of the work done by Mr. Sindel, Mr. Simon and their team is demonstrated by the fact that most of the names of people contacted by Dr. Randall once he was in the case were already known to Mr. Sindel. Vol. III at 188. After all, Mr. Sindel had been preparing mitigation since April, 1997. Vol. III at 196; Vol. III at 236-239. The information provided by Allen to Dr. Randall was not different than that provided previously to anyone else. Vol. III at 189. In Dr. Randall's reports, Mr. Sindel saw very little new information. *Id*. Moreover, Mr. Simon had been adding to the extent of mitigation preparation since his admission to the case. This is evidenced by the fact that when Dr. Randall indicated that he wanted to start from scratch with witness interviews, Mr. Simon stated that he had already conducted many of those interviews and therefore they could not be "first" interviews. Vol. III at 198.

<u>**False Premise #2: The Defense Team Had Insufficient Time To Establish Rapport With Mrs. Allen To Ask Her About Abuse**</u>

Mr. Sindel had regularly communication with Mrs. Allen for nearly a year at the time of trial and had spoken with and met with her on a number of occasions specifically regarding

mitigation. Early on in their relationship, Mrs. Allen stated that she would be completely truthful with Mr. Sindel. Vol. I at 234. Mr. Sindel testified that by the time Mr. Simon joined the team in September of 1997, Mr. Sindel felt that he had a good rapport with Mrs. Allen and that she would be forthcoming with him. Mr. Sindel's rapport with Mrs. Allen was more than sufficient to question her about possible abuse. The point is made by evidence that, *inter alia*, Mr. Sindel *did* ask her on a number of occasions about potential abuse.

Dr. Randall estimated that 6 months was normally enough time to conduct and prepare a mitigation case. Vol. III at 137. At the time Dr. Randall added his full-time efforts to the team, Mr. Sindel and his team had already been investigating mitigation for over *nine* months. Vol. III at 138.

By 1998, it was Mr. Sindel's practice to ask about abuse with clients and families and he, **in fact, asked both Allen and Mrs. Allen about such issues.**[11] Vol. I at 165-67; 194-95; 197 (asked multiple times); Vol. III at 169 (Mr. Sindel asked personally about abuse and nothing prevented him from asking). It also appears that Dr. Cuneo[12] elicited information about physical discipline and discussed abuse with Mrs. Allen but did not find that information clinically significant. Vol. IV at 72. But, Mr. Sindel testified that the answers he received did not give him reason to investigate further or to believe that abuse was as significant as Mrs. Allen now

---

[11] The Government suggests that the clear evidence that Mrs. Allen was questioned about potential abuse renders moot any argument that the trial team needed more time to develop adequate rapport to make the inquiry. In addition, the argument treats Mrs. Allen as the target of the investigation – she was not. It was Allen's life that was being investigated and he was subjected to far more inquiry than Mrs. Allen. The fact that in all the time that he had with the trial team and the number of inquiries into the subject, prior to being sentenced to death, he consistently denied such abuse further refutes Allen's argument that his trial team did not discover the alleged facts due to mismanagement of time. Mr. Sindel never asked the Court for more investigators, because he felt that there was sufficient manpower to located and interview number of witnesses. Vol. III at 203.

[12] Mr. Sindel had to be reminded of that particulars, but Dr. Cuneo had a second, longer examination of Allen on February 22, 1998, about which he did not prepare a report and the first notice to the Government was during Dr. Cuneo's direct examination. This resulted in production of Dr. Cuneo's notes, but those were redacted without the knowledge of the Government and the redacted information related to Allen's denials of being involved in the murder and robbery. Those notes also included information about Mrs. Allen's physical contact with Allen. Vol. IV at 60-76. Among other things, this review demonstrated that Dr. Cuneo's declaration regarding the lack of a second interview with Allen was false.

45

claims[13]. Vol. I at 167. Allen's biography had no negative information in it about his mother. Vol. I at 200. There was also no information suggesting abuse by Allen's father. Vol. I at 201. There was no abuse information from any educator. Vol. I at 203. To the contrary, the teachers thought Allen came from a loving home. Mr. Sindel's own conversations with Raymond Petty and Allen's sisters did not contradict his objectively reasonable belief that Mrs. Allen was a caring and loving mother. Vol. I at 211-213. The results of Mr. Sindel's investigation were that Allen was loved by his family and had value as a person. Vol. I at 204. Witnesses presented were chosen to emphasize the aberrational nature of Allen's conduct within their family, because they had achieved personal and family success.[14] Vol. I at 205. They also subtly presented the sub-theme of execution impact. Vol. I at 206. Mrs. Allen's demeanor and problems with Johnnie Grant gave Mr. Sindel concerns about presenting her as a witness. Vol. I at 208. Part of Mr. Sindel's strategy was not to "trash" Mrs. Allen – presenting the so-called new evidence would have contravened that strategy. Vol. I at 209-10.

On direct examination at the hearing, Mr. Sindel opined that the so-called "new" information "wasn't revealed because that level of trust didn't exist." Vol. I at 123. A possible explanation is the fact that prior to trial neither Allen nor Mrs. Allen ever accepted Mr. Sindel's assessment that Allen's best hope was for a life sentence. Vol. I at 189-93; 196. He stated that even *he* did not have enough time to develop that level of trust. Vol. I at 124. Logically, if he lacked sufficient time to get past the alleged mistrust, then there could be no causal nexus between non-discovery and neglect of Dr. Haney or the late hiring of Dr. Randall. In addition, the time constraints in the case as to Mr. Sindel were not the result of any decision or neglect on his part. If his opinion is correct, the non-discovery was the result of Allens' witnesses not

---

[13] The legal principle applicable here is that counsel is not obliged to look for a needle in a haystack when there is no reason to believe there is a needle there. *Rompilla v. Beard*, 545 U.S. 374, 389 (2005).

[14] Billy Wayne Allen would not have met this criteria.

46

trusting the trial team rather than performance so deficient that the Constitutional right to legal representation was violated.

A significant problem with the evidence on this point is that Mrs. Allen did *not* endorse a lack of trust of the trial team during the trial period. Although not always clear, her position is not that she did not trust the trial team – it is that the trial team was not interested in her life and did not ask her about potential abuse. Another problem is that it was claimed that she was not asked about abuse[15] out of fear of alienating her, but there was no rational basis for that fear once the trial was under way and witnesses like her own brother had already given information to the trial team about some physical discipline. If Dr. Randall thought that there were red flags indicating that Mrs. Allen was an abuser of Allen, an alleged belief that he admitted he did not share with trial counsel and therefore not relevant to evaluating their conduct, there was no reason to not ask her (again) as there was no reason to believe that if she became angry she would stop helping her son.

That time was not as big a problem as now claimed is shown by the fact that Mr. Sindel could not identify a single witness that he chose not to present at trial because he lacked sufficient time to talk with them or prepare them. Vol. III at 172. Mr. Sindel also did not believe there was a lack of trust between Mr. Sindel and the Allen family due to race or any other factor. Vol. III at 177. Further, when Dr. Randall came into the case, if there truly was a time crisis based on a mismanagement of time, the trial team would not have been able to afford the luxury of having Dr. Randall start witness interviews from scratch, alone. Mr. Sindel was aware of Dr. Randall's plan and did not object to it on grounds of efficiency. Vol. III at 191. Mr. Sindel was also still the one who prepared witnesses for direct examination regardless of how far in advance

---

[15] As the evidence made clear, Dr. Randall may not have asked her about abuse, but Mr. Sindel did so on several occasions.

they were prepared. In addition, Mr. Sindel knew that Mr. Simon was simultaneously working on other cases and did not object to that practice on grounds of efficiency or a time crisis. Vol. III at 197. Finally, if there was a time crisis, one solution would have been to ask for more investigators as opposed to a continuance and no such request was ever made. Vol. III at 203.

### False Premise #3: Trial Counsel Had Reason To Believe That Both Allen And Mrs. Allen Were Concealing A Readily Available Truth

Based on the information reasonably available to Mr. Sindel, he was faced with a man of relative youth who had lived his entire life in a small geographic area; had a supportive, concerned and functional family; had received the benefit of a quality public education; and who appeared not to be mentally ill. There was nothing which should have or did raise a red flag for Mr. Sindel that there was a deep, dark closet of skeletons in the Allen family which would take protracted periods of repeated interrogation to unearth. Allen consistently denied an abusive upbringing. Mr. Sindel testified that the information in Allen's hand-written biography in December, 1997, was consistent with the things that Allen had been telling him all along. Vol. III at 33-39. Mr. Sindel had concerns that Allen was not being honest about the extent of Allen's material success and Mr. Sindel spent considerable time with Allen trying to break through his fantasies. Vol. III at 35, 39. However, based on the evidence at the hearing, a good deal of what Mr. Sindel suspected was fantasy, and which he succeeded in convincing the jury was fantasy, may have been factual. Exhibit 539, Allen Deposition at 113-118 (selling drugs), 259 (handled several thousand dollars of drugs), 260 (sold heroin in "button" form). *Cf.* Allen Deposition at 360 (not sure which $20,000 transaction he described to Dr. Yutzy). Also, the shooting of Mrs. Allen's home was portrayed to the jury as resulting from selling fake drugs, another fact which made Allen appear to be a pathetic follower. However, based on evidence at the hearing, and depending on which of Allen's alternative explanations for the shooting that one chooses to

believe, that incident may have resulted from Allen's non-fantastic drug dealing activity. Exhibit 539, Allen Deposition at 269 (shooting was over drug territory).[16]

There was nothing which should have or did raise a red flag for Mr. Sindel that Juanita Allen was lying to him about the circumstances of raising Allen. Vol. 1 at 136 (Mr. Sindel did not have significant information to support a history of abuse and therefore there was no strategic decision to not investigate that topic). Mr. Sindel did not believe that there were hidden family secrets. Vol. IV at 35. Both Mrs. Allen and Allen gave consistent accounts of his upbringing and several witnesses testified to Mrs. Allen being a good, caring, loving mother. Vol. IV at 39-47. Mrs. Allen was not even presented as a witness, in part because credible Government evidence established that she had attempted to obstruct justice for her son. Vol. 1 at 137-38). Thus, it was reasonable for Mr. Sindel to conclude, in his professional judgment, that a mitigation strategy that emphasized the positive qualities and attributes of Allen had the best chance of convincing a jury to spare his life and that concluding the mitigation investigation and preparing the witnesses to testify would not require so much time that it could not be completed in the time remaining.

---

[16] Although the content of the deposition was not explored in depth at the hearing, it warrants review by this Court. Highlights include: Allen only came to see his upbringing as abusive after spending time with Dr. Stewart and habeas counsel, pp. 54-62; much of his "whoopins" as a youth were disciplinary and were not as severe as being grounded or losing phone privileges, pp. 85-99; he lied to Dr. Yutzy in 1998 about abuse, p. 101; beginning at age 11-12 he began using marijuana and drinking, spending more time on the streets and associated with the Crips street gang, pp. 105-110; he chose to switch to City schools because he was "more into street life" and often skipped school to drink and smoke, pp. 129-130; he actively sold crack, cocaine and heroin for years and the shooting of his mother's house was related to a drug territory dispute, pp. 141-167, 268-279; and he was 11 the first time his mother told him to leave and he stayed with friends, pp. 168-174, and started sneeking out of the house at age 15, p. 181. He discussed his work record and social life in detail and both were not consistent with chronic PTSD. Ex. 539 at 227-252. Regarding abandonment, Allen testified that his mother did not expel him from the house; rather it was his decision to leave. *Id.* at 268. He described his life in prison at pp. 290-298. During the remainder of his deposition testimony, Allen was questioned about a number of written statements by him, including letters to his mother and letters to others. At first, he attempted to explain the contents, but then began to dodge questions by splitting hairs regarding the meaning of words. He also denied recalling some of his statements and eventually claimed that he did not recognize the handwriting because his handwriting had changed. *Id.* at 300-340. Ultimately, he refused to answer further questions about the letters. He was equally evasive and disingenuous in his explanations of his answers to Dr. Yutzy's questions in 1998.

49

Mr. Sindel had prepared a direct examination of Mrs. Allen based on what he expected her to say. His strategy was to use her to bring out more positive aspects about Allen and the circumstances of his life at the time of the offense. Vol. III at 241-249. She also was in a position to testify that Allen was a different person now that he had been in jail, that she would maintain a relationship with him in prison, that she loved him and that he was worth saving. Vol. III at 250 Mr. Sindel had not received any information from Dr. Randall about his alleged suspicions of abuse. Vol. III at 254. In addition, everything that Mr. Sindel knew in 1998 pointed to the death of Marquis Taylor being the source of the claimed PTSD.[17] It was a strategic decision to not present Mrs. Allen as a witness at trial. Vol. III at 255. The reason was concerns about her aggressive personality in 1998. *Id.* Mr. Sindel testified that there is no way to know that spending more time with Mrs. Allen would have resulted in her providing the information she claims now. Vol. III at 259. In other words, this third premise is false, in part, because it is based on nothing more than speculation. In 1998, Mr. Sindel had no information to contradict what Allen and Mrs. Allen were saying to each other in their letters in 1997. Vol. III at 261.

Mr. Sindel stated that he reasonably believed that the Allen and his family did not distrust him because he was white. Vol. III at 177. If he had suspected a lack of trust, he might have had a reason to believe that something was being withheld that required further, deeper inquiry. On the contrary, he thought the Allen family was being truthful and open with him. Vol. III at 177. It was also clear that Mr. Sindel did not strategically refrain from investigating or presenting any topic on account of time concerns. Thus, the record supports finding that any avenue of investigation was not pursued due to an unprofessional judgment or due to a mismanagement of

---

[17] PTSD was discussed in great detail at the hearing. All of that testimony need not be rehashed herein, but suffice it to say that at the end of the day, even assuming all of the so-called "undiscovered" information, the death of Marquis taylor was still the trigger for PTSD according to Dr. Cuneo.

time. There simply was nothing facing the trial which gave them any reason to believe that they were missing a needle in a haystack.

It was Allen's burden to prove that the so-called undiscovered evidence was readily available for counsel to find, But, in 1997 and 1998, Allen and his mother were not going to portray their family life as they do now simply for the asking, no matter how much time was provided. It was not always clear when and how they came to "admit" the evidence of abuse, but the admission clearly followed a transformative experience in Mrs. Allen's life. Another factor seems to be the efforts of habeas counsel and the exposure to a mental health expert and anti-death penalty activist, Dr. Pablo Stewart. If there were actual breakthroughs that were the result of detoxification and repeated questioning by habeas counsel prior to the hearing, the circumstances of disclosure prove beyond doubt that the information was not readily or reasonably available in 1997 or 1998. Allen cannot prevail without proving that the opposite.

### False Premise #4: Trial Counsel Acted Unprofessionally In Not Realizing The Dr. Haney "Misunderstanding" Sooner

Mr. Sindel was not deficient in selecting Dr. Haney[18] and found his work satisfactory in subsequent cases. Vol. III at 19-21. Only hindsight, which is not the appropriate perspective, led Mr. Sindel to conclude that he should have hired someone closer to St. Louis with fewer conflicts. But, Allen argues that trial counsel were deficient in not monitoring Dr. Haney and should have realized sooner that Dr. Haney was not actively investigating mitigation facts.

Allen's argument is premised on the false assumption that Dr. Haney was intended to be a "boots on the ground" field investigator rather than a potential consultant and potential trial witness. The next step in Allen's argument is that the alleged failure to understand Dr. Haney's true role sooner created a time crisis whereby it was too late to thoroughly investigate and

---

[18] It appeared from Dr. Haney's letter in January 13, 1998, Ex.330, that he was willing to say anything the defense team wanted, regardless of its truth, to assist them in getting a continuance.

51

prepare mitigation for Allen. The arguments of Allen fall apart, because the record makes clear that neither Mr. Sindel nor Mr. Simon expected that Dr. Haney would be a field investigator. This is demonstrated by several facts. First, unlike other assistants, there was no front-end, judicial authorization sought to fund Dr. Haney's activities. Vol. III at 23. Second, the trial team knew that Dr. Haney had never been to St. Louis, met trial counsel, met Allen or spoken with Mrs. Allen. Vol. III at 24, 31. Third, there was no documentation of any arrangement for Dr. Haney's services other than an estimate of 75-100 hours in November, 1997. Vol. III at 24, 28. Fourth, Ms. Caspari (Supranovich) sent some documents to Dr. Haney and it is reasonable to assume that she did so at the direction of or at least with the knowledge of her boss, Mr. Sindel. Fifth, and most importantly, Mr. Sindel, Mr. Simon and their team of investigators were actually *doing* the work that Allen claims they thought Dr. Haney was doing. Mr. Sindel said it was his plan to have field investigation work done by lower cost investigators, not Dr. Haney. Vol. III at 29, 71-74 (boots on the ground investigation being done by Mr. Sindel, Mr. Simon, Ms. Caspari and Mr. Rackers).

It is undisputed that Mr. Simon engaged in a lengthy interview of Allen, supplemented his findings with evidence from other mitigation witnesses and was well on his way to completing a social history investigation of Allen. Mr. Sindel's statements of his intentions regarding field investigation and the role of Dr. Haney to the Court in July, 1997, were far more credible than his hindsight recollection made without the benefit of having reviewed his prior filings. Contrary to his declaration, Mr. Sindel knew in 1997 that Dr. Haney was not doing the day-to-day investigation and preparation of mitigation because, inter alia, he had never been to St. Louis. Vol. III at 81.

52

There was a lengthy exchange at the hearing regarding "reviewer" and "getter". Mr. Sindel viewed Dr. Haney as a reviewer, not a getter, contrary to his declaration. Vol. III at 88-93. *See also*, Vol. III at 114-115.  Such a view of Dr. Haney was also consistent with the representations made by Mr. Sindel in July, 1997, concerning how mitigation would be investigated. Mr. Sindel reasonably believed that Mr. Simon was locating, meeting and interviewing mitigation witnesses and was not surprised that Dr. Haney was not doing such tasks. Vol. III at 125. When the request for continuance was requested, Mr. Simon advised Mr. Sindel that he was going to get "back" to work on the penalty phase. Vol. III at 128. The reviewer role of Dr. Haney also explains why there was never any documentation to include Dr. Haney within the attorney-client privilege as there was with Dr. Randall. Vol. III at 185. There also was no documentation of Mr. Sindel retaining Dr. Haney's services as there was with Dr. Randall. Vol. III at 205-06.

The reviewer/getter distinction also highlighted an issue which raised serious questions regarding the actions of habeas counsel. Mr. Sindel stated that his declaration was prepared by Ms. Carlyle, that he relied on her representations as to its accuracy, and that when it was prepared he lacked the benefit of refreshing his recollection with documents from the file. Vol. III at 80, 84-86 and 88; Vol. IV at 69-71. The bottom line was that by the time of the hearing, Mr. Sindel agreed that it was inaccurate, particularly with respect to the role of Dr. Haney and the so-called "Haney misunderstanding" being the proximate cause of not discovering evidence of abuse. Vol. III at 93; IV at 14-23. He was only provided the declarations of Dr. Martell and Dr. Stewart and had conversations with habeas counsel to prepare his declaration. Vol. IV at 14-23. The so-called new facts made Mr. Sindel "feel bad" If Mr. Sindel could be influenced by the suggestiveness of habeas counsel, imagine the influence that habeas counsel had on lay

53

witnesses, many of whom lacked the education and sophistication of Mr. Sindel. Most witnesses testified that they did not actually author their declaration and instead reviewed what was placed in front of them and signed the declarations without careful consideration of the contents. The wording and content of many declarations was clearly not the language that might have been used by some witnesses. Huge discrepancies were established by the Government between the declarations of other witnesses, Mr. Simon and Dr. Randall included, and the readily available documents and factual context of the events described in said declarations. Habeas counsel had the benefit of reviewing said documents for years, yet prepared declarations for witnesses to sign which, in many instances, were clearly refuted by known documents. Lay witnesses, in particular, were vulnerable to the power of suggestion given their bias in favor of Allen and their admitted desire that he not be facing the death penalty for his actions. Juanita Allen's own declaration contained a clear statement that her recollection of events only came to exist after repeated questioning by habeas counsel and learning, presumably from them and their experts, what kind of information might be helpful to Allen now. Ex. 258, ¶ ¶ 14-15. Respectfully, this is a state of affairs that the Government should not have had to spend considerable resources to uncover and reveal to the Court through painstaking review of documents, depositions of witnesses and hearing examination.[19]

Besides not viewing Dr. Haney as a getter, Mr. Sindel and Ms. Caspari made efforts to contact Dr. Haney which were not documented and which demonstrated that Mr. Sindel was making reasonable efforts to manage the mitigation investigation. Vol. III at 109.

**False Premise #5: If Dr. Randall Had Joined The Defense Team Sooner Or If Counsel Spent More Time Questioning Allen And Mrs. Allen About Abuse, Additional Mitigation Evidence Would Have Been Discovered**

---

[19] Again, if this Court had been presented with more accurate declarations of witnesses who would actually be called at a hearing, would this Court have reached a different conclusion with respect to Allen's entitlement to a hearing?

There is no reason to believe that additional probing during the period of the trial would have resulted in both Allen and Mrs. Allen painting the picture of abuse that they now choose to paint.

The argument is that if asked in 1998, after the passage of additional time and the influence of Dr. Randall, Mrs. Allen would have admitted felony child abuse conduct, alcoholism and other embarrassing and criminal conduct. There is nothing in the record which makes such an argument credible. Mrs. Allen was not then the person she appears to be now. She acknowledges going through rehab and counseling long after the trial to reach conclusions about the causes of her own behavior. Without completion of that process, it is not credible that she would have been able to make the admissions she made at the hearing (assuming they are true). While it was difficult to pin down precisely when and how there was a "breakthrough" which resulted in both Allen and Mrs. Allen claiming the extent of abuse presently claimed, there is no indication that either one of them would have endorsed such facts in 1998. In 1997 and 1998, Allen was not claiming abuse despite repeated inquiries from numerous sources[20] and Mrs. Allen was apparently still an angry, violent, abusive alcoholic (if her present claims are true). Mr. Sindel could was concerned in 1998 about her "demeanor" as a witness. Therefore, Allen fails to identify any credible circumstance which supports a reasonable probability that given more time proximate to the trial, the evidence in question would have been discovered.

It is wishful thinking that if only Dr. Randall had more time and more time, he would have made a breakthrough with Mrs. Allen. He apparently never even asked her despite telling this Court that he saw "red flags" that Mrs. Allen was a primary abuser of Allen. Allen and Mrs. Allen were consistent in their denials in 1997 and 1998. What is even more telling is that they

---

[20] These included, *inter alia*, Mr. Sindel, Mr. Simon, Dr. Randall, Dr. Cuneo and Dr. Yutzy.

55

communicated *to each other* in a way which contradicts a record of abuse. Allen's letters to his mother are odd if they were mutually concealing a dark secret, because they would have no reason to believe that letters written as confidential needed to support a charade of normalcy and affection. It is understandable that if there was a history of abuse they might hide it from strangers, but it makes no sense that they hid it from each other.

Mr. Sindel and Mr. Simon had been in the case long enough to ask the "tough" questions and in fact did so. However, Allen and Mrs. Allen consistently denied any abuse. Given their present testimony they are either lying now or were lying to trial counsel.

### False Premise #6: The Mitigation Investigation Was Constitutionally Deficient

The Government summarized the extent of the mitigation investigation conducted by Mr. Sindel and Mr. Simon, *supra*. Taken as a whole and viewed in light of what Mr. Sindel and Mr. Simon knew in 1997 and 1998, their mitigation investigation and presentation was a thorough and professionally competent endeavor. They asked the right questions of the right people and obtained the relevant documents. They prepared and presented a large number of witnesses who developed strategically selected themes that were made important by the facts of the offense. The investigation began early and continued over twelve months. Meetings were held among the team members to assess progress. See, e.g. Vol. III at 214. One mental health expert, Dr. Cuneo, became involved earlier than in many cases and the other became involved in sufficient time to conduct a thorough neuro-psychological evaluation. The Government's experts had even less time to assimilate the case materials and conduct evaluation than defense experts, but they were still able to develop robust opinions and bases therefor. Even when trial started, the mitigation investigation could continue because Dr. Randall did not need to be in court every day. Vol. III at 216. Dr. Randall even had time to contribute legal argument theories and content. Vol. III at

217. Rather than unusual, it is typical to make final preparations of witnesses over a weekend or in the evening. Vol. III at 218-219. Dr. Randall's efforts were also supplemented in the trial period by Mr. Rackers. Vol. III at 219. Dr. Randall's efforts were so robust that he exceeded the Court's budget and needed permission to continue. Vol. III at 221, 251.

When asked the first time, the only thing the Mr. Sindel could point to as error on his part was his alleged failure to supervise Mr. Simon more closely. Vol. III at 99-106. However, the facts developed at the hearing and discussed supra demonstrate that Mr. Simon was "supervised" and Mr. Sindel was aware of what Mr. Simon and others were doing to prepare the mitigation case beyond his own personal preparation and investigation. On another day, Mr. Sindel stated that he was somehow at fault because there was not enough time to establish enough rapport to get Allen and Mrs. Allen to stop lying to them.[21] Vol. IV at 34-35. Respectfully, this was simply a regret based on hindsight and not an identification of any professional error on his part viewed according to an objective standard of reasonableness. Within the time frame of a reasonable trial schedule, in 1998, there was never going to be enough time for the so-called "rapport."

Both of these are alleged errors are in contrast to what trial counsel told the Court in January, 1998, in support of the motion for continuance and appointment of Dr. Randall. At that time, trial counsel told this Court that the "fault" lay entirely with a third-party who was not present, namely Dr. Haney. Vol. III at 146, 160 and 161. There was no claim, pre-verdict, that the attorneys were at fault for not supervising each other, communicating with each other, talking to the witnesses more or talking to Dr. Haney sooner.

At the hearing, Mr. Sindel was also presented with a laundry list of claims made by several of the habeas witnesses regarding ways that Mr. Sindel and his team had been

---

[21] However, Mr. Sindel also stated that his present hindsight judgment would be different if the facts developed were not consistent with what Allen was claiming. Vol. IV at 36.

ineffective. Vol. IV at 87-93. Mr. Sindel denied the allegations of each of these witnesses. In addition, he refuted the claims of Dr. Randall that the paternal side of Allen was inaccessible and that there would be problems with maternal side cooperation if the paternal side were contacted. Vol. IV at 93. Finally, Mr. Sindel was confronted with Allen's public claims about Mr. Sindel's representation. Vol. IV at 97. Allen claimed that Mr. Sindel did not interview witnesses, did not investigate facts and did not present favorable evidence. Mr. Sindel denied each of these and stated that he conducted an appropriate factual investigation. Vol. IV at 98. These competing accounts cannot be reconciled. What they show is the exaggeration effect that permeates the claims and evidence in this case. On these points, Mr. Sindel was far more credible and it is only hindsight and a feeling of regret for Allen that gives him any reason to doubt the adequacy of his representation.

Out of the entire hearing perhaps the most significant testimony by any witness on the issue of ineffective assistance came from Mr. Sindel: "I did the best I could." Vol. IV at 38. This is more than the law requires and it was more than sufficient, under all the circumstances viewed from the perspective of 1998 and giving due deference to the decisions of counsel, to satisfy the minimum requirements of the Sixth Amendment.

### B. Even If Counsel Were Deficient, Allen Was Not Prejudiced Because It Is Not Reasonably Probable That The "Undiscovered" Evidence Would Have Produced A Different Outcome

Allen also failed to establish prejudice; that is, that there is a reasonable probability Allen would not have received the death penalty if additional evidence of Allen's alleged abuse had been presented to the jury. Allen claims that the so-called "new" evidence established that he was physically abused several times a week by his mother from early childhood and that his mother was an alcoholic who drank almost every day, all day, well past the point of intoxication.

*Allen Post-Hearing Brief*, pp. 36, 38. [Document 351]. He further posits that childhood abuse would have strengthened the diagnosis of Post-Traumatic Stress Disorder. Id. at 42. Such evidence, he claims, would have caused the jury to impose a life sentence.

Like his deficiency proof, Allen failed to meet his burden of proving prejudice.[22] Under *Sears v. Upton*, 130 S.Ct. 3259 (2010), this Court must now consider the totality of mitigating evidence and reweigh it against aggravation. *Id*. at 3266. This will require the Court to engage in speculation "as to the effect of the new evidence." *Id*. at 3266-67. Thus, this Court must review what evidence was presented at the first trial, determine what "new" mitigating evidence it finds credible in light of all the circumstances and re-weigh it against the aggravating evidence and circumstances. *See, e.g., Holder v. United States*, 2008 WL 2909648 *39-44 (E.D.Mo. 2008) (defendant not prejudiced by failure to present additional evidence in penalty phase). Holder also filed a motion to reconsider under Rule 59(e) of the Federal Rules of Civil Procedure and this Court rejected his attack on the prejudice analysis as follows: "mere speculation about what *might* have happened to the balance of the mitigation and aggravation factors [is] not sufficient to establish prejudice under *Strickland*." *Holder v. United States*, No. 4:03-CV-00923 ERW, Doc. 99 at 21 (E.D.Mo. 2009) (citation omitted) ( emphasis in original). Here, although Allen can show that evidence now exists which the jury did not hear, he cannot show more than mere speculation that said evidence would have resulted in a different weighing of mitigation and aggravation by the jury.

Like his deficiency analysis, Allen's prejudice analysis rests on several false premises. First, he failed to prove that the new evidence would have been presented by competent counsel. Second, he failed to prove that the new evidence would have any significant impact on his

---

[22] The Government's arguments have not changed much since its Sur-Reply was filed and the Government incorporates the prejudice portion by reference herein. Doc. 110 at 96-129. The Government's overview of the guilt phase evidence in its initial responsive filing is also incorporated by reference herein. Doc. 79 at 5-34.

mental health expert evidence. Finally, he failed to prove that if the jury had heard the additional evidence, there is a reasonable likelihood that the jury would not have imposed the death penalty.

Allen's biggest obstacle to meeting the prejudice prong is that he failed to prove with any clarity *what the facts of Allen's life actually were*. At this stage of the proceedings, the evidence on the details of Allen's life is confusing, conflicting and far from clear. It is hardly clear enough to set aside the jury's verdict. No *credible* evidence was presented that Allen was physically abused repeatedly by his mother when he was a child. Instead, the trial team found evidence that Allen was physically disciplined by his mother when, as a teenager, he began to skip school, left home for days at a time, used marijuana daily, and sold crack cocaine. At the time of the original case, both Allen and his mother repeatedly denied any physical abuse. The supposedly private correspondence between Allen and his mother was the antithesis of abuse. While some family members or friends testified at the Section 2255 hearing that Juanita Allen abused Allen, their testimony was contradicted by their statements at the time of the trial or was inherently incredible.

In addition, Allen's claim of Post-Traumatic Stress Disorder suffers from the same weakness shown at trial: it fails to provide a reason that a person who fears violence and guns would arm himself with a semi-automatic rifle, enter a bank to rob it and immediately shoot and kill the bank guard.

### False Premise #7: All Of The "Undiscovered" Information Would Have Been Presented

In the Government's Sur-Reply to Allen's Reply to the Government's Response to Allen's Petition, Doc. 110, the Government identified three categories of mitigating evidence

presented by Allen at trial: 1) positive; 2) negative; and 3) causal nexus. Under positive themes, Allen presented the following categories of evidence:

a. Allen was loved and valued by his friends and family who wished to continue to have him in their lives;

b. Allen had a family support network made up of law-abiding, successful, contributing members of society;

c. Allen had talents and a good side to him;

d. Allen was a non-violent person by nature and the crime conduct was out of character and an aberration;

e. Allen was redeemable and could function peacefully in the structured environment of prison life.

The penalty phase evidence of negative themes included:

a. Allen's home and family life;

b. Allen lacked a father and male role model;

c. Allen grew up in a poor, segregated section of the City of St. Louis infested with gangs, drugs and violence;

d. Allen suffered from poor health, including febrile seizures, lead poisoning, asthma and a skin rash for which he was hazed;

e. Allen had a difficult time adjusting to the grade school he attended as part of a school desegregation program;

f. Allen had learning difficulties in school, the school system failed to meet Allen's needs through intervention, and he should have received Special School District services.

Causal nexus themes included:

> a. Allen was a vulnerable follower, not a leader and not capable of planning this offense and he was an "easy mark" for being misled by Holder;
>
> b. Allen suffered from PTSD as a result of witnessing Marquis Taylor's death and that led to a downward spiral that Allen could not control and adversely impacted his judgment;
>
> c. Prior to the offense Allen was unrealistic about his future, depressed about not being able to go back home, allegedly attempted suicide and sought mental help;
>
> d. Allen's brain was damaged, possibly from febrile seizures or lead poisoning or being hit in the head and as a result he was mentally slow and could not inhibit his impulses

Thus, the mitigation evidence here was voluminous and covered a host of topics.

Mr. Sindel testified that his strategy was to deflect attention to Norris Holder as a violent person and to reduce violence as a role in Allen's life. Vol. 1 at 134-35. He wanted to portray the offense as an aberration for Allen and to portray Allen as someone with benefit to give back to the community and with valuable personality traits. Vol. 1 at 93. Mr. Sindel acknowledged that some of the evidence of Allen's background could present a "double-edged sword" about which Mr. Sindel would want to be very cautious.[23] He was also concerned with presenting witnesses who did not have "baggage" that would have weakened their credibility or, worse, strengthened the Government's arguments for death. Vol. III at 173, 175.

Strategy played a role in the direction of Mr. Sindel's mitigation investigation. He wanted to emphasize some things and de-emphasize others. Vol. 1 at 170. He wanted to keep out

---

[23] An example would be potentially opening the door to evidence of gang involvement and active sales of actual, rather than fake, drugs.

evidence that related to drug dealing, prior violent activity, motive for robbing a bank and possession of weapons[24]. In all trial matters, Mr. Sindel weighed the cost versus the benefit and strove for consistency between guilt and penalty themes. Vol. 1 at 176. He agreed that he succeeded in giving the jury the impression that Allen was incapable of taking any leading role in the murder/robbery and that any notions of Allen being an actual drug dealer were nothing more than fantasy. Vol. 1 at 173; 178-79.

The role of strategy was discussed with Mr. Sindel at length. Vol. IV at 49-58. He agreed that evidence always points more than one direction and that every trial attorney is faced with choices of whether to use evidence that helps in one area but hurts in another. He endorsed the concept that all such decisions have to be made with cost/benefit in mind. Vol. IV at 50. Mr. Sindel did not deliberately ignore any fact or lead, but he still had to choose themes and points where there was evidence to support them and where they moved Allen's case in the direction he wanted. Vol. Iv at 52. The list of themes in Allen's life that Dr. Randall prepared included the themes of poor maternal role model, genetic predisposition to addiction and physical abuse and beatings. Vol. IV at 52-57. However, not all these themes were supported by clear evidence from witnesses without baggage nor were they risk-free in terms of opening doors to topics that Mr. Sindel wanted to avoid. Mr. Sindel wanted to keep out any evidence of Allen's active drug dealing and gang membership. Vol. IV at 77-81. Mr. Sindel's skill was demonstrated by the fact that he was able to get in evidence that Allen grew up in a neighborhood infested with gangs, a potentially mitigating fact, but was able to keep out evidence that Allen was in a gang, a potentially aggravating fact. *Id*.

---

[24] To blindly dump in all of the information developed by the habeas team would have injected these issues, would have established beyond doubt that Allen was an active drug dealer and was involved in drug-related violence and clearly was motivated by his actions to acquire material wealth without working for it.

To establish prejudice, Allen has the burden of showing the probable impact of the undiscovered evidence in his case. But, it is highly unlikely, given Mr. Sindel's strict adherence to keeping an eye on cost/benefit in making such decisions, that he would have viewed the evidence of abuse and dysfunction in Allen's family as worth the cost. This is because a complete examination of Allen's life necessarily entailed detracting from his value as a life worth saving and from the sympathetic value of the impact of the execution on Mrs. Allen. Mr. Sindel clearly wanted positive evidence as a pathway to a life sentence. The negativity inherent in the topics explored at the hearing would have meant "trashing mom." If the jury viewed her as an abusive, alcoholic mother with anger management issues and Allen as the violent product of that upbringing, it would have undercut the value of other evidence. This would have included Mr. Sindel's overarching theme that Allen's life was worth saving, in part because he had a normal, strong and supportive family to whom Allen was very important. The goal of Mr. Sindel's strategy was that if Allen had value to upstanding, hard-working, law-abiding people, then jurors could identify with those witnesses and have value to them. The fact that ultimately this strategy failed does not mean it was not Allen's best strategy.

Just as a full exploration of Mrs. Allen's life and Allen's life required examination of Allen's behavior as a child, adolescent, teenager and young adult, the same would be true if this same evidence had been placed before the jury. The jury would learn about Allen's truancy, his alcohol and marijuana abuse, his striving for materials wealth, his early and extensive involvement in drug dealing and gang activity, his refusal to obey his mother's rules, the real cause for the death of Marquis Taylor, Allen's return to drug dealing on a larger scale even while on probation, the cause of the shooting at his mother's house, and his prior possession of a weapon. These are all topics and facts that Mr. Sindel wanted to keep from the jury and his

64

strategy succeeded for the most part. Thus, Allen failed to establish that if Mr. Sindel had the benefit of all the information now claimed to be true Mr. Sindel and Mr. Simon would have presented it. If it would have not been presented, its non-discovery could not have prejudiced Allen.

### False Premise #8: If The Mental Health Experts Had The Benefit Of The Undiscovered Evidence, Their Opinions Would Have Been More Helpful To Allen

Dr. Cuneo opined that Allen suffered from PTSD as a result of Allen's proximity to Marquis Taylor when he was killed. Dr. Gelbort opined that Allen suffered from brain damage as determined by neuro-psychological testing. At trial, the Government robustly rebutted this evidence with its cross-examination and the testimony of Dr. Wetzel and Dr. Yutzy. Both testified at the hearing and again addressed Dr. Cuneo's opinions and the new conclusions of Dr. Martell. The Government also presented the new testing and conclusions of Dr. Askenazi. The mental health evidence was covered in great detail at the hearing. The Government believes that it impeached Dr. Cuneo's opinion even more than at trial and Dr. Martell was shown to be of little or no credibility given that the Government essentially got to him agree that his primary conclusions were no longer worthy of weight. Dr. Askenazi, on the other hand, was shown to be an extremely credible and conscientious expert whose work was thorough and worthy of great weight. The Government will not take the pages of this brief to cover  said evidence in detail, but is willing to do so in a supplement if this Court deems it helpful. At a minimum, Mr. Sindel testified that the argument that PTSD resulted from the death of Marquis Taylor was consistent with how Allen presented the facts to the trial team and it was corroborated by other witnesses and evidence. Vol. III at 220.

More importantly, the so-called Misunderstanding with Dr. Haney and the so-called time crunch had no impact on the choice of mental health experts. Vol. IV at 23, 30. Mr. Sindel believed that Dr. Cuneo's opinions were scientifically supported. Vol. IV at 24. He also felt that Dr. Gelbort's work was professionally competent and Dr. Randall agreed. Vol. IV at 26-28. Dr. Gelbort had all the time with Allen that he wanted. Vol. IV at 28. In addition, the Dr. Haney situation did not impact trial counsel's discovery of any facts. Vol. IV at 34. Thus, if counsel were deficient in their investigation, it had no effect on the choice of experts or the content of what they presented.

Allen failed to meet his burden of demonstrating that he was prejudiced in the presentation of his mental health experts by non-discovery of the so-called "new" evidence. When viewing the evidence as a whole, the Government's impeachment of Allen's mental health experts would not change significantly and some of the new evidence would provide even stronger proof that PTSD was a factor in his life at the time of the offense, if he ever had it. Similarly, the evidence that he was brain damaged was stronger as presented by Mr. Sindel than it is now, particularly when weighed against the opinions of Dr. Askenazi. Dr. Cuneo is also now impeachable by his false statements in his declaration and Dr. Martell is impeachable by his erroneous calculations and biased analysis to reach his opinions. No jury would agree that Allen is or ever was brain damaged given that he continued to learn and get smarter once the dulling effects of drug and alcohol addiction were removed.  Mr. Sindel stated that in his experienced view, mental health expert evidence is always a "pretty hard sell" to juries. Vol. 1 at 158. Competing experts also neutralize each other. Vol. 1 at 160-61.

**False Premise #9: If Presented, There Is A Reasonable Probability That The Undiscovered Evidence Would Have Resulted In A Sentence of Life**

The primary problem with Allen's argument is that the so-called new evidence would be *merely cumulative* to the already substantial mitigation case mounted by trial counsel. As in *Wong v. Belmontes*, 558 U.S. 15, 22 (2009), adding the so-called new evidence "to what was already there would have made little difference." Creating a focus on Mrs. Allen as the culprit would also have the counterproductive effect of confusing the jury and distracting from the goal of focusing the jury's attention on Holder as the stronger, more culpable planner, organizer and leader who took advantage of Allen. The abuse angle did not offer a causal nexus theme as did the Holder angle. This "cost" factor was also recognized as relevant to a prejudice analysis in *Wong*. *Id.* at 19. Mr. Sindel testified that the "abuse excuse" was of limited value because it did not offer a causal explanation for the offense conduct. Vol. I at 198. A causal nexus them was one of the themes that Mr. Sindel believed to be most likely to produce a life sentence. *Id.* the abuse excuse was also particularly difficult to sell to a jury in a bank robbery case where the motive is money.[25] *Id.* Moreover, Mr. Sindel is of the view that the abuse excuse, in general, is rejected by jurors. Vol. I at 159.

Another reason that the undiscovered evidence would not change the outcome is that the costs of putting the additional evidence on would actually work to Allen's detriment while only offering cumulative benefit. Portraying Allen's extended family as good, hard-working people and portraying Allen as a worthwhile human being whose mother loved him fit with the theme that the Allen they knew would never have done this  but for the influence of the stronger, older Norris Holder. Blaming his mother as well as Holder for murdering Richard Heflin would not

---

[25] The abuse excuse might be a potent mitigator if Allen was found guilty of murdering his mother.

have set well with the jury and detracted from the overall credibility of Allen's mitigation arguments. In a case where the evidence of guilt of a violent, takeover-style bank robbery was overwhelming and devastating, the actual evidence presented had a higher chance of saving Allen than a full airing of the so-called undiscovered evidence, including aggravating evidence about Allen that the trial jury never heard. Mr. Sindel agreed that the evidence of guilt was devastating. Vol. I at 181. A conviction was inevitable. Vol. III at 100, 201-202. Allen's admissions were recorded. Vol. I at 182. Mr. Sindel did not take an unwise "kitchen sink" approach to mitigation. He skillfully classified the thrust of the evidence presented as residual doubt, causal nexus and begging (showing the family in a positive, sympathetic light). Vol. I at 200. Mr. Sindel agreed that mitigating evidence that bears a causal nexus to the offense can be the most effective type of mitigation. Vol. I at 198; Vol. IV at 85. The evidence that Allen says should have been presented does not offer an explanation for why he murdered to get money.

Which raises the question of what does the undiscovered evidence prove with any clarity? At trial there were many contradictions in the mitigation evidence, including why the house was shot up, what triggered Allen's mental decline, what were the symptoms of PTSD, what was his mental state at the time of the offense, why didn't Allen work in a legitimate job, did he actually sell drugs or simply fantasize that he did. However, the evidence regarding abuse and the timing and details of Allen's life are even more confused after the habeas hearing than before.

Allen failed to clearly show prejudice from trial counsel's supposed failure to present evidence of childhood abuse and neglect, because Allen did not prove his claims that he was physically abused as a child. The age, extent, severity and effects were never clearly accounted for. The trial team was aware that Juanita Allen physically punished Allen when he was a

68

teenager and began to skip school and use and sell drugs. Testimony at the Section 2255 hearing of childhood abuse was contradicted by prior statements of the witnesses or was inherently unbelievable. What follows is an overview of the state of the evidence with respect to the lack of clarity of what were the facts of Allen's life, the baggage some witnesses carry and the availability of new and harmful rebuttal/cross-examination.

During the mitigation investigation, the trial team learned that Allen had dropped out of school, regularly used marijuana, and was selling crack cocaine starting when he was still in school. In April 1997, Ms. Allen told Mr. Sindel that her son had dropped out of school in ninth grade and had been skipping school before he dropped out. Ex. 301, p. 3. Allen told Mr. Simon that he started dealing crack when he was still in school. Ex. 635, pp. 4-6. He told Mr. Simon that he smoked marijuana every day, totaling about an ounce per week. Ex. 638A, p. 22. Monette Petty, his cousin, told Dr. Randall that Allen would leave the house and stay with his friends for two to three weeks. Ex. 479. Carol Petty, Allen's aunt, told Dr. Randall that "I heard he had conflicts with his mother. He was staying out late, wouldn't come home, things like that." Ex. 503. Lucy McLemore, Allen's aunt, told Mr. Simon that "He & Nita had a problem, as he got older, he thought he cld stay out as long as he wanted to." Ex. 500, p. 7. Ms. Allen told Mr. Sindel that she had tried to convince Allen to go to counseling but was unsuccessful. Ex. 301, p. 8.

Multiple persons told the trial team that Allen's behavior as a teen needed to be controlled. Shimeka Taylor, a neighbor, told Dr. Randall that "Bill needed discipline, he did need that.  Juanita was great, but too lax when it came to Bill. Boys need a stronger figure. Juanita did not take that role in my opinion." Ex. 452, p. 3. Deborah Ruffin told the trial team that Ms. Allen had to "'tighten Bill up'-get physical." Ex. 486, p. 2; Ex. 485, p. 2. She explained "Not having a

father in the house. Her dad is an older man. She has to do what she has to do to maintain control." Ex. 488, p. 4. Allen's baseball coach, Samuel Moore, described Juanita's discipline of him to Dr. Randall: "Bill was on punishment just a little while back. Try to keep him stay in the house. She'd mop him up." Ex. 436, p. 2. He stated: "[E]verybody knew Bill would be put on punishment. . .his mother would kick his ass in the street." Ex. 436, p. 2. Shimeka Taylor similarly described Ms. Allen's discipline of Allen: "She put him on punishment. His mother, my mother the type they need to control their kids up to a certain point. A whooping and a punishment." Allen told Dr. Cuneo that his mother "physically disciplined him till end." Ex. 565, p. 22. Raymond Petty, Allen's uncle, told Dr. Randall about a single incident: "One time she was getting on him. She was beating him. He was supposed to be in a certain time, and do something, and he didn't do it. He's 16-16-18 [sic], not too long ago." Ex. 458, p. 4. Raymond Petty testified in the penalty phase that he had stopped Juanita Allen from beating Allen with a cord when Allen was fifteen, sixteen or seventeen. Ex. 213, p. 27.

Thus, the family members, neighbors and friends interviewed by the trial team described a teenager who was out of control and a mother who attempted to ground him and physically discipline him to get him to behave. The trial team was not told by anyone that Ms. Allen physically abused her son as a young child.

In fact, at the time of trial, both Ms. Allen and Allen denied any abuse. Allen told Mr. Simon that he "always had a real good childhood. I had people that cared for me." Ex. 633, p. 4. Allen told Mr. Simon that he had never been subjected to physical abuse by anybody when he was growing up. Ex. 638A, p. 1. He also denied that his father had abused his mother when they were living together. Ex. 638A, p. 3. Allen told Dr. Yutzy, the Government psychiatrist, that he got along great with his mother when he was younger. Ex. 46, p. 13. He denied being verbally or

70

physically abused as a child. Ex. 46, pp. 67-8. He told Dr. Yutzy that he considered his mother's punishments of him—not being able to go outside or talk on the phone—to be worse than getting whippings. Ex. 46, pp. 65-66. Juanita Allen told Mr. Sindel that she had not abused Allen. Vol. I, pp. 167-8, 194-195, 196-7. Allen also told Mr. Sindel that he had not been physically abused. Vol. I, p. 194-5, 196-7. Mr. Sindel did not recall any information from Allen's teachers or any indication in Allen's medical records of physical abuse of Allen. Vol. I, pp. 203, 237.

In his Section 2255 motion, Allen now claims that he was repeatedly physically abused by his mother when he was a child. These claims are refuted by the witnesses' prior statements or lack credibility. Each witness' testimony will be examined separately.

Juanita Allen testified in the Section 2255 hearing that she disciplined Allen but that she got out of control with him "going on his teenage years." Vol. IX, p. 50. She said that she remembers hitting him a couple of times in the face. Vol. IX, p. 53. She remembered hitting him with an extension cord and her brother pulling her off of Allen. Vol. IX, p. 52. She identified that incident as an occasion in which her "whooping" went too far. Vol. IX, p. 59. She stated that she struck Allen with her fists or extension cords between the ages of 11 and 16. Vol. IX, p. 100. She stated that it occurred two to three times a week. Vol. IX, p. 101. She later said that she only specifically recalled two times that she struck Allen and those were times that her brother intervened. Vol. IX, pp. 172-175.

Ms. Allen's testimony sharply contrasts with the statements that she made to the trial team. Ms. Allen claims that she does not recall the conversations that she had with the trial team. Vol. IX, p. 97. She testified at the hearing that if she had been asked about abuse she would have told the trial team that she abused Allen. Vol. IX, p. 109. In fact, she told

71

Mr. Sindel that she had not abused Allen. Vol. I, pp. 167-8, 194-195, 196-7. She told Mr. Sindel that she wasn't going to lie to him and that she expected that he would not lie or fabricate to her. Ex. 301, p. 1. She told Mr. Simon that Allen did not come from a bad environment. Ex. 500, p. 60. She rebuked Mr. Simon, stating "you're looking for something extremely negative. There is no complete diagram for any situation." Ex. 500, p. 60. Mr. Simon testified that it was his experience that Ms. Allen was forthright with him. Vol. V, p. 197. Ms. Allen told Dr. Randall that Allen was a perfect son and a mama's boy until the beginning of high school. Ex. 411, p. 1. Ms. Allen's statements at the time of trial clash with her current account.

Allen offers the dubious testimony of Corey Allen in support of his current claim of childhood abuse. Corey Allen testified that he lived on Evans by Allen when Corey Allen was about six or seven years old until he was eight years old. Vol. XV, p. 12. He said that Allen's mother and father beat him with extension cords, brooms and other items every day all day. Vol. XV, p. 16. He said that when Juanita Allen and the children moved to Cote Brilliante, Ms. Allen continued to beat Allen on a daily basis. Vol. XV, p. 30. Allen had bruises on his back, face and legs daily. Vol. XV, p. 32. Corey Allen stated that he was at Allen's house every day to observe these events. Vol. XV, p. 21. Yet, Mr. Allen did not even know that Allen attended Clayton Schools for elementary school and part of middle school. Vol. XV, pp. 32-33. He said that teachers saw bruises on Allen, came to the house to investigate, but never hot-lined the abuse because there was no hotline requirement at that time. Vol. XV, p. 33-34. At least nine of Allen's teachers testified during the penalty phase. Ex. 179 (John Lents), 180 (Ann Edmonds), 184 (Susan Duke), 189 (Joyce Eaton), 194 (Stephanie Stock), 201 (Julie Ellis), 206 (Russell Vanecek), 211 (Barbara Murrell). They testified generally that he was a friendly, happy child. None described any bruises or injuries. Dr. Randall testified that he interviewed many of Allen's

72

teachers and none of them said they had seen any signs of physical abuse of Allen. Vol. VII, p. 176. The Missouri statute requiring teachers and other professionals to hot-line child abuse was enacted in 1975. Section 210.115 Mo. Rev. Stat. Billie Allen was born in 1977. Equally incredibly, Corey Allen testified that Allen was whipped by teachers, although he was uncertain if they were city or county teachers. Vol. XV, pp. 35-36. Mr. Allen's testimony lacked all credibility.

Corey Allen testified that Allen began to use alcohol and marijuana at age 13 or 14. Vol. XV, p. 26. He said that Allen began selling crack daily around the same age and was making $500 to $1000 per day. Vol. XV, pp. 39-40. Marquis Taylor was killed because of disputes over drug territory boundaries. Vol. XV, p. 43. Mr. Allen said that he'd been shot in the summer of 1997 because of his involvement with drugs and spent the following six months to a year in the hospital. Vol. XV, pp. 26-27, 45.  Although he stated he would have testified at trial for Allen, he admitted that was not in the hospital at the time of the trial and did not attend the trial. Vol. XV, pp. 27, 45. The use of Mr. Allen as a witness risked the introduction of evidence of Allen's drug dealing from an early age.

Ms. Ruffin testified that she first met Allen when he was about twelve years old. Vol. XIV, p. 4. She said that Ms. Allen would hit Allen and throw things at him. Vol. XIV, p. 14. She refused to give an estimate as to the number of times she witnessed such actions other than "I'd say more than once." Vol. XIV, pp. 37, 42. She said that Ms. Allen's actions were abusive but that at the time she felt Ms. Allen was doing it because she was disciplining Allen. Vol. XIV, pp. 14-15, 37. Ms. Ruffin conceded that she had never called the police or Children's Services or spoken to Otha Petty, Sr. about the supposed abuse. Vol. XIV, p. 28. Ms. Ruffin testified that Ms. Allen "tried her best to keep him [Allen] from harm and put him on the right path." Vol.

73

XIV, p. 12. She said Ms. Allen "was trying to get him to be more serious, take his school work and his life more serious. She didn't want him running the street with a certain kind of person," that is, drug dealers. Vol. XIV, pp. 13, 38.

At the time of the trial, Ms. Ruffin described Ms. Allen's interaction with Allen as necessary discipline—not abuse. Ms. Ruffin told the trial team that Ms Allen "had to do what she has to do to maintain control" and that she "had to tighten Bill up—get physical." Ex. 484, p. 4; Ex. 500, p. 15; Ex. 485, p. 2.. She told Dr. Randall that "Bill is surrounded by love." Ex. 488, p. 1.  She said that there was a "lot of love, lot of freedom to develop." Ex. 488, p. 3. She told Dr. Randall that "Their mother is a good person. She's raised four children all by herself. I know they're good children. Their grandfather is a beautiful person. The whole family, you couldn't find a better bunch of people. Hard working, church going, open hearts." Ex. 488, p. 1. She told Dr. Randall that Juanita Allen would talk to Allen until she was blue in the face to try to keep him out of trouble. Vol. XIV, p. 40.

At trial, Ms. Ruffin testified to her observations of Ms. Allen's interactions with her son: "I would often hear his mother say, 'Look, you know, you need to clean up your room. It's a pigsty.' You know, 'Go and straighten up your room. When you get done with that, I want you to do your homework.' You know, regular parental things." Ex. 178, p. 20. She testified that before Marquis Taylor died, Allen "would always laugh and joke and play around the house with is mother and the girls." Ex. 178, p. 40.

Ms. Ruffin's testimony at the hearing contradicted both her prior statements to the trial team and her testimony in court. Her previous statements and testimony described a loving family, a son who was becoming involved in the street life, and a mother who tried to keep him

74

on the right path. Her current statements--obviously made to help the son of her longtime friend--lack credibility.

At the hearing, Monette Petty Nelson, Allen's cousin, said that Ms. Allen was "disciplining" Allen with "whoopings." Vol. XIV, p. 69. She said that if Allen got in trouble, Ms. Allen would throw shoes at Allen or hit him. Vol. XIV, p. 70. Back in 1998, Ms. Nelson told the trial team that Ms. Allen has no rules and "was pretty much lenient on them." She told Dr. Randall that she couldn't say it was neglect. Ex. 479, p. 1. At the Section 2255 hearing, Ms. Nelson admitted that she never told the trial team that Ms. Allen had struck Allen because she viewed Ms. Allen's actions as nothing out of the ordinary and as discipline. Vol. XIV, p. 89-90. It is only years later that she now has come to view it as abuse. Vol. XIV, p. 90. Ms. Nelson's Section 2255 testimony is undercut by her statements at the time of the trial.

Yvette Allen, Allen's youngest sister, testified that her mother hit Allen several times a week over a several year period. Vol. X, pp. 37, 73. She said that Ms. Allen used a wooden paddle several times over a number of years. Vol. X, p. 65. Some of the incidents occurred when Allen broke the rules and some did not. Vol. X, pp. 65-66. She stated that there was never a child abuse investigation of her family. Vol. X, p. 64. She said that she had never seen any bruises on her brother. Vol. X, p. 71. She said that the first people she ever told that her mother had beaten her brother were the 2255 attorneys. She never told anyone before because it was "kind of normal then." Vol. X, p. 67. She does not recall if the trial attorneys ever asked her about abuse. Vol. X, p. 68. Although she does not recall being interviewed by the trial team, Yvette Allen was interviewed by Dr. Randall at least twice, as well as Mr. Sindel and Mr. Simon. Ex. 420; Vol. VII, p. 38; Vol. V, p. 105; Ex. 418; Vol. VI, p. 43; Ex. 383. She never told the trial team about any abuse by her mother. At trial, she testified about her relationship with her brother, the fact

75

that her family did not show emotions, and that her father was an alcoholic. Ex. 196, pp. 155, 158, 159. Ms. Allen's current statements are not consistent with her statements before and during the trial.

At the 2255 hearing, Angela Allen, Allen's sister, testified that her mother would punch her brother in the chest several times. Vol. XIV, p. 114. She denied that her mother ever hit Allen with sticks or an extension cord. Vol. XIV, pp. 124-5. She said that her mother hit Allen with a belt and wooden paddle. Vol. XIV, pp. 124-5.  In her declaration filed in 2009, Angela Allen never said that her mother hit Allen; instead, she simply stated that her mother would "yell and scream at him and call him terrible names." Ex. 260, p. 1. In her declaration she stated that she had given the 2255 attorneys "a full description of what life was like for the family and for Billie when he was a kid." Ex. 260, p. 3; Vol. XIV, p.129. Yet, her "full description" did not include any physical abuse of Allen. Similarly, Angela Allen never told the trial team that Juanita Allen beat Allen. Dr. Randall interviewed Angela Allen twice. Vol. VIII, p. 38. His notes indicate that Angela Allen never mentioned any abuse. Ex. 405. Ms. Allen's current claims that her mother beat Allen are belied by her previous declaration and statements.

Johnnie Grant met Allen when he was twelve or thirteen years old. Vol. X, p. 75. He testified that he and Allen "hustled;" that is, sold crack, marijuana, heroin, and cocaine. Vol. X, pp. 122-123. Johnnie Grant testified at the hearing that Allen's sisters and mother smacked Allen in the head. Vol. X, pp. 78-79, 81, 108.  He said that all three sisters physically abused Allen by hitting him in the head, punching him and kicking him. Vol. X, p. 108. He testified that Ms. Allen struck Allen with a belt and hit him with a fist. Vol. X, p. 113. Mr. Grant told the Court that his memory was impaired since he'd been in a car accident. Vol. X, p. 134. His testimony is contradicted by Angela Allen. Angela Allen denied that she, Yvette or Nicole had ever punched

Allen in the head or kicked him. Vol. XIV, pp. 132-133. At trial, when Mr. Grant was asked if family was important to Allen, Mr. Grant testified that Allen had never said anything bad about his family except the typical complaint once in a while. Ex. 176, pp. 14-15.  Mr. Grant was not credible in his belated reports of abuse.

Allen offered the testimony of Brady Toliver at the hearing. There is no record of Mr. Toliver in any trial team list of possible witnesses. No trial team member recalled being provided with the name of Brady Toliver as a possible witness. Vol. III, pp. 15, 171-2 (Sindel); Vol. VI, p. 68 (Simon); Vol. VII, pp. 183-184 (Randall). Mr. Toliver was a student at DePauw University starting in the summer of 1996. Vol. XV, p. 81. He did not have contact with Allen from the time he left for DePauw University through the trial. Vol. XV, p. 82. He never contacted Allen's attorneys or Allen's family to offer assistance. Vol. XV, p. 82. Allen has not established that Mr. Toliver was known to the trial team at the time of trial.

Moreover, Mr. Toliver's testimony at the hearing was unreliable, emotional, argumentative, and inconsistent. His testimony varied from his 2009 declaration and his deposition in significant matters. He testified at the hearing that he saw Allen "just about every weekend." Vol. XV, p. 57. However, his declaration stated that he spent almost every day together with Allen. Ex. 264, p. 1. His explanation for the discrepancy was that he did not have the "emotional stability" to be accurate in his declaration. Vol. XV, p. 58. He testified in his deposition that he wrote out his declaration in his own words and dictated it to the Section 2255 attorney. Ex. 536, p. 64. At the hearing, however, he testified that he gave notes to an attorney who then wrote out the declaration. Vol. XV, p. 66.  At the hearing, Mr. Toliver testified that Jerome Petty's discipline of Allen was abusive sometimes. Vol. XV, p. 77. In contrast, in his deposition he testified that he did not consider Jerome Petty's actions to be abusive. Ex. 536, p.

77

19. At the hearing, Mr. Toliver testified that Allen's sisters physically abused him. Vol. XV, p. 88. However, in his declaration, he stated that the sisters simply called Allen names. Ex. 264, p. 2.

Mr. Toliver was admonished by the Court for "smirky, smiling stuff" and not answering questions. Vol. XV, p. 76. The Court took a recess because Mr. Toliver was "hostile" and noted that "he's discrediting himself before me by this nonsense he's carrying on." Vol. XV, pp. 84-85.

Mr. Toliver testified that Ms. Allen threw a pan and shoes and hit Allen with a belt or extension cord. Vol. XV, p. 60. He said his mother witnessed some of the abuse. Vol. XV, p. 72. He told his father about Ms. Allen's actions. Vol. XV, p. 73. Neither reported Ms. Allen to the Child Abuse Hotline. Vol. XV, p. 73. Despite his claim that he was at Allen's residence every weekend, he had a limited knowledge of Allen's life. He did not know Allen was selling crack and using marijuana. Vol. XV, p. 78. He was unfamiliar with defendant's close friends Ahmed Oliver, Prentiss Church, Johnnie Grant, and Marquis Taylor. Ex. 536, p. 32-33; Vol. XV, p. 79. He never spoke to Allen about the murder of Marquis Taylor. Vol. XV, p. 80.

Finally, Mr. Toliver's testimony veered into the bizarre. He asserted that Allen's zodiac sign would indicate whether or not Allen was a gang member. Vol. XV, pp. 89-90. He asserted that the molecular structure of water is changed by the type of music played. He stated that since human bodies are 85 percent water, energy transformation by 1995 and 1996 showed that the sum total of Allen's abuse had taken place. Ex. 536, p. 84; Vol. XV, p. 91.

Trial counsel had copies of Allen's letters to his mother. In these letters, he continually expressed his love for his mother and his failure to follow her wise advice. He wrote "They [sic] other day I was reading this cartoon and it reminded me of you and I smiled I love you so much, and I know you feel the same." Ex. 493, p. 1. He stated "Everything you tried to teach me I went

78

the other way but I don't look at it as your fault you did your part as a mother for me and I Love you for that." Ex. 493, p. 2. Allen wrote "To me you will still be the best mother in this world even though your son might be locked up like I said you did your part and I didn't do mine I'll Allway's [sic] love you for being there for me when my so called friend's [sic]wasn't. I Love You Mom." Ex. 493, pp. 2-3. In a letter for Mother's Day, Allen wrote:

> The thing I really been thinking about is you, how you been there for me threw [sic] all of my life no matter what, and that's why I love you so much. I really think that your job of being a mom is perfect because you did your part. You raised me the right way it was just my fault that I messed up, you kept me away from all this drama all my life but I was the one who got myself in this. Thanks to the love, from the one who always was in my corner.

Ex. 495. None of these letters expressed any animosity toward her or criticized her actions.

In summary, Allen's claims of childhood abuse were unsupported by credible evidence. In fact, much of the new testimony confirms that as a young teenager Allen was selling and using drugs, had dropped out of school and that his mother was frustrated by the path that he was taking. Her use of physical discipline was not hidden from the trial team; it was intertwined with extremely negative evidence of Allen's drug dealing and use. Allen cannot show prejudice from the trial team's failure to present this new weak and contradictory evidence.

Another factual moving target is Allen's claim that evidence established that his mother was an alcoholic who drank nearly every day, all day, well past the point of intoxication from her own teenage years. Post-Hearing Brief, p. 38. [Document 351]. The Government does not dispute that Ms. Allen drank alcohol. Indeed, the trial team was told that Ms. Allen drank when under stress. However, the current picture of Ms. Allen as a constant falling-down-drunk during Allen's childhood is contradicted by the trial team's observations, statements by witnesses and

witnesses' trial testimony. Moreover, Allen cannot establish that credible evidence of Ms. Allen's drinking would have changed the outcome of the trial.

The trial team knew that Ms. Allen drank alcohol. Mr. Simon testified that he met with Juanita Allen, other family members and friends on January 7, 1998 at approximately 9 p.m. Vol. V, pp. 105-106. He stated that he smelled alcohol in the room and based on his observation of Ms. Allen, he believed that she was impaired due to alcohol. Vol. V, p. 108. He did not recall any other time that he had contact with Ms. Allen in which he believed that she was impaired. Vol. V, pp. 108-109. Dr. Randall testified that he had the sense that she was someone who was a drinker. Vol. VII, p. 52. He never stated that he observed her to be drunk. Mr. Sindel testified in his deposition that he did not remember "anything that would have led me to believe that she had a significant alcohol problem." Ex. 534, p. 30. The trial team's own observations were that Ms. Allen drank alcohol but did not have a significant drinking problem.

The family members and friends interviewed by the trial team described Ms. Allen as a person who drank when she was in trouble or stressed—not intoxicated every day, all day. Deborah Ruffin, Juanita Allen's friend, told Dr. Randall that Ms. Allen would drink when she's upset "sometimes to excess." Ex. 489, p. 2. When asked if Ms. Allen had a problem with alcohol, Ms. Ruffin told Mr. Simon that "She drinks to excess, when she is in trouble." Ex. 500, p. 11. Nancy Harris, Ms. Allen's neighbor, told the trial team that she had never seen Ms. Allen drunk. Mr. Sindel noted that "Juanita would not show this woman her bad behaviors." Ex. 465, p. 5.

Juanita Allen's brother Raymond Petty told Dr. Randall that "When problems arise, Juanita will drink. She would drink to cover up what's going on. When she gets depressed she'll drink." Ex. 458, p. 4. Mr. Petty told Mr. Simon that "Juanita drinks when problems arise." Ex.

80

500, p. 39. Mr. Petty testified to Juanita Allen's use of alcohol during the penalty phase of the trial:

> My sister, I think she -- she doesn't -- she curse a lot, and cursing and drinking and -- it's not going to alleviate the problem. When you are done cursing, when you put that glass down, the problem's still there.

Ex. 213, p. 6.

Thus, the trial team was presented with a mother who drank when under stress and they introduced that evidence.

Furthermore, the trial team was told that the time period of her drinking corresponded with Allen's teenage years. Mr. Petty told Dr. Randall that Ms. Allen began dating her boyfriend at the same time that Allen "started sliding" --when he was a teenager. Ex. 458, p. 3. Mr. Petty told Dr. Randall that:

> I think she failed at the time she should be there knowing when Bill was doing. When he started his slide, he was out to 1 or 2 in the morning. I'd call, mom wouldn't be there, doing her thing. She had just gotten a new boyfriend. That's when Bill got loose. She didn't move out, but she might go over there and not come back to the next day 11 or 12 o'clock.

Ex. 458, pp. 3-4.

At the time of the trial, Allen consistently denied that his mother abused alcohol. He told Dr. Yutzy that his father's side of the family had alcoholics but "everybody on my mom's side is straight." Ex. 46, p. 43. He told Mr. Simon that his father was the only member of the household who used alcohol. Ex. 638A, p. 12. He told Dr. Gelbort that his mother was a social alcohol user. Ex. 102, p. 5. When Mr. Simon asked him if his mother drank, Allen told him that she "stays stressed out." Ex. 500, p. 57. Mr. Simon testified that this meant that Ms. Allen did not drink and instead stayed stressed out. Vol. V, pp. 124-125.  Allen's letters to his mother repeatedly

81

expressed his love for her and appreciation for everything that she had done for him. Ex. 493, 495.

Claude McLemore, defendant's cousin, testified at the 2255 hearing that, when he visited on weekends, Ms. Allen drank 24 ounce cans of Miller Lite and vodka the entire day until she went out at night. Vol. II, pp. 12-13. He said she cussed at Allen for his resemblance to his father, which Mr. McLemore described as a "funny moment." Vol. II, pp. 14-15. Mr. McLemore testified that his parents knew that Juanita Allen was drunk when they left him at her home for the weekend but he wanted to be there so they left him there. Vol. II, pp. 36-38; Ex. 527, p. 35. At the time of the trial, Mr. McLemore told Dr. Randall that "the family was close." Ex. 426, p. 1. He admitted that he did not want to talk to the trial team about anything bad in the family. Ex. 527, pp. 50, 70.  Mr. McLemore testified at trial that he saw defendant twice a week, usually after church on Sunday and sometimes on Saturdays. Ex. 183, p. 3. He described Ms. Allen as someone who would hold her emotions in—not an out-of-control screaming drunk. Ex. 183, p. 12. Mr. McLemore testified at trial that Allen never drank or smoked marijuana around him. Ex. 183, p. 18. This testimony was false. He admitted that both he and Allen drank and smoked marijuana together, often using money Allen made from selling crack cocaine. Vol. II, pp. 51-54. It is apparent that Mr. McLemore tailored his testimony in a manner that he believed would help Allen—even when it completely contradicted his previous sworn testimony.

Juanita Allen testified at the 2255 hearing that she drank while she was pregnant with Allen. Vol. IX, p. 35. Back at the time of the trial, she told Mr. Simon that she did not drink when she was pregnant with Allen. Vol. V, p. 107; Ex. 500, p. 60. When confronted with the statements she had made in 1998, Ms. Allen first testified that "maybe at that point in time, I

may have stopped" drinking but later stated that she did drink while she was pregnant. Vol. V, pp. 132-133.

Ms. Allen testified at the hearing that if she had "maybe two glasses of anything, that got me intoxicated." Vol. IX, p. 33. She said that her drinking got out of control when her boyfriend Louis McClinton committed suicide. Vol. IX, pp. 36-37. She dated Mr. McClinton for "maybe about three years." Vol. IX, p. 37. She believed Allen was in junior high when she dated Mr. McClinton. Vol. IX, pp. 37, 163. She said that she would go to work and then come home and start to drink. Vol. IX, p. 40. At the 2255 hearing, she testified that she stopped drinking six years ago. Vol. IX, p. 45.

During Allen's childhood and through his incarceration for the murder, Ms. Allen was employed at the St. Louis City Public Library, Walgreens, Charter Communications, the Division of Family Services, the Human Development Corporation, the American Red Cross, Goodwill and the Hope Transitional House. Vol. IX, pp. 118-120; Ex. 666.

Ms. Allen testified that she had no independent recollection of any conversation that she had with the trial team. Vol. IX, p. 115. She stated that she had never been hot-lined for suspected child abuse, and no social worker or police officer ever came to talk to her about her treatment of her children. Vol. IX, pp. 127-128. She admitted that she had told Mr. Simon that "Bill don't come from a bad environment." Vol. IX, p. 150; Ex. 500, p. 60. She told Dr. Randall that "Bill was a perfect son. Me and my kids always hung out. People used to say he was a mama's boy, stuff like that. He was always under foot." Ex. 411, p. 1. When confronted at the hearing about her prior statements to the trial team, Ms. Allen stated: "In my mind it was a good environment. I mean, in my mind it was an environment -- up until a certain age, it was a good environment. That's when everything started getting rocky that you're like, oh, okay, fine." Vol.

83

IX, p. 154. She testified that she was never drunk during any meetings with the trial team. Vol. IX, p. 188.

At her deposition, Ms. Allen testified that she had met with the 2255 attorneys more than twenty times. Ex 529, pp. 100-101. At the hearing, she stated that it may not have been more than twenty times. Vol. IX, p. 192. She also spoke on the telephone with them between twenty and fifty times. Vol. IX, p. 194. She had no explanation as to what questions the 2255 attorneys had asked compared to the trial attorneys that caused her to provide the current different information. Vol. IX, p. 194. Ms. Allen clearly attempted to help her son in any way she could—even if her current account contradicted her statements to the trial team.

Yvette Allen testified at the hearing that her mother was intoxicated on a daily basis. Vol. X, p. 27. She never told the trial team that her mother had an alcohol problem. Ex. 420. As stated above, during the trial team's contact with Ms. Allen, there was only one occasion when they believed that she had been drinking—at nine o' clock at night.

Johnnie Grant testified at the hearing that Ms. Allen was drunk every day for years. Vol. X, p. 104-5. He did not meet Allen until he was twelve or thirteen years. Vol. X, p. 75. He did not know that Ms. Allen was working at different jobs or that she had a boyfriend named Louis. Vol. X, p. 106. Mr. Grant and Allen's relationship developed until they spent time together. Vol. X, p. 77. He testified that they sold drugs together. Vol. X, pp. 122-123. It was during this time period, as related by various witnesses to the trial team, that Allen dropped out of school, used marijuana, left the house for weeks at a time, and began to deal crack. Ex. 301, p. 3 (Juanita Allen); Ex. 635, pp. 4-6, Ex. 638A, p. 22 (Billie Allen); Ex. 479 (Monette Petty); Ex. 503 (Carol Petty); Ex. 500, p. 7 (Lucy McLemore).

Monette Petty Nelson testified at the hearing that "I think so" in response to the question "Did [Juanita Allen] have a problem with alcohol?" Vol. XIV, p. 72. She never testified that Juanita Allen was drunk. Back in 1998, she told Dr. Randall that Juanita Allen was "pretty much lenient" and that "she'd go out a lot" at night. Ex. 479 p. 1. She never told the trial team that Juanita Allen had an alcohol problem or drank at the house.

Brady Toliver testified at the hearing that he observed Juanita Allen intoxicated. Vol. XV, p. 59. For the reasons outlined above—his contradictory statements, his demeanor, and his bizarre beliefs--Mr. Toliver was not a credible witness. Furthermore, there is no evidence that he was known or available to the trial team in 1998.

Shirlene Grant's statement in her declaration that "I knew that [Juanita Allen] was a heavy drinker" lacks credibility. She provided no basis for her conclusion. In addition, Eric Taylor, the brother of Marquis Taylor, told Dr. Randall and Mr. Sindel in 1998 that Shirlene Grant smoked crack, making her reliability questionable. Exh 443 p. 2; Exh 440, p. 2.

Allen offers the declaration of Raymond Petty for the statement that Juanita Allen "developed a bad drinking problem when she was a teenager." Ex. 262, p. 1. In 1998, Mr. Petty told Dr. Randall that that "When problems arise Juanita will drink. She would drink to cover up what's going on. When she gets depressed, she'll drink." Ex. 458, p. 4. Mr. Petty testified during the penalty phase about his sister's alcohol use:

> My sister, I think she -- she doesn't -- she curse a lot, and cursing
> and drinking and -- it's not going to alleviate the problem. When
> you are done cursing, when you put that glass down, the
> problem's still there.

Ex. 213, p. 6. There is nothing new of value in Mr. Petty's declaration: Juanita Allen's alcohol use when under stress was known to the trial team and was presented to the jury.

Darletta Tabb provided a declaration that stated that Juanita Allen drank alcohol starting in high school. Ex. 272, p. 1. She stated that she stopped associating with Ms. Allen in 1992, six years before the trial. Ex. 272, p. 1. There is no record that the trial team was aware of the existence of Ms. Tabb at the time of trial. In addition, Ms. Tabb is contradicted by other witnesses. Ms. Tabb stated in the declaration that Ms. Allen checked into an alcohol rehabilitation center right after the trial in 1998. Ex. 272, p. 1. Ms. Allen testified that she had only been treated for alcohol abuse six years before the 2255 hearing—which would have been approximately 2006. Vol. IX, p. 32; Ex. 529, pp. 58, 112.

Angela Allen testified that when the children were older, her mother used to go out pretty regularly with her friends to bars. Vol. XIV, p. 103. She did not recall how often her mother drank in the house. XIV, p. 107. In 2009, Ms. Allen signed a declaration in support of Allen's Section 2255 motion. In that declaration, she stated that the new legal team had spent many hours with her and listened to her "full description of what life was like for the family and for Billie when he was a kid." Ex. 260, p. 1. There is nothing in her declaration about Juanita Allen's use of alcohol. Ms. Allen told the trial team that her father was a "drinking man." Ex. 411, p. 1. She testified at trial that he "drinks heavy" and was "often intoxicated." Ex. 197, p. 4. She never told the trial team that her mother had an alcohol problem.

At the 2255 hearing, Ms. Ruffin testified that Ms. Allen drank until intoxicated every day. Vol. XIV, p. 50. However, back at the time of the trial, she told Dr. Randall that Ms. Allen would drink when she's upset "sometimes to excess." Ex. 489, p. 2. When asked if Ms. Allen had a problem with alcohol, Ms. Ruffin told Mr. Simon that "She drinks to excess, when she is in trouble." Ex. 500, p. 11. She admitted that she did not tell the trial team that Ms. Allen was drunk every day. Vol. XIV, p. 50.

86

In summary, Allen's claim that his mother was intoxicated daily is inconsistent with the trial team's observations of Ms. Allen, the statements made to the trial team by witnesses and the witnesses' previous testimony. The evidence supports the conclusion that at the time that Allen began using drugs, selling crack and dropped out of school was the same time period that Ms. Allen began to drink more heavily. Raymond Petty, her sister, told the trial team that he had observed that, as Allen began his "slide," Ms. Allen was more interested in spending time with her boyfriend than reining in Allen.  Ex. 458, pp. 3-4. He testified concerning her alcohol use during the penalty phase of trial. Ex. 213, p. 6. Allen failed to show a reasonable probability that the jury would have returned with a different sentence if the evidence of Ms. Allen's alcohol use was introduced at trial.

These facts leave serious questions unanswered as to what really were the accurate circumstances of Allen's life. The jury thought that Allen was a fantasy drug dealer, but we now know they were duped. It is even more unclear as to what the facts of Allen's life were based on statements and evidence then and now which are internally and externally conflicting. This evidence, even the so-called undiscovered evidence, is so confused that no jury would be likely to rely on it to choose a life sentence. The evidence of what Allen did was neither confused nor unclear and any jury would give the aggravating facts far greater weight than the mitigating evidence.

## V. CONCLUSION:

Applying an objective test of reasonableness, using the perspective of counsel in 1998 rather than hindsight and a high degree of deference to the decisions of counsel, the mitigation investigation was at least constitutionally adequate. A more realistic assessment is that it was thorough and exceptional. Allen failed to prove that there was readily available evidence that

was not discovered which they should have discovered. The trial team did conduct a thorough investigation based on the leads they possessed and they did explore the question of abuse. Allen and Mrs. Allen chose to conceal what they now claim was the truth, but even if they are believable their testimony added nothing to the deficiency equation.

The fact that Allen is now able to identify evidence from witnesses who were found and known in 1998 that is different from what they told counsel 1998 did not meet Allen's burden of proving deficiency. Allen's witnesses were biased and were impeached by prior inconsistent statements, conflicts between each other and a complete lack of objective corroboration. In an effort to help Allen out of his present predicament, their accounts were exaggerated and embellished. Dr. Martell's errors were grievous and the cross-examination established the effect of his bias – he essentially cherry-picked a few outlier results to establish a case for impairment. Diagnosing dementia defied common sense.

The actual mitigation case presented by counsel reflected consistent themes which had the highest likelihood of achieving a life sentence under all the circumstances. Mr. Sindel consciously avoided presenting witnesses with negative baggage and chose witnesses with whom the jury could identify. Allen failed to prove that he was prejudiced by his counsel's alleged non-discovery of certain evidence. Several of the witnesses would have been seriously impeached and opened doors to topics that Mr. Sindel wisely sought to avoid. None of the so-called new evidence would have presented the jury with a compelling causal nexus. Evidence of a worse childhood than the jury actually heard would not have persuaded a jury that Allen deserved life rather than death for the murder of Richard Heflin.

This case and the underlying criminal case have long procedural histories. The briefing, the discovery and depositions, the hearing and now additional briefing in this case alone has

consumed countless man hours and resources. If a mistake was made, the resources are not an issue, but there is nothing here to suggest that a mistake was made. The jury that imposed death had before it a large body of mitigating evidence discovered and located by the extensive efforts of an extended and experienced defense team over the course of nearly a year. Allen failed to show that his counsel's actions were not professionally reasonable. He also failed to show that the evidence which he claims that his counsel should have developed would have had any impact on the sentencing verdict. Accordingly, Allen's petition for relief under Title 28, United States Code, Section 2255 should be rejected.

Respectfully submitted,
RICHARD G. CALLAHAN
United States Attorney

*s/Steve Holtshouser*
STEVEN E. HOLTSHOUSER 33531 MO
CARRIE COSTANTIN 35925MO
Assistant United States Attorneys
111 S. 10th Street, Room 20.333
St. Louis, Missouri 63102
(314) 539-2200
(314) 539-2309 FAX

## CERTIFICATE OF SERVICE

I hereby certify that on September 4, 2013, the foregoing was filed electronically with the Clerk of the Court and mailed to the following:

*s/Steven E. Holtshouser*
STEVEN E. HOLTSHOUSER 33531 MO
Assistant United States Attorney