# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

_____

BILLIE JEROME ALLEN,

            Petitioner,

      -v-

UNITED STATES OF AMERICA,

          Respondent.

_____

    :
    :    No. 4:07-CV-27 ERW
    :
    :    **Capital 2255 Case**
    :
    :    Hon. E. Richard Webber, U.S.D.J.
    :
    :
    :
    :
    :

### PETITIONER'S REPLY IN SUPPORT OF POST-HEARING BRIEF

Timothy Patrick Kane
Eric John Montroy
James Henry Moreno
Assistant Federal Defenders
Capital Habeas Unit
Federal Community Defender Office
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106


Counsel for Petitioner

October 4, 2013

## TABLE OF CONTENTS

I.    Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    The Government Concedes or Fails to Rebut Important Facts. . . . . . . . . . . 1

III.    The Unpresented Evidence Was "Reasonably Available". . . . . . . . . . . . . . 5

IV.    Trial Counsel Did Not Make a Reasonable Strategic Decision to
Limit the Scope of the Mitigation Investigation.. . . . . . . . . . . . . . . . . . . . . 9

V.    Consideration of All the Available Evidence Establishes
a Reasonable Probability of a Different Outcome . . . . . . . . . . . . . . . . . . . 12

Petitioner, Billie Jerome Allen, through counsel, respectfully submits this reply in support of his post-hearing brief.[1]

## I.  Introduction

As established in Petitioner's Post-Hearing Brief, three questions are dispositive of the issue before the court: (1) whether the unpresented evidence of abuse and dysfunction was reasonably available to trial counsel; (2) if so, whether trial counsel made a strategic decision not to investigate and present such evidence; and (3) whether there is a reasonable probability of a different outcome if the evidence had been presented.  PHB 43-49.

The Government raises a variety of arguments addressing these points, but these arguments are unavailing for the reasons discussed below.  Equally as significant, however, are the evidence and arguments that the Government either concedes or has not rebutted.

## II.  The Government Concedes or Fails to Rebut Important Facts

In his Post-Hearing Brief, Petitioner reviewed the defense teams's detailed billing records to reconstruct the activities and time spent on mitigation investigation.

---

[1] This brief uses the same conventions and abbreviations as Petitioner's Post-Hearing Brief.  In addition, Petitioner's Post-Hearing Brief is cited as "PHB" followed by a page number, and the Government's Post-Hearing Brief is cited as "GB" followed by a page number.

1

*See* PHB 7-20.  Relying on those records, other contemporaneous documents, and Mr. Sindel's hearing testimony, Petitioner established that Mr. Sindel spent less than 20 hours on mitigation investigative activities between April and December 1997, while Mr. Simon spent less than half that amount of time on mitigation before January 1998. *Id.*  Counsel's activities during this time were supplemented by only a handful of mitigation related activities by Ms. Caspari-Supranowich and interns, and those activities focused on record collection.  *See id*.  As a result of the extremely limited mitigation investigation performed in that time period, when January 1998 arrived and with trial set to begin a month later, the defense team had not begun substantive mitigation witness interviews, Petitioner had not been evaluated by any mental health experts, and the preparation of a penalty phase presentation remained in a preliminary stage.  *See id.* at 19-22.

Although Petitioner and the Government obviously characterize the adequacy of this investigation differently, the Government does not dispute the accuracy of Petitioner's reconstruction of the defense team's activities and time allocations.  *See* GB 7-14.  The Government does not point to any mitigation evidence developed from witnesses other than Petitioner and his mother prior to January 1998.  Indeed, the bulk of the Government's account of the mitigation investigation performed between April and December 1997 focuses on Mr. Simon's 3.9 hour-long interview of Petitioner on

2

December 12, 1997.  *See id.* at 10-14.

This leads to another point of general agreement.  In his Post-Hearing Brief, Petitioner explained that the themes and evidence presented at the penalty phase derived primarily from Petitioner himself and, to a lesser extent, from Juanita Allen. PHB 17-18, 31-32.  The Government's account of Mr. Simon's December 1997 and January 1998 interviews with Petitioner confirms this point.  The Government's brief parses the transcripts of these interviews to show that Mr. Simon and Petitioner discussed Petitioner's church activities, his father's alcoholism, his history of illnesses, the death of Marquise Taylor, and his visits to a psychiatric hospital, and then the Government recounts the defense presentation of evidence on these topics at trial.  GB 10-15.

The Government also acknowledges that Petitioner "lied" and "had veracity issues," and that the defense team was well aware of this problem.  *Id*. at 26, 39, 48; *see also id.* at 29, 35 (Government recounting instances of witnesses informing the defense team about Petitioner's history of lying).  The Government even details Mr. Simon's first visit to the family home on January 7, 1998, to meet with Juanita Allen and other family members about mitigation.  *Id.* at 16.  During that meeting, Mr. Simon smelled alcohol and observed that Juanita's speech was impaired due to alcohol intoxication.  *See id*.; V-107-09.  The very next day, Mr. Simon asked

3

Petitioner whether his mother drank alcohol, but Petitioner denied it.  GB 16.  The

Government does not posit how it was reasonable for the defense team to develop the

themes for their penalty phase presentation based primarily on the accounts of a client

they knew to be unreliable.

In his Post-Hearing Brief, Petitioner also established that various witnesses

disclosed information about maternal abuse and dysfunction in Petitioner's

upbringing, but that counsel first learned this information during trial shortly before

the penalty phase began, thus leaving the defense team without enough time to follow

up on these leads and incorporate such information into the penalty phase case.  PHB

24-28.  Again, the Government's account confirms that "[m]ultiple family members

and friends told the trial team of Juanita Allen's physical discipline[2] of Allen and her

use of alcohol."  GB 29.  The Government does not dispute that the defense team first

learned this information in February 1998, or that most of these disclosures occurred

during the final witness prep sessions conducted near the end of the month.  *See* GB

---

[2] Although the government repeatedly refers to the abuse as "physical discipline," its own description of the witness's statements to the trial team belie this characterization.  According to the Government, witnesses told the defense team that Juanita Allen "beat the crap out of" Petitioner, "would use her fists on him," kicked "the snot [] out of him," and "kicked his ass in the street," and that Petitioner was afraid of her.  GB 29-32.  One witness even compared an incident to "a slavery beating."  *Id*. at 30.  The characterization of such behavior as "physical discipline" is, at best, disingenuous.

29-32; *compare* PHB 24-28.[3]

### III.   The Unpresented Evidence Was "Reasonably Available"

Petitioner's Post-Hearing Brief demonstrated that trial counsel had a duty to collect "all reasonably available mitigating evidence" and that counsel failed to meet that duty here.  PHB 44-45 (quoting *Wiggins v. Smith*, 539 U.S. 510, 524 (2003), and *Sinesterra v. United States*, 600 F.3d 900, 907 (8th Cir. 2010)).

The Government raises a number of points in response.  First, the Government makes the following related contentions:

- "There was nothing which should have or did raise a red flag for Mr. Sindel that there was a deep, dark closet of skeletons in the Allen family" concerning an "abusive upbringing."

- "Mr. Sindel had not received any information from Dr. Randall about his alleged suspicions of abuse."

- "Mr. Sindel had no information to contradict what [Petitioner] and Mrs. Allen were saying to each other in their letters" regarding their supposedly loving relationship.

GB 48, 50.  The crux of these contentions is that, because Mr. Sindel learned of no information or "red flag" suggesting a history of abuse, such information was not available to him.  Both the Government's premise and conclusion are untrue and unsupported by the record.

---

[3] Several additional Government concessions are discussed in Part V, *infra*.

As Petitioner discussed in his Post-Hearing Brief, various witnesses provided information to the defense team, including to Mr. Sindel, that plainly raised red flags about abuse and dysfunction. Witnesses told the trial team, *inter alia*, that the Allen family was "dysfunctional"; that Juanita Allen drank alcohol excessively; that Juanita would "tighten" Petitioner up by getting physical with him, and that she "beat the crap out of" Petitioner, "would use her fists on him," kicked "the snot [] out of him," and "kicked his ass in the street." PHB 23-26. In its statement of facts and again in its prejudice analysis, the Government itself attests to these reports. GB 29-32, 69-70, 74-75, 80-81; *see also* n.2, *supra*. Yet, in a telling omission, the Government completely fails to mention these facts in its 22-page analysis of the deficient performance prong. *See* GB 36-58. There is simply no support for the Government's contention that Mr. Sindel "had not received any information" indicative of abuse.[4]

Second, the Government argues that Petitioner "fails to identify any credible circumstance which supports a reasonable probability that given more time proximate to the trial, the evidence in question would have been discovered." GB 55. This argument again omits mention of the information, discussed above, provided by

---

[4] Indeed, Mr. Sindel also received a list of potential penalty phase themes that included "[p]hysical abuse and beatings," Ex. 505, and Mr. Sindel in fact elicited testimony about one such beating from one witness, Raymond Petty. Trial Tr. Vol. 18 at 37-38.

multiple witnesses during their prep sessions.  PHB 23-26.  The Government's argument also overlooks the consistent testimony of the defense team, including Mr. Sindel, that if such information about abuse had been learned earlier, the team would have followed up on it with additional investigation.  *See* IV-170-71 (Sindel); IV-202 (Sindel); VI-127-32 (Simon); VI-205-14 (Randall).  Indeed, counsel's duty to do so is a matter of law.  *See Rompilla v. Beard*, 545 U.S. 374, 391 n.8 (2005) (counsel "could not reasonably have ignored mitigation evidence or red flags simply because they were unexpected."); *accord Porter v. McCollum*, 558 U.S. 30, 39-40 (2009).

Third, the Government argues extensively that the information about abuse and neglect was not available to counsel because Petitioner and Mrs. Allen denied such problems.  GB 44-51. For example, the Government argues that Mr. Sindel asked Petitioner and Mrs. Allen about abuse and that "the answers he received did not give him reason to investigate further."  *Id.* at 45.  The Government likewise asserts that "in 1997 and 1998, Allen and his mother were not going to portray their family life as they do now simply for the asking, no matter how much time was provided."  *Id.* at 51.  The Government contends that this "non-discovery" of the evidence of abuse and neglect was the result of Petitioner and Mrs. Allen "not trusting the trial team" and concludes that counsel's inquiries "refute[ Petitioner's] argument that his trial team did not discover the alleged facts due to mismanagement of time."  *Id*. at 46-47,

7

45 n.11.

The Government's arguments ignore both the facts and the law. As an initial matter, Petitioner told Dr. Yutzy that he was subjected to "whippings," XVII-115-16 (Yutzy), and Mrs. Allen told Dr. Cuneo that she remained "physical" with Petitioner "until the end." XI-160-63 (Cuneo). Although such statements certainly suggest that Petitioner and Mrs. Allen were willing to discuss the issue of abuse, these leads were never followed up on.

More particularly, the Government's argument ignores the fact that counsel's over-reliance on Petitioner and Mrs. Allen was a result of counsel's failure to begin significant mitigation investigation – and their corresponding failure to conduct substantive mitigation witness interviews with persons other than Petitioner and Mrs. Allen – until a few weeks before trial. Had they begun their witness interviews earlier, they would have learned the information indicating abuse and neglect in time to investigate it thoroughly. *See* PHB 22-28, 44-45. As it was, they only learned of most of this information during the final witness prep sessions in late February 1998. *Id*. Moreover, counsel's reliance on Petitioner and Mrs. Allen was unreasonable because counsel knew that Petitioner was not a reliable self-reporter, *see supra* at 3-4, and counsel could not depend on Mrs. Allen to volunteer information regarding what the Government describes as her "felony child abuse conduct, alcoholism and other

8

embarrassing and criminal conduct."  GB 55.

In any event, the law proscribes counsel's reliance on such a "narrow set of sources" and instead requires a "through investigation" in every case.  *Wiggins*, 539 U.S. at 522; *see Williams v. Taylor*, 529 U.S. 362, 395-96 (2000); *Rompilla*, 545 U.S. at 387-88; *Sinesterra*, 600 F.3d at 907.  The law requires such an investigation even where a defendant is "actively obstructive," *Rompilla*, 545 U.S. at 381, "fatalistic or uncooperative." *Porter*, 558 U.S. at 39.  Whether mitigating evidence is "reasonably available" must therefore be considered in light of counsel's duty to conduct a thorough investigation from a wide range of sources – a duty that counsel failed to meet here.

## IV.    Trial Counsel Did Not Make a Reasonable Strategic Decision to Limit the Scope of the Mitigation Investigation

In his Post-Hearing Brief, Petitioner recounted the hearing testimony, and the trial record itself, to demonstrate that counsel made no strategic decision to forgo the investigation or presentation of evidence of abuse and dysfunction.  Petitioner likewise demonstrated that the information about abuse and dysfunction that counsel learned in the witness prep sessions was precisely the type that "would lead a reasonable attorney to investigate further."  PHB 45-46.

The Government nonetheless posits that "[p]art of Mr. Sindel's strategy was

9

not to 'trash' Mrs. Allen" and that presenting evidence of abuse and neglect "would have" contravened this strategy.  GB 46, 64.  The Government, however, also advances the contradictory position that "Mr. Sindel did not have significant information to support a history of abuse and therefore there was no strategic decision to not investigate that topic." GB 49.  Mr. Sindel testified unequivocally to the latter point. I-136.  Indeed, Mr. Sindel ultimately decided that presenting such information *was* worthwhile; the defense did "trash" Mrs. Allen by presenting information about her alcohol problem and an incident of physical abuse.  *See* Trial Tr. Vol. 18 at 37-38.

Thus, even if the defense team at some point considered the potential effects of presenting negative information about Mrs. Allen, those considerations did not limit the scope of the investigation or presentation of negative evidence about her. The Government's attempt to rely on this theory as a reasonable strategic basis for counsel's failure to uncover and present evidence of abuse and dysfunction is therefore unavailing.

The Government further argues that "it was reasonable for Mr. Sindel to conclude, in his professional judgment, that a mitigation strategy that emphasized the positive qualities and attributes of Allen had the best chance of convincing a jury to spare his life." GB 49.  The flaw in this argument is that counsel failed to collect the available evidence about abuse and neglect.  Accordingly, counsel could not weigh

10

the benefits of presenting such information against their chosen strategy, and a "professional judgment" not informed by adequate investigation is unreasonable. *See Rompilla*, 554 U.S. at 396; *Wiggins*, 539 U.S. at 534.

Ultimately, the same three problems undermine all of the "strategic decisions" that the Government suggests. First, they are based on speculation of what counsel "would have" done *if* counsel had collected the available evidence about abuse and neglect. Second, they are contradicted by counsel's uniform testimony that no such strategic decision was made. Third, they are contradicted by the record of what counsel *actually did* at trial. Under these circumstance, the Court is not at liberty to defer to strategic bases for counsel's actions where counsel and the trial record both confirm that no such reason actually existed at the time. *See Wiggins*, 539 U.S. at 526-27 ("the strategic decision [invoked] to justify counsel's limited pursuit of mitigating evidence resembles more a post hoc rationalization of counsel's conduct than an accurate description of their deliberations prior to sentencing."); *Kimmelman v. Morrison*, 477 U.S. 365, 386-87 (1986) (under *Strickland*, courts cannot use hindsight to supply a strategy for counsel); *Harris v. Reed*, 894 F.2d 871, 878 (7th Cir. 1990) ("Just as a reviewing court should not second guess the strategic decisions of counsel with the benefit of hindsight, it should also not construct strategic defenses which counsel does not offer.") *quoted approvingly in Williams v. Roper*, 695 F.3d

11

825, 846 (8th Cir. 2012); *Alcala v. Woodford*, 334 F.3d 862 (9th Cir. 2003) (rejecting government effort to "assume facts not in the record in order to manufacture a reasonable strategic decision."); *Griffin v. Warden*, 970 F.2d 1355, 1358 (4th Cir. 1992) ("courts should not conjure up tactical decisions an attorney could have made, but plainly did not.").

## V.   Consideration of All the Available Evidence Establishes a Reasonable Probability of a Different Outcome

In his Post-Hearing Brief, Petitioner established that the unpresented evidence is the same type of evidence that the Supreme Court and Eighth Circuit have relied on to find *Strickland* prejudice in a long line of cases. Petitioner further explained that the jury's sentencing decision was unusually close in this case, and that the unpresented evidence would have explained and rebutted a number of problems in the defense case that the Government exploited in its penalty phase presentation. PHB 46-49. The Government does not dispute these points and, on that basis alone, this Court should find prejudice.

The Government nonetheless raises several counter-arguments, none of which are persuasive. The Government argues that the cost of presenting evidence of abuse and dysfunction would have outweighed its benefit. GB 64. According to the Government, such evidence would have undercut the strategy of presenting Petitioner

12

to the jury as someone who "had value to upstanding, hard-working, law-abiding people."[5] *Id*. In a similar vein, the Government argues that presenting evidence about Petitioner's abusive upbringing would have opened the door to evidence about his alleged (but unsupported) gang activity; about "the real cause" of Marquise Taylor's death (the Government blames Petitioner); about Petitioner's drug dealing; and about virtually any other negative information concerning Petitioner's family and Petitioner's past. *See id*. at 64-65. The Government cites no authority for this broad assertion, and there is nothing to support it. In fact, the Government elsewhere notes that a presentation about Petitioner's abusive upbringing would rely largely on the same witnesses who actually testified at trial. *Id*. at 37. Testimony about maternal abuse and neglect would have neither raised the factual inferences the Government now suggests nor opened the evidentiary door to such topics. This is plain from the trial record itself, as counsel's presentation of evidence of one incident of abuse had no effect on the Court's evidentiary rulings and did not open the door to any additional aggravating evidence.

---

[5] To the extent the Government posits this theory as a strategic reason for counsel not collecting and presenting the evidence of abuse and neglect, its theory fails for the same reasons as its other proffered strategies: (1) Mr. Sindel testified unequivocally that he would have presented such testimony; (2) the trial record reflects the accuracy of that testimony; and (3) courts may credit only *actual* strategy decisions, not theoretical ones. *See supra* at 9-11.

13

The notion that "a full exploration of Mrs. Allen's life and Allen's life" was too risky also exposes the Government's disregard for the mitigating power of a depraved upbringing where defendants like Petitioner, through no fault of their own, have not been raised in a "normal, strong, and supportive family" and have had experiences that are unfamiliar to some "upstanding, hard-working, law-abiding people." *Id*. at 64. Although nothing requires the Government to relate to or empathize with an upbringing like Petitioner's, capital defense counsel, at a minimum, have a core obligation to conduct "a full exploration" of their client's life *before* deciding to paint a rosy, if misleading, picture of it. *See* PHB 4-6, 46-47 (citing cases). Counsel failed to meet that obligation here.

The Government also argues that evidence of maternal abuse and neglect was not valuable mitigation because it portrays Mrs. Allen "as the culprit," would mean that Petitioner was "[b]laming his mother" for Mr. Heflin's murder, and amounts to an "abuse excuse." GB 67. The Government claims that mitigating evidence of maternal abuse would only be "potent" if Petitioner had been "found guilty of murdering his mother." *Id*. at 67 n.11. The Government concludes that, because the unpresented evidence did not have a "causal nexus" to the offense, it was of little value. *Id*. at 67-68.

The Government's argument, however, is contradicted by Supreme Court

14

precedent. Unpresented evidence of family abuse, neglect, and dysfunction need not have a causal nexus to the crime to establish prejudice. *E.g.*, *Porter*, 558 U.S. at 37, 42 (finding state court prejudice analysis unreasonable where it "discounted the evidence of Porter's abusive childhood because he was 54 years old at the time of the trial."); *see also* PHB 46-47. Such evidence is potent because it "might well have influenced the jury's appraisal of [Petitioner's] *moral culpability*." *Porter*, 558 U.S. at 41 (quoting *Williams*, 529 U.S. at 398) (emphasis added); *accord Tennard v. Dretke*, 542 U.S. 274, 284-85 (2004). The Government's "causal nexus" argument misconceives this broad appraisal of "moral culpability" as a much narrower inquiry into criminal responsibility, and reflects a fundamental misunderstanding of the nature and import of mitigating evidence under the Eighth Amendment.

The Government's argument also ignores that the jury in this case heard and gave effect to mitigating evidence that had no causal nexus to the offense, including Petitioner's likeable personality, his academic problems, his history of emotional problems, and violence in his neighborhood. *See* Exs. 57-58 (penalty phase verdict sheets). Thus, the trial record itself refutes the Government's assertion that only "causal nexus" evidence provides valuable mitigation.

The Government next argues that all of the witnesses who provided testimony about Petitioner's abusive and dysfunctional upbringing lacked credibility. The

15

Government variously describes the testimony of these witnesses as "dubious," as "not consistent with" or "undercut by" prior statements, as "unreliable," and the like. GB 71-87. The Government concludes that Petitioner's "claims of childhood abuse were unsupported by credible evidence." *Id*. at 79.

The Government's argument ignores the plain weight of the evidence. Even excluding Mrs. Allen's inculpatory testimony and Raymond Petty's trial testimony, *eight different witnesses* testified to their *personal observations* of Mrs. Allen beating and whipping Petitioner and striking him with various objects, frequently when she was in an intoxicated and enraged state. PHB 34-37. Equal numbers of witnesses testified to their personal observations of Mrs. Allen's alcoholism, verbal abuse, and neglect of Petitioner. *Id*. at 37-41. This testimony was consistent with reports given to trial counsel – but not adequately followed up on – that the Allen family was "dysfunctional"; that Mrs. Allen drank alcohol excessively; that she would "tighten" Petitioner up by getting physical with him, and that she "beat the crap out of" Petitioner, "would use her fists on him," kicked "the snot [] out of him," and "kicked his ass in the street." PHB 23-26.

The Government nonetheless suggests that the evidence of abuse and neglect derives, not from these witnesses' personal observations, but from "15 years of subsequent investigation" during which this evidence was contrived as a result of

16

"witness bias or witness education from habeas counsel's repeated inquiries about [these] topics." GB 37. According to the Government's theory, "[l]ay witnesses, in particular, were vulnerable to the power of suggestion given their bias in favor of Allen." *Id*. at 54. In essence, the Government alleges that habeas counsel coordinated and/or abetted a process by which false evidence was contrived and then elicited under oath in court. Undersigned counsel flatly denies any and all such allegations. As officers of the Court, counsel acted properly, honestly, and in good faith at all times. Further, counsel at no time learned of witnesses discussing potential testimony with each other; counsel in fact advised witnesses not to do so and observed witnesses abide this guidance.

The Government's theory is also contradicted by the information that trial counsel received from multiple sources suggesting the presence of the very evidence that has now been uncovered by habeas counsel. *See* PHB 23-26. It is nonsensical that witnesses would have fabricated such information in 1998 in anticipation of a later conspiracy to fabricate more of the same.

Ultimately, the Government's specific allegations of inconsistent or dubious witness statements do not alter the conclusion that Petitioner was indeed the victim of significant childhood abuse and neglect. For example, the Government states that Mr. McLemore gave false testimony when, as a teenager at trial, he denied using

17

marijuana and alcohol with Petitioner. GB 82.[6]  The Government similarly argues that Mr. Grant's testimony about abuse and neglect was not credible because it was contradicted by Angela Allen's testimony (in which she denied ever striking Petitioner) and by Mr. Grant's own testimony at trial for the Government that Petitioner "had never said anything bad about his family except the typical complaint once in a while." *Id*. at 76-77.  The Government likewise argues that Ms. Nelson's vivid descriptions of abuse, *see* XIV-70-76, 95-96, are "undercut" by the fact that she did not volunteer this information to trial counsel because, at the time, "she viewed Ms. Allen's actions as nothing out of the ordinary and as discipline." *Id*. at 75; *see also id.* at 75-76 (making similar arguments as to Yvette and  Angela Allen).

It would be "unreasonable to discount to irrelevance," *Porter*, 558 U.S. at 43, the evidence of Petitioner's abusive and dysfunctional upbringing on the basis of such minor, unrelated, or easily explained discrepancies.  Prejudice is an objective inquiry, which asks whether it is reasonably probable that the jury's decision would have been affected by the unpresented evidence. *See Strickland v. Washington*, 466 U.S. 668, 695, 700 (1984); *Wiggins*, 539 U.S. at 537.  An objective jury, faced with ten largely consistent accounts of physical abuse and neglect, would not be apt to accept the

---

[6] The Government's account of Mr. McLemore's hearing testimony omits mention of his detailed, personal observations of extensive physical abuse. *Compare* GB 82 *with* II-15-18.

18

Government's arguments that the evidence should be disbelieved in its entirety.  Far more likely, an objective jury would accept the basic – and tragic – truth of Billie Allen's life: that he was subjected to regular abuse, ridicule, and cruelty inside his own home.  There is a reasonable probability that the jury would have reached a different outcome if it had been given the opportunity to weigh Petitioner's moral culpability in light of his troubled upbringing.

WHEREFORE, for the above reasons and the reasons set forth in Petitioner's prior

pleadings, this Court should vacate Petitioner's death sentence and grant relief.


Respectfully Submitted,


/s/ Timothy Patrick Kane
Timothy Patrick Kane
James Henry Moreno
Eric John Montroy
Assistant Federal Defenders
Capital Habeas Unit
Federal Community Defender Office
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
 (215) 928-0520


Dated:        October 4, 2013

# CERTIFICATE OF SERVICE

I hereby certify that on October 4, 2013, the foregoing *Petitioner's Reply in Support of Post-Hearing Brief* was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the following:

Ms. Carrie Constantin
Assistant United States Attorney
111 South 10th Street, 20th Floor
St. Louis, Missouri 63102

Mr. Steven Holtshouser
Assistant United States Attorney
111 South 10th Street, 20th Floor
St. Louis, Missouri 63102.


/s/ Timothy Patrick Kane
Timothy Patrick Kane
Counsel for Petitioner