RECEIVED

DEC 11 2013

BY MAIL

BILLIE ALLEN,

-v-

UNITED STATES,

---

## REPLY TO THE GOVERNMENT'S RESPONSE

I, Billie Allen ask this Court to consider two straightforward issues:

1. Facts and evidence, which "relate back" to the original filings, should they now be accepted by this Court "in the best interest of justice and fairness?"

2. When counsel fails to present relevent facts and evidence into an issue, should I be allowed to proceed pro se in order to enhance the record so that the Court won't make a ruling based on half-truths or lies, when those facts and evidence could change the Courts rulings?

## PRELIMINARY STATEMENT

**This** Court has made it clear that the "supposed confession", introduced into evidence by the government, through the testimony of Detective's Harper and Lieutenant Ron Henderson, supported the juries findings of guilt. Because the Court cites the testimony of both officers as its main reason why the "supposed confession" was allowed into the record, can one then conclude that the Court wouldn't have allowed the "supposed confession" into my trial if it had known that the testimony presented to the Court, by the Government were indeed lies?

## FACTS THE COURT WOULD RELY ON

The record is clear that it would be through the testimony of Special Agent Jan Hartman that I would invoke my right to have counsel present while I was in police custody and

being questioned by officers:

> A. When I began to advise him of his rights, he stated that---
>    asked if he could have an attorney.

> Q. Okay. Did he say anything else about the attorney?

> A. He asked about an attorney, if he could get one from the court.

Hartman would later answer the following questions:

> Q. Did you give any direction to anybody, either with the F.B.I.
>    or the police department to attempt to locate an attorney for
>    him?

> A. No.

> Q. Did you inform anyone of his request to talk with an attorney?

> A. No.

The Magistrate Judge and this Court would conclude that the testimony of Harper and Henderson should that, not only did officers do everything in their power to honor my rights, but that I waived them after "constant reminders" by officers that I had requested an attorney:

### DETECTIVE HARPER

> A. I'd been informed that he had requested an attorney prior to the
>    lineup and, therefore, I was told not to talk to him.

> Q. Okay. Who told you that?

> A. That would have been **LIEUTENANT RON HENDERSON.**

> Q. Lieutenant Henderson also told you as you testified earlier, not

to ask him any questions because he'd asked for a lawyer; right?

A. Yes, sir....

To further show that He "honored my rights"and that it was I would initiated contact, he would go on to state:

Q. What if anything, did he respond?

A. He said, "I don't want a fucking attorney", he said "I want to talk about it."

Q. Okay, What did you tell him at that time?

A. I told him that he had requested an attorney and therefore we couldn't talk to him about the incident.

## LIEUTENANT RON HENDERSON

Q. Now, you then said that, i believe, at least after the lineup procedure you received an indication from DETECTIVE HARPER that Allen wanted to talk to you?

A. That is correct.

Q. And that Detective Harper at least related to you that you knew Allen or Allen knew you from "another contact?"

A. That's correct.

Q. Was there a situation in which he--you had dealt with him at any time as far as you know in another homicide?

A. At the time I did not know until he brought it to my attention.

EVIDENCE TO THE CONTRARY

From the beginning, someone should've seen through the lies of Harper and Henderson, being that the person who I'd invoke my rights to admitted that she not only, never took any steps to secure counsel for me, but that she never made anyone aware of my request. Her testimony alone should've raised three important questions before the "supposed confession" was allowed to be presented against me at trial:

1. Whether officer's actually "honored" my rights when I invoked them?

2. How could officers "honor" rights that they never knew about?

3. How could officer's remind me of something that they never knew about?

4. After taking their oath to tell "the truth, the whole truth and nothing but the truth, SO HELP THEM GOD; did officers intentionally lie, in order to make the Court rule in its favor?

DID HENDERSON ACTUALLY KNOW ABOUT THE REQUEST
FOR COUNSEL AND DID HE LIE AT THE SUPPRESSION
HEARING?

TRIAL:

Q. Listen to my question. I don't care if you spoke with Agent hartman or not. What I want to know is at the time you interviewed Mr. Allen, were you aware that he had told Agent Hartman- (about the request)

A. No. No, I was not, sir.

In front of this Court, Henderson would finally admit that he never knew of the request for counsel. Henderson's trial testimony calls into question the "supposed reminders" that Harper said he "kept repeating" to me, because there's no way that he could've reminded me of something that the person he said told him about never knew!

## OTHER QUESTIONABLE BEHAVIOR AND ACTIONS

The lies by both officers didn't just end with their testifying about "supposed reminders", "supposedly honoring rights that they never knew about", and what took place that morning while I was in their custody:

### HARPER'S TESTIMONY ABOUT "SUPPOSED" NOTES

Q. And so you were taking notes?

A. Yes. What I did is I had my notepad there and the way that we normally do when we're going to interview someone is you start to write down, you know, the date, who you are interviewing, who's in the room and as I'm doing that, Billie says he don't want anybody writing anything and I said, "Well I have to write some things" and so i basically sat back in my chair and had my notepad here and did continue to take notes.

Q. Alright. Let me ask you this. The notes that you took, did you save those notes?

A. No.

Q. Did you destroy those notes?

A. Yes....

### HENDERSON'S TESTIMONY ABOUT "SUPPOSED" NOTES

Q. And as far as this process of when the interview took place, when was the first time somebody went and wrote down what was said?

A. Later that afternoon.

Q. Okay. And do you know who it was that finally decided maybe we ought to commit this confession to writing?

A. That was my decision.

Q. Did you then write the notes out?

A. No, I had Detective Harper write out what was said and I reviewed what he put on paper in reference to what Mr. Allen had indicated.

Q. As far as you know, did Detective Harper put on paper based on his memory?

A. And my memory, yes, sir.

Q. And certainly if they had written things down, you wouldn't want it destroyed, would you?

A. Of course not!

Harper would always seem to make a colorful showing of the "facts". But the truth always found a way of coming out in the end.

One can see more deception/manipulation on the part of both officers surrounding the "supposed confession", their "reminders" and their "honoring my rights."

### HENDERSON'S TESTIMONY ABOUT "ANOTHER CONTACT"

Q. Now, you then said that, I believe, at least after the lineup procedure you received an indication from DETECTIVE HARPER that Allen wanted to talk to you?

A. That is correct.

Q. And that DETECTIVE HARPER at least related to you that you knew Allen or Allen knew you from "another contact?"

A. That's correct.

Q. Was there  a situation in which he--you had dealt with him at any time as far as you know in another homicide?

A. At the time I did not know until he brought it to my attention.

Both officer would stoop so low and use my friends death to try and show that I "supposedly" knew Henderson and that's why I "supposedly initiated contact with officers." They had to create a story that would excuse their actions. or one might deem their behavior to be a violation of the rights I invoked.

Both the Magistrate and this Court would believe both officers account, but the actual report of the murder of my friend shows something all tother different! It goes to show that while Henderson might have been working the night of my friend's murder, he and I never had "any contact!" A simply search to see if I had been a witness to a homicide could've shown him and Henderson that I had been inside the homicide office before, giving them the story they needed to help hide their misrepresentation of the truth. But why go so far to do so?

(The Court can read the report itself):

1
95063947

At 9:04 P.M., Wednesday, May 3, 1995, Detective Sergeant Robert Davis, DSN 0441, Crime Scene Supervisor, Homicide Section, was contacted by the Bureau of Investigation Dispatcher and advised Homicide Detectives were being requested to 1815 North Taylor for the victim of a Shooting, with the victim en route to Barnes Hospital.

Accordingly, Sergeant Davis responded to Barnes Hospital and Sergeant Andre Hill, DSN 7245, along with Homicide Detectives Jeffrey Crawford, DSN 3444, Phillip Wasem, DSN 8402, Gerald Young, DSN 2215, Brian McGlynn, DSN 2721, and Thomas Wiber, DSN 7777, responded to the scene, arriving at 9:28 P.M.

At the scene, the Homicide Detectives were met by Captain David Dorn, DSN 7539, Commander District Eight, car 1800; Lieutenant Joseph Hoening, DSN 8435, Watch Commander District Eight, car 2801; Sergeant Cliff Sassenger, DSN 8028, car 2811; Sergeant Jerry Dodson, DSN 5320, car 2812; Police Officers Byron Pargo, DSN 3896, car 2827; Dana Isom, DSN 2789, car 2828; Donish Minor, DSN 3194, car 2826; and Steven Dodge, DSN 4278, car 2823; Area III Detectives Jerome Dyson, DSN 2196, car 6333; Nancy James, DSN 3884, car 6335; and Joan Williams, DSN 2709, car 6328; and Canine Officer Catherine Dennis, DSN 3404, along with canine "Cello", car 7215, who relinquished the scene to the Homicide Detectives at that time.

Officer Isom stated she and Officer Pargo received a radio assignment at 9:00 P.M. directing them to 1815 North Taylor for a report of a "Shooting". Upon their arrival they observed the victim lying on the front steps of the residence at 1815 North Taylor, unconscious and unable to make a statement. At that time they requested EMS and a supervisor, who requested Homicide.

Medic #11, manned by Emergency Medical Technicians Pam Delaney, DM4643, and Joslyn Thomas, DM1650, responded to the scene and conveyed the victim to Barnes Hospital where Dr. Steve Carter pronounced the victim lifeless at 9:35 P.M.

Sergeant Davis viewed the victim in the nude at the hospital and observed the victim evidenced two puncture wounds; one in the left arm pit and one in the right shoulder.

Medical Legal Investigator Francis Dawkins, of the Medical Examiner's Office was contacted and initiated his investigation. He later caused the victim's body to be conveyed to the City Morgue by Glenn Livery Service where it was assigned Morgue number 95-959.

Luberta Taylor, residing at 4541 Cote Brillante, home telephone 454-9631, the victim's mother, responded to the hospital where she identified the victim as her son, Marquise Taylor.

0002042

4
95063947


Acres and Shaw stated they were lying in their bed, when they heard approximately seven to eight gunshots coming from outside their residence, apparently from the front. They stated the first shots did not sound as loud as the last two or three. Both subjects stated they looked outside their window but did not see anyone, they only heard people next door (1815 North Taylor) screaming.

    ACRES, ANTHONY      1817 "A" North Taylor, B/M, no phone

Acres stated he heard approximately four or five loud gunshots coming from the front of his residence, but did not see anyone.

    BANKS, JOHN      1819 "A" North Taylor, B/M, 535-6558

Banks stated he heard approximately four to five loud gunshots from the front of his residence, but did not see anyone. Banks stated he is the owner of 1823 North Taylor, the vacant beauty salon where the projectile was recovered from an inside wall. Banks was advised of the damage to his building.

1819 "B" North Taylor     No response

1813 North Taylor     Vacant

1809 North Taylor     Vacant

1803 North Taylor     Vacant

1801      North      Taylor Vacant


Detective Robert Jordan, DSN 3167, interviewed the following subject at the Homicide Office.

    ALLEN, BILLIE     (Identified in Pirs)

Allen stated Eric T., Marquise Taylor (victim) and he were visiting Prentiss C. at his residence at 1815 Taylor. They decided to leave Prentiss' house and go to the residence of a friend named Issac (no further).

Upon leaving the residence, Allen and Marquise Taylor (victim) proceeded to walk north on Taylor approaching Garfield. Prentiss was on the front porch and Eric was on the steps.

0002045

FRAUD ON THE COURT AND RULE (60)

RULE 60

Rule (60) "does not limit a court's power to...(3) set aside a judgement for FRAUD ON THE COURT." Fed. R. Civ. P. 60(d).

FRAUD ON THE COURT, though not easily defined, can be characterized as a scheme to interfere with the JUDICIAL MACHINERY performing the task of impartial adjudication, as by preventing the opposing party from fairly presenting his case or defense. Fraud took place when:

1. The Magistrate and this Court were presented with lies by officers Harper and Henderson, leaving both Courts to rule and/or make decisions based on those lies.

2. The Court couldn't be impartial when all they heard were lies surrounding the issue.

3. Counsel couldn't fairly present a defense at the suppression hearing or at trial when officers intentionally lied about facts of the case.

The FRAUD ON THE COURT standard for independant actions is distinct from the more general fraud standard of Rule 60(b) (3) See Greiner 152 F. 3d at 789  The 3rd Cir. Court Of Appeals uses a four-part test to analize FRAUD ON THE COURT claims. "There must be  (1) an intentional fraud; (2) by an officer of the court; (3) which is directed at the court itself; and (4) in fact deceives the court. (Herring v United States, 424 F. 3d 384 (3rd Cir. 2005) The 6th Cir Court Of Appeals uses a similar 5 prong test that consists of conduct (1) On the part of an officer of the court; (2) that is directed to the Judicial Machinary itself; (3) that is intentionally false, willfully blind to the truth, or is in reckless disregard for the truth; (4) that is a positive averment or is concealment when one is under the duty to disclose; (5) that deceives the court.

If the Court takes into account all the evidence surrounding this issue, the Court should help but see that a Fraud On The Court took place when officers knowingly:

1. Testified falsely at the suppression hearing.

2. Allowed their lies to be used in the Court's decision.

3. Denied the Court the opportunity to rule on the facts when they were left to rule, based on lies.

4. Their lies were directed at the Court's ability to weigh the truth and lies surrounding an issue and decide, based on the truth.

5. Their lies were directed at the oath that everyone takes before they testify, being that there would be no need to take an oath if everyone who swears by it will just lie in the end.

6. Making the suppression hearing irrelevant, since the testimony presented denied the Magistrate a chance to make its ruling based on the truth.

The question then becomes:

1. Is it acceptable for officers to commit a Fraud On The Court by knowingly and intentionally lying about facts of the case in order to make the Court rule on those false facts?

2. Will this Court allow a ruling that it made to stand when the facts it relied on in making its ruling have now been proven to be complete lies and manipulation?

If the "truth, the whole truth and nothing but the truth" is no longer the standard which governs the justice system, then the government is right to say that the truth is untimely.

If this Court is concerned about the things presented and angered that officers would swear to tell the truth, So help them God, yet lie, and allow the Court to rule, beased on those lies, then:

1. Further briefing should be allowed with the "assistance of counsel",

in order to properly presnt "all the facts and evidence" surrounding this issue.

2. Grant a hearing to further review this issue.

3. Have a hearing to look into why counsel failed to properly presnt all the facts and evidence surrounding this issue and his represent-tion.

4. Decide, whether in light of all the things presented before this Court now, should the "supposed confession" had been allowed into my trial, being that the "reminders" that the Magistrate and this Court relied on to make its decisions are now known to be lies.

"By means of shrewd lies, unremittingly repeated, it is possible to make people believe that heaven is hell ---and hell, heaven... The greater the lie, the more readily it will be believed."

    -Adolf Hitler-

I can only pray that this Court will not allow the lies that were put before it and the Magistrate to stand as the truth and that the Court will correct the manipulation and lies that took place.

    Respectfully Submitted,

Billie Allen

26901-044

P.o. Box 33

Terre Haute, In.

47808