RECEIVED

DEC 3 0 2013

BY MAIL

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

1

BILLIE ALLEN,

    Movant,

    -v-

UNITED STATES OF AMERICA,

    Respondent,

## RESPONSE TO COURT'S MEMORANDUM AND ORDER

I, Billie Allen present (4) straightforward issues which deserve the Court's attention:

    A.    FRAUD ON THE COURT

    B.    CONFLICT OF INTEREST

    C.    FURTHER DNA TESTING REQUIRED TO
        PREVENT A MISCARRIAGE OF JUSTICE

    D.    THE CUMULATIVE EFFECT OF TRIAL COUNSEL'S
        INEFFECTIVENESS, WHICH DENIED ME A FAIR
        TRIAL, CONFLICT FREE COUNSEL AND WOULD
        RESULT IN A MISCARRIGE OF JUSTICE

### A.    FRAUD ON THE COURT

The record is clear that it would be through the testimony of Special Agent Jan Hartman that I would invoke my Fifth Amendment right to have counsel present while I was in police custody and being questioned by officers.

#### HARTMAN

A. When I began to advise him of his rights, he stated that--- asked if he could have an attorney.

Q. Okay. Did he say anything else about the attorney?

A. He asked about an attorney, if he could get one from the court.

Hartman would answer the following questions:

Q. Did you give any direction to anybody, either with the F.B.I. or the police department to attempt to locate an attorney for him?

A. No.

Q. Did you inform anyone of his request to talk with an attorney?

A. No.

Both the Magestrate Judge and this Court would rely on this testimony to show that I had indeed invoked my rights.

The Magistrate Judge and this Court would then conclude that the testimony of Detective Harper and Lieutenant Ron Henderson showed that, not only did officers do everything to honor my rights, but that I had waived them after "constant reminders" by officers that I had requested an attorney:

## DETECTIVE HARPER

A. I'd been informed that he had requested an attorney prior to the lineup and, therefore, i was told not to talk to him.

Q. Okay. Who told you that?

A. That would have been LIEUTENANT RON HENDERSON.

Q. Lieutenant Henderson also told you as you testified earlier, not to ask any questions because he'd asked for a lawyer, right?

A. Yes, sir....

To further show that he "supposedly" honored my rights, and that it was "I" who would

initiate contact with officers, he would go on to say:

Q. What if anything, did he respond?

A. He said, "I don't want a fucking attorney", he said "I want to talk about it."

Q. Okay. What did you tell him at that time?

A. I told him that he had "requested" an attorney and therefore we couldn't talk to him about the incident.

## LIEUTENANT RON HENDERSON

Q. Now, you then said that, I believe, at least after the lineup procedure you received an indication from <u>Detective Harper</u> that Allen wanted to talk to you?

A. That is correct.

Q. And that Detective Harper at least related to you that you knew Allen or Allen knew you from "another contact?"

A. That's correct.

Q. Was there a situation in which he--you had dealt with him at any time as far as you know in another homicide?

A. At that time I did not know until he brought it to my attention.

## EVIDENCE TO THE CONTRARY

From the beginning, someone should've seen through the lies of Harper and Henderson, being that the person who I had invoked my rights to admitted that she not only, never took steps to secure counsel for me, but that she never made anyone aware of my request. Her testimony alone should've raised three important questions about the "supposed confession" before it was allowed to be used against me at trial.

1. Whether officer's actually "honored" my rights when I invoked them?

2. How could officers "honor" rights that they never knew about?

3. How could officers "remind" me of something that they never knew about?

4. After swearing to tell "the truth, the whole truth and nothing but the truth, SO HELP THEM GOD; did officer's intentionally lie, in order to get, bot the Magistrate and this Court to rule in their favor?

DID HENDERSON ACTUALLY KNOW ABOUT THE REQUEST FOR COUNSEL AND DID HE LIE AT THE SUPPRESSION HEARING?

TRIAL:

HENDERSON

Q. Listen to my question. I don't care if you spoke with Agent Hartman or not. What I want to know is at the time you interviewed Mr. Allen, were you aware that he had told agent Hartman- [about the request]

A. No. No, I was not, sir.

In front of this Court, Henderson would finally admit that he never knew of my request for counsel. Henderson's confession to the truth about not knowing calls into question the "supposed reminders" that Harper said he "kept repeating to me", because there's no way that he could've reminded me of something that the person he said told him never knew! Trial counsel didn't object, the government didn't try make clear to this court that it had presented false testimony to the Magistrate Judge and neither did this Court acknowledge that officers had lied at the Magistarte Judge's suppression hearing.

(FOOTNOTE: Even now, the Court cites the "reminders as its reasoning to rule against me.)

OTHER QUESTIONABLE BEHAVIOR AND ACTIONS                    5
OF HENDERSON AND HARPER

The lies of both officers didn't just stop with their testifying about the "supposed confession", them "supposedly honoring my rights" and the "supposed waiver":

## HARPER'S TESTIMONY ABOUT "SUPPOSED NOTES"

Q. And so you were taking notes?

A. Yes. What I did is I had my notepad there and the way that we normally do when we're going to interview someone is you start to write down, you know, the date, who you are interviewing, who's in the room and as I'm doing that, Billie says he don't want anybody writing anything and I said, "Well I have to write some things" and so I basically sat back in my chair and had my notepad here and did continue to take notes.

Q. Alright. Let me ask you this. The notes that you took, did you save those notes?

A. No.

Q. Did you destroy those notes?

A. Yes....

## HENDERSON'S TESTIMONY ABOUT "SUPPOSED NOTES"

Q. And as far as this process of when the interview took place, when was the first time somebody went and wrote down what was said?

A. Later that afternoon.

Q. Okay. And do you know who it was that finally decided maybe we ought to commit this confession to writing?

A. That was my decision.

Q. Did you then write the notes out?

A. No, I had Detective Harper write out what was said and I reviewed what he put on paper in reference to what Mr. Allen had indicated.

Q. As far as you know, did Decective Harper Put on paper based on his memory?

A. And my memory, yes, sir.

Q. And certainly if they had written things down, you wouldn't want it destroyed, would you?

A. Of course not!

Harper would always seem to make a colorful showing of the "facts".

One can see more of the deception, manipulation and lies on the part of both officer's Harper and Henderson, surrounding the "supposed confession", their "supposed reminders" and their "honoring my rights".

## HENDERSON'S TESTIMONY ABOUT "ANOTHER CONTACT"

Q. Now, you then said that, I believe, at least after the lineup procedure you received an indication from Detective Harper that Allen wanted to talk to you?

A. That is correct.

Q. And that Detective Harper at least related to you that you knew Allen or Allen knew you from "another contact?"

A. That's correct.

Q. Was there a situation in which he--you dealt with him at any time as far as you know in another homicide?

A. At the time I did not know until he brought it to my attention.

Both officers would go so far and use my friend's murder to "supposedly" establish that I had knew Henderson from "another Contact", and for this reason, I would "supposedly initiate contact" with officers. They had no choice but to create a story that would help excuse and/or cover their actions. Or one would see their actions and behavior as them violating my rights. (Actual reported submitted in previous motion).

Both the Magistrate and this Court would rely on the testimony of both officers in relation to:

1. The "supposed relationship/another contact" with Henderson and I in the death of my friend and use it as me initiating contact with officers.

2. The "supposed reminders from both Harper and Henderson", which neither officer could do, being that they never knew of my request for counsel.

3. The "supposed waiver" when I was "supposedly reminded" that I had requested an attorney, but asked if I would take part in a lineup without counsel.

Alll of these lies would be used by both Courts as determining factors cited in the Court(s) rulings.

## FRAUD ON THE COURT AND RULE 60(b)(3) AND RULE 60(d)(3)

Fed. R. Civ. P. 60(b)(3), Fraud on the Court **standard states** that "the movant must show with clear and convincing evidence, that the opposing party engaged in a fraud or misrepresentation." Murphy v. Mo. Dept. of Corr., 506 F.3d 1111, 1117 (8th Cir. 2007) (quoting United States v. Metro. St. Louis Sewer Dist.,440 F.3d 930, 935 (8th Cir. 2006)).

"Fraud on the court claims merit seperate analysis not only because they are exempt from the one year time-period for filing claims under Rule 60(b)(3), but because they are much more difficult to prove."Zurich, 426 F.3d at 1291(citing 11 Charles Alan Wright & Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure 2860, 2870 (2d ed. 1995)).

The Fraud On The Court presented, it relies on "clear and convincing evidence." That evidence is the testimony of both officer's, Harper and Henderson. Their testimony "in full" goes to show that at the suppression hearing, Harper relied on Henderson to lie and that their lies would be used to influence the Magistrate Judge's ruling.

The misrepresentation of the facts, the lies and the reckless disregard for the truth can be read in the opinions of the Magistrate and this Court's opinions/rulings. (Both would cite the testimony of officer's Harper and Henderson, rely on the facts as they saw fit to tell them, and both Courts would use the lies from the suppression hearing to rule against me). Though every Court seems to overlook Henderson's confession when he would admit at trial that he actually, never knew of my request for counsel.

The lies that both officers would testify to at the suppression hearing were a direct attack on the Judicial Machinary, being that their lies denied the Court a chance to be impartial, decide whether the "supposed confession" came as a violation of my fifth Amendment right, and allow the Magistrate to make a ruling based on the truth.

The foundation and safety net that helps to prevent inadmissable evidence from being introduced into any trial, rests in a suppression hearing, where the truth will come forth and the Magistrate will be allowed to make a fair and impartial ruling, based on the truth.

Making sure that one who takes the stand and takes an oath to "tel the truth, the whole truth and nothing but the truth, so help the God" is another key component in making sure that the Judicial Machinary functions properly. The lies put before the Magistrate, under oath and the Magistrate's dependence on those lies in its ruling, prevented the Court from doing what it was designed to do. Suppress inadmissable evidence that came forth because of a violation of the law.

Both the oath to "tell the truth and nothing but the truth, so help them God", and the process of suppressing inadmissable evidence would be irrelevent if anyone can just come in, lie and testify so that their testimony fits with the results they are after.

### CONCLUSION

I've satisfied the requirment's of Rule 60(b)(3), which state that relief from a judgment is appropriate where the opposing party commited "fraud, misrepresentation, or misconduct" in relation to a judicial proceeding. I have also satisfied the requirment's of Rule 60(d)(3)

which exempts the claim from the strict one year time-bar to setting aside a judgment and from being procedurally defaulted.

The Court can also take into account counsel's ineffectiveness for failing to:

1. renew its objection to the confession being introduced into evidence, when Henderson admitted that he never knew of the request.

2. File a Fraud On The Court claim when the Fraud was revealed.

Lastly, the Court can conclude that if the "supposed confession" wasn't introduced into evidence and the jury were to hear the things introduced in the 2255, the outcome would've been different.

For the reasons stated, the court should find that presentment of this issue doesn't fall under the one year time-bar to set aside a judgment and that the claim is not procedurally defaulted. The Court should:

1. Reverse the conviction.

2. Grant a new trial.

3. Suppress the supposed confession, due to the Fraud on the court, and grant a new trial.

4. At the least, grant a evidentiary hearing on this issue where evidence and testimony can be presented and the Court can make a dicision based on the "truth, the whole truth and nothing but the truth!"

[footnote: I attempted to testify at the suppression hearing about the facts in the proffer, to show what eventially came out at trial. The Magistrate would come to his conclusion

and make a ruling before the proffer was offered. He would rely on the testimony that I've proven to be filled with lies.]

## B.    CONFLICT OF INTEREST

There was a complete denial of effective assistance of counsel and a violation of my Sixth Amendment rights when the Court was made aware of a conflict of interest, between trial counsel, Mr. Sindel and myself. But the court failed to inquire into the conflict, question why Mr. Sindel was being asked to be removed from a capital case, determine if replacing Mr. Sindel was warranted, and whether going forward with Mr. Sindel as counsel would put my Sixth Amendment rights at risk by having me go forward to trial with a conflict between myself and Mr. Sindel.

Caban v. United States, 281 F.3d 778 (8th Cir. 2002)(citing Wood, 450 U.S. at 272 n.18) states, "When a conflict of interest between a defendant's trial attorney is presented to a trial court, the trial Court must make an inquiry into that conflict, regardless of its nature.

### COURT'S FIRST NOTICE OF CONFLICT

Before trial, I'd write a letter to the court, in the form of a motion, asking the Court to remove Mr. Sindel from my case as counsel.

The Court, in response to my motion/request, would simply deny my motion/request without:

> 1. Inquirying into why it was that I wanted Mr. Sindel removed as lead counsel.
>
> 2. What was the conflict that would warrant Mr. Sindel, possibly being removed as counsel.
>
> 3. Whether going forward with Mr. Sindel as counsel would violate my Sixth Amendment rights to effective assistance of counsel.

## COURT'S SECOND NOTICE OF CONFLICT

One of the issues put before this Court in the motion for a New Trial was that Mr. Sindel should've been removed as counsel "before" trial. This isuue was presented to the Court by, both Mr. Sindel and Mr. Simon and it was signed off on by both.

Not only had I tried to put the Court on notice that Mr. Sindel should've been removed as counsel "before" trial, but both attorney's would state the same in the motion for a New trial.

The Court would again fail to seek answers as to why it was that I'd first ask that Mr. Sindel be removed before trial and then, both Mr. Sindel and Mr. Simon say the same. Both motions would be denied by the Court and an inquiry did not and has not taken place to address the conflict.

## CASES WHERE A COURT FAILS TO INQUIRE INTO A CONFLICT

Holloway v. Arkansas, 435 U.S. 475, 55 L. Ed. 2d 426, 98 S. Ct. 1173 (1980), addressed situations where the trial Court is made aware of a potential conflict of interest before, during or in some instances, after trial. Under those circumstances, the Court held the trial Court has a duty to conduct a searching inquiry into the "possibility" of a constitutional violation arising from that conflict. See Wood v. Geaorgia, 450 U.S. 261, 272 n. 18, 67 L. Ed. 2d 220, 101 S. Ct. 1097 (1981)(noting that Cuyler v. Sullivan, 446 U.S. 335(1980), "mandates a reversal when the trial Court has failed to make an inquiry even though it 'knows or reasonably should know that a particular conflict exists'"). Failure to understake this inquiry mandates an automatic reversal of any conviction. Atley v. Ault, 191 F.3d 865, 873(8th Cir. 1999); see also id. at 870 (When a trial Court fails to discharge its constitutional duty to determine whether the defendant is receiving assistance of counsel, unburdened by a conflict of interest, "prejudice is presumed" and reversal of the conviction is automatic.") (citing Holloway.) This rule of reversal applies, "regardless of the nature of the conflict." Atley, 191 F. 3d at 870 n. 4

## COUNSEL'S FAILURE TO NOTIFY COURT SOONER

The motion for a New Trial would state that Mr. Sindel should've been removed as counsel before trial, but he was ineffective for failing to alert the Court sooner of what he would disclose in the motion for a new trial. Counsel took it upon himself to delay him

telling the Court that he should've been removed and that there was a conflict between him and I. The Six Amendment right to counsel exists in order to protect the fundamental right to a fair trial, and how can a capital trial be fair when counsel waited until after the trial to let the Court know that he should've been removed before hand?

Even if the Court decided to not inquire into why I wanted Mr. Sindel removed from my case, his letting the Court know in the motion for a New Trial warranted the Court seeking answers.

Counsel was clearly ineffective for not alerting the court of the conflict sooner. For the reasons stated, I'm asking for the following:

      1. That a new trial be granted.

      2. At the least, a full evidentiary hearing be held on this issue, where:

            a. evidence can be presented to show the depths of the conflict.

            b. evidence can be presented to show that I received ineffective assistance of counsel because of the conflict.

            c. where counsel(s) can testify about the conflict.

            d. where I can testify about the conflict.

The Court Of Appeals for the Eigth Circuit, in McCraney v. Hobbs 2013 U.S. App. LEXIS 4808 was faced with a decision as to whether it would entertain a claim that was procedurally defaulted. The Court would state in its decision to hear the claim that, ("Accordingly, in the interest of judicial economy", the Court would proceed to the merits of McCraney's claim). (citing Trussell v. Bowersox, 447 F.3d 588, 590-91 (8th Cir. 2006)(bypassing questions of procedural default and timeliness in the interest of judicial economy); see also Sweet v. Delo, 125 F. 3d 1144, 1150 (8th Cir. 1997).

United States v. Ward, 55 F.3d 412, 413(8th Cir. 1995) (citing Frady, 456 U.S. at 167-

68)(ineffective assistance of counsel may constitute "cause" to excuse procedural default in a section 2255 action). Counsel was clearly ineffective for his failure to alert the Court sooner of the conflict and waited until after trial to do so; clearly showing prejudice.

## C.  FURTHER DNA TESTING REQUIRED TO PREVENT A MISCARRIAGE OF JUSTICE

Under the Innocence Protection Act, an individual serving a federal sentence may move the sentencing Court for DNA testing of specific evidence. 18 U.S.C. 3600

The DNA in this case was tested by the government and the results would exclude me in whatever they were trying to link me to. Due to the fact that there are new methods of testing being done, which are different than the tests done in the past and the technology is substantially more probative than prior DNA testing, I'd request to the Court that further testing be done in the interest of justice.

### NEW METHODS AND TECHNOLOGY

I'd personally write a letter to the director at John Jay College of Law, asking him to look over the lab reports and the results from this case. he would in turn respond to my letter by telling me that the testing that was done on the DNA was no longer being used by crime labs. These new metods that are being used hold the "possibility" of being able to better pinpoint who the DNA on the "white strap" belongs to if testing is done.

### GOVERNMENT'S THEORY ABOUT DNA

The Government has argued against DNA testing and the Court concluded that further testing wouldn't contribute to a showing of innocence. Both would deem the DNA found on the "white strap" are:

> 1. evidence that comes from a bulletproof vest that Holder was wearing at the time of his arrest.

2. that the DNA found on the white strap had to be
   Holder's, since I was excluded.

### ARGUMENT

To come to the conclusion that was reached by the goverment and the Court, one would
have to speculate that the actual "second suspect":

1. couldn't have purchased a bulletproof vest from another
   source; other than Thomas Mendell.

2. he couldn't have sustained the injuries that witnesses
   reported seeing, that would leave traces of DNA.

Had the government truely believed that the "only source" of the DNA was Holder; then
why test the DNA against me and Mr. Heflin? If anything, their request to have the DNA
tested against me and not MR. Holder contradicts their belief that he was the sorce of
the DNA and that the witnesses accounts of seeing a person matching the discription of
the man fleeing the crime scene, with a cut on his hand was credible.

To suggest that since they didn't get the results that they were after, the results are
irrelevant to my Innocence is appaling. That would mean that only postive results, which
implicate someone, hold the most weight in the Court Of Law. And anything different can
be deemed irrelevant or unimportant to a person's freedon and their being able to prove
their Innocence.

Had the results came back positive, I'm postive that the government would have hesitated
to use to the results to establish:

1. that I had been at the crime scene.
2. that I was indeed with Holder inside the van when
   it crashed.
3. that I had been inside the bank with Holder.
4. that my DNA was on the white strap.
5. that I'm guilty!

But negative results can't be used to establish the opposite?

## FACTS TO SUPPORT FURTHER TESTING

Testimony in this case would be presented to imply that "the second suspect", who committed the crime with Mr. Holder, had a cut or injury to his hand. In this case, DNA was found on a couple of items, which could suggest that the person who had the cut on his hand left behind his DNA at the crime scene.

Several reports indicate that the injury on the "second suspect's" hand was large enough to been seen from a distance; indicating that the injury was large enough to where DNA would be left behind:

**DISPATCHER:**
informed by

Attention all cars. From 6227 he was a jogger inside Forest Park by the Steinberg's Skating Rink that that subject fitting that dicription was last seen going north and east towards the bike path towards Kingshighway. Attention all cars from 6227 he was advised by a jogger by Steinberg's Skating Rink that that subject fitting the description was last seen going north and east towards the bike path. Time is 1112.

And all cars the clothing on that suspect is black male, blue, correction, gray sweatpants, a multi-colored jacket, he possibly has a right hand injury, singed hair.

The government's case would rest on the testimony of two park workers, who would testify that they had "supposedly" given me a ride out of the park. (though their initial statements to police would say that they didn't give anyone a ride. That they had given the person directions). This being the case, then who is the person running through the park with an injury to his hand, matching the discription of the person police are after and who's seen by several witnesses?

This account would support the evidence that we would present in our 2255, where it clearly suggests that I'm Innocent and someone other than myself commited the crime!

[footnote: there is also a report where a "Damp Rag" was discovered with blood on it that has never been tested against, the victim, me or Holder]

## MORE SUPPORT FOR FURTHER TESTING

This Court would simply conclude that our assertion that (J.B.) Jerry Bostic was the actual second suspect was unfounded, because of witnesses account. One only has to look at J.B.'s autopsy report to see that Mr. Bostic, at the time of his death, had scars on his hands and forearm.

(If taken into account with all the evidence presented to this Court in the 2255, not allowing further testing on the DNA and allowing the results to be judged by a jury would be a miscarriage of justice.

## INEFFECTIVE ASSISTANCE OF COUNSEL

Counsel in this case was ineffective for failing to:

1. investigate who "J.B." was.

2. seek testing to exclude Holder.

3. present to the jury the DNA results which excluded me.

4. present testimony and/or reports that pointed to someone, other than myself to establish reasonable doubt.

5. ask the Court for funding to do testing.

6. ask the court for funding to present testimony of expert witnesses, concerning the DNA.

Failure to do all of these things, including a failure to present the things mentioned in the 2255, shows that counsel's performance fell below the standards set forth in Strickland v. Washington and that prejudiced came from his ineffectivennes to present an available and credible defense.

For the reasons stated, I ask the Court:

1. Grant testing on the DNA, using the new methods that are now being used.

2. Allow the jury to decide if the DNA has any relevance, since the government had the test done to link me to the crime.

3. Grant a new trial.

4. Rule that counsel's performance fell below the standards stated in Strickland and grant a new trial.

D.      THE CUMULATIVE EFFECT OF TRIAL COUNSEL'S INEFFECTIVENESS, WHICH DENIED ME A FAIR TRIAL, CONFLICT FRREE) COUNSEL AND WOULD RESULT IN A MISCARRIAGE OF JUSTICE

### INEFFECTIVE ASSISTANCE OF COUNSEL

A key factor behind counsel's ineffectiveness is that there was a deep rooted conflict of interest between trial counsel and I, which deemed him ineffective from representing me effectively. The Sixth Amendment right to effective assistance of counsel includes the right to conflict free representation, Cuyler v Sullivan, 446 U.S. 335, 345 (1980)

I'd write a letter to the court to prevent me having to go to trial with a conflict between Mr. Sindel and myself and to prevent the conflict from denying me of a fair trial. The court would simply deny the request without an inquiry into why was it that I felt Mr. Sindel should've been removed from a capital murder case.

Even a second notice that there was something wrong from trial counsel himself, in the motion for a new trial didn't prompt the court to look into the matter, when the law governing a conflict brought to the court's attention states, "When a conflict of interest between a defendant's trial attorney is presented to a trial court, the trial court must

make an inquiry into that conflict, 'regardless of its nature", Caban v United States, 281 F. 3d 778 (8th Cir. 2002)

The conflict between trial counsel and myself would prevent counsel from being effective and insuring that I received a fair trial.


## SIXTH AMENDMENT VIOLATION

The Sixth Amendment requires counsel to investigate and consider viable theories relevant to the innocence of the accused, See Foster v. Lockhart, 9 F.3d 722, 726(8th Cir. 1993) (affirming grant of writ when trial counsel failed to investigate guilt issues); Parkus v. Delo, 33 F.3d 933, 938-39 & n. 6(8th Cir. 1994)(remanding for evidentiary hearing to address counsel's failure to thoroughly investigate guilt phase defense.)

The defense taken by trial counsel was dependant on what was in the government files and what witnesses said to police. In Reynoso v. Giurbin, 462 F.3d 1099(9th Cir. 2006), the court would state, ("Although trial counsel is typically afforded leeway in the making of tactical decisions regarding trial strategy, counsel cannot be said to have made a tactical decision without first procuring the information necessary to make such a decision.")

Counsel's decision to rely on the government files and chance that witnesses would stand by what they said in their statements to police was a grave mistake which prejudiced me in every aspect. Trial counsel didn't interview any of the alleged eyewitnesses in this case and neither did counsel conduct interviews of potential witnesses in the files who would've been helpful to the defense.

Court's have ruled that when adapting this strategy, their decisions can't be seen as tactical, Reynoso.

In Stanby v Bartley, 465 F.3d 810 (7th. Cir. 2006), the court would find counsel's performance deficient when, ("counsel 'prepared for trial by reading the statement's that prespective witnesses had given the police . . . [but] did not interview any of them.")

The record in this case is overwhelming where witnesses would state on thing to police on the day of the crime or a few days after; then their testimony would change dramaticly when they testified at trial. Witnesses would:

       1. Change what they saw.

2. Change what they did.

3. Change what they heard.

4. Change what they actually knew.

All the changes made seemed to be ways to help the government prove their case and not help the defense. So to not go outside of the government's files was a huge mistake, being that the changes left counsel unprepared and unable to put together a "sound strategy." Counsel taking a chance of that magnitude prejudiced me from receiving a fair trial and caused him to be ineffective. He would fail to interview witnesses, follow credible leads, and present favorable evidence. None of this was ever an option for counsel.

## PROOF OF INEFFECTIVE ASSISTANCE OF COUNSEL

Again, the court should take into account tha there was a conflict of interest between Mr. Sindel and myself as we went to trial.

Strickland v. Washington, 466 U.S. 668, has stated that "in order to prevail on a claim of ineffective assistance of counsel, the defendant must show:(1) his attorney's performance did not conform to the degree of skill, care and dilligence rendered by a reasonably competent attorney under similar circumstances; and(2) as a result of attorney's performance, he was prejudiced.

When considering what counsel did, compared to what counsel didn't do (neglected to do), the scales tilt in favor of counsel's ineffectiveness and his performance being defecient:

## WHAT COUNSEL DID:

1. Counsel would cross-examine the government's witnesses.

2. Counsel would present the testimony of:
   a. Kent Adkins (Detective)
   b. John Fitzer(Special Agent)
   c. Frank Brostrom (F.B.I. St. Louis, violent crimes, bankrobbery)
   d. Joe Papes(Special Agent)
   e. Ruben Lopez(Agent, F.B.I.)

## WHAT COUNSEL DIDN'T DO

1. Failed to interview any of the government witnesses.

2. Present Dispatchtape of the following:
   a. ..."supposedly, he's on North euclid at this time going towards the Metrolink...Time is 1104.
   b. ...He was in that yard at 6900 Clayton ...He saw him crawling underneath the fence.
   c. ...from a guard in the 5900 block of Clayton that the subject was last seen crawling under the fence ...Time is 1107
   d. ...will have an injured right hand...at 1108
   e. ...he was advised by a jogger by <u>Steinberg's Skating Rink</u> that that subject fitting the description was last seen going north and east towards Kingshighway towards the bikepath. ...Time is 1112.

3. present the testimony of Greg Porter. He would describe a person 5'8" and matching the description of the person police were chasing through the park.

4. present the testimony of Joe Powell. He would describe the person who he saw just as Mr. Porter had.

5. Present the testimony of James Combs. he would state that someone 5'10" would come into Deaconess Hospital would come in, look around suspiciously when he looked in that person's direction.

These witnesses would challenge the government's theory that two park workers gave me a ride, and that I was the only "suspect" in the park that day.


## CONTRADICTING THE PLANNING OF THE ROBBERY

6. present the testimony of Broderick Bonner, who was at the bowling the day Wayne Ross said he sat at a table with Holder and I and "supposedly" listened to us talk about robbing a bank. He said that

never heard Holder talk about robbing a bank with Wayne Ross.

7. Present statements by Mr. Ross where he would state that he knew me and that he had seen me several times on the southside.

8. Present the testimony of Jeffrey Moore. He would say that he heard Holder talk to others about robbing the bank a year before hand. He said that he was at the bowling alley the day that Holder and "supposedly" talked about robbing the bank and that Mr. Ross was siiting at another table and not at a table with me and Holder.

9. present the testimony concerning the anonymous call, where a witness saw Holder at the bowling alley, with someone other than me planning a bank robbery.

10. present the testimony of Yalonda Curry. She would state that she knew me in her grand jury testimony and that she knew of the plan to rob the bank. She too would say that I "supposedly" called her after the crime and told her what happened. (Her testimony and her statemnet to police would be read into the record by the government throughout these proceedings. We would never be able to question her.) I've never met this woman before and counsel should've called her as a witness to prove that everything she said to the grand  jury was a lie.

11. present the testimony of G. Vaughn. He would sell Holder the gun used in the robbery. He too would say that Holder had talked to others about robbing a bank.

12. present the records of Holder's withdrawls to show that he regularly picked up his check from the bank when it arrived. There is a withdrawl dated:
    1/13/97; the same day as the purchase of the bulletproof vest, AND THE SAME DATE THAT'S PRINTED ON THE RECEIPT!

This evidence and witnesses accounts should've been used to challenge and disprove the the government's theory that Holder and I had been planning the crime for a long time. That

might've been what Holder was doing, but not me.

## EVIDENCE TO SUPPORT "ANOTHER SUSPECT" BESIDES ME

13. Present the Evidence Receipt of "1 white strip of cloth w/blood blood, found at "6900 Clayton" labeled: Laboratory No. 703360 Q-4

14. Present Evidence Receipt of "1 white strip of cloth w/blood, found at, "6900 Clayton" labeled: Laboratory No. (left blank)

15. Present Evidence Report of "1 white Velcro Strip w/blood spatter" found on street at "5900 Wells Dr. Forest Park."

16 Present Evidence technicians report of "1 'Damp Rag'", found in driver's seat of vehicle. (said to be sent for DNA tests; <u>never tested against the victim's DNA, my DNA or Holder's DNA!</u>)

17. Present Lab Report where the tests from the "Damp Rag" "disclosed the presence of apparent blood."

18. Present DNA results where the government would test my DNA against DNA on evidence, found at the scene of the crime, and where the results would EXCLUDE ME!

19. Present the results where the government would test my clothes for gasoline and the results would come back NEGATIVE!

20. Present J.B. as a witness and ask him about his involvement in the crime.

This evidence and testimony should've been used to exclude me as a suspect and show that someone, other than myself commited the crime.

## OTHER PROOF OF DEFICIENT PERFORMANCE

21. Present evidence to show that while the government presented testimony and files to show that I had (2) tampering charges on my record, that one of them wasn't me. The Second charge was used by the

23

government to establish:
    a. Motive
    b. Oppurtunity
    c. Preperation
    d. Planning
    e. Knowledge

Counsel failed and neglected to do even the most simple things, such as not allow the to present a charge to my jury that I never committed. All it would've taken was for counsel to look at the report, as for the file and see that someone else committed the crime that's on my record. That clearly falls below the standards set forth in Strickland!

## CONCLUSION

When one weighs what was done by trial counsel against what wasn't done, the scales tilt favorably towards a violation of my Sixth Amendment right to:

1. effective assistance of counsel
2. a fair trial, where the evidence and testimony presented by the government is challenged by viable testimony and evidence from the defense, that would've changed the outcome.
3. conflict free representation that would result in counsel being ineffective.
4. prevent a miscarriage of justice.

Trial counsel never considered many of the available options that any other attorney in his position would've taken.

In this motion, I've addressed why each ground overcomes the procedural default and time bar; including counsel's ineffectiveness as "cause." I've laid out the violations of my constitutional rights and how I was prejudiced because of the violations.

Without waiving my contention that each issue, by itself, merits the relief that I know is warranted, the Court should also consider the cumulative effect of the issues presented and how ineffective assistance of counsel is a key factor in each.

Counsel's performance was clearly deficient, based on the things presented herein. Counsel's performance and decisions weren't reasonable in the least, under the circumstances and with the things that were available and favorable to my defense.

Based on the case law citing throughout, the Court should find that I've overcome the obstacles that would normally prevent a court from taking action, correct and/or set aside a ruling.

For the foregoing reasons, the Court should:

1. Suppress the "supposed confession" and grant a new trial, because of the Fraud On The Court.
    a. At the least, the Court should grant a full hearing surrounding the Fraud On The Court, the "supposed confession", counsel's ineffectiveness; in order to prevent a miscarriage of justice, on Ground A.

2. Grant a new trial because the Court failed to inquire into the conflict between Mr. Sindel and myself, which denied me a fair trial, effective assistance of counsel, conflict free representation; in order to prevent a miscarriage of justice on Ground B. (or hearing)....

3. Grant DNA testing on already tested blood found and on blood samples not yet tested. (The Damp Rag, being one of the things needed to be tested).Grant a new trial and allow a jury to determine the weight the results have on the case; in order to prevent a miscarriage of justice on Ground C.

4. Grant a new trial, based on counsel's deficient performance,

which denied me a fair trial, effective assistance of counsel, conflict free representation, and a chance to prove my Innocence based on things that he should've presented, but gave up on with looking into them, on Ground D.

a. at the least, grant a full hearing on this matter.

I thank the Court for allowing me the chance to present to it, claims of merit, which deserve the Court's attention and deserve the the relief that I'm asking for.

12/26/13

Billie Allen
26901-044
P.O. BOX 33
TERRE HAUTE, IN.
47808