BILLIE JEROME ALLEN,       )
                                 )
          Petitioner,      )
                                 )
      v.                 )        No. 4:07CV00027 ERW
                                 )
UNITED STATES OF AMERICA,    )
                                 )
          Respondent.    )

## MEMORANDUM AND ORDER

This matter comes before the Court on Petitioner Billie Jerome Allen's Amended Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody Under a Sentence of Death [ECF No. 60].

## I.    BACKGROUND

On March 17, 1997, Petitioner Billie Jerome Allen (Mr. Allen) and Norris Holder robbed the Lindell Bank & Trust Company in Saint Louis, Missouri. The bank robbery resulted in the death, by multiple gunshot wounds, of bank security guard Richard Heflin. Mr. Allen was indicted for crimes stemming from the armed bank robbery in April 1997. Count I of the indictment charged him with killing Mr. Heflin in the course of committing an armed bank robbery, in violation of 18 U.S.C. § 2113(a) and (e) (1994). Count II of the indictment charged Mr. Allen with using a firearm to commit a crime of violence resulting in the death of another under circumstances constituting first-degree murder, in violation of 18 U.S.C. § 924(j)(1) (1994

and Supp. II 1996).[1]  The Government filed a timely notice of intent to seek the death penalty, and, following a trial, a jury found Mr. Allen guilty on both Counts.

In a separate penalty phase, defense counsel offered testimony from 36 witnesses: 12 family members, 10 friends or neighbors, 12 teachers, coaches or school administrators, and two expert clinical psychologists.  The non-expert witnesses provided largely consistent testimony suggesting Mr. Allen had come from a difficult background, but was friendly and not prone to violence.  They described the difficulties Mr. Allen experienced while attending the suburban Clayton School District, as part of a voluntary desegregation program; witnesses testified, in the Clayton schools, Mr. Allen struggled to succeed academically, and to fit in socially, leading to his eventual transfer to the Saint Louis Metropolitan School District.  Additionally, Mr. Allen's maternal uncle, Raymond Petty, testified about a single incident, during which Mr. Allen's mother, Juanita Allen, beat her son with an extension cord.  Evidence also showed, while growing up, Mr. Allen knew several individuals who suffered violent deaths.  Most notably, Mr. Allen's close friend, Dennis Noble was shot and died, and Marquis Taylor was killed in his presence.  Two clinical psychologists, Dr. Daniel Cuneo and Dr. Michael Gelbort, opined neuropsychological brain defects and post-traumatic stress disorder (PTSD) may have impacted Mr. Allen's criminal actions.  The Government offered rebuttal testimony from a forensic psychiatrist and a clinical psychologist.

The jury returned a sentence of life imprisonment on Count I, and a sentence of death on Count II.  The special verdict forms mirrored the Federal Death Penalty Act (FDPA), which provides a jury must make three distinct determinations before it can impose the death penalty in

_____

[1] Norris Holder was indicted and convicted of identical counts.  He received sentences of death on both counts.

a homicide case:

> First, it must find, unanimously and beyond a reasonable doubt, that the defendant acted with the requisite *mens rea*. *See* 18 U.S.C. § 3591(a)(2). Second, again unanimously and beyond a reasonable doubt, it must find the existence of at least one statutory aggravating factor. *See* 18 U.S.C. §§ 3592(c), 3593(d). If the above two requirements are satisfied, the jury must then determine whether the aggravating factors, both statutory and non-statutory, 'sufficiently outweigh' the mitigating factors presented by the defendant to justify a death sentence, 'or, in the absence of a mitigating factor, whether the aggravating factor or factors alone are sufficient to justify' that sentence. *See* 18 U.S.C. § 3593(e).

*U.S. v. Purkey*, 428 F.3d 738, 749 (8th Cir. 2005). As to both Counts, the jury found the *mens rea* element was satisfied. Regarding the second inquiry, the jury made identical findings as to both Counts. That is, it found two statutory aggravating factors: (1) "knowingly creat[ing] a grave risk of death to one or more persons in addition to [the victim]," Exhibits 57 at 3, 58 at 3, and (2) "commit[ting] the offense in the expectation of the receipt of anything of pecuniary value." Exhibits 57 at 4, 58 at 4. In addition, the jury found one non-statutory aggravating factor: "[Mr. Allen's] conduct in committing the offenses [was] substantially greater in degree than that described in the definition of the crime, apart from statutory aggravating factors[.]" Exhibits 57 at 5, 58 at 5. The jury also found one statutory mitigating factor: "[o]ther factors in Billie Allen's background, record, or character, and any other circumstance of the offense, that mitigate against imposition of the death sentence." Exhibits 57 at 8, 58 at 8. In addition, the jury found two non-statutory mitigating factors: (1) "[t]he offenses for which Billie Allen has been convicted are inconsistent with his prior behavior," Exhibits 57 at 11, 58 at 12, and (2) "Billie Allen had no strong guiding parental influence in the home." Exhibits 57 at 13, 58 at 14. Finally, as to the last inquiry, the jury found the aggravating factors outweighed the mitigating factors sufficiently to justify the death penalty only as to Count II. The Court formally sentenced Mr. Allen on June 4, 1998.

3

On direct appeal, the Eighth Circuit affirmed Mr. Allen's convictions and sentences, rejecting, *inter alia*, his argument that the Fifth Amendment of the United States Constitution required the indictment to include, for consideration by the grand jury, the statutory aggravating factors triggering eligibility for the death penalty. *U.S. v. Allen*, 247 F.3d 741, 761-64 (8th Cir. 2001). Mr. Allen filed a petition for writ of certiorari to the United States Supreme Court. The Supreme Court granted Mr. Allen's petition, vacated the Eighth Circuit's decision as to his sentence, and remanded the case to the Eighth Circuit for reconsideration in light of the then-recent decision, *Ring v. Arizona*, 536 U.S. 584 (2002), which held the Sixth Amendment precludes a sentencing judge, sitting without a jury, from finding aggravating factors necessary for the imposition of the death penalty.

On remand, the Eighth Circuit initially concluded Mr. Allen's sentence of death should be vacated, finding the indictment's failure to charge at least one statutory aggravating factor violated Mr. Allen's Fifth Amendment right to indictment by a grand jury. *U.S. v. Allen*, 357 F.3d 745, 748-51 (8th Cir. 2004). The court also found, although not structural, the error nevertheless required Mr. Allen's sentence to be vacated, because it was not harmless beyond a reasonable doubt.[2] *Id.* at 751-58. Following a subsequent rehearing *en banc*, however, the Eighth Circuit affirmed Mr. Allen's sentence, concluding the defect in the indictment was both non-structural and harmless beyond a reasonable doubt. *See U.S. v. Allen*, 406 F.3d 940 (8th Cir. 2005). On December 11, 2006, the Supreme Court denied Mr. Allen's petition for writ of

---

[2] In *Chapman v. California*, the Supreme Court held "that before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." 386 U.S. 18, 24 (1967). Since then, the Supreme Court has characterized certain, limited classes of constitutional errors as "structural," requiring automatic reversal. *U.S. v. Davila*, 133 S. Ct. 2139, 2149 (2013); *Rivera v. Ill.*, 556 U.S. 148, 160 (2009). In contrast, "non-structural" errors are subject to the 'harmless beyond a reasonable doubt' standard." *Neder v. U.S.*, 527 U.S. 1, 8 (1999).

certiorari, *Allen v. U.S.*, 549 U.S. 1095 (2006), and, on February 20, 2007, it denied his petition for rehearing. *Allen v. U.S.*, 549 U.S. 1246 (2007).

In March 2007, this Court granted Mr. Allen's request for appointment of habeas counsel. *See* ECF No. 10. On February 11, 2008, Mr. Allen filed his Amended Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody Under a Sentence of Death (Amended Motion) [ECF No. 60], raising numerous grounds for relief. In its Memorandum and Order dated May 10, 2011 [ECF No. 147], the Court denied, without an evidentiary hearing, all but one of Mr. Allen's asserted grounds of relief. The Court granted an evidentiary hearing (the Hearing) regarding Mr. Allen's claim trial counsel were ineffective for failing to adequately investigate and present mitigating evidence at the penalty phase of trial.

In granting the Hearing, the Court relied on the factual allegations in Mr. Allen's Amended Motion and supporting declarations. The thrust of Mr. Allen's claim is that trial counsel, Rick Sindel and John Simon, failed to obtain readily available evidence of Mr. Allen's alleged history of severe childhood abuse. Counsel's purported shortcomings originated with alleged communication failures among defense team members during the preparation of the criminal trial. Specifically, Mr. Allen alleges the trial team hired Dr. Craig Haney, a mitigation specialist, shortly after the Government filed its notice of intent to seek the death penalty on August 8, 1997. Mr. Allen asserts the team provided Dr. Haney with minimal mitigation documentation, and failed to adequately collaborate with him until January 1998, when his lack of work product was discovered by trial counsel. Although Dr. Haney knew the criminal trial was set for February 9, 1998, he purportedly believed the date had been continued, or would be continued, due to the lack of communication he received from trial counsel. According to Mr. Allen's Amended Motion, "[i]t was not until mid-January 1998, that Dr. Haney was informed the

case would actually go to trial in February, 1998." ECF No. 60 at 37. Mr. Allen contends, up until this point, the trial team was operating under the mistaken impression Dr. Haney would assume responsibility for the day-to-day preparation of the mitigation case, while, in actuality, Dr. Haney was relying on the trial team to conduct investigations and send him the results for review and analysis.

In correspondence dated January 13, 1998, Dr. Haney informed trial counsel he could not possibly prepare the mitigation case for the trial date as set. Without a continuance, he expressed willingness to withdraw from the criminal case, and promptly did so. Accordingly, trial counsel replaced Dr. Haney with a new mitigation specialist, Dr. David Randall. The Court denied a subsequent motion for continuance, in which trial counsel asked for an additional 120 days for Dr. Randall to complete his mitigation work.

In his Amended Motion, Mr. Allen claims the resulting time constriction rendered an unreasonably deficient mitigation investigation, because trial counsel failed to discover and present evidence establishing Mr. Allen grew up in an abusive, neglectful, and alcohol-ridden home, especially with respect to the conduct of his mother, Juanita Allen. In the May 10, 2011 Memorandum and Order, the Court, relying on factual allegations in Mr. Allen's Amended Motion and supporting declarations, summarized the alleged mitigation deficiencies as follows:

- Because the mitigation investigation had not completed prior to trial, counsel was unable to voir dire prospective jurors based on planned mitigation evidence or to frame guilt-phase issues in light of mitigation evidence that counsel might later offer.

- Allen was largely estranged from his father's side of the family, causing the defense team to focus on potential mitigating evidence from the maternal side. As a result of this reliance, the defense team did not want to alienate . . . Juanita Allen, and failed to develop the rapport necessary to discuss with her the abuse Allen suffered from her and others as a child. Dr. Randall states that it was 'clear

that Ms. Allen was one of the primary abusers of her son,' but that he was unable to build enough trust to discuss these issues with her in the time available.

- According to Dr. Randall, he strongly suspected family abuse and dysfunction based on Allen's history and his interactions with Juanita Allen, but that he was unable to obtain concrete evidence with just over one month of time for the investigation.

- The defense team was unable to prepare witnesses with 'sufficient depth,' leading them to repeatedly focus on Allen being a 'follower,' being afflicted with a variety of childhood illnesses, and having a difficult time adjusting to being a minority student at a predominantly white school. Dr. Randall represents that the defense focused on this school adjustment theme because teachers and school officials were readily accessible and could coherently articulate the theme, but that this otherwise would have been a limited part of the mitigation case.

- Counsel's sentencing presentation included evidence that Allen suffered from post-traumatic stress disorder . . . arising out of the shooting death of a childhood friend, and Dr. Randall states that the defense team decided to focus on the shooting as the underlying trauma based on limited available information, but that with further research, counsel would have been able to show that the trauma was based on "a much richer trauma history and predisposition," beginning with his abusive childhood.

- Counsel presented evidence that Allen suffered from an organic brain impairment, based on evidence of childhood febrile seizures, lead poisoning, asthma, lack of school achievement, emotional lability, and head injuries. Dr. Randall asserts that this presentation was incomplete, as it failed to include since-discovered evidence of maternal in-utero alcohol and tobacco abuse, and was based on a neuropsychological assessment conducted hastily on the day before jury selection by retained expert Dr. Gelbort. To highlight this point, Dr. Randall contrasts Dr. Gelbort's assessment and sentencing testimony with the 'far more comprehensive testing and reporting' submitted by Allen's current counsel in conjunction with this [Amended] Motion.

- In general, Dr. Randall claims that the expert testimony at sentencing, from Dr. Gelbort and Dr. Cuneo, was necessarily based on cursory, last-minute, reviews and evaluations, and as a result, was superficial and incoherent. For example, Dr. Cuneo was originally retained in order to assess whether Allen was competent to stand trial and not for mitigation purposes, and his expert report was based entirely on information obtained for competency purposes.

- The defense team was never able to choose specific mitigation theories or themes to focus on at sentencing; instead, the time constraints caused them to present evidence on any topics they could find.

- The defense team was unable to properly interview and prepare witnesses. Dr. Randall states that he was still 'scrambling' to locate penalty-phase witnesses late at night as the sentencing proceedings were ongoing, and that some of the witnesses who testified on Allen's behalf were interviewed only briefly or not at all.

- As compared to the information that the defense team was able to assemble in their one month of preparation for the mitigation case, Dr. Randall states that the declarations and other evidence compiled by § 2255 counsel concerning Allen's background and upbringing 'present a dramatically more severe and clinically significant picture of the mitigating evidence and psychological conditions that confronted Mr. Allen in his developmental years,' specifically with respect to physical and emotional abuse from both parents that Dr. Randall only suspected at the time. Dr. Randall opines that with this evidence, counsel could have framed Allen's behavior in the proper context, as the outgrowth of 'a lifetime of neglect, abandonment, and physical abuse in the home,' instead of being caused solely by the shooting of his childhood friend when he was teenager.

ECF No. 147 at 51-53. In addition, the Court, in deciding Mr. Allen could pursue one grand in

his habeas Petition, summarized the alleged unpresented mitigating evidence as follows:

- testimony from Allen's uncle, Billy Wayne Allen . . . , that Allen's mother was an alcoholic, that he and Allen's father regularly used and sold drugs in front of Allen, that Allen was regularly beaten with 'straps, shoes, broom handles and pretty much anything that was around,' and that he and Allen's father introduced Allen to the drug trade, which culminated in Allen going to work for a rival drug dealer who specialized in heroin;

- testimony from Allen's mother, Juanita Allen, about her alcohol abuse, Allen's father's drug abuse, her physical and emotional abuse of Allen, including beating him repeatedly and throwing him out of the house as a young boy for days at a time, and about how these circumstances had transformed Allen into a violent drug user and seller by the age of fourteen;

- testimony from Cathy Toliver, a friend of the family, that Juanita Allen neglected and abused Allen and his siblings as small children, refusing to change their diapers and shaking Allen when he experienced asthmas attacks, and that Juanita Allen continued to abuse Allen physically and emotionally throughout his adulthood;

8

- testimony from numerous other witnesses about the physical abuse Allen suffered from Juanita Allen and other relatives as a child, and about how his parents would lock him out of their house as a child and force him to fend for himself on the streets.

ECF No. 147 at 53.

Furthermore, the Court identified Juanita Allen, and Mr. Allen's uncle, Billy Wayne Allen, as potential "primary sources" of evidence of abuse. ECF No. 147 at 60. As an example of evidence anticipated at the Hearing, the Court cited a portion of a declaration signed by Juanita Allen for purposes of the habeas case:

> Billie's lawyers at trial did not spend very much time with me at all. They would give me some basic information about the case, like when the next court date was. But they never really sat with me to hear my story. I told them some information, and they seemed to focus on the story about Marquise [sic] Taylor and the shooting. Had they spent more time with me, and asked about my background, problems and those of Billie's father, I would have told them. But, as I said, it is hard for me to discuss these topics. I only came to do so with Billie's current lawyers after spending many hours over many days with them. Billie's current lawyers have also asked me a lot of different types of questions, which have helped me to understand what information would be important to help Billie's legal case. Billie's trial lawyers were always so rushed and never seemed to have time for me or my family. I recall speaking with an investigator for them, but even then he seemed rushed.

Exhibit 258 at ¶ 14; ECF No. 147 at 60. Likewise, the Court cited a portion of Billy Wayne Allen's declaration:

> I was aware when Billie was tried for capital murder in St. Louis. Except for my time in the Air Force, I am a life long resident of the St. Louis area. At the time of his trial, I never met with anyone working on Billie's case. My only contact with Billie's lawyers came when I telephoned them after Juanita asked me to. I spoke briefly on the phone with someone I thought was his attorney on that occasion and maybe one other time. I received no other phone calls from Billie's lawyers or their associates. The phone call did not last for more than about 10 minutes. The person I spoke with asked me if I could be a 'character' witness for Billie. When I asked what that meant, the person told me that he wanted to hear about 'good' things Billie had done. I really wanted to help, but I could not think of much Billie had done in his young life that was 'good.' Billie had a very hard

life, and I had lots of information to share about that, but I was never asked about those details until Billie's lawyers began to speak with me and asked me to complete this statement. I wanted to attend the trial, but when the person on the phone heard that I had nothing 'good' to say about Billie, he told me it would be best for Billie if I stayed away.

Exhibit 261 at ¶ 2; ECF No. 147 at 60.

In granting the Hearing, the Court also relied heavily on the veracity of allegations made by trial counsel, Dr. Randall, and two experts retained by habeas counsel. Specifically, Mr. Sindel provided two habeas declarations. *See* Exhibits 250, 398. In his first declaration, Mr. Sindel stated,

As lead counsel, I shared with co-counsel the responsibility for providing necessary information to and communicating with Dr. Haney. I do not believe I conducted adequate follow-up with Dr. Haney to insure that the information was being properly compiled. While co-counsel and I began the collection of mitigation information, we anticipated that Dr. Haney would be the primary investigator in the mitigation area.

Exhibit 398 at ¶ 2. He added, "For reasons that did not have to do with any strategic decision on my part, I did not routinely confer with Dr. Haney to make certain that he had adequate information and was actively investigating the case." Exhibit 398 at ¶ 4. After noting Dr. Randall had only 45 days to prepare a mitigation case, Exhibit 398 at ¶¶ 7-8, Mr. Sindel averred,

I am aware that the American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Revised Edition, February 2003, provide that post-conviction counsel should fully re-investigate the mitigation evidence available in a capital case. Guideline 10.15.1 and Commentary. As a result of the problems with the mitigation investigation in THIS case, I believe it is particularly important for post-conviction counsel to investigate fully all the mitigation evidence available in Mr. Allen's case, and to have the necessary resources to do so.

Exhibit 398 at ¶ 9 (emphasis in original).

In his second habeas declaration, Mr. Sindel provided further detail. He described the division of work between himself and Mr. Simon: "I anticipated we would divide the

responsibilities of preparing and trying the lawsuit. I would be primarily responsible for the preparation of guilt phase and Mr. Simon would assist with legal research, family contacts and assist with the mitigation phase investigation." Exhibit 250 at ¶ 5. He added, "It was my responsibility to try the case and supervise the endeavor." Exhibit 250 at ¶ 5. As to the fallout with Dr. Haney, Mr. Sindel stated,

> [Dr. Haney] and I did not have a common understanding of what his role was to be. I believed he would be the person responsible for performing the mitigation investigation, including interviews, obtaining documents, finding witnesses and the like. We would have been ready to investigate any leads he suggested we pursue. He on the other hand, apparently saw his role as that of an expert witness who would be responsible for the development of broad mitigation themes once the witness interviews, document collection and mental health evaluations were conducted. . . . [B]ecause of this misunderstanding, he had done nothing on the case as he was awaiting my office's production of this initial investigative information. The fact that neither Mr. Simon nor I were in direct communication with Dr. Haney during this time period permitted this misunderstanding to undermine the penalty phase preparation.

Exhibit 250 at ¶ 10. Finally, Mr. Sindel assumed fault for the alleged inadequacies of Mr. Allen's mitigation case; he wrote,

> As lead counsel for Mr. Allen I accept full responsibility for the lapse that occurred with Dr. Haney and the resulting shortcomings in the penalty hearing presentation. It was undoubtedly my duty as lead counsel to insure that the required work was being performed in a timely and thorough manner, and I do not believe I and co-counsel satisfactorily performed this duty.

Exhibit 250 at ¶ 15.

Similarly, in summarizing what the Court expected the evidence would be at the Hearing based on representations, the Court noted Mr. Simon's habeas declaration depicted a troublesome chronology of the criminal case preparation. He said his role in the case "was to act as a resource for Mr. Sindel with regard to legal issues, as well as to assist with development of a mitigation case, if needed." Exhibit 251 at ¶ 1. In January 1998, Mr. Simon became concerned

about the progress of the mitigation investigation, and wrote a letter to Mr. Sindel about his reservations. Subsequently, Mr. Sindel wrote to Dr. Haney, who responded with the January 13, 1998 letter. Mr. Simon averred, "It is clear that Mr. Sindel and I had a very different perception than Dr. Haney about what he would be doing for the case. Prior to Mr. Sindel's receipt of Dr. Haney's letter, I had neither mail, telephone, nor personal contact with him in regard to the mitigation issues in this case." Exhibit 251 at ¶ 2. Mr. Simon stated that at the time of the fallout with Dr. Haney, he "did not generate, or assist in generating, a social history for Mr. Allen." Exhibit 251 at ¶ 3. He also indicated "the bulk, if not all" of his communications with Juanita Allen "related to communicating progress reports about the case." Exhibit 251 at ¶ 3. He added, "[E]ssentially no work had been done on t[he mitigation] phase of trial[.]" Exhibit 251 at ¶ 4.

Dr. Randall's habeas declaration also presented a dismal picture of the trial team's preparation for the penalty phase. Although he was informed at the outset "that substantial mitigation work on the case still needed to be done," he later discovered this was a "considerable understatement." Exhibit 254 at ¶ 4. He explained,

> Upon starting work, I quickly realized that the case was in even worse shape than I had expected. In their limited contact with Mr. Allen's family members, trial counsel had not discussed substantive mitigation-related topics and seemed to have not even explained what a mitigation investigation entailed. In essence, counsel had spoken to the family only to keep them updated on the progress of the case. No attempts had been made to begin the laborious process of generating Mr. Allen's social history. Only a few records on Mr. Allen and his family had been collected. Mitigation witnesses outside Mr. Allen's family – teachers, friends, neighbors, etc. – had not even been identified, let alone contacted. Because of their limited contact with the family, compounded by obvious racial and social class issues, counsel had not put the time in, over time, to develop the level of trust necessary for engaging family members around sensitive personal information germane to mitigation.

Exhibit 254 at ¶ 7. Notwithstanding the purportedly poor state of the case and the short amount

of time before trial, Dr. Randall agreed to work on the case, a decision he described in hindsight as a "serious error, in that our work may have presented a 'veneer of competence or adequacy' to the mitigation investigation and sentencing phase, where none existed." Exhibit 254 at ¶ 6. Dr. Randall claimed he focused only on Mr. Allen's mother's side of the family, due to Mr. Allen's estrangement from his father's side of the family; Dr. Randall described this as a "serious shortcoming, given what [habeas] counsel have uncovered from the father's side." Exhibit 254 at ¶ 11. Moreover, Dr. Randall described Juanita Allen as having "an obvious drinking problem, short temper, and . . . an unpredictable, intimidating, and bullying character." Exhibit 254 at ¶ 12. "It was clear that [Juanita] Allen was one of the primary abusers of her son." Exhibit 254 at ¶ 12. Dr. Randall maintained, however, that time constraints prevented him from developing sufficient rapport to discuss "painful and embarrassing" topics with Juanita Allen. Although he "strongly suspected that Mr. Allen was the product of an abusive and highly dysfunctional upbringing," Exhibit 254 at ¶ 13, Dr. Randall "was not able to obtain concrete information from any family member that this existed." Exhibit 254 at ¶ 14.

Aside from the foregoing members of the trial team, two experts, Drs. Pablo Stewart, M.D.,[3] and Daniel Martell, Ph.D., were retained by habeas counsel to provide statements, which influenced the Court's decision to grant the Hearing. At the request of habeas counsel, Dr. Stewart conducted a forensic evaluation to determine, *inter alia*, whether Mr. Allen was suffering from any mental health-related conditions relevant to the capital sentencing proceedings. In preparing his report, Dr. Stewart relied on the evidence available to counsel during trial, a subsequent neuropsychological and psychological report carried out in June 2009, the declarations gathered by habeas counsel, additional interviews with members of Mr. Allen's

---

[3] Notably, Dr. Stewart was not called to testify at the Hearing.

family, and a two-day in-person interview with Mr. Allen in December 2008. After highlighting

Mr. Allen's alleged history of abuse and neglect, Dr. Stewart's declaration states Mr. Allen

suffered from PTSD, dementia, major depressive disorder, substance abuse, and borderline

personality disorder. *See* ECF No. 94-27 at ¶ 22. Dr. Stewart also opined the sentencing

presentation was inadequate in that it, among other things, contained representations that Mr.

Allen had a "loving" and "caring" upbringing, and misidentified the precipitating trauma for his

PTSD as the shooting of Marquis Taylor. ECF No. 94-27 at ¶¶ 37, 38

Similarly, Dr. Martell, a forensic neuropsychologist, examined and tested Mr. Allen, and

reviewed Dr. Gelbort's work conducted at the time of the criminal trial. In a report dated June

30, 2009, Dr. Martell represented to the Court that

> Dr. Gelbort's evaluation was informed by an inadequate and incomplete set of
> background materials, and therefore fell short of the standard of care expected in
> forensic practice due to a failure to recognize the full extent of Mr. Allen's
> neurobehavioral history, particularly in view of the fact that this was a capital
> case.

ECF No. 94-28 at 33. Based on the information available in 2009, and on his own examination

and testing of Mr. Allen, Dr. Martell reached the following conclusions, as summarized by the

Court in its May 10, 2011 Memorandum and Order in deciding to allow the Hearing for Mr.

Allen:

- That Mr. Allen's complicated history of risk factors for brain damage and
  psychiatric disorder; including his abusive and dysfunctional family environment,
  fetal and early childhood exposure to neurotoxins, febrile seizures, uncontrolled
  asthma, head injuries, learning disability, and community exposure to trauma and
  gun violence all had direct implications for his neuropsychological status, mental
  state, and behavior.

- That Mr. Allen had brain damage that impacted his neurobehavioral function in
  multiple areas, including memory, language, motor skills, and executive
  functioning including impulse control.

- That the neuropsychological testing supports a diagnosis of Dementia due to Multiple Etiologies, a neuropsychiatric disorder that influenced his behavior.

- That psychodiagnostic testing indicates that Mr. Allen suffers from symptoms of an Affective disorder (Major Depression or Bipolar II Disorder) together with Post Traumatic Stress Disorder.

- That Mr. Allen was effortful and not malingering during testing.

ECF No. 147 at 55.

In light of the foregoing, the Court granted the Hearing, with the expectation testimony and other evidence would substantiate the sweeping allegations made in the Amended Motion. Sixteen days of testimony ensued.

## II.    LEGAL STANDARD

Under 28 U.S.C. § 2255, a federal prisoner may seek relief from a sentence imposed against him "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack[.]"  To adjudicate § 2255 claims, "the question in each case must be . . . whether the kind of violation alleged demonstrates either 'a fundamental defect which inherently results in a complete miscarriage of justice' or 'an omission inconsistent with the rudimentary demands of fair procedure.'"  *Poor Thunder v. U.S.*, 810 F.2d 817, 822 (8th Cir. 1987) (quoting *Hill v. U.S.*, 368 U.S. 424, 428 (1962)).

A § 2255 petition may be based upon a violation of the Sixth Amendment right to effective assistance of counsel.  *See King v. U.S.,* 595 F.3d 844, 852 (8th Cir. 2010).  If a defendant was denied the effective assistance of counsel guaranteed by the Sixth Amendment,

"then his sentence was imposed 'in violation of the Constitution,' . . . and he is entitled to relief." *Id.* (quoting § 2255(a)). To be successful on a claim of ineffective assistance of counsel, the petitioner must satisfy a two-prong test. *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984). Specifically, the petitioner must demonstrate: (1) counsel's performance was deficient in that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment[,]" and (2) counsel's "deficient performance prejudiced the defense." *Id.* at 687; *see also Auman v. U.S.*, 67 F.3d 157, 162 (8th Cir. 1995). The Court may address the two prongs of the *Strickland* test in any order, and if a petitioner fails to make a sufficient showing on one prong, the Court need not address the other. *Strickland*, 466 U.S. at 697; *see also U.S. v. Walker*, 324 F.3d 1032, 1040 (8th Cir. 2003) (finding no need to address the second prong of *Strickland* after petitioner failed to satisfy the first prong).

To prove deficient performance, a petitioner must demonstrate "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. An assessment of "reasonableness" requires consideration of all the facts, which must be viewed "as they existed at the time of counsel's conduct." *Marcrum v. Luebbers*, 509 F.3d 489, 502 (8th Cir. 2007). Likewise, the Court must view the alleged deficiency of counsel's performance "in light of professional norms prevailing when the representation took place." *Sinisterra v. U.S.*, 600 F.3d 900, 906 (8th Cir. 2010). In this sense, restatements of professional standards are useful "as 'guides' to what reasonableness entails[.]" *Bobby v. Van Hook*, 558 U.S. 4, 7 (2009). The petitioner still must "overcome the strong presumption that his counsel's conduct fell within the wide range of reasonable professional assistance." *Davis v. Norris*, 423 F.3d 868, 877 (8th Cir. 2005); *Strickland*, 466 U.S. at 689. Of particular relevance,

strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.

*Strickland*, 466 U.S. at 690–91. Thus, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691; *Holder v. U.S.*, 721 F.3d 979, 994 (8th Cir. 2013). However, when counsel decides not to investigate, the particular decision must be "directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691. That said, the Court's "duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case." *Burger v. Kemp*, 483 U.S. 776, 785 (1987).

"A deficiency is prejudicial when there is a reasonable probability, that is, one 'sufficient to undermine confidence in the outcome,' that the result of the trial would have been different but for the deficiency." *Close v. U.S.*, 679 F.3d 714, 716 (8th Cir. 2012) (quoting *Strickland*, 466 U.S. at 694). "When a defendant challenges a death sentence . . . , the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. The prejudice requirement requires consideration of "the totality of the evidence before the judge or jury." *Id.* Not every deficiency will affect the outcome of a given case:

Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.

*Id.* at 695-96. In other words, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691; *Gianakos v. U.S.*, 560 F.3d 817, 821 (8th Cir. 2009).

A convicted defendant's right to effective assistance of counsel extends to mitigating evidence in context of capital sentences. That is, convicted defendants have a "constitutionally protected right" to provide the jury with "mitigating evidence that [their] trial counsel either failed to discover or failed to offer." *Williams v. Taylor*, 529 U.S. 362, 393 (2000). Trial counsel, may, however, make tactical decisions against presenting certain mitigating evidence. *See Bell v. Cone*, 535 U.S. 685, 700 (2002). A tactical decision to withhold mitigating evidence is not a deficiency when counsel reasonably determines, after sufficient investigation, that presenting the alleged mitigating evidence would be more harmful than helpful. *Darden v. Wainwright*, 477 U.S. 168, 186 (1986) (using mitigation evidence to portray the defendant as a "nonviolent" man would have allowed the prosecution to rebut with harmful evidence). To establish prejudice in this context, a petitioner must establish a "reasonable probability that a competent attorney, aware of the available mitigating evidence would have introduced it at sentencing, and that had the jury been confronted with this mitigating evidence, there is a reasonable probability that it would have returned with a different sentence." *Sinisterra*, 600 F.3d at 906 (quoting *Wong v. Belmontes*, 558 U.S. 15, 19-20 (2009)). In deciding whether to withhold certain mitigating evidence, "[t]here is no prejudice when the new mitigating evidence 'would barely have altered the sentencing profile presented' to the decisionmaker." *Sears v. Upton*, 130 S. Ct. 3259, 3266 (2010) (quoting *Strickland*, 466 U.S. at 700). To assess the probability of a different outcome, the Court must consider "the totality of the available mitigation evidence – both that adduced at trial, and the evidence adduced in the habeas

proceeding – and reweigh it against the evidence in aggravation." *Porter v. McCollum*, 558 U.S. 30, 41 (2009) (internal quotations omitted).

## III.    EVIDENTIARY HEARING

The testimony and evidence provided at the Hearing was extensive.  The following 20 subsections provide summaries of 18 Hearing witnesses, and two witnesses whose depositions were admitted in lieu of live testimony.  Aside from these 20 witnesses, the parties have provided the Court with nearly seven hundred exhibits, including, *inter alia*, several declarations, expert reports, depositions, criminal trial records, and documents from Mr. Allen's childhood and the years leading to his 1997 arrest.  Therefore, the following summary does not encompass every relevant fact brought to light during the habeas proceedings.[4]  It does, however, provide a synopsis of the most compelling portions of the Hearing, and it offers a basis for the Court's findings and conclusions in this case.

### A.    *Rick Sindel: Trial Counsel for Mr. Allen*

Rick Sindel is an excellent lawyer who has always observed the highest tenets of professionalism before this Court.  At the Hearing, Mr. Sindel provided the following testimony, on which the Court relies in making findings and conclusions in this case.

Mr. Sindel began his legal career as a public defender for the State of Missouri in 1973. In 1976, he engaged in private practice, and since has maintained a private office specializing in criminal defense.  Before representing Mr. Allen, Mr. Sindel had significant experience trying homicide cases, primarily in Saint Louis; he had handled six death penalty cases at the state level, all of which resulted in trials, and one federal death penalty case, which ended in a plea

---

[4] For example, the Court has also reviewed and considered additional materials stipulated by the parties.  *See, e.g.*, ECF Nos. 300-05.

agreement.  He tried the first capital case in Missouri that followed the seminal Supreme Court case, *Furman v. Georgia*, 408 U.S. 238 (1972), in 1978.  Mr. Sindel attended a week-long course on capital cases in Virginia, and he engaged in periodic seminars, some sponsored by the Capital Resources Council.  Both Mr. Sindel and Mr. Simon fit the criteria for "capital-qualified" counsel.

At the time of Mr. Allen's trial, Mr. Sindel had an understanding of the role mental health evidence could play in capital cases; he had previously presented actual mental health defenses, including diminished capacity defenses.  He knew mental health evidence played a standard and accepted role in most mitigation presentations.  He had an understanding of Saint Louis jurors, and had received a number of awards for his work as a trial attorney.  Mr. Sindel believed, and this Court agrees, he had an excellent reputation among state and federal courts in Saint Louis, Missouri, and beyond.  Finally, at the Hearing, Mr. Sindel described both himself and Mr. Simon as "true believers."  He explained,

> I think there are certain lawyers, myself being one of them, who ever since the augment[ation] of the capital litigation have taken a strong, social and moral sense that the death penalty is not the right direction for this country to go.  So 'true believers' really don't believe in the death penalty.

ECF No. 334 at 154:12-17.

### 1.      Relationship with Mr. Allen and Juanita Allen

On April 4, 1997, the Court appointed Mr. Sindel to represent Mr. Allen.  Mr. Sindel immediately began gathering mitigation evidence for Mr. Allen's trial.  At the time, the trial team consisted of Mr. Sindel, private investigator Andy Rackers, and paralegal Connie Caspari-Supranowich.  Shortly after his appointment, Mr. Sindel met with Mr. Allen's mother, Juanita

Allen, at his office.[5]  At the Hearing, he described the meeting as "informational," ECF No. 334 at 54:23, and stated his initial contact with Juanita Allen involved "explain[ing] the system" and obtaining information about the guilt and penalty phases of the case. ECF No. 334 at 120:12-15. He asked Juanita Allen about Mr. Allen's school records, his potential substance abuse problems, and his healthcare issues.  Mr. Sindel testified he "would have explored . . . at least in a general setting the areas such as whether there was any sexual abuse or physical abuse, that kind of thing."  ECF No. 334 at 55:7-10.

Aside from this initial meeting, Mr. Sindel communicated with Juanita Allen by correspondence and telephone.  He testified, during the period from September 1997 to January 1998,

> [t]here were definitely times when certain questions were asked[.] Some of the inquiries had to do with information that we were getting from Mr. Allen and how – you know, verifying that information, exploring that information, trying to see if there was anything that we could develop along the lines that we were getting from him and then also some of the information from Mrs. Allen.

ECF No. 334 at 56:17-23.  Mr. Sindel found Juanita Allen credible and cooperative regarding mitigation.  She provided names and addresses of potential mitigation witnesses.  At Mr. Sindel's request, she retrieved school, hospitalization and other medical records.  When asked whether Juanita Allen ever refused to help him, Mr. Sindel responded she expressed concern about whether the trial team was maintaining an adequate focus on Mr. Allen's complete exoneration.  Mr. Sindel added, "I don't think that's being uncooperative." ECF No. 334 at 118:15-20.

---

[5]At the Hearing, Mr. Sindel believed Juanita Allen brought her daughters to this meeting, and he stated he met with the family as a group on several occasions.

Mr. Sindel testified about his interactions with Mr. Allen. He described Mr. Allen as "a difficult client to deal with," "frustrating," and "exasperating." ECF No. 334 at 164:7-9. Mr. Allen exhibited a general lack of veracity; at one point, Mr. Sindel believed Mr. Allen's persistent lying constituted a personality disorder. From April 1997 to November 1997, Mr. Sindel spoke with Mr. Allen several times. During these interviews, Mr. Sindel explained the "nuts and bolts" of the lawsuit and explored areas of potential investigation, such as alibi witnesses. ECF No. 334 at 124:21-125:4. He also asked Mr. Allen about his educational, social, medical, and family history. Mr. Sindel testified,

> [I]t's the goal of the attorney to get as close as you can to the core of the person you're representing so that they can believe in you and they can trust you because if you don't have that trust, you're not going to have that communication. And if you don't have that communication, you're not going to get the most information you can.

ECF No. 334 at 126:4-10. Although Mr. Sindel and Mr. Allen had a contentious relationship when preparing for the guilt phase of the case, Mr. Sindel did not "recall that [Mr. Allen] sent [the team] on . . . wild goose chases . . . in the mitigation phase." ECF No. 334 at 126:11-19. Mr. Sindel explained Mr. Allen never "simply shut down." ECF No. 334 at 125:19. Rather, he provided names of witnesses and information regarding his schooling and medical records. Mr. Sindel explained to Mr. Allen the importance of obtaining information regarding Mr. Allen's life and past troubles.

Additionally, Mr. Allen did not want Mr. Sindel to focus on the mitigation phase. Instead, Mr. Allen wanted the trial team to focus its energy on complete exoneration. Mr. Sindel did not immediately tell Mr. Allen he lacked a realistic hope of complete exoneration; rather, he waited until he had developed a rapport with Mr. Allen before discussing a strategy focused on pursuing life without parole. Only after reviewing the Government's evidence, exploring Mr.

Allen's information, and investigating potential alibis, did Mr. Sindel broach this subject with Mr. Allen and Juanita Allen. Mr. Sindel testified neither Mr. Allen nor Juanita Allen ever accepted his position that Mr. Allen's best hope was to seek life without parole. He testified the Allens' inability to accept this position influenced his communications with them.

On "multiple" occasions, Mr. Sindel asked Mr. Allen whether his childhood contained abuse. ECF No. 334 at 196:21-197:1. Mr. Allen always denied he was abused. Likewise, Mr. Sindel asked Juanita Allen about Mr. Allen's potential child abuse "at least two or three times." ECF No. 334 at 197:6-8. Juanita Allen denied Mr. Allen was abused as a child. Mr. Sindel stated his efforts to obtain child abuse evidence from Mr. Allen and Juanita Allen were "[n]ot sufficient." ECF No. 334 at 197:20-24. When asked whether this assessment was his "hindsight evaluation based upon what [he] currently th[ought] to be true," Mr. Sindel responded, "In part." ECF No. 334 at 197:25-198-2.

Mr. Sindel stated he explored potential mitigating areas of Mr. Allen's life, including abuse between parents, sibling issues, attachment issues, exposure to toxic substances at a young age, exposure to toxic substances in utero, verbal abuse, physical abuse, sexual abuse, particular injuries, health conditions, extreme nutritional concerns, life experiences and community conditions. Mr. Sindel recalled asking both Mr. Allen and Juanita Allen about many of these issues, including physical abuse. When asked whether Mr. Allen and Juanita Allen conveyed to Mr. Sindel the information now claimed at the habeas phase, Mr. Sindel responded they did not. Although he recalled having evidence of physical abuse on at least one occasion, he stated, "I did not have any belief that it was as significant as [Juanita] Allen now says it was." ECF No. 334 at 167:22-24. Additionally, Mr. Sindel stated Mr. Allen and Juanita Allen provided information about other potential mitigation factors, such as Mr. Allen's exposure to lead at a young age, his

febrile seizures, his affliction with pica,[6] and the violent neighborhood conditions, including gangs and drugs.

At the Hearing, Mr. Sindel examined a document labeled "Mitigation Notebook," dated "April 16, 1997." Exhibit 301. This Notebook transcribes a conversation in which Mr. Sindel asked Juanita Allen a number of questions about Mr. Allen's background, including health problems and schooling. In particular, Mr. Sindel asked Juanita Allen for names of people who could provide "[a] general overlook at Bill," and Juanita Allen readily agreed, stating, "Sure I can, I can do that." Exhibit 301 at 9. They also had the following exchange:

> [Mr. Sindel:] Tell me the absolute 100 percent what happened. Don't color it one way or the other, because I'll find out anyhow. . . .
>
> [Juanita Allen:] Excuse me, first of all, okay, you represent my son.
>
> [Mr. Sindel:] That's right.
>
> [Juanita Allen:] It sounds like to me we have to be on a good rapport, okay?
>
> [Mr. Sindel:] That's exactly right.
>
> [Juanita Allen:] And I'm not going to lie to you, and I'm not expecting you to lie or fabricate to me.
>
> [Mr. Sindel:] That's perfect, that's our understanding.
>
> [Juanita Allen:] Okay, so we got that about the system [sic], so there's no need for that conversation again. Okay.

Exhibit 301 at 1-2. When asked whether he felt "a little bit lectured to or put in [his] place" by this exchange, Mr. Sindel testified, "I enjoy that. I think she wanted to make it clear to me where she was coming from at that point in time." ECF No. 334 at 234:9-12.

---

[6] Pica is "a perversion of appetite with ingestion of material not fit for food, most commonly starch, clay, ashes, or plaster." Exhibit 303 at 2 (internal adjustments omitted).

When questioned whether he ever asked Juanita Allen about Mr. Allen's alleged child abuse, Mr. Sindel responded,

> I can't specifically say, 'I remember that it was the third meeting with her when I asked her that question.' But I believe . . . that that was a practice and that I was certainly aware that those were issues that were appropriate for mitigation. . . . I don't have any specific memory of that occurring at a particular space and time, but I – I mean it's beyond my imagination that I wouldn't have asked some questions in that regard.

ECF No. 337 at 185:10-22. He continued,

> I don't recall saying to Juanita, 'Did you ever beat the crap out of Billie?' I do recall that there were questions that would have touched upon those areas of abuse, but I do not recall ever saying to her because I candidly didn't have anything other than a single event that referred to Mr. Petty that that was life within the household.

ECF No. 337 at 186:14-19. Habeas counsel pressed on, "But you didn't have that event with Mr. Petty until February 22nd, 1998,"[7] ECF No. 337 at 186:20-21; Mr. Sindel answered, "I didn't have it at any time that that was anything that was going on in that household. I didn't have that information. That's the reality." ECF No. 337 at 186:22-24.

### 2. Chronology of Mr. Sindel's Involvement in the Criminal Case

The paper trail of Mr. Sindel's extensive participation in the criminal case begins shortly after his April 4, 1997 appointment. In a letter dated April 17, 1997, Mr. Sindel wrote to Mr. Allen, who had recently written a letter to Judge Mummert, the Magistrate Judge presiding over the criminal case, without first informing Mr. Sindel. *See generally* Exhibit 302. After cautioning Mr. Allen against such communications, Mr. Sindel asked for the address of Mr. Allen's girlfriend, Tasha Valentine. He also asked whether Mr. Allen attended any school district, other than Clayton, and he requested Mr. Allen's signature, so he could obtain Mr.

---

[7] The trial team interviewed Raymond Petty on this date.

Allen's school records.  At the Hearing, Mr. Sindel admitted these questions constituted early efforts to accumulate records in his mitigation investigation; he had commenced building a document base.

On the same date, Mr. Sindel sent a letter to Juanita Allen.  *See generally* Exhibit 305. He expressed gratitude for a conversation they had the previous day, and asked her to provide "names, addresses and phone number of individuals that [she thought he could] talk to to help [him] understand Billie's character and that [could] be used in court to present a strong and positive picture of his background."  Exhibit 305.  Mr. Sindel further asked Juanita Allen for any information "concerning concussions, diseases, or other mental problems that may have complicated Billie's reasoning ability."  Exhibit 305.  He added he was in the process of exploring Mr. Allen's history of lead poisoning.  At the Hearing, Mr. Sindel confirmed he was seeking evidence for the mitigation phase of trial in this letter.  He explained he asked for a "strong and positive picture" of Mr. Allen's background, because he wanted "to just see where we[ were] going and what she [could] provide me.  And then if [he] was able to establish a sufficient rapport, [he] could explore some of the other negative things."  ECF No. 335 at 69:2-6.

On April 25, 1997, Mr. Sindel wrote to Juanita Allen again.  He stated Mr. Allen had provided names of several acquaintances and relatives who had died over the past years, and he asked Juanita Allen for any background information regarding several named individuals: Marquis Taylor, Dennis Noble, "Meman," John Allen, Ross Young, "Ray," and Sonya Petty. Exhibit 306.  At the Hearing, Mr. Sindel acknowledged he had been conducting regular telephone and in-person interviews with Mr. Allen at this point.  He testified "the purpose of this [letter] is what we were exploring at the time, what we were considering as possible mitigation, [what] was the level of violence that he had been exposed to."  ECF No. 335 at 77:10-13.  Mr.

26

Sindel was attempting to capture the concepts of "violent death and loss" in Mr. Allen's life. ECF No. 335 at 78:6-8.

The correspondences between Juanita Allen and Mr. Sindel continued. Only five days later, on April 30, 1997, he wrote to her again, asking for a list of Mr. Allen's medical doctors and previously visited hospitals. He explained, "This information is necessary to investigate a possible penalty phase in his case." Exhibit 307. Additionally, on May 7, 1997, Mr. Sindel wrote to Juanita Allen, stating he had received "very warm and kind letters about Billie from a number of different people." Exhibit 309. Mr. Sindel wrote that the writers had not included contact information, and he asked Juanita Allen to help him locate those individuals: Royce J. Caldwell, Nancy Harris, Raymond Petty, Deborah Ruffin, Ronald Ruffin, and Thelma Ruffin. Mr. Allen also had provided the names of additional potential witnesses, and Mr. Sindel asked Juanita Allen for assistance in locating those individuals as well.

A "Witness List" dated May 7, 1997 provides further evidence Mr. Sindel had already started gathering mitigation evidence. *See generally* Exhibit 308. The Witness List, compiled by Mr. Sindel, contains the names of thirteen individuals, several of whom had potential relevance to the mitigation phase of trial. For example, next to Luther Isgriggs, Mr. Sindel wrote, "Guard in jail. Knows how Billie acts." Exhibit 308. At the Hearing, Mr. Sindel agreed an inmate's manageability in prison often serves as a mitigation theme in capital cases. Similarly, next to Wilson "Flexx" Hankins, Mr. Sindel wrote, "Producer - knows all music is entertainment," and next to Jerome Petty, he wrote, "Knows that Billie played for basketball team." Exhibit 308.

In a memorandum dated May 28, 1997, Ms. Caspari-Supranowich advised Mr. Sindel of the protocol required to obtain Mr. Allen's medical records from Homer G. Phillips Hospital.

Exhibit 310. At the Hearing, Mr. Sindel admitted such records would serve as part of the information base for the mitigation phase. Similarly, a memorandum written by Mr. Sindel dated July 14, 1997 lists two potential witnesses: "Uncle Jerome" and "Lois Allen - aunt." Exhibit 312. Mr. Sindel testified these witnesses would serve the "singular purpose" of mitigation. ECF No. 335 at 101:14-19.

On July 15, 1997, before the Government gave notice of its intent to seek the death penalty, Mr. Sindel filed an Ex Parte Application for Authorization to Obtain Investigative Services, in which he sought the Court's permission to hire nonprofessional investigators. Exhibit 11. At the Hearing, Mr. Sindel admitted he filed this Application in order to obtain records pertaining to Mr. Allen's family and social background, and to organize those records in preparation for review by mental health professionals and other experts. He testified he was attempting to investigate and interview witnesses "necessary to present mitigation evidence at the penalty phase[,] and to investigate and interview witnesses around the charged offense[,] and to secure documents to any defense to the underlying charges." ECF No. 335 at 102:8-16. The Application advises, "[I]nterpretation of some of these records will probably require the assistance of a mitigation specialist, social worker or mental health professional with expertise in social assessment[.]" Exhibit 11 at 2. It expresses Mr. Sindel's "wish[] to begin these very time-consuming tasks as quickly as possible[.]" Exhibit 11 at 2. The Application concludes by requesting permission to hire a paralegal to assist in both the guilt and mitigation phases of trial, a mitigation specialist for the penalty phase of trial, and two private investigators "for the purpose of investigating, securing documentary records and interviewing witnesses pertaining to the mitigation phase of the case." Exhibit 11 at 2-3. When asked whether he was "thinking way

down the road," Mr. Sindel responded, "I'm thinking – Yes, I guess you could – I don't know about way down the road.  I [was] thinking down the road."  ECF No. 335 at 102:21-23.

In the Application, Mr. Sindel sought the less expensive services of a nonprofessional investigator, with the expectation he would later receive "a more expensive mitigation specialist to provide . . . input[.]"  ECF No. 335 at 106:9-12.  During his testimony, he was reminded of his first habeas declaration, which states he "anticipated that Dr. Haney would be the primary investigator in the mitigation area."  Exhibit 398 at ¶ 2.  Mr. Sindel explained his Application did not contain "the best wording [he] could have used for what I understood Mr. Haney was going to do[.]"  ECF No. 336 at 73:20-25.  Similarly, he was confronted with his second habeas declaration, which states,

> It is obvious from [Dr. Haney's] letter and my recollection of the circumstances, that he and I did not have a common understanding of what his role was to be.  I believed he would be the person responsible for performing the mitigation investigation, including interviews, obtaining documents, finding witnesses and the like.  We would have been ready to investigate any leads he suggested we pursue.

Exhibit 250 at ¶ 10.  Mr. Sindel testified he did not review his July 1997 Application before signing this declaration.

In an Order and Certification dated August 18, 1997, the Court granted Mr. Sindel's request for investigative services.  Because the amount requested exceeded what the Court could grant without approval of the Chief Judge of the Eighth Circuit, the Court recommended Mr. Sindel be allowed to obtain services of a paralegal, a mitigation specialist, a social worker or mental health professional, and two investigators.

On September 3, 1997, Mr. Sindel received a facsimile transmission from Kevin McNally, a member of the Federal Death Penalty Resource Counsel Project.  *See* Exhibit 313.

29

The facsimile's subject line states "*United States v. Billie Allen* (E. D. MO CR No. 4:97 CR 0141 ERW(TCM)); request for mitigation experts/severance experts." Exhibit 313. It contains the names of three mitigation investigators, Robert Baugher, Robert Blauner, and Edward Bronson – collectively referred to as the "Killer Bs." Exhibit 313. When asked whether this fax was "the type of information that [he was] asking for and receiving from Mr. McNally," Mr. Sindel said, "Yes." ECF No. 335 at 114:19-21.

Although Mr. Sindel did not believe Mr. Allen was incompetent to stand trial, he "had a belief that [Mr. Allen] was not psychologically free to make appropriate choices." ECF No. 334 at 97:21-98:2. Thus, he retained Dr. Daniel Cuneo. Mr. Sindel testified he did not retain Dr. Cuneo specifically for mitigation, but stated "[a]nything that folded into the mitigation would have been used or evaluated for use." ECF No. 334 at 98:14-15. At Mr. Sindel's directive, Ms. Caspari-Supranowich wrote a letter to Dr. Cuneo on September 11, 1997. *See* Exhibit 314. In her letter, Ms. Caspari-Supranowich enclosed a copy of the police report concerning Mr. Allen's criminal case. She also referenced a prior conversation between Dr. Cuneo and Mr. Sindel. At the Hearing, Mr. Sindel acknowledged he had conversed with Dr. Cuneo and sent him the police report before either Dr. Haney or Mr. Simon began working on the case.

At some point in the same month, Mr. Sindel hired Dr. Haney. Mr. Sindel testified he believed Dr. Haney would develop relationships with important family members and witnesses. He thought Dr. Haney would communicate with Mr. Simon and Ms. Caspari-Supranowich concerning records and police reports potentially useful to the penalty phase. He testified he believed his role was to work on the guilt phase of the trial, while Mr. Simon and Dr. Haney would manage the penalty phase.

On September 16, 1997, Mr. Sindel filed a motion requesting appointment of Mr. Simon as co-counsel for Mr. Allen. Exhibit 17. The Court granted this request on September 24, 1997. Mr. Sindel testified he brought Mr. Simon into the case "to do mitigation investigation, help coordinate mitigation activities, help secure records, . . . develop mitigation themes, and also to assist . . . in research and drafting pleadings, although for the most part that had been done already." ECF No. 334 at 45:23-46:2. Mr. Sindel maintained a high opinion of Mr. Simon, explaining, "I knew Mr. Simon was very intelligent. I knew he could crank out a lot of work. I knew he did great legal research, and I thought he would be a good fit." ECF No. 335 at 120:2-6. He described Mr. Simon as an adept researcher and writer: "[I]f you plug into him, it's like downloading an encyclopedia." ECF No. 334 at 46:6-7.

Mr. Sindel admitted one of Mr. Simon's roles was to assist with mitigation. He explained Mr. Simon did not have the "exclusive" role of assisting with mitigation, which was a responsibility shared by both of them. ECF No. 336 at 18:7-14. Mr. Sindel testified Mr. Simon possessed mitigation workbooks developed by the Capital Resource Center, and he thought Mr. Simon provided him a list of potential mitigation witnesses. When asked whether he had his "finger on the pulse of the preparation of the mitigation case," Mr. Sindel stated, "I had my finger all over the case in January [1998]. I did not have that sort of work involved prior to that." ECF No. 334 at 50:25-51:7.

In the ensuing months, Mr. Sindel, Mr. Simon, Dr. Haney, and Ms. Caspari-Supranowich engaged in various communications, which largely form the basis of Mr. Allen's instant ineffective assistance of counsel claim. First, in a correspondence dated October 1, 1997, Ms. Caspari-Supranowich wrote the following at Mr. Sindel's direction:

> Dear Craig [Haney]:
>
> Enclosed find a copy of the St. Louis Metropolitan Police report in the [Billie Allen] matter. I apologize for the delay in getting this to you. Let me know if you need anything else to get started on the mitigation process.

Exhibit 316. At the Hearing, Mr. Sindel testified he had not previously met with Dr. Haney, but had apprised him of the case's background, and discussed information about Mr. Allen and his family. He had also conversed with Dr. Haney "about an investigator's interviewing people that might potentially be mitigation witnesses[.]" ECF No. 336 at 26:10-12.

The Court announced a trial schedule on October 3, 1997, in the event the Government elected to try Mr. Allen before co-defendant Norris Holder. *See* Exhibit 19. On October 9, 1997, the Government elected to try Mr. Allen first. Exhibit 20. Upon receiving this election, the Court set Mr. Allen's trial for February 9, 1998. Exhibit 21. At the Hearing, Mr. Sindel admitted, as of early October 1997, he knew when the case would go to trial.

Around this time, communications with Dr. Haney began to break down. In a letter dated November 25, 1997, Dr. Haney wrote to Ms. Caspari-Supranowich the following:

> Sorry it's been so difficult for you to contact me. I've been traveling and overburdened with University duties when in town. Part of my delay in responding is that I am hard pressed to know how to estimate hours. I still have very little information about the case or the client. My guess is that it will take me somewhere between 75 and 100 hours total to assemble a social history (including review of documents, several interviews with the client, key family members, and any other folks who can provide relevant information), conferences with you and the attorney in advance of trial, and testimony. There needs to be a little flexibility factored in, largely because it is impossible to tell in advance how many interviews there are to do and how long they will take, not to mention the unpredictability of trial-related time. In addition, there is a fair amount of travel time involved, which I will try to fill by working on the case to and from, but we are still looking at a substantial chunk of time overall.
>
> I hope this helps. Please send me whatever documents you have available. I am concerned – as I'm sure you are – that time is beginning to slip away from us and that there is much to do.

Exhibit 320. Mr. Sindel testified, upon receiving this correspondence, he was "upset" to learn Dr. Haney's work had "stalled." ECF No. 336 at 31:19-21. Mr. Sindel admitted he knew, "within the time period of the fall of [1997, Dr. Haney] wasn't doing day-to-day preparation of the penalty phase[.]" ECF No. 336 at 81:19-22.

Thus, the next day, November 26, 1997, Ms. Caspari-Supranowich sent Dr. Haney a letter, in which she attached (1) Mr. Allen's elementary and junior high school cumulative record, (2) psychiatric records from the Metropolitan Saint Louis Psychiatric Center (MSLPC), (3) inmate medical records from the Franklin County Jail, where Mr. Allen was incarcerated at the time, and (4) medical records from the City of Saint Louis Department of Health and Hospitals. Exhibit 321. She further advised she would forward the following items, once received: (1) probation and parole records, (2) pediatric and general practitioner medical records, and (3) biographies from Mr. Allen and Juanita Allen. Exhibit 321. Ms. Caspari-Supranowich concluded her letter by asking Dr. Haney to advise her if he required other documents. Mr. Sindel testified Dr. Haney never responded by asking for additional documentation.

Evidently, months went by without any meaningful communication with Dr. Haney. On January 9, 1998, the Court ordered "that Dr. Daniel Cuneo be allowed a contact visit with Defendant Billie Allen at the Franklin County Jail on Friday, January 16, 1998." Exhibit 26. At the Hearing, Mr. Sindel stated this visit would include a "psychiatric/psychological" evaluation. ECF No. 336 at 49:18-22. When asked whether the purpose of this visit was to develop the mitigation case, Mr. Sindel testified, "I believe that's probably part of the issue." ECF No. 336 at 50:19-22. Mr. Sindel did not anticipate filing a motion to challenge Mr. Allen's competency to stand trial.

The same day, Mr. Simon wrote a letter to Mr. Sindel. *See* Exhibit 325. Among other things, Mr. Simon discussed his concern "about the lack of contact with Craig Heaney [sic], J.D., Ph.D." Exhibit 325 at 2. He explained, "As you are aware, I am doing a good deal of work on mitigation, and need to coordinate it with our psychiatrist or psychologist. I assume that when we have Billie 'psyched,' it will be by Dr. Heaney [sic]." Exhibit 325 at 2. Mr. Simon also noted his intent to interview Mr. Allen's aunt on January 11, 1998; Mr. Sindel testified this interview served mitigation purposes. On January 12, 1998, Mr. Sindel promptly sent a letter via facsimile to Dr. Haney. *See* Exhibit 327. In the letter, Mr. Sindel noted numerous unsuccessful attempts to contact Dr. Haney, and expressed concern Dr. Haney no longer intended to assist with Mr. Allen's case. He added, "Obviously, the loss of a mitigation consultant leaves Mr. Allen in an extremely precarious position." Exhibit 327.

Dr. Haney responded with a letter to Mr. Sindel the next day. Dr. Haney wrote he was unprepared to proceed with a February 1998 trial date. He conceded knowing the trial was scheduled "sometime around that period," but he had "assumed [Mr. Sindel] . . . obtained a lengthy continuance." Exhibit 330. Dr. Haney stated he had done nothing with the material he had received, wanted Mr. Sindel to obtain a substantial continuance, and had not returned calls because he was in Florida working on another capital case. Dr. Haney stated he had not been contacted by Mr. Sindel at all, and he had received nowhere near the amount of documents he needed to develop a mitigation case. He wrote he was not "an investigator," and did not "retrieve documents, . . . locate people, [or] do initial interviews with the whole range of folks who could – but won't necessarily be – helpful to the case." Exhibit 330. Dr. Haney offered himself as a sacrifice, stating,

> Although I believe the above tasks are clearly your responsibility, use me as an excuse with the judge if you like. You can tell him I misunderstood the timetable, was overcommitted, have become unavailable, am incompetent, or whatever you need to in order to get the time you must have to do the things I have outlined (and only in summary fashion) above.

Exhibit 330. He further stated if Mr. Sindel could get a continuance and desired his continued services, he would remain in the case, provided they proceeded as he had outlined. Alternatively, he offered to recommend another specialist: "If you want to work with someone else – and I can certainly understand why that might be advisable given our shaky start – let me emphasize that all of the above mentioned things must <u>still</u> be done by whomever you retain." Exhibit 330 (emphasis in original).

At the Hearing, Mr. Sindel likened his receipt of this letter to a "cartoon anvil [coming] out of the sky." ECF No. 334 at 63:9-11. He stated it made him realize Mr. Simon and Dr. Haney had not communicated with each other as of late December 1997; this lack of communication was a "big problem." ECF No. 334 at 61:23. When asked whether he "actually adequately supervise[d] Dr. Haney, Mr. Simon and [Ms. Caspari-Supranowich] on the mitigation," Mr. Sindel responded, "I mean I feel comfortable saying that I didn't adequately supervise them." ECF No. 334 at 60:15-18. He testified, contrary to his expectations, the letter demonstrated Dr. Haney had failed to take a hands-on, investigative approach to the mitigation case. Mr. Sindel saw a "red flag" when he learned Dr. Haney had not interviewed Mr. Allen as of mid-January, 1998. ECF No. 334 at 70:15-21. He believed he and Mr. Simon failed to adequately communicate about the case; at the Hearing, he said they "had a framework, and that was about it." ECF No. 334 at 85:2-3.

Notwithstanding the fallout with Dr. Haney, Mr. Sindel and his team continued in their efforts to prepare for the mitigation phase. Mr. Sindel believed the Court would not grant him a

lengthy continuance, and Dr. Haney withdrew from the case. At Mr. Sindel's request, the Court appointed Dr. Randall as a replacement for Dr. Haney on January 16, 1998. Mr. Sindel and Dr. Randall communicated regularly about the case, and Mr. Sindel was "quite pleased" with Dr. Randall, who possessed a "tremendous work ethic." ECF No. 334 at 86:17-20. Dr. Randall "beat[] the bushes," investigating and interviewing witnesses, and he brought reports to Mr. Sindel's office to determine who would best suit the penalty phase. ECF No. 334 at 88:20. At the Hearing, Mr. Sindel stated he and Dr. Randall "had a significant sense of where we were going to direct the mitigation case and what goals we had in mind and who we were going to use to try to reach those goals." ECF No. 334 at 87:20-23.

Around the time of Dr. Randall's appointment, Ms. Caspari-Supranowich sent a Memorandum to Mr. Sindel, writing,

> Billie says the following guards like him and will testify on his behalf in the penalty phase of trial:
>
> Floyd
> Jesse
> Luther
> Sgt. Kline

Exhibit 331. In a handwritten note, Mr. Sindel directed Ms. Caspari-Supranowich to either interview the guards or give the task to Mr. Simon. In response, Ms. Caspari-Supranowich wrote, by hand, "gave to Randall." Exhibit 331.

In another memorandum, Ms. Caspari-Supranowich wrote to Mr. Sindel and described a recent development in Mr. Allen's case. *See* Exhibit 332. Ms. Caspari-Supranowich stated Mr. Allen "told the judge in his letters that he had a baby on the way." Exhibit 332. When she inquired about this child with Mr. Allen, he indicated the mother was "Shontay," but could not provide an address or last name. Mr. Allen alleged his friend, Johnnie Grant, could contact

Shontay, but Ms. Caspari-Supranowich was unable to reach him. Instead, Ms. Caspari-Supranowich contacted Juanita Allen, who knew "nothing of Shontay or of Billie getting anyone pregnant, except Tasha [Valentine.]" Exhibit 332. Tasha Valentine "confirmed that she told Billie in February that she was pregnant and then had an abortion about one month after Billie was locked up. Billie was aware of the abortion." Exhibit 332. Ms. Caspari-Supranowich ended her memorandum with the following statements:

> I spoke to Billie again and confronted him with this and after he was backed in a corner he hung up on me.

> I know this is not a big deal, but I had to vent my frustrations with Billie's complete inability to tell the truth.

Exhibit 332. Mr. Sindel testified Ms. Caspari-Supranowich conducted this investigative work "on her own," which was typical of how his team approached the case. ECF No. 336 at 58:15-19. He described Ms. Caspari-Supranowich as a "self-starter," and as "[b]right and a good worker." ECF No. 336 at 60:20-24.

On January 16, 1998, a document titled "The Life History of Billie Jerome Allen" (Life History), Exhibit 303, prepared by Mr. Simon, was faxed to Mr. Sindel's office. The Life History contains 91 numbered paragraphs of detailed information about Mr. Allen's life, from birth to the bank robbery.[8] Mr. Sindel, when presented with this exhibit, acknowledged Mr. Simon had done "quite a bit of work with Mr. Allen." ECF No. 336 at 182:25-183:2. He said he lacked any specific recollection of seeing the document, but stated, "more than likely I did." ECF No. 337 at 136:12-16. Mr. Sindel examined Mr. Simon's Out of Court Hourly Worksheet, which indicated the Life History was prepared on January 8, 1998. Exhibit 498 at 7. Mr. Sindel testified "[Mr. Simon's] waiting until January 8th could handicap a case . . . to develop a social

---

[8] For a detailed discussion of the Life History, *see* Section III.B.2.

history." ECF No. 337 at 143:21-24. He added, "The only thing I do want to make clear is January 8th was a date that Mr. Simon may have done certain things, but it wasn't necessarily the date that I did certain things. I'm not trying to duck my responsibility." ECF No. 337 at 144:2-8.

The same day, Ms. Caspari-Supranowich sent Dr. Randall a facsimile transmission enclosing phone numbers for Juanita Allen and Otha Petty, Mr. Allen's grandfather. *See* Exhibit 335. She included Mr. Simon's fourteen-page Life History. Mr. Sindel obtained a court order allowing Dr. Randall to visit Mr. Allen the next day, and, thus, on January 17, 1998 – the day after his appointment to the case – Dr. Randall flew from his home in Evanston, Illinois to Saint Louis to meet with Mr. Sindel and Mr. Allen.

Mr. Sindel stated Dr. Randall "hit the ground running." ECF No. 336 at 190:19. At his meeting with Mr. Allen on January 17, 1998, Dr. Randall took ten pages of handwritten notes, including several names of people relevant to Mr. Allen's life. Mr. Sindel testified he was familiar with the names of those people, even before Dr. Randall was appointed as mitigation specialist.[9] Two days later, Dr. Randall followed up with Mr. Sindel and advised he would telephone Mr. Allen's family members in the next 48 hours. *See* Exhibit 341. Dr. Randall described his "plan of attack":

> I have found from my experience that it's best for me to discuss, arrange, and conduct initial interviews with the family members by myself, as it gives me a chance to develop a rapport with these people and gives me a better feel for the mitigation case. Following this initial round of interviews, we can sketch out a rough direct of each potential mitigation witness, and then conduct follow-up interviews soon thereafter.

---

[9] Mr. Sindel stated he was "not quite positive about 'Rachelle Allen,' but all the other people that are named I'm familiar with." ECF No. 336 at 189:2-4 (internal quotations added).

Exhibit 341. Mr. Sindel agreed with this approach, and stated Dr. Randall worked "very hard . . . We were all working long hours." ECF No. 336 at 191:16-17, 204:18-23.

In a letter dated January 27, 1998, Mr. Simon wrote to Mr. Sindel and confirmed he understood Dr. Randall was the "new mitigation expert." Exhibit 352 at 1. Among other things, Mr. Simon explained, "[E]ventually I need to get back to meeting potential witnesses and building rapport with them." Exhibit 352 at 2. At the Hearing, counsel for the Government and Mr. Sindel had the following exchange:

Q      . . . The reference to getting back to meeting potential witnesses, you knew that he had been meeting with potential mitigation witnesses, correct?

A      I knew that that was what his obligations were.

Q      Right. And did you know that he had been doing so?

A      I knew that there was some [sic] meetings he had. I didn't know the details of them or who it was or what he had learned.

Q      Okay. It came to no surprise to you when he said in this letter that he's going to need to get back to meeting those witnesses.

A      No.

Q      You didn't say to yourself, 'Well, wait a minute; what do you mean you've been doing that? I thought Dr. Haney was doing that all along.'

A      No. I – I thought he was doing it all.

Q      Okay. And apparently, by this letter, he's confirming that he had been doing some meeting with mitigation witnesses.

A      Some.

ECF No. 336 at 124:23-125:15.

Additionally, Mr. Sindel was confronted with his second declaration,[10] which states,

> . . . [Dr. Haney] and I did not have a common understanding of what his role was to be. I believed he would be the person responsible for performing the mitigation investigation, including interviews, obtaining documents, finding witnesses and the like. We would have been ready to investigate any leads he suggested we pursue. He on the other hand, apparently saw his role as that of an expert witness who would be responsible for development of broad mitigation themes once the witness interviews, document collection and mental health evaluations were conducted.

Exhibit 250 at ¶ 10. At the Hearing, Mr. Sindel described these statements as "inaccurate"; he explained, "It is – That is not what I understood his role to be, to obtain the documents." ECF No. 336 at 93:6-16. He further admitted he and Ms. Caspari-Supranowich had begun locating witnesses and conducting interviews for the mitigation phase before Dr. Haney and Mr. Simon joined the team. Mr. Sindel stated his second declaration did not contain "the best choice of words." ECF No. 336 at 93:12-14. He further testified he did not prepare the declaration.

At Mr. Simon's suggestion, the trial team began working on a motion to continue the trial. On January 28, 1998, Mr. Simon faxed a draft of the motion to Ms. Caspari-Supranowich. *See* Exhibit 353. In his draft, Mr. Simon wrote, "As defense counsel for Mr. Allen have divided their work, appointed lead counsel for defendant Allen, Richard H. Sindel, is concentrating on the guilt-or-innocence phase, and appointed co-counsel, John William Simon, is concentrating on the penalty phase." Exhibit 353 at 3. At the Hearing, Mr. Sindel agreed with the accuracy of this statement, and the final draft of the motion re-alleged this division of labor. *See* Exhibit 32 at 1. The motion requested a 120-day continuance, and in an attached affidavit, Dr. Randall stated, "Realistically, I believe that a continuance of <u>at least</u> 120 days would allow for the

---

[10] The declarations were prepared by habeas counsel, not the witnesses who appeared at the Hearing. This declaration was signed by Mr. Sindel on July 27, 2009. This declaration is inconsistent with what actually happened in the preparation of the mitigation case.

adequate preparation of mitigation for a potential death penalty sentencing hearing, based on my appraisal of the work that remains to be completed in the Allen case." Exhibit 35 at ¶ 9 (emphasis in original). Mr. Sindel testified he believed 120 days would give him only the "bare bones" amount of time required to do an adequate job. ECF No. 336 at 142:12-17. However, he believed he needed to present the Court with a proposal that it might realistically grant, and he therefore did not ask for more time.

On January 30, 1998, the Court held a hearing on the motion for continuance, and Mr. Simon presented argument and testimony in support of it. Mr. Simon explained the trial team had received a communication from Dr. Haney, advising he could not complete his task for the case. Mr. Simon added, "At the same time, Your Honor, I was doing some of the work that the first mitigation expert, Dr. Haney, either should have done or expected other people to do." Exhibit 36 at 2:24-3:1. The motion for continuance was denied the same day.

At Dr. Randall's suggestion, Mr. Sindel hired Dr. Michael Gelbort, a neuropsychologist, in February 1998. Mr. Sindel retained Dr. Gelbort to determine "whether or not there was any organic brain damage and . . . other things that would have fallen within his area of expertise." ECF No. 337 at 125:7-10. When asked whether he retained Dr. Gelbort due to Mr. Allen's history of pica and lead poisoning, Mr. Sindel responded, "I do not recall exactly what the reason. I do recall that Dr. Randall felt it was appropriate to have that evaluation. It may also have to do with the fact that [Mr. Allen] claimed that he was pistol whipped and then had been knocked unconscious." ECF No. 337 at 125:11-18.

On February 16, 1998, Dr. Cuneo wrote to Mr. Sindel, advising he conferred with Dr. Randall, whom he described as the "mitigation expert," and with Dr. Gelbort. Dr. Cuneo explained he had reviewed police reports, mental health records from Saint Louis City Hospital

and MSLPC. He also reviewed one of Mr. Allen's conviction records and a police report "where shots were fired through [Juanita] Allen's mother's front door." Exhibit 103 at 1. In his letter, he acknowledged he "was also asked to look at possible mitigation factors as [he] may be called upon to testify in the penalty phase if Mr. Allen is convicted of Murder." Exhibit 103 at 1. He added he had not finished his mitigation assessment at the time of his letter, and he expected to receive additional information.

In his letter, Dr. Cuneo described his communications with Juanita Allen, who relayed how Mr. Allen had changed after the deaths of two friends. Juanita Allen told Dr. Cuneo when Mr. Allen was 14 years old, his friend Dennis Noble was killed in a drive-by shooting. Juanita Allen stated Mr. Allen idolized Dennis Noble, and she tried to convince Mr. Allen to see a psychiatrist after this event, but he refused. She eventually succeeded in having a psychiatrist talk to Mr. Allen at school, but Mr. Allen refused to go the psychiatrist's office and continue treatment. Two years later, Mr. Allen's best friend, Marquis Taylor, was killed in front of Mr. Allen in another drive-by shooting. Juanita Allen told Dr. Cuneo this event caused Mr. Allen to become depressed and distant. She stated Mr. Allen "drifted aimlessly and was obsessed with making it in the music world and she feared that he was being drawn into the world of drugs." Exhibit 103 at 3. She described him as "a dreamer in la la land." Exhibit 103 at 3. Juanita Allen told Dr. Cuneo that Mr. Allen continued to live with her until January 9, 1997, "when her house was shot up"; she believed this shooting was drug-related, and "she kicked him out of the house."[11] Exhibit 103 at 3.

Juanita Allen told Dr. Cuneo that Mr. Allen had "always been somewhat depressed, but would attempt to hide it." Exhibit 103 at 3-4. She said he suffered from ichthyosis, a skin

_____

[11] At his deposition, Mr. Allen testified he left home voluntarily. *See* Section III.T.2.

condition resulting in dry, scaly, fish-like skin.  Juanita Allen told Dr. Cuneo Mr. Allen's peers teased him because of his ichthyosis, particularly when he attended the Clayton schools, from kindergarten to seventh grade.  She said Mr. Allen would "laugh when teased," but in reality "he was hurting inside."  Exhibit 103 at 4 (internal quotations omitted).  She felt her son "would take any humiliation to be accepted."  Exhibit 103 at 4.

At the Hearing, Mr. Sindel discussed the scope of the evidence yet to be reviewed by Dr. Randall before trial.  Mr. Sindel admitted the witnesses Dr. Randall sought to contact were almost exclusively located in the Saint Louis area, where Mr. Allen had lived all his 19 years, the majority of which he spent at one address.  Likewise, Mr. Allen primarily attended Clayton schools, although he eventually transferred to the Saint Louis City schools.  Mr. Sindel testified the majority of Mr. Allen's family was located in Saint Louis, and Mr. Allen lacked an extensive medical history.  Mr. Allen spent no time in the care of the Department of Family Services, and he had only one prior conviction – for tampering with a motor vehicle.  Similarly, he had no jail records, except those from Franklin County, where he awaited trial.  By January 30, 1998, Dr. Randall had compiled an updated "Billy [sic] Allen Contact List," containing the names of 54 potential witnesses; Mr. Sindel testified he knew most of the people on the list before Dr. Randall's appointment.  When asked, "Did you deliberately ignore a lead into a particular area or topic relevant to mitigation because you didn't have enough time?" Mr. Sindel responded, "Not relevant to mitigation."  ECF No. 336 at 170:10-13.

Mr. Sindel reviewed a number of documents, dated in February 1998.  In one of these documents, a February 6, 1998 facsimile transmission to Mr. Sindel and Ms. Caspari-Supranowich, Dr. Randall proposed a "meeting on mitigation . . . Thursday evening after court."  Exhibit 369.  He further asked if that date would work for Mr. Simon, Dr. Cuneo, and Dr.

Gelbort. Mr. Sindel testified he could not recall whether the proposed meeting ever occurred, but he admitted "meetings like it" did occur. ECF No. 336 at 214:15-16. Additionally, in a facsimile transmission dated February 14, 1998, Dr. Randall told Mr. Sindel, "Gelbort, Cuneo, and myself need a copy of the police report from Marquis's murder." Exhibit 376. He further indicated he would like to know "how things went in court on Friday." Exhibit 376. Mr. Sindel admitted Dr. Randall "[wa]s out in the field actively working on this case . . . while [he was] in trial[.]" ECF No. 336 at 216:15-18. Finally, on February 20, 1998, Dr. Randall sent Mr. Sindel additional correspondence, noting the trial team had "witness prep sessions scheduled from 10 am to 4:30 pm + on Saturday, 12 noon to at least 4 or 5 on Sunday."[12] Exhibit 381 at 1.

### 3. The Penalty Phase

At the Hearing, Mr. Sindel was questioned about his strategy throughout the penalty phase of trial. He testified he anticipated exploring mental health expert testimony as early as April 1997. He understood the role a mental expert would play in the case; he knew a mental health expert would examine Mr. Allen, conduct or recommend other investigative steps, talk to collateral sources, review source materials, and want to know about Mr. Allen's background, including his parents, home life, and upbringing. Mr. Sindel also was aware that alcoholism, drug addiction, and abuse within a family could increase the probability of mental health problems. He testified evidence of mental health problems was "a pretty hard sell," because jurors viewed it as "psychobabble" and were often averse to the "abuse excuse." ECF No. 334 at 158:16-159:2. In fact, he stated one of the jurors on Mr. Allen's case had expressed skepticism about this type of evidence during voir dire.

---

[12] For a thorough discussion of these interview sessions, *see* Section III.B.4.

Mr. Sindel explained his strategy was to "play up what's good and play down what's bad." ECF No. 334 at 170:17-20. He stated he attempted to "play down" anything that might have increased Mr. Allen's "role in decisions and conduct as it related to the offense[.]" ECF No. 334 at 170:21-25. Mr. Sindel wanted to exclude any evidence concerning Mr. Allen's prior violence, prior possession and use of weapons, and drug dealing. With respect to drug dealing, Mr. Sindel strived to convince the jury that Mr. Allen was a "ganker,"a seller of fake drugs, but never engaged in actual drug dealing. ECF No. 334 at 173:15-20. He believed he succeeded in this attempt, and also in convincing the jury Mr. Allen's claims of night-clubbing, champagne-drinking, and Lexus-driving were pure fantasy. He testified he also succeeded in "playing down" Mr. Allen's alleged gang membership. Mr. Sindel admitted if he had the opportunity to re-try the case, he still would want to exclude these types of evidence.

Prior to 1998, Mr. Sindel had developed theories concerning which mitigation strategies operated most effectively in capital cases in Missouri. First and foremost among such strategies was the theme of "residual doubt," meaning doubt about the defendant's guilt or the role the defendant played in the offense conduct. ECF No. 334 at 177:25-178:12. Mr. Sindel testified he used this strategy in Mr. Allen's case. He stated,

> Well, I mean I think we wanted to stress a couple of things, and I think it played into what we believed was the best mitigation defense that we've been able to develop which was that Billie Allen wasn't the shooter; that Norris Holder was; that Billie Allen was a go-along/get-along and that, you know, he was just the easy guy for Holder to convince to go into the bank and assist him in getting him what he wanted. And I don't even think there was supposed to be an even split of whatever dough they recovered which wasn't burnt up.

ECF No. 334 at 178:16-24. Mr. Sindel testified he did a "good job" of "front loading" this theme in the guilt phase of the case, and he carried on this theme in the mitigation phase by

presenting numerous witnesses who described Mr. Allen as a follower. ECF No. 334 at 178:25-179:8.

Mr. Sindel acknowledged his approach in the mitigation phase had to "deal with" the evidence in the guilt phase; otherwise, jurors could see him as incredible. ECF No. 334 at 179:24-180:3, 183:11-15. Accordingly, in the mitigation phase, Mr. Sindel had to address evidence suggesting Mr. Allen had confessed to his participation in the bank robbery, and made tape-recorded admissions to a young woman while in custody. Additionally, Mr. Allen had told a police officer he attempted to establish an alibi by shopping, applying for a job, contacting a security guard who knew him, and presenting a gift to a girlfriend. He further informed a detective he was part of a "clique" of eight individuals, who had been gathering weapons to commit a series of bank robberies fashioned after a movie called "Set It Off." Exhibit 100 at 3. Although Mr. Sindel could not recall all the details of this evidence, he specifically recalled Mr. Allen's group was using "Set It Off" as a training aid for the robberies. Mr. Sindel testified he attempted to obviate this evidence at trial, and it constituted a reason his "main effort" in the case was to obtain a sentence of life imprisonment without parole. ECF No. 334 at 187:25-188:3.

Experience prior to 1997 taught Mr. Sindel that a theme most likely to secure a life sentence would contain a causal nexus to the crime; that is, the theme would explain why Mr. Allen committed the bank robbery. Because financial motives generally fuel bank robberies, this was a particularly difficult task for Mr. Sindel. Therefore, Mr. Sindel focused on portraying Mr. Allen as a "follower," and Norris Holder as the "older, stronger personality, who could manipulate and mislead Mr. Allen." ECF No. 334 at 199:2-8.

Mr. Sindel also employed a "begging" strategy, ECF No. 334 at 199:10-14, in which he appealed to the emotions of the jury by setting forth evidence of Mr. Allen's family and personal

background.  This "begging" strategy included several topics.  It involved having witnesses testify the bank robbery constituted aberrational conduct, inconsistent with anything else in Mr. Allen's past.  It encompassed evidence Mr. Allen came from a loving immediate and extended family, which Mr. Sindel believed at the time.  To better identify with the jury, Mr. Sindel chose family members who defied a "ghetto" stereotype, and he elicited from them the sadness they would feel if Mr. Allen was taken from their lives.  ECF No. 334 at 205:10-206:9.  A "number" of Mr. Allen's grade school teachers, and some high school teachers, testified regarding the difficulties Mr. Allen faced as a student.  Mr. Sindel offered evidence suggesting Mr. Allen's Clayton School District years were fraught with confrontation with the "have's" of the world, while Mr. Allen was a "have-not."  ECF No. 334 at 201:12-16.  The Clayton school teachers retained distinct and favorable memories of Mr. Allen; none of them suggested his childhood involved abuse.

During the penalty phase, Mr. Sindel stressed Mr. Allen's lack of a father figure, which Mr. Allen described in a handwritten biography.[13]  Mr. Sindel put on "significant" evidence suggesting Mr. Allen's father, John Allen, was a "bum" and an alcoholic.  ECF No. 334 at 206:16-18.  Part of Mr. Sindel's strategy involved establishing Mr. Allen differed from the more successful members of his family due to his lack of a father figure.

Juanita Allen was on the "short list" to be called as a witness, ECF No. 334 at 207:17-19, and Mr. Sindel had prepared a direct examination of her testimony.  *See* Exhibit 416.  Toward the end of the trial, however, Mr. Sindel decided not to call her as a witness.  When asked whether he had "real concerns about her demeanor, if she would testify, that ultimately led to

_____

[13]Mr. Sindel acknowledged this biography contained no negative evidence about Juanita Allen. Likewise, it failed to contain any evidence Mr. Allen's father abused him.

[his] decision not to present her," Mr. Sindel responded, "That's part of the equation. . . . I mean that was a significant part of the equation." ECF No. 334 at 208:7-13. He agreed she could be "volatile," and a "loose cannon." ECF No. 336 at 255:10-14. In addition, Mr. Sindel took Dr. Randall's advice to avoid the "trash Mom" mitigation theory. ECF No. 334 at 209:3-12.

Even still, the jury heard some negative evidence concerning Juanita Allen. Specifically, it heard evidence she drank alcohol, and Raymond Petty testified she had physically punished Mr. Allen with an electrical cord on one occasion. Notwithstanding this testimony, Raymond Petty opined Mr. Allen had a loving relationship with his mother. The jury heard evidence Mr. Allen "was a good kid" until his teenage years, and Juanita Allen had "done the best she could," but did not know how to handle some of Mr. Allen's behavioral problems, such as skipping school and not coming home. ECF No. 334 at 210:21-211:4. The mitigation evidence concerning Juanita Allen suggested she (1) took action to ensure Mr. Allen received medical care throughout his life, (2) attempted to steer Mr. Allen away from a world of drugs, and (3) pushed Mr. Allen in positive directions by encouraging him to stay in high school and enrolling him in a residential program called Job Corps. At the time of the penalty phase, Mr. Sindel believed the evidence "supported a belief [Juanita Allen] could be a caring and loving mother . . . who on occasion or more than that was not satisfactory." ECF No. 334 at 213:13-18, 214:5-9.

Mr. Sindel testified about the choices he made in presenting witnesses. He admitted he could not identify a single witness he would have called at the mitigation phase if he had more time to prepare. He said he did not know Cathy Toliver, or her son Brady Toliver, and when asked whether, given more time, he would have presented Billy Wayne Allen, he stated he did not "recall Billy Wayne Allen being on [his] radar." ECF No. 336 at 172:7-14. He recalled Raymond Petty's testimony, and agreed Raymond Petty was a positive character, who worked

48

full-time, attended school, and brought no other "baggage" to Mr. Allen's case. ECF No. 336 at 173:3-9, 176:1-4. Finally, counsel asked whether Mr. Sindel would willingly call witnesses who might expose themselves and Mr. Allen as drug dealers. Although Mr. Sindel said the answer to this question would depend on the mitigation theme presented at trial, he conceded he could not recall presenting any witnesses who admitted to dealing drugs.

Mr. Sindel testified the alleged "misunderstanding" with Dr. Haney did not affect his choice of expert witnesses. *See* ECF No. 337 at 23:2-14. That is, he would have retained Dr. Cuneo and Dr. Gelbort regardless of any fallout with Dr. Haney. At the time of trial, Mr. Sindel believed in the accuracy and effectiveness of information secured by Dr. Cuneo. Similarly, Mr. Sindel had no reason to doubt Dr. Gelbort followed through with the tasks he initially set out to do; when he called Dr. Gelbort to the stand, Mr. Sindel had no reason to believe his work lacked professionalism. If Dr. Gelbort had asked for a court order for additional time, Mr. Sindel would have "sh[aken his] head, buried [his] head in [his] hands and said, 'Let's go do that then.'" ECF No. 337 at 29:13-17.

Mr. Sindel acknowledged several witnesses testified regarding Juanita Allen's character and relationship with Mr. Allen at the mitigation phase of trial. A neighbor, Nancy Harris, testified Juanita Allen was a caring mother and good with children. Exhibit 202 at 292:6-14. Deborah Ruffin, Juanita Allen's coworker, relayed an incident, in which Johnnie Grant approached Juanita Allen at a grocery store and began yelling at her. Exhibit 178 at 41:1-8. Deborah Ruffin testified Juanita Allen never raised her voice or lost her temper in response. Exhibit 178 at 41:1-14. Additionally, several of Mr. Allen's teachers from the Clayton School District testified that Juanita Allen attended parent-teacher conferences on occasion, and Mr. Sindel recalled offering testimony establishing Juanita Allen had strict rules for Mr. Allen to

follow. Mr. Allen's girlfriend, Tasha Valentine, also testified about Mr. Allen's relationship with his mother. Tasha Valentine recalled a time during January or February of 1997 when Juanita Allen "said she wanted Bill to call her and talk to her." Exhibit 190 at 7:3-5. Mr. Sindel further recalled testimony establishing Juanita Allen secured medical care for Mr. Allen, and on two occasions she filed missing persons reports on Mr. Allen. Mr. Sindel agreed none of this evidence indicated Juanita Allen ever abandoned her son.

Mr. Sindel admitted he offered some evidence of physical abuse. At the penalty phase of trial, he called Raymond Petty as a witness, and had the following exchange:

Q.    How does Juanita deal with her feelings?

A.    My sister, I think she – she doesn't – she curse a lot, and cursing and drinking and – it's not going to alleviate the problem. When you are done cursing, when you put that glass down, the problem's still there.

Q.    Have you seen [Juanita Allen] sometimes behave in ways towards Billie that are scary for you?

A.    One time, and she and I fell out over it, but that's my blood and I -- it didn't make sense to me.

Q.    What was it?

A.    She -- he had to be around 16, 17, something. Fifteen, 16 or 17 and she was whooping him with an extension cord and I think Bill called me on the phone -- this must have been my layoff period also and Bill --

Q.    About how old would Bill have been at that time?

A.    I'm -- he had to be 15, 16 or 17. Fifteen or 16. Maybe 17. But Bill called me on the phone and I went down to the house and she was really just -- just beating him and I stepped between them and Bill broke out the house and he ran down the street and Juanita and I had a few words and I got in the car and I took off and he -- I don't think he came back in the house and this -- from that day, from that night, it was a night -- from that night it was just all downhill from there.

50

Exhibit 213 at 26:16-27:17. At the Hearing, Mr. Sindel confirmed he purposely intended to elicit this testimony when he initiated this exchange. He also acknowledged he had likely seen Dr. Cuneo's handwritten notes dated January 16, 1998, which state, "his mom [illegible] out of house – mom physically discipline [illegible] till end." Exhibit 565 at 22.

### 4. Post-Conviction Impressions

At the close of the penalty phase, Mr. Sindel had a feeling of satisfaction in having "presented a good case in mitigation." ECF No. 334 at 92:12-14. The team had presented "multiple" mitigation themes, including (1) Mr. Allen's neighborhood, (2) Mr. Allen's environment, (3) Mr. Allen's educational failures, (4) Mr. Allen's role in the bank robbery as a follower, not the shooter, (5) co-defendant Norris Holder's role as the "brains behind the operation," and (6) the notion Mr. Allen had people who cared about his fate – that is, "there was more to Billie Allen than . . . this guy who walked into this bank and committed this crime[.]" ECF No. 334 at 92:17-93:12. Mr. Sindel said he did not portray Mr. Allen as a "good guy," but tried to explain the reasons for Mr. Allen's choices, demonstrate his crime was an "aberration" instead of a continuing pattern, and show Mr. Allen could "give back." ECF No. 334 at 93:16-21. Mr. Sindel testified the approximately forty days he and Dr. Randall had to prepare were insufficient to conduct a thorough, detailed mitigation investigation. He said, "The evidence we presented was the result of as thorough and as detailed an investigation that we humanly could conduct under the circumstances." ECF No. 334 at 94:13-15.

At the Hearing, Mr. Sindel examined a letter sent to him from Steven Holtshouser, the prosecuting attorney during the criminal case, two days after the penalty phase concluded. In the letter, Mr. Holtshouser commended Mr. Sindel for his performance during the penalty phase. He stated Mr. Sindel's "determination . . . was heart felt," and he did not "think anyone could have

done a better job than [Mr. Sindel] did . . . in attempting to convince the jury to spare Mr. Allen." Exhibit 620. Mr. Sindel admitted he believed these sentiments were genuine at the time he received them.

Mr. Sindel testified he had reviewed the information contained in the declarations of Dr. Stewart and Dr. Martell. He stated they contained "extremely valuable information." ECF No. 334 at 130:4-7. He had reviewed the deposition and declaration of Juanita Allen, and stated he likely would have presented such information to a jury. He testified he would have informed the mental health experts of the alleged child abuse described by Juanita Allen, and would have presented evidence that such abuse could cause psychological consequences, impair judgment and reasoning, and lead to high-risk and impulsive behavior. Mr. Sindel said if he had information suggesting abuse and trauma could impair cognitive functioning, and increase the likelihood of someone dropping out of high school, he would have wanted to present it to the jury. He averred his failure to investigate and present evidence regarding Mr. Allen's alleged child abuse did not constitute a strategic decision. Finally, when asked why he did not call Juanita Allen as a witness in the penalty phase, Mr. Sindel "surmised" her testimony would have conflicted with that of Johnnie Grant. ECF No. 334 at 138:12-16, 139:2-6. He stated if he knew then what he knew now, he would have called Juanita Allen as a witness, even if Johnnie Grant's testimony negatively affected her credibility.

In a letter to Mr. Sindel dated April 13, 1998, Dr. Randall provided an accounting of his time spent on the case, and explained he "went well over the allotted time[.]" Exhibit 394. He noted, "In an attempt to prepare the mitigation adequately given the time frame involved, I had to totally immerse myself in the case." Exhibit 394. When asked, "In this letter is there any indication by [Dr. Randall] as to any matters, issues, facts, witnesses that there never was time to

get to?" Mr. Sindel answered, "I don't think that was the purpose of the letter, but there's no reference to that." ECF No. 336 at 253:22-254:1. Likewise, when asked whether Dr. Randall ever expressed he saw "red flags" indicating abuse, Mr. Sindel stated, "I don't remember red flags." ECF No. 336 at 254:1-18.

Mr. Sindel testified he never had a realistic hope of a "not guilty" verdict; to him, a "win" would have meant life without parole. ECF No. 334 at 142:3-11. He believed his team "had put on as good a penalty phase case as [it] could under the circumstances," and he admitted he worked "very hard" for Mr. Allen. ECF No. 334 at 143:17-144:2. Reading the habeas materials "had a great impact upon [his] hindsight assessment" of his performance. ECF No. 334 at 144:14-16. He testified he now views his performance as deficient, due to his "[f]ailure to perform as a supervising lead counsel and ensure that those that were working for [him] were doing that." ECF No. 334 at 145:19-22. Mr. Sindel believed his "deficiency" was failing to supervise Mr. Simon and Ms. Caspari-Supranowich. ECF No. 335 at 62:8-15. When asked whether he "ma[d]e efforts to discover all reasonably available mitigating evidence," Mr. Sindel stated, "I made the efforts, yes." ECF No. 334 at 148:7-15.

Mr. Sindel testified he feels "[m]ore than badly" about the purportedly new facts elicited during the habeas proceedings. ECF No. 337 at 32:18-23. He admitted, however, he "never talked to any of the witnesses," and he "never had an opportunity to assess from a one on one [whether] they [were] credible or not." ECF No. 337 at 33:6-8. He stated the "misunderstanding [with Dr. Haney] contributed to the fact that those new facts . . . were not discovered," ECF No. 337 at 34:5-8, and his team failed to make Juanita Allen and Mr. Allen feel comfortable in divulging family secrets. He agreed his position was a hindsight analysis based, in part, on an assumption of the declarations' veracity. After wrestling with counsel for the Government, Mr.

Sindel admitted, "I did the best I could." ECF No. 337 at 38:4. Of the approximately twelve capital cases Mr. Sindel has tried in his career, Mr. Allen is the only defendant to have received a capital sentence; Mr. Allen's fate has been "very hard" for Mr. Sindel to bear. ECF No. 334 at 154:6-7.

### B.    *John Simon: Trial Counsel for Mr. Allen*

John William Simon has been a licensed attorney since 1985. He has a Ph.D. from Harvard, and graduated from Yale Law School. Between 1991 and 2012, he worked on approximately twenty capital habeas cases, and from 2006 to 2008, he was Associate Trial Counsel in the Capital Division of the Missouri State Public Defender system in Kansas City. He has received awards for his work involving capital punishment, including the 2006 Litigator of the Year Award by the Missourians for Abolition of the Death Penalty and the 2010 Spotlight Award for Missourians for Alternatives to the Death Penalty. At the time of the Hearing, he was on the Board of Directors of the Missouri Association of Criminal Defense Attorneys, and was licensed in the State of Missouri, the Southern District of Illinois, the Seventh Circuit Court of Appeals, the Eighth Circuit Court of Appeals, and the United States Supreme Court.

Before his appointment to Mr. Allen's criminal case, Mr. Simon spent eleven years as an Assistant Attorney General for the State of Missouri, handling capital habeas corpus petitions and other death penalty cases involving more extraordinary forms of relief. His representation of the State of Missouri resulted in four executions. In September 1996, he organized and moderated a session on "Ethical Dilemmas Facing Defense Counsel Who Are Accused of Ineffective Assistance of Counsel." ECF No. 277 at 8:5-9. In November 1996, he organized and moderated another session on "Ethical Considerations in the Defense and Prosecution of Criminal Cases in Post-Conviction Relief Proceedings." ECF No. 277 at 8:1-4.

### 1. Chronology of Mr. Simon's Involvement in the Criminal Case

On September 24, 1997, Mr. Simon was appointed to assist in Mr. Allen's criminal case. At the Hearing, Mr. Simon testified, at the time of Mr. Allen's trial, he lacked experience in a number of areas. Specifically, he stated he had no experience in developing social histories; no experience in reviewing collateral records, such as school records, medical records, and institutional records; no experience in developing mitigation themes in a capital case;[14] no experience with mental health experts;[15] and no training in capital defense work. He said he had never built a rapport with a defendant's family for the purpose of extracting information about sensitive issues.[16]

At the Hearing, Mr. Simon testified about his perceived role in Mr. Allen's criminal case. He stated,

> The core of my understanding was that I would be the law man; that I would be the person who would do legal research, who would draft legal pleadings, and who would argue those pleadings before the Court. It was also my understanding that I would have something to do with the penalty phase. I thought that I would be a barrister in open court . . . only in the penalty phase.

ECF No. 337 at 245:10-19. Mr. Simon stated he relied on Dr. Haney to develop the mitigation case; he thought Dr. Haney would interview witnesses and obtain other information for him to "review." ECF No. 337 at 247:19. He believed Dr. Haney or his designees would conduct the investigatory work, and, when asked whether he had a responsibility to substantively interview mitigation witnesses, Mr. Simon responded, "Absolutely not." ECF No. 337 at 248:11. In

---

[14] Rather, Mr. Simon had experience in opposing mitigation themes, when offered.

[14] Mr. Simon qualified this testimony, by stating he had defended mental health experts against charges of deliberate indifference while working as an Assistant Attorney General.

[16] The Court knows from experience that Mr. Simon's attempt to categorize himself as an incompetent oaf is inconsistent with his performance in this case, and with his experience in handling capital litigation. He gave the impression he will do everything to save a client from the death penalty.

contrast, Mr. Simon contemplated his own mitigation work would occur exclusively in a courtroom. ECF No. 337 at 258:7-10. He testified that, before January 1998, he never discussed Dr. Haney's work with Mr. Sindel. When asked whether he provided Mr. Sindel with potential mitigation themes, Mr. Simon answered, "No, sir. No, I did not[, because] I did not believe that was my role." ECF No. 337 at 257:23-25.

Mr. Simon testified Mr. Sindel shared nothing with him concerning Mr. Allen's background, except some medical records referenced in a footnote of the Life History of Billie Jerome Allen. When asked, "Did [Mr. Sindel] convey to you orally what information he had learned during his work on the case about Mr. Allen's life history," Mr. Simon answered, "No." ECF No. 338 at 10:7-10. Likewise, Mr. Simon averred Mr. Sindel shared nothing related to mitigation witness interviews or a list of potential mitigation witnesses, and nothing concerning potential abuse in Mr. Allen's background. Mr. Simon testified Mr. Sindel never gave him assignments to interview particular witnesses. When asked whether the team prepared a "mitigation notebook," Mr. Simon responded, "Based on my view of – review of the record, I would have to answer, 'Yes,' but I do not have a personal recollection of having seen that notebook at the time that – of the representation." ECF No. 338 at 10:20-25.

Mr. Simon examined a four-page autobiography written by Mr. Allen. He testified he had no recollection of the document. He added, "But given the passage of time and the obvious importance of the document, I cannot testify that I did not see it during the trial preparation phase." ECF No. 277 at 63:11-13. Counsel for the Government then read a portion of the document:

> I smoked weed every day because I had so much stress, and I needed someone to talk to, but I didn't feel right talking to my mom about it. Me and my mom were real tight, but it's just a lot better when you have a father there to love you and

spend time with you like fathers do. . . . I felt alone like nobody loved me. Even
though my mom loved me to death, I wanted to just die.

Exhibit 304 at 3. Mr. Simon agreed the document described a close relationship between Mr.

Allen and Juanita Allen. When asked, "And Billie Allen never gave you any indication that his

mother was physically abusive to him; is that correct?" Mr. Simon responded, "That's correct."

ECF No. 277 at 64:7-10.

Mr. Simon testified he had a "good rapport" with Mr. Allen, having met with him

"several times." ECF No. 338 at 11:11-15. When asked for the purpose of his interviews with

Mr. Allen, Mr. Simon stated he had "at least two purposes." ECF No. 338 at 11:19. First and

foremost, he "wanted to be personally familiar with [Mr. Allen] so that [he] would be able to do

an effective job as a trial advocate[.]" ECF No. 338 at 11:20-22. Second, Mr. Simon explained,

> In light of the fact that we were receiving nothing from Dr. Haney, I also gathered
> information that I thought would be useful for mitigation investigation by the
> person who was supposed to be doing it. To that extent, I had to ask some of the
> same questions that I believed a mitigation investigator would ask, but at no point
> was I qualified or self-perceived to be a mitigation investigator.

ECF No. 338 at 12:1-7. Mr. Simon described Mr. Allen as "cooperative," and could not recall

any instance in which Mr. Allen refused to answer his questions. ECF No. 338 at 12:8-13.

Mr. Simon testified he made unsuccessful attempts to build a rapport with Mr. Allen's

family. These attempts occurred in late 1997 and early 1998, when he had "meet-and-greet"

opportunities with some of Mr. Allen's family members. ECF No. 337 at 250:5-8. During

these "meet-and-greet" sessions, Mr. Simon made efforts to bond with potential witnesses by

finding "common roots." ECF No. 337 at 250:11-17. Throughout the Hearing, Mr. Simon

refused to refer to these sessions as "interviews."

When asked for the purpose of encounters like these, Mr. Simon explained, "I – I made verbal contact with a small number of individuals to answer questions for the – that – for the purpose of completing a document that I believe I characterized as a life history." ECF No. 337 at 252:7-10. In preparing what he called "that short life history," ECF No. 337 at 260:9-10, Mr. Simon used a mitigation checklist, "which is the first several pages of the mitigation workbook developed by the defense bar in Tennessee." ECF No. 337 at 262:19-21. He added, however, he was not corroborating information; rather, he stated, "I believed and I still believe that contacting [the witnesses] tended to personalize them to me and me to them[.]" ECF No. 337 at 252:20-22. For example, at one point, Mr. Simon met with Mr. Allen, and discovered they both had experience with the Boy Scouts of America. To ascertain the highest rank Mr. Allen achieved with the Boy Scouts, Mr. Simon went to Raymond Petty, who had been a scout leader. Mr. Simon explained he wanted this information to

> turn . . . over to the mitigation specialist . . . [and] to humanize [himself] to Mr. Allen and vice versa so that if, for example, Mr. Allen [was] a penalty phase witness and [Mr. Simon would] be doing his Direct, Mr. Allen could talk to [him] and would not be talking to a stranger but to someone that he had developed a reasonable level of personal confidence.

ECF No. 337 at 251:16-23.

At the Hearing, Mr. Simon examined his hourly billing statement from the criminal case. *See generally* Exhibit 498. On October 27, 1997, Mr. Simon billed 0.30 hour for a telephone conversation with Mr. Allen concerning the status of the case. Two days later, he had two more telephone calls with Mr. Allen, billing for 0.60 hour to discuss the case. The following day, he had another telephone conversation with Mr. Allen to discuss an upcoming hearing. On November 6, 1997, the day of the hearing, Mr. Simon met with Mr. Allen for 0.40 hour; after the hearing, Mr. Simon interviewed Mr. Allen for 0.70 hour. The resulting interview notes elicit

several relevant topics were discussed. First, they indicate Mr. Allen discussed winning a rap competition at an establishment called "Cloud Nine." *See* Exhibit 319 at 1. Mr. Simon averred this conversation was relevant to guilt; when asked to explain, Mr. Simon testified as follows:

> One of the points that the prosecution made in the first phase of the trial was that Mr. Allen was money hungry. They had a picture of him with the term 'cash money' written on his belly. I don't remember whether they got that in or not. But the – the idea that he was involved in what he referred to as 'clubbin'' . . . went to the motive of why this man would have been engaged in conduct that was completely out of character with him. So, yes, it was relevant to guilt.

ECF No. 338 at 21:4-12. Additionally, the interview notes contain a reference to Mr. Allen's prowess as a basketball player; when asked whether this information was relevant to mitigation, Mr. Simon answered, "Or guilt based on the theory the prosecution was using to attribute some motive to him for an act that was completely out of character, given everything that everyone knew about him." ECF No. 338 at 23:24-24:2. Mr. Simon admitted, however, the defense team did not offer this evidence during the guilt phase of trial. Finally, the interview notes list the name of a jail guard friendly to Mr. Allen, and contain references to Mr. Allen's schooling; Mr. Simon admitted these categories were relevant to mitigation. Mr. Simon's records reflect, on the same day, he participated in a conference with Mr. Sindel and Ms. Caspari-Supranowich "re: client, mitigating issues and discovery." Exhibit 498 at 2.

On November 27 and 28 of 1997, Mr. Simon researched no-fault ineffective assistance of counsel, which he defined as "fault on the part of [a] third-party that causes counsel, who are personally diligent, to fail to deliver the effective assistance of counsel they want to deliver." ECF No. 338 at 30:10-12. Mr. Simon averred he conducted this research "[i]n the context of a discovery dispute[.]" ECF No. 338 at 28:17.

Mr. Simon's records show, on December 12, 1997, he interviewed Mr. Allen on tape at the Franklin County Jail for 3.9 hours. At the Hearing, Mr. Simon explained, "Those time [sic], of course in prison interviews include the time it takes to be processed in and processed out. So the actual time spent with the client is substantially less than what's shown on the timesheet." ECF No. 338 at 31:8-11. The ensuing exchange between Mr. Simon and counsel for the Government was particularly disquieting. Mr. Simon did all he could to unconvincingly persuade the Court that he was incompetent, and incapable of conducting a thorough or even a skeletal mitigation investigation. While hearing his testimony was at times entertaining, it was not persuasive that he did anything but an outstanding job in conducting a thorough mitigation investigation.

First, Mr. Simon was asked a simple question: "Does the microcassette that you used to copy onto the larger cassette exist or did you throw it out or destroy it or re-record it after you copied it onto the larger one? Do you recall?" ECF No. 338 at 32:11-14. He answered, "As of this very moment, I don't recall, but when I had – when I had the collection of cassettes in front of me at the deposition, I gave the best answers I could then. I have seen one cassette so far today. That's all I'm seeing." ECF No. 338 at 32:15-18. Accordingly, he was shown three cassettes, which he supplied to habeas counsel in 2007. *See* Exhibits 630A, 630B, and 630C. One cassette was dated December 11, 1997,[17] and marked "#1." Exhibit 630A. A second cassette was dated December 11, 1997, and marked "#2." Exhibit 630B. The third cassette was dated January 7, 1998, and marked "#2." Exhibit 630C. Upon viewing this third cassette, Mr. Simon had the following exchange with counsel for the Government:

---

[17] It is unclear why the tape is dated December 11, 1997, instead of December 12, 1997. However, the parties appear to agree the tape contains a recording of the December 12, 1997 interview.

Q      Is there a No. 1 from January 7th of 1998?

A      Not here.

Q      Do you recall a No. 1?

A      No.

Q      Okay.

A      I don't recall one way or the other.  I'm not denying the existence of a No. 1.  The way I keep track of things, the fact that there was a No. 2 implies to me that there was a No. 1.

Q      Do you know where No. 1 is?

A      Absolutely not.

Q      If you had No. 1, would you have provided it to 2255 counsel?

A      Of course.[18]

Q      And these tapes that are in front of you, are these more likely than not the tapes of your interview with Billie Allen on – in December and January of 1998?

A      I cannot agree to that under oath in light of my study of Imwinkelried's *Evidentiary Foundation*, Sixth Edition.  There are nine points to laying the foundation.  I've reviewed those nine points.  On the majority, the answer is either 'no' or 'I don't know.'  I have agreed that these appear to be the physical objects, but I have no knowledge of what's been done to the insides of these.  They've been in the exclusive custody of two parties, each of whom have equal and opposite motives to alter the contents of them.  I cannot – I cannot lay a chain of custody for them, and I have no – I have no training in preparing them.  I did not know that the equipment was working well.  I know that they were bad recordings.  That's even reflected by the prosecution's secretary's transcription of them.

So I – I – I have to say when I consider all of the factors, including the incentive to fabricate and the lack of quality, my own lack of training at sound recording, and the fact that I can't even say what the equipment was, let alone that

---

[18] Later in the Hearing, the parties stipulated Mr. Simon found the missing tape and provided it to counsel after giving his testimony.  The Court received the previously missing tape into evidence.  *See* Exhibit 630E.

it was in good working order, I have to say 'no' in response to your answer, and that's why.

ECF No. 338 at 34:18-36:4. Mr. Simon was then reminded of his deposition, in which he agreed these cassettes were "more likely than not" recordings of his interview with Mr. Allen. ECF No. 338 at 36:5-15. Faced with this evidence, Mr. Simon stated, "This is before I had reviewed Imwinkelried." ECF No. 338 at 36:21-22.

Mr. Simon was then confronted with a compact disc recording of the materials in the cassette tapes. *See* Exhibit 631. He stated he had not listened to the entire recording, but he had "reviewed [it] for the poor quality [it] reflect[s]." ECF No. 338 at 37:14-15. Counsel for the Government then played the audio recordings and asked Mr. Simon if he recognized his own voice; Mr. Simon answered, "It sounds like me, but I don't know that is was." ECF No. 338 at 38:8. Counsel for the Government tried again, asking, "So you don't recognize your voice?" ECF No. 338 at 38:9. Mr. Simon responded, "I recognize the ability of human beings to sound like someone else." ECF No. 338 at 38:10-11. On the third try, Mr. Simon admitted he recognized his own voice, and he subsequently testified he recognized Mr. Allen's voice as well. Parsing Mr. Simon's statements again reveals his unsuccessful attempt to discredit himself as incompetent in his role in the mitigation case.

Mr. Simon was questioned about the purpose of the interview. He recalled telling Mr. Allen he was "just trying to figure out what cards [he] ha[d] in the deck[.]" ECF No. 338 at 94:25-95:1. Counsel for the Government asked, "So is it correct that you told Mr. Allen that the focus [of the interview] was going to be on everything – everything that happened in your life and the lives of people very close to you?" ECF No. 338 at 39:10-13. Mr. Simon answered, "During that set of two meetings adding up to less than 3.9 hours, yes." ECF No. 338 at 39:14-

15.  He admitted he told Mr. Allen he was focusing on the penalty phase by attempting to humanize Mr. Allen before the jury.  He further acknowledged he had received transcripts of the recordings, and, when directly asked for the purpose of this interview, he stated,

> As I've testified . . . , there were two purposes.  One was to familiarize Mr. Allen with myself and myself with Mr. Allen.  I was also attempting to prime the pump by getting some information that the mitigation specialist could use to prepare the penalty phase.

ECF No. 338 at 39:1-5.

Mr. Simon admitted he had the mitigation checklist when he conducted the recorded interview with Mr. Allen.  He added, "That was the only instruction or training I received concerning mitigation."  ECF No. 338 at 43:17-18.  Mr. Simon acknowledged several topics covered by the mitigation checklist, including: prenatal issues, such as having an alcoholic mother or a physically abusive mother; childhood illnesses and accidents, such as head trauma and loss of consciousness; drug and toxic chemical issues, such as substance abuse and chemical exposure from industrial employment; school performance; chronic illnesses and conditions; social history issues, such as being a victim of violence, having suicidal episodes, and truancy; parental profile issues, such as having alcoholic or criminal parents; domestic violence, including physical, sexual, psychological and parental violence; neglect and tragedy; drug use; race and sex; poverty; incarceration; and being a good person.  *See generally* Exhibit 628.  When asked whether he attempted to cover these topics in his interview with Mr. Allen, Mr. Simon admitted, "That is what my notes indicate."  ECF No. 338 at 50:16.

Mr. Simon was then cross-examined extensively about the contents of the interview.  Throughout this questioning, he wrestled with counsel for the Government, and expressed repeated reluctance to acknowledge either that the voice on the audio recordings was his own, or

that the transcripts of the interview – jointly admitted by the parties without objection – were accurate. Ultimately, however, Mr. Simon conceded several points. Based in part on these concessions, and in part on the abundance of extrinsic evidence presented at the Hearing, the Court is persuaded of the following facts concerning Mr. Simon's interview of Mr. Allen at the Franklin County Jail:

- Mr. Simon told Mr. Allen he possessed "a bunch of medical records on you, and I reviewed them and I'm going to be referring to them." ECF No. 338 at 50:25-51:1.

- Mr. Allen told Mr. Simon his father, John Allen, "was drunk all the time" and "had nothing to do" with him. ECF No. 338 at 55:2-22.

- Mr. Allen related he cared more for his mother, who was "there for [him]." Exhibit 634 at 36.

- Mr. Allen provided Mr. Simon with names, addresses, and phone numbers of family members.

- Mr. Allen related he attended Bible School at Raymond Petty's church.

- Mr. Allen told Mr. Simon about his Boy Scouts of America activities, including badges he allegedly earned.

- Mr. Allen discussed his illnesses, including an incident when Mr. Allen had an asthma attack resulting in hospitalization.

- Mr. Allen indicated he was on a softball team coached by an individual named Sam Moore.

- Mr. Allen said his mother knew Sam Moore's (Mr. Allen's softball coach) telephone number by heart.

- Mr. Allen told Mr. Simon his best friend was Johnnie Grant.

- Mr. Allen said his teachers liked him, and he provided the name of Joyce Eaton in particular.

- Mr. Allen related he enjoyed his classes and teachers in the Clayton School District.

- Mr. Allen told Mr. Simon he had a "good childhood,"[19] and people cared for him. ECF No. 338 at 73:11-18.

- Mr. Allen stated his uncles kept him out of trouble and helped him stay positive.

- Mr. Allen told Mr. Simon two of his friends, Dennis Noble and "Me'Man," had been killed. ECF No. 338 at 78:12-81:10.

- Mr. Allen relayed the life-changing trauma of Marquis Taylor's death.

- Mr. Allen discussed his girlfriends throughout his life.

- Mr. Allen told Mr. Simon the only recreational drug he used was marijuana.

- Mr. Simon inquired about Mr. Allen's short-term employment at a chemical manufacturing facility, Chemisco, explaining his concern for "the potential causal relationship between [Mr. Allen's] employment at a chemical plant and neurological disorders . . . . Brain damage per the mitigation checklist." ECF No. 338 at 85:11-18.

- Mr. Allen told Mr. Simon he was "mixed up" in drugs, and he had delivered a package for four thousand dollars. ECF No. 338 at 88:3-10.

- Mr. Allen mentioned he was working with a rap music producer named "Flexx."[20]

- Mr. Allen said his friend, Ahmed Oliver, was working with his group, "Unlawful Entry," to produce a rap tape. ECF No. 338 at 92:3-6.

- Mr. Allen said he moved out of his mother's house in January 1997, because he did not want to bring trouble home with him, not because Juanita Allen had thrown him out of the house.

- Mr. Allen relayed his mother had filed a missing person report when he moved out of the house.

- Mr. Allen told Mr. Simon he started dealing drugs after observing the success of a drug house near his home. Mr. Allen said the family house was "shot up" after a

---

[19] Mr. Simon later expounded, "I think that he said something to that effect. I – I know that faking good was in his modus operandi at that time." ECF No. 338 at 75:10-11.

[20] Mr. Simon testified, when he followed up on this allegation, he learned Flexx, whose actual name was Wilson Hankins, had moved to Atlanta.

drug deal "gone bad." ECF No. 338 at 96:19-21. He explained the stress of this event resulted in his admission to MSLPC.

Furthermore, Mr. Simon's billing statement indicates, on January 7, 1998, he interviewed Mr. Allen for an additional 3.1 hours "on mitigation issues" at the Franklin County Jail. Exhibit 498 at 7. Mr. Simon agreed he intended to finish covering the mitigation checklist. Based on his testimony and the transcription of the interview, the Court accepts the January 7, 1998 interview included the following topics of discussion:

- Mr. Allen said, at the time of the interview, his father continued to drink vodka.

- Mr. Allen related, when he was eight or nine years old, his mother took the children and moved away from his father.

- Mr. Allen stated he had suffered head trauma after someone hit him with a nine millimeter Ruger with enough force to break skin.

- Mr. Allen told Mr. Simon he smoked "weed," explaining how he made blunts in a cigar. ECF No. 338 at 113:10-13. Mr. Allen further said he "could get high every day," and he had passed out a "[c]ouple of times" from using marijuana. Exhibit 500 at 50-51.

- Mr. Allen said his mother experienced periods of depression, disabling her from performing certain activities.

- Mr. Allen relayed an incident in which he boxed with his maternal uncle, Jerome Petty, slipped on wet grass, and hit his head on a gate. At the time of the interview, Mr. Allen indicated he still had a scar from this injury.[21]

- Mr. Allen said, after smoking marijuana with his friend, Johnnie Grant, he would telephone Juanita Allen. Juanita Allen would come retrieve Mr. Allen, because she did not want him to walk home alone, even though Johnnie Grant's house was "right down the street" from the Allen household. ECF No. 338 at 119:24.

---

[21] Mr. Simon testified he could not recall Mr. Allen ever stating his uncle beat him, adding, "I'm also aware that people who are domestically abused come up with excuses like that to avoid getting their family members into trouble." ECF No. 338 at 114:15-17.

- Mr. Allen did not make negative comments about his mother, and, on at least one occasion, described her as someone who "was there for him." ECF No. 338 at 120:18-21.

Also on January 7, 1998, Mr. Simon met with witnesses to discuss the case at 9:00 P.M. *See* Exhibit 498 at 6. Specifically, he went to the Allen home on Cote Brilliante, where he spoke with Juanita Allen, Deborah Ruffin, Otha Petty, possibly Mr. Allen's sister Yvette Allen, and someone identified as "Oreo." ECF No. 338 at 105:10-21. Mr. Simon testified he noticed an odor of alcoholic beverages in the room, but could not attribute it to any particular person. However, he believed Juanita Allen was impaired that day, based upon her speech. Mr. Simon stated, aside from this incident, he could not recall any other time when he believed Juanita Allen was impaired; he testified he interacted with her four or five times, and spoke with her on the telephone "a small number" of times. ECF No. 338 at 109:13-14.

Mr. Simon's notes from the meeting indicate Juanita Allen said, "Bill don't come from a bad environment." Exhibit 500 at 60. She further told Mr. Simon she smoked, but did not drink, when pregnant with Mr. Allen; she added, "You're looking for something extremely negative[.] There is no complete diagram for any situation." Exhibit 500 at 61. Mr. Simon testified he did not ask Juanita Allen whether she drank while pregnant; rather, she volunteered such information unprompted. After reminding Mr. Simon that "prenatal alcoholic mother" is the first topic on the mitigation checklist, counsel for the Government asked, "So it's your memory that on January 7th, you're meeting with Juanita Allen and the other folks, and she just spontaneously tells you, 'I didn't drink when I was carrying Billie, but I did smoke when I was carrying Billie.'" ECF No. 338 at 192:3-10. Mr. Simon responded, "That – That is my recollection." ECF No. 338 at 192:11.

On January 8, 1998, Mr. Simon interviewed Mr. Allen again, "re: mitigation + discovery," for an additional 1.4 hours. Exhibit 498 at 7. During the interview, Mr. Simon asked Mr. Allen whether his mother drank, to which Mr. Allen responded, "She stays stressed out." ECF No. 338 at 123:9-11. Mr. Simon opined Mr. Allen was implying that Juanita Allen chose to "stay stressed out" rather than self-medicate with alcohol. When asked, "And is your interpretation based on your interaction with Billie Allen on January 8th of 1998?" Mr. Simon answered, "No. It's simply based on my knowledge of English prose." ECF No. 338 at 124:7-10. Mr. Simon could not recall a time when Mr. Allen indicated his mother drank.

### 2. "The Life History of Billie Jerome Allen"

Dated January 8, 1998, a 3.4-hour entry on Mr. Simon's billing records reads, "Prepared life history of client." Exhibit 498 at 7. Mr. Simon testified, in preparing the Life History of Billie Jerome Allen, he used information gleaned from the interviews of Mr. Allen, conducted December 12, 1997, January 7, 1998, and January 8, 1998. He also used "spot checks that [he] did of other witnesses for purposes of filling in blanks." ECF No. 338 at 126:2-3. The Life History is extensive. Its contents are summarized as follows.[22]

Mr. Allen was born on June 18, 1977. He and his sisters Nicole, Angela, and Yvette were the children of John Allen and Juanita Allen. John Allen also fathered a child out of wedlock. He drank vodka "all the time," and Mr. Allen could tell he "was drunk because of the way he walked." Exhibit 303. John Allen did not abuse Juanita Allen. He did, however, sell drugs.

---

[22] The Court notes the ensuing summary is a further exemplification of the extensive work conducted by Mr. Simon during his preparation of material for the mitigation phase of the trial.

At the age of three or four, Mr. Allen ingested lead, and medical records show a diagnosis of pica, "a perversion of appetite with ingestion of material not fit for food, most commonly starch, clay, ashes, or plaster." Exhibit 303 at 2 (internal adjustments omitted).

When Mr. Allen was eight or nine years old, his mother moved out due to arguments with her husband, taking the children with her, although she and John Allen never legally divorced. She took her children to Otha Petty's home on Cote Brilliante, in a drug-infested neighborhood. Mr. Allen spent much time at the home of his paternal grandmother, Rachel Allen. His uncles assumed, in part, a fatherly role in his life, but one of them sold drugs.[23] Mr. Allen reported he boxed with his uncles in the street, and denied his uncles hit him in the head. Mr. Allen also denied "having run away or having been thrown out of his home at any time." Exhibit 303 at 3. After the house shooting on January 31, 1997, he began staying at the homes of various girlfriends, in part for his family's safety. As a result, his mother filed a missing persons report.

Growing up, Mr. Allen, along with his family, was active in one or more churches. He was baptized and attended Sunday school and Bible school camp. He became involved in Boy Scouts of America, and he had a Scoutmaster who had passed away. Although he earned several merit badges, Mr. Allen never acquired the rank of Eagle Scout; he could not earn the Physical Fitness, Swimming, or Lifesaving badges, due to his asthma and inability to swim.

Mr. Allen initially attended Clayton schools, and took a liking to art. He reported his teachers and administrators knew he was the kind of student "who would do anything [they] asked him to do." Exhibit 303 at 7. In elementary school, one of his drawings won an art contest. Additionally, he played the baritone horn, and attempted to play soccer and tennis. In

---

[23] At trial, the uncles who played a positive role in Mr. Allen's life were called to testify; the uncle who sold drugs was not.

sixth grade, Mr. Allen had an asthma attack, resulting in hospitalization. He played softball for a while, and his coach, Sam Moore, "got [Mr. Allen] to go outside, which he had previously dreaded." Exhibit 303 at 8. Mr. Allen "could not play outfield or run bases [presumably] because of his asthma." Exhibit 303 at 8 (bracketed material in original). Mr. Allen "stopped participating in softball when he realized that he could not actually play it any more." Exhibit 303 at 8.

After starting high school for about one month, he transferred to Sumner High School in the City district, as his sister Nicole had done. Mr. Allen became a "B" team player on the basketball team. He attributed his inability to "play the same as a regular player" to his asthma,[24] and he quit the team. Exhibit 303 at 8. At Sumner, he became bored, because he was ahead of his peers academically, and his teachers covered materials he already knew. He was also "picked on" at Sumner. Exhibit 303 at 6. Thus, he attempted, unsuccessfully, to transfer back to the Clayton School District. He began cutting classes, but the administration at Sumner did not notify his parents. Eventually, he dropped out of school, after an incident in which another student was shot. Juanita Allen then enrolled Mr. Allen in a Job Corps program, including a GED course. However, the Job Corps program dismissed him for failure to conform to its schedule.

Mr. Allen collaborated with his friend Ahmed Oliver to make rap music; Ahmed Oliver acted as producer while Mr. Allen was the main vocalist. Mr. Allen was in a music group called "Unlawful Entry," which he eventually left because it contained too many people. He won an open-mike competition at an establishment called "Cloud Nine," and the owner discussed hiring

---

[24] Mr. Simon's handwritten notes state, "Raymond [Petty]: He had outgrown asthma by this age. He used [illegible] as excuse." Exhibit 303 at 8.

him to perform some music-related work.  Mr. Allen wrote and publicly performed a rap piece about robbing an establishment called the "Casino Queen."  At the time of the bank robbery, he was working with a producer known as "Flexx."

According to Mr. Allen, he had a number of girlfriends, and had sex with several of them. He said his mother "warned him of the dangers of getting AIDS . . . and of getting a girl pregnant."  Exhibit 303 at 10.  Mr. Allen did not have a large number of friends; he kept to himself.  "His principal friendship was with Marquis, who was fatally shot in front of him." Exhibit 303 at 10.  Mr. Allen and Marquis played basketball together, and spent nights at each other's houses.  Marquis's stepfather, a drug dealer, taught Marquis and Mr. Allen how to sell drugs.

Mr. Allen did not have steady employment.  For about one and one-half months, he worked at Chemisco, where he was exposed to toxic chemicals.  His job at Chemsico "did not work out due to limits on his activity stemming from his asthma." Exhibit 303 at 11.

The Life History indicates Mr. Allen suffered a number of traumatic events in his life. Approximately three years before Mr. Simon composed the Life History, "[s]omeone shot at him and others[.]" Exhibit 303 at 12.  While in front of his mother's house, a man struck him in the back of the head with a Ruger nine millimeter handgun, breaking skin and possibly causing unconsciousness.  Mr. Allen reported having chronic headaches after this incident.  Additionally, he knew several people killed in acts of violence.  "The principal trauma in [his] life was the shooting death of his closest friend, Marquis, in front of [his] friend's house."  Exhibit 303 at 12. Marquis died at the scene, in front of Mr. Allen.  Mr. Allen relayed he had not been "right" since Marquis's death.  Exhibit 303 at 12.  On January 31, 1997, "some people shot up [Mr. Allen's]

mother's house over a drug deal gone bad." Exhibit 303 at 12. "Since well before the bank robbery, [Mr. Allen] . . . had nightmares about getting shot." Exhibit 303 at 13.

Mr. Allen lacked a record of juvenile incarceration. He reported, however, he "took the rap for a tampering charge for his friend Marquis, because Marquis could not stand up for himself, *i.e.*, fight, in jail." Exhibit 303 at 13. Mr. Allen received two years of probation for this offense. He said he did not drink until one year before the bank robbery. He further stated he smoked approximately one ounce of marijuana weekly, but did not use hard drugs. He recalled two incidents in which he passed out due to smoking marijuana.

Notably, the Life History omits certain topics. It does not allege Juanita Allen drank alcohol. It does not say Mr. Allen's mother abused him. Although it discusses Mr. Allen's nightmares about gun shootings, it does not allege Mr. Allen had nightmares about Juanita Allen, Jerome Petty, or Otha Petty abusing him. Additionally, Mr. Simon did not include information concerning Mr. Allen's history of drug dealing. When asked whether such information would have aided the Government, he answered, "Oh, yes. It – It was necessary for the defense. It would also have been helpful to the prosecution." ECF No. 338 at 98:17-18.

### 3. Weeks Leading to Trial

In a letter to Mr. Sindel dated January 9, 1998, Mr. Simon expressed concern regarding the lack of communication with Dr. Haney. He also stated, "As you are aware, I am doing a good deal of work on mitigation," and he indicated he planned to conduct an "interview" of Mr. Allen's aunt, Lucy McLemore, in two days. Exhibit 251 at 2. At the Hearing, Mr. Simon attempted to minimize this communication by contesting the terms "good deal" and "interview." He explained,

> 'Good deal' reflected what we've talked about today here. I had conducted the – what – what I agreed to be interviews with Mr. Allen. I had done the spot checking with the other people. As of this point, I would have done the first draft of the life history, and I had arranged for a phone call with Ms. McLemore, possibly an in-person meeting, but it looks more from the record like it was a phone call on the 11th, to answer spot questions. So it – A 'good deal' is not an objective term.

ECF No. 338 at 198:20-199:3. Regarding the planned "interview" with Lucy McLemore, Mr. Simon added, "I used the word 'interview' for the mock-up that was reflected on the marked-up version of the life history." ECF No. 338 at 199:23-24. Notwithstanding his billing statement refers to these meetings as "interviews," Mr. Simon insisted on calling them "spot questions" or "meet-and-greets" at the Hearing. ECF No. 338 at 200:1-8. He attempted to reconcile his discrepancies by stating, "This difference in nomenclature reflected the knowledge that I had gained between Mr. Allen's trial and the present time." ECF No. 338 at 200:13-15.

Mr. Simon examined his notes from the January 11, 1998 discussion with Lucy McLemore. He said the purpose of speaking with Lucy McLemore was to find out information about Mr. Allen's baptism. When asked, "[D]id you interview her for any other purpose -- did you ask her questions about anything other than where was he baptized?" Mr. Simon answered, "It would be my evidence that I did not interview her at all." ECF No. 337 at 253:12-17. He then qualified his answer with the following:

> However, I would have gone beyond that one question in order to lay a foundation for why I was asking that one question, and I would have taken advantage of the opportunity. But the latter part – the latter reference, taking advantage of the opportunity, that was for purposes of acclimating her to me and me to her as a trial advocate, not as a panty waste [sic] mitigation investigator.

ECF No. 337 at 253:19-25. When reminded Lucy McLemore identified her family members for Mr. Simon, he responded, "That would have been volunteered." ECF No. 338 at 202:7. He expounded, "My – my objective was exactly as I've described it here. It was to fill in the blank

73

in the life history.  If the lady was willing to give me more information, I was willing to write it down."  ECF No. 338 at 202:11-14.  He eventually admitted, however, he obtained information about Lucy McLemore's three brothers, her two sisters, her children, including their college attendance, the time of Juanita Allen and John Allen's marriage, and the time Juanita Allen moved into Otha Petty's home.  Once again, Mr. Simon's attempt to minimize his effectiveness in gathering mitigation evidence was patently ineffective.

The same day, Mr. Simon met with Raymond Petty.  Mr. Simon said his "purpose" was to obtain information about Mr. Allen's involvement in the Boy Scouts of America.  ECF No. 338 at 208:23-209:1.  Reviewing his notes from the encounter, however, he agreed Raymond Petty discussed other matters that day, as well.  Specifically, Raymond Petty mentioned Mr. Allen's interest in basketball; Mr. Simon's notes read, "Bill would curse; could be wild; [Raymond Petty] could tame him down; would still have temper tantrums; missed games because of attitude."[25]  ECF No. 338 at 210:18-21.  In an attempt to minimize his substantial efforts in conducting a mitigation investigation, Mr. Simon added,  "[T]hat [information] would have – that would have been volunteered, I can say for sure . . . because I was there on a specific mission, and I had accomplished it by that time."  ECF No. 338 at 211:10-14.  Further examining his notes, he agreed Raymond Petty told him Mr. Allen and Jerome Petty were "very close," and Mr. Allen had outgrown his asthma, a fact noted by hand on the Life History.  ECF No. 338 at 212:3-20.

---

[25] Mr. Simon could not recall whether these notes were "about basketball or just some general comment."  ECF No. 338 at 210:25-211:1.

When asked whether he interviewed anyone other than Raymond Petty and Lucy McLemore, Mr. Simon continued to avert recognition of any effort in preparing a thorough Life History, stating,

> I had verbal interactions with several other people but no interviews except with Mr. Allen.  There was a meeting at Miss – at the home of Otha Petty, Sr., which was also the home of Ms. Juanita Allen, at which I met approximately six people.  And even at that early stage in my career as a capital defense advocate, I would never have interviewed anyone with that many people in the room.  I would have done it one on one.  So I had the same similar – I had the same pattern of humanizing interaction as a prospective trial advocate with them as witnesses falling far short of what I would categorize as an interview.

ECF No. 337 at 254:9-19.  Mr. Simon stated, in preparing the Life History, he did not attempt to impeach information given to him by Mr. Allen; rather, he merely "fill[ed] in gaps, gaps that existed in Mr. Allen's memory."  ECF No. 337 at 263:22-25.  In sum, Mr. Simon testified the Life History of Billie Jerome Allen was "self-reporting."  ECF No. 337 at 263:25.

On January 12, 1998, Ms. Caspari-Supranowich sent a facsimile transmission to Mr. Simon.  *See* Exhibit 328.  In it, she asked Mr. Simon to send her "letters from Juanita."  Exhibit 328.  At the Hearing, Mr. Simon was shown five letters, all written by Mr. Allen and addressed to Juanita Allen.[26]  Mr. Simon testified he lacked any recollection of these letters, and could not say whether he forwarded them to Ms. Caspari-Supranowich upon her request.

Over the next few days, relations with Dr. Haney fell through.  On January 15, 1998, Dr. Randall was appointed mitigation specialist, and communications between Dr. Randall and the trial team began immediately.  In a January 19, 1998 facsimile transmission, Dr. Randall told Mr. Simon, "I have found from my experience that it's best for me to discuss, arrange, and conduct initial interviews with the family members by myself, as it gives me a chance to develop a

---

[26] For a thorough discussion of the content of these letters, *see* Section III.E.3.

rapport with these people and gives me a better feel for the mitigation case." Exhibit 340. In a correspondence dated the following day, Mr. Simon relayed this information to Mr. Sindel, *see* Exhibit 343, but added,

> Of course, it is too late for Dr. Randall to conduct an *initial* interview with several of the family mitigation witnesses, as I interviewed them on Dr. Heaney's [sic] dubious watch. I take Dr. Randall's fax of yesterday as an indication that I should not contact these witnesses or potential witnesses again until he has himself interviewed them.[27]

Exhibit 343 at 1 (emphasis in original). Mr. Simon testified, from the time he received Dr. Randall's fax, he generally allowed Dr. Randall to conduct interviews alone.

Mr. Simon's correspondence to Mr. Sindel continued. Specifically, he suggested the trial team file a motion for continuance. He explained,

> I realize you do not believe the motion will be granted. That would be the Court's responsibility. If we file such a motion, and it is denied, we can cite the denial of the continuance as undermining subsequent decisionmakers' confidence in the likely result of the trial. Section 2255 counsel can point to the denial of continuance along with acts or omissions of trial counsel as 'cause' for failure to present additional evidence if any emerges or occurs to someone later. Because the judge's decision would be 'external to the defense,' section 2255 counsel would not have to prove that we were constitutionally ineffective in order to establish 'cause.' Giving them this second option would be in our client's interest.

Exhibit 343 at 2. At the Hearing, Mr. Simon confirmed his letter described what he characterized as "no fault ineffective assistance of counsel." ECF No. 338 at 243:24-244:2. Counsel for the Government then queried, "Your statement was, 'While this is an example of no fault ineffective assistance of counsel, that is a misnomer because there's really a third-party who's at fault.' And my question is: In this paragraph . . . , is the third-party that would be at fault the Court for denying the continuance?" ECF No. 338 at 244:14-20. Mr. Simon responded,

---

[27] Notably, Mr. Simon used the word "interviewed" when referencing "family mitigation witnesses."

"Yes.  In the context of this paragraph, that would be the third-party[.]"  ECF No. 338 at 244:21-24.  Counsel for the Government persisted, asking, "When you prepared this letter, did you believe that the denial of a continuance would create ineffective assistance of counsel without there being deficient performance by counsel?"  ECF No. 338 at 245:1-3.  Mr. Simon answered, "No, because I expected the continuance would be granted."  ECF No. 338 at 245:4.  On a third try, he agreed with counsel's statement "that if the Court denied the continuance, that would create ineffective assistance of counsel without actually showing that counsel did anything wrong[.]"  ECF No. 338 at 247:10-15.  Finally, when asked, "Do you believe that the mere denial of the continuance back at that time, without deficient performance by counsel, would create ineffective assistance of counsel?  Is that what you believe?" Mr. Simon responded, "Yes, but I also believe we were deficient."  ECF No. 338 at 248:1-5.

Mr. Simon assumed the task of preparing the motion for continuance.  In a January 27, 1998 facsimile transmission to Mr. Sindel and Ms. Caspari-Supranowich, he wrote, "I will proceed to create a motion for continuance.  Please fax or e-mail me the party line on Dr. Heaney [sic]."  Exhibit 352 at 3.  The following day, Ms. Caspari-Supranowich responded with a facsimile transmission to Mr. Simon.  In a "comments" section, she wrote, "Paragraph for motion.  Call if any questions."  Exhibit 354 at 1.  She attached a one-page document, which begins with the following paragraph:

> Mr. John Simon, appointed co-counsel on this case, has assumed responsibility for handling the penalty phase of trial while Mr. Richard Sindel is handling the guilt phase.  As part of his representation of Mr. Allen, Mr. Sindel hired Dr. Craig Haney as an expert in mitigation to consult on this case.

Exhibit 354 at 2.  At the Hearing, Mr. Simon said, "That's an incomplete characterization of the division of labor, because I was also doing the legal research, drafting and argumentation, while

Mr. Sindel was focusing on factual development." ECF No. 277 at 17:14-17. Mr. Simon added, "[I]t was my understanding that I would be presenting a substantial portion of the witnesses in the penalty phase. And at that time I thought that I might be doing the closing argument of the penalty phase." ECF No. 277 at 17:21-24.

Mr. Simon signed and filed the motion for continuance on January 29, 1998. The first page of the motion, which specifically contradicts Mr. Simon's Hearing testimony, reads, "As defense counsel for Mr. Allen have divided their work, appointed lead counsel for defendant Allen, Richard H. Sindel, is concentrating on the guilt-or-innocence phase, and appointed co-counsel, John William Simon, is concentrating on the penalty phase (if any)." Exhibit 32 at ¶ 3. At the Hearing, Mr. Simon agreed, "That is what this motion says. That was what I intended." ECF No. 277 at 20:18-19. He added, "I also as of this point, I still thought that I would be doing at least part of the penalty phase in court." ECF No. 277 at 20:19-20. The motion continues, "As part of his representation of Mr. Allen, Mr. Sindel hired Craig Haney, J.D., Ph.D., in early September 1997, at which time Dr. Haney agreed to consult with counsel regarding mitigation in this case." Exhibit 32 at ¶ 4. When asked, "You did not in your motion state that Dr. Haney's role was to locate, interview, and develop all the mitigation evidence, did you?" Mr. Simon answered, "No. There are many things that I knew or believed that I did not include in that motion." ECF No. 277 at 22:9-13.

The following day, Mr. Simon and Dr. Randall conferred for 1.9 hours concerning mitigation. At this meeting, Dr. Randall referred Mr. Simon to a book, *From Pain to Violence*, which suggests a causal relationship between childhood trauma and later violent activity. ECF No. 277 at 24:14-18. Mr. Simon admitted he purchased the book, and, by the end of January 1998, he believed "childhood trauma could lead to later criminal violent activity[.]" ECF No.

277 at 25:5-11. Mr. Simon testified he told Dr. Randall about Mr. Allen's use of marijuana.[28]

Mr. Simon stated he could not recall whether he told Dr. Randall "that Billie Allen's lying was symptomatic of a problem[.]" ECF No. 277 at 26:24-27:1. However, when asked, "Was Billie Allen lying to you in 1997 and 1998? And did you figure that out during that time period?" Mr. Simon responded, "I believe so, yes." ECF No. 277 at 28:11-14. Finally, he admitted Mr. Allen's lying constituted a "recurring issue" for the trial team. ECF No. 277 at 28:15-18.

On February 6, 1998, the Court issued an order authorizing the trial team to obtain an MRI of Mr. Allen. On the advice of Dr. Gelbort, the team ultimately cancelled the MRI. When asked, "And that's because Dr. Gelbort did not believe an MRI would show any brain damage, isn't it?" Mr. Simon responded, "My recollection of that is that he did not think that one test would be persuasive. I have no recollection of him telling me that there was no brain damage. My recollection is his issue was with one particular test." ECF No. 277 at 29:15-20.

Mr. Simon recollected meeting with Mr. Allen on February 6 and 7 of 1998. After reviewing his corresponding notes, he agreed Mr. Allen stated, "[Three] guys were trying to rob me[.] . . . They didn't know I had a .25 automatic[.] . . . They were trying to steal [money] and drugs." Exhibit 500 at 44. These statements pertained to the time Mr. Allen was allegedly struck by a pistol near his house. Additionally, Mr. Allen told Mr. Simon, "I am a convincing person. I can convince a person who saw a drug deal that he only saw somebody shaking hands." Exhibit 500 at 45.

Mr. Simon took handwritten notes of a conversation he had with Dr. Cuneo on February 14, 1998. At the time, Dr. Cuneo had conducted his initial "competency" evaluation of Mr.

---

[28] He could not recall whether he expressed a belief that Mr. Allen was brain-damaged.

Allen.[29]   The notes indicate Dr. Cuneo relayed he found Mr. Allen suffered from "PTSD" and "cannabis abuse."  Exhibit 378 at 1.  They also dictate Dr. Cuneo's words: "If I put in brain damage, that will be attacked."  Exhibit 378 at 1.  At the Hearing, Mr. Simon agreed these notes reflect a discussion related to mitigation, not competency.

Dr. Cuneo interviewed Mr. Allen a second time, on February 22, 1998.  After this evaluation, Dr. Cuneo and Mr. Simon conversed again.  Upon reviewing his notes, Mr. Simon agreed Dr. Cuneo (1) told him "Marquise [sic] Taylor's death is a dividing line," (2) discussed Dennis Noble's killing, (3) told him Mr. Allen was "scared to death,"(4) opined Mr. Allen and Marquis Taylor were "soulmates in each other's world, and after [Marquis Taylor] died, [nothing] was ever right," (5) discussed Mr. Allen's nightmares, (6) said he did not "see any trouble [with] PTSD," (7) indicated Mr. Allen's "[h]ouse was shot up over a bad deal," (8) discussed Mr. Allen's participation in Job Corps, (9) and conveyed Mr. Allen continued to deny he committed the bank robbery.  Exhibit 500 at 32.  Mr. Simon already knew most of this information from prior conversations with Mr. Allen.  Furthermore, counsel for the Government confronted him with a portion of his declaration, stating,

> [W]e asked Dr. Cuneo, who had already evaluated Mr. Allen for competency, to assess the presence of mitigating factors.  To opine on mitigation, he relied upon his prior competency evaluation, conversations with Dr. Randall, an interview with Mr. Allen's mother, and review of documents.

Exhibit 251 at ¶ 5.  The declaration fails to reveal Dr. Cuneo's second evaluation of Mr. Allen, and, at the Hearing, Mr. Simon conceded, "Yes, that appears to be omitted from this document." ECF No. 277 at 66:2.

---

[29] Dr. Cuneo's testimony made clear he evaluated Mr. Allen for much more than competency.

### 4.       Weekend Interview Sessions

Mr. Simon examined a document labeled "Allen Weekend Interview Schedule."  Exhibit 383.  He acknowledged on Saturday, February 21, 1998, 11 individuals were set for interviews with the trial team.[30]  *See* Exhibit 383 at 2.  Correspondingly, his billing statement indicates he spent 8.6 hours with Mr. Sindel and Dr. Randall, interviewing mitigation witnesses and discussing strategy.  For Sunday, February 22, 1998, 13 individuals were scheduled for interviews.  Mr. Simon's billing records list 8.2 hours devoted to interviewing mitigation witnesses for the same date.  Additionally, Mr. Simon spent 4.1 hours participating in witness interviews on February 23, 1998.  Aside from these weekend interview sessions, Mr. Simon spent 4.3 hours interviewing mitigation witnesses with Dr. Randall on February 24, 1998, 0.4 hour attending parts of Juanita Allen and Otha Petty's interviews on February 25, 1998, and one hour briefing Juanita Allen and preparing other witnesses on February 28, 1998.

Before reviewing his notes of these interviews, Mr. Simon testified he had limited knowledge of Mr. Allen's alleged child abuse at the time of trial.  He said he could only recollect a conversation with Dr. Randall, who said, "[T]here's a lot more going on here, [involving] the child abuse of Billie Allen."  ECF No. 277 at 12:10-14.  Mr. Simon agreed, "[T]he facts in the [habeas Petition] related to the alleged child abuse of Billie Allen by his mother were not known to [him] at the time of trial except for that conversation with Dr. Randall[.]"  ECF No. 277 at 12:20-24.

A review of his notes, however, leads to contrary conclusions from the testimony initially provided by Mr. Simon.  Of the interviewed witnesses, Deborah Ruffin, Marquis Taylor's sister

---

[30] The Allen Weekend Interview Schedule indicates one of these 11 interviews was eventually rescheduled for the following day.

Shimeka Taylor, Raymond Petty, and Lucy McLemore provided particularly relevant information, as summarized below.

<em>a.</em>      <em>Deborah Ruffin</em>

Deborah Ruffin told Mr. Simon she became friends with Juanita Allen when they worked together at the Saint Louis Public Library. She said, "Everybody I knew liked Bill. He would B.S. a lot. He doesn't tell the truth. Bill will shine you on. You have to read between the lines. Bill may not tell you the whole truth. Some people lie to avoid trouble." ECF No. 277 at 48:20-24. Deborah Ruffin said she was "shocked" to learn Mr. Allen was selling drugs, and she described John Allen as "not good" and "a drunk." Exhibit 500 at 11. She also discussed Juanita Allen's drinking habits; Mr. Simon noted, "Does Juanita have a problem w/ alcohol? She drinks, to excess, when she is in trouble." Exhibit 500 at 11. Upon reviewing these notes, Mr. Simon admitted his knowledge of Juanita Allen's alcohol consumption was not limited to the one occasion on which he smelled alcohol in her home on January 7, 1998. He further conceded Deborah Ruffin said Juanita Allen "g[o]t physical" with Mr. Allen, after examining a portion of his notes, stating, "She had to 'tighten Bill up' – get physical." Exhibit 500 at 15.

<em>b.</em>      <em>Shimeka Taylor</em>

Counsel for the Government asked Mr. Simon to examine his notes regarding Shimeka Taylor's interview. As counsel read the notes to Mr. Simon, he was asked to accept or refute them; the following exchange occurred:

Q      Did [Shimeka Taylor] tell you that, 'If Bill did something, he got the snot kicked out of him'?

A      Yes.

Q      'Got back around ten.'

A       Yes.

Q       'Bill cried.  Whipping and a punishment.  Early '90s, 12 to 13'?

A       Yes.  Yes, I see that.

Q       So does that refresh your recollection –

A       Yes.

Q       – that Shimeka Taylor did, in fact, tell you that, 'If Bill did something, he got the snot kicked out of him'?

A       Yes.  I'm surprised that didn't register before, but that's definitely what I transcribed.

ECF No. 277 at 52:23-53:11.

### c.       Raymond Petty

Confronted with his interview notes, Mr. Simon admitted Raymond Petty told him, "Juanita drinks when problems arise."  Exhibit 500 at 39.  Raymond Petty also said Juanita Allen "would use fists on" Mr. Allen. Exhibit 500 at 38.  He described a specific incident, in which Juanita Allen beat Mr. Allen with an extension cord; Raymond Petty estimated Mr. Allen was between the ages of 16 and 18 at the time.  Raymond Petty testified about this incident at trial.

### d.       Lucy McLemore

Mr. Simon's notes from Lucy McLemore's interview indicate she told him, when Mr. Allen was between the ages of 16 and 18, he stole items – he "w[ou]ld pick up things[.]" Exhibit 500 at 6.  She also said Mr. Allen and Juanita Allen "had a problem, as he got older, he thought he c[ou]ld stay out as long as he wanted to."  Exhibit 500 at 7.  When asked, "And did she also tell you that the family was dysfunctional, more subtle than in the usual case?" Mr. Simon answered, "That's the way I interpret it."  ECF No. 277 at 51:25-52:2.

### 5.     The Penalty Phase

After admitting the trial team considered evidence of Mr. Allen's PTSD, Juanita Allen's drinking habits, and her physical punishment of Mr. Allen, Mr. Simon was asked, "[I]sn't it true that the trial team just chose to work with the stronger evidence, which was the PTSD due to Marquis's death?" ECF No. 277 at 74:23-25. Mr. Simon flatly denied this contention. He testified, however, Dr. Randall advised the team not to employ the "trash-the-mother" defense. ECF No. 277 at 77:19-21. Mr. Simon opined the team avoided the "trash-the-mother" defense as a matter of necessity, "[b]ecause the trial team believed, correctly or incorrectly, that we could not alienate Mrs. Allen by making her the target of the penalty phase and still have the other witnesses we were relying on." ECF No. 277 at 78:5-8. Although he admitted Raymond Petty testified about the electrical cord incident at trial, he persisted, "We thought that the reality we were facing was that if we went with the trash-the-mother defense, we would burn the rest of our case, and that we could not do that. And it was beyond our power to do it." ECF No. 277 at 83:7-11.

Counsel for the Government presented Mr. Simon with a document titled, "Factors that Affected Billie's Life." *See* Exhibit 505. Mr. Simon denied he authored this document, but admitted someone from the trial team created it. It reads:

> Febrile Seizures/Phenobarbitol
> Lead Poisoning
> *Poor maternal role model*
> Genetic predisposition to addiction
> [S]evere learning and communication problems run in his family
> Difficulty learning in school
> No adequate intervention in school for learning problems
> Transition to Sumner dramatic
> *Physical abuse and beatings*
> Brutal Neighborhood
> Death of friends Dennis Noble and Marquise [sic] Taylor

84

Exhibit 505 (emphasis added).  When asked specifically to acknowledge "Physical abuse and beatings," Mr. Simon stated, "Of which there was evidence besides the allegations that Mrs. Allen had administered any of the abuse or beatings."  ECF No. 277 at 76:8-10.  Counsel for the Government asked Mr. Simon to explain, stating, "Are you saying the physical abuse and beatings listed here actually referred to something other than Juanita Allen?"  ECF No 277 at 76:19-20.  Mr. Simon answered,

> What I'm saying is that we considered it to be something that was not within our power to do to employ what Dr. Randall characterized as the trash-the-mother defense.  However, other people had beaten Mr. Allen, and we had evidence of that.  So we did not have to – we did not have to go with the trash-the-mother defense for that – for the beating of Mr. Allen to be an element of the penalty phase.

ECF No. 277 at 76:21-77:2.  In short, Mr. Simon testified, because the team had evidence Mr. Allen was abused by individuals other than Juanita Allen, the team could have "trashed" someone else.  When asked for specific evidence, Mr. Simon recalled only two incidents: (1) Mr. Allen's alleged pistol-whipping with a Ruger, and (2) Mr. Allen's alleged head injury while boxing with his uncle.  Mr. Simon admitted, in 1998, he did not characterize these alleged events as physical abuse.

Mr. Simon acknowledged some of the evidence actually presented at the mitigation phase of trial.  The trial team offered evidence Mr. Allen grew up in a drug-infested, gang-ridden neighborhood.  Additionally, Mr. Simon remembered about eight of Mr. Allen's teachers, including Joyce Eaton, testified; the teachers said they were fond of Mr. Allen, and described him as cheerful, and always willing to help.  He recalled Raymond Petty testified he had tried to serve as a role model for his nephew, and he became involved in Boy Scouts of America with Mr. Allen.  Mr. Simon believed Dr. Gelbort testified about Mr. Allen's exposure to toxic

chemicals at his place of previous employment.  Mr. Simon believed Ahmed Oliver testified about his collaboration with Mr. Allen to produce a rap tape in a studio, and about Mr. Allen's asthma attack and resulting hospital stay.  Mr. Simon agreed Tasha Valentine and her mother testified about Mr. Allen's admission to MSLPC.  When asked whether information from the December 12, 1997 interview was presented to the jury, Mr. Simon replied, "After I had presented it to the new mitigation investigator."  ECF No. 338 at 68:8-9.

Mr. Simon confirmed one of the themes developed for mitigation was the deaths of several people close to Mr. Allen.  He added, "That was one of the first things Dr. Randall brought to our attention."  ECF No. 338 at 81:14-15.  Specifically, Mr. Simon recalled evidence at trial concerning the deaths of Dennis Noble and Marquis Taylor.  He stated many witnesses testified at trial about the profound effect Marquis Taylor's death had on Mr. Allen, and agreed Dr. Cuneo "pegged [Mr. Allen's] post-traumatic stress disorder . . . on the concatenation of deaths [in Mr. Allen's life]."  ECF No. 338 at 83:1-2.

The trial team aimed to show the bank robbery constituted an out-of-character aberration in Mr. Allen's life.  Mr. Simon recalled the team attempted to keep out evidence of gang activity, and, in fact, obtained a court order for its exclusion.  Notably, Juanita Allen did not testify.  Mr. Simon averred, at the time he joined the defense team, he anticipated she would testify at the penalty phase; at the Hearing, he could not recall why the team opted out of calling her as a witness.

### 6.    Post-Conviction Impressions

In his declaration, Mr. Simon swore, "Prior to the mid-January exchange of letters with Dr. Haney, I did not generate, or assist in gathering, a social history for Mr. Allen."  Exhibit 251

at ¶ 3.  At the Hearing, when asked, "Now, in fact, you had generated a 14-page typed life history of Billie Allen based on hours of interview with him on December 12th of 1997, . . . January 7th and January 8th.  Is that correct?" Mr. Simon answered, "Yes."  ECF No. 338 at 185:24-186:3.  He also admitted, in preparing the Life History, he conversed with Lucy McLemore, Otha Petty, Raymond Petty, and an unidentified individual who helped him locate Wilson "Flexx" Hankins, and he acknowledged he had a group meeting with Juanita Allen, Yvette Allen, and Deborah Ruffin.  Mr. Simon testified these communications "were means to an end.  The end was to get Craig Haney into the game."  ECF No. 338 at 224:25-225:1.  When asked, "Rather than just call Mr. [sic] Haney, you chose to interview Billie Allen for hours on December 12th, January 7th, and January 8th.  Is that correct?" Mr. Simon answered, "That's correct."  ECF No. 338 at 225:9-13.  He later added, "There was a certain element of provocation or shaming to what I was doing, and eventually it worked."  ECF No. 338 at 227:16-18.

At the Hearing, Mr. Simon adhered to the accuracy of his declaration's allegation he failed to generate a social history.  He explained, "The life history is not a social history."  ECF No. 338 at 187:4.  He defined a life history as something "[n]arrower and shallower" than a social history, which would have included information about extended family members, and must be generated by a social worker or mitigation specialist with a psychology background.  ECF No. 338 at 217:14.  He admitted a social history would include everything in the Life History, but added, "it would run to ground the open questions that were left in the life history, and it would go farther out and longer back in the – in both sides of the family."  ECF No. 338 at 222:8-12.  Subsequently, Mr. Simon and counsel for the Government had the following exchange:

Q      And, Mr. Simon, what I'm trying to do is look at your life history and – that you prepared, and you tell me what's in your life history that would not be in a social history.

A      That is not a way to falsify the proposition that this was not a social history.

Q      No. I'm not asking you to falsify it. I'm asking you: What is in your life history that would not be in a social history?

A      The bulk of the self-reporting would not be in a social history.

Q      Okay.

A      The important thing is what would be in a social history that was not in the life history.

Q      Okay. And what would it be? What would be in the social history that was not in the life history?

A      Vetted third-party information, such as actual analyses of hospital records and school record, rather than occasional citations to individual data points supplemented by the client's self reporting that he – about his being a good student, a great artist and a great musician.

ECF No. 338 at 230:16-231:10. Mr. Simon acknowledged he used the mitigation checklist, but likened this to "[u]sing a cookbook instead of having attended culinary school." ECF No. 338 at 224:1-2. When asked, "Did you in your declaration indicate . . . that you had completed a life history but not a social history?" he responded, "There are many things I did not put in the declaration, but the life history was not a social history. That's lipstick on a pig." ECF No. 338 at 187:5-10. Subsequently, Mr. Simon testified, at the time he signed the declaration, he did not remember composing the Life History.

Mr. Simon was confronted with another portion of his declaration, which states, "I did not conduct mitigation interviews with those who knew Mr. Allen as a child or young man." Exhibit 251 at ¶ 3. In response, Mr. Simon continued to diminish his substantial mitigation

investigation and preparation of mitigation evidence. He testified he conducted "spot checks" and "meet and greets" with certain individuals, such as Lucy McLemore and Raymond Petty. ECF No. 338 at 232:17-18. When reminded he had discussed Mr. Allen's childhood, illnesses, church attendance, Boy Scouts involvement, basketball, and prenatal health, Mr. Simon said, "I took notes to that effect. As we've noted, some of those were volunteered." ECF No. 338 at 233:6-7. Counsel for the Government then asked Mr. Simon whether he believed the statement in his declaration was incomplete. He answered,

> Not in light of my intervening experience and my conduct of numerous mitigation interviews in which I did the entire Mitigation Checklist, plus the next edition of the Mitigation Checklist which I converted into a Word template so that I could go through it entirely with each family member in private.

ECF No. 338 at 233:13-18. Counsel for the Government tried again, and Mr. Simon admitted, "I believe that it's a statement that is liable to misconstruction." ECF No. 338 at 234:4-5. Finally, Counsel for the Government asked, "And at the end of your declaration, you certified that the facts set forth were true and correct to the best of your personal knowledge, information and belief, subject to the penalties of perjury. Is that right?" ECF No. 338 at 234:21-24. Mr. Simon answered, "Yes. And belief includes my definitions [of] 'mitigation interview' and 'social history.'" ECF No. 338 at 234:25-235:1.

### C. Connie Caspari-Supranowich: Paralegal for the Defense Team

The parties stipulated the Court may consider the deposition testimony of Connie Caspari-Supranowich,[31] recorded on November 16, 2011, as if she had testified in person at the Hearing. ECF No. 258. Ms. Caspari-Supranowich attended the University of Missouri-

---

[31] At the time of the criminal trial, her surname was Caspari. At the time of the Hearing, her surname was Supranowich. To avoid confusion, the Court refers to her surname consistently as Caspari-Supranowich.

Columbia for one year, and then entered a paralegal program through the American Institute of Paralegal Studies at Maryville Community College.  She received her certificate in May 1995.

Ms. Caspari-Supranowich testified it was her understanding Mr. Simon had the primary responsibility for preparing the penalty phase, and Mr. Sindel had the primary responsibility in the guilt phase.  She then added, "I just had a vague recollection that's how it was broken up." Exhibit 525 at 132:16-17.  Generally, she had little recollection of the criminal case.  She could not recall any specific communications with Dr. Haney, explaining,

> I don't know, because I don't specifically recall him on the Allen case.  I mean I see these letters that I wrote, but I really don't recall what involvement I had with him or he had on the case.  I just – there's three or four cases before the prison case, and I just don't have a good recollection of those cases.

Exhibit 525 at 45:16-22.  Similarly, Ms. Caspari-Supranowich lacked any specific recollection of her contact with Juanita Allen, other family members, or friends.

She did, however, agree she had some involvement preparing the mitigation case.  That is, she recognized her time records from September 1997 and October 1997.  She acknowledged a three-hour entry dated September 10, 1997, labeled "contact mitigation experts."  Exhibit 525 at 50:18-23.  In addition, Ms. Caspari-Supranowich recalled meeting with Mr. Allen "often." Exhibit 525 at 29:21-22.  Upon reviewing her time records, she agreed she met with Mr. Allen for four hours on September 12, 1997, and for 4.8 hours on September 19, 1997.  She could not recall what she and Mr. Allen discussed during these 8.8 hours.  She surmised she spent time talking about his personal life, and attempting to build a rapport.  Upon further questioning, she added, "I'm not trying to say that that's all we talked about or that that was in any way the purpose of going to meet with him.  I am very sure that we talked about items that pertained to his case.  I just don't know what those items were."  Exhibit 525 at 59:3-7.

Ms. Caspari-Supranowich also recognized a memorandum she wrote to Mr. Sindel on January 13, 1998, expressing her "frustrations with Billie's complete inability to tell the truth." Exhibit 332. When asked to explain the "frustrations" that led to this memorandum, she testified,

> Again, I know this is frustrating for all of us, I don't know specifically, specific examples, but you know, I do just recall that there was a general sense of I believe we were given information from Billie that just didn't pan out when we would check it, check up on it or follow up on it, and it was frustrating.

Exhibit 525 at 85:19-20. Similarly, Ms. Caspari-Supranowich testified she did not know whether she "established a good rapport" with Mr. Allen. Exhibit 525 at 61:7-9. When asked, "Do you have any recall [sic] of any negative interactions with him, where he blew up at you, got angry at you, called you a name?" Ms. Caspari-Supranowich answered, "I don't. But I don't recall any positive ones either." Exhibit 525 at 61:10-14. Records show, in slightly over two weeks, Ms. Caspari-Supranowich spent about 18 to 19 hours with Mr. Allen.

Approximately three years prior to her deposition, Ms. Caspari-Supranowich was contacted by an investigator for the purpose of giving a habeas declaration. She met with the investigator on two occasions, and, during these times, was presented with documents she had either generated or received at the time of the criminal case. The declaration she signed was based on information she supplied, and was prepared by another individual. She signed it without making any changes.

### D. David Randall, Ph.D.: Mitigation Specialist

David Randall, Ph.D., obtained his bachelor's degree in psychology from Muhlenberg College in Pennsylvania, and his master's degree in psychology from Fairleigh Dickinson University in New Jersey. In 1994, he received a doctorate degree in clinical psychology from

the University of Health Sciences, Chicago Medical School in Illinois. Dr. Randall estimated he began working as a private mitigation consultant in 1989. Prior to representing Mr. Allen, Dr. Randall had worked on about 60 other cases. Since 2001, he has maintained employment as a clinical psychologist with the Hawaii Department of Education. In 2005, he became a licensed psychologist.

### 1.    Chronology of Dr. Randall's Involvement in the Criminal Case

On January 15, 1998, Dr. Randall received a telephone call from Ms. Caspari-Supranowich, informing him the trial team needed a mitigation expert for a case with an upcoming trial date. Based upon what he heard from other trial team members, he believed "there was very poor communication between counsel and [Dr. Haney]. And that led to my conclusion that they dropped the ball on the case, because in my experience that should never have happened." ECF No. 277 at 191: 3-7. He testified he was initially reluctant to join the case:

> The – in my experience over a ten-year period working on the capital cases, I would say that I would have at least a year to work on a case to work it up to the point where we were ready to present at a penalty phase.
>
> This was a highly unusual situation because for whatever reason their mitigation expert – I don't know if he bailed, but he was no longer available at the very last minute, three weeks before a trial. So that was very, very unusual, because these cases take a lot of time to prepare, a long time to prepare typically.
>
> And so I was reluctant to sign on because of that situation.

ECF No. 277 at 161:6-17. Dr. Randall joined the case with the understanding the trial team would request a continuance, explaining, "[Mr. Sindel] was persuasive enough that I signed on, that I said, I will do – you know, I'll try to help, and we're going to need to get more time. We're going to need to go in and try to get more time." ECF No. 277 at 163:18-22. He

admitted, however, he did not condition his involvement on obtaining a continuance, and no one ever told him the Court would grant one.

The next day, he was appointed to Mr. Allen's case. Dr. Randall testified, at the time of his appointment, other trial team members included Mr. Sindel, Mr. Simon, Ms. Caspari-Supranowich, and Andy Rackers.[32] He believed Dr. Cuneo had evaluated Mr. Allen for competency by this point. Upon joining the team, he immediately sent Mr. Sindel a retention letter, and a correspondence advising of his willingness to commence work as soon as the following day. *See* Exhibits 336, 339. The day after his appointment to Mr. Allen's case, Dr. Randall left his home in Evanston, Illinois to meet with Mr. Sindel and Mr. Allen in Saint Louis.

Dr. Randall testified the case was at its "most basic stage" when he was appointed, ECF No. 277 at 162:25-163:1, and the trial team was "up the creek." ECF No. 277 at 163:4-8. He said the team had collected "some school records, some medical records, some jail records. There was this document called a Life History of Billie Allen that was drafted by Mr. Simon." ECF No. 277 at 162:2-6. In addition to these documents, Dr. Randall received contact information for Juanita Allen and Otha Petty. *See* Exhibit 335. At the Hearing, Dr. Randall maintained the mitigation investigation "was at the most beginning phase [when he was appointed.]" ECF No. 277 at 167:19-20. He explained, "[T]here were no witness transcripts. There were no – there's nothing developed, especially given that this was many, many months into the case at this point." ECF No. 277 at 167:25-168:2.

Initially, Dr. Randall testified he received limited mitigation information from Mr. Sindel. He said he received nothing from Mr. Sindel about Juanita Allen's social history, and nothing concerning investigative efforts to develop the mitigation case. When asked, "Was there

---

[32] Dr. Randall said he had "zero" interaction with Andy Rackers. ECF No. 277 at 218:17-18.

any indication that any member of the trial team had a conversation with Juanita Allen about possible abuse and neglect of Billie Allen?" Dr. Randall answered, "I saw no evidence of any kind of communication like that." ECF No. 277 at 192:4-8. Similarly, Dr. Randall stated no team member informed him of any conversation about child abuse with other family members. He testified the only time he learned of potential abuse occurred when Raymond Petty mentioned an incident involving an electrical cord.

On cross-examination, however, Dr. Randall conceded several points that contradicted his claimed lack of mitigation information. First, he admitted Mr. Allen was 19 years old at the time of trial, had spent his entire life in Saint Louis, and had attended only two school districts. In light of these facts, counsel asked, "There weren't a voluminous number of records to start off with, right?" to which Dr. Randall answered, "I would say that much of the records that were available were collected by counsel before I entered. There are some records that I believe still remain elusive, but they secured most of them." ECF No. 326 at 150:18-23. Additionally, Dr. Randall reviewed an interview transcript, in which Juanita Allen relayed to Mr. Sindel information about Mr. Allen's medical history, school history, and mental health. Counsel for the Government then asked, "Now, is it your testimony that Rick Sindel never gave you any information about Billie Allen, Juanita Allen, or the family at any time?" Dr. Randall replied, "That would be incorrect." ECF No. 326 at 151:15-20. He also testified, although he could not recall specific conversations, he was "sure" Mr. Sindel relayed information to him concerning the shooting at Juanita Allen's house and Mr. Allen's medical history, including lead poisoning and mental health issues. ECF No. 326 at 151:24-152:24.

Dr. Randall discussed the importance of building a rapport with mitigation witnesses. When asked whether Mr. Simon and Mr. Sindel had established a rapport with Juanita Allen at the time he joined the team, Dr. Randall answered, "My sense was that they had established like a basic rapport with her, like keeping her in the loop about dates and times and, you know, things of that nature." ECF No. 277 at 197:15-17. He said, when he joined the case, he did not feel comfortable broaching "more serious" subjects of mitigation with Juanita Allen. ECF No. 277 at 198:3-17.

Dr. Randall opined the Life History written by Mr. Simon was "pretty sparse[.]" ECF No. 277 at 169:7. He said he "ha[s] trouble calling it a Life History," but acknowledged "that document was sent to [him] during [his] initial contact with counsel's office." ECF No. 326 at 153:20-22. He stated,

> [I]t's highly incomplete. It would be as if I was doing a psychological evaluation, writing in the name of my client, the date, and his birthday and all that. And then there would be subheadings that I would do in an evaluation, and there might be a little like sentences [sic] there under the subheadings, but there would be nothing really flushed out at all, you know, in the document. . . . Then I would save the document and then I would work on it later and flush it out as time went on in my evaluation. With this, I'm glad that – I mean, this is something that is conscientious on Mr. Simon's part to have done, but it's a start, you know. It's a very basic start.

ECF No. 277 at 169:7-21. Dr. Randall further testified a "complete" life history would include "more detail" and "more information," but Mr. Simon's Life History contained only "leads to pursue." ECF No. 277 at 170:8-24. He said Mr. Allen served as the source for most of the information in the Life History; based on conversations he had with other trial team members, Dr. Randall believed Mr. Allen frequently lied. On cross-examination, however, Dr. Randall

reviewed the topics covered by the Life History, and agreed they were all relevant to mitigation. He also admitted he "pursued" these "leads" to the extent he could. ECF No. 326 at 157:18-19.

Based on the Life History, Dr. Randall testified he believed Mr. Simon spoke with several individuals regarding Mr. Allen's background. These individuals included Raymond Petty, Juanita Allen, Lucy McLemore, Otha Petty, Yvette Allen, Deborah Ruffin, and a secretary for the church that sponsored Mr. Allen's Boy Scouts involvement. Dr. Randall acknowledged the Life History contained contact information for Mr. Allen's mother, grandfather, grandmother, and sisters, a minister, other Boy Scouts members, a Scoutmaster, Ahmed Oliver, Sam Moore, Johnnie Grant, Wilson "Flexx" Hankins, and an individual named Prentiss Church. After reviewing these contacts, Dr. Randall was referred to a portion of his habeas declaration, which stated, "No attempts had been made to begin the laborious process of generating Mr. Allen's social history" when he joined the team, and he was asked to reconcile this statement with his Hearing testimony. Exhibit 254 at ¶ 7. Dr. Randall explained:

> I would call it an exaggeration. I would say that that's what it felt like when I entered the case. I would say that what was provided was mostly based on interviews with Billie, mostly, and that it was leads to pursue. So I was provided with some background information. . . . I would say the sentence is incorrect as stated. The word 'no' is too black and white.

ECF No. 326 at 167:8-20.

Dr. Randall acknowledged he "probably" received a copy of Mr. Allen's handwritten autobiography from the trial team. ECF No. 326 at 158:19. In it, Mr. Allen discussed his close relationship with Marquis Taylor. He graphically described Marquis Taylor's death, and the profound, traumatic impact it had on his life. Mr. Allen also mentioned his artistic skills, his athletic skills – purportedly limited by his asthma – his lack of father figure, and the prevalence

of gun violence in his life. When asked if this information constituted useful mitigation evidence, Dr. Randall answered, "It would be areas you would want to explore." ECF No. 326 at 161:3. Dr. Randall admitted the autobiography contained no allegations of child abuse by Juanita Allen, but added, "I never asked him, and he didn't tell me." ECF No. 326 at 162:10. When asked, "Was that a deliberate action on your part to never ask him?" Dr. Randall answered, "No, it was a major lapse on my part." ECF No. 326 at 162:11-13. Later, however, Dr. Randall was confronted with his habeas deposition, in which – in contrast to his current testimony – he testified he could not recall whether he asked Mr. Allen about potential childhood abuse.

On January 17, 1998, Dr. Randall met with Mr. Allen. After reviewing his notes of this interview, Dr. Randall agreed Mr. Allen had provided names of seven jail guards, his mother, his grandfather, some uncles, his grandmother, his girlfriend, his sisters, and Sam Moore. When asked whether this information was "remarkably similar" to the information obtained by Mr. Simon, Dr. Randall answered, "There is overlap, yes." ECF No. 326 at 168:17-21. He further admitted he had conducted "a much shorter version of what [Mr. Simon] did," and he did not obtain any medical records, which had been retrieved and transcribed before he joined the case. ECF No. 326 at 168:22-169:7. Dr. Randall was confronted with another portion of his habeas declaration, stating, "Only a few records on Mr. Allen and his family had been collected." Exhibit 254 at ¶ 7. He testified, "I would say that – again, I would say that probably most of the records were collected." ECF No. 326 at 169:18-19. He also admitted the team had already collected MSLPC records, Franklin County Jail records, Boy Scouts records, prior arrest records, and school records.

Regardless, Dr. Randall voiced dissatisfaction with the amount of records provided at the outset of his appointment. For example, when asked if he was aware of Dr. Cuneo's notes, stating, "Mom physically disciplined [Mr. Allen] until end," Dr. Randall said, "I should have been, but I don't recall." ECF No. 326 at 194:1-5. In addition, he expressed concern that he had unsuccessfully attempted to obtain Special School District records. Yet, he admitted no one had ever located those alleged records, the existence of which has not been confirmed. Finally, he conceded "no new records were found" after he joined the trial team. ECF No. 326 at 175:22-24.

Although he maintained he never asked Mr. Allen about parental abuse or alcohol consumption, Dr. Randall's notes from the January 17, 1998 interview seem to suggest otherwise. After Dr. Randall said Mr. Allen "volunteered" information about his father's drinking habits, ECF No. 326 at 202:11-12, he was asked to review a relevant portion of his notes, which he summarized as follows:

> I asked [Mr. Allen] about John Allen. He says, I just have contact with my grandmother, not his side of the family. They are drunks and alcoholics, all my cousins on his side are locked up. I don't mess with them. Staying drunk all the time, fighting. One cousin, his name is Cory Roy. He had got shot, locked up, all kinds of things. Now straightened out.

ECF No. 326 at 202:20-203:1. After reading this excerpt, Dr. Randall explained, "I don't recall the specific question that I asked, but this is my writing, so one can infer that either questions were asked or I could have said, well, tell me about your dad's side of the family. I don't know what specific questions I asked." ECF No. 326 at 203:7-11. Counsel then asked, "So when you say he volunteered it, you're just saying that he's answering questions that you're asking?" to which Dr. Randall said, "Yes." ECF No. 326 at 203:12-14. Dr. Randall continued to insist he did not ask Mr. Allen whether Juanita Allen drank.

On January 19, 1998, Dr. Randall sent Mr. Simon a facsimile transmission, introducing himself as the new mitigation expert. *See* Exhibit 340. He wrote, "I flew to St. Louis on Saturday, met with Rick Sindel and Connie Caspari, perused numerous documents, and had my first meeting with Billie Allen at the jail in Union." Exhibit 340. He further indicated he would telephone Mr. Allen's family members within the next two days, to arrange meetings with them. Before collaborating with team members and composing rough drafts of direct examinations, he wanted to conduct an initial round of interviews alone, to obtain "a better feel for the mitigation case." Exhibit 340. At the Hearing, Dr. Randall explained having more than one person conduct interviews could result in inconsistent results, and he needed "to take charge of the situation[.]" ECF No. 277 at 182:10-11. He testified another reason for conducting interviews alone was Mr. Simon's personality: Dr. Randall felt Mr. Simon "was a very cerebral, smart person, but his social sense was way off." ECF No. 277 at 180:23-24. Interestingly, though, on cross-examination, Dr. Randall admitted he had not met Mr. Simon at the time he sent this correspondence. He also acknowledged Mr. Simon "may have been present during the witness prep, I don't recall." ECF No. 326 at 101:24-25.

The same day, Dr. Randall sent Mr. Sindel a similar facsimile transmission, advising he would "fax John Simon today to apprise him of my involvement, and discuss the mitigation witnesses with him before I conduct my interviews." Exhibit 341. After reviewing this correspondence, Dr. Randall admitted he "had the written materials prepared by Mr. Simon about his so-called Life History, so [he] knew [Mr. Simon] talked to some people at this point in time." ECF No. 326 at 126:1-4.

On January 20, 1998, Dr. Randall telephoned potential mitigation witnesses and Dr. Cuneo. He sent a facsimile transmission to Mr. Sindel, reminding him to obtain a general court order allowing Dr. Randall visits with Mr. Allen. He further advised, "I'll be seeing [Mr. Allen] again sometime over the weekend. I'm meeting with Juanita [Allen] et al on Saturday and Sunday. I have a call into Dr. Cuneo so that I can coordinate my efforts with him." Exhibit 344. After meeting with Mr. Allen and Mr. Sindel, Dr. Randall flew back to Chicago to complete work on another case. He said, "[W]hen that case was over, I started full on working on Billie's case. . . . I decided to basically move down to St. Louis and throw myself completely into the case." ECF No. 326 at 22:14-19.

Dr. Randall examined his transcribed notes of an initial meeting with Juanita Allen, who reported she had received some written character letters and sent them to the attorneys. She provided contact information for Sam Moore, and she described her reaction to the bank robbery as "[d]isappointment, frustration. A whole lot of anger." Exhibit 411 at 1. She discussed Mr. Allen's association with Norris Holder, his desire to be a "street person," his affliction with pica, and his lead poisoning as a child. ECF No. 327 at 78:4. She said Mr. Allen had checked himself into a psychiatric ward.[33] Juanita Allen added, prior to the psychiatric visit, Mr. Allen had not contacted her since January 1997, after someone shot at her house; she said Mr. Allen left home, but did not say she forced Mr. Allen out of the house.

In addition, Juanita Allen told Dr. Randall about Mr. Allen's background. She had observed changes in Mr. Allen during his freshman and sophomore years in high school, and she had asked a counselor to speak with him. Regarding Mr. Allen's father, she said, "[He] wasn't a

---

[33] In fact, Mr. Allen did not check himself in, but his girlfriend and her mother brought him to a psychiatric ward, when they became concerned Mr. Allen was suicidal. Mr. Allen declined admission.

violent person. I'd be subject to get violent before [he] would." Exhibit 411 at 2. Dr. Randall's notes reflect Juanita Allen told him, "I'm going to back you, but not back you if your [sic] wrong. I'm there for my son, I love my son." Exhibit 411 at 2.

Dr. Randall stated he was attempting to get a sense of Juanita Allen's personality. When asked, "Was there anything that Juanita Allen said to you that made you suspicious that Mr. Allen had been abused and neglected?" Dr. Randall answered,

> I don't believe it was what she – it was more of the way she said things than what she said. Because I think in this initial meeting, she's not volunteering that she's, you know, beat her son, abused her son. And I'm not pushing her to tell me at this point. Because the sense I have of her, you know, at this point is [sic] this is a very angry woman who has been through a lot in her life, and she is – I don't know how much questioning she can – I got the sense that she couldn't tolerate specific questioning about her potential culpability in helping shape Billie in a negative way. In terms of – what I mean by that is bad things that she could have done to him at this point.

ECF No. 326 at 45:18-46:7. Importantly, a portion of Dr. Randall's notes from this interview state, "You don't want to see me angry." Exhibit 411 at 3. Dr. Randall understood that statement "as an indication that she could be violent[.]" ECF No. 327 at 92:23-25. Regardless, he insisted he did not ask her questions on sensitive topics. Thus, counsel for the Government presented Dr. Randall with his notes of a trial team meeting, stating, "Ask Juanita[:] was daddy sexually abusive?" Exhibit 496 at 1. Notwithstanding these notes, when asked, "Did you ask Juanita Allen if daddy was sexually abusive?" Dr. Randall answered, "I doubt it." ECF No. 326 at 201:9-11.

Dr. Randall believed he prepared direct examinations for "a bunch of" witnesses, as promised in his January 19, 1998 correspondence to Mr. Simon. ECF No. 326 at 232:5-6. The rough draft of Raymond Petty's direct examination reads, in part, "Do you recall any specific

incidents between Bill and his mother that stand out for you?  Please tell the jury about it."
Exhibit 506 at 4.  Dr. Randall acknowledged he designed this question to prompt a discussion of
the electrical cord incident.  He had further suggested Mr. Sindel ask the questions, "How does
Juanita deal with her feelings?" and "Does she drink?  When?"  Exhibit 506 at 3.  Dr. Randall
agreed Raymond Petty's anticipated answers would address Juanita Allen's use of alcohol to
cope with stress in her life.

On January 30, 1998, Mr. Simon and Dr. Randall met to discuss mitigation evidence.  Dr.
Randall read his bullet-pointed meeting notes as follows: "He wanted to follow Nicole to City
schools.  . . . He was a pot head. . . . His brain half fried. . . . Lying, symptomatic of a problem. . .
. MRI. . . . Boxing accident, febrile seizures, pistol whipped, pica, pot, headaches."  ECF No. 277
at 178:1-10 (internal quotations omitted).  He also acknowledged a notation, stating, "brain
damage?"  ECF No. 277 at 178:11, and he believed obtaining an MRI was his suggestion.
Furthermore, during this meeting, Dr. Randall recommended the book, *From Pain to Violence*;
he admitted, at the time of this meeting, he believed "in the theory that abuse of a child could
lead to a child's later violent activity[.]"  ECF No. 326 at 135:20-23.  He perceived this theory as
"[p]otentially relevant" to Mr. Allen's case.  ECF No. 326 at 136:1.  Notwithstanding this
admission, Dr. Randall maintained he never asked Mr. Allen whether he suffered abuse in his
childhood.  Later during the Hearing, however, he conceded he was "looking for evidence of
physical abuse."  ECF No. 326 at 197:25-198:1.

Counsel for the Government read a transcript of Mr. Simon's interview of Mr. Allen, in
which Mr. Allen stated he had a "good childhood" and his uncles largely helped in his
upbringing.  ECF No. 326 at 140:1-12.  When asked if this information was consistent with what

Mr. Allen told him, Dr. Randall replied, "I am not looking at my notes of my interviews with Billie. I can't tell you right now that it was consistent or not. My recollection is that I don't know if I got into this with him at all." ECF No. 326 at 141:2-5. Accordingly, counsel presented Dr. Randall with his interview notes, which, according to Dr. Randall, contained inconsistencies when compared to what Mr. Allen relayed to Mr. Simon. When asked to identify the inconsistency, Dr. Randall read a portion of his notes: "John Allen. Me and my dad didn't get along. I didn't associate with him. He wasn't there, didn't really spend no time with him. They split when I was five or six." ECF No. 326 at 141:20-23. Counsel then asked, "Now, Dr. Randall, why is that inconsistent with what it says here, which is that his father was gone?" to which Dr. Randall answered, "Well, he adds in what I had written down, that he and his dad didn't get along. He adds that the dad is over at his grandmother's house. . . . I would say it's additive, not necessarily consistent." ECF No. 326 at 141:24-142:9.

The trial team also moved for a continuance on January 30, 1998. In support of the motion, Dr. Randall submitted an affidavit, discussing his opinions about the services of a mitigation specialist. The affidavit states, "The role of the mitigation specialist in a capital murder case is to assist the attorney by conducting a thorough social history investigation[.]" Exhibit 35 at ¶ 7. Dr. Randall testified, to accomplish this, he would have to "investigate the client's life, not only from the client but also from people who know the client, collaterals. And that can be the whole nexus of people[.]" ECF No. 277 at 186:20-23. He explained his work involved finding "people who can tell Billie Allen's life story through their eyes basically, his life story, his social history through their eyes." ECF No. 277 at 187:12-14. He opined,

> [S]o you're going to want to find factors of like the seizures and the brain damage and history of head injuries, things of that nature. Learning disabilities. Did he have difficulty in school? And depending on what you find in the social history, that's going to guide what kinds of experts you're going to want to bring in.

ECF No. 277 at 187:20-188:1.

In its motion, the trial team requested an additional 120 days. Specifically, Dr. Randall's affidavit stated, "Realistically, I believe that a continuance of <u>at least</u> 120 days would allow for the adequate preparation of mitigation for a potential death penalty sentencing hearing, based on my appraisal of the work that remains to be completed in the Allen case." Exhibit 35 at ¶ 9 (emphasis in original). In contrast, Dr. Randall's habeas declaration states, "Although my affidavit suggested a continuance of 120 days, I actually did not consider this to be sufficient time to prepare a proper penalty phase. It would have merely provided breathing room." Exhibit 254 at ¶ 8. At the Hearing, Dr. Randall testified he underlined "at least," because, in actuality, he desired one year. Mr. Sindel advised the team to ask for only 120 days – a more obtainable goal. Dr. Randall was reminded, however, of his testimony during the motion for continuance:

> Q.     Is 120 days a reasonable approximation of the time that you believe necessary to do your job according to the standards of your professional specialty?

> A.     At this point I believe that would be sufficient.

Exhibit 36 at 10:1-4. The Court denied the motion for continuance the same day. At the Hearing, Dr. Randall said he knew, as of January 30, 1998, the case "was a go[.]" ECF No. 327 at 149:9-10.

Due to Mr. Allen's history of febrile seizures, pica, and head injuries, Dr. Randall decided a neuropsychologist could assist in the case. Aside from helping the jury understand how Mr. Allen reached the point of criminal behavior, a neuropsychologist could rebut an alleged notion of choice, or free will, offered by the prosecution. To Dr. Randall, the decision to

hire a neuropsychologist was "instantaneous," but, he testified, the trial team had not discussed this possibility prior to his joining the case. ECF No. 277 at 233:13. On February 2, 1998, Dr. Randall sent a facsimile transmission to Mr. Sindel, suggesting two potential neuropsychologists – one of which was Dr. Gelbort – to serve as experts. *See* Exhibit 362.

Two days later, Dr. Randall sent a facsimile transmission to Mr. Simon. Dr. Randall wrote,

> We need to get an MRI and neuropsychological assessment conducted on Billie because there have been events in his life that suggest the existence of brain impairment or injury. Brain impairment or injury can have a significant impact on learning, personality, and behavior, and its existence can be an important mitigating factor to be explained to and considered by the jury in sentencing.
>
> Events in his life that indicate possible brain/behavioral implications include: he has a history of 1) lead poisoning[,] 2) seizures, 3) head injuries resulting in loss of consciousness, 4) chronic headaches, and 5) drug abuse.

Exhibit 366. Dr. Randall provided an affidavit in support of hiring an additional expert. In the affidavit, he detailed the general obligations of a mitigation specialist; one of the obligations he described involved interviewing the client about "discipline in the home, including the form of discipline, how administered, frequency, by whom, and for what[.]" Exhibit 368 at ¶ 11. He also wrote the mitigation specialist should inquire of the client regarding

> any significant childhood experiences, including such things as death or serious injury of a family member or other significant person, divorce of parents, abandonment by parents and family, family violence, parental alcohol or drug abuse, or abuse of the client, including physical, sexual or emotional abuse[.]

Exhibit 368 at ¶ 11. When asked whether he questioned Mr. Allen about his mother's drinking habits, Dr. Randall stated, "Billie wasn't going to be testifying." [ECF No. 326 at 204:22]. Then, the following exchange occurred:

> Q.    Okay. In the affidavit that you filed about what a mitigation specialist should do, one of the areas that you shall ask the client about was parental alcohol

or drug abuse. And it's your testimony that you did not ask about Juanita Allen's alcohol or drug abuse; is that correct?

A. Given the time frame involved, I did not ask those questions.

Q. Okay. So you're in the jail with him, you're talking to him. We have your notes from January 17th. He's telling you, my dad's side of the family is drunk. You didn't have enough time to ask the question, how about your mom's side of the family?

A. I didn't ask it.

ECF No. 326 at 204:23-205:10. Later, after repeated questions regarding this topic, Dr. Randall finally conceded, "I would say on January 17th, 1998, time was probably not the variable, but overall in the course of the case time was the variable." ECF No. 326 at 206:10-12.

The Court issued an order, dated February 6, 1998, authorizing the services of a neuropsychologist and an MRI of Mr. Allen. *See* Exhibit 41. Accordingly, Dr. Gelbort was hired to conduct a neuropsychological assessment of Mr. Allen. Once Dr. Gelbort became involved, he advised the team "an MRI would perhaps not be all that informative because the impairments that Billie experienced are not as dramatic, let's say, as a motorcycle accident or, you know, where there's more severe head trauma, obvious head trauma." ECF No. 277 at 236:7-11. Dr. Randall recalled, as an alternative, Dr. Gelbort suggested a functional PET scan. Ultimately, however, neither an MRI nor a PET scan was pursued. Dr. Randall recollected Dr. Gelbort wanted more time: "He was concerned. There was serious time pressure for him." ECF No. 277 at 240:8-9. He admitted, however, the MRI and PET scan were not canceled for lack of time; rather, Dr. Gelbort believed an MRI would not display the type of brain damage Mr. Allen potentially possessed.

Initially, Dr. Randall testified, to his knowledge, Andy Rackers did not conduct any mitigation interviews. Counsel for the Government, however, presented him with two

memoranda from Andy Rackers to Mr. Sindel, both dated February 14, 1998. In one, Andy Rackers wrote about his interview of Eric Taylor, brother of the deceased Marquis Taylor. Eric Taylor had apparently relayed Mr. Allen's depression regarding the death of Marquis Taylor. *See* Exhibit 442 at 1. In the second memorandum, Andy Rackers described his interview of Luveetra Taylor, Eric Taylor's mother, who reportedly discussed, *inter alia*, Mr. Allen's demeanor in the weeks leading to the bank robbery. *See* Exhibit 449 at 1. After examining these exhibits, Dr. Randall admitted Andy Rackers had conducted some mitigation-related work.

## 2. Weekend Interview Sessions

Dr. Randall composed a schedule of witness interviews for Saturday, February 21, 1998 and Sunday, February 22, 1998. *See* Exhibit 383. He described these weekend interviews as "chaotic," explaining,

> Well, it was – the word I used to describe it is it was like an assembly line of people; boom, boom, boom, boom, boom. One would come in, we would talk, they would leave. One would come in, they'd talk, they'd leave. So we were on a tight schedule because there were just so many people, we had to basically cram them in to these weekends. And this was the time – this was the time that was available to do this, and it was during the day of the weekend.

ECF No. 277 at 206:10-25. Dr. Randall said these interviews involved some "information gathering," but mostly "preparation for the trial." ECF No. 277 at 207:7-9.

In one of these interviews, Raymond Petty relayed the incident involving an electrical cord. Dr. Randall's notes describe the incident as follows:

> One time she was getting on him. She was beating him. He was supposed to be in a certain time, and do something, and he didn't do it. He's 16-18-18, not too long ago. Bill calls me, I drive to his house. I jump in between them. He broke out of the house and ran. I never got beat like that before. She was whooping him with an extension cord, just wacking [sic] him. It just went back to slavery times. I couldn't see my blood getting beat like that. I've never seen that kind of beating before. [Like a slavery beating]

Exhibit 458 at 4 (bracketed material in original). Dr. Randall testified he failed to ask Raymond Petty any follow-up questions, due to the "very chaotic situation." ECF No. 326 at 35:18. He further said Mr. Sindel did not instruct him to make additional inquiries about potential child abuse. He testified he erred by failing to pursue this topic with other witnesses. On cross-examination, Dr. Randall admitted the weekend interview session was not the first time he heard about the electrical cord incident. Rather, his notes from an earlier interview of Raymond Petty read, "She was really on him one time, I broke her off him. He was a big kid already. I couldn't see her punishing him like that, doing the things she was doing. She's beat the crap out of him real good." Exhibit 458 at 2. Dr. Randall estimated this earlier interview occurred sometime after January 30, 1998, but before the February weekend prep session.

At least two other witnesses provided pertinent information during the weekend sessions. First, during Deborah Ruffin's interview, Mr. Simon noted, "Does Juanita have a problem w/alcohol? She drinks, to excess, when she is upset." Exhibit 500 at 11. Dr. Randall testified he attended her interview, and had no reason to doubt the veracity of Mr. Simon's notes. Second, during Nancy Harris's interview, Mr. Sindel noted, "Has not seen Juanita drunk." Exhibit 465 at 5. He then added, "Juanita would not show this woman her bad behaviors." Exhibit 465 at 5. When asked "Do you have any reason to doubt that Nancy Harris said that during that interview[?]" Dr. Randall responded, "I suspect that she stated something to this effect." ECF No. 326 at 235:22-236:6.

### 3. Prior Knowledge of Family Dysfunction

Dr. Randall testified he suspected Mr. Allen had suffered abuse and neglect as a child. He said homicide cases often involve problematic childhoods and home lives. Dr. Randall saw Juanita Allen as "a tough character, . . . someone who had been through a lot herself, and

someone who was quick to anger . . . potentially hot-headed[.]" ECF No. 326 at 13:17-19. Another "red flag" for Dr. Randall arose when Raymond Petty described the incident involving an electrical cord. ECF No. 326 at 13:20-14:5. When asked whether Raymond Petty, Deborah Ruffin, Shimeka Taylor, and Sam Moore all indicated Juanita Allen implemented physical punishment, Dr. Randall testified he could only remember Raymond Petty relaying the incidence involving an electrical cord. He could not recall Deborah Ruffin's indication that Juanita Allen "had to tighten Bill up," ECF No. 326 at 211:23-212:2, as indicated by Mr. Sindel's notes of the weekend interview session, which Dr. Randall attended. After examining his own notes, however, he remembered Deborah Ruffin saying, "Not having a father in the house. Her dad is an older man. She has to do what she has to do to maintain control." ECF No. 326 at 212:12-15. Dr. Randall said he should have followed up on this information.

Dr. Randall was reminded of a statement in his habeas declaration: "It was clear that Ms. Allen was one of the primary abusers of her son." Exhibit 254 at ¶ 12; at his habeas deposition, he testified Juanita Allen's demeanor, combined with the impression she drank, served as evidence in support of this statement. He also acknowledged a noteworthy exchange he had with Otha Petty; when Dr. Randall told Otha Petty that Mr. Allen could face the death penalty or life imprisonment, Otha Petty answered, "You have to take the bitter with the sweet." ECF No. 326 at 210:1-8. At the Hearing, Dr. Randall explained, "From his affect and from what he said and from his daughter's – the way she turned out, the way Juanita turned out, I suspected that there was physical abuse in that family." ECF No. 326 at 210:11-14. He added he did not follow up on this notion "to the extent that it needed to be followed up on." ECF No. 326 at 210:17-18.

Cross-examination revealed, at the time of the criminal case, Dr. Randall possessed ample evidence of adverse conditions in the Allen household. First, when asked whether

Deborah Ruffin had informed him about Juanita Allen's use of physical force, Dr. Randall said, "[T]here was some awareness on some level that there was physical abuse related by Deborah Ruffin about Juanita with Billie." ECF No. 326 at 220:20-22. Second, in an interview with Shimeka Taylor, sister of Marquis Taylor, Dr. Randall noted,

> I was there one time when we hung out too late. It was around Christmas Holiday. He got back at maybe 10 o'clock. Bill has always been tall for his age. She put him on punishment. His mother, my mother the type they need to control their kids up to a certain point. A whooping and a punishment. Early '90's. He was 12-13.

Exhibit 452 at 2. Dr. Randall admitted his notes were consistent with Mr. Simon's own account of that interview: "If Bill did something, he got the snot kicked out of him. Got back ~ 10:00[.] Bill cried[.] Whipping & a punishment. Early 90's–12-13[.]" Exhibit 500 at 22. When asked, "So you knew Billie Allen was getting whoopings as a child; is that correct?" Dr. Randall admitted, "We were told this, yes." ECF No. 326 at 222:17-19.

The evidence did not end with Deborah Ruffin and Shimeka Taylor. In an interview with Sam Moore, Dr. Randall wrote, "Billie was on punishment just a little while back. Try to keep him stay in the house. She'd mop him up." Exhibit 436 at 2. He added, "Everybody knew Bill would be put on punishment. That his mother would kick his ass in the street. He had to sneak out, when his mama was at work." Exhibit 436 at 2. In addition, a cousin of Mr. Allen, Monette "Nishelle" Petty Nelson, provided evidence of neglect. Dr. Randall's notes[34] from her interview read, in relevant part,

> When I went over to [Otha Petty's] house, I could do anything I want. At my house, I had to go in. Over there, no rules, not to[o] much they couldn't do. Juanita was pretty much lenient on them. Stay outside, walk the streets, go to the park, go outside the gate. Over there I could visit, people could come over. Not

---

[34] The author of these notes is unclear, but at the Hearing, Dr. Randall acknowledged Monette Petty Nelson relayed this information to him.

in my house.  I can't say it was neglect, but they kind of grew up on their own.
She'd go out a lot.  At night, she'd leave.

Exhibit 479 at 1.  Dr. Randall testified, to him, this information reflected neglect.  Similarly,

Carol Petty, Juanita Allen's sister-in-law, reported,

> They could come and go as they please.  He didn't have to report.  Didn't know a
> lot of whereabouts.  I didn't condone that.  They were free to run the
> neighborhood.  My children weren't allowed to do that.  We were more strict.
> Tried to be consistent as much as possible.  If they're not with us, we know who
> they're with.

Exhibit 503 at 1.  At the Hearing, Dr. Randall agreed Carol Petty described a dysfunctional

family.  Raymond Petty confirmed this description, when he told Dr. Randall,

> I think she failed at the time she shou[ld] be there knowing when Bill was doing.
> When he started his slide, he was out to 1 or 2 in the morning.  I'd call, mom
> wouldn't be there, doing her little thing.  She had just gotten a new boyfriend.
> That's when Bill got loose.  She didn't move out, but she might go over there and
> not come back to the next day 11 or 12 o'clock.  No one to supervise Bill.

Exhibit 458 at 3-4.

Dr. Randall had extensive evidence of physical punishment of Mr. Allen by his mother.

His suggestion he did not have this information, either because he did not have rapport with

witnesses, he did a poor job in discovering abuse, or he did not have time, is not believable.

Aside from the foregoing evidence of abuse and neglect, Dr. Randall's testimony

revealed he spent a great deal of time investigating the Allen family and Mr. Allen's background.

Specifically, cross-examination illuminated Dr. Randall's considerable exertions in interviewing

a wide range of people in Mr. Allen's life.  As a sample of the mitigation information gleaned

from these interviews, the following points illustrate Dr. Randall's extensive efforts:

- Angela Allen, Mr. Allen's sister, told him she and Mr. Allen used to argue when
  they were young, and, during these arguments, Mr. Allen would adhere to his
  own lies.  *See* Exhibit 405.

- Dr. Randall interviewed Yvette Allen, Mr. Allen's sister, twice, and she said Mr. Allen would pick her up from her middle school and take her to parties. *See* Exhibit 420.

- Tyrone Jones, Mr. Allen's basketball coach, told Dr. Randall that Raymond Petty coached the basketball team "a little bit." Exhibit 439 at 2.

- On February 8, 1998, Dr. Randall drove to Manhattan, Kansas to visit Mr. Allen's cousin Colette McLemore, who was then a student at Kansas State University. *See* Exhibit 459. Colette McLemore said Mr. Allen had drawn art work for her, and she had saved it at her house. She also said Mr. Allen came from a close family, she visited him in jail over her Christmas break, and he wrote letters to her.

- Similarly, on February 9, 1998, Dr. Randall drove to Jefferson City to interview Mr. Allen's cousin, Claude "Ed" McLemore, who said Mr. Allen "stayed out of trouble," and had a close family. Exhibit 426 at 1.

- On February 13, 1998, Dr. Randall interviewed Ahmed Oliver, who said, "[Mr. Allen's] mother, sisters are nice. He comes from a good nice people [sic]. His mother's family are nice people." Exhibit 432 at 6.

- A neighbor, Nancy Harris, told Dr. Randall that Juanita Allen was the baby girl of the family and lacked the maturity to lead her children; Nancy Harris also described Mr. Allen's family as dysfunctional. *See* Exhibit 468.

- During another interview, Beverly Oliver, Ahmed Oliver's mother, said Mr. Allen and her son had been friends since kindergarten. *See* Exhibit 472. She continued, "I know his mother, met her at school functions. She's really nice." Exhibit 472 at 1.

- Jerome Petty told Dr. Randall, "Bill's father was not in the picture this whole time." Exhibit 473 at 1. He added,

    I'm upset I missed Bill's problem. I was working jobs. Operations Manager. He was going to move in with me at one point. When I said Bill, do something, Bill jumped. This was about 92 to 94. I wanted him to focus on things he should focus on. He was living with his mother and three sisters. Bill was about 16. He wasn't responsible, being 16. They all got along like brothers and sisters. Had their good days and bad days.

    Exhibit 473 at 1-2.

- Nicole Petty, Mr. Allen's oldest sister, reported the family was happy to leave John Allen. *See* Exhibit 431. She recalled "[w]hoopings, not often," when they

lived with John Allen, and she remembered one occasion when Mr. Allen received a "whooping" on Cote Brilliante. Exhibit 431 at 2.

- Dr. Randall interviewed Eric Taylor, who reported Johnnie Grant's mother, Shirlene Grant, "smoke[d] crack." Exhibit 443 at 2. When asked whether this evidence was the reason for not calling Shirlene Grant to testify at the penalty phase, Dr. Randall said he could not "pin that down." ECF No. 327 at 54:8-11.

- Shimeka Taylor told Dr. Randall that Mr. Allen would spend nights at her family's home if he had an argument with Juanita Allen. *See* Exhibit 452. She said, "Juanita was great, but too lax when it came to Bill. Boys need a stronger figure. Juanita did not take that role in my opinion." Exhibit 452 at 2. Dr. Randall testified other witnesses confirmed Juanita Allen was "laissez-faire and lax." ECF No. 327 at 56:13.

After reviewing this evidence, Dr. Randall was reminded of a section of his declaration, in which he averred, "Despite my suspecting family abuse and dysfunction, I was not able to obtain concrete information from any family member that this existed." Exhibit 254 at ¶ 14. At the Hearing, Dr. Randall stated, "I would say that the – with regard to Raymond Petty, that statement is not correct." ECF No. 326 at 224:13-14. He added, "I did not intentionally try to mislead anybody here." ECF No. 326 at 224:21. When asked, "[A]t least some of the facts we've noted today that you provided are just flat wrong in your declaration, correct?" Dr. Randall answered, "In matters of degrees, yes." ECF No. 326 at 230:6-9.

### 4. The Penalty Phase

Sometime near the penalty phase, Dr. Randall compiled a list, titled "Factors that Affected Billie's Life."[35] *See* Exhibit 505. He opined the team "touched on" all the categories in the list. ECF No. 326 at 17:11. On cross-examination, Dr. Randall admitted physical abuse "must have been discussed [amongst the trial team] because [he] presented this outline to the team." ECF No. 327 at 6:16-20. He qualified this, however, by adding Raymond Petty's electrical cord testimony, and the boxing accident involving Jerome Petty, were the only

---

[35] For the full list, *see* Section III.B.5.

incidents in his mind when he put "[p]hysical abuse and beatings" on the list. ECF No. 327 at 7:20-8:2. When shown his notes from the January 30, 1998 meeting with Mr. Simon, Dr. Randall admitted he described the boxing incident with Jerome Petty as an "accident," not as physical abuse.[36] Exhibit 357. He added, "Had we been aware of more incidents at the [penalty phase], we would have presented them[.]" ECF No. 327 at 9:11-12. Counsel for the Government reminded him of Deborah Ruffin, Shimeka Taylor, and Sam Moore's allegations of abuse, and Dr. Randall replied, "[I]f we were considering [those statements], we would have put them on." ECF No. 327 at 12:15-16. Then, he was reminded those witnesses, did, in fact, testify; he responded, "We would have got that information out of them on the stand." ECF No. 327 at 12:18-19.

Dr. Randall maintained he would "never" tell the team to avoid the "trash-the-mother" defense. ECF No. 327 at 6:2. When confronted with Mr. Simon's testimony, stating otherwise, Dr. Randall said, "[I]f I said something to that effect about this 'Trash the Mother,' he misunderstood what I said because I would never – that would be a critical component of a mitigation strategy. I would never say that we shouldn't pursue that." ECF No. 327 at 5:19-23. The Court does not believe Dr. Randall was being truthful.

Dr. Randall acknowledged the penalty phase included evidence about John and Juanita Allen's separation, Mr. Allen's lead poisoning and pica, church attendance, schooling, sports involvement, rap music endeavors, head trauma, and reaction to Marquis Taylor's death – all topics covered by the Life History. Dr. Randall testified the trial team "basically put up what [it] had" during the penalty phase. ECF No. 326 at 18:18. With one exception, he opined the team

---

[36] Similarly, he later examined his notes of an interview with Mr. Allen. The notes read, "One time me and my Uncle Jerome boxing in back yard. Fell and hit head on bench. I had to go to the hospital. Went to hospital[.] . . . Lost consciousness for a few seconds." Exhibit 621 at 2. At the Hearing, Dr. Randall admitted Mr. Allen never alleged his uncle Jerome Petty abused him.

made no judgment calls regarding which evidence to offer; he could only recall a decision to omit testimony from the jail guards where Mr. Allen was confined. He could not recall why Juanita Allen did not testify at trial. When asked whether Mr. Sindel told him Juanita Allen's testimony would conflict with testimony given by Johnnie Grant in the guilt phase, Dr. Randall stated, "That doesn't stand out to me." ECF No. 326 at 56:7. Dr. Randall admitted Raymond Petty testified about the single incident involving an electrical cord.[37]

Dr. Randall testified the prosecution offered penalty phase evidence regarding Mr. Allen's visit to a psychiatric center in February 1997. Specifically, the prosecution relied on the psychiatric evaluation of Dr. Christopher Wuertz to rebut the defense's claim of PTSD; Dr. Wuertz, a psychiatrist at MSLPC, had diagnosed Mr. Allen with depressive disorder not otherwise specified, but had not checked "PTSD" on the intake form. Dr. Randall felt, in making this determination, Dr. Wuertz lacked critical information about Mr. Allen's social history. Thus, on March 6, 1998, Dr. Randall sent a facsimile transmission to Dr. Wuertz, asking, "If you had the additional social history [information], would that have changed your opinion re: PTSD." Exhibit 388 at 2. Dr. Randall testified no one contacted Dr. Wuertz earlier, because "a lot of things . . . fell through the cracks" given the "compressed time frame." ECF No. 277 at 248:10-19. He said he never received a reply from Dr. Wuertz.

Based on information the trial team received from Mr. Allen, Dr. Randall knew Mr. Allen was a drug dealer at the time of the penalty phase. ECF No. 327 at 115:21-22. At the Hearing, he admitted the trial team avoided this evidence in the mitigation case. Instead, the team made efforts to convince the jury Mr. Allen sold fake drugs, and, in closing arguments, Mr. Sindel argued, "There may be some peppermint candy floating out there, but in terms of this significant

---

[37] Raymond Petty's testimony is quoted in Section III.A.3.

criminal history, take a look at it and think about what you heard." ECF No. 327 at 116:20-22. At the Hearing, Dr. Randall admitted "there is information from witnesses or from Billie Allen that [the team] made a decision not to put on." ECF No. 327 at 117:21-118:1.

Dr. Randall said, at the time of the penalty phase, he knew the mitigation presentation had "problems." ECF No. 326 at 70:6-7. He explained, "I knew that it had fallen short at that time because we weren't able to fully explore what we needed to. And due to the harried, rushed nature of the presentation, it was not effective like it could have been." ECF No. 326 at 70:10-13. Dr. Randall testified the trial team presented over 30 witnesses – the most witnesses presented in any penalty phase in which he became involved. At the close of the criminal case, Dr. Randall billed for 423.30 hours of work, conducted in less than six weeks. In June 1998, Mr. Sindel wrote the following to Dr. Randall:

> We have been advised by the court clerk that everything you have requested [for reimbursement] has been approved, except certain expenses such as toothpaste, mouthwash, Jujubees, M&M's, etc. Did you really put those things in your application for reimbursement? Anyhow, at least there are no drugs.
>
> Furthermore, I have been contacted by another attorney about a capital case in Illinois which he has requested that I work on. I have told him I want to bring you on board if that is the situation. Let me know what you will need for a retainer fee.

Exhibit 396. Dr. Randall testified he considers Mr. Sindel a friend, and respects him as an attorney.

### 5. Post-Conviction Impressions

Dr. Randall testified, in his mitigation investigations, he looks for positive mitigation information – "good character information and positive things that people have done" – and negative mitigation information – "bad things that happened to people that help explain how they turn out the way they do." ECF No. 326 at 10:5-10. He said he strives to find negative

mitigation evidence involving abuse or neglect.  While working Mr. Allen's case, Dr. Randall

tried to find "as much evidence of both kinds of mitigation as [he] could."  ECF No. 326 at

10:17-18.  At the Hearing, he said,

> If evidence is there that is potentially disparaging to family members, parents,
> siblings, you know, in terms of the way they might have treated my client, that's
> the type of information, you know, that helps – you know, if he was mistreated,
> that helps explain a lot of things.  So that's the type of information I would
> actively seek out and not want to exclude.

ECF No. 326 at 12:1-7.  He testified he did not make any strategic decision to exclude evidence

of neglect, abandonment or anything else that could have portrayed Mr. Allen's family in a

negative light; he stated, "[T]hat would be at cross purposes of what my role is."  ECF No. 326 at

11:21-22.  When asked, "If you would have uncovered evidence during your investigation of

abuse and neglect and abandonment, would you have wanted to present that evidence to the jury

at the penalty phase?" Dr. Randall stated, "Absolutely."  ECF No. 326 at 12:8-12.

Dr. Randall discussed at length the problems he perceived in the penalty phase of trial.  In

essence, he believed the time constraint ruined any chance of presenting an acceptable mitigation

presentation.  He said, "[T]here was so much information, I found that we didn't have time to

synthesize and to digest and to make good deliberative decisions in terms of who we put on, who

we didn't put on, that kind of thing."  ECF No. 326 at 23:7-11.  He believed he only "skim[med]

the surface" of information potentially offered by the witnesses, ECF No. 326 at 23:18-19, and

explained, "There were certain like critical things that I messed up on because of the time crunch

in terms of what I now know, what certain people would say based on the declarations and things

like that."  ECF No. 326 at 23:20-23.  He testified the team lacked adequate time to prepare

witnesses for trial.  Specifically, he testified, if "this case [had] been done the right way early on,

a lot of the experts would have been presented with a lot of information, and they would have

been better prepared and not blasted out of the water I think like they were." ECF No. 277 at 229:17-21. Additionally, he believed the team would have chosen different mitigators. He expounded, "Because the PTSD mitigator was not, you know, was – that's what we ran with at this hearing, but had we really had time to analyze it, we might not even have gone with that." ECF No. 277 at 229:24-230:1. Dr. Randall believed the limited time frame also prevented Mr. Sindel from optimally selecting a jury that would be receptive to specific types of mitigation information.

Aside from these preparation issues, Dr. Randall opined more time would have changed the way Juanita Allen was portrayed to the jury. Specifically, Dr. Randall testified Juanita Allen's deposition and declaration contained information he would have wanted to present at trial. He elaborated,

> In that information, in her dialogue she talks about what she was like temperamentally in the home when Billie was growing up, the fact that she was physically abusive to Billie in terms of beating him, whipping him in a number of different ways, throwing shoes at him, et cetera. There was a point – she described a continuing pattern of beating that escalated when Billie got to a certain age, I think around ten years old. She described her drinking and how out of control she was. She described feeling regretful for what she had done.

ECF No. 326 at 57:15-24. He also mentioned he would have presented evidence Juanita Allen used to lock Mr. Allen out of the house. He said all this evidence "was readily available apparently and should have been developed at the time." ECF No. 326 at 58:16-17. Finally, he emphasized, "That type of evidence is critically important to any penalty phase. And there would be no logical or strategic reason to want to not present it." ECF No. 326 at 59:7-9.

In addition, Dr. Randall would have wanted to present the jury with "descriptions of Juanita's drinking at the home, her demeanor in the home, and her physical abuse of Billie." ECF No. 326 at 62:22-24. He also would have emphasized how Juanita Allen "dogged" Mr.

Allen, in comparison of her treatment of her daughters, and he would have offered evidence Mr. Allen was "slow," "zoned out" and "[s]pacy." ECF No. 326 at 62:24-63:18. He explained, "Based on my experience in capital cases, her emotional presentation to me and Billie's affect, his unemotional presentation, it was clear to me he was not raised in a nurturing home." ECF No. 326 at 80:5-8. He also noticed her "demeanor, her angry temperament[.] . . . And then later we learned from Raymond Petty about the beating incident, which confirmed that impression." ECF No. 326 at 80:11-13. Dr. Randall testified he would have expanded on the notion that Juanita Allen was Mr. Allen's primary abuser, claiming:

> It would have been very important to not only do it in a general way, but also bring out specific examples of episodes of abuse of the nature that were brought out in some of the declarations that were prepared. It brings life to what happened. It helps people understand, you know, the feeling of what happened at that time.

ECF No. 326 at 80:20-25. Dr. Randall reiterated he made no logical or strategic decision to exclude this evidence. When asked why he failed to ask Mr. Allen and Juanita Allen about abuse, he testified, "It was a lapse. There was no rationale per se." ECF No. 327 at 150:25.

Dr. Randall felt the team failed to adequately present evidence about Mr. Allen's father, particularly about "how Billie got co-opted into a drug subculture as a young child because his father and his uncle were selling drugs and sort of brought Billie along." ECF No. 326 at 63:22-25. Referring to evidence produced for the habeas case, Dr. Randall said, "There was no logical or strategic reason to not have presented that evidence," ECF No. 326 at 65:3-4, and, "There was nothing in there that I was afraid of." ECF No. 326 at 64:22.

Although he acknowledged 36 witnesses testified at the penalty phase, Dr. Randall believed the presentation was lacking in quality. He stated, "[M]uch of it was off the cuff," and "[W]e threw it on the wall, so to speak[.]" ECF No. 326 at 66:7-15. He added, "The number of

witnesses was impressive, [but] I would have liked to have actually more. The guards would have been more." ECF No. 326 at 66:16-19. He testified he would have liked "an opportunity to have spoken to the guards and developed that facet of the mitigation." ECF No. 326 at 107:3-4. When confronted with his interview notes, however, he admitted he had spoken to four jail guards. Specifically, he acknowledged his notes regarding Deputy Karen Burns contain four bullet points: (1) "Not anything about [Mr. Allen] harming anybody else," (2) "He's basically slow," (3) "Never violent or aggressive," and (4) "Hard time getting him ready in the morning." Exhibit 680. Similarly, Dr. Randall reviewed notes of his conversation with Lieutenant Dave Boehm, who described Mr. Allen as "an average prisoner," "manageable within the setting," and "generally respectful." Exhibit 677. Notes regarding Deputy Mark Prackt state Mr. Allen had "[n]o problems of adjustment." Exhibit 678. Finally, Dr. Randall examined his notes covering an interview with Deputy Todd Sinclair, who advised Mr. Allen "liv[e]d like a teenager," did "a good job" staying out at night to clean the module, never became involved in "real trouble," and never required the use of force. Exhibit 679. Dr. Randall confirmed none of these guards testified at trial; he said he believed they had "a lot to add," but Mr. Sindel made a conscious decision not to call them as witnesses. ECF No. 326 at 117:25.

### 6. Dr. Randall's Habeas Declaration

Before preparing his July 2009 habeas declaration, Dr. Randall met with habeas counsel in Philadelphia. At this meeting, he told habeas counsel he believed Mr. Allen's "situation was . . . a legacy of slavery, multi-generational abuse." ECF No. 327 at 63:1-5. He told habeas counsel this was "his sense of the case" based upon "[t]he grandfather's presentation, what he told me during our interview." ECF No. 327 at 64:5-6.

In his habeas declaration, Dr. Randall quoted a portion of Juanita Allen's declaration, stating,

> Billie's lawyers at trial did not spend very much time with me at all. They would give me some basic information about the case, like when the next court date was. But they never really sat with me to hear my story. I told them some information, and they seemed to focus on the story about Marquise [sic] Taylor and the shooting.

Exhibit 254 at ¶ 23. Dr. Randall averred this statement "most accurately synopsizes the failures of the defense team in this case[.] . . . This statement says it all." Exhibit 254 at ¶ 23. At the Hearing, Dr. Randall testified he never "cut [Juanita Allen] off" deliberately, ECF No. 327 at 72:24, but included her quote in his declaration to capture the "essence" of the "debacle." ECF No. 327 at 73:18-19. However, after reviewing notes of his interviews with Juanita Allen, covering extensive and diverse topics, he admitted her statement "would not be totally correct[.]" ECF No. 327 at 97:20. Nevertheless, he continued to assert his declaration described the "feeling" and his "impressions" of the case. *See, e.g.*, ECF No. 327 at 101:16-22. When asked, "So when you wrote, 'This statement says it all,' what it said was your feelings about what happened then and what you learned now. It wasn't actually factually correct?" Dr. Randall replied, "In terms of literally correct?" ECF No. 327 at 101:23-102:1. Finally, after further debate, Dr. Randall agreed this portion of his declaration was not "factually" correct. ECF No. 327 at 103:12-15.

Another part of Dr. Randall's habeas declaration states, "[B]ecause of the acrimony between Mr. Allen's mother and father, and the compressed time frame, my attempts to reach out to family members on the father's side were limited. This has proved to be a serious shortcoming, given what current counsel have uncovered from the father's side." Exhibit 254 at ¶ 11. At the Hearing, Dr. Randall admitted the only new information concerning the paternal

side of the family came from Billy Wayne Allen, John Allen's brother. Dr. Randall's knowledge of this individual was limited to Billy Wayne Allen's habeas declaration.

Billy Wayne Allen's declaration, however, serves as a dubious basis of knowledge. For instance, it alleges Juanita Allen and John Allen "beat their kids, just like [he and his siblings] got beat by [their] parents who would use straps, shoes, broom handles and pretty much anything that was around." Exhibit 261 ¶ 7. At his deposition, however, Billy Wayne Allen was asked if he ever saw Juanita Allen hit Mr. Allen when she was living with John Allen; Billy Wayne Allen testified, "Not that I was aware of." Exhibit 528 at 50:16. Similarly, when asked, "Did you ever see [John Allen] hit Billie with an extension cord?" Billy Wayne Allen answered, "Never, I never saw anything like that. I saw him slap him upside the head a couple times." Exhibit 528 at 46:9-10. Billy Wayne Allen's declaration also states, "I just remember looking up one day, and Billie was working with us and for us." Exhibit 261 at ¶ 8. When confronted with this statement at his deposition, Billy Wayne Allen said, "Yes. But Billie never worked for me or with us. That's wrong. . . . That's not correct." Exhibit 528 at 55:3-7. At the Hearing, Dr. Randall examined the foregoing, and was asked whether he still perceived his failure to investigate John Allen's family as a shortcoming. He answered, "I still believe that it is a serious or was a serious shortcoming not to have pursued witnesses on the father's side." ECF No. 327 at 132:4-6.

Upon further questioning, Dr. Randall adhered to his position that, at the time of the criminal case, "it was obvious that Billie was physically abused and beaten multiple times in his life." ECF No. 327 at 13:18-20. Again, he was reminded of his declaration, in which he averred, "Despite my suspecting family abuse and dysfunction, I was not able to obtain concrete information from any family member that this existed." Exhibit 254 at ¶ 14. Counsel for the Government repeatedly queried whether this statement was false; Dr. Randall refused to admit he

provided a false statement, but, instead, stated, "It's inaccurate," "The Raymond Petty incident was the incident that I should have referenced here that stood out in my mind," and "I erred." ECF No. 327 at 14:21-15:3. He denied making a conscious decision to exclude the information about Raymond Petty. Finally, when asked, "How is it you can remember right now that [Deborah Ruffin, Shimeka Taylor, and Sam Moore's statements] were not considered at the time when just a few years ago you've written something that's patently incorrect?" Dr. Randall answered,

> Apparently you're pointing out to me correctly we were aware on some level that there were other people that could have potentially testified about that theme that we did not have testify to that at the [penalty phase]. That was not an intentional suppression of that evidence. That was an oversight, a mistake, a problem, okay.
>
> I can attribute that to – I've been attributing it to the time constraints, the time pressure, and I believe that's correct, okay.

ECF No. 327 at 16:5-17:25.

In his habeas declaration, Dr. Randall advised the Court of an American Bar Association (ABA) publication, *Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases*, 36 HOFSTRA L. REV. 677 (2008), which "explain[s] the exhaustive nature of capital mitigation[.]" Exhibit 254 at ¶ 9. At the Hearing, Dr. Randall admitted the ABA published this article in 2008, many years after the criminal trial. He added, "However, what I stated in my continuance motion and other motions about the nature of mitigation and the nature of mitigation investigations is consistent with what was eventually written in these guidelines." ECF No. 326 at 76:10-14. He said he included this reference in his declaration, "[b]ecause it's a good overview of what's entailed in a mitigation investigation." ECF No. 326 at 76:20-21. When asked, "And how was it that these guidelines that we're discussing were mentioned in your declaration, how did that come about?" Dr. Randall answered, "They were suggested by

[habeas counsel] who drafted the recommendation, and then I reviewed the article in preparation for the declaration." ECF No. 326 at 76:22-77:2.

In his habeas declaration, Dr. Randall also averred, "In my short time working on this case, I expended a considerable effort working with Ms. Allen to increase her chances of cooperation with a Caucasian defense team she did not trust." Exhibit 254 at ¶ 11. However, at the Hearing, he testified he did not spend a considerable effort working with Juanita Allen. Referring to the statement in his habeas declaration, he said, "It's inaccurate. . . . It's not correct." ECF No. 326 at 189:8-10.

Finally, when asked, "Do you believe there are significant portions of your declaration that are just incorrect?" Dr. Randall said, "Yes." He admitted he was aware his declaration helped, in part, habeas counsel obtain the Hearing in which he was presently testifying. Finally, he agreed he "made no effort to correct those inaccuracies in [his] declaration until [counsel] asked about them[.]" ECF No. 327 at 161:4-6.

### 7.    Conclusion

Dr. Randall distinguished himself by immersing himself into the preparation of the mitigation phase of Mr. Allen's trial. It is hard to imagine anyone demonstrating more diligence and skill than Dr. Randall did in his effective development of mitigation themes, and arranging for witnesses to supply testimony to support the trial strategy of the case. He seriously damaged his credibility before the Court as he continuously attempted to castigate the superb efforts of the entire trial team, which included him. He signed a declaration prepared by habeas counsel that contained facts unsupported by the record and attempted to reconcile his testimony with false conclusions that were contradictory to his prior statements and handwritten notes. The Court concludes he testified to gain the ultimate goal of supporting the Amended Motion at the cost of

his credibility. The evidence is unchallenged that he was aware of Juanita Allen's alcoholism, her beating of Mr. Allen, and the state of dysfunction in the Allen household. It was Dr. Randall who recommended to trial counsel not to use the "trash the mother" defense. The Court praises Dr. Randall for his stellar work in helping prepare the penalty phase of the trial, but his attempt to destroy that effort is rejected.

### E.    *Juanita Allen: Mr. Allen's Mother*

From the example of the woman who was willing to give her child to a stranger, rather than subjecting him to the sword of King Solomon, we know family members and close friends often surrender the bond of their testimonial oath to save the life of a loved one. Accordingly, a fact finder must consider all of the evidence, weigh it with care, and credit that which is believable, based on the witnesses demeanor, responses, and all other evidence in the case which adds to or detracts from the witness's testimony. Just as the jury is instructed, a fact finder is entitled to believe all a witness says, or part of it, or none of it.

### 1.    Early Years and Life on Evans Street

Juanita Allen grew up in Saint Louis, Missouri. In her own childhood, Juanita Allen recalled getting "whoopings" from her mother, father, and brother. ECF No. 328 at 53:22-54:4. When asked, "Was that with their hands or was that with objects?" she answered, "Probably a cord probably or – a cord." ECF No. 328 at 54:10-11. When Juanita Allen was fourteen years old, her mother passed away, resulting in feelings of abandonment and detachment. She began dating Mr. Allen's father, John Allen, at the age of sixteen, and later gave birth to her oldest child, Nikki. Juanita Allen and John Allen married, and thereafter she gave birth to Mr. Allen and his sisters, Angela and Yvette. Juanita Allen described John Allen as initially attentive and supportive.

The Allen family eventually moved into a small apartment on Evans Street.[38] Crack cocaine was prevalent in the area. John Allen began to change; "[h]e . . . started getting involved with drugs and couldn't keep a job, and his life just basically went down." ECF No. 328 at 17:3-6. Juanita Allen estimated her husband used crack cocaine every day; he also drank alcohol. He invited friends to the Allen household, and drank and used drugs with them, which "wasn't a good influence on [the] children." ECF No. 328 at 18:5-6. The Allen family did not have much money, resulting in frequent utility outages in the household. John Allen's parents lived in the area, and his father was an alcoholic, who commonly engaged in fights with John Allen on Fridays and Saturdays. At some point, John Allen lost his job.

Juanita Allen testified she and John Allen used to drink together "all the time," even before their marriage. ECF No. 328 at 20:18-21. She said, "[P]robably the only common denominator we did have was the drinking." ECF No. 328 at 34:19-20. She stated they usually drank at home, and she typically drank to the point of intoxication. They drank together "whenever he had the money to buy something." ECF No. 328 at 34:22-24.

The couple began fighting before they moved to Evans Street. Juanita Allen testified, "Probably on Evans Street, it probably escalated to where they were just out-of-control arguments." ECF No. 328 at 21:8-9. Their arguments became worse over time. Juanita Allen said she was "more out of control" than John Allen. ECF No. 328 at 21:16-18. She also opined her drinking impacted the way she argued with him, and she had "been told numerous times that [she] was a mean drunk[.]" ECF No. 328 at 19-22. Her children witnessed most of the arguments she had with John Allen. When asked whether she ever made efforts to avoid fighting

---

[38] Juanita Allen could not specifically recall when the Allen family moved onto Evans Street. However, she testified all four children were born at that point, and estimated Mr. Allen was about ten years old.

in front of the children, she stated, "Probably not, because at that point in time if I was angry about something, I was just angry about things. So I wouldn't care who was in the way, so no." ECF No. 328 at 22:5-10.

### 2. Life on Cote Brilliante

At some point, Juanita Allen became concerned about "the overall situation," and "[t]hat's when [she] decided to leave[.]" ECF No. 328 at 22:21-24. She had initially tolerated John Allen's alcohol and drug use "because of the kids[, but] after awhile [sic] it just got so out of hand that [she] went ahead and . . . said [she] just couldn't do it anymore." ECF No. 328 at 19:8-11. They had arguments about money, and about John Allen's failure to live up to the promises he made at the time of their marriage. On one occasion, when Juanita Allen "may [have] be[en] drinking," an altercation became physical. ECF No. 328 at 20:9-12.

When she left John Allen, she took the children with her and moved into her father's three-bedroom house a few blocks away, on Cote Brilliante. At the house on Cote Brilliante, Juanita Allen's father, Otha Petty, lived in the basement, which was a small studio with a kitchen and living room; her brothers, Raymond Petty and Jerome Petty, lived upstairs. Juanita Allen and her four children lived in the third bedroom. She testified this living arrangement was "challenging," and she believed her brothers did not want her there. ECF No. 328 at 26:24-25. She estimated she was in the beginning stages of alcoholism when living on Evans Street, becoming a true alcoholic by the time the family relocated to Cote Brilliante.

Juanita Allen described Mr. Allen's relationship with his father as "basically nonexistent." ECF No. 328 at 23:6. She explained she kept Mr. Allen away from his father, who "was always intoxicated. . . . [H]e just wasn't a good parent at all." ECF No. 328 at 23:6-12. The move to Cote Brilliante marked the end of any relationship John Allen had with his

children. He never paid child support, and he told Juanita Allen he would refuse to seek employment in order to avoid any obligation to pay child support.

Juanita Allen testified relocating to Cote Brilliante did not improve her children's quality of life. Neither Jerome Petty nor Raymond Petty assisted with raising her children, and, although Otha Petty worked and provided for the family, he did not discipline the children. Otha Petty spent most of his time in the basement, which was his personal space. Additionally, she testified she periodically had sexual relationships in exchange for money at the house on Cote Brilliante.

Juanita Allen began drinking at the age of 14, when her mother died. Otha Petty did not attempt to stop her, and, in fact, if she desired alcohol, he would purchase it for her. Initially, two alcoholic beverages would cause her to become intoxicated, and her consumption increased over time; she began by drinking beer, and as the years went on, started drinking "hard stuff." ECF No. 328 at 35:4-5. She further testified she drank and smoked while pregnant with all her children; when asked whether she drank to intoxication while pregnant, Juanita Allen stated there was "a strong possibility." ECF No. 328 at 35:19-24. On cross-examination, however, she was asked, "[B]ack in 1998, before the trial, didn't you tell John Simon that you did not drink while you were pregnant with Billie?" ECF No. 328 at 131:24-132:1. She replied, "I can't recall right now if I did or not. But I know that for sure that I drunk with – starting mostly with Bill. I can't recall Nikki, because I was 16. Maybe at that point in time, I may have stopped. But from – I don't recall having a conversation." ECF No. 328 at 132:2-6. Then, she was confronted with Mr. Simon's transcribed interview notes, stating, "Didn't drink while carrying Bill[.] Did smoke[.]" Exhibit 500 at 60. To this, Juanita Allen said, "It may had [sic] been information that I gave him at the time, yes." ECF No. 328 at 132:13-14. She added the information she gave

Mr. Simon in 1998 was incorrect. This is curious, because she told Mr. Sindel she would be honest with him.

Juanita Allen stated her drinking habits "really got out of control" after Louis McClinton, her boyfriend of three years, committed suicide. ECF No. 328 at 36:22-23. She believes Mr. Allen was in junior high school during this time. She and Louis McClinton would drink to intoxication together, leaving the children alone and unattended. After his death, her drinking escalated; she said, "I think a fifth wouldn't do anything for me." ECF No. 328 at 39:24. She and her friends, Deborah Ruffin and Cathy Toliver, went to bars together, although they did not drink as much as her; she added, "Nobody drunk [sic] as much as me." ECF No. 328 at 42:7. She eventually obtained employment as a bartender at an establishment called "Lucketts," and she drank while working there, as well. Juanita Allen said there were "numerous times" when she became physically ill from drinking too much, and she often experienced blackouts. ECF No. 328 at 44:22. Approximately six years before the Hearing, she went to rehab for alcoholism; she stayed in an inpatient program for 30 days, and has not been drinking since then. She testified her drinking habits impacted her ability to be a good mother to Mr. Allen.

While Mr. Allen was growing up, Juanita Allen had several different jobs. She worked at the Saint Louis Library, Walgreens, Charter Communications, the Division of Family Services, American Red Cross, and Goodwill. When Mr. Allen was in elementary school, she enrolled him in Clayton schools, where his attendance was "pretty good." ECF No. 328 at 126:15-17. Although his report cards were never "good," they became worse "somewhere along the line." ECF No. 328 at 139:16-17. Mr. Allen attended special needs courses. When asked, "So you wanted him to be in special classes?" Juanita Allen answered, "He needed to be in special classes." ECF No. 328 at 140:6-7.

Aside from special needs courses, Juanita Allen involved Mr. Allen in Boy Scouts for several years; at the Hearing, she recalled watching his "cross-over" ceremony, in which he advanced from a Cub Scout to a Boy Scout. When Mr. Allen was older, he enrolled in Job Corps. Juanita Allen admitted no one ever hot-lined her for child abuse, and no social worker ever approached her concerning the treatment of her children.

Juanita Allen testified the death of Marquis Taylor affected Mr. Allen greatly. She explained Marquis Taylor "was the only person . . . in the neighborhood [who] really accepted Bill [for] who he was." ECF No. 328 at 66:20-21. She continued,

> [Mr. Allen] wasn't a kid who was rough and tough in the neighborhood, so he couldn't hang out with the rough and tough kids. He wasn't a kid who started stuff, so therefore he couldn't hang out with those kids. He was just the kid who was trying to find where to fit in. And I think him and Marquis fit in good together.

ECF No. 328 at 66:21-67:2. Juanita Allen testified she never sat down with Mr. Allen and asked him how he felt about Marquis Taylor's death, because such conduct was not in her nature.

Mr. Allen eventually left the Clayton School District to enroll in City schools. Mr. Allen had difficulty adjusting to the City schools, "[b]ecause what he was doing was coming from a European school to an all black school, and it was just totally different." ECF No. 328 at 67:5-7. During his teenage years, Juanita Allen noticed a change in her son. He began drawing "dark," "depressive" artwork, ECF No. 328 at 71:2, and "[h]is appearance wasn't a concern to him anymore." ECF No. 328 at 77:11-12. This prompted Juanita Allen to seek counseling for him.

Juanita Allen testified she hit Mr. Allen "on numerous occasions." ECF No. 328 at 47:22. At times, she was punishing Mr. Allen for misbehavior; other times, she would hit him unprompted. She surmised she targeted Mr. Allen more than his sisters due to his resemblance

of John Allen. When asked whether her anger had "anything to do with [her] situation," Juanita

Allen replied,

> Yes, it did. Not only the situation, but it goes back into foreplay with me holding in a whole lot of things with my mother's death, and also with me having a very big detachment problem. I have a problem whereas I detach myself very easily from situations and things. So, therefore, with me having a detachment problem, I come to find out that lashing out at someone isn't as bad as maybe someone else might think because I'm so able to detach myself from individuals.

ECF No. 328 at 48:19-49:4. She added, to a degree, she was detached from her children as well.

According to Juanita Allen, she first "got out of control" with Mr. Allen during his

"teenage"[39] years. ECF No. 328 at 50:24-25. When asked whether she abused him throughout

his childhood, she said, "I would say not when he was younger, but correct." ECF No. 328 at

99:9-11. When asked to define "younger" she answered, "Maybe when he was five or six or

something like that." ECF No. 328 at 99:13-14. Habeas counsel pressed on, asking, "But after

that, seven, eight, nine, is that when you hit him or was it later than that?" ECF No. 328 at

99:17-18. Juanita Allen stated, "It may have been later than that." ECF No. 328 at 99:19.

She said, "[O]nce I said I was going to get you, if you were there, you were going to get

gotten." ECF No. 328 at 51:19-20. Looking back, she believes she was physically hurting her

son. When asked, "Did you ever give Bill whoopings[40] because you thought he did something

wrong?" Juanita Allen responded, "Yeah I used to tear it up. Yeah, I used to whoop his butt."

ECF No. 328 at 55:14-17. She added, "Bill's punishments usually – I'm not even going to say

punishments – Bill's abuse, if it was done, usually came from me in the heat of anger." ECF No.

328 at 55:20-22. She said her son was "easy prey," because he did not react "in a negative way,"

and he did not challenge her. ECF No. 328 at 84:11-85:1. She related a time when Mr. Allen

---

[39] Throughout the Hearing, Juanita Allen was evasive about what she meant by "teenage."
[40] Juanita Allen defined "whooping" as "[p]hysical pain upon an individual." ECF No. 328 at 58:16-17.

was "passing by," and she "pick[ed] him up by his collar and thr[ew] him against the wall." ECF No. 328 at 51:1-3. She said this was typical behavior when she was angry.

She recalled hitting Mr. Allen with fists and an extension cord, "popping him in the mouth out a couple times," and throwing things at him. ECF No. 328 at 53:3-4. She testified the extension cord incident was not a "one-time thing at all." ECF No. 328 at 100:13-14. When asked, "Did you know that Raymond [Petty] testified at the trial about that [extension cord] incident where he had to pull you off?" Juanita Allen said, "No, I wasn't aware of that." ECF No. 328 at 129:6-8. She could not recall Mr. Allen's age at the time of that incident, but she knew "he wasn't preteen anymore." ECF No. 328 at 129:4-5. Later, during cross-examination, she added,

> This happened at a specific time. I wish I could, but I just can't be like at 13, I beat Bill; at 14, I beat him more; at 16, I kicked his ass; at 17, I really f***ed him up. I can't say that because I don't know at what time it really started generating from this. Only thing I know is that Bill did get his butt kicked sometimes.

ECF No. 328 at 166:24-167:4. When asked whether she ever left marks on her children, Juanita Allen and counsel for the Government had the following exchange:

> A.     Probably Bill with the extension cord, because like I said, he used to get whipped with extension cords, but I'm pretty sure that left a mark on him, because when I got a whoopin' with an extension cord, it left a mark on me, so therefore –
>
> Q.     Do you recall testifying at your deposition when you were asked the question: 'Do you remember leaving a mark on any of your kids?' You answer being: 'That I can't recall. I can't say. I don't know.'
>
> A.     Right. But then, like I said, I just went back to that if it left a mark on me, and Bill had skin like me, whereas I can get scratched up at any time, then I'm pretty sure it left a mark on him.
>
> Q.     Okay. So you're saying you don't remember it leaving –
>
> A.     I don't remember. I'll do it like that, I don't remember.

ECF No. 328 at 129:17-130:10.

Juanita Allen said she locked Mr. Allen out of the house about two or three times while living on Cote Brilliante – in contravention with her declaration, which states, "I beat him and threw him out whenever I thought he deserved it (which was often)." Exhibit 258 at ¶ 13. She estimated Mr. Allen was fourteen years old when she did this, but she could recollect neither a specific instance, nor a reason for these occurrences. Nor could she recall how long he was gone, although, she said, "It wasn't more than a day." ECF No. 328 at 64:21. Again, this testimony was irreconcilable with her declaration: "There were periods of time when I would throw him out of the house and not let him back for days. During those times, I could often only guess about where he stayed (sometimes I know he went to stay with his father and Uncle Billy)." Exhibit 258 at ¶ 9. At the Hearing, she stated John Allen "played little or no role" in Mr. Allen's life. ECF No. 328 at 161:20-22. She admitted the declaration was incorrect in this regard. ECF No. 328 at 162:5-7. Moreover, she acknowledged filing missing person reports on at least two occasions: once when Mr. Allen was 18 years old, and once when he was 19 years old. *See* Exhibits 116, 118.

### 3.     Letters from Mr. Allen to Juanita Allen

While incarcerated, Mr. Allen wrote a number of handwritten letters to his mother, expressing his love and appreciation of her. *See* Exhibits 491-95. In one, he asked Juanita Allen how she was doing, and informed her he had "been doing alot [sic] of reading in the bible." Exhibit 491 at 1. He wrote, "I should of [sic] really put my heart into god in the first place, I believed and still believe in god and now that I know more about him I hate myself for not following his ways." Exhibit 491 at 1. He later added, "GOD knows that you tried to keep me away from all that type of drama but being in that neighborhood he was just testing me to see

what path would I go in[.]"  Exhibit 491 at 2 (emphasis in original).  He signed the letter, "Love Bill."  Exhibit 491 at 3.

In another undated letter to "Moma," Mr. Allen stated he was reading a "real good" book, adding, "[I]t makes me think about what we put you threw [sic] in the past years[.]"  Exhibit 492 at 1.  He indicated he would be out of prison soon, and said, "Tell my grandfather I pray every night that I get out of here so we can go to church together and we can spend more time together. I love my grandfather so much[.]"  Exhibit 492 at 1.  He ended the letter, "I Love You, Bill." Exhibit 492 at 2.

The remaining letters communicate similar sentiments.  In one, Mr. Allen wrote, "The[] other day I was reading this cartoon and it reminded me of you and I smiled.  I love you so much, and I know you feel the same."  Exhibit 493 at 1.  He also said, "At first I wanted to be one of those people who wanted to be known by everybody, but as you told me that wasn't cool at all."  Exhibit 493 at 1.  He consistently praised his mother: "To me you will still be the best mother in this world even though your son might be locked up like I said you did your part and I didn't do mine.  I'll always love you for being there for me when my so-called friends wasn't [sic]."  Exhibit 493 at 2-3.  In an additional letter, Mr. Allen stated, "I wrote my judge and told him about me that I went to Clayton High when I was young I played baseball, basketball, and you kept me out of trouble."  Exhibit 494 at 2.  Finally, an additional letter states, "Thanks to the love, from the one who always was in my corner[,] I know I'm going to pull threw [sic] this. Seeing you when you come up here makes me feel like things are going to get better, and with your support and god with me can't nothing stop me."  Exhibit 495.  The letter is signed, "Love Bill[.]  Happy Mother's Day 96 & 97."  Exhibit 495.

#### 4.    Interaction with the Trial Team

Juanita Allen recalled she met with Mr. Sindel, Mr. Simon, and Dr. Randall during the preparation of the criminal case, although she could not remember how many times.  She stated Mr. Simon came to her house on "several occasions," ECF No. 328 at 150:9-11, but Mr. Sindel did not.  She could not remember details of her discussions with the trial team, but repeatedly stated, if a question was asked by the trial team, she answered it to the best of her ability.  She admitted she told Mr. Sindel she would not lie to him and expected he would not lie to her.[41] She testified she had no memory of Mr. Sindel instructing her to only provide "positive" information about Mr. Allen's life, but formed this opinion on the basis of a letter she received from him.  ECF No. 328 at 117:6-13, 118:3-7.  This letter states, "[P]lease provide me with the names, addresses and phone numbers of individuals that you think I can talk to to help me understand Billie's character and that can be used in court to present a strong and positive picture of his background."  Exhibit 305.  However, it also advises the trial team was in the process of exploring Mr. Allen's lead poisoning, and asks her to provide information about "concussions, diseases, or other mental problems that may have complicated Billie's reasoning ability."  Exhibit 305.

Notwithstanding her initial inability to recall specific conversations with Mr. Sindel, on cross-examination, Juanita Allen acknowledged she spoke with him at his office in April 1997 and told him she would not lie to him.  She admitted she told Mr. Sindel about Mr. Allen's schooling, his lead poisoning and seizures as a child, and her efforts to have Mr. Allen evaluated at a psychological facility while in junior high school.  She further agreed she retrieved Mr. Allen's medical records, and sent him names of relatives and friends upon Mr. Sindel's request.

---

[41] Mr. Sindel also confirmed this occurred.  *See* Section III.A.1.

When asked, "Anything he asked for, you gave it to him?" Juanita Allen answered, "That I can recall." ECF No. 328 at 187:24-25.

When asked if Mr. Sindel ever talked to her about mitigation, Juanita Allen responded, "That I recall, I would have to say no. I don't know. I can't say." ECF No. 328 at 95:10-11. Similarly, she could not remember whether she was asked about her alcoholism. When asked, "Do you recall if you were ever asked any questions about, you know, violence that existed in your home?" Juanita Allen answered, "Not that I recall. I don't remember a whole lot of conversations with them, that's why I'm going like 'not that I recall.' It's not a conversation that we had, that they had that I can remember back from '97 that just stuck out and I remember, no." ECF No. 328 at 97:6-12. She said she could not recall any topics she was unwilling to discuss.

Due to the numerous people involved in the criminal case, Juanita Allen testified she could not specifically recall speaking with Dr. Randall before Mr. Allen's trial. However, she testified she answered all the trial team's questions to the best of her ability, without holding back. On cross examination, however, she stated she had no reason to doubt the accuracy of Mr. Simon's notes, reflecting her statement, "Bill don't come from bad environment." Exhibit 500 at 60. Likewise, she did not doubt the accuracy of Dr. Randall's notes, reflecting her statement, "We had our rules, abide by them. Up until that point, Bill was a perfect son. Me and my kids always hung out. People used to say he was a mama's boy, stuff like that. He was always underfoot." Exhibit 411 at 1.

At some point, Juanita Allen formed an opinion that Mr. Sindel did not have Mr. Allen's best interest at heart. When asked, "[W]hen was it that you believed that Rick Sindel – when did you come to believe that Rick Sindel did not have your son's best interest at heart?" Juanita Allen answered,

That was when we were able to go back into the – finally able to go into the courtroom, and I seen some of the mannerism in which he was doing in the courtroom that I was going like – here I go again, I'm not used to the judicial system, but I'm going like, I know for a fact some of the stuff that was being done, I was going like, nah, is this supposed to be like this?

ECF No. 328 at 156:9-18.  She later specified this happened when she heard Mr. Sindel call her son a liar during closing arguments.

## 5.    Post-Conviction Impressions

On cross-examination, Juanita Allen was confronted with her habeas declaration.  *See* Exhibit 258.  She said habeas counsel took notes while talking to her, and the declaration was prepared based on those notes.  She was shown a portion of the declaration, stating, "By the time he was around fourteen years old, Billie transformed into someone I didn't recognize.  He was a drug user and seller."  Exhibit 258 at ¶ 13.  At the Hearing, she was asked, "Do you recall testifying last year in your deposition that you didn't know Bill was selling drugs?"  ECF No. 141:10-11.  She stated she did so recall, but expounded, "But what happened was when I got home, I really thought about it, and it was after a fact that I thought about it when like, oh, wait a minute, this did happen, I recall."  ECF No. 328 at 141:15-18.  She was then shown Dr. Randall's interview notes, reflecting her statement, "I think that, the last I heard, Bill was selling some drugs, his Dad bought some from him."  Exhibit 411 at 2.  She confirmed she had no reason to doubt the accuracy of Dr. Randall's notes, but she could not recall Mr. Allen's age or school grade when he started selling drugs.

Juanita Allen's declaration further states, "My brother, Jerome, would often rough him up.  Jerome was a rough man during those years, and sometimes his treatment of Billie was abusive."  Exhibit 258 at ¶ 13.  At the Hearing, however, she testified she lacked any reason to doubt the accuracy of Dr. Randall's interview notes, reflecting her statement, "Monette and Billy

[sic] and Erica [McLemore],[42] they played with Jerome and Raymond as if they were one of the kids. Jerome, Raymond, and Bill, they hung out." Exhibit 411 at 3. She admitted, "back in 1998, '[she] didn't tell [the trial team] anything about Jerome abusing or hurting Billie[.]" ECF No. 328 at 161:1-3.

> An additional portion of the declaration states,

> Billie's lawyers at trial did not spend very much time with me at all. They would give me some basic information about the case, like when the next court date was. But they never really sat with me to hear my story. I told them some information, and they seemed to focus on the story about Marquis Taylor and the shooting. Had they spent more time with me, and asked about my background, problems and those of Billie's father, I would have told them. But, as I said, it is hard for me to discuss these topics. I only came to do so with Billie's current lawyers after spending many hours over many days with them. Billie's current lawyers have also asked me a lot of different types of questions, which have helped me to understand what information would be important to help Billie's legal case.[43]

Exhibit 258 at ¶ 14. Upon reviewing this, Juanita Allen testified,

> [L]et me interject and say that still yet even with Bill's lawyers right today, it's still hard for me to talk about some of the subjects that we are talking about. But at any given time, whether it would have been hard or not, if Rick Sindel or anyone else would have asked me those questions, no matter how hard they would had a [sic] been, I would have given them the answers.

ECF No. 328 at 145:7-13. She then said she would have given them straight answers "on the very first day," if they had asked. ECF No. 328 at 145:14-19. When asked, "So you weren't hiding anything from the attorneys at the trial, were you?" Juanita Allen answered, "No." ECF No. 328 at 146:14-16. She was reminded of her deposition, at which she said it was "[n]ot at all" hard to discuss these topics. ECF No. 328 at 147:21. After wrestling with counsel for the Government about whether these discussions are "hard" or not, she testified, "It's both. It's not at all hard because it's something – it's not hard because it's something that has to be talked

---

[42] Erica McLemore is Lucy McLemore's daughter and Mr. Allen's cousin.
[43] As noted in Section I, the Court relied heavily on this statement in granting an evidentiary hearing for this case.

about. And it's hard because it is something that has to be talked about. It's 50 in one hand and 50 in the other." ECF No. 328 at 148:12-16. She testified she could not recall telling Mr. Simon or Dr. Randall about her drinking problem. Finally, Juanita Allen testified she loved her son as a child, and she still loves him today. ECF No. 328 at 69:20-21.

### 6. Conclusion

Juanita Allen presented herself at the Hearing not only as a neglectful mother, but a beast who inflicted multiple felonious assaults on her son. A realistic conclusion is this alcoholic woman, when a harmful environment existed for her four children, responsively moved them to a safe harbor in her father's house. She worked steadily to support all four children; there is no evidence of any period of lengthy unemployment when the children lived with her. Juanita Allen assured that her son received medical care from the beginning of his life until he voluntarily departed from her home. Care by a pediatrician in the inner city is not common. She sought medical care for his dermatology problem. She tried to achieve better educational opportunities for her children, including Mr. Allen. In fact, she wanted him to receive special education. After Marquis Taylor's death, Juanita Allen wanted Mr. Allen to see a counselor, but he demurred. No teacher ever reported any of the Allen children for child abuse, and no evidence exists in this case that any child care worker from the Division of Family Services, or any agency, was ever in the Allen house for any reason. There is no believable evidence in this case that Juanita Allen engaged in behavior that could conceivably be interpreted as child abuse of Mr. Allen, until he started skipping school as a freshman or sophomore in high school, when he was sneaking out of the house and selling drugs. She then reacted with the disciplinary skills acquired from her childhood experience, acting, again, in an effort to save her son from a life of drug-dealing and potential death.

The Court concludes Juanita Allen's alcoholism occasionally took her away from the home overnight. All other evidence concerning this woman, who did the best she could do, considering the numerous obstacles she overcame, are mostly fiction, in the minds of those working to achieve relief for a son, a brother, a friend, and a client. The trial team was well aware of her episodes of violent behavior. They knew of specific witnesses who were available to testify at trial. Trial strategy decisions were made to pursue the strongest themes, believed as having the best route to accomplishing the ultimate goal of obtaining a life without parole sentence. There was an intentional decision not to employ the "trash-the-mother" theme. The team was cognizant of what it would accomplish, and what would be abandoned.

Irrespective of her delivery of incredible testimony at the Hearing, Juanita Allen should never walk away believing much of the fashioned testimonial stories that vilified her as a monster, many of which she adopted. Sometimes the best parenting skills cannot save a child from violent proclivities, unrelated to applied parental skills. The Court concludes Juanita Allen did all she could do to save her son from the drug culture and violence, which consumed the neighborhood in which the Allen family lived. Much of her testimony concerning her infliction of violence against Mr. Allen is unbelievable.

### F.     *Yvette Allen: Mr. Allen's Youngest Sister*

Mr. Allen's youngest sister, Yvette Allen, testified at the Hearing. She described the neighborhood on Evans Street as "pretty rough; a lot of drugs, gangs." ECF No. 329 at 5:21. As a child, she observed shootings and drug transactions, some of which occurred outside her house and involved her father, John Allen. While she never saw John Allen sell drugs, she "definitely" saw him buy drugs from other people. ECF No. 329 at 7:15-17. Yvette Allen testified John Allen would buy drugs in an alley behind the house on Evans Street. When asked, "[W]as Billie

ever there when your father . . . would go outside the house and buy drugs?" she answered, "Oh, definitely."  ECF No. 329 at 8:8-10.

Yvette Allen recalled seeing John Allen both high on drugs and intoxicated with alcohol – "a combination."  ECF No. 329 at 8:18-20.  He drank "[p]retty much every day," and did not work.  ECF No. 329 at 9:6.  She described John Allen and Juanita Allen's relationship was "pretty rocky.  They had a lot of fights . . . inside the house."  ECF No. 329 at 9:15-16.  Yvette Allen testified they fought about drinking, and had verbal and physical altercations in front of the children.  She described a particular altercation, in which John Allen came home drunk, Juanita Allen would not admit him in the home, and the two began to throw punches at each other. When asked, "When you were living on Evans Street, did your father used to have people come over and visit him at the house?" Yvette Allen testified, "I don't remember too much.  I don't remember company being over, a lot of people being over at the house.  I just remember a lot of people being like in the back of the house."[44]  ECF No. 329 at 14:22-15:1.  Yvette Allen stated she was "numb" to this fighting, she did not have a meaningful relationship with her father, and, at the time of the Hearing, John Allen could still be seen in the neighborhood, "stumbling" and drinking.  ECF No. 329 at 13:23-14:21.

According to Yvette Allen, when Juanita Allen and the children moved out of the house on Evans Street, only Otha Petty lived in the house on Cote Brilliante; Jerome Petty and Raymond Petty did not.[45]  ECF No. 329 at 20:23-25.  Yvette Allen testified Jerome Petty often spent time at the house on Cote Brilliante, but did not assist with raising the children.  When asked whether Jerome Petty interacted with Mr. Allen at all, Yvette Allen testified, "The only

---

[44] This is contrary to the testimony given by Juanita Allen, who said John Allen invited friends to the house on Evans Street.  *See* Section III.E.1.

[45] This is contrary to the testimony of Juanita Allen, who said Jerome Petty and Raymond Petty lived in the house on Cote Brilliante.  *See* Section III.E.2.

interactions that I remember were physical." ECF No. 329 at 24:11-14. She explained Jerome Petty used to hit Mr. Allen, adding, "Bill wasn't a violent kid. And, you know, he was a really respectful kid. He would never hit an adult back." ECF No. 329 at 25:16-19.

Yvette Allen testified Juanita Allen drank alcohol on a regular basis; intoxication was a daily occurrence. ECF No. 329 at 27:22-28:3. When Juanita Allen drank, she started fights, and "would hit on Billie a lot." ECF No. 329 at 28:9-12. Yvette Allen stated, "I saw beer bottles everywhere. We actually – when I was younger, we shared a room. I actually shared a room with my mom when I was younger, so we slept in the same room. I saw a lot of alcohol, a lot of drinks on the ground, in the bed, everywhere." ECF No. 329 at 29:12-16. She said Juanita Allen went to work drunk, and drank on the job with her coworkers. Yvette Allen said, at times, Juanita Allen had difficulty getting out of bed in the morning, and when that happened, Nicole Allen would wake up her younger siblings, dress them, do their hair, and make sure they went to school. Yvette Allen added, "Sometimes we didn't get up because we didn't have to because we knew that she wouldn't be up until later. Half of the time she didn't know we were there until she got up." ECF No. 329 at 30:18-22.

In the evenings, Juanita Allen drank with her friends at a club called "Lace." She generally did not come home until the children were asleep, although, at times, Yvette Allen saw her come home intoxicated. On one occasion, Juanita Allen was so intoxicated she went to the wrong house and fell asleep on the porch; the children had to help her home. Yvette Allen said there were times Juanita Allen did not come home at all. On these occasions, Juanita Allen stayed with her boyfriend, Louis McClinton, who Yvette Allen described as "controlling." ECF No. 329 at 34:19.

According to Yvette Allen, Juanita Allen beat Mr. Allen when she was intoxicated. When asked, "What do you remember about your mom hitting Bill?  Did she hit Bill with her fists?  Did she hit with an object?  Did she hit with an open hand?" Yvette Allen answered, "Hit with anything.  She would hit him with her fists.  She would hit, you know, with a paddle.  She had a paddle that she would hit him with a lot of times.  I remember him having a lot of nose bleeds when he was younger.  She used to hit him in the face and stuff a lot."  ECF No. 329 at 37:2-9.  She added, if Mr. Allen avoided fights with his peers, Juanita Allen would beat him. When asked, "And when she's punching him in the face, was he getting bruises in the face?" Yvette Allen answered, "No, I just remember nose bleeds."  ECF No. 329 at 71:15-17. Notwithstanding Juanita Allen allegedly used a paddle, extension cords, and her own hands "several times over a number of years,"[46] Yvette Allen never saw any injuries on Mr. Allen, aside from nose bleeds.  ECF No. 329 at 72:10-20.

Yvette Allen recalled an incident when Mr. Allen came home past curfew, which Juanita Allen imposed.  Yvette Allen estimated Mr. Allen was 13 or 14 years old.  As punishment, Juanita Allen beat him, and forced him to sleep on the porch.  Mr. Allen stayed on the porch for a short while, and left.  Juanita Allen "later on went looking for him in the car[.]"  ECF No. 329 at 41:9-10.  Yvette Allen testified Juanita Allen forced her son outside on other occasions, and when asked, "Did this happen one or two times or did it happen more than that[?]" she answered, "It happened more than that."  ECF No. 329 at 40:15-17.  However, she could not recall other specific incidents; then, she recalled one other time, when she asked Juanita Allen if Mr. Allen could come inside, and Juanita Allen refused.

---

[46] On redirect, habeas counsel asked, "So when you say 'over several years,' is it fair to say that he was beat a few times a week over a several year period?" to which Yvette Allen answered, "Yes."  ECF No. 329 at 73:14-17.

When asked whether Mr. Allen ever "g[o]t up in [Juanita Allen's] face and yell[ed] and cuss[ed] at her," Yvette Allen answered, "Absolutely not." ECF No. 329 at 70:10-12. She was then confronted with her mother's habeas declaration, which states, in part, "[Mr. Allen] would talk back, yell, cuss and disobey me." Exhibit 258 at ¶ 11. Yvette Allen still maintained Mr. Allen "never did that." ECF No. 329 at 71:3-4.

On cross-examination, Yvette Allen agreed Mr. Allen "would make stuff up sometimes in order to make people think he was more important than he was[.]" ECF No. 329 at 55:15-18. She added, "We all did. I said we all did. Like I said, we came from a home where we didn't have much. We all made ourself [sic] out to be more than what it was." ECF No. 329 at 55:18-21. When asked, "Do you remember him giving you money when you would go out?" Yvette Allen said, "No." ECF No. 329 at 56:2-4. Counsel for the Government then presented her with Dr. Randall's interview notes, reflecting her statement, "When I wanted to go out, he's [sic] always give me money." Exhibit 420. Yvette Allen testified she did not remember that statement, but she had no reason to doubt the accuracy of the notes.

Yvette Allen acknowledged Mr. Allen used to take her to parties when she was in middle school. When asked, "[I]n fact, you did know that Billie was using drugs during this time?" she answered, "Absolutely not." ECF No. 329 at 57:13-15. Likewise, at the time, she "had no idea" Mr. Allen was selling crack cocaine; she later learned this about him during the criminal trial. ECF No. 329 at 59:23-60:16. She recalled the house on Cote Brilliante getting "shot up," and when asked whether that incident occurred due to a bad drug deal, she answered, "We never knew exactly what happened." ECF No. 329 at 60:20-24. However, she admitted knowing Mr. Allen was drinking when he was as young as 15 years old.

Yvette Allen was 18 years old, a senior in high school, at the time of Mr. Allen's trial. She testified she did not remember meeting with Mr. Allen's lawyers prior to the criminal trial, although she did remember testifying at trial. She added she remembered going to Mr. Sindel's office once, explaining, "The only time I remember is my mom was actually there, and I went up there. It was my Homecoming night, so I went up there to show her my outfit, and then I left." ECF No. 329 at 49:18-20. She testified, if Mr. Allen's trial lawyers had asked about the matters she discussed at the Hearing, she would have revealed it, and testified about it at the trial. ECF No. 329 at 50:12-21. When asked whether she ever told the trial attorneys about the alleged beatings, she said, "They never asked." ECF No. 329 at 68:12. She was then reminded, "You don't actually remember any meetings with them, do you?" to which she answered, "I don't." ECF No. 329 at 68:13-15. Finally, she admitted she could not remember whether the trial attorneys asked about the alleged beatings.

### G. Claude McLemore: Mr. Allen's Cousin

At the Hearing, Claude McLemore, Mr. Allen's first cousin, provided testimony, which the Court accords minimal weight. Mr. McLemore said Juanita Allen was "very abusive of alcohol," ECF No. 335 at 11:25-12:4, drinking mainly in bed, during the day, until she left to drink at a place called "Lucky's" around 9:00 p.m. He stated Juanita Allen would beat and punch Mr. Allen with "anything that was in her surroundings; whatever she can grab. She just wanted to take it out on him." ECF No. 335 at 15:3-7. He added she would throw things at Mr. Allen, and she "never missed." ECF No. 335 at 15:14.

Mr. McLemore testified Mr. Allen endured beatings from his maternal uncle, Jerome Petty, as well. In his declaration, prepared by habeas counsel, Mr. McLemore stated Jerome Petty "used belts to whip Billie, and . . . also punched him with his fist." Exhibit 269 at ¶ 8.

However, in his deposition, Mr. McLemore testified Jerome Petty never used anything but his hands to hit Mr. Allen. *See* Exhibit 527 at 32:12-14. At the Hearing, Mr. McLemore testified, if trial counsel had inquired, he would have told them about Juanita Allen's drinking, and the verbal and physical abuse allegedly suffered by Mr. Allen.

Mr. McLemore testified he witnessed Mr. Allen drinking alcohol and smoking marijuana. Additionally, at his deposition, Mr. McLemore testified he and Mr. Allen drank alcohol and smoked marijuana together, at Mr. Allen's expense. He was then reminded, in the 1998 trial, he testified Mr. Allen never drank alcohol or smoked "dope" around him. Exhibit 183 at 172:10-15. At the Hearing, he attempted to reconcile his statements, explaining, "I didn't remember at that time of him – I didn't remember at that time about that situation." ECF No. 335 at 52:16-17. He then acknowledged his trial testimony was false, but added he did not want to "talk bad" about family. ECF No. 335 at 53:3-7. He was reminded of additional trial testimony, in which he stated he did not use alcohol or "dope." Exhibit 183 at 172:16-17. Finally, Mr. McLemore testified, "We smoked marijuana, but I'm not saying that it was his money. I could be – It could have been anybody's money. . . . I have my own money. He had his money, so." ECF No. 335 at 54:1-4. Counsel for the Government noted Mr. McLemore's contrary deposition testimony, in which he clearly stated Mr. Allen paid for the alcohol and marijuana. *See* ECF No. 335 at 54:5-20. Confronted with this contradictory evidence, Mr. McLemore stated, "His money – I mean different occasions his money, my money, so." ECF No. 335 at 54:19-20.

## H. Johnnie Grant: Mr. Allen's Friend

Johnnie Grant described Mr. Allen as his "best friend." ECF No. 329 at 75:7. The two met at a softball[47] tryout coached by Sam Moore. Mr. Grant described the Allen household as a "pig pen," ECF No. 329 at 78:5, infested with cockroaches and rats. He said Mr. Allen's bed was "nothing but metal springs" covered with a comforter. ECF No. 329 at 77:11. According to Mr. Grant, the house was occupied by Mr. Allen, Otha Petty, Juanita Allen, and Mr. Allen's three sisters. Mr. Grant could not recollect anything about Mr. Allen's uncles, Jerome Petty and Raymond Petty. This casts serious doubt as to Mr. Grant's credibility, since he testified he went to the Allen household "pretty much" every day, for years. ECF No. 329 at 103:20-25.

Mr. Grant testified Mr. Allen was "dog[ged]" by his family members. ECF No. 329 at 79:3. He continued, "I mean, just dogging him, talking about him, you know, his skin, how ashy he was, how dirty he is, he's a bum, disrespecting him, cussing him out, hitting him upside the head." ECF No. 379 at 79:3-6. He stated, on occasion, Otha Petty would deny Mr. Allen food; if Mr. Allen attempted to defy his grandfather, Otha Petty "pulled out a whip or a rope or a pot or pan or shoe and tried to [hit] him upside the head with it and run him away from the refrigerator."[48] ECF No. 329 at 82:16-18. In addition, Mr. Grant stated Yvette Allen, Nicole Allen, and Angela Allen all physically and verbally abused Mr. Allen. Specifically, he said they would "hit him[,] call him dirty and ugly and, you know, they'll run, they'll dart off, and Bill would be like, 'Boy, they really get on my nerves.'" ECF No. 329 at 108:20-24. This evidence is entirely unbelievable, based on credible evidence in the case.

---

[47] Whether Mr. Grant and Mr. Allen met at a softball tryout, or a baseball tryout, was disputed by other evidence.

[48] This is inconsistent with all other credible witnesses.

147

Mr. Grant testified Juanita Allen physically abused Mr. Allen, by striking him with her hands, both close-fisted and open-fisted, and with a belt. Mr. Grant recalled seeing Juanita Allen in her bedroom, "sitting up there drinking her bottle and smoking cigarettes." ECF No. 329 at 83:24-25. If she was having a bad day, she chased Mr. Allen out of the house. Mr. Grant said, on several occasions, Mr. Allen could not get into his home, and Juanita Allen and her daughters raised the blinds and looked at him, but refused to admit him. Mr. Grant stated there were several times Mr. Allen had to sleep overnight on the front porch; sometimes, Juanita Allen would refuse to admit her son for three to four days. On direct examination, Mr. Grant said these events started when Mr. Allen was 12 or 13 years old, and continued to his arrest, ECF No. 329 at 85:14-19; on cross-examination, however, he agreed Mr. Allen was at least 15 years old when his mother began locking him out. ECF No. 329 at 117:1-4. He also testified Juanita Allen's alleged abuse never resulted in a black eye or bleeding,[49] and he could not recall an instance when Juanita Allen kicked her son to the ground and continued to beat him.

Mr. Grant was presented with two letters he received from Mr. Allen, who was in jail awaiting trial at the time. *See* Exhibits 169, 170. In the letters, Mr. Allen asked Mr. Grant to "say the right things[.]" Exhibit 170 at 1. At the Hearing, Mr. Grant agreed Mr. Allen was asking him to testify falsely. Mr. Grant and his mother took the letters to the United States Attorney. ECF No. 329 at 250:8-12.

In the weeks leading to the criminal trial, Mr. Grant had two encounters with Juanita Allen. The first occurred in a Hardee's restaurant. Juanita Allen asked Mr. Grant, "[H]ow come you won't – you didn't cosign for Bill[?]" ECF No. 329 at 252:23-253:7. By "cosign," Juanita Allen meant "lie." ECF No. 329 at 252:23-253:3. She appeared upset, and stated Mr. Grant was

---

[49] This is inconsistent with the testimony of Yvette Allen, who recalled seeing Mr. Allen with nose bleeds. *See* Section III.F.

not Mr. Allen's friend. In a second encounter, Mr. Grant saw Juanita Allen in Schnucks, with two other women, Deborah Ruffin and Marquis Taylor's mother. On this occasion, Juanita Allen asked Mr. Grant what he had told the "feds," and Mr. Grant replied, "I really can't talk to you, I shouldn't be talking to you." ECF No. 329 at 253:23-254:1. Mr. Grant testified Juanita Allen began "acting outrageous and asking [him] to lie for Mr. Allen[,] [a]nd cussing [him] out[.]" ECF No. 329 at 254:2-5. He agreed Juanita Allen wanted him to lie for her son, specifically, by providing a false alibi.

Mr. Grant's testimony was plagued by his inability to remember basic events. At the outset of his cross-examination, he spontaneously volunteered, "In '06, Your Honor, I was in a seriously, seriously life threatening car accident. As my records reflect, I had brain trauma, a broken back, and I was fighting for my life. So in '06, since then in '98 or whatnot, I don't remember quite a few things." ECF No. 329 at 92:2-6. Notwithstanding he allegedly went to the Allen household over one hundred times, ECF No. 329 at 102:16-17, he did not recall Otha Petty having a studio apartment in the basement with its own kitchen. ECF No. 329 at 112:1-9. He could not recall Mr. Allen's arrest for stealing a car in early 1995, or his guilty plea for tampering with a motor vehicle, ECF No. 329 at 136:3-6; nor did he remember Mr. Allen being on probation. ECF No. 329 at 136:10-11. When asked if Mr. Allen's personality changed before the offense, he said, "No, I never noticed a change." ECF No. 329 at 137:14-15. Mr. Grant could not recall Dennis Noble, and he could not remember the circumstances of Marquis Taylor's death. He could not remember whether Marquis Taylor's death had an effect on Mr. Allen. Although Mr. Grant was "quite sure" he told habeas counsel of his car accident, ECF No. 329 at 154:12, his habeas declaration makes no mention of it. *See* Exhibit 266.

A portion of Mr. Grant's habeas declaration states,

> A few nights before Billie got arrested, I was driving him around and he asked me to take him to his house so he could get some clothes. He walked up to the door and knocked. I saw someone look through the blinds, and Billie asked to get in so he could get some clothes. They told him no, and he pleaded with them and banged on the door but they told him to go away and that he was not welcome there ever again.

Exhibit 266 at ¶ 13. When questioned about this statement at the Hearing, counsel for the Government and Mr. Grant had the following exchange:

> Q.     . . . Who was it that said, he's 'not welcome there ever again,' which person?
>
> A.     I was sitting in the car at that time.
>
> Q.     Did you hear this?
>
> A.     I was sitting in the car at that time so I couldn't see.
>
> Q.     Could you hear?
>
> A.     No, I couldn't hear neither.
>
> Q.     Well, how do you know what –
>
> A.     That's what he told me. That's what he told me at the time when he got back inside my car.

ECF No. 329 at 177:4-14. Mr. Grant was then reminded of his grand jury testimony, in which he relayed his last contacts with Mr. Allen before the March 17, 1997 bank robbery. During that testimony, Mr. Grant failed to mention the incident described in his declaration. Regarding his grand jury testimony, he said, "I still don't – I don't even remember this for real. I don't remember everything that was – I'm looking at it now, and I don't even remember half of this right here that you done read." ECF No. 329 at 181:14-17. He maintained he was "positive" the event described in his declaration occurred on the last night he saw Mr. Allen before the offense. When counsel again began to point out Mr. Grant did not mention this to the grand jury, he interrupted, stating, "Yeah, I mean, hey, it's like that." ECF No. 329 at 183:23-25. Similarly,

during the guilt phase of trial, Mr. Grant testified he did not return to Mr. Allen's house, after he heard rumors it was "shot up." ECF No. 329 at 189:6-20. Again, he did not mention the incident described in his declaration. Mr. Grant admitted he did not prepare his declaration; habeas counsel presented it to him, and he signed it.

An additional portion of Mr. Grant's declaration states, "If I had been asked about any of these topics at Billie's trial, I would have testified to the same information contained in this Declaration." Exhibit 266 at ¶ 15. After reviewing this statement, Mr. Grant was presented with his penalty phase testimony:

Q.      Did [Mr. Allen] talk about his family much?

A.      Yes.

Q.      Did you know his family?

A.      Yes.

Q.      Mother, sisters?

A.      Yes.

Q.      Did you know any extended relatives such as cousins, aunts, uncles?

A.      Yes.

Q.      Was family important to Mr. Allen?

A.      I mean I – I suppose his family is important, but I mean I – he didn't never say anything such as – I mean bad about them, you know, how you upset about your – at your mom, you make a comment about it every now and then.

Exhibit 176 at 226:12-227-1. At the Hearing, review of this testimony led to the following exchange between Mr. Grant and counsel for the Government:

Q.      . . . So let me ask you, Mr. Grant, when you're being asked the question about his family, and no one really asked you whether he ever said anything bad about them, but you volunteered that information, and that he didn't say anything bad about them.

Now, if you're someone sitting there with it in your mind that he was abused by his family and treated unfairly and beaten with belts and had shoes thrown at him and had his grandfather throw shoes at him and so on and so forth, you didn't say that at trial, did you?

A.     That wasn't – that was the furthest thing from my mind as such.  Further wise is that personal business that we have shared and the things that I did see, I did mention them at that time.  But everything that I done said such as him getting beat, locked out of the house, all of the above it true.

Q.     But in terms of what you were asked at trial, you were asked a question at trial about his family and his home life, weren't you?

A.     Right, I didn't remember that until you just recently show [sic] me.

Q.     No, you didn't remember it when you prepared that declaration either, did you?

A.     Right.

ECF No. 329 at 214:7-215:4.  At the Hearing, counsel for the Government continued to present Mr. Grant with portions of his trial testimony, which established Mr. Grant had every opportunity to discuss Mr. Allen's purported abuses.

### I.     Daniel Cuneo, Ph.D.: Clinical Psychologist during the Criminal Case

Dr. Daniel Cuneo, Ph.D., is a clinical psychologist, who was retained by the defense team during Mr. Allen's criminal case.  At the Hearing, Dr. Cuneo testified regarding his involvement in preparing for trial.

### 1.     Chronology of Dr. Cuneo's Involvement in the Criminal Case

In September 1997, Mr. Sindel contacted Dr. Cuneo to conduct a competency evaluation of Mr. Allen.  Dr. Cuneo recalled an early conversation with Mr. Sindel, who described Mr. Allen as unable to "tell . . . the truth to save his soul."  ECF No. 330 at 16:10-11.  On January 16, 1998, Dr. Cuneo met Mr. Allen at the Franklin County Jail to perform a competency evaluation. During this evaluation, Dr. Cuneo gave Mr. Allen a 566-question psychological test called the

Minnesota Multiphasic Personality Inventory (MMPI); rather than waiting for Mr. Allen to fill out the extensive MMPI, he left it with Mr. Allen to complete on his own. In addition, Dr. Cuneo formed an initial impression that Mr. Allen suffered from PTSD. He also believed Mr. Allen had cannabis dependence: "[i]n other words, long-term marijuana abuse." ECF No. 330 at 24:21-25. Dr. Cuneo's billing records state he billed four hours for "Evaluation at Jail" on January 16, 1998, *see* Exhibit 55 at 2; at the Hearing, Dr. Cuneo testified he interviewed Mr. Allen for one and one-half hours, and spent the remainder of the time travelling. ECF No. 330 at 25:9-14. Dr. Cuneo acknowledged some of the information he gathered was also relevant to mitigation. He added, however, "[On] January 16th, I never knew I was going to do anything about mitigation." ECF No. 330 at 22:11-12.

Dr. Cuneo took extensive notes of his January 16, 1998 interview of Mr. Allen. *See generally* Exhibit 565. He noted Mr. Allen had a history of pica and seizures. Mr. Allen told Dr. Cuneo the nature of the criminal charges, but contended he was not involved in the bank robbery. He knew he had been in jail since March 1997, and was oriented to time and place. He stated he went to Clayton schools from kindergarten to eighth grade, and then Sumner High School in the City for ninth grade; he dropped out of school at the age of 15. Mr. Allen related he went to a psychiatric center, after Marquis Taylor was killed in front of him a few years before; after that, Mr. Allen had nightmares. He described his drinking habits to Dr. Cuneo; he drank two or three bottles of wine on weekends, and started having memory lapses two years prior, when he drank excessively. Mr. Allen said he attempted to overdose two to three times since Marquis Taylor's death. He told Dr. Cuneo he sat in his room and meditated to clear his mind, cried about the loss of his friend, and did not tell anyone. He relayed his criminal record, consisting of a tampering charge, for which he received two years of probation. He said he tested "dirty" for his probation

officer, meaning he had tested positive for drug use. ECF No. 330 at 134:1-8. Mr. Allen told Dr. Cuneo at the age of 15, he started smoking marijuana, which he did "a lot" – about two ounces per week, ECF No. 330 at 134:18-23, and he earned $500.00 per week writing music, although he could not play an instrument or read music. Dr. Cuneo asked Mr. Allen to describe his mother, to which Mr. Allen responded, "Real sweet. Tried to give us everything. Steered us out of trouble." ECF No. 330 at 137:15-18. Dr. Cuneo also noted Mr. Allen "lived at home with his mom until January 1997. Left . . . because he felt someone was out to get him." ECF No. 330 at 137:18-21. In a note to the side, Dr. Cuneo wrote, "His mom said he was staying out of the house. Mom physically disciplining [illegible][50] till end."[51] Exhibit 565 at 22; ECF No. 330 at 137:22-138:15. Notwithstanding this annotation, and his knowledge child abuse increases the risk of PTSD, Dr. Cuneo testified he did not see an indication of potential physical abuse. Dr. Cuneo concluded Mr. Allen was not delusional, but was "jumpy," and had periods of paranoia. ECF No. 330 at 135:1-14.

Dr. Cuneo testified he never asked Mr. Allen whether he was abused. He admitted, however, in 1998, he knew prior abuse was "a risk factor that increases the probability of PTSD upon exposure to a qualifying event[.]" ECF No. 330 at 89:16-22. When asked why he never discussed this topic with Mr. Allen, he answered, "Because Mr. Allen described his mother in glowing terms." ECF No. 330 at 90:1-2.

On or about February 1, 1998, the trial team asked Dr. Cuneo to assist with mitigation. When asked for his initial response to this request, Dr. Cuneo testified, "I think my first line was,

---

[50] The illegible word appears to state "him," but Dr. Cuneo could not recall what he had written.

[51] Dr. Cuneo testified he added this annotation because of a statement made by Juanita Allen, not Mr. Allen. *See* ECF No. 330 at 163:11-19. Dr. Cuneo explained he added this to his notes from Mr. Allen's interview, because it contradicted Mr. Allen's description of his mother. That said, his notes from his interview of Juanita Allen do not contain any similar statements, and Dr. Cuneo testified he "ha[s] no idea why" this could be. *See* Exhibit 413; ECF No. 330 at 167:9.

'You're out of your mind.  You want me to do this in a month?  Are you crazy?'  That's not what usually happened."  ECF No. 330 at 26:16-18.  He stated Mr. Sindel ultimately convinced him to agree by making him feel guilty.

On February 15, 1998, Dr. Cuneo had a telephone conversation with Juanita Allen.  *See generally* Exhibit 413.  He explained he wanted to verify the deaths of Dennis Noble and Marquis Taylor, and obtain her perceptions of those events.  Juanita Allen reported Mr. Allen distanced himself from other children in the neighborhood after Marquis Taylor died.  She described her son as a follower.  Dr. Cuneo noted Mr. Allen's experience in Job Corps; he repeatedly ran away from Job Corps to return home.  Juanita Allen also mentioned Mr. Allen had a skin condition as a child.  Dr. Cuneo admitted this information "[c]ould be" relevant to mitigation.  ECF No. 330 at 165:24-166:3.  In addition, Dr. Cuneo testified Juanita Allen told him she used physical discipline on Mr. Allen.  When asked, "So she had no problem telling you on February 15, 1998, that she had physically disciplined Mr. Allen, corporal punishment?" Dr. Cuneo answered, "She didn't say corporal punishment, she said physically discipline."  ECF No. 330 at 167:15-18.  Later, he admitted that on February 15, 1998, he had no time limit on how long he could interview Juanita Allen, he knew he could ask her all the questions he wanted to ask, and there were no questions he was afraid to ask.  ECF No. 331 at 172:9-13.

Dr. Cuneo was shown the letters Mr. Allen wrote to his mother while awaiting trial.[52]  Dr. Cuneo testified he had not reviewed those letters before the criminal trial, but, if he had, he would not have been surprised to learn Mr. Allen wrote them.  He explained,

> That's what happens with abuse.  There's a couple things on this, okay.  That's why you see – 50 percent of all people, when we were talking about kids transitioning out of foster homes that were abused, they end up going back to their original homes.  That's the only home that they know.  So this would not have

---

[52] The letters are fully discussed in Section III.E.3.

> surprised me. It's also even a variation of a Stockholm syndrome, where an individual ends up aligning himself with the abuser or trying to please the abuser.

ECF No. 330 at 43:16-24. Although he did not ask Juanita Allen whether she abused her son, Dr. Cuneo testified there were no topics he was afraid to discuss with her, and he was not concerned particular questions would alienate her. Dr. Cuneo did not know why the trial team refrained from calling Juanita Allen as a witness at trial, explaining, "I was not privy to trial strategy like that." ECF No. 331 at 104:19. Nor could he recall anyone on the trial team ever stating a "trash-the-mother" strategy would be inadvisable. When asked, "Is that something that perhaps you expressed to the trial team?" Dr. Cuneo answered, "No, I would not make that statement. At least I can't see myself making that statement." ECF No. 331 at 108:14-17.

Dr. Cuneo completed his expert report on February 16, 1998. *See generally* Exhibit 103. The cover page states, in part, "Two weeks ago I was also asked to look at possible mitigation factors as I may be called upon to testify in the penalty phase if Mr. Allen is convicted of Murder. I have not finished this assessment and still will be receiving additional information for that. Therefore this report will primarily deal with Mr. Allen's competency to stand trial." Exhibit 103 at 1. Notwithstanding these statements, Dr. Cuneo testified the report fails to address mitigation "at all." ECF No. 330 at 47:4-6.

According to Dr. Cuneo, the report contains a "very, very, very limited [social] history." ECF No. 330 at 111:13-15. In fact, it contains, *inter alia*, information about Mr. Allen's criminal history, education, drinking, and marijuana use, all of which Dr. Cuneo admitted "[c]ould" be relevant to mitigation. ECF No. 330 at 111:21-112:2. The February 16, 1998 report is the only report Dr. Cuneo generated. He said he asked one of Mr. Allen's trial attorneys whether he should generate an additional report, and was instructed he should not. He testified he "knew from experience that the purpose of a report is so that the other side has some notice of what

you're going to say and has something in writing to enable it to at least have some basis to cross-examine you and/or prepare rebuttal[.]" ECF No. 330 at 191:11-16.

Dr. Cuneo conducted a second interview of Mr. Allen on February 22, 1998. At the Hearing, he readily agreed he made a mistake in his habeas declaration, which states, "Due to the time constraints that the defense team was then working under, I did not have time for a second face-to-face interview with Mr. Allen that would have focused solely on mitigation." Exhibit 257 at ¶ 5. He minimized this omission, however, by adding, "I saw him a second time, but it wasn't solely for mitigation. I wanted to see also the MMPI." ECF No. 330 at 32:22-23. After wrestling with counsel for the Government, Dr. Cuneo admitted the February 22, 1998 interview "would have been solely for mitigation. I did look some of the time at his MMPI, but I went back the second time because I was told that I had to go testify in court." ECF No. 330 at 156:9-11. Like other witnesses in this case, Dr. Cuneo did not write his declaration; it was prepared by habeas counsel.

When Dr. Cuneo received the MMPI answers, he noticed Mr. Allen had failed to respond to about seventy questions. Dr. Cuneo testified he went through each of the blank questions with Mr. Allen, and "the thing that was strange about it was that the ones he left blank primarily were ones that would have put him in a bad light. Mr. Allen always wanted to put himself in the best possible light." ECF No. 330 at 34:23-35:2.

As he did in the January 16, 1998 interview, Dr. Cuneo took detailed notes at the February 22, 1998 interview. *See* Exhibit 384. Some of the topics discussed included Mr. Allen's grades in school, basketball, his lack of trust, nightmares, his mother's attempts to have him seek counseling, Job Corps, selling drugs, suicide attempts, the visit to MSLPC, his

childhood nickname "Rusty Crusty Bill," and Dennis Noble's gang-related death. *See generally* Exhibit 384.

When he testified in the mitigation presentation, he had reviewed Mr. Allen's school records, health records, and police records; the police report contained collateral interviews pertaining to actions of Mr. Allen and Norris Holder. When asked, "So apparently would you agree that the investigation that was done by the trial team in '98, at least as to documentary evidence was 100 percent complete and thorough?" Dr. Cuneo answered, "I would say that the documents were there. I don't believe the interviews were done." ECF No. 330 at 102:7-11.

### 2. Post-Conviction Impressions

Dr. Cuneo testified, even after reviewing the evidence adduced by the habeas team, he still would not change his diagnosis of PTSD. ECF No. 330 at 45:18-21. He explained,

> What it would have changed – all of this would have changed is that this would have been another theme to present to the jury, and that would have been the history of abuse. That also would have made sense of why the [PTSD] [sic]. Because what happens with [PTSD], you can have one single event trigger it, okay. And in his case I thought there was [sic] two events. I thought there was Dennis Noble and then later on Marquis Taylor. Especially . . . Marquis Taylor triggered it.
>
> But what would have happened if there had been a long-term pattern of abuse in his family home, that would have further confirmed the diagnosis, because it would have made him more susceptible. What happens with PTSD or with trauma, it has an accumulative effect.

ECF No. 330 at 45:18-46:11.

Dr. Cuneo stated, if the habeas declarations are accurate, he would have "painted a different picture" at the criminal trial. ECF No. 330 at 56:8-15. That is, if Mr. Allen "had been repeatedly thrown out," "raised in a home with alcoholic parents," and "repeatedly physically abused," Dr. Cuneo would have testified about those events during the mitigation presentation. ECF No. 330 at 56:8-57:10. While he would not have altered his diagnosis of PTSD, he would

have used this evidence to bolster his opinion. He also would have wanted to pursue an MRI for Mr. Allen, "because of the possibility of morphological changes in the brain due to repeated trauma." ECF No. 330 at 59:3-5.

In his habeas declaration, Dr. Cuneo opined the quality of his criminal trial testimony was hindered by his lack of information about Mr. Allen's past. Specifically, at the criminal trial, counsel for the Government cross-examined Dr. Cuneo about whether Mr. Allen displayed persistent avoidance.[53] Counsel asked whether Mr. Allen was displaying persistent avoidance by returning to Marquis Taylor's house and Prentiss Church's house – which was the scene of Marquis Taylor's death – to keep the memory alive. *See* Exhibit 208 at 305:8-17. After grappling with counsel, Dr. Cuneo admitted, "In that particular case, that would not be persistent avoidance." Exhibit 208 at 306:5-6. In his habeas declaration, Dr. Cuneo expressed he felt ineffective for his failure to provide a better response. Exhibit 257 at ¶ 11. He continued, "However, had I possessed the information collected by current counsel, which establishes that Mr. Allen had no choice – he was locked out of his home throughout his teen years for no reason and for days at a time – I could have powerfully responded to those questions." Exhibit 257 at ¶ 11.

At the Hearing, however, this proposition was undermined. Counsel for the Government asked, "The fact that [Juanita Allen] may have put [Mr. Allen] out and he had nowhere else to go but the streets, none of that compelled him to go to Prentiss Church's house or to Marquis Taylor's house, did it?" ECF No. 331 at 121:24-122:2. Dr. Cuneo answered, "He went back there to try to put it back together for himself. He had bits and pieces." ECF No. 331 at 122:3-4.

---

[53] According to Dr. Cuneo, "persistent avoidance" is a diagnostic criterion for PTSD. Exhibit 257 at ¶ 11.

Counsel pressed on, asking, "Yet none of that would require him to go to those places, would it?" to which Dr. Cuneo admitted, "No." ECF No. 331 at 122:5-7.

Similarly, during the criminal trial, Dr. Cuneo testified Mr. Allen exhibited social impairment as a result of his PTSD. He said Mr. Allen "had no real friends. He may have had hangers-on, but as he stated to me, he has always been frightened to get close to anyone." Exhibit 208 at 306:11-14. When counsel asked about Mr. Allen's purported nightlife at Cloud Nine, Dr. Cuneo opined Mr. Allen was living in a dream world: "I have difficulties believing that he was always hanging out at Cloud [Nine], or having this fantastic social life, drinking, Moet and Chandon, it's one of the fancier wines." Exhibit 208 at 307:5-8. At the Hearing, counsel asked,

> So if [Mr. Grant] testified that – both at trial and [at the Hearing] that he was Mr. Allen's best friend, and the two of them regularly frequented Cloud Nine, frequently picked up girls there or at shopping malls or other places and that they both had very active social lives, would that be information that's inconsistent with social impairment?

ECF No. 331 at 128:7-12. Dr. Cuneo answered, "It may be."[54] ECF No. 331 at 128:13. Even if Mr. Allen did exhibit social impairment, Dr. Cuneo admitted he could not determine whether it was caused by PTSD, as opposed to excessive use of marijuana and alcohol. ECF No. 331 at 211:1-6.

In his declaration, Dr. Cuneo discussed the expert reports of Dr. Stewart and Dr. Martell. Specifically, he states, "Their reports chronicle frequent, unpredictable beatings and whippings that Mr. Allen suffered at the hands of his mother and other family members; the many nights he spent locked out of his house in the ghetto from a very young age; and the complete absence of a supportive and nurturing home environment." Exhibit 257 at ¶ 8. At the Hearing, when asked,

---

[54] This casts serious doubt on the notion Mr. Allen suffered from social impairment. Mr. Grant testified he and Mr. Allen frequented Cloud Nine and participated in other social events together.

"And the phrase 'very young age,' by what – what age are you referring to there when you use the phrase 'very young'?" Dr. Cuneo answered, "Four, five, six, I believe that's what it had stated in the declarations." ECF No. 331 at 70:10-14. There is no credible evidence Mr. Allen was locked out of any house or abused during these ages. Dr. Cuneo, like other habeas expert witnesses, was unsuccessful in supporting his signed declaration, which was prepared by habeas counsel, and contained purported factual statements, which were inaccurate or totally refuted by the record.

### J. Christopher Wuertz, M.D.: Psychiatrist at the Metropolitan Saint Louis Psychiatric Center

Another witness, Christopher Wuertz, M.D., testified at the Hearing. In his Post-Hearing Brief, Mr. Allen takes the position, had trial counsel had additional time, they could have successfully contacted Dr. Wuertz and presented him as a witness during the penalty phase. ECF No. 351 at 34 n. 9.

In the 1990s, Dr. Wuertz was a practicing psychiatrist at MSLPC. At MSLPC, Dr. Wuertz treated "largely indigent patients" with "acute psychotic illnesses like schizophrenia, bipolar illness. Also individuals with substance abuse. And a smattering of other psychiatric illnesses as well." ECF No. 331 at 28:11-15. MSLPC provided inpatient services; it had an emergency room, where patients were evaluated to determine whether they required inpatient services. If they did not, they were referred elsewhere. Medical records reflect Mr. Allen visited MSLPC twice in February 1997: once on February 11, and once on February 20. *See* Exhibit 119. Dr. Wuertz testified he had no recollection of seeing Mr. Allen.

Dr. Wuertz was the physician of record for Mr. Allen's February 11, 1997 visit to the MSLPC emergency room. Based on the medical records, Dr. Wuertz estimated he spent about 45 minutes with Mr. Allen on that occasion, and his notes indicate Mr. Allen stated, "A lot of

things have been happening to me." Exhibit 119 at 3. Dr. Wuertz further transcribed his notes as follows:

> 21-year-old black male with no prior psychiatric contact brought in by girlfriend and her mother.[55] Patient states that he has been under a lot of psychosocial stressors. These include being put out of family house because he was selling drugs as well as the death of friends. Patient states he has been thinking about dying but denies any suicidal ideation, plan or intent. He is unable to articulate any other depressive symptoms.[56] He denies psychotic symptoms as well as symptoms consistent with substance abuse. Girlfriend and mother unaware of any behaviors consistent with dangerousness to self or others.

ECF No. 331 at 32:25-33:10; Exhibit 119 at 3. Dr. Wuertz testified "dangerousness to self or others" would be the primary reason for admission to the inpatient services at MSLPC. ECF No. 331 at 33:11-21. In addition, Dr. Wuertz transcribed his February 11, 1997 notes regarding Mr. Allen's psychiatric history:

> Denies, although may have . . . antisocial personality disorder traits[.] Has history of suspension for truancy. Support his self [sic] via drug sales since adolescence. Denies other [antisocial personality] symptoms but may be unreliable in this regard. For example, girlfriend's mother told me that patient was put out of family home because . . . someone was looking for him and shot up their home.

ECF No. 331 at 34:5-12; Exhibit 119 at 3. He further noted Mr. Allen denied abusing alcohol or other substances. Exhibit 119 at 3. Dr. Wuertz diagnosed Mr. Allen with "[d]epressive disorder, not otherwise specified." ECF No. 331 at 35:5; Exhibit 119 at 4. According to his notes, he offered inpatient evaluation, but Mr. Allen refused. Mr. Allen did not meet the criteria for involuntary commitment, and was given a referral sheet for an outpatient clinic. Dr. Wuertz testified he did not perform an assessment for PTSD. He explained, "We would largely not look

---

[55] Presumably, this refers to Tasha Valentine and her mother.

[56] Dr. Wuertz explained "other depressive symptoms" could include "a pervasive sense of gloom and doom, . . . alterations in . . . sleeping habits[,] . . . changes in . . . appetite accompanying loss of weight[,] . . . difficulty focusing and concentrating on material[,] anxiety, as manifested by agitation, or slow down, . . . [and] difficulty enjoying normally enjoyable things[.]" ECF No. 331 at 48:18-49:4. Dr. Wuertz testified his notes lack any indication Mr. Allen exhibited any of these symptoms.

for those kinds of things. The nature of that illness is sufficiently difficult and diffuse to diagnose, and oftentimes does not require inpatient admission unless there are imminent danger [sic] to self or others." ECF No. 331 at 37:11-15. Dr. Wuertz testified Mr. Allen's MSLPC records did not point to PTSD "one way or the other." ECF No. 331 at 38:12.

Based on the records for the February 20, 1997 visit, Dr. Wuertz opined Mr. Allen went to the MSLPC emergency room on that occasion as well. Under "History of Present Illness," the records state, "LWBS," which, Dr. Wuertz clarified, means "left without being seen by the physician in the emergency room." Exhibit 119 at 2; ECF No. 331 at 31:23-24.

At the Hearing, Dr. Wuertz was shown Dr. Randall's "extremely urgent" facsimile transmission, dated March 6, 1998. *See* Exhibit 388. Dr. Wuertz testified he had no recollection of receiving this correspondence. Nor did he have any recollection of being contacted about Mr. Allen's 1998 trial proceedings. He testified, if he had been asked to testify in Mr. Allen's trial, he would have provided the same information he provided at the Hearing. When asked, "If . . . either the girlfriend, the mother, or Mr. Allen had claimed in his contact with you that he had been, was being or was going to be physically abused in any way, is that something that you would have noted?" Dr. Wuertz answered, "Yes." ECF No. 331 at 62:23-63:2. He agreed he would have noted "[t]hings like bruises, healing wounds, or recent scars[.]" ECF No. 331 at 63:7-8. Finally, when asked, "Is the absence of those from your record – or given that they are absent from your record, are you fairly confident that there wasn't any of those things present in your observations?" Dr. Wuertz replied, "Correct." ECF No. 331 at 63:9-13. Had he been called as a witness, Mr. Allen's drug use and drug sales would have been an issue for trial counsel, which successfully kept that information away from the jury.

### K.  Daniel Martell, Ph.D.: Forensic Neuropsychologist

At the time of the Hearing, Daniel Martell, Ph.D., had been a forensic neuropsychologist for approximately 23 years, and was board certified in forensic psychology, but not in neuropsychology.[57]  He estimated he had conducted over one thousand forensic neuropsychological evaluations, and provided consulting services in 50 to 60 capital cases.  He had testified as an expert witness approximately 25 to 30 times.  He opined, over the course of his career, about 70 percent of his work was for the prosecution, and 30 percent was for the defense.  In the five or six years preceding the Hearing, the balance of Dr. Martell's work largely shifted to defense in capital cases.

#### 1.  Clinical Interview

In 2009, Dr. Martell conducted an evaluation of Mr. Allen over a three-day period: on February 5, 2009, February 6, 2009, and May 1, 2009.  In total, Dr. Martell spent approximately 13 and one-half hours with Mr. Allen, with more than half of that time spent on administering neuropsychological tests, and the rest of the time spent in clinical interview.

Dr. Martell conducted a mental examination of Mr. Allen, "looking for active evidence of Psychopathology, signs and symptoms of mental illness that would be present[.]"  ECF No. 339 at 18:11-15.  Dr. Martell explained his process:

> You observe him.  I – I take some history.  I ask about psychotic symptoms.  I look for evidence that he's responding to unseen visions or unheard voices.  I look for evidence that he might be encumbered by a false belief system, a delusional belief system, things like that that help me to understand if he is suffering a mental disorder.

ECF No. 339 at 18:17-23.  During the course of this evaluation, Dr. Martell inquired about Mr. Allen's family history, social history, educational background, childhood illnesses, and potential

---

[57] Dr. Martell was admitted, without objection, as an expert witness in both forensic psychology and neuropsychology.

psychiatric history. He testified, "Overall, [Mr. Allen] did fairly well. He had some evidence of depression. That would be the most salient thing that came out of it." ECF No. 339 at 18:25-19:2.

### a. Health Problems

Dr. Martell discussed Mr. Allen's history of pica, which he described as a behavior disorder, because "at its base, it is a behavior . . . driven by situational circumstances." ECF No. 339 at 21:12-14. He opined pica led Mr. Allen to ingest lead paint, ultimately causing lead poisoning, which "may have led or contributed to seizures." ECF No. 339 at 22:4. In addition, he testified, "I would view [lead poisoning] as one of multiple risk factors for brain dysfunction in Mr. Allen's history." ECF No. 339 at 22:20-21.

In addition, Dr. Martell found Mr. Allen suffered from diurnal enuresis as a child. He explained diurnal enuresis is a more severe form of regular enuresis. He continued,

> It may be a behavior that's done to draw attention to oneself; you know, to make up for feeling unrecognized or, you know, to otherwise draw attention. It may reflect some neural developmental delay in the ability to control and to sense the fullness of the bladder. But in general, there's – children that are doing that during the daytime have a more severe form of the disorder.

ECF No. 339 at 23:8-15. He said daytime enuresis "can certainly be associated with abuse and neglect, other psychiatric problems that a child may be having." ECF No. 339 at 23:18-20.

Other childhood health issues included asthma and eczema.[58] Dr. Martell opined Mr. Allen began suffering asthma attacks when he was about one and one-half years old. He testified, "He had attacks where he had to be taken to the Emergency Room because he had been having an attack for 12 hours. Generally, you know, asthma is relatively benign if treated well, but the lack of oxygen to the developing brain is another insult." ECF No. 339 at 23:25-24:4.

---

[58] Dr. Martell defined eczema as "a skin condition with flaking and peeling and reddened patches on the skin." ECF No. 339 at 24:16-17.

Dr. Martell said Mr. Allen's asthma was successfully treated. Regarding eczema, Dr. Martell stated Mr. Allen's condition could have damaged his self-esteem. He explained, "It was disfiguring to the extent that other children, other people could clearly see it on him; would make fun of him for it; would call him names like 'crusty' or 'ashy' because of it, and I think for him it became a sense – a source of embarrassment and shame." ECF No. 339 at 24:19-23.

### b.    Education

Based on school records, Dr. Martell testified Mr. Allen initially attended a neighborhood school, where he repeated kindergarten twice. He later transferred to a "more suburban" school in the Clayton School District, under a desegregation program. ECF No. 339 at 25:11-12. Dr. Martell testified the desegregation program was both "a blessing and a challenge; a blessing because [Mr. Allen] was exposed to very good teachers and exposed to just a better school environment but a challenge in that he was one of a few minority students." ECF No. 339 at 25:14-18. He continued,

> [Mr. Allen] was called names because of his race. He may have experienced some discrimination in that setting, and he also got to see how – he made friends with those kids and got to see how they lived and, you know, wished for a lifestyle like they had which was quite different from the lifestyle that he had at home.

ECF No. 339 at 25:18-23. Dr. Martell acknowledged the school records fail to indicate Mr. Allen had a learning disability, but his family took him to a medical doctor, who prescribed imipramine[59] for his "attentional problems." ECF No. 339 at 26:2-10.

Mr. Allen participated in standardized testing on "an almost yearly basis." ECF No. 339 at 26:12-13. While Mr. Allen "did quite well in some areas, he had a consistent deficit area in expressive language[.]" ECF No. 339 at 26:13-15. In addition, Dr. Gelbort "did some

---

[59] Dr. Martell explained, "In addition to treating depression, [imipramine] also has some effects in focusing attention." ECF No. 339 at 27:19-20.

achievement testing that also showed some impaired achievement, suggesting a learning disability." ECF No. 339 at 26:21-23. Dr. Martell testified he believed the "sum totality of the evidence . . . suggests that there is something was something going on with him in terms of a specific learning disability." ECF No. 339 at 27:4-6.

*c.*      *Family History*

Dr. Martell testified Mr. Allen's family history had serious impacts on his psychological development. Specifically, he stated,

> Well, I think the most salient thing about his family history has to do with his mother and the fact that she had a problem with alcohol and, you know, in the vernacular, was a mean drunk who was excessively – I mean cruelly abusive to Mr. Allen, particularly as he got older. But there's also evidence in the record that she was neglectful, you know, when he was an infant; that she wouldn't respond to him when he cried; that he would be left in his crib in soiled diapers and not changed and cared for; that she would stand over the crib and cigarette ashes would fall on – into his crib as he's laying there in some distress. You know, that's – that's pretty serious neglect.

ECF No. 339 at 27:25-28:11. On cross-examination, counsel for the Government asked, "Now his mother smoking a cigarette over him and ashes falling on the child when he was a baby, what impact do you think that would have on later development of a child?" ECF No. 339 at 73:23-25. Dr. Martell responded, "Well, it's not going to have – He's going to have no recollection of that." ECF No. 339 at 74:1-2. He said he only mentioned this because "it speaks to her child rearing skills and abilities[.]" ECF No. 339 at 74:4-5.

Referring to an unidentified quote, Dr. Martell testified Juanita Allen "drank like a man[.]" ECF No. 339 at 28:16-17. When asked for the psychological significance of growing up in such a household, Dr. Martell expounded,

First and foremost, if a mother drinks during pregnancy,[60] this can cause birth defects, abnormal brain development in particular. It could cause cognitive deficits and mental retardation. . . . Then there's huge literature about children of alcoholics and the problems that they grow up with that include, you know, abuse and neglect from a mother who's busy drinking rather than caregiving as well as the social modeling. . . . [A] child learns that the way you cope with life is through alcohol and substance abuse. It's not the kind of role model that's good for kids. And as a result, kids grow up with a range of psychological problems that stem both from observing the behavior of the parent and that stem from the bad behaviors that the parent exhibits in child rearing.

ECF No. 339 at 28:23-29:13.

Based on "multiple declarations and statements and . . . a passing reference in the penalty phase testimony," Dr. Martell concluded Juanita Allen was severely abusive. ECF No. 339 at 29:22-25. Specifically, he found she "beat [Mr. Allen] excessively," utilizing a number of items not normally employed for corporal punishment purposes. ECF No. 339 at 29:25-30:2. He believed she threw an iron, high-heeled shoes, and a pan removed from the stove at Mr. Allen. He testified she used extension cords, switches, sticks, and her own fist to beat him. He further stated, "All of these are excessive examples of punishment, and they're made worse by the fact that it appears that they were administered for no obvious reason or for the most minute reason which becomes very difficult for the child to process and understand." ECF No. 339 at 30:8-12. Dr. Martell further testified as to Juanita Allen's habit of locking Mr. Allen out of the house was an inappropriate form of punishment, regardless of provocation, for either a 14-year-old, 15-year-old, or 16-year-old child. Then, habeas counsel asked, "Now were there some instances where ostensively [sic] some of Mrs. Allen's actions were, you know, quote, 'discipline'?" to which Dr. Martell answered, "I think there were. There were times when he would stay out later

---

[60] While Dr. Martell testified he believed Juanita Allen drank while pregnant, he was unaware that, at the time of the criminal trial, she denied doing so. He admitted her denial "would raise a red flag that would require further inquiry then. Is she – Who's telling the truth, when, where. You know, it would be something to look into." ECF No. 339 at 85:16-18.

than he should or he may not respond immediately when asked to do something, and that would trigger an abusive incident." ECF No. 339 at 30:16-21. Dr. Martell said whether Mr. Allen felt he was being abused was irrelevant to whether he was actually being abused.

When counsel mentioned Juanita Allen testified she had sex for money on her front porch, Dr. Martell opined, "To a young child, it's extremely confusing; you know, premature sexualization. To an older child, it's a source of shame, embarrassment; can lead to psychiatric problems like depression, anxiety, and you know, just that loss of a normal mother/child relationship." ECF No. 339 at 32:5-10. He further testified this behavior indicates Juanita Allen's judgment was "grossly impaired." ECF No. 339 at 32:13.

Dr. Martell testified Mr. Allen experienced violence outside of his home, as well. Based on declarations he reviewed, he recalled an incident in which Mr. Allen and his mother were walking down an alley, and were "stuck up" at gunpoint. ECF No. 339 at 42:4-5. Mr. Allen was seven years old at the time, and, according to Dr. Martell, the incident had a "profound effect on [Mr. Allen] as it would on anyone." ECF No. 339 at 42:4-7. In addition, Dr. Martell noted the deaths of Dennis Noble and Marquis Taylor as important events in Mr. Allen's life. He described Marquis Taylor's death as the "coup de gras, . . . because that was Mr. Allen's closest friend at the time, and that triggered lasting psychological damage that continues to this day." ECF No. 339 at 42:17-20.

Dr. Martell concluded he "do[es] believe that [Mr. Allen] was abused." ECF No. 339 at 45:21. He reasoned,

> [W]hen I look at a case, what I'm looking for is threads of evidence that all point in the same direction and lend increased credence to a set of behaviors or to an event; in this case, abuse by Mrs. Allen on Billy [sic] Allen. And what I find is there are multiple accounts from multiple witnesses that tell the same story. I'm aware that there may be credibility issues with some of the witness statements, with things that they've said in the past, you know; their willingness to be less

169

than honest. But at the end of the day, for me, looking at all of the data before me, I believe it's true that he was abused.

ECF No. 339 at 46:5-15. He later added "neglect started early and abuse came as he grew older, and got worse." ECF No. 332 at 77:21-22. When asked, "So you're saying the abuse, the physical abuse that you've described and labeled as abuse didn't start until he was a teenager?" Dr. Martell answered, "Well, it's unclear. The declarations don't anchor to points in time. So I'm going in part on what they say and in part on what [Mr. Allen] told me." ECF No. 332 at 77:25-78:5.

In making his conclusions, Dr. Martell relied almost entirely on the habeas declarations. While Dr. Martell also credited Raymond Petty's trial testimony, he admitted he has never spoken to Raymond Petty personally; he only looked at the cold record. In fact, he had not reviewed anything beyond the declarations for any of the fact witnesses. He had no way to evaluate credibility, except to look for consistencies between declarations.[61] While he "may have reviewed" parts of Juanita Allen's deposition, he did not review any of the other depositions, and he was not present in Court to see the testimony of other witnesses. ECF No. 339 at 56:5-6. He testified he was not aware of inconsistencies between the habeas declarations and the facts adduced at the criminal trial. When asked, "Did you question [habeas counsel] about who wrote these [declarations] and whether or not it contains the words of the witness? Anything about how they were prepared or came to be?" Dr. Martell answered, "No. . . . I mean I think it was obvious who wrote them. I mean they've got a name on them." ECF No. 339 at 61:17-23.

---

[61] At the Hearing, doubt was cast, however, even on this notion. Dr. Martell relied on Cathy Toliver's habeas declaration to conclude Juanita Allen let cigarette ashes fall into Mr. Allen's crib as a baby. When asked, "[I]s there anyone else beside her that you rely on for those – for evidence of that particular activity? And is there any thread of consistency from the earlier reports developed?" Dr. Martell answered, "No." ECF No. 339 at 75:7-12.

Finally, Dr. Martell was unaware that Dr. Cuneo noted, while interviewing Juanita Allen, "Mom physically disciplining [illegible] till end."[62]  When asked, "If any mother told you, as a competent psychologist, that she had physically disciplined her child till the end and at that time he was an adult, would that raise some obvious issues for you to pursue and inquire about the potential for abuse?" Dr. Martell answered, "Yes."  ECF No. 339 at 66:1-6.

d.  *Psychological Effects of Abuse*

Dr. Martell testified about a longitudinal study started in 1980, conducted by the Department of Health and Human Services and the Federal Government.  *See* ECF No. 339 at 35:8-23.  He said the study followed 1500 abused children for decades, and monitored their development.  He continued, "One of the most distressing findings is just the fact of being abused causes impaired brain development.  The brain physically does not grow and develop in a normal fashion.  This, in turn, leads to cognitive deficits; learning disabilities, poor academic performance."  ECF No. 339 at 35:17-22.  Aside from impairment of brain function, the study showed "80 percent of abused children placed out of the home developed a diagnosable mental disorder by the time they were 21."  ECF No. 339 at 36:19-21.  Dr. Martell testified, according to this study, abused children have an increased risk for depressive disorders, anxiety disorders, and eating disorders.  He stated child abuse results in impaired socialization.  He explained, "[C]hildren that come out of abusive environments tend to become involved in high risk behaviors.  They . . . are more prone to drug and alcohol abuse; more prone to delinquency and violent behavior; more prone to sexual indiscretion[.]"  ECF No. 339 at 39:4-8.  Dr. Martell stated child abuse, like the abuse allegedly suffered by Mr. Allen, can cause poor judgment, poor reasoning, and lower self-esteem.  Additionally, aside from victims of violence, witnesses of

---

[62] *See also* Section III.I.1.

violence are at increased risk for psychiatric disorders as well. Specifically, children who witness gun violence are at an increased risk for "becoming involved in violent, delinquent or criminal behavior[.]" ECF No. 339 at 43:8-11.

On cross-examination, Dr. Martell admitted "social impairment, occupational impairment, poor performance in school, poor attendance at school [can] be a result of excessive marijuana and alcohol use[.]" ECF No. 339 at 71:19-23. When asked

> When you have an individual who has excessively abused marijuana or alcohol who becomes either socially impaired or occupationally impaired, do you have any way of defining whether the impairment is the result of the excessive marijuana and alcohol use or the result of exposure to the abuse behavior you described?

Dr. Martell answered,

> Well, it's probably not – it's not possible to separate them. That – The abusive behavior leads to the self-medication. The effects of the drug and alcohol use impair the functioning in the school setting. So it's a – it's kind of a feedback loop rather than only one thing or only another thing. They're co-mingled.

ECF No. 339 at 72:19-73:5. When pressed further, Dr. Martell admitted there is "no necessary connection between the two[.] . . . [T]here are those who might be exposed to abuse who do not develop these impairments[.]" ECF No. 339 at 73:6-10.

Dr. Martell stated social support, friends, family, a nurturing environment, and a good school system can "buffer" people from "the additive burden of multiple stressors." ECF No. 339 at 43:14-22. In contrast, "[t]o the extent that those buffers are absent, the effects of the life stress are actually exacerbated." ECF No. 339 at 43:23-24. Initially, Dr. Martell testified Mr. Allen had "minimal to no buffers." ECF No. 339 at 44:11. While he acknowledged Juanita Allen ensured Mr. Allen received medical care, he stated, "The fact that [Juanita Allen] on occasion did the right thing doesn't really make up for the number of bad things and the bad judgment that she showed." ECF No. 339 at 45:2-4. On cross-examination, however, Dr.

Martell admitted he would consider the following as potential buffers: Mr. Allen's closeness with Mr. McLemore, Mr. Allen's relationship with Raymond Petty, Mr. Allen's friendship with Ahmed Oliver and Marquis Taylor, and Mr. Allen's involvement in Boy Scouts, organized sports, and church. *See* ECF No. 339 at 68:14-69:22.

## 2. Neuropsychological Testing and Dr. Martell's Expert Report

On June 30, 2009, Dr. Martell issued an expert report, Exhibit 256, on his findings. The sum total of what Dr. Martell had when he prepared his report was the transcript of the penalty phase, school records, medical records, Franklin County prison records, and a variety of declarations. The expert report reveals Dr. Martell's task, as defined by the habeas team, was threefold. First, Dr. Martell was asked to evaluate Dr. Gelbort's 1998 psychological analysis of Mr. Allen. Exhibit 256 at 1. Second, if Dr. Martell found Dr. Gelbort's performance "fell short" of the 1998 standard of care, he was asked to conduct his own evaluation of Mr. Allen, applying techniques available at the time of the criminal trial. Exhibit 256 at 1. Finally, Dr. Martell was asked to "provide the Court with opinions regarding any mitigating evidence identified in the course of [his] forensic examination that was either not presented, or not fully addressed at the time of [Mr. Allen's] capital sentencing proceedings." Exhibit 256 at 2.

Ultimately, although Dr. Martell found Dr. Gelbort's testing was "sloppy" and contained "problems," he concluded Dr. Gelbort reached the "right answer." ECF No. 339 at 17:6-23. Like Dr. Gelbort, Dr. Martell found Mr. Allen suffered from "some" brain impairments. *See* ECF No. 339 at 16:20-17:3. He administered numerous psychological tests, including the "WAIS-III" and "WMS-III," the California Verbal Learning Test (CVLT), the Stroop test, the FAS test, the Boston Naming Test (BNT), the Neuropsychological Deficit Scale (NDS), and the Halstead Impairment Index (HII). In the report, Dr. Martell concluded, "On the basis of these

test results, [Mr. Allen] clearly meets criteria for a diagnosis of Dementia due to Multiple Etiologies[63] (maternal cigarette smoking; maternal alcohol abuse; lead poisoning; recurrent febrile convulsions; uncontrolled asthma; and one or more mild head injuries)." Exhibit 256 at 32. At the Hearing, Dr. Martell explained a diagnosis of dementia under the Diagnostic and Statistical Manual (DSM) requires satisfaction of two prongs: (1) memory impairment, and (2) some other impairment of intellectual functioning.

a.  *Interpreting Psychological Testing Data*

At the Hearing, Dr. Martell provided background information concerning the interpretation of psychological testing. *See generally* ECF No. 339 at 108-118. After an individual is tested, he or she receives a raw score, which is then converted to a scaled score. The scaled score is, in turn, converted to a "T" score using "norms." Dr. Martell explained the norms come from researchers, who administer particular tests to normative populations, and determine mean results. The norms may become updated over time. A psychologist like Dr. Martell, testing an individual patient, would select the norms that best fit such patient, using factors such as age, education, and sex. This ensures, for instance, an 80-year-old individual with a Ph.D. will not be compared with a 20-year-old college student. He said whether race is an appropriate factor is controversial.

After applying the norms to the scaled score, a resulting T-score will fall between zero and 100. The mean of a T-score scale is always 50, and the ultimate inquiry is how many standard deviations a person strays from the mean. One standard deviation is equal to ten on the T-score scale; for instance, a person with a T-score of 64 has a resulting standard deviation of 1.4. Dr. Martell explained, the ultimate importance of the standard deviation is to "understand

---

[63] At the Hearing, Dr. Martell agreed the term "etiologies" is a "fancy word for 'causes.'" ECF No. 339 at 143:20-22.

how abnormal a person's score is; how far do they fall from the general population average." ECF No. 339 at 111:2-3.

At the outset, the Court notes finding appropriate norms in this case is particularly problematic. Dr. Martell tested Mr. Allen in 2009, not in 1998 when Mr. Allen was 19 or 20 years old. Dr. Martell said, in conducting his 2009 evaluation, he "tried to . . . recreate what Dr. Gelbort could have done if he did a more comprehensive evaluation." ECF No. 339 at 118:17-19. When asked, "So in the intervening ten years, what [Mr. Allen] has been doing with himself, whether or not he's been educating himself any further, and just ten more years of living makes him different than a 20-year-old with a [ninth] grade education. Would you agree?" Dr. Martell answered, "Well, certainly he's older." ECF No. 339 at 119:4-9. That said, he said he did not inquire of Mr. Allen what educational or reading opportunities he experienced while in prison. He testified he used norms "available to Dr. Gelbort at the time of trial." ECF No. 339 at 156:13-14. When asked, "So you gave tests to a 31 or 32-year-old man as if he was 18," Dr. Martell replied, "Well – and there's the rough. That's the one place where you can't reconcile the two things." ECF No. 339 at 156:15-18. Accordingly, he used 1998 norms for 30-year-olds. Dr. Martell described this as a "conundrum," ECF No. 339 at 157:7, but denied trying to "squeeze a square peg through a round hole[.]" ECF No. 339 at 157:18-20.

### b.    WAIS-III and WMS-III

First, Dr. Martell reported he administered the WAIS-III and the WMS-III, a battery of tests resulting in IQ scores. Dr. Martell's data reflect Mr. Allen had an "average" Verbal IQ (VIQ) score of 92, a "high average" Performance IQ (PIQ) score of 110, and a resulting full scale IQ "average" score of 100. Exhibit 568 at 11. At the Hearing, Dr. Martell admitted this score was considerably higher than Mr. Allen's results in 1998. When asked, "The kinds of

deficits normally associated with the kinds of additive burdens that you described, such as fetal alcohol syndrome, lead poisoning, febrile seizures, things like that are not the kind of injuries to the brain that one recovers from, are they?" Dr. Martell answered, "Well, not between age 19 and age 30." ECF No. 339 at 136:17-22. He then conceded, "They would be permanent and stationary." ECF No. 339 at 136:24. Dr. Martell attributed Mr. Allen's lower 1998 scores to "situational factors at play at the time [Mr. Allen] was evaluated by Dr. Gelbort," including the stress of the imminent trial, being arrested, and depression. ECF No. 339 at 137:23-138:5. Dr. Martell testified, while Mr. Allen has a normal IQ, "in the context of overall average intellectual functioning, he demonstrated a number of deficit areas consistent with his history of exposure to neurotoxins, febrile convulsions, asthma, and mild head injuries." ECF No. 339 at 140:19-25; Exhibit 256 at 31. He added, "One tries to understand why you get a pattern of impairment. You look to the history, and those are the significant factors in his history that could account for the impairments seen." ECF No. 339 at 141:1-3.

The report states Mr. Allen's score "on the Working Memory Index of the WAIS-III was impaired relative to his overall level of intellectual functioning, in part due to a significant weakness in Arithmetic skills." Exhibit 256 at 32. At the Hearing, Dr. Martell testified Mr. Allen's Working Memory Index score, which was 84, fell 1.1 standard deviations below the mean, falling in the "low average" or "mild impairment" categories. ECF No. 339 at 147:22-148:3. When asked, "Is this compared to a national sample of 33-year-olds with a ninth grade education or 18, 19-year-olds in 1998?" Dr. Martell replied, "This is compared to people of his age and education at the time of testing." ECF No. 339 at 149:9-13.

Dr. Martell reported average and low average results for WMS-III sub-indexes entitled, "Auditory Immediate," "Visual Immediate," "Immediate Memory," "Auditory Delayed,"

"Visual Delayed," "Auditory Recognition Delayed," "General Memory," and "Working Memory." Exhibit 568 at 19. He testified the results of these indexes explain the difference between Mr. Allen's normal IQ score, and his low average Working Memory Index. He explained, "What you expect in a man of [Mr. Allen's] age is everything's going to be normal, and his IQ would tell you to expect everything to be normal because his IQ is normal. When you find something that deviates significantly from that normal IQ, it's a cause for concern and an issue to be explored." ECF No. 339 at 151:19-23. Dr. Martell was then confronted with the results of the Predicted Memory Method, which calculates the difference between Mr. Allen's ability and his memory. *See* Exhibit 568 at 26. Notably, "ns," which stands for "not significant," is assigned to each of the differences between Mr. Allen's WMS-III sub-indexes and his WAIS-III abilities.

According to a different method, the Simple Difference Method, all but three of Mr. Allen's indexes were not significantly different, and even those three were precisely on the cut-off for significance. Exhibit 568 at 27; ECF No. 339 at 153:25-154:4. At the Hearing, counsel for the Government noted Dr. Martell had two choices: the Predicted Memory Method, which reported no significant differences, and Simple Difference Method, which reported three significant differences. When asked, "Why is it that you chose to report the one that said there was a significance?" Dr. Martell answered

> Well there's two reasons. The first reason is this is the way I was trained. This simple difference method uses his actual scores and looks statistically for a difference between them. That's the reason I went with that because that's what I know and that's how I was trained. That's what I'm comfortable with.

> The Predicted Method is a new method that uses statistical population data to predict what you would expect the score to be. And it didn't find the differences, but there are differences there, and that's what I reported.

ECF No. 339 at 154:16-155:3. Dr. Martell admitted he only reported the "bad" information; this is not something he was trained to do. ECF No. 339 at 155:6-11. Dr. Martell admitted one of his bases for finding a memory impairment – the first prong of a dementia diagnosis according to the DSM – was the difference between Mr. Allen's WMS-III and his IQ.

*c.*     *California Verbal Learning Test*

The report also mentions Dr. Martell administered the CVLT, which tests an individual's ability to memorize a list of grocery items after multiple exposures and a substantial delay. Exhibit 256 at 32. Dr. Martell testified the CVLT addressed the memory impairment prong of the dementia diagnosis. According to the report, Mr. Allen "displayed substantial impairment in verbal learning, with scores on the major CVLT measures falling two to three standard deviations below the mean, together with significant intrusions of erroneous material and a mild degree of perseveration.[64]" Exhibit 256 at 32. In his deposition, Dr. Martell indicated the CVLT affected by life skills; in other words, people accustomed to making grocery lists could fare better than those unaccustomed to doing so. He did not ask Mr. Allen whether he had life experiences related to the CVLT. Similarly, Dr. Martell did not ask Mr. Allen whether he was familiar with certain grocery list items, such as halibut, flounder, paprika, or plums.[65] Dr. Martell later admitted he was unaware of any real world example of a way in which dementia would have manifested itself on Mr. Allen's life.

One stage of the CVLT, which Dr. Martell did not report, required Mr. Allen to answer whether each item was the on grocery list or not. Mr. Allen scored perfectly on this section. When asked, "Why not report that? Is that significant in terms of his verbal learning skill?" Dr.

---

[64] Dr. Martell defined "perseveration" as "repeating the same word more than once in recalling the list." ECF No. 339 at 180:21-23.
[65] On redirect, Dr. Martell explained asking such questions would have been contrary to testing protocol.

Martell answered, "It's easier to identify them in that fashion. What's more significant is if there had been significant items missing, and what's also significant is the fact that he . . . identified items as being on the list that weren't on the list." ECF No. 339 at 181:20-182:1. The Court is not persuaded by his answer. Dr. Martell developed a perceptible habit of not reporting objective findings that detracted from his ultimate conclusions.

d.      *Stroop Test and FAS Test*

According to Dr. Martell, the other prong of the dementia diagnosis was satisfied by the results of the Stroop test and the FAS test, which address executive functioning. Dr. Martell found the results of the Stroop test, an indicator of frontal lobe damage, were "moderate" impairment. ECF No. 339 at 189:24-190:6. There are three parts to the Stroop test: the "Word," the "Color," and the "Color Word" test. ECF No. 339 at 190:19-21. In the Word test, the individual reads the names of colors as quickly as possible in 90 seconds. In 90 seconds, Mr. Allen read 93 out of 100 words. In the Color test, the individuals views "X's" in different colors, and names the color of as many of them as possible in 90 seconds. Out of 100, Mr. Allen named 70 colors. In the Color Word test, the individual views the names of colors, printed in mismatched ink; for example, the word "red" could be printed in green ink. In this phase, the individual must name the color of ink, resisting the frontal lobe's impulse to simply read the word. Out of 100, Mr. Allen named 42 colors. As he testified, Dr. Martell realized his mistake in recording "22" instead of "42." After walking through the relevant calculations with counsel for the Government, Dr. Martell agreed the change from 22 to 42 altered Mr. Allen's standard deviation from 1.7 below the mean to 0.2 above the mean – slightly above "normal." ECF No. 339 at 197:14-15. Dr. Martell readily agreed the Stroop test results, as corrected, do not support a diagnosis of dementia.

Notwithstanding the Stroop test miscalculation, Dr. Martell still opined Mr. Allen met the qualifications for dementia, based on his FAS test results, which were mild impairment, or zero to one standard deviation below the mean. The FAS is a verbal fluency test, containing two parts: the "FAS" portion and the Animal Naming Test. In the FAS portion, the individual has 60 seconds to name as many words as possible beginning with the target letters: first "F," then "A," then "S." *See* Exhibit 570 at 14. Mr. Allen scored 29 points on the FAS portion, with two instances of perseveration. Exhibit 570 at 14. Similarly, in the Animal Naming Test, the subject has 60 seconds to name as many animals as possible; Mr. Allen named 18 animals, with one instance of perseveration.

On cross-examination, Dr. Martell testified he did not report the results of the Animal Naming Test; he added, "I may have just looked the numbers up on a table." ECF No. 332 at 6:10. Accordingly, counsel and Dr. Martell analyzed the results together, at the Hearing. Using a table copyrighted 2004, Mr. Allen's raw FAS score, 29, had a corresponding scaled score of 8. Exhibit 559 at 4. His raw Animal Naming Test score, 18, had a corresponding scaled score of 9. Exhibit 559 at 4.

Next, counsel and Dr. Martell applied norms to the scaled scores, to arrive at a T-score. Dr. Martell objected to the norms presented by counsel, which were specific to the African American race. *See* Exhibit 559 at 5. He explained the use of race is controversial, and, given this uncertainty, the author of the norms recommends avoiding them in capital litigation, particularly because their application lessens the likelihood of obtaining results showing impairment. Dr. Martell testified, when he analyzed Mr. Allen's results, he used a set of race-

neutral norms in existence at the time of the criminal trial.[66]  In addition, Dr. Martell stated race-specific norms were not available at the time of the criminal trial.  ECF No. 332 at 83:24-84:4.

Regardless, counsel and Dr. Martell applied the race-specific norms to Mr. Allen's scaled scores.  Mr. Allen's scaled Animal Naming Testing score had a corresponding T-score of 49, which is 0.1 standard deviation below the mean and therefore normal.  Exhibit 559 at 5.  Mr. Allen's scaled FAS score became a T-score of 47, which is 0.3 standard deviation below the mean, and therefore normal.  Exhibit 559 at 5.  Dr. Martell was asked how he came to the conclusion Mr. Allen's FAS results were "mildly impaired."  ECF No. 332 at 10:23-25; Exhibit 256 at 32.  He answered he used a different set of norms.  When asked, "And how old are those?" he replied, "I don't know.  They were in existence at the time of trial.  They would have been contemporary at the time of trial."  ECF No. 332 at 11:4-7.  When asked for a real-world skill that an FAS mild impairment would affect, Dr. Martell answered, "It reflects problems in verbal processing and accessing vocabulary and language."  ECF No. 332 at 16:24-17:2.  Dr. Martell admitted he did not observe Mr. Allen having any difficulty communicating, but added, "These are subtle deficits that are being detected by this test.  They are not always obvious to the lay person."  ECF No. 332 at 17:22-24.

### e.  Boston Naming Test

Dr. Martell also administered the BNT, which requires an individual to name certain objects according to their pictures.  His report states, "[T]here was evidence of significant aphasia[67] on the [BNT], where his score was in the range of severe impairment, falling four

---

[66] Specifically, Dr. Martell stated he used "Lezak's norms."  ECF No. 332 at 6:17-18.  Neither party has provided the Court with a copy of these norms.
[67] Dr. Martell defined "aphasia" as "a disturbance in language."  ECF No. 332 at 22:3.  He explained, "There are two basic forms.  Expressive aphasia is an impairment in your ability to

standard deviations below normal for his age and education[.]" Exhibit 256 at 32. Out of 60 pictures, Mr. Allen properly named 51 items, ECF No. 332 at 37:9-10; he missed "acorn," "hammock," "stethoscope," "accordion," "compass," "yoke," "trellis," "protractor," and "abacus." Exhibit 570 at 10-12. At the Hearing, Dr. Martell readily admitted he made an additional mistake in analyzing the BNT results, but added, "[I]t doesn't change the outcome." ECF No. 332 at 20:9. Notwithstanding this position, Dr. Martell agreed he would "revise" his conclusions of "severe" impairment to a determination of "mild to moderate" impairment. ECF No. 332 at 43:2-7. He explained he applied incorrect norms to Mr. Allen's BNT results; that is, he used norms from an older version of the BNT, which contained 85 pictures instead of 60. *See* Exhibit 558 at 2. Dr. Martell testified, when he corrected his mistake and applied accurate norms, Mr. Allen was "still one and a half to two standard deviations impaired in his naming ability." ECF No. 332 at 21:12-13. However, when counsel showed Dr. Martell the African American norms for the BNT, Mr. Allen's T-score was 54: 0.4 standard deviation above the mean. *See* Exhibit 559 at 4-5. Dr. Martell continued to aver the African American norms were "inappropriate in this setting." ECF No. 332 at 40:19-20. Dr. Martell admitted he did not observe Mr. Allen demonstrating any symptoms of aphasia in the 13 and one-half hours he spent with him. ECF No. 332 at 22:7-11.

Regardless of his reported "severe" impairment conclusions, Dr. Martell admitted there exist two other ways to calculate Mr. Allen's results for the BNT. Specifically, aside from the norms discussed *supra*, the BNT itself contains its own sets of norms: one that addresses the subject's amount of schooling, and one that addresses the subject's age. *See* Exhibit 570 at 13. Both of these sets of norms are race-neutral. Using the BNT norms for schooling, Mr. Allen

---

speak in a coherent way. Receptive aphasia is in your ability to understand spoken language." ECF No. 332 at 22:3-6.

scored 1.1 standard deviations below the mean.  Exhibit 570 at 13; ECF No. 332 at 46:15-18.

Using the BNT norms for age,[68] Mr. Allen scored 2 standard deviations below the mean.  Exhibit

570 at 13; ECF No. 332 at 48:2-6.   Interestingly, Dr. Martell's report only mentions the

erroneous result of 3.6 standard deviations below the mean, representing severe impairment; he

did not report the other two analyses, which resulted in findings of mild to moderate impairment.

More importantly, Dr. Martell administered to Mr. Allen the Aphasia Screening Test

(AST), which specifically tests for aphasia, Exhibit 569 at 13; Mr. Allen's score was "perfect."

ECF No. 332 at 24:7-8.   When asked, "And even though you reported to the Court . . .  that [Mr.

Allen] had a significant aphasia problem, you didn't tell the Court that he got a perfect score on a

test specifically directed at screening for aphasia?" Dr. Martell averted the question, stating,

"Well, the [BNT] is more sensitive to the language disturbance than this test is."  ECF No. 332 at

24:9-14.  Finally, when asked, "But you didn't explain that in your report or advise the Court of

that, did you?" Dr. Martell responded, "No."  ECF No. 332 at 24:15-17.   This, together with Dr.

Martell's consistent errors and failure to report results detrimental to his goals, drives a stake into

the heart of Dr. Martell's credibility.

### f.    Neuropsychological Deficit Scale

The NDS served as an additional basis for Dr. Martell's ultimate diagnosis of dementia.

*See* Exhibit 256 at 32; Exhibit 569 at 19.   His report states, "[Mr. Allen's] score on the [NDS], a

composite measure based largely on the Halstead-Reitan Neuropsychological Test Battery, was

in the range of mild brain damage (NDS Score = 29, cutoff for normal = 25)."  Exhibit 256 at 32.

The results of the administered test constitute a single, entirely handwritten page in Dr. Martell's

data.   *See* Exhibit 569 at 19.   At the Hearing, Dr. Martell testified the NDS comes from a

---

[68] Dr. Martell used the 30- to 39-year-old age group.

textbook by Ralph Reitan, but he could not recall the name of the book. He stated the NDS is in common use in his field, but could not provide any names of colleagues who do so. Dr. Martell's notes reflect a final score of "29," Exhibit 569 at 19; he testified the NDS does not use T-scores. When asked, "Why is there no T-score for this?" he answered, "I don't know. Ask Dr. Reitan." ECF No. 332 at 54:25-55:1. He stated he used Ralph Reitan's book to determine the corresponding level of impairment; the book was not available at the Hearing. After wrestling for some time with counsel for the Government, Dr. Martell finally agreed with counsel's statement, "[A]t this stage we pretty much have to go on your word that this is correct[.] And that only results in a characterization of mild impairment[.]" ECF No. 332 at 57:25-58:3. Finally, when asked, "Was this result of mild impairment consistent with any real world experience that you had with Mr. Allen?" Dr. Martell said, "No." ECF No. 332 at 58:25-59:2.

g. *Halstead Impairment Index*

The last test allegedly supporting the dementia diagnosis was the HII. *See* Exhibit 569 at 18. The test is copyrighted 1959, with no updated version. To obtain Mr. Allen's index, Dr. Martell administered five main tests: (1) the Category Test, "a test of abstract reasoning and problem solving," ECF No. 332 at 60:11-12; (2) the TPT Total Time test, a tactual test requiring the subject to put wooden blocks into a board while blindfolded; (3) the Seashore Rhythm test, requiring the subject to determine whether a pair of rhythms are the same or different; (4) the Speech-Sounds Perception Test, requiring the subject to underline the word that most closely matches nonsense played aloud; and (5) the Finger Oscillation test, requiring the subject to tap a Morse code-type instrument as many times as possible in a given period of time.

Out of these tests, Mr. Allen scored past the cut-off for impairment for two of them: the Speech Sounds Perception Test and the Finger Oscillation Test. Specifically, the Speech-Sounds

Perception Test has a cut-off of eight or more errors, and Mr. Allen made exactly eight errors; the Finger Oscillation test has a cut-off of 50 or less taps, and Mr. Allen averaged 48.2 taps. Exhibit 569 at 18. His results corresponded into a calculated index of 0.3, representing "mild" impairment. Exhibit 569 at 18. The "Impairment Index" listed on the HII form states "0.5 or above." Exhibit 569 at 18. When asked, "So if you don't have 0.5 or higher in your index score, this particular table is saying you don't have brain damage?" Dr. Martell said, "Correct." ECF No. 332 at 64:24-65:1. Then, when asked, "So with the 0.3, would that translate into he does not have brain damage according to this table?" Dr. Martell testified, "It translates into he has mild neuropsychological deficits." ECF No. 332 at 65:2-5.

More troubling, when shown the norms in existence at the time of trial, Dr. Martell admitted Mr. Allen's 0.3 index had a corresponding T-score of 47, which is only 0.3 standard deviation below the mean. Normal. ECF No. 332 at 67:19-68:11. Then, Dr. Martell and counsel for the Government had the following exchange:

> Q. So why is it that you went all the way back and used the 1959 version of that table rather than the one in existence in 1991 that contained more normative data in order to evaluate the significance of the HII result?
>
> A. Because I needed to calculate the HII in order to put it into the neuropsychological deficits.
>
> Q. If you calculated it, though, you would have seen that the HII result indicates no impairment according to the Compendium in existence at the time of Mr. Allen's trial?
>
> A. That's correct. I didn't report any HII results.
>
> Q. And that was your choice?
>
> A. Yes, because I think that's it's not a good measure. And I think the field has recognized it as not a good measure that is no longer viewed as reliable.
>
> Q. But apparently it's good enough and reliable enough to be included within the neurodeficit scale calculation? There's no inconsistency there?

> A.    I hear the inconsistency.  The problem is the neuropsychological deficit scale is an effort by Dr. Reitan to improve on the HII and supplanted it.

ECF No. 332 at 68:12-69:6.

### h.    *Personality Assessment Inventory*

Dr. Martell administered the Personality Assessment Inventory (PAI), a multiple choice inquiry requiring the subject to answer "false," "slightly true," "mainly true," or "very true" when presented with certain propositions.  *See* Exhibits 574-75.  The PAI includes a "traumatic stress subscale."  ECF No. 332 at 79:13.  Regarding PTSD, Mr. Allen's PAI results included a "coefficient of fit" of 0.837.  Exhibit 574 at 4.  When asked what this coefficient of fit indicated for Mr. Allen, Dr. Martell explained, "It's fairly high on the list.  The larger the number, the closer his profile is to those known clinical groups.  . . . [H]e's closest to depression and PTSD, with some other things in the middle."  ECF No. 332 at 80:19-22.  An analysis of Mr. Allen's results, however, indicates Mr. Allen failed to answer more 20 percent of the questions.  Exhibit 574 at 6.  The analysis, apparently conducted by an outside service, states this amount is "within acceptable limits," but notes, "Any interpretation provided in the report should therefore be viewed with caution."  Exhibit 574 at 6.  It continues,

> The degree to which response styles may have affected or distorted the report of symptomatology on the inventory is also assessed.  Certain of these indicators fall outside of the normal range, suggesting that the respondent may not have answered in a completely forthright manner; the nature of his responses might lead the evaluator to form a somewhat inaccurate impression of the client based upon the style of responding[.]

Exhibit 574 at 6.  Finally, and of particular import, the analysis states,

> With respect to negative impression management, there are subtle suggestions that the client attempted to portray himself in a negative or pathological manner in particular areas.  Some concern about distortion of the clinical picture must be raised as a result; the respondent presents with certain patterns or combinations of

features that are unusual or atypical in clinical populations but relatively common among individuals feigning mental disorder.

Exhibit 574 at 6.

Dr. Martell's testing practices and his testimony clearly demonstrate consistent bias in reporting scores and the importance of cross-examination in exposing incredible testimony.

### L.  *Deborah Ruffin: Friend of Juanita Allen*

Deborah Ruffin, a friend of Juanita Allen, has known Mr. Allen since he was 12 years old.  She described him as "a sweetheart.  He was always smiling, lots of fun, very active physically."  ECF No. 333 at 4:8-9.  Ms. Ruffin recalled Mr. Allen's participation in a basketball team, baseball, and a junior drum and bugle corps.  She met Juanita Allen around 1989, when they were both employed at the Saint Louis Public Library.  They worked together for three to four months, until Ms. Ruffin was assigned to a different branch.  She and Juanita Allen are "[v]ery much" still friends today.  ECF No. 333 at 6:25-7:1.

### 1.  Interaction with Mr. Allen's Family

A couple months after they met, Ms. Ruffin and Juanita Allen began spending time together outside of work.  They would "go clubbing . . . [g]o out for drinks, laugh, dance, have fun."  ECF No. 333 at 7:6-10.  They both drank alcohol, and two of their most frequented destinations were clubs called "Lucketts" and "Lace's."  Around 1992 or 1993, Juanita Allen began working as a bartender at Lucketts about three nights a week, and on some Saturdays.  Ms. Ruffin attended Lucketts while Juanita Allen worked.  She said Juanita Allen was intoxicated while working: "Her words were slurred.  I would actually see her pour a drink for herself as well as the patrons.  At times it seemed to me that she was drinking more than she was pouring for the patrons herself."  ECF No. 333 at 8:21-24.  Juanita Allen would work until after midnight, when Lucketts closed for the night.  Ms. Ruffin was asked whether she would become

intoxicated when she went out with Juanita Allen, to which she answered, "Off and on. Not very often. I don't like being out of control." ECF No. 333 at 9:18-21. In contrast, Juanita Allen was "[f]requently" out of control. ECF No. 333 at 9:22-23. Juanita Allen drank at home and at bars. From 1992 or 1993, until five or six years before the Hearing, Juanita Allen was drunk every day. ECF No. 333 at 33:10-12.

According to Ms. Ruffin, when Juanita Allen was drunk, she was "[s]taggering, combative. Sometimes she would urinate on herself. Falling asleep. Whatever you describe as intoxicated, she would qualify." ECF No. 333 at 10:1-3. When asked for an example of Juanita Allen acting "combatively," Ms. Ruffin described the following incident:

> One night when she was working behind the bar . . . and I came into Lucketts and I saw that she was drunk. And I was really afraid. So I said, 'Well, I'm going to take you home.' And she didn't want me to. She didn't want to leave. So I went behind the bar, and I grabbed her arm. And she was tugging back and forth to get me to let her go. But I wouldn't let her go. And one time I must have tugged too hard, because she fell down. And I felt so bad. She hit her head on the side – there's a dart machine there, and she actually fell down, slid and hit her head against the machine. And I felt really badly because I wasn't trying to hurt her, I was trying to protect her from herself and get her away from that environment, because I didn't want her to try to drive home like that.

ECF No. 333 at 10:6-19. When asked if she ever observed Juanita Allen being combative with anyone else, Ms. Ruffin said, "She would perhaps have words with people if she had to maybe try and settle a disagreement. There were times when we would argue with each other when we were there about certain things. It could have been something small, something large." ECF No. 333 at 11:4-8.

Ms. Ruffin admitted Juanita Allen was never arrested for fighting. Then, she testified, "I wouldn't say necessarily that she is a big fighter." ECF No. 333 at 34:25. When asked, "[I]f Juanita Allen testified that she was physically fighting people on a regular basis, that would not be correct?" Ms. Ruffin answered, "That would be difficult for me to say since I did not spend

every waking moment with Juanita." ECF No. 333 at 35:12-16.  When asked for an example of Juanita Allen physically fighting someone, Ms. Ruffin referenced the time Juanita Allen hit her head on a dart machine.  When asked for a new example, Ms. Ruffin stated, "There was one time where the guy she was dating at the time, she was a bit combative with him.  But at that time they had both been drinking." ECF No. 333 at 36:4-6.

Ms. Ruffin testified she visited Juanita Allen's house one to four times weekly.  She believed Juanita Allen "was as good a mother as she knew how to be." ECF No. 333 at 12:17-18.  She added, "I think she tried her best to keep [Mr. Allen] from harm and put him on the right path." ECF No. 333 at 12:21-22.  That said, "[s]ometimes she was mean to him." ECF No. 333 at 13:2.  Ms. Ruffin testified Juanita Allen "would curse [Mr. Allen], hit him, throw things . . . . She would tell him he was stupid or . . . get the 'F' out of her face, leave her alone. She would sometimes chastise him for not keeping his curfew.  She would punish him by putting him out." ECF No. 333 at 13:4-13.  Ms. Ruffin stated Juanita Allen used to punch Mr. Allen in the head, chest, and arm.  When asked for Juanita Allen's motive, Ms. Ruffin testified,

> Sometimes he was just being the joker that he is.  He would play around a lot. And I think sometimes she thought it was unnecessary.  She was trying to get him to be more serious, take his school work and his life more serious.  She didn't want him running the street with a certain kind of person.[69]

ECF No. 333 at 13:19-24.  Notwithstanding the alleged abuse she observed, Ms. Ruffin testified she believed Juanita Allen loved her son.  Ms. Ruffin testified she was troubled by what she saw Juanita Allen doing to Mr. Allen, causing occasional arguments between Juanita Allen and Ms. Ruffin.

---

[69] Ms. Ruffin said she was told Mr. Allen "was running around with drug dealers[.]" ECF No. 333 at 38:8-10.

On cross-examination, counsel asked how often Juanita Allen punched her son. First, Ms. Ruffin said, "Often enough." ECF No. 333 at 37:1. When asked, "Did that happen once a week, once a month, once a year?" Ms. Ruffin stated, "Again, that's pretty difficult to say since I was not with them every waking moment." ECF No. 333 at 37:2-4. Counsel pressed on, asking, "[D]uring the times that you were with her, did it happen every time you were with her, once a week when you were with her, once a month when you were with her?" ECF No. 333 at 37:5-7. Ms. Ruffin again avoided the question, stating, "I would say it happened often enough in my sight for me to take umbrage to it. I didn't like it." ECF No. 333 at 37:8-9. Finally, when asked for "any number at all," Ms. Ruffin testified, "It's pretty difficult to say. I'd say more than once." ECF No. 333 at 37:10-11. On re-direct examination, in response to a leading question, Ms. Ruffin testified Juanita Allen hit her son more than one time. *See* ECF No. 333 at 57:3-7.

### 2. Interaction with the Trial Team

Ms. Ruffin recalled meeting Mr. Sindel, Mr. Simon, and Dr. Randall at Mr. Sindel's office; at the time, Mr. Allen's trial was ongoing. Ms. Ruffin reviewed the notes Mr. Simon took at her interview on February 21, 1998.[70] Specifically, the notes state, "Things weren't great: there were problems." ECF No. 500 at 8. At the Hearing, Ms. Ruffin stated she had an independent recollection of this statement, which, she said, referred to "[t]he drinking, the hitting, the screaming, the cursing." ECF No. 333 at 19:15. When asked, "Now, . . . after you said this, do you have any recollection of whether or not you were asked what you meant by that?" Ms. Ruffin testified, "I don't think I was, no." ECF No. 333 at 19:19-22.

---

[70] *See* Section III.B.4.a.

Mr. Simon's notes further state, "Does Juanita have a problem w/ alcohol?  She drinks, to excess, when she is in trouble.  What has she told you?  Angry[.]  Upset[.]  Disappointed in Bill[.]"  Exhibit 500 at 11.  When asked to interpret these notes, Ms. Ruffin testified,

> Juanita had a lot of anger.  A lot of times I wasn't sure why.  Sometimes I knew it was the job.  Sometimes it was her personal relationship.  Sometimes she would be displeased with Billie in what she suspected or may have known of the people that he chose to be with sometimes.  I think she thought he could make better choices for himself.

ECF No. 333 at 22:13-18.  On cross-examination, counsel noted Ms. Ruffin limited her description of Juanita Allen's drinking to times of distress.  Ms. Ruffin responded, "That's right. They never asked me to clarify exactly what I meant by that statement."  ECF No. 333 at 49:22-23.  When asked, "And when you told them 'sometimes to excess,' you didn't tell them she was drunk every day?"  Ms. Ruffin replied, "I would think 'to excess' would qualify that."  ECF No. 333 at 49:24-50:1.  Finally, she admitted, "I probably should have said daily, but I did not."  ECF No. 333 at 50:3-4.

Finally, Ms. Ruffin was presented with a portion of Mr. Simon's notes, stating, "Ever seen him react violently to anything.  He tried to shake her off.  She had to 'tighten Bill up' – get physical."  Exhibit 500 at 15.  When asked, "What does that mean, 'tighten up'?"  Ms. Ruffin answered, "That means to actually strike a person or threaten to strike a person, but mostly to lash out.  . . .  Physical abuse, hitting him, cursing him."  ECF No. 333 at 23:20-24.  She stated she never saw Mr. Allen angry with his mother.

On cross-examination, Ms. Ruffin admitted she told the trial team Mr. Allen "was surrounded by love[.]"  ECF No. 333 at 39:2-4.  In addition, she told the trial team "Juanita Allen was a good person, they were good children, and their grandfather was a beautiful person[.]"  ECF No. 333 at 39:13-16.  She told Dr. Randall Mr. Allen had a good relationship with his

sisters; at the Hearing, she reaffirmed this notion, stating, "I never to my recollection at this time saw the girls strike their brother."[71]  ECF No. 333 at 43:10-11.  Likewise, she told Dr. Randall, "Their mother is a good person.  She's raised four children all by herself.  I know they're good children. . . . The whole family, you couldn't find better people.  Hard working, church going, open hearts."  ECF No. 333 at 39:17-24.  When asked, "[D]o you recall telling Dr. Randall that Juanita would talk to Billie . . . until she was blue in the face to try and keep him out of trouble?"  Ms. Ruffin said, "Yes."  ECF No. 333 at 39:25-40:3.  In addition, she told the trial team she never saw Otha Petty or Jerome Petty behave in an abusive manner toward Mr. Allen.

### 3.      Criminal Trial Testimony

Ms. Ruffin testified at Mr. Allen's criminal trial, during which she was asked, "[W]hat kind of things did you and [Juanita Allen] do?"  Exhibit 178 at 2:14-15.  In response, she testified, "Oh, we hung out together at work, we would go to lunch, we would visit other libraries together.  We would sometimes double-date together.  Visit each other's homes, go shopping.  You know, girl things."  Exhibit 178 at 2:16-19.  At the Hearing, Ms. Ruffin was asked, "And you didn't answer that we would get drunk when we went out multiple times a week, did you?" to which she replied, "No.  I was never asked those types of questions."  ECF No. 333 at 30:17-19.  After wrestling with counsel for the Government, Ms. Ruffin agreed she did not answer "as completely as [she] could have."  ECF No. 333 at 31:1.

Ms. Ruffin recalled her trial testimony, in which she stated Juanita Allen did "regular parental things," like tell Mr. Allen to clean his room and do his homework.  ECF No. 333 at 40:24-41:3.  Specifically, at the criminal trial, Ms. Ruffin stated,

---

[71] Johnnie Grant testified inconsistently, when he alleged Mr. Allen's sisters verbally and physically abused him.  *See* Section III.H.

> Billie seemed like he was less interested in his home life for awhile, and he wanted to be elsewhere, like out on the street. He wasn't concentrating on school anymore. It was just like he had lost interest in the things that he knew – he was taught to do.
>
> You know, like go do school, do your school work, come home, do your homework. I would often hear his mother say, 'Look, you know, you need to clean up your room. It's a pigsty.' You know, 'Go and straighten up your room. When you get done with that, I want you to do your homework.' You know, regular parental things.

Exhibit 178 at 20:5-16.

Ms. Ruffin also recalled her trial testimony that, before Marquis Taylor died, Mr. Allen would laugh, joke, and play with his mother and sisters. At the Hearing, when asked, "And is that true?" Ms. Ruffin said, "Yes." ECF No. 333 at 43:19-20. However, when asked, "And that is still your testimony as to what the household was like?" she answered, "Not absolutely, no. . . . I don't believe anybody's household is all sunshine and light." ECF No. 333 at 44:3-8.

### M. *Monette Petty Nelson: Mr. Allen's Cousin*

Monette Petty Nelson is Mr. Allen's maternal cousin; her father is Raymond Petty, Juanita Allen's brother. Ms. Nelson and Mr. Allen are the same age, and they grew up in the same area of Saint Louis until Ms. Nelson's family moved to University City when she was 13 years old. She has a bachelor's degree in social work, and a master's degree in professional school counseling.

Ms. Nelson recalled the house on Cote Brilliante, which was located about three to four blocks from her own family's home. She stated Mr. Allen lived there with his mother and sisters, Otha Petty, Raymond Petty,[72] and sometimes Jerome Petty. She described the house as a "free-for-all," and said Juanita Allen imposed no curfew or restrictions on what the children

---

[72] Ms. Nelson explained her father, Raymond Petty, lived at the house on Cote Brilliante his entire life until he married, when he was approximately nine years old. At that point, Raymond Petty began living in the same house as Ms. Nelson.

could do.  ECF No. 333 at 69:9-17.  On cross-examination, she admitted, at the time of the criminal case, she told Dr. Randall the conditions at the house on Cote Brilliante did not amount to neglect.  ECF No. 333 at 88:3-7.  At the Hearing, however, she maintained, "I can say looking at it now and the way it was, it seemed as though it would define some level of neglect."  ECF No. 333 at 89:13-14.

Ms. Nelson testified Mr. Allen and his mother had "problems" with their relationship. ECF No. 333 at 69:5-7.  She stated, "Bill got more whoopings than the girls.  Or, you know, he would – he would be disciplined more."  ECF No. 333 at 69:22-24.  When asked to define "whoopings," she testified, "If he would get in trouble, it could go from, anywhere from physical, like she could do like throw shoes or anything at him, like he would do something, throw something at him, hitting, I mean, or just hitting physically."  ECF No. 333 at 70:6-9.  Ms. Nelson said Juanita Allen used her hands, shoes, kitchen utensils, or anything nearby to hit Mr. Allen.  Juanita Allen would yell and "try[] to get a point across" when she hit Mr. Allen.  ECF No. 333 at 73:13-14.  Ms. Nelson said Juanita Allen used profanity, but could not remember her calling Mr. Allen any names.  She did not believe Juanita Allen's behavior was appropriate.

When asked to provide an example of one of Juanita Allen's "whoopings," Ms. Nelson recalled one particular incident:

> This one in particular time that I guess I was kind of afraid.  When I guess – it started out like she was hitting him with a house shoe.  And then I guess this was something that he did like was really wrong, and it continued like into his room. But Bill was just, he was like shielding his self like in a corner as he was getting a whooping.

ECF No. 333 at 71:2-7.  She added Mr. Allen was cradling himself on the floor; he never hit his mother back.

Habeas counsel reminded Ms. Nelson of her prior experience doing foster care analysis for the City of Indianapolis. She acknowledged she had professional background in evaluating homes for abuse and neglect issues. When habeas counsel asked her whether she considered Juanita Allen's behavior to be abuse, she answered, "I don't think so. Probably younger, seven to ten, I probably wouldn't have known it as that. Maybe older, may have had questioned.[73] But no, no, I wouldn't." ECF No. 333 at 75:15-17.

Ms. Nelson testified there were other problems in the household. She believed Juanita Allen had a drinking problem, and the physical discipline escalated as Juanita Allen drank more. Ms. Nelson stated Juanita Allen drank a clear liquid – either gin or vodka – which she drank straight, at any time of day. Additionally, Ms. Nelson recalled there were times when Mr. Allen was locked out of his home. She explained, "I could recall times when I would come over to visit and maybe say, 'Where is Bill?' And they – like the sisters would say, 'Well, he locked out right now. He's locked out right now or he can't come home right now.' And just maybe didn't see him that visit." ECF No. 333 at 76:23-77:2. When asked, "What's the youngest age that you recall either hearing about or seeing him locked out of the house?" Ms. Nelson answered, "Probably – probably whatever age he was in between like the eighth and ninth grade." ECF No. 333 at 77:3-6.

To her best recollection, Ms. Nelson met with the trial team twice before her testimony at the penalty phase of Mr. Allen's criminal trial. She admitted she did not testify about abuse in the Allen household during the penalty phase. She was shown a portion of her trial testimony:

Q.     Okay. And do you know what this proceeding is about?

A.     Basically to find out more character about the family background.

---

[73] Ms. Nelson later added Mr. Allen "wandered a lot in the neighborhood" as he got older. ECF No. 333 at 93:21-22.

Q.      And do you know why?

A.      I guess basically to kind of define, you know, what kind of person Bill is and what kind of family he came from.

Q.      What was Billie like growing up?

A.      Growing up Bill was – he was a good kid.

Exhibit 203 at 297:10-18.  At the Hearing, when asked, "Why, if you can recall, in this question and answer series here did you not provide testimony about abuse that you had witnessed in the house that Billie had been subjected to?" Ms. Nelson responded, "I really can't recall why." ECF No. 333 at 80:20-24.

### N.      Angela Allen: Mr. Allen's Younger Sister

Angela Allen, Mr. Allen's younger sister, lived at the house on Cote Brilliante until she was approximately 16 years old.  She moved out, because she did not like the "atmosphere, the environment" of her mother's house.  ECF No. 333 at 102:10-13.  Angela Allen described the house on Cote Brilliante as "junkie" and "unorganized."  ECF No. 333 at 110:1.  She said the house was "[p]robably trashed.  It was like trash all over the place.  We had mice.  We had mice in the house.  Dishes not clean.  Just very filthy like."  ECF No. 333 at 110:7-9.  She described Juanita Allen as "strict and very mean."  ECF No. 333 at 102:23-24.  She acknowledged Juanita Allen worked for a time at the Saint Louis Public Library, the Human Development Corporation, and Charter Communications, but could not remember she had also worked at Walgreens, and the Department of Family Services.  When Juanita Allen went to work, she instructed the children not to go outside, and asked the neighbors to notify her if they disobeyed.  ECF No. 333 at 124:2-9.

Angela Allen testified she and Mr. Allen were not close, and used to argue frequently. On cross-examination, she explained they argued over who could use the telephone, and who had to clean dirty dishes. She denied Mr. Allen had a habit of lying to people, and exaggerating his possessions and lifestyle. Angela Allen said, "He didn't lie to me about anything like that." ECF No. 333 at 122:17. Then, she was shown her trial testimony, stating, "[Mr. Allen] would brag about all kinds of stuff; cars he had and clothes he had that no one ever seen." Exhibit 197 at 176:2-3. At the Hearing, she maintained she still could not remember Mr. Allen telling lies.

Angela Allen described her mother's drinking problems. When asked, "What was it like to be around your mother when she was intoxicated?" Angela Allen testified,

> It wasn't fun. She was – it seemed like she was out of herself. Like she really didn't know what was going on. It would be times even I would put bruises on myself and tell her that she did it so she can stop drinking,[74] but it never made her stop or realize that she was hurting other people with the habit.

ECF No. 333 at 111:10-17. Juanita Allen frequently left home to go out drinking with her friends, Cathy Toliver and Deborah Ruffin. Juanita Allen regularly came home drunk, during the middle of the night, and she was often so intoxicated she had difficulty unlocking the door to her house. Once inside, she would urinate and vomit. Sometimes, she did not come home at all, staying instead with her boyfriend, Louis McClinton.[75] When asked what Juanita Allen used to drink, Angela Allen answered, "I think it was like Crown Royal. I don't remember anything

---

[74] Angela Allen testified she received only one "whooping" in her entire life. ECF No. 333 at 112:15-16. On that occasion, she came home late one night, mistakenly expecting Juanita Allen to be gone. When Juanita Allen found Angela Allen sneaking inside at night, she ordered her daughter upstairs and directed her to remove her clothes. Angela Allen explained, "[S]he kind of examined me to see, you know, like if I was I guess out having sex that night. And then she took a like a board and just, you know, hit me a few times with it." ECF No. 333 at 112:21-24. Angela Allen estimated she was 15 years old at the time.
[75] Angela Allen testified none of the children liked Louis McClinton, because he detracted from their time with Juanita Allen.

else. I just remember Crown Royal."[76] ECF No. 333 at 107:5-6. When asked, "Do you remember how often it was that your mom used to drink in the house?" she said, "No, I don't remember." ECF No. 333 at 107:7-9.

Angela Allen described the occasions in which Juanita Allen locked Mr. Allen out of the house. She said one night, Mr. Allen came home and banged the door for a time, until Juanita Allen yelled at him, telling him to leave. Mr. Allen went to the Taylors' house, and when he came back, resumed banging on the door. Juanita Allen was about to open the door with a knife in her hand, when the police arrived; they had been summoned by Angela Allen, who believed Juanita Allen intended to kill Mr. Allen. At the Hearing, Angela Allen could not recall whether Juanita Allen admitted Mr. Allen into the house that night. Nor could she recall Mr. Allen's age at the time, although she believed he was a teenager.

According to Angela Allen, Juanita Allen habitually punched Mr. Allen in the chest. "One time," she explained, "Billie was in the back yard – well, in the alley, some guys were trying to jump him. And he ran from the fight around the house to run back and, you know, kind of so he wouldn't have to fight the guys. And I seen her jump on him for that because he wouldn't fight[.]" ECF No. 333 at 114:9-14. Then, she described an additional incident, in which Juanita Allen punched her son indiscriminately when she caught him skipping school. Angela Allen said events like these happened "[p]retty often." ECF No. 333 at 115:10. Some of them were unprompted, and occurred merely because Juanita Allen was an angry person. Angela Allen said her mother used belts and a wooden paddle to administer "whoopings," but could not remember any times she used sticks, brooms, or extension cords. She testified she

---

[76] In contrast, Monette Petty Nelson testified Juanita Allen drank a clear liquid. *See* Section III.M. Yvette Allen recalled seeing beer cans. *See* Section III.F.

could not remember Mr. Allen ever talking back to or cursing his mother.[77]  Noticeably, nowhere in Angela Allen's habeas declaration does she allege Juanita Allen hit, beat, or "whooped" Mr. Allen.[78]  *See* Exhibit 260.

Angela Allen testified she could recall neither talking to Mr. Allen's lawyers at the time of trial, nor testifying during Mr. Allen's criminal trial.  She said she could not remember any topics discussed by the trial team or what kinds of questions they may have asked her.  She could not remember whether she read her 2009 habeas declaration, Exhibit 260, before she signed it.  She did not write the declaration, and she did not make any changes to it once it was presented to her.  When asked, "Who wrote it?" Angela Allen replied, "I guess the lawyers."  ECF No. 333 at 128:12-13.

### O.     *Corey Allen: Mr. Allen's Cousin*

Corey Allen is Mr. Allen's paternal cousin; Corey Allen's mother, Darlene Roy, is John Allen's sister.  Corey Allen is approximately two years older than Mr. Allen.  At the Hearing, he discussed his experiences growing up with Mr. Allen.

For a time, both Corey Allen and Mr. Allen lived on Evans Street.  Corey Allen testified, when Mr. Allen's family lived at the house on Evans Street, there was "a lot of drinking, partying, arguing, whoopings."  ECF No. 340 at 13:18.  As children, Corey Allen and Mr. Allen witnessed John Allen and Billy Wayne Allen using heroin regularly.  John Allen and Billy Wayne Allen dealt drugs, as well, selling crack cocaine, heroin, and "Ts and blues."[79]  Corey Allen testified, on Evans Street, Mr. Allen received random "whoopings" all the time.  Some

---

[77] This is inconsistent with Juanita Allen's declaration, which states Mr. Allen "would talk  back, yell, cuss and disobey [her]."  Exhibit 258 at ¶ 11.

[78] Likewise, the declaration says nothing about Otha Petty abusing Mr. Allen.  At the Hearing, however, Angela Allen said, "There would be times that [Otha Petty] would strike [Mr. Allen]."  ECF No. 333 at 133:15.

[79] According to Corey Allen, "Ts and blues" are uppers and downers.  ECF No. 340 at 28:3.

"whoopings" were abusive, and "horrific"; Mr. Allen became the target in his immediate family, because he was the only boy, and resembled his father. ECF No. 340 at 15:23-16:6. Corey Allen recalled seeing Juanita Allen strike Mr. Allen with an extension cord in the bath tub, and witnessing John Allen hit him with brooms and other household items at random. According to Corey Allen, "This could have happened every day all day." ECF No. 340 at 16:16. On cross-examination, Corey Allen testified Mr. Allen's beatings caused bruises "[a]ll over his body," including his back, face, and legs.[80] ECF No. 340 at 31:12-16. He said the injuries were so severe that some days Mr. Allen could not attend school.

Corey Allen said Mr. Allen did not often cry about his abuse: "his outlet was drawing. . . . He expressed his feelings on paper." ECF No. 340 at 20:4-6. When they talked, Mr. Allen would say things like, "Man, what did I do?" "Why do I get whoopings all the time[?]" and "Is it because I'm the only boy?" ECF No. 340 at 20:17-21. Corey Allen witnessed Mr. Allen's sisters receive "whoopings," but not as frequently as Mr. Allen received them.[81]

Corey Allen described a highly volatile relationship between Juanita Allen and John Allen. He said they drank, partied, and fought on a regular basis. Their fights were "excessive." ECF No. 340 at 17:17. Knives were pulled, bottles were broken, furniture was over-turned, and police were summoned.[82] Corey Allen said, at first, he and Mr. Allen cried when they witnessed these altercations; over time, they became anesthetized, waiting out the fights in "some corner" or the basement. ECF No. 340 at 18:9-14.

---

[80] There is no believable evidence from any source that Mr. Allen ever had any visible bruises.
[81] With one exception described by Angela Allen, the believable evidence in the case is that Mr. Allen's sisters did not receive "whoopings."
[82] There is no evidence in the record of any police involvement at the house on Evans Street.

When the Allen family moved to Cote Brilliante, Corey Allen continued to see Mr. Allen every day.[83]   He said the house on Cote Brilliante "was in pretty good shape"; it was not condemned, and everyone had a room.[84]   ECF No. 340 at 22:1-3.   According to Corey Allen, as he and Mr. Allen became teenagers, Mr. Allen's life worsened; Juanita Allen drank more, and Mr. Allen received more frequent beatings.   Corey Allen recalled times when Juanita Allen yelled at Mr. Allen, using profanity; he also recalled times when she spoke to him in a loving way.   ECF No. 340 at 23:2-15.   While he could not recall any specific "whoopings" on Cote Brilliante, he remembered "going over there regularly and Bill getting things thrown at him; being kicked out of the house, not let back in; you know, anything she could put her hand on, it was at Bill, you know.   I can recall that every day.   He was getting cussed out for something." ECF No. 340 at 23:20-25.

When asked whether Mr. Allen continued to suffer injuries all over his body, Corey Allen stated, "Most likely."   ECF No. 340 at 32:2-3.   When asked whether anyone from Mr. Allen's schools every "hotlined" the abuse, Corey Allen said, "No, ma'am.   At that time there wasn't a hotline,[85] but teachers have came [sic] by the house and called concerning it, you know.   At that time there wasn't no hotline at that time."   ECF No. 340 at 33:12-14.   When asked, "So you're saying you believe that teachers came by the house," Corey Allen answered, "I don't believe.   I know they have.   I witnessed them."   ECF No. 340 at 33:15-17.   He explained they "[w]anted to know why he withdraw [sic] from school; why he would have a certain bruise on him; why he

---

[83] Notwithstanding this statement, Corey Allen later testified he did not know Ahmed Oliver, Johnnie Grant, or Brady Toliver – three of Mr. Allen's closest friends.   Corey Allen stated he did not spend much time with Mr. Allen's friends.

[84] This statement further undermines other testimony alleging the house was infested with rats and cockroaches.   *See, e.g.*, Sections III.H, III.N.

[85] As noted by the Government, "The Missouri statute requiring teachers and other professionals to hot-line child abuse was enacted in 1975."   ECF No. 354 at 73 (citing Mo. Rev. Stat. § 210.115).

would act out."[86] ECF No. 340 at 34:4-5. He was "sure" they saw bruises on him. ECF No. 340 at 34:6-7. However, he did not know the names of any of these purported concerned teachers, and he did not know the name of the school from which they came.

When Juanita Allen locked Mr. Allen out of the house, Mr. Allen sometimes went to Corey Allen's house. Corey Allen testified his household had an acceptable environment, but the neighborhood outside was a "jungle" of "violence, rape, [and] drugs[.]" ECF No. 340 at 24:14-21. He testified both he and Mr. Allen became involved in the drug culture, witnessing John Allen and Billy Wayne Allen sell drugs from an early age, and then actively helping them sell drugs beginning at the age of 14.[87] While Corey Allen testified he was affiliated with the gang "Six Deuce Crips," he said Mr. Allen was not affiliated with any gang. He estimated Mr. Allen was 13 or 14 years old when he started using marijuana and alcohol. In 1997, Corey Allen was shot five times[88] in a drug-related shooting by members of the gang "Outre Crips," the same gang responsible for Marquis Taylor's death.[89] At the Hearing, Corey Allen stated he did not know who was responsible for the shooting of the house on Cote Brilliante; he explained he stopped seeing Mr. Allen after "this little incident" – that is, Mr. Allen's criminal case. ECF No. 340 at 44:6-9.

Corey Allen testified he could not recall ever talking to Mr. Allen's trial attorneys. Then, he was shown Mr. Sindel's billing records, reflecting a "[t]elephone conference w/ house –

---

[86] No teacher testified to any bruising on Mr. Allen.

[87] Corey Allen estimated Mr. Allen earned about five hundred to one thousand dollars per day selling crack cocaine.

[88] Initially, he testified he was hospitalized for almost one year. Later, on cross-examination, he said he was hospitalized for six or seven months.

[89] The identity of this gang is based on the belief of Corey Allen. No other witness associated this gang with the killing of Marquis Taylor.

Corey Roy[90]" on April 21, 1997. Exhibit 15 at 8. Confronted with this evidence, Mr. Allen flatly stated he did not "even know who [Mr. Sindel] is," and, "[M]y name is Allen." ECF No. 340 at 46:10-18.

### P. Brady Toliver: Friend of Mr. Allen

At the Hearing, Brady Toliver, an insurance and financial planner in Saint Louis, Missouri, testified about his experiences growing up with Mr. Allen. His mother, Cathy Toliver, was a close friend of Juanita Allen, and from ages seven to 13, he considered himself "very close" to Mr. Allen. ECF No. 340 at 56:21-22. During this time, he saw Mr. Allen "[j]ust about every weekend," and occasionally during the week. ECF No. 340 at 57:4-6. On direct examination, he readily admitted his declaration contained an error when it stated, "We spent almost every day together when we were growing up." Exhibit 264 at ¶ 2. At the Hearing, he offered the following explanation for this inaccuracy:

> The statement that I made – I believe this was in 2009, it was a very emotional time with bringing all this back, and I didn't have, I guess, the emotional stability to really think through and really sort it out, but the statement that was made today [at the Hearing] is accurate.

ECF No. 340 at 58:2-7. On cross-examination, counsel asked, "Are you aware [Claude] McLemore has testified that he spent every other weekend at Billie Allen's house and that Billie Allen spent the other weekends at Ed's house?" ECF No. 340 at 70:8-10. To this, Mr. Toliver said, "Possibly." ECF No. 340 at 70:11. He still maintained he spent every weekend with Mr. Allen. Once he began high school, he played football, and saw less of Mr. Allen; Mr. Allen became involved in the "thug life," and the two went separate ways. ECF No. 340 at 78:4-11.

Mr. Toliver described the house on Cote Brillante as "not very clean. There was roaches all around. It was just kind of unfit for – for living sometimes." ECF No. 340 at 58:22-23.

---

[90] As noted *supra*, Corey Allen's mother is Darlene Roy.

Cathy Toliver and Juanita Allen frequently went out together, coming home intoxicated at late hours. Mr. Toliver's declaration adds, "We were usually left alone in the house while Juanita was out." Exhibit 264 at ¶ 3. When asked whether Otha Petty remained in the basement while Juanita Allen was out, Mr. Toliver said, "From time to time Mr. Petty could be in the house, yes." ECF No. 340 at 71:15. He was asked if he recalled providing inconsistent testimony at his deposition, to which he stated, "No, I don't recall." ECF No. 340 at 71:16-19. Then, counsel presented him with his deposition testimony, stating, "[Mr. Allen's] grandfather was probably in the basement most of the time. . . . If we needed something, we went to the basement. Other than that, we were free to run upstairs." Exhibit 536 at 28:17-23. To this, he stated, "That sounds about right." ECF No. 340 at 72:9.

Mr. Toliver testified his mother and Juanita Allen also drank together in the house on Cote Brillante. Mr. Toliver's declaration states, "[Juanita Allen] was a drunk and always had different men in the house." Exhibit 264 at ¶ 3. At the Hearing, Mr. Toliver was asked, "Are you aware that [Claude] McLemore testified that he never saw any men in the house?" ECF No. 340 at 70:23-24. He answered, "No, I'm not aware of that." ECF No. 340 at 70:25.

Mr. Toliver said Juanita Allen was both verbally and physically abusive toward her son. She "talk[ed] down" to him and called him names. ECF No. 340 at 60:5-7. When asked, "What did you witness that you would characterize as physical abuse?" Mr. Toliver testified, "Throwing a pan, shoes; physically abusing him with a belt or extension cord, things of that matter." ECF No. 340 at 60:12-13. He said Mr. Allen reacted by being "distraught." ECF No. 340 at 60:20. He said things like, "I don't know why she treats me this way," and "I didn't do anything to deserve that." ECF No. 340 at 60:20-24. Mr. Toliver stated he could not "objectively" say how often Mr. Allen was physically abused, but added, "subjectively, what I can say, I have more

memories of that [abuse] than I do of an uplifting or caring version of interaction."  ECF No. 340 at 61:3-5.  He said he told his mother, Cathy Toliver, about Mr. Allen's abuse.  When asked whether he told her "it was wrong," he said, "Probably not."  ECF No. 340 at 72:18-19.  At his deposition, however, he testified differently: "I'd be like, that's kind of wrong; isn't it?  . . .  She's like just, we'll talk about [it] when we're on our way home."  Exhibit 536 at 60:20-24.

Mr. Toliver testified he never saw Otha Petty physically discipline Mr. Allen.  He said he occasionally saw Jerome Petty abuse Mr. Allen, but this notion was entirely contradicted by his previous inconsistent deposition testimony.  Likewise, he testified Mr. Allen's sisters were abusive, but his declaration merely states, "Billie's sisters probably picked up on their mother's abuse of Billie also, because they would call him names and tell him he was stupid also."  Exhibit 264 at ¶ 5.

Counsel for the government questioned Mr. Toliver about Mr. Allen's potential gang involvement.  Mr. Toliver never specifically stated whether he believed Mr. Allen was affiliated with a gang.  He did, however, indicate he could best answer this question by assessing Mr. Allen's zodiac symbol.  Mr. Toliver provided the following colorful opinion: "I would stand by that based on knowing where he had to live and knowing what I know about Geminis[91] being a two-bodied symbol.  Having two different distinct personalities, I could see that happening, yes, to survive."  ECF No. 340 at 89:25-90:3.

During Mr. Toliver's deposition for the habeas case, he was asked whether he observed Mr. Allen change during 1995 and 1996.  At the Hearing, he testified he stood by his deposition testimony:

> That was like the sum total of everything that had happened up to that point.  You got that argument, nature versus nurture.  At some point, that nurture takes over.

[91] Mr. Toliver determined Mr. Allen to be a Gemini, based upon his date of birth, June 18, 1977.

How you give energy, it's a proven fact that if you put water on the table and you play certain types of music to it, the molecular structure of water changes over time based on the type of music.

Since our bodies are made up of 85 percent of water, if you're constantly nurturing it, at some point it's going to manifest itself. I would say based on my understanding of how energy is transferred by '95, '96, that's when the sum total of the abuse had finally taken place.

Exhibit 536 at 84:6-19.

When asked, "If you had been contacted at [the time of Mr. Allen's criminal trial], would you have provided the information that you've provided here [at the Hearing]?" Mr. Toliver said, "Without a doubt." ECF No. 340 at 62:4-6.

### Q. *Richard Wetzel, Ph.D.: Psychologist and Neuropsychologist*

From 1970 to 2012, Richard Wetzel, Ph.D., was a faculty member at Washington University School of Medicine, with appointments in psychiatry, neurology, and neurological surgery. His areas of expertise are general clinical psychology and neuropsychology. At the time of the Hearing, he had been the primary opinion giver for about 65 people charged with murder, 50 of which were charged with capital murder.

Dr. Wetzel became involved in Mr. Allen's criminal case in 1998. He knew Dr. Gelbort and Dr. Cuneo had conducted evaluations of Mr. Allen, and he knew the prosecution had retained an expert, Dr. Sean Yutzy,[92] to perform an independent psychological evaluation. Dr. Wetzel was asked to "supplement the examination of Dr. Yutzy by commenting on the testing material that was available in the case." ECF No. 341 at 10:25-11:2. Specifically, Dr. Wetzel was to investigate for potential brain impairment, cognitive impairment, and learning disabilities. In addition to Dr. Yutzy's evaluation, Dr. Wetzel examined the report and data compiled by Dr. Gelbort. Dr. Wetzel testified for the prosecution during the criminal trial.

---

[92] Dr. Yutzy's testimony is summarized in Section III.R.

At the Hearing, Dr. Wetzel examined Dr. Gelbort's testing data. *See* Exhibit 102. Specifically, Dr. Gelbort had administered the Halstead Category Test, a battery of seven subtests, to Mr. Allen. Exhibit 102 at 9. Dr. Wetzel explained each of the first six tests pertain to a different, learnable principle. The seventh test evaluates the subject's ability to memorize those principles, by presenting all six in a random order. On the seventh test, Mr. Allen answered 19 out of 20 questions correctly. Exhibit 102 at 9. Dr. Wetzel testified, "95 percent correct is an excellent score." ECF No. 341 at 15:20.

Dr. Gelbort's report also addressed issues of learning and memory. Particularly, he noted Mr. Allen "encode[d] incoming material more slowly than . . . normal[.]" ECF No. 341 at 21:6-10. He further found Mr. Allen "was able to learn without difficulty based upon repeated presentations and the opportunity to orient." ECF No. 341 at 21:16-19. Based upon Dr. Gelbort's results, Dr. Wetzel concluded "[t]hat there was no indication of brain damage in the data that he acquired and reported." ECF No. 341 at 22:22-23. Dr. Wetzel disagreed with Dr. Gelbort's finding of "some brain impairment," explaining Dr. Gelbort failed to conduct "parts of the memory test that were most relevant to the point he was making[.]" ECF No. 341 at 22:24-23:4. Dr. Wetzel added, Dr. Gelbort misinterpreted what some of the tests measured, and sometimes commented as if he had conducted an entire test, when, in fact, he had only conducted part of it. Dr. Wetzel testified, "The other thing was that there were a number of tests he said he did, but he didn't report any numbers and he didn't include those . . . with his data so that I could evaluate whether or not he was interpreting them correctly or not." ECF No. 341 at 23:21-24.

In addition, Dr. Gelbort applied norms, but failed to adjust them for age, sex and education. Rather, he used norms without regard to specific demographic variables. Dr. Wetzel testified this was problematic; he explained,

Well, since people who come from a lower socioeconomic class and have the deprivation that's associated with that, they don't do as well on educational tests as people who grow up in upper middle class neighborhoods. So they – they're – you're more likely to get a false positive or to say that somebody has brain damage when they don't when the problem is the environment they've grown up in and the experiences they've had. You can't learn something unless you've dealt with it, and we deal with different things in different neighborhoods.

ECF No. 341 at 26:24-27:8.

Accordingly, in preparation for the criminal trial, Dr. Wetzel translated Dr. Gelbort's data with norms accounting for age, sex and education. *See* Exhibit 162. He started by dividing Dr. Gelbort's data by "frontal lobe tests" and "other tests." Exhibit 162. He explained the frontal lobe has two functions. First, it "does planning and problem solving[.]" ECF No. 341 at 28:17-18. Second, "[i]t does the things that mothers usually do for children. It tells you how you're doing. It tells you when you need to get started on things. It tells you whether or not you're doing it well. . . . You know, it controls your behavior." ECF No. 341 at 28:18-23.

To aid the jury's understanding, Dr. Wetzel converted the resulting T-scores to percentiles. Then, he displayed percentiles calculated from Dr. Gelbort's norms next to percentiles calculated from the demographic-specific norms.[93] Even applying Dr. Gelbort's norms, all of the frontal lobe results were in the "normal" or "above average ranges."[94] Applying the demographic-specific norms resulted in even higher scores than Dr. Gelbort's data reflected. For example, Dr. Gelbort used the Category Test to evaluate "executive functioning." Using Dr. Gelbort's norms, Mr. Allen had a percentile of 84; using Dr. Wetzel's norms, Mr. Allen's percentile was 93. In any event, both of these scores are above average. Dr. Wetzel explained the importance of these results:

---

[93] Specifically, the norms pertain to males, 20 years old, with a ninth grade education. Exhibit 162.

[94] Dr. Wetzel testified "normal" means within the twenty-fifth to seventy-fifth percentiles.

Well, it means (A) he's better than 93 out of 100 people of the same racial group[95] with the same environment and the same age. The Category Test is a frontal lobe test only if there's no brain damage anyplace else. You have to see in order to do it. So if there's brain damage to that part of the brain, you can't do it. You have to understand the directions. So if there's any damage there, you can get a bad score. So it's a – it's a good frontal lobe test only if there's nothing wrong anywhere else in the brain. And the fact that he scored at the ninety-third percentile means there's nothing anywhere in his brain, according to this test.

ECF No. 341 at 30:6-16. When asked, "[B]ased upon your evaluation at trial, did you see any evidence from a [n]europsychology standpoint that any factor in [Mr. Allen's] life had produced a negative outcome in terms of brain function?" Dr. Wetzel answered, "No." ECF No. 341 at 31:11-15.

At Mr. Allen's criminal trial, Dr. Wetzel compiled an exhibit summarizing Mr. Allen's standardized testing scores during his years at the Clayton School District. *See* Exhibit 165. Dr. Wetzel concluded Mr. Allen's aptitude test scores from 1987 through 1991 fell within average ranges, albeit some fell within low average ranges. He noted some of Mr. Allen's scores were inconsistent from test to test; he said the most common explanation for this is that the individual is "not terribly motivated to do well on the test." ECF No. 341 at 20:23-24.

In preparation for Mr. Allen's habeas proceedings, Dr. Wetzel reviewed the work of both Dr. Martell, and Dr. Galit Askenazi,[96] a neuropsychologist and forensic psychologist retained by the Government for the habeas proceedings. Based on this review, Dr. Wetzel agreed Mr. Allen's IQ score significantly increased since 1998, particularly in his verbal score. Explaining this discrepancy, Dr. Wetzel stated, "There's only two logical possibilities. Either his score in 1998 was too low and he was brighter than the score he got or (B) it was artificially depressed by

---

[95] Dr. Wetzel later clarified the adjustments he used in 1998 did not include race-related factors. ECF No. 341 at 52:2-5. He testified race-specific norms were unavailable at that time. ECF No. 341 at 48:4-17.

[96] Dr. Askenazi's testimony is summarized in Section III.S. Dr. Wetzel testified he largely agreed with Dr. Askenzi's findings.

his environment and that in the prison environment he has learned enough and improved enough to improve his score." ECF No. 341 at 32:13-18. The latter option would indicate Mr. Allen's verbal skills operate "really well." ECF No. 341 at 32:23-24.

Additionally, Dr. Wetzel testified about the difference between Mr. Allen's current VIQ score and his current PIQ score.[97] Dr. Wetzel explained the significance of this difference:

> Well, [VIQ] measures what you've learned in the past, and it's simply you have the information pretty much or [you don't] and can you express it. The [PIQ] is: Can you apply it to the situations at hand? Can you do the right things using it? So that's sometimes referred to as fluid intelligence. That's much more important for functioning in life generally.

ECF No. 341 at 33:7-13. Likewise, counsel asked Dr. Wetzel about the difference between Mr. Allen's full IQ score and his Working Memory score.[98] Dr. Wetzel was not concerned, opining,

> Well, everybody is better at one thing than they are at another thing, and the fact that you're better at golf than you are baseball doesn't mean you're impaired. It means you're better at one thing than the other. That some people are more verbal than they are physical or, you know, able to use their hands means that's true, but it doesn't mean that they're impaired. None of the scores here are low enough that they indicate that he has any brain impairment, but he is better at some things than others.

ECF No. 341 at 35:2-10. In sum, Mr. Allen is adept at applying what he learns; to learn, requires some repetition.

Dr. Wetzel testified he used to administer the NDS used by Dr. Martell.[99] He eventually stopped using it, because it did not "make any adjustments that allowed for education, sex or race. It treated everybody as if they were exactly the same." ECF No. 341 at 40:24-41:1. Dr.

---

[97] Dr. Martell also opined on this topic. *See* Section III.K.2.b.
[98] Dr. Martell expressed great concern for this difference. *See* Section III.K.2.b.
[99] For a discussion of Dr. Martell's administration of the NDS, *see* Section III.K.2.f.

Wetzel stopped using the NDS when the Heaton norms[100] came out in 1991 or 1992. He testified he did not know of anyone at Washington University who continues to use the NDS.

One of Dr. Wetzel's main concerns was Dr. Martell's failure to administer any validity tests in the area of verbal performance. Dr. Wetzel testified the standard of care in forensic neuropsychology includes administering at least two tests of effort to determine whether the subject is actually trying to do well. He explained,

> [I]t has always been my practice that if there's an area in which somebody is likely to have a problem or is claiming to have a problem, that I give them two [tests] that specifically relate to that area to see if they're trying hard in that area, and then I give one that goes into the other areas that don't seem to be in question just to make sure that people are trying hard so that I can assure the Court they were.

ECF No. 341 at 43:15-25. Dr. Wetzel added, "It is remarkable to me that Dr. Martell, who is an excellent psychologist and who knows a great deal, only gave half of one of the validity tests he gave, omitting the part that dealt with verbal effort[.]" ECF No. 341 at 44:1-4.

Dr. Wetzel was aware of the claims regarding Mr. Allen's medical history, including exposure to alcohol in utero, lead poisoning and pica, seizures, skin conditions, and asthma. He testified any resulting brain damage would remain present throughout Mr. Allen's life. Dr. Wetzel explained, "[A]ny of these things would have had an effect that you could have picked up when he was 20. And if there's no effect at 20, he didn't have it." ECF No. 341 at 38:8-11.

### R.    Sean Yutzy, M.D.: Psychiatrist

Sean Yutzy, M.D., is a physician specializing in psychiatry. He was head of the Department of Forensic Services at Washington University in Saint Louis before moving to the University of New Mexico, where he was a professor of psychiatry. At the time of the Hearing,

---

[100] Dr. Wetzel testified the Heaton norms take ethnicity into account. He opined there is no "real issue" with using race-specific norms. ECF No. 341 at 47:2-4. Dr. Wetzel estimated the Heaton norms were published in 2004.

Dr. Yutzy was employed at a hospital in Albuquerque, New Mexico, where he treated inpatient and outpatient psychiatric patients.

At the Hearing, Dr. Yutzy began by discussing the field of psychiatry, generally. He testified, in reaching a diagnosis, "the overall package" comes into play. ECF No. 342 at 14:14. That is, a patient's life experiences and developmental history – not just their symptoms – contribute to the physician's diagnosis. Dr. Yutzy agreed this process contains a certain level of "subjectivity." ECF No. 342 at 14:20-21. Likewise, he agreed "tester bias" can impact a clinical evaluation:

> [T]ester bias may be a reflection of how the physician or psychiatrist or evaluator was trained in terms of what they're attempting to look for, and that bias may prejudice them as far as specifics that they're looking for and moving forward towards, trying to construct a psychiatric diagnosis.

ECF No. 342 at 15:1-6. In situations where patients have frequent contact with mental health experts, "patients and evaluees can be educated by the process in terms of moving towards answers in which the evaluator or the evaluee may think that the evaluator is looking for." ECF No. 342 at 15:16-19.

Dr. Yutzy opined, of the 400 to 450 major mental disorders listed in the *DSM-IV*, only 14 have been scientifically validated; PTSD is not one of those 14 disorders. Dr. Yutzy stated, aside from a triggering event, a *DSM* diagnosis of PTSD requires certain symptoms indicative of anxiety. Individuals with PTSD "should withdraw. They should keep to themselves. They should not place themselves in any sort of circumstance or risk to have a recurrence of the situation." ECF No. 342 at 32:14-17. Dr. Yutzy described PTSD as "highly dependent upon the individual and the individual's genetics and temperament and character style," because each individual reacts to stressors differently. ECF No. 342 at 17:13-19. He added the average duration for PTSD is "very short. . . . It's uncommon if the individual, after a month, will

continue to have these symptoms and meet the criteria, even though a rather traumatic situation has been visited upon them." ECF No. 342 at 35:23-36:2. Dr. Yutzy was asked,

> So if someone was experiencing PTSD from – If they had met these criteria as a result of experiencing gun violence firsthand, would planning to commit an armed robbery where there was a risk of getting shot be consistent or inconsistent with the existence of PTSD?

ECF No. 342 at 33:19-23. To this, Dr. Yutzy answered, "In my opinion, based on a reasonable degree of medical certainty, it would be very inconsistent." ECF No. 342 at 33:24-25.

In 1998, Dr. Yutzy was asked to examine Mr. Allen, make a diagnosis, and express opinions regarding his mental health. He was given police reports, mental health records, and life history materials, and he conducted a five-and-one-half-hour examination of Mr. Allen, the primary focus of which was a clinical interview. A transcript of the interview, Exhibit 46, reveals Dr. Yutzy asked Mr. Allen, "[H]ow did you get along with your mom when you were younger?" Exhibit 46 at 11:11-12. Mr. Allen answered, "Great." Exhibit 46 at 11:13. Similarly, when asked, "Can you tell me how you got along with your sisters in the home?" Mr. Allen replied, "It was good. They was [sic] protective of me because I was the only boy. It was like my sisters protected me more than I protected them[.] They made sure I stayed out of trouble, made sure I was taken care of, you know, things like that." Exhibit 46 at 11:4-10. Mr. Allen also stated he got along "[g]reat" with his uncle Billy Wayne Allen, adding, "I mean better than my father I should say." Exhibit 46 at 11:14-18.

Later in the interview, Dr. Yutzy pressed the issue of abuse further. Notably, Dr. Yutzy and Mr. Allen had the following exchange:

> Dr. Yutzey [sic]:     All right. Now, next question I ask you is a question that eight years ago I never used to ask anybody, but if I don't ask now I haven't got a complete exam of the situation. So I don't want you to take it disrespectfully or anything.

Mr. Allen:       Okay.

Dr. Yutzey [sic]:       As a child or as an adolescent say up to age 18 do you have any recollection of being verbally, physically, or sexually abused in any way?

Mr. Allen:       Uh-uh.

Dr. Yutzey [sic]:       Now, this being certain I'm going to have to inquire a little further here, it means different things to different people.  Did your mom – how did your mom discipline you I guess is the best way to say.

Mr. Allen:       Well, I had a lot of girlfriends and I liked to go outside and play on the basketball court in the backyard.  So –

Dr. Yutzey [sic]:       Uh-huh.

Mr. Allen:       So it would be not going outside and talking on the phone.  I mean, those as punishment.  Those are worse than getting whippings to me.[101]

Dr. Yutzey [sic]:       Took away privileges?

Mr. Allen:       Right.

Mr. Allen:       I mean, it was a killer for real.

Dr. Yutzey [sic]:       Uh-huh.

Mr. Allen:       And I couldn't sneak outside when she was gone because my sisters would tell on me.  So, I mean, it was like – it was –

Dr. Yutzey [sic]:       Sisters, you made comment earlier on that.  Okay.  All right.  You don't have any recollection of being either by family member or anybody else verbally or physically abused?

Mr. Allen:       No.

Exhibit 46 at 65:8-66:15.  In addition, Dr. Yutzy specifically asked Mr. Allen whether, prior to

age 13, he recalled "staying out overnight even though [his] mother didn't want [him] to stay

out[?]" to which Mr. Allen answered, "No."  Exhibit 46 at 71:25-72:3.

---

[101] On cross-examination, Dr. Yutzy admitted, at the time of the evaluation, he understood Mr. Allen had been subjected to whippings by his mother.  ECF No. 342 at 115:10-16.  He further admitted he did not inquire about the specifics of these whippings.  ECF No. 342 at 115:17-116:5.

Mr. Allen and Dr. Yutzy also discussed the topic of "stress." *See generally* Exhibit 46 at 124-132. Mr. Allen stated, at the time he visited MSLPC, he "lost track of [his] world," in part, because he was dealing drugs. Exhibit 46 at 124:12-22. He mentioned the shooting of his mother's house as contributing to his stress. When asked whether Juanita Allen forbid him from returning home after this event, Mr. Allen answered, "I said that but I figured she didn't put me out. I left before it all happened because I thought you know . . . worry about the house." Exhibit 46 at 125:24-126:2. Upon further questioning, Mr. Allen elaborated,

> I never stayed away from my family long. I was just like a family person. I never stayed away from my family long. So being away from them that long just stresses you out. Because my mom gave me the type of love no one else can give you. You know, it's like that motherly love is –

Exhibit 46 at 128:24-129:3. When Dr. Yutzy offered, "Unconditional love," Mr. Allen said, "Right." Exhibit 46 at 129:4-5.

Another source of stress in Mr. Allen's life was the death of Marquis Taylor. *See generally* Exhibit 46 at 160-62. Mr. Allen told Dr. Yutzy he was not depressed "for real" before Marquis Taylor died. Exhibit 46 at 160:2-4. Mr. Allen said he never talked to others about the death of his friend, because "[w]hen [he] talked about it [he] got more stressed out." Exhibit 46 at 161:19-21. He added, "It's stressful. I don't like nobody to see me crying so I go in my room, it's hard." Exhibit 46 at 161:24-25.

On March 2, 1998, Dr. Yutzy issued an expert report, based on his evaluation of Mr. Allen, and the substantial number of records he had for review. *See generally* Exhibit 584. Specifically, Dr. Yutzy had medical records, police documents, Dr. Cuneo's report, Dr. Gelbort's neuropsychological report, and letters written by Mr. Allen to various individuals. Additionally, he visited the bank at which the underlying offense occurred, and he reviewed the movie "Set It Off." Exhibit 584 at 2. Regarding PTSD, Dr. Yutzy concluded, "It is my opinion, with a

reasonable degree of medical certainty, that I am unable to identify whether Mr. Allen has ever

manifested the necessary and sufficient symptoms to qualify for the anxiety diagnosis . . . of

[PTSD]." Exhibit 584 at 13. Dr. Yutzy explained he had

> significant concerns about Mr. Allen's reliability in reporting 'criteria' [for
> PTSD] for the following reasons:
>
>> 1) There were inconsistencies in his reporting of his education
>> and medical history to this author.
>>
>> 2) There were inconsistencies between the anxiety criteria
>> documented by Dr. Cuneo and those reported by Mr. Allen
>> to this author.
>>
>> 3) There were inconsistencies among documentation by Dr.
>> Wuertz in the [MSLPC] Emergency Room and other
>> sources.
>>
>> 4) Dr. Wuertz directly raised a concern about Mr. Allen's
>> reliability in the [MSLPC] Emergency Room.[102]
>>
>> 5) Mr. Allen is obviously in a difficult position and hopes to
>> avoid the death penalty. During the interview he was
>> vague on a number of points which raised a direct concern
>> regarding the reliability of some of the history.

Exhibit 584 at 13.

In 2011, Dr. Yutzy was given additional materials relating to Mr. Allen's case. These

materials included transcripts of the penalty phase of trial, declarations collected by habeas

counsel, Court filings regarding Mr. Allen's § 2255 claim, and the materials originally available

---

[102] Dr. Wuertz's medical notes state,

> Denies although may have [antisocial personality disorder traits]. Has [history of]
> suspension for truancy. Supported self via drug sales since adolescent. Denies
> other [antisocial personality symptoms] but may be unreliable in this regard. . . .
> For example, girlfriend's mother told me that [patient] was put out of family
> home [because] 'someone was looking for him [and] shot up their home.'

Exhibit 119 at 3.

to Dr. Yutzy in 1998. After review, Dr. Yutzy generated a new report, Exhibit 587, in which he reaffirmed his previous opinions regarding Mr. Allen's psychiatric state. In fact, Dr. Yutzy testified the new information "substantially bolstered" his opinions, due to "difficulties with the reliability of the information[.]" ECF No. 342 at 92:5-8. Dr. Yutzy stated he was unaware of any scientific evidence suggesting PTSD impacts the organic condition of the brain. Finally, when asked, "In your experience, is it typical or atypical for victims of abuse to deny that the abuse occurred when asked?" Dr. Yutzy testified, "In my opinion, it's atypical." ECF No. 342 at 92:22-24.

### S. *Galit Askenazi, Ph.D.: Neuropsychologist and Forensic Psychologist*

Galit Askenazi, Ph.D., obtained her graduate degree in clinical psychology from Case Western Reserve University. She is board-certified in clinical neuropsychology and forensic psychology; she testified only eight individuals are so dually certified in the United States. At the time of the Hearing, Dr. Askenazi maintained a private solo practice, which she described as "pretty equally split with General Neuropsychology, meaning in terms of treatment assessment, and forensic work, meaning civil and criminal assessments." ECF No. 342 at 134:1-4. Similarly, her work was evenly split between defense and prosecution; often, she testified as an independent consultant for the courts.

### 1. Clinical Evaluation of Mr. Allen

In October 2011, Dr. Askenazi examined Mr. Allen. She had been asked to conduct a comprehensive psychological and neuropsychological evaluation, and to discern possible historical diagnoses he might have had. She had several materials for review, including the work of Dr. Cuneo, Dr. Gelbort, Dr. Yutzy, Dr. Wetzel, and Dr. Martell. Dr. Askenazi spent over six

hours with Mr. Allen. She began with a clinical interview of Mr. Allen. She prepared a report, dated October 24, 2011, of her findings. Exhibit 554.

Aside from considering outside reports, Dr. Askenazi asked Mr. Allen about potential physical, emotional, and psychological abuse in his life. She testified he never used the term "abuse," but did reference "whoopings," "behavior," and "increasing violence," when asked about his parents' treatment of him as a child. ECF No. 342 at 167:12-15. Additionally, Mr. Allen said his uncle Billy Wayne Allen would sometimes punish him, but Mr. Allen believed this punishment was appropriate. ECF No. 342 at 167:20-22. Mr. Allen did not state his sisters were a source of physical abuse toward him. He reported he began staying out late, past curfew, around the age of 15 years; on these occasions, Juanita Allen locked him out of the home, so he could not return.

Mr. Allen also relayed the shooting of his mother's house to Dr. Askenazi. He told her this event occurred due to a territorial drug dispute, but did not say anything regarding a "drug deal gone bad." ECF No. 342 at 169:6-8. He further stated he left Juanita Allen's home, because "he was concerned if they knew where he lived, that they could come get him and harm him and his family." ECF No. 342 at 169:14-16. Dr. Askenazi testified, based on Mr. Allen's account, "It sounded like he left [home] not only voluntarily but very suddenly so that his family didn't even know where he was." ECF No. 342 at 169:19-20. Mr. Allen denied his mother forbid him from returning home, and mentioned Juanita Allen filed a missing person report. ECF No. 342 at 170:7-8. At the time of Dr. Askenazi's examination, Mr. Allen reported he was "close" with his mother. Exhibit 554 at 4. Dr. Askenazi's report elaborates:

> He said that she has been apologizing to him, coming to terms with how she treated him, despite that fact she does not remember a lot because of being drunk when violent towards him. His relationships with his sisters are, 'Very close. They've been with me through this whole situation.'

218

Exhibit 554 at 4.

Dr. Askenazi examined Mr. Allen's standardized testing scores from the Clayton School District. During the first through seventh grades, Mr. Allen scored in the average range, nationally. While his scores may have been lower than expected for a specific school, they "argue[d] against any specific learning disability or any sort of brain dysfunction." ECF No. 342 at 171:22-172:1. Dr. Askenazi noted a "shift in test performance for the years up until and including seventh grade and eighth grade, suggesting that non-academic factors were making an impact on academic performance at this time." Exhibit 554 at 6. Dr. Askenazi added this change occurred at the same time Mr. Allen started using alcohol and marijuana. Similarly, during their interview, Mr. Allen told Dr. Askenazi "that once he had started using particularly marijuana, that school didn't matter as much . . . as the fact that when you're on the streets, sometimes being smart is not a benefit to you." ECF No. 342 at 171:15-18.

During the examination, Mr. Allen also discussed the alleged boxing accident with his uncle, Jerome Petty. Mr. Allen described this incident as an accident; he told Dr. Askenazi he fell and hit his head on a gate. At the Hearing, Dr. Askenazi testified, "I actually specifically asked if his uncle purposely harmed him and he vehemently said that, 'No, it wasn't.' And when, in fact, his mother had maybe suspected it, he had to tell her that that wasn't the case." ECF No. 342 at 175:6-9. Mr. Allen explained, "I remember my mom was going to bust my uncle because she thought he did it." Exhibit 554 at 8.

Mr. Allen told Dr. Askenazi he became withdrawn after the death of Marquis Taylor. "He was avoiding places that he used to go with Marquis Taylor[.]" ECF No. 342 at 177:23-24. He began increasing his substance use. Mr. Allen said the death of Marquis Taylor has been one of the "greatest burdens throughout his life[.]" ECF No. 342 at 178:7-8. Mr. Allen and Marquis

Taylor "had a plan to actually get out of the community, make more of themselves[.]" ECF No. 342 at 178:12-13. After speaking with Mr. Allen, Dr. Askenazi had "the sense that [Mr. Allen] thought his friend was more likely to get out than he was, and his friend didn't get out." ECF No. 342 at 178:12-16.

Dr. Askenazi concluded, at the time of the clinical evaluation, Mr. Allen "was not actively suffering from any mental health diagnoses." ECF No. 342 at 180:6-7. She opined Mr. Allen likely suffered from a "low grade depression" throughout his later childhood to early adulthood, including some instances of "more significant depression." ECF No. 342 at 180:11-15. Dr. Askenazi testified Mr. Allen's depression had abated during his time in prison. She also believed Mr. Allen met the "full criteria for PTSD for at least several months after the shooting death of Marquis Taylor." ECF No. 342 at 181:1-3. She added, however, PTSD is a "short-lived diagnosis in most cases," and after several months, Mr. Allen no longer met the PTSD criteria. ECF No. 342 at 181:7-11. According to Dr. Askenazi, Mr. Allen no longer met the criteria for PTSD by the time he visited the Metropolitan Psychiatric Center in February 1997.

### 2.     Review of Dr. Martell's Work

Dr. Askenazi meticulously scrutinized the work of Dr. Martell. At the outset, she testified about the use of norms in her profession. She said, "The main factors today are age, sex, education and race. Those are the main demographics that we score on." ECF No. 342 at 146:25-147:1. When asked, "What is the generally-accepted practice within your profession . . . since 2004 regarding the use of race-adjusted norms or norms that include adjustments for race?" Dr. Askenazi answered, "You know, the standard of practice, whether it be race or any other factor, is if there are adequate norms, well-validated norms that include reasonably impacting demographic variables, you use those norms for your scoring." ECF No. 342 at 148:21-149:3.

She explained the factors themselves are not controversial; "[t]he only thing that's controversial is when results are not well validated, and that usually happens when sample sizes are small."[103] ECF No. 342 at 149:5-7. The norms applied at the time of the criminal trial did not adjust for race, because those norms did not exist then. ECF No. 342 at 151:15-19. In 2004, the norms were revised to separate between Caucasians and African Americans. Dr. Askenazi testified she was unaware of any professional opinions advising against the use of race-specific norms in a capital case.[104] In Dr. Askenazi's opinion, capital cases do not, in and of themselves, require the use of race-neutral norms. In fact, she testified the standard of care is to "use norms that are as valid and reliable as possible for the individual." ECF No. 342 at 155:17-18.

After examining the work of Dr. Martell in this case, Dr. Askenazi found he failed to follow generally accepted principles and ethical guidelines in selecting tests, scoring results, and drawing conclusions. According to Dr. Askenazi, Dr. Martell used many obsolete tests and applied outdated norms. When asked, "Is it possible to do what Dr. Martell was attempting to do which was to provide a retrospective – that is, test a 31-year-old man who has spent 14 years in prison – using tests available when he was 19 or 20 years old?" Dr. Askenazi answered, "It's considered completely inappropriate. Whenever we are asked to do a retrospective assessment, you do that from looking at records and any testing at the time. You cannot use any test now to estimate how a person was functioning back then." ECF No. 342 at 156:24-157:7.

---

[103] Dr. Askenazi added, at the time of the Hearing, it was nearly impossible to publish norms unless the author of the norms used adequate sample sizes.

[104] Dr. Askenazi qualified this position with one exception: "The only opinions that I'm familiar with in that regard is against using any race-adjusted norms in IQ testings for possible *Atkins* mitigation." ECF No. 342 at 153:6-8. She agreed *Atkins* "has to do with the claim that an individual is mentally retarded and whether or not they are even legally eligible to face a charge where the death penalty might be involved." ECF No. 342 at 153:9-13.

Turning to the tests administered by Dr. Martell, Dr. Askenazi calculated new scores for Mr. Allen, applying the "Heaton" norms published in 2004. Dr. Askenazi testified these Heaton norms were the most recent norms available at the time Dr. Martell conducted his evaluation.[105] She prepared a report, Exhibit 562A, displaying Dr. Martell's data, as contrasted with her own. At the Hearing, counsel and Dr. Askenazi discussed her results in detail. A summary of some of her most notable results follows.

a.     *California Verbal Learning Test*

First, Dr. Askenazi examined Dr. Martell's CVLT data. As an initial matter, Dr. Askenazi noted Dr. Martell administered the original version of the CVLT, notwithstanding the CVLT-II was available to him. Even so, Dr. Askenazi was able to apply current norms to Dr. Martell's testing data. Using the same raw data, her results were drastically different from Dr. Martell's results. For example, on one particular CVLT trial, Mr. Allen obtained a raw score of ten out of 16. Using unknown scoring material, Dr. Martell concluded this raw score was four standard deviations below average, amounting to severe impairment. *See* Exhibit 562A at 1; ECF No. 342 at 190:5-9. Dr. Askenazi explained this result "jumped out" at her, because "a [ten] out of 16 you would never think that that would be an 'impaired' range if you're familiar with the test." ECF No. 342 at 190:9-11. In other words, based on the raw score alone, Dr. Martell's observations "just didn't make any sense." ECF No. 342 at 190:14-15. When Dr. Askenazi rescored the ten-out-of-16 raw score, Mr. Allen had a T-score of 43, or "normal." Exhibit 562A at 1; ECF No. 340 at 190:16-19. This T-score is "better than 24 percent of the population." ECF No. 342 at 190:22-23.

---

[105] Likewise, she testified they were the most current norms available at the time of the Hearing.

After rescoring all five trials of the CVLT, Dr. Askenazi concluded Mr. Allen had a T-score of 47: better than 38 percent of the population. Exhibit 562A at 1. In contrast, Dr. Martell concluded Mr. Allen had a T-score of 33. Exhibit 562A at 1. Rescoring the remaining two portions of the CVLT,[106] Dr. Askenazi reached similar results: while Dr. Martell concluded Mr. Allen had "severe impairment" on both portions, Dr. Askenazi concluded he was within the "normal" range on one portion, and bordering on "normal" and "mild impairment" on the other portion. ECF No. 342 at 191:7-192:4. When asked how Dr. Martell concluded Mr. Allen had "severe impairment" on three of the subparts of the CVLT, Dr. Askenazi answered,

> I have no idea. I actually requested what manual he used. I never got any scoring materials. I suspect that the same thing that happened on another test might have happened here; that the standardization sample data that was used in 1983 might have been where he was pulling these scores from, but I myself requested from many people if they had any of that data for me to check, and I wasn't able to obtain that.

ECF No. 342 at 192:4-10.

### b. Stroop Test

Dr. Askenazi reviewed Mr. Allen's results for the Stroop Test.[107] Dr. Askenazi testified the Stroop manual comes with its own set of norms, which were valid at the time Dr. Martell administered the test to Mr. Allen. However, the results contained a different problem. Specifically, on the Color Word portion of the test, Dr. Martell reported Mr. Allen had a raw score of 22, when, in fact, he scored 42. When Dr. Askenazi applied the norms to the raw score, Mr. Allen's T-score increased from 27 to 47. *See* Exhibit 562A at 2. As a result, his results were normal.

---

[106] These remaining portions are titled "Short Delay Free Recall" and "Long Delay Free Recall." *See* Exhibit 562A at 1.

[107] For a discussion of Dr. Martell's results, *see* Section III.K.2.d.

Dr. Askenazi found problems in Dr. Martell's administration of the FAS test, as well.  On the FAS portion[109] of the test, Dr. Martell calculated a T-score of 41 using the old norms. Notwithstanding this was only 0.9 standard deviation below the mean, he reported this score as mildly impaired.   Dr. Askenazi noted a T-score of 41 is actually within normal range. Additionally, when she applied race-specific norms, Mr. Allen had a T-score of 54, which is 0.4 standard deviations above average, or better than 66 percent of the population.  Exhibit 562A at 1.

Dr. Martell's administration of the Animal Naming Test portion is even more peculiar. As Dr. Askenazi explained, "[Dr. Martell] administered it but he couldn't score it because he used the old version of the Heaton norms; that it wasn't part of the test back then, so he couldn't even score it."  ECF No. 342 at 201:17-21.  When Dr. Askenazi used Mr. Allen's raw score of 18, however, she obtained a T-score of 49, or normal.

d.       *Boston Naming Test*

Aside from the use of outdated norms, Dr. Askenazi discovered two problems with Dr. Martell's scoring of the BNT.  First, as pointed out during Dr. Martell's testimony, he scored the BNT as if it had 85 questions, when, in fact, it had only 60 questions.   Second, Dr. Martell administered the original BNT, when the BNT-2 was available to him.  Dr. Askenazi explained the significance of this: "I don't know the specific differences between the original and the current one, but as with most tests, what they do is they throw out items that are no longer considered to be adequate or valid in today's population and either introduce new items or

---

[108] The FAS test is also known as the "Controlled Oral Word Association Test."  *See* ECF No. 342 at 199:3-7.
[109] For a description of the two portions of this exam, *see* Section III.K.2.d.

perhaps even make the test shorter." ECF No. 342 at 194:15-19. When Dr. Askenazi rescored Mr. Allen's BNT results using the modern Heaton norms, the result was a T-score of 54, or normal.

> e.    Speech-Sounds Perception Test

Dr. Askenazi reviewed Mr. Allen's results for the Speech-Sounds Perception Test, a portion of the HII. Dr. Martell used the old Heaton norms to assess Mr. Allen's results, and obtained a T-score of 39. When Dr. Askenazi applied the current Heaton norms, she obtained a T-score of 44, within the normal range. Exhibit 562A at 1.

> f.    Unreported Tests

There were tests Dr. Martell performed and scored, but chose not to report. Dr. Askenazi testified, "To me, it seemed he was being very selective in only reporting things that he interpreted as being impaired versus being the standard of care that you report all tests you administer and the results to all tests because our job is to paint a comprehensive picture of who the individual is." ECF No. 342 at 210:3-7. For example, Dr. Martell administered a test specific to aphasia. Mr. Allen received a perfect score, putting him in a percentile of 99.9, but Dr. Martell did not report it. ECF No. 342 at 222:6-7.

### 3.    Dr. Askenazi's Conclusions

At the Hearing, Dr. Askenazi discussed her own conclusions at length. In addition to using the data of other experts in this case, Dr. Askenazi administered several tests to Mr. Allen. With one exception, she did not administer any of the same tests administered by Dr. Martell; she explained, "When you administer the same exact tests, there is an artificial increase in scores because of the learning of the actual test." ECF No. 342 at 163:20-22. A summary of her conclusions follows.

Dr. Askenazi began by comparing Mr. Allen's full scale IQ scores over time. In 1998, Dr. Gelbort assigned him an IQ score of 82; in 2009, Dr. Martell assigned him an IQ score of 100; in 2011, Dr. Askenazi assigned him an IQ score of 96. Exhibit 556 at 2. Dr. Askenazi analyzed these results as follows:

> The difference between 100 and 96 is considered a nonsignificant clinical difference. People won't have the same exact score over time. There's a normal fluctuation of scores over time. A difference of four points is considered normal fluctuation. What's interesting is that leap in the 11 years from 1998 to 2009 from 82 to 100 which is broadly been maintained over time. And when you look and see that there's an increase in both the verbal area as well as the performance area, it suggests that he has been learning during that time. . . . [I]t suggests that he is capable of learning information over time, and it's not just factual data which is more of the verbal, but the performance is also visual abstraction and how quickly he completes different tests[.]

ECF No. 342 at 212:12-213:2.

Similarly, Dr. Askenazi found no impairment in Mr. Allen's memory capabilities. While she agreed with Dr. Martell that a diagnosis of dementia requires memory impairment plus some other form of impairment, she found Dr. Martell again selectively reported his results to conclude Mr. Allen had a memory impairment. Specifically, Dr. Martell focused on Mr. Allen's WAIS-III score of 84, while ignoring his WMS-III score of 91. ECF No. 342 at 216:13-19; Exhibit 556 at 4. Moreover, the WAIS-III contains an arithmetic section to test intelligence, "and it was singularly on that one arithmetic test that [Mr. Allen] did more poorly, and it brought the whole score down." ECF No. 342 at 216:25-217:5. The WMS-III, on the other hand, does not contain an arithmetic component, and Mr. Allen's WMS-III results were normal. Likewise, Dr. Askenazi administered the WAIS-IV to Mr. Allen and obtained a normal score of 92. Exhibit 556 at 4. She also administered the Kaplan Baycrest Neuropsychological Assessment (KBNA), "a comprehensive neuropsychological assessment tool that assesses in one battery attention, memory, language, [visuospatial] skills, and executive functioning." ECF No. 342 at

217:22-24. As to the memory portions of the KBNA, Mr. Allen's results were all above average, showing "good memory functions." ECF No. 342 at 220:24-221:2; Exhibit 556 at 4. On cross-examination, Dr. Askenazi admitted she did not subscore for "intrusions," which occur when the evaluee is asked to memorize a list, and names a word not on the list. ECF No. 342 at 262:3-9. She also did not score for perseverations. On re-direct examination, she explained,

> There's no clinical significance. Now if he was repeating himself during the interview, during the day I spent with him, I might have been concerned, but I didn't see that. And the numbers and types of intrusions and repetitions did not appear to be clinically significant, and I didn't even score them.

ECF No. 342 at 280:12-17.

Dr. Askenazi assessed Mr. Allen's language capabilities, as well. One portion of the KBNA, the Picture Naming Test, is analogous to the BNT. In fact, the Picture Naming Test has the "exact same type of format [as] the [BNT]. It's shorter in length." ECF No. 342 at 222:12-13. Mr. Allen obtained a perfect score on the Picture Naming Test. Exhibit 556 at 6. Likewise, Mr. Allen had an average score on the Verbal Fluency portion of the KBNA; Dr. Askenazi explained this was entirely consistent with the rescored FAS test results.[110]

As to attention capabilities, Dr. Askenazi found Mr. Allen fell within average ranges. Mr. Allen's KBNA T-score was 52, or slightly above average. Exhibit 556 at 10. Dr. Askenazi did note, however, on one attention test, the "VPMI," Mr. Allen fell "right below the cutoff of 'average' functioning[.]" ECF No. 342 at 225:17-18. She attributed this aberration to a "decline in afternoon versus morning testing." Exhibit 556 at 11. This conclusion was bolstered by the fact Dr. Gelbort and Dr. Martell's test results all fell within average ranges.[111] Exhibit 556 at 11.

---

[110] On cross-examination, Dr. Askenazi admitted she did not subscore for perseverations for this test.

[111] Dr. Askenazi explained the Verbal Fluency Test requires the evaluee to name words beginning with the letter "C," then animals, and then the first names of people; the evaluee has

Finally, Dr. Askenazi evaluated the risk factors for brain impairment in Mr. Allen's life: in utero teratogens,[112] lead poisoning, febrile seizures, asthma, head injuries, and alcohol and marijuana use. Exhibit 556 at 18. Dr. Askenazi explained these risk factors "have in some way been associated with change in brain functioning. It doesn't guarantee that there is, but these are the things [Mr. Allen] was exposed to that could have potentially had an impact on his thinking abilities." ECF No. 342 at 233:19-23. She concluded,

> Given the educational records I've seen, given the testing I did and the rescoring of Dr. Martell's [data], there's no indication [Mr. Allen] has any cognitive impairment which means even though he may have been exposed to some or all of these risk factors, they have not caused any permanent cognitive impairment in him.

ECF No. 342 at 234:6-10. In sum, Dr. Askenazi found "no indication that Mr. Allen has any organic brain deficits." ECF No. 342 at 234:25-235:1.

Aside from the above discussion, which summarizes only some of the most compelling evidence proffered by Dr. Askenazi, the Court has reviewed the entirety of her testimony, her meticulously prepared expert report, and her exceedingly helpful accompanying exhibits. Dr. Askenazi fastidiously compiled comprehensive information concerning Mr. Allen's brain function, including intelligence, achievement, memory, processing speed, language, visuospatial skills, attention, and executive functioning. Mr. Allen's composite KBNA score[113] placed him in the seventy-ninth percentile, toward the "high end" of average. ECF No. 342 at 228:10-14. Based on Dr. Askenazi's analysis, the Court is convinced Mr. Allen suffers from none of the

---

one minute for each of these categories. Dr. Askenazi noted Dr. Gelbort found "[d]istractibility from the WAIS is noted to be 'low average to borderline deficient[.]'" Exhibit 556 at 11. She also noted, however, the actual score was not reported.

[112] Dr. Askenazi defined "teratogens" as "anything that a baby might have been exposed to when his mother was pregnant with him." ECF No. 342 at 233:9-10.

[113] The composite score accounts for attention, memory, language, executive functioning, and visuospatial skills.

deficits so vehemently propounded by Dr. Martell. Moreover, Dr. Askenazi's opinion of Dr. Martell was charitable. Dr. Martell repeatedly cherry-picked his results to cast Mr. Allen as impaired. This recklessness was compounded by his frequent mistakes. The Court concludes Dr. Martell contorted his data to give Mr. Allen the appearance of impairment, when, in fact, his results consistently fell within normal ranges. Dr. Martell's performance was unprofessional and shameful.

### T.    *Petitioner Billie Jerome Allen*

The parties stipulated the Court may consider Mr. Allen's deposition testimony, recorded on May 8, 2012, as if he had testified in person at the Hearing. ECF No. 306.

### 1.    Life on Evans Street

The first place at which Mr. Allen remembered living was the house on Evans Street, shared with his father, mother, older sister, and cousin, Corey Allen.[114] Mr. Allen stated there were drugs "[r]ight on the corner." Exhibit 539 at 13:13-21. His father and his uncle, Billy Wayne Allen, used and sold drugs there, and Mr. Allen and his cousin Corey Allen spent time with them. Mr. Allen testified he was living on Evans Street the first time he tried alcohol, at the suggestion of his uncles. He could not recall a time when his father, John Allen, was not using or selling drugs. Additionally, John Allen was a drinker; "he used to be drunk a lot." Exhibit 539 at 17:19-20.

During these times, John Allen was "[v]erbally abusive, physically abusive" to Mr. Allen. Exhibit 539 at 17:21-18:2. Mr. Allen testified John Allen gave him "whoopings," hit him with

---

[114] Mr. Allen's paternal grandfather and grandmother also lived in the area. Mr. Allen indicated he lacked a relationship with his grandfather, who had "anger issues." Exhibit 539 at 25:18-19. He was close, however, with his grandmother, and went to her house frequently.

extension cords, and pushed him down.[115]  Exhibit 539 at 18:5-12.  According to Mr. Allen, at times, John Allen would lash out for no reason; other times, John Allen's abuse was a form of punishment for doing things children normally do.  Mr. Allen estimated he was seven or eight years old at the time.  On Evans Street, the source of "whoopings" was approximately even between his mother and father.  At times, Juanita Allen objected to John Allen's "whoopings."  She would tell him to stop and, usually, he would.

Mr. Allen said a "whooping" could mean being struck with a hand, extension cord, tree branch, or, in essence, anything else.  *See, e.g.*, Exhibit 539 at 28:3-8.  He elaborated,

> I mean it was always a joke amongst the kids.  Oh, you are going to get a whoopin' today.  Or are you going to get a whoopin'?  . . .  And you see a kid terrified to go get a whoopin'.  So we joked about it.  You know, it wasn't a joking matter.  You kind of tried to make light of the situation[.]

Exhibit 539 at 29:2-22.  Typically, Mr. Allen would be told to pull his pants down to his ankles and lay down on a bed.  He would obtain welts on his body: "[l]egs, butt, . . . back.  You know, it depends.  You know sometimes you try to ball up and you get hit in the arm and stuff like that."  Exhibit 539 at 30:19-21.  Mr. Allen stated he did not receive "whoopings" every day, but he did receive them frequently.  He said, at the time, he "knew it wasn't normal" to be receiving "whoopings."  Exhibit 539 at 33:1-3.  He added, "At the time, somewhat I guess you could say, being a kid, it was torture.  I mean it felt like, you know, more than what I should have received."  Exhibit 539 at 33:6-9.  Mr. Allen could not recall ever seeing his sisters being disciplined.  Exhibit 539 at 33:21-22.  "[A] few times" the "whoopings" resulted in broken skin and bleeding.  Exhibit 539 at 35:18-22.

---

[115] This is inconsistent with believable evidence in the case.  For example, at the time of the criminal case, Juanita Allen told Dr. Randall that John Allen "wasn't a violent person.  I'd be subject to get violent before [he] would."  Exhibit 411 at 2.

Mr. Allen could not recall either of his parents working during the time the Allen family lived on Evans Street. He testified there were times when they had no electricity, but could not recall a time when the family was evicted. His parents yelled constantly, but he could not recall his parents physically abusing each other. Mr. Allen testified drugs and alcohol caused them to separate. When asked, "When you were growing up did you feel that your mom loved you?" Mr. Allen answered, "I can't say[,] . . . [b]ecause I always felt a person who would harm you, you know, do harm to you, how can they actually love you? So I didn't see it like that." Exhibit 539 at 40:11-21. Later, Mr. Allen added, "It's something that I still hold onto. So it's not something that you – when a person I guess you can say hits you enough where your flesh is torn, then it's not something you forget easily." Exhibit 539 at 57:16-20. When asked, "Has there ever been a time in your life where you just forgot about it and put it out of your mind[?]" Mr. Allen testified, "I've never forgot about whoopin's. I never forgot about them. I will never forget about them." Exhibit 539 at 58:2-7.

While on Evans Street, Mr. Allen became involved in Boys Scouts. He also played basketball, football and did "kid things," but was not involved in organized sports. Exhibit 539 at 68:2-9. At an early age, Mr. Allen discovered he excelled in art. Teachers commented on his abilities, but he could not recall whether his family ever saw his work. Mr. Allen and his sisters were the only children in the neighborhood to attend school in the Clayton School District. Other children went to local schools, and Mr. Allen took some teasing from them for this reason. Similarly, he took teasing from his classmates in the Clayton School District; they called the children who were bussed in names like "dirty kids" and "inner city kids." Exhibit 539 at 108:22-23. It was "obvious" to Mr. Allen that his classmates had more material possessions than him. Exhibit 539 at 107:4. Mr. Allen testified he wanted to go to school with his local friends,

"[b]ecause it seemed like they had more fun." Exhibit 539 at 49:12. According to Mr. Allen, he and Juanita Allen never discussed the reasons for sending him to Clayton schools.

On Evans Street, Mr. Allen spent most of his time with his father's family, which often "had run-ins with the law." Exhibit 539 at 44:23-45:1. He liked his paternal uncle, Billy Wayne Allen, because "he never put his hands on [him]." Exhibit 539 at 42:10-11. Mr. Allen said Billy Wayne Allen was protective in some instances by not permitting other children to bully him. He agreed Billy Wayne Allen would "speak up" for him. Exhibit 539 at 43:24-25.

Mr. Allen recalled his mother drank while living on Evans Street.[116] He said she drank "a lot," and the family always had alcohol in the refrigerator. Exhibit 539 at 45:19-24. During this time, Mr. Allen could not remember Juanita Allen ever drinking anything harder than beer. Exhibit 539 at 46:1-4. He was unable to estimate how many times per week Juanita Allen was drunk when he returned home from school; he could not say there was a pattern to her drinking. Later during his deposition, however, Mr. Allen was shown the transcript of his interview with Dr. Yutzy:

> Dr. Yutzey [sic]:     Okay. Let me ask you a little bit about alcohol and drug use perhaps in the family. Anybody have trouble with alcohol, any real trouble? I don't mean take a drink every once in a while. Anybody admitted to the hospital for detox?
>
> Mr. Allen:     Oh, probably on my father's side. That side has alcoholics and things like that, so it's like I pretty much stayed to my mom's side of the family, you know, every time I go over there like Christmas, Thanksgiving (INAUDIBLE).
>
> Dr. Yutzey [sic]:     Any alcohol on your mother's side or (INAUDIBLE)?
>
> Mr. Allen:     No, everybody on my mom's side is straight.

---

[116] Mr. Allen could not recall his mother using drugs.

> Dr. Yutzey [sic]:     Would you say they're kind of boring?

> Mr. Allen:     (Laugh) Yeah.

Exhibit 46 at 41:9-25. At the deposition, Mr. Allen offered the following explanation for failing to tell Dr. Yutzy his mother had a drinking problem: "I mean, if [Dr. Yutzy] wanted to ask about my mom, he could have asked about my mom. He's talking about my mom's side of the family." Exhibit 539 at 343:4-6.

According to Mr. Allen, after his family left Evans Street, he continued to get "whoopings" from his father, once or twice, after he moved to Cote Brilliante, when he went to his grandmother's house. At that point, Mr. Allen testified he tried to stay away from his father "as much as possible." Exhibit 539 at 27:12-13. He testified his father's side of the family was different than his mother's side of the family; everybody on his mother's side of the family maintained employment.

## 2.     Life on Cote Brilliante

Mr. Allen could not recall his age when he moved to Cote Brilliante, but he estimated he was still attending Glenridge Elementary School in the Clayton School District. He testified there were more gangs in the Cote Brilliante neighborhood than in the Evans Street neighborhood. He did not join a gang, however, because he "knew it wasn't right." Exhibit 539 at 78:20-24. That is, his mother, and others, told him to stay away from gangs. Exhibit 539 at 78:25-79-12. In fact, on Cote Brilliante, Mr. Allen was involved in a variety of sports. He played organized baseball, basketball, and softball. He estimated he was a teenager when he played softball under the supervision of Coach Sam Moore. Additionally, he recalled attending church on Cote Brilliante, with his aunt, Lucy McLemore, and his grandfather, Otha Petty.

Juanita Allen imposed rules at the house on Cote Brilliante. Mr. Allen stated, "She would tell me throughout my life not to go outside when she was gone[.]" Exhibit 539 at 80:4-6. Mr. Allen explained he "loved" staying outside, particularly with his cousin, Claude McLemore,[117] who was close to him and visited often. Exhibit 539 at 81:3-8. Mr. Allen and Mr. McLemore played catch, basketball and baseball together. Mr. Allen testified his mother was "strict"; he explained, "I guess you can say she didn't want me hanging out with a lot of kids. You know, she didn't want me to – I couldn't have the same fun that most kids had." Exhibit 539 at 85:5-8. Juanita Allen imposed a curfew: Mr. Allen had to be home when the streetlights turned on. He also had assigned chores, such as taking out the trash and washing the dishes.

Generally, when Mr. Allen violated his mother's rules, he got punished with a "whooping."[118] Mr. Allen testified his mother's "whoopings" were more severe than his father's. He stated, "I guess you could say that the instruments started getting bigger as time went on. The branches got bigger, you know." Exhibit 539 at 86:2-4. He also said his mother used belts, brooms, and her own hands to strike him, and she threw an iron and shoes at him. Mr. Allen testified Juanita Allen punched him in the mouth "[a] few" times when he was ten or 11 years old.[119] Exhibit 539 at 90:3-16. When asked whether Juanita Allen ever removed privileges, such as telephone use, as punishment, Mr. Allen said, "I mean that was rare." Exhibit 539 at 88:1. When asked, "Which bothered you more? That or the whoopin's?" Mr. Allen answered, "The whoopin's, of course." Exhibit 539 at 88:4-6. While he sometimes received "whoopings" as punishment, more often they occurred for no reason other than his mother's drunkenness. The "whoopings" stopped when Mr. Allen left home at the age of 19.

---

[117] Mr. McLemore's testimony is summarized in Section III.G.
[118] Mr. Allen explained sometimes Juanita Allen was too drunk to enforce her own rules.
[119] The weight of all other evidence is Juanita Allen never behaved in this manner until Mr. Allen started using drugs, when he was a teenager.

Mr. Allen estimated he was about ten or 11 years old when Juanita Allen began banishing him from the house.[120] He stated his mother did this once a week, or once every other week, and it usually occurred at night. Sometimes she simply locked the door while he was out; other times, she told him "to get the hell out." Exhibit 539 at 169:12-13. Mr. Allen testified he went various places on these occasions: Dennis Noble's house, Marquis Taylor's house, Johnnie Grant's house, Corey Allen's house, or sometimes simply the front porch. When asked why Juanita Allen locked him out, Mr. Allen answered,

> Sometimes because I will talk back to her after she comes in drunk. I will say something, and she says, 'Get the hell out,' so I will leave.
>
> Sometimes I will stay out late at a party or something where I was supposed to have been home, so she said, 'If you want to stay out there, stay out there.'

Exhibit 569 at 170:18-25 (internal quotations added). Mr. Allen added he sometimes snuck out of the house while his mother was gone. When asked why he did this, Mr. Allen testified, "I mean I didn't care at the time whether it was somewhere smoking weed or drinking or whatever I wanted to do. I just needed to be away from it." Exhibit 539 at 182. At the deposition, Mr. Allen was shown the portion of the Life History, stating, "Billie denies having run away or having been thrown out of his home at any time." Exhibit 303 at 3. Confronted with this, he testified he had no recollection of making such a statement to Mr. Simon. Similarly, when asked, "Did Mr. Simon [or Mr. Sindel] ever ask you whether or not you had ever been abused in any way, whether physically, sexually, or verbally?" Mr. Allen said he could not recall. Exhibit 539 at 177:12-22.

---

[120] Later during his deposition, Mr. Allen was asked, "Do you remember telling [Dr. Askenazi] that the first time you were ever outside the house for the night was when you started sneaking out at age 15?" Exhibit 539 at 181:10-13. Mr. Allen answered, "No, I don't remember saying it like that, no." Exhibit 539 at 181:14-15.

Similarly, Mr. Allen was questioned regarding his taped interview with Dr. Yutzy. Although Mr. Allen could not recall Dr. Yutzy, he was shown a transcript of the interview, in which he stated he was not verbally, physically, or sexually abused.[121]  He further stated having his privileges removed was "worse than getting whoopin's[.]"  Exhibit 539 at 98:3-6.  Mr. Allen could not recall this conversation, but offered the following explanation for his prior inconsistent statements:

> Well, I mean I don't recall saying it so I really . . . You know, are the answers true that I'm reading in front of me?  I mean probably at the time I probably didn't feel like talking about it.  It's not just something you come out and say, hey, this is what happened to me.

Exhibit 539 at 100:4-10.  At the deposition, Mr. Allen testified the statements made to Dr. Yutzy were not true.

Mr. Allen was questioned about the "boxing" accident with his uncle Jerome Petty.  He summarized the incident as follows: "All I did was had words with him, you know, and he punched me [in the chest], and I hit my head on the fence."[122]  Exhibit 539 at 201:20-22.  He recalled Juanita Allen was angry, because Mr. Allen's head was bleeding.  Mr. Allen testified he and Jerome Petty boxed on occasion, but this event was not one of those times.

Mr. Allen testified about his alcohol consumption, which started with wine coolers, and progressively became more intense.  He stated he began drinking beer with his friends when he was ten or 11 years old.  He added, "I probably drank everything you could think of, but my drink later on after I started getting older, probably 11, 12, 13, 14, was Everclear.[123]  I would just water it down a little bit.  But just Everclear was probably one of my favorites."  Exhibit 539 at

---

[121] For a recitation of this exchange, *see* Section III.R.
[122] This is inconsistent with Mr. Allen's previous statements.  For example, he told Dr. Askenazi this injury was an accident, and his uncle did not intend to hurt him.  *See* Section III.S.1.
[123] Everclear is 190 proof alcohol.

184:2-7.  He testified he could buy liquor underage, because salespeople knew him well.  Exhibit 539 at 185:25-186:1.  Mr. Allen estimated he began drinking at clubs at the age of 14.  He consumed a variety of alcoholic beverages, explaining, "It was all the same.  As long as I get numb, that's all I was really worried about."  Exhibit 539 at 188:15-16.

Mr. Allen began smoking marijuana when he was 11 or 12 years old.  He began selling drugs while he was still in the Clayton School District; he learned this trade primarily from his uncles, and partly from his friend, Dennis Noble.  Mr. Allen recalled selling "weed and crack cocaine" with Dennis Noble, who was the primary source of his drugs.  Exhibit 539 at 116:1-2; 119:25-120:2.  With the money he made selling drugs, Mr. Allen "smok[ed] weed and drank."  Exhibit 539 at 121:13-15.

In the eighth grade, Mr. Allen withdrew from Wydown Middle School in the Clayton School District and enrolled in Simmons Middle School in the Saint Louis Metropolitan School District.  Mr. Allen said he felt like an outsider at Wydown Middle School, but could recall neither why his mother transferred him, nor whether he asked his mother to change his schooling.  According to Mr. Allen, it was at Simmons Middle School that he realized the "whoopings" amount to abuse.  He explained, "[W]hen you go to school, you know, they have programs about abuse and stuff like that.  And then you become enlightened about it."  Exhibit 539 at 54:12-15.  When asked, "What did they teach you that you didn't know or realize before?"  Mr. Allen answered,

> Well, the only thing they really taught was that if you feel abused or something like that, call the police or alert your counselor.  It wasn't like I just sat down and said, okay, I've been abused.  It was a regular thing to me.  So I didn't actually qualify me being abused as being abuse [sic].  I just saw it as me getting whoopin's.

Exhibit 539 at 55:11-20.  When questioned further about these "programs," Mr. Allen stated, "Well, it wasn't really a program.  It was little pamphlets."  Exhibit 539 at 55:24-25.

After transferring to Simmons Middle School, Mr. Allen wanted to return to Wydown Middle School.  He explained, at Simmons Middle School, "they didn't have books.  They didn't have things that they had at Clayton."  Exhibit 539 at 127:6-8.  Violence was frequent at Simmons Middle School, and Mr. Allen was knocked unconscious by an unknown assailant on one occasion.[124]  He transferred back to Wydown Middle School for "a couple days," Exhibit 539 at 126:7-10, after which he enrolled at Sumner High School in the Saint Louis Metropolitan School District.  Although he could not recall who made the decision to make this transfer, he agreed transferring to Sumner High School was "the biggest mistake of [his] life," because of the poor quality of education, the drugs, and the violence.  Exhibit 539 at 128:5-9, 129:12-19.

While attending Sumner High, Mr. Allen recalled skipping school often to drink and smoke marijuana at his friends' houses.  He testified he was subject to teasing even at Sumner, due to his lack of material possessions.  Mr. Allen could not recall whether he finished the tenth grade, but he remembered being suspended on more than one occasion, and being officially expelled for "cussing the principal out or something like that."  Exhibit 539 at 133:12-13.  Mr. Allen testified, at the time he was expelled, he was frequently using alcohol and marijuana, and he could not recall being "interested in anything."  Exhibit 539 at 137:10-11.  When asked whether he left Sumner High because another student was shot,[125] Mr. Allen answered, "No.  I remember the person being shot but I don't think that had anything to do with getting suspended."  Exhibit 539 at 136:8-10.

_____

[124] Mr. Allen testified he did not receive medical treatment for this incident, but was not sure whether he needed medical treatment.
[125] According to the Life History, Mr. Allen left school after another student was shot fatally.

While Mr. Allen denied formal affiliation with any gang, he acknowledged spending time with members of different gangs. Mr. Allen explained he was able to share his time with different groups, because his friend, Dennis Noble, was "basically the bridge between it all." Exhibit 539 at 111:15-18. Sometime between 1994 and 1995, however, Dennis Noble was killed. Mr. Allen took the death of Dennis Noble "hard." Exhibit 539 at 139:16-17. He recalled attending the funeral, and after Dennis Noble's death, Mr. Allen "drank and smoked a lot more." Exhibit 539 at 139:22-24. Additionally, Mr. Allen felt pressure to choose a gang, and he started spending more time with one group, "Crips," than the others. Exhibit 539 at 110:23-24.

Mr. Allen continued to sell drugs after Dennis Noble's death; in fact, his drug sales increased. To get to his drug suppliers, Mr. Allen would take a bus or drive a borrowed car. Because he lacked a driver's license, he learned to drive in a stolen car.[126] He learned to drive by "crashing," explaining, "You get out, you know, every time you crash, you know." Exhibit 539 at 143:2-4. He obtained drugs from "different people in the neighborhood," generally identified only by nicknames. Exhibit 539 at 141:2-9. While he confirmed he practiced "ganking" on three or four occasions, Mr. Allen also recalled selling heroin and cocaine around this time. He conducted drug sales on a street corner, and at an abandoned house[127] on Cote Brilliante. Mr. Allen testified he was robbed twice at gunpoint. On one of those occasions, he was returning home, carrying drug money, and was pistol-whipped by an unknown assailant; he testified this

---

[126] Mr. Allen testified he did not know how to steal a car. Rather, friends would steal cars for him, and he would drive.

[127] Mr. Allen testified his mother was unaware of what he did at the abandoned house. He said, "I would like to think I kept it, you know, without her realizing it." Exhibit 539 at 163:22-25. When asked if he had any expectation of what his mother's reaction would be if she found out he was selling drugs, he answered, "No. I mean most of the time I was high [on marijuana] anyway, so I really didn't. I guess you would say I never had any." Exhibit No. 539 at 164:7-12.

made him dizzy, but he did not lose consciousness.  Exhibit 539 at 204:22-205:1.  At the deposition, Mr. Allen was shown his Life History, which states,

> About three years ago, in front of Billie's mother's house, another man struck Billie in the back of the head with a Ruger 9 mm. handgun.  The blow broke the skin.  Billie fell to the ground, and may have been unconscious.
>
> . . . The altercation arose over a basketball game in which Billie's team had won, and the assaillant's [sic] team had lost; there was a bet of about two hundred dollars at stake.  . . .  The assaillant [sic] was John John, from the Blumeier Projects.  Billie did not press charges.  He did not seek medical care.

Exhibit 303 at 11-12.  Mr. Allen testified he could not remember making these statements.  He expounded, "I mean I don't know what I remembered at that time.  That's what I'm saying.  Now today I can't say what happened back then.  I don't recall."  Exhibit 539 at 206:2-5.  Finally, referring to the statements in the Life History, counsel asked, "Is any of that true?" to which Mr. Allen answered, "I don't recall."  Exhibit 539 at 206:25-207:1.  He was "sure," however, that the pistol-whipping was related to a drug-money robbery, not a basketball game.  Exhibit 539 at 207:14-16.

Mr. Allen testified he and Marquis Taylor socialized together.  They frequented skating rinks and malls to meet girls.  Mr. Allen went to clubs; he had many girlfriends.  While he did not especially enjoy champagne, he recalled purchasing expensive bottles of Dom Perignon to impress girls or get noticed.  When asked, "Just so we are clear, you are going to clubs, socializing, selling drugs, making money from selling drugs, and buying champagne with it? Those are real things that happened?" Mr. Allen replied, "Yeah."  Exhibit 539 at 194:14-18.

Mr. Allen gave an accounting of the jobs he maintained while growing up.  He worked at "a lot of fast food places," including Hardee's, Rally's, and Churches.  Exhibit 539 at 227:24-25.  For about one month, he had a stocking position at the clothing store Express; he enjoyed this job, but was terminated when his probation officer telephoned the store.  When his mother

pushed him into the residential program Job Corps, Mr. Allen worked at a car wash for about one week; he was expelled from Job Corps when he left the premises without permission.  At some point, Mr. Allen desired to join the United States Marine Corps.  When Juanita Allen learned this, she arranged for someone to bring him a recruiting test.  Additionally, for "[a] couple months" in early 1996, he worked at a manufacturing facility for a chemical company called Chemisco.  Exhibit 539 at 231:3-5.  He testified "I quit.  I walked out.  . . .  Just got tired of working."  Exhibit 539 at 235:14-18.  At the deposition, counsel noted, after his 1997 arrest, Mr. Allen told a pretrial services officer that he resigned from Chemisco because his hours had been reduced; Mr. Allen said he could not recall making this statement.  Exhibit 539 at 236:4-24.

Ahmed Oliver and Mr. Allen worked together on their goals to become successful rap musicians.  Ahmed Oliver played instruments, and Mr. Allen rapped.  Mr. Allen could not recall whether he was an official member of Ahmed Oliver's group, "Unlawful Entry."  He testified he never performed in public.  He could not recall winning an open mike contest at Cloud Nine, and, when asked if he ever performed at Cloud Nine, he said, "No, not that I remember.  If I did, I was probably drunk, so I couldn't even tell you."  Exhibit 539 at 253:1-9.  He was then confronted with his Life History, stating, "Billie says that he did not drink until the twelve-month period before the bank robbery.  His favorite form of beverage alcohol is champagne."  Exhibit 303 at 13.  Mr. Allen stated, "Like I say.  I don't remember saying this."[128]  Exhibit 539 at

---

[128] Similarly, Mr. Allen could not recall the following statement in his Life History:

> Billie wrote, and publicly performed, a rap piece about robbing the Casino Queen. The lyrics were on the kitchen table at the residence on Oregon Street where he was arrested.  It does not appear that the police seized these lyrics when they arrested him and searched the residence.

Exhibit 303 at 10.

253:23-24; *see also* Section III.B.1, supra, discussing Mr. Allen's prior statement he won a rap competition at Cloud Nine.

Mr. Allen was acquainted with a record producer nicknamed "Flexx"; Mr. Allen wanted to produce an album with him. Mr. Allen testified Flexx never paid him for his music. When counsel noted Mr. Allen told the pretrial services officer Flexx was paying him 1,000 dollars per month, Mr. Allen said he did not recall saying that, and added, "[Y]ou buy things from Flex[x]. He doesn't give you money. You pay him for his beats." Exhibit 539 at 243:18-20. Mr. Allen testified he never had success or made any breakthroughs in the music industry.

On April 10, 1995, Mr. Allen and some of his friends were arrested while driving stolen cars. Mr. Allen testified, although Marquis Taylor was driving, Mr. Allen "took the case," because he was "[l]ooking out for [his] friend." Exhibit 539 at 146:13-20, 147:3-4. On October 16, 1995, he pled guilty to first degree tampering, received a suspended imposition of sentence, and was put on probation.[129] At the deposition, counsel noted October 16, 1995 was approximately five months after Marquis Taylor's death; Mr. Allen responded, "Are you sure?" Exhibit 539 at 147:15-16. When asked, "[A]re you taking the case for Marquise [sic] five months after he die[d]?" Mr. Allen testified, "Well, I had already pled guilty to the thing when I went down to the police station. So I had already pled to it." Exhibit 539 at 147:19-23. He then added,

> When we got arrested, . . . the officer said, 'Who did what?' I said, 'Okay, I did this.'
>
> So he died after the plea, but I had already said on the record at the police station that the crime was mine, so it wouldn't matter. I can't come back later on after it's done and say, '[H]ey, no, I'm just kidding. You know, my friend died and he really did it, you know.'

---

[129] Mr. Allen admitted he tested positive for marijuana while on probation. He also admitted he continued to smoke marijuana and sell drugs while on probation.

Exhibit 539 at 148:3-11 (internal quotations added).

On May 3, 1995, Marquis Taylor was shot when he and Mr. Allen were walking in front of Prentiss Church's house, on their way to play basketball. Exhibit 539 at 149:8-10. The death of Marquis Taylor was a watershed day in the life of Mr. Allen. In the past, Mr. Allen had told people he believed Marquis Taylor was "better" than him, "because he was trying to live the good life. He was trying." Exhibit 539 at 214:18-22. Mr. Allen recognized there was a rumor Marquis Taylor's assailant intended to kill Mr. Allen; he could not say whether this rumor was true. He testified, "[I stopped p]laying basketball for the teams. Being around people a lot. You know, it's just I preferred to be in small groups or most of the time on my own or something like that." Exhibit 539 at 191:19-22. That said, when asked, "Did you stop going to clubs and hanging out and meeting girls after Marquise [sic] died?" Mr. Allen admitted, "No, I guess you could say I went out more." Exhibit 539 at 196:21-24. He stated, after Marquis Taylor's death, there was no period of time when he stopped going to clubs. Exhibit 197 at 16-23. At first, he did not talk to others about Marquis Taylor's death. Later, he was able to discuss it with friends. He also asked Marquis Taylor's mother whether she blamed him for her son's death; she said she did not.

Mr. Allen acknowledged he was sexually active with several girls in the time period leading to the bank robbery. He had reason to believe he impregnated a woman named Shontay when he was 17 or 18 years old, but he testified the relationship ended after he was arrested in 1997. The Life History, however, states, "The person Billie considers his girlfriend now is Tasha [Valentine]." Exhibit 303 at 11. At the deposition, counsel asked, "Is [Tasha Valentine] actually who your girlfriend was at the time of the offense?" to which Mr. Allen answered, "Yeah." Exhibit 539 at 247:22-24. Mr. Allen stated he and Tasha Valentine had plans to move

into an apartment together, and, in fact, he stayed at her mother's house on more than one occasion. Notwithstanding Tasha Valentine discovered Mr. Allen was sleeping with other women, he said he still intended to rent an apartment with her before his 1997 arrest.

When he was 19 years old, Mr. Allen left home. He testified, "I was just ready to go out on my own. Just ready to leave." Exhibit 539 at 264:6-7. He agreed he made the decision to leave; his mother did not evict him. He visited his home once "every blue moon" to shower and change clothes, but not to visit his family. Exhibit 539 at 267:6-7. During this time, he was not close with his sisters; he explained, "I mean we existed together. That's how I can say it." Exhibit 539 at 268:5-6. He agreed, however, he tried to stay away from his home to protect his family. Exhibit 539 at 272:14-17; 275:10-12. While he was gone from his home, he stayed with Johnnie Grant and Eric Taylor.

Mr. Allen continued to sell drugs out of the abandoned house during this time. At one point, he had territorial problems with unidentified competitors, who threatened him, and attempted to prevent him from selling drugs in the area. Mr. Allen told them he would continue to sell drugs, irrespective of their warnings. In response, "[t]hey talked about shooting [the abandoned house] up[.]" Exhibit 539 at 270:24-25. A few weeks later, and "a couple months" after he left home, unknown assailants fired shots at his mother's house. Mr. Allen learned about this incident after the fact from his sister. Exhibit 539 at 264:3-4, 271:3-5. At the deposition, Mr. Allen testified he believed the shooting of his mother's house was related to the individuals who threatened him about selling drugs in the area. After the shooting, Mr. Allen did not return to his home; he also stopped selling drugs out of the abandoned house.

Interestingly, in a recorded interview during the preparation of the criminal case, Mr. Allen gave a different account of the house shooting to Mr. Simon. Specifically, Mr. Allen stated the shooting arose out of an ill-fated drug deal,

> Well, it was, okay, this is how it went. I, I picked up something from somebody that I usually don't pick it up from. And it was tampered with, but I didn't know that. You know, I don't look at nothing. You know, I just take it where I gotta go. And, you know, I, you know, I weigh it up, you know, put my price on it, you know, if I wanna make a couple extra hundred, couple extra grand.
>
> . . . And that's how I did it. And what I didn't know is that it got tampered with. And the guys, you know, I had a cell phone then. And they called me on the cellular phone. It was like, uh, what happened to that stuff? I'm like, what you talking about? And I was like, uh, it was bad. I was like, I gotta call, you know, them and you know, ask them about it.
>
> . . . You know, and I called them. They said something we got tampered with, so I called them back and told them, well, you know, it's gonna be a couple days, but I be back with you, you know.

Exhibit 634 at 33-34. Mr. Allen stated he offered to "make it good," but failed:

> [I]t took too long, I guess, you know. And they came over there. And after I seen them, I mean, it was, it was like I said forget it. You know?
>
> . . . I just said forget it. I'll leave it at that. They did what they had to do. You know, as long as nobody didn't get killed over this, you know. Or get hurt.
>
> . . . It was I just leave it at that. You know, I just won't go home no more. You know, I just felt I couldn't go home any more.

Exhibit 634 at 34. When confronted with these statements at the deposition, Mr. Allen testified, "I mean I don't recall making that statement. Like I said, I don't recall it." Exhibit 539 at 386:1-2. When asked if the statements he made Mr. Simon were true, Mr. Allen answered, "I mean I don't remember that." Exhibit 539 at 386:10.

About one month after the shooting of the house, on February 12, 1997, Mr. Allen visited MSLPC at the request of Tasha Valentine's mother. He was staying at Tasha Valentine's house at the time, and her mother told him he was "trying to carry too much." Exhibit 539 at 281:12-

13.  Mr. Allen testified he was upset about "[e]verything throughout [his] life."  Exhibit 539 at 280:5-6.  Before visiting MSLPC, Mr. Allen ingested pills he found in a cabinet; he could not recall whether he intended to commit suicide.  He testified he did not see a doctor; he had no recollection of seeing Dr. Wuertz.

### 3.  The Criminal Case

Mr. Allen recalled Connie Caspari-Supranowich, and agreed she "[s]pent a lot of hours with [him.]"  Exhibit 539 at 178:6-13.  When questioned further, however, Mr. Allen stated, "I don't recall talking to her about mitigation things."  Exhibit 539 at 179:9-10.  When asked, "You had conversations with Mr. Sindel and Mr. Simon about the [m]itigation [p]hase, didn't you?"  Mr. Allen answered, "I don't think we actually sat down and went over it.  We were basically in a rush to get it done, so the time spent with me wasn't that much on mitigation stuff."  Exhibit 539 at 179:15-21.  Mr. Allen averred he did not remember the series of recorded meetings with Mr. Simon, which occurred in late 1997 and early 1998.  He could not recall Dr. Randall at all.

At the deposition, although he recalled meeting with experts in preparation for trial, Mr. Allen testified he no longer remembered their names and faces.  When asked whether he answered truthfully to their questions, he replied "I don't know.  I can't really say at that time.  I would like to hope and think that I did."  Exhibit 539 at 299:5-7.  Mr. Allen could not think of anything he intentionally withheld from the experts.  When asked whether his experts inquired about abuse in his background, Mr. Allen stated, "Not that I can recall."  Exhibit 539 at 300:2.  Similarly, Mr. Allen was asked whether Mr. Sindel or Mr. Simon ever inquired of these topics.  He answered, "No, not that I recall.  They didn't go into depth about my past, my history, or things like that."  Exhibit 539 at 299:19-21.

Mr. Allen was shown a copy of his handwritten autobiography. *See* Exhibit 304. He was asked if he recognized his own handwriting, and answered, "I don't know. My handwriting has changed so much, I don't know." Exhibit 539 at 300:6-7. Counsel persisted, asking, "You don't recognize this as your handwriting?" Exhibit 539 at 300:8-9. Mr. Allen answered, "It looks like it," but then recanted, adding, "I mean some of it looks like it and some of it doesn't." Exhibit 539 at 300:10-14. Counsel then read portions of the autobiography, which is titled "The Life of Billie Allen," is written in the first person, and details, among other things, the death of Marquis Taylor. After grappling with counsel, Mr. Allen consistently denied his ability to recall writing the document. Counsel then read the following portion of the document:

> I smoked weed everyday because I had so much stress and I needed someone to talk to but I didn't feel right talking to my mom about it. Me and my mom were real tight but its [sic] just alot [sic] better when you have a father there to love you and spend time with you like fathers do.

Exhibit 304 at 3. When asked, "Is it true that you and your mom were real tight?" Mr. Allen answered, "Well, at the time, my mom was there every day at my trial." Exhibit 539 at 302:24-303:2. After protracted questioning and non-responsive answers, Mr. Allen finally testified, "I don't know. Like I said, I might have misquoted it. So no, me and my mom weren't tight like that." Exhibit 539 at 304:20-22. Counsel read another portion of the handwritten autobiography, stating, "All I would think about was Marquis and all the things he had going on for his self [sic] and he would never be able to do the things he wanted to do again. I felt alone like nobody loved me . . . tho [sic] my mom loved me to death I wanted to just die." Exhibit 304 at 3. After further questioning, Mr. Allen offered the following explanation: "I mean like I said, I wasn't as good at expressing myself at that time. So if you take something out of context,[130] then I have to

---

[130] A review of the transcript reveals counsel did not quote the autobiography out of context.

correct it." Exhibit 539 at 307:15-18. Finally, when asked whether the statement about his mother's love was true, Mr. Allen testified, "No, not that I saw." Exhibit 539 at 307:22-308:1.

Next, Mr. Allen was shown his handwritten letter, Exhibit 491, written to Juanita Allen[131] while he was awaiting trial. Mr. Allen stated he could recall neither the letter nor his handwriting. He added, "I don't remember writing this. It might be my writing. Like I said, my writing style has changed a lot." Exhibit 539 at 309:12-14. When shown his statement, "GOD knows that <u>you</u> tried to keep me away from all that type of drama," Exhibit 491 at 2 (emphasis in original), Mr. Allen admitted, "Well, yes, she tried to keep me away from some things." Exhibit 539 at 311:25-312:1.

When confronted with a similar letter to Juanita Allen, Exhibit 492, Mr. Allen again stated he could not recall writing it. After further questioning, he stated, "Well, like I said, my handwriting has changed. And the run-on sentence, I mean when you look at yourself now, how far you've come on something, you can't sit back and say, okay, I wrote something like this. I just don't see myself writing something like this now." Exhibit 539 at 315:1-6. The letter is signed, "I Love You[,] Bill." Exhibit 492 at 2. When asked if, in fact, he loved his mother at the time of his arrest, he answered, "Well, I guess you can say at times I did. Sometimes. Most of the time I hated her. You know, I expressed this." Exhibit 539 at 8-10.

Finally, Mr. Allen was shown an additional letter, Exhibit 495, stating, "The thing I really have been thinking about is you, how you have been there for me threw [sic] all of my life no matter what, and that's why I love you so much." After grappling with counsel, Mr. Allen admitted, "Yeah, she's been there for me and my sisters through all our lives. She hasn't left us or abandoned us or anything so, yeah, she's been in the house taking care of us." Exhibit 539 at

---

[131] Mr. Allen's letters to his mother are discussed in Section III.E.3.

318:10-13.  The letter continues, "I really think that your job of being a mom is perfect because you did your part."  Exhibit 495.  When asked whether this statement was true, Mr. Allen answered, "She was there with us.  She paid the bills and made sure we ate every day and stuff like that, so."  Exhibit 539 at 318:20-22.  Counsel pressed on, asking, "Is it true that you thought her job of being a mom was perfect?"  Exhibit 539 at 318:23-24.  Mr. Allen replied, "A provider, yes.  For being abusive, no."  Exhibit 539 at 318:25-319:1.  The letter concludes, "I Love You.  Everything I say I mean and god is my witness."  Exhibit 495.  Counsel asked, "So would it be fair to say that you are swearing to God that everything in this letter is a true statement of how you feel about her?"  Exhibit 539 at 323:20-23.  Mr. Allen answered, "That I'm glad she was in my life. . . .  The fact that she was there for me every day.  It's the same thing.  I mean you are going to get the same answer no matter how much you go through this.  It's the same thing.  My mom was there for me.  I love my mom."  Exhibit 539 at 323:24-324:9.

## IV.    DISCUSSION

In his Amended Motion and Post-Hearing Brief, Mr. Allen makes three primary arguments.  The first two of these arguments pertain to trial counsel's alleged deficient performance in preparing for and presenting evidence on the penalty phase of trial.  In his third argument, Mr. Allen contends he has satisfied the prejudice prong of the *Strickland* test, because the evidence establishes a reasonable probability of a different outcome.  Finally, throughout his Amended Motion and Post-Hearing Brief, Mr. Allen relies on several cases, which he maintains are similar to his own situation and establish his entitlement to a writ of habeas corpus.  For reasons stated *infra*, the Court rejects Mr. Allen's arguments, and finds his cited case law highly distinguishable from his case.  Relief will be denied.

### A.   *Deficient Performance*

At the Hearing, the credible evidence adduced a narrative devoid of constitutional error. Those who testified about trial counsel's performance established the trial team began assembling evidence for the penalty phase in the first few days after counsel was appointed; the trial team investigated all potential leads to gather evidence, formed realistic themes and gathered evidence to support these themes.   The trial team worked effectively and tirelessly in representing Mr. Allen in all phases of his trial.   Mr. Sindel began compiling a Mitigation Notebook as early as April 1997.   Mr. Simon began the work of the mitigation specialist by interviewing potential witnesses and assembling the Life History.   When faced with the withdrawal of Dr. Haney, the team acted quickly to retain Dr. Randall, who "hit the ground running."   ECF No. 336 at 190:19.   The day after his appointment to Mr. Allen's criminal case, Dr. Randall flew from his home in Evanston, Illinois to Saint Louis, Missouri; this single act of unrestrained dedication was representative of his assiduous performance throughout the mitigation preparation.   Whatever set-back the team experienced from Dr. Haney's removal from the case, Dr. Randall more than compensated with his aggressive style, skills, and undaunted effort.   His mitigation efforts were complemented by other members of the trial team, including two seasoned attorneys, a paralegal, Dr. Gelbort, and Dr. Cuneo.

Notwithstanding the trial team's exceptional performance, Mr. Allen contends he received ineffective assistance of counsel for two main reasons.   First, he claims the trial team failed to investigate reasonably available mitigating evidence.   Second, he argues, in allegedly

limiting the scope of the mitigation investigation,[132] trial counsel failed to make a reasonable strategic decision.  For reasons stated *infra*, the Court rejects both of these arguments.

### 1.    The Trial Team Effectively Investigated All Reasonably Available Mitigating Evidence

Mr. Allen contends mitigating evidence of abuse and neglect was reasonably available to trial counsel.  He alleges, during the weekend interview sessions, multiple witnesses indicated Juanita Allen was an alcoholic who abused and neglected him during his childhood.  He maintains counsel should have pursued such information, but did not, because by then, it was simply too late.  Mr. Allen states trial counsel would have discovered a "wealth" of mitigating information, had they interviewed those same witnesses in the fall of 1997.  ECF No. 351 at 44. Finally, Mr. Allen argues, to the extent he and Juanita Allen denied or refused to disclose their dysfunctional past, trial counsel still had a duty to investigate the mitigation evidence at issue.

The Court finds Mr. Allen has failed to show the trial team breached its duty to investigate reasonably available mitigating evidence.  The credible evidence established Mr. Allen was asked, on multiple occasions, whether he was abused in his childhood.  Mr. Sindel, in particular, repeatedly asked Mr. Allen about this subject matter.  Mr. Allen consistently denied he was abused.  Some habeas witnesses attempted to excuse Mr. Allen's previous statements by testifying victims of abuse commonly deny their adverse treatment.  The Court is not convinced; Dr. Yutzy testified it is "atypical" for victims to deny their abuse.  ECF No. 342 at 92:22-24. Moreover, at his deposition, Mr. Allen was evasive and nonresponsive when confronted with his prior inconsistent statements.  Rather than explain his previous reluctance to talk about his alleged abuse and acknowledge these statements, he repeatedly claimed he could not remember

---

[132] For reasons discussed *infra*, the Court concludes trial counsel investigated all reasonably available mitigating evidence.

them, and he could not explain why his testimony had changed.

Mr. Sindel testified, at his first meeting with Juanita Allen, he "would have explored . . . at least in a general setting the areas such as whether there was any sexual abuse or physical abuse, that kind of thing." ECF No. 334 at 55:7-10. Juanita Allen spontaneously "lectured" Mr. Sindel about her willingness to be forthright, ECF No. 334 at 234:9-12; she stated, "I'm not going to lie to you, and I'm not expecting you to lie or fabricate to me."[133] Exhibit 301 at 1. Mr. Sindel stated he asked Juanita a total of two or three times about potential child abuse in Mr. Allen's past; she always denied Mr. Allen was abused. Mr. Sindel testified he explained to Mr. Allen the importance of obtaining information about his life and past troubles, and he explored a number of potential mitigating areas, including abuse between parents, sibling issues, attachment issues, exposure to toxic substances at a young age, exposure to toxic substances in utero, verbal abuse, physical abuse, sexual abuse, particular injuries, health conditions, extreme nutritional concerns, life experiences and community conditions. At the Hearing, Mr. Sindel admitted he could not identify a single witness he would have called at the mitigation phase if he had more time to prepare.

Other evidence in this case was consistent with this narrative. Mr. Simon admitted Mr. Allen never gave any indication Juanita Allen was abusive. Similar to her expressions to Mr. Sindel, she told Mr. Simon, "Bill don't come from a bad environment. . . . You're looking for something extremely negative[.] There is no complete diagram for any situation." Exhibit 500 at 60-61. The evidence claimed to be undiscovered by the trial team, for the most part, is based on false or misleading declarations and witness testimony that is not credible. If Juanita Allen did withhold accurate evidence of her physical punishment of Mr. Allen, there is no persuasive

---

[133] For a complete recitation of this exchange, *see* Section III.A.1.

showing any action by the trial team would have discovered such evidence.[134]

Much of the information available at the time of the criminal case affirmatively refuted any indication of child abuse. Mr. Allen told Mr. Simon he cared for his mother, who was "there for [him]." Exhibit 634 at 36. In his handwritten autobiography, Mr. Allen described his relationship with his mother as "real tight." Exhibit 304 at 3. The letters Mr. Allen wrote to Juanita Allen uniformly praised her for being an excellent mother and trying her best to keep him from trouble. Tellingly, no teachers came forward with evidence of abuse or neglect, even though they relayed detailed memories of Mr. Allen. Even Dr. Randall, a highly trained mitigation specialist, eventually conceded he was actively "looking for evidence of physical abuse."[135] ECF No. 326 at 197:25-198:1. Notwithstanding Dr. Randall vehemently and repeatedly testified he never asked Mr. Allen about child abuse, in light of the documentary evidence in the case and Dr. Randall's nonresponsive answers at the Hearing, the Court is entirely convinced he did, in fact, inquire about these topics.

Finally, the Court is not persuaded there existed undiscovered reasonably available mitigating evidence based on the information discovered during the weekend interview sessions. The information provided by the witnesses at those sessions was entirely consistent with the notion Juanita Allen drank to excess in times of distress, and, on occasion, resorted to physical punishment as Mr. Allen grew into his teenage years, began skipping school, leaving home, and

---

[134] The Court by no means believes the evidence of abuse and neglect is accurate. *See* Section IV.B.

[135] The Court also notes Dr. Randall's habeas declaration refers the Court to an American Bar Association (ABA) publication, *Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases*, 36 HOFSTRA L. REV. 677 (2008), which "explain[s] the exhaustive nature of capital mitigation[.]" Exhibit 254 at ¶ 9. The Court is not persuaded by this reference, which was published many years after the criminal trial took place. In assessing deficient performance, the Court must view the alleged deficiency "in light of professional norms prevailing when the representation took place." *Sinisterra v. U.S.*, 600 F.3d 900, 906 (8th Cir. 2010).

became involved in abusing alcohol and associating with people in the drug culture.  *See* Section III.B.4.  As discussed below, the trial team made a reasonable, strategic decision to keep this information from the jury.

### 2. Trial Counsel Made a Reasonable Strategic Decision to Limit the Scope of the Mitigation Presentation

Mr. Allen claims trial counsel's decisions were solely the result of time constraints, not strategic decisions.  He argues trial counsel, in avoiding evidence of physical punishment and neglect, failed to make a reasonable strategic decision, as evidenced by Raymond Petty's penalty phase testimony concerning a single incident involving an electrical cord.  Finally, Mr. Allen contends, even if trial counsel did make a strategic decision in this regard, the decision was unreasonable, and therefore violative of the Sixth Amendment.

The record is abundantly clear the trial team made a reasonable strategic decision to exclude evidence of physical punishment and dysfunction in the Allen household.  At the Hearing, Mr. Sindel testified extensively about his strategy during the mitigation phase of trial.  He explained Mr. Allen's best chances for a life sentence would stem from a causal-nexus theory at trial.  Mr. Sindel testified this was a particularly difficult task for the trial team, because the motive for robbing the bank was financial.  Thus, the team attempted to portray Mr. Allen as a follower, who pandered as an underling to Norris Holder – the overbearing "brains" behind the bank robbery.  ECF No. 334 at 93:3.  Additionally, Mr. Sindel testified the "abuse excuse" was a "hard sell" to jurors.  ECF No. 334 at 159:1-6.  The theme was to portray the Allen family as good, hard-working people, and Mr. Allen as a vulnerable human whose mother loved him, and the Mr. Allen they knew would have never robbed the bank, but for Norris Holder.  Mr. Sindel agreed the evidence of guilt was "devastating."  ECF No. 334 at 181:22-24.  He classified the thrust of the evidence presented as residual doubt, causal nexus and begging, showing the family

in a positive, sympathetic light. He believed mitigating evidence that bears a causal nexus to the offense could be the most effective. The "new" evidence suggested by Mr. Allen does not explain why he murdered to get money.

The team focused on showing Mr. Allen was an individual who could give back to the community, who was loved by his family, and who committed an aberrational offense in an otherwise crimeless life. During the mitigation phase of trial, counsel was successful in presenting a narrative in which Mr. Allen was not dealing actual drugs, but was a pathetic follower, who fantasized about street life, clubs, and women. During closing arguments, trial counsel argued Mr. Allen was not selling drugs, albeit potentially selling fake drugs, and only became involved in the bank robbery at the behest of Norris Holder.[136] Presenting evidence of family dysfunction – be it alcohol, physical punishment, or neglect – would have disclosed testimony Mr. Allen was a real drug dealer. This would have obliterated the team's attempts to portray the bank robbery as an aberration.

Mr. Allen argues Raymond Petty's trial testimony, regarding a single incident involving an extension cord, demonstrates the trial team did not make a strategic decision to avoid evidence of physical punishment. The Court is not convinced. Unlike some of the other witnesses who alerted the trial team to physical punishment and dysfunction, Raymond Petty posed no risk of exposing Mr. Allen's drug-related activities or street life. Rather, Raymond Petty was portrayed as a positive influence in Mr. Allen's life; he tried to serve as a role model for his nephew, and encouraged Mr. Allen's involvement in Boy Scouts of America. In short, eliciting Raymond Petty's testimony did not put the trial team's chosen mitigation themes in jeopardy.

---

[136] This was a particularly impressive effort, as the credible evidence at the Hearing established Mr. Allen's street life, drug dealing, and clubbing were, in fact, reality, not fantasy.

The trial team had knowledge of family dysfunction and physical punishment in the Allen household. The information given by witnesses at the time of the criminal case established what the believable evidence proved at the Hearing: Juanita Allen was an alcoholic who drank to excess in times of distress. The evidence was persuasive that Juanita Allen drank excessively, and increased her drinking when Mr. Allen's life was spinning out of control, when her son became a teenager, was skipping school and was adopting the street life. She resorted to physical punishment in an attempt to keep him away from street life. The undisputed record proves the trial team uncovered this information in 1997 and 1998: Juanita Allen told Dr. Cuneo she "physically disciplined" her son "till end." Exhibit 565 at 22. Raymond Petty informed counsel about the electrical cord incident. Deborah Ruffin stated, "[Juanita Allen] drinks, to excess, when she is in trouble," and explained Juanita Allen "g[o]t physical" with her son. Exhibit 500 at 11, 15. Shimeka Taylor described an incident when Mr. Allen received a "[w]hipping and a punishment" for coming home late. ECF No. 277 at 52:23-53:11. Lucy McLemore conveyed the Allen household was dysfunctional. Even Mr. Simon smelled alcohol in Juanita Allen's home on January 7, 1998.

The Court concludes without doubt the trial team conducted a conscious cost-benefit analysis as to whether it should present evidence of physical punishment and dysfunction. Evidence of this conscious decision was rife at the Hearing. The team had a list, entitled "Factors that Affected Billie's Life." Exhibit 505. This list included themes of "poor maternal role model" and "physical abuse and beatings." Exhibit 505. Mr. Sindel and Mr. Simon both testified Dr. Randall advised against the "trash-the-mother" defense, because probing the sensitive issues surrounding the Allen household would alienate key witnesses. Mr. Sindel expressly testified he decided not to call Juanita Allen as a witness, because she was "volatile,"

and could be a "loose cannon." ECF No. 336 at 255:10-14. Juanita Allen had asked Mr. Grant to "cosign" – that is, lie – for Mr. Allen; her credibility likely would have been destroyed on cross-examination. In addition, Mr. Sindel described evidence of mental health problems as a "hard sell" to jurors, because they perceived it as "psychobabble" and often rejected the "abuse excuse." ECF No. 334 at 158:16-159:2. Mr. Sindel was aware one of the jurors on Mr. Allen's case had expressed skepticism about this type of evidence during voir dire.

In sum, Mr. Allen has failed to establish a deficient performance within the meaning of the Sixth Amendment. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]" *Strickland v. Washington*, 466 U.S. 668, 690 (1984). In addition, "the duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla v. Beard*, 545 U.S. 374, 383 (2005). In the instant case, the trial team did not fall short of its duty to investigate reasonably available mitigating evidence and present such evidence in accordance with strategic decisions. All credible evidence shows Juanita Allen's physical discipline of Mr. Allen occurred when he was 15 years old and older. The evidence at the Hearing established the trial team knew Juanita Allen implemented physical punishment as Mr. Allen grew older and more rebellious.[137] There was no believable evidence, however, she subjected him to the child abuse now argued to the Court. Trial counsel did not "overlook" such evidence, because, to this day, there remains no believable evidence of the horrific allegations asserted in the Amended Motion. In light of the mitigation themes proffered at the penalty phase, trial counsel made a reasonable, strategic decision to avoid presenting further evidence of physical punishment and

---

[137] Individuals who provided this information before the penalty phase included Raymond Petty, Shimeka Taylor, Deborah Ruffin, and Lucy McLemore.

dysfunction.  Because trial counsel was not deficient, habeas relief will be denied.

### B.        *Prejudice*

Having found Mr. Allen failed to establish a deficient performance, the Court need not address prejudice.  *Strickland*, 466 U.S. at 688.  Nonetheless, for the sake of completeness, the Court will discuss Mr. Allen's claim of prejudice.  Mr. Allen maintains the evidence presented at the Hearing establishes a reasonable probability of a different outcome.  At the outset, he argues the criminal case was unusually close, because the jury found three aggravating factors and three mitigating factors as to both Counts of the indictment.  Thus, the imposition of the death penalty came down to one final inquiry: "whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist[.]"  Exhibits 57 at 14, 58 at 15.

In addition, Mr. Allen maintains the purported new mitigating evidence would have remedied a number of problems inherent in the defense.  He states the Government exploited his mitigation themes, and the new evidence would have helped him in this regard.  For example, while trial counsel argued Mr. Allen had a loving family with good values, the Government characterized him as ungrateful and selfish, in the face of positive influences in his home.  Likewise, the Government presented evidence suggesting Mr. Allen did not meet the "persistent avoidance" criterion for a PTSD diagnosis, because he did not avoid street life; Mr. Allen contends an "accurate" description of his upbringing would show his home was not a safe haven from the streets.

The Hearing failed to produce any compelling new mitigating evidence.  The witnesses who testified about Mr. Allen's background provided wildly inconsistent accounts of the Allen household and Mr. Allen's childhood.  Not only were these witnesses inconsistent with each other, but they were, most conspicuously, inconsistent with their own declarations.  Throughout

the evidentiary Hearing, it became readily apparent to the Court that the declarations – which provided the basis for the Court's decision to grant the evidentiary Hearing – were uniformly prepared by habeas counsel; recited facts inconsistent with the record; and were signed by the witnesses without meaningful review or editing.

It also became readily apparent there was no credible evidence of Juanita Allen employing physical punishment on Mr. Allen until he was a teenager who became involved in drug culture. Evidence of physical punishment and neglect was sharply contrasted with the allegations in the habeas declarations. Juanita Allen testified she locked Mr. Allen out of the house two or three times while living on Cote Brilliante. Similarly, Yvette Allen could recall only one specific incident when Juanita Allen forced Mr. Allen to sleep on the porch. Ms. Nelson estimated Mr. Allen was in eighth or ninth grade when this began happening. Even Mr. Grant, after extensive cross-examination, finally admitted Mr. Allen was at least 15 years old when his mother locked him out for the first time. At his deposition, Mr. Allen admitted he voluntarily left home when he was 19 years old.

The believable testimony established Mr. Allen was not subjected to physical punishment in his early years. Juanita Allen testified she did not hit him "when he was younger," ECF No. 328 at 99:9-11. Although she had difficulty pinpointing dates and ages, she surmised Mr. Allen was older than seven, eight, or nine years old when she began "whooping" him. ECF No. 328 at 99:19. Similarly, Ms. Ruffin had difficulty identifying how often Juanita Allen hit her son, and ultimately settled on "more than once." ECF No. 333 at 37:10-11. At the time of the criminal trial, Mr. Allen told Dr. Yutzy he was never verbally, physically, or sexually abused.

The testimony concerning the manner of Mr. Allen's physical punishment was even more inconsistent. Yvette Allen said Juanita Allen hit her son with a paddle. At the criminal trial,

Raymond Petty testified about a single incident involving an extension cord. At the Hearing, Angela Allen stated Juanita Allen used belts and a wooden paddle to administer "whoopings," but could not recall the use of sticks, brooms, or extension cords. Corey Allen recalled seeing Mr. Allen beaten with an extension cord in the bathtub. At his deposition, Mr. Allen testified his mother beat him with belts, brooms, and her own hands. He also testified the "whoopings" bothered him more than having his privileges taken away; at the time of the criminal case, he told Dr. Yutzy having privileges removed was "worse than getting whoopin's[.]" Exhibit 539 at 98:3-6. No credible evidence suggested anyone ever observed scarring or bruises on Mr. Allen. Juanita Allen speculated she "probably" left marks on him when she beat him with an extension cord; she reasoned, "[W]hen I got a whoopin' with an extension cord, it left a mark on me[.]" ECF No. 328 at 129:17-25. In short, the witnesses were unable to provide a consistent, believable narrative of Mr. Allen's so-called abuse.

The evidence surrounding other potential abusers was even more dubious, especially those testifying Mr. Allen took abuse from John Allen, Otha Petty, Jerome Petty, and his sisters. There was absolutely no credible evidence suggesting John Allen or Otha Petty abused Mr. Allen in any way. In addition, the evidence surrounding Jerome Petty was wholly conflicted. In his deposition, Mr. McLemore testified Jerome Petty beat Mr. Allen with his hands only; at trial, Mr. McLemore said Jerome Petty used belts and fists. Mr. Grant, who described Mr. Allen as his best friend, could not recall Jerome Petty at all. Most notably, Mr. Allen told Dr. Askenazi the boxing accident with Jerome Petty was just that: an accident, in which Mr. Allen fell and hit his head on a gate. In fact, Mr. Allen said he had to explain this to his mother. He told Dr. Askenazi, "I remember my mom was going to bust my uncle because she thought he did it." Exhibit 554 at 8.

Finally, Mr. Grant said Mr. Allen was dogged by his sisters. Ms. Ruffin testified she "never" saw Mr. Allen's sisters strike him. ECF No. 333 at 43:10-11. Mr. Toliver testified Mr. Allen's sisters were abusive, but his habeas declaration merely alleges they called Mr. Allen names and told him he was stupid. At the time of the criminal case, Mr. Allen told Dr. Yutzy he had a "good" relationship with his sisters, because they "protected" him. Exhibit 46 at 11:4-10. In short, considering the totality of the evidence, the Court is not convinced Mr. Allen was abused by his sisters, his grandfather, his uncles, or his father.

At the Hearing, evidence regarding alleged neglect was inconsistent and unpersuasive. Mr. Grant described the house on Cote Brilliante as a "pig pen," infested with cockroaches and rats. ECF No. 329 at 78:5. Angela Allen stated the house was "trashed" and infested with mice. ECF No. 333 at 110:7-9. At the time of the criminal trial, Ms. Nelson stated the house conditions did not amount to neglect; at the Hearing, she changed her testimony, speculating, "[I]t seemed as though it would define some level of neglect." ECF No. 333 at 89:13-14. In contrast, Corey Allen testified the house on Cote Brilliante was "in pretty good shape." ECF No. 340 at 22:1-3. He stated everyone had a room, and the house was not condemned. Mr. Toliver testified the house had roaches and was "not very clean." ECF No. 340 at 58:22-23.

While credible evidence established Juanita Allen was an alcoholic, the severity of her drinking and its effects on the Allen household were often exaggerated. Yvette Allen testified she saw beer bottles everywhere, and her mother drank at work with her coworkers. Ms. Nelson testified Juanita Allen drank a clear liquid straight. Angela Allen only could recall her mother drinking Crown Royal. At the time of the criminal case, Mr. Allen denied his mother's side of the family had any problems with alcohol; he told Dr. Yutzy, "[E]verybody on my mom's side is straight." Exhibit 46 at 41:9-25. Inconsistencies aside, the Court is convinced, while Juanita

Allen had a drinking problem, and drank to intoxication many times, she was not in a constant state of intoxication, as some witnesses testified. The trial team, in its numerous interactions with Juanita Allen, smelled alcohol in her home once, on January 7, 1998. The credible evidence supports Ms. Ruffin's statement to Mr. Simon at the time of the criminal case: "She drinks, to excess, when she is in trouble." Exhibit 500 at 11.

The expert testimony adduced at the Hearing failed to support Mr. Allen's position he suffered brain impairment and PTSD. At the outset, the Court notes Dr. Stewart was never called to testify.[138] Furthermore, Dr. Martell's findings were repeatedly debunked and exposed as distressingly biased, sometimes by his own admissions, and sometimes by the meticulous scrutiny of Dr. Askenazi. In contrast, Dr. Askenazi's findings consistently showed Mr. Allen fell within average – and sometimes above average – ranges in the areas of intelligence, achievement, memory, processing speed, language, visuospatial skills, attention, and executive functioning. In addition, the Court is unconvinced by Dr. Cuneo's position that, had he known Mr. Allen was "repeatedly thrown out [of the house]," "raised in a home with alcoholic parents," and "repeatedly physically abused," he would have provided more compelling testimony about PTSD; Dr. Cuneo believed this "evidence" would show Mr. Allen had nowhere to hide, and, therefore, could not display the persistent avoidance required for a PTSD diagnosis. ECF No. 330 at 56:8-57:10. Even assuming Dr. Cuneo's factual premises were supported by credible evidence, Mr. Allen affirmatively contradicted persistent avoidance by repeatedly returning to Marquis Taylor's house and Prentiss Church's house to keep the memory alive. Moreover, at his deposition, Mr. Allen readily admitted he never stopped going to clubs after Marquis Taylor died; in fact, he testified he went out more. As Dr. Yutzy testified, individuals with PTSD

---

[138] The Court relied heavily on Dr. Stewart's statements when it granted the evidentiary Hearing. *See* Section I.

"should withdraw." ECF No. 342 at 32:14-15. The Court concludes credible evidence of brain impairment is nonexistent, and the diagnosis of PTSD was plagued by the same problems at the Hearing as it was at the criminal trial.

In essence, the believable evidence in the habeas proceedings was consistent with what the trial team knew and actually presented in 1998. Juanita Allen removed her children from the adverse influences of John Allen's home. She sought medical care for Mr. Allen, and worked several jobs while her children were growing up. She had absolutely no financial support from Mr. Allen's father. While she was at work, she instructed the children not wander outside, and asked the neighbors to notify her if they disobeyed. She enrolled Mr. Allen in Clayton schools in hopes of a better life for him. She took an interest in Mr. Allen's school grades, and when she noticed them declining, she attempted to obtain special needs courses for him. Juanita Allen recalled attending Mr. Allen's cross-over ceremony, where he advanced from a Cub Scout to a Boy Scout. She imposed a curfew in her home, and regularly instructed Mr. Allen to clean his room and do his homework.

Juanita Allen unsuccessfully tried, "until she was blue in the face," ECF No. 333 at 39:25-40:3, to keep Mr. Allen out of trouble. Mr. Allen struggled to cope with the loss of his friend, Marquis Taylor; this particular grief was compounded by Mr. Allen knowing many individuals who suffered violent deaths.[139] After Marquis Taylor died, Juanita Allen observed Mr. Allen's demeanor change. She noticed his artwork became dark and depressive, and she realized he stopped caring about his appearance. At this point, she sought counseling for her son. When Mr. Allen began to leave home for days at a time, Juanita Allen filed missing person reports. The documentary evidence in this case overwhelmingly establishes Mr. Allen had, and

---

[139] This theme was exhausted at the penalty phase of trial.

has, great love for his mother.

Nor is the Court persuaded by Mr. Allen's argument regarding the closeness of the case. The jury found three aggravating factors beyond a reasonable doubt: (1) "knowingly creat[ing] a grave risk of death to one or more persons in addition to [the victim]," Exhibits 57 at 3, 58 at 3, and (2) "commit[ting] the offense in the expectation of the receipt of anything of pecuniary value," Exhibits 57 at 4, 58 at 4, and (3) "[Mr. Allen's] conduct in committing the offenses [was] substantially greater in degree than that described in the definition of the crime, apart from statutory aggravating factors[.]" Exhibits 57 at 5, 58 at 5. Moreover, the mere "closeness" of the case does not impute constitutional deficiency or prejudice into Mr. Allen's criminal trial. The Court concludes there was simply no believable evidence of a reasonable probability of a different outcome, even if the case was "close." Because there is "no prejudice when the new mitigating evidence 'would barely have altered the sentencing profile presented to the decisionmaker,'" the Court finds Mr. Allen has failed to meet the prejudice prong of the *Strickland* test. *Sears v. Upton*, 130 S. Ct. 3259, 3266 (2010) (quoting *Strickland*, 466 U.S. at 700).

### C.     *Mr. Allen's Cited Case Law*

Finally, throughout his Post-Hearing Brief, Mr. Allen relies primarily on five cases. He contends they are similar to the instant case, warranting habeas relief here. As explained *infra*, however, the cited cases are easily distinguishable from Mr. Allen's case.

### 1. *Porter v. McCollum*, 558 U.S. 30 (2009)

In *Porter v. McCollum*, the petitioner, Porter, was sentenced to death for the first-degree murder of his former girlfriend, Williams.[140] 558 U.S. 30, 31 (2009). Although Porter initially elected to represent himself, his standby counsel began representing him about a month before the penalty phase. *Id.* at 39. During the penalty phase, defense counsel – who had never before represented a defendant during a penalty phase proceeding – put on one witness, Porter's ex-wife, and read a single excerpt from a deposition. *Id.* at 32, 39. Defense counsel told the jury Porter had handicaps "that weren't apparent at trial" and was not "mentally" healthy, but failed to offer any evidence in this regard. *Id.* "The sum total of the mitigating evidence was inconsistent testimony about Porter's behavior when intoxicated and testimony that Porter had a good relationship with his son." *Id.* At a post-conviction hearing, defense counsel testified he "had only one short meeting with Porter regarding the penalty phase[, and h]e did not obtain any of Porter's school, medical, or military service records or interview any members of Porter's family." *Id.* at 39.

The Supreme Court easily concluded Porter's trial counsel performed deficiently. *Id.* at 39-40. The Court explained, "[C]ounsel did not even take the first step of interviewing witnesses or requesting records." *Id.* at 39. Moreover, trial counsel "ignored pertinent avenues for investigation of which he should have been aware." *Id.* at 40. For example, court-ordered competency evaluations indicated Porter received substandard schooling, sustained combat wounds during substantial military service, and was subjected to his father's "over-discipline" as a child. *Id.* Trial counsel attempted to explain Porter was "fatalistic and uncooperative." *Id.* at 40. The Court did not find this persuasive, stating, "although Porter instructed [trial counsel] not

---

[140] Porter was also convicted of first-degree murder for the shooting of Williams's boyfriend, but he did not receive the death penalty for this crime.

to speak with Porter's ex-wife or son, Porter did not give him any other instructions limiting the witnesses he could interview." *Id.* Porter's "fatalistic or uncooperative" characteristics "d[id] not obviate the need for defense counsel to conduct *some* sort of mitigation investigation." *Id.* (emphasis in original).

As to prejudice, the Court held "[t]his [was] not a case in which the new evidence 'would barely have altered the sentencing profile presented to the sentencing judge.'" *Id.* at 41 (quoting *Strickland*, 466 U.S. at 700). At the penalty phase, the judge and jury heard "almost nothing that would humanize Porter or allow them to accurately gauge his moral culpability." *Id.* In contrast, in a two-day post-conviction evidentiary hearing, Porter offered extensive mitigating evidence. *Id.* at 33. The Court detailed the multitude of new mitigating information, including evidence Porter's father abused him regularly as a child; an incident in which his father shot at him and missed; evidence Porter enlisted in the United States Army at the age of 17 and fought in the Korean War; detailed evidence of Porter's involvement in two of the most important battles of the Korean War, including his combat wounds, periods of absence without leave, eventual honorable discharge, and medals for his substantial service; and evidence of mental health issues upon his return from the War, including a severe drinking problem, horrible nightmares, resulting in attempts to climb his bedroom walls with knives at night, brain damage, and PTSD. *Id.* at 33-36. The Court held Porter had established "a probability sufficient to undermine confidence in [the] outcome" of his penalty phase. *Id.* at 44 (quoting *Strickland*, 466 U.S. at 693-94).

This Court has no difficulty distinguishing *Porter* from Mr. Allen's case. The trial team had far more time than Porter's attorney's one month to prepare the mitigation case. While Porter's attorney presented one witness, Mr. Allen's trial team presented 36 witnesses at the

penalty phase, including 12 family members, 10 friends or neighbors, 12 teachers, coaches or school administrators, and two expert clinical psychologists. Porter's attorney merely argued Porter suffered mental illness; Mr. Allen's lawyers secured expert evidence of PTSD and brain impairment, put forth compelling evidence Mr. Allen knew several people who suffered violent deaths, and offered a convincing narrative, in which Mr. Allen became corrupted by the overbearing influences of Norris Holder. Porter's lawyer did not obtain any medical or school records; Mr. Sindel began this process at the outset of his appointment to the case. Porter's counsel did not interview witnesses, while Mr. Allen had a team of professionals, including two seasoned attorneys, a paralegal, and a mitigation specialist, who regularly made documented contact with potential mitigation witnesses.

The two cases are different in regard to prejudice, as well. At Porter's trial, the judge and jury heard "almost nothing that would humanize Porter or allow them to accurately gauge his moral culpability." *Id.* at 41. In contrast, Mr. Allen's trial team specifically focused on a mitigation theme aimed at humanizing Mr. Allen to the jury, depicting him as an individual who was loved and would be missed, and as a pathetic follower and panderer to Norris Holder. In a two-day evidentiary hearing, Porter presented compelling evidence of child abuse, military service, brain damage, PTSD, and alcoholism. In Mr. Allen's Hearing, which lasted more than two weeks, far less similar, credible evidence was received. *Porter* does not apply.

## 2. *Rompilla v. Beard*, 545 U.S. 374 (2005)

In *Rompilla v. Beard*, the petitioner, Rompilla, was convicted of murder and other offenses related to the death-by-stabbing of a bar owner. 545 U.S. 374, 377-78 (2005). During the ensuing penalty phase, Rompilla presented "relatively brief" mitigation testimony. *Id.* at 378. Specifically, he put on five family members, who argued residual doubt and beseeched the

jury for mercy. *Id.* Rompilla's 14-year-old son testified about his love for his father and his plans to visit him in prison. *Id.* In sum, a "few naked pleas for mercy" constituted Rompilla's entire mitigation case. *See id.* at 393.

Rompilla's petition for writ of habeas corpus reached the Supreme Court, which began by examining trial counsel's mitigation investigation. *Id.* at 381-83. Trial counsel obtained mitigation information from three sources: (1) Rompilla himself, who provided "normal" answers to questions about childhood and schooling, often acted uninterested in helping with the mitigation case, and at times sent counsel on false leads; (2) five of Rompilla's family members, who indicated they did not know him well, due to his years of incarceration; and (3) three mental health witnesses, whose reports revealed "nothing useful" to mitigation. *Id.* at 381-82. Trial counsel failed to obtain school records, juvenile incarceration records, adult incarceration records, and evidence of Rompilla's excessive drinking habits, notwithstanding a mental health expert had noted this lead in an expert report. *Id.* at 382.

As to the mitigation investigation, the Court found "there [wa]s room for debate about trial counsel's obligation to follow at least some of those potential lines of enquiry." *Id.* at 383. However, the Court found a deficient performance for an entirely different reason: trial counsel failed to examine the court file on Rompilla's prior rape and assault convictions, despite knowing the prosecutor intended to use the document to show a history of violent character as an aggravating factor. *Id.* at 383. The Court emphasized "[t]here [wa]s no question that defense counsel were on notice," because they had referenced the file in a pre-trial document. *Id.* at 383-84. "Even after obtaining the transcript of the victim's testimony on the eve of the sentencing hearing, counsel apparently examined none of the other materials in the file." *Id.* at 385.

Having found a deficiency, the Court next held "Rompilla ha[d] shown beyond any doubt

that counsel's lapse was prejudicial[.]" *Id.* at 390. Had the defense lawyers examined the file, they would have discovered a "range of mitigation leads[.]" *Id.* The prior conviction file contained records of Rompilla's previous incarceration, and these prison files painted an entirely different picture of his upbringing from that painted by his family. *Id.* at 390-91. The files indicated Rompilla grew up in a "slum environment," dropped out of school at the age of 16, subsequently began a "series of incarcerations," often related to assaults arising out of excessive alcohol consumption. *Id.* They also indicated Rompilla exhibited symptoms of schizophrenia and other disorders, and "a third grade level of cognition after nine years of schooling." *Id.* at 391. Moreover, had counsel followed up on these leads, counsel would have discovered the following evidence found by post-conviction counsel:

> Rompilla's parents were both severe alcoholics who drank constantly. His mother drank during her pregnancy with Rompilla, and he and his brothers eventually developed serious drinking problems. His father, who had a vicious temper, frequently beat Rompilla's mother, leaving her bruised and black-eyed, and bragged about his cheating on her. His parents fought violently, and on at least one occasion his mother stabbed his father. He was abused by his father who beat him when he was young with his hands, fists, leather straps, belts and sticks. All of the children lived in terror. There were no expressions of parental love, affection or approval. Instead, he was subjected to yelling and verbal abuse. His father locked Rompilla and his brother Richard in a small wire mesh dog pen that was filthy and excrement filled. He had an isolated background, and was not allowed to visit other children or to speak to anyone on the phone. They had no indoor plumbing in the house, he slept in the attic with no heat, and the children were not given clothes and attended school in rags.

*Id.* at 391-92 (quoting *Rompilla v. Horn*, 355 F.3d 233 (3d Cir. 2004) (Sloviter, J., dissenting), *rev'd sub nom. Rompilla v. Beard*, 545 U.S. 374 (2005)).

*Rompilla* is distinguishable from the instant case on its facts. The deficient performance in *Rompilla* arose out of a glaring act of negligence: trial counsel failed to examine a document, despite notice the prosecution intended to use it for aggravation purposes. In contrast, here, the trial team aggressively followed reasonable leads to mitigating evidence. Additionally,

Rompilla's counsel's "debatable" performance is eclipsed by trial counsel's performance here. While Rompilla's counsel ignored recognizable leads, the Hearing failed to proffer evidence Mr. Allen's trial team overlooked any meaningful mitigating information. While Rompilla's counsel contacted eight witnesses in the course of their investigation, Mr. Allen's counsel presented 36 witnesses at the penalty phase; the number of witnesses contacted and investigated by the trial team was even larger.

The undiscovered evidence in *Rompilla* was very substantial, in contrast to the inconsistent testimony adduced at the Hearing, much of which was not believable. Even Mr. Allen's allegations, accepted as true, fail to rise to the level of mitigating evidence in *Rompilla*. Rompilla offered evidence he suffered schizophrenia, alcoholism, a third-grade level of cognition, severe abuse and neglect, and a childhood of isolation. The instant case is not controlled by *Rompilla*.

### 3. *Wiggins v. Smith*, 539 U.S. 510 (2003)

The Supreme Court also assessed the required scope of a mitigation investigation in *Wiggins v. Smith*, 539 U.S. 510 (2003). After his conviction of first-degree murder, petitioner, Wiggins, sought to bifurcate the penalty phase of his trial. *Id.* at 515. That is, Wiggins's trial counsel intended to first prove he did not act as a principal in the first degree, thereby ruling out any possibility of the death penalty under applicable state law. *Id.* If necessary, counsel would then present a mitigation case in a separate phase. *Id.* The trial court denied the motion to bifurcate, and the sentencing proceeded. *Id.* During opening statements, counsel told the jurors they would hear evidence about Wiggins' "difficult life." *Id.* "During the proceedings themselves, however, counsel introduced no evidence of Wiggins' life history." *Id.*

Before closing statements, counsel made a proffer to the court to preserve the bifurcation

issue for appeal, and detailed the evidence intended for the mitigation phase, had the court granted the motion for bifurcation. *Id.* at 515-16. Specifically, counsel:

> explained that they would have introduced psychological reports and expert testimony demonstrating Wiggins' limited intellectual capacities and childlike emotional state on the one hand, and the absence of aggressive patterns in this behavior, his capacity for empathy, and his desire to function in the world on the other. At no point did [counsel] proffer any evidence of [Wiggins'] life history or family background.

*Id.* at 516 (internal citations omitted). The jury returned a sentence of death. *Id.*

In his habeas petition, Wiggins claimed trial counsel were ineffective for failing to investigate and present mitigating evidence of his dysfunctional background. *Id.* The Court examined the investigative steps taken by defense counsel. *Id.* at 523. It found counsel's investigation "drew from three sources": (1) Wiggins' tests and resulting reports by a psychologist, who found Wiggins "had difficulty coping with demanding situations, and exhibited features of a personality disorder,"[141] (2) a presentence investigation (PSI) report, including a one-page account of Wiggins' personal history, and (3) Department of Social Services (DSS) records, which documented Wiggins' various placements in foster care. *Id.*

Based on the foregoing, the Court held "[c]ounsel's decision not to expand their investigation beyond the PSI and DSS records fell short of the professional standards that prevailed" at the time and place of the criminal trial. *Id.* at 524. The Court explained, even though developing a social history report was a standard practice in capital cases at the time of Wiggins' trial, "counsel abandoned their investigation of [his] background after having acquired only rudimentary knowledge of his history from a narrow set of sources." *Id.* Counsel's decision was also unreasonable, because the DSS records provided several leads, which

---

[141] The Court added, "These reports revealed nothing, however, of [Wiggins'] life history." *Id.* at 523.

reasonable attorneys would have pursued. *Id.* at 525. Specifically, the DSS records revealed:

> [Wiggins'] mother was a chronic alcoholic; Wiggins was shuttled from foster home to foster home and displayed some emotional difficulties while there; he had frequent, lengthy absences from school; and, on at least one occasion, his mother left him and his siblings alone for days without food.

*Id.* The Court stated "any reasonably competent attorney would have realized that pursuing these leads was necessary to making an informed choice among possible defenses[.]" *Id.*

Finally, the Court noted the sentencing's procedural history suggested counsel did not make a strategic decision to avoid mitigating evidence of Wiggins' background. *Id.* at 526-27. For example, during opening statements, counsel told the jurors they would hear evidence regarding Wiggins' difficult life. *Id.* at 526. Yet, "counsel never followed up on that suggestion with details of Wiggins' history." *Id.* Similarly, on the eve of sentencing, and in moving for bifurcation, counsel represented they were prepared to come forward with mitigating evidence; "[i]n other words, prior to sentencing, counsel never actually abandoned the possibility that they would present a mitigation defense." *Id.* In essence, the Court concluded "[c]ounsel's pursuit of bifurcation until the eve of sentencing and their partial presentation of a mitigation case suggest[ed] that their incomplete investigation was the result of inattention, not reasoned strategic judgment." *Id.* at 534.

As to prejudice, the Court held Wiggins had set forth evidence of a troubled history, relevant to his moral culpability. *Id.* at 535. The evidence adduced by Wiggins' habeas team was "powerful." *See id.* at 516-17, 534. As a child, his alcoholic mother abused him severely; on one occasion, she forced his hand on a hot stove, resulting in his hospitalization. *Id.* at 516. She beat Wiggins and his siblings, left them home alone for days at a time, and often locked them out of the kitchen. *Id.* at 516-17. At times, they were "forc[ed] to beg for food and to eat paint chips and garbage." *Id.* At the age of six, Wiggins was placed in foster homes, where he

suffered abuses, including beatings and rapes, at the hands of various foster parents. *Id.* at 517. When he was 16, Wiggins ran away and began living on the streets, returning to additional foster homes intermittently, "including one in which the foster mother's sons allegedly gang-raped him on more than one occasion." *Id.* The Court held, "[H]ad the jury been confronted with this considerable mitigating evidence, there is a reasonable probability that it would have returned with a different sentence." *Id.* at 536.

*Wiggins* does not apply to Mr. Allen's case, which is distinguishable in at least three principal regards. First, unlike counsel for Wiggins, Mr. Allen's trial counsel made a strategic decision to avoid evidence of physical punishment and dysfunction in the Allen household. The omission of life history evidence in *Wiggins* was the result of trial counsel's unwarranted reliance on obtaining a bifurcated penalty phase; the omission of the alleged "new" evidence in Mr. Allen's case was the result of a conscious decision to focus on different mitigation themes. Second, the jury in *Wiggins* heard "no evidence of Wiggins' life history." *Id.* at 515. The jury in Mr. Allen's case heard considerable evidence about his life history, including information about his schooling, health problems, family members, and friends. Finally, Wiggins' habeas counsel presented "powerful" new evidence. Habeas counsel for Mr. Allen has not. *Wiggins* is inapposite.

### 4. *Williams v. Taylor*, 529 U.S. 362 (2000)

In *Williams v. Taylor*, 529 U.S. 362 (2000), the petitioner, Williams, was convicted of capital murder after confessing to responsibility for two deaths. *Id.* at 368. At the sentencing hearing, trial counsel offered testimony of Williams' mother, a taped excerpt of a psychiatrist's statement, and two neighbors, one of whom had not been previously interviewed by counsel, but was "noticed by counsel in the audience during the proceedings and asked to testify on the spot."

*Id.* at 369.  The three witnesses described Williams as a nonviolent person and a "nice boy."[142] *Id.*  During closing arguments, defense counsel described Williams' confession as "dumb," but asked the jury to give weight to the fact he had come forward to take responsibility.  *Id.*  "The weight of defense counsel's closing, however, was devoted to explaining that it was difficult to find a reason why the jury should spare Williams' life."  *Id.*  After deliberations, the jury sentenced Williams to death.  *Id.* at 370.

The Supreme Court reviewed Williams' petition for writ of habeas corpus, which claimed defense counsel failed to investigate and present substantial mitigating evidence to the jury.  *Id.* at 390.  The Court agreed counsel performed deficiently.  *Id.* at 395.  Specifically, counsel did not begin to prepare for the penalty phase until a week before trial, and they "failed to conduct an investigation that would have uncovered extensive records graphically describing Williams' nightmarish childhood, not because of any strategic calculation but because they incorrectly thought that state law barred access to such records."  *Id.*

Given the wealth of mitigating evidence counsel failed to discover, the Court had no

---

[142] The decision to offer this evidence was particularly questionable, in light of the prosecution's aggravating evidence:

> At Williams' sentencing hearing, the prosecution proved that Williams had been convicted of armed robbery in 1976 and burglary and grand larceny in 1982.  . . . The prosecution described two auto thefts and two separate violent assaults on elderly victims . . . .  On December 4, 1985, Williams had started a fire outside one victim's residence before attacking and robbing him.  On March 5, 1986, Williams had brutally assaulted an elderly woman on West Green Street – an incident he had mentioned in his letter to the police.  That confession was particularly damaging because other evidence established that the woman was in a 'vegetative state' and not expected to recover.  Williams had also been convicted of arson for setting a fire in the jail while awaiting trial in this case.  Two expert witnesses employed by the State testified that there was a 'high probability' that Williams would pose a serious continuing threat to society.

*Id.* at 368-69 (internal citations omitted).

trouble finding Williams met the prejudice requirements of his ineffective assistance claim. *Id.* at 395-97. Had counsel been effective, they would have learned Williams' parents were imprisoned for criminal neglect of their children, Williams' father beat him "severely and repeatedly," Williams spent two years in the custody of social services, and he was "borderline mentally retarded." *Id.* at 395-96. Counsel failed to introduce evidence about Williams' redeeming qualities: he had helped crack a prison drug ring, and returned a prison guard's missing wallet. *Id.* at 396. Prison guards would have testified he was, among the inmates, "least likely to act in a violent, dangerous or provocative way." *Id.* Counsel failed to return the phone call of a certified public accountant who visited Williams in prison as part of a ministry program, offered to testify Williams "seemed to thrive in a more regimented and structured environment, and believed Williams was "proud of the carpentry degree he earned while in prison." *Id.*

Like other cases cited by Mr. Allen, *Williams* is highly distinguishable on its facts. Counsel for Williams did not begin preparing until a week before trial; evidence at the Hearing established Mr. Allen's trial team began compiling mitigation information nearly one year in advance of the penalty phase. Williams presented three witnesses at his sentencing proceeding, in contrast to Mr. Allen's 36 witnesses. While Williams' counsel apparently lacked any coherent mitigation strategy, Mr. Allen's trial team carefully chose mitigation themes, which would be believable to the jury and compatible with other evidence in the case. Finally, habeas counsel for Williams uncovered a wealth of undiscovered evidence, including a history of criminal neglect and borderline mental retardation. Mr. Allen's attempts to prove a history of child abuse and brain impairment were simply not believable.

## 5.        *Simmons v. Luebbers*, 299 F.3d 929 (8th Cir. 2002)

Finally, in *Simmons v. Luebbers*, 299 F.3d 929 (2002), *cert. denied sub. nom Roper v. Simmons*, 123 S. Ct. 1582 (2003), the petitioner, Simmons, was convicted of murder. During the penalty phase, counsel offered only one witness: Simmons' mother, who expressed her love for her son and stated she would "draw value from a continued relationship with him." *Id.* at 931, 936-37. The court found Simmons' trial counsel deficient, because they possessed knowledge of, but made no strategic decision to exclude, evidence establishing:

> (1) he was raised in a very strict home environment; (2) his father had a drinking problem and would beat Simmons' mother in front of him; (3) until he was 17 years of age, he was beaten by his mother so severely that he was left with welts and bruises; (4) he was so scared of being beaten that he would urinate himself prior to beatings; (5) he ran away from home at age 12 or 13 and was assaulted, and possibly raped; (6) he grew up in an impoverished neighborhood frequented by street violence; and (7) his IQ was 83.

*Id.* at 936. If this evidence could have formed the basis for a theme to be strategically adopted in *Simmons*, there is no showing it would have conflicted with soundly adopted strategic themes. The court also held Simmons adequately showed prejudice, because this evidence could have "influenced the jury's assessment of [Simmons'] moral culpability," and "demonstrate[d] that his compulsive, violent reactions were the result of an abusive and traumatic childhood." *Id.* at 939. Propounding these theories would have been particularly compelling, given the state "portrayed Simmons as an individual who responded violently when his advances were not accepted by women." *Id.*

*Simmons* does not apply for the same reasons Mr. Allen's previously cited cases fail to apply. Simmons' counsel's performance pales in comparison to the efforts of Mr. Allen's trial team. Simmons' trial counsel lacked any apparent mitigation themes or strategy, and offered a single witness, Simmons' mother, to testify about her love for him. In contrast, Mr. Allen's trial

team presented coherent, realistic themes to the jury.  The trial team for Mr. Allen was aware of allegations of physical punishment in Mr. Allen's mid-teen years.  The trial team decided to adopt a different theme, focusing on Mr. Allen's strong family support and his worth as a human, while skillfully keeping from the jury Mr. Allen's abuse of alcohol, his drug-dealing, and his criminal conviction.  At the evidentiary Hearing, witness's testimony about abuse was not credible, and, in any event, would have divulged damaging testimony the trial team successfully avoided at trial.

## V.    CERTIFICATE OF APPEALABILITY

In order for Mr. Allen to be permitted an appeal of his habeas proceedings, the Court must conclude he has made a substantial showing on the issues presented to the Court.  *Cox v. Norris*, 133 F.3d 565, 569 (8th Cir. 1997).  "A substantial showing is a showing that issues are debatable among reasonable jurists, a court could resolve the issues differently, or the issues deserve further proceedings."  *Id.*  The Court concludes Mr. Allen has failed to make a substantial showing as to any of his claims in the Amended Motion.  Therefore, the Court will not issue a certificate of appealability.

Accordingly,

**IT IS HEREBY ORDERED** that Petitioner Billie Jerome Allen's Amended Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody Under a Sentence of Death [ECF No. 60] is **DENIED**.

**IT IS FURTHER ORDERED** that the Court shall not issue a certificate of appealability as to any claim raised in Petitioner Billie Jerome Allen's Amended Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody Under a Sentence of Death [ECF No. 60].

Dated this  25th  Day of June, 2014.

E. RICHARD WEBBER
SENIOR UNITED STATES DISTRICT JUDGE